# EXHIBIT 62

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 15, 2011

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

**VIA E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write in response to your September 8, 2011, letter addressing issues raised in our August 29 letter regarding Don Bulson's deposition and production of documents.

1. Withdrawn Objections.   Thank you for confirming the Estate's withdrawal of the objections identified in our August 29 letter regarding Mr. Bulson's deposition.

2. Objections re: Documents or Information Conveyed to Mr. Bulson by Michael Siegel. You still cite to no authority to support your objection to examination of Mr. Bulson that "concerns or implicates the substance of *any communications* between Mr. Bulson and Michael Siegel," including "communications between Michael Siegel and Don Bulson regarding Mr. Siegel's communications with Laura Siegel Larson."  Nor has the Estate has identified any authority to support its instructions to Mr. Bulson to not answer questions regarding non-privileged documents conveyed to Mr. Bulson by Mr. Siegel.  *E.g.,* Tr. 30:1-36:2, 57:9-10, 60:22-61:6, 65:24-67:12.

The record is clear that Mr. Berk did not limit "communications" between Mr. Bulson and Mr. Siegel relating to the seeking or provision of legal advice.  To take an example, defendants claim, "Mr. Berk clearly asserted privilege as to Mr. Siegel's communications with Mr. Bulson about the May 13, 2003 letter, not the May 13 letter itself."  Mr. Berk explicitly argued the May 13 letter would become privileged if Mr. Siegel sent it to Mr. Bulson.  *See* Tr.

**EXHIBIT 62**
**1236**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 2

30:8-13 ("This would be privileged, unless he was to get this from Laura Siegel or someone else. But if he got this from Michael Siegel, it would be part of -- be a *privileged document* as to Mr. Bulson.") (emphasis added).[1]

It is apparent the Estate does not intend to withdraw it objections, so DC will file a motion concerning them. Please let us know if you wish to discuss them further; we can do so this week or next week.

3. <u>Expert Report/Calendar & Billing Entries</u>. You represent in your letter that the Estate requested the "Renner Otto expert report and calendar/billing entries" from Renner Otto for the first time on August 11. First, as we stated before, DC made it request for those documents during Mr. Bulson's deposition on July 19. Tr. 23:11-29:7, 25:5-29:7. You have not provided any explanation for why it took almost one month before you requested the documents from Renner Otto. Nor have you explained why you waited almost a month before following up with Renner Otto by sending a second request on September 8—especially given our letter of August 29. DC requests that the Estate produce the August 11 and September 8 requests to Renner Otto since DC was not copied. Second, we have spoken with Mr. Ryland and he informed us that you or Mr. Berk either are in possession of the report and calendar/billing entries, or have access to them, as the Estate of Michael Siegel's lawyers. This means you had the documents when we requested them on July 22, and have failed to produce them.

We disagree with your contentions regarding the relevance of the documents sought by DC and see no point in further debating the issue. As we previously advised you, the timeline of Mr. Bulson and Mr. Toberoff's interactions is directly relevant to, among other things, establishing when Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing Ms. Siegel's purported Superman interest (the date of Toberoff's first contacts with the heirs is a disputed issue in the case); determining whether communications exchanged between Mr. Toberoff and Mr. Bulson occurred but have neither been produced not logged (similar to defendants' failure to produce or log Mr. Siegel's May 13 letter); and disproving defendants' erroneous assertions of common interest.

Please let us know if you will commit to providing these materials by the end of next week. If not, DC will have to file a motion. Please let us know if you wish to discuss the issue further; we can do so this week or early next week.

4. <u>Michael Siegel File</u>. Defendants provide no support beyond conclusory statements that documents exist in Renner Otto's digital copy of Mr. Siegel's files that are not responsive to

---

[1] *See also* Tr. 33:14-25 ("If the document was given by Michael Siegel to Mr. Bulson it becomes part of his file, it also becomes part of the *privileged file* and part of the litigation or representation by Mr. Bulson of Michael Siegel, and is therefore *privileged*. … It's basic privilege. It's part of the file."); Tr. 62:8-11 ("I'm going to object to that as well, because first of all, if [the May 13 letter] exists and it's in his file, it becomes a privilege, and therefore not discoverable.") (emphasis added to all).

**EXHIBIT 62**
**1237**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 3

DC's requests.  There is no indication—and defendants cite to nothing—that Mr. Bulson represented Mr. Siegel in any matters beyond his purported Superman interest.  Regardless, defendants' speculation is not grounds for preventing Renner Otto from preparing a log of all documents in their possession.

The true disagreement between the parties boils down to the level of detail DC is requesting Renner Otto including in generating a log of Mr. Siegel's file.  Defendants do not explain how the Court's prior orders regarding defendants' privilege logs acts as a bar to DC's request of Renner Otto to prepare a comprehensive log of Mr. Siegel's file, assuming Renner Otto is willing to prepare it, and given that the detail DC seeks is fully consistent with that provided for under the rules.[2]  No court in this case or the *Siegel* case has had the opportunity to address this specific request.

DC's offer to pay Renner Otto's expenses in preparing the proposed log is not "a transparent and improper attempt to buy its way out of adverse discovery rulings."  As previously stated, DC's offer is intended to alleviate Renner Otto's asserted burden in appropriately responding to DC's subpoena and to avoid any dispute regarding who is responsible for the associated costs and expenses.

It is apparent the Estate does not intend to yield on this issue, so DC will file a motion.  Please let us know if you wish to discuss the issue further; we can do so this week or early next week.

5.  <u>"Confidentiality" Designations</u>.  Defendants' continued attempts to extend the protections of the *Siegel* protective order to this case, absent an agreement, are unavailing.  The parties expressly limited the *Siegel* protective order to the *Siegel* cases:  The parties "hereby stipulate to and jointly request that the Court enter a Protective Order governing *this consolidated action* as follows."  Case No. CV-04-8400, Docket No. 50 at 6 (emphasis added).  Absent our express agreement, the *Siegel* protective order has no application here, and defendants do not dispute that they produced documents in this case by designation, without reservation of any rights or claims of confidentiality.

---

[2] *E.g., Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) (A log should identify the primary addressee; "[s]econdary addressee(s); persons copied and recipient (and the relationship of that person(s) to the client and/or author).");  *Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1 (N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for attachments); *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004) (same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

**EXHIBIT 62**
**1238**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 4

Defendants' assertion that the *Siegel* protective order "does not require a party to mark a document as 'Confidential' in any particular way, nor does it require a party to re-label a document as 'Confidential' if the document was already marked 'Confidential,'" is equally without merit. The protective order in the *Siegel* cases limits the categories of documents that fall within its protections, and can therefore be marked "CONFIDENTIAL." *Id*. at ¶ 4. This requires the producing party to evaluate whether the underlying document can be marked "CONFIDENTIAL" under a several-part test and to so mark it as "CONFIDENTIAL" at the time of production. An underlying document that happens to have a "confidential" label affixed to it is not automatically protected because whoever applied that stamp previously, by definition, did not have this several-part test for marking documents before him or her.

Whether or not the *Siegel* protective order applies in this case has no impact on DC's ability to examine Mr. Bulson with the documents at issue since the protective order permits witnesses to be examined with documents marked "confidential." *See id.* ¶ 5. Therefore, DC does not agree to defendants' improper condition for withdrawing their objections.

Please let us know if you will withdraw the instructions and objections you made at Mr. Bulson' deposition on these confidentiality grounds. Tr. 95:3-99:22, 146:10-148:24, 158:1-160:7. If not, DC will have to file a motion. Please let us know if you wish to discuss the issue further; we can do so this week or early next.

6. <u>Protective Order re: Deposition</u>. Mr. Ryland requested that the parties' discuss a protective order concerning Renner Otto's business practices in advance of Mr. Bulson's further deposition later this fall. Tr. 25:14-26:4. Since Renner Otto's business practices were not the subject of any examination during Mr. Bulson's July 22 deposition, Mr. Ryland authorized DC to file the entire transcript as an exhibit to Mr. Petrocelli's declaration. We repeat our offer to draft a proposed protective order concerning Renner Otto's business practices and submit it to you and Mr. Ryland for review.

All of DC's rights are reserved.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:    Daniel M. Petrocelli, Esq.
       Jason Tokoro, Esq.
       Josh Ryland, Esq.
       Richard Kendall, Esq.

EXHIBIT 62
1239

**EXHIBIT 62**
**1240**

**EXHIBIT 62**
**1241**

**EXHIBIT 62**
**1242**

**EXHIBIT 62**

**1243**

**EXHIBIT 62**
**1244**

**EXHIBIT 62**
**1245**

**EXHIBIT 62**
**1246**

**EXHIBIT 62**
**1247**

**EXHIBIT 62**
**1248**

**EXHIBIT 62**
**1249**

**EXHIBIT 62**
**1250**

**EXHIBIT 62**
**1251**

**EXHIBIT 62**
**1252**

# EXHIBIT 63

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

\* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 22, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your September 15, 2011 letter regarding Don Bulson's deposition.

<u>Documents Conveyed to Mr. Bulson:</u>  DC continues to repeat the straw man argument that "non-privileged documents do not become privileged because they are sent to an attorney," and that therefore the Estate's objections as to Mr. Siegel's communications with Mr. Bulson about the May 13 letter were improper.  Mr. Berk's colloquy regarding whether the May 13 letter is privileged is irrelevant given that the May 13 letter was produced and neither the Estate nor defendants have claimed privilege on that letter.  Nor has DC addressed the Estate's point that a client's communications with an attorney about non-privileged documents are privileged.

<u>Expert Report/Calendar & Billing Entries:</u>  We have still not received these documents from Renner Otto for privilege review on behalf of the Estate of Michael Siegel.  We sent e-mails to Renner Otto on August 11 and again on September 8, but have not yet received a response.  We look forward to reviewing these documents when we receive them.

DC's vague response that Mr. Ryland "informed us [*i.e.,* DC] that you or Mr. Berk either are in possession of the report and calendar/billing entries, or have access to them, as the Estate of Michael Siegel's lawyers" is not responsive to the fact that we requested and have still not received for privilege review the documents Renner Otto believes are responsive to DC's request.  We will renew our request to Renner Otto and hopefully this matter can be expeditiously resolved.

**EXHIBIT 63**
**1253**

**TOBEROFF & ASSOCIATES, P.C.**

September 22, 2011
Re:      *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 3

DC's complaints about the timing of our requests to Mr. Ryland is odd given DC's lengthy delays in responding to our letters on this topic – for example, DC did not respond to my August 11 letter until August 29, 2011.

As previously pointed out in my September 8, 2011 letter,  DC's ongoing argument that the documents are relevant to "establishing when Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing *Ms.* Siegel's purported Superman interest" makes no sense because such inquiry never took place, and Mr. Bulson did not represent Ms. Siegel's interest.

As far as the routine e-mails between defendants' counsel and Mr. Ryland, DC has no outstanding discovery requests that seek such communications.  Moreover, as at Mr. Bulson's deposition itself, DC continues to have communications with Mr. Ryland to which defendants are not copied or otherwise privy.  Lastly, such documents are clearly privileged pursuant to Magistrate Zarefsky's May 5, 2011 order.  Docket No. 239.

<u>Michael Siegel File:</u>  As stated previously, DC's assumption that the entire Michael Siegel file in Renner Otto's possession is relevant and solely limited to Mr. Siegel's "purported Superman interest" is inaccurate.  This is not "speculation," as DC asserts.

DC's claim that this dispute "boils down to the level of detail DC is requesting Renner Otto to includ[e]" in a privilege log and that "[n]o court … has had the opportunity to rule on this specific request" is sophistry.

DC litigated the issue of how much detail was required on logs with specific reference to "Michael Siegel" documents on no fewer than three occasions, and was denied each time.  *See* Docket Nos. 209, 248, 285.  Magistrate Zarefsky clearly ruled as to the level of detail to be included in a privilege log in his April 25, 2011 order.

Magistrate Zarefsky's September 15, 2011 order (Docket No. 323) on DC's motion to compel correspondence between Ms. Larson and Mr. Siegel also addressed this issue:

> Perhaps there has in fact been a difficulty in knowing what is contained in the privilege logs, but the descriptions are in keeping with Ninth Circuit case law on the subject, as the Court has ruled in both the prior case and the present case, in response to motions that [DC] has made, several times, for elaborations on such logs.
> At some point a matter has to be set aside, and parties go on to other issues.

<u>Confidentiality Designations:</u>  DC's position – that documents marked "Confidential" and protected under a stipulated protective order in *Siegel* are no longer confidential/ protected because such documents were designated by their Bates numbers as responsive to DC's requests in this case – is extremely unreasonable on its face.  This matter does not warrant burdensome motion practice.

**EXHIBIT 63**
**1254**

**TOBEROFF & ASSOCIATES, P.C.**

September 22, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 3

<u>Protective Order re: Depositions:</u>  The protective order we proposed to you would cover
depositions as well as other discovery.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or
remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

cc:     Josh Ryland

**EXHIBIT 63**
**1255**

# EXHIBIT 64

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

## LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND
## APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

———————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 64**
**1256**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1.  Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2.  DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation.  Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated:  March 23, 2012

O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
    Daniel M. Petrocelli
    Attorneys for Warner Bros.
    Entertainment Inc. and DC Comics

**EXHIBIT 64**
**1257**

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..............................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF ISSUES PRESENTED..................................................5

STATEMENT OF THE CASE...................................................................6

STATEMENT OF FACTS ........................................................................9

      A.    Statutory Background ................................................9

      B.    Factual Background ................................................10

            1.    Siegel And Shuster's Work-For-Hire
                Arrangements With DC During The 1930s And
                1940s................................................................10

            2.    Litigation Over Superman During The 1940s,
                1960s, And 1970s ...........................................14

            3.    Larson's Termination Notices Under The 1976 Act
                And The Parties' 2001 Settlement Agreement..............15

            4.    Larson Allies With A New Business Partner Who
                Induces Her To Repudiate The 2001 Settlement
                Agreement.......................................................18

      C.    Proceedings Below...............................................19

STANDARD OF REVIEW ......................................................................22

SUMMARY OF ARGUMENT .................................................................23

ARGUMENT .......................................................................................25

     DC's Cross-Appeal On Its Second Through Fourth Counterclaims

      I.    THE DISTRICT COURT ERRED IN GRANTING
           SUMMARY JUDGMENT TO LARSON ON THE
           THRESHOLD SETTLEMENT AGREEMENT ISSUE ...................25

**EXHIBIT 64**
**1258**

A.    Under California Law, A Contract Is Enforceable So
      Long As Parties Agree On Its Essential Terms, Even
      Absent Formalized Documentation .........................................25

B.    The October 19, 2001, Writing Constitutes An
      Enforceable Agreement As A Matter Of Law .........................28

C.    At A Minimum, DC Is Entitled To Factfinding As To
      Whether The Parties Intended To Be Bound By The
      Essential Terms Identified In The October 19, 2001,
      Letter ......................................................................................34

II.    THE DISTRICT COURT ERRED IN GRANTING
       SUMMARY JUDGMENT TO LARSON ON DC'S
       LIMITATIONS COUNTERCLAIM ................................................37

Larson's Appeal Of Her First Claim And
DC's Cross-Appeal On Both Parties' First Claims

I.    LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE
      HER CLAIM HAS NOT BEEN FULLY AND FINALLY
      ADJUDICATED ..............................................................................40

II.    THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-
       FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT
       FROM TERMINATION ...................................................................41

A.    A Work Is Made-For-Hire Under The 1909 Copyright
      Act When It Is Created At The "Instance And Expense"
      Of The Commissioning Party ..................................................42

B.    The District Court Correctly Held That *Action Comics
      #2-3, #5-61*, *Superman #1 (Pages 1-2)-23*, And The Post-
      McClure Strips Were Works-For-Hire ....................................45

      1.    *Action Comics #2-3, #5-6* ...............................................48

      2.    *Action Comics #7-61* And *Superman #1-23* .................51

      3.    Post-McClure Newspaper Strips ....................................55

**EXHIBIT 64**
**1259**

C.     The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4*, *Superman #1* (Pages 3-6), And Pre-McClure Strips ...................................................................... 61

     1.    *Action Comics #1* ............................................................ 61

         a.    Key Elements Of *Action Comics #1* Were Made-For-Hire ............................................................... 61

         b.    *National* Is Not Preclusive As To The Work-For-Hire Status Of *Action Comics #1* ...................... 68

     2.    Pre-McClure Strips ....................................................... 71

         a.    The Pre-McClure Strips Were Made At DC's Instance And Expense ......................................... 71

         b.    Larson's Failure To List The Pre-McClure Strips In Her Termination Notice Also Precludes Termination ...................................................... 72

     3.    Pages 3-6 Of *Superman #1* ........................................... 77

     4.    Artwork In *Action Comics #4* ....................................... 79

     5.    Promotional Announcements ......................................... 80

CONCLUSION .................................................................... 87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

EXHIBIT 64

1260

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 29 of 347
Case 1:11-cv-09693-CRM-SR-2012 Document 500-12 Dkt Entry: 31-1 Page 29 of 21
Page ID #:32848

# TABLE OF AUTHORITIES

## CASES

*Almond v. ABB Indus. Sys., Inc.*,
  2001 WL 242548 (S.D. Ohio Mar. 6, 2001) ......................................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller*,
  938 F.2d 1038 (9th Cir. 1991) ..........................................................................40

*Atla-Medine v. Crompton Corp.*,
  2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001) ......................................................36

*Banner Entm't, Inc. v. Super. Ct.*,
  62 Cal.App.4th 348 (1998) ........................................................................ 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.*,
  211 Cal.App.3d 1555 (1989).............................................................................29

*Boisson v. Banian, Ltd.*,
  273 F.3d 262 (2d Cir. 2001)..............................................................................62

*Burroughs v. M-G-M, Inc.*,
  683 F.2d 610 (2d Cir. 1982).................................................................. 74, 75, 76

*Bustamante v. Intuit, Inc.*,
  141 Cal.App.4th 199 (2006) ...................................................................... 29, 35

*Callie v. Near*,
  829 F.2d 888 (9th Cir. 1987).............................................................................35

*CCNV v. Reid*,
  490 U.S. 730 (1989) ..........................................................................................43

*Chaffin v. U.S.*,
  176 F.3d 1208 (9th Cir. 1999) ..........................................................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
  538 U.S. 440 (2003)...........................................................................................43

*Clarke v. Fiedler*,
  44 Cal.App.2d 838 (1941).......................................................................... 26, 27

EXHIBIT 64
1261

Comm'r v. Sunnen,
    333 U.S. 591 (1948) .................................................................................68

Cool Fuel, Inc. v. Connett,
    685 F.2d 309 (9th Cir. 1982) .................................................................82

Cuellar de Osorio v. Mayorkas,
    656 F.3d 954 (9th Cir. 2011) .................................................................22

Dolman v. Agee,
    157 F.3d 708 (9th Cir. 1998) ................................................... 42, 43, 44

Easter Seal Soc'y v. Playboy Enters.,
    815 F.2d 323 (5th Cir. 1987) .................................................................42

Eden Toys, Inc. v. Florelee Undergarment Co.,
    697 F.2d 27 (2d Cir. 1982) ............................................................ 63, 64

Elite Show Servs., Inc. v. Staffpro, Inc.,
    119 Cal.App.4th 263 (2004) .................................................................26

Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,
    122 F.3d 1211 (9th Cir. 1997) .............................................................63

EPIC, Inc. v. Pac. Lumber Co.,
    257 F.3d 1071 (9th Cir. 2001) .............................................................71

Ersa Grae Corp. v. Fluor Corp.,
    1 Cal.App.4th 613 (1991) .....................................................................26

Estate of Hogarth v. Edgar Rice Burroughs, Inc.,
    2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ......................................53

Estate of Hogarth v. Edgar Rice Burroughs, Inc.,
    342 F.3d 149 (2d Cir. 2003).......................................................42, 47, 59

Estate of Thottam,
    165 Cal.App.4th 1331 (2008) ..............................................................26

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,
    499 U.S. 340 (1991) ...................................................................... 63, 80

EXHIBIT 64
1262

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
    773 F.2d 1068 (9th Cir. 1985) ............................................................................71

*Gaiman v. McFarlane*,
    360 F.3d 644 (7th Cir. 2004)..............................................................................80

*Gausvik v. Perez*,
    392 F.3d 1006 (9th Cir. 2004) ............................................................ 22, 51, 81

*Granite Rock Co. v. Teamsters*,
    649 F.3d 1067 (9th Cir. 2011) ..................................................................... 68, 70

*Harper & Row, Publishers v. Nation Enters.*,
    471 U.S. 539 (1985) ..........................................................................................51

*Harris v. Rudin, Richman & Appel*,
    74 Cal.App.4th 299 (1999) ..................................................................... 26, 27, 29

*In re Smith*,
    964 F.2d 636 (7th Cir. 1992)..............................................................................58

*Inamed Corp. v. Kuzmak*,
    275 F.Supp.2d 1100 (C.D. Cal. 2002) ..............................................................34

*Jachetta v. U.S.*,
    653 F.3d 898 (9th Cir. 2011)..............................................................................51

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008)..............................................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.*,
    16 F.Supp.2d 259 (S.D.N.Y. 1997)....................................................................60

*Lamle v. Mattel, Inc.*,
    394 F.3d 1355 (Fed. Cir. 2005)..........................................................................29

*Levin v. Knight*,
    780 F.2d 786 (9th Cir. 1986)..............................................................................29

*Lin-Brook Builders Hardware v. Gertler*,
    352 F.2d 298 (9th Cir. 1965).................................................................. 42, 43, 59

**EXHIBIT 64**
**1263**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 32 of 347
Page ID #:32851
Case 1:11-cv-03663-ODW-RZ Document 500-12 Dkt Entry 91-12 Page 32 of 347

*Lozano v. Ashcroft*,
   258 F.3d 1160 (10th Cir. 2001) ..........................................................83

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.*
   *of Contemporary Dance, Inc.*,
   380 F.3d 624 (2d Cir. 2004)................................................................55

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002)........................................................ 45, 70

*Marvel Worldwide, Inc. v. Kirby*,
   777 F.Supp.2d 720 (S.D.N.Y. 2011)................................ 44, 49, 53, 78

*Mattel, Inc. v. MGA Entm't, Inc.*,
   2011 WL 3420603 (C.D. Cal. Aug. 4, 2011)......................................35

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010)................................................ 24, 35, 39

*May v. Morganelli-Heumann & Assocs.*,
   618 F.2d 1363 (9th Cir. 1980) ............................................. 42, 43, 45

*Medina v. Ramsey Steel Co.*,
   238 F.3d 674 (5th Cir. 2001)...............................................................36

*Meyer v. Holley*,
   537 U.S. 280 (2003) ............................................................................44

*Murray v. Gelderman*,
   566 F.2d 1307 (5th Cir. 1978) .................................................... 43, 49

*Music Sales Corp. v. Morris*,
   73 F.Supp.2d 364 (S.D.N.Y. 1999)....................................................75

*Narayan v. EGL, Inc.*,
   616 F.3d 895 (9th Cir. 2010)...............................................................23

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.*,
   191 F.2d 594 (2d Cir. 1951)........................................................ 58, 69

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ............................................................................39

**EXHIBIT 64**
**1264**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 33 of 347
Case 1:1-cv-0383-09/23/2012 Document 599-1 Dkt Entry: 91.1 Page 33 of 347
Page ID #:32852

*Nike, Inc. v. Just Did It Enters.*,
  6 F.3d 1225 (7th Cir. 1993).................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
  558 F.2d 1090 (2d Cir. 1977)..............................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.*,
  294 F.Supp. 545 (S.D.N.Y. 1968).......................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
  347 U.S. 89 (1954) ..............................................................................51

*Patel v. Liebermensch*,
  45 Cal.4th 344 (2008) .........................................................................27

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972)..................................................... *passim*

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995)................................................... 43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg*,
  2011 WL 1696826 (E.D. Ky. May 4, 2011) .......................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
  77 F.3d 309 (9th Cir. 1996).................................................................29

*S. Cal. Painters v. Best Interiors, Inc.*,
  359 F.3d 1127 (9th Cir. 2004) ............................................................35

*Samuels v. Holland Am. Line-USA Inc.*,
  656 F.3d 948 (9th Cir. 2011)...............................................................22

*Sargent v. Am. Greetings Corp.*,
  588 F.Supp. 912 (N.D. Ohio 1984)....................................................62

*Scherr v. Universal Match Corp.*,
  297 F.Supp. 107 (S.D.N.Y. 1967)......................................................44

*Scherr v. Universal Match Corp.*,
  417 F.2d 497 (2d Cir. 1969) ...............................................................79

viii

**EXHIBIT 64**
**1265**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 34 of 347
Case 2:10-cv-03633-ODW-RZ Document 559-12 Dkt Entry 10-1-1 Page 34 of 913
Page ID #:32853

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ............................................................................40

*Seiler v. Lucasfilm, Ltd.*,
808 F.2d 1316 (9th Cir. 1986) ............................................................................82

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322 (9th Cir. 2000) ............................................. 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
161 F.2d 406 (2d Cir. 1946) ..............................................................................80

*Shaw v. Hahn*,
56 F.3d 1128 (9th Cir. 1995) ..............................................................................70

*Siegel v. Nat'l Periodical Publ'ns*,
364 F.Supp. 1032 (S.D.N.Y. 1973) ........................................ 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns*,
508 F.2d 909 (2d Cir. 1974) .................................................... 11, 15, 68

*St. Paul Water Co. v. Ware*,
83 U.S. 566 (1872) ..............................................................................................44

*Tex Print Indus., Inc. v. Zayre Corp.*,
1977 WL 22752 (D. Mass. Feb. 10, 1977) ....................................................83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ................................................... *passim*

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ............................................................................23

*Toledano v. O'Connor*,
501 F.Supp.2d 127 (D.D.C. 2007) ....................................................................29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869
(9th Cir. 2005) ................................................................................. *passim*

*U.S. v. Alexander*,
326 F.2d 736 (4th Cir. 1964) ..............................................................................83

EXHIBIT 64
1266

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 35 of 347
Case 1:15-cv-05683-GBD Document 599-12 Dkt Entry 9410 Page 23 of 913
Page ID #:32854

*U.S. v. Diaz-Lopez,*
625 F.3d 1198 (9th Cir. 2010) ...........................................................82

*U.S. v. Resnick,*
594 F.3d 562 (7th Cir. 2010)..............................................................78

*Vass v. Compaq Computer Corp.,*
953 F.Supp. 114 (D. Md. 1997) .........................................................36

*Wallace v. City of San Diego,*
479 F.3d 616 (9th Cir. 2007)..............................................................23

*Warren v. Fox Family Worldwide, Inc.,*
328 F.3d 1136 (9th Cir. 2003) ...........................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.,*
320 F.Supp.2d 821 (N.D. Iowa 2004)................................................36

*Weddington Prods., Inc. v. Flick,*
60 Cal.App.4th 793 (1998) ................................................................31

## STATUTES

17 U.S.C. §4 (1909) (repealed 1976)......................................................9

17 U.S.C. §7 (1909) (repealed 1976)....................................................47

17 U.S.C. §24 (1909) (repealed 1976)........................................... *passim*

17 U.S.C. §26 (1909) (repealed 1976)............................................. 9, 41

17 U.S.C. §203 ................................................................................ 10, 41

17 U.S.C. §203 ....................................................................................74

17 U.S.C. §304 .................................................................... *passim*

17 U.S.C. §507 ....................................................................................37

17 U.S.C. §702 ....................................................................................73

28 U.S.C. §1291 ...................................................................................1

28 U.S.C. §1331 ...................................................................................1

EXHIBIT 64
1267

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 36 of 347
Case 1:13-cv-58683-ODW-RZ Document 599-12 Dkt Entry 9/19/12 Page 36 of 17
Page ID #:32855

28 U.S.C. §1338 ...............................................................................1

28 U.S.C. §1367 ...............................................................................1

Cal. Civ. Code §1550 .....................................................................25

**RULES**

Fed. R. Civ. P. 54(b) ................................................................ *passim*

Fed. R. Civ. P. 56(a) .....................................................................22

Fed. R. Evid. 1002 ........................................................................82

Fed. R. Evid. 801(d)(2)(A) ...........................................................78

**REGULATION**

37 C.F.R. §201.10 .................................................................. *passim*

**OTHER AUTHORITIES**

42 F.R. 45916-21 ..................................................................... 74, 77

52 F.R. 23443-46 (1987) ...............................................................62

76 F.R. 32320 (June 6, 2011) .......................................................75

1 William F. Patry, Patry on Copyright (1st ed. 2007) ....................76

41 Am. Jur. 2d *Independent Contractors* §§8, 14, 19, 47 (2005) ...........44

6 Weinstein's Federal Evidence §1003.02[3] (2011) ........................82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 Loy. L.A. Ent. L. Rev. 301 (2003) ...............................................................34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 Va. Sports & Ent. L.J. 101 (2001) ....................................28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. Law. 18 (Apr. 1999) .............................................28

**EXHIBIT 64**
**1268**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 37 of 347
Case 1:12-cv-05938-GBD Document 500-12 Dkt Entry 10-12 Page 43 of 213
Page ID #:32856

Jay M. Spillane,
  *Lawsuits over "Handshake Deals" Are As Old As the
  Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. &
  SPORTS LAW. 15 (1993) ........................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
  (2011) ................................................................................... 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965) ................................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
  LAW, 94TH CONG. 304 (1975) ...........................................................16

**EXHIBIT 64**
**1269**

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth Counterclaims. Larson's First Claim asserts that copyright termination notices she served make her joint owner of several early Superman works. DC's Counterclaims assert that the notices are invalid (First Counterclaim); Larson's lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims. 28 U.S.C. §§1331, 1338, 1367. This Court has jurisdiction over DC's Second, Third, and Fourth Counterclaims, because they were fully and finally adjudicated below. 28 U.S.C. §1291. This Court lacks jurisdiction over Larson's First Claim and DC's First Counterclaim, which were not fully and finally adjudicated. *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that introduced elements of the iconic Superman character and story, including aspects of his appearance, powers, and background. As it comes before this Court—an appeal and cross-appeal addressing multiple rulings below—the case presents an

EXHIBIT 64
1270

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 39 of 347
Case 1:1 cv-35883-09/25/2012 ID: 8315992-12 DktEntry: 14-1 Page 63 of 113
Page ID #:32858

unusually broad array of doctrinal, factual, and procedural issues.  But much of the case reduces to a familiar proposition:  a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act.  The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned—while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance.  On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments.  On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended.  The heirs to Superman's original story writer served notices of termination as to certain early Superman works.  While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

2

**EXHIBIT 64**
**1271**

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman. The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money. In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers. The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized. The rule there is simple, however: a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here. Superman's creators conceived the Superman character, but no one would publish it. It was only DC, years later, that recognized Superman's commercial potential. DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story. DC developed

**EXHIBIT 64**
**1272**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 41 of 347
Case 1:11-cv-35868-09/25/2012 ID: 8315991-12 DktEntry: 94-1 Page: 83 of 217
Page ID #:32860

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer: DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story. Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts. And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims. It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end. Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

4

**EXHIBIT 64**

**1273**

# STATEMENT OF ISSUES PRESENTED

## *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1.  a.  Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b.  Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2.  Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

## *Larson's Appeal On Her First Claim And*
## *DC's Cross-Appeal On Both Parties' First Claims*

1.  Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2.  Assuming the Court has jurisdiction to hear these claims:

a.  Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

**EXHIBIT 64**
**1274**

b.  Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c.  Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938.  ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves.  Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works.  The dispute here centers on whether certain of the

6

EXHIBIT 64
1275

earliest derivative works were "made for hire" on DC's behalf, making DC the "author" of the works under the 1909 Act and precluding termination by Siegel's heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of litigation against DC—sought to exercise any termination rights in Superman. Within a year of Siegel's death in 1996, however, his widow Joanne (now deceased) and daughter Larson served termination notices seeking to recapture a broad range of Superman works. ER-1024-92. DC disputed most aspects of the termination notices, but sought to resolve the controversy through negotiation with Larson and her lawyer Kevin Marks. ER-16; SER-393, 100-01. The parties reached a settlement agreement on October 19, 2001, in which DC agreed to pay Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of millions more in future profit sharing, in exchange for which DC would receive all of the putative Superman rights Larson claimed to own. SER-132, 147-48, 434-35, 456-61. A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37. No buyer emerged; and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking a declaration that her termination notices were valid and entitled her to an

**EXHIBIT 64**
**1276**

accounting of Superman-related profits. ER-325. DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations. ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement. SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim. The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated. ER-43-140. But it held that certain other works were *not* made-for-hire and thus could be terminated. ER-81, 114, 189. The court did not, however, resolve the scope of the rights at issue. *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire: *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1*, *Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938. ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims. DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

**EXHIBIT 64**
**1277**

did not fully adjudicate it (or DC's First Counterclaim).  But assuming this Court

has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting

that while the court's work-for-hire rulings were correct as to the works contested

by Larson, the court erred in rejecting work-for-hire as to the following works (or

certain key elements therein):  *Action Comics #1* and *#4*; pages 3-6 of *Superman*

*#1*, and two weeks of newspaper strips created before the McClure agreement.  DC

also cross-appeals the court's ruling that pre-*Action Comics #1* promotional

announcements, while owned by DC, do not fully depict certain key Superman

elements.

## STATEMENT OF FACTS

### A.  Statutory Background

The 1909 Copyright Act governs the copyright in all works—including

those at issue here—published before January 1, 1978, the effective date of the

1976 Copyright Act.  Under the 1909 Act, copyright could be secured for "all the

writings of an author."  17 U.S.C. §4 (1909) (repealed 1976).  Under the 1909 Act,

an "author" was entitled to a copyright for an initial 28-year period and an

additional 28-year "renewal" period.  *Id*. §24.

The 1909 Act defined the statutory term "author" to "include an employer in

the case of works made for hire."  17 U.S.C. §26 (1909).  It also provided that "in

the case of … any work copyrighted by … an employer for whom such work is

**EXHIBIT 64**
**1278**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 47 of 347
Case 1:11-cv-05988-DAB Document 5999-12 Dkt Entry 9-1-1 Page 94 of 217
Page ID #:32866

made for hire," the author/employer was entitled to renewal rights. *Id*. §24. These

two sections thus made clear that an "employer" in the case of a "work for hire"

was a statutory "author" with full rights in both the original copyright and the

renewal term. For this reason, the 1976 Act's provisions addressing "termination"

of the extended renewal term—the provisions at issue here—have no application to

works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d),

as Larson concedes, LB-21.

     A person or entity who commissions a work is the statutory "author" of that

work under the work-for-hire provision of the 1909 Act whenever the work was

created at the "instance and expense" of the commissioning party, unless the

parties expressly agreed that "the employee or independent contractor retained the

copyright in his work." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429

F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

     **B.**    **Factual Background**

     1.    <u>*Siegel And Shuster's Work-For-Hire Arrangements With DC During*</u>
        <u>*The 1930s And 1940s*</u>

     Siegel, a young writer in Cleveland, and his high-school friend Shuster, an

illustrator, worked together to conceive many fictional characters—including a

crime-fighting hero named "Superman." SER-6-7. Between 1933 and 1937,

Siegel and Shuster submitted draft Superman comic strips to several publishers,

without success. ER-584; SER-12, 678.

**EXHIBIT 64**
**1279**

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 48 of 347
Case 1:11-cv-58983-ODW-RZ Document 599-12 Dkt Entry 11-1 Page 5 of 213
Page ID #:32867

In 1937, DC[1] hired Siegel and Shuster to do comic-book work.  On

December 4, 1937, Siegel and Shuster entered into an employment agreement

providing that DC would "employ [Siegel and Shuster] as Artists for a period of

two years," pay them $10 per page of material, and, in return, Siegel and Shuster

would "give their exclusive services" in producing certain comic features and

submit all material for any new features to DC.  ER-602-03.  This "1937

Employment Agreement" also provided that if Siegel or Shuster left DC's employ,

they were prohibited from using or copying "any of the products or work or

creations or characters or plots used, made or created by [them] while in the

employ of [DC]."  ER-602.

Siegel and Shuster submitted various comic strips to DC under this

agreement, including their existing black-and-white Superman drafts.  SER-12-13,

678.  DC chose to include the Superman story in its new *Action Comics* comic

book, to be published April 18, 1938, with a June 1938 cover date.  DC editor Vin

Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished

Superman drafts into a "full-length 13-panel production suitable for magazine

publication."  ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911

(2d Cir. 1974).  At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors
(including Detective Comics and National Comics Publications).

**EXHIBIT 64**
**1280**

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 49 of 347
Case 1:11-cv-05888-QDW-RZ Document 599-12 DktEntry 14-1 Page 96 of 213
Page ID #:32868

added "several additional pictures to illustrate the story continuity"—including a new picture showing Superman with a distinct "S" on his chest, which DC's own artists colored red. ER-654; SER-385-86. DC's artists colorized the strips, choosing and adding the iconic blue-and-red color scheme to Siegel's and Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover for *Action Comics #1* based on a panel that featured Superman in his DC-colorized costume—red cape and boots, blue leotard, and heraldic red "S" crest—and exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730. These Promotional Announcements were published beginning on April 5, 1938, before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572, 579-580. DC has filed a motion to lodge an original version of one comic book containing a Promotional Announcement (*Detective Comics #15*, published on April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and Shuster assigned to DC in writing all of their rights in Superman and agreed "not to employ said characters or said story ... without obtaining [DC's] written consent" ("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics #1* was published, Siegel and Shuster continued to supply DC with draft Superman

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 50 of 347
Case 1:11-cv-39883-ODW-RZ Document 599-12 Dkt Entry 10/11/12 Page 52 of 213
Page ID #:32869

material, for which they were paid $10 per page.  ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  ER-605.  DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page.  ER-606-07.  The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works.  ER-606.  The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties.  ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do."  SER-219-49, 264-66.  This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media.  ER-858-86.  Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

**EXHIBIT 64**
**1282**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 51 of 347
Case 1:11-cv-53683-ODW/RZ Document 599-12 Dkt Entry 19-1 Page 283 of 913
Page ID #:32870

cartoons, and merchandising resulted in royalty payments, bonuses, and other

compensation for Siegel and Shuster amounting to $5.4 million (in today's terms)

from 1938 to 1946 alone.  ER-466, 585-86, 945.

> 2. *Litigation Over Superman During The 1940s, 1960s, And 1970s*

DC's relationship with Siegel and Shuster became contentious.  Other artists

and editors brought Superman to new media, including radio and film, and created

many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away,"

or "It's a bird, it's a plane, it's Superman."  SER-680-81.  Siegel also left to serve

in World War II; and while gone, DC, working with Shuster, published

"Superboy" stories that Siegel argued DC had no permission to publish.  SER-590-

95, 603-07, 680.

In 1947, Siegel and Shuster filed an action against DC in New York state

court seeking to invalidate the 1938 Assignment ("Westchester Action").  SER-20,

597.  The Westchester court issued an interlocutory ruling concluding, *inter alia*,

that the 1938 Assignment granted "all" Superman rights to DC, but that publishing

the Superboy stories was improper.  ER-939-93.  In May 1948, DC, Shuster, and

Siegel entered into a stipulation and consent judgment under which Siegel and

Shuster acknowledged that the 1938 Assignment transferred to DC all rights in

Superman, including "the title, names, characters, concept and formula" as set

forth in *Action Comics #1*.  ER-995-1017.

**EXHIBIT 64**

**1283**

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences. Siegel again wrote Superman stories for DC, and Shuster received a stipend. SER-294-96. But in 1965, Siegel and Shuster challenged DC's copyright renewal rights in Superman, and in 1969 they filed a lawsuit seeking a declaration that they owned the Superman renewal copyrights. The court held that Siegel and Shuster assigned to DC *all* rights in Superman, including renewal rights. *Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help. In 1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of $20,000 each, lifetime medical benefits, and benefits and payments to their heirs. SER-641-75. In return, Siegel and Shuster acknowledged DC was the exclusive owner of "all right, title and interest" in Superman. SER-641. DC increased its annual payments to more than $125,000 annually, paid special bonuses, and provided other benefits to Siegel, Shuster, and their families. *See* SER-390, 427-31, 448, 641-75, 680.

3. *Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term and give authors and certain heirs limited rights to terminate prior copyright grants for works subject to the extension term. The Act struck a careful "compromise" between the interests of authors and grantees, the latter of whom often invested

15
**EXHIBIT 64**
**1284**

decades of effort to develop copyrighted works into successful properties. SECOND
SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices
purporting to terminate, as of 1999, various of Siegel's Superman copyright grants
to DC ("Notices"). ER-1018-83. DC disputed the Notices' validity; but rather
than litigate, the parties spent the next four years trying to reach a business deal.
Larson was represented by Kevin Marks of the leading entertainment law firm
Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg.
SER-98-99, 433-34. DC's lead negotiator was then-General Counsel of Warner
Bros., John Schulman. SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be
reached, DC paid Larson a non-refundable advance of $250,000. SER-416. On
October 16, 2001, DC made a settlement offer to Larson. SER-105, 434. On
October 19, Marks called Schulman to accept the offer and report "we are closed."
SER-107-08. Later that day, he sent Schulman a letter (1) confirming that Larson
had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in
six, single-spaced pages; and (3) thanking Schulman for his "help and patience in
reaching this monumental accord." SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of
her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy'),'' in

16

**EXHIBIT 64**
**1285**

exchange for, *inter alia*, $3 million, an annual guarantee of $500,000 per year for 10 years, and 6% of gross revenues from all media and merchandising revenues (*e.g.*, television, movies, and toys). SER-456-61. Almost all the money would be Larson's alone—Gang Tyre's fee was 5%. SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties' agreement, set forth "a more fulsome outline of what we believe the deal we've agreed to is," and indicated DC would begin drafting a long-form document so "we will have this super-matter transaction in document form." SER-118-19, 397-98, 463-70. Neither Marks nor Larson objected to Schulman's letter. ER-435. DC began performing its obligations under the October 19 agreement, including establishing a significant reserve for monies owed, which quickly grew to $20 million. SER-397, 399.

DC's outside counsel worked on the separate long-form document for three months and sent Marks a draft on February 1, 2002. SER-125, 435, 472-528. Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's mother sent DC a letter acknowledging that Larson had "accepted" DC's October 16, 2001, offer, but objecting to unspecified portions of the long-form document and concluding that "we have no deal[,] and this [long-form] contract makes an agreement impossible." SER-412-14. Marks told DC the long-form was "aggressive," but "not contrary to what had been agreed to," and the parties would

**EXHIBIT 64**
**1286**

"deal with it."  SER-126-27, 130, 436, 439.  For the next two months, Marks

reworked the draft, which he sent to Larson on July 15, 2002.  SER-131-32.

4.    *Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement*

Starting in 2001, Toberoff, the self-described "rights-hunter," "movie

producer," and "intellectual property entrepreneur," began pursuing Siegel's and

Shuster's heirs.  SER-115-16, 182-84, 404, 817-23, 835-36, 859-63.  In November

2001, he induced the Shusters to become his business partners and to repudiate

their existing contractual arrangements with DC.  SER-183, 858-61.[2]  Thereafter,

the Shusters served a termination notice purporting to recapture certain Superman

rights as of October 26, 2013.  SER-844-56.

Toberoff targeted the Siegels as well.  SER-115-16, 182-83.  He wrote

Larson's brother and called Marks seeking to secure the Siegels' Superman rights

for himself.  SER-814.  Marks rebuffed Toberoff, telling him in February, July,

and August 2002 that Larson had made a deal with DC.  SER-115-16, 119-24, 182-

83, 811.  Toberoff insisted in August 2002 that Marks communicate to Larson that

he and agent Emanuel had an unnamed "investor" willing to purchase her rights for

$15 million cash and generous "back-end" compensation.  SER-122-24, 811, 875-

76.  Marks conveyed this offer to Larson, but admonished her that she had a "deal"

---

[2] Toberoff's business misconduct is the subject of another lawsuit and two appellate matters before this Court.  Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

**EXHIBIT 64**

**1287**

with DC, and if she repudiated it, Marks would have to "testify against [her] in court."  SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations."  SER-418-20.  A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights.  SER-184, 422-25.  But the promised $15 million investor never materialized, and Toberoff never produced any other buyers.  SER-122-23, 184-87, 811-13, 875-76.  Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery.  SER-187, 839-44, 860-63.[3]

## C.    Proceedings Below

Larson filed suit on October 8, 2004.  Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward.  ER-338.  DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement.  ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee.  SER-186, 860-63.

**EXHIBIT 64**
**1288**

In March 2008, the district court issued a partial summary judgment order. SER-5-90. It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman. SER-43-44. The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 … such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63. The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days. ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues. In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140. But the court also ruled that *Action Comics #4*, *Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured. ER-80-81, 140.

20

**EXHIBIT 64**
**1289**

The district court expressly reserved ruling on key issues concerning the scope of rights Larson recaptured. It did not determine the extent to which Larson's recaptured rights were diminished by DC's rights in the Promotional Announcements. SER-298-305, 310-13, 321-24, 2-3. It left open whether its enumeration of the limited Superman elements in *Action Comics #1*—as compared to the universe of elements DC owns outright—was intended to be "dicta," as Larson had argued. SER-305-08, 313-19, 325-26, 2-3. And it deferred ruling on these and other open issues "until shortly before the time of" a later accounting trial. SER-198.

That accounting trial never occurred, and the open questions flagged by the court were never answered. In 2009, the judge presiding over the Superman cases resigned, and the cases were reassigned. The parties submitted a joint status report agreeing that the "promotional announcement" and "dicta" questions had to be answered before Larson's First Claim could be fully resolved. SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that case, and seeking an interlocutory appeal here. SER-143-45. The district court denied Larson's Rule 54 and stay motions, listing seven open issues—including the "promotional announcement" and "dicta" issues—that "foreclosed a finding that [Larson's First Claim] … is final." SER-141. Larson amended her complaint to remove the request for an accounting of profits from the First Claim, but she did

not eliminate the request for a scope of rights declaration.  Dkt. No. 5-1 at 12-14.

She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court

entered partial final judgment on Larson's First Claim and DC's First through

Fourth Counterclaims.  ER-235-41.

Larson appealed and DC cross-appealed.  ER-228, 230.[4]  DC moved to

dismiss Larson's appeal, and the Appellate Commissioner denied the motion

without prejudice to its reargument in merits briefing.  Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of summary

judgment."  *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).

Summary judgment is appropriate if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "In considering a motion for summary judgment, [the court] must draw all

reasonable inferences in favor of the nonmoving party."  *Samuels v. Holland Am.*

*Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011).  The "non-moving party's

evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

[4] Larson's brief does not challenge (and thus waives the right to challenge, *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings on her First Claim, including that she did not recapture the Promotional Announcements, that certain pre-1938 material created by Siegel was *not* copyrightable, and that she was not entitled to profits from foreign exploitation of Superman.  ER-76-77, 180-81, 207.

**EXHIBIT 64**

**1291**

favor," such that its "version of any disputed issue of fact is … presumed correct." *Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must make "[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

### *DC's Cross Appeal On Its Second Through Fourth Counterclaims*

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims below are barred by the parties' 2001 settlement agreement and the Copyright Act's three-year limitations period.  These threshold claims were fully adjudicated by the district court's Rule 54(b) judgment and are ripe for appeal.

I.  Marks' October 19, 2001, letter reflects a legally enforceable agreement to resolve all claims at issue here, because it details all the essential terms of an agreement:  the scope of rights at issue, a significant cash payment, and generous royalty terms, amounting to tens of millions of dollars for Larson.  The letter expressly stated that Larson "accepted" DC's offer and referred to the parties' "monumental accord."  Both parties' representatives testified that they understood an agreement had been reached.  Given the parties' agreement on the essential terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

EXHIBIT 64
1292

subsequently failed to conclude a formalized deal document.  *E.g.*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011).  At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter.  *E.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

    II.  DC was entitled to factfinding on its limitations counterclaim.  Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing.  Larson herself has taken conflicting positions as to when negotiations were terminated.  Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely.  But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred.  Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

### *Larson's And DC's Appeals On Their Respective First Claims*

    I.  The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

    II.  Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part.  The court held that the

**EXHIBIT 64**
**1293**

vast majority of works at issue were created as works-for-hire, including *Action Comics #2-3*, *#5-61*, pages 1-2 of new material in *Superman #1*, *Superman #2-23*, and all strips created after the Syndication Agreement with McClure. Those rulings all involve Superman works created entirely after Siegel and Shuster assigned all Superman rights to DC and entered into employment agreements with DC to produce new Superman work under DC's direction. Those works are obviously and unambiguously works-for-hire. But the court also held that *Action Comics #1* and *#4*, *Superman #1* (pages 3-6), and the two weeks of Strips created before the Syndication Agreement were not works-for-hire and thus could be recaptured. Those rulings were incorrect. The district court also erred in ruling on rights contained within certain Promotional Announcements without examining the best visual evidence of their contents.

## ARGUMENT

## DC'S CROSS-APPEAL ON ITS
## SECOND THROUGH FOURTH COUNTERCLAIMS

### I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE

#### A.  Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation

Under California law, an enforceable agreement is formed where one party accepts another party's offer in exchange for consideration. CAL. CIV. CODE

**EXHIBIT 64**
**1294**

§1550. And once a party accepts an offer, an enforceable agreement may arise even if subsequent documentation is contemplated, or additional terms and conditions are subsequently raised. *See Facebook*, 640 F.3d at 1037-38; *Estate of Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 624 & n.3 (1991).

The question is simply whether the agreed-upon terms are "sufficiently definite that a court can ascertain the parties' obligations thereunder and determine whether those obligations have been performed or breached." *Elite*, 119 Cal.App.4th at 268. So long as "the parties have agreed to its existing terms," and those terms are definite, the "fact that an agreement contemplates subsequent documentation does not invalidate the agreement." *Ersa*, 1 Cal.App.4th at 624 n.3; *see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

"Any other rule" would allow a party to repudiate a contract "whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941). "If this were the rule, the contract would never be completed in cases where, by changes in the market, or other events … it became the interest of either party to adopt that course in order to escape or evade

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 64 of 347
Case 1:11-cv-58683-ODW-RZ Document 599-12 Dkt Entry 91-1 Page 164 of 347
Page ID #:32883

obligations incurred in the ordinary course of commercial business." *Id.* Put simply, "few contracts would be enforceable if … subsequent disputes were taken as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008). Accordingly, "[w]here the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one,'" the parties' "failure to follow it with a more formal writing does not negate the existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

*Facebook* illustrates this rule. After one day of settlement negotiations, the parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms of a corporate acquisition, including cash and stock consideration and mutual releases. 640 F.3d at 1037. The settlement subsequently foundered during negotiation over documents that Facebook said were "required to finalize" the agreement, including a stock agreement and release form. *Id.*

This Court held that the parties had formed an enforceable agreement, because the existing writing showed that the parties "meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later." *Id.* at 1038. An informal agreement is not enforceable, the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

EXHIBIT 64
1296

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

### B. The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1. The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook*. SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

**EXHIBIT 64**
**1297**

*Agreements*, L.A. LAW. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over "Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. & SPORTS LAW. 15, 15 (1993). The question, as in *Facebook*, is simply whether the essential terms of the agreement can be identified. Here the October 19 letter specified every term "deemed essential as a matter of law" in a copyright assignment, *i.e.*, "the subject matter, the price, and the party against whom enforcement is sought." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); *see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v. O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007). The letter identified:

> • the full scope of rights assigned: "all of [their] rights in the 'Superman' and 'Spectre' properties (including 'Superboy'), resulting in 100% ownership to D.C. Comics"
>
> • the precise cash terms: an "advance of $2,000,000" and a "signing bonus of $1,000,000"
>
> • the specific royalty terms: "6% of Superman/Spectre Gross Revenues" from "all media" other than publications and "1% of the cover price of DC Comics' publications." SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was tentative or contingent on formal documentation.[5] The extrinsic record confirms

---

[5] Under California law, an initial writing is not enforceable if it *clearly* demonstrates that the parties did *not* intend to be bound until other documents were executed. *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006); *Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

EXHIBIT 64
1298

the opposite.  Marks testified he worked through "the last open point" of the agreement with Schulman on October 16, which "closed the deal," and he "believed that an accord had been reached on the terms exactly set forth in this letter."  SER-105-06, 111-12.  Schulman testified the October 19 letter "accurately set forth all material terms of our agreement."  SER-435.  DC manifested its understanding that an agreement was reached by beginning performance, setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie—both terms required by the October 19 writing.  SER-397, 399, 435-36, 459.

2.  The district court nevertheless held that no agreement was formed on October 19, finding that the terms of Marks' October 19 acceptance letter were "materially different" from DC's five-page letter of October 26, 2001, and "vastly different" from the 56-page "long form" draft of February 1, 2002.  SER-64.  These differences, the court found, showed that the parties "had not passed the threshold where they had finalized and assented to all material terms," because "as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart."  SER-63-64.

**EXHIBIT 64**
**1299**

That analysis misses the point.  Marks' October 19 acceptance of DC's offer settled the matter, and none of the subsequent discussions undid that contract.  The fact that the parties did not reach agreement on issues that "arose" as they attempted to formalize the deal has no bearing on whether the parties had previously agreed on the *essential* terms of the deal, while understanding "that some material aspects of the deal would be papered later."  *Facebook*, 640 F.3d at 1038.  And the court nowhere identified in the October 26 letter any disagreement over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26 letter expressly confirms its understanding that a binding agreement had been reached.  The letter states that Schulman was merely providing a "more fulsome outline of what we believe the deal *we've agreed to* is," and that DC would begin "working on the draft agreement" to put "this super-matter transaction *in document form*."  SER-463 (emphasis added).  The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to a rough outline of an agreement, but were thereafter unable to reach agreement on the finer details and the negotiations fell apart."  SER-62.  In fact, *Weddington* held the settlement agreement at issue unenforceable only because the parties had failed to agree on *the most essential matter in dispute between them*—the terms of a license for a "sound library," which "was a material issue to both sides" and thus not "a minor, immaterial or separable issue."  60 Cal.App.4th at 815.

31
**EXHIBIT 64**
**1300**

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a
confirmation of terms *already agreed to*, as set forth in the October 19 letter, with
further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form
agreement was even more misplaced. It was, of course, vastly different in the
sense that it was a 56-page, detailed, formal draft contract, rather than a listing of
terms—just the kind of formal documentation that was attempted without success
in *Facebook*. But, again, nowhere did the court identify any essential term in the
long-form agreement that differed from the essential terms in the October 19 letter.
Marks himself did not express any reservations about the February 2002 long-form
until three months later, after he learned that Larson had complained about it.
SER-436. Even then, Marks told Schulman the draft was "not contrary to what
[had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is
the *new* terms that would be unenforceable, not the October 19 terms. As this
Court explained in holding that Facebook's duty to draft deal documents did not
render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms
that are unfair or oppressive, or that deprive the Winklevosses of the benefit of
their bargain, the district court could reject them as a breach of the implied
covenant of good faith and fair dealing .... The district court got it exactly right

when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers. A binding contract already existed, in the essential terms the Siegels accepted on October 19.

3. Although the district court itself identified no disagreements over essential terms reflected in the correspondence and drafts following the October 19 letter, Larson offered up some 10 pages of differences. But none were raised at the time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over an essential term. For example, Larson contended the October 19 and October 26 letters described the rights transfer differently, but both merely used different lawyerly phrases to say that DC would receive 100% of the rights in all Superman properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters state different terms for royalty reductions in "extraordinary cases" involving the use of Superman rights with other properties, but the only difference is that while the October 19 letter gives one *example* of such a use, the October 26 letter provides additional examples; the basic contractual term is identical. *Compare* SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman "cameo" appearances in other characters' stories, SER-553-54, but both letters provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

**EXHIBIT 64**
**1302**

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the
"Summer of the Spinoff" Came to Be: The Branding of Characters in American
Mass Media*, 23 LOY. L.A. ENT. L. REV. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and
warranties, an obligation to provide certain historical documents, a right of first
refusal on biographical works, publicity obligations, advertising credits, dispute-
resolution procedures, and indemnities—likewise do not represent material
differences concerning essential terms. *See Inamed Corp. v. Kuzmak*, 275
F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination,
indemnification, sublicenses, transfer of rights, confidentiality, and dispute
resolution not essential). The differences in language thus do not undermine the
basic agreement that is reflected in the plain terms of the October 19 letter and
confirmed by the parties' contemporaneous conduct and subsequent testimony.

### C. At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter

At minimum, if there were any genuine dispute as to whether the parties
intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the
precise definition of "cameo," SER-437, which would have been worked out in the
long form. Marks did not object to Schulman's description of "cameos" at the
time, and when asked at his deposition to identify all differences between his letter
and Schulman's, he did not mention "cameos." SER-118-19, 435, 533-44.

EXHIBIT 64
1303

dispute should have been resolved by a jury. The question whether parties

intended to be bound by terms expressed in an informal agreement is one of fact,

*see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus

"summary judgment is inappropriate" where that question is materially contested,

*S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see*

*Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement

inappropriate" where there is "conflicting evidence" as to whether parties agreed

on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC,

plainly precludes summary judgment against DC on this question. In *Mattel*, this

Court reversed the same district court for making improper determinations

concerning contractual intent on summary judgment, where they "turn[ed] in part

on the credibility of conflicting extrinsic evidence." 616 F.3d at 910; *see Mattel,*

*Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, *2 (C.D. Cal. Aug. 4, 2011) (jury

finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here. Rather than accepting all

inferences and making all credibility determinations in DC's favor, it engaged in

its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of disagreements over its "finer details," SER-64, but *Callie* actually found disputed factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

**EXHIBIT 64**
**1305**

testimony about the relevant events over testimony from DC witnesses, including

testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz

disputed, and the materiality of differences between the October 19 and 26 letters,

which Schulman addressed.  SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to

light further indicating that Larson knew she was bound by the October 19 terms.

In *Shuster*, the district court compelled Larson to produce a July 2003 letter she

wrote to her brother, in which she repeatedly states that Marks insisted, in August

2002, that Larson had a "deal with Time Warner/DC."  SER-810-14, 824-25.  The

letter states that Marks would "testify against [her] in court" if she repudiated the

deal and accepted Toberoff's offer.  SER-811.  The letter confirms that Marks told

Toberoff that Larson had a "deal" with DC.  SER-811.  Given this letter, there is *at*

*least* a jury question as to whether Larson understood she was bound to the

October 19 terms.

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its

limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued,"

or 1,095 days.  17 U.S.C. §507(b).  Larson's claims accrued on April 16, 1999—

the day her Notices purport to take effect.  SER-62.  Accordingly, Larson was

required to file her claim by April 16, 2002.  The parties, however, entered into a

tolling agreement on April 6, 2000—356 days into the 1,095-day limitations

period, with 739 days left to run—providing that it would expire, as relevant here,

"10 business days after … either party terminat[es] negotiations, in writing,

relating to the Notices."  SER-348-51.

There are two possible termination "triggers" for this provision.  One

occurred on May 9, 2002, when Larson's mother sent DC a letter stating that the

February 2002 draft long-form contract "makes an agreement impossible."  SER-

234.  If that letter terminated negotiations, then the limitations period restarted on

May 20, 2002, and ended May 28, 2004—five months before Larson filed suit.

The other possible event occurred on September 21, 2002, when the Siegels

sent a letter to DC stating that "we are totally stopping and ending negotiations."

SER-420.  If that letter terminated negotiations for purposes of the tolling

agreement, then the limitations period restarted 10 days later, on October 4, 2002,

and closed on October 11, 2004—four days after Larson filed suit.

Larson herself has taken conflicting positions as between these two

possibilities.  In the district court below, she contended that negotiations were not

terminated until the later date of September 21, 2002.  The court agreed, holding

her claims to be timely.  SER-60-61.

**EXHIBIT 64**
**1307**

Since that ruling, however, Larson has argued the opposite in *Shuster*.  In
*Shuster*, DC alleges that Toberoff interfered with DC's business relationship with
Larson by wrongfully inducing her to repudiate the 2001 settlement and cut ties
with DC.  SER-816-19.  Toberoff and Larson filed an unsuccessful motion to strike
this claim, arguing he "had [nothing] to do with the May 9[, 2002] letter that ended
DC's purported 'prospective economic advantage'" and made settlement
discussions "moribund."  SER-825, 868, 878-79; *see* Appeal Nos. 11-55863, 11-
71844 .

Larson cannot have it both ways.  Either the parties' settlement negotiations
"ended" on May 9, 2002—in which case Larson's claims here are time-barred—or
on September 21, 2002—in which case Larson has essentially conceded Toberoff's
liability for DC's interference claim in *Shuster*.  Settled principles of estoppel
prevent Larson (and Toberoff) from "deliberately changing positions according to
the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 750
(2001).  At the very least, her shifting positions demonstrate that a jury, too, could
go either way.  *See Mattel*, 616 F.3d at 910.

**EXHIBIT 64**
**1308**

## LARSON'S APPEAL OF HER FIRST CLAIM AND
## DC'S CROSS-APPEAL ON BOTH PARTIES' FIRST CLAIMS

## I.  LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED

Before this Court can exercise jurisdiction over an interlocutory appeal, it must determine *de novo* whether the claim on appeal has been fully adjudicated. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1084 (9th Cir. 2010).  Rule 54(b) requires final judgment on an *entire* claim.  *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991).

The Rule 54(b) judgment on DC's Second through Fourth Counterclaims was proper, as those claims were fully adjudicated.  The Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, however, was invalid and thus not appealable.  *See* Dkt. No. 5-1.

Larson's First Claim seeks a declaration regarding the parties' "respective *rights and obligations* with respect to the Termination and the *copyright interests thereby recaptured*."  ER-338-39 ¶¶53-55 (emphasis added).  The district court's judgment did not fully determine the parties' "rights and obligations" or the scope of the "copyright interests" assertedly recaptured by Larson.  For example, the judgment does not establish the extent to which Larson's recaptured rights—if any—are diminished by the Promotional Announcements owned by DC, which feature key story elements from *Action Comics #1.*  Dkt. No. 5-1, at 11-17.  The

**EXHIBIT 64**
**1309**

court also left open whether its description of the limited elements in *Action Comics #1* was intended to be "dicta," as Larson argued below.  SER-305-08, 313-19, 325-26, 2-3.

As discussed *supra* at 20-22, both Larson and the district court acknowledged that the court's summary judgment rulings left open key legal and factual questions concerning the "scope of [Larson's] recaptured copyrights." SER-198, 298-305, 310-13, 321-24, 2-3.  Larson sought finality on the First Claim by amending it to remove a request for an accounting, but the accounting request was only *one* of the unresolved matters.  The First Claim will be finally adjudicated only when the parties' "rights and obligations" and "copyright interests" are fully determined.

## II. THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION

Assuming the Court has jurisdiction to consider the remainder of this appeal, the questions largely concern whether certain early Superman works qualify as "works for hire" under the 1909 Copyright Act, 17 U.S.C. §§24, 26 (1909) (repealed 1976).  As Larson acknowledges, LB-21, a work made-for-hire under the 1909 Act is not subject to the termination provisions created by the 1976 Act, 17 U.S.C. §§203(a), 304(c)-(d).  The district court held that the vast majority of works

41

**EXHIBIT 64**
**1310**

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 79 of 347
Case 1:11-cv-53683-QS/23/2012 Dktentry 19-1 Page 66 of 213
Page ID #:32898

at issue were created as works-for-hire, but it held a few works were not, and thus could be recaptured. The first category of rulings was correct, the second was not.

**A.      A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party**

1.  It has been "the well-established law of this circuit"—and others—for decades that a work qualifies as made-for-hire under the 1909 Act whenever it was created at the "instance and expense" of another party. *Fox*, 429 F.3d at 879-81.[10] The instance-and-expense test embodies a presumption "when one person engages another … to produce a work of an artistic nature … the title to the copyright shall be in" the employer. *Lin-Brook*, 352 F.3d at 300.

The "instance" requirement is met where the hiring party was the "motivating factor in producing the work." *Fox*, 429 F.3d at 879. What matters is "the degree to which the 'hiring party had the right to control or supervise the artist's work,'" irrespective of whether it was actually exercised. *Id.* The "expense" requirement can be satisfied in different ways:  (1) the hiring party may assume "the financial risk of the [work's] success," *id.* at 881, or (2) "simply

_____

[10] *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000); *Dolman v. Agee*, 157 F.3d 708, 711-12 (9th Cir. 1998); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158-63 (2d Cir. 2003); *Easter Seal Soc'y v. Playboy Enters.*, 815 F.2d 323, 325-27 (5th Cir. 1987).

**EXHIBIT 64**
**1311**

pay[]" a sum for its creation, *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995), or (3) the hired party may "expect[] to be compensated" for his work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978).

If the "instance and expense" test is satisfied, the court must presume the parties agreed the copyright "lies *ab initio* with the commissioning party." *Fox*, 429 F.3d at 881; *see Self-Realization*, 206 F.3d at 1326; *Dolman*, 157 F.3d at 711-12. That presumption is rebutted *only* if the party seeking to defeat work-for-hire status adduces evidence proving that the parties expressly agreed the commissioning party would *not* own the copyright. *Fox*, 429 F.3d at 881; *Dolman*, 157 F.3d at 712-13; *May*, 618 F.2d at 1368-69; *Lin-Brook*, 352 F.2d at 300.

2. In a tacit concession that she cannot prevail under the settled instance-and-expense test, Larson labors to escape it. She first complains the test has been "criticized," but concedes it has been this Circuit's controlling law for decades. LB-23.[11]

---

[11] Although the criticism is therefore irrelevant, it is also wrong. The commentators Larson cites would limit work-for-hire to traditional "employees"—excluding works made by independent contractors at the "instance and expense" of another—on the theory that the 1909 Act refers to the "employer" in the case of a work-for-hire. LB-26-27. But the word "employer" plainly does *not* limit work-for-hire to the "more conventional master-servant relationship." LB-26; *see* LB-57-58. The cases Larson cites refer only to use of the word "employee," which *does* generally refer to common-law master-servant relationships. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003); *CCNV v. Reid*, 490 U.S. 730, 738-40 (1989). The term "employer" has no such connotation, because it is perfectly conventional to refer to the "employer of an independent

43

**EXHIBIT 64**
**1312**

Larson also suggests that the instance-and-expense test should be applied differently in the context of termination rights under the 1976 Act (LB-27-28), but she cites nothing in the Act's text or history supporting such a rule,[12] and it makes no sense. A work is either made-for-hire or it is not—it cannot be a work-for-hire for all purposes *except* termination rights. In the termination context as in any other, if the work was made at the instance and expense of the employer—whether by a traditional employee or an independent contractor—then the employer was the statutory "author" *ab initio*, leaving no authorship rights for anyone else to recapture. *E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (applying instance-and-expense test in termination context to find work-for-hire).[13]

---

contractor." *See Meyer v. Holley*, 537 U.S. 280, 290 (2003); *St. Paul Water Co. v. Ware*, 83 U.S. 566, 576-77 (1872); *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999); RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-29 (1965); 41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005).

[12] Indeed, leading cases like *Picture Music* and *Lin-Brook* had already applied work-for-hire beyond traditional employer-employee relationships by 1976, and Congress did nothing to alter the doctrine as it applied to works governed by the 1909 Act. What is more, this Court's precedents largely solidified the instance-and-expense test *after* 1976—starting with *May* in 1980, *supra* n.10—refuting any suggestion that the 1976 Act somehow undermined the test.

[13] Larson also errs in asserting that the instance-and-expense test is "ill-suited for summary adjudication due to its inherently fact-intensive nature." LB-57. Courts frequently apply the test on summary judgment where, as here, there are no disputes of historical fact. *E.g.*, *Self-Realization*, 206 F.3d at 1324, 1330; *Dolman*, 157 F.3d at 711; *Kirby*, 777 F.Supp.2d at 738, 743; *Scherr v. Universal Match Corp.*, 297 F.Supp. 107, 113 (S.D.N.Y. 1967), *aff'd*, 417 F.2d 497 (2d Cir. 1969).

**EXHIBIT 64**
**1313**

**B.** **The District Court Correctly Held That** *Action Comics #2-3, #5-61, Superman #1 (Pages 1-2)-23,* **And The Post-McClure Strips Were Works-For-Hire**

In the time period at issue here, DC published and distributed Superman stories in various formats, including:  as part of *Action Comics*, as the standalone comic *Superman*, and in "strips" syndicated in daily newspapers.  The district court held that the following works were made-for-hire:  the Superman works in *Action Comics #2-3* and *#5-61*, pages 1-2 of *Superman #1* and *Superman #2-23*, and newspapers strips created after DC entered into the Syndication Agreement with McClure ("Strips").

All of the foregoing works were both created and published after Siegel and Shuster entered into two relevant agreements with DC:  the 1937 Employment Agreement of December 7, 1937, and the 1938 Assignment, pursuant to which Siegel and Shuster assigned all rights in all aspects of Superman.  *Supra* at 11-12.

Under those agreements, DC possessed complete control over creation of new Superman stories and elements.  Nothing could be done without DC's consent.  DC warned Siegel and Shuster that DC would "not tolerate or accept slipshod work," and that if their new Superman stories and artwork did not "show a marked improvement," DC would "make other arrangements to have it done."

---

In the cases cited by Larson, summary judgment was precluded by credible, admissible, direct evidence that the parties did not intend the commissioning work to be made-for-hire.  *See Fox*, 429 F.3d at 875; *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002); *May*, 618 F.2d at 1368.

**EXHIBIT 64**
**1314**

SER-223, 249. Given the 1938 Assignment, DC had the right to employ other artists to create new Superman works if Siegel and Shuster could not meet DC's quality and timing demands. The parties' correspondence further shows that DC:

- advised Siegel and Shuster that they "need[ed] constant editorial supervision and an alter-ego who can criticize and point out small details … which may make or break the strip," SER-220;

- required them to submit their draft material far enough "in advance" that DC could go over it "with a fine tooth comb," SER-220, 224, 228-35;

- made substantive revisions to the draft material, SER 223-24, 231, 242;

- demanded that Siegel "re-write" scripts and sent him synopses to "elaborate in detail," SER 223-24, 231, 237-38;

- provided detailed instructions for the illustrations, SER-234-35, 242, 244-45;

- directed Siegel as to story elements and themes, SER-223-24, 234-38; and

- insisted that Siegel and Shuster submit sketches of cover art for DC to "okay," SER-224, 234-35, 242.

The record also established without ambiguity that DC incurred significant expense to create new Superman works after retaining Siegel and Shuster and requiring their assignment of all rights in the character and story. DC made a major financial investment in commissioning Siegel and Shuster to create new Superman material—DC compensated them significantly for that material, and bore all the costs of printing, distributing, and promoting the Superman works, which itself suffices to satisfy the expense requirement. ER-425-27, 960; SER-223-24, 678-79; *Fox*, 429 F.3d at 881.

**EXHIBIT 64**
**1315**

After Siegel and Shuster spent years unsuccessfully trying to sell their nascent character and story, DC was the one party willing to take the "tremendous gamble" of purchasing the rights to Superman, hiring Siegel and Shuster to create new Superman works, and developing those works into a successful property. ER-425-27. Further, DC assumed a significant financial risk in relying entirely on Siegel and Shuster, rather than hiring additional artists to meet the demands of producing daily copy for syndicated newspaper comic pages. If Siegel and Shuster did not satisfy their obligations to provide quality work on a timely basis, the result would be empty pages in *Action Comics*, blank space in daily newspaper funny pages, and financial loss to DC's brand and bottom line.

Finally, it bears emphasis that after the 1938 Assignment, DC owned the Superman character and story outright. ER-917. When the commissioning party owns the copyright in the underlying work, that party necessarily has full authority to control and develop the work, thus making any derivative work a work-for-hire. *See Hogarth*, 342 F.3d at 163; *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); 17 U.S.C. §7 (1909) (derivative works "produced with the consent of the proprietor of copyright … shall be regarded as new works").[14]

---

[14] It is true that an artist *can* own the copyright in his contributions to a derivative work (LB-31), but *not* if the derivative work is made-for-hire.

**EXHIBIT 64**
**1316**

Nothing in the foregoing factual record is disputed, and it plainly establishes that all new Superman stories and elements published after the 1937 Employment Agreement and 1938 Assignment were created because DC employed and paid Siegel and Shuster to create them. If DC at any point became dissatisfied with their work, DC could have terminated the relationship and paid someone else to develop DC's exclusive rights in Superman. ER-427, 917. The undisputed record shows, in short, that the new, derivative Superman works created after March 1938 were created at DC's instance and expense, and thus it is presumed that the parties agreed that DC would own the copyright in those works *ab initio*, unless Larson can establish an express agreement to the contrary. *Supra* at 43.

Larson does not even *attempt* to identify any such agreement, because none exists. That should end the matter. Larson instead proffers a litany of arguments with respect to each category of works, in an effort to show that the works were not created at DC's instance, or expense, or both. Those efforts are futile.

1.  *Action Comics #2-3, #5-6*

a. The district court correctly held that *Action Comics #2-3, #5-6*, which were published between May and September 1938, were "done at the instance of" DC. ER-83. Before *Action Comics #1* was published, DC made clear that Superman would be a "new feature" requiring Siegel and Shuster regularly to supply DC with new material. ER-423. Consistent with their agreement, DC set

**EXHIBIT 64**
**1317**

Case 2:10-cv-03683-ODW-RZ Document 500-12 Filed 10/10/12 Page 86 of 347
Case 1:11-cv-05888-QB Document 599-12 DktEntry 19-1 Page 36 of 13
Page ID #:32905

aside space for the Superman feature in its comic books, including "every succeeding monthly issue of Action Comics for the period in question," ER-83, which was "published at regular intervals." ER-960. For each installment, Siegel and Shuster submitted Superman strips to DC and were paid $10 per page. *Id.*

    b. Larson's arguments that *Action Comics #2-3, #5-6* were not created at DC's instance and expense are meritless. Larson first contends the works cannot be works-for-hire because DC did not commit to accepting new material, and thus there was no "guaranteed compensation" and the expense factor is not satisfied. LB-29. That argument has been "roundly rejected." *Kirby*, 777 F.Supp.2d at 742. No court has ever held that the "expense" factor requires guaranteed compensation. *See Murray*, 566 F.2d at 1311 n.7 ("neither the form of compensation, nor the amount, is determinative"); *Picture Music*, 457 F.2d at 1216 (lack of fixed payment "is never conclusive"). To the contrary, courts have found work-for-hire where there was *no* obligation to pay an artist for unpublished works. *E.g.*, *Playboy*, 53 F.3d at 555; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003); *Picture Music*, 457 F.2d at 1216. In fact, the lack of a long-term guarantee "is not something which is atypical" in a work-for-hire situation. ER-86. The expense requirement is satisfied, for example, where an artist is paid only in royalties, which may amount to nothing if the work does not succeed. *Warren*, 328 F.3d at 1142.

Larson next argues that the 1938 Employment Agreement undermines the work-for-hire status of *Action Comics #2-3, #5-6* because it states that DC "*hereby* employ[s] and retain[s] you." LB-30 (emphasis added). But that language simply signifies that Siegel and Shuster were now subject to the particular terms of the 1938 Employment Agreement—it does nothing to establish that Siegel and Shuster were not already producing Superman work at DC's instance and expense. The 1938 Employment Agreement, in fact, expressly states that Siegel and Shuster "*have been* doing the art work and continuity *for us*" and that DC wanted the pair "to *continue* to do said work." ER-605 (emphasis added). The new written agreement thus simply "formalized what had informally been ongoing beforehand." ER-85.

Finally, Larson contends that "Siegel had already written" the Superman stories in *Action Comics #2-3, #5-6*, before 1938. LB-32. Larson's first theory is that because the district court held that certain elements of *Action Comics #4* and *Superman #1* were created before 1938—which is erroneous in any event, *infra* at 61-68—it must be true that the other *Action Comics* contained preexisting elements. LB-32. But Larson has pointed to absolutely no *evidence* that *Action Comics #2-3, #5-6* were based on preexisting materials. Absent such evidence,

**EXHIBIT 64**
**1319**

there is no basis for any inference that they were.[15]  Larson's second theory is that
the new works were based on a paragraph written by Siegel in 1934 that
"previewed" Superman's future exploits (LB-32), but the district court rejected that
argument, holding that the so-called "preview" paragraph "constitutes mere *ideas*
for future works rather than *expressions* of those ideas, and thus contains no
copyrightable material."  ER-75; *see Harper & Row, Publishers v. Nation Enters.*,
471 U.S. 539, 547 (1985) ("no author may copyright facts or ideas").  Larson did
not appeal that ruling, thereby waiving this contention.  *See Partmar Corp. v.
Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 (1954); *Gausvik*, 392 F.3d at
1008 n.1.

      2.    *Action Comics #7-61 And Superman #1-23*

     a.  *Action Comics #7-61* and *Superman #1-23* were produced by Siegel and
Shuster not only after the 1938 Assignment gave DC exclusive rights in Superman,
but after the 1938 Employment Agreement formalized the artists' working
relationship.  ER-87.  The 1938 Employment Agreement confirmed that the works
were created at DC's instance:

- Siegel and Shuster "will supply us each and every month …, in sufficient
  time for publication …, sufficient copy and art";
- "The standard of said comics shall be equal to the present standards";

---

    [15] As for *Action Comics #6*, Larson never argued below that this work was
based on pre-existing material, so the argument is waived.  *See Jachetta v. U.S.*,
653 F.3d 898, 906 (9th Cir. 2011).

**EXHIBIT 64**
**1320**

- "[I]f at any time the art and continuity of any feature shall not be up to the standard …, [DC] may terminate this agreement and substitute other artists";
- DC "shall have the right to reasonably supervise the editorial matter of all features."  ER-605-07.

These works were also created at DC's expense.  All three means of satisfying the expense requirement, *supra* at 42-43, were present here:  DC assumed the financial risk of Superman's success and bore responsibility for printing, distributing, and promoting these works; DC paid Siegel and Shuster for these works; and Siegel and Shuster expected to be compensated pursuant to the 1938 Agreement, which provided that DC would "pay you on publication, for any and all of said comics," according to a fixed pay scale.  ER-606.

Because *Action Comics #7-61* and *Superman #1-23* were plainly created at DC's instance and expense, they are works-for-hire as a matter of law.

b.  None of Larson's barrage of contrary arguments has merit.  Larson first contends that these works were not created at DC's "expense" because DC was obligated to pay only for works DC decided to publish.  LB-49.  But Larson did not below and does not now seek to recapture any unpublished, unpaid-for, non-copyrighted work (nor could she)—making this issue irrelevant.  And she was paid for the works that were published, and no work-for-hire precedent requires *fixed compensation* for every possible submission to satisfy the "expense" test.  *Supra* at

52

**EXHIBIT 64**
**1321**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 90 of 347
Case 1:11-cv-08683-ODW-RZ Document 599-12 Dkt Entry 14-1 Page 96 of 113
Page ID #:32909

49. The *Kirby* court correctly described Larson's argument to the contrary (advanced by her same counsel here) as "roundly rejected." 777 F.Supp.2d at 742.

It is beside the point that Siegel and Shuster *also* incurred costs to create these new Superman works. LB-48. It is undisputed that they were more than compensated for those costs under the payment schedule established by the 1938 Agreement—they both became wealthy as a result of those payments. ER-466, 585-86, 605-07; *see Playboy*, 53 F.3d at 555 (fact that artist provided own tools and studio, hired assistants, paid taxes and benefits, and set his own work schedule had "no bearing on whether the work was made at the hiring party's expense"); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, *20 (S.D.N.Y. Mar. 15, 2002) (artist cannot "unilaterally … disrupt a work for hire arrangement by paying certain costs of the project that he was not contractually bound to pay").

Larson says DC's payments under the 1938 Employment Agreement were "by law" not payments for work produced at DC's instance, but "a discretionary *purchase* of completed material." LB-49. Larson cites no "law" so holding, and the facts preclude that conclusion. DC *already owned all rights to Superman*, so there was nothing for DC to "purchase." *Supra* at 47.[16] Under the 1938

---

[16] Larson says that testimony of DC expert Mark Waid proves DC did not own the rights in not-yet-published Superman material, because Waid sought the "blessing" of the Siegels to publish a newly discovered, unpublished Superman work. LB-52-53. There is no evidence that Waid did so because he thought it was legally required—indeed, a "blessing" is obviously not equivalent to a "license."

**EXHIBIT 64**
**1322**

Employment Agreement, DC paid the artists for work they were obligated to create on a specified timely basis, under quality standards enforced by DC.[17]  ER-605-07.

Larson next contends that *Action Comics #7-61* and *Superman #1-23* were not made at DC's instance because DC did not exercise complete control over Siegel's and Shuster's creative processes.  LB-55.  "All [DC] really had," Larson says, "was the purchasing power of any buyer."  *Id.*  No.  DC had much more— most significantly, it had the power to terminate Siegel and Shuster outright if they did not produce publishable-quality work, to retain other artists to create Superman works and, as the sole owner of Superman, to bar Siegel and Shuster from ever creating any more Superman works of any kind.  *Supra* at 12-13.  DC also had the right to supervise their work to determine whether it satisfied "present standards" of publication.  *See Fox*, 429 F.3d at 880 ("complete control over the author's work is not necessary").  The law does not require the employer to insert itself directly

---

And whatever Waid personally thought does not bind DC as a corporation, nor could his personal state of mind create or eliminate rights that existed as a matter of law in 1938 based on contractual agreements.  Finally, rights in unpublished works are not at issue here.  *Supra* at 52.

[17] The district court concluded that Larson "failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work."  ER-89.  Rather, the court held, a 1939 agreement between the parties suggested that the "pattern and practice" was for DC to pay Siegel and Shuster even for Superman material they had *not* created.  ER-90; *see* ER-965.  Larson addresses the court's inference at great length (LB-51-54), but her entire discussion misses the point: even if Siegel and Shuster were *not* paid for unpublished work, the works that *were* published plainly were created at DC's instance and expense.

**EXHIBIT 64**

**1323**

into the artist's creative process—after all, the whole point of commissioning an

artist is to engage the artist's creative talents. *See Martha Graham Sch. & Dance

Found., Inc. v. Martha Graham Sch. of Contemporary Dance, Inc.*, 380 F.3d 624,

635 (2d Cir. 2004). The employer need not dictate or shape how works are made:

"talented people … are expected by their employers to produce the sort of work for

which they were hired," *id.* at 640-41—exactly as Siegel and Shuster did here.[18]

### 3. *Post-McClure Newspaper Strips*

a. Siegel and Shuster created many Strips after executing the 1938

Employment and Syndication Agreements. It is plain they were created at DC's

instance—Siegel and Shuster were engaged by DC for the express purpose of

creating them, as the district court held. ER-103. The Syndication Agreement

provided: "Detective agrees to permit [Siegel and Shuster] to supply 'Superman'

strip exclusively to us for syndication…." ER-609. The Syndication Agreement

also reaffirmed DC's exclusive ownership of Superman: "[T]he title 'Superman'

shall always remain the property of [DC]." ER-610. And the 1938 Employment

Agreement reinforced that Siegel and Shuster would timely "furnish … all of the

---

[18] Larson asserts in passing that the parties "could not have intended" these
works to be made-for-hire because courts in this time period applied the work-for-
hire doctrine only to "traditional employees." LB-56. This Court rejected the
identical argument in *Fox*, holding that General Eisenhower's war memoir, written
during the same time period at issue here, was a work-for-hire even though he was
not a traditional employee. *Compare* 429 F.3d at 877, *with id.* at 881 (Nelson,
D.W., J., dissenting).

**EXHIBIT 64**
**1324**

art and continuity for the newspaper strip entitled 'Superman'" to McClure. ER-605. That Agreement also gave DC the express "right to reasonably supervise the editorial matter of all features." ER-607. And again, the 1938 Employment Agreement authorized DC to terminate Siegel and Shuster and retain other artists to produce the Strips. *Supra* at 12-13.

As the parties' correspondence establishes, DC gave Siegel and Shuster "constant editorial supervision," insisting that the pair "send all the [newspaper] material here before it goes to the syndicate for release" so its editors could review the draft strips, make substantive revisions to the script and artwork, correct "any mistakes," and "okay" the final strip before sending it to McClure. ER-431-40, 445-56, 453, 460. In a January 23, 1940, letter, an editor reminded Siegel: "[P]lease do not forget that all copy must clear though our office … You've got to give us plenty of time for okaying, so get busy." ER-435. DC made clear that if the newspaper strips did not meet its editorial standards, "we shall have to consider it 'unacceptable', and make other arrangements to have it done." ER-460.

As the court below observed, the facts of this case are "eerily similar" to those in *Picture Music*, 457 F.2d at 1214, and compel the same work-for-hire conclusion. ER-104. As in *Picture Music*, the artists (Siegel and Shuster) worked with another party (McClure) to create derivative works owned by a third party (DC). As in *Picture Music*, the employer here (DC) owned the original work, per

**EXHIBIT 64**
**1325**

the 1938 Assignment. As in *Picture Music*, the artists here exercised substantial creative license in creating the work, but as in *Picture Music*, the employer here had a right to accept, reject, or modify the pair's work. *Id.* at 1217. As in *Picture Music*, it is irrelevant whether they operated as independent contractors.

The Strips also were created at DC's expense. Siegel and Shuster were handsomely compensated for their work pursuant to the 1938 Employment Agreement. As explained, it is irrelevant that they were not paid a guaranteed amount. *Supra* at 49. Further, DC assumed the financial risk of Superman's newspaper syndication; while DC did not expect syndication to be tremendously profitable, it owned all of the underlying rights, and stood to lose the value of those rights if the syndication failed. *See Fox*, 429 F.3d at 881. The Post-McClure Strips were clearly works-for-hire.

b. Larson contends otherwise, but her arguments are meritless. *First*, she says that Siegel's involvement in soliciting newspaper syndication proves the Strips were made at his own "instance." LB-37. But there can be no dispute that the Strips were created pursuant to Siegel's and Shuster's *contractual obligation to create them for DC*. *Supra* at 55-56. And DC itself also actively sought newspaper syndication. *E.g.*, SER-290.

*Second*, Larson tries to distinguish *Picture Music*, saying the employer-artist relationship there was a traditional employer-employee arrangement, while the

**EXHIBIT 64**
**1326**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 95 of 347
Case 1:11-cv-08683-ODW-RZ Document 599-12 Dkt Entry: 9-1 Page 95 of 347
Page ID #:32914

relationship between Siegel, Shuster, and DC was more akin to a joint venture. LB-34, 40.  But again, it is settled that the work-for-hire doctrine applies equally to independent contractors and traditional employees.  *Supra* at 42-43 & n.11.[19]

*Third*, Larson argues that a finding in *Fawcett* that McClure owned the "proprietor" copyright in the Strips precludes a finding that the Strips were made-for-hire pursuant to an obligation to DC.  But the work-for-hire status of the Strips was *never* before the *Fawcett* court, which considered the limited question whether Superman rights had fallen into the public domain due to McClure's failure to properly affix copyright notices to certain newspaper strips, and if so, whether those errors were chargeable to DC.  191 F.2d at 599.  As the district court concluded, "to imply Judge Hand [the judge in *Fawcett*] sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court fifty years later is simply misdirected."  ER-40.

*Fourth*, Larson says McClure and DC owned the Strips not as works-for-hire but by an "implied assignment of Siegel and Shuster's common law copyrights in

---

[19] In any event, as the district court explained, the right of control held by both DC and McClure was "reflective of a more traditional employment engagement." ER-104.  Larson notes that the district court in *Nat'l Comics Pubs., Inc. v. Fawcett Pubs., Inc.*—a lawsuit DC filed in the 1940s alleging that the Captain Marvel comic books infringed its rights in Superman—likened the parties' syndication arrangement to a joint venture, but on appeal the Second Circuit did *not* accept that formulation, 191 F.2d 594, 599 (2d Cir. 1951), so it carries no weight.  *In re Smith*, 964 F.2d 636, 638 (7th Cir. 1992).

**EXHIBIT 64**
**1327**

the strips." LB-43. But even if Larson were correct that there was an assignment (she is not), this Court has held that an assignment of rights is not "inimical with the work-for-hire doctrine." *Fox*, 429 F.3d at 881. Once the instance-and-expense test has been satisfied, the work-for-hire "presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"—an assignment "is insufficient to rebut the presumption." *Id.*; *Lin-Brook*, 352 F.2d at 300.

*Fifth*, Larson says a work-for-hire conclusion is contrary to McClure's copyright registrations for the Strips, which identify Siegel and Shuster as the "author" and McClure as the "owner." LB-43. But the sole case she cites *rejects* her position, holding that a publisher's reference to the hired party as an "author" did *not* change the work-for-hire status of its book, because "author" "was being used, not as a 'legal conclusion,' but 'colloquially.'" *Hogarth*, 342 F.3d at 166-67 & n.24; *see Picture Music*, 457 F.2d at 1214 & n.1. There is no evidence McClure intended to use "author" in anything other than its colloquial sense. ER-610.

*Sixth*, Larson notes that in 1944, McClure assigned to DC "all its right, title and interest in all copyrights in Superman," which she says was unnecessary if DC owned the copyright in the Strips. LB-45. But DC only allowed McClure to register copyrights in its name for practical purposes—the Syndication Agreement

made clear that DC retained beneficial ownership of all Superman rights and the copyrights in the Strips would "revert" back to DC.  ER-610.[20]

*Finally*, Larson argues that DC's ownership of rights is inconsistent with the Syndication Agreement's allowing DC to use the Strips in its comic books "six months after newspaper release."  LB-46.  But DC could grant McClure a six-month exclusive license in the Strips—in exchange for 40-50% of the net proceeds from the Strips—precisely *because* DC owned their rights.  ER-609-10.[21]

The conclusion that the Strips were created at DC's instance-and-expense, pursuant to the 1938 Employment and Syndication Agreements, is unassailable.

---

[20] Larson similarly argues that if DC owned the Strips as works-for-hire, then Siegel and Shuster would not have needed to execute the Syndication Agreement.  LB-46.  But that agreement imposed obligations on Siegel and Shuster, so their execution was necessary.  Notably, the agreement took care to reaffirm that the pair had *no* rights in the Strips, were employees of DC, and could be replaced at any time.  *E.g.*, ER-610.

[21] Nothing about the "indivisibility" doctrine would have precluded DC from granting such a license, as the very case cited by Larson shows.  LB-47 (citing *Jim Henson Prods. v. John T. Brady & Assocs.*, 16 F.Supp.2d 259, 288 (S.D.N.Y. 1997) ("indivisible" right means "the transfer of anything less than all rights was deemed a license rather than an assignment")).  Nor does the holding in *Fawcett* (LB-47) preclude that result.  *Supra* at 58.

**C.    The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And #4, *Superman #1* (Pages 3-6), And Pre-McClure Strips**

The district court incorrectly held that *Action Comics #1* and #4, *Superman #1* (pages 3-6), and the two weeks of strips created before the Syndication Agreement ("Pre-McClure Strips") were not works-for-hire.

1.    Action Comics #1

a.    *Key Elements Of* Action Comics #1 *Were Made-For-Hire*

The undisputed record shows that key graphic and story elements from the Superman story in *Action Comics #1* were made-for-hire for DC.  Indeed, some elements were not even created by Siegel and Shuster, but by other DC artists.

DC's Colorization.  DC colorist Jack Adler testified that, in keeping with industry custom, Siegel and Shuster submitted black-and-white panels to DC for use in *Action Comics #1*.  SER-442.  DC's other artists decided what colors to use and applied those colors to the story, including Superman's iconic blue leotard, red cape, and red S-crest.  *Id.*  The unique combination of these colors with the story elements in *Action Comics #1* will always be DC's property—meaning that DC has an irrevocable joint-ownership stake in *Action Comics #1* even if Larson is able to recapture certain story elements.

The district court erroneously assumed that DC's use of color in *Action Comics #1* was *not* independently copyrightable.  SER-49-51.  In fact, "adding

colors to a previously black and white picture may constitute an original copyrightable contribution." MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §2.14 (2011); *see Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir. 2001); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 n.6 (2d Cir. 1977); 52 F.R. 23443-46 (1987) (colorization of black-and-white motion pictures is copyrightable and may be registered). While color alone may not be copyrightable, the selection and use of color in combination with other protectable elements can be sufficiently creative to warrant copyright protection. *See Boisson*, 273 F.3d at 271; *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 n.6 (9th Cir. 2008); *Sargent v. Am. Greetings Corp.*, 588 F.Supp. 912, 919 (N.D. Ohio 1984); *Pantone, Inc. v. A. I. Friedman, Inc.*, 294 F.Supp. 545, 547 (S.D.N.Y. 1968).

DC's unique selection and application of colors to the *Action Comics #1* story far exceeds the minimal standard for copyrightability. Larson's own expert acknowledged that "Superman's distinctive iconic costume is very much about its colors," SER-370, and the story was promoted as being in "***Color!***," *infra* at 84.

DC's Cover Art. DC's artists also created the cover of *Action Comics #1*, which introduces the Superman story that immediately follows. ER-388; SER-728. A February 22, 1938, letter from DC editor Vin Sullivan to Siegel provided: "I'm enclosing a silverprint of the cover of Action Comics. You'll note that we already used one of those panel drawings of SUPERMAN, as you suggested in

your recent letter." SER-388. In other words, per Siegel's suggestion, DC used one of the panel drawings from the Superman story as a template to create the cover art. Siegel confirmed these events in his memoir. SER-803-04. The court below suggested, however, that Sullivan's letter *could* be read to imply that Siegel created the cover art and enclosed it with his "letter" to Sullivan. SER-51. That reading is at odds with the plain language of the letter and Siegel's own account.

Larson argued below that DC's cover was not independently copyrightable because it was derivative of Siegel and Shuster's preexisting creation. A derivative work is independently copyrightable if it contains "non-trivial" variations from the original work, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997)—*i.e.*, it possesses "more than a de minimis degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991).

In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982), the court considered these two illustrations:




*Original Illustration*    *Derivative Illustration*

EXHIBIT 64
1332

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 101 of 347
Case 1:11-cv-05989 02/23/2012 Document 595-12 Dk Entry 31-11 Page 3 of 17
Page ID #:32920

While the individual distinctions are minimal, the court found that "the numerous changes made by [the second artist]—the changed proportions of the hat, the elimination of individualized fingers and toes, the overall smoothing of lines—combine to give the [second] drawing a different, cleaner 'look'" than the original sketch. *Id.* The second illustration was thus independently copyrightable. *Id.*

Here, there are numerous non-trivial distinctions between the cover of *Action Comics #1* and the panel that inspired it:

- On the cover, Superman has distinguishable facial features and musculature, bears a visible S-crest on his chest, and wears the now-iconic red boots. In the panel, Superman's face, musculature, and S-crest are obscured, and he wears socks.

- The cover depicts a man under the car who was shaken out of the car by Superman—the panel does not.

- The man featured on the bottom left foreground of the cover has different hair, facial features, and clothing than the man in the panel. He is touching his temples in disbelief and his tie is blowing in the wind. In the panel, the man is covering his ears and his tie is stationary.

- The man featured in the left background of the cover has different hair and clothes than the version in the panel, and has discernible facial features.

- In the cover, Superman appears larger than the closest figure(s). In the panel, he appears to be the same size.

- The car featured on the cover is fully visible and contains different rear wheel wells, headlights, and other details than the car in the panel. On the

EXHIBIT 64
1333

cover, the tire that flew off the car is angled differently than the panel, emphasizing the force with which Superman smashed the car into the rocks.

- The scale, layout, and background landscape of the two images are different.

- Even the rocks in the background of the two images are different; they are less detailed and prominent in the cover art.



*Panel in* Action Comics #1

**EXHIBIT 64**

**1334**



*Cover of* Action Comics #1

66
**EXHIBIT 64**
**1335**

These differences warrant independent copyright protection for the cover.

Siegel and Shuster's 1938 Material.  Siegel and Shuster created certain elements of the Superman story in *Action Comics #1* ("Preexisting Material") before entering into employment with DC.  That Preexisting Material is not at issue here.  Siegel and Shuster testified, however, that in early 1938, they made key additions to the Preexisting Material, including:  (1) "several additional pictures to illustrate the story continuity," which appear on the first page of *Action Comics #1*, ER-654; SER-386; (2) the last panel, which features Superman in his cape, leotard, and S-crest breaking through a chain with his chest, ER-654; SER-386; and (3) "the scientific explanation on page 1 … and the last panel," ER-654.

These additions were made at DC's instance and expense, further making *Action Comics #1* and the Superman story therein a joint work that will always be co-owned by DC.  Siegel's sworn affidavit avers that he and Shuster created this material *only after* DC told the pair they "could proceed" and agreed to publish their work.  ER-654.  DC also had the "right to control or supervise" Siegel and Shuster's work, and in fact exercised that right.  *See Fox*, 429 F.3d at 879.  DC sent Siegel and Shuster a letter on February 1, 1938, directing them to "[s]tart immediately on the thirteen (13) page feature of SUPERMAN for the new Action Comics Magazine."  SER-379.  DC instructed the pair to adapt the Preexisting Material "into a full length … strip suitable for magazine production," demanding

that their work be "the very best" and "without imperfections."  ER-957; SER-381.

Siegel and Shuster "compli[ed] with the said request of DC" and submitted the

revised and expanded material on February 22, 1938.  ER-957.  DC later chastised

the pair for failing to comply with the formatting requirements, saying that if DC

were not so pressed for time, it "would have rejected" their submission.  SER-383.

Siegel and Shuster's additions were also created at DC's expense—Siegel

and Shuster were paid for their *Action Comics #1* contributions, and DC assumed

the financial risk and burden of publishing, distributing, and marketing *Action

Comics #1*.  ER-75, 425-27, 917, 958, 960; SER-383, 804.

> b. National *Is Not Preclusive As To The Work-For-Hire Status Of* Action
> Comics #1

The court below erroneously held that the "thrust" of DC's argument that

key elements of *Action Comics #1* were made-for-hire "was made and rejected" in

*National* "and is thus precluded as a matter of collateral estoppel."  SER-46.

Collateral estoppel applies only where "the matter raised in the second suit is

identical in all respects with that decided in the first proceeding."  *Comm'r v.

Sunnen*, 333 U.S. 591, 599-600 (1948); *see Granite Rock Co. v. Teamsters*, 649

F.3d 1067, 1070 (9th Cir. 2011).  That threshold requirement is not satisfied here.

The issue in *National* was whether Siegel and Shuster owned the renewal

copyright in the Superman story in *Action Comics #1*.  364 F.Supp. at 1033.  That

publication, which contained multiple comic features, was considered a periodical

**EXHIBIT 64**
**1337**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 106 of 347
Case 1:11-cv-09663-ODW-RZ Document 500-12 DktEntry: 81 Filed 03/25/2012 Page 3 of 347
Page ID #:32925

magazine under the 1909 Act. 17 U.S.C. §24 (1909). That Act provided that the owner of a copyright in a periodical magazine (*i.e.*, DC) could obtain a renewal copyright for the entirety of the magazine, and the author of a discrete portion of that magazine could obtain a renewal copyright for its discrete contribution— unless it was a work-for-hire. *Id.* DC's predecessor, National, renewed the copyright in the entirety of *Action Comics #1* in 1965 "as a proprietor of a work for hire." ER-1018. In 1969, Siegel and Shuster sued National for a declaration that they owned the renewal copyright for the Superman story in *Action Comics #1*.

The district court in *National* found against Siegel and Shuster on two separate, independent grounds. First, the parties' prior agreements assigned all of their rights in Superman to DC, including any copyright renewal rights. *Nat'l*, 364 F.Supp. at 1037-38. Second, the Westchester Court's prior findings concerning the creation of *Action Comics #1* were binding and compelled the conclusion that Siegel and Shuster's contribution was a work-for-hire. *Id.* at 1035-37.

The Second Circuit affirmed on the sole basis that Siegel and Shuster had assigned their renewal rights to DC. *Nat'l*, 508 F.2d at 914. As such, the Second Circuit did not need to reach the second basis for the district court's ruling. In dicta, however, the Second Circuit disagreed with that ruling, stating that "there was no conclusion of law in the [Westchester Action] that the comic strip was a work for hire so as to create the presumption that the employer was the author."

*Id.* The Second Circuit also commented that the evidence was not otherwise "sufficient to create the presumption that the strip was a work for hire" as to Siegel and Shuster's contribution to *Action Comics #1*. *Id.* But neither the district court nor the Second Circuit reached the opposite conclusion, much less considered whether Superman elements in *Action Comics #1* that were created by DC other artists or added by Siegel and Shuster at DC's instance and expense were works-for-hire—the questions now before this Court. This alone forecloses application of collateral estoppel. *Granite Rock*, 649 F.3d at 1070.

It is irrelevant that, as the court below found, "much of the evidence" cited in DC's motion to prove that the Additional Material was made-for-hire "could have been admitted [in *National*]," but was not. SER-46-48. Collateral estoppel applies only where the identical issue was "actually litigated" and "necessarily decided." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002); *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995).

Nor was the Second Circuit's limited discussion of the work-for-hire issue "necessary to support a valid and final judgment on the merits," as is also required. *Simon*, 310 F.3d at 288-89; *see Shaw*, 56 F.3d at 1132 n.5. The Second Circuit's ruling was based on its finding that Siegel and Shuster assigned all of their rights to DC. Its rejection of the district court's alternative work-for-hire ruling clearly was not "necessary" to its judgment *in DC's favor* affirming that Siegel and Shuster did

70
**EXHIBIT 64**
**1339**

not own any renewal copyright in *Action Comics #1*. Such dicta has "no preclusive

effect," *EPIC, Inc. v. Pac. Lumber Co.*, 257 F.3d 1071,1077 (9th Cir. 2001), just as

"determination[s] adverse to the winning party do not have preclusive effect,"

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985).

The district court's ruling should be reversed, and this Court should rule as a

matter of law that DC owns the color elements and cover art in *Action Comics #1*,

as well as the material added by Siegel and Shuster in 1938.

### 2. *Pre-McClure Strips*

#### a. *The Pre-McClure Strips Were Made At DC's Instance And Expense*

After entering into the 1937 Employment Agreement and assigning all of

their Superman rights to DC in the 1938 Assignment, but before the parties'

business relationship with McClure was formalized in the Syndication Agreement,

Siegel and Shuster drafted two weeks of newspaper strips on behalf of DC. ER-

615; SER-582-89. The court below wrongly concluded that these Pre-McClure

Strips were not made-for-hire because they were created before the Syndication

Agreement. ER-109-14.

The Syndication Agreement was not necessary to establishing that the Pre-

McClure Strips were made at DC's instance and expense. The Pre-McClure Strips

were created during the term of the 1937 Employment Agreement and, even more

significantly, after DC became 100% owner of all rights in Superman pursuant to

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 109 of 347
Case 1:11-cv-58663-ODW-RZ 03/23/2012 Document 500-12 Dkt Entry: 81 10/12 Page 86-09 of 347
Page ID #:32928

the 1938 Assignment. *Supra* at 11-12. Given that assignment, DC had full

authority to control the development of Superman by artists of its choosing,

making any resulting derivative work a work-for-hire. *Supra* at 47.

The district court erroneously assumed that "Siegel created the script and

Shuster created the artwork for the [Pre-McClure Strips] without any indication

that they received permission to do so beforehand from Detective Comics." ER-

111. As Siegel's own account makes clear, these strips were only completed *after*

DC gave its consent. ER-615-17, 620. Siegel created a "script"—which did not

include any artwork—and sent it to McClure. ER-615. He then approached DC to

request permission to proceed. ER-616. DC responded that Siegel needed a

"definite offer" from a syndicate. *Id.* It was only then that Shuster "illustrat[ed

Siegel's] script" and Siegel sent the completed strips to McClure. *Id.*

DC also incurred the expense of compensating Siegel and Shuster for their

work on the Strips, and (along with McClure) bore the financial risk of the Strips'

success. ER-609-11, 466. The Pre-McClure Strips were, in short, made at DC's

instance and expense, just like other derivative Superman works produced under

similar conditions during the same time period.

    b.    *Larson's Failure To List The Pre-McClure Strips In Her Termination
        Notice Also Precludes Termination*

Wholly apart from their status as works-for-hire, there is a separate reason

Larson cannot terminate DC's rights in the Pre-McClure Strips: Larson did not

EXHIBIT 64
1341

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 110 of 347
Case 11-cv-59063-ODW/23/2012 Document 505-12 Dkt Entry: 81-10 Page 110 of 347
Page ID #:32929

identify them in her termination notice, as the Copyright Act requires. ER-1023-92.

The Act requires that a termination notice "comply, in form, content, and manner of service, with requirements" that the Copyright Office prescribes. 17 U.S.C. §304(c)(4)(B); *see id.* §702. The Copyright Office's regulations provide that such a notice must "include a clear identification" of "[t]he title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number." 37 C.F.R. §201.10(b)(1)(ii). It is undisputed that Larson's Notices provide *none* of this information for the Pre-McClure Strips—no title, author, copyright date, or registration number.

The court below nevertheless held that this violation of §201.10(b)(1)(ii) was "harmless error," because the Notices include a "catch-all" footnote:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories …. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

ER-132-33; SER-1026. Under 37 C.F.R. §201.10(e)(1), however, an error in a termination notice is harmless only when it "do[e]s not materially affect the

**EXHIBIT 64**
**1342**

adequacy of the information required to serve the purposes of [17 U.S.C.

§304(c)]." Section 201.10(e)(2) identifies the types of immaterial mistakes

covered by this rule: good-faith errors made in (1) "giving the date or registration

number," (2) identifying the "effective date of termination," (3) "or in describing

the precise relationships" between deceased authors and their statutory heirs. The

C.F.R. comments confirm that the harmless error rule applies only to mistakes

concerning those "specific items" of information. 42 F.R. 45917-19.

　　　None of that applies to the error here, which involves the *complete omission*

of *all* information required by §201.10(b)(1)(ii) concerning the Pre-McClure

Strips. Larson's Notice deprived DC of any "reasonable opportunity to identify the

affected grant and work from the information given in the notice," 42 F.R. 45916-

21, 45918, and denied the public its right under the Act to "constructive notice of

the facts stated in the recorded document," which is supposed to "specifically

identif[y] the work to which it pertains," 17 U.S.C. §§304(c)(4), 205.

　　　The only case to consider this issue confirmed that the complete omission of

a work from a termination notice bars recapture of that work. In *Burroughs v. M-

G-M, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982), the heirs of Tarzan's creator served a

termination notice listing 35 Tarzan stories, including the first, but omitting five

later Tarzan works. The Second Circuit affirmed the district court's conclusion

that the notice was invalid as to the unlisted works, even though their omission was

"undoubtedly inadvertent," and even though the works contained elements in

common with other Tarzan works that were listed and could be recaptured. *Id.*

Although *Burroughs* did not use the words "harmless error." ER-36-37, the

necessary implication was that the heirs' "inadvertent" omission was not harmless.

     Rather than follow *Burroughs*, the district court relied on *Music Sales Corp.*

*v. Morris*, 73 F.Supp.2d 364 (S.D.N.Y. 1999), but that case actually supports DC's

position. *Morris* considered whether a termination notice's vague description of

the grant to be terminated was sufficient to satisfy §201.10(b)(1)(iv)'s notice

requirement. *Morris* did not hold that the failure to identify a *work* was harmless.

To the contrary, it acknowledged that a notice "must list all the works in which the

grantee's rights are to be terminated," and twice emphasized that "only the works

specified in a termination notice are terminated." *Id.* at 378, 380 & 380 n.29.[22]

     The district court cited four additional reasons that Larson's omission of the

Pre-McClure Strips from her termination notice was harmless. None is persuasive.

---

[22] As for the vague grant definition *Morris* addressed, the court held it adequate
because "it appears to be boilerplate on termination notices customarily accepted
by the Register of Copyrights" for recordation. *Id.* at 378. The court read that
statement to demonstrate "how little concrete information need be conveyed and
yet still be considered adequate." ER-18. But 37 C.F.R. §201.10(f)(6) (formerly
(f)(5)) provided at the time that mere recordation of a termination notice by the
Copyright Office "does not mean that it is otherwise sufficient under the law," and
that recordation "is without prejudice to any party claiming that the legal and
formal requirements for issuing a valid notice have not been met." The Copyright
Office has recently reaffirmed that "recordation of a notice does not mean that the
notice meets the requirements of the law." 76 F.R. 32320 (June 6, 2011).

**EXHIBIT 64**
**1344**

*First*, it found that the Pre-McClure Strips were inextricable from the works listed in the Notices because "the Superman character exists as a conglomerate." ER-28, 31. Larson, however, is only entitled to recapture rights in certain *works*, not an entire character. *See Burroughs*, 683 F.2d at 622-23; 1 WILLIAM F. PATRY, PATRY ON COPYRIGHT §3:164 (1st ed. 2007).

*Second*, the district court found that the catch-all footnote's reference to "Krypton" pointed to the Pre-McClure Strips, which contained the first use of "Krypton." ER-16, 17. But the footnote listed *dozens* of common Superman elements, the vast majority of which were undeniably created by DC and thus not subject to termination—including, *e.g.*, "Smallville," the town where Superman grew up; "Kryptonite," fragments of Krypton that have the power to harm Superman; Clark Kent's co-workers "Jimmy Olsen" and "Perry White"; villain "Lex Luthor"; Superman's adoptive parents, the Kents; love interest "Lana Lang"; and allies like "Supergirl." ER-1026, 2036. The unsurprising fact that the long list of elements in the Notices included *one* element that appeared in the Pre-McClure Strips hardly suffices to give notice that Larson sought to terminate those strips.

*Third*, the district court cited the relatively low number of works omitted from the voluminous Notices. ER-28-29, 132. This makes no sense. Of the more than 15,000 works listed in the Notices, only 15 were deemed subject to termination by the court below: *Action Comics #1*, *Action Comics #4*, portions of

**EXHIBIT 64**
**1345**

*Superman #1*, and the 12 Pre-McClure Strips. ER-80, 189. The remaining 15,000-plus works reflect obvious overreaching. The 12 Pre-McClure Strips, which represent 80% of the works held to be terminated, were completely omitted from the Notices. The district court's rule would create a perverse incentive to waste hundreds of pages listing non-terminable works to preserve the argument that the notice was intended to encompass all potentially terminable works.

*Fourth*, the court said the "amount of effort" Larson took to prepare the Notices weighed in favor of harmless error. ER-4. But weighing the terminating party's effort in the harmlessness analysis would override the essential balance struck by §201.10(b)(1)(ii). In crafting the provision, the Copyright Office adopted authors' requests to delete certain requirements as unduly burdensome, while accepting movie studios' request to ensure that notices contain "information necessary to give notice" to grantees. 42 F.R. 45917-18. The "amount of effort" required to file a proper notice, in other words, is reflected in the notice requirements themselves—it cannot excuse the failure to meet those requirements.

3. *Pages 3-6 Of* Superman #1

*Superman #1* contains the Superman stories published in *Action Comics #1-#4*, plus some new material. As for the story based on *Action Comics #1*, DC revised the first two pages (which the district court held were made-for-hire, ER-81), and added four new pages. ER-761. The court below erroneously concluded

that these four new pages—which became pages 3-6 of *Superman #1*—were not

made-for-hire based on hearsay speculation by commentator James Steranko in a

foreword to DC's 1989 reprinting of *Superman #1*.  ER-81.

Steranko opined that, "according to legend," these pages were part of the

original Superman story created by Siegel and Shuster in 1935—before their

employment by DC—but were cut from *Action Comics #1*.  SER-272.  Siegel

himself debunked this theory in his memoir, explaining:  "[Commentators] state

Superman magazine No. 1 contains pages omitted from the Action Comics No. 1

origin story.  *The truth is that the additional pages were specifically created for

use in Superman Magazine No. 1*."  SER-803 (emphasis added).  Siegel also

recounted in *The Story Behind Superman No. 1* that a DC editor sent him a letter

on March 27, 1939 specifying in detail the contents of "the first six pages,"

including specific panels and headings.  ER-761.  That is, pages 3-6 were created

along with the rest of *Superman #1* in 1939—*after* Siegel was employed by DC—

and were thus made as a work-for-hire.[23]

---

[23] Even beyond Siegel's direct repudiation of the "legend," the law requires
evidence, not folklore.  *See Fox*, 429 F.3d at 880 n.3 (rejecting hearsay statements
in magazine that Eisenhower wrote portions of manuscript before being retained by
Doubleday); *accord U.S. v. Resnick*, 594 F.3d 562, 570 n.4 (7th Cir. 2010); *Kirby*,
777 F.Supp.2d at 729; *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, *7-8
(S.D. Ohio Mar. 6, 2001).  The district court appeared to assume that the party-
admission rule would apply because DC published the reprint of *Superman #1*
containing Steranko's foreword.  ER-81.  But there is no evidence that Steranko
was speaking on DC's behalf, *cf.* FED. R. EVID. 801(d)(2)(A) (party-admission rule

4.     *Artwork In* Action Comics #4

The district court held that Siegel wrote a script in 1934 "telling the story of

Superman interceding in a college football game and using his superpowers on the

field," which was incorporated into *Action Comics #4*.  ER-51-52, 77-80.  It is

undisputed that Siegel did not create *any* artwork to accompany his 1934 script.

Even so, the district court held that Larson could recapture the artwork created for

*Action Comics #4*.  ER-77-90.

That conclusion was wrong for two reasons.  First, DC created the artwork

and thus owns it as a work-for-hire.  *See Scherr v. Universal Match Corp.*, 417

F.2d 497 (2d Cir. 1969).  In *Scherr*, a soldier created a "small clay table model" of

an infantryman, and an officer asked him to create a large statue based on the

model.  417 F.2d at 499.  The court held that the large statue was made-for-hire,

because "[w]hile the idea for the statue originated from the smaller clay model, the

statue differs from the model."  *Id.*  Here, the distinction between Siegel's 1934

script and *Action Comics #4* is equally or more substantial—unlike the script,

*Action Comics #4* contains 99 panels of detailed artwork illustrating the story.  ER-

551-58.  That artwork did not exist at all prior to Siegel's employment by DC.

Because the artwork possesses "more than a *de minimis* quantum of creativity," it

---

applies to statements made "in an individual or representative capacity"), and even
if he were, the foreword obviously contains multiple levels of hearsay.

**EXHIBIT 64**
**1348**

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946). Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

5.   *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works. DC argued—and the district court agreed—that Larson failed to recapture

**EXHIBIT 64**
**1349**

the Announcements published before *Action Comics #1* because they fell outside
the Notice's statutory time limit.  SER-43-44; 699-712.  Larson has not appealed
that holding, waiving any right to challenge it.  *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments
concerning the copyrightable elements in the Announcements, based on the court's
review of a poor, multiple-generation photocopy.  SER-44-45.  DC filed a motion
for clarification asserting that these statements could not be binding because
neither party moved for summary judgment as to the scope of the Announcements.
SER-328-343.  The district court found otherwise, on the ground that Larson's
opposition to DC's motion raised "questions concerning the scope of the
copyrightable material contained in those announcements."  SER-1.  Larson's
opposition, however, contended only that DC's motion raised "classic issues of
fact" concerning the scope of rights in the Announcements, "precluding summary
judgment" on the very scope question the court then decided.  SER-356-57.
Indeed, an entire section of Larson's brief was titled "The Question Of What
Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of
Material Fact."  SER-356.  On reply, DC fully agreed that this issue should be
reserved for trial and was *not* an issue for summary judgment.  ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party
must have "reasonable notice" and "a full and fair opportunity to ventilate the

EXHIBIT 64
1350

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). DC had neither. The only issue on summary judgment was whether the Announcements were covered by Larson's Notices. While the scope question came up in briefing, both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard. Because the only issue properly before the court was when the Announcements were first published—and not their copyrightable content—DC did not present original versions of them. Instead, DC appended a multiple-generation photocopy from *More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics #15*. *See* SER-329-43. After reviewing these poor copies, the district court stated at oral argument: "[Y]ou can hardly make out whether it's an 'S' or a '5' or what it is on his chest." SER-339-340 . Rather than reserving the issue for trial or reviewing an original version, the court's summary judgment order concluded that "the 'S' crest" is not "recognizable." SER-44.

That ruling was incorrect. Where, as here, the content of a work is at issue, "[a]n original writing … is required in order to prove its content." FED. R. EVID. 1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986). Given "the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*, 625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

**EXHIBIT 64**
**1351**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 120 of 347
Case 1:11-cv-58663-OC 03/23/2012 Document 599-12 Dkt Entry: 81-12 Pages 120 of 347
Page ID #:32939

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.



# BRAND NEW!

## *AND JUST WHAT YOU'VE BEEN WAITING FOR --*

Look for this dandy new magazine filled with original adventure features and pictures in

### *Color!*

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

### *10c at all Newsstands*

## SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

**VINCENT A. SULLIVAN**

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

**GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.**

*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*

**EXHIBIT 64**

**1353**



*Version Electronically Filed By DC Below*



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the copyrightable elements in the Announcements can be determined at trial.

# CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and statute-of-limitations counterclaims and dismiss the remainder of this appeal on that basis. Alternatively, this Court should remand so the district court can hold a trial on these counterclaims and fully adjudicate Larson's First Claim and DC's First Counterclaim as well. If this Court decides to reach the merits of the parties' First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER                         DANIEL M. PETROCELLI
O'MELVENY & MYERS LLP                      MATTHEW T. KLINE
1625 Eye Street, N.W.                      CASSANDRA L. SETO
Washington, D.C. 20006                     O'MELVENY & MYERS LLP
                                           1999 Avenue of the Stars, 7th Floor
PATRICK T. PERKINS                         Los Angeles, California 90067
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: March 23, 2003

**EXHIBIT 64**
**1356**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief is accompanied by an unopposed motion for leave to file an oversize brief pursuant to Fed. R. App. P. 27, 28.1, and 32 and Circuit Rules 27-1 and 32-2 and is 19,862 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated:  March 23, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
_____
        Daniel M. Petrocelli
    Attorneys for Warner Bros.
    Entertainment Inc. and DC Comics

**EXHIBIT 64**
**1357**

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, DC identifies the following related cases currently pending before this Court:

1. *Pacific Pictures Corp. v. U.S. Dist. Ct.*, Appeal No. 11-71844 (9th Cir.) (filed June 30, 2011) (argued Feb. 7, 2012) (Kozinski, C.J.; O'Scannlain, J.; Smith, J.); and

2. *Pacific Pictures Corp. v. DC Comics*, Appeal No. 11-56934 (9th Cir.) (filed Nov. 2, 2011).

DC has filed concurrently herewith a motion requesting assignment of these appeals to the same panel that is presiding over Appeal No. 11-71844.

Dated:  March 23, 2012                    O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Warner Bros.
Entertainment Inc. and DC Comics

**EXHIBIT 64**
**1358**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 127 of 347
Page ID #:32946
Case 1:11-cv-08633-ODW-RZ Document 500-12 DktEntry: 19-1 Page 542 of 713

## ADDENDUM

Except for the following, all applicable statutes, rules, and regulations, are contained in the Statutory Addendum of Appellant Laura Siegel Larson's First Brief On Cross-Appeal.

### 17 U.S.C. § 4 (1909) (repealed 1976)

§ 4. ALL WRITINGS OF AUTHOR INCLUDED.—The works for which copyright may be secured under this title shall include all the writings of an author.

### 17 U.S.C. § 7 (1909) (repealed 1976)

§ 7. COPYRIGHT ON COMPILATIONS OF WORKS IN PUBLIC DOMAIN OR OF COPYRIGHTED WORKS; SUBSISTING COPYRIGHTS NOT AFFECTED.— Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with, the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

A-1

**EXHIBIT 64**
**1359**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 128 of 347
Case 2:10-cv-03633-ODW-RZ Document 500-12 Dkt Entry 14-9 Page ID #:32528 of 347
Page ID #:32947

No copyright shall subsist in the original text of any work which is in the public domain, or in any work which was published in this country or any foreign country prior to July 1, 1909, and has not been already copyrighted in the United States, or in any publication of the United States Government, or any reprint in whole or in p art, thereof, except that the Postmaster General may secure copyright on behalf of the United States in the whole or any part of the publications authorized by section 2506 of title 39.

The publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor.

## **37 C.F.R. § 201.10**

This section covers notices of termination of transfers and licenses under sections 203, 304(c) and 304(d) of title 17, of the United States Code. A termination under section 304(d) is possible only if no termination was made under section 304(c), and federal copyright was originally secured on or between January 1, 1923, and October 26, 1939.

(a) Form. The Copyright Office does not provide printed forms for the use of persons serving notices of termination.

A-2

**EXHIBIT 64**
**1360**

(b) Contents.

    (1) A notice of termination covering the extended renewal term under sections 304(c) and 304(d) of title 17, U.S.C., must include a clear identification of each of the following:

        (i) Whether the termination is made under section 304(c) or under section 304(d);

        (ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

        (iii) The title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number;

        (iv) A brief statement reasonably identifying the grant to which the notice of termination applies;

        (v) The effective date of termination;

        (vi) If termination is made under section 304(d), a statement that termination of renewal term rights under section 304(c) has not been previously exercised; and

A-3

**EXHIBIT 64**
**1361**

(vii) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant. In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed

A-4

**EXHIBIT 64**
**1362**

by all persons whose signature is necessary to terminate the grant under section 304 of title 17, U.S.C., or by their duly authorized agents.

(2) A notice of termination of an exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, under section 203 of title 17, U.S.C., must include a clear identification of each of the following:

(i) A statement that the termination is made under section 203;

(ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

(iii) The date of execution of the grant being terminated and, if the grant covered the right of publication of a work, the date of publication of the work under the grant;

(iv) For each work to which the notice of termination applies, the title of the work and the name of the author or, in the case of a joint work, the authors who executed the grant being terminated; and, if possible and practicable, the original copyright registration number;

(v) A brief statement reasonably identifying the grant to which the notice of termination applies;

A-5

**EXHIBIT 64**
**1363**

(vi) The effective date of termination; and

(vii) In the case of a termination of a grant executed by one or more of
the authors of the work where the termination is exercised by the
successors of a deceased author, a listing of the names and
relationships to that deceased author of all of the following, together
with specific indication of the person or persons executing the notice
who constitute more than one-half of that author's termination interest:
That author's surviving widow or widower; and all of that author's
surviving children; and, where any of that author's children are dead,
all of the surviving children of any such deceased child of that author;
however, instead of the information required by this paragraph
(b)(2)(vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently
available to the person or persons signing the notice, with a
brief explanation of the reasons why full information is or may
be lacking; together with

(B) A statement that, to the best knowledge and belief of the
person or persons signing the notice, the notice has been signed
by all persons whose signature is necessary to terminate the

A-6

**EXHIBIT 64**
**1364**

Case 2:11-cv-03663-ODW-RZ Document 500-12 DktEntry 194-9 Page 133 of 347
Page ID #:32952

grant under section 203 of title 17, U.S.C., or by their duly

authorized agents.

(3) Clear identification of the information specified by paragraphs (b)(1) and

(b)(2) of this section requires a complete and unambiguous statement of

facts in the notice itself, without incorporation by reference of information in

other documents or records.

(c) Signature.

(1) In the case of a termination of a grant under section 304(c) or section

304(d) executed by a person or persons other than the author, the notice shall

be signed by all of the surviving person or persons who executed the grant,

or by their duly authorized agents.

(2) In the case of a termination of a grant under section 304(c) or section

304(d) executed by one or more of the authors of the work, the notice as to

any one author's share shall be signed by that author or by his or her duly

authorized agent. If that author is dead, the notice shall be signed by the

number and proportion of the owners of that author's termination interest

required under section 304(c) or section 304(d), whichever applies, of title

17, U.S.C., or by their duly authorized agents, and shall contain a brief

statement of their relationship or relationships to that author.

A-7

**EXHIBIT 64**
**1365**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 134 of 347
Case 2:01-cv-08833-ODW-RZ Document 500-12 Dkt Entry 19-1-9 Page 134 of 1
Page ID #:32953

(3) In the case of a termination of a grant under section 203 executed by one or more of the authors of the work, the notice shall be signed by each author who is terminating the grant or by his or her duly authorized agent. If that author is dead, the notice shall be signed by the number and proportion of the owners of that author's termination interest required under section 203 of title 17, U.S.C., or by their duly authorized agents, and shall contain a brief statement of their relationship or relationships to that author.

(4) Where a signature is by a duly authorized agent, it shall clearly identify the person or persons on whose behalf the agent is acting.

(5) The handwritten signature of each person effecting the termination shall either be accompanied by a statement of the full name and address of that person, typewritten or printed legibly by hand, or shall clearly correspond to such a statement elswhere in the notice.

(d) Service.

(1) The notice of termination shall be served upon each grantee whose rights are being terminated, or the grantee's successor in title, by personal service, or by first-class mail sent to an address which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title.

A-8

**EXHIBIT 64**
**1366**

Case 1:01-cv-33063-03/23/2012 Document 599-12 Dkt Entry 19-1-9/12 Page 135 of 13

(2) The service provision of section 203, section 304(c) or section 304(d) of title 17, U.S.C., whichever applies, will be satisfied if, before the notice of termination is served, a reasonable investigation is made by the person or persons executing the notice as to the current ownership of the rights being terminated, and based on such investigation:

> (i) If there is no reason to believe that such rights have been transferred by the grantee to a successor in title, the notice is served on the grantee; or

> (ii) If there is reason to believe that such rights have been transferred by the grantee to a particular successor in title, the notice is served on such successor in title.

(3) For purposes of paragraph (d)(2) of this section, a reasonable investigation includes, but is not limited to, a search of the records in the Copyright Office; in the case of a musical composition with respect to which performing rights are licensed by a performing rights society, a "reasonable investigation" also includes a report from that performing rights society identifying the person or persons claiming current ownership of the rights being terminated.

(4) Compliance with the provisions of paragraphs (d)(2) and (d)(3) of this section will satisfy the service requirements of section 203, section 304(c),

A-9

**EXHIBIT 64**
**1367**

or section 304(d) of title 17, U.S.C., whichever applies. However, as long as the statutory requirements have been met, the failure to comply with the regulatory provisions of paragraph (d)(2) or (d)(3) of this section will not affect the validity of the service.

(e) Harmless errors.

(1) Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of section 203, section 304(c), or section 304(d) of title 17, U.S.C., whichever applies, shall not render the notice invalid.

(2) Without prejudice to the general rule provided by paragraph (e)(1) of this section, errors made in giving the date or registration number referred to in paragraph (b)(1)(iii), (b)(2)(iii), or (b)(2)(iv) of this section, or in complying with the provisions of paragraph (b)(1)(vii) or (b)(2)(vii) of this section, or in describing the precise relationships under paragraph (c)(2) or (c)(3) of this section, shall not affect the validity of the notice if the errors were made in good faith and without any intention to deceive, mislead, or conceal relevant information.

(f) Recordation.

A-10

**EXHIBIT 64**
**1368**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 137 of 347
Case 2:10-cv-03633-ODW-RZ Document 194-9 Filed 05/23/2012 Dkt Entry 194-9 Page 143 of 347
Page ID #:32956

(1) A copy of the notice of termination will be recorded in the Copyright Office upon payment of the fee prescribed by paragraph (2) of this paragraph (f) and upon compliance with the following provisions:

(i) The copy submitted for recordation shall be a complete and exact duplicate of the notice of termination as served and shall include the actual signature or signatures, or a reproduction of the actual signature or signatures, appearing on the notice; where separate copies of the same notice were served on more than one grantee or successor in title, only one copy need be submitted for recordation; and

(ii) The copy submitted for recordation shall be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice. In instances where service is made by first-class mail, the date of service shall be the day the notice of termination was deposited with the United States Postal Service.

(iii) The copy submitted for recordation must be legible per the requirements of §201.4(c)(3).

(2) The fee for recordation of a document is prescribed in §201.3(c).

(3) The date of recordation is the date when all of the elements required for recordation, including the prescribed fee and, if required, the statement

A-11

**EXHIBIT 64**
**1369**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 138 of 347
Case 2:11-cv-39863 05/23/2012 ID: 8165999 DktEntry: 19-4 Page: 538 of 817
Page ID #:32957

referred to in paragraph (f)(1)(ii) of this section, have been received in the Copyright Office. After recordation, the document, including any accompanying statement, is returned to the sender with a certificate of record.

(4) Notwithstanding anything to the contrary in this section, the Copyright Office reserves the right to refuse recordation of a notice of termination as such if, in the judgment of the Copyright Office, such notice of termination is untimely. Conditions under which a notice of termination will be considered untimely include: the effective date of termination does not fall within the five-year period described in section 203(a)(3) or section 304(c)(3), as applicable, of title 17, United States Code; or the documents submitted indicate that the notice of termination was served less than two or more than ten years before the effective date of termination. If a notice of termination is untimely or if a document is submitted for recordation as a notice of termination on or after the effective date of termination, the Office will offer to record the document as a "document pertaining to copyright" pursuant to §201.4(c)(3), but the Office will not index the document as a notice of termination.

(5) In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or

A-12

**EXHIBIT 64**
**1370**

after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created.

(6) A copy of the notice of termination shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect. However, the fact that the Office has recorded the notice does not mean that it is otherwise sufficient under the law. Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.

(7) Notices of termination should be submitted to the address specified in §201.1(b)(2).

A-13

**EXHIBIT 64**
**1371**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2012, I caused to be electronically filed the Principal And Response Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on March 23, 2012, at Los Angeles, California.

/s/ Cassandra Seto
Cassandra Seto

OMM_US:70649074

**EXHIBIT 64**
**1372**

# EXHIBIT 65

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY; LAURA SIEGEL LARSON; JEAN ADELE PEAVY, | No. 11-71844 <br><br> D.C. No. 2:10-cv-03633-ODW-RZ <br><br> AMENDED OPINION |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; MARC TOBEROFF, an individual; JEAN ADELE PEAVY; LAURA SIEGEL LARSON, an individual, <br><br>         Petitioners, <br><br>  v. <br><br> UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES, <br><br>         Respondent, <br><br> DC COMICS, <br><br>         Real Party in Interest. | |

**EXHIBIT 65**
**1373**

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted February 7, 2012
Pasadena, California

Filed April 17, 2012
Amended May 10, 2012

Before: KOZINSKI, Chief Judge, O'SCANNLAIN and N.R. SMITH, Circuit
Judges.

Opinion by Judge O'SCANNLAIN, Circuit Judge:

We must decide whether a party waives attorney-client privilege forever by
voluntarily disclosing privileged documents to the federal government.

I

In the 1930s, writer Jerome Siegel and illustrator Joe Shuster joined forces to
create the character that would eventually become Superman.  They ceded their
intellectual property rights to D.C. Comics when they joined the company as
independent contractors in 1937.[1]  Since the Man of Steel made his first
appearance in 1938, he has been fighting for "truth, justice, and the American

---

[1] The name and corporate structure of the real party in interest has changed a
number of times since 1938.  For simplicity, we refer to it as "D.C. Comics."

2

EXHIBIT 65
1374

Case 2:10-cv-03633-ODW-RZ   Document 500-12   Filed 10/10/12   Page 144 of 347
Case: ev-03633   09/10/2012   ID: 835052   DktEntry: 39-12   Page 3 of 19
Page ID #:32963

way."  Shuster, Siegel, their heirs ("Heirs"), and D.C. Comics have been fighting for the rights to his royalties for almost as long.

Marc Toberoff, a Hollywood producer and a licensed attorney, stepped into the fray around the turn of the millennium.  As one of his many businesses, Toberoff pairs intellectual property rights with talent and markets these packages to movie studios.  Having set his sights on Superman, Toberoff approached the Heirs with an offer to manage preexisting litigation over the rights Siegel and Shuster had ceded to D.C. Comics.  He also claimed that he would arrange for a new Superman film to be produced.  To pursue these goals, Toberoff created a joint venture between the Heirs and an entity he owned.  Toberoff served as both a business advisor and an attorney for that venture.  The ethical and professional concerns raised by Toberoff's actions will likely occur to many readers, but they are not before this court.

While the preexisting litigation was pending, Toberoff hired a new lawyer to work for one of his companies.  This attorney remained in Toberoff's employ for only about three months before allegedly absconding with copies of several documents from the Siegel and Shuster files.  Unsuccessful in his alleged attempt to use the documents to solicit business from the Heirs, this attorney sent the documents to executives at D.C. Comics.  While he did not include his name with

3

**EXHIBIT 65**
**1375**

the package, he did append a cover letter, written in the form of a timeline,

outlining in detail Toberoff's alleged master plan to capture Superman for himself.

This happened no later than June 2006, and the parties have been battling

over what should be done with these documents ever since.  Rather than exploiting

the documents, D.C. Comics entrusted them to an outside attorney and sought to

obtain them through ordinary discovery in the two ongoing lawsuits over

Superman.  Considering every communication he had with the Heirs to be

privileged—regardless of whether the communication was in his capacity as a

business advisor or an attorney—Toberoff resisted all such efforts.  Ultimately, in

April 2007, a magistrate judge ordered certain documents, including the attorney's

cover letter, turned over to D.C. Comics.  A few months later, Toberoff at long last

reported the incident to the authorities (specifically the Federal Bureau of

Investigation).  In December 2008, Toberoff finally produced at least some of the

documents.

In 2010, D.C. Comics filed this lawsuit against Toberoff, the Heirs, and

three entities in which Toberoff owned a controlling interest (collectively, the

"Petitioners"), claiming that Toberoff interfered with its contractual relationships

with the Heirs.  The attorney's cover letter formed the basis of the lawsuit and was

incorporated into the complaint.  Toberoff has continued to resist the use of any of

4

**EXHIBIT 65**
**1376**

the documents taken from his offices, including those already disclosed to D.C.

Comics and especially the cover letter.

About a month after the suit was filed, Toberoff asked the Office of the

United States Attorney for the Central District of California to investigate the theft.

In response to a request from Toberoff, the U.S. Attorney's Office issued a grand

jury subpoena for the documents as well as a letter stating that if Toberoff

voluntarily complied with the subpoena the Government would "not provide the . .

. documents . . . to non-governmental third parties except as may be required by

law or court order." The letter also confirmed that disclosure would indicate that

"Toberoff has obtained all relevant permissions and consents needed (if any) to

provide the . . . documents . . . to the government." Armed with this letter,

Toberoff readily complied with the subpoena, making no attempt to redact

anything from the documents.

D.C. Comics immediately requested all documents disclosed to the U.S.

Attorney, claiming that the disclosure of these unredacted copies waived any

remaining privilege. Examining the weight of authority from other circuits, the

magistrate judge agreed that a party may not selectively waive attorney-client

privilege. The magistrate judge reasoned that, because a voluntary disclosure of

privileged materials breaches confidentiality and is inconsistent with the theory

5

EXHIBIT 65
1377

behind the privilege, such disclosure waives that privilege regardless of whether the third party is the government or a civil litigant.  Having delivered the documents to the government, the magistrate judge concluded, Petitioners could not rely on the attorney-client privilege to shield them from D.C. Comics.

However, the magistrate judge noted that this circuit has twice declined to decide whether a party may selectively waive the attorney-client privilege, and stayed his order to allow Petitioners to seek review.  The district court denied review.  Petitioners seek to overturn the magistrate's order through a writ of mandamus.

## II

A writ of mandamus is an extraordinary remedy.  A party seeking the writ has the "burden of showing that [his] right to the issuance of the writ is clear and indisputable."  *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 656 (9th Cir. 1977) (internal quotation marks omitted).  In evaluating whether a petitioner has met that burden, we consider: (1) whether he "has no other adequate means" of seeking relief; (2) whether he "will be damaged or prejudiced in a way not correctable on appeal" after final judgment; (3) whether the "district court's order is clearly erroneous as a matter of law"; (4) whether the order "is an oft-repeated error"; and (5) whether the order "raises new and important problems, or issues of first

**EXHIBIT 65**
**1378**

impression." *Id.* at 654–55. We have established no specific formula to weigh

these factors, but failure to show what is generally listed as the third factor, error, is

fatal to any petition for mandamus. *See Burlington N. & Santa Fe. Ry. v. U.S. Dist.*

*Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005).[2]

III

Under certain circumstances, the attorney-client privilege will protect

communications between clients and their attorneys from compelled disclosure in a

court of law. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Though

this in some way impedes the truth-finding process, we have long recognized that

"the advocate and counselor [needs] to know all that relates to the client's reasons

for seeking representation" if he is to provide effective legal advice. *Trammel v.*

*United States*, 445 U.S. 40, 51 (1980); *see also* 8 John Henry Wigmore, Evidence

§ 2290 (John T. McNaughton, ed. 1961). As such, we recognize the privilege in

order to "encourage full and frank communication between attorneys and their

---

[2] Petitioners assert that, because this case presents an issue of first impression, they must demonstrate simple rather than clear error. We have not always been precise as to whether we look for "error" or "clear error" where our sister circuits have addressed an issue, but we have not. *Compare Anon. Online Speakers v. U.S. Dist. Ct.*, 661 F.3d 1168 (9th Cir. 2011) (applying the clear error standard in a circuit split situation), *with San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096 (9th Cir. 1999) (applying the simple error standard when other circuits had weighed in on parts of an issue). We assume but do not decide that Petitioners need show only error.

7

**EXHIBIT 65**
**1379**

clients and thereby promote broader public interests in the observance of law and

administration of justice." *Upjohn Co.*, 449 U.S. at 389.[3]

Nonetheless, because, like any other testimonial privilege, this rule

"contravene[s] the fundamental principle that the public has a right to every man's

evidence," *Trammel*, 445 U.S. at 50 (internal alterations and quotation marks

omitted), we construe it narrowly to serve its purposes, *see, e.g.*, *United States v.

Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[4]  In particular, we recognize several

ways by which parties may waive the privilege.  *See, e.g.*, *Hernandez v. Tanninen*,

604 F.3d 1095, 1100 (9th Cir. 2010).  Most pertinent here is that voluntarily

disclosing privileged documents to third parties will generally destroy the

privilege.  *Id.*  The reason behind this rule is that, "'[i]f clients themselves divulge

such information to third parties, chances are that they would also have divulged it

to their attorneys, even without the protection of the privilege.'"  Comment,

---

[3] Because Petitioners have never challenged the district court's application
of federal law, we assume but do not decide that this was correct even though this
case involves diversity claims to which state privilege law would apply.  *Lewis v.
United States*, 517 F.2d 236, 237 n.2 (9th Cir. 1975) (per curiam).

[4] Because no one challenges whether these communications would have
been privileged absent waiver, we do not address that issue.  For example, we
assume but do not decide that these communications were all made for the purpose
of obtaining legal as opposed to business advice.  *Cf. United States v. Ruehle*, 583
F.3d 600, 608 n.8 (9th Cir. 2009) (noting that business advice does not fall within
the purview of attorney-client privilege even if the advisor is a lawyer).

8

**EXHIBIT 65**
**1380**

*Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an Administrative Agency Investigation*, 130 U. Pa. L. Rev. 1198, 1207 (1982).  Under such circumstances, there simply is no justification to shut off judicial inquiry into these communications.

Petitioners concede that this is the general rule, but they assert a number of reasons why it should not apply to them.

A

Petitioners' primary contention is that because Toberoff disclosed these documents to the government, as opposed to a civil litigant, his actions did not waive the privilege as to the world at large.  That is, they urge that we adopt the theory of "selective waiver" initially accepted by the Eight Circuit, *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), but rejected by every other circuit to consider the issue since, *see In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1197 (10th Cir. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 295 (6th Cir. 2002) [hereinafter "*In re Columbia*"]; *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997); *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416–18 (Fed. Cir. 1997); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *Westinghouse Elec.*

9

**EXHIBIT 65**
**1381**

*Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425 (3d Cir. 1991); *In re Martin Marietta Corp.*, 856 F.2d 619, 623–24 (4th Cir. 1988); *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

As the magistrate judge noted, we have twice deferred judgment on whether we will accept a theory of selective waiver. *United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir. 2005) (per curiam); *Bittaker v. Woodford*, 331 F.3d 715, 720 n.5 (9th Cir. 2003) (en banc). But we share the concerns expressed by many of our sister circuits about the cursory analysis behind the *Diversified* rule. The Eighth Circuit—the first court of appeals to consider the issue—adopted what has become a highly controversial rule only because it concluded that "[t]o hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders." *Diversified*, 572 F.2d at 611. This apprehension has proven unjustified. Officers of public corporations, it seems, do not require a rule of selective waiver to employ outside consultants or voluntarily to cooperate with the government. *See, e.g.*, *Westinghouse Elec. Corp.*, 951 F.2d at 1426.

More importantly, such reasoning does little, if anything, to serve the public good underpinning the attorney-client privilege. That is, "selective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to

10

**EXHIBIT 65**
**1382**

government agencies, thereby extending the privilege beyond its intended

purpose." *Id.* at 1425.

It may well be that encouraging cooperation with the government is an

alternative route to the ultimate goal of promoting adherence to the law. *In re

Columbia*, 293 F.3d at 311 (Boggs, J., dissenting). And there are those who assert

that "an exception to the third-party waiver rule need [not] be moored to the

justifications of the attorney-client privilege." *Id.* at 308 (emphasis omitted). We

disagree. If we were to unmoor a privilege from its underlying justification, we

would at least be failing to construe the privilege narrowly. *Cf. Univ. of Pa. v.

EEOC*, 493 U.S. 182, 189 (1990) (citing *Trammel*, 445 U.S. at 50; *United States v.

Bryan*, 339 U.S. 323, 331) (1950)). And more likely, we would be creating an

entirely new privilege. *In re Qwest Commc'ns Int'l*, 450 F.3d 1179; *Westinghouse*,

951 F.2d at 1425.

It is not beyond our power to create such a privilege. *Univ. of Pa.*, 493 U.S.

at 189 (noting that Fed. R. Evid. 501 provides certain flexibility to adopt privilege

rules on a case-by-case basis). But as doing so requires balancing competing

societal interests in access to evidence and in promoting certain types of

communication, the Supreme Court has warned us not to "exercise this authority

expansively." *Id.*; *see also United States v. Nixon*, 418 U.S. 683, 710 (1974). Put

simply, "[t]he balancing of conflicting interests of this type is particularly a

11

**EXHIBIT 65**
**1383**

legislative function." *Univ. of Pa.*, 493 U.S. at 189.

Since *Diversified*, there have been multiple legislative attempts to adopt a theory of selective waiver. Most have failed. Report of the Advisory Committee on Evidence Rules, May 15, 2007, at 4, *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/2007-05-Committee_Report-Evidence.pdf (reporting the selective waiver provision separately from the general proposed rule); *SEC Statement in Support of Proposed Section 24(d) of the Securities Exchange Act of 1934*, 16 Sec. Reg. & L. Rep. 461 (Mar. 2, 1984). *But see* H.R. Rep. No. 870, 96th Cong., 1st Sess. (1980), codified at 15 U.S.C. § 1312. Given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here. *Univ. of Pa.*, 493 U.S. at 189 (requiring federal courts to be particularly cautious when legislators have "considered the relevant competing concerns but [have] not provided the privilege").

B

Petitioners next assert that even if we reject selective waiver as a general matter, we should enforce a purported confidentiality agreement based upon the letter from the U.S. Attorney's Office. Though no circuit has officially adopted such a rule, at least two have "left the door open to selective waiver" where there is a confidentiality agreement. *In re Columbia*, 293 F.3d at 301 (discussing

12

**EXHIBIT 65**
**1384**

*Steinhardt* and *Dellwood Farms, Inc. v. Cargill*, 128 F.3d 1122 (7th Cir. 1997));
*see also In re Qwest Commc'ns Int'l*, 450 F.3d at 1192–94 (describing such a rule
as a "leap" but declining to reject it completely).

Assuming that this letter constitutes a confidentiality agreement, Petitioners
have provided no convincing reason that post hoc contracts regarding how
information may be revealed encourage frank conversation at the time of the
advice. Indeed, as the Sixth Circuit has noted, while this approach "certainly
protects the expectations of the parties to the confidentiality agreement, it does
little to serve the 'public ends' of adequate legal representation that the attorney-
client privilege is designed to protect." *In re Columbia*, 293 F.3d at 303. Instead,
recognizing the validity of such a contract "merely [adds] another brush on an
attorney's palette [to be] utilized and manipulated to gain tactical or strategic
advantage." *Steinhardt*, 9 F.3d at 235; *cf. Permian Corp.*, 665 F.2d at 1221. And
it would undermine the public good of promoting an efficient judicial system by
fostering uncertainty and encouraging litigation. *Upjohn*, 449 U.S. at 393 (noting
that an "uncertain privilege . . . is little better than no privilege at all").

The only justification behind enforcing such agreements would be to
encourage cooperation with the government. But Congress has declined to adopt
even this limited form of selective waiver. *See Statement of Congressional Intent
Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817

13

**EXHIBIT 65**
**1385**

(2008), *reprinted in* Fed. R. Evid. 502 addendum to comm. n subdivision (d) (noting that Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation"). As such, we reject such a theory here.

## C

Petitioners next aver that, because Toberoff was the victim of the crime rather than the target of the grand jury probe, his disclosure should be treated differently. But if it is unnecessary to adopt a theory of selective waiver to encourage potential defendants to cooperate with the government, *In re Qwest Commc'ns Int'l*, 450 F.3d at 11; *Westinghouse*, 951 F.2d at 1425, it is even less necessary to do so to encourage victims to report crimes to the government. The desire to see the crime prosecuted is sufficient impetus to cooperate.

We are unconvinced by Petitioners' argument that adopting such a rule will drastically impair law enforcement attempts to investigate espionage against "attorneys, financial institutions, medical providers, national security agencies, judges, large corporations, or law firms." This has not occurred despite near universal rejection of a selective waiver rule. Furthermore, most of these documents are not covered by attorney-client privilege because they do not represent communications between a lawyer and his client for the purpose of obtaining legal advice. *Cf. Ruehle*, 583 F.3d 608–09 & n.8 (rejecting a

14

**EXHIBIT 65**
**1386**

presumption of privilege even when a communication involves a lawyer). And, even if they were originally covered by the privilege, they would eventually have to be made public if they are to become evidence in a criminal trial. To the extent that timing is a concern, it can be ameliorated by properly seeking a protective order. Fed. R. Evid. 502(d).

We are similarly unpersuaded that, because Toberoff was a victim of the crime, Petitioners have a common interest with the government. Rather than a separate privilege, the "common interest" or "joint defense" rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other. *See Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965); *see also In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases). However, a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. *Id.* Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten. *Cf. Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).

There is no evidence that Toberoff and the Office of the U.S. Attorney agreed before the disclosure jointly to pursue sanctions against Toberoff's former employee. Toberoff is not strategizing with the prosecution. He has no more of a

15

**EXHIBIT 65**
**1387**

common interest with the government than does any individual who wishes to see

the law upheld.  Furthermore, the statements here were not "intended to facilitate

representation" of either Toberoff or the government.  *Hunydee*, 355 F.2d at 185

(limiting privilege to those circumstances); *accord United States v. BDO Seidman*,

492 F.3d 806, 816 (7th Cir. 2007) (same).

D

Petitioners also argue that they should be treated differently because

Toberoff produced these documents subject to a subpoena.  Involuntary disclosures

do not automatically waive the attorney-client privilege.  *United States v. De La*

*Jara*, 973 F.2d 746, 749–50 (9th Cir. 1992).  But without the threat of contempt,

the mere existence of a subpoena does not render testimony or the production of

documents involuntary.  *Westinghouse Elec. Corp.*, 951 F.2d at 1414; *see also*

*United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990).  Instead, whether the

subpoenaed party "chose not to assert the privilege when it was appropriate to do

so is [also] relevant to the waiver analysis."  *In re Grand Jury Proceedings*, 219

F.3d 175, 187 (2d Cir. 2000); *cf. In re Subpoenas Duces Tecum*, 738 F.2d 1367,

1369–70 (D.C. Cir. 1984).

Toberoff both solicited the subpoena and "chose not to assert the privilege

when it was appropriate to do so. . . ."  *In re Grand Jury Proceedings*, 219 F.3d at

187.  That is, even though the subpoena specifically contemplated that Toberoff

16

**EXHIBIT 65**
**1388**

may choose to redact privileged materials, he did not.  Petitioners assert that the

U.S. Attorney would not have been satisfied with redacted documents, but we will

never know because Toberoff never tried.  As such, we conclude that the district

court properly treated the disclosure of these documents as voluntary.[5]

E

Finally, Petitioners asserted for the first time in oral argument that these

documents should remain confidential because the Heirs themselves did not take

the affirmative step to disclose the documents.  We generally do not consider

issues raised for the first time during oral argument, unless "failure to do so would

result in manifest injustice" and the appellee would not be prejudiced by such

consideration.  *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal

quotation marks and emphasis omitted).  There are several instances in which an

attorney's behavior may waive the privilege, even without an explicit act by the

client.  *See, e.g.*, *Himmelfarb v. United States*, 175 F.2d 924, 939 (9th Cir. 1949);

*see generally* 8 Wigmore, Evidence § 2325 (listing actual and implied consent as

well as theft of documents from the attorney's office).  As many of these

---

[5] As these preexisting documents were "sought for [their] own sake rather
than to learn what took place before the grand jury" and as their "disclosure will
not compromise the integrity of the grand jury process," Petitioners' argument that
the disclosure was protected by Federal Rule of Criminal Procedure 6(e)(2)(B) is
similarly without merit.  *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411–12 (9th
Cir. 1993).

17

**EXHIBIT 65**
**1389**

documents fall within these situations, we do not consider it a manifest injustice to hold Petitioners to their apparent acceptance of Toberoff's authority to waive the privilege on behalf of his clients, who have never disputed his authority to do so.[6]

## V

Because Petitioners have not established error, we need not discuss the other *Bauman* factors. The petition for mandamus is **DENIED**.

---

[6] Indeed, there is even circumstantial evidence that the Heirs affirmatively consented to Toberoff's actions. There is also evidence that Toberoff should himself be treated as a co-client. After all, Toberoff represented *all* of the Petitioners, including a joint venture between the Heirs and himself in which he had a controlling interest. As such, he likely had authority unilaterally to waive the privilege on at least some of these documents. Restatement (Third) of Law Governing Lawyers § 76 cmt. g; *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007).

**EXHIBIT 65**
**1390**

Case 2:10-cv-03633-ODW-RZ   Document 500-12   Filed 10/10/12   Page 160 of 347
Case 1:cv-03633-ODW-RZ   05/10/2012   ID: 8173905   DktEntry: 30-21   Page 196 of 95
Page ID #:32979

## COUNSEL

Richard B. Kendall, Kendall Brill & Klieger LLP, Los Angeles, California, argued the cause and filed the briefs for the petitioners.  With him on the briefs were Laura W. Brill, Kendall Brill & Kleiger, LLP, Los Angeles, California as well as Marc Toberoff and Keith G. Adams, Toberoff & Associates, P.C., Los Angeles, California.

Matthew T. Kline, O'Melveny & Myers LLP, Los Angeles, California, argued the cause and filed the brief for the real party in interest.  With him on the brief were Daniel M. Petrocelli and Cassandra L. Seto, O'Melveny & Myers LLP as well as Patrick T. Perkins, Perkins Law Office, P.C., Cold Spring, New York.

19

**EXHIBIT 65**
**1391**

# EXHIBIT 66

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 162 of 347
Case: 11-55863 09/24/2012 ID: 8335382 DktEntry: 49-12 Page 162 of 20 (1 of 150)
Page ID #:32981

APPELLATE CASE NO. 11-55863
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAURA SIEGEL LARSON
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee.*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

**APPELLANT LAURA SIEGEL LARSON'S MOTION TO STRIKE APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD AND PORTIONS OF PRINCIPAL AND RESPONSE BRIEF**

Appeal From The United States District Court for the Central District of California,
Case No. CV-04-08400 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
*mtoberoff@ipwla.com*
Keith G. Adams
*kgadams@ipwla.com*
Pablo D. Arredondo
*parredondo@ipwla.com*

22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff-Appellant,*
*Laura Siegel Larson, individually and*
*as personal representative of The Estate of*
*Joanne Siegel*

**EXHIBIT 66**
**1392**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................2

A.    The Record on Appeal Is Limited To The Materials Filed With The District Court ...................................................................................2

B.    Judicial Notice Is Not a Means For An Appeals Court To Consider the Contents of Purported Evidence Not Presented to the District Court ............6

C.    This Court Should Strike Warner's Offending Portions of the Record and the Improper Argument Based Thereron ...................................................9

D.    Warner Attempts To Prejudice The Court With Irrelevancies ......................10

E.    Warner Should Be Sanctioned........................................................11

CONCLUSION ....................................................................................12

CERTIFICATE OF COMPLIANCE ..............................................................14

CERTIFICATE OF SERVICE ....................................................................15

i

**EXHIBIT 66**
**1393**

Case 2:10-cv-03633-ODW-RZ 09/24/2012 Document 190-12 Docketry: 42-12 Page 3 of 20 (3 of 150)

# TABLE OF AUTHORITIES

## Federal Cases

*Aluisi v. Unum Life Ins. Co. of Am.*,
407 Fed. Appx. 126 (9th Cir. 2010)...............................................................9

*Anton v. Mendez,*
2011 U.S. App. LEXIS 20798 (9th Cir. Sept. 27, 2011).........................3

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*,
289 F.3d 589 (9th Cir. 2002) ........................................................ 2-3, 5, 9

*Colbert v. Potter*,
471 F.3d 158 (D.C. Cir. 2006) ...................................................... 4

*Cootz v. General Tel. Co.*,
988 WL 131672 (9th Cir. Nov. 25, 1988) ................................................4

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006) ........................................................9

*Dela Rosa v. Scottsdale Mem'l Health Sys. Inc.*,
136 F.3d 1241 (9th Cir. 1998) ....................................................11

*Hammock v. Bowen*,
867 F.2d 1209 (9th Cir. 1989) .....................................................8

*Headwaters Inc. v. United States Forest Serv.*,
399 F.3d 1047 (9th Cir. 2005) ..................................................... 7

*Henderson v. State of Oregon*,
203 Fed. Appx. 45 (9th Cir. 2006).................................................7

*In re Weisband*,
BAP AZ-10-1239, 2011 WL 3303453 .................................................... 3

*In Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) ..................................................... 7

**EXHIBIT 66**
**1394**

*Jespersen v. Harrah's Operating Co., Inc.,*
444 F.3d 1104 (9th Cir. 2006) ................................. 6

*King v. AC & R Advertising,*
 65 F.3d 764 (9th Cir. 1995) .................................6

*Kirshner v. Uniden Corp. of Am.,*
842 F.2d 1074 (9th Cir. 1988) ................................. 3

*Lowry v. Barnhart,*
329 F.3d 1019 (9th Cir. 2003) ........................................*passim*

*Mangini v. United States,*
314 F.3d 1158 (9th Cir. 2003) ................................. 3-4

*Milne v. Stephen Slesinger, Inc.,*
156 Fed. Appx. 960 (9th Cir. 2005)...............................9

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.,*
23 F.3d 150 (9th Cir.1994) ................................3

*Peroulis v. Kozak,*
362 Fed. Appx. 727 (9th Cir. 2010) ........................ 6

*Rigsby v. Avenenti,*
1992 U.S. App. LEXIS 15480 (9th Cir. June 26, 1992)......................... 4

*Safron Capital Corp. v. Leadis Tech., Inc.,*
274 Fed. Appx. 540 (9th Cir. 2008).........................7

*Sandpiper Vill. Condo Ass'n v. Louisiana-Pacific Corp.,*
428 F.3d 831 (9th Cir. 2005) ................................ 8

*Sattari v. British Airways World Cargo,*
2012 U.S. App. LEXIS 4749 (9th Cir. Feb. 12, 2012) ........................ 3

*Thol v. Waddington,*
344 Fed. Appx. 452 (9th Cir. 2009)................................. 6-7

iii

**EXHIBIT 66**
**1395**

*Tonry v. Security Experts, Inc.*,
20 F.3d 967 (9th Cir. 1994) ........................................................5

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,
971 F.2d 244 (9th Cir. 1992) ...................................................... 7

*United States v. Armstead*,
421 Fed. Appx. 749 (9th Cir. 2011)........................................... 3

*United States v. Boulware*,
558 F.3d 971 (9th Cir. 2009) .......................................................5

*United States v. Maddox*,
614 F.3d 1046 (9th Cir. 2010) .................................................... 9

*United States v. Wilson*,
631 F.2d 118 (9th Cir. 1980) .......................................................7

*Webb v. Douglas County*,
224 Fed. Appx. 647 (9th Cir. 2007)....................................... 10

*Werner v. Werner*,
267 F.3d 288 (3rd Cir. 2001) .......................................................8

## **Rules**

Fed R. App. P. 10(a) ..........................................................*passim*

Ninth Circuit Rule 10-2.......................................................... 1-2

Fed. R. App. P. 10(e)(2)(C) ...................................................5, 12

iv

**EXHIBIT 66**
**1396**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 167 of 347
Case: 11-56034 09/24/2012 ID: 8332382 DktEntry: 49-12 Page 167 of 20 (6 of 150)
Page ID #:32986

# INTRODUCTION

Plaintiff-Appellant Laura Siegel Larson ("Plaintiff") hereby moves to strike portions of Defendants-Appellees Warner Bros. Entertainment, Inc. and DC Comics' (collectively "Warner") Supplemental Excerpts of Record ("SER") and associated portions of Warner's Principal and Response Brief (Docket No. 31-1).

In gross violation of the rules governing appellate procedure, Warner's Supplemental Excerpts of Records (Docket No. 31) include ***19 documents (166 pages)*** that were not part of the District Court's record in this case, but were largely filed in a different case, *DC Comics v. Pacific Pictures Corp.*, Case No. 10-CV-03633 ODW (RZx) ("*DC Comics*"). Warner made no motion to expand the record; instead, it improperly asked the Court in mere footnotes in the Index to Warner's Supplemental Excerpts of Records to take judicial notice of this purported extra-record evidence. The *contents* of purported evidence, however, filed in a different case, are not subject to judicial notice. These documents and Warner's extra-record arguments based thereon should be swiftly struck. F.R.A.P. 10(a); Circuit Rule 10-2.

In *DC Comics*, Warner ginned up retaliatory claims against Plaintiff and her counsel, Marc Toberoff, after he had secured favorable legal decisions on Plaintiff's behalf in this case. Lacking meritorious legal arguments, Warner tries to improperly shoehorn documents from that case into the record to imbue this

1

**EXHIBIT 66**
**1397**

Case 2:10-cv-03633-ODW-RZ   Document 500-12   Filed 10/10/12   Page 168 of 347
Case: 11-56352   09/24/2012   ID: 8335832   DktEntry: 42-11   Page: 168 of 20  (7 of 150)
Page ID #:32987

appeal, involving genuine copyright issues of considerable interest and import,

with the same smear campaign that dominates *DC Comics*, and which is

completely irrelevant to the issues presented in this appeal.

As a result, Plaintiff is unfairly forced to address Warner's extraneous filings

and prejudicial attacks, furthering Warner's obfuscation of the merits. Warner and

its counsel should be sanctioned for such gamesmanship in blatant violation of

well-known tenets of appellate procedure.[1]

## ARGUMENT

### A.     The Record on Appeal is Limited to the Materials Filed With the District Court

It is fundamental to appellate practice that the record on appeal consists of:

"(1) the official papers and exhibits filed in the district court; (2) the transcript of

proceedings, if any; and (3) a certified copy of the docket entries prepared by the

district clerk."  F.R.A.P. 10(a); *see* Circuit Rule 10-2 (the "complete record on

appeal" consists of "the official transcript[s]" and the "district court clerk's records

of original pleadings, exhibits and other papers filed with the district court").

Thus, the "record on appeal is generally limited to 'the original papers and

exhibits filed in the district court.'"  *Barcamerica Int'l USA Trust v. Tyfield*

---

[1] DC stated that it would "almost certainly" oppose this motion.  Declaration of
Pablo Arredondo, Ex. A.  DC refused to provide a straight answer, and demanded a
"meet and confer," even though the Circuit Rules nowhere require this. *Id.*

**EXHIBIT 66**
**1398**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 169 of 347 (8 of 150)
Case 2:10-cv-03633-ODW-RZ Document 425-5 Filed 09/24/2012 Entry 42-12 Page 8 of 20
Page ID #:32988

*Importers, Inc.*, 289 F.3d 589, 593-94 (9th Cir. 2002) (emphasis in original).

Documents "not filed with the district court … are not part of the clerk's record

and cannot be part of the record on appeal." *Kirshner v. Uniden Corp. of Am.*, 842

F.2d 1074, 1077 (9th Cir. 1988); *see also Sattari v. British Airways World Cargo*,

2012 U.S. App. LEXIS 4749 (9th Cir. Feb. 12, 2012) (same); *Anton v. Mendez,*

2011 U.S. App. LEXIS 20798 (9th Cir. Sept. 27, 2011) (same); *Lowry v. Barnhart*,

329 F.3d 1019, 1025-26 (9th Cir. 2003) (noting that "the 'excerpts of record' are

just that: 'excerpts" of the "record,'" and that "[t]his limitation is fundamental");

*United States v. Armstead*, 421 Fed. Appx. 749, 751 (9th Cir. 2011) (holding that

the "contention that the evidence is properly included in the appellate record

because it consists of documents filed in *other* district court cases is without

merit") (emphasis in original).

This rule applies even where a party asserts "newly discovered" evidence.

*In re Weisband*, BAP AZ-10-1239, 2011 WL 3303453 (B.A.P. 9th Cir. June 13,

2011) (striking "newly discovered evidence" that was not presented to lower

court); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 n. 5

(9th Cir.1994) (declining to consider "new evidence" and noting "[f]acts not

presented to the [trial] court are not part of the record on appeal").

To rationalize its improper conduct Warner has previously cited to cases that

provide no support for its wholesale supplementation of the record. *See Mangini v.*

3

**EXHIBIT 66**
**1399**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 170 of 347 (9 of 150)
Case 2:10-cv-03633-ODW-RZ 09/24/2012 ID: 8325382 DktEntry: 42-12 Page 9 of 20
Page ID #:32989

*United States*, 314 F.3d 1158, 1160-1161 (9th Cir. 2003) (taking notice of evidence

that the judge was unequivocally subject to mandatory disqualification); *Colbert v.*

*Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006) (permitting complete copy of a

single document to be filed where partial copy filed with the district court); *Rigsby*

*v. Avenenti*, 1992 U.S. App. LEXIS 15480 (9th Cir. June 26, 1992) (habeas

petition in criminal case); *Cootz v. General Tel. Co.*, 1988 WL 131672, at *5 n.5

(9th Cir. Nov. 25, 1988) (unpublished summary opinion; taking judicial notice of a

collective bargaining agreement in an employment dispute).

      *Lowry v. Barnhart*, 329 F.3d 1019, expressly limited the situations when

courts should accept extra-record material and advised against the sort of appellate

free-for-all DC seeks:

>       ***Save in unusual circumstances, we consider only the district court***
> ***record on appeal.*** Federal Rule of Appellate Procedure 10(a) explains which
> materials constitute the record. Fed. R. App. P. 10(a). And Circuit Rule 30-1
> provides that the appellant (and, if necessary, the appellee) shall prepare
> "excerpts" of that record. See 9th Cir. R. 30-1.1(a). The rather obvious
> implication is that the "excerpts of record" are just that: "excerpts" of the
> "record."
>
>       ***This limitation is fundamental***. As a court of appeals, we lack the
> means to authenticate documents submitted to us, so ***we must be able to***
> ***assume that documents designated part of the record actually are part of***
> ***the record***. To be sure, the fact that a document is filed in the district court
> doesn't resolve all questions of authenticity, but it does ensure that both
> opposing counsel and the district court are aware of it at a time when
> disputes over authenticity can be properly resolved. ***Litigants who disregard***
> ***this process impair our ability to perform our appellate function.***
>
>       There are exceptions to the general rule. We may correct inadvertent
> omissions from the record, take judicial notice, and exercise inherent
> authority to supplement the record in extraordinary cases. ***Consideration of***

4

**EXHIBIT 66**
**1400**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 171 of 347
Case 2:11-cv-03633-ODW-RZ Document 500-12 Dkt Entry 42-12 Page 107 of 20 (10 of 150)
Page ID #:32990

> ***new facts may even be mandatory, for example, when developments render
> a controversy moot and thus divest us of jurisdiction***.  One constant runs
> through all these exceptions, however:  Only the court may supplement the
> record. "[It is a] basic tenet of appellate jurisprudence . . . that parties may
> not unilaterally supplement the record on appeal with evidence not reviewed
> by the court below."  Litigants should proceed by motion or formal request
> so that the court and opposing counsel are properly apprised of the status of
> the documents in question.
>
>      Sadly, this is not the first time a party has graced us with so-called
> "excerpts of record" that have never before seen the light of courtroom day.

329 F.3d at 1024-25 (Kozinski, C.J.) (emphases added) (sanctioning party for

inclusion of one extra-record document in excerpts of record).

The appropriate remedy is to strike all of Warner's improperly-filed

Warner's attempt to substantially expand the record by requests in mere

footnotes is also improper.  Fed. R. App. P. 10(e)(2)(C) allows the court of appeals

to supplement the record "***only by formal motion*** based on extraordinary

circumstances or error correction."  *United States v. Boulware*, 558 F.3d 971, 976

(9th Cir. 2009) (emphasis added) (citing *Lowry*).

The appropriate remedy is to strike all of Warner's improperly-filed

documents and the portions of the briefing that directly or indirectly rely upon

them.[2]  *See Lowry*, 329 F.3d at 1025-26; *Barcamerica*, 289 F.3d at 595 (striking

excerpt documents and portion of appellate brief relying on them); *Tonry v.*

*Security Experts, Inc.*, 20 F.3d 967, 973-74 (9th Cir. 1994) (refusing to consider

improper documents not filed with district court and references thereto in briefing)

---

[2] A copy of Warner's brief identifying portions that rely on extra-record evidence
is attached as Exhibit B to the accompanying Declaration of Pablo Arredondo.

**EXHIBIT 66**
**1401**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 172 of 347
Case 4:11-cv-03633-ODW-RZ 03/21/2012 Document 500-12 Docket: 7-42-12 Page 172 of 20 (11 of 150)
Page ID #:32991

(*abrogated on other grounds, King v. AC & R Advertising,* 65 F.3d 764 (9th Cir. 1995).

**B.** **Judicial Notice Is Not a Means For An Appeals Court To Consider the Contents of Purported Evidence Not Presented to the District Court**

In a footnote to the Table of Contents of its Supplemental Excerpts of Record, Warner casually couches its improper expansion of the record as a request to take judicial notice of documents filed in the *DC Comics* case. However, judicial notice is only appropriate for matters "'generally known within the territorial jurisdiction of the [] court' or 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Jespersen v. Harrah's Operating Co., Inc.,* 444 F.3d 1104, 1110 (9th Cir. 2006).

Judicial notice is not a device to bootstrap into the appellate record dozens of documents never submitted to, or considered by, the trial court. *See Irvin v. Baca*, 205 Fed. Appx. 577, 578 (9th Cir. 2006) ("Pages … of appellant's supplement excerpts of record were not part of the district court record, and there is no basis for us to take judicial notice of them."); *Peroulis v. Kozak*, 362 Fed. Appx. 727, 729 (9th Cir. 2010) (request for judicial notice denied because "documents not filed with the district court or admitted into evidence by that court"); *Thol v.*

6

**EXHIBIT 66**
**1402**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 173 of 347
Case 2:10-cv-03633-ODW-RZ Document 809-9-3 Filed 11/42/12 Page 176 of 203 (12 of 150)
Page ID #:32992

*Waddington*, 344 Fed. Appx. 452, 453 (9th Cir. 2009) (judicial notice denied "to the extent such documents were not part of the record"); *Safron Capital Corp. v. Leadis Tech., Inc.*, 274 Fed. Appx. 540, 541 (9th Cir. 2008) (denying request for judicial notice as to "extra-record materials").

As Warner and its counsel well know, this contested evidence from another case is not the proper subject of judicial notice. *See Henderson v. State of Oregon*, 203 Fed. Appx. 45, 52 (9th Cir. 2006) ("Adjudicative facts appropriate for judicial notice are typically different from facts found in affidavits supporting litigation positions which often present facts subject to dispute. ")

In the cases cited by Warner, a court took judicial notice of filings in another proceeding not for the truth of their contents, but as to the fact of their occurrence. *See In Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (taking judicial notice of pleadings solely to "determine what issues were actually litigated"); *Headwaters Inc. v. United States Forest Serv.*, 399 F.3d 1047, 1051 (9th Cir. 2005) (taking judicial notice of a docket to establish a procedural event); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of a lower court's final judgment); *United States v. Wilson*, 631 F.2d 118, 119-120 (9th Cir. 1980) (judicial notice was *not* proper given that the facts asserted by movant were in dispute). None of these cases support Warner's attempt to expand the record on

**EXHIBIT 66**
**1403**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 174 of 347
Case: 11-55863 03/26/2012 ID: 8105998 DktEntry: 42-1 Page: 13 of 20 (13 of 150)
Page ID #:32993

appeal by citing to such extraneous and inadmissible materials for their supposed truth. *See, e.g.,* Docket No. 31-1 at 37 ("The letter confirms that Marks told Toberoff that Larson had a 'deal' with DC.").

Warner contends that judicial notice is "particularly appropriate" to documents filed in the *DC Comics* case because these documents were filed after the orders at issue in this appeal and were supposedly "unavailable." SER Vol. 1 at p. xi. The logic of Warner's position would mean that new contested evidence could always be introduced on appeal simply because such documents had been filed in a later case.

The cases Warner relies upon for this point are either inapposite or contrary to its ludicrous position. *See* SER Vol. 1 p. 9; *Werner v. Werner,* 267 F.3d 288, 295 (3rd Cir. 2001) (declining to take "judicial notice of the truth of the contents of a filing from a related action"); *Sandpiper Vill. Condo Ass'n v. Louisiana-Pacific Corp.*, 428 F.3d 831, 837 (9th Cir. 2005) (taking judicial notice of previously-unavailable portions of the district court's trial transcript in the same case); *Hammock v. Bowen*, 867 F.2d 1209, 1214 (9th Cir. 1989) (taking judicial notice of evidence submitted to the district court after a hearing, but prior to the appeal).

Secondly, Warner's contention that such documents were "unavailable" is erroneous as the documents were either in its possession during the case below or could have been obtained via discovery. *See* SER 714-805, 845-868 (in Warner's

8

**EXHIBIT 66**
**1404**

Case 2:10-cv-03638-ODW-RZ Document 500-12 Filed 10/10/12 Page 175 of 347
Case 11-56034 05/24/2012 ID: 8195998 DktEntry: 42-2 Page: 14 of 20 (14 of 150)
Page ID #:32994

possession); SER 809-816, 838-844, 874-876 (produced in *DC Comics* pursuant to

discovery). For instance, Warner requests judicial notice of documents, such as

Detective Comics' magazines and covers from 1938 and excerpts from Jerome

Siegel's decades-old memoir that were in its possession and could have readily

been presented to the district court. SER 714-796, 802-04. *See Milne v. Stephen*

*Slesinger, Inc.*, 156 Fed. Appx. 960, 961 (9th Cir. 2005) (holding that judicial

notice is improper as to evidence that "could have been submitted to the district

court," but was not).

C.     **This Court Should Strike Warner's Offending Portions of the**
       **Record and the Improper Argument Based Thereron**

All of Warner's improper inclusions in its Supplemental Excerpts of Record

(*i.e.*, SER 714-880) that were not before the district court herein should be struck.

In addition, those portions of Warner's appellate brief, set forth in Exhibit B,

which purport to rely on such improper evidence, should also be struck. *See*

*Barcamerica Int'l USA Trust.*, 289 F.3d at 595 (9th Cir. 2002) (striking documents

not before district court and those portions of opening brief which relied on them);

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.,* 450 F.3d 930,

944 (9th Cir. 2006) (same); *Aluisi v. Unum Life Ins. Co. of Am.*, 407 Fed. Appx.

126, 129 (9th Cir. 2010) (same); *United States v. Maddox*, 614 F.3d 1046, 1047

(9th Cir. 2010) (striking portion of brief referring to evidence that was not a part of

9

**EXHIBIT 66**
**1405**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 176 of 347
Case 11-55863 03/24/2012 ID: 8105982 DktEntry: 42-2 Page 15 of 20 (15 of 150)
Page ID #:32995

the district court record); *Webb v. Douglas County*, 224 Fed. Appx. 647, 648 (9th Cir. 2007) (same).

### D.   Warner Attempts To Prejudice The Court With Irrelevancies

Throughout its brief, Warner gratuitously purports to detail extra-record subjects, and misrepresents extra-record documents, in digressions that are wholly irrelevant to the legal issues before this Court.

For instance, citing to extra-record material, Warner falsely claims that an August 2002 offer by Ari Emanuel to the Siegels, and the Siegels' later retention of Mr. Toberoff, "interfered" with its negotiations.  Opp. 7, 18-19, 37, 39.  Warner's trumped-up allegations are flatly contradicted by Joanne Siegel's May 9, 2002 letter complaining about Warner's "unconscionable contract dated February 4, 2002," and that "after negotiations dragged on for four difficult years….we were stabbed in the back with [this] shocking contract."   SER 412-414. Warner's ridiculous allegations are immaterial in any event to the issue before the Court: Whether Warner and the Siegels formed a binding contract nearly a year earlier, in October 2001.

Warner mischaracterizes other extra-record material to prop up its retaliatory attacks against its long-time opposing counsel on matters that have no conceivable relevance to any of the *legal* issues presented in this appeal, including:  Mr. Toberoff's purported business interests (Opp. 18); Mr. Toberoff's purported

10

**EXHIBIT 66**
**1406**

relationship with the heirs of Joseph Shuster (Opp. at 18, 19 n.3); and both Gang Tyre's (Opp. 17) and Mr. Toberoff's (Opp. 19) contingent legal fees. Warner's attempts to derail the merits and elicit prejudice against Plaintiff by attacking her attorney are as transparent as they are improper.

Warner's erroneous factual allegations and legal arguments, not relevant to this case, are addressed more fully in the appellants' opening brief in *DC Comics*, 9th Cir. Case No. 11-71844, Docket No. 8, regarding their Anti-SLAPP motion.

### E. <u>Warner Should Be Sanctioned</u>

Warner's violation of Rule 10(a)(1) is particularly egregious. In assessing the severity of a Rule 10(a)(1) violation for the purpose of deciding whether to impose sanctions, *Lowry* considered the following factors: (1) whether counsel contended that the documents were part of the record; (2) the magnitude of the improper expansion; and (3) whether the issue was "one of first impression." *Lowry,* 329 F.3d at 1026 n 7. All three of these factors point toward imposing sanctions for Warner's knowing violation of the rules. Warner does not contend that any of the documents it improperly put before the Court are part of the district court record. The magnitude of this abuse, 166 pages spanning 19 documents, is much larger than in minor instances where this Court has declined sanctions. *See Dela Rosa v. Scottsdale Mem'l Health Sys. Inc., 136 F.3d 1241, 1242-43* (9th Cir. 1998) (only one page in five-volume excerpts of record improperly included).

11

**EXHIBIT 66**
**1407**

Finally, the impropriety of Warner's gamesmanship is not issues of first impression, as Warner's experienced counsel surely knows.

As a direct result of Warner's improper tactics, Plaintiff has been forced to incur considerable attorney's fees and costs in both addressing Warner's improper extra-records documents and in bringing this motion. Warner has no plausible justification for its willful filing of these blatantly improper extra-record documents, and should be sanctioned for its conduct. "If the only penalty for including forbidden material in the excerpts of record is removal of that material, it's hard to see why anyone would think twice before violating the rule." *Lowry*, 329 F.3d at 1025-1026 (sanctioning appellee and permitting appellant to recover reasonable attorney's fees for appellee's attachment of an extra-record letter in violation of Rule 10(e)(2)(C)). Full reimbursement for the Plaintiff's attorney's fees and costs of bringing this motion to strike and addressing Warner's improper extra-record materials and arguments would be a reasonable sanction.

## CONCLUSION

For all the above reasons, this Court should issue an Order striking the improper portions of Warner's SER and the related portions of Warner's Principal and Response Brief set forth in Exhibit A, and sanctioning Warner in the amount of reasonable attorney's fees in bringing this motion to strike and addressing Warner's improper extra-record materials/arguments.

12

**EXHIBIT 66
1408**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 179 of 347
Case 11-5663 09/24/2012 ID: 8351998 DktEntry: 42-1 Page 187 of 204 (18 of 150)
Page ID #:32998

Dated:  May 24, 2012          TOBEROFF & ASSOCIATES, P.C.


                              /s/ Marc Toberoff
                              Marc Toberoff
                              Attorneys for Appellant, Laura Siegel Larson

**EXHIBIT 66**
**1409**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 180 of 347
Case: 11-55668 05/24/2012 ID: 8191998 DktEntry: 42-1 Page: 19 of 20 (19 of 150)
Page ID #:32999

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that the Plaintiff-Appellant Laura Siegel Larson's brief is proportionately spaced,

has a typeface of 14 points or more, and does not exceed 20 pages.

Dated:  May 24, 2012          TOBEROFF & ASSOCIATES, P.C.


                              /s/ Marc Toberoff
                              Marc Toberoff

                              Attorneys for Appellant, Laura Siegel Larson

14

**EXHIBIT 66**
**1410**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 181 of 347
Case: 11-56063 05/24/2012 ID: 8191998 DktEntry: 42-4 Page: 288 of 20 (20 of 150)
Page ID #:33000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically

by the Court's ECF system and by first class mail on those parties not registered

for ECF pursuant to the rules of this court.

Dated: May 24, 2012              TOBEROFF & ASSOCIATES, P.C.


/s/ Marc Toberoff
Marc Toberoff

Attorneys for Appellant, Laura Siegel Larson

15

**EXHIBIT 66**
**1411**

# EXHIBIT 67

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

### LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

### WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants*.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## OPPOSITION TO MOTION TO STRIKE AND,
## IN THE ALTERNATIVE, MOTION FOR JUDICIAL NOTICE

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

EXHIBIT 67
1412

# INTRODUCTION

The Index to the Supplemental Excerpts of Record submitted by DC clearly identifies any material not submitted to the district court, and requests that this Court take judicial notice of these documents.  *See* Docket No. 32 ("SER") at vi-xiii nn.3-10.  Each request for judicial notice explains the legal basis for judicial notice of the specific document in question, and cites the relevant case law supporting that request.  *Id.*  Larson moves to strike the SER and any portion of DC's brief that relies on documents subject to judicial notice.  But Larson does not question the authenticity of any of these documents, nor does she identify any instance in which consideration of these documents would unfairly prejudice her position.  Instead, she complains about the quantity of documents and the form of DC's request, arguing that requests for judicial notice must be made in a motion.

DC believes its detailed, supported, and explicit request for judicial notice in the SER constitutes a formal request for judicial notice, and thus opposes this motion.  If this Court concludes that a separate motion must be filed, however, then in the alternative DC moves the Court to take notice of the contested documents.

Fully half of this "evidence" consists of comic books, specifically, two self-authenticating 1930s Superman comic books and a comic book cover.  The other primary portion (76 pages, and 15 documents) is made up of court orders and filings from *DC Comics v. Pacific Pictures Corp.*—a case that Larson herself

1

**EXHIBIT 67**
**1413**

admits is a "related" matter currently pending before this Court, as well as the

district court below.  Docket No. 12 at 58-59 (Larson's statement of related cases).

Appeal Nos. 11-71844; No. 11-56934; C.D. Cal. No. CV-10-3633.  These 15 self-

authenticating documents and court filings are the most common example of

evidence appropriate for judicial notice, as shown below.

 The remaining seven pages of extra-record material consist of excerpts from

Jerry Siegel's memoir (Larson's father, and the man whose alleged rights and

creations are at issue in this case), and from the deposition testimony of Kevin

Marks, Larson's prior counsel (and a key witness on DC's settlement defense).

Portions of both of these documents were included in the record below, and are

relied on extensively by Larson.

 All of these documents are necessary for completeness, and Larson cannot

and does not dispute the authenticity of any of this material.  This is not a case

tried to final judgment, but rather one where Larson took a Rule 54(b) appeal while

the briefing and resolution of related issues remains pending before the district

court.  The contested evidence DC submitted is self-authenticating, not subject to

reasonable dispute, and in many cases demonstrates inconsistent factual positions

that Larson herself has taken in related litigation.  Consideration of this material

will aid this Court in reaching a complete and accurate determination of these

issues.

**EXHIBIT 67**
**1414**

Accordingly, Larson's motion should be denied, and DC's request for judicial notice should be granted. To be clear, however, the Court need not consider any of the evidence discussed herein to rule for DC on all of the questions presented in this appeal.

## ARGUMENT

## I. THIS COURT MAY TAKE JUDICIAL NOTICE WITHOUT A FORMAL MOTION

This Court may take judicial notice of documents or information outside the record on appeal, and may do so without a "formal motion." *Singh v. Ashcroft*, 393 F.3d 903, 905-06 (9th Cir. 2004); *see* C. GOELZ & M. WATTS, CALIFORNIA PRACTICE GUIDE: FEDERAL NINTH CIRCUIT CIVIL APPELLATE PRACTICE § 4:220 (Rutter 2012) ("NINTH CIRCUIT PRACTICE GUIDE"). All that is required is a "formal request" sufficient to "apprise[]" the court and opposing party "of the status of the documents." *Lowry v. Barnhart*, 329 F.3d 1019, 1025 (9th Cir. 2003).

DC's particularized requests comply with this standard. Each request identities the document in question, explains the basis for judicial notice, and cites legal support for consideration of that specific document. *See* SER Vol. I at vi-xiii nn.4-10. DC's index clearly marks and distinguishes the extra-record material docketed in the related *Pacific Pictures* case from the materials in this case by listing the *Pacific Pictures* documents in a separate table titled by case name and number. *Id.* at xi. In no way, did DC hide the ball. Despite Larson's hyperbolic

3

**EXHIBIT 67**
**1415**

accusations, Mot. 5, she never identifies a single statement that could remotely be characterized as deceptive or improper.

Larson complains about the "dozens of documents" and "166 pages" DC submitted, implying that the number of pages alone should trump application of the doctrine of judicial notice. Mot. 1, 6. But courts may take judicial notice whenever facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2); *see* 1 J. WEINSTEIN & M. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 201.02[2] (Matthew Bender 2012) (judicial notice "dispens[es] with formal proof when a matter is not really disputable"). The doctrine is particularly appropriate where evidence is self-authenticating or where its authenticity is not contested. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

As DC explained in its individual requests, SER Vol. I at vi-xiii nn.4-10, each document submitted is properly judicially noticed for the following reasons:

Comic books. Fully 83 pages—*half* of the non-record evidence Larson complains about—are simply reproductions of comic books (*Action Comics #1* and *Detective Comics #15*), and the cover image from *Action Comics #1*. SER-714-796. These works are self-authenticating under Federal Rule of Evidence 902(6), and as such, are proper subjects for judicial notice. *See Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) ("We retain discretion to take judicial notice of

4

**EXHIBIT 67**
**1416**

documents 'not subject to reasonable dispute.'"); *Daniels-Hall*, 629 F.3d at 998;

*Valdivia v. Schwarzenegger*, 599 F.3d 984, 994 (9th Cir. 2010); *Hotel Emps. &*

*Rest. Emps. Union, Local 100 v. City of New York Dep't of Parks & Recreation*,

311 F.3d 534, 540 n.1 (2d Cir. 2002). Nor does Siegel dispute for a moment that

the documents are authentic or explain how she would be prejudiced if the Court

considered them. These comics are the subject of the copyright dispute before this

Court, and are relevant to determining the copyrightable elements in the

Promotional Announcements published prior to *Action Comics #1*, including

whether the "S" on Superman's chest is visible, and to establish the non-trivial

distinctions between the cover of *Action Comics #1* and the similar panel inside the

comic book. *See* Docket No. 31-1 at 61-68, 80-86.

<u>Siegel memoir.</u> Two pages are an excerpt from Jerry Siegel's memoir,

portions of which are in the district court record. SER-804-805. Larson relied on

the manuscript extensively in her First Brief on Cross-Appeal, Docket No. 12 at 7-

8, 37, 55, and she does not and cannot dispute its authenticity or that Jerry Siegel

made the admissions DC cites. Consideration of the remaining portions of the

memoir is appropriate for completeness. *Trigueros*, 658 F.3d at 987; *Daniels-Hall*,

629 F.3d at 992; *Valdivia*, 599 F.3d at 994; *see also Colbert v. Potter*, 471 F.3d

158, 165-66 (D.C. Cir. 2006) (a receipt was relevant to whether the statute of

limitations had run, but only a photocopy of the back side of the receipt had been

**EXHIBIT 67**
**1417**

submitted to the district court; the D.C. Circuit allowed appellee to supplement the

record with a complete copy because, as here, this evidence "go[es] to the heart of

the contested issue, [and] it would be inconsistent with this court's own equitable

obligations … to pretend that [it does] not exist").  Here, this indisputably

authentic memoir contains admissions from Larson's predecessor-in-interest that

flatly refute a position she now endorses.  Specifically, these pages contain a clear

admission by Jerry Siegel that pages 3-6 of *Superman #1* were not made for hire,

but rather were created at DC's direction after 1938.  Docket No. 31-1 at 77-78.

    <u>District court filings from a closely related case.</u>  Thirty-three pages are

documents filed or orders issued in the related *Pacific Pictures* case, which

concerns the same parties and judge.  SER-806-828, 869-874, 877-80; FED. R.

EVID. 902(4).  Settled precedent allows this Court to take judicial notice of filings

in this Court, or in any other court.  *See, Trigueros*, 658 F.3d at 987; *Reyn's Pasta

Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006); *Headwaters Inc.

v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 (9th Cir. 2005); *U.S. v. Wilson*, 631 F.2d

118, 119 (9th Cir. 1980); NINTH CIRCUIT PRACTICE GUIDE at § 4:225 ("Appellate

courts may take judicial notice of matters of record in other court proceedings,

including those occurring during the pendency of the federal appeal.").

    Judicial notice of these district court filings is particularly appropriate

because the disputed documents were authored or produced by Larson and her co-

6

**EXHIBIT 67**
**1418**

defendants in *Pacific Pictures* (or were court orders relating to those documents), and bear directly on two determinative issues—DC's settlement defense, and the statute of limitations counter-claim.  The parties in this case are parties in *Pacific Pictures*, and each case and arises out of the same set of facts; thus, it is no surprise that documents revealed in the on-going discovery in *Pacific Pictures* lend direct support to DC's defenses here.  The district court filings are central to the issues in this cross-appeal and will provide this Court with a more comprehensive understanding of the issues presented, in the following respects:

- July 11, 2003, Letter from Larson to Michael Siegel (SER-810-814):
  This letter, authored by Larson, indicates that Larson knew she was bound by the terms of the October 29, 2001, settlement with DC.  In it, she repeatedly states that Kevin Marks insisted, in August 2002, that Larson had a "deal with Time Warner/DC."  This evidence shows that there is, a*t the very least*, a jury question as to whether Larson understood she was bound to the October 19 terms.  Docket No. 31-1 at 37.

- Excerpt of Privilege Log of Bulson Archive (SER-816):  This privilege log, which was prepared by defendants in *Pacific Pictures*, identifies a November 17, 2001, email from Toberoff to Michael, SER-816 (Entry 339), which establishes that Toberoff was in contact with the Siegels well before August 2002—directly refuting claims made by Toberoff in his

7

**EXHIBIT 67**
**1419**

Case 2:10-cv-03633-ODW-RZ  Document 500-12  Filed 10/10/12  Page 191 of 347
Case 2:10-cv-03633-ODW-RZ  Document 325-2  Filed 11/43/12  Page 9 of 30
Page ID #:33010

motion to strike in *Pacific Pictures*.  This evidence is relevant to showing
Toberoff's interference with DC's business relationship with Larson by
wrongfully inducing her to repudiate the 2001 settlement and cut ties
with DC.  Docket No. 31-1 at 39.

- October 25, 2011, Order Denying Defendants' SLAPP Motion (SER-
  817-823):  The district court's order in *Pacific Pictures* denying
  defendants' motion to strike explains Toberoff's inducement of Larson to
  repudiate the 2001 settlement.  Docket No. 31-1 at 39.

- October 24, 2011, Order Granting DC's Motion for Review (SER-824-
  825):  The district court's order in *Pacific Pictures* granting DC's motion
  for review shows that DC recently obtained Larson's July 2003 letter to
  Michael, which directly refutes claims made by Larson here.  Docket No.
  31-1 at 37.

- Excerpt of September 2, 2011,  Joint Stipulation Regarding DC's Motion
  to Compel (SER-826-28) & Excerpt of August 13, 2010, Defendants'
  SLAPP Motion (SER-877-80):  In the district court below, Larson
  contended that negotiations with DC were not terminated until September
  21, 2002.  The court agreed, holding her claims to be timely.  SER-60-61.
  This document shows that Larson argued the opposite in *Shuster* (in
  order to protect the interests of Marc Toberoff), claiming that settlement

8

**EXHIBIT 67**
**1420**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 192 of 347
Case 2:10-cv-03633-ODW-RZ Document 620-9 Filed 04/06/2012 Page 192 of 90
Page ID #:33011

discussions with DC were "moribund" as of May 9, 2002. SER-825; *see also* SER-878-879. This evidence is directly relevant to determining whether Larson's claims were timely brought; the district court below relied on Larson's representations, and she cannot take contradictory factual positions in an attempt to protect Toberoff's interests. Docket No. 31-1 at 39. These statements are judicially noticeable as direct admissions. *Bucci v. Essex Ins. Co.*, 393 F.3d 285, 296 n.5 (1st Cir. 2005); *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995). Indeed, Larson's own brief asks this Court to consider the facts from an unrelated case decided over 60 years ago as substantive evidence relevant to DC's work-for-hire claims, Docket No. 43-1 at 64-65; *National Comics Pubs., Inc. v. Fawcett Pubs., Inc.*, 191 F.2d 594 (2d Cir. 1951), even though the relevant documents from *National* were never filed below and are not part of the record here.

Marks Deposition. Another category of documents is a five-page excerpt from the official deposition transcript of Kevin Marks, substantial portions of which are already in the record here. SER-797-801. The entirety of the transcript was filed in the related *Pacific Pictures* case, Docket No. 305-14, and again, the accuracy and authenticity of the transcript is not subject to dispute, as counsel for both parties participated in the deposition and both cited other parts of the

9

**EXHIBIT 67**
**1421**

transcript extensively below.  This testimony shows that Marks' fee for

representing Larson was only 5%, meaning almost all of the money from the 2001

settlement would be Larson's alone.  Docket No. 31-1 at 17.

    <u>Ninth Circuit filings from a closely related case.</u>  The remaining 42 pages

are made up of documents filed in *both* the district court *Pacific Pictures*

proceeding, No. CV-10-3633, and with this Court in a related writ proceeding

initiated by defendants, Appeal No. 11-71844, Docket No. 3-5.  SER-829-68, 875-

76.  They are thus subject to judicial notice as court filings for all the reasons

discussed above.  These documents establish that Toberoff stands to receive 40%

of any recovery by Larson, SER-839-44; Toberoff has a similar 50% contingency

fee with the Shusters, meaning Toberoff will receive the largest percentage of any

recovery of the heirs, SER-860-63; and Toberoff communicated to Marks in

August 2002 an offer on behalf of an unnamed "investor" willing to purchase the

Siegels' rights for $15 million cash and generous "back-end" compensation, SER-

875-76.  Docket No. 31-1 at 18-19.  Moreover, 14 pages of these Ninth Circuit

filings consist of the Shusters' termination notice filed with the Copyright Office,

which is additionally subject to judicial notice as a public record.  SER-45-58; *e.g.,*

*Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("a court may take

judicial notice of 'matters of public record'"); *In re Chippendales USA, Inc.*, 622

F.3d 1346, 1356 n.14 (Fed. Cir. 2010) (registration documents by Patent and

10

**EXHIBIT 67**
**1422**

Trademark Office are judicially noticeable).  The Shuster termination is relevant to Toberoff's pursuit of Siegel's and Shuster's heirs, and his inducement of both sets of heirs to repudiate their existing contractual arrangements with DC—specifically, the 2001 settlement between the Siegels and DC.  Docket No. 31-1 at 18.

## II.    LARSON'S OBJECTIONS TO JUDICIAL NOTICE LACK MERIT

Larson does not specifically challenge the request for judicial notice as to individual pieces of evidence.  She instead asserts in general terms that judicial notice is inappropriate here, but her objections are meritless.

Larson first argues that judicial notice does not apply to "new evidence." Mot. 8.  But an appellate court "may take judicial notice of filings or developments in related proceedings which take place after the judgment appealed from." *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001); *see Overstreet ex rel. NLRB v. United Bd. of Carpenters & Joiners of Am., Local 1506*, 409 F.3d 1199, 1204 n.7 (9th Cir. 2005); *Hammock v. Bowen*, 867 F.2d 1209, 1214 (9th Cir. 1989); . This rule extends to materials produced by a party, *Hammock*, 867 F.2d at 1214, as well as court orders issued in a related case, *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1186 (9th Cir. 2011); *Overstreet*, 409 F.3d at 1204 n.7.

Second, Larson contends that the materials were "available" and could have been filed by DC in the district court.  None of the court filings from *Pacific Pictures* was available before the court below issued the relevant rulings, however,

11

**EXHIBIT 67**
**1423**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 195 of 347
Page ID #:33014
Case 2:10-cv-03633-ODW-RZ Document 82034252 DktEntry: 46 Page 135 of 90

and the remaining *Pacific Pictures* documents were unavailable because Larson and the other defendants had improperly withheld them. SER-810-14, 874-76. The comic books were available, but there were several issues connected to the scope of the copyright yet to be resolved by the district court. Docket No. 31-1 at 40-41. And in any event the fact that these comic books have been accessible to the public for over 70 years re-affirms their authenticity and discredits any claim of unfair surprise by Larson.

Finally, Larson contends that even if judicial notice applied, it would extend only to the *existence* of certain documents, not to the *truth* of their contents. Mot. 7-8. But *half* of the extra-record documents DC submitted were comic books not submitted for any "truth" contained therein. Many of the other documents are Larson's own admissions subject to judicial notice, and others are submitted to invoke judicial estoppel to prevent Larson from taking inconsistent positions before the courts. Many of the remaining documents DC invokes only for the procedural facts about what happened in the *Pacific Pictures* case. Docket No. 31-1 at 37, 39. In sum, none of Larson's generalized objections addresses the specific bases laid out in DC's requests for judicial notice, and none prevents this Court from exercising its discretion to take judicial notice of these relevant and useful documents.

12

**EXHIBIT 67**
**1424**

# V.    LARSON'S REQUESTED RELIEF IS OVERLY BROAD

Larson requests sanctions, apparently on the theory that identifying each

document and providing legal analysis as to the basis for judicial notice is not

enough to constitute a "formal request or motion" for judicial notice under *Lowry*,

329 F.3d at 1025.  But this case is nothing like *Lowry*, where a party slipped a new

document the party had just created into the appellate record without identifying it

as new.  *Id*.  Here, by contrast, the documents are either self-authenticating or

come from Larson herself, and DC carefully noted each one in its index to the

SER.

Larson also requests that the Court strike all statements in DC's Principal

Brief citing to any extra-record evidence, and attaches as Exhibit B to her motion a

copy of DC's brief with her proposed redactions.  Mot. Ex. B at 4-128.  Even

putting aside the fact that all the contested documents are properly subject to

judicial notice, most of the redactions Larson proposes were of statements

*independently supported by other evidence not subject to dispute*.  Even if Larson

could show that DC's extra-record evidence is not subject to judicial notice—

which she cannot—she provides no support for striking statements that are

otherwise supported by evidence in the record.

For example, Larson asks the Court to strike DC's statement that:  "Siegel

and Shuster's additions were also created at DC's expense—Siegel and Shuster

13

**EXHIBIT 67**
**1425**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 197 of 347
Case 2:10-cv-03633-ODW-RZ Document 620-3 Filed 04/06/2012 Docket #620 Page 15 of 90
Page ID #:33016

were paid for their *Action Comics #1* contributions, and DC assumed the financial

risk and burden of publishing, distributing, and marketing *Action Comics #1*."

Mot. at Ex. B-85.  Besides the disputed excerpt from Siegel's memoir, DC cites a

letter enclosing a check to Siegel as payment for *Action Comics #1*, SER-383;

findings of fact from the Westchester court that DC paid Siegel and Shuster for

that comic book and spent significant sums to promote and popularize it, ER-958-

60; and a 1938 letter from a DC editor to Siegel reminding him of the "tremendous

gamble" DC had taken in choosing to publish Superman, ER-425-27, among other

evidence.  This evidence—which Larson does not challenge—is more than

adequate to support the statement even without any citation to Siegel's memoir.

Similarly, Larson asks this Court to strike the factual statement that "[a] little

more than six months later, however, Larson repudiated the agreement, fired

Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer)

and Ari Emanuel (an agent) to sell her putative Superman rights."  Mot. at Ex. B-

24.  Aside from the *Pacific Pictures* documents DC cited for that statement, the

brief also cites testimony from Kevin Marks, the Siegels' prior counsel; testimony

from Toberoff; a September 21, 2002, letter sent to Marks and DC terminating

Gang Tyre's representation of the Siegels and ending all negotiations with DC; and

the October 3, 2002, business agreement between the Siegels, Ari Emanuel, and

Toberoff .  Docket No. 31-1 at 7 (citing SER-133-34, 182-83, 404, 417-20, 422-25,

**EXHIBIT 67**
**1426**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 198 of 347
Page ID #:33017
Case 1:11-cv-93638-ODW-RZ Document 620500-12 Docket Entry 46/12 Page 198 of 90

819-20, 835-37).  This evidence is likewise independently sufficient to support the proposition even without any reference to the disputed document.

DC's attached Appendix details each instance in which Larson's proposed relief would strike a statement supported by record and extra-record evidence, and reproduces the cited portion of the record evidence to demonstrate the over-breadth of Larson's objections.  There is no basis for these redactions.

## CONCLUSION

For the foregoing reasons, Larson's motion to strike should be denied, and DC's request to take judicial notice of non-record evidence should be granted.

Dated:  June 5, 2012                            O'MELVENY & MYERS LLP

                                                By:  /s/ Daniel M. Petrocelli
                                                       Daniel M. Petrocelli
                                                       Attorneys for Warner Bros.
                                                       Entertainment Inc. and DC Comics

**EXHIBIT 67**
**1427**

## APPENDIX

### Statements in Opening Brief Supported by Uncontested Record Evidence in Addition to the Contested Citations

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. Br. at 7. | **Deposition testimony of Kevin Marks (SER-133-34):**<br><br>Q. Am I correct that on September 21 you received a letter from Joanne and Laura stating that they were terminating the law firm and instructing you not to take any further action?<br><br>A. I don't recall what date the letter received, but it was received sometime after the letter was dated. . . . This letter was the first time I had heard our services had been terminated . . . .<br><br>**Toberoff Timeline (SER-83):**<br><br>The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties' Worldwide, otherwise known as "IPW," Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights.<br><br>**Deposition testimony of Marc Toberoff (SER-404):**<br><br>Q. Prior to the November 29, 2001 |

16

**EXHIBIT 67**
**1428**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | initial call to Mr. Marks, had you and Mr. Emanuel discussed the Siegel interest in Superman? |
| | … |
| | A. Yeah.  Actually, I IP Worldwide I was general counsel to IP Worldwide. . . . |
| | Q. Once again, you were a joint venture with Mr. Emanuel, were you not? |
| | A. That's correct, but I was also part of the company. . . . |
| | **September 21, 2002, letter from Larson and Joanne Siegel to Kevin Marks (SER-418):** |
| | As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters . . . . We similarly reject your redraft . . . . Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately. |
| | **September 21, 2002, letter from Larson and Siegel to Paul Levitz (SER-420):** |
| | [E]ffective immediately, we are totally stopping and ending negotiations with DC Comics, Inc. . . . concerning the Jerry Siegel Family's rights to Superman, Superboy, the Spectre, and all related characters and entities. |

17

**EXHIBIT 67**
**1429**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | **Agreement between Larson and Siegel and Toberoff and Ari Emanuel, on behalf of IP Worldwide, dated October 3, 2002 (SER-422):**<br><br>This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property common known as "Superman," including, without limitation, all characters and copyright interests therein . . . . |
| DC's artists also created a cover for Action Comics #1 based on a panel that featured Superman in his DC-colorized costume—red cape and boots, blue leotard, and heraldic red "S" crest—and exhibiting super-strength by lifting a car.  Br. at 12. | **Order on Motion for Partial Summary Judgment (SER-14):**<br><br>On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics.  Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issues of <u>Action Comics</u>.<br><br>**March 1, 1938, letter from Vin Sullivan to Jerry Siegel (SER-388):**<br><br>I'm enclosing a silverprint of the cover of Action Comics.  You'll note that we already used one of those panel drawings of SUPERMAN, as you suggested in your recent letter. |

**EXHIBIT 67**
**1430**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 202 of 347
Case 2:10-cv-03633-ODW-RZ Document 620-11 Entry 10/40/12 Page 203 of 347
Page ID #:33021

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| DC artists also created "Promotional Announcements"—a black-and-white version of its artists' cover art—to promote Action Comics #1.  Br. at 12. | **Order on Motion for Partial Summary Judgment (SER-15):**<br><br>Similarly, Detective Comics, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement on the comic's inside cover which contained within it a reproduction of the cover (again in a reduced scale) of the soon-to-be published first issue of Action Comics.  (Also includes scanned image of announcement).<br><br>**Declaration of Paul Levitz (SER-678):**<br><br>At Detective's direction, Siegel and Shuster adapted and expanded their existing Superman strips into a format suitable for a comic book, and Detective announced the debut of its *Action Comics* series, and Superman, in full page announcements in its May, 1938 issues of some of its existing publications. |
| Starting in 2001, Toberoff, the self-described "rights-hunter," "movie producer," and "intellectual property entrepreneur," began pursuing Siegel's and Shuster's heirs.  Br. at 28. | **Deposition testimony of Kevin Marks (SER-115-16):**<br><br>Q. Your incoming phone log at GTRB 600 reflects a call from Mark Toberoff on November 29, 2001. . . . Was that call completed?<br><br>A. No.<br><br>Q. Did you at any time return that call?<br><br>A. No.<br><br>. . .<br><br>Q. If you would turn, please, Mr. |

19

**EXHIBIT 67**
**1431**

Case 2:10-cv-03638-ODW-RZ Document 500-12 Filed 10/10/12 Page 203 of 347
Page ID #:33022
Case 2:10-cv-03638-ODW-RZ Document 620-12 Filed 04/06/12 Page 24 of 90

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
|  | Marks, to GTRB 604, that reflects a call from Mar[c] Toberoff, quote, "Re: Superman - potential buyout (end of November)." Did you speak with Mr. Toberoff on that day? |
|  | A. Did you speak with Mr. Toberoff on that day? |
|  | A. I don't know if I spoke with Mr. Toberoff that day. |
|  | Q. Did you return that call at some subsequent time? |
|  | A. I returned that call that day or subsequently, yes. |
|  | Q. Can you tell me to the best of your recollection what Mr. Toberoff said during that conversation and what you said? |
|  | A. Yes. I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself. He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements. I also recall him saying that he had a separate company that was in the business of acquiring intellectual property rights. I recall him saying that he was interested in the Superman property and the Superboy property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that. |
|  | **Toberoff Timeline (SER-182-83):** |
|  | In 2001, Marc Toberoff (MT) began |

20

**EXHIBIT 67**
**1432**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | researching Superman, who had rights, etc. |
| | MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest. |
| | On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement. |
| | MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gag, Tyre, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him. |
| | On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. |
| In November 2001, he induced the Shusters to become his business partners and to repudiate their existing contractual | **Toberoff Timeline (SER-183):**<br><br>On Nov. 23, 2001, MT entered into a joint venture agreement between his own |

21

**EXHIBIT 67**
**1433**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| arrangements with DC. Br. at 18. | outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement. |
| Marks rebuffed Toberoff, telling him in February, July, and August 2002 that Larson had made a deal with DC. Br. at 18. | **Deposition testimony of Kevin Marks (SER-115-16):**<br><br>Q. Your incoming phone log at GTRB 600 reflects a call from Mark Toberoff on November 29, 2001. . . . Was that call completed?<br><br>A. No.<br><br>Q. Did you at any time return that call?<br><br>A. No.<br><br>. . .<br><br>Q. If you would turn, please, Mr. Marks, to GTRB 604, that reflects a call from Mar[c] Toberoff, quote, "Re: Superman - potential buyout (end of November)." Did you speak with Mr. Toberoff on that day?<br><br>A. Did you speak with Mr. Toberoff on that day?<br><br>A. I don't know if I spoke with Mr. Toberoff that day.<br><br>Q. Did you return that call at some subsequent time?<br><br>A. I returned that call that day or subsequently, yes.<br><br>Q. Can you tell me to the best of your recollection what Mr. Toberoff said during that conversation and what you said? |

22

**EXHIBIT 67**
**1434**

Case 2:10-cv-03633-ODW-RZ  Document 500-12  Filed 10/10/12  Page 206 of 347
Case 0:10-cv-93633-ODW-RZ  06/06/2012  820599-52  DktEntry: 40-12  Page 240 of 90
Page ID #:33025

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
|  | A. Yes.  I think Mr. Toberoff started the call by saying that he had called me earlier and that I hadn't returned his call, for which I apologized, and then he introduced himself.  He said he was a lawyer and that he represented individuals that had interests in rights to movie and other properties that had come into those rights either by way of reversions under the law or reversions under Guild agreements.  I also recall him saying that he had a separate company that was in the business of acquiring intellectual property rights.  I recall him saying that he was interested in the Superman property and the Superboy property and had understood that I was representing the Siegel family interest, and he asked if he could talk to me about that. |
| Toberoff insisted in August 2002 that Marks communicate to Larson that he and agent Emanuel had an unnamed "investor" willing to purchase her rights for $15 million cash and generous "back-end" compensation.   Br. at 18. | **Deposition testimony of Kevin Marks (SER-122-24):**  Q. [] Do you recall how long after August 7 that conference call took place?  A. Within the next day or two.  Q. I see.  Would you tell me [] what was involved and what was said in that conversation?  A. Yes.  Mr. Toberoff and Mr. Emanuel both spoke.  I can't completely tell you who said what, but I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights |

23

**EXHIBIT 67**
**1435**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | which they would then package with clients from the Endeavor Talent Agency, then take those to studios to exploit the package, and they understood that the Siegel family had an interest in the termination rights and viewed that as perhaps the most valuable of properties and wanted to make a proposal.<br><br>Q. Okay.  What did you say?<br><br>A. I said in substance and effect, "I'm listening."  And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property.<br><br>…<br><br>Q. And what else did you say?<br><br>A. I asked if there was anything else, and they said "no," and then I asked if this was a proposal that was conditioned on their doing due diligence about the rights, and they said again in substance and effect, "No, it's not.  We've done our due diligence already.  This is the offer."<br><br>Q. Anything else you can recall of that conversation?<br><br>A. I think I said, "Thank you, and I will communicate this to the client" or "take this back to the client."<br><br>Q. And did you in fact do that?<br><br>…<br><br>A. Yes. |
| Marks conveyed this offer | **Toberoff Timeline (SER-183):** |

24

**EXHIBIT 67**
**1436**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 208 of 347
Case 1:10-cv-03633-ODW-RZ Document 250-52 Entry 04/06/2012 Page 26 of 90
Page ID #:33027

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| to Larson, but admonished her that she had a "deal" with DC, and if she repudiated it, Marks would have to "testify against [her] in court."[1]  Br. at 18-19. | Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached. |
| But the promised $15 million investor never materialized, and Toberoff never produced any other buyers.  Br. at 19. | **Deposition testimony of Kevin Marks (SER-184-87):**<br><br>Q. [] Do you recall how long after August 7 that conference call took place?<br><br>A. Within the next day or two.<br><br>Q. I see.  Would you tell me [] what was involved and what was said in that conversation?<br><br>A. Yes.  Mr. Toberoff and Mr. Emanuel both spoke.  I can't completely tell you who said what, but I think Mr. Toberoff may have very briefly referenced past conversations, and then I believe it was Mr. Emanuel who explained that either they or some other people or perhaps some members of the Endeavor Talent Agency had set up a fund or were in the process of setting up a fund to acquire intellectual property rights which they would then package with clients from the Endeavor Talent Agency, then take those to studios to exploit the package, and they understood that the Siegel family had an interest in the termination rights and viewed that as perhaps the most valuable of properties and wanted to make a proposal.<br><br>Q. Okay.  What did you say?<br><br>A. I said in substance and effect, "I'm |

25

**EXHIBIT 67**
**1437**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/40/12 Page 209 of 347
Case 2:10-cv-03633-ODW-RZ Document 60509952 DktEntry 40-12 Page 2209 of 90
Page ID #:33028

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | listening." And I'm not sure who spoke, but they made a proposal of $15 million and what was described as a meaningful back end, which I understood to be a contingent compensation position or a royalty position in the exploitation of the property. |

**Toberoff Timeline (SER-184-87) (emphases in original)**:

Upon the Siegels signing the [October 2001 IPW] agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to Superman returns, which was then in development at Warner Brothers.

…

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate**. . . . MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims.

…

**Significantly, MT admits to Laura Siegel that there never was a billionaire**

26

**EXHIBIT 67**
**1438**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | **willing to invest $15 million when he first approached them.** |
| Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery. Br. at 19. | **Toberoff Timeline (SER-187) (emphasis in original):**<br><br>**In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45% [of the Siegel Superman interest]. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff personally becomes 47.5% of the entire Superman interest.** |
| Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee. Br. at 19 n.3. | **Toberoff Timeline (SER-186) (emphasis in original):**<br><br>On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights . . . . in all of his creations . . . ." In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in case or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, . . . .any monies would be spit 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY** |

27

**EXHIBIT 67**
**1439**

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | **BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets -- under the guise of Pacific Pictures Corp -- the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. |
| DC's artists also created the cover of Action Comics #1, which introduces the Superman story that immediately follows. Br. at 62. | **Letter from Vin Sullivan to Siegel, dated February 22 (SER-388):**<br><br>I'm enclosing a silverprint of the cover of Action Comics. You'll note that we already used one of those panel drawings of SUPERMAN, as you suggested in your recent letter. |
| Siegel and Shuster's additions were also created at DC's expense—Siegel and Shuster were paid for their Action Comics #1 contributions, and DC assumed the financial risk and burden of publishing, distributing, and marketing Action Comics #1. Br. at 68. | **Letter from Leibowitz to Siegel, dated September 28, 1938 (ER-425-27):**<br><br>Also, take into consideration that when we decided to come out with Action Comics, we were taking a tremendous gamble involving many thousands of dollars. We had no assurance from anybody that Action Comics would not be a losing proposition - you took no such gamble.<br><br>**March 1, 1938 Agreement (ER-917):**<br><br>I, the undersigned, am an artist or author and have performed work for strip entitled "SUPERMAN." In consideration of $130 agreed to be paid me by you, I hereby sell and transfer such work and strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, |

28

**EXHIBIT 67**
**1440**

Case 2:10-cv-03638-ODW-RZ Document 500-12 Filed 10/10/12 Page 212 of 347
Case 2:10-cv-03638-ODW-RZ Document 500-12 Filed 10/10/12 Page 36 of 90
Page ID #:33031

| Statement in Brief | Uncontested Record Evidence Cited |
|---|---|
| | to you and your assigns . . . . |
| | **Findings of Fact of the Westchester Court (ER-958-60):** |
| | 23. On March 1, 1938, prior to the printing of the first issue of "Action Comics," DETECTIVE COMICS, INC. wrote to plaintiff SIEGEL at Cleveland, Ohio, where he and plaintiff SHUSTER both resided, enclosing a check in the sum of $412. which included $130. in payment of the first thirteen page SUPERMAN release at the agreed rate of $10. per page, and a written instrument for plaintiffs' signatures. |
| | … |
| | 30. Upon receipt by DETECTIVE COMICS, INC. of the instrument of March 1, 1938 [], it published the first SUPERMAN release in the June, 1938 issue of "Action Comics," which magazine was issued for sale on April 18, 1938…. |
| | 35. Between March, 1938 and March, 1947 DETECTIVE COMICS, INC. expended large sums of money and devoted much time and effort in the promotion and popularization of the comic strip SUPERMAN and the names and characters appearing therein. |
| | **Letter from J.S. Leibowitz to Siegel, dated March 1, 1938 (SER-383):** |
| | Dear Mr. Siegel: |
| | I am enclosing a check for $412.00 for payment of the following: |
| | "Superman" - June issue $130.00 . . . . |

29

**EXHIBIT 67**
**1441**

# EXHIBIT 68

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

## LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 68**
**1442**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION............3

    A.  Larson And DC Formed An Agreement On October 19, 2001 ..........3

    B.  Contemplating A Long-Form Document Does Not Defeat A
        Deal....................................................................................................7

    C.  Larson Has Not Raised Any Material Difference On Any
        Essential Term Between The Marks And Schulman Writings ..........10

        1.  Scope Of Rights ....................................................................10

        2.  Monetary Terms.....................................................................11

        3.  "Other" Non-Essential Terms ................................................13

        4.  The February 2002 Long-Form ..............................................14

    D.  Marks' August 2002 Memo Confirms A Deal Was Made ...............14

II. DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-
    OF-LIMITATIONS COUNTERCLAIM ..............................................16

III. LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS .....17

    A.  Elements Of *AC#1* Were Made-For-Hire .........................................17

        1.  *National* Is Not Preclusive ......................................................17

        2.  The 1938 Additions Were Made-for-Hire ..............................19

            a.  New Content .................................................................20

            b.  Colorization ................................................................21

            c.  Cover Art ....................................................................22

    B.  DC Owns The Pre-McClure Strips....................................................23

        1.  The Strips Were Made-for-Hire.............................................23

        2.  Larson's Failure To Terminate The Strips Is Dispositive .......24

    C.  Pages 3-6 Of *S#1* Are Works-For-Hire .............................................25

    D.  Artwork In *AC#4* Is Work-For-Hire .................................................26

    E.  Copyrightable Elements In DC's Promotional Announcements .......27

CONCLUSION .................................................................................................28

**EXHIBIT 68**
**1443**

## TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 1999) ....................................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.*,
62 Cal.App.4th 348 (1998) ................................................................................7

*Blix St. Records, Inc. v. Cassidy*,
191 Cal.App.4th 39 (2010) ...............................................................................7

*Burroughs v. M-G-M, Inc.*,
491 F.Supp. 1320 (S.D.N.Y. 1980) .................................................................23

*Burroughs v. M-G-M, Inc.*,
683 F.2d 610 (2d Cir. 1982) ............................................................................23

*Chicot County Drainage Dist. v. Baxter County Bank*,
308 U.S. 371 (1940) .........................................................................................18

*Clarke v. Fiedler*,
44 Cal.App.2d 838 (1941) .................................................................................5

*Comm'r v. Sunnen*,
333 U.S. 591 (1948) .........................................................................................18

*Davis & Cox v. Summa Corp.*,
751 F.2d 1507 (9th Cir. 1985) .........................................................................18

*Digerati Holdings, LLC v. Young Money Entm't, LLC*,
194 Cal.App.4th 873 (2011) ............................................................................13

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ...........................................................................21

*Duran v. Duran*,
150 Cal.App.3d 176 (1983) ...........................................................................5, 8

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) .............................................................................6

i

**EXHIBIT 68**
**1444**

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
119 Cal.App.4th 263 (2004) ............................................................................ 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ...........................................................................22

*Ersa Grae Corp. v. Fluor Corp.*,
1 Cal.App.4th 613 (1991) .............................................................................. 6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
342 F.3d 149 (2d Cir. 2003) .............................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ..........................................................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
773 F.2d 1068 (9th Cir. 1985) ...........................................................................19

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) ...................................................................... 19, 26

*Granite Rock Co. v. Teamsters*,
649 F.3d 1067 (9th Cir. 2011) ...........................................................................18

*Harris v. Rudin, Richman & Appel*,
74 Cal.App.4th 299 (1999) ............................................................................ 5, 7

*In re Pacific Pictures Corp.*,
2012 WL 1640627 (9th Cir. May 10, 2012) ......................................................16

*Inamed Corp. v. Kuzmak*,
275 F.Supp.2d 1100 (C.D. Cal. 2002) ...............................................................13

*Leather v. Eyck*,
180 F.3d 420 (2d Cir. 1999) ..............................................................................18

*Levin v. Knight*,
780 F.2d 786 (9th Cir. 1986) ...................................................................... 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby*,
777 F.Supp.2d 720 (S.D.N.Y. 2011) ..................................................................24

ii

**EXHIBIT 68**
**1445**

*Mattel, Inc. v. MGA Entm't, Inc.*,
  616 F.3d 904 (9th Cir. 2010) ...................................................................4

*Murray v. Gelderman*,
  566 F.2d 1307 (5th Cir. 1978) ...............................................................24

*Norris v. Grosvenor Mktg. Ltd.*,
  803 F.2d 1281 (2d Cir. 1986) .................................................................18

*O'Brien v. R.J. O'Brien & Assocs., Inc.*,
  998 F.2d 1394 (7th Cir. 1993) ...............................................................16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
  107 Cal.App.4th 516 (2003) ...................................................................11

*Picture Music, Inc. v. Bourne, Inc.*,
  457 F.2d 1213 (2d Cir. 1972) .................................................................23

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995) .....................................................................24

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
  77 F.3d 309 (9th Cir. 1996) ......................................................................7

*Sanborn v. Fed. Crop Ins. Corp.*,
  93 Cal.App.2d 59 (1949) .........................................................................16

*Siegel v. Nat'l Periodical Publ'ns*,
  508 F.2d 909 (2d Cir. 1974) ........................................................ 17, 18, 19

*Stephan v. Maloof*,
  274 Cal.App.2d 843 (1969) .......................................................................7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
  640 F.3d 1034 (9th Cir. 2011) .......................................................... passim

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
  429 F.3d 869 (9th Cir. 2005) ......................................................... 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney*,
  881 F.2d 772 (9th Cir. 1989) .....................................................................9

iii

**EXHIBIT 68**
**1446**

## Statutes

17 U.S.C § 204(a) ....................................................................................6

37 C.F.R. § 201.10(e)(1)-(2)...................................................................24

Cal. Civ. Code § 1624 .............................................................................6

## Rules

Fed. R. Evid. 1002 .................................................................................27

**EXHIBIT 68**
**1447**

# INTRODUCTION

This case should have ended long before it began.  The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute.  Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer.  Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C."  RER-13.  DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter.  Even now, Larson tells the Court:  "the parties thought they had arrived at terms" in October 2001.  LOR-14.

And indeed they had arrived at terms.  The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties.  Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form.  As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay.  DC would receive peace with Larson and certainty in its Superman rights.  The deal went bad

1

**EXHIBIT 68**
**1448**

only when—and only because—Hollywood businessman Marc Toberoff entered
the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing.  Under
Toberoff's guidance, Larson asserts that, although all parties said they reached
agreement on October 19, they were mistaken about essential terms.  Her only
evidence is an October 26 letter sent by DC's negotiator, John Schulman—which
Larson says differs materially from the October 19 letter.  She is incorrect, and
neither she nor Marks took this position at the time.  Every essential term in
Schulman's letter is identical in substance to those in Marks' letter.  Any
difference either involves a non-essential term or is one of semantics.  If any
material difference does exist, DC has long agreed:  the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the
2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire
rules.  Those rules and deals Larson's father made with DC control here, assuming
the Court reaches these issues.  Each of the disputed Superman works was created
by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point,
litigation must come to an end.  That point [is] now…."  *The Facebook, Inc. v.
Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011).  Judgment should be
entered in DC's favor, and the 2001 settlement agreement should be enforced.

**EXHIBIT 68**
**1449**

## I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer.  SER-105, 434.  Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent.  SER-107-08, 456-61.  A contract was formed on October 19; its terms stated in Marks' letter.  While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal.  And none reflects a disagreement on a material term.

### A.     Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute.  SER-434.  By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one.  SER-105-08, 434-35.  The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16.  SER-105-07, 434-35.  DC made an offer on that final point and all other material terms.  *Id.*  On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed."  SER-107-08.  Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet.  SER-456-61.

3

**EXHIBIT 68**
**1450**

Marks' October 19 call and letter sealed the deal.  The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price."  *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61.  The letter unequivocally accepted DC's offer.  SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001….").  The acceptance was signed by Larson's agent, "the party against whom enforcement is sought."  *Levin*, 780 F.2d at 787.  A binding agreement was formed.  *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter.  Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer."  LOR-14-17.  But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer.  SER-110, 435.  That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor.  Larson does not dispute this Court may enter judgment for DC.  DCB-28.  At a minimum, the issue must be remanded for trial.  *Id*. at 34.  For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

**EXHIBIT 68**
**1451**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

**EXHIBIT 68**
**1452**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL. CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and subscribed by the party to be charged *or by the party's agent*") (emphasis added); DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be "signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson concedes Marks was her agent, RER-9, and his letter clearly expresses her "acceptance" to "transfer all of [her] rights in … 'Superman,'" SER-456, 458. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated for two years, and resolved their last deal point on October 16. SER-456, 463-64. Larson suggests the October 16 deal was so hastily made that within days Marks and Schulman could not remember its terms; exchanged conflicting term sheets; and then let those conflicts fester. LOR-16-17. This account is unsupported. The parties stopped negotiating in October because they had a deal, and Marks *never* objected to Schulman's letter or called it a counter-offer. DC undertook the separate task of preparing a long-form, SER-435, and began performing on the

6

**EXHIBIT 68**
**1453**

2001 deal, reserving amounts due.  These are all acts of parties who had a deal.[2]

## B. Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it "was subject to documentation and would need to be reduced to a mutually-acceptable written contract."  LOR-26.  But (i) Marks' October 19 letter contains no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v. Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St. Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express reservation* to make a contract unenforceable for lack of later documentation, *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of intent not binding because it expressly stated it was "of no binding effect on any party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998) (draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may need to say this to mislead Larson about the deal he induced her to abandon—but the *record fact* remains that a reserve was set; it totals more than $20 million, SER-397-99; and the funds will be paid to Larson if this Court enforces the 2001 agreement.  Larson gets all of this money, though Marks may have a claim to 5%; only Toberoff loses his improperly obtained 40% (or more) cut.  DCB-16-19.

**EXHIBIT 68**
**1454**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office — and likely difficult to reach — for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By
>
> Kevin S. Marks

8

**EXHIBIT 68**
**1455**

Marks never reserves Larson's rights pending a final agreement. That is especially

clear when read in conjunction with the first paragraph of Marks' letter, which

contain an unambiguous "acceptance" by Larson on defined "terms":

> Dear John:
>
> This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an

agreement had already been reached—nothing in it constitutes a "clear

reservation" either. Just the opposite: it expressly confirms "the deal we've

agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting

together the contemplated long-form. And there is no reservation, clear or

otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

**EXHIBIT 68**
**1456**

### C. Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings

Larson does not dispute the only essential terms to a copyright transfer are "the subject matter, the price, and the party against whom enforcement is sought." *Levin*, 780 F.2d at 787; LOR-29. But she spends pages of her brief citing places where, in her view, Marks' October 19 and Schulman's October 26 letters differ. Some of the purported differences result from Larson's misapplication of the rules of contract interpretation. Others result from her failure to read the entire letters. The remainder are at most minor differences on non-essential terms. Even if any one met the high test for materiality (and none does), it would not matter. Sworn testimony from Schulman and Marks establishes that Marks precisely understood DC's October 16 offer, and set forth and accepted its terms. SER-110, 112, 435. Inconsistent terms DC tried to add—if there are any—must be ignored. *Facebook*, 640 F.3d at 1037-38. And while Larson says Schulman tried to get a better deal for DC, DC's position has been throughout: *if* there are any material differences in Schulman's letter, Marks' letter controls. RER-6; DCB-31; SER-435-37.

1. *Scope Of Rights*. Larson asserts that a material difference exists as to the scope of the properties—that Marks' letter applies to Superman, Superboy, Spectre, and related properties, but Schulman's supposedly expands the coverage to unnamed other properties. LOR-17. But in eight years of litigation, Larson has never identified a single property or work that she believes is covered by

10

**EXHIBIT 68**
**1457**

Schulman's supposedly more expansive language, and DC has never asserted any rights over these mystery properties. That is because no such rights exist.

2. *Monetary Terms*. Larson asserts that Marks' letter does not allow DC to recover interest on the advances it provides, while the Schulman draft provides that interest "at 100% of prime" can be recovered after December 31 "of year of payment." LOR-18 (citing SER-458, 467). Larson is incorrect. Paragraph 8 of *Marks'* letter provides that "beginning January 1 of the following year," after DC pays an advance, "there shall be interest at the prime lending rate." SER-458. This provision, which Larson fails to mention, shows no difference exists at all.

Larson also suggests that "6% of DC's receipts from all Media licenses" is materially different from "6% of DC's 'gross revenues' derived from 'use of the property in any and all media,'" because "media licenses" is not defined in the Schulman letter, and thus might exclude direct sales or assignments. LOR-18-19. But the Schulman letter plainly uses the term "media license" in the broader sense to include such revenues. It lists revenue from sales of "merchandise actually produced by DC" as an example of revenue from "merchandising licenses." SER-467. Because his term "license" includes direct sales, it has the broader meaning that Larson says only Marks' letter included. *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526 (2003).

11

**EXHIBIT 68**
**1458**

Larson also points to semantic differences between the letters without assigning any weight to their materiality other than her own conclusory statements. For instance, she focuses on the fact that Marks' letter specifies three instances where the 6% media license fee would be reduced to 1.5%, whereas the Schulman draft cited these three instances as "examples." SER-457-58, 467-68, 495. In years of litigation, Larson has never pointed to a fourth property that was swept in.

Larson also suggests Schulman's letter allows DC to pay royalties below 1% in certain cases. LOR-20. Larson never raised this interpretation in her briefing or testimony below. Marks did not read the language that way, SER-536-37, nor did DC's later long-form draft, which clearly set the floor at 1%, SER-497. Even if Larson's new interpretation were correct, she cannot show it materially altered the agreement—particularly since it would permit *more* than 1% royalty in cases where Marks' letter capped the royalty at 1%. LOR-20.

Larson also says Schulman's letter departed Marks' letter by defining the term "extraordinary cases." SER 457, 467. It is hardly surprising that a vague term would be given a more precise definition, and the definition Schulman gave tracks the purpose articulated in the Marks draft, which stated that Six Flags would serve as an example because it "involves numerous characters." SER 457.

Along the same vein, Larson says Schulman's letter amended Marks' by defining "cameo" to mean stories where the subject "characters do not appear in

12

**EXHIBIT 68**
**1459**

the title of the publication or feature." SER-468. This definition accords with

custom, DCB-33-34, and applied reciprocally—DC would not reduce Larson's

royalties if one of its other characters (*e.g.*, Batman) made a cameo in Superman.

Noting an accepted definition for a vague term is hardly a material change.

3. *"Other" Non-Essential Terms.* Larson also complains of differences in

language concerning warranties, indemnification, publicity, and credit, but none

are essential terms to a copyright transfer. DCB-34; *Inamed Corp. v. Kuzmak*, 275

F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002). Even if there were disagreement over

such non-essential terms, a contract arose on October 19 when agreement on all

*essential* terms was reached. *Facebook*, 640 F.3d at 1037-38.

In any event, Larson does not identify material differences as to these non-

essential terms. As to the warranties, Larson would have been required to provide

"100% ownership" to DC and be subject to a duty of good faith and fair dealing

not to interfere with the contract, which is an implied provision of every contract in

California. *See Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194

Cal.App.4th 873, 885 (2011). The trivial difference in language concerning

warranties thus could hardly give rise to "significant potential liability." LOR-22.

Similarly, the so-called "indemnification" provision merely implements the

requirement that the "Siegel Family would transfer all of its rights … resulting in

100% ownership to D.C.," SER-458, and that the "Siegel Family" acted "through

13

**EXHIBIT 68**
**1460**

Joanne Siegel and Laura Siegel Larson," SER-456, in providing these rights. Far from being "significant obligations of the Siegels to indemnify," LOR-23, the Siegel Family was asked to indemnify DC against suits by the Siegel Family.[5]

    4. *The February 2002 Long-Form.* Larson also points to so-called "vast differences" between Marks' letter and DC's February 2002 long-form, LOR-24, but she identifies only a few provisions in that draft that even arguably conflict. As explained above and in DC's principal brief, DCB-32-33, even if DC proposed materially different terms in the February 2002 draft long-form, those differences cannot erase the October 19 agreement. *Facebook*, 640 F.3d at 1038.[6]

### D. Marks' August 2002 Memo Confirms A Deal Was Made

A document this Court recently ordered Larson to produce confirms the parties made a binding agreement in October 2001. In an August 2002 memo,

---

[5] Larson's remaining items scarcely merit mention. She says Schulman required travel for Joanne Siegel and this was a material difference given her poor health. LOR-23. But Schulman's letter made clear any travel was "subject to [her] health." SER-464. Larson also cites a divergence as to credits in paid ads. LOR-23. But Schulman's letter requires credit on all "works where credit to creators is customary," SER-469, and Larson presents no evidence such credit was otherwise.

[6] Any differences are not material and are typical of clarifications in a long-form. Larson says the draft excluded services from the royalty sums. LOR-19. But because services were never addressed in the prior drafts, this is not a different term. The same is true of units, *e.g.*, returned or lost, for which there would be no revenue to pay royalties. LOR-21. Larson also says the draft excludes cash advances, LOR-19, but it does no such thing—it states a time when sums paid to DC would vest, SER-481. Unsurprisingly, Marks told Schulman the February long-form was "consistent" with the October deal. SER-125-28, 436, 440.

**EXHIBIT 68**
**1461**

Marks reminds Larson *four times* that she made a "deal" or "agreement" with DC
in October 2001, and said he might have to testify against her if she repudiated it.
RER-13.  Even though Marks drafted his memo long after receiving Schulman's
October 26 letter and after DC sent its February long-form, Marks never suggested
that either altered the binding effect of the October 19 deal.  Marks never said the
parties viewed these two later documents as "counter-offers."  Nor did he suggest
that these post-agreement documents revealed a "mistake" about the terms of the
deal.  Rather, Marks stressed again and again that "an agreement was reached"
between DC and Larson, and breaching it would subject her to suit.  RER-13-14.

     As both sides understood at the time, Schulman's October 26 letter and DC's
draft long-form were simply parts of hammering out the formal documentation for
an agreement that had already been reached.  SER-435; RER-13-14.  Had Larson
worked with DC to document the fine points of their agreement, this matter could
have long ago been resolved.  But instead, lured by Toberoff's false promises,
Larson reneged.

*    *    *

     The 2001 deal should be enforced, judgment should be entered in DC's
favor, and this case should end.  At a minimum, the district court's summary
judgment order should be reversed, and the case remanded for a trial on DC's
settlement defense.

15

**EXHIBIT 68**
**1462**

## II. DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM

DC's limitations defense turns on one disputed fact—whether settlement talks were terminated by a May 9, 2002, letter from Larson's mother to DC (making this action untimely), or a September 2002 letter from the Siegels to DC. DCB-37-39. While Larson argued below that settlement talks ended in September, she recently argued in the related *Pacific Pictures* case that the May 9 letter "ended" any chance of settling the matter. SER-827, 878-79. A jury should have a chance to hear this evidence and decide which letter ended settlement talks.

Larson contends the May 9 letter did not meet the requirements of the parties' tolling agreement, but that is a jury question. *Sanborn v. Fed. Crop Ins. Corp.*, 93 Cal.App.2d 59, 65 (1949). She also says that in *Pacific Pictures*, she described the May 9 letter as making negotiations "moribund," which means "dying," not dead. But she argued in *Pacific Pictures* the May 9 letter "ended" any prospect of resolving the matter, SER-825—which is possible only if the letter did, in fact, terminate negotiations.

Larson may have taken her new factual position to shield Toberoff from tort liability in *Pacific Pictures*—casting even more doubt on his relationship with her. *Cf. In re Pacific Pictures Corp.*, 2012 WL 1640627, at *1 (9th Cir. May 10, 2012). But whatever her motive, if it is credible for Larson to argue in *Pacific Pictures*

16

**EXHIBIT 68**
**1463**

that the May 9 letter ended any prospect of completing negotiations, then a jury in

this case could find the same thing, and thus find that her lawsuit was untimely.

## III.  LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS

DC's cross-appeal challenges the district court's summary-judgment ruling

that four Superman works were not made-for-hire:  portions of *Action Comics #1*

("*AC#1*"); *Action Comics #4* ("*AC#4*"); *Superman #1* (pages 3-6) ("*S#1*"); and two

weeks of "Pre-McClure Strips."  Larson's opposition is unavailing.

### A.    Elements Of *AC#1* Were Made-For-Hire

Key elements of *AC#1*, added in 1938, were made-for-hire.  *Compare* ER-

706, *with* SER-78; *see also* ER-654, 917, 957-59; SER-379-88, 442, 803.  The

court in *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974), did not

hold otherwise, and Larson's preclusion and merits arguments are without basis.

#### 1.    National *Is Not Preclusive*

Larson argues *National* precludes DC from making its work-for-hire

arguments about the 1938 additions to *AC#1*, but she is mistaken.  The sole issue in

*National* was whether Siegel and Shuster owned the renewal copyright in *AC#1*.

*National* never considered the issue now before this Court:  whether the 1938

additions in *AC#1* were made-for-hire and thus are not subject to termination.

Larson's suggestion (LOR-43) that *National* ruled on the work-for-hire status of

the 1938 additions is inaccurate.  It merely concluded that these "revisions" were

17

**EXHIBIT 68**
**1464**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 237 of 347
Case 2:10-cv-03633-ODW-RZ Document 259-12 Filed 04/24/12 Page 237 of 347
Page ID #:33056

not "sufficient to create the presumption that *the strip* [*i.e.*, the *AC#1* Superman strip *in toto*] was a work for hire." 508 F.2d at 914 (emphasis added).

Larson concedes this case involves "evidence [and] argument not presented in [*National*]," but says issue-preclusion applies to any issue DC "could have" raised in *National*. LOR-44. Larson conflates issue-preclusion with claim-preclusion—it is only the latter doctrine that precludes litigating a claim that could have been raised. *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948); *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999). Larson offers seemingly contrary quotations from *Chicot County Drainage Dist. v. Baxter Cnty. Bank*, 308 U.S. 371, 378 (1940), and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985), but the quotes refer specifically to *res judicata* (or claim-preclusion).

Under settled *issue*-preclusion rules, a ruling in a prior case is preclusive only if the issue previously resolved is *identical* to the issue now raised, the issue was *actually litigated* before, and resolving it was *necessary*. *Sunnen*, 333 U.S. at 599-600; *Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); DCB-70. Larson's cases confirm this, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986), and she fails all three elements of the test.

Here, new evidence and argument is presented concerning a new issue—the standalone work-for-hire status of the 1938 additions. And *National*'s comments about work-for-hire were "unnecessary" to its decision. *National* affirmed the

18

**EXHIBIT 68**
**1465**

district court's ruling that Siegel transferred his rights in *AC#1*, and, thus, it did not need to address the district court's alternative ruling that *AC#1* was made-for-hire. Additional "determination[s] adverse to the winning party [*i.e.*, DC] do[] not have preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985). Larson disagrees, saying *National* could only reach the transfer-of-rights issue because it found *AC#1* was not a work-for-hire. LOR-44. *National* belies that reading: its comments on work-for-hire are *four sentences* at the end of the opinion, *after* affirming the district court's transfer-of-rights ruling.

### 2. *The 1938 Additions Were Made-for-Hire*

Larson's merits arguments are equally unpersuasive. The disputed *AC#1* elements were all added in 1938, after DC employed Siegel and Shuster as artists to create new and derivative works for DC. Because these elements were added at DC's "instance and expense," they are either works-for-hire in their own right, or DC is a joint owner of the works that contain them. DCB-42-43, 61-68.[7]

---

[7] Larson concedes "authors of derivative works … own the copyright to their added material." LOR-55. DC thus at least owns the copyright in the 1938 elements. Larson denies DC can be a joint owner because there was no intent "that DC or its staff be considered 'coauthors.'" LOR-53. But her own case—*Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 1999)—confirms that a joint work is created where multiple authors make independent contributions intending that their contributions be integrated into a single work. Here, that was plainly the case. DC exercised control over the creation and merging of the new elements into *AC#1*. DCB-67-68. "[C]omic book[s] are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist," *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004), and DC staff artists did the latter work. Larson

19

**EXHIBIT 68**
**1466**

> a. *New Content.*  Pursuant to the 1937 Employment Agreement, DC instructed Siegel and Shuster to adapt their preexisting Superman story "into a full length … strip" to be included in *AC#1*.  ER-957; SER-379, 381.  Siegel and Shuster "compli[ed]," ER-957, and "revised and expanded" their story to include new panels, text, and illustrations.  ER-654, 957; SER-385-86.  DC paid Siegel and Shuster for their contributions, ER-917, 958; SER-383, 804, and had the right to control and supervise them, ER-957; SER-379, 381, 383.  These facts are undisputed, and easily satisfy the instance-and-expense test.  DCB-67-68.

Larson quotes Shuster's testimony that DC did not give them specific directions "as to what to do or what to include in Superman," LOR-47, but the instance-and-expense test does not require particular directions—only that the work itself be ordered and paid for by the employer, DCB-54-55.  It is the *right* to dictate substance that matters, *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879-80 (9th Cir. 2005), and DC owned and did exercise the rights one would expect an employer to exercise, ER-957, SER-379, 381, 383.

---

touts that Siegel and Shuster's names appear on the byline, LOR-53, but this is a custom not remotely dispositive of authorship.  Indeed, the pair's names appear on many works made-for-hire that Larson did not seek to terminate, and DC's name appears on *AC#1*, the Promotional Announcements (which make no reference to Siegel or Shuster), and *all* Superman publications.  Finally, the Announcements feature the cover art DC created and tout *AC#1*'s "*Color!*," SER-370, making clear these DC-created elements were instrumental to *AC#1*'s "appeal," *Aalmuhammed*, 202 F.3d at 1234.

**EXHIBIT 68**
**1467**

Larson also argues the 1938 Assignment proves that the new material—created before the Assignment—was not work-for-hire. LOR-46. This is wrong for many reasons. Among them, the 1938 Assignment assigned to DC the parts of *AC#1* that Siegel and Shuster created *before* working for DC; it is the work the pair did on the new elements that was made-for-hire. *Fox*, 429 F.3d at 881, also rejects Larson's claim about the assignment. Because the instance-and-expense test is satisfied for the 1938 additions, *supra* at 19-20, the presumption that DC owned all copyright in those works may be overcome only by evidence proving the parties *expressly agreed* Siegel would own the copyright, DCB-43. Larson has no such evidence, and *Fox* holds the mere existence of a later assignment does not qualify.[8]

*b. Colorization.* DC colorist Jack Adler—the only percipient witness—testified that Siegel and Shuster submitted the *AC#1* panels in black-and-white, and other DC artists selected colors to add. DCB-61. Larson does not defend the trial court's erroneous ruling that colorization cannot be copyrighted. *Id.* at 61-62. But she does cite the court's equally erroneous criticism of Adler. LOR-48-49. The court said Adler only "describe[d] procedures generally employed in the printing process," rather than "what actually occurred with respect to" *AC#1*, SER-50, when, in fact, Adler addressed those specifics. He testified it was industry custom

---

[8] Larson rewrites *Dolman v. Agee*, 157 F.3d 708, 712-13 (9th Cir. 1998), as holding, contrary to *Fox*, that an assignment alone rebuts the work-for-hire presumption. LOR-46. *Dolman*, 157 F.3d at 713, cited an assignment as but one of *numerous* factors that *together* sufficed. None of the other factors is present here.

21

**EXHIBIT 68**
**1468**

for artists to submit "comic book work … in black and white," and that this "*was the case with Action Comics No. 1*." SER-442 (emphasis added). He elaborated: "Siegel and Shuster provided the artwork in black and white. Color was applied as part of the regular printing process," and he even identified, by name, the DC artist who "selected the color for Superman's 'S.'" *Id.* Larson speculates Siegel or Shuster submitted "color guides," LOR-49, but no evidence supports this claim.

    *c. Cover Art.* DC's February 22, 1938, letter to Siegel makes clear—and Siegel's memoir confirms—that DC's artists "used one of those panel drawings of SUPERMAN" as a template to create "the cover" of *AC#1*. SER-388, 803. Larson says the cover was based on Shuster's "large promotional panel-drawings," LOR-50, but whatever drawing was used as a "template," what matters is that the cover was created *by DC artists* and thus is owned by DC, DCB-62-67.

    Larson asserts DC's cover art is not independently copyrightable because it is "closely derived" from an interior panel and any differences are "de minimis." LOR-51. But Larson concedes that the cover features Superman with "a visible S-crest on his chest" as well as "facial features and musculature," LOR-51 n.8, while the interior panel does not.[9] Those differences satisfy the test in *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220, 1226 (9th Cir. 1997), that a derivative work is copyrightable if it contains "non-trivial" variations

---

    [9] DC did not use a "low-resolution copy" of the panel. LOR-51n.8. In fact, it enlarged the panel to make it more visible. *Compare* DCB-65-66, *with* SER-86.

22

**EXHIBIT 68**
**1469**

from the original work.  Larson says the different S-crest, facial features, and
musculature appear in *other* panels in *AC#1*, LOR-51 n.8, but those elements first
appeared in the Promotional Announcements that DC owns, DCB-80-81, 84.  And,
in any event, DC's cover contains *seven other* non-trivial variations, DCB-64-65—
all of which meet the *Genesis* test, and none of which Larson disputes.

### B.    DC Owns The Pre-McClure Strips ("Strips")

1.    *The Strips Were Made-for-Hire*

The Strips were created *after* Siegel and Shuster entered into the 1937
employment agreement with DC, and *after* the pair assigned all of their Superman
rights to DC in 1938.  ER-602-03, 615, 917; SER-582-89.  DC does not "ignore"
the "instance and expense" test because of these agreements.  LOR-55.  Just the
opposite:  the agreements are what *satisfy* the "instance" prong, because they mean
the Strips were *necessarily* created at DC's instance.  DCB-71-72.  Since DC was
the sole owner of all rights in Superman properties, it had complete control over
the creation of new Superman material.  *Estate of Hogarth v. Edgar Rice
Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Picture Music, Inc. v. Bourne,
Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); DCB-47, 56-57.  It is thus irrelevant that
Siegel and Shuster exercised creative independence.  LOR-55.[10]

---

[10] While authors of authorized derivative works "own the copyright to their
added material" (LOR-55), where—as here—the derivative work is made-for-hire,
the statutory "author" is the hiring party.  *Fox*, 429 F.3d at 881; DCB-9-10, 42-43.

**EXHIBIT 68**
**1470**

Larson concedes "Siegel and Shuster were compensated" for their work, LOR-55, which is enough to satisfy the "expense" prong. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995). And she concedes they created the Strips *expecting* to be compensated for their work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978), and that DC and McClure bore "the financial risk," *Fox*, 429 F.3d at 881—again establishing "expense." But she says the "expense" factor is not satisfied, because Siegel and Shuster were paid a royalty on net profits, rather than guaranteed compensation. LOR-55. Courts "roundly reject[]" that asserted distinction, as Toberoff well knows. *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (collecting cases).

### 2. *Larson's Failure To Terminate The Strips Is Dispositive*

Larson does not deny that her termination notice omitted *all* information concerning the Strips required by federal law—title, author, copyright date, and registration number. Rather, she argues the omission was harmless, because her notice included a "catch-all" footnote indicating an intent to recapture "every … omitted work." LOR-57. That theory contradicts the plain terms of the rule, which treats as harmless *only* those mistakes that "do[] not materially affect the adequacy of the information" in the notice. 37 C.F.R. §201.10(e)(1)-(2). The *complete omission* of all required information obviously *does* materially affect the adequacy of the notice—even with a catch-all, the required information is nonexistent.

24

**EXHIBIT 68**
**1471**

*Burroughs v. M-G-M, Inc.*, 491 F.Supp. 1320, 1326 (S.D.N.Y. 1980) (omission of five Tarzan works "'materially affect(s)' the adequacy of the Notice").[11]

If a termination notice could simply refer to "all works, including omitted works," there would be no point in requiring *any* information concerning particular works. The rules specifically define errors that are harmless, Larson's error is not among them, and courts cannot engraft new exceptions, especially given the careful "compromise" the Copyright Act strikes between the rights of heirs and grantees like DC. DCB-15-16 (citing legislative history).[12]

## C. Pages 3-6 Of *S#1* Are Works-For-Hire

Larson maintains that pages 3-6 of *S#1* were created as part of the original Superman story in 1935—before Siegel and Shuster entered into a work-for-hire relationship with DC—and says there is "no evidence" to the contrary. LOR-53. Incredibly, Larson has no response (other than to ask the Court not to read it) to Siegel's refutation of this theory in his memoir: "[Commentators] state Superman magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story. The truth is that the additional pages were specifically created for use in Superman

---

[11] Larson's effort to distinguish *Burroughs* fails. It held the omission was "not harmless," 491 F.Supp. at 1326, and the Second Circuit ruled the "incomplete notice left [the grantee] with license to use" the works. 683 F.2d 610, 622.

[12] Larson complains about DC's "math," LOR-59, but the numbers do not lie: of the 15 Superman works deemed subject to termination, the 12 Strips—80%— were completely omitted from her notices. DCB-76-77. That Larson wildly "over-noticed" other Superman works cannot turn a *nonexistent* notice of the Strips into an *adequate* one.

**EXHIBIT 68**
**1472**

Magazine No. 1." SER-805. Siegel's admission and DC's other evidence

confirms these pages were made-for-hire on behalf of DC. DCB-78; SER-761.

### D. Artwork In *AC#4* Is Work-For-Hire

It is undisputed Siegel created *no* artwork to accompany the 1934 script that

DC later incorporated into *AC#4*—a story illustrated by DC's staff artists. DCB-

79-80. Larson's contention that DC cannot simultaneously own these illustrations

as the author of a work-for-hire and as a joint author (LOR-54) misunderstands

DC's argument. DC's primary submission is that the artwork is owned outright by

DC as a work-for-hire, as the 99 panels of illustrations possess far more than the

"*de minimis* quantum of creativity" necessary to be copyrightable. *Feist Publ'ns,*

*Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). The artwork is also a joint

work between Siegel and DC, as both intended the script and illustrations to be

combined into a comic strip. *Gaiman*, 360 F.3d at 659; *supra* n.7. Larson has no

response, except to assert—without explanation—that the ownership of the *AC#4*

artwork is "not before the Court." LOR-54. It is. DC claimed ownership below,

RER-3, and the district court considered but "decline[d] to address" it in its August

2009 order being appealed, ER-78-79. The issue is preserved. *O'Brien v. R.J.*

*O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1397 n.1 (7th Cir. 1993).

**EXHIBIT 68**
**1473**

### E.     Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate.  The court held the Announcements were not subject to termination—and Larson does not challenge this ruling.  LOR-71 n.14. The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy.  SER-44-45.  Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it.  DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing.  LOR-72.  Not so.  DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day."  LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002.  *See* DCB-82-83 (collecting cases).  And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial.  In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements.  DCB-84; Docket Nos. 30-1, 36-1.

**EXHIBIT 68**
**1474**

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or,
at the least, reverse and remand on that defense and DC's limitations defense for
trial.  If the Court finds it has jurisdiction on the copyright issues presented, and it
finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated:  June 19, 2012

28

**EXHIBIT 68**
**1475**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of FED. R.

APP. P. 28.1(e)(2)(C) because it contains 6,796 words, excluding the portions

exempted by FED. R. APP. P. 32(a)(7)(B)(iii).  This brief's type size and type face

comply with FED. R. APP. P. 32(a)(5) and (6).

Dated:  June 19, 2012                    O'MELVENY & MYERS LLP

By:   /s/ Matthew T. Kline

Matthew T. Kline
Attorneys for Warner Bros.
Entertainment Inc. and DC Comics

**EXHIBIT 68**
**1476**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2012, I caused to be electronically filed the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on June 19, 2012, at Los Angeles, California.

/s/ Cassandra Seto
Cassandra Seto

**EXHIBIT 68**
**1477**

# EXHIBIT 69

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 251 of 347
Case: 11-55863 06/19/2012 ID: 8215945 DktEntry: 40-2 Page 251 of (1 of 105)
Page ID #:33070

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee,*

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZX)

————————

## MOTION TO SUPPLEMENT THE RECORD WITH THE MARKS MEMO
————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 69**
**1478**

Warner Bros. Entertainment Inc. and DC Comics (collectively, "DC")
respectfully move to supplement the record with one document that this Court
recently ordered defendants to produce. *In re Pacific Pictures Corp.*, 2012 WL
1640627 (9th Cir. May 10, 2012). The document directly relates to the first
question DC presents in its cross-appeal; its consideration will not cause unfair
surprise nor raise questions of authenticity; and, although the contents of the
document were described in the record below in another document, the document
at issue was unavailable to DC when it filed its opening brief in this appeal.
Supplementation of the record is thus appropriate. *Mangini v. U.S.*, 314 F.3d 1158,
1160-61 (9th Cir. 2003); *Overstreet ex rel. NLRB v. United Bd. of Carpenters &
Joiners of Am., Local 1506*, 409 F.3d 1199, 1204 n.7 (9th Cir. 2005). A copy of
the Proposed Reply Excerpts of Record ("RER") is concurrently filed.

    1. Larson cannot dispute the authenticity of the recently produced
document. Nor can she dispute that the failure to include the document in the
record below was not due to any fault or neglect on DC's part. The recently
produced document at issue—the "Marks Memo"—comes from the collection of
"Toberoff Timeline" documents that plaintiff Laura Siegel Larson and her co-
defendants in the related *Pacific Pictures* case finally produced to DC on May 14,
2012. DC has been trying to obtain copies of these documents since July 2006.
Declaration of Ashley Pearson ("Pearson Decl.") Ex. A. DC also argued to the

1

**EXHIBIT 69**
**1479**

Case 2:10-cv-03633-ODW-RZ   Document 500-12   Filed 10/10/12   Page 253 of 347 (3 of 105)
Case 2:10-cv-03633-ODW-RZ   Document 325-9   Filed 05/19/2012   Page 253 of
Page ID #:33072

district court in 2009 that the Timeline documents, and especially the "Marks Memo" that DC requests this Court to consider here, were relevant to the settlement issue that DC presents on this appeal.  *Id.* Ex. B at 50-55; DCB-5, 25.

2.  Larson and her co-defendants asserted privilege over the Timeline documents, but the district court and this Court held that defendants waived any privilege that existed in them by "voluntarily" providing them to the government in 2010.  *Pacific Pictures*, 2012 WL 1640627, at *5-6.  Defendants moved for a stay, which would have kept DC from obtaining or using the Timeline documents in this appeal (and a related SLAPP appeal), Pearson Decl. Ex. C, but the courts denied defendants' motions, *id.* Exs. D, E.  Defendants finally produced the Timeline documents five weeks ago, 10 days before filing their opposition to DC's cross appeal.

3.  The Marks Memo is an August 9, 2002, memo written by the Siegels' former counsel, Kevin Marks, to Larson and her mother Joanne Siegel, and Don Bulson, counsel for Larson's half-brother Michael Siegel.  RER-13-14.  The memo directly supports DC's primary defense in this case—*i.e.*, that Larson's claims are barred by an October 2001 settlement agreement with DC, as DC argues in its first question presented.  DCB-5, 25-37; DC Reply 2-15.

In his 2002 memo, Marks repeatedly affirms that the Siegels and DC made a "deal" in 2001.  RER-13-14.  He recounts that when Toberoff approached him with

**EXHIBIT 69**
**1480**

an offer to buy the Siegels' Superman rights, he told "Toberoff that the Siegel Family had reached an agreement with D.C.," and that he "did not feel that it was appropriate to be making offers while [he] was in the process of documenting an existing deal." RER-13. Marks' letter also conveys a hard offer from Toberoff to the Siegels, but counsels against accepting it, saying: "I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.)" *Id.* Marks recommended the Siegels "continue to negotiate the documentation [of the October 2001 agreement] in good faith with D.C.," and warned the Siegels if they did not do so, DC would likely file suit against them and Toberoff to enforce its rights. RER-13-14.

4. Besides refuting Larson's arguments on appeal that no "agreement" was ever reached, LOR-13-17, these admissions by Larson's admitted agent (Marks), RER-9, run contrary to positions she took before the district court in obtaining summary judgment on DC's settlement defense, SER-561. Larson told the district court "no agreement was ever consummated," SER-549, because even though Marks "styled" his October 19, 2001, letter to DC as an " 'acceptance' of [DC's] 'offer,'" it was really intended as a "counter-offer," *id.* Marks' repeated admissions to Larson that "*an agreement* was reached last October with D.C.," RER-13, refutes this contention and makes clear that Marks—the author of the October 19 letter—knew his letter was an *acceptance*, and a deal was made.

3

**EXHIBIT 69**
**1481**

The district court relied on Larson's representations in finding that there was "no unequivocal acceptance of an offer and, thus, no agreement" in October 2001, ER-200, and Larson now urges this Court to accept the same argument on appeal, LOR-16.  Moreover, in her Third Brief on Cross-Appeal, Larson provides the Court with a litany of alleged "material differences" between Marks' October 19 letter and a later long-form agreement, as well as a letter that John Schulman of DC sent to Marks on October 26, 2001.  LOR-17-24.  Marks' memo undercuts the very premise of Larson's argument—if an "agreement was reached" on October 19, as Marks told Larson in 2002, then the terms of the October 19 letter are binding, and any differences in later communications are irrelevant.  DCB-32-33.

5.  The Marks Memo verifies evidence that was already in the record before the court below—evidence Larson challenged as inaccurate.  For instance, the Toberoff Timeline itself (which is in the record and was before the district court in this case, in early 2009, SER-182-88) describes the events leading up to the Marks Memo and its contents:

> On August 8, 2002, MT [Marc Toberoff] tells Marks that he and Emanuel have a billionaire ready to offer $15 million up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media.  Kevin Marks says to the Siegels, 'Don't do it." …
>
> *In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.*

**EXHIBIT 69**
**1482**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 256 of 347 (6 of 105)
Case 2:10-cv-03633-ODW-RZ Document 259-12 Filed 06/19/12 Page 256 of 347
Page ID #:33075

> *Marks conveys MT's offer to the Siegels, and Marks does say to the*
> *Siegels, it is a better offer than the one you have. However, Marks*
> *also tells the Siegels that he would testify in court against the Siegels*
> *if they accepted this offer because he believes there has already been*
> *an agreement reached [with DC].*

SER-183 (emphasis added). Based on the Timeline's disclosure in 2008, DC

asked the district court in 2009 to re-open discovery, so that DC could gain access

to the Marks Memo and its admissions concerning DC's settlement defense.

Pearson Decl. Ex. B at 37-38, 50-55. Toberoff discounted the Timeline as a

"conspiratorial rant," *id.* at 38-39, and the district court refused to reopen

discovery, *id.* Ex. F. The recently produced Marks memo verifies the accuracy of

this part of the Timeline—a document which the district court chose not to address.

    6. This Court has inherent authority to grant a motion to supplement the

record. *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). The evidence is

relevant to the most important issue on appeal, and there is no fault on DC's part in

failing to submit the Marks Memo sooner. *Mangini*, 314 F.3d at 1160-61; *Colbert*

*v. Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006) (supplementing record where

evidence "go[es] to the heart of the contested issue, [and] it would be inconsistent

with this court's own equitable obligations … to pretend that [it does] not exist").

    DC obtained a court order from the district court, in May 2011, compelling

that the Timeline documents be produced—this was *before* Larson filed her notice

of appeal on this interlocutory appeal. *Pacific Pictures*, 2012 WL 1640627, at *2;

**EXHIBIT 69**
**1483**

ER-230-31.  Larson impeded DC's efforts to obtain the Marks Memo and present it to the district court (and new district judge handling this matter) before this appeal was noticed, by pursuing their writ petition, which this Court ultimately denied in April 2011.  *Pacific Pictures*, 2012 WL 1640627.

Appellate courts supplement the record when the omission of relevant evidence could result in an incomplete account of the facts.  *Mangini*, 314 F.3d at 1160-61 (supplementing record with newly discovered letters refuting party's misstatements below); *Colbert*, 471 F.3d at 165-66 (supplementing record with front of canceled envelope, when only back had been submitted below).

Granting this motion to supplement presents no risk of unfairness or surprise.  Larson and her counsel have possessed the Marks Memo for years, and DC, since 2009, has pressed its relevance.  *Mangini*, 314 F.3d at 1160-61; *More Light Invs. v. Morgan Stanley DW Inc.*, 415 F. App'x 1, 2 (9th Cir. 2011).  Nor can defendants question the authenticity of the memo—they produced it from their own files.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (judicial notice appropriate where "neither party disputes the authenticity" of evidence); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 994 (9th Cir. 2010) (same).

7.  The Court should grant DC's motion to supplement the record with the Marks Memo.  To be clear, consideration of the Marks Memo is not necessary for the Court to hold that judgment should be entered in DC's favor or that, at a

**EXHIBIT 69**
**1484**

minimum, the district court's summary judgment order must be reversed and the

case remanded for a trial on DC's settlement and statute-of-limitations defenses.

Supplementing the record with the Marks Memo should occur, however, to ensure

a full and fair consideration of this case. *Mangini*, 314 F.3d at 1160-61; *Nat'l*

*Senior Citizens Law Ctr. v. Soc. Sec. Admin.*, 849 F.2d 401, 403 & n.3 (9th Cir.

1988); *Mitleider v. Hall*, 391 F.3d 1039, 1041 n.1 (9th Cir. 2004).

    Respectfully submitted,

Dated:  June 19, 2012           O'MELVENY & MYERS LLP

                        By: /s/ Daniel M. Petrocelli
                            Daniel M. Petrocelli
                            Attorneys for Warner Bros.
                            Entertainment and DC Comics

**EXHIBIT 69**
**1485**

## DECLARATION OF ASHLEY PEARSON

I, Ashley Pearson, declare and state as follows:

1.    I am an attorney licensed to practice in the State of California and admitted to practice before the United States Court of Appeals for the Ninth Circuit.  I am an associate at O'Melveny & Myers LLP, counsel of record for DC in the above-entitled appeal, and the related appeals in *DC Comics v. Pacific Pictures Corp.*, Appeal Nos. 11-56934, 11-71844.  I make this declaration in support of DC's Motion To Supplement The Record With The Marks Memo.

2.    Attached hereto as Exhibit A is a true and correct copy of excerpts from DC's Notice Of Motion And Joint Stipulation Re: Defendants' Motion To Compel Production Of Whistle-Blower Documents, filed in this case in the U.S. District Court for the Central District of California, Case No. CV 04-8400, on March 26, 2007.

3.    Attached hereto as Exhibit B is a true and correct copy of excerpts from DC's Notice Of Motion And Joint Stipulation Re: Defendants' Motion To Reopen Discovery, To Compel Production Of Documents, And To Compel The Further Deposition Of Kevin Marks, filed in this case in the U.S. District Court for the Central District of California, Case No. CV 04-8400, on March 2, 2009.

4.    Attached hereto as Exhibit C is a true and correct copy of Petitioners' Motion For Stay Pending Decision On Petition For Rehearing And For Rehearing

**EXHIBIT 69**
**1486**

En Banc filed with this Court in *In re Pacific Pictures* ("*Pacific Pictures*"), Appeal No. 11-71844, on May 8, 2012.

5.  Attached hereto as Exhibit D is a true and correct copy of an order issued by the U.S. District Court for the Central District of California in the related case, *DC Comics v. Pacific Pictures Corp.*, Case No. CV 10-03633 ODW (RZx), on May 7, 2012.

6.  Attached hereto as Exhibit E is a true and correct copy of an order issued by this Court in *Pacific Pictures*, Appeal No. 11-71844, on May 10, 2012.

7.  Attached hereto as Exhibit F is a true and correct copy of an excerpt from the Final Pre-Trial Conference Order, issued by the U.S. District Court for the Central District of California in this case, Case No. CV 04-8400, on March 13, 2009.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 19th day of June, 2012, at Los Angeles, California.

/s/ Ashley Pearson<br>
Ashley Pearson

**EXHIBIT 69**
**1487**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 261 of 347
Case: 11-55683   06/19/2012   ID: 8219025   DktEntry: 50-4   Page: 164 of 92 (11 of 105)
Page ID #:33080

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 27(d)**

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify that Appellee DC Comics' brief is proportionately spaced, has a typeface of 14 points or more, and does not exceed 20 pages.

Dated:  June 19, 2012                    O'MELVENY & MYERS LLP

                                         By:   /s/ Daniel M. Petrocelli
                                              Daniel M. Petrocelli
                                              Attorneys for DC and Warner Bros.

10

**EXHIBIT 69**
**1488**

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2012, I caused to be electronically filed the Motion To Supplement The Record With The Marks Memo with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on June 19, 2012, at Los Angeles, California.

/s/  Ashley Pearson
Ashley Pearson

**EXHIBIT 69**
**1489**

# EXHIBIT 70

APPELLATE CASE NO. 11-55863
CROSS-APPEAL CASE NO. 11-56034

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAURA SIEGEL LARSON
*Plaintiff, Counterclaim-Defendant, and Appellant,*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS
*Defendants, Counterclaimants, and Appellees.*

**APPELLANT LAURA SIEGEL LARSON'S REPLY IN SUPPORT OF MOTION TO STRIKE APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORDS AND PORTIONS OF PRINCIPAL AND RESPONSE BRIEF AND RESPONSE TO APPELLEES' MOTION FOR JUDICIAL NOTICE**

Appeal From The United States District Court
For The Central District of California,
Case No. CV-04-08400 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
*mtoberoff@ipwla.com*
Pablo D. Arredondo
*parredondo@ipwla.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
*Attorneys for Plaintiff-Appellant,*
*Laura Siegel Larson, individually and*
*as personal representative of The Estate of*
*Joanne Siegel*

**EXHIBIT 70**
**1490**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................3

I.    WARNER FAILS TO OVERCOME THE FUNDAMENTAL
      LIMITATION OF RULE 10(a)..........................................................3

II.   THE "JUDICIAL NOTICE" DOCTRINE IS LIMITED TO
      INDISPUTABLE FACTS AND DOES NOT PERMIT THE
      WHOLESALE INJECTION OF DISPUTED EXTRA-RECORD
      EVIDENCE INTO AN APPEAL..........................................................5

      A.    Irrelevant And Inadmissible Material Is Particularly Ineligible
            For Judicial Notice ...............................................................6

      B.    The Documents At Issue Are Not Judicially Noticeable ..............7

III.  WARNER IS PRECLUDED BY Fed. R. Civ. P. 60(B)(2) AND (C)
      FROM ATTEMPTING TO REOPEN THE JUDGMENT BELOW
      WITH SUPPOSED NEW EVIDENCE .......................................18

IV.   THE APPROPRIATE REMEDY IS TO STRIKE THE EXTRA-
      RECORD MATERIAL AND THOSE PARTS OF WARNER'S
      BRIEF THAT RELY ON IT, AND TO SANCTION WARNER ...............19

CONCLUSION.........................................................................................20

RESPONSE-APPENDIX ........................................................................21

CERTIFICATE OF COMPLIANCE.........................................................43

CERTIFICATE OF SERVICE .................................................................44

**EXHIBIT 70**
**1491**

# TABLE OF AUTHORITIES

## Cases

*Am. Prairie Const. Co. v. Hoich*,
560 F.3d 780 (8th Cir. 2009) ...............................................................7

*Baker v. California Dept. of Corr.*,
2012 WL 2045962 (9th Cir. June 7, 2012) .............................................5

*Barcamerica Int'l USA Trust.*,
289 F.3d at 595 (9th Cir. 2002) ...........................................................19

*Bellow v. Charbonnet*,
100 F. Supp. 2d 398 (E.D. La. 2000) .....................................................17

*Blankson-Arkoful v. Sunrise Sr. Living Services, Inc.*,
449 F. App'x 263 (4th Cir. 2011) ...........................................................4

*Colbert v. Potter*,
471 F.3d 158 (D.C. Cir. 2006) ....................................................... 13, 14

*Comerica Bank v. Lexington Ins. Co.*,
3 F.3d 939, 944 (6th Cir. 1993) ...........................................................11

*DC Comics v. Pacific Pictures Corp., et al.*,
C.D. Cal. Case No. 10-CV-03633 ODW (RZx) .........................................9

*Doss v. Clearwater Title Co.*,
551 F.3d 634 (7th Cir. 2008) ................................................................5

*Downs v. Baca*,
2012 WL 1883326 (9th Cir. May 24, 2012) .............................................8

*Eng v. New York Hosp.*,
1999 WL 980963 (2d Cir. 1999) ..........................................................12

*Farkarlun v. Hanning*,
2012 WL 684027 (D. Minn. Mar. 2, 2012) .............................................17

**EXHIBIT 70**
**1492**

*Flick v. Liberty Mut. Fire Ins. Co.*,
205 F.3d 386 (9th Cir.2000) ........................................................ 6, 13, 14

*G.M. v. Dry Creek Joint Elementary Sch. Dist.*,
458 F. App'x 654 (9th Cir. 2011)..................................................6

*Harrell v. Costco*,
422 F. App'x 635 (9th Cir. 2011)..................................................3

*In re Blumer*,
95 B.R. 143 (B.A.P. 9th Cir. 1988) .............................................6

*In re Indian Palms Associates, Ltd.*,
61 F.3d 197 (3d Cir. 1995).............................................................6

*In re Luxor Cab Mfg. Corp. of Am.*,
25 F.2d 646 (2d Cir. 1928)............................................................17

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .........................................................12

*In re Phillips*,
460 F. App'x 625 (9th Cir. 2011)...................................................3

*Israni v. Bittman*,
2012 WL 1074266 (9th Cir. Apr. 2, 2012) ...................................3

*Johnson v. Departments of Army & Air Force*,
2012 WL 32132 (9th Cir. Jan. 6, 2012) ......................................3

*Kazenercom TOO v. Ibar Dev., LLC*,
464 F. App'x 588 (9th Cir. 2011).................................................10

*Keeler v. Sierra Conservation Ctr.*,
2012 WL 1377030 (9th Cir. Apr. 20, 2012) ...............................8

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ......................................................11

iii

**EXHIBIT 70**
**1493**

*Lowe v. McDonald*,
221 F.2d 228 (9th Cir. 1955) ...................................................................................10

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003) ..............................................................................4, 20

*M/V American Queen v. San Diego Marine Construction*,
708 F.2d 1483 (9th Cir.1983) ......................................................... 6, 11, 14, 15, 17

*Maraldo v. Life Ins. Co. of the Sw.*,
2012 WL 1094462 (N.D. Cal. Mar. 30, 2012)................................................ 5, 6, 12

*Matter of Annis*,
78 B.R. 962 (Bankr. W.D. Mo. 1987) ......................................................................7

*McGill v. Michigan S.S. Co.*,
144 F. 788 (9th Cir. 1906) .......................................................................................5

*Meador v. Pleasant Valley State Prison*,
312 F. App'x 954 (9th Cir. 2009)............................................................................10

*Meyer v. Benko*,
55 Cal. App. 3d 937 (1976) ...................................................................................7, 8

*Murakami v. United States*,
398 F.3d 1352 (Fed. Cir. 2005)................................................................................3

*Native Ecosystems Council v. Weldon*,
2012 WL 991833 (D. Mont. Mar. 26, 2012) ............................................................3

*Nevitt v. United States*,
866 F.2d 1187 (9th Cir. 1989) ......................................................................... 17, 18

*Nunes v. Ashcroft*,
375 F.3d 805 (9th Cir. 2004) .......................................................................... 16, 17

*Palasota v. Haggar Clothing Co.*,
499 F.3d 474 (5th Cir.2007) ..................................................................................14

iv

**EXHIBIT 70**
**1494**

*Piedra v. True*,
52 F. App'x 439 (10th Cir. 2002)...............................................................18

*Pratt v. California State Bd. of Pharmacy*,
268 F. App'x 600 (9th Cir. 2008) ................................................ 6, 7, 15

*Pryor v. U.S. Postal Service*,
769 F.2d 281 (5th Cir. 1985) ...................................................................18

*Reusser v. Wachovia Bank, N.A.*,
525 F.3d 855 (9th Cir. 2008) .....................................................................8

*Sandpiper Vill. Condo Ass'n v. Louisiana-Pacific Corp.*,
428 F.3d 831 (9th Cir. 2005) .....................................................................6

*Sattari v. British Airways World Cargo*,
2012 U.S. App. LEXIS 4749 (9th Cir. Feb. 12, 2012) ..............................5

*Laura Siegel Larson v. Warner Bros. Entertainment Inc. et al.*
CV-08400-ODW (RZx) ............................................................................16

*Smith v.Marsh*,
194 F.3d 1045 (9th Cir. 1999) .................................................................16

*Sullivan v. Dollar Tree Stores, Inc.*,
623 F.3d 770 (9th Cir. 2010) .....................................................................8

*United States v. Boulware*,
558 F.3d 971 (9th Cir. 2009) .....................................................................3

*United States v. Maddox*,
614 F.3d 1046 (9th Cir. 2010) .................................................................19

*United States v. Mitchell*,
2007 WL 1521212 (E.D. Pa. May 21, 2007).............................................17

*United States v. Wilson*,
631 F.2d 118 (9th Cir. 1980) .....................................................................6

v

**EXHIBIT 70**
**1495**

*United States v. Ziegler*,
497 F.3d 890 (9th Cir. 2007) ...................................................................17

*Werner v. Werner*,
267 F.3d 288 (3rd Cir. 2001) .............................................................6, 12

*Wham-O, Inc. v. Manley Toys, Ltd.*,
08-56188, 2009 WL 1353752 (9th Cir. May 15, 2009)............................8

*Wierzba v. E\*Trade Fin. LLC*,
2012 WL 821916 (9th Cir. Mar. 13, 2012)...............................................3

*Wyatt v. Terhune*,
315 F.3d 1108 (9th Cir. 2003) ....................................................6, 10, 11

*Yagman v. Republic Ins.*,
987 F.2d 622 (9th Cir. 1993) ..................................................................13

## **Federal Rules**

Fed. R. App. P. 10(a) ................................................................ 2, 3, 5, 12

Fed. R. App. P. 10(e)(2)(c) ...................................................................3, 4

Fed. R. Civ. P. 54(b) .......................................................................... 10, 13

Fed. R. Civ. P. 60(b)(2)....................................................................... 17, 18

Fed. R. Civ. P. 60(c)............................................................................ 17, 18

Fed. R. Evid. 201 ......................................................................................5

**EXHIBIT 70**
**1496**

# **INTRODUCTION**

In complete disregard for standard appellate procedure, Appellees and Cross-Appellants Warner Bros. Entertainment Inc. and DC Comics (collectively "Warner") entered this appeal with Supplemental Excerpts of Record ("Supplemental Excerpts" or "SER") that included 19 documents, totaling 166 pages, that were not before the District Court. Rather than file a motion to supplement that openly identified these documents, Warner included them in its Supplemental Exerpts, requesting judicial notice in footnotes buried therein. After Plaintiff brought this improper expansion of the record to the Court's attention in her motion to strike, Warner belatedly filed a motion for judicial notice "in the alternative," which is no less substantively and procedurally flawed.[1]

Considering its scale, Warner's request is less a motion for judicial notice than a request for an entirely new record. It is questionable whether any set of circumstances would ever merit such a large-scale, rebuilding of the record on appeal. Warner makes no effort to establish the type of extraordinary circumstance that would warrant the expansion of the record by even a single page. Indeed, Warner's position is self-immolating: in the same breath that it claims its

---

[1] Instead of filing a 10-page reply in support of its motion to strike plus a 20-page response to Warner's motion for judicial notice (Rule 27(d)(2)), Plaintiff has filed a combined 20-page reply/response brief by the June 20, 2012 deadline for its response (Rule 27(a)(3)(A)).

1

**EXHIBIT 70**
**1497**

prejudicial extra-record material is "necessary" (MJN 2), it also asserts that "the Court need not consider any of the [extra-record] evidence discussed herein to rule . . . on all of the questions presented in this appeal." MJN 3.    Warner attempts an end run around Fed. R. App. P. 10(a) by requesting judicial notice, but hardly even tries to show why such material would ever be judicially noticeable.  As detailed below, these voluminous extra-record materials consist largely of contested factual allegations and inadmissible evidence.  These types of materials are not the proper subjects of judicial notice, as this and every other Circuit has agreed, and as Warner almost certainly knows.  If litigants were allowed to introduce such extra-record materials on the grounds Warner advances, the judicial notice doctrine would render the fundamental limitation of Fed. R. App. P. 10(a) meaningless, and the appellate record would become a free-for-all.

Judicial notice is not a vehicle to rewrite the record, introduce contested factual content, or bypass the evidentiary rules.  Nor should a request for judicial notice be misused as an opportunity to put before the Court, however briefly, page after page of irrelevant, prejudicial material.  Accordingly, this Court should reject Warner's efforts to substitute a new record on appeal that was not considered by the District Court, that Defendants had no opportunity to address in their opening brief or rebut with other extra-record evidence, and which is entirely improper under the Federal Rules of Appellate Procedure and the Federal Rules of Evidence.

**EXHIBIT 70**
**1498**

## **ARGUMENT**

## I. **WARNER FAILS TO OVERCOME THE FUNDAMENTAL LIMITATION OF RULE 10(a)**

Nowhere does Warner address Fed. R. App. P. 10(a)'s limitation of the record on appeal to "the original papers and exhibits filed in the district court," or the settled precedent cited by Plaintiff which expressly forbids Warner's expansion of the record on appeal. *See* Dkt No. 42-1 at 2-3; *Israni v. Bittman*, 10-16726, 2012 WL 1074266 (9th Cir. Apr. 2, 2012) ("[M]otion to strike is granted because Appellant never filed or submitted the relevant documents to the court below.").[2]

A party cannot use judicial notice, as Warner attempts here, "to circumvent the general rule against supplementing the [] record." *Murakami v. United States*, 398 F.3d 1352, 1355 (Fed. Cir. 2005); *see also Native Ecosystems Council v. Weldon*, 2012 WL 991833 (D. Mont. Mar. 26, 2012) ("A party cannot circumvent the rules governing record supplementation by asking for judicial notice...").

Fed. R. App. P. 10(e)(2)(c) allows this Court to supplement the record only in "extraordinary circumstances." *United States v. Boulware*, 558 F.3d 971, 976 (9th Cir. 2009) ("[10(e)(2)(c)] allows the court of appeals to supplement the record

---

[2] *Wierzba v. E\*Trade Fin. LLC*, 2012 WL 821916 (9th Cir. Mar. 13, 2012) (granting motion to strike extra-record excerpts); *Johnson v. Departments of Army & Air Force*, 2012 WL 32132 (9th Cir. Jan. 6, 2012) (same); *In re Phillips*, 460 F. App'x 625, 626 (9th Cir. 2011) (same); *Harrell v. Costco*, 422 F. App'x 635, 636 (9th Cir. 2011) (same).

3

**EXHIBIT 70**
**1499**

only by formal motion based on extraordinary circumstances or error correction"). Warner cannot establish, and has not even attempted to argue, such "extraordinary circumstances."

Instead, Warner repeatedly asserts that the scores of extra-record documents it unilaterally inserted are supposedly "self-authenticating," and that this, alone, is sufficient ground for expanding the record. MJN 1-2, 4, 12. *First*, the "very limited exceptions" to Rule 10(a) do not include purportedly self-authenticating documents; if it did the exception would quickly swallow the rule. *Blankson-Arkoful v. Sunrise Sr. Living Services, Inc.*, 449 F. App'x 263, 265 (4th Cir. 2011). *Second*, most of the documents Warner says are self-authenticating and uncontested are anything but. *See, e.g.* SER 810-814 (personal correspondence from non-parties). *Third*, the prejudice that occurs when a party unilaterally injects numerous documents into the record on appeal extends well beyond authentication. In fact, Warner exacerbated this prejudice by failing to request judicial notice until *after* Plaintiff had filed her opening brief. Plaintiff did not have proper notice so as to address these documents in her filings below and/or in her opening appellate brief. As this Court expressly noted in *Lowry v. Barnhart*, 329 F.3d 1019, 1025 (9th Cir. 2003), "unilateral supplementation of the record [is] also unfair. . . because [the opposing party] argue[s] the case on a record different from the [supplemented] one."

4

**EXHIBIT 70**
**1500**

Whereas Warner long-planned its appellate strategy, Plaintiff argued her appeal based on the district court record per Fed. R. App. 10(a)– only to be sandbagged by Warner's cross-appeal brief, based on a very different, unilaterally expanded "record." Dkt. Nos. 11, 14, 31, 31-1. Plaintiff is further prejudiced unless she is afforded an equal opportunity to supplement the appellate record with rebuttal evidence to counter DC's misleading arguments based on extra-record materials. Fed. R. App. P. 10(a) and Circuit Rule 10-2 are designed to avoid precisely this sort of unfairness and unmanageable free-for-all.

## II. THE "JUDICIAL NOTICE" DOCTRINE IS LIMITED TO INDISPUTABLE FACTS AND DOES NOT PERMIT THE WHOLESALE INJECTION OF DISPUTED EXTRA-RECORD EVIDENCE INTO AN APPEAL

Pursuant to Fed. R. Evid. 201(b), judicial notice is appropriate only as to "uncontroverted fact[s]" that are not subject to reasonable dispute. *Baker v. California Dept. of Corr.*, 2012 WL 2045962 *1 (9th Cir. June 7, 2012). A "high degree of indisputability is the essential prerequisite." Fed. R. Evid. 201, Advisory Comm. N. (2011). Furthermore, "the power to take judicial notice is to be exercised by courts with caution [and] . . . [e]very reasonable doubt upon the subject should be resolved promptly in the negative." *McGill v. Michigan S.S. Co.*, 144 F. 788, 793 (9th Cir. 1906) (internal quotations and citation omitted).[3]

---

[3] *See also Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir. 2008) ("Judicial notice 'merits the traditional caution it is given, and courts should

5

**EXHIBIT 70**
**1501**

"It is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court," *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 392 n.7 (9th Cir.2000), and even "taking judicial notice of findings of fact from another case exceeds the limits of Rule 201." *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003); *see also G.M. v. Dry Creek Joint Elementary Sch. Dist.*, 458 F. App'x 654, 654-55 (9th Cir. 2011).

Tellingly, the cases Warner relies upon are either inapposite or contrary to their position.[4]

## A. Irrelevant and Inadmissible Material Is Particularly Ineligible For Judicial Notice

"[A] court may not take judicial notice of otherwise inadmissible statements merely because they are part of a court record or file." *M/V American Queen v. San Diego Marine Construction*, 708 F.2d 1483, 1491 (9th Cir.1983); *see also In*

---

strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts.'") (citation omitted); *Maraldo v. Life Ins. Co. of the Sw.*, 2012 WL 1094462 *6 (N.D. Cal. Mar. 30, 2012) ("The Ninth Circuit has indicated that judicial notice should only be taken sparingly, with caution, and after demonstration of a 'high degree of indisputability.'") (citation omitted).

[4] *See United States v. Wilson,* 631 F.2d 118, 119 (9th Cir. 1980) ("The requested judicial notice cannot . . . properly be taken.")*; Werner v. Werner,* 267 F.3d 288, 295 (3rd Cir. 2001) (denying "judicial notice of the truth of the contents of a filing from a related action"); *Sandpiper Vill. Condo Ass'n v. Louisiana-Pacific Corp.*, 428 F.3d 831, 837 (9th Cir. 2005) (taking judicial notice of *previously-unavailable* portions of the trial transcript *in the same case*); *In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995) (judicial notice where "documents are not being used to determine disputed facts relating to the merits of the case").

6

**EXHIBIT 70**
**1502**

*re Blumer*, 95 B.R. 143, 146 (B.A.P. 9th Cir. 1988) (same); *Pratt v. California State Bd. of Pharmacy*, 268 F. App'x 600, 603 (9th Cir. 2008) (denying judicial notice as documents were hearsay); *Am. Prairie Const. Co. v. Hoich,* 560 F.3d 780, 797 (8th Cir. 2009) ("Caution must also be taken to avoid admitting evidence, through . . . judicial notice, in contravention of the relevancy, foundation, and hearsay rules.").[5]

Here, Warner attempts to introduce a host of contested inadmissible evidence into the record under the guise of "judicial notice."

## B.   The Documents At Issue Are Not Judicially Noticeable

- <u>July 2003 Letter from Laura Siegel Larson to Michael Siegel (SER 806-814)</u>

Warner relies on this extra-record letter for its references to what the Siegels' former attorney, Kevin Marks, purportedly said regarding his beliefs as to a "deal" with DC, which the District Court found did not result in a binding agreement.  MJN 7; SER 65 ("One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the [counter-proposals], to reach the conclusion that the parties failed to come to an agreement on all material terms.").  The letter is inadmissible hearsay.  It is also largely irrelevant because contract

---

[5] *See also Matter of Annis*, 78 B.R. 962, 965 (Bankr. W.D. Mo. 1987) (rejecting "proposition that inadmissible hearsay may be bootstrapped in evidence by employing the practice of 'taking judicial notice of the files.'").

**EXHIBIT 70**
**1503**

formation is based on objective manifestations of an agreement on all material terms, not a person's subjective belief. *Meyer v. Benko*, 55 Cal. App. 3d 937, 942-943 (1976) (mutual consent to material terms "is determined by objective rather than subjective criteria"). Moreover, legal conclusions are inadmissible. *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010) (noting that "legal conclusions are not admissible as factual findings").

Warner misleadingly describes this hearsay document as a mere "court filing" when it is actually an extra-record exhibit attached to an extra-record declaration. This Court has routinely denied requests to take judicial notice of such documents. *See Wham-O, Inc. v. Manley Toys, Ltd.*, 2009 WL 1353752 *1 (9th Cir. May 15, 2009) ("We do not, and cannot, take judicial notice of. . . a declaration . . . submitted . . . after the district court ruled."); *Downs v. Baca*, 2012 WL 1883326 *1 (9th Cir. May 24, 2012) (denying "request for judicial notice of non-adjudicative facts in exhibits").[6]

- <u>October 24, 2011 Order Granting DC's Motion for Review (SER 824-825)</u>

The only relevance Warner offers for this extra-record document is that it establishes when it received the July 2003 letter (SER 810-814) described above. MJN 8. As the July 2003 letter is inadmissible hearsay, irrelevant to the issues on

---

[6] *See also Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 858 (9th Cir. 2008) (declining to take judicial notice of a party's declaration); *Keeler v. Sierra Conservation Ctr.*, 2012 WL 1377030 *1 (9th Cir. Apr. 20, 2012) (denying request for judicial notice of extra-record exhibits).

**EXHIBIT 70**
**1504**

appeal, there is no reason to extend judicial notice to this order.

- Excerpts of Privilege Log of Bulson Archive (SER 816):

Mr. Bulson was the attorney for non-party Michael Siegel (deceased), not Ms. Larson, whose copyright termination interest is at issue herein. Warner contends that this extra-record log is somehow relevant to show Mr. Toberoff's purported interference in DC's business relationship with Ms. Larson. MJN 8. Mr. Toberoff's alleged interference is not at issue in this case or in the parties' cross-appeals. Dkt. Nos. 11 at 1-2; 31-1 at 5-6. Warner's appeal turns on whether a binding contract was formed between DC and Ms. Larson in the first place. *Id.*

DC filed its concocted interference claim in *DC Comics v. Pacific Pictures Corp., et al.,* C.D. Cal. Case No. 10-CV-03633 ODW (RZx) ("*DC Comics*"), , where it remains subject to adjudication in the first instance by the district court. Moreover, the Bulson privilege log in no way supports the irrelevant proposition that Mr. Toberoff interfered with anything. Warner falsely asserts that this extra-record material refutes Mr. Toberoff's alleged claims in an uncited motion in the *DC Comics* action regarding when "he was in contact with the Siegels." MJN 7-8. Warner misleadingly omits that in that motion the "Siegels" are expressly defined as "Joanne Siegel and [her] daughter Laura Siegel Larson" (*DC Comics*, Dkt No. 145-1 at 5) and do not include Michael Siegel, who has no relevance even to DC's claims in the *DC Comics* case, and is thus not once mentioned in DC's complaint

9

**EXHIBIT 70**
**1505**

therein. *Id*., Dkt No. 49. The irrelevant Bulson log is not appropriate for judicial

notice. *Meador v. Pleasant Valley State Prison*, 312 F. App'x 954, 956 (9th Cir.

2009) (noting "judicial notice is inappropriate where the facts to be noticed are

irrelevant"); *Kazenercom TOO v. Ibar Dev., LLC*, 464 F. App'x 588 (9th Cir. 2011)

("We decline to take judicial notice of these documents because they are irrelevant

to the issues on appeal.").

- <u>October 25, 2011 Order Denying anti-SLAPP Motion (SER 817-823)</u>

Warner asserts that an October 2011 order in the *DC Comics* action

"explains" Larson's repudiation of an alleged 2001 settlement. MJN 8. The

October 2011 order nowhere finds such a repudiation. This is not surprising as the

district court in *DC Comics* is the same court that entered the Rule 54(b) Judgment

in this case that *no settlement agreement* was reached. ER 236. The *DC Comics*

order, which is currently under appeal (Appeal No. 11-56934), found only that

DC's tort claims are not subject to California' anti-SLAPP statute and therefore

expressly did not reach the merits. *DC Comics*, Dkt. No. 337 at 6.

Moreover, even had there been such a finding, and there was not, it is well

settled that judicial notice cannot be extended to contested factual findings in

extra-record court filings. *Lowe v. McDonald*, 221 F.2d 228, 230 (9th Cir. 1955)

(noting "[a]s a general rule, a court in one case will not take judicial notice of its

own records in another and distinct case ***even between the same parties***".)

10

**EXHIBIT 70**
**1506**

(emphasis added); *Wyatt,* 315 F.3d at 1114 n.5 ("Factual findings in one case
ordinarily are not admissible for their truth in another case through judicial
notice."); *Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1117 n.14 (9th Cir. 2005) ("We
decline. . .request to take judicial notice of [order] because they are offering the
factual findings contained in the order for the purpose of proving the truth of the
factual findings contained therein."); *M/V American Queen*, 708 F.2d at 1491 ("[A]
court may not take judicial notice of proceedings or records in another cause so as
to supply, without formal introduction of evidence, facts essential to support a
contention in a cause then before it.").

- <u>September 2, 2011 Joint Stipulation and August 13, 2010 Anti-SLAPP
  Motion (SER 826-28, 877-80).</u>

Warner asserts that this extra-record material purportedly "shows" that
Larson took a contradictory position in the *DC Comics* case as to when her
negotiations with DC were officially terminated. MJN 8. The entirety of Warner's
argument rests on Ms. Larson describing discussions as "moribund as of May 9,
2002" (MJN 9), which Warner insists means the same thing as terminated
(pursuant to the express notification procedures of the parties' written Tolling
Agreement).[7] SER 348-51. Larson refutes this specious argument in her Third

---

[7] Merriam-Webster defines moribund as "being in the state of dying: approaching
death." http://www.merriam-webster.com/dictionary/moribund, and judicial notice

11

**EXHIBIT 70**
**1507**

Brief on Cross-Appeal. Docket 43-1 at 36-38. The truth of the contents of court filings in another case are not the proper subject of judicial notice, *Werner*, 267 F.3d at 295, and this extra-record material is, in any event, irrelevant to this appeal.

- Kevin Marks Deposition (SER 797-801)

Warner opted below to only submit certain portions of Marks' deposition transcript. Now on appeal, Warner adds new portions without offering any justification. MJN 7. Instead, Warner mischaracterizes this extra-record testimony to draw erroneous conclusions from it. The contents and contested meaning of extra-record testimony is not the proper subject of judicial notice. *See Maraldo*, 2012 WL 1094462 *6. That other portions of Marks' testimony were part of the District Court record is irrelevant under Rule 10 to Warner's belated attempt to add testimony that was not. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) ("The proper place to call attention to any such [deposition] testimony was in front of the district court [and] . . . the content of a deposition is not a clearly established 'fact' of which this panel can take [judicial] notice"); *Eng v. New York Hosp.*, 1999 WL 980963 *1 (2d Cir. 1999) ("Because the deposition pages . . . were not submitted to the district court . . . the motion to supplement the record is denied, and the cross-motion to strike supplemental materials from the record is granted.").

---

of the definition of words *is* proper. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) (judicial notice of the dictionary definition of [a] word).

12

**EXHIBIT 70**
**1508**

- Comic Books (SER 714-796)

Warner erroneously claims that "reproductions of comic books" are somehow exempt from Fed. R. App. P. 10(a). MJN at 4. Warner has had access to these comic books for decades and offers no reason why it did not file them with the District Court.[8] Rather, Warner compounds its error by arguing that this non-record evidence is "relevant to determining the copyrightable elements in the Promotional Announcements." MJN 5. Even if this were true, the copyrightable elements in such promotional materials are *irrelevant* to the Rule 54(b) judgment on appeal. *See* Dkt. No. 43-1 at 68-71. Warner also dubiously asserts that these comics are not submitted for the "truth contained therein" (MJN 12) which is at odds with its argument, that focuses entirely on their contents and contested matters not subject to judicial notice. *See* MJN 5; *Flick,* 205 F.3d at 392 n.7 ("It is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court."); *Yagman v. Republic Ins.*, 987 F.2d 622, 626 n.3 (9th Cir. 1993) (declining to take judicial notice of periodical). In short, Warner seeks to supplement the record with evidence that is irrelevant to this appeal, not subject to judicial notice, and that could readily have been presented below.

- Siegel Memoir (SER 802-805)

Warner also had every opportunity to present below the portions of Jerry

---

[8] Warner submitted, and the District Court reviewed, enlarged versions of the "Promotional Announcements." SER 2.

13

**EXHIBIT 70**
**1509**

Siegel's memoir it now seeks to rely upon. Warner argues it is "appropriate for completeness" (MJN 5), while failing to even provide the complete memoir. SER xiv n.14. Warner relies on *Colbert v. Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006), which made a "limited exception" as to the mere flip side of a single receipt submitted below, where there was "no real dispute between the parties … [that this] would establish beyond any doubt the proper resolution of the pending issues." *Id.* at 166. Here we have the exact opposite; Warner seeks for the first time to introduce hundreds of new pages, and the parties are in complete disagreement over what, if anything, these documents establish.

- <u>Cancelled Agreements Between Mr. Toberoff and The Siegels Or Shusters</u>

In its motion for judicial notice, Warner does not directly mention these three extra-record agreements it inserted in its Supplemental Excerpts (SER 838-44, 859-863, 864-868), and instead refers generally to "documents filed" in the *DC Comics* case. MJN 10. These long cancelled or expired agreements, two between Mr. Toberoff and the non-party Shusters, and the other, between Toberoff, the Siegels, and non-party Ari Emanuel, are of absolutely no relevance to the judgment on appeal. For this reason, DC never submitted these agreements to the District Court, and cannot inject them into the record on appeal. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 n.12 (5th Cir. 2007) ("We are limited in our consideration to that information properly before the district court at the time of its

14

**EXHIBIT 70**
**1510**

decision."). The factual content of purported evidence not properly admitted or before the District Court, is not the proper subject of judicial notice. *See Flick,* 205 F.3d at 392 n.7; *M/V American Queen*, 708 F.2d at 1491.

- May 2003 Letter, Michael Siegel to Laura Siegel Larson (SER 872-876)

Similarly, nowhere in its opposition/motion does Warner assert any reason why judicial notice is proper as to the extra-record May 2003 Letter from non-party Michael Siegel to his half-sister Ms. Larson. This letter is irrelevant to the issues on appeal, consists almost entirely of *contested* factual statements and inadmissible hearsay, and is thus completely inappropriate for judicial notice. *See id.*; *Pratt*, 268 F. App'x at 603. Fed. R. Evid. 801, 802.

- Shuster Termination Notice (SER 845-858)

Warner seeks to add a statutory notice of termination by the Estate of Joseph Shuster, a non-party. This is irrelevant to this appeal, and the underlying litigation, and it is not the proper subject for judicial notice. *Meador*, 312 F. App'x at 956.

- Declaration of Daniel Petrocelli (SER 829-937)

Warner offers no reason why the Court should extend judicial notice to exerpts from this declaration in the *DC Comics* case, which is rife with contested and irrelevant factual allegations. Petrocelli's inadmissible argumentative declaration and its exhibits prompted Defendants to file 90 pages of evidentiary objections in *DC Comics*. The district court in that case did not rule on these

15

**EXHIBIT 70**
**1511**

objections, and the declaration remains subject to objection. Judicial notice of any

portion of this document is wholly improper. *Reusser*, 525 F.3d at 858.

- Anonymous Inadmissble Letter (SER 182-188)

Warner also included in its Supplemental Excerpts an *anonymous* letter (the

so-called "Timeline") which it improperly relies upon in appealing the District

Court's March 26, 2008 summary judgment ruling (certified in the Rule 54(b)

judgment on appeal) that rejected Warner's purported settlement agreement

defense.[9] Dkt. No. 31-1 at 18,-19, 28. Notwithstanding that this inadmissible

diatribe is wholly *irrelevant* to the contract formation issue before this Court, the

document was <u>not</u> before the District Court when it rendered the decision in

question, and Warner is precluded from raising new arguments based upon it for

the first time on appeal. [10] *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.

1999) ("As a general rule, we will not consider arguments that are raised for the

first time on appeal."). Tellingly, even though Warner admitted reading the

Timeline in 2006 (Appeal No. 11-56934, Dkt. No. 16 at 18), and had full use of it

in 2008 (SER 177), Warner did not raise it with the District Court with respect to

---

[9] The letter, written by a thief, enclosed to Warner the Siegels' and Shusters'
privileged documents, stolen from Toberoff & Associates. The thief did not have
or purport to have any first-hand knowledge of the 2001-2002 events he pretended
to describe by mischaracterizing the stolen documents he enclosed. SER 182-184.

[10] A year after the District Court's summary judgment order, Warner merely
attached the "Timeline" among multiple exhibits to a declaration in a discovery
motion filed on March 3, 2009. SER Index at vi.

**EXHIBIT 70**
**1512**

its summary judgment rulings on March 26, 2008 and August 12, 2009, respectively, under appeal. ER 213, 134.

After the District Court upheld the Siegels' statutory terminations here, Warner filed the retaliatory *DC Comics* action on May 14, 2010, and gratuitously attached this salacious anonymous letter to its widely publicized complaint. Dkt. No. 1. Ever since, Warner has transparently attempted to use this anonymous screed to elicit prurient interest and bias, and to derail the merits of the Siegel and Shusters' legal claims by falsely attacking their counsel, Mr. Toberoff. Adjudication of this controversial document, including its provenance, is still pending in *DC Comics*. *See Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (cautioning against transforming "the court of appeals into a court of first instance") (citation omitted); *United States v. Ziegler*, 497 F.3d 890, 900 (9th Cir. 2007) (Kozinski, J., dissenting) ("We may not find facts on appeal; we may only review findings made by the courts below us."). This questionable document, written by a thief, is further inappropriate as record evidence because it is irrelevant, inherently unreliable, riddled with hearsay[11] (if not, double or triple hearsay) and, for these reasons, inadmissible. This anonymous, inadmissible and

---

[11] *See Farkarlun v. Hanning*, 2012 WL 684027 *10 (D. Minn. Mar. 2, 2012) (finding anonymous representations are inadmissible hearsay); *United States v. Mitchell*, 2007 WL 1521212 *1 n.3 (E.D. Pa. May 21, 2007) (anonymous note is inadmissible hearsay); *Bellow v. Charbonnet*, 100 F. Supp. 2d 398, 402 (E.D. La. 2000) (anonymous letter inadmissible as hearsay).

**EXHIBIT 70**
**1513**

extremely prejudicial document has no place in this appeal. *See M/V American Queen* 708 F.2d at 1491; *In re Luxor Cab Mfg. Corp. of Am.*, 25 F.2d 646, 646 (2d Cir. 1928) (irrelevant material should be purged from the record).

## III. WARNER IS PRECLUDED BY FED. R. CIV. P. 60(B)(2) AND (C) FROM ATTEMPTING TO REOPEN THE JUDGMENT BELOW WITH SUPPOSED NEW EVIDENCE

Under Fed. R .Civ. P. 60(b)(2) and (c), a motion to alter a judgment based on purported newly discovered evidence cannot be made "more than one year after the judgment, order, or proceeding was entered or taken." The "pendency of an appeal does not toll the one year period." *Nevitt v. United States*, 866 F.2d 1187, 1188 (9th Cir. 1989). Warner failed to file a Rule 60 motion within one year of the entry of the March 15, 2011 judgment under appeal (*i.e.*, by March 15, 2012), even though it could readily have done so. Instead, Warner has improperly larded its Supplemental Excerpts with dozens of irrelevant extra-record documents and asks to reopen the judgment on this basis. *See* Dkt. No. 31-1 at 37.

Just as Rule 60(b) "may not be used as an end run to effect an appeal outside the specified time limits," neither should an appeal be used to bypass Rule 60(b)'s time limits. *Pryor v. U.S. Postal Service*, 769 F.2d 281, 288 (5th Cir. 1985); *Piedra v. True*, 52 F. App'x 439, 441 (10th Cir. 2002) (noting "[new] evidence is appropriately filed as a F.R.C.P. 60 motion in the district court where judgment was entered, not as a matter of first instance in the Court of Appeals"). The time

**EXHIBIT 70**
**1514**

for Warner to ask to alter the judgment herein based upon purported newly discovered evidence has passed, and jurisdiction to consider that issue has therefore been extinguished. *See Nevitt*, 866 F.2d at 1188 ("Since the Rule 60(b)(2) motion was not filed within one year of entry of judgment, the district court lacked jurisdiction to consider it.").

## IV. THE APPROPRIATE REMEDY IS TO STRIKE THE EXTRA-RECORD MATERIAL AND THOSE PARTS OF WARNER'S BRIEF THAT RELIES ON IT, AND TO SANCTION WARNER

Warner is gaming the system. It has placed hundreds of pages of extra-record material before the Court, and now submits over 3,600 words of extra-argument briefing, styled as an "Appendix," forcing Plaintiff to expend time and space addressing this knowingly improper material.[12] Striking not only the extra-record material but those portions of Warner's brief that rely on it is a common and appropriate remedy. *See Barcamerica Int'l USA Trust.*, 289 F.3d at 595 (9th Cir. 2002) (striking documents not before district court and those portions of opening brief which relied on them); *United States v. Maddox*, 614 F.3d 1046, 1047 (9th Cir. 2010) (striking portion of brief referring to extra-record evidence).

---

[12] In circumvention of the page limits for Warner's opposition and merits briefing, it attaches a fourteen page "Appendix" under the guise of showing the portions of its briefs that cites both record and non-record evidence. Yet, Warner readily could have accomplished with simple citations instead of its Appendix, loaded with argument. Plaintiff is compelled to lodge a response-appendix to address the mischaracterizations in Warner's improper filing, and respectfully requests that if Warner's appendix is considered, so should Plaintiff's response-appendix.

19

**EXHIBIT 70**
**1515**

Warner offers no reason why this Court should not strike the portions of its brief that rely solely on extra-record evidence.[13] Instead it argues that it would be "overbroad" to strike other portions that purportedly rely on both record and extra-record evidence. MJN 13. However, for many such portions the only purported "record" evidence is the anonymous and completely inadmissible "Timeline," which, as shown above, was also not considered by the District Court in rendering the decision Warner appeals. *E.g.*, MJN 21, 24-25, 27. As this Court noted in *Lowry*, the "penalty for including forbidden material in the excerpts" should encourage parties to "think twice before violating the rule." 329 F.3d at 1026. Here, Warner knowingly violated the rules *en masse*. *Lowry's* goal is not achieved by allowing Warner to immunize improper portions of its brief by speckling it with other material, however tenuous, irrelevant or inadmissible.

Finally, Warner should compensate Ms. Larson for the cost of this motion to strike Warner's improper extra-record material and arguments.

## CONCLUSION

For all of the above reasons, Appellant requests that the Court grant her Motion to Strike Appellees' Supplemental Excerpts of Records and Portions of Principal and Response Brief, and deny Warner's Motion for Judicial Notice.

---

[13] These portions appear at pages 12 ("DC has filed. . ."), 17 ("Almost all the…"), 18 ("Thereafter. . ."), 37 ("In *Shuster*…" and "The letter confirms. . ."), 39 ("In *Shuster*. . ."), 63 ("Siegel confirmed . . .") and 78 ("Siegel himself. . .").

**EXHIBIT 70**
**1516**

Dated: June 20, 2012   TOBEROFF & ASSOCIATES, P.C.

       By: ___/s/ Marc Toberoff_____
           Marc Toberoff
        Attorneys for Plaintiff-Appellant,
        Laura Siegel Larson, individually and
        as personal representative of The Estate
        of Joanne Siegel

**EXHIBIT 70**
**1517**

| Warner Argument | Larson Response | Record Evidence |
|---|---|---|
| Larson repudiated<br><br>a purported agreement with DC, fired Marks and began to work with Marc Toberoff and Ari Emanuel (Appendix at 16-17, 22-27) | Notwithstanding that this extra-record argument is false and misleading, it is *irrelevant* to the "work for hire" and contract formation issues before the Court on this appeal.<br><br>The record is clear that Warner Bros./DC ("Warner") botched their own prospects for an agreement by grinding the elderly Joanne Siegel and her daughter Laura Siegel Larson (the "Siegels") in four long years of negotiations regarding their 1997 statutory notices of termination, well before Mr. Emanuel made a legitimate offer to the Siegels in **August 2002**.<br><br>In **May, 2002** Joanne Siegel had sent a letter to Time-Warner bitterly complaining about Warner's improper negotiating tactics and February 1, 2002 draft agreement, filled with new/changed terms and Studio accounting tricks, and informing it that "after four years we have no deal and this contract makes an agreement | **May 9, 2002 Letter from Joanne Siegel to President of AOL Time Warner (SER 412-414)**:<br><br>"Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. . .<br><br>Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the [earlier] proposal.  The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve. . .<br><br>After four years we have no deal and this contract makes an agreement impossible. "<br><br>*See* **Order Granting Partial Summary Judgment (ER 202)** |

22

**EXHIBIT 70**
**1518**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 293 of 347
Case 1:11-cv-03388 06/21/2012 ID: 8229062 DktEntry: 52 Page 294 of 341
Page ID #:33112

| | | |
|---|---|---|
| | impossible."<br><br>On behalf of the Siegels, Mr. Toberoff resumed negotiations with Warner in 2003.<br><br>Unable to succeed on the merits of the legal issues on appeal, Warner repeatedly quotes from a ranting **_anonymous_** letter, the so-called "Timeline," written by a thief who stole the Siegels' privileged legal files, that Warner claims it received in 2006. The salacious and prejudicial "Timeline" is inadmissible hearsay (and often double or triple hearsay). F.R.E. 801, 802. It also consists of inadmissible arguments, lay opinion, and speculation. F.R.E. 602, 701,702. It was written years after the relevant time period by a thief who had no first-hand knowledge of the relevant events. _See Valdovinos v. McGrath_, 598 F.3d 568, 579 (9th Cir. 2010) (vacated on other grounds in _Horel v. Valdovinos_, 131 S. Ct. 1042 (U.S. 2011)) (anonymous letter inadmissible at trial). | "One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 1, 2002 draft to reach the conclusion that the parties failed to come to an agreement on all material terms." |

23

**EXHIBIT 70**
**1519**

| | *See* Larson's Third Brief on Cross-Appeal ("Br.") at 5-8, 13-36. | |
|---|---|---|
| "Toberoff insisted in August 2002 that Marks communicate to Larson that he and Emanuel had an unnamed 'investor' willing to purchase her rights for $15 million…" (Appendix at 23-24)<br><br>Toberoff and Emanuel "promised [a] $15 million investor" (Appendix at 25). | This false and misleading extra-record argument is *irrelevant* to the "work for hire" and contract formation issues on appeal. As it was not raised by Warner before the District Court in this case, Warner is precluded from making such arguments for the first time on appeal. *See Smith v.Marsh,* 194 F.3d 1045, 1052 (9th Cir. 1999).<br><br>Warner misleadingly asserts that Toberoff/Emanuel had an "unnamed 'investor'" and "promised [a] $15 million investor" citing: (a) testimony by Larson's former attorney, Kevin Marks that says nothing to that effect, and (b) the "Timeline." Warner continues its tactic of misrepresenting Marks' testimony, relying solely on clearly inadmissible double hearsay, argument and speculation in this anonymous rambling document. F.R.E. 801, 802, 602, 701,702.<br><br>As Warner well knows and | **Deposition of Kevin Marks (RER 31):**<br><br>Q: Okay. Can you tell me to the best of your recollection what was said by each of you and Mr. Toberoff in that conversation?<br><br>A: ". . .I believe I said. . . [i]f you have an offer, present it to me, and I'll present it to the client."<br><br>**Deposition of Kevin Marks (SER 123):**<br><br>Q: Anything else you can recall of that conversation?<br><br>A: I think I said, "Thank you, and I will communicate this to the client" or "take this back to my client"<br><br>As this extra-record argument was neither raised in nor irrelevant to this case, and is the subject of Warner's retaliatory claims in |

24

**EXHIBIT 70**
**1520**

| | | |
|---|---|---|
| | has elsewhere admitted the "investor" was Mr. Emanuel (current CEO of the William Morris Endeavor Agency) who made the offer to Marks. | the *DC Comics* case, it is impossible for Plaintiff to fully address it, without reference to extra-record evidence. |
| | Warner also misrepresents that Toberoff "insisted" in August 2002 that Marks convey the offer to Larson. (Appendix at 23-24.) Marks' testimony, the only record evidence Warner relies upon, completely contradicts this. Marks testified that he invited an offer and volunteered to take Emanuel's offer to his client. | **Answering Brief of Appellee DC Comics in Appeal No. 11-56934 (Dkt No. 16 at 13)**<br><br>"The 'investor' was. . . Ari Emanuel, a Hollywood talent agent." |
| | Warner's false tactical claims about their long-time opposing counsel, Mr. Toberoff, are fully addressed in the briefing in the *DC Comics v. Pacific Pictures Corporation et al.* ("*DC Comics*") anti-SLAPP appeal. (Appeal No. 11-56934). | |
| "Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights – later trading that | Mr. Toberoff's legal contingency fee is irrelevant to the issues on appeal and Warner can have no other justification for bringing it in other than to transparently elicit prejudice. Warner, again, solely relies on the inadmissible anonymous | |

25

**EXHIBIT 70**
**1521**

| | | |
|---|---|---|
| 50% ownership for 50% contingency fee." (Appendix at 27) | "Timeline." F.R.E. 801, 802, 602,701,702. | |
| The Cover of Action Comics #1 ("Cover") was created by DC's Artists (Appendix at 18, 19, 28) | The record evidence Warner purports to rely on is: 1) the Cover and 2) an ambiguous letter by Vince Sullivan containing "limited" information which the District Court viewed as just as easily supporting the fact that Shuster created the Cover. The extra-record evidence Warner relies upon – a portion of Jerry Siegel's memoir – actually confirms the District Court's reading of the Sullivan letter, i.e., that one Shuster's pre-existing promotional art panels based on an interior panel of Siegel and Shuster's was used by DC for the Cover.<br><br>*See* Br. at 49-51. | *See* **Order Granting Partial Summary Judgment (ER 188)**<br><br>"Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn by Detective Comics' in-house artists. However the scant evidentiary basis provided in support of this argument is ambiguous. . .<br><br>Of course, given the very limited nature of the information contained in the passage [of the Vice Sullivan letter] it could also be argued that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion for the comic book's cover and Detective Comics decided to "use" this suggestion. . .<br><br>Shuster had in the past drawn exemplars for the cover illustration for his comics well before they were ever accepted for publication." |

26

**EXHIBIT 70**
**1522**

| | | **Siegel Memoir( SER 804): Extra-record evidence relied on by DC** |
|---|---|---|
| | | "A couple large promotional panel-drawings had several years earlier been prepared by Joe and me to illustrate Superman in action; these were shown by Joe and me to syndicate editors to demonstrate the impact and appeal of the feature. At my suggestion, Sullivan selected<br><br>one of them and used it for the now very famous cover for [Action Comics, No. 1]." |
| "DC artists also created 'Promotional Announcements' – a black-and-white version of its artists' cover art- to promote Action Comics #1. (Appendix at 19) | This is false as to the Cover, and otherwise, entirely irrelevant to the Rule 54 Judgment on appeal herein. *See* Br. at 68-71.<br><br>As described directly above, DC's artists did not create the Cover, nor any other aspect of Siegel and Shuster's Superman story published in *Action Comics #1*, which the District Court ruled had been successfully recaptured by the Siegels' statutory notices of termination. (ER 133-4). | ***See* Order Granting Partial Summary Judgment (ER 188, 181)**<br><br>"The Court begins by observing what is <u>not</u> depicted in the announcements. Obviously, nothing concerning the Superman storyline (that is, the literary elements contained in <u>Action Comics</u>, Vol. 1) is on display in the ads; thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to |

27

**EXHIBIT 70**
**1523**

|  | exploit. |
|---|---|
|  | The "promotional announcements" contain nothing more than a reduced black-and-white image of Siegel and Shuster's Cover and are entirely derivative thereof, with no new copyrightable elements. The only record evidence cited by DC's is the inadmissible lay opinion of Paul Levitz (DC's CEO) who has no first-hand knowledge of what happened in 1938. F.R.E. 701, 702. *See* Br. 71-74. |  |
| Mr. Toberoff induced the Shusters "to repudiate their existing contractual arrangements with DC." (Appendix at 21-22). | The heirs of Joseph Shuster, Superman's co-creator, are not parties to this case; their purported "contractual arrangements" are entirely irrelevant to this appeal, and Warner's irrelevant argument was not before the District Court when it entered the rulings (certified in the Rule 54(b) judgment) on appeal. *See In re Luxor Cab Mfg. Corp. of Am.*, 25 F.2d 646, 646 (2d Cir. 1928) (irrelevant material should be purged from the record). | As Warner's extra-record arguments or claims regarding the Shusters were not a part of this case and are irrelevant to this appeal, it is impossible for Plaintiff to fully address them without reference to extra-record evidence. **1992 Agreement Between Jean Peavy, Frank Shuster and DC Comics (Appeal No. 11-56934, Dkt. No. 10 at ER 671)** |

28

**EXHIBIT 70**
**1524**

| | | **2001 PPC Agreement (Appeal No. 11-56934, Dkt. No. 10 at ER 725-26)** |
|---|---|---|
| | Furthermore, the only record "evidence" that DC relies upon is not evidence at all: it is the anonymous and clearly inadmissible "Timeline" comprised of inadmissible hearsay, argument, lay opinion and speculation. F.R.E. 801, 802, 602, 701, 702. | "PPC and Claimants hereby form a joint venture. . .[for] the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304(c) of the U.S. Copyright Law. . ." |
| | | "Marc Toberoff, Esq. to render legal services in connection with the Rights and Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights." |
| | Mr. Toberoff's so-called "inducement" was nothing more, than his agreement to help probate the Shuster estate and to represent the estate in exercising their inalienable termination rights under the Copyright Act, 17 U.S.C. § 304(d). | "To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will. . . (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis." |
| | The "contractual relationship" that DC claims Mr. Toberoff interfered with was a one-page 1992 agreement between DC and Joe Shuster's siblings [Frank Shuster (died in 1996) and Jean Peavy] ("1992 Agreement") who as siblings had no termination rights under the Copyright Act, 17 U.S.C. § 304(c)(2). This 1992 Agreement, which nowhere even mentions Superman merely gave the siblings a small pension, and included a quitclaim of any rights or | **2003 PPC Agreement (Appeal No. 11-56934, Dkt. No. 10 at ER 730-33))** |
| | | ". . . Marc Toberoff ("Toberoff") to furnish directly to Client all legal services |

29

**EXHIBIT 70**
**1525**

| | | |
|---|---|---|
| | claims these *siblings* might have.<br><br>Moreover, it is well-settled that the statutory termination right cannot be waived nor re-assigned to the original grantee or its successor until *after* it is exercised by service of a notice of termination.  17 U.S.C. §§ 304(c)(5), (c)(6)(D).  The Shuster estate's notice of termination could not be served and was not served until 2003. 17 U.S.C. § 304(d).<br><br>Consequently, Mr. Toberoff's representation or assistance of the Shuster estate in the exercise of its statutory termination right and the estate's proper service of a copyright notice of termination in 2003, had absolutely no effect on the 1992 Agreement, and did not constitute a repudiation by Ms. Peavy of such agreement.<br><br>After the Siegels, represented by Mr. Toberoff, succeeded here in upholding their statutory termination in four years of hard-fought litigation, Warner, on May 14, | required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or meditation regarding the Rights."<br><br>**Shuster Estate's Notice of Termination (SER 846-858)**<br><br>Signed by "Marc Toberoff, Esq., counsel for the Estate of Joseph Shuster." |

30

EXHIBIT 70
1526

| | 2010, filed concocted retaliatory claims of tortious interference, regarding the Siegels' and Shuster estate's notices of termination, in *DC Comics v. Pacific Pictures Corporation* et al. (Case no. 2:10-cv-03633-ODW-RZ). Defendants' anti-SLAPP motion in that case is the subject of a pending appeal. (Appeal No. 11-56934). | |
|---|---|---|
| "Siegel and Shusters' additions were also created at DC's expense" | The District Court properly rejected Warner's claim that random aspects of Action Comics #1 to convert it from a newspaper format to a magazine format were "works-for-hire," ruling that this argument was made and rejected by the Second Circuit in *Siegel v. Nat'l Periodical Publications*, 508 F.2d 909, 914 (2d Cir. 1974).  ER 183.  *See* Br. at 39-53 | ***See* Order Granting Partial Summary Judgment (ER 183)**  "The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-interest presented much of the same evidence now submitted in this case to argue that this additional material transformed the <u>entirety</u> of Siegel and Shuster's pre-existing Superman material published in <u>Action Comics</u>, Vol. 1, into a work made for hire.  The Second Circuit rejected this argument, elaborating: 'In the case before us, Superman and |

31

**EXHIBIT 70**
**1527**

| | | his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format. We do not consider this sufficient to create the presumption that the [comic book] strip was a work for hire.'" |

EXHIBIT 70
1528

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that the Appellant Laura Siegel Larson's brief is proportionately spaced, has a

typeface of 14 points or more, and does not exceed 20 pages.

Dated: June 20, 2012                    TOBEROFF & ASSOCIATES, P.C.


_____/s/ Marc Toberoff_____
Marc Toberoff
Attorneys for Plaintiff-Appellant,
Laura Siegel Larson, individually and
as personal representative of The Estate
of Joanne Siegel

33

**EXHIBIT 70**
**1529**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. I also caused to be served a true and correct copy of the foregoing by personal service on the following interested parties in this action:

> Daniel Petrocelli, Esq.
> O'MELVENY & MYERS LLP
> 1900 Avenue of the Stars, 7th Floor
> Los Angeles, CA 90067

Dated: June 20, 2012                    TOBEROFF & ASSOCIATES, P.C.


                                        ___/s/ Marc Toberoff___
                                        Marc Toberoff

                                        Attorneys for Plaintiff-Appellant,
                                        Laura Siegel Larson, individually and
                                        as personal representative of The Estate
                                        of Joanne Siegel

34

**EXHIBIT 70**
**1530**

# EXHIBIT 71

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 306 of 347
Case: 11-55863 07/02/2012 ID: 8234051 DktEntry: 55-12 Page: 306 of 347 (1 of 11)
Page ID #:33125

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

## LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZX)

————————

## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS'
## REPLY IN SUPPORT OF MOTION FOR JUDICIAL NOTICE

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 71**
**1531**

Case 2:10-cv-03633-ODW-RZ   Document 500-12   Filed 10/10/12   Page 307 of 347
Case 2:10-cv-03633-ODW-RZ   Document 325-5651-2   Doc Entry 59-12   Page 207 20 (2 of 11)
Page ID #:33126

## INTRODUCTION

A simple, uncontroversial rule governs DC's motion for judicial notice:  this Court may take judicial notice of relevant, authenticated evidence whose accuracy cannot reasonably be questioned.  Nothing Larson says in 32 pages of briefing overcomes that rule.

1.  Larson contends that DC is "precluded" by Rule 60(b)(2) from "attempting to reopen the judgment below."  Resp. 18-19.  But DC does not seek to reopen the judgment or record below.  Reopening a district court judgment under Federal Rule of Civil Procedure 60(b) is an entirely different matter from invoking the court's inherent power to take judicial notice under Federal Rule of Evidence 201, and an appellate court can take judicial notice even when the court below did not.  *E.g., U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); *Bryant v. Carleson*, 444 F.2d 353, 357 (9th Cir. 1971); *Colbert v. Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006) (taking judicial notice of back side of receipt where only front was introduced below); *McKay v. U.S.*, 516 F.3d 848, 849 n.2 (10th Cir. 2008) (taking judicial notice of deed available but not submitted at time of prior proceeding "to inform [its] general understanding of the case).  An appellate court need not "reopen" a trial court record to take notice of documents already inherently within its purview under Federal Rule of Evidence 201.

1

**EXHIBIT 71**
**1532**

Further, Rule 60(b) is inapplicable on its own terms. That rule provides for relief from a final judgment, but as DC has explained at length in prior briefing, the judgment below has never closed, but rather has several open issues rendering this appeal premature. Dkt. 5-1, 8-1.

Rule 60(b) is simply irrelevant to this motion for judicial notice.

2. Larson's accusation that DC "sandbagged" by failing to request judicial notice until after she filed her opening brief (Resp. 5) is also baseless. There is no requirement that a party request judicial notice of every document it could conceivably want to cite before it has even seen what the other side intends to argue; it was not clear which documents would be relevant to DC's opposition brief until Larson filed her opening brief. In any event, Larson had access to the materials at all times, as they were either authored or produced by her, or filed in the related *Pacific Pictures* case, Case No. 10-3633, C.D. Cal.; Appeal No. 11-71844. And she had 17,500 words in her Reply Brief to address any lingering issues.

3. The rest of Larson's arguments were made initially in her motion to Strike; DC has already addressed these, and so will not belabor those points here. As explained in DC's request for judicial notice, there is ample basis for this Court to take judicial notice of the documents at issue. These reasons are summarized in condensed form in the chart below for clarity.

2

**EXHIBIT 71**
**1533**

| SER | Document Title | Basis for Judicial Notice |
|-----|----------------|---------------------------|
| 714-727 | Reproduction of *Action Comics #1* | Comic books are self-authenticating documents, FED. R. EVID. 902(6), and it is appropriate for this Court to take judicial notice where the authenticity of evidence is not disputed. *See* Mot. at 4-5. |
| 728 | Reproduction of *Detective Comics #15* | This cover is a portion of a self-authenticating document, FED. R. EVID. 902(6), and it is appropriate for this Court to take judicial notice where the authenticity of evidence is not disputed. *See* Mot. at 4-5. |
| 797-01 | Excerpt from the transcript of the October 7, 2006, deposition of Kevin Marks | Portions of the deposition transcript are already in the record. Both parties participated in the deposition and relied on other parts of the transcript, and the accuracy or authenticity of the transcript is not in dispute. *See* Mot. at 9-10. |
| 802-05 | Excerpt from Jerome Siegel's unpublished memoir, *Creation of a Superhero* | Portions of the memoir are already in the district court record and have been relied on extensively by Larson in this appeal.<br><br>The excerpt also constitutes a judicially noticeable direct admission by Larson's predecessor-in-interest, *Bucci v. Essex Ins. Co.*, 393 F.3d 285, 296 n.5 (1st Cir. 2005), and its authenticity is not in dispute. *See* Mot. at 5-6. |
| 806-16 | Declaration Of Cassandra Seto In Support Of DC Comics' Motion To Compel Production Of Documents and Exhibits C and F thereto<br><br>*Exhibit C: Letter from Laura Siegel Larson to* | These documents are judicially noticeable as court filings. Their authenticity is not at issue, as (1) there is no dispute that Ms. Seto had the required personal knowledge to prepare her declaration, and her signature attests to its accuracy; (2) the July 2003 letter was written by Larson herself (with help from Toberoff); and |

3

**EXHIBIT 71**
**1534**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 310 of 347 (5 of 11)
Case 2:10-cv-03633-ODW-RZ Document 325-6 Filed 05/12 Page 5 of 20
Page ID #:33129

| | | |
|---|---|---|
| | *Michael Siegel, dated July 11, 2003*<br><br>*Exhibit F: Excerpt from the Privilege Log of Bulson Archive* | (3) the privilege log was prepared by Toberoff and produced by Larson. *See* Mot. at 6-8.<br><br>Contrary to Larson's assertion, Resp. at 7, the July 2003 letter is not hearsay, as it was written by Larson herself (with edits from Toberoff), and is thus admissible as an admission by a party-opponent. FED. R. EVID. 801(d)(2). |
| 817-23 | Order Denying Defendants' Motion To Strike Pursuant To Anti-SLAPP Statute | This document is judicially noticeable as a court filing from the related *Pacific Pictures* case. *See* Mot. at 6, 8. |
| 824-25 | Order Granting DC Comics' Notice Of Motion And Motion For Review Of Magistrate's Order On Plaintiff's Motion To Compel Or, In The Alternative, For Reconsideration Of The Court's June 20 And April 11, 2011, Orders Pursuant To FED. R. CIV. P. 72(a) And L.R. 72-2.1 | This document is judicially noticeable as a court filing from the related *Pacific Pictures* case. *See* Mot. at 6, 8. |
| 826-28 | Excerpt of the Joint Stipulation Regarding DC Comics' Motion To Compel The Production Of Documents Or, In The Alternative, For Reconsideration Of The Court's June 20 And April 11, 2011 Orders | This document is a judicially noticeable as a court filing, and is also a direct admission by Larson in the related *Pacific Pictures* case that contradicts positions she has taken here. *See* Mot. at 8-9. |
| 829-68 | Declaration Of Daniel M. Petrocelli In Support Of DC Comics' Updated, Initial | These documents, submitted to both the district court in *Pacific Pictures* and this Court in a writ proceeding arising from |

4

**EXHIBIT 71**
**1535**

| | Opposition To Defendants' Motion To Strike Under California's Anti-SLAPP Statute and Exhibits 26, 38, 40, and 56 thereto<br><br>*Exhibit 26: Agreement signed by Joanne Siegel, Laura Siegel Larson, and Marc Toberoff, dated October 3, 2004*<br><br>*Exhibit 38: Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman," dated November 10, 2003*<br><br>*Exhibit 40: Agreement signed by Mark Warren Peary on behalf of the Estate of Joseph Shuster, Jean Peavy, and Marc Toberoff, dated November 23, 2001*<br><br>*Exhibit 56: Agreement signed by Joanne Siegel, Laura Siegel Larson, and Marc Toberoff and Ariel Emanuel on behalf of IP Worldwide, dated October 3, 2002* | that case, are judicially noticeable as court filings. *See* Mot. at 10-11.<br><br>The district court gave no credence to the evidentiary objections to Mr. Petrocelli's declaration argued by Larson and her co-defendants in *Pacific Pictures*.<br><br>Exhibit 38 is independently noticeable as a self-authenticating public record. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("a court may take judicial notice of 'matters of public record'"); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1356 n.14 (Fed. Cir. 2010) (registration documents by Patent and Trademark Office are judicially noticeable). |
| 869-71 | Defendants' Opposition To DC Comics' Motion For Reconsideration Of April 11, 2011 Order | This document is judicially noticeable as a court filing from the related *Pacific Pictures* case. *See* Mot. at 6, 8. |
| 872-76 | Declaration Of Cassandra Seto In Support Of DC Comics' Motion For | These documents, submitted to both the district court in *Pacific Pictures* and this Court in a writ proceeding arising from |

**EXHIBIT 71**
**1536**

| | | |
|---|---|---|
| | Review Of Magistrate's Order On Plaintiff's Motion To Compel Pursuant To FED. R. CIV. P. 72(a) And L.R. 72-2.1 and Exhibit B thereto<br><br>*Exhibit B: Letter from Michael Siegel to Laura Siegel Larson, dated May 13, 2003* | that case, are judicially noticeable as court filings.  *See* Mot. at 10-11.<br><br>Their authenticity is not at issue, as: (1) there is no dispute that Ms. Seto had the required personal knowledge to prepare her declaration, and her signature attests to its accuracy; and (2) the May 2003 letter was written by Larson's co-defendant and produced by her and her co-defendants themselves.<br><br>The May 2003 letter, authored by Larson's half-brother Michael Siegel, is admissible as an admission of a party-opponent based on Larson and Michael's claimed common-interest, FED. R. EVID. 801(d)(2), or under the residual exception to the hearsay rule, FED. R. EVID. 807. There is no reason to doubt the trustworthiness of Michael's personal correspondence with Larson, especially in light of their claimed common interest, *U.S. v. Morgan*, 385 F.3d 196, 208-09 (2d Cir. 2004), and Michael's letter is the most probative evidence of Toberoff's interactions with him and the rest of the Siegels since he passed away before he could be deposed.  The letter is relevant to DC's settlement defense, a determinative issue in this cross-appeal, and its inclusion would promote the interests of justice by providing the Court with a more comprehensive background of the facts relevant to this dispute. |
| 877-80 | Notice Of Motion And Motion To Strike Plaintiff's State Law Causes Of Action Pursuant To California's Anti-SLAPP Law (Cal. | This document is judicially noticeable as a court filing from the related *Pacific Pictures* case.  *See* Mot. at 6-9. |

6

**EXHIBIT 71**
**1537**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 313 of 347 (8 of 11)
Case 2:11-cv-03083-ODW-RZ Document 000-12 Filed: 10/11 Page 8 of 10
Page ID #:33132

| | Code Civ. Proc. § 425,16); Memorandum Of Points And Authorities | |
|---|---|---|

4.  Although the failure of Larson's arguments on appeal is readily evident even absent consideration of these documents, their inclusion would provide the Court with a more comprehensive overview of the case and promote a more accurate resolution of the disputes at issue.  Thus, DC respectfully requests this Court grant its request for judicial notice.

Dated:  July 2, 2012             O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
       Daniel M. Petrocelli
       Attorneys for Warner Bros.
       Entertainment Inc. and DC Comics

7

**EXHIBIT 71**
**1538**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 314 of 347
Page ID #:33133
Case: 11-99003 02/27/2013 ID: 32306513 DktEntry: 13-4 Page: 314 of 20 (9 of 11)

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 27(d)**

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify that Warner Bros. Entertainment Inc. and DC Comics' brief is proportionately spaced, has a typeface of 14 points or more, and does not exceed 10 pages.

Dated: July 2, 2012                         O'MELVENY & MYERS LLP

                                            By:   /s/ Daniel M. Petrocelli
                                                  Daniel M. Petrocelli
                                                  Attorneys for Warner Bros.
                                                  Entertainment Inc. and DC Comics

**EXHIBIT 71**
**1539**

Case: 11-56034 09/02/2012 ID: 8298409 DktEntry: 50-4 Page: 10 of 90 (10 of 11)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2012, I caused to be electronically filed
Warner Bros. Entertainment Inc. and DC Comics' Reply In Support Of Motion For
Judicial Notice with the Clerk of the Court for the United States Court of Appeals
for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all
interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that
the above is true and correct.  Executed on July 2, 2012, at Los Angeles,
California.

_/s/  Ashley Pearson_
Ashley Pearson

**EXHIBIT 71**
**1540**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 316 of 347
Case: 11-55863 07/02/2012 ID: 8235055 DktEntry: 58-2 Page: 11 of 11 (11 of 11)
Page ID #:33135

9th Circuit Case Number(s) | 11-55863, 11-56034

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Jul 2, 2012 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Ashley K. Pearson

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |

**EXHIBIT 71**
**1541**

# EXHIBIT 72

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 318 of 347
Case: 11-55863 01/11/2013 ID: 8474952 DktEntry: 65-4 Page 348 of (1 of 50)
Page ID #:33137

Appeal Nos. 11-55863, 11-56034

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## REPLY IN SUPPORT OF WARNER BROS. ENTERTAINMENT INC. AND DC COMICS' MOTION TO SUPPLEMENT THE RECORD WITH THE MARKS MEMO

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT 72**
**1542**

## I.   Introduction

Larson's response once again misses the point.  DC does not deny that in most cases the record on appeal is limited to evidence considered by the court below.  Rather, DC requests, on the basis of established case law, that this Court use its inherent authority to consider a single document recently produced by Larson.  The contents of this document were discussed and disclosed in the "Toberoff Timeline," a document filed with and considered by the district court in 2009.  SER-182-88; Dkt. 50-2 at 36-63.  The single new document that DC asks this Court to consider is a 2002 memo (the "Marks Memo") written by Kevin Marks—Larson's lead negotiator with DC, and a key first-hand witness to the settlement agreement DC seeks to enforce in its first question presented on its cross-appeal.  DC Br. at 25-37.

DC has diligently attempted to obtain the Marks Memo *for years*, but Larson refused to produce it until May 14, 2012—and only after this Court denied both her mandamus petition and subsequent petitions for rehearing of that ruling.  *In re Pacific Pictures*, 679 F.3d 1121 (9th Cir. 2012); Dkt. 50-2 at 94-95; Decl. of Ashley Pearson ("Pearson Decl.") Ex. A at [13-14].  There are no legitimate authenticity or fairness concerns regarding the Marks Memo, because Larson produced it from her own files; its existence and basic contents were disclosed to

1

**EXHIBIT 72**
**1543**

the district court in 2009; and DC put Larson on notice of its intent—weeks ago—

that it would use the Memo in its Reply Brief on this appeal. *Infra* at 6-7.

## II. The Court Should Exercise Its Authority To Consider Marks' Memo

1. Larson's insistence that the record on appeal is strictly limited to the

original papers and exhibits filed in the district court ignores established case law

granting this Court ultimate discretion over the contents of the record. *E.g., Lowry*

*v. Barnhart*, 329 F.3d at 1019, 1025 (9th Cir. 2003), *following Dickerson v. State*

*of Ala.*, 667 F.2d 1364, 1367-1368 (11th Cir. 1982) ("Whether an appellate record

should be supplemented under the particular circumstances of a case is a matter left

to the discretion of the federal courts of appeals.").[1]

This "inherent authority" to supplement the record on appeal, *Lowry*, 329

F.3d at 1025, extends to any relevant and helpful evidence, even when it was not

submitted to or considered by the court below. *E.g., Manjiyani v. Ashcroft*, 343

F.3d 1018, 1019-20 (9th Cir. 2003) (granting motion to supplement record with

complete copy of application filed with immigration agency where only partial

copy was filed below); *Mangini v. U.S.*, 314 F.3d 1158, 1160-61 (9th Cir. 2003)

(same; three newly discovered letters refuting material misstatement in opposing

---

[1] *Accord Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1020 n.3 (9th Cir. 2010); *Siskiyou Regional Educ. Project v. Goodman*, 219 Fed. Appx. 692, 694 n.1 (9th Cir. 2007); *Colbert v. Potter*, 471 F.3d 158, 165-166 (D.C. Cir. 2006); *Salinger v. Random House, Inc.*, 818 F.2d 252, 253 (2d Cir. 1987); *Gibson v. Blackburn*, 744 F.2d 403, 405 n.3 (5th Cir. 1984).

2

**EXHIBIT 72**
**1544**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 321 of 347 (4 of 50)
Case 2:10-cv-03633-ODW-RZ Document 84-69251 DktEntry: 65-11 Page 321 of
Page ID #:33140

party's affidavits); *Nat'l Sr. Citizens Law Ctr. v. Social Sec. Admin.*, 849 F.2d 401, 402 & n.3 (9th Cir. 1988) (same; declaration and attached letter); *Colbert*, 471 F.3d at 165-166 (same; photocopy of both sides of return receipt where only one side of receipt had been submitted below).

2. The relevance of the Marks Memo to DC's settlement defense, Br. at 25-37, is obvious: the Memo was written by Kevin Marks, Larson's lead negotiator and the key eye-witness to settlement. RER-13-14. The Memo repeatedly references the "existing deal" and "agreement of last October [2001]" between Larson and DC and explains to the Siegel-Larson family the consequences of the "deal" they made. *Id*. Given his unique role and intimate involvement in the settlement discussions, Marks' contemporaneous memo stating that the parties had a "deal" in October 2001 is not only relevant to the dispute over whether an agreement was formed, *but is one of the most direct and reliable pieces of evidence on the issue*. Larson's extensive reliance—both in the district court and here, SER-551-60; Dkt. 43-1 at 33-34—on Marks' deposition testimony about his views on whether a deal was made estops Larson from claiming now that Marks' views on the subject are "irrelevant as a matter of law," Resp. at 6-7. The Memo was

3

EXHIBIT 72
1545

written years closer in time to the 2001 agreement, and is far better evidence than a deposition taken years later *without* the Memo in hand.[2]

The Memo's contemporaneous clarity on the question whether the parties reached a deal in 2001 stands in stark contrast with Marks' inconsistent testimony given years later, which the district court credited and relied on in finding no agreement had been reached.  ER-200; Dkt. 31-1 at 30-33; 49 at 4, 10.  In his 2006 deposition, Marks testified that while there was an agreement in October 2001, it was not, in his opinion, "binding."  RER-55.  Larson used this testimony to argue that Marks' October 19, 2001, letter to DC was a non-binding counter-offer rather than an acceptance of DC's October 16 offer.  SER-549-60.

But Marks' contemporaneous Memo reveals that when the agreement was reached in 2001, and in the year that followed, Marks believed the opposite—that a "deal" was made in 2001 and it bound the Siegels.  Indeed, as recounted in his August 2002 memo, Marks turned away Toberoff's first offer (made in February 2002), saying he "did not feel that it was appropriate [for Toberoff] to be making offers while *[Marks] was in the process of documenting an existing deal*," RER-13 (emphasis added).  Marks warned Larson that if her family repudiated their

---

[2]  Larson's assertion that the Memo is irrelevant is also belied by her request to file an additional brief discussing its relevance.  Resp. at 12.  No such leave is warranted in any event.  Larson already spends many more pages discussing the Memo in her response than DC did in its merits reply.  Compare Resp. at 3-7, with DC Reply at 14-15.

4

**EXHIBIT 72**
**1546**

"agreement" with DC in favor of Toberoff's competing summer 2002 offer, he would testify against them. *Id.* And in the Memo, he beseeched Larson to continue documenting her deal with DC in accord with her duty of "good faith," and warned that failure to do so would get her and Toberoff sued. RER-14.

While Larson argues the Memo does not support DC's position that a binding agreement was reached in 2001 because Marks references the need to "document" the "existing deal," Resp. at 8; RER-13, DC has showed in its merits briefing that binding contracts *can be reached and are reached* even when the parties plan to complete formal documentation later, and those documentation efforts fall apart. Br. at 25-28 (collecting cases); Reply at 7-9. This has been the law in California for decades, *id.*, and Marks would have had no reason to turn away Toberoff's "better" offers in 2002, much less to warn the Siegels of litigation, if Marks did not know and believe that the "deal" he told DC the Siegels had accepted on October 19, 2001 was binding. SER-455; RER-13-14; *cf.* Resp. at 4. Moreover, unlike Larson's current efforts to say her acceptance was mistaken, or that Marks and DC really exchanged competing counter-offers, the Marks Memo definitively shows that, in 2001 and 2002, Marks never took these positions invented by Toberoff to get Larson out of her contract. DC Reply at 14-15.

3. There are no legitimate fairness concerns here that would prevent the Court from exercising its authority to consider the Marks Memo. The Memo's

**EXHIBIT 72**
**1547**

Case 2:10-cv-08888-ODW-RZ Document 500-12 Filed 10/10/12 Page 324 of 347
Case 2:10-cv-08888-ODW-RZ Document 84-2 10/10/12 Dkt Entry: 65-12 Page 324 of (7 of 50)
Page ID #:33133
Page ID #:33143

existence and certain of its contents have been part of the district court record since 2009, when DC submitted the Toberoff Timeline document (and its description of the Marks Memo) to re-open discovery. SER-182-88; Dkt. 50-2 at 37-38, 50-55. The Timeline reports that in August 2002, Marks conveyed an offer from Toberoff to the Siegels and that Marks warned the Siegels that "he would testify in court against [them] if they accepted this offer because he believe[d] there ha[d] already been an agreement reached" with DC. SER-183. The Marks Memo confirms this description. *Compare* SER-183, *with* RER-13-14; Mot. at 4-5.

Larson claims she would be prejudiced by this Court's consideration of the Memo because it was produced after she "completed her briefs" here, Resp. at 12, but the timing of production was always in her control, and she is the sole cause of delay. DC first requested the document in 2006, Dkt. 50-1 at 58-59, again in 2009, Dkt. 50-2 at 37-38, 50-55, and a third time this year in the related *Pacific Pictures* case, Pearson Decl. Ex. B. The district court ordered the Marks Memo produced to DC in May 2011, Dkt. 50-2 at 93, but Larson refused to comply with that order and filed a writ petition, Pearson Decl. Ex. A at [13-14]. After this Court affirmed that discovery order on April 17, 2012, *Pacific Pictures*, 679 F.3d at 1131, Larson once again tried to keep the document from this Court on this appeal, unsuccessfully asking the district court and this Court to stay its production pending en banc or writ of certiorari review. Dkt. 50-2 at 64-92; Pearson Decl. Ex. A at 13-14.

6

**EXHIBIT 72**
**1548**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 325 of 347 (8 of 50)
Case 2:10-cv-03633-ODW-RZ Document 494-5 Filed 09/12 Page 325 of 347
Page ID #:33144
Page ID #:33144

In opposing Larson's requests for a stay, DC told the courts and Larson that it intended to use the Marks Memo in its briefing in this appeal. Pearson Decl. Ex. A at 15 (filed Apr. 25, 2012: "DC needs the Timeline documents for soon-to-be-filed appellate briefs.... A central issue in [the *Larson*] appeal—indeed, DC's lead argument on its cross-appeal—is whether the parties reached a binding settlement agreement in 2001 that bars Laura Siegel Larson's claims.... the Marks memo, which is among the Timeline documents, confirms that the Siegels had a 'deal' with DC."); C at 41 (filed May 2, 2012: "At least one [of the Timeline documents the Ninth Circuit] can and should consider is the Marks memo, which … fully supports DC's position in both appeals"). This Court and the district court lifted the stay on discovery and denied Larson's stay applications. Dkt. 50-2 at 93-95; Pearson Decl. Ex. D.

Any dispute over the privileged nature of the Marks Memo was settled—*in DC's favor*—weeks before Larson's filing deadlines on this appeal. Larson was on notice that DC intended to use this document in its Reply, and had ample opportunity to address the Memo in her Second Brief on Cross-Appeal (which she filed *one month* after this Court ordered the document produced, and 10 days after she finally produced it). There is thus no basis for Larson's request that she be given a *third* opportunity to address the Memo in yet another brief. Resp. at 12; *see also supra* n.2. If anything, it was DC that was prejudiced by not being able to

7

**EXHIBIT 72**
**1549**

use this document before the district court or in its opening brief here, and it would be unfair to penalize DC for Larson's decision to ignore the Memo in her briefing despite having this Court's April 17, 2012, opinion in hand, and being on notice of DC's intent to submit it to this Court.

4. Finally, Larson contends that DC is "precluded" by Rule 60(b)(2) from "attempting to reopen the judgment below." Resp. 18-19. But DC does not seek to reopen the judgment or record below. Reopening a district court judgment under Rule 60(b) is an entirely different matter from invoking the court's inherent power to supplement the record with one document—the existence and certain contents of which were already before the court, and which can be done regardless of whether the district court weighed in on the evidence. *E.g., Manjiyani*, 343 F.3d at 1019-20; *Mangini*, 314 F.3d at 1160-61; *Nat'l Sr. Citizens Law Ctr. v. Social Sec. Admin.*, 849 F.2d 401, 402 & n.3 (9th Cir. 1988); *Colbert*, 471 F.3d at 165-166. An appellate court need not "reopen" a trial court record to supplement the record with documents already inherently within its purview.

**EXHIBIT 72**
**1550**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 327 of 347
Case 1:11-cv-03633-ODW-RZ 07/11/2012 Document ID: 8248998 Docket 062-12 Page 120 of 94 (10 of 50)
Page ID #:33146

5. For the reasons above, DC respectfully requests this Court grant its motion and exercise its authority to supplement the record with the Marks Memo.

Respectfully submitted,

Dated: July 11, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli
Attorneys for Warner Bros.
Entertainment and DC Comics

9

**EXHIBIT 72**
**1551**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 328 of 347
Case: 11-56934  07/11/2012  ID: 8244098  DktEntry: 62-12  Page: 328 of 347 (11 of 50)
Page ID #:33147

## DECLARATION OF ASHLEY PEARSON

I, Ashley Pearson, declare and state as follows:

1.      I am an attorney licensed to practice in the State of California and admitted to practice before the United States Court of Appeals for the Ninth Circuit.  I am an associate at O'Melveny & Myers LLP, counsel of record for DC in the above-entitled appeal, and the related appeal in *DC Comics v. Pacific Pictures Corp.*, Appeal Nos. 11-56934.  I make this declaration in support of the Reply In Support of Warner Bros. Entertainment Inc. and DC Comics' Motion To Supplement The Record With The Marks Memo.

2.      Attached hereto as Exhibit A is a true and correct copy of DC Comics' *Ex Parte* Application To Lift Temporary Stay On Court's May 25, 2011, And August 8, 2011, Orders, filed in *Pacific Pictures*, dated April 25, 2012.

3.      Attached hereto as Exhibit B is a true and correct copy of DC Comics' Notice Of Motion And Motion To Compel Production Of Documents, filed in *DC Comics v. Pacific Pictures Corp.*, Case No. CV 10-3633 ODW (RZx), United States District Court for the Central District of California ("*Pacific Pictures*"), dated January 23, 2012.

4.      Attached hereto as Exhibit C is a true and correct copy of DC Comics' Reply In Support Of *Ex Parte* Application To Lift Temporary Stay On Court's May 25, 2011, And August 8, 2011, Orders, filed in *Pacific Pictures* and dated

10

**EXHIBIT 72**
**1552**

May 2, 2012.

     5.     Attached hereto as Exhibit D is a true and correct copy of an order issued by the district court in *Pacific Pictures* and dated May 10, 2012.

     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 11th day of July, 2012, at Los Angeles, California.

_____
/s/ Ashley Pearson
Ashley Pearson

11

**EXHIBIT 72**
**1553**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 330 of 347
Case: 11-55863  07/11/2012  ID: 8240098  DktEntry: 62-4  Page: 330 of 347 (13 of 50)
Page ID #:33149

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 27(d)**

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that Appellee DC Comics' brief is proportionately spaced, has a typeface of 14

points or more, and does not exceed 10 pages.

Dated:  July 11, 2012                  O'MELVENY & MYERS LLP

                                       By:   /s/  Daniel M. Petrocelli
                                             Daniel M. Petrocelli
                                          Attorneys for DC and Warner Bros.

1

**EXHIBIT 72**
**1554**

Case 2:10-cv-03633-ODW-RZ Document 500-12 Filed 10/10/12 Page 331 of 347
Case 11-56638 07/11/2012 ID: 8240098 DktEntry: 62-4 Page 133 of 94 (14 of 50)
Page ID #:33150

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2012, I caused to be electronically filed the

Motion To Supplement The Record With The Marks Memo with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system.  I certify that all interested parties in this case are

registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that

the above is true and correct.  Executed on July 11, 2012, at Los Angeles,

California.

_____/s/ Ashley Pearson_____<br>
Ashley Pearson

OMM_US:70766600

1

**EXHIBIT 72**
**1555**

# EXHIBIT 73

O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

August 30, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write concerning documents identified in the "Privilege Log of Bulson Archive" ("Bulson Log") and "Master List of Bulson Archive" ("Master List") produced in this case on November 29, 2011.

1. Entry No. 335 on the Master List—which appears between October 1, 2002, and September 28, 2002, entries on the list—identifies an "Undated" "Draft" from "Michael Siegel" to "Laura Siegel Larson."   Please confirm whether this document is a draft of the October 2, 2002, letter from Michael to Laura identified in Laura's November 2, 2002, letter to Michael.

In addition, an entry for a draft correspondence from Michael to Laura does not appear on the Bulson Log at or around the same September-October 2002 time period.  Please either identify where Master List Entry No. 335 is identified on the Bulson Log or immediately produce the document since any asserted privilege has been waived by not listing it on a privilege log.

2. Entry Nos. 394 and 395 on the Bulson Log identify emails between Michael and Bulson exchanged on October 1, 2002.  Please confirm whether a draft of Michael's October 2 letter is attached to either of these entries, or if the draft's language is in the body of either email.

**EXHIBIT 73**
**1556**

O'MELVENY & MYERS LLP
August 30, 2012 - Page 2

     3. Entry No. 396 on the Bulson Log identifies an October 4, 2002, email from Michael to Bulson.  Please confirm whether Michael's October 2 letter—or a draft of the letter—is attached to this entry or, if not attached, the text of the letter appears in the body of the email.

     If defendants refuse to produce the requested documents and information to DC, DC requests a Rule 37 meet-and-confer to discuss the issues.  Please let us know when you are available.

     DC reserves all rights.

                              Very truly yours,

                              /s/ Jason H. Tokoro

                              Jason H. Tokoro
                              for O'MELVENY & MYERS LLP

cc:    Daniel M Petrocelli, Esq.
       Matthew T. Kline, Esq.
       Defense Counsel

**EXHIBIT 73**
**1557**

# EXHIBIT 74

**From:** Tokoro, Jason
**Sent:** Wednesday, September 26, 2012 10:18 AM
**To:** 'Keith Adams'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Richard Kendall; Laura Brill; Nicholas Daum; David Harris; Pablo Arredondo; Marc Toberoff
**Subject:** RE: DC v. PPC

Keith,

Tomorrow at 3:00 p.m. PDT works for us to meet and confer.  Please us the following dial-in:

      Dial In:  (866) 285-2458

      Passcode:  (310) 246-6707

We disagree with your assertion that the Kendall Brill firm should not participate in this conference.  They should join as this will relate to DC's motion for sanctions.

Best and thanks,

Jason

**From:** Keith Adams [mailto:kgadams@ipwla.com]
**Sent:** Tuesday, September 25, 2012 6:53 PM
**To:** Tokoro, Jason
**Cc:** Pablo Arredondo; Marc Toberoff; Nicholas Daum
**Subject:** Re: DC v. PPC

Jason:

Your September 10, 2012 letter was an utterly superfluous response to my September 6, 2012 letter, which in turn responded to DC's August 30, 2012 letter.  No additional response to your September 10 letter, which simply demanded additional information DC is not entitled to, was required.  Nonetheless, we are available to meet-and-confer on this "issue" at 3 p.m. on Thursday, September 27.

As this concerns solely the discovery responses of Laura Siegel Larson and the Estate of Michael Siegel, and as DC has rejected Defendants' compromise proposals regarding discovery, the involvement of Kendall, Brill & Klieger is not required.

Keith G. Adams
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348

**EXHIBIT 74**
**1558**

Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient,
you may not read, copy, distribute or use this information. If you have received this transmission in
error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** "Tokoro, Jason" <jtokoro@OMM.com>
**To:** Richard Kendall <rkendall@kbkfirm.com>; Marc Toberoff <mtoberoff@ipwla.com>
**Cc:** "Petrocelli, Daniel" <DPetrocelli@OMM.com>; "Kline, Matthew" <MKline@OMM.com>; "Seto,
Cassandra" <cseto@OMM.com>; "Pearson, Ashley" <APearson@OMM.com>; Laura Brill
<lbrill@kbkfirm.com>; Nicholas Daum <ndaum@kbkfirm.com>; David Harris <dharris@ipwla.com>;
Keith Adams <kgadams@ipwla.com>; Pablo Arredondo <parredondo@ipwla.com>
**Sent:** Tuesday, September 25, 2012 9:33 AM
**Subject:** RE: DC v. PPC

Counsel,

You failed to respond to our letter below and to meet and confer, pursuant to Rule 37,
regarding the issues discussed therein.  We will so advise the Court.

Regards,

Jason

**From:** Tokoro, Jason
**Sent:** Monday, September 10, 2012 9:49 AM
**To:** Richard Kendall; Marc Toberoff
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; Laura Brill; Nicholas Daum; David
Harris; Keith Adams; Pablo Arredondo
**Subject:** RE: DC v. PPC

Counsel,

Please see the attached correspondence.

Jason

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Thursday, September 06, 2012 8:01 PM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David
Harris'
**Subject:** DC v. PPC

Counsel:

Please see the attached correspondence sent on behalf of Mr. Adams.

**EXHIBIT 74**
**1559**

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not
read, copy, distribute or use this information. If you have received this transmission in error, please notify the
sender immediately by reply e-mail and then delete this message.

**EXHIBIT 74**
**1560**

# EXHIBIT 75

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<u>LOCATION OF HEARING for NOVEMBER CALENDAR</u>:        <u>Date of Notice</u>:

Richard H. Chambers US Court of Appeals Bldg.
125 South Grand Avenue
Pasadena, California  91105                          September 10, 2012

☞☞  Picture ID <u>required</u> to enter Courthouse  ☜☜
COUNSEL WILL PLEASE CHECK-IN WITH THE DEPUTY IN THE COURTROOM
All CJA Counsel call (415) 355-7993  for travel authorization

Monday, November 5,  2012   9:30 a.m.   Courtroom 1

( )  *   07-75139    Zadesmaeil v. Holder
( )  *   11-50164    United States v. Montoya
( )  *   11-50265    United States v. Esparza
( )  **  11-56934    DC Comics v. Pacific Pictures Corporation
( )      11-55863)   Larson v. Warner Bros. Entertainment, Inc.
         11-56034)

Monday, November 5,  2012   9:00 a.m.   Courtroom 2

( )  *   07-75032    Nordikyan v. Holder
( )  *   11-50239    United States v. Glover
( )  *   12-50076    United States v. Rodriguez-Garcia
( )  **  10-56042    White v. County of San Bernardino
( )  **  11-55389    Hoffman v. Zenith Insurance Company
( )  **  11-55584    Allen v. Labor Ready Southwest, Inc.

Monday, November 5,  2012   9:00 a.m.   Courtroom 3

( )  *   08-70766    Reynoso-Cisneros v. Holder
( )  *   10-71459    Ramirez-Figueroa v. Holder
( )  *   11-55681    J2F Productions, Inc. v. Sarrow
( )  **  10-56782    Disney Enterprises v. Stephen Slesinger
( )  **  11-55410    Youssef v. Astrue
( )  **  12-55417    United States v. 475 Martin Lane

Tuesday, November 6,  2012   9:30 a.m.   Courtroom 1

( )  *   08-70894    Parihar v. Holder
( )  *   08-72258    Correa Rivera v. Holder
( )  *   11-50252    United States v. Stamps
( )  *   09-73074    Jandres-Turcios v. Holder
( )  **  08-74577    Alas v. Holder
( )      11-55460)   Pacific Shores Properties v. Newport Beach
         11-55461)

**EXHIBIT 75**
**1561**

Tuesday, November 6, 2012   9:00 a.m.   Courtroom 2

| | | |
|---|---|---|
| ( ) * | 11-50503 | United States v. Harris |
| ( ) * | 11-55412 | Medrano v. Flagstar Bank, FSB |
| ( ) * | 08-72430 | Sanchez v. Holder |
| ( ) ** | 07-73106 | Rivera De Zavala v. Holder |
| ( ) ** | 07-74242 | Anguiano-Perez v. Holder |
| | 09-73463) | |
| | | |
| ( ) ** | 10-56877 | T-Mobile West Corporation v. City of Huntington Beach |
| | 10-56944) | |

Tuesday, November 6, 2012   9:00 a.m.   Courtroom 3

| | | |
|---|---|---|
| ( ) * | 11-50508 | United States v. Gonzalez-Alvarez |
| ( ) * | 11-50529 | United States v. Valdavinos-Torres |
| ( ) * | 11-50550 | United States v. Delgado-Moreno |
| ( ) ** | 11-50234 | United States v. Yi |
| ( ) | 10-56406 | Tibble v. Edison International |
| | 10-56415) | 11-56628) |

Wednesday, November 7, 2012   9:30 a.m.   Courtroom 1

| | | |
|---|---|---|
| ( ) + | 09-99017 | Mann v. Ryan |

Wednesday, November 7, 2012   9:00 a.m.   Courtroom 2

| | | |
|---|---|---|
| ( ) ** | 11-55423 | Carswell v. JP Morgan Chase Bank N.A. |
| ( ) ** | 11-50540 | United States v. Moran-Elias |
| ( ) | 10-50151 | United States v. Nava |
| | 10-50594) | United States v. Edward Solarzano |
| | 11-50057) | United States v. Adrian Solarzano |
| ( ) | 11-60070 | Marciano v. Chapnick |

Wednesday, November 7, 2012   9:00 a.m.   Courtroom 3

| | | |
|---|---|---|
| ( ) * | 08-71097 | Ghulyan v. Holder |
| ( ) * | 08-73256 | Alcala Perez v. Holder |
| ( ) * | 10-55758 | Ramos v. Evans |
| ( ) ** | 11-55396 | Jet Source, Charter, Inc. v. Gemini Air Group |
| ( ) ** | 12-56064 | Jamerson v. Lewis |
| ( ) ** | 12-60003 | In re Davies |

* MAX ARGUMENT TIME 10 MINS/SIDE   ** MAX ARGUMENT TIME 15 MINS/SIDE
+ MAX ARGUMENT TIME 30 MINS/SIDE   OTHER CASES 20 MINS/SIDE
[see **Filing Instructions** on the Acknowledgment Form]
Wireless Internet Connectivity is now available in the Richard H Chambers U.S. Court of Appeals Bldg
www.ca9.uscourts.gov

**EXHIBIT 75**
**1562**

Thursday, November 8, 2012   9:30 a.m.   Courtroom 1

|   |   |   |   |
|---|---|---|---|
| ( | ) ** | 10-56787 | Goldstein v. City of Long Beach |
| ( | ) ** | 10-56340 | Arkansas Teacher Ret. System v. Mozilo |
| ( | ) | 11-55570 | Pappas v. Countrywide Financial Corporation |
| ( | ) | 11-50093) | United States v. Martinez |
| | | 11-50258) | United States v. Chavez |

Thursday, November 8, 2012   9:00 a.m.   Courtroom 2

|   |   |   |   |
|---|---|---|---|
| ( | ) * | 08-73253 | Acosta De Leon v. Holder |
| ( | ) * | 09-70997 | Yoon v. Holder |
| ( | ) * | 11-50301 | United States v. Diaz-Cruz |
| ( | ) ** | 11-55249 | Henderson v. Johnson |
| ( | ) | 11-50447) | United States v. Namvar |
| | | 11-50448) | United States v. Tabatabai |

Thursday, November 8, 2012   9:00 a.m.   Courtroom 3

|   |   |   |   |
|---|---|---|---|
| ( | ) * | 07-74961 | Karapetyan v. Holder |
| ( | ) * | 11-50390 | United States v. Flores-Cortes |
| ( | ) * | 11-50043 | United States v. Ramirez-Villalba |
| ( | ) * | 11-55650 | King v. Astrue |
| ( | ) ** | 10-56022 | Mashiri v. Department of Education |
| ( | ) | 11-56318 | Rubin v. City of Lancaster |

Friday, November 9, 2012   9:00 a.m.   Courtroom 2

|   |   |   |   |
|---|---|---|---|
| ( | ) * | 08-70836 | Ceron v. Holder |
| ( | ) * | 08-71950) | Lopez-Vasquez v. Holder |
| | | 08-74867) | |
| ( | ) * | 11-50331 | United States v. Jacobs |
| ( | ) ** | 11-50409 | United States v. Hatcher |
| ( | ) ** | 11-56146 | Thornton v. Schwarzeneggar |
| ( | ) ** | 11-57228) | Radin v. Hunt |
| | | 12-55432) | |

Friday, November 9, 2012   9:00 a.m.   Courtroom 3

|   |   |   |   |
|---|---|---|---|
| ( | ) * | 11-50443 | United States v. Arredondo-Martinez |
| ( | ) * | 12-50047 | United States v. Aviles-Gallegos |
| ( | ) * | 11-50471 | United States v. Bustos-Ochoa |
| ( | ) ** | 10-50515 | United States v. Cardenas |
| ( | ) ** | 10-56205 | Starr v. County of Los Angeles |
| ( | ) ** | 11-55253 | Nicolas v. City of Riverside |

* MAX ARGUMENT TIME 10 MINS/SIDE   ** MAX ARGUMENT TIME 15 MINS/SIDE
+ MAX ARGUMENT TIME 30 MINS/SIDE   OTHER CASES 20 MINS/SIDE
PLEASE RETURN ENCLOSED ACKNOWLEDGMENT NOTICE TO CLERK'S OFFICE
[see **FILING INSTRUCTIONS** on the Acknowledgment Form]

**EXHIBIT 75**
**1563**

+----------------------------------------------------+
|              OFFICE OF THE CLERK                   |
|                                                    |
|   U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT      |
|                                                    |
|    95 SEVENTH STREET, P.O. BOX 193939              |
|                                                    |
|              SAN FRANCISCO                         |
+----------------------------------------------------+

### NOTICE OF CASES SET FOR HEARING

Your case has been set for hearing as indicated on the attached calendar. Please take special note of the time and place of hearing. In order that the court may make proper arrangements for oral argument, it is essential that you immediately complete the attached acknowledgment of hearing notice and return it to the Clerk's Office via the Appellate ECF system [ or by hardcopy for those granted an exemption from using the Appellate ECF system.]

In preparing for oral argument, the parties should be guided by Rule 34 of the Federal Rules of Appellate Procedure. The following information is provided to ensure the effectiveness of the hearing process:

**Possibility of Mootness or Settlement** - If your case has become moot or a settlement is imminent, immediately advise the Clerk's office in writing and **BY TELEPHONE**. For ECF-registered parties, this must be filed electronically as "Correspondence to Court."

**Notification of Related Cases** - If you are aware of other cases pending in this court which are related to and which should be calendared with your case(s) on the attached calendar, please notify this office.

**Admission for Oral Argument** - Any attorney who will be presenting oral argument must have been admitted to the bar of this court. **The forms necessary for admission may be obtained through the court's website [ www.ca9.uscourts.gov ] under Forms. If you have not been admitted, or need to verify you have applied, please call the Attorney Admissions Inquiry line at (415) 355-7800 and leave the requested information.** While admission in open court on the day of hearing is discouraged, you may elect such an admission procedure. Candidates for admission in open court must appear in the Clerk's Office with a sponsor who has already been admitted to the bar of the circuit, and who can orally move the admission before the calendar is called.

**Submission Without Oral Argument** - A party who feels that oral argument would not be of assistance to the court may present a written motion asking the court to submit the case on the briefs for decision without oral argument. Such a motion must be served on all parties. For ECF-registered parties, this motion must be filed electronically. The court may, on its own motion, determine that oral argument would not be of assistance. In such cases, all parties will be advised by separate notice pursuant to Fed. R. App. P. 34(a).

**Appearing for Argument** - If oral argument is to be presented, please register with the courtroom deputy in the courtroom posted for your case 30 minutes before the time of the hearing. All parties for all cases must be registered and present at the time the session is convened.

**Hearing Order of Cases** - Cases are generally heard in the order in which they appear on the calendar. On the other hand, a panel may elect to poll the calendar prior to the commencement of argument and to rearrange the order of cases based on the projected length of the argument. Nevertheless, parties in the first case should be prepared to begin argument immediately after the court is convened in the event that the entire calendar is not polled.

**Time for Oral Argument** - Cases scheduled for oral argument will be assigned ten, fifteen, twenty, or occasionally thirty minutes per side. Check your Location of Hearing Notice to determine your time allotment.

**Subject of Oral Argument** - At the time of hearing, the judges of the panel will have studied the briefs and the excerpts of record and will be familiar with the facts and issues of the case. Argument should be devoted to clarifying issues as needed and to responding to questions raised by the judges of the panel.

**Presenting Additional Citations** - Additional citations of relevant decisions rendered since the filing of the party's last brief -or after oral argument but before decision- may be submitted by letter, showing proof of service on all counsel and parties not represented by counsel. For ECF-registered parties, this letter must be filed electronically, but if filed by paper, **only the** original must be submitted to the court. The letter must state the reasons for the citations, referring to either the page of the brief or to a point argued orally. The body of the letter must not exceed 350 words. Any response must be made promptly and similarly limited. [FRAP 28j, Cir. R. 28-6]

**Identity of Panel Members** - Not earlier than the week before the court week in which your case will be heard, the names of judges hearing the currently calendared cases will be announced. The names will be posted on the public bulletin board of the Clerk's Office of your local U.S. District Court and on this Court's web page. You may also determine the names of the judges by submitting with the enclosed acknowledgment form, a self-addressed, postage-paid envelope and a card listing the case number, date and time of hearing. We will write the names of the judges hearing your case on this card and mail it to you at the same time that the official calendars are mailed to the District Court Clerk's Offices for posting. [ www.ca9.uscourts.gov ]

**Continuances** - After a case has been calendared, continuances are not granted except for a showing of extraordinarily good cause. If oral argument is essential but you find it impossible to be present, you must, immediately after receipt of this hearing notice, submit a formal motion and supporting affidavit for continuance. For ECF-registered parties, this motion must be filed electronically. Presentation of the motion does not ensure that the continuance is granted. The court will not consider the motion for continuance after the identity of the panel of judges has been divulged.

DRIVING DIRECTIONS TO COURTHOUSE

**The Richard H. Chambers U.S. Court of Appeals Building is located at 125 South Grand Avenue, in Pasadena, California.**

From **downtown Los Angeles**, take the Pasadena Freeway (110) to the Orange Grove Blvd. exit.  Go north on Orange Grove approximately two miles and turn left on Maylin Street or Del Rosa Drive one block to Grand Avenue.

From the **west via the Ventura Freeway** (134), exit Colorado/Orange Grove Blvd. exit.  Go south (right) on Orange Grove to Green Street.  Turn right one block to Grand Avenue.

From the **east via the Foothill Freeway** (210) exit at Orange Grove Blvd., go south (left) on Orange Grove to Green Street.  Turn right one block to Grand Avenue.



**Park** in the lot across from the Richard H. Chambers U.S. Court of Appeals Building.

**EXHIBIT 75**
**1566**

July 25, 2011

# Notice for Drivers of Electric Vehicles

Consistent with the government's policy of supporting Zero-Emission Vehicles (ZEV's), the United States Court of Appeals for the Ninth Circuit has an Electric Vehicle Charging Station available at the Richard H. Chambers courthouse in Pasadena, California.

The charging station may be used by attorneys attending oral arguments and other visitors to the Pasadena Courthouse.  The charging station consists of a 20A power outlet, either 220V or 110V, and a Level 2 charger.

Drivers may use the available charger or bring their own portable charger.  Because availability is limited, please reserve a power outlet and charger at least 24 hours in advance by contacting Eve Fisher, Senior Deputy Clerk at Eve_Fisher@ca9.uscourts.gov or at 626-229-7251.

**EXHIBIT 75**
**1567**

**U.S. Court of Appeals for the Ninth Circuit**
**Electronic Devices Policy**

This policy pertains to the use of electronic devices by the bar, media and the public in the courthouses and other dedicated spaces housing the United States Court of Appeals for the Ninth Circuit.   These are the William K. Nakamura U.S. Courthouse in Seattle, the Pioneer U.S. Courthouse in Portland, the James R. Browning U.S. Courthouse in San Francisco, the Richard H. Chambers U.S. Courthouse in Pasadena, and the U.S. Court of Appeals for the Ninth Circuit in Honolulu.  The policy also applies to other places in which the court holds session for special sittings.  These include courtrooms in the district courthouses and spaces in law schools and other locations.

Visitors to any of the Ninth Circuit courthouses and dedicated spaces are allowed to carry and make use of various electronic devices as set out by this policy.  Different rules may apply when the court meets in another venue, such as a district courthouse.  Where conflicts between this policy and that of a district court become known, the chief circuit judge and chief district judge, or their designees, will confer to resolve such conflicts.

General Rules:

1.	Anyone may bring electronic devices, such as a Blackberry, smart phone, laptop computer or a similar functioning device having wireless communications capability into the courthouse.

2.	Except for courtrooms, persons may use such devices in public areas of the courthouse to make telephone calls and to transmit and receive data communications, such as email or text messages, or to access the Internet.  For reasons of privacy, safety, and security, use of these devices to take photographs or for audio or video recording or transmission is prohibited in the courthouse (exceptions for court staff, authorized vendors or for educational or ceremonial events).

3.	In courtrooms, persons may use such devices to take notes, transmit and receive data communications, and access the Internet.  This includes media members who are transmitting written accounts of the proceeding to a wider audience using various means.  Persons may not use these devices for telephone calls, photographs or audio or video recording or transmission.  Telephone ring tones and other functional sounds produced by devices must  be disabled while in the courtroom.   Only quiet keyboards may be used in the courtrooms.

4.	The presiding judge of a judicial panel may prohibit or further restrict use of such devices by all persons prior to or during a proceeding when necessary to protect the rights of the parties or to assure the orderly conduct of the proceedings.

5.	This policy will be prominently displayed wherever the court holds session and posted on the court's website. Failure to adhere to the policy may result in removal from the courtroom or other sanction.

Adopted June 23, 2010.

**EXHIBIT 75**
**1568**