# EXHIBIT 77

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

July 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write pursuant to Local Rule 37 concerning counsel's persistent instructions to defendant Mark Peary not to respond to key lines of questioning during his June 29, 2011, deposition. For the reasons discussed below, there was no basis for these objections and Mr. Peary's wholesale refusal to testify on these topics. As a result, DC wrongfully has been denied critical evidence to support its claims and refute the factual assertions in defendants' Rule 12 and SLAPP briefing. Unless defendants agree to allow Mr. Peary to testify on these topics, DC will file a motion to compel the relevant testimony.

## I.    CONSENT AGREEMENT

Defense counsel instructed Mr. Peary "not to answer any questions regarding the substance of the consent agreement" between the Siegel and Shuster heirs that prohibits either family from entering into an agreement with DC without the consent of the other. *See* Rough Tr. of June 29, 2011, Peary Dep. ("Tr.") at 62. The lines of inquiry blocked included:

- why Mr. Peary entered into the consent agreement, *see id.* at 58-65[1];

_____

[1] Appendix A to this letter highlights deposition questions and answers to which DC would seek to compel answers, as well as the right to ask related follow-up questions.

**EXHIBIT 77**
**1645**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 2

- whether Mr. Peary believes the consent agreement harms or benefits the Shuster heirs, *see id.* at 78;

- Mr. Peary's understanding of how the consent provision works, *see id.* at 79-81; and

- whether any other side deal exists by which the Shuster heirs may claim a share of profits the Siegel heirs receive from DC, *see id.* at 167-68.[2]

Defense counsel objected that the consent agreement "has been [held] to be privileged and off limits" by Magistrate Zarefsky, and also asserted attorney-client and work-product privilege. *See id.* at 62-65. These objections are overbroad and not well taken.

### A.    Magistrate Zarefsky's Ruling

Magistrate Zarefsky denied DC's motion to compel production of the consent agreement based on his application of law-of-the-case doctrine to the *Siegel* court's ruling that the agreement was entered into in connection with mediation. Docket No. 209 at 2-10. While this ruling (which DC has disputed) prevented DC from obtaining the document itself, it in no way bars DC from acquiring independent evidence of the nature and substance of the consent agreement. Courts have established that parties can pursue alternative sources of discovery to prove the existence of facts disclosed during mediation—parties must be given an opportunity to "uncover new, admissible evidence … not protected by the confidentiality statutes." *Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *12-13 (N.D. Cal. Dec. 17, 2009); *see also Foxgate v. Homeowners' Assoc.*, 26 Cal. 4th 1, 17-18 (2001) (allowing plaintiff to seek sanctions based on "assertion and evidence" other than "communications made during the mediation"); *Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011) (citing *Benesch* and *Foxgate* favorably).

Moreover, Mr. Peary's testimony is new evidence confirming that the consent agreement is itself discoverable because it exists separate and apart from any mediation or settlement discussions. Mr. Peary admitted that the consent agreement remains in effect to this day, Tr. at 64—and therefore continues to violate DC's rights long after the parties' 2008 mediation in *Siegel* was terminated. Mr. Peary also testified that the "consent agreement," *e.g.*, Tr. at 47—his

---

[2] Notably, Mr. Toberoff allowed Mr. Peary to answer a similar question during his 2006 deposition in the *Siegel* case without objection. *Compare* Tr. of Nov. 11, 2006 Peary Dep. ("2006 Tr.") at 47 (Question: "And if [the Siegels] were to settle and receive money from DC Comics, is there any arrangement by which you would receive any of that money?" Response: "No."), *with* Tr. at 167 (Question: "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in their case against DC or Warner Bros.?" Mr. Toberoff: "I instruct you not to answer because that delves into the potential substance of the consent agreement."). He also allowed Laura Siegel Larson to answer a similar question in 2006—again with no objection. Tr. of Aug. 1, 2006 Larson Dep. at 20 (Question: "Is there any agreement you're aware of between your mother and yourself on the one hand and any representative or heir of Joseph Shuster on the other hand?" Response: "No.").

**EXHIBIT 77**
**1646**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 3

word for the document—is titled "Superman agreement," *id.* at 59—not "Mediation Agreement," "Settlement Strategy," or the like. Federal Rule of Evidence 408 confirms that the consent agreement is discoverable as evidence of independently wrongful acts that are the subject of DC's claims in this case. The "Superman agreement" is not a mediation communication; it is an illicit and unlawful contractual restraint.[3] Defendants cannot shield such evidence from discovery "through the pretense of disclosing it during compromise negotiations." FED. R. EVID. 408, Advisory Comm. Note; *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007); *Munoz v. J.C. Penney Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009) (Wright, J.); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008); *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999); *accord* CAL. EVID. CODE § 1120 ("Evidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation."); *Rojas v. Super. Ct.*, 33 Cal. 4th 407, 423 n.8 (2004); *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132-33 (2008). Moreover, Mr. Peary's Rule 12 motion asserts—incorrectly—that the consent agreement was entered into "solely for purposes of the parties' settlement mediation, which commenced on May 8, 2008." Docket No. 148 at 20. Mr. Peary cannot make such an assertion in briefing but cut off a complete inquiry in discovery.

## B.    Attorney-Client And Work-Product Privilege

Mr. Peary refused to answer DC's questions on the ground that his understanding of the consent agreement was "bound up" with privileged communications with Mr. Toberoff. *E.g.*, Tr.

---

[3] To be clear, DC is entitled to discovery regarding the consent agreement without first having to prove its unlawfulness—an ultimate fact for trial. *Cf. Munoz v. J.C. Penney Corp.*, 2009 U.S. Dist. LEXIS 36362, at *7-10 (C.D. Cal. Apr. 9, 2009) (mediation communication discoverable so long as it pertains to facts other than an admission of fault or liability in underlying case). In any event, the agreement is unlawful under section 304(c)(6)(D) of the Copyright Act, which gives DC a "competitive advantage" and requires that the Shuster heirs remain free to enter into copyright agreements with DC until the effective termination date in 2013. *See* 17 U.S.C. § 304(c)(6)(D); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005). Moreover, Mr. Toberoff's involvement in the consent agreement appears to violate state law and public policy. *See Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948); *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 522 (N.J. 2006); ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Opinion 06-438 (2006); CAL. RULES OF PROF'L CONDUCT R. 3-310(D) (2011); *Fair v. Bakhtiari*, 2011 WL 1991999 (Cal. Ct. App. May 24, 2011). Indeed, Magistrate Zarefsky recognized that "[o]ne cannot know with certainty what the [2008] consent agreement means without seeing the agreement." Docket No. 209 at 8:1-2. It is for this reason that questions concerning its terms should be compelled (and the document itself should be produced); the mediation ended long ago, *see* Docket No. 171-4 Ex. 3, and there is no basis to shield a consent agreement that admittedly exists independent of it, Tr. at 64, from disclosure.

**EXHIBIT 77**
**1647**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 4

at 59-61, 85-86, 91-92.  To clarify, we asked:  "In your role as executor of the estate, is it your testimony that you have been able to -- you can't do anything or even think of anything that doesn't involve the legal advice of Marc Toberoff?"  *Id.* at 338.  Mr. Peary responded:  "That's correct.  *Id.*  We asked:  "You don't have any judgment or any ideas or any thoughts other than what Toberoff discusses with you?"  *Id.* at 339.  Mr. Peary confirmed again:  "That's correct."  *Id.*  This position is untenable.

First, as a factual matter, DC's questions did not call for the divulgence of *any* privileged information—to the contrary, they were directed to Mr. Peary's reasons for entering into the consent agreement on behalf of the Shuster estate and his understanding of the effect of the agreement on the estate's rights.  As the named executor of the Estate of Joseph Shuster, Mr. Peary has a fiduciary duty to make informed, good faith decisions in furtherance of the Estate's interests.  *E.g.*, CAL. PROB. CODE § 9600(a) ("The personal representative has the management and control of the estate and, in managing and controlling the estate, shall use ordinary care and diligence."); *Estate of Sanders*, 40 Cal. 3d 607, 616 (1985) ("An executor is an officer of the court and occupies a fiduciary relation toward all parties having an interest in the estate.").  Mr. Peary was therefore obligated to exercise some degree of sound, independent judgment even if Mr. Toberoff advised him on whether to enter into the consent agreement.  *See id.*  Moreover, defendants have asserted that the Siegel and Shuster heirs are the only parties to the consent agreement, meaning it is a contractual restraint among non-lawyers.  There is no basis for asserting privilege over such business arrangements.  *E.g.*, *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer "'*in his capacity as such*'"—not where lawyer acts as "business agent"); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005) (business agreements and communications between attorney and client not privileged); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981) (where services primarily non-legal in nature, "communications relating to that service should therefore not be privileged, even though performed by a lawyer"); *Marten v. Yellow Freight Sys.*, 1998 U.S. Dist. LEXIS 268, at *18 (D. Kan. Jan. 6, 1998) (recognizing that "when the legal advice is merely incidental to business advice, the privilege does not apply").

Second, Mr. Peary waived whatever privilege might otherwise have existed by selectively and strategically disclosing certain facts about the consent agreement.  Counsel allowed Mr. Peary to provide testimony that he apparently believed would be helpful to defendants, including when the agreement was signed; its signatories; its title; its continued existence; and the fact that it purportedly does not entitle the Shusters to share in any profits concerning Superboy or the Superboy case the Siegels are pursuing.  *See* Tr. at 48-50, 58-59, 65, 75, 81-83.  While defense counsel allowed this testimony, which apparently counsel found helpful, it shut off all inquiry into questions concerning, for example, the Shusters' entitlement to money from the *Siegel* accounting case that is also proceeding before Judge Wright.[4]  Promises

---

[4] *Compare* Tr. at 81-82 (Question:  "Do you have any current arrangement for the consent agreement or otherwise whereby the Shuster interests share in any proceeds or recovery attributable to Superboy?"  [No objection.]  Response:  "No."), *with id.* at 167 (Question:  "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in

**EXHIBIT 77**
**1648**

O'MELVENY & MYERS LLP

July 11, 2011 - Page 5

the Siegels made to the Shusters to share in monies from court cases in which the Shusters are not parties are relevant to DC's unclean hands claims in this case, and also prove the consent agreement is *not* a Drysdale-Koufax agreement, which is an inapt analogy in any event, given the prohibitions on rights-trafficking found in the Copyright Act. Counsel also blocked our efforts to test the factual assertions in defendants' Rule 12 briefing concerning the nature and substance of the consent agreement—including, for example, that the agreement does not "constitute 'a further grant, or agreement to make a further grant' of the recaptured Superman copyrights," Docket No. 148 at 9; reflects "understandings between the Siegels and the Shuster Estate regarding settlement strategy," *id.* at 2; was entered into "solely for purposes of the parties' settlement mediation" in 2008, *id.* at 20; and was intended to "'achieve the objects of the litigation,'" *id.* at 17; *see also* Docket No. 182 at 17-21 (listing, by way of illustration, fact issues raised in defendants' SLAPP motion).

The Ninth Circuit has rejected such efforts to simultaneously disclose some facts while withholding others—a privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Fort James Corp. v. Solo Cup. Co.*, 412 F.3d 1340, 1349-51 (Fed. Cir. 2005).

<u>Third</u>, Mr. Peary also waived privilege by putting at issue Mr. Toberoff's advice concerning the lawfulness of the consent agreement. Defendants, including Mr. Peary, have repeatedly asserted that the consent agreement "is not unlawful in any respect" and "does not require consent of the Heirs' attorney to any settlement with DC." Docket No. 160 at 53; Docket No. 231 at 7; *see also* Docket No. 170 at 5 ("DC's argument that the Consent Agreement is 'unlawful' or improper is also false and unsupported."). By refusing to answer DC's questions regarding the basis for such assertions, Mr. Peary wrongfully has denied DC an opportunity to test defendants' characterization of the agreement. Courts have established that "the attorney-client privilege cannot at once be used as a shield and a sword." *U.S. v. Bilzerian*, 926 F.2d 1285, 1291-94 (2d Cir. 1991). In *Bilzerian*, the court found that a defendant charged with securities fraud and making false statements to the government placed at issue conversations with his counsel by claiming that he "thought his actions were legal." *Id.* at 1292. The court ruled that privilege as to those conversations was waived because the defendant "put his knowledge of the law and the basis for his understanding of what the law required in issue" and "fairness require[d] examination of protected communications." *Id.* Similarly, by stating that all of his actions have been predicated on Mr. Toberoff's advice, Mr. Peary has put these communications at issue and cannot refuse to testify about them. *See id.*; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992).

---

their case against DC or Warner Bros.?" Instruction: "I instruct you not to answer that because it delves into the potential substance of the consent agreements.").

**EXHIBIT 77**
**1649**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 6

## II.     PACIFIC PICTURES AGREEMENTS

Defense counsel improperly barred Mr. Peary from answering questions concerning the agreements between the Shuster heirs and Pacific Pictures Corporation, including:

- why the Shuster heirs entered into the Pacific Pictures agreements, *see* Tr. at 176-77, 204-05, 211-12;

- whether the Shuster heirs believed that litigation with DC was likely at the time they entered into the Pacific Pictures agreements, *see id.* at 211-13;

- why the Shuster heirs agreed to transfer their putative rights to the Pacific Pictures joint venture, *see id.* at 194-99;

- why the 2001 Pacific Pictures agreement identified Superboy as among the Shuster heirs' rights and the 2003 agreement deleted all reference to Superboy, *see id.* at 278-79, 305-10;

- Mr. Peary's awareness of the unlawfulness of certain provisions in the Pacific Pictures agreements, *see id.* at 260-61;

- the purpose and effect of the 2004 letter purporting to "cancel" the Pacific Pictures joint venture, *see id.* at 324-27;

- Mr. Peary's reason for executing a legal retainer agreement after cancelling the Pacific Pictures agreements, *see id.* at 220; and

- Mr. Peary's awareness of efforts by Mr. Toberoff and/or Pacific Pictures to market the Shuster heirs' rights pursuant to the joint venture, *see id.* at 330-38.

At defense counsel's prompting, Mr. Peary asserted that his knowledge on these subjects was inextricably bound with privileged conversations with Mr. Toberoff. *E.g.*, *id.* at 176-77, 279, 305-07, 335-36. Notably, defense counsel allowed Mr. Peary to answer questions on the same topics during his 2006 *Siegel* deposition. *E.g.*, 2006 Tr. at 33 (Question: "What -- what was your understanding of what would happen to the rights that are at issue in this agreement in the event that this agreement was terminated? … I'm asking you, Mr. Peary, what your understanding was of what would happen to the rights if the agreement was terminated at the time that you signed the agreement?" [No objection.] Response: "The rights would be split 50 percent.").

These instructions not to testify are not well taken. The Pacific Pictures agreements are business contracts regarding the disposition of the Shuster heirs' monetary interests and rights— they are *not* privileged communications, attorney retainer agreements or otherwise. They are signed by Mr. Toberoff in his business capacity (as President of Pacific Pictures), and Mr. Peary negotiated and executed these agreements in his role as executor of the Estate of Joseph Shuster,

**EXHIBIT 77**
**1650**

O'MELVENY & MYERS LLP

July 11, 2011 - Page 7

which required him to exercise independent business judgment. *See* CAL. PROB. CODE §
9600(a); *Estate of Sanders*, 40 Cal. 3d at 616. Defendants notably have failed to produce the
drafts of these agreements that Mr. Peary testified were exchanged. Tr. at 100.

While defendants seek to cloak the negotiations of these agreements in privilege, the fact
that Mr. Toberoff is a lawyer—in addition to being the President of Pacific Pictures—does not
make business negotiations concerning these business contracts privileged. *See Chen*, 99 F.3d at
1501 (privilege cannot apply where attorney acting primarily in business role); *accord Minebea*,
355 F. Supp. 2d at 529; *Davis*, 636 F.2d 1028, 1043. Moreover, defendants waived any claims
of privilege concerning these negotiations by selectively disclosing certain facts surrounding the
negotiation and effect of the Pacific Pictures agreements, including:

- the discussions "back and forth" between Mr. Peary and Mr. Toberoff concerning "what
  would be involved on Marc Toberoff's part, the work involved, the cost he would bear,"
  *see* Tr. at 197-98;

- Mr. Peary's awareness that the 2001 Pacific Pictures agreement listed Superboy as
  among the Shuster heirs' rights, *see id.* at 198-99;

- Mr. Peary's understanding, based in part on his discussions with Mr. Toberoff, of the
  reversion clause in the 2001 and 2003 Pacific Pictures agreements providing that "if [the
  venture] were ever terminated for any reason Pacific Pictures would own half the rights
  forever," *see id.* at 209-10;

- Mr. Peary's belief that Mr. Toberoff "was going to see this case through no matter what
  and … there would be no reason [the joint venture] would be canceled or terminated until
  the rights had been pursued," *see id.* at 210-11;

- Mr. Peary's belief that it was not "unreasonable" that he "could not enter into a contract
  with DC Comics no matter how badly [he] wanted unless Marc Toberoff consented," *see
  id.* at 214-15; and

- Mr. Peary's recently formed understanding, in part through discussions with
  Mr. Toberoff, that the Pacific Pictures agreements he negotiated and signed were void
  under the Copyright Act, *see id.* at 203, 218, 223-24.

Mr. Peary "cannot be allowed, after disclosing as much as he pleases, to withhold the
remainder" of information about the Pacific Pictures agreements. *Weil*, 647 F.2d at 24; *see also
Fort James Corp.*, 412 F.3d at 1349-51. This is particularly true given that defendants have
made factual assertions in their Rule 12 and SLAPP briefing concerning the status and effect of
the Pacific Pictures agreements, yet have denied DC any opportunity to confirm or disprove
those assertions. *See, e.g.*, Docket No. 148-1 at 17 ("PPC had no … ownership interest" in the
Shusters' putative rights); Docket No. 147-1 at 8 (the Pacific Pictures agreements are "moot, as
such were duly and voluntarily cancelled on September 10, 2004"). Similarly, defendants'
SLAPP briefing depends in large part on their contention that the Pacific Pictures "Agreements

**EXHIBIT 77**
**1651**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 8

… clearly contemplate litigation related to the termination of Joseph Shuster's copyright grants" and are thus protected under California's SLAPP statute. Docket No. 145-1 at 17; *see also, e.g.*, *id.* at 16-17 (agreements "were plainly related to contemplated litigation and settlement"). Defendants, however, shut down every one of our questions seeking to test this assertion. *E.g.*, Tr. at 211-13 (Question: The Pacific Pictures agreement "states there that the venture will retain Toberoff to render legal services including in connection with legal disputes and litigation …. Legal disputes and litigation with whom?" (Instruction not to answer.) Question: "Well, it's fair to say that you understood when you signed this that there was a prospect of litigation with DC Comics or some Time-Warner company, correct?" (Instruction not to answer.) Question: "You understood … that when you signed this there was some appreciation that you would be in litigation?" (Instruction not to answer.) Question: "So you shouldn't have been surprised when you read the lawsuit that DC filed since you contemplated litigation as early as 2001, correct?" (Instruction not to answer.) Question: "When you saw the lawsuit from DC Comics …, that's something that you understood could happen as early as 2001 when you signed this joint venture agreement, correct?" (Instruction not to answer.)). Defendants cannot have it both ways; having opted to make factual assertions in their briefing and allow Mr. Peary to testify in support of those assertions, they also must give DC an opportunity to test those claims.

## III.    MR. PEARY'S ROLE AS EXECUTOR OF THE SHUSTER ESTATE

At Mr. Toberoff's instruction, Mr. Peary refused to answer questions concerning his role and responsibilities as the named executor of the Estate of Joseph Shuster, including his efforts to determine the value of rights purportedly held by the Estate, his decision to execute a copyright termination notice on behalf of the Estate, and his opinion as to whether the Estate can sell its rights without making an agreement with DC. *See* Tr. at 74, 191-92, 342-43. Mr. Peary stated that he had no understanding of these important issues aside from what he was told by his attorney. *See id.* at 338-39. As discussed above, Mr. Peary had a fiduciary duty to exercise judgment independent of what he was told by his attorney, *see* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d at 616—and DC is entitled to seek testimony on the nature and scope of Mr. Peary's judgment.

Moreover, Mr. Toberoff has always played a dual role in his dealings with Mr. Peary. As their contracts state—and as Mr. Toberoff has touted on his website and in press interviews—he is a movie producer. DC is entitled to know what Mr. Toberoff told Mr. Peary and others in that role. Indeed, the consideration for the Pacific Pictures agreements—*i.e.*, that the Shusters would give *50% of their rights* to Mr. Toberoff's company—was predicated on Mr. Toberoff helping exploit and market their putative rights as a movie producer. *See* Nov. 23, 2001 Pacific Pictures Agreement at 1 (transferring Shusters' putative rights to Pacific Pictures joint venture "to investigate, retrieve, enforce and exploit" the rights).

In addition, Mr. Peary's Rule 12 briefing makes factual assertions concerning his authority to exercise the Estate's purported termination rights—despite the 1992 agreement signed by the Estate's sole beneficiary, Jean Peavy, extinguishing all such rights—which DC is entitled to test in discovery. *See, e.g.*, Docket No. 148 at 7-14 (Mr. Peary only person with

EXHIBIT 77
1652

O'MELVENY & MYERS LLP
July 11, 2011 - Page 9

standing to terminate and other Shuster heirs did not intend to "waive, transfer or release the Shuster termination rights" in entering into the 1992 agreement).

## IV.    CONFLICTS OF INTEREST

Mr. Peary followed counsel's instructions not to answer questions concerning the conflict of interest arising out of Mr. Toberoff's concurrent representation of the Siegel and Shuster heirs (and, *inter alia*, the Shusters' abdication of Superboy rights in favor of the Siegels), including:

- Mr. Peary's understanding of this conflict of interest, *see* Tr. at 85-86, 227-29;

- whether Mr. Peary agreed to waive the conflict, *see id.* at 241;

- the alleged conflict waiver Mr. Peary claims to have signed in 2010 (but has never produced), *see id.* at 91-93; and

- the connection between the alleged conflict waiver and the 2008 consent agreement or this lawsuit, *see id.* at 92-93;

Defense counsel objected that these questions implicated privileged attorney-client communications.  *E.g., id.* at 85-86, 91-93, 227-28.  Under California law, Mr. Toberoff was required to disclose the conflict to Mr. Peary in writing, recommend that he seek independent legal advice, and obtain a written waiver before proceeding with representation.  *See* CAL. RULES OF PROF'L CONDUCT R. 3-310; *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 284-86 (1994) (same).  Such communications are "not protected by the attorney-client privilege or work product doctrine." *E. Maine Baptist Church v. Regions Bank*, 2007 WL 1445257, at *2-3 (E.D. Mo. May 10, 2007); *see also Chevron USA Inc. v. Peuler*, 2004 WL 224579, at *3 (E.D. La. Feb. 3, 2004).  Moreover, Mr. Peary waived whatever privilege might otherwise have existed by selectively disclosing the existence of a waiver document allegedly signed in 2010—which defendants have improperly withheld from production.  *See Weil*, 647 F.2d at 24; *Fort James Corp.*, 412 F.3d at 1349-51.  Defendants should produce to DC entries 44 (Apr. 17, 2010 e-mail from Mr. Peary to Mr. Toberoff) and 47 (Dec. 6, 2010 e-mail from Mr. Peary to Mr. Toberoff) on Mr. Peary's privilege log or confirm which entry—if either—corresponds to the purported conflict waiver.

## V.    OTHER ISSUES

Mr. Peary refused to answer several other questions on the basis that he had no knowledge independent of his privileged communications with Mr. Toberoff.  *E.g.*, Tr. at 243, 245-46, 330-31.  None of these subjects implicated the conveyance of legal advice.

<u>First</u>, we asked questions concerning Mr. Peary's understanding of why and how Mr. Toberoff initially approached the Siegel heirs.  *See* Tr. at 241-42.  Mr. Toberoff approached the Siegels not in his capacity as an attorney—let alone an attorney acting on behalf of the Shuster heirs' legal interests—but as a businessman and movie producer.  *E.g.*, Docket No. 49 Ex. A at 63 ("MT approaches the Siegels, *not as an attorney but as a film producer*…."); Oct.

**EXHIBIT 77**
**1653**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 10

23, 2002 IP Worldwide agreement ¶¶ 1, 10 (providing that IP Worldwide would "negotiate the sale, lease, license and all other dispositions" of the Siegels' putative rights and confirming "the scope of this Agreement does not include legal services and/or expenses in connection with litigation"); May 13, 2003 Letter from Michael Siegel to Laura Larson at 1 ("I told you when [Toberoff] first contacted me, he wanted to buy my share of the copyright …. Marc has his own production company, he was going to team with [Ari Emanuel] and make a movie.")  Any communications between Mr. Toberoff and Mr. Peary on this topic would have been non-privileged business communications.  *See Chen*, 99 F.3d at 1501; *Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d at 1043.  Moreover, it defies credulity that Mr. Peary's knowledge of Mr. Toberoff's introduction to the Siegels was based solely on his communications with Mr. Toberoff.  Mr. Peary admitted that he and his mother, Jean Peavy, were in regular contact with the Siegels and claimed that it was Ms. Peavy who suggested they meet with Mr. Toberoff.  *See* Tr. at 252.

    Second, we asked questions about Mr. Peary's awareness of and involvement in the alleged grand jury investigation concerning the Toberoff Timeline.  *See* Tr. at 245-46.  This investigation is a factual matter separate and apart from Mr. Toberoff's representation of Mr. Peary.  That Mr. Peary may have learned about it from his attorney does not necessarily make this entire topic immune from discovery.  *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged.").

    Third, we asked questions regarding Mr. Peary's understanding of the Shuster heirs' retainer agreement with Mr. Toberoff based on his review of that document and the consent agreement in preparation for the deposition.  *See* Tr. at 328-29.  As Magistrate Zarefsky has recognized, retainer agreements are not privileged, except to the extent certain provisions convey legal advice.  Docket No. 209 at 11; *see also In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999).  Mr. Peary's knowledge of whether the agreement refers to the Siegels and Superboy, *see* Tr. at 329, has nothing to do with the conveyance of legal advice, and Mr. Peary admitted during the deposition that his review of the retainer agreement and consent agreement refreshed his recollection.  *E.g.*, Tr. at 51 ("Question:  "What did you bring with you?"  Response:  "I brought a copy of the legal retainer as of 2001 and I brought a -- a copy of the first page of the consent agreement with a cover letter …, just to jog my memory.");  *id.* at 53 (Question:  "And were you shown any documents yesterday when you met with Mr. Toberoff?"  Response:  "We … reviewed our agreements."  Question:  "What agreements?"  Response:  "The legal retainer and the -- the complaint from DC and the supporting legal documents…."  Question:  "Did you also show Mr. Toberoff the consent agreement pages that you had taken with you?"  Response:  "Yes, just the -- the copy that I brought to jog my memory.").  Because these documents refreshed his recollection, they must be produced.  *See Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 78 (D. Mass. 2007) (documents used by deponent to refresh recollection of events subject to discovery under Federal Rule of Evidence 612); *In re Comair Air Disaster Litig.*, 100 F.R.D. 350, 353 (D.C. Ky. 1983) (same); *Derderian v. Polaroid Corp.*, 121 F.R.D. 13, 15 (D. Mass.

**EXHIBIT 77**
**1654**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 11


1988) ("By using a document to refresh recollection in connection with testimony at deposition, a privilege or protection which previously attached to the document may be waived.").

*    *    *

    Please let us know when you are available to meet and confer on these issues.

                    Very truly yours,

                    /s/ Daniel M. Petrocelli

                    Daniel M. Petrocelli
                    of O'MELVENY & MYERS LLP

CC1:852626

**EXHIBIT 77**

**1655**

ROUGH DRAFT

1       WARNING!  The following is a rough draft of

2   the within deposition transcript which has been

3   provided upon request with the specific

4   understanding and acknowledgment that:

5       Such transcript is not in final form and is

6   not an official transcript of the proceedings.  The

7   nature of stenographic writing necessitates that the

8   reporter may have to make various corrections and/or

9   changes as a result of human error and/or

10   stenographic notes not being fully translated by the

11   equipment from steno to English.  As a result, the

12   final transcript may vary significantly.

13       Such transcript is being provided as a

14   special service, to be used for limited purposes as

15   may be appropriate in the discretion of the

16   recipient; however, the reporter and/or Merrill

17   Solutions will not be responsible for any of the

18   content of such transcript and/or any variance from

19   the final official transcript.

09:10:32 20

09:10:32 21

22

23

24

25

1

**EXHIBIT 77**
**1656**

ROUGH DRAFT

10:28:58  1          THE VIDEOGRAPHER:  Good morning.  This

10:28:59  2    marks the beginning of Volume I, Videotape Number 1

10:29:02  3    in the deposition of Marc Warren Peary in the matter

10:29:07  4    entitled "DC Comics versus Pacific Pictures

10:29:11  5    Corporation et al., filed in the United States

10:29:14  6    District Court for the Central District of

10:29:16  7    California.  This is case number 1036330 DW R Z X.

10:29:23  8    Today date is June 29, 2011 and the time on the

10:29:27  9    video monitor is 10:28 a.m.  The video operator

10:29:30 10    today is Fritz Sperberg, a notary public, contracted

10:29:33 11    by Merrill Legal Solutions at 20750 Ventura

10:29:37 12    Boulevard, Woodland Hills, California.

10:29:40 13          This video deposition is taking place at

10:29:42 14    1999 Avenue Of The Stars and in Los Angeles and was

10:29:45 15    noticed by Daniel M. Petrocelli of O'Melveny &

10:29:48 16    Myers.

10:29:49 17          Counsel, please identify yourselves and

10:29:51 18    state whom you represent.

10:29:52 19          MR. PETROCELLI:  Daniel Petrocelli for

10:29:55 20    plaintiff DC Comics.

10:29:57 21          MR. TOCORO:  Jason Tocoro for plaintiff DC

10:29:59 22    comics.

10:30:00 23          MR. TOBEROFF:  Marc Toberoff for defendants

10:30:02 24    Laura Siegel Larson and Marc Warren Peary.

10:30:06 25          THE VIDEOGRAPHER:  Our court reporter today

                                                          2

**EXHIBIT 77**
**1657**

ROUGH DRAFT

10:30:09  1    is Shanda Gabriel of Merrill.  Would the reporter

10:30:11  2    please swear in the witness.

10:30:12  3

10:30:12  4                    WARREN PEARY,

10:30:12  5              having been first duly sworn, was

10:30:12  6              examined and testified as follows:

10:30:19  7

10:30:19  8              THE VIDEOGRAPHER:  Please begin.

10:30:19  9

10:30:19 10                    EXAMINATION

10:30:19 11    BY MR. PETROCELLI:

10:30:21 12         Q.  Good morning, Mr. Perry.

10:30:24 13         A.  Good morning.

10:30:25 14         Q.  We're starting at 10:30 rather than the

10:30:27 15    noticed time of 9:30 because Mr. Toberoff informed

10:30:33 16    me this morning of car problems.  So we'll probably

10:30:38 17    have to go later than anticipated but hopefully

10:30:42 18    we'll get through this today.

10:30:43 19              Marc, all the defendants counsel were

10:30:50 20    noticed for the deposition.  The other counsel is

10:30:54 21    not present but we're going to proceed in their

10:30:58 22    absence.  They were given full notice?

10:30:59 23              MR. TOBEROFF:  They're not attending today.

10:31:01 24              MR. PETROCELLI:  Okay.

10:31:04 25         Q.  Let me mention to you, Mr. Perry, that I've

                                                              3

**EXHIBIT 77**
**1658**

ROUGH DRAFT

10:31:10  1    reviewed the deposition that you gave in the Siegel

10:31:13  2    case on November 11, 2006 and it was a somewhat

10:31:23  3    brief deposition.  This will be lengthier.  It's not

10:31:26  4    my intention to duplicate what you were already

10:31:34  5    asked although I will be from time to time picking

10:31:36  6    up on things that were touched upon this that

10:31:39  7    deposition and following up.

10:31:41  8            So I do want you to know that I'm mindful

10:31:45  9    of what your prior testimony is and if you want a --

10:31:48 10    I think you have a copy in front of you mark but if

10:31:51 11    you need to consult a copy I have one.

10:32:01 12            So first let me start by expanding a bit on

10:32:04 13    your background.

10:32:05 14            You were born on January 14, 1962.

10:32:05 15            Is that right?

10:32:08 16    A.   Yes on.

10:32:08 17    Q.   And so you're 49 years old right now?

10:32:10 18    A.   Yes.

10:32:12 19    Q.   And you have never been married, correct?

10:32:12 20    A.   Correct.

10:32:15 21    Q.   And you have no children.

10:32:15 22            Is that right?

10:32:18 23    A.   Correct.

10:32:18 24    Q.   You live in Albuquerque?

10:32:20 25    A.   Santa Fe.

                                                              4

**EXHIBIT 77**
**1659**

ROUGH DRAFT

10:32:21  1          Q.  Santa Fe, New Mexico?

10:32:23  2              Do you live alone?

10:32:25  3          A.  No.

10:32:25  4          Q.  With whom do you reside?

10:32:27  5          A.  I share a house with my family, other

10:32:31  6   family members.

10:32:32  7          Q.  Who are they?

10:32:33  8          A.  My mother and sister.

10:32:36  9          Q.  And your mother is Jean Peavy.

10:32:38 10              Is that right?

10:32:38 11          A.  Yes.

10:32:39 12          Q.  And your sister is Dawn Peavy?

10:32:42 13          A.  Yes.

10:32:44 14          Q.  D-a-w-n, right?

10:32:45 15          A.  Right.

10:32:45 16          Q.  Anyone else reside with you?

10:32:48 17          A.  No.

10:32:51 18          Q.  Okay.  Dawn was born October 1965.

10:32:51 19              Is that right?

10:32:51 20          A.  Yes.

10:32:55 21          Q.  Okay.  She has three children?

10:32:58 22          A.  Yes.

10:33:00 23          Q.  Do they reside with you?

10:33:02 24          A.  She has a -- her youngest is -- is there

10:33:06 25   sometimes.

5

**EXHIBIT 77**
**1660**

ROUGH DRAFT

10:33:09  1        Q.  Do you know the ages of her children and

10:33:11  2    their names?

10:33:13  3        A.  Let's see, the youngest one is 19, and --

10:33:16  4        Q.  And what's the 19 year old's name?

10:33:18  5        A.  Jake.

10:33:20  6        Q.  Jake?

10:33:20  7        A.  Jake.

10:33:21  8        Q.  Last name?

10:33:21  9        A.  He uses -- I think he uses his -- his

10:33:28 10    father's last name, Anderson, I believe.

10:33:30 11        Q.  Okay.

10:33:30 12        A.  I don't use it that much.

10:33:32 13        Q.  Jake Anderson.  19 years old.  And who are

10:33:35 14    the other two?

10:33:36 15        A.  Other 20 -- you want their age or --

10:33:40 16        Q.  Both name and age.

10:33:42 17        A.  Okay.  Nicole and -- let me see, I haven't

10:33:51 18    seen them in a long time.  They live in different

10:33:54 19    cities and I haven't seen them in a very long time

10:33:57 20    so let's see, Nicole and --

10:34:02 21        Q.  Starting with Nicole, how old is Nicole?

10:34:05 22        A.  She's something like 23 or -4.

10:34:06 23        Q.  And where -- what's Nicole's last name?

10:34:09 24        A.  She uses her mother's last name.

10:34:11 25        Q.  Peavy?

                                                                    6

EXHIBIT 77
1661

ROUGH DRAFT

10:34:12  1        A.  Yes.  Yeah.

10:34:15  2        Q.  And who is the third child?

10:34:17  3        A.  Let me see.  I haven't seen him in such a

10:34:20  4    long time.  You're making my -- what is it his name?

10:34:29  5    I haven't seen him in a long time.  He lives far

10:34:31  6    away.

10:34:31  7        Q.  You don't know his name?

10:34:33  8        A.  I do. But I'm not recalling it at the

10:34:35  9    moment.

10:34:35  10        Q.  Do you know his age?

10:34:36  11        A.  He is something -- I -- I don't know, late

10:34:38  12    twenties.

10:34:39  13        Q.  I take it it's a mail?

10:34:40  14        A.  Yes.

10:34:42  15        Q.  Okay.

10:34:42  16        A.  Yes.

10:34:42  17        Q.  And where does Jake Anderson live?  What he

10:34:47  18    city?

10:34:47  19        A.  The youngest, Jake, he's -- sometimes he's

10:34:50  20    with us and sometimes he's elsewhere where.

10:34:58  21        Q.  Elsewhere meaning where?

10:34:58  22        A.  I -- I -- I think he has a girlfriend that

10:35:01  23    he stays with if you want --

10:35:02  24        Q.  In Santa Fe?

10:35:03  25        A.  Yes, if you want the details.

                                                           7

EXHIBIT 77
1662

ROUGH DRAFT

10:35:04  1          Q.  No, I just want to know the city?

10:35:06  2          A.  Okay.

10:35:06  3          Q.  And Nicole lives in what city?

10:35:08  4          A.  She's in Denver.

10:35:09  5          Q.  Denver.  And the -- older boy, you don't

10:35:12  6   remember?

10:35:12  7          A.  He -- he's -- he's in El Paso.

10:35:19  8          Q.  How long have you revieweded with your

10:35:26  9   sister Dawn?

10:35:28 10          A.  She's been with us since 2001 or 2,

10:35:40 11   somewhere in there.

10:35:40 12          Q.  Continuously to the present?

10:35:42 13          A.  Yes.

10:35:44 14          Q.  Okay.  And how long have you resided with

10:35:45 15   your mother Jean?

10:35:47 16          A.  We -- we've been there since -- since 1999.

10:36:00 17          Q.  How old is your mom now?

10:36:01 18          A.  90.

10:36:04 19          Q.  And how is her health?

10:36:05 20          A.  It's -- it's fair.  She had a stroke two

10:36:09 21   years ago.

10:36:13 22          Q.  Do you have full time healthcare for her,

10:36:17 23   like a caretaker?

10:36:19 24          A.  I'm -- I serve as a caretaker quite often.

10:36:22 25          Q.  Okay.  But other than the family members,

8

**EXHIBIT 77**
**1663**

ROUGH DRAFT

10:36:25  1    is there a professional caretaker?

10:36:26  2         A.   No.

10:36:30  3         Q.   Okay.  Your father was William Peavy?

10:36:33  4         A.   Yes.

10:36:33  5         Q.   And he passed away in 1996?

10:36:35  6         A.   That's correct.

10:36:49  7         Q.   And your dad wrote books and was a teacher?

10:36:52  8         A.   Well, he -- he did.  He had -- he had a

10:36:57  9    long career.

10:36:58 10         Q.   As a -- as a teacher and an author?

10:37:00 11         A.   You want his last position before he

10:37:05 12    retired or --

10:37:06 13         Q.   Just in general idea of his?

10:37:07 14         A.   In general,.

10:37:08 15         Q.   Professional background?

10:37:09 16         A.   Yeah, he was civil servant.

10:37:11 17         Q.   Working for whom?

10:37:12 18         A.   He worked for the Texas A&M extension

10:37:17 19    service.

10:37:17 20         Q.   What is that?

10:37:18 21         A.   Texas A&M steps service.

10:37:20 22         Q.   Oh the university?

10:37:21 23         A.   It's a branch of the university.

10:37:23 24         Q.   Okay.  Now what about your employment?  Can

10:37:27 25    you briefly trace it for me?

9

**EXHIBIT 77**
**1664**

ROUGH DRAFT

10:37:28  1          A.  I've been doing investment work.

10:37:31  2          Q.  I saw from your prior -- your deposition in

10:37:35  3     the Siegel case that you have a two-year degree from

10:37:39  4     I think it's Texas El Paso.

10:37:39  5              Is that right?

10:37:39  6          A.  Yes.

10:37:42  7          Q.  And you went there right out of high

10:37:44  8     school?

10:37:45  9          A.  Yes.

10:37:46 10          Q.  And so what have you been doing

10:37:49 11     occupationly from the time you left college, Texas

10:37:53 12     El Paso, to the present?

10:37:55 13          A.  You want everything I've done or just --

10:37:58 14          Q.  If you can summarize it that would be

10:38:00 15     helpful?

10:38:00 16          A.  Summarize it.  I've done a lot of different

10:38:04 17     things.  I built.

10:38:05 18          Q.  Can you do it in chronological order for

10:38:08 19     me?

10:38:08 20          A.  I can try.

10:38:10 21          Q.  Sure?

10:38:11 22          A.  I built homes for a time and sold real

10:38:14 23     estate for a time.

10:38:18 24          Q.  While living in?

10:38:18 25          A.  In El Paso.

**EXHIBIT 77**
**1665**

ROUGH DRAFT

10:38:20  1          Q.  In El Paso.

10:38:27  2          A.  Yes.  And then I -- I -- I had a stint

10:38:34  3      selling insurance as well and then I -- I got

10:38:40  4      involved in trading and investing at a later time.

10:38:47  5          Q.  Trading and investing in what?

10:38:48  6          A.  Yes.  I started off in trading futures.

10:38:55  7          Q.  Commodities?

10:38:56  8          A.  Yes.  And then later on branched out more

10:39:04  9      into equity investments and that type of thing and

10:39:08  10     that's been my primary activity for quite a few

10:39:11  11     years.

10:39:11  12         Q.  To the present?

10:39:12  13         A.  Yes.

10:39:14  14         Q.  And you've also written some books from

10:39:17  15     time to time?

10:39:17  16         A.  Yes.

10:39:18  17         Q.  How many books have you authored?

10:39:19  18         A.  Two.

10:39:21  19         Q.  And do you coauthor or book with your

10:39:25  20     father?

10:39:25  21         A.  Did I.

10:39:25  22         Q.  Is that in addition to the two books or one

10:39:28  23     of the two he?

10:39:28  24         A.  No, that's one of the two.

10:39:30  25         Q.  And what was that book?

11

EXHIBIT 77
1666

ROUGH DRAFT

10:39:31 1        A.  What was the title of it.

10:39:33 2        Q.  Yeah the one you did with your dad?

10:39:34 3        A.  It was called super nutrition gardening.

10:39:37 4        Q.  The one you did on your own?

10:39:38 5        A.  It was called the greatest health secrets.

10:39:41 6        Q.  Okay.  You mentioned at the deposition in

10:39:44 7   November of 2006 that you were working on a screen

10:39:49 8   play of Joe Shuster's life?

10:39:52 9        A.  Yes.

10:39:52 10       Q.  Do you recall that?

10:39:52 11       A.  Yes.

10:39:54 12       Q.  Have you continued to work on that?

10:39:55 13       A.  No.

10:39:58 14       Q.  Have you written any other material

10:40:05 15  regarding either Joe Shuster -- about either Joe

10:40:10 16  Shuster or Jerry Siegel?

10:40:12 17       A.  No..

10:40:13 18       Q.  Have you been on any -- have you

10:40:19 19  participated in any presentations or pitches to

10:40:22 20  third parties about acquiring options for any work

10:40:29 21  that you've done?

10:40:30 22       A.  At one time.

10:40:34 23            MR. TOBEROFF:  Meaning -- meaning --

10:40:35 24            THE WITNESS:  On a screen play?

10:40:37 25            MR. TOBEROFF:  Authored work.

12

**EXHIBIT 77**
**1667**

ROUGH DRAFT

10:40:37  1          MR. PETROCELLI:  Yeah.

10:40:38  2      Q.  Any work that you've authored or -- yeah.

10:40:40  3  Any work that you authored?

10:40:41  4      A.  On any screen play or -- I have other

10:40:44  5  screenplays I've also worked on so.

10:40:46  6          MR. TOBEROFF:  He's just talk about any

10:40:47  7  literary work.

10:40:51  8          THE WITNESS:  I've been offered options on

10:40:53  9  other screenplays, yes.

10:40:53 10  BY MR. PETROCELLI:

10:40:54 11      Q.  Have any of them been developed?

10:40:57 12      A.  No.

10:40:58 13      Q.  Have any of the screenplays concerned at

10:41:02 14  all the life of Joe Shuster the ones that have been

10:41:09 15  optioned

10:41:09 16      A.  There was one that was.

10:41:11 17      Q.  Was optioned?

10:41:13 18      A.  It has expired so it's not active.

10:41:16 19      Q.  Now, was that -- what was the underlying

10:41:19 20  work that was optioned?

10:41:19 21      A.  Screen play.

10:41:19 22      Q.  Was that the screen play to which you add

10:41:23 23  verdict in your deposition in 2006?

10:41:24 24      A.  Yes, yes.

10:41:25 25      Q.  And it was after your deposition that you

13

**EXHIBIT 77**
**1668**

ROUGH DRAFT

10:41:30  1    optioned it?

10:41:33  2         A.  I'm not -- I'm not sure of the exact.  I

10:41:36  3    don't -- I really don't recall the exact date on

10:41:40  4    that.

10:41:41  5         Q.  Did you option it to Ilya Salkind?

10:41:44  6         A.  Yes.

10:41:44  7         Q.  Okay.

10:41:52  8         Q.  And the option was renewed?

10:41:53  9         A.  No.

10:41:59 10         Q.  How much did you receive for the option?

10:42:01 11         A.  We weren't paid anything up front.

10:42:04 12         Q.  Okay.  Did the -- how long was the option?

10:42:08 13         A.  I believe it was a year.

10:42:10 14         Q.  Did it expire?

10:42:11 15         A.  Yes, it did.

10:42:11 16         Q.  And has anything happened to that screen

10:42:15 17    play since the expiration of the option to

10:42:17 18    Mr. Salkind?

10:42:18 19         A.  No.  We have no sales or options.

10:42:22 20         Q.  Have you attempted to present or pitch the

10:42:27 21    screen play to anyone else?

10:42:29 22         A.  No, I have not.

10:42:36 23         Q.  How many pages is that screen play?

10:42:37 24         A.  130.

10:42:43 25         Q.  And have you done any further work on it

                                                                    14

**EXHIBIT 77**
**1669**

ROUGH DRAFT

10:42:45  1    since the time you optioned it?

10:42:51  2          A.  Nothing substantial.

10:42:54  3          Q.  And is the screen play about the life of

10:42:56  4    Joe Shuster?

10:42:57  5          A.  Yes.

10:43:00  6          Q.  When you wrote the screen play, did you

10:43:02  7    collect a -- a file on Joe Shuster from which you

10:43:07  8    put together your screen play?

10:43:08  9          A.  I did.  Historical background research.

10:43:12 10          Q.  What were the years when you wrote the

10:43:14 11    screen play?

10:43:15 12          A.  1996, I started.  Up until the early 2000s.

10:43:27 13          Q.  When your uncle died, he died in July of

10:43:29 14    1992.

10:43:29 15              Is that right?

10:43:29 16          A.  Yes.

10:43:33 17          Q.  And after he passed, you were involved in

10:43:38 18    collecting his belongings?

10:43:40 19          A.  Yes.

10:43:43 20          Q.  You went out to his apartment in

10:43:44 21    Los Angeles with your mom?

10:43:46 22          A.  Yes.

10:43:48 23          Q.  And did you then take possession of some of

10:43:55 24    his papers and library of comic book materials,

10:44:01 25    whatever he had, drawings, things like that?

15

EXHIBIT 77
1670

ROUGH DRAFT

10:44:04  1          A.  There were -- there were very limited

10:44:06  2      papers and we didn't find any vintage comics,

10:44:10  3      unfortunately, which would have been worth a lot.

10:44:13  4      He didn't have any.  There were some limited papers

10:44:19  5      but nothing -- nothing significant.  Mostly personal

10:44:22  6      items.

10:44:24  7          Q.  Where did you get the materials that you

10:44:26  8      used for your book?

10:44:27  9          A.  The book?

10:44:30 10          Q.  Excuse me, the screen play.

10:44:34 11          A.  The materials it came from historical

10:44:37 12      research.

10:44:38 13          Q.  About Joe?

10:44:39 14          A.  Yes.  I had a lot of -- a lot of vintage

10:44:46 15      articles that came from the -- the era which is

10:44:51 16      probably unusual to have a lot of material.  That's

10:44:55 17      where most of it came from.

10:44:57 18          Q.  You collected this on your own?

10:44:58 19          A.  Yes.

10:44:59 20          Q.  By doing public record searches?

10:45:02 21          A.  Yes.  And family files.

10:45:05 22          Q.  Who -- who had possession of the family

10:45:07 23      files?

10:45:07 24          A.  My mother had collected articles throughout

10:45:11 25      the years.

16

**EXHIBIT 77**
**1671**

ROUGH DRAFT

10:45:12  1          Q.  And those articles are in your home where

10:45:14  2    you and your mother now live, right?

10:45:17  3          A.  Oh, I -- I guess so.  It's just old

10:45:23  4    magazine articles.

10:45:28  5          Q.  Did you retrieve any materials from Joe

10:45:32  6    apartment after his death that you put in your file

10:45:37  7    for use in writing your screen play?

10:45:39  8          A.  I -- I don't recall getting any papers from

10:45:42  9    his apartment.  He didn't have much.

10:45:46  10         Q.  What about during his lifetime?  Did he

10:45:50  11   ever give you any material, any papers, any

10:45:53  12   writings, any of his drawings, any comic books,

10:45:56  13   things like that, that you've collected and saved?

10:45:59  14         A.  We -- we had a vintage drawing, a few

10:46:05  15   mementos is all.

10:46:06  16         Q.  Were you close to him?

10:46:08  17         A.  Somewhat.

10:46:11  18         Q.  So you were about 30 when he passed right?

10:46:14  19   You were born in 62, right?

10:46:15  20         A.  Yeah, that sounds correct.

10:46:18  21         Q.  And you had known him since you were a

10:46:21  22   small boy?

10:46:21  23         A.  Yes.  Not real closely but I did know him.

10:46:28  24         Q.  He had no children, right?

10:46:28  25         A.  Correct.

17

**EXHIBIT 77**
**1672**

ROUGH DRAFT

10:46:30  1        Q.  But he had been married once?

10:46:31  2        A.  Briefly.

10:46:36  3        Q.  What years was he married?

10:46:37  4        A.  1979, I believe.

10:46:43  5        Q.  Did you attend his wedding?

10:46:45  6        A.  No.

10:46:46  7        Q.  Did he and his wife elope?

10:46:49  8        A.  Excuse me?

10:46:50  9        Q.  Did they elope, they went off on their own

10:46:53 10    and got married without a sarah -- you know a

10:46:56 11    ceremony for the family?

10:46:57 12        A.  I'm not aware of the circumstances of their

10:47:01 13    marriage.

10:47:01 14        Q.  What was his wife's name?

10:47:02 15        A.  I'm not sure I can recall.  I never met

10:47:11 16    her.

10:47:11 17        Q.  Never spoke with her?

10:47:12 18        A.  No.

10:47:13 19        Q.  Ever communicate at all with her in

10:47:16 20    writing?

10:47:16 21        A.  No, I did not.  It's like 1979, 80.  Last

10:47:20 22    time they were both.

10:47:22 23        Q.  Did you ever see her?

10:47:23 24        A.  I never met her.

10:47:24 25        Q.  Did you ever see a picture of her?

18

EXHIBIT 77
1673

ROUGH DRAFT

10:47:26  1        A.  Yes.

10:47:26  2        Q.  Where?

10:47:31  3        A.  Somehow we had -- we had a picture that I

10:47:33  4    had -- had I seen from -- I don't know what it was.

10:47:38  5    Maybe it was -- I don't remember.  Somewhere I did

10:47:40  6    see a picture of them but I never met her.

10:47:44  7        Q.  And Joe had how many nieces and nephews?

10:47:49  8        A.  Just myself and my sister.

10:47:59  9        Q.  Now, you -- I've seen his will or at least

10:48:03 10    a copy of the will and it names your mom, Jean, as

10:48:08 11    his sole beneficiary but identifies you as an

10:48:10 12    alternate beneficiary, as well as executor in the

10:48:17 13    event that she is unwilling or unable to serve.

10:48:19 14    You're generally familiar with that?

10:48:20 15        A.  Yes.

10:48:21 16        Q.  And I notice that your sister wasn't in

10:48:24 17    there.

10:48:25 18            Did your sister to your knowledge, not have

10:48:30 19    a good relationship with -- with your uncle Joe?

10:48:32 20        A.  No, it had nothing to do with that.

10:48:34 21        Q.  Do you have any understanding or belief why

10:48:37 22    only you were included, not your sister?

10:48:41 23            MR. TOBEROFF:  Don't speculate.

10:48:44 24            THE WITNESS:  My sister's provided for by

10:48:48 25    us so there's no problem with the relationship.

                                                                19

**EXHIBIT 77**
**1674**

ROUGH DRAFT

10:48:53  1    That's all I could say.

10:48:53  2    BY MR. PETROCELLI:

10:48:56  3        Q.  When you said your sister is provided for

10:48:58  4    by us, who is the us?

10:49:00  5        A.  Yeah, me and my mom.

10:49:02  6        Q.  Have you been supporting your mom

10:49:07  7    financially since your dad passed?

10:49:11  8        A.  I don't know if I am supporting her.  We

10:49:15  9    have a mutual relationship where she needs my help

10:49:21 10    and I give it to her.

10:49:23 11        Q.  Do you provide financial support to your

10:49:25 12    sister Dawn?

10:49:28 13        A.  Somewhat but she has a job.

10:49:30 14        Q.  What does she do for a living?

10:49:32 15        A.  She works for a food distributor.

10:49:36 16        Q.  In Santa Fe?

10:49:36 17        A.  Yes.

10:49:37 18        Q.  What's the name of the company?

10:49:41 19        A.  It's called Labat SP.

10:49:43 20        Q.  She's unmarried at the current time?

10:49:47 21        A.  Yes.

10:49:53 22        Q.  Are you familiar with a comic book blogger

10:49:56 23    named Dave Sims or Dave Sim, S-i-m?

10:50:02 24        A.  I'm not sure I am.

10:50:08 25        Q.

EXHIBIT 77
1675

ROUGH DRAFT

10:50:10  1            MR. TOBEROFF:  How do you spell that.

10:50:12  2            MR. PETROCELLI:  S IM.

10:50:13  3        Q.  Did your mom in the last four or five years

10:50:19  4    do an interview for Canadian broadcasting company,

10:50:22  5    CBC?

10:50:23  6        A.  I'm not aware of that.

10:50:26  7        Q.  I've taken the time while we were waiting

10:50:28  8    for you folks to arrive to pre-mark the deposition

10:50:32  9    exhibits that I intend to use.  Now, that said,

10:50:36 10    because I tend to move around a bit they're not

10:50:40 11    exactly in sequential order but let me start by

10:50:45 12    showing you just briefly an exhibit.  Which is a

10:50:47 13    copy of a blog by Mr. Sim about your family dated

10:50:53 14    February 19, 2007.  It's Exhibit 24?

10:51:00 15            MR. PETROCELLI:  Mark I started with 1

10:51:02 16    Exhibit 1.  Which I'll get to and I've numbered

10:51:09 17    exhibits starting with 1 since this is the first

10:51:12 18    deposition in the case.

10:51:13 19               (The document referred to was

10:51:13 20               marked for identification by the

10:51:13 21               C.S.R. as Exhibit ^ and attached to

10:51:16 22               this deposition.)

10:51:16 23    BY MR. PETROCELLI:

10:51:17 24        Q.  Have you ever seen this blog before or

10:51:19 25    this --

                                                            21

**EXHIBIT 77**
**1676**

ROUGH DRAFT

10:51:19  1        A.  No.

10:51:20  2        Q.  Excuse me, this particular addition of the

10:51:23  3    Mr. Sim's blog?

10:51:25  4        A.  No.  I'm not familiar with him.

10:51:28  5        Q.  Okay.  If you go to the second page, the

10:51:31  6    middle of the paragraph, the paragraph that starts

10:51:38  7    with, "Oh, here is a great one," a letter from Jean

10:51:46  8    and Dawn and Warren Shuster Peavy/Perry.

10:51:51  9            Do you see that?

10:51:51 10        A.  Yes.

10:51:53 11        Q.  And then it goes on to have some discussion

10:51:56 12    about -- about you and your sister and your mom.

10:52:00 13            Did you provide a letter to Mr. Sim?

10:52:06 14        A.  A letter?

10:52:06 15        Q.  Yeah.

10:52:16 16        A.  I don't recall having any dealings with

10:52:19 17    Sim.

10:52:19 18        Q.  Did you attend the inaugural Joe Shuster

10:52:23 19    awards at Toronto con it's Toronto and then c-o-n?

10:52:28 20        A.  No.

10:52:29 21        Q.  Do you know that your mother and sister

10:52:31 22    did?

10:52:32 23        A.  Yes.

10:52:32 24        Q.  What year was that?

10:52:40 25        A.  I'm not sure.  I didn't go.

**EXHIBIT 77**
**1677**

ROUGH DRAFT

10:52:41  1        Q.  Last -- was it in the last --

10:52:45  2        A.  Sometime after 2000.

10:52:46  3        Q.  Okay.  Are you aware of any letters that

10:52:50  4    they wrote to Mr. Sim, they being your sister or

10:52:54  5    your mother?

10:53:02  6        A.  No I don't believe I am.

10:53:03  7        Q.  And you'll see in this next paragraph that

10:53:05  8    follows at the very end there's a reference to some

10:53:08  9    of your screenplays.  Then there's some photographs

10:53:12 10    and the photograph on -- on the third page of

10:53:16 11    Exhibit 24 at the very bottom, is that you, your

10:53:19 12    mother, Jean and your sister, Dawn?

10:53:21 13        A.  Yes.

10:53:21 14        Q.  Okay.  And then there's the fourth page at

10:53:25 15    the top talks about the option arrangement with

10:53:28 16    Mr. Salkind.

10:53:29 17            Do you see that?

10:53:29 18        A.  Yes.

10:53:31 19        Q.  Okay.  And as far as you know, you didn't

10:53:34 20    provide any of this information to -- to Mr. Sim.

10:53:34 21            Is that right?

10:53:41 22        A.  I don't recall having any dealings with --

10:53:44 23    with Sim so I don't know where he got it.

10:53:46 24        Q.  And go to the -- the next page at the very

10:53:49 25    end which starts with so there you go?

23

EXHIBIT 77
1678

ROUGH DRAFT

10:53:55  1          A.  Next page at the very end.  Uh-huh.

10:53:57  2          Q.  It says at the end stay tuned as we try to

10:54:01  3      track down Jean Shuster Peavy CVC interview.  Do you

10:54:06  4      know anything about that interview?

10:54:07  5          A.  No, I don't.

10:54:08  6          Q.  Okay.  When did you change your name from

10:54:17  7      Peavy to Peary?

10:54:18  8          A.  Some time in the early 1980s.

10:54:24  9          Q.  Did you legally change it?

10:54:26 10          A.  Yes.

10:54:26 11          Q.  Why did you do that?

10:54:27 12          A.  It was like a kind of a business type of

10:54:34 13      decision.  I was doing some acting at the time.

10:54:38 14      That was part of it.  I thought it had a better

10:54:40 15      sound, as actors frequently change their names so --

10:54:44 16          Q.  Did you --

10:54:45 17          A.  -- it had to do with that.

10:54:46 18          Q.  Did you appear in anything --

10:54:50 19          A.  I did.

10:54:51 20          Q.  -- that was previous to --

10:54:53 21          A.  I did local paid productions and did some

10:54:59 22      various auditions for a time but I didn't pursue it.

10:55:09 23          Q.  Are you also a musician?

10:55:12 24          A.  I have -- yes, I have done music.

10:55:14 25          Q.  Did you perform in a band called the Cotton

                                                                    24

EXHIBIT 77
1679

ROUGH DRAFT

10:55:19  1    Pickin Peavys?

10:55:19  2         A.  As a child as a childhood thing.

10:55:25  3         Q.  Who was in that band?

10:55:26  4         A.  Myself, mother and father, maybe an

10:55:30  5    occasional other musician.

10:55:32  6         Q.  And what did you play the ban Joe?

10:55:33  7         A.  Yes.

10:55:35  8         Q.  Okay.  So you have done some music in your

10:55:40  9    background and you've done some acting?

10:55:41 10         A.  Yes.

10:55:42 11         Q.  Have you ever been compensated for acting?

10:55:43 12         A.  Yes.

10:55:45 13         Q.  How long ago?

10:55:48 14         A.  Early 1980s.

10:55:56 15         Q.  So I want to go back a bit on your

10:55:58 16    relationship with your uncle Joe Shuster.

10:56:05 17              Did you ever spend one on one time with him

10:56:09 18    growing up?

10:56:09 19         A.  Some.

10:56:09 20         Q.  Did you go stay with him, for example, for

10:56:12 21    a while?

10:56:12 22         A.  There was one occasion I stayed with him

10:56:16 23    for a couple weeks.

10:56:18 24         Q.  When was that?

10:56:20 25         A.  That's when I thought I might become an

25

**EXHIBIT 77**
**1680**

ROUGH DRAFT

10:56:22  1    actor and I came out here and he let me stay in his

10:56:27  2    place for a while.

10:56:27  3         Q.  Late '80s?

10:56:28  4         A.  No.  That was the early '80s when I had all

10:56:32  5    my heir.

10:56:33  6         Q.  And when did you last see him before he

10:56:39  7    died?

10:56:39  8         A.  There -- there might have been an occasion

10:56:46  9    in the late '80s where we visited him, I believe.

10:56:52 10    It wasn't very long, though.

10:56:57 11         Q.  What wasn't very long?

10:56:59 12         A.  The visit was not long.

10:57:03 13         Q.  Did you speak with him by phone?

10:57:07 14         A.  Not much.  Mostly it was to his sister

10:57:11 15    Jean.

10:57:15 16         Q.  Were you -- so your contact with him

10:57:18 17    diminished in -- over the last years of his life?

10:57:27 18         A.  I don't know if it diminished.  There

10:57:31 19    was -- I would say it was pretty steady as it had

10:57:34 20    been.

10:57:37 21         Q.  But you hadn't seen him in 3 or 4 years,

10:57:37 22    right?

10:57:40 23         A.  I don't recall the last time I seen him if

10:57:43 24    that's what you're asking.  It was -- we had visited

10:57:45 25    him sometime in the late 1980s and he -- he had

26

EXHIBIT 77
1681

ROUGH DRAFT

10:57:50  1    gotten older and slower and had various health

10:57:55  2    problems so it wasn't -- it wasn't a whole lot said.

10:58:06  3    I don't recall speaking with him much at that time.

10:58:08  4        Q.  Did you ever have a conversation with --

10:58:11  5    with Joe Shuster about copyright interests or

10:58:16  6    termination of copyright interests?

10:58:18  7        A.  No.

10:58:20  8            MR. TOBEROFF:  Compound.

10:58:22  9            THE WITNESS:  No.  Never discussed that.

10:58:22 10    BY MR. PETROCELLI:

10:58:26 11        Q.  Did you ever have a conversation with Joe

10:58:28 12    Shuster about any contractual arrangements he had

10:58:34 13    with DC Comics or Time-Warner or Warner

10:58:39 14    communications or any other affiliated entity?

10:58:42 15            MR. TOBEROFF:  Compound.

10:58:45 16            THE WITNESS:  No.

10:58:45 17    BY MR. PETROCELLI:

10:58:51 18        Q.  Did he ever discuss with you any of his

10:58:55 19    pension arrangements or agreements?

10:58:57 20        A.  No.

10:59:00 21        Q.  Were you aware of them?

10:59:04 22        A.  I knew he was getting a pension.

10:59:06 23        Q.  From whom?

10:59:07 24        A.  Time-Warner, I believe.

10:59:15 25        Q.  Were you at all involved in his financial

                                                        27

EXHIBIT 77
1682

ROUGH DRAFT

10:59:19  1    affairs, helping him out with paying bills or things

10:59:23  2    like that?

10:59:23  3         A.  Not while he was alive.

10:59:26  4         Q.  When he died, though, you -- you did go

10:59:29  5    through and reconstruct all of his payments and

10:59:32  6    checks and tried to get a handle on how much money

10:59:36  7    he had.

10:59:38  8              Is that right?

10:59:38  9              MR. TOBEROFF:  Vague.

10:59:43 10              You can answer.

10:59:43 11              THE WITNESS:  The only thing I recall is I

10:59:45 12    helped my mother clear up his affairs.  That's about

10:59:55 13    the only involvement I had at the -- after he died.

10:59:55 14    BY MR. PETROCELLI:

11:00:03 15         Q.  And after he died, were you assisting your

11:00:11 16    mom in her discussions with either DC Comics or

11:00:17 17    Time-Warner about financial arrangements?

11:00:22 18              MR. TOBEROFF:  Lacks foundation.  Assumes

11:00:24 19    facts.

11:00:30 20              THE WITNESS:  I -- no, I really had nothing

11:00:32 21    to do with what she was saying.

11:00:32 22    BY MR. PETROCELLI:

11:00:34 23         Q.  Okay.  I'll come back to that in a bit.

11:00:39 24              You are aware that DC Comics has filed a

11:00:47 25    lawsuit against you and other defendants, including

                                                           28

EXHIBIT 77
1683

ROUGH DRAFT

11:00:55  1    Mr. Toberoff?

11:00:56  2         A.  Yes.

11:01:02  3         Q.  Let me show you a copy of the complaint

11:01:03  4    which is Exhibit 1.

11:01:06  5              (The document referred to was

11:01:06  6              marked for identification by the

11:01:06  7              C.S.R. as Exhibit 1 and attached to

11:01:16  8              this deposition.)

11:01:16  9              MR. PETROCELLI:  Actually the first amended

11:01:19 10    complaint.

11:01:19 11              MR. TOBEROFF:  Is this -- I thought this --

11:01:21 12    the other blog was Exhibit 1.

11:01:23 13              MR. PETROCELLI:  No, no.  I premarked them,

11:01:25 14    as I said,.  So that was -- I identified that on the

11:01:28 15    record as Exhibit 24.

11:01:40 16              You have a copy of that blog that's been

11:01:43 17    marked by the reporter, mark?  This one right here?

11:01:47 18    Why don't you put that over there so we can keep the

11:01:50 19    exhibits organized that's for the reporter thank

11:01:56 20    you.

11:01:56 21         Q.  This lawsuit was first filed on I believe

11:01:58 22    it was May 14, 2010 and a copy of the complaint at

11:02:05 23    the time was served on you, did you read the

11:02:08 24    complaint?

11:02:09 25         A.  I scanned it.

29

EXHIBIT 77
1684

ROUGH DRAFT

11:02:11  1        Q.  Scanned it?

11:02:12  2        A.  Yes.

11:02:14  3        Q.  Did you discuss it with your mom?

11:02:22  4        A.  Her -- not -- not -- not really.  She

11:02:28  5    faculties are not -- not very good because of her

11:02:34  6    stroke.  She's -- she's perhaps aware -- she's

11:02:38  7    probably aware of it I'm sure.

11:02:40  8        Q.  When the lawsuit was served on you and you

11:02:42  9    became aware of it did you have any discussion at

11:02:45 10    all with your mother about it, even -- even in the

11:02:48 11    most general terms, like, you know, "They filed a

11:02:50 12    case against us or anything like that?

11:02:52 13        A.  That would be the only extent of it.  I

11:02:56 14    would have mentioned something.  That's it.

11:03:00 15        Q.  Do you recall what, if anything, she said

11:03:02 16    to you?

11:03:06 17        A.  Her -- her faultieses are such that I

11:03:09 18    don't think she completely understands what's going

11:03:11 19    on with this.

11:03:13 20        Q.  "With this," meaning --

11:03:14 21        A.  This.

11:03:14 22        Q.  All the legal issues?

11:03:16 23        A.  This legal -- yes.

11:03:18 24        Q.  Did you discuss it with your sister Jean

11:03:26 25    with whom you were living at the time?

                                                              30

**EXHIBIT 77**
**1685**

ROUGH DRAFT

11:03:27  1        A.  You mean --

11:03:28  2        Q.  Your sister Dawn, excuse me?

11:03:29  3        A.  Dawn.

11:03:32  4        Q.  What -- what is Dawn's last name?  Does she

11:03:35  5    go by Peary?

11:03:37  6        A.  She uses Peavy right now.

11:03:38  7        Q.  Peavy.  Excuse me.  Okay.  And what is your

11:03:46  8    address?

11:03:46  9        A.  51 Camino Cabo, Santa Fe, New Mexico,

11:03:58 10    87508.

11:04:00 11        Q.  Who owns the house?

11:04:01 12        A.  I do with -- with my mother.

11:04:10 13        Q.  Did you discuss the lawsuit with -- with

11:04:12 14    Dawn?

11:04:13 15        A.  No.

11:04:16 16        Q.  Never?

11:04:16 17        A.  No.  She hasn't -- she hasn't been involved

11:04:23 18    in any of the legal issues.  She just has a general

11:04:25 19    awareness of it.

11:04:27 20            MR. TOBEROFF:  If I might, just focus --

11:04:28 21    just answer his question and focus on the question.

11:04:28 22    BY MR. PETROCELLI:

11:04:31 23        Q.  Did you tell her that you were coming here

11:04:32 24    for a deposition?

11:04:33 25        A.  She's aware of that.

                                                          31

EXHIBIT 77
1686

ROUGH DRAFT

11:04:38  1      Q.  Based on your interactions with her, do you

11:04:39  2  believe she's aware that a lawsuit has been filed by

11:04:42  3  DC comics against you and others with respect to the

11:04:46  4  Joe Shuster termination interest?

11:04:48  5      A.  I don't know if I've discussed that with

11:04:51  6  her.

11:04:53  7      Q.  Have you discussed this case with anyone

11:04:55  8  else other than Marc Toberoff?

11:04:57  9      A.  No.

11:05:02  10     Q.  Have you discussed it with any other

11:05:06  11  lawyers besides Mr. Toberoff?

11:05:08  12          MR. TOBEROFF:  Including lawyers at my

11:05:09  13  firm.

11:05:09  14          MR. PETROCELLI:  Not including any lawyers

11:05:11  15  at Mr. Toberoff's firm.  Anybody else.

11:05:14  16          THE WITNESS:  No.

11:05:14  17  BY MR. PETROCELLI:

11:05:16  18     Q.  Who is Michael Cataron?

11:05:20  19     A.  He is a friend.

11:05:23  20     Q.  Where does he live?

11:05:24  21     A.  He lives in Pennsylvania.

11:05:28  22     Q.  How did you become acquainted with him?

11:05:30  23     A.  I became acquainted with him -- I don't

11:05:40  24  recall.  I've known him since I was younger.

11:05:43  25     Q.  You grew up together?

32

**EXHIBIT 77**
**1687**

ROUGH DRAFT

11:05:44  1        A.  No, he knew the family.  He knew our family

11:05:48  2    and I knew him since I can't recall exactly.  We've

11:05:52  3    known him for years though.

11:05:53  4        Q.  What does he do for a living?

11:05:55  5        A.  He is some kind of a teacher, I believe.

11:05:59  6        Q.  What city in Pennsylvania?

11:06:01  7        A.  I don't recall.

11:06:04  8        Q.  When was the last time you had any contact

11:06:07  9    with him?

11:06:07 10        A.  Personal or on the phone or --

11:06:12 11        Q.  Anyway.  On the phone, writing, e-mail,

11:06:14 12    anything.

11:06:19 13        A.  I must have spoken with him in the last

11:06:21 14    year on the phone.

11:06:26 15        Q.  And you don't know what city he lives in?

11:06:28 16        A.  I can't recall.  Usually I just talk to him

11:06:32 17    on the phone.

11:06:32 18        Q.  Do you know how old he is?

11:06:33 19        A.  I believe he's in his 50s.

11:06:40 20        Q.  Do you have an e-mail address?

11:06:41 21        A.  Yes.

11:06:42 22        Q.  What is it?

11:06:44 23        A.  W Peary at comcast.net.

11:06:54 24        Q.  Is that P EA R Y?

11:06:57 25        A.  Yes.

                                                              33

EXHIBIT 77
1688

ROUGH DRAFT

11:06:58  1        Q.  And do you know if your sister Dawn has an

11:07:00  2    e-mail address?

11:07:00  3        A.  She uses 1 through work.  I can't recall.

11:07:08  4        Q.  Does your mom have one?

11:07:09  5        A.  No.

11:07:18  6        Q.  Are you generally familiar with the nature

11:07:20  7    of DC Comics' claims in this case?

11:07:22  8        A.  Somewhat.

11:07:29  9        Q.  Are you aware -- and again, very generally,

11:07:34 10    that DC Comics is challenging the termination notice

11:07:40 11    served by the estate of Joe Shuster?

11:07:45 12        A.  Yeah, I saw that here.

11:07:47 13        Q.  And by challenging," I mean DC is

11:07:53 14    contending that the termination notice is not valid

11:07:55 15    or not effective.  Do you have a general

11:07:58 16    understanding of that?

11:08:00 17        A.  Just from what I read here.

11:08:02 18        Q.  Okay.  You also -- do you also have an

11:08:05 19    understanding that DC claims that certain agreements

11:08:19 20    that you and/or your mother entered into violate

11:08:24 21    it's rights under the copyright laws?  Do you have a

11:08:27 22    general understanding that DC is making that

11:08:30 23    contention?

11:08:33 24        MR. TOBEROFF:  I just want to instruct you,

11:08:35 25    Warren, to the extent he asks you a question whether

34

EXHIBIT 77
1689

ROUGH DRAFT

11:08:39  1    you have an understanding, you can answer that

11:08:42  2    question as to what your understanding is, provided

11:08:44  3    that understanding is not based on your

11:08:47  4    conversations with me and is based on something

11:08:50  5    independent of your communications with me.  If

11:08:55  6    it's -- if your understanding is solely based on

11:08:57  7    your communications with me, you can't discuss with

11:09:03  8    Mr. Petrocelli what your answer is because you would

11:09:07  9    be difficult individual the substance of your

11:09:08  10   communications with me.

11:09:09  11           Do you understand that?

11:09:11  12           THE WITNESS:  Yes.

11:09:12  13           MR. TOBEROFF:  So you can answer solely to

11:09:14  14   the extent you have an understanding independent of

11:09:17  15   your discussions with me.

11:09:18  16           THE WITNESS:  Okay.

11:09:18  17   BY MR. PETROCELLI:

11:09:19  18       Q.  You read the complaint you said -- you said

11:09:21  19   you scanned it, right?

11:09:21  20       A.  Yes.

11:09:23  21       Q.  So when you scanned the complaint did you

11:09:27  22   understand that among other things that DC was

11:09:29  23   contending that certain agreements that you and/or

11:09:33  24   your mother entered into entitled "It's rights under

11:09:36  25   the copyright laws?

35

EXHIBIT 77
1690

ROUGH DRAFT

11:09:40  1          MR. TOBEROFF:  Again can you only answer

11:09:41  2     that question to the extent have you some

11:09:43  3     independent understanding, independent of your

11:09:45  4     discussions with me.

11:09:47  5          THE WITNESS:  My understanding of this is

11:09:54  6     intricately linked to my discussions with Marc

11:09:57  7     Toberoff.

11:09:57  8     BY MR. PETROCELLI:

11:09:58  9          Q.  When you receive the complaint and scanned

11:10:03 10     it that was before you spoke to Mr. Toberoff about

11:10:05 11     the contents of the complaint, correct?

11:10:10 12          MR. TOBEROFF:  Assumes facts.

11:10:15 13          THE WITNESS:  I scanned it.

11:10:15 14     BY MR. PETROCELLI:

11:10:16 15          Q.  And so I'm focusing on that point in time

11:10:19 16     before any communication with Mr. Toberoff.

11:10:23 17          MR. TOBEROFF:  I'd like you to answer his

11:10:24 18     question.  He asked you a question and you didn't

11:10:27 19     answer it.

11:10:27 20          MR. PETROCELLI:  I think he answered it?

11:10:29 21          MR. TOBEROFF:  No, he didn't.

11:10:31 22          THE WITNESS:  What was the question.

11:10:31 23     BY MR. PETROCELLI:

11:10:32 24          Q.  Let me re -- rewind this, okay?

11:10:35 25          I want you to focus on the time when you

                                                            36

EXHIBIT 77
1691

ROUGH DRAFT

11:10:39  1    received the complaint and you scanned it before you

11:10:42  2    spoke to Mr. Toberoff about it?

11:10:44  3         MR. TOBEROFF:  Assumes facts.

11:10:44  4    BY MR. PETROCELLI:

11:10:46  5         Q.  Are you with me?

11:10:47  6         A.  Uh-huh.

11:10:48  7         Q.  Okay.  At that point in time, did you have

11:10:53  8    a general understanding that DC was claiming that

11:10:57  9    certain agreements you or your mother entered into

11:10:59 10    violated it's rights?

11:11:03 11         MR. TOBEROFF:  Okay and again, my

11:11:03 12    instruction to you is if you had an understanding

11:11:06 13    that's independent of your discussions with me, you

11:11:09 14    can answer the question.  If you don't, I instruct

11:11:12 15    you not to answer.

11:11:13 16         THE WITNESS:  All my understanding is based

11:11:18 17    on my discussions with Mr. Toberoff.

11:11:18 18    BY MR. PETROCELLI:

11:11:22 19         Q.  Well you had an understanding at some level

11:11:24 20    when you read the complaint, right?

11:11:28 21         A.

11:11:28 22         MR. TOBEROFF:  Assumes facts.

11:11:29 23         THE WITNESS:  I don't really -- I don't

11:11:31 24    really understand the -- the complaints, to tell you

11:11:37 25    the truth.  I don't.  So all my understanding is, is

                                                              37

**EXHIBIT 77**
**1692**

ROUGH DRAFT

11:11:44 1    bound with my discussions with Marc Toberoff.

11:11:44 2    BY MR. PETROCELLI:

11:11:46 3        Q.  Well, when you received it and you saw it

11:11:47 4    you picked it up and you scanned it you said.

11:11:47 5            Is that right?

11:11:47 6        A.  Yes.

11:11:52 7        Q.  And you did that before having an in depth

11:11:55 8    discussion with Mr. Toberoff about the document

11:11:56 9    correct?

11:12:01 10            THE WITNESS:  Your asking what my

11:12:03 11    understanding of this is.

11:12:04 12            MR. TOBEROFF:  Is he ask whether.

11:12:05 13            MR. PETROCELLI:  Mark.

11:12:06 14            MR. TOBEROFF:  I'm sorry.  Focus on the

11:12:07 15    question.

11:12:07 16    BY MR. PETROCELLI:

11:12:08 17        Q.  Yeah. When you got the document, you

11:12:12 18    scanned it and you did that before having an in

11:12:17 19    depth conversation with Mr. Toberoff about the

11:12:20 20    contents of the complaint, correct?

11:12:22 21            MR. TOBEROFF:  Assumes facts.

11:12:27 22            THE WITNESS:  I don't remember if I read

11:12:30 23    through it first or talked to Marc Toberoff first.

11:12:34 24    I really don't.  I don't know what the timeline is

11:12:36 25    on that.

38

**EXHIBIT 77**
**1693**

ROUGH DRAFT

11:12:36  1    BY MR. PETROCELLI:

11:12:37  2        Q.  Speaking of timelines, did you read the

11:12:39  3    last document that the attachment to the complaint

11:12:43  4    called the Toberoff timeline?

11:12:49  5        A.  Yes, I -- I scanned that.

11:12:50  6        Q.  Okay.  When you scanned the Toberoff

11:12:52  7    timeline that's attached as exhibit -- Exhibit A to

11:13:04  8    the complaint, is that the first time you had ever

11:13:09  9    seen the Toberoff timeline?

11:13:11  10       A.  No.

11:13:14  11       Q.  When had you first seen it?

11:13:20  12       A.  I had seen it sometime before.  I don't

11:13:23  13   recall when.  There's so much documents that -- so

11:13:26  14   much discussions that I was aware of this.

11:13:32  15       Q.  This document?

11:13:32  16       A.  Yes.

11:13:33  17       Q.  Do you know when you first became aware of

11:13:35  18   it?

11:13:40  19       A.  I couldn't give you a date.  I know that I

11:13:43  20   had become aware of it.

11:13:51  21       Q.  When you -- had you received a copy of it

11:13:54  22   prior to seeing it attached to the complaint?

11:13:58  23       A.  I had -- I had seen it some point I know I

11:14:04  24   had seen it.  I don't know if it was -- how it came

11:14:08  25   to me.  I don't recall.  Because I get so much.  I

                                                            39

**EXHIBIT 77**
**1694**

ROUGH DRAFT

11:14:13  1    do recall seeing it.

11:14:14  2        Q.  You get so much what?

11:14:15  3        A.  Material.

11:14:16  4        Q.  Okay.  What do you do with the material

11:14:18  5    that you get?

11:14:19  6        A.  If it comes by mail, I keep it.  E-mail, if

11:14:28  7    it -- I look at it.  Keep some of it if I need to,

11:14:32  8    if not it just gets taken away.

11:14:36  9        Q.  You've -- you delete e-mails?

11:14:38 10        A.  Yes.

11:14:39 11        Q.  Related to this case?

11:14:40 12        A.  Well, if it -- if it isn't some -- some --

11:14:46 13    some -- some communications I would delete.  Only

11:14:49 14    documents I would save.

11:14:57 15        Q.  When you say only documents you would safe,

11:15:00 16    what do you mean by that?  You mean attachments to

11:15:02 17    e-mails?

11:15:02 18        A.  Legal documents.  Things -- things that

11:15:05 19    should be kept.

11:15:08 20        Q.  Have you had this e-mail address for the

11:15:10 21    past three years?

11:15:11 22        A.  Yes.

11:15:13 23        Q.  Do you have any other?

11:15:17 24        A.  No.

11:15:20 25        Q.  Have you been made aware of the need to

                                                                40

**EXHIBIT 77**
**1695**

ROUGH DRAFT

11:15:23  1  preserve evidence since the moment this case was

11:15:27  2  filed?

11:15:31  3      A.  Preserve evidence?  Can you clarify?

11:15:34  4      Q.  Have you been made -- have you been made

11:15:37  5  aware of -- that should you not delete e-mails or

11:15:45  6  discard material that could be evidence in this

11:15:49  7  case?

11:15:49  8      A.  I don't believe I've deleted anything that

11:15:53  9  would be evidence.

11:15:56  10     Q.  I asked you if you've been made aware that

11:15:58  11  you should not do so?

11:15:59  12          MR. TOBEROFF:  Objection.  The only way he

11:16:02  13  could be made aware of is through communications

11:16:04  14  with his attorney so you're asking him.

11:16:08  15          MR. PETROCELLI:  Mark that's not

11:16:09  16  necessarily true.

11:16:10  17          MR. TOBEROFF:  How else could he be made

11:16:12  18  aware.

11:16:12  19          MR. PETROCELLI:  His sister could have told

11:16:17  20  him.  I mean I would appreciate you don't prompt him

11:16:17  21  that way.

11:16:17  22          MR. TOBEROFF:  Excuse me I'm not prompting.

11:16:19  23          You could answer the question if so long --

11:16:22  24  regard to whether you were made aware to preserve

11:16:25  25  evidence by someone other than your attorney.

41

EXHIBIT 77
1696

ROUGH DRAFT

11:16:32  1          THE WITNESS:  So are you asking if -- if I

11:16:36  2     was supposed to save this, if I received it, if I

11:16:40  3     was made aware to save it?

11:16:40  4     BY MR. PETROCELLI:

11:16:43  5          Q.  No.

11:16:44  6          A.  Oh.

11:16:44  7          Q.  I'm asking something different than that.

11:16:46  8          A.  Oh.

11:16:46  9          Q.  I'm asking whether you have been made aware

11:16:51  10    that you are required to preserve material that

11:16:55  11    could be evidence relevant to this case?

11:16:58  12          MR. TOBEROFF:  And -- and --

11:17:00  13          Q.  BY MR. PETROCELLI:  You can answer that

11:17:01  14    "yes" or "no"?

11:17:01  15          MR. TOBEROFF:  And I'm instructing you that

11:17:03  16    you can answer that question with respect to any

11:17:06  17    party except an attorney.

11:17:08  18          MR. PETROCELLI:  And by the way, just for

11:17:11  19    the record, because I don't like to have big

11:17:13  20    arguments on the record.

11:17:14  21          MR. TOBEROFF:  I agree.

11:17:14  22          MR. PETROCELLI:  I don't even agree with

11:17:16  23    that instruction because I believe that's

11:17:18  24    discoverable even if it comes from counsel.

11:17:20  25          Q.  But -- but I can't -- there's no judge here

                                                              42

EXHIBIT 77
1697

ROUGH DRAFT

11:17:24 1    so I can't force you to answer over your attorney's

11:17:30 2    instructions and I'm going to assume that you're

11:17:32 3    going to abide by your attorney's instructions at

11:17:34 4    all times.

11:17:34 5              Is that right?

11:17:35 6        A.  Yes, that's correct.

11:17:35 7        Q.  Okay.

11:17:39 8              (Instruction not to answer.)

11:17:39 9    BY MR. PETROCELLI:

11:17:40 10       Q.  Prior to -- on what -- from the time that

11:17:44 11   this lawsuit became aware, other than conversations

11:17:48 12   with Mr. Toberoff, were you aware of an obligation

11:17:52 13   to preserve evidence related to this case?

11:17:57 14       A.  I'm not sure.  I --

11:18:07 15       Q.  Going back to the first agreement you

11:18:10 16   entered into with Mr. Toberoff or one of his

11:18:13 17   entities, which I think is sometime in

11:18:16 18   November 2001, from that point on, were you aware of

11:18:25 19   an obligation to preserve evidence related in any

11:18:30 20   way to the Joe Shuster termination issue?

11:18:34 21             MR. TOBEROFF:  Same instruction.

11:18:37 22             You can answer outside of communications

11:18:38 23   with your attorney.

11:18:42 24             THE WITNESS:  I'm not -- my understanding

11:18:48 25   is that any documents that need to be saved would be

43

EXHIBIT 77
1698

ROUGH DRAFT

11:18:53  1    saved by my attorney.  So I wouldn't -- I don't -- I

11:19:00  2    don't know specifically if it was something I'm

11:19:06  3    supposed to save.  I'm not -- I'm not sure I

11:19:08  4    understand the question.

11:19:08  5    BY MR. PETROCELLI:

11:19:15  6        Q.  From whom -- where in your home are the --

11:19:23  7    are the papers related to this case or any legal

11:19:28  8    matter having to do with Joe Shuster?

11:19:31  9        A.  I've a filing cabinet.

11:19:37  10       Q.  How many drawers?

11:19:38  11       A.  Three.

11:19:41  12       Q.  When did you start to collect that material

11:19:47  13   that is contained in these drawers of this filing

11:19:51  14   cabinet?

11:19:54  15       A.  It would have been with the original legal

11:19:57  16   agreement.

11:19:59  17       Q.  Back in 2001?

11:20:00  18       A.  Yes.

11:20:01  19       Q.  Where is the cabinet located?

11:20:03  20       A.  In a study.

11:20:06  21       Q.  In your home?

11:20:07  22       A.  Yes.

11:20:08  23       Q.  And that has all the physical copies of

11:20:12  24   documents?

11:20:13  25       A.  Yes.

                                                                    44

EXHIBIT 77
1699

ROUGH DRAFT

11:20:15  1        Q.   And besides -- it fills up three drawers?

11:20:19  2        A.   No.   It shares it with a host of other

11:20:22  3    papers.

11:20:22  4        Q.   Okay.   And besides that filing cabinet,

11:20:27  5    where else, if anyplace do you keep any copies of

11:20:31  6    documents relating to this -- this matter?

11:20:37  7        A.   Perhaps a lock box.

11:20:43  8        Q.   What's --

11:20:44  9        A.   A lock box.

11:20:45  10       Q.   What do you mean by "a lock box?

11:20:46  11       A.   Just a fire proof lock box.

11:20:48  12       Q.   In your house?

11:20:49  13       A.   Yes.

11:20:50  14       Q.   And how big, is it?

11:20:51  15       A.   Very small.   Hand held.

11:20:53  16       Q.   What do you have in there?

11:20:56  17       A.   Oh, original documents of all kinds.

11:21:01  18    Titles, house, car titles, everything like that.

11:21:06  19       Q.   As pertains to Joe Shuster what do you

11:21:14  20    have?

11:21:14  21       A.   Oh,.   The -- the original -- original

11:21:19  22    signed agreements, legal agreements and retainers

11:21:23  23    that I have with my attorney.

11:21:30  24       Q.   Anything else?

11:21:30  25       A.   There might be the original will might be

                                                            45

EXHIBIT 77
1700

ROUGH DRAFT

11:21:40  1    in there.  I would have -- I'm not sure.

11:21:44  2        Q.  Anything else?

11:21:44  3        A.  Not pertaining to the case, no.

11:21:48  4        Q.  How many agreements are there in your lock

11:21:51  5    box between you and Mr. Toberoff or any of his

11:21:56  6    companies?

11:21:57  7        A.  There is -- there's only one.

11:22:02  8        Q.  Which one is that?

11:22:03  9        A.  That's the legal retainer.

11:22:07 10        Q.  What's the date of it?

11:22:08 11        A.  It is -- it is active as of 2001.

11:22:19 12        Q.  But created after the fact?

11:22:20 13        A.  Yes.

11:22:23 14        Q.  When was it created?

11:22:24 15        A.  2004, I believe.

11:22:32 16        Q.  And is that the last document you have

11:22:39 17    signed with Mr. Toberoff or any of his entities?

11:22:44 18        A.  With Mr. Toberoff.

11:22:45 19            MR. TOBEROFF:  You mean last agreement or

11:22:47 20    any document?

11:22:47 21    BY MR. PETROCELLI:

11:22:49 22        Q.  Is that the last agreement, contract, that

11:22:54 23    you have signed with Mr. Toberoff or any of his

11:22:56 24    entities, the one in 2004 that you said goes back to

11:23:03 25    2001?

46

**EXHIBIT 77**
**1701**

ROUGH DRAFT

11:23:05  1        A.  Yes.

11:23:07  2        Q.  Have you signed any other agreements at any

11:23:13  3    time since 2004 relating to legal representation,

11:23:20  4    relating to this case in any way?

11:23:22  5        A.  Yes.

11:23:24  6        Q.  What have you signed?

11:23:25  7        A.  It's a.

11:23:28  8            MR. TOBEROFF:  Don't go into -- just --

11:23:36  9    just give a very -- the title or -- don't go into

11:23:40 10    details of the document.

11:23:40 11            THE WITNESS:  It's called a consent

11:23:42 12    agreement.

11:23:42 13    BY MR. PETROCELLI:

11:23:45 14        Q.  Is that in your lock box?

11:23:46 15        A.  Yes.

11:23:50 16        Q.  Why didn't you mention it earlier when I

11:23:52 17    asked you about the agreements in your lock box?

11:23:55 18            MR. TOBEROFF:  Argumentative.

11:24:01 19            THE WITNESS:  I -- I mentioned what I had

11:24:07 20    recalled.

11:24:07 21    BY MR. PETROCELLI:

11:24:10 22        Q.  So you're now recalling as additional

11:24:12 23    documents that you signed?

11:24:12 24        A.  I -- I recall -- I stated what the

11:24:18 25    documents I recalled.

47

**EXHIBIT 77**
**1702**

ROUGH DRAFT

11:24:20  1        Q.  You now recall that you signed something

11:24:22  2    called a consent agreement and that's also in your

11:24:24  3    lock box?

11:24:25  4        A.  Yes.

11:24:26  5        Q.  Okay.  When was that signed?

11:24:30  6        A.  That was 2008, I believe.

11:24:38  7        Q.  When is the last time you saw it, or a copy

11:24:42  8    of it?

11:24:46  9        A.  Fairly recently I reviewed it last, I don't

11:24:51 10    know, maybe in the last month or so I might have

11:24:53 11    reviewed it.

11:24:54 12        Q.  Why?

11:24:54 13        A.  Because I was thinking about this case

11:25:00 14    because of this.

11:25:02 15        Q.  This deposition?

11:25:03 16        A.  Yes.

11:25:06 17        Q.  Besides the 2008 consent agreement, what

11:25:09 18    else did you review in connection with this

11:25:13 19    deposition?

11:25:13 20        A.  I reviewed my prior deposition for the

11:25:19 21    Siegel case and exhibits.  That's -- that's what

11:25:30 22    I've reviewed.

11:25:32 23        Q.  Did you have a copy of your prior

11:25:34 24    deposition?

11:25:36 25        A.  Yes.

48

**EXHIBIT 77**
**1703**

ROUGH DRAFT

11:25:37  1         Q.  And the exhibits?

11:25:38  2         A.  Yes.

11:25:42  3         Q.  Besides the 2008 consent agreement and your

11:25:45  4    deposition in the Siegel case together with the

11:25:48  5    exhibits of that deposition, what else did you

11:25:51  6    review in connection with this deposition?

11:25:55  7         A.  That's -- that's pretty much it.

11:26:02  8         Q.  Where did you get the consent agreement to

11:26:04  9    review, from the lock box?

11:26:10 10         A.  I -- I -- I -- yes or -- or it could have

11:26:15 11    been a copy.

11:26:16 12         Q.  Where -- where was the copy?

11:26:18 13         A.  The copy is -- it could be in a separate

11:26:22 14    folder.

11:26:24 15         Q.  What -- what's the name of the folder?

11:26:26 16         A.  The folder is legal.

11:26:29 17         Q.  Where is the folder maintained?

11:26:30 18         A.  The folder, there could be a copy in there

11:26:35 19    in the -- in the filing cabinet.

11:26:40 20         Q.  Is the 2008 consent agreement the last

11:26:44 21    agreement of any kind that you have signed in

11:26:49 22    connection with either this case or anything having

11:26:52 23    to do with the Joe Shuster termination issue?

11:26:55 24         A.  Yes.

11:26:57 25         Q.  Okay.  Who else signed the 2008 consent

                                                              49

EXHIBIT 77
1704

ROUGH DRAFT

11:27:07  1    agreement?

11:27:07  2         A.  Would have been the -- Laura, Joanne

11:27:17  3    Siegel.

11:27:17  4         Q.  Laura Siegel and Joanne Siegel?

11:27:20  5         A.  Yes.

11:27:20  6         Q.  Anyone else?

11:27:21  7         A.  I think there was -- and -- and my attorney

11:27:28  8    signed it.

11:27:28  9         Q.  You mean Mr. Toberoff?

11:27:29  10        A.  Yes.

11:27:30  11        Q.  And did your mother Jean Peavy sign it?

11:27:33  12        A.  I don't recall if she did.  I just -- I

11:27:44  13   didn't read it.  I just scanned the -- the pages.  I

11:27:48  14   didn't -- I don't recall the signature page.  She

11:27:51  15   might have.

11:27:53  16        Q.  Do you know where you were when you signed

11:27:55  17   the document in -- in 2008?

11:27:57  18        A.  Yeah.  When I signed it, I was at home.

11:28:05  19        Q.  And what did you do after you signed it?

11:28:08  20   What did you do with it?

11:28:09  21        A.  Well, an original was FedExed to

11:28:14  22   Mr. Toberoff and I kept another original.

11:28:18  23        Q.  You signed two copies?

11:28:20  24        A.  Yes.

11:28:21  25        Q.  And you put the other original in your lock

                                                          50

**EXHIBIT 77**
**1705**

ROUGH DRAFT

11:28:25  1    box?

11:28:25  2          A.  Yes.

11:28:26  3          Q.  Did you ever get back from Mr. Toberoff a

11:28:29  4    version that had more signatures on it?

11:28:30  5          A.  Well, yes, the version in the lock box

11:28:35  6    would have all the original signatures.

11:28:48  7          Q.  Why did you review -- why did you pick the

11:28:51  8    2008 concent agreement to review?

11:28:53  9          A.  Well, before I came I -- I brought out my

11:28:59  10   folder and it says legal Shuster case and I flipped

11:29:07  11   through documents, just looked at them and said what

11:29:09  12   do I want to bring, what don't I want to bring

11:29:12  13   and -- and that's all.  It was just a cursory review

11:29:15  14   of what I had in there and I left most of it at home

11:29:19  15   so it was just a cursory review of what I had.

11:29:23  16         Q.  What did you bring with you?

11:29:25  17         A.  I brought a copy of the legal retainer as

11:29:28  18   of 2001 and I brought a -- a copy of the first page

11:29:41  19   of the consent agreement with a cover letter that

11:29:47  20   was a communication between Mr. Toberoff and another

11:29:49  21   attorney so it was just like the first page of it,

11:29:54  22   just to jog my memory.  And --

11:29:56  23         Q.  Who was the other attorney?

11:29:57  24         A.  It was -- can I say that?  Just -- it was a

11:30:04  25   communication.  I don't know if that's privileged.

                                                                    51

EXHIBIT 77
1706

ROUGH DRAFT

11:30:07  1          MR. TOBEROFF:  Well --

11:30:07  2          THE WITNESS:  Just.

11:30:08  3          MR. TOBEROFF:  I -- I think you can -- I

11:30:12  4    think you can give the name of the attorney.

11:30:15  5          THE WITNESS:  It was Bergman.

11:30:15  6    BY MR. PETROCELLI:

11:30:17  7       Q.  Michael Bergman?

11:30:19  8       A.  Yes.

11:30:19  9          MR. TOBEROFF:  That's not privileged.

11:30:20 10          THE WITNESS:  No, okay.  Okay.  Yeah.

11:30:20 11    BY MR. PETROCELLI:

11:30:24 12       Q.  When did you arrive in Los Angeles for this

11:30:26 13    deposition?

11:30:27 14       A.  Oh, it was -- it was a Monday afternoon,

11:30:33 15    Monday.

11:30:34 16       Q.  Of this week?

11:30:35 17       A.  Yes, of this week.

11:30:37 18       Q.  And have you had meetings with Mr. Toberoff

11:30:42 19    to get ready for this deposition?

11:30:43 20       A.  Yes.  We talked.

11:30:48 21       Q.  Who attended the meetings?

11:30:49 22       A.  Just Mr. Toberoff.

11:30:52 23       Q.  How long did you meet in total since you

11:30:56 24    arrived Monday afternoon?

11:30:57 25       A.  Yeah, a couple hours.

52

**EXHIBIT 77**
**1707**

ROUGH DRAFT

11:31:03  1          Q.  When?  Monday?

11:31:05  2          A.  No, primarily yesterday.

11:31:10  3          Q.  At Mr. Toberoff's office?

11:31:11  4          A.  No, in my hotel.

11:31:13  5          Q.  Where is your hotel?

11:31:14  6          A.  Hyatt.

11:31:17  7          Q.  Right here in Century City?

11:31:19  8          A.  Yes.

11:31:20  9          Q.  The Hyatt century plaza?

11:31:24 10          A.  Yes.

11:31:24 11          Q.  And were you shown any documents yesterday

11:31:32 12   when you met with Mr. Toberoff?

11:31:35 13          A.  We reviewed the prior deposition and

11:31:41 14   exhibits and the -- reviewed our agreements.

11:31:46 15          Q.  What agreements?

11:31:47 16          A.  The legal retainer and the -- the complaint

11:31:55 17   from DC and the supporting legal documents, quite --

11:32:01 18   quite a few but just -- just that stuff.

11:32:07 19          Q.  Did you also show Mr. Toberoff the consent

11:32:11 20   agreement pages that you had taken with you?

11:32:14 21          A.  Yes, just the -- the copy that I brought to

11:32:17 22   jog my memory.

11:32:19 23          Q.  Okay.

11:32:33 24          MR. TOBEROFF:  Is this a good time for a

11:32:34 25   short break, Dan to use the restroom.

53

**EXHIBIT 77**
**1708**

ROUGH DRAFT

11:32:36  1          MR. PETROCELLI:  Okay.

11:32:38  2          THE VIDEOGRAPHER:  Off the record.  The

11:32:40  3  time is 11:31.

11:32:45  4          (Brief recess.)

11:42:27  5          THE VIDEOGRAPHER:  Back on the record at

11:42:38  6  11:41.

11:42:38  7  BY MR. PETROCELLI:

11:42:41  8      Q.  Mr. Peary, did you travel here alone?

11:42:44  9      A.  Yes.

11:42:50 10      Q.  Besides the -- some of the pages from the

11:42:53 11  2008 concent agreement and I think you said the your

11:43:02 12  legal retention agreement as well?

11:43:02 13      A.  Yes.

11:43:04 14      Q.  Did you bring any other documents with you

11:43:07 15  when you took your trip here?

11:43:08 16      A.  No.

11:43:10 17      Q.  Just those two documents?

11:43:11 18      A.  Yes.

11:43:14 19      Q.  Did you take the complaint?

11:43:15 20      A.  No.

11:43:22 21      Q.  Other than the 2008 consent agreement, have

11:43:28 22  you signed any other papers that any member of the

11:43:34 23  Siegel family also has signed?

11:43:37 24      A.  No.

11:43:39 25      Q.  Is that the only one?

54

**EXHIBIT 77**
**1709**

ROUGH DRAFT

11:43:39  1        A.  Yes.

11:43:48  2        Q.  Have you spoken to any member of the Siegel

11:43:51  3    family since this lawsuit was filed back in May of

11:43:56  4    2010?

11:44:07  5        A.  2010.  Yes.

11:44:11  6        Q.  With whom?

11:44:14  7        A.  With -- with Joanne before she died.  And

11:44:18  8    once with Laura.

11:44:23  9        Q.  Did you attend funeral services for Joanne?

11:44:26 10        A.  No.

11:44:29 11        Q.  Any member of your family attend?

11:44:31 12        A.  No.

11:44:34 13        Q.  Did you speak to Laura before or after

11:44:36 14    JoAnne's passing?

11:44:40 15        A.  After.

11:44:43 16        Q.  Addressing first your -- was it a phone

11:44:46 17    call with Joanne before she passed?

11:44:48 18        A.  Yes.

11:44:49 19        Q.  What was the -- what did you talk about?

11:44:52 20        A.  The phone call after she passed.

11:44:54 21        Q.  The one with Joanne before she died?

11:44:56 22        A.  Oh, Joanne.

11:44:57 23        Q.  That was a phone call?

11:44:58 24        A.  Yes.

11:45:03 25        Q.  What did the two of you talk about?

EXHIBIT 77
1710

ROUGH DRAFT

11:45:04  1          A.  It was more or less friendly chitchat.  We

11:45:11  2     did not discuss any legal issues.

11:45:13  3          Q.  You called her?

11:45:14  4          A.  She called me.  And she speaks with Jean as

11:45:18  5     well, of course.

11:45:19  6          Q.  Did she speak with Jean?

11:45:20  7          A.  Yes.

11:45:26  8          Q.  So the purpose of the call as far as you

11:45:28  9     know, was pure pleasantries?

11:45:30 10          A.  Yes.

11:45:33 11          Q.  Nothing at all discussed about legal

11:45:35 12     issues?

11:45:35 13          A.  No.  I didn't discuss any legal issues.

11:45:39 14          Q.  Did your mother?

11:45:40 15          A.  I'm not aware she did.

11:45:43 16          Q.  Was it just the two of you on the phone?

11:45:46 17          A.  Yes.

11:45:46 18          Q.  Joanne and you?

11:45:47 19          A.  Yes.

11:45:48 20          Q.  Did you then pass the phone to your mom?

11:45:49 21          A.  Yes.

11:45:54 22          Q.  And that's the only time you've spoken to

11:45:57 23     Joanne prior to her death for a long period of time?

11:46:01 24          A.  I may have spoken with her just a couple

11:46:07 25     times in the recent past.

56

**EXHIBIT 77**
**1711**

ROUGH DRAFT

11:46:10  1          Q.  About what?

11:46:11  2          A.  It's -- she usually calls when she was

11:46:14  3    alive she usually calls to speak with Jean and I

11:46:19  4    kind of talk to her like a grandson would talk to a

11:46:22  5    grandmother kind of -- her faculties weren't, I

11:46:28  6    don't think, the way old people are, you have to be

11:46:33  7    kind of slow and friendly, so it's friendly, kind of

11:46:36  8    grandson top grandmother type talk basically.  How

11:46:41  9    are you, what are you doing, you know, and what --

11:46:44  10   what's going on, what are your -- pleasantries.  No

11:46:50  11   legal.

11:46:51  12         Q.  Were you very close to her?

11:46:53  13         A.  I was -- I knew her.  I wouldn't say close,

11:46:59  14   but I did know her.

11:47:01  15         Q.  When was the last time you saw her before

11:47:04  16   she passed?

11:47:04  17         A.  That would have been in 2008.

11:47:16  18         Q.  What was the occasion?

11:47:17  19         A.  Oh,.  It was -- there was a summer of

11:47:22  20   Superman event in Cleveland.

11:47:28  21         Q.  Did you attend a mediation in April 2010

11:47:36  22   where she was also present?

11:47:37  23         A.  Yes.

11:47:41  24         Q.  So you saw her then too?

11:47:42  25         A.  Yes.

57

**EXHIBIT 77**
**1712**

ROUGH DRAFT

11:47:44  1        Q.  Did you spend any time with her before or

11:47:48  2    after the mediation session?

11:47:53  3        A.  No.

11:47:54  4        Q.  Was that mediation session in April 2010

11:47:56  5    the last time you saw her?

11:48:00  6        A.  In person, yes.

11:48:02  7        Q.  You said you spoke with her daughter Laura?

11:48:05  8        A.  Yes.

11:48:07  9        Q.  When was that?

11:48:09 10        A.  After see died.

11:48:11 11        Q.  What was the purpose of that?  Phone call?

11:48:14 12        A.  Yes.

11:48:16 13        Q.  To give your condolences?

11:48:17 14        A.  Yes.

11:48:18 15        Q.  And have you spoken to Laura since then?

11:48:25 16        A.  No.

11:48:28 17        Q.  You identified the document that the

11:48:30 18    Siegels and you signed as a consent agreement.

11:48:34 19               Is the word  -- is that the title of the

11:48:37 20    document?

11:48:43 21        A.  I believe the title, if I'm allowed to say

11:48:45 22    that.

11:48:46 23               MR. TOBEROFF:  Objection.  Actually you

11:48:51 24    can -- you can testify as to the title but that's

11:48:54 25    it.  Not to any contents of the document.

58

**EXHIBIT 77**

**1713**

ROUGH DRAFT

11:48:57  1          THE WITNESS:  I recall the title says

11:48:59  2    Superman agreement.

11:48:59  3    BY MR. PETROCELLI:

11:49:03  4          Q.  Why did you use the word "consent

11:49:06  5    agreement"?

11:49:08  6          A.  It's.

11:49:11  7          MR. TOBEROFF:  You can only answer that if

11:49:11  8    that answer is not based on communication with your

11:49:14  9    attorney.

11:49:15 10          THE WITNESS:  It's -- it's -- it's all

11:49:17 11    based on my communication with my attorney.

11:49:17 12    BY MR. PETROCELLI:

11:49:23 13          Q.  What's --

11:49:23 14          A.  The term.

11:49:25 15          Q.  The use of the term?

11:49:26 16          A.  The use of the term, yes.

11:49:30 17          (Instruction not to answer.)

11:49:30 18    BY MR. PETROCELLI:

11:49:42 19          Q.  When you signed the 2008 consent agreement,

11:49:50 20    did you -- what did you understand the purpose of

11:49:51 21    this agreement to be?  Why were you signing it?

11:49:57 22          MR. TOBEROFF:  You can only answer that --

11:49:58 23    actually, I instruct you not to answer because the

11:50:01 24    sole -- your sole understanding is through

11:50:03 25    communications with me.

59

**EXHIBIT 77**

**1714**

ROUGH DRAFT

11:50:04  1               (Instruction not to answer.)

11:50:04  2      BY MR. PETROCELLI:

11:50:05  3          Q.  You read the document before you signed it,

11:50:05  4      didn't you?

11:50:09  5          A.  Yes, but I'll have to follow my attorney's

11:50:11  6      advice.

11:50:12  7          Q.  Well, based on your reading of the

11:50:14  8      document, what did you understand the purpose of

11:50:16  9      your signing it to be?

11:50:18 10               MR. TOBEROFF:  I instruct you not to answer

11:50:19 11      if you -- put it this way.  You can only answer the

11:50:23 12      question if you have an understanding independent of

11:50:24 13      your conversations with me.

11:50:28 14               THE WITNESS:  Well, all my understanding is

11:50:30 15      based on my communication with my attorneys so I

11:50:32 16      can't say anything.

11:50:33 17               (Instruction not to answer.)

11:50:33 18      BY MR. PETROCELLI:

11:50:34 19          Q.  Are you saying that when -- when you read

11:50:36 20      the document, you derived absolutely no

11:50:39 21      understanding from reading the words?

11:50:41 22          A.  My understanding is intricately bound with

11:50:43 23      my communications with Marc Toberoff.

11:50:46 24          Q.  Can you answer my question?

11:50:47 25          A.  I don't believe I can.

60

**EXHIBIT 77**
**1715**

ROUGH DRAFT

11:50:49  1            MR. TOBEROFF:  He did.

11:50:49  2     BY MR. PETROCELLI:

11:50:52  3        Q.  It wasn't responsive to my question.  My

11:50:54  4     question was when you read the document are you

11:50:57  5     saying that you drew no understanding at all from

11:51:00  6     reading the words on the page of the document?

11:51:07  7            MR. TOBEROFF:  It's -- it's all based upon

11:51:10  8     my understanding is intricately bound to my

11:51:14  9     communications with my attorney.

11:51:14 10     BY MR. PETROCELLI:

11:51:19 11        Q.  Are you saying that had you not spoken to

11:51:20 12     your attorney you would have had no idea what --

11:51:26 13     what you were signing?

11:51:28 14        A.  What if I had no idea?

11:51:30 15        Q.  Right.  You signed a -- a document together

11:51:34 16     with other individuals.  Are you saying that you did

11:51:38 17     not understand what you were signing except for what

11:51:41 18     Marc Toberoff had to tell you?

11:51:42 19            MR. TOBEROFF:  Asked and answered.

11:51:43 20     Misstates his testimony.

11:51:47 21            THE WITNESS:  My understanding is -- is

11:51:52 22     bound up what whatever I have is bound up.

11:51:52 23     BY MR. PETROCELLI:

11:51:56 24        Q.  I appreciate you keep repeating that phrase

11:52:00 25     your understanding is bound up or intricately bound

61

**EXHIBIT 77**
**1716**

ROUGH DRAFT

11:52:03  1    up.  I'm asking you something different than that.

11:52:05  2    I'm not required to simply accept that phrase?

11:52:07  3        A.  Uh-huh.

11:52:08  4        Q.  Did you understand that you were entering

11:52:12  5    into a contract, an agreement, with the Siegels when

11:52:17  6    you signed the document?

11:52:23  7        A.  Yes.

11:52:24  8        Q.  Did you understand that the agreement that

11:52:25  9    you were entering into required that you could not

11:52:32  10   settle any claim with DC Comics without the consent

11:52:38  11   of the Siegels?

11:52:39  12           MR. TOBEROFF:  I instruct you not to

11:52:41  13   answer.  The document has been hailed to be

11:52:44  14   privileged and off limits and they can't ask you

11:52:47  15   questions about the contents of the document.

11:52:48  16   Instructs you not to answer.

11:52:50  17           (Instruction not to answer.)

11:52:50  18           MR. PETROCELLI:  I don't agree with that as

11:52:53  19   you well know.

11:52:54  20       Q.  Is there any arrangement whereby you would

11:52:57  21   have the authority to approve any kind of settlement

11:52:59  22   that Joanne Siegel might enter into with DC comics?

11:53:03  23           MR. TOBEROFF:  Instruct you not to answer.

11:53:07  24           (Instruction not to answer.)

11:53:07  25           MR. PETROCELLI:  Mark you allowed that

62

**EXHIBIT 77**
**1717**

ROUGH DRAFT

11:53:09 1    verbatim question to be answered at the first -- at

11:53:12 2    the Siegel session of his deposition.

11:53:13 3            MR. TOBEROFF:  I'm instructing him not to

11:53:15 4    answer and as you suggested we shouldn't debate

11:53:17 5    these things in the deposition.

11:53:21 6            MR. PETROCELLI:  So is it possible to

11:53:23 7    answer.

11:53:23 8            MR. TOBEROFF:  I'm going to instruct him --

11:53:25 9    just to shorten this, I will instruct him not to

11:53:28 10   answer any questions regarding the substance of the

11:53:30 11   consent agreement.

11:53:30 12   BY MR. PETROCELLI:

11:53:33 13       Q.  So is it possible for Joanne Siegel and

11:53:36 14   Laura Siegel Larson to settle their case with DC

11:53:40 15   Comics and you would have no say so in that.

11:53:41 16           Is that accurate?

11:53:42 17           MR. TOBEROFF:  I instruct you not to answer

11:53:48 18   on the basis of attorney-client privilege.

11:53:48 19   BY MR. PETROCELLI:

11:53:50 20       Q.  And if they were to settle and receive

11:53:52 21   money from DC Comics, is there any arrangement by

11:53:55 22   which you would receive any of that money?

11:53:57 23           MR. TOBEROFF:  Same instruction.

11:53:57 24           (Instruction not to answer.)

11:53:57 25   BY MR. PETROCELLI:

63

**EXHIBIT 77**
**1718**

ROUGH DRAFT

11:54:06  1            Q.  Are you able right now on behalf of the Joe

11:54:09  2    Shuster estate to enter into an agreement with DC

11:54:13  3    regarding the Shuster termination interests without

11:54:17  4    the consent of any -- anyone else?

11:54:22  5            MR. TOBEROFF:  Same instruction.

11:54:24  6    Attorney-client privilege.

11:54:25  7            (Instruction not to answer.)

11:54:26  8            THE WITNESS:  I'll have to follow my

11:54:27  9    attorney's advice.

11:54:27 10    BY MR. PETROCELLI:

11:54:32 11            Q.  Do you have a current agreement to share

11:54:36 12    with any member of the Siegel family in any

11:54:39 13    settlement or other recoveries having to do with the

11:54:43 14    Superman termination interests?

11:54:47 15            MR. TOBEROFF:  I instruct you not to answer

11:54:48 16    based on privilege.

11:54:49 17            (Instruction not to answer.)

11:54:57 18            MR. PETROCELLI:  When you say "based on

11:54:59 19    privilege, to be clear, what privilege, Mr. -- are

11:55:02 20    you talking about the attorney-client privilege.

11:55:04 21            MR. TOBEROFF:  Attorney-client privilege,

11:55:05 22    work product, the privilege that was upheld by

11:55:10 23    magistrate shuriskey SP, Judge Larson in your motion

11:55:14 24    that was denied as to obtaining the consent

11:55:16 25    agreement.  If you can't obtain the consent

64

**EXHIBIT 77**
**1719**

ROUGH DRAFT

11:55:19 1    agreement because you're not entitled to view the

11:55:21 2    substance of the consent agreement you're not

11:55:24 3    entitled to get at that substance through

11:55:27 4    questioning my client.

11:55:28 5         MR. PETROCELLI:  We -- we disagree.

11:55:33 6         MR. TOBEROFF:  That's fine.

11:55:33 7    BY MR. PETROCELLI:

11:55:34 8         Q.  Is the consent agreement that you signed in

11:55:36 9    2008 still in effect?

11:55:39 10        A.  Yes.

11:55:48 11        Q.  Have you had any discussions with any

11:55:50 12   member of the Siegel family about it at any time

11:55:55 13   both before or after signing it?

11:55:59 14        A.  Not directly.

11:56:00 15        Q.  What does that mean?

11:56:01 16        A.  All my discussions is through my attorney.

11:56:04 17        Q.  How do you have a discussion with the

11:56:08 18   Siegels through the attorney?

11:56:09 19        A.  Then the answer is no.

11:56:11 20        Q.  What did you mean when you said not

11:56:13 21   directly, through your attorney?

11:56:14 22        A.  All my communication about the agreement

11:56:17 23   is -- is through my discussions with my attorney and

11:56:22 24   what he has told me the Siegels have communicated.

11:56:27 25   That's what I mean.

65

**EXHIBIT 77**
**1720**

ROUGH DRAFT

| | | |
|---|---|---|
| 11:56:28 | 1 | Q. Have you ever had a -- a discussion with |
| 11:56:43 | 2 | your mom about the consent agreement? |
| 11:56:56 | 3 | A. She -- she -- I may have -- she has a -- |
| 11:57:04 | 4 | little interest in this. Her faculties as I said, |
| 11:57:08 | 5 | are -- are poor and I don't recall if I've mentioned |
| 11:57:14 | 6 | it to her or not because it's a detail. |
| 11:57:19 | 7 | Q. Back in 2008 she was of sound mind, |
| 11:57:19 | 8 | correct? |
| 11:57:25 | 9 | A. That's when she had her stroke. |
| 11:57:27 | 10 | Q. Before or after the consent agreement? |
| 11:57:29 | 11 | A. I don't -- I don't recall. I don't -- I |
| 11:57:38 | 12 | don't know if I've ever discussed it with her or |
| 11:57:41 | 13 | not. I mean she's not -- she's not that interested |
| 11:57:46 | 14 | in legal matters. I know that she -- she -- she |
| 11:57:53 | 15 | knows about it. I don't know if she understands it. |
| 11:58:00 | 16 | Q. How do you know she knows about it? |
| 11:58:01 | 17 | A. I -- I -- she would have been aware of it. |
| 11:58:05 | 18 | Q. How do you know that? |
| 11:58:05 | 19 | A. Well, I -- as far as I know, she -- as far |
| 11:58:10 | 20 | as -- as far as I can remember, I probably have said |
| 11:58:14 | 21 | something. That's all I can say. I mean that's -- |
| 11:58:17 | 22 | Q. What did you say to her? |
| 11:58:20 | 23 | A. I -- if I had said anything, it would just |
| 11:58:23 | 24 | have been that there's -- I don't remember what I |
| 11:58:29 | 25 | said to her frankly. I mean I don't know what to |

66

**EXHIBIT 77**
**1721**

ROUGH DRAFT

11:58:31 1    say because I don't -- I don't remember my words.

11:58:33 2    She doesn't really.

11:58:34 3        MR. TOBEROFF:  Don't speculate.

11:58:35 4        THE WITNESS:  Right.  I -- I -- it would be

11:58:37 5    speculating.  I don't remember.

11:58:43 6        MR. PETROCELLI:  Don't interrupt the

11:58:44 7    witness, please.

11:58:49 8        Q.  Have you -- do you think the consent

11:58:55 9    agreement was an important document at the time that

11:58:58 10   you signed it?

11:58:59 11       A.  Yes.

11:59:01 12       Q.  Did you think your mother had a right to

11:59:02 13   know what it meant?

11:59:08 14       A.  Did she have a right to know?

11:59:11 15       Q.  Yeah.  Do you think she was entitled to

11:59:12 16   know what -- what document you were signing that was

11:59:16 17   important?

11:59:19 18       A.  She -- she's not directly involved in this

11:59:23 19   case so I don't know how to answer that.  She -- she

11:59:29 20   doesn't -- there's not a legal right.

11:59:36 21       Q.  I didn't mean a legal right.

11:59:36 22       A.  Yeah.

11:59:38 23       Q.  I mean do you think she would want to know

11:59:39 24   that kind of information?

11:59:40 25       A.  Would she want to know, yeah.  Well

67

EXHIBIT 77
1722

ROUGH DRAFT

11:59:47  1   that's --

11:59:47  2         MR. TOBEROFF: Calls for speculation.

11:59:48  3   BY MR. PETROCELLI:

11:59:48  4      Q. Did you explain to her what it meant?

11:59:51  5         MR. TOBEROFF: Asked and answered.

11:59:52  6         THE WITNESS: Just -- just what I said

11:59:54  7   before. I can't remember exactly what I said.

11:59:54  8   BY MR. PETROCELLI:

11:59:58  9      Q. What's your best recollection of what you

11:59:59 10   told her?

12:00:00 11      A. That -- that that is some agreement that we

12:00:10 12   are making with the Siegels. That would have been

12:00:12 13   about the extent of it.

12:00:14 14      Q. Well, you explained to her that the

12:00:17 15   agreement had to do with Superman, right?

12:00:17 16      A. Yes.

12:00:20 17      Q. And you explained to her that it had to do

12:00:22 18   with settling your case, right?

12:00:29 19      A. I suppose. That's about it. I wouldn't

12:00:33 20   have said any more.

12:00:46 21      Q. Who -- whose the beneficiary of any money

12:00:51 22   that comes in as a result of the Superman

12:00:53 23   termination interest that Joe Shuster has asserted?

12:01:00 24   Who gets the money?

12:01:01 25      A. We plan on any proceeds would go into a

68

**EXHIBIT 77**

**1723**

ROUGH DRAFT

12:01:06  1    trust.

12:01:08  2        Q.  Well, your mother is the beneficiary,

12:01:08  3    correct?

12:01:13  4        A.  According to the will.  She -- she's

12:01:20  5    expressed that she wants me and my sister to -- to

12:01:25  6    have -- to have anything through a trust.

12:01:29  7        Q.  Under Joe Schuster's will, she's the sole

12:01:32  8    beneficiary, correct?

12:01:33  9        A.  Yes.

12:01:35 10        Q.  Okay.  And are you saying that your mother

12:01:39 11    has in turn created a testamentary documents that

12:01:46 12    pass the interest to you and your sister?

12:01:47 13        A.  She -- she has expressed that she wants any

12:01:52 14    proceeds to go into a trust for me and my sister.

12:01:56 15        Q.  Does such a trust exist?

12:01:58 16        A.  Not yet.

12:02:00 17        Q.  Does your mother have a will?

12:02:02 18        A.  Yes.

12:02:03 19        Q.  Have you ever seen it?

12:02:04 20        A.  Yes.

12:02:07 21        Q.  Does it name you as the executor?

12:02:10 22        A.  I believe.

12:02:16 23        Q.  Does it distribute her estate equally

12:02:20 24    between you and your sister Dawn?

12:02:25 25        A.  I believe.

69

**EXHIBIT 77**
**1724**

ROUGH DRAFT

12:02:27  1          Q.  Does it distribute the estate directly to

12:02:32  2   Dawn and you or to trusts of which Dawn and you are

12:02:36  3   beneficiaries?

12:02:37  4          A.  It doesn't -- it doesn't state trust in the

12:02:43  5   will but that's -- that's her intention.

12:02:46  6          Q.  How do you know that's her intention?

12:02:50  7          A.  We've talked about it.

12:02:52  8          Q.  When did she tell you that she want to

12:02:55  9   create trusts for you to receive her testamentary

12:02:58 10   disposition?

12:02:59 11          A.  Well, let me see, she wants -- she wants us

12:03:06 12   to -- to be provided for and secure and she's 90

12:03:13 13   years old and she's had a stroke so she knows she's

12:03:16 14   not going to be around forever and she doesn't

12:03:18 15   really have any need for -- for money.  So we've

12:03:25 16   discussed it for -- well, we've probably -- we've

12:03:30 17   properly discussed it for a few years.

12:03:33 18          Q.  In the last few years?

12:03:34 19          A.  Yes.

12:03:35 20          Q.  And when you've discussed it, given the

12:03:37 21   comments you've made about your mom's mental state,

12:03:41 22   do you believe that she understood what she was

12:03:43 23   talking about?

12:03:44 24          MR. TOBEROFF:  Assumes facts.

12:03:48 25          THE WITNESS:  Yes she understands.

                                                              70

**EXHIBIT 77**
**1725**

ROUGH DRAFT

12:03:48  1    BY MR. PETROCELLI:

12:03:49  2        Q.  In talking about things like trusts and

12:03:51  3    such, she's competent to discuss those topics, in

12:03:51  4    your view?

12:03:55  5        A.  She understands the --

12:03:56  6            MR. TOBEROFF:  Excuse me.  You have to

12:03:57  7    leave time for me to object after asks the question.

12:04:01  8    You got to pause after he asks the question so I

12:04:03  9    have time to object.

12:04:06  10            The question assumes facts.

12:04:06  11    BY MR. PETROCELLI:

12:04:10  12        Q.  You can answer.

12:04:11  13        A.  Okay.

12:04:13  14        Q.  Want me to repeat the question?

12:04:14  15        A.  Yes.

12:04:16  16        Q.  Yeah.  When you have been talking with her

12:04:17  17    about -- in the last couple of years regarding such

12:04:20  18    issues as trusts for your benefit and Dawn's

12:04:24  19    benefit, do you believe that she was competent to

12:04:27  20    talk about and understand those ideas?

12:04:31  21            MR. TOBEROFF:  Misstates testimony.

12:04:33  22            THE WITNESS:  I -- I believe she

12:04:38  23    understands the idea.  I know what her intentions

12:04:41  24    are.  She's expressed them to me.

12:04:41  25    BY MR. PETROCELLI:

EXHIBIT 77
1726

ROUGH DRAFT

12:04:43  1          Q.  Verbally?

12:04:44  2          A.  Yes.

12:04:45  3          Q.  What has she said to you?

12:04:46  4          A.  She wants us to be provided for.  To be

12:04:49  5      secure.

12:04:52  6          Q.  You already are provided for her in her

12:04:54  7      will, right?

12:04:57  8          A.  I'm in her -- her will.

12:04:58  9          Q.  Right?

12:04:59 10          A.  Yes.

12:05:00 11          Q.  Why -- why the specific -- in other words,

12:05:03 12      did she discuss with you that she wants you to

12:05:05 13      receive the inheritance together with Dawn through a

12:05:07 14      trust?

12:05:10 15          A.  That's -- that's what we have discussed.

12:05:12 16          Q.  Who is the "we"?

12:05:14 17          A.  Me and my mother.

12:05:15 18          Q.  Has Dawn been part of the discussion?

12:05:17 19          A.  I -- I don't know specifically about

12:05:22 20      trusts.  But she knows she's a part of this.

12:05:25 21          Q.  Is there any particular discussion that

12:05:28 22      you've had about trusts as to why it would be a

12:05:31 23      trust rather than just a bequest under a will?

12:05:34 24          A.  As to like in financial planning terms,

12:05:38 25      that kind of thing?

72

**EXHIBIT 77**

**1727**

ROUGH DRAFT

12:05:38  1        Q.  Yes.

12:05:40  2        A.  It's -- the idea is it's a sensible means

12:05:46  3    of per -- preserving assets so that they're not

12:05:51  4    wasted and squandered so it's a long-term thing.

12:05:57  5    And not wasted away.

12:06:00  6        Q.  Wasted by you and Dawn?

12:06:01  7        A.  Yes.

12:06:04  8        Q.  Is your mom expressed reservations that you

12:06:07  9    or Dawn might waste the money absent a trust?

12:06:11 10        A.  No.  That's -- that is a -- the purpose of

12:06:14 11    a trust, to preserve assets.

12:06:17 12        Q.  Do you have an estate or trust lawyer?

12:06:19 13        A.  Yes.

12:06:23 14        Q.  Who is it?

12:06:27 15        A.  The -- there's an attorney that established

12:06:29 16    the Shuster estate.

12:06:32 17        Q.  Here in Los Angeles, the probate attorney?

12:06:35 18        A.  I believe so.

12:06:37 19        Q.  And have you consulted him regarding estate

12:06:40 20    planning in recent years?

12:06:42 21        A.  No.  Not on that issue, no.

12:06:45 22        Q.  Not on the issue of the trust?

12:06:46 23        A.  That's correct.

12:06:48 24        Q.  Have you in discussions with your mother

12:06:51 25    about the will, the trust and the financial

73

EXHIBIT 77
1728

ROUGH DRAFT

12:06:53 1    planning, have ever discussed how much money might

12:06:58 2    be received one day for your benefit and Dawn's

12:07:02 3    benefit?

12:07:03 4         A.  No.  We haven't got into that.

12:07:10 5         Q.  For example, have you said, you know, it

12:07:12 6    would be in approximately 5 million or 10 million or

12:07:16 7    100 million or any numbers, discuss in your

12:07:22 8    conversations with your mother?

12:07:23 9         A.  I don't recall getting into figures with

12:07:29 10   her.  We just -- no, I don't.

12:07:34 11        Q.  Have you ever had anybody try to do an

12:07:38 12   estimate for you as to how much you might recover

12:07:40 13   one day as a result of Joe Schuster's asserted

12:07:44 14   termination interests?

12:07:48 15        A.  I -- I know.

12:07:49 16             MR. TOBEROFF:  You -- you could answer that

12:07:51 17   question solely if it's outside of the

12:07:57 18   attorney-client relationship.

12:08:00 19             THE WITNESS:  All I know is that my

12:08:04 20   attorney, Marc Toberoff, has.

12:08:06 21             MR. TOBEROFF:  Don't -- don't discuss what

12:08:07 22   your attorney has done.

12:08:08 23             THE WITNESS:  Okay.  Okay.

12:08:09 24             MR. TOBEROFF:  The --

12:08:10 25             THE WITNESS:  I don't have any -- no, I

74

**EXHIBIT 77**
**1729**

ROUGH DRAFT

12:08:12  1    don't have any idea of economic value outside of my

12:08:16  2    discussions, no.

12:08:16  3    BY MR. PETROCELLI:

12:08:17  4        Q.  Have you ever met or spoken or communicated

12:08:20  5    with anybody who you understood to be estimating the

12:08:26  6    value of the termination interest?

12:08:27  7        A.  No.

12:08:29  8        Q.  Have you ever provided any information to

12:08:31  9    any such person?

12:08:31 10        A.  No.

12:08:38 11        Q.  Did you tell your mother in your

12:08:42 12    conversations over the years and in particular about

12:08:46 13    the consent agreement that any agreement with DC or

12:08:54 14    settlement with DC requires the consent of the

12:08:56 15    Siegels?

12:09:05 16            MR. TOBEROFF:  Am I allowed to answer that?

12:09:07 17    Is that --

12:09:07 18    BY MR. PETROCELLI:

12:09:09 19        Q.  You are.

12:09:09 20            MR. TOBEROFF:  Actually, I'll let you

12:09:27 21    answer that question without waiver of any privilege

12:09:31 22    that could apply.

12:09:31 23            THE WITNESS:  Okay.  So the question being

12:09:34 24    she --

12:09:50 25            MR. PETROCELLI:  Can you repeat the

75

**EXHIBIT 77**
**1730**

ROUGH DRAFT

12:09:51  1   question.

12:09:51  2                    (The reporter read the record

12:09:51  3            as follows:

12:09:52  4                 "^ QUESTION ^ ANSWER " ).

12:09:52  5            THE WITNESS:  Yes.

12:09:52  6   BY MR. PETROCELLI:

12:09:54  7        Q.  What did you say in that regard?

12:09:59  8        A.  Pretty much what -- what you said there.

12:10:04  9        Q.  Did you discuss with her what would happen

12:10:12 10   if, for example, you wanted to do a settlement or an

12:10:16 11   agreement with DC but the Siegels did not, how you

12:10:19 12   would deal with that circumstance?

12:10:27 13        A.  I don't recall going into that detail of

12:10:30 14   what ifs.

12:10:32 15        Q.  Did your mom ask you, well, what if we

12:10:35 16   can't agree with the Siegels?  I mean what happens

12:10:37 17   then?  Did she put that --

12:10:40 18        A.  No.

12:10:41 19        Q.  -- question to you in so many words?

12:10:42 20        A.  No.

12:10:46 21        Q.  Do you -- did -- if she had put that

12:10:48 22   question to you, could you have answered it?

12:10:53 23            MR. TOBEROFF:  Again, don't testify based

12:10:56 24   on knowledge and communications you received --

12:11:00 25   don't testify based on knowledge you received

76

**EXHIBIT 77**
**1731**

ROUGH DRAFT

12:11:02  1    through your communications with your attorney.

12:11:07  2            THE WITNESS:  I -- all I can.

12:11:08  3            MR. TOBEROFF:  And I also, when he asks you

12:11:11  4    about conversations, if you understand the substance

12:11:14  5    of the conversation you can give him that substance.

12:11:17  6    If you understand the exact words you used, you can

12:11:19  7    give him the exact words but if you don't remember

12:11:21  8    the exact words you used, don't make up the words to

12:11:25  9    fill in the blanks.  That would be speculating.

12:11:27  10           THE WITNESS:  Uh-huh.  The question again

12:11:33  11   being.

12:11:33  12   BY MR. PETROCELLI:

12:11:33  13       Q.  Did you have an understanding in

12:11:38  14   discussions with your mom about the consent

12:11:40  15   agreement what would happen if the Siegels and you

12:11:43  16   could not agree?

12:11:45  17           MR. TOBEROFF:  Asked and answered.

12:11:49  18           THE WITNESS:  I didn't discuss that with

12:11:51  19   her.

12:11:51  20   BY MR. PETROCELLI:

12:11:52  21       Q.  Did you have an awareness in your own mind

12:11:57  22   of what would happen?

12:11:59  23       A.  I'm aware.

12:11:59  24       Q.  Had she asked you the question, could you

12:12:01  25   have answered it?

77

**EXHIBIT 77**
**1732**

ROUGH DRAFT

12:12:02  1          A.  Oh,.

12:12:02  2              MR. TOBEROFF:  You can only answer the next

12:12:04  3      question to the extent you have an understanding

12:12:06  4      that's separate and apart from your communications

12:12:09  5      with me.

12:12:10  6              THE WITNESS:  Just -- okay.

12:12:14  7              It's just we -- I thought the agreement was

12:12:17  8      good.  It was mutually beneficial.  That's -- that's

12:12:24  9      all I can say.

12:12:24  10     BY MR. PETROCELLI:

12:12:25  11         Q.  Why did you think it was good and mutually

12:12:28  12     beneficial?

12:12:28  13             MR. TOBEROFF:  I instruct you not to

12:12:29  14     answer.

12:12:30  15             (Instruction not to answer.)

12:12:32  16             THE WITNESS:  I follow --

12:12:34  17             MR. TOBEROFF:  I instruct you not to

12:12:35  18     answer.

12:12:35  19             THE WITNESS:  I follow my attorney's

12:12:36  20     advice.

12:12:36  21     BY MR. PETROCELLI:

12:12:47  22         Q.  Can I get an answer to my prior question,

12:12:50  23     which was, did you have an awareness of what would

12:12:52  24     happen in the event the Siegels and the Schusters

12:12:55  25     could not agree on -- on an agreement with DC?

78

**EXHIBIT 77**

**1733**

ROUGH DRAFT

12:13:03  1          A.  I didn't think it was a problem.

12:13:06  2              MR. TOBEROFF:  He -- that's not his

12:13:08  3  question.

12:13:08  4              THE WITNESS:  No?

12:13:11  5              MR. TOBEROFF:  Focus on the question.

12:13:11  6              THE WITNESS:  Say it again.

12:13:12  7              MR. TOBEROFF:  It's a "yes" or "no"

12:13:15  8  question.

12:13:15  9              THE WITNESS:  Did I have -- say it again

12:13:16 10  please.

12:13:16 11  BY MR. PETROCELLI:

12:13:17 12          Q.  Did you have an understanding in your

12:13:19 13  conversations with your mom about the 2008 consent

12:13:22 14  agreement, what would happen?

12:13:25 15          A.  Oh,.

12:13:25 16          Q.  If the Siegels and you could not agree?

12:13:27 17          A.  Did I have an understanding.

12:13:28 18              MR. TOBEROFF:  In his conversations with

12:13:30 19  his mom.

12:13:30 20              MR. PETROCELLI:  Yeah.

12:13:31 21          Q.  At the time that you were -- during the

12:13:34 22  period of time when you were having these

12:13:34 23  discussions with your mom?

12:13:35 24          A.  Did have I an understanding.

12:13:36 25          Q.  Yeah.  Had she asked you, well, what did

                                                                    79

**EXHIBIT 77**
**1734**

ROUGH DRAFT

12:13:39  1      she call you, Warren?

12:13:41  2           A.   Yes.

12:13:42  3           Q.   Okay, well, Warren, what happens if the

12:13:44  4      Siegels and we can't agree?  We want to do's deal

12:13:46  5      and the Siegels don't want to do a deal and, you

12:13:48  6      know, consent is required, how do we get out of

12:13:51  7      that?

12:13:53  8                First of all, did she ever ask you such a

12:13:55  9      thing?

12:13:56  10               MR. TOBEROFF:  Asked and answered you can

12:14:00  11     answer again.

12:14:01  12               THE WITNESS:  No.

12:14:01  13     BY MR. PETROCELLI:

12:14:02  14          Q.   Did you ever explain to her that

12:14:07  15     circumstance or walk her through that situation?

12:14:11  16               MR. TOBEROFF:  Asked and answered.

12:14:14  17               You can answer.

12:14:14  18               THE WITNESS:  I -- I don't recall getting

12:14:18  19     to that level of detail.  She didn't ask any more

12:14:22  20     about it.

12:14:22  21     BY MR. PETROCELLI:

12:14:30  22          Q.   And had she asked you, could you have

12:14:32  23     answered the question?  That's a "yes" or "no."

12:14:37  24          A.   Yes.

12:14:38  25          Q.   Okay.  What would you have said?

80

**EXHIBIT 77**
**1735**

ROUGH DRAFT

12:14:39  1              MR. TOBEROFF:  Instruct you not to answer.

12:14:40  2     You can't divulge the substance of the consent

12:14:42  3     agreement.

12:14:43  4              (Instruction not to answer.)

12:14:43  5     BY MR. PETROCELLI:

12:14:58  6         Q.  Do you have any current arrangement for the

12:15:05  7     consent agreement or otherwise whereby the Shuster

12:15:12  8     interests share in any proceeds or recovery

12:15:16  9     attributable to Superboy?

12:15:19 10              MR. TOBEROFF:  Okay.  On this question,

12:15:23 11     I -- I will make an exception and allow him to

12:15:27 12     answer that question provided you agree that his

12:15:30 13     answering the question is not a waiver of any

12:15:32 14     privilege regarding the consent agreement.

12:15:34 15     Otherwise I'll instruct him not to answer.

12:15:46 16              MR. PETROCELLI:  I guess I'll have to do

12:15:47 17     this on a question by question basis.  So as to this

12:15:53 18     particular question and answer, that's acceptable.

12:15:56 19              MR. TOBEROFF:  Okay.  Do you want to.

12:15:58 20              MR. PETROCELLI:  Do you want to repeat the

12:15:59 21     question.

12:16:00 22              MR. TOBEROFF:  Read back the question.

12:16:23 23                 (The reporter read the record

12:16:23 24              as follows:

12:16:24 25                   "^ QUESTION ^ ANSWER ").

81

**EXHIBIT 77**
**1736**

ROUGH DRAFT

12:16:24  1           THE WITNESS:  No.

12:16:24  2    BY MR. PETROCELLI:

12:16:31  3           Q.  Does the consent agreement -- under the

12:16:33  4    concent agreement as you understand it, would the

12:16:39  5    Shuster interest share in any proceeds or recovery

12:16:44  6    be attributable to Superboy?

12:16:47  7           MR. TOBEROFF:  This is the same question.

12:16:49  8    Do we have the same agreement.

12:16:50  9           MR. PETROCELLI:  We do.  It's not the same

12:16:54 10    question because he limited it to the consent

12:16:54 11    agreement.

12:16:54 12           MR. PETROCELLI:  Do we have the same

12:16:58 13    agreement that I will allow him to answer but that

12:16:58 14    will not be deemed --

12:16:58 15           MR. PETROCELLI:  Yes.

12:17:00 16           MR. TOBEROFF:  A waiver of the privilege as

12:17:00 17    to any other questions or the document?

12:17:02 18           MR. PETROCELLI:  Yes.

12:17:03 19           MR. TOBEROFF:  You can answer.

12:17:03 20           THE WITNESS:  Okay.  No

12:17:03 21    BY MR. PETROCELLI:

12:17:07 22           Q.  Have the Schusters, by the Shusters I mean

12:17:13 23    you, your mom, the estates of Joe Shuster, the

12:17:17 24    Shuster interest, have the Shusters ever had any

12:17:21 25    agreement with the Siegels regarding Superboy?

82

EXHIBIT 77
1737

ROUGH DRAFT

12:17:28  1        A.   No.

12:17:34  2        Q.   Is it your understanding that if the

12:17:42  3     Siegels were to be paid or recover money associated

12:17:47  4     with Superboy, that it would belong solely to them

12:17:50  5     and not to the Shuster side?  Is that your

12:17:55  6     understanding?

12:17:56  7        A.   Yes.

12:18:02  8        Q.   Have you ever had any discussions with any

12:18:08  9     member of the Siegel family about Superboy and

12:18:16 10     sharing or not sharing  in recoveries associated

12:18:20 11     with Superboy?

12:18:21 12        A.   No.

12:18:24 13        Q.   Have you ever had a discussion with your

12:18:24 14     mother about whether the Schusters had an interest

12:18:32 15     in Superboy?

12:18:37 16        A.   No.

12:18:37 17        Q.   You never once raised that subject with

12:18:39 18     her?

12:18:41 19        A.   No.

12:18:42 20        Q.   Has she ever discussed it with you?

12:18:45 21        A.   No.

12:18:46 22        Q.   At any time, even going back to the time

12:18:49 23     when Joe Shuster was alive?

12:18:51 24        A.   We never discussed that.

12:18:53 25        Q.   Did you ever discuss it with Joe Shuster?

                                                              83

**EXHIBIT 77**
**1738**

ROUGH DRAFT

12:18:55  1      A.  No.

12:19:07  2      Q.  Okay.  Okay.  Would you agree that I don't

12:19:15  3  need to ask any more questions about his knowledge

12:19:19  4  about the consent agreement because you're -- you're

12:19:22  5  going to assert the same objections?

12:19:24  6          MR. TOBEROFF:  If you're asking as to the

12:19:26  7  substance of contents of the consent agreement I

12:19:29  8  will assert same.

12:19:30  9          MR. PETROCELLI:  The existence of the terms

12:19:31 10  and provisions, the substance of them, the contents

12:19:34 11  of them.

12:19:34 12          MR. TOBEROFF:  Yes.

12:19:36 13          MR. PETROCELLI:  Okay.  Let me just make

12:19:48 14  sure I nail this down.

12:19:51 15      Q.  After signing the consent agreement in

12:19:57 16  2008, did you ever sign a piece of paper that you

12:20:04 17  thought was amending or modifying the consent

12:20:07 18  agreement?

12:20:08 19      A.  No.

12:20:11 20      Q.  Okay.  Or cancelling it?

12:20:12 21      A.  No.

12:20:13 22      Q.  Okay.  When you signed the consent

12:20:25 23  agreement in 2008, your lawyer at the time was whom?

12:20:34 24      A.  Marc Toberoff.

12:20:36 25      Q.  Who did you understand -- did you

84

**EXHIBIT 77**
**1739**

ROUGH DRAFT

12:20:39  1    understand that the Siegels were represented by

12:20:41  2    counsel?

12:20:41  3         A.  Yes.

12:20:44  4         Q.  Who did you understand their counsel to be?

12:20:46  5         A.  Marc Toberoff.

12:20:51  6         Q.  Did you consult with any attorney other

12:20:55  7    than Marc Toberoff about signing a document with the

12:20:59  8    Siegels?

12:20:59  9         A.  No.

12:21:02 10         Q.  Did you consult with anyone other than Marc

12:21:06 11    Toberoff on that subject, attorney or not?

12:21:08 12         A.  No.

12:21:11 13         Q.  Did you give any thought or consideration

12:21:17 14    to whether there were conflict of interest given

12:21:21 15    Mr. Toberoff's representation of the Siegels and the

12:21:27 16    Schusters?  Did that thought cross your mind?

12:21:33 17         A.  I suppose.

12:21:33 18         Q.  When it crossed your mind, in what respect

12:21:39 19    did you think about it?

12:21:41 20              MR. TOBEROFF:  You could only answer that

12:21:42 21    to the extent you have an understanding of conflict

12:21:45 22    of interest independent of your discussions with me.

12:21:52 23              THE WITNESS:  Okay.  Well, my whole

12:21:56 24    understanding is -- is bound up with my

12:22:00 25    conversations with Marc Toberoff.

85

**EXHIBIT 77**
**1740**

ROUGH DRAFT

12:22:04  1            MR. TOBEROFF:  Then I instruct you not to

12:22:06  2    answer.

12:22:06  3            (Instruction not to answer.)

12:22:06  4    BY MR. PETROCELLI:

12:22:10  5        Q.  Did you receive any disclosures from

12:22:13  6    Mr. Toberoff regarding potential or actual conflict

12:22:17  7    of interest?

12:22:18  8        A.  Yes.

12:22:20  9        Q.  In what form?

12:22:24 10        A.  He sent a -- he sent a -- a letter, a

12:22:29 11    waiver, a document.

12:22:33 12        Q.  Is that a document separate from the

12:22:35 13    consent agreement that you signed?

12:22:38 14        A.  Yes.

12:22:39 15        Q.  Did you sign that document?

12:22:40 16        A.  Yes.

12:22:44 17        Q.  So that's another document you signed

12:22:46 18    right, you -- that you didn't mention earlier.

12:22:53 19            Is that in your lock box?

12:23:01 20        A.  I suppose.

12:23:02 21        Q.  Did you bring -- bring it with you?

12:23:07 22        A.  The waiver of conflict of interest?

12:23:07 23        Q.  Right?

12:23:10 24        A.  Is that the --

12:23:11 25            MR. TOBEROFF:  He is asking whether you

                                                              86

EXHIBIT 77
1741

ROUGH DRAFT

12:23:12  1    brought that document with you to answer.

12:23:13  2             THE WITNESS:  The waiver of conflict of

12:23:14  3    interest.

12:23:14  4    BY MR. PETROCELLI:

12:23:15  5        Q.  Correct.  That's how you call the document

12:23:17  6    right?

12:23:18  7        A.  Yeah.

12:23:18  8        Q.  And it's a separate document from the

12:23:19  9    consent agreement.

12:23:19 10             Is that right?

12:23:19 11        A.  Yes.

12:23:22 12        Q.  Who are the signatories to that document?

12:23:29 13        A.  I believe that -- that I am and the Siegels

12:23:32 14    and Mr. Toberoff.

12:23:38 15        Q.  When was that signed?

12:23:39 16        A.  2010, I believe.

12:23:54 17        Q.  Two years after the consent agreement?

12:23:57 18        A.  Yeah, if my memory is right.

12:24:03 19        Q.  And after the filing of this lawsuit?

12:24:05 20        A.  I don't know if it was after.  I don't

12:24:10 21    recall the date.  I think it was sometime -- I don't

12:24:14 22    recall the date.

12:24:16 23        Q.  The date's on the document, right?

12:24:20 24        A.  Yeah, it's not on this document though.

12:24:22 25        Q.  No it's on the conflict of interest

EXHIBIT 77
1742

ROUGH DRAFT

12:24:24  1    document right?

12:24:24  2         A.  Yeah.

12:24:25  3         Q.  Does the conflict of interest document say

12:24:27  4    at that time date is effective as to some earlier

12:24:29  5    point in time?  Like the legal representation

12:24:33  6    documents you described, it went back from 04 to 01?

12:24:40  7         A.  I don't know.

12:24:41  8         Q.  Did you -- were you advised to seek

12:24:49  9    independent counsel before signing or even in

12:24:54 10    considering whether to sign the conflict of waiver?

12:24:56 11         A.  Yes.

12:24:58 12         Q.  Who told you that?

12:25:00 13         A.  Mr. Toberoff.

12:25:01 14         Q.  What did he tell you?

12:25:03 15         A.  He said that I could seek separate counsel.

12:25:10 16    Ask -- ask someone else.

12:25:11 17         Q.  Did he suggest any lawyers to you?

12:25:14 18         A.  No.

12:25:18 19         Q.  Okay.  Did he tell you this in a verbal

12:25:20 20    conversation or in a letter?

12:25:22 21         A.  Probably verbal.

12:25:30 22         Q.  Did you seek separate counsel?

12:25:31 23         A.  No.

12:25:34 24         Q.  Did you make any inquiries at all?

12:25:38 25         MR. TOBEROFF:  As to separate counsel?

                                                                88

**EXHIBIT 77**
**1743**

ROUGH DRAFT

12:25:40  1            MR. PETROCELLI:  Correct.

12:25:41  2            THE WITNESS:  No.

12:25:41  3    BY MR. PETROCELLI:

12:25:42  4        Q.  Did you even consider it?

12:25:47  5        A.  I may have considered it.

12:25:48  6        Q.  You decided not to?

12:25:52  7        A.  Yes.

12:25:53  8        Q.  Did you discuss it with the Siegels?

12:25:58  9            MR. TOBEROFF:  The conflict waiver?

12:26:00 10            MR. PETROCELLI:  Yes.

12:26:01 11            THE WITNESS:  No, not directly.

12:26:01 12    BY MR. PETROCELLI:

12:26:03 13        Q.  Did you discuss with the Siegels whether

12:26:04 14    they were seeking separate counsel or independent

12:26:07 15    counsel in deciding whether to sign the conflict

12:26:09 16    waiver?

12:26:11 17        A.  No, I did not.

12:26:12 18        Q.  Do you know if they did?

12:26:14 19        A.  I don't.

12:26:20 20            MR. PETROCELLI:  I think we're going to run

12:26:22 21    out of videotape now so it's probably a good time to

12:26:24 22    go to lunch.

12:26:24 23            THE VIDEOGRAPHER:  This will mark the end

12:26:26 24    of Volume I Tape Number 1 in the deposition of Mark

12:26:30 25    Warren Peary.  Going off the record.  The time is

                                                              89

**EXHIBIT 77**
**1744**

ROUGH DRAFT

```
12:26:32   1    12:25.

12:27:45   2                    (At ^ ^ a.m. ^ p.m., the

           3              deposition of WARREN PEARY was

           4              adjourned for noon recess.)

           5    ///

           6    ///

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

90

**EXHIBIT 77**
**1745**

ROUGH DRAFT

```
        1              (At ^ ^ a.m. ^ p.m., the

        2              deposition of WARREN PEARY was

        3              reconvened.)

13:18:26 4

13:18:26 5              THE VIDEOGRAPHER:  We're back on the

13:18:35 6       record.  This marks the beginning of Volume I, Tape

13:18:38 7       Number 2 in the deposition of Mark Warren Peary.

13:18:41 8       The time is 1:17.

13:18:41 9

13:18:45 10              EXAMINATION (CONTINUED)

13:18:45 11       BY MR. PETROCELLI:

13:18:46 12              Q.  Mr. Peary, with respect to the conflict of

13:18:51 13       interest document that you signed in or about 2010

13:18:55 14       that we were talking about before the lunch break,

13:18:58 15       do you remember that?

13:18:58 16              A.  Yes.

13:18:59 17              Q.  Okay.  Did you understand that that

13:19:04 18       document that you signed pertained to the 2008

13:19:10 19       consent agreement?

13:19:14 20              MR. TOBEROFF:  You -- you -- I instruct you

13:19:17 21       not to answer regarding the contents of the consent

13:19:22 22       agreement -- it's a conflict waiver which is listed

13:19:26 23       on the privilege log and privileged.

13:19:28 24              THE WITNESS:  Yeah.  I'll have to follow my

13:19:30 25       attorney's advice.
```

91

**EXHIBIT 77**
**1746**

ROUGH DRAFT

13:19:30  1            (Instruction not to answer.)

13:19:30  2     BY MR. PETROCELLI:

13:19:31  3         Q.  Well, I'm not asking about the contents of

13:19:34  4     the consent agreement in this question I'm?

13:19:36  5             MR. TOBEROFF:  No, the conflict waiver.

13:19:36  6     BY MR. PETROCELLI:

13:19:42  7         Q.  Did you understand that the purpose of the

13:19:43  8     conflict waiver related to the consent agreement?

13:19:49  9             MR. TOBEROFF:  You can only answer that

13:19:50 10     question if you have an understanding of the purpose

13:19:52 11     of the conflict waiver separate and apart from your

13:19:55 12     communications with counsel.

13:19:59 13             THE WITNESS:  Well then all my

13:20:00 14     understanding is associated with my communications

13:20:03 15     with counsel.  So I guess I can't answer it.

13:20:03 16     BY MR. PETROCELLI:

13:20:07 17         Q.  You've -- but you've testified to some of

13:20:10 18     your communications with counsel on the subject of

13:20:12 19     this conflict waiver already before the lunch break.

13:20:20 20     In those communications that you had with counsel

13:20:22 21     about the conflict waiver, which you said that he

13:20:25 22     made you disclosure to you about a conflict of

13:20:27 23     interest and/or potential conflict of interest, said

13:20:31 24     that you could seek independent, Counsel, do you

13:20:34 25     recall --

**EXHIBIT 77**
**1747**

ROUGH DRAFT

13:20:34  1          A.  Yes.

13:20:35  2          Q.  Having related that to me?

13:20:36  3          A.  Yes.

13:20:37  4          Q.  Okay.  In your conversations with

13:20:41  5    Mr. Toberoff, was -- did you gain an understanding

13:20:47  6    of the purpose of your being presented with a

13:20:51  7    conflict waiver?

13:20:52  8          A.  Yes.

13:20:54  9          Q.  What was that purpose?

13:20:57  10              MR. TOBEROFF:  I instruct you not to

13:20:58  11    answer.

13:21:06  12              (Instruction not to answer.)

13:21:06  13    BY MR. PETROCELLI:

13:21:06  14          Q.  Was the purpose of the conflict waiver set

13:21:08  15    forth in the document?

13:21:11  16          A.  I believe so.

13:21:17  17          Q.  And again, this was a document you said

13:21:18  18    signed by the Siegel parties as well as the Shuster

13:21:23  19    side, right?

13:21:23  20          A.  Yes.

13:21:24  21          Q.  And Mr. Toberoff, correct?

13:21:25  22          A.  Yes.

13:21:26  23          Q.  Did your mother sign it?

13:21:36  24          A.  I don't remember.  I don't remember.

13:21:47  25          Q.  In or about 2008 at the time when you

93

**EXHIBIT 77**
**1748**

ROUGH DRAFT

13:21:50  1    signed the consent agreement, did you at that time

13:21:57  2    sign any document involving a conflict of interest

13:22:01  3    or a potential conflict of interest?

13:22:08  4         MR. TOBEROFF:  Objection.  Asks for a legal

13:22:09  5    conclusion and you could answer that question if you

13:22:15  6    have an understanding of conflict of interest and

13:22:17  7    potential conflict of interest outside of your

13:22:21  8    communications with me.

13:22:22  9         MR. PETROCELLI:  Let me rephrase that

13:22:23 10    question.

13:22:24 11         Q.  In or about 2008 when you signed the

13:22:27 12    consent agreement, did you also sign another

13:22:31 13    document that you believed related to the subject of

13:22:37 14    waiving conflicts of interest?

13:22:42 15         A.  I don't recall.

13:22:46 16         Q.  You don't -- you don't recall having done

13:22:47 17    so?

13:22:48 18         A.  I don't recall, no, having done so.

13:22:53 19         Q.  Okay.  Is the only time that you can recall

13:22:54 20    having signed a document related to conflicts of

13:22:58 21    interest is this one in 2010?

13:23:03 22         MR. TOBEROFF:  Vague and overbroad.

13:23:08 23         MR. PETROCELLI:  Let me rephrase it.

13:23:10 24         Q.  Is the only time that you can recall

13:23:12 25    signing a document waiving any potential or actual

                                                            94

**EXHIBIT 77**
**1749**

ROUGH DRAFT

13:23:16  1    conflict of interest is the one that you signed in

13:23:19  2    2010?

13:23:22  3        A.  That's the one I recall.

13:23:24  4        Q.  Do you think there are others?

13:23:26  5        A.  I -- I don't remember any others.

13:23:39  6        Q.  Okay.  Okay.  Let me show you Exhibit 2

13:23:52  7    which is the 1975 agreement that Joe Shuster and

13:24:04  8    Jerry Siegel signed with Warner communications

13:24:06  9    calling for various payments to -- to both men and

13:24:13  10   their families.

13:24:15  11               (The document referred to was

13:24:15  12                marked for identification by the

13:24:15  13                C.S.R. as Exhibit 2 and attached to

13:24:19  14                this deposition.)

13:24:19  15   BY MR. PETROCELLI:

13:24:19  16       Q.  Have you seen this document before?

13:24:20  17       A.  No, sir.

13:24:27  18       Q.  You were asked about a pension agreement in

13:24:28  19   your Siegel deposition in 2006.

13:24:32  20               Did you have an understanding -- let me ask

13:24:39  21   you these questions prior to the time that you first

13:24:44  22   had any contact with Mr. Toberoff, okay?

13:24:47  23       A.  Uh-huh.

13:24:49  24       Q.  You first had contact with Mr. Toberoff

13:24:53  25   sometime in 2001.

95

**EXHIBIT 77**

**1750**

ROUGH DRAFT

13:24:55  1          Is that right?

13:24:56  2          A.  Yes.

13:24:56  3          Q.  In your Siegel deposition you said that you

13:25:03  4     were looking into the issue of copyright matters and

13:25:09  5     you came across Mr. Toberoff?

13:25:10  6          A.  Yes.

13:25:15  7          Q.  I think you said it might have been six

13:25:17  8     months or so or a few months prior to time that you

13:25:20  9     signed your first agreement in November 2001.  Does

13:25:22 10     that sound, right?

13:25:23 11          A.  Between the time I first contacted him and

13:25:26 12     then we signed an agreement?

13:25:27 13          Q.  Yeah, what was that time span?

13:25:30 14          A.  I remember I first contacted him in 2001.

13:25:35 15     That's all I can recall.

13:25:36 16          Q.  Okay.  And to provide a bit more detail,

13:25:38 17     did someone give you his number?

13:25:42 18          A.  I found it through research on my own.

13:25:44 19          Q.  When you say "research on your own, the

13:25:46 20     computer on the Internet?

13:25:47 21          A.  Yes, yes.

13:25:48 22          Q.  And how did you come across it?  What did

13:25:50 23     you search that yielded his name?

13:25:53 24          A.  I was doing research on copyright law and

13:25:56 25     changes to the copyright law and various searches

96

**EXHIBIT 77**
**1751**

ROUGH DRAFT

13:26:06  1    having to do with copyright and attorneys involved

13:26:08  2    in that entertainment.

13:26:09  3        Q.  And how many names were netted as a result

13:26:14  4    of your searches?

13:26:21  5        A.  Oh, boy, I can't recall that.  I was

13:26:22  6    impressed with when I came across information

13:26:27  7    regarding Mr. Toberoff's dealings.

13:26:31  8        Q.  On the Web site?

13:26:32  9        A.  Yes.  I was impressed.

13:26:33 10        Q.  What impressed you about what you saw on

13:26:35 11    the Web site?

13:26:36 12        A.  I was impressed with what I had read.  Gave

13:26:39 13    me the impression he had a great deal of knowledge

13:26:41 14    and talent and copyright law with property and

13:26:46 15    rights.

13:26:47 16        Q.  Had you -- did you visit his Web site?

13:26:53 17        A.  I don't recall his Web site in particular.

13:26:56 18        Q.  Was it an article you -- you recall having

13:26:59 19    read about him?

13:27:00 20        A.  Excuse me?

13:27:00 21        Q.  An article about him?  I mean what is it

13:27:03 22    that you read that impressed you?

13:27:04 23        A.  Jeez, it's so far back.  Various searches,

13:27:10 24    his mentions of lawyers and articles.  That's all I

13:27:15 25    can recall.

97

EXHIBIT 77
1752

ROUGH DRAFT

13:27:15  1          Q.  Searches you're doing on your home

13:27:17  2     computer?

13:27:17  3          A.  Yes.

13:27:18  4          Q.  Okay.  When you -- whatever you read -- by

13:27:22  5     the way, did you save the material that mentioned

13:27:26  6     him?

13:27:26  7          A.  I don't think so from that time.  But I --

13:27:34  8     I got his contact information and contacted him.

13:27:37  9              MR. TOBEROFF:  Just focus on his question.

13:27:38 10     Only answer his question.

13:27:38 11     BY MR. PETROCELLI:

13:27:40 12          Q.  Did you contact anyone other?

13:27:41 13              MR. TOBEROFF:  Don't give a narrative.

13:27:41 14     BY MR. PETROCELLI:

13:27:43 15          Q.  Contact anyone other than him?

13:27:44 16          A.  Prior to that time, I did.

13:27:50 17          Q.  As a result of the research you were doing?

13:27:52 18          A.  Oh, at that time, no.

13:27:53 19          Q.  Okay.  So when you did the research, the

13:27:58 20     only person that you contacted as a result of that

13:28:02 21     research was Mr. Toberoff?

13:28:03 22          A.  At that time, yes.

13:28:04 23          Q.  Then you called him on the telephone?

13:28:06 24          A.  Yes.

13:28:07 25          Q.  And you had a phone conversation?

EXHIBIT 77
1753

ROUGH DRAFT

13:28:08  1          A.  Yes.

13:28:10  2          Q.  And after that phone conversation did you

13:28:12  3   have a meeting?

13:28:14  4          A.  In face to face.

13:28:19  5          Q.  Face-to-face meeting, right?

13:28:20  6          A.  Not at that time.

13:28:23  7          Q.  How long thereafter until you first met

13:28:28  8   him?

13:28:28  9          A.  When I first met him it was -- it was after

13:28:32 10   we had signed the original legal agreement.

13:28:36 11          Q.  So you had not met him prior to signing the

13:28:40 12   document.

13:28:42 13              Is that correct?

13:28:43 14          A.  Not face to face.

13:28:44 15          Q.  Okay.  Had your sister met him?

13:28:48 16          A.  No.

13:28:49 17          Q.  Had your mother?

13:28:50 18          A.  No.

13:28:53 19          Q.  Had you spoken to anybody who had met him

13:28:57 20   or worked with him prior to signing the document,

13:29:01 21   the first document?

13:29:02 22          A.  I don't believe so.

13:29:11 23          Q.  Did you -- did you have more than one

13:29:12 24   telephone call?

13:29:13 25          A.  Yes.

99

**EXHIBIT 77**
**1754**

ROUGH DRAFT

13:29:16  1          Q.  About how many?

13:29:22  2          A.  Boy, before signing the first agreement I

13:29:28  3     would have had to -- I don't know exactly but it was

13:29:32  4     a number of times.  I don't know to characterize.  I

13:29:36  5     don't have a log but I talked to him quite a bit.

13:29:41  6          Q.  Okay.  The agreement that you did sign

13:29:43  7     which I'll show you in a bit, were there drafts of

13:29:48  8     that that went back and forth as you recall or did

13:29:51  9     you get a document sign it and return it?

13:29:54 10          A.  There were drafts.

13:29:56 11          Q.  Did you keep copies of the drafts?

13:29:57 12          A.  No.

13:30:01 13          Q.  On your end, who was reviewing the drafts?

13:30:07 14          A.  I was.

13:30:09 15          Q.  Did you feel competent and capable to

13:30:11 16     understand what you were reading and made changes

13:30:15 17     and comments?

13:30:16 18          A.  Yes.

13:30:18 19          Q.  Okay.  Did you consult with anybody?

13:30:26 20          A.  Like another lawyer?

13:30:26 21          Q.  Yes.

13:30:26 22          A.  No.

13:30:29 23          Q.  Did you discuss with your mother in 2001

13:30:34 24     these -- your talking to Mr. Toberoff, your

13:30:40 25     telephone calls with him, receiving the draft

                                                              100

**EXHIBIT 77**
**1755**

ROUGH DRAFT

13:30:44  1    agreements, working on them, this whole activity,

13:30:46  2    did you share all of that with your mother?

13:30:52  3         A.  I'm sure I did.

13:30:54  4         Q.  Did she ask you to undertake this effort?

13:30:57  5         A.  No.  I -- I was doing all of this research

13:30:59  6    on my own.  She didn't know anything about it.

13:31:03  7         Q.  At one point did you disclose to her what

13:31:06  8    you were doing?

13:31:06  9         A.  Probably when I decided to work, retain

13:31:15 10    Mr. Toberoff.  It's probably when I really discussed

13:31:20 11    it.

13:31:20 12         Q.  Did you have a one-on-one conversation with

13:31:23 13    your mother or was your sister involved?

13:31:26 14         A.  Boy.

13:31:28 15         Q.  Family meeting?

13:31:30 16         A.  I can't actually visualize that in my mind.

13:31:33 17    I know I talked with Jean.  I don't recall talking

13:31:38 18    to Dawn at that time.

13:31:43 19         Q.  You -- why did you decide not to share with

13:31:47 20    your mother your -- your activities until just

13:31:52 21    before you were ready to sign the document?

13:31:58 22         A.  I was doing research on my own and she had

13:32:01 23    no interest or knowledge of any of -- of that, any

13:32:06 24    of rights or anything.  It was something I did

13:32:10 25    completely on my own because I wanted to be

101

EXHIBIT 77
1756

ROUGH DRAFT

13:32:12  1    thorough, so that's the reason.

13:32:19  2        Q.  And did you come to a point when you

13:32:20  3    thought like you had sufficient thorough information

13:32:23  4    that you could then talk with her?

13:32:25  5        A.  Yes.

13:32:26  6        Q.  And when you did talk with her was it in

13:32:31  7    that conversation that you first identified to her

13:32:33  8    that you had contacted Mr. Toberoff and you were

13:32:36  9    recommending him?

13:32:36 10        A.  I believe so.

13:32:42 11        Q.  Had she ever heard of Mr. Toberoff, to your

13:32:45 12    knowledge?

13:32:45 13        A.  No.

13:32:54 14        Q.  Did you put Mr. Toberoff in touch with the

13:32:57 15    Siegel family?

13:33:01 16        A.  If I recall, after we had signed a legal

13:33:05 17    agreement at some point we were -- we were happy

13:33:13 18    that my mother had talked with Joanne and mentioned

13:33:16 19    his name.

13:33:24 20        Q.  Were you present when your mother first

13:33:28 21    mentioned Mr. Toberoff to Joanne?

13:33:32 22        A.  No.

13:33:34 23        Q.  It's telephone call?

13:33:35 24        A.  Yes.

13:33:40 25        Q.  Okay.  You said that you had contacted a

                                                        102

**EXHIBIT 77**
**1757**

ROUGH DRAFT

13:33:43  1    lawyer at some time before Mr. Toberoff.

13:33:46  2            Was that a fellow in Albuquerque?

13:33:49  3        A.  Yes.  There was a lawyer in Albuquerque.

13:33:52  4        Q.  And what was that person's name?

13:33:53  5        A.  I don't think I remember it because I

13:33:58  6    didn't do any -- I didn't sign anything with him.

13:34:02  7        Q.  What year was that?

13:34:03  8        A.  Would have first been, I believe, 1999.

13:34:15  9        Q.  Is 1999 the first time that you started to

13:34:20  10   think about researching copyright issues related to

13:34:25  11   Mr. Shuster or his estate?

13:34:27  12       A.  Boy, the first time I started thinking

13:34:33  13   about that.  Probably I thought about it earlier.

13:34:39  14       Q.  When is the first time you actually did

13:34:40  15   anything on that subject?

13:34:42  16       A.  As far as research?

13:34:46  17       Q.  You said you probably thought about it

13:34:47  18   earlier, right?

13:34:51  19       A.  Uh-huh.

13:34:51  20       Q.  So when is the first time you decided to do

13:34:53  21   something, whether it be start looking things up the

13:34:56  22   Internet, start making inquiries to friends, maybe

13:34:59  23   look for a lawyer regarding the subject of his

13:35:03  24   copyright and whether he had a termination interest

13:35:07  25   and?

103

**EXHIBIT 77**
**1758**

ROUGH DRAFT

13:35:07  1        A.  Yeah.

13:35:08  2        Q.  Related Superman.

13:35:13  3        A.  Yeah that might have been when I first

13:35:15  4    looked through the copyright code, maybe 1998 I was

13:35:19  5    looking through that and then after that that's when

13:35:25  6    I contacted an attorney in Albuquerque.

13:35:31  7        Q.  Did you meet with him?

13:35:36  8        A.  Yes.

13:35:36  9        Q.  Where?

13:35:37 10        A.  In Albuquerque.

13:35:38 11        Q.  Who attended the meeting?

13:35:40 12        A.  I think it was just me.

13:35:45 13        Q.  Did your mom know what you were doing?

13:35:49 14        A.  I don't believe so.

13:35:55 15        Q.  And you decided not to higher this fellow?

13:35:57 16        A.  That's correct.

13:35:58 17        Q.  And you don't know his name?

13:36:00 18        A.  I can't recall.

13:36:01 19        Q.  Did you get any documents from him?

13:36:03 20        A.  I don't -- I don't think so.

13:36:11 21        Q.  Where did you get his name from?

13:36:16 22        A.  That's a long time back.  I don't know if

13:36:21 23    it was the -- the phone book or under a attorneys it

13:36:26 24    said intellectual property or something of that

13:36:28 25    nature.  I really don't remember.

104

**EXHIBIT 77**
**1759**

ROUGH DRAFT

13:36:30  1          Q.  Why didn't you hire him?

13:36:34  2          A.  Gee, I think it's because I thought they

13:36:37  3    maybe weren't as good as the best.  Maybe they

13:36:43  4    didn't know everything that they should have.

13:36:46  5          Q.  They is whom?

13:36:47  6          A.  The attorney.

13:36:48  7          Q.  Was it a law firm?

13:36:50  8          A.  It was -- well, it was one attorney in a

13:36:52  9    firm.

13:36:55  10         Q.  Okay.  And so after that -- that was the

13:36:58  11   first person you've ever -- lawyer you've ever

13:37:02  12   contacted?

13:37:02  13         A.  Yes.

13:37:03  14         Q.  In pursuit of this issue, right?

13:37:03  15         A.  Yes.

13:37:05  16         Q.  But before you contacted that lawyer, had

13:37:07  17   you spoken to other people, like in the comic book

13:37:10  18   business or in entertainment business about this

13:37:16  19   issue?

13:37:20  20         A.  It's possible that just in conversation

13:37:27  21   that I talked with other people but not lawyers.

13:37:29  22         Q.  Okay.  Were you starting to do research?

13:37:34  23         A.  Yes.

13:37:36  24         Q.  Is there any particular reason why you

13:37:37  25   didn't come across Mr. Toberoff's name back in 1999

                                                              105

**EXHIBIT 77**
**1760**

ROUGH DRAFT

13:37:41  1   when you were first -- or in '98 when you were first

13:37:44  2   looking into this?

13:37:45  3       A.  Well, I didn't think of contacting a lawyer

13:37:52  4   at all until sometime in '99.

13:37:54  5       Q.  Right?

13:37:55  6       A.  Probably the second half.  Because I wasn't

13:37:59  7   sure of what rights were available under the law.

13:38:02  8   And I -- I guess I wanted to go to a local lawyer

13:38:08  9   that was right there in town so I could just drive

13:38:10 10   to the office and meet with them.

13:38:19 11       Q.  In Santa Fe?

13:38:19 12       A.  That was in Albuquerque.

13:38:19 13       Q.  That was Albuquerque?

13:38:19 14       A.  That was Albuquerque.

13:38:19 15       Q.  You were living in Albuquerque then?

13:38:19 16       A.  Yes, just before I moved.

13:38:20 17       Q.  Living alone?

13:38:21 18       A.  I think it was -- it was after my father

13:38:24 19   died so I was with -- I was just with -- with my

13:38:29 20   mother just the two of us.

13:38:32 21       Q.  When your dad passed you were all living in

13:38:35 22   Albuquerque?

13:38:36 23       A.  Yes.

13:38:37 24       Q.  Okay.  And then you folks moved to?

13:38:42 25       A.  Santa Fe.

106

**EXHIBIT 77**
**1761**

ROUGH DRAFT

13:38:43  1          Q.  Santa Fe?

13:38:44  2          A.  Yes.

13:38:46  3          Q.  So you expanded your search then as time

13:38:52  4     on -- went by and extended it to Los Angeles?

13:38:56  5          A.  Yes.

13:38:58  6          Q.  Okay.  So from the time that you met with

13:39:03  7     this attorney in Albuquerque until the time that you

13:39:05  8     identified Mr. Toberoff, had you identified any

13:39:08  9     other attorneys in between then, those two time

13:39:12  10    periods?

13:39:17  11         A.  I -- I didn't talk with any others.  Is

13:39:21  12    that what you're asking?

13:39:21  13         Q.  Yes.

13:39:24  14         A.  Okay.

13:39:26  15         Q.  Were you referred to any?

13:39:27  16         A.  No.

13:39:29  17         Q.  Okay.  And you said you got a -- you were

13:39:33  18    studying the copyright code.  How did you get a copy

13:39:36  19    of it?

13:39:39  20         A.  It must have been -- must have been at the

13:39:42  21    university library re because I photocopied some

13:39:46  22    sheets.

13:39:47  23         Q.  University of New Mexico?

13:39:48  24         A.  I believe so.

13:39:56  25         Q.  Okay.  What else did you research besides

107

EXHIBIT 77
1762

ROUGH DRAFT

13:40:00  1    the copyright code?  What other materials?

13:40:07  2        A.  With regard to.

13:40:08  3        Q.  This issue of whether there was any

13:40:10  4    copyright rights that your family might have.

13:40:18  5        A.  I found out that there was legislation that

13:40:20  6    was passed that -- that gave the -- broadened the

13:40:28  7    scope of rights to estates.

13:40:35  8        Q.  How did you find out about that

13:40:37  9    legislation?

13:40:40 10        A.  Oh just looking around.

13:40:45 11        Q.  Had you heard that the Siegel family had or

13:40:51 12    was in the process of pursuing termination rights on

13:40:54 13    behalf of Jerome Siegel?

13:40:57 14        A.  I had heard that.

13:40:58 15        Q.  And how had you heard that?

13:41:05 16        A.  Oh, boy.  I don't know exactly.  I just

13:41:11 17    know I had heard about it.  I --

13:41:18 18        Q.  Did you come across a notice of termination

13:41:22 19    of copyright interest that the Siegel family served

13:41:27 20    in 1997?

13:41:31 21        A.  Did I see that?

13:41:31 22        Q.  Yes.

13:41:32 23        A.  Their notice of termination?

13:41:34 24        Q.  No I did see that.

13:41:36 25        Q.  Okay.  Did you speak to Joanne or Laura

108

**EXHIBIT 77**
**1763**

ROUGH DRAFT

13:41:39  1    Siegel about their having filed such a notice of

13:41:43  2    termination around the time that they did?

13:41:46  3        A.  Not at that time.

13:41:48  4        Q.  Do you know if your mom did?

13:41:50  5        A.  I don't believe so.

13:41:52  6        Q.  Is it -- is it -- was it upon learning that

13:41:54  7    they were seeking to terminate copyright interest

13:42:00  8    that spurred you to begin inquiring about the same

13:42:03  9    thing?

13:42:08 10        A.  I'm sure it's a factor.

13:42:09 11        Q.  What were the other factors?

13:42:15 12        A.  I don't know.  I guess that's the main

13:42:17 13    thing that spurred me.

13:42:20 14        Q.  At the time that you began thinking about

13:42:23 15    this, were you under the belief that your family had

13:42:27 16    no termination interests?

13:42:33 17        A.  At one time I had thought that and later

13:42:37 18    changed -- changed my mind.

13:42:40 19        Q.  What changed your mind?

13:42:42 20        A.  The legislation.

13:42:45 21        Q.  Prior to the legislation, you're talking

13:42:49 22    about a change to the copyright act?

13:42:51 23        A.  Yes.

13:42:51 24        Q.  That became effective in or about 1998,

13:42:51 25    right?

109

**EXHIBIT 77**
**1764**

ROUGH DRAFT

13:42:55  1          A.  Yeah, I believe.

13:42:56  2          Q.  Sometimes known as the Sonny Bono copyright

13:42:59  3  extension act?

13:43:00  4          A.  Yes.

13:43:01  5          Q.  Okay.  Prior to your learning about that

13:43:06  6  act, you were of the view that your family had no

13:43:09  7  termination rights?

13:43:10  8          A.  I didn't -- didn't think so.  I wasn't

13:43:17  9  certain.  I -- I wasn't positive so that's what

13:43:24 10  spurred me to do the research.

13:43:27 11          Q.  And why did you think that the family might

13:43:30 12  not have termination rights prior to the -- the

13:43:33 13  change in the law?

13:43:35 14          A.  The -- when I looked at the copyright code,

13:43:41 15  it -- it only stated certain relations to creators

13:43:47 16  at that time, spouses and children, and it didn't

13:43:52 17  say anything else.

13:43:54 18          Q.  And you were aware that Joe Shuster had

13:43:57 19  died without a surviving spouse, correct?

13:43:57 20          A.  Yes.

13:44:00 21          Q.  And without a surviving child or

13:44:04 22  grandchild, correct?

13:44:05 23          A.  That's correct.

13:44:08 24          Q.  And you were also aware that he had never

13:44:10 25  exercised a right of termination during his

                                                           110

**EXHIBIT 77**
**1765**

ROUGH DRAFT

13:44:12  1    lifetime, right?

13:44:15  2        A.  That's right.

13:44:15  3        Q.  But you were aware that he did have an

13:44:17  4    opportunity to have done so prior to his death?

13:44:20  5        A.  I'm not -- I'm not sure about those

13:44:32  6    details.  I'm not sure.

13:44:32  7        Q.  Did you discuss with your mother from time

13:44:38  8    to time this idea or view that because he did not

13:44:41  9    leave a surviving spouse or issue that he -- this is

13:44:47 10    after he died, I mean --

13:44:49 11        A.  Uh-huh.

13:44:49 12        Q.  That there was no right of termination?  Is

13:44:54 13    that a topic you discussed with your mom?

13:44:56 14        A.  I don't think it was discussed until I got

13:45:01 15    serious about confirming we actually had rights.

13:45:08 16    And then at that point probably at that point I

13:45:11 17    probably discussed it.

13:45:14 18            MR. TOBEROFF:  Again Warren, if you have a

13:45:17 19    basis for -- if you remember discussing something,

13:45:24 20    of course, talk about it.  But if you don't have a

13:45:27 21    specific memory or any memory, don't speculate as to

13:45:34 22    what you probably did or probably didn't do.

13:45:34 23            MR. PETROCELLI:  Mark honestly, I don't

13:45:36 24    think that's necessary.  He wasn't speculating.

13:45:37 25            THE WITNESS:  I didn't say he was

                                                                111

**EXHIBIT 77**
**1766**

ROUGH DRAFT

13:45:38  1   speculating.

13:45:39  2            MR. PETROCELLI:  I know there's no reason.

13:45:40  3            MR. TOBEROFF:  I'm cautioning him.

13:45:41  4            MR. PETROCELLI:  No reason to caution him

13:45:43  5   not to speculate when he is not speculating.

13:45:45  6            MR. TOBEROFF:  Actually, I think he may

13:45:47  7   have been speculating but I'm not going to pass

13:45:48  8   judgments on that.  I'm just advising my client not

13:45:50  9   to -- there's a human tendency to try to fill in the

13:45:57  10  blanks.

13:45:58  11           MR. PETROCELLI:  You understand though that

13:45:59  12  I'm entitled to your best recollection no matter how

13:46:04  13  faint or vague it might be.

13:46:05  14      A.  Yes, and it is faint often.

13:46:07  15      Q.  Okay.  That's okay.

13:46:11  16

13:46:11  17           MR. TOBEROFF:  Is he also entitled to your

13:46:13  18  best estimation if you have a basis for estimating.

13:46:13  19  BY MR. PETROCELLI:

13:46:15  20      Q.  I am.

13:46:19  21           So getting back to where we were did you

13:46:29  22  ever discuss with your mother whether Joe Shuster

13:46:32  23  had a right of termination with regard Superman

13:46:37  24  copyrights prior to the time that Joe died in?

13:46:41  25           MR. TOBEROFF:  Asked and answered.

112

**EXHIBIT 77**
**1767**

ROUGH DRAFT

13:46:42  1          THE WITNESS:  No.

13:46:42  2    BY MR. PETROCELLI:

13:46:45  3        Q.  Were you even aware of the subject prior to

13:46:48  4    the time of Joe -- that Joe died?

13:46:50  5          MR. TOBEROFF:  Asked and answered.

13:46:51  6          THE WITNESS:  No.

13:46:51  7    BY MR. PETROCELLI:

13:46:54  8        Q.  When is the first time you ever learned

13:46:57  9    about the side that an heir an author, I should say

13:47:04 10    could terminate a right interest?

13:47:08 11          MR. TOBEROFF:  You mean a copyright grant.

13:47:10 12          MR. PETROCELLI:  Copyright grant, yes.

13:47:14 13          THE WITNESS:  Probably around 1998.

13:47:14 14    BY MR. PETROCELLI:

13:47:19 15        Q.  And how did you become aware of it?

13:47:20 16        A.  I became aware of the idea of the

13:47:26 17    possibility, it's as I stated before, I did some

13:47:33 18    research in copyrigh law --

13:47:36 19        Q.  Yeah, I want to make sure you're

13:47:37 20    understanding what I'm asking.  I'm not asking you

13:47:39 21    when you standard to believe that the Shuster family

13:47:42 22    had the ability to terminate a copyright grant? I'm

13:47:45 23    asking when did you first become aware that there

13:47:47 24    was even such a thing possible in the law of

13:47:51 25    copyright that creators could terminate copyright

                                                               113

EXHIBIT 77
1768

ROUGH DRAFT

13:47:54 1    grants?

13:47:55 2        A.  It's -- well, it would be around that time

13:47:58 3    and that's when I heard something about the Siegel

13:48:01 4    termination.

13:48:03 5        Q.  Okay.  And when you heard that, did you

13:48:08 6    talk to your mom about it and ask -- because she was

13:48:11 7    the sole beneficiary of the estate, whether she knew

13:48:15 8    anything about this, whether she had ever spoken to

13:48:18 9    her brother about it, you know --

13:48:20 10       A.  Well, no, I don't think so.  Initially I

13:48:23 11   didn't think that we had anything.

13:48:24 12       Q.  Why did you think that?  Because your

13:48:27 13   reading of the code?

13:48:28 14       A.  Yes.

13:48:29 15       Q.  Okay.  Did you -- during this period, '97,

13:48:34 16   '98 that you're now describing, did you come across

13:48:41 17   any of the agreements that Joe had signed with DC or

13:48:47 18   Warner Bros. including Exhibit 2 in front of you?

13:48:50 19       A.  No.

13:48:53 20       Q.  As of the time that you first contacted

13:48:54 21   Mr. Toberoff, had you come across Exhibit 2?

13:49:00 22       A.  No.

13:49:03 23       Q.  Had you come across any of the agreements

13:49:06 24   that had been signed either by Joe Shuster or by

13:49:11 25   Jean Peavy or by Frank Shuster?

114

**EXHIBIT 77**
**1769**

ROUGH DRAFT

13:49:13  1        A.  I don't believe so.

13:49:17  2        Q.  Were you aware of the existence of such

13:49:19  3    agreements as of the time you contacted

13:49:21  4    Mr. Toberoff?

13:49:23  5        A.  I don't think so.

13:49:30  6        Q.  And re mines me, I may have asked you this,

13:49:32  7    when was the first time you saw Exhibit 2?

13:49:41  8            MR. TOBEROFF:  Lacks foundation.  Assumes

13:49:43  9    facts.

13:49:47  10            You can answer.

13:49:47  11            THE WITNESS:  Oh.  I don't think I've seen

13:49:50  12    it before, actually.

13:49:50  13    BY MR. PETROCELLI:

13:49:52  14        Q.  Before today?

13:49:52  15        A.  Yes.

13:49:53  16        Q.  Okay.  When your uncle died Joe Shuster in

13:50:33  17    July of 1992, did you become aware about any

13:50:37  18    dealings that your mother then had with DC Comics or

13:50:42  19    Warner communications regarding financial affairs?

13:50:48  20        A.  Yeah, the only dealing I'm aware of is she

13:50:55  21    asked for them to cover some expenses because he

13:50:58  22    had -- he had more debts than assets.

13:51:01  23        Q.  Okay.  Well take a look at Exhibit 3.

13:51:07  24    Jason.  You can maybe make a file there so we don't

13:51:15  25    lose track of the official exhibits.  Mr. Peary can

115

**EXHIBIT 77**
**1770**

ROUGH DRAFT

13:51:19  1    also take that complaint.  Put that over there, too.

13:51:22  2    Thank you.

13:51:23  3              (The document referred to was

13:51:23  4              marked for identification by the

13:51:23  5              C.S.R. as Exhibit 3 and attached to

13:51:23  6              this deposition.)

13:51:23  7    BY MR. PETROCELLI:

13:51:26  8        Q.  Exhibit 3 is two documents.  One is a

13:51:32  9    handwritten note from Jean Peavy to Paul, Paul is

13:51:36 10    Paul Levitz, dated August 21, 1992 and then there's

13:51:41 11    a typewritten letter from Jean to Marty Payson ckdoc

13:51:47 12    the then vice president of Time-Warner dated

13:51:49 13    August 21, 1992.

13:51:52 14              Have you ever seen either of these

13:51:53 15    documents before?

13:51:59 16        A.  I don't believe so, no.

13:52:02 17        Q.  In 1992 -- well turn to the top of page 2

13:52:19 18    of the typewritten letter.

13:52:28 19              Your mom's typewritten letter.  Do you have

13:52:30 20    that?

13:52:30 21        A.  Yes.

13:52:30 22        Q.  And you'll see at the very top of the page

13:52:33 23    in that first paragraph that says this is very

13:52:35 24    embarrassing"?

13:52:36 25        A.  Yes.

116

**EXHIBIT 77**
**1771**

ROUGH DRAFT

13:52:38  1       Q.  She says in the middle of the sentence, in

13:52:41  2   the middle of the paragraph:

13:52:42  3                "I had my son itemize Joe's

13:52:45  4            1992 checks and bank statements to

13:52:47  5            see where his money went.  We've

13:52:51  6            been able to account for most of

13:52:53  7            his checks."

13:52:53  8            And that's something that you did at your

13:52:56  9   mom's request, right?

13:52:56  10       A.  Yeah, at the time of his death.

13:52:56  11       Q.  Correct?

13:52:56  12       A.  Yes.

13:52:58  13       Q.  Okay.  Were you aware that your mother was

13:53:00  14   communicating with Time-Warner about these matters?

13:53:07  15       A.  I had some awareness.

13:53:09  16       Q.  Did you help her draft the letters?

13:53:12  17       A.  I -- no, I did not.

13:53:14  18       Q.  Were you living with her at the time?

13:53:15  19       A.  Yes, I was -- after my father had died and

13:53:21  20   before we moved to Santa Fe, yes.

13:53:23  21       Q.  I thought your dad died in 1996?

13:53:25  22       A.  Yes.

13:53:25  23       Q.  This is 1992?

13:53:26  24       A.  Wait a minute.  After?  Oh I'm mixed up.

13:53:28  25   Sorry.  Okay well he was alive, then. , yeah.

117

**EXHIBIT 77**
**1772**

ROUGH DRAFT

13:53:31  1    Anyway, I -- 1992.  That's a long time ago.  Didn't

13:53:38  2    realize.

13:53:38  3            I -- no, I did not help her with this,

13:53:41  4    though.  I did not see this.

13:53:42  5        Q.  Do you know if your dad was helping your

13:53:44  6    mom write these letters?

13:53:46  7        A.  No, I don't know.

13:53:53  8        Q.  Did you attend Joe Shuster's funeral?

13:53:56  9        A.  Yes.

13:54:02 10        Q.  The one in Los Angeles or the memorial

13:54:03 11    service in New York?

13:54:04 12        A.  It was New York.

13:54:15 13        Q.  Videographer interruption.

13:54:15 14    BY MR. PETROCELLI:

13:54:18 15        Q.  The next paragraph on the second page of

13:54:24 16    your mother's typewritten letter it indicates that

13:54:35 17    Joe was paying over $1,200 a month to Joanne Siegel

13:54:40 18    for some kind of commission.

13:54:41 19            Do you see that?

13:54:41 20        A.  Yes.

13:54:42 21        Q.  Were you aware over the years that your

13:54:47 22    uncle was paying a commission to the Siegel family?

13:54:55 23        A.  Not at the time.

13:54:57 24        Q.  And after your uncle's death in 1992, were

13:55:01 25    you aware that those commission payments continued?

                                                              118

EXHIBIT 77
1773

ROUGH DRAFT

13:55:08  1        A.  After his death?

13:55:11  2        Q.  Yes.  Were you aware whether any commission

13:55:13  3    payments continued to Joanne Siegel after Joe's

13:55:16  4    death based on money that Warner Bros. or Warner

13:55:21  5    communication or DC was paying to the Shuster

13:55:25  6    family?

13:55:26  7        A.  She might have mentioned something about

13:55:29  8    it.

13:55:30  9        Q.  She being whom?

13:55:30 10        A.  Jean.

13:55:32 11        Q.  Mentioned to you that commissions were

13:55:33 12    being paid?

13:55:34 13        A.  I -- I think she mentioned something.

13:55:36 14    That's all I can recall.

13:55:37 15        Q.  And do you know why commissions were being

13:55:41 16    paid to Joanne Siegel for monies paid to the Shuster

13:55:44 17    family?

13:55:45 18        A.  Not really.

13:55:49 19        Q.  Did you ever ask why are we paying her

13:55:52 20    money?

13:55:52 21        A.  Well, it was Joe, she told me it was Joe

13:55:56 22    that was paying.

13:55:56 23        Q.  What about after Joe's death?

13:55:59 24        A.  No.

13:55:59 25        Q.  No what?

                                                                119

**EXHIBIT 77**
**1774**

ROUGH DRAFT

13:55:59  1        A.  There was nothing paid after his death.

13:56:05  2        Q.  Okay.  Go down to the fourth paragraph,

13:56:07  3    take a quick look at that, Joe's lady friend?

13:56:10  4        A.  Uh-huh.

13:56:20  5        Q.  It said Joe's lady friend admitted to me

13:56:24  6    how generous he had been to her and her son.  Her

13:56:27  7    son is a psychology professor.

13:56:27  8            Do you see that?

13:56:30  9        A.  Yes.

13:56:30 10        Q.  Do you know who Joe's lady friend was at

13:56:33 11    that time?

13:56:38 12        A.  I never met her, I just saw pictures as we

13:56:43 13    stated earlier yes, sir I just saw pictures of her.

13:56:46 14        Q.  Is it your understanding the reference to

13:56:48 15    the lady friend was the woman that Joe had married

13:56:50 16    because you talked about pictures of Joe's former

13:56:52 17    spouse?

13:56:52 18        A.  That's a good question.  Joe's lady friend

13:56:59 19    Ts must have been another lady friend after.

13:57:01 20        Q.  Did you ever meet that person?

13:57:03 21        A.  No.

13:57:04 22        Q.  Do you know who the son is, the psychology

13:57:05 23    professor?

13:57:05 24        A.  I think I very briefly met him very briefly

13:57:11 25    after Joe's death.

                                                              120

**EXHIBIT 77**
**1775**

ROUGH DRAFT

13:57:13  1          Q.   Where did you meet him?

13:57:16  2          A.   He came by Joe's a apartment briefly.

13:57:20  3          Q.   Do you remember his name?

13:57:21  4          A.   Oh, boy, no.

13:57:22  5          Q.   Have you had any contact with him since?

13:57:23  6          A.   No.

13:57:24  7          Q.   Do you know where he taught?

13:57:28  8          A.   No, I don't remember.

13:57:36  9          Q.   And then if you go to the last page of your

13:57:37 10     mother's letter, you'll see a reference to the

13:57:41 11     agreement with Joanne Siegel to take 20 percent of

13:57:44 12     his, his being Joe's being.

13:57:48 13               Have you ever seen a written agreement to

13:57:50 14     that effect?

13:57:51 15          A.   No, I haven't.

13:57:59 16          Q.   Now, did you have any interactions at all

13:58:01 17     in 1992 with the people at Time-Warner, time --

13:58:06 18     Time-Warner or DC Comics?

13:58:07 19          A.   No.

13:58:08 20          Q.   Like Paul Levitz or Marty Payson, any of

13:58:11 21     those people?

13:58:12 22          A.   No, I did not.  SP.

13:58:13 23          Q.   At any time prior to contacting

13:58:17 24     Mr. Toberoff did you have any contact with any

13:58:20 25     representatives of DC Comics or Time-Warner?

                                                             121

**EXHIBIT 77**
**1776**

ROUGH DRAFT

13:58:26  1         A.  If -- if I had -- I might have had contact

13:58:32  2    but it wasn't regarding any rights.

13:58:34  3         Q.  What was it regarding?

13:58:36  4         A.  I think my mother had written to Paul about

13:58:41  5    A I've got a screen play, are you interested?  And

13:58:45  6    there was another book that I had written to submit

13:58:51  7    to Warner books and she had asked for a contact.

13:58:57  8    That's all I recall.

13:58:58  9         Q.  Did you ever talk to Frank Shuster, he was

13:59:01 10    your uncle, right?

13:59:01 11         A.  Yes.

13:59:03 12         Q.  About Joe Shuster's copyright interests?

13:59:08 13         A.  No.

13:59:18 14         Q.  Do you know what year your uncle passed

13:59:22 15    away?

13:59:22 16         A.  I don't recall the exact year.

13:59:29 17         Q.  1996 sound right?

13:59:32 18         A.  Yeah.

13:59:32 19         Q.  Okay.  Prior to Frank Shuster's death,

13:59:39 20    that's what I meant by your uncle?

13:59:43 21         A.  Uh-huh.

13:59:43 22         Q.  Prior to Frank Shuster's death in 1996, to

13:59:46 23    be clear, you never had any discussions with him on

13:59:49 24    the subject of copyright interests or terminating

13:59:50 25    copyright interests?

                                                                122

**EXHIBIT 77**
**1777**

ROUGH DRAFT

13:59:50  1          A.  No, I did not.

13:59:52  2          Q.  Okay.  Can you turn to Exhibit 4?

14:00:14  3          A.  Oh, okay.

14:00:14  4               (The document referred to was

14:00:14  5               marked for identification by the

14:00:14  6               C.S.R. as Exhibit 4 and attached to

14:00:16  7               this deposition.)

14:00:16  8     BY MR. PETROCELLI:

14:00:16  9          Q.  This is a letter from Frank Shuster to Paul

14:00:18 10     Levitz dated September 10, 1992.

14:00:23 11               Have you ever seen this letter before

14:00:24 12     today?

14:00:35 13          A.  I don't think so --

14:00:36 14          Q.  Did you become aware that after Joe

14:00:37 15     Shuster's death as a result of your mother's efforts

14:00:46 16     DC Comics or Time-Warner agreed to make pension

14:00:54 17     payments or payments to the Shuster family?

14:00:57 18          A.  I was aware of a pension agreement.

14:01:02 19          Q.  And are you aware that after Joe Shuster's

14:01:04 20     death, that -- that the folks at Time-Warner or DC

14:01:12 21     Comics agreed to increase payments?

14:01:17 22          A.  No, I didn't know the details, no.

14:01:21 23          Q.  Was your father working in 1992 or was he

14:01:27 24     retired or disabled?

14:01:33 25          A.  I believe he was mostly retired.

                                                            123

**EXHIBIT 77**

**1778**

ROUGH DRAFT

14:01:40  1        Q.  Do you know if he had a pension?

14:01:41  2        A.  Yes.

14:01:44  3        Q.  From where?

14:01:50  4        A.  It was a teacher retirement system and a

14:01:52  5    civil service.

14:01:54  6        Q.  From Texas?

14:01:55  7        A.  Yes.

14:01:58  8        Q.  El- -- where did you say?

14:01:59  9        A.  Texas A&M.

14:02:01 10        Q.  That's right, Texas A&M.

14:02:03 11            Did your mother have any source of income

14:02:10 12    in 1992 in the years thereafter other than what she

14:02:13 13    received from DC Comics or Time-Warner?

14:02:16 14        A.  She had a survivor's pension.

14:02:23 15        Q.  From your dad -- for your dad's employment?

14:02:26 16        A.  Yes.

14:02:26 17        Q.  Other than that?

14:02:26 18        A.  No.

14:02:31 19        Q.  And forgive me, I don't remember your

14:02:33 20    answer, but have you seen this document Exhibit 4

14:02:37 21    before today?

14:02:38 22        A.  I don't believe so.

14:02:43 23        Q.  Okay.  Were you aware that Frank Shuster

14:02:46 24    had requested that payments -- were you aware that

14:02:54 25    Time-Warner or DC Comics was making payments also to

                                                        124

EXHIBIT 77
1779

ROUGH DRAFT

14:02:58   1    Frank Shuster after Joe Shuster's death?

14:03:03   2         A.  I don't -- no, I don't think I knew the

14:03:05   3    details.

14:03:05   4         Q.  Did you know that he was receiving money?

14:03:07   5         A.  No.

14:03:12   6         Q.  I'll direct you to the third paragraph of

14:03:16   7    this letter by Frank to Paul Levitz.  He states the

14:03:22   8    suggestion that payments were made in her name,

14:03:25   9    meaning your mother's name -- she would not pursue

14:03:30  10    the termination of the Superman copyright as

14:03:33  11    provided for to creators heirs in the 1976 U.S.

14:03:38  12    copyright act and that she could send me whatever

14:03:43  13    money I wanted as a gift which would not be taxable

14:03:45  14    to me."

14:03:46  15         Were you aware of an arrangement whereby DC

14:03:50  16    Comics or Time-Warner agreed to give money to Jean

14:03:55  17    who in turn would then gift it to Frank.

14:03:58  18         A.  I never heard that from her, those details,

14:04:04  19    no.

14:04:05  20         Q.  Did you know of any of this prior to the

14:04:07  21    time you contacted Mr. Toberoff?

14:04:09  22         A.  I don't think I did.

14:04:14  23         Q.  Prior to the time you contacted

14:04:16  24    Mr. Toberoff, did you know that Frank Shuster had

14:04:21  25    suggested that Jean Peavy would not pursue the

125

EXHIBIT 77
1780

ROUGH DRAFT

14:04:26  1    termination of the Superman copyright under the 1976

14:04:31  2    U.S. copyright act?

14:04:32  3        A.  I didn't know anything about this.

14:04:36  4        Q.  Is this the first time you've learned about

14:04:40  5    that?

14:04:40  6        A.  Yes.

14:04:41  7        Q.  Okay.  Go to the second page of this letter

14:04:51  8    and you'll see in the second paragraph that it

14:04:53  9    refers to the memorial service held in New York on

14:04:56 10    September 24.  It says:

14:05:00 11            "Some of Joe's relatives have

14:05:02 12            said they would like to attend."

14:05:05 13            You indicated you attended, right.

14:05:05 14        A.  Yes.

14:05:08 15        Q.  Who else attended, if you remember?

14:05:12 16        A.  Oh, boy.  There was -- it seems to me that

14:05:19 17    some of Siegel's relatives might have been there

14:05:21 18    because they lived in the northeast part of the

14:05:23 19    country.

14:05:23 20        Q.  The Siegel relatives?

14:05:25 21        A.  A few.  I don't recall -- I didn't know

14:05:27 22    really any of the others.  I don't recall any other

14:05:32 23    Shuster relatives besides Frank.

14:05:34 24        Q.  Your sister attend, Dawn?

14:05:39 25        A.  No.  I don't think so.

                                                              126

EXHIBIT 77
1781

ROUGH DRAFT

14:05:40  1        Q.  Your father?

14:05:40  2        A.  Yes.

14:05:41  3        Q.  And your mother?

14:05:42  4        A.  Yes.

14:05:43  5        Q.  And Frank?

14:05:44  6        A.  Right.

14:05:47  7        Q.  Let's turn to Exhibit 5.

14:05:59  8             (The document referred to was

14:05:59  9        marked for identification by the

14:05:59 10        C.S.R. as Exhibit 5 and attached to

14:06:02 11        this deposition.)

14:06:02 12  BY MR. PETROCELLI:

14:06:03 13        Q.  Exhibit 5 is an agreement apparently signed

14:06:08 14  by Frank Shuster and Jean Peavy on October 2, 1992

14:06:13 15  dated as of August 1, 1992.

14:06:18 16             An agreement between DC Comics and Jean

14:06:22 17  Shuster Peavy and Frank Shuster.

14:06:25 18             Have you ever seen this document before

14:06:27 19  today?

14:06:28 20        A.  Yes.

14:06:29 21        Q.  When did you first see this document?

14:06:30 22        A.  I -- I found it in -- when I started

14:06:36 23  working with Marc Toberoff and we were -- it came up

14:06:42 24  at that time, sometime around -- sometime around

14:06:45 25  that time, as I recall.

                                                          127

EXHIBIT 77
1782

ROUGH DRAFT

14:06:49  1        Q.  Where did you find this document?

14:06:54  2        A.  Where -- that's a good question.  Marc

14:06:59  3    Toberoff might have showed it to me.  I don't -- I

14:07:03  4    don't recall where I first saw it.  I know that I

14:07:05  5    saw it around that time.

14:07:07  6        Q.  Did you send -- after you retained

14:07:11  7    Mr. Toberoff or around the time you retained him,

14:07:13  8    did you collect materials and send them to him?

14:07:17  9        A.  Yes.

14:07:20 10        Q.  Was this Exhibit 5 one of the documents you

14:07:24 11    sent him?

14:07:26 12        A.  It could have been.

14:07:28 13        Q.  Did you discuss Exhibit 5 with your mother?

14:07:31 14        A.  I don't know.  I don't remember.  I

14:07:40 15    don't -- I -- that was when I saw it.  I didn't know

14:07:44 16    it was until at that time, I didn't-I didn't know

14:07:48 17    she had this.

14:07:50 18        Q.  When you saw it is when you first learned

14:07:51 19    that -- that Frank and Jean were getting $25,000 a

14:07:57 20    year and all?

14:07:58 21        A.  Yes.

14:07:58 22        Q.  The other details in this?

14:08:00 23        A.  Yes.

14:08:06 24        Q.  Now at the -- around this time then you had

14:08:08 25    been doing your research on the copyright

                                                        128

**EXHIBIT 77**
**1783**

ROUGH DRAFT

14:08:11  1    termination issue, including having read the 1998

14:08:16  2    amendment to the copyright law right?

14:08:18  3        A.  Yes.

14:08:18  4            MR. TOBEROFF:  Objection.  Misstates his

14:08:20  5    testimony.

14:08:20  6    BY MR. PETROCELLI:

14:08:23  7        Q.  And?

14:08:25  8            MR. TOBEROFF:  Give me time to object

14:08:26  9    please and listen carefully to all aspects of his

14:08:30 10    questions.

14:08:30 11    BY MR. PETROCELLI:

14:08:32 12        Q.  You had -- you reached out to Mr. Toberoff

14:08:41 13    in 2001, you said, and you had reached out to the

14:08:45 14    Albuquerque lawyer around the second half of 1999?

14:08:49 15        A.  Yes.

14:08:49 16        Q.  And in between that time period, were you

14:08:55 17    steadily doing research on this issue of whether

14:08:58 18    there were termination rights under the -- under the

14:09:01 19    copyright laws?  Or had you put it down for a while

14:09:05 20    and then started up again in 2001?

14:09:12 21        A.  Oh, I -- I don't remember exactly how much

14:09:15 22    research I did this between those times.  I'm not

14:09:18 23    sure.  I might have set it aside and started up

14:09:22 24    again.

14:09:23 25        Q.  And at the point when you first went to

129

EXHIBIT 77
1784

ROUGH DRAFT

14:09:27  1    your mom to explain that you had been doing this

14:09:30  2    research, and you had reached out and found a lawyer

14:09:34  3    that you wanted to recommend?

14:09:35  4         A.  Uh-huh.

14:09:37  5         Q.  -- did you discuss this letter with her and

14:09:40  6    whether this letter affected the family's ability to

14:09:45  7    claim any termination rights?

14:09:47  8         A.  I didn't know about it, then.

14:09:49  9         Q.  Well, you learned about it not long

14:09:53 10    thereafter, right, because you found it as among the

14:09:56 11    materials that you were gathering for Mr. Toberoff,

14:09:56 12    right?

14:09:59 13         A.  When I entered into an agreement with

14:10:01 14    Mr. Toberoff around that time.

14:10:05 15         Q.  It's when you found it, right?

14:10:05 16         A.  Yes.

14:10:08 17         Q.  And you don't remember where you found it?

14:10:09 18         A.  It would have been -- it would have been in

14:10:16 19    Jean's files somewhere.

14:10:18 20         Q.  When you say "Jean's files, do you call

14:10:20 21    your mom Jean?

14:10:21 22         A.  Oftentimes.  Sometimes mom and oftentimes

14:10:24 23    Jean.

14:10:24 24         Q.  Okay.  When you -- where are Jean's files,

14:10:41 25    as you put it, -- strike that.

130

**EXHIBIT 77**
**1785**

ROUGH DRAFT

14:10:42  1          Where were -- you were living in 19 -- in

14:10:47  2    2001 when you retained Mr. Toberoff in the same home

14:10:52  3    you're living now?

14:10:53  4          A.  Yes.

14:10:54  5          Q.  Okay.  And does Jean have her own study or

14:10:57  6    place where she keeps her files?

14:10:59  7          A.  Yes.

14:11:00  8          Q.  Separate from yours?

14:11:01  9          A.  Yes.

14:11:04  10         Q.  And when you were doing your research, did

14:11:07  11   you even before you called Mr. Toberoff, did you go

14:11:12  12   through Jean's files to see what documents she had

14:11:15  13   relating to Joe Shuster's copyrights?

14:11:21  14         A.  No.  I didn't.

14:11:32  15         Q.  At the time -- at the time that you first

14:11:45  16   saw Exhibit 5, I assume you read it, correct?

14:11:45  17         A.  Yes.

14:11:55  18         Q.  Okay.  And you saw the reference in the

14:11:57  19   second paragraph to fully settling all claims to any

14:12:10  20   payments or other rights or remedies which you may

14:12:12  21   have under any other agreement or otherwise whether

14:12:16  22   now or hereafter existing regarding any copyrights,

14:12:20  23   trademarks or other property right and any and all

14:12:24  24   works created in whole or in part by your brother

14:12:27  25   Joseph Shuster or any works based there on.

                                                              131

EXHIBIT 77
1786

ROUGH DRAFT

14:12:32  1          You read that language, right?

14:12:32  2      A.  Yes.

14:12:34  3      Q.  And you also read the next sentence which

14:12:36  4  said in any event you now grant to us any such

14:12:39  5  rights and release us.  Our licensees and all others

14:12:45  6  and it goes on and I won't read the rest of the --

14:12:48  7  the legal words there.

14:12:50  8          When you read those words in that second

14:12:54  9  paragraph, did you believe they had any impact on

14:13:00 10  whether your family had any termination rights?

14:13:08 11      A.  If I can answer that, I -- no, I did not

14:13:12 12  think it affected the -- the rights that I was

14:13:16 13  looking at.

14:13:17 14      Q.  And why is that?

14:13:20 15      A.  Because the copyright act allows the

14:13:25 16  estate's rights.

14:13:32 17      Q.  Because the copyright act allows the

14:13:37 18  estate's rights?

14:13:38 19      A.  Grants estates rates.

14:13:40 20      Q.  Okay.

14:13:41 21      A.  Estates, rights.

14:13:42 22      Q.  Okay.

14:13:45 23          MR. TOBEROFF:  Apostrophe you mean.

14:13:45 24  BY MR. PETROCELLI:

14:13:47 25      Q.  Apostrophe you mean?

132

**EXHIBIT 77**
**1787**

ROUGH DRAFT

14:13:48  1          A.  Okay, yes.

14:13:50  2          Q.  Did you consult with anyone other than

14:13:53  3    Mr. Toberoff whether this paragraph had any affect

14:13:57  4    on any termination rights you were inquiring about?

14:14:00  5          A.  No.

14:14:03  6          Q.  Did you go to your mom and say, Jean,

14:14:06  7    what's this about, you know, why did we do this, ask

14:14:13  8    her to explain the circumstances to you?  Did you

14:14:15  9    have any discussion with her about this agreement

14:14:19  10   and in particular, the paragraph that I just read to

14:14:23  11   you?

14:14:25  12         A.  I'm sure I asked her about it.

14:14:28  13         Q.  What did she say?

14:14:31  14             MR. TOBEROFF:  Again, I just -- and I'm --

14:14:35  15   I want you to freely testify based on your memory

14:14:38  16   but when you say "I'm sure I asked her about it,"

14:14:41  17   that makes me wonder whether you recall asking her

14:14:45  18   about it or you're assuming you asked her about it.

14:14:49  19   I don't want you to make assumptions and speculate.

14:14:51  20             THE WITNESS:  Okay.

14:14:51  21             MR. TOBEROFF:  I want you to testify from

14:14:51  22   memory.

14:14:52  23             THE WITNESS:  I don't remember.

14:14:53  24             MR. TOBEROFF:  Even if you have the

14:14:54  25   slightest memory I want you to testify as to that

133

EXHIBIT 77
1788

ROUGH DRAFT

14:14:57 1    memory as Mr. Petrocelli aptly put it.

14:15:01 2         THE WITNESS:  I don't remember what I said.

14:15:02 3    I can't recall the conversation.  I'm just assuming

14:15:05 4    that I asked her about it.

14:15:09 5         MR. TOBEROFF:  I don't want you to assume.

14:15:10 6    I want you to testify from your memory.

14:15:12 7         THE WITNESS:  Okay. Well I don't recall the

14:15:13 8    conversation.

14:15:13 9    BY MR. PETROCELLI:

14:15:20 10        Q.  Now, you said you read that paragraph and

14:15:24 11   having studied the copyright code in which estates

14:15:28 12   had certain rights you believe that this paragraph

14:15:30 13   had no bearing on the estates' rights, correct?

14:15:39 14        A.  Yes.

14:15:40 15        Q.  Is that a conclusion that you reached

14:15:43 16   without much thought or did you think about it?  Did

14:15:46 17   you go back and look at the code?  Did you ask

14:15:51 18   around?  Did you inquire of the Siegels?

14:15:55 19        A.  I am -- employed Marc Toberoff to represent

14:15:58 20   me.

14:16:06 21        Q.  And is that the answer to my question?

14:16:07 22        A.  Yes, yes.

14:16:08 23        Q.  So in order to determine the impact that

14:16:09 24   this had you wanted Mr. Toberoff to assist in that?

14:16:12 25        A.  Yes.

                                                        134

**EXHIBIT 77**
**1789**

ROUGH DRAFT

14:16:13  1        Q.  Okay.  Did you receive any money when you

14:16:20  2    signed the first document or agreement with

14:16:23  3    Mr. Toberoff?

14:16:24  4        A.  No.

14:16:26  5        Q.  Did he pay you or your family any money?

14:16:28  6        A.  No.

14:16:51  7        Q.  As we'll see momentarily, you -- the first

14:16:55  8    agreement you signed was with a company that

14:17:00  9    Mr. Toberoff owned called Pacific Pictures

14:17:04 10    Corporation.  Do you remember the name of that

14:17:05 11    company?

14:17:06 12        A.  Yes.

14:17:09 13        Q.  Did you receive any money or did members of

14:17:11 14    your family receive any money from Pacific Pictures

14:17:14 15    Corporation?

14:17:14 16        A.  No.

14:17:14 17        Q.  Or any other entity with which Mr. Toberoff

14:17:17 18    was affiliated?

14:17:18 19        A.  No.

14:17:26 20        Q.  Now, I'll come back to this letter moment,

14:17:40 21    this agreement, Exhibit 5, but let's go to Exhibit 6

14:17:43 22    now.

14:17:43 23            (The document referred to was

14:17:43 24            marked for identification by the

14:17:43 25            C.S.R. as Exhibit 5 and attached to

135

**EXHIBIT 77**
**1790**

ROUGH DRAFT

14:17:52  1            this deposition.)

14:17:52  2     BY MR. PETROCELLI:

14:17:53  3         Q.  Exhibit 6 is a document, letter between

14:17:55  4     Frank Shuster and Paul Levitz dated October 2, 1992.

14:18:07  5     Which briefly states in consideration of the

14:18:09  6     agreement dated as of August 1, 1992, between DC

14:18:13  7     Comics, myself and Jean Shuster Peavy, I hear by way

14:18:17  8     of any rights or remedies that I may have under the

14:18:19  9     agreement dated December 23, 1975 between Warner

14:18:25 10     communications, Inc., Jerome Siegel and Joseph

14:18:29 11     Shuster.

14:18:30 12            This is the first time you've seen this

14:18:35 13     document?

14:18:35 14         A.  Yes.

14:18:36 15         Q.  Okay.  One second.  Jason --

14:18:51 16            (Pause in proceedings.)

14:18:51 17     BY MR. PETROCELLI:

14:19:08 18         Q.  After Joe Shuster passed away in 1992, did

14:19:11 19     you assist in finding an estate lawyer or anybody to

14:19:17 20     deal with his estate issues?

14:19:22 21         A.  No.

14:19:30 22         Q.  Did you come across a copy of his will in

14:19:33 23     1992?

14:19:34 24         A.  I don't know if we found his copy.  We had

14:19:43 25     a copy and an original.  I don't know if we found

**EXHIBIT 77**
**1791**

ROUGH DRAFT

14:19:48  1    his copy.  It was disorganized.

14:19:52  2         Q.  Did you find an original?

14:19:54  3         A.  Yes.

14:19:56  4         Q.  Is there any reason why the original wasn't

14:19:58  5    made available when the probate was opened in

14:20:01  6    Los Angeles in 2003?

14:20:04  7         A.  Yes.

14:20:06  8         Q.  What's the reason?

14:20:06  9         A.  My mother had lost it back in a file

14:20:10 10    somewhere, mixed up.  We found it later.

14:20:15 11         Q.  When did you start using your lock box?

14:20:22 12         A.  Soon thereafter.

14:20:23 13              MR. PETROCELLI:  Jason does this have an

14:20:25 14    Exhibit Number?

14:20:27 15              MR. TOKORO:  Yes, it's number 26.

14:20:31 16              MR. PETROCELLI:  I already used 26 I

14:20:32 17    thought, no?  I used 24.  Okay.

14:20:37 18                   (The document referred to was

14:20:37 19                   marked for identification by the

14:20:37 20                   C.S.R. as Exhibit 26 and attached

14:20:38 21                   to this deposition.)

14:20:38 22    BY MR. PETROCELLI:

14:20:38 23         Q.  Take a look at Exhibit 26.

14:20:43 24              This is a copy of Mr. Shuster's -- what

14:20:48 25    purports to be Mr. Shuster's last will and

137

**EXHIBIT 77**

**1792**

ROUGH DRAFT

14:20:50  1    testament.  And you've seen a copy of his will

14:20:56  2    before, right?

14:20:56  3        A.  Yes.

14:20:59  4        Q.  And by the way, on the second page it

14:21:01  5    identifies a couple of the -- it identifies two

14:21:05  6    witnesses to the execution of his will.  Do you know

14:21:11  7    who these people are?

14:21:14  8        A.  Not personally, no.

14:21:16  9        Q.  Have you ever spoken to them?

14:21:16  10        A.  No.

14:21:24  11        Q.  One is named Tom last name seems to be FA?

14:21:29  12            MR. TOBEROFF:  FE.

14:21:30  13            MR. PETROCELLI:  FE N/A U G H T Y and the

14:21:37  14    other one appears to be Robert S Williams.

14:21:40  15        Q.  But you don't know either of them.

14:21:41  16            Is that right ?

14:21:42  17        A.  I don't know them.

14:21:43  18        Q.  Either of these two people?

14:21:44  19        A.  I don't know them, no.

14:21:46  20        Q.  Never heard the names before, right?

14:21:50  21        A.  Only when I saw the -- the will.

14:21:52  22        Q.  Did you try contacting them?

14:21:54  23        A.  No.

14:21:55  24        Q.  Okay.  Now attached to this document on the

14:21:58  25    third page of Exhibit 26 is an affidavit of Jean

                                                          138

EXHIBIT 77
1793

ROUGH DRAFT

14:22:03  1    Peavy under California probate code section 13101.

14:22:12  2    It's dated August 17, 1992 and it's signed by Jean

14:22:15  3    Peavy.

14:22:16  4            Do you -- have you ever seen this document

14:22:19  5    before?

14:22:20  6        A.  I might have seen this document.

14:22:31  7        Q.  Do you know --

14:22:31  8        A.  I might have seen this.

14:22:33  9        Q.  What do you remember about it?

14:22:36 10        A.  I know that his estate was so small that he

14:22:38 11    had to go through the small estates -- small estates

14:22:49 12    code or something like that.  That was -- that's all

14:22:52 13    I know.

14:22:52 14        Q.  Do you know who prepared this document?

14:22:56 15        A.  I don't remember.

14:22:59 16        Q.  Did you assist in finding a person to

14:23:01 17    prepare it?

14:23:05 18        A.  Yeah, I might have assisted.

14:23:07 19        Q.  Who did you locate?  An attorney?

14:23:14 20        A.  No.  I don't believe so.  I don't believe

14:23:14 21    so.

14:23:18 22        Q.  Who did you locate?

14:23:19 23        A.  It would have been either a friend,

14:23:34 24    unless -- unless I helped with it.  I'm not sure.

14:23:38 25        Q.  Which friend?

139

**EXHIBIT 77**
**1794**

ROUGH DRAFT

14:23:39  1          A.  I don't -- I don't know.  I don't remember.

14:23:41  2     I -- it's -- it's quite a while back.

14:23:46  3          Q.  A friend in -- in Los Angeles?  Or where

14:23:51  4     you lived?

14:23:52  5          A.  Yeah, it could have been Los Angeles.

14:23:53  6          Q.  What friend did you have in Los Angeles

14:23:55  7     that might have assisted you in 1992?

14:23:57  8          A.  I might have done this.  Just with the

14:23:59  9     small estate -- I might have assisted her with this.

14:24:04 10     I'm not recalling

14:24:04 11          Q.  You might have prepared it?

14:24:05 12          A.  I might have.  Yeah, it's been a long time.

14:24:15 13          Q.  What happens to the shares of stock in

14:24:16 14     time -- in the Time-Warner rights?  Those were given

14:24:19 15     to your mom?

14:24:20 16          A.  Yeah, those were stock rights, I believe.

14:24:23 17     Not copyright rights.  Stock.  It was -- gee, it

14:24:29 18     must have -- I don't know, she must have -- she must

14:24:34 19     have sold the stock for cash, I guess.

14:24:37 20          Q.  To have prepared a document like this, did

14:24:42 21     you research the law books and find a -- a model

14:24:45 22     that you could use?

14:24:50 23          A.  I must have.  I -- it was such a -- this --

14:24:53 24     the estate had a negative net worth or it was very

14:24:57 25     small.  It was very small.  That's what it was.

140

**EXHIBIT 77**
**1795**

ROUGH DRAFT

14:24:59   1          Q.  Under $60,000?

14:25:00   2          A.  Yes.  Yeah it was smaller than that even,

14:25:02   3    so --

14:25:03   4          Q.  Paragraph 5 says it's under $60,000?

14:25:05   5          A.  Right.

14:25:05   6          Q.  Right?

14:25:06   7              Okay let's take a look at Exhibit 7.

14:25:12   8                  (The document referred to was

14:25:12   9                  marked for identification by the

14:25:12  10                  C.S.R. as Exhibit 7 and attached to

14:25:21  11                  this deposition.)

14:25:21  12              THE WITNESS:  7?

14:25:21  13    BY MR. PETROCELLI:

14:25:25  14          Q.  This is a letter from Jean to Paul Levitz

14:25:28  15    of DC dated April 27, 1995 thanking Paul for the

14:25:37  16    book the adventures of Superman by Lawther, L O W T

14:25:42  17    H ER that Paul sent.  Talking about the low us and

14:25:48  18    Clark show and then states being in the middle I do

14:25:53  19    hope you will remember Frank and myself once again.

14:25:56  20    Is it possible to reward us with a gift versus a

14:26:00  21    bonus so that there's no tax liability to us."

14:26:06  22              Did you become -- first of all, have you

14:26:11  23    seen this document Exhibit 7 before today.

14:26:13  24          A.  I don't think I have, no.

14:26:16  25          Q.  Were you aware that from time to time your

141

EXHIBIT 77
1796

ROUGH DRAFT

14:26:18  1    mom had requested bonuses or -- or gifts from DC in

14:26:26  2    addition to what was provided in the 1992 agreement?

14:26:32  3        A.  She might have mentioned something.  I have

14:26:36  4    not seen this.

14:26:41  5        Q.  Let's turn to the next exhibit, Exhibit 8.

14:26:44  6    This is a letter from Jean to Paul Levitz dated

14:26:47  7    September 7, 1999.

14:26:50  8            (The document referred to was

14:26:50  9            marked for identification by the

14:26:50  10           C.S.R. as Exhibit 8 and attached to

14:27:01  11           this deposition.)

14:27:01  12   BY MR. PETROCELLI:

14:27:02  13       Q.  In the first paragraph it says Mike Catron

14:27:04  14   recently sent me a video he made of the 1919 action

14:27:08  15   number 1 comic book panel which I had participated

14:27:11  16   in.

14:27:11  17           Mike Catron is a fellow you know who lives

14:27:15  18   in Pennsylvania.

14:27:15  19           Is that right?

14:27:15  20       A.  Yes.

14:27:16  21       Q.  Okay.  Is is one of Mikes hobbies comic

14:27:23  22   books or is he involved in the comic book business

14:27:25  23   somehow?

14:27:26  24       A.  Yes, he is interested.

14:27:28  25       Q.  As a hobby or professionally?

                                                          142

**EXHIBIT 77**
**1797**

ROUGH DRAFT

14:27:29  1          A.  Yes, possibly.

14:27:31  2          Q.  Had you ever seen this video that he sent

14:27:33  3    your mom?

14:27:37  4          A.  I don't know if I saw that video.  I don't

14:27:40  5    remember.

14:27:40  6          Q.  Have you ever seen this letter before

14:27:42  7    today, Exhibit 8?

14:27:45  8          A.  No, this is -- this is her doing.

14:27:52  9          Q.  And you see in the third paragraph it says

14:27:54  10   had you once told Frank and I that instead of a

14:27:56  11   yearly raise of the pension you would prefer to

14:27:59  12   offer a bonus directly from DC itself.  I'm making

14:28:03  13   that request again for 1999.

14:28:04  14          Did she discuss any of these affairs with

14:28:07  15   you that she was asking for bonuses and how much she

14:28:10  16   would receive and so forth?  Would she discuss these

14:28:18  17   matters with you?

14:28:19  18          A.  From time to time.

14:28:19  19          Q.  How much was she receiving do you know?

14:28:24  20          A.  As far as I know, every now and then she

14:28:27  21   would get a small bonus.

14:28:33  22          Q.  Did she ever ask for your help in any way?

14:28:36  23          A.  No, these letters are hers.  I didn't have

14:28:41  24   any involvement in this.

14:28:44  25          Q.  Did you have the view that let's say around

                                                            143

**EXHIBIT 77**
**1798**

ROUGH DRAFT

14:28:46  1    1998 to 1999, that your family had not been

14:28:52  2    adequately compensated by DC Comics or Time-Warner?

14:28:58  3        A.  Did I have that view?

14:28:58  4        Q.  Yes.

14:28:58  5        A.  Yes.

14:29:01  6        Q.  What informed that view?

14:29:08  7        A.  What informed the view?

14:29:09  8        Q.  Yeah, why did you feel that way?

14:29:13  9        A.  The value of Superman from my own ideas of

14:29:20 10    what I know of it.

14:29:27 11        Q.  When did you first have that view?

14:29:30 12        A.  About how much Superman is worth?

14:29:32 13        Q.  That you did not believe your family was

14:29:34 14    being properly compensated?

14:29:40 15        A.  When did I first have that view?  Well,

14:29:46 16    maybe later on when I -- when I -- I realized how --

14:29:56 17    how broke Joe was when he died and I know that

14:30:02 18    Superman had brought in billions in revenues over

14:30:06 19    the years and they had a -- basically just how --

14:30:14 20    how poor he was in relation to the value of

14:30:18 21    Superman.

14:30:20 22        Q.  But you also knew that Joe never felt the

14:30:22 23    need to terminate or try to terminate his copyright

14:30:26 24    grants, right?

14:30:30 25            MR. TOBEROFF:  Assumes facts.

                                                              144

**EXHIBIT 77**

**1799**

ROUGH DRAFT

14:30:31  1            THE WITNESS:  My knowledge of the history

14:30:36  2    is that they did try to get rights back at times.

14:30:36  3    BY MR. PETROCELLI:

14:30:40  4        Q.  He never tried to get rights back under the

14:30:43  5    termination provisions of the 1976 copyright act,

14:30:43  6    right?

14:30:47  7        A.  Not that I -- no, not on that.

14:30:49  8        Q.  Did you ever inquire why if he felt -- if

14:30:53  9    he was as broke as -- as you say he was, why he

14:30:56  10    didn't seek to terminate any copyright grants that

14:31:00  11    he had given?

14:31:02  12        A.  I didn't ask him about it.

14:31:04  13        Q.  Did you ask your mother?

14:31:05  14        A.  No.

14:31:11  15        Q.  Did you become aware as part of your

14:31:13  16    research that as early as 1994 Joe Shuster had the

14:31:17  17    right to serve a notice of copyright termination

14:31:23  18    under the 1976 act?

14:31:24  19        A.  No.

14:31:26  20        Q.  And that he lived for eight years without

14:31:29  21    having done so?

14:31:32  22        A.  I was not aware.

14:31:35  23        Q.  After you saw how broke he was, and I know

14:31:37  24    you were involved in totaling up the -- the checks

14:31:39  25    and the bills that we saw from your mother's letter,

145

**EXHIBIT 77**
**1800**

ROUGH DRAFT

14:31:44  1    did you discuss with your mother the idea that hey,

14:31:47  2    what happened here?  You know, why is he so broke?

14:31:50  3    Superman has made billions?

14:31:55  4         A.  Yeah, might have -- might have asked her

14:31:58  5    about it.

14:31:58  6         Q.  What did she say?

14:32:02  7         A.  That it's just expressed that it was just

14:32:08  8    an injustice and it was just -- it wasn't right,

14:32:14  9    that type of thing.

14:32:19 10         Q.  How did you know as early as $19.92 when

14:32:23 11    Joe Shuster died that Superman had --, as you put

14:32:26 12    it, generated billions of in revenue?

14:32:28 13         A.  Well, I had seen Superman all my life.  I

14:32:32 14    grew up -- grew up with Superman and the -- the big

14:32:37 15    movie in '79, the big Superman movie or '78, I was

14:32:44 16    aware that was the first big Blockbuster super hero

14:32:48 17    movie that started the whole genre of superior hero

14:32:53 18    movies that is just the range so I'm just aware

14:32:55 19    of -- of how wide spread it is and popular.

14:32:58 20         Q.  You were aware of this in 1992 when Joe

14:33:00 21    died broke, right?

14:33:02 22         A.  Yeah, just in general of how the history of

14:33:06 23    Superman and how big it is.

14:33:13 24         Q.  And come you had this conversation with

14:33:15 25    your mother right after Joe's death, you're telling

                                                              146

**EXHIBIT 77**

**1801**

ROUGH DRAFT

14:33:23  1    us that she agreed with you?

14:33:24  2        A.  Well, she expressed to me that she thought

14:33:31  3    it was an injustice and did I agree with her is that

14:33:34  4    what you're asking?

14:33:35  5        Q.  Yes?

14:33:36  6        A.  Well, yes.

14:33:39  7        Q.  The injustice that she expressed to you was

14:33:41  8    that Joe had so little money when Superman had

14:33:44  9    generated so much?

14:33:45 10        A.  Yes.

14:33:53 11        Q.  So did it come as a surprise to you then

14:33:55 12    that she entered into an agreement after that

14:33:59 13    conversation with DC and Time-Warner in which she

14:34:06 14    gave up any copyright interest that the family might

14:34:10 15    have?

14:34:10 16        A.  I don't know what her thinking was.

14:34:13 17            MR. TOBEROFF:  Sorry.  Assumes facts.

14:34:16 18    Lacks foundation.

14:34:16 19    BY MR. PETROCELLI:

14:34:18 20        Q.  She didn't consult with you, right?

14:34:18 21        A.  No.

14:34:20 22        Q.  She was certainly of sound mind in 1992,

14:34:20 23    right?

14:34:20 24        A.  Yes.

14:34:24 25        Q.  When she was expressing to you the

                                                              147

**EXHIBIT 77**
**1802**

ROUGH DRAFT

14:34:26  1    injustice after Joe's death, you didn't think she --

14:34:30  2    she was mentally infirm, you thought that she was

14:34:34  3    healthy and sound and knew exactly what she was

14:34:35  4    saying, right?

14:34:36  5         A.  Yes.

14:34:36  6         Q.  And in -- and she didn't consult with you

14:34:41  7    when she signed that agreement, Exhibit 5, as of

14:34:46  8    August 31, 1992, correct?

14:34:48  9         A.  That's correct.

14:34:50  10        Q.  And when you saw it, were you surprised

14:34:52  11   that she had signed that agreement given her

14:34:54  12   statements to you that it was an injustice?

14:34:57  13        A.  Well, yes.

14:34:59  14        Q.  Do you think that she felt like the

14:35:00  15   injustice had been rectified by virtue of her having

14:35:05  16   obtains that agreement from DC?

14:35:07  17            MR. TOBEROFF:  Calls for speculation.

14:35:09  18            THE WITNESS:  I can answer.

14:35:09  19   BY MR. PETROCELLI:

14:35:17  20        Q.  Did you discuss that with her when you saw

14:35:18  21   the letter?

14:35:20  22        A.  Yeah what was the original question?

14:35:21  23        Q.  When you saw the letter, the agreement,

14:35:23  24   Exhibit 5, and I misspoke, I said August 31, it's

14:35:28  25   August 1, 1992, when you found it and you saw it,

148

EXHIBIT 77
1803

ROUGH DRAFT

14:35:36  1    did you have a discussion with her to the effect

14:35:38  2    that -- about whether she felt better now that the

14:35:42  3    injustice had been -- had been rectified because DC

14:35:47  4    has -- had entered into this agreement?

14:35:50  5         A.  No, she didn't feel it had been rectified.

14:35:52  6         Q.  How do you know?

14:35:54  7         A.  This is what I recall her telling me 17,000

14:35:57  8    year after tax as a pension didn't feel it was

14:36:01  9    rectified.

14:36:02 10         Q.  Did she -- but you didn't know about this

14:36:04 11    agreement when she told you that, right?

14:36:06 12         A.  No. , no.

14:36:06 13         Q.  And when you saw the agreement, did you

14:36:09 14    have a discussion with her about why did you sign

14:36:11 15    it?

14:36:11 16         A.  Well, well, yeah, I -- I -- I -- I can't

14:36:17 17    recall what exactly I said but I -- I -- I'm sure I

14:36:20 18    talked with her.

14:36:22 19         Q.  Do you know why -- did you ask her well

14:36:26 20    since we -- since you knew about it the time you

14:36:29 21    signed this agreement how valuable Superman was, we

14:36:32 22    had talked about how it was an injustice that Joe

14:36:35 23    died broke when it made so much money, what was your

14:36:38 24    thinking in signing this agreement, Exhibit 5?  Did

14:36:42 25    you have that kind of conversation with her?

                                                              149

EXHIBIT 77
1804

ROUGH DRAFT

14:36:43  1        A.  Oh, if I asked her that?

14:36:45  2        Q.  Did you have that kind of discussion with

14:36:46  3    her?

14:36:46  4        A.  I -- I -- her thinking was that.

14:36:50  5            MR. TOBEROFF:  Answer the question.

14:36:50  6    BY MR. PETROCELLI:

14:36:51  7        Q.  Did you have that kind of a discussion with

14:36:53  8    her?

14:36:53  9        A.  Oh,.  Okay.  Did --

14:36:56  10       Q.  Are you tracking what I'm asking you?

14:36:57  11       A.  Yes.  Yes.  I -- I asked her.

14:37:03  12       Q.  And what did she say?

14:37:06  13       A.  That she didn't feel that it had rectified

14:37:10  14   anything.

14:37:11  15       Q.  Did you ask well then why did you sign it?

14:37:15  16   Why didn't ask you for more?

14:37:16  17       A.  I don't -- I don't recall the details.

14:37:19  18       Q.  Did she say I asked for millions and they

14:37:21  19   said no?

14:37:23  20       A.  I -- I think she didn't believe she had any

14:37:26  21   rights at that time.

14:37:30  22       Q.  Why did she agree to give up termination

14:37:33  23   rights if she didn't have any?

14:37:35  24       A.  I don't know.

14:37:36  25           MR. TOBEROFF:  Assumes facts.  Lacks

EXHIBIT 77
1805

ROUGH DRAFT

14:37:39  1    foundation.  You got to -- we're speeding up here so

14:37:41  2    you got to keep the same -- he can speed it up.  You

14:37:44  3    stay the same pace.  Give me time to object.

14:37:47  4             THE WITNESS:  Okay.

14:37:47  5    BY MR. PETROCELLI:

14:37:52  6        Q.  Did she have a discussion with you where

14:37:55  7    she said I agree to give up termination rights even

14:38:03  8    though I didn't have any?

14:38:08  9        A.  I don't -- I don't think she understood

14:38:14 10    exactly what she signed.  I don't think she

14:38:17 11    understood the details.  That's my impression.

14:38:22 12        Q.  She didn't tell you that she didn't

14:38:26 13    understand it, right?

14:38:27 14        A.  That was my impression that she didn't.

14:38:29 15        Q.  But she didn't tell you that, right?

14:38:31 16        A.  That -- specifically that I don't

14:38:32 17    understand the details?

14:38:33 18        Q.  Right.  She did not say to you, I did not

14:38:36 19    understand what I was signing back in 1992",

14:38:36 20    correct?

14:38:40 21        A.  She didn't say that specifically.

14:38:46 22        Q.  And, in fact, she never once brought this

14:38:48 23    agreement to your attention until you first found it

14:38:50 24    and asked her about it, right?

14:38:51 25        A.  Yes.

                                                              151

**EXHIBIT 77**
**1806**

ROUGH DRAFT

14:38:52  1          Q.  Were you upset when you saw that she had

14:38:58  2     signed this agreement?

14:38:58  3          A.  Yes.

14:39:01  4          Q.  Why?

14:39:04  5          A.  I -- I didn't know if it affected our

14:39:07  6     rights or not.

14:39:09  7          Q.  Why?  Why didn't you know?

14:39:13  8          A.  I didn't know because I'm not a legal

14:39:15  9     expert.

14:39:18 10          Q.  But you were concerned about it, right?

14:39:21 11          A.  I had concerns.

14:39:24 12          Q.  Did you ask her why she didn't consult with

14:39:29 13     a lawyer in 1992?  Or whether she had?

14:39:34 14          A.  I don't know if I asked her about that.

14:39:36 15          Q.  Do you know if she had?

14:39:39 16          A.  I don't know.

14:39:43 17          Q.  Were you upset that she hadn't consulted

14:39:47 18     with you in 1992 before signing this document?

14:39:51 19          A.  Was I upset?  Well, I couldn't do anything

14:39:53 20     about it.  So I -- I decided to -- to pursue legal

14:40:00 21     advice instead of getting upset.

14:40:04 22          Q.  Do you have Exhibit 8 in front of you?  Do

14:40:14 23     you have it in front of you?

14:40:15 24          A.  Yes.

14:40:16 25          Q.  The last paragraph says -- this is your

                                                                    152

**EXHIBIT 77**
**1807**

ROUGH DRAFT

14:40:18  1    mother's letter again, September 7, 1999:

14:40:22  2                    "I have learned from the

14:40:23  3                    Internet that Joanne Siegel has

14:40:25  4                    filed a copyright claim for

14:40:27  5                    Superman.  I want you to know that

14:40:29  6                    I intent to continue to honor our

14:40:31  7                    pension agreement.  I would however

14:40:35  8                    appreciate a generous bonus for

14:40:37  9                    this year as you have done many

14:40:39 10                    times in the past."

14:40:45 11         Q.  And this is the first time you've seen this

14:40:48 12    letter?

14:40:48 13         A.  Yes.

14:40:50 14         Q.  Okay.  And your mother did not tell you

14:40:52 15    that she was expressing her gratitude to DC as late

14:40:55 16    as 1999, even after knowing that the Siegel family

14:40:58 17    had terminated their interest -- had sought to

14:41:02 18    terminate their copyright?

14:41:03 19         A.  No, I did not know about this.

14:41:04 20         Q.  And did you not know that your mother with

14:41:07 21    knowledge that the Siegel family had filed for

14:41:11 22    copyright termination, told DC that she intended to

14:41:17 23    honor their agreement?

14:41:18 24         A.  I didn't know this letter.

14:41:26 25         Q.  Are you aware of any letter that Jean wrote

153

**EXHIBIT 77**
**1808**

ROUGH DRAFT

14:41:28  1    to DC after she signed the 1992 agreement saying

14:41:31  2    that DC was mistreating her or that there was a

14:41:35  3    grave injustice being perpetrated on her, or her

14:41:38  4    family?

14:41:41  5         A.  I'm not aware of any of her letters really.

14:41:44  6         Q.  Have you ever seen such a letter to that

14:41:46  7    effect?

14:41:46  8         A.  No.

14:42:00  9         Q.  After you have the conversation with Jean

14:42:04 10    following Joe's death about the injustice, did you

14:42:09 11    continue to have conversations with her over the

14:42:12 12    years from let's say 1992 to 2001 about this

14:42:18 13    injustice?

14:42:20 14         A.  I believe it came up from time to time.

14:42:28 15         Q.  And when it came up she was not telling you

14:42:31 16    that she was thanking and expressing her gratitude

14:42:36 17    to DC and affirmatively telling them she had no

14:42:40 18    intent to exercise any copyright termination rights?

14:42:43 19         A.  No, she wasn't telling me that.

14:43:02 20         Q.  Have you -- did you make this letter

14:43:04 21    available to Mr. Toberoff when you signed the first

14:43:08 22    document with him?

14:43:11 23         A.  Exhibit 8?

14:43:11 24         Q.  Yes.

14:43:18 25         A.  I don't remember.

154

**EXHIBIT 77**
**1809**

ROUGH DRAFT

14:43:19  1      Q.  You had never seen it before now, right?

14:43:21  2      A.  No, I don't -- I don't remember Siegel it

14:43:25  3  before now, so -- no, I don't.

14:43:31  4      Q.  Do you think it -- it matters that your --

14:43:35  5  your mom specifically told DC in September of 1999

14:43:40  6  that she had no intent to terminate any interest in

14:43:42  7  Superman?

14:43:46  8          MR. TOBEROFF:  Ambiguous.  You can only

14:43:48  9  answer to the extent your answer to that question

14:43:50  10  isn't based on conversations with your attorney and

14:43:53  11  legal advice from your attorney.

14:43:58  12          THE WITNESS:  Yeah, well, issues of -- of

14:44:03  13  rights are all based on my attorney discussions.

14:44:08  14          (Instruction not to answer.)

14:44:08  15  BY MR. PETROCELLI:

14:44:09  16      Q.  What about your conversations with your

14:44:11  17  mom?  When you -- have you had any conversations

14:44:18  18  with her in recent years when you -- in which you

14:44:27  19  asked her why were you -- why did you tell DC you

14:44:31  20  wouldn't exercise any rights even after you knew

14:44:33  21  that the law had changed and that the Siegel family

14:44:38  22  was doing so?  Did you ever have that kind of

14:44:40  23  conversation with her?

14:44:40  24      A.  I never berated her.

14:44:42  25      Q.  I didn't say berate her.  Did you inquire

155

EXHIBIT 77
1810

ROUGH DRAFT

14:44:45  1    of her?

14:44:46  2         A.  Inquire.

14:44:46  3         Q.  Why she would tell DC that she had no

14:44:49  4    intent to exercise any copyright claims, no intent

14:44:52  5    to terminate?

14:44:55  6         A.  Did I --

14:44:56  7         Q.  Even after the Siegel family terminated

14:45:01  8    following the 1998 change in the law?

14:45:07  9              MR. TOBEROFF:  Assumes facts.  Lacks

14:45:13 10    foundation.

14:45:13 11         A.  I never really asked her that specifically.

14:45:13 12    BY MR. PETROCELLI:

14:45:22 13         Q.  When you -- did you remember when you

14:45:27 14    finally sat down and told her that you had been

14:45:29 15    doing all of this research and all of this work and

14:45:32 16    wanted to go out and hire a lawyer and -- and

14:45:37 17    terminate grants in Superman that Joe Shuster had

14:45:44 18    made years before?  Do you remember that

14:45:46 19    conversation?

14:45:49 20              MR. TOBEROFF:  Assumes facts.  Lacks

14:45:52 21    foundation.

14:45:52 22              THE WITNESS:  Not -- not the specific

14:45:57 23    conversation, no.  Not a specific conversation.

14:45:57 24    BY MR. PETROCELLI:

14:46:02 25         Q.  Well, you said you hasn't -- you didn't

156

**EXHIBIT 77**

**1811**

ROUGH DRAFT

14:46:04  1    tell her initially because you wanted to be

14:46:07  2    thorough, remember?

14:46:07  3        A.  Right.

14:46:08  4        Q.  And you were doing this research, you

14:46:09  5    identified Mr. Toberoff and then at some point you

14:46:12  6    told her?

14:46:12  7        A.  Yes.

14:46:14  8        Q.  That you had been -- did you tell her look,

14:46:16  9    Jean, or mom, I've been?

14:46:17 10        A.  Yeah.

14:46:18 11        Q.  Doing all this work and I want to go ahead

14:46:21 12    and do this?

14:46:23 13        A.  At some point I would have said something

14:46:25 14    to that effect.

14:46:30 15        Q.  And do you remember what she said to you?

14:46:32 16        A.  She didn't -- it was not really.  It was

14:46:42 17    something that was my initiative so no she didn't

14:46:45 18    say anything particular.

14:46:53 19        Q.  Exhibit 9, take a look at Exhibit 9.

14:47:03 20            (The document referred to was

14:47:03 21            marked for identification by the

14:47:03 22            C.S.R. as Exhibit 9 and attached to

14:47:16 23            this deposition.)

14:47:16 24            MR. PETROCELLI:  This is the notice of

14:47:19 25    termination sent by the Siegels in 1997.

                                                              157

**EXHIBIT 77**
**1812**

ROUGH DRAFT

14:47:31  1        Q.  Have you ever seen this before?

14:47:32  2        A.  No.

14:47:34  3        Q.  Did you come across this in any of your

14:47:36  4    research?

14:47:39  5        A.  No.  I did not look at this.

14:47:40  6        Q.  Your mom wrote that she saw that the Siegel

14:47:42  7    family had -- had effectuated a termination by

14:47:48  8    looking on the Internet.

14:47:50  9            She would use the Internet as of 1999?

14:47:55 10        A.  That was probably a result of my research

14:47:59 11    on the Internet.

14:48:01 12        Q.  Did she use the computer?

14:48:02 13        A.  No.

14:48:04 14        Q.  So you found it on the Internet?

14:48:06 15        A.  Yes.

14:48:07 16        Q.  How did you find it?

14:48:10 17        A.

14:48:10 18            MR. TOBEROFF:  Let's be clear.  Are you

14:48:11 19    asking whether he found this document on the

14:48:13 20    Internet?

14:48:13 21            MR. PETROCELLI:  No.  I'm asking about the

14:48:15 22    facts of termination.

14:48:17 23            THE WITNESS:  Oh.  Just general searches.

14:48:24 24    Lots of different sites.

14:48:24 25    BY MR. PETROCELLI:

158

**EXHIBIT 77**
**1813**

ROUGH DRAFT

14:48:27  1        Q.  Is that how you first learned it or was it

14:48:29  2    mentioned by the Siegel family and then you went on

14:48:32  3    the Internet to follow up?  Do you remember what the

14:48:34  4    sequence?

14:48:35  5        A.  I first found out about it in my own

14:48:37  6    research.

14:48:37  7        Q.  Did you come across this document, Exhibit

14:48:39  8    9?

14:48:43  9        A.  No.

14:48:43 10        Q.  Have you ever seen it before today?

14:48:44 11        A.  No.

14:48:51 12        Q.  When you learned that the Siegels had

14:48:53 13    terminated in 1999 as a result of your research, did

14:48:55 14    you understand that they had terminated a copyright

14:48:59 15    grants with respect to both Superman and Superboy?

14:49:03 16        A.  Yes.

14:49:04 17        Q.  That was in the research that you found?

14:49:11 18        A.  I don't know if I had that level of

14:49:13 19    understanding until I consulted with Marc Toberoff.

14:49:15 20        Q.  Prior to consulting with Marc Toberoff, did

14:49:19 21    you have a view based on the research that you had

14:49:23 22    done or anything else about whether the Shuster

14:49:26 23    family had any rights to Superboy as opposed

14:49:29 24    Superman?

14:49:36 25        A.  I didn't consider Superboy.  I mainly

159

EXHIBIT 77
1814

ROUGH DRAFT

14:49:38  1    focused on Superman.

14:49:40  2        Q.  Well, you were aware of Superboy, right?

14:49:40  3        A.  Yes.

14:49:43  4        Q.  Did you have a -- did you make a decision

14:49:48  5    not to -- to exclude Superboy from your

14:49:50  6    consideration?

14:49:53  7        A.  That was only after consulting with my

14:49:56  8    attorney.

14:49:56  9        Q.  Your attorney is Richard Toberoff.

14:49:57 10            Is that right?

14:49:58 11            MR. TOBEROFF:  Don't talk about the

14:49:59 12    substance of your consultation with your attorney

14:50:01 13    either directly or by implication.

14:50:01 14    BY MR. PETROCELLI:

14:50:07 15        Q.  Your attorney is Mr. Toberoff for the

14:50:07 16    record.

14:50:07 17            Is that right?

14:50:07 18        A.  Yes.

14:50:07 19        Q.  Again I'm referring to before --

14:50:10 20        A.  Oh,.

14:50:10 21        Q.  -- you ever spoke to Mr. Toberoff.  Are you

14:50:12 22    with me?

14:50:13 23        A.  Yes.

14:50:14 24        Q.  Okay.  When you were doing your research

14:50:16 25    about termination of copyright grants and reading

                                                                160

EXHIBIT 77
1815

ROUGH DRAFT

14:50:20  1    the Code, the 1998 change of law, and so forth, you

14:50:31  2    were not making a calculated effort to exclude

14:50:34  3    Superboy from your consideration, right?

14:50:39  4        A.  Specifically.

14:50:39  5        Q.  Not specifically.  And you had no view at

14:50:43  6    the time whether Joe Shuster did or did not have any

14:50:45  7    claim to Superboy, right?

14:50:47  8        A.  Right.

14:50:50  9        Q.  And that's a view that you've only come to

14:50:52 10    hold after you contacted Mr. Toberoff, correct?

14:50:55 11        A.  Yes.

14:50:55 12        Q.  Okay.

14:51:01 13        Q.  Now prior to contacting Mr. Toberoff did

14:51:06 14    you do any research regarding Joe Shuster's role

14:51:14 15    with respect to Superboy?

14:51:16 16        A.  I -- I had a cursory knowledge of his role.

14:51:23 17        Q.  Where did you get it from?

14:51:25 18        A.  Just my understanding of the history.

14:51:29 19        Q.  Where did you get it from?

14:51:32 20        A.  It would have been various sources.  Just

14:51:34 21    reading articles about their ideas for Superboy and

14:51:41 22    just the history of articles of different kinds.

14:51:47 23        Q.  Did you do any searches of the copyright

14:51:50 24    records?  Registrations, copyright registrations, to

14:51:56 25    see what kind of copyrights Joe Shuster had filed

                                                        161

**EXHIBIT 77**
**1816**

ROUGH DRAFT

14:52:03  1    over the years?

14:52:05  2         A.  No, not that.

14:52:11  3         Q.  Okay.  Did you -- did you review any of the

14:52:17  4    old comic books related to Superboy to see the buy

14:52:21  5    lines?

14:52:24  6         A.  I had seen reproductions.

14:52:27  7         Q.  And did you see Joe Shuster's name

14:52:28  8    attributed to Superboy together with Jerry Siegel's?

14:52:31  9         A.  Yes.

14:52:34 10         Q.  And did you ask your mother about what she

14:52:39 11    knew regarding Joe's contributions to the creation

14:52:43 12    of Superboy?

14:52:44 13         A.  Yes.

14:52:45 14         Q.  What did she tell you?

14:52:48 15         A.  Just that they -- it was one of the

14:52:52 16    derivative characters.

14:52:54 17         Q.  Derivative of what?

14:52:55 18         A.  Of Superman.

14:53:03 19         Q.  So when you were researching copyright

14:53:08 20    termination issues in 1998 and 1999 after the change

14:53:13 21    in law and after you heard about what the Siegel

14:53:15 22    family was doing, you were looking at it broadly,

14:53:23 23    right, Superman, Superboy, whatever Joe had an

14:53:25 24    interest in, you wanted to know, correct?

14:53:27 25         A.  Yes.

                                                         162

EXHIBIT 77
1817

ROUGH DRAFT

14:53:29  1          Q.  By the way, why didn't you contact the

14:53:32  2     Siegels' lawyer?

14:53:37  3          A.  We didn't discuss their filing at the time.

14:53:40  4     They didn't say anything about that to us.

14:53:42  5          Q.  But once you found out they had filed it,

14:53:45  6     as you did and as your mom wrote to DC, why didn't

14:53:51  7     you instead of doing all this research to find an

14:53:54  8     attorney, why didn't you just pick up the phone and

14:53:56  9     call Joanne, a woman that you said was like a

14:53:59 10     grandmother to you, and say hey, who is your

14:54:05 11     attorney?

14:54:06 12               MR. TOBEROFF:  Misstates his testimony.

14:54:11 13               THE WITNESS:  It -- I -- I came to

14:54:15 14     understand they weren't entirely happy with their

14:54:17 15     attorney.

14:54:17 16     BY MR. PETROCELLI:

14:54:20 17          Q.  When did you understand that?

14:54:22 18          A.  I don't know.  I just heard that they

14:54:24 19     weren't.

14:54:24 20          Q.  Who told you that?

14:54:26 21          A.  I don't remember.

14:54:27 22          Q.  Can't identify anybody who told you such a

14:54:30 23     thing?

14:54:30 24          A.  No.

14:54:33 25          Q.  Did you call and ask them and say, hey, I'm

                                                                    163

EXHIBIT 77
1818

ROUGH DRAFT

14:54:37  1    looking for an attorney regarding the Joe Shuster

14:54:42  2    rights situation and how about your attorney?  Or I

14:54:49  3    heard that your attorney, you may not be happy with

14:54:52  4    your attorney.  Did you have those kinds of

14:54:55  5    discussions with him before contacting Mr. Toberoff?

14:55:00  6        A.  I did not discuss it with him, no.

14:55:05  7        Q.  Is it fair to say that you wanted your own

14:55:07  8    attorney, not the same attorney that the Siegel

14:55:10  9    family had?

14:55:13 10        A.  That's not quite right.

14:55:15 11        Q.  Is that part of it?

14:55:18 12        A.  No.  It's not.

14:55:19 13        Q.  You didn't have any concern whatsoever

14:55:21 14    about sharing the same lawyer that the Siegel family

14:55:24 15    had?

14:55:26 16        A.  That -- that was not the issue.

14:55:28 17        Q.  I didn't ask you if that was the issue.

14:55:31 18            MR. TOBEROFF:  Asked and answered twice.

14:55:31 19    BY MR. PETROCELLI:

14:55:32 20        Q.  I asked you whether you had any concern at

14:55:34 21    all about sharing the same attorney that they had

14:55:37 22    when you were looking for an attorney.

14:55:42 23        A.  I didn't think about that at the time.

14:55:45 24        Q.  Are you saying the thought never occurred

14:55:46 25    to you to calling the Siegels and ask them who their

                                                              164

EXHIBIT 77
1819

ROUGH DRAFT

14:55:52 1   attorney was and at least have a conversation with

14:55:54 2   that person?

14:55:55 3        A.  Not after I found out they were unhappy

14:55:58 4   with their attorney.

14:55:58 5        Q.  What about before you found out they were

14:56:00 6   unhappy?

14:56:01 7        A.  Well, I don't know about that.  It's around

14:56:04 8   the time that I was looking into the rights issue

14:56:09 9   that I came to be aware that they were unhappy with

14:56:12 10  their attorney.

14:56:13 11       Q.  What year was that?

14:56:15 12       A.  I don't recall.

14:56:18 13       Q.  And yet you can't tell us how or who or

14:56:23 14  what you heard or anything about this notion that

14:56:26 15  they were unhappy with their attorney?

14:56:30 16       A.  Not really.  This conversations my mother

14:56:38 17  would have with Joanne could have been trauma it

14:56:44 18  could have been from something I -- I read.

14:56:46 19       Q.  Did you call them up and ask them if they

14:56:48 20  were unhappy with their attorney?

14:56:53 21       A.  No.

14:56:54 22            MR. TOBEROFF:  Asked and answered.

14:56:54 23  BY MR. PETROCELLI:

14:57:00 24       Q.  Do you know why they were unhappy with

14:57:03 25  their attorney?

165

**EXHIBIT 77**
**1820**

ROUGH DRAFT

14:57:03  1        A.  Not exactly.

14:57:08  2        Q.  What do you mean exactly"?  Do you know

14:57:09  3    anything about why they were unhappy with their

14:57:10  4    attorney that you learned prior to calling

14:57:18  5    Mr. Toberoff?  Not after?

14:57:20  6        A.  Oh, no, not -- not prior.  I don't know

14:57:23  7    exactly.

14:57:23  8        Q.  Okay.  Did you have any inkling that they

14:57:27  9    were unhappy with their attorney prior to your

14:57:30 10    calling Mr. Toberoff?

14:57:31 11        A.  Yes.

14:57:33 12        Q.  But you dont have any details?

14:57:34 13        A.  No.

14:57:36 14        Q.  And you never spoke to them about it?

14:57:37 15        A.  No.

14:57:44 16        Q.  We'll take a short break.

14:57:46 17            THE VIDEOGRAPHER:  Off the record.  The

14:57:47 18    time is 2:56.  There will mark end of Volume I, Tape

14:57:53 19    Number 2 in the deposition of Mark Warren Peary.  Of

15:04:15 20    of test tested test test test test test test tested

15:08:49 21    test test test test of test test as you sit here

15:17:12 22    today.

15:17:12 23            THE VIDEOGRAPHER:  We're back on the

15:17:20 24    record.  This marks the beginning of Volume I, Tape

15:17:22 25    Number 3 in the deposition of Mark Warren Peary.

                                                              166

**EXHIBIT 77**
**1821**

ROUGH DRAFT

15:17:25  1    The time is 3:16.

15:17:25  2    BY MR. PETROCELLI:

15:17:30  3        Q.  Do you have any agreement to share in any

15:17:35  4    accounting recovery that the Siegels might obtain in

15:17:39  5    their case against DC or Warner Bros.?

15:17:48  6            MR. TOBEROFF:  I instruct you not to answer

15:17:50  7    that because it delves into the potential substance

15:17:56  8    of the consent agreements.

15:17:58  9            (Instruction not to answer.)

15:17:58 10            THE WITNESS:  I'll have to follow my

15:18:00 11    attorney's advice.

15:18:00 12    BY MR. PETROCELLI:

15:18:08 13        Q.  Putting aside the consent agreement, the

15:18:10 14    2008 consent agreement for the moment, have you

15:18:14 15    signed any agreement by which the Shuster interests

15:18:22 16    would share in any accounting recovery by the Siegel

15:18:28 17    parties?

15:18:31 18            MR. TOBEROFF:  Asked and answered.

15:18:32 19            You can answer.

15:18:34 20            THE WITNESS:  As I stated before, is

15:18:44 21    that --

15:18:45 22            MR. TOBEROFF:  You can answer the question.

15:18:45 23            THE WITNESS:  I can answer that?  Okay.

15:18:47 24            MR. TOBEROFF:  I'm just objecting for the

15:18:48 25    record that it's asked and answered.

167

**EXHIBIT 77**
**1822**

ROUGH DRAFT

15:18:50  1              THE WITNESS:  I understand?

15:18:51  2              MR. TOBEROFF:  But you can answer it again.

15:18:53  3              THE WITNESS:  No.

15:18:53  4      BY MR. PETROCELLI:

15:18:54  5          Q.  As part of the 2008 consent agreement, is

15:18:57  6      there a provision by which the Shusters share in any

15:19:00  7      accounting recoveries that the Siegels might obtain?

15:19:05  8              MR. TOBEROFF:  I instruct you not to answer

15:19:06  9      as to the contents of the consent agreement.

15:19:09  10             (Instruction not to answer.)

15:19:09  11     BY MR. PETROCELLI:

15:19:15  12         Q.  When you -- when you were doing the

15:19:19  13     research on Mr. Toberoff, did you come to learn that

15:19:29  14     in addition to being an experienced entertainment

15:19:32  15     attorney, that he was also a producer of literary

15:19:39  16     properties, including motion pictures and other

15:19:43  17     popular titles?

15:19:45  18         A.  Yes.

15:19:49  19         Q.  And how did you come to learn that?

15:19:54  20         A.  In our discussions.

15:19:57  21         Q.  With Mr. Toberoff?

15:19:58  22         A.  Yes.

15:20:10  23         Q.  Did you also see descriptions of

15:20:17  24     Mr. Toberoff's business activities outside of his

15:20:21  25     law practice on the Internet when you were doing

168

**EXHIBIT 77**
**1823**

ROUGH DRAFT

15:20:23  1    your research?

15:20:27  2         A.  No.

15:20:28  3         Q.  References to him as an entrepreneur and

15:20:32  4    producer?

15:20:33  5         A.  No, I don't recall that.

15:20:34  6         Q.  You didn't check his Web site?

15:20:40  7         A.  Not initially, no.

15:20:41  8         Q.  At some point did you?

15:20:42  9         A.  I don't recall.  I don't remember checking

15:20:47  10   his Web site.

15:20:50  11        Q.  Did you speak to anybody about Mr. Toberoff

15:20:54  12   before signing the document after having called him

15:20:57  13   and spoken to him, did you call around for

15:21:00  14   references?

15:21:01  15            MR. TOBEROFF:  Asked and answered.

15:21:02  16            You can answer.

15:21:03  17            THE WITNESS:  I -- I don't remember doing

15:21:14  18   that.

15:21:14  19   BY MR. PETROCELLI:

15:21:20  20        Q.  Did you speak to anybody else at his office

15:21:22  21   or at any of his companies?

15:21:24  22            MR. TOBEROFF:  At any time?

15:21:25  23            MR. PETROCELLI:  Prior to signing.

15:21:28  24            THE WITNESS:  Not about any issues.

15:21:28  25   BY MR. PETROCELLI:

169

**EXHIBIT 77**
**1824**

ROUGH DRAFT

15:21:32  1        Q.  About what?

15:21:35  2        A.  Did I speak to anyone who -- maybe they

15:21:37  3   answered the phone.  So, no.

15:21:46  4        Q.  If you -- if you said you didn't do any

15:21:48  5   research -- did you do any research at all on any of

15:21:52  6   his companies like Pacific Pictures Corporation?

15:21:54  7        A.  No.

15:21:59  8        Q.  But yet you signed a contract with Pacific

15:22:03  9   Pictures Corporation?

15:22:03 10        A.  That was a -- a legal.

15:22:07 11            MR. TOBEROFF:  Just answer the question.

15:22:09 12            THE WITNESS:  Okay.  Yes.

15:22:09 13   BY MR. PETROCELLI:

15:22:11 14        Q.  Did you do any research on what was Pacific

15:22:16 15   Pictures corporation before you signed a contract

15:22:17 16   with it?

15:22:17 17        A.  No.

15:22:22 18        Q.  Did you think Pacific Pictures Corporation

15:22:23 19   was the name of a law firm?

15:22:28 20        A.  I didn't -- I didn't think about it.

15:22:31 21        Q.  In fact, the documents that you signed

15:22:33 22   specifically state that Pacific Pictures is not a

15:22:36 23   law firm, right?

15:22:42 24        A.  I -- I -- yes, I guess that's correct.

15:22:44 25        Q.  So why did you enter into a contract with a

EXHIBIT 77
1825

ROUGH DRAFT

15:22:47  1   company that was not a law firm?

15:22:52  2        A.   That's how we retained our attorney.

15:22:55  3        Q.   Why -- why did you retain your attorney by

15:22:58  4   entering into a contract with a company that was in

15:23:01  5   the motion or in the entertainment production

15:23:03  6   business called Pacific Pictures?

15:23:07  7             MR. TOBEROFF:  Assumes facts not in

15:23:09  8   evidence.

15:23:13  9             THE WITNESS:  I don't know why he used that

15:23:14 10   format exactly.

15:23:14 11   BY MR. PETROCELLI:

15:23:16 12        Q.   Well, why were you comfortable with it?

15:23:23 13        A.   It established our legal relationship with

15:23:25 14   one another.

15:23:27 15        Q.   Why didn't you assign a simple

15:23:31 16   attorney-client legal agreement that doesn't involve

15:23:35 17   a motion -- an entertainment company called Pacific

15:23:39 18   Pictures?

15:23:40 19             MR. TOBEROFF:  Assumes facts not in

15:23:41 20   evidence.

15:23:43 21             THE WITNESS:  I don't know.

15:23:43 22   BY MR. PETROCELLI:

15:23:45 23        Q.   Did you get any advice on it from anyone

15:23:49 24   other than Mr. Toberoff?

15:23:51 25             MR. TOBEROFF:  Assumes facts not in

                                                          171

**EXHIBIT 77**
**1826**

ROUGH DRAFT

15:23:51  1   evidence.

15:23:54  2          THE WITNESS:  No.

15:23:54  3   BY MR. PETROCELLI:

15:23:58  4      Q.  Why did you enter into a joint venture with

15:24:03  5   Pacific Pictures?

15:24:08  6      A.  I -- I don't know why he used that

15:24:10  7   particular form.

15:24:12  8      Q.  Why are you saying -- why are you answering

15:24:14  9   my questions by telling me what Mr. Toberoff did?

15:24:17 10   You're a person, you're making decisions.  You

15:24:21 11   understood that this was an important matter, right?

15:24:21 12      A.  Yes.

15:24:24 13      Q.  You -- you had your mother's interest at

15:24:28 14   heart, right?

15:24:32 15          MR. TOBEROFF: .

15:24:32 16   BY MR. PETROCELLI:

15:24:32 17      Q.  She was the sole beneficiary of the

15:24:34 18   termination interest that you were seeking to

15:24:36 19   pursue, correct?

15:24:38 20      A.

15:24:38 21          MR. TOBEROFF:  Assumes facts.  Lacks

15:24:38 22   foundation.

15:24:38 23   BY MR. PETROCELLI:

15:24:42 24      Q.  Am I correct, sir, that your mother, not

15:24:44 25   you, and not your sister, was the sole beneficiary

172

**EXHIBIT 77**
**1827**

ROUGH DRAFT

15:24:47  1    of any termination interest that the estate could --

15:24:51  2    could obtain, correct?

15:24:53  3            MR. TOBEROFF:  Assumes facts lacks

15:24:57  4    foundation.  Calls for a legal conclusion.

15:24:58  5            THE WITNESS:  I guess it's a legal

15:25:02  6    conclusion.  I don't know if I'm going to answer it,

15:25:06  7    if I'm qualified to answer.

15:25:06  8    BY MR. PETROCELLI:

15:25:09  9        Q.  I'm not asking you about legal conclusions.

15:25:11 10    I'm asking you, you signed agreements, you're acting

15:25:15 11    as an executor, you have legal duties to the Court,

15:25:18 12    you have legal duties to the beneficiary and you

15:25:22 13    can't hide behind the privilege on all these

15:25:26 14    questions.  I've been very careful in how I'm asking

15:25:28 15    these questions?

15:25:31 16            MR. TOBEROFF:  Objection.

15:25:31 17    BY MR. PETROCELLI:

15:25:32 18        Q.  So let me try this again?

15:25:34 19            MR. TOBEROFF:  Argumentative.

15:25:36 20            MR. PETROCELLI:  Well, he's parroting your

15:25:38 21    objections.  And I've been tolerant of it but I

15:25:42 22    don't want this to get carried away with that.

15:25:48 23            MR. TOBEROFF:  Argumentative.  Don't focus.

15:25:48 24            MR. PETROCELLI:  Let's try it again.

15:25:52 25            MR. TOBEROFF:  On the argument just focus

                                                        173

**EXHIBIT 77**
**1828**

ROUGH DRAFT

15:25:53  1    on his questions.  Every piece and every part of his

15:25:56  2    question, and answer it to the best of your ability.

15:25:56  3    BY MR. PETROCELLI:

15:26:04  4        Q.  Exactly.

15:26:04  5            You understood that when you were pursuing

15:26:08  6    this termination interest, your research, you're

15:26:10  7    looking out to hire a lawyer, your wanting to see if

15:26:14  8    your family had rights, your concern about the 1992

15:26:18  9    agreement, all of the things that we've been

15:26:21  10   discussing, you were pursuing this for the benefit

15:26:25  11   of your mother who was the sole beneficiary under

15:26:29  12   Joe Shuster's will, correct?

15:26:32  13           MR. TOBEROFF:  Assumes facts.  Lacks

15:26:36  14   foundation.

15:26:36  15           THE WITNESS:  Yes.

15:26:36  16   BY MR. PETROCELLI:

15:26:37  17       Q.  Okay.  You're not a personal beneficiary,

15:26:37  18   right?

15:26:46  19       A.  I am a per.

15:26:48  20       Q.  But your mother could change her will,

15:26:51  21   correct?  You don't have a legal right to this money

15:26:53  22   that the estate may recover, correct?

15:26:55  23           MR. TOBEROFF:  Talking about him

15:26:57  24   personally?

15:26:57  25           MR. PETROCELLI:  Correct.

                                                              174

**EXHIBIT 77**
**1829**

ROUGH DRAFT

15:26:57  1            THE WITNESS:  Yes.

15:26:57  2    BY MR. PETROCELLI:

15:26:58  3        Q.  Your mother could decide to give it all to

15:27:00  4    charity, right?

15:27:00  5        A.  Yes.

15:27:01  6        Q.  Okay.  Now, you understand that you have

15:27:05  7    fiduciary duty to your mother as the person who took

15:27:13  8    up this cause to pursue this termination interest,

15:27:13  9    right?

15:27:17 10            MR. TOBEROFF:  Calls for a legal

15:27:18 11    conclusion.  Could you answer to the sentence you

15:27:21 12    have knowledge.

15:27:21 13    BY MR. PETROCELLI:

15:27:21 14        Q.  I didn't ask you if you had a fiduciary

15:27:24 15    duty, I asked you did you understand that you had a

15:27:26 16    fiduciary duty?

15:27:27 17        A.  Yes.

15:27:28 18        Q.  Okay.  And then you also agree to serve as

15:27:33 19    the executor of your mother's estate in lieu of your

15:27:36 20    mother, right?

15:27:37 21            MR. TOBEROFF:  Assumes facts.  Lacks

15:27:40 22    foundation.  You can answer.

15:27:41 23            THE WITNESS:  Yes.

15:27:41 24    BY MR. PETROCELLI:

15:27:42 25        Q.  In 2003, your mother was competent.  She

                                                              175

**EXHIBIT 77**
**1830**

ROUGH DRAFT

15:27:45  1    had the ability to serve as an executor, correct?

15:27:45  2        A.  Yes.

15:27:54  3        Q.  Yet you were the executor, not her,

15:27:58  4    correct?

15:27:58  5        A.  Yes.

15:27:59  6        Q.  And you filed papers with the Court which

15:28:01  7    we'll -- we'll talk about, but?

15:28:04  8        A.  Yes.

15:28:05  9        Q.  Agreeing to be the executor, right?

15:28:07 10        A.  Yes.

15:28:09 11        Q.  Now, what -- what did you do -- withdrawn.

15:28:20 12            Why did you agree in lieu of entering into

15:28:26 13    a traditional lawyer client agreement to hire the

15:28:30 14    services of a lawyer, whether it's on a contingent

15:28:33 15    fee or an hourly fee, why did you agree to enter

15:28:37 16    into a joint venture with Pacific Pictures, a

15:28:45 17    company that is not a law firm?

15:28:50 18            MR. TOBEROFF:  You can't -- unless you can

15:28:56 19    answer that question independent of your discussions

15:28:58 20    with me, I instruct you not to answer.

15:29:02 21            THE WITNESS:  Okay.  I'll have to follow

15:29:07 22    your advice.

15:29:10 23            (Instruction not to answer.)

15:29:10 24    BY MR. PETROCELLI:

15:29:10 25        Q.  But you understood that Mr. Toberoff not

**EXHIBIT 77**
**1831**

ROUGH DRAFT

15:29:13  1    only acted as a lawyer in some of your dealings with

15:29:16  2    him, but he also acted as the president of a company

15:29:19  3    with whom you entered interest a joint venture,

15:29:21  4    correct?

15:29:21  5         A.  Yes.

15:29:24  6         Q.  And that company was called Pacific

15:29:26  7    Pictures, correct?

15:29:26  8         A.  Yes.

15:29:30  9         Q.  And that company is not a law firm,

15:29:30 10    correct?

15:29:35 11         A.  Not the company.

15:29:36 12         Q.  Right.  And did you do any background on

15:29:41 13    what Pacific Pictures was, what it did in -- in

15:29:46 14    its -- in its business?

15:29:48 15            MR. TOBEROFF:  Asked and answered.

15:29:48 16    BY MR. PETROCELLI:

15:29:49 17         Q.  What assets it owned?

15:29:51 18         A.  My.

15:29:52 19            MR. TOBEROFF:  Asked and answered.  You can

15:29:54 20    answer.

15:29:54 21            THE WITNESS:  It's already -- my purpose in

15:30:00 22    contacting him was to retain legal counsel.

15:30:00 23            MR. PETROCELLI:

15:30:00 24         Q.  I didn't ask you about your purpose in

15:30:09 25    contacting him.  I'm not trying to be difficult but

EXHIBIT 77
1832

ROUGH DRAFT

15:30:09  1   can you repeat my question?

15:30:09  2                  (The reporter read the record

15:30:09  3            as follows:

15:30:21  4                  "^ QUESTION ^ ANSWER ").

15:30:21  5            THE WITNESS:  Not really, no.

15:30:21  6   BY MR. PETROCELLI:

15:30:25  7        Q.  Did you think it was a typical to enter

15:30:28  8   into a joint venture agreement with an entertainment

15:30:35  9   company instead of a standard lawyer-client

15:30:38 10   engagement letter if you're trying to secure the

15:30:42 11   services of a lawyer?

15:30:43 12            MR. TOBEROFF:  Assumes facts.

15:30:43 13   BY MR. PETROCELLI:

15:30:44 14        Q.  Did that strike you as standard or did that

15:30:46 15   strike you as somewhat unusual?

15:30:49 16        A.  I'm not familiar enough to -- for -- to

15:30:54 17   have struck me as being outline or untoward or

15:30:59 18   anything.

15:31:00 19        Q.  Well, have you ever entered into a joint

15:31:02 20   venture with anyone before?

15:31:03 21        A.  No.

15:31:10 22        Q.  This is the first joint venture you ever

15:31:13 23   entered into?

15:31:13 24        A.  Yes.

15:31:15 25        Q.  Did you -- were you concerned that by

                                                              178

**EXHIBIT 77**
**1833**

ROUGH DRAFT

15:31:25  1    entering into a joint venture for the purpose of

15:31:31  2    pursuing Joe Shuster's termination interests, if

15:31:36  3    any, that you were violating the law?

15:31:38  4         A.  No.

15:31:42  5         Q.  Did you receive any advice on that subject?

15:31:44  6         A.  No.

15:31:48  7         Q.  Are you aware that in the lawsuit that DC

15:31:51  8    has filed, it claims that your agreements with

15:31:55  9    Pacific Pictures did in fact violate the law?

15:32:01 10         A.  I may have scanned it.

15:32:07 11         Q.  Why did you just scan it?  You seem very

15:32:11 12    adept at reading code provisions that you find on

15:32:14 13    your own, the copyright code, the amendments in 1998

15:32:24 14    and yet you just scanned a lawsuit against you?

15:32:27 15         A.  Yes.

15:32:28 16         Q.  And against your mother relating to the

15:32:32 17    matters as to which you are executor?  And you

15:32:36 18    didn't read it carefully?  Not once?

15:32:42 19         A.  I -- I scanned it because I -- I find

15:32:47 20    the -- the claims to be unfounded and -- and it

15:32:52 21    ticks me off that they're filing the claim and I am

15:32:55 22    referring all of the detailed analysis to my

15:32:59 23    attorney because it angers me to read -- read these

15:33:04 24    claims.

15:33:05 25         Q.  Well, how could it anger you to read the

                                                              179

**EXHIBIT 77**
**1834**

ROUGH DRAFT

15:33:11  1   how could it anger you unless you first understood

15:33:13  2   what the claims were which you would need to read

15:33:17  3   the complaint rather than just scan it in order to

15:33:19  4   understand?  How would you be angry about it?

15:33:22  5       A.  I understood the gist of the claims and I

15:33:27  6   find -- find them to be reprehensible that they

15:33:34  7   would sue us for trying to give us something that

15:33:37  8   the law grants to us.

15:33:39  9       Q.  Okay.  And you had that view on your own

15:33:41 10   before talking to Mr. Toberoff.

15:33:41 11           Is that right?

15:33:41 12       A.  Yes.

15:33:45 13       Q.  That's based on your scanning but not

15:33:47 14   reading carefully the complaint, right?

15:33:51 15       A.  I got the gist of it.

15:33:52 16       Q.  And -- and you did not read it word for

15:33:55 17   word.

15:33:55 18           Is that correct?

15:34:02 19       A.  I got the gist of it perhaps not word for

15:34:04 20   word.

15:34:07 21       Q.  You did not read it word for word.

15:34:08 22           Is that correct?

15:34:09 23       A.  I'd say so.

15:34:14 24       Q.  Is that the first time that a lawsuit's

15:34:16 25   been filed against you?

180

**EXHIBIT 77**
**1835**

ROUGH DRAFT

15:34:17  1        A.  Yes.

15:34:18  2        Q.  First time to your knowledge, a lawsuit has

15:34:19  3    been filed against your mother?

15:34:23  4        A.  Yes.

15:34:24  5        Q.  And you didn't bother to read the complaint

15:34:26  6    word for word?

15:34:27  7            MR. TOBEROFF:  He's answered that question

15:34:28  8    three times.  You don't have to answer that question

15:34:30  9    again.

15:34:30 10            THE WITNESS:  I already answered.

15:34:30 11    BY MR. PETROCELLI:

15:34:32 12        Q.  What's the answer?

15:34:33 13        A.  What I said before.

15:34:33 14        Q.  Which is what?

15:34:38 15        A.  That I read the gist of it then discussed

15:34:40 16    it with my attorney.

15:34:41 17        Q.  After you read the gist of it, you said you

15:34:46 18    got angry.

15:34:46 19            Is that right?

15:34:46 20        A.  Yes.

15:34:49 21        Q.  And why did you get angry?

15:34:55 22            MR. TOBEROFF:  He already answered that

15:34:57 23    question on his own.

15:35:00 24            But you can answer it again.

15:35:02 25            THE WITNESS:  Because DC is fighting us on

                                                              181

**EXHIBIT 77**
**1836**

ROUGH DRAFT

15:35:09  1    grants and rights that are granted to us by law

15:35:13  2    instead of cooperating.

15:35:13  3    BY MR. PETROCELLI:

15:35:21  4        Q.  How do you know that DC's claims are

15:35:24  5    unfounded?

15:35:27  6        A.  That's my impression from my reading and my

15:35:31  7    discussions.

15:35:32  8        Q.  Well, before talking to -- to Mr. Toberoff

15:35:34  9    based on your reading of the claims, why would you

15:35:39 10    have concluded that they're unfounded?

15:35:43 11        A.  They're trying to deny our termination

15:35:46 12    rights.  Is that pisses me off.

15:35:52 13        Q.  Are you -- but at the time that you -- but

15:35:58 14    you, yourself, didn't know about the 1992 agreement

15:36:01 15    at the time you began to undertake this research and

15:36:05 16    as you've already testified, you, yourself, were

15:36:08 17    concerned when you saw the agreement for the first

15:36:10 18    time.  And it was only after you retained

15:36:16 19    Mr. Toberoff that you formed the view that the

15:36:21 20    agreement posed no threat, correct?

15:36:24 21        A.  I was unsure what the agreement meant.

15:36:28 22        Q.  Now, could you not appreciate that DC

15:36:31 23    Comics, given even your apparent concern on reading

15:36:34 24    the agreement, might have a different view and that

15:36:37 25    that could be a matter on which reasonable minds

182

EXHIBIT 77
1837

ROUGH DRAFT

15:36:40  1    could differ?

15:36:48  2         A.   What I know is that Jean and Frank had no

15:36:51  3    termination rights so it's irrelevant to this case.

15:36:55  4         Q.   How do you know that?

15:36:56  5         A.   I know that from my research and my

15:36:58  6    discussions with my attorney.

15:37:02  7         Q.   Can you appreciate that there -- well, if

15:37:04  8    they didn't have any rights, why did they agree in

15:37:12  9    writing in order to get money in order to get more

15:37:14 10    money for your family that they wouldn't assert any

15:37:19 11    such rights even if they were hereafter created?

15:37:22 12         A.   I don't know.

15:37:23 13              MR. TOBEROFF:  Misstates their letters.

15:37:26 14              MR. PETROCELLI:  Not really.

15:37:28 15              MR. TOBEROFF:  Yes, it does.

15:37:28 16    BY MR. PETROCELLI:

15:37:30 17         Q.   Well can you appreciate that -- that that's

15:37:36 18    an issue that should be resolved by the Courts?

15:37:40 19    That's a serious issue?  When you read the complaint

15:37:45 20    did that occur to you?

15:37:48 21         A.   If it has to be resolved by the courts it

15:37:50 22    will be.

15:37:51 23         Q.   And you've seen letters today that you've

15:37:53 24    never seen before, even though your attorney has a

15:37:59 25    advised you, as you've said, letters that which your

183

EXHIBIT 77
1838

ROUGH DRAFT

15:38:02  1    mother said she had no intention to pursue

15:38:03  2    termination rights, even after knowing about the

15:38:06  3    change of the law, even after knowing about the

15:38:08  4    Siegel family?

15:38:09  5         A.  She wrote letters to everyone frequently I

15:38:14  6    didn't know anything about.  She was always writing

15:38:16  7    and chatting and I was unaware of all this back and

15:38:21  8    forth chitchatting and letters that she was writing

15:38:24  9    off.

15:38:24 10         Q.  So you're belittling your mother?

15:38:26 11         A.  No, I'm not belittling my mother.

15:38:28 12         Q.  In 1999 writing letters?

15:38:30 13         A.  I'm not belittling her.

15:38:31 14         Q.  That -- well, sounds like you're saying

15:38:34 15    that her letters have no real meaning or consequence

15:38:37 16    and that you would have known better.  Is that a

15:38:39 17    what you're suggesting?

15:38:40 18         A.  No, no.

15:38:40 19              MR. TOBEROFF:  It.

15:38:40 20    BY MR. PETROCELLI:

15:38:42 21         Q.  Okay?

15:38:42 22              MR. TOBEROFF:  Just focus on the questions.

15:38:42 23    BY MR. PETROCELLI:

15:38:48 24         Q.  So what you're suggesting by your answer

15:38:50 25    about your mother just chitchatting is that those

                                                      184

EXHIBIT 77
1839

ROUGH DRAFT

15:38:52  1   letters have no real significance.

15:38:52  2            Is that right?

15:38:59  3       A.  I don't know.  She wrote letters to lots of

15:39:03  4   people I didn't know about.

15:39:05  5       Q.  You don't think your mother was capable of

15:39:07  6   expressing how she really felt about things?

15:39:10  7            MR. TOBEROFF:  Vague and ambiguous.

15:39:10  8   BY MR. PETROCELLI:

15:39:14  9       Q.  Is that what you're suggesting?

15:39:15 10       A.  No.  I don't know how to answer that.

15:39:18 11       Q.  In 1999 did your mother understand how to

15:39:21 12   express her feelings about things?

15:39:23 13       A.  Yes.

15:39:24 14       Q.  And in 1992 did she understand that?

15:39:25 15       A.  Yes.

15:39:45 16       Q.  Let me show you -- by the way, after you

15:39:48 17   hired Mr. Toberoff, have you had occasion to do any

15:39:50 18   research on all the entertainment companies with

15:39:54 19   which he is associated?

15:39:59 20            MR. TOBEROFF:  Assumes facts.  Vague and

15:40:00 21   ambiguous.

15:40:00 22   BY MR. PETROCELLI:

15:40:00 23       Q.  Such as intellectual properties worldwide,

15:40:04 24   such as IPW?

15:40:06 25       A.  I'm aware of those.

                                                          185

**EXHIBIT 77**
**1840**

ROUGH DRAFT

15:40:07  1        Q.  And have you researched those companies to

15:40:10  2    see what kind of business Mr. Toberoff conducts and

15:40:17  3    through those companies?

15:40:18  4              MR. TOBEROFF:  Assumes facts.

15:40:21  5              THE WITNESS:  Minimally.

15:40:21  6    BY MR. PETROCELLI:

15:40:28  7        Q.  Did you know about those other companies

15:40:30  8    when you entered into the first agreement with

15:40:33  9    Pacific Pictures?

15:40:38 10              MR. TOBEROFF:  Assumes facts.

15:40:39 11              THE WITNESS:  I don't remember about those

15:40:41 12    other companies specifically.

15:40:41 13    BY MR. PETROCELLI:

15:40:45 14        Q.  Do you believe that when you are having a

15:40:47 15    conversation with Mr. Toberoff in his role as

15:40:51 16    president of Pacific Pictures, that every one of

15:40:53 17    your conversations is a -- is an attorney client

15:40:56 18    privileged conversations?

15:40:58 19              MR. TOBEROFF:  Assumes facts.  Ask --

15:41:01 20    really asks for a legal conclusion.

15:41:02 21              MR. PETROCELLI:  No, I didn't.  I didn't

15:41:04 22    ask him what the law was I asked for his state of

15:41:07 23    mind.

15:41:07 24              MR. TOBEROFF:  His state of mind as to what

15:41:09 25    the law is.

                                                              186

EXHIBIT 77
1841

ROUGH DRAFT

15:41:09  1          MR. PETROCELLI:  Correct.

15:41:11  2          MR. TOBEROFF:  Okay.

15:41:11  3          MR. PETROCELLI:  That's correct.

15:41:11  4          MR. TOBEROFF:  I don't accept that carve

15:41:13  5    out.

15:41:16  6          You can answer the question.

15:41:16  7          THE WITNESS:  Okay.  At the time it was

15:41:20  8    Pacific Pictures.  All my dealings were with Marc

15:41:23  9    Toberoff as my attorney.

15:41:23 10    BY MR. PETROCELLI:

15:41:28 11          Q.  You never once communicated with the

15:41:30 12    president of Pacific Pictures, the company with whom

15:41:32 13    you entered interest a joint venture agreement?

15:41:34 14          A.  No.

15:41:36 15          Q.  Do you even know who the president is?

15:41:37 16          A.  I -- not really.  It never came up.

15:41:43 17          Q.  Did you see it in the document you signed

15:41:45 18    who the president was?

15:41:46 19          A.  No.

15:41:47 20          Q.  You didn't read the document that you

15:41:48 21    signed?

15:41:49 22          A.  Yes.

15:41:51 23          Q.  And the document said that Marc Toberoff

15:41:53 24    was the president of Pacific Pictures right?

15:41:57 25          MR. TOBEROFF:  Only answer to the extent

                                                      187

EXHIBIT 77
1842

ROUGH DRAFT

15:41:59  1    have you a recollection of that.  Otherwise he can

15:42:01  2    show you the document.

15:42:02  3            THE WITNESS:  Okay.  I don't recall.  I'd

15:42:03  4    have to see the document.

15:42:04  5            MR. PETROCELLI:  I'll slow it to you.  Next

15:42:06  6    document is Exhibit 10.

15:42:07  7                (The document referred to was

15:42:07  8                marked for identification by the

15:42:07  9                C.S.R. as Exhibit 10 and attached

15:42:24 10                to this deposition.)

15:42:24 11    BY MR. PETROCELLI:

15:42:25 12        Q.  I notice you're looking right to the end

15:42:28 13    where I wanted to direct you and you see it says

15:42:30 14    Marc Toberoff, president of Pacific Pictures

15:42:32 15    cooperation correct?

15:42:34 16        A.  Yes.

15:42:34 17            MR. TOBEROFF:  He actually was not for the

15:42:36 18    record looking right to the end he was looking in

15:42:38 19    the middle.

15:42:38 20    BY MR. PETROCELLI:

15:42:40 21        Q.  Signature page.  Do you see any signature

15:42:46 22    on this document that says Marc Toberoff, attorney?

15:42:50 23        A.  No.

15:42:55 24        Q.  Okay.  And this is in fact -- and for the

15:43:00 25    record, I will describe it as a document

EXHIBIT 77
1843

ROUGH DRAFT

15:43:02  1   entitled "Joint venture agreement as of November 23,

15:43:08  2   2001 by and between Pacific Pictures Corporation and

15:43:11  3   Jean Peavy and her son Mark Warren Peavy formerly

15:43:17  4   known as -- Mark Warren Peary formerly known as Mark

15:43:22  5   Warren Peavy signed by you correct on November 28,

15:43:27  6   2001?

15:43:27  7        A.  Yes.

15:43:27  8        Q.  And by your mother Jean?

15:43:29  9        A.  Yes.

15:43:30  10       Q.  On the same day?

15:43:33  11       A.  Yes.

15:43:33  12       Q.  And you -- and then you see that

15:43:37  13  Mr. Toberoff signed it as president of Pacific

15:43:40  14  Pictures on November 28, 2001, correct?

15:43:40  15       A.  Yes.

15:43:48  16       Q.  And this was the only agreement that you

15:43:51  17  signed in 2001 with Mr. Toberoff, right?

15:43:51  18       A.  Yes.

15:43:58  19       Q.  And you didn't sign any agreements with him

15:44:00  20  in 2002, correct?

15:44:03  21       A.  Not to my recollection.

15:44:04  22       Q.  And you signed another agreement with him

15:44:06  23  in 2003 also as president of Pacific Pictures,

15:44:06  24  correct?

15:44:06  25       A.  Yes.

                                                        189

**EXHIBIT 77**
**1844**

ROUGH DRAFT

15:44:16  1          Q.  And the first time you signed if he

15:44:17  2     agreement with him where he signed as a lawyer was

15:44:21  3     in 2004, correct?

15:44:21  4          A.  Yes.

15:44:24  5          Q.  That's what you've been calling the legal

15:44:25  6     retainer agreement, right?

15:44:25  7          A.  Yes.

15:44:28  8          Q.  Okay.  Now, you certainly understood this

15:44:37  9     agreement -- withdrawn you did read this agreement

15:44:40 10     word for word before you signed it, correct?

15:44:40 11          A.  Yes.

15:44:43 12          Q.  You didn't just scan it, right?

15:44:43 13          A.  Yes.

15:44:45 14          Q.  You understood that signing this was a

15:44:48 15     matter of extreme importance, correct?

15:44:50 16          MR. TOBEROFF:  Hold on.  I needs you're

15:44:51 17     answering his questions too quickly without me being

15:44:54 18     able to interject an objection okay?  You got to

15:44:57 19     pause after he asks his question so that I can

15:44:59 20     object.  He is saying correct you're saying yes

15:45:02 21     immediately and I can't object in between.

15:45:13 22          Do you understand?  Just slow is it down so

15:45:14 23     I can object.

15:45:14 24               (The reporter read the record

15:45:14 25               as follows:

                                                          190

EXHIBIT 77
1845

ROUGH DRAFT

15:45:23  1              "^ QUESTION ^ ANSWER ").

15:45:23  2              THE WITNESS:

15:45:27  3              MR. TOBEROFF :  You can answer.

15:45:28  4              THE WITNESS:  Yes.

15:45:28  5         BY MR. PETROCELLI:

15:45:32  6              Q.  Did you go over this carefully with your

15:45:34  7         mother before you and she signed?

15:45:39  8              A.  I went over it with her.

15:45:47  9              Q.  Now, when you signed this, did you

15:45:50  10        understood that you were expecting to at some point

15:46:00  11        serve a notice of termination with respect to the

15:46:03  12        Shuster interest.

15:46:03  13                  Is that right?

15:46:03  14             A.  Yes.

15:46:07  15             Q.  Did you have an understanding when you

15:46:09  16        signed Exhibit 10 when you would serve that notice?

15:46:12  17             A.  Yes.

15:46:16  18             Q.  When?

15:46:20  19                  MR. TOBEROFF:  You can -- you CAN'T --

15:46:23  20        since you've testified that you viewed me as your

15:46:26  21        attorney and you're seeking legal advice from me,

15:46:30  22        any -- you can't answer that question because that

15:46:32  23        question would be based on your discussions with me

15:46:34  24        acting as your counsel with respect to the

15:46:36  25        termination notices.  So I instruct you not to

191

**EXHIBIT 77**
**1846**

ROUGH DRAFT

15:46:44  1    answer.

15:46:44  2                MR. PETROCELLI:  You know we're not going

15:46:45  3    to solve the problem today of course but we dispute

15:46:48  4    that you can cover every single conversation you had

15:46:51  5    with him based on the attorney-client privilege in

15:46:55  6    the face of these documents and other facts.

15:46:58  7                (Instruction not to answer.)

15:46:58  8                MR. PETROCELLI:  Do the best I can.

15:47:09  9        Q.  Based on the research that you had done

15:47:10 10    before contacting Mr. Toberoff, did you have an

15:47:14 11    understanding as to when the earliest you could

15:47:18 12    serve a notice of termination was?

15:47:23 13                MR. TOBEROFF:  Separate from your

15:47:23 14    conversations with me.

15:47:24 15                THE WITNESS:  Well.

15:47:25 16                MR. PETROCELLI:  Well, it has to be

15:47:26 17    separate because I said before.

15:47:28 18                THE WITNESS:  Okay.  I don't believe I

15:47:32 19    understood that level of detail at that time.

15:47:32 20    BY MR. PETROCELLI:

15:47:43 21        Q.  Now you said that there were drafts of this

15:47:45 22    that went back and forth.  What changes did you make

15:47:48 23    prior to agreeing to this Exhibit 10?

15:48:05 24        A.  I believe I had some issues with if

15:48:12 25    something had happened to Marc Toberoff bodily harm

192

**EXHIBIT 77**
**1847**

ROUGH DRAFT

15:48:16  1    or something of that nature.

15:48:23  2         Q.  You asked him to address that?

15:48:24  3         A.  Yes.  I don't recall what else there was

15:48:32  4    discussions.

15:48:33  5         Q.  Did you -- did you have any discussions as

15:48:35  6    to why you were entering into a joint venture

15:48:41  7    agreement rather than a regular attorney-client

15:48:43  8    agreement?  And why he wasn't signing as Marc

15:48:48  9    Toberoff the lawyer?  Any discussions on that

15:48:50 10    subject?

15:48:54 11         A.  Yes.  It was -- it was clear to me that he.

15:48:59 12              MR. TOBEROFF:  Just -- just answer his --

15:49:01 13    he asked you whether you had any discussions with

15:49:04 14    me.

15:49:04 15              THE WITNESS:  Yes.

15:49:04 16              MR. TOBEROFF:  And you're launching --

15:49:06 17              MR. PETROCELLI:  I didn't actually ask with

15:49:08 18    you, I said any discussions.

15:49:10 19              MR. TOBEROFF:  And you are launching --

15:49:10 20              MR. PETROCELLI:  He said yes.

15:49:12 21              MR. TOBEROFF:  He just wanted to know if

15:49:14 22    you had any discussions --

15:49:15 23              THE WITNESS:  Yes.

15:49:15 24    BY MR. PETROCELLI:

15:49:15 25         Q.  With whom?

193

**EXHIBIT 77**
**1848**

ROUGH DRAFT

15:49:16  1          MR. TOBEROFF:  Excuse me.  When he asks you

15:49:17  2      a question, I know it's difficult, try and answer

15:49:19  3      the question.  Don't launch into a narrative.

15:49:19  4      BY MR. PETROCELLI:

15:49:21  5          Q.  With whom?

15:49:22  6          A.  With Marc Toberoff.

15:49:27  7          Q.  What did he say and what did you say on

15:49:30  8      that subject?

15:49:30  9          A.  Can I answer?

15:49:41 10          MR. TOBEROFF:  You can -- what's the

15:49:42 11      question again?  Can you read it back to me or can

15:49:44 12      you repeat it to me.

15:49:46 13          MR. PETROCELLI:  Yeah.

15:49:47 14          Q.  What did you and he discuss on this subject

15:49:49 15      as to why you were entering into a joint venture

15:49:52 16      agreement rather than a normal attorney-client

15:49:54 17      agreement?

15:49:54 18          A.  Can I --

15:50:00 19          MR. TOBEROFF:  You can't answer that

15:50:01 20      question.

15:50:02 21          THE WITNESS:  Okay.

15:50:02 22          MR. TOBEROFF:  You cannot answer that

15:50:03 23      question.

15:50:03 24          THE WITNESS:  Okay.  Okay.

15:50:05 25          (Instruction not to answer.)

194

**EXHIBIT 77**
**1849**

ROUGH DRAFT

15:50:06   1              MR. PETROCELLI:

15:50:07   2              MR. TOBEROFF:  I'm instructing him not to

15:50:09   3    answer that question.

15:50:09   4              MR. PETROCELLI:  Attorney-client privilege,

15:50:09   5    right.

15:50:11   6              MR. TOBEROFF:  Yes.

15:50:12   7              THE WITNESS:  Okay.

15:50:12   8    BY MR. PETROCELLI:

15:50:15   9         Q.  Did you discuss with your mother why she

15:50:18  10    and you were forming a joint venture with a company

15:50:23  11    called pacific pictures corporation?

15:50:27  12         A.  No.

15:50:28  13         Q.  Have you ever heard of Pacific Pictures

15:50:30  14    Corporation before?

15:50:30  15         A.  No.

15:50:31  16         Q.  Were you aware of anything that it had

15:50:33  17    done?

15:50:33  18         A.  It had -- we had discussed -- discussed it.

15:50:42  19    I can't recall the details now.

15:50:44  20         Q.  Did you inquire whether Pacific Pictures

15:50:47  21    Corporation had -- had owned any other termination

15:50:53  22    interests?  Or this was the first one?

15:51:00  23              MR. TOBEROFF:  Lacks foundation.

15:51:05  24              THE WITNESS:  No, I don't know about that.

15:51:05  25    BY MR. PETROCELLI:

                                                              195

**EXHIBIT 77**
**1850**

ROUGH DRAFT

15:51:15  1        Q.  Did you have any discussion about giving

15:51:21  2    away 50 percent of your rights to a joint venture?

15:51:26  3        A.  Yes.

15:51:29  4        Q.  With whom?

15:51:29  5        A.  Marc Toberoff.

15:51:31  6        Q.  What did you and he discuss on that

15:51:34  7    subject?

15:51:40  8            MR. TOBEROFF:  I instruct you not to answer

15:51:41  9    as to the substance of our discussions.

15:51:44  10           (Instruction not to answer.)

15:51:44  11   BY MR. PETROCELLI:

15:51:47  12       Q.  Did you discuss that with your mother?

15:51:49  13       A.  Not -- not details, no.

15:51:58  14       Q.  Why didn't you go over this in detail with

15:52:00  15   your mother, explain exactly what was happening?

15:52:05  16   You were creating a joint venture, you're giving up

15:52:08  17   50 percent of the rights?

15:52:09  18       A.  She -- she read it.

15:52:13  19       Q.  So -- and you assumed that by her reading

15:52:16  20   it that she knew exactly what she was doing?

15:52:18  21       A.  Yes.

15:52:27  22       Q.  Just like she knew exactly what she was

15:52:29  23   doing when she signed the 92 agreement, right?

15:52:35  24       A.  I don't know.

15:52:36  25       Q.  Unsure?

**EXHIBIT 77**
**1851**

ROUGH DRAFT

15:52:37  1          A.   Unsure, yeah.

15:52:39  2          Q.   But not this one ten years later.

15:52:48  3               Was there any negotiation over the 50

15:52:52  4    percent?  Did you say 50 percent?  You got to be

15:52:54  5    kidding me?  How about 5 percent?  Or 10 percent?

15:53:01  6    You know was there any conversation about that?

15:53:06  7               MR. TOBEROFF:  You can answer at that.

15:53:06  8    BY MR. PETROCELLI:

15:53:07  9          Q.   You said there were drafts that went back

15:53:09 10    and forth?

15:53:09 11          A.   Yes, there were conversations.

15:53:10 12          Q.   What were they?  Relate them to me.

15:53:17 13               THE WITNESS:  Can I answer.

15:53:18 14               MR. TOBEROFF:  You can answer as to whether

15:53:19 15    there were negotiations regarding the 50 percent.

15:53:24 16    But not as to -- not -- just whether we had the

15:53:28 17    conversation.  Actually you already answered that.

15:53:30 18               THE WITNESS:  Yeah.

15:53:31 19               MR. TOBEROFF:  But you can't answer the

15:53:33 20    substance of our conversations.

15:53:35 21               THE WITNESS:  We had discussed the split.

15:53:35 22    BY MR. PETROCELLI:

15:53:42 23          Q.   Did you seek a lower split?  Lower for

15:53:47 24    the -- for Pacific Pictures?

15:53:51 25          A.   I -- I had asked about the split and we

                                                              197

EXHIBIT 77
1852

ROUGH DRAFT

15:53:55 1    discussed it back and forth and what would be

15:53:59 2    involved on Marc Toberoff's part, the work involved,

15:54:04 3    the cost he would bear.

15:54:08 4        Q.  Did you suggest a different number?

15:54:10 5        A.  I don't remember if I did.  We arrived at

15:54:24 6    a -- a mutual agreement after talking about it.

15:54:31 7        Q.  Did you check around on whether 50 percent

15:54:37 8    was appropriate for this joint venture?

15:54:40 9        A.  Check around?

15:54:46 10       Q.  Research.

15:54:48 11           MR. TOBEROFF:  Vague.

15:54:55 12           THE WITNESS:  I don't remember if I did or

15:54:56 13   not.

15:54:56 14   BY MR. PETROCELLI:

15:55:04 15       Q.  Once you signed Exhibit 10, you were

15:55:07 16   satisfied that you understood all of its terms and

15:55:10 17   provisions?

15:55:13 18       A.  Yes.

15:55:15 19       Q.  Okay.  And you understood that it included

15:55:18 20   in addition to Superman elements, Superboy as well,

15:55:24 21   including smallville, right?

15:55:27 22       A.  I saw that, yes.

15:55:34 23       Q.  And you didn't make any effort to exclude

15:55:36 24   Superboy or smallville from this agreement Exhibit

15:55:38 25   10, correct?

198

**EXHIBIT 77**
**1853**

ROUGH DRAFT

15:55:40  1        A.  No.

15:55:40  2        Q.  In fact, it's specifically included,

15:55:43  3    correct?

15:55:43  4        A.  Yes.  Can I finish answering that?

15:55:55  5        Q.  Sure?

15:55:56  6            MR. TOBEROFF:  No.

15:55:56  7            THE WITNESS:  No?  Okay.

15:55:57  8            MR. TOBEROFF:  Wait for the --

15:55:58  9            THE WITNESS:  Okay.

15:55:59 10            MR. TOBEROFF:  Just answer the question.

15:56:00 11            THE WITNESS:  Okay.  I didn't know if I

15:56:03 12    answered it.

15:56:03 13    BY MR. PETROCELLI:

15:56:10 14        Q.  Now, you -- can you turn to paragraph 8.

15:56:18 15    Starting with the second sentence it says:

15:56:21 16            "Upon the expiration of the

15:56:22 17            term and the winding up of the

15:56:24 18            venture or in the event of

15:56:26 19            termination of the venture for any

15:56:28 20            reason, all rights, property or

15:56:31 21            assets of the venture will be held

15:56:34 22            50 percent by the claimants and 50

15:56:37 23            percent by PPC as tenants in

15:56:41 24            common."

15:56:42 25            Do you see that?

**EXHIBIT 77**
**1854**

ROUGH DRAFT

15:56:42  1          A.  Yes.

15:56:43  2          Q.  It goes on to continue from there.

15:56:45  3              Now you understood when you signed this

15:56:47  4      that rights is a defined word.  Do you see it has

15:56:52  5      capital R?

15:56:52  6          A.  Yes.

15:56:53  7          Q.  And it's defined in the first paragraph as

15:56:57  8      all of the Joe Shusters and his estate's rights,

15:57:02  9      claims, copyrights, property, title and interests

15:57:07  10     into Joe Shuster's creations?

15:57:08  11         A.  Yes.

15:57:09  12         Q.  Okay?  And you understood that once you

15:57:15  13     signed this document, those rights became the

15:57:18  14     property of the venture called the Joe Shuster

15:57:22  15     venture, correct?

15:57:30  16         A.  My understanding is that it's a -- a -- an

15:57:36  17     interest -- an interest in proceeds coming from the

15:57:40  18     rights.

15:57:44  19         Q.  It says all rights properties or assets of

15:57:47  20     the venture.

15:57:49  21             Do you see that? Paragraph 8?

15:57:49  22         A.  Yes.

15:57:52  23         Q.  Will be in the event of a termination for

15:57:54  24     any reason will be held 50 percent by the claimants,

15:57:58  25     that's and you your mother, right?

                                                        200

**EXHIBIT 77**
**1855**

ROUGH DRAFT

15:57:59  1        A.  Yes.

15:58:00  2        Q.  And then 50 percent by Pacific Pictures

15:58:04  3    Corporation, correct?

15:58:04  4        A.  Yes.

15:58:07  5        Q.  So, you understood that even if this

15:58:13  6    venture was terminated for any reason, you would own

15:58:17  7    50 percent of the rights with your mother but PPC

15:58:21  8    would own the other 50 percent as a tenant in

15:58:24  9    common, correct?

15:58:27 10        A.  Well --

15:58:27 11        Q.  Not in the proceeds, but in the actual

15:58:29 12    rights?

15:58:29 13        A.  My -- my understanding is you can't

15:58:31 14    transfer something you have rights in.

15:58:34 15        Q.  And that's something that you learned after

15:58:37 16    you signed this agreement, correct?

15:58:41 17        A.  Well I believe I had some awareness of that

15:58:44 18    before I signed it.

15:58:45 19        Q.  You learned that after you signed this

15:58:47 20    agreement when you tried to fix the problem by

15:58:51 21    entering into the legal agreement in 2004 which you

15:58:55 22    then backdated back to 2001, correct?

15:59:02 23        MR. TOBEROFF:  Also let me just interject.

15:59:03 24    I don't want you answering questions that are based

15:59:07 25    on any legal understanding that you've received or

                                                              201

**EXHIBIT 77**
**1856**

ROUGH DRAFT

15:59:11  1    knowledge or -- he is asking you information that

15:59:16  2    you just know all on your own.  I know it's hard to

15:59:17  3    distinguish between the two but -- but I'm going to

15:59:22  4    ask you to try and do that and not answer questions

15:59:24  5    based on conversations with attorneys.

15:59:28  6         THE WITNESS:  Okay.

15:59:28  7    BY MR. PETROCELLI:

15:59:47  8         Q.  Can you look at paragraph 2?  It says in

15:59:54  9    the middle, "In consideration for PPC" -- that's

15:59:57  10   Pacific Pictures Corporation's -- "contributions to

16:00:00  11   the venture," and you see venture is capital V,

16:00:00  12   right?

16:00:07  13        A.  Which line are you on?  Oh, yes, okay.

16:00:09  14        Q.  And that's the venture between Pacific

16:00:12  15   Pictures and you and your mother, correct?

16:00:12  16        A.  Yes.

16:00:15  17        Q.  Okay.  It says:

16:00:16  18             "In consideration for PPC's

16:00:18  19             contributions to the venture in the

16:00:19  20             mutual covenants contained here in,

16:00:22  21             claimants hereby transfer and

16:00:24  22             assign to the venture share rights,

16:00:27  23             titles and title and interests in

16:00:30  24             the rights."

16:00:31  25        Do you see that?

                                                              202

EXHIBIT 77
1857

ROUGH DRAFT

16:00:31  1        A.  Yes.

16:00:32  2        Q.  So you understood when you signed this that

16:00:36  3    all of the Joe Shuster rights, termination rights to

16:00:40  4    the extent they existed were being transferred and

16:00:44  5    assigned to the venture just as it says, correct?

16:00:44  6        A.  Yes.

16:00:50  7        Q.  Now, are you saying you signed this

16:00:52  8    believing it was invalid because you can't make such

16:00:56  9    an assignment or transfer of the rights?  Or are you

16:00:59 10    telling me?

16:00:59 11        A.  No.

16:01:00 12        Q.  Now that it's something you learned

16:01:01 13    afterwards?

16:01:04 14        A.  I learned it afterwards.

16:01:07 15        Q.  Okay.  Let's continue.  How did you learn

16:01:11 16    it by the way?

16:01:15 17        A.  Discussions with my attorney.

16:01:17 18        Q.  Who is that?

16:01:20 19            MR. TOBEROFF:  I'll let you answer without

16:01:22 20    waiver.

16:01:22 21            MR. PETROCELLI:  I just need to know who

16:01:23 22    the attorney is.  I'd rather have you say

16:01:26 23    Mr. Toberoff.

16:01:26 24            THE WITNESS:  Mr. Toberoff?

16:01:28 25            MR. TOBEROFF:  But I'm saying lime's

                                                                203

**EXHIBIT 77**
**1858**

ROUGH DRAFT

16:01:29  1    letting him answer that question without waiver of

16:01:31  2    the privilege.

16:01:31  3    BY MR. PETROCELLI:

16:01:32  4        Q.  The reason I ask you that question is

16:01:34  5    because you may be referring to some other attorney

16:01:35  6    and I just have to have the record be clear?

16:01:39  7        A.  Okay.

16:01:39  8        Q.  So what did you learn from Mr. Toberoff

16:01:44  9    that was different from what you signed in 2001?

16:01:49 10            MR. TOBEROFF:  I'm instructing you not to

16:01:52 11    answer.  I've already let -- let -- give the gist of

16:01:56 12    it, and I'm sure Mr. Petrocelli could figure out the

16:01:58 13    rest on his own.

16:02:00 14            THE WITNESS:  Okay.

16:02:01 15            (Instruction not to answer.)

16:02:01 16    BY MR. PETROCELLI:

16:02:03 17        Q.  Did you ask Mr. Toberoff -- well, when you

16:02:09 18    signed this document you thought that Mr. Toberoff

16:02:10 19    was an expert in these issues right, termination

16:02:14 20    issues?

16:02:15 21        A.  Yes.

16:02:16 22        Q.  So when you later found out that you had

16:02:19 23    signed something that was not valid, did you ask him

16:02:25 24    why did you have us sign this document?  You were

16:02:28 25    the expert.  Did you get into that kind of

204

**EXHIBIT 77**
**1859**

ROUGH DRAFT

16:02:32 1    discussion with him?

16:02:39 2              MR. TOBEROFF:  Don't -- don't -- I instruct

16:02:42 3    you not to give testimony as to what discussions you

16:02:45 4    got into or got -- didn't get into with me.

16:02:45 5    BY MR. PETROCELLI:

16:02:50 6        Q.  Did you talk to him on that subject?

16:02:52 7              MR. TOBEROFF:  I instruct you not to

16:02:54 8    answer.

16:02:54 9              (Instruction not to answer.)

16:02:57 10             MR. TOBEROFF:  The question is

16:02:59 11   rhetorical -- the question is rhetorical anyway.

16:02:59 12   BY MR. PETROCELLI:

16:03:03 13       Q.  I want to go back to where I was before

16:03:05 14   then paragraph 8 and when you signed this you

16:03:07 15   understood that in the event that this venture was

16:03:09 16   terminated for any reason, that PPC would own 50

16:03:14 17   percent of the rights as a tenant in common with

16:03:17 18   Jean and you, correct?

16:03:17 19       A.  Yes.

16:03:31 20       Q.  Okay.  Also by the way, in paragraph 10

16:03:35 21   there's a reference to approving Mr. Michael Cataron

16:03:39 22   to become the administrator of Joe Shuster's estate

16:03:43 23   once it's established.

16:03:44 24             Do you see that?

16:03:44 25       A.  Yes.

205

**EXHIBIT 77**
**1860**

ROUGH DRAFT

16:03:45  1        Q.  Whose idea was that?

16:03:51  2        A.  I'm not sure.

16:03:52  3        Q.  Why was he selected?  He is a guy -- you

16:03:55  4   don't even know what city he lives in?

16:03:57  5        A.  Well  --

16:03:59  6        Q.  Why is he in here as -- as the executor of

16:04:02  7   Joe Shuster's estate?

16:04:08  8        A.  I don't recall why we had -- had him listed

16:04:11  9   at that time.

16:04:12 10        Q.  But your mother's -- but Joe's will said it

16:04:15 11   was to be your mother or if she's unable or

16:04:17 12   unwilling to serve, then you?

16:04:18 13        A.  Uh-huh.

16:04:19 14        Q.  It said nothing about Mr. Cataron?

16:04:21 15        A.  Uh-huh.

16:04:22 16        Q.  So why -- why did you agree to that?

16:04:27 17        A.  I don't know.

16:04:30 18        Q.  You don't know?

16:04:31 19        A.  I don't know.  I don't recall why we did.

16:04:35 20        Q.  Did Michael Cataron ever meet Joe Shuster?

16:04:37 21        A.  Yes.

16:04:40 22        Q.  Did they -- how well did they know each

16:04:43 23   other?

16:04:43 24        A.  Pretty well.

16:04:45 25        Q.  Do you have his contact information Michael

                                                              206

**EXHIBIT 77**
**1861**

ROUGH DRAFT

16:04:47 1    Cataron?

16:04:49 2        A.  Yeah.

16:04:50 3        Q.  What is his phone number?

16:04:51 4        A.  Not with me.

16:04:54 5        Q.  And you don't know his address, right?

16:04:56 6        A.  Not on the top of my head.

16:04:59 7        Q.  Do you know his e-mail address?

16:05:00 8        A.  Not on the top of my head.

16:05:08 9        Q.  Now, go to paragraph 7.  It states:

16:05:11 10              "The venture and/or the estate

16:05:12 11          of Joe Shuster (to be established

16:05:15 12          here under) will retain Marc

16:05:20 13          Toberoff esquire to render legal

16:05:23 14          services in connection with the

16:05:25 15          rights in the venture, including in

16:05:30 16          connection with all legal disputes,

16:05:32 17          litigation, arbitration and/or

16:05:34 18          mediation regarding the rights, et

16:05:37 19          cetera."

16:05:40 20          Now, paragraph 7 says that the venture or

16:05:47 21    Mr. Shuster's estate will retain Mr. Toberoff.

16:05:47 22          Do you see that?

16:05:47 23        A.  Yes.

16:05:54 24        Q.  This -- Mr. Toberoff was not retained as a

16:05:57 25    lawyer in this document, though, right?

207

EXHIBIT 77
1862

ROUGH DRAFT

16:06:01  1              MR. TOBEROFF:  Calls for a legal

16:06:01  2     conclusion.

16:06:01  3     BY MR. PETROCELLI:

16:06:03  4          Q.  Do you see a signature line for Marc

16:06:04  5     Toberoff esquire agreeing to render services?

16:06:09  6              MR. TOBEROFF:  Asked and answered.

16:06:13  7              You can answer.

16:06:13  8              THE WITNESS:  It's already been answered.

16:06:16  9              MR. TOBEROFF:  You can answer.

16:06:17 10              THE WITNESS: .

16:06:17 11     BY MR. PETROCELLI:

16:06:20 12          Q.  When you signed this document, you

16:06:23 13     understood that you would have to sign another

16:06:26 14     document or the venture would, to retain

16:06:28 15     Mr. Toberoff, correct?

16:06:35 16              MR. TOBEROFF:  Assumes facts.

16:06:36 17              THE WITNESS:  My understanding this was

16:06:37 18     document retained Marc Toberoff as our tone.

16:06:37 19     BY MR. PETROCELLI:

16:06:40 20          Q.  Where does it say that?

16:06:44 21          A.  Paragraph 7.

16:06:44 22          Q.  Where is the signature of Mr. Toberoff?

16:06:49 23          A.  Signature page.

16:06:50 24          Q.  It says president, right?  Pacific Pictures

16:06:54 25     Corporation.  Where is there a signature line for

                                                              208

**EXHIBIT 77**
**1863**

ROUGH DRAFT

16:06:56 1    Marc Toberoff esquire?

16:06:57 2        A.  He's also esquire.

16:07:03 3        Q.  But he signed the document only in his

16:07:04 4    capacity as the president of this company that was

16:07:08 5    doing a joint venture with you.  Did you -- did you

16:07:13 6    question why he is not signing on as a lawyer to

16:07:16 7    render the services contemplated by paragraph 7?

16:07:21 8    Did you have that discussion with him?

16:07:24 9        MR. TOBEROFF:  You can answer.  He's asking

16:07:27 10   whether you had a discussion, he just summarized

16:07:33 11   with me.

16:07:34 12       THE WITNESS:  Yes.

16:07:34 13       MR. TOBEROFF:  Do you understand the

16:07:35 14   question?  Do you want to repeat the question.

16:07:35 15           (The reporter read the record

16:07:35 16       as follows:

16:07:58 17           "^ QUESTION ^ ANSWER ").

16:07:58 18       MR. TOBEROFF:  Yes or no.

16:07:59 19       THE WITNESS:  I -- I don't recall if I

16:08:02 20   specifically asked him why he didn't sign, how

16:08:08 21   you're saying.

16:08:08 22   BY MR. PETROCELLI:

16:08:14 23       Q.  Did you express concern about entering into

16:08:17 24   a joint venture agreement that if it were ever

16:08:19 25   terminated for any reason Pacific Pictures would own

209

EXHIBIT 77
1864

ROUGH DRAFT

16:08:23  1    half the rights forever?

16:08:25  2         A.  Yes.

16:08:32  3         Q.  Who did you express that to?

16:08:35  4         A.  I expressed it to Marc Toberoff.

16:08:37  5         Q.  Did you explain that consequence to your

16:08:39  6    mother?

16:08:44  7         A.  I don't I don't know if I got into that

16:08:50  8    with her or not.  I don't remember.

16:08:51  9         Q.  Do you think that was important for her to

16:08:54  10   understand?

16:08:54  11        A.  Yes.

16:09:01  12        Q.  Why did you agree to that?

16:09:07  13        A.  Why?

16:09:08  14        Q.  Yes.  Why didn't you insist on a provision

16:09:10  15   that said in the event that the agreement is

16:09:12  16   terminated for any reason, that the rights revert

16:09:15  17   back to the Shusters, 100 percent of that?

16:09:22  18             MR. TOBEROFF:  Answer to the extent that

16:09:23  19   you have a recollection of why.

16:09:26  20             THE WITNESS:  Yeah, okay.

16:09:32  21             THE WITNESS:  My -- my recollection of why

16:09:33  22   is that -- that he was going to see this case

16:09:37  23   through no matter what and I thought that he would

16:09:42  24   and I had thought that there would be no reason it

16:09:48  25   would be canceled or terminated until the rights had

210

EXHIBIT 77
1865

ROUGH DRAFT

16:09:52  1    been pursued.  He had every -- every economic motive

16:09:58  2    to pursue it to the full evident extent.

16:09:58  3    BY MR. PETROCELLI:

16:10:05  4        Q.  But if he quit two years later or you fired

16:10:08  5    him or canceled this agreement, he owned half the

16:10:11  6    rights.  That didn't bother you?

16:10:15  7            MR. TOBEROFF:  Not according to you.

16:10:18  8            THE WITNESS:  No.

16:10:18  9    BY MR. PETROCELLI:

16:10:21  10        Q.  Okay.  Take a look at paragraph 7.  It

16:11:14  11    states there that the venture will retain Toberoff

16:11:18  12    to render legal services including in connection

16:11:21  13    with legal disputes and litigation.

16:11:23  14            Do you see that?

16:11:23  15        A.  Yes.

16:11:26  16        Q.  Legal disputes and litigation with whom?

16:11:31  17            MR. TOBEROFF:  I instruct you not to

16:11:32  18    answer.  This obviously deals with discussions with

16:11:39  19    counsel regarding potential litigation.

16:11:40  20            (Instruction not to answer.)

16:11:40  21    BY MR. PETROCELLI:

16:11:42  22        Q.  Well, it's fair to say that you understood

16:11:44  23    when you signed this that there was a prospect of

16:11:50  24    litigation with DC Comics or some Time-Warner

16:11:53  25    company, correct?

211

**EXHIBIT 77**
**1866**

ROUGH DRAFT

16:11:54  1            MR. TOBEROFF:  Instruct you not to answer.

16:11:56  2        It implicates attorney-client communications.

16:11:58  3            (Instruction not to answer.)

16:11:58  4    BY MR. PETROCELLI:

16:11:59  5        Q.  You didn't -- you didn't need a lawyer to

16:12:01  6    tell you that, right?

16:12:02  7            MR. TOBEROFF:  Instruct you not to answer.

16:12:02  8            MR. PETROCELLI:  Why?

16:12:04  9            MR. TOBEROFF:  It implicates

16:12:05 10    attorney-client communications.

16:12:07 11            (Instruction not to answer.)

16:12:07 12            MR. PETROCELLI:  That doesn't cover any

16:12:08 13    privilege.  That's just un- -- unreasonable.

16:12:12 14            MR. TOBEROFF:  How he is assessing the

16:12:13 15    potential for litigation --

16:12:15 16            MR. PETROCELLI:  I didn't ask how he is

16:12:16 17    assessing.  Merely the fact.

16:12:18 18            MR. TOBEROFF:  Whether there is a potential

16:12:20 19    for litigation.

16:12:20 20    BY MR. PETROCELLI:

16:12:21 21        Q.  You understood -- you understood that when

16:12:26 22    you signed this there was some appreciation that you

16:12:31 23    would be in litigation?

16:12:32 24            MR. TOBEROFF:  Instruction.  Same

16:12:33 25    instruction.

EXHIBIT 77
1867

ROUGH DRAFT

16:12:34   1                (Instruction not to answer.)

16:12:34   2      BY MR. PETROCELLI:

16:12:58   3           Q.  So you shouldn't have been surprised when

16:12:59   4      you read the lawsuit that DC filed since you

16:13:05   5      contemplated litigation as early as 2001, correct?

16:13:08   6                MR. TOBEROFF:  I instruct you not to answer

16:13:10   7      as to your reactions in the midst of a litigation

16:13:15   8      because it implicates attorney-client

16:13:18   9      communications.

16:13:19  10                (Instruction not to answer.)

16:13:19  11                THE WITNESS:  I'll have to follow

16:13:21  12      Mr. Toberoff's advice.

16:13:21  13      BY MR. PETROCELLI:

16:13:22  14           Q.  When you saw the lawsuit from DC Comics

16:13:25  15      challenging the termination, that's something that

16:13:27  16      you understood could happen as early as 2001 when

16:13:31  17      you signed this joint venture agreement, correct?

16:13:34  18                MR. TOBEROFF:  Same instruction.

16:13:35  19                (Instruction not to answer.)

16:13:36  20                MR. PETROCELLI:  Again, I don't think these

16:13:39  21      questions are -- these instructions are proper.

16:13:42  22                MR. TOBEROFF:  I'm not going allow him to

16:13:44  23      answer how is he assessing potential litigation

16:13:49  24      after he has retained me.

16:13:49  25                MR. PETROCELLI:  It's just going to have to

                                                        213

**EXHIBIT 77**
**1868**

ROUGH DRAFT

16:13:52  1    get sorted out in court.

16:13:55  2         Q.  Go to paragraph 4.  It says:

16:13:59  3              "The terms of any and all

16:14:00  4          agreements regarding any of the

16:14:02  5          rights and any respects shall be

16:14:04  6          subject to the express written

16:14:06  7          approval of claimants and PPC.  The

16:14:10  8          parties each warrants and represent

16:14:11  9          that after signing this agreement

16:14:13 10          they will not without the expressed

16:14:15 11          written consent of all the parties

16:14:16 12          transfer limit or encumber the

16:14:18 13          rights in any respect."

16:14:20 14          When you signed this, you understood that

16:14:24 15    you could not enter into any agreement with DC

16:14:30 16    Comics or any affiliate of DC Comics without the

16:14:35 17    expressed written consent of Pacific Pictures,

16:14:35 18    correct.

16:14:35 19         A.  Yes.

16:14:40 20         Q.  And in your mind who is Pacific Pictures?

16:14:45 21         A.  Marc Toberoff.

16:14:50 22         Q.  And so you understood that you -- you, and

16:14:54 23    your family could not enter into a contract with DC

16:14:58 24    Comics no matter how badly you wanted unless Marc

16:15:03 25    Toberoff consented, correct?

214

**EXHIBIT 77**
**1869**

ROUGH DRAFT

16:15:03  1        A.  Yes.

16:15:09  2        Q.  Did you think that that was an appropriate

16:15:17  3    power for a lawyer to have over a client?

16:15:24  4        A.  I thought it was in his best interest to --

16:15:35  5        Q.  That's not what I asked you?

16:15:36  6        MR. TOBEROFF:  He's trying to answer your

16:15:37  7    question.

16:15:37  8        MR. PETROCELLI:  Yes.

16:15:38  9        Q.  Did you think -- did you think that it was

16:15:44 10    proper for lawyers to impose that -- to have such

16:15:52 11    a -- an agreement with a client that the client

16:15:54 12    can't settle without the lawyer's consent no matter

16:15:58 13    how much the client wants to settle?

16:16:04 14        A.  At the time I didn't consider it

16:16:05 15    unreasonable.

16:16:08 16        Q.  Did you think it was appropriate?  Did you

16:16:11 17    have any knowledge on that subject whether the

16:16:13 18    lawyers are even permitted under the law to have

16:16:17 19    such arrangements?

16:16:21 20        A.  No, I -- I was not aware.

16:16:22 21        Q.  Did you do any research on that subject?

16:16:27 22        A.  Not specifically this, no.

16:16:30 23        Q.  Were you aware that it's not lawful for a

16:16:33 24    lawyer to have such a -- an agreement with a client?

16:16:39 25        A.  Not at the time.

215

**EXHIBIT 77**
**1870**

ROUGH DRAFT

16:16:40  1        Q.  Have you since become aware of that?

16:16:42  2        A.  Yes.

16:16:46  3        Q.  When?

16:16:55  4        A.  Sometime 2003.

16:16:57  5        Q.  How?

16:17:01  6        A.  Discussions with Marc Toberoff.

16:17:11  7        Q.  What led -- what prompted those

16:17:13  8    discussions?

16:17:13  9        A.  We -- we both realized that this format was

16:17:20 10    not -- not the best approach to take.

16:17:25 11        Q.  Why was it not the best approach?

16:17:30 12        A.  We decided a legal retainer, a standard

16:17:33 13    legal retainer was a preferred association.

16:17:36 14        Q.  You said in 2001 when you signed this,

16:17:42 15    you -- you were not even able to appreciate the

16:17:44 16    difference between a standard legal retainer and a

16:17:46 17    joint venture agreement.  Do you recall giving that

16:17:49 18    testimony?  You said you were not even in a position

16:17:54 19    to note that there was anything unusual about it.

16:17:57 20    Do you recall giving me that answer?

16:17:58 21            MR. TOBEROFF:  I believe that misstates his

16:17:59 22    testimony.

16:17:59 23            MR. PETROCELLI:  I don't think so.

16:18:01 24            THE WITNESS:  What -- what did I say?

16:18:01 25    BY MR. PETROCELLI:

                                                          216

EXHIBIT 77
1871

ROUGH DRAFT

16:18:02  1          Q.  So you were aware in 2001 when you signed

16:18:04  2     the agreement that you were agreeing to a -- an

16:18:08  3     arrangement that was different from the standard

16:18:11  4     lawyer client agreement in setting up a joint

16:18:15  5     venture with Pacific Pictures?

16:18:16  6              MR. TOBEROFF:  Misstates his testimony.

16:18:16  7     BY MR. PETROCELLI:

16:18:18  8          Q.  I'm asking you now.

16:18:20  9          A.  What did I say before?

16:18:22 10          Q.  Let's not get hung occupy what you said

16:18:25 11     before.  It's a new question?

16:18:26 12          A.  Okay.

16:18:26 13          Q.  Okay?  Can you read it back please?

16:18:26 14              (The reporter read the record

16:18:26 15          as follows:

16:18:43 16              "^ QUESTION ^ ANSWER ").

16:18:43 17              THE WITNESS:  Was I aware that it was

16:18:45 18     different than the standard legal retain center.

16:18:45 19     BY MR. PETROCELLI:

16:18:48 20          Q.  In 2001 when you signed Exhibit 10?

16:18:50 21          A.  2001.

16:18:51 22          Q.  Were -- were -- were you --

16:18:53 23          A.  I was.

16:18:53 24          Q.  Aware that you were signing a contract that

16:18:58 25     was different from the standard lawyer client

217

EXHIBIT 77
1872

ROUGH DRAFT

16:19:01  1    agreement?

16:19:03  2        A.  I was not keenly aware of that.

16:19:06  3        Q.  But you became keenly aware of it in 2003,

16:19:06  4    correct?

16:19:10  5        A.  Sometime in there.

16:19:12  6        Q.  Okay.  You said that you and Mr. Toberoff

16:19:14  7    decided that this approach was not the best approach

16:19:19  8    and you should revert to a lawyer -- a standard

16:19:22  9    lawyer client agreement, right?

16:19:24  10       A.  Yes.

16:19:25  11       Q.  Okay.  What prompted that?

16:19:32  12       A.  I -- I don't remember.  We just discussed

16:19:36  13   things over time.

16:19:40  14       Q.  You said you learned that the -- it was not

16:19:46  15   lawful for a lawyer to be able to withhold his

16:19:49  16   consent to a client settlement.

16:19:53  17       A.  I did -- at the time I didn't know that --

16:19:56  18   that was the case.

16:19:56  19       Q.  But you knew that in 03, right?

16:19:59  20       A.  Whenever -- whenever we started discussing

16:20:02  21   changing the form, then at some point after that we

16:20:09  22   agree we needed to change it, I became aware of

16:20:11  23   that.

16:20:14  24       Q.  Was it -- did he just call you up one day

16:20:16  25   and say we have to make a change?  What brought the

218

EXHIBIT 77
1873

ROUGH DRAFT

16:20:19  1    change about?

16:20:20  2        A.  I don't remember.

16:20:30  3        Q.  Did you get any legal advice from someone

16:20:32  4    other than Mr. Toberoff when he told you that a

16:20:37  5    change was required?

16:20:38  6        A.  No.

16:20:43  7        Q.  Did it cause you any concern after you

16:20:45  8    learned that you had signed an agreement that had

16:20:47  9    legal problems associated with it?

16:20:51 10        A.  No, because we were replacing it with a

16:20:54 11    better one.

16:20:57 12        Q.  How do you know it was been?  You thought

16:21:02 13    the first one was good?

16:21:03 14        A.  Well, maybe I got smarter.

16:21:07 15        Q.  In other words, you -- you believed what

16:21:09 16    Mr. Toberoff told you, correct?

16:21:09 17        A.  Yes.

16:21:13 18        Q.  Okay.  But you believed him in 2001 when

16:21:15 19    you signed the invalid agreement, right?

16:21:20 20        A.

16:21:20 21            MR. TOBEROFF:  Assumes facts.

16:21:22 22            THE WITNESS:  I'm not aware it was invalid.

16:21:22 23    BY MR. PETROCELLI:

16:21:31 24        Q.  Do you -- when you -- you ultimately signed

16:21:34 25    a document -- well, I'll get to that.

219

EXHIBIT 77
1874

ROUGH DRAFT

16:21:47  1          Did you come to learn that there were --

16:21:52  2    the agreement that you signed with Mr. Toberoff this

16:21:55  3    joint venture agreement in 2001 and again, in 03 did

16:22:03  4    violate the copyright laws, correct?

16:22:07  5          MR. TOBEROFF:  Mischaracterizes.  Strike

16:22:07  6    that.

16:22:12  7          You can answer.

16:22:13  8          THE WITNESS:  I didn't know that

16:22:17  9    specifically.  That it violated copyright laws.  But

16:22:22 10    it wasn't the best structure.

16:22:22 11    BY MR. PETROCELLI:

16:22:25 12          Q.  Okay.  Tell me how it wasn't the best

16:22:27 13    structure?

16:22:28 14          A.  We needed to have a standard legal

16:22:30 15    retainer.

16:22:31 16          Q.  Why?

16:22:32 17          A.  Because that was the best structure.

16:22:33 18          Q.  Why?  Why was it the best?  In what way was

16:22:39 19    it better?

16:22:39 20          MR. TOBEROFF:  The whys get into his

16:22:41 21    conversations with me.  And so you can't get into

16:22:44 22    that.

16:22:44 23    BY MR. PETROCELLI:

16:22:45 24          Q.  You understood when you changed this

16:22:47 25    structure or at least attempted to change the

220

**EXHIBIT 77**
**1875**

ROUGH DRAFT

16:22:50  1    structure that the Pacific picture agreements

16:22:55  2    constituted a violation of the copyright laws,

16:23:01  3    correct?  Did you have at that understanding at that

16:23:02  4    time?

16:23:02  5        A.  At that time -- at that time, no.

16:23:04  6        Q.  Did you come to that understanding

16:23:06  7    afterwards?

16:23:10  8            MR. TOBEROFF:  You can't answer that

16:23:11  9    without divulging attorney-client communications.

16:23:16 10    Instruct you not to answer.

16:23:17 11            (Instruction not to answer.)

16:23:18 12            THE WITNESS:  I have to follow Marc

16:23:20 13    Toberoff's advice.

16:23:20 14    BY MR. PETROCELLI:

16:23:22 15        Q.  You -- you are familiar with an aspect of

16:23:27 16    the copyright law in the sections dealing with

16:23:30 17    termination that the grantee -- that the grantor

16:23:39 18    cannot enter into an agreement with anyone other

16:23:43 19    than the grantee until the termination is effective?

16:23:49 20            MR. TOBEROFF:  I instruct you not to

16:23:50 21    answer.  He can't possibly answer those legal

16:23:52 22    questions without divulging his communications with

16:23:55 23    his attorney.

16:23:55 24            (Instruction not to answer.)

16:23:56 25            MR. PETROCELLI:  Why?  He is perfectly

                                                            221

**EXHIBIT 77**
**1876**

ROUGH DRAFT

16:23:57 1    capable of knowing that and he reads the codes, he

16:24:01 2    researches and he reads all the legal papers.

16:24:03 3         MR. TOBEROFF:  You're exaggerating his

16:24:05 4    testimony.

16:24:05 5         MR. PETROCELLI:  No, I'm not.

16:24:10 6         MR. TOBEROFF:  Same instruction.  When I

16:24:11 7    instruct you, you don't answer.  You don't have to

16:24:13 8    keep asserting that you're --

16:24:13 9    BY MR. PETROCELLI:

16:24:13 10        Q.  You -- you are --

16:24:13 11        MR. TOBEROFF:  Excuse me.  You don't have

16:24:15 12   to keep asserting that you're going to follow my

16:24:16 13   instruction.  We've already established you're going

16:24:18 14   to follow my instruction.

16:24:18 15   BY MR. PETROCELLI:

16:24:20 16        Q.  You read the complaint or you scanned it

16:24:21 17   but got the gist of it that DC Comics was contending

16:24:28 18   in the lawsuit that these Pacific Pictures

16:24:30 19   agreements violated the exclusivity provisions of

16:24:33 20   the copyright statute.  You got the gist of that,

16:24:33 21   right?

16:24:39 22        A.  The exclusivity provisions?

16:24:41 23        Q.  In the copyright termination provisions,

16:24:44 24   correct.

16:24:46 25        A.  I'm not sure I -- I have enough legal

222

**EXHIBIT 77**
**1877**

ROUGH DRAFT

16:24:48  1    knowledge about the exclusivity provisions.

16:24:50  2        Q.  Did you get the gist of the claim that DC

16:24:56  3    Comics made in the lawsuit that these Pacific

16:24:59  4    Pictures agreements violated certain provisions of

16:25:02  5    the copyright statute?

16:25:04  6        A.  I got the gist.

16:25:05  7        Q.  And did you understand that DC Comics was

16:25:08  8    contending that the Shusters did not have the legal

16:25:14  9    right to enter into an agreement with anyone other

16:25:20 10    than DC until and unless their termination became

16:25:24 11    effective?

16:25:29 12            MR. TOBEROFF:  You can only answer to the

16:25:30 13    extent you scanned the complaint on your own and you

16:25:35 14    came to that conclusion.

16:25:36 15            THE WITNESS:  I may not be fully aware of

16:25:39 16    that detail.

16:25:39 17    BY MR. PETROCELLI:

16:25:42 18        Q.  Are you aware that Mr. Toberoff has stated

16:25:44 19    in papers filed with the court that these Pacific

16:25:47 20    picture agreements were void?

16:25:54 21        A.  Yes.

16:25:55 22        Q.  How did you become aware of that?

16:25:58 23        A.  Through our discussions.

16:26:00 24        Q.  Did you read any of the legal filings that

16:26:02 25    are made in this case?

223

EXHIBIT 77
1878

ROUGH DRAFT

16:26:03  1        A.  The voiding of the Pacific Pictures or

16:26:12  2    anything else?

16:26:13  3        Q.  Well, you understand you filed the lawsuit

16:26:15  4    and then your -- your counsel has filed a motion to

16:26:19  5    dismiss the lawsuit and through lots of briefs have

16:26:23  6    been filed.  Do you read that material?

16:26:25  7        A.  I read some of it.

16:26:31  8        Q.  Are you aware that Mr. Toberoff has

16:26:33  9    acknowledged that the Pacific Pictures agreements

16:26:37 10    did not comply with the copyright laws?

16:26:41 11        A.  Yes.

16:26:45 12        Q.  Why did you sign agreements that did not

16:26:47 13    comply with the copyright laws?

16:26:51 14        A.  At the time I was unaware.

16:26:55 15        Q.  Why were you unaware?

16:26:58 16        A.  I'm not a lawyer.

16:27:01 17        Q.  You relied on Mr. Toberoff?

16:27:07 18        A.  Yes.

16:27:07 19        Q.  Having learned that you signed agreements

16:27:17 20    that violated the copyright law why did you think

16:27:26 21    that DC Comics had no right to file a claim?

16:27:31 22            MR. TOBEROFF:  Objection.  I'm objecting to

16:27:33 23    your use of the word "violated the copyright laws."

16:27:35 24    Also stated in that paper something being invalid --

16:27:35 25            MR. PETROCELLI:  You don't need to --

                                                        224

EXHIBIT 77
1879

ROUGH DRAFT

16:27:37  1            MR. TOBEROFF:  Under the copyright law and

16:27:39  2    violating law is two separate --

16:27:40  3            MR. PETROCELLI:  That's not appropriate,

16:27:42  4    Marc.

16:27:42  5            MR. TOBEROFF:  Okay.

16:27:44  6            MR. PETROCELLI:  We don't need to teach

16:27:45  7    Mr. Peary the niceties of copyright law.

16:27:50  8            MR. TOBEROFF:  I'm not teaching him.

16:27:51  9            MR. PETROCELLI:  Let's move on.  What's the

16:27:58  10   next Exhibit 11?  Okay.

16:28:00  11       Q.  Now, after signing this document exhibit

16:28:03  12   10, sometime there after your -- your mother put

16:28:14  13   Joanne Siegel in touch with Marc Toberoff, right?

16:28:14  14       A.  Yes.

16:28:18  15       Q.  And do you know when that happened?

16:28:25  16       A.  I believe sometime in 2003.

16:28:31  17       Q.  Were you keeping close -- in close contact

16:28:36  18   with Mr. Toberoff about his contacts with the Siegel

16:28:42  19   family prior to the time the Siegel family hired

16:28:46  20   him?

16:28:49  21            MR. TOBEROFF:  Assumes facts.  Lacks

16:28:55  22   foundation.  Do you understand the question?

16:28:55  23            THE WITNESS:  Was I in closes contact with

16:28:57  24   him regarding the Siegels?

16:28:57  25   BY MR. PETROCELLI:

**EXHIBIT 77**
**1880**

ROUGH DRAFT

16:29:00  1          Q.  Yes.  As he was courting the Siegels?

16:29:03  2               MR. TOBEROFF:  Assumes facts.  Lacks

16:29:05  3     foundation.  Object to the word "courting the

16:29:06  4     Siegels" -- the phrase "courting the Siegels."

16:29:09  5               THE WITNESS:  I was aware he had a --

16:29:13  6               MR. TOBEROFF:  Do you understand what the

16:29:14  7     question is because I don't.

16:29:16  8               THE WITNESS:  Maybe not.  I don't know.

16:29:17  9               MR. PETROCELLI:  He was about to answer it.

16:29:18 10     Of course he understood what the question was.

16:29:20 11               MR. TOBEROFF:  No, it's very confusing.

16:29:20 12     Can you read back --

16:29:21 13               MR. PETROCELLI:  It's not confusing.

16:29:23 14               MR. TOBEROFF:  Okay.  Let me just restate

16:29:23 15     that.  Could you read back the question for me.

16:29:29 16               MR. PETROCELLI:  We're into the courtship

16:29:31 17     of the Siegels, Marc. Come on this is a good part of

16:29:34 18     the exam.

16:29:34 19               MR. TOBEROFF:  I object to your

16:29:36 20     self-serving word courtship as I do to the word

16:29:38 21     "violation of the copyright act.

16:29:51 22                    (The reporter read the record

16:29:51 23               as follows:

16:29:52 24                    "^ QUESTION ^ ANSWER ").

16:29:52 25               THE WITNESS:  Yes.

                                                              226

EXHIBIT 77
1881

ROUGH DRAFT

16:29:52  1    BY MR. PETROCELLI:

16:29:54  2        Q.  Did you approve of Mr. Toberoff taking on

16:30:03  3    the representation of the Siegels?

16:30:11  4        A.  Yes.

16:30:11  5        Q.  Did you feel that in some way that might

16:30:14  6    conflict with your interests or your mother's

16:30:19  7    interests?

16:30:22  8        A.  I thought it would potentially be an

16:30:24  9    advantage.

16:30:25 10        Q.  How so?

16:30:29 11            MR. TOBEROFF:  You can only answer that if

16:30:30 12    you formed an opinion as to that that's not bound up

16:30:36 13    with your discussions with me.

16:30:36 14    BY MR. PETROCELLI:

16:30:40 15        Q.  Now look?

16:30:41 16            MR. TOBEROFF:  If you have an opinion

16:30:42 17    that's independent of your advice of, Counsel, you

16:30:45 18    can answer.  If not, you instruct you not to.

16:30:50 19            THE WITNESS:  Okay.  Well, my opinion is

16:30:51 20    bound up in discussions.

16:30:54 21            (Instruction not to answer.)

16:30:54 22    BY MR. PETROCELLI:

16:30:55 23        Q.  Just because something may be bound up in

16:30:58 24    discussions, whatever that means, doesn't mean that

16:31:01 25    you can't have a thought of your own.  That you

227

EXHIBIT 77
1882

ROUGH DRAFT

16:31:06 1    can't convey?

16:31:08 2              MR. TOBEROFF:  Argumentative and don't

16:31:10 3    listen to his instructions listen to mine and I

16:31:12 4    instruct you not to answer unless you can answer

16:31:14 5    independently of your discussions with me.

16:31:18 6              THE WITNESS:  Well, my.

16:31:18 7    BY MR. PETROCELLI:

16:31:21 8         Q.  Why did you believe that Marc Toberoff

16:31:26 9    representing the Siegels would be to your advantage?

16:31:31 10             MR. TOBEROFF:  Same instruction.

16:31:31 11             (Instruction not to answer.)

16:31:31 12   BY MR. PETROCELLI:

16:31:35 13        Q.  Did you discuss that with anyone?

16:31:37 14        A.  My belief as to why it's an advantage?

16:31:39 15             MR. TOBEROFF:  Excuse me.  I'm instructing

16:31:41 16   you not to answer what your belief was based on your

16:31:44 17   testimony that it's bound up with your discussions

16:31:47 18   with me.  What's the -- what's the next question?

16:31:47 19   BY MR. PETROCELLI:

16:31:51 20        Q.  Did you discuss that with anyone?

16:31:52 21             MR. TOBEROFF:  Other than me?

16:31:53 22             MR. PETROCELLI:  No, I said with anyone.

16:31:56 23             THE WITNESS:  You can.

16:31:56 24   BY MR. PETROCELLI:

16:31:57 25        Q.  Answer that yes or no?

228

**EXHIBIT 77**
**1883**

ROUGH DRAFT

16:31:58  1           MR. TOBEROFF:  You can answer whether you

16:31:59  2    discussed the subject with your attorney yes or no.

16:32:01  3           MR. PETROCELLI:  I didn't say with your

16:32:03  4    attorney I said with anyone.

16:32:04  5           MR. TOBEROFF:  With anyone with anyone.

16:32:05  6           THE WITNESS:  With anyone else.

16:32:05  7    BY MR. PETROCELLI:

16:32:06  8        Q.  No with anyone?

16:32:07  9        A.  Oh, yes.

16:32:08 10        Q.  With whom?

16:32:08 11        A.  Well, Marc Toberoff.

16:32:09 12        Q.  Anyone else?

16:32:10 13        A.  No.

16:32:12 14        Q.  Did you discuss it with your mother?

16:32:16 15           MR. TOBEROFF:  Asked and answered.

16:32:24 16           THE WITNESS:  I -- I don't recall if I

16:32:29 17    discussed it with her.

16:32:29 18    BY MR. PETROCELLI:

16:32:31 19        Q.  You realize -- you believe that it was

16:32:36 20    advantageous for Marc Toberoff to also represent the

16:32:39 21    Siegels and you didn't discuss that with your

16:32:42 22    mother?

16:32:43 23           MR. TOBEROFF:  Asked and answered.

16:32:48 24           THE WITNESS:  Just what I said.  That.

16:32:53 25           MR. TOBEROFF:  Just.

229

EXHIBIT 77
1884

ROUGH DRAFT

16:32:53  1    BY MR. PETROCELLI:

16:32:55  2        Q.  What did you -- you said you can't recall.

16:32:58  3        A.  Yes.

16:32:59  4        Q.  Do you believe you would have discussed

16:33:01  5    that with her given the nature of its importance?

16:33:06  6            MR. TOBEROFF:  Don't speculate.  Only

16:33:07  7    testify as to your memory.

16:33:09  8            THE WITNESS:  Yeah, I don't know.

16:33:09  9    BY MR. PETROCELLI:

16:33:12 10        Q.  It's not speculation.  It's based on a

16:33:14 11    practice that would you have had of conveying and

16:33:16 12    sharing and communicating with your mother on

16:33:19 13    matters that were important to this topic.  Is it

16:33:26 14    fair to say that you had that practice of sharing

16:33:28 15    important and discussing important information

16:33:32 16    relating to the Superman issue after you retained

16:33:34 17    Mr. Toberoff that would you have discussions on

16:33:36 18    important developments with your mother?

16:33:40 19            MR. TOBEROFF:  Vague.

16:33:43 20            THE WITNESS:  Some.

16:33:43 21    BY MR. PETROCELLI:

16:33:45 22        Q.  Did you believe that this was an important

16:33:46 23    development, whether or not Mr. Toberoff should

16:33:51 24    become the lawyers for the Siegels given that you

16:33:52 25    believed he also was your family's lawyer?

230

**EXHIBIT 77**
**1885**

ROUGH DRAFT

16:33:55  1         A.  Yes.

16:33:56  2         Q.  Do you believe based on the importance of

16:33:57  3    that information that you discuss that with your

16:34:01  4    mother?

16:34:04  5         A.  Probably.

16:34:08  6         Q.  And what did you and she discuss on that

16:34:10  7    subject?

16:34:12  8              MR. TOBEROFF:  Only answer if you have a

16:34:13  9    recollection.

16:34:15 10              MR. PETROCELLI:  That's true of every

16:34:16 11    answer?

16:34:17 12              MR. TOBEROFF:  But I want to make sure.

16:34:19 13    Witnesses have a tendency.  Not this witness but any

16:34:21 14    witness has a tendency to try to fill in the blanks.

16:34:26 15              THE WITNESS:  My mother, she liked Marc

16:34:31 16    Toberoff a lot personally.  She had spoken with him

16:34:36 17    and she -- she thought she would be helping the

16:34:40 18    Siegels by referring them to him.

16:34:40 19    BY MR. PETROCELLI:

16:34:44 20         Q.  Did you discuss how this would be

16:34:47 21    advantageous to the Shuster family by having

16:34:51 22    Mr. Toberoff also represent the Siegels?

16:34:57 23         A.  I don't think we discussed that at that

16:34:59 24    time.

16:34:59 25         Q.  Why didn't you discuss that?  Wasn't that

                                                            231

EXHIBIT 77
1886

ROUGH DRAFT

16:35:02  1    the -- the most important part of the discussion?

16:35:13  2        A.  The -- the advantages came up in

16:35:18  3    discussions over time as we discussed back and forth

16:35:23  4    with Marc Toberoff.  That's -- that's --

16:35:27  5        Q.  I'm asking about you your discussions with

16:35:29  6    your mother because I'm trying to get at information

16:35:31  7    that's clearly and plainly discoverable.

16:35:35  8        A.  At that time we did not discuss any

16:35:39  9    specific strategic value for having the Siegels and

16:35:47 10    Toberoff work together.

16:35:49 11        Q.  Why did you not discuss that subject with

16:35:51 12    your mother given it's importance?

16:35:55 13        A.  I don't know.

16:35:59 14        Q.  You made a decision not to bring it up?

16:36:03 15        A.  I know she recommended him to the Siegels

16:36:06 16    because she liked him and trusted him and -- and she

16:36:11 17    thought it would be a good idea for them to talk to

16:36:14 18    him and that's -- that was at that point that's all

16:36:18 19    we discussed.

16:36:19 20        Q.  And you never once discussed with her your

16:36:21 21    views as to how it would be advantageous to the

16:36:25 22    Shusters to have Mr. Toberoff represent the Siegels?

16:36:28 23            MR. TOBEROFF:  Asked and answered twice.

16:36:29 24            THE WITNESS:  Not at that time.

16:36:29 25    BY MR. PETROCELLI:

**EXHIBIT 77**
**1887**

ROUGH DRAFT

16:36:32  1        Q.  At any time?

16:36:33  2        A.  At any time -- some -- some -- some time

16:36:49  3    later I suppose.

16:36:50  4        Q.  Tell me what you said to her about those

16:36:54  5    advantages.

16:36:55  6        A.  It was based upon my discussions with Marc

16:37:01  7    Toberoff about the value of having all the rights.

16:37:10  8        Q.  Tell me what you said to your mother?

16:37:12  9        A.  That's what I told her.

16:37:13  10        Q.  On that subject.

16:37:14  11            You said it was based on?

16:37:16  12        A.  Yes.

16:37:17  13        Q.  I didn't ask you what it was based on.

16:37:18  14        A.  Okay.

16:37:18  15        Q.  I'm asking you what you actually said to

16:37:21  16    her.

16:37:22  17        A.  Okay.

16:37:22  18        Q.  Tell me what you said to her about why it

16:37:24  19    was valuable to have all the rights.

16:37:29  20        A.  I believe that's all I said.

16:37:30  21        Q.  What did you mean by that?

16:37:33  22        A.  Just what it says.  Valuable to have all

16:37:36  23    the rights.

16:37:36  24        Q.  Valuable to whom?

16:37:38  25        A.  To all of us.

**EXHIBIT 77**
**1888**

ROUGH DRAFT

16:37:39  1        Q.  Who are all?

16:37:40  2        A.  Siegels and Shusters together.

16:37:49  3        Q.  Valuable in that you can demand and command

16:37:55  4    more money?  Valuable in that sense?

16:37:57  5        A.  Well, there's -- there's.

16:38:04  6            MR. TOBEROFF:  Excuse me.  You can testify

16:38:07  7    as to what you specifically said to your mother but

16:38:11  8    you can't testify as to your understanding of the

16:38:14  9    value if that value is based on discussions with

16:38:19 10    your attorney.

16:38:21 11            MR. PETROCELLI:  That's not exactly true if

16:38:23 12    he has discussed that subject with his mother.

16:38:26 13            MR. TOBEROFF:  That's what I just said.

16:38:27 14    You can testify.

16:38:29 15            MR. PETROCELLI:  But even if the

16:38:30 16    information came from you.

16:38:31 17            MR. TOBEROFF:  He can testify.

16:38:32 18            MR. PETROCELLI:  Entirely.

16:38:34 19            MR. TOBEROFF:  Only to what he said to his

16:38:35 20    mother even if the information came from me.

16:38:35 21            MR. PETROCELLI:  Correct.

16:38:37 22            MR. TOBEROFF:  If he didn't say that to his

16:38:39 23    mother and he just said I think this is a good

16:38:41 24    idea --

16:38:41 25            MR. PETROCELLI:  Well --

                                                                    234

EXHIBIT 77
1889

ROUGH DRAFT

16:38:42  1           MR. TOBEROFF:  Then -- then you can't say

16:38:43  2    why do you think it was a good idea.

16:38:44  3           MR. PETROCELLI:  I'm also entitled to ask

16:38:45  4    about his state of mind as to why he said what he

16:38:48  5    said to his mother.

16:38:51  6           MR. TOBEROFF:  This isn't a hearsay

16:38:53  7    objection, this is a privilege objection.

16:38:55  8           MR. PETROCELLI:  No, but we're trying to

16:38:56  9    get at discovery.

16:38:59 10           MR. TOBEROFF:  Okay.

16:38:59 11           MR. PETROCELLI:  And its relevant for that

16:39:04 12    purpose.

16:39:05 13           MR. TOBEROFF:  You can testify as to what

16:39:06 14    you said to your mother.  If he asks you why you

16:39:10 15    said that and the whys and the wheres are based on

16:39:13 16    your conversations with me, I instruct you not to

16:39:17 17    testify.  That's.

16:39:18 18           MR. PETROCELLI:  Well, I don't accept that.

16:39:19 19           THE WITNESS:  Well.

16:39:19 20    BY MR. PETROCELLI:

16:39:20 21       Q.  Let me ask my next question.

16:39:21 22           Did you -- you did not sign a conflict

16:39:37 23    waiver in 2001, 2002 or '3 having to do with

16:39:45 24    Mr. Toberoff representing the Siegels, right?

16:39:49 25       A.  Right.

235

EXHIBIT 77
1890

ROUGH DRAFT

16:39:49  1       Q.  You were never presented with one either,

16:39:49  2    right?

16:39:53  3       A.  I don't think so.

16:40:05  4       Q.  Did you -- did Mr. Toberoff discuss with

16:40:11  5    you his attempts to reach out to the Siegels prior

16:40:17  6    now, this is prior to the time that Mr. Toberoff

16:40:21  7    went to work for the Siegels which I will represent

16:40:23  8    to you was sometime in the late summer of 2002.

16:40:31  9           MR. TOBEROFF:  That's incorrect.  That's

16:40:34 10    misrepresentation of fact.

16:40:36 11       Q.  September, October 2002?

16:40:46 12       Q.  Prior to that time?

16:40:47 13           MR. TOBEROFF:  Nobody used ever use

16:40:49 14    October as late summer.

16:40:50 15           MR. PETROCELLI:  Well it's a little bit

16:40:52 16    unclear.

16:40:52 17           MR. TOBEROFF:  If you say I'm taking a

16:40:54 18    summer holiday.

16:40:54 19           MR. PETROCELLI:  You've got a September --

16:40:55 20    you've got a September date in there where she's

16:40:58 21    terminated the lawyers.  I think it's September 21.

16:41:03 22    I think there's a letter there.  I may be mixing my

16:41:06 23    dates up.  Let's call it October.  I'm not going

16:41:10 24    to -- vouching for the date, but let's just say

16:41:13 25    prior to October 2002, prior to that time -- well,

236

EXHIBIT 77
1891

ROUGH DRAFT

16:41:18   1   let me do it differently.

16:41:19   2          Q.  Did there come a time where you learned

16:41:25   3   that Mr. Toberoff had been retained by the Siegels?

16:41:28   4          A.  Yes.

16:41:29   5          Q.  How did you find out?

16:41:30   6          A.  He told me.

16:41:31   7          Q.  Okay.  Prior to that time when he told you

16:41:37   8   he was retained by the Siegels, and you think that

16:41:40   9   was in 2003 you said, right?

16:41:45  10          A.  That's -- that's what I had thought.  I

16:41:47  11   didn't -- I don't remember.

16:41:52  12          Q.  Did -- did the Joanne Siegel or Laura

16:41:56  13   Siegel have any discussions with you or your mother

16:42:02  14   to your knowledge, about the decision to hire

16:42:02  15   Mr. Toberoff?

16:42:02  16          A.  No, discussions with me.

16:42:07  17          Q.  Do you know whether they had any

16:42:08  18   discussions with your mother to the effect hey, I

16:42:11  19   met him or I've talked to him, I think I'm -- I

16:42:14  20   think I'm going to retain him?

16:42:16  21          A.  I don't know what they said to her.

16:42:17  22          Q.  Did they call you up to ask if it would

16:42:20  23   pose any problem with respect to you or your mother

16:42:26  24   if he went to work for the Siegels?

16:42:28  25          A.  No.

                                                              237

**EXHIBIT 77**
**1892**

ROUGH DRAFT

16:42:36 1        Q.  Have you -- were you told about -- by

16:42:40 2    Mr. Toberoff about any of his efforts to contact the

16:42:44 3    Siegels or make contact with them prior to the time

16:42:47 4    he was retained by them?

16:42:48 5        A.  No.

16:42:54 6        Q.  Did you learn about what he was -- about

16:42:59 7    his efforts to get in touch with them from any other

16:43:03 8    source?

16:43:03 9        A.  No.

16:43:09 10       Q.  So is what you're telling me that at one

16:43:15 11   point you told him that you had no issue with his

16:43:18 12   representing the Siegels and then the next time you

16:43:22 13   discussed the subject with him, he told you he was

16:43:25 14   the lawyer for the Siegels and there was no

16:43:27 15   discussion in between on that subject?

16:43:32 16       A.  I don't know.

16:43:33 17       Q.  When did you and Mr. Toberoff have the

16:43:36 18   discussion about it being mutually advantageous for

16:43:43 19   Mr. Toberoff to also represent the Siegels?  When

16:43:48 20   did you have that discussion?

16:43:50 21       A.  Sometime after they retained him.

16:43:54 22       Q.  Oh after they retained him?

16:43:55 23       A.  Yes.

16:43:57 24       Q.  Okay.  So prior to the time that the

16:44:00 25   Siegels retained Mr. Toberoff, other than your

                                                            238

**EXHIBIT 77**
**1893**

ROUGH DRAFT

16:44:05  1    mother putting -- other than your mother making a

16:44:09  2    phone call to Joanne, you had no knowledge about

16:44:16  3    Mr. Toberoff contacting the Siegels or trying to

16:44:20  4    become their lawyer or anything like that?

16:44:22  5         MR. TOBEROFF:  Lacks foundation.  Assumes

16:44:25  6    facts as to trying to become their lawyer.

16:44:32  7         THE WITNESS:  I don't know about that.

16:44:32  8    BY MR. PETROCELLI:

16:44:36  9         Q.  Do you -- when did -- when did you and your

16:44:45 10    mother discuss that she would recommend Mr. Toberoff

16:44:49 11    to Joanne Siegel?  Was that before or after you

16:44:52 12    signed the 2001 agreement with Mr. Toberoff?

16:44:57 13         A.  Before or after we signed the 2001

16:45:05 14    agreement?

16:45:05 15         Q.  Yes.

16:45:09 16         A.

16:45:09 17         MR. TOBEROFF:  Do you understand the

16:45:10 18    question?

16:45:12 19         THE WITNESS:  Yeah yeah.

16:45:12 20         MR. TOBEROFF:  Do you understand the

16:45:13 21    question.

16:45:13 22    BY MR. PETROCELLI:

16:45:14 23         Q.  Exhibit 10 was signed in November 2001

16:45:16 24    right Exhibit 10 you have that in front of you the

16:45:18 25    joint venture agreement?

                                                      239

EXHIBIT 77
1894

ROUGH DRAFT

16:45:19  1        A.  Yes.

16:45:19  2        Q.  Was it before or after you signed Exhibit

16:45:21  3    10 that you and your mother had a discussion about

16:45:24  4    putting him -- putting -- having Joanne Siegel --

16:45:29  5    telling Joanne Siegel about Marc Toberoff?

16:45:31  6        A.  I don't know if we specifically discussed

16:45:34  7    it.  She mentioned him.

16:45:38  8        Q.  She whom?

16:45:38  9        A.  My mother.  In just a phone conversation.

16:45:42 10        Q.  To whom?

16:45:43 11        A.  To Joanne.

16:45:45 12        Q.  Before or after?

16:45:46 13        A.  After.

16:45:47 14        Q.  How long after?

16:45:50 15        MR. TOBEROFF:  Asked and answered.

16:45:50 16        THE WITNESS:  I don't know.

16:45:50 17    BY MR. PETROCELLI:

16:45:52 18        Q.  And you were there when she mentioned it or

16:45:56 19    she told you about it afterwards?

16:45:57 20        A.  She told me.

16:45:58 21        Q.  Okay.  And what did she tell you she had

16:46:01 22    done?

16:46:04 23        A.  I don't remember exactly what she said.

16:46:08 24        Q.  Okay.  Did you have a follow-up

16:46:09 25    conversation with Mr. Toberoff about the fact that

                                                           240

**EXHIBIT 77**
**1895**

ROUGH DRAFT

16:46:11  1    your mother had mentioned him to Joanne Siegel?

16:46:15  2         A.  No.

16:46:17  3         Q.  Did you have any conversations with him

16:46:19  4    about whether it would be a good idea or a bad idea

16:46:22  5    for him also to represent the Siegel family?

16:46:26  6              MR. TOBEROFF:  I instruct you not to answer

16:46:28  7    as to the substance of our conversations whether

16:46:30  8    it's a good idea or bad idea.

16:46:32  9              (Instruction not to answer.)

16:46:32 10    BY MR. PETROCELLI:

16:46:33 11         Q.  Did you -- when is the next time you had

16:46:35 12    any conversation with anyone about the subject of

16:46:39 13    mark Siegel having some kind of a relationship with

16:46:44 14    the Siegels?

16:46:45 15              MR. TOBEROFF:  Mark.

16:46:45 16    BY MR. PETROCELLI:

16:46:46 17         Q.  Marc Toberoff having some kind of

16:46:49 18    relationship with the Siegels after this one event

16:46:52 19    that you describe where your mother told you she

16:46:54 20    spoke to Joanne?

16:46:55 21         A.  When is the next time I talked to anyone?

16:46:57 22         Q.  On that subject correct.

16:47:01 23         A.  Other than Marc Toberoff?

16:47:02 24         Q.  No including Marc Toberoff.

16:47:03 25         A.  Oh.

241

EXHIBIT 77
1896

ROUGH DRAFT

16:47:05  1                MR. TOBEROFF:  You can't -- okay.  I'll let

16:47:08  2    you answer that.

16:47:08  3                THE WITNESS:  I don't remember.

16:47:08  4    BY MR. PETROCELLI:

16:47:10  5         Q.  Was it before or after Mr. Toberoff was

16:47:13  6    retained by the Siegels?

16:47:14  7         A.  I don't -- I don't remember.  Too long ago.

16:47:24  8         Q.  Did Mr. Toberoff discuss with you that

16:47:26  9    there was a -- that he was approaching the Siegels

16:47:29  10   not to represent them as a lawyer but to do a

16:47:32  11   business transaction with them?

16:47:35  12                MR. TOBEROFF:  Assumes facts.  Lacks

16:47:41  13   foundation.  Instruct you not to answer as to the

16:47:44  14   substance of our conversations.

16:47:45  15                (Instruction not to answer.)

16:47:45  16   BY MR. PETROCELLI:

16:47:46  17        Q.  Did he discuss that he was aware of an

16:47:50  18   investor, very wealthy investor, maybe even a

16:47:54  19   billionaire investor who wanted to do a deal for the

16:47:59  20   Superman rights?

16:48:00  21                MR. TOBEROFF:  Same instruction.

16:48:04  22                (Instruction not to answer.)

16:48:04  23                MR. TOBEROFF:  As to our discussions or

16:48:06  24   conversations.

16:48:06  25   BY MR. PETROCELLI:

242

**EXHIBIT 77**
**1897**

ROUGH DRAFT

16:48:06  1        Q.  Did he discuss with you that he was going

16:48:08  2    to approach the Siegels about such an investor?

16:48:14  3            MR. TOBEROFF:  Same instruction.

16:48:16  4            (Instruction not to answer.)

16:48:16  5    BY MR. PETROCELLI:

16:48:19  6        Q.  Have you ever come to learn that

16:48:23  7    Mr. Toberoff had discussions with the Siegels about

16:48:27  8    an investor who would buy their Superman rights?

16:48:35  9            MR. TOBEROFF:  You can only answer that if

16:48:39 10    you have knowledge independent of your discussions

16:48:39 11    with me.

16:48:41 12            THE WITNESS:  I don't have knowledge

16:48:43 13    independent of my discussions.

16:48:45 14            MR. TOBEROFF:  Then I instruct you not to

16:48:47 15    answer.

16:48:47 16            (Instruction not to answer.)

16:48:47 17    BY MR. PETROCELLI:

16:48:48 18        Q.  Did you have discussions with Mr. Toberoff

16:48:51 19    on that topic in 2002?

16:48:55 20            MR. TOBEROFF:  Same instruction.

16:48:55 21            (Instruction not to answer.)

16:48:55 22    BY MR. PETROCELLI:

16:49:00 23        Q.  Did you have discussions with Mr. Toberoff

16:49:01 24    on -- about the Siegels in 2002?

16:49:07 25            MR. TOBEROFF:  Just about the Siegels?

243

**EXHIBIT 77**
**1898**

ROUGH DRAFT

16:49:08  1          MR. PETROCELLI:  Anything related to the

16:49:09  2    Siegels.

16:49:11  3          MR. TOBEROFF:  You can -- you could

16:49:13  4    answer -- without waiver of privilege, you can

16:49:16  5    answer whether we had any discussions on the subject

16:49:17  6    of the Siegels if you remember.  Date specific.

16:49:22  7          THE WITNESS:  I don't remember

16:49:23  8    specifically.  I can only assume.  I don't remember.

16:49:23  9    BY MR. PETROCELLI:

16:49:28  10         Q.  You said earlier that you saw a document

16:49:30  11    called the Toberoff timeline and you saw it prior to

16:49:37  12    Siegel that it was attached to the lawsuit that we

16:49:39  13    filed.

16:49:39  14         A.  Yes.

16:49:41  15         Q.  Okay.  And when you saw that document you

16:49:43  16    read it?

16:49:44  17         A.  Yeah, scanned it.

16:49:50  18         Q.  Scanned again?

16:49:50  19         A.  Yeah, I read it.

16:49:52  20         Q.  Read it?

16:49:53  21         A.  I didn't think much of it.

16:49:55  22         Q.  What does that mean?

16:49:59  23         A.  You want me to explain my -- my feelings

16:50:01  24    about what that is?

16:50:03  25         Q.  Sure.

**EXHIBIT 77**
**1899**

ROUGH DRAFT

16:50:05  1          A.  I think that someone came in intentionally

16:50:12  2     to try to set Marc Toberoff up to make him look bad

16:50:16  3     and sent an anonymous letter.

16:50:23  4          Q.  What's the basis?

16:50:24  5          A.  Without -- without signing.  That's what

16:50:26  6     I -- my belief and feeling is about that.

16:50:29  7          Q.  Why -- why did you form that belief, that

16:50:34  8     someone was trying to set him up?

16:50:34  9          A.  Because --

16:50:36 10          Q.  Set him up for what?

16:50:37 11          A.  Because documents were stolen.

16:50:39 12          Q.  What does that mean they were stolen?

16:50:41 13          A.  Documents were stolen from his office.

16:50:43 14          Q.  How do you know that?

16:50:44 15          A.  He told me.

16:50:47 16          Q.  Do you know it from any other source?

16:50:54 17          A.  Just from a -- a later as a grand jury

16:51:02 18     subpoena regarding that theft.

16:51:04 19          Q.  You were examined if front of the grand

16:51:07 20     jury?

16:51:07 21          A.  No, there was -- I was aware of a grand

16:51:10 22     jury subpoena regarding that theft issue.

16:51:12 23          Q.  How did you become aware of that?

16:51:14 24              MR. TOBEROFF:  You're getting into an area

16:51:17 25     where your awareness is solely based on

245

**EXHIBIT 77**
**1900**

ROUGH DRAFT

16:51:20 1    conversations with me.  You were talking quickly and

16:51:22 2    you meant when you said he told me I would have

16:51:25 3    objected to that attorney-client privilege.

16:51:26 4                MR. PETROCELLI:  He learned about the grand

16:51:27 5    jury --

16:51:27 6                MR. TOBEROFF:  You got that out before I

16:51:28 7    could object.

16:51:28 8                THE WITNESS:  Oh, sorry.

16:51:29 9                MR. TOBEROFF:  So I would slow it down.

16:51:32 10   BY MR. PETROCELLI:

16:51:33 11        Q.  The grand jury subpoena came from

16:51:35 12   Mr. Toberoff.

16:51:35 13             Is that right?

16:51:36 14        A.  Yes.

16:51:37 15        Q.  And the information about the circumstances

16:51:39 16   of how those documents got created came from

16:51:43 17   Mr. Toberoff, right?

16:51:44 18                MR. TOBEROFF:  I instruct you not to

16:51:45 19   answer.

16:51:45 20             (Instruction not to answer.)

16:51:46 21                THE WITNESS:  Okay.

16:51:46 22   BY MR. PETROCELLI:

16:51:47 23        Q.  Well, you said he is the one who told you

16:51:49 24   they were stolen, right?

16:51:49 25        A.  Yes.

246

**EXHIBIT 77**
**1901**

ROUGH DRAFT

16:51:53   1        Q.  Have you ever spoken to the person who

16:51:56   2    allegedly took the documents?

16:51:57   3        A.  No.

16:52:02   4        Q.  Did you ever speak to the Siegels about

16:52:04   5    whether anything said in the document is true?

16:52:10   6            MR. TOBEROFF:  Vague.  You mean the

16:52:11   7    timeline?

16:52:12   8            MR. PETROCELLI:  Yeah.

16:52:12   9        Q.  Did you ever talk to the Siegels about

16:52:14  10    whether anything stated in the timeline is true?

16:52:17  11        A.  No.

16:52:22  12        Q.  Why not?

16:52:23  13        A.  I don't know.

16:52:27  14        Q.  You saw in there references to Mr. Toberoff

16:52:30  15    misleading the Siegels?

16:52:32  16        A.  Yes.

16:52:33  17        Q.  Okay.  And trying to you know corner the

16:52:37  18    rights mainly for himself?

16:52:40  19        A.  I saw that.

16:52:44  20        Q.  Okay.  And you saw in there that there were

16:52:46  21    references of making statements to the Siegels that

16:52:49  22    there was a billionaire investor when in fact there

16:52:51  23    wasn't?

16:52:56  24        A.  I read that.

16:52:56  25        Q.  Okay.  Did you discuss any of that with

                                                              247

EXHIBIT 77
1902

ROUGH DRAFT

16:52:58  1    your mother when you first read that material?

16:53:04  2         A.  I don't recall.

16:53:09  3         Q.  And the -- did you give any thought to

16:53:12  4    talking to the Siegels about whether any of it was

16:53:17  5    true?

16:53:21  6              MR. TOBEROFF:  Asked and answered.

16:53:22  7              THE WITNESS:  I did not discuss it with

16:53:26  8    them.

16:53:26  9    BY MR. PETROCELLI:

16:53:27 10         Q.  Did you give any thought to discussing it

16:53:29 11    with them?

16:53:29 12         A.  I don't know if I gave any thought.

16:53:37 13         Q.  Did you do anything to look into the -- the

16:53:42 14    truth of what was said in that document?  See if any

16:53:49 15    of it was true?

16:53:50 16         A.  I I'm aware that there were a number of

16:53:55 17    factual errors and falsehoods as a matter of fact.

16:53:59 18    A lot of concoctuns, things that are concocted that

16:54:05 19    are factually incorrect.

16:54:06 20         Q.  How do you know they are?

16:54:07 21         A.  Because I'm familiar with some of the

16:54:09 22    timelines.

16:54:10 23         Q.  Let me show it to you.   It's Exhibit 25.

16:54:31 24              (The document referred to was

16:54:31 25              marked for identification by the

                                                              248

**EXHIBIT 77**
**1903**

ROUGH DRAFT

16:54:31  1          C.S.R. as Exhibit 25 and attached

16:54:33  2          to this deposition.)

16:54:33  3    BY MR. PETROCELLI:

16:54:33  4       Q.  Identify for me what you know to be false.

16:54:40  5       A.  Well, I have to go through it.

16:54:41  6       Q.  To be clear, you received this -- you first

16:54:44  7    saw this document years ago, right?

16:54:50  8       A.

16:54:52  9          MR. TOBEROFF:  Asked and answered.

16:54:52  10         THE WITNESS:  Yeah, I already answered.

16:54:52  11   BY MR. PETROCELLI:

16:54:55  12      Q.  Please answer my question?

16:54:55  13         MR. TOBEROFF:  You can -- when I say asked

16:54:57  14   and answered that's for the record -- excuse me.

16:54:59  15   When I say asked and answered, I'm not instructing

16:55:02  16   you not to answer.  I'm making an objection for the

16:55:04  17   record.

16:55:04  18         You can answer again -- you can answer

16:55:07  19   again unless I instruct you.

16:55:08  20         THE WITNESS:  Oh.  I don't remember exactly

16:55:15  21   when I saw it I know I have seen it before today.

16:55:17  22         MR. PETROCELLI:  Have and you got it from

16:55:18  23   Mr. Toberoff when you did see it for the first time,

16:55:18  24   right?

16:55:18  25      A.  Yes.

EXHIBIT 77
1904

ROUGH DRAFT

16:55:24  1          Q.  Now can you answer my question.  I snow you

16:55:24  2     have to look at the documents but my question is to

16:55:27  3     identified what you know to be false.

16:55:36  4               MR. TOBEROFF:  Take your time reading the

16:55:37  5     document.

16:55:41  6               THE WITNESS:  Well --

16:55:43  7               MR. TOBEROFF:  There's a lot in here.

16:55:44  8               THE WITNESS:  Yeah, it is.  There is a lot

16:55:46  9     in here.  There's a lot in here.

16:56:36  10              Well one inaccuracy is here on page 3,

16:56:40  11    March 2003.  It characterizes March 3rd, 2003 -- it

16:56:49  12    characterizes Marc Toberoff as, quote, messing up

16:56:52  13    relationships for his own personal benefits and as

16:56:55  14    if DC and the Siegels had a great relationship and

16:56:59  15    when it in fact that they had a cut off talks fired

16:57:04  16    their attorneys and -- and wrote a letter calling

16:57:10  17    Time-Warner -- comparing them to the gestapo in

16:57:15  18    their dealings with them.  He is saying that Marc

16:57:17  19    Toberoff is interfering with all the relationships

16:57:19  20    up to this point.  It was already -- the

16:57:21  21    relationship was already bad.

16:57:21  22    BY MR. PETROCELLI:

16:57:23  23         Q.  Let me stop you right there.

16:57:24  24              How do you know what you just said?

16:57:26  25         A.  Well, I -- I know and independently that

                                                                   250

**EXHIBIT 77**
**1905**

ROUGH DRAFT

16:57:31  1    the Siegels fired their lawyer.

16:57:32  2        Q.  How do you know that?

16:57:33  3        A.  I'm -- how do I know that?  I'm aware

16:57:41  4    from -- I'm aware from them at some point they

16:57:46  5    informed us of that.  And that they had broken off

16:57:53  6    negotiations with -- with DC because they were

16:57:57  7    unhappy with the terms.  And I know that also from

16:58:02  8    my discussion with Marc Toberoff.

16:58:05  9            MR. TOBEROFF:  Don't talk with your

16:58:06  10   discussions with me.

16:58:07  11           THE WITNESS:  Okay.  Okay.

16:58:07  12   BY MR. PETROCELLI:

16:58:10  13       Q.  When you -- you had previously told me that

16:58:13  14   you couldn't recall any contact with the Siegels

16:58:17  15   about their relationship with Toberoff and I asked

16:58:25  16   you a number of times about the time period up to

16:58:29  17   the time when Mr. Toberoff was first retained by

16:58:32  18   them.  Now, you're telling me they told you that

16:58:36  19   they broke off talks and all this other stuff.  Did

16:58:40  20   you learn that after the fact?

16:58:41  21           MR. TOBEROFF:  Misstates his testimony.

16:58:42  22           THE WITNESS:  Yes, it does misstated my

16:58:44  23   testimony.

16:58:44  24   BY MR. PETROCELLI:

16:58:45  25       Q.  How does it misstate your testimony?

251

**EXHIBIT 77**
**1906**

ROUGH DRAFT

16:58:46  1        A.  The only -- the only thing that I knew at

16:58:49  2    the time that my mother contacted Joanne --

16:58:51  3        Q.   Correct?

16:58:51  4        A.  -- was that they were not happy with their

16:58:54  5    attorney and she recommended Marc Toberoff.  And

16:58:57  6    that's the only thing that I knew from them at that

16:59:00  7    time.

16:59:00  8        Q.  Well, that's not what you testified testify

16:59:02  9    on but let me -- let me go over this again.

16:59:04 10            Are you saying that your mother had a phone

16:59:08 11    call with Joanne Siegel after you and she signed

16:59:14 12    Exhibit 10 in November 2001 and in that phone call

16:59:21 13    Joanne Siegel says I'm not happy with my attorney

16:59:25 14    and your mother says oh, let me introduce to you

16:59:28 15    Marc Toberoff?  And that occurs in a conversation

16:59:32 16    after November 2001?

16:59:34 17        A.  Yes.

16:59:36 18        Q.  All in one conversation?

16:59:39 19        A.  I don't know about that.

16:59:46 20        Q.  Okay.  And other than that, you had no

16:59:49 21    other contact with the Siegels prior to the time

16:59:52 22    that they hired Mr. Toberoff?  You said that

16:59:57 23    already, correct?

17:00:00 24        A.  Phone contact?

17:00:01 25        Q.  Any contact.

                                                            252

**EXHIBIT 77**
**1907**

ROUGH DRAFT

17:00:02 1        A.  I --

17:00:03 2        Q.  2001 all the way through 2002 up to the

17:00:07 3    time they hired Mr. Toberoff?

17:00:08 4        A.  I -- I don't know if I had no phone contact

17:00:12 5    at all.  I don't remember.  I don't remember that.

17:00:18 6        Q.  Did you have any contact with him during

17:00:19 7    that time period from the moment your mom made that

17:00:22 8    phone call until the time that they hired

17:00:24 9    Mr. Toberoff?

17:00:24 10       A.  I -- I don't -- I do not remember.

17:00:26 11       Q.  Okay.  And did your mother have any contact

17:00:28 12   with him during that year?

17:00:34 13           MR. TOBEROFF: .

17:00:34 14   BY MR. PETROCELLI:

17:00:34 15       Q.  From the time that she made that first

17:00:36 16   phone call until the time they hired Mr. Toberoff

17:00:38 17   sometime in September or October 2002?

17:00:41 18       A.  I -- I don't know if there was any.

17:00:43 19           MR. TOBEROFF:  Assumes facts.  Lacks

17:00:44 20   foundation.

17:00:44 21   BY MR. PETROCELLI:

17:00:45 22       Q.  Okay you don't know, right?

17:00:46 23       A.  I don't know if there was any subsequent

17:00:49 24   phone call.

17:00:49 25       Q.  So why where you getting the information?

                                                           253

EXHIBIT 77
1908

ROUGH DRAFT

17:00:51  1    Other than from Mr. Toberoff where did you get the

17:00:53  2    information that they break off talks and gestapo

17:00:57  3    letter and all this other kind of stuff?  Where did

17:00:59  4    that in from?

17:01:01  5        A.  Well, in the present I have gotten much of

17:01:04  6    this from my discussions with Marc Toberoff.

17:01:08  7        Q.  Okay.

17:01:09  8            MR. TOBEROFF:  Don't talk about your

17:01:11  9    discussions with me.

17:01:11 10    BY MR. PETROCELLI:

17:01:12 11        Q.  So the reason why you know is that the

17:01:13 12    statements in here are untrue is what Marc Toberoff

17:01:15 13    has told you?

17:01:16 14        A.  And -- and there has been -- there has been

17:01:20 15    contact with the -- the Siegels.

17:01:24 16        Q.  Tell me about it.  When?

17:01:27 17        A.  I -- I don't know.  They call every now and

17:01:30 18    then to wish Merry Christmas and happy birthday

17:01:36 19    and -- and usually my mother has talked with them

17:01:39 20    and she has become aware of their situation in

17:01:43 21    casual conversation.

17:01:47 22        Q.  This is what your mother has told you?

17:01:49 23        A.  Yes.

17:01:50 24        Q.  Okay.  And -- and in casual conversation

17:01:55 25    they said I wrote a gestapo letter?

254

EXHIBIT 77
1909

ROUGH DRAFT

17:01:59 1        A.  I don't know if they -- they discussed that

17:02:02 2   particular thing.

17:02:02 3        Q.  So here's what I'm trying to find out from

17:02:05 4   you because this is how we got on to this subject

17:02:12 5   what -- what information do you have that any of

17:02:16 6   this is un through, other than what Marc Toberoff

17:02:16 7   has told you?  I don't -- for the purpose of this

17:02:18 8   question, I am not interested in what Marc Toberoff

17:02:21 9   told you?

17:02:22 10       MR. TOBEROFF:  And I'm instructing you not

17:02:24 11  to answer as to what I've told you.

17:02:29 12       THE WITNESS:  Okay.  You're instructing me

17:02:32 13  not to answer?

17:02:33 14       MR. TOBEROFF:  No.  You can answer the

17:02:34 15  question but don't answer if you can as to -- don't

17:02:41 16  answer based on our conversations.  So you've

17:02:45 17  testified to a gestapo letter.  If you have a basis

17:02:49 18  other than conversations with me that you can

17:02:51 19  recollect, you can discuss that with him.  That's

17:02:53 20  what he was asking you.

17:02:54 21       THE WITNESS:  Uh-huh.

17:02:54 22  BY MR. PETROCELLI:

17:02:57 23       Q.  Tell me what you know to be untrue based on

17:03:00 24  information that you have obtained from people other

17:03:03 25  than Marc Toberoff?

255

EXHIBIT 77
1910

ROUGH DRAFT

17:03:04  1        A.  Well, I know there are things to be untrue

17:03:06  2    that are -- are based on my discussions with Marc

17:03:12  3    Toberoff.

17:03:12  4        Q.  And I'm not asking about you that?

17:03:14  5        A.  Okay.  I guess I can't say it then.

17:03:16  6        Q.  Okay?

17:03:17  7        MR. TOBEROFF:  Well, you can -- you can

17:03:18  8    look at the letter and you -- you have to.

17:03:20  9        MR. PETROCELLI:  We don't have to spend any

17:03:21 10    more time on it if that's your answer?

17:03:21 11        MR. TOBEROFF:  No.

17:03:24 12        MR. PETROCELLI:  But if you want to read

17:03:26 13    through it you tell me if there's anything that you

17:03:28 14    know to be untrue based on something other than Marc

17:03:33 15    Toberoff telling you.

17:03:34 16        MR. TOBEROFF:  And what I'm suggesting to

17:03:36 17    you is that.

17:03:36 18    BY MR. PETROCELLI:

17:03:37 19        Q.  Now, what is it you're pointing out to him

17:03:39 20    you're not allowed to do that?

17:03:41 21        MR. TOBEROFF:  He is pointing out a

17:03:42 22    paragraph.  Can you take this thing from the very

17:03:44 23    beginning -- wait -- since he's asked the question,

17:03:47 24    this document is several pages long, it's goes on

17:03:53 25    for 7 pages.  Read every single line and answer when

256

EXHIBIT 77
1911

ROUGH DRAFT

17:03:59  1    you reach something that you believe is untrue and

17:04:03  2    you can talk about it because it's not based on

17:04:05  3    conversation with me, you can tell Mr. Petrocelli

17:04:10  4    what you believe is untrue, if anything, and why.

17:04:13  5    That's it.  And take your time because it's his

17:04:17  6    deposition and you can -- you need to spend the time

17:04:21  7    to answer the question properly.  It's very

17:04:23  8    time-consuming assignment.

17:04:23  9    BY MR. PETROCELLI:

17:04:25 10        Q.  What paragraph did you just point out to

17:04:27 11    Mr. Toberoff?

17:04:29 12            MR. TOBEROFF:  You can answer that.

17:04:30 13            THE WITNESS:  The one on -- referencing

17:04:36 14    October 27, 2003.

17:04:36 15    BY MR. PETROCELLI:

17:04:40 16        Q.  What page is that on?

17:04:41 17        A.  5.

17:04:45 18        Q.  Okay.  Tell me about that paragraph.

17:04:46 19    Why -- why were you pointing it out?

17:04:53 20        A.  It completely mischaracterizes the current

17:04:57 21    legal agreement.

17:05:00 22        Q.  How so?

17:05:00 23        A.  That we have.

17:05:02 24        Q.  How does it mischaracterize it?

17:05:05 25        A.  Can I go into that?

257

EXHIBIT 77
1912

ROUGH DRAFT

17:05:09  1         Q.  Well, again this is based on -- this is

17:05:11  2    based on what you know not based on what Marc

17:05:15  3    Toberoff told you.  So that's -- that's what you're

17:05:19  4    answering.

17:05:21  5              MR. TOBEROFF:  You can't go -- what are you

17:05:23  6    talking about can you go into the details of our

17:05:26  7    retainer agreement?

17:05:27  8              THE WITNESS:  Why this is false.

17:05:31  9              MR. TOBEROFF:  Let me read it.

17:05:57 10              MR. PETROCELLI:  Do you have to change the

17:05:59 11    videotape.

17:05:59 12              THE VIDEOGRAPHER:  I do you have

17:06:00 13    approximately a minute or a little bit more.

17:06:02 14              MR. PETROCELLI:  Okay?

17:06:04 15              MR. TOBEROFF:  Yes.  Are you talking about

17:06:04 16    the highlighted portion?

17:06:06 17              THE WITNESS:  Yes.

17:06:07 18              MR. TOBEROFF:  Yes you can -- you can --

17:06:09 19    you can answer that.

17:06:12 20              THE WITNESS:  Okay.

17:06:14 21              MR. PETROCELLI:  Well, we're going to have

17:06:15 22    to change the videotape right now.

17:06:16 23              THE WITNESS:  Oh.

17:06:17 24              THE VIDEOGRAPHER:  Okay.  This will mark

17:06:19 25    the end of Volume I, Tape Number 3 in the deposition

                                                            258

EXHIBIT 77
1913

ROUGH DRAFT

17:06:21  1    of Mark Warren Peary.  Changing tapes at 5:05.

17:06:26  2              (Brief recess.)

17:18:26  3              THE VIDEOGRAPHER:  We are back on the

17:18:33  4    record and this marks the beginning of Volume I,

17:18:36  5    tape number 4 in the deposition of Mark Warren

17:18:39  6    Peary.  The time is 5:17.

17:18:39  7    BY MR. PETROCELLI:

17:18:44  8         Q.  You were going to tell me what was

17:18:46  9    inaccurate about the October 27, 2003 reference in

17:18:51 10    the timeline document Exhibit 25?

17:18:54 11         A.  Yes.

17:18:57 12         Q.  Without telling me about your conversations

17:18:59 13    with Mr. Toberoff on that subject?

17:19:00 14         A.  Yes.  The -- the new legal retainer

17:19:08 15    completely superseded all the old agreements with

17:19:12 16    Pacific Pictures and canceled those out completely

17:19:18 17    and so this completely mischaracterizes his interest

17:19:23 18    in -- in any proceeds.

17:19:31 19         Q.  We'll talk about that when we get to it.

17:19:33 20              Anything else?

17:19:35 21         A.  There -- there are probably lots of things

17:19:39 22    if I had a lot of time to study it it's full of

17:19:42 23    inaccuracies and mischaracterizations.  Just -- I

17:19:50 24    would just say in -- in general that Marc Toberoff

17:19:59 25    is -- is probably one of the hardest working.

                                                        259

**EXHIBIT 77**
**1914**

ROUGH DRAFT

17:20:02  1        Q.  That's not what I'm asking you?

17:20:04  2        A.  Dedicated lawyers.

17:20:05  3            MR. PETROCELLI:  Move to strike it's

17:20:06  4    non-responsive.

17:20:08  5            MR. TOBEROFF:  Let him answer.

17:20:09  6            MR. PETROCELLI:  We're not doing that.

17:20:11  7            MR. TOBEROFF:  And this mischaracterizes --

17:20:13  8    BY MR. PETROCELLI:

17:20:14  9        Q.  Not -- I was asking you about if there were

17:20:16 10    any other particular statements in here.

17:20:17 11            MR. TOBEROFF:  He is answering you.  You

17:20:19 12    cut off his answer because you didn't want to hear

17:20:21 13    it.

17:20:21 14            MR. PETROCELLI:  I'm asking about specific

17:20:22 15    statements in here.

17:20:24 16            MR. TOBEROFF:  He's answering.  Objection.

17:20:29 17    You need to let the witness answer.

17:20:29 18    BY MR. PETROCELLI:

17:20:40 19        Q.  Let me ask you a question about the last --

17:20:43 20    right after that paragraph you pointed out to me it

17:20:46 21    says:

17:20:50 22                "N T inquires into the

17:20:51 23                legality of entering into the

17:20:52 24                Pacific Pictures Corporation

17:20:54 25                agreement with the Peavys heirs the

                                                              260

**EXHIBIT 77**
**1915**

ROUGH DRAFT

17:20:58  1           Shuster estate using the law firm

17:21:00  2           Armstrong Hirsch Jackoway Tyerman

17:21:02  3           and Wertheimer."

17:21:06  4           Did Mr. Toberoff discuss with you that he

17:21:11  5    had obtained legal advice from the Armstrong her

17:21:17  6    issue firm on the subject of the legality of your

17:21:19  7    agreement.

17:21:19  8           MR. TOBEROFF:  Instruct you not to answer

17:21:21  9    as to the substance of our discussions.

17:21:24 10           (Instruction not to answer.)

17:21:24 11    BY MR. PETROCELLI:

17:21:25 12        Q.  Have you seen a -- any opinion or memoranda

17:21:31 13    from the Armstrong Hirsch firm on the subject of

17:21:35 14    your agreement?

17:21:38 15        A.  No.

17:21:40 16        Q.  Have you spoken to anyone other than

17:21:42 17    Mr. Toberoff on the subject of the validity or

17:21:47 18    legality of your Pacific Pictures agreements?

17:21:49 19           MR. TOBEROFF:  Asked and answered.

17:21:50 20           You can answer again.

17:21:51 21           THE WITNESS:  No.

17:21:51 22    BY MR. PETROCELLI:

17:21:52 23        Q.  Okay.  Put this document aside in the

17:21:56 24    interest of time.

17:21:58 25           MR. TOBEROFF:  So you're not interested in

261

**EXHIBIT 77**
**1916**

ROUGH DRAFT

17:21:59 1    him finishing his answer about what's inn correct

17:22:02 2    about this document.

17:22:03 3            MR. PETROCELLI:  I'm going to have to come

17:22:04 4    back to it if I have time but since I'm working on a

17:22:08 5    budget right here I got to make better use of my

17:22:10 6    time.

17:22:22 7        Q.  Now, in 2003 you -- you became the executor

17:22:31 8    of the Joe Shuster estate, correct?

17:22:31 9        A.  Yes.

17:22:35 10       Q.  And did your mother indicate that she was

17:22:37 11   unwilling to serve?

17:22:41 12       A.  We had no such discussion.

17:22:47 13       Q.  Well, did she say why wasn't she named the

17:22:50 14   executor of the estate pursuant to the will?

17:22:55 15       A.  I'm the one that has initiated the whole --

17:23:02 16   the whole project.  I've been involved in it with

17:23:06 17   Marc Toberoff from the beginning and I'm active and

17:23:12 18   knowledgeable on it.

17:23:15 19       Q.  You never had any discussion that your

17:23:16 20   mother was unable or unwilling to serve as executor.

17:23:22 21           Is that correct?

17:23:22 22       A.  Right.

17:23:23 23       Q.  Take a look at Exhibit 12 which is a

17:23:29 24   collection of papers from the probate proceeding.

17:23:42 25           (The document referred to was

262

**EXHIBIT 77**
**1917**

ROUGH DRAFT

17:23:42  1          marked for identification by the

17:23:42  2          C.S.R. as Exhibit 12 and attached

17:23:43  3          to this deposition.)

17:23:43  4   BY MR. PETROCELLI:

17:23:44  5       Q.  Now you'll see your signature.

17:23:49  6   September 30, 2003, Mark Warren Peary.

17:23:53  7       A.  Okay.

17:23:54  8       Q.  On the first page?

17:23:57  9          Do you see that?

17:23:58 10       A.  Yes.

17:23:59 11       Q.  Do you see your signature on the second

17:24:00 12   page?

17:24:00 13       A.  Yes.

17:24:01 14       Q.  These applications for the administration

17:24:04 15   of the estate?

17:24:05 16       A.  Yes.

17:24:06 17       Q.  Do you see your signature there under the

17:24:08 18   date September 30, 2003?

17:24:09 19       A.  Yes.

17:24:12 20       Q.  Now, if we go to the next page we have

17:24:14 21   proof of subscribing witness Tom Fenaughty

17:24:20 22   F-e-n-a-u-g-h-t-y the same person who witnessed Joe

17:24:22 23   Shuster's will.

17:24:27 24          Do you see that? It's on page 3?

17:24:28 25       A.  Oh, 3.

263

**EXHIBIT 77**
**1918**

ROUGH DRAFT

17:24:30  1        Q.  Did you have any contact with him, put him

17:24:36  2   in touch with your lawyer?

17:24:45  3        A.  I didn't have personal contact.

17:24:46  4        Q.  John Petker SP is the name of the probate

17:24:49  5   attorney that was retained to do this work on behalf

17:24:51  6   of the Shuster estate?

17:24:52  7        A.  Yes.

17:24:53  8        Q.  Did you understand that he was reaching out

17:24:55  9   to Mr. Fenaughty?

17:24:58 10        A.  I -- I wasn't aware.

17:25:06 11        Q.  Okay.  Just flipping through to page -- go

17:25:22 12   to the page that's -- Jason, can you -- can you help

17:25:28 13   him find these pages because they're not marked.  Go

17:25:32 14   get this page for him.  At the top it says in the

17:25:34 15   matter of the estate of Joseph Shuster decedent

17:25:38 16   attachment 2 D 1 et cetera et cetera.

17:25:57 17        Do you have that page in front of you?

17:26:00 18        MR. TOBEROFF:  Just a second.  I need to

17:26:02 19   get it too.

17:26:13 20        MR. KLINE:  It's towards the back.

17:26:13 21   BY MR. PETROCELLI:

17:26:17 22        Q.  While he is looking for that, do you have

17:26:21 23   that page in front of you, sir?

17:26:23 24        A.  Yes.

17:26:23 25        Q.  Okay.  And you'll see that it's an

EXHIBIT 77
1919

ROUGH DRAFT

17:26:26  1    attachment to a -- if you go two pages earlier, it's

17:26:29  2    a petition for probate and this is an attachment to

17:26:34  3    it that you signs on July 15, 2003.  Correct?

17:26:34  4        A.  Yes.

17:26:40  5        Q.  Okay.  And that's your signature above the

17:26:42  6    name Mark Warren Peary, right?

17:26:45  7            MR. TOBEROFF:  Is he referring to this

17:26:46  8    document.  You're looking at this document.  He is

17:26:48  9    asking you about this.

17:26:49 10            THE WITNESS:  Uh-huh.

17:26:49 11    BY MR. PETROCELLI:

17:26:50 12        Q.  Okay.  Do you have that in front of you now

17:26:52 13    the right document?

17:26:53 14        A.  Yes.

17:26:56 15        Q.  Do you see that that's an attachment to a

17:26:58 16    petition that appears two pages earlier in the

17:27:02 17    stack?  I think that's why -- you're looking at the

17:27:04 18    right document?

17:27:05 19        A.  I was looking at this petition.

17:27:07 20        Q.  Yes you were.  Okay.  Now, go back to the

17:27:09 21    attachment that bears your signature and the date

17:27:10 22    July 15, 2003.  And for the record, this is all part

17:27:14 23    of Exhibit 12.

17:27:16 24            Now look at paragraph 1.  It says that

17:27:22 25    second sentence:

                                                         265

EXHIBIT 77
1920

ROUGH DRAFT

17:27:24  1                "Jean Adele Peavy."

17:27:25  2            That's your mother, right?

17:27:26  3        A.  Yes.

17:27:27  4        Q.  Jean Adele Peavy who is the sister of the

17:27:29  5    decedent is also the sole beneficiary under the

17:27:33  6    decedent's will.  And the sole heir at law of the

17:27:36  7    decedent's estates under the laws of intestacy.

17:27:41  8            Do you see that?

17:27:41  9        A.  Yes.

17:27:41  10        Q.  And you signed this statement indicating

17:27:45  11    that that was a truthful statement correct?

17:27:48  12        A.  Yes.

17:27:48  13        Q.  That was not a truthful statement though,

17:27:56  14    correct?  Because under the laws of intestacy your

17:28:00  15    mother Jean Adele Peavy was not the sole air at law

17:28:03  16    under the laws of intestacy, she ask Frank Shuster

17:28:10  17    were the heirs at law?

17:28:11  18            MR. TOBEROFF:  Calls for a legal

17:28:12  19    conclusion.  You're asking him to -- to -- this is

17:28:15  20    something.

17:28:15  21    BY MR. PETROCELLI:

17:28:16  22        Q.  Is that correct?

17:28:18  23            MR. TOBEROFF:  You can only answer if you.

17:28:18  24    BY MR. PETROCELLI:

17:28:19  25        Q.  At the time?

EXHIBIT 77
1921

ROUGH DRAFT

17:28:20  1           MR. TOBEROFF:  If you feel equipped to

17:28:22  2    answer these questions can you answer.

17:28:23  3           MR. PETROCELLI:  You don't have to tell him

17:28:25  4    not to answer, Marc.

17:28:26  5           MR. TOBEROFF:  I'm not telling him not to

17:28:27  6    answer.  I'm advising him only answer to the extent

17:28:30  7    you feel equipped to answer.  He is going into legal

17:28:30  8    teritory --

17:28:30  9           MR. PETROCELLI:

17:28:34 10        Q.  That's true of all questions.

17:28:35 11           MR. TOBEROFF:  -- I'm not sure I even

17:28:37 12    understand because I'm not a trust and estates

17:28:40 13    lawyer.

17:28:40 14    BY MR. PETROCELLI:

17:28:41 15        Q.  When Joe Shuster died had he two siblings

17:28:44 16    who survived him, correct, Jean and Frank?

17:28:47 17        A.  Yes.

17:28:47 18        Q.  Okay.

17:28:52 19        Q.  Why did you write here that Jean would have

17:28:55 20    been the sole heir at law under the laws of

17:28:58 21    intestacy?

17:28:59 22           MR. TOBEROFF:  Misstates the report

17:29:03 23     record.

17:29:03 24           MR. PETROCELLI:

17:29:03 25        Q.  Do you know what that means under the laws

                                                              267

**EXHIBIT 77**
**1922**

ROUGH DRAFT

17:29:06  1    of intestacy?

17:29:07  2         A.  Please explain.

17:29:08  3         Q.  It means that if you had died without a

17:29:13  4    will based on the statutory laws of -- of

17:29:15  5    disposition?

17:29:18  6         A.  Uh-huh.

17:29:18  7         Q.  And are you aware that under authorize laws

17:29:20  8    that Jean was not the sole air -- was one of two

17:29:26  9    heirs?

17:29:29 10         A.  All I know that she -- she had a will.

17:29:36 11    That's all I'm aware of.

17:29:38 12         Q.  Who prepared this document?

17:29:39 13         A.  I am not certain.

17:29:41 14         Q.  What did you do to assure yourself that the

17:29:44 15    statements were truthful before you made them to the

17:29:47 16    Court?

17:29:47 17         A.  I trusted the state attorneys.

17:29:54 18         Q.  Did you understand that this was a serious

17:29:56 19    matter that you're making a filing with a court

17:29:58 20    representing that Ms. -- that your mother was the

17:30:03 21    sole heir at law because you did not have an

17:30:07 22    original will you had a copy and you were

17:30:11 23    representing to the Court that it should accept the

17:30:14 24    copy because even if no will existed she would still

17:30:16 25    be the sole heir?  You understood that of the

268

EXHIBIT 77
1923

ROUGH DRAFT

17:30:19  1    purpose of this filing?

17:30:22  2        A.  Frank Shuster was dead at that time.

17:30:26  3    That's my understanding of it.

17:30:30  4        Q.  But you understood that when Joe died Frank

17:30:32  5    was alive, as well as your mother, correct?

17:30:35  6        A.  At that time.

17:30:36  7        Q.  Did Joe have -- did Frank have a will?

17:30:38  8        A.  I believe so.

17:30:44  9        Q.  Do you know so?

17:30:46 10        A.  I -- I can't -- I can't say with certainty.

17:30:55 11        Q.  Did you understand that you were making a

17:30:57 12    filing with the Court in that it was your obligation

17:31:00 13    to provide the Court with accurate information?

17:31:07 14            MR. TOBEROFF:  You can answer that.

17:31:11 15            THE WITNESS:  Yes.

17:31:11 16    BY MR. PETROCELLI:

17:31:13 17        Q.  Turn the page.  In the next attachment to

17:31:18 18    the probate petition that you filed it said the

17:31:22 19    decedent never married and never had any children.

17:31:27 20            That also is false?

17:31:30 21        A.  It was a mistake.

17:31:34 22        Q.  Why did you allow this to be filed and why

17:31:36 23    did you sign it if it was untrue?

17:31:42 24        A.  It was simply a mistake.

17:31:44 25        Q.  Did you scan this or did you read this?

269

**EXHIBIT 77**
**1924**

ROUGH DRAFT

17:31:54  1          A.   I -- I don't know.

17:31:57  2          Q.   And go to the 1, 2, 3, 4, 5th page from

17:32:05  3    the -- from the end, document called declination to

17:32:09  4    act as personal representative signed by Jean Peavy.

17:32:19  5    And this document signed in the same day that you

17:32:21  6    sign the do you remember we just looked at.  Your

17:32:24  7    mom is -- is declining to serve as personal

17:32:30  8    representative of Joe Shuster's estate.  As

17:32:35  9    indicated in paragraph 3.

17:32:35 10          Do you see that?

17:32:35 11          A.   Yes.

17:32:39 12          Q.   Do you have any understanding why she so

17:32:41 13    declined?

17:32:46 14          A.   She didn't want to be bothered with this.

17:32:49 15          Q.   Is that what she told you?

17:32:51 16          A.   To that effect.

17:32:52 17          A.   I don't want to be bothered with this?

17:32:54 18    What does that mean.

17:32:58 19          A.   She wants me to handle these affairs.

17:33:00 20          Q.   In paragraph 1 it says I am the only

17:33:02 21    sibling of the decedent Joseph Shuster.

17:33:02 22          Do you see that?

17:33:06 23          A.   At the time that's true.

17:33:09 24          Q.   She wasn't the only sibling Joe Shuster had

17:33:12 25    two siblings correct?

                                                                270

**EXHIBIT 77**
**1925**

ROUGH DRAFT

17:33:13  1        A.  Yes.

17:33:13  2        Q.  She was the only living sibling?

17:33:15  3        A.  Yes.

17:33:27  4        Q.  Did Frank have any familiar leave his own?

17:33:29  5        A.  No.

17:33:41  6        Q.  Is there any reason that you can think of

17:33:43  7    why all these mistakes were made in these documents?

17:33:52  8             MR. TOBEROFF:  Assumes facts.  Lacks

17:33:54  9    foundation.

17:33:54  10            THE WITNESS:  I'm not sure.

17:33:54  11   BY MR. PETROCELLI:

17:33:56  12       Q.  There seems to have been an effort not to

17:33:58  13   identify the existence of either Joe Shuster's wife

17:34:02  14   or Frank Shuster, Joe Shuster's brother?

17:34:07  15            MR. TOBEROFF:  Misstates the document.

17:34:07  16   BY MR. PETROCELLI:

17:34:09  17       Q.  Were you a representing to represent to the

17:34:12  18   Court that only ask your mother were the sole

17:34:17  19   interested parties in Joe Shuster's estate?

17:34:19  20       A.  Well, at this time that's correct.

17:34:23  21       Q.  But did you make a decision not to disclose

17:34:26  22   to the Court that he had been married and that he

17:34:32  23   had a brother and let the Court sort out whether

17:34:32  24   there were any interests there?

17:34:32  25       A.  No.

                                                          271

**EXHIBIT 77**
**1926**

ROUGH DRAFT

17:34:34  1        Q.  You just signed the documents that the

17:34:37  2    lawyers put in front of you without reading them

17:34:39  3    carefully?

17:34:39  4        A.  I -- I signed the -- I read the documents

17:34:45  5    what required signatures.

17:34:47  6        Q.  The purpose of your becoming the executive

17:34:50  7    estate was to be able to serve the termination

17:34:52  8    notice, correct?

17:34:52  9        A.  Yes.

17:34:55 10        Q.  Can you take a look at the next exhibit,

17:34:57 11    Exhibit 13.  Before I go to Exhibit 13, which is the

17:35:10 12    letter -- another agreement with Pacific Pictures

17:35:13 13    dated October 27, 2003, take a look at -- where is

17:35:32 14    the Superboy termination?  What exhibit number is

17:35:34 15    that?

17:35:44 16            Take a look at exhibit 11, please.  Of

17:35:49 17    paragraph Exhibit 11 is the notice of termination of

17:35:54 18    grants regarding Superboy filed by Mr. Toberoff on

17:36:01 19    behalf of the Siegels?

17:36:01 20                (The document referred to was

17:36:01 21                marked for identification by the

17:36:01 22                C.S.R. as Exhibit 11 and attached

17:36:04 23                to this deposition.)

17:36:04 24        MR. TOBEROFF:  This is Shuster 11?

17:36:08 25        MR. PETROCELLI:  Exhibit 11 right.

                                                          272

**EXHIBIT 77**
**1927**

ROUGH DRAFT

17:36:11  1        Q.  After you entered into the November 2001

17:36:14  2    Pacific Pictures joint venture agreement, which

17:36:18  3    mentioned that the rights included Superboy, did

17:36:24  4    you -- you said you became aware at some point of

17:36:26  5    that -- of some issue regarding Superboy.

17:36:26  6            Is that right?

17:36:26  7        A.  Yes.

17:36:33  8        Q.  What did you become aware of?

17:36:34  9        A.  That the Shuster estate doesn't have rights

17:36:39 10    to it.

17:36:41 11        Q.  How did you learn that?

17:36:43 12        A.  Through my attorney Marc Toberoff.

17:36:45 13        Q.  Did you learn it from any other source?

17:36:47 14        A.  No.

17:36:49 15        Q.  Did you do any work to verify it?  Did you

17:36:54 16    contact any other counsel?

17:36:55 17        A.  No.

17:36:56 18        Q.  Did you get a second opinion from anybody?

17:36:58 19        A.  No.

17:37:02 20        Q.  Okay.  Did you do any independent review to

17:37:07 21    determine whether Mr. Toberoff was, correct?

17:37:12 22        A.  I -- I did some research on my own.

17:37:17 23        Q.  After he told you?

17:37:19 24        A.  I believe.

17:37:20 25        Q.  What research did you do?

                                                               273

EXHIBIT 77
1928

ROUGH DRAFT

17:37:23   1        A.   There was a 1947 case where the courts

17:37:28   2   awarded Superboy to Jerry Siegel.

17:37:31   3        Q.   Mr. Toberoff pointed that out to you,

17:37:31   4   correct?

17:37:33   5        A.   Well, I became aware of that --

17:37:34   6        Q.   He --

17:37:35   7        A.   -- and that's correct.

17:37:36   8        Q.   He pointed it out to you, correct?

17:37:37   9        A.   I was aware of that case prior to that.

17:37:39  10        Q.   Were you aware of that when you signed the

17:37:43  11   November 2001 joint venture agreement?

17:37:44  12        A.   I don't know if I was aware of the legal

17:37:50  13   details.

17:37:50  14        Q.   You were aware of the case?

17:37:51  15        A.   I was aware of the case back to 47.

17:37:53  16        Q.   And you became aware of the legal details

17:37:55  17   as a result of conversations with Mr. Toberoff,

17:37:55  18   correct?

17:37:59  19        A.   Yes.

17:38:00  20        Q.   And then you became aware so your -- you

17:38:11  21   accepted Mr. Toberoff advice that the Shuster estate

17:38:13  22   had no interest in Superboy, correct?

17:38:13  23        A.   Yes.

17:38:16  24        Q.   Okay.  And you became aware around the same

17:38:20  25   time that the Siegels were claiming 100 percent

                                                         274

EXHIBIT 77
1929

ROUGH DRAFT

17:38:27 1    rights to Superboy, correct?

17:38:31 2        A.  I don't know exactly when I became aware of

17:38:34 3    it.

17:38:34 4        Q.  But you became aware of that, right?

17:38:36 5        A.  I did.

17:38:36 6        Q.  And you became aware of that at a time when

17:38:41 7    Mr. Toberoff was representing the Siegels, correct?

17:38:44 8        A.  Sometime in there.

17:38:46 9        Q.  Okay.  And Exhibit 11 is the Superboy

17:38:50 10   notice of termination that the Siegels filed at the

17:38:57 11   time that they were represented by Mr. Toberoff.

17:39:00 12           Did you see it at the time?

17:39:01 13       A.  No.

17:39:04 14       Q.  Okay.  Now, thereafter you then entered

17:39:09 15   into an amendment to your joint venture agreement to

17:39:14 16   delete Superboy from the venture, correct?

17:39:14 17       A.  Yes.

17:39:18 18       Q.  And you did that?

17:39:18 19           MR. TOBEROFF:  Excuse me.  Excuse me.

17:39:18 20   BY MR. PETROCELLI:

17:39:28 21       Q.  Take a look at Exhibit 13?

17:39:32 22           MR. TOBEROFF:  Okay.

17:39:32 23   BY MR. PETROCELLI:

17:39:33 24       Q.  Do you have that in front of you?  You can

17:39:34 25   put the other exhibits away?

                                                                    275

**EXHIBIT 77**
**1930**

ROUGH DRAFT

17:39:36  1          MR. TOBEROFF:  You need to weight after he

17:39:37  2    asks a question before you answer particularly when

17:39:40  3    he asks a leading question.  Wait give me a chance

17:39:42  4    to object okay?  So what's the question.

17:39:50  5          MR. PETROCELLI:  Does very Exhibit 13 in

17:39:51  6    front of him Marc?

17:39:57  7          THE WITNESS:  Yes.

17:39:57  8    BY MR. PETROCELLI:

17:39:58  9       Q.  Is that Exhibit 13?  Okay.  Can you push

17:40:00  10   aside the other exhibits?  Thank you.  Okay.

17:40:06  11         Can you take these exhibits and move those

17:40:07  12   over there so -- they're obstructing my view.  Thank

17:40:14  13   you and also the big thick one as well.

17:40:20  14         Now, Exhibit 13 is dated October 27, 2003

17:40:28  15   directed to you as now the new executor of the

17:40:32  16   estate, right?

17:40:32  17      A.  Yes.

17:40:36  18      Q.  Okay.  And if you go to the end, it is

17:40:41  19   signed by you as executor on October 30, 2003,

17:40:41  20   right?

17:40:41  21      A.  Yes.

17:40:52  22      Q.  And it's signed by Jean Peavy your mother

17:40:58  23   on the same date correct?

17:40:59  24      A.  Yes.

17:40:59  25      Q.  And it's signed by Mr. Toberoff as

**EXHIBIT 77**
**1931**

ROUGH DRAFT

17:41:01  1   president of PPC, correct?

17:41:06  2        A.  Yes.

17:41:06  3        Q.  Okay.  And you do see in paragraph 2 here

17:41:10  4   that it states PPC is not a law firm, right?

17:41:10  5        A.  Yes.

17:41:17  6        Q.  Okay.  And you understood that when you

17:41:18  7   signed it, right?

17:41:21  8        A.  Yes.

17:41:21  9        Q.  And you -- and the first paragraph and you

17:41:24 10   read this carefully before signing it and you

17:41:27 11   understood it when you signed it right?  It being

17:41:31 12   Exhibit 13?

17:41:32 13        A.  Yes.

17:41:34 14        Q.  Okay.  And it states that this letter

17:41:38 15   was -- is intended to supplement your prior joint

17:41:42 16   venture agreement dated as of November 31, 2001,

17:41:42 17   right?

17:41:42 18        A.  Yes.

17:41:50 19        Q.  And in paragraph 1 it re defines the rights

17:41:55 20   but this time excludes Superboy, correct?

17:42:01 21           MR. TOBEROFF:  Wait.  Just one second.

17:42:12 22   Objection.  You're mischaracterizing the agreement.

17:42:12 23   BY MR. PETROCELLI:

17:42:19 24        Q.  Is that correct, sir?  There's no reference

17:42:26 25   to Superboy in paragraph 1, correct?

277

**EXHIBIT 77**
**1932**

ROUGH DRAFT

17:42:28  1        A.  I don't see it.

17:42:29  2        Q.  And there was in the first version,

17:42:29  3    correct?

17:42:29  4        A.  Yes.

17:42:32  5        Q.  And there's no reference?

17:42:33  6            MR. TOBEROFF:  Excuse me I'd like to give

17:42:35  7    him the first version so he can compare the two.

17:42:35  8    BY MR. PETROCELLI:

17:42:38  9        Q.  Do you have exhibit -- what's the Exhibit

17:42:41 10    Number mark?

17:42:41 11            MR. TOBEROFF:  10.

17:42:41 12    BY MR. PETROCELLI:

17:42:43 13        Q.  Do you have Exhibit 10 and you see the

17:42:44 14    reference to Superboy in Smalville?  What paragraph

17:42:47 15    is it contained in Exhibit 10?

17:42:49 16        A.  1.

17:42:49 17        Q.  And in paragraph 1 of Exhibit 13 there's no

17:42:52 18    reference to Superboy or smallville.

17:42:52 19            Is that correct?

17:42:52 20        A.  Yes.

17:42:57 21        Q.  Okay.  And that was the result of the

17:43:00 22    advice given to you that the Shuster estate had no

17:43:04 23    interest in Superboy?

17:43:05 24            MR. TOBEROFF:  I instruct you not to answer

17:43:07 25    as to the advice given to you.  You can't answer

278

**EXHIBIT 77**
**1933**

ROUGH DRAFT

17:43:10  1    that question.

17:43:11  2              (Instruction not to answer.)

17:43:11  3    BY MR. PETROCELLI:

17:43:12  4         Q.  Whether you signed this you understood that

17:43:13  5    Superboy was not part of the agreement, correct?

17:43:15  6              MR. TOBEROFF:  Instruct you not to answer

17:43:16  7    to the extent your understanding is based on

17:43:18  8    conversations with me.

17:43:19  9              MR. PETROCELLI:  Come you you can't -- you

17:43:21 10    can't block all examination on this subject.

17:43:23 11              MR. TOBEROFF:  You shouldn't be surprised

17:43:25 12    Mr. Petrocelli after suing your opposing counsel for

17:43:28 13    six years.  You shouldn't be surprised.

17:43:30 14              MR. PETROCELLI:  For six years?

17:43:30 15              MR. TOBEROFF:  That's right.  You're DC.

17:43:32 16    Seven years.

17:43:37 17              MR. PETROCELLI:  I'm going to through and

17:43:38 18    follow that, but --

17:43:45 19              MR. TOBEROFF:  In talking about -- excuse

17:43:47 20    me.  In talking about these agreementses, if he is

17:43:49 21    comparing this agreement to this agreement make sure

17:43:52 22    you read carefully what is he comparing it to before

17:43:55 23    you answer.

17:43:55 24    BY MR. PETROCELLI:

17:44:00 25         Q.  You can put aside paragraph -- excuse me,

**EXHIBIT 77**
**1934**

ROUGH DRAFT

17:44:03  1    the Exhibit 10.  I'm going to focus on Exhibit 13

17:44:08  2    because we've been through Exhibit 10 already.

17:44:10  3           When you signed -- when you as the executor

17:44:17  4    signed this supplement to your joint venture

17:44:21  5    agreement with your joint venture partner Pacific

17:44:28  6    Pictures Corporation, you understood that you were

17:44:30  7    eliminating Superboy from the definition of rights

17:44:34  8    contained in paragraph 1, correct?

17:44:41  9           MR. TOBEROFF:  He's asking you at the time

17:44:42 10    that you signed it so you can only answer that

17:44:44 11    question what your understanding was at the time you

17:44:49 12    signed it.

17:44:49 13           THE WITNESS:  Yes.

17:44:49 14    BY MR. PETROCELLI:

17:44:51 15       Q.  Okay.  And in paragraph 4 you see that you

17:45:04 16    understood by virtue of your agreeing to paragraph 4

17:45:08 17    that on behalf of the Shuster estate you as executor

17:45:13 18    required the agreement of PPC Pacific Pictures

17:45:17 19    Corporation to enter into any agreement regarding

17:45:19 20    the Superman rights, correct?

17:45:19 21       A.  Yes.

17:45:23 22       Q.  And you understood in paragraph 7 that upon

17:45:31 23    the expiration of the term of this joint venture

17:45:34 24    agreement or in the event of a termination for any

17:45:40 25    reason that the estate would hold 50 percent of the

                                                        280

**EXHIBIT 77**
**1935**

ROUGH DRAFT

17:45:49  1   rights and Pacific Pictures Corporation would hold

17:45:54  2   the remaining 50 percent as tenants in common,

17:45:54  3   correct?

17:45:54  4        A.  Yes.

17:46:04  5        Q.  Did you discuss with your mother the

17:46:08  6   elimination of Superboy from your joint venture

17:46:11  7   agreement?

17:46:18  8        A.  I don't remember a specific discussion.

17:46:24  9        Q.  Do you -- did you believe that that was an

17:46:26 10   important matter?

17:46:27 11        A.  Yes.

17:46:30 12        Q.  And you as the executor, you -- you

17:46:34 13   understood you had a fiduciary duty to your mother

17:46:36 14   in her role as the sole beneficiary, correct?

17:46:36 15        A.  Yes.

17:46:40 16        Q.  And you were signing an agreement

17:46:48 17   subtracting rights from the prior agreement,

17:46:48 18   correct?

17:46:53 19             MR. TOBEROFF:  Lacks foundation.  Assumes

17:46:55 20   facts.  Mischaracterizes the exhibit.

17:46:55 21   BY MR. PETROCELLI:

17:47:01 22        Q.  In your capacity as the executor the Court

17:47:04 23   appointed executor who applied for and obtained the

17:47:08 24   right and power to administer this estate with

17:47:13 25   respect to this issue, you understood that in

281

EXHIBIT 77
1936

ROUGH DRAFT

17:47:18  1    signing this document you were removing from the

17:47:27  2    estate any claim to the Superboy rights, correct?

17:47:35  3        A.  Only with regard to this document.

17:47:38  4        Q.  Well, what other document were you

17:47:39  5    reserving it in?

17:47:43  6        A.  My understanding was we didn't have rights.

17:47:46  7    That's why this agreement did not include it in

17:47:48  8    Superboy.

17:47:48  9        Q.  But you -- it was included in the first

17:47:51  10   agreement that you signed in November, Exhibit 10?

17:47:54  11       MR. TOBEROFF:  Here is the exhibit.

17:47:54  12   BY MR. PETROCELLI:

17:47:56  13       Q.  Paragraph 1?

17:47:56  14       A.  Yes.

17:47:57  15       MR. TOBEROFF:  Is he referring again when

17:47:58  16   he refers to Exhibit 10, paragraph 1 in the en

17:48:02  17   conclusion of Superboy I'd like you to read

17:48:04  18   paragraph 1 to see the way Superboy is included.

17:48:07  19       MR. PETROCELLI:  You know, please don't?

17:48:07  20       MR. TOBEROFF:  No.

17:48:09  21       MR. PETROCELLI:  It's not appropriate.

17:48:10  22       MR. TOBEROFF:  It's only fair that when you

17:48:11  23   talk about something, he looks at it.

17:48:13  24       MR. PETROCELLI:  He doesn't need you to

17:48:14  25   tell him how to read it, okay.

                                                                282

**EXHIBIT 77**
**1937**

ROUGH DRAFT

17:48:16  1          MR. TOBEROFF:  I'm not telling him --

17:48:16  2          MR. PETROCELLI:  That's just inappropriate.

17:48:17  3          MR. TOBEROFF:  I'm telling him to read it.

17:48:19  4          MR. PETROCELLI:  No, you're telling him

17:48:20  5     more than that.  Let's not go down this path.

17:48:22  6          Q.  What did you as the executor on behalf of

17:48:26  7     the estate get as consideration for giving up any

17:48:30  8     claim to Superboy?

17:48:32  9          MR. TOBEROFF:  Assumes facts.  Lacks

17:48:33 10     foundation.

17:48:36 11          THE WITNESS:  My understanding is the

17:48:40 12     Shuster estate.

17:48:40 13          MR. PETROCELLI:

17:48:41 14          Q.  Did you understand my question?  Let me ask

17:48:44 15     it again.

17:48:48 16          A.  Repeat it.

17:48:48 17          Q.  Yes.  As the executor of the Shuster

17:48:57 18     estate, in executing Exhibit 13, the October 27,

17:48:57 19     2003 amendment to your joint venture agreement, what

17:49:01 20     did the estate get in return forgiving up any and

17:49:05 21     all claim to Superboy?

17:49:07 22          MR. TOBEROFF:  Assumes facts and lacks

17:49:13 23     foundation.

17:49:13 24          THE WITNESS:  I think the question

17:49:14 25     mischaracterizes the situation.

**EXHIBIT 77**
**1938**

ROUGH DRAFT

17:49:14  1    BY MR. PETROCELLI:

17:49:18  2        Q.  Can you answer the question?

17:49:19  3            MR. TOBEROFF:  Is he trying and you're

17:49:20  4    interrupting his answer.

17:49:21  5            MR. PETROCELLI:  No.

17:49:22  6            MR. TOBEROFF:  Excuse me.

17:49:22  7            MR. PETROCELLI:  Is he arguing and he is

17:49:23  8    not answering my question?

17:49:25  9            MR. TOBEROFF:  No, he's.

17:49:26 10            MR. PETROCELLI:

17:49:26 11        Q.  Do you understand the question, sir?

17:49:27 12        A.  I think it mischaracterizes the situation.

17:49:29 13        Q.  It's not up to you to make that decision.

17:49:31 14    That's for a judge to make.

17:49:33 15

17:49:33 16            MR. TOBEROFF:  He can answer.

17:49:33 17    BY MR. PETROCELLI:

17:49:34 18        Q.  Do you understand the question?

17:49:35 19        A.  I don't know how to answer it because it

17:49:37 20    assumes certain things that are -- that I don't

17:49:40 21    believe are true.

17:49:40 22    BY MR. PETROCELLI:

17:49:42 23        Q.  What, if anything, did the estate get for

17:49:44 24    removing the words Superboy" and smallville from

17:49:49 25    your joint venture agreement from the way they

284

EXHIBIT 77
1939

ROUGH DRAFT

17:49:52  1    appeared in Exhibit 10?

17:49:55  2         MR. TOBEROFF:  Again he's referring to

17:49:57  3    Exhibit 10.  Please look at Exhibit 10 and the way

17:49:59  4    they appeared in Exhibit 10.  Those are your words

17:50:02  5    Mr. Petrocelli.  So please look at the way Superboy

17:50:06  6    appeared in Exhibit 10.

17:50:07  7         MR. PETROCELLI:  Mark you don't need to

17:50:08  8    repeat my question to him now really you're starting

17:50:11  9    to get out of hand here.

17:50:12  10         MR. TOBEROFF:  I've been pretty good I've

17:50:14  11    been a good boy.

17:50:15  12         MR. PETROCELLI:  Let's keep it that pay

17:50:17  13    okay.

17:50:18  14         MR. TOBEROFF:  Please look at Exhibit 10

17:50:20  15    which he's referred to before you answer the

17:50:21  16    question.

17:50:21  17    BY MR. PETROCELLI:

17:50:27  18         Q.  So what's the answer?

17:50:29  19         A.  What did we get?

17:50:31  20         Q.  Yes.  What did you get in return for your

17:50:33  21    agreement to delete the references to Superboy and

17:50:38  22    smallville?

17:50:45  23         A.  All I can say is I don't think we have

17:50:48  24    rights to it.

17:50:48  25         Q.  I didn't ask you whether you thought had

                                                                    285

**EXHIBIT 77**
**1940**

ROUGH DRAFT

17:50:50  1   you rights.  I ask you what, if anything, did you

17:50:53  2   get for agreeing to do this supplement?

17:50:56  3        A.  There was -- okay there was no remuneration

17:50:58  4   or compensation or anything.

17:51:01  5        Q.  None, right?

17:51:02  6        A.  Okay.

17:51:03  7        Q.

17:51:03  8            Is that correct?

17:51:05  9            MR. TOBEROFF:  He just answered you.

17:51:06  10           THE WITNESS:  That's what I said.

17:51:06  11  BY MR. PETROCELLI:

17:51:07  12       Q.  Okay.  And and the estate of which you were

17:51:12  13  in charge of administering did not seek a second

17:51:15  14  opinion from another lawyer on that subject.

17:51:15  15           Is that right?

17:51:20  16       A.  That's correct.

17:51:20  17       Q.  The sole advice that you accepted was the

17:51:24  18  lawyer who represented the Siegels who were

17:51:28  19  asserting 100 percent ownership.

17:51:28  20           Is that correct?

17:51:28  21       A.  Yes.

17:51:41  22       Q.  Did you disclose to the probate court that

17:51:45  23  you had executed this amendment deleting any

17:51:48  24  reference to Superboy and smallville for no

17:51:53  25  remuneration or compensation based on the advice of

286

**EXHIBIT 77**
**1941**

ROUGH DRAFT

17:51:56  1    the lawyer for the Siegels who were claiming 100

17:52:01  2    percent rights to Superboy?  Did you make that

17:52:03  3    disclosure to the probate court?

17:52:06  4        A.  I don't believe so.

17:52:13  5        Q.  When you -- in connection with your

17:52:17  6    decision to accept the advice of Mr. Toberoff, were

17:52:28  7    you made aware of any copyright -- before I get

17:52:40  8    there, turn to Exhibit 14.

17:52:44  9            (The document referred to was

17:52:44 10            marked for identification by the

17:52:44 11            C.S.R. as Exhibit 14 and attached

17:52:44 12            to this deposition.)

17:52:53 13            MR. PETROCELLI:  Exhibit 14 is the --

17:53:00 14    notice of termination prepared by Mr. Toberoff on

17:53:03 15    behalf of the Schusters that was sent out this

17:53:10 16    November -- November 7, 2003.

17:53:14 17        Q.  You've seen this document before?

17:53:16 18        A.  Yes.

17:53:17 19        Q.  And you signed it correct if you look at

17:53:25 20    page 9?  You signed it as the executor of the estate

17:53:28 21    of Joseph Shuster?

17:53:29 22        A.  Yeah, let me find it.  I don't see the

17:53:34 23    signature page.

17:53:35 24        Q.  It's page 9, Mr. Peary if you look at the

17:53:38 25    numbers in the center of the page?

287

**EXHIBIT 77**
**1942**

ROUGH DRAFT

17:53:39  1        A.  The center?

17:53:41  2        Q.  The one -- the one on the right-hand corner

17:53:43  3    would be 17.

17:53:44  4        A.  Oh.  Okay.  The signature page oh, okay,

17:53:44  5    yes.

17:53:57  6        Q.  That's your signature as the executor of

17:53:58  7    the Joseph Shuster estate?

17:54:00  8        A.  Yes.

17:54:00  9        Q.  And you executed this document Exhibit 14

17:54:02  10   the notice of termination a little more than a week

17:54:06  11   after the Exhibit 13 the amendment to the joint

17:54:12  12   venture agreement dated October 27, 2003, correct?

17:54:16  13       A.  Yes.

17:54:17  14       Q.  Okay.  And this notice of termination

17:54:23  15   includes no reference to Superboy or smallville,

17:54:23  16   correct?

17:54:30  17       A.  I believe that's correct.

17:54:33  18       Q.  Okay.

17:54:33  19           MR. TOBEROFF:  Don't -- don't -- you have

17:54:34  20   to read the document before you can answer it do I.

17:54:39  21           THE WITNESS:  Okay.  I don't remember it

17:54:43  22   being in there.

17:54:43  23   BY MR. PETROCELLI:

17:54:44  24       Q.  Well based on your prior testimony you

17:54:46  25   would not expect it to be there because you said did

288

EXHIBIT 77
1943

ROUGH DRAFT

17:54:49  1    you not believe the estate had any such interest

17:54:51  2    based on the advise you received, correct?

17:54:53  3         A.  I would not expect it.

17:54:54  4              MR. TOBEROFF:  Calls for a legal

17:54:55  5    conclusion.  Legal document.

17:54:55  6    BY MR. PETROCELLI:

17:55:08  7         Q.  I'm going to ask you another question now?

17:55:10  8              MR. TOBEROFF:  Are you asking him Mr. It's

17:55:12  9    in here or not.

17:55:12 10              MR. PETROCELLI:  No, I'm not.  It's

17:55:14 11    innocent there.  I'll represent that.

17:55:18 12         Q.  To be clear, when you executed this notice

17:55:21 13    of termination you understood that Superboy was not

17:55:24 14    included, correct?

17:55:24 15         A.  Yes.

17:55:29 16         Q.  Okay.  Did you disclose to the probate

17:55:30 17    court that you had served in your capacity as

17:55:34 18    executor a notice of termination that did not extend

17:55:37 19    to Superboy?

17:55:38 20         A.  Did I give notice to the probate court?

17:55:43 21         Q.  Did you make that disclosure to the probate

17:55:45 22    court yes?

17:55:45 23         A.  I don't recall that.

17:55:48 24         Q.  You didn't do that, right?

17:55:51 25         A.  I don't recall doing that.

                                                             289

**EXHIBIT 77**
**1944**

ROUGH DRAFT

17:55:57  1          Q.  Okay.  Now, and you understood that by not

17:55:58  2     serving notice of termination with respect to

17:56:00  3     Superboy that the state would be forever giving up

17:56:06  4     any ability to recapture or terminate or recapture

17:56:10  5     any Superboy rights, correct?

17:56:14  6          MR. TOBEROFF:  Assume -- calls for a legal

17:56:16  7     conclusion.  Assumes facts and lacks foundation.

17:56:19  8          MR. PETROCELLI:

17:56:19  9          Q.  You can answer.

17:56:20  10         A.  I'm not sure what the legal technicalities.

17:56:22  11         Q.  You understood that by not seeking to

17:56:26  12    terminate is the estate was giving up any claim even

17:56:29  13    to Superboy right?

17:56:32  14         MR. TOBEROFF:  Calls for a legal

17:56:33  15    conclusion.

17:56:36  16         THE WITNESS:  All I know is it wasn't -- it

17:56:38  17    wasn't a notice was not given in this document.

17:56:38  18    BY MR. PETROCELLI:

17:56:43  19         Q.  Or in any other document right?

17:56:47  20         A.  No.

17:56:47  21         Q.   Correct?

17:56:48  22         A.  That's correct.

17:56:48  23         Q.  In fact, the -- the time within which to

17:56:52  24    file a notice of termination with respect to

17:56:55  25    Superboy on behalf of the Shuster estate expired 11

                                                              290

**EXHIBIT 77**
**1945**

ROUGH DRAFT

17:56:58  1    days later on November 18, 2003 correct?

17:57:04  2            MR. TOBEROFF:  Assumes facts lacks

17:57:06  3    foundation.  Calls for a legal conclusion.

17:57:09  4            THE WITNESS:  I'm not positive of the

17:57:11  5    details.

17:57:11  6    BY MR. PETROCELLI:

17:57:12  7        Q.  But you do know now that as you sit here

17:57:15  8    now as the executor of the Joseph Shuster estate

17:57:17  9    that the time has long passed for -- for the estate

17:57:21 10    filing a notice of termination with respect to

17:57:23 11    Superboy, correct?

17:57:24 12            MR. TOBEROFF:  You can -- can you only

17:57:25 13    answer these questions requiring legal knowledge

17:57:28 14    number 1 if you know one way or another and number

17:57:32 15    2, if it's not based on your discussions with me.

17:57:35 16    That's it.

17:57:38 17            THE WITNESS:  Okay.  I'm -- I'm not sure.

17:57:38 18    BY MR. PETROCELLI:

17:57:41 19        Q.  Well since 2003 to the present have you

17:57:44 20    ever purported to serve a notice of termination for

17:57:47 21    Superboy on behalf of the Shuster estate?

17:57:49 22        A.  No.

17:57:52 23        Q.  Okay.  And do you have any intention right

17:57:53 24    now to do so?

17:57:58 25            MR. TOBEROFF:  Don't discuss your

                                                              291

EXHIBIT 77
1946

ROUGH DRAFT

17:57:59  1    intentions as to legal acts in this case.

17:57:59  2    BY MR. PETROCELLI:

17:58:04  3        Q.  In your capacity as executor do you have a

17:58:06  4    current intention of which you are currently aware

17:58:08  5    to serve a notice of termination with respect to

17:58:12  6    Superboy?

17:58:12  7            MR. TOBEROFF:  Instruct you not to answer

17:58:13  8    that.

17:58:14  9            (Instruction not to answer.)

17:58:14 10            MR. PETROCELLI:  On what ground?

17:58:16 11            MR. TOBEROFF:  On the ground that any

17:58:17 12    intention he has as to exercising his -- exercising

17:58:21 13    whatever rights he may or may not have under the

17:58:23 14    copyright act the product of any discussions with

17:58:27 15    his counsel.

17:58:28 16            MR. PETROCELLI:  That's not a fair response

17:58:29 17    to my question.

17:58:30 18            MR. TOBEROFF:  I disagree.

17:58:30 19    BY MR. PETROCELLI:

17:58:33 20        Q.  Have you reviewed any drafts of any notices

17:58:35 21    of termination with respect to Superboy?

17:58:37 22        A.  No.

17:58:43 23        Q.  Okay.  Take a look at Exhibit 15.  At the

17:58:48 24    at the time that Mr. Toberoff gave you advice that

17:58:51 25    the estate had no claim to Superboy, did

292

**EXHIBIT 77**
**1947**

ROUGH DRAFT

17:58:55 1    Mr. Toberoff show you Exhibit 15?

17:58:58 2            MR. TOBEROFF:  Misstates his testimony.

17:58:59 3    Misstates the record.  This is 15?

17:59:06 4            MR. PETROCELLI:  Yes.  15 is a 1940

17:59:11 5    Superboy script.

17:59:14 6        Q.  Have you seen this document before?

17:59:18 7        A.  No, I don't think so.

17:59:20 8        Q.  Okay.  And so I take it from your answer

17:59:22 9    that prior to serving the notice of termination

17:59:28 10   Exhibit 14 you were not aware of this document.

17:59:28 11           Is that correct?

17:59:28 12       A.  Yes.

17:59:34 13       Q.  Okay.  And the document says in the first

17:59:38 14   sentence or first paragraph:

17:59:45 15           "Panel occupies full page

17:59:46 16           contains the title Superboy the buy

17:59:48 17           line by Jerry Siegel and Joe

17:59:51 18           Shuster."

17:59:52 19           And then it goes on.

17:59:57 20           Were you aware of the existence of this

18:00:02 21   script by which Joe Shuster was identified as one of

18:00:09 22   the two buy line people?

18:00:12 23           MR. TOBEROFF:  Vague.  Unintelligible.

18:00:17 24           THE WITNESS:  I haven't seen this before.

18:00:17 25   BY MR. PETROCELLI:

**EXHIBIT 77**
**1948**

ROUGH DRAFT

18:00:27  1        Q.  Take a look at Exhibit 16.

18:00:29  2             (The document referred to was

18:00:29  3             marked for identification by the

18:00:29  4             C.S.R. as Exhibit 16 and attached

18:00:43  5             to this deposition.)

18:00:43  6    BY MR. PETROCELLI:

18:00:44  7        Q.  Do you have Exhibit 16?

18:00:46  8             Prior to serving the notice of termination,

18:00:50  9    exhibit 14, were you aware of Exhibit 16?

18:01:02 10    Exhibit 16 is more -- a copy of parts of more fun

18:01:07 11    comics number 101.

18:01:20 12        A.  Are you asking me if I've ever seen this

18:01:22 13    before?

18:01:22 14        Q.  Yes.

18:01:34 15        A.  I don't recognize this first page

18:01:37 16    specifically showing Superboy, no.

18:01:39 17        Q.  You're referring to page -- the second page

18:01:42 18    of this exhibit?

18:01:42 19        A.  Yes.

18:01:43 20        Q.  That has the picture of Superboy on it?

18:01:44 21        A.  Yes.

18:01:45 22        Q.  Were you aware that copyright renewal

18:01:53 23    registrations were filed indicating that in the name

18:01:59 24    of both Joe Shuster and Jerome Siegel with respect

18:02:04 25    to more fun comics 101?

**EXHIBIT 77**
**1949**

ROUGH DRAFT

18:02:06  1            MR. TOBEROFF:  Lacks foundation.

18:02:06  2    BY MR. PETROCELLI:

18:02:12  3        Q.  Were you aware prior to the time that you

18:02:13  4    sent out -- that you signed the termination notice,

18:02:17  5    exhibits 14, that copyright registration renewals

18:02:25  6    for Superboy by Jerome Siegel and Joe Shuster had

18:02:29  7    been filed with the copyright office?

18:02:30  8        A.  At -- at what -- at what time?

18:02:39  9        Q.  As of the time you sent out the notice of

18:02:40 10    termination in November 2003.

18:02:43 11        A.  As of -- no.

18:02:46 12        Q.  Were you aware -- were you aware of either

18:02:49 13    this -- any such copyright registration renewals or

18:02:55 14    Exhibit 15, the Superboy script at the time that you

18:02:58 15    signed the amendment to the joint venture deleting

18:03:00 16    Superboy?

18:03:04 17        A.  Copyright renewals in the '60s?  1960s?

18:03:11 18        Q.  No.  71 -- 72.

18:03:13 19        A.  72.  Okay.

18:03:17 20        Q.  Were you aware of those documents the

18:03:20 21    renewal registration for Superboy in the name of Joe

18:03:24 22    Shuster and secretary re Siegel and were you aware

18:03:25 23    of the Superboy script Exhibit 15 when you deleted

18:03:30 24    or agreed to delete Superboy from your joint

18:03:33 25    venture?

                                                              295

**EXHIBIT 77**
**1950**

ROUGH DRAFT

18:03:36  1          A.  I was not aware of the specific documents.

18:03:40  2          Q.  The ones that I just asked you about,

18:03:40  3     correct?

18:03:42  4          A.  Yeah, right.  I've never seen those.

18:03:44  5          Q.  Okay.  Take a look at Exhibit 17.

18:03:47  6               (The document referred to was

18:03:47  7               marked for identification by the

18:03:47  8               C.S.R. as Exhibit 17 and attached

18:04:02  9               to this deposition.)

18:04:02 10     BY MR. PETROCELLI:

18:04:02 11          Q.  At the time that you signed the -- at the

18:04:06 12     time that you signed the -- the supplement to the

18:04:12 13     joint venture agreement removing Superboy and

18:04:18 14     smallville, were you aware that your uncle Joe

18:04:22 15     Shuster in the 1970s claimed a joint interest in

18:04:25 16     Superboy in copyright filings?

18:04:30 17               MR. TOBEROFF:  Misstates the evidence.

18:04:32 18     Assumes facts and lacks foundation.

18:04:36 19               THE WITNESS:  No.

18:04:36 20     BY MR. PETROCELLI:

18:04:40 21          Q.  Okay.  Take a look at Exhibit 17.  Do you

18:04:44 22     see the reference -- I'll represent to you this is a

18:04:49 23     listing of copyright renewal registrations and do

18:04:53 24     you see the name Joe Shuster?

18:04:55 25          A.  Oh.  Yes.

                                                              296

EXHIBIT 77
1951

ROUGH DRAFT

18:04:59  1          Q.  And you see Superboy under the name Joe

18:05:04  2      Shuster?

18:05:04  3          A.  Yes.

18:05:05  4          Q.  And it says Siegel Jerome?

18:05:09  5          A.  Yes.

18:05:10  6          Q.  Then you go under Siegel Jerome.

18:05:13  7              Do you see that couple entries down?

18:05:16  8          A.  Yes.

18:05:16  9          Q.  It says Superboy by Jerome Siegel and Joe

18:05:19 10      Shuster in more fun comics January to February 1945

18:05:28 11      copyright sign 18 November 1944 B 653651 Jerome

18:05:35 12      Siegel and Joe Shuster and then there's some

18:05:40 13      other -- other data.

18:05:42 14              Were you aware of such copyright

18:05:46 15      registration filings when you agreed to remove

18:05:56 16      Superboy from your joint venture agreement?

18:05:58 17          A.  No.

18:06:01 18          Q.  When you served the termination notice

18:06:03 19      without reference to Superboy?

18:06:04 20          A.  No.

18:06:07 21          Q.  Did Mr. Toberoff provide these -- any of

18:06:09 22      these documents to you, Exhibits 15, 16 and 17?

18:06:16 23      That I've just gone through with you?

18:06:21 24          A.  I don't believe so.

18:06:23 25          Q.  Take a look at Exhibit 18.

EXHIBIT 77
1952

ROUGH DRAFT

18:06:24  1            (The document referred to was

18:06:24  2            marked for identification by the

18:06:24  3            C.S.R. as Exhibit 18 and attached

18:06:31  4            to this deposition.)

18:06:31  5            THE WITNESS:  Can we get some

18:06:33  6    air-conditioning in here?

18:06:33  7    BY MR. PETROCELLI:

18:06:39  8        Q.  Exhibit 18 is an application for

18:06:41  9    registration of a claim to renewal of copyright.

18:06:49 10    Indicating for Superboy more fun comics 101

18:06:57 11    indicating co-authors Jerome Siegel and Joe Shuster.

18:07:02 12    Do you see that document?

18:07:03 13        A.  Yes.

18:07:07 14        Q.  Is this the first time you're Siegel this

18:07:09 15    document?

18:07:09 16        A.  Yes.

18:07:12 17        Q.  I take it that this document was not

18:07:14 18    provided to you by Mr. Toberoff.

18:07:14 19            Is that correct?

18:07:14 20        A.  Yes.

18:07:23 21        Q.  You were unaware of this document when you

18:07:26 22    removed Superboy and smallville from the joint

18:07:29 23    venture agreement, correct?

18:07:29 24        A.  Yes.

18:07:34 25        Q.  And whether you sent out the termination

**EXHIBIT 77**
**1953**

ROUGH DRAFT

18:07:36  1    notice without reference to Superboy, correct?

18:07:36  2        A.  Yes.

18:07:42  3        Q.  And you reference some case in the 1940's.

18:07:45  4            Do you recall that? That Mr. Toberoff

18:07:49  5    mentioned to you?

18:07:49  6        A.  Yes.

18:07:53  7        Q.  And you're aware that these filings are

18:07:55  8    made in the 1970s some 25 years later?

18:07:57  9        A.  Yes.

18:08:03 10        Q.  Take a look at Exhibit 19.

18:08:06 11            (The document referred to was

18:08:06 12            marked for identification by the

18:08:06 13            C.S.R. as Exhibit 19 and attached

18:08:16 14            to this deposition.)

18:08:16 15    BY MR. PETROCELLI:

18:08:16 16        Q.  Exhibit 19 is another page from --

18:08:22 17    indicating copyright registration filings.

18:08:25 18            Do you have that in front of you?

18:08:27 19        A.  Yes.

18:08:28 20        Q.  Do you see the reference to Joe Shuster?

18:08:30 21        A.  Yes.

18:08:34 22        Q.  This is for the year 1973.  The one I just

18:08:39 23    showed you before, Exhibits -- exhibit 17 was for

18:08:42 24    the year 1972.

18:08:47 25            And you'll see the reference to Joe Shuster

299

**EXHIBIT 77**
**1954**

ROUGH DRAFT

18:08:50  1    and Superboy which is then cross-referenced down to

18:08:55  2    Jerome Siegel where it also indicates that both the

18:09:00  3    names of Jerome Siegel and Joe Shuster for Superboy

18:09:03  4    in more fun comics.

18:09:05  5         Do you see that?

18:09:05  6    A.  Yes.

18:09:08  7    Q.  And were you aware that they had filed

18:09:12  8    copyright renewal registrations in 1973 with respect

18:09:16  9    to Superboy, that is Joe Shuster had together with

18:09:19  10   Jerome Siegel?

18:09:20  11   A.  I had some vague awareness that they were

18:09:26  12   filing for renewal copyrights and they were denied.

18:09:29  13   Q.  With respect to Superboy?

18:09:30  14   A.  With all the -- all the elements.

18:09:36  15   Q.  I'm asking you specifically did you know

18:09:37  16   about the Superboy copyright registration renewals

18:09:40  17   when you signed those documents?

18:09:41  18   A.  A general vague idea of Superman and

18:09:44  19   related elements.

18:09:45  20   Q.  But you didn't have they specific knowledge

18:09:47  21   of the Superboy registration filings.

18:09:49  22        Is that correct?

18:09:49  23   A.  Not specifically Superboy.

18:09:51  24   Q.  None these documents with respect to

18:09:52  25   Superboy had been made available to you at the time

                                                              300

**EXHIBIT 77**
**1955**

ROUGH DRAFT

18:09:55  1    you signed the amendment to the joint venture

18:09:58  2    agreement on October 27, 2003 removing Superboy,

18:09:58  3    correct?

18:10:06  4        A.  Yes.

18:10:07  5        Q.  And is it fair to say that had these

18:10:09  6    documents been made available to you you would have

18:10:11  7    taken them into account in making a decision whether

18:10:14  8    or not to delete Superboy, correct?

18:10:17  9            MR. TOBEROFF:  Calls for a legal conclusion

18:10:17 10    as to a complex issue.

18:10:21 11            MR. PETROCELLI:  Hardly.

18:10:22 12            MR. TOBEROFF:  You're so wrong.

18:10:25 13            MR. TOBEROFF:  You're so wrong.

18:10:27 14            MR. PETROCELLI:  You didn't listen to my

18:10:28 15    question.

18:10:28 16            MR. TOBEROFF:  I listened to it.

18:10:28 17    BY MR. PETROCELLI:

18:10:33 18        Q.  Can you answer my question?

18:10:34 19        A.  Would I have --

18:10:34 20        Q.  Taken these documents into account had they

18:10:38 21    been made available to you?

18:10:39 22        A.  I don't think it would have made a

18:10:43 23    difference because the legal situation with regard

18:10:46 24    to.

18:10:48 25            MR. TOBEROFF:  Don't testify based on

301

EXHIBIT 77
1956

ROUGH DRAFT

18:10:50  1    conversations with your attorney.

18:10:51  2            THE WITNESS:  Okay then I can't say

18:10:52  3    anything.

18:10:52  4    BY MR. PETROCELLI:

18:10:56  5        Q.  Did your -- you were unaware of these

18:10:56  6    documents, correct?

18:10:59  7        A.  Of these specific documents.

18:10:59  8        Q.  Correct.  Right.

18:11:02  9            And you were -- is it fair to say that

18:11:07 10    would you have wanted to know about these -- these

18:11:11 11    documents prior to having made the decision to sign

18:11:14 12    those -- the amended joint venture agreement?

18:11:20 13            MR. TOBEROFF:  Calls for a legal

18:11:21 14    conclusion.

18:11:22 15            THE WITNESS:  I knew their renewal requests

18:11:25 16    were denied back in the early '70s.

18:11:25 17    BY MR. PETROCELLI:

18:11:29 18        Q.  You're not -- you're not answering my

18:11:31 19    question?

18:11:31 20            MR. TOBEROFF:  He is answering your

18:11:32 21    question.  You keep cutting him off -- excuse me I'm

18:11:35 22    talking being.

18:11:35 23    BY MR. PETROCELLI:

18:11:36 24        Q.  You testified?

18:11:36 25            MR. TOBEROFF:  Excuse me excuse me excuse

302

**EXHIBIT 77**
**1957**

ROUGH DRAFT

18:11:37  1    me.  Excuse me, I'm talking.

18:11:38  2              MR. PETROCELLI:  Don't waste my time.

18:11:40  3              MR. TOBEROFF:  I will not I will not.

18:11:40  4    BY MR. PETROCELLI:

18:11:42  5         Q.  You already testified, sir?

18:11:43  6              MR. TOBEROFF:  I will not.

18:11:44  7              MR. PETROCELLI:  Sir, you testified.

18:11:45  8              MR. TOBEROFF:  You're talking over me I

18:11:46  9    will not have you talk over me now.

18:11:48  10             MR. PETROCELLI:  Take a break off the

18:11:49  11   record court or we're on the record I don't agree to

18:11:53  12   go off the record.

18:11:53  13             MR. PETROCELLI:  I do not agree to go off

18:11:56  14   the record.

18:11:57  15             MR. PETROCELLI:  I'm not going let you chew

18:11:58  16   up my time making speeches.

18:12:00  17             MR. TOBEROFF:  I'm not chewing up your time

18:12:01  18   don't talk over me you're going to let me finish.

18:12:05  19             MR. PETROCELLI:  Terminate the deposition

18:12:06  20   if you continue.

18:12:06  21             MR. TOBEROFF:  You can do whatever you see

18:12:08  22   fit I'm going to finish my sentence.

18:12:10  23             MR. PETROCELLI:  Finish your sentence and

18:12:12  24   you've got 20 seconds.

18:12:14  25             MR. TOBEROFF:  You're wasting time.  You

                                                                    303

**EXHIBIT 77**
**1958**

ROUGH DRAFT

18:12:15  1    don't tell me how long I get to speak.

18:12:17  2            MR. PETROCELLI:  You're timed go.

18:12:18  3            MR. TOBEROFF:  When he says something that

18:12:20  4    you don't want him to say you cut him off.  It's an

18:12:23  5    old trick.  My client when he is attempting to

18:12:26  6    answer your question, you have to let him finish the

18:12:29  7    answer.  He was about to -- he was talking and you

18:12:31  8    cut him off and then when I objected and said please

18:12:34  9    let me client finish you cut me off and standard

18:12:36 10    talking over me.  Please don't do that.  I'm

18:12:39 11    finished.

18:12:39 12    BY MR. PETROCELLI:

18:12:40 13        Q.  Mr. Court how did do I on the 20 seconds?

18:12:42 14            MR. PETROCELLI:  Just made it.

18:12:43 15        Q.  I -- I don't want you to be telling me

18:12:46 16    about copyright registration renewals that were

18:12:49 17    denied when you have already specifically testified

18:12:52 18    that you have no knowledge that these specific

18:12:55 19    Superboy registrations were designed.  It's not

18:12:58 20    responsive and it's not helpful.

18:13:00 21            MR. TOBEROFF:  And you can -- can you

18:13:02 22    answer the question anyway you see fit.

18:13:02 23    BY MR. PETROCELLI:

18:13:04 24        Q.  And if you do I will?

18:13:05 25            MR. TOBEROFF:  You're talking over me

                                                                 304

**EXHIBIT 77**
**1959**

ROUGH DRAFT

18:13:07  1    again.  Can you answer the question anyway you see

18:13:08  2    fit.  And -- and I -- and with the exception that I

18:13:12  3    will instruct you not to answer certain questions

18:13:15  4    that impinge on the attorney-client privilege.

18:13:15  5    BY MR. PETROCELLI:

18:13:18  6         Q.  Now, my question to you is would you have

18:13:20  7    wanted to know about various documents in which that

18:13:23  8    evidence your uncle claiming co-authorship of

18:13:28  9    Superboy and filing copyright registrations as late

18:13:32 10    as the mid-'70s in making a determination to remove

18:13:37 11    the -- any interest of the estate to Superboy?

18:13:40 12         MR. TOBEROFF:  Objection.  Assumes facts.

18:13:43 13    Lacks foundaton.  It mischaracterizes the exhibits

18:13:48 14    you can answer.

18:13:51 15         THE WITNESS:  My answer is I don't think it

18:13:52 16    would have made any difference so no.

18:13:52 17    BY MR. PETROCELLI:

18:13:55 18         Q.  Why wouldn't it have made a difference?

18:13:57 19         MR. TOBEROFF:  You can only answer that to

18:13:59 20    the extent that your knowledge is not based on

18:14:01 21    conversations with me regarding Superboy.

18:14:05 22         THE WITNESS:  I -- I -- it's kind of legal.

18:14:15 23    I just know.

18:14:17 24         MR. TOBEROFF:  You can only answer that --

18:14:19 25    please follow my instruction.  If your conversations

305

**EXHIBIT 77**

**1960**

ROUGH DRAFT

18:14:23  1    are based on knowledge independent of your

18:14:25  2    discussions with me I'm happy for you to answer the

18:14:27  3    question.  If they're not, then you can't answer the

18:14:31  4    question.  That's it.

18:14:33  5         THE WITNESS:  Okay.

18:14:33  6    BY MR. PETROCELLI:

18:14:37  7         Q.  As --

18:14:38  8         A.  My -- my knowledge of it is -- is based

18:14:44  9    mostly on my discussions so I guess I can't answer

18:14:49 10    it.

18:14:50 11         Q.  You're the executor of the estate.  You

18:14:52 12    filed legal documents in that capacity.  You filed

18:14:56 13    them as a matter of public record.

18:15:03 14              On what basis did you file documents

18:15:06 15    concluding that the estate had no interest in

18:15:09 16    Superboy?

18:15:13 17         MR. TOBEROFF:  You can answer that as -- as

18:15:15 18    long is as your basis is not based on conversations

18:15:18 19    and advice with your -- from and with your attorney.

18:15:25 20         THE WITNESS:  Okay.  So what do I know

18:15:30 21    separate from talking with my attorney?

18:15:33 22         MR. TOBEROFF:  Don't involve him in that

18:15:34 23    thought process.  Think to yourself whether you have

18:15:36 24    an understanding separate from your conversations

18:15:41 25    with me or if you can separate it then can you

306

**EXHIBIT 77**
**1961**

ROUGH DRAFT

18:15:43  1    answer the question.  If not, I instruct you not to

18:15:46  2    answer.

18:15:48  3            THE WITNESS:  Well my knowledge is tied to

18:15:50  4    my discussions with Marc Toberoff.  I don't know how

18:15:54  5    to separate it.

18:15:54  6    BY MR. PETROCELLI:

18:15:56  7        Q.  I'm asking you for --

18:15:57  8            MR. TOBEROFF:  I instruct you not to

18:15:58  9    answer.

18:15:58 10    BY MR. PETROCELLI:

18:15:59 11        Q.  I'm asking you to answer the question based

18:16:01 12    on your judgment and your capacity as the executor

18:16:03 13    of the estate.  You're the decision-maker not your

18:16:06 14    lawyer.

18:16:07 15            MR. TOBEROFF:  It's the same instruction.

18:16:09 16    His question doesn't change my instruction.

18:16:14 17            THE WITNESS:  I have to follow the

18:16:15 18    instruction.

18:16:16 19            (Instruction not to answer.)

18:16:16 20    BY MR. PETROCELLI:

18:16:17 21        Q.  Did you -- do you believe that Joe Shuster

18:16:20 22    new better than Marc Toberoff as to whether he

18:16:25 23    participated in the creation of Superboy?

18:16:34 24        A.  I'm not sure I understand the question.

18:16:34 25        Q.  Well, you saw that I showed you various

307

**EXHIBIT 77**
**1962**

ROUGH DRAFT

18:16:36  1    documents including copyright registration files --

18:16:41  2    filings in which Joe Shuster was attributed as a

18:16:49  3    co-shore of Superboy.  You saw that, right?

18:16:51  4         A.  Yes.

18:16:52  5         Q.  Okay.  Do you think that Joe Shuster would

18:16:54  6    have had a better understanding of whether he was a

18:16:56  7    co-author of Superboy than Marc Toberoff?

18:17:01  8              MR. TOBEROFF:  Calls for a legal

18:17:02  9    conclusion.  Lacks foundation.

18:17:09 10              THE WITNESS:  All I know is she's -- these

18:17:13 11    terminations were based upon a -- a renewal period

18:17:17 12    that -- that doesn't currently apply.

18:17:20 13              MR. TOBEROFF:  Don't -- don't discuss --.

18:17:20 14    BY MR. PETROCELLI:

18:17:23 15         Q.  How do you know what you just said?

18:17:24 16              MR. TOBEROFF:  Excuse me.

18:17:24 17    BY MR. PETROCELLI:

18:17:26 18         Q.  You just said that these renewals don't

18:17:29 19    apply.  What did you mean by that?

18:17:31 20              MR. TOBEROFF:  Excuse me.  I'm going to

18:17:33 21    make my instruction again.  I'm instructing you not

18:17:36 22    to testify based on advice or information that you

18:17:41 23    have only received from your attorney.

18:17:43 24              Do you understand that instruction?

18:17:45 25              Do you understand that instruction?

**EXHIBIT 77**
**1963**

ROUGH DRAFT

18:17:48  1          THE WITNESS:  Not to testify to information

18:17:49  2     that I have received from my attorney?

18:17:51  3          MR. TOBEROFF:  Yes.

18:17:51  4          Do you understand that instruction.

18:17:53  5          THE WITNESS:  Yes.

18:17:54  6          MR. TOBEROFF:  Okay.  So if you have

18:17:55  7     knowledge outside of your conversations with me or

18:17:59  8     outside of advice that I have given you, then can

18:18:02  9     you testify.

18:18:09 10          THE WITNESS:  Okay.  Well --

18:18:11 11          MR. TOBEROFF:  And you don't have to feel

18:18:12 12     bad about it.  Just you make the decision whether

18:18:14 13     it's based on knowledge -- based on advice and

18:18:17 14     knowledge you've obtained from me and conversations

18:18:19 15     with me in which event I instruct you not to answer.

18:18:22 16     You don't have to feel bad about not answering.  You

18:18:24 17     don't answer the question.  You're instructed not to

18:18:27 18     answer.  If however you have information based on

18:18:30 19     your own independent knowledge that's not part and

18:18:34 20     parcel of your discussions and advice from me, then

18:18:37 21     you -- then you can answer the question and only,

18:18:39 22     then.

18:18:39 23          Do you understand that?

18:18:44 24          THE WITNESS:  Okay yes.

18:18:45 25          MR. TOBEROFF:  Okay good.

**EXHIBIT 77**
**1964**

ROUGH DRAFT

18:18:45  1     BY MR. PETROCELLI:

18:18:47  2          Q.  So answer the question now.

18:18:48  3          A.  So my -- my -- my understanding is based on

18:18:58  4     my discussions with Marc Toberoff, my -- and where

18:19:02  5     we discuss copyright law.  That's.

18:19:06  6          Q.  But you -- you made a judgment it was your

18:19:08  7     decision to make not Mr. Toberoff's.  You made a

18:19:11  8     judgment to enter into an amendment to a joint

18:19:14  9     venture removing certain rights from the venture.

18:19:18 10     And in what -- when you made that judgment I

18:19:20 11     would -- I want you to tell me what was the basis of

18:19:23 12     that judgment?

18:19:24 13          MR. TOBEROFF:  Asked and answered.  I

18:19:25 14     instruct you not to answer.  You've already answered

18:19:28 15     the question.  Basis is legal advice.  You don't

18:19:30 16     have to answer and you don't have to speak.

18:19:32 17          (Instruction not to answer.)

18:19:34 18          MR. TOBEROFF:  Next question.

18:19:34 19     BY MR. PETROCELLI:

18:19:36 20          Q.  And when you made the judgment as the

18:19:38 21     executor of the estate to reject any claim to

18:19:48 22     Superboy, what was the basis of that judgment?

18:19:56 23          MR. TOBEROFF:  Same instruction.

18:19:56 24          (Instruction not to answer.)

18:19:56 25     BY MR. PETROCELLI:

310

**EXHIBIT 77**
**1965**

ROUGH DRAFT

18:20:03  1        Q.  Did you -- did you talk to the -- to the

18:20:11  2    Siegels about your decision before making it?

18:20:24  3        A.  I don't recall doing that.

18:20:25  4        Q.  Did you approach the Siegels at any time

18:20:30  5    and indicate to them that based on Joe Shuster's

18:20:38  6    contributions to Superboy, that the right should be

18:20:44  7    equally divided?  Did you have any discussion like

18:20:47  8    that with the Siegels?

18:20:48  9        A.  No.

18:20:50 10        Q.  Did you even think about having that kind

18:20:52 11    of conversation?

18:20:57 12        A.  I don't know if I thought about it.

18:20:59 13        Q.  Did you talk to your mom that you were

18:21:03 14    going to relinquish rights to Superboy?

18:21:06 15        A.

18:21:06 16            MR. TOBEROFF:  Misstates his testimony.

18:21:09 17    Assumes facts.  Lacks foundation.

18:21:15 18            THE WITNESS:  I didn't think we had rights.

18:21:15 19    BY MR. PETROCELLI:

18:21:18 20        Q.  That was based on what Marc Toberoff told

18:21:19 21    you, correct?

18:21:21 22        A.  Largely.

18:21:22 23        Q.  Well what -- what part wasn't based on what

18:21:24 24    Marc Toberoff told you?

18:21:25 25        A.  I have seen section 304 D of the copyright

311

**EXHIBIT 77**
**1966**

ROUGH DRAFT

18:21:33  1    law.

18:21:34  2        Q.  So you made your own interpretation of

18:21:36  3    section 304 D of the copyright law and concluded

18:21:39  4    that Joe Shuster had no rights to Superboy?

18:21:43  5        A.  I read it in consultation with my attorney.

18:21:46  6        MR. TOBEROFF:  Again, please, don't go into

18:21:48  7    areas that are based on your consultation with your

18:21:50  8    attorney, please.

18:21:51  9        THE WITNESS:  Okay.

18:21:52 10        MR. TOBEROFF:  Just because he keeps asking

18:21:54 11    you the same questions all over again you don't have

18:21:56 12    to feel bad when you can't answer those questions

18:21:58 13    because it's attorney-client privilege.  He could

18:22:01 14    ask the question.

18:22:01 15        MR. PETROCELLI:  Mark.

18:22:02 16        MR. TOBEROFF:  Over and over again.

18:22:03 17        MR. PETROCELLI:  Mark it's not.

18:22:04 18        MR. TOBEROFF:  I'm instructing.

18:22:05 19        MR. PETROCELLI:  No, no.

18:22:06 20        MR. TOBEROFF:  When you interrupt me it

18:22:07 21    wastes more time than you letting me finish.

18:22:10 22        MR. PETROCELLI:  You're taking a moment can

18:22:11 23    you go off the record and tell him that.

18:22:13 24        MR. TOBEROFF:  You're wasting time.

18:22:14 25        MR. PETROCELLI:  I don't want you using

312

**EXHIBIT 77**
**1967**

ROUGH DRAFT

18:22:16  1    valuable time telling him he doesn't have to feel

18:22:19  2    bad.

18:22:19  3              MR. TOBEROFF:  If you're concerned about

18:22:20  4    the time you wouldn't engage in me in colloquy.

18:22:20  5              MR. PETROCELLI:  No, No, I can't let you

18:22:20  6    keep doing this.

18:22:23  7              MR. TOBEROFF:  Court consider I'm going

18:22:25  8    instruct my client you can reserve all your rights.

18:22:27  9              MR. PETROCELLI:  I'm putting you on notice

18:22:29 10    right now.

18:22:29 11              MR. TOBEROFF:  Interrupting me again.

18:22:31 12              MR. PETROCELLI:  That I'm going to seek

18:22:34 13    more time to examine the witness.

18:22:34 14              MR. TOBEROFF:  I reject that.

18:22:37 15              MR. PETROCELLI:  Because you're talking.

18:22:40 16              MR. TOBEROFF:  The time is wasted by -- he

18:22:43 17    you're not going to brow meet your?

18:22:45 18              MR. PETROCELLI:  That you instruct him not

18:22:47 19    to answer.  You don't have to go into any further

18:22:49 20    colloquy request him.

18:22:50 21              MR. TOBEROFF:  I see that my client is

18:22:52 22    getsing very distressed because your asking him the

18:22:55 23    same question -- please don't interrupt plea please

18:22:57 24    don't interrupt me.

18:22:58 25              MR. PETROCELLI:  Asking you to go off the

                                                              313

EXHIBIT 77
1968

ROUGH DRAFT

18:22:59  1    record so you don't take up my time that's all I'm

18:23:02  2    asking you.

18:23:02  3              MR. TOBEROFF:  We can govern govern the

18:23:04  4    record.

18:23:05  5              THE VIDEOGRAPHER:  Video off the record the

18:23:06  6    time is 6:22.

18:32:05  7          (Brief recess.)

18:32:06  8              THE VIDEOGRAPHER:  Back on the record at

18:32:11  9    6:31.

18:32:11 10    BY MR. PETROCELLI:

18:32:15 11        Q.  I put Exhibit 13 back in front of you.

18:32:17 12    It's the October 27, 2003 amendment to the joint

18:32:21 13    venture agreement.  Which you signed as executor

18:32:26 14    with Pacific Pictures Corporation.

18:32:33 15              When you entered into this amendment to the

18:32:36 16    joint venture agreement with Pacific Pictures

18:32:41 17    Corporation, on what basis did you determine to

18:32:48 18    remove references to Superboy from your joint

18:32:52 19    venture?

18:32:56 20        A.  It was on advice of counsel.

18:32:59 21        Q.  But the counsel you're talking about is --

18:33:03 22    was the other party to the joint venture, correct?

18:33:07 23              MR. TOBEROFF:  Argumentative.

18:33:07 24    BY MR. PETROCELLI:

18:33:11 25        Q.  The counsel you're talking about is Marc

                                                          314

**EXHIBIT 77**
**1969**

ROUGH DRAFT

18:33:13  1    Toberoff, correct?

18:33:13  2         A.  Marc Toberoff attorney.

18:33:14  3         Q.  Marc Toberoff was the president of the

18:33:16  4    joint venture that was the other party to your joint

18:33:23  5    venture agreement, correct?

18:33:23  6         A.  Yes.

18:33:27  7         Q.  President of Pacific Pictures so you took

18:33:30  8    the advice of the president of Pacific -- you're

18:33:32  9    relying on the advice of the president of Pacific

18:33:37 10    Pictures Corporation and on that basis refusing to

18:33:39 11    tell me why you deleted Superboy?

18:33:43 12              MR. TOBEROFF:  Argumentative.

18:33:44 13              THE WITNESS:  My relationship with.

18:33:47 14              MR. TOBEROFF:  What's the question?

18:33:49 15    BY MR. PETROCELLI:

18:33:51 16         Q.

18:33:51 17              Is that correct?

18:33:52 18         A.  That -- say it again.

18:33:53 19         Q.  That you're -- you're telling me that the

18:33:56 20    sole basis of your decision to remove Superboy from

18:34:01 21    your amendment to your joint venture which is

18:34:04 22    Exhibit 13 that you entered into with the president

18:34:08 23    of Pacific Pictures Corporation was the advice given

18:34:12 24    to you by the president of Pacific Pictures

18:34:15 25    Corporation?

315

**EXHIBIT 77**

**1970**

ROUGH DRAFT

18:34:17  1          A.  As my attorney, yes.

18:34:20  2          Q.  And you had no other basis other than what

18:34:23  3     your attorney told you, other than what Mr. Toberoff

18:34:25  4     told you, correct?

18:34:25  5          A.  Yes.

18:34:29  6          Q.  And you refused to -- to share the basis

18:34:36  7     for your judgment simply because your lawyer told

18:34:39  8     you?

18:34:41  9          A.  My counsel told me, yes.

18:34:47 10          Q.  And -- and you understood at the time that

18:34:55 11     you relied exclusively on the advice of Mr. Toberoff

18:35:02 12     that he was the lawyer for the Siegels who were

18:35:07 13     claiming 100 percent rights to Superboy, correct?

18:35:07 14          A.  Yes.

18:35:29 15          Q.  Now, you said that this agreement got

18:35:40 16     terminated or canceled because you learned from

18:35:45 17     Mr. Toberoff that it was invalid.

18:35:45 18               Is that correct?

18:35:50 19               MR. TOBEROFF:  I believe that misstates his

18:35:51 20     testimony.

18:35:53 21               THE WITNESS:  I don't remember the reason

18:35:55 22     why I said.

18:35:55 23     BY MR. PETROCELLI:

18:35:59 24          Q.  What was your understanding why the

18:36:01 25     reason -- why the agreement was invalid?

EXHIBIT 77
1971

ROUGH DRAFT

18:36:06  1          A.  I don't know if I thought it was invalid.

18:36:09  2     We changed it to a legal retainer because it was a

18:36:12  3     better format.

18:36:18  4          Q.  Why -- and -- but you also in connection

18:36:21  5     with that decision received advice that certain

18:36:27  6     parts of your agreement might not be valid, correct?

18:36:35  7          A.  I believe so.

18:36:35  8          Q.  What parts?

18:36:43  9          MR. TOBEROFF:  I'll -- I'll -- I'll -- he

18:36:46 10     can't go into that without divulging the substance

18:36:51 11     of his communications with me on the subject.

18:36:51 12     BY MR. PETROCELLI:

18:36:55 13          Q.  Well as the executor of the estate entering

18:36:58 14     into -- well, let me start all over again.

18:37:00 15              Take a look at Exhibit 20.

18:37:09 16              (The document referred to was

18:37:09 17              marked for identification by the

18:37:09 18              C.S.R. as Exhibit 20 and attached

18:37:15 19              to this deposition.)

18:37:15 20          MR. PETROCELLI:  This is the September 10,

18:37:17 21     20004 document that you signed and your mother also

18:37:21 22     signed, correct?

18:37:21 23          A.  Yes.

18:37:25 24          Q.  You signed it both in your individual

18:37:26 25     capacity as executor of Mr. Shuster's estate?

317

**EXHIBIT 77**
**1972**

ROUGH DRAFT

18:37:29  1         A.  Yes.

18:37:31  2         Q.  And it says:

18:37:36  3                  "It's a letter from

18:37:37  4             Mr. Toberoff to you.  And to

18:37:41  5             Ms. Peavy, right?

18:37:42  6         A.  Yes.

18:37:43  7         Q.  It says this is to confirm that one, the

18:37:46  8    joint venture agreement dated as of November 23,

18:37:50  9    2001 between you and Pacific Pictures Corporation

18:37:53 10    and 2, the engagement agreement dated October 27,

18:37:58 11    2003 between the estate of Joseph Shuster and

18:38:01 12    Pacific Pictures corp. have been canceled.

18:38:06 13    Sincerely yours Marc Toberoff and its on the

18:38:08 14    letterhead of Pacific Pictures Corporation.

18:38:11 15         Do you see that?

18:38:11 16         A.  Yes.

18:38:18 17         Q.  When you agreed to this cancellation what

18:38:26 18    provisions of your prior agreements did you believe

18:38:28 19    were invalid?

18:38:33 20         MR. TOBEROFF:  Same instruction.

18:38:33 21    BY MR. PETROCELLI:

18:38:40 22         Q.  Were there drafts of the October 27, 2003

18:38:42 23    amendment to the joint venture or did you just sign

18:38:44 24    the one and only version that was given to you?

18:38:53 25         A.  I don't remember if there were any other

                                                          318

**EXHIBIT 77**
**1973**

ROUGH DRAFT

18:38:54  1    drafts.

18:38:54  2          Q.  Were there drafts of Exhibit 20 in the

18:38:56  3    September 10, 20004 document that you have in front

18:39:04  4    of you?

18:39:04  5          A.  I only recall getting this.

18:39:10  6          Q.  Excuse me?  You only recall receiving?

18:39:10  7          A.  This I only recall getting this document.

18:39:12  8          Q.  If you go back and look at Exhibit 10 for a

18:39:15  9    moment?

18:39:15 10          A.  Which is.

18:39:32 11          Q.  Exhibit 10.  And paragraph -- paragraph 8

18:40:04 12    and you see the reference in there that in the event

18:40:06 13    of a termination for any reason the rights will be

18:40:11 14    held by the claimants that's you and your mother 50

18:40:15 15    percent and by PPC as tenants in common by percent."

18:40:20 16          Do you see that? Paragraph 8?

18:40:20 17          A.  Yes.

18:40:21 18          Q.  And you see the same provision in Exhibit

18:40:24 19    13 in paragraph 7 that's the October 27, 2003

18:40:30 20    amendment.  In the event of a termination for any

18:40:33 21    reason the rights go to you 50 percent, the estate

18:40:42 22    and then 50 percent PPC.

18:40:47 23          Do you see that?

18:40:47 24          A.  2003, which.

18:41:12 25          Q.  Paragraph 7?

319

**EXHIBIT 77**
**1974**

ROUGH DRAFT

18:41:12  1       A.  Oh, 7.  Okay.

18:41:19  2       A.  Yeah okay.

18:41:20  3       Q.  You got that?

18:41:32  4       A.  In the event of termination?

18:41:33  5       Q.  Right for any reason?

18:41:34  6       A.  On expiration -- oh, okay.

18:41:37  7       Q.  So you see it has the same provision,

18:41:37  8    correct?

18:41:40  9       A.  Almost.  It just leaves out the word

18:41:44 10    "venture" is all.

18:41:47 11       Q.  Okay.  Now, are you aware of any document

18:41:51 12    at the time you executed Exhibit 20 which is the

18:41:54 13    December -- excuse me, the September 10, 20004

18:41:58 14    document, that states that the rights do not go 50

18:42:10 15    percent to the estate and 50 percent to PPC in the

18:42:14 16    event of a termination.

18:42:19 17       A.  Not in that document, no.

18:42:20 18       Q.  It's not in Exhibit 20 corrects?

18:42:24 19       A.  That's correct.

18:42:24 20       Q.  Is there any other document of which you

18:42:26 21    were aware that provided that as a result of

18:42:29 22    executing Exhibit 20 the rights went other than as

18:42:35 23    directed by exhibits 10 and 13 the joint venture

18:42:39 24    agreements?

18:42:39 25       A.  Yes.

                                                        320

**EXHIBIT 77**
**1975**

ROUGH DRAFT

18:42:42  1        Q.  What document is that?

18:42:44  2        A.  The legal retainer.

18:42:46  3        Q.  Okay.  Show me that.  Here is our copy of T

18:42:54  4    it's Exhibit 21.

18:43:01  5            MR. TOBEROFF:  May I have a copy, please.

18:43:03  6                (The document referred to was

18:43:03  7                marked for identification by the

18:43:03  8                C.S.R. as Exhibit 21 and attached

18:43:11  9                to this deposition.)

18:43:11 10    BY MR. PETROCELLI:

18:43:12 11        Q.  Now, this is a copy that's redacted.  Do

18:43:19 12    you understand what redacted means?  When

18:43:23 13    Mr. Toberoff produced it to us he excised or omitted

18:43:26 14    various parts of it so it's not a complete document

18:43:29 15    but it's all that we have.  This is a document that

18:43:40 16    you signed?  What you're now calling this retainer

18:43:47 17    agreement Exhibit 21.

18:43:48 18        A.  Yes.

18:43:48 19        Q.  Okay.  And did you sign this at or around

18:43:51 20    the time that you executed Exhibit 20 the September

18:43:57 21    10, 20004 document?

18:44:04 22        A.  It was signed around that time.

18:44:09 23        Q.  And where in Exhibit 21, the -- by the way,

18:44:21 24    would you call Exhibit 21 the -- more or less a

18:44:24 25    standard legal retainer agreement?

                                                            321

**EXHIBIT 77**
**1976**

ROUGH DRAFT

18:44:28  1        A.  I believe.

18:44:28  2             MR. TOBEROFF:  Vague.

18:44:28  3    BY MR. PETROCELLI:

18:44:30  4        Q.  Where in the Exhibit 21 does it say that

18:44:35  5    the rights upon termination of the venture go other

18:44:41  6    than as directed by the joint venture agreements

18:44:45  7    exhibits 10 and 13?

18:44:51  8        A.  In 9 it says this agreement supersedes all

18:44:54  9    prior and contemporaneous understandings.

18:45:01 10        Q.  Is there anyplace in this document that

18:45:03 11    says that in the event that the joints venture

18:45:06 12    agreements -- because the joint venture agreements

18:45:10 13    have been canceled that the rights go not as

18:45:13 14    directed by the joint venture agreements by but in

18:45:16 15    some other manner?  Is there some more explicit

18:45:20 16    clause than 9?

18:45:20 17             MR. TOBEROFF:  Are you asking -- are you

18:45:22 18    asking him to read the document.

18:45:22 19    BY MR. PETROCELLI:

18:45:24 20        Q.  No I'm asking him to tell me from memory,

18:45:27 21    because I've read what you've given me and there is

18:45:30 22    no such statement in what you produced to us in the

18:45:33 23    redacted version so is there any such statement that

18:45:39 24    you recall that appeared in this document when you

18:45:42 25    signed it before it was sent to us in redacted form?

322

EXHIBIT 77
1977

ROUGH DRAFT

18:45:45 1        A.  That specifically states.

18:45:46 2        Q.  That notwithstanding -- in words or

18:45:49 3     substance notwithstanding what is stated in the

18:45:52 4     joint venture agreements and the event of a

18:45:53 5     termination for any reason the claimants will own 50

18:45:56 6     percent and PPC will own the remaining 50 percent.

18:46:00 7          MR. TOBEROFF:  Asked and answered.

18:46:00 8     BY MR. PETROCELLI:

18:46:01 9        Q.  That the rights about not go to

18:46:04 10    Mr. Toberoff or any company associated with him or

18:46:06 11    PPC but will go as -- in some different way?

18:46:11 12         MR. TOBEROFF:  Asked and answered.

18:46:11 13    BY MR. PETROCELLI:

18:46:12 14       Q.  Something like that.  Is there some

18:46:13 15    explicit reference in this retainer agreement along

18:46:16 16    those lines?

18:46:17 17         MR. TOBEROFF:  Asked and answered.

18:46:21 18         You can answer.

18:46:22 19         THE WITNESS:  Not exactly as you stated it.

18:46:22 20    BY MR. PETROCELLI:

18:46:25 21       Q.  Is there any reference to the did he say

18:46:28 22    position of the rights upon termination of the joint

18:46:33 23    venture other than the first sentence of paragraph 9

18:46:37 24    that you just pointed out to me?

18:46:42 25       A.  Well, to me the --

323

**EXHIBIT 77**
**1978**

ROUGH DRAFT

18:46:44  1          MR. TOBEROFF:  You'd have to read the

18:46:45  2   agreement before you can answer.

18:46:47  3          Do you want him to read the agreements.

18:46:47  4   BY MR. PETROCELLI:

18:46:49  5          Q.  Are you aware of anything?  You pointed

18:46:52  6   readily to paragraph 9.  Are you aware of any other

18:46:54  7   agreement, other provision in the document that

18:46:56  8   deals with the disposition was rights?

18:46:58  9          MR. TOBEROFF:  Without reading it?

18:47:00 10          MR. PETROCELLI:  Yes.  Without reading it

18:47:02 11   word for word:  You can scan it.

18:47:15 12          THE WITNESS:  To me it's -- it's clear

18:47:20 13   between the legal retainer and the letter that

18:47:20 14   canceled the joint venture that the -- the legal

18:47:28 15   retainer as it states supersedes everything else.

18:47:28 16   BY MR. PETROCELLI:

18:47:33 17          Q.  Your understanding that Pacific Pictures

18:47:36 18   Corporation was a party to this retainer agreement?

18:47:36 19          A.  No.

18:47:45 20          Q.  So Pacific Pictures Corporation didn't

18:47:50 21   agree to anything in this retainer agreement so far

18:47:56 22   as you know, right?

18:47:57 23          A.  As far as I know they're not a party.

18:47:59 24          Q.  So are you aware of a document by which

18:48:02 25   Pacific Pictures Corporation specifically stated

**EXHIBIT 77**
**1979**

ROUGH DRAFT

18:48:07 1     that notwithstanding the provisions of the joint

18:48:09 2     venture agreement in the event of a termination

18:48:12 3     Pacific Pictures Corporation will not own any

18:48:16 4     rights?

18:48:17 5          A.  The -- my understanding of the Pacific

18:48:26 6     Pictures it says if the venture is terminated not if

18:48:30 7     it's canceled.

18:48:32 8          Q.  Terminated for any reason, right?

18:48:35 9          A.  That's -- if the venture is -- it's not the

18:48:38 10    same thing as canceled.  That's my understanding.

18:48:43 11         Q.  What's the difference between the two?

18:48:44 12         A.  The -- the difference being canceled means

18:48:48 13    it has been supplanted by the legal retainer and

18:48:52 14    supersedes all prior agreements like it states here.

18:48:55 15         Q.  Pacific Pictures is not a party to this

18:48:58 16    agreement you said, right?

18:48:59 17         A.  Not to the legal retainer.

18:49:00 18         Q.  Right.  So you're saying that -- who told

18:49:03 19    you that the word "canceled" means that the

18:49:07 20    termination provisions of the joint venture

18:49:09 21    agreements no longer apply?

18:49:11 22              MR. TOBEROFF:  Assumes facts.  Lacks

18:49:11 23    foundation.

18:49:11 24    BY MR. PETROCELLI:

18:49:17 25         Q.  Is that something that you just thought of

325

**EXHIBIT 77**

**1980**

ROUGH DRAFT

18:49:18  1    right now or is that something that you were told at

18:49:21  2    the time that by using one word canceled instead of

18:49:24  3    the word "terminated, that would solve the problem?

18:49:32  4        A.  That's my understanding of it.

18:49:33  5        Q.  And who told you that?

18:49:37  6            MR. TOBEROFF:  Assumes facts.  Lacks

18:49:39  7    foundation.

18:49:39  8            THE WITNESS:  I told myself that.

18:49:39  9    BY MR. PETROCELLI:

18:49:40  10       Q.  No one told you that in other words, right?

18:49:45  11   That's something you've come up with on your own?

18:49:47  12       A.  We have a clear -- a clear understanding

18:49:50  13   when we switch from the joint venture to the legal

18:49:52  14   retainer.  We clearly understood each other.

18:49:55  15       Q.  Who is we?

18:49:57  16       A.  Me and Marc Toberoff.

18:49:58  17       Q.  How do you know that?

18:49:59  18       A.  Because we discussed.

18:50:01  19       Q.  What did you -- what did you and he discuss

18:50:03  20   in that regard?

18:50:06  21           MR. TOBEROFF:  I'll allow you to answer

18:50:07  22   that question without waiver of the attorney-client

18:50:09  23   privilege.

18:50:11  24           THE WITNESS:  We discussed.

18:50:12  25           MR. TOBEROFF:  Do you agree that I'm not

326

**EXHIBIT 77**
**1981**

ROUGH DRAFT

18:50:14  1    waiving the privilege by allowing him to answer

18:50:16  2    that?

18:50:17  3                MR. PETROCELLI:  No.

18:50:18  4                MR. TOBEROFF:  Okay.  Then I instruct you

18:50:19  5    not to answer our discussions.

18:50:21  6                (Instruction not to answer.)

18:50:27  7                MR. PETROCELLI:  No, I can't -- I can't

18:50:29  8    allow you to selectively waive like that.

18:50:36  9                MR. TOBEROFF:  Fine.

18:50:36 10    BY MR. PETROCELLI:

18:50:56 11        Q.  Did you -- have you reviewed a copy of this

18:51:03 12    retainer agreement recently?

18:51:07 13        A.  I believe so.

18:51:09 14        Q.  When?

18:51:13 15        A.  I believe before I came here.

18:51:18 16        Q.  In connection with the deposition?

18:51:23 17        A.  I would say so.

18:51:25 18        Q.  Do you have a copy at home?

18:51:26 19        A.  Yes.

18:51:31 20        Q.  Where was it maintained?

18:51:37 21        A.  A copy?

18:51:37 22        Q.  Yes.

18:51:39 23        A.  There's one in a filing cabinet.

18:51:44 24        Q.  And you read this retainer agreement and

18:51:47 25    you also said you read the consent agreement and

327

**EXHIBIT 77**
**1982**

ROUGH DRAFT

18:51:51   1   what else did you read?

18:51:55   2        A.   The deposition materials.

18:51:57   3        Q.   The prior deposition in the Siegel case?

18:51:59   4        A.   Yes.

18:52:00   5        Q.   And you read all of those materials prior

18:52:03   6   to coming here for the deposition?

18:52:05   7        A.   Yes.

18:52:06   8        Q.   Did you bring the retainer agreement with

18:52:08   9   you?

18:52:09  10        A.   No.

18:52:16  11        Q.   Is this the last document that you have

18:52:21  12   signed in connection with either Mr. Toberoff or the

18:52:27  13   Siegels other than the subsequent 2008 consent

18:52:31  14   agreement?

18:52:32  15        A.   This would be the last one other than that.

18:52:34  16        Q.   Next -- so this is the next to last one,

18:52:34  17   right?

18:52:38  18        A.   I believe so.

18:52:38  19        Q.   And does this document Exhibit 21 contain

18:52:48  20   any provisions in it that deal with agreements with

18:52:55  21   the Siegels or getting the consent of the Siegels?

18:53:05  22             MR. TOBEROFF:   You have to read the

18:53:06  23   document.

18:53:07  24             MR. PETROCELLI:   I'm talking about the

18:53:08  25   parts that are omitted.   The redacted parts.

**EXHIBIT 77**
**1983**

ROUGH DRAFT

18:53:13  1          MR. TOBEROFF:  He can't testify as to the

18:53:15  2      redacted parts obviously.  Instruct you not to

18:53:18  3      answer any questions about the redacted parts.

18:53:21  4          (Instruction not to answer.)

18:53:21  5          MR. PETROCELLI:  With resp- -- yeah because

18:53:23  6      I can read the parts that have been produced to us.

18:53:25  7      Q.  Based on your review of the entire

18:53:27  8      documents was there any reference in the document to

18:53:29  9      the Siegels?

18:53:33 10          MR. TOBEROFF:  Instruct you not to answer.

18:53:34 11          (Instruction not to answer.)

18:53:34 12      BY MR. PETROCELLI:

18:53:36 13      Q.  Was there -- is there any reference in the

18:53:38 14      document to Superboy?

18:53:43 15          MR. TOBEROFF:  Are you asking him

18:53:44 16      whether -- about the omitted portions in the

18:53:46 17      document?

18:53:46 18          MR. PETROCELLI:  Yes.

18:53:47 19          MR. TOBEROFF:  Okay.

18:53:47 20          MR. PETROCELLI:  In other words, can I read

18:53:48 21      the portion.

18:53:49 22          MR. TOBEROFF:  Since you're concerned about

18:53:50 23      your time we can save a lot of time I'm going to

18:53:53 24      instruct him not to answer any question as to the

18:53:55 25      redacted portions of the agreement that have been

329

**EXHIBIT 77**
**1984**

ROUGH DRAFT

18:53:58   1    upheld by the Court.

18:54:00   2              (Instruction not to answer.)

18:54:00   3    BY MR. PETROCELLI:

18:54:18   4        Q.  Have you been aware of any efforts to

18:54:24   5    market any rights Superman that you or the estate

18:54:30   6    may own?

18:54:31   7        A.  No.

18:54:35   8        Q.  Are you aware that Mr. -- of any efforts by

18:54:38   9    Mr. Toberoff to approach third parties like motion

18:54:47  10    picture studios or other, to try to sell an interest

18:54:54  11    in Superman?

18:54:54  12              MR. TOBEROFF:  Instruct you not to answer

18:54:54  13    as to any awareness that can only be based on the

18:54:58  14    substance of communications between us.

18:54:59  15              (Instruction not to answer.)

18:54:59  16    BY MR. PETROCELLI:

18:55:00  17        Q.  Are you aware of any reports by

18:55:01  18    Mr. Toberoff not of legal advice but that he met

18:55:04  19    with third parties to discuss possible sale of your

18:55:13  20    interest in Superman?

18:55:14  21              MR. TOBEROFF:  Same instruction.

18:55:15  22              (Instruction not to answer.)

18:55:15  23    BY MR. PETROCELLI:

18:55:17  24        Q.  On what ground?

18:55:20  25              MR. TOBEROFF:  Same ground.

330

**EXHIBIT 77**
**1985**

ROUGH DRAFT

18:55:21  1            MR. PETROCELLI:  Attorney-client privilege.

18:55:22  2            MR. TOBEROFF:  Same grounds.

18:55:22  3            MR. PETROCELLI:  Even though there's no

18:55:24  4    legal advice.

18:55:24  5            MR. TOBEROFF:  I'm not going to argue with

18:55:26  6    you.

18:55:26  7    BY MR. PETROCELLI:

18:55:27  8            Q.  Are you aware that whether or not any

18:55:29  9    contacts have been made to sell the estates'

18:55:33 10    interest or negotiate potential sale of the estate's

18:55:37 11    interest on your behalf?

18:55:38 12            MR. TOBEROFF:  Same instruction.

18:55:38 13    BY MR. PETROCELLI:

18:55:43 14            Q.  Is the -- what is the estates doing to

18:55:49 15    market its interest?

18:55:56 16            A.  Currently?

18:55:57 17            Q.  Yes.  What -- since you became the executor

18:55:59 18    of the estate, what efforts have you undertaken as

18:56:02 19    the executor to determine -- to attempts to sell any

18:56:07 20    interest in the rights that the estate seeks to --

18:56:11 21    seeks to recapture?

18:56:13 22            A.  I don't believe we've done that yet.

18:56:18 23            Q.  Are you aware of Mr. Toberoff having

18:56:22 24    contacted third parties on behalf of the estate?

18:56:26 25            MR. TOBEROFF:  I instruct you not to

                                                      331

**EXHIBIT 77**
**1986**

ROUGH DRAFT

18:56:27  1    answer.  It implicates our communications.

18:56:30  2             (Instruction not to answer.)

18:56:30  3    BY MR. PETROCELLI:

18:56:35  4        Q.  Are you aware -- have you discussed that

18:56:37  5    subject with your mother?

18:56:44  6        A.  I don't believe so.

18:56:44  7        Q.  Or with the Siegels?

18:56:45  8        A.  No.

18:56:47  9        Q.  Take a look at Exhibit 22.

18:56:49 10             (The document referred to was

18:56:49 11             marked for identification by the

18:56:49 12             C.S.R. as Exhibit 22 and attached

18:56:55 13             to this deposition.)

18:56:55 14             MR. TOBEROFF:  Can I get a time check how

18:56:57 15    long we've been going here.

18:56:58 16             THE VIDEOGRAPHER:  Yes.  Approximately 14

18:57:01 17    minutes left in the 7 hours.

18:57:04 18             MR. TOBEROFF:  Could you please let me know

18:57:06 19    when it's 7 hours?

18:57:06 20    BY MR. PETROCELLI:

18:57:26 21        Q.  Are you aware of -- have you seen this

18:57:30 22    document before?

18:57:35 23        A.  I don't believe so.

18:57:36 24        Q.  Have you seen any e-mails between Paramount

18:57:43 25    Pictures and Marc Toberoff prior to today,?

332

**EXHIBIT 77**
**1987**

ROUGH DRAFT

18:57:44  1        A.  No.

18:57:47  2        Q.  You'll see on page 1 that this is an e-mail

18:57:49  3    from Mr. Toberoff to individuals at Paramount dated

18:57:57  4    April 29, 2010.

18:57:57  5        A.  Yes.

18:58:00  6        Q.  And you see that some of the attachments

18:58:03  7    are listed below one of them is the Shuster

18:58:06  8    termination.

18:58:06  9            Do you see that?

18:58:12 10        A.  Which one is that on the e-mail?

18:58:15 11        Q.  The first page?

18:58:16 12        A.  Yeah.  The attachments.

18:58:17 13        Q.  You see the reference the Shuster

18:58:19 14    termination it says three attachments Shuster

18:58:21 15    termination?

18:58:25 16        A.  That's the Siegel V?

18:58:27 17        Q.  Excuse me?  I can't hear you, sir?

18:58:32 18        A.  That's the Siegel V attachments at the

18:58:34 19    bottom?

18:58:37 20        Q.  I'm just asking do you see the reference to

18:58:39 21    Shuster termination on page 1?

18:58:41 22        A.  Oh, let me see.

18:58:48 23        Q.  Are you looking at the same document I am?

18:58:53 24            MR. TOBEROFF:  We have a different document

18:58:53 25    here.

                                                            333

**EXHIBIT 77**
**1988**

ROUGH DRAFT

18:58:53  1          MR. PETROCELLI:  Well, that explains the

18:58:54  2     confusion.  Okay.  Can you get what page is he on?

18:59:13  3     Okay.  So for the record you're looking on a page

18:59:20  4     that's included in Exhibit 22 and at the top it says

18:59:22  5     attachments for Paramount part 2/2, correct?

18:59:30  6          A.  At the bottom there's a Bates number L S L

18:59:32  7     00098.

18:59:34  8          Do you see that?

18:59:34  9          A.  Yes.

18:59:34  10         Q.  Okay.  And you'll see I just wanted to

18:59:36  11    direct your attention to the e-mail in the reference

18:59:38  12    to the Shuster termination notice.  You see that

18:59:44  13    now, correct?

18:59:44  14         A.  Yes.

18:59:45  15         Q.  Okay.  Now, can you turn to the page that

18:59:54  16    says part one of 2 L S L 00209.  And there's another

19:00:04  17    e-mail there from Mr. Toberoff to folks at Paramount

19:00:08  18    saying this is the first two e-mails attaching

19:00:13  19    requested documents and then there's some

19:00:19  20    description of the documents that were forwarded

19:00:25  21    including documents relating to the Schusters.

19:00:29  22         Do you see that?

19:00:29  23         A.  Yes.

19:00:30  24         Q.  Okay.  Now were you aware that documents

19:00:35  25    relating to the Shuster termination interest were

334

**EXHIBIT 77**
**1989**

ROUGH DRAFT

19:00:40 1    being sent to Paramount Pictures?

19:00:47 2         A.  I don't think so.

19:00:49 3         Q.  Okay.  First time you're seeing this?

19:00:52 4         A.  These e-mails, yes.

19:00:56 5         Q.  Okay.  And were you aware of any contacts

19:01:01 6    that Mr. Toberoff had made with Paramount regarding

19:01:04 7    the Shuster termination interest prior to today?

19:01:13 8         A.  There have been discussions.

19:01:16 9              MR. TOBEROFF:  Don't -- you can't talk

19:01:18 10   about discussions with me.

19:01:18 11             THE WITNESS:  I know I know can't.

19:01:18 12   BY MR. PETROCELLI:

19:01:21 13        Q.  Discussions with whom?

19:01:21 14        A.  My attorney.

19:01:22 15        Q.  Who is your attorney?

19:01:23 16        A.  Marc Toberoff.

19:01:24 17        Q.  When did those discussions occur?

19:01:25 18        A.  I can't remember specific dates.

19:01:32 19        Q.  What year?

19:01:35 20        A.  Some time in the seven years that he has

19:01:37 21   been working on this is all I can say.

19:01:40 22        Q.  Were you aware of discussions within the

19:01:44 23   last year having to do with Paramount?

19:01:50 24        A.

19:01:50 25             MR. TOBEROFF:  If you're awareness is

335

**EXHIBIT 77**
**1990**

ROUGH DRAFT

19:01:52  1    solely based on discussions with me I have to cut it

19:01:55  2    off.  I can't have you testify.

19:01:58  3              THE WITNESS:  Okay.  Can't say anything.

19:02:01  4              (Instruction not to answer.)

19:02:01  5    BY MR. PETROCELLI:

19:02:01  6        Q.  Have you had any discussions directly with

19:02:04  7    third parties like Paramount?

19:02:08  8        A.  No.

19:02:18  9        Q.  How is it that the estate intends to --

19:02:21 10    before I ask you that, take a look at Exhibit 23.

19:02:27 11    Which is a vehicle pass that Mr. Toberoff has

19:02:31 12    produced.  Which says pitch Superman.

19:02:38 13              (The document referred to was

19:02:38 14              marked for identification by the

19:02:38 15              C.S.R. as Exhibit 23 and attached

19:02:50 16              to this deposition.)

19:02:50 17    BY MR. PETROCELLI:

19:02:52 18        Q.  Are you aware of any pitches that this one

19:02:55 19    is date November 19, 2010.  It's got Bates number L

19:02:59 20    S L 00210 on it.

19:02:59 21              Do you see that?

19:03:05 22        A.  Yes.

19:03:05 23        Q.  Are you aware of any meetings that

19:03:10 24    Mr. Toberoff attended relating to the Shuster's

19:03:15 25    termination interest meetings with third parties to

                                                              336

**EXHIBIT 77**
**1991**

ROUGH DRAFT

19:03:17  1    pitch Superman?

19:03:18  2         A.  Not this specifically.

19:03:25  3         Q.  How is it that the estate intends to get

19:03:32  4    any money for the Superman interest that it has

19:03:36  5    sought to terminate?

19:03:40  6              MR. TOBEROFF:  You -- you can't -- I

19:03:42  7    instruct you not to answer that question if your

19:03:44  8    answer to that question is based on your discussions

19:03:46  9    with me and advice of counsel.

19:03:48 10              (Instruction not to answer.)

19:03:51 11              THE WITNESS:  Well my understanding is

19:03:53 12    based on discussions with counsel.

19:03:53 13    BY MR. PETROCELLI:

19:03:56 14         Q.  I'm not asking about legal advice.  Your --

19:03:58 15    in your capacity as executor of the escrow state,

19:04:02 16    how is it you -- you've asked for the powers to be

19:04:07 17    granted to you and they were granted to go and take

19:04:15 18    various proceedings with respect to the Shuster

19:04:17 19    termination interest for the benefit of the estate.

19:04:20 20    How is it that you as the executor intend to get any

19:04:28 21    money for the termination interest?

19:04:30 22              MR. TOBEROFF:  Same instruction.

19:04:31 23              (Instruction not to answer.)

19:04:31 24    BY MR. PETROCELLI:

19:04:33 25         Q.  Have you given any thought to that?

337

**EXHIBIT 77**
**1992**

ROUGH DRAFT

19:04:36  1          MR. TOBEROFF:  Same instruction.

19:04:36  2          (Instruction not to answer.)

19:04:37  3          MR. PETROCELLI:  That --

19:04:39  4          MR. TOBEROFF:  Can you answer whether or

19:04:40  5    not -- yes or no you've given any thought to it you

19:04:42  6    can answer that.

19:04:45  7          THE WITNESS:  Yes.  I've given thought.

19:04:47  8          MR. TOBEROFF:  Okay.

19:04:47  9    BY MR. PETROCELLI:

19:04:48 10        Q.  And what -- what thoughts have you had on

19:04:50 11    that subject?

19:04:51 12          MR. TOBEROFF:  Same instruction.

19:04:51 13          (Instruction not to answer.)

19:04:51 14    BY MR. PETROCELLI:

19:04:55 15        Q.  Are you incapable of having a thought on

19:04:57 16    that subject that does not involve Marc Toberoff?

19:05:01 17          MR. TOBEROFF:  Argumentative.

19:05:02 18          MR. PETROCELLI:  It's definitely not

19:05:04 19    argumentative.

19:05:07 20        Q.  In your role as executor of the estate, is

19:05:10 21    it your testimony that you have been able to -- you

19:05:15 22    can't do anything or even think of anything that

19:05:17 23    doesn't involve the legal advice of Marc Toberoff?

19:05:22 24        A.  That's correct.

19:05:25 25        Q.  Okay.  So everything that you do and

338

**EXHIBIT 77**
**1993**

ROUGH DRAFT

19:05:27  1    everything that you know as the executor of the

19:05:32  2    estate is based on the legal advice of Marc

19:05:37  3    Toberoff?

19:05:37  4           MR. TOBEROFF:  Vague.

19:05:41  5           THE WITNESS:  Yes. Follow my counsel.

19:05:43  6           MR. PETROCELLI:

19:05:43  7       Q.  And -- well, I didn't ask you whether you

19:05:45  8    follow your counsel.  I'm asking you in your role as

19:05:48  9    your executor, you don't have any judgment or any

19:05:56  10   ideas or any thoughts other than what Toberoff

19:06:01  11   discusses with you.

19:06:01  12           Is that correct?

19:06:03  13           MR. TOBEROFF:  Misstates his testimony.

19:06:04  14           You can answer.

19:06:07  15           THE WITNESS:  That's correct.

19:06:07  16   BY MR. PETROCELLI:

19:06:16  17       Q.  Do you believe your fit to be an executor

19:06:18  18   under those circumstances?

19:06:22  19       A.  Yes.

19:06:27  20       Q.  Have you disclosed to the Court that you

19:06:29  21   refuse to say anything about your thinking your

19:06:36  22   thoughts your judgments or your actions because

19:06:38  23   everything is based on conversations with Marc

19:06:41  24   Toberoff as to which you will claim the privilege?

19:06:43  25   Is that something that you indicated to the probate

339

**EXHIBIT 77**
**1994**

ROUGH DRAFT

19:06:46  1    court when you sought permission to act as executor?

19:06:53  2         MR. TOBEROFF:  Misstates testimony and the

19:06:55  3    assertion of privilege.

19:06:56  4         THE WITNESS:  No.

19:06:56  5    BY MR. PETROCELLI:

19:06:58  6         Q.  Do you understand that you have fiduciary

19:06:59  7    duties to people other than your mother as the

19:07:07  8    beneficiary?

19:07:08  9         MR. TOBEROFF:  Calls for a legal

19:07:09  10   conclusion.  Lacks foundation.  Assumes facts.

19:07:09  11   BY MR. PETROCELLI:

19:07:16  12        Q.  Who do you understand in your role as the

19:07:18  13   executor who do you understand that you owe a

19:07:23  14   fiduciary duty to?

19:07:24  15        MR. TOBEROFF:  Calls for a legal

19:07:24  16   conclusion.

19:07:26  17        THE WITNESS:  My understanding is the

19:07:29  18   Shuster heirs.

19:07:29  19   BY MR. PETROCELLI:

19:07:31  20        Q.  And who is that?

19:07:35  21        A.  Jean, myself and my sister.

19:07:38  22        Q.  Is that a thought that you've had without

19:07:40  23   talking to Marc Toberoff or did Mr. Toberoff tell

19:07:47  24   you that?

19:07:47  25        A.  No, I'm aware of that on my own.

340

**EXHIBIT 77**
**1995**

ROUGH DRAFT

19:07:49  1         Q.  Is that the only thing you're aware of on

19:07:51  2     your own?

19:07:52  3              MR. TOBEROFF:  About anything?

19:07:54  4              MR. PETROCELLI:  Correct.

19:07:56  5         Q.  Having to do with the administration of the

19:07:58  6     estate and in particular the termination interest.

19:08:01  7              MR. TOBEROFF:  Vague.  Overbroad.

19:08:03  8              THE WITNESS:  I don't know.  You would have

19:08:04  9     to be specific.

19:08:04  10    BY MR. PETROCELLI:

19:08:10  11        Q.  Has anyone told you that you owe fiduciary

19:08:13  12    duty to creditors including DC Comics?

19:08:18  13        A.  I don't know about that.

19:08:29  14        Q.  Are you aware that unless you make an

19:08:34  15    agreement with DC Comics that the estate may get

19:08:40  16    nothing at any time with respect to its Superman

19:08:44  17    interests?

19:08:46  18              MR. TOBEROFF:  You can't -- if you have an

19:08:50  19    opinion about that independent on discussions with

19:08:53  20    me, can you answer the question.  Otherwise, I

19:08:56  21    instruct you not to answer.

19:09:01  22              THE WITNESS:  No my -- my opinion is based

19:09:04  23    on discussions with counsel.

19:09:04  24              (Instruction not to answer.)

19:09:04  25    BY MR. PETROCELLI:

341

**EXHIBIT 77**
**1996**

ROUGH DRAFT

19:09:06  1          Q.  Do you have the opinion that the estate can

19:09:07  2     sell an interest in Superman without making an

19:09:10  3     agreement with DC Comics?

19:09:13  4          MR. TOBEROFF:  Same instruction.  If you

19:09:14  5     have an opinion independent of the advice of

19:09:16  6     counsel, you can answer.  Otherwise I instruct you

19:09:19  7     not to answer.

19:09:21  8          (Instruction not to answer.)

19:09:21  9          MR. PETROCELLI:  I'm not strictly asking

19:09:23  10    for opinions I'm asking for your state of mind, your

19:09:25  11    knowledge, your information, your beliefs.

19:09:27  12         MR. TOBEROFF:  If any, of those are

19:09:29  13    independent of the advice of counsel regarding his

19:09:31  14    particular question, can you answer.  Otherwise I

19:09:33  15    instruct you not to answer.

19:09:36  16         THE WITNESS:  No they're not independent of

19:09:38  17    counsel.

19:09:38  18    BY MR. PETROCELLI:

19:09:41  19         Q.  Have you formed any views about the

19:09:46  20    estate's ability to sell an interest in Superman

19:09:51  21    without having an agreement with DC Comics?

19:10:02  22         MR. TOBEROFF:  He is just asking -- I'll

19:10:02  23    let you answer the question whether or not you

19:10:04  24    formed any views not what those views are.

19:10:07  25         THE WITNESS:  Okay.  Yes, I formed views.

342

**EXHIBIT 77**
**1997**

ROUGH DRAFT

19:10:07  1    BY MR. PETROCELLI:

19:10:11  2         Q.  And what are those views?

19:10:12  3              MR. TOBEROFF:  Based on your prior answers

19:10:13  4    to his similar questions I instruct you not to

19:10:16  5    answer.

19:10:16  6    BY MR. PETROCELLI:

19:10:20  7         Q.  Are -- are you aware that the estate could

19:10:27  8    lose this case and the Court could find that the

19:10:31  9    Shuster termination notice is not valid with respect

19:10:35 10    to Superman?

19:10:40 11              MR. TOBEROFF:  If you're --.

19:10:40 12    BY MR. PETROCELLI:

19:10:42 13         Q.  As the executor of the estate have you --

19:10:46 14    have you thought about that issue?

19:10:51 15              MR. TOBEROFF:  Can you just answer that in

19:10:53 16    the most general fashion without going into any

19:10:55 17    particulars.

19:10:56 18              THE WITNESS:  Okay.  Yes.

19:10:56 19    BY MR. PETROCELLI:

19:10:58 20         Q.  Okay.  And have you received any advice on

19:11:03 21    that subject other than from Marc Toberoff?

19:11:06 22         A.  No.

19:11:15 23         Q.  Okay.  And the estate has already given up

19:11:17 24    any interest in claim to Superboy, correct?

19:11:21 25         A.

343

**EXHIBIT 77**
**1998**

ROUGH DRAFT

19:11:21  1          MR. TOBEROFF:  Assumes facts.  Lacks

19:11:23  2    foundation.

19:11:23  3          THE WITNESS:  As far as I know.

19:11:23  4    BY MR. PETROCELLI:

19:11:27  5        Q.  So you -- you understand that given that

19:11:30  6    the estate has already given up an interest in

19:11:32  7    Superboy, and the estate could lose this case and

19:11:40  8    the Court could find that the Shuster termination

19:11:42  9    notice is invalid that you as executor could yield

19:11:45 10    the estate 0.  You entertain that as a possible

19:11:50 11    outcome, correct?

19:11:51 12          MR. TOBEROFF:  Assumes facts.  Lacks

19:11:55 13    foundation.  You can answer in the most general

19:11:57 14    fashion without going into any details.

19:12:01 15          THE WITNESS:  I.

19:12:02 16          MR. TOBEROFF:  This is -- this is his last

19:12:05 17    answer because we're -- we've met our 7 hour max.

19:12:08 18          THE WITNESS:

19:12:09 19          MR. PETROCELLI:  It's not a max but I

19:12:11 20    understand your leaving at the end of 7 hours.

19:12:13 21          THE WITNESS:  I've only considered that

19:12:17 22    like I would an asteroid hitting us and wiping out

19:12:21 23    life on earth.

19:12:21 24    BY MR. PETROCELLI:

19:12:22 25        Q.  Is -- and again, it's based on

344

**EXHIBIT 77**
**1999**

ROUGH DRAFT

19:12:25  1    Mr. Toberoff's advice?

19:12:25  2           MR. TOBEROFF:  We're cutting this as 7

19:12:27  3    hour.

19:12:28  4           THE WITNESS:  Yes.

19:12:28  5    BY MR. PETROCELLI:

19:12:29  6       Q.  Okay.  One other question.  Are you able to

19:12:33  7    enter into a settlement agreement with DC without

19:12:37  8    the consent of the Siegels?

19:12:39  9           MR. TOBEROFF:  I instruct you not to answer

19:12:40 10    that question.  He's asking you about the consent

19:12:43 11    agreements.

19:12:44 12           (Instruction not to answer.)

19:12:46 13           MR. PETROCELLI:  Well, I wasn't but --

19:12:46 14       Q.  Independent --

19:12:52 15           MR. TOBEROFF:  No more questions.  Done.  7

19:12:53 16    hours and I'm cutting it off.

19:12:55 17           MR. PETROCELLI:  Are you saying that we're.

19:12:57 18           MR. TOBEROFF:  I'm abiding by the Federal

19:13:00 19    rules we're over the 7 hours I gave you an extra

19:13:02 20    question and that was one question too many.

19:13:04 21           MR. PETROCELLI:  Well since your declining

19:13:08 22    to go forward, we obviously are not finished.  So we

19:13:12 23    will.

19:13:12 24           MR. TOBEROFF:  I disagree.

19:13:13 25           MR. PETROCELLI:  Well, I understand.  I'm

                                                                   345

**EXHIBIT 77**
**2000**

ROUGH DRAFT

19:13:15  1   just making it clear that I'm not concluding the

19:13:18  2   deposition.  We'll have to seek court relief to not

19:13:22  3   only continue it but also, mark, to address the

19:13:28  4   objections.

19:13:28  5        MR. TOBEROFF:  On what basis are you saying

19:13:30  6   we haven't concluded if you've used up the 7 hours

19:13:32  7   that you've gotten under the rulings.

19:13:35  8        MR. PETROCELLI:  Because the rules require,

19:13:36  9   permit more time inappropriate circumstances and

19:13:40 10   there'sly Johns of cases on that.  We don't need to

19:13:43 11   debate that now.

19:13:44 12        MR. TOBEROFF:  Okay.  Well our position of

19:13:46 13   course is that it has concluded you used up your 7

19:13:48 14   hours and that you're not entitled to go beyond

19:13:51 15   that.

19:13:51 16        MR. PETROCELLI:  Can we have the normal

19:13:54 17   stipulation on the record which is that when this

19:13:58 18   has -- let's say 30 days to review it and to advise

19:14:01 19   of any corrections bearing in mind that any

19:14:05 20   corrections of substance may shed light on your

19:14:09 21   credibility.  It can be signed under penalty of

19:14:12 22   perjury.  And if it's not signed it can be used as

19:14:16 23   though signed.

19:14:17 24        MR. TOBEROFF:  Yes and then the court

19:14:19 25   reporter don't we under California have to relieve

346

**EXHIBIT 77**
**2001**

ROUGH DRAFT

19:14:22 1    the court reporter.

19:14:23 2         MR. PETROCELLI:  Relieve the court reporter

19:14:24 3    of her duties.

19:14:25 4         MR. TOBEROFF:  I will hold the original and

19:14:28 5    send that to us.

19:14:29 6         MR. PETROCELLI:  You'll send the original

19:14:31 7    to Mr. Toberoff and certified copy to us.  And you

19:14:35 8    have 30 days on your receipt of it.

19:14:38 9         MR. TOBEROFF:  Okay.

19:14:38 10        MR. PETROCELLI:  Thank you.

19:14:39 11        MR. TOBEROFF:  Agreed so stipulated.

19:14:42 12        MR. PETROCELLI:  Thank you.

19:14:42 13        THE VIDEOGRAPHER:  This will then mark the

19:14:44 14   end of Volume I tape number 4 in the deposition of

19:14:46 15   mark war penalty rather re.  All original videotapes

19:14:49 16   will be retained by Merrill Legal Solutions at 20750

19:14:53 17   Ventura Boulevard Woodland Hills, California.  Going

19:14:55 18   off the record.  The time is 7:13.

         19

         20

         21

         22

         23

         24

         25

                                                              347

**EXHIBIT 77**
**2002**

# EXHIBIT 78

**From:** Hayden, Aaron
**Sent:** Tuesday, July 12, 2011 7:23 PM
**To:** 'mtoberoff@ipwla.com'; 'Keith Adams'; 'lbrill@kbkfirm.com'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Subject:** DC Comics v. PPC

Counsel,

Following up on our letter from yesterday, three exchanges cited in the body of the letter were not highlighted in Appendix A.  Those exchanges are:

<u>Page 196</u>

```
15:51:15  1        Q.  Did you have any discussion about giving

15:51:21  2    away 50 percent of your rights to a joint venture?

15:51:26  3        A.  Yes.

15:51:29  4        Q.  With whom?

15:51:29  5        A.  Marc Toberoff.

15:51:31  6        Q.  What did you and he discuss on that

15:51:34  7    subject?

15:51:40  8            MR. TOBEROFF:  I instruct you not to answer

15:51:41  9    as to the substance of our discussions.

15:51:44 10            (Instruction not to answer.)
```

<u>Page 204</u>

```
16:01:39  8        Q.  So what did you learn from Mr. Toberoff

16:01:44  9    that was different from what you signed in 2001?

16:01:49 10            MR. TOBEROFF:  I'm instructing you not to

16:01:52 11    answer.  I've already let -- let -- give the gist of

16:01:56 12    it, and I'm sure Mr. Petrocelli could figure out the

16:01:58 13    rest on his own.

16:02:00 14            THE WITNESS:  Okay.

16:02:01 15            (Instruction not to answer.)
```

<u>Page 243</u>

1

**EXHIBIT 78**
**2003**

16:48:16   5    BY MR. PETROCELLI:

16:48:19   6        Q.  Have you ever come to learn that

16:48:23   7    Mr. Toberoff had discussions with the Siegels about

16:48:27   8    an investor who would buy their Superman rights?

16:48:35   9            MR. TOBEROFF:  You can only answer that if

16:48:39  10    you have knowledge independent of your discussions

16:48:39  11    with me.

16:48:41  12            THE WITNESS:  I don't have knowledge

16:48:43  13    independent of my discussions.

16:48:45  14            MR. TOBEROFF:  Then I instruct you not to

16:48:47  15    answer.

16:48:47  16            (Instruction not to answer.)

16:48:47  17    BY MR. PETROCELLI:

16:48:48  18        Q.  Did you have discussions with Mr. Toberoff

16:48:51  19    on that topic in 2002?

16:48:55  20            MR. TOBEROFF:  Same instruction.

16:48:55  21            (Instruction not to answer.)

**Aaron Hayden**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
(310) 246-8560
ahayden@omm.com

*This message and any attached documents contain information from the law firm
of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are
not the intended recipient, you may not read, copy, distribute, or use this
information. If you have received this transmission in error, please notify the
sender immediately by reply e-mail and then delete this message.*

**EXHIBIT 78**
**2004**

# EXHIBIT 79

| | |
|---|---|
| **From:** | Keith Adams [kgadams@ipwla.com] |
| **Sent:** | Monday, July 18, 2011 4:30 PM |
| **To:** | Seto, Cassandra |
| **Cc:** | Kline, Matthew; Petrocelli, Daniel; Marc Toberoff |
| **Subject:** | Re: FW: DC Comics v. PPC |

Counsel:

We'll need to make the call at 10:30 a.m., rather than 10.

Keith G. Adams
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read,
copy, distribute or use this information. If you have received this transmission in error, please notify the sender
immediately by reply e-mail and then delete this message.

--- On **Thu, 7/14/11, Seto, Cassandra <_cseto@OMM.com_>** wrote:

From: Seto, Cassandra <cseto@OMM.com>
Subject: FW: DC Comics v. PPC
To: "Keith Adams" <kgadams@ipwla.com>, "Marc Toberoff" <mtoberoff@ipwla.com>
Cc: "Petrocelli, Daniel" <DPetrocelli@OMM.com>, "Kline, Matthew" <MKline@OMM.com>
Date: Thursday, July 14, 2011, 9:07 AM

Counsel,


July 20 is confirmed.  Let's talk at 10am PDT.


Again, we wish you'd make time sooner than next week, and not always wait until the last day or two to meet
and confer.


Thank you,


Cassie

1

**EXHIBIT 79**
**2005**

**From:** Keith Adams [mailto:kgadams@ipwla.com]
**Sent:** Wednesday, July 13, 2011 1:23 PM
**To:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Cc:** Marc Toberoff
**Subject:** Re: DC Comics v. PPC


Counsel:

In light of Mr. Bulson and Ms. Larson's upcoming depositions, and DC's rescheduling of Mr. Marks' deposition, defendants are available to meet-and-confer as to the contents of Mr. Petrocelli's letter and Mr. Peary's deposition on July 20-21, 2011.

Keith G. Adams
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

--- On **Mon, 7/11/11, Seto, Cassandra <*cseto@OMM.com*>** wrote:


From: Seto, Cassandra <cseto@OMM.com>
Subject: DC Comics v. PPC
To: "Marc Toberoff" <mtoberoff@ipwla.com>, "Keith Adams" <kgadams@ipwla.com>, "Laura Brill" <lbrill@kbkfirm.com>
Cc: "Petrocelli, Daniel" <DPetrocelli@OMM.com>, "Kline, Matthew" <MKline@OMM.com>
Date: Monday, July 11, 2011, 7:02 PM

Dear Counsel,

Please see the attached letter from Dan Petrocelli.

Thanks,
Cassie

2

**EXHIBIT 79**
**2006**

# EXHIBIT 80

**From:** Seto, Cassandra
**Sent:** Wednesday, July 20, 2011 6:38 PM
**To:** Marc Toberoff; 'Keith Adams'
**Cc:** Petrocelli, Daniel; Kline, Matthew
**Subject:** DC Comics v. PPC

Marc,

This is to confirm our call of this morning. You said that you reviewed our lengthy meet-and-confer letter concerning Mr. Peary's deposition and found no possible basis for compromise, so DC should file its motion, and defendants will oppose it.

We asked if you would identify the privilege log entries that correspond to the conflict waiver Mr. Peary signed in 2010. Rough Transcript at 85-86 (Question: "Did you receive any disclosures from Mr. Toberoff regarding potential or actual conflict of interest? Answer: Yes. Q: In what form? A: He sent a … letter, a waiver, a document …. Q: Did you sign that document? A: Yes …. Q: When was it signed? A: 2010, I believe."); 90 (Q: Mr. Peary, with respect to the conflict of interest document that you signed in or about 2010 …, [d]id you understand that that document that you signed pertained to the 2008 consent agreement? Objection: … I instruct you not to answer regarding the contents of the consent agreement -- it's a conflict waiver which is listed on the privilege log and privileged.") Your colleague, Mr. Adams, responded that: (1) Magistrate Zarefsky ruled that defendants didn't have to give any additional information concerning their logs; and (2) in any event, in Mr. Peary's deposition corrections (which you said he would produce next month), he might indicate the alleged waiver was signed in 2009. These positions are not sustainable. Magistrate Zarefsky never ruled on this specific log entry, and we only requested this detail after Mr. Peary's deposition. Moreover, your refusal to tell us now when the alleged waiver was signed -- when that is a knowable fact, right now -- can only be designed to obfuscate and delay.

At the end of the call, you raised issues concerning Dawn Peavy and Kevin Marks' depositions, which we responded to in a separate email.

Cassie

**Cassandra L. Seto**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067
Telephone: 310.246.6703 | Facsimile: 310.246.6779

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**EXHIBIT 80**
**2007**

# EXHIBIT 81

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 17, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

As you know, and as we discussed in recent letters, emails, and our call earlier this week, DC intends to move to re-open the depositions of defendants Laura Siegel Larson and Mark Peary based on several significant discovery disclosures and developments in this case that warrant further examination. In addition, DC intends to move to compel these witnesses' testimony concerning key lines of questioning that defense counsel persistently instructed the witnesses not to respond. In our letter to you dated July 11, 2011 (and in our subsequent phone conference), we detailed the defects in the objections defense counsel made during Peary's June 29, 2011, deposition. A copy of our July 11 letter (the "Peary Letter") is attached. Similarly defective objections were made at Larson's July 22, 2011, deposition, and we will move to have those objections overruled for the same reasons we will move to overrule the Peary objections. If you wish to abandon the Peary and/or Larson objections set forth in our Peary Letter and this letter, please let us know. If you refuse to withdraw the objections, and wish to discuss the matter further, we can do so next week. As discussed, we believe all necessary Rule 37 conferences have occurred on these issues, but to avoid any wasteful arguments to the contrary by defendants, we write this letter and invite you to discuss these issues by phone next week.

1. <u>Consent Agreement</u>. Defense counsel instructed Larson not to answer any questions regarding the "substance of the consent agreement" between defendants that, at a minimum, prohibits the Siegel and Shuster families from entering into an agreement with DC without the consent of the other. Defense counsel refuses to produce the document—though he and

**EXHIBIT 81**
**2008**

O'MELVENY & MYERS LLP

August 17, 2012 - Page 2

defendants have made many arguments about its substance—on the ground that it was "held to be privileged." Larson Tr. at 41:3-19. The lines of inquiry blocked by defense counsel included:

- whether any other side deal exists by which the Shuster heirs may claim a share of profits the Siegel heirs received from DC, *see id.* at 41:3-19;[1]

- whether the consent agreement contains any reference to Superboy, *see id.* at 42:20-44:18, 45:17-46:5; and

- Ms. Larson's understanding on how the consent provision works, *see id.* at 46:6-12.

As explained in our July 11 Peary Letter, defense counsel's objections are overbroad and not well-taken. Peary Letter at 1-5.

a. Magistrate Judge Zarefsky denied DC's motion to compel production of the consent agreement based on his application of law-of-the-case doctrine to the *Siegel* court's ruling that the agreement (1) was entered into in connection with mediation; and (2) is privileged based on Toberoff's representations "as an officer of the Court." Docket No. 163-11 at 724:9-11. Neither of these two bases for the Court's rulings bars the discovery DC seeks.

As to the first ground for His Honor's opinion, Peary confirmed at his subsequent deposition that the consent agreement was created—and continues to exist—separate and apart from any mediation discussion. Peary Tr. 53:21-54:6, 58:13-18, 72:5-7. Moreover, courts have established that parties can pursue alternative sources of discovery to prove the existence of facts disclosed during mediation—parties must be given an opportunity to "uncover new, admissible evidence … not protected by the confidentiality statutes." *Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *12-13 (N.D. Cal. Dec. 17, 2009); *see also Foxgate v. Homeowners' Assoc.*, 26 Cal. 4th 1, 17-18 (2001) (allowing plaintiff to seek sanctions based on "assertion and evidence" other than "communications made during the mediation"); *Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011) (citing *Benesch* and *Foxgate* favorably).

As to the second ground for His Honor's opinion, it has repeatedly been held and shown subsequent to His Honor's ruling that Toberoff's representations to DC and the courts cannot be trusted. *E.g.*, Docket Nos. 161-5 at 30-31; 209 at 12; 336; 457; 477 at 4-7; Docket No. 477; Aug. 7, 2012 letter from DC to Defendants. The Ninth Circuit, moreover, in an opinion that is the law of this case, expressly *called out defense counsel for refusing to produce non-privileged documents, compare In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012)*, and id. at 1129* ("most of the[ Timeline] documents are not covered by attorney-client privilege because they do not represent communications between a lawyer and his client for the purpose of obtaining legal advice. *Cf.* [*U.S. v.*] *Ruehle*, 583 F.3d [600], 608-09 n.8 [(9th Cir.2009)] (rejecting a presumption of privilege even when a communication involves a lawyer)*, with id. at* 1125 ("Considering every communication he had with the Heirs to be privileged—regardless of

---

[1] Appendix A to this letter highlights deposition questions and answers to which DC would seek to compel answers, as well as the right to ask related follow-up questions.

**EXHIBIT 81**
**2009**

O'MELVENY & MYERS LLP

August 17, 2012 - Page 3

whether the communication was in his capacity as a business advisor or an attorney—Toberoff resisted all such [discovery].").

Moreover, Larson's and Peary's testimony—which was obtained after His Honor's ruling—makes clear that the consent agreement is a business agreement between the Siegels and the Shusters—affecting and impairing their putative copyright claims. *See* Peary Tr. 175:5-176:12; Larson Tr. at 42:20-25, 44:20-45:3, 45:17-46:4, 99:19-25. Privilege does not extend to such business arrangements, as the Ninth Circuit made clear in *Pacific Pictures*, 679 F.3d at 1125, 1129, and as many other cases hold, *e.g.*, *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer "'*in his capacity as such*'"—not where lawyer acts as "business agent"); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005) (business agreements and communications between attorney and client not privileged); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981) (where services primarily non-legal in nature, "communications relating to that service should therefore not be privileged, even though performed by a lawyer"); *Marten v. Yellow Freight Sys.*, 1998 U.S. Dist. LEXIS 268, at *18 (D. Kan. Jan. 6, 1998) (recognizing that "when the legal advice is merely incidental to business advice, the privilege does not apply").

b. Larson and Peary also waived whatever privilege might otherwise have existed in the consent agreement by, at their depositions, selectively and strategically disclosing certain facts about the consent agreement. Counsel allowed Larson and Peary to provide testimony that counsel apparently believed helped defendants' case (using these disclosures as a sword)—including on topics such as who is purportedly bound by the agreement; whether it entitles the Shusters to share in money from the Siegels' claims; and whether it provides Toberoff additional remuneration. Larson Tr. at 41:3-6, 41:10-42:11, 42:18, 99:15-100:5; Peary Letter at 4-5 (collecting testimony). Defense counsel then improperly used privilege as a shield to shut off numerous lines of related inquiry—including on issues like Superboy, *e.g.*, Larson Tr. 42:20-44:18, 45:17-46:5, which is the subject of DC's unclean hands claim on which defendants threaten to move for summary judgment. *Compare* Docket No. 49 ¶¶ 129-33, 178, 86-91, *with, e.g.*, June 28, 2012, letter from Defendants to DC ("Pursuant to Federal Rule of Civil Procedure 56, Defendants will be bringing a cross-motion for partial summary judgment … on DC's Third Claim for the reasons that have been extensively brief and discussed."). A privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Fort James Corp. v. Solo Cup. Co.*, 412 F.3d 1340, 1349-51 (Fed. Cir. 2005).

2. <u>Other Issues</u>. Defense counsel instructed Larson not to answer several other questions on the basis of the attorney-client privilege. None of these subjects implicated the conveyance of legal advice:

- We asked questions concerning Larson's awareness of efforts to market the Siegels' putative Superman rights. *See* Larson Tr. 46:19-48:7. There is no basis for asserting privilege over such business communications. *See In re Pacific Pictures Corp.*, 679

**EXHIBIT 81**
**2010**

O'MELVENY & MYERS LLP
August 17, 2012 - Page 4

F.3d 1121 at 1125, 1129; *Chen*, 99 F.3d at 1501 (privilege cannot apply where attorney acting primarily in business role); *accord Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d at 1043.  That Ms. Larson may have learned about these business meetings and proposals from her attorneys does not make the entire topic immune from discovery.  *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged.").

- We asked questions about the August 2002 communication from Kevin Marks to the Siegel heirs conveying Toberoff's and Emanuel's offer to acquire the Siegels' putative Superman rights (the "Marks Memo").  *See* Larson Tr. at 147:6-150:22, 156:13-23.  Defendants waived privilege over the Marks Memo by disclosing it to the U.S. Attorney's Office in 2010, and thus the communication and its contents are appropriate subjects for examination of Larson.  Docket Nos. 262 at 2-4; 279; *In re Pacific Pictures Corp.*, 679 F.3d at 1131.

- We asked questions about Larson's understanding of the value of the Siegels' putative Superman rights and how the heirs could monetize those rights.  Larson Tr. 322:11-.  DC's questions did not call for the divulgence of *any* privileged information—to the contrary, they were directed to Larson's understanding of the value of the Siegel's putative rights.  *Cf. Martin*, 278 F.3d at 999.

These are examples of defense counsel's persistent instructions to Larson not to respond to key lines of questioning during her July 22 deposition.  DC reserves the right to move on all objections in Appendix A or that subsequent events necessitate DC move on.

*        *        *

Please let us know immediately if you will withdraw defense counsel's objections.  If not, please let us know if you want to further meet and confer on these issues and, if so, when you are available.  Again, the Kendall Brill firm should be a part of this discussion.

Very truly yours,

/s/ Jason H. Tokoro

Jason H. Tokoro
for O'MELVENY & MYERS LLP

Enclosure

cc:    Daniel M Petrocelli, Esq.; Matthew T. Kline, Esq.; Defense Counsel

**EXHIBIT 81**
**2011**

# **Appendix A**

EXHIBIT 81
2012

# In The Matter Of:

*DC COMICS*
*v.*
*PACIFIC PICTURES CORPORATION*

_____

*LARSON, LAURA SIEGEL - Vol. 1*

*July 22, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**                    20750 Ventura Boulevard
                                      Suite 205
                                      Woodland Hills, CA 91364
                                      Phone: 818.593.2300
                                      Fax: 818.593.2301

**EXHIBIT 81**
**2013**

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DC COMICS,                        )
                                  )
                Plaintiff,        )
                                  )
        vs.                       )   Case No.
                                  )
PACIFIC PICTURES CORPORATION,     )   CV-10-3633 ODW (RZx)
IP WORLDWIDE, LLC, IPW, LLC,      )
MARC TOBEROFF, an individual,     )
MARK WARREN PEARY, as             )
personal representative of        )
the ESTATE OF JOSEPH SHUSTER,     )
JEAN ADELE PEAVY, an              )
individual, JOANNE SIEGEL,        )
an individual, LAURA SIEGEL       )
LARSON, an individual, and        )
DOES 1-10, inclusive,             )
                                  )
                Defendants.       )
_____    )




DEPOSITION OF:

        LAURA SIEGEL LARSON

        FRIDAY, JULY 22, 2011

        9:45 A.M.


Reported by:

        Kathleen E. McCarthy

        CSR No. 4483

EXHIBIT 81
2014

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 2

1          Deposition of LAURA SIEGEL LARSON, the witness,

2     taken on behalf of the Plaintiff, on Friday, July 22,

3     2011, 9:45 a.m., at 1999 Avenue of the Stars,

4     Sixteenth Floor, Los Angeles, California, before

5     Kathleen E. McCarthy, CSR No. 4483.

6

7     APPEARANCES OF COUNSEL:

8          FOR PLAINTIFF:

9               O'MELVENY & MYERS LLP

10              BY:  DANIEL M. PETROCELLI, ESQ.

11                  MATTHEW T. KLINE, ESQ.

12                  JASON TOKORO, ESQ.

13                  CASSANDRA L. SETO, ATTORNEY AT LAW

14              1999 Avenue of the Stars

15              Seventh Floor

16              Los Angeles, California  90067-6035

17              (310) 553-6700

18

19          FOR DEFENDANTS:

20              TOBEROFF & ASSOCIATES

21              BY:  MARC TOBEROFF, ESQ.

22              2049 Century Park East

23              Suite 3630

24              Los Angeles, California  90067

25              (310) 246-3333

EXHIBIT 81
2015

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 3

1        APPEARANCES (Continued):

2          ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 81
2016

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 4

1                           INDEX

2    WITNESS                EXAMINATION       PAGE

3    LAURA SIEGEL LARSON

4                           Mr. Petrocelli     10

5

6                           EXHIBITS

7    NO.        PAGE          DESCRIPTION

8    Exhibit 55    13    Last Will of Joanne Siegel;

9                        Durable Power of Attorney for

10                       Management of Property and

11                       Personal Affairs (LSL 00414 -

12                       00428 and LSL 00430 - 00450)

13   Exhibit 56   110    Letter to Paul Levitz from Joanne

14                       Siegel and Laura Siegel Larson

15                       dated September 21, 2002

16                       (WB006022)

17   Exhibit 57   177    Siegel Privilege Log

18   Exhibit 58   196    Superman -- Marc Toberoff Timeline

19                       (Q 0001 - Q 0007)

20   Exhibit 59   211    First Amended Complaint dated

21                       September 3, 2010

22   Exhibit 60   234    Facsimile Cover Page to Ariel Z.

23                       Emanuel from Marc Toberoff dated

24                       6-3-02; Memorandum of Agreement

25                       (EN00001 - 00007)

EXHIBIT 81
2017

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 5

1                          INDEX (Continued)

2                              EXHIBITS

3      NO.         PAGE           DESCRIPTION

4      Exhibit 61   236    Letter to Richard D. Parsons from

5                          Joanne Siegel dated May 9, 2002

6                          (000000676 - 000000678)

7      Exhibit 62   253    Letter to Lillian J. Laserson from

8                          Joanne Siegel and Laura Siegel

9                          Larson dated October 28, 2002

10                         (000001299 - 000001300)

11     Exhibit 63   260    Letter to Don W. Bulson from

12                         Joanne Siegel and Laura Siegel

13                         Larson dated November 1, 2002 (LSL

14                         00451)

15     Exhibit 64   285    Letter to Joanne Siegel and Laura

16                         Siegel Larson from Marc Toberoff

17                         dated November 26, 2002

18                         (000001894)

19     Exhibit 65   289    Letter to Joanne Siegel, Laura

20                         Siegel Larson, and Ariel Emanuel

21                         from Marc Toberoff dated December

22                         16, 2002 (000001883 - 000001884)

23

24

25

EXHIBIT 81
2018

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 6

1                          INDEX (Continued)

2                    PREVIOUSLY MARKED EXHIBITS

3      NO.          PAGE           DESCRIPTION

4      Exhibit 45    60     Letter to Joanne Siegel and Laura

5                           Siegel Larson from Marc Toberoff

6                           and Ariel Emanuel dated as of

7                           October 3, 2022 (000001878 -

8                           000001881)

9      Exhibit 48   108     Letter to John A. Schulman from

10                          Kevin S. Marks dated October 19,

11                          2001; Transmission Report (GTRB

12                          0302 - 0308)

13     Exhibit 10   212     Joint Venture Agreement made as of

14                          November 23, 2001 (134 - 137)

15     Exhibit 17   220     Renewal Registrations

16     Exhibit 18   220     U.S. Copyright Office certificate;

17                          Application for Registration of a

18                          Claim to Renewal Copyright

19     Exhibit 19   221     List of books

20     Exhibit 13   226     Letter to Mark Warren Peary from

21                          Marc Toberoff dated October 27,

22                          2003 (125 - 128)

23

24

25

EXHIBIT 81
2019

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 7

```
 1                          INDEX (Continued)

 2                     PREVIOUSLY MARKED EXHIBITS

 3       NO.        PAGE           DESCRIPTION

 4       Exhibit 54   243    Letter to Kevin S. Marks and Bruce

 5                           M. Ramer from Joanne Siegel and

 6                           Laura Siegel Larson dated

 7                           September 21, 2002; Transmission

 8                           Report (GTRB 0321 - 0322)

 9       Exhibit 46   293    Letter to Joanne Siegel and Laura

10                           Siegel Larson from Marc Toberoff

11                           dated January 21, 2002 (000001888

12                           - 000001890)

13       Exhibit 30   298    Letter to Laura from Michael

14                           Siegel dated May 13, 2003 (LSL

15                           00211 - 00212)

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 81**
**2020**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 8

1                          INDEX (Continued)

2                   INSTRUCTIONS NOT TO ANSWER

| 3 | PAGE | LINE | PAGE | LINE | PAGE | LINE |
|---|------|------|------|------|------|------|
| 4  | 27  | 4  | 106 | 1  | 323 | 3  |
| 5  | 27  | 12 | 106 | 9  | 324 | 12 |
| 6  | 28  | 3  | 147 | 8  | 325 | 13 |
| 7  | 28  | 11 | 147 | 17 | 326 | 10 |
| 8  | 33  | 13 | 147 | 22 | 326 | 13 |
| 9  | 34  | 11 | 148 | 4  | 327 | 15 |
| 10 | 41  | 13 | 148 | 10 | 327 | 24 |
| 11 | 41  | 19 | 148 | 15 | 328 | 7  |
| 12 | 42  | 1  | 156 | 16 | 328 | 17 |
| 13 | 42  | 23 | 156 | 23 | 328 | 22 |
| 14 | 44  | 13 | 186 | 1  | 329 | 1  |
| 15 | 45  | 1  | 219 | 24 | 329 | 23 |
| 16 | 46  | 1  | 258 | 4  | 330 | 7  |
| 17 | 46  | 9  | 260 | 4  | 330 | 17 |
| 18 | 48  | 7  | 266 | 9  | 332 | 10 |
| 19 | 50  | 17 | 266 | 19 | 333 | 1  |
| 20 | 101 | 5  | 268 | 6  |     |    |
| 21 | 103 | 25 | 268 | 15 |     |    |
| 22 | 105 | 21 | 322 | 14 |     |    |

23

24

25

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 9

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011         |
|          | 2  | 9:45 A.M.                                              |
| 08:45:40 | 3  |                                                        |
| 09:45:27 | 4  | THE VIDEOGRAPHER:  Good morning.  This marks           |
| 09:45:29 | 5  | the beginning of Volume 1, videotape number one, in    |
| 09:45:32 | 6  | the deposition of Laura Siegel in the matter entitled  |
| 09:45:36 | 7  | DC Comics versus Pacific Pictures Corporation, et al., |
| 09:45:40 | 8  | filed in the United States District Court for the      |
| 09:45:42 | 9  | Central District of California.  This is Case No.      |
| 09:45:45 | 10 | CV-10-3633 ODW (RZx)                                   |
| 09:45:51 | 11 | Today's date is July 22, 2011, and the time            |
| 09:45:53 | 12 | on the video monitor is 9:45 a.m.                     |
| 09:45:57 | 13 | The video operator today is Fritz Sperberg, a          |
| 09:46:01 | 14 | notary public contracted by Merrill Legal Solutions at |
| 09:46:03 | 15 | 20750 Ventura Boulevard, Woodland Hills, California.   |
| 09:46:08 | 16 | This video deposition is taking place at 1999          |
| 09:46:12 | 17 | Avenue of the Stars in Los Angeles and was noticed by  |
| 09:46:15 | 18 | Daniel Petrocelli of O'Melveny & Myers.               |
| 09:46:17 | 19 | Counsel, please identify yourselves and state          |
| 09:46:18 | 20 | whom you represent.                                    |
| 09:46:20 | 21 | MR. PETROCELLI:  Dan Petrocelli for DC                 |
| 09:46:24 | 22 | Comics.                                                |
| 09:46:25 | 23 | MR. TOBEROFF:  Mark Toberoff for Laura Siegel          |
| 09:46:28 | 24 | Larson and Warren Peavy -- Peary and Jean Peavy.       |
| 09:46:35 | 25 | MR. PETROCELLI:  We also have Jason Tokoro             |

**Merrill  Corporation  -  Los Angeles**

EXHIBIT 81
2022

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 10

| | | |
|---|---|---|
| 09:46:36 | 1 | and Matt Kline of O'Melveny here as well. |
| 09:46:41 | 2 | THE WITNESS:  Excuse me.  Which is Matt and |
| 09:46:42 | 3 | which is -- |
| 09:46:43 | 4 | MR. PETROCELLI:  Jason -- |
| 09:46:44 | 5 | THE WITNESS:  Jason, and Matt -- |
| 09:46:45 | 6 | MR. PETROCELLI:  -- is to my right -- |
| 09:46:45 | 7 | THE WITNESS:  Okay. |
| 09:46:45 | 8 | MR. PETROCELLI:  -- and then Matt is down at |
| 09:46:48 | 9 | the end there. |
| 09:46:48 | 10 | THE WITNESS:  All right.  Thank you. |
| 09:46:48 | 11 | THE VIDEOGRAPHER:  The court reporter today |
| 09:46:50 | 12 | is Kathy McCarthy of Merrill. |
| 09:46:50 | 13 | Would the reporter please swear in the |
| 09:46:52 | 14 | witness. |
| 09:46:52 | 15 | |
| | 16 | LAURA SIEGEL LARSON, |
| | 17 | having been first duly sworn, was |
| | 18 | examined and testified as follows: |
| 09:47:02 | 19 | |
| 09:47:02 | 20 | THE VIDEOGRAPHER:  You may begin. |
| | 21 | |
| 09:47:03 | 22 | EXAMINATION |
| | 23 | BY MR. PETROCELLI: |
| 09:47:04 | 24 | Q.   Could you please state your full name. |
| 09:47:07 | 25 | A.   Laura Siegel Larson. |

**EXHIBIT 81**
**2023**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 11

| | | |
|---|---|---|
| 09:47:08 | 1 | Q. And shall I call you Ms. Larson? |
| 09:47:10 | 2 | A. That's fine. |
| 09:47:11 | 3 | Q. Thank you. |
| 09:47:13 | 4 | Ms. Larson, first of all, let me express our |
| 09:47:17 | 5 | condolences of the passing of your mother earlier this |
| 09:47:21 | 6 | year, and we're sorry about that. And I understand |
| 09:47:29 | 7 | also that you may have some need for a rest or breaks |
| 09:47:34 | 8 | during the course of the day. |
| 09:47:35 | 9 | A. Yes. |
| 09:47:36 | 10 | Q. And please let us know whenever you need to |
| 09:47:43 | 11 | take a break because you're not feeling well or you're |
| 09:47:45 | 12 | tired. Just say so and we'll stop. Okay? |
| 09:47:48 | 13 | A. All right. |
| 09:47:51 | 14 | Q. Okay. Let me just begin by saying you |
| 09:47:55 | 15 | understand that we're taking this deposition in a case |
| 09:47:58 | 16 | filed by DC Comics? |
| 09:47:59 | 17 | A. Yes. |
| 09:47:59 | 18 | Q. Okay. And you have previously been deposed |
| 09:48:05 | 19 | in the lawsuit that you filed a few years back. You |
| 09:48:10 | 20 | recall that? |
| 09:48:10 | 21 | A. Yes. |
| 09:48:12 | 22 | Q. I want you to know that I have reviewed your |
| 09:48:16 | 23 | testimony in your deposition, and I will endeavor not |
| 09:48:21 | 24 | to go over or repeat things you have already said. To |
| 09:48:24 | 25 | be sure, though, there will be overlap, and I will be |

EXHIBIT 81
2024

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 12

| | | |
|---|---|---|
| 09:48:28 | 1 | mindful, though, of not wasting your time or my time |
| 09:48:32 | 2 | by asking you things we already know. |
| 09:48:33 | 3 | A.    Good. |
| 09:48:37 | 4 | Q.    You are the executrix of your mother's |
| 09:48:42 | 5 | estate? |
| 09:48:42 | 6 | A.    That's correct. |
| 09:48:43 | 7 | MR. PETROCELLI:  Okay.  Let me show you as |
| 09:48:47 | 8 | the first deposition exhibit -- |
| 09:48:50 | 9 | And forgive me.  What is the convention that |
| 09:48:51 | 10 | we're using here? |
| 09:48:55 | 11 | MR. TOKORO:  We're continuing the exhibit |
| 09:48:57 | 12 | numbers from the last time. |
| 09:48:58 | 13 | MR. PETROCELLI:  Okay.  I'm told we're |
| 09:48:59 | 14 | continuing exhibit numbers from when we last left off. |
| 09:49:02 | 15 | So what is the next in order? |
| 09:49:04 | 16 | MR. TOKORO:  This is going to be number 53. |
| 09:49:07 | 17 | MR. PETROCELLI:  So we're going to mark as -- |
| 09:49:10 | 18 | MR. TOKORO:  55.  I'm sorry.  55. |
| 09:49:12 | 19 | MR. PETROCELLI:  -- 55 your mother's Last |
| 09:49:16 | 20 | Will and a Durable Power of Attorney as one document. |
| 09:49:19 | 21 | I just have a couple questions about them. |
| 09:49:31 | 22 | THE WITNESS:  Thank you.  Let me just ask, |
| 09:49:32 | 23 | could you speak up just a little bit more because I |
| 09:49:35 | 24 | also have a hearing impairment, so it would help. |
| 09:49:38 | 25 | MR. PETROCELLI:  Sure.  It's important that |

EXHIBIT 81
2025

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 13

09:49:39    1    you hear me.

09:49:41    2           THE WITNESS:  Yes.

09:49:41    3           MR. PETROCELLI:  So I'm glad you pointed that

09:49:43    4    out.

            5           (Whereupon, Plaintiff's Exhibit 55

09:49:49    6           was marked for identification.)

            7    BY MR. PETROCELLI:

09:49:49    8      Q.   These two documents, your mother's Last Will

09:49:52    9    and the Durable Power of Attorney, were executed in

09:49:58   10    November of 2000, according to the documents, November

09:50:01   11    14, 2000.  To your knowledge, these are the last time

09:50:06   12    your mother executed a Will and Power of Attorney?

09:50:09   13      A.   Yes, that's correct.

09:50:11   14      Q.   And you were appointed as the person who

09:50:16   15    would have power of attorney over her affairs --

09:50:21   16      A.   Yes.

09:50:22   17      Q.   -- in the year 2000?

09:50:23   18      A.   I think there were some limitations to that,

09:50:25   19    though.

09:50:26   20      Q.   Based on what the document says?

09:50:27   21      A.   Yes.

09:50:28   22      Q.   And in the year 2000 was your mother of sound

09:50:32   23    mind and health?

09:50:33   24      A.   Oh, yes, of course.

09:50:50   25      Q.   Did there come a time since 2000 to the

**Merrill  Corporation  -  Los Angeles**

800-826-0277                          www.merillcorp.com/law

**EXHIBIT 81**
**2026**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 14

| 09:50:54 | 1 | present when she exhibited symptoms of dementia? |
|---|---|---|
| 09:51:02 | 2 | A.   No. |
| 09:51:02 | 3 | Q.   So until she passed away, she was of sound |
| 09:51:05 | 4 | mind? |
| 09:51:05 | 5 | A.   Oh, absolutely. |
| 09:51:08 | 6 | Q.   On page 2 of the will, there are different |
| 09:51:16 | 7 | beneficiaries named.  Michael Larson and James Larson |
| 09:51:19 | 8 | are your two children? |
| 09:51:20 | 9 | A.   That's correct. |
| 09:51:20 | 10 | Q.   And those are the only grandchildren of your |
| 09:51:23 | 11 | mother? |
| 09:51:23 | 12 | A.   Yes. |
| 09:51:25 | 13 | Q.   And Sophie Halko, H-a-l-k-o, that's your |
| 09:51:29 | 14 | mom's sister, your aunt? |
| 09:51:30 | 15 | A.   It's her only surviving sister, yes. |
| 09:51:33 | 16 | Q.   Only surviving sibling? |
| 09:51:36 | 17 | A.   Yes. |
| 09:51:37 | 18 | Q.   Where does she live? |
| 09:51:37 | 19 | A.   In Ohio, Cleveland, Ohio. |
| 09:51:41 | 20 | Q.   Has lived there her whole life? |
| 09:51:43 | 21 | A.   Yes. |
| 09:51:43 | 22 | Q.   Okay.  And how old is she? |
| 09:51:46 | 23 | A.   She's in her eighties. |
| 09:51:48 | 24 | Q.   And does she live alone, or is she married? |
| 09:51:51 | 25 | A.   No.  She's living with her son. |

LAURA SIEGEL LARSON - 7/22/2011

Page 15

| | | |
|---|---|---|
| 09:51:53 | 1 | Q.   Son.   Okay.   What's his name? |
| 09:51:55 | 2 | A.   Gregory -- well, she has more than one son, |
| 09:51:58 | 3 | but Gregory is living with her now. |
| 09:52:00 | 4 | Q.   Gregory Halko? |
| 09:52:01 | 5 | A.   Yes. |
| 09:52:02 | 6 | Q.   And who is, finally, George Zadrozny, Esq. |
| 09:52:08 | 7 | of -- |
| 09:52:08 | 8 | A.   Yes.   He's -- |
| 09:52:09 | 9 | Q.   -- Timber Bay Circle, Oldsman, Florida? |
| 09:52:13 | 10 | A.   He's a long-time friend and also served as an |
| 09:52:17 | 11 | attorney for us in the early days of the terminations. |
| 09:52:23 | 12 | Q.   What do you consider the early days of the |
| 09:52:26 | 13 | termination? |
| 09:52:26 | 14 | A.   Well, it was prior to my father's death.   So |
| 09:52:30 | 15 | he was a -- he was a consultant helping, you know, my |
| 09:52:35 | 16 | mother and father learn about the -- about the |
| 09:52:38 | 17 | copyright law. |
| 09:52:40 | 18 | Q.   Your father passed in 1996? |
| 09:52:42 | 19 | A.   Correct. |
| 09:52:43 | 20 | Q.   Okay.   Did there come a time when |
| 09:52:49 | 21 | Mr. Zadrozny stopped rendering services as a lawyer to |
| 09:52:52 | 22 | any member of your family? |
| 09:52:54 | 23 | A.   No.   I mean he's -- you know, he's on an |
| 09:53:00 | 24 | as-needed basis. |
| 09:53:00 | 25 | Q.   Has he continued to render services to this |

LAURA SIEGEL LARSON - 7/22/2011

Page 16

| | | |
|---|---|---|
| 09:53:03 | 1 | day? |
| 09:53:05 | 2 | A.    When needed. |
| 09:53:06 | 3 | Q.    When is the last time he has been called upon |
| 09:53:10 | 4 | to give any advice? |
| 09:53:16 | 5 | A.    I really don't remember, but, you know, it |
| 09:53:21 | 6 | was fairly recently. |
| 09:53:24 | 7 | Q.    In connection with Superman? |
| 09:53:27 | 8 | A.    I -- I don't remember if the last time that I |
| 09:53:31 | 9 | spoke to him was about Superman or whether it had to |
| 09:53:34 | 10 | do with my mother's estate. |
| 09:53:41 | 11 | Q.    Has he provided advice regarding Superman |
| 09:53:52 | 12 | since the time that you retained Mr. Toberoff? |
| 09:53:58 | 13 | A.    Regarding -- could you clarify your question? |
| 09:54:00 | 14 | Q.    Yeah.  I'm trying to deliberately be very |
| 09:54:03 | 15 | vague -- not vague, but broad -- |
| 09:54:06 | 16 | A.    It is broad. |
| 09:54:07 | 17 | Q.    -- because I want to stay away from privilege |
| 09:54:09 | 18 | issues, so I'm not asking you, at least right now, |
| 09:54:12 | 19 | about any specific subject matter.  I'm just trying to |
| 09:54:16 | 20 | generally understand if this person is a relevant |
| 09:54:19 | 21 | witness to anything.  And so the question I'm putting |
| 09:54:22 | 22 | to you is whether since the time that you first |
| 09:54:27 | 23 | entered into a relationship with Mr. Toberoff back in |
| 09:54:33 | 24 | 2002, since that time to the present, has Mr. Zadrozny |
| 09:54:40 | 25 | rendered any legal advice regarding Superman? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 17

| | | | |
|---|---|---|---|
| 09:54:42 | 1 | A. | Yes. |

09:54:43    2        Q.    And when is the last time that he has done

09:54:47    3    so?

09:54:47    4        A.    As I said, I can't recall, but I would be

09:54:52    5    guessing.

09:54:52    6        Q.    Has he done so since your mother passed away?

09:54:55    7        A.    Not regarding Superman.

09:54:57    8        Q.    Not regarding.  And prior to your mom's

09:55:00    9    passing, you don't remember the last time?

09:55:03   10        A.    No.

09:55:03   11        Q.    Did you send him a copy of the lawsuit in

09:55:07   12    this case?

09:55:08   13        A.    Yes.

09:55:10   14        Q.    Okay.  And without getting into the details,

09:55:15   15    have you had discussions --

09:55:16   16        A.    Oh, I'm sorry.  When you say in this case,

09:55:19   17    you're talking about the current -- the current one

09:55:21   18    that we're discussing.

09:55:22   19        Q.    The DC Comics case, correct.

09:55:23   20        A.    That I don't recall.

09:55:24   21        Q.    But the other case you did.

09:55:25   22        A.    Yes.

09:55:25   23        Q.    The one you filed.

09:55:26   24        A.    Yes.

09:55:30   25        Q.    Okay.  Is he -- how old is Mr. Zadrozny?  Do

EXHIBIT 81
2030

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 18

| | | |
|---|---|---|
| 09:55:36 | 1 | you know? |
| 09:55:39 | 2 | A.   I would say he's probably somewhere between |
| 09:55:43 | 3 | 58 and 62. |
| 09:55:44 | 4 | Q.   And he's still an active member of the bar? |
| 09:55:46 | 5 | A.   Yes. |
| 09:55:49 | 6 | Q.   Does he work with a firm? |
| 09:55:51 | 7 | A.   No.  He works independently. |
| 09:56:03 | 8 | Q.   If you go to page 15 of the will, there are |
| 09:56:08 | 9 | two witnesses who attested to the will.  I just want |
| 09:56:14 | 10 | to make sure we know who they are.  The first one |
| 09:56:17 | 11 | looks like to be the signature of the lawyer who |
| 09:56:20 | 12 | prepared the document, Gary Ruttenberg; is that |
| | 13 | correct? |
| 09:56:24 | 14 | A.   Yes. |
| 09:56:24 | 15 | Q.   And the second person is his legal assistant, |
| 09:56:27 | 16 | Mary Carrier? |
| 09:56:27 | 17 | A.   That's true. |
| 09:56:29 | 18 | Q.   And how long have Mr. Ruttenberg -- how long |
| 09:56:31 | 19 | has Mr. Ruttenberg been a lawyer for your family? |
| 09:56:38 | 20 | A.   Probably -- well, the only -- only thing that |
| 09:56:43 | 21 | he ever dealt with was, you know, wills.  You know, I |
| 09:56:46 | 22 | mean he had nothing to do with any other legal |
| 09:56:49 | 23 | matters.  So if we needed something having to do with |
| 09:56:52 | 24 | a will, I believe that -- that that would be 19 -- |
| 09:57:06 | 25 | about 1995. |

**EXHIBIT 81**
**2031**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 19

| 09:57:11 | 1 | Q. That had to do with a prior will? |
| 09:57:14 | 2 | A. No, had to do with my father's will. |
| 09:57:16 | 3 | Q. Your father's will. Okay. And since 2000 |
| 09:57:21 | 4 | when he prepared your mother's will until your mom |
| 09:57:25 | 5 | passed earlier this year, did you have any interaction |
| 09:57:29 | 6 | with him at all regarding Superman? |
| 09:57:31 | 7 | A. No. |
| 09:57:31 | 8 | Q. Or did your mother, to your knowledge? |
| 09:57:33 | 9 | A. No. |
| 09:57:34 | 10 | Q. Has Mr. Zadrozny, to your knowledge, reviewed |
| 09:57:39 | 11 | any of the -- any agreements relating in any way to |
| 09:57:47 | 12 | Superman? |
| 09:57:48 | 13 | A. Could you be more specific? |
| 09:57:51 | 14 | Q. H'm. The notice of termination that you |
| 09:57:56 | 15 | served in 1997, did he have anything to do with its |
| 09:58:01 | 16 | preparation? |
| 09:58:01 | 17 | A. He was a consultant for us at that time. |
| 09:58:05 | 18 | Q. Was he at all involved in any way regarding |
| 09:58:13 | 19 | your negotiations and discussions with Warner Bros. or |
| 09:58:16 | 20 | DC Comics prior to your relationship with |
| 09:58:19 | 21 | Mr. Toberoff? |
| 09:58:19 | 22 | A. You know, he was not a negotiator. |
| 09:58:21 | 23 | Q. Was he consulted from time to time in regard |
| 09:58:23 | 24 | to those matters? |
| 09:58:26 | 25 | A. As a friend, perhaps. |

LAURA SIEGEL LARSON - 7/22/2011

Page 20

| | | |
|---|---|---|
| 09:58:29 | 1 | Q.   Okay. |
| 09:58:30 | 2 | A.   I don't -- I don't really -- |
| 09:58:32 | 3 | Q.   So, for example -- |
| 09:58:33 | 4 | A.   May I just clarify? |
| 09:58:34 | 5 | Q.   Sure. |
| 09:58:35 | 6 | A.   My mother really communicated with him far |
| 09:58:40 | 7 | more than I did, so I really couldn't be exactly sure |
| 09:58:42 | 8 | of the answer to that. |
| 09:58:50 | 9 | Q.   Okay.  Did you ever communicate with him |
| 09:58:53 | 10 | during the time when there were discussions with |
| 09:58:57 | 11 | Warner Bros. let's say from 1997 until the time that |
| 09:58:59 | 12 | you started your relationship with Mr. Toberoff, let's |
| 09:59:02 | 13 | say during that five-, six-year period of time?  You |
| 09:59:06 | 14 | recall there were lots of discussions and negotiations |
| 09:59:09 | 15 | with DC Comics and Warner Bros.? |
| 09:59:10 | 16 | A.   Um-hum.  Yes. |
| 09:59:12 | 17 | Q.   You have to answer audibly. |
| 09:59:13 | 18 | A.   Yes. |
| 09:59:16 | 19 | Q.   At some point in time you were represented, |
| 09:59:18 | 20 | your family was, by -- is it George Levine?  Arthur |
| | 21 | Levine.  Excuse me. |
| | 22 | A.   Arthur Levine. |
| 09:59:22 | 23 | Q.   And then Kevin Marks and Bruce Ramer of the |
| 09:59:27 | 24 | Gang Tyre firm. |
| 09:59:27 | 25 | A.   Yes. |

**Merrill   Corporation   -   Los Angeles**
800-826-0277                          www.merillcorp.com/law

EXHIBIT 81
2033

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 21

| | | |
|---|---|---|
| 09:59:27 | 1 | MR. TOBEROFF:  Wait until he finishes the |
| 09:59:30 | 2 | question. |
| 09:59:30 | 3 | THE WITNESS:  I'm sorry. |
| 09:59:31 | 4 | MR. TOBEROFF:  And you need to give me time |
| 09:59:33 | 5 | in case I want to object. |
| | 6 | BY MR. PETROCELLI: |
| 09:59:34 | 7 | Q.   And prior to Mr. Toberoff, were you |
| 09:59:39 | 8 | represented by any other lawyer, you or any member of |
| 09:59:40 | 9 | your family, regarding Superman besides Arthur Levine |
| 09:59:47 | 10 | and besides the Gang Tyre law firm? |
| 10:00:02 | 11 | A.   No. |
| 10:00:11 | 12 | Q.   Okay. |
| 10:00:12 | 13 | Did Mr. -- to your knowledge, did |
| 10:00:16 | 14 | Mr. Zadrozny review any agreements that you or members |
| 10:00:21 | 15 | of your family entered into with Mr. Toberoff? |
| 10:00:24 | 16 | A.   Yes. |
| 10:00:26 | 17 | Q.   Which agreements? |
| 10:00:28 | 18 | A.   The original documents when we were retaining |
| 10:00:35 | 19 | his legal services in 2002 and also when we entered |
| 10:00:43 | 20 | into a litigation agreement with him in -- I believe |
| 10:00:48 | 21 | that was 2004. |
| 10:00:50 | 22 | Q.   And "with him," you meant with Mr. Toberoff. |
| 10:00:53 | 23 | A.   Correct. |
| 10:00:55 | 24 | Q.   Do you know whether Mr. Zadrozny charged your |
| 10:01:00 | 25 | family for any legal fees for reviewing those |

## LAURA SIEGEL LARSON - 7/22/2011

Page 22

| | | |
|---|---|---|
| 10:01:04 | 1 | documents? |
| 10:01:05 | 2 | A.    Yes. |
| 10:01:05 | 3 | Q.    How do you know that? |
| 10:01:07 | 4 | A.    My mother told me. |
| 10:01:10 | 5 | Q.    Do you know how much he charged? |
| 10:01:12 | 6 | A.    It was a very low hourly rate. |
| 10:01:17 | 7 | Q.    After this litigation document in 2004 that |
| 10:01:22 | 8 | you entered into -- when I say "you," you know I'm |
| 10:01:24 | 9 | talking about really you and your mother. |
| 10:01:28 | 10 | A.    Correct. |
| 10:01:29 | 11 | Q.    Joanne Siegel. |
| 10:01:30 | 12 | A.    Us as the Siegels. |
| 10:01:31 | 13 | Q.    But I'm not talking about Michael Siegel. |
| 10:01:33 | 14 | A.    No, no.  He wasn't -- he had nothing to do |
| 10:01:36 | 15 | with that. |
| 10:01:37 | 16 | Q.    We'll deal with him separately. |
| 10:01:39 | 17 | MR. TOBEROFF:  I just want to for clarity, |
| 10:01:41 | 18 | when "you" does not refer to her and her mother and |
| 10:01:45 | 19 | refers just to her, you need to tell her. |
| 10:01:47 | 20 | MR. PETROCELLI:  Fair enough.  Fair enough. |
| 10:01:50 | 21 | I will try to be clear. |
| 10:01:55 | 22 | I forgot what I was asking.  So it was a |
| 10:01:59 | 23 | clever device by good lawyers to get you off track. |
| 10:02:06 | 24 | What was I asking?  Senior moment here. |
| 10:02:22 | 25 | (The record was read.) |

**EXHIBIT 81**
**2035**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 23

| | | |
|---|---|---|
| 10:02:22 | 1 | MR. PETROCELLI:  Okay.  There you go. |
| 10:02:24 | 2 | THE WITNESS:  Okay. |
| | 3 | BY MR. PETROCELLI: |
| 10:02:25 | 4 | Q.  So after the litigation document that you and |
| 10:02:27 | 5 | your family entered into with Mr. Toberoff in 2004, |
| 10:02:31 | 6 | were there any other documents, to your knowledge, |
| 10:02:34 | 7 | that were sent to Mr. Zadrozny for his review related |
| 10:02:40 | 8 | to Superman? |
| 10:02:41 | 9 | A.  I don't recall. |
| 10:02:44 | 10 | Q.  You signed a document sometime in or about |
| 10:02:49 | 11 | 2008 that the Shusters also signed, some agreement; |
| 10:02:52 | 12 | correct? |
| 10:02:53 | 13 | A.  Yes. |
| 10:02:54 | 14 | Q.  And Mr. Toberoff also signed that; correct? |
| 10:02:57 | 15 | A.  Yes. |
| 10:02:59 | 16 | Q.  Did Mr. Zadrozny, to your knowledge, review |
| 10:03:05 | 17 | that document? |
| 10:03:05 | 18 | A.  Yes. |
| 10:03:07 | 19 | Q.  Did he review that document prior to the time |
| 10:03:10 | 20 | you signed it? |
| 10:03:11 | 21 | A.  Yes. |
| 10:03:14 | 22 | Q.  How do you know he reviewed it? |
| 10:03:20 | 23 | A.  Because he and I spoke about it. |
| 10:03:27 | 24 | Q.  How long before you signed it -- withdrawn. |
| 10:03:33 | 25 | Did you send him a copy of it before signing |

**Merrill  Corporation  -  Los Angeles**

**EXHIBIT 81**
**2036**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 24

| | | |
|---|---|---|
| 10:03:35 | 1 | it? |
| 10:03:36 | 2 | A.   Yes. |
| 10:03:37 | 3 | Q.   Was he here in town with you or -- |
| 10:03:40 | 4 | A.   No. |
| 10:03:40 | 5 | Q.   He was living in Florida? |
| 10:03:42 | 6 | A.   Yes. |
| 10:03:42 | 7 | Q.   Has he lived in Florida the whole time you've |
| 10:03:45 | 8 | been dealing with him? |
| 10:03:45 | 9 | A.   Yes. |
| 10:03:51 | 10 | Q.   Okay.  Did any other attorney besides |
| 10:03:53 | 11 | Mr. Zadrozny review that document, to your knowledge, |
| 10:03:57 | 12 | before you or your mother signed it? |
| 10:03:58 | 13 | A.   Which document are you speaking of? |
| 10:04:00 | 14 | Q.   This 2008 -- we've been calling it a consent |
| 10:04:04 | 15 | agreement. |
| 10:04:05 | 16 | A.   Oh.  The -- no. |
| 10:04:11 | 17 | Q.   How many documents have you or your mother |
| 10:04:15 | 18 | signed that the Shusters also signed, one or more |
| 10:04:19 | 19 | Shuster people? |
| 10:04:20 | 20 | A.   Only one. |
| 10:04:32 | 21 | Q.   Was the 2008 consent agreement the last |
| 10:04:41 | 22 | document you asked or your mother asked, to your |
| 10:04:44 | 23 | knowledge, Mr. Zadrozny to review related to Superman? |
| 10:04:49 | 24 | A.   I believe so. |
| 10:04:52 | 25 | Q.   Have you signed any other documents related |

## LAURA SIEGEL LARSON - 7/22/2011

Page 25

| | | |
|---|---|---|
| 10:04:56 | 1 | to Superman after the 2008 consent agreement that you |
| 10:05:02 | 2 | signed together with the Shusters and Mr. Toberoff and |
| 10:05:05 | 3 | your mother? |
| 10:05:07 | 4 | A.  I don't remember any other document. |
| 10:05:22 | 5 | Q.  How did you obtain a copy -- withdrawn. |
| 10:05:26 | 6 | Did you or your mother send the draft of the |
| 10:05:29 | 7 | 2008 consent agreement to Mr. Zadrozny, or did someone |
| 10:05:33 | 8 | else send it on your behalf? |
| 10:05:36 | 9 | A.  I believe my mother sent it. |
| 10:05:40 | 10 | Q.  And do you know how long before your signing |
| 10:05:48 | 11 | it your mother sent it to him? |
| 10:05:52 | 12 | A.  I don't know.  I would be guessing, but, you |
| 10:05:54 | 13 | know -- |
| 10:05:55 | 14 | MR. TOBEROFF:  Don't guess. |
| 10:05:56 | 15 | THE WITNESS:  You know. |
| | 16 | BY MR. PETROCELLI: |
| 10:05:57 | 17 | Q.  On the subject of guessing, your lawyer said |
| 10:06:00 | 18 | don't guess, and I concur with that except that you |
| 10:06:02 | 19 | need to understand that there's a wild guess, which we |
| 10:06:06 | 20 | don't want to know about.  Wild speculation we don't |
| 10:06:08 | 21 | want to know about.  But if you have some basis to |
| 10:06:12 | 22 | estimate something or approximate something based on |
| 10:06:14 | 23 | your overall knowledge, we are entitled to that, just |
| 10:06:19 | 24 | so you keep that in mind.  Okay? |
| 10:06:22 | 25 | A.  Um-hum.  Yes.  You pointed -- |

**EXHIBIT 81**
**2038**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 26

| 10:06:24 | 1 | Q.    Yeah. |
| 10:06:26 | 2 | A.    Pointing reminder. |

10:06:27    3        Q.    The pointing is not to be rude at all.  It's

10:06:30    4    just that --

10:06:31    5        A.    I understand.

10:06:31    6        Q.    -- to make sure that you answer audibly.

10:06:33    7              MR. TOBEROFF:  Give me time to object.

10:06:38    8              MR. PETROCELLI:  Mr. Toberoff does like to

10:06:39    9    object, so we don't want -- we don't want to take away

10:06:44   10    that pleasure.

10:06:45   11              MR. TOBEROFF:  I like to have something to do

10:06:47   12    at deposition.

10:06:47   13              MR. PETROCELLI:  You don't need to be here,

10:06:49   14    you know.

10:06:50   15              THE WITNESS:  Yes, he does.  I would miss him

10:06:52   16    if he wasn't here.

           17    BY MR. PETROCELLI:

10:06:55   18        Q.    Did -- do you remember if there were any

10:07:00   19    changes made to the consent agreement after

10:07:04   20    Mr. Zadrozny reviewed it?

10:07:08   21        A.    I don't remember.

10:07:13   22        Q.    Did you discuss it with him?

10:07:15   23        A.    Yes.

10:07:17   24        Q.    What did you and he discuss about it?

10:07:22   25              MR. TOBEROFF:  Actually, you can't disclose

**EXHIBIT 81**
**2039**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 27

| 10:07:24 | 1 | that. |
| 10:07:24 | 2 | THE WITNESS:  I didn't think I could. |
| 10:07:26 | 3 | MR. TOBEROFF:  Attorney-client privilege, and |
| 10:07:27 | 4 | I instruct you not to answer. |
| | 5 | BY MR. PETROCELLI: |
| 10:07:29 | 6 | Q.  Did you discuss with your mother what you and |
| 10:07:35 | 7 | Mr. Zadrozny talked about? |
| 10:07:42 | 8 | A.  Probably. |
| 10:07:45 | 9 | Q.  As best as you can remember, what did you and |
| 10:07:48 | 10 | your mom say to each other in that regard? |
| 10:07:53 | 11 | MR. TOBEROFF:  Joint client privilege. |
| 10:07:54 | 12 | Instruct you not to answer. |
| | 13 | BY MR. PETROCELLI: |
| 10:07:55 | 14 | Q.  I'm referring to discussions that the two of |
| 10:07:57 | 15 | you had privately, not with Mr. Zadrozny in the room |
| 10:08:01 | 16 | or on the phone.  You understand that? |
| 10:08:04 | 17 | A.  I hear what you're saying. |
| 10:08:06 | 18 | Q.  Okay.  And I'm asking you to tell me what you |
| 10:08:08 | 19 | discussed with your mother regarding what Mr. Zadrozny |
| 10:08:13 | 20 | did or said. |
| 10:08:15 | 21 | MR. TOBEROFF:  You can answer so long as your |
| 10:08:17 | 22 | answer doesn't disclose the substance of conversations |
| 10:08:21 | 23 | that you had with Mr. Zadrozny. |
| 10:08:23 | 24 | THE WITNESS:  Um-hum. |
| 10:08:26 | 25 | That we were grateful for his input. |

LAURA SIEGEL LARSON - 7/22/2011

Page 28

| | | |
|---|---|---|
| 10:08:29 | 1 | BY MR. PETROCELLI: |
| 10:08:29 | 2 | Q.   What was his input? |
| 10:08:32 | 3 | MR. TOBEROFF:  I instruct you not to answer. |
| 10:08:35 | 4 | Attorney-client privilege. |
| | 5 | BY MR. PETROCELLI: |
| 10:08:37 | 6 | Q.   You and your mother discussed his input? |
| 10:08:40 | 7 | A.   Yes. |
| 10:08:41 | 8 | Q.   What did the two of you discuss about his |
| 10:08:44 | 9 | input? |
| 10:08:44 | 10 | MR. TOBEROFF:  Attorney-client privilege. |
| 10:08:46 | 11 | Joint client privilege.  I instruct you not to answer. |
| | 12 | BY MR. PETROCELLI: |
| 10:08:48 | 13 | Q.   Did he provide any input to you or your |
| 10:08:53 | 14 | mother in writing? |
| 10:08:56 | 15 | A.   I don't believe so. |
| 10:08:57 | 16 | Q.   Did he mark up a document and send you some |
| 10:09:01 | 17 | revisions or tell you -- send you some revisions in |
| 10:09:05 | 18 | writing? |
| 10:09:06 | 19 | A.   I don't recall that. |
| 10:09:06 | 20 | Q.   Were there any -- did you e-mail him at all? |
| 10:09:10 | 21 | A.   Well, on other occasions, but, you know, not |
| 10:09:13 | 22 | regarding this. |
| 10:09:16 | 23 | Q.   Did you meet with him in person regarding the |
| 10:09:19 | 24 | 2008 consent agreement? |
| 10:09:20 | 25 | A.   No. |

EXHIBIT 81
2041

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 29

| | | |
|---|---|---|
| 10:09:20 | 1 | Q.   Did you meet with him in person regarding the |
| 10:09:24 | 2 | 2004 litigation agreement with Mr. Toberoff? |
| 10:09:28 | 3 | A.   No. |
| 10:09:28 | 4 | Q.   And did you meet with him in person regarding |
| 10:09:31 | 5 | the 2002 agreement with Mr. Toberoff? |
| 10:09:41 | 6 | A.   No. |
| 10:09:41 | 7 | Q.   And to be clear, Mr. Zadrozny is the only |
| 10:09:48 | 8 | lawyer to review your agreements with Mr. Toberoff? |
| 10:09:52 | 9 | A.   No, that's not correct. |
| 10:09:54 | 10 | Q.   Okay.  Is he the only lawyer to review the |
| 10:09:57 | 11 | 2008 consent agreement? |
| 10:10:02 | 12 | A.   I believe so. |
| 10:10:06 | 13 | Q.   Okay.  And with respect to the 2002 |
| 10:10:12 | 14 | agreement, the first agreement with Mr. Toberoff, who |
| 10:10:12 | 15 | reviewed that agreement, if anyone, other than |
| 10:10:15 | 16 | Mr. Zadrozny? |
| 10:10:16 | 17 | A.   I believe Arthur Levine looked at it, if I'm |
| 10:10:20 | 18 | recalling correctly. |
| 10:10:23 | 19 | Q.   During the time that you were working with |
| 10:10:26 | 20 | Gang Tyre, Bruce Ramer and Kevin Marks of Gang Tyre, |
| 10:10:29 | 21 | you were still calling on Mr. Levine from time to |
| 10:10:31 | 22 | time -- |
| 10:10:32 | 23 | A.   Yes. |
| 10:10:32 | 24 | Q.   -- with regard to Superman? |
| 10:10:34 | 25 | A.   Yes. |

Merrill   Corporation   -   Los Angeles

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 30

| | | |
|---|---|---|
| 10:10:34 | 1 | Q.   And have you continued to do so even after |
| 10:10:37 | 2 | your relationship with Mr. Toberoff began? |
| 10:10:42 | 3 | A.   Yes. |
| 10:10:43 | 4 | Q.   And to the present? |
| 10:10:47 | 5 | A.   Well, I haven't talked to Arthur in a really |
| 10:10:50 | 6 | long time. |
| 10:10:50 | 7 | Q.   When is the last time that you or your mother |
| 10:10:54 | 8 | consulted with Mr. Levine regarding Superman? |
| 10:11:04 | 9 | A.   I don't remember.  I couldn't give you a |
| 10:11:07 | 10 | date. |
| 10:11:07 | 11 | Q.   Would it be within the last five years? |
| 10:11:14 | 12 | A.   Possibly. |
| 10:11:16 | 13 | Q.   Did Mr. Levine review the 2004 litigation |
| 10:11:22 | 14 | agreement with Mr. Toberoff? |
| 10:11:23 | 15 | A.   Yes, he did. |
| 10:11:25 | 16 | Q.   Did any other lawyer besides Mr. Levine and |
| 10:11:29 | 17 | Mr. Zadrozny review the 2002 agreement with |
| 10:11:31 | 18 | Mr. Toberoff, to your knowledge? |
| 10:11:36 | 19 | A.   Are you saying, you know, on my behalf? |
| 10:11:39 | 20 | Q.   Or your mother's behalf, yes. |
| 10:11:42 | 21 | A.   No. |
| 10:11:43 | 22 | Q.   The same question for the 2004 litigation |
| 10:11:46 | 23 | agreement. |
| 10:11:47 | 24 | A.   No other lawyer besides Arthur and George. |
| 10:11:50 | 25 | Q.   Okay.  Arthur Levine and George Zadrozny. |

EXHIBIT 81
2043

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 31

| | | |
|---|---|---|
| 10:11:55 | 1 | A.    Correct. |
| 10:11:56 | 2 | Q.    And the 2008 consent agreement was just |
| 10:11:59 | 3 | George, not Arthur. |
| 10:12:00 | 4 | A.    I believe so.  I -- I don't remember talking |
| 10:12:05 | 5 | to Arthur about it, but I might have, but I really |
| 10:12:09 | 6 | think it was just George. |
| 10:12:12 | 7 | Q.    Do you know whether the Shusters had any |
| 10:12:18 | 8 | lawyer review the 2008 consent agreement? |
| 10:12:22 | 9 | A.    I have no idea. |
| 10:12:31 | 10 | Q.    Do you recall that Mr. Toberoff sent you some |
| 10:12:41 | 11 | letters regarding a potential conflict of interest |
| 10:12:46 | 12 | with respect to acquiring Michael Siegel's termination |
| 10:12:53 | 13 | interest? |
| 10:12:54 | 14 | A.    I believe he did, yes. |
| 10:12:56 | 15 | Q.    And I'll show them to you as we get into it. |
| 10:12:59 | 16 | Do you know whether any lawyer for you or |
| 10:13:02 | 17 | your mother reviewed those documents? |
| 10:13:06 | 18 | A.    I'm -- probably -- I'm guessing, but I |
| 10:13:11 | 19 | probably would have had George look at that also. |
| 10:13:18 | 20 | Q.    You're not -- |
| | 21 | A.    Zadrozny. |
| 10:13:18 | 22 | Q.    -- sure, is it fair to say? |
| 10:13:20 | 23 | A.    I'm not sure, but I -- I would say probably. |
| 10:13:31 | 24 | Q.    The record will show that those consent -- |
| 10:13:35 | 25 | excuse me -- those disclosure -- withdrawn. |

**EXHIBIT 81**
**2044**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 32

| | | |
|---|---|---|
| 10:13:38 | 1 | The record will show that those conflict of |
| 10:13:40 | 2 | interest letters were sent to you -- |
| 10:13:44 | 3 | What year was that? |
| 10:13:48 | 4 | MR. TOKORO:  2002, 2003. |
| | 5 | BY MR. PETROCELLI: |
| 10:13:49 | 6 | Q.   -- 2002, 2003, that general time frame.  And |
| 10:13:52 | 7 | I'll show them to you when we get to them, but for |
| 10:13:55 | 8 | now -- and again, I'm trying to get a broad picture of |
| 10:13:58 | 9 | who is involved in all this. |
| 10:14:04 | 10 | Have you received any conflict of interest |
| 10:14:10 | 11 | letters from Mr. Toberoff since those ones in 2002 and |
| 10:14:15 | 12 | 2003 related to Michael Siegel? |
| 10:14:21 | 13 | MR. TOBEROFF:  Vague and -- are you asking |
| 10:14:23 | 14 | whether any other conflict of interest letters, |
| 10:14:27 | 15 | period, or any other conflict of interest letters |
| 10:14:30 | 16 | relating to Michael Siegel? |
| 10:14:33 | 17 | MR. PETROCELLI:  Let me clarify. |
| 10:14:37 | 18 | Q.   Other than conflict of interest letters |
| 10:14:40 | 19 | related to Michael Siegel -- |
| 10:14:42 | 20 | A.   Yes. |
| 10:14:43 | 21 | Q.   -- have you received any conflict of interest |
| 10:14:46 | 22 | letters from Mr. Toberoff in the course of your |
| 10:14:49 | 23 | relationship with him? |
| 10:14:51 | 24 | A.   Well, every time there was any sort of |
| 10:14:56 | 25 | agreement that we were entering into with |

EXHIBIT 81
2045

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 33

| | | |
|---|---|---|
| 10:14:58 | 1 | Mr. Toberoff, he would disclose to us any conflicts of |
| 10:15:02 | 2 | interest that he had in writing. |
| 10:15:06 | 3 | Q.   Which -- can you give -- can you be more |
| 10:15:11 | 4 | specific? |
| 10:15:12 | 5 | A.   For the 2002 agreement. |
| 10:15:16 | 6 | Q.   There's a letter he sent to you disclosing |
| 10:15:19 | 7 | conflicts of interest? |
| 10:15:20 | 8 | A.   I believe so. |
| 10:15:22 | 9 | Q.   And what do you -- what do you understand the |
| 10:15:25 | 10 | potential conflict of interest to have been that he |
| 10:15:27 | 11 | was disclosing to you? |
| 10:15:29 | 12 | MR. TOBEROFF:  Attorney-client privilege.  I |
| 10:15:30 | 13 | instruct you not to answer. |
| | 14 | BY MR. PETROCELLI: |
| 10:15:39 | 15 | Q.   Was that conflict of interest -- do you know |
| 10:15:42 | 16 | who it is? |
| 10:15:44 | 17 | A.   Do I know who what is? |
| 10:15:45 | 18 | Q.   Bad question. |
| 10:15:46 | 19 | As you sit here now, do you remember the |
| 10:15:49 | 20 | subject matter of the conflict of interest letter that |
| 10:15:52 | 21 | you received from Mr. Toberoff at the time that you |
| 10:15:55 | 22 | entered into the first agreement with him in 2002? |
| 10:15:59 | 23 | A.   I don't -- |
| 10:16:00 | 24 | MR. TOBEROFF:  You can answer. |
| 10:16:01 | 25 | THE WITNESS:  I don't remember details. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 34

| | | |
|---|---|---|
| 10:16:04 | 1 | BY MR. PETROCELLI: |
| 10:16:04 | 2 | Q.   Are you certain that you received in writing |
| 10:16:11 | 3 | a conflict of interest letter when you entered into |
| 10:16:17 | 4 | the written agreement with Mr. Toberoff in 2002? |
| 10:16:21 | 5 | MR. TOBEROFF:  Asked and answered. |
| 10:16:24 | 6 | THE WITNESS:  Yes. |
| | 7 | BY MR. PETROCELLI: |
| 10:16:29 | 8 | Q.   Did that conflict of interest letter pertain |
| 10:16:32 | 9 | in any way to Mr. Toberoff's relationship with the |
| 10:16:38 | 10 | Shusters? |
| 10:16:39 | 11 | MR. TOBEROFF:  I instruct you not to answer |
| 10:16:41 | 12 | as to the contents of any conflict of interest waivers |
| 10:16:48 | 13 | based on the attorney-client privilege, attorney work |
| 10:16:51 | 14 | product. |
| | 15 | BY MR. PETROCELLI: |
| 10:16:52 | 16 | Q.   Did you sign any document relating to a |
| 10:16:59 | 17 | conflict of interest that you received from |
| 10:17:03 | 18 | Mr. Toberoff at the time you signed your first |
| 10:17:07 | 19 | agreement with him in 2002? |
| 10:17:10 | 20 | A.   Yes. |
| 10:17:12 | 21 | Q.   And who else, to your knowledge, signed such |
| 10:17:15 | 22 | a document? |
| 10:17:19 | 23 | A.   My mother. |
| 10:17:19 | 24 | Q.   Were there any other signatories to such a |
| 10:17:22 | 25 | document? |

**EXHIBIT 81**
**2047**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 35

| | | |
|---|---|---|
| 10:17:22 | 1 | A.   Mr. Toberoff. |
| 10:17:23 | 2 | Q.   Were there any other signatories? |
| 10:17:25 | 3 | A.   I don't believe so. |
| 10:17:25 | 4 | Q.   This is in 2002 now. |
| 10:17:27 | 5 | A.   Yeah. |
| 10:17:29 | 6 | Q.   Okay. |
| 10:17:29 | 7 | A.   I'm trying to follow that.  Yes.  No other -- |
| 10:17:33 | 8 | Q.   Like did the Shusters sign the document? |
| 10:17:35 | 9 | A.   No. |
| 10:17:36 | 10 | Q.   Okay. |
| 10:17:42 | 11 | Is the next conflict of interest document |
| 10:17:45 | 12 | that you recall receiving from Mr. Shuster -- from |
| 10:17:49 | 13 | Mr. Toberoff, again, unrelated to Michael Siegel, in |
| 10:17:54 | 14 | 2004 when you signed the litigation agreement with |
| 10:17:57 | 15 | him? |
| 10:17:57 | 16 | A.   Yes. |
| 10:17:58 | 17 | Q.   Okay.  And you are certain that you received |
| 10:18:02 | 18 | and signed such a document? |
| 10:18:04 | 19 | A.   Yes. |
| 10:18:08 | 20 | Q.   Have you reviewed either the 2002 conflict |
| 10:18:13 | 21 | document that you signed or the 2004 conflict document |
| 10:18:16 | 22 | that you signed recently? |
| 10:18:19 | 23 | A.   No, not for a long time. |
| 10:18:23 | 24 | Q.   Do you remember who the signatories are to |
| 10:18:26 | 25 | the 2004 conflict document that you signed? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 36

| | | |
|---|---|---|
| 10:18:31 | 1 | A.   It would have been my mother and me and |
| 10:18:33 | 2 | Mr. Toberoff. |
| 10:18:38 | 3 | Q.   Do you know if that document was reviewed by |
| 10:18:42 | 4 | Mr. Zadrozny? |
| 10:18:42 | 5 | A.   I believe it was. |
| 10:18:45 | 6 | Q.   Was it reviewed by anyone else? |
| 10:18:48 | 7 | A.   I believe it was reviewed by Arthur Levine. |
| 10:18:53 | 8 | Q.   Is 2004 the last time that you received a |
| 10:18:59 | 9 | conflict of interest document from Mr. Toberoff? |
| 10:19:02 | 10 | A.   No. |
| 10:19:03 | 11 | Q.   When is the last time -- let me ask it this |
| 10:19:05 | 12 | way.  When is the next time after the 2004 litigation |
| 10:19:12 | 13 | agreement? |
| 10:19:12 | 14 | A.   Well, I know we received one in 2008. |
| 10:19:18 | 15 | Q.   Is the conflict of interest document that you |
| 10:19:20 | 16 | received in 2008 one that you also signed? |
| 10:19:26 | 17 | A.   Yes. |
| 10:19:28 | 18 | Q.   Your mother signed it? |
| 10:19:30 | 19 | A.   Yes. |
| 10:19:30 | 20 | Q.   And who else signed it? |
| 10:19:35 | 21 | A.   Mr. Toberoff, Warren Peary, and Jean Shuster |
| 10:19:44 | 22 | Peavy. |
| 10:19:44 | 23 | MR. PETROCELLI:  Peary is P-a-e-r-y. |
| 10:19:47 | 24 | THE WITNESS:  Yes. |
| | 25 | BY MR. PETROCELLI: |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 37

| 10:19:49 | 1 | Q. Okay. Did you have someone review that 2008 |
| 10:19:54 | 2 | conflict document that you received from Mr. Toberoff? |
| 10:19:56 | 3 | A. Yes. |
| 10:19:57 | 4 | Q. And who reviewed it? |
| 10:19:59 | 5 | A. George Zadrozny and -- yes, I believe it was |
| 10:20:02 | 6 | just George. As I said, I don't remember whether or |
| 10:20:06 | 7 | not Arthur was involved with that. |
| 10:20:11 | 8 | Q. Okay. Do you know whether any lawyer |
| 10:20:14 | 9 | reviewed it on behalf of the Shuster family? |
| 10:20:16 | 10 | A. I have no idea. |
| 10:20:18 | 11 | Q. Is the 2008 conflict document that you |
| 10:20:23 | 12 | reviewed and signed a separate document from the 2008 |
| 10:20:29 | 13 | consent agreement that you signed? |
| 10:20:32 | 14 | A. Yes. I believe they were two separate |
| 10:20:34 | 15 | documents. |
| 10:20:34 | 16 | Q. So there are actually two documents, then, |
| 10:20:37 | 17 | that bear your signature and a signature of a member |
| 10:20:42 | 18 | of the Shuster family related to Superman. |
| 10:20:45 | 19 | A. Well, they were in essence all the, you know, |
| 10:20:49 | 20 | the same issue. It was all, you know, all at one |
| 10:20:53 | 21 | time. |
| 10:20:53 | 22 | Q. I understand that. |
| 10:20:55 | 23 | A. They were given to us. |
| 10:20:56 | 24 | Q. Two separate documents, though. |
| 10:20:57 | 25 | A. Two separate documents, I believe. |

**EXHIBIT 81**
**2050**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 38

| 10:20:58 | 1 | Q.   Okay.  And is that the last time in 2008 that |
| 10:21:05 | 2 | you signed a conflict of interest document received |
| 10:21:08 | 3 | from Mr. Toberoff? |
| 10:21:09 | 4 | A.   I believe so. |
| 10:21:11 | 5 | Q.   Is that the last time in 2008 that you |
| 10:21:14 | 6 | received a conflict of interest document from |
| 10:21:15 | 7 | Mr. Toberoff? |
| 10:21:17 | 8 | A.   Yes. |
| 10:21:19 | 9 | Q.   And are you certain that you have signed no |
| 10:21:26 | 10 | other conflict of interest documents or any other |
| 10:21:30 | 11 | documents with the Shuster family other than the 2008 |
| 10:21:34 | 12 | consent agreement and the related conflict document? |
| 10:21:40 | 13 | A.   Those were the only occasions on which we |
| 10:21:44 | 14 | signed a document that the Shusters also signed. |
| 10:21:49 | 15 | Q.   And even with respect to that issue in 2008, |
| 10:21:51 | 16 | were there any other documents that you recall having |
| 10:21:54 | 17 | signed together with the Shusters? |
| 10:21:56 | 18 | A.   I'm sorry.  Could you repeat that? |
| 10:21:58 | 19 | Q.   Were there any other documents that you |
| 10:21:59 | 20 | recall having signed with the Shusters other than |
| 10:22:02 | 21 | those two documents, the 2008 consent agreement and |
| 10:22:06 | 22 | the related conflict document? |
| 10:22:08 | 23 | A.   No. |
| 10:22:15 | 24 | Q.   Okay. |
| 10:22:16 | 25 | Did you have any discussions with either Jean |

LAURA SIEGEL LARSON - 7/22/2011

Page 39

| | | |
|---|---|---|
| 10:22:22 | 1 | Peavy or Warren Peary about the 2008 consent |
| 10:22:31 | 2 | agreement? |
| 10:22:32 | 3 | A.   No, we did not. |
| 10:22:34 | 4 | Q.   To your knowledge, did your mother? |
| 10:22:36 | 5 | A.   I don't believe so. |
| 10:22:48 | 6 | Q.   Have you ever had any discussion with any |
| 10:22:52 | 7 | member of the Shuster family regarding the 2008 |
| 10:22:58 | 8 | consent agreement? |
| 10:23:02 | 9 | A.   I can't recall any discussion that we had. |
| 10:23:08 | 10 | Q.   Have you ever -- you understand that in this |
| 10:23:14 | 11 | lawsuit DC is alleging certain issues with respect to |
| 10:23:18 | 12 | that document? |
| 10:23:21 | 13 | A.   I think, you know, that's one of several |
| 10:23:24 | 14 | things in that lawsuit. |
| 10:23:25 | 15 | Q.   Have you read the lawsuit? |
| 10:23:26 | 16 | A.   Yes.  Not recently, but I've read it. |
| 10:23:32 | 17 | Q.   After this lawsuit was filed, which you |
| 10:23:34 | 18 | believe was on or about May 14 of 2010, did you have |
| 10:23:38 | 19 | any discussion with either Jean Peavy or Warren Peary |
| 10:23:43 | 20 | about the lawsuit? |
| 10:23:50 | 21 | A.   No. |
| 10:23:50 | 22 | Q.   Did you talk to your mother about the |
| 10:23:54 | 23 | lawsuit? |
| 10:23:54 | 24 | A.   Yes. |
| 10:23:58 | 25 | Q.   Did you talk to your mother about the consent |

EXHIBIT 81
2052

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 40

10:24:01    1    agreement after the filing of the lawsuit?

10:24:10    2         A.    The consent -- the consent agreement from

10:24:13    3    2008 after the lawsuit was filed in 2010?

10:24:16    4         Q.    Exactly.  You're very good.

10:24:22    5         A.    Have to try and follow this.

10:24:22    6         Q.    You're following it perfectly.

10:24:23    7         A.    You're throwing a lot of dates at me here.

10:24:28    8              I don't remember any particular conversation

10:24:31    9    that we had.

10:24:32   10         Q.    Okay.

10:24:38   11              Have you signed any conflict document since

10:24:45   12    the filing of this lawsuit in May, 2010?

10:24:51   13         A.    I don't believe so.

10:24:55   14         Q.    And have you signed any agreements at all

10:25:00   15    with Mr. Toberoff since the filing of this lawsuit in

10:25:06   16    May, 2010?

10:25:09   17         A.    No.

10:25:09   18         Q.    And to your knowledge, your mother didn't

10:25:12   19    either; correct?

10:25:12   20         A.    No.

10:25:13   21         Q.    Is that correct?

10:25:13   22         A.    Correct.  She did not.

10:25:15   23         Q.    Okay.  Do you have any agreements with any

10:25:43   24    member of the Shuster family regarding Superman other

10:25:53   25    than the 2008 consent agreement or the conflict

EXHIBIT 81
2053

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 41

| 10:25:58 | 1 | document related to it? |
| 10:26:06 | 2 | A.    No. |
| 10:26:06 | 3 | Q.    Do you have any arrangements with the Shuster |
| 10:26:13 | 4 | family to share in any monies that either the Shusters |
| 10:26:17 | 5 | or the Siegels receive for the sale of their Superman |
| 10:26:24 | 6 | rights, including in settlement of litigation? |
| 10:26:28 | 7 | MR. TOBEROFF:  Excuse me.  Could you read |
| 10:26:30 | 8 | back that question for me? |
| 10:26:51 | 9 | (The record was read.) |
| 10:26:51 | 10 | MR. TOBEROFF:  To the extent any part of that |
| 10:26:56 | 11 | question reveals the substance of -- any part of it |
| 10:27:00 | 12 | reveals the substance of the consent agreement, which |
| 10:27:02 | 13 | was held to be privileged twice, I would instruct you |
| 10:27:05 | 14 | not to answer. |
|  | 15 | BY MR. PETROCELLI: |
| 10:27:15 | 16 | Q.    Do you have any arrangement to share with the |
| 10:27:25 | 17 | Shusters any monies that the Siegel family might |
| 10:27:33 | 18 | receive with respect to their accounting on Superman? |
| 10:27:40 | 19 | MR. TOBEROFF:  Same instruction.  Same basis. |
|  | 20 | BY MR. PETROCELLI: |
| 10:27:43 | 21 | Q.    Do you have any arrangements with the |
| 10:27:46 | 22 | Shusters to share in any money that the Siegel family |
| 10:27:51 | 23 | might receive with respect to the disposition of |
| 10:27:58 | 24 | Superboy rights or settlement of litigation regarding |
| 10:28:02 | 25 | Superboy? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 42

| 10:28:02 | 1 | MR. TOBEROFF: Same instruction. We made an |
| 10:28:07 | 2 | exception with respect to Warren Peary based on an |
| 10:28:12 | 3 | agreement that that exception would not constitute a |
| 10:28:14 | 4 | waiver of privilege. If we had the same agreement |
| 10:28:16 | 5 | with respect to Laura Siegel, I will let her answer |
| 10:28:19 | 6 | that question. Otherwise I have to instruct her not |
| 10:28:21 | 7 | to answer. |
| 10:28:24 | 8 | MR. PETROCELLI: Well, you know, it's a bit |
| 10:28:29 | 9 | unprincipled to be selectively waiving, but for the |
| 10:28:35 | 10 | purpose of this question, I'll make that agreement. |
| 10:28:43 | 11 | MR. TOBEROFF: You can answer. |
| 10:28:45 | 12 | THE WITNESS: Could you -- |
| 10:28:46 | 13 | MR. TOBEROFF: Read back the question? |
| 10:28:48 | 14 | THE WITNESS: Yeah. Would you ask the |
| 10:28:49 | 15 | question again, please? |
| 10:28:50 | 16 | MR. PETROCELLI: Please repeat it. |
| 10:29:08 | 17 | (The record was read.) |
| 10:29:09 | 18 | THE WITNESS: No. |
|  | 19 | BY MR. PETROCELLI: |
| 10:29:11 | 20 | Q. Does the consent agreement that you signed |
| 10:29:16 | 21 | with the Shusters make any reference at all to |
| 10:29:22 | 22 | Superboy? |
| 10:29:24 | 23 | MR. TOBEROFF: I instruct you not to answer |
| 10:29:27 | 24 | based on the consent agreement being held to be |
| 10:29:31 | 25 | privileged, not disclose the substance. |

Merrill Corporation - Los Angeles
800-826-0277                              www.merillcorp.com/law
EXHIBIT 81
2055
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 43

| | | |
|---|---|---|
| 10:29:38 | 1 | MR. PETROCELLI:  And to be clear, with |
| 10:29:40 | 2 | respect to the last several questions on which you |
| 10:29:45 | 3 | have instructed, you decline to allow the witness to |
| 10:29:52 | 4 | answer even were I to agree that it would not |
| 10:29:55 | 5 | constitute a waiver of any privilege? |
| 10:29:59 | 6 | MR. TOBEROFF:  If you would agree -- in some |
| 10:30:02 | 7 | instances if you agree that it doesn't constitute a |
| 10:30:04 | 8 | waiver of privilege, I could allow her to answer |
| 10:30:10 | 9 | certain questions. |
| 10:30:11 | 10 | MR. PETROCELLI:  Okay. |
| 10:30:12 | 11 | MR. TOBEROFF:  But -- |
| 10:30:12 | 12 | MR. PETROCELLI:  I notice you didn't extend |
| 10:30:14 | 13 | the offer with respect to some of those questions, but |
| 10:30:16 | 14 | you did on the Superboy, so -- |
| 10:30:18 | 15 | MR. TOBEROFF:  You know, there are a number |
| 10:30:20 | 16 | of issues here surrounding, you know -- also, you |
| 10:30:25 | 17 | know, when the answer to something is no, you're not |
| 10:30:27 | 18 | revealing the content, so it wouldn't actually be |
| 10:30:30 | 19 | privileged, but I don't necessarily know how the |
| 10:30:34 | 20 | witnesses is going to answer. |
| 10:30:35 | 21 | MR. PETROCELLI:  Okay.  Well, with respect |
| 10:30:38 | 22 | to -- with respect to my question, then, about |
| 10:30:40 | 23 | arrangements that you have with the Shusters regarding |
| 10:30:43 | 24 | the sharing in any Superman recoveries or proceeds, I |
| 10:30:49 | 25 | would like the witness to answer, and I will agree |

## LAURA SIEGEL LARSON - 7/22/2011

Page 44

| | | |
|---|---|---|
| 10:30:52 | 1 | that her answer is not a waiver of any privilege. |
| 10:30:54 | 2 | MR. TOBEROFF:  She already answered that |
| 10:30:55 | 3 | question.  She said no. |
| 10:30:57 | 4 | MR. PETROCELLI:  Not with respect to |
| 10:30:58 | 5 | Superman.  She did with respect to Superboy. |
| 10:31:01 | 6 | MR. TOBEROFF:  I thought you said -- |
| 10:31:02 | 7 | MR. PETROCELLI:  Did I misspeak? |
| 10:31:03 | 8 | THE WITNESS:  I kind of lost track for a |
| 10:31:06 | 9 | minute. |
| 10:31:06 | 10 | MR. PETROCELLI:  Let me put it again for the |
| 10:31:08 | 11 | record, then. |
| 10:31:08 | 12 | MR. TOBEROFF:  As to that question, we are |
| 10:31:11 | 13 | asserting privilege, and I'm instructing her not to |
| 10:31:13 | 14 | answer. |
| 10:31:13 | 15 | MR. PETROCELLI:  Okay.  So even though I |
| 10:31:15 | 16 | would agree that the answer would not affect the |
| 10:31:17 | 17 | waiver. |
| 10:31:18 | 18 | MR. TOBEROFF:  Yes. |
| 10:31:19 | 19 | MR. PETROCELLI:  Okay. |
| 10:31:51 | 20 | Q.  And does the -- did you discuss with your |
| 10:31:55 | 21 | mother at any time whether or not to enter into an |
| 10:32:04 | 22 | agreement with the Shusters regarding the sharing of |
| 10:32:09 | 23 | recoveries or proceeds from Superman? |
| 10:32:18 | 24 | A.  I believe we talked about it. |
| 10:32:21 | 25 | Q.  Can you relate that discussion to me? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 45

| 10:32:23 | 1 | MR. TOBEROFF:  I instruct you not to answer |
| 10:32:25 | 2 | based on the attorney-client privilege, joint client |
| 10:32:28 | 3 | privilege. |
| | 4 | BY MR. PETROCELLI: |
| 10:32:30 | 5 | Q.   And these were conversations just between |
| 10:32:32 | 6 | your mother and you; is that correct? |
| 10:32:33 | 7 | A.   Yes. |
| 10:32:41 | 8 | Excuse me.  May I take a bathroom break for a |
| 10:32:43 | 9 | moment? |
| 10:32:44 | 10 | MR. PETROCELLI:  Sure.  Let's stop right now. |
| 10:32:48 | 11 | THE VIDEOGRAPHER:  Off the record.  The time |
| 10:32:48 | 12 | is 10:32. |
| 10:33:54 | 13 | (A recess was taken.) |
| 10:46:52 | 14 | THE VIDEOGRAPHER:  We're back on the record |
| 10:46:54 | 15 | at 10:46. |
| | 16 | BY MR. PETROCELLI: |
| 10:46:57 | 17 | Q.   I just want to follow up a bit on that last |
| 10:47:01 | 18 | area that we covered about the consent agreements and |
| 10:47:04 | 19 | the arrangements with the Shusters.  Does -- do the |
| 10:47:10 | 20 | consent agreements -- I may have asked you this |
| 10:47:17 | 21 | already, but let me ask you again.  Do the consent |
| 10:47:22 | 22 | agreement documents -- does the consent agreement |
| 10:47:25 | 23 | document make any reference at all to Superboy? |
| 10:47:31 | 24 | A.   You did ask me that. |
| 10:47:32 | 25 | MR. TOBEROFF:  Asked and answered.  And I |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 46

| | | |
|---|---|---|
| 10:47:34 | 1 | instruct you not to answer. |
| 10:47:37 | 2 | MR. PETROCELLI:  If I agree that it's not a |
| 10:47:39 | 3 | waiver, do you continue to instruct on that? |
| 10:47:41 | 4 | MR. TOBEROFF:  Yes. |
| 10:47:42 | 5 | MR. PETROCELLI:  Okay. |
| 10:47:59 | 6 | Q.   Are you currently able to enter into an |
| 10:48:04 | 7 | agreement with DC Comics without the consent of the |
| 10:48:15 | 8 | Shuster side, the Shuster family? |
| 10:48:22 | 9 | MR. TOBEROFF:  I instruct you not to answer |
| 10:48:25 | 10 | that. |
| 10:48:25 | 11 | MR. PETROCELLI:  Same objection?  Privilege? |
| 10:48:30 | 12 | MR. TOBEROFF:  Same objection.  Privilege. |
| | 13 | BY MR. PETROCELLI: |
| 10:48:35 | 14 | Q.   Have you had any discussions with any member |
| 10:48:38 | 15 | of the Shuster family since 2008 when the both of you |
| 10:48:45 | 16 | signed the consent agreement about the marketing of |
| 10:48:50 | 17 | the Superman rights? |
| 10:48:54 | 18 | A.   I can't recall any discussion. |
| 10:49:02 | 19 | Q.   Are -- have any efforts been made on your |
| 10:49:05 | 20 | behalf or your family's behalf to market the Superman |
| 10:49:10 | 21 | rights since 2008? |
| 10:49:15 | 22 | MR. TOBEROFF:  You can -- you could answer |
| 10:49:23 | 23 | that yes or no, a yes or no question, and you can also |
| 10:49:28 | 24 | answer it to the extent your knowledge does not reveal |
| 10:49:31 | 25 | the substance of your communications with counsel. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 47

| | | |
|---|---|---|
| 10:49:35 | 1 | THE WITNESS: Okay. |
| 10:49:37 | 2 | MR. TOBEROFF: So -- |
| 10:49:39 | 3 | MR. PETROCELLI: To be clear, Marc, and we're |
| 10:49:41 | 4 | not going to settle this on the record, but I do want |
| 10:49:43 | 5 | to make clear that I disagree that all conversations |
| 10:49:46 | 6 | with you are privileged. They have to involve the |
| 10:49:48 | 7 | rendition of legal advice at the very minimum. |
| 10:49:51 | 8 | MR. TOBEROFF: Well, the marketing of her -- |
| 10:49:55 | 9 | the subject of a litigation for the past six now going |
| 10:49:58 | 10 | to the seventh year of rights wouldn't necessarily |
| 10:50:01 | 11 | entail legal advice. |
| 10:50:03 | 12 | MR. PETROCELLI: If you meet with Paramount |
| 10:50:05 | 13 | Pictures about the sale of Superman or you go to Fox |
| 10:50:08 | 14 | and you then report on the meeting, that's hardly the |
| 10:50:11 | 15 | rendition of legal advice. |
| 10:50:12 | 16 | MR. TOBEROFF: It's totally intertwined with |
| 10:50:15 | 17 | legal advice. Any studio would want to know the state |
| 10:50:18 | 18 | of the litigation, the odds of the litigation, the |
| 10:50:21 | 19 | odds on appeal. There's so much going on in this case |
| 10:50:25 | 20 | that would be relevant to the status of those rights |
| 10:50:28 | 21 | and which would -- it's just very closely intertwined. |
| 10:50:34 | 22 | If she has knowledge of that independent of her |
| 10:50:37 | 23 | discussions with me, I will allow her to answer. |
| 10:50:38 | 24 | Otherwise I would instruct you not to answer. |
| 10:50:40 | 25 | MR. PETROCELLI: It seems like it's |

**EXHIBIT 81**
**2060**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 48

| 10:50:41 | 1 | impossible for her to have any knowledge independent |
|---|---|---|

10:50:44    2    of you.

10:50:45    3           MR. TOBEROFF:  Certainly when it regards

10:50:48    4    legal matters, that would be the case.

10:50:50    5           MR. PETROCELLI:  This is a business question

10:50:51    6    about selling the rights.

10:50:55    7           MR. TOBEROFF:  Same instruction.

8    BY MR. PETROCELLI:

10:50:56    9        Q.    Have you -- let me ask the question so we

10:51:00    10    have a record here.

10:51:02    11           Do you -- are you aware of any efforts made

10:51:04    12    on your behalf to market your Superman rights since

10:51:10    13    2008?

10:51:10    14           MR. TOBEROFF:  You could just answer that yes

10:51:12    15    or no.

10:51:16    16           Laura?

10:51:17    17           THE WITNESS:  I'm thinking.

10:51:18    18           MR. TOBEROFF:  Okay.

10:51:21    19           THE WITNESS:  There's -- there's so much to

10:51:22    20    remember in this --

10:51:23    21           MR. PETROCELLI:  That's like --

22           THE WITNESS:  -- situation.

10:51:24    23           MR. PETROCELLI:  -- the old Jack Benny joke.

10:51:26    24    "Your money or your life," and he goes "I'm thinking!

10:51:30    25    I'm thinking!"

EXHIBIT 81
2061

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 49

| | | |
|---|---|---|
| 10:51:30 | 1 | THE WITNESS: I know the joke. |
| 10:51:37 | 2 | MR. PETROCELLI: Marc, you're still smiling. |
| 10:51:39 | 3 | You appreciate that, I know. |
| 10:51:41 | 4 | THE WITNESS: That's a good joke. That's a |
| 10:51:43 | 5 | good joke. |
| 10:51:44 | 6 | MR. PETROCELLI: I used to love Jack Benny. |
| 10:51:46 | 7 | THE WITNESS: I know. I did too. |
| 10:51:50 | 8 | MR. PETROCELLI: We're telling our age. |
| 10:51:51 | 9 | THE WITNESS: I don't believe so. |
| 10:51:52 | 10 | MR. TOBEROFF: As to showing your age or the |
| 10:51:54 | 11 | question? |
| 10:51:54 | 12 | MR. PETROCELLI: We will get back on track |
| 10:51:56 | 13 | here. It's really my fault. |
| 10:51:58 | 14 | Q. You're not aware of any efforts to market the |
| 10:52:03 | 15 | Superman rights since 2008; is that correct? |
| 10:52:05 | 16 | A. I don't recall any. |
| 10:52:06 | 17 | Q. Are you aware of any discussions that were |
| 10:52:11 | 18 | had on your behalf with representatives of Paramount |
| 10:52:17 | 19 | Pictures or the Paramount Studio? |
| 10:52:21 | 20 | A. I don't remember a time frame. I believe |
| 10:52:24 | 21 | that may have occurred, but -- |
| 10:52:27 | 22 | Q. Why do you believe it may have occurred? |
| 10:52:29 | 23 | A. I'm just trying to draw on my memory here. |
| 10:52:37 | 24 | Was it Paramount? Yeah. I guess it was Paramount. |
| 10:52:41 | 25 | Q. And are you aware of any efforts to market |

**Merrill Corporation - Los Angeles**

**EXHIBIT 81**
**2062**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 50

| | | |
|---|---|---|
| 10:52:43 | 1 | the property to anyone other than Paramount? |
| 10:52:49 | 2 | A.    I can't recall any right now. |
| 10:52:52 | 3 | Q.    What came of the Paramount marketing effort? |
| 10:52:58 | 4 | A.    I don't believe -- |
| 10:52:59 | 5 | MR. TOBEROFF:  I instruct you not to -- you |
| 10:53:00 | 6 | know, again, we have to be careful here because |
| 10:53:04 | 7 | when -- you object to my instruction based on |
| 10:53:06 | 8 | privilege, and then when I let her answer, you claim a |
| 10:53:08 | 9 | broad waiver of privilege.  So it's almost a |
| 10:53:14 | 10 | self-fulfilling prophecy to a certain extent. |
| 10:53:16 | 11 | MR. PETROCELLI:  You act as though I'm taking |
| 10:53:19 | 12 | some kind of inappropriate position, Marc.  I have to |
| 10:53:22 | 13 | follow the rules and we have to abide by the |
| 10:53:24 | 14 | consequences. |
| 10:53:26 | 15 | MR. TOBEROFF:  We have different views |
| 10:53:27 | 16 | clearly as to what's appropriate. |
| 10:53:30 | 17 | So I'm instructing you not to answer as to |
| 10:53:35 | 18 | the marketing of or whatever his question regarding |
| 10:53:40 | 19 | the marketing of your rights to the extent your |
| 10:53:45 | 20 | knowledge of the details come only through me.  If you |
| 10:53:48 | 21 | have independent knowledge of that, then you can |
| 10:53:52 | 22 | discuss that. |
| 10:53:53 | 23 | THE WITNESS:  Okay. |
| | 24 | BY MR. PETROCELLI: |
| 10:53:56 | 25 | Q.    Is everything you know about the marketing of |

**EXHIBIT 81**
**2063**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 51

| | | |
|---|---|---|
| 10:53:58 | 1 | the Superman rights information you learned from Marc |
| 10:54:05 | 2 | Toberoff? |
| 10:54:05 | 3 | A.   Yes. |
| 10:54:06 | 4 | Q.   In every single discussion you had with Marc |
| 10:54:10 | 5 | Toberoff, you are receiving legal advice? |
| 10:54:13 | 6 | A.   Yes. |
| 10:54:14 | 7 | Q.   And you believe that when he's reporting on a |
| 10:54:17 | 8 | meeting that he had with third parties, that's legal |
| 10:54:21 | 9 | advice? |
| 10:54:21 | 10 | A.   Yes. |
| 10:54:23 | 11 | Q.   Why? |
| 10:54:24 | 12 | A.   He's my lawyer. |
| 10:54:26 | 13 | Q.   You also know that he's an entrepreneur in |
| 10:54:30 | 14 | the motion picture industry; correct? |
| 10:54:33 | 15 | A.   It has nothing to do with me. |
| 10:54:35 | 16 | MR. TOBEROFF:  Vague and ambiguous. |
| | 17 | BY MR. PETROCELLI: |
| 10:54:35 | 18 | Q.   I didn't ask you that question; right?  I |
| 10:54:37 | 19 | simply asked you whether you were aware of that. |
| 10:54:40 | 20 | MR. TOBEROFF:  Just focus on his question. |
| 10:54:45 | 21 | THE WITNESS:  I am not aware of him having |
| 10:54:47 | 22 | any current activities. |
| | 23 | BY MR. PETROCELLI: |
| 10:54:48 | 24 | Q.   I didn't ask that question either.  You are |
| 10:54:53 | 25 | aware -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 52

| | | |
|---|---|---|
| 10:54:53 | 1 | MR. TOBEROFF: Just wait. Wait. Wait. I |
| 10:54:55 | 2 | just want to instruct -- |
| 10:54:57 | 3 | THE WITNESS: Okay. Okay. I'm reading too |
| 10:54:59 | 4 | much into what you're saying. |
| 10:55:00 | 5 | MR. PETROCELLI: I think you are. I think |
| 10:55:01 | 6 | you are, because you're -- |
| 10:55:03 | 7 | MR. TOBEROFF: Wait. Wait. I'd just like to |
| 10:55:04 | 8 | talk to my client. |
| 10:55:06 | 9 | Just try and -- first of all, I want to slow |
| 10:55:09 | 10 | it down so I have time to object. Just try and focus |
| 10:55:11 | 11 | on his question. Don't try and think of where he's |
| 10:55:14 | 12 | going with the question. Just focus on the question |
| 10:55:16 | 13 | and answer the question. |
| 10:55:17 | 14 | THE WITNESS: Um-hum. Okay. |
| 10:55:18 | 15 | MR. PETROCELLI: I concur. |
| 10:55:24 | 16 | Q. You are aware based on your knowledge of |
| 10:55:29 | 17 | Mr. Toberoff from the first time you ever heard his |
| 10:55:32 | 18 | name until today that he has been involved in various |
| 10:55:39 | 19 | business activities in the entertainment industry; |
| 10:55:42 | 20 | correct? |
| 10:55:42 | 21 | A. Yes. |
| 10:55:43 | 22 | Q. And that he has been involved in the |
| 10:55:47 | 23 | acquisition of various literary properties; correct? |
| 10:55:54 | 24 | A. Acquisition? |
| 10:55:55 | 25 | Q. Yes. |

EXHIBIT 81
2065

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 53

| | | |
|---|---|---|
| 10:55:56 | 1 | A.    Do you want to define "acquisition" for me? |
| 10:55:58 | 2 | Q.    To acquire rights to sell or produce various |
| 10:56:02 | 3 | properties in the entertainment business. |
| 10:56:04 | 4 | A.    Yes. |
| 10:56:09 | 5 | Q.    And you are aware that he had a business |
| 10:56:21 | 6 | collaboration with Ari Emanuel in connection with the |
| 10:56:27 | 7 | acquisition of various entertainment properties; |
| 10:56:31 | 8 | correct? |
| 10:56:31 | 9 | A.    Yes. |
| 10:56:32 | 10 | Q.    And you were aware that he had that |
| 10:56:35 | 11 | collaboration when you first became acquainted with |
| 10:56:39 | 12 | Mr. Toberoff; correct? |
| 10:56:40 | 13 | A.    Yes. |
| 10:56:42 | 14 | Q.    And when you entered into your first |
| 10:56:46 | 15 | agreement with Mr. Toberoff, part of that agreement |
| 10:56:49 | 16 | involved services to be rendered by Mr. Toberoff and |
| 10:56:55 | 17 | Mr. Emanuel for a 10 percent representation fee; |
| 10:57:03 | 18 | correct? |
| 10:57:04 | 19 | A.    Yes. |
| 10:57:04 | 20 | Q.    That would be like an agent's fee; correct? |
| 10:57:07 | 21 | A.    Yes. |
| 10:57:07 | 22 | Q.    And you understood that Mr. Toberoff would |
| 10:57:10 | 23 | share in that agent's fee of 10 percent; correct? |
| 10:57:13 | 24 | MR. TOBEROFF:  I object.  Objection.  Vague |
| 10:57:20 | 25 | and ambiguous. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 54

| | | |
|---|---|---|
| 10:57:20 | 1 | BY MR. PETROCELLI: |
| 10:57:20 | 2 | Q.    You may answer. |
| 10:57:24 | 3 | A.    Well, the -- the -- could you reask the |
| 10:57:35 | 4 | question so I'm sure that I'm answering it correctly, |
| 10:57:38 | 5 | you know?  I do not want to read into what you're |
| 10:57:42 | 6 | saying. |
| 10:57:42 | 7 | Q.    With respect to the 10 percent representation |
| 10:57:45 | 8 | or agent's fee that you agreed to pay in connection |
| 10:57:52 | 9 | with the efforts of Mr. Emanuel and Mr. Toberoff, you |
| 10:58:00 | 10 | understood that Mr. Toberoff would share in part of |
| 10:58:04 | 11 | that 10 percent fee; correct? |
| 10:58:06 | 12 | MR. TOBEROFF:  Vague and ambiguous. |
| | 13 | BY MR. PETROCELLI: |
| 10:58:07 | 14 | Q.    Yes or no? |
| 10:58:09 | 15 | A.    I would like to go back and say that when you |
| 10:58:12 | 16 | refer to it as an agent's fee, I didn't -- I didn't |
| 10:58:17 | 17 | understand, you know, exactly what you were referring |
| 10:58:20 | 18 | to.  Mr. Toberoff did not act as an agent. |
| 10:58:24 | 19 | Q.    Well, when you signed an agreement in 2002 -- |
| 10:58:28 | 20 | A.    Yes. |
| 10:58:28 | 21 | Q.    -- you didn't sign it personally with |
| 10:58:30 | 22 | Mr. Toberoff.  You signed it with an entity called IP |
| 10:58:36 | 23 | Worldwide; is that correct? |
| 10:58:37 | 24 | A.    That's correct. |
| 10:58:39 | 25 | Q.    And that was a company, to your knowledge, at |

LAURA SIEGEL LARSON - 7/22/2011

Page 55

| 10:58:43 | 1 | the time that consisted of Mr. Toberoff and |
| 10:58:48 | 2 | Mr. Emanuel; correct? |
| 10:58:50 | 3 | A.   Yes. |
| 10:58:52 | 4 | Q.   And the fee that you agreed to pay to employ |
| 10:58:59 | 5 | Mr. Toberoff and Mr. Emanuel was 10 percent of the |
| 10:59:06 | 6 | proceeds that they would generate with respect to the |
| 10:59:09 | 7 | sale of your Superman rights; correct? |
| 10:59:15 | 8 | A.   I don't believe "sale" is the correct word to |
| 10:59:18 | 9 | use. |
| 10:59:18 | 10 | Q.   What is the correct word? |
| 10:59:21 | 11 | A.   Negotiations on representation. |
| 10:59:26 | 12 | Q.   Okay. |
| 10:59:26 | 13 | A.   Exploring, you know, different avenues of, |
| 10:59:30 | 14 | you know, how, you know, our rights could be marketed. |
| 10:59:34 | 15 | Q.   But the 10 percent fee would not be payable |
| 10:59:37 | 16 | until and unless their efforts to exploit and |
| 10:59:42 | 17 | negotiate and market resulted in a transaction that |
| 10:59:45 | 18 | generated proceeds; correct? |
| 10:59:46 | 19 | A.   Correct. |
| 10:59:47 | 20 | Q.   Okay.  And with respect to that 10 percent |
| 10:59:52 | 21 | that you agreed to pay if the transaction was |
| 10:59:56 | 22 | consummated that generated proceeds, did you have any |
| 11:00:00 | 23 | understanding as to how that money would be split up |
| 11:00:03 | 24 | as between Mr. Toberoff and Mr. Emanuel? |
| 11:00:10 | 25 | A.   No. |

EXHIBIT 81
2068

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 56

| | | |
|---|---|---|
| 11:00:10 | 1 | Q.    Were you made aware of the joint venture |
| 11:00:17 | 2 | agreement between the two of them that created IP |
| 11:00:23 | 3 | Worldwide? |
| 11:00:23 | 4 | A.    Could you define "made aware"? |
| 11:00:25 | 5 | Q.    Did you ever see it? |
| 11:00:27 | 6 | A.    No. |
| 11:00:30 | 7 | Q.    Have you ever seen it? |
| 11:00:33 | 8 | A.    No. |
| 11:00:33 | 9 | Q.    Did they describe it to you? |
| 11:00:38 | 10 | A.    Well, Mr. Toberoff was acting as my attorney, |
| 11:00:42 | 11 | so I'm not sure whether -- |
| 11:00:44 | 12 | Q.    Okay.  Well, you're not responding to my |
| 11:00:46 | 13 | question -- |
| 11:00:47 | 14 | A.    No. |
| 11:00:47 | 15 | Q.    -- but I don't want to interrupt you, so |
| 11:00:49 | 16 | complete the answer.  Normally when a witness doesn't |
| 11:00:51 | 17 | respond to a lawyer, at least a good lawyer moves to |
| 11:00:53 | 18 | strike as nonresponsive.  I'm trying not to do that -- |
| 11:00:56 | 19 | A.    Um-hum. |
| 11:00:57 | 20 | Q.    -- because I want to accommodate you, but it |
| 11:00:59 | 21 | would be helpful if you tried to just respond to my |
| 11:01:03 | 22 | question. |
| 11:01:04 | 23 | A.    Okay.  So could you -- could I have the |
| 11:01:07 | 24 | question again, please? |
| | 25 | MR. TOBEROFF:  Who's here to hear your motion |

**EXHIBIT 81**
**2069**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 57

11:01:11    1    to strike as nonresponsive?

11:01:12    2         MR. PETROCELLI:  It's only for the purpose of

11:01:14    3    preserving it for the record so when we're in trial, I

11:01:16    4    can seek to have that excluded from the record.

11:01:30    5         Q.   Did Mr. Emanuel or Mr. Toberoff describe to

11:01:33    6    you the terms of their arrangement prior to the time

11:01:37    7    you retained them in 2002?

11:01:39    8         A.   Yes.

11:01:41    9         Q.   What did they say to you?

11:01:43    10        A.   That they had a company together.

11:01:46    11        Q.   Okay.  And did they tell you about their

11:01:51    12   track record as a company together?

11:01:55    13        A.   Yes.

11:01:56    14        Q.   And did they tell you about prior successes

11:02:02    15   that they had achieved together?

11:02:05    16        A.   I remember Mr. Toberoff's achievements.

11:02:10    17        Q.   Did they tell you about prior transactions

11:02:16    18   that they, "they" being Mr. Emanuel and Mr. Toberoff

11:02:20    19   through their company, had accomplished prior to your

11:02:26    20   retaining them?  Did they say, for example, "We did a

11:02:30    21   similar transaction for" this person or that person.

11:02:34    22   "We can do the same for you"?

11:02:36    23        A.   As a company, no.

11:02:40    24        Q.   Okay.  Was it your understanding that the

11:02:46    25   arrangement with you that IP Worldwide made was the

**Merrill   Corporation   -   Los Angeles**

800-826-0277                        www.merillcorp.com/law

**EXHIBIT 81**
**2070**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 58

| | | |
|---|---|---|
| 11:02:49 | 1 | first business dealing of this new company, of this |
| 11:02:55 | 2 | company, IP Worldwide? |
| 11:02:57 | 3 | A.   I had no knowledge of that. |
| 11:02:59 | 4 | Q.   Did you have any knowledge how old the |
| 11:03:01 | 5 | company was? |
| 11:03:03 | 6 | A.   I believe it was -- it was a fairly new |
| 11:03:06 | 7 | company. |
| 11:03:07 | 8 | Q.   And again, did you believe that yours was the |
| 11:03:10 | 9 | first transaction the company entered into? |
| 11:03:14 | 10 | A.   I don't have any recollection of it being a |
| 11:03:17 | 11 | first. |
| 11:03:18 | 12 | Q.   Did you do any research on the company? |
| 11:03:21 | 13 | A.   I did research on Mr. Toberoff and on |
| 11:03:25 | 14 | Mr. Emanuel. |
| 11:03:25 | 15 | Q.   And did you do any research on IP Worldwide? |
| 11:03:32 | 16 | A.   I don't recall anything specific. |
| 11:03:33 | 17 | Q.   Now, at the time you knew that Mr. Toberoff |
| 11:03:37 | 18 | also was a lawyer; right? |
| 11:03:39 | 19 | A.   Yes. |
| 11:03:40 | 20 | Q.   Okay.  And you knew that Mr. Emanuel was a |
| 11:03:44 | 21 | talent agent; correct? |
| 11:03:45 | 22 | A.   Correct. |
| 11:03:45 | 23 | Q.   And you knew that Mr. Emanuel was a partner |
| 11:03:49 | 24 | at an agency called Endeavor; correct? |
| 11:03:52 | 25 | A.   Correct. |

EXHIBIT 81
2071

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 59

| | | |
|---|---|---|
| 11:03:52 | 1 | Q. We're now talking 2002; right? |
| 11:03:54 | 2 | A. Yes. |
| 11:03:55 | 3 | Q. And you knew Mr. Toberoff had a law firm; |
| 11:03:59 | 4 | correct? |
| 11:04:00 | 5 | A. Correct. |
| 11:04:00 | 6 | Q. Did you know the name of his law firm? |
| 11:04:04 | 7 | A. Law Offices of Marc Toberoff. |
| 11:04:07 | 8 | Q. Okay. You did not enter into an agreement |
| 11:04:09 | 9 | with The Law Offices of Marc Toberoff in 2002; is that |
| 11:04:15 | 10 | correct? |
| 11:04:15 | 11 | A. Not that name, no. |
| 11:04:18 | 12 | Q. There is no agreement between any member of |
| 11:04:22 | 13 | the Siegel family and The Law Offices of Marc Toberoff |
| 11:04:27 | 14 | in 2002; correct? |
| 11:04:28 | 15 | A. Correct. |
| 11:04:29 | 16 | Q. And there is no agreement between any member |
| 11:04:33 | 17 | of the Siegel family and the Endeavor talent agency in |
| 11:04:37 | 18 | 2002; correct? |
| 11:04:37 | 19 | A. Correct. |
| 11:04:38 | 20 | Q. The only agreement that you entered into for |
| 11:04:41 | 21 | the services of Mr. Emanuel and Mr. Toberoff was the |
| 11:04:45 | 22 | IP Worldwide agreement; is that right? |
| 11:04:46 | 23 | A. Correct. |
| 11:04:58 | 24 | Q. The 10 percent -- let me ask you this |
| 11:05:01 | 25 | question. The record will reflect that that agreement |

LAURA SIEGEL LARSON - 7/22/2011

Page 60

| | | |
|---|---|---|
| 11:05:04 | 1 | is dated as of October 3, 2002.  In fact, let me just |
| 11:05:12 | 2 | show you a copy of it. |
| 11:05:14 | 3 | A.    Okay. |
| 11:05:14 | 4 | Q.    It's been previously marked as Plaintiff's |
| 11:05:17 | 5 | Exhibit 45. |
| 11:05:18 | 6 | A.    Thank you. |
| | 7 | (Whereupon, Plaintiff's Exhibit 45 |
| 11:05:29 | 8 | was placed before the witness.) |
| 11:05:31 | 9 | BY MR. PETROCELLI: |
| 11:05:31 | 10 | Q.    And you'll see at the last page it bears |
| 11:05:32 | 11 | your -- |
| 11:05:33 | 12 | A.    It's a bad copy. |
| 11:05:34 | 13 | Q.    It's the best copy we have. |
| 11:05:36 | 14 | A.    Okay. |
| 11:05:36 | 15 | Q.    You'll see on the last page it bears your |
| 11:05:41 | 16 | signature? |
| 11:05:41 | 17 | A.    Yes. |
| 11:05:41 | 18 | Q.    And the signature of your mother, Joanne |
| 11:05:45 | 19 | Siegel? |
| 11:05:45 | 20 | A.    Yes. |
| 11:05:46 | 21 | Q.    And Mr. Toberoff? |
| 11:05:47 | 22 | A.    Yes. |
| 11:05:48 | 23 | Q.    And Mr. Emanuel. |
| 11:05:52 | 24 | A.    Yes. |
| 11:06:01 | 25 | Q.    You'll see that in paragraph 6 there's a |

EXHIBIT 81
2073

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 61

| | | |
|---|---|---|
| 11:06:06 | 1 | provision for a 10 percent payment to IP Worldwide, |
| 11:06:13 | 2 | based on any gross proceeds that they generate.  And |
| 11:06:18 | 3 | I'm simplifying it.  I don't want to read that whole |
| 11:06:22 | 4 | paragraph.  Do you see that? |
| 11:06:24 | 5 | A.  I'm reading it. |
| 11:06:54 | 6 | Okay.  I'm sorry.  Your question? |
| 11:06:57 | 7 | Q.  You see that paragraph 6 provides for the |
| 11:07:00 | 8 | compensation of 10 percent to IP Worldwide for the |
| 11:07:03 | 9 | rendition of their services? |
| 11:07:04 | 10 | A.  Yes. |
| 11:07:29 | 11 | Q.  Do you know if this agreement still exists? |
| 11:07:35 | 12 | A.  It does not. |
| 11:07:39 | 13 | Q.  When did it end? |
| 11:07:42 | 14 | A.  It expired, I believe, early 2005.  I believe |
| 11:07:52 | 15 | it was 2005. |
| 11:07:54 | 16 | Q.  And what about 2005 causes you to believe |
| 11:07:57 | 17 | that it expired? |
| 11:07:58 | 18 | A.  Well, because we had an end date for it. |
| 11:08:02 | 19 | Q.  Where is the end date indicated? |
| 11:08:04 | 20 | A.  It's not in this document. |
| 11:08:06 | 21 | Q.  Is it in another document? |
| 11:08:07 | 22 | A.  Yes, it is. |
| 11:08:09 | 23 | Q.  What's the other document? |
| 11:08:10 | 24 | A.  There was a -- we extended this for a limited |
| 11:08:17 | 25 | period of time, and there was an end date stated in |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 62

| | | |
|---|---|---|
| 11:08:21 | 1 | that document. |
| 11:08:25 | 2 | MR. PETROCELLI:  Bear with me. |
| 11:08:33 | 3 | This is a better copy. |
| 11:08:43 | 4 | Q.   Can you take a look at paragraph 10 of |
| 11:08:50 | 5 | Exhibit 45? |
| 11:08:50 | 6 | A.   Yes. |
| 11:08:51 | 7 | Q.   It states: |
| 11:08:52 | 8 | "The parties understand and |
| 11:08:56 | 9 | acknowledge that the scope of this |
| 11:08:57 | 10 | Agreement does not include legal |
| 11:09:00 | 11 | services and/or expenses in |
| 11:09:04 | 12 | connection with litigation or formal |
| 11:09:06 | 13 | legal arbitration, if any.  The |
| 11:09:09 | 14 | provision of such services and |
| 11:09:13 | 15 | advancing of such expenses, is |
| 11:09:15 | 16 | requested and desired by Owner" -- |
| 11:09:18 | 17 | excuse me -- "if requested and |
| 11:09:20 | 18 | desired by Owner, will be rendered |
| 11:09:22 | 19 | and provided by Marc Toberoff, Esq., |
| 11:09:27 | 20 | subject to good faith negotiation of |
| 11:09:30 | 21 | mutually acceptable" -- "of a |
| 11:09:32 | 22 | mutually acceptable agreement |
| 11:09:33 | 23 | executed by Mr. Toberoff and Owner," |
| 11:09:36 | 24 | end of quotes. |
| 11:09:38 | 25 | And you agreed to that provision when you |

EXHIBIT 81
2075

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 63

| | | |
|---|---|---|
| 11:09:40 | 1 | signed Exhibit 45; correct? |
| 11:09:42 | 2 | A.   Yes, regarding litigation. |
| 11:09:44 | 3 | Q.   Right.  And it wasn't until I believe you |
| 11:09:51 | 4 | said 2004 that you entered into the litigation |
| 11:09:56 | 5 | agreement -- entered into a litigation agreement with |
| 11:09:59 | 6 | Mr. Toberoff; is that correct? |
| 11:10:00 | 7 | A.   Correct. |
| 11:10:07 | 8 | Q.   And between the signing of Exhibit 45 as of |
| 11:10:13 | 9 | October 3, 2002, and the signing of the litigation |
| 11:10:18 | 10 | agreement in 2004, you signed no agreements with |
| 11:10:22 | 11 | Mr. Toberoff for the rendition of litigation services; |
| 11:10:29 | 12 | correct? |
| 11:10:30 | 13 | A.   Not for litigation, correct.  I don't know if |
| 11:10:35 | 14 | I answered yes or no to that the way it's phrased. |
| 11:10:39 | 15 | That's why I'm trying to clarify. |
| 11:10:40 | 16 | Q.   Let me repeat it -- |
| 11:10:42 | 17 | A.   Okay. |
| 11:10:42 | 18 | Q.   -- because I think if you had said yes, we |
| 11:10:44 | 19 | would be in agreement with each other. |
| 11:10:47 | 20 | A.   Oh. |
| 11:10:48 | 21 | Q.   From the time that you signed Exhibit 45 as |
| 11:10:50 | 22 | of October 3, 2002, until the time that you signed the |
| 11:10:56 | 23 | litigation agreement with Mr. Toberoff in 2004, |
| 11:11:02 | 24 | neither you nor your mom signed an agreement with |
| 11:11:05 | 25 | Mr. Toberoff calling for him to render litigation |

**EXHIBIT 81**
**2076**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 64

| | | |
|---|---|---|
| 11:11:08 | 1 | services; correct? |
| 11:11:09 | 2 | A.    Correct. |
| 11:11:24 | 3 | Q.    Do you recall having signed an amendment to |
| 11:11:29 | 4 | this Exhibit 45 extending the term till, I think you |
| 11:11:34 | 5 | said, 2005? |
| 11:11:35 | 6 | A.    Yes. |
| 11:11:38 | 7 | Q.    What can you tell me about that document?  I |
| 11:11:40 | 8 | don't believe we have it. |
| 11:11:43 | 9 | A.    It was very short, and I believe it just |
| 11:11:50 | 10 | referenced this document, and the only thing that was |
| 11:11:54 | 11 | different about it was it said that we were extending |
| 11:11:58 | 12 | the terms of this contract through a particular date. |
| 11:12:03 | 13 | MR. PETROCELLI:  Marc, have you produced |
| 11:12:04 | 14 | that?  I mean we may have overlooked it. |
| 11:12:09 | 15 | MR. TOBEROFF:  I can't say off the top of my |
| 11:12:10 | 16 | head.  We can -- |
| 11:12:11 | 17 | MR. PETROCELLI:  Can you please check? |
| 11:12:13 | 18 | MR. TOBEROFF: -- see if we have it.  We will |
| 11:12:16 | 19 | look for it and produce it. |
| 11:12:18 | 20 | MR. PETROCELLI:  Thank you. |
| 11:12:21 | 21 | Q.    Is it -- in two thousand -- |
| 11:12:27 | 22 | MR. TOBEROFF:  I should say if it exists and |
| 11:12:29 | 23 | we have it, we will produce it. |
| | 24 | BY MR. PETROCELLI: |
| 11:12:32 | 25 | Q.    Do you have a copy? |

**Merrill   Corporation   -   Los Angeles**

**EXHIBIT 81**
**2077**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 65

| | | |
|---|---|---|
| 11:12:34 | 1 | A.   I -- I don't know what I -- what I have. |
| 11:12:38 | 2 | Q.   Where do you -- where do you have your |
| 11:12:41 | 3 | documents related to this whole Superman saga? |
| 11:12:46 | 4 | A.   All over the place.  I'm not very organized. |
| 11:12:54 | 5 | Q.   There's a black cabinet that contained a lot |
| 11:12:56 | 6 | of these documents; right? |
| 11:13:00 | 7 | A.   No.  There was a black cabinet that my |
| 11:13:02 | 8 | ex-husband had that contained some of his things. |
| 11:13:06 | 9 | Q.   Was that a black cabinet that was in the home |
| 11:13:10 | 10 | that you shared with your husband before the two of |
| 11:13:12 | 11 | you separated? |
| 11:13:13 | 12 | A.   Yes, yes. |
| 11:13:13 | 13 | Q.   Okay.  And was that the same cabinet that you |
| 11:13:18 | 14 | shared your materials while you were married with |
| 11:13:21 | 15 | him related to this case? |
| 11:13:22 | 16 | A.   No.  That was strictly his. |
| 11:13:24 | 17 | Q.   What color was your cabinet? |
| 11:13:27 | 18 | A.   I don't have a cabinet.  No, it's -- you |
| 11:13:31 | 19 | know, I mean I have boxes. |
| 11:13:34 | 20 | Q.   What was the address where you lived with |
| 11:13:37 | 21 | your husband before your separation in 2000? |
| 11:13:41 | 22 | A.   The same address I have now. |
| 11:13:43 | 23 | Q.   Which is what? |
| 11:13:44 | 24 | A.   6400 Pacific Avenue, Playa del Rey, |
| 11:13:48 | 25 | California. |

**EXHIBIT 81**
**2078**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 66

| | | |
|---|---|---|
| 11:13:48 | 1 | Q.    And is there a space in your home where you |
| 11:13:54 | 2 | keep your papers related to this matter, "this matter" |
| 11:13:56 | 3 | being going back to the serving of the termination |
| 11:13:59 | 4 | notices to the present? |
| 11:14:00 | 5 | A.    Well, I have -- I have them throughout the |
| 11:14:05 | 6 | place.  There isn't one place.  Throughout my |
| 11:14:10 | 7 | condominium. |
| 11:14:10 | 8 | Q.    Is there a room where you have most of the |
| 11:14:14 | 9 | papers? |
| 11:14:15 | 10 | A.    I wish I could say yes.  The answer is no. |
| 11:14:17 | 11 | Q.    Do you have filing cabinets where you keep |
| 11:14:21 | 12 | them? |
| 11:14:22 | 13 | A.    No. |
| 11:14:22 | 14 | Q.    Do you just put them on the floor in boxes? |
| 11:14:25 | 15 | A.    They are in boxes. |
| 11:14:26 | 16 | Q.    Okay.  About how many boxes do you have? |
| 11:14:32 | 17 | A.    Well, some are in boxes and some are in |
| 11:14:36 | 18 | furniture where I had to put them because I can't live |
| 11:14:38 | 19 | with that many boxes. |
| 11:14:39 | 20 | Q.    What kind of furniture? |
| 11:14:40 | 21 | A.    It's just a large -- I used to have records |
| 11:14:44 | 22 | in there, but now I have no space for the records |
| 11:14:47 | 23 | because I put papers in there. |
| 11:14:50 | 24 | Q.    And -- |
| 11:14:51 | 25 | A.    It's just a couple of shelves. |

EXHIBIT 81
2079

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 67

| | | |
|---|---|---|
| 11:14:52 | 1 | Q.    When your husband left the home, he took his |
| 11:14:55 | 2 | black cabinet with him? |
| 11:14:56 | 3 | A.    No, he did not. |
| 11:14:58 | 4 | Q.    He left it there, but he took the papers out |
| 11:15:00 | 5 | of it? |
| 11:15:00 | 6 | A.    Yes. |
| 11:15:04 | 7 | Q.    When Michael Siegel -- he's your stepbrother. |
| 11:15:07 | 8 | He was your stepbrother? |
| 11:15:09 | 9 | A.    Half brother. |
| 11:15:10 | 10 | Q.    Half brother.  Excuse me.  He died in what |
| 11:15:14 | 11 | year?  2006? |
| 11:15:16 | 12 | A.    Yes. |
| 11:15:17 | 13 | Q.    After his death, did you receive any papers |
| 11:15:23 | 14 | from him or his estate or related to Superman in any |
| 11:15:28 | 15 | way, any correspondence, any letters, anything like |
| 11:15:33 | 16 | that? |
| 11:15:33 | 17 | A.    I can't recall any after his death, no. |
| 11:15:37 | 18 | Q.    Who took possession of his papers, if you |
| 11:15:41 | 19 | know? |
| 11:15:42 | 20 | A.    Well, I hired somebody to go in and to help |
| 11:15:47 | 21 | me clear out the place. |
| 11:15:48 | 22 | Q.    Who was that? |
| 11:15:50 | 23 | A.    My cousin. |
| 11:15:51 | 24 | Q.    Who is your cousin? |
| 11:15:52 | 25 | A.    Michele Innenberg. |

Merrill  Corporation  -  Los Angeles

EXHIBIT 81
2080

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 68

| | | |
|---|---|---|
| 11:15:54 | 1 | Q.   Where does Michele live? |
| 11:15:56 | 2 | A.   In Cleveland. |
| 11:15:57 | 3 | Q.   How is she your cousin?  Through what |
| 11:15:59 | 4 | relationship? |
| 11:15:59 | 5 | A.   She -- like a second cousin.  She's the |
| 11:16:03 | 6 | daughter of one of my cousins. |
| 11:16:07 | 7 | Q.   What town does she live in? |
| 11:16:09 | 8 | A.   Cleveland. |
| 11:16:10 | 9 | Q.   Cleveland? |
| 11:16:11 | 10 | A.   Um-hum. |
| 11:16:11 | 11 | Q.   And was -- now, is she related to Michael? |
| 11:16:15 | 12 | A.   No.  She's related to me through my father's |
| 11:16:19 | 13 | side of the family. |
| 11:16:20 | 14 | Q.   Okay.  Did Michael -- well, that's the same |
| 11:16:24 | 15 | side that -- |
| 11:16:24 | 16 | A.   It has nothing -- it wasn't -- |
| 11:16:27 | 17 | Q.   Okay.  Michael's father was Jerome Siegel, |
| 11:16:34 | 18 | your father; right? |
| 11:16:35 | 19 | A.   Yes. |
| 11:16:35 | 20 | Q.   Okay.  Who was Michael's mother? |
| 11:16:39 | 21 | A.   Bella Siegel. |
| 11:16:40 | 22 | Q.   When did she -- is she alive? |
| 11:16:41 | 23 | A.   No. |
| 11:16:41 | 24 | Q.   When did she pass? |
| 11:16:47 | 25 | A.   Maybe about a year before Michael. |

**EXHIBIT 81**
**2081**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 69

| | | |
|---|---|---|
| 11:16:50 | 1 | Q.   Okay.  And did Michael have any other -- so |
| 11:16:57 | 2 | your dad was married to Bella before your dad married |
| 11:17:00 | 3 | Joanne? |
| 11:17:01 | 4 | A.   Correct. |
| 11:17:01 | 5 | Q.   Did they have any children other than |
| 11:17:06 | 6 | Michael? |
| 11:17:07 | 7 | A.   There -- there was a child that died at |
| 11:17:10 | 8 | birth. |
| 11:17:10 | 9 | Q.   Okay.  And was Michael ever married? |
| 11:17:13 | 10 | A.   No.  He lived with his mother his whole life. |
| 11:17:19 | 11 | Q.   How old was Michael when he died? |
| 11:17:21 | 12 | A.   In his sixties. |
| 11:17:25 | 13 | Q.   And he had had heart problems? |
| 11:17:27 | 14 | A.   He had a lot of health problems. |
| 11:17:31 | 15 | Q.   Did Michele know Michael? |
| 11:17:33 | 16 | A.   No.  I should actually clarify.  Michele's |
| 11:17:45 | 17 | role was to help with furniture and to help clear out, |
| 11:17:52 | 18 | you know, certain -- certain things that I wanted.  So |
| 11:17:58 | 19 | she boxed them up. |
| 11:18:01 | 20 | Q.   Did -- what did you want? |
| 11:18:04 | 21 | A.   Oh, there was a saxophone.  There were |
| 11:18:08 | 22 | pictures of Michael as a kid, things like that. |
| 11:18:13 | 23 | Q.   Did you receive from Michael after his death |
| 11:18:17 | 24 | through Michele or through anyone else any materials |
| 11:18:20 | 25 | of any kind related to Superman? |

Merrill   Corporation   -   Los Angeles

800-826-0277                          www.merillcorp.com/law

EXHIBIT 81
2082

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 70

| | | |
|---|---|---|
| 11:18:23 | 1 | A.   He had some Superman books and pins and |
| 11:18:29 | 2 | things like that. |
| 11:18:30 | 3 | Q.   What about any papers, letters, things like |
| 11:18:35 | 4 | that? |
| 11:18:35 | 5 | A.   No, I don't recall any. |
| 11:18:37 | 6 | Q.   Letters to you, for example? |
| 11:18:39 | 7 | A.   I don't recall any. |
| 11:18:41 | 8 | Q.   Okay.  You and he corresponded from time to |
| 11:18:47 | 9 | time in writing about Superman; correct? |
| 11:18:49 | 10 | A.   Every so often. |
| 11:18:50 | 11 | Q.   And there were some letters, in fact, about |
| 11:18:53 | 12 | Mr. Toberoff; correct? |
| 11:18:56 | 13 | A.   He mentioned him.  It wasn't, you know, all |
| 11:18:59 | 14 | he would talk about. |
| 11:19:00 | 15 | Q.   No, I'm not saying that's all he would talk |
| 11:19:04 | 16 | about, but there was correspondence that you and he |
| 11:19:06 | 17 | exchanged, prior to his death, of course, about |
| 11:19:09 | 18 | Mr. Toberoff; correct? |
| 11:19:10 | 19 | A.   Yes. |
| 11:19:10 | 20 | Q.   Including his expressing his concern to you |
| 11:19:14 | 21 | about Mr. Toberoff; correct? |
| 11:19:16 | 22 | A.   Yes. |
| 11:19:17 | 23 | Q.   Have you reviewed any of that correspondence |
| 11:19:20 | 24 | recently? |
| 11:19:21 | 25 | A.   Not recently. |

LAURA SIEGEL LARSON - 7/22/2011

Page 71

| | | |
|---|---|---|
| 11:19:22 | 1 | Q. You met with Mr. Toberoff yesterday? |
| 11:19:25 | 2 | A. Yes. |
| 11:19:26 | 3 | Q. Who else was present? |
| 11:19:28 | 4 | A. Just Mr. Toberoff. |
| 11:19:30 | 5 | Q. At his office? |
| 11:19:30 | 6 | A. Yes. |
| 11:19:31 | 7 | Q. How long did you meet? |
| 11:19:33 | 8 | A. A couple of hours, maybe two and a half. |
| 11:19:35 | 9 | Q. Prior to yesterday did you have any |
| 11:19:38 | 10 | discussions with him about the deposition other than |
| 11:19:43 | 11 | scheduling it? |
| 11:19:43 | 12 | A. Just scheduling. |
| 11:19:45 | 13 | Q. Did you review any documents, see any |
| 11:19:48 | 14 | documents, look at any documents yesterday? |
| 11:19:52 | 15 | A. I looked at my former depositions. |
| 11:19:55 | 16 | (Whereupon, Ms. Seto entered the room.) |
| 11:19:58 | 17 | BY MR. PETROCELLI: |
| 11:19:58 | 18 | Q. Besides your former depositions? |
| 11:20:01 | 19 | A. No. |
| 11:20:01 | 20 | Q. Okay. Were you shown any letters, any |
| 11:20:03 | 21 | agreements, anything at all in your meeting yesterday? |
| 11:20:10 | 22 | A. No. |
| 11:20:13 | 23 | Q. Have you looked at any materials in the last |
| 11:20:13 | 24 | couple of weeks, except your deposition, related to |
| 11:20:19 | 25 | this case? |

**EXHIBIT 81**
**2084**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 72

11:20:23    1        A.    I don't think so.

11:20:31    2        Q.    What happened to Michael's correspondence, to

11:20:35    3    your knowledge, after his death?

11:20:38    4              MR. TOBEROFF:  Vague and ambiguous.

            5    BY MR. PETROCELLI:

11:20:39    6        Q.    About Superman.

11:20:42    7        A.    Well --

11:20:44    8              MR. TOBEROFF:  Still vague and ambiguous.

11:20:45    9    Lacks foundation.

11:20:48   10              THE WITNESS:  Some -- somewhere I have the

11:20:50   11    copies of the things that he sent to me.

           12    BY MR. PETROCELLI:

11:20:54   13        Q.    And that's somewhere in your home?

11:20:57   14        A.    I would -- yes.

11:20:59   15        Q.    Okay.  Where did your mom live before she

11:21:10   16    died?

11:21:10   17        A.    In Marina del Rey.

11:21:11   18        Q.    In a different place than you?

11:21:13   19        A.    Yes.

11:21:14   20        Q.    Did she live alone?

11:21:15   21        A.    Yes.

11:21:16   22        Q.    All the way into the very end?

11:21:17   23        A.    Yes.

11:21:20   24        Q.    What was the address, if you remember?

11:21:24   25        A.    13929 Marquesas Way in Marina Del Rey.

EXHIBIT 81
2085

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 73

| | | |
|---|---|---|
| 11:21:30 | 1 | Q.  Was she renting? |
| 11:21:31 | 2 | A.  Yes. |
| 11:21:32 | 3 | Q.  And so now someone else has that place? |
| 11:21:35 | 4 | A.  Yes. |
| 11:21:35 | 5 | Q.  Okay.  And did you help clean it out after |
| 11:21:39 | 6 | she passed? |
| 11:21:40 | 7 | A.  Yes. |
| 11:21:46 | 8 | MR. PETROCELLI:  I was told I'm a little bit |
| 11:21:49 | 9 | too close to the camera, so it was picking up my hand. |
| 11:21:52 | 10 | I have now moved away.  Thank you for letting me know. |
| 11:21:58 | 11 | Q.  Your mother kept papers in her home related |
| 11:22:02 | 12 | to Superman? |
| 11:22:03 | 13 | A.  Yes. |
| 11:22:05 | 14 | Q.  Including letters and agreements and |
| 11:22:10 | 15 | memorabilia, all sorts of things? |
| 11:22:11 | 16 | A.  That's right. |
| 11:22:12 | 17 | Q.  And did she also have them all over the |
| 11:22:16 | 18 | place, to use your expression? |
| 11:22:18 | 19 | A.  Yes. |
| 11:22:18 | 20 | Q.  She did not have like an office or a filing |
| 11:22:22 | 21 | cabinet where she kept the materials? |
| 11:22:24 | 22 | A.  She didn't keep an office. |
| 11:22:28 | 23 | Q.  Okay.  Now, did your mother have a typewriter |
| 11:22:32 | 24 | or computer in her home? |
| 11:22:34 | 25 | A.  She didn't -- no.  She had a computer, but |

EXHIBIT 81
2086

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 74

| | | |
|---|---|---|
| 11:22:36 | 1 | she never figured out how to use it. |
| 11:22:39 | 2 | Q. And she didn't have a typewriter; right? |
| 11:22:42 | 3 | A. She gave up using that years ago. |
| 11:22:45 | 4 | Q. Now, you have a computer in your home? |
| 11:22:48 | 5 | A. Yes. |
| 11:22:49 | 6 | Q. And what kind of computer do you have? |
| 11:22:51 | 7 | A. I have a laptop. |
| 11:22:57 | 8 | Q. What -- how long have you had it? |
| 11:23:04 | 9 | A. I think two years. |
| 11:23:05 | 10 | Q. And before the laptop, what did you have? |
| 11:23:09 | 11 | A. I had a PC that died. |
| 11:23:12 | 12 | Q. How long did you have the PC? |
| 11:23:15 | 13 | A. Several years. |
| 11:23:18 | 14 | Q. Would -- let's say starting in 2000 -- 2000, |
| 11:23:26 | 15 | what equipment did you have in your home that you |
| 11:23:30 | 16 | would use to type or create letters or other |
| 11:23:36 | 17 | documents? |
| 11:23:36 | 18 | A. A computer. |
| 11:23:37 | 19 | Q. Okay. You're a former journalist; right? |
| 11:23:40 | 20 | A. Yes. |
| 11:23:40 | 21 | Q. You retired in the mid eighties? |
| 11:23:43 | 22 | A. No, 1994. |
| 11:23:44 | 23 | Q. 1994. And you were a broadcast journalist? |
| 11:23:48 | 24 | A. Yes. |
| 11:23:49 | 25 | Q. For CNN and some other organizations? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 75

| | | |
|---|---|---|
| 11:23:51 | 1 | A.   CNN, CBS, KCAL. |
| 11:23:55 | 2 | Q.   On camera? |
| 11:23:56 | 3 | A.   On camera and also as an executive producer |
| 11:24:00 | 4 | and producer and writer. |
| 11:24:02 | 5 | Q.   Was it a network program, or was it a local |
| 11:24:05 | 6 | program? |
| 11:24:05 | 7 | A.   Some of my things were carried on the |
| 11:24:08 | 8 | network.  Of course on CNN it was carried on the |
| 11:24:11 | 9 | network. |
| 11:24:11 | 10 | Q.   Right. |
| 11:24:13 | 11 | A.   And some of my CBS programming was carried on |
| 11:24:19 | 12 | ESPN, and also they would pick up things sometimes on |
| 11:24:22 | 13 | the CBS network. |
| 11:24:24 | 14 | Q.   And you wrote a lot of your own scripts and |
| 11:24:27 | 15 | stories? |
| 11:24:27 | 16 | A.   Oh, yes. |
| 11:24:36 | 17 | Q.   So let's go back to the equipment in your |
| 11:24:42 | 18 | place. |
| 11:24:42 | 19 | First of all, you have had no office outside |
| 11:24:44 | 20 | of your home since the year 2000 to the present? |
| 11:24:47 | 21 | A.   No. |
| 11:24:48 | 22 | Q.   So the only place that you would create |
| 11:24:52 | 23 | documents like letters would be in your house? |
| 11:24:55 | 24 | A.   Correct. |
| 11:24:56 | 25 | Q.   Did you ever create any documents or letters |

EXHIBIT 81
2088

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 76

| | | |
|---|---|---|
| 11:24:59 | 1 | related to Superman in your mother's home? |
| 11:25:05 | 2 | A.   No. |
| 11:25:05 | 3 | Q.   Okay.  And to your knowledge, your mother |
| 11:25:11 | 4 | never typed out or caused to be printed on a computer |
| 11:25:16 | 5 | a letter or a document related to Superman; correct? |
| 11:25:20 | 6 | A.   Well, she wrote tons of things longhand, and |
| 11:25:26 | 7 | there were times when she would type a few things up |
| 11:25:31 | 8 | on her old typewriter until that, you know, wasn't |
| 11:25:35 | 9 | working any longer. |
| 11:25:35 | 10 | Q.   That would be before year 2000; right? |
| 11:25:38 | 11 | A.   You know, I don't know whether it was before |
| 11:25:40 | 12 | or after 2000. |
| 11:25:42 | 13 | Q.   That she would work on a typewriter? |
| 11:25:44 | 14 | A.   Yes.  I don't know for sure. |
| 11:25:48 | 15 | Q.   Did you retrieve the typewriter when she |
| 11:25:50 | 16 | passed away? |
| 11:25:51 | 17 | A.   Yes. |
| 11:25:51 | 18 | Q.   You still have it? |
| 11:25:52 | 19 | A.   Yes. |
| 11:25:52 | 20 | Q.   Where is it? |
| 11:25:54 | 21 | A.   I put it with her other furniture that I |
| 11:25:58 | 22 | currently have just put in storage until I figure out |
| 11:26:02 | 23 | what to do with it. |
| 11:26:03 | 24 | Q.   What's the storage facility? |
| 11:26:05 | 25 | A.   It's called Public Storage. |

LAURA SIEGEL LARSON - 7/22/2011

Page 77

| | | |
|---|---|---|
| 11:26:07 | 1 | Q.    The one -- is there one in Marina nearby? |
| 11:26:11 | 2 | A.    Yes. |
| 11:26:12 | 3 | Q.    The Superman papers and materials that you |
| 11:26:15 | 4 | collected from your mother's home -- |
| 11:26:17 | 5 | A.    Um-hum. |
| 11:26:18 | 6 | Q.    -- did you put those in Public Storage? |
| 11:26:21 | 7 | A.    Well, I brought a lot of them home.  I'm |
| 11:26:26 | 8 | currently trying to go through things.  So at the |
| 11:26:30 | 9 | moment my place is almost unlivable because I have, |
| 11:26:33 | 10 | you know, my stuff and her stuff, and, you know, it's |
| 11:26:40 | 11 | unbelievable. |
| 11:26:40 | 12 | Q.    And again, I'm only focused on Superman |
| 11:26:46 | 13 | materials.  But between your Superman papers, files, |
| 11:26:50 | 14 | and materials and your mother's -- |
| 11:26:52 | 15 | A.    Yes. |
| 11:26:52 | 16 | Q.    -- can you somehow in your own way |
| 11:26:55 | 17 | approximate the volume?  Let's say boxes.  If you put |
| 11:27:00 | 18 | it all in the bankers boxes, how many boxes would |
| 11:27:02 | 19 | there be?  Ten boxes? |
| 11:27:06 | 20 | A.    I couldn't guess at that because there were a |
| 11:27:08 | 21 | lot of things that -- there are many different things |
| 11:27:12 | 22 | in any one given box, these things that I haven't gone |
| 11:27:16 | 23 | through yet.  So there could be a box that has one |
| 11:27:19 | 24 | paper relating to Superman or there could be many |
| 11:27:28 | 25 | papers. |

**EXHIBIT 81**
**2090**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 78

| | | |
|---|---|---|
| 11:27:28 | 1 | Q.   Like, for example, the letters that you |
| 11:27:31 | 2 | exchanged with Michael Siegel that you said are in |
| 11:27:34 | 3 | your home, where in your home are those letters? |
| 11:27:37 | 4 | MR. TOBEROFF:  Lacks foundation. |
| 11:27:40 | 5 | THE WITNESS:  Well, anything that I had, you |
| 11:27:44 | 6 | know, is also mixed in with papers.  I mean I have -- |
| 11:27:51 | 7 | I have various boxes that relate to the case.  I have |
| 11:27:56 | 8 | other boxes that relate to my divorce.  I've got a lot |
| 11:28:01 | 9 | of different things. |
| | 10 | BY MR. PETROCELLI: |
| 11:28:02 | 11 | Q.   Have you -- since this lawsuit was filed in |
| 11:28:05 | 12 | May, 2010, have you gone and searched for and given to |
| 11:28:13 | 13 | someone else your Michael Siegel correspondence? |
| 11:28:20 | 14 | A.   Well, whenever I find anything that I think |
| 11:28:24 | 15 | relates to the case, I turn it over to Mr. Toberoff. |
| 11:28:28 | 16 | Q.   Since May, 2010, have you turned over to |
| 11:28:31 | 17 | Mr. Toberoff any of your correspondence with Michael |
| 11:28:36 | 18 | Siegel that was in your home? |
| 11:28:39 | 19 | A.   Probably. |
| 11:28:40 | 20 | Q.   Okay. |
| 11:28:42 | 21 | A.   Oh, excuse me.  May I say something about |
| 11:28:46 | 22 | 2010? |
| 11:28:47 | 23 | Q.   You may. |
| 11:28:49 | 24 | A.   I believe that you -- I believe that you |
| 11:28:52 | 25 | asked me earlier about documents from 2010, around |

**EXHIBIT 81**
**2091**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 79

| | | |
|---|---|---|
| 11:29:00 | 1 | that time.  We were talking about different agreements |
| 11:29:03 | 2 | and we were talking about in connection with when this |
| 11:29:08 | 3 | lawsuit had been filed. |
| 11:29:09 | 4 | Q.    Proceed. |
| 11:29:10 | 5 | A.    Okay.  I believe that I misstated something. |
| 11:29:16 | 6 | I -- after this lawsuit was filed, Mr. Toberoff did |
| 11:29:20 | 7 | send me another -- what was it called? -- conflict, |
| 11:29:29 | 8 | another, you know, delineating, you know, potential |
| 11:29:33 | 9 | conflicts, a document regarding conflicts, and I |
| 11:29:36 | 10 | don't -- I don't believe I mentioned that earlier. |
| 11:29:38 | 11 | You were asking me different ones for different dates. |
| 11:29:41 | 12 | Q.    And your recollection about that was prompted |
| 11:29:43 | 13 | as a result of Mr. Toberoff mentioning it to you |
| 11:29:45 | 14 | during a break? |
| 11:29:46 | 15 | A.    Well, I went to the bathroom.  It was cooler. |
| 11:29:49 | 16 | I was -- |
| 11:29:50 | 17 | MR. TOBEROFF:  You can -- you can -- you |
| 11:29:55 | 18 | can -- you can answer that you recalled that during |
| 11:29:58 | 19 | the break. |
| 11:30:00 | 20 | THE WITNESS:  Yeah, I recalled it during the |
| 11:30:03 | 21 | break. |
| | 22 | BY MR. PETROCELLI: |
| 11:30:04 | 23 | Q.    And as a result of talking to Mr. Toberoff? |
| 11:30:06 | 24 | MR. TOBEROFF:  Well, you can't -- you can't |
| 11:30:09 | 25 | talk about your conversations with me. |

**Merrill  Corporation  -  Los Angeles**

800-826-0277                    www.merillcorp.com/law

**EXHIBIT 81**
**2092**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 80

| 11:30:10 | 1 | BY MR. PETROCELLI: |
| 11:30:10 | 2 | Q.  Did you talk to Mr. Toberoff about anything |
| 11:30:12 | 3 | during the break? |
| 11:30:14 | 4 | MR. TOBEROFF:  You can answer that. |
| | 5 | BY MR. PETROCELLI: |
| 11:30:15 | 6 | Q.  Yes or no? |
| 11:30:16 | 7 | A.  Yes. |
| 11:30:19 | 8 | Q.  Okay.  And you remembered this new document |
| 11:30:25 | 9 | that I will now ask you about after talking to |
| 11:30:28 | 10 | Mr. Toberoff during the break. |
| 11:30:33 | 11 | A.  Yes. |
| 11:30:34 | 12 | Q.  Okay. |
| 11:30:34 | 13 | A.  While I was in the restroom. |
| 11:30:38 | 14 | Q.  Well, so tell me more about this document. |
| 11:30:42 | 15 | What is it and -- |
| 11:30:45 | 16 | A.  No, I just remember that -- that he wanted to |
| 11:30:51 | 17 | make sure that -- |
| 11:30:53 | 18 | MR. TOBEROFF:  Don't -- don't talk about the |
| 11:30:55 | 19 | contents of the document.  You can talk about whether |
| 11:30:57 | 20 | or not you signed it. |
| 11:30:59 | 21 | THE WITNESS:  Right. |
| 11:31:00 | 22 | MR. TOBEROFF:  Another conflict waiver. |
| 11:31:01 | 23 | THE WITNESS:  Right.  He wanted to make sure |
| 11:31:03 | 24 | that I signed, you know, this document that he felt |
| 11:31:08 | 25 | was warranted. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 81

11:31:10    1    BY MR. PETROCELLI:

11:31:10    2        Q.    What was the subject matter of the document?

11:31:15    3        A.    As I said, it was a conflict disclosure.

11:31:18    4        Q.    Did it relate to this new case that DC filed?

11:31:22    5        A.    It was as a result of this case.

11:31:25    6        Q.    Did anybody else sign it besides you and -- I

11:31:30    7    presume Mr. Toberoff signed it?

11:31:31    8        A.    I believe my mother signed it.

11:31:33    9        Q.    Anyone else?

11:31:34    10       A.    I don't think so.

11:31:35    11       Q.    Did anybody review it on your behalf?

11:31:40    12       A.    I'm sure George did, George Zadrozny.

11:31:48    13       Q.    You remember that he did?

11:31:49    14       A.    I believe that he did.

11:31:51    15       Q.    Did you send it to him before signing it?

11:31:55    16       A.    I believe so.

11:31:56    17       Q.    How do you send things to George?

11:32:00    18       A.    Well, sometimes by mail.

11:32:03    19       Q.    In 2010 how did you send this document to

11:32:07    20   George?

11:32:07    21       A.    If it was sent to me in electronic form,

11:32:12    22   then --

11:32:13    23       Q.    E-mailed?

11:32:14    24       A.    -- then I could e-mail him.  I don't recall

11:32:16    25   whether this one was sent to me or, you know --

EXHIBIT 81
2094

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 82

| | | |
|---|---|---|
| 11:32:19 | 1 | Q.    You would forward the e-mail. |
| 11:32:21 | 2 | A.    A copy, right.  If I get something that's |
| 11:32:25 | 3 | papers, then I can fax it, but, you know -- |
| 11:32:27 | 4 | Q.    What is your e-mail address? |
| 11:32:29 | 5 | A.    Mistylight3@cs.com. |
| 11:32:33 | 6 | Q.    What is George's e-mail address? |
| 11:32:35 | 7 | MR. TOBEROFF:  I would just like to say in |
| 11:32:36 | 8 | terms of her home address and her e-mail address, I |
| 11:32:39 | 9 | want to keep that private on the record -- |
| 11:32:42 | 10 | MR. PETROCELLI:  That's fine. |
| 11:32:43 | 11 | MR. TOBEROFF:  -- to disclose documents, |
| 11:32:44 | 12 | because there's so many -- so much commentary and fans |
| 11:32:48 | 13 | that are interested in this Superman case. |
| 11:32:50 | 14 | MR. PETROCELLI:  We have no interest at all |
| 11:32:53 | 15 | in publicizing it.  We may use it for purposes of the |
| 11:32:58 | 16 | lawsuit, but -- |
| 11:32:58 | 17 | MR. TOBEROFF:  But when it's used for |
| 11:32:58 | 18 | purposes of the lawsuit, I don't want her address and |
| 11:33:00 | 19 | her personal e-mail to be disclosed.  I want it to |
| 11:33:05 | 20 | be -- |
| 11:33:05 | 21 | MR. PETROCELLI:  Well, I want to work with |
| 11:33:06 | 22 | you on that because we have no interest in causing any |
| 11:33:10 | 23 | unwarranted invasion of her privacy, but the details |
| 11:33:13 | 24 | of that we will have to work out.  Okay?  Because I |
| 11:33:15 | 25 | don't know exactly what that means.  We're not going |

EXHIBIT 81
2095

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 83

| | | |
|---|---|---|
| 11:33:17 | 1 | to negotiation a protective order right now on the |
| 11:33:20 | 2 | record. |
| 11:33:20 | 3 | MR. TOBEROFF:  No.  What I'm saying is we've |
| 11:33:21 | 4 | talked at times about having a protective order in |
| 11:33:23 | 5 | this case. |
| 11:33:23 | 6 | MR. PETROCELLI:  Okay. |
| 11:33:24 | 7 | MR. TOBEROFF:  And I'm sure your client is |
| 11:33:25 | 8 | going to want a protective order when it comes to |
| 11:33:30 | 9 | discovery of its materials, and that day is coming, |
| 11:33:32 | 10 | that we -- this information should be subject to that |
| 11:33:37 | 11 | protective order. |
| 11:33:38 | 12 | MR. PETROCELLI:  I understand you would like |
| 11:33:39 | 13 | to designate this as confidential.  Okay. |
| 11:33:42 | 14 | Q.   What is George's e-mail address? |
| 11:33:44 | 15 | A.   I don't have it off the top of my head. |
| 11:33:47 | 16 | Q.   Did your mother have an e-mail address? |
| 11:33:57 | 17 | A.   No. |
| 11:33:57 | 18 | Q.   So before you remembered this document, we |
| 11:34:00 | 19 | were talking about documents in general, and I want to |
| 11:34:04 | 20 | go back to that.  Okay? |
| 11:34:05 | 21 | A.   Okay. |
| 11:34:08 | 22 | Q.   You said you -- when you gave Mr. Toberoff |
| 11:34:18 | 23 | documents related to this case -- |
| 11:34:19 | 24 | A.   Yes. |
| 11:34:22 | 25 | Q.   -- did you keep copies for yourself? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 84

| | | |
|---|---|---|
| 11:34:29 | 1 | A.   No.  When I gave them to him, I gave them to |
| 11:34:32 | 2 | him. |
| 11:34:33 | 3 | Q.   When your mom passed and you took some -- you |
| 11:34:35 | 4 | took all of her files and papers, did you turn any of |
| 11:34:38 | 5 | that material over to Mr. Toberoff? |
| 11:34:42 | 6 | A.   Yes.  I found something that I -- |
| 11:34:45 | 7 | Q.   What did you find? |
| 11:34:46 | 8 | A.   I found a file that she had about a lawyer |
| 11:34:50 | 9 | that we had been talking about potentially hiring. |
| 11:34:53 | 10 | Q.   Is that Gerry Spence? |
| 11:34:55 | 11 | A.   Gerry Spence, yes. |
| 11:34:58 | 12 | Q.   And you just turned that over to him when? |
| 11:35:01 | 13 | A.   Just a couple of days ago. |
| 11:35:03 | 14 | Q.   Okay.  So what caused you a couple of days |
| 11:35:06 | 15 | ago to come across that file?  Were you looking for |
| 11:35:09 | 16 | materials related to this case? |
| 11:35:11 | 17 | A.   No.  I was going -- going through a box of |
| 11:35:14 | 18 | her papers, and it happened to be in there. |
| 11:35:17 | 19 | Q.   Has anyone other than you -- since the filing |
| 11:35:22 | 20 | of this lawsuit in May, 2010, has anyone other than |
| 11:35:26 | 21 | you searched the papers in your home related to this |
| 11:35:32 | 22 | case? |
| 11:35:32 | 23 | MR. TOBEROFF:  At her home? |
| 11:35:33 | 24 | MR. PETROCELLI:  Yes. |
| 11:35:36 | 25 | THE WITNESS:  No. |

**EXHIBIT 81**
**2097**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 85

| 11:35:36 | 1 | BY MR. PETROCELLI: |
| 11:35:37 | 2 | Q.   For example, did Mr. Toberoff come to your |

11:35:36      1      BY MR. PETROCELLI:

11:35:37      2          Q.   For example, did Mr. Toberoff come to your

11:35:40      3      house and search through your files or a member of his

11:35:43      4      law firm?

11:35:44      5          A.   No.

11:35:47      6          Q.   Okay.  Since the filing of this case, have

11:35:57      7      you provided Mr. Toberoff with any materials other

11:36:02      8      than that Gerry Spence file you just found?

11:36:08      9          A.   Yes.

11:36:08     10          Q.   What did you give?

11:36:13     11          A.   Papers relating to my divorce.

11:36:18     12          Q.   When was that?

11:36:21     13          A.   There was a document request from, I believe,

11:36:25     14      your office, and in response to that, I produce those.

11:36:30     15          Q.   Anything other than the divorce file --

11:36:34     16      that's from your former husband, Dennis Larson;

11:36:37     17      correct?

11:36:38     18          A.   Yes.

11:36:38     19          Q.   And the Gerry Spence file.  Anything else

11:36:43     20      since the filing of this lawsuit that you gave to

11:36:43     21      Mr. Toberoff from your home?

11:36:43     22          A.   Since the filing of this lawsuit.  I don't

11:36:47     23      recall anything specific.

11:36:52     24          Q.   Okay.  Now, why -- how was it that you came

11:36:59     25      across the Gerry Spence file a couple of days ago?

## LAURA SIEGEL LARSON - 7/22/2011

Page 86

| | | |
|---|---|---|
| 11:37:01 | 1 | MR. TOBEROFF:  Asked and answered. |
| 11:37:02 | 2 | You can answer. |
| | 3 | BY MR. PETROCELLI: |
| 11:37:03 | 4 | Q.   You were looking -- |
| 11:37:04 | 5 | A.   I was -- I wasn't looking for it, but I was |
| 11:37:06 | 6 | going through, you know, one of the boxes of my mom's |
| 11:37:10 | 7 | papers, and it was in there. |
| 11:37:11 | 8 | Q.   Okay.  Have you provided any papers in your |
| 11:37:17 | 9 | home since the filing of this lawsuit to anyone other |
| 11:37:21 | 10 | than Mr. Toberoff? |
| 11:37:24 | 11 | A.   No. |
| 11:37:24 | 12 | Q.   Has any other lawyer seen any materials in |
| 11:37:28 | 13 | your home or have you given them any materials? |
| 11:37:38 | 14 | A.   No. |
| 11:37:38 | 15 | Q.   When you collected the papers from your |
| 11:37:42 | 16 | mother's place, how did you collect them?  You just |
| 11:37:44 | 17 | put them in a box or a couple of boxes? |
| 11:37:46 | 18 | A.   Well, she had a lot of boxes already, and she |
| 11:37:51 | 19 | had -- you know, there were bags.  There were boxes. |
| 11:37:54 | 20 | There were a lot of -- a lot of different things that |
| 11:37:58 | 21 | were already, you know -- what can I call them?  They |
| 11:38:04 | 22 | were in containers of one sort or another. |
| 11:38:06 | 23 | Q.   Paper containers? |
| 11:38:08 | 24 | A.   Well, when I say container -- |
| 11:38:10 | 25 | Q.   What kind of -- cardboard containers? |

**EXHIBIT 81**
**2099**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 87

| | | |
|---|---|---|
| 11:38:11 | 1 | A.   No, no.  I'm using the term generically for |
| 11:38:14 | 2 | both bags and boxes. |
| 11:38:15 | 3 | Q.   I see.  Like those big trash bags? |
| 11:38:18 | 4 | A.   No.  Oftentimes they were like Ralphs bags. |
| 11:38:23 | 5 | Q.   Okay. |
| 11:38:24 | 6 | A.   Things like that, you know, so I -- you know, |
| 11:38:27 | 7 | in the interest of time I couldn't go through |
| 11:38:31 | 8 | everything.  So, you know, I packed those things, you |
| 11:38:34 | 9 | know, into my car, took them to the place where I |
| 11:38:39 | 10 | live, and then there were other things that I had a |
| 11:38:43 | 11 | professional mover when he moved the furniture also |
| 11:38:46 | 12 | moved some additional boxes for me because it was just |
| 11:38:49 | 13 | too much stuff for me to transport. |
| 11:38:51 | 14 | Q.   I was going to ask you that.  Who helped you |
| 11:38:53 | 15 | move these containers of papers and Superman-related |
| 11:38:57 | 16 | materials from your mother's home to your home? |
| 11:39:03 | 17 | A.   Well, my sons helped me, and it was just my |
| 11:39:04 | 18 | sons and me and then professional movers. |
| 11:39:08 | 19 | Q.   What was the moving company you used? |
| 11:39:12 | 20 | A.   Starving Students. |
| 11:39:15 | 21 | Q.   How old are your children? |
| 11:39:18 | 22 | A.   20 and 23 years old. |
| 11:39:21 | 23 | Q.   The 20-year-old is whom? |
| 11:39:22 | 24 | A.   Michael -- no, no.  James.  James is 20. |
| 11:39:25 | 25 | Q.   And Michael is how old? |

**EXHIBIT 81**
**2100**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 88

| | | |
|---|---|---|
| 11:39:27 | 1 | A.    23. |
| 11:39:28 | 2 | Q.    Do they live with you? |
| 11:39:30 | 3 | A.    Some of the time, not really anymore. |
| 11:39:36 | 4 | Q.    Okay.  Now, with respect to the typing or |
| 11:39:41 | 5 | computer equipment in your home since 2000, and you |
| 11:39:45 | 6 | said you did take possession of your mother's |
| 11:39:48 | 7 | typewriter, and remind me.  Did she or did she not |
| 11:39:52 | 8 | have an old computer there as well? |
| 11:39:53 | 9 | A.    She had a laptop that my sons tried to teach |
| 11:39:57 | 10 | her how to use, but it was unused. |
| 11:40:00 | 11 | Q.    Where is that laptop now? |
| 11:40:01 | 12 | A.    I have it. |
| 11:40:03 | 13 | Q.    In your home? |
| 11:40:04 | 14 | A.    Yes. |
| 11:40:05 | 15 | Q.    Okay.  And with respect to the computer |
| 11:40:08 | 16 | equipment going back to 2000 that you used -- |
| 11:40:11 | 17 | A.    Um-hum. |
| 11:40:12 | 18 | Q.    -- why don't you just bring me up to date on |
| 11:40:16 | 19 | that.  What did you use going back to 2000 to today? |
| 11:40:19 | 20 | A.    Well, I had -- you know, I had a PC, as I |
| 11:40:23 | 21 | explained before. |
| 11:40:24 | 22 | Q.    What kind of PC?  Do you remember? |
| 11:40:28 | 23 | A.    It was a Hewlett Packard or something. |
| 11:40:30 | 24 | Q.    Do you have a printer in your home? |
| 11:40:32 | 25 | A.    Yes.  I've had -- you know, they die, you |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 89

| | | |
|---|---|---|
| 11:40:36 | 1 | know, periodically, you know, so I had printers that I |
| 11:40:42 | 2 | had to throw away and replace, and I currently have an |
| 11:40:46 | 3 | all in one.  It's an all in one.  You know, it's both |
| 11:40:49 | 4 | a fax machine and a -- |
| 11:40:50 | 5 | Q.    Right. |
| 11:40:51 | 6 | A.    -- printer. |
| 11:40:51 | 7 | Q.    What's the name of the laptop that you now |
| 11:40:54 | 8 | use?  What's the model? |
| 11:40:55 | 9 | A.    Toshiba. |
| 11:40:57 | 10 | Q.    Are you a pretty good typist? |
| 11:41:00 | 11 | A.    I'm okay. |
| 11:41:02 | 12 | Q.    And you typed letters for your mother related |
| 11:41:06 | 13 | to this case? |
| 11:41:07 | 14 | A.    Yes. |
| 11:41:17 | 15 | Q.    Okay. |
| 11:41:31 | 16 |       What were the reasons why you decided not to |
| 11:41:38 | 17 | extend your business arrangement with IP Worldwide |
| 11:41:42 | 18 | calling for the payment of a 10 percent commission? |
| 11:41:46 | 19 | A.    It became unnecessary because we were |
| 11:41:48 | 20 | entering into litigation. |
| 11:41:52 | 21 | Q.    And that was about the late 2004 and early |
| 11:41:55 | 22 | 2005 time period? |
| 11:41:57 | 23 | A.    Yes. |
| 11:42:04 | 24 | Q.    Any -- is it your understanding, then, |
| 11:42:06 | 25 | that -- well, before I go there, prior to the time |

## LAURA SIEGEL LARSON - 7/22/2011

Page 90

| | | |
|---|---|---|
| 11:42:11 | 1 | that you decided not to extend the IP Worldwide |
| 11:42:16 | 2 | business arrangement, was the commission still 10 |
| 11:42:23 | 3 | percent, or had that number been modified in some way? |
| 11:42:28 | 4 | A.  You mean just this document itself, or are |
| 11:42:33 | 5 | you talking about services?  I -- |
| 11:42:35 | 6 | Q.  I'm not sure why you're asking me those |
| 11:42:38 | 7 | questions, so -- |
| 11:42:40 | 8 | A.  I'm not understanding your question. |
| 11:42:41 | 9 | Q.  Well, in paragraph 6 of this agreement -- |
| 11:42:43 | 10 | A.  Yes. |
| 11:42:44 | 11 | Q.  -- Exhibit 45, there's a 10 percent |
| 11:42:45 | 12 | commission. |
| 11:42:46 | 13 | A.  Yes. |
| 11:42:47 | 14 | Q.  When this agreement was no longer in effect |
| 11:42:52 | 15 | sometime in early 2005, as you said -- |
| 11:42:55 | 16 | A.  Yes. |
| 11:42:56 | 17 | Q.  -- was the commission still 10 percent at |
| 11:42:59 | 18 | that moment in time? |
| 11:43:02 | 19 | A.  No. |
| 11:43:02 | 20 | Q.  What was it? |
| 11:43:05 | 21 | A.  It -- once the -- once the litigation |
| 11:43:08 | 22 | agreement went into effect, it was reduced because |
| 11:43:12 | 23 | Mr. Toberoff was not going to receive any -- any |
| 11:43:19 | 24 | percentage under the IP Worldwide. |
| 11:43:22 | 25 | Q.  And it was reduced -- |

LAURA SIEGEL LARSON - 7/22/2011

Page 91

| | | |
|---|---|---|
| 11:43:24 | 1 | A.   So it was reduced to 5 percent for |
| 11:43:29 | 2 | Mr. Emanuel only. |
| 11:43:29 | 3 | Q.   I see.  So that any money that Mr. Toberoff |
| 11:43:32 | 4 | would get he would get pursuant to the litigation |
| 11:43:34 | 5 | agreement which had shortly before been executed. |
| 11:43:38 | 6 | A.   Correct. |
| 11:43:39 | 7 | Q.   Okay.  And so for a period of time, then, you |
| 11:43:45 | 8 | had in effect a litigation agreement with Mr. Toberoff |
| 11:43:50 | 9 | calling for a particular percentage, and then you had |
| 11:43:54 | 10 | an IP Worldwide agreement that the commission of which |
| 11:43:58 | 11 | in paragraph 6 was reduced from 6 -- from 10 to 5 |
| 11:44:02 | 12 | percent; correct? |
| 11:44:03 | 13 | A.   Correct. |
| 11:44:03 | 14 | Q.   Okay.  Now, was there a document that |
| 11:44:06 | 15 | reflected the reduction of the commission from 10 |
| 11:44:10 | 16 | percent to 5 percent for IP Worldwide? |
| 11:44:15 | 17 | A.   It was -- it was reflected in the litigation |
| 11:44:22 | 18 | agreement. |
| 11:44:23 | 19 | Q.   So the litigation agreement contains a |
| 11:44:26 | 20 | reference that the IP Worldwide commission is dropping |
| 11:44:29 | 21 | from 10 to 5. |
| 11:44:32 | 22 | A.   I can't remember the exact details. |
| 11:44:36 | 23 | Q.   Okay.  You indicated that there was a |
| 11:44:38 | 24 | document that you recall having signed that extended |
| 11:44:41 | 25 | the IP Worldwide agreement.  Do you remember that |

LAURA SIEGEL LARSON - 7/22/2011

Page 92

11:44:44    1    testimony?

11:44:44    2        A.    Yes.

11:44:45    3        Q.    Was there one extension that you signed or

11:44:48    4    more than one?

11:44:53    5        A.    There may have been more than one.

11:44:55    6        Q.    And did any of those extensions that you

11:44:58    7    signed also address the reduction of the commission

11:45:00    8    from 10 to 5?

11:45:07    9        A.    No.

11:45:07   10        Q.    Now, when -- given that you had for at least

11:45:15   11    a period of time two agreements in effect, one for the

11:45:19   12    litigation with Mr. Toberoff and then the IP Worldwide

11:45:22   13    agreement at 5 percent, why did you then decide to

11:45:27   14    stop the 5 percent agreement?

11:45:31   15        A.    Well, Mr. Emanuel's services were not needed.

11:45:36   16        Q.    Well, why were Mr. Emanuel's services needed

11:45:39   17    the moment you signed the litigation agreement with

11:45:43   18    Mr. Toberoff?

11:45:44   19            MR. TOBEROFF:  You mean not needed?  You said

11:45:46   20    "needed."

11:45:47   21            MR. PETROCELLI:  No.  I meant "needed."

11:45:50   22            MR. TOBEROFF:  Oh.

11:45:50   23            MR. PETROCELLI:  Let me go back.

11:45:51   24            THE WITNESS:  Okay.

           25    BY MR. PETROCELLI:

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 93

| 11:45:52 | 1 | Q. First of all, the percentage in the |
| 11:45:55 | 2 | litigation agreement with Mr. Toberoff ranged from 33 |
| 11:45:59 | 3 | percent to 40 percent; correct? |
| 11:46:01 | 4 | A. Yes. |
| 11:46:02 | 5 | Q. Okay. Is that still the current arrangement? |
| 11:46:05 | 6 | A. Yes. |
| 11:46:06 | 7 | MR. TOBEROFF: Okay. I just want to -- |
| 11:46:08 | 8 | before we ask more questions regarding the retainer |
| 11:46:10 | 9 | agreement, I just want you to be aware that certain |
| 11:46:13 | 10 | portions of the retainer agreement have been redacted |
| 11:46:16 | 11 | as privileged. |
| 11:46:17 | 12 | THE WITNESS: Okay. |
| 11:46:18 | 13 | MR. TOBEROFF: They made a motion to compel, |
| 11:46:19 | 14 | and a redaction was upheld by the court. So I need |
| 11:46:22 | 15 | you to pause and particularly when they start asking |
| 11:46:25 | 16 | you questions about what's in the retainer agreement |
| 11:46:27 | 17 | so I can instruct you -- |
| 11:46:29 | 18 | THE WITNESS: All right. |
| 11:46:30 | 19 | MR. TOBEROFF: -- accordingly. |
| | 20 | BY MR. PETROCELLI: |
| 11:46:32 | 21 | Q. After the -- you signed the 33 to 40 percent |
| 11:46:37 | 22 | litigation agreement with Mr. Toberoff, you determined |
| 11:46:41 | 23 | you would still have an arrangement with IP Worldwide |
| 11:46:46 | 24 | for Mr. Emanuel's services, but that was reduced to 5 |
| 11:46:50 | 25 | percent; correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 94

| | | |
|---|---|---|
| 11:46:51 | 1 | MR. TOBEROFF:  Misstates her testimony. |
| 11:46:54 | 2 | MR. PETROCELLI:  I didn't misstate anything. |
| 11:46:56 | 3 | It's not even a proper objection. |
| 11:46:58 | 4 | But go ahead. |
| 11:46:59 | 5 | MR. TOBEROFF:  Misstates the record. |
| 11:47:01 | 6 | MR. PETROCELLI:  Nor is that. |
| 11:47:04 | 7 | THE WITNESS:  I'm lost. |
| 11:47:05 | 8 | MR. TOBEROFF:  Misstates the -- |
| | 9 | BY MR. PETROCELLI: |
| 11:47:09 | 10 | Q.   When you -- you indicated that there was -- |
| 11:47:12 | 11 | at the time of the litigation agreement with |
| 11:47:15 | 12 | Mr. Toberoff which called for a percentage to |
| 11:47:19 | 13 | Mr. Toberoff of 33 to 40 percent, that there was a |
| 11:47:23 | 14 | simultaneous reduction of the IPW commission, IP |
| 11:47:28 | 15 | Worldwide commission, from 10 percent to 5 percent. |
| 11:47:31 | 16 | Do you recall that? |
| 11:47:31 | 17 | A.   Yes. |
| 11:47:32 | 18 | Q.   In fact, you said it was in the same document |
| 11:47:34 | 19 | that that occurred, the litigation document; right? |
| 11:47:37 | 20 | A.   Yes. |
| 11:47:37 | 21 | Q.   Okay.  Why did you retain Mr. Emanuel once |
| 11:47:42 | 22 | you had signed the litigation agreement with |
| 11:47:46 | 23 | Mr. Toberoff? |
| 11:47:46 | 24 | MR. TOBEROFF:  Assumes facts.  Lacks |
| 11:47:48 | 25 | foundation. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 95

| | | |
|---|---|---|
| 11:47:49 | 1 | THE WITNESS:  There was a -- |
| | 2 | BY MR. PETROCELLI: |
| 11:47:51 | 3 | Q.   Why did you continue the services of |
| 11:47:53 | 4 | Mr. Emanuel at 5 percent after having entered into the |
| 11:47:57 | 5 | litigation agreement with Mr. Toberoff? |
| 11:47:59 | 6 | MR. TOBEROFF:  Objection.  Assumes facts. |
| 11:48:01 | 7 | Lacks foundation. |
| | 8 | BY MR. PETROCELLI: |
| 11:48:01 | 9 | Q.   You may answer. |
| 11:48:03 | 10 | A.   There was a very short period of time.  The |
| 11:48:08 | 11 | litigation had not actually begun yet.  There was a |
| 11:48:13 | 12 | possibility that Mr. Emanuel's services prior to the |
| 11:48:17 | 13 | initiation of the actual litigation might be needed. |
| 11:48:21 | 14 | MR. PETROCELLI:  Okay.  We have to stop now |
| 11:48:23 | 15 | because he needs to change the tape. |
| 11:48:24 | 16 | THE WITNESS:  Okay. |
| 11:48:25 | 17 | MR. PETROCELLI:  So we'll take a short break. |
| 11:48:28 | 18 | THE WITNESS:  Okay.  Good. |
| 11:48:29 | 19 | THE VIDEOGRAPHER:  This will mark the end of |
| | 20 | Volume 1, tape number one, in the deposition of Laura |
| 11:48:30 | 21 | Siegel.  Going off the record.  The time is 11:48. |
| 11:59:45 | 22 | (A recess was taken.) |
| 11:59:48 | 23 | THE VIDEOGRAPHER:  We're back on the record, |
| 11:59:51 | 24 | and this marks the beginning of Volume 1, tape number |
| 11:59:53 | 25 | two, in the deposition of Laura Siegel.  The time is |

**EXHIBIT 81**
**2108**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 96

| | | |
|---|---|---|
| 11:59:56 | 1 | 11:59.  Go ahead. |
| | 2 | BY MR. PETROCELLI: |
| 12:00:03 | 3 | Q.   When is the last -- after the end of the |
| 12:00:10 | 4 | IPW -- IP Worldwide agreement in early 2005, as you |
| 12:00:15 | 5 | said, when litigation began, you said it became |
| 12:00:18 | 6 | unnecessary; right? |
| 12:00:19 | 7 | A.   Correct. |
| 12:00:21 | 8 | Q.   Okay.  From that point on until today, have |
| 12:00:25 | 9 | you had any contact at all with Ari Emanuel? |
| 12:00:30 | 10 | A.   No. |
| 12:00:30 | 11 | Q.   Has your mother?  Did your mother, to your |
| 12:00:34 | 12 | knowledge, prior to her death? |
| 12:00:36 | 13 | A.   I don't believe so. |
| 12:00:37 | 14 | Q.   Are you aware of any ongoing role that Ari |
| 12:00:44 | 15 | Emanuel plays -- |
| 12:00:46 | 16 | A.   I'm not -- |
| 12:00:47 | 17 | Q.   -- with respect to your Superman rights? |
| 12:00:50 | 18 | A.   I'm not aware of that. |
| 12:00:52 | 19 | Q.   Are you aware of any financial arrangement |
| 12:00:57 | 20 | that may exist with respect to the services of Ari |
| 12:01:03 | 21 | Emanuel regarding any transaction for your Superman |
| 12:01:07 | 22 | rights? |
| 12:01:08 | 23 | A.   I'm not aware of anything like that. |
| 12:01:10 | 24 | Q.   So for example, if your Superman rights were |
| 12:01:15 | 25 | sold in a transaction to Paramount Pictures, to your |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 97

| | | |
|---|---|---|
| 12:01:21 | 1 | knowledge, would Ari Emanuel receive a fee of any |
| 12:01:25 | 2 | kind? |
| 12:01:25 | 3 | A.   I don't believe so. |
| 12:01:28 | 4 | Q.   It's your view that you have no current |
| 12:01:30 | 5 | agreements with him at all; is that right? |
| 12:01:33 | 6 | A.   I believe so, yes. |
| 12:01:35 | 7 | Q.   Based on the totality of your financial |
| 12:01:41 | 8 | arrangements, if you entered into a transaction to |
| 12:01:46 | 9 | sell your Superman rights today, what would be the |
| 12:01:55 | 10 | percentage of the gross proceeds that you would be |
| 12:01:58 | 11 | obligated to pay? |
| 12:01:59 | 12 | MR. TOBEROFF:  Wait.  If you can answer that |
| 12:02:07 | 13 | without revealing the contents of the consent |
| 12:02:11 | 14 | agreement, I would allow you to answer that question |
| 12:02:14 | 15 | if you know the answer.  Otherwise I instruct you not |
| 12:02:16 | 16 | to answer. |
| 12:02:21 | 17 | THE WITNESS:  You know, I really don't know |
| 12:02:24 | 18 | exactly what it is. |
| | 19 | BY MR. PETROCELLI: |
| 12:02:29 | 20 | Q.   Well, you do know; right?  I mean you do know |
| 12:02:32 | 21 | the terms that you have with Mr. Toberoff; correct? |
| 12:02:37 | 22 | A.   Not separately from the instruction that I |
| 12:02:41 | 23 | received. |
| 12:02:41 | 24 | Q.   Well, the instruction had to do with the |
| 12:02:43 | 25 | consent agreement.  The financial terms, at least some |

**EXHIBIT 81**
**2110**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 98

| | | |
|---|---|---|
| 12:02:48 | 1 | of them, have already been disclosed to us with |
| 12:02:51 | 2 | respect to the litigation retainer agreement. |
| 12:02:53 | 3 | A.   Oh, okay.  Sometimes it gets confusing |
| 12:02:55 | 4 | because we're talking about so many agreements, you |
| 12:02:57 | 5 | know. |
| 12:02:58 | 6 | Q.   Okay.  So let me see if I can break it down |
| 12:03:00 | 7 | for you. |
| 12:03:00 | 8 | A.   All right. |
| 12:03:01 | 9 | Q.   If there were a transaction today for the |
| 12:03:03 | 10 | sale of your Superman rights, you would have to pay |
| 12:03:10 | 11 | Mr. Toberoff 33 to 40 percent based on your agreement; |
| | 12 | is that correct? |
| 12:03:14 | 13 | A.   I believe so. |
| 12:03:15 | 14 | Q.   And would that be 33 or 40 percent?  Do you |
| 12:03:21 | 15 | know?  What range applies as of today? |
| 12:03:36 | 16 | A.   I believe because we had an initial trial |
| 12:03:45 | 17 | before -- was that considered a trial with Judge |
| 12:03:50 | 18 | Larson? |
| 12:03:51 | 19 | Q.   Well, Mr. Toberoff has -- would certainly |
| 12:03:55 | 20 | suggest that it was. |
| 12:03:57 | 21 | A.   I mean, you know, what's the definition of a |
| 12:04:00 | 22 | trial, yes.  Okay. |
| 12:04:02 | 23 | Q.   So an argument could be made that the current |
| 12:04:05 | 24 | percentage of 40 percent is owed; correct?  If that |
| 12:04:10 | 25 | were a trial? |

EXHIBIT 81
2111

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 99

| 12:04:10 | 1 | A. If it were a trial, yes. |

12:04:12    2    Q.    Okay.  So besides that 40 percent to

12:04:22    3    Mr. Toberoff, is there any other percent that would

12:04:26    4    have to be paid to Mr. Toberoff?

12:04:31    5    A.    No.

12:04:32    6    Q.    Is there any other fee that would have to be

12:04:35    7    paid to Mr. Toberoff?

12:04:38    8    A.    No.  I can't think of any.

12:04:39    9    Q.    Any other type of remuneration of any kind

12:04:42    10    that would be paid to Mr. Toberoff?

12:04:44    11    A.    You know, I think that there were some --

12:04:47    12    some costs that were advanced.

12:04:49    13    Q.    Besides that.

12:04:50    14    A.    Other than costs, no.

12:04:51    15    Q.    Okay.  Is there anything in the 2008 consent

12:04:56    16    agreement that would trigger additional remuneration

12:05:01    17    to Mr. Toberoff based on a transaction of the Siegel

12:05:05    18    rights?

12:05:06    19    MR. TOBEROFF:  I -- I will allow you to

12:05:09    20    answer as to -- because what is not in the agreement

12:05:13    21    would not be privileged.  Did I say that right?

12:05:18    22    MR. PETROCELLI:  You did.

12:05:18    23    MR. TOBEROFF:  Some things not in the

12:05:20    24    agreement we are not asserting privilege.  We are

12:05:24    25    asserting privilege to what is in the agreement.  So

EXHIBIT 81
2112

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 100

| 12:05:25 | 1 | to that extent, you can answer the question. |
| 12:05:27 | 2 | THE WITNESS:  Well, there's no -- I can never |
| 12:05:28 | 3 | say the word.  What is it?  Remuneration?  There's |
| 12:05:33 | 4 | no -- you know what I'm talking about.  There's no |
| 12:05:35 | 5 | additional percentage. |
| | 6 | BY MR. PETROCELLI: |
| 12:05:38 | 7 | Q.   To Mr. Toberoff. |
| 12:05:39 | 8 | A.   To Mr. Toberoff. |
| 12:05:40 | 9 | Q.   As a result of anything in the consent |
| 12:05:42 | 10 | agreement. |
| 12:05:43 | 11 | A.   Correct. |
| 12:05:43 | 12 | Q.   Correct? |
| 12:05:45 | 13 | A.   Correct. |
| 12:05:46 | 14 | Q.   Okay.  And to your knowledge, would there be |
| 12:05:50 | 15 | any percentage -- in addition to the 40 to |
| 12:05:56 | 16 | Mr. Toberoff, would there be any percentage or any fee |
| 12:05:59 | 17 | payable to Ari Emanuel or any of his companies? |
| 12:06:05 | 18 | A.   No. |
| 12:06:06 | 19 | Q.   So to your knowledge, he would not |
| 12:06:08 | 20 | participate at all in any current transaction. |
| 12:06:12 | 21 | MR. TOBEROFF:  Asked and answered. |
| | 22 | BY MR. PETROCELLI: |
| 12:06:13 | 23 | Q.   Is that correct? |
| 12:06:13 | 24 | A.   Correct. |
| 12:06:18 | 25 | Q.   Out of the 60 percent or other proceeds that |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 101

```
12:06:22    1    you would receive, putting aside Mr. Toberoff's 40
12:06:27    2    percent, would you have to share any of those proceeds
12:06:31    3    with anyone else as a result of any contractual
12:06:34    4    arrangements that you currently have?
12:06:36    5         MR. TOBEROFF:  I instruct you not to answer
12:06:38    6    to the extent your answer would necessarily reveal the
12:06:45    7    substance of the consent agreement held to be
12:06:48    8    privileged.
12:06:50    9         MR. PETROCELLI:  May I just take one shot at
12:06:51   10    you on this, Marc, because what the court held was
12:06:56   11    that a particular document, at least on that record,
12:07:03   12    was not discoverable at this time.  But the court did
12:07:07   13    not hold that any and all financial arrangements or
12:07:11   14    contractual arrangements between the parties or
12:07:18   15    between witnesses, and these parties are also
12:07:22   16    witnesses, are barred from discovery.  It goes
12:07:26   17    directly, among other things, to motive and --
12:07:31   18         MR. TOBEROFF:  I think --
12:07:32   19         MR. PETROCELLI:  -- a host of other
12:07:33   20    credibility issues.
12:07:34   21         MR. TOBEROFF:  I think I stated my
12:07:36   22    instruction, and if I wasn't clear -- I thought it was
12:07:38   23    clear.
12:07:39   24         MR. PETROCELLI:  The existence of those
12:07:41   25    arrangements are relevant and would be discoverable in
```

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 102

12:07:45    1    any case.

12:07:47    2            MR. TOBEROFF:  I said she can't disclose to

12:07:49    3    the extent there is another agreement out there in

12:07:54    4    which she's sharing her proceeds.  Other than anything

12:07:59    5    that speaks to that in the consent agreement she can

12:08:02    6    testify.

12:08:02    7            MR. PETROCELLI:  I'm suggesting to you that

12:08:03    8    the court did not issue an order categorically ruling

12:08:15    9    that we are unable to discover financial or

12:08:19    10   contractual arrangements between the parties even if

12:08:25    11   reflected in the consent agreement.

12:08:28    12           MR. TOBEROFF:  I -- the court doesn't have to

12:08:29    13   use those exact words.

12:08:31    14           MR. PETROCELLI:  I didn't say it had to use

12:08:32    15   those exact words, but that's the essence of your

12:08:34    16   position.

12:08:35    17           MR. TOBEROFF:  I disagree.  There are

12:08:37    18   certain -- the court held that the contents of that

12:08:40    19   document are privileged, and that therefore, if your

12:08:44    20   question by necessity requires her to divulge -- or it

12:08:48    21   may or may not, but to the extent it requires her to

12:08:52    22   divulge contents of the consent agreement, I'm

12:08:55    23   instructing her not to answer.

12:09:04    24           MR. PETROCELLI:  Okay.  Well, to the

12:09:04    25   extent --

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 103

| 12:09:04 | 1 | MR. TOBEROFF: Well, if she answers in the |
| 12:09:06 | 2 | negative where she's not implicating any of the |
| 12:09:10 | 3 | contents of the consent agreement, I'm -- there's no |
| 12:09:13 | 4 | intention, to the extent I let her answer questions, |
| 12:09:15 | 5 | to waive the privilege as to the consent agreement. |
| 12:09:17 | 6 | MR. PETROCELLI: I understand that's your |
| 12:09:19 | 7 | position, but, you know, we will obviously have to |
| 12:09:23 | 8 | litigate this issue before the court. |
| 12:09:30 | 9 | MR. TOBEROFF: In other words, I don't |
| 12:09:31 | 10 | believe that you can, if there's a ruling that the |
| 12:09:33 | 11 | document is privileged, you can get around the ruling |
| 12:09:36 | 12 | by asking questions that unearth the contents of the |
| 12:09:40 | 13 | privileged documents. |
| 12:09:41 | 14 | MR. PETROCELLI: I think you've |
| 12:09:43 | 15 | misapprehended the court's ruling, and the record now |
| 12:09:46 | 16 | is different in any event. But I think we've |
| 12:09:50 | 17 | discussed it sufficient to persuade me you're not |
| 12:09:54 | 18 | going to change your mind at this deposition. So we |
| 12:09:56 | 19 | will just proceed. |
| 12:10:02 | 20 | Q. Are you aware of any other piece of paper of |
| 12:10:10 | 21 | any kind other than the consent agreement document |
| 12:10:18 | 22 | that expresses or reflects any arrangement between the |
| 12:10:25 | 23 | Siegels and the Shusters regarding the sharing of |
| 12:10:29 | 24 | proceeds? |
| 12:10:30 | 25 | MR. TOBEROFF: I instruct you not to answer |

EXHIBIT 81
2116

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 104

| 12:10:33 | 1 | to the extent that question implies the contents of |
| 12:10:36 | 2 | the consent agreement, but you can -- you can answer |
| 12:10:39 | 3 | whether there's any other document other than -- |
| 12:10:42 | 4 | there's a document -- excluding the consent agreement, |
| 12:10:45 | 5 | is there another document that provides for you to |
| 12:10:48 | 6 | share proceeds, you can answer that question. |
|  | 7 | BY MR. PETROCELLI: |
| 12:10:50 | 8 | Q.  Or that just discusses it or references or |
| 12:10:53 | 9 | mentions.  It's not that it has to be a contract in |
| 12:10:55 | 10 | and of itself.  Any piece of paper. |
| 12:10:59 | 11 | A.  I can't think of any. |
| 12:11:01 | 12 | Q.  Did you -- did you engage in any negotiations |
| 12:11:09 | 13 | with anyone regarding the terms of the consent |
| 12:11:16 | 14 | agreement? |
| 12:11:16 | 15 | A.  Could you -- could you explain that a little |
| 12:11:20 | 16 | bit better?  I don't quite understand what you mean. |
| 12:11:23 | 17 | Q.  Yeah. |
| 12:11:23 | 18 | Who created the terms in the consent |
| 12:11:28 | 19 | document? |
| 12:11:29 | 20 | MR. TOBEROFF:  Vague and ambiguous as to |
| 12:11:31 | 21 | "created." |
|  | 22 | BY MR. PETROCELLI: |
| 12:11:32 | 23 | Q.  Who came up with them? |
| 12:11:35 | 24 | A.  You mean who -- who wrote the document? |
| 12:11:39 | 25 | Q.  Not who was the scrivener who put the words |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 105

| | | |
|---|---|---|
| 12:11:42 | 1 | on the paper, but who conceived and who came up with |
| 12:11:47 | 2 | the terms that are subsequently put down in the paper? |
| 12:11:53 | 3 | A.   I think it evolved out of conversations that |
| 12:11:58 | 4 | my mother and I had with Mr. Toberoff and perhaps |
| 12:12:04 | 5 | conversations that the Shusters had with Mr. Toberoff. |
| 12:12:11 | 6 | Q.   Okay.   And do you recall that you wanted to |
| 12:12:18 | 7 | have particular provisions as part of the arrangement |
| 12:12:23 | 8 | that the Shusters had a different view about and that |
| 12:12:28 | 9 | there was kind of a back-and-forth exchange? |
| 12:12:32 | 10 | A.   I -- the way I recall it, there was -- |
| 12:12:34 | 11 | MR. TOBEROFF:   Wait.   Wait.   Wait.   Wait. |
| 12:12:35 | 12 | I'm not going to allow questions as to -- the consent |
| 12:12:40 | 13 | agreement is held to be privileged.   There's a joint |
| 12:12:42 | 14 | interest privilege between my representation of the |
| 12:12:45 | 15 | Siegels and my representation of the Shusters, the |
| 12:12:50 | 16 | Shusters we'll call them, and I'm not going to allow |
| 12:12:53 | 17 | questions as to characterizing conversations that are |
| 12:13:03 | 18 | privileged. |
| 12:13:03 | 19 | MR. PETROCELLI:   Are you instructing not to |
| 12:13:05 | 20 | answer on that question? |
| 12:13:06 | 21 | MR. TOBEROFF:   Yes. |
| | 22 | BY MR. PETROCELLI: |
| 12:13:15 | 23 | Q.   Did you agree to share in any of your |
| 12:13:21 | 24 | proceeds for this -- the disposition or sale or |
| 12:13:24 | 25 | settlement of the Siegel rights with the Shusters? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 106

| | | |
|---|---|---|
| 12:13:31 | 1 | MR. TOBEROFF:  I instruct you not to answer |
| 12:13:32 | 2 | that question to the extent that the question |
| 12:13:35 | 3 | implicates the contents of the consent agreement. |
| | 4 | BY MR. PETROCELLI: |
| 12:13:38 | 5 | Q.   Right now do you have an agreement in place |
| 12:13:41 | 6 | to share with the Shusters with respect to any sale or |
| 12:13:45 | 7 | disposition or settlement regarding the Siegel rights? |
| 12:13:50 | 8 | MR. TOBEROFF:  Same -- asked and answered. |
| 12:13:51 | 9 | Same instruction based on attorney-client privilege, |
| 12:13:55 | 10 | joint interest. |
| 12:14:07 | 11 | MR. PETROCELLI:  You know what?  This is |
| 12:14:09 | 12 | probably a good time to break. |
| 12:14:10 | 13 | THE WITNESS:  Okay. |
| 12:14:11 | 14 | MR. PETROCELLI:  We'll make it like 30 |
| 12:14:13 | 15 | minutes or 45 minutes. |
| 12:14:15 | 16 | MR. TOBEROFF:  Same objection.  Same |
| 12:14:17 | 17 | instruction.  Just kidding. |
| 12:14:18 | 18 | MR. PETROCELLI:  You're on a roll, Marc.  By |
| 12:14:21 | 19 | the way, that's not much different than your other |
| 12:14:23 | 20 | instructions. |
| 12:14:24 | 21 | THE VIDEOGRAPHER:  Off the record.  The time |
| 12:14:25 | 22 | is 12:14. |
| 12:14:27 | 23 | (Lunch recess taken at 12:14 p.m.) |
| | 24 | |
| | 25 | |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 107

|  |  |  |
|---|---|---|
| | 1 | LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011 |
| | 2 | 1:29 P.M. |
| | 3 | |
| 12:15:00 | 4 | (Whereupon, Ms. Seto was not present.) |
| 13:29:24 | 5 | THE VIDEOGRAPHER:  We are back on the record |
| 13:29:26 | 6 | at 1:29. |
| 13:29:27 | 7 | EXAMINATION (Resumed) |
| | 8 | BY MR. PETROCELLI: |
| 13:29:27 | 9 | Q.  Ms. Siegel, we took a longer break than I had |
| 13:29:32 | 10 | expected only because I understand and was told that |
| 13:29:34 | 11 | you needed to rest, and again, that's fine, and if you |
| 13:29:39 | 12 | continue to need to rest, just let us know.  All |
| 13:29:41 | 13 | right? |
| 13:29:42 | 14 | A.  Thank you. |
| 13:29:43 | 15 | Q.  And we did find an office here for you that |
| 13:29:48 | 16 | had a couch to accommodate you. |
| 13:29:50 | 17 | A.  Good. |
| 13:29:51 | 18 | Q.  Okay.  Sorry we didn't have room service, but |
| 13:29:55 | 19 | maybe -- maybe next time. |
| 13:29:56 | 20 | A.  Not necessary. |
| 13:29:58 | 21 | Q.  Okay.  So what I would like to do is I want |
| 13:30:06 | 22 | to go back to a point in time when for point of |
| 13:30:14 | 23 | reference you had been working with the lawyers at |
| 13:30:23 | 24 | Gang Tyre in conducting negotiations with Warner Bros. |
| 13:30:26 | 25 | and DC Comics, and for point of reference, let me show |

## LAURA SIEGEL LARSON - 7/22/2011

Page 108

| | | |
|---|---|---|
| 13:30:32 | 1 | you Exhibit 48, which is a letter dated October 19, |
| 13:30:40 | 2 | 2001, from Kevin Marks to John Schulman. |
| | 3 | (Whereupon, Plaintiff's Exhibit 48 |
| 13:30:47 | 4 | was placed before the witness.) |
| | 5 | BY MR. PETROCELLI: |
| 13:30:48 | 6 | Q.   And you have already testified about this |
| 13:30:50 | 7 | letter, I believe, and I'm not going to go into it, |
| 13:30:54 | 8 | but I just want to orient you regarding the time |
| 13:30:59 | 9 | period. |
| 13:31:00 | 10 | A.   Okay. |
| 13:31:00 | 11 | Q.   So you recall that in or about October of |
| 13:31:07 | 12 | 2001 this correspondence occurred regarding your |
| 13:31:16 | 13 | negotiations with Superman -- with Warner Bros. |
| 13:31:20 | 14 | regarding Superman and receiving a copy of your |
| 13:31:24 | 15 | lawyer's letter to Mr. Schulman that's been marked as |
| 13:31:27 | 16 | Exhibit 48; right? |
| 13:31:28 | 17 | A.   Yes. |
| 13:31:30 | 18 | Q.   Indicating that your family had accepted DC |
| 13:31:35 | 19 | Comics' offer based on the terms set forth in the |
| 13:31:37 | 20 | document; correct? |
| 13:31:39 | 21 | A.   Yeah, it was a provisional acceptance. |
| 13:31:42 | 22 | Q.   Okay.  And I don't want to go through that. |
| 13:31:45 | 23 | The word "provisional" isn't in there, but you |
| 13:31:49 | 24 | testified to that in your previous deposition. |
| 13:31:51 | 25 | Now, as of this point in time, October 19, |

**EXHIBIT 81**
**2121**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 109

| | | |
|---|---|---|
| 13:31:55 | 1 | 2001, is it fair to say that through different lawyers |
| 13:32:00 | 2 | you had been in discussions and negotiations with |
| 13:32:04 | 3 | Warner Bros. and DC Comics for a number of years? |
| 13:32:08 | 4 | Correct? |
| 13:32:08 | 5 | A.   A long time. |
| 13:32:11 | 6 | Q.   Going back to when -- even before the notices |
| 13:32:14 | 7 | of termination were served in 1997; right? |
| 13:32:18 | 8 | A.   No.  There were no negotiations before 1997. |
| 13:32:21 | 9 | Q.   But shortly -- but upon issuance of the |
| 13:32:24 | 10 | notice of termination, is that when the negotiations |
| 13:32:27 | 11 | began initially with Arthur Levine?  Correct? |
| 13:32:30 | 12 | A.   Yes, sometime during 1997. |
| 13:32:33 | 13 | Q.   Okay.  And they had been going on all the way |
| 13:32:36 | 14 | through October 19, 2001; correct? |
| 13:32:39 | 15 | A.   Yes. |
| 13:32:40 | 16 | Q.   Okay.  And they actually continued after |
| 13:32:44 | 17 | October 19, 2001.  This is not the last document in |
| 13:32:47 | 18 | the exchange; correct? |
| 13:32:49 | 19 | A.   Correct. |
| 13:32:51 | 20 | Q.   And you formally -- withdrawn. |
| 13:32:55 | 21 | You notified DC Comics at some point in time |
| 13:32:59 | 22 | that you were cutting off any further negotiations; |
| 13:33:03 | 23 | correct? |
| 13:33:03 | 24 | A.   Correct. |
| 13:33:04 | 25 | Q.   And you did so in writing; correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 110

| | | |
|---|---|---|
| 13:33:05 | 1 | A. Correct. |

13:33:07    2    Q. And you notified DC Comics for the first time

13:33:10    3    that you were cutting off negotiations in a document

13:33:13    4    sent to them in October, 2001; is that correct?

13:33:30    5    A. No.

13:33:30    6    Q. Excuse me. Let me withdraw the question.

13:33:33    7    First of all, let me find the document so I'm

13:33:35    8    not guessing on the dates. I'm a year off.

13:33:54    9    The first time that you notified DC Comics or

13:34:00    10    Warner Bros. that you were cutting off negotiations

13:34:04    11    towards an agreement with him to sell your Superman

13:34:07    12    rights was when you sent your letter dated September

13:34:11    13    21, 2002, that you signed together with your mother;

13:34:15    14    correct?

13:34:16    15    A. Yes, that's correct.

13:34:17    16    Q. Let me show you a copy of that letter. That

13:34:21    17    is Exhibit 56.

18    (Whereupon, Plaintiff's Exhibit 56

13:34:45    19    was marked for identification.)

13:34:46    20    MR. TOBEROFF: Did you say -- did you date

13:34:47    21    this letter in the last question?

13:34:50    22    MR. PETROCELLI: Yes, I'll follow up on it.

13:34:52    23    The date was in the question, but it's also in the

13:34:56    24    exhibit number. We have an exhibit number. We have a

13:35:02    25    specific document, and the document is dated September

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 111

```
13:35:04    1    21, 2002.  So let me just --
13:35:07    2            MR. TOBEROFF:  I thought you had said 2001.
13:35:10    3    Maybe I heard it wrong.
13:35:13    4            MR. PETROCELLI:  Okay.  Let's start all over
            5    again.
13:35:13    6            What's the exhibit number?
13:35:15    7            MR. TOKORO:  56.
            8    BY MR. PETROCELLI:
13:35:15    9        Q.   You have Exhibit 56 in front of you, which is
13:35:17   10    the letter that you and your mother sent to DC Comics
13:35:21   11    dated September 21, 2002, when you for the first time
13:35:25   12    cut off negotiations with them; correct?
13:35:27   13        A.   Yes.
13:35:28   14        Q.   Now, when -- did you write this letter
13:35:33   15    yourself?
13:35:34   16        A.   No.
13:35:35   17        Q.   Who wrote it?
13:35:36   18        A.   My mother with some input from me.
13:35:40   19        Q.   Well, your mother didn't type.
13:35:42   20        A.   Well, she wrote it.  She wrote it out in
13:35:46   21    longhand.
13:35:46   22        Q.   How do you know?
13:35:47   23        A.   How do I know?
13:35:48   24        Q.   Yeah.
13:35:50   25        A.   She gave it to me.
```

**EXHIBIT 81**
**2124**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 112

| | | |
|---|---|---|
| 13:35:50 | 1 | Q.   Where is the -- you have the paper that she |
| 13:35:55 | 2 | gave you? |
| 13:35:56 | 3 | A.   I don't know. |
| 13:35:57 | 4 | Q.   What did she write it on? |
| 13:36:04 | 5 | A.   A piece of paper this big.  Sometimes she |
| 13:36:07 | 6 | would write -- I don't remember this specific one. |
| 13:36:10 | 7 | Sometimes she would write on a yellow pad.  Sometimes |
| 13:36:13 | 8 | she would write on a white pad. |
| 13:36:15 | 9 | Q.   Did you type it? |
| 13:36:17 | 10 | A.   Yes. |
| 13:36:17 | 11 | Q.   Where did you type it? |
| 13:36:19 | 12 | A.   I typed it on my computer. |
| 13:36:21 | 13 | Q.   Your computer at your home? |
| 13:36:23 | 14 | A.   Yes. |
| 13:36:24 | 15 | Q.   That was which computer?  The PC that you |
| 13:36:30 | 16 | said you had? |
| 13:36:30 | 17 | A.   Yes. |
| 13:36:34 | 18 | Q.   Did you show this letter to anybody after |
| 13:36:38 | 19 | typing it before it went out? |
| 13:36:40 | 20 | A.   No.  Just my mother and I saw it. |
| 13:36:42 | 21 | Q.   Well, I'm curious about that.  You had |
| 13:36:46 | 22 | Mr. Levine.  You had Mr. -- what's George's last name? |
| 13:36:52 | 23 | A.   Zadrozny. |
| 13:36:53 | 24 | Q.   Zadrozny. |
| 13:36:54 | 25 | A.   You pronounced it correctly. |

Merrill  Corporation  -  Los Angeles

EXHIBIT 81
2125

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 113

| | | |
|---|---|---|
| 13:36:56 | 1 | Q.    You had Mr. Zadrozny.  You didn't have him |
| 13:36:59 | 2 | take a look at this before it went out? |
| 13:37:01 | 3 | A.    I don't recall us having them look at it. |
| 13:37:04 | 4 | Q.    And you had certainly been in touch with |
| 13:37:06 | 5 | Mr. Toberoff by this time, September 21, 2002. |
| 13:37:14 | 6 | A.    We had only learned of his existence at a |
| 13:37:23 | 7 | point shortly before this, but he -- you know, he |
| 13:37:29 | 8 | didn't see this, if that's what you're asking me. |
| 13:37:33 | 9 | Q.    How do you know he didn't see it?  You didn't |
| 13:37:35 | 10 | show it to him.  Is that what you're saying? |
| 13:37:37 | 11 | A.    Correct. |
| 13:37:44 | 12 | Q.    You said it was shortly before this letter, |
| 13:37:48 | 13 | Exhibit 56, which is dated September 21, 2002, that |
| 13:37:52 | 14 | you first interacted with Mr. Toberoff? |
| 13:37:57 | 15 | MR. TOBEROFF:  Misstates her testimony. |
| | 16 | BY MR. PETROCELLI: |
| 13:37:59 | 17 | Q.    That you first interacted with Mr. Toberoff? |
| 13:38:02 | 18 | MR. TOBEROFF:  Misstates the testimony. |
| 13:38:03 | 19 | THE WITNESS:  No, that we were first informed |
| 13:38:06 | 20 | of him. |
| | 21 | BY MR. PETROCELLI: |
| 13:38:08 | 22 | Q.    Is it your testimony that you never spoke to |
| 13:38:13 | 23 | Mr. Toberoff prior to September 21, 2002? |
| 13:38:17 | 24 | A.    I don't recall speaking with him before then. |
| 13:38:19 | 25 | Q.    Can you say so with certainty? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 114

| | | |
|---|---|---|
| 13:38:23 | 1 | A.    I can't say so with absolute certainty. |
| 13:38:27 | 2 | Q.    Okay.  And do you have any way of refreshing |
| 13:38:33 | 3 | your recollection as to the exact date that you first |
| 13:38:36 | 4 | spoke to Mr. Toberoff? |
| 13:38:41 | 5 | A.    Well, my mother first spoke to Mr. Toberoff, |
| 13:38:46 | 6 | so -- |
| 13:38:46 | 7 | Q.    Before you did? |
| 13:38:47 | 8 | A.    Yes. |
| 13:38:50 | 9 | Q.    Do you know with certainty the date your |
| 13:38:53 | 10 | mother first spoke to Mr. Toberoff? |
| 13:38:54 | 11 | A.    No, I don't. |
| 13:38:56 | 12 | Q.    Do you know whether it was -- well, it was |
| 13:39:02 | 13 | certainly before September 21, 2002; correct? |
| 13:39:05 | 14 | A.    No.  I said I don't know when it was. |
| 13:39:08 | 15 | Q.    Nor do you know when your mother first spoke |
| 13:39:12 | 16 | with Mr. Toberoff; is that correct? |
| 13:39:13 | 17 | A.    Yes.  I don't know when she spoke to him. |
| 13:39:16 | 18 | Q.    Okay.  And you have no way of dating when |
| 13:39:19 | 19 | your mother first spoke with Mr. Toberoff just like |
| 13:39:21 | 20 | you don't have any way of dating when you did; |
| 13:39:23 | 21 | correct? |
| 13:39:23 | 22 | A.    Yes. |
| 13:39:24 | 23 | Q.    Okay.  Did you keep a calendar of |
| 13:39:29 | 24 | appointments, you know, like a daily reminder book or |
| 13:39:32 | 25 | anything else in which you made appointments? |

LAURA SIEGEL LARSON - 7/22/2011

Page 115

| 13:39:34 | 1 | A. No, not really. |
| 13:39:35 | 2 | Q. Or did you do so on your computer? |
| 13:39:39 | 3 | A. No. |
| 13:39:39 | 4 | Q. Did your mother? |
| 13:39:40 | 5 | A. No. |

13:39:41    6        Q.   Not on the computer, but let's say some kind

13:39:44    7    of appointment book?  Did she keep anything like that?

13:39:46    8        A.   Not that I'm aware of.

13:39:59    9        Q.   You had -- by the way, when your -- how did

13:40:05   10    you find out about your mother's first contact with

13:40:11   11    Mr. Toberoff?

13:40:11   12        A.   Well, she told me.

13:40:13   13        Q.   Did she tell you before she spoke with him or

13:40:16   14    after she spoke with him?

13:40:18   15        A.   No.  She was -- she -- we had been looking

13:40:23   16    for attorneys, and we had been talking to, you know,

13:40:27   17    different people.  I had been doing research to try

13:40:29   18    and -- you know, like the Gerry Spence research that I

13:40:33   19    was doing.  We were -- but it wasn't an easy process

13:40:36   20    trying to find, you know, an attorney that would be

13:40:40   21    willing to on a contingency fee -- excuse me -- on a

13:40:46   22    contingency fee that did not have a conflict with

13:40:52   23    Warner Bros. to, you know, to find additional

13:40:57   24    representation.

13:40:58   25        Q.   Did you talk to Gerry Spence or your mother

## LAURA SIEGEL LARSON - 7/22/2011

Page 116

| | | |
|---|---|---|
| 13:41:01 | 1 | talk to Gerry Spence or communicate with Gerry Spence |
| 13:41:03 | 2 | in some way in 2002? |
| 13:41:08 | 3 | A.   Yes. |
| 13:41:08 | 4 | Q.   Is that the only time you communicated with |
| 13:41:10 | 5 | him? |
| 13:41:10 | 6 | A.   Yes, because he appeared to have a conflict |
| 13:41:12 | 7 | of interest. |
| 13:41:13 | 8 | Q.   And that was the end of it? |
| 13:41:15 | 9 | A.   Yes. |
| 13:41:16 | 10 | Q.   Okay.  The -- did you -- your mother found |
| 13:41:35 | 11 | out about Mr. Toberoff from whom? |
| 13:41:36 | 12 | A.   From Jean Peavy. |
| 13:41:38 | 13 | Q.   And then she informed you, your mother did. |
| 13:41:44 | 14 | A.   Yes. |
| 13:41:44 | 15 | Q.   You were not on the call with -- |
| 13:41:46 | 16 | A.   No. |
| 13:41:46 | 17 | Q.   Okay.  And do you know from the time she told |
| 13:41:51 | 18 | you about Mr. Toberoff how long it was thereafter that |
| 13:41:59 | 19 | she met with Mr. Toberoff or spoke with him, "she" |
| 13:42:02 | 20 | being your mother? |
| 13:42:03 | 21 | A.   I don't really know. |
| 13:42:04 | 22 | Q.   In other words, did your mother come to you |
| 13:42:07 | 23 | and say, "Hey, there's some person named Marc Toberoff |
| 13:42:10 | 24 | that Jean Peavy told me about.  I would like you to do |
| 13:42:12 | 25 | some research into him or check into him"?  Did she |

## Merrill  Corporation  -  Los Angeles

**EXHIBIT 81**
**2129**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 117

| | | |
|---|---|---|
| 13:42:16 | 1 | have that kind of conversation with you? |
| 13:42:18 | 2 | A.   She said, "It sounds interesting.  You know, |
| 13:42:21 | 3 | we should probably look into this some more." |
| 13:42:24 | 4 | Q.   And what did you do to look into it? |
| 13:42:32 | 5 | A.   I'm trying to remember.  I think -- I think I |
| 13:42:37 | 6 | searched his name on the Internet, you know, to see if |
| 13:42:41 | 7 | there was any information on him. |
| 13:42:43 | 8 | Q.   What did you find out from the Internet |
| 13:42:47 | 9 | search? |
| 13:42:47 | 10 | A.   I -- it's hard to remember.  It's a long time |
| 13:42:50 | 11 | ago, but I think that there was like a press article |
| 13:42:55 | 12 | or something about his involvement in some |
| 13:42:59 | 13 | intellectual property rights cases in which he was |
| 13:43:02 | 14 | protecting the interests of authors and creators. |
| 13:43:06 | 15 | Q.   Did you print that material? |
| 13:43:08 | 16 | A.   I did at the time, yeah. |
| 13:43:09 | 17 | Q.   And did you keep a copy of it? |
| 13:43:12 | 18 | A.   I did at that time, yeah, and I shared it |
| 13:43:16 | 19 | with my mother. |
| 13:43:18 | 20 | Q.   Do you still have it in your papers at home? |
| 13:43:20 | 21 | A.   I doubt it -- |
| 13:43:22 | 22 | Q.   You kept -- |
| 13:43:23 | 23 | A.   -- because I've been -- |
| 13:43:24 | 24 | Q.   -- the Gerry Spence material, but you didn't |
| 13:43:27 | 25 | keep the Marc Toberoff material? |

LAURA SIEGEL LARSON - 7/22/2011

Page 118

| | | |
|---|---|---|
| 13:43:27 | 1 | A.  I didn't keep the Gerry Spence material.  My |
| 13:43:31 | 2 | mom did.  It was among her things. |
| 13:43:35 | 3 | Q.  But you gave it to her because you downloaded |
| 13:43:35 | 4 | it from the computer; right? |
| 13:43:37 | 5 | A.  Yes, yes. |
| 13:43:37 | 6 | Q.  And did you find the materials that you |
| 13:43:38 | 7 | downloaded about Mr. Toberoff when you went through |
| 13:43:42 | 8 | your mom's files? |
| 13:43:44 | 9 | A.  I have not found it. |
| 13:43:46 | 10 | Q.  Have you gone through everything yet? |
| 13:43:49 | 11 | A.  No. |
| 13:43:49 | 12 | Q.  Okay.  You're still working through it? |
| 13:43:50 | 13 | A.  Yes. |
| 13:43:54 | 14 | Q.  Other than the Internet search, did you do |
| 13:43:57 | 15 | anything else to research Mr. Toberoff? |
| 13:44:00 | 16 | A.  Well, my mother did. |
| 13:44:02 | 17 | Q.  How do you know that? |
| 13:44:03 | 18 | A.  She told me. |
| 13:44:05 | 19 | Q.  And what did she tell you? |
| 13:44:06 | 20 | A.  She told me that she -- and this was at the |
| 13:44:11 | 21 | point when she called Mr. Toberoff and said that she |
| 13:44:15 | 22 | had gotten his name from Jean Peavy and she was |
| 13:44:19 | 23 | interested in knowing, you know, who he had |
| 13:44:22 | 24 | represented and, you know, what his attitude was |
| 13:44:26 | 25 | towards -- towards intellectual property.  So they had |

**EXHIBIT 81**
**2131**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 119

| | | |
|---|---|---|
| 13:44:30 | 1 | a conversation. |
| 13:44:30 | 2 | Q.   You're now reporting what your mother told |
| 13:44:33 | 3 | you about her first conversation with Mr. Toberoff; |
| 13:44:35 | 4 | right? |
| 13:44:35 | 5 | A.   Yes. |
| 13:44:36 | 6 | Q.   But before that first conversation, before |
| 13:44:39 | 7 | Mr. Toberoff -- before she called Mr. Toberoff -- |
| 13:44:44 | 8 | well, let me ask you that question.  We lawyers |
| 13:44:48 | 9 | shouldn't assume anything, so forgive me for having to |
| 13:44:51 | 10 | ask so many questions. |
| 13:44:53 | 11 | Did she call Mr. Toberoff first, or did he |
| 13:44:57 | 12 | call her based on, you know, some reference that he |
| 13:45:01 | 13 | had been given? |
| 13:45:02 | 14 | A.   No.  Jean Peavy gave his phone number to my |
| 13:45:04 | 15 | mom, and my mom called him. |
| 13:45:07 | 16 | Q.   Okay.  And before your mom called |
| 13:45:10 | 17 | Mr. Toberoff, you had already given your mom the |
| 13:45:14 | 18 | downloaded commuter material about him? |
| 13:45:16 | 19 | A.   No.  No. |
| 13:45:17 | 20 | Q.   No.  So the sequence of events was Jean Peavy |
| 13:45:21 | 21 | told your mother about Mr. Toberoff, and without |
| 13:45:23 | 22 | consulting you, your mother then called Mr. Toberoff |
| 13:45:27 | 23 | and then reported the conversation to you? |
| 13:45:29 | 24 | A.   No.  I think -- well, you know, I'm trying to |
| 13:45:32 | 25 | remember it.  I think -- I think she had the |

EXHIBIT 81
2132

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 120

| | | |
|---|---|---|
| 13:45:36 | 1 | conversation with Jean.  She told me about it, and |
| 13:45:40 | 2 | then she said, you know, "We should be looking" -- "We |
| 13:45:44 | 3 | should look into this," and probably around that time |
| 13:45:48 | 4 | I started looking up things on the Internet, and she |
| 13:45:51 | 5 | placed a call to him because she had gotten his phone |
| 13:45:54 | 6 | number from Jean. |
| 13:45:56 | 7 | Q.    And you don't know whether you had given her |
| 13:45:59 | 8 | the Internet materials before or after her phone call |
| 13:46:03 | 9 | with Mr. Toberoff? |
| 13:46:05 | 10 | A.    No, I don't remember. |
| 13:46:06 | 11 | Q.    Okay.  And so after the first phone call that |
| 13:46:10 | 12 | she reported to you -- |
| 13:46:10 | 13 | A.    Um-hum. |
| 13:46:11 | 14 | Q.    -- what was the next thing that happened? |
| 13:46:13 | 15 | A.    Well, she had asked for him to -- |
| 13:46:15 | 16 | MR. TOBEROFF:  Okay.  I just want to say |
| 13:46:17 | 17 | that -- |
| 13:46:17 | 18 | THE WITNESS:  Yeah. |
| 13:46:18 | 19 | MR. TOBEROFF:  -- when it comes to general |
| 13:46:22 | 20 | subject matter of a conversation in these |
| 13:46:25 | 21 | conversations, you can disclose it, but I don't want |
| 13:46:28 | 22 | you to disclose what your mother said I said to her or |
| 13:46:31 | 23 | she said to me -- |
| 13:46:33 | 24 | THE WITNESS:  Okay. |
| 13:46:34 | 25 | MR. TOBEROFF:  -- because that would be |

**EXHIBIT 81**
**2133**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 121

| 13:46:35 | 1 | privileged. |

13:46:36    2         MR. PETROCELLI:  Well, I disagree.

13:46:38    3         MR. TOBEROFF:  Even if she had not yet

13:46:38    4  retained me.

13:46:39    5         MR. PETROCELLI:  But we're going to have to

13:46:40    6  make a record here.  So if your lawyer instructs you

13:46:45    7  not to answer, that's one thing, but I don't want you

13:46:47    8  to answer my questions in a misleading way.  So I'll

13:46:50    9  just ask the questions, and either you'll answer or he

13:46:53   10  will instruct you not to answer.

13:46:54   11         THE WITNESS:  Um-hum.  Um-hum.

13:46:56   12         MR. PETROCELLI:  Okay.

13:46:56   13     Q.   So I think my question was after this initial

13:46:59   14  phone call and you downloaded the material on

13:47:08   15  Mr. Toberoff, what was the next step in terms of any

13:47:11   16  further contacts with Mr. Toberoff?

13:47:13   17     A.   Well, my mother wanted references, you know,

13:47:17   18  of other people that he had represented so that she

13:47:21   19  could, you know, interview them and get a feel for

13:47:25   20  what they thought of him and his work.

13:47:30   21     Q.   Your mother wanted references?

13:47:31   22     A.   Yes.

13:47:32   23     Q.   And then she asked you to go and get them?

13:47:36   24     A.   No.  She obtained them.

13:47:38   25     Q.   How do you know that?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 122

| | | |
|---|---|---|
| 13:47:41 | 1 | By the way, I have to keep asking you that |
| 13:47:43 | 2 | because your mom is not here to testify. |
| 13:47:45 | 3 | A.   I understand. |
| 13:47:46 | 4 | Q.   Okay. |
| 13:47:47 | 5 | A.   No.  She gave me a copy of the printout of |
| 13:47:50 | 6 | the names and phone numbers of the people. |
| 13:47:53 | 7 | Q.   Do you still have a copy of the printout? |
| 13:47:55 | 8 | A.   I don't know. |
| 13:47:57 | 9 | Q.   Okay.  When you say a printout, what do you |
| 13:48:02 | 10 | mean by that? |
| 13:48:03 | 11 | A.   Well, I remember it was typed, but, you know, |
| 13:48:07 | 12 | I don't -- I don't know whether it came by -- by |
| 13:48:11 | 13 | e-mail or whether it was mailed to her.  That part I |
| 13:48:14 | 14 | don't remember. |
| 13:48:14 | 15 | Q.   How would it have come -- it wouldn't have |
| 13:48:17 | 16 | come from your mother to you by e-mail; right? |
| 13:48:20 | 17 | A.   No, that's true.  That's true, because she |
| 13:48:22 | 18 | didn't get it by e-mail.  So she must have -- it could |
| 13:48:26 | 19 | have been faxed to her because she had a fax machine, |
| 13:48:29 | 20 | so it was either faxed to her or it was mailed to her. |
| 13:48:32 | 21 | Q.   And do you know who gave it to her, this |
| 13:48:35 | 22 | list? |
| 13:48:35 | 23 | A.   Mr. Toberoff. |
| 13:48:37 | 24 | Q.   I see.  Do you know any of the names on the |
| 13:48:44 | 25 | list? |

**EXHIBIT 81**
**2135**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 123

| | | | |
|---|---|---|---|
| 13:48:44 | 1 | A. | Oh, I can't remember exactly. |
| 13:48:49 | 2 | Q. | Did you contact any of the people? |
| 13:48:51 | 3 | A. | My mother did.  My mother -- I was very |

13:48:55    4    involved in something at that time, so --

13:48:57    5        Q.    That was your divorce?

13:49:00    6        A.    It -- yeah.

13:49:00    7        Q.    Your divorce was around 2000; right?

13:49:03    8        A.    No.  We separated in 2000, and I was heavily

13:49:05    9    involved in divorce matters until -- it was either --

13:49:08   10    I think it was 2005 when things finally wrapped up.

13:49:13   11        Q.    When you said you were involved with

13:49:16   12    something in 2002 around this time period --

13:49:19   13        A.    Um-hum

13:49:19   14        Q.    -- that we're discussing, what were you

13:49:22   15    involved in?

13:49:22   16        A.    It could very well have been my divorce, or

13:49:25   17    it could have been illness on my part because my

13:49:29   18    multiple sclerosis and other illnesses that I have.

13:49:32   19        Q.    When --

13:49:32   20        A.    But she took the initiative to make the phone

13:49:35   21    calls, and this is what I'm saying.

13:49:37   22        Q.    Okay.  And she contacted the references?  You

13:49:40   23    didn't contact any of them; is that right?

13:49:44   24        A.    I think I did contact one of them.

13:49:46   25        Q.    Who did you contact?

**EXHIBIT 81**
**2136**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 124

| | | |
|---|---|---|
| 13:49:54 | 1 | A.  I don't know.  Maybe if I have some more time |
| 13:49:56 | 2 | to think about it, maybe it will come back to me. |
| 13:49:58 | 3 | Q.  You'll -- |
| 13:49:59 | 4 | A.  I'll think about it. |
| 13:50:01 | 5 | Q.  You'll let me know.  Okay? |
| 13:50:02 | 6 | A.  Yeah.  Yeah.  I mean I'll try and remember. |
| 13:50:12 | 7 | Q.  Do you remember any of the names your mom |
| 13:50:19 | 8 | contacted? |
| 13:50:21 | 9 | A.  Right here today at this minute, no.  I have |
| 13:50:28 | 10 | a mental picture of the page and with things typed on |
| 13:50:32 | 11 | it, but it's not clear enough for me to focus on, you |
| 13:50:35 | 12 | know, the names that were on it. |
| 13:50:37 | 13 | Q.  And you think it was a page that came from |
| 13:50:40 | 14 | Mr. Toberoff's office? |
| 13:50:40 | 15 | A.  Yes. |
| 13:50:42 | 16 | Q.  And it had several names on it? |
| 13:50:45 | 17 | A.  I -- I think it had at least three.  There |
| 13:50:48 | 18 | may have been more. |
| 13:51:00 | 19 | Q.  When is the last time you saw that piece of |
| 13:51:03 | 20 | paper? |
| 13:51:03 | 21 | A.  It's been a number of years. |
| 13:51:10 | 22 | Q.  After you and/or your mom made the phone |
| 13:51:16 | 23 | calls, did you and she discuss what you had learned? |
| 13:51:19 | 24 | A.  Yes. |
| 13:51:20 | 25 | Q.  Okay.  And you received, I assume, favorable |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 125

| | | |
|---|---|---|
| 13:51:25 | 1 | reports? |
| 13:51:25 | 2 | A.   Yes.  She -- very favorable. |
| 13:51:29 | 3 | Q.   What was the next thing that then happened in |
| 13:51:32 | 4 | terms of contacting Mr. Toberoff? |
| 13:51:39 | 5 | A.   I think -- I think my mother said, you know, |
| 13:51:46 | 6 | "Maybe we should -- we should talk to him in person |
| 13:51:49 | 7 | and, you know, see if we like him." |
| 13:51:54 | 8 | Q.   And did that happen? |
| 13:51:55 | 9 | A.   Yes. |
| 13:51:56 | 10 | Q.   Who met with him? |
| 13:51:58 | 11 | A.   My mother and I. |
| 13:52:02 | 12 | Q.   And anyone else present? |
| 13:52:04 | 13 | A.   No. |
| 13:52:04 | 14 | Q.   Just you, your mother, and Mr. Toberoff? |
| 13:52:07 | 15 | A.   That's right. |
| 13:52:07 | 16 | Q.   And where was that meeting? |
| 13:52:09 | 17 | A.   It was in Beverly Hills. |
| 13:52:12 | 18 | Q.   At his -- |
| 13:52:12 | 19 | A.   An office in Beverly Hills. |
| 13:52:14 | 20 | Q.   His office? |
| 13:52:17 | 21 | A.   That first meeting I think we went to a |
| 13:52:20 | 22 | restaurant.  But -- no, no, no.  I think we met at the |
| 13:52:24 | 23 | Endeavor offices in a conference room. |
| 13:52:28 | 24 | Q.   Was Mr. Emanuel present at all? |
| 13:52:31 | 25 | A.   No, he was not. |

**Merrill  Corporation  -  Los Angeles**

800-826-0277                          www.merillcorp.com/law

EXHIBIT 81
2138

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 126

| | | |
|---|---|---|
| 13:52:31 | 1 | Q.    Did you -- when you were at the offices of |
| 13:52:37 | 2 | Endeavor meeting Mr. Toberoff, that was your first |
| 13:52:39 | 3 | time meeting with him; right? |
| 13:52:40 | 4 | A.    That's right. |
| 13:52:41 | 5 | Q.    And you had heard of Mr. Emanuel by then; |
| 13:52:55 | 6 | correct? |
| 13:52:55 | 7 | A.    No, we had not. |
| 13:52:57 | 8 | Q.    Did you ask why -- |
| 13:52:58 | 9 | A.    Oh, wait, wait, wait.  I'm sorry.  Yes, we |
| 13:53:00 | 10 | did. |
| 13:53:00 | 11 | Q.    Yeah, you were meeting in his firm; right? |
| 13:53:02 | 12 | A.    Yeah, but it wasn't -- he wasn't a part of |
| 13:53:05 | 13 | the discussion. |
| 13:53:08 | 14 | Q.    Did you ask why you were meeting in his |
| 13:53:11 | 15 | office? |
| 13:53:11 | 16 | A.    I think -- |
| 13:53:14 | 17 | MR. TOBEROFF:  Vague and ambiguous. |
| 13:53:16 | 18 | THE WITNESS:  We weren't meeting in his |
| 13:53:18 | 19 | office.  We were meeting in a conference room, and, |
| 13:53:22 | 20 | you know, there was no meeting with Mr. Emanuel. |
| | 21 | BY MR. PETROCELLI: |
| 13:53:28 | 22 | Q.    You said you had heard of him by then. |
| 13:53:31 | 23 | A.    I'm sorry.  Had heard of Mr. -- |
| 13:53:32 | 24 | Q.    Thank you.  You said you had heard of |
| 13:53:35 | 25 | Mr. Emanuel -- |

## Merrill Corporation - Los Angeles

**EXHIBIT 81**
**2139**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 127

| | | |
|---|---|---|
| 13:53:35 | 1 | A.   Okay. |
| 13:53:35 | 2 | Q.   -- as of the date that you were meeting with |
| 13:53:38 | 3 | Mr. Toberoff and your mother in the conference room at |
| 13:53:41 | 4 | Endeavor. |
| 13:53:41 | 5 | A.   Yes. |
| 13:53:42 | 6 | Q.   Okay.  That was on -- Endeavor's offices are |
| 13:53:47 | 7 | in Beverly Hills I think on Camden; is that correct? |
| 13:53:51 | 8 | A.   Probably. |
| 13:53:51 | 9 | Q.   Okay.  And how had you heard of Mr. Emanuel? |
| 13:53:57 | 10 | A.   Well, he was in Variety and in The Hollywood |
| 13:54:01 | 11 | Reporter, and, you know, he had a, you know, a high |
| 13:54:06 | 12 | profile as, you know, as an agent. |
| 13:54:09 | 13 | Q.   But you had also heard of him in connection |
| 13:54:13 | 14 | with Mr. Toberoff; correct?  By the time you were |
| 13:54:15 | 15 | meeting with Mr. Toberoff in the Endeavor office? |
| 13:54:18 | 16 | A.   Yes. |
| 13:54:19 | 17 | Q.   Okay.  And is that something your mother |
| 13:54:22 | 18 | learned in her conversations with Mr. Toberoff that |
| 13:54:27 | 19 | she reported to you? |
| 13:54:30 | 20 | A.   She may have mentioned that. |
| 13:54:31 | 21 | Q.   Did you uncover any of that in your research |
| 13:54:34 | 22 | at all? |
| 13:54:36 | 23 | A.   I -- I think there may have been one -- one |
| 13:54:40 | 24 | article.  I mean there were certainly, you know, |
| 13:54:43 | 25 | things on the Internet about Emanuel that I read at |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 128

| | | |
|---|---|---|
| 13:54:47 | 1 | one point or another, but what the sequence was in |
| 13:54:50 | 2 | time, I can't recall. |
| 13:54:52 | 3 | Q.  After that -- were there any documents |
| 13:55:01 | 4 | displayed or used or exchanged at that first meeting |
| 13:55:06 | 5 | with Mr. Toberoff? |
| 13:55:08 | 6 | A.  No.  It was really a -- pretty much a casual |
| 13:55:13 | 7 | meet and greet kind of thing, just "Hi," you know. |
| 13:55:19 | 8 | Q.  Before entering into the first agreement with |
| 13:55:22 | 9 | Mr. Toberoff and Mr. Emanuel in October of 2002, the |
| 13:55:25 | 10 | one that we just saw -- |
| 13:55:27 | 11 | A.  Um-hum. |
| 13:55:28 | 12 | Q.  Actually, it says "as of October, 2002," had |
| 13:55:33 | 13 | you interviewed any other people to assist in |
| 13:55:39 | 14 | connection with your Superman issues? |
| 13:55:43 | 15 | A.  I -- |
| 13:55:45 | 16 | MR. TOBEROFF:  Vague. |
| 13:55:47 | 17 | THE WITNESS:  In what time frame are you |
| 13:55:49 | 18 | talking about? |
| | 19 | BY MR. PETROCELLI: |
| 13:55:51 | 20 | Q.  Oh, in 2002. |
| 13:55:55 | 21 | A.  2002, I believe I spoke to some people on the |
| 13:56:00 | 22 | phone, you know, following things that I found on the |
| 13:56:03 | 23 | Internet to try and see whether, you know, whether the |
| 13:56:06 | 24 | firm was taking on new clients or something like that. |
| 13:56:08 | 25 | Q.  Who did you speak to? |

**EXHIBIT 81**
**2141**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 129

13:56:10    1         A.    You know, I would have to see whether I can

13:56:16    2    remember that.  You know, this period of time is not

13:56:18    3    all that easy for me to recall.

13:56:20    4         Q.    You did speak to some lawyers?

13:56:23    5         A.    I don't know whether I spoke directly to like

13:56:26    6    the lawyer or whether I was speaking to an associate.

13:56:30    7    I really don't remember.

13:56:32    8         Q.    Did you speak to any --

13:56:33    9         A.    But I wasn't particularly interested in them,

13:56:35    10   so it didn't kind of lodge itself in my memory.

13:56:38    11        Q.    Why did you call them if you weren't

13:56:40    12   interested in them?

13:56:41    13        A.    No.  I mean after talking and, you know, just

13:56:44    14   getting a feel for, you know, it was a company that

13:56:47    15   did have a conflict of interest or they were closely

13:56:50    16   aligned with a lot of studios, and it just didn't seem

13:56:54    17   to feel like a good fit for us.

13:56:56    18        Q.    Is it fair to say that you contacted

13:57:00    19   entertainment lawyers in town?

13:57:02    20        A.    Yes.

13:57:02    21        Q.    Okay.  And you obtained their names from

13:57:08    22   Internet work that you did?

13:57:09    23        A.    Well, you know, I had interviewed a lot of

13:57:15    24   entertainment attorneys prior to retaining Gang Tyre,

13:57:21    25   so I had already talked to and eliminated a number of

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 130

| | | |
|---|---|---|
| 13:57:25 | 1 | people a couple of years before this.  So, you know, |
| 13:57:30 | 2 | during -- from that search I already had knowledge of |
| 13:57:34 | 3 | people not to bother to contact this time. |
| 13:57:36 | 4 | Q.  You didn't go back to the people you had |
| 13:57:38 | 5 | eliminated; right? |
| 13:57:40 | 6 | A.  No, no, because at that time we interviewed a |
| 13:57:43 | 7 | lot of people. |
| 13:57:44 | 8 | Q.  Can you remember the names of any of the |
| 13:57:47 | 9 | firms that you contacted? |
| 13:57:48 | 10 | A.  Yeah.  There was somebody at William Morris. |
| 13:57:52 | 11 | There were some -- God, what was the -- I remember the |
| 13:57:57 | 12 | office.  There was an office on Olympic where there |
| 13:58:00 | 13 | was a fairly large firm. |
| 13:58:02 | 14 | Q.  Is that Mitchell, Silberberg & Knupp? |
| 13:58:05 | 15 | A.  It could have been.  It could have been.  I |
| 13:58:07 | 16 | think there was somebody in that office.  My |
| 13:58:10 | 17 | ex-husband had been asking around.  He's an attorney, |
| 13:58:13 | 18 | so he asked some people for referrals. |
| 13:58:16 | 19 | Q.  We're now talking about 2002. |
| 13:58:18 | 20 | A.  No.  I'm talking about prior to retaining |
| 13:58:22 | 21 | Gang Tyre in 1999. |
| 13:58:24 | 22 | Q.  Those are the folks that you contacted and |
| 13:58:28 | 23 | eliminated. |
| 13:58:28 | 24 | A.  Correct. |
| 13:58:29 | 25 | Q.  Someone at William Morris and someone -- |

## LAURA SIEGEL LARSON - 7/22/2011

Page 131

| | | |
|---|---|---|
| 13:58:32 | 1 | A. There were probably at least five to seven. |
| 13:58:37 | 2 | Oh, what was the name of that guy? We talked to Joel |
| 13:58:43 | 3 | Gotler. |
| 13:58:43 | 4 | Q. Again, in '97? |
| 13:58:45 | 5 | A. No. '99. |
| 13:58:46 | 6 | Q. '99. Excuse me. Right. |
| 13:58:48 | 7 | A. Yeah. I know we talked -- we met quite a bit |
| 13:58:52 | 8 | with Joel Gotler several times but ultimately decided |
| 13:58:55 | 9 | not to hire him and went with Gang Tyre. |
| 13:58:58 | 10 | Q. Now going to 2002, other than Mr. Toberoff, |
| 13:59:04 | 11 | can you search your memory and tell me the names of |
| 13:59:08 | 12 | any firm or person that you contacted? |
| 13:59:10 | 13 | A. I can think about it, but right now I can't |
| 13:59:13 | 14 | remember specifically. |
| 13:59:16 | 15 | Q. Do you have some notes at home about this? |
| 13:59:21 | 16 | A. Possibly. |
| 13:59:22 | 17 | Q. Do you remember whether you actually met |
| 13:59:25 | 18 | anyone in person other than Mr. Toberoff? |
| 13:59:28 | 19 | A. I don't think so. |
| 13:59:30 | 20 | Q. Do you know whether your mother spoke to |
| 13:59:33 | 21 | other people other than Mr. Toberoff in 2002? |
| 13:59:40 | 22 | A. I don't remember her mentioning anyone |
| 13:59:48 | 23 | specific. |
| 13:59:49 | 24 | Q. What happened after the discussion with |
| 13:59:55 | 25 | Mr. Toberoff at the offices of Endeavor? What was the |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 132

| | | |
|---|---|---|
| 13:59:58 | 1 | next thing that happened regarding your entering into |
| 14:00:00 | 2 | an agreement with Mr. Toberoff and Mr. Emanuel? |
| 14:00:05 | 3 | A.  Well, we were -- we were very impressed with |
| 14:00:11 | 4 | Mr. Toberoff's history of commitment to helping |
| 14:00:20 | 5 | authors and his, you know, knowledge of intellectual |
| 14:00:24 | 6 | property issues, and we found a rapport with him that |
| 14:00:30 | 7 | we hadn't found with people that we had historically |
| 14:00:33 | 8 | spoken to, whether it was in 1999 or whenever, you |
| 14:00:36 | 9 | know.  So it felt -- it felt comfortable. |
| 14:00:41 | 10 | Q.  So what was the next step then after the |
| 14:00:46 | 11 | discussion at Endeavor? |
| 14:00:47 | 12 | A.  Well, it was a discussion with my mom about, |
| 14:00:50 | 13 | you know, what was our comfort level. |
| 14:00:52 | 14 | Q.  I see. |
| 14:00:53 | 15 | A.  And so after that, I think we got back to him |
| 14:00:59 | 16 | and we asked to -- oh, yeah.  This is when we asked to |
| 14:01:03 | 17 | see copies of briefs, things that he had done for |
| 14:01:08 | 18 | other clients, because we wanted to get a feel for the |
| 14:01:13 | 19 | quality of his work, his legal work. |
| 14:01:16 | 20 | Q.  Did you get them? |
| 14:01:16 | 21 | A.  Yes. |
| 14:01:16 | 22 | Q.  What were they?  Do you remember? |
| 14:01:18 | 23 | A.  Well, they were specific to cases that he had |
| 14:01:25 | 24 | handled, and we liked them. |
| 14:01:27 | 25 | Q.  How did you request them? |

**Merrill  Corporation  -  Los Angeles**

**EXHIBIT 81**
**2145**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

---

Page 133

| | | | |
|---|---|---|---|
| 14:01:31 | 1 | A. | A verbal request. |
| 14:01:33 | 2 | Q. | Over the telephone? |
| 14:01:34 | 3 | A. | I think we asked him in that -- in that |
| 14:01:37 | 4 | meeting, either in that meeting or over the telephone. |
| 14:01:40 | 5 | Q. | How long thereafter did you receive these |
| 14:01:43 | 6 | materials? |
| 14:01:43 | 7 | A. | Very quickly. |
| 14:01:45 | 8 | Q. | How did you receive them? |
| 14:01:48 | 9 | A. | Well, there was a big stack of them, so I |
| 14:01:51 | 10 | think they came in the mail. |
| 14:01:55 | 11 | Q. | And did you read them? |
| 14:01:57 | 12 | A. | Yes. |
| 14:02:00 | 13 | Q. | Did you have anyone else take a look at them? |
| 14:02:02 | 14 | A. | My mother looked at them. |
| 14:02:05 | 15 | Q. | Did you have anyone else like Mr. Levine or |
| 14:02:09 | 16 | Mr. -- |
| 14:02:09 | 17 | A. | George might have looked at them. |
| 14:02:11 | 18 | Q. | George. |
| 14:02:12 | 19 | A. | George might have looked at them. |
| 14:02:14 | 20 | Q. | You would have e-mailed them to him? |
| 14:02:17 | 21 | A. | No, because they didn't have it in electronic |
| 14:02:19 | 22 | form.  You know, if there -- if there was something |
| 14:02:22 | 23 | that I had a question about, I may have faxed, you |
| 14:02:26 | 24 | know, one of the briefs to him or something. |
| 14:02:31 | 25 | Q. | Do you remember what the specific documents |

---

**EXHIBIT 81**
**2146**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 134

14:02:33    1    were that you received and reviewed?

14:02:38    2        A.    Are you asking me what the cases were?

14:02:40    3        Q.    Or anything you can recall about them.

14:02:42    4        A.    I -- I believe that one of them was -- maybe

14:02:46    5    it was a motion for summary judgment, and there

14:02:50    6    were -- there were -- you know, there were various

14:02:53    7    briefs.  They weren't all the same type of brief,

14:02:55    8    which was kind of, you know, reassuring because I

14:02:58    9    think my mom and I both wanted to get an idea for how

14:03:03    10   his -- how his mind worked, and so this told us, you

14:03:07    11   know, his approach and how he argues things having to

14:03:11    12   do with intellectual property.

14:03:13    13       Q.    Did you -- were they copyright termination

14:03:17    14   cases on behalf of similarly situated authors or

14:03:22    15   heirs?

14:03:22    16       A.    I don't think they were copyright

14:03:26    17   termination.

14:03:27    18       Q.    You still have those papers at your home?

14:03:29    19       A.    Could be.

14:03:32    20       Q.    Okay.  What was the next thing that happened

14:03:34    21   after you reviewed those materials that he sent you?

14:03:38    22       A.    We called him back and --

14:03:42    23       Q.    A telephone call?

14:03:43    24       A.    Meaning my mother and I, yes.  I don't know

14:03:47    25   whether we were both on the phone or what, but, you

**Merrill  Corporation  -  Los Angeles**

EXHIBIT 81
2147

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 135

| | | |
|---|---|---|
| 14:03:50 | 1 | know, either one or both of us said that we were, you |
| 14:03:55 | 2 | know, interested in him representing us. |
| 14:03:59 | 3 | Q.   What happened next? |
| 14:04:02 | 4 | A.   I think, you know, he said he was delighted, |
| 14:04:07 | 5 | and, you know, beyond that, I think we got into |
| 14:04:10 | 6 | discussing matters relating to our case. |
| 14:04:14 | 7 | Q.   What happened next? |
| 14:04:18 | 8 | A.   We formalized our arrangement. |
| 14:04:21 | 9 | Q.   And then you signed what we previously saw as |
| | 10 | Exhibit 45? |
| 14:04:28 | 11 | A.   Was that the -- |
| 14:04:29 | 12 | Q.   Is that 46?  What's the exhibit number? |
| 14:04:31 | 13 | A.   This one? |
| 14:04:32 | 14 | Q.   Let me see. |
| 14:04:33 | 15 | A.   45. |
| 14:04:34 | 16 | Q.   45.  Okay. |
| 14:04:37 | 17 | A.   Yes. |
| 14:04:39 | 18 | Q.   Which is the document that's dated as of |
| 14:04:43 | 19 | October 3, 2002; correct? |
| 14:04:47 | 20 | A.   Correct. |
| 14:04:50 | 21 | Q.   Now -- |
| 14:04:50 | 22 | A.   But the -- you know -- well -- |
| 14:04:53 | 23 | MR. TOBEROFF:  Wait for the question. |
| 14:04:55 | 24 | THE WITNESS:  I was just going to say -- |
| 14:04:56 | 25 | MR. TOBEROFF:  Wait. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 136

| 14:04:57 | 1 | BY MR. PETROCELLI: |
| 14:04:58 | 2 | Q.   Now, prior to your getting this document, you |
| 14:05:04 | 3 | had to have some discussion about the role of Ari |
| 14:05:08 | 4 | Emanuel. |
| 14:05:09 | 5 | A.   Yes. |
| 14:05:09 | 6 | Q.   Given that you're not -- you were not given a |
| 14:05:13 | 7 | litigation retainer agreement of the sort that you |
| 14:05:15 | 8 | filed in 2004, but you're given a -- |
| 14:05:19 | 9 | MR. TOBEROFF:  Signed. |
| | 10 | BY MR. PETROCELLI: |
| 14:05:20 | 11 | Q.   -- representation -- |
| 14:05:21 | 12 | Excuse me? |
| 14:05:22 | 13 | MR. TOBEROFF:  You said "filed" in -- |
| 14:05:24 | 14 | MR. PETROCELLI:  Thank you. |
| 14:05:25 | 15 | Q.   Given that you did not receive and then sign |
| 14:05:28 | 16 | a litigation agreement in 2002, but instead received |
| 14:05:33 | 17 | and ended up signing this particular agreement, |
| 14:05:37 | 18 | Exhibit 45 -- |
| 14:05:37 | 19 | A.   Yes. |
| 14:05:38 | 20 | Q.   -- with a company called IP Worldwide signed |
| 14:05:42 | 21 | by Mr. Emanuel and Mr. Toberoff, at some point in your |
| 14:05:50 | 22 | chronology -- |
| 14:05:50 | 23 | A.   Um-hum. |
| 14:05:51 | 24 | Q.   -- there had to have been some discussion |
| 14:05:54 | 25 | about Mr. Emanuel; is that right? |

LAURA SIEGEL LARSON - 7/22/2011

Page 137

14:05:56    1        A.    Yes.

14:05:57    2        Q.    Okay.  And prior to signing this document,

14:06:02    3    Exhibit 45, did you meet Mr. Emanuel?

14:06:04    4        A.    I believe we did.

14:06:06    5        Q.    Okay.  And did your mother meet him?

14:06:08    6        A.    Yes.

14:06:09    7        Q.    Where did you meet him?

14:06:10    8        A.    At Endeavor.

14:06:12    9        Q.    Again, before signing Exhibit 45; right?

14:06:15    10       A.    I believe so.

14:06:16    11       Q.    Okay.  And who else was present at that

14:06:18    12   meeting?

14:06:20    13       A.    My mother, I was there, Mr. Emanuel, and

14:06:25    14   Mr. Toberoff.

14:06:25    15       Q.    Okay.  And this is the first time you met

14:06:29    16   Mr. Emanuel?

14:06:30    17       A.    Yes.

14:06:31    18       Q.    And did you have a draft of this agreement,

14:06:38    19   Exhibit 45, as of the date of your meeting with

14:06:41    20   Mr. Emanuel?

14:06:42    21       A.    I don't believe so.

14:06:44    22       Q.    And what was discussed at that meeting?

14:06:53    23       A.    Well, since that was the first time we were

14:06:57    24   meeting Mr. Emanuel, we wanted to know what his vision

14:07:01    25   was of the character and what he thought he might, you

EXHIBIT 81
2150

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 138

14:07:06    1    know, bring to us as a representative.

14:07:10    2        Q.    Did you ask Mr. Emanuel about the nature of

14:07:16    3    his relationship with Mr. Toberoff and their business,

14:07:19    4    IPW, and what work they had done together or whether

14:07:22    5    this was their maiden voyage and, you know, things

14:07:25    6    like that?

14:07:26    7        A.    No, because we knew that Ari's reputation was

14:07:33    8    huge.  He had, you know, a long -- a long-term, you

14:07:38    9    know -- what am I trying to say?  He had a long-term

14:07:42    10   high profile in the entertainment industry, and, you

14:07:46    11   know, that was -- those were his credentials.  We had

14:07:52    12   researched Mr. Toberoff's credentials.  We were

14:07:55    13   looking at them as two individuals who would be

14:07:59    14   serving different functions for us, but they were

14:08:02    15   united, so we were kind of getting a two for one in

14:08:05    16   the deal in a sense.

14:08:06    17       Q.    A dynamic duo.

14:08:08    18       A.    Yes.

14:08:10    19       Q.    Okay.

14:08:10    20       A.    You could say that.

14:08:13    21       Q.    Now, as of the time --

14:08:17    22           MR. TOBEROFF:  That's a competing property.

14:08:20    23           MR. PETROCELLI:  I understand.

14:08:21    24           THE WITNESS:  I know.  You know, dynamic duo.

14:08:22    25   I hear that.

EXHIBIT 81
2151

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 139

| | | |
|---|---|---|
| 14:08:25 | 1 | MR. PETROCELLI:  Or we could go Clark Kent, |
| 14:08:26 | 2 | Superman, you know, either way. |
| 14:08:28 | 3 | Q.    From the time that you first met Mr. Toberoff |
| 14:08:32 | 4 | until the meeting with Mr. Toberoff and Mr. Emanuel -- |
| 14:08:35 | 5 | A.    Um-hum. |
| 14:08:36 | 6 | Q.    -- what's a -- how long did that take in |
| 14:08:40 | 7 | between? |
| 14:08:40 | 8 | A.    Not very long. |
| 14:08:41 | 9 | Q.    A week? |
| 14:08:43 | 10 | A.    Possibly. |
| 14:08:44 | 11 | Q.    Okay.  And again, that was also at the |
| 14:08:48 | 12 | offices of Endeavor? |
| 14:08:49 | 13 | A.    Correct. |
| 14:08:49 | 14 | Q.    And no one else was there except the four of |
| 14:08:53 | 15 | you; right? |
| 14:08:53 | 16 | A.    No, because we went in at this -- for that |
| 14:08:56 | 17 | meeting we went into Mr. Emanuel's office.  It wasn't |
| 14:09:01 | 18 | in a conference room.  It was in Mr. Emanuel's office. |
| 14:09:04 | 19 | Q.    But did anybody else participate at all in |
| 14:09:06 | 20 | any part of the meeting? |
| 14:09:08 | 21 | A.    No. |
| 14:09:08 | 22 | Q.    Like anybody else from his agency come in? |
| 14:09:11 | 23 | A.    No. |
| 14:09:11 | 24 | Q.    Okay.  Now, did you understand that you were |
| 14:09:17 | 25 | doing this deal with Mr. Emanuel as part of IP |

## LAURA SIEGEL LARSON - 7/22/2011

Page 140

| | | |
|---|---|---|
| 14:09:23 | 1 | Worldwide or Mr. Emanuel as part of Endeavor or both? |
| 14:09:27 | 2 | A.   No.  By that time, you know, we understood |
| 14:09:31 | 3 | that, you know, that the intellectual property aspects |
| 14:09:36 | 4 | that we were interested in, you know, was under this |
| 14:09:40 | 5 | heading of IP Worldwide. |
| 14:09:44 | 6 | Q.   Okay.  Did you understand that Endeavor, the |
| 14:09:47 | 7 | talent agency, was somehow involved in your agreement |
| 14:09:52 | 8 | with IP Worldwide, or was it just Ari Emanuel and |
| 14:09:58 | 9 | Mr. Toberoff? |
| 14:09:59 | 10 | A.   I believe that Endeavor was going to supply |
| 14:10:01 | 11 | some support services, but, you know, it was Ari |
| 14:10:09 | 12 | Emanuel that we were interested in.  We weren't |
| 14:10:11 | 13 | interested in Endeavor. |
| 14:10:16 | 14 | Q.   Okay. |
| 14:10:17 | 15 | Now, by the time of this meeting, and indeed |
| 14:10:20 | 16 | by the time of your first meeting with Mr. Toberoff -- |
| 14:10:24 | 17 | A.   Um-hum. |
| 14:10:26 | 18 | Q.   -- you had already heard that Mr. Toberoff |
| 14:10:29 | 19 | and Mr. Emanuel had presented an offer to your prior |
| 14:10:38 | 20 | counsel, Mr. Marks; right? |
| 14:10:40 | 21 | A.   Yes. |
| 14:10:43 | 22 | Q.   Okay.  And an offer to acquire the property; |
| 14:10:45 | 23 | correct? |
| 14:10:48 | 24 | A.   It was an offer to -- I believe to market the |
| 14:11:01 | 25 | property. |

LAURA SIEGEL LARSON - 7/22/2011

Page 141

| 14:11:01 | 1 | Q. An offer to market the property to whom? |

14:11:06    2        A.    You know, I mean I don't have, you know,

14:11:09    3    anything in front of me right now.  I'm trying to

14:11:12    4    recall the exact terminology, but to represent -- to

14:11:18    5    represent us concerning our rights.

14:11:21    6        Q.    Now, when you heard that Ari Emanuel and Marc

14:11:26    7    Toberoff had approached Kevin Marks, it was --

14:11:31    8    correct?

14:11:31    9        A.    Yes.

14:11:32   10        Q.    When you learned that Ari Emanuel and Marc

14:11:37   11    Toberoff had approached Kevin Marks about, as you just

14:11:40   12    put it, representing the property for purposes of

14:11:46   13    marketing it, was that before or after Jean Peavy gave

14:11:55   14    your mother the name of Marc Toberoff?

14:12:03   15        A.    I don't recall exactly, but it must have been

14:12:08   16    kind of like all around the same time.

14:12:11   17        Q.    Well, if Jean Peavy is giving the name of

14:12:14   18    Marc --

14:12:15   19        A.    No, no, no.  It had to be after.

14:12:17   20        Q.    So Jean Peavy -- just to get the sequence

14:12:21   21    straight, Jean Peavy gives the name of Marc Toberoff

14:12:23   22    to your mother.  You and your mother then do some due

14:12:29   23    diligence on Marc Toberoff.

14:12:30   24        A.    Right.

14:12:30   25        Q.    And right around that same period of time

LAURA SIEGEL LARSON - 7/22/2011

Page 142

14:12:33    1    when you're doing this due diligence about Marc

14:12:39    2    Toberoff, you suddenly hear that Marc Toberoff and Ari

14:12:44    3    Emanuel have contacted Kevin Marks?

14:12:46    4        A.    No, no.  That's why I said, after you said

14:12:48    5    that, that it had to have -- we -- we did not know of

14:12:54    6    Marc Toberoff, to my recollection, of Marc Toberoff or

14:12:59    7    Ari Emanuel independently of the information that we

14:13:01    8    were given by Kevin Marks.  We were in the process of

14:13:06    9    looking for other attorneys during that period of

14:13:10    10   time.

14:13:10    11       Q.    So --

14:13:11    12       A.    So we had already -- you know, in March we

14:13:13    13   had contacted Gerry Spence.  We were looking at

14:13:16    14   various people.

14:13:16    15       Q.    And you said March because you saw the file

14:13:19    16   recently.

14:13:20    17       A.    A couple of days ago.

14:13:21    18       Q.    That had the date on it.  You would never

14:13:25    19   have remembered that; correct?

14:13:27    20       A.    No, I would not have remembered it.

14:13:29    21       Q.    So in March you contacted Gerry Spence.  He

14:13:33    22   had a conflict.  So continue.

14:13:33    23       A.    Yeah.  So we were thinking about other

14:13:37    24   attorneys.  At what point my mom revealed to Jean that

14:13:39    25   we were looking for other attorneys and she mentioned

LAURA SIEGEL LARSON - 7/22/2011

Page 143

| | | |
|---|---|---|
| 14:13:43 | 1 | his name, I'm not sure.  However, logic tells me that |
| 14:13:52 | 2 | it must have been after it was -- it was already |
| 14:13:57 | 3 | mentioned to us, you know, that Kevin Marks had |
| 14:14:00 | 4 | received contact from them because the name didn't |
| 14:14:03 | 5 | ring a bell.  You know, it just -- |
| 14:14:07 | 6 | Q.   I'm getting confused about the sequence, and |
| 14:14:09 | 7 | I want to be clear about this. |
| 14:14:10 | 8 | A.   Well, I'm confused about the sequence too. |
| 14:14:13 | 9 | Q.   Okay.  Well, maybe we can see if we can do |
| 14:14:15 | 10 | the best we can to get the best recollection you have |
| 14:14:18 | 11 | on this. |
| 14:14:18 | 12 | A.   Um-hum. |
| 14:14:21 | 13 | Q.   What happened first is the question -- |
| 14:14:23 | 14 | okay? -- your learning about Marc Toberoff from your |
| 14:14:31 | 15 | mother and your mother calling him up and you're |
| 14:14:35 | 16 | checking him out on the Internet or your learning |
| 14:14:40 | 17 | about Marc Toberoff and Ari Emanuel from Kevin Marks? |
| 14:14:48 | 18 | A.   I would be guessing.  I can't -- I can't 100 |
| 14:14:57 | 19 | percent say.  But -- |
| 14:15:00 | 20 | Q.   Well, when you had -- if Jean Peavy had told |
| 14:15:11 | 21 | your mother about a guy named Marc Toberoff -- |
| 14:15:15 | 22 | A.   Well, she said "I've got a lawyer." |
| 14:15:17 | 23 | Q.   -- you would have said, "Oh, that's the same |
| 14:15:19 | 24 | guy that Mark -- Kevin Marks just told us about, and |
| 14:15:24 | 25 | he's with Ari Emanuel," and you would have made that |

LAURA SIEGEL LARSON - 7/22/2011

Page 144

14:15:28    1    connection; correct?

14:15:28    2        A.   It sounds that way.  I don't remember it that

14:15:31    3    way, but as I said, logic sort of says that that would

14:15:33    4    probably be the case.

14:15:34    5        Q.   So then did you ask yourself why is a guy

14:15:37    6    that we're thinking about hiring as a lawyer calling

14:15:42    7    Kevin Marks and presenting himself as a person who

14:15:45    8    will market a property?

14:15:48    9        A.   You know, what Kevin Marks told us was that

14:15:53   10    Marc Toberoff was a lawyer, you know, who was

14:15:57   11    partnered with a Hollywood agent.  You know, it didn't

14:16:00   12    seem to us that he was recommending him as anything.

14:16:06   13    He wasn't recommending him at all.  You know, he was

14:16:09   14    simply relaying to us that there was an intellectual

14:16:14   15    property lawyer named Marc Toberoff who was partnered

14:16:16   16    with a Hollywood agent, you know, named Ari Emanuel.

14:16:21   17        Q.   And that they had called him to --

14:16:23   18        A.   They had called him to see what the status

14:16:25   19    was of the Superman.

14:16:28   20        Q.   Well, let's be clear.  Mr. Marks -- Mr. Marks

14:16:32   21    didn't tell you that Marc Toberoff called him and

14:16:35   22    said, "Hey, Mr. Marks, I'm a lawyer, and I want to

14:16:38   23    take your client away from you."

14:16:40   24        A.   He didn't --

14:16:41   25            MR. TOBEROFF:   Wait a second.

Merrill   Corporation   -   Los Angeles

**EXHIBIT 81**
**2157**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 145

| | | |
|---|---|---|
| 14:16:41 | 1 | BY MR. PETROCELLI: |
| 14:16:42 | 2 | Q.    He didn't say that to you; right? |
| 14:16:43 | 3 | A.    Yes, that's right. |
| | 4 | MR. TOBEROFF:  I don't want you getting |
| | 5 | into -- |
| 14:16:44 | 6 | THE WITNESS:  I shouldn't be talking about -- |
| 14:16:45 | 7 | MR. TOBEROFF:  -- the disclosure about what |
| 14:16:47 | 8 | Mr. Marks said to you or didn't say other than broad |
| 14:16:51 | 9 | subjects. |
| 14:16:52 | 10 | THE WITNESS:  Okay. |
| | 11 | BY MR. PETROCELLI: |
| 14:16:52 | 12 | Q.    But you have already testified that what |
| 14:16:56 | 13 | Mr. Marks told you is that these were two people who |
| 14:16:58 | 14 | were calling about marketing the property; correct? |
| 14:17:02 | 15 | A.    He didn't tell us anything.  He wrote |
| 14:17:06 | 16 | something to us in the mail. |
| 14:17:08 | 17 | Q.    Okay.  You received that by way of a written |
| 14:17:10 | 18 | communication. |
| 14:17:10 | 19 | A.    Correct. |
| 14:17:11 | 20 | Q.    A letter? |
| 14:17:12 | 21 | A.    Yes. |
| 14:17:14 | 22 | Q.    Okay.  Do you have a copy of it? |
| 14:17:18 | 23 | A.    I believe so. |
| 14:17:19 | 24 | Q.    When is the last time you saw it? |
| 14:17:21 | 25 | A.    It's been quite a while. |

Merrill  Corporation  -  Los Angeles
800-826-0277                        www.merillcorp.com/law
EXHIBIT 81
2158
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 146

14:17:23    1        Q.    And did Mr. Marks convey to you -- by the

14:17:33    2    way, to whom was the letter addressed?

14:17:35    3        A.    To my mother and to me.

14:17:37    4        Q.    And so he would have mailed -- he mailed two

14:17:41    5    copies, one to you and one to your mother at the

14:17:44    6    separate addresses?

14:17:45    7        A.    Yeah, I would think so.

14:18:03    8        Q.    Okay.

14:18:04    9            Hold on one second.

14:18:23   10            (Pause in proceedings.)

           11    BY MR. PETROCELLI:

14:18:25   12        Q.    Did --

14:18:26   13            So I'm sorry.  I'm trying to get some

14:18:29   14    information from my colleagues so I can frame my next

14:18:33   15    question.

14:18:36   16            Did -- I apologize for asking you again, but

14:18:38   17    did you say you received a copy at your home and your

14:18:42   18    mother also received a copy?

14:18:43   19        A.    Yes.

14:18:44   20        Q.    Okay.

14:18:52   21        A.    However, my mother --

14:18:53   22            MR. TOBEROFF:  Hey, there's no question

14:18:54   23    pending.

14:18:55   24            THE WITNESS:  Okay.

           25    BY MR. PETROCELLI:

LAURA SIEGEL LARSON - 7/22/2011

Page 147

| | | |
|---|---|---|
| 14:18:57 | 1 | Q.   Did you -- have you seen that letter in the |
| 14:18:59 | 2 | last week? |
| 14:18:59 | 3 | A.   No. |
| 14:19:00 | 4 | MR. TOBEROFF:  Asked and answered. |
| | 5 | BY MR. PETROCELLI: |
| 14:19:01 | 6 | Q.   Now, the letter said that an offer had been |
| 14:19:11 | 7 | made? |
| 14:19:11 | 8 | MR. TOBEROFF:  I instruct you not to answer |
| 14:19:13 | 9 | as to the contents of the attorney-client |
| 14:19:17 | 10 | communication.  I allowed you to broadly speak about |
| 14:19:20 | 11 | the subject matter. |
| | 12 | BY MR. PETROCELLI: |
| 14:19:21 | 13 | Q.   Did the letter state that Mr. Toberoff and |
| 14:19:28 | 14 | Mr. Emanuel were themselves seeking to acquire the |
| 14:19:36 | 15 | interest in your Superman rights? |
| 14:19:38 | 16 | MR. TOBEROFF:  Attorney-client privilege. |
| 14:19:39 | 17 | Instruct you not to answer. |
| | 18 | BY MR. PETROCELLI: |
| 14:19:41 | 19 | Q.   Did the letter say that Mr. Toberoff and |
| 14:19:49 | 20 | Mr. Emanuel had a wealthy investor who might be |
| 14:19:56 | 21 | interested in acquiring your rights? |
| 14:19:58 | 22 | MR. TOBEROFF:  Same instruction and |
| 14:20:00 | 23 | objection. |
| | 24 | BY MR. PETROCELLI: |
| 14:20:01 | 25 | Q.   Did the letter indicate that such an investor |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 148

| | | |
|---|---|---|
| 14:20:04 | 1 | was willing to pay much more money than the last offer |
| 14:20:11 | 2 | Warner Bros. and DC Comics had made to you? |
| 14:20:16 | 3 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:16 | 4 | instruction. |
| | 5 | BY MR. PETROCELLI: |
| 14:20:16 | 6 | Q.   Did the letter indicate that such an investor |
| 14:20:22 | 7 | or party was interested in paying as much as |
| 14:20:27 | 8 | $15 million -- |
| 14:20:27 | 9 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:29 | 10 | instruction. |
| | 11 | BY MR. PETROCELLI: |
| 14:20:29 | 12 | Q.   -- plus additional terms including a back end |
| 14:20:31 | 13 | if a movie was made? |
| 14:20:33 | 14 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:39 | 15 | instruction. |
| | 16 | BY MR. PETROCELLI: |
| 14:20:39 | 17 | Q.   What did you do after you got the letter? |
| 14:20:45 | 18 | MR. TOBEROFF:  Vague as to -- calls for a |
| 14:20:48 | 19 | narrative. |
| 14:20:50 | 20 | BY MR. PETROCELLI: |
| 14:20:50 | 21 | Q.   You understand what I'm asking you; right? |
| 14:20:52 | 22 | It's not like did you go get a cup of coffee.  What |
| 14:20:55 | 23 | did you do in reference to the letter? |
| 14:20:57 | 24 | A.   My mother got it several days before I did |
| 14:20:59 | 25 | because I was out of town. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 149

| 14:21:00 | 1 | Q. Okay. Did she discuss it with you? |
| 14:21:03 | 2 | A. When I was back, yes. |
| 14:21:04 | 3 | Q. What did she say to you? |
| 14:21:07 | 4 | MR. TOBEROFF: You can only talk about that |
| 14:21:09 | 5 | discussion to the extent you're not revealing the |
| 14:21:12 | 6 | contents of Mr. Marks' communication considering you |
| 14:21:18 | 7 | were both represented by the same attorney. |
| | 8 | BY MR. PETROCELLI: |
| 14:21:19 | 9 | Q. What did she say to you? |
| 14:21:21 | 10 | A. She was surprised. |
| 14:21:23 | 11 | MR. TOBEROFF: Object -- oh, you're answering |
| 14:21:24 | 12 | subject to my instruction; correct? |
| 14:21:26 | 13 | THE WITNESS: Yes. |
| 14:21:27 | 14 | MR. TOBEROFF: Okay. Go ahead. |
| | 15 | BY MR. PETROCELLI: |
| 14:21:29 | 16 | Q. And did -- what was she surprised about? |
| 14:21:38 | 17 | A. She surprised to receive this |
| 14:21:42 | 18 | information. |
| 14:21:43 | 19 | Q. What about the information surprised her? |
| 14:21:49 | 20 | MR. TOBEROFF: You can answer so long as |
| 14:21:51 | 21 | you're not divulging the contents of the |
| 14:21:55 | 22 | attorney-client communication. |
| 14:21:56 | 23 | THE WITNESS: I know. Well, I'm thinking |
| 14:21:57 | 24 | about it. |
| 14:22:03 | 25 | I don't think there's anything that I could |

LAURA SIEGEL LARSON - 7/22/2011

Page 150

| 14:22:05 | 1 | say that would not divulge attorney-client privilege. |
| | 2 | BY MR. PETROCELLI: |
| 14:22:09 | 3 | Q.   There was no attorney present during that |
| 14:22:11 | 4 | conversation with your mother. |
| 14:22:13 | 5 | A.   No, but -- okay.  Maybe I'm -- |
| 14:22:15 | 6 | MR. TOBEROFF:  She's following my |
| 14:22:16 | 7 | instruction. |
| 14:22:16 | 8 | MR. PETROCELLI:  Okay.  I just want the |
| 14:22:19 | 9 | record to be clear that -- |
| 14:22:21 | 10 | THE WITNESS:  I don't want to -- I maybe used |
| 14:22:23 | 11 | the wrong term. |
| | 12 | BY MR. PETROCELLI: |
| 14:22:24 | 13 | Q.   This is just you and your mom talking; right? |
| 14:22:26 | 14 | A.   Yes. |
| 14:22:38 | 15 | Q.   When you got the letter, had you already by |
| 14:22:44 | 16 | that time heard of Mr. Toberoff? |
| 14:22:46 | 17 | MR. TOBEROFF:  Asked and answered. |
| 14:22:49 | 18 | MR. PETROCELLI:  It was not asked and |
| 14:22:50 | 19 | answered.  It doesn't matter. |
| 14:22:53 | 20 | THE WITNESS:  I don't believe so.  But as I |
| 14:22:56 | 21 | said, that particular time for me, you know, what the |
| 14:23:00 | 22 | sequence of events was, I don't recall exactly. |
| 14:23:05 | 23 | BY MR. PETROCELLI: |
| 14:23:05 | 24 | Q.   So in your view, was it a complete |
| 14:23:10 | 25 | coincidence that you got a letter about a man named |

EXHIBIT 81
2163

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 151

| | | |
|---|---|---|
| 14:23:14 | 1 | Toberoff who was interested in marketing the property |
| 14:23:19 | 2 | and then around the same time your mother gets a call |
| 14:23:23 | 3 | from Jean Peavy about a man named Toberoff? |
| 14:23:26 | 4 | MR. TOBEROFF:  Misstates the record and lacks |
| 14:23:29 | 5 | foundation. |
| 14:23:31 | 6 | THE WITNESS:  If I had heard of Toberoff |
| 14:23:34 | 7 | previous -- you know, prior to any communication, it |
| 14:23:38 | 8 | was only when I was doing kind of generic research of |
| 14:23:42 | 9 | who were lawyers who specialized in intellectual |
| 14:23:46 | 10 | property.  So it wasn't -- it wasn't as if I was, you |
| 14:23:49 | 11 | know, I was looking for research on Marc Toberoff at |
| 14:23:56 | 12 | that point.  If you go to Martindale Hubbell or |
| 14:23:59 | 13 | something and you type in a specialty and you look to |
| 14:24:01 | 14 | see what lawyers are available, that's the kind of |
| 14:24:06 | 15 | research that I was initially doing. |
| | 16 | BY MR. PETROCELLI: |
| 14:24:09 | 17 | Q.   So you would have done that research, then, |
| 14:24:12 | 18 | prior to having received this letter mentioning the |
| 14:24:15 | 19 | name Marc Toberoff. |
| 14:24:16 | 20 | A.   Generic research I would have done prior to. |
| 14:24:19 | 21 | Q.   Which meant that your mother would have |
| 14:24:21 | 22 | received the call about Toberoff, again, prior to your |
| 14:24:25 | 23 | having gotten this letter. |
| 14:24:26 | 24 | A.   No, not necessarily.  What I was saying is |
| 14:24:30 | 25 | that as far back as when I was contacting Gerry |

## LAURA SIEGEL LARSON - 7/22/2011

Page 152

14:24:33    1    Spence, I was researching to see what types of lawyers

14:24:37    2    who, you know, might be able to help us existed

14:24:43    3    generically.  You know, I wasn't looking up

14:24:46    4    Mr. Toberoff.  And so I think your question was asking

14:24:50    5    me was I looking for Mr. Toberoff because Jean Peavy

14:24:53    6    had mentioned his name.

14:24:54    7         Q.   No.  I think you misunderstood my question.

14:24:56    8         A.   Okay.

14:24:57    9         Q.   And/or I miscommunicated it, so I apologize.

14:24:59   10              When you did your Internet search on

14:25:02   11    Mr. Toberoff, that wasn't because you were searching

14:25:06   12    entertainment lawyers and his named popped up.  That

14:25:08   13    was because your mother had mentioned that Jean had

14:25:11   14    given her that name and you were specifically looking

14:25:14   15    into that person; correct?

14:25:15   16         A.   When I looked specifically for him.

14:25:18   17         Q.   Okay.  And when you had done your generic

14:25:22   18    search that yielded the name Gerry Spence, for

14:25:25   19    example --

14:25:25   20         A.   Um-hum.

14:25:26   21         Q.   -- you hadn't come across Mr. Toberoff's name

14:25:29   22    at that point in time; correct?

14:25:30   23         A.   I may have in terms of lawyers in the

14:25:34   24    Los Angeles area that handled intellectual property.

14:25:36   25         Q.   But you don't specifically recall having done

**EXHIBIT 81**
**2165**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 153

14:25:38    1    so, and if you did, you didn't follow up on it;

14:25:41    2    correct?

14:25:42    3        A.    Yeah.    I didn't put a gold star next to his

14:25:44    4    name and immediately do something, you know.

14:25:46    5        Q.    But you did put a gold star next to Gerry

14:25:51    6    Spence's name.

14:25:51    7        A.    Yes, but my mom put a gold star next to Gerry

14:25:53    8    Spence's name.

14:25:53    9            MR. TOBEROFF:    They liked the jacket.

14:25:55    10           THE WITNESS:    Yep.    Well, my mom had seen him

14:25:57    11   like on CNN or something, and, you know --

14:26:02    12           MR. TOBEROFF:    He's got the gift.

14:26:05    13           MR. PETROCELLI:    I won't comment.

14:26:08    14           THE WITNESS:    I can read into that.

            15   BY MR. PETROCELLI:

14:26:15    16       Q.    Now, when you did your search, by the way,

14:26:20    17   back in '99 and interviewed all those lawyers, Marc

14:26:24    18   Toberoff wasn't one of them; correct?

14:26:25    19       A.    No.

14:26:25    20       Q.    In fact, his name didn't even come up; right?

14:26:28    21       A.    No.

14:26:28    22       Q.    Is that correct?

14:26:28    23       A.    That's correct.

14:26:37    24       Q.    Okay.    So getting back to the sequence here,

14:26:47    25   you -- by the time you had first spoken to your

LAURA SIEGEL LARSON - 7/22/2011

Page 154

| | | |
|---|---|---|
| 14:26:51 | 1 | mother -- excuse me.  You received this letter from |
| 14:26:56 | 2 | Kevin Marks mentioning Marc Toberoff and Ari Emanuel |
| 14:27:01 | 3 | after your mother had told you the name Marc Toberoff |
| 14:27:05 | 4 | that she had received from Jean Peavy; correct? |
| 14:27:07 | 5 | A.   As I said, I can't testify for sure. |
| 14:27:27 | 6 | Q.   Do you know the date of the letter that you |
| 14:27:31 | 7 | received from Mr. Marks that mentioned Mr. Toberoff? |
| 14:27:34 | 8 | A.   I haven't seen it in a long time. |
| 14:27:36 | 9 | Q.   Now, again -- |
| 14:27:40 | 10 | A.   No.  The answer is no. |
| 14:27:41 | 11 | Q.   -- I'm trying to press your recollection on |
| 14:27:44 | 12 | this.  But when you first saw the letter or heard |
| 14:27:49 | 13 | about it from your mother that mentioned Mr. Toberoff |
| 14:27:51 | 14 | and Mr. Emanuel, do you have a state of mind or did |
| 14:27:55 | 15 | you have a state of mind at the time that this is the |
| 14:27:59 | 16 | same person that you had already looked into and |
| 14:28:02 | 17 | indeed had already contacted? |
| 14:28:04 | 18 | A.   No.  As I said, there may have been some |
| 14:28:11 | 19 | generic information. |
| 14:28:12 | 20 | Q.   So by the time that Jean Peavy gave your |
| 14:28:16 | 21 | mother the name of Marc Toberoff, you would have |
| 14:28:22 | 22 | associated it with the same name you had seen in |
| 14:28:27 | 23 | Mr. Marks' letter; right? |
| 14:28:28 | 24 | A.   I really don't recall. |
| 14:28:48 | 25 | Q.   Did you -- you said your mother was surprised |

## LAURA SIEGEL LARSON - 7/22/2011

Page 155

| | | |
|---|---|---|
| 14:28:59 | 1 | when she got the letter. |
| 14:29:01 | 2 | A.   Um-hum. |
| 14:29:02 | 3 | Q.   What -- what did you do next with respect to |
| 14:29:07 | 4 | the letter?  So, for example, did you contact |
| 14:29:16 | 5 | Mr. Marks? |
| 14:29:16 | 6 | A.   Possibly. |
| 14:29:21 | 7 | Q.   Were you interested in pursuing the |
| 14:29:33 | 8 | Toberoff/Emanuel proposal or introduction that was set |
| 14:29:36 | 9 | forth in the letter? |
| 14:29:39 | 10 | MR. TOBEROFF:  When they first -- |
| | 11 | BY MR. PETROCELLI: |
| 14:29:41 | 12 | Q.   Yeah.  You saw the letter.  The letter says, |
| 14:29:44 | 13 | you know, "These people called me and they're |
| 14:29:45 | 14 | interested in" whatever it is they said, and were you |
| 14:29:50 | 15 | and your mom interested in pursuing it? |
| 14:29:53 | 16 | A.   We wanted to know what it was all about. |
| 14:29:57 | 17 | Q.   Okay.  And did you find out what it was all |
| 14:30:00 | 18 | about? |
| 14:30:00 | 19 | A.   Eventually. |
| 14:30:01 | 20 | Q.   How did you find out? |
| 14:30:04 | 21 | A.   Through the contact that we had with Mr. -- |
| 14:30:11 | 22 | Mr. Toberoff and then Mr. Emanuel when my mother |
| 14:30:16 | 23 | placed a call to him and began to ask him some |
| 14:30:18 | 24 | questions. |
| 14:30:18 | 25 | Q.   So by the time that your mother placed that |

## LAURA SIEGEL LARSON - 7/22/2011

Page 156

| | | |
|---|---|---|
| 14:30:21 | 1 | call, you had already had the letter from Mr. Marks |
| 14:30:24 | 2 | and were able to follow up on it? |
| 14:30:26 | 3 | A.   I don't know whether it was following up on |
| 14:30:28 | 4 | that.  I'm just -- you asked me how I got information |
| 14:30:32 | 5 | about them, and I'm just talking in general terms. |
| 14:30:34 | 6 | Q.   Did you get any information from Mr. Marks |
| 14:30:39 | 7 | beyond that letter? |
| 14:30:43 | 8 | A.   I can't recall any. |
| 14:30:48 | 9 | Q.   Did you have -- did you give Mr. Marks any |
| 14:30:55 | 10 | directions or instructions with respect to that |
| 14:31:01 | 11 | letter? |
| 14:31:03 | 12 | A.   No. |
| 14:31:04 | 13 | Q.   Did you -- did Mr. Marks tell you that if you |
| 14:31:26 | 14 | pursued any arrangement with Mr. Toberoff or |
| 14:31:30 | 15 | Mr. Emanuel, that it posed any legal risk to you? |
| 14:31:34 | 16 | MR. TOBEROFF:  Excuse me.  I instruct you not |
| 14:31:36 | 17 | to answer.  Attorney-client privilege. |
| | 18 | BY MR. PETROCELLI: |
| 14:31:38 | 19 | Q.   Did he tell you that he might be called upon |
| 14:31:41 | 20 | to testify and might have to testify in a way that was |
| 14:31:45 | 21 | not helpful to you? |
| 14:31:46 | 22 | MR. TOBEROFF:  Same objection.  Same |
| 14:31:49 | 23 | instruction. |
| | 24 | BY MR. PETROCELLI: |
| 14:31:49 | 25 | Q.   After receiving that letter did you |

## LAURA SIEGEL LARSON - 7/22/2011

Page 157

14:31:52    1    immediately fire Mr. Marks?

14:31:54    2              MR. TOBEROFF:  Which letter?

14:31:55    3              MR. PETROCELLI:  The letter that she

14:31:57    4    received, that your mother received, talking about

14:31:59    5    Mr. Toberoff and Mr. Emanuel.

14:32:01    6              THE WITNESS:  Not immediately.

             7    BY MR. PETROCELLI:

14:32:03    8        Q.    Did you receive any other letters from

14:32:09    9    Mr. Marks regarding Mr. Toberoff and Mr. Emanuel

14:32:12   10    except that one that you have already described?

14:32:14   11        A.    I don't believe so.

14:32:17   12        Q.    Did you have any meetings with Mr. Marks

14:32:22   13    following your receipt of that letter, a copy of which

14:32:26   14    your mother also received?

14:32:30   15        A.    I'm trying to reconstruct the time frame.

14:32:46   16              I don't remember whether we had a meeting

14:32:48   17    with him.

14:32:50   18        Q.    Or with Mr. Ramer?  Do you remember that?

14:32:53   19        A.    We almost never saw Mr. Ramer, so I know it

14:32:57   20    wouldn't have been with Mr. Ramer.

14:32:58   21        Q.    Mr. Marks by then was your lead lawyer?

14:33:01   22        A.    Yes.

14:33:06   23        Q.    Okay.  Did you discuss the letter with

14:33:12   24    anyone -- with anyone after you received it other than

14:33:14   25    your mother?

LAURA SIEGEL LARSON - 7/22/2011

Page 158

14:33:23    1        A.    We may have discussed it with George.

14:33:27    2        Q.    Did you send George a copy of the letter?

14:33:29    3        A.    I don't recall.

14:33:36    4        Q.    Did you discuss it with Jean Peavy?

14:33:43    5        A.    No.

14:33:43    6        Q.    You had learned at some point that Jean Peavy

14:33:46    7    had retained Mr. Toberoff at an earlier point in time;

14:33:50    8    correct?

14:33:51    9        A.    Yes.  When my mom had the conversation with

14:33:54   10    Jean, Mr. Toberoff was already her attorney.

14:33:58   11        Q.    Did Mr. -- did Ms. Peavy tell you that she

14:34:03   12    had entered into a joint venture agreement with

14:34:06   13    Mr. Toberoff's company, Pacific Pictures Corporation?

14:34:12   14        A.    No.

14:34:12   15        Q.    Did she share any of her agreements with you

14:34:16   16    or your mother?

14:34:17   17        A.    No.

14:34:18   18        Q.    Her agreements with Mr. Toberoff's company?

14:34:28   19        A.    No.

14:34:28   20        Q.    When did you first -- so when you first

14:34:36   21    contacted Mr. Toberoff, it was your belief that he was

14:34:42   22    already a lawyer working with the Shusters?

14:34:45   23        A.    Yes.  I -- you know, if that's the correct

14:34:52   24    sequence.  I'm trying to remember.

14:34:54   25        Q.    You're not sure of the exact sequence.

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 159

| | | |
|---|---|---|
| 14:34:57 | 1 | A.    I'm not sure, no. |
| 14:34:57 | 2 | Q.    Okay.  I appreciate that. |
| 14:34:59 | 3 | A.    In general, you know. |
| 14:35:05 | 4 | Q.    Did you sign any conflict documents in 2002 |
| 14:35:08 | 5 | having to do with Mr. Toberoff's relationship with the |
| 14:35:18 | 6 | Shusters? |
| 14:35:18 | 7 | MR. TOBEROFF:  Don't discuss the contents of |
| 14:35:20 | 8 | the conflict waivers. |
| | 9 | BY MR. PETROCELLI: |
| 14:35:25 | 10 | Q.    You can answer that question. |
| 14:35:26 | 11 | A.    Well, no, I'm trying to remember.  There -- |
| 14:35:30 | 12 | you know, since this was 2002 and there was a conflict |
| 14:35:35 | 13 | waiver that accompanied this, so yes, we did sign a |
| 14:35:39 | 14 | conflict waiver in 2002. |
| 14:35:41 | 15 | Q.    And did that conflict waiver that you signed |
| 14:35:43 | 16 | in 2002, was that a conflict waiver with IP Worldwide |
| 14:35:48 | 17 | or with The Law Offices of Marc Toberoff, or do you |
| 14:35:51 | 18 | not remember? |
| 14:35:52 | 19 | A.    I don't remember. |
| 14:35:56 | 20 | Q.    Okay.  And did it have anything to do with |
| 14:36:01 | 21 | the Shusters? |
| 14:36:01 | 22 | A.    I -- well, I don't remember. |
| 14:36:03 | 23 | MR. TOBEROFF:  Don't discuss what the |
| 14:36:06 | 24 | conflict waiver -- excuse me.  Don't discuss the |
| 14:36:08 | 25 | substance of the conflict waiver.  It's privileged. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 160

| | | |
|---|---|---|
| 14:36:10 | 1 | THE WITNESS:  Besides, I don't remember. |
| 14:36:16 | 2 | MR. TOBEROFF:  It's moot. |
| | 3 | BY MR. PETROCELLI: |
| 14:36:27 | 4 | Q.  Were you ever shown a copy of Mr. Toberoff's |
| 14:36:33 | 5 | agreements with the Shuster family? |
| 14:36:38 | 6 | A.  No. |
| 14:36:38 | 7 | Q.  Was your mother? |
| 14:36:41 | 8 | A.  No. |
| 14:36:41 | 9 | Q.  Do you know whether you requested that such |
| 14:36:44 | 10 | agreements be made available to any other counsel on |
| 14:36:48 | 11 | your behalf, like Arthur Levine or George? |
| 14:36:57 | 12 | A.  No. |
| 14:36:58 | 13 | Q.  Were you -- did you ever become aware that |
| 14:37:05 | 14 | Mr. Toberoff owned a company called Pacific Pictures? |
| 14:37:09 | 15 | A.  Not until your lawsuit. |
| 14:37:13 | 16 | Q.  Prior to my lawsuit did you become aware that |
| 14:37:20 | 17 | Mr. Toberoff through a company by whatever name |
| 14:37:23 | 18 | entered into a joint venture where his company |
| 14:37:26 | 19 | acquired 50 percent of the Shusters' termination |
| 14:37:29 | 20 | interests? |
| 14:37:37 | 21 | A.  No. |
| 14:37:38 | 22 | Q.  Prior to reading our lawsuit did you ever |
| 14:37:45 | 23 | become aware that the agreement Mr. Toberoff entered |
| 14:37:53 | 24 | into with the Shuster family was void under the |
| 14:37:59 | 25 | copyright statute? |

LAURA SIEGEL LARSON - 7/22/2011

Page 161

14:38:01    1        A.    I don't understand the question.

14:38:05    2        Q.    That he had entered into an agreement with

14:38:07    3    the Shuster family that violated a copyright statute?

14:38:13    4        A.    I have no knowledge of anything like that.

14:38:20    5        Q.    Are you aware that Mr. Toberoff has conceded

14:38:24    6    in this case that his Pacific Pictures agreement with

14:38:30    7    the Shuster family did not comply with the copyright

14:38:36    8    statute?

14:38:36    9        A.    No, I'm not aware of that.

14:38:53    10        Q.    Did anything about -- were you aware prior to

14:39:04    11    the filing of our lawsuit that Mr. Toberoff's Pacific

14:39:12    12    Pictures agreement with the Shusters concerned

14:39:21    13    Superboy as well as Superman?

14:39:22    14        A.    I wasn't --

14:39:24    15        MR. TOBEROFF:    Wait.    Lacks foundation.

14:39:26    16    Assumes facts.

14:39:27    17        THE WITNESS:    I wasn't conscious of any

14:39:31    18    agreement.

            19    BY MR. PETROCELLI:

14:39:31    20        Q.    Since this lawsuit have you seen the written

14:39:38    21    agreement that Mr. Toberoff's Pacific Pictures company

14:39:43    22    entered into with the Shusters in 2001 relating to

14:39:47    23    both Superman and Superboy?

14:39:51    24        A.    I don't remember exactly what exhibits were

14:39:54    25    shown to me in my previous depositions.    So, you know,

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 162

| | | |
|---|---|---|
| 14:40:00 | 1 | I remember that there was some document that was shown |
| 14:40:05 | 2 | to me, but exactly what it was, I really don't recall, |
| 14:40:10 | 3 | but I -- you know, so I can't really answer your |
| 14:40:14 | 4 | question. |
| 14:40:17 | 5 | Q.   Okay.  Was there anything about Mr. Marks' |
| 14:40:21 | 6 | letter to you that discussed Mr. Toberoff and |
| 14:40:26 | 7 | Mr. Emanuel that angered you or your mother? |
| 14:40:32 | 8 | MR. TOBEROFF:  You can answer whether the |
| 14:40:34 | 9 | letter angered you or your mother. |
| | 10 | BY MR. PETROCELLI: |
| 14:40:36 | 11 | Q.   Or upset you in some way. |
| 14:40:38 | 12 | MR. TOBEROFF:  You can answer that. |
| 14:40:42 | 13 | THE WITNESS:  We were kind of upset. |
| | 14 | BY MR. PETROCELLI: |
| 14:40:53 | 15 | Q.   Okay.  How long after you received the letter |
| 14:40:59 | 16 | that kind of upset you did you terminate Mr. Marks? |
| 14:41:07 | 17 | A.   Well, I don't recall the date of his letter, |
| 14:41:10 | 18 | so I can't really answer that. |
| 14:41:12 | 19 | Q.   I appreciate you don't know the dates, but in |
| 14:41:15 | 20 | terms of the passage of time, was it a day?  Was it |
| 14:41:18 | 21 | two days?  Was it two months?  Can you estimate for |
| 14:41:22 | 22 | me? |
| 14:41:23 | 23 | A.   I would say weeks, but I don't know how many |
| 14:41:39 | 24 | weeks. |
| 14:41:40 | 25 | Q.   Given that Mr. Marks' letter informed you |

**Merrill   Corporation  -  Los Angeles**

800-826-0277                              www.merillcorp.com/law

**EXHIBIT 81**
**2175**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 163

14:41:45    1    that Mr. Emanuel and Mr. Toberoff had an interest in

14:41:50    2    marketing the property, I assume you discussed with

14:41:57    3    both of Mr. Emanuel and Mr. Toberoff when you met with

14:42:01    4    them both what that interest was?

14:42:04    5        A.    Yes.

14:42:04    6        Q.    Okay.  And in that discussion did you inquire

14:42:09    7    whether they had an investor who was interested in

14:42:15    8    acquiring the property?

14:42:16    9        MR. TOBEROFF:  You can answer as to your

14:42:18   10    discussions with Mr. Emanuel.

14:42:20   11        THE WITNESS:  Um-hum.

14:42:26   12        Ari gave us information, you know, relating

14:42:34   13    to his offer, and, you know, I mean he, you know, he's

14:42:41   14    a rich guy.  He's got rich friends and you know, so

14:42:46   15    he, you know, had -- had good connections, and it was

14:42:53   16    interesting, but, you know --

           17    BY MR. PETROCELLI:

14:42:57   18        Q.    Well, what did he say about his offer?  What

14:43:03   19    did you mean by "his offer"?

14:43:04   20        A.    Well, he -- he offered to put a substantial

14:43:09   21    amount of money up front and, you know, if he was able

14:43:15   22    to negotiate, you know, a good deal for us, that we

14:43:23   23    would have meaningful participation, and it sounded

14:43:32   24    interesting.

14:43:32   25        Q.    Let's be clear.  This would be a deal whereby

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 164

| | | |
|---|---|---|
| 14:43:32 | 1 | you and your mom would sell your interest to |
| 14:43:36 | 2 | Mr. Emanuel. |
| 14:43:37 | 3 | A.   I don't believe we were selling our interest |
| 14:43:39 | 4 | to him. |
| 14:43:40 | 5 | Q.   What were you doing, then?  Partnering with |
| 14:43:45 | 6 | him? |
| 14:43:45 | 7 | A.   That's more the feel that I got from it. |
| 14:43:48 | 8 | Q.   Okay.  So it wasn't like you were going to |
| 14:43:50 | 9 | give up all your Superman interests and he would now |
| 14:43:53 | 10 | own them.  It was that there would be some business |
| 14:43:56 | 11 | arrangement between the two of you where you would |
| 14:43:59 | 12 | mutually exploit the property; correct? |
| 14:44:00 | 13 | A.   Mutually benefit from it, I believe was the |
| 14:44:03 | 14 | gist of it. |
| 14:44:06 | 15 | Q.   And how much did Mr. Emanuel say that he |
| 14:44:09 | 16 | would be willing to invest? |
| 14:44:14 | 17 | A.   Well, I think it was in the range of |
| 14:44:17 | 18 | 15 million. |
| 14:44:18 | 19 | Q.   Okay.  And did he identify anyone else who |
| 14:44:24 | 20 | might co-invest with him?  You said he had a lot of |
| 14:44:27 | 21 | rich friends. |
| 14:44:28 | 22 | A.   Um-hum.  Well, he didn't give us specific |
| 14:44:34 | 23 | names. |
| 14:44:34 | 24 | Q.   Did he identify any other -- did he say |
| 14:44:39 | 25 | anything about a Superman movie to you? |

LAURA SIEGEL LARSON - 7/22/2011

Page 165

| | | |
|---|---|---|
| 14:44:41 | 1 | A.    No, there was no mention of a movie. |
| 14:44:43 | 2 | Q.    But if there were a movie that could be |
| 14:44:46 | 3 | produced, then you might share in the exploitation of |
| 14:44:49 | 4 | it? |
| 14:44:50 | 5 | A.    On down the line if there was a movie. |
| 14:44:52 | 6 | Q.    Okay. |
| 14:44:53 | 7 | MR. TOBEROFF:  Are you referring to her |
| 14:45:01 | 8 | understanding of what a deal would be with Mr. Emanuel |
| 14:45:04 | 9 | or as to a conversation? |
| 14:45:07 | 10 | MR. PETROCELLI:  I'm talking about the |
| 14:45:08 | 11 | information she got from Mr. Emanuel at this meeting, |
| 14:45:12 | 12 | her conversation. |
| 14:45:19 | 13 | Q.    What happened -- |
| 14:45:20 | 14 | MR. TOBEROFF:  Well, then vague as to that. |
| 14:45:22 | 15 | BY MR. PETROCELLI: |
| 14:45:22 | 16 | Q.    What happened -- did you pursue with |
| 14:45:35 | 17 | Mr. Emanuel this interest that he expressed? |
| 14:45:38 | 18 | A.    My mother and I discussed it, and our feeling |
| 14:45:43 | 19 | was that if he was willing to come up with 15 -- he or |
| 14:45:49 | 20 | a group of people were willing to come up with |
| 14:45:52 | 21 | $15 million, that that told us that the property was |
| 14:45:57 | 22 | worth a lot more than that because why would he be |
| 14:46:01 | 23 | willing to pay full value for it?  And so in thinking |
| 14:46:06 | 24 | about how we wanted to proceed, we thought that it |
| 14:46:10 | 25 | would be better for us to simply have an arrangement |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 166

| | | |
|---|---|---|
| 14:46:14 | 1 | with him in which he would for a 10 percent or an |
| 14:46:20 | 2 | agent's fee negotiate these things for us, you know, |
| 14:46:23 | 3 | because his 10 percent of a much larger figure would |
| 14:46:28 | 4 | be better for us in the long run financially. |
| 14:46:31 | 5 | Q.   Did you then tell him at some point that you |
| 14:46:34 | 6 | were not interested in doing an arrangement with him |
| 14:46:40 | 7 | for the 15 million where he was a direct participant? |
| 14:46:44 | 8 | A.   Yes. |
| 14:46:44 | 9 | Q.   Was it at that meeting, or was it at a |
| 14:46:48 | 10 | subsequent meeting? |
| 14:46:48 | 11 | A.   I believe it was at a subsequent meeting. |
| 14:46:50 | 12 | Q.   And did you inform him of your decision and |
| 14:46:55 | 13 | your mother's decision not to do a deal with him where |
| 14:46:58 | 14 | he was a principal as opposed to an agent prior to |
| 14:47:02 | 15 | signing Exhibit 45, the IPW -- IP Worldwide agreement? |
| 14:47:08 | 16 | A.   Yes. |
| 14:47:13 | 17 | Q.   When you had this discussion with Mr. Emanuel |
| 14:47:17 | 18 | in his office at Endeavor together with your mother -- |
| 14:47:21 | 19 | I think you said Mr. Toberoff also was there? |
| 14:47:23 | 20 | A.   Um-hum. |
| 14:47:27 | 21 | Q.   -- did he confirm to you that he had |
| 14:47:33 | 22 | presented this same proposal to Mr. Marks sometime |
| 14:47:38 | 23 | before? |
| 14:47:38 | 24 | A.   I believe he did. |
| 14:47:40 | 25 | Q.   Okay.  And did he tell you whether or not he |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 167

| | | |
|---|---|---|
| 14:47:43 | 1 | had ever heard back from Mr. Marks? |
| 14:47:48 | 2 | A.   I don't recall him talking about it. |
| 14:47:49 | 3 | Q.   Did you tell him that you had instructed |
| 14:47:54 | 4 | Mr. Marks not to get back to him? |
| 14:48:02 | 5 | A.   No. |
| 14:48:03 | 6 | Q.   By the time of this meeting with Mr. Emanuel |
| 14:48:09 | 7 | in his office talking about this arrangement, had you |
| 14:48:12 | 8 | already terminated Mr. Marks? |
| 14:48:16 | 9 | A.   Yes. |
| 14:48:17 | 10 | Q.   Are you certain? |
| 14:48:19 | 11 | A.   I believe so.  It was -- it was right around |
| 14:48:22 | 12 | the same time, because we're talking about September, |
| 14:48:26 | 13 | you know, so sometime in September. |
| 14:48:32 | 14 | Q.   Was $15 million the number that Mr. Emanuel |
| 14:48:37 | 15 | mentioned to you more than any offer that DC Comics or |
| 14:48:44 | 16 | Warner Bros. had previously presented to you? |
| 14:48:47 | 17 | A.   Yes, I believe it was. |
| 14:48:56 | 18 | Q.   Did Mr. Emanuel identify any other investors |
| 14:49:05 | 19 | besides himself? |
| 14:49:06 | 20 | MR. TOBEROFF:  Asked and answered. |
| 14:49:08 | 21 | You can answer. |
| 14:49:15 | 22 | THE WITNESS:  No. |
| | 23 | BY MR. PETROCELLI: |
| 14:49:16 | 24 | Q.   Did you have an understanding that |
| 14:49:21 | 25 | Mr. Emanuel -- from Mr. Emanuel's proposal about |

## LAURA SIEGEL LARSON - 7/22/2011

Page 168

| | | |
|---|---|---|
| 14:49:24 | 1 | $15 million and whatever other terms there were |
| 14:49:32 | 2 | whether that would include some participation by |
| 14:49:37 | 3 | Mr. Toberoff? |
| 14:49:38 | 4 | MR. TOBEROFF:  Vague and ambiguous as to -- |
| 14:49:40 | 5 | THE WITNESS:  I -- I don't recall any mention |
| 14:49:42 | 6 | of that. |
| | 7 | BY MR. PETROCELLI: |
| 14:49:46 | 8 | Q.  Okay.  Was there any discussion at this |
| 14:49:49 | 9 | meeting about Michael Siegel's 25 percent ownership of |
| 14:49:57 | 10 | the Siegel termination interests? |
| 14:50:01 | 11 | A.  I don't -- I don't believe that it was |
| 14:50:05 | 12 | discussed except to the extent of making him realize |
| 14:50:09 | 13 | that there was a Michael Siegel and that there was a |
| 14:50:14 | 14 | passive interest involved. |
| 14:50:18 | 15 | Q.  Was there any discussion that the $15 million |
| 14:50:23 | 16 | would also involve the exploitation of Superboy |
| 14:50:29 | 17 | rights? |
| 14:50:29 | 18 | A.  I think only Superman was mentioned. |
| 14:50:34 | 19 | Q.  Did -- was there any discussion at this |
| 14:50:38 | 20 | meeting with Mr. Emanuel about the fact that DC Comics |
| 14:50:48 | 21 | would hold the remaining 50 percent of the copyright |
| 14:50:55 | 22 | interest for an extended period of time? |
| 14:50:58 | 23 | A.  He was aware of that. |
| | 24 | THE REPORTER:  Was that "50"? |
| 14:51:02 | 25 | MR. PETROCELLI:  Fifty, yes. |

**EXHIBIT 81**
**2181**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 169

| | | |
|---|---|---|
| 14:51:02 | 1 | Q.   At least until 2013; right? |
| 14:51:05 | 2 | A.   He was aware of that. |
| 14:51:06 | 3 | Q.   And did he indicate whether that would |
| 14:51:14 | 4 | necessitate trying to reengage with DC comics or |
| 14:51:19 | 5 | Warner Bros. to do a deal? |
| 14:51:21 | 6 | A.   Well, he felt that they were the likely |
| 14:51:26 | 7 | purchaser if there was going to be a purchaser or, you |
| 14:51:29 | 8 | know, that a license agreement, you know, could be |
| 14:51:33 | 9 | entered into with them. |
| 14:51:37 | 10 | Q.   Did you -- when you got back to him and told |
| 14:51:41 | 11 | him that you preferred to work with him as an agent, |
| 14:51:44 | 12 | not as a business partner -- |
| 14:51:46 | 13 | A.   Um-hum. |
| 14:51:47 | 14 | Q.   -- did you and he have discussion then about |
| 14:51:51 | 15 | reengaging with Warner Bros. and DC Comics along the |
| 14:51:54 | 16 | lines that you had previously discussed? |
| 14:51:56 | 17 | A.   Yes. |
| 14:51:57 | 18 | Q.   And did he still agree that that was a |
| 14:52:01 | 19 | logical thing to do? |
| 14:52:02 | 20 | A.   Yes. |
| 14:52:03 | 21 | Q.   Okay.  Then he underwent -- undertook to do |
| 14:52:07 | 22 | that? |
| 14:52:08 | 23 | A.   At some point, yes. |
| 14:52:10 | 24 | MR. PETROCELLI:  Okay.  And why don't we stop |
| 14:52:15 | 25 | right now and take a short break.  We've been going |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 170

| | | |
|---|---|---|
| 14:52:17 | 1 | for a bit. |
| 14:52:19 | 2 | THE VIDEOGRAPHER:  This will mark the end of |
| 14:52:20 | 3 | Volume 1, tape number two, in the deposition of Laura |
| 14:52:23 | 4 | Siegel.  Going off the record.  The time is 2:52. |
| 14:52:44 | 5 | (A recess was taken.) |
| 15:22:09 | 6 | THE VIDEOGRAPHER:  We are back on the record, |
| 15:22:11 | 7 | and this marks the beginning of Volume 1, tape number |
| 15:22:13 | 8 | three, of the deposition of Laura Siegel.  The time is |
| 15:22:17 | 9 | 3:22. |
| | 10 | BY MR. PETROCELLI: |
| 15:22:35 | 11 | Q.  Was -- going back to your discussion with |
| 15:22:40 | 12 | Mr. Emanuel -- this was in his office -- Mr. Toberoff, |
| 15:22:49 | 13 | you, and your mother and Mr. Emanuel -- |
| 15:22:52 | 14 | A.  Um-hum. |
| 15:22:54 | 15 | Q.  Remember we were talking about that before |
| 15:22:56 | 16 | the break? |
| 15:22:57 | 17 | A.  Yes. |
| 15:22:58 | 18 | Q.  Did -- I think you said you were not sure |
| 15:23:02 | 19 | whether you had already terminated the services of |
| 15:23:06 | 20 | Mr. Marks as of the time of this discussion; correct? |
| 15:23:12 | 21 | A.  You know, the time frame is difficult to |
| 15:23:15 | 22 | remember, but -- no, no, no, no.  Wait.  What am I |
| 15:23:20 | 23 | saying?  No.  We had -- we definitely had.  I mean |
| 15:23:24 | 24 | back as far as May, you know, we were like 95 percent |
| 15:23:28 | 25 | there.  We were, you know, going to cut off |

## LAURA SIEGEL LARSON - 7/22/2011

Page 171

| | | |
|---|---|---|
| 15:23:30 | 1 | negotiations and everything, you know, so we were |
| 15:23:35 | 2 | really, really close to doing it early on. |
| 15:23:38 | 3 | Q.  Now, this idea about cutting off negotiations |
| 15:23:41 | 4 | in May, is that something that you and Mr. Toberoff |
| 15:23:45 | 5 | discussed during the break? |
| 15:23:47 | 6 | A.  No. |
| 15:23:47 | 7 | Q.  Is it something that you have had some -- |
| 15:23:50 | 8 | A.  It was that I didn't -- |
| 15:23:51 | 9 | Q.  -- some recollection about or something? |
| 15:23:53 | 10 | A.  Well, like, you know, I didn't have an |
| 15:23:56 | 11 | opportunity really to clarify it before. |
| 15:23:57 | 12 | Q.  The truth of the matter is you did not cut |
| 15:24:00 | 13 | off negotiations with Warner Bros. until the date you |
| 15:24:04 | 14 | sent your letter; correct? |
| 15:24:05 | 15 | A.  Correct. |
| 15:24:06 | 16 | Q.  Okay. |
| 15:24:07 | 17 | A.  Yeah.  But we were contemplating it, was all |
| 15:24:10 | 18 | I was saying. |
| 15:24:10 | 19 | Q.  I didn't ask you about cutting off |
| 15:24:13 | 20 | negotiations, and I noticed that you injected that |
| 15:24:16 | 21 | into your testimony, and I would appreciate it if you |
| 15:24:18 | 22 | could just try to answer my questions. |
| 15:24:20 | 23 | A.  What was your question? |
| 15:24:21 | 24 | Q.  My question was about the discharge of |
| 15:24:28 | 25 | Mr. Marks. |

LAURA SIEGEL LARSON - 7/22/2011

Page 172

| | | |
|---|---|---|
| 15:24:28 | 1 | A. Yes. |
| 15:24:37 | 2 | Q. You had not discharged Mr. Marks as of the |
| 15:24:39 | 3 | time of that meeting with Mr. Emanuel; correct? |
| 15:24:43 | 4 | A. No, that's not correct. |
| 15:24:44 | 5 | Q. Had you written Mr. Marks the letter |
| 15:24:48 | 6 | terminating him? |
| 15:24:48 | 7 | A. Yes. |
| 15:24:48 | 8 | Q. Prior to the meeting? |
| 15:24:50 | 9 | A. Yes. |
| 15:24:50 | 10 | Q. Okay. And why is it that you, given your |
| 15:24:54 | 11 | inability to recall with precision any of these other |
| 15:24:57 | 12 | dates, you remember that clearly or definitely, as you |
| 15:25:01 | 13 | said? |
| 15:25:01 | 14 | A. Well, because you're pressing me on it now. |
| 15:25:04 | 15 | Q. I've been pressing you on the sequence of |
| 15:25:07 | 16 | events throughout the day. |
| 15:25:08 | 17 | A. Yeah. |
| 15:25:08 | 18 | Q. But that one you know for sure. |
| 15:25:10 | 19 | A. I just had a break and I had some water, and |
| 15:25:12 | 20 | I feel a little bit better. |
| 15:25:15 | 21 | Q. So what is the date, then, of your meeting |
| 15:25:17 | 22 | with Mr. Emanuel? |
| 15:25:21 | 23 | A. The date I couldn't tell you for sure, but, |
| 15:25:24 | 24 | you know, I knew that we felt that we were, you know, |
| 15:25:28 | 25 | completely free and clear of the Gang, you know, Tyre |

Merrill Corporation - Los Angeles

800-826-0277                              www.merillcorp.com/law

EXHIBIT 81
2185

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 173

| | | |
|---|---|---|
| 15:25:32 | 1 | group before we had a meeting. |
| 15:25:34 | 2 | Q.   I didn't ask if you felt you were free and |
| 15:25:37 | 3 | clear.  I've asked whether you were a hundred -- I'll |
| 15:25:40 | 4 | ask it to you this way.  Are you 100 percent certain |
| 15:25:46 | 5 | that the date you met with Mr. Emanuel that you've |
| 15:25:48 | 6 | been testifying about with Mr. Toberoff and your |
| 15:25:54 | 7 | mother, by that date you had already sent your letter |
| 15:25:58 | 8 | terminating Mr. Marks? |
| 15:26:00 | 9 |       MR. TOBEROFF:  Asked and answered. |
| 15:26:00 | 10 |       THE WITNESS:  To the best of my recollection, |
| 15:26:01 | 11 | yes. |
| | 12 | BY MR. PETROCELLI: |
| 15:26:03 | 13 | Q.   Okay.  So you're not a hundred percent |
| 15:26:05 | 14 | certain; correct? |
| 15:26:05 | 15 | A.   Correct. |
| 15:26:08 | 16 | Q.   Okay.  Now, do you have any way of |
| 15:26:13 | 17 | establishing the date of your meeting with |
| 15:26:15 | 18 | Mr. Emanuel? |
| 15:26:19 | 19 | A.   With Mr. -- |
| 15:26:20 | 20 | Q.   Emanuel. |
| 15:26:22 | 21 | A.   The exact date? |
| 15:26:24 | 22 | Q.   Yes. |
| 15:26:24 | 23 | A.   No. |
| 15:26:25 | 24 | Q.   Do you have any way of refreshing your |
| 15:26:27 | 25 | recollection about the date? |

EXHIBIT 81
2186

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 174

| | | |
|---|---|---|
| 15:26:28 | 1 | A.   I can keep trying to remember.  I can keep |
| 15:26:31 | 2 | trying to think about it. |
| 15:26:32 | 3 | Q.   Is there any document or anything that would |
| 15:26:35 | 4 | refresh your memory that you're aware of? |
| 15:26:43 | 5 | A.   No, there are no documents. |
| 15:26:45 | 6 | Q.   Is there any document or anything that would |
| 15:26:47 | 7 | refresh your memory about the first time you met |
| 15:26:52 | 8 | Mr. Toberoff before the Mr. Emanuel meeting? |
| 15:26:55 | 9 | A.   No, there are no documents. |
| 15:26:56 | 10 | Q.   Is there anything else that would refresh |
| 15:26:58 | 11 | your recollection as to the date of that meeting? |
| 15:27:00 | 12 | A.   No, I don't think so. |
| 15:27:04 | 13 | Q.   When you met with Mr. Emanuel, did you and -- |
| 15:27:09 | 14 | was there any discussion in that meeting about the |
| 15:27:12 | 15 | fact that Kevin Marks might have to testify in a way |
| 15:27:18 | 16 | that was not helpful to you? |
| 15:27:20 | 17 | A.   In which meeting? |
| 15:27:22 | 18 | Q.   The meeting with Mr. Emanuel. |
| 15:27:23 | 19 | MR. TOBEROFF:  Excuse me.  Lacks foundation. |
| 15:27:25 | 20 | Assumes facts. |
| 15:27:28 | 21 | THE WITNESS:  I -- I don't recall any |
| 15:27:30 | 22 | discussion of that. |
| | 23 | BY MR. PETROCELLI: |
| 15:27:31 | 24 | Q.   Was there any discussion that if -- that |
| 15:27:43 | 25 | Warner Bros. or DC Comics may sue for interference? |

## Merrill  Corporation  -  Los Angeles

**EXHIBIT 81**
**2187**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 175

| | | |
|---|---|---|
| 15:27:47 | 1 | A.    With -- have a discussion with whom? |
| 15:27:51 | 2 | Q.    With Mr. Emanuel. |
| 15:28:03 | 3 | A.    No. |
| 15:28:03 | 4 | Q.    You understand that Warner Bros. in this case |
| 15:28:11 | 5 | is suing Mr. -- excuse me -- DC Comics in this case is |
| 15:28:15 | 6 | suing Mr. Toberoff and certain of his entities for |
| 15:28:22 | 7 | interfering with rights stemming from the negotiations |
| 15:28:30 | 8 | and discussions with you and your mother to acquire |
| 15:28:35 | 9 | the Siegel interest; correct? |
| 15:28:37 | 10 | A.    Yes. |
| 15:28:38 | 11 | MR. TOBEROFF:  Misstates your own Complaint, |
| 15:28:40 | 12 | but that's okay. |
| | 13 | BY MR. PETROCELLI: |
| 15:28:41 | 14 | Q.    And you understand that we contend that |
| 15:28:55 | 15 | Mr. Toberoff's and Mr. Emanuel's proposal to Mr. Marks |
| 15:29:03 | 16 | and then to you about a $15 million investment was |
| 15:29:12 | 17 | designed to break off your dealings with DC Comics and |
| 15:29:18 | 18 | Warner Bros.  You understand that's our contention; |
| 15:29:21 | 19 | correct? |
| 15:29:22 | 20 | A.    That's your contention. |
| 15:29:23 | 21 | Q.    How do you know that's our contention? |
| 15:29:26 | 22 | A.    From -- from the Complaint in this action. |
| 15:29:29 | 23 | Q.    Okay.  And when you just gave your answer a |
| 15:29:35 | 24 | few minutes ago after the break -- by the way, you |
| 15:29:39 | 25 | spoke to Mr. Toberoff during break; correct? |

Merrill  Corporation  -  Los Angeles

800-826-0277                              www.merillcorp.com/law

EXHIBIT 81
2188

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 176

| | | |
|---|---|---|
| 15:29:40 | 1 | A.   Yes.  He accompanied me to the restroom. |
| 15:29:46 | 2 | Q.   After the break -- after coming back from the |
| 15:29:51 | 3 | break and after speaking to Mr. Toberoff, you gave an |
| 15:29:57 | 4 | answer that was not responsive to my question about |
| 15:30:01 | 5 | being 95 percent sure that you were going to break off |
| 15:30:06 | 6 | dealings with DC as early as May.  Do you recall that? |
| 15:30:09 | 7 | A.   Yes, I do. |
| 15:30:10 | 8 | Q.   And you understood in giving that answer that |
| 15:30:12 | 9 | that would be helpful to Mr. Toberoff because it would |
| 15:30:20 | 10 | help establish that Mr. Toberoff did not interfere |
| 15:30:25 | 11 | with DC Comics' rights; correct? |
| 15:30:28 | 12 | A.   I was simply telling the truth. |
| 15:30:30 | 13 | Q.   I didn't ask you that question.  But you |
| 15:30:32 | 14 | understood that that answer was helpful to |
| 15:30:35 | 15 | Mr. Toberoff; correct? |
| 15:30:36 | 16 | A.   I wasn't thinking about that. |
| 15:30:38 | 17 | Q.   You have -- you understood that we were |
| 15:30:44 | 18 | making the interference claim; correct?  You said you |
| 15:30:48 | 19 | read the lawsuit; right? |
| 15:30:50 | 20 | A.   I did read the lawsuit. |
| 15:30:52 | 21 | Q.   And you were trying to help Mr. Toberoff |
| 15:30:57 | 22 | because he told you to give that answer and to work |
| 15:31:00 | 23 | that into one of your answers when you came back after |
| 15:31:03 | 24 | a break; correct? |
| 15:31:04 | 25 | A.   No.  No, that's not correct. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 177

| | | |
|---|---|---|
| 15:31:08 | 1 | Q.    Fortunately we have documents. |
| 15:31:15 | 2 | Speaking of which -- |
| 15:31:17 | 3 | MR. TOBEROFF:  Is that a question? |
| 15:31:19 | 4 | MR. PETROCELLI:  It is.  It is a prelude to a |
| 15:31:21 | 5 | question. |
| 15:31:25 | 6 | Q.    Mr. Marks sent you this document that you've |
| 15:31:30 | 7 | described in which Mr. Toberoff appeared on the scene |
| 15:31:36 | 8 | with Mr. Emanuel talking about a $15 million |
| 15:31:41 | 9 | investment, much greater than any offer Warner Bros. |
| 15:31:43 | 10 | or DC had ever made in mid August, 2002; correct? |
| 15:31:49 | 11 | A.    Well, as I said, I don't recall the date. |
| 15:31:51 | 12 | Q.    Okay.  Well, take a look at this privilege |
| 15:31:55 | 13 | log which we will mark as Exhibit 57. |
| | 14 | (Whereupon, Plaintiff's Exhibit 57 |
| 15:32:16 | 15 | was marked for identification.) |
| 15:32:17 | 16 | THE WITNESS:  Is there a page you want me to |
| 15:32:18 | 17 | look at? |
| | 18 | BY MR. PETROCELLI: |
| 15:32:21 | 19 | Q.    Yes.  Take a look at item number -- take a |
| 15:32:29 | 20 | look at the page that starts with or that ends with |
| 15:32:34 | 21 | item 628. |
| 15:32:39 | 22 | A.    Okay. |
| 15:32:44 | 23 | MR. TOBEROFF:  You got there pretty quickly. |
| 15:32:46 | 24 | THE WITNESS:  I got lucky. |
| 15:32:47 | 25 | MR. TOBEROFF:  Wait a second.  I need to turn |

EXHIBIT 81
2190

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 178

| | | |
|---|---|---|
| 15:32:48 | 1 | to this. |
| 15:32:51 | 2 | Okay. |
| | 3 | BY MR. PETROCELLI: |
| 15:33:01 | 4 | Q.   Now, you see the entry for 623? |
| 15:33:06 | 5 | A.   Yes. |
| 15:33:07 | 6 | Q.   Does Attorney Kevin Marks' letter to Joanne, |
| 15:33:11 | 7 | Laura Siegel -- Joanne is your mother; right? |
| 15:33:14 | 8 | A.   Correct. |
| 15:33:15 | 9 | Q.   -- Attorney Don Bulson and Attorney Bruce |
| 15:33:20 | 10 | Ramer.  Do you see that? |
| 15:33:22 | 11 | A.   Yes. |
| 15:33:23 | 12 | Q.   Do you remember whether the letter you |
| 15:33:24 | 13 | received and that your mother received in which |
| 15:33:27 | 14 | Mr. Marks discussed the Toberoff/Emanuel proposal |
| 15:33:31 | 15 | was -- also included Mr. Bulson on it? |
| 15:33:35 | 16 | A.   I don't remember. |
| 15:33:36 | 17 | Q.   Okay.  Did you discuss the letter with |
| 15:33:39 | 18 | Michael Siegel or Mr. Bulson? |
| 15:33:43 | 19 | A.   I don't remember doing that. |
| 15:33:43 | 20 | Q.   Mr. Bulson you understood to be Mr. Michael |
| 15:33:49 | 21 | Siegel's lawyer? |
| 15:33:49 | 22 | A.   Correct. |
| 15:33:49 | 23 | Q.   And you will see that was item number 623 on |
| 15:33:52 | 24 | this privilege log which has been marked as Exhibit -- |
| 15:33:54 | 25 | What? |

LAURA SIEGEL LARSON - 7/22/2011

Page 179

| | | |
|---|---|---|
| 15:33:55 | 1 | MR. TOKORO:  57. |
| 15:33:56 | 2 | MR. PETROCELLI:  57. |
| 15:34:02 | 3 | Q.  And now we go to item 624, and that's a |
| 15:34:06 | 4 | document dated August 12, 2002, which is a letter to |
| 15:34:11 | 5 | you and your mother.  Do you see that? |
| 15:34:12 | 6 | A.  Yes. |
| 15:34:14 | 7 | Q.  And then if you skip down, there's a document |
| 15:34:17 | 8 | dated August 20, 2002, a letter to you, your mother, |
| 15:34:21 | 9 | with a copy to Bruce Ramer.  That's Mr. Marks' |
| 15:34:27 | 10 | partner; right? |
| 15:34:28 | 11 | A.  Yes. |
| 15:34:51 | 12 | Q.  Is it your recollection that the letter you |
| 15:34:55 | 13 | received occurred in or about August, 2002?  Does that |
| 15:35:00 | 14 | sound right timewise? |
| 15:35:01 | 15 | A.  I have no way of knowing whether it was back |
| 15:35:04 | 16 | here in July or if it was in August. |
| 15:35:07 | 17 | Q.  Okay. |
| 15:35:22 | 18 | You did not notify DC that you were cutting |
| 15:35:29 | 19 | off negotiations until after you heard about the |
| 15:35:37 | 20 | Toberoff/Emanuel offer from Kevin Marks; correct? |
| 15:35:45 | 21 | A.  Could have been. |
| 15:35:46 | 22 | Q.  Well, we saw that you cut off the -- |
| 15:35:49 | 23 | A.  In September. |
| 15:35:51 | 24 | Q.  Correct.  And that was after you had already |
| 15:35:53 | 25 | heard about the Toberoff/Emanuel proposal from |

EXHIBIT 81
2192

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 180

| | | |
|---|---|---|
| 15:35:58 | 1 | Mr. Marks; correct? |
| 15:36:00 | 2 | A.    It seems that way. |
| 15:36:22 | 3 | Q.    Okay. |
| 15:36:22 | 4 | Did you discuss with Mr. Emanuel in the |
| 15:36:26 | 5 | meeting that we've been talking about, the date of |
| 15:36:30 | 6 | which you can't give us -- |
| 15:36:31 | 7 | A.    Um-hum. |
| 15:36:32 | 8 | Q.    -- that Mr. Marks might take the position |
| 15:36:46 | 9 | that you already had reached an agreement with |
| 15:36:49 | 10 | Time-Warner and DC Comics? |
| 15:36:51 | 11 | MR. TOBEROFF:  Asked and answered. |
| 15:36:52 | 12 | THE WITNESS:  No.  I think you asked me.  I |
| 15:36:55 | 13 | said no. |
| | 14 | BY MR. PETROCELLI: |
| 15:36:55 | 15 | Q.    I didn't ask you that.  I asked you about |
| 15:36:58 | 16 | whether he would testify adversely to you.  This is a |
| 15:37:02 | 17 | different question. |
| 15:37:03 | 18 | A.    The answer is still no. |
| 15:37:04 | 19 | Q.    Okay.  You don't recall, or it's definitely |
| 15:37:07 | 20 | no? |
| 15:37:08 | 21 | A.    Well, I don't remember talking to Mr. Emanuel |
| 15:37:10 | 22 | about that subject. |
| 15:37:11 | 23 | Q.    This is in the group meeting now we're |
| 15:37:13 | 24 | talking about. |
| 15:37:18 | 25 | A.    Yeah, you're talking about with Mr. Emanuel |

## Merrill  Corporation  -  Los Angeles

**EXHIBIT 81**
**2193**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 181

| | | |
|---|---|---|
| 15:37:21 | 1 | and my mother. |
| 15:37:22 | 2 | Q. Right. Did you have any discussion in that |
| 15:37:24 | 3 | meeting that Warner Bros. or DC Comics might take that |
| 15:37:28 | 4 | position, that there was already an agreement reached |
| 15:37:30 | 5 | and you're not going to be able to get out of it? |
| 15:37:34 | 6 | A. I don't believe so. I think we were looking |
| 15:37:36 | 7 | forward, not backward. |
| 15:37:37 | 8 | Q. But you had to appreciate that DC Comics and |
| 15:37:41 | 9 | Warner Bros. might have a different view than you; |
| 15:37:44 | 10 | right? That they might say you had no right to just |
| 15:37:48 | 11 | terminate a deal? |
| 15:37:49 | 12 | A. Everybody -- they could take that position if |
| 15:37:52 | 13 | they chose to. |
| 15:37:53 | 14 | Q. Correct, and what I'm asking you is whether |
| 15:37:55 | 15 | you discussed that with the folks at this meeting. |
| 15:38:00 | 16 | A. I don't remember discussing that. |
| 15:38:02 | 17 | Q. Okay. And you said you were looking forward, |
| 15:38:07 | 18 | meaning your focus was looking forward in making a new |
| 15:38:11 | 19 | deal. |
| 15:38:11 | 20 | A. Yes. |
| 15:38:26 | 21 | Q. Does the name David Michaels mean anything to |
| 15:38:28 | 22 | you? |
| 15:38:28 | 23 | A. Yes. |
| 15:38:31 | 24 | Q. Who is he, or how do you know him? |
| 15:38:34 | 25 | A. He was a guy who worked for a short amount of |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 182

| 15:38:37 | 1 | time in Mr. Toberoff's office. |

15:38:40    2    Q.   And how do you know that?

15:38:42    3    A.   Because when my mother and I went for, you

15:38:45    4    know, a meeting or two with Mr. Toberoff, he was

15:38:49    5    there, and I was introduced to him.

15:38:55    6    Q.   Do you know what year it was?

15:39:02    7    A.   What year was that?  I don't know.  Maybe

15:39:08    8    around 2004, 2005, in there somewhere.

15:39:13    9    Q.   Did you interact with him at all?

15:39:16    10   A.   You know, "Hello.  How are you."  You know,

15:39:21    11   he said, you know, he was excited to be working on

15:39:30    12   Superman.

15:39:30    13   Q.   When is the last time you had any interaction

15:39:34    14   with him of any kind or the last time your mother did,

15:39:38    15   to your knowledge?

15:39:39    16   A.   Yeah, it was -- it was late in -- I think it

15:39:46    17   was 2005.  Yeah, I think it was late in 2005.

15:39:53    18   Q.   What was the nature of that interaction?

15:39:56    19   A.   He contacted me and said he had some

15:40:00    20   information for my mother and me about our case.

15:40:04    21   Q.   Was he still working for Mr. Toberoff at that

15:40:07    22   time?

15:40:08    23   A.   It wasn't really clear to me.

15:40:14    24   Q.   What else was discussed?

15:40:19    25   A.   Other than -- are you talking about when he

LAURA SIEGEL LARSON - 7/22/2011

Page 183

| | | |
|---|---|---|
| 15:40:21 | 1 | first contacted me? |
| 15:40:22 | 2 | Q.   I thought I asked you when you and he last |
| 15:40:27 | 3 | interacted. |
| 15:40:28 | 4 | A.   Yes. |
| 15:40:28 | 5 | Q.   Was that the occasion? |
| 15:40:29 | 6 | MR. TOBEROFF:   She was -- I think she -- at |
| 15:40:32 | 7 | least I thought and she thought you were asking about |
| 15:40:34 | 8 | when he first contacted her. |
| 15:40:38 | 9 | MR. PETROCELLI:   Okay.   Let me rewind this a |
| 15:40:41 | 10 | bit. |
| 15:40:41 | 11 | THE WITNESS:   Okay. |
| | 12 | BY MR. PETROCELLI: |
| 15:40:42 | 13 | Q.   Is the last time -- when is the last time you |
| 15:40:45 | 14 | had any communication with David Michaels? |
| 15:40:49 | 15 | A.   Late in -- as I said, I believe it was 2005. |
| 15:40:52 | 16 | Q.   And that is because you received a telephone |
| 15:40:54 | 17 | call from him? |
| 15:40:55 | 18 | A.   A telephone call, and then he followed -- |
| 15:40:58 | 19 | followed that up with a meeting with my mom and me. |
| 15:41:02 | 20 | Q.   Okay.   And where did the meeting take place? |
| 15:41:07 | 21 | A.   At my condominium. |
| 15:41:11 | 22 | Q.   Did you tell Mr. Toberoff about this meeting? |
| 15:41:13 | 23 | A.   Later. |
| 15:41:15 | 24 | Q.   Not at the time. |
| 15:41:18 | 25 | A.   Not at the time. |

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merillcorp.com/law

EXHIBIT 81
2196

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 184

| 15:41:18 | 1 | Q.   And that was a deliberate choice on your part |
|---|---|---|
| 15:41:27 | 2 | not to mention to Mr. Toberoff that you were having a |
| 15:41:27 | 3 | meeting with someone who used to work for him; |
| 15:41:27 | 4 | correct? |
| 15:41:27 | 5 | A.   Well, yeah, it was kind of an embarrassing |
| 15:41:30 | 6 | situation, but, you know, we were curious.  We wanted |
| 15:41:34 | 7 | to know what this guy had to say. |
| 15:41:40 | 8 | Q.   Okay.  And how long -- what -- how long was |
| 15:41:44 | 9 | it between the time he called you and the time that |
| 15:41:46 | 10 | you folks met at your home?  What was the -- a day?  A |
| 15:41:52 | 11 | couple of days? |
| 15:41:54 | 12 | A.   A few days. |
| 15:42:00 | 13 | Q.   Prior to the time that he called you, you |
| 15:42:04 | 14 | said you think it was maybe late '05? |
| 15:42:07 | 15 | A.   I think so. |
| 15:42:08 | 16 | Q.   What was the last time before then that you |
| 15:42:11 | 17 | had any kind of communication with him? |
| 15:42:14 | 18 | A.   It was, I guess, a couple of months before |
| 15:42:18 | 19 | that when I had seen him at Mr. Toberoff's office. |
| 15:42:24 | 20 | Q.   Okay.  And when he spoke to you on the phone |
| 15:42:28 | 21 | and said he had information for you, did he say he |
| 15:42:31 | 22 | wanted to meet you? |
| 15:42:32 | 23 | A.   Yes. |
| 15:42:32 | 24 | Q.   Okay.  And you agreed? |
| 15:42:36 | 25 | A.   Well, I said, "What is this about," you know, |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 185

| | | |
|---|---|---|
| 15:42:38 | 1 | and he said, "I really don't want to talk about it on |
| 15:42:42 | 2 | the phone.  You know, is it okay if I come by?" |
| 15:42:45 | 3 | Q.   Okay.  Did he tell you what the nature of the |
| 15:42:48 | 4 | information was? |
| 15:42:48 | 5 | A.   No, he did not, not on the phone. |
| 15:42:50 | 6 | Q.   So when you met with him, what did he tell |
| 15:42:52 | 7 | you? |
| 15:42:52 | 8 | MR. TOBEROFF:  Okay.  We have asserted |
| 15:42:55 | 9 | privilege between your conversation with David |
| 15:42:57 | 10 | Michaels other than pleasantries or saying "I want to |
| 15:43:00 | 11 | speak to you."  As to your actual conversation, those |
| 15:43:04 | 12 | are privileged. |
| | 13 | BY MR. PETROCELLI: |
| 15:43:07 | 14 | Q.   Did -- did he give you legal advice at this |
| 15:43:14 | 15 | meeting -- |
| 15:43:14 | 16 | MR. TOBEROFF:  Don't -- don't -- |
| | 17 | BY MR. PETROCELLI: |
| 15:43:15 | 18 | Q.   -- at a meeting that you secreted from your |
| 15:43:18 | 19 | lawyer? |
| 15:43:19 | 20 | MR. TOBEROFF:  Don't -- |
| 15:43:19 | 21 | THE WITNESS:  No, he was a lawyer. |
| 15:43:21 | 22 | MR. TOBEROFF:  Wait.  Wait.  Wait.  Don't -- |
| | 23 | BY MR. PETROCELLI: |
| 15:43:22 | 24 | Q.   I know Mr. Michaels is a lawyer, but he did |
| 15:43:29 | 25 | not give you legal advice at this meeting; correct? |

**EXHIBIT 81**
**2198**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 186

| | | |
|---|---|---|
| 15:43:32 | 1 | MR. TOBEROFF:  Okay.  I instruct you not to |
| 15:43:34 | 2 | answer as to the legal conclusion as to whether it's |
| 15:43:39 | 3 | legal advice, not legal advice.  We have already |
| 15:43:42 | 4 | litigated this, and those communications were upheld |
| 15:43:45 | 5 | as privileged. |
| 15:43:46 | 6 | THE WITNESS:  Okay. |
| 15:43:46 | 7 | MR. TOBEROFF:  So we're going to follow the |
| 15:43:48 | 8 | court's ruling. |
| 15:43:49 | 9 | MR. PETROCELLI:  You know, Marc, you have a |
| 15:43:52 | 10 | way of misstating the record.  What the court ruled on |
| 15:43:56 | 11 | were certain written communications.  As you know, |
| 15:44:00 | 12 | there has been no record put in front of the judge |
| 15:44:03 | 13 | about these conversations.  So you can take the |
| 15:44:06 | 14 | position that the same reasoning and ruling would |
| 15:44:09 | 15 | apply, but I do object to your overstating the record. |
| 15:44:12 | 16 | MR. TOBEROFF:  And I object to you accusing |
| 15:44:14 | 17 | me of misstating the record when I'm not. |
| 15:44:17 | 18 | MR. PETROCELLI:  Okay, but you are misstating |
| 15:44:19 | 19 | it. |
| 15:44:19 | 20 | MR. TOBEROFF:  No, I'm not.  The whole |
| 15:44:22 | 21 | lawsuit that you designed and filed is designed to |
| 15:44:24 | 22 | improperly interfere with the attorney-client |
| 15:44:26 | 23 | relationship.  So I have no doubt that you will |
| 15:44:28 | 24 | continue that attempt at interference at every chance |
| 15:44:32 | 25 | you get, try and learn every single privileged |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 187

| | | |
|---|---|---|
| 15:44:34 | 1 | communication you can possibly learn, and I object to |
| 15:44:37 | 2 | that. And the process, we have a lengthy list of |
| 15:44:40 | 3 | written communications from you and your cohorts at |
| 15:44:44 | 4 | your firm almost pathologically misstating the record. |
| 15:44:49 | 5 | MR. PETROCELLI: And -- |
| 15:44:49 | 6 | MR. TOBEROFF: So we can cross swords on -- |
| 15:44:51 | 7 | MR. PETROCELLI: Just -- |
| 15:44:52 | 8 | MR. TOBEROFF: If we had a score board as to |
| 15:44:54 | 9 | characterizing the record -- mischaracterizing the |
| 15:44:59 | 10 | record, I think you're way ahead of me. |
| 15:45:00 | 11 | MR. PETROCELLI: I doubt it. And I think you |
| 15:45:02 | 12 | are the lawyer who identified as privileged 15 |
| 15:45:06 | 13 | communications that a judge found to be bogus 15 out |
| 15:45:10 | 14 | of 15 times. |
| 15:45:11 | 15 | MR. TOBEROFF: He didn't find them bogus, but |
| 15:45:13 | 16 | you also challenged all the communications. So it was |
| 15:45:16 | 17 | something like 15 out of 150 that were found to be |
| 15:45:21 | 18 | privileged -- |
| 15:45:21 | 19 | MR. PETROCELLI: Irrelevant, because they did |
| 15:45:22 | 20 | not relate to the accounting issues. |
| 15:45:23 | 21 | MR. TOBEROFF: And you said none of them were |
| 15:45:25 | 22 | privileged. |
| 15:45:26 | 23 | MR. PETROCELLI: So let's get back on track |
| 15:45:28 | 24 | here. You -- |
| 15:45:29 | 25 | MR. TOBEROFF: And in fact, you're seeking -- |

LAURA SIEGEL LARSON - 7/22/2011

Page 188

15:45:30    1    your whole lawsuit is based on privileged documents

15:45:34    2    stolen from my law firm that your client held onto for

15:45:39    3    about five months, illegally stolen property without

15:45:42    4    even letting us know.

15:45:43    5        MR. PETROCELLI:  As far as I'm concerned,

15:45:44    6    there's zero evidence --

15:45:45    7        MR. TOBEROFF:  There's zero evidence?

15:45:45    8    Consider this an early holiday gift and an enclosing

15:45:48    9    document and your client said they got it in June or

15:45:51    10    July?

15:45:52    11        MR. PETROCELLI:  Well, if you were right --

15:45:53    12        MR. TOBEROFF:  What holiday are you taking

15:45:55    13    about?  July 4th?

15:45:56    14        MR. PETROCELLI:  If you were right, then such

15:45:57    15    a person would be behind bars, would have been

15:46:00    16    criminally convicted, and no judge would have ever

15:46:02    17    ordered the production of those documents.

15:46:05    18        MR. TOBEROFF:  Not necessarily, as we'll see.

15:46:06    19        MR. PETROCELLI:  So I guess it's not as clear

15:46:08    20    cut as you're suggesting.

15:46:10    21        MR. TOBEROFF:  We asked your client for --

15:46:12    22    it's a studio that keeps track of everything going in

15:46:15    23    and out of that studio 18 different ways from Sunday,

15:46:18    24    and they didn't have a single record of three packages

15:46:22    25    of documents in the middle of a litigation that the

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 189

15:46:24   1   general counsel to Alan Horn, the president or CEO --

15:46:29   2   I forget which -- and the head of production, they

15:46:34   3   didn't have a single corroborating piece of evidence

15:46:34   4   as to when these three huge packages of documents

15:46:40   5   arrived at their firm, arrived at their studio.

15:46:40   6          MR. PETROCELLI:  Just like you mysteriously

15:46:41   7   don't have any evidence to date the contacts that you

15:46:43   8   made when you interfered with my client's rights?

15:46:46   9          MR. TOBEROFF:  I interfered with your

15:46:48  10   client's rights?

15:46:48  11          MR. PETROCELLI:  We'll get there.

15:46:50  12          MR. TOBEROFF:  This is something spun out of

15:46:52  13   whole cloth in order to try and leverage a settlement,

15:46:55  14   and we all know it.

15:46:55  15          MR. PETROCELLI:  We'll get there.

15:46:56  16          MR. TOBEROFF:  You will not get there.

15:46:58  17          MR. PETROCELLI:  It may take time, but

15:47:00  18   there's no quickness.

15:47:01  19          MR. TOBEROFF:  You don't have a prayer, and

15:47:02  20   you know it.

15:47:04  21          MR. PETROCELLI:  I don't need prayers.

15:47:06  22          MR. TOBEROFF:  You don't have a -- as --

15:47:11  23   if -- I could use an expression from my father, but I

15:47:15  24   probably shouldn't.

15:47:16  25          MR. PETROCELLI:  No, you shouldn't.  You

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 190

15:47:17    1    shouldn't invoke your dad.  Okay?

15:47:20    2        Q.    Ms. Siegel, when you met with Mr. Michaels --

15:47:30    3    first of all, did you take any notes?

15:47:32    4        A.    No, I don't believe so.

15:47:33    5        Q.    Did your mother?

15:47:35    6        A.    No.

15:47:39    7        Q.    What happened with respect to your

15:47:42    8    interaction with Mr. Michaels after he left?

15:47:46    9    Anything?

15:47:47    10        A.    After he left?

15:47:47    11        Q.    Yes, after the meeting was over.

15:47:50    12        A.    He sent -- he sent me a follow-up e-mail.

15:47:57    13        Q.    So you got just one e-mail from him?

15:48:02    14        A.    I'm remembering one in particular right now.

15:48:06    15    May have received more than one.

15:48:07    16        Q.    And did you respond to the e-mails?

15:48:10    17        A.    Yes, I did.

15:48:16    18        Q.    Did you basically tell him not to contact you

15:48:19    19    again?

15:48:19    20        A.    You bet.

15:48:20    21        Q.    Okay.  So after you responded to his e-mail,

15:48:27    22    did he respond to you again or communicate in any way

15:48:32    23    with you again, or your mother, for that matter?

15:48:34    24        A.    Yeah, I think he sent an e-mail apologizing

15:48:38    25    for trying to --

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 191

| | | |
|---|---|---|
| 15:48:39 | 1 | MR. TOBEROFF: Don't -- don't discuss the |
| | 2 | substance. |
| 15:48:41 | 3 | THE WITNESS: Okay. |
| | 4 | BY MR. PETROCELLI: |
| 15:48:42 | 5 | Q. Apologizing? |
| 15:48:43 | 6 | A. Apologizing to my mom and me. |
| 15:48:48 | 7 | Q. Okay. And when is the last time you saw |
| 15:48:50 | 8 | those e-mails? |
| 15:48:52 | 9 | A. It's been a long time. I don't know. |
| 15:48:54 | 10 | Q. What was he apologizing for? |
| 15:48:57 | 11 | A. For something that was discussed that it |
| 15:49:02 | 12 | seems to me that I cannot reveal. |
| 15:49:06 | 13 | Q. Do you remember what you and he discussed? |
| 15:49:09 | 14 | A. Yes. |
| 15:49:10 | 15 | Q. Okay. And I think I've asked you this, and I |
| 15:49:17 | 16 | think you have instructed. But did he give you legal |
| 15:49:19 | 17 | advice in that meeting? |
| 15:49:23 | 18 | MR. TOBEROFF: Calls for a legal conclusion. |
| 15:49:27 | 19 | THE WITNESS: May I answer that question? |
| 15:49:33 | 20 | MR. TOBEROFF: No, I don't think you can |
| 15:49:35 | 21 | answer that question, characterizing his |
| 15:49:39 | 22 | communications. There's been certain limited |
| 15:49:42 | 23 | disclosure as to David Michaels which was held not to |
| 15:49:46 | 24 | be a waiver of the privilege, and I don't want you to |
| 15:49:53 | 25 | go beyond that. |

Merrill Corporation - Los Angeles
800-826-0277                    www.merillcorp.com/law
EXHIBIT 81
2204
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 192

| | | |
|---|---|---|
| 15:49:54 | 1 | THE WITNESS:  Okay. |
| | 2 | BY MR. PETROCELLI: |
| 15:49:59 | 3 | Q.    Did -- well, certainly when Mr. Michaels |
| 15:50:06 | 4 | apologized to you, he wasn't giving you legal advice, |
| 15:50:10 | 5 | was he? |
| 15:50:12 | 6 | A.    No.  It was at -- the apology was based on |
| 15:50:16 | 7 | something that had previously occurred. |
| 15:50:20 | 8 | Q.    And did -- do you know -- did Mr. -- to your |
| 15:50:24 | 9 | knowledge, did Mr. Michaels learn anything at the |
| 15:50:29 | 10 | meeting that caused him later to apologize? |
| 15:50:34 | 11 | A.    No.  It's not something that he learned. |
| 15:50:36 | 12 | It's -- he was apologizing for something that he did. |
| 15:50:40 | 13 | Q.    To you and your mother? |
| 15:50:43 | 14 | MR. TOBEROFF:  I will allow you to testify as |
| 15:50:45 | 15 | to what he apologized -- you know, I think we're -- |
| 15:50:51 | 16 | you characterize as an apology broadly because I |
| 15:50:57 | 17 | believe it was disclosed previously and held not to be |
| 15:51:00 | 18 | a waiver of the privilege.  So you can testify |
| 15:51:03 | 19 | generally as to what he was apologizing for. |
| 15:51:07 | 20 | THE WITNESS:  It became very clear when he |
| 15:51:10 | 21 | was -- when he was at the meeting and then in this |
| 15:51:13 | 22 | follow-up e-mail that he sent to us that it was a bold |
| 15:51:17 | 23 | attempt on his part to steal my mom and I away from |
| 15:51:22 | 24 | Mr. Toberoff as clients, and he wanted us to sign with |
| 15:51:26 | 25 | him for him to be our attorney. |

EXHIBIT 81
2205

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 193

| | | |
|---|---|---|
| 15:51:29 | 1 | BY MR. PETROCELLI: |
| 15:51:29 | 2 | Q.   And why would he apologize for that, to your |
| 15:51:33 | 3 | knowledge? |
| 15:51:34 | 4 | A.   Because we let him know that we were |
| 15:51:39 | 5 | outraged -- |
| 15:51:39 | 6 | Q.   Okay. |
| 15:51:40 | 7 | A.   -- that he would do that. |
| 15:51:41 | 8 | Q.   When did you let him know that? |
| 15:51:43 | 9 | A.   By e-mail. |
| 15:51:44 | 10 | Q.   You didn't tell him at the meeting? |
| 15:51:48 | 11 | A.   We told him that -- you know, we didn't -- |
| 15:51:52 | 12 | MR. TOBEROFF:   Wait. |
| | 13 | BY MR. PETROCELLI: |
| 15:51:52 | 14 | Q.   Did you kick him out of your house and say |
| 15:51:56 | 15 | "What are you doing here?" |
| 15:51:58 | 16 | A.   Let me put it this way.  All of his motives |
| 15:52:03 | 17 | were not revealed in our meeting.  It became much -- |
| 15:52:08 | 18 | it became clearer, you know, after the meeting when he |
| 15:52:13 | 19 | sent follow-up e-mails what his actual intention was. |
| 15:52:21 | 20 | Q.   After the meeting and before you received the |
| 15:52:27 | 21 | e-mails -- well, after he left the meeting with you, |
| 15:52:30 | 22 | did you have a belief that he was interested in having |
| 15:52:35 | 23 | you sign with him? |
| 15:52:37 | 24 | A.   On his way out the door he turned and said, |
| 15:52:41 | 25 | "I've got an idea.  You know, why don't you guys just, |

**EXHIBIT 81**
**2206**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 194

| | | |
|---|---|---|
| 15:52:44 | 1 | you know, come with me and I'll introduce you to |
| 15:52:47 | 2 | another firm." |
| 15:52:49 | 3 | Q.   Did he identify the firm? |
| 15:52:52 | 4 | A.   No.  I think he was looking for a job at the |
| 15:52:56 | 5 | time. |
| 15:52:58 | 6 | Q.   Okay.  Had he been fired? |
| 15:53:02 | 7 | A.   I don't -- I don't know. |
| 15:53:02 | 8 | Q.   Did he tell you what his employment status |
| 15:53:05 | 9 | was? |
| 15:53:05 | 10 | A.   I think he said he was looking for a job. |
| 15:53:12 | 11 | Q.   And then when he said that to you as he was |
| 15:53:15 | 12 | going out the door, what did you or your mother say to |
| 15:53:19 | 13 | him?  "Don't waste your time" or you're not |
| 15:53:22 | 14 | interested, or what do you recall saying? |
| 15:53:24 | 15 | A.   It was -- it was like -- first of all, we |
| 15:53:28 | 16 | were shocked because we thought it was pretty |
| 15:53:32 | 17 | outrageous, and, you know, we felt that he had, you |
| 15:53:35 | 18 | know, come -- come in to talk to us under false |
| 15:53:42 | 19 | pretenses.  But he was -- he was on the way out the |
| 15:53:45 | 20 | door, and my mom and I, you know, didn't have to kick |
| 15:53:47 | 21 | him out because he was already leaving, but, you know, |
| 15:53:51 | 22 | we wanted to talk about it afterwards and figure out |
| 15:53:54 | 23 | what had just happened. |
| 15:53:58 | 24 | Q.   So after he left, what did you and your |
| 15:54:01 | 25 | mother discuss that you would do with this encounter |

LAURA SIEGEL LARSON - 7/22/2011

Page 195

| | | |
|---|---|---|
| 15:54:03 | 1 | that you just had? |
| 15:54:06 | 2 | A.   My mom and I said we didn't have a good |
| 15:54:08 | 3 | feeling about it, you know, but we just -- we wanted |
| 15:54:12 | 4 | to, you know, to kind of think, just as we do about |
| 15:54:15 | 5 | everything, think about things, talk about things, and |
| 15:54:18 | 6 | what could this guy's motivations possibly be. |
| 15:54:22 | 7 | Q.   Did he provide you any documents? |
| 15:54:25 | 8 | A.   He had documents with him, but he didn't |
| 15:54:27 | 9 | really provide them to me. |
| 15:54:29 | 10 | Q.   Did he show them to you? |
| 15:54:30 | 11 | A.   He was waving stuff around. |
| 15:54:32 | 12 | Q.   What was he waving?  Can you tell me the best |
| 15:54:35 | 13 | as you can recall any of the documents that he was |
| 15:54:37 | 14 | waving around? |
| 15:54:39 | 15 | A.   I did not see them enough to be able to read |
| 15:54:44 | 16 | them, so I couldn't identify them. |
| 15:54:47 | 17 | Q.   Well, when he was waving them around, he was |
| 15:54:51 | 18 | identifying them; right? |
| 15:54:52 | 19 | A.   He said, "I've got some stuff here and" -- |
| 15:54:55 | 20 | Q.   Did it relate to your case? |
| 15:54:57 | 21 | A.   He said -- he said it did. |
| 15:55:01 | 22 | Q.   Had he written this -- do you think he's the |
| 15:55:03 | 23 | author of this timeline document?  Are you familiar |
| 15:55:06 | 24 | with the timeline document? |
| 15:55:08 | 25 | A.   I saw it in your Complaint. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 196

| | | |
|---|---|---|
| 15:55:09 | 1 | Q.   Okay.  And you had not seen it prior to |
| 15:55:19 | 2 | seeing it in our Complaint? |
| 15:55:21 | 3 | A.   No.  I don't recall ever seeing it before |
| 15:55:23 | 4 | your Complaint. |
| 15:55:24 | 5 | Q.   You had not -- you had not heard about the |
| 15:55:32 | 6 | litigation regarding it in your case back in 2006, '7, |
| 15:55:37 | 7 | and '8? |
| 15:55:38 | 8 | A.   Oh, well, I'm sorry.  I'm sorry.  I guess |
| 15:55:41 | 9 | you're right.  I guess it was before then. |
| 15:55:44 | 10 | Q.   Was this encounter with Mr. Michaels before |
| 15:55:47 | 11 | or after he sent -- withdrawn. |
| 15:55:51 | 12 | Do you believe he's the person who wrote this |
| 15:55:54 | 13 | timeline document? |
| 15:55:54 | 14 | A.   Yes, I do. |
| 15:55:55 | 15 | Q.   How do you know he wrote it? |
| 15:55:58 | 16 | A.   It sounds like him. |
| 15:56:01 | 17 | Q.   Let me make sure I put the document in front |
| 15:56:04 | 18 | of you just so we have a record. |
| 15:56:05 | 19 | A.   Okay. |
| 15:56:09 | 20 | MR. PETROCELLI:  This is Exhibit 58. |
| 15:56:10 | 21 | THE WITNESS:  Thank you. |
| | 22 | (Whereupon, Plaintiff's Exhibit 58 |
| 15:56:16 | 23 | was marked for identification.) |
| | 24 | BY MR. PETROCELLI: |
| 15:56:17 | 25 | Q.   Did you first learn of Exhibit 58, what we've |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 197

| | | |
|---|---|---|
| 15:56:20 | 1 | been calling the Toberoff timeline, before or after |
| 15:56:23 | 2 | your encounter with Mr. Michaels at your home? |
| 15:56:25 | 3 | A. After. |
| 15:56:26 | 4 | Q. Okay. Was it shortly after or long after? |
| 15:56:31 | 5 | Can you estimate the time interval? |
| 15:56:36 | 6 | A. I -- I think it was long after, but it |
| 15:56:39 | 7 | depends what you mean by long. |
| 15:56:41 | 8 | Q. Months? Years? |
| 15:56:42 | 9 | A. It wasn't years. |
| 15:56:47 | 10 | Q. Was -- so it's now your recollection that you |
| 15:56:53 | 11 | first saw this timeline document when the issues |
| 15:56:57 | 12 | surfaced in the case you brought? |
| 15:57:01 | 13 | A. Well, whenever it was first produced for |
| 15:57:06 | 14 | whatever case that was, that was when I saw it. |
| 15:57:11 | 15 | What -- which case it was, there's so many different |
| 15:57:14 | 16 | cases and motions and things like that, I mean I |
| 15:57:16 | 17 | can't -- I can't remember exactly which one, but |
| 15:57:19 | 18 | whenever it was first presented, that -- in a legal |
| 15:57:23 | 19 | forum, that was the first time I saw it. |
| 15:57:26 | 20 | Q. At some point in time you learned that Warner |
| 15:57:30 | 21 | Bros. had received and notified Mr. Toberoff that it |
| 15:57:34 | 22 | had received an anonymous submission regarding your |
| 15:57:40 | 23 | case; correct? |
| 15:57:41 | 24 | A. Yes. |
| 15:57:43 | 25 | MR. TOBEROFF: Anonymous submission. I like |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 198

| 15:57:47 | 1 | that. |
| | 2 | BY MR. PETROCELLI: |
| 15:57:48 | 3 | Q.    And at that time did you have an occasion to |
| 15:58:00 | 4 | see the document or the documents that Warner Bros. |
| 15:58:05 | 5 | had received?  Were they shown to you by Mr. Toberoff |
| 15:58:09 | 6 | or anyone else? |
| 15:58:12 | 7 | A.    I -- I don't remember when it was that I |
| 15:58:14 | 8 | first saw it. |
| 15:58:15 | 9 | Q.    When you saw the document for the first time, |
| 15:58:17 | 10 | that is, Exhibit 56 -- |
| 15:58:21 | 11 | Jason? |
| 15:58:23 | 12 | THE WITNESS:  58. |
| 15:58:24 | 13 | MR. TOKORO:  58. |
| 15:58:24 | 14 | MR. PETROCELLI:  58?  Okay. |
| 15:58:25 | 15 | Q.    When you saw Exhibit 58, did it discuss |
| 15:58:30 | 16 | matters similar to what had been discussed in the |
| 15:58:35 | 17 | meeting that Mr. Michaels had with you? |
| 15:58:37 | 18 | A.    Yes. |
| 15:58:39 | 19 | Q.    Okay. |
| 15:58:39 | 20 | A.    Because he was talking about unconscionable |
| 15:58:42 | 21 | fees, unconscionable fees. |
| 15:58:50 | 22 | Q.    And did you -- after the meeting that you had |
| 15:58:53 | 23 | with Mr. Michaels, did you relate the contents of the |
| 15:58:59 | 24 | meeting to Mr. Toberoff? |
| 15:59:03 | 25 | A.    Yes, at a certain point I did, yes. |

LAURA SIEGEL LARSON - 7/22/2011

Page 199

| | | |
|---|---|---|
| 15:59:08 | 1 | Q. Did you do that before the e-mail exchange or |
| 15:59:12 | 2 | right after Mr. Michaels left your home? |
| 15:59:15 | 3 | A. No. It was after the e-mail exchange. |
| 15:59:17 | 4 | Q. So even though I think you said you were |
| 15:59:21 | 5 | outraged by his suggestion as he left the door, it |
| 15:59:25 | 6 | wasn't until after this e-mail exchange that you first |
| 15:59:28 | 7 | mentioned it to Mr. -- Mr. Toberoff; right? |
| 15:59:31 | 8 | A. Right. |
| 15:59:35 | 9 | Q. Did you relate that discussion that you had |
| 15:59:38 | 10 | with Mr. Michaels to anybody else in order to see if |
| 15:59:43 | 11 | there was any, you know, anything to it? |
| 15:59:46 | 12 | A. No. |
| 15:59:46 | 13 | Q. Like, for example, George? |
| 15:59:48 | 14 | A. No. |
| 15:59:48 | 15 | Q. Or Arthur? |
| 15:59:50 | 16 | A. No. |
| 15:59:51 | 17 | Q. Arthur Levine I'm talking about. |
| 15:59:53 | 18 | A. Correct. |
| 16:00:03 | 19 | Q. The unconscionable fee, is that -- what was |
| 16:00:06 | 20 | the unconscionable fee? The 40 percent fee? |
| 16:00:10 | 21 | A. Yeah. |
| 16:00:20 | 22 | Q. The document that you received and the e-mail |
| 16:00:24 | 23 | from Mr. Michaels following your meeting with him was |
| 16:00:28 | 24 | what? A proposed engagement agreement? |
| 16:00:31 | 25 | MR. TOBEROFF: You can answer that. |

EXHIBIT 81
2212

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 200

| | | |
|---|---|---|
| 16:00:32 | 1 | THE WITNESS:  Yes. |
| | 2 | BY MR. PETROCELLI: |
| 16:00:34 | 3 | Q.   And on the stationery of or letterhead of |
| 16:00:37 | 4 | what firm? |
| 16:00:38 | 5 | A.   His -- his own, his home address. |
| 16:00:41 | 6 | Q.   Okay.  And did you ask for it? |
| 16:00:46 | 7 | A.   Absolutely not. |
| 16:00:47 | 8 | Q.   So it was unsolicited? |
| 16:00:49 | 9 | A.   Unsolicited. |
| 16:00:51 | 10 | Q.   What did you do with it? |
| 16:00:53 | 11 | A.   Well, I discussed it with my mother, and we |
| 16:00:58 | 12 | wrote a response telling him, you know, that we had |
| 16:01:02 | 13 | absolutely no interest in that or in discussing |
| 16:01:06 | 14 | anything with him further. |
| 16:01:08 | 15 | Q.   And then he wrote back saying "I'm sorry"? |
| 16:01:11 | 16 | A.   Yeah, "Didn't want to offend you." |
| 16:01:15 | 17 | Q.   And that's where it was left, with his |
| 16:01:18 | 18 | apology? |
| 16:01:18 | 19 | A.   Yes. |
| 16:01:21 | 20 | Q.   Okay.  And what did his document provide? |
| 16:01:24 | 21 | A.   What do you mean? |
| 16:01:26 | 22 | Q.   What did it say, his unsolicited agreement or |
| 16:01:31 | 23 | proposed agreement? |
| 16:01:31 | 24 | A.   Well, he actually sent two documents. |
| 16:01:34 | 25 | Q.   What were the two documents? |

EXHIBIT 81
2213

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 201

| | | |
|---|---|---|
| 16:01:36 | 1 | A.   One was his draft of an unsolicited, you |
| 16:01:43 | 2 | know, agreement retaining him as our attorney at a -- |
| 16:01:48 | 3 | at a lower percentage than the one that Mr. Toberoff |
| 16:01:55 | 4 | had in our litigation agreement with him. |
| 16:01:57 | 5 | Q.   What was the percentage? |
| 16:01:58 | 6 | A.   I really don't -- I don't remember right now. |
| 16:02:00 | 7 | Q.   But you do remember it was lower. |
| 16:02:02 | 8 | A.   Yes.  Yes. |
| 16:02:04 | 9 | Q.   What was the other document? |
| 16:02:05 | 10 | A.   The other document was an unsolicited draft |
| 16:02:09 | 11 | that he had put together that he wanted us to sign |
| 16:02:15 | 12 | terminating -- |
| 16:02:15 | 13 | Q.   Mr. Toberoff? |
| 16:02:17 | 14 | A.   -- Mr. Toberoff. |
| 16:02:17 | 15 | Q.   Okay.  And you didn't ask for any of those |
| 16:02:19 | 16 | documents; right? |
| 16:02:20 | 17 | A.   No. |
| 16:02:20 | 18 | Q.   And there was no discussion at the meeting |
| 16:02:22 | 19 | that he was going to send you those documents? |
| 16:02:24 | 20 | A.   No. |
| 16:02:24 | 21 | Q.   That was a complete surprise to you; right? |
| 16:02:26 | 22 | A.   Yes.  It really pissed us off. |
| 16:02:30 | 23 | Q.   Okay.  And you -- what did the -- did the |
| 16:02:36 | 24 | letter terminating Mr. Toberoff -- Mr. Toberoff give a |
| 16:02:39 | 25 | reason for his termination? |

**LAURA SIEGEL LARSON - 7/22/2011**

Page 202

| | | |
|---|---|---|
| 16:02:41 | 1 | A.    No, I don't think so.  I think it was just, |
| 16:02:45 | 2 | you know, "We no longer want your services" or |
| 16:02:48 | 3 | something like that, and we had never said anything |
| 16:02:52 | 4 | like that to him.  In fact, we were very happy with |
| 16:02:56 | 5 | Mr. Toberoff. |
| 16:02:57 | 6 | Q.    Did Mr. Michaels explain to you why he |
| 16:03:02 | 7 | thought you should fire Mr. Toberoff? |
| 16:03:05 | 8 | A.    Because he said that he was charging us |
| 16:03:08 | 9 | unconscionable fees. |
| 16:03:10 | 10 | Q.    Did you do any diligence or checking into the |
| 16:03:17 | 11 | reasonableness of the fee after that discussion? |
| 16:03:24 | 12 | A.    No. |
| 16:03:25 | 13 | Q.    Did he explain to you why he thought it was |
| 16:03:29 | 14 | unconscionable? |
| 16:03:30 | 15 | A.    His discussion was -- it seemed to be coming |
| 16:03:35 | 16 | from a very confused person.  He was talking all over |
| 16:03:38 | 17 | the place and not very clear about what he was trying |
| 16:03:41 | 18 | to express, so it was very hard to follow what he was |
| 16:03:46 | 19 | saying. |
| 16:03:46 | 20 | Q.    Did he seem to you like he was not of sound |
| 16:03:52 | 21 | mind? |
| 16:03:52 | 22 | A.    He seemed extremely nervous and very, very |
| 16:03:58 | 23 | skittish about everything. |
| 16:04:01 | 24 | Q.    Did you think he was ill? |
| 16:04:04 | 25 | A.    He didn't look like he was ill.  It just |

**Merrill  Corporation  -  Los Angeles**

**EXHIBIT 81**
**2215**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 203

| | | |
|---|---|---|
| 16:04:07 | 1 | looked like he was -- |
| 16:04:08 | 2 | Q.   Mentally imbalanced? |
| 16:04:10 | 3 | A.   I don't know whether it was -- it's like he |
| 16:04:14 | 4 | knew he was doing something wrong and that -- that he |
| 16:04:17 | 5 | felt guilty about it and he was trying to kind of |
| 16:04:21 | 6 | cover his tracks or something. |
| 16:04:23 | 7 | Q.   Did he explain to you why he would care if |
| 16:04:30 | 8 | Mr. Toberoff was charging you an unconscionable fee? |
| 16:04:34 | 9 | A.   That's what didn't make sense to us at all. |
| 16:04:37 | 10 | You know, that's -- you know, it was like, you know, |
| 16:04:41 | 11 | "It hurts me to see this happening to you," you know. |
| 16:04:45 | 12 | So when the pitch came at the end for "Hey, I can do |
| 16:04:48 | 13 | this for you for less," it started, you know -- |
| 16:04:52 | 14 | Q.   Well, you said before that it was kind of a |
| 16:04:57 | 15 | passing comment as he walked out the door.  "Hey, I've |
| 16:04:59 | 16 | got an idea.  You can hire me."  Do you recall that? |
| 16:05:02 | 17 | A.   Yes. |
| 16:05:05 | 18 | Q.   When he said that, did you tell him "I have |
| 16:05:09 | 19 | no interest in hiring you," or I think you said you |
| 16:05:12 | 20 | didn't and that's why he followed up with those |
| 16:05:14 | 21 | e-mails; right? |
| 16:05:15 | 22 | A.   Yeah.  We just -- you know, it's like "Bye." |
| 16:05:20 | 23 | Q.   Well, when he was explaining this story to |
| 16:05:28 | 24 | you about unconscionable fees and all, did you ask |
| 16:05:28 | 25 | him, "Why are you telling us this?  What's your |

**EXHIBIT 81**
**2216**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 204

| | | |
|---|---|---|
| 16:05:31 | 1 | purpose?  Why are you here?  What is the reason why |
| 16:05:34 | 2 | you're sharing this with us?" |
| 16:05:36 | 3 | A.   Because he -- |
| 16:05:38 | 4 | Q.   Did you ask him those questions? |
| 16:05:39 | 5 | A.   Well, as I said before, you know, he was |
| 16:05:42 | 6 | volunteering that out of the goodness of his heart. |
| 16:05:44 | 7 | You know, he felt that, you know, he as an attorney |
| 16:05:49 | 8 | had a -- what was it?  He had the responsibility to |
| 16:05:55 | 9 | talk to us about this. |
| 16:05:59 | 10 | Q.   Did he tell you that he had had some kind of |
| 16:06:03 | 11 | dispute or disagreement with Mr. Toberoff? |
| 16:06:06 | 12 | A.   No.  I don't recall him saying anything like |
| 16:06:07 | 13 | that. |
| 16:06:08 | 14 | Q.   Did he tell you that he had been fired? |
| 16:06:14 | 15 | A.   I think he just -- you know, I don't -- I |
| 16:06:21 | 16 | don't remember how he explained it.  I think he just |
| 16:06:25 | 17 | said, you know, "I'm no longer with the firm."  I |
| 16:06:28 | 18 | think that was it. |
| 16:06:29 | 19 | Q.   Okay.  And now, given this bizarre discussion |
| 16:06:36 | 20 | about a person who seemed skittish to you, talking |
| 16:06:41 | 21 | about unconscionable fees, kind of not making sense, |
| 16:06:45 | 22 | going outside, you know, and as he leaves he said |
| 16:06:48 | 23 | "Hey, I'll represent you," why didn't you immediately |
| 16:06:52 | 24 | call up Mr. Toberoff and say, "What's the story with |
| 16:06:55 | 25 | this guy?" |

## LAURA SIEGEL LARSON - 7/22/2011

Page 205

| | | |
|---|---|---|
| 16:06:57 | 1 | A.   I don't know.  You know, it just -- we |
| 16:07:01 | 2 | felt -- we felt uncomfortable about the whole thing, |
| 16:07:03 | 3 | and in a way we kind of felt sorry for the guy, you |
| 16:07:06 | 4 | know, because I mean here's this young guy.  You know, |
| 16:07:11 | 5 | he's out of work.  He said he was trying to do |
| 16:07:14 | 6 | something to help us.  It turned out that he wasn't, |
| 16:07:19 | 7 | but, you know, we thought, you know, he'll just go |
| 16:07:23 | 8 | away. |
| 16:07:23 | 9 | Q.   Why do you say it turned out that he wasn't? |
| 16:07:29 | 10 | A.   No, I don't know why I said that.  No, I just |
| 16:07:31 | 11 | mean that at that moment he didn't appear threatening |
| 16:07:34 | 12 | to us.  You know, when we were right there, it wasn't |
| 16:07:39 | 13 | as if we felt we were physically in danger or |
| 16:07:43 | 14 | anything, but we became more concerned, you know, when |
| 16:07:45 | 15 | we started getting these e-mails, and fortunately, you |
| 16:07:49 | 16 | know, he wasn't in our presence, but, you know, I |
| 16:07:53 | 17 | started really getting concerned at that point about, |
| 16:07:55 | 18 | you know, what's going on with this guy? |
| 16:07:58 | 19 | Q.   Did you forward the e-mails to Mr. Toberoff? |
| 16:08:03 | 20 | A.   I did eventually, yes. |
| 16:08:07 | 21 | Q.   Have you forwarded them to anyone else? |
| 16:08:09 | 22 | A.   I don't believe so. |
| 16:08:19 | 23 | Q.   Did he discuss with you other -- besides the |
| 16:08:23 | 24 | unconscionable fees, did he discuss with you other |
| 16:08:28 | 25 | matters of the sort set forth in Exhibit 58, the |

**EXHIBIT 81**
**2218**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 206

| | | |
|---|---|---|
| 16:08:32 | 1 | Superman Marc Toberoff timeline? |
| 16:08:36 | 2 | A.   Well, you know, I know he said something to |
| 16:08:38 | 3 | us to the effect of "Did you know that Marc represents |
| 16:08:42 | 4 | the Shusters?"  Of course we knew that.  You know, I |
| 16:08:44 | 5 | mean he acted like that was, you know, a big |
| 16:08:47 | 6 | disclosure, that it was something that we didn't know |
| 16:08:50 | 7 | and that it was something -- that there was something |
| 16:08:53 | 8 | wrong with that.  And of course, you know, we knew |
| 16:08:56 | 9 | that because Jean Peavy had recommended Marc Toberoff. |
| 16:09:03 | 10 | So he kept, you know, trying to, you know, stir the |
| 16:09:08 | 11 | pot. |
| 16:09:09 | 12 | Q.   Did he discuss with you the idea that Marc |
| 16:09:21 | 13 | Toberoff together with Ari Emanuel claimed to have had |
| 16:09:27 | 14 | a billionaire, a mysterious billionaire investor as a |
| 16:09:34 | 15 | way of getting in the door with you? |
| 16:09:35 | 16 | A.   Yeah, well, he said a lot of things that we |
| 16:09:38 | 17 | thought was a lot of crap. |
| 16:09:40 | 18 | Q.   Was that one of them? |
| 16:09:41 | 19 | A.   That was one of them. |
| 16:09:42 | 20 | Q.   He said that at the meeting, or are you just |
| 16:09:47 | 21 | remembering what you think he wrote in the document? |
| 16:09:49 | 22 | A.   I don't know.  It could be that the document |
| 16:09:52 | 23 | is influencing me.  But I know that he, you know, he |
| 16:09:59 | 24 | was just constantly saying -- saying things that in |
| 16:10:04 | 25 | his mind he thought would shock us. |

EXHIBIT 81
2219

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 207

16:10:07    1        Q.    Did -- when he discussed -- when he discussed

16:10:13    2    the issue of the Shusters with you, did he talk about

16:10:21    3    issues related to Superboy?

16:10:25    4        A.    I don't recall that coming up.

16:10:27    5        Q.    Did he discuss with you that when

16:10:35    6    Mr. Toberoff first began to work with the Shusters,

16:10:40    7    that the Shusters claimed that Joe Shuster had been a

16:10:48    8    co-creator of Superboy and they were seeking rights to

16:10:51    9    Superboy?

16:10:52    10        MR. TOBEROFF:  Misstates the record and the

16:10:55    11    evidence.

16:10:55    12        MR. PETROCELLI:  I'm not purporting to state

16:10:58    13    anything.

16:10:58    14        MR. TOBEROFF:  The way you're phrasing it.

16:10:59    15        MR. PETROCELLI:  I'm asking a question.

16:11:00    16        MR. TOBEROFF:  The way -- you had said

16:11:02    17    "discussed his claim that."  You stated it as a fact

16:11:08    18    almost.

16:11:08    19        MR. PETROCELLI:  It's called coaching the

16:11:10    20    witness.

16:11:11    21        Q.    Can you answer that question?

16:11:13    22        A.    Well, I believe you're asking me whether he

16:11:16    23    discussed Superboy with us?

16:11:18    24        Q.    Generally, but I was asking for specifically

16:11:20    25    whether he discussed the idea that the Shuster family

EXHIBIT 81
2220

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 208

| | | |
|---|---|---|
| 16:11:25 | 1 | asserted that Joe Shuster was a co-creator of Superboy |
| 16:11:32 | 2 | and on that basis the Shusters were claiming copyright |
| 16:11:37 | 3 | termination interests. |
| 16:11:37 | 4 | A.   I -- |
| 16:11:39 | 5 | MR. TOBEROFF:  Wait.  Same objection.  Lacks |
| 16:11:40 | 6 | foundation.  Assumes facts. |
| 16:11:41 | 7 | THE WITNESS:  No, I don't recall that being |
| 16:11:45 | 8 | discussed. |
| | 9 | BY MR. PETROCELLI: |
| 16:11:46 | 10 | Q.   Did he discuss with you that after or as part |
| 16:11:54 | 11 | of working with the Siegel family, Mr. Toberoff caused |
| 16:12:01 | 12 | the Shusters to disavow any interest in Superboy? |
| 16:12:04 | 13 | A.   No, he did not discuss that with us. |
| 16:12:13 | 14 | Q.   You're aware that the Shusters when they |
| 16:12:21 | 15 | initially began working with Mr. Toberoff asserted an |
| 16:12:25 | 16 | interest in Superboy. |
| 16:12:27 | 17 | A.   Well, I really don't know much about the |
| 16:12:29 | 18 | Shuster case because that's their business. |
| 16:12:32 | 19 | Q.   Well, you were aware from reading our |
| 16:12:35 | 20 | lawsuit; right? |
| 16:12:35 | 21 | A.   From reading your lawsuit. |
| 16:12:37 | 22 | Q.   Right.  And you're aware from reading our |
| 16:12:41 | 23 | lawsuit that when Mr. Toberoff started working with |
| 16:12:46 | 24 | you and your mom, he then entered into a new |
| 16:12:51 | 25 | arrangement with the Shusters whereby they disavowed |

**EXHIBIT 81**
**2221**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 209

| | | |
|---|---|---|
| 16:12:55 | 1 | any interest in Superboy. |
| 16:12:57 | 2 | A.  I don't know anything about his arrangements |
| 16:12:58 | 3 | with the Shusters. |
| 16:13:00 | 4 | Q.  Have you ever inquired of anybody why the |
| 16:13:04 | 5 | Shusters would give up their entire interest in |
| 16:13:07 | 6 | Superboy that they were asserting at one point in |
| 16:13:10 | 7 | time? |
| 16:13:10 | 8 | MR. TOBEROFF:  Assumes facts.  Lacks |
| 16:13:12 | 9 | foundation. |
| 16:13:12 | 10 | THE WITNESS:  I think they -- they found out |
| 16:13:16 | 11 | by reading more carefully the 1947 ruling. |
| | 12 | BY MR. PETROCELLI: |
| 16:13:21 | 13 | Q.  Well, that's an interesting point.  It's not |
| 16:13:23 | 14 | what I asked you.  That's your speculation; right? |
| 16:13:28 | 15 | A.  That's my speculation. |
| 16:13:30 | 16 | Q.  And you know there's a lot of documents after |
| 16:13:32 | 17 | 1947 that they could have read that would have |
| 16:13:36 | 18 | informed them that Joe Shuster was a co-creator of |
| 16:13:41 | 19 | Superboy; correct? |
| 16:13:41 | 20 | A.  I don't know that. |
| 16:13:42 | 21 | Q.  I know that you picked the 1947 ruling |
| 16:13:44 | 22 | because that's the one Mr. Toberoff likes to talk |
| 16:13:46 | 23 | about; right? |
| 16:13:48 | 24 | A.  No.  That's the one that my father told me |
| 16:13:51 | 25 | about my entire life. |

**EXHIBIT 81**
**2222**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 210

| | | |
|---|---|---|
| 16:13:52 | 1 | Q.   But that's not the last word on the subject; |
| 16:13:54 | 2 | right? |
| 16:13:54 | 3 | A.   I don't know that that's the last word on the |
| 16:13:56 | 4 | subject. |
| 16:13:57 | 5 | Q.   And you're aware that there are documents |
| 16:13:58 | 6 | that both Joe Shuster and your dad caused to be filed |
| 16:14:03 | 7 | in which they claimed co-credit for Superboy; correct? |
| 16:14:06 | 8 | A.   I do not know that. |
| 16:14:07 | 9 | Q.   And you have seen those copyright |
| 16:14:10 | 10 | certifications. |
| 16:14:10 | 11 | A.   I don't recall anything like that. |
| 16:14:11 | 12 | Q.   Copyright registration documents; correct? |
| 16:14:15 | 13 | MR. TOBEROFF:  Just slow it down.  Let him |
| 16:14:18 | 14 | finish the question.  What's your answer? |
| 16:14:20 | 15 | THE WITNESS:  My answer is I have not seen |
| 16:14:21 | 16 | those.  I have not seen what you're referring to. |
| | 17 | BY MR. PETROCELLI: |
| 16:14:24 | 18 | Q.   But I had asked you not to surmise that the |
| 16:14:29 | 19 | Shusters must have read some opinion back in 1947.  I |
| 16:14:32 | 20 | had asked you if you had ever discussed with anyone |
| 16:14:36 | 21 | why they would disavow on the interest in Superboy |
| 16:14:42 | 22 | that they previously had -- |
| 16:14:43 | 23 | A.   Okay. |
| 16:14:44 | 24 | Q.   -- claimed. |
| 16:14:45 | 25 | A.   I didn't understand that that was your |

**EXHIBIT 81**
**2223**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 211

16:14:46    1    question.  The answer to that is no.

16:15:06    2         Q.   Okay.  Do you have a copy of our Complaint

16:15:14    3    there just while we're on this subject?

16:15:18    4         A.   No, I don't.

16:15:34    5         Q.   You are aware that in Action Comics No. 1,

16:15:39    6    Mr. Shuster did the illustrations or worked on the

16:15:43    7    illustrations; correct?

16:15:44    8         A.   Yes.

16:15:44    9         Q.   And there's some depiction of Superman as a

16:15:51    10   youth with super powers; correct -- not in Action

16:15:54    11   Comics No. 1.  Excuse me.  In Superman No. 1.

16:15:58    12        A.   I haven't seen it for a long time.

16:16:01    13        Q.   Okay.  Well, rather than put you through a

16:16:03    14   memory test, can you take a look at our Complaint

16:16:07    15   which has been marked as Exhibit 59.  Turn to page 29,

16:16:12    16   paragraph 88.

            17            (Whereupon, Plaintiff's Exhibit 59

16:16:16    18            was marked for identification.)

16:16:17    19            THE WITNESS:  29, paragraph 88, yes.

16:16:18    20            MR. PETROCELLI:  Yes.

16:16:21    21        Q.   When you read paragraph 88 and you saw the

16:16:26    22   first bullet under paragraph 88 which states that, in

16:16:33    23   part, "Toberoff had entered into the 2001

16:16:37    24   joint-venture agreement with the Shuster Heirs,

16:16:40    25   specifying that the Shuster Heirs owned an interest in

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 212

| | | |
|---|---|---|
| 16:16:42 | 1 | 'Superboy,'" do you see that? |
| 16:16:43 | 2 | A.   I see that. |
| 16:16:44 | 3 | Q.   Was that the first time you had learned that? |
| 16:16:46 | 4 | A.   Yes, I believe so.  I don't recall, you know, |
| 16:16:52 | 5 | any -- any previous discussion. |
| 16:16:54 | 6 | Q.   Okay. |
| 16:16:55 | 7 | MR. TOBEROFF:  I object to the question to |
| 16:16:58 | 8 | the extent that you're characterizing allegations as |
| 16:17:11 | 9 | fact. |
| 16:17:11 | 10 | MR. PETROCELLI:  Can you get me the 2001. |
| 16:17:20 | 11 | Q.   Take a look at Exhibit 10, please. |
| | 12 | (Whereupon, Plaintiff's Exhibit 10 |
| 16:17:23 | 13 | was placed before the witness.) |
| 16:17:23 | 14 | THE WITNESS:  Thank you. |
| | 15 | BY MR. PETROCELLI: |
| 16:17:31 | 16 | Q.   This is an agreement by Pacific Pictures |
| 16:17:37 | 17 | Corporation through its president, Marc Toberoff, and |
| 16:17:42 | 18 | Jean Peavy and Warren Peary dated as of November 23, |
| 16:17:48 | 19 | 2001.  This has previously been marked as Exhibit 10. |
| 16:17:50 | 20 | Do you see that? |
| 16:17:51 | 21 | A.   Yes, I do. |
| 16:17:53 | 22 | Q.   Okay.  And you will see that in the first |
| 16:18:00 | 23 | paragraph it's discussing formation of a joint venture |
| 16:18:04 | 24 | with respect to Mr. Shuster's claimed copyright |
| 16:18:07 | 25 | interest.  Do you see that? |

EXHIBIT 81
2225

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 213

16:18:08    1         A.    Well, I see it, but I'm not fully reading it.

16:18:11    2    Do you want me to spend the time to read it?

16:18:16    3         Q.    Not really just because I don't want to pass

16:18:18    4    the time.

16:18:18    5            Take paragraph 1, and you might read

16:18:22    6    paragraph 1 to yourself.

16:18:25    7            MR. TOBEROFF:  Before answering any questions

16:18:26    8    regarding this agreement, if there is a question as

16:18:29    9    opposed to a rhetorical statement, then I would like

16:18:32   10    you to please read whatever he's asking you very

16:19:05   11    carefully.

           12    BY MR. PETROCELLI:

16:19:06   13         Q.    You do see the reference there that the

16:19:11   14    rights that are the subject of this agreement include

16:19:21   15    Superboy and Smallville; correct?

16:19:22   16         A.    I see that it's written there.

16:19:28   17         Q.    Okay.  Was this shown to you at the time that

16:19:31   18    you entered into your first agreement with

16:19:36   19    Mr. Toberoff?

16:19:36   20         A.    No, it was not.

16:19:40   21         Q.    When you signed your agreement with

16:19:43   22    Mr. Toberoff in August, 2002 -- excuse me -- in

16:19:46   23    October, 2002, the one with IP Worldwide --

16:19:49   24         A.    Yeah, the end of October.

16:19:51   25         Q.    The end -- whenever it was --

**Merrill   Corporation   -   Los Angeles**

800-826-0277                          www.merillcorp.com/law

**EXHIBIT 81**
**2226**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 214

| | | |
|---|---|---|
| 16:19:53 | 1 | A.   Yeah. |
| 16:19:53 | 2 | Q.   -- were you aware that as of that point in |
| 16:19:58 | 3 | time that Mr. Toberoff had entered into a joint |
| 16:20:02 | 4 | venture through his company, Pacific Pictures, with |
| 16:20:06 | 5 | the Shusters regarding Superman rights that included, |
| 16:20:09 | 6 | without limitation, Superboy? |
| 16:20:11 | 7 | MR. TOBEROFF:  Misstates the paragraph 1. |
| | 8 | BY MR. PETROCELLI: |
| 16:20:15 | 9 | Q.   You can answer. |
| 16:20:17 | 10 | A.   The information that we had from Jean Peavy |
| 16:20:20 | 11 | was that Mr. Toberoff was her attorney, and she didn't |
| 16:20:25 | 12 | supply us with any agreements or any more details than |
| 16:20:29 | 13 | that. |
| 16:20:29 | 14 | Q.   You didn't even know that Mr. Toberoff had |
| 16:20:32 | 15 | entered into a joint venture through his company, |
| 16:20:36 | 16 | Pacific Pictures? |
| 16:20:37 | 17 | A.   We knew that he was their attorney. |
| 16:20:39 | 18 | Q.   No, you're not answering my question. |
| 16:20:41 | 19 | A.   No, I'm trying to.  I'm sorry. |
| 16:20:43 | 20 | Q.   No.  What you're doing is you're continuing |
| 16:20:45 | 21 | to assert that Mr. Toberoff's your attorney because |
| 16:20:49 | 22 | you believe that it is important to his case and your |
| 16:20:53 | 23 | case to say that. |
| 16:20:54 | 24 | MR. TOBEROFF:  Please don't argue with the |
| 16:20:55 | 25 | witness. |

EXHIBIT 81
2227

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 215

| | | |
|---|---|---|
| 16:20:55 | 1 | THE WITNESS:  No, I'm not. |
| 16:20:57 | 2 | MR. TOBEROFF:  Wait a second.  Ask your |
| 16:20:59 | 3 | question.  Don't argue with her. |
| | 4 | BY MR. PETROCELLI: |
| 16:20:59 | 5 | Q.   I'm capable of asking a question that will |
| 16:21:02 | 6 | elicit that answer, but frankly, you know, we have |
| 16:21:05 | 7 | somewhat limited time.  I'm not asking that question, |
| 16:21:08 | 8 | so please bear with me. |
| 16:21:10 | 9 | Can you read my question back?  I move to |
| 16:21:12 | 10 | strike that answer as nonresponsive. |
| 16:21:14 | 11 | THE WITNESS:  Okay.  I just wanted to say I'm |
| 16:21:16 | 12 | sorry.  That's just the way I express myself |
| 16:21:19 | 13 | sometimes.  I'll try and listen more closely to your |
| 16:21:21 | 14 | question. |
| 16:21:22 | 15 | MR. TOBEROFF:  And I would advise you don't |
| 16:21:25 | 16 | let Mr. Petrocelli browbeat you with his argumentative |
| 16:21:29 | 17 | statements.  You answer the questions as you see fit. |
| 16:21:32 | 18 | THE WITNESS:  Um-hum. |
| 16:21:51 | 19 | (The record was read.) |
| 16:21:51 | 20 | THE WITNESS:  The answer is no. |
| 16:21:54 | 21 | MR. PETROCELLI:  Let me sharpen my question a |
| 16:21:56 | 22 | bit. |
| 16:21:56 | 23 | Q.   As of the time you had entered into the first |
| 16:21:59 | 24 | agreement with Mr. Toberoff, the IP Worldwide |
| 16:22:02 | 25 | agreement in October of 2002 or as of October, 2002, |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 216

| | | |
|---|---|---|
| 16:22:07 | 1 | were you aware that he, through Pacific Pictures or |
| 16:22:10 | 2 | any other entity, had entered into a joint venture |
| 16:22:16 | 3 | agreement with the Shusters regarding Superboy or |
| 16:22:19 | 4 | Superman? |
| 16:22:19 | 5 | A.   Would you speak up just a little bit?  I |
| 16:22:22 | 6 | think I got what you said, but I'd appreciate it if |
| 16:22:24 | 7 | maybe she could read it back. |
| 16:22:27 | 8 | MR. PETROCELLI:  Definitely I will try to |
| 16:22:28 | 9 | speak up. |
| 16:22:29 | 10 | THE WITNESS:  Thank you. |
| | 11 | (The record was read.) |
| 16:22:52 | 12 | THE WITNESS:  No, I was not aware of that. |
| | 13 | BY MR. PETROCELLI: |
| 16:22:54 | 14 | Q.   Were you aware of that as of the time that |
| 16:22:57 | 15 | you entered into what you call the litigation |
| 16:22:59 | 16 | agreement with Mr. Toberoff sometime in 2004? |
| 16:23:05 | 17 | A.   You're asking the same question about if I |
| 16:23:07 | 18 | knew about this? |
| 16:23:08 | 19 | Q.   Yes. |
| 16:23:09 | 20 | A.   No, I don't believe so. |
| 16:23:15 | 21 | Q.   And to your knowledge, your mother was not |
| 16:23:16 | 22 | aware of it either; correct? |
| 16:23:19 | 23 | A.   Except it's possible, because I have not read |
| 16:23:24 | 24 | it in a really long time, but it's possible that it |
| 16:23:26 | 25 | was disclosed in one of the -- one of the -- what was |

EXHIBIT 81
2229

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 217

| | | |
|---|---|---|
| 16:23:31 | 1 | it called?  The conflict.  It might have been |
| 16:23:38 | 2 | disclosed in the conflict document. |
| 16:23:39 | 3 | Q.  Are you saying that it was? |
| 16:23:40 | 4 | A.  I'm saying -- |
| 16:23:41 | 5 | MR. TOBEROFF:  Don't discuss the content of |
| 16:23:45 | 6 | conflict letter. |
| 16:23:45 | 7 | THE WITNESS:  Okay.  I'm saying I don't know. |

```
            8     BY MR. PETROCELLI:

16:23:54    9         Q.   Okay.  So let's go back to paragraph 88 of

16:23:58   10     the Complaint, which is paragraph 59.  The second

16:24:01   11     bullet states "The original Superboy 'script' on which

16:24:04   12     the Siegel Heirs' ownership claims rely openly

16:24:07   13     contains the byline:  By Jerry Siegel and Joe

16:24:10   14     Shuster."  Do you see that?

16:24:12   15         A.   I do see that.

16:24:13   16         Q.   Were you aware of Superboy scripts -- prior

16:24:17   17     to reading this Complaint, were you aware that there

16:24:19   18     were Superboy scripts that contained a byline that

16:24:23   19     included Joe Shuster as well as Jerry Siegel?

16:24:26   20         A.   I -- I saw a script that had that written,

16:24:31   21     typed on it.

16:24:31   22         Q.   Just one.

16:24:33   23         A.   Well, I only believe there was one.  I can't

16:24:35   24     remember more than one.

16:24:36   25         Q.   Okay.  And you had seen that prior to reading
```

LAURA SIEGEL LARSON - 7/22/2011

Page 218

16:24:42    1    this lawsuit; is that right?

16:24:43    2        A.   I saw that a long time ago.

16:24:45    3        Q.   A long time ago.  And the next bullet talks

16:24:49    4    about "In 1948, a Court in Westchester, New York found

16:24:55    5    that Joe Shuster provided the artwork for the Superboy

16:24:58    6    story and More Fun Comics No. 101."  Were you aware of

16:25:04    7    that?

16:25:04    8        A.   Yes.

16:25:04    9        Q.   Okay.  And the next bullet says "In 1972 and

16:25:06    10   1973, Siegel and Shuster together filed their own

16:25:10    11   copyright renewal notices with the copyright office

16:25:12    12   for Superboy, in which they identified Superboy as a

16:25:15    13   work that they had jointly created."  Were you aware

16:25:17    14   of that?

16:25:18    15       A.   I'm not aware of that.

16:25:19    16       Q.   When you read this, did you inquire of anyone

16:25:25    17   whether that was true or not?

16:25:27    18       A.   Well, I was surprised by it, and no, I didn't

16:25:33    19   inquire about it.

16:25:34    20       Q.   Well, given you were surprised by it, do you

16:25:36    21   mean it was not consistent with what you believed to

16:25:39    22   be true?

16:25:39    23       A.   Was this consistent?

16:25:40    24       Q.   This was inconsistent with what you believed

16:25:43    25   to be true; correct?

EXHIBIT 81
2231

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 219

| | | |
|---|---|---|
| 16:25:44 | 1 | A.    Could you ask that in another way?  I'm not |
| | 2 | following you. |
| 16:25:47 | 3 | Q.    You said you were surprised by it.  Why were |
| 16:25:49 | 4 | you surprised by it? |
| 16:25:50 | 5 | A.    I was surprised that this, what you're saying |
| 16:25:56 | 6 | here, occurred in 1972 and 1973. |
| 16:25:58 | 7 | Q.    Why were you surprised? |
| 16:26:00 | 8 | A.    Because I was not aware of it. |
| 16:26:03 | 9 | Q.    Okay.  And did you disbelieve it when you |
| 16:26:05 | 10 | read it? |
| 16:26:10 | 11 | A.    I questioned whether it was true or not. |
| 16:26:13 | 12 | Q.    And have you since found out whether or not |
| 16:26:16 | 13 | it's true? |
| 16:26:18 | 14 | A.    I believe that it falls under a discussion |
| 16:26:24 | 15 | that I had with Mr. Toberoff. |
| 16:26:28 | 16 | Q.    Okay.  Did you have that discussion after |
| 16:26:31 | 17 | reading it in the lawsuit that we filed in May, 2010, |
| 16:26:35 | 18 | the one that you just described? |
| 16:26:37 | 19 | A.    I believe so. |
| 16:26:38 | 20 | Q.    Okay.  Did Mr. Toberoff show you the |
| 16:26:47 | 21 | copyright renewal forms or the copyright registration |
| 16:26:50 | 22 | forms? |
| 16:26:50 | 23 | MR. TOBEROFF:  Attorney-client privilege. |
| 16:26:51 | 24 | Instruct you not to answer. |
| | 25 | BY MR. PETROCELLI: |

EXHIBIT 81
2232

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 220

| | | |
|---|---|---|
| 16:26:52 | 1 | Q.   Have you ever seen those forms, the ones |
| 16:26:56 | 2 | referenced in paragraph 88 of our lawsuit? |
| 16:26:58 | 3 | A.   I don't remember ever seeing them. |
| 16:27:01 | 4 | Q.   Take a look at Exhibit 17. |
| | 5 | (Whereupon, Plaintiff's Exhibit 17 |
| 16:27:09 | 6 | was placed before the witness.) |
| 16:27:10 | 7 | THE WITNESS:  Thank you. |
| | 8 | BY MR. PETROCELLI: |
| 16:27:16 | 9 | Q.   This is for the year 1972 listing of renewal |
| 16:27:20 | 10 | registrations from the copyright office.  The year |
| 16:27:23 | 11 | "1972" is in the top-left corner.  And -- well, first |
| 16:27:28 | 12 | of all, have you ever seen this document before? |
| 16:27:32 | 13 | A.   I've seen similar documents.  I can't tell |
| 16:27:36 | 14 | you whether I saw this page or not. |
| 16:27:38 | 15 | Q.   Well, have you ever seen a document which |
| 16:27:40 | 16 | identified the name Joe Shuster and Superboy? |
| 16:27:44 | 17 | A.   I don't recall that, no. |
| 16:27:51 | 18 | Q.   I'll show you one more for 1973.  Okay.  I'll |
| 16:27:56 | 19 | show you another one I forgot to include.  This is |
| 16:28:00 | 20 | Exhibit 18. |
| | 21 | (Whereupon, Plaintiff's Exhibit 18 |
| 16:28:02 | 22 | was placed before the witness.) |
| 16:28:02 | 23 | THE WITNESS:  Excuse me.  May I just have a |
| 16:28:04 | 24 | minute because I'm having trouble with this small |
| 16:28:07 | 25 | print. |

EXHIBIT 81
2233

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 221

| | | |
|---|---|---|
| 16:28:24 | 1 | BY MR. PETROCELLI: |
| 16:28:25 | 2 | Q.   Take a look at Exhibit 18, which is a |
| 16:28:29 | 3 | November 15, 1972, certification of a copyright |
| 16:28:36 | 4 | registration for Superboy. |
| 16:28:40 | 5 | A.   Okay. |
| 16:28:41 | 6 | Q.   And you will see on the second page that the |
| 16:28:47 | 7 | two claimants are Jerome Siegel -- that's your |
| 16:28:51 | 8 | father -- as an author and Joe Shuster as an author |
| 16:28:56 | 9 | for the title "Superboy."  Do you see that? |
| 16:29:01 | 10 | A.   Yes. |
| 16:29:02 | 11 | Q.   And is this the first time you've seen this |
| 16:29:04 | 12 | document? |
| 16:29:04 | 13 | A.   Yes. |
| 16:29:08 | 14 | Q.   And finally, take a look at Exhibit 19, which |
| | 15 | is a listing of registrations for the year 1973. |
| | 16 | (Whereupon, Plaintiff's Exhibit 19 |
| 16:29:25 | 17 | was placed before the witness.) |
| | 18 | BY MR. PETROCELLI: |
| 16:29:26 | 19 | Q.   And you'll see a reference to "Superboy." |
| 16:29:38 | 20 | A.   I see "Superman." |
| 16:29:48 | 21 | Q.   You see under the name "Jerome Siegel" it |
| 16:29:52 | 22 | says "Superboy.  By Jerome Siegel"? |
| 16:29:54 | 23 | A.   This one entry, yeah.  All of these others |
| 16:29:56 | 24 | are Superman.  I see. |
| 16:29:57 | 25 | Q.   Do you see the one for Superboy where it says |

LAURA SIEGEL LARSON - 7/22/2011

Page 222

| | | |
|---|---|---|
| 16:30:00 | 1 | "By Jerome Siegel & Joe Shuster"? |
| 16:30:02 | 2 | A.    In More Fun Comics? |
| 16:30:04 | 3 | Q.    Yes.  Is that the first time you've seen this |
| 16:30:11 | 4 | document? |
| 16:30:11 | 5 | A.    Yeah, I believe so. |
| 16:30:21 | 6 | Q.    Okay.  Are you aware, going down to the next |
| 16:30:25 | 7 | bullet of paragraph 88, that in Action Comics No. 1, |
| 16:30:29 | 8 | Joe Shuster drew Superman as a very young boy |
| 16:30:34 | 9 | displaying a chair being held over his head? |
| 16:30:40 | 10 | A.    Yes.  You mean that one -- that one -- if I'm |
| 16:30:43 | 11 | recalling correctly, there's one panel. |
| 16:30:46 | 12 | Q.    If you turn the page -- |
| 16:30:49 | 13 | A.    That's the panel. |
| 16:30:51 | 14 | Q.    -- that's the panel that you're referring to? |
| 16:30:53 | 15 | MR. TOBEROFF:  Superbaby. |
| 16:30:54 | 16 | THE WITNESS:  As a baby, right. |
| | 17 | BY MR. PETROCELLI: |
| 16:30:55 | 18 | Q.    "Action Comics No. 1 (1930)."  Do you see that? |
| 16:30:58 | 19 | A.    Yes. |
| 16:30:58 | 20 | Q.    And you understood that Joe Shuster had |
| 16:31:01 | 21 | illustrated that; correct? |
| 16:31:02 | 22 | A.    Yes, he did. |
| 16:31:06 | 23 | Q.    And in the next panel on page 30 of the |
| 16:31:10 | 24 | Complaint, which is part of paragraph 88, were you |
| 16:31:17 | 25 | aware that Mr. Shuster had illustrated a -- Superman |

EXHIBIT 81
2235

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 223

| | | |
|---|---|---|
| 16:31:24 | 1 | as a youth in Superman No. 1 in May of 1939? |
| 16:31:30 | 2 | A.   Well, this says it's from Superman No. 1, |
| 16:31:34 | 3 | and, you know, I don't recall it being, but I |
| 16:31:38 | 4 | recognize this panel.  So yes, this one panel I do |
| 16:31:42 | 5 | recognize. |
| 16:31:43 | 6 | Q.   Okay.  And then also comic strips in 1942 |
| 16:31:53 | 7 | depicting Superman as a youth as shown in the Superman |
| 16:32:01 | 8 | Sunday Strip, May 31, 1942, depicted on page 31 of our |
| 16:32:01 | 9 | Complaint, have you seen that panel before? |
| 16:32:02 | 10 | A.   No, I haven't seen that one before.  I don't |
| 16:32:04 | 11 | recall that one. |
| 16:32:05 | 12 | Q.   Now, given that Joe -- given this body of |
| 16:32:15 | 13 | evidence that Joe Shuster was a co-creator of |
| 16:32:24 | 14 | Superboy, are you aware of any reason why -- |
| | 15 | withdrawn. |
| 16:32:30 | 16 | Given this body of evidence regarding Joe |
| 16:32:39 | 17 | Shuster's role in the creation of Superboy, including |
| 16:32:44 | 18 | illustrating Superboy and filing the copyright |
| 16:32:48 | 19 | registrations in his name and so forth -- |
| 16:32:50 | 20 | MR. TOBEROFF:  Assumes facts.  Lacks |
| 16:32:52 | 21 | foundation. |
| | 22 | BY MR. PETROCELLI: |
| 16:32:53 | 23 | Q.   -- are you -- did you ever have any |
| 16:32:57 | 24 | discussion with anyone about why the Shusters two |
| 16:33:05 | 25 | years after entering into that agreement with |

**EXHIBIT 81**
**2236**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 224

```
16:33:07   1   Mr. Toberoff's company in which they included as one
16:33:11   2   of the claimed rights -- rights to Superboy would then
16:33:15   3   disavow such rights?
16:33:17   4              MR. TOBEROFF:  Assumes facts.  Lacks
16:33:19   5   foundation.  Misstates the record.
16:33:24   6              And you could answer excluding your
16:33:29   7   conversations with your attorneys.
16:33:31   8              THE WITNESS:  And the question was did I
16:33:33   9   discuss this with anyone?
16:33:34  10              MR. PETROCELLI:  Yes.
16:33:39  11              THE WITNESS:  No one other than my attorney.
          12   BY MR. PETROCELLI:
16:33:41  13        Q.   And who is your attorney?
16:33:43  14        A.   Marc Toberoff.
16:33:45  15        Q.   And you discussed with your attorney --
16:33:48  16              MR. TOBEROFF:  Excuse me.  Excuse me.  I want
16:33:51  17   to make sure when you're answering these privileged
16:33:54  18   questions not to answer the question -- the questions
16:33:58  19   that invade the privilege, when I say to you you can
16:34:02  20   only answer to the extent of conversations excluding
16:34:05  21   your conversations with me, that means if you have a
16:34:08  22   conversation with somebody outside of your
16:34:10  23   conversations with me and they're not an attorney, you
16:34:12  24   can answer the question.  Otherwise, you don't answer
16:34:14  25   the question.
```

Merrill   Corporation  -  Los Angeles

800-826-0277                        www.merillcorp.com/law

EXHIBIT 81
2237

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 225

| | | |
|---|---|---|
| 16:34:15 | 1 | THE WITNESS:  Oh, oh.  Okay.  I'm sorry.  I |
| 16:34:17 | 2 | didn't -- |
| 16:34:18 | 3 | MR. TOBEROFF:  Don't answer the question in |
| 16:34:19 | 4 | such a way that by inference you're disclosing the |
| 16:34:22 | 5 | substance of your conversations with me. |
| 16:34:24 | 6 | THE WITNESS:  Okay.  I was confused. |
| 16:34:26 | 7 | MR. TOBEROFF:  It's tricky.  It can be |
| 16:34:27 | 8 | tricky. |
| 16:34:28 | 9 | THE WITNESS:  Yeah. |
| | 10 | BY MR. PETROCELLI: |
| 16:34:29 | 11 | Q.    Did you ever discuss this with your mother? |
| 16:34:34 | 12 | MR. TOBEROFF:  Discuss what? |
| | 13 | BY MR. PETROCELLI: |
| 16:34:35 | 14 | Q.    The issue that I've been talking about, |
| 16:34:39 | 15 | why -- why on the one hand the Shusters would claim an |
| 16:34:43 | 16 | interest in Superboy, particularly given some of the |
| 16:34:49 | 17 | evidence that I have discussed with you, and then on |
| 16:34:52 | 18 | the other hand relinquish any interest in Superboy two |
| 16:34:55 | 19 | years later. |
| 16:34:57 | 20 | MR. TOBEROFF:  Mis- -- lacks foundation. |
| 16:34:59 | 21 | Assumes facts.  Misstates the record. |
| 16:35:01 | 22 | You can answer. |
| 16:35:03 | 23 | THE WITNESS:  I don't -- I don't believe that |
| 16:35:04 | 24 | I -- that I discussed the way you asked the question. |
| | 25 | BY MR. PETROCELLI: |

LAURA SIEGEL LARSON - 7/22/2011

Page 226

| | | |
|---|---|---|
| 16:35:10 | 1 | Q.   Well, did you discuss with your mother -- |
| 16:35:16 | 2 | MR. TOBEROFF:  You can say no.  Don't -- |
| | 3 | BY MR. PETROCELLI: |
| 16:35:17 | 4 | Q.   -- any issue relating to the relinquishment |
| 16:35:23 | 5 | of the Superboy interest or any claim to a Superboy |
| 16:35:27 | 6 | interest by the Shuster family? |
| 16:35:31 | 7 | A.   No. |
| 16:35:31 | 8 | MR. TOBEROFF:  Same -- you answered for me |
| 16:35:34 | 9 | too quickly for me to object. |
| | 10 | BY MR. PETROCELLI: |
| | 11 | Q.   Were -- |
| 16:35:35 | 12 | MR. TOBEROFF:  Excuse me.  Same objection. |
| | 13 | BY MR. PETROCELLI: |
| 16:35:43 | 14 | Q.   Were you aware prior to reading our lawsuit |
| 16:35:55 | 15 | that after Mr. Toberoff's agreement with you in |
| 16:36:01 | 16 | October, 2002, he entered into a new agreement with |
| 16:36:10 | 17 | the Shusters which deleted Superboy from the |
| 16:36:14 | 18 | definition of rights in their joint venture? |
| 16:36:18 | 19 | A.   No. |
| 16:36:18 | 20 | Q.   Take a look at Exhibit 13. |
| | 21 | (Whereupon, Plaintiff's Exhibit 13 |
| 16:36:28 | 22 | was placed before the witness.) |
| | 23 | BY MR. PETROCELLI: |
| 16:36:29 | 24 | Q.   Now, what's the other one?  Exhibit -- I want |
| 16:36:38 | 25 | you to put Exhibit 10 and Exhibit 13 next to each |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 227

| | | |
|---|---|---|
| 16:36:41 | 1 | other. |
| 16:36:43 | 2 | A.   What is 10?  What am I looking for? |
| 16:36:46 | 3 | Q.   I'll straighten this all out for you once you |
| 16:36:49 | 4 | get 10. |
| 16:36:50 | 5 | A.   Oh, I didn't get it yet.  That's why. |
| 16:36:54 | 6 | There's a copy here? |
| 16:36:55 | 7 | Q.   Yes. |
| 16:37:01 | 8 | A.   Do you want this back?  Do you need it, Marc? |
| 16:37:05 | 9 | MR. TOBEROFF:  I already have it. |
| 16:37:07 | 10 | THE WITNESS:  Okay. |
| | 11 | BY MR. PETROCELLI: |
| 16:37:07 | 12 | Q.   So just to make sure that we're oriented |
| 16:37:10 | 13 | correctly, Exhibit 10 is the first Joint Venture |
| 16:37:14 | 14 | Agreement between Mr. Toberoff's company and the |
| 16:37:17 | 15 | Shusters dated as of November 23, 2001, and Exhibit 13 |
| 16:37:30 | 16 | is the change or supplement to that joint venture |
| 16:37:36 | 17 | dated as of -- dated as of October 27, 2003, some two |
| 16:37:42 | 18 | years later.  Okay? |
| 16:37:43 | 19 | A.   Uh-huh. |
| 16:37:44 | 20 | Q.   And you will see in paragraph 1 of Exhibit 10 |
| 16:37:49 | 21 | where it discusses the rights, it references the |
| 16:37:52 | 22 | Superboy and Smallville.  I've already showed that to |
| 16:37:55 | 23 | you; right?  In Exhibit 10? |
| 16:37:57 | 24 | A.   Yes, I saw Exhibit 10. |
| 16:37:59 | 25 | Q.   And now if you go to Exhibit 13 where there's |

LAURA SIEGEL LARSON - 7/22/2011

Page 228

| | | |
|---|---|---|
| 16:38:03 | 1 | a discussion of Superman in paragraph 1, you'll see |
| 16:38:13 | 2 | the word "Rights" in capital letter "R" is defined in |
| 16:38:16 | 3 | the first sentence of paragraph 1.  Do you see that? |
| 16:38:19 | 4 | A.   Yes, I see it. |
| 16:38:20 | 5 | Q.   And then if you read the rest of that |
| 16:38:23 | 6 | paragraph you'll see a reference to "all rights to |
| 16:38:26 | 7 | proceeds from 'SUPERMAN,' or the 'SUPERMAN' stories in |
| 16:38:32 | 8 | comic books, including, without limitation, Client's |
| 16:38:36 | 9 | copyright termination interest in 'SUPERMAN.'"  Do you |
| 16:38:40 | 10 | see that? |
| 16:38:40 | 11 | A.   Yes, I do. |
| 16:38:43 | 12 | Q.   And you do not see any reference in paragraph |
| 16:38:46 | 13 | 1 to Superboy or Smallville; is that correct? |
| 16:38:47 | 14 | MR. TOBEROFF:  Before you answer the |
| 16:38:48 | 15 | question, since he's asking you to compare these |
| 16:38:50 | 16 | paragraphs, I would like you to read the sentences |
| 16:38:52 | 17 | he's referring to carefully before you answer any |
| 16:38:54 | 18 | questions about it. |
| 16:38:56 | 19 | THE WITNESS:  Um-hum. |
| 16:39:12 | 20 | And your question was? |
| 16:39:14 | 21 | MR. TOBEROFF:  And read the other one he's |
| 16:39:15 | 22 | asking you to compare it to as well. |
| 16:39:17 | 23 | THE WITNESS:  Yeah, I did just read that. |
| 16:39:19 | 24 | Thank you. |
| | 25 | BY MR. PETROCELLI: |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 229

16:39:19    1         Q.    And you would agree with me you see no

16:39:22    2    reference to Superboy or Smallville in the discussion

16:39:24    3    of the rights in paragraph 1 of Exhibit 13, the 2003

16:39:29    4    agreement; correct?

16:39:29    5         A.    Yes.

16:39:30    6         Q.    And in between these two joint venture

16:39:34    7    agreements, 2001 and 2003, that Mr. Toberoff entered

16:39:38    8    into with the Shusters is when he and you joined up

16:39:45    9    and signed your agreement in October of 2002; correct?

16:39:50    10        A.    Yes.

16:39:52    11        Q.    And when you signed this agreement with

16:39:58    12    Mr. Toberoff and Mr. Emanuel in October of 2002, you

16:40:03    13    were asserting a 100 percent interest to Superboy on

16:40:07    14    the ground that your father, Jerome Siegel, was the

16:40:12    15    sole creator of Superboy; correct?

16:40:15    16            MR. TOBEROFF:  Vague and ambiguous.  Where in

16:40:18    17    the agreement?  Just in general?

16:40:20    18            MR. PETROCELLI:  Just in general.

16:40:21    19            THE WITNESS:  In general that our --

            20    BY MR. PETROCELLI:

            21        Q.    That was your point of view.

16:40:24    22        A.    You said that our belief, our point of view

16:40:27    23    was that -- yes.

16:40:28    24        Q.    And you expressed that point of view to

16:40:31    25    Mr. Emanuel and Mr. Toberoff, that your father was the

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 230

| | | |
|---|---|---|
| 16:40:34 | 1 | sole creator of Superboy and you were claiming a |
| 16:40:37 | 2 | hundred percent termination interest to Superboy; |
| 16:40:41 | 3 | correct? |
| 16:40:41 | 4 | MR. TOBEROFF:  Vague as to time. |
| | 5 | BY MR. PETROCELLI: |
| 16:40:44 | 6 | Q.   Correct? |
| 16:40:44 | 7 | A.   Are you saying at the time in 2002? |
| 16:40:47 | 8 | Q.   Yes. |
| 16:40:48 | 9 | A.   Yes. |
| 16:40:48 | 10 | Q.   And it was shortly -- a very short time after |
| 16:40:52 | 11 | you signed the agreement with Mr. Emanuel and |
| 16:40:57 | 12 | Mr. Toberoff in October, 2002, that your family issued |
| 16:41:03 | 13 | a notice of termination with respect to Superboy; |
| 16:41:05 | 14 | correct? |
| 16:41:06 | 15 | A.   Yes. |
| 16:41:06 | 16 | Q.   That was, in fact, the next month, in |
| 16:41:09 | 17 | November; correct? |
| 16:41:11 | 18 | A.   It could have been November. |
| 16:41:12 | 19 | Q.   And that notice of termination for Superboy |
| 16:41:15 | 20 | that your family filed or that was filed on behalf of |
| 16:41:18 | 21 | your family asserted that your father, Mr. Siegel, was |
| 16:41:22 | 22 | the sole creator of Superboy and you were claiming a |
| 16:41:25 | 23 | hundred percent termination interest, not 50 percent; |
| 16:41:28 | 24 | correct? |
| 16:41:28 | 25 | MR. TOBEROFF:  Okay.  Wait.  I would like to |

**EXHIBIT 81**
**2243**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 231

| | | |
|---|---|---|
| 16:41:30 | 1 | slow this down.  I need time to object.  Okay?  So |
| 16:41:34 | 2 | after he asks the question, count to 5 or 10 so I have |
| 16:41:37 | 3 | time to object even if I don't object.  Okay? |
| 16:41:40 | 4 | MR. PETROCELLI:  I don't think it's |
| 16:41:41 | 5 | reasonable to count to 5 to 10. |
| 16:41:44 | 6 | MR. TOBEROFF:  Count to 5. |
| 16:41:45 | 7 | MR. PETROCELLI:  You just need to pause. |
| 16:41:47 | 8 | MR. TOBEROFF:  I'm happy with 5. |
| | 9 | MR. PETROCELLI:  Just be reasonable. |
| 16:41:49 | 10 | Can we repeat the question, please? |
| 16:41:51 | 11 | MR. TOBEROFF:  It's a common instruction. |
| 16:41:52 | 12 | You say count to 10 knowing no one is going to count |
| 16:41:56 | 13 | to 10 and you end up with 2. |
| 16:42:23 | 14 | (The record was read.) |
| 16:42:24 | 15 | THE WITNESS:  Yes. |
| | 16 | BY MR. PETROCELLI: |
| 16:42:25 | 17 | Q.  And at the time that you authorized the |
| 16:42:26 | 18 | filing of that hundred percent Superboy termination |
| 16:42:29 | 19 | notice in November of 2002, were you aware that |
| 16:42:38 | 20 | Mr. Toberoff through his company, Pacific Pictures, |
| 16:42:41 | 21 | had entered into a joint venture agreement with the |
| 16:42:46 | 22 | Shusters in which they included among the rights of |
| 16:42:50 | 23 | the joint venture references to Superboy? |
| 16:43:00 | 24 | A.  No, we were not aware of that. |
| 16:43:02 | 25 | MR. PETROCELLI:  Okay.  We'll take your break |

LAURA SIEGEL LARSON - 7/22/2011

Page 232

| | | |
|---|---|---|
| 16:43:04 | 1 | now. |
| 16:43:04 | 2 | THE WITNESS:  Thank you. |
| 16:43:05 | 3 | THE VIDEOGRAPHER:  Off the record.  The time |
| 16:43:08 | 4 | is 4:43. |
| 17:00:12 | 5 | (A recess was taken.) |
| 17:00:20 | 6 | THE VIDEOGRAPHER:  We're back on the record, |
| 17:00:22 | 7 | and this marks the beginning of tape number four in |
| 17:00:26 | 8 | the deposition of Laura Siegel.  The time is 5 |
| 17:00:28 | 9 | o'clock. |
| | 10 | BY MR. PETROCELLI: |
| 17:00:28 | 11 | Q.   Ms. Siegel, were you aware that in -- that |
| 17:00:34 | 12 | after Mr. Toberoff entered into his first agreement |
| 17:00:37 | 13 | with the Shusters in November, 2001, that around that |
| 17:00:43 | 14 | same period of time, I should say, that he contacted |
| 17:00:48 | 15 | Kevin Marks or left a voicemail for Kevin Marks -- |
| 17:00:54 | 16 | A.   I -- no. |
| 17:00:54 | 17 | Q.   -- on November 29, 2001? |
| 17:00:57 | 18 | A.   2001, no. |
| 17:00:58 | 19 | Q.   Did you learn about that contact from |
| 17:01:02 | 20 | Mr. Marks at that time? |
| 17:01:07 | 21 | A.   No. |
| 17:01:08 | 22 | Q.   And are you aware that in February, 2002, |
| 17:01:14 | 23 | February 6, to be exact, that Mr. Toberoff contacted |
| 17:01:19 | 24 | Kevin Marks again? |
| 17:01:23 | 25 | A.   No. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 233

| | | |
|---|---|---|
| 17:01:23 | 1 | MR. TOBEROFF:  What date? |
| 17:01:25 | 2 | MR. PETROCELLI:  February 6, 2002. |
| 17:01:27 | 3 | Q.  And are you aware -- and I'm basing these |
| 17:01:32 | 4 | questions off of, I'll tell you, the testimony of |
| 17:01:35 | 5 | Kevin Marks -- |
| 17:01:35 | 6 | A.  Okay. |
| 17:01:35 | 7 | Q.  -- in the case that you filed. |
| 17:01:37 | 8 | A.  Um-hum. |
| 17:01:39 | 9 | Q.  Are you aware -- |
| 17:01:40 | 10 | MR. TOBEROFF:  Allegedly. |
| | 11 | BY MR. PETROCELLI: |
| 17:01:41 | 12 | Q.  -- that Mr. Marks said or -- are you aware |
| 17:01:45 | 13 | that Mr. Toberoff told Mr. Marks that he was |
| 17:01:47 | 14 | interested in the Superman property and the Superboy |
| 17:01:51 | 15 | property when he called him and spoke to him for the |
| 17:01:53 | 16 | first time in February of 2002? |
| 17:01:56 | 17 | A.  2000 -- I can't hear you. |
| 17:02:01 | 18 | Q.  February, 2002.  Were you aware that |
| 17:02:01 | 19 | Mr. Toberoff told Mr. Marks that he was interested in |
| 17:02:03 | 20 | the Superman property and the Superboy property? |
| 17:02:06 | 21 | A.  No, I was not. |
| 17:02:07 | 22 | Q.  Mr. Marks did not convey that to you? |
| 17:02:09 | 23 | A.  No, he did not. |
| 17:02:13 | 24 | Q.  And are you aware that Mr. Marks told |
| 17:02:18 | 25 | Mr. Toberoff on that occasion that the Siegels were |

LAURA SIEGEL LARSON - 7/22/2011

Page 234

| | | |
|---|---|---|
| 17:02:22 | 1 | very far along with DC Comics and at a documentation |
| 17:02:26 | 2 | phase? |
| 17:02:27 | 3 | A.   Well, I don't know that he had the |
| 17:02:28 | 4 | conversation. |
| 17:02:30 | 5 | Q.   Okay.  Were you aware that three days later |
| 17:02:33 | 6 | on February 9, 2002, Mr. Toberoff approached Steve |
| 17:02:38 | 7 | Spira, an executive at Warner Bros., at an event and |
| 17:02:42 | 8 | said that Warner Bros. had a Superman rights problem? |
| 17:02:46 | 9 | A.   No, I did not know that. |
| 17:02:48 | 10 | Q.   Take a look at the next exhibit in order, |
| 17:02:50 | 11 | which is Exhibit 60.  And this is an agreement -- |
| 17:03:08 | 12 | excuse me.  This is a document between Mr. Emanuel and |
| 17:03:11 | 13 | Mr. Toberoff dated June 3. |
| 17:03:15 | 14 | A.   Thank you. |
| | 15 | (Whereupon, Plaintiff's Exhibit 60 |
| 17:03:24 | 16 | was marked for identification.) |
| 17:03:24 | 17 | THE WITNESS:   June 3. |
| 17:03:42 | 18 | MR. PETROCELLI:  Excuse me.  Exhibit 60 is a |
| 17:03:45 | 19 | redacted agreement, redacted meaning that we don't |
| 17:03:48 | 20 | have the whole agreement, just parts of it, signed |
| 17:03:52 | 21 | between Mr. Emanuel and Mr. Toberoff on or about |
| 17:03:57 | 22 | February 12, 2002. |
| 17:03:59 | 23 | Q.   Have you ever seen this document before -- or |
| 17:04:04 | 24 | have you ever seen the agreement in its entirety? |
| 17:04:11 | 25 | A.   No. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 235

17:04:11    1        Q.    And were you aware that IP Worldwide was

17:04:20    2    created as a combination between Mr. Emanuel and

17:04:24    3    Mr. Toberoff's company, Pacific Pictures Corporation?

17:04:40    4        A.    No.

17:04:41    5            MR. TOBEROFF:  I just want to object.  This

17:04:44    6    document is stamped "Confidential," and I believe it

17:04:47    7    was stamped -- I believe by the Bates number this is a

17:04:53    8    document produced by Endeavor.

17:05:00    9            MR. PETROCELLI:  In the Siegel case.

17:05:01    10            MR. TOBEROFF:  In the Siegel case, and I

17:05:02    11    believe it was stamped "Confidential" pursuant to and

17:05:06    12    under a protective order in that case, and I'm just

17:05:09    13    objecting on that basis and not waiving any objections

17:05:17    14    to the use of this document in this deposition, and at

17:05:22    15    a minimum it should be subject to that protective

17:05:29    16    order because I believe the protective order extends

17:05:32    17    beyond the Siegel case.

17:05:32    18            MR. PETROCELLI:  Okay.  Well, we're willing

17:05:37    19    to treat it as such until we work this out.

17:05:43    20            Okay.  I'm told that it was reproduced in

17:05:46    21    this case in the absence of any protective order.  But

17:05:50    22    look, I'm not going to argue about that, so we'll

17:05:52    23    figure it out.

17:05:55    24            Next is a document dated May 9, 2002 --

17:06:06    25            MR. TOKORO:  Exhibit 61.

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 236

| | | |
|---|---|---|
| 17:06:07 | 1 | MR. PETROCELLI:  -- which will be Exhibit 61. |
| 17:06:08 | 2 | It's a letter from -- from Joanne Siegel to Richard |
| 17:06:19 | 3 | Parsons. |
| | 4 | (Whereupon, Plaintiff's Exhibit 61 |
| 17:06:19 | 5 | was marked for identification.) |
| | 6 | BY MR. PETROCELLI: |
| 17:06:23 | 7 | Q.   You testified about this letter in your prior |
| 17:06:26 | 8 | deposition in the Siegel case.  A couple of follow-up |
| 17:06:32 | 9 | questions. |
| 17:06:32 | 10 | Did you type this letter? |
| 17:06:34 | 11 | A.   Yes, I typed it. |
| 17:06:36 | 12 | Q.   And you typed it at your home? |
| 17:06:37 | 13 | A.   Yes. |
| 17:06:38 | 14 | Q.   Did you assist in drafting it? |
| 17:06:42 | 15 | A.   If I'm recalling correctly, my mom said |
| 17:06:46 | 16 | "Don't change one word."  She was pretty insistent, so |
| 17:06:50 | 17 | no, I did not make changes to it. |
| 17:06:52 | 18 | Q.   Did you show it to anybody before it went |
| 17:06:54 | 19 | out? |
| 17:06:54 | 20 | A.   No. |
| 17:06:54 | 21 | Q.   Did you discuss -- do you know if your |
| 17:07:02 | 22 | attorneys knew it had gone out, Mr. Marks? |
| 17:07:06 | 23 | A.   No. |
| 17:07:06 | 24 | Q.   They did not know? |
| 17:07:07 | 25 | A.   They did not know. |

**EXHIBIT 81**
**2249**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 237

| | | |
|---|---|---|
| 17:07:24 | 1 | Q.  Now, in this letter you say -- it states at |
| 17:07:40 | 2 | the very end -- |
| 17:07:43 | 3 | A.  You mean she says? |
| 17:07:44 | 4 | Q.  She says, correct -- that -- part of the last |
| 17:07:50 | 5 | paragraph "Have you been aware that your |
| 17:07:52 | 6 | representatives have gone too far?  If not, you do |
| 17:07:57 | 7 | now."  Were you -- was your mother concerned as far as |
| 17:08:02 | 8 | you knew that the lawyers were taking positions that |
| 17:08:06 | 9 | the company wasn't aware? |
| 17:08:09 | 10 | A.  Yes.  I believe that's what she was |
| 17:08:11 | 11 | expressing here. |
| 17:08:12 | 12 | Q.  Was there a response received to this letter? |
| 17:08:16 | 13 | A.  Oh.  Perhaps, but I don't know for sure. |
| 17:08:27 | 14 | Q.  Okay. |
| 17:08:28 | 15 | MR. TOBEROFF:  A response from Dick Parsons? |
| 17:08:30 | 16 | THE WITNESS:  That's what I assumed you |
| 17:08:32 | 17 | meant. |
| 17:08:32 | 18 | MR. PETROCELLI:  I did mean that, right. |
| 17:08:34 | 19 | THE WITNESS:  Dick Parsons' response. |
| | 20 | BY MR. PETROCELLI: |
| 17:08:35 | 21 | Q.  And the answer is you don't know. |
| 17:08:37 | 22 | A.  I don't know. |
| 17:08:37 | 23 | Q.  And do you know whether anyone else responded |
| 17:08:40 | 24 | to this letter? |
| 17:08:40 | 25 | A.  I don't -- I don't recall. |

**EXHIBIT 81**
**2250**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 238

| | | |
|---|---|---|
| 17:08:42 | 1 | Q.   Okay. |
| 17:09:04 | 2 | Now, did at some point you make your lawyers |
| 17:09:08 | 3 | aware that your mother had sent this letter? |
| 17:09:11 | 4 | A.   Actually, they found out, and then my mother |
| 17:09:15 | 5 | and I discussed it with them. |
| 17:09:16 | 6 | Q.   How did they find out?  From Warner Bros.? |
| 17:09:19 | 7 | A.   Yes. |
| 17:09:23 | 8 | Q.   And you wrote this letter on May 9, 2002. |
| 17:09:27 | 9 | A.   No, I didn't write it.  My mother did. |
| 17:09:29 | 10 | Q.   Excuse me.  You typed it for your mother? |
| 17:09:31 | 11 | A.   Yes. |
| 17:09:31 | 12 | Q.   And is it your testimony that every single |
| 17:09:33 | 13 | word was drafted by your mother and no one else? |
| 17:09:36 | 14 | A.   That's correct. |
| 17:09:40 | 15 | Q.   Including some of the legal-sounding |
| 17:09:46 | 16 | sentences? |
| 17:09:47 | 17 | A.   That's right.  She -- she was a hell of a |
| 17:09:54 | 18 | writer. |
| 17:09:54 | 19 | Q.   Did she have a writing background? |
| 17:09:57 | 20 | A.   She had written, yes. |
| 17:10:01 | 21 | Q.   What had she written? |
| 17:10:01 | 22 | A.   Well, she didn't -- she didn't get to sell |
| 17:10:04 | 23 | them, but she had written several books, and, you |
| 17:10:08 | 24 | know, she was constantly writing and drafting things |
| 17:10:11 | 25 | for my father through the years. |

EXHIBIT 81
2251

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 239

| | | |
|---|---|---|
| 17:10:13 | 1 | Q.    What kind of books had she written? |
| 17:10:16 | 2 | A.    Well, she wrote a children's book.  She |
| 17:10:18 | 3 | wrote, you know, just things that moved her, memories |
| 17:10:24 | 4 | that she had from her youth. |
| 17:10:25 | 5 | Q.    Did she ever write anything regarding |
| 17:10:28 | 6 | Superman or her husband's role in Superman? |
| 17:10:41 | 7 | A.    No. |
| 17:10:41 | 8 | Q.    And again, you sent this -- this letter was |
| 17:10:46 | 9 | sent by your mother on May 9, 2002, but it was not |
| 17:10:50 | 10 | until September 21, 2002, that DC was informed that |
| 17:10:55 | 11 | negotiations were being stopped; correct? |
| 17:10:58 | 12 | A.    Yes.  I mean we -- you know, by that time we |
| 17:11:01 | 13 | reached our decision, and that was it. |
| 17:11:05 | 14 | Q.    By that time, meaning September 21, 2002? |
| 17:11:08 | 15 | A.    By September 21, right. |
| 17:11:10 | 16 | Q.    2002. |
| 17:11:11 | 17 | A.    2002. |
| 17:11:12 | 18 | Q.    Okay.  Thank you. |
| 17:11:28 | 19 | At some point -- the reaction expressed in |
| 17:11:33 | 20 | this letter was to the -- a proposed agreement that |
| 17:11:43 | 21 | was sent to your lawyer by the folks at Warner Bros. |
| 17:11:46 | 22 | and DC Comics; is that correct? |
| 17:11:48 | 23 | A.    You're talking about the February -- |
| 17:11:50 | 24 | Q.    Yes. |
| 17:11:50 | 25 | A.    -- 2002 one?  Yes. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 240

| | | |
|---|---|---|
| 17:11:53 | 1 | Q.  And after that, your lawyer, Mr. Marks, |
| 17:11:56 | 2 | undertook to prepare a redraft of that document; |
| 17:11:59 | 3 | correct? |
| 17:11:59 | 4 | A.  After a long period of time he suggested that |
| 17:12:03 | 5 | he might do that. |
| 17:12:04 | 6 | Q.  Okay.  And you saw that redraft; right? |
| 17:12:08 | 7 | A.  Yes, I did. |
| 17:12:09 | 8 | MR. TOBEROFF:  Okay.  Try and stay away |
| 17:12:14 | 9 | from -- give ballpark things, but try and stay away |
| 17:12:16 | 10 | from the substance of your conversations with your |
| 17:12:18 | 11 | attorney, what he said, what you said. |
| 17:12:21 | 12 | THE WITNESS:  Right. |
| 17:12:22 | 13 | MR. TOBEROFF:  Don't try and stay away from |
| 17:12:25 | 14 | it.  Stay away from it. |
| | 15 | BY MR. PETROCELLI: |
| 17:12:32 | 16 | Q.  And did you ever have an occasion to see the |
| 17:12:35 | 17 | redraft that he prepared? |
| 17:12:37 | 18 | A.  That Kevin Marks prepared? |
| 17:12:39 | 19 | Q.  Yes. |
| 17:12:40 | 20 | A.  Yes. |
| 17:12:40 | 21 | MR. TOBEROFF:  I just want to tell you |
| 17:12:41 | 22 | because I don't want to read your work product, but on |
| 17:12:43 | 23 | the back of that thing you're holding up there's |
| 17:12:47 | 24 | language.  There's writing. |
| 17:12:52 | 25 | MR. PETROCELLI:  It's about Woody Harrelson |

**EXHIBIT 81**
**2253**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 241

| | | |
|---|---|---|
| 17:12:54 | 1 | being a big Oscar nominee. |
| 17:12:58 | 2 | THE WITNESS:  How did it get in my file? |
| 17:13:01 | 3 | Tell Woody I said hi. |
| 17:13:03 | 4 | BY MR. PETROCELLI: |
| 17:13:04 | 5 | Q.   And you're aware that the date of that |
| 17:13:08 | 6 | redrafted long-form agreement was July 15, 2002? |
| 17:13:12 | 7 | A.   Sounds about right. |
| 17:13:50 | 8 | Q.   Shortly after the redraft was created, are |
| 17:13:55 | 9 | you aware that Mr. Toberoff called Mr. Marks to try to |
| 17:14:03 | 10 | set up a meeting with Mr. Toberoff and Mr. Emanuel? |
| 17:14:09 | 11 | A.   Set up a meeting with whom? |
| 17:14:12 | 12 | Q.   With Mr. Toberoff and Mr. Emanuel. |
| 17:14:14 | 13 | A.   No, no, no.  You're saying he called and |
| 17:14:16 | 14 | wanted to set up a meeting with Kevin Marks? |
| 17:14:19 | 15 | Q.   Or another -- Mr. Toberoff calls Mr. Marks to |
| 17:14:21 | 16 | try to arrange a meeting or a conference call with |
| 17:14:26 | 17 | Toberoff, Marks, and Emanuel. |
| 17:14:29 | 18 | A.   No, I was not aware of that. |
| 17:14:31 | 19 | Q.   Okay.  Then that -- according to Mr. Marks' |
| 17:14:35 | 20 | call logs, Mr. Toberoff made that contact on July 24, |
| 17:14:41 | 21 | 2002.  Do you have any recollection of Mr. Marks |
| 17:14:43 | 22 | having conveyed that to you? |
| 17:14:44 | 23 | A.   Mr. Marks did not. |
| 17:14:52 | 24 | Q.   Why are you -- are you certain he didn't? |
| 17:14:54 | 25 | A.   I'm very certain that he didn't. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 242

| | | |
|---|---|---|
| 17:14:55 | 1 | Q.   Why is that? |
| 17:14:57 | 2 | A.   Because when we -- we finally received |
| 17:15:01 | 3 | communication from Mr. Marks that he had been |
| 17:15:05 | 4 | contacted by -- by Mr. Toberoff, it was later than |
| 17:15:11 | 5 | that.  So, you know, he didn't specify the date on |
| 17:15:16 | 6 | which -- on which he contacted him, but when did you |
| 17:15:19 | 7 | say that was?  July what? |
| 17:15:21 | 8 | Q.   24th. |
| 17:15:21 | 9 | A.   Yeah, I think it was shortly thereafter that |
| 17:15:24 | 10 | we found out about it, but he never referenced any |
| 17:15:28 | 11 | phone call in July, is what I'm trying to -- |
| 17:15:30 | 12 | Q.   I see. |
| 17:15:31 | 13 | A.   He didn't convey it to us. |
| 17:15:32 | 14 | Q.   When you say you shortly found out about it, |
| 17:15:35 | 15 | meaning you shortly found out about the |
| 17:15:42 | 16 | Toberoff/Emanuel contact when you received the letter |
| 17:15:43 | 17 | from Mr. Marks. |
| 17:15:46 | 18 | A.   I believe so, yes. |
| 17:15:48 | 19 | Q.   That's the first time you found out from |
| 17:15:52 | 20 | Mr. Marks that Mr. Toberoff had contacted him; is that |
| 17:15:55 | 21 | right? |
| 17:15:55 | 22 | A.   That's correct. |
| 17:15:58 | 23 | Q.   And Mr. Marks had not told you about the |
| 17:16:01 | 24 | February contact. |
| 17:16:02 | 25 | A.   No. |

Merrill   Corporation   -   Los Angeles

800-826-0277                    www.merillcorp.com/law

EXHIBIT 81
2255

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 243

| | | |
|---|---|---|
| 17:16:02 | 1 | Q.   Or that Mr. Toberoff had called him in |
| 17:16:04 | 2 | November of '01. |
| 17:16:25 | 3 | A.   No. |
| 17:16:25 | 4 | Q.   Now, when Mr. -- according to Mr. Marks' |
| 17:16:31 | 5 | testimony, on August 8, 2002, there was a conference |
| 17:16:36 | 6 | call with Mr. Emanuel and Mr. Marks and Mr. Toberoff |
| 17:16:41 | 7 | in which Mr. Emanuel and Mr. Toberoff expressed their |
| 17:16:45 | 8 | interest in pursuing the property.  Did Mr. Marks |
| 17:16:51 | 9 | convey to you what had transpired in that call prior |
| 17:16:56 | 10 | to your receiving the letter from him about it? |
| 17:16:59 | 11 | A.   No, he did not. |
| 17:17:14 | 12 | Q.   Okay.  Take a look at Exhibit 54. |
| 17:17:25 | 13 | MR. TOBEROFF:  What was the number of the |
| 17:17:26 | 14 | Parsons letter? |
| 17:17:28 | 15 | THE WITNESS:  That's 61. |
| 17:17:29 | 16 | MR. TOKORO:  61. |
| 17:17:30 | 17 | MR. TOBEROFF:  Thank you. |
| | 18 | (Whereupon, Plaintiff's Exhibit 54 |
| 17:17:32 | 19 | was placed before the witness.) |
| | 20 | BY MR. PETROCELLI: |
| 17:17:33 | 21 | Q.   Exhibit -- excuse me.  Exhibit 54 is a letter |
| 17:17:38 | 22 | from your mother and you to Mr. Marks and Mr. Ramer of |
| 17:17:47 | 23 | Gang Tyre dated September 21, 2002 -- |
| 17:17:47 | 24 | A.   Um-hum. |
| 17:17:51 | 25 | Q.   -- stating that you had rejected the DC |

EXHIBIT 81
2256

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 244

| | | |
|---|---|---|
| 17:17:55 | 1 | Comics offer sent to you on February 4, 2002, as well |
| 17:18:01 | 2 | as Mr. Marks' redraft which was sent to you on July |
| 17:18:07 | 3 | 15, 2002.  Do you see that? |
| 17:18:08 | 4 | A.   Yes, I do. |
| 17:18:10 | 5 | Q.   And then you say due to irreconcilable |
| 17:18:13 | 6 | differences and so forth, that you're terminating |
| 17:18:18 | 7 | Mr. Marks' firm's services effective, I guess -- well, |
| 17:18:25 | 8 | immediately; right? |
| 17:18:26 | 9 | A.   That's right. |
| 17:18:28 | 10 | Q.   As of September 21, 2002; correct? |
| 17:18:32 | 11 | A.   Yes. |
| 17:18:32 | 12 | Q.   Now, you copied Michael Siegel on this as |
| 17:18:34 | 13 | well as his lawyer, Don Bulson.  As of this point in |
| 17:18:42 | 14 | time, September 21, 2002, you had heard about the |
| 17:18:51 | 15 | Toberoff/Emanuel discussion with Mr. Marks through his |
| 17:18:56 | 16 | letter to you.  You had now terminated Mr. Marks. |
| 17:19:04 | 17 | A.   Um-hum. |
| 17:19:06 | 18 | Q.   On the same date, September 21, 2002, you |
| 17:19:10 | 19 | advised DC that you were terminating negotiations with |
| 17:19:14 | 20 | them as well as with Warner Bros.; correct? |
| 17:19:16 | 21 | A.   Correct. |
| 17:19:18 | 22 | Q.   You copied Michael Siegel and Mr. Bulson on |
| 17:19:21 | 23 | these various letters.  Had you had conversations with |
| 17:19:26 | 24 | Michael as of this point in time about what you were |
| 17:19:30 | 25 | doing? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 245

| | | |
|---|---|---|
| 17:19:30 | 1 | A.   We were -- we were frustrated because we felt |
| 17:19:42 | 2 | that the Ramer firm had really done as much as they |
| 17:19:46 | 3 | could do, and from -- okay.  I won't say what. |
| 17:19:50 | 4 | MR. TOBEROFF:  I want you to focus on his |
| 17:19:52 | 5 | question. |
| 17:19:52 | 6 | THE WITNESS:  Okay.  I'm sorry.  What was |
| 17:19:54 | 7 | your question? |
| | 8 | BY MR. PETROCELLI: |
| 17:19:55 | 9 | Q.   My question was given that you had copied |
| 17:19:59 | 10 | Mr. Siegel and his lawyer, Don Bulson, in these |
| 17:20:06 | 11 | important notifications that you sent out on September |
| 17:20:09 | 12 | 21, 2002, whether and to what extent you had |
| 17:20:14 | 13 | communicated with Mr. Siegel about these plans and |
| 17:20:17 | 14 | these activities. |
| 17:20:18 | 15 | A.   Oh.  No.  We didn't talk about them |
| 17:20:22 | 16 | beforehand.  We were -- |
| 17:20:23 | 17 | Q.   Just out of the clear blue you sent him a |
| 17:20:26 | 18 | copy of your letters? |
| 17:20:27 | 19 | A.   Yes.  That's the way I remember it. |
| 17:20:31 | 20 | Q.   Do you recall any discussion with him or his |
| 17:20:35 | 21 | lawyer, Mr. Bulson? |
| 17:20:38 | 22 | A.   You know, we didn't really communicate very |
| 17:20:41 | 23 | much. |
| 17:20:41 | 24 | Q.   Okay.  Why did you copy him? |
| 17:20:48 | 25 | A.   Because his attorney would on occasion |

## LAURA SIEGEL LARSON - 7/22/2011

Page 246

| | | |
|---|---|---|
| 17:20:54 | 1 | communicate with Kevin Marks, and we wanted to let |
| 17:20:57 | 2 | them know that that was no longer appropriate, that |
| 17:20:59 | 3 | they were no longer representing us. |
| 17:21:03 | 4 | Q.  When you were -- you hadn't paid Kevin Marks |
| 17:21:08 | 5 | any fee because their firm was charging 5 percent of |
| 17:21:11 | 6 | whatever settlement might occur; right? |
| 17:21:14 | 7 | A.  We made regular payments on costs. |
| 17:21:16 | 8 | Q.  Costs. |
| 17:21:16 | 9 | A.  Only. |
| 17:21:17 | 10 | Q.  Was Mr. Siegel, Michael Siegel, sharing in |
| 17:21:20 | 11 | those costs? |
| 17:21:21 | 12 | A.  We asked him to, and there was an ongoing |
| 17:21:26 | 13 | dispute over that. |
| 17:21:27 | 14 | Q.  And had you asked him to share in those costs |
| 17:21:29 | 15 | all the way back to the beginning, starting with the |
| 17:21:33 | 16 | termination notice with Mr. Levine and then going |
| 17:21:35 | 17 | forward through the Marks firm? |
| 17:21:37 | 18 | A.  We requested that. |
| 17:21:40 | 19 | Q.  And did you bill him for it? |
| 17:21:42 | 20 | A.  Yes, we billed him for it. |
| 17:21:44 | 21 | Q.  Who prepared the bills? |
| 17:21:45 | 22 | A.  My mother and I did. |
| 17:21:47 | 23 | Q.  Who would you send the bills to? |
| 17:21:49 | 24 | A.  We sent -- we sent -- well, when you say |
| 17:21:51 | 25 | bills -- |

**EXHIBIT 81**
**2259**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 247

| | | |
|---|---|---|
| 17:21:51 | 1 | Q.   Or statements or requests for his share of |
| 17:21:55 | 2 | the costs. |
| 17:21:56 | 3 | A.   I believe we gave that to Kevin Marks, and |
| 17:22:01 | 4 | Kevin Marks submitted it on our behalf. |
| 17:22:02 | 5 | Q.   What did you charge him?  25 percent of the |
| 17:22:06 | 6 | total costs? |
| 17:22:07 | 7 | A.   That -- that was what we asked for. |
| 17:22:09 | 8 | Q.   Or actually was it more than that?  Was it a |
| 17:22:12 | 9 | third?  How did you do the math? |
| 17:22:14 | 10 | A.   No, it was 25 percent.  I mean under |
| 17:22:17 | 11 | copyright law it was 50 percent for my mother, 25 |
| 17:22:20 | 12 | percent for me, 25 percent for Michael.  And so, you |
| 17:22:23 | 13 | know, we felt it was appropriate for him to have a |
| 17:22:27 | 14 | corresponding responsibility for costs. |
| 17:22:29 | 15 | Q.   When Mr. Ramer was doing the negotiations -- |
| 17:22:34 | 16 | Mr. Marks or Mr. Ramer, the Gang Tyre firm, with |
| 17:22:39 | 17 | Warner Bros. and DC Comics, was that on behalf of the |
| 17:22:42 | 18 | entire hundred percent Siegel interest, including |
| 17:22:45 | 19 | Michael's 25 percent? |
| 17:22:46 | 20 | A.   Yes, it was. |
| 17:22:48 | 21 | Q.   Had Michael entered into an engagement letter |
| 17:22:51 | 22 | with the Gang Tyre firm, to your knowledge? |
| 17:22:55 | 23 | A.   I don't believe he did. |
| 17:23:06 | 24 | Q.   Did Bulson and -- did Kevin Marks ever meet |
| 17:23:14 | 25 | Michael Siegel, to your knowledge? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 248

| | | |
|---|---|---|
| 17:23:15 | 1 | A.   I -- not to my knowledge. |
| 17:23:17 | 2 | Q.   Were there ever any joint meetings with all |
| 17:23:20 | 3 | of you together and Kevin Marks or Bruce Ramer? |
| 17:23:23 | 4 | A.   Not -- not all of us together, but I know |
| 17:23:27 | 5 | that Don Bulson, you know, did meet up with Kevin |
| 17:23:31 | 6 | Marks at one point. |
| 17:23:32 | 7 | Q.   When you sent out the -- excuse me.  When |
| 17:23:35 | 8 | your mother wrote out and you typed out and you sent |
| 17:23:39 | 9 | to Warner Bros. and DC Comics the letter in May |
| 17:23:44 | 10 | expressing your upset about the February -- |
| 17:23:44 | 11 | A.   This one?  Yeah. |
| 17:23:47 | 12 | Q.   -- long form agreement -- |
| 17:23:50 | 13 | A.   Um-hum. |
| 17:23:50 | 14 | Q.   -- did you first clear that with Michael |
| 17:23:50 | 15 | Siegel or Don Bulson? |
| 17:23:53 | 16 | A.   No. |
| 17:23:53 | 17 | Q.   Did you send them a copy of it? |
| 17:23:57 | 18 | A.   That I don't remember. |
| 17:24:08 | 19 | Q.   Oh.  Why was there a dispute between you and |
| 17:24:13 | 20 | your mother on the one hand and Michael Siegel on the |
| 17:24:16 | 21 | other hand regarding this issue prior -- yes, as of |
| 17:24:22 | 22 | September 21, 2002? |
| 17:24:23 | 23 | A.   You're talking about costs. |
| 17:24:24 | 24 | Q.   Was that the subject of the dispute, the |
| 17:24:26 | 25 | costs? |

EXHIBIT 81
2261

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 249

17:24:26    1        A.    Yes.

17:24:27    2        Q.    And why was there a dispute about the costs?

17:24:33    3        A.    Michael was the child of a very upsetting

17:24:39    4    divorce, and he -- you know, it hurts me to have to

17:24:44    5    say this, but, you know, he was a very kind of

17:24:48    6    confused guy and he really kind of couldn't keep

17:24:50    7    things straight.  It was very difficult to communicate

17:24:54    8    with him, and it was very upsetting to receive

17:25:04    9    communications from him that were kind of all over the

17:25:08    10    place, things that didn't really make any sense, and

17:25:14    11    he was very secretive, and he just couldn't really

17:25:20    12    grasp legal principles.  So discussions with --

17:25:24    13    directly with him really didn't work.  It really

17:25:32    14    required attorneys to explain things to him, and

17:25:34    15    that's why he had his own attorney, who was, of

17:25:38    16    course, interpreting things, you know, for Michael and

17:25:42    17    explaining things to him.  But he didn't -- he didn't

17:25:46    18    have any -- any background in understanding the

17:25:50    19    history of, you know, the Superman litigations or --

17:25:54    20    you know.

17:25:54    21        Q.    What did he do for a living?

17:25:55    22        A.    He was a plumber.

17:26:00    23        Q.    And so you didn't grow up close at all.

17:26:06    24        A.    I never met him.

17:26:07    25        Q.    Ever?

**Merrill   Corporation   -   Los Angeles**

EXHIBIT 81
2262

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 250

| | | |
|---|---|---|
| 17:26:07 | 1 | A.   Ever.  And he wouldn't send me any |
| 17:26:12 | 2 | photographs of himself. |
| 17:26:13 | 3 | Q.   He did or did not? |
| 17:26:14 | 4 | A.   Did not.  I sent him photographs of myself |
| 17:26:17 | 5 | and my children and asked him to reciprocate, and he |
| 17:26:23 | 6 | refused to do that.  So the first time I ever saw what |
| 17:26:27 | 7 | my brother looked like was after he died and I went to |
| 17:26:31 | 8 | the home that he had shared with his mother, and, you |
| 17:26:35 | 9 | know, found things like a dog dish, you know, in the |
| 17:26:38 | 10 | kitchen, and I said, "Where's the dog?"  And they |
| 17:26:41 | 11 | said, you know, the dog -- when I say "they," a friend |
| 17:26:45 | 12 | told me that the dog had died years before and -- you |
| 17:26:48 | 13 | know, but I found photographs of him in his home. |
| 17:26:52 | 14 | Q.   Your children never met with him either? |
| 17:26:54 | 15 | A.   No. |
| 17:26:54 | 16 | Q.   Did your mom ever meet him? |
| 17:26:56 | 17 | A.   No, I don't believe so.  He was -- he was |
| 17:27:01 | 18 | very young when the divorce occurred. |
| 17:27:04 | 19 | Q.   How old was he? |
| 17:27:06 | 20 | A.   5 or 6, I think. |
| 17:27:08 | 21 | Q.   What year was it that your dad divorced his |
| 17:27:11 | 22 | mom? |
| 17:27:11 | 23 | A.   It was in the 1940s. |
| 17:27:13 | 24 | Q.   And when did your mother and your father |
| 17:27:16 | 25 | marry? |

LAURA SIEGEL LARSON - 7/22/2011

Page 251

| | | |
|---|---|---|
| 17:27:16 | 1 | A.    In 1948. |
| 17:27:27 | 2 | Q.    How did you first get in touch with Michael |
| 17:27:31 | 3 | Siegel about this termination issue going back to |
| 17:27:37 | 4 | 1997? |
| 17:27:37 | 5 | A.    Well, my husband, who was an attorney -- |
| 17:27:41 | 6 | excuse me -- and also, you know, kind of helped us |
| 17:27:44 | 7 | with things, phoned -- phoned Michael and informed him |
| 17:27:50 | 8 | that, you know, he had a passive interest and, you |
| 17:27:54 | 9 | know, that he wanted to let him know about that, and, |
| 17:28:00 | 10 | you know, after -- after that, Michael retained an |
| 17:28:04 | 11 | attorney in Cleveland. |
| 17:28:06 | 12 | Q.    Did you ever meet Mr. Bulson? |
| 17:28:08 | 13 | A.    I did after Michael died. |
| 17:28:17 | 14 | Q.    Are you aware that Michael wanted to have a |
| 17:28:21 | 15 | will made out but never got -- |
| 17:28:25 | 16 | A.    He never did it. |
| 17:28:27 | 17 | Q.    Did you ever see what his wishes were? |
| 17:28:31 | 18 | A.    He had some kind of rambling communications |
| 17:28:33 | 19 | with his attorney. |
| 17:28:35 | 20 | Q.    To the effect that he did not want either you |
| 17:28:38 | 21 | or your mother to share in anything? |
| 17:28:40 | 22 | A.    He stated that in an e-mail, but the court |
| 17:28:44 | 23 | ruled otherwise.  Not for my mother, but for me. |
| 17:29:00 | 24 | Q.    The next exhibit is -- |
| 17:29:06 | 25 | Make sure we did. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 252

| 17:29:15 | 1 | MR. TOKORO:  It's 56. |
| 17:29:17 | 2 | MR. PETROCELLI:  Are you sure? |
| 17:29:18 | 3 | MR. TOKORO:  Yes. |
| 17:29:22 | 4 | MR. PETROCELLI:  I thought he did multiple. |
| 17:29:32 | 5 | Q.  Going back to Exhibit 56 for a second, which |
| 17:29:35 | 6 | is your notification to DC Comics that you were |
| 17:29:39 | 7 | terminating negotiations dated September 21, 2002 -- |
| 17:29:43 | 8 | A.  Is it 54?  I have 54. |
| 17:29:46 | 9 | Q.  Can I see that? |
| 17:29:47 | 10 | A.  Yes.  I think that's only the Ramer and Marks |
| 17:29:51 | 11 | one. |
| 17:29:52 | 12 | Q.  Yes, this is the termination of the Gang Tyre |
| 17:29:55 | 13 | firm. |
| 17:29:55 | 14 | A.  I don't have that yet unless it's stapled to |
| 17:30:01 | 15 | this. |
| 17:30:01 | 16 | MR. TOKORO:  It was one of the early ones. |
| 17:30:03 | 17 | MR. PETROCELLI:  I showed it to you earlier |
| 17:30:05 | 18 | on, all the way on the bottom.  He'll fish it out for |
| 17:30:08 | 19 | you. |
| 17:30:09 | 20 | THE WITNESS:  Okay. |
| 17:30:12 | 21 | Oh, thank you. |
|  | 22 | BY MR. PETROCELLI: |
| 17:30:13 | 23 | Q.  So you have in front of you now Exhibit 56? |
| 17:30:16 | 24 | A.  Um-hum. |
| 17:30:17 | 25 | Q.  And you will see that you're advising DC |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 253

17:30:22    1    about the termination of the Gang Tyre firm and that

17:30:25    2    you have instructed the Gang Tyre firm to take no

17:30:28    3    further actions on your behalf.  Do you see that?

17:30:32    4        A.    Yes, I do.

17:30:32    5        Q.    And September 21, 2002, is the first time

17:30:38    6    that you so advised DC Comics that you were

17:30:39    7    terminating the Gang Tyre firm and that they were to

17:30:42    8    take no further actions on your behalf; correct?

17:30:45    9        A.    Yes.

17:30:45    10        Q.    And that's the first time that you also

17:30:47    11    advised the Gang Tyre firm that they were to take no

17:30:50    12    further actions on your behalf; correct?

17:30:52    13        A.    Yes, that's correct.

17:31:36    14        Q.    Okay.

17:31:36    15             Okay.  Let me mark as the --

17:31:39    16             MR. TOKORO:  62.

17:31:40    17             MR. PETROCELLI:  -- next exhibit in order,

17:31:46    18    Exhibit 62, a letter to DC Comics by your mother and

17:31:51    19    you dated October 28, 2002 --

            20             (Whereupon, Plaintiff's Exhibit 62

17:32:00    21             was marked for identification.)

17:32:00    22             MR. PETROCELLI:  -- giving notice of the

17:32:05    23    cancellation of a tolling period under a tolling

17:32:08    24    agreement.

17:32:09    25        Q.    Do you see that?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 254

| | | | |
|---|---|---|---|
| 17:32:09 | 1 | A. | Yes, I do. |
| 17:32:11 | 2 | Q. | Now, did you type this document? |
| 17:32:13 | 3 | A. | Yes, I did. |
| 17:32:17 | 4 | Q. | Who drafted this document? |
| 17:32:19 | 5 | A. | My mother and I did. |
| 17:32:22 | 6 | Q. | Did you have the assistance of a lawyer? |
| 17:32:25 | 7 | A. | No. |
| 17:32:25 | 8 | Q. | Are you sure? |
| 17:32:27 | 9 | A. | I'm pretty sure.  I don't recall. |
| 17:32:29 | 10 | Q. | Even though you had already retained |

17:32:33   11   Mr. Emanuel and Mr. Toberoff?

17:32:39   12       A.   Without revealing the communication between

17:32:44   13   my former attorney and me, I will say that we were

17:32:50   14   informed by the Gang Tyre firm that we needed to pay

17:32:56   15   attention to the wording in the tolling agreement.

17:33:01   16       Q.   Why --

17:33:02   17       A.   So as a result of reading the tolling

17:33:04   18   agreement and seeing that notification was necessary

17:33:07   19   to certain people under the tolling agreement, we went

17:33:11   20   ahead, my mother and I, and drafted this.

17:33:14   21       Q.   Did you run it by a lawyer first?

17:33:17   22       A.   I -- I don't remember.

17:33:20   23       Q.   Even though you were now working with

17:33:22   24   Mr. Toberoff, you didn't --

17:33:24   25       A.   Oh --

**Merrill  Corporation  -  Los Angeles**

800-826-0277                        www.merillcorp.com/law

**EXHIBIT 81**
**2267**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 255

| | | |
|---|---|---|
| 17:33:25 | 1 | Q.   -- show it to him? |
| 17:33:27 | 2 | A.   Well, actually -- |
| 17:33:29 | 3 | Q.   And it's in a totally different type face -- |
| 17:33:31 | 4 | A.   Possibly -- |
| 17:33:32 | 5 | Q.   -- than the prior document. |
| 17:33:33 | 6 | A.   That doesn't mean anything.  That's because, |
| 17:33:36 | 7 | you know, my computers were always on the fritz. |
| 17:33:43 | 8 | Q.   It's kind of -- |
| 17:33:44 | 9 | A.   No.  It's -- well, we had been talking to |
| 17:33:48 | 10 | Mr. Toberoff since the beginning of October about |
| 17:33:51 | 11 | retaining him.  We did not actually sign with him |
| 17:33:54 | 12 | until the end of October.  So we had not signed and |
| 17:33:58 | 13 | fully retained him at the time when my mother and I |
| 17:34:02 | 14 | were drafting this, because when you showed me -- you |
| 17:34:08 | 15 | showed me the -- our agreement earlier, I looked at |
| 17:34:11 | 16 | the back and the signature page said October 28. |
| 17:34:15 | 17 | Q.   No.  I think -- take a look at it again, |
| 17:34:28 | 18 | Exhibit 45. |
| 17:34:28 | 19 | A.   These are all mixed up. |
| 17:34:43 | 20 | Oh, 23.  I'm sorry.  I'm sorry.  The "3" |
| 17:34:46 | 21 | looked like an "8" to me when I looked at the Xerox |
| 17:34:49 | 22 | because it's not a great Xerox. |
| 17:34:52 | 23 | Q.   So now you're seeing more clearly that it was |
| 17:34:57 | 24 | as of October 23, 2002, that you had signed the IP |
| 17:35:01 | 25 | Worldwide agreement with Mr. Emanuel and Mr. Toberoff. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 256

17:35:03    1         A.    Yes.

17:35:04    2               MR. TOBEROFF:   Objection to "as of."

17:35:06    3    Otherwise --

17:35:07    4               THE WITNESS:   We had just finalized our

17:35:11    5    agreement.

            6    BY MR. PETROCELLI:

17:35:12    7         Q.    And now does that cause you to believe that

17:35:13    8    you had some assistance in the preparation of the

17:35:16    9    tolling agreement?

17:35:19   10         A.    Well, we weren't advised to do it by

17:35:22   11    Mr. Toberoff.   He may have looked at the draft just to

17:35:25   12    make sure that the language was correct.

17:35:28   13         Q.    Well, why wouldn't you have him do it?   Why

17:35:31   14    are you --

17:35:31   15         A.    You asked me if I remembered it.

17:35:33   16         Q.    You don't remember.

17:35:35   17         A.    Okay.   I'm trying to answer your question.

17:35:37   18         Q.    Before you answered with some degree of

17:35:39   19    certainty that you and your mother wrote this

17:35:41   20    document, which I must say seems implausible to me.

17:35:44   21    It's a -- it's a technical legal document that your

17:35:49   22    prior counsel had advised you was important for you to

17:35:52   23    pay attention to.

17:35:53   24         A.    Uh-huh.

17:35:53   25         Q.    And I'm just pressing you now on whether you

**Merrill   Corporation  -  Los Angeles**

800-826-0277                          www.merillcorp.com/law

**EXHIBIT 81**
**2269**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 257

| | | |
|---|---|---|
| 17:35:56 | 1 | actually remember or you're just trying to surmise |
| 17:36:00 | 2 | that you prepared this document. |
| 17:36:03 | 3 | A.   I'm trying to surmise. |
| 17:36:08 | 4 | Q.   Okay.  Is it fair to say -- |
| 17:36:09 | 5 | A.   No, no.  Excuse me.  I don't think I really |
| 17:36:13 | 6 | answered -- you're saying do I think I prepared it? |
| 17:36:19 | 7 | Q.   Do you -- |
| 17:36:20 | 8 | A.   Or do I think somebody else prepared it? |
| 17:36:22 | 9 | Q.   Do you know whether, even though it went out |
| 17:36:25 | 10 | on your letterhead -- |
| 17:36:25 | 11 | A.   Yes. |
| 17:36:26 | 12 | Q.   -- do you know whether this was prepared by a |
| 17:36:29 | 13 | lawyer for you to send out? |
| 17:36:31 | 14 | A.   Oh.  It -- we did a draft -- my mother and I |
| 17:36:34 | 15 | did a draft, and to the best of my recollection, we |
| 17:36:39 | 16 | probably ran it by Mr. Toberoff. |
| 17:36:44 | 17 | Q.   Did you run it by Arthur or George, the other |
| 17:36:48 | 18 | lawyers? |
| 17:36:48 | 19 | A.   We might have. |
| 17:36:55 | 20 | Q.   When you were told by Gang Tyre to pay |
| 17:36:58 | 21 | attention to this, some concern was expressed to you |
| 17:37:02 | 22 | that deadlines might run? |
| 17:37:05 | 23 | MR. TOBEROFF:  Don't talk any more of |
| 17:37:07 | 24 | substance than he advised you to draw your attention |
| 17:37:10 | 25 | to the tolling agreement. |

**EXHIBIT 81**
**2270**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 258

| | | |
|---|---|---|
| 17:37:11 | 1 | THE WITNESS:  Yeah.  I mean that's really -- |
| | 2 | BY MR. PETROCELLI: |
| 17:37:14 | 3 | Q.  Why did you send this out to DC Comics? |
| 17:37:16 | 4 | MR. TOBEROFF:  Privileged.  I instruct you |
| 17:37:19 | 5 | not to answer. |
| | 6 | BY MR. PETROCELLI: |
| 17:37:19 | 7 | Q.  Privilege with whom?  Who is the lawyer that |
| 17:37:22 | 8 | you're asserting your privilege with? |
| 17:37:22 | 9 | MR. TOBEROFF:  I'm going to -- |
| 17:37:23 | 10 | MR. PETROCELLI:  I'm asking her, not you. |
| 17:37:25 | 11 | MR. TOBEROFF:  I'm asserting it on her |
| 17:37:27 | 12 | behalf. |
| 17:37:28 | 13 | MR. PETROCELLI:  I know, but I'm asking her. |
| 17:37:28 | 14 | Q.  With whom did you have an attorney-client -- |
| 17:37:31 | 15 | who were the attorneys with whom you received legal |
| 17:37:34 | 16 | advice, if any, about the -- about this tolling |
| 17:37:38 | 17 | agreement, Exhibit 62? |
| 17:37:40 | 18 | A.  Well, as I testified before, I don't remember |
| 17:37:43 | 19 | exactly which attorneys we shared this with, but any |
| 17:37:49 | 20 | attorney that is in our employ I have an |
| 17:37:52 | 21 | attorney-client privilege with.  So -- |
| 17:37:54 | 22 | MR. TOBEROFF:  And -- |
| 17:37:54 | 23 | MR. PETROCELLI:  I know, but I'm asking you. |
| 17:37:56 | 24 | MR. TOBEROFF:  I'm asserting the |
| 17:37:57 | 25 | attorney-client privilege on your behalf with respect |

EXHIBIT 81
2271

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 259

| | | |
|---|---|---|
| 17:37:58 | 1 | to Kevin Marks even though he has been terminated |
| 17:38:01 | 2 | since the subject of the communication is a tolling |
| 17:38:04 | 3 | agreement that was entered into that he negotiated and |
| 17:38:08 | 4 | entered into as part of his legal representation of |
| 17:38:10 | 5 | you. |
| | 6 | BY MR. PETROCELLI: |
| 17:38:12 | 7 | Q.  Did -- |
| 17:38:14 | 8 | MR. TOBEROFF:  Clearly privileged. |
| | 9 | BY MR. PETROCELLI: |
| 17:38:15 | 10 | Q.  With what lawyers specifically do you |
| 17:38:17 | 11 | remember discussing this tolling agreement with |
| 17:38:20 | 12 | prior -- this tolling notice, Exhibit 62, prior to |
| 17:38:24 | 13 | your sending it out? |
| 17:38:24 | 14 | A.  As I testified before, I don't recall. |
| 17:38:30 | 15 | Q.  And do you recall discussing it with any |
| 17:38:33 | 16 | lawyer? |
| 17:38:33 | 17 | A.  With my mother. |
| 17:38:35 | 18 | Q.  Any lawyer I said. |
| 17:38:37 | 19 | A.  I don't recall. |
| 17:38:40 | 20 | Q.  Okay.  Why did you send it out? |
| 17:38:44 | 21 | A.  Because in reading the tolling -- |
| 17:38:46 | 22 | MR. TOBEROFF:  Wait, wait, wait.  You've |
| 17:38:52 | 23 | testified that you received advice -- |
| 17:38:55 | 24 | MR. PETROCELLI:  Marc -- |
| 17:38:55 | 25 | MR. TOBEROFF:  Excuse me. |

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merrillcorp.com/law

EXHIBIT 81
2272

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 260

| | | |
|---|---|---|
| 17:38:56 | 1 | MR. PETROCELLI:  -- you're just coaching the |
| 17:38:58 | 2 | witness. |
| 17:38:58 | 3 | MR. TOBEROFF:  I'm not coaching the witness. |
| 17:39:00 | 4 | Attorney-client privilege.  Instruct you not to |
| 17:39:01 | 5 | answer.  I'm not going to explain it. |
| 17:39:04 | 6 | THE WITNESS:  Okay. |
| 17:39:05 | 7 | MR. TOBEROFF:  Is that better? |
| 17:39:08 | 8 | MR. PETROCELLI:  I can't control what you do. |
| 17:39:11 | 9 | I'm not here to critique you. |
| 17:39:14 | 10 | MR. TOBEROFF:  What exhibit number is this |
| 17:39:16 | 11 | one? |
| 17:39:16 | 12 | THE WITNESS:  That was 62.  This one you |
| 17:39:19 | 13 | mean; right? |
| 17:39:21 | 14 | MR. TOBEROFF:  Right. |
| 17:39:21 | 15 | THE WITNESS:  Yeah. |
| 17:39:53 | 16 | MR. PETROCELLI:  Let's look at the next |
| 17:39:54 | 17 | document, which is what? |
| 17:39:56 | 18 | MR. TOKORO:  63. |
| 17:39:57 | 19 | MR. PETROCELLI:  Exhibit 63? |
| 17:39:59 | 20 | MR. TOKORO:  63. |
| | 21 | (Whereupon, Plaintiff's Exhibit 63 |
| 17:40:10 | 22 | was marked for identification.) |
| 17:40:11 | 23 | THE WITNESS:  Thank you. |
| | 24 | BY MR. PETROCELLI: |
| 17:40:14 | 25 | Q.   This is a letter to Mr. Bulson with a copy to |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 261

| | | |
|---|---|---|
| 17:40:17 | 1 | Michael Siegel by you and your mother.  Do you see |
| 17:40:22 | 2 | that? |
| 17:40:22 | 3 | A.   Yes. |
| 17:40:23 | 4 | Q.   Enclosing your letter? |
| 17:40:30 | 5 | A.   Excuse me.  This? |
| 17:40:31 | 6 | Q.   Which was the prior exhibit, apparently; |
| 17:40:34 | 7 | right? |
| 17:40:34 | 8 | A.   Yes, it looks that way. |
| 17:40:37 | 9 | Q.   About the tolling agreement; correct? |
| 17:40:38 | 10 | A.   It looks that way. |
| 17:40:40 | 11 | Q.   It states notifying DC "that under the terms |
| 17:40:42 | 12 | of the April 6, 2000 Tolling Agreement, and due to our |
| 17:40:46 | 13 | written notification to DC Comics on September 21, |
| 17:40:51 | 14 | 2002 which totally stopped and ended negotiations with |
| 17:40:54 | 15 | that company, its parent company and all its |
| 17:40:58 | 16 | representatives, the Tolling Period has been |
| 17:41:02 | 17 | canceled."  Why did you send this to Michael Siegel's |
| 17:41:05 | 18 | lawyer? |
| 17:41:05 | 19 | A.   To keep him informed. |
| 17:41:13 | 20 | Q.   Did you get a response from Michael Siegel or |
| 17:41:16 | 21 | his lawyer to your letter in September when you sent |
| 17:41:20 | 22 | him copies of the September 21 letters?  Did you hear |
| 17:41:24 | 23 | from him at that time as to what's going on? |
| 17:41:26 | 24 | A.   I could have. |
| 17:41:27 | 25 | Q.   Do you remember? |

## Merrill  Corporation  -  Los Angeles

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 262

| | | |
|---|---|---|
| 17:41:28 | 1 | A.   I don't remember specifically. |
| 17:41:30 | 2 | Q.   Do you remember any communication with him |
| 17:41:33 | 3 | about why you're changing representatives? |
| 17:41:39 | 4 | A.   There probably -- there probably was, but I |
| 17:41:43 | 5 | can't remember specifically when it was. |
| 17:41:47 | 6 | Q.   Given your testimony that you never met him, |
| 17:41:52 | 7 | did you ever speak to him? |
| 17:41:57 | 8 | A.   No. |
| 17:41:58 | 9 | Q.   And to your knowledge, did your mother ever |
| 17:42:00 | 10 | speak to him? |
| 17:42:01 | 11 | A.   I think -- no, I don't think she even spoke |
| 17:42:06 | 12 | to him when he was a child. |
| 17:42:08 | 13 | Q.   So the only type of communication that you |
| 17:42:11 | 14 | actually had with Michael Siegel was in writing |
| 17:42:18 | 15 | directly to him or to Mr. Bulson; correct? |
| 17:42:21 | 16 | A.   It -- it was more often through his attorney. |
| 17:42:26 | 17 | It was occasionally directly with Michael.  But he was |
| 17:42:31 | 18 | sick for like long periods of time, so, you know, long |
| 17:42:37 | 19 | periods would go by and I wouldn't hear from him, and |
| 17:42:40 | 20 | then all of a sudden a letter would pop up. |
| 17:42:42 | 21 | Q.   And the only way that you would hear from him |
| 17:42:47 | 22 | was through a letter; right? |
| 17:42:48 | 23 | A.   Yes. |
| 17:42:48 | 24 | Q.   Did you have his phone number? |
| 17:42:49 | 25 | A.   I did not have his phone number. |

**EXHIBIT 81**
**2275**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 263

| 17:42:51 | 1 | Q. Did you give him your phone number? |

17:42:55    2    A.    I don't remember whether I did or not.

17:42:57    3    Q.    Did you give him your e-mail address?

17:43:03    4    A.    We never communicated by e-mail, so I

17:43:05    5    probably did not.

17:43:17    6    Q.    Can you go to the next exhibit, which is the

17:43:19    7    Superboy termination notice that was sent out on your

17:43:26    8    behalf on November 8, 2002.

17:43:31    9    A.    Thank you.

17:43:39    10    Q.    Why didn't you send this out sooner?

17:43:53    11    MR. TOBEROFF:    You can answer except I

17:43:56    12    wouldn't go into anything that implicates

17:43:59    13    communication with an attorney.

17:44:02    14    THE WITNESS:    We had our hands full.  We had

17:44:04    15    a lot of -- a lot of things that were going on in the

17:44:08    16    case and trying to find a new attorney after we were

17:44:15    17    dissatisfied with the February offer from DC.  We

17:44:20    18    spent a long period of time just trying to decide what

17:44:23    19    to do with what was already before us, and once we

17:44:29    20    figured that out, then we turned our attention to

17:44:35    21    Superboy.

22    BY MR. PETROCELLI:

17:44:35    23    Q.    Do you know when the earliest time was when

17:44:37    24    you could have sent out a notice of termination for

17:44:39    25    Superboy?

## LAURA SIEGEL LARSON - 7/22/2011

Page 264

| | | |
|---|---|---|
| 17:44:39 | 1 | A.   No, I really don't. |
| 17:44:42 | 2 | Q.   Do you know whether you were bumping up |
| 17:44:44 | 3 | against a deadline to send out the Superboy notice? |
| 17:44:48 | 4 | A.   I think we were getting close to a deadline, |
| 17:44:50 | 5 | I think more in terms of end date than beginning date. |
| 17:44:55 | 6 | Q.   Did you have any discussions with any member |
| 17:45:03 | 7 | of the Shuster family that you were going to be |
| 17:45:06 | 8 | sending out the Superboy notice -- |
| 17:45:09 | 9 | A.   No. |
| 17:45:10 | 10 | Q.   -- claiming a hundred percent termination |
| 17:45:12 | 11 | interest? |
| 17:45:12 | 12 | A.   No, we did not. |
| 17:45:14 | 13 | Q.   Did you and your mother discuss whether you |
| 17:45:16 | 14 | should do so beforehand? |
| 17:45:18 | 15 | A.   Whether we should what? |
| 17:45:19 | 16 | Q.   Contact them beforehand and let them know. |
| 17:45:26 | 17 | A.   No. |
| 17:45:27 | 18 | Q.   Did you have any idea what their view was |
| 17:45:33 | 19 | about Mr. Shuster's termination interest with respect |
| 17:45:37 | 20 | to Superboy? |
| 17:45:39 | 21 | A.   We didn't talk to them about Superboy. |
| 17:45:43 | 22 | Q.   Well, were you not concerned that they might |
| 17:45:48 | 23 | protest or contest the assertion by the Siegel family |
| 17:45:53 | 24 | that Jerome Siegel was the sole creator and the sole |
| 17:45:57 | 25 | person entitled to claim a termination interest? |

**EXHIBIT 81**
**2277**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 265

| | | | |
|---|---|---|---|
| 17:45:59 | 1 | A. | No. |
| 17:46:02 | 2 | Q. | Why not? |

17:46:05  3     A.   Because we were, you know, relying on the

17:46:08  4   Westchester decision.

17:46:10  5     Q.   In 1947?

17:46:11  6     A.   Yes, correct.

17:46:12  7     Q.   But --

17:46:13  8     A.   '47, '48, whenever it was.

17:46:15  9     Q.   How did you know they were aware of it?

17:46:17  10     A.   We weren't trying to get inside their minds.

17:46:20  11   We were doing what we thought, you know, we had rights

17:46:25  12   to.

17:46:26  13     Q.   But what if -- but did you discuss with your

17:46:30  14   mother the possibility that you may now be entering

17:46:33  15   into an area in which they might contest your

17:46:43  16   position?  Did that thought ever occur to you?

17:46:45  17     A.   We felt perfectly confident that we were

17:46:47  18   within our rights.

17:46:48  19     Q.   I understand that you made a judgment that

17:46:49  20   you were within your rights, but did you give some

17:46:52  21   consideration to the idea that the family of Joe

17:46:58  22   Shuster might have a different view and might dispute

17:47:01  23   this in some way?

17:47:05  24     A.   I don't recall that being a concern.

17:47:07  25     Q.   Never even occurred to you?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 266

| | | |
|---|---|---|
| 17:47:08 | 1 | A.    I don't think so. |
| 17:47:13 | 2 | Q.    And you knew that their lawyer was your |
| 17:47:17 | 3 | lawyer; right? |
| 17:47:17 | 4 | A.    Correct. |
| 17:47:17 | 5 | Q.    Did you ask your lawyer? |
| 17:47:20 | 6 | A.    Do we -- |
| 17:47:21 | 7 | MR. TOBEROFF:  Don't disclose -- |
| 17:47:23 | 8 | MR. PETROCELLI:   Yes. |
| 17:47:24 | 9 | MR. TOBEROFF:  Don't disclose -- I instruct |
| 17:47:26 | 10 | you not to answer. |
| 17:47:27 | 11 | THE WITNESS:   Okay. |
| | 12 | BY MR. PETROCELLI: |
| 17:47:28 | 13 | Q.    Did you ask Mr. Toberoff in his -- |
| | 14 | MR. TOBEROFF:   Privilege.   Excuse me. |
| | 15 | BY MR. PETROCELLI: |
| 17:47:31 | 16 | Q.    Did you ask Mr. Toberoff in his capacity as a |
| 17:47:35 | 17 | lawyer for the Shusters what their view of the |
| 17:47:39 | 18 | Superboy issue was? |
| 17:47:41 | 19 | MR. TOBEROFF:   Privileged.   Instruct you not |
| 17:47:42 | 20 | to answer. |
| | 21 | BY MR. PETROCELLI: |
| 17:47:42 | 22 | Q.    I'm not asking about any conversations with |
| 17:47:46 | 23 | you as their lawyer, but with you as the Shuster |
| 17:47:50 | 24 | lawyer. |
| 17:47:51 | 25 | MR. TOBEROFF:   You know -- |

## LAURA SIEGEL LARSON - 7/22/2011

Page 267

| | | |
|---|---|---|
| 17:47:52 | 1 | BY MR. PETROCELLI: |
| 17:47:52 | 2 | Q.   Did you understand my question? |
| 17:47:54 | 3 | MR. TOBEROFF:  Dan, you can't have it both |
| 17:47:56 | 4 | ways.  You can't ask me to keep my objections short |
| 17:47:58 | 5 | and accuse me of coaching and then when I keep it |
| 17:48:00 | 6 | short you engage me in conversations which makes me |
| 17:48:03 | 7 | defensive the next time I object so I explain my |
| 17:48:05 | 8 | objections. |
| 17:48:05 | 9 | MR. PETROCELLI:  Okay.  I just want to make |
| 17:48:06 | 10 | sure, though, based on your objections that you |
| 17:48:08 | 11 | understood and more importantly that the witness |
| 17:48:10 | 12 | understood.  So let me -- because I don't want to |
| 17:48:13 | 13 | argue with you, and I regret the few instances in |
| 17:48:18 | 14 | which we have and apologize if I said anything in |
| 17:48:25 | 15 | temper. |
| 17:48:25 | 16 | MR. TOBEROFF:  I accept your apology in this |
| 17:48:27 | 17 | limited instance. |
| 17:48:30 | 18 | MR. PETROCELLI:  And I accept yours. |
| 17:48:32 | 19 | MR. TOBEROFF:  I didn't apologize. |
| 17:48:34 | 20 | MR. PETROCELLI:  Noted. |
| 17:48:36 | 21 | THE WITNESS:  You guys. |
| | 22 | BY MR. PETROCELLI: |
| 17:48:40 | 23 | Q.   Did -- did you, knowing that a lawyer with |
| 17:48:44 | 24 | whom you were dealing, Marc Toberoff, was also a |
| 17:48:50 | 25 | person who represented the Shusters -- |

LAURA SIEGEL LARSON - 7/22/2011

Page 268

| 17:48:53 | 1 | A.   Um-hum. |
|---|---|---|

17:48:54    2        Q.    -- did you ask Mr. Toberoff with his Shuster

17:48:59    3    lawyer hat on, not the Siegel lawyer hat on, to

17:49:03    4    discuss with you what the Shuster position was on

17:49:10    5    Superboy?

17:49:10    6            MR. TOBEROFF:   Instruct you not to answer.

17:49:14    7    Privilege.

            8    BY MR. PETROCELLI:

17:49:17    9        Q.   Did you have any discussions with

17:49:23    10   Mr. Toberoff in his capacity as a lawyer for the

17:49:29    11   Shusters --

17:49:30    12           MR. TOBEROFF:   Same.

17:49:30    13           THE WITNESS:   You can't separate them out,

17:49:33    14   though.

17:49:33    15           MR. TOBEROFF:   Same instruction.

17:49:34    16           THE WITNESS:   I couldn't separate them out.

17:49:36    17           MR. TOBEROFF:   Same instruction.

            18   BY MR. PETROCELLI:

17:49:41    19       Q.   Can you answer that question for me?

17:49:43    20       A.   I think I've been instructed not to.

17:49:49    21       Q.   Okay.  And did you have any conversations

17:49:51    22   with your mother about what the Shuster position is or

17:49:59    23   might be regarding your issuance of a notice of

17:50:03    24   termination claiming a hundred percent of the

17:50:06    25   termination interest to Superboy?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 269

| | | |
|---|---|---|
| 17:50:07 | 1 | A.   I don't believe we did. |
| 17:50:11 | 2 | Q.   And even though Ms. Peary had been kind |
| 17:50:20 | 3 | enough to refer Mr. Toberoff to your family -- |
| 17:50:23 | 4 | A.   Um-hum. |
| 17:50:24 | 5 | Q.   -- it didn't occur to you that you might want |
| 17:50:27 | 6 | to check with the Peary family or the Peavy family on |
| 17:50:32 | 7 | what their view is on Superboy before you filed a |
| 17:50:36 | 8 | notice claiming a hundred percent of the termination |
| 17:50:39 | 9 | interest? |
| 17:50:40 | 10 | A.   I can't -- I can't testify as to what my |
| 17:50:44 | 11 | mother may or may not have done. |
| 17:50:44 | 12 | Q.   Well, what about you? |
| 17:50:53 | 13 | A.   I did not. |
| 17:50:53 | 14 | Q.   Okay.  Did you tell your mother it might be a |
| 17:50:53 | 15 | good thing as a courtesy to let Ms. Peavy know? |
| 17:50:57 | 16 | A.   I don't recall. |
| 17:50:57 | 17 | Q.   You didn't give your mother that advice? |
| 17:51:00 | 18 | A.   I don't remember giving her advice. |
| 17:51:02 | 19 | Q.   Did your mother -- you certainly understood |
| 17:51:07 | 20 | how proud Jean Peavy was of her husband's |
| 17:51:13 | 21 | contributions -- |
| 17:51:13 | 22 | A.   Her brother. |
| 17:51:14 | 23 | Q.   -- her brother's contributions to Superman? |
| 17:51:17 | 24 | A.   Of course. |
| 17:51:18 | 25 | Q.   And the whole Superman history; correct? |

**EXHIBIT 81**
**2282**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 270

| | | |
|---|---|---|
| 17:51:23 | 1 | A.   Of course. |
| 17:51:25 | 2 | Q.   And you knew your father felt that way also; |
| 17:51:28 | 3 | right? |
| 17:51:28 | 4 | A.   Yes. |
| 17:51:29 | 5 | Q.   And your mother felt that way; correct? |
| 17:51:31 | 6 | A.   We all did. |
| 17:51:32 | 7 | Q.   And do you think that -- did it occur to you |
| 17:51:35 | 8 | that Jean Peavy might have some feelings about her |
| 17:51:40 | 9 | brother's getting credit for Superboy when you now |
| 17:51:45 | 10 | were claiming sole credit? |
| 17:51:46 | 11 | A.   To the best of my recollection, it wasn't -- |
| 17:51:51 | 12 | it wasn't anything that we were concerned about or |
| 17:51:54 | 13 | worried about.  We thought that they shared the same |
| 17:51:58 | 14 | view that we had. |
| 17:51:59 | 15 | Q.   You had no basis to think that.  What was |
| 17:52:02 | 16 | your basis? |
| 17:52:03 | 17 | A.   I'm -- |
| 17:52:04 | 18 | Q.   Some opinion in 1947 that you don't even know |
| 17:52:07 | 19 | that they were aware of? |
| 17:52:08 | 20 | A.   Just discussions that I had had with my |
| 17:52:10 | 21 | father during his lifetime. |
| 17:52:14 | 22 | Q.   Did you ever at any time have a discussion |
| 17:52:17 | 23 | with someone in the Shuster family about whether they |
| 17:52:21 | 24 | agreed with that position? |
| 17:52:22 | 25 | A.   I did not. |

**Merrill   Corporation   -   Los Angeles**
800-826-0277                      www.merillcorp.com/law
**EXHIBIT 81**
**2283**
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 271

| | | |
|---|---|---|
| 17:52:22 | 1 | Q.   Do you know if your mother did? |
| 17:52:25 | 2 | A.   She may have. |
| 17:52:25 | 3 | Q.   Do you know if she did? |
| 17:52:27 | 4 | A.   I do not know whether she did. |
| 17:52:42 | 5 | Q.   Did you inform the Peary or Peavy family |

after you served the notice of termination claiming a
hundred percent termination interest for Superboy that
you had done so?

| | | |
|---|---|---|
| 17:52:59 | 9 | A.   Yes, I believe we did. |
| 17:53:01 | 10 | Q.   Who did so? |
| 17:53:03 | 11 | A.   I think my mother did. |
| 17:53:06 | 12 | Q.   How do you know she did? |
| 17:53:08 | 13 | A.   Well, just every so often she would talk to |

Jean on the phone.  I mean they had a very friendly
relationship, and I think she brought it up.

| | | |
|---|---|---|
| 17:53:16 | 16 | Q.   She said, "Hey, Jean, just want you to know |

we filed a notice of termination claiming a hundred
percent on Superboy"?

| | | |
|---|---|---|
| 17:53:24 | 19 | A.   Possibly.  I wasn't on the phone. |
| 17:53:25 | 20 | Q.   Are you speculating or do you know for a fact |

that she told that to Ms. Peavy?

| | | |
|---|---|---|
| 17:53:30 | 22 | A.   I'm speculating what she said. |
| 17:53:32 | 23 | Q.   Okay.  Well, that's -- that's of no help to |

us.

Okay.  Let's take a look at the next exhibit.

**EXHIBIT 81**
**2284**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 272

| | | |
|---|---|---|
| 17:53:55 | 1 | At some point in time did Mr. Emanuel and |
| 17:54:00 | 2 | Mr. Toberoff approach you about their wanting to |
| 17:54:07 | 3 | pursue Michael Siegel's termination interest? |
| 17:54:11 | 4 | A.   Yes. |
| 17:54:12 | 5 | Q.   And that they were going to purchase it |
| 17:54:16 | 6 | themselves? |
| 17:54:17 | 7 | A.   That -- they -- it was Ari who was going to |
| 17:54:21 | 8 | purchase it. |
| 17:54:27 | 9 | Q.   Did Ari ask your permission? |
| 17:54:29 | 10 | A.   Yes, he did. |
| 17:54:31 | 11 | Q.   Okay.  Did you give it to him? |
| 17:54:33 | 12 | A.   Yes, we did. |
| 17:54:35 | 13 | Q.   Did you discuss the price that he would pay? |
| 17:54:44 | 14 | A.   No. |
| 17:54:44 | 15 | Q.   He said to you, "I want to buy Michael |
| 17:54:47 | 16 | Siegel's termination interest," and you said, "Fine"? |
| 17:54:53 | 17 | A.   Well, it wasn't only the word "fine."  We |
| 17:54:56 | 18 | talked about it a little bit more than that, but -- |
| 17:54:58 | 19 | Q.   Tell me what you said, and what did you guys |
| 17:55:01 | 20 | talk about in that regard? |
| 17:55:03 | 21 | A.   It was just that, you know, Michael was kind |
| 17:55:07 | 22 | of a loose cannon.  He was, you know -- he was |
| 17:55:11 | 23 | difficult to deal with.  At times he perfectly |
| 17:55:17 | 24 | understood that, you know, we should have a united |
| 17:55:20 | 25 | family front, and at other times he was, you know, |

LAURA SIEGEL LARSON - 7/22/2011

Page 273

17:55:27    1    kind of off the beam, and so it became increasingly

17:55:34    2    difficult to deal with him.  So it seemed that it

17:55:39    3    might be a good idea to have somebody who was friendly

17:55:44    4    to us acquire his rights.

17:55:49    5        Q.    Did you tell Michael that you were involved

17:55:58    6    in Ari, in the decision to have Ari Emanuel acquire

17:56:03    7    his termination interests?

17:56:05    8        A.    I don't believe we discussed it.

17:56:06    9        Q.    Well, you never had a conversation with him.

17:56:09    10       A.    No.

17:56:12    11       Q.    Okay.  And did you write him a letter saying,

17:56:14    12   "Michael, I want you to understand that I'm having Ari

17:56:17    13   Emanuel approach you to buy your interest because

17:56:20    14   you're out of control and this will be in my best

17:56:23    15   interest if I have this happen"?  Did you write that

17:56:26    16   kind of a letter to him?

17:56:27    17       A.    I did not write it in the words that you

17:56:28    18   used.

17:56:29    19       Q.    Did you write any letter to him advising him

17:56:32    20   that Michael -- that you were giving -- you had

17:56:38    21   approved Ari Emanuel purchasing his termination

17:56:41    22   interest?

17:56:41    23       A.    I believe that he wrote to me and had

17:56:47    24   mentioned it to me, and I responded and said if he

17:56:50    25   wanted to do it, I would not stand in his way.

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 274

| | | |
|---|---|---|
| 17:56:53 | 1 | Q.   Did he write to you saying what? |
| 17:56:55 | 2 | A.   He said he was in need of immediate cash. |
| 17:57:00 | 3 | Q.   He happened to write to you just at the same |
| 17:57:04 | 4 | time that -- withdrawn. |
| 17:57:06 | 5 | When did he write this letter to you? |
| 17:57:09 | 6 | A.   It had to have been after an offer was made |
| 17:57:14 | 7 | to him because he was telling me about an offer. |
| 17:57:17 | 8 | Q.   Okay.  But when you -- you initially spoke |
| 17:57:21 | 9 | with Mr. Emanuel about his purchasing the interest |
| 17:57:27 | 10 | because you thought that would be beneficial to you |
| 17:57:30 | 11 | and your mother's interest; correct? |
| 17:57:33 | 12 | A.   And to Michael because he was looking for |
| 17:57:35 | 13 | money. |
| 17:57:36 | 14 | Q.   Well, I didn't ask you about that -- |
| 17:57:38 | 15 | A.   Sorry. |
| 17:57:38 | 16 | Q.   -- because you didn't know that Michael was |
| 17:57:40 | 17 | looking for money at the time.  He told you |
| 17:57:42 | 18 | afterwards. |
| 17:57:43 | 19 | A.   No.  I'm sorry.  He was always saying that he |
| 17:57:45 | 20 | needed money. |
| 17:57:46 | 21 | Q.   But he didn't call you up and say, "Look, I'm |
| 17:57:48 | 22 | looking for money," and it was for that reason that |
| 17:57:51 | 23 | you and Ari first had your discussion about his |
| 17:57:55 | 24 | buying the Super- -- about his buying Michael's |
| 17:57:56 | 25 | interest. |

EXHIBIT 81
2287

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 275

| | | |
|---|---|---|
| 17:57:56 | 1 | A.  No, he never called me. |
| 17:57:58 | 2 | Q.  Okay.  So you had no communication with |
| 17:57:59 | 3 | Michael that he wanted to sell his Superman interest |
| 17:58:03 | 4 | which led you to then authorize Ari to go ahead and do |
| 17:58:06 | 5 | it.  That's not what happened; correct? |
| 17:58:08 | 6 | A.  Could you ask it again?  I'm a little |
| 17:58:13 | 7 | confused. |
| 17:58:13 | 8 | Q.  You did not receive the communication from |
| 17:58:15 | 9 | Michael Siegel saying he needed money, he wanted to |
| 17:58:17 | 10 | sell his Superman interest, and for that reason you |
| 17:58:19 | 11 | then went to Ari and said, "Here, go buy it.  My |
| 17:58:23 | 12 | brother needs money."  There's no such document; |
| 17:58:26 | 13 | correct? |
| 17:58:26 | 14 | A.  It was -- is there a document.  I haven't |
| 17:58:29 | 15 | seen those documents in a really long time.  I can't |
| 17:58:32 | 16 | really answer your question. |
| 17:58:33 | 17 | Q.  Where are those documents? |
| 17:58:35 | 18 | A.  Whatever documents that -- |
| 17:58:36 | 19 | MR. TOBEROFF:  What documents are you |
| 17:58:37 | 20 | referring to? |
| | 21 | BY MR. PETROCELLI: |
| 17:58:38 | 22 | Q.  You said "I haven't seen those documents in a |
| 17:58:41 | 23 | long time."  Where are those documents? |
| 17:58:42 | 24 | A.  Any letters between myself and Michael. |
| 17:58:45 | 25 | Q.  Where are they? |

LAURA SIEGEL LARSON - 7/22/2011

Page 276

| | | |
|---|---|---|
| 17:58:45 | 1 | A.    I turned them over to my attorney. |
| 17:58:47 | 2 | Q.    You said you had letters in your apartment, |
| 17:58:50 | 3 | in your condominium. |
| 17:58:52 | 4 | A.    Well, anything that I found I turned over to |
| 17:58:55 | 5 | my attorney.  I said that if there's anything else, it |
| 17:58:58 | 6 | would be in my apartment. |
| 17:58:59 | 7 | Q.    When you turned those letters over to your |
| 17:59:02 | 8 | attorney, do you mean Marc Toberoff? |
| 17:59:03 | 9 | A.    Yes. |
| 17:59:03 | 10 | Q.    How did you turn your letters with Michael |
| 17:59:05 | 11 | Siegel over to Marc Toberoff? |
| 17:59:07 | 12 | A.    Well, in a general request for production of |
| 17:59:11 | 13 | documents. |
| 17:59:12 | 14 | Q.    How did you give them to Mr. Toberoff? |
| 17:59:15 | 15 | MR. TOBEROFF:  He's talking about -- |
| | 16 | BY MR. PETROCELLI: |
| 17:59:16 | 17 | Q.    How did you transmit them to Mr. Toberoff? |
| 17:59:18 | 18 | MR. TOBEROFF:  Mail it? |
| 17:59:20 | 19 | THE WITNESS:  In a box. |
| | 20 | BY MR. PETROCELLI: |
| 17:59:20 | 21 | Q.    Did you ever fax any to Mr. Toberoff? |
| 17:59:23 | 22 | A.    I don't recall any faxes. |
| 17:59:25 | 23 | Q.    You have a fax machine; right? |
| 17:59:27 | 24 | A.    Yes, I do. |
| 17:59:31 | 25 | Q.    Okay.  Is it fair to say that Mr. Toberoff |

LAURA SIEGEL LARSON - 7/22/2011

Page 277

| | | |
|---|---|---|
| 17:59:34 | 1 | has a copy of every single letter that you exchanged |
| 17:59:40 | 2 | with Michael Siegel -- |
| 17:59:44 | 3 | A.   What I -- |
| 17:59:45 | 4 | Q.   -- regarding Superman? |
| 17:59:47 | 5 | A.   Whatever I have found that pertains to the |
| 17:59:50 | 6 | case I have turned over to him. |
| 17:59:54 | 7 | Q.   Okay.  And when is the last time that you |
| 17:59:59 | 8 | gave Mr. Toberoff or any member of his firm a -- any |
| 18:00:05 | 9 | correspondence with Michael Siegel? |
| 18:00:07 | 10 | A.   Oh. |
| 18:00:08 | 11 | Q.   When is the last time that you located such a |
| 18:00:10 | 12 | document and gave it to him? |
| 18:00:14 | 13 | A.   Well, that's hard to answer because, you |
| 18:00:17 | 14 | know, I -- I don't necessarily just find something of |
| 18:00:21 | 15 | Michael's separately from finding other things. |
| 18:00:24 | 16 | Q.   So I didn't mean to suggest -- |
| 18:00:26 | 17 | A.   No, I'm just trying -- I know I'm not |
| 18:00:27 | 18 | answering your question.  I'm trying to reconstruct in |
| 18:00:30 | 19 | my mind. |
| 18:00:31 | 20 | Q.   Okay.  I'm just saying when is the last time |
| 18:00:32 | 21 | you recall coming across a Michael Siegel letter and |
| 18:00:36 | 22 | giving it to Mr. Toberoff? |
| 18:00:39 | 23 | A.   I don't know.  It could have been a few |
| 18:00:41 | 24 | months ago. |
| 18:00:41 | 25 | Q.   What was the letter that you found? |

LAURA SIEGEL LARSON - 7/22/2011

Page 278

| | | |
|---|---|---|
| 18:00:43 | 1 | MR. TOBEROFF:  Misstates.  Okay. |
| | 2 | BY MR. PETROCELLI: |
| 18:00:46 | 3 | Q.   What was the letter that you came across a |
| 18:00:50 | 4 | few months ago and gave to Mr. Toberoff? |
| 18:00:52 | 5 | MR. TOBEROFF:  Misstates her testimony. |
| 18:00:53 | 6 | I just want to instruct you when he's asking |
| 18:00:55 | 7 | you these questions, just focus on the question, and |
| 18:00:59 | 8 | this isn't a memory test.  If you know the answer, let |
| 18:01:01 | 9 | him know.  If you can recall, recall.  But you don't |
| 18:01:05 | 10 | have to feel constrained to put something together if |
| 18:01:09 | 11 | you don't remember.  Just let him know what you |
| 18:01:12 | 12 | remember. |
| 18:01:12 | 13 | MR. PETROCELLI:  You know, to the extent your |
| 18:01:14 | 14 | lawyer is telling you to say you don't recall, it's |
| 18:01:17 | 15 | really not appropriate. |
| 18:01:18 | 16 | MR. TOBEROFF:  I'm not -- I'm not saying |
| 18:01:18 | 17 | that. |
| 18:01:19 | 18 | THE WITNESS:  No, I don't -- |
| | 19 | MR. PETROCELLI:  We've gone over this, and |
| 18:01:21 | 20 | it's really late in the day to be talking about this |
| 18:01:21 | 21 | now.  You just have to give me your very, very best |
| 18:01:25 | 22 | recollection even if it's a faint recollection.  I |
| 18:01:26 | 23 | don't want you speculating wildly. |
| 18:01:27 | 24 | MR. TOBEROFF:  Excuse me.  I object to the |
| 18:01:29 | 25 | implication I'm telling her not to recall.  She |

LAURA SIEGEL LARSON - 7/22/2011

Page 279

| | | |
|---|---|---|
| 18:01:30 | 1 | started saying things that were unresponsive, and then |
| 18:01:34 | 2 | she said she's just trying to put it together and by |
| 18:01:38 | 3 | vocalizing various things, and I said look, it's not a |
| 18:01:40 | 4 | memory test.  Try and remember.  If you can remember, |
| 18:01:42 | 5 | give it to him.  If you don't, don't.  That's not |
| 18:01:45 | 6 | coaching her not to recall, and I take object -- you |
| 18:01:47 | 7 | know, that's a snotty comment, and I object to it. |
| 18:01:52 | 8 | MR. PETROCELLI:  We better change the tape. |
| 18:01:54 | 9 | THE VIDEOGRAPHER:  Okay.  This will mark the |
| 18:01:55 | 10 | end of Volume -- sorry -- Volume 1, tape number four, |
| 18:01:58 | 11 | in the deposition of Laura Siegel.  Going off the |
| 18:02:04 | 12 | record.  The time is 6:02. |
| 18:08:07 | 13 | (A recess was taken.) |
| 18:08:15 | 14 | THE VIDEOGRAPHER:  We are back on the record. |
| 18:08:17 | 15 | This marks the beginning of Volume 1, tape number |
| 18:08:19 | 16 | five, in the deposition of Laura Siegel.  The time is |
| 18:08:23 | 17 | 6:08. |
| | 18 | BY MR. PETROCELLI: |
| 18:08:24 | 19 | Q.   I want to get back to these questions about |
| 18:08:32 | 20 | Mr. Emanuel purchasing the interest of Mr. Siegel. |
| 18:08:37 | 21 | Now, first of all, were you aware that |
| 18:08:40 | 22 | Mr. Toberoff would be assisting Mr. Emanuel in |
| 18:08:45 | 23 | acquiring Mr. Michael Siegel's termination interest? |
| 18:08:49 | 24 | A.   What do you mean by assisting? |
| 18:08:52 | 25 | Q.   Working with him in some way. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 280

| | | |
|---|---|---|
| 18:08:56 | 1 | A.   I believe that he was communicating with |
| 18:09:00 | 2 | Michael Siegel or with Don Bulson. |
| 18:09:03 | 3 | Q.   Mr. Toberoff was? |
| 18:09:04 | 4 | A.   Mr. Toberoff. |
| 18:09:05 | 5 | Q.   On behalf of whom? |
| 18:09:07 | 6 | A.   On behalf of Mr. Emanuel. |
| 18:09:08 | 7 | Q.   Okay.  And how do you know that? |
| 18:09:13 | 8 | A.   It was a discussion. |
| 18:09:16 | 9 | Q.   Mr. Emanuel told you that, that he would be |
| 18:09:18 | 10 | working with Mr. Toberoff in connection with his |
| 18:09:21 | 11 | activities with Mr. Siegel and Mr. Bulson? |
| 18:09:24 | 12 | A.   Yes. |
| 18:09:24 | 13 | Q.   Okay.  Did you and Mr. Emanuel discuss price? |
| 18:09:40 | 14 | A.   No, we did not. |
| 18:09:41 | 15 | MR. TOBEROFF:  Asked and answered. |
| | 16 | BY MR. PETROCELLI: |
| 18:09:41 | 17 | Q.   Were you made aware at any time of any of the |
| 18:09:45 | 18 | offers going back and forth? |
| 18:09:49 | 19 | A.   No. |
| 18:09:50 | 20 | Q.   Are you certain? |
| 18:09:50 | 21 | A.   Not the amount of the offers.  I was aware |
| 18:09:53 | 22 | that offers were going back and forth. |
| 18:09:55 | 23 | Q.   Were you aware generally of the nature of the |
| 18:09:59 | 24 | offers that were going back and forth? |
| 18:10:01 | 25 | MR. TOBEROFF:  Vague and ambiguous. |

**EXHIBIT 81**
**2293**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 281

18:10:03    1              THE WITNESS:  I don't believe that there was

18:10:05    2       a number ever mentioned.

            3       BY MR. PETROCELLI:

18:10:07    4          Q.   But you were being kept apprised of what was

18:10:11    5       happening on a general basis; is that right?

18:10:13    6          A.   Yes, correct.

18:10:19    7          Q.   Was it your view that it would be

18:10:25    8       advantageous to have the Michael Siegel interest

18:10:34    9       purchased and getting a maximum price for your

18:10:36   10       interest and your mother's interest in your dealings

18:10:38   11       with Warner Bros. or DC?

18:10:41   12          A.   I'm not sure I understand the question.

18:10:44   13          Q.   Did you believe that if Mr. Emanuel purchased

18:10:49   14       the Michael Siegel interest, that would facilitate

18:10:53   15       discussions that you and your mother would have to

18:10:56   16       transact your interest?

18:10:58   17          A.   Yes.

18:11:02   18          Q.   Did you think it was important for Michael

18:11:05   19       Siegel, your stepbrother, to know that it was Ari

18:11:11   20       Emanuel, a person with whom you were doing business,

18:11:14   21       who was seeking to purchase his interest?

18:11:18   22          A.   First of all, he was my half brother, but --

18:11:21   23          Q.   Half brother.  Forgive me.

18:11:25   24              Did you think it was important for your half

18:11:27   25       brother, Michael Siegel, to know that the person who

LAURA SIEGEL LARSON - 7/22/2011

Page 282

| | | |
|---|---|---|
| 18:11:31 | 1 | was seeking to acquire his termination interest was |
| 18:11:37 | 2 | Ari Emanuel, the same person with whom you were doing |
| 18:11:40 | 3 | business? |
| 18:11:41 | 4 | A.   No, I didn't think that was important. |
| 18:11:44 | 5 | Q.   And you did not ever communicate to your |
| 18:11:47 | 6 | brother that it was Ari Emanuel who was this investor; |
| 18:11:53 | 7 | correct? |
| 18:11:54 | 8 | A.   I don't recall doing that. |
| 18:11:56 | 9 | Q.   And you know that your brother -- excuse me. |
| 18:12:00 | 10 | You know that Michael Siegel was never told that Ari |
| 18:12:03 | 11 | Emanuel was the person who was interested in |
| 18:12:09 | 12 | purchasing his termination interest; correct? |
| 18:12:11 | 13 | MR. TOBEROFF:  Vague as to time. |
| 18:12:12 | 14 | THE WITNESS:  Well, I do not know that. |
| 18:12:14 | 15 | BY MR. PETROCELLI: |
| 18:12:16 | 16 | Q.   You know that in the correspondence and the |
| 18:12:18 | 17 | communications with Michael Siegel and his lawyer, Don |
| 18:12:21 | 18 | Bulson, the purchaser was never named; correct? |
| 18:12:26 | 19 | A.   I -- I think -- I think that I heard that. |
| 18:12:31 | 20 | Q.   What was the strategy behind not telling |
| 18:12:35 | 21 | Michael Siegel that it was Ari Emanuel? |
| 18:12:41 | 22 | A.   I don't know that there was a strategy. |
| 18:12:43 | 23 | Q.   You didn't want Mr. Siegel to know that it |
| 18:12:46 | 24 | was Ari Emanuel; correct? |
| 18:12:47 | 25 | A.   I didn't have any feelings about it one way |

Merrill  Corporation  -  Los Angeles

800-826-0277                              www.merillcorp.com/law

EXHIBIT 81
2295

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 283

| | | |
|---|---|---|
| 18:12:49 | 1 | or another. |
| 18:12:50 | 2 | Q.   But you never felt that you should tell him; |
| 18:12:54 | 3 | right? |
| 18:13:00 | 4 | A.   No. |
| 18:13:00 | 5 | Q.   And you had rejected selling your interest to |
| 18:13:04 | 6 | Ari Emanuel because you thought that he wasn't |
| 18:13:09 | 7 | offering enough money; right? |
| 18:13:13 | 8 | A.   No. |
| 18:13:14 | 9 | Q.   You said that he offered you 15 million and |
| 18:13:18 | 10 | that why would he ever pay full value, so it must be |
| 18:13:21 | 11 | worth a lot more than that.  Do you recall that? |
| 18:13:23 | 12 | A.   We preferred to have him negotiate for us |
| 18:13:26 | 13 | than make a purchase. |
| 18:13:26 | 14 | Q.   Did you make a counteroffer to him and say, |
| 18:13:29 | 15 | "You know, Ari, a guy like you would never offer 15 if |
| 18:13:34 | 16 | it's worth 15, so it must be worth 30 or 40 or 50 or a |
| 18:13:38 | 17 | hundred, so I'm going to counter at a much higher |
| 18:13:40 | 18 | number"?  Did you ever have that kind of discussion |
| 18:13:42 | 19 | with Mr. Emanuel? |
| 18:13:43 | 20 | A.   No. |
| 18:13:43 | 21 | Q.   Did you ever make any counterproposal to his |
| 18:13:46 | 22 | $15 million proposal? |
| 18:13:47 | 23 | A.   Yeah.  The counter was "Why don't you |
| 18:13:50 | 24 | represent us." |
| 18:13:50 | 25 | Q.   A counter to do a deal with him, I meant, |

## LAURA SIEGEL LARSON - 7/22/2011

Page 284

| | | |
|---|---|---|
| 18:13:53 | 1 | other than an agency deal. |
| 18:14:01 | 2 | A.   No. |
| 18:14:01 | 3 | Q.   Why didn't you suggest to Mr. Emanuel that he |
| 18:14:05 | 4 | represent Michael Siegel just like he was representing |
| 18:14:09 | 5 | you to try to sell Michael Siegel's interest as an |
| 18:14:12 | 6 | agent rather than as a principal? |
| 18:14:14 | 7 | A.   He didn't express any interest in doing that. |
| 18:14:16 | 8 | Q.   Did you try to persuade him to doing so, into |
| 18:14:23 | 9 | doing that? |
| 18:14:23 | 10 | A.   We may have discussed it, but he didn't ever |
| 18:14:25 | 11 | show any interest in doing that. |
| 18:14:25 | 12 | Q.   Did you have a point of view about that?  Did |
| 18:14:30 | 13 | you have a preference? |
| 18:14:31 | 14 | A.   Not really. |
| 18:14:46 | 15 | Q.   Did you have any issue with the fact that the |
| 18:14:51 | 16 | person that you thought was your lawyer was now acting |
| 18:14:54 | 17 | in an adverse capacity to your stepbrother? |
| 18:15:00 | 18 | A.   I don't think we considered it an adverse |
| 18:15:03 | 19 | capacity. |
| 18:15:03 | 20 | Q.   You don't believe that Mr. Toberoff |
| 18:15:06 | 21 | representing Ari Emanuel in trying to provide the |
| 18:15:14 | 22 | lowest price to Michael Siegel to acquire his interest |
| 18:15:19 | 23 | was adverse to Michael Siegel? |
| 18:15:23 | 24 | A.   We had knowledge of the fact that Michael |
| 18:15:25 | 25 | wanted to speed up the process.  He really didn't want |

**EXHIBIT 81**
**2297**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 285

| | | |
|---|---|---|
| 18:15:27 | 1 | to wait things out.  He wasn't interested in |
| 18:15:33 | 2 | prolonging anything and wanted some money.  So it |
| 18:15:37 | 3 | seemed as if it was going to be to his advantage. |
| 18:15:40 | 4 | Q.   Why didn't you buy it? |
| 18:15:41 | 5 | A.   Didn't have the money. |
| 18:15:42 | 6 | Q.   Why didn't you try to borrow the money? |
| 18:15:47 | 7 | A.   Hey, I'm disabled.  I live on a disability |
| 18:15:51 | 8 | income.  There's no way that I could borrow any kind |
| 18:15:53 | 9 | of money for that. |
| 18:15:54 | 10 | Q.   Why didn't you ask Ari Emanuel to put up the |
| 18:15:58 | 11 | funds on your behalf? |
| 18:15:59 | 12 | A.   I just didn't think of it. |
| 18:16:00 | 13 | Q.   Nobody suggested that to you? |
| 18:16:07 | 14 | A.   No. |
| 18:16:07 | 15 | Q.   Did you tell -- since you never spoke to |
| 18:16:12 | 16 | Michael Siegel, did you communicate with Michael |
| 18:16:16 | 17 | Siegel that -- did you ask Michael Siegel in writing |
| 18:16:29 | 18 | whether he had any issue with your lawyer, Marc |
| 18:16:34 | 19 | Toberoff, representing this purchaser of his interest? |
| 18:16:40 | 20 | A.   I never asked him that. |
| 18:16:54 | 21 | Q.   Take a look at the next exhibit. |
| 18:16:59 | 22 | MR. TOKORO:  64. |
| | 23 | (Whereupon, Plaintiff's Exhibit 64 |
| | 24 | was marked for identification.) |
| 18:17:08 | 25 | THE WITNESS:  Thank you. |

LAURA SIEGEL LARSON - 7/22/2011

Page 286

| | | |
|---|---|---|
| 18:17:08 | 1 | BY MR. PETROCELLI: |
| 18:17:08 | 2 | Q.   This is a document sent to you and your |
| 18:17:10 | 3 | mother on the letterhead of IP Worldwide dated |
| 18:17:15 | 4 | November 26, 2002, with respect to the purchase of |
| 18:17:27 | 5 | Michael Siegel's termination interest by Ari Emanuel. |
| 18:17:33 | 6 | A.   I'm reading it, so I'm sorry.  If you could |
| 18:17:37 | 7 | give me a few minutes. |
| 18:17:56 | 8 | Q.   Tell me when you're ready. |
| 18:18:19 | 9 | A.   Okay.  I've read it. |
| 18:18:21 | 10 | Q.   What were the potential conflicts of interest |
| 18:18:27 | 11 | that you understood related to this document? |
| 18:18:35 | 12 | A.   I don't recall because it's not in this |
| 18:18:38 | 13 | document. |
| 18:18:38 | 14 | Q.   What's not in this document? |
| 18:18:40 | 15 | A.   Potential conflicts of interest.  It's not -- |
| 18:18:44 | 16 | it's not explained in the document, so I don't recall |
| 18:18:49 | 17 | something that was discussed in 2002 that's not in |
| 18:18:52 | 18 | front of me. |
| 18:18:53 | 19 | Q.   Right now as you sit here, you have no idea |
| 18:18:56 | 20 | what the potential conflicts of interest were? |
| 18:18:58 | 21 | A.   May I read that paragraph again? |
| 18:19:00 | 22 | Q.   Please. |
| 18:19:32 | 23 | A.   It doesn't refresh my memory by reading it. |
| 18:19:35 | 24 | Q.   Now, you see it's on the stationery or |
| 18:19:41 | 25 | letterhead of IP Worldwide.  Do you see that? |

EXHIBIT 81
2299

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 287

| | | |
|---|---|---|
| 18:19:43 | 1 | A.   Yes. |
| 18:19:43 | 2 | Q.   Go to the beginning of the second paragraph. |
| 18:19:46 | 3 | It says "IPW will enter into negotiations."  Do you |
| 18:19:52 | 4 | see that? |
| 18:19:52 | 5 | A.   Yes, I do. |
| 18:19:53 | 6 | Q.   What did you understand IPW to be? |
| 18:19:55 | 7 | A.   IP Worldwide. |
| 18:19:58 | 8 | Q.   Tell me -- so then it was IP Worldwide that |
| 18:20:00 | 9 | was going to acquire the Michael Siegel interests; |
| 18:20:04 | 10 | correct? |
| 18:20:06 | 11 | A.   No.  It says it will be directly financed by |
| 18:20:08 | 12 | Ari Emanuel. |
| 18:20:09 | 13 | Q.   Financed by, but the acquisition is to occur |
| 18:20:13 | 14 | by IPW; correct? |
| 18:20:15 | 15 | A.   My understanding of that was that IP |
| 18:20:20 | 16 | Worldwide, meaning as a lawyer, Mr. Toberoff was going |
| 18:20:24 | 17 | to conduct the negotiations. |
| 18:20:28 | 18 | Q.   If IPW acquired the termination interest of |
| 18:20:33 | 19 | Michael Siegel, a company in which Mr. Toberoff had an |
| 18:20:36 | 20 | ownership interest, you would have had no objection to |
| 18:20:38 | 21 | that; correct? |
| 18:20:39 | 22 | MR. TOBEROFF:  I just want to make -- when |
| 18:20:40 | 23 | we're speaking -- you're saying I, because there is a |
| | 24 | company called IPW. |
| | 25 | MR. PETROCELLI:  I know, but not at this |

**EXHIBIT 81**
**2300**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 288

1        point in time.

18:20:44    2              MR. TOBEROFF:  You're talking about IP

18:20:45    3        Worldwide; correct?

18:20:46    4              MR. PETROCELLI:  Yes.  I'm using "IPW"

18:20:48    5        because as the witness said, she understood it to mean

18:20:52    6        IP Worldwide as used in this letter.

18:20:53    7              MR. TOBEROFF:  Okay.

18:20:54    8              THE WITNESS:  And the question?

9        BY MR. PETROCELLI:

18:20:55    10        Q.    You would have had no objection to Michael

18:20:58    11        Siegel's interests being purchased in the name of IP

18:21:01    12        Worldwide, a company in which Mr. Toberoff had an

18:21:04    13        ownership interest; correct?

18:21:05    14        A.    Correct.

18:21:13    15        Q.    And again, you can't recall any of the

18:21:16    16        conflicts over the subject of this document.

18:21:18    17        A.    No.  Sorry.  I can't.

18:21:21    18              MR. PETROCELLI:  What exhibit number is this?

18:21:23    19              MR. TOKORO:  64.

18:21:29    20              MR. PETROCELLI:  Go to the next one.

18:21:30    21              MR. TOBEROFF:  I would like you to read me --

18:21:32    22        she asked a question, and you said "correct," and you

18:21:34    23        said "correct."  Can you read me that question,

18:21:37    24        please?

18:21:51    25              (The record was read.)

EXHIBIT 81
2301

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 289

| | | |
|---|---|---|
| 18:21:51 | 1 | MR. TOBEROFF:  Okay.  Thank you. |
| 18:21:55 | 2 | MR. PETROCELLI:  Next is Exhibit 65, which is |
| 18:21:58 | 3 | another draft of this document dated December 16, |
| 18:22:02 | 4 | 2002, which contains more terms. |
| | 5 | (Whereupon, Plaintiff's Exhibit 65 |
| 18:22:11 | 6 | was marked for identification.) |
| | 7 | BY MR. PETROCELLI: |
| 18:22:12 | 8 | Q.   Were you negotiating this document with |
| 18:22:17 | 9 | Mr. Emanuel? |
| 18:22:18 | 10 | A.   May I read it first? |
| 18:22:20 | 11 | Q.   Sure. |
| 18:22:21 | 12 | A.   Thank you. |
| 18:22:45 | 13 | MR. TOBEROFF:  Do you have a signed -- you're |
| 18:22:47 | 14 | showing her documents that are unsigned.  Do you have |
| 18:22:50 | 15 | a signed document? |
| 18:22:58 | 16 | MR. PETROCELLI:  No.  You didn't produce it. |
| 18:23:19 | 17 | Q.   You do recall signing a version of this |
| 18:23:19 | 18 | document; is that right? |
| 18:23:19 | 19 | A.   A version.  I can't say this was the final. |
| 18:23:20 | 20 | MR. TOBEROFF:  I think there was a signed |
| 18:23:22 | 21 | document that was produced. |
| 18:23:24 | 22 | MR. PETROCELLI:  Well, I don't have it here, |
| 18:23:28 | 23 | and it's certainly possible. |
| 18:23:55 | 24 | THE WITNESS:  Okay.  I'm ready for your |
| 18:23:58 | 25 | question. |

LAURA SIEGEL LARSON - 7/22/2011

Page 290

| | | |
|---|---|---|
| 18:23:58 | 1 | MR. PETROCELLI:  Oh.  So you did find one. |
| 18:24:03 | 2 | Let me see it. |
| 18:24:17 | 3 | We're going to get to a signed version. |
| 18:24:19 | 4 | THE WITNESS:  Okay. |
| 18:24:20 | 5 | MR. PETROCELLI:  But it's not -- we're going |
| 18:24:22 | 6 | to stay with this document first. |
| 18:24:24 | 7 | THE WITNESS:  All right. |
| 18:24:32 | 8 | BY MR. PETROCELLI: |
| 18:24:32 | 9 | Q.   This is Exhibit 65.  Who was negotiating the |
| 18:24:37 | 10 | terms of this document? |
| 18:24:39 | 11 | A.   My mother and I. |
| 18:24:42 | 12 | Q.   And who were you negotiating with? |
| 18:24:47 | 13 | A.   Ari. |
| 18:24:49 | 14 | Q.   How?  Over the phone?  In person?  Through |
| 18:24:52 | 15 | Mr. Toberoff?  All the above? |
| 18:24:53 | 16 | A.   All the above. |
| 18:24:58 | 17 | Q.   Was anybody other than Mr. Toberoff working |
| 18:25:02 | 18 | with you on the negotiations? |
| 18:25:10 | 19 | A.   No. |
| 18:25:11 | 20 | Q.   You -- you were the one insisting that if |
| 18:25:19 | 21 | Michael Siegel sold this interest to IPW and/or Ari |
| 18:25:26 | 22 | Emanuel, that they in turn, that is, IPW and/or Ari |
| 18:25:35 | 23 | Emanuel, would only sell the Michael Siegel interest |
| 18:25:39 | 24 | to a third party in connection with the sale of your |
| 18:25:43 | 25 | interest; correct? |

EXHIBIT 81
2303

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 291

| | | |
|---|---|---|
| 18:25:45 | 1 | A.   Can you show me where in the document it says |
| 18:25:47 | 2 | that? |
| 18:25:48 | 3 | Q.   3(a). |
| 18:25:58 | 4 | A.   If this was the final version, then that's |
| 18:26:01 | 5 | what we agreed to. |
| 18:26:02 | 6 | Q.   But that's -- I'm not asking right now |
| 18:26:05 | 7 | whether you agreed to it, but that's something you |
| 18:26:07 | 8 | wanted; right? |
| 18:26:07 | 9 | A.   Yes. |
| 18:26:08 | 10 | Q.   And you wanted the complete decision making |
| 18:26:12 | 11 | authority with respect to the disposition of not only |
| 18:26:15 | 12 | your interest, but the Michael Siegel interest; |
| 18:26:17 | 13 | correct? |
| 18:26:17 | 14 | A.   That's correct. |
| 18:26:18 | 15 | Q.   So you were basically using Ari Emanuel and |
| 18:26:22 | 16 | IPW as a front to acquire this interest that you would |
| 18:26:27 | 17 | ultimately control without telling your stepbrother; |
| 18:26:29 | 18 | correct? |
| 18:26:30 | 19 | A.   No. |
| 18:26:30 | 20 | Q.   And you did not tell your stepbrother that it |
| 18:26:32 | 21 | was you who was going to have complete control over |
| 18:26:35 | 22 | his interest; correct? |
| 18:26:36 | 23 | A.   I didn't discuss the details with him. |
| 18:26:39 | 24 | Q.   Well, you didn't tell him anything, did you? |
| 18:26:41 | 25 | A.   I don't recall. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 292

| | | |
|---|---|---|
| 18:26:41 | 1 | Q.   You never spoke to him, you said. |
| 18:26:44 | 2 | A.   No, I didn't. |
| 18:26:45 | 3 | Q.   You never wrote to him about any of this; |
| 18:26:47 | 4 | right? |
| 18:26:48 | 5 | A.   I said I didn't remember whether I wrote to |
| 18:26:50 | 6 | him about this. |
| 18:26:53 | 7 | Q.   You remember, and you did not advise Michael |
| 18:26:57 | 8 | Siegel that you were negotiating against him through |
| 18:27:00 | 9 | Ari Emanuel; correct? |
| 18:27:02 | 10 | MR. TOBEROFF:  Argumentative. |
| 18:27:03 | 11 | THE WITNESS:  I don't think you can read my |
| 18:27:05 | 12 | mind, with all due respect. |
| | 13 | BY MR. PETROCELLI: |
| 18:27:07 | 14 | Q.   Well, are you saying you did make this full |
| 18:27:09 | 15 | disclosure to him about what your demands were of |
| 18:27:14 | 16 | Mr. Ari Emanuel, that you wanted to control the |
| 18:27:17 | 17 | disposition of the Michael Siegel interests, that it |
| 18:27:19 | 18 | could only be sold in connection with your interest? |
| 18:27:22 | 19 | Are you telling me that you told that to your half |
| 18:27:25 | 20 | brother in writing? |
| 18:27:28 | 21 | A.   I don't -- I don't remember what we discussed |
| 18:27:31 | 22 | in writing. |
| 18:27:32 | 23 | Q.   Did you have a single communication with him |
| 18:27:34 | 24 | in writing on this subject? |
| 18:27:36 | 25 | A.   I do not recall. |

EXHIBIT 81
2305

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 293

| 18:27:43 | 1 | Q.   In paragraph (c) here of this draft it says |
| 18:27:47 | 2 | that Mr. Emanuel is going to indemnify you in case |
| 18:27:51 | 3 | there is any litigation arising out of your -- arising |
| 18:27:54 | 4 | out of the purchase of the Michael Siegel interests. |
| 18:27:56 | 5 | Why do you want an indemnification from Mr. Emanuel? |
| 18:28:00 | 6 | What kind of litigation were you concerned about? |
| 18:28:02 | 7 | A.   We had no idea what might occur in the |
| 18:28:16 | 8 | future. |
| 18:28:16 | 9 | Q.   How were you communicating your demands and |
| 18:28:20 | 10 | your positions such that they were being embodied in |
| 18:28:25 | 11 | these drafts?  Were you doing it orally, or were you |
| 18:28:29 | 12 | like typing things out and sending it to Mr. Toberoff |
| 18:28:33 | 13 | or Mr. Emanuel? |
| 18:28:34 | 14 | A.   Oh, you're saying the negotiation over -- |
| 18:28:36 | 15 | Q.   Yes. |
| 18:28:37 | 16 | A.   -- over this document? |
| 18:28:38 | 17 | Q.   Yes. |
| 18:28:41 | 18 | A.   I think we did it in conversation. |
| 18:28:47 | 19 | Q.   Okay.  Take a look at the next document. |
| 18:28:51 | 20 | This is Exhibit 46. |
|  | 21 | (Whereupon, Plaintiff's Exhibit 46 |
| 18:28:59 | 22 | was placed before the witness.) |
|  | 23 | BY MR. PETROCELLI: |
| 18:28:59 | 24 | Q.   Now, it says that it's dated January 21, |
| 18:29:03 | 25 | 2002.  I'm assuming that's a typo.  That must be 2003. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 294

18:29:07    1       A.    Yeah, because it's --

18:29:09    2       Q.    The sequence of time here.  Does that make

18:29:11    3   sense to you?

18:29:11    4       A.    It's signed on 2003.

18:29:13    5       Q.    Well, Exhibit 46 is not signed.  You're

18:29:15    6   looking at the wrong exhibit.

18:29:18    7       A.    46.

18:29:20    8            MR. TOBEROFF:  Signed.

18:29:20    9            THE WITNESS:  Is signed.

18:29:23    10            MR. PETROCELLI:  Time out.  Time out.  Time

18:29:25    11   out.  Time out.

18:29:55    12       Q.    You have Exhibit 46 in front of you?

18:29:57    13       A.    Yes, I do.

18:29:57    14       Q.    And that is a signed version?

18:29:59    15       A.    Yes.

18:30:08    16       Q.    Okay.  And you will see in paragraph 2 -- in

18:30:21    17   paragraph 1 we're dealing with Mr. Siegel's interests,

18:30:26    18   Michael Siegel's interest in Superman, Superboy, and

18:30:29    19   The Spectre.  Do you see that?

18:30:30    20       A.    Yes, I do.

18:30:31    21       Q.    What's The Spectre?

18:30:32    22       A.    That's another character that my father

18:30:39    23   co-created.

18:30:39    24       Q.    And you wanted to have Mr. Emanuel acquire

18:30:42    25   Michael Siegel's interest in that character as well?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 295

| Time | Line | Text |
|---|---|---|
| 18:30:45 | 1 | A.   Yes. |
| 18:30:45 | 2 | Q.   So at the end of the day, you wanted to |
| 18:30:50 | 3 | obtain everything Michael Siegel might own with |
| 18:30:53 | 4 | respect to your father's creations; correct? |
| 18:30:56 | 5 | MR. TOBEROFF:  Misstates the document and the |
| 18:30:58 | 6 | record.  Assumes facts.  Lacks foundation. |
| 18:31:02 | 7 | MR. PETROCELLI:  Repeat the question because |
| 18:31:04 | 8 | I made a mistake in it. |
| 18:31:05 | 9 | Q.   You wanted Mr. Emanuel and negotiated and |
| 18:31:09 | 10 | contracted with Mr. Emanuel that he would acquire all |
| 18:31:15 | 11 | copyright termination interests that Michael Siegel |
| 18:31:17 | 12 | might hold with respect to your father's creations; |
| 18:31:20 | 13 | correct? |
| 18:31:22 | 14 | A.   These Superman, Superboy, and The Spectre |
| 18:31:25 | 15 | were the only properties that had at this point been |
| 18:31:30 | 16 | terminated.  There is always the possibility that |
| 18:31:32 | 17 | there are additional characters created by my father |
| 18:31:36 | 18 | that would be terminated in the future. |
| 18:31:39 | 19 | Q.   Were you -- |
| 18:31:40 | 20 | A.   This agreement didn't apply to anything |
| 18:31:43 | 21 | except for the specific characters. |
| 18:31:43 | 22 | Q.   What were the other characters that you were |
| 18:31:46 | 23 | leaving available for Michael Siegel to exercise |
| 18:31:48 | 24 | copyright termination interests over? |
| 18:31:50 | 25 | A.   Anything that came -- because of the calendar |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 296

| | | |
|---|---|---|
| 18:31:53 | 1 | of the way copyright terminations go, there are -- you |
| 18:31:57 | 2 | know, there are different dates of publication, and, |
| 18:32:01 | 3 | you know, the window for termination for each |
| 18:32:04 | 4 | character is different. |
| 18:32:05 | 5 | Q. Well, were you aware of any other windows of |
| 18:32:08 | 6 | termination for any other characters that were coming |
| 18:32:11 | 7 | up? |
| 18:32:11 | 8 | A. There were some, but they were way down the |
| 18:32:14 | 9 | road. |
| 18:32:14 | 10 | Q. What were they? |
| 18:32:15 | 11 | A. Oh, you would ask me that. At this moment I |
| 18:32:30 | 12 | can't recall. |
| 18:32:30 | 13 | Q. Well, as of January 21, 2003, you were |
| 18:32:37 | 14 | authorizing Ari Emanuel to purchase all existing |
| 18:32:42 | 15 | termination interests of Michael Siegel in your |
| 18:32:46 | 16 | father's creations; is that correct? |
| 18:32:48 | 17 | A. That were -- that were in effect or had been |
| 18:32:51 | 18 | terminated at that point. |
| 18:32:56 | 19 | Q. And this is the document you did sign; right? |
| 18:33:02 | 20 | A. Yes. |
| 18:33:03 | 21 | Q. Which sets forth the condition that the |
| 18:33:10 | 22 | Michael Siegel interests so acquired by Mr. Emanuel |
| 18:33:12 | 23 | could only be sold to a third party in conjunction |
| 18:33:17 | 24 | with the sale of the Siegel interests, your interests; |
| 18:33:20 | 25 | correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 297

| | | |
|---|---|---|
| 18:33:20 | 1 | A.   Correct. |
| 18:33:21 | 2 | Q.   And that you and your mother would retain |
| 18:33:24 | 3 | full and complete decision making authority with |
| 18:33:26 | 4 | respect to such a disposition; correct? |
| 18:33:29 | 5 | A.   Where is that, please?  I didn't have a |
| 18:33:31 | 6 | chance to read the entire document. |
| 18:33:33 | 7 | Q.   3(b). |
| 18:33:39 | 8 | A.   Correct. |
| 18:33:40 | 9 | Q.   3(c) is the indemnity that you're getting |
| 18:33:43 | 10 | from Mr. Emanuel in case there's any litigation |
| 18:33:46 | 11 | arising out of the purchase of the Michael Siegel |
| 18:33:49 | 12 | interest; correct? |
| 18:33:49 | 13 | A.   Correct. |
| 18:33:49 | 14 | Q.   And you understood that might apply if |
| 18:33:52 | 15 | Michael Siegel himself filed suit against you; |
| 18:33:54 | 16 | correct? |
| 18:33:54 | 17 | A.   I believe so. |
| 18:34:03 | 18 | Q.   In paragraph 3(d) you ask Mr. Emanuel to |
| 18:34:08 | 19 | reimburse you for the Michael Siegel 25 percent share |
| 18:34:13 | 20 | of the expenses that you had been advancing; correct? |
| 18:34:19 | 21 | A.   That we advanced on behalf of the entire |
| 18:34:37 | 22 | interest. |
| 18:34:37 | 23 | Q.   In the first paragraph of this document, |
| 18:34:42 | 24 | Exhibit 46, again it makes reference to various risks |
| 18:34:48 | 25 | and potential problems regarding Michael Siegel and |

LAURA SIEGEL LARSON - 7/22/2011

Page 298

| | | |
|---|---|---|
| 18:34:52 | 1 | the mitigation of possible conflicts of interest with |
| 18:34:56 | 2 | respect to the following proposed remedial actions. |
| 18:35:00 | 3 | What were the risks, the potential problems, and the |
| 18:35:05 | 4 | possible conflicts? |
| 18:35:07 | 5 | A.    I really don't recall. |
| 18:35:08 | 6 | Q.    You can't remember a single thing about that? |
| 18:35:11 | 7 | A.    Not today. |
| 18:35:56 | 8 | Q.    Take a look at the next document in order, |
| 18:36:03 | 9 | Exhibit 30. |
| | 10 | (Whereupon, Plaintiff's Exhibit 30 |
| | 11 | was placed before the witness.) |
| | 12 | BY MR. PETROCELLI: |
| 18:36:12 | 13 | Q.    This is a letter from Michael Siegel to you |
| 18:36:15 | 14 | dated May 13; is that correct? |
| 18:36:19 | 15 | A.    Yes. |
| 18:36:22 | 16 | Q.    When is the last time you saw this document? |
| 18:36:25 | 17 | A.    It's been quite a while. |
| 18:36:34 | 18 | Q.    When you received documents -- well, |
| 18:36:37 | 19 | withdrawn. |
| 18:36:38 | 20 | A.    I'm sorry.  What was -- |
| 18:36:40 | 21 | Q.    Withdrawn.  Let me start all over again. |
| 18:36:42 | 22 | When did you first give a copy of this |
| 18:36:45 | 23 | document to Mr. Toberoff? |
| 18:36:50 | 24 | A.    Whenever there was a request for the |
| 18:36:53 | 25 | production of documents, whenever that was. |

**EXHIBIT 81**
**2311**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 299

| | | |
|---|---|---|
| 18:36:56 | 1 | Q.    In what case? |
| 18:36:59 | 2 | A.    Good question.  There's just so many cases. |
| 18:37:04 | 3 | You know, they're all kind of running together to me, |
| 18:37:06 | 4 | so I don't remember. |
| 18:37:12 | 5 | Q.    When you provided documents from time to time |
| 18:37:15 | 6 | to Mr. Toberoff, did you maintain copies for yourself? |
| 18:37:20 | 7 | A.    No. |
| 18:37:21 | 8 | Q.    Never? |
| 18:37:21 | 9 | A.    I don't -- I don't believe so. |
| 18:37:23 | 10 | Q.    Even letters with your stepbrother? |
| 18:37:26 | 11 | A.    Well, I knew that he had them, and if I |
| 18:37:28 | 12 | needed them, I could always get a copy from him. |
| 18:37:42 | 13 | Q.    This letter starts out "Thank you for your |
| 18:37:44 | 14 | letter of November 2 of last year."  What letter was |
| 18:37:49 | 15 | that? |
| 18:37:49 | 16 | A.    A letter I sent him on November 2. |
| 18:37:51 | 17 | Q.    Do you have any idea what you wrote in that |
| 18:37:53 | 18 | letter? |
| 18:37:54 | 19 | A.    No, I don't. |
| 18:38:01 | 20 | Q.    Now, you see -- you recall receiving this |
| 18:38:05 | 21 | letter? |
| 18:38:05 | 22 | A.    Well, the part that I remember is when he |
| 18:38:07 | 23 | told me that his mother passed away. |
| 18:38:11 | 24 | Q.    That's in the second sentence. |
| 18:38:13 | 25 | A.    That's right. |

**Merrill  Corporation  -  Los Angeles**

EXHIBIT 81
2312

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 300

| 18:38:13 | 1 | Q. And then the rest of this letter goes on to |
| 18:38:17 | 2 | discuss his concerns about Mr. Toberoff, and are you |
| 18:38:21 | 3 | suggesting that none of that was important to you? |
| 18:38:27 | 4 | A. I didn't say it wasn't important to me. I |
| 18:38:31 | 5 | just said that the thing that made me remember this |
| 18:38:34 | 6 | letter was the fact that he said that his mother |
| 18:38:34 | 7 | passed away. |
| 18:38:50 | 8 | Q. Do you know what prompted his sending this |
| 18:38:52 | 9 | letter to you? |
| 18:38:54 | 10 | A. I don't know. |
| 18:38:59 | 11 | Q. Did you respond to it? |
| 18:39:02 | 12 | A. I'm sure I did. |
| 18:39:05 | 13 | Q. What did you say? |
| 18:39:08 | 14 | A. I'm sorry, but I don't recall. |
| 18:39:14 | 15 | Q. He said here in the -- directing your |
| 18:39:18 | 16 | attention to the second paragraph, okay -- |
| 18:39:21 | 17 | A. Um-hum. |
| 18:39:22 | 18 | Q. -- it starts out "I really wish to discuss |
| 18:39:26 | 19 | Marc Toberoff." And it says in the third sentence: |
| 18:39:37 | 20 | "I told you when he first contacted |
| 18:39:41 | 21 | me, he wanted to buy my share of the |
| 18:39:47 | 22 | copyright. Marc had a mysterious |
| 18:39:51 | 23 | billionaire who wanted to invest in |
| 18:39:52 | 24 | the Superman copyright, put |
| 18:39:54 | 25 | 15 million dollars up front plus |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 301

| | | |
|---|---|---|
| 18:39:57 | 1 | participation.  When you signed with |
| 18:40:01 | 2 | Marc the billionaire invested |
| 18:40:04 | 3 | elsewhere." |
| 18:40:08 | 4 | Do you know where he got that information? |
| 18:40:10 | 5 | A.   I have no idea. |
| 18:40:11 | 6 | Q.   You don't think he made it up, do you? |
| 18:40:14 | 7 | A.   You know, Michael was a very confused guy, on |
| 18:40:21 | 8 | a lot of medication, and when he would write things to |
| 18:40:25 | 9 | me, such as asking me did I know that Marc was the |
| 18:40:29 | 10 | attorney for the Shusters, well, of course I did, and, |
| 18:40:33 | 11 | you know -- |
| 18:40:35 | 12 | Q.   He's telling you that Marc Toberoff contacted |
| 18:40:38 | 13 | him and said he had a mysterious billionaire. |
| 18:40:43 | 14 | A.   Yeah.  Well, I don't know where that came |
| 18:40:45 | 15 | from. |
| 18:40:46 | 16 | Q.   Did you think your brother -- your |
| 18:40:48 | 17 | stepbrother was lying? |
| 18:40:49 | 18 | A.   I don't -- I don't know that he came up with |
| 18:40:57 | 19 | the wording himself.  You know, I mean it -- I had |
| 18:41:01 | 20 | never heard this referred to in any way other than in |
| 18:41:04 | 21 | this letter, "mysterious billionaire."  I don't know |
| 18:41:08 | 22 | what that means. |
| 18:41:12 | 23 | Q.   Put $15 million up front, plus participation, |
| 18:41:15 | 24 | that happened to be exactly the same number that |
| 18:41:19 | 25 | Mr. Emanuel had offered you; correct? |

**Merrill  Corporation  -  Los Angeles**

800-826-0277                              www.merillcorp.com/law

**EXHIBIT 81**
**2314**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 302

| | | |
|---|---|---|
| 18:41:21 | 1 | A.   That was interesting, and that caught my eye. |
| 18:41:27 | 2 | Q.   Mr. Toberoff had told you that he knew |
| 18:41:32 | 3 | billionaire investors; correct? |
| 18:41:33 | 4 | A.   No, he never used that term. |
| 18:41:34 | 5 | Q.   Well, he used terms similar, like he knew |
| 18:41:39 | 6 | very wealthy investors and people in the entertainment |
| 18:41:41 | 7 | industry who had money and would buy properties; |
| 18:41:43 | 8 | correct? |
| 18:41:44 | 9 | A.   No.  The offer came from -- directly from Ari |
| 18:41:46 | 10 | Emanuel. |
| 18:41:47 | 11 | Q.   What offer? |
| 18:41:49 | 12 | A.   Well, Ari Emanuel was involved in that |
| 18:41:53 | 13 | proposal of the $15 million. |
| 18:41:56 | 14 | Q.   Was involved with Mr. Toberoff. |
| 18:41:58 | 15 | A.   No, was -- it was going to be Ari Emanuel |
| 18:42:02 | 16 | putting up the $15 million in that discussion, the |
| 18:42:07 | 17 | initial discussion that apparently happened with Kevin |
| 18:42:11 | 18 | Marks. |
| 18:42:11 | 19 | Q.   How do you know that it was so specific that |
| 18:42:13 | 20 | it was only going to be Ari Emanuel acquiring the |
| 18:42:17 | 21 | interest and not IPW or an entity with which |
| 18:42:23 | 22 | Mr. Toberoff had an interest? |
| 18:42:24 | 23 | A.   It wasn't mentioned to me. |
| 18:42:25 | 24 | Q.   It was not. |
| 18:42:26 | 25 | A.   No. |

**EXHIBIT 81**
**2315**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 303

| | | |
|---|---|---|
| 18:42:26 | 1 | Q.    Okay. |
| 18:42:31 | 2 | A.    Not that I recall. |
| 18:42:33 | 3 | Q.    Then you're basing that off of your |
| 18:42:35 | 4 | recollection of the letter, what you just told me? |
| 18:42:38 | 5 | MR. TOBEROFF:  What letter?  What letter? |
| 18:42:40 | 6 | THE WITNESS:  Yeah. |
| | 7 | BY MR. PETROCELLI: |
| 18:42:40 | 8 | Q.    The letter you got from Mr. Marks that |
| 18:42:43 | 9 | advised you about the approach by Mr. Emanuel and -- |
| 18:42:46 | 10 | A.    I believe that -- |
| 18:42:47 | 11 | MR. TOBEROFF:  Wait a second.  You can |
| 18:42:49 | 12 | answer -- let me slow this down for a second. |
| 18:42:52 | 13 | THE WITNESS:  Of course. |
| 18:42:53 | 14 | MR. TOBEROFF:  You can answer not in such a |
| 18:42:55 | 15 | way that discloses the substance of the letter from |
| 18:42:58 | 16 | Kevin Marks advising you that there had been a |
| 18:43:02 | 17 | $15 million offer. |
| 18:43:03 | 18 | THE WITNESS:  Um-hum. |
| | 19 | BY MR. PETROCELLI: |
| 18:43:04 | 20 | Q.    You just gave some testimony -- |
| 18:43:05 | 21 | MR. TOBEROFF:  And make sure when you're |
| 18:43:06 | 22 | answering, you keep your parties straight. |
| 18:43:09 | 23 | THE WITNESS:  Yes. |
| | 24 | BY MR. PETROCELLI: |
| 18:43:09 | 25 | Q.    You just gave some testimony about the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 304

| | | |
|---|---|---|
| 18:43:11 | 1 | $15 million was to be from Ari Emanuel, and then I |
| 18:43:15 | 2 | pressed you about, well, maybe Mr. Toberoff would have |
| 18:43:18 | 3 | had a piece of it through IPW, and you said, well, |
| 18:43:22 | 4 | you're not sure, okay, words to that effect.  When you |
| 18:43:25 | 5 | gave that answer about the $15 million coming from |
| 18:43:28 | 6 | Ari, was that based on your recollection of the letter |
| 18:43:31 | 7 | from Kevin Marks? |
| 18:43:34 | 8 | A.  It -- I believe it was based not only on the |
| 18:43:36 | 9 | letter, but on a subsequent conversation with Kevin |
| 18:43:41 | 10 | Marks and also with Ari Emanuel. |
| 18:43:44 | 11 | Q.  Where they said that Mr. Emanuel was going to |
| 18:43:47 | 12 | fund the $15 million? |
| 18:43:48 | 13 | MR. TOBEROFF:  You can answer only with |
| 18:43:50 | 14 | respect to the conversation with Ari Emanuel. |
| 18:43:52 | 15 | THE WITNESS:  Yeah.  Well, you know, it may |
| 18:43:55 | 16 | not have solely been Ari, but, you know, he was |
| 18:43:59 | 17 | obviously the driving force in it. |
| | 18 | BY MR. PETROCELLI: |
| 18:44:02 | 19 | Q.  Yes, and again, you had no issue whatsoever |
| 18:44:06 | 20 | if Ari was funding an investment through IPW in which |
| 18:44:15 | 21 | Mr. Toberoff -- IP Worldwide in which Mr. Toberoff had |
| 18:44:18 | 22 | an interest; correct? |
| 18:44:19 | 23 | A.  At that point I wasn't aware of IP Worldwide, |
| 18:44:24 | 24 | if you're talking -- if you're talking about when |
| 18:44:27 | 25 | Kevin Marks first mentioned it. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 305

| | | |
|---|---|---|
| 18:44:28 | 1 | Q.    Later on when you had your meeting with |
| 18:44:31 | 2 | Mr. Emanuel and again he discussed the $15 million |
| 18:44:35 | 3 | offer and you said ultimately "No, I want you to be an |
| 18:44:38 | 4 | agent, not a business partner" -- |
| 18:44:41 | 5 | A.    Um-hum. |
| 18:44:41 | 6 | Q.    -- had you done a deal for $15 million or |
| 18:44:52 | 7 | whatever with Mr. Emanuel, you would have had no |
| 18:44:52 | 8 | objection to doing it with IP Worldwide and |
| 18:44:52 | 9 | Mr. Toberoff participating; correct? |
| 18:44:54 | 10 | MR. TOBEROFF:  Incomplete hypothetical. |
| 18:44:55 | 11 | THE WITNESS:  Well, we didn't proceed with |
| 18:44:57 | 12 | it, so we weren't -- you know, it wasn't that we were |
| 18:45:00 | 13 | in favor of it.  We were not in favor of it because we |
| 18:45:03 | 14 | didn't do it. |
| | 15 | BY MR. PETROCELLI: |
| 18:45:03 | 16 | Q.    I understand, but you didn't have some hard |
| 18:45:06 | 17 | and fast rule that in no circumstance could Marc |
| 18:45:10 | 18 | Toberoff participate in the acquisition of any |
| 18:45:12 | 19 | interest that you would sell. |
| 18:45:13 | 20 | MR. TOBEROFF:  Same objection. |
| | 21 | BY MR. PETROCELLI: |
| 18:45:14 | 22 | Q.    Correct? |
| 18:45:15 | 23 | THE WITNESS:  What was the objection? |
| 18:45:17 | 24 | MR. TOBEROFF:  It's okay. |
| 18:45:18 | 25 | MR. PETROCELLI:  He doesn't even remember. |

EXHIBIT 81
2318

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 306

| | | |
|---|---|---|
| 18:45:20 | 1 | MR. TOBEROFF:  I remember.  Incomplete |
| 18:45:23 | 2 | hypothetical. |
| | 3 | BY MR. PETROCELLI: |
| 18:45:24 | 4 | Q.   In other words, you understand my question. |
| 18:45:27 | 5 | You had no hard and fast rule that if you were going |
| 18:45:29 | 6 | to sell your interest to IP Worldwide or Mr. Emanuel, |
| 18:45:33 | 7 | that Mr. Toberoff was not to participate economically; |
| 18:45:36 | 8 | correct? |
| 18:45:37 | 9 | A.   It was never discussed. |
| 18:45:39 | 10 | MR. TOBEROFF:  Same objection. |
| | 11 | BY MR. PETROCELLI: |
| 18:45:40 | 12 | Q.   I understand it wasn't discussed, but you |
| 18:45:42 | 13 | didn't have the state of mind that you were going to |
| 18:45:43 | 14 | be adamantly opposed to it; correct? |
| 18:45:46 | 15 | MR. TOBEROFF:  Incomplete hypothetical. |
| 18:45:47 | 16 | THE WITNESS:  I didn't form an opinion. |
| | 17 | BY MR. PETROCELLI: |
| 18:45:49 | 18 | Q.   Never; right?  One way or the other; correct? |
| 18:45:51 | 19 | A.   Not that I can recall. |
| 18:45:52 | 20 | Q.   One way or the other; correct? |
| 18:45:54 | 21 | A.   Correct. |
| 18:45:55 | 22 | Q.   Okay. |
| 18:45:55 | 23 | A.   I think, if I'm following that. |
| 18:46:18 | 24 | Q.   By the way, when you wrote your stepbrother |
| 18:46:21 | 25 | back, did you straighten him out on things that you |

**EXHIBIT 81**
**2319**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 307

| | | |
|---|---|---|
| 18:46:24 | 1 | think he had wrong in his letter to you of May 13? |
| 18:46:27 | 2 | A.   I did my best to. |
| 18:46:29 | 3 | Q.   Can you explain to me as best as you can, for |
| 18:46:32 | 4 | example, what you said about the billionaire, the |
| 18:46:36 | 5 | mysterious billionaire? |
| 18:46:37 | 6 | A.   You know, I don't remember how I put it to |
| 18:46:39 | 7 | him, but I, you know, I tried to in as simple a manner |
| 18:46:46 | 8 | as possible explain what he had wrong in this letter. |
| 18:46:51 | 9 | Regarding specifically the billionaire, I really don't |
| 18:46:54 | 10 | recall what I said. |
| 18:46:55 | 11 | Q.   Did you type the letter yourself? |
| | 12 | A.   Yes, I did. |
| 18:46:59 | 13 | Q.   Did your mother help you prepare it? |
| 18:47:01 | 14 | A.   I think she had input. |
| 18:47:02 | 15 | Q.   Now, did you explain to him the situation |
| 18:47:05 | 16 | with the Shusters? |
| 18:47:09 | 17 | A.   Well, I cleared up some of his misconceptions |
| 18:47:13 | 18 | about the Shusters. |
| 18:47:14 | 19 | Q.   How did you clear them up?  In other words, |
| 18:47:16 | 20 | just generally what did you say? |
| 18:47:19 | 21 | A.   Once again, you're asking me to answer |
| 18:47:22 | 22 | something that I really can't recall.  I'm sorry. |
| 18:47:25 | 23 | Q.   When you said you cleared up the Shuster |
| 18:47:27 | 24 | issue for him, did you explain to him that you were |
| 18:47:29 | 25 | aware that Mr. Toberoff was working with the Shusters? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 308

| | | |
|---|---|---|
| 18:47:33 | 1 | A.   I'm sure I did. |
| 18:47:36 | 2 | Q.   Do you know when you wrote your responsive |
| 18:47:39 | 3 | letter back to this May 13 letter? |
| 18:47:41 | 4 | A.   I don't know exactly. |
| 18:47:43 | 5 | Q.   Did you have Mr. Toberoff assist in any way |
| 18:47:48 | 6 | in the response that you prepared? |
| 18:47:51 | 7 | A.   I believe I had him look at it. |
| 18:47:53 | 8 | Q.   And before you sent it to Mr. -- |
| 18:47:55 | 9 | A.   Yes. |
| 18:47:56 | 10 | Q.   And why did you have him look at it? |
| 18:47:58 | 11 | A.   Well, you know, it was dealing with issues |
| 18:48:04 | 12 | that had to do with legal matters, and I didn't want |
| 18:48:07 | 13 | to misstate something that basically would, you know, |
| 18:48:11 | 14 | come back and bite me in the butt later.  So I just |
| 18:48:15 | 15 | wanted -- wanted to make sure that I was as a civilian |
| 18:48:19 | 16 | expressing myself properly. |
| 18:48:21 | 17 | Q.   And in order for Mr. Toberoff to assist or |
| 18:48:27 | 18 | review the letter that you drafted, you would have |
| 18:48:30 | 19 | sent him Mr. Michael Siegel's May 13 letter so he |
| 18:48:35 | 20 | could have both letters. |
| 18:48:36 | 21 | A.   This letter? |
| 18:48:37 | 22 | Q.   Correct. |
| 18:48:37 | 23 | A.   Probably. |
| 18:48:39 | 24 | Q.   Okay.  And take a look at the Toberoff |
| 18:48:42 | 25 | timeline for a second, please, which is Exhibit 58. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 309

| | | |
|---|---|---|
| 18:48:45 | 1 | A.    I already have that, don't I? |
| 18:48:49 | 2 | Q.    Yes. |
| 18:48:49 | 3 | MR. PETROCELLI:  Can you fish that out for |
| 18:48:51 | 4 | her, Jason?  Thank you. |
| 18:48:53 | 5 | THE WITNESS:  Thank you. |
| | 6 | BY MR. PETROCELLI: |
| | 7 | Q.    I'd like to direct your attention -- |
| 18:48:54 | 8 | THE WITNESS:  Do I still need this one? |
| 18:48:56 | 9 | MR. PETROCELLI:  Yeah, leave it there. |
| 18:49:10 | 10 | THE WITNESS:  Okay.  Thank you. |
| | 11 | MR. TOBEROFF:  I can help explain it. |
| | 12 | MR. KLINE:  Are you reading our notes, Marc? |
| | 13 | THE WITNESS:  Thank you. |
| 18:49:17 | 14 | MR. TOBEROFF:  No, because I haven't gotten a |
| 18:49:17 | 15 | package -- duplicate packages with your notes. |
| 18:49:22 | 16 | MR. KLINE:  Oh, no.  Did you read this note? |
| | 17 | MR. PETROCELLI:  Okay.  So you have them. |
| 18:49:24 | 18 | MR. KLINE:  Please don't -- |
| 18:49:25 | 19 | MR. TOBEROFF:  Of course not.  I'm making a |
| 18:49:28 | 20 | joke.  Lighten up. |
| | 21 | BY MR. PETROCELLI: |
| 18:49:29 | 22 | Q.    So you have the Superman -- you have the Marc |
| 18:49:32 | 23 | Toberoff timeline, Exhibit 58, in front of you? |
| 18:49:33 | 24 | A.    Yes. |
| 18:49:33 | 25 | Q.    And you also have Exhibit 30, the Michael |

**EXHIBIT 81**
**2322**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 310

| | | |
|---|---|---|
| 18:49:37 | 1 | Siegel letter to you dated May 13, 2003? |
| 18:49:39 | 2 | A.   Yes, I do. |
| 18:49:40 | 3 | Q.   Now, go to the end of the fourth page as |
| 18:49:46 | 4 | Q 0004 and you'll see a reference to a July 5, 2003 -- |
| 18:50:02 | 5 | first of all, go to the prior page of this Exhibit 58. |
| 18:50:06 | 6 | A.   Okay. |
| 18:50:06 | 7 | Q.   And you'll see that the author of this |
| 18:50:09 | 8 | document is identifying Michael Siegel's May 13, 2003, |
| 18:50:15 | 9 | letter, the one that you have in front of you as |
| 18:50:18 | 10 | Exhibit 30.  Do you see that? |
| 18:50:19 | 11 | A.   I do. |
| 18:50:19 | 12 | Q.   And then he is -- he or she is purporting to |
| 18:50:23 | 13 | state some of the contents of that letter.  Do you see |
| 18:50:26 | 14 | that? |
| 18:50:26 | 15 | A.   I see a paragraph about it. |
| 18:50:29 | 16 | Q.   Okay.  And now dropping down to the end of |
| 18:50:32 | 17 | the next page with the Bates label Q 0004, the |
| 18:50:43 | 18 | reference to the July 5, 2003, date, do you see that? |
| 18:50:43 | 19 | A.   Yes, I do. |
| 18:50:43 | 20 | Q.   It says "Laura Siegel reveals her ignorance |
| 18:50:52 | 21 | of Toberoff's dubious actions in her return letter |
| 18:50:52 | 22 | back to Michael."  Putting aside the characterization |
| 18:50:54 | 23 | of your ignorance, does July 5, 2003, sound right to |
| 18:50:58 | 24 | you as around the time that you responded to the May |
| 18:51:01 | 25 | 13, 2003, letter? |

Merrill  Corporation  -  Los Angeles

800-826-0277                     www.merillcorp.com/law

EXHIBIT 81
2323

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 311

| | | |
|---|---|---|
| 18:51:04 | 1 | A.    It could have been. |
| 18:51:11 | 2 | Q.    Okay.  Is it fair to say that your letter |
| 18:51:16 | 3 | back to Mr. Michael Siegel did not agree with any of |
| 18:51:24 | 4 | his criticisms of Mr. Toberoff's actions and |
| 18:51:29 | 5 | Mr. Toberoff generally? |
| 18:51:32 | 6 | A.    Well, whoever stole this document, you know, |
| 18:51:36 | 7 | is doing his version of what he's reading into |
| 18:51:40 | 8 | whatever the letter said. |
| 18:51:42 | 9 | Q.    You're not following my question. |
| 18:51:44 | 10 | A.    Well, I haven't read the letter in a long |
| 18:51:51 | 11 | time. |
| 18:51:51 | 12 | Q.    My question to you is when you wrote back to |
| 18:51:54 | 13 | Michael -- |
| 18:51:54 | 14 | A.    Yes. |
| 18:51:56 | 15 | Q.    -- in response to his May 13, 2003, letter, |
| 18:51:59 | 16 | is it fair to say that you expressed no agreement with |
| 18:52:04 | 17 | any of his criticisms of Mr. Toberoff? |
| 18:52:08 | 18 | A.    I would say that's probably safe to say. |
| 18:52:19 | 19 | Q.    Did you tell Michael Siegel in your response |
| 18:52:26 | 20 | letter back that Mr. Toberoff does not have a |
| 18:52:31 | 21 | production company? |
| 18:52:32 | 22 | A.    Yes, I believe I did. |
| 18:52:35 | 23 | Q.    And you will see on the next page of this |
| 18:52:39 | 24 | document, Exhibit 58, in the description of the entry |
| 18:52:45 | 25 | July 5, 2003 -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 312

18:52:47    1        A.    I'm sorry.  You're saying continuation on the

18:52:50    2    top of the page?

18:52:51    3        Q.    Yes.  It says "Also, in the letter back to

18:52:53    4    Michael Siegel, that MT helped Laura Siegel draft --

18:52:57    5    in response to Michael's accusations of Toberoff,

18:53:00    6    Laura clearly states that MT does not have a

18:53:06    7    production company."  And that was your belief at the

18:53:08    8    time; correct?

18:53:10    9        A.    Correct.

18:53:11    10        Q.    And it goes on to say that, in parentheses:

18:53:17    11            "(This is false -- Marc Toberoff's

18:53:19    12            IPW has been in existence, partly

18:53:21    13            funded by Ari Emanuel, since at

18:53:21    14            least 2002).  In the draft of the

18:53:26    15            letter, MT crossed out the statement

18:53:27    16            that he does not have a production

18:53:29    17            company, and writes," quote, "'MT

18:53:33    18            has not plans to produce a SUPERMAN

18:53:36    19            movie, nor is this feasible given

18:53:38    20            the division of ownership of the

18:53:41    21            rights,'" end of quotes.

18:53:43    22            Now, does that -- is that consistent with

18:53:47    23    your recollection that your statement that

18:53:51    24    Mr. Toberoff did not have a production company was

18:53:54    25    crossed out by Mr. Toberoff in the final draft and

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 313

| 18:53:57 | 1 | replaced with the quoted language that I just read? |
| 18:53:59 | 2 | A.   It could have been. |
| 18:54:03 | 3 | Q.   And when Mr. Toberoff made his changes to the |
| 18:54:07 | 4 | letter and returned it to you, did you review it and |
| 18:54:11 | 5 | sign it before you sent it out as your response letter |
| 18:54:15 | 6 | back to Michael? |
| 18:54:16 | 7 | A.   Well, he made suggestions of changes in the |
| 18:54:22 | 8 | wording of certain areas, and, you know, I retyped the |
| 18:54:28 | 9 | letter, accepted some of the things that he said and |
| 18:54:30 | 10 | didn't use some other suggestions that he made. |
| 18:54:33 | 11 | Q.   How did he convey his suggestions to you? |
| 18:54:36 | 12 | A.   He wrote it on -- he wrote it on this |
| 18:54:39 | 13 | letter -- no, not this letter.  He wrote it on that |
| 18:54:43 | 14 | letter that's being discussed here and faxed it back |
| 18:54:46 | 15 | to me. |
| 18:54:47 | 16 | Q.   Okay.  So you did engage in faxed |
| 18:54:50 | 17 | communication with Mr. Toberoff from time to time. |
| 18:54:51 | 18 | A.   Yes. |
| 18:54:53 | 19 | Q.   Okay.  Including with respect to this very |
| 18:54:55 | 20 | correspondence that we're discussing. |
| 18:54:56 | 21 | A.   I believe so. |
| 18:54:58 | 22 | Q.   Okay. |
| 18:54:59 | 23 | Now, did you show him the final draft before |
| 18:55:03 | 24 | you sent it out? |
| 18:55:05 | 25 | A.   I believe I did. |

**Merrill   Corporation   -   Los Angeles**

**EXHIBIT 81**
**2326**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 314

| | | |
|---|---|---|
| 18:55:07 | 1 | Q.   And which of the changes did you reject? |
| 18:55:16 | 2 | A.   I don't remember.  I just remember the |
| 18:55:18 | 3 | process, but I don't remember the contents. |
| 18:55:37 | 4 | Q.   Now, by the time you received this letter, |
| 18:55:43 | 5 | Mr. Emanuel was -- |
| 18:55:44 | 6 | A.   I'm sorry.  You're talking about the May 13 |
| 18:55:47 | 7 | letter? |
| 18:55:47 | 8 | Q.   Thank you. |
| 18:55:48 | 9 | By the time you received the May 13, 2003, |
| 18:55:50 | 10 | letter, Exhibit 30, and then responded with your |
| 18:55:53 | 11 | letter that you've been describing, during that period |
| 18:55:58 | 12 | of time, that's when you knew that Mr. Emanuel was |
| 18:56:07 | 13 | secretly attempting to purchase Michael Siegel's |
| 18:56:09 | 14 | interest; correct? |
| 18:56:11 | 15 | MR. TOBEROFF:  Misstates the record. |
| 18:56:13 | 16 | THE WITNESS:  I -- you know, I wouldn't use |
| 18:56:16 | 17 | the word "secretly," but I believe an offer -- an |
| 18:56:20 | 18 | offer may have been made during that period. |
| | 19 | BY MR. PETROCELLI: |
| 18:56:21 | 20 | Q.   You said you wouldn't use the word |
| 18:56:24 | 21 | "secretly," but you knew that Mr. Michael Siegel did |
| 18:56:26 | 22 | not know that it was Mr. Emanuel who was the |
| 18:56:29 | 23 | prospective purchaser.  We've discussed that already; |
| 18:56:31 | 24 | correct? |
| 18:56:31 | 25 | A.   Yes, we did. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 315

| | | |
|---|---|---|
| 18:56:32 | 1 | Q.  And you did not tell Michael Siegel in your |
| 18:56:39 | 2 | response letter back that Mr. Emanuel was indeed the |
| 18:56:46 | 3 | very person with your full knowledge and blessing who |
| 18:56:48 | 4 | was attempting to acquire his interest. |
| 18:56:51 | 5 | MR. TOBEROFF:  Asked and answered. |
| 18:56:52 | 6 | THE WITNESS:  No, I did not mention that. |
| | 7 | BY MR. PETROCELLI: |
| 18:56:56 | 8 | Q.  And your letter back to Mr. Michael Siegel |
| 18:56:59 | 9 | does in fact mention Mr. Emanuel; correct? |
| 18:57:01 | 10 | A.  I'm sorry.  Does or does not? |
| 18:57:03 | 11 | Q.  Does. |
| 18:57:05 | 12 | A.  Does mention Mr. Emanuel? |
| 18:57:07 | 13 | Q.  Yes. |
| 18:57:07 | 14 | A.  I don't -- I don't recall. |
| 18:57:16 | 15 | Q.  Have you given any consideration to the idea |
| 18:57:27 | 16 | that is being stated in these documents that |
| 18:57:30 | 17 | Mr. Toberoff is going to end up with the lion's share |
| 18:57:32 | 18 | of the money with respect to any disposition of the |
| 18:57:39 | 19 | termination interests of the -- stemming from Superman |
| 18:57:42 | 20 | both from the Siegel side and the Shuster side? |
| 18:57:44 | 21 | A.  Well, I disagree with your characterization |
| 18:57:49 | 22 | of lion's share. |
| 18:57:52 | 23 | Q.  Well, let's -- |
| 18:57:52 | 24 | A.  I mean he has a contingency agreement with me |
| 18:57:56 | 25 | and with my mom, and he had a contingency agreement |

LAURA SIEGEL LARSON - 7/22/2011

Page 316

| | | |
|---|---|---|
| 18:57:59 | 1 | with the Shusters. |
| 18:58:00 | 2 | Q.   So when you do the math, though, as was |
| 18:58:03 | 3 | pointed out in some of these documents, he ends up |
| 18:58:05 | 4 | with the biggest percentage, bigger than what you |
| 18:58:09 | 5 | would receive and bigger than what the Shuster side |
| 18:58:13 | 6 | would receive; right? |
| 18:58:14 | 7 | A.   He was being compensated for at this point |
| 18:58:16 | 8 | nearly ten years of work. |
| 18:58:18 | 9 | Q.   But when you made these deals, there wasn't |
| 18:58:20 | 10 | ten years of work; correct? |
| 18:58:22 | 11 | A.   No, but we had no idea how long or how much |
| 18:58:24 | 12 | or how expensive it was all going to be. |
| 18:58:26 | 13 | Q.   So you understood that at the end of the day |
| 18:58:30 | 14 | Mr. Toberoff might end up with 45 percent or so of the |
| 18:58:36 | 15 | total proceeds with you and your mother's side, |
| 18:58:42 | 16 | Michael Siegel's side 27 and a half percent and the |
| 18:58:46 | 17 | Shuster side 25 percent; correct? |
| 18:58:48 | 18 | A.   You know, I'm sorry, but you're throwing |
| 18:58:51 | 19 | around percentages, and that's not correct. |
| 18:58:52 | 20 | Q.   But you have fully appreciated that at the |
| 18:58:55 | 21 | end of the day Mr. Toberoff would have the biggest |
| 18:59:01 | 22 | stake in the proceeds. |
| 18:59:03 | 23 | A.   My only concerns -- excuse me.  Were you |
| 18:59:06 | 24 | finished?  I didn't want to interrupt you. |
| 18:59:07 | 25 | Q.   I want to make sure you understand what I'm |

LAURA SIEGEL LARSON - 7/22/2011

Page 317

| | | |
|---|---|---|
| 18:59:10 | 1 | asking you, that you have understood and understand to |
| 18:59:15 | 2 | this day that given his agreements with the Shuster |
| 18:59:19 | 3 | family, given his agreements with you and your mother, |
| 18:59:23 | 4 | given the fact that you succeeded to your half |
| 18:59:28 | 5 | brother's rights, that Mr. Toberoff's aggregate share |
| 18:59:37 | 6 | in any proceeds from the disposition of all these |
| 18:59:40 | 7 | Shuster and Siegel interests is greater than your |
| 18:59:44 | 8 | interest and greater than the Shuster interest; |
| 18:59:46 | 9 | correct? |
| 18:59:46 | 10 | A.   I was only concerned with my interest.  I did |
| 18:59:50 | 11 | not even know what his percentage was with the |
| 18:59:53 | 12 | Shusters. |
| 18:59:53 | 13 | Q.   But you certainly became aware of it when you |
| 18:59:56 | 14 | read it in the timeline document; correct? |
| 18:59:59 | 15 | A.   Well, I didn't get this timeline until |
| 19:00:03 | 16 | much -- a long time afterward, and, you know -- |
| 19:00:06 | 17 | Q.   Well, when you saw -- take a look at the |
| 19:00:09 | 18 | timeline.  That's Exhibit 58 -- bear with me.  I'm |
| 19:00:37 | 19 | looking for -- |
| 19:00:52 | 20 | Here it is. |
| 19:01:02 | 21 | When you were meeting with David Michaels, by |
| 19:01:04 | 22 | the way, did he run through these different numbers in |
| 19:01:08 | 23 | the way that I just did in describing to you that |
| 19:01:10 | 24 | Mr. Toberoff would end up with the biggest share? |
| 19:01:14 | 25 | A.   He ran some numbers by us, but, you know, he |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 318

| | | |
|---|---|---|
| 19:01:17 | 1 | offered no proof. |
| 19:01:20 | 2 | Q.   Well, you knew what your agreements were, and |
| 19:01:22 | 3 | he was aware of them as well. |
| 19:01:24 | 4 | A.   He was actually mischaracterizing to us what |
| 19:01:26 | 5 | our agreement was. |
| 19:01:27 | 6 | Q.   You mean the percentages? |
| 19:01:28 | 7 | A.   Correct. |
| 19:01:29 | 8 | Q.   In what way did he mischaracterize it? |
| 19:01:32 | 9 | A.   He was inflating it. |
| 19:01:33 | 10 | Q.   It was 40 percent; right? |
| 19:01:35 | 11 | A.   It was 40 percent, but he was claiming |
| 19:01:37 | 12 | something much larger than that. |
| 19:01:39 | 13 | Q.   He was claiming an additional 5 or 10 percent |
| 19:01:42 | 14 | that you thought no longer applied? |
| 19:01:44 | 15 | A.   Well, that I knew no longer applied. |
| 19:01:55 | 16 | Q.   Okay. |
| 19:02:00 | 17 | Can you turn to page 6 of Exhibit 58. |
| 19:02:15 | 18 | A.   Yeah. |
| 19:02:21 | 19 | Q.   First of all, on page 1 it states: |
| 19:02:25 | 20 | "As it stands right now, the |
| 19:02:27 | 21 | single person who would stand to |
| 19:02:28 | 22 | gain the MOST in a settlement with |
| 19:02:30 | 23 | Time Warner regarding the ongoing |
| 19:02:33 | 24 | SUPERMAN legal dispute would not be |
| 19:02:34 | 25 | the heirs themselves, but Marc |

## LAURA SIEGEL LARSON - 7/22/2011

Page 319

| | | |
|---|---|---|
| 19:02:36 | 1 | Toberoff." |
| 19:02:37 | 2 | Now, when you read that, did you agree with |
| 19:02:39 | 3 | that statement? |
| 19:02:40 | 4 | A.   No. |
| 19:02:41 | 5 | Q.   But it is factually true that in terms of the |
| 19:02:43 | 6 | division of the proceeds, he would receive the largest |
| 19:02:47 | 7 | share; correct? |
| 19:02:48 | 8 | A.   What I objected to was the -- was the way |
| 19:02:51 | 9 | this was -- the way that this was presented. |
| 19:02:54 | 10 | Q.   Putting this aside, though, in terms of the |
| 19:02:56 | 11 | mathematical division of the shares, the Toberoff |
| 19:03:01 | 12 | share is the biggest share.  It's 45 or 40 -- in |
| 19:03:05 | 13 | excess of 45 percent; correct? |
| 19:03:08 | 14 | A.   Well, it's not bigger than my share now. |
| 19:03:10 | 15 | Q.   Why is that? |
| 19:03:12 | 16 | A.   Well, I inherited my mother's, I inherited |
| 19:03:16 | 17 | Michael's, and I have my own. |
| 19:03:17 | 18 | Q.   But if you take all of that, Mr. Toberoff |
| 19:03:21 | 19 | gets 40 percent of that; right? |
| 19:03:22 | 20 | A.   He gets 40 percent.  I get 60 percent. |
| 19:03:25 | 21 | Q.   And then he gets 40 percent of your piece, |
| 19:03:29 | 22 | which is half, with the Shusters owning the other |
| 19:03:33 | 23 | half; correct? |
| 19:03:33 | 24 | A.   You're not saying that he gets half of mine. |
| 19:03:36 | 25 | You're saying that my share of the overall Superman |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 320

| | | |
|---|---|---|
| 19:03:39 | 1 | copyright is 50 percent? |
| 19:03:41 | 2 | Q.   Correct.  And he gets 40 percent of your 50 |
| 19:03:47 | 3 | percent; correct? |
| 19:03:47 | 4 | A.   Correct. |
| 19:03:47 | 5 | Q.   And he gets 50 percent of the Shuster 50 |
| 19:03:49 | 6 | percent; right? |
| 19:03:49 | 7 | A.   If he does. |
| 19:03:53 | 8 | Q.   Well, you saw that referenced in the timeline |
| 19:03:54 | 9 | document; right? |
| 19:03:55 | 10 | A.   Yeah, but there are errors in this timeline, |
| 19:03:58 | 11 | so I don't know if that's correct. |
| 19:03:59 | 12 | Q.   You don't know that it's incorrect, do you? |
| 19:04:01 | 13 | A.   No. |
| 19:04:01 | 14 | Q.   The bottom line is you are aware that there's |
| 19:04:04 | 15 | a possibility that he could end up as the biggest |
| 19:04:07 | 16 | financial recipient of proceeds among you and the |
| 19:04:11 | 17 | Shuster family and him; correct? |
| 19:04:13 | 18 | A.   Look -- |
| 19:04:14 | 19 | Q.   Are you aware of that? |
| 19:04:16 | 20 | A.   It may be possible.  I'm not doing the math |
| 19:04:28 | 21 | today. |
| 19:04:29 | 22 | Q.   Have you ever calculated how much you would |
| 19:04:33 | 23 | have received today had you accepted the proposal that |
| 19:04:45 | 24 | DC had made back in 2001, 2002? |
| 19:04:49 | 25 | A.   At the time it was offered -- |

Merrill   Corporation   -   Los Angeles
800-826-0277                      www.merillcorp.com/law

EXHIBIT 81
2333

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 321

| | | |
|---|---|---|
| 19:04:50 | 1 | MR. TOBEROFF:  Again, objection.  Compound. |
| 19:04:53 | 2 | Which are you referring to, the February, 2002, draft |
| 19:04:56 | 3 | or the Kevin Marks letter in October of 2001? |
| 19:05:04 | 4 | MR. PETROCELLI:  Either one. |
| 19:05:05 | 5 | Q.   Have you ever done the -- |
| 19:05:06 | 6 | MR. TOBEROFF:  Compound. |
| | 7 | BY MR. PETROCELLI: |
| 19:05:07 | 8 | Q.   Have you ever done the calculation of what |
| 19:05:10 | 9 | dollars would have been received by you and your |
| 19:05:13 | 10 | mother? |
| 19:05:14 | 11 | A.   Well, you're talking about two different |
| 19:05:17 | 12 | calculations. |
| 19:05:17 | 13 | Q.   Have you done the calculations for both of |
| 19:05:19 | 14 | them? |
| 19:05:19 | 15 | A.   You say ever.  At one time when it was |
| 19:05:22 | 16 | initially offered, you know, we did a projection on |
| 19:05:27 | 17 | it.  I haven't done it recently. |
| 19:05:31 | 18 | Q.   Do you have any -- |
| 19:05:32 | 19 | A.   We just knew a lot of money had already been |
| 19:05:35 | 20 | owed to us, which was the basis of the accounting |
| 19:05:41 | 21 | claim. |
| 19:05:41 | 22 | Q.   How is it -- |
| 19:05:41 | 23 | A.   That lawsuit. |
| 19:05:42 | 24 | Q.   How is it that you think that you can |
| 19:05:45 | 25 | financially benefit from now having, like you said, a |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 322

19:05:50    1    hundred percent of 50 percent of the copyright subject

19:05:55    2    to Mr. Toberoff's share?  How is it that you can

19:05:58    3    financially benefit from the termination interests

19:06:00    4    that you believe you have recaptured and that you --

19:06:04    5    that you believe you have recaptured?

19:06:06    6              MR. TOBEROFF:  Objection.  Vague and

19:06:08    7    ambiguous.

            8    BY MR. PETROCELLI:

19:06:09    9         Q.   You can answer.

19:06:10   10         A.   It's so broad, I don't understand.

19:06:12   11         Q.   Well, what are the ways in which you believe

19:06:13   12    that you can turn your termination interest into

19:06:16   13    money?

19:06:16   14              MR. TOBEROFF:  I instruct you not to answer

19:06:18   15    to the extent your answer reveals communications with

19:06:27   16    your attorney, either with me or with your former

19:06:30   17    attorney, Kevin Marks.

           18    BY MR. PETROCELLI:

19:06:32   19         Q.   I don't believe you need to rely on

19:06:36   20    attorney-client discussions to answer this question.

19:06:38   21    I'm asking you, an extremely intelligent person who

19:06:41   22    has been involved with this for many years.

19:06:44   23              MR. TOBEROFF:  Excuse me.

           24    BY MR. PETROCELLI:

19:06:45   25         Q.   In what ways have you considered that you

EXHIBIT 81
2335

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 323

| 19:06:47 | 1 | might be able to turn your termination interest, |
| 19:06:51 | 2 | whatever it is and whenever it's final, into money? |
| 19:06:56 | 3 | MR. TOBEROFF:  I instruct you not to answer |
| 19:06:59 | 4 | to the extent your answer reveals the contents of |
| 19:07:08 | 5 | attorney-client communications.  If you can answer |
| 19:07:14 | 6 | without divulging the substance of attorney-client |
| 19:07:18 | 7 | communications, then you can only answer to that |
| 19:07:20 | 8 | extent. |
| 19:07:21 | 9 | THE WITNESS:  Yeah. |
| 19:07:21 | 10 | My answer is that's the subject of |
| 19:07:25 | 11 | litigation. |
|  | 12 | BY MR. PETROCELLI: |
| 19:07:26 | 13 | Q.    What's the subject of litigation? |
| 19:07:28 | 14 | A.    You know, what -- what my rights were and |
| 19:07:32 | 15 | potentially what the value of the rights are. |
| 19:07:33 | 16 | Q.    But you understand that -- you're talking |
| 19:07:35 | 17 | about the lawsuit that you filed on your termination |
| 19:07:37 | 18 | interest? |
| 19:07:38 | 19 | A.    Yes. |
| 19:07:38 | 20 | Q.    Okay.  Now, you understand, though, that as a |
| 19:07:41 | 21 | result of that lawsuit, and let's say you're |
| 19:07:45 | 22 | completely successful in every respect after all |
| 19:07:48 | 23 | appeals and so forth, the only compensation you would |
| 19:07:51 | 24 | receive as a result of the lawsuit is an accounting |
| 19:07:55 | 25 | from 1999 to 2013; correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 324

| | | |
|---|---|---|
| 19:07:58 | 1 | A.    Not necessarily. |
| 19:07:59 | 2 | Q.    What other compensation do you believe in |
| 19:08:02 | 3 | terms of money that would -- can be awarded to you by |
| 19:08:07 | 4 | way of a lawsuit? |
| 19:08:08 | 5 | A.    I believe it depends on the court ruling. |
| 19:08:10 | 6 | Q.    How so? |
| 19:08:12 | 7 | MR. TOBEROFF:  I again -- |
| | 8 | BY MR. PETROCELLI: |
| 19:08:14 | 9 | Q.    How so do you -- |
| 19:08:15 | 10 | MR. TOBEROFF:  If you have any understanding |
| 19:08:16 | 11 | of those things that are independent of the advice of |
| 19:08:19 | 12 | counsel, you can answer.  If you don't, I instruct you |
| 19:08:21 | 13 | not to answer. |
| | 14 | BY MR. PETROCELLI: |
| 19:08:22 | 15 | Q.    I'm not asking about your legal advice.  I'm |
| 19:08:24 | 16 | asking about you as a plaintiff in that -- |
| 19:08:25 | 17 | MR. TOBEROFF:  That's not the instruction. |
| | 18 | BY MR. PETROCELLI: |
| 19:08:26 | 19 | Q.    -- in that, and you can disregard whatever |
| 19:08:28 | 20 | Mr. Toberoff and you have discussed.  But do you have |
| 19:08:31 | 21 | an understanding that you have a claim for money in |
| 19:08:36 | 22 | that case other than the accounting claim? |
| 19:08:42 | 23 | A.    Well, I believe that there are numerous |
| 19:08:46 | 24 | appeals.  There are numerous issues that are still |
| 19:08:48 | 25 | going to be examined in a court of law that could |

LAURA SIEGEL LARSON - 7/22/2011

Page 325

| | | |
|---|---|---|
| 19:08:52 | 1 | directly affect, you know, my income going forward. |
| 19:08:58 | 2 | Q.   Well, is it your -- but isn't your |
| 19:09:02 | 3 | understanding that the only way -- the only possible |
| 19:09:08 | 4 | money that you can recover from your lawsuit is |
| 19:09:13 | 5 | whatever the court finally determines is the amount |
| 19:09:17 | 6 | that DC was required to account and pay to you for the |
| 19:09:22 | 7 | years 1999 through 2013 for the works in which the |
| 19:09:28 | 8 | court finds you had an interest? |
| 19:09:30 | 9 | MR. TOBEROFF:  Again, my instruction is if |
| 19:09:32 | 10 | you can answer that question on your own and not based |
| 19:09:35 | 11 | on any advice or discussions with counsel, you can |
| 19:09:38 | 12 | answer the question.  If your answer is based on your |
| 19:09:41 | 13 | discussions with counsel, then I instruct you not to |
| 19:09:46 | 14 | answer. |
| 19:09:48 | 15 | THE WITNESS:  Going beyond the lawsuit, there |
| 19:09:52 | 16 | are always possibilities. |
| | 17 | BY MR. PETROCELLI: |
| 19:09:52 | 18 | Q.   I was just focused on the lawsuit, that the |
| 19:09:54 | 19 | only -- that you have an understanding that the only |
| 19:09:56 | 20 | money that you can recover from your lawsuit is the |
| 19:10:00 | 21 | accounting money for the period 1999 to 2013.  Are you |
| 19:10:05 | 22 | aware of that? |
| 19:10:06 | 23 | A.   Yes. |
| 19:10:07 | 24 | Q.   Okay.  And in terms of getting any other |
| 19:10:13 | 25 | money in respect of your termination interest, you |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 326

| | | |
|---|---|---|
| 19:10:16 | 1 | understand that that would require some kind of |
| 19:10:17 | 2 | business transaction? |
| 19:10:18 | 3 | A.   Yes, that's correct. |
| 19:10:19 | 4 | Q.   Okay.  A business transaction in which you |
| 19:10:22 | 5 | would partner up with someone or license someone or |
| 19:10:26 | 6 | sell your interest; correct? |
| 19:10:27 | 7 | A.   Correct. |
| 19:10:33 | 8 | Q.   When do you believe that you will be able to |
| 19:10:35 | 9 | do so? |
| 19:10:37 | 10 | MR. TOBEROFF:  I'm instructing you not to |
| 19:10:39 | 11 | answer unless you can answer independent of any advice |
| 19:10:43 | 12 | of counsel, if you can answer.  If your answer |
| 19:10:48 | 13 | implicates advice of counsel, I instruct you not to |
| 19:10:50 | 14 | answer the question. |
| 19:10:51 | 15 | THE WITNESS:  Yeah, I mean -- |
| 19:10:53 | 16 | MR. TOBEROFF:  You don't -- do you understand |
| 19:10:55 | 17 | the instruction? |
| 19:10:55 | 18 | THE WITNESS:  I do. |
| 19:10:56 | 19 | MR. TOBEROFF:  Okay. |
| 19:10:57 | 20 | THE WITNESS:  I do. |
| 19:10:57 | 21 | I'm not able to say anything, you know, |
| 19:11:01 | 22 | specific because it all involves discussions with my |
| 19:11:06 | 23 | attorney regarding legal matters. |
| 19:11:08 | 24 | MR. PETROCELLI:  Well, that doesn't necess- |
| 19:11:09 | 25 | arily mean you can't answer the question.  Let me -- |

Merrill  Corporation  -  Los Angeles

800-826-0277                         www.merillcorp.com/law

EXHIBIT 81
2339

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

**LAURA SIEGEL LARSON - 7/22/2011**

Page 327

| | | |
|---|---|---|
| 19:11:12 | 1 | THE WITNESS:  In my mind it does. |
| 19:11:13 | 2 | MR. PETROCELLI:  Let me try again. |
| 19:11:15 | 3 | Q.  Do you have an understanding -- |
| 19:11:17 | 4 | MR. TOBEROFF:  It does pursuant to my |
| 19:11:21 | 5 | instruction. |
| | 6 | BY MR. PETROCELLI: |
| 19:11:21 | 7 | Q.  Do you have an understanding that -- |
| 19:11:31 | 8 | withdrawn. |
| 19:11:31 | 9 | Do you have a plan or intent to enter into a |
| 19:11:36 | 10 | business transaction regarding your Superman rights? |
| 19:11:39 | 11 | A.  I believe I have very valuable rights and |
| 19:11:43 | 12 | that at some point I will be able to profit from them. |
| 19:11:48 | 13 | Q.  Do -- what are the ways in which you believe |
| 19:11:50 | 14 | you can profit from them? |
| 19:11:52 | 15 | MR. TOBEROFF:  Same instruction. |
| 19:11:55 | 16 | THE WITNESS:  That's something that I really |
| 19:11:56 | 17 | can't respond to. |
| | 18 | BY MR. PETROCELLI: |
| 19:11:58 | 19 | Q.  Well, you just said "I believe they're |
| 19:12:00 | 20 | valuable."  Why do you believe they're valuable? |
| 19:12:02 | 21 | A.  Because it's Superman. |
| 19:12:04 | 22 | Q.  Do you believe that you'll have the ability |
| 19:12:06 | 23 | to sell them? |
| 19:12:08 | 24 | MR. TOBEROFF:  Same instruction.  Same |
| 19:12:11 | 25 | instruction. |

**EXHIBIT 81**
**2340**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 328

| Time | Line | Text |
|------|------|------|
| 19:12:11 | 1 | THE WITNESS:  I can't respond to that. |
| | 2 | BY MR. PETROCELLI: |
| 19:12:15 | 3 | Q.   Have you ever attempted to find out, other |
| 19:12:19 | 4 | than through talking to Marc Toberoff, what kind of |
| 19:12:23 | 5 | value there is in these Superman rights for which you |
| 19:12:26 | 6 | have been involved for 15 years or so? |
| 19:12:29 | 7 | MR. TOBEROFF:  Same instruction, and that |
| 19:12:31 | 8 | instruction doesn't just implicate talking to Marc |
| 19:12:34 | 9 | Toberoff.  It implicates things that Marc Toberoff has |
| 19:12:37 | 10 | done on your behalf and my work product. |
| 19:12:40 | 11 | THE WITNESS:  It's all intertwined with |
| 19:12:44 | 12 | matters that are of a legal nature, so I can't answer |
| 19:12:47 | 13 | that question. |
| | 14 | BY MR. PETROCELLI: |
| 19:12:49 | 15 | Q.   Have you identified in your own mind or |
| 19:12:51 | 16 | thinking any prospective purchasers of your rights? |
| 19:12:56 | 17 | MR. TOBEROFF:  Same instruction. |
| 19:12:58 | 18 | THE WITNESS:  No one specific. |
| | 19 | BY MR. PETROCELLI: |
| 19:13:00 | 20 | Q.   Have you given some thought to how much you |
| 19:13:06 | 21 | would sell your rights for? |
| 19:13:09 | 22 | MR. TOBEROFF:  Same instruction. |
| 19:13:11 | 23 | THE WITNESS:  I don't have a clear number. |
| | 24 | BY MR. PETROCELLI: |
| 19:13:14 | 25 | Q.   A range. |

EXHIBIT 81
2341

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 329

| | | |
|---|---|---|
| 19:13:17 | 1 | MR. TOBEROFF:  Same instruction. |
| 19:13:18 | 2 | THE WITNESS:  Sitting here today, no. |
| 19:13:21 | 3 | MR. TOBEROFF:  Not -- and if you did, you |
| 19:13:24 | 4 | could only disclose that to the extent that it's not |
| 19:13:26 | 5 | the product of your conversations with your attorney |
| 19:13:29 | 6 | or the analysis done by your attorneys on your behalf. |
| 19:13:32 | 7 | You understand that?  You understand that? |
| 19:13:33 | 8 | THE WITNESS:  Yes, I do.  That goes without |
| 19:13:35 | 9 | saying. |
| | 10 | BY MR. PETROCELLI: |
| 19:13:35 | 11 | Q.    Do you have a belief that DC Comics or Warner |
| 19:13:43 | 12 | Bros. is a potential purchaser of your rights? |
| 19:13:48 | 13 | A.    Of course. |
| 19:13:49 | 14 | Q.    Why do you believe that? |
| 19:13:51 | 15 | A.    Well, they're one of many studios, and I |
| 19:13:55 | 16 | believe that they would have -- it would be in their |
| 19:13:58 | 17 | best interest to try to, you know, make a reasonable |
| 19:14:02 | 18 | deal with me.  When I say reasonable, I mean, you |
| 19:14:06 | 19 | know, something that would be completely acceptable to |
| 19:14:09 | 20 | me. |
| 19:14:10 | 21 | Q.    Do you know what that is? |
| 19:14:12 | 22 | A.    Sitting here -- |
| 19:14:13 | 23 | MR. TOBEROFF:  Same instruction. |
| 19:14:14 | 24 | THE WITNESS:  Sitting here today, I cannot |
| 19:14:15 | 25 | give you an answer to that. |

Merrill  Corporation  -  Los Angeles
800-826-0277                     www.merrillcorp.com/law

EXHIBIT 81
2342

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 330

| | | |
|---|---|---|
| 19:14:19 | 1 | BY MR. PETROCELLI: |
| 19:14:20 | 2 | Q.   Do you believe that because the Shusters have |
| 19:14:26 | 3 | asserted that their termination interest becomes |
| 19:14:30 | 4 | effective in 2013, that that will somehow enhance the |
| 19:14:36 | 5 | value of your Superman rights? |
| 19:14:39 | 6 | A.   Yes. |
| 19:14:40 | 7 | MR. TOBEROFF:  Same instruction.  You can |
| 19:14:41 | 8 | only answer that if you formed a belief as to that |
| 19:14:44 | 9 | independent of your advice of counsel. |
| 19:14:46 | 10 | THE WITNESS:  Yes, I do. |
| | 11 | BY MR. PETROCELLI: |
| 19:14:49 | 12 | Q.   Why do you believe that? |
| 19:14:50 | 13 | A.   Well -- |
| 19:14:53 | 14 | MR. TOBEROFF:  I -- if you want -- don't |
| 19:14:56 | 15 | venture into this territory unless your answer to his |
| 19:14:59 | 16 | question is independent of any advice of counsel, and |
| 19:15:02 | 17 | if you can't separate the two, then I instruct you not |
| 19:15:04 | 18 | to answer. |
| 19:15:06 | 19 | THE WITNESS:  Just very simply, I think that |
| 19:15:11 | 20 | a whole is always more valuable than part, than a |
| 19:15:14 | 21 | part. |
| | 22 | BY MR. PETROCELLI: |
| 19:15:15 | 23 | Q.   Do you believe that between the Shuster |
| 19:15:19 | 24 | interest if and when it were to become effective and |
| 19:15:22 | 25 | the interests that you own, that that is the entirety |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 331

| | | |
|---|---|---|
| 19:15:26 | 1 | of the Superman interest? |
| 19:15:28 | 2 | A.    I'm sorry? |
| 19:15:29 | 3 | Q.    Do you believe that the Shuster interest and |
| 19:15:31 | 4 | the Siegel interest -- you said a whole is better than |
| 19:15:34 | 5 | a part or words to that effect.  Do you believe that |
| 19:15:37 | 6 | the Siegel termination interest and the Shuster |
| 19:15:41 | 7 | termination interest constitute 100 percent of the |
| 19:15:43 | 8 | interest in Superman? |
| 19:15:46 | 9 | MR. TOBEROFF:  Vague and ambiguous as to -- |
| 19:15:50 | 10 | vague and ambiguous. |
| 19:15:50 | 11 | THE WITNESS:  It depends on the time frame |
| 19:15:59 | 12 | that you're talking about. |
| | 13 | BY MR. PETROCELLI: |
| 19:15:59 | 14 | Q.    Well, do you understand that DC Comics owns |
| 19:16:00 | 15 | Superman rights that you don't have the ability to |
| 19:16:03 | 16 | recapture? |
| 19:16:04 | 17 | A.    As of today.  That may change. |
| 19:16:07 | 18 | Q.    As of any day. |
| 19:16:08 | 19 | A.    That may change. |
| 19:16:09 | 20 | Q.    How? |
| 19:16:10 | 21 | A.    There are court decisions that are yet to |
| 19:16:12 | 22 | come. |
| 19:16:12 | 23 | Q.    Assuming you win every single court decision |
| 19:16:15 | 24 | and assuming the Shusters win every single court |
| 19:16:18 | 25 | decision, is it your belief that the Shusters and the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 332

| | | |
|---|---|---|
| 19:16:21 | 1 | Siegels collectively could end up with every single |
| 19:16:25 | 2 | right associated with Superman? |
| 19:16:28 | 3 | MR. TOBEROFF:  Vague and ambiguous.  Again, |
| 19:16:29 | 4 | you're getting into legal territory here. |
| 19:16:32 | 5 | He's asking you for legal conclusions, and if |
| 19:16:35 | 6 | you can form an opinion independent of your advice of |
| 19:16:38 | 7 | counsel, you can only answer to that limited extent. |
| 19:16:40 | 8 | But if you can't or your opinions are so intertwined |
| 19:16:44 | 9 | with the advice of counsel that you can't, then I'm |
| 19:16:47 | 10 | instructing you not to answer. |
| 19:16:49 | 11 | MR. PETROCELLI:  Do you want to hear the |
| 19:16:50 | 12 | question back? |
| 19:16:51 | 13 | THE WITNESS:  No, I don't need to hear the |
| 19:16:52 | 14 | question. |
| 19:16:53 | 15 | You know, I really don't think that it's |
| 19:16:55 | 16 | appropriate for me to answer that. |
| | 17 | BY MR. PETROCELLI: |
| 19:16:56 | 18 | Q.  Why is that? |
| 19:16:57 | 19 | A.  Because it's too enmeshed in years of |
| 19:17:02 | 20 | discussions with legal counsel. |
| 19:17:04 | 21 | Q.  Are you aware that there are rights that DC |
| 19:17:11 | 22 | Comics and or Warner Bros. has that are not subject to |
| 19:17:15 | 23 | termination or recapture at all?  Is it your belief |
| 19:17:20 | 24 | that there are such Superman rights or Superboy |
| 19:17:23 | 25 | rights? |

**EXHIBIT 81**
**2345**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 333

| | | |
|---|---|---|
| 19:17:23 | 1 | MR. TOBEROFF:  Same -- same instruction.  I'm |
| 19:17:25 | 2 | instructing you not to answer that question because it |
| 19:17:27 | 3 | calls for a legal conclusion.  So I don't have to ask |
| 19:17:30 | 4 | you whether it's unrelated to advise of counsel |
| 19:17:34 | 5 | MR. PETROCELLI:  I didn't ask you for a legal |
| 19:17:34 | 6 | conclusion.  I asked for your belief and understanding |
| 19:17:36 | 7 | in that regard. |
| 19:17:37 | 8 | MR. TOBEROFF:  I'm instructing you not to |
| 19:17:39 | 9 | answer.  It divulges attorney-client communications. |
| 19:17:42 | 10 | MR. PETROCELLI:  You know, we're going to |
| 19:17:43 | 11 | stop right now.  I have a ton more of documents, as |
| 19:17:45 | 12 | you can see, in front of you. |
| 19:17:47 | 13 | THE WITNESS:  I'm begging you not to stop. |
| 19:17:49 | 14 | MR. PETROCELLI:  I understand, but we can't |
| 19:17:51 | 15 | go any further.  It's past quarter after 7:00, and I |
| 19:17:53 | 16 | have accommodated your schedule and your situation, |
| 19:17:58 | 17 | and I'm not being disrespectful, but there's no way |
| 19:18:02 | 18 | we're going to finish, and so we'll just have to fight |
| 19:18:05 | 19 | about it another day. |
| 19:18:06 | 20 | MR. TOBEROFF:  I would like to know -- wait a |
| 19:18:07 | 21 | second.  I would like to know how much time we have |
| 19:18:09 | 22 | been on the record. |
| 19:18:11 | 23 | THE VIDEOGRAPHER:  At this point you're a |
| 19:18:15 | 24 | minute or two shy of seven hours. |
| 19:18:17 | 25 | MR. PETROCELLI:  There you go. |

**EXHIBIT 81**
**2346**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 334

| | | |
|---|---|---|
| 19:18:18 | 1 | MR. TOBEROFF:  So you're stopping a minute or |
| 19:18:20 | 2 | two shy of seven hours and you're not finishing the |
| 19:18:22 | 3 | deposition when you -- |
| 19:18:24 | 4 | MR. PETROCELLI:  As you know, I made my |
| 19:18:26 | 5 | statement without having any knowledge of the time. |
| 19:18:28 | 6 | MR. TOBEROFF:  Okay.  Well, now you have -- |
| | 7 | MR. PETROCELLI:  I don't have an internal |
| | 8 | clock. |
| 19:18:29 | 9 | MR. TOBEROFF:  Now you have the knowledge of |
| 19:18:30 | 10 | the time, so -- and please let me finish.  I didn't |
| 19:18:33 | 11 | interrupt you when you were speaking. |
| | 12 | MR. PETROCELLI:  Sure.  You can finish. |
| 19:18:35 | 13 | MR. TOBEROFF:  You're not stopping as a |
| 19:18:38 | 14 | strategic effort a minute or two before seven hours to |
| 19:18:41 | 15 | continue the deposition.  And you're smiling.  It's |
| 19:18:43 | 16 | clear that that's what you're doing.  So -- |
| 19:18:46 | 17 | MR. PETROCELLI:  You are joking; right? |
| 19:18:47 | 18 | MR. TOBEROFF:  Am I joking?  It's obvious -- |
| 19:18:49 | 19 | excuse me.  I'm allowed to speak.  I'm not joking. |
| 19:18:52 | 20 | MR. PETROCELLI:  You're going to embarrass |
| 19:18:54 | 21 | yourself. |
| 19:18:54 | 22 | THE WITNESS:  You have one day of seven hours |
| 19:18:56 | 23 | of Ms. Siegel.  She wants to continue to complete her |
| 19:19:00 | 24 | deposition.  You refuse to do that even though she's |
| 19:19:02 | 25 | the one with M.S. and you're perfectly happy -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 335

19:19:06    1    perfectly capable of finishing the deposition, but

19:19:09    2    you're choosing not to and choosing not to close the

19:19:13    3    deposition.  This deposition is going to close after

19:19:15    4    today, and we will vigorously oppose you dragging her

19:19:19    5    back in here for more time because you have two

19:19:22    6    minutes left on your seven hours.

19:19:25    7            MR. PETROCELLI:  You know, I will respond.

19:19:26    8    Okay?

19:19:28    9            I think your comments are disgraceful

19:19:31    10   especially in reference to the witness' condition

19:19:34    11   because I have done everything, frankly, beyond the

19:19:39    12   call of duty, to accommodate her, her illness, her

19:19:43    13   schedule, finding an office with a sofa so she can lie

19:19:47    14   down, in every --

            15            MR. TOBEROFF:  No one -- no one --

19:19:47    16            MR. PETROCELLI:  Excuse me.  I'm not

19:19:48    17   finished.

19:19:49    18            MR. TOBEROFF:  I wasn't referring to that.

19:19:51    19            MR. PETROCELLI:  Excuse me -- in every one of

19:19:51    20   the requests, and I have made it perfectly clear on

19:19:52    21   the record throughout that she is entitled to take as

19:19:57    22   many and as lengthy breaks as she wants knowing that

19:20:00    23   it was going to require us to work far, far later than

19:20:05    24   a normal schedule would.  So I really find that

            25   distasteful.

LAURA SIEGEL LARSON - 7/22/2011

Page 336

| | | |
|---|---|---|
| 19:20:11 | 1 | Secondly -- |
| 19:20:11 | 2 | MR. TOBEROFF:  I'm referring to the couple |
| 19:20:12 | 3 | minutes short of the seven hours, not to be |
| | 4 | providing -- |
| | 5 | MR. PETROCELLI:  Time out.  Don't -- |
| 19:20:13 | 6 | MR. TOBEROFF:  -- for a room to lie down, |
| | 7 | and -- |
| | 8 | MR. PETROCELLI:  I'm not finished. |
| 19:20:14 | 9 | MR. TOBEROFF:  -- I thanked you for that. |
| 19:20:16 | 10 | MR. PETROCELLI:  I'm not finished with my |
| 19:20:19 | 11 | statement. |
| 19:20:19 | 12 | Secondly, as you well know, I indicated that |
| 19:20:22 | 13 | we were stopping because the court reporter told me we |
| 19:20:28 | 14 | had three minutes and two minutes on the tape, and I |
| 19:20:33 | 15 | knew I wasn't going to possibly finish the deposition. |
| 19:20:36 | 16 | I had no idea whatsoever, of course, and you know I |
| 19:20:39 | 17 | didn't, that there was two minutes left to go to |
| 19:20:42 | 18 | complete seven hours.  And for you to accuse me of |
| 19:20:46 | 19 | trying to make some kind of tactic about that, I want |
| 19:20:51 | 20 | to be real clear about that.  I will cede the two |
| 19:20:54 | 21 | minutes to you. |
| 19:20:54 | 22 | MR. TOBEROFF:  Okay.  If you're ceding the |
| 19:20:58 | 23 | two minutes to me, then the deposition is over. |
| 19:20:58 | 24 | MR. PETROCELLI:  No, it is not. |
| 19:20:58 | 25 | MR. TOBEROFF:  Because you have seven hours |

**Merrill  Corporation  -  Los Angeles**

**EXHIBIT 81
2349**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 337

| | | |
|---|---|---|
| 19:20:59 | 1 | of deposition. |
| 19:20:59 | 2 | MR. PETROCELLI: I understand your position, |
| 19:21:01 | 3 | but, Marc, that's really quite sophomoric of you. You |
| 19:21:05 | 4 | don't decide when depositions are over. Courts decide |
| 19:21:09 | 5 | that. So I understand your position that you want to |
| 19:21:15 | 6 | resist this deposition from being continued to a later |
| 19:21:21 | 7 | date, but that's what I'm doing. |
| 19:21:23 | 8 | MR. TOBEROFF: Okay. |
| 19:21:23 | 9 | MR. PETROCELLI: And you obviously will |
| 19:21:26 | 10 | disagree about it, and we'll go to court about it. I |
| 19:21:28 | 11 | just want to be clear that I'm not going to make an |
| 19:21:31 | 12 | argument that I'm entitled to more time because |
| 19:21:34 | 13 | apparently there were one or two minutes left before |
| 19:21:37 | 14 | the seven hours. It's because I have not had enough |
| 19:21:41 | 15 | within seven hours to complete the examination given |
| 19:21:44 | 16 | the importance of this witness -- |
| 19:21:46 | 17 | MR. TOBEROFF: Just so -- |
| 19:21:47 | 18 | MR. PETROCELLI: -- and we will argue about |
| 19:21:48 | 19 | it another day. |
| 19:21:49 | 20 | MR. TOBEROFF: Just to be clear, my reference |
| 19:21:52 | 21 | to tactics doesn't refer to the two minutes left on |
| 19:21:56 | 22 | the seven hours. It refers -- because I said the same |
| 19:21:59 | 23 | exact thing to you when you told me you were going to |
| 19:22:02 | 24 | stop at 6:00. I objected at that point. And this |
| 19:22:06 | 25 | isn't state court, and I think you're confusing the |

**Merrill   Corporation   -   Los Angeles**

800-826-0277                          www.merillcorp.com/law

EXHIBIT 81
2350

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 338

| | | |
|---|---|---|
| 19:22:08 | 1 | two.  This is federal court.  In federal court you |
| 19:22:11 | 2 | have one day of seven hours.  You don't continue from |
| 19:22:14 | 3 | day to day until you're finished. |
| 19:22:15 | 4 | MR. PETROCELLI:  Marc, you -- |
| 19:22:17 | 5 | MR. TOBEROFF:  So we will vigorously |
| 19:22:19 | 6 | oppose -- oppose, and Laura stated on the record that |
| 19:22:22 | 7 | she would like you to continue rather than have to |
| 19:22:26 | 8 | come back for yet another deposition.  This is now her |
| 19:22:29 | 9 | third deposition. |
| 19:22:30 | 10 | MR. PETROCELLI:  Wait a second.  There's |
| 19:22:31 | 11 | nothing to continue.  Are you telling me that you're |
| 19:22:33 | 12 | going to make her available tonight beyond seven |
| 19:22:36 | 13 | hours? |
| 19:22:36 | 14 | MR. TOBEROFF:  No.  I'm telling you -- |
| 19:22:37 | 15 | MR. PETROCELLI:  Okay. |
| 19:22:38 | 16 | MR. TOBEROFF:  -- you can finish her |
| 19:22:40 | 17 | seven-hour deposition. |
| 19:22:41 | 18 | MR. PETROCELLI:  It's done.  I told you I'm |
| 19:22:43 | 19 | giving up the last one or two minutes just to make the |
| 19:22:46 | 20 | point to you.  But to be clear, you're not willing |
| 19:22:48 | 21 | tonight to have the witness stay beyond seven hours of |
| 19:22:51 | 22 | testimony. |
| 19:22:51 | 23 | MR. TOBEROFF:  I don't think you're entitled |
| 19:22:52 | 24 | to more than one day of seven hours. |
| 19:22:54 | 25 | MR. PETROCELLI:  That's my point.  Because I |

**EXHIBIT 81**
**2351**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 339

| | | |
|---|---|---|
| 19:22:55 | 1 | believe that I am entitled to more than seven hours, I |
| 19:22:58 | 2 | will have to go to court and seek the court's |
| 19:23:01 | 3 | intervention. |
| 19:23:01 | 4 | MR. TOBEROFF:  That's your -- you can do -- |
| 19:23:02 | 5 | you can always make a motion to the court. |
| 19:23:04 | 6 | MR. PETROCELLI:  Let's have a stipulation on |
| 19:23:06 | 7 | the record as we had before that the witness will have |
| 19:23:10 | 8 | within 30 days of your receipt to advise us of any |
| 19:23:15 | 9 | corrections to the deposition transcript, but bearing |
| 19:23:19 | 10 | in mind, Ms. Siegel -- Ms. Larson, of course, that if |
| 19:23:23 | 11 | you do make any changes of substance, it can be |
| 19:23:26 | 12 | commented upon as affecting your credibility.  The |
| 19:23:31 | 13 | court reporter's transcript can be signed under |
| 19:23:34 | 14 | penalty of perjury, and the court reporter is |
| 19:23:36 | 15 | otherwise relieved of her duties under the Code.  So |
| 19:23:38 | 16 | stipulated? |
| 19:23:38 | 17 | MR. TOBEROFF:  So stipulated. |
| 19:23:41 | 18 | THE REPORTER:  Where is the original to go, |
| 19:23:42 | 19 | please? |
| 19:23:43 | 20 | MR. PETROCELLI:  The original should go to, I |
| 19:23:46 | 21 | guess -- |
| 19:23:46 | 22 | What did we do last time? |
| 19:23:49 | 23 | MR. TOKORO:  The original to them and a copy |
| 19:23:51 | 24 | to us. |
| 19:23:51 | 25 | THE VIDEOGRAPHER:  That will then mark the |

LAURA SIEGEL LARSON - 7/22/2011

Page 340

19:23:53    1        end of Volume 1, tape number five, in the deposition

19:23:55    2        of Laura Siegel.  Going off the record.  The time is

           3        7:24.

19:24:01    4                (The deposition was concluded at 7:24 p.m.)

           5

           6

           7

           8

           9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

EXHIBIT 81
2353

LAURA SIEGEL LARSON - 7/22/2011

Page 341

```
 1    STATE OF CALIFORNIA          )

 2                                 ) ss.

 3    COUNTY OF LOS ANGELES        )

 4

 5

 6          I, LAURA SIEGEL LARSON, declare under the

 7    penalties of perjury under the laws of the United

 8    States that the foregoing is true and correct.

 9          Executed this    day of                      ,

10    2011, at                         , California.

11

12

13

14

15                                  LAURA SIEGEL LARSON

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 81
2354

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 342

1    STATE OF CALIFORNIA      )

2                            )   ss.

3    COUNTY OF LOS ANGELES   )

4      I, Kathleen E. McCarthy, Certified Shorthand

5    Reporter No. 4483 for the State of California, do

6    hereby certify:

7      That prior to being examined, the witness named in

8    the foregoing deposition was duly sworn to testify the

9    truth, the whole truth, and nothing but the truth;

10     That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced by me to typewritten form and that

13   the same is a true, correct, and complete transcript

14   of said proceedings.

15          Before completion of the deposition, review

16   of the transcript [X] was [ ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed

19   are appended hereto.

20     I further certify that I'm not interested in the

21   outcome of the action.

22     Witness my hand this 3rd day of August, 2011.

23

24

25                     Kathleen E. McCarthy, CSR No. 4483

EXHIBIT 81
2355

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

# EXHIBIT 82

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

August 27, 2012

<u>Via E-Mail</u>

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dear Jason:

I write in response to your August 17, 2012 letter, regarding DC's intent to move to compel the further depositions of defendants Laura Siegel Larson and Mark Peary, and to follow-up on my August 14, 2012 meet-and-confer with Matt Kline as to DC's July 27, 2012 letter, my August 1, 2012 letter, and the parties' subsequent e-mail correspondence.

## I.    REPEAT DEPOSITIONS OF MR. PEARY AND MS. LARSON

While unclear from your August 17 letter, defendants' understanding is that DC will seek to compel the further deposition of Mark Warren Peary and Laura Siegel Larson for an additional day each.  DC will seek to depose Mr. Peary and Ms. Larson regarding:  (a) anything "new" in the case since their depositions in June-July 2011, including any documents produced since that time (*e.g.,* the "Timeline" documents); and (b) questions which were objected to as improper at those depositions, as set forth below.

As to category (a), DC chose to take the depositions knowing there were numerous outstanding document discovery issues and a pending writ on which DC did not seek to expedite review. That some of those issues have been resolved and DC now has additional documents is not a basis to re-depose these witnesses.  Between this case and the closely related *Siegel* litigation, Ms. Larson has already been deposed three times, while Mr. Peary has been deposed twice.

As to category (b), defendants strongly object to DC's tactic of bringing discovery disputes up at a meet-and-confer, waiting to bring a motion for over a year, and then attempting to incorporate the prior dispute in a separate dispute/motion.  DC's specific issues as to such disputes are addressed below.

**EXHIBIT 82**
**2356**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 5

Furthermore, during the August 14 meet-and-confer, you stated that you had not confirmed with Mr. Petrocelli or your client what potential compromises would be acceptable, but indicated that DC might agree to shorten the time of such depositions on the topics listed above if it would avoid motion practice.  However, no compromise was proposed in your letter.

## II.    OBJECTIONS AT THE INITIAL DEPOSITION

As set forth below, the objections made by Mr. Toberoff at Mr. Peary's June 29, 2011 deposition and Ms. Larson's July 22, 2011 deposition were proper.

1.    <u>Consent Agreement</u>

Magistrate Zarefsky denied DC's motion to compel production of the 2008 collective negotiation agreement (the "Consent Agreement"), as did Judge Larson in *Siegel*.  Docket Nos. 209, 163-11 at 724:9-11.  Judge Wright also weighed in, denying DC's motion for review on this subject.  Docket Nos. 248, 252.  All of this occurred well before DC took either Mr. Peary's or Ms. Larson's depositions, and the time to challenge Magistrate Zarefsky's (and Judge Wright's) ruling has long since passed.  Fed. R. Civ. P. 72; L.R. 72-2.1.

DC now improperly attempts an end-run around these decisions by deposing defendants on the privileged contents of the consent agreement.  DC's only justifications for this are: (a) its erroneous and rejected belief that Magistrate Zarefsky's order was wrongly decided; (b) its erroneous and insulting assertion that Mr. Toberoff "cannot be trusted"; and (c) its erroneous contention that Ms. Larson and Mr. Peary waived privilege.

A.    <u>Judge Larson's, Magistrate Zarefsky's, and Judge Wright's Rulings Were Not Erroneous</u>

These decisions were clearly correct.  None of them relied on DC's straw man of a "settlement" or "mediation" privilege.  *See* Docket No. 209 at 8 ("Nor will the Court re-visit Judge Larson's ruling that the attorney-client and related privileges protect the consent agreement.").  The Consent Agreement, which was expressly entered into in connection with the settlement of legal claims, contains the Heirs and their counsel's settlement strategies and is clearly protected by the attorney-client privilege and attorney work-product doctrine.  *See Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). The privilege encompasses documents that reveal, involve or implicate legal advice, litigation strategy or litigation motives of a party.  *Id.* at 129.  The Consent Agreement constitutes a communication among the Heirs and their counsel Mr. Toberoff, and reflects Mr. Toberoff's legal advice to his clients and legal strategies regarding settlement of their termination interests.  It is also protected by the work-product doctrine, as it "reveal[s] an attorney's strategy [or] evaluation of strengths and weaknesses" of the case.  *Schwarzer*, et al., Fed. Civ. Proc. Before Trial § 11:285 (2010), citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). *See* F.R.C.P. 26(b)(3).  Accordingly, it is absolutely privileged and was duly listed on the Heirs' privilege logs in this case.  *See United States v. Martin*, 278 F.3d 988,

**EXHIBIT 82**
**2357**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  3 of 5

999-1000 (9th Cir. 2002)

      B.    <u>DC's Baseless *Ad Hominem* Attacks Are Insufficient To Pierce Privilege</u>

As it does in virtually all of its correspondence and briefing where it loses on the merits, DC devotes a substantial portion of its letter to empty rhetoric, impugning opposing counsel.  These baseless attacks are dealt with at length in Laura Brill's July 11, 2012 letter and in defendants' briefing.  Such attacks offer nothing to justify piercing the Heirs' privilege over the consent agreement that has been thrice upheld.

DC's repeated refrain is that defendants' representations as to documents somehow cannot be trusted.  Yet when Magistrate Zarefsky has reviewed defendants' documents *in camera*, defendants' privilege assertions have been largely upheld, and, in any event, there is no indication that defendants ever misrepresented the contents of such documents to the Court.  See Docket Nos. 239, 439, 451.

Notably, DC recently repeatedly contended that defendants had misrepresented the contents of a November 2001 e-mail between Michael Siegel and Mr. Toberoff, by stating that it "pertains to legal retention."  Docket No. 412 at 4:16-17.  After Magistrate Judge Zarefsky reviewed the document *in camera*, he confirmed that the "subject matter of the e-mail concerns legal rights and potential representation of Michael Siegel," and held the document privileged.  Docket No. 451 at 1-2.  Tellingly, now that DC has secured a copy of this e-mail, its August 17 letter makes no mention of the document.

      C.    <u>Ms. Larson and Mr. Peary Did Not Waive Privilege</u>

DC contends that Ms. Larson and Mr. Peary waived privilege over the Consent Agreement by "selectively and strategically disclosing certain facts about [it]."  This argument was already made by DC, Docket No. 160 at 26:5-6, and rejected by Magistrate Zarefsky and Judge Wright. Docket Nos. 209 at 9-10, 248, 252.

Furthermore, the very testimony DC cites confirms that the parties agreed that allowing Ms. Larson to answer certain questions would not constitute a waiver (Larson Tr. 42:1-10; Peary Tr. 81:10-15) and that the witness was allowed to answer only because the question did not call for privileged material.  Larson Tr. 99:15-100:5.  In both depositions, counsel for defendants was explicit that the witness could not testify as to the contents of the privileged document.  Larson Tr. 42:23-25; Peary Tr. 58:23-25.

Nor did defendants waive privilege by rebutting DC's inaccurate assertion to the Court as to the unlawfulness of the Consent Agreement.  The comments concerning the consent agreement in recent motions were no more "revealing" than those in defendants' prior motions to dismiss and/or strike – and those comments were held not to waive privilege by Magistrate Zarefsky and Judge Wright, as defendants have a right to counter DC's false assertions as to the Consent

**EXHIBIT 82**
**2358**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   4 of 5

Agreement without waiving privilege.  Docket Nos. 209 at 10:6-11, 248, 252; Docket Nos. 78, 100; Docket Nos. 462, 478.  Furthermore, the "disclosure of a general description of the subject matter of a privileged communication does not operate as a waiver of the privilege." *United States v. Zuckerman*, 88 F. Supp. 2d 9, 15 (E.D.N.Y. 2000).

Under DC's skewed logic, a party could make frivolous misrepresentations about an opposing party's privileged documents and the opposing party would have no options but to let the misstatements go unchallenged or waive privilege.  Magistrate Zarefsky expressly rejected this false construct:  "Defendants do not waive privilege by defending themselves."  Docket No. 209 at 10:10-11.

      2.    <u>Rights Strategy/Evaluation:</u>

DC mischaracterizes the record in claiming that defendants' counsel asserted privilege over "business communications," specifically marketing the Siegels' rights in Superman.  The testimony DC points to makes clear that Mr. Toberoff objected only to the extent it called on Ms. Larson to "reveal the substance of [her] communications with counsel."  Larson Tr. 46:22-25.  Legal advice remains privileged even if it regards business or naturally incorporates business advice.  *See ABB Kent-Taylor v. Stallings and Co., Inc.,* 172 F.R.D. 53, 55 (W.D.N.Y.1996) ("Often intertwined with legal advice as to substantive issues is counsel's strategic assessment of alternative choices of action available to the client."); *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 254 (E.D. Va. 2012) (privilege applies to mixture of business and legal advice).

DC's assertion that the privilege somehow does not apply to Mr. Toberoff's advice to Ms. Larson about "the value of the Siegels' putative Superman rights and how the heirs could monetize these rights" is wrong.  Even prior to the filing of the *Siegel* lawsuits in 2004, Mr. Toberoff's advice about the Siegels' Superman rights took place against the backdrop of anticipated litigation and settlement with DC/Warner Bros. over the rights to Superman; Mr. Toberoff held settlement discussions with Warner Bros.' General Counsel, John Schulman, in 2003-04; and since *Siegel*, any such advice is obviously bound up in litigation and settlement discussions with DC/Warner.  Ms. Larson's "understanding" is privileged to the extent it is based on privileged attorney-client communications as to settlement and legal strategy.

      3.    <u>Subject Matter Waiver</u>

The disclosure of certain stolen privileged documents to the United States Attorney's Office to facilitate its investigation of the theft does not constitute a subject matter waiver.  *See, e.g, In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987).  DC has previously made this argument with regard to communications between David Michael and the Siegels (Docket No. 205 at 14:8-15), and Magistrate Zarefsky has rejected that argument.  Docket No. 262 at 4:9-12.  DC has also advanced similar arguments with respect to communications between the Siegels and Kevin Marks, which both Magistrate Zarefsky and Judge Wright have rejected.  Docket Nos. 362, 378, 389.

**EXHIBIT 82**
**2359**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  5 of 5

**III.    DEFENDANTS' COMPROMISE PROPOSAL**

If DC has any proposals to narrow the scope of this dispute, defendants are available to meet and confer on September 6, 2012.  As DC's contemplated motion is directed solely at defendants Laura Siegel Larson and Mark Warren Peary, the Kendall Brill firm, which represents neither defendant, will not participate.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith G. Adams

**EXHIBIT 82**
**2360**

# EXHIBIT 83

| From: | Tokoro, Jason |
|---|---|
| To: | Keith Adams |
| Cc: | Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Richard Kendall; Laura Brill; Nicholas Daum; David Harris; Pablo Arredondo; Marc Toberoff |
| Subject: | FW: DC v. PPC |
| Date: | Tuesday, August 28, 2012 3:37:00 PM |
| Attachments: | DC v. PPC.Letters.Adams-Tokoro.Depositions.8.27.2012.final.pdf |

Keith:

DC disagrees with your letter below and will file its motion.

We are copying the Kendall Brill firm on this response (and attaching a copy of your letter), as we understand that they remain counsel in the case.

All of the DC's rights are reserved.

Jason


**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Monday, August 27, 2012 6:09 PM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris'
**Subject:** DC v. PPC

Counsel:

Please see the attached correspondence sent on behalf of Keith Adams.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101


This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**EXHIBIT 83**
**2361**

# EXHIBIT 84

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA       )
SIEGEL LARSON,                )
                              )
          Plaintiffs,         )
                              )
     vs.                      )      No. 04-8400 (RSWL)(RZx)
                              )
WARNER BROS. ENTERTAINMENT    )         -and-
INC., et al.,                 )
                              )      No. 04-8776 (RSWL)(RZx)
          Defendants.         )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

**EXHIBIT 84**
**2562**

Page 1

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
JOANNE SIEGEL and LAURA    )
SIEGEL LARSON,             )
                           )
           Plaintiffs,     )
                           )
     vs.                   )     No. 04-8400 (RSWL)(RZx)
                           )
WARNER BROS. ENTERTAINMENT )         -and-
INC., et al.,              )
                           )     No. 04-8776 (RSWL)(RZx)
           Defendants.     )
_____)
AND RELATED COUNTERCLAIMS. )
```

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL SUPPORT**

**EXHIBIT 84**

**2563**

04:37 1    nature of the question, even though it's phrased as a yes

04:37 2    or no question, calls for the witness to divulge work

04:37 3    product information which is to discuss matters with, and

04:38 4    I would object and instruct on that basis.

04:38 5            (Instruction not to answer.)

04:38 6            MR. BERGMAN:  Okay.

04:38 7        Q    After you reviewed this October 26 letter, did

04:38 8    you compare the terms set forth in the letter with those

04:38 9    set forth in your October 19 letter?

04:3810            THE WITNESS:  Can I answer that?

04:3811            MR. MARMARO:  Yes, unless Mr. Toberoff has an

04:3812    issue with it.

04:3813            MR. TOBEROFF:  I'm not going to object.  It's

04:3914    work product, but I think it's yours.

04:3915            MR. MARMARO:  As long as you have no objection,

04:3916    he can answer the question.

04:3917            THE WITNESS:  I was even a month or five or six

04:3918    weeks after the fact of the October 19th letter pretty

04:3919    familiar with the terms that set -- that were set forth

04:3920    in that letter, so on first read I didn't -- I don't

04:3921    believe I did a line-by-line comparison, but I believe I

04:3922    later did.

04:3923    BY MR. BERGMAN:

04:3924        Q    Okay.  Did you at any time after that line-by-

04:3925    line comparison advise Mr. Schulman that there was any

                                                              150

EXHIBIT 84
2564

04:40 1    inconsistency between your October 19 letter and his

04:40 2    October 26 letter?

04:40 3        A    I don't believe so.

04:40 4        Q    Your incoming phone log at GTRB 600 reflects a

04:40 5    call from Mark Toberoff on November 29, 2001.

04:40 6            MR. TOBEROFF:   What page is that on?

04:41 7            MR. BERGMAN:   600.

04:41 8        Q    Was that call completed?

04:41 9        A    No.

04:41 10       Q    Did you at any time return that call?

04:41 11       A    No.

04:41 12       Q    May I ask why?

04:41 13           MR. MARMARO:   I think you're going to be

04:41 14    invading his mental processes and work product, and I'll

04:41 15    object and instruct on that basis.

04:41 16           (Instruction not to answer.)

04:41 17           MR. BERGMAN:   Okay.

04:41 18       Q    If you would turn, please, Mr. Marks, to GTRB

04:41 19    604, that reflects a call from Mark Toberoff, quote, "Re:

04:42 20    Superman – potential buyout (end of November)."

04:42 21           Did you speak with Mr. Toberoff on that day?

04:42 22       A    I don't know if I spoke with Mr. Toberoff that

04:42 23    day.

04:42 24       Q    Did you return that call at some subsequent

04:42 25    time?

                                                            151

**U.S. LEGAL SUPPORT**

**EXHIBIT 84**
**2565**

04:42 1          A    I returned that call that day or subsequently,

04:42 2    yes.

04:42 3          Q    Can you tell me to the best of your recollection

04:42 4    what Mr. Toberoff said during that conversation and what

04:42 5    you said?

04:42 6          A    Yes.  I think Mr. Toberoff started the call by

04:43 7    saying that he had called me earlier and that I hadn't

04:43 8    returned his call, for which I apologized, and then he

04:43 9    introduced himself.  He said he was a lawyer and that he

04:43 10   represented individuals that had interests in rights to

04:43 11   movie and other properties that had come into those

04:43 12   rights either by way of reversions under the law or

04:43 13   reversions under Guild agreements.  I also recall him

04:43 14   saying that he had a separate company that was in the

04:43 15   business of acquiring intellectual property rights.  I

04:44 16   recall him saying that he was interested in the Superman

04:44 17   property and the Superboy property and had understood

04:44 18   that I was representing the Siegel family interest, and

04:44 19   he asked if he could talk to me about that.

04:44 20          My recollection is that my response was that we

04:44 21   were very far along with DC Comics and at a documentation

04:44 22   phase.  I may have said DC Comics or Warner Bros. because

04:45 23   I do think that part of the conversation, I have a

04:45 24   recollection of Mr. Toberoff saying that he had dealt

04:45 25   with Warner Bros. before, the people at Warner Bros., in

                                                                152

**EXHIBIT 84**
**2566**

04:45 1   connection with the "Wild Wild West" and rights involving

04:45 2   the "Wild Wild West" in which some deal had been made

04:45 3   that led to the making of the feature film.

04:45 4        Q    Do you recall anything else of that

04:45 5   conversation?

04:45 6        A    That's my best recollection as I sit here today.

04:45 7        Q    Do you recall telling Mr. Toberoff that you had

04:45 8   closed a deal with DC regarding the Siegel interest?

04:45 9        MR. TOBEROFF:  Leading.

04:4510        THE WITNESS:  My best recollection is how I

04:4611   described it, but I think I said we were in the process

04:4612   of -- in the documentation phase, were trying to document

04:4613   a deal.

04:4614   BY MR. BERGMAN:

04:4615        Q    And do you recall what response, if any,

04:4616   Mr. Toberoff made?

04:4617        A    I don't.

04:4618        Q    And do you recall anything further about the

04:4619   conversation or how it ended?

04:4620        A    I don't recall how it ended.

04:4621        Q    Did you as of February 6, '02 believe that you

04:4622   had closed a deal with DC for the Superman interest?

04:4623        MR. MARMARO:  The question is vague and

04:4624   ambiguous, calls for a legal conclusion, and again I am

04:4625   going to defer to Mr. Toberoff whether he has any

153

U.S. LEGAL SUPPORT

**EXHIBIT 84**
**2567**

04:47 1    objection to -- subject to those objections, having

04:47 2    Mr. Marks answer the question.

04:47 3            MR. TOBEROFF:  I object on work product

04:47 4    privilege, but I think I am not asserting that on behalf

04:47 5    of the clients.  I am not asserting that on behalf of the

04:47 6    Siegels.

04:47 7            MR. MARMARO:  Mr. Marks would be prepared to

04:47 8    answer the question if the Siegels have no objection to

04:47 9    it.

04:4710            MR. TOBEROFF:  As to your personal belief, no

04:4711    objection.

04:4712            THE WITNESS:  Well, if the question is did I

04:4713    think at this point there was a final, binding,

04:4714    enforceable agreement, the answer would be no, but I did

04:4715    believe that we had come to an agreement back on October

04:4716    19th, 2001, that was reflected exactly in the terms that

04:4817    I set out.

04:4818            At the end of that letter I wrote to John in

04:4819    substance and effect, "John, if I've gotten anything

04:4820    wrong, if I've misstated any of these terms, please let

04:4821    me know."  When John writes back on October 26, which I

04:4822    see later, in effect his letter is, "Yeah, you've got

04:4823    terms wrong.  My outline of the deal terms is different

04:4824    than your outline of the deal terms."  So while I thought

04:4825    we had an agreement on these terms, John evidently

                                                              154

**U.S. LEGAL SUPPORT**

**EXHIBIT 84**
**2568**

04:48 1   didn't, and where you don't have a meeting of the minds,

04:48 2   you don't have an agreement.

04:48 3   BY MR. BERGMAN:

04:48 4       Q    What portion or with respect to what elements of

04:48 5   the October 19 letter did Mr. Schulman's October 26

04:49 6   letter depart from, were different from?

04:49 7            MR. MARMARO:  Again, the same -- my position is

04:49 8   the same:  Mr. Marks will answer the question as long as

04:49 9   there is no objection from Mr. Toberoff.

04:4910            MR. TOBEROFF:  Not to the extent you are

04:4911   comparing the documents.

04:4912            MR. MARMARO:  Maybe we should have the documents

04:4913   in front of us.  Do you have any objection to him looking

04:4914   at Mr. Schulman's letter?

04:4915            MR. BERGMAN:  Not at all.

04:4916            THE WITNESS:  I know that one area of difference

04:4917   was the scope of the rights granted.  In my letter it

04:4918   referred to -- very specifically to the Superman property

04:4919   and the Spectre property.  That's what we had been

04:5020   talking about the whole time of our negotiations going

04:5021   back to the first meeting in 2 -- 1999.  And, of course,

04:5022   as you see here, the consideration, at least as set forth

04:5023   in my letter, for that matter I guess in John's letter,

04:5024   is based on revenue from the Superman and Spectre

04:5025   properties, yet John's letter referred more generally to

155

**EXHIBIT 84**
**2569**

05:15 1    between the two letters?

05:15 2          MR. MARMARO:  Do you mean the draft long form?

05:15 3          MR. BERGMAN:  Yes.

05:15 4          THE WITNESS:  I did put a call in to

05:15 5    Mr. Schulman during this time period, but I don't recall

05:15 6    that we spoke.  I found out he was on vacation.  Or I

05:16 7    would later learn he was on vacation.

05:16 8    BY MR. BERGMAN:

05:16 9          Q    Returning to your phone register at page 614 --

05:1610          A    One moment, please.

05:1611          Q    There is a reference to a phone call from

05:1612    Mr. Toberoff at 6:09.  Was that call completed that day?

05:1613    Did you return it?

05:1614          A    I don't know if it was completed that day.

05:1615          Q    Did you return it at some point?

05:1616          A    Yes, I believe so.

05:1717          Q    Before I get into that, let me just make sure.

05:1718    If you look at page 615, you'll see another reference to

05:1719    a phone call from Mr. Toberoff.

05:1720          Was your reply to the phone call that you

05:1721    received on the 24th made prior to the 30th, or was it

05:1722    after the 30th?

05:1723          MR. MARMARO:  30th of July?

05:1724          MR. BERGMAN:  Yes.

05:1725          THE WITNESS:  I believe, looking at these

                                                              165

U.S. LEGAL SUPPORT

**EXHIBIT 84**
**2570**

05:17 1    records, that what must have happened is I returned the

05:17 2    call, didn't reach Mr. Toberoff; he called back, and

05:17 3    we -- on the 30th, and we spoke subsequent, either on

05:17 4    that day or subsequent to that day.

05:17 5    BY MR. BERGMAN:

05:17 6        Q    Would it be accurate to say that you do not

05:18 7    recall speaking -- actually speaking with Mr. Toberoff

05:18 8    twice during the last week of July '02?

05:18 9        A    I recall one conversation.

05:18 10       Q    Okay.  Can you tell me to the best of your

05:18 11   recollection what was said by each of you and

05:18 12   Mr. Toberoff in that conversation?

05:18 13       A    I think Mr. Toberoff said he was -- wanted to

05:18 14   check in with me to see where we were in our dealings

05:18 15   with DC Comics, and I think I told him then that -- and I

05:18 16   may have also said it in our first conversation -- that

05:18 17   we had a confidentiality agreement with DC Comics, and I

05:19 18   didn't feel at liberty to discuss the status of our

05:19 19   dealings with him.

05:19 20       Mr. Toberoff said, "Can you tell me what DC

05:19 21   Comics offered you," and I said, "No.  We have a

05:19 22   confidentiality agreement."

05:19 23       And I believe Mr. Toberoff said, "Would you be

05:19 24   willing to enter into negotiations with me," and I

05:19 25   believe I said, "Initiating negotiations, no.  That's

166

**EXHIBIT 84**
**2571**

05:19 1   something that makes me very uncomfortable.  If you have

05:19 2   an offer, present it to me, and I'll present it to the

05:19 3   client."

05:19 4       Q    Do you recall what he said in response?

05:20 5       A    I think that was the summary of the substance of

05:20 6   the conversation other than goodbyes.

05:20 7       Q    If you turn the page to 616, you will see a

05:20 8   reference to a conference call, quote, "with Mark, Kevin,

05:20 9   and Ari Emanuel at Endeavor," close quote.  There also

05:2010   appears to be a notation, "approximately 20 minutes."

05:2011           Do you see that?

05:2012       A    Yes, and it looks like the "20" is crossed out,

05:2013   and it says "5 to 10" above it.

05:2014       Q    I see.  Okay.

05:2015           Off the record.

05:2016           (Discussion held off the record.)

05:2017   BY MR. BERGMAN:

05:2018       Q    Would you describe to the best of your

05:2119   recollection and as specifically as possible what was

05:2120   said by each of the three of you during that

05:2121   conversation?

05:2122       A    I think this record may actually be setting up a

05:2123   conference call rather than the conference call, but

05:2124   ultimately there was a conference call at this time

05:2125   period.

                                                                167

**EXHIBIT 84**
**2572**

05:21 1    Q   I see.  Okay.

05:21 2       Do you recall how long after August 7 that

05:21 3 conference call took place?

05:21 4    A   Within the next day or two.

05:21 5    Q   I see.

05:21 6       Would you tell me --

05:21 7    A   If not on that date.

05:21 8    Q   -- what was involved and what was said in that

05:21 9 conversation?

05:22 10    A   Yes.  Mr. Toberoff and Mr. Emanuel both spoke.

05:22 11 I can't completely tell you who said what, but I think

05:22 12 Mr. Toberoff may have very briefly referenced past

05:22 13 conversations, and then I believe it was Mr. Emanuel who

05:22 14 explained that either they or some other people or

05:22 15 perhaps some members of the Endeavor Talent Agency had

05:22 16 set up a fund or were in the process of setting up a fund

05:22 17 to acquire intellectual property rights which they would

05:22 18 then package with clients from the Endeavor Talent

05:23 19 Agency, then take those to studios to exploit the

05:23 20 package, and they understood that the Siegel family had

05:23 21 an interest in the termination rights and viewed that as

05:23 22 perhaps the most valuable of properties and wanted to

05:23 23 make a proposal.

05:23 24    Q   Okay.  What did you say?

05:23 25    A   I said in substance and effect, "I'm listening."

168

**EXHIBIT 84**
**2573**

05:23 1   And I'm not sure who spoke, but they made a proposal of

05:23 2   $15 million and what was described as a meaningful back

05:23 3   end, which I understood to be a contingent compensation

05:23 4   position or a royalty position in the exploitation of the

05:23 5   property.

05:24 6        Q    And was that for the entire Siegel Superman

05:24 7   interest?  Did it include Michael's?

05:24 8        A    I don't think that was discussed, but that's how

05:24 9   I understood it.

05:24 10       Q    Did they say -- attempt to quantify what that

05:24 11  meaningful back end would be?

05:24 12       A    They did not.  I believe I asked, but they did

05:24 13  not.

05:24 14       Q    And what else did you say?

05:24 15       A    I asked if there was anything else, and they

05:24 16  said "No," and then I asked if this was a proposal that

05:24 17  was conditioned on their doing due diligence about the

05:24 18  rights, and they said again in substance and effect, "No,

05:25 19  it's not.  We've done our due diligence already.  This is

05:25 20  the offer."

05:25 21       Q    Anything else you can recall of that

05:25 22  conversation?

05:25 23       A    I think I said, "Thank you, and I will

05:25 24  communicate this to the client" or "take this back to the

05:25 25  client."

                                                                   169

EXHIBIT 84
2574

05:25 1        Q    And did you in fact do that?

05:25 2            MR. MARMARO:  Before you answer the question, is

05:25 3    there any objection to the answer?  The question calls

05:25 4    for a communication between Mr. Marks and the clients.

05:25 5            MR. TOBEROFF:  Without a waiver, no, whether or

05:25 6    not you communicated that to the client.

05:25 7            MR. MARMARO:  A yes or a no.

05:25 8            THE WITNESS:  Yes.

05:25 9    BY MR. BERGMAN:

05:2510        Q    And was that a communication within let's say a

05:2511    week of the conference call?

05:2512        A    Yes.

05:2513        Q    Your phone register, 617, indicates a call from

05:2614    Mr. Toberoff on August 29.  Was that call returned?

05:2615        A    I -- was it returned.  I don't know.

05:2616            MR. TOBEROFF:  Which number -- Bates number?

05:2617            MR. BERGMAN:  617.

05:2618        Q    Do you recall having a telephone conversation

05:2619    with Mr. Toberoff subsequent to the conference call?

05:2620        A    The best I can say is that it may be that

05:2621    Mr. Toberoff called to see if I had a response, and I

05:2622    could only have said at that time that the clients had

05:2723    been away, and I don't have a response.  I have -- I am

05:2724    not certain about that.

05:2725        Q    Did there ever come a time when you communicated

                                                              170

**U.S. LEGAL SUPPORT**

**EXHIBIT 84**
**2575**

```
 1   STATE OF CALIFORNIA    )
                            ) ss
 2   COUNTY OF LOS ANGELES  )

 3

 4          I, DAVID S. COLEMAN, a Certified Shorthand

 5   Reporter, do hereby certify:

 6          That prior to being examined, the witness in

 7   the foregoing proceedings was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing

 9   but the truth;

10          That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14          I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   nor in anywise interested in the outcome thereof.

17          In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated:   OCT 1 7 2006

21

22                        _____

23                        DAVID S. COLEMAN
                          CSR No. 4613
24

25
```

**EXHIBIT 84**
**2576**

# EXHIBIT 85

MARK WARREN PEARY – 6/29/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

| | |
|---|---|
| DC COMICS, ) | |
| ) | |
| Plaintiff, ) | No. CV-10-3633 ODW (RZx) |
| ) | |
| VS. ) | |
| ) | |
| PACIFIC PICTURES CORPORATION,) | |
| IP WORLDWIDE, LLC, IPW, LLC, ) | |
| MARC TOBEROFF, an individual,) | |
| Laura Siegel Larson, as ) | |
| personal representative of ) | |
| the ESTATE OF JOSEPH SHUSTER,) | |
| JEAN ADELE PEAVY, an ) | |
| individual, JOANNE SIEGEL, ) | |
| an individual, LAURA SIEGEL ) | |
| LARSON, an individual, and ) | |
| DOES 1-10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

CSR No. 10094

**EXHIBIT 85**
**2577**

MARK WARREN PEARY - 6/29/2011

Page 65

| | | |
|---|---|---|
| 1 | Q. Was that mediation session in April 2010 | 11:47:54 |
| 2 | the last time you saw her? | 11:47:56 |
| 3 | A. In person, yes. | 11:48:00 |
| 4 | Q. You said you spoke with her daughter, | 11:48:02 |
| 5 | Laura? | 11:48:04 |
| 6 | A. Yes. | 11:48:05 |
| 7 | Q. When was that? | 11:48:07 |
| 8 | A. After she died. | 11:48:09 |
| 9 | Q. What was the purpose of that?  Phone call? | 11:48:11 |
| 10 | A. Yes. | 11:48:14 |
| 11 | Q. To give your condolences? | 11:48:16 |
| 12 | A. Yes. | 11:48:17 |
| 13 | Q. And have you spoken to Laura since then? | 11:48:18 |
| 14 | A. No. | 11:48:25 |
| 15 | Q. You identified the document that the | 11:48:28 |
| 16 | Siegels and you signed as a consent agreement. | 11:48:30 |
| 17 | Is the word -- is that the title of the | 11:48:34 |
| 18 | document? | 11:48:37 |
| 19 | A. I believe the title, if I'm allowed to say | 11:48:43 |
| 20 | that -- | 11:48:45 |
| 21 | MR. TOBEROFF:  Objection.  Actually, you | 11:48:46 |
| 22 | can -- you can testify as to the title, but that's | 11:48:50 |
| 23 | it.  Not to any contents of the document. | 11:48:53 |
| 24 | THE WITNESS:  I recall the title says | 11:48:57 |
| 25 | "Superman Agreement." | 11:48:59 |

EXHIBIT 85
2578

MARK WARREN PEARY - 6/29/2011

Page 66

```
 1    BY MR. PETROCELLI:                                      11:48:59
 2        Q.   Why did you use the word consent agreement?   11:49:03
 3        A.   It's --                                       11:49:08
 4            MR. TOBEROFF:   You can only answer if that    11:49:11
 5    answer is not based on communication with your         11:49:12
 6    attorney.                                              11:49:14
 7            THE WITNESS:   It's -- it's -- it's all        11:49:15
 8    based on my communication with my attorney.            11:49:17
 9            (Unanswered question.)                         11:49:17
10    BY MR. PETROCELLI:                                     11:49:17
11        Q.   What's --                                     11:49:23
12        A.   The term.                                     11:49:23
13        Q.   The use of the term?                          11:49:25
14        A.   The use of the term, yes.                     11:49:26
15        Q.   When you signed the 2008 consent agreement,   11:49:30
16    did you -- what did you understand the purpose of      11:49:50
17    that agreement to be?  Why were you signing it?        11:49:52
18            MR. TOBEROFF:   You can only answer that --    11:49:57
19    actually, I instruct you not to answer because the     11:49:58
20    sole -- your sole understanding is through             11:50:01
21    communications with me.                                11:50:03
22            (Unanswered question.)                         11:50:04
23    BY MR. PETROCELLI:                                     11:50:04
24        Q.   You read the document before you signed it,   11:50:05
25    didn't you?                                            11:50:05
```

Merrill   Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law

**EXHIBIT 85**
**2579**

MARK WARREN PEARY - 6/29/2011

Page 67

```
 1        A.   Yes, but I'll have to follow my attorney's      11:50:09
 2   advice.                                                    11:50:11
 3        Q.   Well, based on your reading of the               11:50:12
 4   document, what did you understand the purpose of          11:50:14
 5   your signing it to be?                                     11:50:16
 6             MR. TOBEROFF:   I instruct you not to answer    11:50:18
 7   if you -- put it this way:  You can only answer the        11:50:19
 8   question if you have an understanding independent of       11:50:23
 9   your conversations with me.                                11:50:24
10             THE WITNESS:   Well, all my understanding is     11:50:28
11   based on my communication with my attorney, so I          11:50:30
12   can't say anything.                                        11:50:32
13             (Unanswered question.)                           11:50:33
14   BY MR. PETROCELLI:                                         11:50:33
15        Q.   Are you saying that when -- when you read       11:50:34
16   the document, you derived absolutely no                    11:50:36
17   understanding from reading the words?                      11:50:39
18        A.   My understanding is intricately bound with     11:50:41
19   my communications with Marc Toberoff.                      11:50:43
20        Q.   Can you answer my question?                      11:50:46
21        A.   I don't believe I can.                           11:50:47
22             MR. TOBEROFF:   He did.                          11:50:49
23             MR. PETROCELLI:   It wasn't responsive to my    11:50:52
24   question.                                                  11:50:53
25        Q.   My question was, when you read the document      11:50:54
```

EXHIBIT 85
2580

MARK WARREN PEARY - 6/29/2011

Page 68

```
 1    are you saying that you drew no understanding at all      11:50:57
 2    from reading the words on the page of the document?       11:51:00
 3         A.   It's -- it's all based upon -- my              11:51:07
 4    understanding is intricately bound to my                 11:51:10
 5    communications with my attorney.                         11:51:14
 6         Q.   Are you saying that had you not spoken to      11:51:19
 7    your attorney, you would have had no idea what --        11:51:20
 8    what you were signing?                                    11:51:26
 9         A.   What, if I had no idea?                        11:51:28
10         Q.   Right.   You signed a -- a document together  11:51:30
11    with other individuals.   Are you saying that you did   11:51:34
12    not understand what you were signing except for what    11:51:38
13    Marc Toberoff had to tell you?                           11:51:41
14         MR. TOBEROFF:   Asked and answered.                11:51:42
15    Misstates his testimony.                                 11:51:43
16         THE WITNESS:   My understanding is -- is           11:51:47
17    bound up, what -- whatever I have is bound up.          11:51:52
18    BY MR. PETROCELLI:                                       11:51:52
19         Q.   I appreciate you keep repeating that phrase   11:51:56
20    that your understanding is bound up or intricately      11:52:00
21    bound up.   I'm asking you something different than     11:52:03
22    that.   I'm not required to simply accept that          11:52:05
23    phrase.                                                  11:52:07
24         A.   Uh-huh.                                        11:52:07
25         Q.   Did you understand that you were entering     11:52:08
```

**EXHIBIT 85**
**2581**

MARK WARREN PEARY - 6/29/2011

Page 69

| | | |
|---|---|---|
| 1 | into a contract, an agreement, with the Siegels when | 11:52:12 |
| 2 | you signed the document? | 11:52:17 |
| 3 | A.   Yes. | 11:52:23 |
| 4 | Q.   Did you understand that the agreement that | 11:52:24 |
| 5 | you were entering into required that you could not | 11:52:25 |
| 6 | settle any claim with DC Comics without the consent | 11:52:32 |
| 7 | of the Siegels? | 11:52:38 |
| 8 | MR. TOBEROFF:   I instruct you not to | 11:52:39 |
| 9 | answer.   The document has been held to be privileged | 11:52:41 |
| 10 | and off limits and they can't ask you questions | 11:52:44 |
| 11 | about the contents of the document.   Instruct you | 11:52:47 |
| 12 | not to answer. | 11:52:49 |
| 13 | (Unanswered question.) | 11:52:50 |
| 14 | MR. PETROCELLI:   I don't agree with that as | 11:52:50 |
| 15 | you well know. | 11:52:53 |
| 16 | Q.   Is there any arrangement whereby you would | 11:52:54 |
| 17 | have the authority to approve any kind of settlement | 11:52:57 |
| 18 | that Joanne Siegel might enter into with DC Comics? | 11:52:59 |
| 19 | MR. TOBEROFF:   Instruct you not to answer. | 11:53:03 |
| 20 | (Unanswered question.) | 11:53:07 |
| 21 | MR. PETROCELLI:   Marc, you allowed that | 11:53:07 |
| 22 | verbatim question to be answered at the first -- at | 11:53:09 |
| 23 | the Siegel session of his deposition. | 11:53:12 |
| 24 | MR. TOBEROFF:   I'm instructing him not to | 11:53:13 |
| 25 | answer and as you suggested we shouldn't debate | 11:53:15 |

**EXHIBIT 85**
**2582**

MARK WARREN PEARY - 6/29/2011

Page 351

| | | |
|---|---|---|
| 1 | THE WITNESS: Well, my understanding is | 19:03:51 |
| 2 | based on discussions with counsel. | 19:03:53 |
| 3 | BY MR. PETROCELLI: | 19:03:53 |
| 4 | Q. I'm not asking about legal advice. Your -- | 19:03:56 |
| 5 | in your capacity as executor of the estate, how is | 19:03:58 |
| 6 | it you -- you've asked for the powers to be granted | 19:04:03 |
| 7 | to you and they were granted to go and take various | 19:04:07 |
| 8 | proceedings to -- with respect to the Shuster | 19:04:15 |
| 9 | termination interest for the benefit of the estate. | 19:04:17 |
| 10 | How is it that you as the executor intend | 19:04:20 |
| 11 | to get any money for the termination interest? | 19:04:25 |
| 12 | MR. TOBEROFF: Same instruction. | 19:04:30 |
| 13 | (Unanswered question.) | 19:04:31 |
| 14 | BY MR. PETROCELLI: | 19:04:31 |
| 15 | Q. Have you given any thought to that? | 19:04:33 |
| 16 | MR. TOBEROFF: Same instruction. | 19:04:36 |
| 17 | (Unanswered question.) | 19:04:36 |
| 18 | MR. PETROCELLI: That -- | 19:04:37 |
| 19 | MR. TOBEROFF: You can answer whether or | 19:04:39 |
| 20 | not, "yes" or "no," you've given any thought to it. | 19:04:40 |
| 21 | You can answer that. | 19:04:42 |
| 22 | THE WITNESS: Yes. I've given thought. | 19:04:45 |
| 23 | MR. TOBEROFF: Okay. | 19:04:47 |
| 24 | BY MR. PETROCELLI: | 19:04:47 |
| 25 | Q. And what -- what thoughts have you had on | 19:04:48 |

**EXHIBIT 85**
**2583**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | that subject? | 19:04:50 |
| 2 | MR. TOBEROFF:  Same instruction. | 19:04:51 |
| 3 | (Unanswered question.) | 19:04:51 |
| 4 | BY MR. PETROCELLI: | 19:04:51 |
| 5 | Q.  Are you incapable of having a thought on | 19:04:55 |
| 6 | that subject that does not involve Marc Toberoff? | 19:04:57 |
| 7 | MR. TOBEROFF:  Argumentative. | 19:05:01 |
| 8 | MR. PETROCELLI:  It's definitely not | 19:05:02 |
| 9 | argumentative. | 19:05:04 |
| 10 | Q.  In your role as executor of the estate, is | 19:05:07 |
| 11 | it your testimony that you have been able to -- you | 19:05:10 |
| 12 | can't do anything or even think of anything that | 19:05:15 |
| 13 | doesn't involve the legal advice of Marc Toberoff? | 19:05:17 |
| 14 | A.  That's correct. | 19:05:22 |
| 15 | Q.  Okay.  So everything that you do and | 19:05:25 |
| 16 | everything that you know as the executor of the | 19:05:27 |
| 17 | estate is based on the legal advice of Marc | 19:05:32 |
| 18 | Toberoff? | 19:05:37 |
| 19 | MR. TOBEROFF:  Vague. | 19:05:37 |
| 20 | THE WITNESS:  Yes.  Follow my counsel. | 19:05:41 |
| 21 | BY MR. PETROCELLI: | 19:05:43 |
| 22 | Q.  And -- well, I didn't ask you whether you | 19:05:43 |
| 23 | follow your counsel.  I'm asking you in your role | 19:05:45 |
| 24 | as -- you're executor, you don't have any judgment | 19:05:47 |
| 25 | or any ideas or any thoughts other than what | 19:05:54 |

**EXHIBIT 85**
**2584**

MARK WARREN PEARY - 6/29/2011

Page 353

| | | |
|---|---|---|
| 1 | Toberoff discusses with you. | 19:06:00 |
| 2 | Is that correct? | 19:06:00 |
| 3 | MR. TOBEROFF:  Misstates his testimony. | 19:06:03 |
| 4 | You can answer. | 19:06:04 |
| 5 | THE WITNESS:  That's correct. | 19:06:07 |
| 6 | BY MR. PETROCELLI: | 19:06:07 |
| 7 | Q.  Do you believe you're fit to be an executor | 19:06:16 |
| 8 | under those circumstances? | 19:06:18 |
| 9 | A.  Yes. | 19:06:22 |
| 10 | Q.  Have you disclosed to the court that you | 19:06:27 |
| 11 | refuse to say anything about your thinking, your | 19:06:29 |
| 12 | judgement, your thoughts or your actions because | 19:06:36 |
| 13 | everything is based on conversations with Marc | 19:06:38 |
| 14 | Toberoff as to which you will claim the privilege? | 19:06:41 |
| 15 | Is that something that you indicated to the probate | 19:06:43 |
| 16 | court when you sought permission to act as executor? | 19:06:46 |
| 17 | MR. TOBEROFF:  Misstates testimony and the | 19:06:53 |
| 18 | assertion of privilege. | 19:06:55 |
| 19 | THE WITNESS:  No. | 19:06:56 |
| 20 | BY MR. PETROCELLI: | 19:06:56 |
| 21 | Q.  Do you understand that you have fiduciary | 19:06:58 |
| 22 | duties to people other than your mother as the | 19:06:59 |
| 23 | beneficiary? | 19:07:07 |
| 24 | MR. TOBEROFF:  Calls for a legal | 19:07:08 |
| 25 | conclusion.  Lacks foundation.  Assumes facts. | 19:07:09 |

**EXHIBIT 85**
**2585**

MARK WARREN PEARY - 6/29/2011

Page 354

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 19:07:09 |
| 2 | Q.  Who do you understand -- in your role as | 19:07:16 |
| 3 | the executor, who do you understand that you owe a | 19:07:18 |
| 4 | fiduciary duty to? | 19:07:23 |
| 5 | MR. TOBEROFF:  Calls for a legal | 19:07:24 |
| 6 | conclusion. | 19:07:24 |
| 7 | THE WITNESS:  My understanding is the | 19:07:26 |
| 8 | Shuster heirs. | 19:07:29 |
| 9 | BY MR. PETROCELLI: | 19:07:29 |
| 10 | Q.  And who is that? | 19:07:31 |
| 11 | A.  Jean, myself and my sister. | 19:07:35 |
| 12 | Q.  Is that a thought that you've had without | 19:07:38 |
| 13 | talking to Marc Toberoff or did Mr. Toberoff tell | 19:07:40 |
| 14 | you that? | 19:07:47 |
| 15 | A.  No, I'm -- I'm aware of that on my own. | 19:07:47 |
| 16 | Q.  Is that the only thing you're aware of on | 19:07:49 |
| 17 | your own? | 19:07:51 |
| 18 | MR. TOBEROFF:  About anything? | 19:07:52 |
| 19 | MR. PETROCELLI:  Correct. | 19:07:54 |
| 20 | Q.  Having to do with the administration of the | 19:07:56 |
| 21 | estate, and in particular, the termination interest. | 19:07:58 |
| 22 | MR. TOBEROFF:  Vague.  Overbroad. | 19:08:01 |
| 23 | THE WITNESS:  I don't know.  You would have | 19:08:03 |
| 24 | to be specific. | 19:08:04 |
| 25 | BY MR. PETROCELLI: | 19:08:04 |

**EXHIBIT 85**
**2586**

MARK WARREN PEARY - 6/29/2011

```
 1    STATE OF CALIFORNIA       )
                                )  ss.
 2    COUNTY OF LOS ANGELES     )

 3

 4         I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7         I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10         Prior to being examined the witness was by

11    me first duly sworn;

12         The foregoing transcript is a true record

13    of the testimony given.

14

15    Dated   July 14, 2011              .

16

17                   _____

18                        Shanda Gabriel
                          CSR 10094

19

20

21

22

23

24

25
```

Merrill   Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law

**EXHIBIT 85**
**2587**

# EXHIBIT 86

**CERTIFIED COPY**

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

## *LARSON, LAURA SIEGEL - Vol. 1*

### *July 22, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 86**
**2588**

LAURA SIEGEL LARSON - 7/22/2011

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

| | |
|---|---|
| DC COMICS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | |
| PACIFIC PICTURES CORPORATION, ) | CV-10-3633 ODW (RZx) |
| IP WORLDWIDE, LLC, IPW, LLC, ) | |
| MARC TOBEROFF, an individual, ) | |
| MARK WARREN PEARY, as ) | |
| personal representative of ) | |
| the ESTATE OF JOSEPH SHUSTER, ) | |
| JEAN ADELE PEAVY, an ) | |
| individual, JOANNE SIEGEL, ) | |
| an individual, LAURA SIEGEL ) | |
| LARSON, an individual, and ) | |
| DOES 1-10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ) | |

DEPOSITION OF:

LAURA SIEGEL LARSON

FRIDAY, JULY 22, 2011

9:45 A.M.


Reported by:

Kathleen E. McCarthy

CSR No. 4483

**EXHIBIT 86**
**2589**

LAURA SIEGEL LARSON - 7/22/2011

Page 297

| | | |
|---|---|---|
| 1 | A. Correct. | 18:33:20 |
| 2 | Q. And that you and your mother would retain | 18:33:21 |
| 3 | full and complete decision making authority with | 18:33:24 |
| 4 | respect to such a disposition; correct? | 18:33:26 |
| 5 | A. Where is that, please? I didn't have a | 18:33:29 |
| 6 | chance to read the entire document. | 18:33:31 |
| 7 | Q. 3(b). | 18:33:33 |
| 8 | A. Correct. | 18:33:39 |
| 9 | Q. 3(c) is the indemnity that you're getting | 18:33:40 |
| 10 | from Mr. Emanuel in case there's any litigation | 18:33:43 |
| 11 | arising out of the purchase of the Michael Siegel | 18:33:46 |
| 12 | interest; correct? | 18:33:49 |
| 13 | A. Correct. | 18:33:49 |
| 14 | Q. And you understood that might apply if | 18:33:49 |
| 15 | Michael Siegel himself filed suit against you; | 18:33:52 |
| 16 | correct? | 18:33:54 |
| 17 | A. I believe so. | 18:33:54 |
| 18 | Q. In paragraph 3(d) you ask Mr. Emanuel to | 18:34:03 |
| 19 | reimburse you for the Michael Siegel 25 percent share | 18:34:08 |
| 20 | of the expenses that you had been advancing; correct? | 18:34:13 |
| 21 | A. That we advanced on behalf of the entire | 18:34:19 |
| 22 | interest. | 18:34:37 |
| 23 | Q. In the first paragraph of this document, | 18:34:37 |
| 24 | Exhibit 46, again it makes reference to various risks | 18:34:42 |
| 25 | and potential problems regarding Michael Siegel and | 18:34:48 |

**EXHIBIT 86**
**2590**

LAURA SIEGEL LARSON - 7/22/2011

Page 298

| | | |
|---|---|---|
| 1 | the mitigation of possible conflicts of interest with | 18:34:52 |
| 2 | respect to the following proposed remedial actions. | 18:34:56 |
| 3 | What were the risks, the potential problems, and the | 18:35:00 |
| 4 | possible conflicts? | 18:35:05 |
| 5 | A.   I really don't recall. | 18:35:07 |
| 6 | Q.   You can't remember a single thing about that? | 18:35:08 |
| 7 | A.   Not today. | 18:35:11 |
| 8 | Q.   Take a look at the next document in order, | 18:35:56 |
| 9 | Exhibit 30. | 18:36:03 |
| 10 | (Whereupon, Plaintiff's Exhibit 30 | |
| 11 | was placed before the witness.) | |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   This is a letter from Michael Siegel to you | 18:36:12 |
| 14 | dated May 13; is that correct? | 18:36:15 |
| 15 | A.   Yes. | 18:36:19 |
| 16 | Q.   When is the last time you saw this document? | 18:36:22 |
| 17 | A.   It's been quite a while. | 18:36:25 |
| 18 | Q.   When you received documents -- well, | 18:36:34 |
| 19 | withdrawn. | 18:36:37 |
| 20 | A.   I'm sorry.  What was -- | 18:36:38 |
| 21 | Q.   Withdrawn.  Let me start all over again. | 18:36:40 |
| 22 | When did you first give a copy of this | 18:36:42 |
| 23 | document to Mr. Toberoff? | 18:36:45 |
| 24 | A.   Whenever there was a request for the | 18:36:50 |
| 25 | production of documents, whenever that was. | 18:36:53 |

EXHIBIT 86
2591

LAURA SIEGEL LARSON - 7/22/2011

Page 299

| | |
|---|---|
| 1    Q.   In what case? | 18:36:56 |
| 2    A.   Good question.   There's just so many cases. | 18:36:59 |
| 3  You know, they're all kind of running together for me, | 18:37:04 |
| 4  so I don't remember. | 18:37:06 |
| 5    Q.   When you provided documents from time to time | 18:37:12 |
| 6  to Mr. Toberoff, did you maintain copies for yourself? | 18:37:15 |
| 7    A.   No. | 18:37:20 |
| 8    Q.   Never? | 18:37:21 |
| 9    A.   I don't -- I don't believe so. | 18:37:21 |
| 10    Q.   Even letters with your stepbrother? | 18:37:23 |
| 11    A.   Well, I knew that he had them, and if I | 18:37:26 |
| 12  needed them, I could always get a copy from him. | 18:37:28 |
| 13    Q.   This letter starts out "Thank you for your | 18:37:42 |
| 14  letter of November 2 of last year."  What letter was | 18:37:44 |
| 15  that? | 18:37:49 |
| 16    A.   A letter I sent him on November 2. | 18:37:49 |
| 17    Q.   Do you have any idea what you wrote in that | 18:37:51 |
| 18  letter? | 18:37:53 |
| 19    A.   No, I don't. | 18:37:54 |
| 20    Q.   Now, you see -- you recall receiving this | 18:38:01 |
| 21  letter? | 18:38:05 |
| 22    A.   Well, the part that I remember is when he | 18:38:05 |
| 23  told me that his mother passed away. | 18:38:07 |
| 24    Q.   That's in the second sentence. | 18:38:11 |
| 25    A.   That's right. | 18:38:13 |

**EXHIBIT 86**
**2592**

LAURA SIEGEL LARSON - 7/22/2011

Page 300

| | | |
|---|---|---|
| 1 | Q.  And then the rest of this letter goes on to | 18:38:13 |
| 2 | discuss his concerns about Mr. Toberoff, and are you | 18:38:17 |
| 3 | suggesting that none of that was important to you? | 18:38:21 |
| 4 | A.  I didn't say it wasn't important to me.  I | 18:38:27 |
| 5 | just said that the thing that made me remember this | 18:38:31 |
| 6 | letter was the fact that he said that his mother | 18:38:34 |
| 7 | passed away. | 18:38:34 |
| 8 | Q.  Do you know what prompted his sending this | 18:38:50 |
| 9 | letter to you? | 18:38:52 |
| 10 | A.  I don't know. | 18:38:54 |
| 11 | Q.  Did you respond to it? | 18:38:59 |
| 12 | A.  I'm sure I did. | 18:39:02 |
| 13 | Q.  What did you say? | 18:39:05 |
| 14 | A.  I'm sorry, but I don't recall. | 18:39:08 |
| 15 | Q.  He said here in the -- directing your | 18:39:14 |
| 16 | attention to the second paragraph, okay -- | 18:39:18 |
| 17 | A.  Um-hum. | 18:39:21 |
| 18 | Q.  -- it starts out "I really wish to discuss | 18:39:22 |
| 19 | Marc Toberoff."  And it says in the third sentence: | 18:39:26 |
| 20 | "I told you when he first contacted | 18:39:37 |
| 21 | me, he wanted to buy my share of the | 18:39:41 |
| 22 | copyright.  Marc had a mysterious | 18:39:47 |
| 23 | billionaire who wanted to invest in | 18:39:51 |
| 24 | the Superman copyright, put | 18:39:52 |
| 25 | 15 million dollars up front plus | 18:39:54 |

**EXHIBIT 86**
**2593**

LAURA SIEGEL LARSON - 7/22/2011

Page 301

| | | |
|---|---|---|
| 1 | participation.  When you signed with | 18:39:57 |
| 2 | Marc the billionaire invested | 18:40:01 |
| 3 | elsewhere." | 18:40:04 |
| 4 | Do you know where he got that information? | 18:40:08 |
| 5 | A.    I have no idea. | 18:40:10 |
| 6 | Q.    You don't think he made it up, do you? | 18:40:11 |
| 7 | A.    You know, Michael was a very confused guy, on | 18:40:14 |
| 8 | a lot of medication, and when he would write things to | 18:40:21 |
| 9 | me, such as asking me did I know that Marc was the | 18:40:25 |
| 10 | attorney for the Shusters, well, of course I did, and, | 18:40:29 |
| 11 | you know -- | 18:40:33 |
| 12 | Q.    He's telling you that Marc Toberoff contacted | 18:40:35 |
| 13 | him and said he had a mysterious billionaire. | 18:40:38 |
| 14 | A.    Yeah.  Well, I don't know where that came | 18:40:43 |
| 15 | from. | 18:40:45 |
| 16 | Q.    Did you think your brother -- your | 18:40:46 |
| 17 | stepbrother was lying? | 18:40:48 |
| 18 | A.    I don't -- I don't know that he came up with | 18:40:49 |
| 19 | the wording himself.  You know, I mean it -- I had | 18:40:57 |
| 20 | never heard this referred to in any way other than in | 18:41:01 |
| 21 | this letter, "mysterious billionaire."  I don't know | 18:41:04 |
| 22 | what that means. | 18:41:08 |
| 23 | Q.    Put $15 million up front, plus participation, | 18:41:12 |
| 24 | that happened to be exactly the same number that | 18:41:15 |
| 25 | Mr. Emanuel had offered you; correct? | 18:41:19 |

**EXHIBIT 86**
**2594**

LAURA SIEGEL LARSON - 7/22/2011

Page 306

```
1              MR. TOBEROFF:  I remember.  Incomplete          18:45:20

2    hypothetical.                                             18:45:23

3    BY MR. PETROCELLI:

4         Q.   In other words, you understand my question.    18:45:24

5    You had no hard and fast rule that if you were going      18:45:27

6    to sell your interest to IP Worldwide or Mr. Emanuel,     18:45:29

7    that Mr. Toberoff was not to participate economically;    18:45:33

8    correct?                                                  18:45:36

9         A.   It was never discussed.                         18:45:37

10             MR. TOBEROFF:  Same objection.                  18:45:39

11   BY MR. PETROCELLI:

12        Q.   I understand it wasn't discussed, but you       18:45:40

13   didn't have the state of mind that you were going to      18:45:42

14   be adamantly opposed to it; correct?                      18:45:43

15             MR. TOBEROFF:  Incomplete hypothetical.         18:45:46

16             THE WITNESS:  I didn't form an opinion.         18:45:47

17   BY MR. PETROCELLI:

18        Q.   Never; right?  One way or the other; correct?   18:45:49

19        A.   Not that I can recall.                          18:45:51

20        Q.   One way or the other; correct?                  18:45:52

21        A.   Correct.                                        18:45:54

22        Q.   Okay.                                           18:45:55

23        A.   I think, if I'm following that.                 18:45:55

24        Q.   By the way, when you wrote your stepbrother     18:46:18

25   back, did you straighten him out on things that you       18:46:21
```

**EXHIBIT 86**
**2595**

LAURA SIEGEL LARSON - 7/22/2011

Page 307

1    think he had wrong in his letter to you of May 13?          18:46:24

2        A.    I did my best to.                                 18:46:27

3        Q.    Can you explain to me as best as you can, for     18:46:29

4    example, what you said about the billionaire, the           18:46:32

5    mysterious billionaire?                                     18:46:36

6        A.    You know, I don't remember how I put it to        18:46:37

7    him, but I, you know, I tried to in as simple a manner      18:46:39

8    as possible explain what he had wrong in this letter.       18:46:46

9    Regarding specifically the billionaire, I really don't      18:46:51

10   recall what I said.                                         18:46:54

11       Q.    Did you type the letter yourself?                 18:46:55

12       A.    Yes, I did.

13       Q.    Did your mother help you prepare it?              18:46:59

14       A.    I think she had input.                            18:47:01

15       Q.    Now, did you explain to him the situation         18:47:02

16   with the Shusters?                                          18:47:05

17       A.    Well, I cleared up some of his misconceptions     18:47:09

18   about the Shusters.                                         18:47:13

19       Q.    How did you clear them up?  In other words,       18:47:14

20   just generally what did you say?                            18:47:16

21       A.    Once again, you're asking me to answer            18:47:19

22   something that I really can't recall.  I'm sorry.           18:47:22

23       Q.    When you said you cleared up the Shuster          18:47:25

24   issue for him, did you explain to him that you were         18:47:27

25   aware that Mr. Toberoff was working with the Shusters?      18:47:29

EXHIBIT 86
2596

LAURA SIEGEL LARSON - 7/22/2011

Page 308

| | | |
|---|---|---|
| 1 | A.    I'm sure I did. | 18:47:33 |
| 2 | Q.    Do you know when you wrote your responsive | 18:47:36 |
| 3 | letter back to this May 13 letter? | 18:47:39 |
| 4 | A.    I don't know exactly. | 18:47:41 |
| 5 | Q.    Did you have Mr. Toberoff assist in any way | 18:47:43 |
| 6 | in the response that you prepared? | 18:47:48 |
| 7 | A.    I believe I had him look at it. | 18:47:51 |
| 8 | Q.    And before you sent it to Mr. -- | 18:47:53 |
| 9 | A.    Yes. | 18:47:55 |
| 10 | Q.    And why did you have him look at it? | 18:47:56 |
| 11 | A.    Well, you know, it was dealing with issues | 18:47:58 |
| 12 | that had to do with legal matters, and I didn't want | 18:48:04 |
| 13 | to misstate something that basically would, you know, | 18:48:07 |
| 14 | come back and bite me in the butt later.  So I just | 18:48:11 |
| 15 | wanted -- wanted to make sure that I was as a civilian | 18:48:15 |
| 16 | expressing myself properly. | 18:48:19 |
| 17 | Q.    And in order for Mr. Toberoff to assist or | 18:48:21 |
| 18 | review the letter that you drafted, you would have | 18:48:27 |
| 19 | sent him Mr. Michael Siegel's May 13 letter so he | 18:48:30 |
| 20 | could have both letters. | 18:48:35 |
| 21 | A.    This letter? | 18:48:36 |
| 22 | Q.    Correct. | 18:48:37 |
| 23 | A.    Probably. | 18:48:37 |
| 24 | Q.    Okay.  And take a look at the Toberoff | 18:48:39 |
| 25 | timeline for a second, please, which is Exhibit 58. | 18:48:42 |

EXHIBIT 86
2597

LAURA SIEGEL LARSON - 7/22/2011

Page 309

| | | |
|---|---|---|
| 1 | A.   I already have that, don't I? | 18:48:45 |
| 2 | Q.   Yes. | 18:48:49 |
| 3 | MR. PETROCELLI:  Can you fish that out for | 18:48:49 |
| 4 | her, Jason?  Thank you. | 18:48:51 |
| 5 | THE WITNESS:  Thank you. | 18:48:53 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.   I'd like to direct your attention -- | |
| 8 | THE WITNESS:  Do I still need this one? | 18:48:54 |
| 9 | MR. PETROCELLI:  Yeah, leave it there. | 18:48:56 |
| 10 | THE WITNESS:  Okay.  Thank you. | 18:49:10 |
| 11 | MR. TOBEROFF:  I can help explain it. | |
| 12 | MR. KLINE:  Are you reading our notes, Marc? | |
| 13 | THE WITNESS:  Thank you. | |
| 14 | MR. TOBEROFF:  No, because I haven't gotten a | 18:49:17 |
| 15 | package -- duplicate packages with your notes. | 18:49:17 |
| 16 | MR. KLINE:  Oh, no.  Did you read this note? | 18:49:22 |
| 17 | MR. PETROCELLI:  Okay.  So you have them. | |
| 18 | MR. KLINE:  Please don't -- | 18:49:24 |
| 19 | MR. TOBEROFF:  Of course not.  I'm making a | 18:49:25 |
| 20 | joke.  Lighten up. | 18:49:28 |
| 21 | BY MR. PETROCELLI: | |
| 22 | Q.   So you have the Superman -- you have the Marc | 18:49:29 |
| 23 | Toberoff timeline, Exhibit 58, in front of you? | 18:49:32 |
| 24 | A.   Yes. | 18:49:33 |
| 25 | Q.   And you also have Exhibit 30, the Michael | 18:49:33 |

**EXHIBIT 86**
**2598**

LAURA SIEGEL LARSON - 7/22/2011

Page 310

1    Siegel letter to you dated May 13, 2003?                  18:49:37

2        A.   Yes, I do.                                        18:49:39

3        Q.   Now, go to the end of the fourth page as         18:49:40

4    Q 0004 and you'll see a reference to a July 5, 2003 --    18:49:46

5    first of all, go to the prior page of this Exhibit 58.    18:50:02

6        A.   Okay.                                             18:50:06

7        Q.   And you'll see that the author of this           18:50:06

8    document is identifying Michael Siegel's May 13, 2003,    18:50:09

9    letter, the one that you have in front of you as          18:50:15

10   Exhibit 30.  Do you see that?                             18:50:18

                                                               18:50:19
11       A.   I do.

12       Q.   And then he is -- he or she is purporting to     18:50:19

13   state some of the contents of that letter.  Do you see    18:50:23

                                                               18:50:26
14   that?

                                                               18:50:26
15       A.   I see a paragraph about it.

16       Q.   Okay.  And now dropping down to the end of       18:50:29

17   the next page with the Bates label Q 0004, the           18:50:32

18   reference to the July 5, 2003, date, do you see that?     18:50:43

19       A.   Yes, I do.                                        18:50:43

20       Q.   It says "Laura Siegel reveals her ignorance      18:50:43

21   of Toberoff's dubious actions in her return letter        18:50:52

22   back to Michael."  Putting aside the characterization     18:50:52

23   of your ignorance, does July 5, 2003, sound right to      18:50:54

24   you as around the time that you responded to the May      18:50:58

                                                               18:51:01
25   13, 2003, letter?

EXHIBIT 86
2599

LAURA SIEGEL LARSON - 7/22/2011

Page 313

| | | |
|---|---|---|
| 1 | replaced with the quoted language that I just read? | 18:53:57 |
| 2 | A.  It could have been. | 18:53:59 |
| 3 | Q.  And when Mr. Toberoff made his changes to the | 18:54:03 |
| 4 | letter and returned it to you, did you review it and | 18:54:07 |
| 5 | sign it before you sent it out as your response letter | 18:54:11 |
| 6 | back to Michael? | 18:54:15 |
| 7 | A.  Well, he made suggestions of changes in the | 18:54:16 |
| 8 | wording of certain areas, and, you know, I retyped the | 18:54:22 |
| 9 | letter, accepted some of the things that he said and | 18:54:28 |
| 10 | didn't use some other suggestions that he made. | 18:54:30 |
| 11 | Q.  How did he convey his suggestions to you? | 18:54:33 |
| 12 | A.  He wrote it on -- he wrote it on this | 18:54:36 |
| 13 | letter -- no, not this letter.  He wrote it on that | 18:54:39 |
| 14 | letter that's being discussed here and faxed it back | 18:54:43 |
| 15 | to me. | 18:54:46 |
| 16 | Q.  Okay.  So you did engage in faxed | 18:54:47 |
| 17 | communication with Mr. Toberoff from time to time. | 18:54:50 |
| 18 | A.  Yes. | 18:54:51 |
| 19 | Q.  Okay.  Including with respect to this very | 18:54:53 |
| 20 | correspondence that we're discussing. | 18:54:55 |
| 21 | A.  I believe so. | 18:54:56 |
| 22 | Q.  Okay. | 18:54:58 |
| 23 | Now, did you show him the final draft before | 18:54:59 |
| 24 | you sent it out? | 18:55:03 |
| 25 | A.  I believe I did. | 18:55:05 |

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merillcorp.com/law

**EXHIBIT 86**
**2600**

LAURA SIEGEL LARSON - 7/22/2011

Page 314

| | | |
|---|---|---|
| 1 | Q.   And which of the changes did you reject? | 18:55:07 |
| 2 | A.   I don't remember.  I just remember the | 18:55:16 |
| 3 | process, but I don't remember the contents. | 18:55:18 |
| 4 | Q.   Now, by the time you received this letter, | 18:55:37 |
| 5 | Mr. Emanuel was -- | 18:55:43 |
| 6 | A.   I'm sorry.  You're talking about the May 13 | 18:55:44 |
| 7 | letter? | 18:55:47 |
| 8 | Q.   Thank you. | 18:55:47 |
| 9 | By the time you received the May 13, 2003, | 18:55:48 |
| 10 | letter, Exhibit 30, and then responded with your | 18:55:50 |
| 11 | letter that you've been describing, during that period | 18:55:53 |
| 12 | of time, that's when you knew that Mr. Emanuel was | 18:55:58 |
| 13 | secretly attempting to purchase Michael Siegel's | 18:56:07 |
| 14 | interest; correct? | 18:56:09 |
| 15 | MR. TOBEROFF:  Misstates the record. | 18:56:11 |
| 16 | THE WITNESS:  I -- you know, I wouldn't use | 18:56:13 |
| 17 | the word "secretly," but I believe an offer -- an | 18:56:16 |
| 18 | offer may have been made during that period. | 18:56:20 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.   You said you wouldn't use the word | 18:56:21 |
| 21 | "secretly," but you knew that Mr. Michael Siegel did | 18:56:24 |
| 22 | not know that it was Mr. Emanuel who was the | 18:56:26 |
| 23 | prospective purchaser.  We've discussed that already; | 18:56:29 |
| 24 | correct? | 18:56:31 |
| 25 | A.   Yes, we did. | 18:56:31 |

**EXHIBIT 86**
**2601**

LAURA SIEGEL LARSON - 7/22/2011

Page 315

```
 1      Q.   And you did not tell Michael Siegel in your      18:56:32

 2   response letter back that Mr. Emanuel was indeed the     18:56:39

 3   very person with your full knowledge and blessing who    18:56:46

 4   was attempting to acquire his interest.                  18:56:48

 5          MR. TOBEROFF:  Asked and answered.                18:56:51

 6          THE WITNESS:  No, I did not mention that.         18:56:52

 7   BY MR. PETROCELLI:                                       

 8      Q.   And your letter back to Mr. Michael Siegel       18:56:56

 9   does in fact mention Mr. Emanuel; correct?               18:56:59

10      A.   I'm sorry.  Does or does not?                    18:57:01

11      Q.   Does.                                            18:57:03

12      A.   Does mention Mr. Emanuel?                        18:57:05

13      Q.   Yes.                                             18:57:07

14      A.   I don't -- I don't recall.                       18:57:07

15      Q.   Have you given any consideration to the idea     18:57:16

16   that is being stated in these documents that             18:57:27

17   Mr. Toberoff is going to end up with the lion's share    18:57:30

18   of the money with respect to any disposition of the      18:57:32

19   termination interests of the -- stemming from Superman   18:57:39

20   both from the Siegel side and the Shuster side?          18:57:42

21      A.   Well, I disagree with your characterization      18:57:44

22   of lion's share.                                         18:57:49

23      Q.   Well, let's --                                   18:57:52

24      A.   I mean he has a contingency agreement with me    18:57:52

25   and with my mom, and he had a contingency agreement      18:57:56
```

**EXHIBIT 86**
**2602**

1    STATE OF CALIFORNIA      )

2                             )    ss.

3    COUNTY OF LOS ANGELES    )

4        I, Kathleen E. McCarthy, Certified Shorthand Reporter

5    No. 4483 for the State of California, do hereby certify:

6        That prior to being examined, the witness named in the

7    foregoing deposition was duly sworn to testify the truth,

8    the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in shorthand

10   at the time and place therein named and thereafter reduced

11   by me to typewritten form and that the same is a true,

12   correct, and complete transcript of said proceedings.

13           Before completion of the deposition, review of

14   the transcript [ ] was [ ] was not requested.  If

15   requested, any changes made by the deponent (and provided

16   to the reporter) during the period allowed are appended

17   hereto.

18       I further certify that I am not interested in the

19   outcome of the action.

20   Witness my hand this 3rd day of August, 2011.

21

22

23           Kathleen E. McCarthy, CSR No. 4483

24

25

**EXHIBIT 86**
**2603**

# EXHIBIT 87

MARC  TOBEROFF - 9/18/2012

Page  1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,                      )
                                )
          Plaintiff,            )No.
                                )CV-10-3633 ODW (RZx)
          VS.                   )
                                )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as         )
personal representative of      )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an            )
individual, JOANNE SIEGEL,      )
an individual, LAURA SIEGEL     )
LARSON, an individual, and      )
DOES 1-10, inclusive,           )
                                )
          Defendants.           )
                                )
          _____       )


VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012


Reported by:  SHANDA GABRIEL

CSR No. 10094

EXHIBIT 87
2604

MARC  TOBEROFF - 9/18/2012

```
 1    accept a corporation.  There are various Guild         09:51:21
 2    rules, and companies were incorporated to make a       09:51:26
 3    specific movie.  And those companies may still         09:51:29
 4    exist -- my name could be affiliated with one of       09:51:36
 5    those companies and it could still exist or not        09:51:39
 6    exist.                                                 09:51:43
 7    BY MR. PETROCELLI:                                     09:51:43
 8        Q.  Can you estimate the number of such            09:51:43
 9    companies?                                             09:51:45
10        A.  No.                                            09:51:45
11        Q.  Were you -- when they were established,        09:51:49
12    were --                                                09:51:51
13        A.  For instance, there was -- there was a         09:51:53
14    company, I -- I get -- there was a company to do a     09:51:55
15    movie about -- I just forgot the title of the movie.   09:52:02
16    It was a movie about wine.  It may come to me later    09:52:05
17    on.  And I believe there was a special purpose, they   09:52:13
18    call it a special purpose vehicle that was             09:52:15
19    established for purposes of that movie.                09:52:19
20        Q.  When such entities have been established,      09:52:21
21    were you a shareholder of them or a member of them?    09:52:24
22        A.  I'm not sure.                                  09:52:26
23        Q.  Were you involved in setting them up?          09:52:26
24        A.  No.                                            09:52:28
25        Q.  Who would have knowledge about the status      09:52:31
```

**EXHIBIT 87**
**2605**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | of these entities? | 09:52:34 |
| 2 | A.  I think basically whoever was the line | 09:52:36 |
| 3 | producer or primary producer of the picture. | 09:52:38 |
| 4 | Q.  And these are projects in which you had | 09:52:43 |
| 5 | some kind of participation? | 09:52:44 |
| 6 | MR. KENDALL:  Vague and ambiguou- -- | 09:52:44 |
| 7 | THE WITNESS:  Yes. | 09:52:44 |
| 8 | MR. KENDALL:  Vague and ambiguous. | 09:52:47 |
| 9 | BY MR. PETROCELLI: | 09:52:48 |
| 10 | Q.  IP Worldwide, that was a limited liability | 09:52:54 |
| 11 | company? | 09:52:58 |
| 12 | A.  Yes. | 09:52:58 |
| 13 | Q.  And who were its members? | 09:53:00 |
| 14 | A.  Myself and Ari Emanuel. | 09:53:01 |
| 15 | Q.  And was Endeavor at the time also a member? | 09:53:08 |
| 16 | A.  I believe Endeavor -- I believe Endeavor | 09:53:11 |
| 17 | may have had some equity in it.  I believe 10 | 09:53:16 |
| 18 | percent. | 09:53:18 |
| 19 | Q.  Did -- | 09:53:19 |
| 20 | A.  I'm not sure whether they were a member or | 09:53:20 |
| 21 | whether they simply were entitled to a percentage of | 09:53:22 |
| 22 | proceeds. | 09:53:25 |
| 23 | Q.  A 10 percent contractual interest? | 09:53:26 |
| 24 | A.  Right. | 09:53:28 |
| 25 | Q.  Okay.  Did IP Worldwide get replaced | 09:53:30 |

**EXHIBIT 87**
**2606**

MARC   TOBEROFF - 9/18/2012

Page 33

| | | |
|---|---|---|
| 1 | MR. KENDALL:  Vague and ambiguous.  Calls | 09:59:47 |
| 2 | for a legal conclusion. | 09:59:48 |
| 3 | THE WITNESS:  No. | 09:59:49 |
| 4 | BY MR. PETROCELLI: | 09:59:49 |
| 5 | Q.  What -- what happened to IP Worldwide's | 09:59:52 |
| 6 | agreement with the Siegels such that it was not | 09:59:56 |
| 7 | transferred to IPW? | 09:59:58 |
| 8 | A.  There's not a -- let me just try and answer | 10:00:00 |
| 9 | it this way:  The IP Worldwide agreement was | 10:00:09 |
| 10 | governed by a term.  I don't know what the | 10:00:14 |
| 11 | initial -- | 10:00:17 |
| 12 | Q.  Eighteen months. | 10:00:18 |
| 13 | A.  -- term -- | 10:00:18 |
| 14 | Okay.  So you had an 18-month term and then | 10:00:19 |
| 15 | there was an extension of that term and I don't know | 10:00:22 |
| 16 | what -- | 10:00:24 |
| 17 | Q.  Three months. | 10:00:25 |
| 18 | A.  --  the exact date -- the exact time frame | 10:00:25 |
| 19 | of that extension.  I don't know if it was three | 10:00:31 |
| 20 | months, I thought it was a little bit longer. | 10:00:32 |
| 21 | There was -- IP -- the -- the -- the IP | 10:00:36 |
| 22 | Worldwide agreement expired on its own.  It wasn't | 10:00:40 |
| 23 | part of any assets that were transferred to IPW. | 10:00:47 |
| 24 | Q.  Okay. | 10:00:57 |
| 25 | A.  And I -- I'm not sure, but I believe it | 10:00:58 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

**EXHIBIT 87**
**2607**

MARC  TOBEROFF - 9/18/2012

Page 34

| | | |
|---|---|---|
| 1 | had -- had expired before that or was about to | 10:01:00 |
| 2 | expire.  And was either -- moot, essentially moot. | 10:01:04 |
| 3 | Q.  In 2004, you entered into what has been | 10:01:16 |
| 4 | referred to as a legal retainer agreement with the | 10:01:24 |
| 5 | Siegels, correct? | 10:01:26 |
| 6 | A.  Correct. | 10:01:28 |
| 7 | Q.  Was that done through IPW? | 10:01:28 |
| 8 | A.  No. | 10:01:32 |
| 9 | Q.  That was done through your law offices? | 10:01:38 |
| 10 | A.  Correct, a litigation retainer agreement. | 10:01:39 |
| 11 | Q.  And neither Mr. Karsh nor IPW had any | 10:01:43 |
| 12 | interest in any proceeds under that legal retainer | 10:01:46 |
| 13 | agreement, right? | 10:01:49 |
| 14 | A.  Correct. | 10:01:50 |
| 15 | Q.  And that legal retainer agreement remains | 10:01:51 |
| 16 | extant to this day. | 10:01:54 |
| 17 | Is that right? | 10:01:54 |
| 18 | A.  Correct. | 10:01:56 |
| 19 | Q.  All right.  Is it correct, then, that in | 10:01:56 |
| 20 | the event of any proceeds or recovery by way of | 10:02:07 |
| 21 | litigation outcome or transaction or settlement, | 10:02:10 |
| 22 | that Ari Emanuel would not be entitled to any | 10:02:13 |
| 23 | contractual payments? | 10:02:18 |
| 24 | A.  Correct. | 10:02:20 |
| 25 | MR. KENDALL:  Calls for a legal conclusion. | 10:02:20 |

**EXHIBIT 87**
**2608**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 10:02:20 |
| 2 |     Q.  Nor would any -- | 10:02:22 |
| 3 |     A.  Sorry. | 10:02:25 |
| 4 |     Q.  -- any of his talent agencies, such as | 10:02:25 |
| 5 | Endeavor, William Morris Endeavor, correct? | 10:02:28 |
| 6 |     A.  Correct. | 10:02:28 |
| 7 |     MR. KENDALL:  Calls for a legal conclusion. | 10:02:31 |
| 8 | BY MR. PETROCELLI: | 10:02:31 |
| 9 |     Q.  So he has no further interest in any of | 10:02:31 |
| 10 | this, correct? | 10:02:33 |
| 11 |     MR. KENDALL:  Calls for a legal conclusion. | 10:02:34 |
| 12 |     THE WITNESS:  Correct. | 10:02:34 |
| 13 | BY MR. PETROCELLI: | 10:02:34 |
| 14 |     Q.  Did he or Endeavor receive any | 10:02:37 |
| 15 | consideration at the time that IP Worldwide was | 10:02:40 |
| 16 | folded into IPW? | 10:02:50 |
| 17 |     A.  Why don't we use the term "wound down." | 10:02:53 |
| 18 |     Q.  Wound down.  Fair enough. | 10:02:55 |
| 19 |     A.  Did they receive -- are you talking about | 10:02:57 |
| 20 | consideration -- when you say "consideration," are | 10:02:59 |
| 21 | you talking about in the legal sense or are you | 10:03:02 |
| 22 | talking about it in money? | 10:03:05 |
| 23 |     Q.  Well, start with money. | 10:03:08 |
| 24 |     A.  I mean, I -- there's probably -- let me put | 10:03:10 |
| 25 | it this way:  A lawyer would look at a document and | 10:03:15 |

EXHIBIT 87
2609

MARC   TOBEROFF - 9/18/2012

Page 36

```
 1    could find consideration for the agreement, but they      10:03:17
 2    didn't receive money --                                   10:03:20
 3         Q.  Can you --                                        10:03:22
 4         A.  -- or -- or some other asset when it was          10:03:23
 5    wound down.                                                10:03:30
 6         Q.  Now, as part of the consider- -- as part of       10:03:38
 7    the consideration that -- first of all, who received      10:03:40
 8    the consideration?  Was it Ari or was it Endeavor?        10:03:43
 9              MR. KENDALL:  Lacks foundation.                  10:03:46
10    BY MR. PETROCELLI:                                         10:03:46
11         Q.  To your knowledge.                                10:03:48
12         A.  It was -- the -- the -- let me just --            10:03:48
13         Q.  What was the nature of the consideration?        10:03:51
14              MR. KENDALL:  Lacks foundation.                  10:03:52
15              THE WITNESS:  The nature of the                  10:03:53
16    consideration was that these assets, which consisted      10:03:55
17    of various interests and various intellectual             10:03:59
18    properties that the company had accumulated, would        10:04:04
19    be transferred to IPW, and -- but in the event that       10:04:09
20    there were proceeds from those assets, that Ari had       10:04:13
21    a carried interest in those proceeds.                      10:04:24
22    BY MR. PETROCELLI:                                         10:04:26
23         Q.  But that carried interest did not apply to       10:04:26
24    the new agreement made with the Siegels.  That           10:04:30
25    replaced the IP Worldwide agreement, correct?            10:04:32
```

**EXHIBIT 87**
**2610**

MARC  TOBEROFF - 9/18/2012

Page 37

| | | |
|---|---|---|
| 1 | A.  I don't know if it's correct to say | 10:04:40 |
| 2 | "replaced."  They were different agreements. | 10:04:41 |
| 3 | Q.  Okay. | 10:04:41 |
| 4 | A.  They -- one -- one came after the other.  I | 10:04:44 |
| 5 | don't know if it's correct to say "replaced." | 10:04:47 |
| 6 | Q.  Did Mr. Emanuel negotiate with you for some | 10:04:50 |
| 7 | consideration in respect of the Siegel agreement | 10:04:58 |
| 8 | that IP Worldwide had entered into during the time | 10:05:04 |
| 9 | that you and he were members of IP Worldwide? | 10:05:07 |
| 10 | MR. KENDALL:  Vague and ambiguous. | 10:05:10 |
| 11 | THE WITNESS:  Did he negotiate with me? | 10:05:14 |
| 12 | BY MR. PETROCELLI: | 10:05:15 |
| 13 | Q.  Correct. | 10:05:15 |
| 14 | A.  No. | 10:05:16 |
| 15 | Q.  In other words, did he attempt to obtain | 10:05:16 |
| 16 | any consideration as a result of what would be your | 10:05:19 |
| 17 | ongoing efforts on behalf of the Siegels after the | 10:05:21 |
| 18 | winding down of IP Worldwide? | 10:05:24 |
| 19 | MR. KENDALL:  Vague and ambiguous. | 10:05:25 |
| 20 | THE WITNESS:  No.  I think he asked me | 10:05:30 |
| 21 | about it. | 10:05:33 |
| 22 | BY MR. PETROCELLI: | 10:05:33 |
| 23 | Q.  And you declined to offer him any | 10:05:35 |
| 24 | participation or any piece of the -- of the -- of | 10:05:38 |
| 25 | the proceeds. | 10:05:43 |

**EXHIBIT 87**
**2611**

MARC  TOBEROFF - 9/18/2012

Page 38

| | | |
|---|---|---|
| 1 | Is that correct? | 10:05:43 |
| 2 | A.  Correct. | 10:05:44 |
| 3 | Q.  And he accepted that? | 10:05:45 |
| 4 | A.  As far as I know. | 10:05:46 |
| 5 | Q.  Okay.  Do you have any documentation with | 10:05:53 |
| 6 | Mr. Emanuel that reflects the nature of your winding | 10:05:55 |
| 7 | down of this company, IP Worldwide? | 10:06:00 |
| 8 | MR. KENDALL:  Vague and ambiguous. | 10:06:04 |
| 9 | THE WITNESS:  We have a winding down | 10:06:04 |
| 10 | agreement. | 10:06:07 |
| 11 | BY MR. PETROCELLI: | 10:06:07 |
| 12 | Q.  Is that the only document of which you are | 10:06:08 |
| 13 | aware? | 10:06:10 |
| 14 | A.  I believe so.  It was a winding down | 10:06:12 |
| 15 | agreement.  It had exhibits to it. | 10:06:15 |
| 16 | Q.  Since -- | 10:06:18 |
| 17 | A.  I believe it was one comprehensive | 10:06:21 |
| 18 | document. | 10:06:24 |
| 19 | Q.  Right.  Since the winding down of IP | 10:06:24 |
| 20 | Worldwide and the exit of Mr. Emanuel, has he | 10:06:33 |
| 21 | approached you regarding any financial interest in | 10:06:39 |
| 22 | the Shuster or Siegel cases or recoveries of | 10:06:44 |
| 23 | proceeds of any monies that might be forthcoming? | 10:06:51 |
| 24 | MR. KENDALL:  Now, in responding to that | 10:06:54 |
| 25 | question, I just want to caution you that to the | 10:06:56 |

**EXHIBIT 87**
**2612**

| | | |
|---|---|---|
| 1 | And -- and -- and I said, "First of all, I | 10:10:50 |
| 2 | can't share legal fees, I can't share legal fees | 10:10:58 |
| 3 | with you, and all I have are legal fees from that | 10:11:00 |
| 4 | case." | 10:11:03 |
| 5 | And I -- we may have joked or I may have | 10:11:04 |
| 6 | joked and said, "You didn't do anything." | 10:11:10 |
| 7 | And he may have said something to the | 10:11:11 |
| 8 | effect, "Since when do I have to do something to get | 10:11:13 |
| 9 | paid?  Since when do I have to do something to make | 10:11:16 |
| 10 | money?" | 10:11:18 |
| 11 | Which is -- | 10:11:19 |
| 12 | MR. KENDALL:  Again, don't -- don't | 10:11:22 |
| 13 | comment. | 10:11:23 |
| 14 | THE WITNESS:  Okay. | 10:11:24 |
| 15 | MR. KENDALL:  State the facts. | 10:11:25 |
| 16 | THE WITNESS:  Something to that effect. | 10:11:26 |
| 17 | MR. PETROCELLI:  I believe he's stating | 10:11:27 |
| 18 | what transpired in the conversation, which was | 10:11:28 |
| 19 | responsive to my question. | 10:11:31 |
| 20 | THE WITNESS:  No, I was about to give a | 10:11:33 |
| 21 | little flourish, so I appreciate the objection. | 10:11:34 |
| 22 | BY MR. PETROCELLI: | 10:11:34 |
| 23 | Q.  Have you recounted the conversation as best | 10:11:44 |
| 24 | you can recall it? | 10:11:46 |
| 25 | A.  Yes. | 10:11:46 |

**EXHIBIT 87**
**2613**

```
 1        Q.  Okay.  When did that happen?              10:11:47

 2        A.  I would say within -- I don't know, within  10:11:48

 3   a year of the company being wound down.  Could be   10:11:59

 4   within six months.  But I can't really put a time on  10:12:04

 5   it.                                                  10:12:07

 6        Q.  Since the winding down of IP Worldwide,    10:12:07

 7   have you had any other business agreements with      10:12:11

 8   Mr. Emanuel or his agencies?                         10:12:13

 9            MR. KENDALL:  Vague and ambiguous.          10:12:17

10   Overbroad.                                           10:12:22

11            THE WITNESS:  Not that I could think of     10:12:23

12   right now.                                           10:12:29

13   BY MR. PETROCELLI:                                   10:12:29

14        Q.  From e-mails that have been produced in     10:12:34

15   this case, is it correct that Mr. Emanuel reached    10:12:35

16   out to the U.S. Attorney's office regarding the      10:12:40

17   effort to identify and investigate the person who    10:12:45

18   wrote the timeline documents and took documents from  10:12:53

19   your office?                                         10:12:56

20        A.  I don't know what you mean by "reached      10:12:56

21   out."  My understanding was that he made a call.     10:13:02

22        Q.  What are the circumstances, to your         10:13:06

23   knowledge, under which he made that call?            10:13:09

24        A.  My wanting to have the matter investigated.  10:13:10

25            MR. KENDALL:  Okay.  I want to caution you   10:13:22
```

**EXHIBIT 87**
**2614**

```
 1    now that we're in an area that involves privilege,        10:13:26

 2    so keep your answer general and I'm sure there will       10:13:30

 3    be follow-up questions and we can clarify where the       10:13:34

 4    privilege line should be drawn so that                    10:13:37

 5    Mr. Petrocelli has a record.                              10:13:39

 6         THE WITNESS:  The circumstances are that I           10:13:43

 7    wanted to have the matter investigated and had never      10:13:45

 8    had any experience like that before and wasn't            10:13:54

 9    getting any traction.                                     10:14:01

10    BY MR. PETROCELLI:                                        10:14:01

11         Q.  Did you speak to Mr. Emanuel about this          10:14:07

12    subject?                                                  10:14:10

13         A.  Yes, I did.                                      10:14:12

14         Q.  Did you initiate that contact?                   10:14:16

15         A.  Yes.                                             10:14:18

16         Q.  Why did you initiate it with Mr. Emanuel?        10:14:20

17         MR. KENDALL:  Okay.  So now I need to                10:14:26

18    caution you, if -- if this is something that you          10:14:27

19    consider to be work product arising from your            10:14:31

20    representation of your clients, then I think you          10:14:36

21    should, in that circumstance, so indicate and             10:14:41

22    decline to answer the question.                           10:14:46

23         If, on the other hand, you don't, then so           10:14:48

24    indicate and answer it.                                   10:14:52

25         THE WITNESS:  I think it is work product.            10:14:53
```

**EXHIBIT 87**
**2615**

MARC   TOBEROFF - 9/18/2012

Page 45

```
 1   BY MR. PETROCELLI:                                      10:14:57

 2        Q.   So on that question, you won't answer?        10:14:58

 3        A.   Correct.                                      10:15:00

 4        Q.   Okay.  And we'll have a stipulation that      10:15:00

 5   whenever you tell me that something is privileged or    10:15:05

 6   it's work product, it means you're not going to         10:15:07

 7   answer?                                                 10:15:09

 8        A.   Correct.                                      10:15:10

 9        Q.   Okay.  When you spoke with Mr. Emanuel on     10:15:14

10   this topic -- when was that, by the way?               10:15:17

11        A.   It would have been around the time of any    10:15:23

12   e-mails that were produced.                            10:15:26

13        Q.   Okay.  Did you discuss --                    10:15:32

14        A.   Would have been -- would have been sometime  10:15:33

15   before that or shortly before that.                    10:15:36

16        Q.   Was that the first communication you had     10:15:37

17   with Mr. Emanuel on the subject -- on any subject      10:15:40

18   related to the Siegel or Shuster issues since the      10:15:43

19   conversation where he asked for some consideration     10:15:49

20   and you declined to offer it to him?                   10:15:53

21        A.   No.                                          10:15:57

22        Q.   You had had intervening communications?      10:15:57

23        A.   Casual conversations.  He knows that's what  10:16:01

24   I've been working on almost exclusively for a very     10:16:03

25   long period of time.                                   10:16:06
```

**EXHIBIT 87**
**2616**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | Q.  And he checks in on it every now and then? | 10:16:08 |
| 2 | A.  He doesn't check in.  We will be talking | 10:16:11 |
| 3 | about something else and, "How is Superman going?" | 10:16:15 |
| 4 | We have casual, friendly conversations. | 10:16:17 |
| 5 | Q.  Have you worked with Mr. Emanuel in | 10:16:20 |
| 6 | connection with, for example, exploring potential | 10:16:24 |
| 7 | purchasers of the Siegel or Shuster interests? | 10:16:26 |
| 8 | MR. KENDALL:  Now I'm going to have to give | 10:16:33 |
| 9 | you that same admonition as to the context in which | 10:16:35 |
| 10 | this occurs and whether you believe that it falls | 10:16:38 |
| 11 | within your work product privilege. | 10:16:40 |
| 12 | THE WITNESS:  I think that is work product | 10:16:46 |
| 13 | as well. | 10:16:48 |
| 14 | BY MR. PETROCELLI: | 10:16:48 |
| 15 | Q.  Have such -- have you had conversations | 10:16:50 |
| 16 | with Mr. Emanuel on the subject of his assisting | 10:16:55 |
| 17 | with respect to potential purchasers of the Siegel | 10:17:02 |
| 18 | or Shuster interests?  You can answer that "yes" | 10:17:05 |
| 19 | or "no." | 10:17:25 |
| 20 | MR. KENDALL:  I think you can answer that | 10:17:25 |
| 21 | "yes" or "no" without waiving your privilege. | 10:17:27 |
| 22 | THE WITNESS:  Yes.  Without waiver of any | 10:17:28 |
| 23 | privilege. | 10:17:30 |
| 24 | BY MR. PETROCELLI: | 10:17:30 |
| 25 | Q.  Have you had any discussions with anybody | 10:17:31 |

**EXHIBIT 87**
**2617**

MARC  TOBEROFF - 9/18/2012

```
 1    other than Mr. Emanuel on that subject?              10:17:33

 2            MR. KENDALL:  So now with that --           10:17:38

 3    BY MR. PETROCELLI:                                   10:17:38

 4        Q.  Let me exclude for the purpose of this      10:17:41

 5    question, Joanne Siegel, Laura Siegel, Mr. Peary,   10:17:43

 6    Ms. Peavy and Dawn Peavy.                           10:17:55

 7            MR. KENDALL:  And his -- and Mr. Toberoff's 10:17:59

 8    counsel?                                            10:18:01

 9            MR. PETROCELLI:  Yes.  He meaning you, your 10:18:03

10    firm?                                               10:18:03

11            MR. KENDALL:  Well, and members of his     10:18:04

12    firm, too.                                          10:18:05

13            MR. PETROCELLI:  Yes.                       10:18:06

14            MR. KENDALL:  I'm sorry, I shouldn't have   10:18:06

15    said "members."  Associates.                        10:18:08

16            MR. PETROCELLI:  Yes.  In other words, I'm  10:18:09

17    not interested in -- yes, Mr. Kendall's firm,       10:18:10

18    members of your firm, he and the Siegels and the    10:18:12

19    Shusters.                                           10:18:15

20        Q.  Other than those folks with whom you may    10:18:15

21    have discussed this topic, I'm not, at least not    10:18:17

22    right now inquiring about that, I'm asking about    10:18:22

23    people other than those individuals.                10:18:24

24            MR. KENDALL:  Could I just ask, would you   10:18:25

25    also include --                                     10:18:27
```

**EXHIBIT 87**
**2618**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | discussions with Mr. Emanuel? | 10:42:54 |
| 2 | MR. KENDALL:  Again, I think you can answer | 10:42:57 |
| 3 | that question at a general level and then -- but do | 10:42:58 |
| 4 | not get into work product in describing it. | 10:43:02 |
| 5 | THE WITNESS:  I'm not going to disclose my | 10:43:05 |
| 6 | thought processes, which the purpose would entail, | 10:43:07 |
| 7 | but the subject was, as I said, to explore | 10:43:11 |
| 8 | opportunities for monetizing my clients' rights. | 10:43:16 |
| 9 | BY MR. PETROCELLI: | 10:43:16 |
| 10 | Q.  Can you disclose to me the specifics of | 10:43:23 |
| 11 | your conversations with Mr. Emanuel on that subject? | 10:43:25 |
| 12 | MR. KENDALL:  Same caution. | 10:43:36 |
| 13 | BY MR. PETROCELLI: | 10:43:41 |
| 14 | Q.  So to be clear, what I'm asking you to | 10:43:42 |
| 15 | elicit is everything you can remember about the | 10:43:45 |
| 16 | conversations without withholding any part of the | 10:43:50 |
| 17 | conversations.  I'm not asking for your thought | 10:43:52 |
| 18 | process for this question, I'm just asking you what | 10:43:54 |
| 19 | you and he discussed. | 10:43:57 |
| 20 | MR. KENDALL:  And overbroad.  Vague and | 10:43:58 |
| 21 | ambiguous. | 10:43:58 |
| 22 | Same caution. | 10:44:02 |
| 23 | THE WITNESS:  So, let me tell you what I am | 10:44:03 |
| 24 | not discussing on the basis of work product; that is | 10:44:08 |
| 25 | the -- my strategy with respect to monetizing those | 10:44:14 |

**EXHIBIT 87**
**2619**

MARC  TOBEROFF - 9/18/2012

Page 58

| | | |
|---|---|---|
| 1 | rights, which in turn impinges on settlement with | 10:44:19 |
| 2 | Warner Bros. and DC and the value of those rights. | 10:44:24 |
| 3 | That I'm not -- any conversations that impinge upon | 10:44:33 |
| 4 | that.  But I can tell you that my conversations with | 10:44:36 |
| 5 | Ari are usually general and casual. | 10:44:40 |
| 6 | BY MR. PETROCELLI: | 10:44:40 |
| 7 | Q.  On what basis are you declining to tell me | 10:44:57 |
| 8 | everything you and Mr. Emanuel discussed? | 10:45:04 |
| 9 | A.  On the basis that certain things coming | 10:45:06 |
| 10 | from me are revealing my work product on behalf of | 10:45:08 |
| 11 | the Siegels and the Shusters. | 10:45:13 |
| 12 | Q.  What relationship, if any, does Mr. Emanuel | 10:45:15 |
| 13 | have with the Siegels or the Shusters? | 10:45:19 |
| 14 | MR. KENDALL:  I'm going to call -- I'm | 10:45:21 |
| 15 | sorry.  I'm going to object as that calls for a | 10:45:23 |
| 16 | legal conclusion and it's vague and ambiguous. | 10:45:28 |
| 17 | THE WITNESS:  He doesn't, to my knowledge, | 10:45:36 |
| 18 | have any direct relationship with the Siegels or the | 10:45:37 |
| 19 | Shusters. | 10:45:40 |
| 20 | BY MR. PETROCELLI: | 10:45:40 |
| 21 | Q.  And do you -- | 10:45:40 |
| 22 | A.  His relationship is through me. | 10:45:41 |
| 23 | Q.  Do you have any agreement of any kind with | 10:45:43 |
| 24 | him in connection with your work on this case, on | 10:45:49 |
| 25 | the Siegel and Shuster litigation? | 10:45:53 |

**EXHIBIT 87**
**2620**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | MR. KENDALL:  Vague and ambiguous. | 10:45:57 |
| 2 | THE WITNESS:  I wouldn't call it an | 10:46:03 |
| 3 | agreement. | 10:46:04 |
| 4 | BY MR. PETROCELLI: | 10:46:04 |
| 5 | Q.  What is it about your relationship with | 10:46:13 |
| 6 | Mr. Emanuel that you believe justifies not | 10:46:16 |
| 7 | disclosing your conversations with him? | 10:46:24 |
| 8 | MR. KENDALL:  Just a moment, please. | 10:46:31 |
| 9 | Lacks foundation.  Vague and ambiguous. | 10:46:36 |
| 10 | And I'll caution you in answering that | 10:46:38 |
| 11 | question not to reveal either work product or | 10:46:40 |
| 12 | communications that you had with Mr. Emanuel in | 10:46:46 |
| 13 | furtherance of your representation of your clients | 10:46:49 |
| 14 | to the extent that those communications were | 10:46:55 |
| 15 | intended by you to be maintained as confidential. | 10:46:57 |
| 16 | MR. PETROCELLI:  I think we're just going | 10:47:05 |
| 17 | around in circles. | 10:47:07 |
| 18 | I'm trying to understand why his | 10:47:08 |
| 19 | conversations with Ari would be work product as | 10:47:11 |
| 20 | opposed to his conversations with the man on the | 10:47:14 |
| 21 | street or the folks at Fox, Paramount or Sony. | 10:47:17 |
| 22 | What's different about the Ari communications such | 10:47:22 |
| 23 | that they -- | 10:47:25 |
| 24 | MR. KENDALL:  Just a minute. | 10:47:26 |
| 25 | MR. PETROCELLI:  -- are subject to some | 10:47:26 |

**EXHIBIT 87**
**2621**

MARC   TOBEROFF - 9/18/2012

Page 62

| | | |
|---|---|---|
| 1 | allowed to disclose those matters to anybody? | 10:49:46 |
| 2 | A.  Yes. | 10:49:48 |
| 3 | Q.  And has he agreed to that? | 10:49:49 |
| 4 | A.  Yes. | 10:49:49 |
| 5 | Q.  And how has he agreed to it? | 10:49:50 |
| 6 | A.  Verbally. | 10:49:51 |
| 7 | Q.  Okay.  When did you first reach that | 10:49:57 |
| 8 | agreement with him, that verbal agreement? | 10:49:59 |
| 9 | A.  When we first started discussing matters of | 10:50:01 |
| 10 | that nature. | 10:50:09 |
| 11 | Q.  When did that happen? | 10:50:10 |
| 12 | A.  It would be sometime after the commencement | 10:50:11 |
| 13 | of the Siegel lawsuit in late 2004. | 10:50:15 |
| 14 | Q.  And what does Mr. Emanuel get in return for | 10:50:22 |
| 15 | having this verbal agreement with you and sharing | 10:50:27 |
| 16 | information with you and having discussions with | 10:50:31 |
| 17 | you?  Is he being compensated?  Is there anything | 10:50:32 |
| 18 | he's receiving for this role he's playing? | 10:50:35 |
| 19 | MR. KENDALL:  Vague and ambiguous.  Lacks | 10:50:38 |
| 20 | foundation. | 10:50:42 |
| 21 | THE WITNESS:  No. | 10:50:42 |
| 22 | BY MR. PETROCELLI: | 10:50:42 |
| 23 | Q.  Just out of friendship? | 10:50:44 |
| 24 | MR. KENDALL:  Vague and ambiguous. | 10:50:46 |
| 25 | THE WITNESS:  I can't -- | 10:50:47 |

**EXHIBIT 87**
**2622**

MARC  TOBEROFF - 9/18/2012

Page 63

```
 1              MR. KENDALL:  Just a minute.  Just a          10:50:47

 2     minute.                                                10:50:48

 3              THE WITNESS:  Sorry.                          10:50:48

 4              MR. KENDALL:  Calls for speculation.          10:50:50

 5              THE WITNESS:   I can't answer as to what his  10:50:53

 6     motivations are.                                       10:50:56

 7     BY MR. PETROCELLI:                                     10:50:56

 8         Q.  What are yours?                                10:50:57

 9         A.  In furtherance of my clients.                  10:51:00

10         Q.  Have you withheld in this litigation e-mail    10:51:06

11     communications with Mr. Emanuel on the basis of this   10:51:09

12     verbal agreement -- this verbal confidentiality        10:51:12

13     agreement?                                             10:51:16

14              MR. KENDALL:  I'm going to object to that     10:51:17

15     question on the ground that I don't think it's         10:51:19

16     proper for you to ask questions in this deposition     10:51:23

17     about Mr. Toberoff's actions or decisions in his       10:51:25

18     capacity as counsel for his clients or as -- in his    10:51:36

19     capacity as counsel for and his firm's counsel for     10:51:45

20     himself and the Toberoff entities.                     10:51:52

21              So I think you're free to ask questions       10:51:54

22     that you would normally ask of a lay witness but not   10:51:56

23     about the discovery process.                           10:52:00

24     BY MR. PETROCELLI:                                     10:52:00

25         Q.  Have you --                                    10:52:01
```

**EXHIBIT 87**
**2623**

MARC  TOBEROFF - 9/18/2012

```
 1            I'm not going to respond other than to have      10:52:04

 2     you understand that when I don't respond, it doesn't    10:52:10

 3     mean I agree.                                           10:52:12

 4            MR. KENDALL:  We can say that that's a           10:52:14

 5     reciprocal understanding.                              10:52:16

 6            MR. PETROCELLI:  Yes.  It will save a lot        10:52:17

 7     of chatter.                                             10:52:19

 8        Q.  The -- have you had written communications       10:52:21

 9     with Mr. Emanuel since 2004 to the present?            10:52:25

10        A.  Casual, casual e-mails.                          10:52:29

11        Q.  Related --                                       10:52:37

12        A.  Not a lot.  I don't -- I don't -- I              10:52:37

13     generally communicate with him by phone.                10:52:40

14        Q.  Have you had --                                  10:52:42

15        A.  He's not very responsive to e-mails and         10:52:43

16     things.                                                 10:52:46

17        Q.  Have you had written communications with         10:52:46

18     him since 2004 related to the Siegel or Shuster        10:52:48

19     interests?                                              10:52:53

20        A.  I'm sure I have.                                 10:52:53

21        Q.  Okay.                                            10:52:53

22            MR. KENDALL:  Mr. Petrocelli, could I just       10:52:58

23     ask that you try to hold your questions until he's      10:53:00

24     finished answering.  I think when you look at the       10:53:03

25     record eventually, you will see many interruptions      10:53:05
```

**EXHIBIT 87**
**2624**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | where the answer continues, despite interjections by | 10:53:10 |
| 2 | you, and so I think it would be much easier for the | 10:53:13 |
| 3 | reporter if you wait until the witness has stopped | 10:53:16 |
| 4 | talking before you start talking again. | 10:53:19 |
| 5 | MR. PETROCELLI:  I think the witness and I | 10:53:22 |
| 6 | are communicating easily and clearly and oftentimes, | 10:53:23 |
| 7 | as virtually all witnesses do, they pause between | 10:53:29 |
| 8 | words and don't complete their sentences all at once | 10:53:32 |
| 9 | so it's hard for me to know when the witness is | 10:53:35 |
| 10 | ending, but I'll make an effort to do better. | 10:53:37 |
| 11 | Q.  The -- other than talking with you, are you | 10:53:44 |
| 12 | aware of any other activity that Mr. Emanuel has | 10:53:50 |
| 13 | undertaken or performed in connection with the | 10:53:56 |
| 14 | Siegel or Shuster interest since 2004 and the wind | 10:53:59 |
| 15 | down of IP Worldwide, other than conversations with | 10:54:02 |
| 16 | you? | 10:54:08 |
| 17 | MR. KENDALL:  That would call for a "yes" | 10:54:13 |
| 18 | or "no." | 10:54:14 |
| 19 | THE WITNESS:  Can you repeat the question? | 10:54:18 |
| 20 | MR. PETROCELLI:  Yes. | 10:54:36 |
| 21 | (The reporter read the record | 10:54:36 |
| 22 | as follows: | 10:54:36 |
| 23 | "QUESTION:  Other than talking | 10:53:47 |
| 24 | with you, are you aware of any | 10:53:48 |
| 25 | other activity that Mr. Emanuel has | 10:53:52 |

**EXHIBIT 87**
**2625**

| | | |
|---|---|---|
| 1 | going over the same timeline of events.  I think | 11:38:07 |
| 2 | that's obvious. | 11:38:12 |
| 3 |         So with that, can you repeat the question, | 11:38:15 |
| 4 | please. | 11:38:18 |
| 5 |         THE WITNESS:  I just want to note that | 11:38:18 |
| 6 | what's salient of that, and I think what prompted | 11:38:23 |
| 7 | you to say at the Siegel deposition that you're not | 11:38:24 |
| 8 | going to repeat the questions is because in allowing | 11:38:27 |
| 9 | you to take depositions of the same parties whose | 11:38:30 |
| 10 | depositions you had taken on the same subjects in | 11:38:35 |
| 11 | the Siegel case, the Magistrate Zarefsky cautioned | 11:38:38 |
| 12 | that he expects that DC's counsel would not be just | 11:38:42 |
| 13 | asking the same questions. | 11:38:50 |
| 14 |         MR. PETROCELLI:  And I'm mindful of the | 11:38:51 |
| 15 | Court's rulings and where we are right now in the | 11:38:58 |
| 16 | case. | 11:39:00 |
| 17 |         THE WITNESS:  Okay. | 11:39:01 |
| 18 |         MR. PETROCELLI:  And I'm the last person in | 11:39:02 |
| 19 | this room who wants to waste time so -- | 11:39:03 |
| 20 | .       THE WITNESS:  Right. | 11:39:06 |
| 21 |         MR. PETROCELLI:  -- we'll do our best. | 11:39:07 |
| 22 |         (The reporter read the record | 11:39:17 |
| 23 |         as follows: | 11:39:17 |
| 24 |         "QUESTION:  Let me take you | 11:36:18 |
| 25 |         back to 2001.  We started out the | 11:36:19 |

**EXHIBIT 87**
**2626**

|   |   |   |
|---|---|---|
| 1 | deposition by walking through your | 11:36:25 |
| 2 | employment history.  Do you | 11:36:29 |
| 3 | remember the year when you first | 11:36:35 |
| 4 | learned of either the Siegel or | 11:36:38 |
| 5 | Shuster termination issue?") | 11:36:43 |
| 6 | THE WITNESS:  I don't know what you mean | 11:39:19 |
| 7 | by "Shuster termination issue."  But to try and cut | 11:39:40 |
| 8 | through it, I -- I had read on the Internet, I | 11:39:43 |
| 9 | believe it was on the Internet, about the Shusters | 11:39:52 |
| 10 | having exercised -- Siegels having exercised their | 11:39:56 |
| 11 | termination rights and I believe that was sometime | 11:40:01 |
| 12 | in 2001. | 11:40:03 |
| 13 | BY MR. PETROCELLI: | 11:40:03 |
| 14 | Q.  Do you have any documents that would date | 11:40:05 |
| 15 | when that occurred? | 11:40:09 |
| 16 | A.  No. | 11:40:10 |
| 17 | Q.  Okay. | 11:40:13 |
| 18 | A.  I -- I remember that it was all over the | 11:40:14 |
| 19 | Internet. | 11:40:19 |
| 20 | Q.  Okay. | 11:40:19 |
| 21 | A.  That there were copies of the termination | 11:40:21 |
| 22 | notice that were posted on the Internet.  And just | 11:40:24 |
| 23 | like they talked about these litigations on the | 11:40:30 |
| 24 | Internet, there was a tremendous amount of talk and | 11:40:32 |
| 25 | speculation as to what is happening with the | 11:40:35 |

| | | |
|---|---|---|
| 1 | Siegels, the Superman termination. | 11:40:39 |
| 2 | MR. KENDALL: I'm going to caution you to | 11:40:43 |
| 3 | listen to the questions and ask the question | 11:40:45 |
| 4 | that's -- answer the question that is posed and wait | 11:40:47 |
| 5 | for the next question which might ask you for other | 11:40:50 |
| 6 | information instead of anticipating it. Okay? | 11:40:53 |
| 7 | THE WITNESS: Okay. | 11:40:58 |
| 8 | BY MR. PETROCELLI: | 11:40:58 |
| 9 | Q. When you saw this Internet report or | 11:40:58 |
| 10 | whatever it was, is it just something you happened | 11:41:02 |
| 11 | to see fortuitously or were you endeavoring to | 11:41:08 |
| 12 | research and investigate ownership of rights | 11:41:12 |
| 13 | associated with Superman? | 11:41:15 |
| 14 | A. I don't have a recollection of the latter. | 11:41:22 |
| 15 | I believe so it was the former. | 11:41:26 |
| 16 | Q. Once you saw a reference to the Shusters | 11:41:29 |
| 17 | having filed -- | 11:41:33 |
| 18 | A. Siegel. | 11:41:33 |
| 19 | Q. Excuse me. Once you saw a reference to the | 11:41:33 |
| 20 | Siegels having filed some documents that terminate | 11:41:36 |
| 21 | copyright interests, did that then spawn an interest | 11:41:43 |
| 22 | on your part in investigating further? | 11:41:48 |
| 23 | A. I'm trying to think back to 2001. I do | 11:42:01 |
| 24 | have a recollection of Superman being all over the | 11:42:09 |
| 25 | Internet. I don't know in thinking about it right | 11:42:12 |

EXHIBIT 87
2628

```
 1    now whether I -- actually, a question triggered this      11:42:16

 2    thought.                                                  11:42:29

 3            I don't know whether I was looking into           11:42:29

 4    Superman after I was contacted by Warren Peary or         11:42:32

 5    was aware of the Siegel termination before I was          11:42:41

 6    contacted by Warren Peary.  I don't know.                 11:42:44

 7            So when I say it was all over the Internet,       11:42:48

 8    that I do recall.  But I don't recall whether I saw       11:42:51

 9    it all over the Internet or I did a -- I typed in --      11:42:54

10    Googled "Superman" after I got a call from Warren         11:42:58

11    Peary.  It may very well have been the latter.  I         11:43:01

12    don't recall.                                             11:43:03

13        Q.  Do you have any documents that would             11:43:04

14    identify when Mr. Peary called you?                       11:43:09

15        A.  You mean like a phone log or something?          11:43:18

16        Q.  Any -- any document or any -- any piece of       11:43:20

17    evidence that would establish when he contacted you?     11:43:24

18        A.  Not that I can think of.  Except the 2001.       11:43:29

19        Q.  Sometime prior to 2000- --                       11:43:37

20        A.  No, I'm saying the 2001 PPC agreement --         11:43:40

21        Q.  Correct.                                          11:43:43

22        A.  -- means that he contacted me before that,       11:43:44

23    so that would be a document.                              11:43:45

24        Q.  Right.  I meant affix the actual date            11:43:46

25    within a couple of days?                                  11:43:49
```

**EXHIBIT 87**
**2629**

| | | |
|---|---|---|
| 1 | A.   No. | 11:43:50 |
| 2 | Q.   Okay.   And do you know whether -- when | 11:43:55 |
| 3 | Mr. Peary contacted you, you were already familiar | 11:43:58 |
| 4 | to some degree with the Superman termination issue | 11:44:03 |
| 5 | because you read on the Internet something about it? | 11:44:06 |
| 6 | A.   That's the part I -- I couldn't say. | 11:44:09 |
| 7 | Q.   Okay. | 11:44:10 |
| 8 | A.   I may have -- I may have -- I may have been | 11:44:12 |
| 9 | aware of it or I may have looked into it after he | 11:44:14 |
| 10 | called me. | 11:44:19 |
| 11 | Q.   Whenever -- | 11:44:20 |
| 12 | A.   I wouldn't be surprised if I -- if either | 11:44:21 |
| 13 | was the case. | 11:44:23 |
| 14 | Q.   When you did look into it, did you look | 11:44:24 |
| 15 | into it by yourself or did someone assist you? | 11:44:28 |
| 16 | A.   By myself. | 11:44:32 |
| 17 | Q.   Okay.   As of this point in time in 2001, | 11:44:37 |
| 18 | whether it's when you saw Superman all over the | 11:44:39 |
| 19 | Internet or when Mr. Peary called you, and I | 11:44:42 |
| 20 | appreciate you can't remember which happened first, | 11:44:45 |
| 21 | had you had any prior -- | 11:44:49 |
| 22 | A.   May I ask -- | 11:44:51 |
| 23 | MR. KENDALL:   Just a minute.   Let him | 11:44:52 |
| 24 | finish his question. | 11:44:53 |
| 25 | THE WITNESS:   Okay. | 11:44:55 |

**EXHIBIT 87**
**2630**

MARC TOBEROFF - 9/18/2012

Page 105

| | | |
|---|---|---|
| 1 | generally without waiver of privilege or work | 11:56:04 |
| 2 | product.  When I say "privilege," I'm referring to | 11:56:08 |
| 3 | work product as well. | 11:56:10 |
| 4 |      That the purpose was to check the status of | 11:56:14 |
| 5 | the -- the Siegel termination.  "What do you mean | 11:56:22 |
| 6 | status?"  You know, had a complaint been filed?  Had | 11:56:25 |
| 7 | the matter been settled?  What -- what's the status? | 11:56:32 |
| 8 | BY MR. PETROCELLI: | 11:56:37 |
| 9 |      Q.  You saw from the -- by the way, for all | 11:56:38 |
| 10 | these privilege and work product assertions, in the | 11:56:48 |
| 11 | year 2001, there's only one -- who is the client? | 11:56:54 |
| 12 |      A.  Who is the client? | 11:57:02 |
| 13 |      Q.  Yes. | 11:57:02 |
| 14 |      A.  At the point when I was inquiring into the | 11:57:05 |
| 15 | status of the Siegel termination, the Shusters were | 11:57:09 |
| 16 | the clients. | 11:57:14 |
| 17 |      Q.  And who was the client or who were the | 11:57:14 |
| 18 | clients in 2002, through September 30, 2002? | 11:57:17 |
| 19 |      A.  To September 30, 2000- to -- 2002?  The | 11:57:31 |
| 20 | Shusters were the client. | 11:57:36 |
| 21 |      Q.  No other client? | 11:57:38 |
| 22 |      MR. KENDALL:  I'm going to object as | 11:57:42 |
| 23 | overbroad.  Vague and ambiguous. | 11:57:43 |
| 24 | BY MR. PETROCELLI: | 11:57:43 |
| 25 |      Q.  You can answer. | 11:57:54 |

**EXHIBIT 87**
**2631**

MARC TOBEROFF - 9/18/2012

Page 106

| | | |
|---|---|---|
| 1 | MR. KENDALL: And I'm going to have an | 11:58:10 |
| 2 | additional objection to it. Lacks foundation. | 11:58:12 |
| 3 | THE WITNESS: To the extent I was | 11:58:17 |
| 4 | communicating on behalf of IP Worldwide, or Ari | 11:58:31 |
| 5 | Emanuel, I would say there was a attorney-client | 11:58:38 |
| 6 | relationship there. I handled all legal matters for | 11:58:42 |
| 7 | IP Worldwide. | 11:58:49 |
| 8 | MR. KENDALL: I think we need to go off the | 11:58:51 |
| 9 | record for a minute, because there's a privilege | 11:58:53 |
| 10 | matter I need to discuss with the witness. | 11:58:55 |
| 11 | Shouldn't take long. | 11:58:59 |
| 12 | MR. PETROCELLI: Okay. | 11:59:00 |
| 13 | THE VIDEOGRAPHER: Off the record. The | 11:59:01 |
| 14 | time is 11:59. | 11:59:02 |
| 15 | (Brief recess.) | 12:04:19 |
| 16 | THE VIDEOGRAPHER: We're back on the record | 12:04:38 |
| 17 | at 12:04. | 12:04:39 |
| 18 | BY MR. PETROCELLI: | 12:04:39 |
| 19 | Q. I think there was a pending question about | 12:04:43 |
| 20 | prior to September 30, 2002, who your clients were | 12:04:47 |
| 21 | regarding Superman, and you indicated that in all of | 12:04:59 |
| 22 | 2001 it was Shuster, Joe Shuster. | 12:05:03 |
| 23 | Is that correct? | 12:05:09 |
| 24 | A. No, I said Shuster and then I included IP | 12:05:09 |
| 25 | Worldwide. | 12:05:18 |

**EXHIBIT 87**
**2632**

MARC  TOBEROFF - 9/18/2012

Page 108

| | | |
|---|---|---|
| 1 | it calls for work product or attorney-client | 12:06:27 |
| 2 | communications. | 12:06:30 |
| 3 | THE WITNESS:  I'll just answer generally | 12:06:33 |
| 4 | that I acted as general counsel for the joint | 12:06:36 |
| 5 | venture IP Worldwide, because I was a lawyer.  And | 12:06:44 |
| 6 | communications between Ari Emanuel, who was a | 12:06:53 |
| 7 | general partner or a member of IP Worldwide with me | 12:06:57 |
| 8 | regarding matters of a legal nature I believe are | 12:07:02 |
| 9 | privileged, we've asserted privilege and I'll assert | 12:07:08 |
| 10 | a privilege as to that. | 12:07:11 |
| 11 | BY MR. PETROCELLI: | 12:07:12 |
| 12 | Q.  And I'm only asking about matters related | 12:07:12 |
| 13 | to Superman. | 12:07:14 |
| 14 | Are you saying you had privileged | 12:07:14 |
| 15 | discussions with Ari Emanuel in 2002 related to | 12:07:17 |
| 16 | Superman where you were the lawyer and he was the | 12:07:20 |
| 17 | client? | 12:07:24 |
| 18 | MR. KENDALL:  Vague and ambiguous. | 12:07:26 |
| 19 | Misstates the witness' answer and therefore lacks | 12:07:28 |
| 20 | foundation and is argumentative. | 12:07:30 |
| 21 | THE WITNESS:  When you say "you were the | 12:07:35 |
| 22 | lawyer and he was the client," that -- that | 12:07:38 |
| 23 | doesn't -- I don't know if that's the proper way to | 12:07:44 |
| 24 | describe a relationship within a company or a joint | 12:07:46 |
| 25 | venture between a member of that company and general | 12:07:52 |

**EXHIBIT 87**
**2633**

MARC  TOBEROFF - 9/18/2012

Page 109

| | | |
|---|---|---|
| 1 | counsel for that company. | 12:07:57 |
| 2 | BY MR. PETROCELLI: | 12:07:57 |
| 3 | Q.  Well, you were the only lawyer involved for | 12:08:00 |
| 4 | IPW during this period of time? | 12:08:04 |
| 5 | A.  It's not IPW, it's IP Worldwide. | 12:08:06 |
| 6 | Q.  You're right, IP Worldwide.  Correct? | 12:08:09 |
| 7 | A.  Yes, yes. | 12:08:12 |
| 8 | Q.  And the only other person who was | 12:08:12 |
| 9 | affiliated with IP Worldwide other than you is Ari | 12:08:14 |
| 10 | Emanuel, correct? | 12:08:17 |
| 11 | A.  Correct. | 12:08:19 |
| 12 | Q.  So are you saying you had conversations | 12:08:19 |
| 13 | between you and Ari Emanuel where, by virtue of your | 12:08:23 |
| 14 | status as a lawyer for IPW and -- Worldwide and his | 12:08:26 |
| 15 | status as a member of IP Worldwide, you're saying | 12:08:32 |
| 16 | they were privileged? | 12:08:36 |
| 17 | A.  Yes. | 12:08:37 |
| 18 | Q.  And they related to Superman? | 12:08:37 |
| 19 | A.  Yes. | 12:08:38 |
| 20 | Q.  Did they relate to the Shuster interest in | 12:08:40 |
| 21 | Superman? | 12:08:44 |
| 22 | MR. KENDALL:  Vague and ambiguous. | 12:08:45 |
| 23 | Overbroad. | 12:08:45 |
| 24 | THE WITNESS:  I don't recall. | 12:08:47 |
| 25 | BY MR. PETROCELLI: | 12:08:47 |

**EXHIBIT 87**
**2634**

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | Q.  You earlier testified that the Shuster | 12:08:50 |
| 2 | interest was excluded from IP Worldwide, correct? | 12:08:52 |
| 3 | A.  That's correct. | 12:08:55 |
| 4 | Q.  Okay.  Did you -- | 12:08:55 |
| 5 | A.  You said "relate."  That's a broad word. | 12:08:57 |
| 6 | Q.  Correct. | 12:09:00 |
| 7 | Did you have discussions with Mr. Emanuel | 12:09:03 |
| 8 | on which you're asserting privilege involving the | 12:09:07 |
| 9 | Shuster termination interest? | 12:09:13 |
| 10 | MR. KENDALL:  Just a moment. | 12:09:14 |
| 11 | Vague and ambiguous.  Overbroad.  I think | 12:09:28 |
| 12 | you can answer that question with a "yes" or a "no" | 12:09:32 |
| 13 | or whether you recall, but do not get into | 12:09:35 |
| 14 | discussions of that, if you can -- if it's your view | 12:09:38 |
| 15 | that those would be privileged. | 12:09:42 |
| 16 | THE WITNESS:  I don't -- it's moot, because | 12:09:46 |
| 17 | I don't recall specific conversations. | 12:09:48 |
| 18 | BY MR. PETROCELLI: | 12:09:48 |
| 19 | Q.  With Mr. Emanuel about the Shuster side of | 12:09:51 |
| 20 | the -- of Superman? | 12:09:55 |
| 21 | A.  I don't recall a specific conversation. | 12:09:56 |
| 22 | Q.  Okay. | 12:09:59 |
| 23 | A.  But you may ask me a question that will | 12:10:00 |
| 24 | refresh my recollection. | 12:10:03 |
| 25 | This conversation started with you asking | 12:10:05 |

MARC  TOBAROFF  9/28/2012

Page 315

```
1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF LOS ANGELES    )

3

4              I, Shanda Gabriel, Certified Shorthand

5    Reporter, Certificate No. 10094, for the State of

6    California, hereby certify:

7              I am the deposition officer that

8    stenographically recorded the testimony in the

9    foregoing deposition;

10             Prior to being examined the witness was by

11   me first duly sworn;

12             The foregoing transcript is a true record

13   of the testimony given.

14             Before completion of the deposition, review

15   of the transcript [X] was [] was not requested.  If

16   requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   are appended hereto.

19

20   Dated  September 20, 2012.

21

22

23                    Shanda Gabriel
                      CSR 10094

24

25
```

**EXHIBIT 87**
**2636**