1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10  DC COMICS,                              Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,                  **DC COMICS' NOTICE OF
                                            MOTION AND MOTION FOR
12        v.                                RECONSIDERATION OF MAY
                                            23, 2011, ORDER DENYING
13  PACIFIC PICTURES                        MOTION FOR REVIEW RE:
    CORPORATION, IP WORLDWIDE,              PRODUCTION OF
14  LLC, IPW, LLC, MARC TOBEROFF,           DEFENDANTS' CONSENT
    an individual, MARK WARREN              AGREEMENT
15  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,           DECLARATION OF DANIEL M.
16  JEAN ADELE PEAVY, an individual,        PETROCELLI AND [PROPOSED]
    LAURA SIEGEL LARSON, an                 ORDER FILED CONCURRENTLY
17  individual and as personal              HEREWITH
    representative of the ESTATE OF
18  JOANNE SIEGEL, and DOES 1-10,           Hon. Otis D. Wright II
    inclusive,
19                                          Hearing Date:    November 12, 2012
                Defendants.                 Hearing Time:    1:30 p.m.
20                                          Courtroom:       11
21
22
23
24
25
26
27
28

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2          PLEASE TAKE NOTICE that on November 12, 2012, at 1:30 p.m., or as

3   soon thereafter as the matter may be heard by the above-entitled Court, located in

4   Courtroom 11 at 312 North Spring Street, Los Angeles, California, DC Comics

5   ("DC") will and hereby does move for reconsideration of the Court's May 23, 2011

6   order denying its motion for review of Judge Zarefsky's April 11, 2011 ruling

7   declining to order defendants to produce the "Consent Agreement."  DN 248, 209.[1]

8          This motion is made pursuant to Local Rule 7-18 and the Court's inherent

9   authority to reconsider interlocutory orders in light of newly discovered facts and

10  evidence.  *E.g.*, *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F.

11  Supp. 2d 1152, 1162-63 (C.D. Cal. 2008).  Judge Zarefsky denied DC's motion to

12  compel production of defendants' Consent Agreement based on Marc Toberoff's

13  unsupported claim, which Judge Larson accepted in the *Siegel* case, that the

14  Consent Agreement documented privileged discussions that occurred in connection

15  with a 2008 mediation session.  DN 209 at 1-10.

16         In the 16 months since this Court denied DC's motion for review, new facts

17  and court rulings have emerged that show Toberoff's claims about the contents of

18  the Consent Agreement were incorrect, and that the Consent Agreement is not a

19  privileged mediation document, but an illicit arrangement orchestrated by Toberoff

20  that continues to exist today—far outside any mediation, and in violation of DC's

21  rights.  At their depositions, defendants also selectively disclosed facts about the

22  Consent Agreement, thereby waiving any potential privilege.  Further, defendant

23  Mark Warren Peary admitted he reviewed the Consent Agreement in advance of his

24  deposition to refresh his recollection—yet another ground for disclosure of the

25  Agreement.

26

27

28         [1] All cites to "DN" are to the Docket in this case.

i

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

1         This motion is made following several conferences of counsel concerning

2  DC's need to obtain the Consent Agreement and related testimony based on new

3  developments in the case.  Decl. of Daniel M. Petrocelli ("PD") Exs. K at 404-06;

4  G-J, L-M; *see* DN 493 ¶¶ 13-18; 374 at 5 n.7; 307 at 21 n.3; Ninth Circuit Appeal

5  No. 11-56934, DN 16 at 39-40.  The motion is based on this Notice of Motion and

6  Motion; the accompanying Memorandum of Points and Authorities; the

7  concurrently filed Declaration of Daniel M. Petrocelli and exhibits in support

8  thereof; any additional briefing that may be filed; all exhibits, files, and records on

9  file in this action; matters of which judicial notice may be taken; and such

10  additional submissions and argument as may be presented at or before the hearing

11  on this motion.

12  Dated:      October 10, 2012        Respectfully Submitted,

13                        By:  /s/ Daniel M. Petrocelli

14                           Daniel M. Petrocelli
                         Attorneys for Plaintiff DC Comics

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND .................................... 2

        A.      The Consent Agreement And Its Origins ............................... 2

        B.      Prior Litigation Concerning The Consent Agreement .......................... 5

III.    NEW FACTS WARRANT DISCOVERY OF THE CONSENT
        AGREEMENT ................................................................................. 6

        A.      The Consent Agreement Is Not Privileged ........................... 7

        B.      Defendants' Selective Disclosures Require Production ..................... 11

        C.      Peary's Use Of The Consent Agreement Before His Deposition
                To Refresh His Recollection Requires Production ............................. 15

IV.     CONCLUSION ................................................................................. 17

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Athey v. Farmers Ins. Exch.*,

