# EXHIBIT

# A

## JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001by and between Pacific Pictures Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu, CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively, "Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505) 466-4551, regarding the formation of a joint venture for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights").

1.      The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy," "Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

2.      In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations. In consideration for PPC'S contributions to the Venture and the mutual covenants contained herein Claimants hereby transfer and assign to the Venture their rights, title and interests in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's office address shall be the California address set forth above.

3.      PPC will pay any and all costs and expenses of the Venture, including the legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _____

134

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials _____

135

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.      The term ("Term") of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.      To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10.     All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

136

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall
bind and inure to the benefit of the parties, their respective heirs, successors and assigns.
Executed facsimile copies of this Agreement shall be valid acceptable substitutes for
executed originals.

11.    This Agreement shall be governed by the laws of California applicable to
agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation


By: Marc Toberoff, President                    Date: _Nov. 28, 2001_


Jean A. Peavy                                   Date: _Nov. 28, 2001_


Mark Warren Peary                               Date: _Nov. 28, 2001_
(f/k/a Mark Warren Peavy)

# EXHIBIT

# B

# Ip worldwide

As of October 3, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

**RECEIVED**

OCT 24

Marc Toberoff

Re: *"Superman"*

Dear Joanne and Laura:

This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property commonly known as *"Superman,"* including, without limitation, all characters and copyright interests therein (jointly and individually, "Rights"):

    1.    In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.

    2.    IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. IPW will also provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above. IPW will be solely responsible for Marc Toberoff's legal fees in connection herewith, if any.

    3.    The terms of any and all agreements regarding the Rights will require Owner's express written approval.

    4.    IPW will pay its own costs and expenses in connection with this Agreement, including without limitation, office overhead, photocopying, messenger fees, postage and overnight mail, long distance telephone and fax charges, travel and accommodation costs and any legal fees to Marc Toberoff, and such costs will not be recoupable from Proceeds hereunder. Notwithstanding this, in the event IPW advances or loans Owner moneys to pay costs in furtherance of the Rights (e.g., US Copyright Office fees and audit fees, if any) the terms and repayment of any such advances or loans will be set forth in a separate written agreement between the parties.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

000001878

**EXHIBIT B**

8

-2002 04:56 PM   (
Oct-21-02  09:15am  From-

1  (  1 827 7227      P.03
T-298  P.005/013  F-766

# Ip worldwide

Page 2
Retainer Agreement/ *Superman*
As of October 3, 2002

    5.    The term ("Term") of this Agreement is eighteen (18) months from the date this Agreement is executed by all parties. In the event the parties are actively negotiating an agreement regarding the Rights when the Term is due to expire, the Term will automatically be extended for three (3) additional months. In the event during the Term either Marc Toberoff or Ariel Emanuel are unable to render services in connection with this Agreement for a continuous period greater than three (3) months due to death, incapacity or otherwise, Owner may in its discretion terminate this Agreement prior to the expiration of the Term.

    6.    In consideration of the services to be furnished by IPW hereunder you hereby agree to pay and authorize IPW to retain out of all gross compensation, moneys or other consideration that may be payable or recovered for or by reason of Owner's Rights whether by negotiation, dispute resolution, settlement or otherwise ("Proceeds"): a fee ("Fee") of ten percent (10%) of any and all gross compensation payable including , without limitation, option, quitclaim or licensing fees, purchase price, settlement amounts, advances, fixed and/or contingent compensation. In computing IPW's fee no deduction will be made from gross Proceeds, including, without limitation, no deduction for Owner's taxes, expenses and/or moneys payable to any and all third parties if any. IPW's Fee shall apply to any and all agreements regarding the Rights made during the Term or the material terms of which are substantially negotiated during the Term and/or to any agreements between Owner and an investor or buyer introduced by IPW to Owner during the Term. For the avoidance of doubt, in the event *"Superman"* and the Rights are sold, settled, licensed or otherwise exploited in conjunction with other characters or rights owned or controlled by Owner (s.g., *"Superboy"*); it is understood and agreed that IPW will not "double dip" and the above 10% IPW Fee will apply to gross Proceeds from any said joined transaction(s).

    Notwithstanding the above, for purposes of computing IPW's Fee, Proceeds will not include Joanne Siegel's annual "pension" payments which commenced in 1996 (currently $ 126,148 annually, plus cost of living increases or bonuses, if any) and her full medical and dental coverage provided by AOL Time Warner which consideration and interests pre-date and are wholly separate from her copyright termination interests.

