# EXHIBIT
# G



## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

July 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write pursuant to Local Rule 37 concerning counsel's persistent instructions to defendant Mark Peary not to respond to key lines of questioning during his June 29, 2011, deposition. For the reasons discussed below, there was no basis for these objections and Mr. Peary's wholesale refusal to testify on these topics. As a result, DC wrongfully has been denied critical evidence to support its claims and refute the factual assertions in defendants' Rule 12 and SLAPP briefing. Unless defendants agree to allow Mr. Peary to testify on these topics, DC will file a motion to compel the relevant testimony.

## I.    CONSENT AGREEMENT

Defense counsel instructed Mr. Peary "not to answer any questions regarding the substance of the consent agreement" between the Siegel and Shuster heirs that prohibits either family from entering into an agreement with DC without the consent of the other. _See_ Rough Tr. of June 29, 2011, Peary Dep. ("Tr.") at 62. The lines of inquiry blocked included:

- why Mr. Peary entered into the consent agreement, _see id._ at 58-65[1];

---

[1] Appendix A to this letter highlights deposition questions and answers to which DC would seek to compel answers, as well as the right to ask related follow-up questions.

O'MELVENY & MYERS LLP
July 11, 2011 - Page 2

- whether Mr. Peary believes the consent agreement harms or benefits the Shuster heirs, *see id.* at 78;

- Mr. Peary's understanding of how the consent provision works, *see id.* at 79-81; and

- whether any other side deal exists by which the Shuster heirs may claim a share of profits the Siegel heirs receive from DC, *see id.* at 167-68.[2]

Defense counsel objected that the consent agreement "has been [held] to be privileged and off limits" by Magistrate Zarefsky, and also asserted attorney-client and work-product privilege. *See id.* at 62-65. These objections are overbroad and not well taken.

### A.    Magistrate Zarefsky's Ruling

Magistrate Zarefsky denied DC's motion to compel production of the consent agreement based on his application of law-of-the-case doctrine to the *Siegel* court's ruling that the agreement was entered into in connection with mediation. Docket No. 209 at 2-10. While this ruling (which DC has disputed) prevented DC from obtaining the document itself, it in no way bars DC from acquiring independent evidence of the nature and substance of the consent agreement. Courts have established that parties can pursue alternative sources of discovery to prove the existence of facts disclosed during mediation—parties must be given an opportunity to "uncover new, admissible evidence … not protected by the confidentiality statutes." *Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *12-13 (N.D. Cal. Dec. 17, 2009); *see also Foxgate v. Homeowners' Assoc.*, 26 Cal. 4th 1, 17-18 (2001) (allowing plaintiff to seek sanctions based on "assertion and evidence" other than "communications made during the mediation"); *Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011) (citing *Benesch* and *Foxgate* favorably).

Moreover, Mr. Peary's testimony is new evidence confirming that the consent agreement is itself discoverable because it exists separate and apart from any mediation or settlement discussions. Mr. Peary admitted that the consent agreement remains in effect to this day, Tr. at 64—and therefore continues to violate DC's rights long after the parties' 2008 mediation in *Siegel* was terminated. Mr. Peary also testified that the "consent agreement," *e.g.*, Tr. at 47—his

---

[2] Notably, Mr. Toberoff allowed Mr. Peary to answer a similar question during his 2006 deposition in the *Siegel* case without objection. *Compare* Tr. of Nov. 11, 2006 Peary Dep. ("2006 Tr.") at 47 (Question: "And if [the Siegels] were to settle and receive money from DC Comics, is there any arrangement by which you would receive any of that money?" Response: "No."), *with* Tr. at 167 (Question: "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in their case against DC or Warner Bros.?" Mr. Toberoff: "I instruct you not to answer because that delves into the potential substance of the consent agreement."). He also allowed Laura Siegel Larson to answer a similar question in 2006—again with no objection. Tr. of Aug. 1, 2006 Larson Dep. at 20 (Question: "Is there any agreement you're aware of between your mother and yourself on the one hand and any representative or heir of Joseph Shuster on the other hand?" Response: "No.").

**EXHIBIT G**
**42**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 3

word for the document—is titled "Superman agreement," *id.* at 59—not "Mediation Agreement," "Settlement Strategy," or the like. Federal Rule of Evidence 408 confirms that the consent agreement is discoverable as evidence of independently wrongful acts that are the subject of DC's claims in this case. The "Superman agreement" is not a mediation communication; it is an illicit and unlawful contractual restraint.[3] Defendants cannot shield such evidence from discovery "through the pretense of disclosing it during compromise negotiations." FED. R. EVID. 408, Advisory Comm. Note; *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007); *Munoz v. J.C. Penney Corp., Inc.*, 2009 U.S. Dist. LEXIS 36362, at *8-10 (C.D. Cal. Apr. 9, 2009) (Wright, J.); *Bd. of Trs. v. Tyco Int'l, Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008); *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999); *accord* CAL. EVID. CODE § 1120 ("Evidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation."); *Rojas v. Super. Ct.*, 33 Cal. 4th 407, 423 n.8 (2004); *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 132-33 (2008). Moreover, Mr. Peary's Rule 12 motion asserts—incorrectly—that the consent agreement was entered into "solely for purposes of the parties' settlement mediation, which commenced on May 8, 2008." Docket No. 148 at 20. Mr. Peary cannot make such an assertion in briefing but cut off a complete inquiry in discovery.

### B.    Attorney-Client And Work-Product Privilege

Mr. Peary refused to answer DC's questions on the ground that his understanding of the consent agreement was "bound up" with privileged communications with Mr. Toberoff. *E.g.*, Tr.

---

[3] To be clear, DC is entitled to discovery regarding the consent agreement without first having to prove its unlawfulness—an ultimate fact for trial. *Cf. Munoz v. J.C. Penney Corp.*, 2009 U.S. Dist. LEXIS 36362, at *7-10 (C.D. Cal. Apr. 9, 2009) (mediation communication discoverable so long as it pertains to facts other than an admission of fault or liability in underlying case). In any event, the agreement is unlawful under section 304(c)(6)(D) of the Copyright Act, which gives DC a "competitive advantage" and requires that the Shuster heirs remain free to enter into copyright agreements with DC until the effective termination date in 2013. *See* 17 U.S.C. § 304(c)(6)(D); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005). Moreover, Mr. Toberoff's involvement in the consent agreement appears to violate state law and public policy. *See Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948); *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 522 (N.J. 2006); ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Opinion 06-438 (2006); CAL. RULES OF PROF'L CONDUCT R. 3-310(D) (2011); *Fair v. Bakhtiari*, 2011 WL 1991999 (Cal. Ct. App. May 24, 2011). Indeed, Magistrate Zarefsky recognized that "[o]ne cannot know with certainty what the [2008] consent agreement means without seeing the agreement." Docket No. 209 at 8:1-2. It is for this reason that questions concerning its terms should be compelled (and the document itself should be produced); the mediation ended long ago, *see* Docket No. 171-4 Ex. 3, and there is no basis to shield a consent agreement that admittedly exists independent of it, Tr. at 64, from disclosure.

O'MELVENY & MYERS LLP
July 11, 2011 - Page 4

at 59-61, 85-86, 91-92. To clarify, we asked: "In your role as executor of the estate, is it your testimony that you have been able to -- you can't do anything or even think of anything that doesn't involve the legal advice of Marc Toberoff?" *Id.* at 338. Mr. Peary responded: "That's correct." *Id.* We asked: "You don't have any judgment or any ideas or any thoughts other than what Toberoff discusses with you?" *Id.* at 339. Mr. Peary confirmed again: "That's correct." *Id.* This position is untenable.

First, as a factual matter, DC's questions did not call for the divulgence of *any* privileged information—to the contrary, they were directed to Mr. Peary's reasons for entering into the consent agreement on behalf of the Shuster estate and his understanding of the effect of the agreement on the estate's rights. As the named executor of the Estate of Joseph Shuster, Mr. Peary has a fiduciary duty to make informed, good faith decisions in furtherance of the Estate's interests. *E.g.,* CAL. PROB. CODE § 9600(a) ("The personal representative has the management and control of the estate and, in managing and controlling the estate, shall use ordinary care and diligence."); *Estate of Sanders,* 40 Cal. 3d 607, 616 (1985) ("An executor is an officer of the court and occupies a fiduciary relation toward all parties having an interest in the estate."). Mr. Peary was therefore obligated to exercise some degree of sound, independent judgment even if Mr. Toberoff advised him on whether to enter into the consent agreement. *See id.* Moreover, defendants have asserted that the Siegel and Shuster heirs are the only parties to the consent agreement, meaning it is a contractual restraint among non-lawyers. There is no basis for asserting privilege over such business arrangements. *E.g., U.S. v. Chen,* 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer "'*in his capacity as such*'"—not where lawyer acts as "business agent"); *Minebea Co., Ltd. v. Papst,* 355 F. Supp. 2d 526, 529 (D.D.C. 2005) (business agreements and communications between attorney and client not privileged); *U.S. v. Davis,* 636 F.2d 1028, 1043 (5th Cir. 1981) (where services primarily non-legal in nature, "communications relating to that service should therefore not be privileged, even though performed by a lawyer"); *Marten v. Yellow Freight Sys.,* 1998 U.S. Dist. LEXIS 268, at *18 (D. Kan. Jan. 6, 1998) (recognizing that "when the legal advice is merely incidental to business advice, the privilege does not apply").

Second, Mr. Peary waived whatever privilege might otherwise have existed by selectively and strategically disclosing certain facts about the consent agreement. Counsel allowed Mr. Peary to provide testimony that he apparently believed would be helpful to defendants, including when the agreement was signed; its signatories; its title; its continued existence; and the fact that it purportedly does not entitle the Shusters to share in any profits concerning Superboy or the Superboy case the Siegels are pursuing. *See* Tr. at 48-50, 58-59, 65, 75, 81-83. While defense counsel allowed this testimony, which apparently counsel found helpful, it shut off all inquiry into questions concerning, for example, the Shusters' entitlement to money from the *Siegel* accounting case that is also proceeding before Judge Wright.[4] Promises

---

[4] *Compare* Tr. at 81-82 (Question: "Do you have any current arrangement for the consent agreement or otherwise whereby the Shuster interests share in any proceeds or recovery attributable to Superboy?" [No objection.] Response: "No."), *with id.* at 167 (Question: "Do you have any agreement to share in any accounting recovery that the Siegels might obtain in

**EXHIBIT G**
**44**

O'Melveny & Myers llp
July 11, 2011 - Page 5

the Siegels made to the Shusters to share in monies from court cases in which the Shusters are not parties are relevant to DC's unclean hands claims in this case, and also prove the consent agreement is *not* a Drysdale-Koufax agreement, which is an inapt analogy in any event, given the prohibitions on rights-trafficking found in the Copyright Act. Counsel also blocked our efforts to test the factual assertions in defendants' Rule 12 briefing concerning the nature and substance of the consent agreement—including, for example, that the agreement does not "constitute 'a further grant, or agreement to make a further grant' of the recaptured Superman copyrights," Docket No. 148 at 9; reflects "understandings between the Siegels and the Shuster Estate regarding settlement strategy," *id.* at 2; was entered into "solely for purposes of the parties' settlement mediation" in 2008, *id.* at 20; and was intended to "'achieve the objects of the litigation,'" *id.* at 17; *see also* Docket No. 182 at 17-21 (listing, by way of illustration, fact issues raised in defendants' SLAPP motion).

The Ninth Circuit has rejected such efforts to simultaneously disclose some facts while withholding others—a privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Fort James Corp. v. Solo Cup. Co.*, 412 F.3d 1340, 1349-51 (Fed. Cir. 2005).

Third, Mr. Peary also waived privilege by putting at issue Mr. Toberoff's advice concerning the lawfulness of the consent agreement. Defendants, including Mr. Peary, have repeatedly asserted that the consent agreement "is not unlawful in any respect" and "does not require consent of the Heirs' attorney to any settlement with DC." Docket No. 160 at 53; Docket No. 231 at 7; *see also* Docket No. 170 at 5 ("DC's argument that the Consent Agreement is 'unlawful' or improper is also false and unsupported."). By refusing to answer DC's questions regarding the basis for such assertions, Mr. Peary wrongfully has denied DC an opportunity to test defendants' characterization of the agreement. Courts have established that "the attorney-client privilege cannot at once be used as a shield and a sword." *U.S. v. Bilzerian*, 926 F.2d 1285, 1291-94 (2d Cir. 1991). In *Bilzerian*, the court found that a defendant charged with securities fraud and making false statements to the government placed at issue conversations with his counsel by claiming that he "thought his actions were legal." *Id.* at 1292. The court ruled that privilege as to those conversations was waived because the defendant "put his knowledge of the law and the basis for his understanding of what the law required in issue" and "fairness require[d] examination of protected communications." *Id.* Similarly, by stating that all of his actions have been predicated on Mr. Toberoff's advice, Mr. Peary has put these communications at issue and cannot refuse to testify about them. *See id.*; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992).

---

their case against DC or Warner Bros.?" Instruction: "I instruct you not to answer that because it delves into the potential substance of the consent agreements.").

**EXHIBIT G**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 6

## II.    PACIFIC PICTURES AGREEMENTS

Defense counsel improperly barred Mr. Peary from answering questions concerning the agreements between the Shuster heirs and Pacific Pictures Corporation, including:

- why the Shuster heirs entered into the Pacific Pictures agreements, *see* Tr. at 176-77, 204-05, 211-12;

- whether the Shuster heirs believed that litigation with DC was likely at the time they entered into the Pacific Pictures agreements, *see id.* at 211-13;

- why the Shuster heirs agreed to transfer their putative rights to the Pacific Pictures joint venture, *see id.* at 194-99;

- why the 2001 Pacific Pictures agreement identified Superboy as among the Shuster heirs' rights and the 2003 agreement deleted all reference to Superboy, *see id.* at 278-79, 305-10;

- Mr. Peary's awareness of the unlawfulness of certain provisions in the Pacific Pictures agreements, *see id.* at 260-61;

- the purpose and effect of the 2004 letter purporting to "cancel" the Pacific Pictures joint venture, *see id.* at 324-27;

- Mr. Peary's reason for executing a legal retainer agreement after cancelling the Pacific Pictures agreements, *see id.* at 220; and

- Mr. Peary's awareness of efforts by Mr. Toberoff and/or Pacific Pictures to market the Shuster heirs' rights pursuant to the joint venture, *see id.* at 330-38.

