ROUGH DRAFT

11:55:19  1    agreement because you're not entitled to view the

11:55:21  2    substance of the consent agreement you're not

11:55:24  3    entitled to get at that substance through

11:55:27  4    questioning my client.

11:55:28  5         MR. PETROCELLI:  We -- we disagree.

11:55:33  6         MR. TOBEROFF:  That's fine.

11:55:33  7    BY MR. PETROCELLI:

11:55:34  8         Q.  Is the consent agreement that you signed in

11:55:36  9    2008 still in effect?

11:55:39  10        A.  Yes.

11:55:48  11        Q.  Have you had any discussions with any

11:55:50  12   member of the Siegel family about it at any time

11:55:55  13   both before or after signing it?

11:55:59  14        A.  Not directly.

11:56:00  15        Q.  What does that mean?

11:56:01  16        A.  All my discussions is through my attorney.

11:56:04  17        Q.  How do you have a discussion with the

11:56:08  18   Siegels through the attorney?

11:56:09  19        A.  Then the answer is no.

11:56:11  20        Q.  What did you mean when you said not

11:56:13  21   directly, through your attorney?

11:56:14  22        A.  All my communication about the agreement

11:56:17  23   is -- is through my discussions with my attorney and

11:56:22  24   what he has told me the Siegels have communicated.

11:56:27  25   That's what I mean.

**EXHIBIT G**
**116**

ROUGH DRAFT

11:56:28　1　　　　Q.　Have you ever had a -- a discussion with

11:56:43　2　　your mom about the consent agreement?

11:56:56　3　　　　A.　She -- she -- I may have -- she has a --

11:57:04　4　　little interest in this.  Her faculties as I said,

11:57:08　5　　are -- are poor and I don't recall if I've mentioned

11:57:14　6　　it to her or not because it's a detail.

11:57:19　7　　　　Q.　Back in 2008 she was of sound mind,

11:57:19　8　　correct?

11:57:25　9　　　　A.　That's when she had her stroke.

11:57:27　10　　　　Q.　Before or after the consent agreement?

11:57:29　11　　　　A.　I don't -- I don't recall.  I don't -- I

11:57:38　12　　don't know if I've ever discussed it with her or

11:57:41　13　　not.  I mean she's not -- she's not that interested

11:57:46　14　　in legal matters.  I know that she -- she -- she

11:57:53　15　　knows about it.  I don't know if she understands it.

11:58:00　16　　　　Q.　How do you know she knows about it?

11:58:01　17　　　　A.　I -- I -- she would have been aware of it.

11:58:05　18　　　　Q.　How do you know that?

11:58:05　19　　　　A.　Well, I -- as far as I know, she -- as far

11:58:10　20　　as -- as far as I can remember, I probably have said

11:58:14　21　　something.  That's all I can say.  I mean that's --

11:58:17　22　　　　Q.　What did you say to her?

11:58:20　23　　　　A.　I -- if I had said anything, it would just

11:58:23　24　　have been that there's -- I don't remember what I

11:58:29　25　　said to her frankly.  I mean I don't know what to

**EXHIBIT G**
**117**

ROUGH DRAFT

11:58:31  1    say because I don't -- I don't remember my words.

11:58:33  2    She doesn't really.

11:58:34  3            MR. TOBEROFF:  Don't speculate.

11:58:35  4            THE WITNESS:  Right.  I -- I -- it would be

11:58:37  5    speculating.  I don't remember.

11:58:43  6            MR. PETROCELLI:  Don't interrupt the

11:58:44  7    witness, please.

11:58:49  8        Q.  Have you -- do you think the consent

11:58:55  9    agreement was an important document at the time that

11:58:58  10   you signed it?

11:58:59  11       A.  Yes.

11:59:01  12       Q.  Did you think your mother had a right to

11:59:02  13   know what it meant?

11:59:08  14       A.  Did she have a right to know?

11:59:11  15       Q.  Yeah.  Do you think she was entitled to

11:59:12  16   know what -- what document you were signing that was

11:59:16  17   important?

11:59:19  18       A.  She -- she's not directly involved in this

11:59:23  19   case so I don't know how to answer that.  She -- she

11:59:29  20   doesn't -- there's not a legal right.

11:59:36  21       Q.  I didn't mean a legal right.

11:59:36  22       A.  Yeah.

11:59:38  23       Q.  I mean do you think she would want to know

11:59:39  24   that kind of information?

11:59:40  25       A.  Would she want to know, yeah.  Well

67

**EXHIBIT G**
**118**

ROUGH DRAFT

11:59:47  1    that's --

11:59:47  2              MR. TOBEROFF:  Calls for speculation.

11:59:48  3    BY MR. PETROCELLI:

11:59:48  4        Q.  Did you explain to her what it meant?

11:59:51  5              MR. TOBEROFF:  Asked and answered.

11:59:52  6              THE WITNESS:  Just -- just what I said

11:59:54  7    before.  I can't remember exactly what I said.

11:59:54  8    BY MR. PETROCELLI:

11:59:58  9        Q.  What's your best recollection of what you

11:59:59 10    told her?

12:00:00 11        A.  That -- that that is some agreement that we

12:00:10 12    are making with the Siegels.  That would have been

12:00:12 13    about the extent of it.

12:00:14 14        Q.  Well, you explained to her that the

12:00:17 15    agreement had to do with Superman, right?

12:00:17 16        A.  Yes.

12:00:20 17        Q.  And you explained to her that it had to do

12:00:22 18    with settling your case, right?

12:00:29 19        A.  I suppose.  That's about it.  I wouldn't

12:00:33 20    have said any more.

12:00:46 21        Q.  Who -- whose the beneficiary of any money

12:00:51 22    that comes in as a result of the Superman

12:00:53 23    termination interest that Joe Shuster has asserted?

12:01:00 24    Who gets the money?

12:01:01 25        A.  We plan on any proceeds would go into a

68

**EXHIBIT G**
**119**

ROUGH DRAFT

12:01:06  1    trust.

12:01:08  2         Q.  Well, your mother is the beneficiary,

12:01:08  3    correct?

12:01:13  4         A.  According to the will.  She -- she's

12:01:20  5    expressed that she wants me and my sister to -- to

12:01:25  6    have -- to have anything through a trust.

12:01:29  7         Q.  Under Joe Schuster's will, she's the sole

12:01:32  8    beneficiary, correct?

12:01:33  9         A.  Yes.

12:01:35 10         Q.  Okay.  And are you saying that your mother

12:01:39 11    has in turn created a testamentary documents that

12:01:46 12    pass the interest to you and your sister?

12:01:47 13         A.  She -- she has expressed that she wants any

12:01:52 14    proceeds to go into a trust for me and my sister.

12:01:56 15         Q.  Does such a trust exist?

12:01:58 16         A.  Not yet.

12:02:00 17         Q.  Does your mother have a will?

12:02:02 18         A.  Yes.

12:02:03 19         Q.  Have you ever seen it?

12:02:04 20         A.  Yes.

12:02:07 21         Q.  Does it name you as the executor?

12:02:10 22         A.  I believe.

12:02:16 23         Q.  Does it distribute her estate equally

12:02:20 24    between you and your sister Dawn?

12:02:25 25         A.  I believe.

69

**EXHIBIT G**
**120**

ROUGH DRAFT

12:02:27  1          Q.  Does it distribute the estate directly to

12:02:32  2     Dawn and you or to trusts of which Dawn and you are

12:02:36  3     beneficiaries?

12:02:37  4          A.  It doesn't -- it doesn't state trust in the

12:02:43  5     will but that's -- that's her intention.

12:02:46  6          Q.  How do you know that's her intention?

12:02:50  7          A.  We've talked about it.

12:02:52  8          Q.  When did she tell you that she want to

12:02:55  9     create trusts for you to receive her testamentary

12:02:58 10     disposition?

12:02:59 11          A.  Well, let me see, she wants -- she wants us

12:03:06 12     to -- to be provided for and secure and she's 90

12:03:13 13     years old and she's had a stroke so she knows she's

12:03:16 14     not going to be around forever and she doesn't

12:03:18 15     really have any need for -- for money.  So we've

12:03:25 16     discussed it for -- well, we've probably -- we've

12:03:30 17     properly discussed it for a few years.

12:03:33 18          Q.  In the last few years?

12:03:34 19          A.  Yes.

12:03:35 20          Q.  And when you've discussed it, given the

12:03:37 21     comments you've made about your mom's mental state,

12:03:41 22     do you believe that she understood what she was

12:03:43 23     talking about?

12:03:44 24          MR. TOBEROFF:  Assumes facts.

12:03:48 25          THE WITNESS:  Yes she understands.

**EXHIBIT G**
**121**

ROUGH DRAFT

12:03:48  1    BY MR. PETROCELLI:

12:03:49  2        Q.  In talking about things like trusts and

12:03:51  3    such, she's competent to discuss those topics, in

12:03:51  4    your view?

12:03:55  5        A.  She understands the --

12:03:56  6            MR. TOBEROFF:  Excuse me.  You have to

12:03:57  7    leave time for me to object after asks the question.

12:04:01  8    You got to pause after he asks the question so I

12:04:03  9    have time to object.

12:04:06  10           The question assumes facts.

12:04:06  11   BY MR. PETROCELLI:

12:04:10  12       Q.  You can answer.

12:04:11  13       A.  Okay.

12:04:13  14       Q.  Want me to repeat the question?

12:04:14  15       A.  Yes.

12:04:16  16       Q.  Yeah.  When you have been talking with her

12:04:17  17   about -- in the last couple of years regarding such

12:04:20  18   issues as trusts for your benefit and Dawn's

12:04:24  19   benefit, do you believe that she was competent to

12:04:27  20   talk about and understand those ideas?

12:04:31  21           MR. TOBEROFF:  Misstates testimony.

12:04:33  22           THE WITNESS:  I -- I believe she

12:04:38  23   understands the idea.  I know what her intentions

12:04:41  24   are.  She's expressed them to me.

12:04:41  25   BY MR. PETROCELLI:

71

**EXHIBIT G**
**122**

ROUGH DRAFT

12:04:43  1        Q.  Verbally?

12:04:44  2        A.  Yes.

12:04:45  3        Q.  What has she said to you?

12:04:46  4        A.  She wants us to be provided for.  To be

12:04:49  5    secure.

12:04:52  6        Q.  You already are provided for her in her

12:04:54  7    will, right?

12:04:57  8        A.  I'm in her -- her will.

12:04:58  9        Q.  Right?

12:04:59  10       A.  Yes.

12:05:00  11       Q.  Why -- why the specific -- in other words,

12:05:03  12   did she discuss with you that she wants you to

12:05:05  13   receive the inheritance together with Dawn through a

12:05:07  14   trust?

12:05:10  15       A.  That's -- that's what we have discussed.

12:05:12  16       Q.  Who is the "we"?

12:05:14  17       A.  Me and my mother.

12:05:15  18       Q.  Has Dawn been part of the discussion?

12:05:17  19       A.  I -- I don't know specifically about

12:05:22  20   trusts.  But she knows she's a part of this.

12:05:25  21       Q.  Is there any particular discussion that

12:05:28  22   you've had about trusts as to why it would be a

12:05:31  23   trust rather than just a bequest under a will?

12:05:34  24       A.  As to like in financial planning terms,

12:05:38  25   that kind of thing?

72

**EXHIBIT G**
**123**

ROUGH DRAFT

12:05:38  1        Q.  Yes.

12:05:40  2        A.  It's -- the idea is it's a sensible means

12:05:46  3   of per -- preserving assets so that they're not

12:05:51  4   wasted and squandered so it's a long-term thing.

12:05:57  5   And not wasted away.

12:06:00  6        Q.  Wasted by you and Dawn?

12:06:01  7        A.  Yes.

12:06:04  8        Q.  Is your mom expressed reservations that you

12:06:07  9   or Dawn might waste the money absent a trust?

12:06:11 10        A.  No.  That's -- that is a -- the purpose of

12:06:14 11   a trust, to preserve assets.

12:06:17 12        Q.  Do you have an estate or trust lawyer?

12:06:19 13        A.  Yes.

12:06:23 14        Q.  Who is it?

12:06:27 15        A.  The -- there's an attorney that established

12:06:29 16   the Shuster estate.

12:06:32 17        Q.  Here in Los Angeles, the probate attorney?

12:06:35 18        A.  I believe so.

12:06:37 19        Q.  And have you consulted him regarding estate

12:06:40 20   planning in recent years?

12:06:42 21        A.  No.  Not on that issue, no.

12:06:45 22        Q.  Not on the issue of the trust?

12:06:46 23        A.  That's correct.

12:06:48 24        Q.  Have you in discussions with your mother

12:06:51 25   about the will, the trust and the financial

                                                              73

**EXHIBIT G**
**124**

ROUGH DRAFT

12:06:53  1    planning, have ever discussed how much money might

12:06:58  2    be received one day for your benefit and Dawn's

12:07:02  3    benefit?

12:07:03  4        A.  No.  We haven't got into that.

12:07:10  5        Q.  For example, have you said, you know, it

12:07:12  6    would be in approximately 5 million or 10 million or

12:07:16  7    100 million or any numbers, discuss in your

12:07:22  8    conversations with your mother?

12:07:23  9        A.  I don't recall getting into figures with

12:07:29 10    her.  We just -- no, I don't.

12:07:34 11        Q.  Have you ever had anybody try to do an

12:07:38 12    estimate for you as to how much you might recover

12:07:40 13    one day as a result of Joe Schuster's asserted

12:07:44 14    termination interests?

12:07:48 15        A.  I -- I know.

12:07:49 16        MR. TOBEROFF:  You -- you could answer that

12:07:51 17    question solely if it's outside of the

12:07:57 18    attorney-client relationship.

12:08:00 19        THE WITNESS:  All I know is that my

12:08:04 20    attorney, Marc Toberoff, has.

12:08:06 21        MR. TOBEROFF:  Don't -- don't discuss what

12:08:07 22    your attorney has done.

12:08:08 23        THE WITNESS:  Okay.  Okay.

12:08:09 24        MR. TOBEROFF:  The --

12:08:10 25        THE WITNESS:  I don't have any -- no, I

                                                        74

**EXHIBIT G**
**125**

ROUGH DRAFT

12:08:12  1    don't have any idea of economic value outside of my

12:08:16  2    discussions, no.

12:08:16  3    BY MR. PETROCELLI:

12:08:17  4        Q.  Have you ever met or spoken or communicated

12:08:20  5    with anybody who you understood to be estimating the

12:08:26  6    value of the termination interest?

12:08:27  7        A.  No.

12:08:29  8        Q.  Have you ever provided any information to

12:08:31  9    any such person?

12:08:31  10       A.  No.

12:08:38  11       Q.  Did you tell your mother in your

12:08:42  12   conversations over the years and in particular about

12:08:46  13   the consent agreement that any agreement with DC or

12:08:54  14   settlement with DC requires the consent of the

12:08:56  15   Siegels?

12:09:05  16           MR. TOBEROFF:  Am I allowed to answer that?

12:09:07  17   Is that --

12:09:07  18   BY MR. PETROCELLI:

12:09:09  19       Q.  You are.

12:09:09  20           MR. TOBEROFF:  Actually, I'll let you

12:09:27  21   answer that question without waiver of any privilege

12:09:31  22   that could apply.

12:09:31  23           THE WITNESS:  Okay.  So the question being

12:09:34  24   she --

12:09:50  25           MR. PETROCELLI:  Can you repeat the

**EXHIBIT G**
**126**

ROUGH DRAFT

12:09:51  1    question.

12:09:51  2                    (The reporter read the record

12:09:51  3            as follows:

12:09:52  4                "^ QUESTION ^ ANSWER " ).

12:09:52  5            THE WITNESS:  Yes.

12:09:52  6    BY MR. PETROCELLI:

12:09:54  7        Q.  What did you say in that regard?

12:09:59  8        A.  Pretty much what -- what you said there.

12:10:04  9        Q.  Did you discuss with her what would happen

12:10:12  10   if, for example, you wanted to do a settlement or an

12:10:16  11   agreement with DC but the Siegels did not, how you

12:10:19  12   would deal with that circumstance?

12:10:27  13       A.  I don't recall going into that detail of

12:10:30  14   what ifs.

12:10:32  15       Q.  Did your mom ask you, well, what if we

12:10:35  16   can't agree with the Siegels?  I mean what happens

12:10:37  17   then?  Did she put that --

12:10:40  18       A.  No.

12:10:41  19       Q.  -- question to you in so many words?

12:10:42  20       A.  No.

12:10:46  21       Q.  Do you -- did -- if she had put that

12:10:48  22   question to you, could you have answered it?

12:10:53  23            MR. TOBEROFF:  Again, don't testify based

12:10:56  24   on knowledge and communications you received --

12:11:00  25   don't testify based on knowledge you received

76

**EXHIBIT G**
**127**

ROUGH DRAFT

12:11:02  1      through your communications with your attorney.

12:11:07  2              THE WITNESS:  I -- all I can.

12:11:08  3              MR. TOBEROFF:  And I also, when he asks you

12:11:11  4      about conversations, if you understand the substance

12:11:14  5      of the conversation you can give him that substance.

12:11:17  6      If you understand the exact words you used, you can

12:11:19  7      give him the exact words but if you don't remember

12:11:21  8      the exact words you used, don't make up the words to

12:11:25  9      fill in the blanks.  That would be speculating.

12:11:27 10              THE WITNESS:  Uh-huh.  The question again

12:11:33 11      being.

12:11:33 12      BY MR. PETROCELLI:

12:11:33 13          Q.  Did you have an understanding in

12:11:38 14      discussions with your mom about the consent

12:11:40 15      agreement what would happen if the Siegels and you

12:11:43 16      could not agree?

12:11:45 17              MR. TOBEROFF:  Asked and answered.

12:11:49 18              THE WITNESS:  I didn't discuss that with

12:11:51 19      her.

12:11:51 20      BY MR. PETROCELLI:

12:11:52 21          Q.  Did you have an awareness in your own mind

12:11:57 22      of what would happen?

12:11:59 23          A.  I'm aware.

12:11:59 24          Q.  Had she asked you the question, could you

12:12:01 25      have answered it?

77

**EXHIBIT G**
**128**

ROUGH DRAFT

12:12:02  1         A.  Oh,.

12:12:02  2             MR. TOBEROFF:  You can only answer the next

12:12:04  3     question to the extent you have an understanding

12:12:06  4     that's separate and apart from your communications

12:12:09  5     with me.

12:12:10  6             THE WITNESS:  Just -- okay.

12:12:14  7             It's just we -- I thought the agreement was

12:12:17  8     good.  It was mutually beneficial.  That's -- that's

12:12:24  9     all I can say.

12:12:24 10     BY MR. PETROCELLI:

12:12:25 11         Q.  Why did you think it was good and mutually

12:12:28 12     beneficial?

12:12:28 13             MR. TOBEROFF:  I instruct you not to

12:12:29 14     answer.

12:12:30 15             (Instruction not to answer.)

12:12:32 16             THE WITNESS:  I follow --

12:12:34 17             MR. TOBEROFF:  I instruct you not to

12:12:35 18     answer.

12:12:35 19             THE WITNESS:  I follow my attorney's

12:12:36 20     advice.

12:12:36 21     BY MR. PETROCELLI:

12:12:47 22         Q.  Can I get an answer to my prior question,

12:12:50 23     which was, did you have an awareness of what would

12:12:52 24     happen in the event the Siegels and the Schusters

12:12:55 25     could not agree on -- on an agreement with DC?

78

**EXHIBIT G**
**129**

ROUGH DRAFT

12:13:03  1        A.  I didn't think it was a problem.

12:13:06  2            MR. TOBEROFF:  He -- that's not his

12:13:08  3    question.

12:13:08  4            THE WITNESS:  No?

12:13:11  5            MR. TOBEROFF:  Focus on the question.

12:13:11  6            THE WITNESS:  Say it again.

12:13:12  7            MR. TOBEROFF:  It's a "yes" or "no"

12:13:15  8    question.

12:13:15  9            THE WITNESS:  Did I have -- say it again

12:13:16  10   please.

12:13:16  11   BY MR. PETROCELLI:

12:13:17  12       Q.  Did you have an understanding in your

12:13:19  13   conversations with your mom about the 2008 consent

12:13:22  14   agreement, what would happen?

12:13:25  15       A.  Oh,.

12:13:25  16       Q.  If the Siegels and you could not agree?

12:13:27  17       A.  Did I have an understanding.

12:13:28  18            MR. TOBEROFF:   In his conversations with

12:13:30  19   his mom.

12:13:30  20            MR. PETROCELLI:  Yeah.

12:13:31  21       Q.  At the time that you were -- during the

12:13:34  22   period of time when you were having these

12:13:34  23   discussions with your mom?

12:13:35  24       A.  Did have I an understanding.

12:13:36  25       Q.  Yeah.  Had she asked you, well, what did

ROUGH DRAFT

12:13:39 1    she call you, Warren?

12:13:41 2        A.  Yes.

12:13:42 3        Q.  Okay, well, Warren, what happens if the

12:13:44 4    Siegels and we can't agree?  We want to do's deal

12:13:46 5    and the Siegels don't want to do a deal and, you

12:13:48 6    know, consent is required, how do we get out of

12:13:51 7    that?

12:13:53 8            First of all, did she ever ask you such a

12:13:55 9    thing?

12:13:56 10           MR. TOBEROFF:  Asked and answered you can

12:14:00 11   answer again.

12:14:01 12           THE WITNESS:  No.

12:14:01 13   BY MR. PETROCELLI:

12:14:02 14       Q.  Did you ever explain to her that

12:14:07 15   circumstance or walk her through that situation?

12:14:11 16           MR. TOBEROFF:  Asked and answered.

12:14:14 17           You can answer.

12:14:14 18           THE WITNESS:  I -- I don't recall getting

12:14:18 19   to that level of detail.  She didn't ask any more

12:14:22 20   about it.

12:14:22 21   BY MR. PETROCELLI:

12:14:30 22       Q.  And had she asked you, could you have

12:14:32 23   answered the question?  That's a "yes" or "no."

12:14:37 24       A.  Yes.

12:14:38 25       Q.  Okay.  What would you have said?

80

**EXHIBIT G**
**131**

ROUGH DRAFT

12:14:39  1          MR. TOBEROFF:  Instruct you not to answer.

12:14:40  2    You can't divulge the substance of the consent

12:14:42  3    agreement.

12:14:43  4          (Instruction not to answer.)

12:14:43  5    BY MR. PETROCELLI:

12:14:58  6          Q.  Do you have any current arrangement for the

12:15:05  7    consent agreement or otherwise whereby the Shuster

12:15:12  8    interests share in any proceeds or recovery

12:15:16  9    attributable to Superboy?

12:15:19  10         MR. TOBEROFF:  Okay.  On this question,

12:15:23  11   I -- I will make an exception and allow him to

12:15:27  12   answer that question provided you agree that his

12:15:30  13   answering the question is not a waiver of any

12:15:32  14   privilege regarding the consent agreement.

12:15:34  15   Otherwise I'll instruct him not to answer.

12:15:46  16         MR. PETROCELLI:  I guess I'll have to do

12:15:47  17   this on a question by question basis.  So as to this

12:15:53  18   particular question and answer, that's acceptable.

12:15:56  19         MR. TOBEROFF:  Okay.  Do you want to.

12:15:58  20         MR. PETROCELLI:  Do you want to repeat the

12:15:59  21   question.

12:16:00  22         MR. TOBEROFF:  Read back the question.

12:16:23  23             (The reporter read the record

12:16:23  24         as follows:

12:16:24  25             "^ QUESTION ^ ANSWER ").

                                                              81

ROUGH DRAFT

12:16:24  1            THE WITNESS:  No.

12:16:24  2    BY MR. PETROCELLI:

12:16:31  3        Q.  Does the consent agreement -- under the

12:16:33  4    concent agreement as you understand it, would the

12:16:39  5    Shuster interest share in any proceeds or recovery

12:16:44  6    be attributable to Superboy?

12:16:47  7            MR. TOBEROFF:  This is the same question.

12:16:49  8    Do we have the same agreement.

12:16:50  9            MR. PETROCELLI:  We do.  It's not the same

12:16:54  10   question because he limited it to the consent

12:16:54  11   agreement.

12:16:54  12           MR. PETROCELLI:  Do we have the same

12:16:58  13   agreement that I will allow him to answer but that

12:16:58  14   will not be deemed --

12:16:58  15           MR. PETROCELLI:  Yes.

12:17:00  16           MR. TOBEROFF:  A waiver of the privilege as

12:17:00  17   to any other questions or the document?

12:17:02  18           MR. PETROCELLI:  Yes.

12:17:03  19           MR. TOBEROFF:  You can answer.

12:17:03  20           THE WITNESS:  Okay.  No

12:17:03  21   BY MR. PETROCELLI:

12:17:07  22       Q.  Have the Schusters, by the Shusters I mean

12:17:13  23   you, your mom, the estates of Joe Shuster, the

12:17:17  24   Shuster interest, have the Shusters ever had any

12:17:21  25   agreement with the Siegels regarding Superboy?

                                                          82

**EXHIBIT G**
**133**

ROUGH DRAFT

12:17:28   1        A.  No.

12:17:34   2        Q.  Is it your understanding that if the

12:17:42   3    Siegels were to be paid or recover money associated

12:17:47   4    with Superboy, that it would belong solely to them

12:17:50   5    and not to the Shuster side?  Is that your

12:17:55   6    understanding?

12:17:56   7        A.  Yes.

12:18:02   8        Q.  Have you ever had any discussions with any

12:18:08   9    member of the Siegel family about Superboy and

12:18:16   10   sharing or not sharing  in recoveries associated

12:18:20   11   with Superboy?

12:18:21   12       A.  No.

12:18:24   13       Q.  Have you ever had a discussion with your

12:18:24   14   mother about whether the Schusters had an interest

12:18:32   15   in Superboy?

12:18:37   16       A.  No.

12:18:37   17       Q.  You never once raised that subject with

12:18:39   18   her?

12:18:41   19       A.  No.

12:18:42   20       Q.  Has she ever discussed it with you?

12:18:45   21       A.  No.

12:18:46   22       Q.  At any time, even going back to the time

12:18:49   23   when Joe Shuster was alive?

12:18:51   24       A.  We never discussed that.

12:18:53   25       Q.  Did you ever discuss it with Joe Shuster?

83

**EXHIBIT G**
**134**

ROUGH DRAFT

12:18:55  1        A.  No.

12:19:07  2        Q.  Okay.  Okay.  Would you agree that I don't

12:19:15  3    need to ask any more questions about his knowledge

12:19:19  4    about the consent agreement because you're -- you're

12:19:22  5    going to assert the same objections?

12:19:24  6            MR. TOBEROFF:  If you're asking as to the

12:19:26  7    substance of contents of the consent agreement I

12:19:29  8    will assert same.

12:19:30  9            MR. PETROCELLI:  The existence of the terms

12:19:31 10    and provisions, the substance of them, the contents

12:19:34 11    of them.

12:19:34 12            MR. TOBEROFF:  Yes.

12:19:36 13            MR. PETROCELLI:  Okay.  Let me just make

12:19:48 14    sure I nail this down.

12:19:51 15        Q.  After signing the consent agreement in

12:19:57 16    2008, did you ever sign a piece of paper that you

12:20:04 17    thought was amending or modifying the consent

12:20:07 18    agreement?

12:20:08 19        A.  No.

12:20:11 20        Q.  Okay.  Or cancelling it?

12:20:12 21        A.  No.

12:20:13 22        Q.  Okay.  When you signed the consent

12:20:25 23    agreement in 2008, your lawyer at the time was whom?

12:20:34 24        A.  Marc Toberoff.

12:20:36 25        Q.  Who did you understand -- did you

**EXHIBIT G**
**135**

ROUGH DRAFT

12:20:39  1    understand that the Siegels were represented by

12:20:41  2    counsel?

12:20:41  3        A.  Yes.

12:20:44  4        Q.  Who did you understand their counsel to be?

12:20:46  5        A.  Marc Toberoff.

12:20:51  6        Q.  Did you consult with any attorney other

12:20:55  7    than Marc Toberoff about signing a document with the

12:20:59  8    Siegels?

12:20:59  9        A.  No.

12:21:02  10       Q.  Did you consult with anyone other than Marc

12:21:06  11   Toberoff on that subject, attorney or not?

12:21:08  12       A.  No.

12:21:11  13       Q.  Did you give any thought or consideration

12:21:17  14   to whether there were conflict of interest given

12:21:21  15   Mr. Toberoff's representation of the Siegels and the

12:21:27  16   Schusters?  Did that thought cross your mind?

12:21:33  17       A.  I suppose.

12:21:33  18       Q.  When it crossed your mind, in what respect

12:21:39  19   did you think about it?

12:21:41  20           MR. TOBEROFF:  You could only answer that

12:21:42  21   to the extent you have an understanding of conflict

12:21:45  22   of interest independent of your discussions with me.

12:21:52  23           THE WITNESS:  Okay.  Well, my whole

12:21:56  24   understanding is -- is bound up with my

12:22:00  25   conversations with Marc Toberoff.

85

**EXHIBIT G**
**136**

ROUGH DRAFT

12:22:04  1          MR. TOBEROFF:  Then I instruct you not to

12:22:06  2   answer.

12:22:06  3          (Instruction not to answer.)

12:22:06  4   BY MR. PETROCELLI:

12:22:10  5      Q.  Did you receive any disclosures from

12:22:13  6   Mr. Toberoff regarding potential or actual conflict

12:22:17  7   of interest?

12:22:18  8      A.  Yes.

12:22:20  9      Q.  In what form?

12:22:24  10     A.  He sent a -- he sent a -- a letter, a

12:22:29  11  waiver, a document.

12:22:33  12     Q.  Is that a document separate from the

12:22:35  13  consent agreement that you signed?

12:22:38  14     A.  Yes.

12:22:39  15     Q.  Did you sign that document?

12:22:40  16     A.  Yes.

12:22:44  17     Q.  So that's another document you signed

12:22:46  18  right, you -- that you didn't mention earlier.

12:22:53  19          Is that in your lock box?

12:23:01  20     A.  I suppose.

12:23:02  21     Q.  Did you bring -- bring it with you?

12:23:07  22     A.  The waiver of conflict of interest?

12:23:07  23     Q.  Right?

12:23:10  24     A.  Is that the --

12:23:11  25          MR. TOBEROFF:  He is asking whether you

86

**EXHIBIT G**
**137**

ROUGH DRAFT

12:23:12  1    brought that document with you to answer.

12:23:13  2             THE WITNESS:  The waiver of conflict of

12:23:14  3    interest.

12:23:14  4    BY MR. PETROCELLI:

12:23:15  5        Q.  Correct.  That's how you call the document

12:23:17  6    right?

12:23:18  7        A.  Yeah.

12:23:18  8        Q.  And it's a separate document from the

12:23:19  9    consent agreement.

12:23:19  10            Is that right?

12:23:19  11       A.  Yes.

12:23:22  12       Q.  Who are the signatories to that document?

12:23:29  13       A.  I believe that -- that I am and the Siegels

12:23:32  14    and Mr. Toberoff.

12:23:38  15       Q.  When was that signed?

12:23:39  16       A.  2010, I believe.

12:23:54  17       Q.  Two years after the consent agreement?

12:23:57  18       A.  Yeah, if my memory is right.

12:24:03  19       Q.  And after the filing of this lawsuit?

12:24:05  20       A.  I don't know if it was after.  I don't

12:24:10  21    recall the date.  I think it was sometime -- I don't

12:24:14  22    recall the date.

12:24:16  23       Q.  The date's on the document, right?

12:24:20  24       A.  Yeah, it's not on this document though.

12:24:22  25       Q.  No it's on the conflict of interest

87

**EXHIBIT G**
**138**

ROUGH DRAFT

12:24:24  1    document right?

12:24:24  2        A.  Yeah.

12:24:25  3        Q.  Does the conflict of interest document say

12:24:27  4    at that time date is effective as to some earlier

12:24:29  5    point in time?  Like the legal representation

12:24:33  6    documents you described, it went back from 04 to 01?

12:24:40  7        A.  I don't know.

12:24:41  8        Q.  Did you -- were you advised to seek

12:24:49  9    independent counsel before signing or even in

12:24:54 10    considering whether to sign the conflict of waiver?

12:24:56 11        A.  Yes.

12:24:58 12        Q.  Who told you that?

12:25:00 13        A.  Mr. Toberoff.

12:25:01 14        Q.  What did he tell you?

12:25:03 15        A.  He said that I could seek separate counsel.

12:25:10 16    Ask -- ask someone else.

12:25:11 17        Q.  Did he suggest any lawyers to you?

12:25:14 18        A.  No.

12:25:18 19        Q.  Okay.  Did he tell you this in a verbal

12:25:20 20    conversation or in a letter?

12:25:22 21        A.  Probably verbal.

12:25:30 22        Q.  Did you seek separate counsel?

12:25:31 23        A.  No.

12:25:34 24        Q.  Did you make any inquiries at all?

12:25:38 25            MR. TOBEROFF:  As to separate counsel?

**EXHIBIT G**
**139**

ROUGH DRAFT

12:25:40  1          MR. PETROCELLI:  Correct.

12:25:41  2          THE WITNESS:  No.

12:25:41  3   BY MR. PETROCELLI:

12:25:42  4       Q.  Did you even consider it?

12:25:47  5       A.  I may have considered it.

12:25:48  6       Q.  You decided not to?

12:25:52  7       A.  Yes.

12:25:53  8       Q.  Did you discuss it with the Siegels?

12:25:58  9          MR. TOBEROFF:  The conflict waiver?

12:26:00 10          MR. PETROCELLI:  Yes.

12:26:01 11          THE WITNESS:  No, not directly.

12:26:01 12   BY MR. PETROCELLI:

12:26:03 13       Q.  Did you discuss with the Siegels whether

12:26:04 14   they were seeking separate counsel or independent

12:26:07 15   counsel in deciding whether to sign the conflict

12:26:09 16   waiver?

12:26:11 17       A.  No, I did not.

12:26:12 18       Q.  Do you know if they did?

12:26:14 19       A.  I don't.

12:26:20 20          MR. PETROCELLI:  I think we're going to run

12:26:22 21   out of videotape now so it's probably a good time to

12:26:24 22   go to lunch.

12:26:24 23          THE VIDEOGRAPHER:  This will mark the end

12:26:26 24   of Volume I Tape Number 1 in the deposition of Mark

12:26:30 25   Warren Peary.  Going off the record.  The time is

**EXHIBIT G**
**140**

ROUGH DRAFT

12:26:32  1    12:25.

12:27:45  2                    (At ^ ^ a.m. ^ p.m., the

          3                    deposition of WARREN PEARY was

          4                    adjourned for noon recess.)

          5    ///

          6    ///

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

90

ROUGH DRAFT

|   |   |   |
|---|---|---|
| | 1 | (At ^ ^ a.m. ^ p.m., the |
| | 2 | deposition of WARREN PEARY was |
| | 3 | reconvened.) |
| 13:18:26 | 4 | |
| 13:18:26 | 5 | THE VIDEOGRAPHER:  We're back on the |
| 13:18:35 | 6 | record.  This marks the beginning of Volume I, Tape |
| 13:18:38 | 7 | Number 2 in the deposition of Mark Warren Peary. |
| 13:18:41 | 8 | The time is 1:17. |
| 13:18:41 | 9 | |
| 13:18:45 | 10 | EXAMINATION (CONTINUED) |
| 13:18:45 | 11 | BY MR. PETROCELLI: |
| 13:18:46 | 12 | Q.  Mr. Peary, with respect to the conflict of |
| 13:18:51 | 13 | interest document that you signed in or about 2010 |
| 13:18:55 | 14 | that we were talking about before the lunch break, |
| 13:18:58 | 15 | do you remember that? |
| 13:18:58 | 16 | A.  Yes. |
| 13:18:59 | 17 | Q.  Okay.  Did you understand that that |
| 13:19:04 | 18 | document that you signed pertained to the 2008 |
| 13:19:10 | 19 | consent agreement? |
| 13:19:14 | 20 | MR. TOBEROFF:  You -- you -- I instruct you |
| 13:19:17 | 21 | not to answer regarding the contents of the consent |
| 13:19:22 | 22 | agreement -- it's a conflict waiver which is listed |
| 13:19:26 | 23 | on the privilege log and privileged. |
| 13:19:28 | 24 | THE WITNESS:  Yeah.  I'll have to follow my |
| 13:19:30 | 25 | attorney's advice. |

91

**EXHIBIT G**
**142**

ROUGH DRAFT

13:19:30  1          (Instruction not to answer.)

13:19:30  2     BY MR. PETROCELLI:

13:19:31  3          Q.  Well, I'm not asking about the contents of

13:19:34  4     the consent agreement in this question I'm?

13:19:36  5          MR. TOBEROFF:  No, the conflict waiver.

13:19:36  6     BY MR. PETROCELLI:

13:19:42  7          Q.  Did you understand that the purpose of the

13:19:43  8     conflict waiver related to the consent agreement?

13:19:49  9          MR. TOBEROFF:  You can only answer that

13:19:50 10     question if you have an understanding of the purpose

13:19:52 11     of the conflict waiver separate and apart from your

13:19:55 12     communications with counsel.

13:19:59 13          THE WITNESS:  Well then all my

13:20:00 14     understanding is associated with my communications

13:20:03 15     with counsel.  So I guess I can't answer it.

13:20:03 16     BY MR. PETROCELLI:

13:20:07 17          Q.  You've -- but you've testified to some of

13:20:10 18     your communications with counsel on the subject of

13:20:12 19     this conflict waiver already before the lunch break.

13:20:20 20     In those communications that you had with counsel

13:20:22 21     about the conflict waiver, which you said that he

13:20:25 22     made you disclosure to you about a conflict of

13:20:27 23     interest and/or potential conflict of interest, said

13:20:31 24     that you could seek independent, Counsel, do you

13:20:34 25     recall --

                                                          92

ROUGH DRAFT

13:20:34  1         A.  Yes.

13:20:35  2         Q.  Having related that to me?

13:20:36  3         A.  Yes.

13:20:37  4         Q.  Okay.  In your conversations with

13:20:41  5   Mr. Toberoff, was -- did you gain an understanding

13:20:47  6   of the purpose of your being presented with a

13:20:51  7   conflict waiver?

13:20:52  8         A.  Yes.

13:20:54  9         Q.  What was that purpose?

13:20:57 10             MR. TOBEROFF:  I instruct you not to

13:20:58 11   answer.

13:21:06 12             (Instruction not to answer.)

13:21:06 13   BY MR. PETROCELLI:

13:21:06 14         Q.  Was the purpose of the conflict waiver set

13:21:08 15   forth in the document?

13:21:11 16         A.  I believe so.

13:21:17 17         Q.  And again, this was a document you said

13:21:18 18   signed by the Siegel parties as well as the Shuster

13:21:23 19   side, right?

13:21:23 20         A.  Yes.

13:21:24 21         Q.  And Mr. Toberoff, correct?

13:21:25 22         A.  Yes.

13:21:26 23         Q.  Did your mother sign it?

13:21:36 24         A.  I don't remember.  I don't remember.

13:21:47 25         Q.  In or about 2008 at the time when you

                                                              93

**EXHIBIT G**
**144**

ROUGH DRAFT

13:21:50  1    signed the consent agreement, did you at that time

13:21:57  2    sign any document involving a conflict of interest

13:22:01  3    or a potential conflict of interest?

13:22:08  4         MR. TOBEROFF:  Objection.  Asks for a legal

13:22:09  5    conclusion and you could answer that question if you

13:22:15  6    have an understanding of conflict of interest and

13:22:17  7    potential conflict of interest outside of your

13:22:21  8    communications with me.

13:22:22  9         MR. PETROCELLI:  Let me rephrase that

13:22:23 10    question.

13:22:24 11         Q.  In or about 2008 when you signed the

13:22:27 12    consent agreement, did you also sign another

13:22:31 13    document that you believed related to the subject of

13:22:37 14    waiving conflicts of interest?

13:22:42 15         A.  I don't recall.

13:22:46 16         Q.  You don't -- you don't recall having done

13:22:47 17    so?

13:22:48 18         A.  I don't recall, no, having done so.

13:22:53 19         Q.  Okay.  Is the only time that you can recall

13:22:54 20    having signed a document related to conflicts of

13:22:58 21    interest is this one in 2010?

13:23:03 22         MR. TOBEROFF:  Vague and overbroad.

13:23:08 23         MR. PETROCELLI:  Let me rephrase it.

13:23:10 24         Q.  Is the only time that you can recall

13:23:12 25    signing a document waiving any potential or actual

94

**EXHIBIT G**
**145**

ROUGH DRAFT

13:23:16  1    conflict of interest is the one that you signed in

13:23:19  2    2010?

13:23:22  3        A.  That's the one I recall.

13:23:24  4        Q.  Do you think there are others?

13:23:26  5        A.  I -- I don't remember any others.

13:23:39  6        Q.  Okay.  Okay.  Let me show you Exhibit 2

13:23:52  7    which is the 1975 agreement that Joe Shuster and

13:24:04  8    Jerry Siegel signed with Warner communications

13:24:06  9    calling for various payments to -- to both men and

13:24:13 10    their families.

13:24:15 11                    (The document referred to was

13:24:15 12                marked for identification by the

13:24:15 13                C.S.R. as Exhibit 2 and attached to

13:24:19 14                this deposition.)

13:24:19 15    BY MR. PETROCELLI:

13:24:19 16        Q.  Have you seen this document before?

13:24:20 17        A.  No, sir.

13:24:27 18        Q.  You were asked about a pension agreement in

13:24:28 19    your Siegel deposition in 2006.

13:24:32 20                Did you have an understanding -- let me ask

13:24:39 21    you these questions prior to the time that you first

13:24:44 22    had any contact with Mr. Toberoff, okay?

13:24:47 23        A.  Uh-huh.

13:24:49 24        Q.  You first had contact with Mr. Toberoff

13:24:53 25    sometime in 2001.

95

**EXHIBIT G**
**146**

ROUGH DRAFT

13:24:55   1          Is that right?

13:24:56   2      A.  Yes.

13:24:56   3      Q.  In your Siegel deposition you said that you

13:25:03   4  were looking into the issue of copyright matters and

13:25:09   5  you came across Mr. Toberoff?

13:25:10   6      A.  Yes.

13:25:15   7      Q.  I think you said it might have been six

13:25:17   8  months or so or a few months prior to time that you

13:25:20   9  signed your first agreement in November 2001.  Does

13:25:22  10  that sound, right?

13:25:23  11      A.  Between the time I first contacted him and

13:25:26  12  then we signed an agreement?

13:25:27  13      Q.  Yeah, what was that time span?

13:25:30  14      A.  I remember I first contacted him in 2001.

13:25:35  15  That's all I can recall.

13:25:36  16      Q.  Okay.  And to provide a bit more detail,

13:25:38  17  did someone give you his number?

13:25:42  18      A.  I found it through research on my own.

13:25:44  19      Q.  When you say "research on your own, the

13:25:46  20  computer on the Internet?

13:25:47  21      A.  Yes, yes.

13:25:48  22      Q.  And how did you come across it?  What did

13:25:50  23  you search that yielded his name?

13:25:53  24      A.  I was doing research on copyright law and

13:25:56  25  changes to the copyright law and various searches

96

**EXHIBIT G**
**147**

ROUGH DRAFT

13:26:06  1    having to do with copyright and attorneys involved

13:26:08  2    in that entertainment.

13:26:09  3        Q.  And how many names were netted as a result

13:26:14  4    of your searches?

13:26:21  5        A.  Oh, boy, I can't recall that.  I was

13:26:22  6    impressed with when I came across information

13:26:27  7    regarding Mr. Toberoff's dealings.

13:26:31  8        Q.  On the Web site?

13:26:32  9        A.  Yes.  I was impressed.

13:26:33  10       Q.  What impressed you about what you saw on

13:26:35  11   the Web site?

13:26:36  12       A.  I was impressed with what I had read.  Gave

13:26:39  13   me the impression he had a great deal of knowledge

13:26:41  14   and talent and copyright law with property and

13:26:46  15   rights.

13:26:47  16       Q.  Had you -- did you visit his Web site?

13:26:53  17       A.  I don't recall his Web site in particular.

13:26:56  18       Q.  Was it an article you -- you recall having

13:26:59  19   read about him?

13:27:00  20       A.  Excuse me?

13:27:00  21       Q.  An article about him?  I mean what is it

13:27:03  22   that you read that impressed you?

13:27:04  23       A.  Jeez, it's so far back.  Various searches,

13:27:10  24   his mentions of lawyers and articles.  That's all I

13:27:15  25   can recall.

97

**EXHIBIT G**
**148**

ROUGH DRAFT

13:27:15  1        Q.   Searches you're doing on your home

13:27:17  2    computer?

13:27:17  3        A.   Yes.

13:27:18  4        Q.   Okay.  When you -- whatever you read -- by

13:27:22  5    the way, did you save the material that mentioned

13:27:26  6    him?

13:27:26  7        A.   I don't think so from that time.  But I --

13:27:34  8    I got his contact information and contacted him.

13:27:37  9             MR. TOBEROFF:  Just focus on his question.

13:27:38 10    Only answer his question.

13:27:38 11    BY MR. PETROCELLI:

13:27:40 12        Q.   Did you contact anyone other?

13:27:41 13             MR. TOBEROFF:  Don't give a narrative.

13:27:41 14    BY MR. PETROCELLI:

13:27:43 15        Q.   Contact anyone other than him?

13:27:44 16        A.   Prior to that time, I did.

13:27:50 17        Q.   As a result of the research you were doing?

13:27:52 18        A.   Oh, at that time, no.

13:27:53 19        Q.   Okay.  So when you did the research, the

13:27:58 20    only person that you contacted as a result of that

13:28:02 21    research was Mr. Toberoff?

13:28:03 22        A.   At that time, yes.

13:28:04 23        Q.   Then you called him on the telephone?

13:28:06 24        A.   Yes.

13:28:07 25        Q.   And you had a phone conversation?

98

**EXHIBIT G**
**149**

ROUGH DRAFT

13:28:08  1          A.  Yes.

13:28:10  2          Q.  And after that phone conversation did you

13:28:12  3   have a meeting?

13:28:14  4          A.  In face to face.

13:28:19  5          Q.  Face-to-face meeting, right?

13:28:20  6          A.  Not at that time.

13:28:23  7          Q.  How long thereafter until you first met

13:28:28  8   him?

13:28:28  9          A.  When I first met him it was -- it was after

13:28:32  10  we had signed the original legal agreement.

13:28:36  11         Q.  So you had not met him prior to signing the

13:28:40  12  document.

13:28:42  13             Is that correct?

13:28:43  14         A.  Not face to face.

13:28:44  15         Q.  Okay.  Had your sister met him?

13:28:48  16         A.  No.

13:28:49  17         Q.  Had your mother?

13:28:50  18         A.  No.

13:28:53  19         Q.  Had you spoken to anybody who had met him

13:28:57  20  or worked with him prior to signing the document,

13:29:01  21  the first document?

13:29:02  22         A.  I don't believe so.

13:29:11  23         Q.  Did you -- did you have more than one

13:29:12  24  telephone call?

13:29:13  25         A.  Yes.

99

**EXHIBIT G**
**150**

ROUGH DRAFT

13:29:16  1          Q.  About how many?

13:29:22  2          A.  Boy, before signing the first agreement I

13:29:28  3      would have had to -- I don't know exactly but it was

13:29:32  4      a number of times.  I don't know to characterize.  I

13:29:36  5      don't have a log but I talked to him quite a bit.

13:29:41  6          Q.  Okay.  The agreement that you did sign

13:29:43  7      which I'll show you in a bit, were there drafts of

13:29:48  8      that that went back and forth as you recall or did

13:29:51  9      you get a document sign it and return it?

13:29:54 10          A.  There were drafts.

13:29:56 11          Q.  Did you keep copies of the drafts?

13:29:57 12          A.  No.

13:30:01 13          Q.  On your end, who was reviewing the drafts?

13:30:07 14          A.  I was.

13:30:09 15          Q.  Did you feel competent and capable to

13:30:11 16      understand what you were reading and made changes

13:30:15 17      and comments?

13:30:16 18          A.  Yes.

13:30:18 19          Q.  Okay.  Did you consult with anybody?

13:30:26 20          A.  Like another lawyer?

13:30:26 21          Q.  Yes.

13:30:26 22          A.  No.

13:30:29 23          Q.  Did you discuss with your mother in 2001

13:30:34 24      these -- your talking to Mr. Toberoff, your

13:30:40 25      telephone calls with him, receiving the draft

100

**EXHIBIT G**
**151**

ROUGH DRAFT

13:30:44  1    agreements, working on them, this whole activity,

13:30:46  2    did you share all of that with your mother?

13:30:52  3        A.  I'm sure I did.

13:30:54  4        Q.  Did she ask you to undertake this effort?

13:30:57  5        A.  No.  I -- I was doing all of this research

13:30:59  6    on my own.  She didn't know anything about it.

13:31:03  7        Q.  At one point did you disclose to her what

13:31:06  8    you were doing?

13:31:06  9        A.  Probably when I decided to work, retain

13:31:15 10    Mr. Toberoff.  It's probably when I really discussed

13:31:20 11    it.

13:31:20 12        Q.  Did you have a one-on-one conversation with

13:31:23 13    your mother or was your sister involved?

13:31:26 14        A.  Boy.

13:31:28 15        Q.  Family meeting?

13:31:30 16        A.  I can't actually visualize that in my mind.

13:31:33 17    I know I talked with Jean.  I don't recall talking

13:31:38 18    to Dawn at that time.

13:31:43 19        Q.  You -- why did you decide not to share with

13:31:47 20    your mother your -- your activities until just

13:31:52 21    before you were ready to sign the document?

13:31:58 22        A.  I was doing research on my own and she had

13:32:01 23    no interest or knowledge of any of -- of that, any

13:32:06 24    of rights or anything.  It was something I did

13:32:10 25    completely on my own because I wanted to be

                                                              101

ROUGH DRAFT

13:32:12  1    thorough, so that's the reason.

13:32:19  2        Q.  And did you come to a point when you

13:32:20  3    thought like you had sufficient thorough information

13:32:23  4    that you could then talk with her?

13:32:25  5        A.  Yes.

13:32:26  6        Q.  And when you did talk with her was it in

13:32:31  7    that conversation that you first identified to her

13:32:33  8    that you had contacted Mr. Toberoff and you were

13:32:36  9    recommending him?

13:32:36  10        A.  I believe so.

13:32:42  11        Q.  Had she ever heard of Mr. Toberoff, to your

13:32:45  12    knowledge?

13:32:45  13        A.  No.

13:32:54  14        Q.  Did you put Mr. Toberoff in touch with the

13:32:57  15    Siegel family?

13:33:01  16        A.  If I recall, after we had signed a legal

13:33:05  17    agreement at some point we were -- we were happy

13:33:13  18    that my mother had talked with Joanne and mentioned

13:33:16  19    his name.

13:33:24  20        Q.  Were you present when your mother first

13:33:28  21    mentioned Mr. Toberoff to Joanne?

13:33:32  22        A.  No.

13:33:34  23        Q.  It's telephone call?

13:33:35  24        A.  Yes.

13:33:40  25        Q.  Okay.  You said that you had contacted a

102

**EXHIBIT G**
**153**

ROUGH DRAFT

13:33:43   1   lawyer at some time before Mr. Toberoff.

13:33:46   2        Was that a fellow in Albuquerque?

13:33:49   3        A.  Yes.  There was a lawyer in Albuquerque.

13:33:52   4        Q.  And what was that person's name?

13:33:53   5        A.  I don't think I remember it because I

13:33:58   6   didn't do any -- I didn't sign anything with him.

13:34:02   7        Q.  What year was that?

13:34:03   8        A.  Would have first been, I believe, 1999.

13:34:15   9        Q.  Is 1999 the first time that you started to

13:34:20  10   think about researching copyright issues related to

13:34:25  11   Mr. Shuster or his estate?

13:34:27  12        A.  Boy, the first time I started thinking

13:34:33  13   about that.  Probably I thought about it earlier.

13:34:39  14        Q.  When is the first time you actually did

13:34:40  15   anything on that subject?

13:34:42  16        A.  As far as research?

13:34:46  17        Q.  You said you probably thought about it

13:34:47  18   earlier, right?

13:34:51  19        A.  Uh-huh.

13:34:51  20        Q.  So when is the first time you decided to do

13:34:53  21   something, whether it be start looking things up the

13:34:56  22   Internet, start making inquiries to friends, maybe

13:34:59  23   look for a lawyer regarding the subject of his

13:35:03  24   copyright and whether he had a termination interest

13:35:07  25   and?

                                                          103

**EXHIBIT G**
**154**

ROUGH DRAFT

13:35:07  1          A.  Yeah.

13:35:08  2          Q.  Related Superman.

13:35:13  3          A.  Yeah that might have been when I first

13:35:15  4     looked through the copyright code, maybe 1998 I was

13:35:19  5     looking through that and then after that that's when

13:35:25  6     I contacted an attorney in Albuquerque.

13:35:31  7          Q.  Did you meet with him?

13:35:36  8          A.  Yes.

13:35:36  9          Q.  Where?

13:35:37 10          A.  In Albuquerque.

13:35:38 11          Q.  Who attended the meeting?

13:35:40 12          A.  I think it was just me.

13:35:45 13          Q.  Did your mom know what you were doing?

13:35:49 14          A.  I don't believe so.

13:35:55 15          Q.  And you decided not to higher this fellow?

13:35:57 16          A.  That's correct.

13:35:58 17          Q.  And you don't know his name?

13:36:00 18          A.  I can't recall.

13:36:01 19          Q.  Did you get any documents from him?

13:36:03 20          A.  I don't -- I don't think so.

13:36:11 21          Q.  Where did you get his name from?

13:36:16 22          A.  That's a long time back.  I don't know if

13:36:21 23     it was the -- the phone book or under a attorneys it

13:36:26 24     said intellectual property or something of that

13:36:28 25     nature.  I really don't remember.

                                                                    104

**EXHIBIT G**
**155**

ROUGH DRAFT

13:36:30  1      Q.  Why didn't you hire him?

13:36:34  2      A.  Gee, I think it's because I thought they

13:36:37  3  maybe weren't as good as the best.  Maybe they

13:36:43  4  didn't know everything that they should have.

13:36:46  5      Q.  They is whom?

13:36:47  6      A.  The attorney.

13:36:48  7      Q.  Was it a law firm?

13:36:50  8      A.  It was -- well, it was one attorney in a

13:36:52  9  firm.

13:36:55  10      Q.  Okay.  And so after that -- that was the

13:36:58  11  first person you've ever -- lawyer you've ever

13:37:02  12  contacted?

13:37:02  13      A.  Yes.

13:37:03  14      Q.  In pursuit of this issue, right?

13:37:03  15      A.  Yes.

13:37:05  16      Q.  But before you contacted that lawyer, had

13:37:07  17  you spoken to other people, like in the comic book

13:37:10  18  business or in entertainment business about this

13:37:16  19  issue?

13:37:20  20      A.  It's possible that just in conversation

13:37:27  21  that I talked with other people but not lawyers.

13:37:29  22      Q.  Okay.  Were you starting to do research?

13:37:34  23      A.  Yes.

13:37:36  24      Q.  Is there any particular reason why you

13:37:37  25  didn't come across Mr. Toberoff's name back in 1999

105

**EXHIBIT G**
**156**

ROUGH DRAFT

13:37:41 1    when you were first -- or in '98 when you were first

13:37:44 2    looking into this?

13:37:45 3        A.  Well, I didn't think of contacting a lawyer

13:37:52 4    at all until sometime in '99.

13:37:54 5        Q.  Right?

13:37:55 6        A.  Probably the second half.  Because I wasn't

13:37:59 7    sure of what rights were available under the law.

13:38:02 8    And I -- I guess I wanted to go to a local lawyer

13:38:08 9    that was right there in town so I could just drive

13:38:10 10   to the office and meet with them.

13:38:19 11       Q.  In Santa Fe?

13:38:19 12       A.  That was in Albuquerque.

13:38:19 13       Q.  That was Albuquerque?

13:38:19 14       A.  That was Albuquerque.

13:38:19 15       Q.  You were living in Albuquerque then?

13:38:19 16       A.  Yes, just before I moved.

13:38:20 17       Q.  Living alone?

13:38:21 18       A.  I think it was -- it was after my father

13:38:24 19   died so I was with -- I was just with -- with my

13:38:29 20   mother just the two of us.

13:38:32 21       Q.  When your dad passed you were all living in

13:38:35 22   Albuquerque?

13:38:36 23       A.  Yes.

13:38:37 24       Q.  Okay.  And then you folks moved to?

13:38:42 25       A.  Santa Fe.

106

**EXHIBIT G**
**157**

ROUGH DRAFT

13:38:43  1        Q.  Santa Fe?

13:38:44  2        A.  Yes.

13:38:46  3        Q.  So you expanded your search then as time

13:38:52  4    on -- went by and extended it to Los Angeles?

13:38:56  5        A.  Yes.

13:38:58  6        Q.  Okay.  So from the time that you met with

13:39:03  7    this attorney in Albuquerque until the time that you

13:39:05  8    identified Mr. Toberoff, had you identified any

13:39:08  9    other attorneys in between then, those two time

13:39:12  10    periods?

13:39:17  11        A.  I -- I didn't talk with any others.  Is

13:39:21  12    that what you're asking?

13:39:21  13        Q.  Yes.

13:39:24  14        A.  Okay.

13:39:26  15        Q.  Were you referred to any?

13:39:27  16        A.  No.

13:39:29  17        Q.  Okay.  And you said you got a -- you were

13:39:33  18    studying the copyright code.  How did you get a copy

13:39:36  19    of it?

13:39:39  20        A.  It must have been -- must have been at the

13:39:42  21    university library re because I photocopied some

13:39:46  22    sheets.

13:39:47  23        Q.  University of New Mexico?

13:39:48  24        A.  I believe so.

13:39:56  25        Q.  Okay.  What else did you research besides

107

**EXHIBIT G**
**158**

ROUGH DRAFT

13:40:00  1    the copyright code?  What other materials?

13:40:07  2        A.  With regard to.

13:40:08  3        Q.  This issue of whether there was any

13:40:10  4    copyright rights that your family might have.

13:40:18  5        A.  I found out that there was legislation that

13:40:20  6    was passed that -- that gave the -- broadened the

13:40:28  7    scope of rights to estates.

13:40:35  8        Q.  How did you find out about that

13:40:37  9    legislation?

13:40:40  10       A.  Oh just looking around.

13:40:45  11       Q.  Had you heard that the Siegel family had or

13:40:51  12   was in the process of pursuing termination rights on

13:40:54  13   behalf of Jerome Siegel?

13:40:57  14       A.  I had heard that.

13:40:58  15       Q.  And how had you heard that?

13:41:05  16       A.  Oh, boy.  I don't know exactly.  I just

13:41:11  17   know I had heard about it.  I --

13:41:18  18       Q.  Did you come across a notice of termination

13:41:22  19   of copyright interest that the Siegel family served

13:41:27  20   in 1997?

13:41:31  21       A.  Did I see that?

13:41:31  22       Q.  Yes.

13:41:32  23       A.  Their notice of termination?

13:41:34  24       Q.  No I did see that.

13:41:36  25       Q.  Okay.  Did you speak to Joanne or Laura

108

**EXHIBIT G**
**159**

ROUGH DRAFT

13:41:39  1    Siegel about their having filed such a notice of

13:41:43  2    termination around the time that they did?

13:41:46  3        A.  Not at that time.

13:41:48  4        Q.  Do you know if your mom did?

13:41:50  5        A.  I don't believe so.

13:41:52  6        Q.  Is it -- is it -- was it upon learning that

13:41:54  7    they were seeking to terminate copyright interest

13:42:00  8    that spurred you to begin inquiring about the same

13:42:03  9    thing?

13:42:08 10        A.  I'm sure it's a factor.

13:42:09 11        Q.  What were the other factors?

13:42:15 12        A.  I don't know.  I guess that's the main

13:42:17 13    thing that spurred me.

13:42:20 14        Q.  At the time that you began thinking about

13:42:23 15    this, were you under the belief that your family had

13:42:27 16    no termination interests?

13:42:33 17        A.  At one time I had thought that and later

13:42:37 18    changed -- changed my mind.

13:42:40 19        Q.  What changed your mind?

13:42:42 20        A.  The legislation.

13:42:45 21        Q.  Prior to the legislation, you're talking

13:42:49 22    about a change to the copyright act?

13:42:51 23        A.  Yes.

13:42:51 24        Q.  That became effective in or about 1998,

13:42:51 25    right?

109

**EXHIBIT G**
**160**

ROUGH DRAFT

13:42:55  1       A.  Yeah, I believe.

13:42:56  2       Q.  Sometimes known as the Sonny Bono copyright

13:42:59  3  extension act?

13:43:00  4       A.  Yes.

13:43:01  5       Q.  Okay.  Prior to your learning about that

13:43:06  6  act, you were of the view that your family had no

13:43:09  7  termination rights?

13:43:10  8       A.  I didn't -- didn't think so.  I wasn't

13:43:17  9  certain.  I -- I wasn't positive so that's what

13:43:24 10  spurred me to do the research.

13:43:27 11       Q.  And why did you think that the family might

13:43:30 12  not have termination rights prior to the -- the

13:43:33 13  change in the law?

13:43:35 14       A.  The -- when I looked at the copyright code,

13:43:41 15  it -- it only stated certain relations to creators

13:43:47 16  at that time, spouses and children, and it didn't

13:43:52 17  say anything else.

13:43:54 18       Q.  And you were aware that Joe Shuster had

13:43:57 19  died without a surviving spouse, correct?

13:43:57 20       A.  Yes.

13:44:00 21       Q.  And without a surviving child or

13:44:04 22  grandchild, correct?

13:44:05 23       A.  That's correct.

13:44:08 24       Q.  And you were also aware that he had never

13:44:10 25  exercised a right of termination during his

110

**EXHIBIT G**
**161**

ROUGH DRAFT

13:44:12  1    lifetime, right?

13:44:15  2         A.  That's right.

13:44:15  3         Q.  But you were aware that he did have an

13:44:17  4    opportunity to have done so prior to his death?

13:44:20  5         A.  I'm not -- I'm not sure about those

13:44:32  6    details.  I'm not sure.

13:44:32  7         Q.  Did you discuss with your mother from time

13:44:38  8    to time this idea or view that because he did not

13:44:41  9    leave a surviving spouse or issue that he -- this is

13:44:47 10    after he died, I mean --

13:44:49 11         A.  Uh-huh.

13:44:49 12         Q.  That there was no right of termination?  Is

13:44:54 13    that a topic you discussed with your mom?

13:44:56 14         A.  I don't think it was discussed until I got

13:45:01 15    serious about confirming we actually had rights.

13:45:08 16    And then at that point probably at that point I

13:45:11 17    probably discussed it.

13:45:14 18         MR. TOBEROFF:  Again Warren, if you have a

13:45:17 19    basis for -- if you remember discussing something,

13:45:24 20    of course, talk about it.  But if you don't have a

13:45:27 21    specific memory or any memory, don't speculate as to

13:45:34 22    what you probably did or probably didn't do.

13:45:34 23         MR. PETROCELLI:  Mark honestly, I don't

13:45:36 24    think that's necessary.  He wasn't speculating.

13:45:37 25         THE WITNESS:  I didn't say he was

                                                                    111

**EXHIBIT G**
**162**

ROUGH DRAFT

13:45:38  1    speculating.

13:45:39  2            MR. PETROCELLI:  I know there's no reason.

13:45:40  3            MR. TOBEROFF:  I'm cautioning him.

13:45:41  4            MR. PETROCELLI:  No reason to caution him

13:45:43  5    not to speculate when he is not speculating.

13:45:45  6            MR. TOBEROFF:  Actually, I think he may

13:45:47  7    have been speculating but I'm not going to pass

13:45:48  8    judgments on that.  I'm just advising my client not

13:45:50  9    to -- there's a human tendency to try to fill in the

13:45:57 10    blanks.

13:45:58 11            MR. PETROCELLI:  You understand though that

13:45:59 12    I'm entitled to your best recollection no matter how

13:46:04 13    faint or vague it might be.

13:46:05 14        A.  Yes, and it is faint often.

13:46:07 15        Q.  Okay.  That's okay.

13:46:11 16

13:46:11 17            MR. TOBEROFF:  Is he also entitled to your

13:46:13 18    best estimation if you have a basis for estimating.

13:46:13 19    BY MR. PETROCELLI:

13:46:15 20        Q.  I am.

13:46:19 21            So getting back to where we were did you

13:46:29 22    ever discuss with your mother whether Joe Shuster

13:46:32 23    had a right of termination with regard Superman

13:46:37 24    copyrights prior to the time that Joe died in?

13:46:41 25            MR. TOBEROFF:  Asked and answered.

                                                               112

**EXHIBIT G**
**163**

ROUGH DRAFT

13:46:42  1            THE WITNESS:  No.

13:46:42  2     BY MR. PETROCELLI:

13:46:45  3         Q.  Were you even aware of the subject prior to

13:46:48  4     the time of Joe -- that Joe died?

13:46:50  5            MR. TOBEROFF:  Asked and answered.

13:46:51  6            THE WITNESS:  No.

13:46:51  7     BY MR. PETROCELLI:

13:46:54  8         Q.  When is the first time you ever learned

13:46:57  9     about the side that an heir an author, I should say

13:47:04 10     could terminate a right interest?

13:47:08 11            MR. TOBEROFF:  You mean a copyright grant.

13:47:10 12            MR. PETROCELLI:  Copyright grant, yes.

13:47:14 13            THE WITNESS:  Probably around 1998.

13:47:14 14     BY MR. PETROCELLI:

13:47:19 15         Q.  And how did you become aware of it?

13:47:20 16         A.  I became aware of the idea of the

13:47:26 17     possibility, it's as I stated before, I did some

13:47:33 18     research in copyrigh law --

13:47:36 19         Q.  Yeah, I want to make sure you're

13:47:37 20     understanding what I'm asking.  I'm not asking you

13:47:39 21     when you standard to believe that the Shuster family

13:47:42 22     had the ability to terminate a copyright grant? I'm

13:47:45 23     asking when did you first become aware that there

13:47:47 24     was even such a thing possible in the law of

13:47:51 25     copyright that creators could terminate copyright

                                                              113

**EXHIBIT G**
**164**

ROUGH DRAFT

13:47:54  1    grants?

13:47:55  2        A.   It's -- well, it would be around that time

13:47:58  3    and that's when I heard something about the Siegel

13:48:01  4    termination.

13:48:03  5        Q.   Okay.  And when you heard that, did you

13:48:08  6    talk to your mom about it and ask -- because she was

13:48:11  7    the sole beneficiary of the estate, whether she knew

13:48:15  8    anything about this, whether she had ever spoken to

13:48:18  9    her brother about it, you know --

13:48:20 10        A.   Well, no, I don't think so.  Initially I

13:48:23 11    didn't think that we had anything.

13:48:24 12        Q.   Why did you think that?  Because your

13:48:27 13    reading of the code?

13:48:28 14        A.   Yes.

13:48:29 15        Q.   Okay.  Did you -- during this period, '97,

13:48:34 16    '98 that you're now describing, did you come across

13:48:41 17    any of the agreements that Joe had signed with DC or

13:48:47 18    Warner Bros. including Exhibit 2 in front of you?

13:48:50 19        A.   No.

13:48:53 20        Q.   As of the time that you first contacted

13:48:54 21    Mr. Toberoff, had you come across Exhibit 2?

13:49:00 22        A.   No.

13:49:03 23        Q.   Had you come across any of the agreements

13:49:06 24    that had been signed either by Joe Shuster or by

13:49:11 25    Jean Peavy or by Frank Shuster?

                                                              114

ROUGH DRAFT

13:49:13  1        A.  I don't believe so.

13:49:17  2        Q.  Were you aware of the existence of such

13:49:19  3    agreements as of the time you contacted

13:49:21  4    Mr. Toberoff?

13:49:23  5        A.  I don't think so.

13:49:30  6        Q.  And re mines me, I may have asked you this,

13:49:32  7    when was the first time you saw Exhibit 2?

13:49:41  8            MR. TOBEROFF:  Lacks foundation.  Assumes

13:49:43  9    facts.

13:49:47  10           You can answer.

13:49:47  11           THE WITNESS:  Oh.  I don't think I've seen

13:49:50  12   it before, actually.

13:49:50  13   BY MR. PETROCELLI:

13:49:52  14       Q.  Before today?

13:49:52  15       A.  Yes.

13:49:53  16       Q.  Okay.  When your uncle died Joe Shuster in

13:50:33  17   July of 1992, did you become aware about any

13:50:37  18   dealings that your mother then had with DC Comics or

13:50:42  19   Warner communications regarding financial affairs?

13:50:48  20       A.  Yeah, the only dealing I'm aware of is she

13:50:55  21   asked for them to cover some expenses because he

13:50:58  22   had -- he had more debts than assets.

13:51:01  23       Q.  Okay.  Well take a look at Exhibit 3.

13:51:07  24   Jason.  You can maybe make a file there so we don't

13:51:15  25   lose track of the official exhibits.  Mr. Peary can

115

**EXHIBIT G**
**166**

ROUGH DRAFT

13:51:19  1    also take that complaint.  Put that over there, too.

13:51:22  2    Thank you.

13:51:23  3                (The document referred to was

13:51:23  4                marked for identification by the

13:51:23  5                C.S.R. as Exhibit 3 and attached to

13:51:23  6                this deposition.)

13:51:23  7    BY MR. PETROCELLI:

13:51:26  8        Q.  Exhibit 3 is two documents.  One is a

13:51:32  9    handwritten note from Jean Peavy to Paul, Paul is

13:51:36 10    Paul Levitz, dated August 21, 1992 and then there's

13:51:41 11    a typewritten letter from Jean to Marty Payson ckdoc

13:51:47 12    the then vice president of Time-Warner dated

13:51:49 13    August 21, 1992.

13:51:52 14            Have you ever seen either of these

13:51:53 15    documents before?

13:51:59 16        A.  I don't believe so, no.

13:52:02 17        Q.  In 1992 -- well turn to the top of page 2

13:52:19 18    of the typewritten letter.

13:52:28 19            Your mom's typewritten letter.  Do you have

13:52:30 20    that?

13:52:30 21        A.  Yes.

13:52:30 22        Q.  And you'll see at the very top of the page

13:52:33 23    in that first paragraph that says this is very

13:52:35 24    embarrassing"?

13:52:36 25        A.  Yes.

                                                            116

**EXHIBIT G**
**167**

ROUGH DRAFT

13:52:38  1        Q.  She says in the middle of the sentence, in

13:52:41  2    the middle of the paragraph:

13:52:42  3                "I had my son itemize Joe's

13:52:45  4            1992 checks and bank statements to

13:52:47  5            see where his money went.  We've

13:52:51  6            been able to account for most of

13:52:53  7            his checks."

13:52:53  8            And that's something that you did at your

13:52:56  9    mom's request, right?

13:52:56  10       A.  Yeah, at the time of his death.

13:52:56  11       Q.  Correct?

13:52:56  12       A.  Yes.

13:52:58  13       Q.  Okay.  Were you aware that your mother was

13:53:00  14   communicating with Time-Warner about these matters?

13:53:07  15       A.  I had some awareness.

13:53:09  16       Q.  Did you help her draft the letters?

13:53:12  17       A.  I -- no, I did not.

13:53:14  18       Q.  Were you living with her at the time?

13:53:15  19       A.  Yes, I was -- after my father had died and

13:53:21  20   before we moved to Santa Fe, yes.

13:53:23  21       Q.  I thought your dad died in 1996?

13:53:25  22       A.  Yes.

13:53:25  23       Q.  This is 1992?

13:53:26  24       A.  Wait a minute.  After?  Oh I'm mixed up.

13:53:28  25   Sorry.  Okay well he was alive, then. , yeah.

                                                        117

**EXHIBIT G**
**168**

ROUGH DRAFT

13:53:31  1    Anyway, I -- 1992.  That's a long time ago.  Didn't

13:53:38  2    realize.

13:53:38  3              I -- no, I did not help her with this,

13:53:41  4    though.  I did not see this.

13:53:42  5        Q.  Do you know if your dad was helping your

13:53:44  6    mom write these letters?

13:53:46  7        A.  No, I don't know.

13:53:53  8        Q.  Did you attend Joe Shuster's funeral?

13:53:56  9        A.  Yes.

13:54:02  10       Q.  The one in Los Angeles or the memorial

13:54:03  11   service in New York?

13:54:04  12       A.  It was New York.

13:54:15  13       Q.  Videographer interruption.

13:54:15  14   BY MR. PETROCELLI:

13:54:18  15       Q.  The next paragraph on the second page of

13:54:24  16   your mother's typewritten letter it indicates that

13:54:35  17   Joe was paying over $1,200 a month to Joanne Siegel

13:54:40  18   for some kind of commission.

13:54:41  19             Do you see that?

13:54:41  20       A.  Yes.

13:54:42  21       Q.  Were you aware over the years that your

13:54:47  22   uncle was paying a commission to the Siegel family?

13:54:55  23       A.  Not at the time.

13:54:57  24       Q.  And after your uncle's death in 1992, were

13:55:01  25   you aware that those commission payments continued?

118

**EXHIBIT G**
**169**

ROUGH DRAFT

13:55:08  1        A.  After his death?

13:55:11  2        Q.  Yes.  Were you aware whether any commission

13:55:13  3    payments continued to Joanne Siegel after Joe's

13:55:16  4    death based on money that Warner Bros. or Warner

13:55:21  5    communication or DC was paying to the Shuster

13:55:25  6    family?

13:55:26  7        A.  She might have mentioned something about

13:55:29  8    it.

13:55:30  9        Q.  She being whom?

13:55:30 10        A.  Jean.

13:55:32 11        Q.  Mentioned to you that commissions were

13:55:33 12    being paid?

13:55:34 13        A.  I -- I think she mentioned something.

13:55:36 14    That's all I can recall.

13:55:37 15        Q.  And do you know why commissions were being

13:55:41 16    paid to Joanne Siegel for monies paid to the Shuster

13:55:44 17    family?

13:55:45 18        A.  Not really.

13:55:49 19        Q.  Did you ever ask why are we paying her

13:55:52 20    money?

13:55:52 21        A.  Well, it was Joe, she told me it was Joe

13:55:56 22    that was paying.

13:55:56 23        Q.  What about after Joe's death?

13:55:59 24        A.  No.

13:55:59 25        Q.  No what?

119

**EXHIBIT G**
**170**

ROUGH DRAFT

13:55:59  1      A.  There was nothing paid after his death.

13:56:05  2      Q.  Okay.  Go down to the fourth paragraph,

13:56:07  3  take a quick look at that, Joe's lady friend?

13:56:10  4      A.  Uh-huh.

13:56:20  5      Q.  It said Joe's lady friend admitted to me

13:56:24  6  how generous he had been to her and her son.  Her

13:56:27  7  son is a psychology professor.

13:56:27  8          Do you see that?

13:56:30  9      A.  Yes.

13:56:30 10      Q.  Do you know who Joe's lady friend was at

13:56:33 11  that time?

13:56:38 12      A.  I never met her, I just saw pictures as we

13:56:43 13  stated earlier yes, sir I just saw pictures of her.

13:56:46 14      Q.  Is it your understanding the reference to

13:56:48 15  the lady friend was the woman that Joe had married

13:56:50 16  because you talked about pictures of Joe's former

13:56:52 17  spouse?

13:56:52 18      A.  That's a good question.  Joe's lady friend

13:56:59 19  Ts must have been another lady friend after.

13:57:01 20      Q.  Did you ever meet that person?

13:57:03 21      A.  No.

13:57:04 22      Q.  Do you know who the son is, the psychology

13:57:05 23  professor?

13:57:05 24      A.  I think I very briefly met him very briefly

13:57:11 25  after Joe's death.

                                                          120

**EXHIBIT G**
**171**

ROUGH DRAFT

13:57:13  1        Q.  Where did you meet him?

13:57:16  2        A.  He came by Joe's a apartment briefly.

13:57:20  3        Q.  Do you remember his name?

13:57:21  4        A.  Oh, boy, no.

13:57:22  5        Q.  Have you had any contact with him since?

13:57:23  6        A.  No.

13:57:24  7        Q.  Do you know where he taught?

13:57:28  8        A.  No, I don't remember.

13:57:36  9        Q.  And then if you go to the last page of your

13:57:37 10    mother's letter, you'll see a reference to the

13:57:41 11    agreement with Joanne Siegel to take 20 percent of

13:57:44 12    his, his being Joe's being.

13:57:48 13            Have you ever seen a written agreement to

13:57:50 14    that effect?

13:57:51 15        A.  No, I haven't.

13:57:59 16        Q.  Now, did you have any interactions at all

13:58:01 17    in 1992 with the people at Time-Warner, time --

13:58:06 18    Time-Warner or DC Comics?

13:58:07 19        A.  No.

13:58:08 20        Q.  Like Paul Levitz or Marty Payson, any of

13:58:11 21    those people?

13:58:12 22        A.  No, I did not.  SP.

13:58:13 23        Q.  At any time prior to contacting

13:58:17 24    Mr. Toberoff did you have any contact with any

13:58:20 25    representatives of DC Comics or Time-Warner?

121

**EXHIBIT G**
**172**

ROUGH DRAFT

13:58:26  1      A.  If -- if I had -- I might have had contact

13:58:32  2  but it wasn't regarding any rights.

13:58:34  3      Q.  What was it regarding?

13:58:36  4      A.  I think my mother had written to Paul about

13:58:41  5  A I've got a screen play, are you interested?  And

13:58:45  6  there was another book that I had written to submit

13:58:51  7  to Warner books and she had asked for a contact.

13:58:57  8  That's all I recall.

13:58:58  9      Q.  Did you ever talk to Frank Shuster, he was

13:59:01 10  your uncle, right?

13:59:01 11      A.  Yes.

13:59:03 12      Q.  About Joe Shuster's copyright interests?

13:59:08 13      A.  No.

13:59:18 14      Q.  Do you know what year your uncle passed

13:59:22 15  away?

13:59:22 16      A.  I don't recall the exact year.

13:59:29 17      Q.  1996 sound right?

13:59:32 18      A.  Yeah.

13:59:32 19      Q.  Okay.  Prior to Frank Shuster's death,

13:59:39 20  that's what I meant by your uncle?

13:59:43 21      A.  Uh-huh.

13:59:43 22      Q.  Prior to Frank Shuster's death in 1996, to

13:59:46 23  be clear, you never had any discussions with him on

13:59:49 24  the subject of copyright interests or terminating

13:59:50 25  copyright interests?

**EXHIBIT G**
**173**

ROUGH DRAFT

13:59:50  1        A.  No, I did not.

13:59:52  2        Q.  Okay.  Can you turn to Exhibit 4?

14:00:14  3        A.  Oh, okay.

14:00:14  4             (The document referred to was

14:00:14  5             marked for identification by the

14:00:14  6             C.S.R. as Exhibit 4 and attached to

14:00:16  7             this deposition.)

14:00:16  8    BY MR. PETROCELLI:

14:00:16  9        Q.  This is a letter from Frank Shuster to Paul

14:00:18 10    Levitz dated September 10, 1992.

14:00:23 11             Have you ever seen this letter before

14:00:24 12    today?

14:00:35 13        A.  I don't think so --

14:00:36 14        Q.  Did you become aware that after Joe

14:00:37 15    Shuster's death as a result of your mother's efforts

14:00:46 16    DC Comics or Time-Warner agreed to make pension

14:00:54 17    payments or payments to the Shuster family?

14:00:57 18        A.  I was aware of a pension agreement.

14:01:02 19        Q.  And are you aware that after Joe Shuster's

14:01:04 20    death, that -- that the folks at Time-Warner or DC

14:01:12 21    Comics agreed to increase payments?

14:01:17 22        A.  No, I didn't know the details, no.

14:01:21 23        Q.  Was your father working in 1992 or was he

14:01:27 24    retired or disabled?

14:01:33 25        A.  I believe he was mostly retired.

123

**EXHIBIT G**
**174**

ROUGH DRAFT

14:01:40  1        Q.  Do you know if he had a pension?

14:01:41  2        A.  Yes.

14:01:44  3        Q.  From where?

14:01:50  4        A.  It was a teacher retirement system and a

14:01:52  5    civil service.

14:01:54  6        Q.  From Texas?

14:01:55  7        A.  Yes.

14:01:58  8        Q.  El- -- where did you say?

14:01:59  9        A.  Texas A&M.

14:02:01  10       Q.  That's right, Texas A&M.

14:02:03  11            Did your mother have any source of income

14:02:10  12   in 1992 in the years thereafter other than what she

14:02:13  13   received from DC Comics or Time-Warner?

14:02:16  14       A.  She had a survivor's pension.

14:02:23  15       Q.  From your dad -- for your dad's employment?

14:02:26  16       A.  Yes.

14:02:26  17       Q.  Other than that?

14:02:26  18       A.  No.

14:02:31  19       Q.  And forgive me, I don't remember your

14:02:33  20   answer, but have you seen this document Exhibit 4

14:02:37  21   before today?

14:02:38  22       A.  I don't believe so.

14:02:43  23       Q.  Okay.  Were you aware that Frank Shuster

14:02:46  24   had requested that payments -- were you aware that

14:02:54  25   Time-Warner or DC Comics was making payments also to

124

**EXHIBIT G**
**175**

ROUGH DRAFT

14:02:58  1    Frank Shuster after Joe Shuster's death?

14:03:03  2        A.  I don't -- no, I don't think I knew the

14:03:05  3    details.

14:03:05  4        Q.  Did you know that he was receiving money?

14:03:07  5        A.  No.

14:03:12  6        Q.  I'll direct you to the third paragraph of

14:03:16  7    this letter by Frank to Paul Levitz.  He states the

14:03:22  8    suggestion that payments were made in her name,

14:03:25  9    meaning your mother's name -- she would not pursue

14:03:30 10    the termination of the Superman copyright as

14:03:33 11    provided for to creators heirs in the 1976 U.S.

14:03:38 12    copyright act and that she could send me whatever

14:03:43 13    money I wanted as a gift which would not be taxable

14:03:45 14    to me."

14:03:46 15        Were you aware of an arrangement whereby DC

14:03:50 16    Comics or Time-Warner agreed to give money to Jean

14:03:55 17    who in turn would then gift it to Frank.

14:03:58 18        A.  I never heard that from her, those details,

14:04:04 19    no.

14:04:05 20        Q.  Did you know of any of this prior to the

14:04:07 21    time you contacted Mr. Toberoff?

14:04:09 22        A.  I don't think I did.

14:04:14 23        Q.  Prior to the time you contacted

14:04:16 24    Mr. Toberoff, did you know that Frank Shuster had

14:04:21 25    suggested that Jean Peavy would not pursue the

125

**EXHIBIT G**
**176**

ROUGH DRAFT

14:04:26  1    termination of the Superman copyright under the 1976

14:04:31  2    U.S. copyright act?

14:04:32  3         A.  I didn't know anything about this.

14:04:36  4         Q.  Is this the first time you've learned about

14:04:40  5    that?

14:04:40  6         A.  Yes.

14:04:41  7         Q.  Okay.  Go to the second page of this letter

14:04:51  8    and you'll see in the second paragraph that it

14:04:53  9    refers to the memorial service held in New York on

14:04:56 10    September 24.  It says:

14:05:00 11              "Some of Joe's relatives have

14:05:02 12          said they would like to attend."

14:05:05 13          You indicated you attended, right.

14:05:05 14         A.  Yes.

14:05:08 15         Q.  Who else attended, if you remember?

14:05:12 16         A.  Oh, boy.  There was -- it seems to me that

14:05:19 17    some of Siegel's relatives might have been there

14:05:21 18    because they lived in the northeast part of the

14:05:23 19    country.

14:05:23 20         Q.  The Siegel relatives?

14:05:25 21         A.  A few.  I don't recall -- I didn't know

14:05:27 22    really any of the others.  I don't recall any other

14:05:32 23    Shuster relatives besides Frank.

14:05:34 24         Q.  Your sister attend, Dawn?

14:05:39 25         A.  No.  I don't think so.

**EXHIBIT G**
**177**

ROUGH DRAFT

14:05:40  1        Q.   Your father?

14:05:40  2        A.   Yes.

14:05:41  3        Q.   And your mother?

14:05:42  4        A.   Yes.

14:05:43  5        Q.   And Frank?

14:05:44  6        A.   Right.

14:05:47  7        Q.   Let's turn to Exhibit 5.

14:05:59  8              (The document referred to was

14:05:59  9              marked for identification by the

14:05:59  10             C.S.R. as Exhibit 5 and attached to

14:06:02  11             this deposition.)

14:06:02  12    BY MR. PETROCELLI:

14:06:03  13        Q.   Exhibit 5 is an agreement apparently signed

14:06:08  14    by Frank Shuster and Jean Peavy on October 2, 1992

14:06:13  15    dated as of August 1, 1992.

14:06:18  16             An agreement between DC Comics and Jean

14:06:22  17    Shuster Peavy and Frank Shuster.

14:06:25  18             Have you ever seen this document before

14:06:27  19    today?

14:06:28  20        A.   Yes.

14:06:29  21        Q.   When did you first see this document?

14:06:30  22        A.   I -- I found it in -- when I started

14:06:36  23    working with Marc Toberoff and we were -- it came up

14:06:42  24    at that time, sometime around -- sometime around

14:06:45  25    that time, as I recall.

127

**EXHIBIT G**
**178**

ROUGH DRAFT

14:06:49  1        Q.  Where did you find this document?

14:06:54  2        A.  Where -- that's a good question.  Marc

14:06:59  3    Toberoff might have showed it to me.  I don't -- I

14:07:03  4    don't recall where I first saw it.  I know that I

14:07:05  5    saw it around that time.

14:07:07  6        Q.  Did you send -- after you retained

14:07:11  7    Mr. Toberoff or around the time you retained him,

14:07:13  8    did you collect materials and send them to him?

14:07:17  9        A.  Yes.

14:07:20  10        Q.  Was this Exhibit 5 one of the documents you

14:07:24  11    sent him?

14:07:26  12        A.  It could have been.

14:07:28  13        Q.  Did you discuss Exhibit 5 with your mother?

14:07:31  14        A.  I don't know.  I don't remember.  I

14:07:40  15    don't -- I -- that was when I saw it.  I didn't know

14:07:44  16    it was until at that time, I didn't-I didn't know

14:07:48  17    she had this.

14:07:50  18        Q.  When you saw it is when you first learned

14:07:51  19    that -- that Frank and Jean were getting $25,000 a

14:07:57  20    year and all?

14:07:58  21        A.  Yes.

14:07:58  22        Q.  The other details in this?

14:08:00  23        A.  Yes.

14:08:06  24        Q.  Now at the -- around this time then you had

14:08:08  25    been doing your research on the copyright

128

**EXHIBIT G**
**179**

ROUGH DRAFT

14:08:11  1    termination issue, including having read the 1998

14:08:16  2    amendment to the copyright law right?

14:08:18  3        A.  Yes.

14:08:18  4            MR. TOBEROFF:  Objection.  Misstates his

14:08:20  5    testimony.

14:08:20  6    BY MR. PETROCELLI:

14:08:23  7        Q.  And?

14:08:25  8            MR. TOBEROFF:  Give me time to object

14:08:26  9    please and listen carefully to all aspects of his

14:08:30 10    questions.

14:08:30 11    BY MR. PETROCELLI:

14:08:32 12        Q.  You had -- you reached out to Mr. Toberoff

14:08:41 13    in 2001, you said, and you had reached out to the

14:08:45 14    Albuquerque lawyer around the second half of 1999?

14:08:49 15        A.  Yes.

14:08:49 16        Q.  And in between that time period, were you

14:08:55 17    steadily doing research on this issue of whether

14:08:58 18    there were termination rights under the -- under the

14:09:01 19    copyright laws?  Or had you put it down for a while

14:09:05 20    and then started up again in 2001?

14:09:12 21        A.  Oh, I -- I don't remember exactly how much

14:09:15 22    research I did this between those times.  I'm not

14:09:18 23    sure.  I might have set it aside and started up

14:09:22 24    again.

14:09:23 25        Q.  And at the point when you first went to

129

**EXHIBIT G**
**180**

ROUGH DRAFT

14:09:27  1    your mom to explain that you had been doing this

14:09:30  2    research, and you had reached out and found a lawyer

14:09:34  3    that you wanted to recommend?

14:09:35  4        A.  Uh-huh.

14:09:37  5        Q.  -- did you discuss this letter with her and

14:09:40  6    whether this letter affected the family's ability to

14:09:45  7    claim any termination rights?

14:09:47  8        A.  I didn't know about it, then.

14:09:49  9        Q.  Well, you learned about it not long

14:09:53 10    thereafter, right, because you found it as among the

14:09:56 11    materials that you were gathering for Mr. Toberoff,

14:09:56 12    right?

14:09:59 13        A.  When I entered into an agreement with

14:10:01 14    Mr. Toberoff around that time.

14:10:05 15        Q.  It's when you found it, right?

14:10:05 16        A.  Yes.

14:10:08 17        Q.  And you don't remember where you found it?

14:10:09 18        A.  It would have been -- it would have been in

14:10:16 19    Jean's files somewhere.

14:10:18 20        Q.  When you say "Jean's files, do you call

14:10:20 21    your mom Jean?

14:10:21 22        A.  Oftentimes.  Sometimes mom and oftentimes

14:10:24 23    Jean.

14:10:24 24        Q.  Okay.  When you -- where are Jean's files,

14:10:41 25    as you put it, -- strike that.

**EXHIBIT G**
**181**

ROUGH DRAFT

14:10:42  1          Where were -- you were living in 19 -- in

14:10:47  2     2001 when you retained Mr. Toberoff in the same home

14:10:52  3     you're living now?

14:10:53  4          A.  Yes.

14:10:54  5          Q.  Okay.  And does Jean have her own study or

14:10:57  6     place where she keeps her files?

14:10:59  7          A.  Yes.

14:11:00  8          Q.  Separate from yours?

14:11:01  9          A.  Yes.

14:11:04  10         Q.  And when you were doing your research, did

14:11:07  11    you even before you called Mr. Toberoff, did you go

14:11:12  12    through Jean's files to see what documents she had

14:11:15  13    relating to Joe Shuster's copyrights?

14:11:21  14         A.  No.  I didn't.

14:11:32  15         Q.  At the time -- at the time that you first

14:11:45  16    saw Exhibit 5, I assume you read it, correct?

14:11:45  17         A.  Yes.

14:11:55  18         Q.  Okay.  And you saw the reference in the

14:11:57  19    second paragraph to fully settling all claims to any

14:12:10  20    payments or other rights or remedies which you may

14:12:12  21    have under any other agreement or otherwise whether

14:12:16  22    now or hereafter existing regarding any copyrights,

14:12:20  23    trademarks or other property right and any and all

14:12:24  24    works created in whole or in part by your brother

14:12:27  25    Joseph Shuster or any works based there on.

                                                              131

**EXHIBIT G**
**182**

ROUGH DRAFT

14:12:32  1              You read that language, right?

14:12:32  2         A.  Yes.

14:12:34  3         Q.  And you also read the next sentence which

14:12:36  4    said in any event you now grant to us any such

14:12:39  5    rights and release us.  Our licensees and all others

14:12:45  6    and it goes on and I won't read the rest of the --

14:12:48  7    the legal words there.

14:12:50  8              When you read those words in that second

14:12:54  9    paragraph, did you believe they had any impact on

14:13:00 10    whether your family had any termination rights?

14:13:08 11         A.  If I can answer that, I -- no, I did not

14:13:12 12    think it affected the -- the rights that I was

14:13:16 13    looking at.

14:13:17 14         Q.  And why is that?

14:13:20 15         A.  Because the copyright act allows the

14:13:25 16    estate's rights.

14:13:32 17         Q.  Because the copyright act allows the

14:13:37 18    estate's rights?

14:13:38 19         A.  Grants estates rates.

14:13:40 20         Q.  Okay.

14:13:41 21         A.  Estates, rights.

14:13:42 22         Q.  Okay.

14:13:45 23              MR. TOBEROFF:  Apostrophe you mean.

14:13:45 24    BY MR. PETROCELLI:

14:13:47 25         Q.  Apostrophe you mean?

                                                              132

**EXHIBIT G**
**183**

ROUGH DRAFT

14:13:48  1          A.  Okay, yes.

14:13:50  2          Q.  Did you consult with anyone other than

14:13:53  3  Mr. Toberoff whether this paragraph had any affect

14:13:57  4  on any termination rights you were inquiring about?

14:14:00  5          A.  No.

14:14:03  6          Q.  Did you go to your mom and say, Jean,

14:14:06  7  what's this about, you know, why did we do this, ask

14:14:13  8  her to explain the circumstances to you?  Did you

14:14:15  9  have any discussion with her about this agreement

14:14:19 10  and in particular, the paragraph that I just read to

14:14:23 11  you?

14:14:25 12          A.  I'm sure I asked her about it.

14:14:28 13          Q.  What did she say?

14:14:31 14          MR. TOBEROFF:  Again, I just -- and I'm --

14:14:35 15  I want you to freely testify based on your memory

14:14:38 16  but when you say "I'm sure I asked her about it,"

14:14:41 17  that makes me wonder whether you recall asking her

14:14:45 18  about it or you're assuming you asked her about it.

14:14:49 19  I don't want you to make assumptions and speculate.

14:14:51 20          THE WITNESS:  Okay.

14:14:51 21          MR. TOBEROFF:  I want you to testify from

14:14:51 22  memory.

14:14:52 23          THE WITNESS:  I don't remember.

14:14:53 24          MR. TOBEROFF:  Even if you have the

14:14:54 25  slightest memory I want you to testify as to that

133

**EXHIBIT G**
**184**

ROUGH DRAFT

14:14:57  1    memory as Mr. Petrocelli aptly put it.

14:15:01  2         THE WITNESS:  I don't remember what I said.

14:15:02  3    I can't recall the conversation.  I'm just assuming

14:15:05  4    that I asked her about it.

14:15:09  5         MR. TOBEROFF:  I don't want you to assume.

14:15:10  6    I want you to testify from your memory.

14:15:12  7         THE WITNESS:  Okay. Well I don't recall the

14:15:13  8    conversation.

14:15:13  9    BY MR. PETROCELLI:

14:15:20 10    Q.  Now, you said you read that paragraph and

14:15:24 11    having studied the copyright code in which estates

14:15:28 12    had certain rights you believe that this paragraph

14:15:30 13    had no bearing on the estates' rights, correct?

14:15:39 14    A.  Yes.

14:15:40 15    Q.  Is that a conclusion that you reached

14:15:43 16    without much thought or did you think about it?  Did

14:15:46 17    you go back and look at the code?  Did you ask

14:15:51 18    around?  Did you inquire of the Siegels?

14:15:55 19    A.  I am -- employed Marc Toberoff to represent

14:15:58 20    me.

14:16:06 21    Q.  And is that the answer to my question?

14:16:07 22    A.  Yes, yes.

14:16:08 23    Q.  So in order to determine the impact that

14:16:09 24    this had you wanted Mr. Toberoff to assist in that?

14:16:12 25    A.  Yes.

134

**EXHIBIT G**
**185**

ROUGH DRAFT

14:16:13  1        Q.  Okay.  Did you receive any money when you

14:16:20  2   signed the first document or agreement with

14:16:23  3   Mr. Toberoff?

14:16:24  4        A.  No.

14:16:26  5        Q.  Did he pay you or your family any money?

14:16:28  6        A.  No.

14:16:51  7        Q.  As we'll see momentarily, you -- the first

14:16:55  8   agreement you signed was with a company that

14:17:00  9   Mr. Toberoff owned called Pacific Pictures

14:17:04 10   Corporation.  Do you remember the name of that

14:17:05 11   company?

14:17:06 12        A.  Yes.

14:17:09 13        Q.  Did you receive any money or did members of

14:17:11 14   your family receive any money from Pacific Pictures

14:17:14 15   Corporation?

14:17:14 16        A.  No.

14:17:14 17        Q.  Or any other entity with which Mr. Toberoff

14:17:17 18   was affiliated?

14:17:18 19        A.  No.

14:17:26 20        Q.  Now, I'll come back to this letter moment,

14:17:40 21   this agreement, Exhibit 5, but let's go to Exhibit 6

14:17:43 22   now.

14:17:43 23             (The document referred to was

14:17:43 24              marked for identification by the

14:17:43 25              C.S.R. as Exhibit 5 and attached to

**EXHIBIT G**
**186**

ROUGH DRAFT

14:17:52  1          this deposition.)

14:17:52  2    BY MR. PETROCELLI:

14:17:53  3          Q.  Exhibit 6 is a document, letter between

14:17:55  4    Frank Shuster and Paul Levitz dated October 2, 1992.

14:18:07  5    Which briefly states in consideration of the

14:18:09  6    agreement dated as of August 1, 1992, between DC

14:18:13  7    Comics, myself and Jean Shuster Peavy, I hear by way

14:18:17  8    of any rights or remedies that I may have under the

14:18:19  9    agreement dated December 23, 1975 between Warner

14:18:25 10    communications, Inc., Jerome Siegel and Joseph

14:18:29 11    Shuster.

14:18:30 12          This is the first time you've seen this

14:18:35 13    document?

14:18:35 14          A.  Yes.

14:18:36 15          Q.  Okay.  One second.  Jason --

14:18:51 16          (Pause in proceedings.)

14:18:51 17    BY MR. PETROCELLI:

14:19:08 18          Q.  After Joe Shuster passed away in 1992, did

14:19:11 19    you assist in finding an estate lawyer or anybody to

14:19:17 20    deal with his estate issues?

14:19:22 21          A.  No.

14:19:30 22          Q.  Did you come across a copy of his will in

14:19:33 23    1992?

14:19:34 24          A.  I don't know if we found his copy.  We had

14:19:43 25    a copy and an original.  I don't know if we found

136

**EXHIBIT G**
**187**

ROUGH DRAFT

14:19:48  1    his copy.  It was disorganized.

14:19:52  2         Q.  Did you find an original?

14:19:54  3         A.  Yes.

14:19:56  4         Q.  Is there any reason why the original wasn't

14:19:58  5    made available when the probate was opened in

14:20:01  6    Los Angeles in 2003?

14:20:04  7         A.  Yes.

14:20:06  8         Q.  What's the reason?

14:20:06  9         A.  My mother had lost it back in a file

14:20:10 10    somewhere, mixed up.  We found it later.

14:20:15 11         Q.  When did you start using your lock box?

14:20:22 12         A.  Soon thereafter.

14:20:23 13         MR. PETROCELLI:  Jason does this have an

14:20:25 14    Exhibit Number?

14:20:27 15         MR. TOKORO:  Yes, it's number 26.

14:20:31 16         MR. PETROCELLI:  I already used 26 I

14:20:32 17    thought, no?  I used 24.  Okay.

14:20:37 18              (The document referred to was

14:20:37 19              marked for identification by the

14:20:37 20              C.S.R. as Exhibit 26 and attached

14:20:38 21              to this deposition.)

14:20:38 22    BY MR. PETROCELLI:

14:20:38 23         Q.  Take a look at Exhibit 26.

14:20:43 24              This is a copy of Mr. Shuster's -- what

14:20:48 25    purports to be Mr. Shuster's last will and

137

**EXHIBIT G**
**188**

ROUGH DRAFT

14:20:50  1    testament.  And you've seen a copy of his will

14:20:56  2    before, right?

14:20:56  3         A.  Yes.

14:20:59  4         Q.  And by the way, on the second page it

14:21:01  5    identifies a couple of the -- it identifies two

14:21:05  6    witnesses to the execution of his will.  Do you know

14:21:11  7    who these people are?

14:21:14  8         A.  Not personally, no.

14:21:16  9         Q.  Have you ever spoken to them?

14:21:16 10         A.  No.

14:21:24 11         Q.  One is named Tom last name seems to be FA?

14:21:29 12              MR. TOBEROFF:  FE.

14:21:30 13              MR. PETROCELLI:  FE N/A U G H T Y and the

14:21:37 14    other one appears to be Robert S Williams.

14:21:40 15         Q.  But you don't know either of them.

14:21:41 16              Is that right ?

14:21:42 17         A.  I don't know them.

14:21:43 18         Q.  Either of these two people?

14:21:44 19         A.  I don't know them, no.

14:21:46 20         Q.  Never heard the names before, right?

14:21:50 21         A.  Only when I saw the -- the will.

14:21:52 22         Q.  Did you try contacting them?

14:21:54 23         A.  No.

14:21:55 24         Q.  Okay.  Now attached to this document on the

14:21:58 25    third page of Exhibit 26 is an affidavit of Jean

                                                              138

**EXHIBIT G**
**189**

ROUGH DRAFT

14:22:03  1    Peavy under California probate code section 13101.

14:22:12  2    It's dated August 17, 1992 and it's signed by Jean

14:22:15  3    Peavy.

14:22:16  4         Do you -- have you ever seen this document

14:22:19  5    before?

14:22:20  6         A.  I might have seen this document.

14:22:31  7         Q.  Do you know --

14:22:31  8         A.  I might have seen this.

14:22:33  9         Q.  What do you remember about it?

14:22:36  10        A.  I know that his estate was so small that he

14:22:38  11   had to go through the small estates -- small estates

14:22:49  12   code or something like that.  That was -- that's all

14:22:52  13   I know.

14:22:52  14        Q.  Do you know who prepared this document?

14:22:56  15        A.  I don't remember.

14:22:59  16        Q.  Did you assist in finding a person to

14:23:01  17   prepare it?

14:23:05  18        A.  Yeah, I might have assisted.

14:23:07  19        Q.  Who did you locate?  An attorney?

14:23:14  20        A.  No.  I don't believe so.  I don't believe

14:23:14  21   so.

14:23:18  22        Q.  Who did you locate?

14:23:19  23        A.  It would have been either a friend,

14:23:34  24   unless -- unless I helped with it.  I'm not sure.

14:23:38  25        Q.  Which friend?

139

**EXHIBIT G**
**190**

ROUGH DRAFT

14:23:39  1        A.  I don't -- I don't know.  I don't remember.

14:23:41  2    I -- it's -- it's quite a while back.

14:23:46  3        Q.  A friend in -- in Los Angeles?  Or where

14:23:51  4    you lived?

14:23:52  5        A.  Yeah, it could have been Los Angeles.

14:23:53  6        Q.  What friend did you have in Los Angeles

14:23:55  7    that might have assisted you in 1992?

14:23:57  8        A.  I might have done this.  Just with the

14:23:59  9    small estate -- I might have assisted her with this.

14:24:04 10    I'm not recalling

14:24:04 11        Q.  You might have prepared it?

14:24:05 12        A.  I might have.  Yeah, it's been a long time.

14:24:15 13        Q.  What happens to the shares of stock in

14:24:16 14    time -- in the Time-Warner rights?  Those were given

14:24:19 15    to your mom?

14:24:20 16        A.  Yeah, those were stock rights, I believe.

14:24:23 17    Not copyright rights.  Stock.  It was -- gee, it

14:24:29 18    must have -- I don't know, she must have -- she must

14:24:34 19    have sold the stock for cash, I guess.

14:24:37 20        Q.  To have prepared a document like this, did

14:24:42 21    you research the law books and find a -- a model

14:24:45 22    that you could use?

14:24:50 23        A.  I must have.  I -- it was such a -- this --

14:24:53 24    the estate had a negative net worth or it was very

14:24:57 25    small.  It was very small.  That's what it was.

140

**EXHIBIT G
191**

ROUGH DRAFT

14:24:59   1        Q.  Under $60,000?

14:25:00   2        A.  Yes.  Yeah it was smaller than that even,

14:25:02   3    so --

14:25:03   4        Q.  Paragraph 5 says it's under $60,000?

14:25:05   5        A.  Right.

14:25:05   6        Q.  Right?

14:25:06   7            Okay let's take a look at Exhibit 7.

14:25:12   8            (The document referred to was

14:25:12   9            marked for identification by the

14:25:12  10            C.S.R. as Exhibit 7 and attached to

14:25:21  11            this deposition.)

14:25:21  12            THE WITNESS:  7?

14:25:21  13    BY MR. PETROCELLI:

14:25:25  14        Q.  This is a letter from Jean to Paul Levitz

14:25:28  15    of DC dated April 27, 1995 thanking Paul for the

14:25:37  16    book the adventures of Superman by Lawther, L O W T

14:25:42  17    H ER that Paul sent.  Talking about the low us and

14:25:48  18    Clark show and then states being in the middle I do

14:25:53  19    hope you will remember Frank and myself once again.

14:25:56  20    Is it possible to reward us with a gift versus a

14:26:00  21    bonus so that there's no tax liability to us."

14:26:06  22            Did you become -- first of all, have you

14:26:11  23    seen this document Exhibit 7 before today.

14:26:13  24        A.  I don't think I have, no.

14:26:16  25        Q.  Were you aware that from time to time your

                                                                    141

                                  .

**EXHIBIT G**
**192**

ROUGH DRAFT

14:26:18  1      mom had requested bonuses or -- or gifts from DC in

14:26:26  2      addition to what was provided in the 1992 agreement?

14:26:32  3          A.  She might have mentioned something.  I have

14:26:36  4      not seen this.

14:26:41  5          Q.  Let's turn to the next exhibit, Exhibit 8.

14:26:44  6      This is a letter from Jean to Paul Levitz dated

14:26:47  7      September 7, 1999.

14:26:50  8              (The document referred to was

14:26:50  9              marked for identification by the

14:26:50 10              C.S.R. as Exhibit 8 and attached to

14:27:01 11              this deposition.)

14:27:01 12      BY MR. PETROCELLI:

14:27:02 13          Q.  In the first paragraph it says Mike Catron

14:27:04 14      recently sent me a video he made of the 1919 action

14:27:08 15      number 1 comic book panel which I had participated

14:27:11 16      in.

14:27:11 17              Mike Catron is a fellow you know who lives

14:27:15 18      in Pennsylvania.

14:27:15 19              Is that right?

14:27:15 20          A.  Yes.

14:27:16 21          Q.  Okay.  Is is one of Mikes hobbies comic

14:27:23 22      books or is he involved in the comic book business

14:27:25 23      somehow?

14:27:26 24          A.  Yes, he is interested.

14:27:28 25          Q.  As a hobby or professionally?

142

**EXHIBIT G**
**193**

ROUGH DRAFT

14:27:29  1        A.  Yes, possibly.

14:27:31  2        Q.  Had you ever seen this video that he sent

14:27:33  3   your mom?

14:27:37  4        A.  I don't know if I saw that video.  I don't

14:27:40  5   remember.

14:27:40  6        Q.  Have you ever seen this letter before

14:27:42  7   today, Exhibit 8?

14:27:45  8        A.  No, this is -- this is her doing.

14:27:52  9        Q.  And you see in the third paragraph it says

14:27:54 10   had you once told Frank and I that instead of a

14:27:56 11   yearly raise of the pension you would prefer to

14:27:59 12   offer a bonus directly from DC itself.  I'm making

14:28:03 13   that request again for 1999.

14:28:04 14        Did she discuss any of these affairs with

14:28:07 15   you that she was asking for bonuses and how much she

14:28:10 16   would receive and so forth?  Would she discuss these

14:28:18 17   matters with you?

14:28:19 18        A.  From time to time.

14:28:19 19        Q.  How much was she receiving do you know?

14:28:24 20        A.  As far as I know, every now and then she

14:28:27 21   would get a small bonus.

14:28:33 22        Q.  Did she ever ask for your help in any way?

14:28:36 23        A.  No, these letters are hers.  I didn't have

14:28:41 24   any involvement in this.

14:28:44 25        Q.  Did you have the view that let's say around

                                                              143

**EXHIBIT G**
**194**

ROUGH DRAFT

14:28:46  1    1998 to 1999, that your family had not been

14:28:52  2    adequately compensated by DC Comics or Time-Warner?

14:28:58  3        A.  Did I have that view?

14:28:58  4        Q.  Yes.

14:28:58  5        A.  Yes.

14:29:01  6        Q.  What informed that view?

14:29:08  7        A.  What informed the view?

14:29:09  8        Q.  Yeah, why did you feel that way?

14:29:13  9        A.  The value of Superman from my own ideas of

14:29:20  10   what I know of it.

14:29:27  11       Q.  When did you first have that view?

14:29:30  12       A.  About how much Superman is worth?

14:29:32  13       Q.  That you did not believe your family was

14:29:34  14   being properly compensated?

14:29:40  15       A.  When did I first have that view?  Well,

14:29:46  16   maybe later on when I -- when I -- I realized how --

14:29:56  17   how broke Joe was when he died and I know that

14:30:02  18   Superman had brought in billions in revenues over

14:30:06  19   the years and they had a -- basically just how --

14:30:14  20   how poor he was in relation to the value of

14:30:18  21   Superman.

14:30:20  22       Q.  But you also knew that Joe never felt the

14:30:22  23   need to terminate or try to terminate his copyright

14:30:26  24   grants, right?

14:30:30  25           MR. TOBEROFF:  Assumes facts.

**EXHIBIT G**
**195**

ROUGH DRAFT

14:30:31  1          THE WITNESS:  My knowledge of the history

14:30:36  2    is that they did try to get rights back at times.

14:30:36  3    BY MR. PETROCELLI:

14:30:40  4          Q.  He never tried to get rights back under the

14:30:43  5    termination provisions of the 1976 copyright act,

14:30:43  6    right?

14:30:47  7          A.  Not that I -- no, not on that.

14:30:49  8          Q.  Did you ever inquire why if he felt -- if

14:30:53  9    he was as broke as -- as you say he was, why he

14:30:56 10    didn't seek to terminate any copyright grants that

14:31:00 11    he had given?

14:31:02 12          A.  I didn't ask him about it.

14:31:04 13          Q.  Did you ask your mother?

14:31:05 14          A.  No.

14:31:11 15          Q.  Did you become aware as part of your

14:31:13 16    research that as early as 1994 Joe Shuster had the

14:31:17 17    right to serve a notice of copyright termination

14:31:23 18    under the 1976 act?

14:31:24 19          A.  No.

14:31:26 20          Q.  And that he lived for eight years without

14:31:29 21    having done so?

14:31:32 22          A.  I was not aware.

14:31:35 23          Q.  After you saw how broke he was, and I know

14:31:37 24    you were involved in totaling up the -- the checks

14:31:39 25    and the bills that we saw from your mother's letter,

145

**EXHIBIT G**
**196**

ROUGH DRAFT

14:31:44  1    did you discuss with your mother the idea that hey,

14:31:47  2    what happened here?  You know, why is he so broke?

14:31:50  3    Superman has made billions?

14:31:55  4        A.  Yeah, might have -- might have asked her

14:31:58  5    about it.

14:31:58  6        Q.  What did she say?

14:32:02  7        A.  That it's just expressed that it was just

14:32:08  8    an injustice and it was just -- it wasn't right,

14:32:14  9    that type of thing.

14:32:19 10        Q.  How did you know as early as $19.92 when

14:32:23 11    Joe Shuster died that Superman had --, as you put

14:32:26 12    it, generated billions of in revenue?

14:32:28 13        A.  Well, I had seen Superman all my life.  I

14:32:32 14    grew up -- grew up with Superman and the -- the big

14:32:37 15    movie in '79, the big Superman movie or '78, I was

14:32:44 16    aware that was the first big Blockbuster super hero

14:32:48 17    movie that started the whole genre of superior hero

14:32:53 18    movies that is just the range so I'm just aware

14:32:55 19    of -- of how wide spread it is and popular.

14:32:58 20        Q.  You were aware of this in 1992 when Joe

14:33:00 21    died broke, right?

14:33:02 22        A.  Yeah, just in general of how the history of

14:33:06 23    Superman and how big it is.

14:33:13 24        Q.  And come you had this conversation with

14:33:15 25    your mother right after Joe's death, you're telling

                                                              146

**EXHIBIT G**
**197**

ROUGH DRAFT

14:33:23  1    us that she agreed with you?

14:33:24  2         A.  Well, she expressed to me that she thought

14:33:31  3    it was an injustice and did I agree with her is that

14:33:34  4    what you're asking?

14:33:35  5         Q.  Yes?

14:33:36  6         A.  Well, yes.

14:33:39  7         Q.  The injustice that she expressed to you was

14:33:41  8    that Joe had so little money when Superman had

14:33:44  9    generated so much?

14:33:45  10        A.  Yes.

14:33:53  11        Q.  So did it come as a surprise to you then

14:33:55  12   that she entered into an agreement after that

14:33:59  13   conversation with DC and Time-Warner in which she

14:34:06  14   gave up any copyright interest that the family might

14:34:10  15   have?

14:34:10  16        A.  I don't know what her thinking was.

14:34:13  17            MR. TOBEROFF:  Sorry.  Assumes facts.

14:34:16  18   Lacks foundation.

14:34:16  19   BY MR. PETROCELLI:

14:34:18  20        Q.  She didn't consult with you, right?

14:34:18  21        A.  No.

14:34:20  22        Q.  She was certainly of sound mind in 1992,

14:34:20  23   right?

14:34:20  24        A.  Yes.

14:34:24  25        Q.  When she was expressing to you the

147

**EXHIBIT G**
**198**

ROUGH DRAFT

14:34:26  1      injustice after Joe's death, you didn't think she --

14:34:30  2      she was mentally infirm, you thought that she was

14:34:34  3      healthy and sound and knew exactly what she was

14:34:35  4      saying, right?

14:34:36  5          A.  Yes.

14:34:36  6          Q.  And in -- and she didn't consult with you

14:34:41  7      when she signed that agreement, Exhibit 5, as of

14:34:46  8      August 31, 1992, correct?

14:34:48  9          A.  That's correct.

14:34:50  10         Q.  And when you saw it, were you surprised

14:34:52  11     that she had signed that agreement given her

14:34:54  12     statements to you that it was an injustice?

14:34:57  13         A.  Well, yes.

14:34:59  14         Q.  Do you think that she felt like the

14:35:00  15     injustice had been rectified by virtue of her having

14:35:05  16     obtains that agreement from DC?

14:35:07  17             MR. TOBEROFF:  Calls for speculation.

14:35:09  18             THE WITNESS:  I can answer.

14:35:09  19     BY MR. PETROCELLI:

14:35:17  20         Q.  Did you discuss that with her when you saw

14:35:18  21     the letter?

14:35:20  22         A.  Yeah what was the original question?

14:35:21  23         Q.  When you saw the letter, the agreement,

14:35:23  24     Exhibit 5, and I misspoke, I said August 31, it's

14:35:28  25     August 1, 1992, when you found it and you saw it,

148

**EXHIBIT G**
**199**

ROUGH DRAFT

14:35:36 1    did you have a discussion with her to the effect

14:35:38 2    that -- about whether she felt better now that the

14:35:42 3    injustice had been -- had been rectified because DC

14:35:47 4    has -- had entered into this agreement?

14:35:50 5         A.  No, she didn't feel it had been rectified.

14:35:52 6         Q.  How do you know?

14:35:54 7         A.  This is what I recall her telling me 17,000

14:35:57 8    year after tax as a pension didn't feel it was

14:36:01 9    rectified.

14:36:02 10        Q.  Did she -- but you didn't know about this

14:36:04 11   agreement when she told you that, right?

14:36:06 12        A.  No. , no.

14:36:06 13        Q.  And when you saw the agreement, did you

14:36:09 14   have a discussion with her about why did you sign

14:36:11 15   it?

14:36:11 16        A.  Well, well, yeah, I -- I -- I -- I can't

14:36:17 17   recall what exactly I said but I -- I -- I'm sure I

14:36:20 18   talked with her.

14:36:22 19        Q.  Do you know why -- did you ask her well

14:36:26 20   since we -- since you knew about it the time you

14:36:29 21   signed this agreement how valuable Superman was, we

14:36:32 22   had talked about how it was an injustice that Joe

14:36:35 23   died broke when it made so much money, what was your

14:36:38 24   thinking in signing this agreement, Exhibit 5?  Did

14:36:42 25   you have that kind of conversation with her?

149

**EXHIBIT G**
**200**

ROUGH DRAFT

14:36:43  1        A.  Oh, if I asked her that?

14:36:45  2        Q.  Did you have that kind of discussion with

14:36:46  3   her?

14:36:46  4        A.  I -- I -- her thinking was that.

14:36:50  5            MR. TOBEROFF:  Answer the question.

14:36:50  6   BY MR. PETROCELLI:

14:36:51  7        Q.  Did you have that kind of a discussion with

14:36:53  8   her?

14:36:53  9        A.  Oh,.  Okay.  Did --

14:36:56 10        Q.  Are you tracking what I'm asking you?

14:36:57 11        A.  Yes.  Yes.  I -- I asked her.

14:37:03 12        Q.  And what did she say?

14:37:06 13        A.  That she didn't feel that it had rectified

14:37:10 14   anything.

14:37:11 15        Q.  Did you ask well then why did you sign it?

14:37:15 16   Why didn't ask you for more?

14:37:16 17        A.  I don't -- I don't recall the details.

14:37:19 18        Q.  Did she say I asked for millions and they

14:37:21 19   said no?

14:37:23 20        A.  I -- I think she didn't believe she had any

14:37:26 21   rights at that time.

14:37:30 22        Q.  Why did she agree to give up termination

14:37:33 23   rights if she didn't have any?

14:37:35 24        A.  I don't know.

14:37:36 25            MR. TOBEROFF:  Assumes facts.  Lacks

                                                              150

**EXHIBIT G**
**201**

ROUGH DRAFT

14:37:39  1    foundation.  You got to -- we're speeding up here so

14:37:41  2    you got to keep the same -- he can speed it up.  You

14:37:44  3    stay the same pace.  Give me time to object.

14:37:47  4         THE WITNESS:  Okay.

14:37:47  5    BY MR. PETROCELLI:

14:37:52  6         Q.  Did she have a discussion with you where

14:37:55  7    she said I agree to give up termination rights even

14:38:03  8    though I didn't have any?

14:38:08  9         A.  I don't -- I don't think she understood

14:38:14 10    exactly what she signed.  I don't think she

14:38:17 11    understood the details.  That's my impression.

14:38:22 12         Q.  She didn't tell you that she didn't

14:38:26 13    understand it, right?

14:38:27 14         A.  That was my impression that she didn't.

14:38:29 15         Q.  But she didn't tell you that, right?

14:38:31 16         A.  That -- specifically that I don't

14:38:32 17    understand the details?

14:38:33 18         Q.  Right.  She did not say to you, I did not

14:38:36 19    understand what I was signing back in 1992",

14:38:36 20    correct?

14:38:40 21         A.  She didn't say that specifically.

14:38:46 22         Q.  And, in fact, she never once brought this

14:38:48 23    agreement to your attention until you first found it

14:38:50 24    and asked her about it, right?

14:38:51 25         A.  Yes.

151

**EXHIBIT G**
**202**

ROUGH DRAFT

14:38:52  1          Q.  Were you upset when you saw that she had

14:38:58  2    signed this agreement?

14:38:58  3          A.  Yes.

14:39:01  4          Q.  Why?

14:39:04  5          A.  I -- I didn't know if it affected our

14:39:07  6    rights or not.

14:39:09  7          Q.  Why?  Why didn't you know?

14:39:13  8          A.  I didn't know because I'm not a legal

14:39:15  9    expert.

14:39:18 10          Q.  But you were concerned about it, right?

14:39:21 11          A.  I had concerns.

14:39:24 12          Q.  Did you ask her why she didn't consult with

14:39:29 13    a lawyer in 1992?  Or whether she had?

14:39:34 14          A.  I don't know if I asked her about that.

14:39:36 15          Q.  Do you know if she had?

14:39:39 16          A.  I don't know.

14:39:43 17          Q.  Were you upset that she hadn't consulted

14:39:47 18    with you in 1992 before signing this document?

14:39:51 19          A.  Was I upset?  Well, I couldn't do anything

14:39:53 20    about it.  So I -- I decided to -- to pursue legal

14:40:00 21    advice instead of getting upset.

14:40:04 22          Q.  Do you have Exhibit 8 in front of you?  Do

14:40:14 23    you have it in front of you?

14:40:15 24          A.  Yes.

14:40:16 25          Q.  The last paragraph says -- this is your

                                                                    152

**EXHIBIT G**
**203**

ROUGH DRAFT

14:40:18  1     mother's letter again, September 7, 1999:

14:40:22  2                 "I have learned from the

14:40:23  3                 Internet that Joanne Siegel has

14:40:25  4                 filed a copyright claim for

14:40:27  5                 Superman.  I want you to know that

14:40:29  6                 I intent to continue to honor our

14:40:31  7                 pension agreement.  I would however

14:40:35  8                 appreciate a generous bonus for

14:40:37  9                 this year as you have done many

14:40:39 10                 times in the past."

14:40:45 11          Q.  And this is the first time you've seen this

14:40:48 12     letter?

14:40:48 13          A.  Yes.

14:40:50 14          Q.  Okay.  And your mother did not tell you

14:40:52 15     that she was expressing her gratitude to DC as late

14:40:55 16     as 1999, even after knowing that the Siegel family

14:40:58 17     had terminated their interest -- had sought to

14:41:02 18     terminate their copyright?

14:41:03 19          A.  No, I did not know about this.

14:41:04 20          Q.  And did you not know that your mother with

14:41:07 21     knowledge that the Siegel family had filed for

14:41:11 22     copyright termination, told DC that she intended to

14:41:17 23     honor their agreement?

14:41:18 24          A.  I didn't know this letter.

14:41:26 25          Q.  Are you aware of any letter that Jean wrote

                                                              153

**EXHIBIT G**
**204**

ROUGH DRAFT

14:41:28  1    to DC after she signed the 1992 agreement saying

14:41:31  2    that DC was mistreating her or that there was a

14:41:35  3    grave injustice being perpetrated on her, or her

14:41:38  4    family?

14:41:41  5        A.  I'm not aware of any of her letters really.

14:41:44  6        Q.  Have you ever seen such a letter to that

14:41:46  7    effect?

14:41:46  8        A.  No.

14:42:00  9        Q.  After you have the conversation with Jean

14:42:04 10    following Joe's death about the injustice, did you

14:42:09 11    continue to have conversations with her over the

14:42:12 12    years from let's say 1992 to 2001 about this

14:42:18 13    injustice?

14:42:20 14        A.  I believe it came up from time to time.

14:42:28 15        Q.  And when it came up she was not telling you

14:42:31 16    that she was thanking and expressing her gratitude

14:42:36 17    to DC and affirmatively telling them she had no

14:42:40 18    intent to exercise any copyright termination rights?

14:42:43 19        A.  No, she wasn't telling me that.

14:43:02 20        Q.  Have you -- did you make this letter

14:43:04 21    available to Mr. Toberoff when you signed the first

14:43:08 22    document with him?

14:43:11 23        A.  Exhibit 8?

14:43:11 24        Q.  Yes.

14:43:18 25        A.  I don't remember.

**EXHIBIT G**
**205**

ROUGH DRAFT

14:43:19  1        Q.  You had never seen it before now, right?

14:43:21  2        A.  No, I don't -- I don't remember Siegel it

14:43:25  3    before now, so -- no, I don't.

14:43:31  4        Q.  Do you think it -- it matters that your --

14:43:35  5    your mom specifically told DC in September of 1999

14:43:40  6    that she had no intent to terminate any interest in

14:43:42  7    Superman?

14:43:46  8            MR. TOBEROFF:  Ambiguous.  You can only

14:43:48  9    answer to the extent your answer to that question

14:43:50 10    isn't based on conversations with your attorney and

14:43:53 11    legal advice from your attorney.

14:43:58 12            THE WITNESS:  Yeah, well, issues of -- of

14:44:03 13    rights are all based on my attorney discussions.

14:44:08 14            (Instruction not to answer.)

14:44:08 15    BY MR. PETROCELLI:

14:44:09 16        Q.  What about your conversations with your

14:44:11 17    mom?  When you -- have you had any conversations

14:44:18 18    with her in recent years when you -- in which you

14:44:27 19    asked her why were you -- why did you tell DC you

14:44:31 20    wouldn't exercise any rights even after you knew

14:44:33 21    that the law had changed and that the Siegel family

14:44:38 22    was doing so?  Did you ever have that kind of

14:44:40 23    conversation with her?

14:44:40 24        A.  I never berated her.

14:44:42 25        Q.  I didn't say berate her.  Did you inquire

                                                          155

**EXHIBIT G**
**206**

ROUGH DRAFT

14:44:45  1    of her?

14:44:46  2         A.  Inquire.

14:44:46  3         Q.  Why she would tell DC that she had no

14:44:49  4    intent to exercise any copyright claims, no intent

14:44:52  5    to terminate?

14:44:55  6         A.  Did I --

14:44:56  7         Q.  Even after the Siegel family terminated

14:45:01  8    following the 1998 change in the law?

14:45:07  9              MR. TOBEROFF:  Assumes facts.  Lacks

14:45:13 10    foundation.

14:45:13 11         A.  I never really asked her that specifically.

14:45:13 12    BY MR. PETROCELLI:

14:45:22 13         Q.  When you -- did you remember when you

14:45:27 14    finally sat down and told her that you had been

14:45:29 15    doing all of this research and all of this work and

14:45:32 16    wanted to go out and hire a lawyer and -- and

14:45:37 17    terminate grants in Superman that Joe Shuster had

14:45:44 18    made years before?  Do you remember that

14:45:46 19    conversation?

14:45:49 20              MR. TOBEROFF:  Assumes facts.  Lacks

14:45:52 21    foundation.

14:45:52 22              THE WITNESS:  Not -- not the specific

14:45:57 23    conversation, no.  Not a specific conversation.

14:45:57 24    BY MR. PETROCELLI:

14:46:02 25         Q.  Well, you said you hasn't -- you didn't

                                                              156

ROUGH DRAFT

14:46:04  1    tell her initially because you wanted to be

14:46:07  2    thorough, remember?

14:46:07  3        A.  Right.

14:46:08  4        Q.  And you were doing this research, you

14:46:09  5    identified Mr. Toberoff and then at some point you

14:46:12  6    told her?

14:46:12  7        A.  Yes.

14:46:14  8        Q.  That you had been -- did you tell her look,

14:46:16  9    Jean, or mom, I've been?

14:46:17  10       A.  Yeah.

14:46:18  11       Q.  Doing all this work and I want to go ahead

14:46:21  12   and do this?

14:46:23  13       A.  At some point I would have said something

14:46:25  14   to that effect.

14:46:30  15       Q.  And do you remember what she said to you?

14:46:32  16       A.  She didn't -- it was not really.  It was

14:46:42  17   something that was my initiative so no she didn't

14:46:45  18   say anything particular.

14:46:53  19       Q.  Exhibit 9, take a look at Exhibit 9.

14:47:03  20            (The document referred to was

14:47:03  21            marked for identification by the

14:47:03  22            C.S.R. as Exhibit 9 and attached to

14:47:16  23            this deposition.)

14:47:16  24            MR. PETROCELLI:  This is the notice of

14:47:19  25   termination sent by the Siegels in 1997.

                                                            157

**EXHIBIT G**
**208**

ROUGH DRAFT

14:47:31 1      Q.  Have you ever seen this before?

14:47:32 2      A.  No.

14:47:34 3      Q.  Did you come across this in any of your

14:47:36 4   research?

14:47:39 5      A.  No.  I did not look at this.

14:47:40 6      Q.  Your mom wrote that she saw that the Siegel

14:47:42 7   family had -- had effectuated a termination by

14:47:48 8   looking on the Internet.

14:47:50 9          She would use the Internet as of 1999?

14:47:55 10     A.  That was probably a result of my research

14:47:59 11  on the Internet.

14:48:01 12     Q.  Did she use the computer?

14:48:02 13     A.  No.

14:48:04 14     Q.  So you found it on the Internet?

14:48:06 15     A.  Yes.

14:48:07 16     Q.  How did you find it?

14:48:10 17     A.

14:48:10 18         MR. TOBEROFF:  Let's be clear.  Are you

14:48:11 19  asking whether he found this document on the

14:48:13 20  Internet?

14:48:13 21         MR. PETROCELLI:  No.  I'm asking about the

14:48:15 22  facts of termination.

14:48:17 23         THE WITNESS:  Oh.  Just general searches.

14:48:24 24  Lots of different sites.

14:48:24 25  BY MR. PETROCELLI:

**EXHIBIT G**
**209**

ROUGH DRAFT

14:48:27  1       Q.   Is that how you first learned it or was it

14:48:29  2   mentioned by the Siegel family and then you went on

14:48:32  3   the Internet to follow up?  Do you remember what the

14:48:34  4   sequence?

14:48:35  5       A.   I first found out about it in my own

14:48:37  6   research.

14:48:37  7       Q.   Did you come across this document, Exhibit

14:48:39  8   9?

14:48:43  9       A.   No.

14:48:43 10       Q.   Have you ever seen it before today?

14:48:44 11       A.   No.

14:48:51 12       Q.   When you learned that the Siegels had

14:48:53 13   terminated in 1999 as a result of your research, did

14:48:55 14   you understand that they had terminated a copyright

14:48:59 15   grants with respect to both Superman and Superboy?

14:49:03 16       A.   Yes.

14:49:04 17       Q.   That was in the research that you found?

14:49:11 18       A.   I don't know if I had that level of

14:49:13 19   understanding until I consulted with Marc Toberoff.

14:49:15 20       Q.   Prior to consulting with Marc Toberoff, did

14:49:19 21   you have a view based on the research that you had

14:49:23 22   done or anything else about whether the Shuster

14:49:26 23   family had any rights to Superboy as opposed

14:49:29 24   Superman?

14:49:36 25       A.   I didn't consider Superboy.  I mainly

ROUGH DRAFT

14:49:38  1    focused on Superman.

14:49:40  2         Q.  Well, you were aware of Superboy, right?

14:49:40  3         A.  Yes.

14:49:43  4         Q.  Did you have a -- did you make a decision

14:49:48  5    not to -- to exclude Superboy from your

14:49:50  6    consideration?

14:49:53  7         A.  That was only after consulting with my

14:49:56  8    attorney.

14:49:56  9         Q.  Your attorney is Richard Toberoff.

14:49:57 10         Is that right?

14:49:58 11         MR. TOBEROFF:  Don't talk about the

14:49:59 12    substance of your consultation with your attorney

14:50:01 13    either directly or by implication.

14:50:01 14    BY MR. PETROCELLI:

14:50:07 15         Q.  Your attorney is Mr. Toberoff for the

14:50:07 16    record.

14:50:07 17         Is that right?

14:50:07 18         A.  Yes.

14:50:07 19         Q.  Again I'm referring to before --

14:50:10 20         A.  Oh,.

14:50:10 21         Q.  -- you ever spoke to Mr. Toberoff.  Are you

14:50:12 22    with me?

14:50:13 23         A.  Yes.

14:50:14 24         Q.  Okay.  When you were doing your research

14:50:16 25    about termination of copyright grants and reading

**EXHIBIT G**
**211**

ROUGH DRAFT

14:50:20  1    the Code, the 1998 change of law, and so forth, you

14:50:31  2    were not making a calculated effort to exclude

14:50:34  3    Superboy from your consideration, right?

14:50:39  4        A.   Specifically.

14:50:39  5        Q.   Not specifically.  And you had no view at

14:50:43  6    the time whether Joe Shuster did or did not have any

14:50:45  7    claim to Superboy, right?

14:50:47  8        A.   Right.

14:50:50  9        Q.   And that's a view that you've only come to

14:50:52  10   hold after you contacted Mr. Toberoff, correct?

14:50:55  11       A.   Yes.

14:50:55  12       Q.   Okay.

14:51:01  13       Q.   Now prior to contacting Mr. Toberoff did

14:51:06  14   you do any research regarding Joe Shuster's role

14:51:14  15   with respect to Superboy?

14:51:16  16       A.   I -- I had a cursory knowledge of his role.

14:51:23  17       Q.   Where did you get it from?

14:51:25  18       A.   Just my understanding of the history.

14:51:29  19       Q.   Where did you get it from?

14:51:32  20       A.   It would have been various sources.  Just

14:51:34  21   reading articles about their ideas for Superboy and

14:51:41  22   just the history of articles of different kinds.

14:51:47  23       Q.   Did you do any searches of the copyright

14:51:50  24   records?  Registrations, copyright registrations, to

14:51:56  25   see what kind of copyrights Joe Shuster had filed

161

**EXHIBIT G**
**212**

ROUGH DRAFT

14:52:03  1    over the years?

14:52:05  2        A.  No, not that.

14:52:11  3        Q.  Okay.  Did you -- did you review any of the

14:52:17  4    old comic books related to Superboy to see the buy

14:52:21  5    lines?

14:52:24  6        A.  I had seen reproductions.

14:52:27  7        Q.  And did you see Joe Shuster's name

14:52:28  8    attributed to Superboy together with Jerry Siegel's?

14:52:31  9        A.  Yes.

14:52:34 10        Q.  And did you ask your mother about what she

14:52:39 11    knew regarding Joe's contributions to the creation

14:52:43 12    of Superboy?

14:52:44 13        A.  Yes.

14:52:45 14        Q.  What did she tell you?

14:52:48 15        A.  Just that they -- it was one of the

14:52:52 16    derivative characters.

14:52:54 17        Q.  Derivative of what?

14:52:55 18        A.  Of Superman.

14:53:03 19        Q.  So when you were researching copyright

14:53:08 20    termination issues in 1998 and 1999 after the change

14:53:13 21    in law and after you heard about what the Siegel

14:53:15 22    family was doing, you were looking at it broadly,

14:53:23 23    right, Superman, Superboy, whatever Joe had an

14:53:25 24    interest in, you wanted to know, correct?

14:53:27 25        A.  Yes.

162

**EXHIBIT G**
**213**

ROUGH DRAFT

14:53:29  1         Q.  By the way, why didn't you contact the

14:53:32  2    Siegels' lawyer?

14:53:37  3         A.  We didn't discuss their filing at the time.

14:53:40  4    They didn't say anything about that to us.

14:53:42  5         Q.  But once you found out they had filed it,

14:53:45  6    as you did and as your mom wrote to DC, why didn't

14:53:51  7    you instead of doing all this research to find an

14:53:54  8    attorney, why didn't you just pick up the phone and

14:53:56  9    call Joanne, a woman that you said was like a

14:53:59 10    grandmother to you, and say hey, who is your

14:54:05 11    attorney?

14:54:06 12              MR. TOBEROFF:  Misstates his testimony.

14:54:11 13              THE WITNESS:  It -- I -- I came to

14:54:15 14    understand they weren't entirely happy with their

14:54:17 15    attorney.

14:54:17 16    BY MR. PETROCELLI:

14:54:20 17         Q.  When did you understand that?

14:54:22 18         A.  I don't know.  I just heard that they

14:54:24 19    weren't.

14:54:24 20         Q.  Who told you that?

14:54:26 21         A.  I don't remember.

14:54:27 22         Q.  Can't identify anybody who told you such a

14:54:30 23    thing?

14:54:30 24         A.  No.

14:54:33 25         Q.  Did you call and ask them and say, hey, I'm

                                                              163

**EXHIBIT G**
**214**

ROUGH DRAFT

14:54:37  1    looking for an attorney regarding the Joe Shuster

14:54:42  2    rights situation and how about your attorney?  Or I

14:54:49  3    heard that your attorney, you may not be happy with

14:54:52  4    your attorney.  Did you have those kinds of

14:54:55  5    discussions with him before contacting Mr. Toberoff?

14:55:00  6        A.  I did not discuss it with him, no.

14:55:05  7        Q.  Is it fair to say that you wanted your own

14:55:07  8    attorney, not the same attorney that the Siegel

14:55:10  9    family had?

14:55:13  10       A.  That's not quite right.

14:55:15  11       Q.  Is that part of it?

14:55:18  12       A.  No.  It's not.

14:55:19  13       Q.  You didn't have any concern whatsoever

14:55:21  14   about sharing the same lawyer that the Siegel family

14:55:24  15   had?

14:55:26  16       A.  That -- that was not the issue.

14:55:28  17       Q.  I didn't ask you if that was the issue.

14:55:31  18           MR. TOBEROFF:  Asked and answered twice.

14:55:31  19   BY MR. PETROCELLI:

14:55:32  20       Q.  I asked you whether you had any concern at

14:55:34  21   all about sharing the same attorney that they had

14:55:37  22   when you were looking for an attorney.

14:55:42  23       A.  I didn't think about that at the time.

14:55:45  24       Q.  Are you saying the thought never occurred

14:55:46  25   to you to calling the Siegels and ask them who their

                                                                    164

**EXHIBIT G**
**215**

ROUGH DRAFT

14:55:52  1    attorney was and at least have a conversation with

14:55:54  2    that person?

14:55:55  3        A.  Not after I found out they were unhappy

14:55:58  4    with their attorney.

14:55:58  5        Q.  What about before you found out they were

14:56:00  6    unhappy?

14:56:01  7        A.  Well, I don't know about that.  It's around

14:56:04  8    the time that I was looking into the rights issue

14:56:09  9    that I came to be aware that they were unhappy with

14:56:12 10    their attorney.

14:56:13 11        Q.  What year was that?

14:56:15 12        A.  I don't recall.

14:56:18 13        Q.  And yet you can't tell us how or who or

14:56:23 14    what you heard or anything about this notion that

14:56:26 15    they were unhappy with their attorney?

14:56:30 16        A.  Not really.  This conversations my mother

14:56:38 17    would have with Joanne could have been trauma it

14:56:44 18    could have been from something I -- I read.

14:56:46 19        Q.  Did you call them up and ask them if they

14:56:48 20    were unhappy with their attorney?

14:56:53 21        A.  No.

14:56:54 22            MR. TOBEROFF:  Asked and answered.

14:56:54 23    BY MR. PETROCELLI:

14:57:00 24        Q.  Do you know why they were unhappy with

14:57:03 25    their attorney?

165

**EXHIBIT G**
**216**

ROUGH DRAFT

14:57:03  1      A.  Not exactly.

14:57:08  2      Q.  What do you mean exactly"?  Do you know

14:57:09  3  anything about why they were unhappy with their

14:57:10  4  attorney that you learned prior to calling

14:57:18  5  Mr. Toberoff?  Not after?

14:57:20  6      A.  Oh, no, not -- not prior.  I don't know

14:57:23  7  exactly.

14:57:23  8      Q.  Okay.  Did you have any inkling that they

14:57:27  9  were unhappy with their attorney prior to your

14:57:30 10  calling Mr. Toberoff?

14:57:31 11      A.  Yes.

14:57:33 12      Q.  But you dont have any details?

14:57:34 13      A.  No.

14:57:36 14      Q.  And you never spoke to them about it?

14:57:37 15      A.  No.

14:57:44 16      Q.  We'll take a short break.

14:57:46 17          THE VIDEOGRAPHER:  Off the record.  The

14:57:47 18  time is 2:56.  There will mark end of Volume I, Tape

14:57:53 19  Number 2 in the deposition of Mark Warren Peary.  Of

15:04:15 20  of test tested test test test test test tested

15:08:49 21  test test test test of test test as you sit here

15:17:12 22  today.

15:17:12 23          THE VIDEOGRAPHER:  We're back on the

15:17:20 24  record.  This marks the beginning of Volume I, Tape

15:17:22 25  Number 3 in the deposition of Mark Warren Peary.

                                                    166

**EXHIBIT G**
**217**

ROUGH DRAFT

15:17:25  1     The time is 3:16.

15:17:25  2     BY MR. PETROCELLI:

15:17:30  3          Q.  Do you have any agreement to share in any

15:17:35  4     accounting recovery that the Siegels might obtain in

15:17:39  5     their case against DC or Warner Bros.?

15:17:48  6              MR. TOBEROFF:  I instruct you not to answer

15:17:50  7     that because it delves into the potential substance

15:17:56  8     of the consent agreements.

15:17:58  9              (Instruction not to answer.)

15:17:58 10              THE WITNESS:  I'll have to follow my

15:18:00 11     attorney's advice.

15:18:00 12     BY MR. PETROCELLI:

15:18:08 13          Q.  Putting aside the consent agreement, the

15:18:10 14     2008 consent agreement for the moment, have you

15:18:14 15     signed any agreement by which the Shuster interests

15:18:22 16     would share in any accounting recovery by the Siegel

15:18:28 17     parties?

15:18:31 18              MR. TOBEROFF:  Asked and answered.

15:18:32 19              You can answer.

15:18:34 20              THE WITNESS:  As I stated before, is

15:18:44 21     that --

15:18:45 22              MR. TOBEROFF:  You can answer the question.

15:18:45 23              THE WITNESS:  I can answer that?  Okay.

15:18:47 24              MR. TOBEROFF:  I'm just objecting for the

15:18:48 25     record that it's asked and answered.

167

**EXHIBIT G**
**218**

ROUGH DRAFT

15:18:50  1          THE WITNESS:  I understand?

15:18:51  2          MR. TOBEROFF:  But you can answer it again.

15:18:53  3          THE WITNESS:  No.

15:18:53  4     BY MR. PETROCELLI:

15:18:54  5          Q.  As part of the 2008 consent agreement, is

15:18:57  6     there a provision by which the Shusters share in any

15:19:00  7     accounting recoveries that the Siegels might obtain?

15:19:05  8          MR. TOBEROFF:  I instruct you not to answer

15:19:06  9     as to the contents of the consent agreement.

15:19:09 10          (Instruction not to answer.)

15:19:09 11     BY MR. PETROCELLI:

15:19:15 12          Q.  When you -- when you were doing the

15:19:19 13     research on Mr. Toberoff, did you come to learn that

15:19:29 14     in addition to being an experienced entertainment

15:19:32 15     attorney, that he was also a producer of literary

15:19:39 16     properties, including motion pictures and other

15:19:43 17     popular titles?

15:19:45 18          A.  Yes.

15:19:49 19          Q.  And how did you come to learn that?

15:19:54 20          A.  In our discussions.

15:19:57 21          Q.  With Mr. Toberoff?

15:19:58 22          A.  Yes.

15:20:10 23          Q.  Did you also see descriptions of

15:20:17 24     Mr. Toberoff's business activities outside of his

15:20:21 25     law practice on the Internet when you were doing

                                                        168

**EXHIBIT G**
**219**

ROUGH DRAFT

15:20:23  1    your research?

15:20:27  2         A.   No.

15:20:28  3         Q.   References to him as an entrepreneur and

15:20:32  4    producer?

15:20:33  5         A.   No, I don't recall that.

15:20:34  6         Q.   You didn't check his Web site?

15:20:40  7         A.   Not initially, no.

15:20:41  8         Q.   At some point did you?

15:20:42  9         A.   I don't recall.  I don't remember checking

15:20:47  10   his Web site.

15:20:50  11        Q.   Did you speak to anybody about Mr. Toberoff

15:20:54  12   before signing the document after having called him

15:20:57  13   and spoken to him, did you call around for

15:21:00  14   references?

15:21:01  15        MR. TOBEROFF:  Asked and answered.

15:21:02  16        You can answer.

15:21:03  17        THE WITNESS:  I -- I don't remember doing

15:21:14  18   that.

15:21:14  19   BY MR. PETROCELLI:

15:21:20  20        Q.   Did you speak to anybody else at his office

15:21:22  21   or at any of his companies?

15:21:24  22        MR. TOBEROFF:  At any time?

15:21:25  23        MR. PETROCELLI:  Prior to signing.

15:21:28  24        THE WITNESS:  Not about any issues.

15:21:28  25   BY MR. PETROCELLI:

169

**EXHIBIT G**
**220**

ROUGH DRAFT

15:21:32  1        Q.  About what?

15:21:35  2        A.  Did I speak to anyone who -- maybe they

15:21:37  3    answered the phone.  So, no.

15:21:46  4        Q.  If you -- if you said you didn't do any

15:21:48  5    research -- did you do any research at all on any of

15:21:52  6    his companies like Pacific Pictures Corporation?

15:21:54  7        A.  No.

15:21:59  8        Q.  But yet you signed a contract with Pacific

15:22:03  9    Pictures Corporation?

15:22:03 10        A.  That was a -- a legal.

15:22:07 11            MR. TOBEROFF:  Just answer the question.

15:22:09 12            THE WITNESS:  Okay.  Yes.

15:22:09 13    BY MR. PETROCELLI:

15:22:11 14        Q.  Did you do any research on what was Pacific

15:22:16 15    Pictures corporation before you signed a contract

15:22:17 16    with it?

15:22:17 17        A.  No.

15:22:22 18        Q.  Did you think Pacific Pictures Corporation

15:22:23 19    was the name of a law firm?

15:22:28 20        A.  I didn't -- I didn't think about it.

15:22:31 21        Q.  In fact, the documents that you signed

15:22:33 22    specifically state that Pacific Pictures is not a

15:22:36 23    law firm, right?

15:22:42 24        A.  I -- I -- yes, I guess that's correct.

15:22:44 25        Q.  So why did you enter into a contract with a

                                                                    170

**EXHIBIT G**
**221**

ROUGH DRAFT

15:22:47  1    company that was not a law firm?

15:22:52  2         A.  That's how we retained our attorney.

15:22:55  3         Q.  Why -- why did you retain your attorney by

15:22:58  4    entering into a contract with a company that was in

15:23:01  5    the motion or in the entertainment production

15:23:03  6    business called Pacific Pictures?

15:23:07  7              MR. TOBEROFF:  Assumes facts not in

15:23:09  8    evidence.

15:23:13  9              THE WITNESS:  I don't know why he used that

15:23:14  10   format exactly.

15:23:14  11   BY MR. PETROCELLI:

15:23:16  12        Q.  Well, why were you comfortable with it?

15:23:23  13        A.  It established our legal relationship with

15:23:25  14   one another.

15:23:27  15        Q.  Why didn't you assign a simple

15:23:31  16   attorney-client legal agreement that doesn't involve

15:23:35  17   a motion -- an entertainment company called Pacific

15:23:39  18   Pictures?

15:23:40  19             MR. TOBEROFF:  Assumes facts not in

15:23:41  20   evidence.

15:23:43  21             THE WITNESS:  I don't know.

15:23:43  22   BY MR. PETROCELLI:

15:23:45  23        Q.  Did you get any advice on it from anyone

15:23:49  24   other than Mr. Toberoff?

15:23:51  25             MR. TOBEROFF:  Assumes facts not in

                                                            171

**EXHIBIT G**
**222**

ROUGH DRAFT

15:23:51  1    evidence.

15:23:54  2              THE WITNESS:  No.

15:23:54  3    BY MR. PETROCELLI:

15:23:58  4        Q.  Why did you enter into a joint venture with

15:24:03  5    Pacific Pictures?

15:24:08  6        A.  I -- I don't know why he used that

15:24:10  7    particular form.

15:24:12  8        Q.  Why are you saying -- why are you answering

15:24:14  9    my questions by telling me what Mr. Toberoff did?

15:24:17 10    You're a person, you're making decisions.  You

15:24:21 11    understood that this was an important matter, right?

15:24:21 12        A.  Yes.

15:24:24 13        Q.  You -- you had your mother's interest at

15:24:28 14    heart, right?

15:24:32 15              MR. TOBEROFF: .

15:24:32 16    BY MR. PETROCELLI:

15:24:32 17        Q.  She was the sole beneficiary of the

15:24:34 18    termination interest that you were seeking to

15:24:36 19    pursue, correct?

15:24:38 20        A.

15:24:38 21              MR. TOBEROFF:  Assumes facts.  Lacks

15:24:38 22    foundation.

15:24:38 23    BY MR. PETROCELLI:

15:24:42 24        Q.  Am I correct, sir, that your mother, not

15:24:44 25    you, and not your sister, was the sole beneficiary

172

**EXHIBIT G**
**223**

ROUGH DRAFT

15:24:47  1    of any termination interest that the estate could --

15:24:51  2    could obtain, correct?

15:24:53  3         MR. TOBEROFF:  Assumes facts lacks

15:24:57  4    foundation.  Calls for a legal conclusion.

15:24:58  5         THE WITNESS:  I guess it's a legal

15:25:02  6    conclusion.  I don't know if I'm going to answer it,

15:25:06  7    if I'm qualified to answer.

15:25:06  8    BY MR. PETROCELLI:

15:25:09  9         Q.  I'm not asking you about legal conclusions.

15:25:11 10    I'm asking you, you signed agreements, you're acting

15:25:15 11    as an executor, you have legal duties to the Court,

15:25:18 12    you have legal duties to the beneficiary and you

15:25:22 13    can't hide behind the privilege on all these

15:25:26 14    questions.  I've been very careful in how I'm asking

15:25:28 15    these questions?

15:25:31 16         MR. TOBEROFF:  Objection.

15:25:31 17    BY MR. PETROCELLI:

15:25:32 18         Q.  So let me try this again?

15:25:34 19         MR. TOBEROFF:  Argumentative.

15:25:36 20         MR. PETROCELLI:  Well, he's parroting your

15:25:38 21    objections.  And I've been tolerant of it but I

15:25:42 22    don't want this to get carried away with that.

15:25:48 23         MR. TOBEROFF:  Argumentative.  Don't focus.

15:25:48 24         MR. PETROCELLI:  Let's try it again.

15:25:52 25         MR. TOBEROFF:  On the argument just focus

                                                            173

**EXHIBIT G**
**224**

ROUGH DRAFT

15:25:53  1    on his questions.  Every piece and every part of his

15:25:56  2    question, and answer it to the best of your ability.

15:25:56  3    BY MR. PETROCELLI:

15:26:04  4        Q.  Exactly.

15:26:04  5            You understood that when you were pursuing

15:26:08  6    this termination interest, your research, you're

15:26:10  7    looking out to hire a lawyer, your wanting to see if

15:26:14  8    your family had rights, your concern about the 1992

15:26:18  9    agreement, all of the things that we've been

15:26:21 10    discussing, you were pursuing this for the benefit

15:26:25 11    of your mother who was the sole beneficiary under

15:26:29 12    Joe Shuster's will, correct?

15:26:32 13            MR. TOBEROFF:  Assumes facts.  Lacks

15:26:36 14    foundation.

15:26:36 15            THE WITNESS:  Yes.

15:26:36 16    BY MR. PETROCELLI:

15:26:37 17        Q.  Okay.  You're not a personal beneficiary,

15:26:37 18    right?

15:26:46 19        A.  I am a per.

15:26:48 20        Q.  But your mother could change her will,

15:26:51 21    correct?  You don't have a legal right to this money

15:26:53 22    that the estate may recover, correct?

15:26:55 23            MR. TOBEROFF:  Talking about him

15:26:57 24    personally?

15:26:57 25            MR. PETROCELLI:  Correct.

                                                              174

**EXHIBIT G**
**225**

ROUGH DRAFT

15:26:57 1           THE WITNESS:  Yes.

15:26:57 2   BY MR. PETROCELLI:

15:26:58 3       Q.  Your mother could decide to give it all to

15:27:00 4   charity, right?

15:27:00 5       A.  Yes.

15:27:01 6       Q.  Okay.  Now, you understand that you have

15:27:05 7   fiduciary duty to your mother as the person who took

15:27:13 8   up this cause to pursue this termination interest,

15:27:13 9   right?

15:27:17 10          MR. TOBEROFF:  Calls for a legal

15:27:18 11  conclusion.  Could you answer to the sentence you

15:27:21 12  have knowledge.

15:27:21 13  BY MR. PETROCELLI:

15:27:21 14      Q.  I didn't ask you if you had a fiduciary

15:27:24 15  duty, I asked you did you understand that you had a

15:27:26 16  fiduciary duty?

15:27:27 17      A.  Yes.

15:27:28 18      Q.  Okay.  And then you also agree to serve as

15:27:33 19  the executor of your mother's estate in lieu of your

15:27:36 20  mother, right?

15:27:37 21          MR. TOBEROFF:  Assumes facts.  Lacks

15:27:40 22  foundation.  You can answer.

15:27:41 23          THE WITNESS:  Yes.

15:27:41 24  BY MR. PETROCELLI:

15:27:42 25      Q.  In 2003, your mother was competent.  She

                                                                175

**EXHIBIT G**
**226**

ROUGH DRAFT

15:27:45  1      had the ability to serve as an executor, correct?

15:27:45  2          A.  Yes.

15:27:54  3          Q.  Yet you were the executor, not her,

15:27:58  4      correct?

15:27:58  5          A.  Yes.

15:27:59  6          Q.  And you filed papers with the Court which

15:28:01  7      we'll -- we'll talk about, but?

15:28:04  8          A.  Yes.

15:28:05  9          Q.  Agreeing to be the executor, right?

15:28:07 10          A.  Yes.

15:28:09 11          Q.  Now, what -- what did you do -- withdrawn.

15:28:20 12              Why did you agree in lieu of entering into

15:28:26 13      a traditional lawyer client agreement to hire the

15:28:30 14      services of a lawyer, whether it's on a contingent

15:28:33 15      fee or an hourly fee, why did you agree to enter

15:28:37 16      into a joint venture with Pacific Pictures, a

15:28:45 17      company that is not a law firm?

15:28:50 18              MR. TOBEROFF:  You can't -- unless you can

15:28:56 19      answer that question independent of your discussions

15:28:58 20      with me, I instruct you not to answer.

15:29:02 21              THE WITNESS:  Okay.  I'll have to follow

15:29:07 22      your advice.

15:29:10 23              (Instruction not to answer.)

15:29:10 24      BY MR. PETROCELLI:

15:29:10 25          Q.  But you understood that Mr. Toberoff not

176

**EXHIBIT G**
**227**

ROUGH DRAFT

15:29:13  1    only acted as a lawyer in some of your dealings with

15:29:16  2    him, but he also acted as the president of a company

15:29:19  3    with whom you entered interest a joint venture,

15:29:21  4    correct?

15:29:21  5        A.  Yes.

15:29:24  6        Q.  And that company was called Pacific

15:29:26  7    Pictures, correct?

15:29:26  8        A.  Yes.

15:29:30  9        Q.  And that company is not a law firm,

15:29:30 10    correct?

15:29:35 11        A.  Not the company.

15:29:36 12        Q.  Right.  And did you do any background on

15:29:41 13    what Pacific Pictures was, what it did in -- in

15:29:46 14    its -- in its business?

15:29:48 15            MR. TOBEROFF:  Asked and answered.

15:29:48 16    BY MR. PETROCELLI:

15:29:49 17        Q.  What assets it owned?

15:29:51 18        A.  My.

15:29:52 19            MR. TOBEROFF:  Asked and answered.  You can

15:29:54 20    answer.

15:29:54 21            THE WITNESS:  It's already -- my purpose in

15:30:00 22    contacting him was to retain legal counsel.

15:30:00 23            MR. PETROCELLI:

15:30:00 24        Q.  I didn't ask you about your purpose in

15:30:09 25    contacting him.  I'm not trying to be difficult but

**EXHIBIT G**
**228**

ROUGH DRAFT

15:30:09  1    can you repeat my question?

15:30:09  2                    (The reporter read the record

15:30:09  3            as follows:

15:30:21  4                    "^ QUESTION ^ ANSWER ").

15:30:21  5            THE WITNESS:  Not really, no.

15:30:21  6    BY MR. PETROCELLI:

15:30:25  7        Q.  Did you think it was a typical to enter

15:30:28  8    into a joint venture agreement with an entertainment

15:30:35  9    company instead of a standard lawyer-client

15:30:38  10   engagement letter if you're trying to secure the

15:30:42  11   services of a lawyer?

15:30:43  12           MR. TOBEROFF:  Assumes facts.

15:30:43  13   BY MR. PETROCELLI:

15:30:44  14       Q.  Did that strike you as standard or did that

15:30:46  15   strike you as somewhat unusual?

15:30:49  16       A.  I'm not familiar enough to -- for -- to

15:30:54  17   have struck me as being outline or untoward or

15:30:59  18   anything.

15:31:00  19       Q.  Well, have you ever entered into a joint

15:31:02  20   venture with anyone before?

15:31:03  21       A.  No.

15:31:10  22       Q.  This is the first joint venture you ever

15:31:13  23   entered into?

15:31:13  24       A.  Yes.

15:31:15  25       Q.  Did you -- were you concerned that by

178

**EXHIBIT G**
**229**

ROUGH DRAFT

15:31:25  1    entering into a joint venture for the purpose of

15:31:31  2    pursuing Joe Shuster's termination interests, if

15:31:36  3    any, that you were violating the law?

15:31:38  4        A.  No.

15:31:42  5        Q.  Did you receive any advice on that subject?

15:31:44  6        A.  No.

15:31:48  7        Q.  Are you aware that in the lawsuit that DC

15:31:51  8    has filed, it claims that your agreements with

15:31:55  9    Pacific Pictures did in fact violate the law?

15:32:01 10        A.  I may have scanned it.

15:32:07 11        Q.  Why did you just scan it?  You seem very

15:32:11 12    adept at reading code provisions that you find on

15:32:14 13    your own, the copyright code, the amendments in 1998

15:32:24 14    and yet you just scanned a lawsuit against you?

15:32:27 15        A.  Yes.

15:32:28 16        Q.  And against your mother relating to the

15:32:32 17    matters as to which you are executor?  And you

15:32:36 18    didn't read it carefully?  Not once?

15:32:42 19        A.  I -- I scanned it because I -- I find

15:32:47 20    the -- the claims to be unfounded and -- and it

15:32:52 21    ticks me off that they're filing the claim and I am

15:32:55 22    referring all of the detailed analysis to my

15:32:59 23    attorney because it angers me to read -- read these

15:33:04 24    claims.

15:33:05 25        Q.  Well, how could it anger you to read the

                                                                    179

**EXHIBIT G**
**230**

ROUGH DRAFT

15:33:11  1    how could it anger you unless you first understood

15:33:13  2    what the claims were which you would need to read

15:33:17  3    the complaint rather than just scan it in order to

15:33:19  4    understand?  How would you be angry about it?

15:33:22  5         A.  I understood the gist of the claims and I

15:33:27  6    find -- find them to be reprehensible that they

15:33:34  7    would sue us for trying to give us something that

15:33:37  8    the law grants to us.

15:33:39  9         Q.  Okay.  And you had that view on your own

15:33:41 10    before talking to Mr. Toberoff.

15:33:41 11              Is that right?

15:33:41 12         A.  Yes.

15:33:45 13         Q.  That's based on your scanning but not

15:33:47 14    reading carefully the complaint, right?

15:33:51 15         A.  I got the gist of it.

15:33:52 16         Q.  And -- and you did not read it word for

15:33:55 17    word.

15:33:55 18              Is that correct?

15:34:02 19         A.  I got the gist of it perhaps not word for

15:34:04 20    word.

15:34:07 21         Q.  You did not read it word for word.

15:34:08 22              Is that correct?

15:34:09 23         A.  I'd say so.

15:34:14 24         Q.  Is that the first time that a lawsuit's

15:34:16 25    been filed against you?

                                                              180

ROUGH DRAFT

15:34:17  1        A.  Yes.

15:34:18  2        Q.  First time to your knowledge, a lawsuit has

15:34:19  3   been filed against your mother?

15:34:23  4        A.  Yes.

15:34:24  5        Q.  And you didn't bother to read the complaint

15:34:26  6   word for word?

15:34:27  7            MR. TOBEROFF:  He's answered that question

15:34:28  8   three times.  You don't have to answer that question

15:34:30  9   again.

15:34:30 10            THE WITNESS:  I already answered.

15:34:30 11   BY MR. PETROCELLI:

15:34:32 12        Q.  What's the answer?

15:34:33 13        A.  What I said before.

15:34:33 14        Q.  Which is what?

15:34:38 15        A.  That I read the gist of it then discussed

15:34:40 16   it with my attorney.

15:34:41 17        Q.  After you read the gist of it, you said you

15:34:46 18   got angry.

15:34:46 19            Is that right?

15:34:46 20        A.  Yes.

15:34:49 21        Q.  And why did you get angry?

15:34:55 22            MR. TOBEROFF:  He already answered that

15:34:57 23   question on his own.

15:35:00 24            But you can answer it again.

15:35:02 25            THE WITNESS:  Because DC is fighting us on

181

**EXHIBIT G**
**232**

ROUGH DRAFT

15:35:09  1    grants and rights that are granted to us by law

15:35:13  2    instead of cooperating.

15:35:13  3    BY MR. PETROCELLI:

15:35:21  4        Q.  How do you know that DC's claims are

15:35:24  5    unfounded?

15:35:27  6        A.  That's my impression from my reading and my

15:35:31  7    discussions.

15:35:32  8        Q.  Well, before talking to -- to Mr. Toberoff

15:35:34  9    based on your reading of the claims, why would you

15:35:39 10    have concluded that they're unfounded?

15:35:43 11        A.  They're trying to deny our termination

15:35:46 12    rights.  Is that pisses me off.

15:35:52 13        Q.  Are you -- but at the time that you -- but

15:35:58 14    you, yourself, didn't know about the 1992 agreement

15:36:01 15    at the time you began to undertake this research and

15:36:05 16    as you've already testified, you, yourself, were

15:36:08 17    concerned when you saw the agreement for the first

15:36:10 18    time.  And it was only after you retained

15:36:16 19    Mr. Toberoff that you formed the view that the

15:36:21 20    agreement posed no threat, correct?

15:36:24 21        A.  I was unsure what the agreement meant.

15:36:28 22        Q.  Now, could you not appreciate that DC

15:36:31 23    Comics, given even your apparent concern on reading

15:36:34 24    the agreement, might have a different view and that

15:36:37 25    that could be a matter on which reasonable minds

182

**EXHIBIT G**
**233**

ROUGH DRAFT

15:36:40  1    could differ?

15:36:48  2        A.  What I know is that Jean and Frank had no

15:36:51  3    termination rights so it's irrelevant to this case.

15:36:55  4        Q.  How do you know that?

15:36:56  5        A.  I know that from my research and my

15:36:58  6    discussions with my attorney.

15:37:02  7        Q.  Can you appreciate that there -- well, if

15:37:04  8    they didn't have any rights, why did they agree in

15:37:12  9    writing in order to get money in order to get more

15:37:14 10    money for your family that they wouldn't assert any

15:37:19 11    such rights even if they were hereafter created?

15:37:22 12        A.  I don't know.

15:37:23 13            MR. TOBEROFF:  Misstates their letters.

15:37:26 14            MR. PETROCELLI:  Not really.

15:37:28 15            MR. TOBEROFF:  Yes, it does.

15:37:28 16    BY MR. PETROCELLI:

15:37:30 17        Q.  Well can you appreciate that -- that that's

15:37:36 18    an issue that should be resolved by the Courts?

15:37:40 19    That's a serious issue?  When you read the complaint

15:37:45 20    did that occur to you?

15:37:48 21        A.  If it has to be resolved by the courts it

15:37:50 22    will be.

15:37:51 23        Q.  And you've seen letters today that you've

15:37:53 24    never seen before, even though your attorney has a

15:37:59 25    advised you, as you've said, letters that which your

**EXHIBIT G**
**234**

ROUGH DRAFT

15:38:02  1    mother said she had no intention to pursue

15:38:03  2    termination rights, even after knowing about the

15:38:06  3    change of the law, even after knowing about the

15:38:08  4    Siegel family?

15:38:09  5        A.  She wrote letters to everyone frequently I

15:38:14  6    didn't know anything about.  She was always writing

15:38:16  7    and chatting and I was unaware of all this back and

15:38:21  8    forth chitchatting and letters that she was writing

15:38:24  9    off.

15:38:24 10        Q.  So you're belittling your mother?

15:38:26 11        A.  No, I'm not belittling my mother.

15:38:28 12        Q.  In 1999 writing letters?

15:38:30 13        A.  I'm not belittling her.

15:38:31 14        Q.  That -- well, sounds like you're saying

15:38:34 15    that her letters have no real meaning or consequence

15:38:37 16    and that you would have known better.  Is that a

15:38:39 17    what you're suggesting?

15:38:40 18        A.  No, no.

15:38:40 19            MR. TOBEROFF:  It.

15:38:40 20    BY MR. PETROCELLI:

15:38:42 21        Q.  Okay?

15:38:42 22            MR. TOBEROFF:  Just focus on the questions.

15:38:42 23    BY MR. PETROCELLI:

15:38:48 24        Q.  So what you're suggesting by your answer

15:38:50 25    about your mother just chitchatting is that those

                                                              184

**EXHIBIT G**
**235**

ROUGH DRAFT

15:38:52  1    letters have no real significance.

15:38:52  2            Is that right?

15:38:59  3        A.  I don't know.  She wrote letters to lots of

15:39:03  4    people I didn't know about.

15:39:05  5        Q.  You don't think your mother was capable of

15:39:07  6    expressing how she really felt about things?

15:39:10  7            MR. TOBEROFF:  Vague and ambiguous.

15:39:10  8    BY MR. PETROCELLI:

15:39:14  9        Q.  Is that what you're suggesting?

15:39:15  10       A.  No.  I don't know how to answer that.

15:39:18  11       Q.  In 1999 did your mother understand how to

15:39:21  12   express her feelings about things?

15:39:23  13       A.  Yes.

15:39:24  14       Q.  And in 1992 did she understand that?

15:39:25  15       A.  Yes.

15:39:45  16       Q.  Let me show you -- by the way, after you

15:39:48  17   hired Mr. Toberoff, have you had occasion to do any

15:39:50  18   research on all the entertainment companies with

15:39:54  19   which he is associated?

15:39:59  20           MR. TOBEROFF:  Assumes facts.  Vague and

15:40:00  21   ambiguous.

15:40:00  22   BY MR. PETROCELLI:

15:40:00  23       Q.  Such as intellectual properties worldwide,

15:40:04  24   such as IPW?

15:40:06  25       A.  I'm aware of those.

185

**EXHIBIT G**
**236**

ROUGH DRAFT

15:40:07  1        Q.  And have you researched those companies to

15:40:10  2    see what kind of business Mr. Toberoff conducts and

15:40:17  3    through those companies?

15:40:18  4            MR. TOBEROFF:  Assumes facts.

15:40:21  5            THE WITNESS:  Minimally.

15:40:21  6    BY MR. PETROCELLI:

15:40:28  7        Q.  Did you know about those other companies

15:40:30  8    when you entered into the first agreement with

15:40:33  9    Pacific Pictures?

15:40:38 10            MR. TOBEROFF:  Assumes facts.

15:40:39 11            THE WITNESS:  I don't remember about those

15:40:41 12    other companies specifically.

15:40:41 13    BY MR. PETROCELLI:

15:40:45 14        Q.  Do you believe that when you are having a

15:40:47 15    conversation with Mr. Toberoff in his role as

15:40:51 16    president of Pacific Pictures, that every one of

15:40:53 17    your conversations is a -- is an attorney client

15:40:56 18    privileged conversations?

15:40:58 19            MR. TOBEROFF:  Assumes facts.  Ask --

15:41:01 20    really asks for a legal conclusion.

15:41:02 21            MR. PETROCELLI:  No, I didn't.  I didn't

15:41:04 22    ask him what the law was I asked for his state of

15:41:07 23    mind.

15:41:07 24            MR. TOBEROFF:  His state of mind as to what

15:41:09 25    the law is.

186

**EXHIBIT G**
**237**

ROUGH DRAFT

15:41:09  1          MR. PETROCELLI:  Correct.

15:41:11  2          MR. TOBEROFF:  Okay.

15:41:11  3          MR. PETROCELLI:  That's correct.

15:41:11  4          MR. TOBEROFF:  I don't accept that carve

15:41:13  5   out.

15:41:16  6          You can answer the question.

15:41:16  7          THE WITNESS:  Okay.  At the time it was

15:41:20  8   Pacific Pictures.  All my dealings were with Marc

15:41:23  9   Toberoff as my attorney.

15:41:23 10   BY MR. PETROCELLI:

15:41:28 11      Q.  You never once communicated with the

15:41:30 12   president of Pacific Pictures, the company with whom

15:41:32 13   you entered interest a joint venture agreement?

15:41:34 14      A.  No.

15:41:36 15      Q.  Do you even know who the president is?

15:41:37 16      A.  I -- not really.  It never came up.

15:41:43 17      Q.  Did you see it in the document you signed

15:41:45 18   who the president was?

15:41:46 19      A.  No.

15:41:47 20      Q.  You didn't read the document that you

15:41:48 21   signed?

15:41:49 22      A.  Yes.

15:41:51 23      Q.  And the document said that Marc Toberoff

15:41:53 24   was the president of Pacific Pictures right?

15:41:57 25          MR. TOBEROFF:  Only answer to the extent

                                                        187

**EXHIBIT G**
**238**

ROUGH DRAFT

15:41:59  1    have you a recollection of that.  Otherwise he can

15:42:01  2    show you the document.

15:42:02  3            THE WITNESS:  Okay.  I don't recall.  I'd

15:42:03  4    have to see the document.

15:42:04  5            MR. PETROCELLI:  I'll slow it to you.  Next

15:42:06  6    document is Exhibit 10.

15:42:07  7                (The document referred to was

15:42:07  8                marked for identification by the

15:42:07  9                C.S.R. as Exhibit 10 and attached

15:42:24 10                to this deposition.)

15:42:24 11    BY MR. PETROCELLI:

15:42:25 12        Q.  I notice you're looking right to the end

15:42:28 13    where I wanted to direct you and you see it says

15:42:30 14    Marc Toberoff, president of Pacific Pictures

15:42:32 15    cooperation correct?

15:42:34 16        A.  Yes.

15:42:34 17            MR. TOBEROFF:  He actually was not for the

15:42:36 18    record looking right to the end he was looking in

15:42:38 19    the middle.

15:42:38 20    BY MR. PETROCELLI:

15:42:40 21        Q.  Signature page.  Do you see any signature

15:42:46 22    on this document that says Marc Toberoff, attorney?

15:42:50 23        A.  No.

15:42:55 24        Q.  Okay.  And this is in fact -- and for the

15:43:00 25    record, I will describe it as a document

188

**EXHIBIT G**
**239**

ROUGH DRAFT

15:43:02  1    entitled "Joint venture agreement as of November 23,

15:43:08  2    2001 by and between Pacific Pictures Corporation and

15:43:11  3    Jean Peavy and her son Mark Warren Peavy formerly

15:43:17  4    known as -- Mark Warren Peary formerly known as Mark

15:43:22  5    Warren Peavy signed by you correct on November 28,

15:43:27  6    2001?

15:43:27  7        A.  Yes.

15:43:27  8        Q.  And by your mother Jean?

15:43:29  9        A.  Yes.

15:43:30 10        Q.  On the same day?

15:43:33 11        A.  Yes.

15:43:33 12        Q.  And you -- and then you see that

15:43:37 13    Mr. Toberoff signed it as president of Pacific

15:43:40 14    Pictures on November 28, 2001, correct?

15:43:40 15        A.  Yes.

15:43:48 16        Q.  And this was the only agreement that you

15:43:51 17    signed in 2001 with Mr. Toberoff, right?

15:43:51 18        A.  Yes.

15:43:58 19        Q.  And you didn't sign any agreements with him

15:44:00 20    in 2002, correct?

15:44:03 21        A.  Not to my recollection.

15:44:04 22        Q.  And you signed another agreement with him

15:44:06 23    in 2003 also as president of Pacific Pictures,

15:44:06 24    correct?

15:44:06 25        A.  Yes.

189

**EXHIBIT G**
**240**

ROUGH DRAFT

15:44:16  1        Q.  And the first time you signed if he

15:44:17  2   agreement with him where he signed as a lawyer was

15:44:21  3   in 2004, correct?

15:44:21  4        A.  Yes.

15:44:24  5        Q.  That's what you've been calling the legal

15:44:25  6   retainer agreement, right?

15:44:25  7        A.  Yes.

15:44:28  8        Q.  Okay.  Now, you certainly understood this

15:44:37  9   agreement -- withdrawn you did read this agreement

15:44:40 10   word for word before you signed it, correct?

15:44:40 11        A.  Yes.

15:44:43 12        Q.  You didn't just scan it, right?

15:44:43 13        A.  Yes.

15:44:45 14        Q.  You understood that signing this was a

15:44:48 15   matter of extreme importance, correct?

15:44:50 16             MR. TOBEROFF:  Hold on.  I needs you're

15:44:51 17   answering his questions too quickly without me being

15:44:54 18   able to interject an objection okay?  You got to

15:44:57 19   pause after he asks his question so that I can

15:44:59 20   object.  He is saying correct you're saying yes

15:45:02 21   immediately and I can't object in between.

15:45:13 22             Do you understand?  Just slow is it down so

15:45:14 23   I can object.

15:45:14 24                  (The reporter read the record

15:45:14 25                  as follows:

                                                              190

ROUGH DRAFT

15:45:23  1                    "^ QUESTION ^ ANSWER ").

15:45:23  2              THE WITNESS:

15:45:27  3              MR. TOBEROFF :  You can answer.

15:45:28  4              THE WITNESS:  Yes.

15:45:28  5   BY MR. PETROCELLI:

15:45:32  6         Q.  Did you go over this carefully with your

15:45:34  7   mother before you and she signed?

15:45:39  8         A.  I went over it with her.

15:45:47  9         Q.  Now, when you signed this, did you

15:45:50 10   understood that you were expecting to at some point

15:46:00 11   serve a notice of termination with respect to the

15:46:03 12   Shuster interest.

15:46:03 13              Is that right?

15:46:03 14         A.  Yes.

15:46:07 15         Q.  Did you have an understanding when you

15:46:09 16   signed Exhibit 10 when you would serve that notice?

15:46:12 17         A.  Yes.

15:46:16 18         Q.  When?

15:46:20 19              MR. TOBEROFF:  You can -- you CAN'T --

15:46:23 20   since you've testified that you viewed me as your

15:46:26 21   attorney and you're seeking legal advice from me,

15:46:30 22   any -- you can't answer that question because that

15:46:32 23   question would be based on your discussions with me

15:46:34 24   acting as your counsel with respect to the

15:46:36 25   termination notices.  So I instruct you not to

                                                              191

**EXHIBIT G**
**242**

ROUGH DRAFT

15:46:44  1   answer.

15:46:44  2        MR. PETROCELLI:  You know we're not going

15:46:45  3   to solve the problem today of course but we dispute

15:46:48  4   that you can cover every single conversation you had

15:46:51  5   with him based on the attorney-client privilege in

15:46:55  6   the face of these documents and other facts.

15:46:58  7        (Instruction not to answer.)

15:46:58  8        MR. PETROCELLI:  Do the best I can.

15:47:09  9        Q.  Based on the research that you had done

15:47:10 10   before contacting Mr. Toberoff, did you have an

15:47:14 11   understanding as to when the earliest you could

15:47:18 12   serve a notice of termination was?

15:47:23 13        MR. TOBEROFF:  Separate from your

15:47:23 14   conversations with me.

15:47:24 15        THE WITNESS:  Well.

15:47:25 16        MR. PETROCELLI:  Well, it has to be

15:47:26 17   separate because I said before.

15:47:28 18        THE WITNESS:  Okay.  I don't believe I

15:47:32 19   understood that level of detail at that time.

15:47:32 20   BY MR. PETROCELLI:

15:47:43 21        Q.  Now you said that there were drafts of this

15:47:45 22   that went back and forth.  What changes did you make

15:47:48 23   prior to agreeing to this Exhibit 10?

15:48:05 24        A.  I believe I had some issues with if

15:48:12 25   something had happened to Marc Toberoff bodily harm

                                                          192

ROUGH DRAFT

15:48:16  1    or something of that nature.

15:48:23  2         Q.  You asked him to address that?

15:48:24  3         A.  Yes.  I don't recall what else there was

15:48:32  4    discussions.

15:48:33  5         Q.  Did you -- did you have any discussions as

15:48:35  6    to why you were entering into a joint venture

15:48:41  7    agreement rather than a regular attorney-client

15:48:43  8    agreement?  And why he wasn't signing as Marc

15:48:48  9    Toberoff the lawyer?  Any discussions on that

15:48:50 10    subject?

15:48:54 11         A.  Yes.  It was -- it was clear to me that he.

15:48:59 12              MR. TOBEROFF:  Just -- just answer his --

15:49:01 13    he asked you whether you had any discussions with

15:49:04 14    me.

15:49:04 15              THE WITNESS:  Yes.

15:49:04 16              MR. TOBEROFF:  And you're launching --

15:49:06 17              MR. PETROCELLI:  I didn't actually ask with

15:49:08 18    you, I said any discussions.

15:49:10 19              MR. TOBEROFF:  And you are launching --

15:49:10 20              MR. PETROCELLI:  He said yes.

15:49:12 21              MR. TOBEROFF:  He just wanted to know if

15:49:14 22    you had any discussions --

15:49:15 23              THE WITNESS:  Yes.

15:49:15 24    BY MR. PETROCELLI:

15:49:15 25         Q.  With whom?

**EXHIBIT G**
**244**

ROUGH DRAFT

15:49:16  1          MR. TOBEROFF:  Excuse me.  When he asks you

15:49:17  2    a question, I know it's difficult, try and answer

15:49:19  3    the question.  Don't launch into a narrative.

15:49:19  4    BY MR. PETROCELLI:

15:49:21  5          Q.  With whom?

15:49:22  6          A.  With Marc Toberoff.

15:49:27  7          Q.  What did he say and what did you say on

15:49:30  8    that subject?

15:49:30  9          A.  Can I answer?

15:49:41 10          MR. TOBEROFF:  You can -- what's the

15:49:42 11    question again?  Can you read it back to me or can

15:49:44 12    you repeat it to me.

15:49:46 13          MR. PETROCELLI:  Yeah.

15:49:47 14          Q.  What did you and he discuss on this subject

15:49:49 15    as to why you were entering into a joint venture

15:49:52 16    agreement rather than a normal attorney-client

15:49:54 17    agreement?

15:49:54 18          A.  Can I --

15:50:00 19          MR. TOBEROFF:  You can't answer that

15:50:01 20    question.

15:50:02 21          THE WITNESS:  Okay.

15:50:02 22          MR. TOBEROFF:  You cannot answer that

15:50:03 23    question.

15:50:03 24          THE WITNESS:  Okay.  Okay.

15:50:05 25          (Instruction not to answer.)

**EXHIBIT G**
**245**

ROUGH DRAFT

15:50:06  1          MR. PETROCELLI:

15:50:07  2          MR. TOBEROFF:  I'm instructing him not to

15:50:09  3  answer that question.

15:50:09  4          MR. PETROCELLI:  Attorney-client privilege,

15:50:09  5  right.

15:50:11  6          MR. TOBEROFF:  Yes.

15:50:12  7          THE WITNESS:  Okay.

15:50:12  8  BY MR. PETROCELLI:

15:50:15  9      Q.  Did you discuss with your mother why she

15:50:18 10  and you were forming a joint venture with a company

15:50:23 11  called pacific pictures corporation?

15:50:27 12      A.  No.

15:50:28 13      Q.  Have you ever heard of Pacific Pictures

15:50:30 14  Corporation before?

15:50:30 15      A.  No.

15:50:31 16      Q.  Were you aware of anything that it had

15:50:33 17  done?

15:50:33 18      A.  It had -- we had discussed -- discussed it.

15:50:42 19  I can't recall the details now.

15:50:44 20      Q.  Did you inquire whether Pacific Pictures

15:50:47 21  Corporation had -- had owned any other termination

15:50:53 22  interests?  Or this was the first one?

15:51:00 23          MR. TOBEROFF:  Lacks foundation.

15:51:05 24          THE WITNESS:  No, I don't know about that.

15:51:05 25  BY MR. PETROCELLI:

195

**EXHIBIT G**
**246**

ROUGH DRAFT

15:51:15  1        Q.  Did you have any discussion about giving

15:51:21  2     away 50 percent of your rights to a joint venture?

15:51:26  3        A.  Yes.

15:51:29  4        Q.  With whom?

15:51:29  5        A.  Marc Toberoff.

15:51:31  6        Q.  What did you and he discuss on that

15:51:34  7     subject?

15:51:40  8             MR. TOBEROFF:  I instruct you not to answer

15:51:41  9     as to the substance of our discussions.

15:51:44 10             (Instruction not to answer.)

15:51:44 11     BY MR. PETROCELLI:

15:51:47 12        Q.  Did you discuss that with your mother?

15:51:49 13        A.  Not -- not details, no.

15:51:58 14        Q.  Why didn't you go over this in detail with

15:52:00 15     your mother, explain exactly what was happening?

15:52:05 16     You were creating a joint venture, you're giving up

15:52:08 17     50 percent of the rights?

15:52:09 18        A.  She -- she read it.

15:52:13 19        Q.  So -- and you assumed that by her reading

15:52:16 20     it that she knew exactly what she was doing?

15:52:18 21        A.  Yes.

15:52:27 22        Q.  Just like she knew exactly what she was

15:52:29 23     doing when she signed the 92 agreement, right?

15:52:35 24        A.  I don't know.

15:52:36 25        Q.  Unsure?

                                                        196

**EXHIBIT G**
**247**

ROUGH DRAFT

15:52:37  1        A.  Unsure, yeah.

15:52:39  2        Q.  But not this one ten years later.

15:52:48  3            Was there any negotiation over the 50

15:52:52  4    percent?  Did you say 50 percent?  You got to be

15:52:54  5    kidding me?  How about 5 percent?  Or 10 percent?

15:53:01  6    You know was there any conversation about that?

15:53:06  7            MR. TOBEROFF:  You can answer at that.

15:53:06  8    BY MR. PETROCELLI:

15:53:07  9        Q.  You said there were drafts that went back

15:53:09 10    and forth?

15:53:09 11        A.  Yes, there were conversations.

15:53:10 12        Q.  What were they?  Relate them to me.

15:53:17 13            THE WITNESS:  Can I answer.

15:53:18 14            MR. TOBEROFF:  You can answer as to whether

15:53:19 15    there were negotiations regarding the 50 percent.

15:53:24 16    But not as to -- not -- just whether we had the

15:53:28 17    conversation.  Actually you already answered that.

15:53:30 18            THE WITNESS:  Yeah.

15:53:31 19            MR. TOBEROFF:  But you can't answer the

15:53:33 20    substance of our conversations.

15:53:35 21            THE WITNESS:  We had discussed the split.

15:53:35 22    BY MR. PETROCELLI:

15:53:42 23        Q.  Did you seek a lower split?  Lower for

15:53:47 24    the -- for Pacific Pictures?

15:53:51 25        A.  I -- I had asked about the split and we

                                                    197

**EXHIBIT G**
**248**

ROUGH DRAFT

15:53:55  1    discussed it back and forth and what would be

15:53:59  2    involved on Marc Toberoff's part, the work involved,

15:54:04  3    the cost he would bear.

15:54:08  4         Q.  Did you suggest a different number?

15:54:10  5         A.  I don't remember if I did.  We arrived at

15:54:24  6    a -- a mutual agreement after talking about it.

15:54:31  7         Q.  Did you check around on whether 50 percent

15:54:37  8    was appropriate for this joint venture?

15:54:40  9         A.  Check around?

15:54:46 10         Q.  Research.

15:54:48 11         MR. TOBEROFF:  Vague.

15:54:55 12         THE WITNESS:  I don't remember if I did or

15:54:56 13    not.

15:54:56 14    BY MR. PETROCELLI:

15:55:04 15         Q.  Once you signed Exhibit 10, you were

15:55:07 16    satisfied that you understood all of its terms and

15:55:10 17    provisions?

15:55:13 18         A.  Yes.

15:55:15 19         Q.  Okay.  And you understood that it included

15:55:18 20    in addition to Superman elements, Superboy as well,

15:55:24 21    including smallville, right?

15:55:27 22         A.  I saw that, yes.

15:55:34 23         Q.  And you didn't make any effort to exclude

15:55:36 24    Superboy or smallville from this agreement Exhibit

15:55:38 25    10, correct?

198

**EXHIBIT G**
**249**

ROUGH DRAFT

15:55:40  1        A.  No.

15:55:40  2        Q.  In fact, it's specifically included,

15:55:43  3    correct?

15:55:43  4        A.  Yes.  Can I finish answering that?

15:55:55  5        Q.  Sure?

15:55:56  6            MR. TOBEROFF:  No.

15:55:56  7            THE WITNESS:  No?  Okay.

15:55:57  8            MR. TOBEROFF:  Wait for the --

15:55:58  9            THE WITNESS:  Okay.

15:55:59 10            MR. TOBEROFF:  Just answer the question.

15:56:00 11            THE WITNESS:  Okay.  I didn't know if I

15:56:03 12    answered it.

15:56:03 13    BY MR. PETROCELLI:

15:56:10 14        Q.  Now, you -- can you turn to paragraph 8.

15:56:18 15    Starting with the second sentence it says:

15:56:21 16                "Upon the expiration of the

15:56:22 17            term and the winding up of the

15:56:24 18            venture or in the event of

15:56:26 19            termination of the venture for any

15:56:28 20            reason, all rights, property or

15:56:31 21            assets of the venture will be held

15:56:34 22            50 percent by the claimants and 50

15:56:37 23            percent by PPC as tenants in

15:56:41 24            common."

15:56:42 25            Do you see that?

199

**EXHIBIT G**
**250**

ROUGH DRAFT

15:56:42  1        A.  Yes.

15:56:43  2        Q.  It goes on to continue from there.

15:56:45  3            Now you understood when you signed this

15:56:47  4    that rights is a defined word.  Do you see it has

15:56:52  5    capital R?

15:56:52  6        A.  Yes.

15:56:53  7        Q.  And it's defined in the first paragraph as

15:56:57  8    all of the Joe Shusters and his estate's rights,

15:57:02  9    claims, copyrights, property, title and interests

15:57:07 10    into Joe Shuster's creations?

15:57:08 11        A.  Yes.

15:57:09 12        Q.  Okay?  And you understood that once you

15:57:15 13    signed this document, those rights became the

15:57:18 14    property of the venture called the Joe Shuster

15:57:22 15    venture, correct?

15:57:30 16        A.  My understanding is that it's a -- a -- an

15:57:36 17    interest -- an interest in proceeds coming from the

15:57:40 18    rights.

15:57:44 19        Q.  It says all rights properties or assets of

15:57:47 20    the venture.

15:57:49 21            Do you see that? Paragraph 8?

15:57:49 22        A.  Yes.

15:57:52 23        Q.  Will be in the event of a termination for

15:57:54 24    any reason will be held 50 percent by the claimants,

15:57:58 25    that's and you your mother, right?

                                                           200

**EXHIBIT G**
**251**

ROUGH DRAFT

15:57:59  1        A.  Yes.

15:58:00  2        Q.  And then 50 percent by Pacific Pictures

15:58:04  3   Corporation, correct?

15:58:04  4        A.  Yes.

15:58:07  5        Q.  So, you understood that even if this

15:58:13  6   venture was terminated for any reason, you would own

15:58:17  7   50 percent of the rights with your mother but PPC

15:58:21  8   would own the other 50 percent as a tenant in

15:58:24  9   common, correct?

15:58:27 10        A.  Well --

15:58:27 11        Q.  Not in the proceeds, but in the actual

15:58:29 12   rights?

15:58:29 13        A.  My -- my understanding is you can't

15:58:31 14   transfer something you have rights in.

15:58:34 15        Q.  And that's something that you learned after

15:58:37 16   you signed this agreement, correct?

15:58:41 17        A.  Well I believe I had some awareness of that

15:58:44 18   before I signed it.

15:58:45 19        Q.  You learned that after you signed this

15:58:47 20   agreement when you tried to fix the problem by

15:58:51 21   entering into the legal agreement in 2004 which you

15:58:55 22   then backdated back to 2001, correct?

15:59:02 23        MR. TOBEROFF:  Also let me just interject.

15:59:03 24   I don't want you answering questions that are based

15:59:07 25   on any legal understanding that you've received or

**EXHIBIT G**
**252**

ROUGH DRAFT

15:59:11  1    knowledge or -- he is asking you information that

15:59:16  2    you just know all on your own.  I know it's hard to

15:59:17  3    distinguish between the two but -- but I'm going to

15:59:22  4    ask you to try and do that and not answer questions

15:59:24  5    based on conversations with attorneys.

15:59:28  6         THE WITNESS:  Okay.

15:59:28  7    BY MR. PETROCELLI:

15:59:47  8         Q.  Can you look at paragraph 2?  It says in

15:59:54  9    the middle, "In consideration for PPC" -- that's

15:59:57 10    Pacific Pictures Corporation's -- "contributions to

16:00:00 11    the venture," and you see venture is capital V,

16:00:00 12    right?

16:00:07 13         A.  Which line are you on?  Oh, yes, okay.

16:00:09 14         Q.  And that's the venture between Pacific

16:00:12 15    Pictures and you and your mother, correct?

16:00:12 16         A.  Yes.

16:00:15 17         Q.  Okay.  It says:

16:00:16 18              "In consideration for PPC's

16:00:18 19              contributions to the venture in the

16:00:19 20              mutual covenants contained here in,

16:00:22 21              claimants hereby transfer and

16:00:24 22              assign to the venture share rights,

16:00:27 23              titles and title and interests in

16:00:30 24              the rights."

16:00:31 25         Do you see that?

                                                          202

**EXHIBIT G**
**253**

ROUGH DRAFT

16:00:31  1      A.  Yes.

16:00:32  2      Q.  So you understood when you signed this that

16:00:36  3   all of the Joe Shuster rights, termination rights to

16:00:40  4   the extent they existed were being transferred and

16:00:44  5   assigned to the venture just as it says, correct?

16:00:44  6      A.  Yes.

16:00:50  7      Q.  Now, are you saying you signed this

16:00:52  8   believing it was invalid because you can't make such

16:00:56  9   an assignment or transfer of the rights?  Or are you

16:00:59 10   telling me?

16:00:59 11      A.  No.

16:01:00 12      Q.  Now that it's something you learned

16:01:01 13   afterwards?

16:01:04 14      A.  I learned it afterwards.

16:01:07 15      Q.  Okay.  Let's continue.  How did you learn

16:01:11 16   it by the way?

16:01:15 17      A.  Discussions with my attorney.

16:01:17 18      Q.  Who is that?

16:01:20 19          MR. TOBEROFF:  I'll let you answer without

16:01:22 20   waiver.

16:01:22 21          MR. PETROCELLI:  I just need to know who

16:01:23 22   the attorney is.  I'd rather have you say

16:01:26 23   Mr. Toberoff.

16:01:26 24          THE WITNESS:  Mr. Toberoff?

16:01:28 25          MR. TOBEROFF:  But I'm saying lime's

                                                              203

**EXHIBIT G**
**254**

ROUGH DRAFT

16:01:29  1     letting him answer that question without waiver of

16:01:31  2     the privilege.

16:01:31  3     BY MR. PETROCELLI:

16:01:32  4         Q.  The reason I ask you that question is

16:01:34  5     because you may be referring to some other attorney

16:01:35  6     and I just have to have the record be clear?

16:01:39  7         A.  Okay.

16:01:39  8         Q.  So what did you learn from Mr. Toberoff

16:01:44  9     that was different from what you signed in 2001?

16:01:49 10         MR. TOBEROFF:  I'm instructing you not to

16:01:52 11     answer.  I've already let -- let -- give the gist of

16:01:56 12     it, and I'm sure Mr. Petrocelli could figure out the

16:01:58 13     rest on his own.

16:02:00 14         THE WITNESS:  Okay.

16:02:01 15         (Instruction not to answer.)

16:02:01 16     BY MR. PETROCELLI:

16:02:03 17         Q.  Did you ask Mr. Toberoff -- well, when you

16:02:09 18     signed this document you thought that Mr. Toberoff

16:02:10 19     was an expert in these issues right, termination

16:02:14 20     issues?

16:02:15 21         A.  Yes.

16:02:16 22         Q.  So when you later found out that you had

16:02:19 23     signed something that was not valid, did you ask him

16:02:25 24     why did you have us sign this document?  You were

16:02:28 25     the expert.  Did you get into that kind of

                                                                    204

**EXHIBIT G**
**255**

ROUGH DRAFT

16:02:32  1    discussion with him?

16:02:39  2         MR. TOBEROFF:  Don't -- don't -- I instruct

16:02:42  3    you not to give testimony as to what discussions you

16:02:45  4    got into or got -- didn't get into with me.

16:02:45  5    BY MR. PETROCELLI:

16:02:50  6      Q.  Did you talk to him on that subject?

16:02:52  7         MR. TOBEROFF:  I instruct you not to

16:02:54  8    answer.

16:02:54  9         (Instruction not to answer.)

16:02:57 10         MR. TOBEROFF:  The question is

16:02:59 11    rhetorical -- the question is rhetorical anyway.

16:02:59 12    BY MR. PETROCELLI:

16:03:03 13      Q.  I want to go back to where I was before

16:03:05 14    then paragraph 8 and when you signed this you

16:03:07 15    understood that in the event that this venture was

16:03:09 16    terminated for any reason, that PPC would own 50

16:03:14 17    percent of the rights as a tenant in common with

16:03:17 18    Jean and you, correct?

16:03:17 19      A.  Yes.

16:03:31 20      Q.  Okay.  Also by the way, in paragraph 10

16:03:35 21    there's a reference to approving Mr. Michael Cataron

16:03:39 22    to become the administrator of Joe Shuster's estate

16:03:43 23    once it's established.

16:03:44 24         Do you see that?

16:03:44 25      A.  Yes.

205

**EXHIBIT G**
**256**

ROUGH DRAFT

16:03:45  1        Q.  Whose idea was that?

16:03:51  2        A.  I'm not sure.

16:03:52  3        Q.  Why was he selected?  He is a guy -- you

16:03:55  4   don't even know what city he lives in?

16:03:57  5        A.  Well  --

16:03:59  6        Q.  Why is he in here as -- as the executor of

16:04:02  7   Joe Shuster's estate?

16:04:08  8        A.  I don't recall why we had -- had him listed

16:04:11  9   at that time.

16:04:12 10        Q.  But your mother's -- but Joe's will said it

16:04:15 11   was to be your mother or if she's unable or

16:04:17 12   unwilling to serve, then you?

16:04:18 13        A.  Uh-huh.

16:04:19 14        Q.  It said nothing about Mr. Cataron?

16:04:21 15        A.  Uh-huh.

16:04:22 16        Q.  So why -- why did you agree to that?

16:04:27 17        A.  I don't know.

16:04:30 18        Q.  You don't know?

16:04:31 19        A.  I don't know.  I don't recall why we did.

16:04:35 20        Q.  Did Michael Cataron ever meet Joe Shuster?

16:04:37 21        A.  Yes.

16:04:40 22        Q.  Did they -- how well did they know each

16:04:43 23   other?

16:04:43 24        A.  Pretty well.

16:04:45 25        Q.  Do you have his contact information Michael

                                                              206

ROUGH DRAFT

16:04:47  1    Cataron?

16:04:49  2         A.  Yeah.

16:04:50  3         Q.  What is his phone number?

16:04:51  4         A.  Not with me.

16:04:54  5         Q.  And you don't know his address, right?

16:04:56  6         A.  Not on the top of my head.

16:04:59  7         Q.  Do you know his e-mail address?

16:05:00  8         A.  Not on the top of my head.

16:05:08  9         Q.  Now, go to paragraph 7.  It states:

16:05:11  10                "The venture and/or the estate

16:05:12  11            of Joe Shuster (to be established

16:05:15  12            here under) will retain Marc

16:05:20  13            Toberoff esquire to render legal

16:05:23  14            services in connection with the

16:05:25  15            rights in the venture, including in

16:05:30  16            connection with all legal disputes,

16:05:32  17            litigation, arbitration and/or

16:05:34  18            mediation regarding the rights, et

16:05:37  19            cetera."

16:05:40  20            Now, paragraph 7 says that the venture or

16:05:47  21    Mr. Shuster's estate will retain Mr. Toberoff.

16:05:47  22            Do you see that?

16:05:47  23         A.  Yes.

16:05:54  24         Q.  This -- Mr. Toberoff was not retained as a

16:05:57  25    lawyer in this document, though, right?

                                                              207

**EXHIBIT G**
**258**

ROUGH DRAFT

16:06:01  1          MR. TOBEROFF:  Calls for a legal

16:06:01  2    conclusion.

16:06:01  3    BY MR. PETROCELLI:

16:06:03  4          Q.  Do you see a signature line for Marc

16:06:04  5    Toberoff esquire agreeing to render services?

16:06:09  6          MR. TOBEROFF:  Asked and answered.

16:06:13  7          You can answer.

16:06:13  8          THE WITNESS:  It's already been answered.

16:06:16  9          MR. TOBEROFF:  You can answer.

16:06:17 10          THE WITNESS: .

16:06:17 11    BY MR. PETROCELLI:

16:06:20 12          Q.  When you signed this document, you

16:06:23 13    understood that you would have to sign another

16:06:26 14    document or the venture would, to retain

16:06:28 15    Mr. Toberoff, correct?

16:06:35 16          MR. TOBEROFF:  Assumes facts.

16:06:36 17          THE WITNESS:  My understanding this was

16:06:37 18    document retained Marc Toberoff as our tone.

16:06:37 19    BY MR. PETROCELLI:

16:06:40 20          Q.  Where does it say that?

16:06:44 21          A.  Paragraph 7.

16:06:44 22          Q.  Where is the signature of Mr. Toberoff?

16:06:49 23          A.  Signature page.

16:06:50 24          Q.  It says president, right?  Pacific Pictures

16:06:54 25    Corporation.  Where is there a signature line for

208

**EXHIBIT G**
**259**

ROUGH DRAFT

16:06:56  1    Marc Toberoff esquire?

16:06:57  2          A.  He's also esquire.

16:07:03  3          Q.  But he signed the document only in his

16:07:04  4    capacity as the president of this company that was

16:07:08  5    doing a joint venture with you.  Did you -- did you

16:07:13  6    question why he is not signing on as a lawyer to

16:07:16  7    render the services contemplated by paragraph 7?

16:07:21  8    Did you have that discussion with him?

16:07:24  9          MR. TOBEROFF:  You can answer.  He's asking

16:07:27  10   whether you had a discussion, he just summarized

16:07:33  11   with me.

16:07:34  12         THE WITNESS:  Yes.

16:07:34  13         MR. TOBEROFF:  Do you understand the

16:07:35  14   question?  Do you want to repeat the question.

16:07:35  15             (The reporter read the record

16:07:35  16         as follows:

16:07:58  17             "^ QUESTION ^ ANSWER ").

16:07:58  18         MR. TOBEROFF:  Yes or no.

16:07:59  19         THE WITNESS:  I -- I don't recall if I

16:08:02  20   specifically asked him why he didn't sign, how

16:08:08  21   you're saying.

16:08:08  22   BY MR. PETROCELLI:

16:08:14  23         Q.  Did you express concern about entering into

16:08:17  24   a joint venture agreement that if it were ever

16:08:19  25   terminated for any reason Pacific Pictures would own

                                                              209

**EXHIBIT G**
**260**

ROUGH DRAFT

16:08:23  1    half the rights forever?

16:08:25  2          A.  Yes.

16:08:32  3          Q.  Who did you express that to?

16:08:35  4          A.  I expressed it to Marc Toberoff.

16:08:37  5          Q.  Did you explain that consequence to your

16:08:39  6    mother?

16:08:44  7          A.  I don't I don't know if I got into that

16:08:50  8    with her or not.  I don't remember.

16:08:51  9          Q.  Do you think that was important for her to

16:08:54 10    understand?

16:08:54 11          A.  Yes.

16:09:01 12          Q.  Why did you agree to that?

16:09:07 13          A.  Why?

16:09:08 14          Q.  Yes.  Why didn't you insist on a provision

16:09:10 15    that said in the event that the agreement is

16:09:12 16    terminated for any reason, that the rights revert

16:09:15 17    back to the Shusters, 100 percent of that?

16:09:22 18              MR. TOBEROFF:  Answer to the extent that

16:09:23 19    you have a recollection of why.

16:09:26 20              THE WITNESS:  Yeah, okay.

16:09:32 21              THE WITNESS:  My -- my recollection of why

16:09:33 22    is that -- that he was going to see this case

16:09:37 23    through no matter what and I thought that he would

16:09:42 24    and I had thought that there would be no reason it

16:09:48 25    would be canceled or terminated until the rights had

210

**EXHIBIT G**
**261**

ROUGH DRAFT

16:09:52  1    been pursued.  He had every -- every economic motive

16:09:58  2    to pursue it to the full evident extent.

16:09:58  3    BY MR. PETROCELLI:

16:10:05  4        Q.  But if he quit two years later or you fired

16:10:08  5    him or canceled this agreement, he owned half the

16:10:11  6    rights.  That didn't bother you?

16:10:15  7            MR. TOBEROFF:  Not according to you.

16:10:18  8            THE WITNESS:  No.

16:10:18  9    BY MR. PETROCELLI:

16:10:21 10        Q.  Okay.  Take a look at paragraph 7.  It

16:11:14 11    states there that the venture will retain Toberoff

16:11:18 12    to render legal services including in connection

16:11:21 13    with legal disputes and litigation.

16:11:23 14            Do you see that?

16:11:23 15        A.  Yes.

16:11:26 16        Q.  Legal disputes and litigation with whom?

16:11:31 17            MR. TOBEROFF:  I instruct you not to

16:11:32 18    answer.  This obviously deals with discussions with

16:11:39 19    counsel regarding potential litigation.

16:11:40 20            (Instruction not to answer.)

16:11:40 21    BY MR. PETROCELLI:

16:11:42 22        Q.  Well, it's fair to say that you understood

16:11:44 23    when you signed this that there was a prospect of

16:11:50 24    litigation with DC Comics or some Time-Warner

16:11:53 25    company, correct?

                                                            211

**EXHIBIT G**
**262**

ROUGH DRAFT

16:11:54  1          MR. TOBEROFF:  Instruct you not to answer.

16:11:56  2    It implicates attorney-client communications.

16:11:58  3          (Instruction not to answer.)

16:11:58  4    BY MR. PETROCELLI:

16:11:59  5      Q.  You didn't -- you didn't need a lawyer to

16:12:01  6    tell you that, right?

16:12:02  7          MR. TOBEROFF:  Instruct you not to answer.

16:12:02  8          MR. PETROCELLI:  Why?

16:12:04  9          MR. TOBEROFF:  It implicates

16:12:05 10    attorney-client communications.

16:12:07 11          (Instruction not to answer.)

16:12:07 12          MR. PETROCELLI:  That doesn't cover any

16:12:08 13    privilege.  That's just un- -- unreasonable.

16:12:12 14          MR. TOBEROFF:  How he is assessing the

16:12:13 15    potential for litigation --

16:12:15 16          MR. PETROCELLI:  I didn't ask how he is

16:12:16 17    assessing.  Merely the fact.

16:12:18 18          MR. TOBEROFF:  Whether there is a potential

16:12:20 19    for litigation.

16:12:20 20    BY MR. PETROCELLI:

16:12:21 21      Q.  You understood -- you understood that when

16:12:26 22    you signed this there was some appreciation that you

16:12:31 23    would be in litigation?

16:12:32 24          MR. TOBEROFF:  Instruction.  Same

16:12:33 25    instruction.

                                                          212

**EXHIBIT G**
**263**

ROUGH DRAFT

16:12:34  1          (Instruction not to answer.)

16:12:34  2     BY MR. PETROCELLI:

16:12:58  3          Q.  So you shouldn't have been surprised when

16:12:59  4     you read the lawsuit that DC filed since you

16:13:05  5     contemplated litigation as early as 2001, correct?

16:13:08  6          MR. TOBEROFF:  I instruct you not to answer

16:13:10  7     as to your reactions in the midst of a litigation

16:13:15  8     because it implicates attorney-client

16:13:18  9     communications.

16:13:19 10          (Instruction not to answer.)

16:13:19 11          THE WITNESS:  I'll have to follow

16:13:21 12     Mr. Toberoff's advice.

16:13:21 13     BY MR. PETROCELLI:

16:13:22 14          Q.  When you saw the lawsuit from DC Comics

16:13:25 15     challenging the termination, that's something that

16:13:27 16     you understood could happen as early as 2001 when

16:13:31 17     you signed this joint venture agreement, correct?

16:13:34 18          MR. TOBEROFF:  Same instruction.

16:13:35 19          (Instruction not to answer.)

16:13:36 20          MR. PETROCELLI:  Again, I don't think these

16:13:39 21     questions are -- these instructions are proper.

16:13:42 22          MR. TOBEROFF:  I'm not going allow him to

16:13:44 23     answer how is he assessing potential litigation

16:13:49 24     after he has retained me.

16:13:49 25          MR. PETROCELLI:  It's just going to have to

                                                              213

**EXHIBIT G**
**264**

ROUGH DRAFT

16:13:52  1    get sorted out in court.

16:13:55  2        Q.  Go to paragraph 4.  It says:

16:13:59  3            "The terms of any and all

16:14:00  4            agreements regarding any of the

16:14:02  5            rights and any respects shall be

16:14:04  6            subject to the express written

16:14:06  7            approval of claimants and PPC.  The

16:14:10  8            parties each warrants and represent

16:14:11  9            that after signing this agreement

16:14:13 10            they will not without the expressed

16:14:15 11            written consent of all the parties

16:14:16 12            transfer limit or encumber the

16:14:18 13            rights in any respect."

16:14:20 14            When you signed this, you understood that

16:14:24 15    you could not enter into any agreement with DC

16:14:30 16    Comics or any affiliate of DC Comics without the

16:14:35 17    expressed written consent of Pacific Pictures,

16:14:35 18    correct.

16:14:35 19        A.  Yes.

16:14:40 20        Q.  And in your mind who is Pacific Pictures?

16:14:45 21        A.  Marc Toberoff.

16:14:50 22        Q.  And so you understood that you -- you, and

16:14:54 23    your family could not enter into a contract with DC

16:14:58 24    Comics no matter how badly you wanted unless Marc

16:15:03 25    Toberoff consented, correct?

                                                      214

**EXHIBIT G**
**265**

ROUGH DRAFT

16:15:03  1      A.  Yes.

16:15:09  2      Q.  Did you think that that was an appropriate

16:15:17  3  power for a lawyer to have over a client?

16:15:24  4      A.  I thought it was in his best interest to --

16:15:35  5      Q.  That's not what I asked you?

16:15:36  6          MR. TOBEROFF:  He's trying to answer your

16:15:37  7  question.

16:15:37  8          MR. PETROCELLI:  Yes.

16:15:38  9      Q.  Did you think -- did you think that it was

16:15:44 10  proper for lawyers to impose that -- to have such

16:15:52 11  a -- an agreement with a client that the client

16:15:54 12  can't settle without the lawyer's consent no matter

16:15:58 13  how much the client wants to settle?

16:16:04 14      A.  At the time I didn't consider it

16:16:05 15  unreasonable.

16:16:08 16      Q.  Did you think it was appropriate?  Did you

16:16:11 17  have any knowledge on that subject whether the

16:16:13 18  lawyers are even permitted under the law to have

16:16:17 19  such arrangements?

16:16:21 20      A.  No, I -- I was not aware.

16:16:22 21      Q.  Did you do any research on that subject?

16:16:27 22      A.  Not specifically this, no.

16:16:30 23      Q.  Were you aware that it's not lawful for a

16:16:33 24  lawyer to have such a -- an agreement with a client?

16:16:39 25      A.  Not at the time.

**EXHIBIT G**
**266**

ROUGH DRAFT

16:16:40  1      Q.  Have you since become aware of that?

16:16:42  2      A.  Yes.

16:16:46  3      Q.  When?

16:16:55  4      A.  Sometime 2003.

16:16:57  5      Q.  How?

16:17:01  6      A.  Discussions with Marc Toberoff.

16:17:11  7      Q.  What led -- what prompted those

16:17:13  8  discussions?

16:17:13  9      A.  We -- we both realized that this format was

16:17:20 10  not -- not the best approach to take.

16:17:25 11      Q.  Why was it not the best approach?

16:17:30 12      A.  We decided a legal retainer, a standard

16:17:33 13  legal retainer was a preferred association.

16:17:36 14      Q.  You said in 2001 when you signed this,

16:17:42 15  you -- you were not even able to appreciate the

16:17:44 16  difference between a standard legal retainer and a

16:17:46 17  joint venture agreement.  Do you recall giving that

16:17:49 18  testimony?  You said you were not even in a position

16:17:54 19  to note that there was anything unusual about it.

16:17:57 20  Do you recall giving me that answer?

16:17:58 21          MR. TOBEROFF:  I believe that misstates his

16:17:59 22  testimony.

16:17:59 23          MR. PETROCELLI:  I don't think so.

16:18:01 24          THE WITNESS:  What -- what did I say?

16:18:01 25  BY MR. PETROCELLI:

                                                        216

ROUGH DRAFT

16:18:02  1          Q.  So you were aware in 2001 when you signed

16:18:04  2     the agreement that you were agreeing to a -- an

16:18:08  3     arrangement that was different from the standard

16:18:11  4     lawyer client agreement in setting up a joint

16:18:15  5     venture with Pacific Pictures?

16:18:16  6              MR. TOBEROFF:  Misstates his testimony.

16:18:16  7     BY MR. PETROCELLI:

16:18:18  8          Q.  I'm asking you now.

16:18:20  9          A.  What did I say before?

16:18:22 10          Q.  Let's not get hung occupy what you said

16:18:25 11     before.  It's a new question?

16:18:26 12          A.  Okay.

16:18:26 13          Q.  Okay?  Can you read it back please?

16:18:26 14              (The reporter read the record

16:18:26 15          as follows:

16:18:43 16              "^ QUESTION ^ ANSWER ").

16:18:43 17              THE WITNESS:  Was I aware that it was

16:18:45 18     different than the standard legal retain center.

16:18:45 19     BY MR. PETROCELLI:

16:18:48 20          Q.  In 2001 when you signed Exhibit 10?

16:18:50 21          A.  2001.

16:18:51 22          Q.  Were -- were -- were you --

16:18:53 23          A.  I was.

16:18:53 24          Q.  Aware that you were signing a contract that

16:18:58 25     was different from the standard lawyer client

                                                              217

**EXHIBIT G**
**268**

ROUGH DRAFT

16:19:01  1    agreement?

16:19:03  2         A.  I was not keenly aware of that.

16:19:06  3         Q.  But you became keenly aware of it in 2003,

16:19:06  4    correct?

16:19:10  5         A.  Sometime in there.

16:19:12  6         Q.  Okay.  You said that you and Mr. Toberoff

16:19:14  7    decided that this approach was not the best approach

16:19:19  8    and you should revert to a lawyer -- a standard

16:19:22  9    lawyer client agreement, right?

16:19:24  10        A.  Yes.

16:19:25  11        Q.  Okay.  What prompted that?

16:19:32  12        A.  I -- I don't remember.  We just discussed

16:19:36  13   things over time.

16:19:40  14        Q.  You said you learned that the -- it was not

16:19:46  15   lawful for a lawyer to be able to withhold his

16:19:49  16   consent to a client settlement.

16:19:53  17        A.  I did -- at the time I didn't know that --

16:19:56  18   that was the case.

16:19:56  19        Q.  But you knew that in 03, right?

16:19:59  20        A.  Whenever -- whenever we started discussing

16:20:02  21   changing the form, then at some point after that we

16:20:09  22   agree we needed to change it, I became aware of

16:20:11  23   that.

16:20:14  24        Q.  Was it -- did he just call you up one day

16:20:16  25   and say we have to make a change?  What brought the

218

**EXHIBIT G**
**269**

ROUGH DRAFT

16:20:19  1    change about?

16:20:20  2        A.  I don't remember.

16:20:30  3        Q.  Did you get any legal advice from someone

16:20:32  4    other than Mr. Toberoff when he told you that a

16:20:37  5    change was required?

16:20:38  6        A.  No.

16:20:43  7        Q.  Did it cause you any concern after you

16:20:45  8    learned that you had signed an agreement that had

16:20:47  9    legal problems associated with it?

16:20:51 10        A.  No, because we were replacing it with a

16:20:54 11    better one.

16:20:57 12        Q.  How do you know it was been?  You thought

16:21:02 13    the first one was good?

16:21:03 14        A.  Well, maybe I got smarter.

16:21:07 15        Q.  In other words, you -- you believed what

16:21:09 16    Mr. Toberoff told you, correct?

16:21:09 17        A.  Yes.

16:21:13 18        Q.  Okay.  But you believed him in 2001 when

16:21:15 19    you signed the invalid agreement, right?

16:21:20 20        A.

16:21:20 21            MR. TOBEROFF:  Assumes facts.

16:21:22 22            THE WITNESS:  I'm not aware it was invalid.

16:21:22 23    BY MR. PETROCELLI:

16:21:31 24        Q.  Do you -- when you -- you ultimately signed

16:21:34 25    a document -- well, I'll get to that.

                                                            219

**EXHIBIT G**
**270**

ROUGH DRAFT

16:21:47  1          Did you come to learn that there were --

16:21:52  2     the agreement that you signed with Mr. Toberoff this

16:21:55  3     joint venture agreement in 2001 and again, in 03 did

16:22:03  4     violate the copyright laws, correct?

16:22:07  5          MR. TOBEROFF:  Mischaracterizes.  Strike

16:22:07  6     that.

16:22:12  7          You can answer.

16:22:13  8          THE WITNESS:  I didn't know that

16:22:17  9     specifically.  That it violated copyright laws.  But

16:22:22  10    it wasn't the best structure.

16:22:22  11    BY MR. PETROCELLI:

16:22:25  12         Q.  Okay.  Tell me how it wasn't the best

16:22:27  13    structure?

16:22:28  14         A.  We needed to have a standard legal

16:22:30  15    retainer.

16:22:31  16         Q.  Why?

16:22:32  17         A.  Because that was the best structure.

16:22:33  18         Q.  Why?  Why was it the best?  In what way was

16:22:39  19    it better?

16:22:39  20         MR. TOBEROFF:  The whys get into his

16:22:41  21    conversations with me.  And so you can't get into

16:22:44  22    that.

16:22:44  23    BY MR. PETROCELLI:

16:22:45  24         Q.  You understood when you changed this

16:22:47  25    structure or at least attempted to change the

                                                              220

**EXHIBIT G**
**271**

ROUGH DRAFT

16:22:50  1    structure that the Pacific picture agreements

16:22:55  2    constituted a violation of the copyright laws,

16:23:01  3    correct?  Did you have at that understanding at that

16:23:02  4    time?

16:23:02  5        A.  At that time -- at that time, no.

16:23:04  6        Q.  Did you come to that understanding

16:23:06  7    afterwards?

16:23:10  8            MR. TOBEROFF:  You can't answer that

16:23:11  9    without divulging attorney-client communications.

16:23:16  10   Instruct you not to answer.

16:23:17  11           (Instruction not to answer.)

16:23:18  12           THE WITNESS:  I have to follow Marc

16:23:20  13   Toberoff's advice.

16:23:20  14   BY MR. PETROCELLI:

16:23:22  15       Q.  You -- you are familiar with an aspect of

16:23:27  16   the copyright law in the sections dealing with

16:23:30  17   termination that the grantee -- that the grantor

16:23:39  18   cannot enter into an agreement with anyone other

16:23:43  19   than the grantee until the termination is effective?

16:23:49  20           MR. TOBEROFF:  I instruct you not to

16:23:50  21   answer.  He can't possibly answer those legal

16:23:52  22   questions without divulging his communications with

16:23:55  23   his attorney.

16:23:55  24           (Instruction not to answer.)

16:23:56  25           MR. PETROCELLI:  Why?  He is perfectly

**EXHIBIT G**
**272**

ROUGH DRAFT

16:23:57  1    capable of knowing that and he reads the codes, he

16:24:01  2    researches and he reads all the legal papers.

16:24:03  3        MR. TOBEROFF:  You're exaggerating his

16:24:05  4    testimony.

16:24:05  5        MR. PETROCELLI:  No, I'm not.

16:24:10  6        MR. TOBEROFF:  Same instruction.  When I

16:24:11  7    instruct you, you don't answer.  You don't have to

16:24:13  8    keep asserting that you're --

16:24:13  9    BY MR. PETROCELLI:

16:24:13  10        Q.  You -- you are --

16:24:13  11        MR. TOBEROFF:  Excuse me.  You don't have

16:24:15  12    to keep asserting that you're going to follow my

16:24:16  13    instruction.  We've already established you're going

16:24:18  14    to follow my instruction.

16:24:18  15    BY MR. PETROCELLI:

16:24:20  16        Q.  You read the complaint or you scanned it

16:24:21  17    but got the gist of it that DC Comics was contending

16:24:28  18    in the lawsuit that these Pacific Pictures

16:24:30  19    agreements violated the exclusivity provisions of

16:24:33  20    the copyright statute.  You got the gist of that,

16:24:33  21    right?

16:24:39  22        A.  The exclusivity provisions?

16:24:41  23        Q.  In the copyright termination provisions,

16:24:44  24    correct.

16:24:46  25        A.  I'm not sure I -- I have enough legal

222

**EXHIBIT G**
**273**

ROUGH DRAFT

16:24:48  1    knowledge about the exclusivity provisions.

16:24:50  2         Q.  Did you get the gist of the claim that DC

16:24:56  3    Comics made in the lawsuit that these Pacific

16:24:59  4    Pictures agreements violated certain provisions of

16:25:02  5    the copyright statute?

16:25:04  6         A.  I got the gist.

16:25:05  7         Q.  And did you understand that DC Comics was

16:25:08  8    contending that the Shusters did not have the legal

16:25:14  9    right to enter into an agreement with anyone other

16:25:20 10    than DC until and unless their termination became

16:25:24 11    effective?

16:25:29 12         MR. TOBEROFF:  You can only answer to the

16:25:30 13    extent you scanned the complaint on your own and you

16:25:35 14    came to that conclusion.

16:25:36 15         THE WITNESS:  I may not be fully aware of

16:25:39 16    that detail.

16:25:39 17    BY MR. PETROCELLI:

16:25:42 18         Q.  Are you aware that Mr. Toberoff has stated

16:25:44 19    in papers filed with the court that these Pacific

16:25:47 20    picture agreements were void?

16:25:54 21         A.  Yes.

16:25:55 22         Q.  How did you become aware of that?

16:25:58 23         A.  Through our discussions.

16:26:00 24         Q.  Did you read any of the legal filings that

16:26:02 25    are made in this case?

                                                              223

**EXHIBIT G**
**274**

ROUGH DRAFT

16:26:03  1        A.  The voiding of the Pacific Pictures or

16:26:12  2    anything else?

16:26:13  3        Q.  Well, you understand you filed the lawsuit

16:26:15  4    and then your -- your counsel has filed a motion to

16:26:19  5    dismiss the lawsuit and through lots of briefs have

16:26:23  6    been filed.  Do you read that material?

16:26:25  7        A.  I read some of it.

16:26:31  8        Q.  Are you aware that Mr. Toberoff has

16:26:33  9    acknowledged that the Pacific Pictures agreements

16:26:37 10    did not comply with the copyright laws?

16:26:41 11        A.  Yes.

16:26:45 12        Q.  Why did you sign agreements that did not

16:26:47 13    comply with the copyright laws?

16:26:51 14        A.  At the time I was unaware.

16:26:55 15        Q.  Why were you unaware?

16:26:58 16        A.  I'm not a lawyer.

16:27:01 17        Q.  You relied on Mr. Toberoff?

16:27:07 18        A.  Yes.

16:27:07 19        Q.  Having learned that you signed agreements

16:27:17 20    that violated the copyright law why did you think

16:27:26 21    that DC Comics had no right to file a claim?

16:27:31 22        MR. TOBEROFF:  Objection.  I'm objecting to

16:27:33 23    your use of the word "violated the copyright laws."

16:27:35 24    Also stated in that paper something being invalid --

16:27:35 25        MR. PETROCELLI:  You don't need to --

224

**EXHIBIT G**
**275**

ROUGH DRAFT

16:27:37  1            MR. TOBEROFF:  Under the copyright law and

16:27:39  2    violating law is two separate --

16:27:40  3            MR. PETROCELLI:  That's not appropriate,

16:27:42  4    Marc.

16:27:42  5            MR. TOBEROFF:  Okay.

16:27:44  6            MR. PETROCELLI:  We don't need to teach

16:27:45  7    Mr. Peary the niceties of copyright law.

16:27:50  8            MR. TOBEROFF:  I'm not teaching him.

16:27:51  9            MR. PETROCELLI:  Let's move on.  What's the

16:27:58  10   next Exhibit 11?  Okay.

16:28:00  11       Q.  Now, after signing this document exhibit

16:28:03  12   10, sometime there after your -- your mother put

16:28:14  13   Joanne Siegel in touch with Marc Toberoff, right?

16:28:14  14       A.  Yes.

16:28:18  15       Q.  And do you know when that happened?

16:28:25  16       A.  I believe sometime in 2003.

16:28:31  17       Q.  Were you keeping close -- in close contact

16:28:36  18   with Mr. Toberoff about his contacts with the Siegel

16:28:42  19   family prior to the time the Siegel family hired

16:28:46  20   him?

16:28:49  21            MR. TOBEROFF:  Assumes facts.  Lacks

16:28:55  22   foundation.  Do you understand the question?

16:28:55  23            THE WITNESS:  Was I in closes contact with

16:28:57  24   him regarding the Siegels?

16:28:57  25   BY MR. PETROCELLI:

                                                          225

**EXHIBIT G**
**276**

ROUGH DRAFT

16:29:00  1        Q.  Yes.  As he was courting the Siegels?

16:29:03  2             MR. TOBEROFF:  Assumes facts.  Lacks

16:29:05  3   foundation.  Object to the word "courting the

16:29:06  4   Siegels" -- the phrase "courting the Siegels."

16:29:09  5             THE WITNESS:  I was aware he had a --

16:29:13  6             MR. TOBEROFF:  Do you understand what the

16:29:14  7   question is because I don't.

16:29:16  8             THE WITNESS:  Maybe not.  I don't know.

16:29:17  9             MR. PETROCELLI:  He was about to answer it.

16:29:18 10   Of course he understood what the question was.

16:29:20 11             MR. TOBEROFF:  No, it's very confusing.

16:29:20 12   Can you read back --

16:29:21 13             MR. PETROCELLI:  It's not confusing.

16:29:23 14             MR. TOBEROFF:  Okay.  Let me just restate

16:29:23 15   that.  Could you read back the question for me.

16:29:29 16             MR. PETROCELLI:  We're into the courtship

16:29:31 17   of the Siegels, Marc.  Come on this is a good part of

16:29:34 18   the exam.

16:29:34 19             MR. TOBEROFF:  I object to your

16:29:36 20   self-serving word courtship as I do to the word

16:29:38 21   "violation of the copyright act.

16:29:51 22                  (The reporter read the record

16:29:51 23             as follows:

16:29:52 24                  "^ QUESTION ^ ANSWER ").

16:29:52 25             THE WITNESS:  Yes.

                                                          226

**EXHIBIT G**
**277**

ROUGH DRAFT

16:29:52  1    BY MR. PETROCELLI:

16:29:54  2        Q.  Did you approve of Mr. Toberoff taking on

16:30:03  3    the representation of the Siegels?

16:30:11  4        A.  Yes.

16:30:11  5        Q.  Did you feel that in some way that might

16:30:14  6    conflict with your interests or your mother's

16:30:19  7    interests?

16:30:22  8        A.  I thought it would potentially be an

16:30:24  9    advantage.

16:30:25  10       Q.  How so?

16:30:29  11           MR. TOBEROFF:  You can only answer that if

16:30:30  12   you formed an opinion as to that that's not bound up

16:30:36  13   with your discussions with me.

16:30:36  14   BY MR. PETROCELLI:

16:30:40  15       Q.  Now look?

16:30:41  16           MR. TOBEROFF:  If you have an opinion

16:30:42  17   that's independent of your advice of, Counsel, you

16:30:45  18   can answer.  If not, you instruct you not to.

16:30:50  19           THE WITNESS:  Okay.  Well, my opinion is

16:30:51  20   bound up in discussions.

16:30:54  21           (Instruction not to answer.)

16:30:54  22   BY MR. PETROCELLI:

16:30:55  23       Q.  Just because something may be bound up in

16:30:58  24   discussions, whatever that means, doesn't mean that

16:31:01  25   you can't have a thought of your own.  That you

227

**EXHIBIT G**
**278**

ROUGH DRAFT

16:31:06  1    can't convey?

16:31:08  2            MR. TOBEROFF:  Argumentative and don't

16:31:10  3    listen to his instructions listen to mine and I

16:31:12  4    instruct you not to answer unless you can answer

16:31:14  5    independently of your discussions with me.

16:31:18  6            THE WITNESS:  Well, my.

16:31:18  7    BY MR. PETROCELLI:

16:31:21  8        Q.  Why did you believe that Marc Toberoff

16:31:26  9    representing the Siegels would be to your advantage?

16:31:31 10            MR. TOBEROFF:  Same instruction.

16:31:31 11            (Instruction not to answer.)

16:31:31 12    BY MR. PETROCELLI:

16:31:35 13        Q.  Did you discuss that with anyone?

16:31:37 14        A.  My belief as to why it's an advantage?

16:31:39 15            MR. TOBEROFF:  Excuse me.  I'm instructing

16:31:41 16    you not to answer what your belief was based on your

16:31:44 17    testimony that it's bound up with your discussions

16:31:47 18    with me.  What's the -- what's the next question?

16:31:47 19    BY MR. PETROCELLI:

16:31:51 20        Q.  Did you discuss that with anyone?

16:31:52 21            MR. TOBEROFF:  Other than me?

16:31:53 22            MR. PETROCELLI:  No, I said with anyone.

16:31:56 23            THE WITNESS:  You can.

16:31:56 24    BY MR. PETROCELLI:

16:31:57 25        Q.  Answer that yes or no?

                                                    228

**EXHIBIT G**
**279**

ROUGH DRAFT

16:31:58  1           MR. TOBEROFF:  You can answer whether you

16:31:59  2    discussed the subject with your attorney yes or no.

16:32:01  3           MR. PETROCELLI:  I didn't say with your

16:32:03  4    attorney I said with anyone.

16:32:04  5           MR. TOBEROFF:  With anyone with anyone.

16:32:05  6           THE WITNESS:  With anyone else.

16:32:05  7    BY MR. PETROCELLI:

16:32:06  8       Q.  No with anyone?

16:32:07  9       A.  Oh, yes.

16:32:08  10       Q.  With whom?

16:32:08  11       A.  Well, Marc Toberoff.

16:32:09  12       Q.  Anyone else?

16:32:10  13       A.  No.

16:32:12  14       Q.  Did you discuss it with your mother?

16:32:16  15           MR. TOBEROFF:  Asked and answered.

16:32:24  16           THE WITNESS:  I -- I don't recall if I

16:32:29  17    discussed it with her.

16:32:29  18    BY MR. PETROCELLI:

16:32:31  19       Q.  You realize -- you believe that it was

16:32:36  20    advantageous for Marc Toberoff to also represent the

16:32:39  21    Siegels and you didn't discuss that with your

16:32:42  22    mother?

16:32:43  23           MR. TOBEROFF:  Asked and answered.

16:32:48  24           THE WITNESS:  Just what I said.  That.

16:32:53  25           MR. TOBEROFF:  Just.

                                                           229

**EXHIBIT G**
**280**

ROUGH DRAFT

16:32:53    1    BY MR. PETROCELLI:

16:32:55    2        Q.  What did you -- you said you can't recall.

16:32:58    3        A.  Yes.

16:32:59    4        Q.  Do you believe you would have discussed

16:33:01    5    that with her given the nature of its importance?

16:33:06    6            MR. TOBEROFF:  Don't speculate.  Only

16:33:07    7    testify as to your memory.

16:33:09    8            THE WITNESS:  Yeah, I don't know.

16:33:09    9    BY MR. PETROCELLI:

16:33:12   10        Q.  It's not speculation.  It's based on a

16:33:14   11    practice that would you have had of conveying and

16:33:16   12    sharing and communicating with your mother on

16:33:19   13    matters that were important to this topic.  Is it

16:33:26   14    fair to say that you had that practice of sharing

16:33:28   15    important and discussing important information

16:33:32   16    relating to the Superman issue after you retained

16:33:34   17    Mr. Toberoff that would you have discussions on

16:33:36   18    important developments with your mother?

16:33:40   19            MR. TOBEROFF:  Vague.

16:33:43   20            THE WITNESS:  Some.

16:33:43   21    BY MR. PETROCELLI:

16:33:45   22        Q.  Did you believe that this was an important

16:33:46   23    development, whether or not Mr. Toberoff should

16:33:51   24    become the lawyers for the Siegels given that you

16:33:52   25    believed he also was your family's lawyer?

230

**EXHIBIT G**
**281**

ROUGH DRAFT

16:33:55  1        A.   Yes.

16:33:56  2        Q.   Do you believe based on the importance of

16:33:57  3    that information that you discuss that with your

16:34:01  4    mother?

16:34:04  5        A.   Probably.

16:34:08  6        Q.   And what did you and she discuss on that

16:34:10  7    subject?

16:34:12  8             MR. TOBEROFF:  Only answer if you have a

16:34:13  9    recollection.

16:34:15 10             MR. PETROCELLI:  That's true of every

16:34:16 11    answer?

16:34:17 12             MR. TOBEROFF:  But I want to make sure.

16:34:19 13    Witnesses have a tendency.  Not this witness but any

16:34:21 14    witness has a tendency to try to fill in the blanks.

16:34:26 15             THE WITNESS:  My mother, she liked Marc

16:34:31 16    Toberoff a lot personally.  She had spoken with him

16:34:36 17    and she -- she thought she would be helping the

16:34:40 18    Siegels by referring them to him.

16:34:40 19    BY MR. PETROCELLI:

16:34:44 20        Q.   Did you discuss how this would be

16:34:47 21    advantgeous to the Shuster family by having

16:34:51 22    Mr. Toberoff also represent the Siegels?

16:34:57 23        A.   I don't think we discussed that at that

16:34:59 24    time.

16:34:59 25        Q.   Why didn't you discuss that?  Wasn't that

                                                            231

ROUGH DRAFT

16:35:02  1    the -- the most important part of the discussion?

16:35:13  2        A.   The -- the advantages came up in

16:35:18  3    discussions over time as we discussed back and forth

16:35:23  4    with Marc Toberoff.  That's -- that's --

16:35:27  5        Q.   I'm asking about you your discussions with

16:35:29  6    your mother because I'm trying to get at information

16:35:31  7    that's clearly and plainly discoverable.

16:35:35  8        A.   At that time we did not discuss any

16:35:39  9    specific strategic value for having the Siegels and

16:35:47 10    Toberoff work together.

16:35:49 11        Q.   Why did you not discuss that subject with

16:35:51 12    your mother given it's importance?

16:35:55 13        A.   I don't know.

16:35:59 14        Q.   You made a decision not to bring it up?

16:36:03 15        A.   I know she recommended him to the Siegels

16:36:06 16    because she liked him and trusted him and -- and she

16:36:11 17    thought it would be a good idea for them to talk to

16:36:14 18    him and that's -- that was at that point that's all

16:36:18 19    we discussed.

16:36:19 20        Q.   And you never once discussed with her your

16:36:21 21    views as to how it would be advantageous to the

16:36:25 22    Shusters to have Mr. Toberoff represent the Siegels?

16:36:28 23             MR. TOBEROFF:   Asked and answered twice.

16:36:29 24             THE WITNESS:   Not at that time.

16:36:29 25    BY MR. PETROCELLI:

232

**EXHIBIT G**
**283**

ROUGH DRAFT

16:36:32  1       Q.  At any time?

16:36:33  2       A.  At any time -- some -- some -- some time

16:36:49  3   later I suppose.

16:36:50  4       Q.  Tell me what you said to her about those

16:36:54  5   advantages.

16:36:55  6       A.  It was based upon my discussions with Marc

16:37:01  7   Toberoff about the value of having all the rights.

16:37:10  8       Q.  Tell me what you said to your mother?

16:37:12  9       A.  That's what I told her.

16:37:13 10       Q.  On that subject.

16:37:14 11           You said it was based on?

16:37:16 12       A.  Yes.

16:37:17 13       Q.  I didn't ask you what it was based on.

16:37:18 14       A.  Okay.

16:37:18 15       Q.  I'm asking you what you actually said to

16:37:21 16   her.

16:37:22 17       A.  Okay.

16:37:22 18       Q.  Tell me what you said to her about why it

16:37:24 19   was valuable to have all the rights.

16:37:29 20       A.  I believe that's all I said.

16:37:30 21       Q.  What did you mean by that?

16:37:33 22       A.  Just what it says.  Valuable to have all

16:37:36 23   the rights.

16:37:36 24       Q.  Valuable to whom?

16:37:38 25       A.  To all of us.

                                                            233

**EXHIBIT G**
**284**

ROUGH DRAFT

16:37:39  1        Q.  Who are all?

16:37:40  2        A.  Siegels and Shusters together.

16:37:49  3        Q.  Valuable in that you can demand and command

16:37:55  4    more money?  Valuable in that sense?

16:37:57  5        A.  Well, there's -- there's.

16:38:04  6            MR. TOBEROFF:  Excuse me.  You can testify

16:38:07  7    as to what you specifically said to your mother but

16:38:11  8    you can't testify as to your understanding of the

16:38:14  9    value if that value is based on discussions with

16:38:19 10    your attorney.

16:38:21 11            MR. PETROCELLI:  That's not exactly true if

16:38:23 12    he has discussed that subject with his mother.

16:38:26 13            MR. TOBEROFF:  That's what I just said.

16:38:27 14    You can testify.

16:38:29 15            MR. PETROCELLI:  But even if the

16:38:30 16    information came from you.

16:38:31 17            MR. TOBEROFF:  He can testify.

16:38:32 18            MR. PETROCELLI:  Entirely.

16:38:34 19            MR. TOBEROFF:  Only to what he said to his

16:38:35 20    mother even if the information came from me.

16:38:35 21            MR. PETROCELLI:  Correct.

16:38:37 22            MR. TOBEROFF:  If he didn't say that to his

16:38:39 23    mother and he just said I think this is a good

16:38:41 24    idea --

16:38:41 25            MR. PETROCELLI:  Well --

                                                            234

**EXHIBIT G**
**285**

ROUGH DRAFT

16:38:42  1          MR. TOBEROFF:  Then -- then you can't say

16:38:43  2      why do you think it was a good idea.

16:38:44  3          MR. PETROCELLI:  I'm also entitled to ask

16:38:45  4      about his state of mind as to why he said what he

16:38:48  5      said to his mother.

16:38:51  6          MR. TOBEROFF:  This isn't a hearsay

16:38:53  7      objection, this is a privilege objection.

16:38:55  8          MR. PETROCELLI:  No, but we're trying to

16:38:56  9      get at discovery.

16:38:59 10          MR. TOBEROFF:  Okay.

16:38:59 11          MR. PETROCELLI:  And its relevant for that

16:39:04 12      purpose.

16:39:05 13          MR. TOBEROFF:  You can testify as to what

16:39:06 14      you said to your mother.  If he asks you why you

16:39:10 15      said that and the whys and the wheres are based on

16:39:13 16      your conversations with me, I instruct you not to

16:39:17 17      testify.  That's.

16:39:18 18          MR. PETROCELLI:  Well, I don't accept that.

16:39:19 19          THE WITNESS:  Well.

16:39:19 20      BY MR. PETROCELLI:

16:39:20 21      Q.  Let me ask my next question.

16:39:21 22          Did you -- you did not sign a conflict

16:39:37 23      waiver in 2001, 2002 or '3 having to do with

16:39:45 24      Mr. Toberoff representing the Siegels, right?

16:39:49 25      A.  Right.

**EXHIBIT G**
**286**

ROUGH DRAFT

16:39:49  1       Q.  You were never presented with one either,

16:39:49  2   right?

16:39:53  3       A.  I don't think so.

16:40:05  4       Q.  Did you -- did Mr. Toberoff discuss with

16:40:11  5   you his attempts to reach out to the Siegels prior

16:40:17  6   now, this is prior to the time that Mr. Toberoff

16:40:21  7   went to work for the Siegels which I will represent

16:40:23  8   to you was sometime in the late summer of 2002.

16:40:31  9       MR. TOBEROFF:  That's incorrect.  That's

16:40:34 10   misrepresentation of fact.

16:40:36 11       Q.  September, October 2002?

16:40:46 12       Q.  Prior to that time?

16:40:47 13       MR. TOBEROFF:  Nobody used ever use

16:40:49 14   October as late summer.

16:40:50 15       MR. PETROCELLI:  Well it's a little bit

16:40:52 16   unclear.

16:40:52 17       MR. TOBEROFF:  If you say I'm taking a

16:40:54 18   summer holiday.

16:40:54 19       MR. PETROCELLI:  You've got a September --

16:40:55 20   you've got a September date in there where she's

16:40:58 21   terminated the lawyers.  I think it's September 21.

16:41:03 22   I think there's a letter there.  I may be mixing my

16:41:06 23   dates up.  Let's call it October.  I'm not going

16:41:10 24   to -- vouching for the date, but let's just say

16:41:13 25   prior to October 2002, prior to that time -- well,

236

**EXHIBIT G**
**287**

ROUGH DRAFT

16:41:18  1    let me do it differently.

16:41:19  2         Q.  Did there come a time where you learned

16:41:25  3    that Mr. Toberoff had been retained by the Siegels?

16:41:28  4         A.  Yes.

16:41:29  5         Q.  How did you find out?

16:41:30  6         A.  He told me.

16:41:31  7         Q.  Okay.  Prior to that time when he told you

16:41:37  8    he was retained by the Siegels, and you think that

16:41:40  9    was in 2003 you said, right?

16:41:45  10        A.  That's -- that's what I had thought.  I

16:41:47  11   didn't -- I don't remember.

16:41:52  12        Q.  Did -- did the Joanne Siegel or Laura

16:41:56  13   Siegel have any discussions with you or your mother

16:42:02  14   to your knowledge, about the decision to hire

16:42:02  15   Mr. Toberoff?

16:42:02  16        A.  No, discussions with me.

16:42:07  17        Q.  Do you know whether they had any

16:42:08  18   discussions with your mother to the effect hey, I

16:42:11  19   met him or I've talked to him, I think I'm -- I

16:42:14  20   think I'm going to retain him?

16:42:16  21        A.  I don't know what they said to her.

16:42:17  22        Q.  Did they call you up to ask if it would

16:42:20  23   pose any problem with respect to you or your mother

16:42:26  24   if he went to work for the Siegels?

16:42:28  25        A.  No.

                                                              237

**EXHIBIT G**
**288**

ROUGH DRAFT

16:42:36  1        Q.  Have you -- were you told about -- by

16:42:40  2   Mr. Toberoff about any of his efforts to contact the

16:42:44  3   Siegels or make contact with them prior to the time

16:42:47  4   he was retained by them?

16:42:48  5        A.  No.

16:42:54  6        Q.  Did you learn about what he was -- about

16:42:59  7   his efforts to get in touch with them from any other

16:43:03  8   source?

16:43:03  9        A.  No.

16:43:09 10        Q.  So is what you're telling me that at one

16:43:15 11   point you told him that you had no issue with his

16:43:18 12   representing the Siegels and then the next time you

16:43:22 13   discussed the subject with him, he told you he was

16:43:25 14   the lawyer for the Siegels and there was no

16:43:27 15   discussion in between on that subject?

16:43:32 16        A.  I don't know.

16:43:33 17        Q.  When did you and Mr. Toberoff have the

16:43:36 18   discussion about it being mutually advantageous for

16:43:43 19   Mr. Toberoff to also represent the Siegels?  When

16:43:48 20   did you have that discussion?

16:43:50 21        A.  Sometime after they retained him.

16:43:54 22        Q.  Oh after they retained him?

16:43:55 23        A.  Yes.

16:43:57 24        Q.  Okay.  So prior to the time that the

16:44:00 25   Siegels retained Mr. Toberoff, other than your

                                                            238

**EXHIBIT G**
**289**

ROUGH DRAFT

16:44:05  1    mother putting -- other than your mother making a

16:44:09  2    phone call to Joanne, you had no knowledge about

16:44:16  3    Mr. Toberoff contacting the Siegels or trying to

16:44:20  4    become their lawyer or anything like that?

16:44:22  5          MR. TOBEROFF:  Lacks foundation.  Assumes

16:44:25  6    facts as to trying to become their lawyer.

16:44:32  7          THE WITNESS:  I don't know about that.

16:44:32  8    BY MR. PETROCELLI:

16:44:36  9       Q.  Do you -- when did -- when did you and your

16:44:45  10   mother discuss that she would recommend Mr. Toberoff

16:44:49  11   to Joanne Siegel?  Was that before or after you

16:44:52  12   signed the 2001 agreement with Mr. Toberoff?

16:44:57  13      A.  Before or after we signed the 2001

16:45:05  14   agreement?

16:45:05  15      Q.  Yes.

16:45:09  16      A.

16:45:09  17          MR. TOBEROFF:  Do you understand the

16:45:10  18   question?

16:45:12  19          THE WITNESS:  Yeah yeah.

16:45:12  20          MR. TOBEROFF:  Do you understand the

16:45:13  21   question.

16:45:13  22   BY MR. PETROCELLI:

16:45:14  23      Q.  Exhibit 10 was signed in November 2001

16:45:16  24   right Exhibit 10 you have that in front of you the

16:45:18  25   joint venture agreement?

                                                              239

**EXHIBIT G**
**290**

ROUGH DRAFT

16:45:19  1        A.  Yes.

16:45:19  2        Q.  Was it before or after you signed Exhibit

16:45:21  3   10 that you and your mother had a discussion about

16:45:24  4   putting him -- putting -- having Joanne Siegel --

16:45:29  5   telling Joanne Siegel about Marc Toberoff?

16:45:31  6        A.  I don't know if we specifically discussed

16:45:34  7   it.  She mentioned him.

16:45:38  8        Q.  She whom?

16:45:38  9        A.  My mother.  In just a phone conversation.

16:45:42 10        Q.  To whom?

16:45:43 11        A.  To Joanne.

16:45:45 12        Q.  Before or after?

16:45:46 13        A.  After.

16:45:47 14        Q.  How long after?

16:45:50 15             MR. TOBEROFF:  Asked and answered.

16:45:50 16             THE WITNESS:  I don't know.

16:45:50 17   BY MR. PETROCELLI:

16:45:52 18        Q.  And you were there when she mentioned it or

16:45:56 19   she told you about it afterwards?

16:45:57 20        A.  She told me.

16:45:58 21        Q.  Okay.  And what did she tell you she had

16:46:01 22   done?

16:46:04 23        A.  I don't remember exactly what she said.

16:46:08 24        Q.  Okay.  Did you have a follow-up

16:46:09 25   conversation with Mr. Toberoff about the fact that

                                                              240

**EXHIBIT G**
**291**

ROUGH DRAFT

16:46:11  1    your mother had mentioned him to Joanne Siegel?

16:46:15  2        A.  No.

16:46:17  3        Q.  Did you have any conversations with him

16:46:19  4    about whether it would be a good idea or a bad idea

16:46:22  5    for him also to represent the Siegel family?

16:46:26  6            MR. TOBEROFF:  I instruct you not to answer

16:46:28  7    as to the substance of our conversations whether

16:46:30  8    it's a good idea or bad idea.

16:46:32  9            (Instruction not to answer.)

16:46:32 10    BY MR. PETROCELLI:

16:46:33 11        Q.  Did you -- when is the next time you had

16:46:35 12    any conversation with anyone about the subject of

16:46:39 13    mark Siegel having some kind of a relationship with

16:46:44 14    the Siegels?

16:46:45 15            MR. TOBEROFF:  Mark.

16:46:45 16    BY MR. PETROCELLI:

16:46:46 17        Q.  Marc Toberoff having some kind of

16:46:49 18    relationship with the Siegels after this one event

16:46:52 19    that you describe where your mother told you she

16:46:54 20    spoke to Joanne?

16:46:55 21        A.  When is the next time I talked to anyone?

16:46:57 22        Q.  On that subject correct.

16:47:01 23        A.  Other than Marc Toberoff?

16:47:02 24        Q.  No including Marc Toberoff.

16:47:03 25        A.  Oh.

                                                            241

**EXHIBIT G**
**292**

ROUGH DRAFT

16:47:05  1          MR. TOBEROFF:  You can't -- okay.  I'll let

16:47:08  2     you answer that.

16:47:08  3          THE WITNESS:  I don't remember.

16:47:08  4     BY MR. PETROCELLI:

16:47:10  5          Q.  Was it before or after Mr. Toberoff was

16:47:13  6     retained by the Siegels?

16:47:14  7          A.  I don't -- I don't remember.  Too long ago.

16:47:24  8          Q.  Did Mr. Toberoff discuss with you that

16:47:26  9     there was a -- that he was approaching the Siegels

16:47:29 10     not to represent them as a lawyer but to do a

16:47:32 11     business transaction with them?

16:47:35 12          MR. TOBEROFF:  Assumes facts.  Lacks

16:47:41 13     foundation.  Instruct you not to answer as to the

16:47:44 14     substance of our conversations.

16:47:45 15          (Instruction not to answer.)

16:47:45 16     BY MR. PETROCELLI:

16:47:46 17          Q.  Did he discuss that he was aware of an

16:47:50 18     investor, very wealthy investor, maybe even a

16:47:54 19     billionaire investor who wanted to do a deal for the

16:47:59 20     Superman rights?

16:48:00 21          MR. TOBEROFF:  Same instruction.

16:48:04 22          (Instruction not to answer.)

16:48:04 23          MR. TOBEROFF:  As to our discussions or

16:48:06 24     conversations.

16:48:06 25     BY MR. PETROCELLI:

                                                                    242

**EXHIBIT G**
**293**

ROUGH DRAFT

16:48:06  1        Q.  Did he discuss with you that he was going

16:48:08  2   to approach the Siegels about such an investor?

16:48:14  3            MR. TOBEROFF:  Same instruction.

16:48:16  4            (Instruction not to answer.)

16:48:16  5   BY MR. PETROCELLI:

16:48:19  6        Q.  Have you ever come to learn that

16:48:23  7   Mr. Toberoff had discussions with the Siegels about

16:48:27  8   an investor who would buy their Superman rights?

16:48:35  9            MR. TOBEROFF:  You can only answer that if

16:48:39  10   you have knowledge independent of your discussions

16:48:39  11   with me.

16:48:41  12            THE WITNESS:  I don't have knowledge

16:48:43  13   independent of my discussions.

16:48:45  14            MR. TOBEROFF:  Then I instruct you not to

16:48:47  15   answer.

16:48:47  16            (Instruction not to answer.)

16:48:47  17   BY MR. PETROCELLI:

16:48:48  18        Q.  Did you have discussions with Mr. Toberoff

16:48:51  19   on that topic in 2002?

16:48:55  20            MR. TOBEROFF:  Same instruction.

16:48:55  21            (Instruction not to answer.)

16:48:55  22   BY MR. PETROCELLI:

16:49:00  23        Q.  Did you have discussions with Mr. Toberoff

16:49:01  24   on -- about the Siegels in 2002?

16:49:07  25            MR. TOBEROFF:  Just about the Siegels?

                                                              243

**EXHIBIT G**
**294**

ROUGH DRAFT

16:49:08  1          MR. PETROCELLI:  Anything related to the

16:49:09  2   Siegels.

16:49:11  3          MR. TOBEROFF:  You can -- you could

16:49:13  4   answer -- without waiver of privilege, you can

16:49:16  5   answer whether we had any discussions on the subject

16:49:17  6   of the Siegels if you remember.  Date specific.

16:49:22  7          THE WITNESS:  I don't remember

16:49:23  8   specifically.  I can only assume.  I don't remember.

16:49:23  9   BY MR. PETROCELLI:

16:49:28 10      Q.  You said earlier that you saw a document

16:49:30 11   called the Toberoff timeline and you saw it prior to

16:49:37 12   Siegel that it was attached to the lawsuit that we

16:49:39 13   filed.

16:49:39 14      A.  Yes.

16:49:41 15      Q.  Okay.  And when you saw that document you

16:49:43 16   read it?

16:49:44 17      A.  Yeah, scanned it.

16:49:50 18      Q.  Scanned again?

16:49:50 19      A.  Yeah, I read it.

16:49:52 20      Q.  Read it?

16:49:53 21      A.  I didn't think much of it.

16:49:55 22      Q.  What does that mean?

16:49:59 23      A.  You want me to explain my -- my feelings

16:50:01 24   about what that is?

16:50:03 25      Q.  Sure.

244

**EXHIBIT G**
**295**

ROUGH DRAFT

16:50:05  1          A.  I think that someone came in intentionally

16:50:12  2     to try to set Marc Toberoff up to make him look bad

16:50:16  3     and sent an anonymous letter.

16:50:23  4          Q.  What's the basis?

16:50:24  5          A.  Without -- without signing.  That's what

16:50:26  6     I -- my belief and feeling is about that.

16:50:29  7          Q.  Why -- why did you form that belief, that

16:50:34  8     someone was trying to set him up?

16:50:34  9          A.  Because --

16:50:36  10         Q.  Set him up for what?

16:50:37  11         A.  Because documents were stolen.

16:50:39  12         Q.  What does that mean they were stolen?

16:50:41  13         A.  Documents were stolen from his office.

16:50:43  14         Q.  How do you know that?

16:50:44  15         A.  He told me.

16:50:47  16         Q.  Do you know it from any other source?

16:50:54  17         A.  Just from a -- a later as a grand jury

16:51:02  18    subpoena regarding that theft.

16:51:04  19         Q.  You were examined if front of the grand

16:51:07  20    jury?

16:51:07  21         A.  No, there was -- I was aware of a grand

16:51:10  22    jury subpoena regarding that theft issue.

16:51:12  23         Q.  How did you become aware of that?

16:51:14  24              MR. TOBEROFF:  You're getting into an area

16:51:17  25    where your awareness is solely based on

                                                              245

**EXHIBIT G**
**296**

ROUGH DRAFT

16:51:20  1    conversations with me.  You were talking quickly and

16:51:22  2    you meant when you said he told me I would have

16:51:25  3    objected to that attorney-client privilege.

16:51:26  4         MR. PETROCELLI:  He learned about the grand

16:51:27  5    jury --

16:51:27  6         MR. TOBEROFF:  You got that out before I

16:51:28  7    could object.

16:51:28  8         THE WITNESS:  Oh, sorry.

16:51:29  9         MR. TOBEROFF:  So I would slow it down.

16:51:32 10    BY MR. PETROCELLI:

16:51:33 11         Q.  The grand jury subpoena came from

16:51:35 12    Mr. Toberoff.

16:51:35 13         Is that right?

16:51:36 14         A.  Yes.

16:51:37 15         Q.  And the information about the circumstances

16:51:39 16    of how those documents got created came from

16:51:43 17    Mr. Toberoff, right?

16:51:44 18         MR. TOBEROFF:  I instruct you not to

16:51:45 19    answer.

16:51:45 20         (Instruction not to answer.)

16:51:46 21         THE WITNESS:  Okay.

16:51:46 22    BY MR. PETROCELLI:

16:51:47 23         Q.  Well, you said he is the one who told you

16:51:49 24    they were stolen, right?

16:51:49 25         A.  Yes.

246

**EXHIBIT G**
**297**

ROUGH DRAFT

16:51:53  1      Q.  Have you ever spoken to the person who

16:51:56  2   allegedly took the documents?

16:51:57  3      A.  No.

16:52:02  4      Q.  Did you ever speak to the Siegels about

16:52:04  5   whether anything said in the document is true?

16:52:10  6           MR. TOBEROFF:  Vague.  You mean the

16:52:11  7   timeline?

16:52:12  8           MR. PETROCELLI:  Yeah.

16:52:12  9      Q.  Did you ever talk to the Siegels about

16:52:14 10   whether anything stated in the timeline is true?

16:52:17 11      A.  No.

16:52:22 12      Q.  Why not?

16:52:23 13      A.  I don't know.

16:52:27 14      Q.  You saw in there references to Mr. Toberoff

16:52:30 15   misleading the Siegels?

16:52:32 16      A.  Yes.

16:52:33 17      Q.  Okay.  And trying to you know corner the

16:52:37 18   rights mainly for himself?

16:52:40 19      A.  I saw that.

16:52:44 20      Q.  Okay.  And you saw in there that there were

16:52:46 21   references of making statements to the Siegels that

16:52:49 22   there was a billionaire investor when in fact there

16:52:51 23   wasn't?

16:52:56 24      A.  I read that.

16:52:56 25      Q.  Okay.  Did you discuss any of that with

                                                            247

**EXHIBIT G**
**298**

ROUGH DRAFT

16:52:58  1    your mother when you first read that material?

16:53:04  2        A.  I don't recall.

16:53:09  3        Q.  And the -- did you give any thought to

16:53:12  4    talking to the Siegels about whether any of it was

16:53:17  5    true?

16:53:21  6            MR. TOBEROFF:  Asked and answered.

16:53:22  7            THE WITNESS:  I did not discuss it with

16:53:26  8    them.

16:53:26  9    BY MR. PETROCELLI:

16:53:27  10       Q.  Did you give any thought to discussing it

16:53:29  11   with them?

16:53:29  12       A.  I don't know if I gave any thought.

16:53:37  13       Q.  Did you do anything to look into the -- the

16:53:42  14   truth of what was said in that document?  See if any

16:53:49  15   of it was true?

16:53:50  16       A.  I I'm aware that there were a number of

16:53:55  17   factual errors and falsehoods as a matter of fact.

16:53:59  18   A lot of concoctuns, things that are concocted that

16:54:05  19   are factually incorrect.

16:54:06  20       Q.  How do you know they are?

16:54:07  21       A.  Because I'm familiar with some of the

16:54:09  22   timelines.

16:54:10  23       Q.  Let me show it to you.  It's Exhibit 25.

16:54:31  24            (The document referred to was

16:54:31  25            marked for identification by the

                                                                    248

**EXHIBIT G**
**299**

ROUGH DRAFT


16:54:31   1              C.S.R. as Exhibit 25 and attached

16:54:33   2              to this deposition.)

16:54:33   3    BY MR. PETROCELLI:

16:54:33   4         Q.   Identify for me what you know to be false.

16:54:40   5         A.   Well, I have to go through it.

16:54:41   6         Q.   To be clear, you received this -- you first

16:54:44   7    saw this document years ago, right?

16:54:50   8         A.

16:54:52   9              MR. TOBEROFF:  Asked and answered.

16:54:52  10              THE WITNESS:  Yeah, I already answered.

16:54:52  11    BY MR. PETROCELLI:

16:54:55  12         Q.   Please answer my question?

16:54:55  13              MR. TOBEROFF:  You can -- when I say asked

16:54:57  14    and answered that's for the record -- excuse me.

16:54:59  15    When I say asked and answered, I'm not instructing

16:55:02  16    you not to answer.  I'm making an objection for the

16:55:04  17    record.

16:55:04  18              You can answer again -- you can answer

16:55:07  19    again unless I instruct you.

16:55:08  20              THE WITNESS:  Oh.  I don't remember exactly

16:55:15  21    when I saw it I know I have seen it before today.

16:55:17  22              MR. PETROCELLI:  Have and you got it from

16:55:18  23    Mr. Toberoff when you did see it for the first time,

16:55:18  24    right?

16:55:18  25         A.   Yes.

                                                              249


**EXHIBIT G**
**300**

ROUGH DRAFT

16:55:24  1        Q.  Now can you answer my question.  I snow you

16:55:24  2    have to look at the documents but my question is to

16:55:27  3    identified what you know to be false.

16:55:36  4            MR. TOBEROFF:  Take your time reading the

16:55:37  5    document.

16:55:41  6            THE WITNESS:  Well --

16:55:43  7            MR. TOBEROFF:  There's a lot in here.

16:55:44  8            THE WITNESS:  Yeah, it is.  There is a lot

16:55:46  9    in here.  There's a lot in here.

16:56:36  10           Well one inaccuracy is here on page 3,

16:56:40  11   March 2003.  It characterizes March 3rd, 2003 -- it

16:56:49  12   characterizes Marc Toberoff as, quote, messing up

16:56:52  13   relationships for his own personal benefits and as

16:56:55  14   if DC and the Siegels had a great relationship and

16:56:59  15   when it in fact that they had a cut off talks fired

16:57:04  16   their attorneys and -- and wrote a letter calling

16:57:10  17   Time-Warner -- comparing them to the gestapo in

16:57:15  18   their dealings with them.  He is saying that Marc

16:57:17  19   Toberoff is interfering with all the relationships

16:57:19  20   up to this point.  It was already -- the

16:57:21  21   relationship was already bad.

16:57:21  22   BY MR. PETROCELLI:

16:57:23  23       Q.  Let me stop you right there.

16:57:24  24           How do you know what you just said?

16:57:26  25       A.  Well, I -- I know and independently that

                                                              250

EXHIBIT G
**301**

ROUGH DRAFT

16:57:31   1    the Siegels fired their lawyer.

16:57:32   2         Q.  How do you know that?

16:57:33   3         A.  I'm -- how do I know that?  I'm aware

16:57:41   4    from -- I'm aware from them at some point they

16:57:46   5    informed us of that.  And that they had broken off

16:57:53   6    negotiations with -- with DC because they were

16:57:57   7    unhappy with the terms.  And I know that also from

16:58:02   8    my discussion with Marc Toberoff.

16:58:05   9         MR. TOBEROFF:  Don't talk with your

16:58:06  10    discussions with me.

16:58:07  11         THE WITNESS:  Okay.  Okay.

16:58:07  12    BY MR. PETROCELLI:

16:58:10  13         Q.  When you -- you had previously told me that

16:58:13  14    you couldn't recall any contact with the Siegels

16:58:17  15    about their relationship with Toberoff and I asked

16:58:25  16    you a number of times about the time period up to

16:58:29  17    the time when Mr. Toberoff was first retained by

16:58:32  18    them.  Now, you're telling me they told you that

16:58:36  19    they broke off talks and all this other stuff.  Did

16:58:40  20    you learn that after the fact?

16:58:41  21         MR. TOBEROFF:  Misstates his testimony.

16:58:42  22         THE WITNESS:  Yes, it does misstated my

16:58:44  23    testimony.

16:58:44  24    BY MR. PETROCELLI:

16:58:45  25         Q.  How does it misstate your testimony?

                                                            251

**EXHIBIT G**
**302**

ROUGH DRAFT

16:58:46  1          A.   The only -- the only thing that I knew at

16:58:49  2     the time that my mother contacted Joanne --

16:58:51  3          Q.   Correct?

16:58:51  4          A.   -- was that they were not happy with their

16:58:54  5     attorney and she recommended Marc Toberoff.  And

16:58:57  6     that's the only thing that I knew from them at that

16:59:00  7     time.

16:59:00  8          Q.   Well, that's not what you testified testify

16:59:02  9     on but let me -- let me go over this again.

16:59:04  10          Are you saying that your mother had a phone

16:59:08  11     call with Joanne Siegel after you and she signed

16:59:14  12     Exhibit 10 in November 2001 and in that phone call

16:59:21  13     Joanne Siegel says I'm not happy with my attorney

16:59:25  14     and your mother says oh, let me introduce to you

16:59:28  15     Marc Toberoff?  And that occurs in a conversation

16:59:32  16     after November 2001?

16:59:34  17          A.   Yes.

16:59:36  18          Q.   All in one conversation?

16:59:39  19          A.   I don't know about that.

16:59:46  20          Q.   Okay.  And other than that, you had no

16:59:49  21     other contact with the Siegels prior to the time

16:59:52  22     that they hired Mr. Toberoff?  You said that

16:59:57  23     already, correct?

17:00:00  24          A.   Phone contact?

17:00:01  25          Q.   Any contact.

252

**EXHIBIT G**
**303**

ROUGH DRAFT

17:00:02  1       A.  I --

17:00:03  2       Q.  2001 all the way through 2002 up to the

17:00:07  3   time they hired Mr. Toberoff?

17:00:08  4       A.  I -- I don't know if I had no phone contact

17:00:12  5   at all.  I don't remember.  I don't remember that.

17:00:18  6       Q.  Did you have any contact with him during

17:00:19  7   that time period from the moment your mom made that

17:00:22  8   phone call until the time that they hired

17:00:24  9   Mr. Toberoff?

17:00:24 10       A.  I -- I don't -- I do not remember.

17:00:26 11       Q.  Okay.  And did your mother have any contact

17:00:28 12   with him during that year?

17:00:34 13           MR. TOBEROFF: .

17:00:34 14   BY MR. PETROCELLI:

17:00:34 15       Q.  From the time that she made that first

17:00:36 16   phone call until the time they hired Mr. Toberoff

17:00:38 17   sometime in September or October 2002?

17:00:41 18       A.  I -- I don't know if there was any.

17:00:43 19           MR. TOBEROFF:  Assumes facts.  Lacks

17:00:44 20   foundation.

17:00:44 21   BY MR. PETROCELLI:

17:00:45 22       Q.  Okay you don't know, right?

17:00:46 23       A.  I don't know if there was any subsequent

17:00:49 24   phone call.

17:00:49 25       Q.  So why where you getting the information?

**EXHIBIT G**
**304**

ROUGH DRAFT

| | | |
|---|---|---|
| 17:00:51 | 1 | Other than from Mr. Toberoff where did you get the |
| 17:00:53 | 2 | information that they break off talks and gestapo |
| 17:00:57 | 3 | letter and all this other kind of stuff?  Where did |
| 17:00:59 | 4 | that in from? |
| 17:01:01 | 5 |     A.  Well, in the present I have gotten much of |
| 17:01:04 | 6 | this from my discussions with Marc Toberoff. |
| 17:01:08 | 7 |     Q.  Okay. |
| 17:01:09 | 8 |       MR. TOBEROFF:  Don't talk about your |
| 17:01:11 | 9 | discussions with me. |
| 17:01:11 | 10 | BY MR. PETROCELLI: |
| 17:01:12 | 11 |     Q.  So the reason why you know is that the |
| 17:01:13 | 12 | statements in here are untrue is what Marc Toberoff |
| 17:01:15 | 13 | has told you? |
| 17:01:16 | 14 |     A.  And -- and there has been -- there has been |
| 17:01:20 | 15 | contact with the -- the Siegels. |
| 17:01:24 | 16 |     Q.  Tell me about it.  When? |
| 17:01:27 | 17 |     A.  I -- I don't know.  They call every now and |
| 17:01:30 | 18 | then to wish Merry Christmas and happy birthday |
| 17:01:36 | 19 | and -- and usually my mother has talked with them |
| 17:01:39 | 20 | and she has become aware of their situation in |
| 17:01:43 | 21 | casual conversation. |
| 17:01:47 | 22 |     Q.  This is what your mother has told you? |
| 17:01:49 | 23 |     A.  Yes. |
| 17:01:50 | 24 |     Q.  Okay.  And -- and in casual conversation |
| 17:01:55 | 25 | they said I wrote a gestapo letter? |

                                                                    254

**EXHIBIT G**
**305**

ROUGH DRAFT

17:01:59  1          A.  I don't know if they -- they discussed that

17:02:02  2      particular thing.

17:02:02  3          Q.  So here's what I'm trying to find out from

17:02:05  4      you because this is how we got on to this subject

17:02:12  5      what -- what information do you have that any of

17:02:16  6      this is un through, other than what Marc Toberoff

17:02:16  7      has told you?  I don't -- for the purpose of this

17:02:18  8      question, I am not interested in what Marc Toberoff

17:02:21  9      told you?

17:02:22 10          MR. TOBEROFF:  And I'm instructing you not

17:02:24 11      to answer as to what I've told you.

17:02:29 12          THE WITNESS:  Okay.  You're instructing me

17:02:32 13      not to answer?

17:02:33 14          MR. TOBEROFF:  No.  You can answer the

17:02:34 15      question but don't answer if you can as to -- don't

17:02:41 16      answer based on our conversations.  So you've

17:02:45 17      testified to a gestapo letter.  If you have a basis

17:02:49 18      other than conversations with me that you can

17:02:51 19      recollect, you can discuss that with him.  That's

17:02:53 20      what he was asking you.

17:02:54 21          THE WITNESS:  Uh-huh.

17:02:54 22      BY MR. PETROCELLI:

17:02:57 23          Q.  Tell me what you know to be untrue based on

17:03:00 24      information that you have obtained from people other

17:03:03 25      than Marc Toberoff?

255

**EXHIBIT G**
**306**

ROUGH DRAFT

17:03:04  1      A.  Well, I know there are things to be untrue

17:03:06  2    that are -- are based on my discussions with Marc

17:03:12  3    Toberoff.

17:03:12  4      Q.  And I'm not asking about you that?

17:03:14  5      A.  Okay.  I guess I can't say it then.

17:03:16  6      Q.  Okay?

17:03:17  7      MR. TOBEROFF:  Well, you can -- you can

17:03:18  8    look at the letter and you -- you have to.

17:03:20  9      MR. PETROCELLI:  We don't have to spend any

17:03:21 10    more time on it if that's your answer?

17:03:21 11      MR. TOBEROFF:  No.

17:03:24 12      MR. PETROCELLI:  But if you want to read

17:03:26 13    through it you tell me if there's anything that you

17:03:28 14    know to be untrue based on something other than Marc

17:03:33 15    Toberoff telling you.

17:03:34 16      MR. TOBEROFF:  And what I'm suggesting to

17:03:36 17    you is that.

17:03:36 18    BY MR. PETROCELLI:

17:03:37 19      Q.  Now, what is it you're pointing out to him

17:03:39 20    you're not allowed to do that?

17:03:41 21      MR. TOBEROFF:  He is pointing out a

17:03:42 22    paragraph.  Can you take this thing from the very

17:03:44 23    beginning -- wait -- since he's asked the question,

17:03:47 24    this document is several pages long, it's goes on

17:03:53 25    for 7 pages.  Read every single line and answer when

256

**EXHIBIT G**
**307**

ROUGH DRAFT

17:03:59  1    you reach something that you believe is untrue and

17:04:03  2    you can talk about it because it's not based on

17:04:05  3    conversation with me, you can tell Mr. Petrocelli

17:04:10  4    what you believe is untrue, if anything, and why.

17:04:13  5    That's it.  And take your time because it's his

17:04:17  6    deposition and you can -- you need to spend the time

17:04:21  7    to answer the question properly.  It's very

17:04:23  8    time-consuming assignment.

17:04:23  9    BY MR. PETROCELLI:

17:04:25 10        Q.  What paragraph did you just point out to

17:04:27 11    Mr. Toberoff?

17:04:29 12            MR. TOBEROFF:  You can answer that.

17:04:30 13            THE WITNESS:  The one on -- referencing

17:04:36 14    October 27, 2003.

17:04:36 15    BY MR. PETROCELLI:

17:04:40 16        Q.  What page is that on?

17:04:41 17        A.  5.

17:04:45 18        Q.  Okay.  Tell me about that paragraph.

17:04:46 19    Why -- why were you pointing it out?

17:04:53 20        A.  It completely mischaracterizes the current

17:04:57 21    legal agreement.

17:05:00 22        Q.  How so?

17:05:00 23        A.  That we have.

17:05:02 24        Q.  How does it mischaracterize it?

17:05:05 25        A.  Can I go into that?

257

ROUGH DRAFT

17:05:09  1        Q.  Well, again this is based on -- this is

17:05:11  2    based on what you know not based on what Marc

17:05:15  3    Toberoff told you.  So that's -- that's what you're

17:05:19  4    answering.

17:05:21  5             MR. TOBEROFF:  You can't go -- what are you

17:05:23  6    talking about can you go into the details of our

17:05:26  7    retainer agreement?

17:05:27  8             THE WITNESS:  Why this is false.

17:05:31  9             MR. TOBEROFF:  Let me read it.

17:05:57 10             MR. PETROCELLI:  Do you have to change the

17:05:59 11    videotape.

17:05:59 12             THE VIDEOGRAPHER:  I do you have

17:06:00 13    approximately a minute or a little bit more.

17:06:02 14             MR. PETROCELLI:  Okay?

17:06:04 15             MR. TOBEROFF:  Yes.  Are you talking about

17:06:04 16    the highlighted portion?

17:06:06 17             THE WITNESS:  Yes.

17:06:07 18             MR. TOBEROFF:  Yes you can -- you can --

17:06:09 19    you can answer that.

17:06:12 20             THE WITNESS:  Okay.

17:06:14 21             MR. PETROCELLI:  Well, we're going to have

17:06:15 22    to change the videotape right now.

17:06:16 23             THE WITNESS:  Oh.

17:06:17 24             THE VIDEOGRAPHER:  Okay.  This will mark

17:06:19 25    the end of Volume I, Tape Number 3 in the deposition

                                                                    258

**EXHIBIT G**
**309**

ROUGH DRAFT

17:06:21  1   of Mark Warren Peary.  Changing tapes at 5:05.

17:06:26  2             (Brief recess.)

17:18:26  3             THE VIDEOGRAPHER:  We are back on the

17:18:33  4   record and this marks the beginning of Volume I,

17:18:36  5   tape number 4 in the deposition of Mark Warren

17:18:39  6   Peary.  The time is 5:17.

17:18:39  7   BY MR. PETROCELLI:

17:18:44  8        Q.  You were going to tell me what was

17:18:46  9   inaccurate about the October 27, 2003 reference in

17:18:51 10   the timeline document Exhibit 25?

17:18:54 11        A.  Yes.

17:18:57 12        Q.  Without telling me about your conversations

17:18:59 13   with Mr. Toberoff on that subject?

17:19:00 14        A.  Yes.  The -- the new legal retainer

17:19:08 15   completely superseded all the old agreements with

17:19:12 16   Pacific Pictures and canceled those out completely

17:19:18 17   and so this completely mischaracterizes his interest

17:19:23 18   in -- in any proceeds.

17:19:31 19        Q.  We'll talk about that when we get to it.

17:19:33 20             Anything else?

17:19:35 21        A.  There -- there are probably lots of things

17:19:39 22   if I had a lot of time to study it it's full of

17:19:42 23   inaccuracies and mischaracterizations.  Just -- I

17:19:50 24   would just say in -- in general that Marc Toberoff

17:19:59 25   is -- is probably one of the hardest working.

                                                              259

**EXHIBIT G**
**310**

ROUGH DRAFT

17:20:02  1        Q.  That's not what I'm asking you?

17:20:04  2        A.  Dedicated lawyers.

17:20:05  3            MR. PETROCELLI:  Move to strike it's

17:20:06  4    non-responsive.

17:20:08  5            MR. TOBEROFF:  Let him answer.

17:20:09  6            MR. PETROCELLI:  We're not doing that.

17:20:11  7            MR. TOBEROFF:  And this mischaracterizes --

17:20:13  8    BY MR. PETROCELLI:

17:20:14  9        Q.  Not -- I was asking you about if there were

17:20:16 10    any other particular statements in here.

17:20:17 11            MR. TOBEROFF:  He is answering you.  You

17:20:19 12    cut off his answer because you didn't want to hear

17:20:21 13    it.

17:20:21 14            MR. PETROCELLI:  I'm asking about specific

17:20:22 15    statements in here.

17:20:24 16            MR. TOBEROFF:  He's answering.  Objection.

17:20:29 17    You need to let the witness answer.

17:20:29 18    BY MR. PETROCELLI:

17:20:40 19        Q.  Let me ask you a question about the last --

17:20:43 20    right after that paragraph you pointed out to me it

17:20:46 21    says:

17:20:50 22                "N T inquires into the

17:20:51 23                legality of entering into the

17:20:52 24                Pacific Pictures Corporation

17:20:54 25                agreement with the Peavys heirs the

260

**EXHIBIT G**
**311**

ROUGH DRAFT

17:20:58  1          Shuster estate using the law firm

17:21:00  2          Armstrong Hirsch Jackoway Tyerman

17:21:02  3          and Wertheimer."

17:21:06  4          Did Mr. Toberoff discuss with you that he

17:21:11  5   had obtained legal advice from the Armstrong her

17:21:17  6   issue firm on the subject of the legality of your

17:21:19  7   agreement.

17:21:19  8          MR. TOBEROFF:  Instruct you not to answer

17:21:21  9   as to the substance of our discussions.

17:21:24 10          (Instruction not to answer.)

17:21:24 11   BY MR. PETROCELLI:

17:21:25 12      Q.  Have you seen a -- any opinion or memoranda

17:21:31 13   from the Armstrong Hirsch firm on the subject of

17:21:35 14   your agreement?

17:21:38 15      A.  No.

17:21:40 16      Q.  Have you spoken to anyone other than

17:21:42 17   Mr. Toberoff on the subject of the validity or

17:21:47 18   legality of your Pacific Pictures agreements?

17:21:49 19          MR. TOBEROFF:  Asked and answered.

17:21:50 20          You can answer again.

17:21:51 21          THE WITNESS:  No.

17:21:51 22   BY MR. PETROCELLI:

17:21:52 23      Q.  Okay.  Put this document aside in the

17:21:56 24   interest of time.

17:21:58 25          MR. TOBEROFF:  So you're not interested in

                                                            261

**EXHIBIT G**
**312**

ROUGH DRAFT

17:21:59  1    him finishing his answer about what's inn correct

17:22:02  2    about this document.

17:22:03  3         MR. PETROCELLI:  I'm going to have to come

17:22:04  4    back to it if I have time but since I'm working on a

17:22:08  5    budget right here I got to make better use of my

17:22:10  6    time.

17:22:22  7         Q.  Now, in 2003 you -- you became the executor

17:22:31  8    of the Joe Shuster estate, correct?

17:22:31  9         A.  Yes.

17:22:35 10         Q.  And did your mother indicate that she was

17:22:37 11    unwilling to serve?

17:22:41 12         A.  We had no such discussion.

17:22:47 13         Q.  Well, did she say why wasn't she named the

17:22:50 14    executor of the estate pursuant to the will?

17:22:55 15         A.  I'm the one that has initiated the whole --

17:23:02 16    the whole project.  I've been involved in it with

17:23:06 17    Marc Toberoff from the beginning and I'm active and

17:23:12 18    knowledgeable on it.

17:23:15 19         Q.  You never had any discussion that your

17:23:16 20    mother was unable or unwilling to serve as executor.

17:23:22 21              Is that correct?

17:23:22 22         A.  Right.

17:23:23 23         Q.  Take a look at Exhibit 12 which is a

17:23:29 24    collection of papers from the probate proceeding.

17:23:42 25              (The document referred to was

262

**EXHIBIT G**
**313**

ROUGH DRAFT

17:23:42  1          marked for identification by the

17:23:42  2          C.S.R. as Exhibit 12 and attached

17:23:43  3          to this deposition.)

17:23:43  4   BY MR. PETROCELLI:

17:23:44  5      Q.  Now you'll see your signature.

17:23:49  6   September 30, 2003, Mark Warren Peary.

17:23:53  7      A.  Okay.

17:23:54  8      Q.  On the first page?

17:23:57  9          Do you see that?

17:23:58 10      A.  Yes.

17:23:59 11      Q.  Do you see your signature on the second

17:24:00 12   page?

17:24:00 13      A.  Yes.

17:24:01 14      Q.  These applications for the administration

17:24:04 15   of the estate?

17:24:05 16      A.  Yes.

17:24:06 17      Q.  Do you see your signature there under the

17:24:08 18   date September 30, 2003?

17:24:09 19      A.  Yes.

17:24:12 20      Q.  Now, if we go to the next page we have

17:24:14 21   proof of subscribing witness Tom Fenaughty

17:24:20 22   F-e-n-a-u-g-h-t-y the same person who witnessed Joe

17:24:22 23   Shuster's will.

17:24:27 24          Do you see that? It's on page 3?

17:24:28 25      A.  Oh, 3.

263

**EXHIBIT G**
**314**

ROUGH DRAFT

17:24:30   1        Q.  Did you have any contact with him, put him

17:24:36   2    in touch with your lawyer?

17:24:45   3        A.  I didn't have personal contact.

17:24:46   4        Q.  John Petker SP is the name of the probate

17:24:49   5    attorney that was retained to do this work on behalf

17:24:51   6    of the Shuster estate?

17:24:52   7        A.  Yes.

17:24:53   8        Q.  Did you understand that he was reaching out

17:24:55   9    to Mr. Fenaughty?

17:24:58  10        A.  I -- I wasn't aware.

17:25:06  11        Q.  Okay.  Just flipping through to page -- go

17:25:22  12    to the page that's -- Jason, can you -- can you help

17:25:28  13    him find these pages because they're not marked.  Go

17:25:32  14    get this page for him.  At the top it says in the

17:25:34  15    matter of the estate of Joseph Shuster decedent

17:25:38  16    attachment 2 D 1 et cetera et cetera.

17:25:57  17            Do you have that page in front of you?

17:26:00  18            MR. TOBEROFF:  Just a second.  I need to

17:26:02  19    get it too.

17:26:13  20            MR. KLINE:  It's towards the back.

17:26:13  21    BY MR. PETROCELLI:

17:26:17  22        Q.  While he is looking for that, do you have

17:26:21  23    that page in front of you, sir?

17:26:23  24        A.  Yes.

17:26:23  25        Q.  Okay.  And you'll see that it's an

                                                              264

**EXHIBIT G**
**315**

ROUGH DRAFT

17:26:26  1    attachment to a -- if you go two pages earlier, it's

17:26:29  2    a petition for probate and this is an attachment to

17:26:34  3    it that you signs on July 15, 2003.  Correct?

17:26:34  4        A.  Yes.

17:26:40  5        Q.  Okay.  And that's your signature above the

17:26:42  6    name Mark Warren Peary, right?

17:26:45  7            MR. TOBEROFF:  Is he referring to this

17:26:46  8    document.  You're looking at this document.  He is

17:26:48  9    asking you about this.

17:26:49 10            THE WITNESS:  Uh-huh.

17:26:49 11    BY MR. PETROCELLI:

17:26:50 12        Q.  Okay.  Do you have that in front of you now

17:26:52 13    the right document?

17:26:53 14        A.  Yes.

17:26:56 15        Q.  Do you see that that's an attachment to a

17:26:58 16    petition that appears two pages earlier in the

17:27:02 17    stack?  I think that's why -- you're looking at the

17:27:04 18    right document?

17:27:05 19        A.  I was looking at this petition.

17:27:07 20        Q.  Yes you were.  Okay.  Now, go back to the

17:27:09 21    attachment that bears your signature and the date

17:27:10 22    July 15, 2003.  And for the record, this is all part

17:27:14 23    of Exhibit 12.

17:27:16 24            Now look at paragraph 1.  It says that

17:27:22 25    second sentence:

                                                              265

**EXHIBIT G**
**316**

ROUGH DRAFT

17:27:24  1          "Jean Adele Peavy."

17:27:25  2          That's your mother, right?

17:27:26  3      A.  Yes.

17:27:27  4      Q.  Jean Adele Peavy who is the sister of the

17:27:29  5  decedent is also the sole beneficiary under the

17:27:33  6  decedent's will.  And the sole heir at law of the

17:27:36  7  decedent's estates under the laws of intestacy.

17:27:41  8          Do you see that?

17:27:41  9      A.  Yes.

17:27:41 10      Q.  And you signed this statement indicating

17:27:45 11  that that was a truthful statement correct?

17:27:48 12      A.  Yes.

17:27:48 13      Q.  That was not a truthful statement though,

17:27:56 14  correct?  Because under the laws of intestacy your

17:28:00 15  mother Jean Adele Peavy was not the sole air at law

17:28:03 16  under the laws of intestacy, she ask Frank Shuster

17:28:10 17  were the heirs at law?

17:28:11 18          MR. TOBEROFF:  Calls for a legal

17:28:12 19  conclusion.  You're asking him to -- to -- this is

17:28:15 20  something.

17:28:15 21  BY MR. PETROCELLI:

17:28:16 22      Q.  Is that correct?

17:28:18 23          MR. TOBEROFF:  You can only answer if you.

17:28:18 24  BY MR. PETROCELLI:

17:28:19 25      Q.  At the time?

**EXHIBIT G**
**317**

ROUGH DRAFT

17:28:20  1          MR. TOBEROFF:  If you feel equipped to

17:28:22  2    answer these questions can you answer.

17:28:23  3          MR. PETROCELLI:  You don't have to tell him

17:28:25  4    not to answer, Marc.

17:28:26  5          MR. TOBEROFF:  I'm not telling him not to

17:28:27  6    answer.  I'm advising him only answer to the extent

17:28:30  7    you feel equipped to answer.  He is going into legal

17:28:30  8    teritory --

17:28:30  9          MR. PETROCELLI:

17:28:34  10     Q.  That's true of all questions.

17:28:35  11          MR. TOBEROFF:  -- I'm not sure I even

17:28:37  12    understand because I'm not a trust and estates

17:28:40  13    lawyer.

17:28:40  14    BY MR. PETROCELLI:

17:28:41  15     Q.  When Joe Shuster died had he two siblings

17:28:44  16    who survived him, correct, Jean and Frank?

17:28:47  17     A.  Yes.

17:28:47  18     Q.  Okay.

17:28:52  19     Q.  Why did you write here that Jean would have

17:28:55  20    been the sole heir at law under the laws of

17:28:58  21    intestacy?

17:28:59  22          MR. TOBEROFF:  Misstates the report

17:29:03  23     record.

17:29:03  24          MR. PETROCELLI:

17:29:03  25     Q.  Do you know what that means under the laws

267

**EXHIBIT G**
**318**

ROUGH DRAFT

17:29:06  1    of intestacy?

17:29:07  2        A.  Please explain.

17:29:08  3        Q.  It means that if you had died without a

17:29:13  4    will based on the statutory laws of -- of

17:29:15  5    disposition?

17:29:18  6        A.  Uh-huh.

17:29:18  7        Q.  And are you aware that under authorize laws

17:29:20  8    that Jean was not the sole air -- was one of two

17:29:26  9    heirs?

17:29:29  10       A.  All I know that she -- she had a will.

17:29:36  11   That's all I'm aware of.

17:29:38  12       Q.  Who prepared this document?

17:29:39  13       A.  I am not certain.

17:29:41  14       Q.  What did you do to assure yourself that the

17:29:44  15   statements were truthful before you made them to the

17:29:47  16   Court?

17:29:47  17       A.  I trusted the state attorneys.

17:29:54  18       Q.  Did you understand that this was a serious

17:29:56  19   matter that you're making a filing with a court

17:29:58  20   representing that Ms. -- that your mother was the

17:30:03  21   sole heir at law because you did not have an

17:30:07  22   original will you had a copy and you were

17:30:11  23   representing to the Court that it should accept the

17:30:14  24   copy because even if no will existed she would still

17:30:16  25   be the sole heir?  You understood that of the

268

**EXHIBIT G**
**319**

ROUGH DRAFT

17:30:19  1    purpose of this filing?

17:30:22  2        A.  Frank Shuster was dead at that time.

17:30:26  3    That's my understanding of it.

17:30:30  4        Q.  But you understood that when Joe died Frank

17:30:32  5    was alive, as well as your mother, correct?

17:30:35  6        A.  At that time.

17:30:36  7        Q.  Did Joe have -- did Frank have a will?

17:30:38  8        A.  I believe so.

17:30:44  9        Q.  Do you know so?

17:30:46 10        A.  I -- I can't -- I can't say with certainty.

17:30:55 11        Q.  Did you understand that you were making a

17:30:57 12    filing with the Court in that it was your obligation

17:31:00 13    to provide the Court with accurate information?

17:31:07 14        MR. TOBEROFF:  You can answer that.

17:31:11 15        THE WITNESS:  Yes.

17:31:11 16    BY MR. PETROCELLI:

17:31:13 17        Q.  Turn the page.  In the next attachment to

17:31:18 18    the probate petition that you filed it said the

17:31:22 19    decedent never married and never had any children.

17:31:27 20        That also is false?

17:31:30 21        A.  It was a mistake.

17:31:34 22        Q.  Why did you allow this to be filed and why

17:31:36 23    did you sign it if it was untrue?

17:31:42 24        A.  It was simply a mistake.

17:31:44 25        Q.  Did you scan this or did you read this?

269

**EXHIBIT G**
**320**

ROUGH DRAFT

17:31:54  1        A.  I -- I don't know.

17:31:57  2        Q.  And go to the 1, 2, 3, 4, 5th page from

17:32:05  3    the -- from the end, document called declination to

17:32:09  4    act as personal representative signed by Jean Peavy.

17:32:19  5    And this document signed in the same day that you

17:32:21  6    sign the do you remember we just looked at.  Your

17:32:24  7    mom is -- is declining to serve as personal

17:32:30  8    representative of Joe Shuster's estate.  As

17:32:35  9    indicated in paragraph 3.

17:32:35 10            Do you see that?

17:32:35 11        A.  Yes.

17:32:39 12        Q.  Do you have any understanding why she so

17:32:41 13    declined?

17:32:46 14        A.  She didn't want to be bothered with this.

17:32:49 15        Q.  Is that what she told you?

17:32:51 16        A.  To that effect.

17:32:52 17        A.  I don't want to be bothered with this?

17:32:54 18    What does that mean.

17:32:58 19        A.  She wants me to handle these affairs.

17:33:00 20        Q.  In paragraph 1 it says I am the only

17:33:02 21    sibling of the decedent Joseph Shuster.

17:33:02 22            Do you see that?

17:33:06 23        A.  At the time that's true.

17:33:09 24        Q.  She wasn't the only sibling Joe Shuster had

17:33:12 25    two siblings correct?

270

**EXHIBIT G**
**321**

ROUGH DRAFT

17:33:13  1      A.  Yes.

17:33:13  2      Q.  She was the only living sibling?

17:33:15  3      A.  Yes.

17:33:27  4      Q.  Did Frank have any familiar leave his own?

17:33:29  5      A.  No.

17:33:41  6      Q.  Is there any reason that you can think of

17:33:43  7  why all these mistakes were made in these documents?

17:33:52  8          MR. TOBEROFF:  Assumes facts.  Lacks

17:33:54  9  foundation.

17:33:54 10          THE WITNESS:  I'm not sure.

17:33:54 11  BY MR. PETROCELLI:

17:33:56 12      Q.  There seems to have been an effort not to

17:33:58 13  identify the existence of either Joe Shuster's wife

17:34:02 14  or Frank Shuster, Joe Shuster's brother?

17:34:07 15          MR. TOBEROFF:  Misstates the document.

17:34:07 16  BY MR. PETROCELLI:

17:34:09 17      Q.  Were you a representing to represent to the

17:34:12 18  Court that only ask your mother were the sole

17:34:17 19  interested parties in Joe Shuster's estate?

17:34:19 20      A.  Well, at this time that's correct.

17:34:23 21      Q.  But did you make a decision not to disclose

17:34:26 22  to the Court that he had been married and that he

17:34:32 23  had a brother and let the Court sort out whether

17:34:32 24  there were any interests there?

17:34:32 25      A.  No.

271

**EXHIBIT G**
**322**

ROUGH DRAFT

17:34:34  1        Q.  You just signed the documents that the

17:34:37  2   lawyers put in front of you without reading them

17:34:39  3   carefully?

17:34:39  4        A.  I -- I signed the -- I read the documents

17:34:45  5   what required signatures.

17:34:47  6        Q.  The purpose of your becoming the executive

17:34:50  7   estate was to be able to serve the termination

17:34:52  8   notice, correct?

17:34:52  9        A.  Yes.

17:34:55 10        Q.  Can you take a look at the next exhibit,

17:34:57 11   Exhibit 13.  Before I go to Exhibit 13, which is the

17:35:10 12   letter -- another agreement with Pacific Pictures

17:35:13 13   dated October 27, 2003, take a look at -- where is

17:35:32 14   the Superboy termination?  What exhibit number is

17:35:34 15   that?

17:35:44 16           Take a look at exhibit 11, please.  Of

17:35:49 17   paragraph Exhibit 11 is the notice of termination of

17:35:54 18   grants regarding Superboy filed by Mr. Toberoff on

17:36:01 19   behalf of the Siegels?

17:36:01 20              (The document referred to was

17:36:01 21              marked for identification by the

17:36:01 22              C.S.R. as Exhibit 11 and attached

17:36:04 23              to this deposition.)

17:36:04 24        MR. TOBEROFF:  This is Shuster 11?

17:36:08 25        MR. PETROCELLI:  Exhibit 11 right.

272

**EXHIBIT G**
**323**

ROUGH DRAFT

17:36:11  1         Q.  After you entered into the November 2001

17:36:14  2    Pacific Pictures joint venture agreement, which

17:36:18  3    mentioned that the rights included Superboy, did

17:36:24  4    you -- you said you became aware at some point of

17:36:26  5    that -- of some issue regarding Superboy.

17:36:26  6             Is that right?

17:36:26  7         A.  Yes.

17:36:33  8         Q.  What did you become aware of?

17:36:34  9         A.  That the Shuster estate doesn't have rights

17:36:39 10    to it.

17:36:41 11         Q.  How did you learn that?

17:36:43 12         A.  Through my attorney Marc Toberoff.

17:36:45 13         Q.  Did you learn it from any other source?

17:36:47 14         A.  No.

17:36:49 15         Q.  Did you do any work to verify it?  Did you

17:36:54 16    contact any other counsel?

17:36:55 17         A.  No.

17:36:56 18         Q.  Did you get a second opinion from anybody?

17:36:58 19         A.  No.

17:37:02 20         Q.  Okay.  Did you do any independent review to

17:37:07 21    determine whether Mr. Toberoff was, correct?

17:37:12 22         A.  I -- I did some research on my own.

17:37:17 23         Q.  After he told you?

17:37:19 24         A.  I believe.

17:37:20 25         Q.  What research did you do?

                                                              273

**EXHIBIT G**
**324**

ROUGH DRAFT

17:37:23  1          A.  There was a 1947 case where the courts

17:37:28  2    awarded Superboy to Jerry Siegel.

17:37:31  3          Q.  Mr. Toberoff pointed that out to you,

17:37:31  4    correct?

17:37:33  5          A.  Well, I became aware of that --

17:37:34  6          Q.  He --

17:37:35  7          A.  -- and that's correct.

17:37:36  8          Q.  He pointed it out to you, correct?

17:37:37  9          A.  I was aware of that case prior to that.

17:37:39 10          Q.  Were you aware of that when you signed the

17:37:43 11    November 2001 joint venture agreement?

17:37:44 12          A.  I don't know if I was aware of the legal

17:37:50 13    details.

17:37:50 14          Q.  You were aware of the case?

17:37:51 15          A.  I was aware of the case back to 47.

17:37:53 16          Q.  And you became aware of the legal details

17:37:55 17    as a result of conversations with Mr. Toberoff,

17:37:55 18    correct?

17:37:59 19          A.  Yes.

17:38:00 20          Q.  And then you became aware so your -- you

17:38:11 21    accepted Mr. Toberoff advice that the Shuster estate

17:38:13 22    had no interest in Superboy, correct?

17:38:13 23          A.  Yes.

17:38:16 24          Q.  Okay.  And you became aware around the same

17:38:20 25    time that the Siegels were claiming 100 percent

                                                              274

**EXHIBIT G**
**325**

ROUGH DRAFT

17:38:27  1    rights to Superboy, correct?

17:38:31  2        A.  I don't know exactly when I became aware of

17:38:34  3    it.

17:38:34  4        Q.  But you became aware of that, right?

17:38:36  5        A.  I did.

17:38:36  6        Q.  And you became aware of that at a time when

17:38:41  7    Mr. Toberoff was representing the Siegels, correct?

17:38:44  8        A.  Sometime in there.

17:38:46  9        Q.  Okay.  And Exhibit 11 is the Superboy

17:38:50 10    notice of termination that the Siegels filed at the

17:38:57 11    time that they were represented by Mr. Toberoff.

17:39:00 12            Did you see it at the time?

17:39:01 13        A.  No.

17:39:04 14        Q.  Okay.  Now, thereafter you then entered

17:39:09 15    into an amendment to your joint venture agreement to

17:39:14 16    delete Superboy from the venture, correct?

17:39:14 17        A.  Yes.

17:39:18 18        Q.  And you did that?

17:39:18 19            MR. TOBEROFF:  Excuse me.  Excuse me.

17:39:18 20    BY MR. PETROCELLI:

17:39:28 21        Q.  Take a look at Exhibit 13?

17:39:32 22            MR. TOBEROFF:  Okay.

17:39:32 23    BY MR. PETROCELLI:

17:39:33 24        Q.  Do you have that in front of you?  You can

17:39:34 25    put the other exhibits away?

                                                                     275

**EXHIBIT G**
**326**

ROUGH DRAFT

17:39:36  1          MR. TOBEROFF:  You need to weight after he

17:39:37  2     asks a question before you answer particularly when

17:39:40  3     he asks a leading question.  Wait give me a chance

17:39:42  4     to object okay?  So what's the question.

17:39:50  5          MR. PETROCELLI:  Does very Exhibit 13 in

17:39:51  6     front of him Marc?

17:39:57  7          THE WITNESS:  Yes.

17:39:57  8     BY MR. PETROCELLI:

17:39:58  9       Q.  Is that Exhibit 13?  Okay.  Can you push

17:40:00  10    aside the other exhibits?  Thank you.  Okay.

17:40:06  11         Can you take these exhibits and move those

17:40:07  12    over there so -- they're obstructing my view.  Thank

17:40:14  13    you and also the big thick one as well.

17:40:20  14         Now, Exhibit 13 is dated October 27, 2003

17:40:28  15    directed to you as now the new executor of the

17:40:32  16    estate, right?

17:40:32  17       A.  Yes.

17:40:36  18       Q.  Okay.  And if you go to the end, it is

17:40:41  19    signed by you as executor on October 30, 2003,

17:40:41  20    right?

17:40:41  21       A.  Yes.

17:40:52  22       Q.  And it's signed by Jean Peavy your mother

17:40:58  23    on the same date correct?

17:40:59  24       A.  Yes.

17:40:59  25       Q.  And it's signed by Mr. Toberoff as

                                                          276

**EXHIBIT G**
**327**

ROUGH DRAFT

17:41:01  1    president of PPC, correct?

17:41:06  2         A.  Yes.

17:41:06  3         Q.  Okay.  And you do see in paragraph 2 here

17:41:10  4    that it states PPC is not a law firm, right?

17:41:10  5         A.  Yes.

17:41:17  6         Q.  Okay.  And you understood that when you

17:41:18  7    signed it, right?

17:41:21  8         A.  Yes.

17:41:21  9         Q.  And you -- and the first paragraph and you

17:41:24 10    read this carefully before signing it and you

17:41:27 11    understood it when you signed it right?  It being

17:41:31 12    Exhibit 13?

17:41:32 13         A.  Yes.

17:41:34 14         Q.  Okay.  And it states that this letter

17:41:38 15    was -- is intended to supplement your prior joint

17:41:42 16    venture agreement dated as of November 31, 2001,

17:41:42 17    right?

17:41:42 18         A.  Yes.

17:41:50 19         Q.  And in paragraph 1 it re defines the rights

17:41:55 20    but this time excludes Superboy, correct?

17:42:01 21              MR. TOBEROFF:  Wait.  Just one second.

17:42:12 22    Objection.  You're mischaracterizing the agreement.

17:42:12 23    BY MR. PETROCELLI:

17:42:19 24         Q.  Is that correct, sir?  There's no reference

17:42:26 25    to Superboy in paragraph 1, correct?

277

**EXHIBIT G**
**328**

ROUGH DRAFT

17:42:28  1        A.  I don't see it.

17:42:29  2        Q.  And there was in the first version,

17:42:29  3   correct?

17:42:29  4        A.  Yes.

17:42:32  5        Q.  And there's no reference?

17:42:33  6            MR. TOBEROFF:  Excuse me I'd like to give

17:42:35  7   him the first version so he can compare the two.

17:42:35  8   BY MR. PETROCELLI:

17:42:38  9        Q.  Do you have exhibit -- what's the Exhibit

17:42:41  10  Number mark?

17:42:41  11           MR. TOBEROFF:  10.

17:42:41  12  BY MR. PETROCELLI:

17:42:43  13       Q.  Do you have Exhibit 10 and you see the

17:42:44  14  reference to Superboy in Smalville?  What paragraph

17:42:47  15  is it contained in Exhibit 10?

17:42:49  16       A.  1.

17:42:49  17       Q.  And in paragraph 1 of Exhibit 13 there's no

17:42:52  18  reference to Superboy or smallville.

17:42:52  19           Is that correct?

17:42:52  20       A.  Yes.

17:42:57  21       Q.  Okay.  And that was the result of the

17:43:00  22  advice given to you that the Shuster estate had no

17:43:04  23  interest in Superboy?

17:43:05  24           MR. TOBEROFF:  I instruct you not to answer

17:43:07  25  as to the advice given to you.  You can't answer

278

**EXHIBIT G**
**329**

ROUGH DRAFT

17:43:10  1    that question.

17:43:11  2              (Instruction not to answer.)

17:43:11  3    BY MR. PETROCELLI:

17:43:12  4        Q.  Whether you signed this you understood that

17:43:13  5    Superboy was not part of the agreement, correct?

17:43:15  6              MR. TOBEROFF:  Instruct you not to answer

17:43:16  7    to the extent your understanding is based on

17:43:18  8    conversations with me.

17:43:19  9              MR. PETROCELLI:  Come you you can't -- you

17:43:21 10    can't block all examination on this subject.

17:43:23 11              MR. TOBEROFF:  You shouldn't be surprised

17:43:25 12    Mr. Petrocelli after suing your opposing counsel for

17:43:28 13    six years.  You shouldn't be surprised.

17:43:30 14              MR. PETROCELLI:  For six years?

17:43:30 15              MR. TOBEROFF:  That's right.  You're DC.

17:43:32 16    Seven years.

17:43:37 17              MR. PETROCELLI:  I'm going to through and

17:43:38 18    follow that, but --

17:43:45 19              MR. TOBEROFF:  In talking about -- excuse

17:43:47 20    me.  In talking about these agreementses, if he is

17:43:49 21    comparing this agreement to this agreement make sure

17:43:52 22    you read carefully what is he comparing it to before

17:43:55 23    you answer.

17:43:55 24    BY MR. PETROCELLI:

17:44:00 25        Q.  You can put aside paragraph -- excuse me,

279

**EXHIBIT G**
**330**

ROUGH DRAFT

17:44:03 1    the Exhibit 10.  I'm going to focus on Exhibit 13

17:44:08 2    because we've been through Exhibit 10 already.

17:44:10 3        When you signed -- when you as the executor

17:44:17 4    signed this supplement to your joint venture

17:44:21 5    agreement with your joint venture partner Pacific

17:44:28 6    Pictures Corporation, you understood that you were

17:44:30 7    eliminating Superboy from the definition of rights

17:44:34 8    contained in paragraph 1, correct?

17:44:41 9        MR. TOBEROFF:  He's asking you at the time

17:44:42 10    that you signed it so you can only answer that

17:44:44 11    question what your understanding was at the time you

17:44:49 12    signed it.

17:44:49 13        THE WITNESS:  Yes.

17:44:49 14    BY MR. PETROCELLI:

17:44:51 15        Q.  Okay.  And in paragraph 4 you see that you

17:45:04 16    understood by virtue of your agreeing to paragraph 4

17:45:08 17    that on behalf of the Shuster estate you as executor

17:45:13 18    required the agreement of PPC Pacific Pictures

17:45:17 19    Corporation to enter into any agreement regarding

17:45:19 20    the Superman rights, correct?

17:45:19 21        A.  Yes.

17:45:23 22        Q.  And you understood in paragraph 7 that upon

17:45:31 23    the expiration of the term of this joint venture

17:45:34 24    agreement or in the event of a termination for any

17:45:40 25    reason that the estate would hold 50 percent of the

280

**EXHIBIT G**
**331**

ROUGH DRAFT

17:45:49  1    rights and Pacific Pictures Corporation would hold

17:45:54  2    the remaining 50 percent as tenants in common,

17:45:54  3    correct?

17:45:54  4        A.  Yes.

17:46:04  5        Q.  Did you discuss with your mother the

17:46:08  6    elimination of Superboy from your joint venture

17:46:11  7    agreement?

17:46:18  8        A.  I don't remember a specific discussion.

17:46:24  9        Q.  Do you -- did you believe that that was an

17:46:26 10    important matter?

17:46:27 11        A.  Yes.

17:46:30 12        Q.  And you as the executor, you -- you

17:46:34 13    understood you had a fiduciary duty to your mother

17:46:36 14    in her role as the sole beneficiary, correct?

17:46:36 15        A.  Yes.

17:46:40 16        Q.  And you were signing an agreement

17:46:48 17    subtracting rights from the prior agreement,

17:46:48 18    correct?

17:46:53 19            MR. TOBEROFF:  Lacks foundation.  Assumes

17:46:55 20    facts.  Mischaracterizes the exhibit.

17:46:55 21    BY MR. PETROCELLI:

17:47:01 22        Q.  In your capacity as the executor the Court

17:47:04 23    appointed executor who applied for and obtained the

17:47:08 24    right and power to administer this estate with

17:47:13 25    respect to this issue, you understood that in

281

**EXHIBIT G**
**332**

ROUGH DRAFT

17:47:18  1    signing this document you were removing from the

17:47:27  2    estate any claim to the Superboy rights, correct?

17:47:35  3         A.  Only with regard to this document.

17:47:38  4         Q.  Well, what other document were you

17:47:39  5    reserving it in?

17:47:43  6         A.  My understanding was we didn't have rights.

17:47:46  7    That's why this agreement did not include it in

17:47:48  8    Superboy.

17:47:48  9         Q.  But you -- it was included in the first

17:47:51 10    agreement that you signed in November, Exhibit 10?

17:47:54 11         MR. TOBEROFF:  Here is the exhibit.

17:47:54 12    BY MR. PETROCELLI:

17:47:56 13         Q.  Paragraph 1?

17:47:56 14         A.  Yes.

17:47:57 15         MR. TOBEROFF:  Is he referring again when

17:47:58 16    he refers to Exhibit 10, paragraph 1 in the en

17:48:02 17    conclusion of Superboy I'd like you to read

17:48:04 18    paragraph 1 to see the way Superboy is included.

17:48:07 19         MR. PETROCELLI:  You know, please don't?

17:48:07 20         MR. TOBEROFF:  No.

17:48:09 21         MR. PETROCELLI:  It's not appropriate.

17:48:10 22         MR. TOBEROFF:  It's only fair that when you

17:48:11 23    talk about something, he looks at it.

17:48:13 24         MR. PETROCELLI:  He doesn't need you to

17:48:14 25    tell him how to read it, okay.

                                                    282


**EXHIBIT G**
**333**

ROUGH DRAFT

17:48:16  1          MR. TOBEROFF:  I'm not telling him --

17:48:16  2          MR. PETROCELLI:  That's just inappropriate.

17:48:17  3          MR. TOBEROFF:  I'm telling him to read it.

17:48:19  4          MR. PETROCELLI:  No, you're telling him

17:48:20  5     more than that.  Let's not go down this path.

17:48:22  6          Q.  What did you as the executor on behalf of

17:48:26  7     the estate get as consideration for giving up any

17:48:30  8     claim to Superboy?

17:48:32  9          MR. TOBEROFF:  Assumes facts.  Lacks

17:48:33 10     foundation.

17:48:36 11          THE WITNESS:  My understanding is the

17:48:40 12     Shuster estate.

17:48:40 13          MR. PETROCELLI:

17:48:41 14          Q.  Did you understand my question?  Let me ask

17:48:44 15     it again.

17:48:48 16          A.  Repeat it.

17:48:48 17          Q.  Yes.  As the executor of the Shuster

17:48:57 18     estate, in executing Exhibit 13, the October 27,

17:48:57 19     2003 amendment to your joint venture agreement, what

17:49:01 20     did the estate get in return forgiving up any and

17:49:05 21     all claim to Superboy?

17:49:07 22          MR. TOBEROFF:  Assumes facts and lacks

17:49:13 23     foundation.

17:49:13 24          THE WITNESS:  I think the question

17:49:14 25     mischaracterizes the situation.

                                                              283

**EXHIBIT G**
**334**

ROUGH DRAFT

17:49:14  1    BY MR. PETROCELLI:

17:49:18  2        Q.  Can you answer the question?

17:49:19  3            MR. TOBEROFF:  Is he trying and you're

17:49:20  4    interrupting his answer.

17:49:21  5            MR. PETROCELLI:  No.

17:49:22  6            MR. TOBEROFF:  Excuse me.

17:49:22  7            MR. PETROCELLI:  Is he arguing and he is

17:49:23  8    not answering my question?

17:49:25  9            MR. TOBEROFF:  No, he's.

17:49:26 10            MR. PETROCELLI:

17:49:26 11        Q.  Do you understand the question, sir?

17:49:27 12        A.  I think it mischaracterizes the situation.

17:49:29 13        Q.  It's not up to you to make that decision.

17:49:31 14    That's for a judge to make.

17:49:33 15

17:49:33 16            MR. TOBEROFF:  He can answer.

17:49:33 17    BY MR. PETROCELLI:

17:49:34 18        Q.  Do you understand the question?

17:49:35 19        A.  I don't know how to answer it because it

17:49:37 20    assumes certain things that are -- that I don't

17:49:40 21    believe are true.

17:49:40 22    BY MR. PETROCELLI:

17:49:42 23        Q.  What, if anything, did the estate get for

17:49:44 24    removing the words Superboy" and smallville from

17:49:49 25    your joint venture agreement from the way they

                                                          284

**EXHIBIT G**
**335**

ROUGH DRAFT

17:49:52  1    appeared in Exhibit 10?

17:49:55  2         MR. TOBEROFF:  Again he's referring to

17:49:57  3    Exhibit 10.  Please look at Exhibit 10 and the way

17:49:59  4    they appeared in Exhibit 10.  Those are your words

17:50:02  5    Mr. Petrocelli.  So please look at the way Superboy

17:50:06  6    appeared in Exhibit 10.

17:50:07  7         MR. PETROCELLI:  Mark you don't need to

17:50:08  8    repeat my question to him now really you're starting

17:50:11  9    to get out of hand here.

17:50:12  10        MR. TOBEROFF:  I've been pretty good I've

17:50:14  11   been a good boy.

17:50:15  12        MR. PETROCELLI:  Let's keep it that pay

17:50:17  13   okay.

17:50:18  14        MR. TOBEROFF:  Please look at Exhibit 10

17:50:20  15   which he's referred to before you answer the

17:50:21  16   question.

17:50:21  17   BY MR. PETROCELLI:

17:50:27  18        Q.  So what's the answer?

17:50:29  19        A.  What did we get?

17:50:31  20        Q.  Yes.  What did you get in return for your

17:50:33  21   agreement to delete the references to Superboy and

17:50:38  22   smallville?

17:50:45  23        A.  All I can say is I don't think we have

17:50:48  24   rights to it.

17:50:48  25        Q.  I didn't ask you whether you thought had

                                                              285

**EXHIBIT G**
**336**

ROUGH DRAFT

17:50:50  1    you rights.  I ask you what, if anything, did you

17:50:53  2    get for agreeing to do this supplement?

17:50:56  3         A.  There was -- okay there was no remuneration

17:50:58  4    or compensation or anything.

17:51:01  5         Q.  None, right?

17:51:02  6         A.  Okay.

17:51:03  7         Q.

17:51:03  8              Is that correct?

17:51:05  9              MR. TOBEROFF:  He just answered you.

17:51:06  10             THE WITNESS:  That's what I said.

17:51:06  11   BY MR. PETROCELLI:

17:51:07  12        Q.  Okay.  And and the estate of which you were

17:51:12  13   in charge of administering did not seek a second

17:51:15  14   opinion from another lawyer on that subject.

17:51:15  15             Is that right?

17:51:20  16        A.  That's correct.

17:51:20  17        Q.  The sole advice that you accepted was the

17:51:24  18   lawyer who represented the Siegels who were

17:51:28  19   asserting 100 percent ownership.

17:51:28  20             Is that correct?

17:51:28  21        A.  Yes.

17:51:41  22        Q.  Did you disclose to the probate court that

17:51:45  23   you had executed this amendment deleting any

17:51:48  24   reference to Superboy and smallville for no

17:51:53  25   remuneration or compensation based on the advice of

                                                              286

**EXHIBIT G**
**337**

ROUGH DRAFT

17:51:56  1    the lawyer for the Siegels who were claiming 100

17:52:01  2    percent rights to Superboy?  Did you make that

17:52:03  3    disclosure to the probate court?

17:52:06  4        A.  I don't believe so.

17:52:13  5        Q.  When you -- in connection with your

17:52:17  6    decision to accept the advice of Mr. Toberoff, were

17:52:28  7    you made aware of any copyright -- before I get

17:52:40  8    there, turn to Exhibit 14.

17:52:44  9            (The document referred to was

17:52:44 10            marked for identification by the

17:52:44 11            C.S.R. as Exhibit 14 and attached

17:52:44 12            to this deposition.)

17:52:53 13            MR. PETROCELLI:  Exhibit 14 is the --

17:53:00 14    notice of termination prepared by Mr. Toberoff on

17:53:03 15    behalf of the Schusters that was sent out this

17:53:10 16    November -- November 7, 2003.

17:53:14 17        Q.  You've seen this document before?

17:53:16 18        A.  Yes.

17:53:17 19        Q.  And you signed it correct if you look at

17:53:25 20    page 9?  You signed it as the executor of the estate

17:53:28 21    of Joseph Shuster?

17:53:29 22        A.  Yeah, let me find it.  I don't see the

17:53:34 23    signature page.

17:53:35 24        Q.  It's page 9, Mr. Peary if you look at the

17:53:38 25    numbers in the center of the page?

287

**EXHIBIT G**
**338**

ROUGH DRAFT

17:53:39  1    A.   The center?

17:53:41  2    Q.   The one -- the one on the right-hand corner

17:53:43  3  would be 17.

17:53:44  4    A.   Oh.   Okay.   The signature page oh, okay,

17:53:44  5  yes.

17:53:57  6    Q.   That's your signature as the executor of

17:53:58  7  the Joseph Shuster estate?

17:54:00  8    A.   Yes.

17:54:00  9    Q.   And you executed this document Exhibit 14

17:54:02  10  the notice of termination a little more than a week

17:54:06  11  after the Exhibit 13 the amendment to the joint

17:54:12  12  venture agreement dated October 27, 2003, correct?

17:54:16  13    A.   Yes.

17:54:17  14    Q.   Okay.   And this notice of termination

17:54:23  15  includes no reference to Superboy or smallville,

17:54:23  16  correct?

17:54:30  17    A.   I believe that's correct.

17:54:33  18    Q.   Okay.

17:54:33  19        MR. TOBEROFF:   Don't -- don't -- you have

17:54:34  20  to read the document before you can answer it do I.

17:54:39  21        THE WITNESS:   Okay.   I don't remember it

17:54:43  22  being in there.

17:54:43  23  BY MR. PETROCELLI:

17:54:44  24    Q.   Well based on your prior testimony you

17:54:46  25  would not expect it to be there because you said did

288

**EXHIBIT G**
**339**

ROUGH DRAFT

17:54:49  1    you not believe the estate had any such interest

17:54:51  2    based on the advise you received, correct?

17:54:53  3        A.  I would not expect it.

17:54:54  4            MR. TOBEROFF:  Calls for a legal

17:54:55  5    conclusion.  Legal document.

17:54:55  6    BY MR. PETROCELLI:

17:55:08  7        Q.  I'm going to ask you another question now?

17:55:10  8            MR. TOBEROFF:  Are you asking him Mr. It's

17:55:12  9    in here or not.

17:55:12 10            MR. PETROCELLI:  No, I'm not.  It's

17:55:14 11    innocent there.  I'll represent that.

17:55:18 12        Q.  To be clear, when you executed this notice

17:55:21 13    of termination you understood that Superboy was not

17:55:24 14    included, correct?

17:55:24 15        A.  Yes.

17:55:29 16        Q.  Okay.  Did you disclose to the probate

17:55:30 17    court that you had served in your capacity as

17:55:34 18    executor a notice of termination that did not extend

17:55:37 19    to Superboy?

17:55:38 20        A.  Did I give notice to the probate court?

17:55:43 21        Q.  Did you make that disclosure to the probate

17:55:45 22    court yes?

17:55:45 23        A.  I don't recall that.

17:55:48 24        Q.  You didn't do that, right?

17:55:51 25        A.  I don't recall doing that.

                                                            289

**EXHIBIT G**
**340**

ROUGH DRAFT

17:55:57  1        Q.  Okay.  Now, and you understood that by not

17:55:58  2    serving notice of termination with respect to

17:56:00  3    Superboy that the state would be forever giving up

17:56:06  4    any ability to recapture or terminate or recapture

17:56:10  5    any Superboy rights, correct?

17:56:14  6            MR. TOBEROFF:  Assume -- calls for a legal

17:56:16  7    conclusion.  Assumes facts and lacks foundation.

17:56:19  8            MR. PETROCELLI:

17:56:19  9        Q.  You can answer.

17:56:20  10       A.  I'm not sure what the legal technicalities.

17:56:22  11       Q.  You understood that by not seeking to

17:56:26  12   terminate is the estate was giving up any claim even

17:56:29  13   to Superboy right?

17:56:32  14           MR. TOBEROFF:  Calls for a legal

17:56:33  15   conclusion.

17:56:36  16           THE WITNESS:  All I know is it wasn't -- it

17:56:38  17   wasn't a notice was not given in this document.

17:56:38  18   BY MR. PETROCELLI:

17:56:43  19       Q.  Or in any other document right?

17:56:47  20       A.  No.

17:56:47  21       Q.   Correct?

17:56:48  22       A.  That's correct.

17:56:48  23       Q.  In fact, the -- the time within which to

17:56:52  24   file a notice of termination with respect to

17:56:55  25   Superboy on behalf of the Shuster estate expired 11

                                                              290

**EXHIBIT G**
**341**

ROUGH DRAFT

17:56:58  1    days later on November 18, 2003 correct?

17:57:04  2            MR. TOBEROFF:  Assumes facts lacks

17:57:06  3    foundation.  Calls for a legal conclusion.

17:57:09  4            THE WITNESS:  I'm not positive of the

17:57:11  5    details.

17:57:11  6    BY MR. PETROCELLI:

17:57:12  7        Q.  But you do know now that as you sit here

17:57:15  8    now as the executor of the Joseph Shuster estate

17:57:17  9    that the time has long passed for -- for the estate

17:57:21  10   filing a notice of termination with respect to

17:57:23  11   Superboy, correct?

17:57:24  12           MR. TOBEROFF:  You can -- can you only

17:57:25  13   answer these questions requiring legal knowledge

17:57:28  14   number 1 if you know one way or another and number

17:57:32  15   2, if it's not based on your discussions with me.

17:57:35  16   That's it.

17:57:38  17           THE WITNESS:  Okay.  I'm -- I'm not sure.

17:57:38  18   BY MR. PETROCELLI:

17:57:41  19       Q.  Well since 2003 to the present have you

17:57:44  20   ever purported to serve a notice of termination for

17:57:47  21   Superboy on behalf of the Shuster estate?

17:57:49  22       A.  No.

17:57:52  23       Q.  Okay.  And do you have any intention right

17:57:53  24   now to do so?

17:57:58  25           MR. TOBEROFF:  Don't discuss your

                                                          291

**EXHIBIT G**
**342**

ROUGH DRAFT

17:57:59  1    intentions as to legal acts in this case.

17:57:59  2    BY MR. PETROCELLI:

17:58:04  3        Q.  In your capacity as executor do you have a

17:58:06  4    current intention of which you are currently aware

17:58:08  5    to serve a notice of termination with respect to

17:58:12  6    Superboy?

17:58:12  7            MR. TOBEROFF:  Instruct you not to answer

17:58:13  8    that.

17:58:14  9            (Instruction not to answer.)

17:58:14 10            MR. PETROCELLI:  On what ground?

17:58:16 11            MR. TOBEROFF:  On the ground that any

17:58:17 12    intention he has as to exercising his -- exercising

17:58:21 13    whatever rights he may or may not have under the

17:58:23 14    copyright act the product of any discussions with

17:58:27 15    his counsel.

17:58:28 16            MR. PETROCELLI:  That's not a fair response

17:58:29 17    to my question.

17:58:30 18            MR. TOBEROFF:  I disagree.

17:58:30 19    BY MR. PETROCELLI:

17:58:33 20        Q.  Have you reviewed any drafts of any notices

17:58:35 21    of termination with respect to Superboy?

17:58:37 22        A.  No.

17:58:43 23        Q.  Okay.  Take a look at Exhibit 15.  At the

17:58:48 24    at the time that Mr. Toberoff gave you advice that

17:58:51 25    the estate had no claim to Superboy, did

                                                          292

ROUGH DRAFT

17:58:55  1    Mr. Toberoff show you Exhibit 15?

17:58:58  2            MR. TOBEROFF:  Misstates his testimony.

17:58:59  3    Misstates the record.  This is 15?

17:59:06  4            MR. PETROCELLI:  Yes.  15 is a 1940

17:59:11  5    Superboy script.

17:59:14  6        Q.  Have you seen this document before?

17:59:18  7        A.  No, I don't think so.

17:59:20  8        Q.  Okay.  And so I take it from your answer

17:59:22  9    that prior to serving the notice of termination

17:59:28 10    Exhibit 14 you were not aware of this document.

17:59:28 11            Is that correct?

17:59:28 12        A.  Yes.

17:59:34 13        Q.  Okay.  And the document says in the first

17:59:38 14    sentence or first paragraph:

17:59:45 15            "Panel occupies full page

17:59:46 16            contains the title Superboy the buy

17:59:48 17            line by Jerry Siegel and Joe

17:59:51 18            Shuster."

17:59:52 19            And then it goes on.

17:59:57 20            Were you aware of the existence of this

18:00:02 21    script by which Joe Shuster was identified as one of

18:00:09 22    the two buy line people?

18:00:12 23            MR. TOBEROFF:  Vague.  Unintelligible.

18:00:17 24            THE WITNESS:  I haven't seen this before.

18:00:17 25    BY MR. PETROCELLI:

293

**EXHIBIT G**
**344**

ROUGH DRAFT

18:00:27  1          Q.  Take a look at Exhibit 16.

18:00:29  2                  (The document referred to was

18:00:29  3              marked for identification by the

18:00:29  4              C.S.R. as Exhibit 16 and attached

18:00:43  5              to this deposition.)

18:00:43  6      BY MR. PETROCELLI:

18:00:44  7          Q.  Do you have Exhibit 16?

18:00:46  8              Prior to serving the notice of termination,

18:00:50  9      exhibit 14, were you aware of Exhibit 16?

18:01:02 10      Exhibit 16 is more -- a copy of parts of more fun

18:01:07 11      comics number 101.

18:01:20 12          A.  Are you asking me if I've ever seen this

18:01:22 13      before?

18:01:22 14          Q.  Yes.

18:01:34 15          A.  I don't recognize this first page

18:01:37 16      specifically showing Superboy, no.

18:01:39 17          Q.  You're referring to page -- the second page

18:01:42 18      of this exhibit?

18:01:42 19          A.  Yes.

18:01:43 20          Q.  That has the picture of Superboy on it?

18:01:44 21          A.  Yes.

18:01:45 22          Q.  Were you aware that copyright renewal

18:01:53 23      registrations were filed indicating that in the name

18:01:59 24      of both Joe Shuster and Jerome Siegel with respect

18:02:04 25      to more fun comics 101?

                                                              294

**EXHIBIT G**
**345**

ROUGH DRAFT

18:02:06  1          MR. TOBEROFF:  Lacks foundation.

18:02:06  2     BY MR. PETROCELLI:

18:02:12  3          Q.  Were you aware prior to the time that you

18:02:13  4     sent out -- that you signed the termination notice,

18:02:17  5     exhibits 14, that copyright registration renewals

18:02:25  6     for Superboy by Jerome Siegel and Joe Shuster had

18:02:29  7     been filed with the copyright office?

18:02:30  8          A.  At -- at what -- at what time?

18:02:39  9          Q.  As of the time you sent out the notice of

18:02:40 10     termination in November 2003.

18:02:43 11          A.  As of -- no.

18:02:46 12          Q.  Were you aware -- were you aware of either

18:02:49 13     this -- any such copyright registration renewals or

18:02:55 14     Exhibit 15, the Superboy script at the time that you

18:02:58 15     signed the amendment to the joint venture deleting

18:03:00 16     Superboy?

18:03:04 17          A.  Copyright renewals in the '60s?  1960s?

18:03:11 18          Q.  No.  71 -- 72.

18:03:13 19          A.  72.  Okay.

18:03:17 20          Q.  Were you aware of those documents the

18:03:20 21     renewal registration for Superboy in the name of Joe

18:03:24 22     Shuster and secretary re Siegel and were you aware

18:03:25 23     of the Superboy script Exhibit 15 when you deleted

18:03:30 24     or agreed to delete Superboy from your joint

18:03:33 25     venture?

                                                              295

**EXHIBIT G**
**346**

ROUGH DRAFT

18:03:36  1        A.  I was not aware of the specific documents.

18:03:40  2        Q.  The ones that I just asked you about,

18:03:40  3    correct?

18:03:42  4        A.  Yeah, right.  I've never seen those.

18:03:44  5        Q.  Okay.  Take a look at Exhibit 17.

18:03:47  6             (The document referred to was

18:03:47  7             marked for identification by the

18:03:47  8             C.S.R. as Exhibit 17 and attached

18:04:02  9             to this deposition.)

18:04:02 10    BY MR. PETROCELLI:

18:04:02 11        Q.  At the time that you signed the -- at the

18:04:06 12    time that you signed the -- the supplement to the

18:04:12 13    joint venture agreement removing Superboy and

18:04:18 14    smallville, were you aware that your uncle Joe

18:04:22 15    Shuster in the 1970s claimed a joint interest in

18:04:25 16    Superboy in copyright filings?

18:04:30 17             MR. TOBEROFF:  Misstates the evidence.

18:04:32 18    Assumes facts and lacks foundation.

18:04:36 19             THE WITNESS:  No.

18:04:36 20    BY MR. PETROCELLI:

18:04:40 21        Q.  Okay.  Take a look at Exhibit 17.  Do you

18:04:44 22    see the reference -- I'll represent to you this is a

18:04:49 23    listing of copyright renewal registrations and do

18:04:53 24    you see the name Joe Shuster?

18:04:55 25        A.  Oh.  Yes.

                                                                296

**EXHIBIT G**
**347**

ROUGH DRAFT

18:04:59  1      Q.   And you see Superboy under the name Joe

18:05:04  2    Shuster?

18:05:04  3      A.   Yes.

18:05:05  4      Q.   And it says Siegel Jerome?

18:05:09  5      A.   Yes.

18:05:10  6      Q.   Then you go under Siegel Jerome.

18:05:13  7           Do you see that couple entries down?

18:05:16  8      A.   Yes.

18:05:16  9      Q.   It says Superboy by Jerome Siegel and Joe

18:05:19 10    Shuster in more fun comics January to February 1945

18:05:28 11    copyright sign 18 November 1944 B 653651 Jerome

18:05:35 12    Siegel and Joe Shuster and then there's some

18:05:40 13    other -- other data.

18:05:42 14           Were you aware of such copyright

18:05:46 15    registration filings when you agreed to remove

18:05:56 16    Superboy from your joint venture agreement?

18:05:58 17      A.   No.

18:06:01 18      Q.   When you served the termination notice

18:06:03 19    without reference to Superboy?

18:06:04 20      A.   No.

18:06:07 21      Q.   Did Mr. Toberoff provide these -- any of

18:06:09 22    these documents to you, Exhibits 15, 16 and 17?

18:06:16 23    That I've just gone through with you?

18:06:21 24      A.   I don't believe so.

18:06:23 25      Q.   Take a look at Exhibit 18.

                                                              297

**EXHIBIT G**
**348**

ROUGH DRAFT

18:06:24  1              (The document referred to was

18:06:24  2              marked for identification by the

18:06:24  3              C.S.R. as Exhibit 18 and attached

18:06:31  4              to this deposition.)

18:06:31  5              THE WITNESS:  Can we get some

18:06:33  6  air-conditioning in here?

18:06:33  7  BY MR. PETROCELLI:

18:06:39  8       Q.  Exhibit 18 is an application for

18:06:41  9  registration of a claim to renewal of copyright.

18:06:49 10  Indicating for Superboy more fun comics 101

18:06:57 11  indicating co-authors Jerome Siegel and Joe Shuster.

18:07:02 12  Do you see that document?

18:07:03 13       A.  Yes.

18:07:07 14       Q.  Is this the first time you're Siegel this

18:07:09 15  document?

18:07:09 16       A.  Yes.

18:07:12 17       Q.  I take it that this document was not

18:07:14 18  provided to you by Mr. Toberoff.

18:07:14 19              Is that correct?

18:07:14 20       A.  Yes.

18:07:23 21       Q.  You were unaware of this document when you

18:07:26 22  removed Superboy and smallville from the joint

18:07:29 23  venture agreement, correct?

18:07:29 24       A.  Yes.

18:07:34 25       Q.  And whether you sent out the termination

**EXHIBIT G**
**349**

ROUGH DRAFT

18:07:36  1    notice without reference to Superboy, correct?

18:07:36  2         A.  Yes.

18:07:42  3         Q.  And you reference some case in the 1940's.

18:07:45  4              Do you recall that?  That Mr. Toberoff

18:07:49  5    mentioned to you?

18:07:49  6         A.  Yes.

18:07:53  7         Q.  And you're aware that these filings are

18:07:55  8    made in the 1970s some 25 years later?

18:07:57  9         A.  Yes.

18:08:03 10         Q.  Take a look at Exhibit 19.

18:08:06 11              (The document referred to was

18:08:06 12              marked for identification by the

18:08:06 13              C.S.R. as Exhibit 19 and attached

18:08:16 14              to this deposition.)

18:08:16 15    BY MR. PETROCELLI:

18:08:16 16         Q.  Exhibit 19 is another page from --

18:08:22 17    indicating copyright registration filings.

18:08:25 18              Do you have that in front of you?

18:08:27 19         A.  Yes.

18:08:28 20         Q.  Do you see the reference to Joe Shuster?

18:08:30 21         A.  Yes.

18:08:34 22         Q.  This is for the year 1973.  The one I just

18:08:39 23    showed you before, Exhibits -- exhibit 17 was for

18:08:42 24    the year 1972.

18:08:47 25              And you'll see the reference to Joe Shuster

299

ROUGH DRAFT

18:08:50  1    and Superboy which is then cross-referenced down to

18:08:55  2    Jerome Siegel where it also indicates that both the

18:09:00  3    names of Jerome Siegel and Joe Shuster for Superboy

18:09:03  4    in more fun comics.

18:09:05  5         Do you see that?

18:09:05  6         A.  Yes.

18:09:08  7         Q.  And were you aware that they had filed

18:09:12  8    copyright renewal registrations in 1973 with respect

18:09:16  9    to Superboy, that is Joe Shuster had together with

18:09:19  10   Jerome Siegel?

18:09:20  11        A.  I had some vague awareness that they were

18:09:26  12   filing for renewal copyrights and they were denied.

18:09:29  13        Q.  With respect to Superboy?

18:09:30  14        A.  With all the -- all the elements.

18:09:36  15        Q.  I'm asking you specifically did you know

18:09:37  16   about the Superboy copyright registration renewals

18:09:40  17   when you signed those documents?

18:09:41  18        A.  A general vague idea of Superman and

18:09:44  19   related elements.

18:09:45  20        Q.  But you didn't have they specific knowledge

18:09:47  21   of the Superboy registration filings.

18:09:49  22        Is that correct?

18:09:49  23        A.  Not specifically Superboy.

18:09:51  24        Q.  None these documents with respect to

18:09:52  25   Superboy had been made available to you at the time

300

**EXHIBIT G**
**351**

ROUGH DRAFT

18:09:55  1    you signed the amendment to the joint venture

18:09:58  2    agreement on October 27, 2003 removing Superboy,

18:09:58  3    correct?

18:10:06  4        A.  Yes.

18:10:07  5        Q.  And is it fair to say that had these

18:10:09  6    documents been made available to you you would have

18:10:11  7    taken them into account in making a decision whether

18:10:14  8    or not to delete Superboy, correct?

18:10:17  9            MR. TOBEROFF:  Calls for a legal conclusion

18:10:17 10    as to a complex issue.

18:10:21 11            MR. PETROCELLI:  Hardly.

18:10:22 12            MR. TOBEROFF:  You're so wrong.

18:10:25 13            MR. TOBEROFF:  You're so wrong.

18:10:27 14            MR. PETROCELLI:  You didn't listen to my

18:10:28 15    question.

18:10:28 16            MR. TOBEROFF:  I listened to it.

18:10:28 17    BY MR. PETROCELLI:

18:10:33 18        Q.  Can you answer my question?

18:10:34 19        A.  Would I have --

18:10:34 20        Q.  Taken these documents into account had they

18:10:38 21    been made available to you?

18:10:39 22        A.  I don't think it would have made a

18:10:43 23    difference because the legal situation with regard

18:10:46 24    to.

18:10:48 25            MR. TOBEROFF:  Don't testify based on

                                                          301

**EXHIBIT G**
**352**

ROUGH DRAFT

18:10:50  1    conversations with your attorney.

18:10:51  2            THE WITNESS:  Okay then I can't say

18:10:52  3    anything.

18:10:52  4    BY MR. PETROCELLI:

18:10:56  5        Q.  Did your -- you were unaware of these

18:10:56  6    documents, correct?

18:10:59  7        A.  Of these specific documents.

18:10:59  8        Q.  Correct.  Right.

18:11:02  9            And you were -- is it fair to say that

18:11:07 10    would you have wanted to know about these -- these

18:11:11 11    documents prior to having made the decision to sign

18:11:14 12    those -- the amended joint venture agreement?

18:11:20 13            MR. TOBEROFF:  Calls for a legal

18:11:21 14    conclusion.

18:11:22 15            THE WITNESS:  I knew their renewal requests

18:11:25 16    were denied back in the early '70s.

18:11:25 17    BY MR. PETROCELLI:

18:11:29 18        Q.  You're not -- you're not answering my

18:11:31 19    question?

18:11:31 20            MR. TOBEROFF:  He is answering your

18:11:32 21    question.  You keep cutting him off -- excuse me I'm

18:11:35 22    talking being.

18:11:35 23    BY MR. PETROCELLI:

18:11:36 24        Q.  You testified?

18:11:36 25            MR. TOBEROFF:  Excuse me excuse me excuse

302

**EXHIBIT G**
**353**

ROUGH DRAFT

18:11:37  1    me.  Excuse me, I'm talking.

18:11:38  2            MR. PETROCELLI:  Don't waste my time.

18:11:40  3            MR. TOBEROFF:  I will not I will not.

18:11:40  4    BY MR. PETROCELLI:

18:11:42  5        Q.  You already testified, sir?

18:11:43  6            MR. TOBEROFF:  I will not.

18:11:44  7            MR. PETROCELLI:  Sir, you testified.

18:11:45  8            MR. TOBEROFF:  You're talking over me I

18:11:46  9    will not have you talk over me now.

18:11:48  10            MR. PETROCELLI:  Take a break off the

18:11:49  11    record court or we're on the record I don't agree to

18:11:53  12    go off the record.

18:11:53  13            MR. PETROCELLI:  I do not agree to go off

18:11:56  14    the record.

18:11:57  15            MR. PETROCELLI:  I'm not going let you chew

18:11:58  16    up my time making speeches.

18:12:00  17            MR. TOBEROFF:  I'm not chewing up your time

18:12:01  18    don't talk over me you're going to let me finish.

18:12:05  19            MR. PETROCELLI:  Terminate the deposition

18:12:06  20    if you continue.

18:12:06  21            MR. TOBEROFF:  You can do whatever you see

18:12:08  22    fit I'm going to finish my sentence.

18:12:10  23            MR. PETROCELLI:  Finish your sentence and

18:12:12  24    you've got 20 seconds.

18:12:14  25            MR. TOBEROFF:  You're wasting time.  You

                                                                    303

**EXHIBIT G**
**354**

ROUGH DRAFT

18:12:15  1    don't tell me how long I get to speak.

18:12:17  2              MR. PETROCELLI:  You're timed go.

18:12:18  3              MR. TOBEROFF:  When he says something that

18:12:20  4    you don't want him to say you cut him off.  It's an

18:12:23  5    old trick.  My client when he is attempting to

18:12:26  6    answer your question, you have to let him finish the

18:12:29  7    answer.  He was about to -- he was talking and you

18:12:31  8    cut him off and then when I objected and said please

18:12:34  9    let me client finish you cut me off and standard

18:12:36  10   talking over me.  Please don't do that.  I'm

18:12:39  11   finished.

18:12:39  12   BY MR. PETROCELLI:

18:12:40  13       Q.  Mr. Court how did do I on the 20 seconds?

18:12:42  14              MR. PETROCELLI:  Just made it.

18:12:43  15       Q.  I -- I don't want you to be telling me

18:12:46  16   about copyright registration renewals that were

18:12:49  17   denied when you have already specifically testified

18:12:52  18   that you have no knowledge that these specific

18:12:55  19   Superboy registrations were designed.  It's not

18:12:58  20   responsive and it's not helpful.

18:13:00  21              MR. TOBEROFF:  And you can -- can you

18:13:02  22   answer the question anyway you see fit.

18:13:02  23   BY MR. PETROCELLI:

18:13:04  24       Q.  And if you do I will?

18:13:05  25              MR. TOBEROFF:  You're talking over me

                                                                    304

ROUGH DRAFT

18:13:07  1    again.  Can you answer the question anyway you see

18:13:08  2    fit.  And -- and I -- and with the exception that I

18:13:12  3    will instruct you not to answer certain questions

18:13:15  4    that impinge on the attorney-client privilege.

18:13:15  5    BY MR. PETROCELLI:

18:13:18  6        Q.  Now, my question to you is would you have

18:13:20  7    wanted to know about various documents in which that

18:13:23  8    evidence your uncle claiming co-authorship of

18:13:28  9    Superboy and filing copyright registrations as late

18:13:32 10    as the mid-'70s in making a determination to remove

18:13:37 11    the -- any interest of the estate to Superboy?

18:13:40 12        MR. TOBEROFF:  Objection.  Assumes facts.

18:13:43 13    Lacks foundaton.  It mischaracterizes the exhibits

18:13:48 14    you can answer.

18:13:51 15        THE WITNESS:  My answer is I don't think it

18:13:52 16    would have made any difference so no.

18:13:52 17    BY MR. PETROCELLI:

18:13:55 18        Q.  Why wouldn't it have made a difference?

18:13:57 19        MR. TOBEROFF:  You can only answer that to

18:13:59 20    the extent that your knowledge is not based on

18:14:01 21    conversations with me regarding Superboy.

18:14:05 22        THE WITNESS:  I -- I -- it's kind of legal.

18:14:15 23    I just know.

18:14:17 24        MR. TOBEROFF:  You can only answer that --

18:14:19 25    please follow my instruction.  If your conversations

305

**EXHIBIT G**
**356**

ROUGH DRAFT

18:14:23  1    are based on knowledge independent of your

18:14:25  2    discussions with me I'm happy for you to answer the

18:14:27  3    question.  If they're not, then you can't answer the

18:14:31  4    question.  That's it.

18:14:33  5         THE WITNESS:  Okay.

18:14:33  6    BY MR. PETROCELLI:

18:14:37  7         Q.  As --

18:14:38  8         A.  My -- my knowledge of it is -- is based

18:14:44  9    mostly on my discussions so I guess I can't answer

18:14:49 10    it.

18:14:50 11         Q.  You're the executor of the estate.  You

18:14:52 12    filed legal documents in that capacity.  You filed

18:14:56 13    them as a matter of public record.

18:15:03 14         On what basis did you file documents

18:15:06 15    concluding that the estate had no interest in

18:15:09 16    Superboy?

18:15:13 17         MR. TOBEROFF:  You can answer that as -- as

18:15:15 18    long is as your basis is not based on conversations

18:15:18 19    and advice with your -- from and with your attorney.

18:15:25 20         THE WITNESS:  Okay.  So what do I know

18:15:30 21    separate from talking with my attorney?

18:15:33 22         MR. TOBEROFF:  Don't involve him in that

18:15:34 23    thought process.  Think to yourself whether you have

18:15:36 24    an understanding separate from your conversations

18:15:41 25    with me or if you can separate it then can you

**EXHIBIT G**
**357**

ROUGH DRAFT

18:15:43  1    answer the question.  If not, I instruct you not to

18:15:46  2    answer.

18:15:48  3              THE WITNESS:  Well my knowledge is tied to

18:15:50  4    my discussions with Marc Toberoff.  I don't know how

18:15:54  5    to separate it.

18:15:54  6    BY MR. PETROCELLI:

18:15:56  7        Q.  I'm asking you for --

18:15:57  8              MR. TOBEROFF:  I instruct you not to

18:15:58  9    answer.

18:15:58 10    BY MR. PETROCELLI:

18:15:59 11        Q.  I'm asking you to answer the question based

18:16:01 12    on your judgment and your capacity as the executor

18:16:03 13    of the estate.  You're the decision-maker not your

18:16:06 14    lawyer.

18:16:07 15              MR. TOBEROFF:  It's the same instruction.

18:16:09 16    His question doesn't change my instruction.

18:16:14 17              THE WITNESS:  I have to follow the

18:16:15 18    instruction.

18:16:16 19              (Instruction not to answer.)

18:16:16 20    BY MR. PETROCELLI:

18:16:17 21        Q.  Did you -- do you believe that Joe Shuster

18:16:20 22    new better than Marc Toberoff as to whether he

18:16:25 23    participated in the creation of Superboy?

18:16:34 24        A.  I'm not sure I understand the question.

18:16:34 25        Q.  Well, you saw that I showed you various

307

**EXHIBIT G**
**358**

ROUGH DRAFT


18:16:36  1    documents including copyright registration files --

18:16:41  2    filings in which Joe Shuster was attributed as a

18:16:49  3    co-shore of Superboy.  You saw that, right?

18:16:51  4        A.  Yes.

18:16:52  5        Q.  Okay.  Do you think that Joe Shuster would

18:16:54  6    have had a better understanding of whether he was a

18:16:56  7    co-author of Superboy than Marc Toberoff?

18:17:01  8            MR. TOBEROFF:  Calls for a legal

18:17:02  9    conclusion.  Lacks foundation.

18:17:09 10            THE WITNESS:  All I know is she's -- these

18:17:13 11    terminations were based upon a -- a renewal period

18:17:17 12    that -- that doesn't currently apply.

18:17:20 13            MR. TOBEROFF:  Don't -- don't discuss --.

18:17:20 14    BY MR. PETROCELLI:

18:17:23 15        Q.  How do you know what you just said?

18:17:24 16            MR. TOBEROFF:  Excuse me.

18:17:24 17    BY MR. PETROCELLI:

18:17:26 18        Q.  You just said that these renewals don't

18:17:29 19    apply.  What did you mean by that?

18:17:31 20            MR. TOBEROFF:  Excuse me.  I'm going to

18:17:33 21    make my instruction again.  I'm instructing you not

18:17:36 22    to testify based on advice or information that you

18:17:41 23    have only received from your attorney.

18:17:43 24            Do you understand that instruction?

18:17:45 25            Do you understand that instruction?

ROUGH DRAFT

18:17:48  1           THE WITNESS:  Not to testify to information

18:17:49  2    that I have received from my attorney?

18:17:51  3           MR. TOBEROFF:  Yes.

18:17:51  4           Do you understand that instruction.

18:17:53  5           THE WITNESS:  Yes.

18:17:54  6           MR. TOBEROFF:  Okay.  So if you have

18:17:55  7    knowledge outside of your conversations with me or

18:17:59  8    outside of advice that I have given you, then can

18:18:02  9    you testify.

18:18:09 10           THE WITNESS:  Okay.  Well --

18:18:11 11           MR. TOBEROFF:  And you don't have to feel

18:18:12 12    bad about it.  Just you make the decision whether

18:18:14 13    it's based on knowledge -- based on advice and

18:18:17 14    knowledge you've obtained from me and conversations

18:18:19 15    with me in which event I instruct you not to answer.

18:18:22 16    You don't have to feel bad about not answering.  You

18:18:24 17    don't answer the question.  You're instructed not to

18:18:27 18    answer.  If however you have information based on

18:18:30 19    your own independent knowledge that's not part and

18:18:34 20    parcel of your discussions and advice from me, then

18:18:37 21    you -- then you can answer the question and only,

18:18:39 22    then.

18:18:39 23           Do you understand that?

18:18:44 24           THE WITNESS:  Okay yes.

18:18:45 25           MR. TOBEROFF:  Okay good.

                                                          309

**EXHIBIT G**
**360**

ROUGH DRAFT

18:18:45  1   BY MR. PETROCELLI:

18:18:47  2        Q.  So answer the question now.

18:18:48  3        A.  So my -- my -- my understanding is based on

18:18:58  4   my discussions with Marc Toberoff, my -- and where

18:19:02  5   we discuss copyright law.  That's.

18:19:06  6        Q.  But you -- you made a judgment it was your

18:19:08  7   decision to make not Mr. Toberoff's.  You made a

18:19:11  8   judgment to enter into an amendment to a joint

18:19:14  9   venture removing certain rights from the venture.

18:19:18 10   And in what -- when you made that judgment I

18:19:20 11   would -- I want you to tell me what was the basis of

18:19:23 12   that judgment?

18:19:24 13        MR. TOBEROFF:  Asked and answered.  I

18:19:25 14   instruct you not to answer.  You've already answered

18:19:28 15   the question.  Basis is legal advice.  You don't

18:19:30 16   have to answer and you don't have to speak.

18:19:32 17           (Instruction not to answer.)

18:19:34 18        MR. TOBEROFF:  Next question.

18:19:34 19   BY MR. PETROCELLI:

18:19:36 20        Q.  And when you made the judgment as the

18:19:38 21   executor of the estate to reject any claim to

18:19:48 22   Superboy, what was the basis of that judgment?

18:19:56 23        MR. TOBEROFF:  Same instruction.

18:19:56 24           (Instruction not to answer.)

18:19:56 25   BY MR. PETROCELLI:

                                                            310

**EXHIBIT G**
**361**

ROUGH DRAFT

18:20:03  1          Q.  Did you -- did you talk to the -- to the

18:20:11  2     Siegels about your decision before making it?

18:20:24  3          A.  I don't recall doing that.

18:20:25  4          Q.  Did you approach the Siegels at any time

18:20:30  5     and indicate to them that based on Joe Shuster's

18:20:38  6     contributions to Superboy, that the right should be

18:20:44  7     equally divided?  Did you have any discussion like

18:20:47  8     that with the Siegels?

18:20:48  9          A.  No.

18:20:50  10          Q.  Did you even think about having that kind

18:20:52  11     of conversation?

18:20:57  12          A.  I don't know if I thought about it.

18:20:59  13          Q.  Did you talk to your mom that you were

18:21:03  14     going to relinquish rights to Superboy?

18:21:06  15          A.

18:21:06  16              MR. TOBEROFF:  Misstates his testimony.

18:21:09  17     Assumes facts.  Lacks foundation.

18:21:15  18              THE WITNESS:  I didn't think we had rights.

18:21:15  19     BY MR. PETROCELLI:

18:21:18  20          Q.  That was based on what Marc Toberoff told

18:21:19  21     you, correct?

18:21:21  22          A.  Largely.

18:21:22  23          Q.  Well what -- what part wasn't based on what

18:21:24  24     Marc Toberoff told you?

18:21:25  25          A.  I have seen section 304 D of the copyright

                                                                    311

**EXHIBIT G**
**362**

ROUGH DRAFT

18:21:33  1   law.

18:21:34  2           Q.  So you made your own interpretation of

18:21:36  3   section 304 D of the copyright law and concluded

18:21:39  4   that Joe Shuster had no rights to Superboy?

18:21:43  5           A.  I read it in consultation with my attorney.

18:21:46  6           MR. TOBEROFF:  Again, please, don't go into

18:21:48  7   areas that are based on your consultation with your

18:21:50  8   attorney, please.

18:21:51  9           THE WITNESS:  Okay.

18:21:52 10           MR. TOBEROFF:  Just because he keeps asking

18:21:54 11   you the same questions all over again you don't have

18:21:56 12   to feel bad when you can't answer those questions

18:21:58 13   because it's attorney-client privilege.  He could

18:22:01 14   ask the question.

18:22:01 15           MR. PETROCELLI:  Mark.

18:22:02 16           MR. TOBEROFF:  Over and over again.

18:22:03 17           MR. PETROCELLI:  Mark it's not.

18:22:04 18           MR. TOBEROFF:  I'm instructing.

18:22:05 19           MR. PETROCELLI:  No, no.

18:22:06 20           MR. TOBEROFF:  When you interrupt me it

18:22:07 21   wastes more time than you letting me finish.

18:22:10 22           MR. PETROCELLI:  You're taking a moment can

18:22:11 23   you go off the record and tell him that.

18:22:13 24           MR. TOBEROFF:  You're wasting time.

18:22:14 25           MR. PETROCELLI:  I don't want you using

                                                                    312

**EXHIBIT G**
**363**

ROUGH DRAFT

18:22:16 1    valuable time telling him he doesn't have to feel

18:22:19 2    bad.

18:22:19 3                MR. TOBEROFF:  If you're concerned about

18:22:20 4    the time you wouldn't engage in me in colloquy.

18:22:20 5                MR. PETROCELLI:  No, No, I can't let you

18:22:20 6    keep doing this.

18:22:23 7                MR. TOBEROFF:  Court consider I'm going

18:22:25 8    instruct my client you can reserve all your rights.

18:22:27 9                MR. PETROCELLI:  I'm putting you on notice

18:22:29 10   right now.

18:22:29 11               MR. TOBEROFF:  Interrupting me again.

18:22:31 12               MR. PETROCELLI:  That I'm going to seek

18:22:34 13   more time to examine the witness.

18:22:34 14               MR. TOBEROFF:  I reject that.

18:22:37 15               MR. PETROCELLI:  Because you're talking.

18:22:40 16               MR. TOBEROFF:  The time is wasted by -- he

18:22:43 17   you're not going to brow meet your?

18:22:45 18               MR. PETROCELLI:  That you instruct him not

18:22:47 19   to answer.  You don't have to go into any further

18:22:49 20   colloquy request him.

18:22:50 21               MR. TOBEROFF:  I see that my client is

18:22:52 22   getsing very distressed because your asking him the

18:22:55 23   same question -- please don't interrupt plea please

18:22:57 24   don't interrupt me.

18:22:58 25               MR. PETROCELLI:  Asking you to go off the

                                                              313

**EXHIBIT G**
**364**

ROUGH DRAFT

18:22:59  1    record so you don't take up my time that's all I'm

18:23:02  2    asking you.

18:23:02  3          MR. TOBEROFF:  We can govern govern the

18:23:04  4    record.

18:23:05  5          THE VIDEOGRAPHER:  Video off the record the

18:23:06  6    time is 6:22.

18:32:05  7          (Brief recess.)

18:32:06  8          THE VIDEOGRAPHER:  Back on the record at

18:32:11  9    6:31.

18:32:11  10   BY MR. PETROCELLI:

18:32:15  11        Q.  I put Exhibit 13 back in front of you.

18:32:17  12   It's the October 27, 2003 amendment to the joint

18:32:21  13   venture agreement.  Which you signed as executor

18:32:26  14   with Pacific Pictures Corporation.

18:32:33  15        When you entered into this amendment to the

18:32:36  16   joint venture agreement with Pacific Pictures

18:32:41  17   Corporation, on what basis did you determine to

18:32:48  18   remove references to Superboy from your joint

18:32:52  19   venture?

18:32:56  20        A.  It was on advice of counsel.

18:32:59  21        Q.  But the counsel you're talking about is --

18:33:03  22   was the other party to the joint venture, correct?

18:33:07  23        MR. TOBEROFF:  Argumentative.

18:33:07  24   BY MR. PETROCELLI:

18:33:11  25        Q.  The counsel you're talking about is Marc

314

**EXHIBIT G**
**365**

ROUGH DRAFT


18:33:13  1    Toberoff, correct?

18:33:13  2        A.  Marc Toberoff attorney.

18:33:14  3        Q.  Marc Toberoff was the president of the

18:33:16  4    joint venture that was the other party to your joint

18:33:23  5    venture agreement, correct?

18:33:23  6        A.  Yes.

18:33:27  7        Q.  President of Pacific Pictures so you took

18:33:30  8    the advice of the president of Pacific -- you're

18:33:32  9    relying on the advice of the president of Pacific

18:33:37 10    Pictures Corporation and on that basis refusing to

18:33:39 11    tell me why you deleted Superboy?

18:33:43 12            MR. TOBEROFF:  Argumentative.

18:33:44 13            THE WITNESS:  My relationship with.

18:33:47 14            MR. TOBEROFF:  What's the question?

18:33:49 15    BY MR. PETROCELLI:

18:33:51 16        Q.

18:33:51 17            Is that correct?

18:33:52 18        A.  That -- say it again.

18:33:53 19        Q.  That you're -- you're telling me that the

18:33:56 20    sole basis of your decision to remove Superboy from

18:34:01 21    your amendment to your joint venture which is

18:34:04 22    Exhibit 13 that you entered into with the president

18:34:08 23    of Pacific Pictures Corporation was the advice given

18:34:12 24    to you by the president of Pacific Pictures

18:34:15 25    Corporation?

315


**EXHIBIT G**
**366**

ROUGH DRAFT

18:34:17  1        A.  As my attorney, yes.

18:34:20  2        Q.  And you had no other basis other than what

18:34:23  3    your attorney told you, other than what Mr. Toberoff

18:34:25  4    told you, correct?

18:34:25  5        A.  Yes.

18:34:29  6        Q.  And you refused to -- to share the basis

18:34:36  7    for your judgment simply because your lawyer told

18:34:39  8    you?

18:34:41  9        A.  My counsel told me, yes.

18:34:47 10        Q.  And -- and you understood at the time that

18:34:55 11    you relied exclusively on the advice of Mr. Toberoff

18:35:02 12    that he was the lawyer for the Siegels who were

18:35:07 13    claiming 100 percent rights to Superboy, correct?

18:35:07 14        A.  Yes.

18:35:29 15        Q.  Now, you said that this agreement got

18:35:40 16    terminated or canceled because you learned from

18:35:45 17    Mr. Toberoff that it was invalid.

18:35:45 18            Is that correct?

18:35:50 19            MR. TOBEROFF:  I believe that misstates his

18:35:51 20    testimony.

18:35:53 21            THE WITNESS:  I don't remember the reason

18:35:55 22    why I said.

18:35:55 23    BY MR. PETROCELLI:

18:35:59 24        Q.  What was your understanding why the

18:36:01 25    reason -- why the agreement was invalid?

                                                          316

**EXHIBIT G**
**367**

ROUGH DRAFT

18:36:06  1        A.  I don't know if I thought it was invalid.

18:36:09  2    We changed it to a legal retainer because it was a

18:36:12  3    better format.

18:36:18  4        Q.  Why -- and -- but you also in connection

18:36:21  5    with that decision received advice that certain

18:36:27  6    parts of your agreement might not be valid, correct?

18:36:35  7        A.  I believe so.

18:36:35  8        Q.  What parts?

18:36:43  9        MR. TOBEROFF:  I'll -- I'll -- I'll -- he

18:36:46 10    can't go into that without divulging the substance

18:36:51 11    of his communications with me on the subject.

18:36:51 12    BY MR. PETROCELLI:

18:36:55 13        Q.  Well as the executor of the estate entering

18:36:58 14    into -- well, let me start all over again.

18:37:00 15            Take a look at Exhibit 20.

18:37:09 16            (The document referred to was

18:37:09 17            marked for identification by the

18:37:09 18            C.S.R. as Exhibit 20 and attached

18:37:15 19            to this deposition.)

18:37:15 20        MR. PETROCELLI:  This is the September 10,

18:37:17 21    20004 document that you signed and your mother also

18:37:21 22    signed, correct?

18:37:21 23        A.  Yes.

18:37:25 24        Q.  You signed it both in your individual

18:37:26 25    capacity as executor of Mr. Shuster's estate?

                                                    317

**EXHIBIT G**
**368**

ROUGH DRAFT

18:37:29  1        A.  Yes.

18:37:31  2        Q.  And it says:

18:37:36  3             "It's a letter from

18:37:37  4        Mr. Toberoff to you.  And to

18:37:41  5        Ms. Peavy, right?

18:37:42  6        A.  Yes.

18:37:43  7        Q.  It says this is to confirm that one, the

18:37:46  8   joint venture agreement dated as of November 23,

18:37:50  9   2001 between you and Pacific Pictures Corporation

18:37:53 10   and 2, the engagement agreement dated October 27,

18:37:58 11   2003 between the estate of Joseph Shuster and

18:38:01 12   Pacific Pictures corp. have been canceled.

18:38:06 13   Sincerely yours Marc Toberoff and its on the

18:38:08 14   letterhead of Pacific Pictures Corporation.

18:38:11 15             Do you see that?

18:38:11 16        A.  Yes.

18:38:18 17        Q.  When you agreed to this cancellation what

18:38:26 18   provisions of your prior agreements did you believe

18:38:28 19   were invalid?

18:38:33 20             MR. TOBEROFF:  Same instruction.

18:38:33 21   BY MR. PETROCELLI:

18:38:40 22        Q.  Were there drafts of the October 27, 2003

18:38:42 23   amendment to the joint venture or did you just sign

18:38:44 24   the one and only version that was given to you?

18:38:53 25        A.  I don't remember if there were any other

318

**EXHIBIT G**
**369**

ROUGH DRAFT

18:38:54  1    drafts.

18:38:54  2        Q.  Were there drafts of Exhibit 20 in the

18:38:56  3    September 10, 20004 document that you have in front

18:39:04  4    of you?

18:39:04  5        A.  I only recall getting this.

18:39:10  6        Q.  Excuse me?  You only recall receiving?

18:39:10  7        A.  This I only recall getting this document.

18:39:12  8        Q.  If you go back and look at Exhibit 10 for a

18:39:15  9    moment?

18:39:15  10       A.  Which is.

18:39:32  11       Q.  Exhibit 10.  And paragraph -- paragraph 8

18:40:04  12   and you see the reference in there that in the event

18:40:06  13   of a termination for any reason the rights will be

18:40:11  14   held by the claimants that's you and your mother 50

18:40:15  15   percent and by PPC as tenants in common by percent."

18:40:20  16            Do you see that? Paragraph 8?

18:40:20  17       A.  Yes.

18:40:21  18       Q.  And you see the same provision in Exhibit

18:40:24  19   13 in paragraph 7 that's the October 27, 2003

18:40:30  20   amendment.  In the event of a termination for any

18:40:33  21   reason the rights go to you 50 percent, the estate

18:40:42  22   and then 50 percent PPC.

18:40:47  23            Do you see that?

18:40:47  24       A.  2003, which.

18:41:12  25       Q.  Paragraph 7?

319

**EXHIBIT G**
**370**

ROUGH DRAFT

18:41:12  1        A.  Oh, 7.  Okay.

18:41:19  2        A.  Yeah okay.

18:41:20  3        Q.  You got that?

18:41:32  4        A.  In the event of termination?

18:41:33  5        Q.  Right for any reason?

18:41:34  6        A.  On expiration -- oh, okay.

18:41:37  7        Q.  So you see it has the same provision,

18:41:37  8    correct?

18:41:40  9        A.  Almost.  It just leaves out the word

18:41:44  10    "venture" is all.

18:41:47  11        Q.  Okay.  Now, are you aware of any document

18:41:51  12    at the time you executed Exhibit 20 which is the

18:41:54  13    December -- excuse me, the September 10, 20004

18:41:58  14    document, that states that the rights do not go 50

18:42:10  15    percent to the estate and 50 percent to PPC in the

18:42:14  16    event of a termination.

18:42:19  17        A.  Not in that document, no.

18:42:20  18        Q.  It's not in Exhibit 20 corrects?

18:42:24  19        A.  That's correct.

18:42:24  20        Q.  Is there any other document of which you

18:42:26  21    were aware that provided that as a result of

18:42:29  22    executing Exhibit 20 the rights went other than as

18:42:35  23    directed by exhibits 10 and 13 the joint venture

18:42:39  24    agreements?

18:42:39  25        A.  Yes.

320

**EXHIBIT G**
**371**

ROUGH DRAFT

18:42:42  1      Q.  What document is that?

18:42:44  2      A.  The legal retainer.

18:42:46  3      Q.  Okay.  Show me that.  Here is our copy of T

18:42:54  4   it's Exhibit 21.

18:43:01  5              MR. TOBEROFF:  May I have a copy, please.

18:43:03  6                   (The document referred to was

18:43:03  7                   marked for identification by the

18:43:03  8                   C.S.R. as Exhibit 21 and attached

18:43:11  9                   to this deposition.)

18:43:11  10  BY MR. PETROCELLI:

18:43:12  11     Q.  Now, this is a copy that's redacted.  Do

18:43:19  12  you understand what redacted means?  When

18:43:23  13  Mr. Toberoff produced it to us he excised or omitted

18:43:26  14  various parts of it so it's not a complete document

18:43:29  15  but it's all that we have.  This is a document that

18:43:40  16  you signed?  What you're now calling this retainer

18:43:47  17  agreement Exhibit 21.

18:43:48  18     A.  Yes.

18:43:48  19     Q.  Okay.  And did you sign this at or around

18:43:51  20  the time that you executed Exhibit 20 the September

18:43:57  21  10, 20004 document?

18:44:04  22     A.  It was signed around that time.

18:44:09  23     Q.  And where in Exhibit 21, the -- by the way,

18:44:21  24  would you call Exhibit 21 the -- more or less a

18:44:24  25  standard legal retainer agreement?

**EXHIBIT G**
**372**

ROUGH DRAFT

18:44:28  1      A.  I believe.

18:44:28  2          MR. TOBEROFF:  Vague.

18:44:28  3    BY MR. PETROCELLI:

18:44:30  4      Q.  Where in the Exhibit 21 does it say that

18:44:35  5    the rights upon termination of the venture go other

18:44:41  6    than as directed by the joint venture agreements

18:44:45  7    exhibits 10 and 13?

18:44:51  8      A.  In 9 it says this agreement supersedes all

18:44:54  9    prior and contemporaneous understandings.

18:45:01  10     Q.  Is there anyplace in this document that

18:45:03  11   says that in the event that the joints venture

18:45:06  12   agreements -- because the joint venture agreements

18:45:10  13   have been canceled that the rights go not as

18:45:13  14   directed by the joint venture agreements by but in

18:45:16  15   some other manner?  Is there some more explicit

18:45:20  16   clause than 9?

18:45:20  17         MR. TOBEROFF:  Are you asking -- are you

18:45:22  18   asking him to read the document.

18:45:22  19   BY MR. PETROCELLI:

18:45:24  20     Q.  No I'm asking him to tell me from memory,

18:45:27  21   because I've read what you've given me and there is

18:45:30  22   no such statement in what you produced to us in the

18:45:33  23   redacted version so is there any such statement that

18:45:39  24   you recall that appeared in this document when you

18:45:42  25   signed it before it was sent to us in redacted form?

322

**EXHIBIT G**
**373**

ROUGH DRAFT

18:45:45  1        A.  That specifically states.

18:45:46  2        Q.  That notwithstanding -- in words or

18:45:49  3    substance notwithstanding what is stated in the

18:45:52  4    joint venture agreements and the event of a

18:45:53  5    termination for any reason the claimants will own 50

18:45:56  6    percent and PPC will own the remaining 50 percent.

18:46:00  7            MR. TOBEROFF:  Asked and answered.

18:46:00  8    BY MR. PETROCELLI:

18:46:01  9        Q.  That the rights about not go to

18:46:04  10   Mr. Toberoff or any company associated with him or

18:46:06  11   PPC but will go as -- in some different way?

18:46:11  12           MR. TOBEROFF:  Asked and answered.

18:46:11  13   BY MR. PETROCELLI:

18:46:12  14       Q.  Something like that.  Is there some

18:46:13  15   explicit reference in this retainer agreement along

18:46:16  16   those lines?

18:46:17  17           MR. TOBEROFF:  Asked and answered.

18:46:21  18           You can answer.

18:46:22  19           THE WITNESS:  Not exactly as you stated it.

18:46:22  20   BY MR. PETROCELLI:

18:46:25  21       Q.  Is there any reference to the did he say

18:46:28  22   position of the rights upon termination of the joint

18:46:33  23   venture other than the first sentence of paragraph 9

18:46:37  24   that you just pointed out to me?

18:46:42  25       A.  Well, to me the --

323

**EXHIBIT G**
**374**

ROUGH DRAFT

18:46:44  1          MR. TOBEROFF:  You'd have to read the

18:46:45  2     agreement before you can answer.

18:46:47  3          Do you want him to read the agreements.

18:46:47  4     BY MR. PETROCELLI:

18:46:49  5          Q.  Are you aware of anything?  You pointed

18:46:52  6     readily to paragraph 9.  Are you aware of any other

18:46:54  7     agreement, other provision in the document that

18:46:56  8     deals with the disposition was rights?

18:46:58  9          MR. TOBEROFF:  Without reading it?

18:47:00 10          MR. PETROCELLI:  Yes.  Without reading it

18:47:02 11     word for word:  You can scan it.

18:47:15 12          THE WITNESS:  To me it's -- it's clear

18:47:20 13     between the legal retainer and the letter that

18:47:20 14     canceled the joint venture that the -- the legal

18:47:28 15     retainer as it states supersedes everything else.

18:47:28 16     BY MR. PETROCELLI:

18:47:33 17          Q.  Your understanding that Pacific Pictures

18:47:36 18     Corporation was a party to this retainer agreement?

18:47:36 19          A.  No.

18:47:45 20          Q.  So Pacific Pictures Corporation didn't

18:47:50 21     agree to anything in this retainer agreement so far

18:47:56 22     as you know, right?

18:47:57 23          A.  As far as I know they're not a party.

18:47:59 24          Q.  So are you aware of a document by which

18:48:02 25     Pacific Pictures Corporation specifically stated

                                                                    324

**EXHIBIT G**
**375**

ROUGH DRAFT

18:48:07  1  that notwithstanding the provisions of the joint

18:48:09  2  venture agreement in the event of a termination

18:48:12  3  Pacific Pictures Corporation will not own any

18:48:16  4  rights?

18:48:17  5      A.  The -- my understanding of the Pacific

18:48:26  6  Pictures it says if the venture is terminated not if

18:48:30  7  it's canceled.

18:48:32  8      Q.  Terminated for any reason, right?

18:48:35  9      A.  That's -- if the venture is -- it's not the

18:48:38 10  same thing as canceled.  That's my understanding.

18:48:43 11      Q.  What's the difference between the two?

18:48:44 12      A.  The -- the difference being canceled means

18:48:48 13  it has been supplanted by the legal retainer and

18:48:52 14  supersedes all prior agreements like it states here.

18:48:55 15      Q.  Pacific Pictures is not a party to this

18:48:58 16  agreement you said, right?

18:48:59 17      A.  Not to the legal retainer.

18:49:00 18      Q.  Right.  So you're saying that -- who told

18:49:03 19  you that the word "canceled" means that the

18:49:07 20  termination provisions of the joint venture

18:49:09 21  agreements no longer apply?

18:49:11 22          MR. TOBEROFF:  Assumes facts.  Lacks

18:49:11 23  foundation.

18:49:11 24  BY MR. PETROCELLI:

18:49:17 25      Q.  Is that something that you just thought of

**EXHIBIT G**
**376**

ROUGH DRAFT

18:49:18  1    right now or is that something that you were told at

18:49:21  2    the time that by using one word canceled instead of

18:49:24  3    the word "terminated, that would solve the problem?

18:49:32  4        A.  That's my understanding of it.

18:49:33  5        Q.  And who told you that?

18:49:37  6            MR. TOBEROFF:  Assumes facts.  Lacks

18:49:39  7    foundation.

18:49:39  8            THE WITNESS:  I told myself that.

18:49:39  9    BY MR. PETROCELLI:

18:49:40 10        Q.  No one told you that in other words, right?

18:49:45 11    That's something you've come up with on your own?

18:49:47 12        A.  We have a clear -- a clear understanding

18:49:50 13    when we switch from the joint venture to the legal

18:49:52 14    retainer.  We clearly understood each other.

18:49:55 15        Q.  Who is we?

18:49:57 16        A.  Me and Marc Toberoff.

18:49:58 17        Q.  How do you know that?

18:49:59 18        A.  Because we discussed.

18:50:01 19        Q.  What did you -- what did you and he discuss

18:50:03 20    in that regard?

18:50:06 21            MR. TOBEROFF:  I'll allow you to answer

18:50:07 22    that question without waiver of the attorney-client

18:50:09 23    privilege.

18:50:11 24            THE WITNESS:  We discussed.

18:50:12 25            MR. TOBEROFF:  Do you agree that I'm not

                                                                    326

**EXHIBIT G**
**377**

ROUGH DRAFT

18:50:14  1    waiving the privilege by allowing him to answer

18:50:16  2    that?

18:50:17  3              MR. PETROCELLI:  No.

18:50:18  4              MR. TOBEROFF:  Okay.  Then I instruct you

18:50:19  5    not to answer our discussions.

18:50:21  6              (Instruction not to answer.)

18:50:27  7              MR. PETROCELLI:  No, I can't -- I can't

18:50:29  8    allow you to selectively waive like that.

18:50:36  9              MR. TOBEROFF:  Fine.

18:50:36 10    BY MR. PETROCELLI:

18:50:56 11        Q.  Did you -- have you reviewed a copy of this

18:51:03 12    retainer agreement recently?

18:51:07 13        A.  I believe so.

18:51:09 14        Q.  When?

18:51:13 15        A.  I believe before I came here.

18:51:18 16        Q.  In connection with the deposition?

18:51:23 17        A.  I would say so.

18:51:25 18        Q.  Do you have a copy at home?

18:51:26 19        A.  Yes.

18:51:31 20        Q.  Where was it maintained?

18:51:37 21        A.  A copy?

18:51:37 22        Q.  Yes.

18:51:39 23        A.  There's one in a filing cabinet.

18:51:44 24        Q.  And you read this retainer agreement and

18:51:47 25    you also said you read the consent agreement and

                                                              327

**EXHIBIT G**
**378**

ROUGH DRAFT

18:51:51  1    what else did you read?

18:51:55  2         A.   The deposition materials.

18:51:57  3         Q.   The prior deposition in the Siegel case?

18:51:59  4         A.   Yes.

18:52:00  5         Q.   And you read all of those materials prior

18:52:03  6    to coming here for the deposition?

18:52:05  7         A.   Yes.

18:52:06  8         Q.   Did you bring the retainer agreement with

18:52:08  9    you?

18:52:09  10        A.   No.

18:52:16  11        Q.   Is this the last document that you have

18:52:21  12   signed in connection with either Mr. Toberoff or the

18:52:27  13   Siegels other than the subsequent 2008 consent

18:52:31  14   agreement?

18:52:32  15        A.   This would be the last one other than that.

18:52:34  16        Q.   Next -- so this is the next to last one,

18:52:34  17   right?

18:52:38  18        A.   I believe so.

18:52:38  19        Q.   And does this document Exhibit 21 contain

18:52:48  20   any provisions in it that deal with agreements with

18:52:55  21   the Siegels or getting the consent of the Siegels?

18:53:05  22             MR. TOBEROFF:  You have to read the

18:53:06  23   document.

18:53:07  24             MR. PETROCELLI:  I'm talking about the

18:53:08  25   parts that are omitted.  The redacted parts.

328

**EXHIBIT G**
**379**

ROUGH DRAFT

18:53:13  1          MR. TOBEROFF:  He can't testify as to the

18:53:15  2    redacted parts obviously.  Instruct you not to

18:53:18  3    answer any questions about the redacted parts.

18:53:21  4          (Instruction not to answer.)

18:53:21  5          MR. PETROCELLI:  With resp- -- yeah because

18:53:23  6    I can read the parts that have been produced to us.

18:53:25  7      Q.  Based on your review of the entire

18:53:27  8    documents was there any reference in the document to

18:53:29  9    the Siegels?

18:53:33 10          MR. TOBEROFF:  Instruct you not to answer.

18:53:34 11          (Instruction not to answer.)

18:53:34 12    BY MR. PETROCELLI:

18:53:36 13      Q.  Was there -- is there any reference in the

18:53:38 14    document to Superboy?

18:53:43 15          MR. TOBEROFF:  Are you asking him

18:53:44 16    whether -- about the omitted portions in the

18:53:46 17    document?

18:53:46 18          MR. PETROCELLI:  Yes.

18:53:47 19          MR. TOBEROFF:  Okay.

18:53:47 20          MR. PETROCELLI:  In other words, can I read

18:53:48 21    the portion.

18:53:49 22          MR. TOBEROFF:  Since you're concerned about

18:53:50 23    your time we can save a lot of time I'm going to

18:53:53 24    instruct him not to answer any question as to the

18:53:55 25    redacted portions of the agreement that have been

**EXHIBIT G**
**380**

ROUGH DRAFT

18:53:58  1    upheld by the Court.

18:54:00  2         (Instruction not to answer.)

18:54:00  3    BY MR. PETROCELLI:

18:54:18  4         Q.  Have you been aware of any efforts to

18:54:24  5    market any rights Superman that you or the estate

18:54:30  6    may own?

18:54:31  7         A.  No.

18:54:35  8         Q.  Are you aware that Mr. -- of any efforts by

18:54:38  9    Mr. Toberoff to approach third parties like motion

18:54:47 10    picture studios or other, to try to sell an interest

18:54:54 11    in Superman?

18:54:54 12         MR. TOBEROFF:  Instruct you not to answer

18:54:54 13    as to any awareness that can only be based on the

18:54:58 14    substance of communications between us.

18:54:59 15         (Instruction not to answer.)

18:54:59 16    BY MR. PETROCELLI:

18:55:00 17         Q.  Are you aware of any reports by

18:55:01 18    Mr. Toberoff not of legal advice but that he met

18:55:04 19    with third parties to discuss possible sale of your

18:55:13 20    interest in Superman?

18:55:14 21         MR. TOBEROFF:  Same instruction.

18:55:15 22         (Instruction not to answer.)

18:55:15 23    BY MR. PETROCELLI:

18:55:17 24         Q.  On what ground?

18:55:20 25         MR. TOBEROFF:  Same ground.

                                                    330

**EXHIBIT G**
**381**

ROUGH DRAFT

18:55:21  1            MR. PETROCELLI:  Attorney-client privilege.

18:55:22  2            MR. TOBEROFF:  Same grounds.

18:55:22  3            MR. PETROCELLI:  Even though there's no

18:55:24  4    legal advice.

18:55:24  5            MR. TOBEROFF:  I'm not going to argue with

18:55:26  6    you.

18:55:26  7    BY MR. PETROCELLI:

18:55:27  8        Q.  Are you aware that whether or not any

18:55:29  9    contacts have been made to sell the estates'

18:55:33 10    interest or negotiate potential sale of the estate's

18:55:37 11    interest on your behalf?

18:55:38 12            MR. TOBEROFF:  Same instruction.

18:55:38 13    BY MR. PETROCELLI:

18:55:43 14        Q.  Is the -- what is the estates doing to

18:55:49 15    market its interest?

18:55:56 16        A.  Currently?

18:55:57 17        Q.  Yes.  What -- since you became the executor

18:55:59 18    of the estate, what efforts have you undertaken as

18:56:02 19    the executor to determine -- to attempts to sell any

18:56:07 20    interest in the rights that the estate seeks to --

18:56:11 21    seeks to recapture?

18:56:13 22        A.  I don't believe we've done that yet.

18:56:18 23        Q.  Are you aware of Mr. Toberoff having

18:56:22 24    contacted third parties on behalf of the estate?

18:56:26 25            MR. TOBEROFF:  I instruct you not to

                                                              331

ROUGH DRAFT

18:56:27  1    answer.  It implicates our communications.

18:56:30  2            (Instruction not to answer.)

18:56:30  3    BY MR. PETROCELLI:

18:56:35  4        Q.  Are you aware -- have you discussed that

18:56:37  5    subject with your mother?

18:56:44  6        A.  I don't believe so.

18:56:44  7        Q.  Or with the Siegels?

18:56:45  8        A.  No.

18:56:47  9        Q.  Take a look at Exhibit 22.

18:56:49 10            (The document referred to was

18:56:49 11            marked for identification by the

18:56:49 12            C.S.R. as Exhibit 22 and attached

18:56:55 13            to this deposition.)

18:56:55 14            MR. TOBEROFF:  Can I get a time check how

18:56:57 15    long we've been going here.

18:56:58 16            THE VIDEOGRAPHER:  Yes.  Approximately 14

18:57:01 17    minutes left in the 7 hours.

18:57:04 18            MR. TOBEROFF:  Could you please let me know

18:57:06 19    when it's 7 hours?

18:57:06 20    BY MR. PETROCELLI:

18:57:26 21        Q.  Are you aware of -- have you seen this

18:57:30 22    document before?

18:57:35 23        A.  I don't believe so.

18:57:36 24        Q.  Have you seen any e-mails between Paramount

18:57:43 25    Pictures and Marc Toberoff prior to today,?

332

**EXHIBIT G**
**383**

ROUGH DRAFT

18:57:44   1          A.  No.

18:57:47   2          Q.  You'll see on page 1 that this is an e-mail

18:57:49   3     from Mr. Toberoff to individuals at Paramount dated

18:57:57   4     April 29, 2010.

18:57:57   5          A.  Yes.

18:58:00   6          Q.  And you see that some of the attachments

18:58:03   7     are listed below one of them is the Shuster

18:58:06   8     termination.

18:58:06   9              Do you see that?

18:58:12  10          A.  Which one is that on the e-mail?

18:58:15  11          Q.  The first page?

18:58:16  12          A.  Yeah.  The attachments.

18:58:17  13          Q.  You see the reference the Shuster

18:58:19  14     termination it says three attachments Shuster

18:58:21  15     termination?

18:58:25  16          A.  That's the Siegel V?

18:58:27  17          Q.  Excuse me?  I can't hear you, sir?

18:58:32  18          A.  That's the Siegel V attachments at the

18:58:34  19     bottom?

18:58:37  20          Q.  I'm just asking do you see the reference to

18:58:39  21     Shuster termination on page 1?

18:58:41  22          A.  Oh, let me see.

18:58:48  23          Q.  Are you looking at the same document I am?

18:58:53  24              MR. TOBEROFF:  We have a different document

18:58:53  25     here.

                                                                   333

ROUGH DRAFT

18:58:53  1          MR. PETROCELLI:  Well, that explains the

18:58:54  2     confusion.  Okay.  Can you get what page is he on?

18:59:13  3     Okay.  So for the record you're looking on a page

18:59:20  4     that's included in Exhibit 22 and at the top it says

18:59:22  5     attachments for Paramount part 2/2, correct?

18:59:30  6          A.  At the bottom there's a Bates number L S L

18:59:32  7     00098.

18:59:34  8          Do you see that?

18:59:34  9          A.  Yes.

18:59:34 10          Q.  Okay.  And you'll see I just wanted to

18:59:36 11     direct your attention to the e-mail in the reference

18:59:38 12     to the Shuster termination notice.  You see that

18:59:44 13     now, correct?

18:59:44 14          A.  Yes.

18:59:45 15          Q.  Okay.  Now, can you turn to the page that

18:59:54 16     says part one of 2 L S L 00209.  And there's another

19:00:04 17     e-mail there from Mr. Toberoff to folks at Paramount

19:00:08 18     saying this is the first two e-mails attaching

19:00:13 19     requested documents and then there's some

19:00:19 20     description of the documents that were forwarded

19:00:25 21     including documents relating to the Schusters.

19:00:29 22          Do you see that?

19:00:29 23          A.  Yes.

19:00:30 24          Q.  Okay.  Now were you aware that documents

19:00:35 25     relating to the Shuster termination interest were

334

**EXHIBIT G**
**385**

ROUGH DRAFT

19:00:40  1    being sent to Paramount Pictures?

19:00:47  2        A.  I don't think so.

19:00:49  3        Q.  Okay.  First time you're seeing this?

19:00:52  4        A.  These e-mails, yes.

19:00:56  5        Q.  Okay.  And were you aware of any contacts

19:01:01  6    that Mr. Toberoff had made with Paramount regarding

19:01:04  7    the Shuster termination interest prior to today?

19:01:13  8        A.  There have been discussions.

19:01:16  9            MR. TOBEROFF:  Don't -- you can't talk

19:01:18 10    about discussions with me.

19:01:18 11            THE WITNESS:  I know I know can't.

19:01:18 12    BY MR. PETROCELLI:

19:01:21 13        Q.  Discussions with whom?

19:01:21 14        A.  My attorney.

19:01:22 15        Q.  Who is your attorney?

19:01:23 16        A.  Marc Toberoff.

19:01:24 17        Q.  When did those discussions occur?

19:01:25 18        A.  I can't remember specific dates.

19:01:32 19        Q.  What year?

19:01:35 20        A.  Some time in the seven years that he has

19:01:37 21    been working on this is all I can say.

19:01:40 22        Q.  Were you aware of discussions within the

19:01:44 23    last year having to do with Paramount?

19:01:50 24        A.

19:01:50 25            MR. TOBEROFF:  If you're awareness is

                                                            335

ROUGH DRAFT

19:01:52  1    solely based on discussions with me I have to cut it

19:01:55  2    off.  I can't have you testify.

19:01:58  3            THE WITNESS:  Okay.  Can't say anything.

19:02:01  4            (Instruction not to answer.)

19:02:01  5    BY MR. PETROCELLI:

19:02:01  6        Q.  Have you had any discussions directly with

19:02:04  7    third parties like Paramount?

19:02:08  8        A.  No.

19:02:18  9        Q.  How is it that the estate intends to --

19:02:21 10    before I ask you that, take a look at Exhibit 23.

19:02:27 11    Which is a vehicle pass that Mr. Toberoff has

19:02:31 12    produced.  Which says pitch Superman.

19:02:38 13            (The document referred to was

19:02:38 14            marked for identification by the

19:02:38 15            C.S.R. as Exhibit 23 and attached

19:02:50 16            to this deposition.)

19:02:50 17    BY MR. PETROCELLI:

19:02:52 18        Q.  Are you aware of any pitches that this one

19:02:55 19    is date November 19, 2010.  It's got Bates number L

19:02:59 20    S L 00210 on it.

19:02:59 21            Do you see that?

19:03:05 22        A.  Yes.

19:03:05 23        Q.  Are you aware of any meetings that

19:03:10 24    Mr. Toberoff attended relating to the Shuster's

19:03:15 25    termination interest meetings with third parties to

ROUGH DRAFT

19:03:17  1    pitch Superman?

19:03:18  2        A.  Not this specifically.

19:03:25  3        Q.  How is it that the estate intends to get

19:03:32  4    any money for the Superman interest that it has

19:03:36  5    sought to terminate?

19:03:40  6            MR. TOBEROFF:  You -- you can't -- I

19:03:42  7    instruct you not to answer that question if your

19:03:44  8    answer to that question is based on your discussions

19:03:46  9    with me and advice of counsel.

19:03:48  10           (Instruction not to answer.)

19:03:51  11           THE WITNESS:  Well my understanding is

19:03:53  12   based on discussions with counsel.

19:03:53  13   BY MR. PETROCELLI:

19:03:56  14       Q.  I'm not asking about legal advice.  Your --

19:03:58  15   in your capacity as executor of the escrow state,

19:04:02  16   how is it you -- you've asked for the powers to be

19:04:07  17   granted to you and they were granted to go and take

19:04:15  18   various proceedings with respect to the Shuster

19:04:17  19   termination interest for the benefit of the estate.

19:04:20  20   How is it that you as the executor intend to get any

19:04:28  21   money for the termination interest?

19:04:30  22           MR. TOBEROFF:  Same instruction.

19:04:31  23           (Instruction not to answer.)

19:04:31  24   BY MR. PETROCELLI:

19:04:33  25       Q.  Have you given any thought to that?

337

**EXHIBIT G**
**388**

ROUGH DRAFT

19:04:36  1           MR. TOBEROFF:  Same instruction.

19:04:36  2           (Instruction not to answer.)

19:04:37  3           MR. PETROCELLI:  That --

19:04:39  4           MR. TOBEROFF:  Can you answer whether or

19:04:40  5    not -- yes or no you've given any thought to it you

19:04:42  6    can answer that.

19:04:45  7           THE WITNESS:  Yes.  I've given thought.

19:04:47  8           MR. TOBEROFF:  Okay.

19:04:47  9    BY MR. PETROCELLI:

19:04:48  10      Q.  And what -- what thoughts have you had on

19:04:50  11   that subject?

19:04:51  12          MR. TOBEROFF:  Same instruction.

19:04:51  13          (Instruction not to answer.)

19:04:51  14   BY MR. PETROCELLI:

19:04:55  15      Q.  Are you incapable of having a thought on

19:04:57  16   that subject that does not involve Marc Toberoff?

19:05:01  17          MR. TOBEROFF:  Argumentative.

19:05:02  18          MR. PETROCELLI:  It's definitely not

19:05:04  19   argumentative.

19:05:07  20      Q.  In your role as executor of the estate, is

19:05:10  21   it your testimony that you have been able to -- you

19:05:15  22   can't do anything or even think of anything that

19:05:17  23   doesn't involve the legal advice of Marc Toberoff?

19:05:22  24      A.  That's correct.

19:05:25  25      Q.  Okay.  So everything that you do and

                                                              338

**EXHIBIT G**
**389**

ROUGH DRAFT

19:05:27  1    everything that you know as the executor of the

19:05:32  2    estate is based on the legal advice of Marc

19:05:37  3    Toberoff?

19:05:37  4            MR. TOBEROFF:  Vague.

19:05:41  5            THE WITNESS:  Yes. Follow my counsel.

19:05:43  6            MR. PETROCELLI:

19:05:43  7        Q.  And -- well, I didn't ask you whether you

19:05:45  8    follow your counsel.  I'm asking you in your role as

19:05:48  9    your executor, you don't have any judgment or any

19:05:56  10   ideas or any thoughts other than what Toberoff

19:06:01  11   discusses with you.

19:06:01  12           Is that correct?

19:06:03  13           MR. TOBEROFF:  Misstates his testimony.

19:06:04  14           You can answer.

19:06:07  15           THE WITNESS:  That's correct.

19:06:07  16   BY MR. PETROCELLI:

19:06:16  17       Q.  Do you believe your fit to be an executor

19:06:18  18   under those circumstances?

19:06:22  19       A.  Yes.

19:06:27  20       Q.  Have you disclosed to the Court that you

19:06:29  21   refuse to say anything about your thinking your

19:06:36  22   thoughts your judgments or your actions because

19:06:38  23   everything is based on conversations with Marc

19:06:41  24   Toberoff as to which you will claim the privilege?

19:06:43  25   Is that something that you indicated to the probate

                                                          339

**EXHIBIT G**
**390**

ROUGH DRAFT

19:06:46  1    court when you sought permission to act as executor?

19:06:53  2            MR. TOBEROFF:  Misstates testimony and the

19:06:55  3    assertion of privilege.

19:06:56  4            THE WITNESS:  No.

19:06:56  5    BY MR. PETROCELLI:

19:06:58  6        Q.  Do you understand that you have fiduciary

19:06:59  7    duties to people other than your mother as the

19:07:07  8    beneficiary?

19:07:08  9            MR. TOBEROFF:  Calls for a legal

19:07:09 10    conclusion.  Lacks foundation.  Assumes facts.

19:07:09 11    BY MR. PETROCELLI:

19:07:16 12        Q.  Who do you understand in your role as the

19:07:18 13    executor who do you understand that you owe a

19:07:23 14    fiduciary duty to?

19:07:24 15            MR. TOBEROFF:  Calls for a legal

19:07:24 16    conclusion.

19:07:26 17            THE WITNESS:  My understanding is the

19:07:29 18    Shuster heirs.

19:07:29 19    BY MR. PETROCELLI:

19:07:31 20        Q.  And who is that?

19:07:35 21        A.  Jean, myself and my sister.

19:07:38 22        Q.  Is that a thought that you've had without

19:07:40 23    talking to Marc Toberoff or did Mr. Toberoff tell

19:07:47 24    you that?

19:07:47 25        A.  No, I'm aware of that on my own.

340

**EXHIBIT G**
**391**

ROUGH DRAFT

19:07:49  1        Q.  Is that the only thing you're aware of on

19:07:51  2   your own?

19:07:52  3            MR. TOBEROFF:  About anything?

19:07:54  4            MR. PETROCELLI:  Correct.

19:07:56  5        Q.  Having to do with the administration of the

19:07:58  6   estate and in particular the termination interest.

19:08:01  7            MR. TOBEROFF:  Vague.  Overbroad.

19:08:03  8            THE WITNESS:  I don't know.  You would have

19:08:04  9   to be specific.

19:08:04 10   BY MR. PETROCELLI:

19:08:10 11        Q.  Has anyone told you that you owe fiduciary

19:08:13 12   duty to creditors including DC Comics?

19:08:18 13        A.  I don't know about that.

19:08:29 14        Q.  Are you aware that unless you make an

19:08:34 15   agreement with DC Comics that the estate may get

19:08:40 16   nothing at any time with respect to its Superman

19:08:44 17   interests?

19:08:46 18            MR. TOBEROFF:  You can't -- if you have an

19:08:50 19   opinion about that independent on discussions with

19:08:53 20   me, can you answer the question.  Otherwise, I

19:08:56 21   instruct you not to answer.

19:09:01 22            THE WITNESS:  No my -- my opinion is based

19:09:04 23   on discussions with counsel.

19:09:04 24            (Instruction not to answer.)

19:09:04 25   BY MR. PETROCELLI:

                                                              341

**EXHIBIT G**
**392**

ROUGH DRAFT

19:09:06  1          Q.  Do you have the opinion that the estate can

19:09:07  2     sell an interest in Superman without making an

19:09:10  3     agreement with DC Comics?

19:09:13  4          MR. TOBEROFF:  Same instruction.  If you

19:09:14  5     have an opinion independent of the advice of

19:09:16  6     counsel, you can answer.  Otherwise I instruct you

19:09:19  7     not to answer.

19:09:21  8          (Instruction not to answer.)

19:09:21  9          MR. PETROCELLI:  I'm not strictly asking

19:09:23  10    for opinions I'm asking for your state of mind, your

19:09:25  11    knowledge, your information, your beliefs.

19:09:27  12         MR. TOBEROFF:  If any, of those are

19:09:29  13    independent of the advice of counsel regarding his

19:09:31  14    particular question, can you answer.  Otherwise I

19:09:33  15    instruct you not to answer.

19:09:36  16         THE WITNESS:  No they're not independent of

19:09:38  17    counsel.

19:09:38  18    BY MR. PETROCELLI:

19:09:41  19         Q.  Have you formed any views about the

19:09:46  20    estate's ability to sell an interest in Superman

19:09:51  21    without having an agreement with DC Comics?

19:10:02  22         MR. TOBEROFF:  He is just asking -- I'll

19:10:02  23    let you answer the question whether or not you

19:10:04  24    formed any views not what those views are.

19:10:07  25         THE WITNESS:  Okay.  Yes, I formed views.

342

**EXHIBIT G**
**393**

ROUGH DRAFT

19:10:07  1    BY MR. PETROCELLI:

19:10:11  2        Q.  And what are those views?

19:10:12  3        MR. TOBEROFF:  Based on your prior answers

19:10:13  4    to his similar questions I instruct you not to

19:10:16  5    answer.

19:10:16  6    BY MR. PETROCELLI:

19:10:20  7        Q.  Are -- are you aware that the estate could

19:10:27  8    lose this case and the Court could find that the

19:10:31  9    Shuster termination notice is not valid with respect

19:10:35  10   to Superman?

19:10:40  11       MR. TOBEROFF:  If you're --.

19:10:40  12   BY MR. PETROCELLI:

19:10:42  13       Q.  As the executor of the estate have you --

19:10:46  14   have you thought about that issue?

19:10:51  15       MR. TOBEROFF:  Can you just answer that in

19:10:53  16   the most general fashion without going into any

19:10:55  17   particulars.

19:10:56  18       THE WITNESS:  Okay.  Yes.

19:10:56  19   BY MR. PETROCELLI:

19:10:58  20       Q.  Okay.  And have you received any advice on

19:11:03  21   that subject other than from Marc Toberoff?

19:11:06  22       A.  No.

19:11:15  23       Q.  Okay.  And the estate has already given up

19:11:17  24   any interest in claim to Superboy, correct?

19:11:21  25       A.

                                                            343

**EXHIBIT G**
**394**

ROUGH DRAFT

19:11:21  1          MR. TOBEROFF:  Assumes facts.  Lacks

19:11:23  2    foundation.

19:11:23  3          THE WITNESS:  As far as I know.

19:11:23  4    BY MR. PETROCELLI:

19:11:27  5      Q.  So you -- you understand that given that

19:11:30  6    the estate has already given up an interest in

19:11:32  7    Superboy, and the estate could lose this case and

19:11:40  8    the Court could find that the Shuster termination

19:11:42  9    notice is invalid that you as executor could yield

19:11:45  10   the estate 0.  You entertain that as a possible

19:11:50  11   outcome, correct?

19:11:51  12         MR. TOBEROFF:  Assumes facts.  Lacks

19:11:55  13   foundation.  You can answer in the most general

19:11:57  14   fashion without going into any details.

19:12:01  15         THE WITNESS:  I.

19:12:02  16         MR. TOBEROFF:  This is -- this is his last

19:12:05  17   answer because we're -- we've met our 7 hour max.

19:12:08  18         THE WITNESS:

19:12:09  19         MR. PETROCELLI:  It's not a max but I

19:12:11  20   understand your leaving at the end of 7 hours.

19:12:13  21         THE WITNESS:  I've only considered that

19:12:17  22   like I would an asteroid hitting us and wiping out

19:12:21  23   life on earth.

19:12:21  24   BY MR. PETROCELLI:

19:12:22  25     Q.  Is -- and again, it's based on

344

**EXHIBIT G**
**395**

ROUGH DRAFT

19:12:25  1   Mr. Toberoff's advice?

19:12:25  2          MR. TOBEROFF:  We're cutting this as 7

19:12:27  3   hour.

19:12:28  4          THE WITNESS:  Yes.

19:12:28  5   BY MR. PETROCELLI:

19:12:29  6      Q.  Okay.  One other question.  Are you able to

19:12:33  7   enter into a settlement agreement with DC without

19:12:37  8   the consent of the Siegels?

19:12:39  9          MR. TOBEROFF:  I instruct you not to answer

19:12:40 10   that question.  He's asking you about the consent

19:12:43 11   agreements.

19:12:44 12          (Instruction not to answer.)

19:12:46 13          MR. PETROCELLI:  Well, I wasn't but --

19:12:46 14      Q.  Independent --

19:12:52 15          MR. TOBEROFF:  No more questions.  Done.  7

19:12:53 16   hours and I'm cutting it off.

19:12:55 17          MR. PETROCELLI:  Are you saying that we're.

19:12:57 18          MR. TOBEROFF:  I'm abiding by the Federal

19:13:00 19   rules we're over the 7 hours I gave you an extra

19:13:02 20   question and that was one question too many.

19:13:04 21          MR. PETROCELLI:  Well since your declining

19:13:08 22   to go forward, we obviously are not finished.  So we

19:13:12 23   will.

19:13:12 24          MR. TOBEROFF:  I disagree.

19:13:13 25          MR. PETROCELLI:  Well, I understand.  I'm

                                                              345

**EXHIBIT G**
**396**

ROUGH DRAFT

19:13:15  1    just making it clear that I'm not concluding the

19:13:18  2    deposition.  We'll have to seek court relief to not

19:13:22  3    only continue it but also, mark, to address the

19:13:28  4    objections.

19:13:28  5         MR. TOBEROFF:  On what basis are you saying

19:13:30  6    we haven't concluded if you've used up the 7 hours

19:13:32  7    that you've gotten under the rulings.

19:13:35  8         MR. PETROCELLI:  Because the rules require,

19:13:36  9    permit more time inappropriate circumstances and

19:13:40 10    there'sly Johns of cases on that.  We don't need to

19:13:43 11    debate that now.

19:13:44 12         MR. TOBEROFF:  Okay.  Well our position of

19:13:46 13    course is that it has concluded you used up your 7

19:13:48 14    hours and that you're not entitled to go beyond

19:13:51 15    that.

19:13:51 16         MR. PETROCELLI:  Can we have the normal

19:13:54 17    stipulation on the record which is that when this

19:13:58 18    has -- let's say 30 days to review it and to advise

19:14:01 19    of any corrections bearing in mind that any

19:14:05 20    corrections of substance may shed light on your

19:14:09 21    credibility.  It can be signed under penalty of

19:14:12 22    perjury.  And if it's not signed it can be used as

19:14:16 23    though signed.

19:14:17 24         MR. TOBEROFF:  Yes and then the court

19:14:19 25    reporter don't we under California have to relieve

                                                              346

**EXHIBIT G**
**397**

ROUGH DRAFT

19:14:22  1    the court reporter.

19:14:23  2            MR. PETROCELLI:  Relieve the court reporter

19:14:24  3    of her duties.

19:14:25  4            MR. TOBEROFF:  I will hold the original and

19:14:28  5    send that to us.

19:14:29  6            MR. PETROCELLI:  You'll send the original

19:14:31  7    to Mr. Toberoff and certified copy to us.  And you

19:14:35  8    have 30 days on your receipt of it.

19:14:38  9            MR. TOBEROFF:  Okay.

19:14:38  10           MR. PETROCELLI:  Thank you.

19:14:39  11           MR. TOBEROFF:  Agreed so stipulated.

19:14:42  12           MR. PETROCELLI:  Thank you.

19:14:42  13           THE VIDEOGRAPHER:  This will then mark the

19:14:44  14   end of Volume I tape number 4 in the deposition of

19:14:46  15   mark war penalty rather re.  All original videotapes

19:14:49  16   will be retained by Merrill Legal Solutions at 20750

19:14:53  17   Ventura Boulevard Woodland Hills, California.  Going

19:14:55  18   off the record.  The time is 7:13.

          19

          20

          21

          22

          23

          24

          25

**EXHIBIT G**
**398**