# EXHIBIT

# L

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

### 22337 PACIFIC COAST HIGHWAY #348
#### MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

\* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

August 27, 2012

Via E-Mail

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Jason:

I write in response to your August 17, 2012 letter, regarding DC's intent to move to compel the further depositions of defendants Laura Siegel Larson and Mark Peary, and to follow-up on my August 14, 2012 meet-and-confer with Matt Kline as to DC's July 27, 2012 letter, my August 1, 2012 letter, and the parties' subsequent e-mail correspondence.

## I.    REPEAT DEPOSITIONS OF MR. PEARY AND MS. LARSON

While unclear from your August 17 letter, defendants' understanding is that DC will seek to compel the further deposition of Mark Warren Peary and Laura Siegel Larson for an additional day each.  DC will seek to depose Mr. Peary and Ms. Larson regarding:  (a) anything "new" in the case since their depositions in June-July 2011, including any documents produced since that time (*e.g.*, the "Timeline" documents); and (b) questions which were objected to as improper at those depositions, as set forth below.

As to category (a), DC chose to take the depositions knowing there were numerous outstanding document discovery issues and a pending writ on which DC did not seek to expedite review.  That some of those issues have been resolved and DC now has additional documents is not a basis to re-depose these witnesses.  Between this case and the closely related *Siegel* litigation, Ms. Larson has already been deposed three times, while Mr. Peary has been deposed twice.

As to category (b), defendants strongly object to DC's tactic of bringing discovery disputes up at a meet-and-confer, waiting to bring a motion for over a year, and then attempting to incorporate the prior dispute in a separate dispute/motion.  DC's specific issues as to such disputes are addressed below.

EXHIBIT L
752

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:    2 of 5

Furthermore, during the August 14 meet-and-confer, you stated that you had not confirmed with Mr. Petrocelli or your client what potential compromises would be acceptable, but indicated that DC might agree to shorten the time of such depositions on the topics listed above if it would avoid motion practice. However, no compromise was proposed in your letter.

## II.    OBJECTIONS AT THE INITIAL DEPOSITION

As set forth below, the objections made by Mr. Toberoff at Mr. Peary's June 29, 2011 deposition and Ms. Larson's July 22, 2011 deposition were proper.

### 1.    Consent Agreement

Magistrate Zarefsky denied DC's motion to compel production of the 2008 collective negotiation agreement (the "Consent Agreement"), as did Judge Larson in *Siegel*. Docket Nos. 209, 163-11 at 724:9-11. Judge Wright also weighed in, denying DC's motion for review on this subject. Docket Nos. 248, 252. All of this occurred well before DC took either Mr. Peary's or Ms. Larson's depositions, and the time to challenge Magistrate Zarefsky's (and Judge Wright's) ruling has long since passed. Fed. R. Civ. P. 72; L.R. 72-2.1.

DC now improperly attempts an end-run around these decisions by deposing defendants on the privileged contents of the consent agreement. DC's only justifications for this are: (a) its erroneous and rejected belief that Magistrate Zarefsky's order was wrongly decided; (b) its erroneous and insulting assertion that Mr. Toberoff "cannot be trusted"; and (c) its erroneous contention that Ms. Larson and Mr. Peary waived privilege.

#### A.    Judge Larson's, Magistrate Zarefsky's, and Judge Wright's Rulings Were Not Erroneous

These decisions were clearly correct. None of them relied on DC's straw man of a "settlement" or "mediation" privilege. *See* Docket No. 209 at 8 ("Nor will the Court re-visit Judge Larson's ruling that the attorney-client and related privileges protect the consent agreement."). The Consent Agreement, which was expressly entered into in connection with the settlement of legal claims, contains the Heirs and their counsel's settlement strategies and is clearly protected by the attorney-client privilege and attorney work-product doctrine. *See Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). The privilege encompasses documents that reveal, involve or implicate legal advice, litigation strategy or litigation motives of a party. *Id.* at 129. The Consent Agreement constitutes a communication among the Heirs and their counsel Mr. Toberoff, and reflects Mr. Toberoff's legal advice to his clients and legal strategies regarding settlement of their termination interests. It is also protected by the work-product doctrine, as it "reveal[s] an attorney's strategy [or] evaluation of strengths and weaknesses" of the case. *Schwarzer*, et al., Fed. Civ. Proc. Before Trial § 11:285 (2010), citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). *See* F.R.C.P. 26(b)(3). Accordingly, it is absolutely privileged and was duly listed on the Heirs' privilege logs in this case. *See United States v. Martin*, 278 F.3d 988,

**EXHIBIT L**
**753**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 5

999-1000 (9th Cir. 2002)

> B.    DC's Baseless *Ad Hominem* Attacks Are Insufficient To Pierce Privilege

As it does in virtually all of its correspondence and briefing where it loses on the merits, DC devotes a substantial portion of its letter to empty rhetoric, impugning opposing counsel. These baseless attacks are dealt with at length in Laura Brill's July 11, 2012 letter and in defendants' briefing. Such attacks offer nothing to justify piercing the Heirs' privilege over the consent agreement that has been thrice upheld.

DC's repeated refrain is that defendants' representations as to documents somehow cannot be trusted. Yet when Magistrate Zarefsky has reviewed defendants' documents *in camera*, defendants' privilege assertions have been largely upheld, and, in any event, there is no indication that defendants ever misrepresented the contents of such documents to the Court. See Docket Nos. 239, 439, 451.

Notably, DC recently repeatedly contended that defendants had misrepresented the contents of a November 2001 e-mail between Michael Siegel and Mr. Toberoff, by stating that it "pertains to legal retention." Docket No. 412 at 4:16-17. After Magistrate Judge Zarefsky reviewed the document *in camera*, he confirmed that the "subject matter of the e-mail concerns legal rights and potential representation of Michael Siegel," and held the document privileged. Docket No. 451 at 1-2. Tellingly, now that DC has secured a copy of this e-mail, its August 17 letter makes no mention of the document.

> C.    Ms. Larson and Mr. Peary Did Not Waive Privilege

DC contends that Ms. Larson and Mr. Peary waived privilege over the Consent Agreement by "selectively and strategically disclosing certain facts about [it]." This argument was already made by DC, Docket No. 160 at 26:5-6, and rejected by Magistrate Zarefsky and Judge Wright. Docket Nos. 209 at 9-10, 248, 252.

Furthermore, the very testimony DC cites confirms that the parties agreed that allowing Ms. Larson to answer certain questions would not constitute a waiver (Larson Tr. 42:1-10; Peary Tr. 81:10-15) and that the witness was allowed to answer only because the question did not call for privileged material. Larson Tr. 99:15-100:5. In both depositions, counsel for defendants was explicit that the witness could not testify as to the contents of the privileged document. Larson Tr. 42:23-25; Peary Tr. 58:23-25.

Nor did defendants waive privilege by rebutting DC's inaccurate assertion to the Court as to the unlawfulness of the Consent Agreement. The comments concerning the consent agreement in recent motions were no more "revealing" than those in defendants' prior motions to dismiss and/or strike – and those comments were held not to waive privilege by Magistrate Zarefsky and Judge Wright, as defendants have a right to counter DC's false assertions as to the Consent

**EXHIBIT L**
**754**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:    4 of 5

Agreement without waiving privilege. Docket Nos. 209 at 10:6-11, 248, 252; Docket Nos. 78, 100; Docket Nos. 462, 478. Furthermore, the "disclosure of a general description of the subject matter of a privileged communication does not operate as a waiver of the privilege." *United States v. Zuckerman*, 88 F. Supp. 2d 9, 15 (E.D.N.Y. 2000).

Under DC's skewed logic, a party could make frivolous misrepresentations about an opposing party's privileged documents and the opposing party would have no options but to let the misstatements go unchallenged or waive privilege. Magistrate Zarefsky expressly rejected this false construct: "Defendants do not waive privilege by defending themselves." Docket No. 209 at 10:10-11.

2.    Rights Strategy/Evaluation:

DC mischaracterizes the record in claiming that defendants' counsel asserted privilege over "business communications," specifically marketing the Siegels' rights in Superman. The testimony DC points to makes clear that Mr. Toberoff objected only to the extent it called on Ms. Larson to "reveal the substance of [her] communications with counsel." Larson Tr. 46:22-25. Legal advice remains privileged even if it regards business or naturally incorporates business advice. *See ABB Kent-Taylor v. Stallings and Co., Inc.*, 172 F.R.D. 53, 55 (W.D.N.Y.1996) ("Often intertwined with legal advice as to substantive issues is counsel's strategic assessment of alternative choices of action available to the client."); *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 254 (E.D. Va. 2012) (privilege applies to mixture of business and legal advice).

DC's assertion that the privilege somehow does not apply to Mr. Toberoff's advice to Ms. Larson about "the value of the Siegels' putative Superman rights and how the heirs could monetize these rights" is wrong. Even prior to the filing of the *Siegel* lawsuits in 2004, Mr. Toberoff's advice about the Siegels' Superman rights took place against the backdrop of anticipated litigation and settlement with DC/Warner Bros. over the rights to Superman; Mr. Toberoff held settlement discussions with Warner Bros.' General Counsel, John Schulman, in 2003-04; and since *Siegel*, any such advice is obviously bound up in litigation and settlement discussions with DC/Warner. Ms. Larson's "understanding" is privileged to the extent it is based on privileged attorney-client communications as to settlement and legal strategy.

3.    Subject Matter Waiver

The disclosure of certain stolen privileged documents to the United States Attorney's Office to facilitate its investigation of the theft does not constitute a subject matter waiver. *See, e.g, In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987). DC has previously made this argument with regard to communications between David Michael and the Siegels (Docket No. 205 at 14:8-15), and Magistrate Zarefsky has rejected that argument. Docket No. 262 at 4:9-12. DC has also advanced similar arguments with respect to communications between the Siegels and Kevin Marks, which both Magistrate Zarefsky and Judge Wright have rejected. Docket Nos. 362, 378, 389.

**EXHIBIT L**
**755**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   5 of 5

**III.     DEFENDANTS' COMPROMISE PROPOSAL**

If DC has any proposals to narrow the scope of this dispute, defendants are available to meet and confer on September 6, 2012.  As DC's contemplated motion is directed solely at defendants Laura Siegel Larson and Mark Warren Peary, the Kendall Brill firm, which represents neither defendant, will not participate.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith G. Adams

**EXHIBIT L**
**756**

# EXHIBIT

# M

| From: | Tokoro, Jason |
|---|---|
| To: | Keith Adams |
| Cc: | Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Richard Kendall; Laura Brill; Nicholas Daum; David Harris; Pablo Arredondo; Marc Toberoff |
| Subject: | FW: DC v. PPC |
| Date: | Tuesday, August 28, 2012 3:37:00 PM |
| Attachments: | DC v. PPC.Letters.Adams-Tokoro.Depositions.8.27.2012.final.pdf |

Keith:

DC disagrees with your letter below and will file its motion.

We are copying the Kendall Brill firm on this response (and attaching a copy of your letter), as we understand that they remain counsel in the case.

All of the DC's rights are reserved.

Jason


**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Monday, August 27, 2012 6:09 PM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris'
**Subject:** DC v. PPC

Counsel:

Please see the attached correspondence sent on behalf of Keith Adams.

Pablo

Pablo D. Arredondo

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**EXHIBIT M**
**757**

# EXHIBIT N

O



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

DC COMICS,

            Plaintiff,

vs.

PACIFIC PICTURES CORP., *et al.*,

            Defendants.

CASE NO. CV 10-3633 ODW (RZx)

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [458]

## I.    INTRODUCTION

DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed interest in the Superman copyrights, after certain heirs of Joseph Shuster, the first illustrator of Superman, served DC with a copyright termination notice purporting to recapture certain early Superman works as of October 26, 2013.

DC now moves for partial summary judgment as to the First and Third Claims. DC's First Claim contests the validity of the termination notice at issue here, and its Third

**EXHIBIT N**
**758**

Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and his entertainment companies and business partners engineered in alleged violation of DC's rights under the Copyright Act. (Mot. at 1 ("There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.")).

## II.    FACTS

Semantic quibbles aside, the following facts are undisputed.   On March 1, 1938, Jerome Siegel and Joseph Shuster granted DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)   "Action Comics #1 ("AC#1"), published on April 18, 1938, with a cover date of June 1938, featured an adapted version of Siegel and Shuster's Superman story." (UF 4.)   Defendants purport, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'   Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.)   All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.   Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success. (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone. (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.")).   In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.   The court concluded that the 1938 assignment granted all Superman rights to DC.   In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster

2

acknowledged that the 1938 assignment granted DC all rights in Superman. (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.   Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. (UF 8.)   Defendants argue DC does not disclose its financial assumptions for its supposed calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500 . . . ." (Id.)

Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families have to Superman-related events. (UF 9.)   All told, the Siegels and Shusters have been paid over $4 million under the 1975 agreement, not including medical benefits or bonuses. (UF 10.)   Shuster passed away on July 30, 1992. (UF 12.)

Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. (UF 13.)   Defendants dispute this, arguing the statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary in the event Jean predeceased him and omits that the will states: 'In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor.'" (Opp'n UF.)   On August 17, 1992, Jean filed an affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that certain property "be paid, delivered or transferred to her." (UF 14.)

Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay

Shuster's "final debts and expenses." (UF 15.)   Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." (Opp'n UF.)   In response, DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.)      On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]."   Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. (UF 17.)   Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. (Opp'n UF.)

**TENTATIVE**

Paul Levitz dealt with many authors and heirs during his decades at DC.   When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: This agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.)   The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.   In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19.)

**ORDER**

Over the next decade, DC maintained good relations with the Shusters, and Jean and Paul Levitz corresponded regularly.   In the close-to-60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992

EXHIBIT N
761

agreement, and requested bonus payments in excess of those required. (UF 20.)
Defendants contend that, over this decade, Jean expressed displeasure at the amount and
form of her pension payments and requested changes. (Opp'n UF.)   In a 1993 letter, Jean
confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman
copyright," but asked for an increase in payments "plus a yearly increment to account for
inflation." (UF 21.)   Defendants contend "Jean stated that at the present time 'Frank and
I are not planning to reclaim the Superman copyright.' [And]: 'We believe we have a
right to expect that you will be fair with us as well and will grant our request for increased
payment.   We will stick to our bargain [which we signed, dated as of August 1, 1992]'"
(Opp'n UF.)

    In 1999 – after Congress amended the copyright statute to grant additional
statutory heirs termination rights under 17 U.S.C. § 304(d) – and after learning that Jerry
Siegel's heirs had served Superman copyright termination notices on DC–Jean reiterated
her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for
> Superman. I want you to know that I intend to continue to honor our pension
> agreement. I would, however, appreciate a generous bonus for this year as you had
> done many times in the past.

(UF 22.)

    In 1993, 1994, 1995, 1996, 1997, 1999, 2000, and 2001, DC provided additional
bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.)   In one instance when Jean
asked for a bonus, DC made clear its position that Jean had no legal right to make such
requests, but would pay her a bonus anyway, which she thanked DC for doing. (UF 24.)
Jean's 50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound
mind when she sent these letters to DC. (UF 26.)   Mark Peary, Jean's doctor, and Jean's
daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean
has aphasia, and has difficulty communicating and "understand[ing] what people are
saying." (UF 27.)   On November 7, 2003, Mark Warren Peary (as substitute executor of

5

the Shuster estate) served on DC a notice of termination of the prior grants of Shuster's Superman copyrights. (*See* Petrocelli Decl. Exh. 37.)   Other facts shall be discussed as necessary.

## III. DISCUSSION

As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice [is] invalid." Docket No. 49 ¶¶ 106-34.   DC argues it is entitled to summary judgment on three grounds: (1) "The 1992 Agreement Bars the Shusters from Pursuing Termination[;]" (2) "The Shusters Lack the Majority Interest Necessary to Terminate" because they assigned 50% of their putative rights to Pacific Pictures; and (3) "There Is No Statutory Basis for the Shusters to Terminate, given that Joe Shuster had no statutory heir under the Copyright Act when he died." (Mot. at 9.)   "DC's Third Claim, which is pled in the alternative to its First Claim, alleges that the Pacific Pictures Agreements and 2008 consent agreement improperly restrict the Shuster heirs' ability to enter into agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.).

### *1992 Agreement*

The Copyright Act provides a termination right for the grant of a copyright transfer or license made by parties other than the author only if the grant was made prior to January 1, 1978. 17 U.S.C. § 304(c).   Our inquiry begins, then, with whether the 1992 Agreement superseded "Joseph Shuster's key 1938 Grant and subsequent Superman grants[,]" as Defendants put it. (Opp'n at 12.)

DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank Shuster –Joseph's siblings – bars the Shusters from exercising their statutory termination rights. (Mot. at 10.)   That agreement provides, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. *In any event*, you now grant to us any such rights and release us, our

6

**EXHIBIT N**
**763**

> licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

(Mot. at 6) (quoting SUF 19; Petrocelli Decl. Exh. 24) (emphasis added).

Defendants contend "DC attempts to circumvent termination by trying to jam the 1992 Agreement into a narrow and inapplicable 'revocation and re-grant' exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005)" ("*Milne*"). (Opp'n at 9) (arguing DC ignores "the plain language of the 1992 Agreement").

As Defendants acknowledged earlier in this litigation, it is New York law, which governs the 1992 Agreement. (Docket No. 191 at 4, n.6; Docket No. 333 at 21; *see also* Reply at 2 ("'whether [an] Agreement terminated and superseded [an earlier agreement],' is determined by governing state law – in this case, as in *Steinbeck*, 'New York law'") (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008) ("*Steinbeck*") (citing *Milne* with approval).

Under New York law, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (2d Dep't 1994); *see also Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (2d Dep't 1984) ("[W]here the parties have clearly expressed . . . their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.").

The question is thus "whether the subsequent agreement, . . . in whatever form it may be, is a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (emphasis added). With a broad release and all-encompassing language, it would here appear that the 1992 Agreement aims to supersede any and all

**EXHIBIT N**

**764**

prior agreements between the parties. (*See* SUF 19 ("this agreement *fully settles all claims* to *any payments or other rights or remedies* which you *may have* under *any other agreement or otherwise, whether now or hereafter existing* regarding *any copyrights . . . in any and all work created in whole or in part by your brother, Joseph Shuster*")) (emphasis added).

Pointing to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ("*Mewborn*"), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike [that] in *Milne*, did not '*expressly* revoke the earlier … assignments.'" (Opp'n at 11) (quoting *Id.* at 989) (emphasis added by Defendants). In *Mewborn*, the Ninth Circuit upheld a termination notice regarding the novel "Lassie Come Home," finding *Milne* inapplicable. In 1976, the author's daughter, Mewborn, assigned her share of Lassie film and television rights to the publisher. *Id.* at 980. In 1978, she signed a second contract which purported to assign additional copyrights to the publisher for $3,000. *Id.* at 981. In 1996, Mewborn served a termination notice as to her 1976 grant. The publisher sued Mewborn, claiming that the non-terminable 1978 grant "superseded" and implicitly "revoked and re-granted" her Lassie rights. *Id.* at 981-82. The Ninth Circuit disagreed, upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at 989.

Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its decision on the lack of an express revocation of earlier agreements. *See id.* at 989 ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer Mewborn's termination right as to the 1976 Assignment, and that the circumstances here are not even close to those in *Milne*, the district court improperly concluded that the 1978 Assignment included a grant of Mewborn's termination right.") (emphasis added).

Rather than revoke and supersede the prior agreement, the Ninth Circuit found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the additional

8

enumerated rights that Mewborn had not assigned in 1976." *Id.* (observing "[n]or is there
any evidence in the record to support a finding that Mewborn or LTI, when entering into
the 1978 Agreement, considered Mewborn's termination rights under § 304(c), or that
Mewborn intended to waive or relinquish them. Rather, the evidence suggests that
Mewborn did not intend to waive her termination rights. ").

Such is not the case here.   The broad and all-encompassing language of the 1992
Agreement unmistakably operates to supersede all prior grants. (*See* Petrocelli Decl. Exh.
24.)   Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to"
those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same
subject matter as the parties' earlier agreements, settling and   displacing "all claims . . ..
under any agreement" related to "any and all" works "created in whole or in part by . . .
Joseph Shuster." (UF 19.)   Unlike the heirs in *Mewborn*, moreover, Jean and Frank were
aware of the Copyright Act's termination rights when they bargained for and entered into
the 1992 Agreement. (*See* UF 17, 21, 22.)   As DC points out, "the fact that Jean and
Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows that
*Mewborn*'s concerns about [the heirs'] ignorance are inapt here." (Mot. at 17.)

Defendants insist "the 1992 agreement does not even mention Superman or
Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.)
Surely Defendants recognize that "any and all work created in whole or in part by . . .
Joseph Shuster" necessarily includes his most famous creation, Superman.   And, just as
clear, when once a party seeks to supersede all prior agreements, that party need not
specifically list every superseded agreement, lest that party forget one such agreement
and thus leave open the door for subsequent disputes.   Indeed, Defendants' own
expansive language that the 1992 Agreement does not mention "Joseph Shuster's key
1938 Grant *and subsequent Superman grants*" lends credence to the need for
all-encompassing language.

And, unlike in *Mewborn*, the record here is rife with "evidence . . . to support a finding that [Jean Peavy], when entering into the [1992] Agreement, considered . . . termination rights . . . [and] that [Jean] intended to waive or relinquish them." *Mewborn*, 532 F.3d at 989; *see also Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. 1977) (considering extrinsic evidence).

In a 1993 letter, for example, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright." (UF 21.)   And, in 1999–after Congress amended the Copyright Act to grant additional statutory heirs termination rights, and after learning that Jerome Siegel's heirs had served Superman copyright termination notices on DC–Jean again reiterated her commitment "to honor" the 1992 Agreement. (UF 22.)   Such evidence is uncontroverted by Defendants, who merely allege in conclusory fashion that, by entering into the 1992 Agreement, they did not intend to discharge and supersede all prior grants of the Superman copyrights.   Such a showing (or lack thereof) is decidedly insufficient at this stage in the litigation.

As one New York court put it, "while the question of whether a substituted agreement effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no evidence as to the parties' intent in making the agreement." *Callanan Industries, Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712 (N.Y.A.D. 3 Dept.,1986) (citations omitted).   As in *Callanan*, although Defendants have alleged in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, they have offered absolutely no evidence in support of that conclusion.   Nor, indeed, have Defendants even earnestly controverted the facts alleged in Plaintiff's moving papers with anything other than general denials, which is "patently insufficient." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

10

**EXHIBIT N**

**767**

(1986) (explicating the parties' relative burdens on summary judgment).

To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong.  As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement (along with Frank) which renegotiated the terms of the parties' prior agreements to her and Frank's benefit.  By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Schuster's original grants of licenses to his copyrights.  As in *Milne*, Defendants "present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights." *Milne*, 430 F.3d at 1046-47 ("certainly with regard to [*Milne*], [the heir's] concerns are unfounded.  The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades.").

Similarly here, the 1992 Agreement came about some sixteen (16) years "after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act . . . ." *Id.*  Joseph Shuster, who himself passed away in 1992, never did terminate his prior grants of the Superman copyrights to DC and, by entering into the 1992 Agreement – which increased Frank and Jean's payments – the heirs essentially

EXHIBIT N
768

struck a deal that binds all other heirs. *See Steinbeck*, 537 F.3d at 202 (" Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise.").[1]

# TENTATIVE

# ORDER

---

[1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

EXHIBIT N
769

Defendants next argue that an author or his estate may exercise termination rights "notwithstanding any agreement to the contrary, including an agreement to make a will or to make a future grant. 17 U.S.C. § 304(c)(5)" (Opp'n at 8 ("Thus, any agreement that purports to waive, settle or limit the termination right is unenforceable.").  Such an argument has been previously considered and rejected.

As the *Steinbeck* court noted:
We do not read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right. To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights. . . . Moreover, the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement.  In 1994 [as in 1992], only 17 U.S.C. § 304(c) provided a termination right; section 304(d) would not become effective for another four years.  It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.  As of 1994, then, the agreement entered into by Elaine Steinbeck did not deprive the Steinbeck Descendants of any right they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination right four years later.  Had Elaine Steinbeck not entered into the 1994 Agreement, the section 304(c) termination right would have expired, and Penguin would have been bound only by the 1938 Agreement for the duration of the copyright terms absent (as ultimately happened) Congressional action.  *We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.*

Steinbeck, 537 F.3d at 202-03 (emphasis added).

13

The same holds true here.   In 1992, when Joseph Shuster passed away and his heirs entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody else, held a termination right . . . ." (Opp'n at 16.)   As of 1992, then, "the agreement entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could have realized at that time." *Steinbeck*, 537 F.3d at 203.   Nor, of course, could the parties have contemplated that Congress would create a second termination right six years later.   In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist." *Id.*

Defendants contend "DC's motion is defective as it fails to address most of defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories." (Opp'n at 2.)   The Court disagrees.   It is not Plaintiff's duty to disprove Defendants' affirmative defenses, but rather it is Defendants who bear the burden of proving the applicability of their affirmative defenses. *See, e.g., Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir.2006) (noting that a defendant bears the burden of proof at summary judgment with respect to affirmative defenses); c.f. *Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F.Supp.2d 1019, 1023 -24 (W.D.Wash.,2003) ("Since the affirmative defense of obviousness is Defendant's burden, by failing to challenge the issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

Finally, the 1992 Agreement explains that "[i]f, despite the terms of this agreement, either of you [Jean or Frank] assert any [ ] claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement." (Petrocelli Decl. Exh. 24 ("We also reserve all of our other rights, remedies

14

and defenses in such an event.")).    Suffice it to say, it does not appear from the record before this Court that the heirs refunded any such monies.

In sum, the Court finds that the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate their prior grants of copyrights, impliedly superseded all prior grants of the Superman copyrights.    The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 agreement, it is not subject to termination pursuant to 17 U.S.C. § 304(d).

///

///

///

# TENTATIVE

## Majority Interest

Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who . . . own and are entitled to exercise a total of more than one-half of [an] author's termination interest" and "shall be signed by the [requisite] number and proportion of the owners." (Mot. at 18) (quoting 17 U.S.C. §§ 304(d)(1), (c)(1)-(4)); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).

# ORDER

"According to the Shuster heirs' written contracts and deposition admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate served the [Termination] Notice." (Mot. at 18)    In 2001, the Shusters "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc Toberoff. (UF 31.)    In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in

EXHIBIT N
772

'Superman' pursuant to Section 304(d) of the U.S. Copyright Law." (UF 32.)    Mark Warren Peary even admitted under oath that he understood when he signed the Pacific Pictures agreement, "that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says." (UF 33.)

Defendants argue "the copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to anyone prior to the service of a termination notice, and can be transferred only to the grantee [i.e., DC] or its successor before 'the effective date of the termination' – here, October 26, 2013. (Opp'n at 18) (quoting 17 U.S.C. §304(c)(6)(D)).    Thus, argue Defendants, "as a pure matter of law, the 2001/2003 [Pacific Pictures Corporation] PPC Agreements –pre-dating both the effective date and the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster Termination." (Opp'n at 18.)

TENTATIVE

DC argues Defendants must be held accountable for entering into these agreements, notwithstanding their illegality. (Reply at 8) ("This illegality defense fails for two reasons.").    First, although defendants say the Pacific Pictures contracts "did not transfer the prospective copyrights to be recovered by the Shuster Termination," Peary testified under oath, and without any objection, that the 2001 contract "transferr[ed] and assign[ed] to the venture" "all of the Joe Shuster rights, termination rights, to the extent they existed," (Reply at 8) (citations omitted).    "The 2003 agreement reaffirmed the 2001 Agreement [and] [t]hese admissions and facts are fatal to defendants' defense." *Id.*

ORDER

While the Court finds problematic Defendants' conduct – especially their failure to inform the copyright office of agreements which they themselves believed would affect ownership of the subject copyrights – these agreements do not alter the fact that "the inalienable right to serve the Shuster Termination could not have been transferred to

16

**EXHIBIT N**

**773**

PPC." (Opp'n at 18) ("No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4)).  Thus, although the Defendants believed their contracts transferred the Shuster heirs' termination rights, those agreements did not and, indeed, could not have done so.

Second, DC argues Defendants fail "to address the public-policy rule that they may not assert the illegality of their own contracts as a defense." Mot. 19-20 (citing cases)." (Reply at 8) ("Like a swindler who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal to avoid liabilities they create.").  While that may be so, the Court does not believe that estoppel is applicable here.  In fact, were the Court to hold Defendants to their contracts (and find they lacked the majority interest to terminate), it would essentially rewrite copyright law, allowing parties to traffic in future rights. *See Milne,* 430 F.3d at 1047 (clarifying that Congress intended to protect original grantees like DC by "prohibit[ing] a new grant of rights terminated by statute until after the effective date of termination—to avoid trafficking in future interests" by third parties).

