1 | KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
2 |   *rkendall@kbkfirm.com*
Laura W. Brill (195889)
3 |   *lbrill@kbkfirm.com*
Nicholas F. Daum (236155)
4 |   *ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
5 | Los Angeles, California 90067
Telephone: 310.556.2700
6 | Facsimile: 310.556.2705

7 | Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP Worldwide,
8 | LLC, and IPW, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>                     Plaintiff,<br><br>          vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL,<br>and DOES 1-10, inclusive,<br><br>                     Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' OPPOSITION TO DC'S MOTION FOR AN EVIDENTIARY HEARING AND FOR SANCTIONS**<br><br>*Declarations of Marc Toberoff, Laura Siegel Larson, and Keith G. Adams filed concurrently herewith*<br><br>Complaint filed: May 14, 2010<br>Discovery Cutoff: None Set<br>Trial Date: None Set<br><br>Date: December 10, 2012<br>Time: 1:30 p.m.<br>Place: Courtroom 11 |

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (State Bar No. 188547)
 *mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
 *kgadams@ipwla.com*
Pablo D. Arredondo (State Bar No. 241142)
 *parredondo@ipwla.com*
David Harris (State Bar No. 255557)
 *dharris@ipwla.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

DEFENDANTS' OPPOSITION TO MOTION FOR SANCTIONS

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

I.     JURISDICTION .............................................................................................. 3

    A.     This Court Lacks Jurisdiction Over DC's Motion ................................. 3

    B.     DC Should Have Brought Its Motion Before Magistrate Zarefsky ................................................................................................. 4

II.    THE DISCOVER MATTERS AT ISSUE ....................................................... 4

    A.     The May-July 2003 Documents ........................................................... 4

        1.     The Documents ........................................................................... 4

        2.     The Logging And Production Of The Documents ...................... 7

            (a)     The *Siegel* Litigation ...................................................... 7

            (b)     The *DC Comics* Litigation............................................. 9

        3.     There Was No "Conspiracy" Concerning The Documents, And No Prejudice To DC ......................................................... 11

        4.     Defendants Did Not Mislead About Drafts Of The Letters ...................................................................................... 13

    B.     The "Renner-Otto" Documents .......................................................... 14

        1.     DC's Claims Concerning The Renner-Otto Documents Are Based On Blatant Misrepresentations Of The Facts ............. 14

        2.     DC Suffered No Prejudice From The Production Of The Renner Otto Documents ......................................................... 16

    C.     DC's Lack Of Prejudice Contrasts Sharply With Defendants' Prejudice From DC's Discovery Misconduct ................................... 16

    D.     DC Mischaracterizes The Order It Accuses Defendants Of Violating .............................................................................................. 18

III.   THE SANCTIONS DC SEEKS ARE LEGALLY UNWARRANTED ........................................................................................ 19

    A.     The Standard For Terminating Sanctions Is Extremely High ............. 19

    B.     Terminating Sanctions Are Completely Unjustified Here ................... 21

    C.     There Is No Justification For Appointing A Special Master ............... 22

    D.     Broad Privilege Waivers Are Not Justified Here ................................ 24

        E.      There Is No Basis For An Evidentiary ......................................................25

V.      CONCLUSION ..............................................................................................25

TABLES OF CONTENTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*400 Walnut Assocs., L.P. v. 4th Walnut Assocs., L.P.*,
  475 B.R. 217 (Bankr. E.D. Pa. 2012) .......................................................... 24

*Adriana Int'l Corp. v. Thoeren*,
  913 F.2d 1406 (9th Cir. 1990) ............................................................... 20-21

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
  69 F.3d 337 (9th Cir. 1995) ................................................................... 21-22

*Bankatlantic v. Blyth Eastman Paine Webber, Inc.*,
  127 F.R.D. 224 (S.D. Fla. 1989) ................................................................. 24

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ..................................................................... 3

*Brandt v. Vulcan, Inc.*,
  30 F.3d 752, 757 (7th Cir. 1994) ............................................................... 22

*Brookhaven Typesetting Servs. v. Adobe Sys.*,
  332 Fed. Appx. 387 (9th Cir. 2009) ........................................................... 20

*Burlington N. & Santa Fe Ry. Co. v. Dist. Court*,
  408 F.3d 1142 (9th Cir. 2005) ..................................................................... 7

*Burlington N. R. Co. v. Dep't of Revenue of State of Wash.*,
  934 F.2d 1064 (9th Cir. 1991) ............................................................... 22-23

*C.T. v. Liberal Sch. Dist.*,
  2008 WL 217203 (D. Kan. Jan. 25, 2008) ................................................. 24

*Chih-Cheng Tsao v. County of Los Angeles*,
  2011 U.S. Dist. LEXIS 43837 (C.D. Cal. Mar. 30, 2011)........................... 25

*Chuman v. Wright*,
  960 F.2d 104 (9th Cir. 1992) ....................................................................... 3

*Computer Task Group, Inc. v. Brotby*,
  364 F.3d 1112 (9th Cir. 2004) ................................................................... 22

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  482 F.3d 1091 (9th Cir. 2007) ............................................................... 19-21

*E. & J. Gallo Winery v. Gibson, Dunn & Crutchery LLP*,
  432 Fed. Appx. 657 (9th Cir. 2011) ........................................................... 21

*E.E.O.C. v. Safeway Store, Inc.*,

2002 WL 31947153  (N.D. Cal. Sept. 16, 2002) ................................... 24

*Fair Housing of Marin v. Combs,*
285 F.3d 899 (9th Cir.2002) ................................................................. 20

*Fjelstad v. American Honda Motor Co., Inc.,*
762 F.2d 1334 (9th Cir. 1985) ............................................................. 20

*Franklin v. Krueger Int'l, Inc.,*
1997 WL 691424 (S.D.N.Y.  Nov. 5, 1997)......................................... 22

*Get-A-Grip, II, Inc. v. Hornell Brewing Co.,*
2000 WL 1201385 (E.D. Pa. Aug 8, 2000) ......................................... 24

*G-K Properties v. Redevelopment Agency of San Jose,*
577 F.2d 645 (9th Cir. 1978) ............................................................... 22

*Goins v. Hitchcock I.S.D.,*
191 F. Supp. 2d 860 (S.D. Tex. 2002) ................................................. 23

*Griffith v. Davis,*
161 F.R.D. 687 (C.D. Cal. 1995) ......................................................... 11

*Griggs v. Provident Consumer Discount Co.,*
459 U.S. 56 (1982).................................................................................. 3

*Hester v. Vision Airlines, Inc.,*
687 F.3d 1162 (9th Cir. 2012) .......................................................21-22

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
115 F.R.D. 308 (N.D. Cal. 1987) ......................................................... 11

*Hiern v. Sarpy,*
161 F.R.D. 332 (E.D. La. 1995) ........................................................... 23

*Hook v. Arizona,*
120 F.3d 921 (9th Cir. 1997) ............................................................... 22

*Hunydee v. U.S.,*
355 F.2d 183 (9th Cir. 1965) ............................................................... 11

*In re Law,*
309 F. Appx. 95 (9th Cir. 2009) .......................................................... 20

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,*
460 F.3d 1217 (9th Cir. 2006) ............................................................. 22

*Janssen v. Benihana, Inc.,*
2012 U.S. Dist. LEXIS 10557 (C.D. Cal. January 30, 2012)............... 25

*La Buy v. Howes Leather Co.,*
352 U.S. 249, 256 (1957).................................................................... 23

*Leon v. IDX Sys. Corp.*,
  464 F.3d 951 (9th Cir. 2006) ................................................................. 20

*Nassirpour v. F.D.I.C.*,
  2008 U.S. Dist. LEXIS 105940 (C.D. Cal. December 29, 2008) ............................ 25

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
  115 F.R.D. 543 (N.D. Cal. 1987) ............................................................ 24

*North Am. Watch Corp. v. Princess Ermine Jewels*,
  786 F.2d 1447 (9th Cir. 1986) ............................................................. 21

*Patroski v. Ridge*,
  2011 WL 5593738 (W.D. Pa. Nov. 17, 2011) ................................................. 23

*Ritacca v. Abbott Labs.*,
  203 F.R.D. 332 (N.D. Ill. 2001) ........................................................... 24

*Sanchez v. Johnson*,
  2001 WL 1870308 (N.D. Cal. Nov. 19, 2001) ............................................... 25

