1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
    *kgadams@ipwla.com*
3  Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@ipwla.com*
4  David Harris (State Bar No. 255557)
    *dharris@ipwla.com*
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:          (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11                **UNITED STATES DISTRICT COURT**

12        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

13

| | |
|---|---|
| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | |
| vs. | Hon. Otis D. Wright II, U.S.D.J. |
| | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | **DECLARATION OF KEITH G. ADAMS IN OPPOSITION TO DC'S MOTION FOR AN EVIDENTIARY HEARING AND FOR SANCTIONS** |
| | *Opposition; Declaration of Marc Toberoff; and Declaration of Laura Siegel Larson filed concurrently herewith* |
| | Complaint filed:  May 14, 2010 |
| | Discovery Cutoff:  None Set |
| | Trial Date:  None Set |
| Defendants. | Date:   December 10, 2012 |
| | Time:   1:30 p.m. |
| | Place:  Courtroom 11 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.      I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and submit this declaration in support of Defendants' Opposition to DC's Motion For An Evidentiary Hearing And Sanctions.  I have personal knowledge of the matters set forth below.

2.      Attached hereto as Exhibit "A" are four true and correct copies of a letter from Michael Siegel to Laura Siegel Larson, dated May 13, 2003, which was sent via facsimile from Laura Siegel Larson to Marc Toberoff on July 6, 2003.

3.      Attached hereto as Exhibit "B" are three true and correct copies of a draft letter from Laura Siegel Larson to Michael Siegel, dated July 5, 2003, which was sent via facsimile from Laura Siegel Larson to Marc Toberoff on July 6, 2003.

4.      Attached hereto as Exhibit "C" are six true and correct copies of a draft letter from Laura Siegel Larson to Michael Siegel, dated July 5, 2003, which was sent via facsimile from Laura Siegel Larson to Marc Toberoff on July 8, 2003.

5.      Attached hereto as Exhibit "D" are seven true and correct copies of a letter from Laura Siegel Larson to Michael Siegel, dated July 11, 2003, which was sent via facsimile from Laura Siegel Larson to Marc Toberoff on July 11, 2003.

6.      Attached hereto as Exhibit "E" is a true and correct copy of a letter from Jennifer Moore to Melvin Banchek, Executor for the Estate of Michael Siegel, dated June 15, 2006.

7.      Attached hereto as Exhibit "F" is a true and correct copy of excerpts from Defendants' Opposition to Plaintiffs' Motion For Partial Summary Judgment And Memorandum of Points And Authorities In Support Thereof, submitted on May 29, 2007 in *Siegel v. Warner Bros. Entertainment, Inc.* ("*Siegel*"), Case No. 04-8400

1   SGL (RZx).

2      8.    Attached hereto as Exhibit "G" is a true and correct copy of the

3 Declaration of Marc Toberoff Pursuant to Magistrate Zarefsky's April 30, 2007

4 Order, submitted on May 21, 2007 in *Siegel*.

5      9.    Attached hereto as Exhibit "H" is a true and correct copy of excerpts

6 from Plaintiff Joanne Siegel And Laura Siegel Larson's Reply Memorandum Of

7 Points And Authorities In Support Of Motion For Partial Summary Judgment,

8 submitted on June 25, 2007 in *Siegel*.

9      10.    Attached hereto as Exhibit "I" is a true and correct copy of an email sent

10 from my colleague Marc Toberoff to Daniel Petrocelli, counsel for DC, dated

11 November 29, 2010.

12      11.    Attached hereto as Exhibit "J" is a true and correct copy of a letter sent

13 from my colleague Marc Toberoff to Daniel Petrocelli, counsel for DC, dated April

14 18, 2011

15      12.    Attached hereto as Exhibit "K" is a true and correct copy of an email

16 sent from me to Daniel Petrocelli, counsel for DC, dated November 1, 2011.

17      13.    Attached hereto as Exhibit "L" is a true and correct copy of a letter sent

18 from me to Daniel Petrocelli, counsel for DC, dated August 13, 2012.

19      14.    DC has produced no privilege logs to date in this litigation, citing

20 disputes over whether it is necessary to log post-2004 documents.  DC has also not

21 brought or served a threatened motion for a protective order on this subject.

22

23      I declare under penalty of perjury of the laws of the United States of America

24 that the foregoing is true and correct.

25      Executed on November 14, at Malibu, California.

26

27                               _____

28                                 Keith G. Adams

DECLARATION OF KEITH G. ADAMS

# INDEX

| Ex. | Document | Page |
|---|---|---|
| A | Copies of May 13, 2003 Letter from Laura Siegel Larson to Michael Siegel faxed to counsel on July 6, 2003 | 3 |
| B | Copies of July 5, 2003 Draft Letter from Laura Siegel Larson to Michael Siegel, faxed to counsel on July 6, 2003 | 11 |
| C | Copies of July 5, 2003 Draft Letter from Laura Siegel Larson to Michael Siegel, faxed to counsel on July 8, 2003 | 26 |
| D | Copies of July 11, 2003 letter from Laura Siegel Larson to Michael Siegel faxed to counsel on July 11, 2003 | 56 |
| E | Letter from Jennifer Moore to Melvin Banchek, dated June 15, 2006 | 91 |
| F | Excerpts from Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment submitted in *Siegel* | 92 |
| G | April 30, 2007 Declaration of Marc Toberoff | 100 |
| H | Excerpts from Plaintiffs' Reply Memorandum In Support of Motion For Partial Summary Judgment, submitted in *Siegel* | 111 |
| I | Email from Marc Toberoff to Daniel Petrocelli, dated November 29, 2010 | 116 |
| J | Letter from Marc Toberoff to Daniel Petrocelli, dated April 18, 2011 | 117 |
| K | Email from Keith Adams to Daniel Petrocelli, dated November 1, 2011 | 118 |
| L | Letter from Keith Adams to Daniel Petroceli, dated August 13, 2012 | 119 |

JU 06-2003 11:07 PM                                1   10 827 7227          P.0:

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year.  I would have written sooner but I have endured much sadness.  My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff.  I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this?  Now that you have signed with him, he is in control of the whole Superman copyright.  I told you when he first contacted me, he wanted to buy my share of the copyright.  Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation  When you signed with Marc the billionaire invested elsewhere.  Marc has his own production company, he was going to team with Emmanuel and make a movie.  This has not happened.  You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us.  Marc has chosen not to open any dialog with Time Warner or anyone else.  How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright.  In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner.  Has he told you this?  Do you know who owns the Shuster interest in the Superman copyright?  Has Marc bought the Shuster interest himself?  For a long time now, Marks and Rammer said there should be a united Siegel front.  Marc is not negotiating with anyone, but he has found someone willing to buy me out.  How can he find someone to buy me out and not negotiate for the entire Siegel interest?  Has Marc offered to find someone to buy your interest?  If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright.  This would weaken your position?  The amount Marc's investor is offering is less than half of what DC showed as my share,  There is a very real possibility I will contact Time Warner and see if they will buy me out.  Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get.  Marc is really pressing for an answer to the offer his investor made.

Am I missing something?  Is it Joanne's and your intention to do nothing?  You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more?  Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc.  If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly.  Last week a package of documents arrived from Marc.  Don and I have not had time to review them yet.

Q 0032

SD 00032

JUL-06-2003 11:08 PM                                          1  '10 827 7227        P.0:

This procedure has taken way to long.  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Q 0033

SD 00033

6-2003 11:07 PM                                    1  ¯18 827 7227         P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have
endured much sadness. My mother passed away last year and I am particularly saddened by her
not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the
attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of
this? Now that you have signed with him, he is in control of the whole Superman copyright. I
told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a
mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up
front plus participation When you signed with Marc the billionaire invested elsewhere. Marc has
his own production company, he was going to team with Emmanuel and make a movie. This has
not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring
all members of the Siegel interest both justice and many times more than the amount DC's
representatives wanted to throw our way to get rid of us. Marc has chosen not to open any  ⚡
dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to
anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law
Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do
you know who owns the Shuster interest in the Superman copyright? Has Marc bought the
Shuster interest himself? For a long time now, Marks and Rammer said there should be a united
Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me
out. How can he find someone to buy me out and not negotiate for the entire Siegel interest?
Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave
you with less than half of the Superman copyright and not all of the Siegel interest in the
Superman copyright. This would weaken your position? The amount Marc's investor is offering
is less than half of what DC showed as my share, There is a very real possibility I will contact
Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying
me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to
the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters
of Termination on Superman and The Spectre, have any other letters of Termination been filed or
will there be more? Regarding an old item, I would very much appreciate the release of the funds
I understand are being held in escrow for me by Marc. If it turns out that we have no
disagreement regarding your expenses and too much money was released, that certainly can be
dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not
had time to review them yet.

Q 0139

Privileged & Confidential
All Rights Reserved

**Exhibit A**
5

SD 00139

JUL.-06-2003 11:08 PM                                1   10 827 7227          P.03

This procedure has taken way to long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0140

Privileged & Confidential
All Rights Reserved

**Exhibit A**
**6**

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation  When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any ✗ dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share, There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0317

Privileged & Confidential
All Rights Reserved

**Exhibit A**
7

This <u>procedure has taken way to long.</u>  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  <u>I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently,</u> Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Q 0318

Privileged & Confidential
All Rights Reserved

**Exhibit A**
**8**

SD 00319

JUL-06-2003 11:07 PM                                    1 ¯10 827 7227           P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation  When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0590

Privileged & Confidential
All Rights Reserved

SD 00591

This procedure has taken way to long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0591

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit A**
**10**

SD 00592

Laura Siegel Larson
6400 Pacific Avenue #106          DRAFT
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Opinion re:

~~Facts regarding~~ the Time Warner-DC offer ~~and why it sucked~~:
  -It was a bogus offer filled with land mines and things they knew we'd never agree to
  -They wanted us to warrant we had no rights
  -As a result, we could have had trouble collecting money had we signed with them
  -They wanted us to sign away the right to get anything additional if the copyright law changed, giving creators and their families additional rights or an extension of the time before it went into the public domain

Q 0141

Privileged & Confidential
All Rights Reserved
**Exhibit B**
11

SD 00141

JUL-06-2003 11:08 PM                                    1  10 827 7227            P.05

*DRAFT*

-They even wanted us to sign away the public domain rights we'd one day have
-You and Don Bulson stated that you couldn't believe how bad the contract they had written was
-It was a bad deal ~~and a trap and~~ we had to walk away *from* (MT)

### Marc Toberoff and the Shuster interest:

-~~He~~ He does not "control" the Superman copyright. He has been hired to do a job.
-~~He~~ He does not own the Shuster interest. He is a lawyer hired by ~~Jean Peavy Shuster,~~ Joe Shuster's ~~state~~ *Estate.* (v/e) *Estate*
-In 2013, he doesn't "take" the copyright from Time Warner, Shuster's ~~heirs~~ could reacquire rights as we have ~~as a result of our~~ Terminations. Then the Shusters would have to negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

### We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take the bad TW-DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away ~~falsely~~ saying we had a deal with DC
-Marc did not call my mom nor me
-My mom called ~~Jean Peavy~~ to see what the Shusters were doing *the Shuster family*
-~~Peavy~~ gave Marc's number to my mom and she called him after we had fired Ramer and Marks *— has no plan to produce a Superman movie, nor is his business* *the Shuster family*
-We felt he grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff ~~does not have a production company and we have never heard anything about him planning to make a movie~~ *since the diversity of ownership in his rights.*

### Why the original (~~$15 million~~) investor left:

-Kevin Marks ~~falsely~~ told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

### With Marc's assistance, new Notices of Termination regarding Superboy were sent out:

-We did this to further assert the Siegel rights to this character, ~~separately created from Superman~~
-My mom advanced the $4,000 filing fees immediately to the Copyright Office when the Notices were sent in October 2002
-A copy of the $4,000 check recently processed by the Copyright Office is enclosed with this letter to you.

Q 0142

Privileged & Confidential
All Rights Reserved                    **Exhibit B**
                                         12                                    SD 00142

JUL-06-2003 11:09 PM                                    1 ¯10 827 7227              P.06

*DRAFT*

- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

**Unfortunately we've discovered that The Spectre Terminations did not vest for the Siegel family:**
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The Spectre rights are a dead issue

**Marc has a limited negotiation period to represent the Siegel interest:**
- For Superman: 18 months from Oct. 23, 2002 (until April 23, 2004)
- For the newly filed Superboy Terminations: 30 months from Oct.23, 2002 (until April 23, 2005) This is longer because there is a two year waiting period from the time the Notices were served to the date the rights vest.
- If we are not pleased with the results, he will no longer represent us after that time

**Why Marc has not been negotiating with Time Warner:**
- The fact that DC doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- It may be better not to deal with Time Warner at all but to go elsewhere

**Why there is a buyout offer from a venture capitalist for your interest only:**
- You have been saying you needed money badly, were out of work and had big bills
- The venture capitalist doesn't want to invest more than the amount to buy your interest
- My interests are too entangled due to my divorce
- Marc asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it. We do not know the amount that the investor is offering to you.