4

    234 F.3d 357 (8th Cir. 2000) ................................................................... 5

5

*Bd. of Trs. v. Tyco Int'l, Ltd.*,

    253 F.R.D. 521 (C.D. Cal. 2008) ........................................................... 5

6

*Carmona v. Carmona*,

7

    603 F.3d 1041 (9th Cir. 2010) ............................................................... 6

8

*Carney v. Am. Univ.*,

    151 F.3d 1090 (D.C. Cir. 1998) ............................................................ 5

9

*Doe 1 v. Super. Ct.*,

10

    132 Cal. App. 4th 1160 (2005) .............................................................. 4

11

*Ehrlich v. Howe*,

12

    848 F. Supp. 482 (S.D.N.Y. 1994) ..................................................... 17

13

*FDIC v. White*,

    76 F. Supp. 2d 736 (N.D. Tex. 1999) ................................................... 5

14

*Hernandez v. Tanninen*,

15

    604 F.3d 1095 (9th Cir. 2010) ............................................................. 15

16

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*,

    2010 WL 3894966 (S.D. Cal. Sept. 29, 2010) ................................... 17

17

*In re Comair Air Disaster Litig.*,

18

    100 F.R.D. 350 (D.C. Ky. 1983) ........................................................ 17

19

*In re Pacific Pictures Corp.*,

20

    679 F.3d 1121 (9th Cir. 2012) ................................................... 9, 11, 15

21

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*,

    739 F. Supp. 2d 125 (D. Conn. 2010) .................................................. 4

22

*Milne v. Stephen Slesinger, Inc.*,

23

    430 F.3d 1036 (9th Cir. 2005) ............................................................... 3

24

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*,

    568 F. Supp. 2d 1152 (C.D. Cal. 2008) ............................................ i, 7

25

*Minebea Co., Ltd. v. Papst*,

26

    355 F. Supp. 2d 526 (D.D.C. 2005) ...................................................... 9

27

*Munoz v. J.C. Penney Corp.*,

28

    2009 U.S. Dist. LEXIS 36362 (C.D. Cal. Apr. 9, 2009) ..................... 5

*Rhoades v. Avon Prods., Inc.*,
   504 F.3d 1151 (9th Cir. 2007) ........................................................... 5

*S&A Painting Co., Inc. v. O.W.B. Corp.*,
   103 F.R.D. 407 (W.D. Penn. 1984) .................................................. 17

*Thomas v. Bible*,
   983 F.2d 152 (9th Cir. 1993) ............................................................ 6

*Trebor Sportswear Co. v. Limited Stores, Inc.*,
   865 F.2d 506 (2d Cir. 1989) ............................................................. 4

*U.S. v. 22.80 Acres of Land*,
   107 F.R.D. 20 (N.D. Cal. 1985) ................................................. 16, 17

*U.S. v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .......................................................... 11

*U.S. v. Chen*,
   99 F.3d 1495 (9th Cir. 1996) ............................................................ 9

*U.S. v. Ruehle*,
   583 F.3d 600 (9th Cir. 2009) .......................................................... 11

*Uforma/Shelby Bus. Forms, Inc. v. NLRB*,
   111 F.3d 1284 (6th Cir. 1997) .......................................................... 5

*Weil v. Inv./Indicators, Research & Mgmt., Inc.*,
   647 F.2d 18 (9th Cir. 1981) ............................................................. 15

*Westinghouse Elec. Corp. v. Republic of Phil.*,
   951 F.2d 1414 (3d Cir. 1991) .......................................................... 15

**STATUTES**

CAL. EVID. CODE § 1120 ......................................................................... 4

**RULES**

FED. R. CIV. P. 30(C) ............................................................................. 16

FED. R. EVID. 408 .................................................................................. 4

FED. R. EVID. 408, Advisory Comm. Note .............................................. 4

FED. R. EVID. 502, Advisory Comm. Note ............................................ 11

FED. R. EVID. 612 ............................................................................. 16-17

Local Rule 7-18 ................................................................................... i, 6

**OTHER AUTHORITIES**

18B C. WRIGHT ET AL., FED. PRAC. & PROC. § 4478 (2d ed. 2002) ........................ 6

v

# I.   INTRODUCTION

The "Consent Agreement" is an arrangement that prohibits the Siegel and Shuster parties from making any agreement with DC regarding Superman without the other's consent.  It is an illicit agreement, in DC's view, violating DC's rights under the U.S. copyright laws and public policy.  It is not privileged, and no court has ever reviewed it, not even *in camera*.  Disclosure of the agreement is vitally important to DC's claims in this case, as well as its ability to settle all disputes with the Siegel and Shuster defendants.  The Consent Agreement relates to pending summary judgment motions, particularly as DC's unclean-hands claim alleges that the Consent Agreement contains an improper *quid pro quo* in which the Siegels will pay off the Shusters for falsely disclaiming any ownership interest in the Superboy character.  DN 491 at 17-25; 493 ¶¶ 12-18; 494-1 at 54-56, 59; *see* DN 458 at 2, 9, 23-25; 458-1 at 10-11, 13; 468 at 10-12; 471 at 36-39, 69-70.  The Consent Agreement also bears directly on DC's pending sanctions motion, DN 500 ("Sanctions Mot."), as it is yet another piece of key evidence that defendants have suppressed through misrepresentations and false privilege assertions.

DC moved to compel production of the Consent Agreement in February 2011.  Judge Zarefsky denied the motion based on Judge Larson's acceptance of Toberoff's representation in the *Siegel* case, "as an officer of the court," that the so-called "Withheld Document" merely memorialized privileged "discussions" among Toberoff and the heirs in advance of mediation.  DN 160 at 11-27; 209 at 1-10.  Neither Judge Larson nor Judge Zarefsky reviewed the few-pages-long document.  DC moved for review in this case in 2011, arguing Judge Larson's and Judge Zarefsky's rulings were neither binding nor correct, DN 244, and this Court denied that motion in May 2011.  DN 244, 252.

Two sets of recent events confirm the Court should reconsider its May 2011 Order.  *First*, in the past 16 months, new facts have emerged establishing that Toberoff's representations about the allegedly privileged nature of the "Withheld

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

1  Document," on which Judge Larson relied, were untrue and should be given no

2  further deference.  As the Shuster and Siegel parties have now admitted in

3  depositions, the Consent Agreement reflects a contract between these two families

4  that remains in effect today, well outside the scope of any mediation—like other

5  business contracts and communications that this Court and the Ninth Circuit

6  recently ordered Toberoff to produce over false claims of privilege.