///
///
///
///
///
///

000001879

**EXHIBIT B**

9

2002 04:56 PM
Oct-21-02  08:18pm  From-

1   827 7227                P.04
T-254  P.008/013  F-786

# **Ip**world w i d e

Page 3
Retainer Agreement/ *Superman*
As of October 3, 2002

7.      Owner hereby authorizes IPW to collect and receive all Proceeds due and payable; to endorse and deposit any checks or moneys payable into a client trust account on Owner's behalf; to deduct IPW's fee as set forth above; whereupon IPW will promptly pay the remainder directly to Owner as directed by Owner in writing. It is understood that the Rights may involve multiple rights and claims against multiple parties and accordingly IPW's above fee shall be applicable to each Rights payment or recovery from any party and same is not contingent on any other Rights payment.

8.      Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.

9.      All notices and/or payments hereunder shall be made to the parties at the addresses set forth on page 1 hereof unless and until either party gives the other prior written notice of a change of address.

10.     The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and Owner.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by both parties. The parties acknowledge that they fully understand the terms and conditions of this Agreement and have agreed to such terms and conditions after negotiation, mature thought and deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. The terms of this Agreement shall be construed pursuant to their fair meaning, not for or against either party. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals. This Agreement shall be governed by the

000001880

**EXHIBIT B**
**10**

# **Ip** w o r l d w i d e

Page 4
Retainer Agreement/ *Superman*
As of October 3, 2002

Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased and excited to work with you and will do our very best to handle this matter in a dedicated manner and to achieve results satisfactory to you.

Yours sincerely,

Marc Toberoff
Authorized signatory

Ariel Emanuel
Authorized signatory

Agreed, Understood and Accepted:

Joanne Siegel

Date: October 23rd 2002

Laura Siegel Larson

Date: October 23, 2002

000001881

**EXHIBIT B**
**11**

# EXHIBIT
# C

# PACIFIC PICTURES CORPORATION

**23852 Pacific Coast Highway, Suite 555**
**Malibu, CA 90265**
**Tel: (310) 589-5151**
**Fax: (310) 589-5152**



---

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

  We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

  1. Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

  2. In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

  3. PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: *MT, MWP*

**125**

**EXHIBIT C**
**12**

## PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peary, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____

**126**

**EXHIBIT C**
**13**

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.      To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.      All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.      This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.      This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MS_, _NVT_

127

EXHIBIT C
14

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor                Date: 10-30-03
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

Jean A. Peavy                Date: 10-30-03

**128**

EXHIBIT C
15

# EXHIBIT D

WWBCGE

**VIA FACSIMILE
AND U.S. MAIL**

June 24, 2008

Marc Toberoff, Esq.
Law Offices of Marc Toberoff
2049 Century Park East, Suite 2720
Los Angeles, CA 90067

**Michael Bergman**
a professional corporation
mbergman@wwllp.com
(310) 860-3317

Our File No. 2231.811

Re:   Superman/Superboy Litigations
      Case Nos. 04-CV-8400, 8776 SGL (RZx)

Dear Marc:

As I stated at our meeting on June 5th, defendants seek the immediate production of the Agreement identified in your letter of May 2, 2008.

This Agreement is clearly relevant, material and discoverable. Agreements of this precise nature are called for by Requests Nos. 59 and 63 of Defendants'/Counterclaimant's First Set of Requests for the Production of Documents and Things:

> "Request No. 59: All writings concerning any disposition of any rights relating to Superman, including but not limited to any solicitation, offer, option, agreement or license."

> "Request No. 63: All writings concerning the Shuster Representatives, including but not limited to any communication or agreements between Plaintiffs and any of the Shuster Representatives."

Hopefully, you'll agree to partially supplement your prior responses by producing a copy of this Agreement; we are, however, prepared to seek judicial relief if you fail to do so. Please contact me so that we may schedule a meet and confer in order to address this matter.

**EXHIBIT D**

16

Marc Toberoff, Esq.
June 24, 2008
Page 2

Thank you.