At defense counsel's prompting, Mr. Peary asserted that his knowledge on these subjects was inextricably bound with privileged conversations with Mr. Toberoff. *E.g., id.* at 176-77, 279, 305-07, 335-36. Notably, defense counsel allowed Mr. Peary to answer questions on the same topics during his 2006 *Siegel* deposition. *E.g.*, 2006 Tr. at 33 (Question: "What -- what was your understanding of what would happen to the rights that are at issue in this agreement in the event that this agreement was terminated? ... I'm asking you, Mr. Peary, what your understanding was of what would happen to the rights if the agreement was terminated at the time that you signed the agreement?" [No objection.] Response: "The rights would be split 50 percent.").

These instructions not to testify are not well taken. The Pacific Pictures agreements are business contracts regarding the disposition of the Shuster heirs' monetary interests and rights—they are *not* privileged communications, attorney retainer agreements or otherwise. They are signed by Mr. Toberoff in his business capacity (as President of Pacific Pictures), and Mr. Peary negotiated and executed these agreements in his role as executor of the Estate of Joseph Shuster,

**EXHIBIT G**
**46**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 7

which required him to exercise independent business judgment. *See* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d at 616. Defendants notably have failed to produce the drafts of these agreements that Mr. Peary testified were exchanged. Tr. at 100.

While defendants seek to cloak the negotiations of these agreements in privilege, the fact that Mr. Toberoff is a lawyer—in addition to being the President of Pacific Pictures—does not make business negotiations concerning these business contracts privileged. *See Chen*, 99 F.3d at 1501 (privilege cannot apply where attorney acting primarily in business role); *accord Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d 1028, 1043. Moreover, defendants waived any claims of privilege concerning these negotiations by selectively disclosing certain facts surrounding the negotiation and effect of the Pacific Pictures agreements, including:

- the discussions "back and forth" between Mr. Peary and Mr. Toberoff concerning "what would be involved on Marc Toberoff's part, the work involved, the cost he would bear," *see* Tr. at 197-98;

- Mr. Peary's awareness that the 2001 Pacific Pictures agreement listed Superboy as among the Shuster heirs' rights, *see id.* at 198-99;

- Mr. Peary's understanding, based in part on his discussions with Mr. Toberoff, of the reversion clause in the 2001 and 2003 Pacific Pictures agreements providing that "if [the venture] were ever terminated for any reason Pacific Pictures would own half the rights forever," *see id.* at 209-10;

- Mr. Peary's belief that Mr. Toberoff "was going to see this case through no matter what and … there would be no reason [the joint venture] would be canceled or terminated until the rights had been pursued," *see id.* at 210-11;

- Mr. Peary's belief that it was not "unreasonable" that he "could not enter into a contract with DC Comics no matter how badly [he] wanted unless Marc Toberoff consented," *see id.* at 214-15; and

- Mr. Peary's recently formed understanding, in part through discussions with Mr. Toberoff, that the Pacific Pictures agreements he negotiated and signed were void under the Copyright Act, *see id.* at 203, 218, 223-24.

Mr. Peary "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder" of information about the Pacific Pictures agreements. *Weil*, 647 F.2d at 24; *see also Fort James Corp.*, 412 F.3d at 1349-51. This is particularly true given that defendants have made factual assertions in their Rule 12 and SLAPP briefing concerning the status and effect of the Pacific Pictures agreements, yet have denied DC any opportunity to confirm or disprove those assertions. *See, e.g.*, Docket No. 148-1 at 17 ("PPC had no … ownership interest" in the Shusters' putative rights); Docket No. 147-1 at 8 (the Pacific Pictures agreements are "moot, as such were duly and voluntarily cancelled on September 10, 2004"). Similarly, defendants' SLAPP briefing depends in large part on their contention that the Pacific Pictures "Agreements

**EXHIBIT G**
**47**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 8

… clearly contemplate litigation related to the termination of Joseph Shuster's copyright grants" and are thus protected under California's SLAPP statute. Docket No. 145-1 at 17; *see also, e.g.*, *id.* at 16-17 (agreements "were plainly related to contemplated litigation and settlement"). Defendants, however, shut down every one of our questions seeking to test this assertion. *E.g.*, Tr. at 211-13 (Question: The Pacific Pictures agreement "states there that the venture will retain Toberoff to render legal services including in connection with legal disputes and litigation …. Legal disputes and litigation with whom?" (Instruction not to answer.) Question: "Well, it's fair to say that you understood when you signed this that there was a prospect of litigation with DC Comics or some Time-Warner company, correct?" (Instruction not to answer.) Question: "You understood … that when you signed this there was some appreciation that you would be in litigation?" (Instruction not to answer.) Question: "So you shouldn't have been surprised when you read the lawsuit that DC filed since you contemplated litigation as early as 2001, correct?" (Instruction not to answer.) Question: "When you saw the lawsuit from DC Comics …, that's something that you understood could happen as early as 2001 when you signed this joint venture agreement, correct?" (Instruction not to answer.)). Defendants cannot have it both ways; having opted to make factual assertions in their briefing and allow Mr. Peary to testify in support of those assertions, they also must give DC an opportunity to test those claims.

### III.    MR. PEARY'S ROLE AS EXECUTOR OF THE SHUSTER ESTATE

At Mr. Toberoff's instruction, Mr. Peary refused to answer questions concerning his role and responsibilities as the named executor of the Estate of Joseph Shuster, including his efforts to determine the value of rights purportedly held by the Estate, his decision to execute a copyright termination notice on behalf of the Estate, and his opinion as to whether the Estate can sell its rights without making an agreement with DC. *See* Tr. at 74, 191-92, 342-43. Mr. Peary stated that he had no understanding of these important issues aside from what he was told by his attorney. *See id.* at 338-39. As discussed above, Mr. Peary had a fiduciary duty to exercise judgment independent of what he was told by his attorney, *see* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d at 616—and DC is entitled to seek testimony on the nature and scope of Mr. Peary's judgment.

Moreover, Mr. Toberoff has always played a dual role in his dealings with Mr. Peary. As their contracts state—and as Mr. Toberoff has touted on his website and in press interviews—he is a movie producer. DC is entitled to know what Mr. Toberoff told Mr. Peary and others in that role. Indeed, the consideration for the Pacific Pictures agreements—*i.e.*, that the Shusters would give *50% of their rights* to Mr. Toberoff's company—was predicated on Mr. Toberoff helping exploit and market their putative rights as a movie producer. *See* Nov. 23, 2001 Pacific Pictures Agreement at 1 (transferring Shusters' putative rights to Pacific Pictures joint venture "to investigate, retrieve, enforce and exploit" the rights).

In addition, Mr. Peary's Rule 12 briefing makes factual assertions concerning his authority to exercise the Estate's purported termination rights—despite the 1992 agreement signed by the Estate's sole beneficiary, Jean Peavy, extinguishing all such rights—which DC is entitled to test in discovery. *See, e.g.*, Docket No. 148 at 7-14 (Mr. Peary only person with

O'MELVENY & MYERS LLP
July 11, 2011 - Page 9

standing to terminate and other Shuster heirs did not intend to "waive, transfer or release the Shuster termination rights" in entering into the 1992 agreement).

## IV.    CONFLICTS OF INTEREST

Mr. Peary followed counsel's instructions not to answer questions concerning the conflict of interest arising out of Mr. Toberoff's concurrent representation of the Siegel and Shuster heirs (and, *inter alia*, the Shusters' abdication of Superboy rights in favor of the Siegels), including:

- Mr. Peary's understanding of this conflict of interest, *see* Tr. at 85-86, 227-29;

- whether Mr. Peary agreed to waive the conflict, *see id.* at 241;

- the alleged conflict waiver Mr. Peary claims to have signed in 2010 (but has never produced), *see id.* at 91-93; and

- the connection between the alleged conflict waiver and the 2008 consent agreement or this lawsuit, *see id.* at 92-93;

Defense counsel objected that these questions implicated privileged attorney-client communications. *E.g., id.* at 85-86, 91-93, 227-28. Under California law, Mr. Toberoff was required to disclose the conflict to Mr. Peary in writing, recommend that he seek independent legal advice, and obtain a written waiver before proceeding with representation. *See* CAL. RULES OF PROF'L CONDUCT R. 3-310; *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 284-86 (1994) (same). Such communications are "not protected by the attorney-client privilege or work product doctrine." *E. Maine Baptist Church v. Regions Bank*, 2007 WL 1445257, at *2-3 (E.D. Mo. May 10, 2007); *see also Chevron USA Inc. v. Peuler*, 2004 WL 224579, at *3 (E.D. La. Feb. 3, 2004). Moreover, Mr. Peary waived whatever privilege might otherwise have existed by selectively disclosing the existence of a waiver document allegedly signed in 2010—which defendants have improperly withheld from production. *See Weil*, 647 F.2d at 24; *Fort James Corp.*, 412 F.3d at 1349-51. Defendants should produce to DC entries 44 (Apr. 17, 2010 e-mail from Mr. Peary to Mr. Toberoff) and 47 (Dec. 6, 2010 e-mail from Mr. Peary to Mr. Toberoff) on Mr. Peary's privilege log or confirm which entry—if either—corresponds to the purported conflict waiver.

## V.    OTHER ISSUES

Mr. Peary refused to answer several other questions on the basis that he had no knowledge independent of his privileged communications with Mr. Toberoff. *E.g.*, Tr. at 243, 245-46, 330-31. None of these subjects implicated the conveyance of legal advice.

First, we asked questions concerning Mr. Peary's understanding of why and how Mr. Toberoff initially approached the Siegel heirs. *See* Tr. at 241-42. Mr. Toberoff approached the Siegels not in his capacity as an attorney—let alone an attorney acting on behalf of the Shuster heirs' legal interests—but as a businessman and movie producer. *E.g.*, Docket No. 49 Ex. A at 63 ("MT approaches the Siegels, *not as an attorney but as a film producer*...."); Oct.

**EXHIBIT G**
**49**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 10

23, 2002 IP Worldwide agreement ¶¶ 1, 10 (providing that IP Worldwide would "negotiate the sale, lease, license and all other dispositions" of the Siegels' putative rights and confirming "the scope of this Agreement does not include legal services and/or expenses in connection with litigation"); May 13, 2003 Letter from Michael Siegel to Laura Larson at 1 ("I told you when [Toberoff] first contacted me, he wanted to buy my share of the copyright …. Marc has his own production company, he was going to team with [Ari Emanuel] and make a movie.")  Any communications between Mr. Toberoff and Mr. Peary on this topic would have been non-privileged business communications. *See Chen*, 99 F.3d at 1501; *Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d at 1043.  Moreover, it defies credulity that Mr. Peary's knowledge of Mr. Toberoff's introduction to the Siegels was based solely on his communications with Mr. Toberoff.  Mr. Peary admitted that he and his mother, Jean Peavy, were in regular contact with the Siegels and claimed that it was Ms. Peavy who suggested they meet with Mr. Toberoff.  *See* Tr. at 252.

Second, we asked questions about Mr. Peary's awareness of and involvement in the alleged grand jury investigation concerning the Toberoff Timeline. *See* Tr. at 245-46.  This investigation is a factual matter separate and apart from Mr. Toberoff's representation of Mr. Peary.  That Mr. Peary may have learned about it from his attorney does not necessarily make this entire topic immune from discovery. *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged.").

Third, we asked questions regarding Mr. Peary's understanding of the Shuster heirs' retainer agreement with Mr. Toberoff based on his review of that document and the consent agreement in preparation for the deposition. *See* Tr. at 328-29.  As Magistrate Zarefsky has recognized, retainer agreements are not privileged, except to the extent certain provisions convey legal advice.  Docket No. 209 at 11; *see also In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999).  Mr. Peary's knowledge of whether the agreement refers to the Siegels and Superboy, *see* Tr. at 329, has nothing to do with the conveyance of legal advice, and Mr. Peary admitted during the deposition that his review of the consent agreement and retainer agreement refreshed his recollection. *E.g.*, Tr. at 51 ("Question: "What did you bring with you?"  Response: "I brought a copy of the legal retainer as of 2001 and I brought a -- a copy of the first page of the consent agreement with a cover letter …, just to jog my memory."); *id.* at 53 (Question: "And were you shown any documents yesterday when you met with Mr. Toberoff?"  Response: "We … reviewed our agreements."  Question: "What agreements?"  Response: "The legal retainer and the -- the complaint from DC and the supporting legal documents…."  Question: "Did you also show Mr. Toberoff the consent agreement pages that you had taken with you?"  Response: "Yes, just the -- the copy that I brought to jog my memory.").  Because these documents refreshed his recollection, they must be produced. *See Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 78 (D. Mass. 2007) (documents used by deponent to refresh recollection of events subject to discovery under Federal Rule of Evidence 612); *In re Comair Air Disaster Litig.*, 100 F.R.D. 350, 353 (D.C. Ky. 1983) (same); *Derderian v. Polaroid Corp.*, 121 F.R.D. 13, 15 (D. Mass.

**EXHIBIT G**
**50**

O'MELVENY & MYERS LLP
July 11, 2011 - Page 11


1988) ("By using a document to refresh recollection in connection with testimony at deposition, a privilege or protection which previously attached to the document may be waived.").

               \*        \*        \*

    Please let us know when you are available to meet and confer on these issues.

                   Very truly yours,

                   /s/ Daniel M. Petrocelli

                   Daniel M. Petrocelli
                   of O'MELVENY & MYERS LLP

CC1:852626

ROUGH DRAFT

1          WARNING!  The following is a rough draft of

2     the within deposition transcript which has been

3     provided upon request with the specific

4     understanding and acknowledgment that:

5          Such transcript is not in final form and is

6     not an official transcript of the proceedings.  The

7     nature of stenographic writing necessitates that the

8     reporter may have to make various corrections and/or

9     changes as a result of human error and/or

10     stenographic notes not being fully translated by the

11     equipment from steno to English.  As a result, the

12     final transcript may vary significantly.

13          Such transcript is being provided as a

14     special service, to be used for limited purposes as

15     may be appropriate in the discretion of the

16     recipient; however, the reporter and/or Merrill

17     Solutions will not be responsible for any of the

18     content of such transcript and/or any variance from

19     the final official transcript.

09:10:32 20

09:10:32 21

22

23

24

25

1

ROUGH DRAFT

10:28:58  1          THE VIDEOGRAPHER:  Good morning.  This

10:28:59  2      marks the beginning of Volume I, Videotape Number 1

10:29:02  3      in the deposition of Marc Warren Peary in the matter

10:29:07  4      entitled "DC Comics versus Pacific Pictures

10:29:11  5      Corporation et al., filed in the United States

10:29:14  6      District Court for the Central District of

10:29:16  7      California.  This is case number 1036330 DW R Z X.