### *Third Claim* ORDER

DC argues it is "entitled to summary judgment on its Third Claim, which is pled in the alternative. (Mot. at 23.)  The gist of this claim is that "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (I) purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective termination date in 2013, and (ii) barring the Shusters from making any deal with DC without Toberoff's and the Siegels' consent." (Reply at 10.)

Section 304(c)(6)(D) provides:
A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further

17

grant may be made between the author or [his heirs] and the original grantee or [its successor], after the notice of termination has been served….

17 U.S.C. § 304(c)(6)(D).

As DC points out, "Congress described this right in the original grantee's favor as 'in the nature of a right of 'first refusal,'" (Mot at 23) (quoting H.R. REP. NO. 94-1476 at 127). In *Milne*, the Ninth Circuit cited the statutory text and legislative history, and confirmed that § 304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin to a "right of 'first refusal.'" 430 F.3d at 1047.

As discussed above, Defendants do not dispute that they entered into multiple agreements purporting to grant rights covered by a (to be) terminated grant. Defendants merely argue, as they do above, that those agreements are void. (*See* Opp'n at 18.) Given that DC brings this claim in the alternative to its first claim, on which it prevailed, it suffices to note that DC prevails on this claim as well. (*See* Mot at 23-25; Reply at 10-12.)[2]

# TENTATIVE

# ORDER

---

[2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22) (citation omitted). For one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized agreements. That section, moreover, *does* in fact state that a third party grant agreement "is valid only if it is *made* after the effective date of termination." 304(c)(6)(D) (emphasis added). And, finally, it is beyond dispute that the subject agreements at issue here were made well *before* the termination date.

IV.    CONCLUSION

As explained above, DC's motion for summary judgment is **GRANTED**.


SO ORDERED

August 30, 2012

_____
OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE


# TENTATIVE

# ORDER

EXHIBIT N
776

# EXHIBIT O

**CERTIFIED COPY**

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

## *PEARY, MARK WARREN – Vol. 1*

### *June 29, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

MARK WARREN PEARY - 6/29/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

DC COMICS,                          )
                                    )
            Plaintiff,              )   No. CV-10-3633 ODW (RZx)
                                    )
      VS.                           )
                                    )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as      )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an         )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL  )
LARSON, an individual, and   )
DOES 1-10, inclusive,        )
                                    )
            Defendants.             )
                                    )
      _____)

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

CSR No. 10094

**EXHIBIT O
778**

MARK WARREN PEARY - 6/29/2011

```
 1    anything.                                                11:06:14
 2         A.   I must have spoken with him in the last        11:06:19
 3    year on the phone.                                       11:06:21
 4         Q.   And you don't know what city he lives in?      11:06:26
 5         A.   I can't recall.  Usually I just talk to him    11:06:28
 6    on the phone.                                            11:06:32
 7         Q.   Do you know how old he is?                      11:06:32
 8         A.   I believe he's in his 50s.                     11:06:33
 9         Q.   Do you have an e-mail address?                 11:06:40
10         A.   Yes.                                           11:06:41
11         Q.   What is it?                                    11:06:42
12         A.   WPeary@comcast.net.                            11:06:44
13         Q.   Is that P-e-a-r-y?                             11:06:54
14         A.   Yes.                                           11:06:57
15         Q.   And do you know if your sister, Dawn, has      11:06:58
16    an e-mail address?                                       11:07:00
17         A.   She uses one through work.  I can't recall.    11:07:00
18         Q.   Does your mom have one?                        11:07:08
19         A.   No.                                            11:07:09
20         Q.   Are you generally familiar with the nature     11:07:18
21    of DC Comics' claims in this case?                       11:07:20
22         A.   Somewhat.                                      11:07:22
23         Q.   Are you aware, and again, very generally,      11:07:29
24    that DC Comics is challenging the termination notice     11:07:34
25    served by the estate of Joe Shuster?                     11:07:40
```

EXHIBIT O
779

MARK WARREN PEARY - 6/29/2011

1      A.    Yeah, I saw that here.                          11:07:45

2      Q.    And by "challenging," I mean DC is              11:07:47

3  contending that the termination notice is not valid      11:07:53

4  or not effective.                                         11:07:55

5          Do you have a general understanding of           11:07:58

6  that?                                                     11:07:59

7      A.    Just from what I read here.                     11:08:00

8      Q.    Okay.  You also -- do you also have an          11:08:02

9  understanding that DC claims that certain agreements      11:08:05

10  that you and/or your mother entered into, violate        11:08:19

11  its rights under the copyright laws?  Do you have a      11:08:24

12  general understanding that DC is making that             11:08:27

13  contention?                                              11:08:30

14          MR. TOBEROFF:  I just want to instruct you,      11:08:33

15  Warren, to the extent he asks you a question whether     11:08:35

16  you have an understanding, you can answer that           11:08:39

17  question as to what your understanding is, provided      11:08:42

18  that understanding is not based on your                  11:08:44

19  conversations with me and is based on something          11:08:47

20  independent of your communications with me.              11:08:50

21          If it's -- if your understanding is solely       11:08:54

22  based on your communications with me, you can't          11:08:57

23  discuss with Mr. Petrocelli what your answer is          11:09:02

24  because you would be divulging the substance of your     11:09:06

25  communications with me.                                  11:09:08

**EXHIBIT O**
**780**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | Do you understand that? | 11:09:09 |
| 2 | THE WITNESS:  Yes. | 11:09:11 |
| 3 | MR. TOBEROFF:  So you can answer solely to | 11:09:12 |
| 4 | the extent you have an understanding independent of | 11:09:14 |
| 5 | your discussions with me. | 11:09:17 |
| 6 | THE WITNESS:  Okay. | 11:09:18 |
| 7 | BY MR. PETROCELLI: | 11:09:18 |
| 8 | Q.  You read the complaint, you said -- you | 11:09:19 |
| 9 | said you scanned it, right? | 11:09:21 |
| 10 | A.  Yes. | 11:09:21 |
| 11 | Q.  So when you scanned the complaint, did you | 11:09:23 |
| 12 | understand that, among other things, that DC was | 11:09:27 |
| 13 | contending that certain agreements that you and/or | 11:09:29 |
| 14 | your mother entered into violated its rights under | 11:09:33 |
| 15 | the copyright laws? | 11:09:36 |
| 16 | MR. TOBEROFF:  Again, you can only answer | 11:09:40 |
| 17 | that question to the extent you have some | 11:09:41 |
| 18 | independent understanding, independent of your | 11:09:43 |
| 19 | discussions with me. | 11:09:45 |
| 20 | THE WITNESS:  My understanding of -- of | 11:09:47 |
| 21 | this is intricately linked to my discussions with | 11:09:50 |
| 22 | Marc Toberoff. | 11:09:56 |
| 23 | (Unanswered question.) | 11:09:56 |
| 24 | BY MR. PETROCELLI: | 11:09:56 |
| 25 | Q.  When you receive the complaint and scanned | 11:09:58 |

**EXHIBIT O**
**781**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | it, that was before you spoke to Mr. Toberoff about | 11:10:03 |
| 2 | the contents of the complaint, correct? | 11:10:05 |
| 3 | MR. TOBEROFF: Assumes facts. | 11:10:10 |
| 4 | THE WITNESS: I scanned it. | 11:10:15 |
| 5 | BY MR. PETROCELLI: | 11:10:15 |
| 6 | Q. And so I'm focusing on that point in time | 11:10:16 |
| 7 | before any communication with Mr. Toberoff. | 11:10:19 |
| 8 | MR. TOBEROFF: I'd like you to answer his | 11:10:23 |
| 9 | question. He asked you a question and you didn't | 11:10:24 |
| 10 | answer it. | 11:10:27 |
| 11 | MR. PETROCELLI: I think he answered it. | 11:10:27 |
| 12 | MR. TOBEROFF: No, he didn't. | 11:10:29 |
| 13 | THE WITNESS: What was the question? | 11:10:31 |
| 14 | BY MR. PETROCELLI: | 11:10:31 |
| 15 | Q. Let me re- -- rewind this, okay? | 11:10:32 |
| 16 | I want you to focus on the time when you | 11:10:35 |
| 17 | received the complaint and you scanned it before you | 11:10:39 |
| 18 | spoke to Mr. Toberoff about it. | 11:10:42 |
| 19 | MR. TOBEROFF: Assumes facts. | 11:10:44 |
| 20 | BY MR. PETROCELLI: | 11:10:44 |
| 21 | Q. Are you with me? | 11:10:46 |
| 22 | A. Uh-huh. | 11:10:47 |
| 23 | Q. Okay. At that point in time, did you have | 11:10:48 |
| 24 | a general understanding that DC was claiming that | 11:10:53 |
| 25 | certain agreements you or your mother entered into | 11:10:57 |

**EXHIBIT O**
**782**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | violated its rights? | 11:10:59 |
| 2 | MR. TOBEROFF:  Okay.  And again, my | 11:11:03 |
| 3 | instruction to you is if you had an understanding | 11:11:03 |
| 4 | that's independent of your discussions with me, you | 11:11:06 |
| 5 | can answer the question.  If you don't, I instruct | 11:11:09 |
| 6 | you not to answer. | 11:11:12 |
| 7 | THE WITNESS:  All my understanding is based | 11:11:13 |
| 8 | on my discussions with Mr. Toberoff. | 11:11:18 |
| 9 | (Unanswered question.) | 11:11:18 |
| 10 | BY MR. PETROCELLI: | 11:11:18 |
| 11 | Q.  Well, you had an understanding at some | 11:11:22 |
| 12 | level when you read the complaint, right? | 11:11:24 |
| 13 | MR. TOBEROFF:  Assumes facts. | 11:11:28 |
| 14 | THE WITNESS:  I don't really -- I don't | 11:11:29 |
| 15 | really understand the -- the complaints, to tell you | 11:11:31 |
| 16 | the truth.  I don't.  So all my understanding is -- | 11:11:37 |
| 17 | is bound with my discussions with Marc Toberoff. | 11:11:41 |
| 18 | BY MR. PETROCELLI: | 11:11:41 |
| 19 | Q.  Well, when you received it and you saw it, | 11:11:46 |
| 20 | you picked it up and you scanned it, you said. | 11:11:47 |
| 21 | Is that right? | 11:11:47 |
| 22 | A.  Yes. | 11:11:47 |
| 23 | Q.  And you did that before having an in-depth | 11:11:52 |
| 24 | discussion with Mr. Toberoff about the document, | 11:11:55 |
| 25 | correct? | 11:11:56 |

**EXHIBIT O**
**783**

MARK WARREN PEARY - 6/29/2011

| | |
|---|---|
| 1      A.  You're asking what my understanding of this | 11:12:02 |
| 2    says? | 11:12:04 |
| 3            MR. TOBEROFF:  He's asking whether -- | 11:12:04 |
| 4            MR. PETROCELLI:  Marc. | 11:12:05 |
| 5            MR. TOBEROFF:  Okay.  I'm sorry.  Focus on | 11:12:06 |
| 6    the question. | 11:12:07 |
| 7    BY MR. PETROCELLI: | 11:12:07 |
| 8      Q.  Yeah.  When you got the document, you | 11:12:08 |
| 9    scanned it and you did that before having an | 11:12:12 |
| 10   in-depth conversation with Mr. Toberoff about the | 11:12:17 |
| 11   contents of the complaint, correct? | 11:12:20 |
| 12           MR. TOBEROFF:  Assumes facts. | 11:12:22 |
| 13           THE WITNESS:  I -- I don't remember if I | 11:12:27 |
| 14   read through it first or talked to Marc Toberoff | 11:12:30 |
| 15   first.  I really don't.  I don't know what the | 11:12:33 |
| 16   timeline is on that. | 11:12:35 |
| 17   BY MR. PETROCELLI: | 11:12:35 |
| 18     Q.  Speaking of timelines, did you read the | 11:12:37 |
| 19   last document, the attachment to the complaint | 11:12:39 |
| 20   called the Toberoff timeline? | 11:12:43 |
| 21     A.  Yes, I -- I scanned that. | 11:12:49 |
| 22     Q.  Okay.  When you scanned the Toberoff | 11:12:50 |
| 23   timeline that's attached as Exhibit -- Exhibit A to | 11:12:52 |
| 24   the complaint, is that the first time you had ever | 11:13:04 |
| 25   seen the Toberoff timeline? | 11:13:09 |

**EXHIBIT O**
**784**

MARK WARREN PEARY - 6/29/2011

Page 46

| | | |
|---|---|---|
| 1 | A.  No. | 11:13:11 |
| 2 | Q.  When had you first seen it? | 11:13:14 |
| 3 | A.  I had seen it sometime before.  I -- I | 11:13:20 |
| 4 | don't recall when.  There's so much documents | 11:13:22 |
| 5 | that -- so much discussions, but I was aware of | 11:13:26 |
| 6 | this. | 11:13:30 |
| 7 | Q.  This document? | 11:13:32 |
| 8 | A.  Yes. | 11:13:32 |
| 9 | Q.  Do you know when you first became aware of | 11:13:33 |
| 10 | it? | 11:13:35 |
| 11 | A.  I couldn't give you a date.  I know that I | 11:13:40 |
| 12 | had become aware of it. | 11:13:43 |
| 13 | Q.  When you -- had you received a copy of it | 11:13:51 |
| 14 | prior to seeing it attached to the complaint? | 11:13:54 |
| 15 | A.  I had -- I had seen it.  Some point I know | 11:13:58 |
| 16 | I had seen it.  I don't know if it was -- how it | 11:14:04 |
| 17 | came to me.  I don't recall because I get so much, | 11:14:08 |
| 18 | but I do recall seeing it. | 11:14:13 |
| 19 | Q.  You get so much what? | 11:14:14 |
| 20 | A.  Material. | 11:14:15 |
| 21 | Q.  Okay.  What do you do with the material | 11:14:16 |
| 22 | that you get? | 11:14:18 |
| 23 | A.  If it comes by mail, I keep it.  E-mail, if | 11:14:19 |
| 24 | it -- I look at it.  Keep some of it if I need to, | 11:14:28 |
| 25 | if not, it just gets taken away. | 11:14:32 |

**EXHIBIT O**
**785**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | Q.   You've -- you delete e-mails? | 11:14:36 |
| 2 | A.   Yes. | 11:14:38 |
| 3 | Q.   Related to this case? | 11:14:39 |
| 4 | A.   Well, if it -- if it isn't some -- some -- | 11:14:40 |
| 5 | some -- some communications I would delete.  Only | 11:14:46 |
| 6 | documents I would save. | 11:14:49 |
| 7 | Q.   When you say only documents you would save, | 11:14:57 |
| 8 | what do you mean by that?  You mean attachments to | 11:15:00 |
| 9 | e-mails? | 11:15:02 |
| 10 | A.   Legal documents.  Things -- things that | 11:15:02 |
| 11 | should be kept. | 11:15:05 |
| 12 | Q.   Have you had this e-mail address for the | 11:15:08 |
| 13 | past three years? | 11:15:10 |
| 14 | A.   Yes. | 11:15:11 |
| 15 | Q.   Do you have any other? | 11:15:13 |
| 16 | A.   No. | 11:15:17 |
| 17 | Q.   Have you been made aware of the need to | 11:15:20 |
| 18 | preserve evidence since the moment this case was | 11:15:23 |
| 19 | filed? | 11:15:27 |
| 20 | A.   Preserve evidence?  Can you clarify? | 11:15:31 |
| 21 | Q.   Have you been made -- have you been made | 11:15:34 |
| 22 | aware of -- that you should not delete e-mails or | 11:15:37 |
| 23 | discard material that could be evidence in this | 11:15:45 |
| 24 | case? | 11:15:49 |
| 25 | A.   I don't believe I've deleted anything that | 11:15:49 |

**EXHIBIT O**
**786**

MARK WARREN PEARY – 6/29/2011

| | | | |
|---|---|---|---|
| 1 | A. | There is -- there's only one. | 11:21:57 |
| 2 | Q. | Which one is that? | 11:22:02 |
| 3 | A. | That's the legal retainer. | 11:22:03 |
| 4 | Q. | What's the date of it? | 11:22:07 |
| 5 | A. | It is -- it is active as of 2001. | 11:22:08 |
| 6 | Q. | But created after the fact? | 11:22:19 |
| 7 | A. | Yes. | 11:22:20 |
| 8 | Q. | When was it created? | 11:22:23 |
| 9 | A. | 2004, I believe. | 11:22:24 |

10      Q.  And is that the last document you have      11:22:32
11  signed with Mr. Toberoff or any of his entities?      11:22:39
12      A.  With Mr. Toberoff.      11:22:44
13          MR. TOBEROFF:  You mean last agreement or      11:22:45
14  any document?      11:22:47
15  BY MR. PETROCELLI:      11:22:47
16      Q.  Is that the last agreement, contract, that      11:22:49
17  you have signed with Mr. Toberoff or any of his      11:22:54
18  entities, the one in 2004 that you said goes back to      11:22:56
19  2001?      11:23:03
20      A.  Yes.      11:23:05
21      Q.  Have you signed any other agreements at any      11:23:07
22  time since 2004 relating to legal representation      11:23:13
23  relating to this case in any way?      11:23:20
24      A.  Yes.      11:23:22
25      Q.  What have you signed?      11:23:24

**EXHIBIT O**
**787**

MARK WARREN PEARY - 6/29/2011

Page 54

```
 1           A.  It's a --                              11:23:25
 2               MR. TOBEROFF:  Don't go into -- just -- 11:23:28
 3      just give a very -- the title or -- don't go into 11:23:36
 4      details of the document.                        11:23:40
 5               THE WITNESS:  It's -- it's called a consent 11:23:40
 6      agreement.                                      11:23:42
 7      BY MR. PETROCELLI:                              11:23:42
 8           Q.  Is that in your lock box?              11:23:45
 9           A.  Yes.                                   11:23:46
10           Q.  Why didn't you mention it earlier when I 11:23:50
11      asked you about the agreements in your lock box? 11:23:52
12               MR. TOBEROFF:  Argumentative.          11:23:55
13               THE WITNESS:  I -- I mentioned what I had 11:24:01
14      recalled.                                       11:24:07
15      BY MR. PETROCELLI:                              11:24:07
16           Q.  So you're now recalling additional     11:24:10
17      documents that you signed?                     11:24:12
18           A.  I -- I recall -- I stated what -- the  11:24:12
19      documents I recalled.                          11:24:18
20           Q.  You now recall that you signed something 11:24:20
21      called a consent agreement and that's also in your 11:24:22
22      lock box?                                       11:24:24
23           A.  Yes.                                   11:24:25
24           Q.  Okay.  When was that signed?           11:24:26
25           A.  That was 2008, I believe.             11:24:30
```

**EXHIBIT O**
**788**

MARK WARREN PEARY - 6/29/2011

1       Q.   When is the last time you saw it, or a copy          11:24:38

2    of it?                                                       11:24:42

3       A.   Fairly recently I reviewed it last, I don't         11:24:46

4    know, maybe in the last month or so I might have            11:24:51

5    reviewed it.                                                11:24:53

6       Q.   Why?                                                11:24:54

7       A.   Because I was thinking about this case             11:24:54

8    because of this.                                            11:25:00

9       Q.   This deposition?                                    11:25:02

10      A.   Yes.                                                11:25:03

11      Q.   Besides the 2008 consent agreement, what           11:25:06

12   else did you review in connection with this                 11:25:09

13   deposition?                                                 11:25:13

14      A.   I reviewed my prior deposition for the             11:25:13

15   Siegel case and exhibits.   That's -- that's what          11:25:19

16   I've reviewed.                                              11:25:30

17      Q.   Did you have a copy of your prior                   11:25:32

18   deposition?                                                 11:25:34

19      A.   Yes.                                                11:25:36

20      Q.   And the exhibits?                                   11:25:37

21      A.   Yes.                                                11:25:38

22      Q.   Besides the 2008 consent agreement and your        11:25:42

23   deposition in the Siegel case together with the             11:25:45

24   exhibits of that deposition, what else did you              11:25:48

25   review in connection with this deposition?                  11:25:51

**EXHIBIT O**
**789**

MARK WARREN PEARY - 6/29/2011

Page 56

```
 1        A.   That's -- that's pretty much it.              11:25:55
 2        Q.   Where did you get the consent agreement to    11:26:02
 3   review, from the lock box?                              11:26:04
 4        A.   I -- I -- I -- yes or -- or it could have     11:26:10
 5   been a copy.                                            11:26:15
 6        Q.   Where -- where was the copy?                  11:26:16
 7        A.   The copy is -- it could be in a separate      11:26:18
 8   folder.                                                 11:26:22
 9        Q.   What -- what's the name of the folder?        11:26:24
10        A.   The folder is "Legal."                        11:26:26
11        Q.   Where is the folder maintained?               11:26:29
12        A.   The folder, there could be a copy in there,   11:26:30
13   in the -- in the filing cabinet.                        11:26:35
14        Q.   Is the 2008 consent agreement the last        11:26:40
15   agreement of any kind that you have signed in           11:26:44
16   connection with either this case or anything having     11:26:49
17   to do with the Joe Shuster termination issue?           11:26:52
18        A.   Yes.                                           11:26:55
19        Q.   Okay.  Who else signed the 2008 consent       11:26:57
20   agreement?                                              11:27:07
21        A.   Would have been the -- Laura, Joanne          11:27:07
22   Siegel.                                                 11:27:17
23        Q.   Laura Siegel and Joanne Siegel?               11:27:17
24        A.   Yes.                                           11:27:20
25        Q.   Anyone else?                                  11:27:20
```

**EXHIBIT O**
**790**

MARK WARREN PEARY - 6/29/2011

Page 57

| | | |
|---|---|---|
| 1 | A.  I think there was -- and -- and my attorney | 11:27:21 |
| 2 | signed it. | 11:27:28 |
| 3 | Q.  You mean Mr. Toberoff? | 11:27:28 |
| 4 | A.  Yes. | 11:27:29 |
| 5 | Q.  And did your mother, Jean Peavy, sign it? | 11:27:30 |
| 6 | A.  I don't recall if she did.  I just -- I | 11:27:33 |
| 7 | didn't read it.  I just scanned the -- the pages.  I | 11:27:44 |
| 8 | didn't -- I don't recall the signature page.  She | 11:27:48 |
| 9 | might have. | 11:27:51 |
| 10 | Q.  Do you know where you were when you signed | 11:27:53 |
| 11 | the document in -- in 2008? | 11:27:55 |
| 12 | A.  Yeah.  When -- when I signed it, I -- I was | 11:27:57 |
| 13 | at home. | 11:28:01 |
| 14 | Q.  And what did you do after you signed it? | 11:28:05 |
| 15 | What did you do with it? | 11:28:08 |
| 16 | A.  Well, an original was FedExed to | 11:28:09 |
| 17 | Mr. Toberoff and I kept another original. | 11:28:14 |
| 18 | Q.  You signed two copies? | 11:28:18 |
| 19 | A.  Yes. | 11:28:20 |
| 20 | Q.  And you put the other original in your lock | 11:28:21 |
| 21 | box? | 11:28:25 |
| 22 | A.  Yes. | 11:28:25 |
| 23 | Q.  Did you ever get back from Mr. Toberoff a | 11:28:26 |
| 24 | version that had more signatures on it? | 11:28:29 |
| 25 | A.  Well, yes, the version in the lock box | 11:28:30 |

**EXHIBIT O**
**791**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | would have all the original signatures. | 11:28:35 |
| 2 | Q.  Why did you review -- why did you pick the | 11:28:48 |
| 3 | 2008 consent agreement to review? | 11:28:51 |
| 4 | A.  Well, before I came I -- I brought out my | 11:28:53 |
| 5 | folder and it says "Legal, Shuster case" and I | 11:28:59 |
| 6 | flipped through documents, just looked at them and | 11:29:06 |
| 7 | said what do I want to bring, what don't I want to | 11:29:08 |
| 8 | bring and -- and that's all.  It was just a cursory | 11:29:10 |
| 9 | review of what I had in there.  And I left most of | 11:29:15 |
| 10 | it at home, so it was just a cursory review of what | 11:29:18 |
| 11 | I had. | 11:29:21 |
| 12 | Q.  What did you bring with you? | 11:29:23 |
| 13 | A.  I brought a copy of the legal retainer as | 11:29:25 |
| 14 | of 2001 and I brought a -- a copy of the first page | 11:29:28 |
| 15 | of the consent agreement and a -- with a cover | 11:29:41 |
| 16 | letter that was a communication between Mr. Toberoff | 11:29:43 |
| 17 | and another attorney, so it was just like the first | 11:29:48 |
| 18 | page of it, just to jog my memory.  And -- | 11:29:53 |
| 19 | Q.  Who was the other attorney? | 11:29:56 |
| 20 | A.  It was -- can I say that?  Just -- it was a | 11:29:57 |
| 21 | communication.  I don't know if that's privileged. | 11:30:04 |
| 22 | MR. TOBEROFF:  Well -- | 11:30:07 |
| 23 | THE WITNESS:  Just -- | 11:30:07 |
| 24 | MR. TOBEROFF:  I -- I think you can -- I | 11:30:08 |
| 25 | think you can give the name of the attorney. | 11:30:12 |

**EXHIBIT O**
**792**

MARK WARREN PEARY - 6/29/2011

Page 59

| | | |
|---|---|---|
| 1 | THE WITNESS: It was -- it was -- it was | 11:30:15 |
| 2 | Bergman. | 11:30:16 |
| 3 | BY MR. PETROCELLI: | 11:30:16 |
| 4 | Q. Michael Bergman? | 11:30:17 |
| 5 | A. Yes. | 11:30:19 |
| 6 | MR. TOBEROFF: That's not privileged. | 11:30:19 |
| 7 | THE WITNESS: No, okay. Okay. Yeah. | 11:30:20 |
| 8 | BY MR. PETROCELLI: | 11:30:20 |
| 9 | Q. When did you arrive in Los Angeles for this | 11:30:24 |
| 10 | deposition? | 11:30:26 |
| 11 | A. Oh, it was -- it was a Monday afternoon, | 11:30:27 |
| 12 | Monday. | 11:30:33 |
| 13 | Q. Of this week? | 11:30:34 |
| 14 | A. Yes, of this week. | 11:30:35 |
| 15 | Q. And have you had meetings with Mr. Toberoff | 11:30:37 |
| 16 | to get ready for this deposition? | 11:30:42 |
| 17 | A. Yes. We talked. | 11:30:43 |
| 18 | Q. Who attended the meetings? | 11:30:48 |
| 19 | A. Just Mr. Toberoff. | 11:30:49 |
| 20 | Q. How long did you meet in total since you | 11:30:52 |
| 21 | arrived Monday afternoon? | 11:30:56 |
| 22 | A. Yeah, a couple hours. | 11:30:57 |
| 23 | Q. When? Monday? | 11:31:03 |
| 24 | A. No, primarily yesterday. | 11:31:05 |
| 25 | Q. At Mr. Toberoff's office? | 11:31:10 |

Merrill   Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law

**EXHIBIT O**
**793**

MARK WARREN PEARY - 6/29/2011

Page 60

| | | |
|---|---|---|
| 1 | A.  No, in my hotel. | 11:31:11 |
| 2 | Q.  Where is your hotel? | 11:31:13 |
| 3 | A.  Hyatt. | 11:31:14 |
| 4 | Q.  Right here in Century City? | 11:31:17 |
| 5 | A.  Yes. | 11:31:19 |
| 6 | Q.  The Hyatt Century Plaza? | 11:31:20 |
| 7 | A.  Yes. | 11:31:24 |
| 8 | Q.  And were you shown any documents yesterday | 11:31:24 |
| 9 | when you met with Mr. Toberoff? | 11:31:32 |
| 10 | A.  We reviewed the prior deposition and | 11:31:35 |
| 11 | exhibits and the -- reviewed our agreements. | 11:31:41 |
| 12 | Q.  What agreements? | 11:31:46 |
| 13 | A.  The legal retainer and the -- the complaint | 11:31:47 |
| 14 | from DC and the supporting legal documents, quite -- | 11:31:55 |
| 15 | quite a few, but just -- just that stuff. | 11:32:01 |
| 16 | Q.  Did you also show Mr. Toberoff the consent | 11:32:07 |
| 17 | agreement pages that you had taken with you? | 11:32:11 |
| 18 | A.  Yes, just the -- the copy that I brought to | 11:32:14 |
| 19 | jog my memory. | 11:32:17 |
| 20 | Q.  Okay. | 11:32:19 |
| 21 | MR. TOBEROFF:  Is this a good time for a | 11:32:33 |
| 22 | short break, Dan, to use the restroom? | 11:32:34 |
| 23 | MR. PETROCELLI:  Okay. | 11:32:36 |
| 24 | THE VIDEOGRAPHER:  Off the record.  The | 11:32:38 |
| 25 | time is 11:31. | 11:32:40 |