*Siegel v. Warner Bros. Entertainment, Inc.*,
  542 F. Supp. 2d 1098 (C.D. Cal. 2008) .................................................... 13

*Smith v. Ford Motor Co.*,
  31 Fed. R. Serv. 2d 1297 (N.D. Ga. 1981) ................................................. 24

*Stewart v. Donges*,
  915 F.2d 572 (10th Cir. 1990) .............................................................. 3

*United States use of Wiltec Guam, Inc. v. Kahaluu Constr. Co.*,
  857 F.2d 600 (9th Cir. 1988) ........................................................... 19-21

*United States v. Gonzalez*,
  669 F.3d 974 (9th Cir. 2012) ............................................................ 7, 11

*United States v. National Medical Enterprises, Inc.*,
  792 F.2d 906, 912 (9th Cir. 1986) ........................................................ 20

*Valley Engineers Inc. v. Elec. Eng'g Co.*,
  158 F.3d 1051 (9th Cir. 1998) .......................................................... 20-21

*Wachtel v. Health Net, Inc.*,
  239 F.R.D. 81 (D.N.J. 2006) ............................................................... 24

*Williams v. Brooks*,
  996 F.2d 728 (5th Cir. 1993) ............................................................. 3-4

*Wyle v. R.J. Reynolds Industries Inc.*,
  709 F.2d 585 (9th Cir. 1983) .......................................................... 20, 25

1

*Yeseta v. Baima,*
 837 F.2d 380 (9th Cir. 1988) ............................................................ 23-245

**<u>Statutes</u>**

17 U.S.C. § 304(c)(2).......................................................................... 4

17 U.S.C. § 304(c)(6)(C) .................................................................... 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLES OF CONTENTS AND AUTHORITIES

# INTRODUCTION

Plaintiff DC Comics' ("DC") motion for an evidentiary hearing and sanctions (Dkt. 500; "Mot.") sows confusion over the discovery record to win terminating sanctions on its meritless Fifth Claim. As we demonstrate below, DC's intemperate claim of a conspiracy to secrete evidence is absolutely false. Furthermore, DC has not been prejudiced by the timing of the production. The documents at issue have long been in DC's possession, and support Defendants' case.

As a preliminary matter, the merits of DC's Fifth Claim are currently before the Ninth Circuit, and this Court therefore lacks jurisdiction to issue evidentiary, issue or terminating sanctions on the Fifth Claim – the main thrust of DC's motion.

Nor is there justification for the draconian sanctions DC seeks. DC's trumped-up allegations boil down to: (a) the alleged mis-logging of four documents (of thousands), where DC has been perfectly aware of the documents and how they were logged since 2007; and (b) DC's misrepresentation that Michael Siegel's lawyers sent documents to Mr. Toberoff in 2006, when in fact the documents were not sent until 2011, at which point they were promptly logged or produced.

This record cannot possibly support terminating or evidentiary sanctions, which require repeated, flagrant violations of court orders and significant substantive prejudice to the moving party. In eight years of litigation, no Defendant has ever been sanctioned or even reprimanded in this litigation or the related case, *Siegel v. Warner Bros. Entertainment Inc.* ("*Siegel*"), Case No. 04-CV-08400. In addition, DC has failed to identify even a single finding that any Defendant has violated a court order, much less engaged in willful, repeated violations. Nor has DC suffered any actual prejudice with respect to the Fifth Claim because DC has long had the documents in question (*e.g.*, for a year) and has been free to take discovery on them. DC cites no case where terminating sanctions were imposed in a situation like this.

Terminating or evidentiary sanctions are also inappropriate because DC's Fifth Claim is demonstrably without merit. DC alleges that Mr. Toberoff caused Laura

1

Siegel Larson and her mother, Joanne Siegel (the "Siegels"), to reject DC's
settlement proposals as to the termination rights by purportedly making a fraudulent
offer in August 2002 that a "secret" billionaire wished to buy their Superman rights
for $15 million.  Dkt. 49 at ¶¶180-186.  These allegations are false, and are disproven
by all the record evidence, including, critically, the documents that DC claims in this
motion were improperly withheld by Defendants.  For the avoidance of doubt,
Defendants have submitted in connection with this motion a declaration from Laura
Siegel Larson, the only party with personal knowledge of the facts, which confirms
that (a) there was no fraudulent offer made by Mr. Toberoff or any associate of Mr.
Toberoff concerning a "secret" billionaire; (b) Laura and Joanne Siegel decided to
end their negotiations with DC and terminate their former counsel completely
independently of Mr. Toberoff; and (c) that neither Mr. Toberoff nor any associate of
Mr. Toberoff caused Laura and Joanne Siegel to reject DC's settlement offer.  *See*
Declaration of Laura Siegel Larson ("LD"), ¶¶2-4, Exs. A-C.

DC's other demands fare no better.  There is no justification for the imposition
of a special master, which requires extraordinary circumstances not present here.
This is especially true because DC, intent on bringing its trumped-up motion, flatly
rejected reasonable compromise proposals that amply addressed DC's supposed
concerns.  PD Exs. 4-5, 8-10.  Nor is there any justification for a blanket waiver of
privilege over every communication between Ms. Larson and her counsel, the
overwhelming majority of which are not even in dispute.

As DC has suffered no prejudice as to documents long ago produced, it would
be clear error for the Court, which lacks jurisdiction as to DC's Fifth Claim, to grant
DC's motion to establish, as a sanction, a frivolous tort claim DC cannot prove on the
merits, based upon DC's mischaracterizations of ordinary discovery disputes that
have long been resolved.  DC's motion must be denied.

///

///

# I.    JURISDICTION

## A.    This Court Lacks Jurisdiction Over DC's Motion

This Court lacks jurisdiction to entertain DC's motion which seeks dispositive terminating and issue sanctions on DC's Fifth Claim.  Mot. 22, 24.  DC admitted as "undisputed" that "DC's Fourth, Fifth and Sixth Claim are before the Ninth Circuit as part of the anti-SLAPP appeal."  Dkt. 494-1 at 51 ¶73; *see* Dkt. 364 at 15 (DC not seeking trial date on state claims "[i]n light of the appeal.").

It is fundamental that "a federal district court and a court of appeal should not attempt to assert jurisdiction over a case simultaneously."  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  "The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and ***divests the district court of its control*** over those aspects of the case involved in the appeal."  *Id* (emphasis added).  This loss of jurisdiction "is especially significant when the appeal is an interlocutory one on *an immunity issue*."  *Williams v. Brooks*, 996 F.2d 728, 730 (5th Cir. 1993) (quotations omitted).

Defendants' appeal (9th Cir. Case No. 11-56934) of the denial of their anti-SLAPP motion (Dkt. 337) seeks a determination of whether they have "substantive immunity from suit" on DC's Fourth, Fifth and Sixth Claims.  *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).  The Circuit Courts have "uniformly held that the filing of a non-frivolous notice of interlocutory appeal following a district court's denial of a defendant's immunity defense divests the district court of jurisdiction to proceed against that defendant."  *Williams*, 996 F.2d at 729-30.  An appeal from a denial of immunity "divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant."  *Stewart v. Donges*, 915 F.2d 572, 576 (10th Cir. 1990); *see Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992) (approving *Stewart*; appeal "divests the district court of jurisdiction to proceed").