**Why any investor would offer less than Time Warner did in its last offer:**
- It is a risky investment
- No immediate payback
- The investor and we may face legal expenses and conflict with DC in the future if we have to sue to get what's already owed or if we eventually make a deal with them and they withhold payment due to "creative bookkeeping" or for other reasons

Page 3

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit B**
**13**

Q 0143

SD 00143

JUL-06-2003 11:09 PM                                    1 710 827 7227            P.07

DRAFT

-The investor wants a worthwhile profit on his investment
-It is a situation similar to one in which businesses that give immediate money to
    beneficiaries of Wills who do not want to wait until the Will goes through Probate
    for them to receive their money.  The beneficiaries always get less than if they
    wait for the Will to go through Probate.

Why you cannot ask Time Warner/DC for a buyout:
    -It destroys the possibility of us negotiating a fair deal
    -It shows weakness
    -As the controlling interest, we do not give you approval to do it
    -If it damaged our ability to later make a better deal, we would have no choice but to sue
        you

Why this has not been like other "contract negotiations":
    -Time Warner is a huge, arrogant company
    -They took months to respond to each issue all along the way and their responses were
        unacceptable
    -Time Warner has nothing to gain by settling this, they keep on making millions
    -Their lawyers are particularly heartless, masters at screwing people.  They have a bad
        reputation for this
    -They delight in playing off what they see as the Siegel interest's weakness—our need for
        money
    -If that wasn't enough, they want to include additional characters created by our father in
        one settlement. (They apparently do not yet realize that The Spectre rights did not
        vest to the Siegels.)
    -They want to win this David and Goliath matter so that the rich and powerful will
        triumph over the little guy
    -They want to make an example of us so that other creators and their heirs won't go after
        their rights

Your belief that you have something to sell independently:
    -You can only sell your rights to a third party with my mom's and my approval because
        we are the majority interest holders and you have a passive interest
    -We will not give approval for a sale to Time Warner because it would damage the
        overall Siegel interest
    -We will give approval for a sale to a third party found by Marc Toberoff as long as it is
        not Time Warner, DC, or any part of the Time Warner family of businesses and
        providing the sale does not damage our ability to make a deal for our portion of
        the Siegel interest

    Although a united Siegel front would be best, we won't stand in your way if you decide
you want to take the buyout from the investor that Marc has found. The decision has to be yours
and yours alone. However, for the reasons listed above, we will not give approval for you to go
to Time Warner regarding a buyout,

Page 4

Privileged & Confidential
All Rights Reserved

Exhibit B
14

Q 0144

SD 00144

1  '10 827 7227          P.08

DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. If the 15 million dollar offer from the other investor hadn't fallen through, we probably would have taken it. Unfortunately, offers like that are rare and we do not expect any offers to come our way that would include my mom and me.

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if you don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. Please let us know what you decide regarding a buyout through Marc.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Q 0145

Privileged & Confidential
All Rights Reserved                    **Exhibit B**
                                        **15**

SD 00145

JUL-06-2003 11:08 PM                          1  10 827 7227              P.04

Laura Siegel Larson
6400 Pacific Avenue #106            DRAFT
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

*Opinion re:*

Facts regarding the Time Warner-DC offer and why it sucked:

-It was a bogus offer filled with land mines and things they knew we'd never agree to
-They wanted us to warrant we had no rights
-As a result, we could have had trouble collecting money had we signed with them
-They wanted us to sign away the right to get anything additional if the copyright law changed, giving creators and their families additional rights or an extension of the time before it went into the public domain.

Q 0319

Page 1

Privileged & Confidential
All Rights Reserved

Exhibit B
16

SD 00320

JUL-06-2003 11:08 PM                        1 '10 827 7227            P.05

DRAFT

-They even wanted us to sign away the public domain rights we'd one day have
-You and Don Bulson stated that you couldn't believe how bad the contract they had
    written was
-It was a bad deal and a trap and we had to walk away *from*
    *(MT)*

## Marc Toberoff and the Shuster interest:

*(MT)* -He does not "control" the Superman copyright. He has been hired to do a job.
    *MT* -He does not own the Shuster interest. He is a lawyer hired by ~~Jean Peavy~~ Shuster, Joe
        Shuster's ~~sister~~ *Estate. via* *Estate.*
    -In 2013, he doesn't "take" the copyright from Time Warner, Shuster's ~~heirs~~ *Estate* could
        reacquire rights as we have ~~as a result of our~~ Terminations. Then the Shusters
        would have to negotiate a deal or handle things as they choose.
    -The Shuster rights are completely separate from the Siegel rights.
    -DC will own the Shuster rights until they vest in 2013
    -We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

    -We fired Kevin Marks and Bruce Ramer because they were insisting we take the bad
        TW-DC deal. You'll remember that you, Don Bulson and we were shocked when
        Kevin Marks said that if asked to, he would testify against us in court.
    -Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted
        Marks and you about the Superman rights until months after it had taken place.
    -Kevin Marks had turned Marc Toberoff away ~~falsely~~ saying we had a deal with DC
    -Marc did not call my mom nor me
*the Shusters* -My mom called ~~Jean Peavy~~ to see what the Shusters were doing
*The Shusters* -Peavy gave Marc's number to my mom and she called him after we had fired Ramer and
*family*     Marks    *has no plans to produce a Superman movie, nor is this his Responsible*
    -We felt he grasped our situation very well and was sympathetic to author's rights    *since*
    -Marc Toberoff ~~does not have a production company and we have never heard anything~~    *the*
        ~~about him planning to make a movie~~    *division of ownership of*
                                    *the rights.*

## Why the original (~~$15 million~~) investor left:

    -Kevin Marks ~~falsely~~ told Marc we had a deal with DC
    -Marc told this to the investor who found another place to invest his money
    -Marc did not know we did not have a deal with DC until later when we contacted him

## With Marc's assistance, new Notices of Termination regarding Superboy were sent out:

    -We did this to further assert the Siegel rights to this character, ~~separately created from~~
        ~~Superman~~
    -My mom advanced the $4,000 filing fees immediately to the Copyright Office when the
        Notices were sent in October 2002
    -A copy of the $4,000 check recently processed by the Copyright Office is enclosed with
        this letter to you.

                                                        Q 0320

                            Page 2

Privileged & Confidential
All Rights Reserved                    Exhibit B
                                        17
                                                            SD 00321

JUL-06-2003 11:09 PM                                    1 ‾10 827 7227            P.06

DRAFT

-The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
-Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Terminations did not vest for the Siegel family:
-Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
-Kevin did not tell us there was a time limit on when the fees could be paid
-When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
-The Spectre rights are a dead issue

Marc has a limited negotiation period to represent the Siegel interest:
-For Superman: 18 months from Oct. 23, 2002 (until April 23, 2004)
-For the newly filed Superboy Terminations: 30 months from Oct. 23, 2002 (until April 23, 2005) This is longer because there is a two year waiting period from the time the Notices were served to the date the rights vest.
-If we are not pleased with the results, he will no longer represent us after that time

Why Marc has not been negotiating with Time Warner:
-The fact that DC doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
-By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
-Timing the negotiations is an art
-It may be better not to deal with Time Warner at all but to go elsewhere

Why there is a buyout offer from a venture capitalist for your interest only:
-You have been saying you needed money badly, were out of work and had big bills
-The venture capitalist doesn't want to invest more than the amount to buy your interest
-My interests are too entangled due to my divorce
-Marc asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it. We do not know the amount that the investor is offering to you

Why any investor would offer less than Time Warner did in its last offer:
-It is a risky investment
-No immediate payback
-The investor and we may face legal expenses and conflict with DC in the future if we have to sue to get what's already owed or if we eventually make a deal with them and they withhold payment due to "creative bookkeeping" or for other reasons

Page 3

Privileged & Confidential
All Rights Reserved

Exhibit B
18

Q 0321

SD 00322

JUL-06-2003 11:09 PM                    1 710 827 7227          P.07

DRAFT

-The investor wants a worthwhile profit on his investment
-It is a situation similar to one in which businesses that give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate for them to receive their money. The beneficiaries always get less than if they wait for the Will to go through Probate.

Why you cannot ask Time Warner/DC for a buyout:
-It destroys the possibility of us negotiating a fair deal
-It shows weakness which Tw will take advantage of.
-As the controlling interest, we do not give you approval to do it
-If it damaged our ability to later make a better deal, we would have no choice but to sue you hold you accountable for such damages.

Why this has not been like other "contract negotiations":
-Time Warner is a huge, arrogant company
-They took months to respond to each issue all along the way and their responses were unacceptable
-Time Warner has nothing to gain by settling this, they keep on making millions
-Their lawyers are particularly heartless, masters at screwing people. They have a bad reputation for this
-They delight in playing off what they see as the Siegel interest's weakness—our need for money
-If that wasn't enough, they want to include additional characters created by our father in one settlement. (They apparently do not yet realize that The Spectre rights did not vest to the Siegels.)
-They want to win this David and Goliath matter so that the rich and powerful will triumph over the little guy
-They want to make an example of us so that other creators and their heirs won't go after their rights.

Your belief that you have something to sell independently:
-You can only sell your rights to a third party with my mom's and my approval because we are the majority interest holders and you have a passive interest only
-We will not give approval for a sale to Time Warner because it would damage the overall Siegel interest
-We will give approval for a sale to a third party found by Marc Toberoff as long as it is not Time Warner, DC, or any part of the Time Warner family of businesses and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

Although a united Siegel front would be best, we won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. The decision has to be yours and yours alone. However, for the reasons listed above, we will not give approval for you to go to Time Warner regarding a buyout, which would be a grave mistake even from your own point of view.

Q 0322

Privileged & Confidential
All Rights Reserved
Exhibit B
19

SD 00323

JUL-06-2003 11:10 PM                                    ] ˙10 827 7227        P.09

*fair*                          DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. ~~If the 15 million dollar offer from the other investor hadn't fallen through, we probably would have taken it.~~ Unfortunately, ~~offers like that are rare and we do not expect any offers to come our way that would include my mom and me.~~

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if you don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. ~~Please let us know what you decide regarding a buyout through Marc.~~

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Q 0323

Page 5

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit B**
20

SD 00324

JUL-06-2003 11:08 PM                                    1   10 827 7227          P.04

Laura Siegel Larson
6400 Pacific Avenue #106          DRAFT
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

## Outline of Topics:

Opinion re:

Facts regarding the Time Warner-DC offer and why it sucked:
- It was a bogus offer filled with land mines and things they knew we'd never agree to
- They wanted us to warrant we had no rights
- As a result, we could have had trouble collecting money had we signed with them
- They wanted us to sign away the right to get anything additional if the copyright law changed, giving creators and their families additional rights or an extension of the time before it went into the public domain

Page 1

Q 0592

Privileged & Confidential
All Rights Reserved

Exhibit B
21
SD 00593

JUL-06-2003 11:08 PM                                    1 `10 827 7227          P.05

DRAFT

-They even wanted us to sign away the public domain rights we'd one day have
-You and Don Bulson stated that you couldn't believe how bad the contract they had
     written was
-It was a bad deal and a trap and we had to walk away from

(MT)

## Marc Toberoff and the Shuster interest:

-He does not "control" the Superman copyright. He has been hired to do a job.
-He does not own the Shuster interest. He is a lawyer hired by Jean Peavy Shuster, Joe
     Shuster's sister Estate.   (via)        Estate
-In 2013, he doesn't "take" the copyright from Time Warner, Shuster's heirs could
     reacquire rights as we have as a result of our Terminations. Then the Shusters
     would have to negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take the bad
     TW-DC deal. You'll remember that you, Don Bulson and we were shocked when
     Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted
     Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away falsely saying we had a deal with DC
-Marc did not call my mom nor me           family
the Shuster's -My mom called Jean Peavy to see what the Shusters were doing
the Shuster -Peavy gave Marc's number to my mom and she called him after we had fired Ramer and
family    Marks   -has no plan to produce a Superman movie, nor is this feasible
-We felt he grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff does not have a production company and we have never heard anything  since
     about him planning to make a movie                            the
                                                         diversion of ownership of
                                                              the rights

## Why the original ($xx million) investor left:

-Kevin Marks falsely told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

## With Marc's assistance, new Notices of Termination regarding Superboy were sent out:

-We did this to further assert the Siegel rights to this character, separately created from
     Superman.
-My mom advanced the $4,000 filing fees immediately to the Copyright Office when the
     Notices were sent in October 2002
-A copy of the $4,000 check recently processed by the Copyright Office is enclosed with
     this letter to you.

Page 2

Q 0593

Privileged & Confidential
All Rights Reserved

**Exhibit B**
22

SD 00594

JUL-06-2003 11:09 PM                                    1  10 827 7227          P.06

DRAFT

- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Terminations did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The Spectre rights are a dead issue

<u>Marc has a limited negotiation period to represent the Siegel interest:</u>
- For Superman: 18 months from Oct. 23, 2002 (until April 23, 2004)
- For the newly filed Superboy Terminations: 30 months from Oct. 23, 2002 (until April 23, 2005) This is longer because there is a two year waiting period from the time the Notices were served to the date the rights vest.
- If we are not pleased with the results, he will no longer represent us after that time

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that DC doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- It may be better not to deal with Time Warner at all but to go elsewhere

<u>Why there is a buyout offer from a venture capitalist for your interest only:</u>
- You have been saying you needed money badly, were out of work and had big bills
- The venture capitalist doesn't want to invest more than the amount to buy your interest
- My interests are too entangled due to my divorce
- Marc asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it. We do not know the amount that the investor is offering to you.