7      *Second*, in the months since the Court's May 2011 ruling, defendants have

8  tactically and selectively disclosed self-serving parts of the Consent Agreement in

9  depositions and briefs, and defendant Mark Warren Peary used it to refresh his

10  recollection before testifying at deposition.  While defendants eagerly reveal

11  aspects of the Consent Agreement they deem helpful to their case (and their recent

12  summary judgment motion), they refuse to disclose its harmful contents (including

13  the illicit *quid pro quo*) behind false and untenable privilege claims.  Such selective

14  disclosures and uses—not previously before the Court—are not permitted under

15  federal law and constitute a waiver of any privilege previously applicable to the

16  Consent Agreement.

17      DC's motion should be granted.

18  **II.    RELEVANT FACTUAL BACKGROUND**

19      **A.  The Consent Agreement And Its Origins.**

20      1.  Over the past decade, Toberoff and his entertainment companies have

21  engineered a series of rights-tying agreements that unlawfully restrict the Siegels'

22  and Shusters' freedom to enter into agreements concerning their putative rights in

23  Superman.  Starting in 2001, the Shusters "assigned" to a joint venture with

24  Toberoff's company Pacific Pictures all of their "rights, title, and interest" in

25  Superman, and promised not to "transfer, limit, or encumber the Rights in any

26  respect … without the express written consent" of Pacific Pictures.  PD Exs. A, C.

27      Defendants admit the Pacific Pictures agreements are unlawful and "void *ab*

28  *initio*" under the Copyright Act, DN 147-1 at 2, 8; 191 at 8, which prohibits such

2

1   "trafficking in future [copyright] interests," *Milne v. Stephen Slesinger, Inc.*, 430

2   F.3d 1036, 1047 (9th Cir. 2005).  And despite defendants' previous efforts to cast

3   the Pacific Pictures agreements as legal retainer agreements, Toberoff admitted in

4   his deposition last month that the Pacific Pictures agreements were modeled after a

5   "form of agreement" used in "entertainment business-type of ventures."  *Compare*

6   DN 145-1 at 6, 17, *with* PD Ex. Q at 847:2, 849:8-12.  Toberoff also conceded that

7   any retainer agreement containing a "provision that said that the client requires [his]

8   consent to settle"—as the Pacific Pictures agreements do—would violate the ethical

9   rules governing attorneys.  PD Ex. Q at 853:10-19.

10       In 2002, the Siegels likewise granted Toberoff's company IP Worldwide the

11   exclusive right to "negotiate the sale, lease, license and all other dispositions" of

12   their putative Superman rights.  *Id.* Ex. B at 8.  In exchange, IP Worldwide was to

13   be paid a 10% "agent's fee."  *Id.* at 9; *id.* Ex. K at 462.  Like the Pacific Pictures

14   agreements, the IP Worldwide agreement restricted the Siegels' freedom to deal

15   with DC, providing that they could "not transfer, assign, license or in any manner

16   encumber" their rights other than through IP Worldwide, controlled by Toberoff.

17   *Id.* at 10.

18       2.  By their own admission, defendants entered into at least one more consent

19   agreement in 2008 that—to this day—bars the Siegel and Shuster heirs from

20   assigning their rights in Superman without each other's written consent.  DN 173 at

21   707; *see* DN 160 at 50-51; 147-1 at 2; 245.  Like defendants' prior agreements, the

22   2008 Consent Agreement is a business deal governing the heirs' ability to dispose

23   of their putative Superman rights and setting certain monetary terms for any such

24   disposition—it is plainly not a document conveying legal advice or confined just to

25   mediation, as defendants claim.  Indeed, as shown below and in DC's pending

26   summary judgment opposition, one of the central purposes of the Consent

27   Agreement was to provide the Shuster family with a share of any money the Siegel

28   family obtains in the *Siegel* <u>Superman</u> case—in exchange for the Shusters having

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

1  falsely disclaimed any ownership interests in Superboy in favor of the Siegels.

2  *Infra* at 8, 13-15; DN 491 at 19-23; 493 ¶¶ 13-18.

3      Toberoff disclosed the existence of the Consent Agreement in a letter sent

4  before a 2008 mediation session in *Siegel*.  That letter is at DN 245 and was

5  submitted to the Court under seal.  In it, Toberoff generally described the Consent

6  Agreement.  *Id.*  He did *not* say it was privileged—to the contrary, he disclosed its

7  existence and essential business terms to DC, the Siegels' litigation adversary.

8      That Toberoff first revealed the Agreement before a mediation is irrelevant—

9  federal and California law make clear that a party may not "immunize admissible

10  information, *such as a pre-existing document*, through the pretense of disclosing it

11  during compromise negotiations."  FED. R. EVID. 408, Advisory Comm. Note

12  (emphasis added); *see* CAL. EVID. CODE § 1120; *Doe 1 v. Super. Ct.*, 132 Cal. App.