Very truly yours,


Michael Bergman

# EXHIBIT E

1

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7    JOANNE SIEGEL, ET AL.,              )
                                         )
8                       Plaintiffs,      )
                                         )
9             vs.                        )   No. CV 04-08776-SGL
                                         )
10   TIME WARNER, INC., ET AL.,          )
                                         )
11                      Defendants.      )   Cross Motions
     _____)   to Compel
12

13

14            Reporter's Transcript of Proceedings

15                  Riverside, California

16              Wednesday, January 14, 2009

17                      1:32 P.M.

18

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
             Federal Official Court Reporter
24             3470 12th Street, Rm. 134
               Riverside, California  92501
25                  (951) 274-0844
                 WWW.THERESALANZA.COM

2

```
1     APPEARANCES:

2

3     On Behalf of Plaintiffs:

4
                      LAW OFFICES OF MARC TOBEROFF
5                     BY:  Marc Toberoff
                      BY:  Nicholas C. Williamson
6                     2049 Century Park East,
                      Suite 2720
7                     Los Angeles, California   90067
                      310-246-3100
8

9
      on behalf of Defendants:
10

11                    WEISSMANN WOLFF BERGMAN COLEMAN
                       GRODIN & EVALL LLP
12                    BY:  Michael Bergman
                      9665 Wilshire Boulevard,
13                    Ninth Floor
                      Beverly Hills, California   90212
14                    310-858-7888

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2                                              Page

3   MOTIONS.........................................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    Riverside, California; Wednesday, January 14, 2009; 1:32 P.M.

2                                -oOo-

3         **THE CLERK:**  Calling calendar item two in the case of

4    Joanne Siegel, etc., versus Warner Brothers Entertainment Inc.,

5    etc., case number CV 04-08400-SGL(RZx).                          00:11

6         May we have counsel please come forward and state

7    your appearances for the record.

8         **MR. BERGMAN:**  Good afternoon, your Honor.

9         Michael Bergman for the defendants.

10        **MR. TOBEROFF:**  Marc Toberoff for the plaintiff, along   00:12

11   with my associate Nicholas Williamson.

12        **THE COURT:**  Good afternoon to you both.

13        I'm sorry about the terrible traffic conditions that

14   you encountered coming out here.

15        **MR. BERGMAN:**  Thank you, your Honor.                    00:12

16        I apologize to the Court and to opposing counsel.

17        **THE COURT:**  No apology necessary.  Unfortunately,

18   that's part of living and driving in Southern California.

19        I have before me two discovery motions.  I've

20   reviewed the papers.  Let's begin with the defendant's motion    00:12

21   to produce this letter.

22        I guess my first question for Warner Brothers on this

23   is this:  The characterization of the letter by Mr. Toberoff in

24   his papers characterizes it as a communication essentially

25   between counsel and a client.  I don't find anywhere where you   00:12

Wednesday, January 14, 2009    **EXHIBIT E**        CV 04-08400-SGL(RZx)
                                    21

1   dispute that characterization.

2          Am I mistaken?

3      **MR. BERGMAN:**  No, your Honor, you're not.  But I'm in

4   a position where, due to the confidentiality agreement, I

5   cannot disclose, absent Mr. Toberoff relieving me of that

6   confidentiality, how Mr. Toberoff characterized the document in

7   the letter which disclosed it.

8          I can tell the Court that it was not described in

9   Mr. Toberoff's letter as a communication with clients.

10     **THE COURT:**  It was not described in Mr. Toberoff's

11  letter --

12     **MR. BERGMAN:**  The letter to me in which he disclosed

13  what the document was.

14     **THE COURT:**  Fair enough.  But the characterization I

15  have from Mr. Toberoff at this point is that, and I'll just

16  quote it:  "The privileged document consists of a communication

17  between plaintiffs, the executor of the estate of Superman

18  co-creator Joe Shuster, and plaintiff's counsel who represents

19  both parties, regarding settlement of this action."

20     **MR. BERGMAN:**  Based on --

21     **THE COURT:**  I don't have the letter.

22          You don't have the letter, I presume.

23     **MR. BERGMAN:**  That's correct.

24          Well, I have the letter, Your Honor.

25     **THE COURT:**  That's right.  You do have the letter.

1    Of course.

2         **MR. BERGMAN:**  Based on what Mr. Toberoff stated in

3    the letter, his characterization of a communication with

4    clients is not correct.  It is characterized as something else;

5    something else which I will represent to the Court falls                00:14

6    clearly, if it's producible, within the two categories of the

7    requests that we have outlined.

8         Beyond that, there's really nothing.