10:29:23  8      Today date is June 29, 2011 and the time on the

10:29:27  9      video monitor is 10:28 a.m.  The video operator

10:29:30  10     today is Fritz Sperberg, a notary public, contracted

10:29:33  11     by Merrill Legal Solutions at 20750 Ventura

10:29:37  12     Boulevard, Woodland Hills, California.

10:29:40  13          This video deposition is taking place at

10:29:42  14     1999 Avenue Of The Stars and in Los Angeles and was

10:29:45  15     noticed by Daniel M. Petrocelli of O'Melveny &

10:29:48  16     Myers.

10:29:49  17          Counsel, please identify yourselves and

10:29:51  18     state whom you represent.

10:29:52  19          MR. PETROCELLI:  Daniel Petrocelli for

10:29:55  20     plaintiff DC Comics.

10:29:57  21          MR. TOCORO:  Jason Tocoro for plaintiff DC

10:29:59  22     comics.

10:30:00  23          MR. TOBEROFF:  Marc Toberoff for defendants

10:30:02  24     Laura Siegel Larson and Marc Warren Peary.

10:30:06  25          THE VIDEOGRAPHER:  Our court reporter today

2

**EXHIBIT G**
**53**

ROUGH DRAFT

10:30:09  1    is Shanda Gabriel of Merrill.  Would the reporter

10:30:11  2    please swear in the witness.

10:30:12  3

10:30:12  4                        WARREN PEARY,

10:30:12  5              having been first duly sworn, was

10:30:12  6              examined and testified as follows:

10:30:19  7

10:30:19  8        THE VIDEOGRAPHER:  Please begin.

10:30:19  9

10:30:19  10                      EXAMINATION

10:30:19  11   BY MR. PETROCELLI:

10:30:21  12        Q.  Good morning, Mr. Perry.

10:30:24  13        A.  Good morning.

10:30:25  14        Q.  We're starting at 10:30 rather than the

10:30:27  15   noticed time of 9:30 because Mr. Toberoff informed

10:30:33  16   me this morning of car problems.  So we'll probably

10:30:38  17   have to go later than anticipated but hopefully

10:30:42  18   we'll get through this today.

10:30:43  19        Marc, all the defendants counsel were

10:30:50  20   noticed for the deposition.  The other counsel is

10:30:54  21   not present but we're going to proceed in their

10:30:58  22   absence.  They were given full notice?

10:30:59  23        MR. TOBEROFF:  They're not attending today.

10:31:01  24        MR. PETROCELLI:  Okay.

10:31:04  25        Q.  Let me mention to you, Mr. Perry, that I've

3

**EXHIBIT G**
**54**

ROUGH DRAFT

10:31:10  1    reviewed the deposition that you gave in the Siegel

10:31:13  2    case on November 11, 2006 and it was a somewhat

10:31:23  3    brief deposition.  This will be lengthier.  It's not

10:31:26  4    my intention to duplicate what you were already

10:31:34  5    asked although I will be from time to time picking

10:31:36  6    up on things that were touched upon this that

10:31:39  7    deposition and following up.

10:31:41  8            So I do want you to know that I'm mindful

10:31:45  9    of what your prior testimony is and if you want a --

10:31:48 10    I think you have a copy in front of you mark but if

10:31:51 11    you need to consult a copy I have one.

10:32:01 12            So first let me start by expanding a bit on

10:32:04 13    your background.

10:32:05 14            You were born on January 14, 1962.

10:32:05 15            Is that right?

10:32:08 16    A.  Yes on.

10:32:08 17    Q.  And so you're 49 years old right now?

10:32:10 18    A.  Yes.

10:32:12 19    Q.  And you have never been married, correct?

10:32:12 20    A.  Correct.

10:32:15 21    Q.  And you have no children.

10:32:15 22            Is that right?

10:32:18 23    A.  Correct.

10:32:18 24    Q.  You live in Albuquerque?

10:32:20 25    A.  Santa Fe.

4

**EXHIBIT G**
**55**

ROUGH DRAFT

10:32:21  1       Q.  Santa Fe, New Mexico?

10:32:23  2           Do you live alone?

10:32:25  3       A.  No.

10:32:25  4       Q.  With whom do you reside?

10:32:27  5       A.  I share a house with my family, other

10:32:31  6   family members.

10:32:32  7       Q.  Who are they?

10:32:33  8       A.  My mother and sister.

10:32:36  9       Q.  And your mother is Jean Peavy.

10:32:38 10           Is that right?

10:32:38 11       A.  Yes.

10:32:39 12       Q.  And your sister is Dawn Peavy?

10:32:42 13       A.  Yes.

10:32:44 14       Q.  D-a-w-n, right?

10:32:45 15       A.  Right.

10:32:45 16       Q.  Anyone else reside with you?

10:32:48 17       A.  No.

10:32:51 18       Q.  Okay.  Dawn was born October 1965.

10:32:51 19           Is that right?

10:32:51 20       A.  Yes.

10:32:55 21       Q.  Okay.  She has three children?

10:32:58 22       A.  Yes.

10:33:00 23       Q.  Do they reside with you?

10:33:02 24       A.  She has a -- her youngest is -- is there

10:33:06 25   sometimes.

5

**EXHIBIT G**
**56**

ROUGH DRAFT

10:33:09  1        Q.  Do you know the ages of her children and

10:33:11  2    their names?

10:33:13  3        A.  Let's see, the youngest one is 19, and --

10:33:16  4        Q.  And what's the 19 year old's name?

10:33:18  5        A.  Jake.

10:33:20  6        Q.  Jake?

10:33:20  7        A.  Jake.

10:33:21  8        Q.  Last name?

10:33:21  9        A.  He uses -- I think he uses his -- his

10:33:28 10    father's last name, Anderson, I believe.

10:33:30 11        Q.  Okay.

10:33:30 12        A.  I don't use it that much.

10:33:32 13        Q.  Jake Anderson.  19 years old.  And who are

10:33:35 14    the other two?

10:33:36 15        A.  Other 20 -- you want their age or --

10:33:40 16        Q.  Both name and age.

10:33:42 17        A.  Okay.  Nicole and -- let me see, I haven't

10:33:51 18    seen them in a long time.  They live in different

10:33:54 19    cities and I haven't seen them in a very long time

10:33:57 20    so let's see, Nicole and --

10:34:02 21        Q.  Starting with Nicole, how old is Nicole?

10:34:05 22        A.  She's something like 23 or -4.

10:34:06 23        Q.  And where -- what's Nicole's last name?

10:34:09 24        A.  She uses her mother's last name.

10:34:11 25        Q.  Peavy?

6

**EXHIBIT G**
**57**

ROUGH DRAFT

10:34:12  1        A.  Yes.  Yeah.

10:34:15  2        Q.  And who is the third child?

10:34:17  3        A.  Let me see.  I haven't seen him in such a

10:34:20  4  long time.  You're making my -- what is it his name?

10:34:29  5  I haven't seen him in a long time.  He lives far

10:34:31  6  away.

10:34:31  7        Q.  You don't know his name?

10:34:33  8        A.  I do. But I'm not recalling it at the

10:34:35  9  moment.

10:34:35  10        Q.  Do you know his age?

10:34:36  11        A.  He is something -- I -- I don't know, late

10:34:38  12  twenties.

10:34:39  13        Q.  I take it it's a mail?

10:34:40  14        A.  Yes.

10:34:42  15        Q.  Okay.

10:34:42  16        A.  Yes.

10:34:42  17        Q.  And where does Jake Anderson live?  What he

10:34:47  18  city?

10:34:47  19        A.  The youngest, Jake, he's -- sometimes he's

10:34:50  20  with us and sometimes he's elsewhere where.

10:34:58  21        Q.  Elsewhere meaning where?

10:34:58  22        A.  I -- I -- I think he has a girlfriend that

10:35:01  23  he stays with if you want --

10:35:02  24        Q.  In Santa Fe?

10:35:03  25        A.  Yes, if you want the details.

                                                        7

ROUGH DRAFT

10:35:04  1        Q.  No, I just want to know the city?

10:35:06  2        A.  Okay.

10:35:06  3        Q.  And Nicole lives in what city?

10:35:08  4        A.  She's in Denver.

10:35:09  5        Q.  Denver.  And the -- older boy, you don't

10:35:12  6    remember?

10:35:12  7        A.  He -- he's -- he's in El Paso.

10:35:19  8        Q.  How long have you revieweded with your

10:35:26  9    sister Dawn?

10:35:28  10       A.  She's been with us since 2001 or 2,

10:35:40  11   somewhere in there.

10:35:40  12       Q.  Continuously to the present?

10:35:42  13       A.  Yes.

10:35:44  14       Q.  Okay.  And how long have you resided with

10:35:45  15   your mother Jean?

10:35:47  16       A.  We -- we've been there since -- since 1999.

10:36:00  17       Q.  How old is your mom now?

10:36:01  18       A.  90.

10:36:04  19       Q.  And how is her health?

10:36:05  20       A.  It's -- it's fair.  She had a stroke two

10:36:09  21   years ago.

10:36:13  22       Q.  Do you have full time healthcare for her,

10:36:17  23   like a caretaker?

10:36:19  24       A.  I'm -- I serve as a caretaker quite often.

10:36:22  25       Q.  Okay.  But other than the family members,

8

**EXHIBIT G**
**59**

ROUGH DRAFT

10:36:25  1    is there a professional caretaker?

10:36:26  2         A.  No.

10:36:30  3         Q.  Okay.  Your father was William Peavy?

10:36:33  4         A.  Yes.

10:36:33  5         Q.  And he passed away in 1996?

10:36:35  6         A.  That's correct.

10:36:49  7         Q.  And your dad wrote books and was a teacher?

10:36:52  8         A.  Well, he -- he did.  He had -- he had a

10:36:57  9    long career.

10:36:58 10         Q.  As a -- as a teacher and an author?

10:37:00 11         A.  You want his last position before he

10:37:05 12    retired or --

10:37:06 13         Q.  Just in general idea of his?

10:37:07 14         A.  In general,.

10:37:08 15         Q.  Professional background?

10:37:09 16         A.  Yeah, he was civil servant.

10:37:11 17         Q.  Working for whom?

10:37:12 18         A.  He worked for the Texas A&M extension

10:37:17 19    service.

10:37:17 20         Q.  What is that?

10:37:18 21         A.  Texas A&M steps service.

10:37:20 22         Q.  Oh the university?

10:37:21 23         A.  It's a branch of the university.

10:37:23 24         Q.  Okay.  Now what about your employment?  Can

10:37:27 25    you briefly trace it for me?

                                                          9

**EXHIBIT G**
**60**

ROUGH DRAFT

10:37:28  1        A.  I've been doing investment work.

10:37:31  2        Q.  I saw from your prior -- your deposition in

10:37:35  3    the Siegel case that you have a two-year degree from

10:37:39  4    I think it's Texas El Paso.

10:37:39  5             Is that right?

10:37:39  6        A.  Yes.

10:37:42  7        Q.  And you went there right out of high

10:37:44  8    school?

10:37:45  9        A.  Yes.

10:37:46  10       Q.  And so what have you been doing

10:37:49  11   occupationly from the time you left college, Texas

10:37:53  12   El Paso, to the present?

10:37:55  13       A.  You want everything I've done or just --

10:37:58  14       Q.  If you can summarize it that would be

10:38:00  15   helpful?

10:38:00  16       A.  Summarize it.  I've done a lot of different

10:38:04  17   things.  I built.

10:38:05  18       Q.  Can you do it in chronological order for

10:38:08  19   me?

10:38:08  20       A.  I can try.

10:38:10  21       Q.  Sure?

10:38:11  22       A.  I built homes for a time and sold real

10:38:14  23   estate for a time.

10:38:18  24       Q.  While living in?

10:38:18  25       A.  In El Paso.

10

**EXHIBIT G**
**61**

ROUGH DRAFT

10:38:20  1        Q.  In El Paso.

10:38:27  2        A.  Yes.  And then I -- I -- I had a stint

10:38:34  3    selling insurance as well and then I -- I got

10:38:40  4    involved in trading and investing at a later time.

10:38:47  5        Q.  Trading and investing in what?

10:38:48  6        A.  Yes.  I started off in trading futures.

10:38:55  7        Q.  Commodities?

10:38:56  8        A.  Yes.  And then later on branched out more

10:39:04  9    into equity investments and that type of thing and

10:39:08 10    that's been my primary activity for quite a few

10:39:11 11    years.

10:39:11 12        Q.  To the present?

10:39:12 13        A.  Yes.

10:39:14 14        Q.  And you've also written some books from

10:39:17 15    time to time?

10:39:17 16        A.  Yes.

10:39:18 17        Q.  How many books have you authored?

10:39:19 18        A.  Two.

10:39:21 19        Q.  And do you coauthor or book with your

10:39:25 20    father?

10:39:25 21        A.  Did I.

10:39:25 22        Q.  Is that in addition to the two books or one

10:39:28 23    of the two he?

10:39:28 24        A.  No, that's one of the two.

10:39:30 25        Q.  And what was that book?

                                                            11

ROUGH DRAFT

10:39:31 1  A. What was the title of it.

10:39:33 2  Q. Yeah the one you did with your dad?

10:39:34 3  A. It was called super nutrition gardening.

10:39:37 4  Q. The one you did on your own?

10:39:38 5  A. It was called the greatest health secrets.

10:39:41 6  Q. Okay.  You mentioned at the deposition in

10:39:44 7 November of 2006 that you were working on a screen

10:39:49 8 play of Joe Shuster's life?

10:39:52 9  A. Yes.

10:39:52 10  Q. Do you recall that?

10:39:52 11  A. Yes.

10:39:54 12  Q. Have you continued to work on that?

10:39:55 13  A. No.

10:39:58 14  Q. Have you written any other material

10:40:05 15 regarding either Joe Shuster -- about either Joe

10:40:10 16 Shuster or Jerry Siegel?

10:40:12 17  A. No..

10:40:13 18  Q. Have you been on any -- have you

10:40:19 19 participated in any presentations or pitches to

10:40:22 20 third parties about acquiring options for any work

10:40:29 21 that you've done?

10:40:30 22  A. At one time.

10:40:34 23  MR. TOBEROFF:  Meaning -- meaning --

10:40:35 24  THE WITNESS:  On a screen play?

10:40:37 25  MR. TOBEROFF:  Authored work.