**EXHIBIT O**
**794**

MARK WARREN PEARY - 6/29/2011

```
 1              (Brief recess.)                           11:32:45
 2              THE VIDEOGRAPHER:  Back on the record at  11:42:27
 3    11:41.                                              11:42:38
 4    BY MR. PETROCELLI:                                  11:42:38
 5         Q.  Mr. Peary, did you travel here alone?      11:42:41
 6         A.  Yes.                                       11:42:44
 7         Q.  Besides the -- some of the pages from the  11:42:50
 8    2008 consent agreement and I think you said the --  11:42:53
 9    your legal retention agreement as well --           11:43:02
10         A.  Yes.                                       11:43:02
11         Q.  -- did you bring any other documents with  11:43:04
12    you when you took your trip here?                   11:43:05
13         A.  No.                                        11:43:08
14         Q.  Just those two documents?                  11:43:10
15         A.  Yes.                                       11:43:11
16         Q.  Did you take the complaint?                11:43:14
17         A.  No.                                        11:43:15
18         Q.  Have -- other than the 2008 consent        11:43:22
19    agreement, have you signed any other papers that any 11:43:24
20    member of the Siegel family also has signed?        11:43:32
21         A.  No.                                        11:43:37
22         Q.  Is that the only one?                      11:43:39
23         A.  Yes.                                       11:43:39
24         Q.  Have you spoken to any member of the Siegel 11:43:48
25    family since this lawsuit was filed back in May of  11:43:51
```

**EXHIBIT O**
**795**

MARK WARREN PEARY - 6/29/2011

1    kind of talk to her like a grandson would talk to a          11:46:19

2    grandmother, kind of -- her faculties weren't, I            11:46:22

3    don't think -- the way old people are, you have to          11:46:28

4    be kind of slow and friendly, so it's friendly, kind        11:46:33

5    of grandson-to-grandmother-type talk basically.  How        11:46:36

6    are you, what -- what -- what are you doing, you            11:46:41

7    know, and what -- what's going on, what are your --        11:46:43

8    pleasantries.  No legal.                                    11:46:48

9         Q.   Were you very close to her?                       11:46:51

10        A.   I was -- I knew her.  I wouldn't say close,       11:46:53

11   but I did know her.                                         11:46:59

12        Q.   When was the last time you saw her before        11:47:01

13   she passed?                                                 11:47:04

14        A.   That would have been in 2008.                     11:47:04

15        Q.   What was the occasion?                            11:47:16

16        A.   Oh.  It was -- there was a Summer of             11:47:17

17   Superman event in Cleveland.                                11:47:22

18        Q.   Did you attend a mediation in April 2010         11:47:28

19   where she was also present?                                 11:47:36

20        A.   Yes.                                              11:47:37

21        Q.   So you saw her then, too?                         11:47:41

22        A.   Yes.                                              11:47:42

23        Q.   Did you spend any time with her before or        11:47:44

24   after the mediation session?                                11:47:48

25        A.   No.                                               11:47:53

**EXHIBIT O**
**796**

MARK WARREN PEARY - 6/29/2011

Page 65

1          Q.   Was that mediation session in April 2010                11:47:54

2     the last time you saw her?                                        11:47:56

3          A.   In person, yes.                                         11:48:00

4          Q.   You said you spoke with her daughter,                   11:48:02

5     Laura?                                                            11:48:04

6          A.   Yes.                                                    11:48:05

7          Q.   When was that?                                          11:48:07

8          A.   After she died.                                         11:48:09

9          Q.   What was the purpose of that?   Phone call?             11:48:11

10         A.   Yes.                                                    11:48:14

11         Q.   To give your condolences?                               11:48:16

12         A.   Yes.                                                    11:48:17

13         Q.   And have you spoken to Laura since then?                11:48:18

14         A.   No.                                                     11:48:25

15         Q.   You identified the document that the                    11:48:28

16    Siegels and you signed as a consent agreement.                    11:48:30

17         Is the word -- is that the title of the                      11:48:34

18    document?                                                         11:48:37

19         A.   I believe the title, if I'm allowed to say             11:48:43

20    that --                                                           11:48:45

21         MR. TOBEROFF:  Objection.  Actually, you                     11:48:46

22    can -- you can testify as to the title, but that's                11:48:50

23    it.  Not to any contents of the document.                         11:48:53

24         THE WITNESS:  I recall the title says                        11:48:57

25    "Superman Agreement."                                             11:48:59

EXHIBIT O
797

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 11:48:59 |
| 2 | Q.  Why did you use the word consent agreement? | 11:49:03 |
| 3 | A.  It's -- | 11:49:08 |
| 4 | MR. TOBEROFF:  You can only answer if that | 11:49:11 |
| 5 | answer is not based on communication with your | 11:49:12 |
| 6 | attorney. | 11:49:14 |
| 7 | THE WITNESS:  It's -- it's -- it's all | 11:49:15 |
| 8 | based on my communication with my attorney. | 11:49:17 |
| 9 | (Unanswered question.) | 11:49:17 |
| 10 | BY MR. PETROCELLI: | 11:49:17 |
| 11 | Q.  What's -- | 11:49:23 |
| 12 | A.  The term. | 11:49:23 |
| 13 | Q.  The use of the term? | 11:49:25 |
| 14 | A.  The use of the term, yes. | 11:49:26 |
| 15 | Q.  When you signed the 2008 consent agreement, | 11:49:30 |
| 16 | did you -- what did you understand the purpose of | 11:49:50 |
| 17 | that agreement to be?  Why were you signing it? | 11:49:52 |
| 18 | MR. TOBEROFF:  You can only answer that -- | 11:49:57 |
| 19 | actually, I instruct you not to answer because the | 11:49:58 |
| 20 | sole -- your sole understanding is through | 11:50:01 |
| 21 | communications with me. | 11:50:03 |
| 22 | (Unanswered question.) | 11:50:04 |
| 23 | BY MR. PETROCELLI: | 11:50:04 |
| 24 | Q.  You read the document before you signed it, | 11:50:05 |
| 25 | didn't you? | 11:50:05 |

**EXHIBIT O**
**798**

MARK WARREN PEARY - 6/29/2011

1      A.   Yes, but I'll have to follow my attorney's          11:50:09

2   advice.                                                     11:50:11

3      Q.   Well, based on your reading of the                  11:50:12

4   document, what did you understand the purpose of            11:50:14

5   your signing it to be?                                      11:50:16

6         MR. TOBEROFF:   I instruct you not to answer          11:50:18

7   if you -- put it this way:  You can only answer the         11:50:19

8   question if you have an understanding independent of        11:50:23

9   your conversations with me.                                 11:50:24

10        THE WITNESS:   Well, all my understanding is          11:50:28

11  based on my communication with my attorney, so I            11:50:30

12  can't say anything.                                         11:50:32

13        (Unanswered question.)                                11:50:33

14  BY MR. PETROCELLI:                                          11:50:33

15     Q.   Are you saying that when -- when you read           11:50:34

16  the document, you derived absolutely no                     11:50:36

17  understanding from reading the words?                       11:50:39

18     A.   My understanding is intricately bound with          11:50:41

19  my communications with Marc Toberoff.                       11:50:43

20     Q.   Can you answer my question?                         11:50:46

21     A.   I don't believe I can.                              11:50:47

22        MR. TOBEROFF:   He did.                               11:50:49

23        MR. PETROCELLI:   It wasn't responsive to my          11:50:52

24  question.                                                   11:50:53

25     Q.   My question was, when you read the document         11:50:54

**EXHIBIT O**
**799**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | are you saying that you drew no understanding at all | 11:50:57 |
| 2 | from reading the words on the page of the document? | 11:51:00 |
| 3 |     A.  It's -- it's all based upon -- my | 11:51:07 |
| 4 | understanding is intricately bound to my | 11:51:10 |
| 5 | communications with my attorney. | 11:51:14 |
| 6 |     Q.  Are you saying that had you not spoken to | 11:51:19 |
| 7 | your attorney, you would have had no idea what -- | 11:51:20 |
| 8 | what you were signing? | 11:51:26 |
| 9 |     A.  What, if I had no idea? | 11:51:28 |
| 10 |     Q.  Right.  You signed a -- a document together | 11:51:30 |
| 11 | with other individuals.  Are you saying that you did | 11:51:34 |
| 12 | not understand what you were signing except for what | 11:51:38 |
| 13 | Marc Toberoff had to tell you? | 11:51:41 |
| 14 |     MR. TOBEROFF:  Asked and answered. | 11:51:42 |
| 15 | Misstates his testimony. | 11:51:43 |
| 16 |     THE WITNESS:  My understanding is -- is | 11:51:47 |
| 17 | bound up, what -- whatever I have is bound up. | 11:51:52 |
| 18 | BY MR. PETROCELLI: | 11:51:52 |
| 19 |     Q.  I appreciate you keep repeating that phrase | 11:51:56 |
| 20 | that your understanding is bound up or intricately | 11:52:00 |
| 21 | bound up.  I'm asking you something different than | 11:52:03 |
| 22 | that.  I'm not required to simply accept that | 11:52:05 |
| 23 | phrase. | 11:52:07 |
| 24 |     A.  Uh-huh. | 11:52:07 |
| 25 |     Q.  Did you understand that you were entering | 11:52:08 |

**EXHIBIT O**
**800**

MARK WARREN PEARY – 6/29/2011

Page 69

| | | |
|---|---|---|
| 1 | into a contract, an agreement, with the Siegels when | 11:52:12 |
| 2 | you signed the document? | 11:52:17 |
| 3 |     A.   Yes. | 11:52:23 |
| 4 |     Q.   Did you understand that the agreement that | 11:52:24 |
| 5 | you were entering into required that you could not | 11:52:25 |
| 6 | settle any claim with DC Comics without the consent | 11:52:32 |
| 7 | of the Siegels? | 11:52:38 |
| 8 |          MR. TOBEROFF:  I instruct you not to | 11:52:39 |
| 9 | answer.  The document has been held to be privileged | 11:52:41 |
| 10 | and off limits and they can't ask you questions | 11:52:44 |
| 11 | about the contents of the document.  Instruct you | 11:52:47 |
| 12 | not to answer. | 11:52:49 |
| 13 |          (Unanswered question.) | 11:52:50 |
| 14 |          MR. PETROCELLI:  I don't agree with that as | 11:52:50 |
| 15 | you well know. | 11:52:53 |
| 16 |     Q.   Is there any arrangement whereby you would | 11:52:54 |
| 17 | have the authority to approve any kind of settlement | 11:52:57 |
| 18 | that Joanne Siegel might enter into with DC Comics? | 11:52:59 |
| 19 |          MR. TOBEROFF:  Instruct you not to answer. | 11:53:03 |
| 20 |          (Unanswered question.) | 11:53:07 |
| 21 |          MR. PETROCELLI:  Marc, you allowed that | 11:53:07 |
| 22 | verbatim question to be answered at the first -- at | 11:53:09 |
| 23 | the Siegel session of his deposition. | 11:53:12 |
| 24 |          MR. TOBEROFF:  I'm instructing him not to | 11:53:13 |
| 25 | answer and as you suggested we shouldn't debate | 11:53:15 |

**EXHIBIT O**

801

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | these things in the deposition. | 11:53:17 |
| 2 | BY MR. PETROCELLI: | 11:53:17 |
| 3 | Q.  So is it possible for Joanne Siegel -- | 11:53:22 |
| 4 | MR. TOBEROFF:  I'm going to instruct | 11:53:23 |
| 5 | him not to -- just to shorten -- shorten this, I | 11:53:25 |
| 6 | will instruct him not to answer any questions | 11:53:27 |
| 7 | regarding the substance of the consent agreement. | 11:53:29 |
| 8 | BY MR. PETROCELLI: | 11:53:29 |
| 9 | Q.  So is it possible for Joanne Siegel and | 11:53:33 |
| 10 | Laura Siegel-Larson to settle their case with DC | 11:53:36 |
| 11 | Comics and you would have no say so in that? | 11:53:40 |
| 12 | Is that accurate? | 11:53:41 |
| 13 | MR. TOBEROFF:  I instruct you not to answer | 11:53:42 |
| 14 | on the basis of attorney-client privilege. | 11:53:48 |
| 15 | (Unanswered question.) | 11:53:48 |
| 16 | BY MR. PETROCELLI: | 11:53:48 |
| 17 | Q.  And if they were to settle -- and if they | 11:53:50 |
| 18 | were to settle and receive money from DC Comics, is | 11:53:50 |
| 19 | there any arrangement by which you would receive any | 11:53:53 |
| 20 | of that money? | 11:53:56 |
| 21 | MR. TOBEROFF:  Same instruction. | 11:53:57 |
| 22 | (Unanswered question.) | 11:53:57 |
| 23 | BY MR. PETROCELLI: | 11:53:57 |
| 24 | Q.  Are you able right now, on behalf of the | 11:54:06 |
| 25 | Joe Shuster estate, to enter into an agreement with | 11:54:09 |

**EXHIBIT O**
**802**

MARK WARREN PEARY - 6/29/2011

1    DC regarding the Shuster termination interests          11:54:12
2    without the consent of any -- anyone else?              11:54:17
3            MR. TOBEROFF:  Same instruction.                11:54:22
4    Attorney-client privilege.                              11:54:24
5            (Unanswered question.)                          11:54:25
6            THE WITNESS:  I'll have to follow my            11:54:26
7    attorney's advice.                                      11:54:27
8    BY MR. PETROCELLI:                                      11:54:27
9        Q.  Do you have a current agreement to share        11:54:32
10   with any member of the Siegel family any settlement     11:54:36
11   or other recoveries having to do with the Superman      11:54:39
12   termination interests?                                  11:54:43
13           MR. TOBEROFF:  I instruct you not to answer     11:54:47
14   based on privilege.                                     11:54:48
15           (Unanswered question.)                          11:54:49
16           MR. PETROCELLI:  When you say "based on         11:54:57
17   privilege," to be clear, what privilege, Mr. -- are     11:54:59
18   you talking about the attorney-client privilege?        11:55:02
19           MR. TOBEROFF:  Attorney-client privilege,       11:55:04
20   work product, the privilege that was upheld by          11:55:05
21   Magistrate Suresky, Judge Larson in your motion that    11:55:10
22   was denied as to obtaining the consent agreement.       11:55:14
23   If you can't obtain the consent agreement because       11:55:17
24   you're not entitled to view the substance of the        11:55:21
25   consent agreement, you're not entitled to get at        11:55:24

**EXHIBIT O**
**803**

MARK WARREN PEARY - 6/29/2011

Page 72

| | | |
|---|---|---|
| 1 | that substance through questioning my client. | 11:55:27 |
| 2 | MR. PETROCELLI:  We -- we disagree. | 11:55:28 |
| 3 | MR. TOBEROFF:   That's fine. | 11:55:33 |
| 4 | BY MR. PETROCELLI: | 11:55:33 |
| 5 | Q.  Is the consent agreement that you signed in | 11:55:34 |
| 6 | 2008 still in effect? | 11:55:36 |
| 7 | A.  Yes. | 11:55:39 |
| 8 | Q.  Have you had any discussions with any | 11:55:48 |
| 9 | member of the Siegel family about it at any time | 11:55:50 |
| 10 | both before or after signing it? | 11:55:55 |
| 11 | A.  Not directly. | 11:55:59 |
| 12 | Q.  What does that mean? | 11:56:00 |
| 13 | A.  All my discussions are through my attorney. | 11:56:01 |
| 14 | Q.  How do you have a discussion with the | 11:56:04 |
| 15 | Siegels through the attorney? | 11:56:08 |
| 16 | A.  Then the answer is no. | 11:56:09 |
| 17 | Q.  What did you mean when you said not | 11:56:11 |
| 18 | directly, through your attorney? | 11:56:13 |
| 19 | A.  All -- all my communication about the | 11:56:14 |
| 20 | agreement is -- is through my discussions with my | 11:56:15 |
| 21 | attorney and what he has told me the Siegels have | 11:56:19 |
| 22 | communicated.  That's what I mean. | 11:56:26 |
| 23 | Q.  Have you ever had a -- a discussion with | 11:56:28 |
| 24 | your mom about the consent agreement? | 11:56:43 |
| 25 | A.  She -- she -- I may have -- she has a -- | 11:56:56 |

**EXHIBIT O**

804

MARK WARREN PEARY - 6/29/2011

Page 73

| | | |
|---|---|---|
| 1 | little interest in this.  Her faculties, as I said, | 11:57:04 |
| 2 | are -- are poor and I don't recall if I've mentioned | 11:57:08 |
| 3 | it to her or not because of its detail. | 11:57:14 |
| 4 | Q.  Back in 2008 she was of sound mind, | 11:57:19 |
| 5 | correct? | 11:57:19 |
| 6 | A.  That's when she had her stroke. | 11:57:25 |
| 7 | Q.  Before or after the consent agreement? | 11:57:27 |
| 8 | A.  I don't -- I don't recall.  I don't -- I | 11:57:29 |
| 9 | don't know if I've ever discussed it with her or | 11:57:38 |
| 10 | not.  I mean, she's not -- she's not that interested | 11:57:41 |
| 11 | in legal matters.  I know that she -- she -- she | 11:57:46 |
| 12 | knows about it.  I don't know if she understands it. | 11:57:53 |
| 13 | Q.  How do you know she knows about it? | 11:58:00 |
| 14 | A.  I -- I -- she would have been aware of it. | 11:58:01 |
| 15 | Q.  How do you know that? | 11:58:05 |
| 16 | A.  Well, I -- as far as I know, she -- as far | 11:58:05 |
| 17 | as -- as far as I can remember, I probably have said | 11:58:10 |
| 18 | something.  That's all I can say.  I mean, that's -- | 11:58:14 |
| 19 | Q.  What did you say to her? | 11:58:17 |
| 20 | A.  I -- if I had said anything, it would just | 11:58:20 |
| 21 | have been that there's -- I don't remember what I | 11:58:23 |
| 22 | said to her, frankly.  I mean, I don't know what to | 11:58:29 |
| 23 | say because I don't -- I don't remember my words. | 11:58:31 |
| 24 | She doesn't really -- | 11:58:33 |
| 25 | MR. TOBEROFF:  Don't speculate. | 11:58:34 |

**EXHIBIT O**
**805**

MARK WARREN PEARY - 6/29/2011

Page 81

```
 1        A.  No.  We haven't got into that.              12:07:03
 2        Q.  For example, have you said, you know, it    12:07:10
 3   would be in -- approximately 5 million or 10 million 12:07:12
 4   or 100 million or any numbers, discussed in your     12:07:15
 5   conversations with your mother?                      12:07:22
 6        A.  I don't recall getting into figures with    12:07:23
 7   her.  We just -- no, I don't.                        12:07:29
 8        Q.  Have you ever had anybody try to do an      12:07:34
 9   estimate for you as to how much you might recover    12:07:38
10   one day as a result of Joe Shuster's asserted        12:07:40
11   termination interests?                               12:07:44
12        A.  I -- I know --                              12:07:48
13        MR. TOBEROFF:  You -- you could answer that     12:07:49
14   question solely if it's outside of the               12:07:51
15   attorney-client relationship.                        12:07:57
16        THE WITNESS:  All I know is that my             12:08:00
17   attorney, Marc Toberoff, has --                      12:08:04
18        MR. TOBEROFF:  Don't -- don't discuss what      12:08:06
19   your attorney has done.                              12:08:07
20        THE WITNESS:  Okay.  Okay.                      12:08:08
21        MR. TOBEROFF:  The --                           12:08:09
22        THE WITNESS:  I don't have any -- no, I         12:08:10
23   don't have any idea of economic value outside of my  12:08:12
24   discussions, no.                                     12:08:16
25   BY MR. PETROCELLI:                                   12:08:16
```

**EXHIBIT O**

806

MARK WARREN PEARY - 6/29/2011

Page 82

```
 1        Q.  Have you ever met or spoken or communicated    12:08:17
 2   with anybody who you understood to be estimating the    12:08:20
 3   value of the termination interest?                      12:08:26
 4        A.  No.                                            12:08:27
 5        Q.  Have you ever provided any information to      12:08:29
 6   any such person?                                        12:08:31
 7        A.  No.                                            12:08:31
 8        Q.  Did you tell your mother in your               12:08:38
 9   conversations over the years, and in particular         12:08:42
10   about the consent agreement, that any agreement with    12:08:46
11   DC or settlement with DC requires the consent of the    12:08:52
12   Siegels?                                                12:08:56
13             THE WITNESS:  Am I allowed to answer that?    12:09:05
14   Is that --                                              12:09:07
15   BY MR. PETROCELLI:                                      12:09:07
16        Q.  You are.                                       12:09:09
17             MR. TOBEROFF:  Actually, I'll let you         12:09:09
18   answer that question without waiver of any privilege    12:09:27
19   that could apply.                                       12:09:31
20             THE WITNESS:  Okay.  So the question being    12:09:31
21   she --                                                  12:09:34
22             MR. PETROCELLI:  Can you repeat the           12:09:50
23   question.                                               12:09:51
24             (The reporter read the record                12:09:51
25             as follows:                                   12:09:51
```

**EXHIBIT O**

807

MARK WARREN PEARY - 6/29/2011

Page 83

| | | |
|---|---|---|
| 1 | "QUESTION:  Did you tell your | 12:08:40 |
| 2 | mother in your conversations over | 12:08:41 |
| 3 | the years and in particular about | 12:08:44 |
| 4 | the consent agreement that any | 12:08:46 |
| 5 | agreement with DC or settlement | 12:08:51 |
| 6 | with DC requires the consent of the | 12:08:54 |
| 7 | Siegels?") | 12:08:56 |
| 8 | THE WITNESS:  Yes. | 12:09:52 |
| 9 | BY MR. PETROCELLI: | 12:09:52 |
| 10 | Q.  What did you say in that regard? | 12:09:54 |
| 11 | A.  Pretty much what -- what you said there. | 12:09:59 |
| 12 | Q.  Did you discuss with her what would happen | 12:10:04 |
| 13 | if, for example, you wanted to do a settlement or an | 12:10:12 |
| 14 | agreement with DC but the Siegels did not, how you | 12:10:16 |
| 15 | would deal with that circumstance? | 12:10:19 |
| 16 | A.  I don't recall going into that detail of | 12:10:27 |
| 17 | what-ifs. | 12:10:30 |
| 18 | Q.  Did your mom ask you, "Well, what if we | 12:10:32 |
| 19 | can't agree with the Siegels?  I mean, what happens | 12:10:35 |
| 20 | then?"  Did she put that -- | 12:10:37 |
| 21 | A.  No. | 12:10:40 |
| 22 | Q.  -- question to you in so many words? | 12:10:41 |
| 23 | A.  No. | 12:10:42 |
| 24 | Q.  Do you -- did -- if she had put that | 12:10:46 |
| 25 | question to you, could you have answered it? | 12:10:48 |

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law

**EXHIBIT O**

808

MARK WARREN PEARY - 6/29/2011

Page 84

| | | |
|---|---|---|
| 1 | MR. TOBEROFF: Again, don't testify based | 12:10:53 |
| 2 | on knowledge and communications you received -- | 12:10:56 |
| 3 | don't testify based on knowledge you received | 12:11:00 |
| 4 | through your communications with your attorney. | 12:11:02 |
| 5 | THE WITNESS: I -- all I can -- | 12:11:07 |
| 6 | MR. TOBEROFF: And I also, when he asks you | 12:11:08 |
| 7 | about conversations, if you understand the substance | 12:11:11 |
| 8 | of the conversation you can give him that substance. | 12:11:14 |
| 9 | If you understand the exact words you used, you can | 12:11:17 |
| 10 | give him the exact words. But if you don't remember | 12:11:19 |
| 11 | the exact words you used, don't make up the words to | 12:11:21 |
| 12 | fill in the blanks. That would be speculating. | 12:11:25 |
| 13 | THE WITNESS: Uh-huh. The question again | 12:11:27 |
| 14 | being? | 12:11:33 |
| 15 | BY MR. PETROCELLI: | 12:11:33 |
| 16 | Q. Did you have an understanding in | 12:11:33 |
| 17 | discussions with your mom about the consent | 12:11:38 |
| 18 | agreement what would happen if the Siegels and you | 12:11:40 |
| 19 | could not agree? | 12:11:43 |
| 20 | MR. TOBEROFF: Asked and answered. | 12:11:45 |
| 21 | THE WITNESS: I didn't discuss that with | 12:11:49 |
| 22 | her. | 12:11:51 |
| 23 | BY MR. PETROCELLI: | 12:11:51 |
| 24 | Q. Did you have an awareness in your own mind | 12:11:52 |
| 25 | of what would happen? | 12:11:57 |

**EXHIBIT O**

**809**

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | A.  I'm aware -- | 12:11:59 |
| 2 | Q.  Had she asked you the question, could you | 12:11:59 |
| 3 | have answered it? | 12:12:01 |
| 4 | A.  Oh. | 12:12:02 |
| 5 | MR. TOBEROFF:  You can only answer the next | 12:12:02 |
| 6 | question to the extent you have an understanding | 12:12:04 |
| 7 | that's separate and apart from your communications | 12:12:06 |
| 8 | with me. | 12:12:09 |
| 9 | THE WITNESS:  Just -- okay. | 12:12:10 |
| 10 | It's just we -- I thought the agreement was | 12:12:14 |
| 11 | good.  It was mutually beneficial.  That's -- that's | 12:12:17 |
| 12 | all I can say. | 12:12:24 |
| 13 | BY MR. PETROCELLI: | 12:12:24 |
| 14 | Q.  Why did you think it was good and mutually | 12:12:25 |
| 15 | beneficial? | 12:12:28 |
| 16 | MR. TOBEROFF:  I instruct you not to | 12:12:28 |
| 17 | answer. | 12:12:29 |
| 18 | (Unanswered question.) | 12:12:30 |
| 19 | THE WITNESS:  I follow -- | 12:12:32 |
| 20 | MR. TOBEROFF:  I instruct you not to | 12:12:34 |
| 21 | answer. | 12:12:35 |
| 22 | THE WITNESS:  I follow my attorney's | 12:12:35 |
| 23 | advice. | 12:12:36 |
| 24 | BY MR. PETROCELLI: | 12:12:36 |
| 25 | Q.  Can I get an answer to my prior question, | 12:12:47 |

**EXHIBIT O**

810

MARK WARREN PEARY - 6/29/2011

Page 86

| | | |
|---|---|---|
| 1 | which was, did you have an awareness of what would | 12:12:50 |
| 2 | happen in the event the Siegels and the Shusters | 12:12:52 |
| 3 | could not agree on -- on an agreement with DC? | 12:12:55 |
| 4 | A.   I didn't think it was a problem. | 12:13:03 |
| 5 | MR. TOBEROFF:  He -- that's not his | 12:13:06 |
| 6 | question. | 12:13:08 |
| 7 | THE WITNESS:  No? | 12:13:08 |
| 8 | MR. TOBEROFF:  Focus on the question. | 12:13:11 |
| 9 | THE WITNESS:  Say it again. | 12:13:11 |
| 10 | MR. TOBEROFF:  It's a "yes" or "no" | 12:13:12 |
| 11 | question. | 12:13:15 |
| 12 | THE WITNESS:  Did I have -- say it again, | 12:13:15 |
| 13 | please. | 12:13:16 |
| 14 | BY MR. PETROCELLI: | 12:13:16 |
| 15 | Q.   Did you have an understanding in your | 12:13:17 |
| 16 | conversations with your mom about the 2008 consent | 12:13:19 |
| 17 | agreement, what would happen -- | 12:13:22 |
| 18 | A.   Oh. | 12:13:25 |
| 19 | Q.   -- if the Siegels and you could not agree? | 12:13:25 |
| 20 | A.   Did I have an understanding -- | 12:13:27 |
| 21 | MR. TOBEROFF:  In his conversations with | 12:13:28 |
| 22 | his mom? | 12:13:30 |
| 23 | MR. PETROCELLI:  Yeah. | 12:13:30 |
| 24 | Q.   At the time that you were -- during the | 12:13:31 |
| 25 | period of time when you were having these | 12:13:34 |