*Williams* is particularly on-point.  While an immunity appeal was pending, the district court "dismissed the case with prejudice on the ground that the parties had

1  failed to file a joint pre-trial order in a timely fashion," and the Circuit reversed, as

2  the "filing of the interlocutory appeal on the immunity issue divested the district

3  court of jurisdiction."  996 F.2d at 729.  Just as the district court in *Williams* could

4  not dismiss the case, even on an issue separate from the merits, this Court lacks

5  jurisdiction to dispose of DC's state-law claims, even in the form of sanctions.  The

6  disposition of the Fifth Claim sought by DC here will directly conflict with the Ninth

7  Circuit if that court finds DC's Fifth Claim subject to anti-SLAPP law and meritless.

8  ## B.   DC Should Have Brought Its Motion Before Magistrate Zarefsky

9  While the district court lacks jurisdiction over DC's motion, it is also clear that

10  such motion should have been brought before Magistrate Judge Zarefsky under this

11  Court's order referring "[a]ll discovery matters … to a United States Magistrate

12  Judge" (Dkt. 18 at 3), rather than burden this court with thousands of pages of

13  exhibits and briefing on matters which Magistrate Judge Zarefsky is already

14  intimately familiar with.  Magistrates routinely address sanctions motions.[1]  In over

15  eight years of litigation, Magistrate Zarefsky has presided over dozens of motions in

16  *Siegel* and this case, many on the precise issues re-litigated by DC in this motion.[2]

17  ## II.   THE DISCOVERY MATTERS AT ISSUE

18  ### A.   The May-July 2003 Documents

19  #### 1.   The Documents

20  Michael Siegel and Laura Siegel Larson, the children (by different marriages)

21  of Jerome Siegel, are half-siblings.  Under 17 U.S.C. § 304(c)(2), they both had a

22  25% share in Jerome Siegel's termination rights, while Joanne (his widow) had a

23  50% share.  Because only Joanne and Laura served/filed statutory notices of

24  termination, Michael had only a passive minority interest in the terminations.  17

---

[1] *See Humphreys v. Regents of the Univ. of Cal.*, 2006 WL 1409336, at *3 (N.D. Cal. May 23, 2006) (referring sanctions disputes to Magistrate); *Grider v. Keystone Health Plan Cent., Inc.*, 2004 WL 902367, at *9 (E.D. Pa. Apr. 27, 2004) ("Because this issue revolves around the conduct of counsel during discovery, we refer the matter to [a magistrate]….").

[2] *Siegel*, Dkt. 53, 60, 69, 77, 104, 107, 110, 127, 240 (motions), 57, 58, 67, 87, 91, 158, 159, 178, 245 (orders); Dkt. 44, 159, 205, 206, 253, 267, 283, 296-298, 315, 355, 360, 361, 362, 394, 396 (motions); 74, 209, 239, 262, 285, 287, 309, 323, 365, 377, 378, 439, 451 (orders).

1   U.S.C. § 304(c)(6)(C).  Thus Laura and Joanne, not Michael, negotiated with DC.

2          In November 2001, Mr. Toberoff sent an email to Michael about potential

3   legal representation, but that went nowhere, and Michael did not mention Toberoff to

4   Laura or Joanne until late 2002.  PD Ex. 25-26.  After receiving DC's objectionable

5   February 2002 draft agreement, Laura and Joanne grew dissatisfied with their

6   attorney, Kevin Marks, and in March 2002 began looking for replacement counsel.

7   PD Ex 26 at 355; 305-24, Ex. 24 at 860:4-24; LD Ex. B.  On May 9, 2002, Joanne

8   sent a letter to Time-Warner's CEO, Richard Parsons, rejecting DC's February 2002

9   draft, objecting to DC's hardball tactics and stating "after four years we have no deal

10  and this [draft] contract makes an agreement impossible."  LD Ex. C.  Laura and

11  Joanne formally confirmed negotiations with DC had ended on September 21, 2002,

12  and subsequently hired Mr. Toberoff to represent them.  Dkt. 305-23, Ex. 23 at 717;

13  Dkt. 305-25, Ex. 25 at 1061-62; 305-56, Ex. 56 at 2074-77.

14         Michael, who was not active in the DC negotiations, grew increasingly anxious

15  over delays, and the lack of money from the termination interest.  PD Ex. 28.  In

16  January 2003, Ari Emanuel, with the Siegels' consent, made a separate offer,

17  conveyed by Mr. Toberoff, to purchase Michael's share of the interest to consolidate

18  the Siegels' position against DC.  Declaration of Marc Toberoff ("TD"), ¶2; Dkt.

19  305-24, Ex. 24 at 990:1-12; 161-8, Ex. H at 57-81.  Michael, who countered the

20  initial offer in June 2003 (Dkt. 161-8, Ex. H at 57), first sent a May 13, 2003 letter to

21  Laura filled with doubts and speculation, including about Mr. Toberoff, based on his

22  frustrations over the amount offered him.  PD Ex 28.[3]  On July 11, 2003, Laura sent a

23  letter replying to Michael's May 13 letter.  PD Ex. 32.

24         In the Siegels' legal files in *Siegel*, there were copies of:  (1) the May 13, 2003

25  letter, which Laura faxed to Mr. Toberoff on July 6, 2003, containing attorney-client

26

27  _____

    [3] DC portrays Michael's misguided May 13, 2003 letter as revelatory, misleadingly
    matching it to DC's complaint.  However, the thief who wrote the Timeline largely
28  mimicked the accusatory speculation in Michael's letter that he enclosed and, in turn, DC's
    complaint attached and tracked the anonymous Timeline – like the blind leading the blind.

5

DEFENDANTS' OPPOSITION TO MOTION FOR SANCTIONS

communications (the "May 2003 Letter"); (2) a draft of the July 2003 letter, dated July 5, 2003, sent from Laura to Mr. Toberoff on July 6, 2003, containing attorney-client communications (the "July 6 Draft"); (3) a draft of the July 2003 letter, also dated July 5, 2003, sent from Laura to Mr. Toberoff on July 8, 2003, containing attorney-client communications (the "July 8 Draft"); and (4) a final version of Laura's letter, dated July 11, 2003, sent from Laura to Mr. Toberoff on July 11, 2003, containing attorney-client communications (the "July 2003 Letter").  Declaration of Keith Adams ("AD"), Exs. A-D (the "May-July Documents").

These four documents are the focus of DC's motion.  DC misleadingly cites identical duplicates of these four documents that were sent to Warner with other stolen documents to falsely suggest that "18" documents are at issue.  But there are only four relevant originals.  Mot. 11; *see* AD, Ex. A (four identical copies of May 2003 Letter), B (three identical copies of July 6 Draft), C (six identical copies of July 8 Draft), D (seven identical copies of marked-up final version of July 2003 letter).

Laura's July 2003 Letter, written years before DC brought its claims against Mr. Toberoff, makes clear that the Siegels' 2002 decision to replace their counsel and stop negotiating with DC, for the time being, had nothing to do with Mr. Toberoff:

> We went to Marc to talk about him representing the Siegels.  **Marc did not pursue us:**
> -We fired Kevin Marks and Bruce Ramer **because they were insisting we take a bad TW/DC deal.**  You'll remember that you, Don Bulson, and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
> -**Neither Kevin Marks or Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.**
> -**Kevin Marks had turned away Marc saying we had a deal with DC when we did not.**
> -Marc did not call my mom nor me.

PD Ex. 32.  DC omits the import of the July 2003 Letter, which is that Laura (the one with personal knowledge) specifically renounced the allegations in DC's Fifth Claim, seven years before DC even made them.  DC's sanctions motion is thus based on documents which, while withheld as privileged, decisively disprove DC's claims.

## 2.   The Logging And Production Of The Documents

### (a)   The *Siegel* Litigation

As Magistrate Zarefsky has noted, in an order upheld by this Court, "[p]arties can even be adverse for some purposes and share a community of legal interest for other purposes."  Dkt. 378 at 5 (citing *United States v. Gonzalez*, 669 F.3d 974 (9th Cir. 2012); 389.  Because Michael had a common interest with Laura and Joanne in the negotiations with DC over their shared termination interest, their communications relating to such negotiations are reasonably subject to the joint interest privilege, a sub-set of the attorney-client privilege.  *Gonzalez*, 669 F.3d at 978.  Mr. Toberoff's firm kept the May-July Documents received from their client, and subject to that privilege, in their attorney-client correspondence files.  TD ¶6; Dkt. 317-2, Ex. 1 (2006 Siegel Logs).  These four documents were among hundreds of privileged documents logged by the Siegels in response to DC's discovery requests.  Dkt. 317-2, Ex. 1.  These letters/drafts were logged as part of an attorney-client communication from Laura to Mr. Toberoff  and identified as such on the privilege logs.  TD ¶9.

For over six years, DC has disputed the *manner* in which these four documents were described on the Siegels' privilege logs in *Siegel* and this case.  Dkt. 160 at 30-33, 40-44; 163-13, Ex. UU at 749:2-25; 163-14, Ex. VV at ¶¶6-7; 171 at 3-5; 225 at 15, 17-20; 243 at 10-12; 253.  Defendants' manner of logging privileged documents has been extensively litigated, and primarily resolved against DC, as set forth below.  But, aside from the issue of the manner of their logging, there is no dispute that these four documents, at all relevant times (i) *were* withheld as privileged, (ii) *were* logged (even if DC alleges such was inadequate), and that (iii) DC had sufficient information about this correspondence to dispute the Siegels' claim of privilege since 2006.  Privilege logs allow a party seeking discovery to challenge the privilege.  *See Burlington N. & Santa Fe Ry. Co. v. Dist. Court*, 408 F.3d 1142, 1148 (9th Cir. 2005).  DC not only had that opportunity, it consistently exercised it.