<u>Why any investor would offer less than Time Warner did in its last offer:</u>
- It is a risky investment
- No immediate payback
- The investor and we may face legal expenses and conflict with DC in the future if we have to sue to get what's already owed or if we eventually make a deal with them and they withhold payment due to "creative bookkeeping" or for other reasons

Page 3

Q 0594

Privileged & Confidential
All Rights Reserved

Exhibit B
23

SD 00595

JUL-06-2003 11:09 PM                                    1 ·10 827 7227          P.07

*DRAFT*

- The investor wants a worthwhile profit on his investment
- It is a situation similar to one in which businesses that give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate for them to receive their money. The beneficiaries always get less than if they wait for the Will to go through Probate.

## Why you cannot ask Time Warner/DC for a buyout:
- It destroys the possibility of us negotiating a fair deal
- It shows weakness
- As the controlling interest, we do not give you approval to do it
- If it damaged our ability to later make a better deal, we would have no choice but to ~~sue~~ ~~you~~

## Why this has not been like other "contract negotiations":
- Time Warner is a huge, arrogant company
- They took months to respond to each issue all along the way and their responses were unacceptable
- Time Warner has nothing to gain by settling this, they keep on making millions
- Their lawyers are particularly heartless, masters at screwing people. They have a bad reputation for this
- They delight in playing off what they see as the Siegel interest's weakness—our need for money
- If that wasn't enough, they want to include additional characters created by our father in one settlement. (They apparently do not yet realize that The Spectre rights did not vest to the Siegels.)
- They want to win this David and Goliath matter so that the rich and powerful will triumph over the little guy
- They want to make an example of us so that other creators and their heirs won't go after their rights

## Your belief that you have something to sell independently:
- You can only sell your rights to a third party with my mom's and my approval because we are the majority interest holders and you have a passive interest
- We will not give approval for a sale to Time Warner because it would damage the overall Siegel interest
- We will give approval for a sale to a third party ~~found by Marc Toberoff~~ as long as it is not Time Warner, DC, or any ~~part of the Time Warner family of businesses and~~ providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

Although a united Siegel front would be best, we won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. The decision has to be yours and yours alone. However, for the reasons listed above, we will not give approval for you to go to Time Warner regarding a buyout,

Page 4

Q 0595

Privileged & Confidential
All Rights Reserved

Exhibit B
24

SD 00596

⅂ `10 827 7227        P.08

DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. If the 15 million dollar offer from the other investor hadn't fallen through, we probably would have taken it. Unfortunately, offers like that are rare and we do not expect any offers to come our way that would include my mom and me.

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if you don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. Please let us know what you decide regarding a buyout through Marc.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Q 0596

Privileged & Confidential
All Rights Reserved                        **Exhibit B**
                                                    **25**

SD 00597

JUL-08-2003 11:27 PM                                        1 310 827 7227        P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1

Q 0147

Privileged & Confidential
All Rights Reserved

Exhibit C
26

SD 00147

JUL-08-2003 11:28 PM                                    1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written

Our opinion as to why this has not been like other "contract negotiations":
    -Time Warner is a huge, and we believe, arrogant company
    -They took months to respond to each issue all along the way and their responses were
        unacceptable.
    -We believe their lawyers are particularly heartless and they have a bad reputation for
        grinding individuals in negotiations
    -This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
        losing it.
    -They want to make an example of us so that other creators and their heirs won't go after
        their rights.

Marc Toberoff and the Shuster interest:
    -Marc does not control the Superman copyright.  He has been hired to do a job.
    -Marc does not own the Shuster interest.  He is a lawyer hired by Joe Shuster's estate
    -In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
        reacquire rights as we have via Terminations.  Then the Shusters would have to
        negotiate a deal or handle things as they choose.
    -The Shuster rights are completely separate from the Siegel rights.
    -Time Warner/DC will own the Shuster rights until they vest in 2013
    -We have no intention of waiting until 2013 to do something with the Siegel rights

We went to Marc to talk about him representing the Siegels.  Marc did not pursue us:
    -We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
        deal.  You'll remember that you, Don Bulson and we were shocked when Kevin
        Marks said that if asked to, he would testify against us in court.
    -Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
        and you about the Superman rights until months after it had taken place.
    -Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did
        not have
    -Marc did not call my mom nor me
    -My mom called the Shuster family to see what the Shusters were doing
    -The family gave Marc's number to my mom and she called him after we had fired Ramer
        and Marks
    -We felt Marc grasped our situation very well and was sympathetic to author's rights
    -Marc Toberoff has no plans to produce a Superman movie

Why the original investor left:
    -Kevin Marks told Marc we had a deal with DC
    -Marc told this to the investor who found another place to invest his money
    -Marc did not know we did not have a deal with DC until later when we contacted him

Page 2

Privileged & Confidential
All Rights Reserved

Exhibit C
27

SD 00148

Q 0148

JUL-08-2003 11:28 PM                                    1 310 827 7227          P.04

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- -We did this to further assert the Siegel rights to this character
- -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- -A copy of the $4,000 check which was recently processed by the Copyright Office is
  enclosed
- -The canceled check was not sent to my mom by her bank until recently. This was after we
  sent the itemization of other expenses to Don Buison.
- -Your 25% of this expense is $1,000. We are also sending this to Don and it will be
  included in the settling of the account before the money being held in trust is
  forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
  copyright filing while he was negotiating although she told him several times that she
  wanted to send in the fees.
- -Kevin did not tell us there was a time limit on when the fees could be paid
- -When negotiations were terminated, we found out from the Copyright Office it was too late
  to pay the fees
- -The window to reacquire our share of the Spectre rights through Termination is,
  unfortunately, no longer open

<u>Why Marc has not been negotiating with Time Warner:</u>
- -The fact that Time Warner doesn't know what to expect from us since we broke off
  negotiations and turned down their last offer gives us strength
- -By not running to them right away, we do not appear desperate and needy, willing to take
  a bad deal
- -Timing the negotiations is an art
- -When we were in our last negotiations with Time Warner, they were moving ahead on a
  Superman movie with a top director, Brett Ratner. TW was trying to sign the director
  and actors to a three picture deal. Now the film appears to be on hold, the director
  left and stars are repeatedly turning down offers to play the role of Superman in the
  three projected films.
- -We believe that with far less happening on the Superman movie right now, our negotiating
  power is even less with Time Warner than when they offered us that bad deal. Right
  now, there's nothing really happening so there is no motivation for them to wrap up
  a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- -My interests are too entangled due to my divorce
- -You have been saying you needed money badly, were out of work and had big bills
- -We have not received an offer from the investor. Apparently the investor does not want to
  pay the higher amount that would be required to buy 100% of the Siegel interest (as
  opposed to your 25%).
- -Marc first asked our permission to present an offer to you and we decided not to stand in
  your way if you want to accept it.

Page 3

Q 0149

**Privileged & Confidential**
**All Rights Reserved**                    **Exhibit C**
                                                        **28**
                                                                              **SD 00149**

JUL-08-2003 11:29 PM                                    1 310 827 7227    P.05

## Why I think any investor would offer less than Time Warner did in its last offer:

- -It is a risky investment
- -No immediate or guaranteed payback
- -The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- -Any investor would want some protection and a worthwhile profit on his investment
- -It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

## Your belief that you have something to sell independently:

- -Since you did not take part in the actual Termination, you do not have legal title to the copyrights
- -You therefore have no right to sell any copyright interest
- -You only have a right to receive a portion of the money that we receive, if any.
- -Your right to receive money is known as a passive financial interest.
- -In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- -We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- -We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

## Why you cannot ask Time Warner/DC for a buyout:

- -As the controlling interest, we do not give you approval to do it
- -It damages the possibility of us negotiating a fair deal
- -It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- -Because Time Warner would get so little from you--a 12 1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- -If it damaged our ability to later make a better deal, we would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4

Q 0150

Privileged & Confidential
All Rights Reserved

Exhibit C

29

JUL-08-2003 11:29 PM                              1 310 827 7227              P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0151

Privileged & Confidential
All Rights Reserved

Exhibit C
30

SD 00151

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

Our opinion regarding the Time Warner-DC offer:

    -It was a bogus offer filled with unacceptable land mines
    -They wanted us to warrant we had no rights which is completely false
    -They insisted on a deal that included characters that had nothing to do with Superman
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain
    -They even wanted us to sign away the public domain rights we'd one day have
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them
    -It was a bad and unreasonable deal

Page 1

Q 0153

Privileged & Confidential
All Rights Reserved

Exhibit C
31

SD 00153

JUL-88-2003    1    318 827 7227    P.85

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written

Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company

-They took months to respond to each issue all along the way and their responses were unacceptable,

-We believe their lawyers are particularly heartless and they have a bad reputation for grinding individuals in negotiations

-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.

-They want to make an example of us so that other creators and their heirs won't go after their rights.

Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright.  He has been hired to do a job.

-Marc does not own the Shuster interest.  He is a lawyer hired by Joe Shuster's estate

-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations.  Then the Shusters would have to negotiate a deal or handle things as they choose.

-The Shuster rights are completely separate from the Siegel rights.

-Time Warner/DC will own the Shuster rights until they vest in 2013

-We have no intention of waiting until 2013 to do something with the Siegel rights

We went to Marc to talk about him representing the Siegels.  Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal.  You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.

-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.

-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did not have

-Marc did not call my mom nor me

-My mom called the Shuster family to see what the Shusters were doing

-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks

-We felt Marc grasped our situation very well and was sympathetic to author's rights

-Marc Toberoff has no plans to produce a Superman movie

Why the original investor left:

-Kevin Marks told Marc we had a deal with DC

-Marc told this to the investor who found another place to invest his money

-Marc did not know we did not have a deal with DC until later when we contacted him

Q 0154

Page 2

Privileged & Confidential
All Rights Reserved

Exhibit C
32

SD 00154

With Marc's assistance, a new Notice of Termination regarding Superboy was ~~sent out~~

- -We did this to further assert the Siegel rights to this character
- -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- -A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- -The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- -Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:

- -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees. _(Time left/after, it would hurt the negotiations)_
- -Kevin did not tell us there was a time limit on when the fees could be paid
- -When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- -The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:

- -The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- -By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- -Timing the negotiations is an art
- -When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman ~~in the three projected films~~.
- -We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:

- -My interests are too entangled due to my divorce
- -You have been saying you needed money badly, were out of work and had big bills
- -We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- -Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Q 0155

Privileged & Confidential
All Rights Reserved

Exhibit C
33

JUL-28-2003 11:29 PM                                    1 310 827 7227      P.05

## Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment

-No immediate or guaranteed payback

-The investor may well face legal expenses and ongoing litigation with Time Warner in the
   future. For instance, we may have to sue to have a Court define the "profits" we
   participate in. If we eventually make a deal with TW/DC, they may withhold
   payment due to "creative bookkeeping" or for other reasons that we can't currently
   predict

-Any investor would want some protection and a worthwhile profit on his investment

-It is a situation that sounds similar to one in which businesses give immediate money to
   beneficiaries of Wills who do not want to wait until the Will goes through Probate
   to receive their money. The beneficiaries always get less if they do this than if they
   wait for the Will to go through Probate. And that's more certain than this.

## Your belief that you have something to sell independently:

-Since you did not take part in the actual Termination, you do not have legal title to the
   Siegel copyrights

-You therefore have no right to sell any copyright interest

-You only have a right to receive a portion of the money that we receive, if any.

-Your right to receive money is known as a passive financial interest.

-In addition, we believe that since my mom and I hold legal title to the Copyright
   Termination Interest, you cannot sell even your passive financial interest to a third
   party without approval from my mom and me

-We will not give approval for a sale by you of your passive financial interest to Time
   Warner because it would damage the overall Siegel interest

-We will give approval for a sale by you of your passive financial interest to a third party
   monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any
   affiliated company and providing the sale does not damage our ability to make a deal
   for our portion of the Siegel interest

## Why you cannot ask Time Warner/DC for a buyout:

-As the controlling interest, we do not give you approval to do it

-It damages the possibility of us negotiating a fair deal

-It shows weakness which Time Warner will take full advantage of and grind you in any
   deal.

-Because Time Warner would get so little from you--a 12 1/2% passive financial interest in
   the character--that would be reflected in a low amount of money paid to you

-If it damaged our ability to later make a better deal, we would have no choice but to hold
   you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that
Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time
Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake
from any point of view.