13  4th 1160, 1173 (2005) (if the rule were otherwise, parties improperly "could use

14  mediation as a pretext to shield materials from disclosure"); *see* DN 244 at 3-4

15  (discussing relevant cases); 243 at 7-8 (same).  Defendants invoked these very rules

16  last week in summary judgment briefing:

17      "Rule 408 … has limits."  *Master-Halco, Inc. v. Scillia, Dowling &*
       *Natarelli, LLC*, 739 F. Supp. 2d 125, 130 (D. Conn. 2010).  Evidence
18      regarding settlement negotiations is not admissible to prove liability,
       but it is admissible "for another purpose."  Fed. R. Evid. 408; *Trebor*
19      *Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.
       1989) ("Evidence of an offer to compromise though otherwise barred
20      by Rule 408, can fall outside the Rule if it is offered for 'another
       purpose' …."").  DN 495-3 at 3 (underlining added).
21

22      While Rule 408 prohibits reliance on a settlement communication for the use

23  defendants seek to make of DC's 2005 offer in summary judgment briefing—*i.e.*, to

24  prove the invalidity of DC's First Claim—the Consent Agreement is discoverable

25  evidence of independently wrongful acts occurring outside the auspices of a

26  mediation or settlement discussion.  It is not a privileged mediation communication;

27  it is an unlawful contractual restraint.  This Court has recognized that parties may

28  rely on proof of statements made during mediation sessions to prove facts other

4

than "liability, invalidity of, or amount of a claim" in the case being mediated, *Munoz v. J.C. Penney Corp.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009) (Wright, J.)[2]—meaning DC can use the Consent Agreement in this case to prove defendants' liability for claims that were not asserted in *Siegel*.

### B. Prior Litigation Concerning The Consent Agreement.

1. In *Siegel*, DC demanded the Siegels produce the Consent Agreement— which was responsive to discovery requests—but Toberoff refused, claiming it was a privileged mediation document and irrelevant.  PD Ex. D; DN 173 at 710-12.  DC moved to compel in December 2008.  Case No. CV-04-8400, DN 395.  At Toberoff's insistence, DC only described the Consent Agreement as the "Withheld Document."  *Id.*  Without disclosing its contents, DC argued the "Withheld Document" was responsive to discovery requests and relevant to "the upcoming accounting trial" in *Siegel*.  *Id.* at 5, 2-6.  Toberoff asserted the "Withheld Document" was privileged, shielded from disclosure by the parties' mediation confidentiality agreement, and had "absolutely no relevance."  *Id.* at 2, 6-15.

Judge Larson declined to review the "Withheld Document" or even Toberoff's letter to DC describing it.  Given that Judge Larson had ordered the parties to mediate and the parties had "a bench trial starting in a few weeks," he explained in a January 2009 oral ruling that he "would rather not look at this letter

---

[2] *Accord Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1294 (6th Cir. 1997) (evidence of threats made in settlement negotiations admissible); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000) (evidence of settlement offer admitted to prove bad faith); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161-62 (9th Cir. 2007) (disclosure of settlement communications to satisfy jurisdictional requirements); *Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998) (settlement letter threatening to retaliate against plaintiff unless he dropped claim admissible as evidence of new, independent tort); *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999) (no federal privilege prevents parties from challenging wrongdoing "under the guise of preserving the integrity of the mediation process"); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008) ("[T]here is no federal privilege preventing the discovery of settlement agreements and related documents.").

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

myself."  PD Ex. E at 23.  Judge Larson also accepted Toberoff's assertion, "as an
officer of the court," that the document was privileged.  *Id.* at 29.  Judge Larson
never reviewed the document *in camera* or asked Toberoff to explain how a
contract between two parties that affected their respective rights and financial
obligations could be a privileged communication.  *Id.*  He could not ask these
questions because he did not know what the Withheld Document was.

2.  After filing this new case, DC moved to compel the Consent Agreement,
arguing it was neither privileged (it was a business agreement that defendants had
chosen to disclose to DC), nor shielded by mediation confidentiality rules (the
mediation had long since ended, the agreement was still in effect, and the mediation
confidentiality rules do not shield evidence of misconduct or evidence that parties
disclose during settlement talks).  DN 160 at 1-3, 11-27; *see supra* at 3-5.

Judge Zarefsky denied DC's motion based on the erroneous ground that he
was bound by Judge Larson's ruling in *Siegel* under "law of the case" doctrine.  DN
209 at 3-4.  Judge Zarefsky, like Judge Larson, never reviewed the Consent
Agreement, though he rightly observed:  "One cannot know with certainty what the
consent agreement means without seeing [it]."  *Id.* at 8:1-2.

3.  DC filed a motion for review before this Court, making its arguments
above and showing that the "law of the case" doctrine applies only to rulings made
"in the identical case."  DN 244 at 1-12 (citing *Thomas v. Bible*, 983 F.2d 152, 154
(9th Cir. 1993); *Carmona v. Carmona*, 603 F.3d 1041, 1052 (9th Cir. 2010)); 18B
C. WRIGHT ET AL., FED. PRAC. & PROC. § 4478, at 637-39 (2d ed. 2002) ("The rule
does "not apply between separate actions.");  *see* DN 243 at 5-7; 244 at 5-6.  This
Court denied DC's motion in May 2011, in a one-word order.  DN 252.

## III.   NEW FACTS WARRANT DISCOVERY OF THE CONSENT
## AGREEMENT

Under Local Rule 7-18, "the emergence of new material facts" may warrant
reconsideration of an earlier ruling.  *Milton H. Greene Archives, Inc. v. CMG*

6

*Worldwide, Inc.*, 568 F. Supp. 2d 1152, 1162-63 (C.D. Cal. 2008).  In the 16 months since the Court's May 2011 ruling, key facts have come to light that confirm:  (a) the Consent Agreement is *not* a privileged communication created solely for use in a 2008 mediation—as Toberoff told Judge Larson—but a business arrangement between the Siegels and Shusters that continues to exist today; and (b) defendants waived any privilege that may have existed by selectively disclosing facts about the agreement, and otherwise using it in connection with recent depositions and briefs.