9         **THE COURT:**  That, to me, is the turning point, the

10   tipping point of this argument right here; so Mr. Toberoff, I          00:14

11   need your response.

12        I would ordinarily simply accept the representation

13   of any counsel before me that a letter is privileged

14   communication.  This is a unique situation where, because it

15   was in a settlement conference, defense counsel sees it.  He is        00:15

16   disputing your characterization.

17        I would rather not look at this letter myself,

18   particularly since we have a bench trial starting in a few

19   weeks, but there may not be any other way for me to address

20   this than to do so.                                                    00:15

21        I'll give you an opportunity to respond.

22        **MR. TOBEROFF:**  Your Honor, this is absolutely a

23   privileged communication, attorney-client privilege, joint

24   interest privilege, as a communication between parties with an

25   interest in litigation and attorney-work product.  The document       00:15

1   was signed by me summarizing discussions between my clients.

2   There's no way this document would not be protected by the

3   attorney-client privilege.

4           The document was written a week before the settlement

5   mediation solely for the purposes of advancing settlement.  It          00:15

6   reflects discussions between myself and my clients regarding

7   settlement and settlement strategy.

8           **THE COURT:**  Without getting into the substance of the

9   document, is it fair to say -- and perhaps this explains your

10  different positions -- is it fair to say, Mr. Toberoff, that it         00:16

11  is not self evident from the letter itself that it is

12  representing a communication between a lawyer and a client and

13  that is perhaps why defense counsel looks at it and does not

14  see it that way, but you, being in your position, know that it

15  is?                                                                      00:16

16          Is that what it is?

17          **MR. TOBEROFF:**  Let me correct a misimpression I

18  believe the Court has.

19          Defendants have never seen the document; all they

20  received from me was -- they never saw --                               00:16

21          **THE COURT:**  They never saw the letter.

22          **MR. TOBEROFF:**  They never saw the document on which

23  to base a claim that it's not privileged.  I simply described

24  it in a different letter after we entered into a

25  confidentiality agreement which took the JAMMS confidentiality          00:16

8

1    settlement agreement, actually beefed up those provisions;

2    included in the confidentiality agreement was the provision

3    that any communications in the course of mediation marked

4    'settlement, for confidential purposes only' --

5         THE COURT:  I read that.                              00:17

6         MR. TOBEROFF:  So I wrote a letter, 'settlement, for

7    confidential purposes only,' and in there I talked about this

8    communication because it bore on -- it was a discussion between

9    my clients regarding settlement, and I gave some of the results

10   of that.  Based on that, they are demanding the underlying     00:17

11   communication.

12        THE COURT:  I have to stop you and go back to defense

13   counsel.

14        Did you see the letter or did you just see a letter

15   describing the letter?                                     00:17

16        MR. BERGMAN:  Your Honor, I did not see the letter

17   which we are calling the undisclosed document; it has not been

18   produced to us.

19        THE COURT:  I'm sorry, then.  I thought you just told

20   me that you did see the letter.                            00:17

21        MR. BERGMAN:  No, your Honor.  What I meant -- and

22   perhaps I misspoke.

23        Mr. Toberoff, the day after we signed the

24   confidentiality agreement, sent me a letter; that letter in

25   redacted form is attached to my declaration.              00:18

Wednesday, January 14, 2009    **EXHIBIT E**         CV 04-08400-SGL(RZx)
                                    **25**

1      **THE COURT:**  Okay.

2      **MR. BERGMAN:**  That letter, which is what's called the

3  transmittal letter or the disclosure letter, the disclosure

4  letter from Mr. Toberoff to me purports to describe the

5  document which we are seeking production of.  As described in                00:18

6  Mr. Toberoff's letter to me, it does not appear to be a

7  communication between a lawyer and a client.  It is

8  characterized by Mr. Toberoff as being something much different

9  than that; something which would, unquestionably, if it were

10  not privileged, be producible in response to request number 63.              00:18

11      **THE COURT:**  Fair enough.  That would provide you

12  basis for having brought your motion.  I understand that.  But

13  now we're at a different juncture, and I'm having counsel

14  characterize the undisclosed document itself.

15      So my question is:  Is there any reason at this point         00:19

16  to question counsel's clarified clarification of the document

17  in question?