12

**EXHIBIT G**
**63**

ROUGH DRAFT

10:40:37 1          MR. PETROCELLI:  Yeah.

10:40:38 2      Q.  Any work that you've authored or -- yeah.

10:40:40 3  Any work that you authored?

10:40:41 4      A.  On any screen play or -- I have other

10:40:44 5  screenplays I've also worked on so.

10:40:46 6          MR. TOBEROFF:  He's just talk about any

10:40:47 7  literary work.

10:40:51 8          THE WITNESS:  I've been offered options on

10:40:53 9  other screenplays, yes.

10:40:53 10 BY MR. PETROCELLI:

10:40:54 11     Q.  Have any of them been developed?

10:40:57 12     A.  No.

10:40:58 13     Q.  Have any of the screenplays concerned at

10:41:02 14 all the life of Joe Shuster the ones that have been

10:41:09 15 optioned

10:41:09 16     A.  There was one that was.

10:41:11 17     Q.  Was optioned?

10:41:13 18     A.  It has expired so it's not active.

10:41:16 19     Q.  Now, was that -- what was the underlying

10:41:19 20 work that was optioned?

10:41:19 21     A.  Screen play.

10:41:19 22     Q.  Was that the screen play to which you add

10:41:23 23 verdict in your deposition in 2006?

10:41:24 24     A.  Yes, yes.

10:41:25 25     Q.  And it was after your deposition that you

13

**EXHIBIT G**
**64**

ROUGH DRAFT

10:41:30  1    optioned it?

10:41:33  2        A.  I'm not -- I'm not sure of the exact.  I

10:41:36  3    don't -- I really don't recall the exact date on

10:41:40  4    that.

10:41:41  5        Q.  Did you option it to Ilya Salkind?

10:41:44  6        A.  Yes.

10:41:44  7        Q.  Okay.

10:41:52  8        Q.  And the option was renewed?

10:41:53  9        A.  No.

10:41:59 10        Q.  How much did you receive for the option?

10:42:01 11        A.  We weren't paid anything up front.

10:42:04 12        Q.  Okay.  Did the -- how long was the option?

10:42:08 13        A.  I believe it was a year.

10:42:10 14        Q.  Did it expire?

10:42:11 15        A.  Yes, it did.

10:42:11 16        Q.  And has anything happened to that screen

10:42:15 17    play since the expiration of the option to

10:42:17 18    Mr. Salkind?

10:42:18 19        A.  No.  We have no sales or options.

10:42:22 20        Q.  Have you attempted to present or pitch the

10:42:27 21    screen play to anyone else?

10:42:29 22        A.  No, I have not.

10:42:36 23        Q.  How many pages is that screen play?

10:42:37 24        A.  130.

10:42:43 25        Q.  And have you done any further work on it

                                                                    14

ROUGH DRAFT

10:42:45  1    since the time you optioned it?

10:42:51  2        A.  Nothing substantial.

10:42:54  3        Q.  And is the screen play about the life of

10:42:56  4    Joe Shuster?

10:42:57  5        A.  Yes.

10:43:00  6        Q.  When you wrote the screen play, did you

10:43:02  7    collect a -- a file on Joe Shuster from which you

10:43:07  8    put together your screen play?

10:43:08  9        A.  I did.  Historical background research.

10:43:12 10        Q.  What were the years when you wrote the

10:43:14 11    screen play?

10:43:15 12        A.  1996, I started.  Up until the early 2000s.

10:43:27 13        Q.  When your uncle died, he died in July of

10:43:29 14    1992.

10:43:29 15            Is that right?

10:43:29 16        A.  Yes.

10:43:33 17        Q.  And after he passed, you were involved in

10:43:38 18    collecting his belongings?

10:43:40 19        A.  Yes.

10:43:43 20        Q.  You went out to his apartment in

10:43:44 21    Los Angeles with your mom?

10:43:46 22        A.  Yes.

10:43:48 23        Q.  And did you then take possession of some of

10:43:55 24    his papers and library of comic book materials,

10:44:01 25    whatever he had, drawings, things like that?

                                                              15

**EXHIBIT G**
**66**

ROUGH DRAFT

10:44:04  1      A.  There were -- there were very limited

10:44:06  2  papers and we didn't find any vintage comics,

10:44:10  3  unfortunately, which would have been worth a lot.

10:44:13  4  He didn't have any.  There were some limited papers

10:44:19  5  but nothing -- nothing significant.  Mostly personal

10:44:22  6  items.

10:44:24  7      Q.  Where did you get the materials that you

10:44:26  8  used for your book?

10:44:27  9      A.  The book?

10:44:30 10      Q.  Excuse me, the screen play.

10:44:34 11      A.  The materials it came from historical

10:44:37 12  research.

10:44:38 13      Q.  About Joe?

10:44:39 14      A.  Yes.  I had a lot of -- a lot of vintage

10:44:46 15  articles that came from the -- the era which is

10:44:51 16  probably unusual to have a lot of material.  That's

10:44:55 17  where most of it came from.

10:44:57 18      Q.  You collected this on your own?

10:44:58 19      A.  Yes.

10:44:59 20      Q.  By doing public record searches?

10:45:02 21      A.  Yes.  And family files.

10:45:05 22      Q.  Who -- who had possession of the family

10:45:07 23  files?

10:45:07 24      A.  My mother had collected articles throughout

10:45:11 25  the years.

16

ROUGH DRAFT

10:45:12    1        Q.  And those articles are in your home where

10:45:14    2    you and your mother now live, right?

10:45:17    3        A.  Oh, I -- I guess so.  It's just old

10:45:23    4    magazine articles.

10:45:28    5        Q.  Did you retrieve any materials from Joe

10:45:32    6    apartment after his death that you put in your file

10:45:37    7    for use in writing your screen play?

10:45:39    8        A.  I -- I don't recall getting any papers from

10:45:42    9    his apartment.  He didn't have much.

10:45:46   10        Q.  What about during his lifetime?  Did he

10:45:50   11    ever give you any material, any papers, any

10:45:53   12    writings, any of his drawings, any comic books,

10:45:56   13    things like that, that you've collected and saved?

10:45:59   14        A.  We -- we had a vintage drawing, a few

10:46:05   15    mementos is all.

10:46:06   16        Q.  Were you close to him?

10:46:08   17        A.  Somewhat.

10:46:11   18        Q.  So you were about 30 when he passed right?

10:46:14   19    You were born in 62, right?

10:46:15   20        A.  Yeah, that sounds correct.

10:46:18   21        Q.  And you had known him since you were a

10:46:21   22    small boy?

10:46:21   23        A.  Yes.  Not real closely but I did know him.

10:46:28   24        Q.  He had no children, right?

10:46:28   25        A.  Correct.

17

**EXHIBIT G**
**68**

ROUGH DRAFT

10:46:30  1        Q.  But he had been married once?

10:46:31  2        A.  Briefly.

10:46:36  3        Q.  What years was he married?

10:46:37  4        A.  1979, I believe.

10:46:43  5        Q.  Did you attend his wedding?

10:46:45  6        A.  No.

10:46:46  7        Q.  Did he and his wife elope?

10:46:49  8        A.  Excuse me?

10:46:50  9        Q.  Did they elope, they went off on their own

10:46:53 10   and got married without a sarah -- you know a

10:46:56 11   ceremony for the family?

10:46:57 12        A.  I'm not aware of the circumstances of their

10:47:01 13   marriage.

10:47:01 14        Q.  What was his wife's name?

10:47:02 15        A.  I'm not sure I can recall.  I never met

10:47:11 16   her.

10:47:11 17        Q.  Never spoke with her?

10:47:12 18        A.  No.

10:47:13 19        Q.  Ever communicate at all with her in

10:47:16 20   writing?

10:47:16 21        A.  No, I did not.  It's like 1979, 80.  Last

10:47:20 22   time they were both.

10:47:22 23        Q.  Did you ever see her?

10:47:23 24        A.  I never met her.

10:47:24 25        Q.  Did you ever see a picture of her?

                                                            18

ROUGH DRAFT

10:47:26  1      A.  Yes.

10:47:26  2      Q.  Where?

10:47:31  3      A.  Somehow we had -- we had a picture that I

10:47:33  4  had -- had I seen from -- I don't know what it was.

10:47:38  5  Maybe it was -- I don't remember.  Somewhere I did

10:47:40  6  see a picture of them but I never met her.

10:47:44  7      Q.  And Joe had how many nieces and nephews?

10:47:49  8      A.  Just myself and my sister.

10:47:59  9      Q.  Now, you -- I've seen his will or at least

10:48:03 10  a copy of the will and it names your mom, Jean, as

10:48:08 11  his sole beneficiary but identifies you as an

10:48:10 12  alternate beneficiary, as well as executor in the

10:48:17 13  event that she is unwilling or unable to serve.

10:48:19 14  You're generally familiar with that?

10:48:20 15      A.  Yes.

10:48:21 16      Q.  And I notice that your sister wasn't in

10:48:24 17  there.

10:48:25 18          Did your sister to your knowledge, not have

10:48:30 19  a good relationship with -- with your uncle Joe?

10:48:32 20      A.  No, it had nothing to do with that.

10:48:34 21      Q.  Do you have any understanding or belief why

10:48:37 22  only you were included, not your sister?

10:48:41 23          MR. TOBEROFF:  Don't speculate.

10:48:44 24          THE WITNESS:  My sister's provided for by

10:48:48 25  us so there's no problem with the relationship.

                                                            19

ROUGH DRAFT

10:48:53  1    That's all I could say.

10:48:53  2    BY MR. PETROCELLI:

10:48:56  3        Q.  When you said your sister is provided for

10:48:58  4    by us, who is the us?

10:49:00  5        A.  Yeah, me and my mom.

10:49:02  6        Q.  Have you been supporting your mom

10:49:07  7    financially since your dad passed?

10:49:11  8        A.  I don't know if I am supporting her.  We

10:49:15  9    have a mutual relationship where she needs my help

10:49:21  10   and I give it to her.

10:49:23  11       Q.  Do you provide financial support to your

10:49:25  12   sister Dawn?

10:49:28  13       A.  Somewhat but she has a job.

10:49:30  14       Q.  What does she do for a living?

10:49:32  15       A.  She works for a food distributor.

10:49:36  16       Q.  In Santa Fe?

10:49:36  17       A.  Yes.

10:49:37  18       Q.  What's the name of the company?

10:49:41  19       A.  It's called Labat SP.

10:49:43  20       Q.  She's unmarried at the current time?

10:49:47  21       A.  Yes.

10:49:53  22       Q.  Are you familiar with a comic book blogger

10:49:56  23   named Dave Sims or Dave Sim, S-i-m?

10:50:02  24       A.  I'm not sure I am.

10:50:08  25       Q.

                                                          20

**EXHIBIT G**
**71**

ROUGH DRAFT

10:50:10  1          MR. TOBEROFF:  How do you spell that.

10:50:12  2          MR. PETROCELLI:  S IM.

10:50:13  3     Q.  Did your mom in the last four or five years

10:50:19  4   do an interview for Canadian broadcasting company,

10:50:22  5   CBC?

10:50:23  6     A.  I'm not aware of that.

10:50:26  7     Q.  I've taken the time while we were waiting

10:50:28  8   for you folks to arrive to pre-mark the deposition

10:50:32  9   exhibits that I intend to use.  Now, that said,

10:50:36 10   because I tend to move around a bit they're not

10:50:40 11   exactly in sequential order but let me start by

10:50:45 12   showing you just briefly an exhibit.  Which is a

10:50:47 13   copy of a blog by Mr. Sim about your family dated

10:50:53 14   February 19, 2007.  It's Exhibit 24?

10:51:00 15          MR. PETROCELLI:  Mark I started with 1

10:51:02 16   Exhibit 1.  Which I'll get to and I've numbered

10:51:09 17   exhibits starting with 1 since this is the first

10:51:12 18   deposition in the case.

10:51:13 19              (The document referred to was

10:51:13 20              marked for identification by the

10:51:13 21              C.S.R. as Exhibit ^ and attached to

10:51:16 22              this deposition.)

10:51:16 23   BY MR. PETROCELLI:

10:51:17 24     Q.  Have you ever seen this blog before or

10:51:19 25   this --

                                                              21

**EXHIBIT G**
**72**

ROUGH DRAFT

10:51:19  1      A.  No.

10:51:20  2      Q.  Excuse me, this particular addition of the

10:51:23  3    Mr. Sim's blog?

10:51:25  4      A.  No.  I'm not familiar with him.

10:51:28  5      Q.  Okay.  If you go to the second page, the

10:51:31  6    middle of the paragraph, the paragraph that starts

10:51:38  7    with, "Oh, here is a great one," a letter from Jean

10:51:46  8    and Dawn and Warren Shuster Peavy/Perry.

10:51:51  9          Do you see that?

10:51:51 10      A.  Yes.

10:51:53 11      Q.  And then it goes on to have some discussion

10:51:56 12    about -- about you and your sister and your mom.

10:52:00 13          Did you provide a letter to Mr. Sim?

10:52:06 14      A.  A letter?

10:52:06 15      Q.  Yeah.

10:52:16 16      A.  I don't recall having any dealings with

10:52:19 17    Sim.

10:52:19 18      Q.  Did you attend the inaugural Joe Shuster

10:52:23 19    awards at Toronto con it's Toronto and then c-o-n?

10:52:28 20      A.  No.

10:52:29 21      Q.  Do you know that your mother and sister

10:52:31 22    did?

10:52:32 23      A.  Yes.

10:52:32 24      Q.  What year was that?

10:52:40 25      A.  I'm not sure.  I didn't go.

                                                              22

**EXHIBIT G**
**73**

ROUGH DRAFT

10:52:41  1        Q.  Last -- was it in the last --

10:52:45  2        A.  Sometime after 2000.

10:52:46  3        Q.  Okay.  Are you aware of any letters that

10:52:50  4    they wrote to Mr. Sim, they being your sister or

10:52:54  5    your mother?

10:53:02  6        A.  No I don't believe I am.

10:53:03  7        Q.  And you'll see in this next paragraph that

10:53:05  8    follows at the very end there's a reference to some

10:53:08  9    of your screenplays.  Then there's some photographs

10:53:12  10   and the photograph on -- on the third page of

10:53:16  11   Exhibit 24 at the very bottom, is that you, your

10:53:19  12   mother, Jean and your sister, Dawn?

10:53:21  13       A.  Yes.