**EXHIBIT O**

811

MARK WARREN PEARY - 6/29/2011

Page 88

| | | |
|---|---|---|
| 1 | answered the question?  That's a "yes" or "no." | 12:14:32 |
| 2 | A.   Yes. | 12:14:37 |
| 3 | Q.   Okay.  What would you have said? | 12:14:38 |
| 4 | MR. TOBEROFF:  Instruct you not to answer. | 12:14:39 |
| 5 | You can't divulge the substance of the consent | 12:14:40 |
| 6 | agreement. | 12:14:42 |
| 7 | (Unanswered question.) | 12:14:43 |
| 8 | BY MR. PETROCELLI: | 12:14:43 |
| 9 | Q.   Do you have any current arrangement for the | 12:14:58 |
| 10 | consent agreement or otherwise whereby the Shuster | 12:15:05 |
| 11 | interest's share in any proceeds or recovery | 12:15:13 |
| 12 | attributable to Superboy? | 12:15:16 |
| 13 | MR. TOBEROFF:  Okay.  On this question, | 12:15:19 |
| 14 | I -- I will make an exception and allow him to | 12:15:23 |
| 15 | answer that question provided you agree that his | 12:15:27 |
| 16 | answering the question is not a waiver of any | 12:15:30 |
| 17 | privilege regarding the consent agreement. | 12:15:32 |
| 18 | Otherwise, I'll instruct him not to answer. | 12:15:34 |
| 19 | MR. PETROCELLI:  I guess I'll have to do | 12:15:46 |
| 20 | this on a question-by-question basis.  So as to this | 12:15:47 |
| 21 | particular question and answer, that's acceptable. | 12:15:53 |
| 22 | MR. TOBEROFF:  Okay.  Do you want to -- | 12:15:56 |
| 23 | MR. PETROCELLI:  Do you want to repeat the | 12:15:58 |
| 24 | question? | 12:15:59 |
| 25 | Read back the question. | 12:16:00 |

**EXHIBIT O**

812

MARK WARREN PEARY - 6/29/2011

Page 89

```
 1              (The reporter read the record          12:16:23
 2        as follows:                                  12:16:23
 3              "QUESTION:  Do you have any             12:14:58
 4        current arrangement for the consent          12:15:00
 5        agreement or otherwise whereby the           12:15:06
 6        Shuster interest's share in any              12:15:10
 7        proceeds or recovery attributable            12:15:15
 8        to Superboy?")                               12:15:17
 9        MR. TOBEROFF:  That was really fast.         12:15:17
10        THE REPORTER:  I'm sorry.                    12:15:17
11              (The reporter read the record as       12:15:17
12        follows:                                     12:15:17
13              "QUESTION:  Do you have any            12:14:58
14        current arrangement for the consent          12:15:00
15        agreement or otherwise whereby the           12:15:06
16        Shuster interests share in any               12:15:10
17        proceeds or recovery attributable            12:15:15
18        to Superboy.")                               12:15:17
19        THE WITNESS:  No.                            12:16:24
20   BY MR. PETROCELLI:                                12:16:24
21     Q.  Does the consent agreement -- under the    12:16:31
22   consent agreement as you understand it, would the 12:16:33
23   Shuster interest's share in any proceeds or recovery 12:16:39
24   attributable to Superboy?                         12:16:44
25        MR. TOBEROFF:  This is the same question.   12:16:47
```

Merrill   Corporation   -   Los Angeles

800-826-0277                                www.merrillcorp.com/law

**EXHIBIT O**

813

MARK WARREN PEARY - 6/29/2011

Page 90

| | | |
|---|---|---|
| 1 | Do we have the same agreement? | 12:16:49 |
| 2 | MR. PETROCELLI:  We do.  It's not the same | 12:16:50 |
| 3 | question because I limited it to the consent | 12:16:54 |
| 4 | agreement. | 12:16:54 |
| 5 | MR. TOBEROFF:  Do we have the same | 12:16:54 |
| 6 | agreement that I will allow him to answer but that | 12:16:58 |
| 7 | will not be deemed -- | 12:16:58 |
| 8 | MR. PETROCELLI:  Yes. | 12:16:58 |
| 9 | MR. TOBEROFF:  -- a waiver of the privilege | 12:17:00 |
| 10 | as to any other questions or the document? | 12:17:00 |
| 11 | MR. PETROCELLI:  Yes. | 12:17:02 |
| 12 | MR. TOBEROFF:  You can answer. | 12:17:03 |
| 13 | THE WITNESS:  Okay.  No. | 12:17:03 |
| 14 | BY MR. PETROCELLI: | 12:17:03 |
| 15 | Q.  Have the Shusters, by "the Shusters" I mean | 12:17:07 |
| 16 | you, your mom, the estate of Joe Shuster, the | 12:17:13 |
| 17 | Shuster interest, have the Shusters ever had any | 12:17:17 |
| 18 | agreement with the Siegels regarding Superboy? | 12:17:21 |
| 19 | A.  No. | 12:17:28 |
| 20 | Q.  Is it your understanding that if the | 12:17:34 |
| 21 | Siegels were to be paid or recover money associated | 12:17:42 |
| 22 | with Superboy, that it would belong solely to them | 12:17:47 |
| 23 | and not to the Shuster side? | 12:17:50 |
| 24 | Is that your understanding? | 12:17:55 |
| 25 | A.  Yes. | 12:17:56 |

Merrill  Corporation  -  Los Angeles

800-826-0277                                          www.merrillcorp.com/law

**EXHIBIT O**

814

MARK WARREN PEARY - 6/29/2011

|   |   |   |
|---|---|---|
| 1 | Q.  Have you ever had any discussions with any | 12:18:02 |
| 2 | member of the Siegel family about Superboy and | 12:18:08 |
| 3 | sharing or not sharing in recoveries associated with | 12:18:16 |
| 4 | Superboy? | 12:18:21 |
| 5 | A.  No. | 12:18:21 |
| 6 | Q.  Have you ever had a discussion with your | 12:18:24 |
| 7 | mother about whether the Shusters had an interest in | 12:18:24 |
| 8 | Superboy? | 12:18:33 |
| 9 | A.  No. | 12:18:37 |
| 10 | Q.  You never once raised that subject with | 12:18:37 |
| 11 | her? | 12:18:39 |
| 12 | A.  No. | 12:18:41 |
| 13 | Q.  Has she ever discussed it with you? | 12:18:42 |
| 14 | A.  No. | 12:18:45 |
| 15 | Q.  At any time, even going back to the time | 12:18:46 |
| 16 | when Joe Shuster was alive? | 12:18:49 |
| 17 | A.  We never discussed that. | 12:18:51 |
| 18 | Q.  Did you ever discuss it with Joe Shuster? | 12:18:53 |
| 19 | A.  No. | 12:18:55 |
| 20 | MR. PETROCELLI:  Okay.  Okay.  Would you | 12:19:07 |
| 21 | agree that I don't need to ask any more questions | 12:19:14 |
| 22 | about his knowledge about the consent agreement | 12:19:17 |
| 23 | because you're -- you're going to assert the same | 12:19:21 |
| 24 | objections? | 12:19:23 |
| 25 | MR. TOBEROFF:  If you're asking as to the | 12:19:24 |

**EXHIBIT O**

MARK WARREN PEARY - 6/29/2011

Page 174

| | | |
|---|---|---|
| 1 | Q.   Do you know why they were unhappy with | 14:57:00 |
| 2 | their attorney? | 14:57:03 |
| 3 | A.   Not exactly. | 14:57:03 |
| 4 | Q.   What do you mean "exactly"?  Do you know | 14:57:08 |
| 5 | anything about why they were unhappy with their | 14:57:09 |
| 6 | attorney that you learned, prior to calling | 14:57:10 |
| 7 | Mr. Toberoff, not after? | 14:57:18 |
| 8 | A.   Oh, no, not -- not prior.  I don't know | 14:57:20 |
| 9 | exactly. | 14:57:23 |
| 10 | Q.   Okay.  Did you have any inkling that they | 14:57:23 |
| 11 | were unhappy with their attorney prior to your | 14:57:27 |
| 12 | calling Mr. Toberoff? | 14:57:30 |
| 13 | A.   Yes. | 14:57:31 |
| 14 | Q.   But you don't have any details? | 14:57:33 |
| 15 | A.   No. | 14:57:34 |
| 16 | Q.   And you never spoke to them about it? | 14:57:36 |
| 17 | A.   No. | 14:57:37 |
| 18 | MR. PETROCELLI:  We'll take a short break. | 14:57:44 |
| 19 | THE VIDEOGRAPHER:  Off the record.  The | 14:57:46 |
| 20 | time is 2:56. | 14:57:47 |
| 21 | This will mark the end of Volume I, Tape | 14:57:51 |
| 22 | Number 2 in the deposition of Mark Warren Peary. | 14:57:53 |
| 23 | (Brief recess.) | 15:17:12 |
| 24 | THE VIDEOGRAPHER:  We're back on the | 15:17:12 |
| 25 | record. | 15:17:20 |

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merrillcorp.com/law

**EXHIBIT O**
816

MARK WARREN PEARY - 6/29/2011

Page 175

| | | |
|---|---|---|
| 1 | This marks the beginning of Volume I, Tape | 15:17:20 |
| 2 | Number 3 in the deposition of Mark Warren Peary. | 15:17:22 |
| 3 | The time is 3:16. | 15:17:25 |
| 4 | BY MR. PETROCELLI: | 15:17:25 |
| 5 | Q. Do you have any agreement to share in any | 15:17:30 |
| 6 | accounting recovery that the Siegels might obtain in | 15:17:35 |
| 7 | their case against DC or Warner Bros.? | 15:17:39 |
| 8 | MR. TOBEROFF: I instruct you not to answer | 15:17:48 |
| 9 | that because it delves into the potential substance | 15:17:50 |
| 10 | of the consent agreement. | 15:17:56 |
| 11 | (Unanswered question.) | 15:17:58 |
| 12 | THE WITNESS: I'll have to follow my | 15:17:58 |
| 13 | attorney's advice. | 15:18:00 |
| 14 | BY MR. PETROCELLI: | 15:18:00 |
| 15 | Q. Putting aside the consent agreement, the | 15:18:08 |
| 16 | 2008 consent agreement for the moment, have you | 15:18:10 |
| 17 | signed any agreement by which the Shuster interests | 15:18:14 |
| 18 | would share in any accounting recovery by the Siegel | 15:18:22 |
| 19 | parties? | 15:18:28 |
| 20 | MR. TOBEROFF: Asked and answered. | 15:18:31 |
| 21 | You can answer. | 15:18:32 |
| 22 | THE WITNESS: As I stated before, is | 15:18:34 |
| 23 | that -- | 15:18:44 |
| 24 | MR. TOBEROFF: You can answer the question. | 15:18:45 |
| 25 | THE WITNESS: I can answer that? Okay. | 15:18:45 |

Merrill Corporation - Los Angeles
800-826-0277                        www.merrillcorp.com/law

**EXHIBIT O**

817

MARK WARREN PEARY - 6/29/2011

Page 176

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  I'm just objecting for the | 15:18:47 |
| 2 | record that it's asked and answered. | 15:18:48 |
| 3 | THE WITNESS:  I understand. | 15:18:50 |
| 4 | MR. TOBEROFF:  But you can answer it again. | 15:18:51 |
| 5 | THE WITNESS:  No. | 15:18:53 |
| 6 | BY MR. PETROCELLI: | 15:18:53 |
| 7 | Q.  As part of the 2008 consent agreement, is | 15:18:54 |
| 8 | there a provision by which the Shusters share in any | 15:18:57 |
| 9 | accounting recoveries that the Siegels might obtain? | 15:19:00 |
| 10 | MR. TOBEROFF:  I instruct you not to answer | 15:19:05 |
| 11 | as to the contents of the consent agreement. | 15:19:06 |
| 12 | (Unanswered question.) | 15:19:09 |
| 13 | BY MR. PETROCELLI: | 15:19:09 |
| 14 | Q.  When you -- when you were doing the | 15:19:15 |
| 15 | research on Mr. Toberoff, did you come to learn that | 15:19:19 |
| 16 | in addition to being an experienced entertainment | 15:19:29 |
| 17 | attorney, that he was also a producer of literary | 15:19:32 |
| 18 | properties, including motion pictures and other | 15:19:39 |
| 19 | popular titles? | 15:19:43 |
| 20 | A.  Yes. | 15:19:45 |
| 21 | Q.  And how did you come to learn that? | 15:19:49 |
| 22 | A.  In our discussions. | 15:19:54 |
| 23 | Q.  With Mr. Toberoff? | 15:19:57 |
| 24 | A.  Yes. | 15:19:58 |
| 25 | Q.  Did you also see descriptions of | 15:20:10 |

Merrill    Corporation    -    Los Angeles

800-826-0277                          www.merrillcorp.com/law

**EXHIBIT O**

**818**

MARK WARREN PEARY - 6/29/2011

Page 362

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merrillcorp.com/law

1                              DECLARATION

2

3

4

5

6           I hereby declare I am the deponent in the

7    within matter; that I have read the foregoing

8    deposition and know the contents thereof, and I

9    declare that the same is true of my knowledge except

10   as to the matters which are therein stated upon my

11   information or belief, and as to those matters, I

12   believe it to be true.

13          I declare under the penalties of perjury of

14   the State of California that the foregoing is true

15   and correct.

16          Executed on the _____ day of

17   _____ 2011, at

18   _____,

19   California.

20

21

22

23

24        _____

25                    W I T N E S S

MARK WARREN PEARY - 6/29/2011

Page 363

```
1     STATE OF CALIFORNIA    )
                             )   ss.
2     COUNTY OF LOS ANGELES  )

3

4         I, Shanda Gabriel, Certified Shorthand

5     Reporter, Certificate No. 10094, for the State of

6     California, hereby certify:

7         I am the deposition officer that

8     stenographically recorded the testimony in the

9     foregoing deposition;

10        Prior to being examined the witness was by

11    me first duly sworn;

12        The foregoing transcript is a true record

13    of the testimony given.

14

15    Dated   July 14, 2011          .

16

17                    _____

18                    Shanda Gabriel
                      CSR 10094

19

20

21

22

23

24

25
```

**EXHIBIT O**

**820**

# EXHIBIT P

**CERTIFIED COPY**

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

## *LARSON, LAURA SIEGEL - Vol. 1*

### *July 22, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

LAURA SIEGEL LARSON - 7/22/2011

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

DC COMICS,                          )
                                    )
              Plaintiff,            )
                                    )
        vs.                         )  Case No.
                                    )
PACIFIC PICTURES CORPORATION,       )  CV-10-3633 ODW (RZx)
IP WORLDWIDE, LLC, IPW, LLC,        )
MARC TOBEROFF, an individual,       )
MARK WARREN PEARY, as               )
personal representative of          )
the ESTATE OF JOSEPH SHUSTER,       )
JEAN ADELE PEAVY, an                )
individual, JOANNE SIEGEL,          )
an individual, LAURA SIEGEL         )
LARSON, an individual, and          )
DOES 1-10, inclusive,               )
                                    )
              Defendants.           )
_____)


DEPOSITION OF:

        LAURA SIEGEL LARSON

        FRIDAY, JULY 22, 2011

        9:45 A.M.


Reported by:

        Kathleen E. McCarthy

        CSR No. 4483

LAURA SIEGEL LARSON - 7/22/2011

Page 22

| | | | |
|---|---|---|---|
| 1 | | documents? | 10:01:04 |
| 2 | A. | Yes. | 10:01:05 |
| 3 | Q. | How do you know that? | 10:01:05 |
| 4 | A. | My mother told me. | 10:01:07 |
| 5 | Q. | Do you know how much he charged? | 10:01:10 |
| 6 | A. | It was a very low hourly rate. | 10:01:12 |
| 7 | Q. | After this litigation document in 2004 that | 10:01:17 |
| 8 | | you entered into -- when I say "you," you know I'm | 10:01:22 |
| 9 | | talking about really you and your mother. | 10:01:24 |
| 10 | A. | Correct. | 10:01:28 |
| 11 | Q. | Joanne Siegel. | 10:01:29 |
| 12 | A. | Us as the Siegels. | 10:01:30 |
| 13 | Q. | But I'm not talking about Michael Siegel. | 10:01:31 |
| 14 | A. | No, no. He wasn't -- he had nothing to do | 10:01:33 |
| 15 | | with that. | 10:01:36 |
| 16 | Q. | We'll deal with him separately. | 10:01:37 |
| 17 | | MR. TOBEROFF: I just want to for clarity, | 10:01:39 |
| 18 | | when "you" does not refer to her and her mother and | 10:01:41 |
| 19 | | refers just to her, you need to tell her. | 10:01:45 |
| 20 | | MR. PETROCELLI: Fair enough. Fair enough. | 10:01:47 |
| 21 | | I will try to be clear. | 10:01:50 |
| 22 | | I forgot what I was asking. So it was a | 10:01:55 |
| 23 | | clever device by good lawyers to get you off track. | 10:01:59 |
| 24 | | What was I asking? Senior moment here. | 10:02:06 |
| 25 | | (The record was read.) | 10:02:22 |

**EXHIBIT P**
**823**

LAURA SIEGEL LARSON - 7/22/2011

Page 23

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  Okay.  There you go. | 10:02:22 |
| 2 | THE WITNESS:  Okay. | 10:02:24 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.    So after the litigation document that you and | 10:02:25 |
| 5 | your family entered into with Mr. Toberoff in 2004, | 10:02:27 |
| 6 | were there any other documents, to your knowledge, | 10:02:31 |
| 7 | that were sent to Mr. Zadrozny for his review related | 10:02:34 |
| 8 | to Superman? | 10:02:40 |
| 9 | A.    I don't recall. | 10:02:41 |
| 10 | Q.    You signed a document sometime in or about | 10:02:44 |
| 11 | 2008 that the Shusters also signed, some agreement; | 10:02:49 |
| 12 | correct? | 10:02:52 |
| 13 | A.    Yes. | 10:02:53 |
| 14 | Q.    And Mr. Toberoff also signed that; correct? | 10:02:54 |
| 15 | A.    Yes. | 10:02:57 |
| 16 | Q.    Did Mr. Zadrozny, to your knowledge, review | 10:02:59 |
| 17 | that document? | 10:03:05 |
| 18 | A.    Yes. | 10:03:05 |
| 19 | Q.    Did he review that document prior to the time | 10:03:07 |
| 20 | you signed it? | 10:03:10 |
| 21 | A.    Yes. | 10:03:11 |
| 22 | Q.    How do you know he reviewed it? | 10:03:14 |
| 23 | A.    Because he and I spoke about it. | 10:03:20 |
| 24 | Q.    How long before you signed it -- withdrawn. | 10:03:27 |
| 25 | Did you send him a copy of it before signing | 10:03:33 |

**EXHIBIT P**
**824**

LAURA SIEGEL LARSON - 7/22/2011

Page 24

| | | |
|---|---|---|
| 1 | it? | 10:03:35 |
| 2 | A.    Yes. | 10:03:36 |
| 3 | Q.    Was he here in town with you or -- | 10:03:37 |
| 4 | A.    No. | 10:03:40 |
| 5 | Q.    He was living in Florida? | 10:03:40 |
| 6 | A.    Yes. | 10:03:42 |
| 7 | Q.    Has he lived in Florida the whole time you've | 10:03:42 |
| 8 | been dealing with him? | 10:03:45 |
| 9 | A.    Yes. | 10:03:45 |
| 10 | Q.    Okay.  Did any other attorney besides | 10:03:51 |
| 11 | Mr. Zadrozny review that document, to your knowledge, | 10:03:53 |
| 12 | before you or your mother signed it? | 10:03:57 |
| 13 | A.    Which document are you speaking of? | 10:03:58 |
| 14 | Q.    This 2008 -- we've been calling it a consent | 10:04:00 |
| 15 | agreement. | 10:04:04 |
| 16 | A.    Oh.  The -- no. | 10:04:05 |
| 17 | Q.    How many documents have you or your mother | 10:04:11 |
| 18 | signed that the Shusters also signed, one or more | 10:04:15 |
| 19 | Shuster people? | 10:04:19 |
| 20 | A.    Only one. | 10:04:20 |
| 21 | Q.    Was the 2008 consent agreement the last | 10:04:32 |
| 22 | document you asked or your mother asked, to your | 10:04:41 |
| 23 | knowledge, Mr. Zadrozny to review related to Superman? | 10:04:44 |
| 24 | A.    I believe so. | 10:04:49 |
| 25 | Q.    Have you signed any other documents related | 10:04:52 |

**EXHIBIT P**
**825**

LAURA SIEGEL LARSON - 7/22/2011

Page 26

| | | |
|---|---|---|
| 1 | Q.   Yeah. | 10:06:24 |
| 2 | A.   Pointing reminder. | 10:06:26 |
| 3 | Q.   The pointing is not to be rude at all.   It's | 10:06:27 |
| 4 | just that -- | 10:06:30 |
| 5 | A.   I understand. | 10:06:31 |
| 6 | Q.   -- to make sure that you answer audibly. | 10:06:31 |
| 7 | MR. TOBEROFF:  Give me time to object. | 10:06:33 |
| 8 | MR. PETROCELLI:  Mr. Toberoff does like to | 10:06:38 |
| 9 | object, so we don't want -- we don't want to take away | 10:06:39 |
| 10 | that pleasure. | 10:06:44 |
| 11 | MR. TOBEROFF:  I like to have something to do | 10:06:45 |
| 12 | at deposition. | 10:06:47 |
| 13 | MR. PETROCELLI:  You don't need to be here, | 10:06:47 |
| 14 | you know. | 10:06:49 |
| 15 | THE WITNESS:  Yes, he does.  I would miss him | 10:06:50 |
| 16 | if he wasn't here. | 10:06:52 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.   Did -- do you remember if there were any | 10:06:55 |
| 19 | changes made to the consent agreement after | 10:07:00 |
| 20 | Mr. Zadrozny reviewed it? | 10:07:04 |
| 21 | A.   I don't remember. | 10:07:08 |
| 22 | Q.   Did you discuss it with him? | 10:07:13 |
| 23 | A.   Yes. | 10:07:15 |
| 24 | Q.   What did you and he discuss about it? | 10:07:17 |
| 25 | MR. TOBEROFF:  Actually, you can't disclose | 10:07:22 |

**EXHIBIT P**
**826**

LAURA SIEGEL LARSON - 7/22/2011

Page 27

| | | |
|---|---|---|
| 1 | that. | 10:07:24 |
| 2 | THE WITNESS:  I didn't think I could. | 10:07:24 |
| 3 | MR. TOBEROFF:  Attorney-client privilege, and | 10:07:26 |
| 4 | I instruct you not to answer. | 10:07:27 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.    Did you discuss with your mother what you and | 10:07:29 |
| 7 | Mr. Zadrozny talked about? | 10:07:35 |
| 8 | A.    Probably. | 10:07:42 |
| 9 | Q.    As best as you can remember, what did you and | 10:07:45 |
| 10 | your mom say to each other in that regard? | 10:07:48 |
| 11 | MR. TOBEROFF:  Joint client privilege. | 10:07:53 |
| 12 | Instruct you not to answer. | 10:07:54 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.    I'm referring to discussions that the two of | 10:07:55 |
| 15 | you had privately, not with Mr. Zadrozny in the room | 10:07:57 |
| 16 | or on the phone.  You understand that? | 10:08:01 |
| 17 | A.    I hear what you're saying. | 10:08:04 |
| 18 | Q.    Okay.  And I'm asking you to tell me what you | 10:08:06 |
| 19 | discussed with your mother regarding what Mr. Zadrozny | 10:08:08 |
| 20 | did or said. | 10:08:13 |
| 21 | MR. TOBEROFF:  You can answer so long as your | 10:08:15 |
| 22 | answer doesn't disclose the substance of conversations | 10:08:17 |
| 23 | that you had with Mr. Zadrozny. | 10:08:21 |
| 24 | THE WITNESS:  Um-hum. | 10:08:23 |
| 25 | That we were grateful for his input. | 10:08:26 |

**EXHIBIT P**
**827**

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 10:08:29 |
| 2 |    Q.   What was his input? | 10:08:29 |
| 3 |        MR. TOBEROFF:  I instruct you not to answer. | 10:08:32 |
| 4 | Attorney-client privilege. | 10:08:35 |
| 5 | BY MR. PETROCELLI: | |
| 6 |    Q.   You and your mother discussed his input? | 10:08:37 |
| 7 |    A.   Yes. | 10:08:40 |
| 8 |    Q.   What did the two of you discuss about his | 10:08:41 |
| 9 | input? | 10:08:44 |
| 10 |        MR. TOBEROFF:  Attorney-client privilege. | 10:08:44 |
| 11 | Joint client privilege.  I instruct you not to answer. | 10:08:46 |
| 12 | BY MR. PETROCELLI: | |
| 13 |    Q.   Did he provide any input to you or your | 10:08:48 |
| 14 | mother in writing? | 10:08:53 |
| 15 |    A.   I don't believe so. | 10:08:56 |
| 16 |    Q.   Did he mark up a document and send you some | 10:08:57 |
| 17 | revisions or tell you -- send you some revisions in | 10:09:01 |
| 18 | writing? | 10:09:05 |
| 19 |    A.   I don't recall that. | 10:09:06 |
| 20 |    Q.   Were there any -- did you e-mail him at all? | 10:09:06 |
| 21 |    A.   Well, on other occasions, but, you know, not | 10:09:10 |
| 22 | regarding this. | 10:09:13 |
| 23 |    Q.   Did you meet with him in person regarding the | 10:09:16 |
| 24 | 2008 consent agreement? | 10:09:19 |
| 25 |    A.   No. | 10:09:20 |

**EXHIBIT P**
**828**

LAURA SIEGEL LARSON - 7/22/2011

Page 29

| | | |
|---|---|---|
| 1 | Q.    Did you meet with him in person regarding the | 10:09:20 |
| 2 | 2004 litigation agreement with Mr. Toberoff? | 10:09:24 |
| 3 | A.    No. | 10:09:28 |
| 4 | Q.    And did you meet with him in person regarding | 10:09:28 |
| 5 | the 2002 agreement with Mr. Toberoff? | 10:09:31 |
| 6 | A.    No. | 10:09:41 |
| 7 | Q.    And to be clear, Mr. Zadrozny is the only | 10:09:41 |
| 8 | lawyer to review your agreements with Mr. Toberoff? | 10:09:48 |
| 9 | A.    No, that's not correct. | 10:09:52 |
| 10 | Q.    Okay.  Is he the only lawyer to review the | 10:09:54 |
| 11 | 2008 consent agreement? | 10:09:57 |
| 12 | A.    I believe so. | 10:10:02 |
| 13 | Q.    Okay.  And with respect to the 2002 | 10:10:06 |
| 14 | agreement, the first agreement with Mr. Toberoff, who | 10:10:12 |
| 15 | reviewed that agreement, if anyone, other than | 10:10:12 |
| 16 | Mr. Zadrozny? | 10:10:15 |
| 17 | A.    I believe Arthur Levine looked at it, if I'm | 10:10:16 |
| 18 | recalling correctly. | 10:10:20 |
| 19 | Q.    During the time that you were working with | 10:10:23 |
| 20 | Gang Tyre, Bruce Ramer and Kevin Marks of Gang Tyre, | 10:10:26 |
| 21 | you were still calling on Mr. Levine from time to | 10:10:29 |
| 22 | time -- | 10:10:31 |
| 23 | A.    Yes. | 10:10:32 |
| 24 | Q.    -- with regard to Superman? | 10:10:32 |
| 25 | A.    Yes. | 10:10:34 |

**EXHIBIT P**
**829**

LAURA SIEGEL LARSON - 7/22/2011

Page 40

| | | |
|---|---|---|
| 1 | agreement after the filing of the lawsuit? | 10:24:01 |
| 2 | A.    The consent -- the consent agreement from | 10:24:10 |
| 3 | 2008 after the lawsuit was filed in 2010? | 10:24:13 |
| 4 | Q.    Exactly.  You're very good. | 10:24:16 |
| 5 | A.    Have to try and follow this. | 10:24:22 |
| 6 | Q.    You're following it perfectly. | 10:24:22 |
| 7 | A.    You're throwing a lot of dates at me here. | 10:24:23 |
| 8 | I don't remember any particular conversation | 10:24:28 |
| 9 | that we had. | 10:24:31 |
| 10 | Q.    Okay. | 10:24:32 |
| 11 | Have you signed any conflict document since | 10:24:38 |
| 12 | the filing of this lawsuit in May, 2010? | 10:24:45 |
| 13 | A.    I don't believe so. | 10:24:51 |
| 14 | Q.    And have you signed any agreements at all | 10:24:55 |
| 15 | with Mr. Toberoff since the filing of this lawsuit in | 10:25:00 |
| 16 | May, 2010? | 10:25:06 |
| 17 | A.    No. | 10:25:09 |
| 18 | Q.    And to your knowledge, your mother didn't | 10:25:09 |
| 19 | either; correct? | 10:25:12 |
| 20 | A.    No. | 10:25:12 |
| 21 | Q.    Is that correct? | 10:25:13 |
| 22 | A.    Correct.  She did not. | 10:25:13 |
| 23 | Q.    Okay.  Do you have any agreements with any | 10:25:15 |
| 24 | member of the Shuster family regarding Superman other | 10:25:43 |
| 25 | than the 2008 consent agreement or the conflict | 10:25:53 |