The May-July Documents were among privileged material stolen from Mr.

Toberoff's firm in 2005, with copies illicitly sent to at least three Warner Bros. executives by 2006.  Dkt. 163-12, Ex. TT, ¶¶2-3; Dkt. Nos. 42 at 8-14; 210 at 3-4. Warner reviewed the stolen documents.  Dkt. 163-12, Ex. TT, ¶¶8-12.

At that point, DC was indisputably aware that the May-July Documents had been withheld as privileged by the Siegels.  In 2007, DC moved to compel the production of all the stolen documents, or for *in camera* review of any over which privilege was claimed.  *See* Dkt. 42-9, Ex. 23 at 627.  In support, Warner's in-house counsel *specifically* testified that the stolen documents included unproduced correspondence between Laura and her "estranged step-brother, Michael Siegel." Dkt. 163, Ex. TT, ¶9; 164-1, Ex. B, ¶3.  Magistrate Zarefsky denied the bulk of DC's motion, but ordered the Siegels to "match up" the stolen documents to the documents produced by the Siegels or their privilege log entries.  Dkt. 163-13, Ex. UU at 759-61.[4]  Defendants did just that, including matching-up the multiple copies of the May-July Documents included in the stolen documents to the privilege log entries for the documents.  TD ¶¶13-14; AD Ex. G.  In doing this, there was an inadvertent clerical error in matching-up one of four copies of the May 2003 Letter, while the other three identical copies of the May 2003 Letter were correctly matched up to the entry on the Siegels' privilege logs.  TD ¶¶15-17.  DC's accusations that Mr. Toberoff's 2007 declaration was improper because of this, is not well taken.

That was not the end of the matter.  DC continued to seek the May-July Documents, and Defendants continued to assert privilege over these documents.  On September 17, 2007, DC filed a further motion to compel that specifically contended "[a]mong the 'non-privileged' Escrow Documents was correspondence [July 2003 letters] concerning … Michael Siegel.  That correspondence has never been produced…."  Dkt. 164-1, Ex. C at 20-22.  DC thereafter claimed that "Plaintiffs have not produced any such [Michael-Laura] correspondence … and it has not been

---

[4] DC falsely claims the Court "ordered" Mr. Toberoff to correct "his logs" in *Siegel*.  In reality, DC argued that the logs were insufficient to assert privilege (DP Ex. 39 at 615-16); and the Court held that the logs "sufficiently asserted" privilege.  DP Ex. 41 at 666.

1  identified on any of the privilege logs." Dkt. 164-2, Ex. D, ¶¶48-51. Later in 2008,

2  DC again argued Defendants had not produced "a communication [the July 2003

3  Letter] from plaintiff Laura Siegel Larson to Michael Siegel." Dkt. 164-2, Ex. G at 5.

4  DC even expressly matched up the Siegels' "supplemental privilege log # 82" (Dkt.

5  163-14, Ex. VV, ¶¶6-7) to Laura's July 2003 Letter based on their in-house counsel's

6  memory of the stolen documents – the exact same argument and log entry DC

7  illustrates with pictures here. Mot. 8, 10-11.

8      On September 26, 2008 and again on December 4, 2008, Judge Larson rejected

9  DC's repeated challenges to the Siegels' privilege logs and upheld the "privilege log

10 entries … [noted] in Mr. Toberoff's May 21, 2007 declaration" (Dkt. 164, Ex. H at 5;

11 *see also id.*, Ex. I), despite DC's contentions about the 2003 correspondence. In

12 short, in *Siegel*, the May-July Documents were withheld and logged as privileged,

13 DC and the Court were aware of the May-July Documents and the manner of

14 logging, DC challenged that logging, and its challenge was denied.

15              **(b)**   **The _DC Comics_ Litigation**

16      When DC brought this litigation in 2010, DC attempted to re-litigate matters it

17 lost in *Siegel*, and again sought the May-July Documents. DC argued that "[o]n July

18 11, 2003, Laura Siegel Larson sent a letter or email to her half-brother, Michael

19 Siegel;" that "Defendants claim privilege over this letter and have included it on their

20 privilege log," but that it should be produced; and that the "May 13, 2003, letter"

21 from Michael to Laura existed and should be produced. Dkt. 160 at 30-33, 37-38.

22      In preparing their opposition, Defendants realized for the first time that one of

23 four identical copies of the  May 2003 Letter, while privileged, had been incorrectly

24 "matched up" to the Siegels' privilege log, as stated above. TD ¶19. Defendants

25 thus incorrectly believed that privilege was likely waived as to the May 2003 Letter

26 (TD ¶¶19-20) and in opposition to DC's motion, regarding multiple documents, did

27 not specifically respond "as to the May 13, 2003 letter." Dkt. 209 at 12. Magistrate

28 Zarefsky thus ordered Defendants to either produce the May 2003 Letter or verify

DEFENDANTS' OPPOSITION TO MOTION FOR SANCTIONS

1    that it did not exist.  Dkt. 209 at 12.  Defendants promptly produced the May 2003

2    Letter (with attorney-client information redacted from the faxed letter).  AD, Ex. J.

3         As to the July 2003 Letter, Magistrate Zarefsky *denied* DC's motion, noting

4    that Defendants "asserted privilege as to the letter during the prior litigation, a

5    designation that was upheld by this Court."  Dkt. 209 at 11.  On April 25, 2011, DC

6    argued in a motion for review to this Court that the July 2003 letter was not

7    privileged and must be produced.  *See* Dkt. 225 at 15-17; 243 at 10 ("[T]he 'July 11,

8    2003,' letter exists and is a non-privileged communication….").  Defendants argued

9    "law of the case" and that the "July 11, 2003 letter [] has been repeatedly held to be

10   privileged."  Dkt. 231 at 19-20.  This Court rejected DC's motion.  Dkt. 252.

11        On May 23, 2011, in DC's first motion for reconsideration to Magistrate

12   Zarefsky, it again argued that the July 2003 Letter was in Defendants' possession,

13   and was not privileged.  Dkt. 253 at 6-9.  In response, Defendants expressly referred

14   to the "logged July 11, 2003 letter."  Dkt. 269 at 11.  On June 20, 2011, after oral

15   argument, Magistrate Zarefsky – with full information about the logging of the July

16   2003 Letter, and the existence and production of the May 2003 Letter – rejected DC's

17   motion.  Dkt. 285.  When DC made *yet another* motion for reconsideration,

18   Defendants again acknowledged the "logged" "July 2003 letter from Laura Siegel

19   Larson to Michael Siegel."  Dkt. 316 at 4, 21.  Magistrate Zarefsky *rejected* DC's

20   motion, noting that the "descriptions [on Defendants' logs] are in keeping with Ninth

21   Circuit case law on the subject, as the Court has ruled in both the prior case and the

22   present case, in response to motions that [DC] has made, several times, for

23   elaborations upon the logs."  Dkt. 323 at 2.  DC then brought another motion for

24   review (Dkt. 329), which this Court granted for unspecified reasons (Dkt. 336), after

25   having denied DC's prior motion for review on the same subject.  Dkt. 252.

26   Defendants then *promptly* produced the July 2003 Letter.  AD Ex. K.

27        In short, the May-July Documents were privileged, were withheld from

28   production in *Siegel* based on reasonable claims of privilege, and were duly logged.

TD ¶¶3-9.  DC knew about the correspondence in 2006, made the Courts aware of it, repeatedly moved to compel its production, and challenged the form of Defendants' privilege logs as to this correspondence.  In these motions, Defendants did not deny the letters' existence, but maintained privilege and relevance objections, and the parties litigated the privilege issue.  *See* Dkt. 316 at 13 (DC:  "[Defendants] did *not* deny Larson's [July 2003] Letter and drafts of it exist or that they possess these documents.").  When Defendants realized that they had made a mistake with respect to the May 2003 Letter, they did not oppose DC's motion on this point, did not deny the letter's existence and thereafter promptly produced a copy.  Dkt. 160; AD Ex. J.  DC's sanctions motion relies on allegedly inadequate logging, the same issue that has been litigated time after time before Judge Larson, Magistrate Zarefsky, and this Court, and DC's desire to revisit this issue is no basis for sanctions.