Page 4                                               Q 0156

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit C**
**34**

SD 00156

JUL-08-2003 11:29 PM                                                    627 7227          P.86

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner
have taken a long time and we have no idea when or if we will ever reach a fair and acceptable
settlement. I know you are not happy about this. It doesn't make my mom and me happy either but
this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the
money that is being held in trust for you. We completed the very detailed volumes of the proof of
expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but
Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work
into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that
we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your
last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of
your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Page 5                                      Q 0157

Privileged & Confidential
All Rights Reserved

Exhibit C
35

SD 00157

JUL-08-2003 11:27 PM                                    1 310 827 7227         P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 00296

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Our opinion regarding the Time Warner-DC offer:

- It was a bogus offer filled with unacceptable land mines
- They wanted us to warrant we had no rights which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1

Q 0389

Privileged & Confidential
All Rights Reserved

**Exhibit C**
**36**

SD 00390

JUL-08-2003 11:25    1 310 827 7227    P.83

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were unacceptable, *self - serving and one-sided,* that *credibility it is their common*
-We believe their lawyers are particularly heartless and they have a bad reputation for *~/ grinding individuals in negotiations*
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it. *which is particularly objectionable above*
-They want to make an example of us so that other creators and their heirs won't go after their rights. *via Terminals or otherwise.*

*to use every owner of their leverage to*

*by both Joe and Shuster family.*

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal or handle things as they choose. *with Time Warner*
-The Shuster rights are completely separate from the Siegel rights. *with the Shuster share*
-Time Warner/DC will own the Shuster rights until they vest in 2013 *at the earliest*
-We have no intention of waiting until 2013 to do something with the Siegel rights

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did *had* not have. *closed*
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

Why the original investor left:    Q 0390
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

*Marc was also unable to get funds to our investor with any anything creditable regarding your interest because apparently neither you nor Don Bulson, specifically responded to his interest for a very long time.*

Page 2

Privileged & Confidential
All Rights Reserved

**Exhibit C**
37

SD 00391

`-28-2003 11:28 PM                    1 318                    P.04`

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
  - We did this to further assert the Siegel rights to this character
  - My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
  - A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
  - The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
  - Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
  - Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees. *(with time notifying it would hurt the negotiation)*
  - Kevin did not tell us there was a time limit on when the fees could be paid
  - When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
  - The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:
  - The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
  - By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
  - Timing the negotiations is an art
  - When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
  - We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
  - My interests are too entangled due to my divorce
  - You have been saying you needed money badly, were out of work and had big bills
  - We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
  - Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Q 0391

Privileged & Confidential
All Rights Reserved

Exhibit C
38

SD 00392

JUL-08-2003 11:29 PM                    1 310 827 7227 (no)      P.05

*[handwritten marginalia at top: "Your interest is ... a passive beneficial ... rest, with ... or ... (25% of what we get)" and "... the sale de ... making p-wer ... regarding the ... Siegel ... interest"]*

Why I think any investor would offer less then Time Warner did in its last offer:

- -It is a risky investment
- -No immediate or guaranteed payback
- -The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- -Any investor would want some protection and a worthwhile profit on his investment
- -It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

Your belief that you have something to sell independently: *[handwritten: (we except it)]*

- -Since you did not take part in the actual Termination, you do not have legal title to the Siegel copyrights *[handwritten: interest]*
- -You therefore have no right to sell any copyright interest
- -You only have a right to receive a portion of the money that we receive, if any.
- -Your right to receive money is known as a passive financial interest.
- -In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- -We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- -We will give approval for a sale by you of your passive financial interest to a third party *[handwritten: an investor]* monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

*[handwritten: (will offer you ... less not buyer offer greater less (then 25% of the 25%) but offer)]*

Why you cannot ask Time Warner/DC for a buyout:

- -As the controlling interest, we do not give you approval to do it
- -It damages the possibility of us negotiating a fair deal
- -It shows weakness which Time Warner will take full advantage of and grind you in any deal. *[handwritten: Your approaching TW shows ... and ... division in our ranks]*
- -Because Time Warner would get so little from you--a 12-1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- -If it damaged our ability to later make a better deal, we would have no choice but to hold you accountable for any harm to us *[handwritten: very lowball amount]*

*[handwritten: everything being your concern]*

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4                                              Q 0392

Privileged & Confidential
All Rights Reserved

Exhibit C
39

SD 00393

JUL-08-2003 11:29 PM                                             ⊃ 627 7227           P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0393

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit C**
**40**

SD 00394

JUL-08-2003 11:27 PM                    1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer</u>:
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Q 0478

Page 1

Privileged & Confidential
All Rights Reserved

Exhibit C
41

SD 00479

JUL-08-2003 11:28 PM                          1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written

Our opinion as to why this has not been like other "contract negotiations":
    -Time Warner is a huge, and we believe, arrogant company
    -They took months to respond to each issue all along the way and their responses were
      unacceptable.
    -We believe their lawyers are particularly heartless and they have a bad reputation for
      grinding individuals in negotiations
    -This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
      losing it.
    -They want to make an example of us so that other creators and their heirs won't go after
      their rights.

Marc Toberoff and the Shuster interest:
    -Marc does not control the Superman copyright. He has been hired to do a job.
    -Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
    -In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
      reacquire rights as we have via Terminations. Then the Shusters would have to
      negotiate a deal or handle things as they choose.
    -The Shuster rights are completely separate from the Siegel rights.
    -Time Warner/DC will own the Shuster rights until they vest in 2013
    -We have no intention of waiting until 2013 to do something with the Siegel rights

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
    -We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
      deal. You'll remember that you, Don Bulson and we were shocked when Kevin
      Marks said that if asked to, he would testify against us in court.
    -Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
      and you about the Superman rights until months after it had taken place.
    -Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did
      not have.
    -Marc did not call my mom nor me
    -My mom called the Shuster family to see what the Shusters were doing
    -The family gave Marc's number to my mom and she called him after we had fired Ramer
      and Marks
    -We felt Marc grasped our situation very well and was sympathetic to author's rights
    -Marc Toberoff has no plans to produce a Superman movie

Q 0479

Why the original investor left:
    -Kevin Marks told Marc we had a deal with DC
    -Marc told this to the investor who found another place to invest his money
    -Marc did not know we did not have a deal with DC until later when we contacted him

Page 2

Privileged & Confidential
All Rights Reserved

Exhibit C
42

SD 00480

JUL-08-2003 11:28 PM                                    1 310 827 7227              P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Q 0480

Privileged & Confidential
All Rights Reserved

**Exhibit C**
43

SD 00481

JUL-08-2003 11:29 PM                                    1 310 827 7227        P.05

## Why I think any investor would offer less than Time Warner did in its last offer:

- -It is a risky investment
- -No immediate or guaranteed payback
- -The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- -Any investor would want some protection and a worthwhile profit on his investment
- -It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

## Your belief that you have something to sell independently:

- -Since you did not take part in the actual Termination, you do not have legal title to the copyrights
- -You therefore have no right to sell any copyright interest
- -You only have a right to receive a portion of the money that we receive, if any.
- -Your right to receive money is known as a passive financial interest.
- -In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- -We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- -We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

## Why you cannot ask Time Warner/DC for a buyout:

- -As the controlling interest, we do not give you approval to do it
- -It damages the possibility of us negotiating a fair deal
- -It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- -Because Time Warner would get so little from you--a 12 1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- -If it damaged our ability to later make a better deal, We would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Privileged & Confidential
All Rights Reserved                              Page 4

                                              Exhibit C                            Q 0481
                                                44
                                                                                   SD 00482

JUL-08-2003 11:29 PM                    1 310 827 7227          P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0482

Privileged & Confidential
All Rights Reserved

Page 5
Exhibit C
45

SD 00483

JUL-08-2003 11:27 PM                                                          1 310 827 7227        P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

Our opinion regarding the Time Warner-DC offer:

    -It was a bogus offer filled with unacceptable land mines
    -They wanted us to <u>warrant we had no rights</u> which is completely false
    -They insisted on a deal that included characters that had nothing to do with Superman
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain
    -They even wanted us to sign away the public domain rights we'd one day have
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them
    -It was a bad and unreasonable deal

Page 1

Q 0661

Privileged & Confidential
All Rights Reserved

Exhibit C
46

SD 00662

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written

## Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were unacceptable,
-We believe their lawyers are particularly heartless and they have a bad reputation for grinding individuals in negotiations
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights.

## Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did not have.
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

## Why the original investor left:
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

Page 2

Q 0662

Privileged & Confidential
All Rights Reserved

Exhibit C
47

SD 00663

08-2003 11:28 PM    1 310    P.04

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out</u>

- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>

- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

<u>Why Marc has not been negotiating with Time Warner:</u>

- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>

- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Privileged & Confidential
All Rights Reserved

Exhibit C
48

Q 0663

SD 00664

JUL-08-2003 11:29 PM                                              1 310 827 7227   P.05

## Why I think any investor would offer less than Time Warner did in its last offer:

- It is a risky investment
- No immediate or guaranteed payback
- The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- Any investor would want some protection and a worthwhile profit on his investment
- It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

## Your belief that you have something to sell independently:

- Since you did not take part in the actual Termination, you do not have legal title to the Siegel copyrights.
- You therefore have no right to sell any copyright interest
- You only have a right to receive a portion of the money that we receive, if any.
- Your right to receive money is known as a passive financial interest.
- In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

## Why you cannot ask Time Warner/DC for a buyout:

- As the controlling interest, we do not give you approval to do it
- It damages the possibility of us negotiating a fair deal
- It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- Because Time Warner would get so little from you--a 12 1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- If it damaged our ability to later make a better deal, we would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4

Q 0664

Privileged & Confidential
All Rights Reserved

Exhibit C

49

SD 00665

JUL-08-2003 11:29 PM                                                   627 7227          P.86

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure


Page 5                                           Q 0665

**Privileged & Confidential**
**All Rights Reserved**                          **Exhibit C**
                                                 **50**                              SD 00666

JUL 08-2003 11:27 PM                                    1 310 827 7227        P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1                                            Q 0750

Privileged & Confidential
All Rights Reserved                    Exhibit C
                                                       51

SD 00751

JUL-08-2003 11:28 PM                                    1 310 827 7227              P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they
   had written

## Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were
   unacceptable.
-We believe their lawyers are particularly heartless and they have a bad reputation for
   grinding individuals in negotiations
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
   losing it.
-They want to make an example of us so that other creators and their heirs won't go after
   their rights.

## Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
   reacquire rights as we have via Terminations. Then the Shusters would have to
   negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
   deal. You'll remember that you, Don Bulson and we were shocked when Kevin
   Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
   and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did
   not have
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer
   and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

## Why the original investor left:

-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

Page 2

Privileged & Confidential
All Rights Reserved

Exhibit C
52

Q 0751

SD 00752

JUL 08-2003 11:28 PM                              1  310 827 7227              P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is
  enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we
  sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be
  included in the settling of the account before the money being held in trust is
  forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
  copyright filing while he was negotiating although she told him several times that she
  wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late
  to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is,
  unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off
  negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take
  a bad deal
- Timing the negotiations is an art
- When we were in our last negotiations with Time Warner, they were moving ahead on a
  Superman movie with a top director, Brett Ratner. TW was trying to sign the director
  and actors to a three picture deal. Now the film appears to be on hold, the director
  left and stars are repeatedly turning down offers to play the role of Superman in the
  three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating
  power is even less with Time Warner than when they offered us that bad deal. Right
  now, there's nothing really happening so there is no motivation for them to wrap up
  a deal with us.

Why there is a buyout offer from an investor for your interest only:
- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to
  pay the higher amount that would be required to buy 100% of the Siegel interest (as
  opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in
  your way if you want to accept it.

Page 3

Q 0752

Privileged & Confidential
All Rights Reserved

Exhibit C
53

SD 00753

JUL-08-2003 11:29 PM    1 310 827 7227    P.05

## Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment

-No immediate or guaranteed payback

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict

-Any investor would want some protection and a worthwhile profit on his investment

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

## Your belief that you have something to sell independently:

-Since you did not take part in the actual Termination, you do not have legal title to the copyrights

-You therefore have no right to sell any copyright interest

-You only have a right to receive a portion of the money that we receive, if any.

-Your right to receive money is known as a passive financial interest.

-In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me

-We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest

-We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

## Why you cannot ask Time Warner/DC for a buyout:

-As the controlling interest, we do not give you approval to do it

-It damages the possibility of us negotiating a fair deal

-It shows weakness which Time Warner will take full advantage of and grind you in any deal.

-Because Time Warner would get so little from you--a 12 1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you

-If it damaged our ability to later make a better deal, we would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4

Q 0753

Privileged & Confidential
All Rights Reserved

Exhibit C
54

SD 00754

JUL 08 2003 11:29 PM                                    1 310 827 7227                    P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0754

Page 5

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit C**
**55**

**SD 00755**

JUL-11 2003 12:03 PM                                    1 310 827 7227                P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
    -It was a bogus offer filled with unacceptable land mines.
    -They wanted us to <u>warrant we had no rights</u> which is completely false.
    -They insisted on a deal that included characters that had nothing to do with Superman.
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain.
    -They even wanted us to sign away the public domain rights we'd one day have.
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them.
    -It was a bad and unreasonable deal.

Page 1

Q 0027

Exhibit D
56

SD 00027

-You and Don Bulson stated that you couldn't believe how bad the document was that they
  had written.

### Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were
  unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use
  every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
  losing it.
-They want to make an example of us so that other creators and their heirs won't go after
  their rights by Termination or otherwise.

### Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own nor the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
  reacquire rights as we have via Terminations. Then the Shusters would have to
  negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the
  earliest.

### We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
  deal. You'll remember that you, Don Bulson and we were shocked when Kevin
  Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
  and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer
  and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

### Why the original investor left:

-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0028

SD 00028

1-2003 12:04 PM

1 310 827 7227          P.6

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0029

Exhibit D
58

SD 00029

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.

-Any investor would want some protection and a worthwhile profit on his investment.

-There is no immediate or guaranteed payback.

-Your interest is only a passive financial interest (25% of what we get) with no decision making power.

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.

-You only have a right to receive 25% of the money that we receive, if any.

-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.

-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.