### A.    The Consent Agreement Is Not Privileged.

1.  Judge Zarefsky's denial of DC's motion concerning the Consent Agreement pivoted on Judge Larson's decision in *Siegel* that he would trust Toberoff's assertion that the "Withheld Document" was a "privileged" mediation-related communication.  Reproduced below is what Toberoff told Judge Larson about the "Withheld Document," and Judge Zarefsky treated those representations as sufficient, holding he would not "re-visit Judge Larson's ruling that the attorney-client and related privileges protect the consent agreement," DN 209 at 10:

> [Mr. Toberoff:]  Your Honor, this is absolutely a privileged communication, attorney-client privilege, joint interest privilege, as a communication between parties with an interest in litigation and attorney-work product. *The document was signed by me <u>summarizing discussions</u> between my clients.*  There's no way this document would not be protected by the attorney-client privilege.
>
> The document was written a week before the settlement mediation solely for the purposes of advancing settlement.  *It reflects <u>discussions</u> between myself and my clients regarding settlement and settlement strategy….*
>
> I wrote a letter [to DC], 'settlement, for confidential purposes only,' and in there I talked about this communication because it bore on — *it was a discussion between my clients regarding settlement, and I gave some of the results of that.*  Based on that, they are demanding the underlying communication….
>
> The communication *is signed by me.*  It is signed by me, *and <u>it refers to discussions</u> that I had with my clients regarding settlement.*  How that cannot be privileged, I do not know.  Even if it had not been signed by me but merely reflected a communication between two parties with an

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

interest in litigation regarding settlement or regarding settlement strategy, that would be protected by the joint interest privilege.

PD Ex. E at 23-27 (emphases added).

2.  Toberoff's repeated description of the Withheld Document as a summary of "discussions" that he and the Siegels and Shusters had is inconsistent with the testimony defendants have since given about the agreement.  In reality, the Withheld Document is a *binding contract* that (a) restricts the Shusters' ability to assign their putative copyright interests, in violation of the Copyright Act and other laws, DN 458 at 23-24; 468 at 10-12; PD Ex. N at 774-75; and (b) supplies the Shusters with the "quo," or monetary payoff, in defendants' Superboy *quid pro quo* fraud, DN 491 at 19-22; 245 (Toberoff's description of agreement).

Toberoff never told Judge Larson that an *agreement* existed, complete with signatures of the various parties, and he never even told Judge Larson the agreement's name.  PD Ex. E at 23-27.  Judge Larson, moreover, *never* reviewed the Consent Agreement, *never* saw Toberoff's letter describing the contents of the agreement (DN 245), and *never* had before him defendants' admissions in this case that their agreement continues to exist today—years after the mediation for which it was allegedly created.  *Infra* at 9; *see* DN 173 at 710, Case No. CV-04-8400, DN 395 at 10:1-2, 13:11-12.  Judge Larson accepted Toberoff's "characterization of [the agreement] as a privileged document, as an officer of the court," explaining:  "I have every reason to believe that he … is fairly and accurately representing that to the Court; and I will rely on that representation."  PD Ex. E at 29.

3.  Toberoff's representations to the Courts—particularly as to the allegedly privileged status of documents—were not candid.  In this case, after this Court issued its May 2011 ruling declining to order production of the Consent Agreement, Peary, Larson, and Toberoff were all deposed.  Their testimony made clear that Toberoff's characterization of the "Withheld Document" to Judge Larson (and to Judge Zarefsky and to this Court) was not accurate.  For example, Peary and

1   Toberoff both testified that the Consent Agreement remains in effect to this day, PD

2   Ex. O at 804:5-7 (Peary); Q at 856:10-12 (Toberoff)—despite Toberoff's claims

3   that it was entered into "solely for purposes of the parties' settlement mediation,

4   which commenced on May 8, 2008," DN 147-1 at 20.  As defendants know, that

5   mediation ended years ago.  PD Ex. F.  It is also obvious from defendants'

6   testimony that the Consent Agreement is *not* a summary of privileged legal advice,

7   but involves a *quid pro quo* business arrangement in which the Siegels bind

8   themselves to pay the Shusters money.  DN 491 at 19-23; 493 ¶¶ 13-17; 245; *infra*

9   at 8, 13-15.  Such business dealings are not privileged.  *Cf. In re Pacific Pictures*

10  *Corp.*, 679 F.3d 1121, 1129, 1125 (9th Cir. 2012); *U.S. v. Chen*, 99 F.3d 1495,

11  1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer

12  "'in his capacity as such'"—not where lawyer acts as a "business agent"); *Minebea*

13  *Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005) ("'if a lawyer is wearing

14  a businessman's hat, there's a presumption that it's not privileged'").

15      4.  As detailed in DC's concurrently filed sanctions motion, years of hard-

16  fought discovery post-dating Judge Larson's ruling—and a series of orders from

17  this Court, an Ohio court, and the Ninth Circuit—have all exposed that Toberoff

18  has engaged in a pattern of misrepresentations and false privilege assertions to

19  suppress damaging evidence.  Sanctions Mot. at 6-21.  Thus, Toberoff's untested

20  assertion "as an officer of the court" that the Consent Agreement is privileged

21  should no longer be given conclusive, dispositive effect.