18      **MR. BERGMAN:**  Well, with all respect, your Honor, the

19  only reason would be is that it is contrary to the way

20  Mr. Toberoff described the document when he disclosed its              00:19

21  existence to us.

22      **THE COURT:**  Can you explain that, Mr. Toberoff?

23      **MR. TOBEROFF:**  That's an incorrect statement.

24      **THE COURT:**  How did you describe it in the letter?

25      Could I see that?  Is that the unredacted version?             00:19

10

1          **MR. BERGMAN:**  That's correct.

2          **THE COURT:**  Let me see the unredacted version.

3          This is the letter that was disclosed describing the

4   letter?

5          **MR. TOBEROFF:**  But that discloses the contents of the     00:19

6   letter.

7          **THE COURT:**  It does?

8          **MR. TOBEROFF:**  Yes; that's totally covered by our

9   confidentiality agreement --

10         **THE COURT:**  Okay.  Then I don't want to see that.     00:19

11         **MR. TOBEROFF:**  -- which they are not supposed to use

12  anything in settlement in this litigation, which they are now

13  attempting to do by putting this in front of you.

14         I'll say this:  The letter that I sent does not

15  describe every aspect of this communication, nor does it attach     00:20

16  the communication.  It describes some of the results of the

17  communication as it bears on settlement.

18         The communication is signed by me.  It is signed by

19  me, and it refers to discussions that I had with my clients

20  regarding settlement.  How that cannot be privileged, I do not     00:20

21  know.  Even if it had not been signed by me but merely

22  reflected a communication between two parties with an interest

23  in litigation regarding settlement or regarding settlement

24  strategy, that would be protected by the joint interest

25  privilege.     00:20

Wednesday, January 14, 2009     **EXHIBIT E**     CV 04-08400-SGL(RZx)

27

1          **THE COURT:**  Thank you, Counsel.

2          Anything further?

3          **MR. BERGMAN:**  I'm at a real disadvantage here.

4          **THE COURT:**  I know you are.  The only one who is at

5    more of a disadvantage is the Court.                          00:20

6          **MR. BERGMAN:**  I understand.

7          Would your Honor permit me to use the one-word

8    adjective with which Mr. Toberoff described the letter?

9          **MR. TOBEROFF:**  No I will not.

10         You're breaching the confidentiality--                  00:21

11         **THE COURT:**  Counsel, stop.  Stop.  We have a lot of

12   litigation together.  I don't want to see that happen again.

13         You address the Court one at a time.

14         Understood?

15         **MR. TOBEROFF:**  Sure.                                 00:21

16         **THE COURT:**  No.

17         Is there anything further on this point?

18         **MR. BERGMAN:**  Only, your Honor, the obvious point

19   that if there is an agreement in existence which is not

20   privileged which has never before been disclosed and it's     00:21

21   disclosed for the first time as part of a mediation process,

22   that does not make the document itself privileged.

23         **THE COURT:**  I understand that.

24         Mr. Toberoff, I've heard enough.

25         **MR. TOBEROFF:**  If I may just --                      00:21

12

1          **THE COURT:**  I said I've heard enough.

2          The motion is denied.

3          I will accept Mr. Toberoff's clarification of the

4    letter or characterization of the letter.  I understand without

5    having seen it that defense received a partial rendering of          00:22

6    that letter that led them to believe that it was not

7    privileged.  I can understand why they brought this motion and

8    I certainly do not fault them for doing that.

9          However, I will accept Mr. Toberoff's

10   characterization of it as a privileged document, as an officer      00:22

11   of the court.  I have every reason to believe that he is the

12   only person who has access to the underlying privileged

13   document; is fairly and accurately representing that to the

14   Court; and I will rely on that representation.

15          Part of this is motivated simply by the Court's            00:22

16   commitment to maintaining the settlement privilege.  It was the

17   Court that encouraged you to engage in that settlement effort,

18   and I want to maintain the confidences that were agreed to

19   during that period.  So that motion is denied.

20          Let's take up the plaintiff's motion with respect to       00:23

21   compelling documents.

22          I guess I need clarification, perhaps from both sides

23   on this.  As I understand it, there were three or four

24   different document productions made by the defense.  And if I

25   am understanding the plaintiff's motion correctly, you're          00:23

Wednesday, January 14, 2009    **EXHIBIT E**          CV 04-08400-SGL(RZx)

**29**

1   simply asking that the defense supplement any and all requests

2   for which supplemental documentation exists.

3           Is that correct, Mr. Toberoff?

4           **MR. TOBEROFF:**  That's correct, your Honor.