10:53:21  14       Q.  Okay.  And then there's the fourth page at

10:53:25  15   the top talks about the option arrangement with

10:53:28  16   Mr. Salkind.

10:53:29  17           Do you see that?

10:53:29  18       A.  Yes.

10:53:31  19       Q.  Okay.  And as far as you know, you didn't

10:53:34  20   provide any of this information to -- to Mr. Sim.

10:53:34  21           Is that right?

10:53:41  22       A.  I don't recall having any dealings with --

10:53:44  23   with Sim so I don't know where he got it.

10:53:46  24       Q.  And go to the -- the next page at the very

10:53:49  25   end which starts with so there you go?

                                                              23

**EXHIBIT G**
**74**

ROUGH DRAFT

10:53:55  1    A.  Next page at the very end.  Uh-huh.

10:53:57  2    Q.  It says at the end stay tuned as we try to

10:54:01  3    track down Jean Shuster Peavy CVC interview.  Do you

10:54:06  4    know anything about that interview?

10:54:07  5    A.  No, I don't.

10:54:08  6    Q.  Okay.  When did you change your name from

10:54:17  7    Peavy to Peary?

10:54:18  8    A.  Some time in the early 1980s.

10:54:24  9    Q.  Did you legally change it?

10:54:26  10   A.  Yes.

10:54:26  11   Q.  Why did you do that?

10:54:27  12   A.  It was like a kind of a business type of

10:54:34  13   decision.  I was doing some acting at the time.

10:54:38  14   That was part of it.  I thought it had a better

10:54:40  15   sound, as actors frequently change their names so --

10:54:44  16   Q.  Did you --

10:54:45  17   A.  -- it had to do with that.

10:54:46  18   Q.  Did you appear in anything --

10:54:50  19   A.  I did.

10:54:51  20   Q.  -- that was previous to --

10:54:53  21   A.  I did local paid productions and did some

10:54:59  22   various auditions for a time but I didn't pursue it.

10:55:09  23   Q.  Are you also a musician?

10:55:12  24   A.  I have -- yes, I have done music.

10:55:14  25   Q.  Did you perform in a band called the Cotton

                                                        24

**EXHIBIT G**
**75**

ROUGH DRAFT

10:55:19  1    Pickin Peavys?

10:55:19  2        A.  As a child as a childhood thing.

10:55:25  3        Q.  Who was in that band?

10:55:26  4        A.  Myself, mother and father, maybe an

10:55:30  5    occasional other musician.

10:55:32  6        Q.  And what did you play the ban Joe?

10:55:33  7        A.  Yes.

10:55:35  8        Q.  Okay.  So you have done some music in your

10:55:40  9    background and you've done some acting?

10:55:41 10        A.  Yes.

10:55:42 11        Q.  Have you ever been compensated for acting?

10:55:43 12        A.  Yes.

10:55:45 13        Q.  How long ago?

10:55:48 14        A.  Early 1980s.

10:55:56 15        Q.  So I want to go back a bit on your

10:55:58 16    relationship with your uncle Joe Shuster.

10:56:05 17            Did you ever spend one on one time with him

10:56:09 18    growing up?

10:56:09 19        A.  Some.

10:56:09 20        Q.  Did you go stay with him, for example, for

10:56:12 21    a while?

10:56:12 22        A.  There was one occasion I stayed with him

10:56:16 23    for a couple weeks.

10:56:18 24        Q.  When was that?

10:56:20 25        A.  That's when I thought I might become an

25

ROUGH DRAFT

10:56:22  1    actor and I came out here and he let me stay in his

10:56:27  2    place for a while.

10:56:27  3          Q.  Late '80s?

10:56:28  4          A.  No.  That was the early '80s when I had all

10:56:32  5    my heir.

10:56:33  6          Q.  And when did you last see him before he

10:56:39  7    died?

10:56:39  8          A.  There -- there might have been an occasion

10:56:46  9    in the late '80s where we visited him, I believe.

10:56:52  10   It wasn't very long, though.

10:56:57  11         Q.  What wasn't very long?

10:56:59  12         A.  The visit was not long.

10:57:03  13         Q.  Did you speak with him by phone?

10:57:07  14         A.  Not much.  Mostly it was to his sister

10:57:11  15   Jean.

10:57:15  16         Q.  Were you -- so your contact with him

10:57:18  17   diminished in -- over the last years of his life?

10:57:27  18         A.  I don't know if it diminished.  There

10:57:31  19   was -- I would say it was pretty steady as it had

10:57:34  20   been.

10:57:37  21         Q.  But you hadn't seen him in 3 or 4 years,

10:57:37  22   right?

10:57:40  23         A.  I don't recall the last time I seen him if

10:57:43  24   that's what you're asking.  It was -- we had visited

10:57:45  25   him sometime in the late 1980s and he -- he had

26

**EXHIBIT G**

**77**

ROUGH DRAFT

| | | |
|---|---|---|
| 10:57:50 | 1 | gotten older and slower and had various health |
| 10:57:55 | 2 | problems so it wasn't -- it wasn't a whole lot said. |
| 10:58:06 | 3 | I don't recall speaking with him much at that time. |
| 10:58:08 | 4 | Q.  Did you ever have a conversation with -- |
| 10:58:11 | 5 | with Joe Shuster about copyright interests or |
| 10:58:16 | 6 | termination of copyright interests? |
| 10:58:18 | 7 | A.  No. |
| 10:58:20 | 8 | MR. TOBEROFF:  Compound. |
| 10:58:22 | 9 | THE WITNESS:  No.  Never discussed that. |
| 10:58:22 | 10 | BY MR. PETROCELLI: |
| 10:58:26 | 11 | Q.  Did you ever have a conversation with Joe |
| 10:58:28 | 12 | Shuster about any contractual arrangements he had |
| 10:58:34 | 13 | with DC Comics or Time-Warner or Warner |
| 10:58:39 | 14 | communications or any other affiliated entity? |
| 10:58:42 | 15 | MR. TOBEROFF:  Compound. |
| 10:58:45 | 16 | THE WITNESS:  No. |
| 10:58:45 | 17 | BY MR. PETROCELLI: |
| 10:58:51 | 18 | Q.  Did he ever discuss with you any of his |
| 10:58:55 | 19 | pension arrangements or agreements? |
| 10:58:57 | 20 | A.  No. |
| 10:59:00 | 21 | Q.  Were you aware of them? |
| 10:59:04 | 22 | A.  I knew he was getting a pension. |
| 10:59:06 | 23 | Q.  From whom? |
| 10:59:07 | 24 | A.  Time-Warner, I believe. |
| 10:59:15 | 25 | Q.  Were you at all involved in his financial |

27

**EXHIBIT G**
**78**

ROUGH DRAFT

10:59:19  1    affairs, helping him out with paying bills or things

10:59:23  2    like that?

10:59:23  3        A.  Not while he was alive.

10:59:26  4        Q.  When he died, though, you -- you did go

10:59:29  5    through and reconstruct all of his payments and

10:59:32  6    checks and tried to get a handle on how much money

10:59:36  7    he had.

10:59:38  8            Is that right?

10:59:38  9            MR. TOBEROFF:  Vague.

10:59:43 10            You can answer.

10:59:43 11            THE WITNESS:  The only thing I recall is I

10:59:45 12    helped my mother clear up his affairs.  That's about

10:59:55 13    the only involvement I had at the -- after he died.

10:59:55 14    BY MR. PETROCELLI:

11:00:03 15        Q.  And after he died, were you assisting your

11:00:11 16    mom in her discussions with either DC Comics or

11:00:17 17    Time-Warner about financial arrangements?

11:00:22 18            MR. TOBEROFF:  Lacks foundation.  Assumes

11:00:24 19    facts.

11:00:30 20            THE WITNESS:  I -- no, I really had nothing

11:00:32 21    to do with what she was saying.

11:00:32 22    BY MR. PETROCELLI:

11:00:34 23        Q.  Okay.  I'll come back to that in a bit.

11:00:39 24            You are aware that DC Comics has filed a

11:00:47 25    lawsuit against you and other defendants, including

                                                          28

**EXHIBIT G**
**79**

ROUGH DRAFT

11:00:55  1    Mr. Toberoff?

11:00:56  2        A.  Yes.

11:01:02  3        Q.  Let me show you a copy of the complaint

11:01:03  4    which is Exhibit 1.

11:01:06  5            (The document referred to was

11:01:06  6            marked for identification by the

11:01:06  7            C.S.R. as Exhibit 1 and attached to

11:01:16  8            this deposition.)

11:01:16  9            MR. PETROCELLI:  Actually the first amended

11:01:19  10   complaint.

11:01:19  11           MR. TOBEROFF:  Is this -- I thought this --

11:01:21  12   the other blog was Exhibit 1.

11:01:23  13           MR. PETROCELLI:  No, no.  I premarked them,

11:01:25  14   as I said,.  So that was -- I identified that on the

11:01:28  15   record as Exhibit 24.

11:01:40  16           You have a copy of that blog that's been

11:01:43  17   marked by the reporter, mark?  This one right here?

11:01:47  18   Why don't you put that over there so we can keep the

11:01:50  19   exhibits organized that's for the reporter thank

11:01:56  20   you.

11:01:56  21       Q.  This lawsuit was first filed on I believe

11:01:58  22   it was May 14, 2010 and a copy of the complaint at

11:02:05  23   the time was served on you, did you read the

11:02:08  24   complaint?

11:02:09  25       A.  I scanned it.

                                                                29

**EXHIBIT G**
**80**

ROUGH DRAFT

11:02:11  1        Q.  Scanned it?

11:02:12  2        A.  Yes.

11:02:14  3        Q.  Did you discuss it with your mom?

11:02:22  4        A.  Her -- not -- not -- not really.  She

11:02:28  5    faculties are not -- not very good because of her

11:02:34  6    stroke.  She's -- she's perhaps aware -- she's

11:02:38  7    probably aware of it I'm sure.

11:02:40  8        Q.  When the lawsuit was served on you and you

11:02:42  9    became aware of it did you have any discussion at

11:02:45  10   all with your mother about it, even -- even in the

11:02:48  11   most general terms, like, you know, "They filed a

11:02:50  12   case against us or anything like that?

11:02:52  13       A.  That would be the only extent of it.  I

11:02:56  14   would have mentioned something.  That's it.

11:03:00  15       Q.  Do you recall what, if anything, she said

11:03:02  16   to you?

11:03:06  17       A.  Her -- her faculties are such that I

11:03:09  18   don't think she completely understands what's going

11:03:11  19   on with this.

11:03:13  20       Q.  "With this," meaning --

11:03:14  21       A.  This.

11:03:14  22       Q.  All the legal issues?

11:03:16  23       A.  This legal -- yes.

11:03:18  24       Q.  Did you discuss it with your sister Jean

11:03:26  25   with whom you were living at the time?

                                                              30

**EXHIBIT G**
**81**

ROUGH DRAFT

11:03:27  1        A.   You mean --

11:03:28  2        Q.   Your sister Dawn, excuse me?

11:03:29  3        A.   Dawn.

11:03:32  4        Q.   What -- what is Dawn's last name?  Does she

11:03:35  5   go by Peary?

11:03:37  6        A.   She uses Peavy right now.

11:03:38  7        Q.   Peavy.  Excuse me.  Okay.  And what is your

11:03:46  8   address?

11:03:46  9        A.   51 Camino Cabo, Santa Fe, New Mexico,

11:03:58 10   87508.

11:04:00 11        Q.   Who owns the house?

11:04:01 12        A.   I do with -- with my mother.

11:04:10 13        Q.   Did you discuss the lawsuit with -- with

11:04:12 14   Dawn?

11:04:13 15        A.   No.

11:04:16 16        Q.   Never?

11:04:16 17        A.   No.  She hasn't -- she hasn't been involved

11:04:23 18   in any of the legal issues.  She just has a general

11:04:25 19   awareness of it.

11:04:27 20             MR. TOBEROFF:  If I might, just focus --

11:04:28 21   just answer his question and focus on the question.

11:04:28 22   BY MR. PETROCELLI:

11:04:31 23        Q.   Did you tell her that you were coming here

11:04:32 24   for a deposition?

11:04:33 25        A.   She's aware of that.

31

**EXHIBIT G**
**82**

ROUGH DRAFT

11:04:38  1        Q.  Based on your interactions with her, do you

11:04:39  2    believe she's aware that a lawsuit has been filed by

11:04:42  3    DC comics against you and others with respect to the

11:04:46  4    Joe Shuster termination interest?

11:04:48  5        A.  I don't know if I've discussed that with

11:04:51  6    her.

11:04:53  7        Q.  Have you discussed this case with anyone

11:04:55  8    else other than Marc Toberoff?

11:04:57  9        A.  No.

11:05:02 10        Q.  Have you discussed it with any other

11:05:06 11    lawyers besides Mr. Toberoff?

11:05:08 12            MR. TOBEROFF:  Including lawyers at my

11:05:09 13    firm.

11:05:09 14            MR. PETROCELLI:  Not including any lawyers

11:05:11 15    at Mr. Toberoff's firm.  Anybody else.

11:05:14 16            THE WITNESS:  No.

11:05:14 17    BY MR. PETROCELLI:

11:05:16 18        Q.  Who is Michael Cataron?

11:05:20 19        A.  He is a friend.

11:05:23 20        Q.  Where does he live?

11:05:24 21        A.  He lives in Pennsylvania.

11:05:28 22        Q.  How did you become acquainted with him?

11:05:30 23        A.  I became acquainted with him -- I don't

11:05:40 24    recall.  I've known him since I was younger.

11:05:43 25        Q.  You grew up together?

32

**EXHIBIT G**
**83**

ROUGH DRAFT

11:05:44  1        A.  No, he knew the family.  He knew our family

11:05:48  2   and I knew him since I can't recall exactly.  We've

11:05:52  3   known him for years though.

11:05:53  4        Q.  What does he do for a living?

11:05:55  5        A.  He is some kind of a teacher, I believe.

11:05:59  6        Q.  What city in Pennsylvania?

11:06:01  7        A.  I don't recall.

11:06:04  8        Q.  When was the last time you had any contact

11:06:07  9   with him?

11:06:07 10        A.  Personal or on the phone or --

11:06:12 11        Q.  Anyway.  On the phone, writing, e-mail,

11:06:14 12   anything.

11:06:19 13        A.  I must have spoken with him in the last

11:06:21 14   year on the phone.

11:06:26 15        Q.  And you don't know what city he lives in?

11:06:28 16        A.  I can't recall.  Usually I just talk to him

11:06:32 17   on the phone.