LAURA SIEGEL LARSON - 7/22/2011

Page 41

| | | |
|---|---|---|
| 1 | document related to it? | 10:25:58 |
| 2 | A.    No. | 10:26:06 |
| 3 | Q.    Do you have any arrangements with the Shuster | 10:26:06 |
| 4 | family to share in any monies that either the Shusters | 10:26:13 |
| 5 | or the Siegels receive for the sale of their Superman | 10:26:17 |
| 6 | rights, including in settlement of litigation? | 10:26:24 |
| 7 | MR. TOBEROFF:  Excuse me.  Could you read | 10:26:28 |
| 8 | back that question for me? | 10:26:30 |
| 9 | (The record was read.) | 10:26:51 |
| 10 | MR. TOBEROFF:  To the extent any part of that | 10:26:51 |
| 11 | question reveals the substance of -- any part of it | 10:26:56 |
| 12 | reveals the substance of the consent agreement, which | 10:27:00 |
| 13 | was held to be privileged twice, I would instruct you | 10:27:02 |
| 14 | not to answer. | 10:27:05 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.    Do you have any arrangement to share with the | 10:27:15 |
| 17 | Shusters any monies that the Siegel family might | 10:27:25 |
| 18 | receive with respect to their accounting on Superman? | 10:27:33 |
| 19 | MR. TOBEROFF:  Same instruction.  Same basis. | 10:27:40 |
| 20 | BY MR. PETROCELLI: | |
| 21 | Q.    Do you have any arrangements with the | 10:27:43 |
| 22 | Shusters to share in any money that the Siegel family | 10:27:46 |
| 23 | might receive with respect to the disposition of | 10:27:51 |
| 24 | Superboy rights or settlement of litigation regarding | 10:27:58 |
| 25 | Superboy? | 10:28:02 |

**EXHIBIT P**
**831**

LAURA SIEGEL LARSON - 7/22/2011

Page 42

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Same instruction.  We made an | 10:28:02 |
| 2 | exception with respect to Warren Peary based on an | 10:28:07 |
| 3 | agreement that that exception would not constitute a | 10:28:12 |
| 4 | waiver of privilege.  If we had the same agreement | 10:28:14 |
| 5 | with respect to Laura Siegel, I will let her answer | 10:28:16 |
| 6 | that question.  Otherwise I have to instruct her not | 10:28:19 |
| 7 | to answer. | 10:28:21 |
| 8 | MR. PETROCELLI:  Well, you know, it's a bit | 10:28:24 |
| 9 | unprincipled to be selectively waiving, but for the | 10:28:29 |
| 10 | purpose of this question, I'll make that agreement. | 10:28:35 |
| 11 | MR. TOBEROFF:  You can answer. | 10:28:43 |
| 12 | THE WITNESS:  Could you -- | 10:28:45 |
| 13 | MR. TOBEROFF:  Read back the question? | 10:28:46 |
| 14 | THE WITNESS:  Yeah.  Would you ask the | 10:28:48 |
| 15 | question again, please? | 10:28:49 |
| 16 | MR. PETROCELLI:  Please repeat it. | 10:28:50 |
| 17 | (The record was read.) | 10:29:08 |
| 18 | THE WITNESS:  No. | 10:29:09 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.   Does the consent agreement that you signed | 10:29:11 |
| 21 | with the Shusters make any reference at all to | 10:29:16 |
| 22 | Superboy? | 10:29:22 |
| 23 | MR. TOBEROFF:  I instruct you not to answer | 10:29:24 |
| 24 | based on the consent agreement being held to be | 10:29:27 |
| 25 | privileged, not disclose the substance. | 10:29:31 |

**EXHIBIT P**
**832**

LAURA SIEGEL LARSON - 7/22/2011

Page 43

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  And to be clear, with | 10:29:38 |
| 2 | respect to the last several questions on which you | 10:29:40 |
| 3 | have instructed, you decline to allow the witness to | 10:29:45 |
| 4 | answer even were I to agree that it would not | 10:29:52 |
| 5 | constitute a waiver of any privilege? | 10:29:55 |
| 6 | MR. TOBEROFF:  If you would agree -- in some | 10:29:59 |
| 7 | instances if you agree that it doesn't constitute a | 10:30:02 |
| 8 | waiver of privilege, I could allow her to answer | 10:30:04 |
| 9 | certain questions. | 10:30:10 |
| 10 | MR. PETROCELLI:  Okay. | 10:30:11 |
| 11 | MR. TOBEROFF:  But -- | 10:30:12 |
| 12 | MR. PETROCELLI:  I notice you didn't extend | 10:30:12 |
| 13 | the offer with respect to some of those questions, but | 10:30:14 |
| 14 | you did on the Superboy, so -- | 10:30:16 |
| 15 | MR. TOBEROFF:  You know, there are a number | 10:30:18 |
| 16 | of issues here surrounding, you know -- also, you | 10:30:20 |
| 17 | know, when the answer to something is no, you're not | 10:30:25 |
| 18 | revealing the content, so it wouldn't actually be | 10:30:27 |
| 19 | privileged, but I don't necessarily know how the | 10:30:30 |
| 20 | witnesses is going to answer. | 10:30:34 |
| 21 | MR. PETROCELLI:  Okay.  Well, with respect | 10:30:35 |
| 22 | to -- with respect to my question, then, about | 10:30:38 |
| 23 | arrangements that you have with the Shusters regarding | 10:30:40 |
| 24 | the sharing in any Superman recoveries or proceeds, I | 10:30:43 |
| 25 | would like the witness to answer, and I will agree | 10:30:49 |

**EXHIBIT P**
**833**

LAURA SIEGEL LARSON - 7/22/2011

Page 44

```
 1    that her answer is not a waiver of any privilege.       10:30:52

 2            MR. TOBEROFF:  She already answered that         10:30:54

 3    question.  She said no.                                  10:30:55

 4            MR. PETROCELLI:  Not with respect to             10:30:57

 5    Superman.  She did with respect to Superboy.             10:30:58

 6            MR. TOBEROFF:  I thought you said --             10:31:01

 7            MR. PETROCELLI:  Did I misspeak?                 10:31:02

 8            THE WITNESS:  I kind of lost track for a         10:31:03

 9    minute.                                                  10:31:06

10            MR. PETROCELLI:  Let me put it again for the     10:31:06

11    record, then.                                            10:31:08

12            MR. TOBEROFF:  As to that question, we are       10:31:08

13    asserting privilege, and I'm instructing her not to      10:31:11

14    answer.                                                  10:31:13

15            MR. PETROCELLI:  Okay.  So even though I         10:31:13

16    would agree that the answer would not affect the         10:31:15

17    waiver.                                                  10:31:17

18            MR. TOBEROFF:  Yes.                              10:31:18

19            MR. PETROCELLI:  Okay.                           10:31:19

20        Q.  And does the -- did you discuss with your        10:31:51

21    mother at any time whether or not to enter into an       10:31:55

22    agreement with the Shusters regarding the sharing of     10:32:04

23    recoveries or proceeds from Superman?                    10:32:09

24        A.  I believe we talked about it.                    10:32:18

25        Q.  Can you relate that discussion to me?            10:32:21
```

**EXHIBIT P**

**834**

LAURA SIEGEL LARSON - 7/22/2011

Page 45

```
 1              MR. TOBEROFF:  I instruct you not to answer      10:32:23
 2    based on the attorney-client privilege, joint client      10:32:25
 3    privilege.                                                10:32:28
 4    BY MR. PETROCELLI:
 5        Q.   And these were conversations just between        10:32:30
 6    your mother and you; is that correct?                     10:32:32
 7        A.   Yes.                                             10:32:33
 8              Excuse me.  May I take a bathroom break for a    10:32:41
 9    moment?                                                   10:32:43
10              MR. PETROCELLI:  Sure.  Let's stop right now.   10:32:44
11              THE VIDEOGRAPHER:  Off the record.  The time    10:32:48
12    is 10:32.                                                 10:32:48
13              (A recess was taken.)                           10:33:54
14              THE VIDEOGRAPHER:  We're back on the record     10:46:52
15    at 10:46.                                                 10:46:54
16    BY MR. PETROCELLI:
17        Q.   I just want to follow up a bit on that last      10:46:57
18    area that we covered about the consent agreements and     10:47:01
19    the arrangements with the Shusters.  Does -- do the       10:47:04
20    consent agreements -- I may have asked you this           10:47:10
21    already, but let me ask you again.  Do the consent        10:47:17
22    agreement documents -- does the consent agreement         10:47:22
23    document make any reference at all to Superboy?           10:47:25
24        A.   You did ask me that.                             10:47:31
25              MR. TOBEROFF:  Asked and answered.  And I       10:47:32
```

LAURA SIEGEL LARSON - 7/22/2011

Page 46

| | | |
|---|---|---|
| 1 | instruct you not to answer. | 10:47:34 |
| 2 | MR. PETROCELLI:  If I agree that it's not a | 10:47:37 |
| 3 | waiver, do you continue to instruct on that? | 10:47:39 |
| 4 | MR. TOBEROFF:  Yes. | 10:47:41 |
| 5 | MR. PETROCELLI:  Okay. | 10:47:42 |
| 6 | Q.   Are you currently able to enter into an | 10:47:59 |
| 7 | agreement with DC Comics without the consent of the | 10:48:04 |
| 8 | Shuster side, the Shuster family? | 10:48:15 |
| 9 | MR. TOBEROFF:  I instruct you not to answer | 10:48:22 |
| 10 | that. | 10:48:25 |
| 11 | MR. PETROCELLI:  Same objection?  Privilege? | 10:48:25 |
| 12 | MR. TOBEROFF:  Same objection.  Privilege. | 10:48:30 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   Have you had any discussions with any member | 10:48:35 |
| 15 | of the Shuster family since 2008 when the both of you | 10:48:38 |
| 16 | signed the consent agreement about the marketing of | 10:48:45 |
| 17 | the Superman rights? | 10:48:50 |
| 18 | A.   I can't recall any discussion. | 10:48:54 |
| 19 | Q.   Are -- have any efforts been made on your | 10:49:02 |
| 20 | behalf or your family's behalf to market the Superman | 10:49:05 |
| 21 | rights since 2008? | 10:49:10 |
| 22 | MR. TOBEROFF:  You can -- you could answer | 10:49:15 |
| 23 | that yes or no, a yes or no question, and you can also | 10:49:23 |
| 24 | answer it to the extent your knowledge does not reveal | 10:49:28 |
| 25 | the substance of your communications with counsel. | 10:49:31 |

**EXHIBIT P**
**836**

LAURA SIEGEL LARSON - 7/22/2011

Page 47

| | | |
|---|---|---|
| 1 | THE WITNESS: Okay. | 10:49:35 |
| 2 | MR. TOBEROFF: So -- | 10:49:37 |
| 3 | MR. PETROCELLI: To be clear, Marc, and we're | 10:49:39 |
| 4 | not going to settle this on the record, but I do want | 10:49:41 |
| 5 | to make clear that I disagree that all conversations | 10:49:43 |
| 6 | with you are privileged. They have to involve the | 10:49:46 |
| 7 | rendition of legal advice at the very minimum. | 10:49:48 |
| 8 | MR. TOBEROFF: Well, the marketing of her -- | 10:49:51 |
| 9 | the subject of a litigation for the past six now going | 10:49:55 |
| 10 | to the seventh year of rights wouldn't necessarily | 10:49:58 |
| 11 | entail legal advice. | 10:50:01 |
| 12 | MR. PETROCELLI: If you meet with Paramount | 10:50:03 |
| 13 | Pictures about the sale of Superman or you go to Fox | 10:50:05 |
| 14 | and you then report on the meeting, that's hardly the | 10:50:08 |
| 15 | rendition of legal advice. | 10:50:11 |
| 16 | MR. TOBEROFF: It's totally intertwined with | 10:50:12 |
| 17 | legal advice. Any studio would want to know the state | 10:50:15 |
| 18 | of the litigation, the odds of the litigation, the | 10:50:18 |
| 19 | odds on appeal. There's so much going on in this case | 10:50:21 |
| 20 | that would be relevant to the status of those rights | 10:50:25 |
| 21 | and which would -- it's just very closely intertwined. | 10:50:28 |
| 22 | If she has knowledge of that independent of her | 10:50:34 |
| 23 | discussions with me, I will allow her to answer. | 10:50:37 |
| 24 | Otherwise I would instruct you not to answer. | 10:50:38 |
| 25 | MR. PETROCELLI: It seems like it's | 10:50:40 |

**EXHIBIT P**
**837**

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | of them, have already been disclosed to us with | 12:02:48 |
| 2 | respect to the litigation retainer agreement. | 12:02:51 |
| 3 | A.   Oh, okay.   Sometimes it gets confusing | 12:02:53 |
| 4 | because we're talking about so many agreements, you | 12:02:55 |
| 5 | know. | 12:02:57 |
| 6 | Q.   Okay.   So let me see if I can break it down | 12:02:58 |
| 7 | for you. | 12:03:00 |
| 8 | A.   All right. | 12:03:00 |
| 9 | Q.   If there were a transaction today for the | 12:03:01 |
| 10 | sale of your Superman rights, you would have to pay | 12:03:03 |
| 11 | Mr. Toberoff 33 to 40 percent based on your agreement; | 12:03:10 |
| 12 | is that correct? | |
| 13 | A.   I believe so. | 12:03:14 |
| 14 | Q.   And would that be 33 or 40 percent?   Do you | 12:03:15 |
| 15 | know?   What range applies as of today? | 12:03:21 |
| 16 | A.   I believe because we had an initial trial | 12:03:36 |
| 17 | before -- was that considered a trial with Judge | 12:03:45 |
| 18 | Larson? | 12:03:50 |
| 19 | Q.   Well, Mr. Toberoff has -- would certainly | 12:03:51 |
| 20 | suggest that it was. | 12:03:55 |
| 21 | A.   I mean, you know, what's the definition of a | 12:03:57 |
| 22 | trial, yes.   Okay. | 12:04:00 |
| 23 | Q.   So an argument could be made that the current | 12:04:02 |
| 24 | percentage of 40 percent is owed; correct?   If that | 12:04:05 |
| 25 | were a trial? | 12:04:10 |

LAURA SIEGEL LARSON - 7/22/2011

Page 99

| | | |
|---|---|---|
| 1 | A.   If it were a trial, yes. | 12:04:10 |
| 2 | Q.   Okay.  So besides that 40 percent to | 12:04:12 |
| 3 | Mr. Toberoff, is there any other percent that would | 12:04:22 |
| 4 | have to be paid to Mr. Toberoff? | 12:04:26 |
| 5 | A.   No. | 12:04:31 |
| 6 | Q.   Is there any other fee that would have to be | 12:04:32 |
| 7 | paid to Mr. Toberoff? | 12:04:35 |
| 8 | A.   No.  I can't think of any. | 12:04:38 |
| 9 | Q.   Any other type of remuneration of any kind | 12:04:39 |
| 10 | that would be paid to Mr. Toberoff? | 12:04:42 |
| 11 | A.   You know, I think that there were some -- | 12:04:44 |
| 12 | some costs that were advanced. | 12:04:47 |
| 13 | Q.   Besides that. | 12:04:49 |
| 14 | A.   Other than costs, no. | 12:04:50 |
| 15 | Q.   Okay.  Is there anything in the 2008 consent | 12:04:51 |
| 16 | agreement that would trigger additional remuneration | 12:04:56 |
| 17 | to Mr. Toberoff based on a transaction of the Siegel | 12:05:01 |
| 18 | rights? | 12:05:05 |
| 19 | MR. TOBEROFF:  I -- I will allow you to | 12:05:06 |
| 20 | answer as to -- because what is not in the agreement | 12:05:09 |
| 21 | would not be privileged.  Did I say that right? | 12:05:13 |
| 22 | MR. PETROCELLI:  You did. | 12:05:18 |
| 23 | MR. TOBEROFF:  Some things not in the | 12:05:18 |
| 24 | agreement we are not asserting privilege.  We are | 12:05:20 |
| 25 | asserting privilege to what is in the agreement.  So | 12:05:24 |

**EXHIBIT P**
**839**

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | to that extent, you can answer the question. | 12:05:25 |
| 2 | THE WITNESS: Well, there's no -- I can never | 12:05:27 |
| 3 | say the word. What is it? Remuneration? There's | 12:05:28 |
| 4 | no -- you know what I'm talking about. There's no | 12:05:33 |
| 5 | additional percentage. | 12:05:35 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.    To Mr. Toberoff. | 12:05:38 |
| 8 | A.    To Mr. Toberoff. | 12:05:39 |
| 9 | Q.    As a result of anything in the consent | 12:05:40 |
| 10 | agreement. | 12:05:42 |
| 11 | A.    Correct. | 12:05:43 |
| 12 | Q.    Correct? | 12:05:43 |
| 13 | A.    Correct. | 12:05:45 |
| 14 | Q.    Okay.  And to your knowledge, would there be | 12:05:46 |
| 15 | any percentage -- in addition to the 40 to | 12:05:50 |
| 16 | Mr. Toberoff, would there be any percentage or any fee | 12:05:56 |
| 17 | payable to Ari Emanuel or any of his companies? | 12:05:59 |
| 18 | A.    No. | 12:06:05 |
| 19 | Q.    So to your knowledge, he would not | 12:06:06 |
| 20 | participate at all in any current transaction. | 12:06:08 |
| 21 | MR. TOBEROFF:  Asked and answered. | 12:06:12 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.    Is that correct? | 12:06:13 |
| 24 | A.    Correct. | 12:06:13 |
| 25 | Q.    Out of the 60 percent or other proceeds that | 12:06:18 |

EXHIBIT P
840

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | you would receive, putting aside Mr. Toberoff's 40 | 12:06:22 |
| 2 | percent, would you have to share any of those proceeds | 12:06:27 |
| 3 | with anyone else as a result of any contractual | 12:06:31 |
| 4 | arrangements that you currently have? | 12:06:34 |
| 5 | MR. TOBEROFF:  I instruct you not to answer | 12:06:36 |
| 6 | to the extent your answer would necessarily reveal the | 12:06:38 |
| 7 | substance of the consent agreement held to be | 12:06:45 |
| 8 | privileged. | 12:06:48 |
| 9 | MR. PETROCELLI:  May I just take one shot at | 12:06:50 |
| 10 | you on this, Marc, because what the court held was | 12:06:51 |
| 11 | that a particular document, at least on that record, | 12:06:56 |
| 12 | was not discoverable at this time.  But the court did | 12:07:03 |
| 13 | not hold that any and all financial arrangements or | 12:07:07 |
| 14 | contractual arrangements between the parties or | 12:07:11 |
| 15 | between witnesses, and these parties are also | 12:07:18 |
| 16 | witnesses, are barred from discovery.  It goes | 12:07:22 |
| 17 | directly, among other things, to motive and -- | 12:07:26 |
| 18 | MR. TOBEROFF:  I think -- | 12:07:31 |
| 19 | MR. PETROCELLI:  -- a host of other | 12:07:32 |
| 20 | credibility issues. | 12:07:33 |
| 21 | MR. TOBEROFF:  I think I stated my | 12:07:34 |
| 22 | instruction, and if I wasn't clear -- I thought it was | 12:07:36 |
| 23 | clear. | 12:07:38 |
| 24 | MR. PETROCELLI:  The existence of those | 12:07:39 |
| 25 | arrangements are relevant and would be discoverable in | 12:07:41 |

**EXHIBIT P**
**841**

LAURA SIEGEL LARSON - 7/22/2011

Page 341

1     STATE OF CALIFORNIA         )

2                                 ) ss.

3     COUNTY OF LOS ANGELES       )

4

5

6          I, LAURA SIEGEL LARSON, declare under the

7     penalties of perjury under the laws of the United

8     States that the foregoing is true and correct.

9          Executed this      day of                   ,

10    2011, at                          , California.

11

12

13

14

15                              LAURA SIEGEL LARSON

16

17

18

19

20

21

22

23

24

25

Merrill   Corporation  -  Los Angeles

800-826-0277                          www.merillcorp.com/law

**EXHIBIT P**
**842**

1    STATE OF CALIFORNIA        )

2                               )    ss.

3    COUNTY OF LOS ANGELES     )

4        I, Kathleen E. McCarthy, Certified Shorthand Reporter

5    No. 4483 for the State of California, do hereby certify:

6        That prior to being examined, the witness named in the

7    foregoing deposition was duly sworn to testify the truth,

8    the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in shorthand

10   at the time and place therein named and thereafter reduced

11   by me to typewritten form and that the same is a true,

12   correct, and complete transcript of said proceedings.

13       Before completion of the deposition, review of

14   the transcript [ ] was [ ] was not requested.  If

15   requested, any changes made by the deponent (and provided

16   to the reporter) during the period allowed are appended

17   hereto.

18       I further certify that I am not interested in the

19   outcome of the action.

20   Witness my hand this 3rd day of August ,2011 .

21

22

23   Kathleen E. McCarthy, CSR No. 4483

24

25

# EXHIBIT Q

CERTIFIED COPY

# In The Matter Of:

*DC COMICS*
*v.*
*PACIFIC PICTURES CORPORATION*

---

## TOBEROFF, MARC  - Vol. 1
### September 18, 2012

---

**MERRILL CORPORATION**
LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

MARC TOBEROFF - 9/18/2012

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CERTIFIED
COPY

DC COMICS,                          )
                                    )
            Plaintiff,              )No.
                                    )CV-10-3633 ODW (RZx)
        VS.                         )
                                    )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as        )
personal representative of     )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an           )
individual, JOANNE SIEGEL,     )
an individual, LAURA SIEGEL    )
LARSON, an individual, and     )
DOES 1-10, inclusive,          )
                                    )
            Defendants.             )
                                    )
        _____               )

VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012

Reported by:  SHANDA GABRIEL

CSR No. 10094

EXHIBIT Q
845

MARC  TOBEROFF - 9/18/2012

Page 167

| | | |
|---|---|---|
| 1 | A.  No written agreement. | 14:28:58 |
| 2 | Q.  No written agreement.  Okay. | 14:28:59 |
| 3 | Now, at the time you prepared this joint | 14:29:04 |
| 4 | venture agreement in your capacity as president of | 14:29:09 |
| 5 | Pacific Pictures Corporation, you had the option of | 14:29:16 |
| 6 | also preparing a written legal retainer agreement at | 14:29:24 |
| 7 | the same time, correct? | 14:29:30 |
| 8 | MR. KENDALL:  Argumentative. | 14:29:32 |
| 9 | THE WITNESS:  What's the question? | 14:29:36 |
| 10 | BY MR. PETROCELLI: | 14:29:36 |
| 11 | Q.  Is that correct? | 14:29:36 |
| 12 | A.  Could I have just had a legal retainer | 14:29:38 |
| 13 | agreement? | 14:29:40 |
| 14 | Q.  Sure, yeah.  It's a different question but | 14:29:44 |
| 15 | that's fine. | 14:29:45 |
| 16 | A.  I think I could have proposed that. | 14:29:47 |
| 17 | Q.  And what was the reason that you elected to | 14:29:49 |
| 18 | use a joint venture agreement in lieu of a written | 14:29:53 |
| 19 | retainer agreement, a more conventional written | 14:29:57 |
| 20 | retainer agreement of the sort that, let's say, you | 14:30:01 |
| 21 | used in 2004? | 14:30:03 |
| 22 | MR. KENDALL:  Assumes facts.  Lacks | 14:30:04 |
| 23 | foundation.  Argumentative. | 14:30:06 |
| 24 | THE WITNESS:  I believe in 2000- -- around | 14:30:16 |
| 25 | this time period, 2001, 2000- -- remember I told you | 14:30:18 |

**EXHIBIT Q**
**846**

MARC  TOBEROFF - 9/18/2012

Page 168

| | | |
|---|---|---|
| 1 | I had moved to Los Angeles and I was focusing on | 14:30:21 |
| 2 | some entertainment business-type of ventures and | 14:30:34 |
| 3 | also doing legal work, and I mentioned the Writers | 14:30:36 |
| 4 | Guild case that I was involved in. | 14:30:45 |
| 5 | So when it came to people who had | 14:30:50 |
| 6 | intellectual property rights -- I'm sorry, this is a | 14:30:58 |
| 7 | longer explanation.  Do you want the long | 14:31:04 |
| 8 | explanation? | 14:31:06 |
| 9 | Q.   If that's what it takes, sure. | 14:31:07 |
| 10 | A.   Okay.  So when it came to people with | 14:31:09 |
| 11 | rights, like someone had written a novel which would | 14:31:15 |
| 12 | make a good movie, what many independent people did | 14:31:17 |
| 13 | is they would enter into a free option regarding | 14:31:25 |
| 14 | those rights, and the free option would be for a | 14:31:28 |
| 15 | term, and at the end of the term you could exer- -- | 14:31:36 |
| 16 | during the term you could exercise the option by | 14:31:39 |
| 17 | paying a fixed price for those rights and I had | 14:31:43 |
| 18 | developed this form of agreement originally as an | 14:31:48 |
| 19 | alternative to that and the reason -- | 14:31:53 |
| 20 | Q.   "That" being what? | 14:31:56 |
| 21 | A.   An option.  An option purchase agreement. | 14:31:57 |
| 22 | And in an option purchase agreement, the person | 14:32:02 |
| 23 | doing the optioning, it's in their interest to make | 14:32:05 |
| 24 | the purchase price as low as possible so that they | 14:32:07 |
| 25 | could then use that as a building block to | 14:32:13 |

**EXHIBIT Q**
**847**

MARC   TOBEROFF - 9/18/2012

Page 169

| | | |
|---|---|---|
| 1 | facilitate, let's say, making a movie, setting up a | 14:32:15 |
| 2 | movie, producing a movie. | 14:32:21 |
| 3 | And I didn't like that form of agreement. | 14:32:24 |
| 4 | I preferred a form of agreement where the ultimate | 14:32:26 |
| 5 | monetization was left open and that the rights | 14:32:31 |
| 6 | hold- -- both I and the rights holder could | 14:32:36 |
| 7 | participate in that in the way where our interests | 14:32:39 |
| 8 | were aligned rather than our interests being | 14:32:41 |
| 9 | misaligned because I'm trying to peg them at a low | 14:32:43 |
| 10 | purchase price even though they're giving me | 14:32:47 |
| 11 | something akin to a free option. | 14:32:54 |
| 12 | Q.  In the option paradigm, you would have a | 14:32:55 |
| 13 | period of time in which to exercise the option and | 14:32:59 |
| 14 | if you chose to exercise it, you would then pay a | 14:33:02 |
| 15 | pre specified amount of consideration? | 14:33:05 |
| 16 | A.  Right.  You have an option for a 24-month | 14:33:08 |
| 17 | term, the purchase price is 100,000, and you can | 14:33:11 |
| 18 | exercise that -- that option any time within that 24 | 14:33:14 |
| 19 | months. | 14:33:17 |
| 20 | And so you then would control these rights | 14:33:19 |
| 21 | and you use that as a building block to produce a | 14:33:21 |
| 22 | movie or set up a movie at a studio, the lower the | 14:33:23 |
| 23 | price the easier it is for you to set up the movie | 14:33:27 |
| 24 | and, therefore, to leverage off of that, because | 14:33:30 |
| 25 | it's inexpensive, so that someone else could -- like | 14:33:35 |

**EXHIBIT Q**
**848**

MARC  TOBEROFF - 9/18/2012

Page 170

| | | |
|---|---|---|
| 1 | if you were a producer, you could charge a much | 14:33:37 |
| 2 | bigger producer fee, and thereby the rights holder | 14:33:40 |
| 3 | would get shortchanged. | 14:33:43 |
| 4 | And so I viewed that as being -- not | 14:33:44 |
| 5 | having -- being aligned in interest.  So I developed | 14:33:49 |
| 6 | this form of agreement for better or for worse, | 14:33:52 |
| 7 | which is this joint venture agreement form. | 14:33:55 |
| 8 | So when that's -- the way this came about | 14:33:59 |
| 9 | is, I basically looked for a form of agreement with | 14:34:02 |
| 10 | a rights holder and used this form and then modified | 14:34:11 |
| 11 | it to -- in the descriptive paragraphs to mention | 14:34:17 |
| 12 | Superman and the particular rights at issue. | 14:34:21 |
| 13 | Q.  Was it a prior joint venture agreement that | 14:34:23 |
| 14 | you had used or that you found elsewhere? | 14:34:26 |
| 15 | A.  I believe this was based on a prior | 14:34:30 |
| 16 | agreement that I had used for somebody else, for | 14:34:35 |
| 17 | some other matter.  But I couldn't tell you what | 14:34:38 |
| 18 | prior agreement. | 14:34:41 |
| 19 | Q.  Can you turn back for a moment to Exhibit | 14:34:45 |
| 20 | 101, the Michael Siegel e-mail, and at the very end | 14:34:50 |
| 21 | you list five references. | 14:34:57 |
| 22 | A.  Yes. | 14:34:57 |
| 23 | Q.  One of them, number 4, has reference to the | 14:35:09 |
| 24 | Combat! separated rights issue you previously | 14:35:12 |
| 25 | described, right? | 14:35:15 |