### 3.   There Was No Improper Scheme Concerning The Documents, And No Prejudice to DC

DC's notion that the dispute as to the logging of the May-July Documents was an attempt to conceal them does not add up.

*First,* the letters were in fact privileged as communications between parties who have a joint legal interest, and reasonably withheld on that basis.  *See Gonzalez*, 669 F.3d at 978 (recognizing privilege); *U.S. v. Under Seal*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987).  Such a joint interest can exist even if the interests of the parties are at odds in certain respects.  *See Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965); *Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D. Cal. 1995).

The Siegels consistently invoked this privilege, based on their common interest with Michael in negotiations with DC, and this Court and others have repeatedly upheld a joint interest privilege between Michael and Laura Siegel.  Dkt. 209; 239; 368-2, Ex. B at 18-23; 378; 389.  DC contends that the Siegels agreed to produce all letters between Laura and Michael in *Siegel* (Mot. 6) when, if fact, they invoked the

"joint interest" privilege.  Dkt. 161-1, Exs. D-E.  When DC challenged this privilege in Ohio, the Ohio District Court rejected a common interest privilege as to Mr. Emanuel's offer to purchase Michael's interest, but ***upheld*** most assertions of common interest privilege between Michael and Laura Siegel, as Magistrate Zarefsky has noted.  Dkt. 161-5, Ex. E at 30; Dkt. 378 at 4-5.  In this litigation, Defendants similarly asserted the "joint interest" privilege and the Court held that "[B]oth Ms. Larson and Mr. Siegel were entitled to claim privilege, and they and their counsel were entitled to communicate about the subject of the negotiations." Dkt. 378 at 3-5.

*Second*, since the May-July Documents were logged, DC was aware of this correspondence, and DC specifically litigated this issue, DC's theory that the Siegels' attorneys attempted to hide the letters (which refute DC) does not make any sense.

*Third,* the May-July Documents have long since been produced.  There is no prejudice in this case from the timing of the letters' production.  DC's complaint does not even mention Michael Siegel (Dkt. 49), no trial date or motion deadline has been set, DC has had the letters for over a year, and DC has had ample opportunity to take discovery.  Indeed, DC asked Mr. Toberoff questions *specifically* based upon this correspondence at his recent deposition.  Dkt. 493-1, Ex. 3 at 395:12-403:12.

*Fourth,* DC has no claim that it was prejudiced in *Siegel*.  The May-July Documents were irrelevant to the issues in the *Siegel* case, where they were logged. Dkt. 317-2, Ex. 1 at 8.  DC hangs its hat on the notion that the July 2003 Letter says "that Marks told [Laura] in 2002 she 'had a deal with Time Warner/DC.'" Mot. 2.[5] However, in *Siegel,* DC already argued that Marks had confirmed a 2001 "deal" with DC **based on Marks' own deposition testimony**, but this was properly *rejected as irrelevant* when the Court issued its summary judgment ruling.  *See* AD Ex. F at 93-99; *see also id*. at 93-94 (DC arguing that the Siegels rejected DC's offer due to "a seemingly more lucrative offer by their current counsel [Mr. Toberoff]"); Ex. H at

---

[5] This grossly misrepresents Marks' communication, which expressly notes that there is no "final agreement" and that any "deal" is still "subject to documentation."  PD Ex. 27.

112 n.31, 133-14 (Siegels noting that accusations against Mr. Toberoff were false and irrelevant). The Court noted DC's allegations, including Marks' testimony that there was a "deal," but held such subjective beliefs irrelevant to whether a binding contract was formed. *Siegel v. Warner Bros. Ent., Inc.*, 542 F. Supp. 2d 1098, 1138 (C.D. Cal. 2008) ("None of this subjective belief is sufficient to defeat the objective manifestation of [] intent relayed in the documents…,").

DC cannot be "prejudiced" by a lack of *cumulative* evidence (hearsay as to Marks' beliefs) on facts already established (by Marks' testimony) on an issue held irrelevant in *Siegel*. Moreover, DC had this correspondence by November 2011 (AD Exs. J-K), judgment was entered in *Siegel* in May 2011, and DC had a year under F.R.C.P. 60 to reopen that judgment. DC never once sought to do so, for the obvious reason that the correspondence is irrelevant.

**Fifth,** as noted above, it makes no sense to accuse Defendants of a scheme to improperly withhold documents that confirm the falsity of DC's claims.

### 4.    Defendants Did Not Mislead About Drafts Of The Letters

DC suggests that Defendants somehow misled the courts concerning privileged *drafts* of the July 2003 Letter. Mot. 18-19. In reality, DC filed a motion seeking to compel production of a supposed "July 5" letter from Laura to Michael based on the Timeline's express reference to a purported actual letter. Dkt. 160 at 71-72. Defendants pointed out that no such letter existed, because there is no "July 5" letter from Laura to Michael: Laura's unsent July 6 Draft is not the same thing as an actual sent letter. TD ¶22. DC's motion was denied. Dkt. 209 at 12.

DC then moved for reconsideration, shifting its focus from an actual "July 5 letter" to a possible "July 5" draft of the actual July 11, 2003 letter. Dkt. 253 at 9. Defendants objected to producing "privileged communications," such as a "'draft' of [a] contemplated communication" sent by Laura to her counsel, and referred to privilege log entries dated July 5. Dkt. 269 at 13. Defendants thus accurately stated that no July 5 letter between Laura and Michael existed, and referred to the privileged

log entry concerning the July 6 draft that did exist.  Lastly, the July 2003 drafts were produced in May 2012.  Dkt. 427-1 ¶8; 427-3, Ex. G at 244-45.  DC has taken discovery on the drafts, and was not prejudiced by the timing of production.

### B.    The "Renner-Otto" Documents

#### 1.    DC's Claims Concerning the Renner-Otto Documents Are Based On Blatant Misrepresentations Of The Facts

DC's other main accusation is that Defendants purportedly improperly withheld certain documents kept in Michael Siegel's client files by his Ohio law firm, Renner, Otto, Boiselle & Sklar, LLP ("Renner Otto").  Mot. 19-21.  The basis for this is a misrepresentation by DC that in 2006, in *Siegel*, Renner Otto sent Mr. Toberoff all of Michael Siegel's paper files, including the documents in question.  *Id.*  This is false.  Mr. Toberoff did not receive the complete files in 2006; when his firm did receive them, in 2011, the relevant documents were promptly produced or logged.

In 2006, after Michael's death, Renner Otto sent Michael's paper files to another Ohio attorney, Melvin Banchek, the administrator of Michael's Estate (AD Ex. E at 91), ***not*** to Mr. Toberoff.[6]  TD ¶26.  In 2006, in response to DC's subpoena in *Siegel* to Don Bulson, Michael Siegel's former attorney*,* Mr. Banchek pulled responsive Michael Siegel files out of "storage," and sent them to Mr. Toberoff's law firm, which prepared a privilege log.  TD ¶27; Dkt. 161-2, Ex. B at 11; 477-2, Ex. F at 52 ¶¶2-7.  Aside from the materials sent to Mr. Toberoff by Mr. Banchek, Mr. Toberoff did not access Mr. Banchek's files.  TD ¶27.  To the extent the privileged documents sent by Mr. Banchek were responsive, the Toberoff firm logged them.  PD Exhibit 46.  Neither the November 2001 email nor the November 2002 letter referred to in DC's motion were in the paper files sent to Toberoff's firm.  Dkt. 466-1, ¶17; TD ¶29.  There is no legitimate basis to claim that these documents were concealed or withheld.  In 2006, the chain of custody over Renner Otto's *paper* files

---

[6] DC has long possessed Renner Otto's cover letter to Mr. Banchek and other documents which clearly demonstrate that Renner Otto sent Michael Siegel paper files to Mr. Banchek, contrary to DC's repeated willful misrepresentations to the Court.  PD Ex. 56 at 989.

was twice broken (by Renner Otto and then Mr. Banchek) before such paper files were received by Mr. Toberoff's firm.  Since Defendants did not have these documents, they were not logged or produced.