-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.

-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.

-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.

-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.

-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

SD 00030

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Q 0031

SD 00031

JUL 11-2003 12:03 PM                          1 310 827 7227        P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
    -It was a bogus offer filled with unacceptable land mines.
    -They wanted us to warrant we had no rights which is completely false.
    -They insisted on a deal that included characters that had nothing to do with Superman.
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain.
    -They even wanted us to sign away the public domain rights we'd one day have.
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them.
    -It was a bad and unreasonable deal.

Page 1

Q 0133

Privileged & Confidential
All Rights Reserved
**Exhibit D**
**61**

SD 00133

JUL 1-2003 12:03 PM                    1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

## Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

## Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

## Why the original investor left:

-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0134

Privileged & Confidential
All Rights Reserved                    **Exhibit D**
                                        **62**

SD 00134

JUL 11-2003 12:04 PM                                    1 310 827 7227          P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0135

Privileged & Confidential
All Rights Reserved

SD 00135

JUL.-11-2003 12:04 PM                          1 310 827 7227          P.05

-We have not received an offer from the investor.  Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.

-Any investor would want some protection and a worthwhile profit on his investment.

-There is no immediate or guaranteed payback.

-Your interest is only a passive financial interest (25% of what we get) with no decision making power.

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future.  For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money.  The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.

-You only have a right to receive 25% of the money that we receive, if any.

-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.

-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.

-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.

-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.

-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.

-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.

-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Q 0136

Privileged & Confidential
All Rights Reserved

**Exhibit D**
**64**

SD 00136

JUL-11-2003 12:05 PM                              1 310 827 7227            P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Q 0137

Privileged & Confidential
All Rights Reserved

Exhibit D
65

SD 00137

JUL-1, M        :03 PM                                    1 310 827 7227

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
    -It was a bogus offer filled with unacceptable land mines.
    -They wanted us to <u>warrant we had no rights</u> which is completely false.
    -They insisted on a deal that included characters that had nothing to do with Superman.
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain.
    -They even wanted us to sign away the public domain rights we'd one day have.
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them.
    -It was a bad and unreasonable deal.

Q 0159

Privileged & Confidential
All Rights Reserved

**Exhibit D**
66

SD 00159

JUL-11-200?    ?? PM    1 510 827 7227

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

## Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

## Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

## Why the original investor left:

-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0160

Privileged & Confidential
All Rights Reserved

**Exhibit D**

67

SD 00160

JUL-11-2003 12:04          1 510 827 7227          P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- -We did this to further assert the Siegel rights to this character.
- -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- -A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- -The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- -Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- -Kevin did not tell us there was a time limit on when the fees could be paid.
- -When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- -The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- -The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- -By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- -Timing the negotiations is an art.
- -When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- -We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- -You have been saying you needed money badly, were out of work and had big bills.
- -Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- -My interests are too entangled due to my divorce.

Page 3

Q 0161

Privileged & Confidential
All Rights Reserved

Exhibit D
68

SD 00161

JUL-1,-2003 12:04 PM                                    1 310 827 7227           P.05

-We have not received an offer from the investor. Apparently the investor wants some stake
in Superman but does not want to pay the higher amount that would be required to
buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision
making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the
future. For instance, we may have to sue to have a Court define the "profits" we
participate in, to combat Time Warner/DC's "creative bookkeeping" or for other
reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to
beneficiaries of Wills who do not want to wait until the Will goes through Probate
to receive their money. The beneficiaries always get less if they do this than if they
wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned
that under the law, you do not have the right to sell a copyright interest because since
you did not take part in the actual Termination, you do not have legal title to the
Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a
third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner
because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any
harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc
Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any
affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last
offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them,
they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time
Warner would take full advantage of and use against all of us.
-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of
what we receive, if anything)--that would be reflected in a very low-ball amount of
money offered to you.

Page 4                                      Q 0162

Privileged & Confidential
All Rights Reserved
**Exhibit D**
69
SD 00162

JUL-11-2003,12:05 PM                                    1 310 927 7227          P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Privileged & Confidential
All Rights Reserved

**Exhibit D**
**70**

Q 0163

**SD 00163**

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to warrant we had no rights which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1

Q 0395

SD 00396

JUL-11-2005    1:03 PM    1 310 827 7227

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0396

SD 00397

JUL-11-2003 12:04    1 310 827 7227    P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0397

SD 00398

JUL-11-2003 12:04 PM                                    1 310 827 7227          P.05

-We have not received an offer from the investor.  Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

## Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.

-Any investor would want some protection and a worthwhile profit on his investment.

-There is no immediate or guaranteed payback.

-Your interest is only a passive financial interest (25% of what we get) with no decision making power.

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future.  For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money.  The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

## Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.

-You only have a right to receive 25% of the money that we receive, if any.

-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.

-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.

-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.

-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

## Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.

-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.

-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.

-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Exhibit D
74

SD 00399

JUL-11-2003 12:05 PM                          1 310 927 7227              P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Q 0399

SD 00400

J|IL-11-2003 12:03 PM                    1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to <u>warrant we had no rights</u> which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law
     changes to give creators and their families additional rights or if an extension of time
     is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble
     collecting any future money from them.
- It was a bad and unreasonable deal.

Q 0484

Page 1

Privileged & Confidential
All Rights Reserved

Exhibit D
76

SD 00485

JUL-11-2003 12:03 PM                                    1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:

-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0485

Privileged & Confidential
All Rights Reserved

SD 00486

JUL-11-2003 12:04 PM                    1 310 827 7227              P.04

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0486

Privileged & Confidential
All Rights Reserved

**Exhibit D**
78

SD 00487

JUL-11-2003 12:04 PM                           1 310 827 7227            P.05

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.

-Any investor would want some protection and a worthwhile profit on his investment.

-There is no immediate or guaranteed payback.

-Your interest is only a passive financial interest (25% of what we get) with no decision making power.

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.

-You only have a right to receive 25% of the money that we receive, if any.

-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.

-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.

-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.

-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.

-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.

-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.

-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Q 0487

**Privileged & Confidential**
**All Rights Reserved**

Page 4
**Exhibit D**
**79**

SD 00488

JUL-11-2003 12:05 PM                                    1 310 827 7227         P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

**Privileged & Confidential**
**All Rights Reserved**

Page 5
**Exhibit D**
**80**

Q 0488

SD 00489

JUL-    :03 PM                                              1 310 827 7227

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother
and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the
extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have
to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer
representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying
to get the Court to award him half of my rights to Superman and other properties created by our
father, claiming they should be treated as community property. This is a particularly difficult fight
because there are no legal precedents for a case like mine and finding a lawyer who knows both
Copyright Termination Law and California Divorce and Family Law is like looking for a needle in
a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know
anything about Copyright Law. The decision that will be made in my case in a few weeks will set
the precedent for all heirs of author-creators who receive intellectual property rights through
Termination and later go through a divorce. It would be a tragedy not only for me but for all
intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and
this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers
so I don't miss anything. Because I am still pressed for time I am writing the following in outline
form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>

-It was a bogus offer filled with unacceptable land mines.

-They wanted us to <u>warrant we had no rights</u> which is completely false.

-They insisted on a deal that included characters that had nothing to do with Superman.

-They wanted us to sign away the ability to get anything additional if the copyright law
    changes to give creators and their families additional rights or if an extension of time
    is one day given to rights holders before the property goes into the public domain.

-They even wanted us to sign away the public domain rights we'd one day have.

-As a result of Time Warner's hardball tactics, we feared that we would have trouble
    collecting any future money from them.

-It was a bad and unreasonable deal.

Page 1

Q 0667

Privileged & Confidential
All Rights Reserved

Exhibit D
81

SD 00668

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":

-Time Warner is a huge, and we believe, arrogant company.

-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.

-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.

-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.

-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:

-Marc does not control the Superman copyright. He has been hired to do a job.

-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.

-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.

-The Shuster rights are completely separate from the Siegel rights.

-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:

-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.

-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.

-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.

-Marc did not call my mom nor me.

-My mom called the Shuster family to see what the Shusters were doing.

-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.

-We felt Marc grasped our situation very well and was sympathetic to author's rights.

-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:

-Kevin Marks told Marc we had a deal with Time Warner/DC.

-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.

-Marc told the above to the investor who found another place to invest his money.

-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Page 2

Q 0668

Privileged & Confidential
All Rights Reserved

Exhibit D
82

SD 00669

JUL-11-2003 12:04                                                     518 827 7227          P.04

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0669

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit D**
**83**

JUL-11-2003 12:04 PM                                                    1 310 827 7227          P.05

-We have not received an offer from the investor. Apparently the investor wants some stake
    in Superman but does not want to pay the higher amount that would be required to
    buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>

-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision
    making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the
    future.  For instance, we may have to sue to have a Court define the "profits" we
    participate in, to combat Time Warner/DC's "creative bookkeeping" or for other
    reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to
    beneficiaries of Wills who do not want to wait until the Will goes through Probate
    to receive their money.  The beneficiaries always get less if they do this than if they
    wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently:</u>

-We empathize with the fact that this will be upsetting to you, but we have recently learned
    that under the law, you do not have the right to sell a copyright interest because since
    you did not take part in the actual Termination, you do not have legal title to the
    Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a
    third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner
    because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any
    harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc
    Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any
    affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last
offer):</u>

-Since Time Warner would know that we wouldn't give approval for you to approach them,
    they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time
    Warner would take full advantage of and use against all of us.
-Even an <u>attempt</u> by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of
    what we receive, if anything)--that would be reflected in a very low-ball amount of
    money offered to you.

Page 4                                          Q 0670

Privileged & Confidential
All Rights Reserved
                                    **Exhibit D**
                                        84
                                                                        SD 00671

JUL-11-2003 12:05 PM                                        1 310 927 7227                P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Q 0671

Privileged & Confidential
All Rights Reserved

**Exhibit D**
**85**

SD 00672

JUL-11-2003 12:03 PM                                        1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like from looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to warrant we had no rights which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1

Q 0756

Privileged & Confidential
All Rights Reserved

**Exhibit D**
86

SD 00757

JUL-11-2003 12:03 PM                                      1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0757

Privileged & Confidential
All Rights Reserved

**Exhibit D**
87

SD 00758

JUL-11-2003 12:04 PM                           1 310 827 7227              P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
  -We did this to further assert the Siegel rights to this character.
  -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
  -A copy of the $4,000 check which was recently processed by the Copyright Office is
    enclosed.
  -The canceled check was not sent to my mom by her bank until recently. This was after we
    sent the itemization of other expenses to Don Bulson.
  -Your 25% of this expense is $1,000. We are also sending this to Don and it will be
    included in the settling of the account before the money being held in trust is
    forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
  -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
    copyright filing while he was negotiating with Time Warner. He said she shouldn't
    waste thousands of dollars of her money for the filing fees because Time Warner/DC
    was going to include payment for The Spectre in a deal. She told him several times
    that she wanted to send in the fees but he kept telling her it wasn't a good time and
    it was unnecessary.
  -Kevin did not tell us there was a time limit on when the fees could be paid.
  -When negotiations were terminated, we found out from the Copyright Office it was too late
    to pay the fees.
  -The window to reacquire our share of the Spectre rights through Termination is,
    unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
  -The fact that Time Warner doesn't know what to expect from us since we broke off
    negotiations and turned down their last offer gives us strength.
  -By not running to them right away, we do not appear desperate and needy, willing to take
    a bad deal.
  -Timing the negotiations is an art.
  -When we were in our last negotiations with Time Warner, they were moving ahead on a
    Superman movie with a top director. TW was trying to sign the director and actors
    to a three picture deal. Now even a single film appears to be on hold indefinitely.
    The director left the project and stars are repeatedly turning down offers to play the
    role of Superman.
  -We believe that with far less happening on the Superman movie right now, our negotiating
    leverage with Time Warner is less than when they offered us that bad deal. Right
    now, there's nothing really happening so there is no motivation for them to wrap up
    a deal with us.

Why there is a buyout offer from an investor for your interest only:
  -You have been saying you needed money badly, were out of work and had big bills.
  -Marc asked our permission to present the investor's offer to you and we decided not to
    stand in your way if you want to accept it.
  -My interests are too entangled due to my divorce.

Page 3

Q 0758

Privileged & Confidential
All Rights Reserved

Exhibit D
88

SD 00759

JUL-11-2003 12:04 PM                                1 310 827 7227        P.05

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

## Why I think any investor would offer less than Time Warner did in its last offer:

-It is a risky investment.

-Any investor would want some protection and a worthwhile profit on his investment.

-There is no immediate or guaranteed payback.

-Your interest is only a passive financial interest (25% of what we get) with no decision making power.

-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.

-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

## Your belief that you have something to sell independently:

-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.

-You only have a right to receive 25% of the money that we receive, if any.

-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.

-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.

-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.

-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

## Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):

-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.

-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.

-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.