22      While Toberoff has prevented DC from discovering the full sweep of his

23  misconduct, the following is clear:  here and in *Siegel*, he has filed no fewer than

24  four false and misleading declarations, violated at least three court orders, and made

25  repeated misrepresentations to DC and the Court in briefs and at hearings.  *Id.*  This

26  conduct was not limited to peripheral discovery issues, but involved critical

27  evidence supporting DC's core allegations in this case.  To take two examples:

28

9

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

- Toberoff persistently misled the Court about correspondence between Laura Siegel Larson and her half-brother Michael Siegel—claiming such letters did not exist, hiding others behind misleading entries on privilege logs, and asserting overreaching privilege claims over others still.  *Id*.  These letters, many of which defendants have been ordered to produce in the past year, refute Toberoff's indignant claims that DC's case is without basis.[3]

- And two months ago, even after DC commenced meet-and-confer discussions on its sanctions motion, Toberoff submitted a declaration to this Court seeking to suppress yet another key piece of evidence.  In briefing before this Court and the Ninth Circuit, Toberoff claimed that he had "no contact with any member of the Siegel family" until "October 2002," DN 145-1 at 23-24—and thus he could not have interfered with DC's 2001 deal with the Siegels.  In July 2012, this Court ordered Toberoff to produce a November 2001 email from Toberoff to Michael, which confirms he had *direct* contact with the Siegels nine months earlier.  DN 457.  Toberoff hid the existence of this email for *six years*, Sanctions Mot. at 19-21, yet in support of a failed motion for reconsideration, swore under oath he "first received the November 2001 Email in 2011," *id*. at 20.  Earlier sworn admissions by Toberoff and his associate disproved this assertion, as did evidence from lawyers for Michael and his Estate.  *Id*. at 20-21.

Toberoff's lack of candor, DN 489 at 9:25-10:20, has not gone unnoticed.  This Court observed his "problematic" misleading of the U.S. Copyright Office,

---

[3] *Compare id*. at 14 (Toberoff calling DC's "billionaire investor" claim a "mockery," "contrary to all evidence," and based the "untrustworthy" Toberoff Timeline); *id*. ("[t]here are *no documents* related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights"), *with id*. at 19-20 (long-suppressed November 2002 letter from Laura to Michael:  Toberoff and Emanuel told Laura that "the billionaire investor … had invested his money elsewhere"); *id*. at 15-17 (long-suppressed May 2003 letter from Michael to Laura: "when [Laura] signed with Marc the billionaire invested elsewhere.") (all emphases added).

10

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

1    DN 491 at 24-25, and the Ninth Circuit commented on his disregard for his
2    "ethical" duties, *Pacific Pictures*, 679 F.3d at 1124, and his improper blanketing of
3    business communications with claims of privilege, *id.* at 1129 ("most of the
4    [Timeline] documents are not covered by attorney-client privilege because they do
5    not represent communications between a lawyer and his client for the purpose of
6    obtaining legal advice.  *Cf.* [*U.S. v.*] *Ruehle*, 583 F.3d [600,] 608-09 n.8 [(9th Cir.
7    2009)] (rejecting a presumption of privilege even when a communication involves a
8    lawyer).");  *id.* at 1125 ("Considering every communication he had with the Heirs to
9    be privileged—regardless of whether the communication was in his capacity as a
10   business advisor or an attorney—Toberoff resisted all such [discovery].");  DN 161-
11   5 at 30-31 (Ohio federal court in 2008; same).

12        Based on DC's pending sanctions motion alone, the Court can and should
13   order the Consent Agreement produced and allow DC to fully examine defendants
14   about its contents.

15            **B.    Defendants' Selective Disclosures Require Production.**

16        Even if some portion of the Consent Agreement was privileged, defendants'
17   selective deposition testimony concerning its contents effected a broad privilege
18   waiver over the entire document.  As the courts have made clear, "the attorney-
19   client privilege cannot at once be used as a shield and a sword."  *U.S. v. Bilzerian*,
20   926 F.2d 1285, 1291-94 (2d Cir. 1991).  The Rules "prevent a selective and
21   misleading presentation of evidence to the disadvantage of" the non-disclosing
22   party.  Fed. R. Evid. 502, Advisory Comm. Note.

23        Toberoff *allowed* Peary and Larson to testify on certain aspects of the
24   supposedly privileged Consent Agreement, including:

25        •    that the agreement does *not* entitle the Shusters to share in the Siegels'
26             recovery from the *Siegel* Superboy case, PD Ex. O at 813:21-814:13 (Peary);
27        •    that it remains in force and effect today, *see id.* at 804:5-7 (Peary) (Q. "Is the
28             consent agreement that you signed in 2008 still in effect?"  A. "Yes.");

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

- that its terms bar the Siegels or Shuster from making a deal with DC without the consent of the other, *see id.* Ex. Q at 807:8-808:8 (Peary);

- who signed the document, *see id.* Exs. O at 790:19-791:4 (Peary) (Q. "Who else signed the 2008 consent agreement?"  A. "Laura, Joanne Siegel … and my attorney signed it."); P at 824:10-15 (Larson);

- what its title is, *see id.* Ex. O at 797:15-25 (Peary) (Q. "You identified the document that the Siegels and you signed as a consent agreement …. [I]s that the title of the document?"  A. "I recall the title says 'Superman Agreement.'"); and

- that it allegedly does not entitle Toberoff to any new remuneration, *see id.* Ex. P at 839:15-840:5 (Larson) (Q. "Is there anything in the 2008 consent agreement that would trigger additional remuneration to Mr. Toberoff based on a transaction of the Siegel rights?"  A. "[T]here's no … [r]emuneration.").