5           **THE COURT:**  Okay.                                      00:23

6           That's required by the local rules regardless of any

7   requests or regardless of any letters or specific meet and

8   confers; that's something which is an ongoing obligation which

9   I know the defense understands and appreciates; so I don't see

10  what the problem is.                                              00:23

11          **MR. BERGMAN:**  Indeed, we do understand that, your

12  Honor.  And as a matter of fact, the documents have been

13  produced, and our papers reflect that.

14          **THE COURT:**  I understand documents have been

15  produced.  My question to you is have supplemental documents    00:24

16  been produced in all categories for which previous documents

17  have been produced, so as to update them and fulfill your

18  obligations under the Federal Rules of Civil Procedure?

19          **MR. BERGMAN:**  Yes, Sir.

20          And the reason why -- just to explain the                00:24

21  circumstances, if I may briefly, your Honor -- why we did not

22  produce these requested documents immediately is the narrow

23  focus of the February 3rd trial.  Mr. Toberoff and we had

24  agreed 60 days prior to each trial, we would supplement our

25  prior productions relating to the issue to be tried.            00:24

1       The issues to be tried on February 3rd are either

2   alter ego or sweetheart deal; that is something that's going to

3   be addressed in the motion in limine.

4       **THE COURT:**  I've gone through the motions in limine,

5   the motions in limine/motions for reconsideration of the                00:25

6   Court's summary judgment order, and I will deal with those on

7   Monday, January 26th.

8       **MR. BERGMAN:**  Okay.

9       The documents which Mr. Toberoff specified in his

10  letter which began this process, which is Exhibit H to              00:25

11  Mr. Toberoff's declaration, his meet and confer letter, if you

12  will, lists the categories of documents that he wanted

13  supplemented.  With one exception, the 12 or 13 categories all

14  relate to the exploitation in one way or another of either the

15  "Superman Returns" film or "Smallville", documents pertaining          00:25

16  to its exhibition on ABC to its syndication to independent

17  television stations.

18      None of that material is relevant to the issue of

19  "are these contracts sweetheart deals?"  It has nothing do with

20  that subject.  It has nothing do with the alter ego subject.          00:26

21  That was our basis for not producing the documents in the first

22  instance.  We reached the point where we realized that the

23  fight was not worth the fight, and we produced all of the

24  documents we had.

25      If I'm not mistaken, as I read Mr. Toberoff's                      00:26

1    supplemental brief, it appears that the only thing he's

2    complaining of now is that we did not provide drafts and

3    correspondence pertaining to the agreements which we did

4    produce in the supplemental production, one of them being an

5    agreement with Warner Brothers consumer products that had          00:26

6    literally been executed on December 15th or 16th, after the

7    date to produce, and we've produced it.

8         THE COURT:  I guess my concern is, and I want to make

9    sure I'm being clear, I don't want Mr. Toberoff's specific

10   requests and your satisfaction of those specific requests to be    00:27

11   viewed as satisfying your ongoing obligations to supplement for

12   the entire category of requests that have been made and to

13   which you have produced documents in the past.  And that's the

14   impression that I got from reading that correspondence and your

15   responses.                                                         00:27

16         I want it understood that if there's an agreement

17   between counsel that we're going to focus on discovery for the

18   trial that we have on February 3rd now, that makes sense to me.

19   But at some point in time, sooner as opposed to later, there

20   needs to be a full supplemental production on the part of          00:27

21   Warner Brothers for every category for which they have

22   previously produced documents to the extent that they have

23   supplemental documents.  That's understood.

24         MR. BERGMAN:  That is understood, and I assume the

25   same thing applies to plaintiffs.                                  00:26

1        **THE COURT:** Of course. Rules apply to both sides.

2        So let me hear from Mr. Toberoff.

3        If counsel understands that obligation, do you have

4   this agreement to cabin off the discovery in anticipation of

5   the February 3rd trial?                                              00:28

6        What exactly is it that you're seeking from the Court

7   to order in light of counsel's representation that he

8   understands his obligations to supplement to the extent there

9   are supplemental documents.

10       **MR. TOBEROFF:** First of all, it's incorrect that they     00:28

11  have produced all documents.

12       Even though it's not plaintiff's burden to pinpoint

13  documents they have not seen yet but to give requests for