11:06:32 18        Q.  Do you know how old he is?

11:06:33 19        A.  I believe he's in his 50s.

11:06:40 20        Q.  Do you have an e-mail address?

11:06:41 21        A.  Yes.

11:06:42 22        Q.  What is it?

11:06:44 23        A.  W Peary at comcast.net.

11:06:54 24        Q.  Is that P EA R Y?

11:06:57 25        A.  Yes.

33

**EXHIBIT G**
**84**

ROUGH DRAFT

11:06:58  1        Q.  And do you know if your sister Dawn has an

11:07:00  2    e-mail address?

11:07:00  3        A.  She uses 1 through work.  I can't recall.

11:07:08  4        Q.  Does your mom have one?

11:07:09  5        A.  No.

11:07:18  6        Q.  Are you generally familiar with the nature

11:07:20  7    of DC Comics' claims in this case?

11:07:22  8        A.  Somewhat.

11:07:29  9        Q.  Are you aware -- and again, very generally,

11:07:34 10    that DC Comics is challenging the termination notice

11:07:40 11    served by the estate of Joe Shuster?

11:07:45 12        A.  Yeah, I saw that here.

11:07:47 13        Q.  And by challenging," I mean DC is

11:07:53 14    contending that the termination notice is not valid

11:07:55 15    or not effective.  Do you have a general

11:07:58 16    understanding of that?

11:08:00 17        A.  Just from what I read here.

11:08:02 18        Q.  Okay.  You also -- do you also have an

11:08:05 19    understanding that DC claims that certain agreements

11:08:19 20    that you and/or your mother entered into violate

11:08:24 21    it's rights under the copyright laws?  Do you have a

11:08:27 22    general understanding that DC is making that

11:08:30 23    contention?

11:08:33 24        MR. TOBEROFF:  I just want to instruct you,

11:08:35 25    Warren, to the extent he asks you a question whether

                                                              34

ROUGH DRAFT

11:08:39  1     you have an understanding, you can answer that

11:08:42  2     question as to what your understanding is, provided

11:08:44  3     that understanding is not based on your

11:08:47  4     conversations with me and is based on something

11:08:50  5     independent of your communications with me.  If

11:08:55  6     it's -- if your understanding is solely based on

11:08:57  7     your communications with me, you can't discuss with

11:09:03  8     Mr. Petrocelli what your answer is because you would

11:09:07  9     be difficult individual the substance of your

11:09:08  10    communications with me.

11:09:09  11            Do you understand that?

11:09:11  12            THE WITNESS:  Yes.

11:09:12  13            MR. TOBEROFF:  So you can answer solely to

11:09:14  14    the extent you have an understanding independent of

11:09:17  15    your discussions with me.

11:09:18  16            THE WITNESS:  Okay.

11:09:18  17    BY MR. PETROCELLI:

11:09:19  18       Q.  You read the complaint you said -- you said

11:09:21  19    you scanned it, right?

11:09:21  20       A.  Yes.

11:09:23  21       Q.  So when you scanned the complaint did you

11:09:27  22    understand that among other things that DC was

11:09:29  23    contending that certain agreements that you and/or

11:09:33  24    your mother entered into entitled "It's rights under

11:09:36  25    the copyright laws?

                                                                35

**EXHIBIT G**
**86**

ROUGH DRAFT

11:09:40  1          MR. TOBEROFF:  Again can you only answer

11:09:41  2    that question to the extent have you some

11:09:43  3    independent understanding, independent of your

11:09:45  4    discussions with me.

11:09:47  5          THE WITNESS:  My understanding of this is

11:09:54  6    intricately linked to my discussions with Marc

11:09:57  7    Toberoff.

11:09:57  8    BY MR. PETROCELLI:

11:09:58  9        Q.  When you receive the complaint and scanned

11:10:03 10    it that was before you spoke to Mr. Toberoff about

11:10:05 11    the contents of the complaint, correct?

11:10:10 12          MR. TOBEROFF:  Assumes facts.

11:10:15 13          THE WITNESS:  I scanned it.

11:10:15 14    BY MR. PETROCELLI:

11:10:16 15        Q.  And so I'm focusing on that point in time

11:10:19 16    before any communication with Mr. Toberoff.

11:10:23 17          MR. TOBEROFF:  I'd like you to answer his

11:10:24 18    question.  He asked you a question and you didn't

11:10:27 19    answer it.

11:10:27 20          MR. PETROCELLI:  I think he answered it?

11:10:29 21          MR. TOBEROFF:  No, he didn't.

11:10:31 22          THE WITNESS:  What was the question.

11:10:31 23    BY MR. PETROCELLI:

11:10:32 24        Q.  Let me re -- rewind this, okay?

11:10:35 25          I want you to focus on the time when you

36

**EXHIBIT G**
**87**

ROUGH DRAFT

11:10:39  1    received the complaint and you scanned it before you

11:10:42  2    spoke to Mr. Toberoff about it?

11:10:44  3         MR. TOBEROFF:  Assumes facts.

11:10:44  4    BY MR. PETROCELLI:

11:10:46  5         Q.  Are you with me?

11:10:47  6         A.  Uh-huh.

11:10:48  7         Q.  Okay.  At that point in time, did you have

11:10:53  8    a general understanding that DC was claiming that

11:10:57  9    certain agreements you or your mother entered into

11:10:59 10    violated it's rights?

11:11:03 11         MR. TOBEROFF:  Okay and again, my

11:11:03 12    instruction to you is if you had an understanding

11:11:06 13    that's independent of your discussions with me, you

11:11:09 14    can answer the question.  If you don't, I instruct

11:11:12 15    you not to answer.

11:11:13 16         THE WITNESS:  All my understanding is based

11:11:18 17    on my discussions with Mr. Toberoff.

11:11:18 18    BY MR. PETROCELLI:

11:11:22 19         Q.  Well you had an understanding at some level

11:11:24 20    when you read the complaint, right?

11:11:28 21         A.

11:11:28 22         MR. TOBEROFF:  Assumes facts.

11:11:29 23         THE WITNESS:  I don't really -- I don't

11:11:31 24    really understand the -- the complaints, to tell you

11:11:37 25    the truth.  I don't.  So all my understanding is, is

ROUGH DRAFT

11:11:44  1    bound with my discussions with Marc Toberoff.

11:11:44  2    BY MR. PETROCELLI:

11:11:46  3        Q.  Well, when you received it and you saw it

11:11:47  4    you picked it up and you scanned it you said.

11:11:47  5            Is that right?

11:11:47  6        A.  Yes.

11:11:52  7        Q.  And you did that before having an in depth

11:11:55  8    discussion with Mr. Toberoff about the document

11:11:56  9    correct?

11:12:01 10            THE WITNESS:  Your asking what my

11:12:03 11    understanding of this is.

11:12:04 12            MR. TOBEROFF:  Is he ask whether.

11:12:05 13            MR. PETROCELLI:  Mark.

11:12:06 14            MR. TOBEROFF:  I'm sorry.  Focus on the

11:12:07 15    question.

11:12:07 16    BY MR. PETROCELLI:

11:12:08 17        Q.  Yeah. When you got the document, you

11:12:12 18    scanned it and you did that before having an in

11:12:17 19    depth conversation with Mr. Toberoff about the

11:12:20 20    contents of the complaint, correct?

11:12:22 21            MR. TOBEROFF:  Assumes facts.

11:12:27 22            THE WITNESS:  I don't remember if I read

11:12:30 23    through it first or talked to Marc Toberoff first.

11:12:34 24    I really don't.  I don't know what the timeline is

11:12:36 25    on that.

38

**EXHIBIT G**
**89**

ROUGH DRAFT

11:12:36  1    BY MR. PETROCELLI:

11:12:37  2        Q.  Speaking of timelines, did you read the

11:12:39  3    last document that the attachment to the complaint

11:12:43  4    called the Toberoff timeline?

11:12:49  5        A.  Yes, I -- I scanned that.

11:12:50  6        Q.  Okay.  When you scanned the Toberoff

11:12:52  7    timeline that's attached as exhibit -- Exhibit A to

11:13:04  8    the complaint, is that the first time you had ever

11:13:09  9    seen the Toberoff timeline?

11:13:11  10       A.  No.

11:13:14  11       Q.  When had you first seen it?

11:13:20  12       A.  I had seen it sometime before.  I don't

11:13:23  13   recall when.  There's so much documents that -- so

11:13:26  14   much discussions that I was aware of this.

11:13:32  15       Q.  This document?

11:13:32  16       A.  Yes.

11:13:33  17       Q.  Do you know when you first became aware of

11:13:35  18   it?

11:13:40  19       A.  I couldn't give you a date.  I know that I

11:13:43  20   had become aware of it.

11:13:51  21       Q.  When you -- had you received a copy of it

11:13:54  22   prior to seeing it attached to the complaint?

11:13:58  23       A.  I had -- I had seen it some point I know I

11:14:04  24   had seen it.  I don't know if it was -- how it came

11:14:08  25   to me.  I don't recall.  Because I get so much.  I

                                                              39

**EXHIBIT G**
**90**

ROUGH DRAFT

11:14:13  1    do recall seeing it.

11:14:14  2        Q.  You get so much what?

11:14:15  3        A.  Material.

11:14:16  4        Q.  Okay.  What do you do with the material

11:14:18  5    that you get?

11:14:19  6        A.  If it comes by mail, I keep it.  E-mail, if

11:14:28  7    it -- I look at it.  Keep some of it if I need to,

11:14:32  8    if not it just gets taken away.

11:14:36  9        Q.  You've -- you delete e-mails?

11:14:38  10       A.  Yes.

11:14:39  11       Q.  Related to this case?

11:14:40  12       A.  Well, if it -- if it isn't some -- some --

11:14:46  13   some -- some communications I would delete.  Only

11:14:49  14   documents I would save.

11:14:57  15       Q.  When you say only documents you would safe,

11:15:00  16   what do you mean by that?  You mean attachments to

11:15:02  17   e-mails?

11:15:02  18       A.  Legal documents.  Things -- things that

11:15:05  19   should be kept.

11:15:08  20       Q.  Have you had this e-mail address for the

11:15:10  21   past three years?

11:15:11  22       A.  Yes.

11:15:13  23       Q.  Do you have any other?

11:15:17  24       A.  No.

11:15:20  25       Q.  Have you been made aware of the need to

40

**EXHIBIT G**
**91**

ROUGH DRAFT

11:15:23  1   preserve evidence since the moment this case was

11:15:27  2   filed?

11:15:31  3       A.  Preserve evidence?  Can you clarify?

11:15:34  4       Q.  Have you been made -- have you been made

11:15:37  5   aware of -- that should you not delete e-mails or

11:15:45  6   discard material that could be evidence in this

11:15:49  7   case?

11:15:49  8       A.  I don't believe I've deleted anything that

11:15:53  9   would be evidence.

11:15:56  10      Q.  I asked you if you've been made aware that

11:15:58  11  you should not do so?

11:15:59  12          MR. TOBEROFF:  Objection.  The only way he

11:16:02  13  could be made aware of is through communications

11:16:04  14  with his attorney so you're asking him.

11:16:08  15          MR. PETROCELLI:  Mark that's not

11:16:09  16  necessarily true.

11:16:10  17          MR. TOBEROFF:  How else could he be made

11:16:12  18  aware.

11:16:12  19          MR. PETROCELLI:  His sister could have told

11:16:17  20  him.  I mean I would appreciate you don't prompt him

11:16:17  21  that way.

11:16:17  22          MR. TOBEROFF:  Excuse me I'm not prompting.

11:16:19  23          You could answer the question if so long --

11:16:22  24  regard to whether you were made aware to preserve

11:16:25  25  evidence by someone other than your attorney.

41

**EXHIBIT G**
**92**

ROUGH DRAFT

11:16:32  1            THE WITNESS:  So are you asking if -- if I

11:16:36  2    was supposed to save this, if I received it, if I

11:16:40  3    was made aware to save it?

11:16:40  4    BY MR. PETROCELLI:

11:16:43  5        Q.  No.

11:16:44  6        A.  Oh.

11:16:44  7        Q.  I'm asking something different than that.

11:16:46  8        A.  Oh.

11:16:46  9        Q.  I'm asking whether you have been made aware

11:16:51 10    that you are required to preserve material that

11:16:55 11    could be evidence relevant to this case?

11:16:58 12            MR. TOBEROFF:  And -- and --

11:17:00 13        Q.  BY MR. PETROCELLI:  You can answer that

11:17:01 14    "yes" or "no"?

11:17:01 15            MR. TOBEROFF:  And I'm instructing you that

11:17:03 16    you can answer that question with respect to any

11:17:06 17    party except an attorney.

11:17:08 18            MR. PETROCELLI:  And by the way, just for

11:17:11 19    the record, because I don't like to have big

11:17:13 20    arguments on the record.

11:17:14 21            MR. TOBEROFF:  I agree.

11:17:14 22            MR. PETROCELLI:  I don't even agree with

11:17:16 23    that instruction because I believe that's

11:17:18 24    discoverable even if it comes from counsel.

11:17:20 25        Q.  But -- but I can't -- there's no judge here

42

ROUGH DRAFT

11:17:24  1    so I can't force you to answer over your attorney's

11:17:30  2    instructions and I'm going to assume that you're

11:17:32  3    going to abide by your attorney's instructions at

11:17:34  4    all times.

11:17:34  5            Is that right?

11:17:35  6        A.  Yes, that's correct.

11:17:35  7        Q.  Okay.

11:17:39  8            (Instruction not to answer.)

11:17:39  9    BY MR. PETROCELLI:

11:17:40  10       Q.  Prior to -- on what -- from the time that

11:17:44  11   this lawsuit became aware, other than conversations

11:17:48  12   with Mr. Toberoff, were you aware of an obligation

11:17:52  13   to preserve evidence related to this case?

11:17:57  14       A.  I'm not sure.  I --

11:18:07  15       Q.  Going back to the first agreement you

11:18:10  16   entered into with Mr. Toberoff or one of his

11:18:13  17   entities, which I think is sometime in

11:18:16  18   November 2001, from that point on, were you aware of

11:18:25  19   an obligation to preserve evidence related in any

11:18:30  20   way to the Joe Shuster termination issue?

11:18:34  21           MR. TOBEROFF:  Same instruction.

11:18:37  22           You can answer outside of communications

11:18:38  23   with your attorney.