**EXHIBIT Q**
**849**

MARC   TOBEROFF - 9/18/2012

Page 171

| | | |
|---|---|---|
| 1 | A.  Exactly. | 14:35:16 |
| 2 | Q.  The others, numbers 1, 2, 3 and 5, do they | 14:35:17 |
| 3 | involve copyright termination issues? | 14:35:21 |
| 4 | A.  No. | 14:35:24 |
| 5 | Q.  Did you have business arrangements, and by | 14:35:25 |
| 6 | that I mean other than legal retainer agreements, | 14:35:34 |
| 7 | with the references identified in 1 through 5? | 14:35:37 |
| 8 | MR. KENDALL:  Vague and ambiguous.  Calls | 14:35:44 |
| 9 | for a legal conclusion. | 14:35:46 |
| 10 | THE WITNESS:  I -- I -- I don't believe I | 14:35:46 |
| 11 | had legal retainer agreements.  The Ralston matter | 14:35:56 |
| 12 | was a litigation matter from the get-go.  Gilligan's | 14:36:01 |
| 13 | Island was a Writers Guild arbitration from the | 14:36:11 |
| 14 | get-go.  Roy Huggins, I don't know whether we | 14:36:14 |
| 15 | actually had an agreement or not.  We had an ongoing | 14:36:25 |
| 16 | relationship where I was looking at his rights | 14:36:28 |
| 17 | because he had created so many famous | 14:36:35 |
| 18 | things, but I don't know -- | 14:36:37 |
| 19 | BY MR. PETROCELLI: | 14:36:45 |
| 20 | Q.  And number 2? | 14:36:45 |
| 21 | A.  -- whether we had an agreement. | 14:36:46 |
| 22 | Swerling, I believe it was a legal retainer | 14:36:49 |
| 23 | with -- I believe it was a legal retainer. | 14:36:55 |
| 24 | Q.  Given your explanation for why you elected | 14:37:06 |
| 25 | to use a joint venture agreement, is there a reason | 14:37:08 |

**EXHIBIT Q**
**850**

MARC  TOBEROFF - 9/18/2012

Page 172

| | | |
|---|---|---|
| 1 | why you also did not contemporaneously prepare a | 14:37:11 |
| 2 | legal retainer agreement? | 14:37:16 |
| 3 | MR. KENDALL:  Argumentative.  Calls for a | 14:37:18 |
| 4 | legal conclusion. | 14:37:21 |
| 5 | THE WITNESS:  I can't point -- you know, | 14:37:25 |
| 6 | other than laziness or something of that nature, I | 14:37:27 |
| 7 | can't point to a specific -- you know, a specific | 14:37:34 |
| 8 | reason or thinking that I don't want to do this.  I | 14:37:36 |
| 9 | can't point to anything specific on that. | 14:37:44 |
| 10 | BY MR. PETROCELLI: | 14:37:44 |
| 11 | Q.  At the time you entered into this | 14:37:46 |
| 12 | agreement, as it states you were the president of | 14:37:48 |
| 13 | PPC, right? | 14:37:51 |
| 14 | A.  Yes. | 14:37:51 |
| 15 | Q.  And the only representative of PPC, | 14:37:53 |
| 16 | correct? | 14:37:53 |
| 17 | A.  The -- I was the only shareholder and | 14:37:57 |
| 18 | officer. | 14:38:01 |
| 19 | Q.  Okay.  And only employee, right? | 14:38:04 |
| 20 | A.  I believe so in 2001, yeah. | 14:38:05 |
| 21 | Q.  Paragraph 4 states: | 14:38:11 |
| 22 | "The terms of any and all | 14:38:11 |
| 23 | agreements regarding any of the | 14:38:13 |
| 24 | rights in any respect shall be | 14:38:14 |
| 25 | subject to the expressed written | 14:38:16 |

**EXHIBIT Q**
**851**

MARC  TOBEROFF - 9/18/2012

Page 173

| | | |
|---|---|---|
| 1 | approval of claimants and PPC.  The | 14:38:18 |
| 2 | parties each warrant and represent | 14:38:23 |
| 3 | that after signing this agreement, | 14:38:24 |
| 4 | they will not, without the | 14:38:25 |
| 5 | expressed written consent of all | 14:38:27 |
| 6 | the parties transfer, limit or | 14:38:28 |
| 7 | encumber the rights in any | 14:38:31 |
| 8 | respect." | 14:38:34 |
| 9 | The claimants were Jean and Mark and PPC | 14:38:34 |
| 10 | was your company, correct? | 14:38:39 |
| 11 | A.  Correct. | 14:38:41 |
| 12 | Q.  So when you executed this, you understood | 14:38:42 |
| 13 | that neither the Shusters nor PPC could make a deal | 14:38:45 |
| 14 | with respect to the rights without the written | 14:38:51 |
| 15 | consent of all three of you, correct?  Namely Jean | 14:38:55 |
| 16 | Peavy, Mark Peary and PPC? | 14:39:00 |
| 17 | A.  Yes, that's correct. | 14:39:03 |
| 18 | Q.  And as far as PPC is concerned, the only | 14:39:06 |
| 19 | person acting for PPC was you, correct? | 14:39:11 |
| 20 | MR. KENDALL:  Asked and answered. | 14:39:13 |
| 21 | Argumentative. | 14:39:13 |
| 22 | THE WITNESS:  Yes. | 14:39:16 |
| 23 | BY MR. PETROCELLI: | 14:39:16 |
| 24 | Q.  Is it fair to say that -- and by the way, | 14:39:23 |
| 25 | that provision remained in effect until when? | 14:39:29 |

**EXHIBIT Q**
**852**

MARC   TOBEROFF - 9/18/2012

Page 174

| | | |
|---|---|---|
| 1 | A.  I'd have to look at whether the 2003 PPC | 14:39:42 |
| 2 | agreement, what effect that had on this agreement. | 14:39:47 |
| 3 | But if that didn't have -- if that didn't effect | 14:39:53 |
| 4 | this provision, then it would be until we replaced | 14:39:55 |
| 5 | this agreement with a legal retainer dated as of | 14:40:02 |
| 6 | November 23rd, 2001. | 14:40:05 |
| 7 | Q.  But signed when? | 14:40:06 |
| 8 | A.  Signed in -- I think it was 2004. | 14:40:09 |
| 9 | Q.  Okay.  We'll get to that one. | 14:40:11 |
| 10 | Is it fair to say in 2001 when PPC entered | 14:40:22 |
| 11 | into this joint venture agreement with Jean Peavy | 14:40:26 |
| 12 | and Mark Peary, you understood that in a legal | 14:40:28 |
| 13 | retainer agreement, you as a lawyer would not be | 14:40:38 |
| 14 | permitted to include a provision that said that the | 14:40:41 |
| 15 | client requires your consent to settle, correct? | 14:40:44 |
| 16 | MR. KENDALL:  Objection.  Calls for a legal | 14:40:50 |
| 17 | conclusion.  Incomplete hypothetical. | 14:40:50 |
| 18 | THE WITNESS:  I know that's the case | 14:41:00 |
| 19 | sitting here today.  I can't -- I can't -- I don't | 14:41:01 |
| 20 | have a -- I don't have a specific knowledge of | 14:41:04 |
| 21 | whether I knew that in 2001. | 14:41:08 |
| 22 | BY MR. PETROCELLI: | 14:41:08 |
| 23 | Q.  Do you have any reason to believe you | 14:41:10 |
| 24 | didn't know that in 2001? | 14:41:11 |
| 25 | A.  I don't have a reason to believe either | 14:41:17 |

**EXHIBIT Q**
**853**

MARC   TOBEROFF - 9/18/2012

Page 175

| | | |
|---|---|---|
| 1 | way. | 14:41:19 |
| 2 | THE VIDEOGRAPHER:  I'm getting some | 14:41:20 |
| 3 | transmissions from some sort of electronic device. | 14:41:22 |
| 4 | MR. KENDALL:  It's probably because I put | 14:41:29 |
| 5 | my iPad on my lap.  Sorry. | 14:41:30 |
| 6 | THE VIDEOGRAPHER:  Thank you.  Appreciate | 14:41:32 |
| 7 | it.  We're fine now. | 14:41:34 |
| 8 | MR. PETROCELLI:  Are we on the record? | 14:41:37 |
| 9 | Q.  One -- one reason to believe you did know | 14:41:39 |
| 10 | at the time that a lawyer cannot have an agreement | 14:41:41 |
| 11 | with a client that requires the lawyer's consent for | 14:41:47 |
| 12 | a client to settle -- | 14:41:50 |
| 13 | A.  Uh-huh. | 14:41:50 |
| 14 | Q.  -- is that you were a lawyer in good | 14:41:52 |
| 15 | standing in California who would be chargeable with | 14:41:54 |
| 16 | that knowledge, correct? | 14:41:59 |
| 17 | A.  Are you asking me whether I should know -- | 14:42:01 |
| 18 | you're asking -- you're asking me different things. | 14:42:03 |
| 19 | The first question is, do I know here sitting today | 14:42:05 |
| 20 | that I specifically knew that at that time, and I -- | 14:42:08 |
| 21 | and I don't know the answer to that one way or the | 14:42:15 |
| 22 | other. | 14:42:16 |
| 23 | Q.  Then I asked you do you have any reason to | 14:42:20 |
| 24 | believe that you wouldn't have been aware of that | 14:42:22 |
| 25 | general principal, and you said, "I have no reason | 14:42:24 |

**EXHIBIT Q**
**854**

MARC   TOBEROFF - 9/18/2012

Page 268

| | | |
|---|---|---|
| 1 | others to consummate a settlement? | 17:15:24 |
| 2 | A.  I don't believe that had any requirement of | 17:15:26 |
| 3 | any other consent than Joanna and Laura to a | 17:15:37 |
| 4 | settlement. | 17:15:44 |
| 5 | Q.  Any such requirement -- | 17:15:44 |
| 6 | A.  I don't believe the Shuster retainer | 17:15:46 |
| 7 | agreement has that also.  But in your -- your -- I | 17:15:48 |
| 8 | don't have the unredacted agreement in front of me | 17:15:56 |
| 9 | to verify that. | 17:15:59 |
| 10 | Q.  And that requirement after 2004, the first | 17:16:00 |
| 11 | time that requirement came into existence was in | 17:16:06 |
| 12 | 2008 when the parties signed the consent agreement? | 17:16:08 |
| 13 | MR. KENDALL:  What requirement? | 17:16:14 |
| 14 | MR. PETROCELLI:  The requirement for the | 17:16:15 |
| 15 | consent of another to consummate a settlement. | 17:16:16 |
| 16 | THE WITNESS:  Well, again, we're getting | 17:16:23 |
| 17 | into an area of where we assert a privilege, and | 17:16:25 |
| 18 | privilege has been upheld, so my answer is without | 17:16:27 |
| 19 | waiver of privilege, same agreement, correct? | 17:16:30 |
| 20 | BY MR. PETROCELLI: | 17:16:30 |
| 21 | Q.  Yes. | 17:16:33 |
| 22 | A.  Okay.  And I'm also discussing what has | 17:16:33 |
| 23 | already been disclosed, which is essentially -- and | 17:16:37 |
| 24 | now I've forgotten the question.  So I prepared -- I | 17:16:41 |
| 25 | prepared the record to answer the question. | 17:16:45 |

**EXHIBIT Q**
**855**

MARC  TOBEROFF - 9/18/2012

Page 269

| | | |
|---|---|---|
| 1 | Q.  My question was the first time that a | 17:16:46 |
| 2 | requirement for the consent of another to consummate | 17:16:48 |
| 3 | a settlement was 2008, after the 2004 agreements? | 17:16:51 |
| 4 | A.  With respect to the Siegels and Shusters? | 17:16:57 |
| 5 | Q.  Yes.  Correct. | 17:16:57 |
| 6 | A.  Yes. | 17:16:57 |
| 7 | Q.  Is the consent -- | 17:17:01 |
| 8 | A.  But I would answer that more specifically, | 17:17:10 |
| 9 | it's not the consent of another.  You're technically | 17:17:13 |
| 10 | correct, but it's basically mutual consent of the | 17:17:15 |
| 11 | Siegels and Shusters to a settlement of their | 17:17:19 |
| 12 | termination interests. | 17:17:21 |
| 13 | Q.  Did they receive -- | 17:17:22 |
| 14 | A.  Not my consent. | 17:17:25 |
| 15 | Q.  Your consent is not required at all? | 17:17:28 |
| 16 | A.  Absolutely not. | 17:17:30 |
| 17 | Q.  And not any entity associated with you? | 17:17:31 |
| 18 | A.  Correct. | 17:17:34 |
| 19 | Q.  Okay.  And no third party, it's just the | 17:17:34 |
| 20 | Siegels and the Shusters? | 17:17:39 |
| 21 | A.  Correct. | 17:17:39 |
| 22 | Q.  Okay.  Is -- is it both Mark -- | 17:17:40 |
| 23 | A.  And -- and -- | 17:17:51 |
| 24 | Q.  -- Warren Peary and Jean? | 17:17:53 |
| 25 | A.  I was just about to say that the -- the | 17:17:54 |

**EXHIBIT Q**
**856**

MARC  TOBEROFF - 9/18/2012

Page 270

| | | |
|---|---|---|
| 1 | consent, I believe, is the executor. | 17:17:58 |
| 2 | Q.  On the Shuster side? | 17:18:04 |
| 3 | A.  I believe so. | 17:18:05 |
| 4 | Q.  And on the Siegel side? | 17:18:08 |
| 5 | A.  I'm not 100 percent certain. | 17:18:09 |
| 6 | On the Siegel side it was Laura and Joanne. | 17:18:11 |
| 7 | Q.  Now it's just Laura? | 17:18:14 |
| 8 | A.  Correct. | 17:18:15 |
| 9 | Q.  Did -- you said that there was a conflict | 17:18:19 |
| 10 | waiver signed by Peary in or about 2008, I believe? | 17:18:24 |
| 11 | A.  Yes. | 17:18:34 |
| 12 | Q.  What prompted that? | 17:18:35 |
| 13 | A.  The consent agreement. | 17:18:35 |
| 14 | MR. KENDALL:  Just a minute.  I think we're | 17:18:37 |
| 15 | getting into a slightly different area. | 17:18:38 |
| 16 | So, again, I just want to caution you on | 17:18:40 |
| 17 | privilege.  And I assume we have the same | 17:18:43 |
| 18 | understanding, that it will not be a waiver, so | 17:18:47 |
| 19 | you'll just have to make a determination whether | 17:18:49 |
| 20 | you -- you want to provide this information since it | 17:18:51 |
| 21 | may be privileged. | 17:18:55 |
| 22 | MR. PETROCELLI:  I believe he answered the | 17:18:56 |
| 23 | question.  He said "the consent agreement." | 17:18:58 |
| 24 | MR. KENDALL:  So he did, but that's because | 17:19:06 |
| 25 | he didn't give me an opportunity to object first and | 17:19:07 |

**EXHIBIT Q**
**857**

MARC  TOBEROFF - 9/18/2012

Page 314

```
 1                          DECLARATION

 2

 3

 4

 5

 6          I hereby declare I am the deponent in the

 7     within matter; that I have read the foregoing

 8     deposition and know the contents thereof, and I

 9     declare that the same is true of my knowledge except

10     as to the matters which are therein stated upon my

11     information or belief, and as to those matters, I

12     believe it to be true.

13          I declare under the penalties of perjury of

14     the State of California that the foregoing is true

15     and correct.

16          Executed on the _____ day of

17     _____ 2012, at

18     _____,

19     California.

20

21

22

23

24          _____

25                          MARC TOBEROFF
```

**EXHIBIT Q**
**858**

MARC   TOBEROFF – 9/18/2012

Page 315

```
 1    STATE OF CALIFORNIA     )
                              )   ss.
 2    COUNTY OF LOS ANGELES   )

 3

 4            I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7            I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10            Prior to being examined the witness was by

11    me first duly sworn;

12            The foregoing transcript is a true record

13    of the testimony given.

14            Before completion of the deposition, review

15    of the transcript [X] was [] was not requested.  If

16    requested, any changes made by the deponent (and

17    provided to the reporter) during the period allowed

18    are appended hereto.

19

20    Dated  September 20, 2012.

21

22                    _____
                            Shanda Gabriel
23                          CSR 10094

24

25
```

**EXHIBIT Q**
**859**

# EXHIBIT R



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 7, 2012

**VIA EMAIL**

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:    ___DC Comics v. Pacific Pictures Corp. et al.,___ CV-10-3633 (ODW) (RZx)

Dear Dick:

We write in response to your July 20 letter and your firm's offer to review a limited number of your clients' files and re-log and produce documents, if DC promises not to file its special-master motion with the District Court. While we appreciate that your firm has taken a small step in the right direction, there are several shortcomings in the proposal, chief among them: (1) your firm's and your clients' failure to acknowledge the seriousness of the discovery problems at issue (or the significant cost and delay caused by defendants' actions); (2) your firm's and your clients' failure meaningfully to address many of the issues we raised during our lengthy in-person meet-and-confer on these issues; and (3) your firm's and your clients' assertion that appointment of a special master is unnecessary. Also unacceptable is your firm's offer to do work required of it by law as a quid pro quo to avoid DC's motion. In short, based on the present record, DC is not prepared to accept your offer, and will file its motion shortly, unless there is a significant change in defendants' position.

## I.    TOBEROFF'S DISCOVERY MISCONDUCT MUST BE ACKNOWLEDGED.

Your July 20 letter begins by staking out the following factual and legal position:

Defendants disagree strongly with DC's contention that there has been any material error (other than a very small number of inadvertent errors of no consequence that are common in complex litigation) concerning Defendants' privilege logs. In fact, both the form and content of the logs have been repeatedly upheld both in this action and in the *Siegel* case, over the course of active litigation spanning nearly eight years. We also believe, as stated in prior correspondence to you, that your other accusations of discovery misconduct in this litigation by Toberoff & Associates are

**EXHIBIT R**
**860**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 2

without basis, and nothing in this offer of compromise should be deemed to suggest otherwise.

Each claim you make above is in error, improperly minimizes fundamental discovery misconduct that cannot be swept away, *cf. Hester v. Vision Airlines, Inc.*, 2012 WL 2914108, at *5-7 (9th Cir. July 18, 2012), and pays no heed either to the significant prejudice DC has suffered or the needless costs defendants have imposed on the courts. We discussed many examples of your clients' discovery misconduct at our recent in-person meeting, and while you claimed to be unaware of many of the issues we discussed, your letter does nothing to address the points we raised or the further diligence you said your firm would conduct in response.

A.   Toberoff's Conduct Was Intentional And The Heaviest Sanctions Are Warranted.
Toberoff's pattern of obstructing the discovery process has prejudiced DC's ability to litigate its claims in this case.[1] Just last month, the Ninth Circuit issued an opinion re-affirming the propriety of the most grave sanctions (default) where a party withholds relevant evidence, redacts information that is not legitimately privileged, and obfuscates efforts to uncover it. *Hester*, 2012 WL 2914108, at *5-7. In *Hester*, plaintiffs alleged that their employer was wrongfully retaining hazard pay, and issued interrogatories and requests for production asking for "all communications and documents that relate to hazard pay." *Id.* at *2. Defendant refused to cooperate with plaintiff's requests by first asserting the documents did not exist, and later making an incomplete production that only included select pages of some documents, and heavily redacted copies of others. *Id.* at *2-3. The district court found that defendant "intentionally delayed production of documents, misrepresented its current and past production … and otherwise engaged in bad faith conduct." *Id.* at *5. As a sanction, the court struck defendant's answer. *Id.* The Ninth Circuit affirmed and recommended other possible sanctions. *Id.* at *9; *accord, e.g., Connecticut Gen.*, 482 F.3d at 1097 (defendant's "pattern of deception and discovery abuse …. so damage[d] the integrity of the discovery process that there [could] never be assurance of proceeding on the true facts"); *Valley Eng'rs*, 158 F.3d at 1054-58 (terminating sanctions warranted where party suppressed smoking-gun document by denying it existed and through false privilege claims; plaintiffs "probably would never have seen [it], had [their] lawyer not been sharp enough to spot what was not there"; defendant's "discovery violations ma[de] it impossible for [the] court to be confident that the parties [would] ever have access to the true facts").

---

[1] *See* FED. R. CIV. P. 37; *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007); *In re Phenylpropanolamine Prods. Liab. Litig.*, 460 F.3d 1217, 1236-1237 (9th Cir. 2006); *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112 (9th Cir. 2004); *Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1057-1058 (9th Cir. 1998); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 349 (9th Cir. 1995); *Adriana Intl. Corp. v. Lewis & Co.*, 913 F.2d 1406, 1412 (9th Cir. 1990); *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1450-1451 (9th Cir. 1986); *G-K Props. v. Redevelopment Agency of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978); *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 2012 WL 3036481, at *4 (Jul. 26, 2012).

O'MELVENY & MYERS LLP
August 7, 2012 - Page 3

Toberoff's pattern of withholding non-privileged documents, redacting non-privileged information, falsely claiming that requested documents do not exist, and knowingly manipulating his privilege logs is equally improper. So, too, is his and his counsel's refusal fully and finally to remedy the situation. As we will show the Court, Toberoff's "willful halting [of] the discovery process" has prejudiced DC's ability to litigate its claims, *Barbieri v. Rio Suites Hotel & Casino*, 45 Fed. Appx. 652, 653 (9th Cir. 2002); wasted the courts' limited resources, *G-K Props.*, 577 F.2d at 647; and "damage[d] the integrity of the discovery process," *Conn. Gen. Life Ins.*, 482 F.3d at 1097. Many documents central to DC's case have been produced only after DC has "spot[ted] what was not there," *Valley Engr's*, 158 F.3d at 1058—and then had to fight through false denials that such documents did not exist, purposefully opaque privilege logs, and costly motion practice. The Ninth Circuit not only permits sanctions in such circumstances, it "encourage[s]" them, *G-K Props.*, 577 F.2d at 647, and both sanctions and a special master are needed to get to the full depths of Toberoff's misconduct.

Discussed below are a few examples (not exhaustive) showing that Toberoff's actions have been "deliberate," "material," and prejudicial, despite your claims in your July 20 letter to the contrary, and Toberoff's recent denials, *see* Docket No. 466, which your firm notably did not sign off on our join.

*1. The May 13, 2003, Letter.* The Toberoff Timeline identifies a May 13, 2003, letter from Michael Siegel to Laura Siegel Larson that had never been produced or logged in this case or in *Siegel*—despite its being directly responsive to document requests in both cases. The Timeline describes the May 2003 letter as documenting Michael's many concerns about Toberoff's misconduct, including his efforts to secure the Superman copyrights for himself.

After defendants failed to produce the document by the court-ordered date for defendants to make their document production in December 2010, DC requested during a meet-and-confer that month that Toberoff confirm whether the May 2003 letter existed and, if so, to produce it. Toberoff refused to confirm the letter's existence, instead stating only that DC should not rely on the Timeline. Given Toberoff's non-answer, DC sent a follow-up letter on December 29 concerning documents identified in the Timeline that defendants had never produced or logged, including (1) the May 2003 letter; (2) a December 16, 2002, letter from Toberoff to the Siegel heirs; (3) a July 5, 2003, letter from Michael to Laura; and (4) a September-October 2003 letter regarding Ari Emanuel's fee for representing the Siegel heirs. Toberoff responded in a letter a few days later that "the ranting anonymous 'Timeline' [is] inaccurate and untrustworthy," he claimed that the December 2002 and September-October 2003 letters did not exist, and he evaded DC's questions as to the May 2003 and July 5 letters. Docket Nos. 162-9, 162-10.

DC pressed Toberoff again, requesting on January 5 that defendants produce several documents, *including specifically the May 2003 letter from Michael to Laura*. Docket No. 162-11. Your claims that Toberoff did not intentionally obstruct discovery (stated in your July 20 letter and elsewhere) are belied by Toberoff's letter of January 8, 2011, in which he stated:

> *As to your claims that we have not produce documents alluded to in the ranting, anonymous Timeline, we have repeatedly stated that the inadmissible Timeline is*

**EXHIBIT R**
**862**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 4

*extremely untrustworthy.* **To the extent that relevant documents exist, they have either been produced or designated as privileged.**

Nonetheless, in the interest of clarity: …

- *There are no documents related to an offer by a "billionaire investor" to purchase the Siegels' Superman rights, because no such offer was ever conveyed, and the sworn testimony of the relevant witnesses is consistent on this point. The Timeline itself, states that this supposed offer was made at the August 2002 meeting between Kevin Marks, Ari Emanuel, and [Mr. Toberoff]. Docket No. 98 at 4:21-6:3. As Kevin Marks testified, "[a]t no time during that conversation did either Mr. Toberoff or Mr. Emanuel say anything about a 'billionaire investor.' The world 'billionaire' was never used in the conversation by any of its participants." Docket No. 98-3 at 1:16-2:7.*

*DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent "hit piece" is unworthy of DC and its counsel.*

Docket No. 162-12 at 589 (emphases added).

a. While you, Mr. Daum, and Toberoff (in our in-person meeting) and Ms. Brill (in her letter that preceded it) all tried to downplay Toberoff's failure to produce the May 2003 letter in late 2010 or early 2011, every one of the defenses offered is without merit. During our meeting, Toberoff argued that DC's discovery requests were blunderbuss and he innocently did not locate the May 2003 letter during his searches. But as you and he know, DC's December 2010 and January 2011 letters—which we discussed during our meeting—asked Toberoff to confirm the existence of the May 2003 letter based on a search of the documents in defendants' possession, which would include the Timeline documents. Docket No. 162-9 at 574-78; 162-11 at 583-86. The letters confirm we also specifically raised the letter during our lengthy meet-and-confer call.

Mr. Daum argued that any failure to find the document was inadvertent, but when we pressed him on the any factual basis he had to make this claim, he conceded that he and your firm played *no role* in trying to discern why Toberoff had not produced the document in 2010 or 2011, much less any role in searching for the document in 2010. In any event, Mr. Daum's suggestion that Toberoff innocently could not locate the May 2003 letter cannot be taken seriously: the May 2003 letter appears no fewer than *four* times among the Toberoff Timeline documents at Q0032-33, Q0139-40, Q0317-18, Q0590-91. Both Toberoff and your firm had to have reviewed this document on numerous occasions in making the representations you did in numerous briefs to the Court in 2010 about the accuracy of the Timeline and DC's reliance on the allegations contained therein.

We pressed Toberoff in December 2010 and January 2011 to look among the Timeline documents for the May 2003 letter, and his response was: the Timeline is "untrustworthy" and

**EXHIBIT R**
**863**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 5

"to the extent relevant documents exist, they have either been produced or designated as privileged." Docket No. 162-12 at 589. These were direct, knowing misrepresentations and not inadvertent errors, as you now describe them. Nowhere among any of defendants' logs in *Siegel* or this case was or is the May 2003 letter from Michael to Laura ever listed. And as of January 2011, never had it been produced.

Your letter notably makes no mention of any of these facts or any follow-up investigation your firm has done into why Toberoff did not produce the May 2003 letter in 2010 or early 2011. Nor does your letter grapple with the fact that Toberoff made numerous affirmative misstatements to DC and the Court about the Timeline, the May 2003 letter, and otherwise, including the following, false statement in Toberoff's January 8, 2011, letter that: "There are *no documents* related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights, because no such offer was ever conveyed...." Docket No. 162-12 at 589.

As both Toberoff and your firm well knew in 2010 and 2011, the May 2003 letter existed among the Toberoff Timeline documents, it had never been produced or logged, and that letter expressly mentioned the "billionaire" investor. *See* Docket No. 225-4 at 3 ("Marc [Toberoff] had a mysterious *billionaire* who wanted to invest in the Superman copyright. When you signed with Marc the *billionaire* invested elsewhere."). As Toberoff and your firm also knew, defendants were under a court order, issued in December 2010, to produce all responsive, non-privileged documents—having waived all other objections to DC's document requests—and yet they failed to do either with respect to the May 2003 letter. Docket No. 133. Nor did your firm ever produce or log the document among the productions made for the Toberoff defendants, and even though Toberoff and your firm have possessed the May 2003 letter since at least mid-2010, in possessing the Toberoff Timeline documents.