All the evidence clearly indicates that Mr. Toberoff's firm received the November 2001 email and the November 2002 letter for the first time in August 2011 when Renner Otto provided an "electronic archive" of all its Michael Siegel files to the Toberoff firm.  Dkt. 466-1, ¶¶2, 17.  Once Mr. Toberoff's firm obtained these documents, they were promptly logged on a privilege log (Dkt. 362-2, Ex. F (privilege log), 412-2, Ex. A (production letter)) and eventually ordered produced to DC.  Dkt. 451, 457.  The "electronic archive" included many other privileged and non-privileged documents (relevant and irrelevant) that were not in the paper files received by the Toberoff firm in 2006, and were duly logged or produced upon receipt.  Dkt. 362-2, Ex. F at 295-318; 412-2, Ex. A; TD ¶¶28-29.[7]

While DC may stomp its feet and falsely declare that Renner Otto sent Michael's complete paper files to Mr. Toberoff in 2006, it is simply not so.  There is not even evidence that the paper files sent to Mr. Banchek in 2006 contained the November 2001 email and November 2002 letter, much less that Mr. Banchek sent these documents to Mr. Toberoff.  DC points to:  (a) a 2012 e-mail from Josh Ryland (a litigator who neither represented Michael nor participated in the creation of the electronic archive *six years ago*) suggesting that the paper files "should be the same;" and (b) a statement from an associate at Mr. Toberoff's firm that it received paper files from Mr. Banchek, retrieved from "storage."  Mot. 20; Dkt. 427-2, Ex. A at 4; 477-2, Ex. F ¶¶2-7; Dkt. 477 at 5-6.  DC also refers to a "recent document production by the Estate" (Mot. 21) – but that was for the electronic archive produced/logged in

---

[7] DC complains that Defendants logged drafts of a letter from Michael to Laura from October 2002 which are clearly privileged and DC has never moved to compel. [8] A November 2002 fax from Laura (ordered produced) confirms these statements.  PD. Ex. 26 at 337 ("We went to a meeting at Kevin's office in May, 2002 prepared to terminate them …. At that [] meeting … Marks told us that if we did not accept the February 1, 2002 DC proposed contract or a redraft … that he and his firm could no longer represent us.").

1  2011.  PD Ex. 76 at 1569.  None of this shows or even suggests that Mr. Toberoff

2  received the November 2001 email or November 2002 letter prior to 2011.

3       Furthermore, the 2011 "electronic archive" of Michael Siegel's files included

4  not only the November 2001 email and November 2002 letter, but numerous other

5  documents not included in the 2006 paper file.  Dkt. 412-2, Ex. A.  Many of those

6  documents were inconsequential (*e.g.,* relating to the sale of Superman memorabilia),

7  while others were clearly relevant (*e.g.,* letters between Michael and Renner Otto

8  about termination), but all of them were either promptly logged or produced by Mr.

9  Toberoff's firm.  Dkt. 362-2, Ex. F; 412-2.  DC can offer no explanation for why

10  such documents would not have been logged in 2006, if Mr. Toberoff's firm had

11  possessed such documents.

12       DC's discussion of the "electronic archive" is itself misleading.  DC

13  misrepresents to the Court *five times* in its brief that the log of the "electronic

14  archive" contains "224+ *entries* that had never been produced or logged before."

15  Mot 8, 19, 20, 21, 25.  DC repeats this falsehood even though Defendants showed

16  DC numerous examples where the "224" entries *matched up exactly* to prior logs, and

17  explained that DC was likely mixing-up the "sender" and "recipient" columns in

18  comparing the 2011 and 2006 logs.  DP, Ex. 17 at 169-170.  The electronic archive

19  actually contains approximately 85 entries not on the 2006 log, some relevant, some

20  not, but all of which were not in the paper files received by Toberoff's firm in 2006.

21      **2.**    **DC Suffered No Prejudice From The Production Of The**

22              **Renner Otto Documents**

23       Far from being evidence that Defendants had an incentive to suppress, the

24  November 2002 letter and November 2001 e-mail, like the 2003 correspondence,

25  *undermine* DC's Fifth Claim.  The November 2002 letter from Laura makes clear

26  that Mr. Toberoff had nothing to do with the Siegels' rejection of DC's proposals:

27      We were shocked by the change of attitude we saw in Bruce Ramer and
       Kevin Marks from the time we retained them to recent months. In the

28      beginning they appeared to be very much on our side, determined to get
       justice for us and they vowed to work hard for us in negotiations versus

DC and AOL Time Warner. Toward the end of 2001, there was a shift. They started pressuring us to lower our expectations and to take an offer we did not want. ….

*Between February and May of this year we became so dissatisfied with their representation and the revolting offer from DC that we asked for a meeting with Kevin on May 22d planning to fire them then and there*. In the meeting, we decided to give Kevin one last chance. He wanted to redraft DC's February proposal along the lines of the last discussion he had had with John Schulman. We gave Kevin conditional permission to do just that but it was not to be sent out if we did not approve of it. *As you know it was unacceptable and we fired Gang, Tyre, Ramer & Brown and notified DC, etc. that negotiations were over*.

PD Ex. 26 (emphasis added).[8]

The November 2001 email does not support DC's repeated contention that Mr. Toberoff acted as a "businessman," not as an attorney. Mot 25; Dkt. 307 at 1. As Magistrate Zarefsky confirmed after *en camera* review, the privileged "e-mail concerns legal rights and potential representation of Michael Siegel" by Mr. Toberoff (Dkt. 451 at 1) and thus also supports Defendants' "litigation privilege" defense.

Finally, as with the 2003 letters, there is simply no basis for a claim of substantial prejudice from any delay in receiving these documents. DC has not argued these documents were relevant in *Siegel*, and to the extent they are relevant here, DC has had them for months, with ample opportunity to take discovery.

## C.    DC's Lack Of Prejudice Contrasts Sharply With Defendants' Prejudice From DC's Discovery Misconduct

DC's allegations concerning the Michael -Laura correspondence and the Renner Otto documents must also be placed in context. Since 2004, Mr. Toberoff's small firm has represented the Siegels in hard-fought litigation against DC. In this case and *Siegel*, there have been dozens of discovery motions, thousands of documents produced, and thousands of privilege log entries. Throughout, while there were legitimate discovery disputes, DC's false allegations of willful misconduct,

---

[8] A November 2002 fax from Laura (ordered produced) confirms these statements. PD. Ex. 26 at 337 ("We went to a meeting at Kevin's office in May, 2002 prepared to terminate them …. At that [] meeting … Marks told us that if we did not accept the February 1, 2002 DC proposed contract or a redraft … that he and his firm could no longer represent us.").

1  distort the record, as shown above, and DC has suffered no prejudice.

2        This lack of real misconduct and prejudice contrasts sharply with DC's own

3  practices.  Despite complaining about a couple entries among thousands in

4  Defendants' privilege logs, DC has consistently failed to provide *any* privilege logs

5  in this case.  AD ¶15.  Moreover, DC *lost* on twenty-nine of the forty-three discovery

6  issues it has moved on (70%), in a waste of court resources for which DC has been

7  admonished several times.  Dkt. 74, 209; 239; 262; 248; 285; 287; 309; 323; 378;

8  389; 439 (DC admonished to "not create undue burden or harassment"); 451.

9        In addition, as Defendants have shown, DC claimed to have produced all

10  responsive documents on a range of subjects but in fact surreptitiously withheld, and

11  then belatedly produced *during* summary judgment briefing, obviously relevant, non-

12  privileged documents relating to the 1992 agreement on which DC's First Claim is

13  based, and DC likely continues to withhold other relevant documents. *See* Dkt. 514.

14        Moreover, it should not be forgotten that the documents at issue in this motion

15  would have remained privileged if DC did not have the highly unusual and improper

16  advantage of unfettered access to hundreds of pages of privileged material *stolen*

17  from their opposing counsel's legal files.  Despite this extreme advantage, DC still

18  has no evidence to establish the merits of its claims, and instead resorts to the farce

19  that it was somehow prejudiced in discovery.

20        Finally, DC seeks sanctions in this case against Mr. Toberoff *as a party* and as

21  the only defendant to DC's Fifth Claim, based on his actions as *litigation counsel* in

22  the separate *Siegel* matter, in which Mr. Toberoff was never sanctioned or

23  reprimanded.  DC points to no case where sanctions have been imposed on a party

24  for conduct as a lawyer in a different lawsuit.  To do so here would be especially

25  contradictory, because DC has insisted (as it must to avoid dispositive defenses) that

26  its "claims do not arise out of Toberoff's … activities as a lawyer."  Dkt. 307 at 1.