-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Q 0759

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit D**
**89**

SD 00760

JUL-11-2003 12:05 PM                        1 310 827 7227              P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura


Enclosure


Q 0760

**Privileged & Confidential**
**All Rights Reserved**

**Exhibit D**
**90**

**SD 00761**

LAW OFFICES
## RENNER, OTTO, BOISSELLE & SKLAR, LLP
1621 EUCLID AVENUE - NINETEENTH FLOOR
CLEVELAND, OHIO   44115-2191
Tel: (216) 621-1113   Fax: (216) 621-6165
EMAIL: MAILROOM@RENNEROTTO.COM

Extension   149
Direct Email:   DBulson@RennerOtto.com

June 15, 2006

Melvin H. Banchek, Esq.
55 Public Square, Suite 918
Cleveland, Ohio 44113

> Re:   Estate of Michael Siegel
>   Cuyahoga County Probate Court Case
>   Number 2006 EST 0110075

Dear Mr. Bancheck:

Enclosed are Renner Otto's files pertaining to Michael Siegel.

Please be advised that we have retained a research file containing general research as well as files containing a copy of the termination notices and copies of litigation which Mrs. Larson provided us.

Please let us know if you have any questions.

Very truly yours,

Jennifer A. Moore
Assistant to Don W. Bulson

**Exhibit E**
**91**

Bulson Production
00001

1  WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
4  Telephone:  310-858-7888
   Fax:        310-550-7191
5
   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6  Roger L. Zissu (Admitted *pro hac vice*)
   866 United Nations Plaza
7  New York, New York 10017
   Telephone: 212-813-5900
8  Fax:        212-813-5901
9  PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
10 1711 Route 9D
   Cold Spring, NY 10516
11 Telephone: 845-265-2820
   Fax:        845-265-2819
12
   Attorneys for Defendants and Counterclaimant
13
                UNITED STATES DISTRICT COURT
14
      CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
15
16 JOANNE SIEGEL and LAURA          )  Case No. 04-8400 SGL (RZx)
   SIEGEL LARSON,                   )
17                                  )  Hon. Stephen G. Larson, U.S.D.J.
                                    )
18             Plaintiffs,          )
                                    )  **DEFENDANTS' OPPOSITION
19        vs.                       )  TO PLAINTIFFS' MOTION FOR
                                    )  PARTIAL SUMMARY
20 WARNER BROS. ENTERTAINMENT       )  JUDGMENT AND
   INC.; TIME WARNER INC.; DC       )  MEMORANDUM OF POINTS
21 COMICS; and DOES 1-10,           )  AND AUTHORITIES IN
                                    )  SUPPORT THEREOF**
22             Defendants.          )
                                    )  [Defendants' Opposition to Local
23                                  )  Rule 56.1 Statement; Declaration of
                                    )  Michael Bergman and exhibits
24                                  )  thereto]
                                    )
25                                  )  Date:    July 23, 2007
                                    )  Time:    10:00 a.m.
26                                  )  Place:   Courtroom 1
                                    )
27 ────────────────────────────────  )
   AND RELATED COUNTERCLAIMS.       )
28                                  )

judgment.  Indeed, it has routinely been held that the question of the formation of a contract is <u>for the trier of fact</u> upon considering the appropriate evidence.  *See Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) (whether parties mutually intended to be bound by terms contained in a proposed written agreement is to be determined from the facts and circumstances of a particular case and is a question of fact); *Symphony Fabrics Corp. v. Podell Indus., Inc.,* 94 Civ. 4373 (BSJ) 1996 U.S. Dist. LEXIS 12767, *14 (S.D.N.Y. Aug. 30, 1996) (to determine whether a contract has been formed, the trier of fact must evaluate the objective manifestations of the intent of the parties).

In general, an enforceable contract requires a meeting of the minds on the material terms, along with an intention by the parties to be bound.  *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959); *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("In addition to the intent of the parties to bind themselves, the formation of a settlement contract requires agreement on its material terms."). Plaintiffs have failed to provide any sworn testimony from either of them containing any objective evidence that the October 19, 2001 Letter did not represent a "meeting of the minds" on all material terms.  This evidentiary failing alone dooms Plaintiffs' motion.

Moreover, as demonstrated below, Defendants have presented sufficient admissible evidence for a trier of fact to conclude that in October, 2001, (i) the parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their respective clients, reached a meeting of the minds on all material terms pursuant to which Plaintiffs would convey their Superman copyright interests to DC, (ii) that this agreement was contemporaneously memorialized and affirmed in a writing executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties intended and expected to be bound by the terms of that agreement notwithstanding the fact that they contemplated negotiating and executing a more formal contract thereafter.  In fact, the parties were proceeding along on that basis, with the

drafting and re-drafting of their more formal documentation, until Plaintiffs suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel, and abruptly jettisoned both the deal and their attorneys who negotiated it.

This evidence cannot be rejected or negated *as a matter of law* as would be required in a motion for summary judgment. *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129, 141 (2002) ("where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist."). Indeed, in assessing the existence of a contract on summary judgment, the court *must* draw all inferences in the light most favorable to the non-moving party. *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1116 (C.D. Cal. 2002) (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987)). Accordingly, Plaintiffs' motion for partial summary judgment on these claims must be denied, and DC should be permitted to present its contract Counterclaims to a jury for determination at trial.

## A.    It Has Been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement

As a preliminary matter, the question of Mr. Marks' authority to act on behalf of and to bind Plaintiffs to an agreement with DC is no longer an issue in this case. Generally, an attorney is *presumed* to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *See In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2nd Cir. 1996). In their Reply to DC's Counterclaims on the contract issues, Plaintiffs expressly asserted as their Thirty-Seventh affirmative defense that "Plaintiffs' attorneys lacked

1 | authority and/or exceeded the scope of their authority with respect to the purported

2 | settlement agreement alleged by Counterclaimant." (Bergman Decl. Exh. II.)

3 | Notwithstanding this stated defense, Plaintiffs vigorously resisted all attempts by

4 | Defendants to inquire into the scope of Mr. Marks' authority, and specifically into

5 | whether or not Plaintiffs had authorized in advance or had consented to his

6 | communication to DC on October 19, 2001, that "the Siegel Family . . . has

7 | accepted" DC's offer. (Bergman Decl. JJ; *see also id.* Exh. S (Marks Tr.) at

8 | 146:21-147:11.) However, in response to Defendants' motions to compel

9 | Plaintiffs and Mr. Marks to produce documents and respond to deposition

10 | questions regarding his authority – and in an apparent attempt to forestall any order

11 | by the Court in that regard – Plaintiffs' current attorney, Mr. Toberoff, conceded in

12 | open court, *without qualification*, that the Marks Letter represented the statements

13 | of Plaintiffs themselves. (Bergman Decl. Exh. KK.) Accordingly, relying on Mr.

14 | Toberoff's statement and finding it to be binding on Plaintiffs, the Court *dismissed*

15 | Plaintiffs' affirmative defense denying Mr. Marks' authority, and ruled that the

16 | statements contained in the Marks Letter are the statements of Plaintiffs:

17 | To make sure of Plaintiffs' position, the Court, at the

18 | hearing on April 30, 2007, directly asked Plaintiffs'

19 | counsel whether the statements in the October 19, 2001

20 | letter represented the statements of Plaintiffs. Plaintiffs'

21 | counsel replied with an unqualified "yes." That answer

22 | binds Plaintiffs here. To further make absolutely sure

23 | that there is no remaining issue as to Mr. Marks'

24 | authority in connection with the October 19, 2001 letter,

25 | the Court hereby strikes the thirty-seventh affirmative

26 | defense from the reply to the counterclaims in both cases.

27

28

(Bergman Decl. Exh. <u>LL</u>.)[49]

**B.    The Fact That the Parties Contemplated the Later**
**Negotiation and Execution of a Long-Form Contract Does**
**Not Negate the October 19 Agreement as a Matter of Law**

Plaintiffs assert that even if the parties had "provisionally" agreed on all material terms of their deal in October, 2001, "given the importance and complexity of the subject matter and proposed deal points, any agreement would need to be reduced to a written contract in mutually acceptable fashion."  (Pl. Mem. at 59-60.)  From this premise, Plaintiffs argue that since no long-form contract was in fact finalized and executed, no enforceable agreement can exist. (*Id.* at 60-61.)  But the mere fact that the parties contemplated, and embarked on the process of drafting, a later, long-form contract, does not establish *as a matter of law* that the parties did not intend their agreement, as memorialized in the Marks Letter, to be binding.  *See Inamed Corp.,* 275 F. Supp. 2d at 1116 ("whether the parties intended that the letter agreement be a binding contract or rather an agreement to negotiate a further contract is a question of fact."); *Beck v. American Health Group Int'l,* 211 Cal. App. 3d 1555, 1562 (1989) ("Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties.").

Thus, where the parties intend to be bound – even if they expect to further reduce their informal writing to a more formal one – "the failure to follow it with a more formal writing <u>does not negate the existence of the prior contract</u>."  *Harris v. Rudin, Richman & Appel,* 74 Cal. App. 4th 299, 307 (1999) (emphasis added).[50] *See also Louis Lesser Enters., Ltd. v. Roeder,* 209 Cal. App. 2d 401, 404 (1962)

---

[49] The Court's order also found that "An attorney is presumed to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *In re Artha Mgm't, Inc.,* 91 F.3d 326, 329 (2d Cir. 1996) (Bergman Decl. Ex. <u>LL</u>.)

[50] Holding, in overruling a demurrer, that "[w]hether the parties intended their communications to be a binding settlement agreement or an agreement to further negotiate after a formal draft was prepared is a factual question. . . ." *Id.* at 308.

**Exhibit F**
**96**    71

("[P]reliminary negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend to execute a formal writing."); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 at n3 (1991) (an agreement which contemplates subsequent, more detailed documentation is <u>not</u> invalid if the parties have agreed to its existing terms).

Defendants do not dispute that the parties contemplated further documentation of their agreement, including the preparation of formal assignments reflecting the transfer of Plaintiffs' copyright interests to DC. However, they contend that the evidence – and the reasonable inferences to be drawn from that evidence – supports a finding that the parties intended to be bound to the terms of their agreement reached on October 19, 2001, even before any such formal document was prepared and signed: Unlike the circumstances of the cases on which Plaintiffs rely,[51] neither Mr. Marks nor Mr. Schulman conditioned their agreement on the execution of more formal documentation, either in their correspondence, or orally. (Schulman Decl. ¶ 10.) In fact, both the Marks Letter and the Schulman Letter speak to a *presently existing* agreement. (Toberoff Decl. Exhs. <u>BB</u>, <u>CC</u>.)[52] Thus, for example, the detailed Marks Letter states of the parties' agreement that "the terms are as follows," and contains many references to "this deal." It sets forth all the material terms of the parties' agreement, and makes no mention of the preparation of a long-form agreement – that is, it operates as a stand alone document. Indeed, the only mention of additional documentation in the Marks Letter is with respect to ministerial-type documents relating to the

---

[51] *See, e.g., Patch v. Anderson*, 66 Cal. App. 2d 63, 66 (1944); *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 155, 163 (1989); *Duran v. Duran*, 150 Cal. App. 3d 176, 180 (1983); *Roth v. Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957)

[52] The Marks Letter expressly states that "the Siegel Family ... <u>has accepted</u> D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties," and acknowledges that a deal has been reached: "Many thanks for help and patience in <u>reaching this monumental accord</u>." (Toberoff Decl. Exh. <u>BB</u>.) Mr. Schulman's follow up correspondence encloses "a more fulsome outline of what we believe <u>the deal we've agreed to</u> is," filling in a few details, but otherwise in accord with the material terms set forth in the Marks Letter. (*Id*. Exh. <u>CC</u>.)

copyright transfers: "The Siegel Family would agree to execute further

documents, and D.C. Comics would be appointed as attorney-in-fact to execute

such documents if the Siegel Family fails to do so within a reasonable period of

time." (*Id*. Exh. <u>BB</u>.)  The Schulman Letter similarly states only that the "Siegels

will execute further documents as may be necessary to evidence DC's ownership

of rights; designate WB as attorney in fact." (*Id*. Exh. <u>CC</u>.)

     Nor is there any other type of indication in the Marks Letter that the

agreement the parties had reached as reflected therein was not immediately

binding.  On the contrary, Mr. Marks' choice of language reflects a deliberate

effort to fully document the parties' agreement in the letter without the necessity

for further negotiation of outstanding terms, without the need for additional

documentation, and inviting the very type of response Mr. Schulman provided in

his letter of October 26, 2001. (*Id*. Exh. <u>BB</u>)  Likewise, the Schulman Letter (*id*.

Exh. <u>CC</u>), which started the process of the more formal documentation that was

admittedly contemplated by the negotiators, also contains no indication that the

parties are not bound unless a more formal agreement is executed.  In fact, DC

*affirmatively acted* on the understanding that there was an immediate agreement,

by negotiating for Warner Bros. to include Plaintiffs' credits in the upcoming

motion picture *Superman Returns* (Schulman Decl. ¶ 7), and by setting up a

reserve for the payment of all monies due to Plaintiffs pursuant to the terms of the

agreement. (Bergman Decl. Exh. <u>R</u> (Levitz Tr.) at 289:9-290:1.)

     Similarly, in her May 9, 2002 letter to Richard Parsons, Mrs. Siegel

*acknowledged* that the parties had reached an accord six months earlier, but

protested only − *albeit* strongly − that the February Draft (Toberoff Decl. Exh.