However, asserting privilege, Toberoff *blocked* all of DC's questions concerning:

- why Peary and Larson entered into the agreement, *see id.* Exs. O at 798:15-800:21 (Peary); P at 834:20-835:7 (Larson);

- Peary's and Larson's understanding of the purpose of the agreement, *see id.* Exs. O at 798:15-800:17, 801:4-13 (Peary); P at 831:3-832:7 (Larson);

- why Peary refers to the document as a "consent agreement," *see id.* Exs. O at 798:2-14;

- Peary and Larson's understanding of the effect of the agreement, *see id.* Exs. O at 801:4-13 (Peary); P at 831:3-832:7, 836:6-12 (Larson);

- whether and why Peary believes the agreement benefits the Shusters, *see id.* Ex. O at 810:14-23;

- Peary's understanding that the agreement violates DC's rights, *see id.* at 780:8-783:17;

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

- Larson's non-privileged discussions with her mother about the agreement, *see id.* Ex. P at 827:9-828:11;

- whether the consent agreement refers to "Superboy," *see id.* Ex. P at 832: 20-25 (Larson); and

- ***most importantly—and most tellingly—***whether the agreement entitles the Shusters to share a portion of the Siegels' recovery in the *Siegel* <u>Superman</u> case, *see id.* Exs. O at 802:17-22, 803:9-15, 817:5-13, 818:6-12 (Peary); P at 831:3-19 (Larson).

The Superboy *quid pro quo* is at the heart of DC's First Claim in this case, and defendants have moved for summary judgment on it. DN 491 at 19-23; 491 at 19-23; 493 ¶¶ 13-18.  As recently as two weeks ago, defendants filed a reply in support of their motion asserting that "DC's allegation of a 'quid pro quo' … is nothing but wild speculation, supported by <u>no evidence</u> …. Ms. Larson and Mr. Peary *both* testified that the Shusters have no interest whatsoever in the Siegels' Superboy termination or Superboy litigation."  DN 495 at 10; *see* DN 495-4 at 5-6.

Defendants' sole emphasis and focus on the *Siegel* <u>Superboy</u> termination and litigation—as opposed to the *Siegel* Superman termination and litigation—are telling.  Their recent briefs notably say nothing about the *Siegel* <u>Superman</u> termination and litigation and the Shusters' stake in both, as provided by the Consent Agreement.  *Cf. id.*  And while defendants freely and openly volunteered and testified at their depositions that the Consent Agreement does not entitle the Shusters to share in proceeds from the Siegels' <u>*Superboy*</u> termination and case, Toberoff systematically blocked all inquiry into whether the Consent Agreement entitles the Shusters to share in proceeds from the Siegels' <u>*Superman*</u> termination and pending case—*i.e.*, proceeds from the *Siegel* accounting trial or a settlement with DC.  For example, while Toberoff permitted Peary to answer whether the Shusters have an agreement with the Siegels *other than* the Consent Agreement

13

entitling them to share proceeds in the *Siegel* accounting case, he instructed Peary *not* to answer an identical question as to the Consent Agreement:

> Q.  Do you have any agreement to share in any accounting recovery that the Siegels might obtain in their case against DC or Warner Bros.?
> MR. TOBEROFF:  *I instruct you not to answer that because it delves into the potential substance of the consent agreement.*
> (Unanswered question.)
> THE WITNESS:  I'll have to follow my attorney's advice.
> Q.  *Putting aside the consent agreement*, the 2008 consent agreement for the moment, *have you signed any agreement by which the Shuster interests would share in any accounting recovery by the Siegel parties?* …
> MR. TOBEROFF:  You can answer the question.
> THE WITNESS:  I can answer that?  Okay …. *No.*
> Q.  As part of the 2008 consent agreement, is there a provision by which the Shusters share in any accounting recoveries that the Siegels might obtain?
> MR. TOBEROFF:  I instruct you not to answer as to the contents of the consent agreement.  PD Ex. O at 817:5-818:11 (emphases added).

Toberoff also barred Larson from answering any questions concerning the Superboy *quid pro quo*, even in conversations with her mother:

> Q. Does the consent agreement that you signed with the Shusters make any reference at all to Superboy?
> MR. TOBEROFF: I instruct you not to answer based on the consent agreement being held to be privileged, not disclose the substance.
> ….
> Q. I just want to follow up a bit on that last area that we covered about the consent agreements and the arrangements with the Shusters. Does -- do the consent agreements -- I may have asked you this already, but let me ask you again. Do the consent agreement documents -- does the consent agreement document make any reference at all to Superboy?
> A. You did ask me that.
> MR. TOBEROFF: Asked and answered. And I instruct you not to answer.
> MR. PETROCELLI: If I agree that it's not a waiver, do you continue to instruct on that?
> MR. TOBEROFF: Yes.
> ….
> Q. And does the -- did you discuss with your mother at any time whether or not to enter into an agreement with the Shusters regarding the sharing of recoveries or proceeds from Superman?
> A. I believe we talked about it.
> Q. Can you relate that discussion to me?

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

MR. TOBEROFF: I instruct you not to answer based on the attorney-client privilege, joint client privilege. *Id.* Ex. P at 832:20-25, 835:17-836:4, 834:20-835:3.