14  categories to which they need to respond, I can think of a few

15  areas where they have not produced documents where documents    00:28

16  would exist.

17       Since 2006, the last production, there have been

18  additional Superman agreements and amendments to existing

19  agreements.  They produced those finally on December 17th, but

20  they did not produce drafts showing the negotiating history of   00:29

21  those agreements, which are obviously relevant to an

22  examination of whether agreements are entered into at arms'

23  length.

24       Previously, in their prior production they produced

25  drafts and correspondence, but in their supplemental they did    00:29

1   not supplement by producing drafts and correspondence of new

2   agreements and amendments; so that's one area that I can think

3   of.

4         Another is for over two years there have been

5   internal memorandum of D.C. and Warner Brothers and

6   correspondence between D.C. and Warner Brothers regarding their

7   Superman agreements and regarding their relationship which are

8   all very relevant to the upcoming alter ego trial.  They have

9   not produced any internal memorandum or correspondence which

10  they must produce.

11        I need to take this back, because this is really not

12  a casual thing; this is a bigger problem and should not be

13  treated in the casual manner advocated by defendants.

14        I spent about four to five months with them prior to

15  arriving at this agreement, meeting and conferring about

16  supplementation, because I was very concerned about it.  In

17  fact, we had to bring a prior motion to compel where we served

18  our portion of a joint stipulation, and it was only after that

19  that they finally agreed to supplement 60 days before trial.

20  That date was calculated to also be before the LR 16 when each

21  side had to basically earmark their evidence and plan out their

22  trial strategy.

23        We finally arrive at this discovery agreement -- and

24  the rules are meant to promote exactly this type of

25  compromise -- and they willfully breached the agreement.  When

1   I address it, Mr. Bergman is evasive.  I bring it up again

2   on -- we comply with the agreement on November 21st.  Not only

3   do we supplement with our prior production, but we supplement

4   by providing all documents we intend to rely upon at trial.

5           I bring it up.  They are evasive.  Then on                    00:31

6   December 2nd, they say flat out, 'we're not supplementing.'

7   December 8th, at another meet and confer regarding motions in

8   limine, they say 'we are not supplementing.'  Then on

9   December 17th at 7:00 p.m., a messenger is sent over to the

10  office; the next day the motion in limine on this very subject   00:31

11  is due, they suddenly make a selective production.

12          This is just flat out wrong.

13          And they did it to disrupt their trial preparation,

14  to disrupt our motion to compel on the subject, and to disrupt

15  their motion in limine on the subject.                           00:31

16          In that supplementation, rather than supplement

17  within the responsive framework of requests and their prior

18  production, as your Honor has referred to, they simply take my

19  meet and confer letter which specifically mentioned the

20  relevant requests that are relevant to the alter ego trial, and 00:32

21  instead of focusing on documents responsive to those requests,

22  they say 'we disagree that we have any duty to supplement,' and

23  then they selectively go through some of the examples I've

24  given of what would be responsive documents and they narrow

25  that list and claim they have supplemented.                      00:32

1          This is improper.  And because they have breached an

2    expressed agreement, we believe they need to be ordered by the

3    Court to supplement, if not sanctioned, for their behavior.

4          **THE COURT:**  At this point, though, you do agree that

5    there is this agreement in terms of narrowing the production to    00:32

6    documents that are relevant to the February 3rd trial; is that

7    correct?

8          **MR. TOBEROFF:**  Absolutely.  And we gave them a list

9    of those requests which are relevant to this first phase of the

10   trial.                                                              00:32

11         **THE COURT:**  Very well.

12         And Counsel, you agree with this?

13         **MR. BERGMAN:**  I'm not sure what the 'this' is, your

14   Honor.

15         **THE COURT:**  'This' being that you have a duty to        00:33

16   supplement all document requests that are related to this

17   phase, this trial.

18         **MR. BERGMAN:**  Unquestionably.

19         **THE COURT:**  And you have made that production.

20         **MR. BERGMAN:**  I believe that we have produced          00:33

21   everything that Mr. Toberoff has identified.

22         **THE COURT:**  That wasn't the question I asked.

23         You're doing it again what you did in the papers, and

24   that's really causing me to think that you have not done what I

25   asked.                                                             00:33

20