11:18:42  24           THE WITNESS:  I'm not -- my understanding

11:18:48  25   is that any documents that need to be saved would be

43

**EXHIBIT G**
**94**

ROUGH DRAFT

11:18:53  1    saved by my attorney.  So I wouldn't -- I don't -- I

11:19:00  2    don't know specifically if it was something I'm

11:19:06  3    supposed to save.  I'm not -- I'm not sure I

11:19:08  4    understand the question.

11:19:08  5    BY MR. PETROCELLI:

11:19:15  6        Q.  From whom -- where in your home are the --

11:19:23  7    are the papers related to this case or any legal

11:19:28  8    matter having to do with Joe Shuster?

11:19:31  9        A.  I've a filing cabinet.

11:19:37 10        Q.  How many drawers?

11:19:38 11        A.  Three.

11:19:41 12        Q.  When did you start to collect that material

11:19:47 13    that is contained in these drawers of this filing

11:19:51 14    cabinet?

11:19:54 15        A.  It would have been with the original legal

11:19:57 16    agreement.

11:19:59 17        Q.  Back in 2001?

11:20:00 18        A.  Yes.

11:20:01 19        Q.  Where is the cabinet located?

11:20:03 20        A.  In a study.

11:20:06 21        Q.  In your home?

11:20:07 22        A.  Yes.

11:20:08 23        Q.  And that has all the physical copies of

11:20:12 24    documents?

11:20:13 25        A.  Yes.

44

**EXHIBIT G**
**95**

ROUGH DRAFT

11:20:15  1      Q.   And besides -- it fills up three drawers?

11:20:19  2      A.   No.   It shares it with a host of other

11:20:22  3   papers.

11:20:22  4      Q.   Okay.   And besides that filing cabinet,

11:20:27  5   where else, if anyplace do you keep any copies of

11:20:31  6   documents relating to this -- this matter?

11:20:37  7      A.   Perhaps a lock box.

11:20:43  8      Q.   What's --

11:20:44  9      A.   A lock box.

11:20:45 10      Q.   What do you mean by "a lock box?

11:20:46 11      A.   Just a fire proof lock box.

11:20:48 12      Q.   In your house?

11:20:49 13      A.   Yes.

11:20:50 14      Q.   And how big, is it?

11:20:51 15      A.   Very small.   Hand held.

11:20:53 16      Q.   What do you have in there?

11:20:56 17      A.   Oh, original documents of all kinds.

11:21:01 18   Titles, house, car titles, everything like that.

11:21:06 19      Q.   As pertains to Joe Shuster what do you

11:21:14 20   have?

11:21:14 21      A.   Oh,.   The -- the original -- original

11:21:19 22   signed agreements, legal agreements and retainers

11:21:23 23   that I have with my attorney.

11:21:30 24      Q.   Anything else?

11:21:30 25      A.   There might be the original will might be

45

**EXHIBIT G**
**96**

ROUGH DRAFT

11:21:40  1    in there.  I would have -- I'm not sure.

11:21:44  2        Q.  Anything else?

11:21:44  3        A.  Not pertaining to the case, no.

11:21:48  4        Q.  How many agreements are there in your lock

11:21:51  5    box between you and Mr. Toberoff or any of his

11:21:56  6    companies?

11:21:57  7        A.  There is -- there's only one.

11:22:02  8        Q.  Which one is that?

11:22:03  9        A.  That's the legal retainer.

11:22:07 10        Q.  What's the date of it?

11:22:08 11        A.  It is -- it is active as of 2001.

11:22:19 12        Q.  But created after the fact?

11:22:20 13        A.  Yes.

11:22:23 14        Q.  When was it created?

11:22:24 15        A.  2004, I believe.

11:22:32 16        Q.  And is that the last document you have

11:22:39 17    signed with Mr. Toberoff or any of his entities?

11:22:44 18        A.  With Mr. Toberoff.

11:22:45 19            MR. TOBEROFF:  You mean last agreement or

11:22:47 20    any document?

11:22:47 21    BY MR. PETROCELLI:

11:22:49 22        Q.  Is that the last agreement, contract, that

11:22:54 23    you have signed with Mr. Toberoff or any of his

11:22:56 24    entities, the one in 2004 that you said goes back to

11:23:03 25    2001?

**EXHIBIT G**
**97**

ROUGH DRAFT

11:23:05  1        A.  Yes.

11:23:07  2        Q.  Have you signed any other agreements at any

11:23:13  3    time since 2004 relating to legal representation,

11:23:20  4    relating to this case in any way?

11:23:22  5        A.  Yes.

11:23:24  6        Q.  What have you signed?

11:23:25  7        A.  It's a.

11:23:28  8            MR. TOBEROFF:  Don't go into -- just --

11:23:36  9    just give a very -- the title or -- don't go into

11:23:40 10    details of the document.

11:23:40 11            THE WITNESS:  It's called a consent

11:23:42 12    agreement.

11:23:42 13    BY MR. PETROCELLI:

11:23:45 14        Q.  Is that in your lock box?

11:23:46 15        A.  Yes.

11:23:50 16        Q.  Why didn't you mention it earlier when I

11:23:52 17    asked you about the agreements in your lock box?

11:23:55 18            MR. TOBEROFF:  Argumentative.

11:24:01 19            THE WITNESS:  I -- I mentioned what I had

11:24:07 20    recalled.

11:24:07 21    BY MR. PETROCELLI:

11:24:10 22        Q.  So you're now recalling as additional

11:24:12 23    documents that you signed?

11:24:12 24        A.  I -- I recall -- I stated what the

11:24:18 25    documents I recalled.

47

**EXHIBIT G**
**98**

ROUGH DRAFT

11:24:20  1      Q.  You now recall that you signed something

11:24:22  2    called a consent agreement and that's also in your

11:24:24  3    lock box?

11:24:25  4      A.  Yes.

11:24:26  5      Q.  Okay.  When was that signed?

11:24:30  6      A.  That was 2008, I believe.

11:24:38  7      Q.  When is the last time you saw it, or a copy

11:24:42  8    of it?

11:24:46  9      A.  Fairly recently I reviewed it last, I don't

11:24:51 10    know, maybe in the last month or so I might have

11:24:53 11    reviewed it.

11:24:54 12      Q.  Why?

11:24:54 13      A.  Because I was thinking about this case

11:25:00 14    because of this.

11:25:02 15      Q.  This deposition?

11:25:03 16      A.  Yes.

11:25:06 17      Q.  Besides the 2008 consent agreement, what

11:25:09 18    else did you review in connection with this

11:25:13 19    deposition?

11:25:13 20      A.  I reviewed my prior deposition for the

11:25:19 21    Siegel case and exhibits.  That's -- that's what

11:25:30 22    I've reviewed.

11:25:32 23      Q.  Did you have a copy of your prior

11:25:34 24    deposition?

11:25:36 25      A.  Yes.

48

ROUGH DRAFT

11:25:37  1          Q.  And the exhibits?

11:25:38  2          A.  Yes.

11:25:42  3          Q.  Besides the 2008 consent agreement and your

11:25:45  4     deposition in the Siegel case together with the

11:25:48  5     exhibits of that deposition, what else did you

11:25:51  6     review in connection with this deposition?

11:25:55  7          A.  That's -- that's pretty much it.

11:26:02  8          Q.  Where did you get the consent agreement to

11:26:04  9     review, from the lock box?

11:26:10 10          A.  I -- I -- I -- yes or -- or it could have

11:26:15 11     been a copy.

11:26:16 12          Q.  Where -- where was the copy?

11:26:18 13          A.  The copy is -- it could be in a separate

11:26:22 14     folder.

11:26:24 15          Q.  What -- what's the name of the folder?

11:26:26 16          A.  The folder is legal.

11:26:29 17          Q.  Where is the folder maintained?

11:26:30 18          A.  The folder, there could be a copy in there

11:26:35 19     in the -- in the filing cabinet.

11:26:40 20          Q.  Is the 2008 consent agreement the last

11:26:44 21     agreement of any kind that you have signed in

11:26:49 22     connection with either this case or anything having

11:26:52 23     to do with the Joe Shuster termination issue?

11:26:55 24          A.  Yes.

11:26:57 25          Q.  Okay.  Who else signed the 2008 consent

                                                                    49

ROUGH DRAFT

11:27:07  1    agreement?

11:27:07  2          A.  Would have been the -- Laura, Joanne

11:27:17  3    Siegel.

11:27:17  4          Q.  Laura Siegel and Joanne Siegel?

11:27:20  5          A.  Yes.

11:27:20  6          Q.  Anyone else?

11:27:21  7          A.  I think there was -- and -- and my attorney

11:27:28  8    signed it.

11:27:28  9          Q.  You mean Mr. Toberoff?

11:27:29 10          A.  Yes.

11:27:30 11          Q.  And did your mother Jean Peavy sign it?

11:27:33 12          A.  I don't recall if she did.  I just -- I

11:27:44 13    didn't read it.  I just scanned the -- the pages.  I

11:27:48 14    didn't -- I don't recall the signature page.  She

11:27:51 15    might have.

11:27:53 16          Q.  Do you know where you were when you signed

11:27:55 17    the document in -- in 2008?

11:27:57 18          A.  Yeah.  When I signed it, I was at home.

11:28:05 19          Q.  And what did you do after you signed it?

11:28:08 20    What did you do with it?

11:28:09 21          A.  Well, an original was FedExed to

11:28:14 22    Mr. Toberoff and I kept another original.

11:28:18 23          Q.  You signed two copies?

11:28:20 24          A.  Yes.

11:28:21 25          Q.  And you put the other original in your lock

50

ROUGH DRAFT

11:28:25  1    box?

11:28:25  2         A.  Yes.

11:28:26  3         Q.  Did you ever get back from Mr. Toberoff a

11:28:29  4    version that had more signatures on it?

11:28:30  5         A.  Well, yes, the version in the lock box

11:28:35  6    would have all the original signatures.

11:28:48  7         Q.  Why did you review -- why did you pick the

11:28:51  8    2008 consent agreement to review?

11:28:53  9         A.  Well, before I came I -- I brought out my

11:28:59 10    folder and it says legal Shuster case and I flipped

11:29:07 11    through documents, just looked at them and said what

11:29:09 12    do I want to bring, what don't I want to bring

11:29:12 13    and -- and that's all.  It was just a cursory review

11:29:15 14    of what I had in there and I left most of it at home

11:29:19 15    so it was just a cursory review of what I had.

11:29:23 16         Q.  What did you bring with you?

11:29:25 17         A.  I brought a copy of the legal retainer as

11:29:28 18    of 2001 and I brought a -- a copy of the first page

11:29:41 19    of the consent agreement with a cover letter that

11:29:47 20    was a communication between Mr. Toberoff and another

11:29:49 21    attorney so it was just like the first page of it,

11:29:54 22    just to jog my memory.  And --

11:29:56 23         Q.  Who was the other attorney?

11:29:57 24         A.  It was -- can I say that?  Just -- it was a

11:30:04 25    communication.  I don't know if that's privileged.

51

ROUGH DRAFT

11:30:07  1          MR. TOBEROFF:  Well --

11:30:07  2          THE WITNESS:  Just.

11:30:08  3          MR. TOBEROFF:  I -- I think you can -- I

11:30:12  4    think you can give the name of the attorney.

11:30:15  5          THE WITNESS:  It was Bergman.

11:30:15  6    BY MR. PETROCELLI:

11:30:17  7          Q.  Michael Bergman?

11:30:19  8          A.  Yes.

11:30:19  9          MR. TOBEROFF:  That's not privileged.

11:30:20  10         THE WITNESS:  No, okay.  Okay.  Yeah.

11:30:20  11   BY MR. PETROCELLI:

11:30:24  12         Q.  When did you arrive in Los Angeles for this

11:30:26  13   deposition?

11:30:27  14         A.  Oh, it was -- it was a Monday afternoon,

11:30:33  15   Monday.

11:30:34  16         Q.  Of this week?

11:30:35  17         A.  Yes, of this week.

11:30:37  18         Q.  And have you had meetings with Mr. Toberoff

11:30:42  19   to get ready for this deposition?

11:30:43  20         A.  Yes.  We talked.

11:30:48  21         Q.  Who attended the meetings?

11:30:49  22         A.  Just Mr. Toberoff.

11:30:52  23         Q.  How long did you meet in total since you

11:30:56  24   arrived Monday afternoon?

11:30:57  25         A.  Yeah, a couple hours.

**EXHIBIT G**
**103**

ROUGH DRAFT

11:31:03  1        Q.  When?  Monday?

11:31:05  2        A.  No, primarily yesterday.

11:31:10  3        Q.  At Mr. Toberoff's office?

11:31:11  4        A.  No, in my hotel.

11:31:13  5        Q.  Where is your hotel?

11:31:14  6        A.  Hyatt.

11:31:17  7        Q.  Right here in Century City?

11:31:19  8        A.  Yes.

11:31:20  9        Q.  The Hyatt century plaza?

11:31:24 10        A.  Yes.

11:31:24 11        Q.  And were you shown any documents yesterday

11:31:32 12 when you met with Mr. Toberoff?

11:31:35 13        A.  We reviewed the prior deposition and

11:31:41 14 exhibits and the -- reviewed our agreements.

11:31:46 15        Q.  What agreements?

11:31:47 16        A.  The legal retainer and the -- the complaint

11:31:55 17 from DC and the supporting legal documents, quite --

11:32:01 18 quite a few but just -- just that stuff.

11:32:07 19        Q.  Did you also show Mr. Toberoff the consent

11:32:11 20 agreement pages that you had taken with you?

11:32:14 21        A.  Yes, just the -- the copy that I brought to

11:32:17 22 jog my memory.

11:32:19 23        Q.  Okay.

11:32:33 24        MR. TOBEROFF:  Is this a good time for a

11:32:34 25 short break, Dan to use the restroom.

53

**EXHIBIT G**
**104**

ROUGH DRAFT

11:32:36  1          MR. PETROCELLI:  Okay.

11:32:38  2          THE VIDEOGRAPHER:  Off the record.  The

11:32:40  3   time is 11:31.

11:32:45  4          (Brief recess.)

11:42:27  5          THE VIDEOGRAPHER:  Back on the record at

11:42:38  6   11:41.

11:42:38  7   BY MR. PETROCELLI:

11:42:41  8          Q.  Mr. Peary, did you travel here alone?

11:42:44  9          A.  Yes.

11:42:50 10          Q.  Besides the -- some of the pages from the

11:42:53 11   2008 concent agreement and I think you said the your

11:43:02 12   legal retention agreement as well?

11:43:02 13          A.  Yes.

11:43:04 14          Q.  Did you bring any other documents with you

11:43:07 15   when you took your trip here?