At our recent in-person meeting, you said that said Toberoff's January 8 letter—and the representations he made therein—were a revelation to you, and you wanted to look into them. Yet, your July 20 letter only makes further blanket denials of misconduct and does nothing to grapple with Toberoff's January 8 statements, or your firm's or defendants' failure to produce this non-privileged, obviously responsive, relevant document, which directly belied statements your firm was making in court filings.

b.  Your July 20 letter argues no harm, no foul—going so far as to say Toberoff's suppression of this evidence was "of no consequence." But as we explained at our in-person meeting, defendants' and their counsels' efforts to minimize the impropriety, cost, and impact of the discovery misconduct at issue here is not well-taken. Defendants and their counsel have knowingly caused DC to spend hundreds of thousands of dollars and to waste months of precious time to obtain documents like the May 2003 letter, which defendants were under court order to produce in December 2010. And as we will discuss below, Toberoff's misconduct—which your firm has permitted—has allowed defendants to present a skewed evidentiary record to the courts, including in the SLAPP appeal papers your firm recently filed and has done nothing to correct. These record issues, akin to those raised in Rule 28(j) letter after the oral argument in the *Pacific Pictures* case are troubling, to say the least.

**EXHIBIT R**
**864**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 6

And the prejudice DC has suffered under cannot be undersold. Toberoff did not turn over the May 2003 letter in December 2010, as he was required. Rather, he rather represented to DC in January 2011, when DC pressed on why the May 2003 document had not been produced: "DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent 'hit piece' is unworthy of DC and its counsel." Docket No. 162-12 at 589. In his court filings (with which your firm was served), he did not disclose that the May 2003 letter was among the Timeline documents. Instead, he chastised DC for relying on the Timeline as proof that the letter existed, insisting the Timeline was "unreliable" and "grossly inaccurate." Docket No. 160 at 5, 71-72. Nowhere did Toberoff disclose that the May 2003 letter was among the Timeline documents, or that he had never specifically logged the letter. Worse, he took deliberate steps to hid the letter's existence. And, in fact, by their own later admission, defendants conceded they had *never* claimed *any* privilege over the May 2003 letter, but only other communications that DC sought. Docket No. 412 at 10.

Toberoff's deceptions were not "inadvertent errors … common in complex litigation," as your July 20 letter asserts. They were sanctionable acts of deliberately misleading DC and the courts. *E.g.*, *Hester*, 2012 WL 2914108, at *5-7. Fortunately, DC spotted the gap in defendants' production, pressed the issue despite Toberoff's bellicose claims that DC's suspicions were "unworthy" of counsel, and Judge Zarefsky ultimately granted DC's motion and ordered defendants to either (a) produce the May 2003 letter, or (b) provide a verified response that it did not exist. Docket No. 209 at 12. Only then did Toberoff produce the May 2003 letter.

Mr. Daum's recent suggestion—based on no evidence submitted by Toberoff in 2011 or now—that Toberoff only found the May 2003 letter after Judge Zarefsky issued his order is incredible. It also directly belied by the fact that the document appears no fewer than *four times* among the Toberoff Timeline documents that DC asked Toberoff to search in December 2010 and January 2011, and with which your firm has long been intimately familiar. It is also belied by the fact that Toberoff had to review all of the Timeline documents in preparing his court-ordered declaration in May 2007—and yet he not only failed to produce this document then, he later denied its existence. And it is belied by the fact that both your firm and Toberoff must have reviewed the Timeline documents before producing them to the U.S. Attorney's Office in September 2010—and yet neither he nor your firm volunteered to produce the document when DC served its motion on all parties and counsel seeking it. Toberoff (and your firm) also had to review the logs (and logged documents) in producing privilege logs for all defendants in late December 2010 and early 2011. If you have any basis to support Mr. Daum's claim of an innocent discovery of this document after Judge Zarefsky's order—based on an actual investigation into actual facts—please provide it without delay. Otherwise, we can only assume you have no facts to support your claim that the failure to produce this document was an "inadvertent error." That Mr. Daum made this statement—with no basis to support it, and when the plain evidence so clearly contradicts it—causes us even deeper concern.

Still another reason we know no inadvertent error occurred are the steps Toberoff took after producing the document to cover his tracks. Not only did he refuse to produce the document in December 2010, as required by court order, he also refused to produce all Q-Bates

O'MELVENY & MYERS LLP
August 7, 2012 - Page 7

stamped versions of the May 2003 letter when DC requested it. Docket Nos. 160 at 71-72; 296-1 at 4-6; 296-8 at 76; 296-9 at 77-79. Producing the Q-Bates stamped versions of the documents would have shown (a) that non-privileged, non-produced documents existed among the Timeline documents, and (b) that Toberoff's privilege logs, as discussed further below, were a sham. Yet he successfully refused to produce the Q-Bates stamp version, calling DC's claimed need to obtain the documents baseless. He also objected successfully to orders that would have compelled him to produce all Michael-Laura Siegel-related correspondence, and that would have compelled him to update and re-scrub his privilege logs. Docket Nos. 160 at 68-71; 209 at 11-12. As we would learn, and is discussed below, the May 2003 letter was not the only document Toberoff suppressed. Many more existed, and many more were buried among the Timeline documents and false privilege entries that neither Toberoff nor your firm did anything to correct.

   c.  The production of May 2003 letter—and the recent production of the Toberoff Timeline documents—also show what a sham defendants' privilege logs have been, and why the modest corrective action you propose falls well short. Defendants' production of the Timeline documents in May 2012 show that *four versions* of the May 2003 letter existed among the Timeline documents, and that Toberoff repeatedly misled DC and the courts with false, overbroad privilege log entries that claim no privilege over letters like the May 2003 letter, but instead lump and hide them behind other specific logged documents. This is not an isolated mistake; this intentionally deceptive and sanctionable practice repeats itself time and again. To take one example (among many), a copy of the May 2003 letter included among the Timeline documents bears Bates stamps Q0139-40. In his court-ordered May 2007 declaration in *Siegel*, Toberoff said that these pages corresponded with Siegel Supplemental Privilege Log Entry 79:

   Q 0138-45        Plaintiffs' supplemental privilege log # 79

   As shown below, Entry No. 79 only identifies a July 5, 2003, transmittal from Laura to Toberoff—and makes utterly no mention of a May 2003 letter from Michael to Laura. Indeed, the log entry makes no mention of a *May* 2003 communication. It makes no mention of *Michael Siegel*. And it makes no mention of a *letter*—just a July "Facsimile" from Laura to Toberoff.

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 79 | 7/5/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

   You cannot claim this a simple mistake, or that Toberoff's failure to address and correct this issue in late 2010 or early 2011 was an innocent error. DC pressed Toberoff repeatedly to identify and produce the May 2003 letter. DC also pressed Toberoff to look at and for July 2003 correspondence involving Laura Siegel—including on July 5, 2003, specifically. Docket No. 162-9 at 577 ("We raised that there are certain communications listed on the Toberoff Timeline documents that neither appear on defendants' logs nor have been produced. We provided the following document as an example, a May 13, 2003 letter from Michael Siegel to Laura Siegel Larson discussed in the last paragraph of page 3 on the Timeline, ... [and a] July 5, 2003 letter from Laura Siegel Larson to Michael Siegel discussed on page 4... You said that DC should not rely on the accuracy of the Timeline, but took under advisement our request that you verify

**EXHIBIT R**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 8

whether such documents exist—and, if so, to either produce them, or list them on defendants'
privilege logs."). So not only did Toberoff have the Timeline documents to go through and find
the May 2003 letter among them—and to produce all versions of it—he had DC asking him to
look at documents from July 2003 for Michael-Laura Siegel correspondence. This included the
July 5 letter at log entry No. 79. Again, rather than producing the May 2003 letter—which
Toberoff *never* asserted was privileged, Docket No. 412 at 10—he lied and dissembled. He and
your firm said the Timeline was a ranting "hit piece" that could not be believed. He said DC had
all the documents to which it was entitled and that his logs needed no correcting and did nothing
to obscure the existence of relevant, responsive, or non-privileged documents. And he and your
firm said that DC's "billionaire investor" claim was a "mockery."[2]

Not only did Toberoff repeatedly and deliberately lie in his logs, he did not correct his
misstatements (a) when Judge Zarefsky ordered him in 2007 to go through all the Timeline
documents once again; or (b) when DC repeatedly challenged the logs in this case. While
Toberoff claimed in our meeting the other day that a paralegal went through the underlying
documents to create his 2007 declaration, that is not what his declaration states, and it is not what
Judge Zarefsky ordered him to do. *Cf.* May 21, 2007, Toberoff Decl. at 1 (Toberoff declaring:
"Pursuant to the Order, *I have accounted for each of the Documents….*") (emphasis added).
Worse still, DC raised repeated complaints with Toberoff's logs and filed motions seeking to
require defendants to update them to ensure that non-privileged documents were not being
hidden behind opaque, incomplete, and false log entries. Docket Nos. 160 at 40-44; 162-8 at
571-73; 162-9 at 574-78; 162-11 at 583-86; 205 at 3, 18-19; 207-10 at 472-75; 207-12 at 488;
225 at 13-20; 243 at 10-12; 253 at 6-10; 274 at 7-8. Time and again, Toberoff rejected DC's
claims of impropriety, arguing that his logs were fully proper and that he was hiding nothing.
Docket Nos. 160 at 66-68, 74-78; 162-10 at 579-82; 162-12 at 587-90; 207-11 at 481-82; 207-13
at 494; 210 at 12-13, 15-16; 231 at 16-22; 269 at 11-15. The production of the May 2003 letter
and the recent production of the Toberoff Timeline documents—with full Q-Bates stamping
finally exposed—show just how badly Toberoff misled DC and the courts in claiming his logs
were proper and did not need to be updated in any way.

Toberoff's knowing, deliberate, and repeated suppression of the May 2003 letter is reason
alone to justify terminating sanctions in this case. *See Valley Eng'rs*, 158 F.3d at 1054-58; *supra*
at 2-3. But there are many other acts in which defendants have engaged to justify this relief and
that show that Toberoff's failure to produce the May 2003 letter was far from an innocent error.
As shown below, Toberoff played the same games in hiding Laura's July 2003 response to
Michael—first suggesting it did not exist, and then being caught hiding the document behind yet
another fax-cover-sheet privilege log entry, listing only Laura and himself as recipients.

---

[2] How your firm could make such representations about the accuracy of the Timeline and
DC's allegations when you possessed and had reviewed the Timeline documents is an issue that
must be fully explored. So, too, is your firm's failure to fulfill its duty of candor when Toberoff
falsely told DC and the courts the documents it sought did not exist.

O'MELVENY & MYERS LLP
August 7, 2012 - Page 9

d.  Finally, as for your repeated claims that Toberoff's failure to produce this and other smoking-gun documents were not "material," your own briefs and letters in this case, as do Toberoff's, refute this.  As you know, before defendants produced the May 2003 letter, they and your firm argued repeatedly and vociferously that DC's and the Timeline's "mysterious billionaire" investor claim, Docket Nos. 181 at 23-24; 201 at 3-7; 205 at 17-20; 215 at 8-10; 225-4 at 3, was a "mockery," "contrary to all the evidence," and "based entirely on the untrustworthy, inadmissible Timeline," *e.g.,* Docket No. 196 at 1-5, 10.  Yet Michael's May 2003 letter supports this claim and corroborates the Timeline:

> Marc had a *mysterious billionaire* who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation.  When you signed with Marc the *billionaire* invested elsewhere.  Marc has his own production company, he was going to team with Emanuel and make a [Superman] movie.  This has not happened.  Docket No. 225-4 at 3 (emphases added).

The May 2003 letter also contradicts Toberoff's representation in his January 8 letter to DC that "[t]here are no documents related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights."  Docket No. 162-12 at 589.  As shown below, DC has obtained—at great expense, and only after overcoming significant deception and stonewalling—still other documents that corroborate its "billionaire investor" claim, including from Larson herself.  While Toberoff, Larson, and you may all now try to explain key evidence like the May 2003 letter away, those explanations are for the jury—and not for defendants and their counsel to use as a basis improperly to withhold discovery.  Such skewing of the facts, especially when defendants and their counsel were taking such strident positions in their briefs about such issues, require the stiffest and fullest sanctions.

2.  *July 2003 Letter And Drafts.*  As noted above, Toberoff's pattern of burying smoking-gun documents behind fax cover sheets to him was repeated when it came to Laura's July 2003 response to Michael's May 2003 letter.  Like the May 2003 letter, the Timeline identifies a July 5, 2003, letter from Laura to Michael that had never been produced or logged in this case or in *Siegel*.  DC requested that defendants (1) confirm whether the July 5 letter existed and, if so, to produce it; and (2) to review Entry Nos. 715 and/or 716 to the Siegel Privilege Log in this case— both listed as facsimiles from Laura to Marc—and confirm whether the logged documents included a July 11, 2003, letter from Laura to Michael, which DC believed could be the non-privileged July 2003 letter referenced in the Timeline.  Docket Nos. 162-9 at 576-577; 162-11 at 583-84.  In any event, Toberoff was under court order, as of December 2010, to produce or log responsive documents—and he did neither for the July 2003 letter that would only finally emerge in late 2011, and pursuant to court order issued by Judge Wright.

a.  Ms. Brill's claim in her recent letter that three potential "July 2003" letters are at issue and that Toberoff made no misrepresentations as to any one is false.  She ignores Toberoff's and your firm's obligation to produce or log the document in late 2010 and/or early 2011—neither of which ever occurred.

O'MELVENY & MYERS LLP
August 7, 2012 - Page 10

As for Ms. Brill's three asserted categories, the first is the July 11 letter. Despite DC's simple and straightforward requests, and the court's December 2010 order mandating the production or logging of responsive documents, Toberoff refused to review Log Entry Nos. 715 and 716 or to confirm DC's understanding that the July 11 letter from Laura to Michael was included as an attachment to the fax cover sheet but not separately logged. Docket Nos. 162-10 at 580-82; 162-12 at 588-89. Toberoff asserted that privilege as to the documents identified at Entry Nos. 715 and 716 had been repeatedly upheld by the courts in this case and in *Siegel*, but would not state whether the July 11 letter existed, or whether his logs accurately depicted what documents were hidden behind them. Docket Nos. 160 at 66-68; 231 at 19-20. Based on Toberoff's representations that DC was not entitled to the documents, Judge Zarefsky and the District Court rejected DC's motions to obtain the July 11 correspondence from Laura to Michael, though Judge Zarefsky did note that Toberoff's responses about the document were "cryptic." Docket Nos. 209, 248.

During Larson's July 22, 2011, deposition, she testified that she responded to Michael's May 2003 letter, that Toberoff made factual edits to the letter (via faxes to her), that she believed she sent the response in July 2003, and that she gave Toberoff a copy of the final letter. Docket No. 316-5 at 314:12-15, 316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3. Despite these clear admissions, Toberoff again refused to produce a copy of the letter; confirm whether defendants' possessed a copy; address whether it was defendants' position that the letter was privileged, and, if so, why; or confirm whether the letter appears on defendants' logs, and, if so, at what entry number. Docket No. 361-2 at 216-18.

It was not until DC filed its second motion to compel production of the July 11 letter in September 2011, that Toberoff finally conceded defendants did not separately log the July 11 letter, as the law requires them to do. Toberoff conceded the July 11 letter appeared at Siegel Privilege Log Entry No. 82 in the *Siegel* case. Docket Nos. 316 at 21-24; 317 at 1-5. Again, Log Entry No. 82 does not identify Laura's July 11 letter; nor does any other entry. Entry No. 82 logs a "Facsimile" from "Laura Siegel" to "Marc Toberoff." It says nothing about a letter from Laura to Michael, and does not specify the alleged "common interest" privilege claim that defendants now newly asserted:

| Log# | Date | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|------|------|--------------------------|------------------------|---------------------|-----------------|------------------|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiff's Counsel |

Docket No. 317-2 at 8.

Clearly, none of the rulings in *Siegel*—which Toberoff argued precluded DC from obtaining the July 11 letter—conceivably could have dealt with the discoverability of the July 11 letter, since its existence was only confirmed by Toberoff in September 2011. Toberoff's suppression of Laura's letter behind a false privilege entry was not an "inadvertent" mistake as

**EXHIBIT R**
**869**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 11

you claim. Toberoff used this same calculated, illegal devise to hide evidence in burying the May 2003 letter. Both your firm and Toberoff knew this critically important letter existed in the Timeline documents, was directly responsive to DC's requests, related closely to DC's claims in this case (and arguments defendants were making to the contrary, including whether DC had a "deal" with the Siegel family in 2001, with which Toberoff interfered). DC asked Toberoff to review the Timeline documents for this July 2003 letter. And Toberoff—despite knowing the exact location of the July 11 letter, knowing he had never separately logged it, and knowing it was responsive to DC's requests—dissembled to both DC and the courts about its existence, all while your firm looked on in silence. As for the privilege claim that was asserted in Log Entry No. 82, it did not reach or even embrace the Michael to Laura letter—only attorney-client privilege was asserted, and yet where common-interest privilege had been claimed over Michael-Laura communications, that specific claim, not an attorney-client privilege claim, had been made. *E.g.,* Docket No. 162-6 at 416-17 (Entry Nos. 495, 507-09, 512, 516-19). Toberoff's representations to the courts that his privilege claims to this document had been upheld was, thus, false—and, at best—horribly misleading. Courts in the Ninth Circuit do not permit such games. *Supra* at 2-3.

b. The second "July 2003" letter at issue, according to Ms. Brill's letter, is the July 5 letter identified in the Timeline that defendants had never produced or logged. Toberoff refused to confirm whether the July 5 letter existed and instead, like the May 2003 letter, chastised DC for relying on the "inadmissible" and "untrustworthy" Timeline and represented that "[t]o the extent that relevant documents exist, they have either been produced or designated as privileged." Docket No. 162-12 at 589. When DC moved to compel, Toberoff for the first time claimed that defendants were "unable to identify a document that *matched*" the description of the July 5 letter—a representation Judge Zarefsky found meant "the document does not in fact exist so far as Defendants know." Docket Nos. 160 at 71-72 & n.2; 209 at 11-12 & n.2. DC requested that defendants conduct a diligent review of all files in their possession, custody, or control (including any files obtained from Michael or Don Bulson, Michael's attorney) for any unproduced documents from June or July 2003, since the July 5 letter could be misdated in the Timeline or be found in a different form, such as a draft letter. Docket Nos. 253 at 9; 253-17. Toberoff continued to claim the July 5 letter, in whatever form, did not exist. Docket No. 269 at 12-13.

Defendants' recent production of the Timeline documents refutes Marc's claims that he could not "match" any documents in defendants' possession, custody, or control to the July 5 letter: the July 5 letter appears no fewer than *nine* times among the Timeline documents at Q0141-45, Q0147-51, Q0153-57, Q0319-23, Q0389-93, Q0478-82, Q0592-96, Q0661-65, and Q0750-54. As DC suggested to defendants, the July 5 letter appears to be a draft of Laura's July 11 letter. Toberoff's clear misrepresentation is recklessly repeated in Ms. Brill's recent letter and reinforces why DC is saying you cannot rely on his representations or the review he has purportedly conducted of defendants' documents.

c. The third category of "July 2003" letters identified by Ms. Brill are the drafts that DC learned about during Laura's July 2011 deposition, which defendants had never

**EXHIBIT R**
**870**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 12

logged or produced in this case or in *Siegel*. Docket No. 316-5 at 314:12-15, 316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3. Ms. Brill claims without citation to anything that defendants representations about these drafts have been "entirely consistent, as reflected in nearly five years of pleadings on this issue." This means nothing, other than that Toberoff consistently has made entirely false misrepresentations about this evidence. When DC requested that defendants produce all drafts of the July 11 letter, Toberoff represented that the drafts had been logged and upheld as privileged in this case and in *Siegel*. Like the May 2003 and July 11 letters, however, defendants never separately logged the drafts, as they were obligated to do. And as discussed below, defendants' recent production of the Timeline documents (yet again) shows that the drafts were hidden behind fax cover sheets, instead of being separately logged. No court could have ruled on the discoverability of the July 11 drafts since their existence was not confirmed until May 2012. Toberoff knew this, but he continued to make contrary representations to DC and the courts, with no acts of intervention by your firm.

d. Defendants' production of the July 11, 2003, letter fully revealed that defendants had lied to the courts about its contents—and the veracity of the Timeline. Among many other important revelations, the document confirms that Kevin Marks, the Siegels' prior attorney, who negotiated the October 2001 settlement between DC and the heirs, told Toberoff and the Siegels that the Siegels "had a deal with DC"—which directly refuted arguments Toberoff and defendants and their counsel had made in this case. Docket No. 362-2 at 286-90.

Again, failing to produce this document or to log it properly, so that any privilege claim over it could have been litigated years ago, was not an "inadvertent error[] of no consequence," as your July 20 letter asserts. Laura's admissions in the letter to her brother go to core issues in the *Siegel* case—and the letter should have been produced years ago, when she, Michael, and Marks could have been deposed using the document. But now Michael is dead, summary judgment was entered in *Siegel* without access to this evidence, and a Rule 54 motion was granted in *Siegel* (again without access to this evidence)—all to DC's great prejudice. Equally harmful, Toberoff and his counsel have had the audacity in this case to make arguments directly contrary to the letter, knowing the letter was suppressed and being kept from DC. And only further adding to the harm defendants suppressed the letter long enough to keep DC from using it in its briefs on defendants' SLAPP motion (both in the district court and before the Ninth Circuit), and in Larson's deposition.

Indeed, only after a year of delay and Judge Wright's rejection of Toberoff's belated and baseless claim of privilege in the July 11 letter did defendants finally produce it in November 2011. While Ms. Brill and Toberoff now argues (wrongly) that the letter somehow actually supports defendants' defenses in this case, such self-serving claims have never been a basis to suppress evidence, nor are they an after-the-fact excuse for having done so. *Supra* at 2-3 (collecting cases).

O'MELVENY & MYERS LLP
August 7, 2012 - Page 13

    e.  The production of the Timeline documents, including the Q-Bates versions of the July 11, July 5, and July 11 draft letters, confirm how deliberately misleading defendants' privilege logs have been.  A copy of the July 11 letter included in the Timeline documents bears Bates stamps Q0484-88.  In his court-ordered May 21, 2007, declaration in *Siegel*, Toberoff said that these pages corresponded with Siegel Supplemental Privilege Log Entry Nos. 82 and 83:

      Q 0483-88      Plaintiffs' supplemental privilege log # 82, 83

Entry Nos. 82 and 83 identify two July 11, 2003, transmittals from Laura to Toberoff—and makes no mention of a July 11 letter from Laura to Michael:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiff Counsel |
| 83 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiff's Course |

Listing the document in this manner allowed Toberoff to suppress the July 11 letter for years by hiding it behind an allegedly privileged facsimile from Laura.

    f.  DC spent tens of thousands of dollars—sending numerous letters, participating in several meet-and-confers, filing five sets of briefs, and appearing at oral arguments on the issue of the July 2003 letter—over a period of ten months.  Your blithe assurances that DC has not been harmed by defendants' and their counsels' actions are not well taken.  This is especially true give defendants' and their counsels' recent efforts to keep record evidence from the Ninth Circuit that directly refutes key factual positions they are taking before that Court.

    *3. November 2, 2002, Letter.*  When DC received the May 2003 letter, it disclosed yet another communication between Michael and Laura that defendants had never produced, logged, or disclosed in this case or the *Siegel* case—a November 2, 2002, letter from Laura to Michael. DC requested that defendants produce the November 2 letter immediately after learning of its existence in April 2011.  Docket No. 267-3 at 8.  Toberoff represented that defendants could not "locate" the November 2 letter.  Docket Nos. 267-2 ¶¶ 4-5; 267-7 at 18.  DC pressed defendants to conduct a diligent search of all files in their possession, including Michael's files, which were in Toberoff's possession since 2006 when he handled the production of documents and preparation of privilege logs for *both* Bulson and Melvin Banchek, Michael's estate administrator.  Docket No. 267-1 at 9.  Toberoff again said the letter could not be found, and Judge Zarefsky denied DC's motion to compel it based on Toberoff's representation that he "perform[ed] a diligent search of [defendants'] record, all of [defendants'] records."  Docket No. 288 at 38:23-39:1; *see also* Docket No. 267-16 ¶ 4 ("After DC asked for a November 2, 2002 letter from Laura Siegel to Michael Siegel, I caused my office to re-check our relevant case files.").

    a.  While you and Toberoff (in our in-person meeting) and Ms. Brill (in her recent letter) suggested that Toberoff did not obtain a copy of the November 2 letter until 2011, the facts show

O'MELVENY & MYERS LLP
August 7, 2012 - Page 14

otherwise. As you know, in late 2011—after all SLAPP briefing had been closed, and after DC
had to send four letters and hold multiple meet-and-confers on the subject—defendants finally
produced a privilege log for the electronic archive of Michael's files that we only months earlier
learned that the Renner Otto firm possessed. Among the new entries on the Bulson Archive Log
that appear nowhere in the Michael Siegel-related logs in *Siegel*—which Toberoff prepared—
was the November 2, 2002, letter from Laura to Michael. Docket No. 362-2 at 313 (Entry 399).

Toberoff refused to produce the November 2 letter to DC, claiming he had not logged the
document six years earlier because it was not part of Michael's files he received in 2006, and
claiming that the document was subject to attorney-client and common-interest privilege.
Docket No. 412 at 7-11. Both these claims were specious. Judge Zarefsky rejected Toberoff's
privilege claims after an *in camera* review, Docket No. 451 at 5, and Renner Otto confirmed:

> I appreciate you making us aware of Mr. Toberoff's 5/7/12 filing. I've spoken to
> Don Bulson and consulted the "Renner Otto [electronic] archive" referenced in
> [Toberoff's] brief. To the best of my knowledge, *the "Renner Otto archive" was
> the product of scanning Mr. Siegel's paper files* before they were forwarded to the
> attorneys for Mr. Siegel's estate, *and the documents in the "Renner Otto archive"
> and the paper file should be the same.*

Docket No. 427-2 at 4 (Renner Otto partner J. Ryland) (emphasis added); *see also* Docket No.
362-2 at 319 (Renner Otto told DC that the electronic archive is an exact replica of the
documents returned to defendants).

At our recent meeting, and in the days after, you, Toberoff, and one of his associates have
speculated—based on no hard evidence or facts—that somehow the November 2 letter, which is
devastating for defendants, did not make it into the hard copy file that Toberoff received in 2006.
Your July 20 letter says and does nothing to justify this speculation. As the facts all show, and
as Judge Wright recently ruled in ordering Toberoff to produce another document from the
Bulson log based on DC's arguments of waiver, Docket No. 457, Toberoff possessed the
November 2002 letter in 2006, and he chose first neither to produce it or log it in *Siegel*, next
neither to produce it or log it in this case, and finally to lie about whether he possessed the
document in briefing and oral argument before the Court. Toberoff's recent motion for
reconsideration on this issue, Docket No. 466, may assert that he engaged in no misconduct, but
his words and actions in the *Siegel* case, including handling the document production for
Mr. Banchek, all refute his current arguments. Again, notably, your firm did not join that recent
brief that Toberoff filed.

b. Defendants' suggestion that the November 2 letter somehow supports defendants'
positions in this case, and thus DC was not harmed by its suppression, are equally without merit.
The November 2 letter not only directly contradicts factual assertions made by defendants in
their briefing in this case, it directly supports DC's claim that Toberoff used false promises of a
"mysterious billionaire" investor to induce the Siegels to end their business relationship with DC
and to do business with him instead. Docket No. 225-4 at 3; *see also* Docket Nos. 181 at 23-24;
201 at 3-7; 205 at 17-20; 215 at 8-10. In the long-suppressed November 2, 2002, letter, Laura

**EXHIBIT R**
**873**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 15

herself writes: "My mother and I have had extensive meetings with Toberoff and Emanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin had given them that *there was a deal with DC, the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere.*" (Emphases added.) This (empty) $15 million offer by an alleged billionaire investor (who Toberoff's discovery responses in this case show never existed) matches exactly the $15 million offer Kevin Marks said that Toberoff and Emanuel made to the Siegels in 2002. Docket No. 427-3 at 333-34. While Kevin Marks, in a narrowly crafted declaration, denied that Toberoff invoked the "billionaire investor" with him, this November 2002 letter from Larson is stunning, contemporaneous proof that Toberoff invoked this fake investor with her and her family. Laura's recent denial that Toberoff invoked the "billionaire investor" with her, Docket No. 466, is directly belied by her own words in 2002, and casts her credibility, in general, in even greater doubt.