27  **D.    <u>DC Mischaracterizes The Order It Accuses Defendants Of Violating</u>**

28        Finally, DC mischaracterizes the Court Order it claims Defendants have

18
DEFENDANTS' OPPOSITION TO MOTION FOR SANCTIONS

violated, and to be clear: neither this Court nor any other Court has found Defendants to have been in violation of a Court order.  Mot. 15.

On November 22, 2010, shortly before the Thanksgiving holiday, DC served an unnecessary motion to compel seeking relief that Defendants had already offered – the production of documents and privilege logs by a date certain.  Dkt. 127-6, Ex. 6 at 10; 128 ¶4.  When DC insisted on resolving the dispute in a stipulation, Defendants agreed, "[t]o avoid burdening Magistrate Judge Zarefsky, with yet another unnecessary and moot motion."  AD Ex I.  On December 7, 2010, Magistrate Zarefsky signed the stipulation setting dates for Defendants to produce non-privileged responsive documents and privilege logs.  Dkt. 133 ¶¶1-3.

That stipulated order *expressly* left unresolved for a future motion any issues DC had with the form or content of Defendants' privilege logs.  Dkt. 133 ¶7 ("DC reserves all rights … to bring a motion challenging Defendants' privilege logs and document production, and DC and Defendants reserve all their respective rights and arguments with respect to any such motion.").  This stipulated order did not and could not, as DC suggests repeatedly (Mot. 1, 15), have resolved privilege disputes in DC's favor or render the refusal to produce a document on privilege grounds a violation of that order, as Magistrate Judge Zarefsky himself held.  Dkt. 288 at 44:3-8 (Magistrate Zarefsky:  "Based on the terms of the December 2010 stipulation it does not appear to the Court that the defendants have waived claims of privilege or other protection.").  Accordingly, DC's claims of violation of this order are baseless.

## III.   THE SANCTIONS DC SEEKS ARE LEGALLY UNWARRANTED

### A.   The Standard For Terminating Sanctions Is Extremely High

The main thrust of DC's motion is terminating sanctions.  Mot. at i, ii, 4, 22-23; Dkt. 500-1 at 1-2.  "[A] terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe" (*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills* ("*Connecticut*"), 482 F.3d 1091, 1096 (9th Cir. 2007)) and "authorized only in 'extreme circumstances.'"  *United States use of*

19

*Wiltec Guam, Inc. v. Kahaluu Constr. Co.* ("*Guam*"), 857 F.2d 600, 603 (9th Cir. 1988) (citing *Fjelstad v. American Honda Motor Co., Inc.*, 762 F.2d 1334, 1338 (9th Cir. 1985)); *see also Fair Housing of Marin v. Combs,* 285 F.3d 899, 906 (9th Cir.2002) (same); *In re Law*, 309 F. Appx. 95, 96 (9th Cir. 2009) (same). Despite DC's false assertion that terminating sanctions are "encourage[d]" (Mot. 22), "[t]he sanction of dismissal is not favored." *Brookhaven Typesetting Servs. v. Adobe Sys.*, 332 Fed. Appx. 387, 389 (9th Cir. 2009). "[P]ublic policy favor[s] disposition of cases on their merits." *Connecticut*, 482 F.3d at 1096.

"Sanctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *Wyle v. R.J. Reynolds Industries Inc.*, 709 F.2d 585, 591 (9th Cir. 1983). Terminating sanctions are generally only imposed where one party is seriously prejudiced and the other party flagrantly disobeys multiple court orders, despite express warnings from the Court and the imposition of lesser sanctions that leave terminating sanctions as the only available remedy.[9] Less extreme circumstances, even violations of court orders, do not warrant terminating sanctions. *See Brookhaven Typesetting Servs.,* 332 Fed. Appx. at 389 (court properly denied terminating sanctions despite "troubling and unflattering history of discovery compliance"); *Fjelstad*, 762 F.2d at 1343 (terminating sanctions based on "single willful violation of the [court's] order would be unjust").

Due to its severity, a "district court abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the sanction and the adequacy of less drastic sanctions." *U.S. v. National Medical Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir. 1986). *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006)

---

[9] *See Connecticut*, *supra* (party falsified a document, lied to the court, and was warned about terminating sanctions); *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1054 (9th Cir. 1998) ("Warnings were given and monetary sanctions were imposed as [party] continued to violate one court order after another"); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1413 (9th Cir. 1990) (party "continually disobeyed court orders," had multiple sanctions imposed, and was warned that failure to comply could cause dismissal).

("[T]he district court must consider 'less severe' alternatives.") (quotation om.). "[F]ailure to warn [prior to terminating sanctions] may place the district court's order in serious jeopardy." *Guam,* 857 F.2d at 605.

### B.  Terminating Sanctions Are Completely Unjustified Here

Terminating sanctions cannot be justified.  DC points to ***no*** finding that Defendants violated any Court orders, ***no*** prior imposition of sanctions – ever – over eight years of litigating this case and *Siegel*, and ***no*** warning by any Court that such sanctions were even a remote possibility.  "What is most critical for case-dispositive sanctions is whether the discovery violations threaten to interfere with the rightful decision of the case." *Connecticut,* 482 F.3d at 1097 (quotation omitted).  Far from threatening the "rightful disposition" of the case, the documents were produced long before (some, a year ago) any substantive decision on DC's Fifth Claim (or any other claim) was made.  DC suffered no prejudice because it has had ample time for follow-up discovery, and, in any event, the documents do not support its allegations.

The cases DC's cites do not support terminating sanctions here.  Mot. 22-23. In *Valley Eng'rs,* 158 F.3d 1051, 1054, "several trial date settings had to be vacated," "[w]arnings were given[,] monetary sanctions were imposed," and the party "violated one court order after another."  The other cases DC cites are also inapposite.[10]  DC asks this Court to ignore that all of the evidence at issue in its motion was ***long-ago produced in discovery***, suggesting that this is irrelevant.  Mot. 23.  This is wrong, because the discovery issues have not prejudiced DC nor delayed trial, and "[d]elay alone has been held to be insufficient prejudice" for terminating sanctions.  *Adriana Int'l Corp.*, 913 F.2d at 1412.  DC's cited cases do not support this argument either.[11]

---

[10] *See North Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (party violated court order, "misled the court," and then produced "a large number" of the documents the "day before" a hearing on the issue); *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169-71 (9th Cir. 2012) (party disobeyed multiple court orders, was warned several times about terminating sanctions, and did not dispute that its actions were "willful and in bad faith"); *E. & J. Gallo Winery v. Gibson, Dunn & Crutchery LLP*, 432 Fed. Appx. 657, 659 (9th Cir. 2011) (addressing monetary sanctions).

[11] *See Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 354 (9th Cir. 1995) (party repeatedly violated court's orders, lied under oath, and was "explicitly warn[ed]" that

DC asks this Court to ignore any "explanations" as to the timing of production and DC's lack of prejudice (Mot. 23), but its own cases demonstrate that any "presumption [of prejudice] may be rebutted and if there is a showing that no actual prejudice occurred, that fact should be considered." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1228 (9th Cir. 2006).[12]

Moreover, DC, despite having the May and July 2003 Letters in its possession for more than a year, did not previously seek sanctions related to the production of these documents. That is a decisive indication that DC was not in fact prejudiced by the timing of the production of the May-July Documents, and is an independent reason why DC's sanctions request is barred. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 757 (7th Cir. 1994) (years delay in bringing Rule 37 sanctions motion meant that no sanctions could be obtained, regardless of merit); *Franklin v. Krueger Int'l, Inc.*, 1997 WL 691424 (S.D.N.Y. Nov. 5, 1997) (8 month delay in bringing motion for sanctions barred bringing sanctions motion).

In short, imposition of terminating sanctions here would be clearly erroneous.