<u>DD</u>) did not reflect that agreement. (Bergman Decl. Exh. <u>Z</u>.)[53]  Tellingly,

---

[53] "We made painful concessions assured if we did we would arrive at an agreement.
When we made those difficult concessions and reluctantly <u>accepted John Schulman's last</u>
<u>proposal</u> six months ago, we were stabbed in the back with a shocking contract. . . . For
your representatives to condition our receiving financial compensation for our rights on

Plaintiffs have submitted no evidence of any contemporaneous objective manifestation by them or their counsel of an intent not to be bound until the execution of a long-form.  Indeed, Plaintiffs' have submitted *no evidence whatsoever* of their purported intention not to be bound – whether objective or subjective – in connection with this motion.

C.   <u>The October 19, 2001 Agreement Is An Acceptance Of DC Comics' Offer And Is Not A "Counteroffer" That Was Rejected By Defendants</u>

Plaintiffs concede that the October 19, 2001 Agreement is drafted as an "acceptance" of an offer made on October 16, 2001.  (Pl. Mem. at 57.)  However, because Plaintiffs now attempt to avoid the agreement reached via that acceptance, they seek to characterize the October 19, 2001 Agreement as a "counteroffer" that was later rejected by Defendants.  (*Id.*)  Defendants absolutely reject this characterization – Defendants have consistently maintained and assert again now that the October 19, 2001 Agreement represented an acceptance of all material terms offered by Mr. Schulman on behalf of Defendant DC.  (Schulman Decl. ¶¶ 10, 13-15.)

As noted above, a contract is established when there is a meeting of the minds between the parties on all material terms of their agreement, *Apablasa*, 176 Cal. App. 2d at 726, and its formation is a question *of fact* to be determined from the particular circumstances of each case, *Banner Entertainment*, 62 Cal. App. 4th at 358.  *What* the material terms of the contract are "depends on the circumstances of the agreement, including the agreement and its context, the subsequent conduct of the parties, and the remedy sought."  *House of Prayer, etc. v. Evangelical Assoc. for India*, 113 Cal. App. 4th 48, 53 (2003).  To ascertain whether the requisite meeting of the minds exists – that is, whether the parties have assented "to the

demands which were not in <u>the proposal we accepted</u>, is deceitful."  (*Id.*, emphasis added.)

1 | Marc Toberoff (CA State Bar No. 188547)
Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
2049 Century Park East, Suite 2720
3 | Los Angeles, CA 90067
Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

6

7 | **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9   JOANNE SIEGEL, an individual; and<br>10   LAURA SIEGEL LARSON, an<br>individual,<br>11         Plaintiffs,<br>12   vs.<br>13   TIME WARNER INC., a corporation;<br>14   WARNER COMMUNICATIONS<br>INC., a corporation; WARNER<br>15   BROS. ENTERTAINMENT INC., a<br>corporation; WARNER BROS.<br>16   TELEVISION PRODUCTION INC.,<br>a corporation; DC COMICS, a general<br>17   partnership; and DOES 1-10,<br>18<br>19       Defendants.<br>20   DC COMICS,<br>21<br>22      Counterclaimant,<br>23   vs.<br>24   JOANNE SIEGEL, an individual; and<br>LAURA SIEGEL LARSON, an<br>25   individual,<br>26<br>27      Counterclaim Defendants. | Case Nos.:<br>CV 04-08400 SGL (RZx)<br>CV 04-08776 SGL (RZx)<br><br>[Hon. Stephen G. Larson, U.S.D.J.]<br>[Hon. Ralph Zaresky, U.S.M.J.]<br><br>**DECLARATION OF MARC<br>TOBEROFF PURSUANT TO<br>MAGISTRATE ZAREFSKY'S<br>APRIL 30, 2007 ORDER** |

28

1    I, Marc Toberoff, declare as follows:

2    1.    I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of

3    record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a

4    member in good standing of the State Bar of California and submit this declaration

5    pursuant to Magistrate Zarefsky's order at the April 30, 2007 hearing ("Order") on

6    defendants' motion to compel the production of documents stolen from my law

7    offices ("Documents"). I have personal knowledge of the facts set forth in this

8    declaration and, if called as a witness, could and would testify competently to such

9    facts under oath.

10    2.    Pursuant to the Order, I have accounted for each of the Documents as

11    bate stamped by John Quinn, Esq. (designated by "Q") and identified by bates

12    numbers the Documents produced to defendants by Plaintiffs or third party witnesses,

13    as applicable, or listed in a privilege log furnished to defendants by Plaintiffs and/or

14    such third parties:

15

16    Q 0001- 7    Un-dated defamatory cover letter

17    Q 0008-9    Plaintiffs' Kevin Marks ("Marks") Privilege Log # 325

18    Q 0010    Privileged communication between Law Offices of Marc
19    Toberoff and Plaintiff Laura Siegel Larson dated October
20    10, 2005, after the start of this litigation. This document is
      *not* required to be listed in a privilege log pursuant to the parties'
21    standing agreement.

22    Q 0011-13    Produced by Plaintiffs- 000001888-90
23
24    Q 0014-18    Produced by IPW, LLC- 17-20

25    Q 0019-20    Produced by Plaintiffs- 000001883-1884
26
      Q 0021-24    Produced by Pacific Pictures Corporation.- 00001- 4
27

28

1

Declaration Of Marc Toberoff
**Exhibit G**
**101**

46

| | | |
|---|---|---|
| Q 0025 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0026 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0027-33 | Plaintiffs' supplemental privilege log # 82 |
| Q 0034-35 | Produced by Jean Peavy and Warren Peary ("Shusters")-142-43 |
| Q 0036-39 | Produced by Shusters- 125-28 |
| Q 0040 | Attorney Don Bulson ("Bulson") privilege log #319 |
| Q 0041 | Produced by Shusters- 119 |
| Q 0042-50 | Produced by Shusters-113- 118 |
| Q 0051 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| Q 0052 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| Q 0053-54 | Produced by Shusters-140-141 |
| Q 0055-56 | Produced by Shusters- 138-139 |
| Q 0057-58 | Bulson privilege log # 327 |
| Q 0059-74 | Produced by Shusters- 63-78 |
| Q 0075-76 | Bulson privilege log # 327 |
| Q 0077-81 | Produced  by Shusters- 79- 83 |
| Q 0082-85 | Produced by Shusters- 105- 108 |
| Q 0083-85 | Produced by Shusters- 106 |
| Q 0086 | Produced by Plaintiffs- 000002050 |

2

| | |
|---|---|
| Q 0087-0089 | Plaintiffs' supplemental privilege log # 69 |
| Q 0090-95 | Plaintiffs' supplemental privilege log # 76 |
| Q 0096-104 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0105-127 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0128-31 | Plaintiffs' supplemental privilege log # 98 |
| Q 0132-37 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0138-45 | Plaintiffs' supplemental privilege log # 79 |
| Q 0146-51 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0152-57 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0158-63 | Plaintiffs' supplemental privilege log #82, 83 |
| Q 0164- 171 | Plaintiffs' supplemental privilege log # 182 |
| Q 0172-175 | Plaintiffs' supplemental privilege log # 181 |
| Q 0176-94 | Shusters' supplemental privilege log # 2 |
| Q 0195-199 | Shusters' supplemental privilege log # 3 |
| Q 0200 | Shusters' supplemental privilege log # 5 |
| Q 0201-222 | Shusters' supplemental privilege log # 4 |
| Q 0223 | Produced by Shusters- 103 |
| Q 0224-42 | Shusters' supplemental privilege log # 4 |
| Q 0243-44 | Shusters' supplemental privilege log # 9 |
| Q 0245-49 | Produced by Shusters- 79-83 |

3

| | |
|---|---|
| Q 0250-254 | Plaintiffs' supplemental privilege log # 98 |
| Q 0255-273 | Shusters' supplemental privilege log # 2 |
| Q 0274-5 | Shusters' supplemental privilege log # 8 |
| Q 0276 | Shusters' supplemental privilege log # 6 |
| Q 0277 | Shusters' supplemental privilege log # 7 |
| Q 0278 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0279-80 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0281-82 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0283 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0284 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0285-289 | Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0290-0296 | Un-dated defamatory cover letter (duplicate) |
| Q 0297-299 | Produced by Plaintiffs- 000001888-90 |
| Q 0300 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| Q 0301-303 | Produced by Pacific Pictures Corp- 1-4 |
| Q 0304-305 | Produced by Shusters- 142-143 |

4

| | |
|---|---|
| Q 0306-309 | Produced by Shusters- 125- 128 |
| Q 0310-13 | Plaintiffs' supplemental privilege log #175 |
| Q 0314 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0315 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0316-23 | Plaintiffs' supplemental privilege log # 79 |
| Q 0324-32 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0333-35 | Plaintiffs' supplemental privilege log # 69 |
| Q 0336-340 | Produced by IPW, LLC 17- 20, Plaintiffs- 000001882 |
| Q 0341-42 | Produced by Plaintiffs- 000001883-84 |
| Q 0343-44 | Produced by Plaintiffs- 000002048-49 |
| Q 0343-44 | Produced by Plaintiffs- 000002048-9 |
| Q 0345-50 | Plaintiffs' supplemental privilege log # 76 |
| Q 0351 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| Q 0352 | Bulson privilege log # 319 |
| Q 0353-360 | Plaintiffs' supplemental privilege log # 182 |
| Q 0361 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0362-63 | Produced by Shusters- 140-41 |

5

| | | |
|---|---|---|
| 1 | Q 0364-382 | Shusters' supplemental privilege log #2 |
| 2 | Q 0383-87 | Shusters' supplemental privilege log #3 |
| 3 | Q 0388-93 | Plaintiffs' supplemental privilege log #80, 81 |
| 4 | | |
| 5 | Q 0394-399 | Plaintiffs' supplemental privilege log #82, 83 |
| 6 | Q 0400-01 | Bulson privilege log # 327 |
| 7 | Q 0402-408 | Shusters' privilege log # 9 |
| 8 | | |
| 9 | Q 0409-424 | Produced by Shusters- 63-78 |
| 10 | Q 0425-29 | Plaintiffs' supplemental privilege log # 98 |
| 11 | Q 0430-52 | Plaintiffs' supplemental privilege log # 77, 78 |
| 12 | | |
| 13 | Q 0453-71 | Shusters' supplemental privilege log # 2 |
| 14 | Q 0472-76 | Shusters' supplemental privilege log # 3 |
| 15 | Q 0477-82 | Plaintiffs' supplemental privilege log # 80 |
| 16 | | |
| 17 | Q 0483-88 | Plaintiffs' supplemental privilege log # 82, 83 |
| 18 | Q 0489-90 | Bulson privilege log # 327, 328 |
| 19 | Q 0491-95 | Produced by Shusters- 79-83 |
| 20 | | |
| 21 | Q 0496-99 | Plaintiffs' supplemental privilege log # 98 |
| 22 | Q 0500-1 | Shusters' supplemental privilege log # 8 |
| 23 | Q 0502-05 | Produced by Shusters- 105-08 |
| 24 | | |
| 25 | Q 0506-30 | Shusters' supplemental privilege log # 5 |
| 26 | Q 0531-32 | Produced by Shusters- 138-139 |
| 27 | Q 0533-46 | Shusters' supplemental privilege log # 4 |
| 28 | | |

6

| | |
|---|---|
| Q 0547 | Produced by Plaintiffs- 000002050 |
| Q 0548 | Shusters' supplemental privilege log # 6 |
| Q 0549 | Shusters' supplemental privilege log # 7 |
| Q 0550 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278). |
| Q 0551-52 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0553-4 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0555 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0556 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0557-61 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289) |
| Q 0562-569 | Un-dated defamatory cover letter (duplicate) |
| Q 0570-72 | Produced by Plaintiffs- 000001888-90 |
| Q 0573-74 | Produced by Plaintiffs- 000001883-84 |
| Q 0575-76 | Produced by Plaintiffs- 000002048-49 |
| Q 0577-80 | Produced by Shusters- 125-128 |
| Q 0581-582 | Produced by Shusters- 142-143 |
| Q 0583-586 | Produced by Shusters- 125-128 |

7

| | |
|---|---|
| Q 0587 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0588 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0589- 596 | Plaintiffs' supplemental privilege log # 79 |
| Q 0597- 0605 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0606- 0609 | Plaintiffs' supplemental privilege log # 175 |
| Q 0610-0617 | Plaintiffs' supplemental privilege log # 182 |
| Q 0618 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0361). |
| Q 0619-20 | Produced by Shusters- 140-141 |
| Q 0621-23 | Plaintiffs' supplemental privilege log # 69 |
| Q 0624-28 | Produced by IPW, LLC- 17- 20; Produced by Plaintiffs- 000001882 |
| Q 0629-0634 | Plaintiffs' supplemental privilege log # 76 |
| Q 0635 | Bulson privilege log # 318 |
| Q 0636- 654 | Shusters' supplemental privilege log # 2 |
| Q 0655-659 | Shusters' supplemental privilege log # 3 |
| Q 0660-65 | Plaintiffs' supplemental privilege log # 80, 81 |
| Q 0666-71 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0672-73 | Bulson's privilege log # 327, 328 |

8

| | |
|---|---|
| Q 0674-680 | Shusters' supplemental privilege log # 9 |
| Q 0681-696 | Produced by Shusters- 63- 78 |
| Q 0697-701 | Plaintiffs' supplemental privilege log # 98 |
| Q 0702-724 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0725-743 | Shusters' supplemental privilege log # 2 |
| Q 0744-748 | Shusters' supplemental privilege log # 3 |
| Q 0749- 754 | Plaintiffs' supplemental privilege log # 80, 81 |
| Q 0755-760 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0761-762 | Bulson privilege log # 327, 328 |
| Q 0763-767 | Produced by Shusters- 79-83 |
| Q 0768-771 | Plaintiffs' supplemental privilege log # 98 |
| Q 0772-773 | Shusters' supplemental privilege log # 8 |
| Q 0774-777 | Produced by Shusters- 105- 108 |
| Q 0778-802 | Shusters' supplemental privilege log # 5 |
| Q 0803-804 | Produced by Shusters 138-39 |
| Q 0805-823 | Shusters' supplemental privilege log # 4 |
| Q 0824 | Produced by Plaintiffs- 000002050 |
| Q 0825 | Shusters' supplemental privilege log #6 |
| Q 0826 | Shusters' supplemental privilege log #7 |
| Q 0827 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August |

9

13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278).

| | | |
|---|---|---|
| Q 0828-29 | | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0830-31 | | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0832 | | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0833 | | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0836-38 | | Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289) |
| Q 0839 | | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on May 21, 2007 in Los Angeles, California.