Defendants and Toberoff cannot have it both ways.  They cannot disclose those contents of the Consent Agreement that they find helpful (*e.g.*, the Consent Agreement does *not* entitle the Shusters to share in the Siegels' recovery from the *Siegel* <u>Superboy</u> case; Toberoff gets no extra money under the Consent Agreement), while barring DC from exploring those portions defendants consider unhelpful (*i.e.*, money to the Shusters from the Siegels for the Shusters agreeing to go along with the Superboy fraud).  A party "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or disclose, but after a certain point his election must remain final."  *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991) (same) (case cited favorably in *Pacific Pictures*, 679 F.3d at 1127); *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) ("Disclosing a privileged communication … results in waiver as to all other communications on the same subject.") (case cited favorably in *Pacific Pictures*, 679 F.3d at 1126).

## C.   Peary's Use Of The Consent Agreement Before His Deposition To Refresh His Recollection Requires Production.

At his deposition, Peary admitted he reviewed the Consent Agreement in order to refresh his memory:

> Q.  You now recall that you signed something called a consent agreement and that's also in your lock box?
> A.  Yes….
> Q.  When is the last time you saw it, or a copy of it?
> A.  Fairly recently I reviewed it last, I don't know, maybe in the last month or so I might have reviewed it.
> Q.  Why?
> A.  Because I was thinking about this case because of this.
> Q.  This deposition?
> A.  Yes….

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT

Q.  Why did you review -- why did you pick the 2008 consent agreement to review?

A.  Well, before I came I -- I brought out my folder and it says "Legal, Shuster case" and I flipped through documents, just looked at them and said what do I want to bring, what don't I want to bring and -- and that's all.  It was just a cursory review of what I had in there.  And I left most of it at home, so it was just a cursory review of what I had.  PD Ex. O at 788:20-23, 792:2-11.

In addition to reviewing the *entire* Consent Agreement, Peary testified that he brought the first page of the Agreement to the deposition to further "jog [his] memory":

Q.  What did you bring with you?

A.  I brought a copy of the legal retainer as of 2001 and I brought a -- a copy of the first page of the consent agreement and a -- with a cover letter that was a communication between Mr. Toberoff and another attorney so it was just like the first page of it, just to jog my memory….

Q.  And were you shown any documents yesterday when you met with Mr. Toberoff?

A.  We reviewed the prior deposition and exhibits and the -- reviewed our agreements.

Q.  What agreements?

A.  The legal retainer and the -- the complaint from DC and the supporting legal documents, quite -- quite a few but just -- just that stuff.

Q.  Did you also show Mr. Toberoff the consent agreement pages that you had taken with you?

A.  Yes, just the -- the copy that I brought to jog my memory.  *Id.* at 792:12-18, 794:8-19.

Federal Rule of Evidence 612 "permit[s] discovery of writings (or portions thereof) that a witness reviewed *before* a deposition for the purpose of refreshing his or her recollection; *any privilege or work product protection against disclosure is deemed waived as to those portions so reviewed*.  The court then may order disclosure if, in its discretion, it determines disclosure is in the interest of justice." *U.S. v. 22.80 Acres of Land*, 107 F.R.D. 20, 25 (N.D. Cal. 1985) (ordering production of appraisal report reviewed by deponents to refresh recollection) (second emphasis added); FED. R. CIV. P. 30(c) (Rule 612 applicable to depositions).

DC'S MOT. FOR RECONSIDERATION RE: CONSENT AGREEMENT

1   Courts have ordered disclosure of a privileged document used to refresh a

2   deponent's memory where there is a substantial "need[] for effective cross-

3   examination." *22.80 Acres of Land*, 107 F.R.D. at 26.  "When … a witness has

4   used such materials to refresh his recollection prior to testifying," Rule 612

5   "weights the balance in favor of finding that the 'substantial need' exists, because

6   of the policy in favor of effective cross-examination." *In re Comair Air Disaster*

7   *Litig.*, 100 F.R.D. 350, 353 (D.C. Ky. 1983) (ordering production of privileged

8   report).  Otherwise, "it would be unfair and unduly prejudicial to permit the

9   deponent" to review the document, "give a deposition with it fresh in his mind, yet

10   keep it unavailable to opposing counsel." *Id.* at 354; *accord S&A Painting Co., Inc.*

11   *v. O.W.B. Corp.*, 103 F.R.D. 407, 409-10 (W.D. Penn. 1984) (ordering production

12   of attorney notes and observing:  "Confronted with the conflict between the

13   command of Rule 612 to disclose materials used to refresh recollection and the

14   protections afforded by the attorney-client privilege …, the weight of authority

15   holds that the privilege and protections are waived."); *Hoot Winc, LLC v. RSM*

16   *McGladrey Fin. Process Outsourcing, LLC*, 2010 WL 3894966, at *5 (S.D. Cal.

17   Sept. 29, 2010) (ordering production of attorney's report); *Ehrlich v. Howe*, 848 F.

18   Supp. 482, 494 (S.D.N.Y. 1994) (ordering production of privileged memorandum).

19   In this case, the "substantial need" for the Consent Agreement is clear.  The

20   Agreement is centrally at issue in pending summary judgment motions, and its

21   contents bear directly on DC's pending sanctions motion.  DC also needs the

22   document to conduct fair and complete depositions of defendants—something

23   Toberoff's objections have barred.

24   **IV.   CONCLUSION**

25   DC's motion should be granted.

26   Dated:        October 10, 2012                    Respectfully Submitted,

27                                                     By:  /s/ Daniel M. Petrocelli

28

17

DC'S MOT. FOR RECONSIDERATION
RE: CONSENT AGREEMENT