```
 1              Have you produced supplements for every document
 2    request that is relevant to the February 3rd trial?
 3              It's a yes or no.
 4              MR. BERGMAN:  Yes.
 5              THE COURT:  I want you to make sure of that.        00:33
 6              MR. BERGMAN:  Yes, sir.
 7              THE COURT:  Because of your equivocation, I'm going
 8    to give you one week to make sure of that.
 9              Today is the 14th, you have to the 21st; so you have
10    one week to reaffirm, to make sure, that you have supplemented  00:33
11    every category.  Not just what Mr. Toberoff has identified, but
12    every category that is relevant to the February 3rd trial.
13              And more than that, I'm going to accept your
14    representation today that you have done so.  Nothing that you
15    produce after today is going to be used in the February 3rd    00:34
16    trial by Warner Brothers.
17              MR. BERGMAN:  Yes, sir.
18              THE COURT:  Anything further, Mr. Toberoff?
19              MR. TOBEROFF:  Yes, your Honor.
20              It has to do with the aspect of your words 'relevant  00:34
21    to the trial.'
22              Defendants have taken a very sort of self-serving
23    view.  It's in their interests to try and narrow what this
24    trial is about.  They want to narrow the trial, not only to the
25    terms of a couple agreements, but just to the financial terms   00:34
```

Wednesday, January 14, 2009    **EXHIBIT E**    CV 04-08400-SGL(RZx)

**37**

1    of those agreements.  So when they say, 'yes, relevant to the

2    trial,' that really should not be the measure.  It should be

3    relevant to either the scope that you say that is --

4    　　　　　　THE COURT:  If I was dealing with a young,

5    fresh-out-of-law-school attorney, I would have more concerns

6    about this, but I'm sure that all counsel in this room

7    understand the distinction between the standard of relevancy in

8    the discovery phase versus the standard of relevancy at the

9    trial itself.  And I'm sure at the end of this next week,

10   counsel will make sure that anything that is discoverable, as

11   that term is used in the Federal Rules of Civil Procedure,

12   related or potentially related or likely to lead to the

13   discovery of evidence, will be produced.

14   　　　　　　MR. TOBEROFF:  I understand, your Honor.

15   　　　　May I bring up one aspect which was touched upon?

16   　　　　　　THE COURT:  Sure.

17   　　　　　　MR. TOBEROFF:  He mentioned documents which regard

18   the distribution of Smallville or Superman Returns as being

19   entirely irrelevant.

20   　　　　We've asked for -- once this television show

21   "Smallville" is produced, they make an agreement to broadcast

22   it; and then, after they make an agreement, to put it on cable

23   and other media.  So we asked for their agreement between WBTV

24   and the WB Network which broadcasts and for the agreement with

25   the ABC Family Entertainment, and they have taken the position

00:35
00:35
00:35
00:35
00:36

Wednesday, January 14, 2009    **EXHIBIT E**
38                    CV 04-08400-SGL(RZx)

22

1   that it's completely irrelevant to this trial.

2          It is not irrelevant, and I can just give you a few

3   examples.

4          **THE COURT:**  It may or may not be relevant in terms of

5   being admitted at trial.  I'm not going to rule on that now.     00:36

6   It's certainly subject to discovery, and let's have it turned

7   over.

8          **MR. TOBEROFF:**  Thank you, your Honor.

9          **THE COURT:**  We have some very interesting issues to

10  take up on the 26th.  The Court believes that it will be in a    00:36

11  position to rule from the bench on all eight motions that it

12  has before it on the 26th.

13         Be prepared to argue.  I will certainly indicate at

14  the outset my tentative.  I'll look forward to seeing you on

15  January 26th.                                                    00:36

16         **THE CLERK:**  Court is in recess.

17

18                          CERTIFICATE

19

20  I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
21  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
22  conformance with the regulations of the Judicial Conference of
    the United States.

23

24  _____        _1-15-09_
    THERESA A. LANZA, CSR, RPR              Date
25  Federal Official Court Reporter

# EXHIBIT

# F



## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
905,900-321

May 14, 2010

**VIA E-MAIL AND U.S. MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Dear Mr. Toberoff:

I write to respond to your letter to me of April 27, 2010. Your letter mischaracterizes the mediation session in which our clients participated. Please assume that every claim made in your letter is rejected. Please also note that our mediation session terminated when you and your clients abandoned it, and we reject your improper invocation of the settlement privilege to cloak your subsequent letter or any similar communications.

Very truly yours,

Daniel Petrocelli
of O'MELVENY & MYERS LLP

**EXHIBIT F**
**40**