11:43:08 16          A.  No.

11:43:10 17          Q.  Just those two documents?

11:43:11 18          A.  Yes.

11:43:14 19          Q.  Did you take the complaint?

11:43:15 20          A.  No.

11:43:22 21          Q.  Other than the 2008 consent agreement, have

11:43:28 22   you signed any other papers that any member of the

11:43:34 23   Siegel family also has signed?

11:43:37 24          A.  No.

11:43:39 25          Q.  Is that the only one?

54

**EXHIBIT G**
**105**

ROUGH DRAFT

11:43:39  1        A.  Yes.

11:43:48  2        Q.  Have you spoken to any member of the Siegel

11:43:51  3    family since this lawsuit was filed back in May of

11:43:56  4    2010?

11:44:07  5        A.  2010.  Yes.

11:44:11  6        Q.  With whom?

11:44:14  7        A.  With -- with Joanne before she died.  And

11:44:18  8    once with Laura.

11:44:23  9        Q.  Did you attend funeral services for Joanne?

11:44:26 10        A.  No.

11:44:29 11        Q.  Any member of your family attend?

11:44:31 12        A.  No.

11:44:34 13        Q.  Did you speak to Laura before or after

11:44:36 14    JoAnne's passing?

11:44:40 15        A.  After.

11:44:43 16        Q.  Addressing first your -- was it a phone

11:44:46 17    call with Joanne before she passed?

11:44:48 18        A.  Yes.

11:44:49 19        Q.  What was the -- what did you talk about?

11:44:52 20        A.  The phone call after she passed.

11:44:54 21        Q.  The one with Joanne before she died?

11:44:56 22        A.  Oh, Joanne.

11:44:57 23        Q.  That was a phone call?

11:44:58 24        A.  Yes.

11:45:03 25        Q.  What did the two of you talk about?

**EXHIBIT G**
**106**

ROUGH DRAFT

11:45:04  1       A.  It was more or less friendly chitchat.  We

11:45:11  2   did not discuss any legal issues.

11:45:13  3       Q.  You called her?

11:45:14  4       A.  She called me.  And she speaks with Jean as

11:45:18  5   well, of course.

11:45:19  6       Q.  Did she speak with Jean?

11:45:20  7       A.  Yes.

11:45:26  8       Q.  So the purpose of the call as far as you

11:45:28  9   know, was pure pleasantries?

11:45:30 10       A.  Yes.

11:45:33 11       Q.  Nothing at all discussed about legal

11:45:35 12   issues?

11:45:35 13       A.  No.  I didn't discuss any legal issues.

11:45:39 14       Q.  Did your mother?

11:45:40 15       A.  I'm not aware she did.

11:45:43 16       Q.  Was it just the two of you on the phone?

11:45:46 17       A.  Yes.

11:45:46 18       Q.  Joanne and you?

11:45:47 19       A.  Yes.

11:45:48 20       Q.  Did you then pass the phone to your mom?

11:45:49 21       A.  Yes.

11:45:54 22       Q.  And that's the only time you've spoken to

11:45:57 23   Joanne prior to her death for a long period of time?

11:46:01 24       A.  I may have spoken with her just a couple

11:46:07 25   times in the recent past.

56

**EXHIBIT G**
**107**

ROUGH DRAFT

11:46:10  1        Q.  About what?

11:46:11  2        A.  It's -- she usually calls when she was

11:46:14  3    alive she usually calls to speak with Jean and I

11:46:19  4    kind of talk to her like a grandson would talk to a

11:46:22  5    grandmother kind of -- her faculties weren't, I

11:46:28  6    don't think, the way old people are, you have to be

11:46:33  7    kind of slow and friendly, so it's friendly, kind of

11:46:36  8    grandson top grandmother type talk basically.  How

11:46:41  9    are you, what are you doing, you know, and what --

11:46:44 10    what's going on, what are your -- pleasantries.  No

11:46:50 11    legal.

11:46:51 12        Q.  Were you very close to her?

11:46:53 13        A.  I was -- I knew her.  I wouldn't say close,

11:46:59 14    but I did know her.

11:47:01 15        Q.  When was the last time you saw her before

11:47:04 16    she passed?

11:47:04 17        A.  That would have been in 2008.

11:47:16 18        Q.  What was the occasion?

11:47:17 19        A.  Oh,.  It was -- there was a summer of

11:47:22 20    Superman event in Cleveland.

11:47:28 21        Q.  Did you attend a mediation in April 2010

11:47:36 22    where she was also present?

11:47:37 23        A.  Yes.

11:47:41 24        Q.  So you saw her then too?

11:47:42 25        A.  Yes.

57

**EXHIBIT G**
**108**

ROUGH DRAFT

11:47:44   1          Q.   Did you spend any time with her before or

11:47:48   2   after the mediation session?

11:47:53   3          A.   No.

11:47:54   4          Q.   Was that mediation session in April 2010

11:47:56   5   the last time you saw her?

11:48:00   6          A.   In person, yes.

11:48:02   7          Q.   You said you spoke with her daughter Laura?

11:48:05   8          A.   Yes.

11:48:07   9          Q.   When was that?

11:48:09   10         A.   After see died.

11:48:11   11         Q.   What was the purpose of that?   Phone call?

11:48:14   12         A.   Yes.

11:48:16   13         Q.   To give your condolences?

11:48:17   14         A.   Yes.

11:48:18   15         Q.   And have you spoken to Laura since then?

11:48:25   16         A.   No.

11:48:28   17         Q.   You identified the document that the

11:48:30   18   Siegels and you signed as a consent agreement.

11:48:34   19              Is the word -- is that the title of the

11:48:37   20   document?

11:48:43   21         A.   I believe the title, if I'm allowed to say

11:48:45   22   that.

11:48:46   23              MR. TOBEROFF:   Objection.   Actually you

11:48:51   24   can -- you can testify as to the title but that's

11:48:54   25   it.   Not to any contents of the document.

                                                                    58

**EXHIBIT G**
**109**

ROUGH DRAFT

11:48:57  1          THE WITNESS:  I recall the title says

11:48:59  2    Superman agreement.

11:48:59  3    BY MR. PETROCELLI:

11:49:03  4        Q.  Why did you use the word "consent

11:49:06  5    agreement"?

11:49:08  6        A.  It's.

11:49:11  7          MR. TOBEROFF:  You can only answer that if

11:49:11  8    that answer is not based on communication with your

11:49:14  9    attorney.

11:49:15 10          THE WITNESS:  It's -- it's -- it's all

11:49:17 11    based on my communication with my attorney.

11:49:17 12    BY MR. PETROCELLI:

11:49:23 13        Q.  What's --

11:49:23 14        A.  The term.

11:49:25 15        Q.  The use of the term?

11:49:26 16        A.  The use of the term, yes.

11:49:30 17          (Instruction not to answer.)

11:49:30 18    BY MR. PETROCELLI:

11:49:42 19        Q.  When you signed the 2008 consent agreement,

11:49:50 20    did you -- what did you understand the purpose of

11:49:51 21    this agreement to be?  Why were you signing it?

11:49:57 22          MR. TOBEROFF:  You can only answer that --

11:49:58 23    actually, I instruct you not to answer because the

11:50:01 24    sole -- your sole understanding is through

11:50:03 25    communications with me.

59

**EXHIBIT G**
**110**

ROUGH DRAFT

11:50:04 1                    (Instruction not to answer.)

11:50:04 2        BY MR. PETROCELLI:

11:50:05 3             Q.  You read the document before you signed it,

11:50:05 4        didn't you?

11:50:09 5             A.  Yes, but I'll have to follow my attorney's

11:50:11 6        advice.

11:50:12 7             Q.  Well, based on your reading of the

11:50:14 8        document, what did you understand the purpose of

11:50:16 9        your signing it to be?

11:50:18 10                   MR. TOBEROFF:  I instruct you not to answer

11:50:19 11       if you -- put it this way.  You can only answer the

11:50:23 12       question if you have an understanding independent of

11:50:24 13       your conversations with me.

11:50:28 14                   THE WITNESS:  Well, all my understanding is

11:50:30 15       based on my communication with my attorneys so I

11:50:32 16       can't say anything.

11:50:33 17                   (Instruction not to answer.)

11:50:33 18       BY MR. PETROCELLI:

11:50:34 19            Q.  Are you saying that when -- when you read

11:50:36 20       the document, you derived absolutely no

11:50:39 21       understanding from reading the words?

11:50:41 22            A.  My understanding is intricately bound with

11:50:43 23       my communications with Marc Toberoff.

11:50:46 24            Q.  Can you answer my question?

11:50:47 25            A.  I don't believe I can.

                                                              60

**EXHIBIT G**
**111**

ROUGH DRAFT

11:50:49  1          MR. TOBEROFF: He did.

11:50:49  2   BY MR. PETROCELLI:

11:50:52  3          Q.  It wasn't responsive to my question.  My

11:50:54  4   question was when you read the document are you

11:50:57  5   saying that you drew no understanding at all from

11:51:00  6   reading the words on the page of the document?

11:51:07  7          MR. TOBEROFF:  It's -- it's all based upon

11:51:10  8   my understanding is intricately bound to my

11:51:14  9   communications with my attorney.

11:51:14  10  BY MR. PETROCELLI:

11:51:19  11         Q.  Are you saying that had you not spoken to

11:51:20  12  your attorney you would have had no idea what --

11:51:26  13  what you were signing?

11:51:28  14         A.  What if I had no idea?

11:51:30  15         Q.  Right.  You signed a -- a document together

11:51:34  16  with other individuals.  Are you saying that you did

11:51:38  17  not understand what you were signing except for what

11:51:41  18  Marc Toberoff had to tell you?

11:51:42  19         MR. TOBEROFF:  Asked and answered.

11:51:43  20  Misstates his testimony.

11:51:47  21         THE WITNESS:  My understanding is -- is

11:51:52  22  bound up what whatever I have is bound up.

11:51:52  23  BY MR. PETROCELLI:

11:51:56  24         Q.  I appreciate you keep repeating that phrase

11:52:00  25  your understanding is bound up or intricately bound

61

**EXHIBIT G**
**112**

ROUGH DRAFT

11:52:03  1    up.  I'm asking you something different than that.

11:52:05  2    I'm not required to simply accept that phrase?

11:52:07  3         A.  Uh-huh.

11:52:08  4         Q.  Did you understand that you were entering

11:52:12  5    into a contract, an agreement, with the Siegels when

11:52:17  6    you signed the document?

11:52:23  7         A.  Yes.

11:52:24  8         Q.  Did you understand that the agreement that

11:52:25  9    you were entering into required that you could not

11:52:32 10    settle any claim with DC Comics without the consent

11:52:38 11    of the Siegels?

11:52:39 12         MR. TOBEROFF:  I instruct you not to

11:52:41 13    answer.  The document has been hailed to be

11:52:44 14    privileged and off limits and they can't ask you

11:52:47 15    questions about the contents of the document.

11:52:48 16    Instructs you not to answer.

11:52:50 17         (Instruction not to answer.)

11:52:50 18         MR. PETROCELLI:  I don't agree with that as

11:52:53 19    you well know.

11:52:54 20         Q.  Is there any arrangement whereby you would

11:52:57 21    have the authority to approve any kind of settlement

11:52:59 22    that Joanne Siegel might enter into with DC comics?

11:53:03 23         MR. TOBEROFF:  Instruct you not to answer.

11:53:07 24         (Instruction not to answer.)

11:53:07 25         MR. PETROCELLI:  Mark you allowed that

62

**EXHIBIT G**
**113**

ROUGH DRAFT

11:53:09  1   verbatim question to be answered at the first -- at

11:53:12  2   the Siegel session of his deposition.

11:53:13  3        MR. TOBEROFF:  I'm instructing him not to

11:53:15  4   answer and as you suggested we shouldn't debate

11:53:17  5   these things in the deposition.

11:53:21  6        MR. PETROCELLI:  So is it possible to

11:53:23  7   answer.

11:53:23  8        MR. TOBEROFF:  I'm going to instruct him --

11:53:25  9   just to shorten this, I will instruct him not to

11:53:28 10   answer any questions regarding the substance of the

11:53:30 11   consent agreement.

11:53:30 12   BY MR. PETROCELLI:

11:53:33 13        Q.  So is it possible for Joanne Siegel and

11:53:36 14   Laura Siegel Larson to settle their case with DC

11:53:40 15   Comics and you would have no say so in that.

11:53:41 16        Is that accurate?

11:53:42 17        MR. TOBEROFF:  I instruct you not to answer

11:53:48 18   on the basis of attorney-client privilege.

11:53:48 19   BY MR. PETROCELLI:

11:53:50 20        Q.  And if they were to settle and receive

11:53:52 21   money from DC Comics, is there any arrangement by

11:53:55 22   which you would receive any of that money?

11:53:57 23        MR. TOBEROFF:  Same instruction.

11:53:57 24        (Instruction not to answer.)

11:53:57 25   BY MR. PETROCELLI:

63

**EXHIBIT G**
**114**

ROUGH DRAFT

11:54:06  1          Q.  Are you able right now on behalf of the Joe

11:54:09  2      Shuster estate to enter into an agreement with DC

11:54:13  3      regarding the Shuster termination interests without

11:54:17  4      the consent of any -- anyone else?

11:54:22  5          MR. TOBEROFF:  Same instruction.

11:54:24  6      Attorney-client privilege.

11:54:25  7          (Instruction not to answer.)

11:54:26  8          THE WITNESS:  I'll have to follow my

11:54:27  9      attorney's advice.

11:54:27 10      BY MR. PETROCELLI:

11:54:32 11          Q.  Do you have a current agreement to share

11:54:36 12      with any member of the Siegel family in any

11:54:39 13      settlement or other recoveries having to do with the

11:54:43 14      Superman termination interests?

11:54:47 15          MR. TOBEROFF:  I instruct you not to answer

11:54:48 16      based on privilege.

11:54:49 17          (Instruction not to answer.)

11:54:57 18          MR. PETROCELLI:  When you say "based on

11:54:59 19      privilege, to be clear, what privilege, Mr. -- are

11:55:02 20      you talking about the attorney-client privilege.

11:55:04 21          MR. TOBEROFF:  Attorney-client privilege,

11:55:05 22      work product, the privilege that was upheld by

11:55:10 23      magistrate shuriskey SP, Judge Larson in your motion

11:55:14 24      that was denied as to obtaining the consent

11:55:16 25      agreement.  If you can't obtain the consent

64

**EXHIBIT G**
**115**