Despite the November 2002 letter, which Toberoff has had in his possession since 2006 (and Laura herself knows she wrote), defendants filed one brief after another in this case saying there was no proof—none—of DC's billionaire-investor claims. You said this in your SLAPP briefs. Ms. Brill said this to us. And Toberoff said on January 8, 2011: "There are no documents related to an offer by a "billionaire investor" to purchase the Siegels' Superman rights, because no such offer was ever conveyed.... DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent 'hit piece' is unworthy of DC and its counsel." Docket No. 162-12 at 589. The prejudice here is palpable—your SLAPP brief on file with the Ninth Circuit right now disputes DC's billionaire investor claim. Appeal No. 11-56934, Docket No. 8 at 53-54. And you have resisted any efforts to get evidence like the November 2002 letter before the Court. *Id.*, Docket Nos. 25, 26. Defendants' discovery misconduct has not only deprived the courts of key evidence, but it flouts Toberoff's and his counsels' duty of candor to the courts to make such arguments when you know such evidence was withheld. Indeed, Toberoff was well aware of this document well before the district court denied defendants' SLAPP motion, and well before defendants' filed their SLAPP appeal. Even under his false submission, Docket Ni. 466, he received the electronic archive from Bulson *last year*—and *before* Judge Wright ruled on the SLAPP motion, and before you and he filed your SLAPP briefs in the Ninth Circuit.

c. Again, Ms. Brill's and Toberoff's efforts to argue how the document should be interpreted—and to (preview the false testimony Laura will proffer (were Toberoff not refusing to allow her to be deposed again)—do nothing to justify defendants' discovery misconduct. Your claim now that Laura was using the term "billionaire investor" to "placate" Michael, who was "very confused," is not only implausible on its face, but should have been the subjects of Laura's depositions in *Siegel* and this case—which defendants prevented by not producing these documents, and now are seeking to prevent further by not allowing her to be examined about this document or her recent declaration.

*4. November 17, 2001, Email and the Renner Otto Bills.* Toberoff's production in late 2011 of the Bulson Privilege Log listed for the first time another critical document: a November

**EXHIBIT R**
**874**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 16

17, 2001, email from Toberoff to Michael. That email showed that Toberoff had contacted the Siegel family well before he claimed to have done so in SLAPP briefs you filed. Docket No. 145-1 at 23-24. Like the November 2, 2002, letter, Toberoff claimed the November 17, 2001, email had not previously been logged because it was not a part of Michael's hard copy file returned to Toberoff in 2006. Docket No. 412. DC showed in its motion before the District Court that this claim was false, Docket No. 455, and Judge Wright ordered defendants to produce the November 17 email. Docket No. 457.

Toberoff also forced us to incur needless costs to obtain Renner Otto's bills—which also show that he contacted Michael Siegel well before he claimed. A Renner Otto billing entry from November 17, 2001—which took us months of effort and yet another motion, Docket No. 394 at 10-13—confirm that Toberoff spoke to Bulson in November *2001*.



Docket No. 455-2 at 5. And as before, defendants' recent efforts to explain away these harmful documents miss the point. Such explanations are no excuse for failing to produce responsive evidence.

    *5. Other Defects In Toberoff's and Defendants' Privilege Logs.* DC has successfully shown, again and again, that defendants' privilege logs have been used to hide key, non-privileged documents by excluding important identifying information. And as the Ninth Circuit noted, Toberoff has also abused his position as a lawyer to assert privilege over business communications. *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124, 1129, 1127 n.4 (9th Cir. 2012).

Yet another stark example of Toberoff manipulating the contents of his privilege logs to hide key facts—and to harm DC—is his failure to list Ari Emanuel as a recipient of communications with the U.S. Attorney's Office. You claim that the failure to list Emanuel was inadvertent—and, in any event, inconsequential because these were "scheduling emails" that contain "absolutely nothing of any substance."

To begin, as Mr. Daum acknowledged during our meet-and-confer, this was not a one-time oversight or mistake. Both times Emanuel's name should have appeared—on two separate entries, Docket Nos. 163-17 at 1038 (Entry Nos. 3158, 3159); 427-11 at 1137-41—Toberoff omitted Emanuel's name. This is exactly the same pattern and practice of omitting damaging details that one sees when you look at Toberoff's log entries for the May and July 2003 letters discussed above (buried and never listed), the November 2002 letter and November 2001 email (never listed), and other documents.

**EXHIBIT R**
**875**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 17

As for the notion that Emanuel's inclusion in these discussions was unimportant, that is a farce. You represented to the Ninth Circuit that defendants and the USAO formed a common-interest agreement, documented by a letter you sent the USAO. Appeal No. 11-71844, Docket No. 1-1 at 9-11, 26-29. That letter never mentioned Emanuel, Docket No. 212 at 12-13, and had we obtained real privilege logs from defendants that showed that Toberoff had included Emanuel (not his or your client, and not part of your defense team) as part of the discussions with the USAO, we could have shown only how much more baseless defendants' common-interest claims were.

*6. Toberoff's Privilege Claims Made In Bad Faith.* In *Siegel*, DC sought to discover communications between Michael, Bulson, Toberoff, and Laura relating to Toberoff's efforts to secure Michael's rights for the mysterious "investor" he claimed to represent. Toberoff asserted a common interest privilege over all communications with Michael—whether they resided in the files of the Siegels, their agents, or with Bulson. DC challenged this broad assertion of privilege. The district court in Ohio conducted an *in camera* review of 15 communications and ordered defendants to produce all 15 after rejecting Toberoff's position that these documents were "clearly protected under the doctrine of the 'common interest'" and were "<u>classic</u> *privileged* subject matter." Docket No. 161-4 at 26, 27. The district court found:

> After reviewing all of the 15 documents, and the claimed joint interest privilege which has been asserted, the court finds that none of the 15 documents are subject to the attorney/client privilege based on the joint interest exception. First, the court finds that none of the 15 communications … are for the purpose of giving legal advice. Second, the court finds [that 13] communications … are not made in regard to the joint and common legal or defense strategy relative to ongoing or upcoming litigation. Finally, *the court finds that the interest of Michael Siegel, as reflected in the 13 communications, is separate and apart from those of Joanne and Laura Siegel.* These documents relate to the offers back and forth between Mike [*sic*] Toberoff, on behalf of an investor who wishes to purchase Michael Siegel's interest and Bulson on behalf of Michael Siegel. Docket No. 161-5 at 30-31 (emphasis added).

Toberoff had no basis to assert privilege over these 15 documents, much less to claim that they were "clearly" protected and "classic" privileged material. We urge you, read each of these documents and please tell us if you can truly claim that Toberoff's privilege claims are within bounds of reason. Each discusses a business deal over which attorney-client privilege does not remotely extend. For example, Bulson wrote to Toberoff in a June 18, 2003, letter: "I have discussed with Michael the offer you passed on from a potential investor who is interest in purchasing Michael's interest in the Superman copyright. The amount offered is not acceptable to Michael." Docket No. 161-8 at 57. Toberoff responded on August 6 stating he had a "high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegels' long-awaited June 18, 2003, counter-offer regarding buy-out." Toberoff went on to write that Michael's counter-offer was "well over twice (230%) of the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB

O'Melveny & Myers llp
August 7, 2012 - Page 18

offer, rejected by the Siege's [*sic*]." *Id.* at 61. Toberoff then walked through all the reasons why Michael should accept his unnamed investor's offer, and why Michael's claims to the contrary were without merit. *Id.* at 61-62.

Is it really your position that the objection to producing such documents was made in good faith? Or that the common-interest privilege claims Toberoff belatedly made over the November 2002 or July 2003 letters were made in good faith—and not intended to delay and deny DC discovery?[3] As we will discuss below, your present positions on these questions (*i.e.*, that Toberoff did nothing wrong) make your compromise offer (*i.e.*, let your firm, rather than a special master, make similar privilege calls in its sole discretion), an illusory one.

## II.   YOUR FIRM'S "COMPROMISE" PROPOSAL FALLS WELL SHORT.

Your compromise proposal includes three parts—each of which is somewhat hard to follow, and none of which meets or satisfies DC's concerns.

A. Part 1. Your July 20 letter begins:

> *First*, counsel from [KBK] will independently review each document created prior to October 8, 2004 (the date the *Siegel* litigation commenced) that *is listed* on the privilege logs submitted in this action. If, *in the independent judgment of KBK*, privilege does not apply to any logged document, that document will be produced promptly to DC. (Emphases added.)

There are three significant problems with this proposal.

*First*, it confines itself to documents "*listed* on the privilege logs submitted in this action." As shown above, none of the May 2003, July 2003, November 2002, or November 2001 correspondence was ever "listed" on logs. The May and July 2003 documents were hidden behind other entries. The November 2002 and November 2001 documents appeared nowhere—they were not even buried behind other entries—until after (a) we uncovered that the Renner Otto firm kept an electronic copy of the Michael Siegel documents; and (b) Renner Otto itself agreed to create new logs (at DC's expense) that listed each and every document in its possession. You have given us no express assurances that your review would include documents like the May and July 2003 letters (which were buried, but not "listed" on logs) and you have come up with no protocol to make sure documents like the November 2001 and November 2002 correspondence do not exist. Again, it is your duty as counsel in this case to make sure that your

---

[3] For example, Toberoff asserted the November 2 letter from Laura to Michael was protected by a common-interest privilege, Docket No. 412 at 7-11, chastised DC for engaging in "self-serving speculation" about its contents, and asserted that the letter concerned "legal and settlement strategies vis-à-vis DC/Warner that is squarely within the common interest privilege," *id.* at 10. Judge Zarefsky rejected those claims, and for good reason: the November 2 letter is yet again Laura trying to get Michael to do business with Toberoff—the very same non-privileged subject matter rejected by the Ohio court.

O'MELVENY & MYERS LLP
August 7, 2012 - Page 19

clients are fulfilling their discovery obligations. (Our previous letters on these issues make that plain.) We will not make trades that alleviate your firm of this duty—which is only heightened in this case, given the extensive misconduct in which your clients have engaged.

*Second*, the October 2004 cut-off you propose is unworkable. Toberoff has shown a propensity to bury privileged documents in time-periods other than those listed on the face of his logs, *supra*, and the October 2004 cut-off excludes several critical categories of documents— among them, communications involving David Michaels starting in 2006; with Michael before his death in 2006; regarding the 2008 Consent Agreement and related conflict disclosures and waivers; and regarding the USAO-related issues from 2010.

*Third*, with all respect, we cannot rely on KBK's "independent judgment" about what is privileged or not, given the positions you have taken so far in this case—and particularly in defending (often blindly, and based on no hard facts) Toberoff's conduct. *See supra* Part I.

   B. Part 2.  The next part of your proposal is:

*Second*, KBK will prepare amended privilege logs. If DC Comics agrees to provide subject-matter descriptions in the privilege logs it is to submit in this action, Defendants will also provide subject-matter descriptions on their privilege logs, even though the Court ruled that it need not do so. *See* Docket No. 209 at 13. Regardless of whether or not the subject matter descriptions are included, if any *logged entry* fails to list any recipient of a privileged document, the logs will be appropriately amended. (Emphasis added.)

There are four significant problems with this proposal.

*First*, you again focus on amending "logged entries"—not amending the logs to include any and all documents whether previously logged or not, and providing full and complete bibliographic information for each. This may be a drafting issue with your recent letter, but given the way defendants have improperly parsed words to deny DC documents in the past, we can permit no ambiguity.

*Second*, DC's discovery responses are not remotely an issue here—and as was revealed by your comments at our recent meeting, and by your letter, you are not even aware of the substance of DC's discovery responses. Each already provides a "subject matter" line-item entry; defendants provide *none*, and never have.

We understand from our meeting that Marc seeks further log entries from DC flagging any communications regarding the Toberoff Timeline. Defendants already possess Wayne Smith's declaration in *Siegel* setting forth the precise circumstances of DC's receipt and handling of the Timeline documents, and Judge Zarefsky's ruling finding that Mr. Smith acted appropriately and professionally. Case No. CV 04-8400, Docket Nos. 108; 177 at 19:3-7. Moreover, to put this issue to rest, there are no documents or communications that relate to the Timeline that predate June 28, 2006.

**EXHIBIT R**
**878**

O'Melveny & Myers llp
August 7, 2012 - Page 20

If defendants want to finalize the privilege logging stipulation that we completed only in part in 2010, we are happy to do so. To be clear, however, defendants cannot use that stipulation as a chit to avoid the full relief DC now seeks from defendants, in the form of a full document production, fully redone privilege logs, and special master both to police that process and to make recommendations about the appropriate sanctions to impose on defendants given the grave prejudice they have cause.

*Third*, defendants and their counsel are already under a legal obligation to amend their logs, and every day they fail to do so, the need for and propriety of the fullest sanctions becomes all the more appropriate. That the court in *Siegel*—without any close examination of the logs, the documents contained therein, or the many examples of discovery abuse exposed in this case—held that defendants' privilege logs were consistent with the Ninth Circuit default standards is irrelevant. As you know, the *Siegel* court issued its rulings before the Ninth Circuit called Toberoff out for failing to produce non-privileged business documents that he falsely claimed were privileged. *Pacific Pictures*, 679 F.3d at 1129, 1127 n.4. Moreover, the Rutter section on which defendants and the *Siegel* court relied says that more details are needed, including that "[a]ny attachment to an allegedly privileged document should be listed separately from the document to which it is attached." W. Schwarzer, et al., Rutter Group Practice Guide: Fed. Civ. Proc. Before Trial § 11:1921 (2012) ("*Rutter*"). Finally, the record plainly shows that Toberoff has violated this rule (and other rules) time and again—the May and July 2003 letters, and July 5, 2003, draft letters are all examples of this, as are the Emanuel log entries.

*Fourth*, "if any logged entry fails to list any recipient of a privileged document, the logs will be *appropriately amended*." It is unclear what you mean by "appropriately amended." And Toberoff's misconduct in preparing defendants' privilege logs is, as you know, not limited to his failure to list all recipients. He has also failed to log certain documents *at all*, and has improperly grouped multiple documents together and listed them as one. At a bare minimum, any log would need to comport with the Rutter Guide format set forth at, *e.g.*, *Rutter* §§ 11:1914-21 (*e.g.*, "Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds."; "Any attachment to an allegedly privileged document should be listed separately from the document to which it is attached.").

C. Part 3.  You lastly say:

*Third*, KBK will conduct a reasonable, independent search concerning documents in the second "bucket": that is, documents identified by DC that are referred to in other communications but which have not been located and produced, such as the October 2, 2002 letter, and KBK will confirm to DC the records searched and the results of this search. If any such documents are found following this search, they will promptly be produced or, if privileged, appropriately logged. To date, the October 2, 2002 letter is the only such document identified by DC. However, if there are other such documents sought by DC, please let us know at once, and we will look for them as well.

There are a number of problems with this proposal as well.

**EXHIBIT R**
**879**

O'Melveny & Myers llp
August 7, 2012 - Page 21

*First*, it ignores the "third bucket" of documents that we discussed at our meeting, as does the thrust of your letter. This third bucket is defendants' Superman-related files in general. It is comprised of documents over which defendants or their agents have possession, custody, or control, and have not produced or logged, no matter the reason—be it claims the documents are not responsive to DC's requests in this case and/or in *Siegel*, Toberoff wanted to suppress them, etc. Your firm has never conducted a review of these materials, yet, as you know, Toberoff has withheld documents in the past on a number of improper grounds. This includes the Don Bulson-related materials. It also includes his withholding clearly relevant documents as non-responsive, based on intentionally narrow interpretations of DC's requests. One example of this—and one that caused us to have to re-open the deposition of a witness—was Jean Peavy's will. Docket Nos. 360, 377.

While you say that KBK will conduct a search for further responsive documents, you qualify this by saying it will do *only if* KBK finds in its review "information suggesting that any other responsive documents exist." Both your firm's normal legal obligations that apply in any case, as well as all of the misconduct that has occurred here, is more than enough to "suggest[]" that any other responsive documents exist." KBK must review all documents in defendants' possession, custody, and control in conducting this review, to ensure documents are not omitted—including files held by Toberoff, his entertainment companies, and the documents Toberoff has obtained from third parties. This includes, among other sources, the boxes of documents Laura found after Joanne's death and gave to Toberoff; the file cabinet or safe where Mark Peary keeps "important documents, including the 2008 Consent Agreement"; and the "boxes of divorce, copyright and financial paperwork" referenced in Laura's November 2 letter. This must be a comprehensive review and cannot in any way rely on Toberoff's representations regarding his purported prior searches for documents.

*Second*, there are a number of documents that your firm can and should be looking for and producing. This includes the:

- October 2, 2002, Michael letter to Laura: The November 2, 2002, letter disclosed yet another document defendants had never produced or log in this case or in *Siegel*—an October 2, 2002, letter from Michael to Laura. Toberoff claims defendants do not possess the October 2 letter, but similar claims have consistently proven to be false. KBK must conduct an independent search for this document and cannot rely on Toberoff's representations. As you start your search, we note from Don Bulson's billing entries (only recently produced) that on September 4, 2002, Bulson was working on a "draft letter." See below:

**EXHIBIT R**
**880**

O'Melveny & Myers LLP
August 7, 2012 - Page 22



Toberoff redacted the subject matter of the letter on which Bulson was working and all work that Bulson did that followed on September 20, 2002. This very well could be a draft of the October 2, 2002, letter, and if Bulson helped work on it, it very well exists in his files—either in draft or final form. We assume defendants have no objection to the Renner Otto firm searching for and producing this October 2002 letter if they can find it, or even drafts if the final does not exist. Please let us know immediately. We also note that the Bulson privilege log finally produced in 2011 mentions communications between Michael and Bulson during this September-October 2002 time period, including two communications on October 1.

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 636 | 9/2/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 637 | 9/2/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 638 | 9/3/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 641 | 9/4/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 642 | 9/19/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 643 | 9/19/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 645 | 9/22/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 646 | 9/23/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 647 | 9/23/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 649 | 9/24/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 650 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 651 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 653 | 9/28/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 654 | 9/28/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 655 | 10/1/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 656 | 10/1/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |

So, too, do later billing entries, which mention Bulson reviewing a "Letter from Laura" on September 29, 2002, and doing fully redacted work on October 1, 2002, the day before the October 2 letter was sent. Bulson also had a long meeting with Michael on October 5.

O'MELVENY & MYERS LLP
August 7, 2012 - Page 23



| Date D | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 9/24/2002 | DWB | 290.00 | 0.40 | 116.00 | Billable |
| 59757 | Service | | | | |
| | Email to Marks re status, review email from Mike Siegel | | | | |
| 9/26/2002 | DWB | 290.00 | 1.10 | 319.00 | Billable |
| 59800 | Service | | | | |
| | Tel. conf. with Kevin Marks, tel. conf. with Mike Siegel | | | | |
| 9/27/2002 | DWB | 290.00 | 1.30 | 377.00 | Billable |
| 59808 | Service | | | | |
| | Review letters from Joanne Siegel, tel. conf. with Mike Siegel | | | | |
| 9/29/2002 | DWB | 290.00 | 0.35 | 101.50 | Billable |
| 59831 | Service | | | | |
| | Review letter from Laura Siegel | | | | |
| Total September 2002 | | | 6.05 | | $1,754.50 |
| Date October 2002 | | | | | |
| 10/1/2002 | | | | | |
| 62797 | | | | | |
| 10/5/2002 | DWB | 290.00 | 2.25 | 652.50 | Billable |
| 62831 | Service | | | | |
| | Meeting with Mike Siegel | | | | |

- <u>2008 Consent Agreement and Drafts</u>:  KBK can and must review the 2008 consent agreement and any drafts.  The only basis for defendants not producing the 2008 consent agreement was Toberoff's self-serving and unsubstantiated claim to Judge Larson that the entire document was privileged (which must be contrasted with Toberoff's recent claims that he was not a party to the agreement at all).  Judge Larson accepted this representation at face value, neither he nor Judge Zarefsky ever review the document in camera, and Judge Zarefsky held he was bound by Judge Larson's ruling absent new facts.  Those new facts have emerged.  Larson and Peary have openly discussed certain contents of the consent agreement in depositions since Judge Zarefsky's ruling, and their testimony confirms that the consent agreement—at least in part—documents business agreements about when and how the Siegel and Shuster family can deal with DC.  Docket Nos. 163-11 at 722:2-10; 160 at 25-26, 50-52; 147-1 at 2.  Since Judge Zarefsky's ruling, Toberoff's claims of privilege have also proven to be highly unreliable at best, *supra* Part I, and the Ninth Circuit specifically recognized that he was suppressing non-privileged business documents claiming they were privileged, *Pacific Pictures*, 679 F.3d at 1129.  The emergence of documents like the May and July 2003 letters, and November 2002 letter all confirm this is the case—as do the Ohio court's rulings.

    KBK must review the consent agreement and either produce the document (redacted if necessary) or represent to DC or a special master that in its view as well the document is privileged in its entirety—meaning, that no part of the 2008 consent agreement contains business terms or agreements between the Siegels, Shusters, and/or Toberoff or his entertainment companies.

**EXHIBIT R**
**882**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 24

- <u>Documents identified in Timeline that Have Never Been Produced or Logged</u>: DC requested in December 2010 that defendants produce two additional documents identified in the Timeline: (1) a December 16, 2002, letter from Marc and Mr. Emanuel to Joanne and Laura; and (2) a September-October 2003 letter with Mr. Emanuel. Docket No. 162-9 at 577 n.1. Marc claimed defendants were unable to identify a document that "matched" either of these descriptions. Docket No. 162-10 at 581-82. It has been shown over and over that the Timeline accurately describes documents. While Toberoff has played games about what documents "match" or not, we need a reasonable and diligent search for all documents described in the Timeline. This means looking both at the date of the documents, as well as their contents to see if they fairly match.

- <u>Conflict Disclosures, Waivers, and Similar Documents Addressing the Conflict of interest between Toberoff and the Siegel and/or Shuster heirs</u>: Defendants have represented that Toberoff disclosed potential and actual conflicts of interest to the Siegels and the Shusters at various times in their relationships and the heirs executed conflict waivers. This includes at the time of entering into the Pacific Pictures agreements, the IP Worldwide agreements, and the 2008 consent agreement. Defendants have never produced these documents and refuse to identify where they are listed (if at all) on their logs. This is a whole category of documents that needs carefully to be reviewed to ensure Toberoff is not hiding business communications among them. And as you know, the terms of retention are not privileged and must be produced—even if documents need to be redacted to do that.

- <u>Drafts of the Pacific Pictures Agreements with the Shusters (2001 & 2003)</u>: No drafts have ever been produced to DC nor has Toberoff identified where such drafts appear on defendants' privilege logs, if at all.

- <u>Drafts of the IP Worldwide agreements with the Siegels</u>: No drafts have ever been produced to DC nor has Toberoff identified where such drafts appear on defendants' privilege logs, if at all.

- <u>Siegel Retainer Agreement</u>: Defendants produced to DC a heavily redacted copy of the Siegels' October 2004 retainer agreement with Marc (LSL00213-20). Toberoff claims the redactions relate to the provision of legal advice. Yet, Laura testified at her deposition that the initial retainer agreement was amended shortly after it was executed to reflect that Mr. Emanuel's role had come to an end with the filing of the *Siegel* litigation. Docket No. 305-24 at 807:16-814:7. There is no basis to redact this purely business-related information.

  In addition, the Siegel agreement is similar to the boilerplate form in *Rutter*. *See* PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY FORM 5:C (2010). Assuming that the redacted portions generally correspondence to the boilerplate *Rutter* form, the redactions would appear to be

**EXHIBIT R**
**883**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 25

overbroad. To the extent the redacted material includes provisions between the Siegels and Shusters, as well as their counsel, setting forth arrangements or agreements regarding settlement, such material should not have been redacted—such contractual arrangements are not privileged and are directly relevant to DC's claims in this case. *See* Docket No. 160 at 11:27-12:18; *Calvert v. Stoner*, 33 Cal.2d 97, 103 (1948) (agreement preventing settlement without attorney consent void); *Nehad v. Mukasey*, 535 F.3d 962, 970 (9th Cir. 2008) ("Only the client … may decide whether to make or accept an offer of settlement.").

It is incumbent upon KBK to review the Siegel agreement and verify the propriety of Toberoff's privilege claims. If the redacted contents do not reflect legal "advice given," but rather contractual arrangements, limitations on settlement, or other non-privileged material, such material must be produced to DC.

- <u>Shuster Retainer Agreement</u>: Defendants similarly produced a heavily redacted copy of the Shusters' 2004 retainer agreement with Marc (dated "As of November 23, 2001) (MWP00054-57). For the same reasons, it is incumbent upon KBK to review the Shuster agreement and verify the propriety of Toberoff's privilege claims.

- <u>Communications with David Michaels</u>: Toberoff identified for the first time in interrogatory responses and privilege logs provided to DC in January 2011, that Mr. Michaels communicated with the Siegels in late 2005 in an attempt to "steal" them as clients from Toberoff. Toberoff refused to produce the documents, claiming the communications were privileged despite that Mr. Michaels was no longer employed by Toberoff & Associates when the communications were sent and defendants accused Mr. Michaels of "disparaging" Marc in his communications. Toberoff represented that the communications were made in connection with Mr. Michaels' potential representation of the Siegels, and discussed their case. Judge Zarefsky denied DC's motion to compel the Michaels-Siegel communications based on Toberoff's representations concerning the privileged nature of the documents. Docket No. 262 at 4. As we have seen, Toberoff's representations cannot be trusted and you and/or the special master should review them, like the documents above and below.

- <u>May 13, 2003, letter</u>: When Toberoff produced the May 13 letter to DC, he redacted unidentified portions of it without explaining what had been redacted or why. The Court's order did not invite defendants to redact the May 13 letter and defendants waived any privilege that might otherwise have existed by not listing the document (in whole or as redacted) on a privilege log. *E.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149-50 (9th Cir. 2005); *Vieste, LLC v. Hill Redwood Dev.*, 2010 WL 4807058, at *9 (N.D. Cal. Nov. 18, 2010).

When DC asked Toberoff to clarify the scope and basis for defendants' redactions, he would say only that the redacted material consisted or marginalia and underlining by

**EXHIBIT R**
**884**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 26

an unnamed attorney. This does not meet defendants' burden of proving the elements of a privilege claim, given, as they claim , they do not know who made the redacted notations, or when, or why. *See U.S. v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) ("The party asserting the privilege bears the burden of proving each essential element."); *Martin*, 278 F.3d at 999-1000 (laying out elements); *Williams v. Adams*, 2009 WL 1220311, at *7 (E.D. Cal. May 4, 2009).

KBK must review the unredacted copy of the May 13 letter and verify the redactions made by Marc are appropriate.

- <u>Agreements with Mr. Emanuel</u>:  Defendants keep stating that Mr. Emanuel has no continuing financial interest in any recovery by the Siegel and/or Shuster heirs pursuant to their Superman and/or Superboy termination notices. What defendants refuse to answer is whether Mr. Emanuel retains an interest in monies received by Toberoff or his entertainment companies from this case, representation of the Siegel and/or Shuster heirs, or any contingent interest Toberoff has in Superman and/or Superboy rights.

  Defendants' recent disclosure that Mr. Emanuel was involved in the grand jury investigation of the Timeline author suggests he continues to retain an interest in Superman and/or this litigation. DC is entitled to discover what that financial interest is and the business arrangement between Mr. Emanuel and Toberoff.

  *          *          *

Given the severity of defendants' discovery misconduct—and your refusal to directly acknowledge or remedy it—DC will have to ask the Court for significant relief. This includes appointing a special master to make sure all responsive documents are produced without delay, defendants' privilege logs are full and complete, legitimate privilege claims can be fully and fairly ventilated, and that the Court can remedy the significant prejudice defendants have caused.

Your claim that the Court has rejected DC's call for a special master is erroneous—DC has never moved to appoint a special master, and in any event, defendants' discovery misconduct plainly satisfies the "exceptional circumstances" required to appoint one. FED. R. CIV. P. 53(a).

As we have noted, and you have yet to agree to, the Renner Otto firm should also be asked to prepare a complete log of the electronic archive of Michael Siegel's file that lists all bibliographic information for each document in the file. DC has agreed to pay the reasonable costs for this work, and we can only hope you agree Renner Otto can proceed, since you made no objection in your July 20 letter.

Finally, if your firm makes a significant move in its position shortly, we will consider not filing the motion. Your July 20 letter and proposal is unacceptable, however, mainly because of its first premise—that no material, intentional, or prejudicial misconduct has occurred here. That position is neither sustainable under the facts of this case, nor the relevant case law.

**EXHIBIT R**
**885**

O'Melveny & Myers LLP
August 7, 2012 - Page 27

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:     Daniel M. Petrocelli, Esq.
        Marc Toberoff, Esq.
        Defense Counsel

OMM_US:70812504.1

**EXHIBIT R**
**886**