## C.    There Is No Justification For Appointing A Special Master

A district court should not appoint a special master except in "exceptional circumstances." *Hook v. Arizona*, 120 F.3d 921, 926 (9th Cir. 1997); *see Burlington N. R.R. v. Department of Revenue*, 934 F.2d 1064, 1071 (1991) (the Ninth Circuit "strictly appl[ies] Rule 53(b) to require a showing of exceptional conditions to justify

---

her misconduct could lead to terminating sanctions); *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1116 (9th Cir. 2004) (party did not comply despite "two monetary sanctions, five orders compelling him to cooperate and repeated oral warnings," most documents were never produced, and what was produced came "after discovery had already ended"); *G-K Properties v. Redevelopment Agency of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978) (party disregarded multiple court orders and several commands made during in-chamber conferences, and offered to produce documents only *during* the sanctions hearing).

[12] Nor do courts ignore parties' explanations as to discovery. In DC's cited cases, the party's explanations were "absurd." *Computer Task Group, Inc.,* 364 F.3d at 1115 ("contradictory excuses" were " "completely unbelievable") (quotations omitted); *see Anheuser-Busch, Inc.,* 69 F.3d at 354 (party's "story is utterly devoid of credibility"); *G-K Properties,* 577 F.2d at 648 (rejecting that party did not understand order where judge "did not think there's a human being that could have … misconstrued the Court's comments"); *Hester,* 687 F.3d at 1169 (party admitted it acted "willful[ly] and in bad faith").

1  the appointment"). The Supreme Court has explained that a whole host of

2  circumstances do not qualify as "exceptional" so as to justify a special master. *La*

3  *Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (congested dockets, complexity

4  of issues and the time required for trial are all insufficient). *See Burlington N. R. Co.*

5  *v. Dep't of Revenue of State of Wash.*, 934 F.2d 1064, 1072 (9th Cir. 1991) (Rule

6  53(b) is read "narrowly" and "restricted to situations where [masters] are necessary").

7      Here, Defendants reasonably proposed that a highly-regarded law firm

8  independently review all of Defendants' privilege logs and privileged documents;

9  produce amended privilege logs as appropriate; and search for any referenced

10  documents that appeared missing. This comprehensive compromise also provided

11  that any discovery disputes that remained would be resolved on an expedited basis.

12  PD Exs. 4, 7, 9. DC flatly rejected this constructive offer, intent on filing its tactical

13  sanctions motion no matter what. *Id.* Exs. 5, 8, 10. The reason is that DC is not

14  concerned about resolving any real issues, but seeks to use discovery complaints as

15  an independent lever to establish claims it cannot establish on the merits.

16      DC's rejection of this reasonable offer (PD Exs. 4, 7, 9) and insistence on a

17  special master is also obviously intended to impose economic leverage on Defendants

18  by driving up their litigation costs. *See Patroski v. Ridge*, 2011 WL 5593738, at *3

19  (W.D. Pa. Nov. 17, 2011) (refusing special master where cost would create financial

20  hardship); *Hiern v. Sarpy*, 161 F.R.D. 332, 335 (E.D. La. 1995) (same). DC

21  attempted a similar strategy in *Siegel*, insisting on a special master that would have

22  cost hundreds of thousands of dollars to "apportion" the profits from every post-1999

23  Superman work. This Court rejected DC's transparent attempt to drive up costs,

24  noting that a litigant should not have to buy his day in court, and instead ordered the

25  parties to mediate (*Siegel*, Dkt. 636) and thereafter entered a Rule 54(b) judgment.

26  *Siegel*, Dkt. 669; *see Goins v. Hitchcock I.S.D.*, 191 F. Supp. 2d 860, 867 (S.D. Tex.

27  2002) (refusing special master where it would "bring about considerable added

28  expenses"); *Yeseta v. Baima*, 837 F.2d 380, 387 (9th Cir. 1988) ("Reference to a

[special] master is …. reserved for extremely complex cases") (quotations omitted).

As with terminating sanctions, none of DC's cited cases supports the appointment of a special master here.[13]  DC also cites cases (Mot. 24 n.11) where a special master was appointed to supervise depositions.  However, DC has not *once* moved to compel based on any deposition objections; and there is no basis to appoint a special master to address this fictitious circumstance.

Nor can DC point to the "sheer number of discovery disputes" as justification for a special master where DC created – and lost – most of those disputes and Defendants have never been sanctioned.  *See Smith v. Ford Motor Co.*, 31 Fed. R. Serv. 2d 1297 (N.D. Ga. 1981) (declining to appoint special master to oversee discovery where no sanctions had ever been imposed).

### D.    <u>Broad Privilege Waivers Are Not Justified Here</u>

DC also cannot justify "a waiver of privilege over all documents withheld" – *i.e.,* over a decades' worth of privileged communications.  Mot. 24.  Courts only order such waivers in the most extreme circumstances, as shown by the cases DC itself cites.[14]  *See E.E.O.C. v. Safeway Store, Inc.*, 2002 WL 31947153 at *3 (N.D. Cal. Sept. 16, 2002) (declining to find waiver "given the harshness of the sanction" and where moving "party was aware that opposing party was asserting [privilege]");

---

[13] *See Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 561 (N.D. Cal. 1987) (appointing special master due to "egregiously sanctionable conduct" – including "intentional or reckless" destruction of "four garbage cans" of relevant documents); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 112 (D.N.J. 2006) (special master appointed after "pattern of repeated and gross non-compliance" with court orders, and over 160 orders, often required because party repeatedly "ignored a prior Court Order on the same issue").

[14] *See 400 Walnut Assocs., L.P. v. 4th Walnut Assocs., L.P.*, 475 B.R. 217, 233 (Bankr. E.D. Pa. 2012) (blatant "institutional misconduct," including an "inexplicable proclamation that [party] routinely and as matter of course violates the rules of discovery"); *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 334-36 (N.D. Ill. 2001) (party failed to timely respond to communications and did not specify basis for privilege claims);  *Get-A-Grip, II, Inc. v. Hornell Brewing Co.*, 2000 WL 1201385, at *1-3 (E.D. Pa. Aug 8, 2000) (party disobeyed two specific court orders and made numerous misrepresentations to the court); *Bankatlantic v. Blyth Eastman Paine Webber, Inc.*, 127 F.R.D. 224, 232-236 (S.D. Fla. 1989) (waiving privilege, but holding that the court would "still consider an assertion of privilege in an extreme case" even though defendant had "offered no reasonable excuse" for breaking its "promise" to the Court); *C.T. v. Liberal Sch. Dist.*, 2008 WL 217203, at *1, 9 (D. Kan. Jan. 25, 2008) (waiver over certain documents where plaintiff filed an inadequate privilege log, was ordered to produce another, and produced a still-inadequate amended log).

*Sanchez v. Johnson*, 2001 WL 1870308, at *3 (N.D. Cal. Nov. 19, 2001) (finding waiver would be "disproportionate" in light of "large volume of documents at issue").  DC also conspicuously omits that Magistrate Zarefsky, Judge Larson and this Court have all upheld Defendants' privilege logs, and that on numerous occasions when Defendants have submitted documents for *en camera* review, such were *upheld* as privileged.  Dkt. 239, 451 at 1-2.

### E.    There Is No Basis For An Evidentiary Hearing

Because there is no basis for sanctions, there is no basis to hold an evidentiary hearing.  *See Robinson v. Adams*, 2011 U.S. Dist. LEXIS 60370, at *60 (E.D. Cal. May 26, 2011) (denying request for evidentiary hearing as motion for sanctions was denied).  Moreover, DC, in the parties' discussions over its sanctions motion, <u>never</u> met-and-conferred or even once mentioned an "evidentiary hearing" in violation of Local Rules 7-3 and 37-1.  *Id.*  This too justifies denial of the motion.[15]  In the unlikely event sanctions are considered, a hearing "best determines the appropriate sanctions while protecting a party's due process rights."  *Wyle*, 709 F.2d at 592.

### CONCLUSION

DC's overreaching motion should be denied in its entirety.

November 14, 2012    RESPECTFULLY SUBMITTED,

/s/ Laura Brill
KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff, *et al.*

/s/ Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

---

[15] *See Chih-Cheng Tsao v. County of Los Angeles*, 2011 U.S. Dist. LEXIS 43837, at *7 n.6 (C.D. Cal. Mar. 30, 2011); *Nassirpour v. F.D.I.C.*, 2008 U.S. Dist. LEXIS 105940, at *9 (C.D. Cal. December 29, 2008); *Janssen v. Benihana, Inc.*, 2012 U.S. Dist. LEXIS 10557, at *2 (C.D. Cal. January 30, 2012).

DEFENDANTS' OPPOSITION TO MOTION FOR SANCTIONS