_____
Marc Toberoff

10

Declaration Of Marc Toberoff
**Exhibit G**
**110**

55

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   E-mail:  MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

7              **UNITED STATES DISTRICT COURT**

8      **CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION**

9

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | Case No. CV 04-08400 SGL (RZx) |
| Plaintiffs, | [Honorable Stephen G. Larson] |
| vs. | **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10, | |
| Defendants. | [Complaint filed: October 8, 2004] |
| | Date:  July 23, 2007 |
| | Time:  10:00 a.m. |
| | Place:  Courtroom 1 |
| DC COMICS, | |
| Counterclaimant, | [Reply To Defendants' Local Rule 56-2 Statement Of Genuine Issues; Reply Declaration of Marc Toberoff; Reply Declaration of Mark Evanier and Evidentiary Objections Filed Concurrently Herewith] |
| vs. | |
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, | |
| Counterclaim Defendants. | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                      0

1    However, Defendants present only the self-serving, carefully worded

2  declaration of their General Counsel, Schulman, but do not, because they cannot

3  present, any objective manifestation of his statements that refute the clear

4  documentary evidence to the contrary.  *Gasaway v. Nothwestern Mut. Life Ins. Co*. 26

5  F.3d 957, 960 (9th Cir. 1994) ("mere allegations or denials" do not meet the non-

6  movants' burden); *Celotex*, 477 U.S. at 324 (On summary judgment, the non-moving

7  party must go beyond the pleadings and "designate 'specific facts showing that there

8  is a genuine issue for trial.'")

9    Firstly, the material differences between the October 19, 2001 Letter, the

10  October 21, 2001 Letter and the February 1, 2001 Draft (*see* Mot. at 48-57)

11  unquestionably demonstrate that there was <u>no</u> "meeting of the minds on all material

12  terms."  Toberoff Decl., Exs. BB, CC, DD.  Secondly, Defendants made it abundantly

13  clear that they did <u>not</u> intend to be bound by the October 19, 2001 Letter by their

14  divergent October 26, 2001 Letter in reply and thereafter by their aggressive February

15  1, 2001 Draft.  Toberoff Decl., Exs. CC, DD.  Thirdly, the October 26, 2001 Letter

16  and February 1, 2001 Draft in no way constitute the mere "drafting of more formal

17  documentation" of a fixed agreement as Defendants now make believe in retrospect.

18  The documents speak for themselves as the ongoing *negotiation* of terms

19  considerably more favorable to Defendants. *Id*.  Finally, the record is clear that

20  Plaintiffs vehemently rejected Defendants' overreaching proposals by letter dated

21  May 9, 2002.[31]  Bergman Ex. Z (May 9, 2002 letter).

22    Tellingly, after Plaintiffs' rejection on May 9, 2002 and formal termination of

23  negotiations on September 21, 2002 (Bergman Decl., Ex. DD), Defendants uttered

24  not even a whisper.  Not once did Defendants claim or even hint that the October 19,

25  2001 Letter constituted a binding agreement or that they had *any* agreement with

26  Plaintiffs.  Nor did Defendants tender payment or ever attempt to perform under their

27

28
[31] This rejection occurred long before the August, 2002 third party offer alleged by Defendants to muddy the waters and falsely imply a motive for rejection unrelated to the egregious new terms contained in their proposals.  (Opp. at 23:3-11, 24:16-18).

59

1  fictitious purported agreement.[32]  It is undisputed that the first time, Defendants made

2  their unlikely claim was on November 22, 2004 in answer to Plaintiffs' complaint to

3  enforce their "Superman" Termination Notices.  Defendants' Opposition does not,

4  because it cannot, explain these inconsistencies and further objective manifestations

5  that no agreement had been consummated.

6        Instead, Defendants lard their Opposition with inaccurate, immaterial and

7  misleading assertions that are apparently designed to prejudice the Court against

8  Plaintiffs and their counsel.  Though immaterial to the unmistakable conclusion that

9  no contract was completed, Plaintiffs briefly address Defendants' accusations and

10  innuendo below.

11        Defendants recite the irrelevant prior involvement of Plaintiffs' counsel, Marc

12  Toberoff ("Toberoff") in other companies, and incorrectly state that in late

13  November, 2001 he "informed Mr. Marks that he was interested in acquiring Siegel's

14  interest in the Superman property," citing to Marks' deposition transcript at 152:3-

15  153:22 which nowhere states this.  (Opp. at 22:3-17).  Defendants nonetheless admit

16  that Marks and Toberoff *had no substantive communications until August, 2002*.

17  (Opp. 24:16).  Defendants then inaccurately state that in early August, 2002, "Mr.

18  Toberoff's company, IPW, offered to purchase Plaintiffs' Superman copyright

19  interests," citing to Marks' deposition transcript at 167:7-169:25 which again does

20  not indicate this.  (Opp. 24: 16-18).  Defendants recite in the next sentence that "[o]n

21  September 21, 2002, Plaintiffs abruptly terminated Mr. Marks without any prior

22  notice" (without evidence that this was either "abrupt" or "without prior notice") and

23  "sent a separate letter to defendants repudiating the October 19 agreement" (citing

24  Plaintiffs' letter which nowhere mentions the October 19, 2001 Letter).  (Opp. 24: 20-

25  24).  In reality, Plaintiffs September 21, 2002 letter consistently states:

26

27  [32] *See* 1 Witkin Sum. Cal. Law Contracts, § 769 (a "tender [of performance] when properly made, has the effect of placing the other party in default if he or she refuses to accept it, and the party making the tender may rescind, or sue for breach of contract or for specific performance where this remedy is available.")

28

**Exhibit H**
**113**
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1

2

3

4

5

> "We regret to inform you that after many years of difficult negotiations with your representatives culminating in an offer sent to us on February 4, 2002 [February 1, 2002 Draft], irreconciliable differences that cannot be overcome.  Therefore, effective immediately we are totally stopping and ending negotiations with DC…It is shame that four years were wasted due to your representatives desire to wear [us] down…Putting outrageous, never discussed, unacceptable demands into DC's February document made it clear that no agreement could ever be reached."

6   Bergman Decl., Ex. DD.  Defendants end by stating that Plaintiffs thereafter retained

7   Mr. Toberoff and an agent to represent them.  (Opp. at 25:1-8).

8         Defendants' three page recitation of largely immaterial information and

9   disinformation is designed to prejudice the straightforward legal analysis that so

10  disfavors them.  Defendants' thinly veiled narration falsely implies that Plaintiffs'

11  counsel interfered with their so-called "agreement" and that Plaintiffs reneged on this

12  non-extant contract for a better offer.   None of this false innuendo is supported by

13  the record, and all of it is a poor substitute for legal analysis.

14        It *is* clear from the record that Joanne Siegel by letter dated May 9, 2002 (long

15  before Toberoff had a single substantive conversation with Marks) expressed great

16  dissatisfaction with Defendants' aggressive negotiating tactics and their February 1,

17  2002 Draft in the strongest of terms, much like those in Plaintiffs' September 22,

18  2002 letter, formally terminating negotiations:

19

20

21

22

> "Your company's unconscionable contract dated February 4, 2002 [*sic*] contained new, outrageous demands that were not in the proposal.  The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve…After four years we have no deal and this contract makes an agreement impossible."

23  Bergman Decl., Ex. Z (May 9, 2002 letter); Ex. DD (September 22, 2002 letter).

24  Having blown the negotiation by their own avarice, Defendants now desperately

25  attempt to shift the blame.

26        Notwithstanding Defendants' *post hoc* mischaracterizations and muddying, the

27  parties' objective manifestations of their intent, in the form of their written

28  communications and conduct at the time in question, tell an exceedingly clear story.

**Exhibit H**

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

2002 Draft) at 39-40; Ex. EE (Marks Tr.) at 161:12-20; and the imposition on Plaintiffs in the October 26, 2001 Letter of new affirmative obligations to "positively publicize the Properties," including "public appearances" and related "travel;" to issue "a joint press release;" and to "consult with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties," which are then heightened in the February 1, 2002 Draft.  Toberoff Decl., Ex. CC (October 26, 2001 Letter) at 2; Ex. DD (February 1, 2002 Draft) at 41; Ex. EE (Marks Tr.) at 157:19-158:3.

No reasonable juror could find that the above differences in these deal points, and the others set for in Plaintiffs' Chart, are immaterial.  Moreover, Defendants have utterly failed to meet their burden of providing evidence raising a genuine issue of fact as the materiality of these differing terms.  Defendants have admitted, as they must, that there can be no contract unless there is a *"meeting of the minds" "on all material terms* of [an] agreement" (Opp. at 68:10-14, 74:19) as this is well-settled law.  *Apablasa*, 176 Cal. App. 2d at 726; *Callie*, 829 F.2d at 891.  Accordingly, this Court can and should dispose of this matter on summary judgment by ruling that no contract for the sale of Plaintiffs' recaptured copyright interests was consummated by the parties.

Accordingly, for the reasons set forth above, Plaintiffs move to dismiss Defendants' Third and Fourth Alternative Counterclaims and parts of their Eighth and Ninth Affirmative Defenses, because Defendants fail as a matter of law to establish an agreement on all material terms.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant their motion for summary adjudication in the form lodged separately herewith as the Proposed Judgment.



Hi, **Keith** | Sign Out | Options | Help **Make Y! My Homepage** | My Y! | Yahoo!

stipulation production logs **Search Mail** **Search Web**

**WHAT'S NEW** | **INBOX** (14969) | **CONTACTS** | **SEARCH: stipulation ...** | **Re: DC v. PPC** | **DC v. PPC**

**Compose Message** **Delete** **Reply** **Forward** **Spam** **Print**

Inbox
Drafts 3
Sent
Spam 2
Trash
**Folders**
**Paralegal** 4
Sent to Opposing Cou…
**Applications**
All My Purchases
Attach Large Files
Automatic Organizer
Calendar
Flickr
Notepad
Unsubscriber

**DC v. PPC** 2 Hide Details

**FROM:** Marc Toberoff — Monday, November 29, 2010 12:42 PM
**TO:** dpetrocelli@omm.com cseto@omm.com mkline@omm.com
**CC:** Nicholas Williamson Keith Adams

Counsel:

To avoid burdening Magistrate Judge Zarefsky, with yet another unnecessary and moot motion, Defendants are willing to enter into the attached stipulation and order.

I look forward to concluding this matter.

Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

**2** Attached files | **114**KB

DC v. PPC… DC v. PPC…

Download All

Reply to Marc Toberoff **Send**

**Exhibit I**
**116**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

\* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

April 18, 2011

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dear Dan:

Pursuant to the Court's April 11, 2011 order, enclosed please find the following document production:

1.  LSL    00211-00284 (Production of defendant Laura Siegel Larson)
2.  MWP  00054-00057 (Production of defendants Mark Warren Peary and Jean Peavy)

Very truly yours,

Marc Toberoff

Enclosures

| Subject: | DC Comics v. Pacific Pictures Corp. – Production |
| --- | --- |
| From: | Keith Adams (kgadams@ipwla.com) |
| To: | dpetrocelli@omm.com; MKline@OMM.com; cseto@OMM.com; |
| Cc: | mtoberoff@ipwla.com; |
| Date: | Tuesday, November 1, 2011 9:34 PM |

Counsel:

Please see the attached document production from Laura Siegel Larson.

Keith G. Adams
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read,
copy, distribute or use this information. If you have received this transmission in error, please notify the sender
immediately by reply e-mail and then delete this message.

**Exhibit K**
**118**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22631 PACIFIC COAST HIGHWAY #348
MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

August 13, 2012

<u>Via U.S. Mail</u>

Daniel Petrocelli, Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Counsel:

Pursuant to the Court's July 16, 2012 order (Docket No. 457), enclosed please find the November 17, 2001 e-mail from Marc Toberoff to Michael Siegel. Defendants' motion for reconsideration of the Court's July 16 order (Docket No. 466) is pending. The document is properly subject to the attorney-client privilege, and defendants will pursue all available remedies if DC or its counsel disseminates this privileged information, or attempts to use it in public filings, prior to the Court's decision on that pending motion.

All of Defendants' rights are reserved.

Very truly yours,

Keith Adams

Exhibit L
119