# EXHIBIT 1

MARK WARREN PEARY - 6/29/2011

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

| | | |
|---|---|---|
| DC COMICS, | ) | |
| | ) | |
| Plaintiff, | ) | No. CV-10-3633 ODW (RZx) |
| | ) | |
| VS. | ) | |
| | ) | |
| PACIFIC PICTURES CORPORATION, | ) | |
| IP WORLDWIDE, LLC, IPW, LLC, | ) | |
| MARC TOBEROFF, an individual, | ) | |
| Laura Siegel Larson, as | ) | |
| personal representative of | ) | |
| the ESTATE OF JOSEPH SHUSTER, | ) | |
| JEAN ADELE PEAVY, an | ) | |
| individual, JOANNE SIEGEL, | ) | |
| an individual, LAURA SIEGEL | ) | |
| LARSON, an individual, and | ) | |
| DOES 1-10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

CSR No. 10094

Merrill  Corporation  -  Los Angeles
800-826-0277                                    www.merrillcorp.com/law

**EXHIBIT 1**

2

MARK WARREN PEARY  6/29/2011

Page 74

```
 1              THE WITNESS:  Right.  I -- I -- it would be      11:58:35
 2    speculating.  I don't remember.                           11:58:37
 3              MR. PETROCELLI:  Don't interrupt the            11:58:43
 4    witness, please.                                           11:58:44
 5         Q.  Have you -- do you think the consent             11:58:49
 6    agreement was an important document at the time that      11:58:55
 7    you signed it?                                             11:58:58
 8         A.  Yes.                                              11:58:59
 9         Q.  Did you think your mother had a right to         11:59:01
10    know what it meant?                                        11:59:02
11         A.  Did she have a right to know?                    11:59:08
12         Q.  Yeah.  Do you think she was entitled to          11:59:11
13    know what -- what document you were signing that was      11:59:12
14    important?                                                 11:59:16
15         A.  She -- she's not directly involved in this       11:59:19
16    case, so I don't know how to answer that.  She --         11:59:23
17    she doesn't -- there's not a legal right.                 11:59:29
18         Q.  I didn't mean a legal right.                     11:59:36
19         A.  Yeah.                                             11:59:36
20         Q.  I mean, do you think she would want to know      11:59:38
21    that kind of information?                                 11:59:39
22         A.  Would she want to know, yeah.  Well,             11:59:40
23    that's --                                                 11:59:47
24              MR. TOBEROFF:  Calls for speculation.           11:59:47
25    BY MR. PETROCELLI:                                         11:59:48
```

**EXHIBIT 1**
3

MARK WARREN PEARY    6/29/2011

| | | |
|---|---|---|
| 1 | Q.   Did you explain to her what it meant? | 11:59:48 |
| 2 | MR. TOBEROFF:  Asked and answered. | 11:59:51 |
| 3 | THE WITNESS:  Just -- just what I said | 11:59:52 |
| 4 | before.  I can't remember exactly what I said. | 11:59:54 |
| 5 | BY MR. PETROCELLI: | 11:59:54 |
| 6 | Q.   What's your best recollection of what you | 11:59:58 |
| 7 | told her? | 11:59:59 |
| 8 | A.   That -- that there is some agreement that | 12:00:00 |
| 9 | we are making with the Siegels.  That would have | 12:00:09 |
| 10 | been about the extent of it. | 12:00:12 |
| 11 | Q.   Well, you explained to her that the | 12:00:14 |
| 12 | agreement had to do with Superman, right? | 12:00:17 |
| 13 | A.   Yes. | 12:00:17 |
| 14 | Q.   And you explained to her that it had to do | 12:00:20 |
| 15 | with settling your case, right? | 12:00:22 |
| 16 | A.   I suppose.  That's about it.  I wouldn't | 12:00:29 |
| 17 | have said any more. | 12:00:33 |
| 18 | Q.   Who -- who's the beneficiary of any money | 12:00:46 |
| 19 | that comes in as a result of the Superman | 12:00:51 |
| 20 | termination interest that Joe Shuster has asserted? | 12:00:53 |
| 21 | Who gets the money? | 12:01:00 |
| 22 | A.   We plan on any proceeds would go into a | 12:01:01 |
| 23 | trust. | 12:01:06 |
| 24 | Q.   Well, your mother is the beneficiary, | 12:01:08 |
| 25 | correct? | 12:01:08 |

MARK WARREN PEARY 6/29/2011

Page 76

| | | |
|---|---|---|
| 1 | A.   According to the will.  She -- she's | 12:01:13 |
| 2 | expressed that she wants me and my sister to -- to | 12:01:20 |
| 3 | have -- to have anything through a trust. | 12:01:25 |
| 4 | Q.   Under Joe Shuster's will, she's the sole | 12:01:29 |
| 5 | beneficiary, correct? | 12:01:32 |
| 6 | A.   Yes. | 12:01:33 |
| 7 | Q.   Okay.  And are you saying that your mother | 12:01:35 |
| 8 | has in turn created testamentary documents that pass | 12:01:39 |
| 9 | the interest to you and your sister? | 12:01:46 |
| 10 | A.   She -- she has expressed that she wants any | 12:01:47 |
| 11 | proceeds to go into a trust for me and my sister. | 12:01:52 |
| 12 | Q.   Does such a trust exist? | 12:01:56 |
| 13 | A.   Not yet. | 12:01:58 |
| 14 | Q.   Does your mother have a will? | 12:02:00 |
| 15 | A.   Yes. | 12:02:02 |
| 16 | Q.   Have you ever seen it? | 12:02:03 |
| 17 | A.   Yes. | 12:02:04 |
| 18 | Q.   Does it name you as the executor? | 12:02:07 |
| 19 | A.   I believe. | 12:02:10 |
| 20 | Q.   Does it distribute her estate equally | 12:02:16 |
| 21 | between you and your sister, Dawn? | 12:02:20 |
| 22 | A.   I believe. | 12:02:25 |
| 23 | Q.   Does it distribute the estate directly to | 12:02:27 |
| 24 | Dawn and you or to trusts of which Dawn and you are | 12:02:32 |
| 25 | beneficiaries? | 12:02:36 |

```
 1    STATE OF CALIFORNIA      )
                               )  ss.
 2    COUNTY OF LOS ANGELES    )

 3

 4           I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7           I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10           Prior to being examined the witness was by

11    me first duly sworn;

12           The foregoing transcript is a true record

13    of the testimony given.

14

15    Dated  July 14, 2011            .

16

17           _____
                    Shanda Gabriel
18                  CSR 10094

19

20

21

22

23

24

25
```

Aug 12 11 04:49p    M. Warren Peary                              505-466-4551                    p.1

## ERRATA SHEET

| Page | Line | | |
|------|------|---|---|
| <u>54</u> | <u>23</u> | Change: | From "Yes." to "Yes, but it's not called that." |
| | | Reason: | Clarification |
| <u>61</u> | <u>13</u> | Change: | From "No." to "No, except for the letter between Mr. Toberoff and Mr. Bergman." |
| | | Reason: | Clarification |
| <u>61</u> | <u>15</u> | Change: | From "Yes." to "Yes, including the letter between Mr. Toberoff and Mr. Bergman." |
| | | Reason: | Clarification |
| <u>95</u> | <u>7-8</u> | Change: | From "I believe that — that I am and the Siegels and Mr. Toberoff." to "I am and Mr. Toberoff." |
| | | Reason: | Clarification |
| <u>95</u> | <u>10</u> | Change: | From "2010, I believe." to "2008." |
| | | Reason: | Clarification |
| <u>95</u> | <u>12</u> | Change: | From "Yeah, if my memory is right." to "No." |
| | | Reason: | Clarification |
| <u>100</u> | <u>19</u> | Change: | From "Yes." to "No, by me and Mr. Toberoff." |
| | | Reason: | Clarification |
| <u>101</u> | <u>15</u> | Change: | From "I don't recall." to "Yes." |
| | | Reason: | Clarification |
| <u>101</u> | <u>18</u> | Change: | From "I don't recall, no, having done so." to "I signed a conflict waiver in 2008." |
| | | Reason: | Clarification |
| <u>235</u> | <u>9</u> | Change: | From "2003" to "2002" |
| | | Reason: | Clarification |
| <u>341</u> | <u>24</u> | Change: | From "other than that" to "other than that and the conflict waivers." |
| | | Reason: | Clarification |

_____ Subject to the above changes, I certify that the transcript is true and correct
___✓___ No changes have been made. I certify that the transcript is true and correct.

_Mark Warren Peary_ _____          _8-12-11_ _____
(Signature)                                     (Date)

Received   Aug-12-11   02:18pm     From-505 466 4551          To-              Page 001

## EXHIBIT 1

7

# EXHIBIT 2

# In The Matter Of:

## PACIFIC PICTURES CORPORATION
### *v.*
## DC COMICS

---

## ORAL ARGUMENT
### *November 5, 2012*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 2**
**8**

ORAL ARGUMENT - 11/5/2012

Appeal No. 11-56934

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

PACIFIC PICTURES CORPORATION ET AL.,
Defendants and Appellants,

v.

DC COMICS,
Plaintiff and Appellee.

————————————

ON APPEAL FROM THE UNITIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-10-3633 ODW (RZx)

————————————

ORAL ARGUMENT

HEARD BEFORE NINTH CIRCUIT PANEL:

REINHARDT, THOMAS, SEDWICK

NOVEMBER 5, 2012

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR NO. 6420

EXHIBIT 2
9

ORAL ARGUMENT - 11/5/2012

Page 2

```
1                    PASADENA, CALIFORNIA

2                    NOVEMBER 5, 2012

3

4                         ---0---

5

6       RICHARD B. KENDALL, ESQ.:  May it please the Court.

7    Richard Kendall on behalf of the Defendants and

8    Appellees.

9            The first issue on this appeal is whether the

10   California anti-SLAPP statute applies to DC Comics'

11   state law claims.

12           They allege that Mr. Toberoff induced and

13   assisted the heirs of the Superman authors to breach

14   their agreements and instead to pursue their termination

15   rights.

16           These claims of breach of disruption and damage

17   all flow from the heirs' very efforts to terminate DC's

18   copyrights.

19           If you delete those allegations from this

20   complaint, there would be no claim, there would be no

21   harm, there would be no breach, there would be no

22   interference because there would be no breach.

23           The anti-SLAPP law therefore covers the conduct

24   that is alleged, and the District Court was wrong to

25   fail to appreciate that this is protected activity.
```

**EXHIBIT 2**
**10**

ORAL ARGUMENT - 11/5/2012

1           The policy of the anti-SLAPP statute is to

2     prevent defendants who have bottomless pockets from

3     bankrupting -- from litigating to the death a plaintiff

4     who simply wants to pursue her government given rights.

5           And what's happened here is that two years and

6     six months into this litigation we are still litigating

7     a case that has never addressed the lack of merit

8     because of the very clear affirmative defense of the

9     Statute of Limitations and very clear affirmative

10    defense of liquidate -- litigation privilege and other

11    defenses as well that this Court de novo as a matter of

12    law and the District Court should as a matter of law

13    have determined about this case with no merit.

14          The argument that is made by the other side is,

15    "No, no, no, this case is not about pursuing

16    termination rights."

17          But I ask the Court, if you took out all of the

18    places in the complaint, and there are many, where the

19    termination rights pursued by these heirs as referenced,

20    what would be left?  Why would we be here?

21          Do we think that Warner Bros. and the

22    subsidiary DC Comics has brought year upon year of

23    litigation in this case, in the case you're about to

24    hear in Siegel simply because they are fine with

25    termination?

ORAL ARGUMENT - 11/5/2012

Page 4

1              No.   The whole issue here is whether the heirs
2     can terminate their rights.
3              And it is Mr. Toberoff's assistance,
4     inducement, whatever they want to allege that it is,
5     that they're complaining about, but only because it
6     resulted in first the Shuster heirs and later the Siegel
7     heirs deciding they did not want to accept what DC was
8     offering; instead they wanted to pursue the rights that
9     Congress enacted for them to level the playing field.
10             The fourth claim, which is the claim that DC
11    alleges that Mr. Toberoff interfered with the 1992
12    contract, alleges a breach of a contract that they claim
13    means that the Shuster heirs had given away their
14    termination rights in 1992 and therefore were not
15    allowed to pursue termination when they met up with
16    Mr. Toberoff.  Mr. Toberoff provided financial
17    assistance and legal assistance to enable them to pursue
18    those rights.
19             The pursuit of those rights, as in the Mindys
20    Cosmetics case, which is a trademark case, and as in all
21    the other cases that we cited where there is an effort
22    by a litigant to pursue rights either through settlement
23    or through litigation, that's protected activity.
24             Script that protected activity out, as I've
25    said, and there's no case left.

ORAL ARGUMENT - 11/5/2012

1              The only breach, the only possible breach that

2    was induced here, the only possible disruption that

3    could be claimed here of the 1992 agreement is the

4    pursuit of termination rights.

5              As a matter of law, their argument is wrong,

6    but there's no question in addition to that that it's

7    protected activity.

8              Now move on to the fifth claim.  That's the

9    claim as to the Siegel heirs.

10             In this case the Siegels have been arguing with

11   DC about the termination that they had filed in 1997.

12   From 1997 until 2002, for all that period of time,

13   without Mr. Toberoff being involved at all.  All of

14   those arguments, all of their dealings with DC occurred

15   against the backdrop of threatened litigation because

16   when the Siegels had in 1997 terminated, they were

17   immediately met with a threat by DC to go after them, to

18   invalidate their termination.  And there was a tolling

19   agreement in 1999, again showing that this was a matter

20   that was inevitably going to go to litigation if they

21   didn't settle.

22             The complaint that is made is that after the

23   Siegels had rejected the long form settlement agreement

24   that was proposed -- and of course you'll be hearing

25   more about this in the companion appeal -- and after

ORAL ARGUMENT - 11/5/2012

```
 1    they had gone off looking for replacement counsel, as it

 2    says in the record, they were searching for counsel even

 3    in March of 2002, they had gone after Jerry Spence to

 4    see whether Jerry Spence would represent them, there was

 5    very angry correspondence written by the very elderly

 6    Mrs. Siegel, who unfortunately is not with us today

 7    because this endless battle finally ended with her dying

 8    before she could see the end of it, and what happens

 9    then is that they allege that Mr. Toberoff in the fall

10    of 2002 and late summer induces the Siegels not to

11    settle, not to take what DC is offering but to try for

12    something better.

13          That is protected activity.  Solicitation of a

14    client is protected activity.  We cited cases on that

15    proposition.  The leading one is the Taheri Group case.

16    Funding litigation is protected activity.  Engaging in

17    settlement discussions is protected activity.

18          And all of these challenged activities, in

19    addition to being protected, are barred by the Statute

20    of Limitations.  The three-year Statute of Limitations

21    is the one that governs the fourth and fifth claims for

22    interference.

23          Now, it is clear on the face of the pleadings

24    and it is certainly clear in the record that in 2006 at

25    the very latest DC was on inquiry notice of all of its
```

**EXHIBIT 2**

**14**

ORAL ARGUMENT – 11/5/2012

Page 7

```
 1    claims in the fourth and the fifth claims for relief.
 2            The fourth claim, DC received in discovery in
 3    2006 the agreements between the Toberoff corporate
 4    entities Pacific Pictures and the Shuster heirs that
 5    allegedly interfered with DC's rights.
 6            They had what they're complaining about in
 7    2006.  They did not bring this case until May of 2010.
 8    They sat on that.
 9            Why did they sit on it?
10            Well, we can only speculate, but it may have
11    had something to do with Judge Larson's summary judgment
12    decision in the companion case you're about to hear and
13    their desire to keep this litigation going as long as
14    they could to have something else to do to make it
15    difficult for the Siegel heirs to --
16        JUDGE REINHARDT:  The Statute of Limitations bars
17    their case.
18            Have you made a motion to dismiss on the basis
19    of -- or summary judgment on the basis of the Statute of
20    Limitations?
21        RICHARD B. KENDALL, ESQ.:  Well, that was part of
22    our anti-SLAPP motion, your Honor.  And the anti-SLAPP
23    statute works like a reversal.
24        JUDGE REINHARDT:  Why do you need -- even need an
25    anti-SLAPP motion if you've got a clear basis for
```

ORAL ARGUMENT - 11/5/2012

1    dismissal or judgment on the Statute of Limitations?

2        RICHARD B. KENDALL, ESQ.:  Because -- we could do

3    that, your Honor, and in fact we had a motion to dismiss

4    that was pending.  But the anti-SLAPP statute is

5    supposed to go quickly and it's supposed to go first.

6    And in fact, although the State Court rule does not bind

7    the Federal Court, you know, in State Court it's 90 days

8    it has to be decided.  We expected that this would move

9    much more quickly.

10        And then after the District Court denied the

11    anti-SLAPP statute, there is case law that says that all

12    matters on the merits should then be brought to a halt

13    while the immunity that's supposed to be conferred by

14    anti-SLAPP goes up on appeal.

15        Again, in the State Court the appeal is an

16    automatic stay.  In the Federal courts, as in the

17    qualified immunity cases, when there's a denial of

18    qualified immunity, that brings to a halt the merits

19    reviews.

20        And also we had a desire to -- since we fully

21    recognized these issues were going to all end up going

22    up on appeal, because the nature of this litigation, not

23    to have piecemeal appeals.

24        JUDGE SEDWICK:  Let me just see if I understand it.

25        If -- if you were unsuccessful with your

ORAL ARGUMENT - 11/5/2012

1    arguments about the anti-SLAPP statute, then this would

2    go back to the Court and you feel you would win on the

3    Statute of Limitation grounds, as least as to the fourth

4    and fifth claims?

5        RICHARD B. KENDALL, ESQ.:  We believe that that's

6    what should happen, but we do not believe we should have

7    to wait for that to happen, your Honor, because the

8    policy of the anti-SLAPP statute is to bring the matter

9    to an end.

10        And in this case, unlike the last case where

11    Judge Thomas was asking -- the District Court didn't

12    decide that issue, should we remand to the District

13    Court, here we have a de novo issue that should be

14    decided by this Court in the first instance.  And in

15    fact, that is routinely what happens in the courts, the

16    California courts and the Federal courts.

17        So even though the District Court has not

18    decided the matter, we cited a Fifth Circuit case to the

19    Court, Henry against Lake Charles American Press, in

20    which this Court -- a Court of Appeal, owing to the fact

21    that it's a de novo issue, there's no need to -- to --

22    to have any more discovery.  There's no need for

23    anything other than a resolution of the very simple

24    question on both the fourth claim and the fifth claim

25    and also the sixth claim, that owing to when it is

ORAL ARGUMENT - 11/5/2012

1    indisputable that DC had all the information necessary

2    to know it had a claim, maybe not all the facts that

3    have piled up since, but that's not the issue because

4    the claim accrues when you're on inquiry notice.

5        JUDGE SEDWICK:  So are you saying then that we could

6    simply rule in your favor based on the Statute of

7    Limitations, that this Court could do that?

8        RICHARD B. KENDALL, ESQ.:  Yes, absolutely.  There's

9    no question whatsoever about that.

10           You could also do it on the basis of other pure

11    issues of law that are presented here, including the

12    litigation privilege, and with respect to the 1992

13    agreement, the misreading as a matter of law of the

14    copyright statute.  But you needn't go to those other

15    issues because the Statute of Limitations disposes of

16    all of the claims here.

17        JUDGE SEDWICK:  The sixth claim as well as the

18    fourth claim?

19        RICHARD B. KENDALL, ESQ.:  The sixth claim -- now,

20    there is some vagueness in the pleading.  There are

21    potentially three agreements at issue in the sixth

22    claim.

23           Now, first of all, the sixth claim is a

24    four-year Statute of Limitations, but under the unfair

25    competition law in California, that's -- there's no

ORAL ARGUMENT – 11/5/2012

1    discovery rule whatsoever.

2            So with respect to the claims in the sixth

3    claim relating to the 2001 and 2003 agreements between

4    the Shusters and the Toberoff entities, those claims

5    accrued no later than 2003, and they had expired by

6    2007.  They were long gone when this case was filed.

7            There's also a claim relating to the 2008

8    so-called consent agreement, which is the or what the

9    magistrate described as the sort of Koufax/Drysdale

10   collective negotiation agreement.

11           The argument that is made is that that

12   agreement is somehow unlawful under the copyright

13   statute because of the way that the termination windows

14   work.

15           That is clearly wrong as a matter of law.

16           There's no question that they have misread

17   Section 304(c)(6)(d).  You don't need to dig into the

18   record at all to determine that that provision did not

19   give DC any exclusive and enforceable right that would

20   have prohibited the Shuster and Siegel families from

21   banding together and decide that neither one would

22   settle without the other.

23           The statute does no such thing.  The statute

24   doesn't compel the terminating parties to negotiate with

25   the terminated grantee, here DC Comics, and it doesn't

ORAL ARGUMENT - 11/5/2012

1    forbid those terminating parties from negotiating with

2    anyone else.

3         All it requires is that before the Shusters

4    and the Siegels could have actually transferred the

5    copyright, which there's no basis whatsoever to think

6    occurred in these 2008 consent agreements, they couldn't

7    transfer the copyright, but banding together there's --

8    there's absolutely nothing in the copyright statute that

9    prevents that.

10        As to that, though, even if the Court didn't

11   want to reach that pure issue of law, it's also clearly

12   litigation privileged for the two families to band

13   together for purposes of a mediation, which is what they

14   did, and for the ongoing purposes of these litigations,

15   which they've done.

16        Your Honor, I am seeing that I'm just about out

17   of time.  If I can reserve at least a minute or two for

18   rebuttal.

19    JUDGE REINHARDT:  We'll give you a minute or two.

20    RICHARD B. KENDALL, ESQ.:  Thank you very much.

21    MATTHEW T. KLINE, ESQ.:  Good morning, your Honors.

22   May it please the Court.  My name is Matt Kline.  I

23   represent DC Comics.

24        The SLAPP statute does not apply here for one

25   simple reason.

ORAL ARGUMENT - 11/5/2012

```
 1              The focus of California law in analyzing a
 2    SLAPP claim is whether the claim at issue targets is
 3    based on or arises out of protected activity.
 4              And I'd like to walk you through the three
 5    claims here.
 6              The fifth claim is based on the following
 7    allegation.
 8              Marc Toberoff makes a false representation
 9    to the Siegel heirs in August of 2002 that he has a
10    $15 million hard offer in hand from a billionaire
11    investor, and if the Siegels take that offer, they can
12    sell their rights to him and his company, Marc Toberoff,
13    Ari Emanuel, a business agent, and IPW Worldwide and
14    this unnamed investor.
15              That was not the solicitation of a legal
16    client.  That was not a request that litigation be
17    initiated.  That was not done in the context of
18    litigation.  There was no litigation between the Siegels
19    and DC.  They had an existing contractual relationship.
20              And Mr. Kendall says to you, "Please read out
21    from the complaint all of the later conduct, all the
22    later litigation and all the later settlement.  Please
23    do so."
24              How were we harmed when that happened?  How was
25    DC harmed in 2002 when that happened?
```

ORAL ARGUMENT - 11/5/2012

1          Well, for one, it had paid $250,000 to the

2     Siegels as a good faith advance payment in connection

3     with that settlement agreement.  That $250,000 was

4     gone.

5          And what have we learned from the California

6     cases about whether that's protected activity or not?

7          The cases of Haneline and Newport Builders are

8     directly on point.

9          Newport Builders holds that if two parties are

10    in a settlement conference and there the defendant was a

11    former party to that litigation, the defendant shows up

12    at their two-party settlement conference and makes

13    fraudulent business offers, actually to both parties,

14    trying to get one of them to sell him valuable rights,

15    he later is sued for those fraudulent business offers,

16    and he's even injected in actual court --

17    court-appointed settlement process, the California Court

18    of Appeal holds that that intervention in that

19    settlement process is not protected by SLAPP or the

20    litigation privilege.

21          Why is that?

22          Because we don't want people intruding on these

23    types of processes and then using the cloak of the

24    litigation privilege or even their role as a lawyer, as

25    Mr. Toberoff has done, to say that that conduct is

**EXHIBIT 2**
**22**

ORAL ARGUMENT - 11/5/2012

1     protected.

2          And to be very clear, if you look at the offer

3     that he's made, and it's testified to in Mr. Marks'

4     deposition and the Marks memo that we've asked you to

5     review in connection with this appeal, he's not saying

6     to them, "Please hire me as a lawyer."  He's saying,

7     "Please sell me your rights for $15 million."

8          And under the clear case law, Haneline is

9     another classic example, you have two part- -- a party,

10    a buyer and a seller.  The seller is about to sell a

11    valuable piece of property to the buyer.  A third party

12    comes along and says, "Hey, don't sell that property to

13    the buyer.  Let's go out and initiate some litigation.

14    In fact, I have a lawyer here.  Please come hire my

15    lawyer, and we'll go out and we'll file a lawsuit and

16    our rights will become much more valuable and we can

17    find another buyer."  That's the Haneline case.

18          And they say in their appeal, "Hold on a

19    second.  DC, you haven't been harmed."

20          Again, let's look at the fourth claim, the

21    Shuster claims.

22          We have been paying the Shusters $600,000 over

23    the course of years.  We would have been damaged had

24    Marc Toberoff never filed a termination notice.  We

25    would have been damaged had they never initiated

ORAL ARGUMENT - 11/5/2012

```
 1    litigation.
 2            And to be clear, the Shusters never did
 3    initiate litigation.
 4            And what does the Haneline case say?
 5            The Haneline case says, "You can get the" -- in
 6    a tortious interference case like this where somebody
 7    says, "Hey, don't honor your existing deal.  Come with
 8    me.  Initiate litigation," what does the Haneline case
 9    say?
10            It says two things.  Number one, you can
11    recover the delta between the original contract you had
12    and this new contract you had to go out and enforce.
13    There is $425,000.  And it says a second very important
14    thing.  It says you can also get as consequential
15    damages in that case the attorneys' fees that you've
16    spent having to pursue your rights.
17            And Mr. Kendall urges you, he says, "Read out
18    all of the so-called protected activity," the probate
19    action that they filed, none of which would ever accuse
20    Mr. Toberoff, is the basis for our fourth, fifth and
21    sixth claims.  He says, "Read all that out."
22            That's fine.  Under the well-established
23    California case law, we prevail in this case.
24            And they say, "Well, hold on a second.  You do
25    seek attorneys' fees and costs as one form of damages,
```

ORAL ARGUMENT - 11/5/2012

```
 1    and you can't do that under California law."
 2              Well, the Cozen O'Connor case, 192 Cal.App.
 3    4th 1392 says, and I quote, "The remedy sought does not
 4    affect whether the claim is based on protected
 5    activity."  The Marlin case says the exact same.  And
 6    the Sutter case says the exact same.
 7              And why is that?
 8              Because California has a special pleading
 9    doctrine called "the primary right of action," and the
10    remedies you seek do not affect what the primary right
11    is.
12              And here under the fourth claim -- I'm sorry --
13    under the fifth claim, we are suing Mr. Toberoff for
14    this fraudulent business offer.
15              And discovery in the case has proven this
16    fraudulent business offer occurred.  It has proven that
17    there is no billionaire investor; it has proven that
18    there was no $15 million.
19              And looking at the fourth claim, for example,
20    they say SLAPP applies because in this joint venture
21    agreement in which Mr. Toberoff made the choice, "I
22    don't only want to serve as your lawyer.  I want you to
23    give me 50 percent of your copyrights," they say the
24    litigation privilege should apply, they say that SLAPP
25    should apply because down the road he actually in fact
```

**EXHIBIT 2**
**25**

ORAL ARGUMENT - 11/5/2012

1    did act as their lawyer.

2           Well, that's not what the case law holds.

3           The case law holds that when you have an

4    admittedly illegal contract -- this is their own case.

5    This is the Huntington Life Sciences case.  That case

6    holds when you have an admittedly illegal act, when the

7    conduct complained of was illegal, then as a matter of

8    law the defendant cannot make a prima facie showing that

9    SLAPP applies.

10          Now, where do we have those admissions in this

11   record?

12          You have Mark Peary, one of the defendants in

13   this case, one of the signatories to the PPC agreements,

14   he testifies under oath that Marc Toberoff told him --

15   this is at SER 512 -- the Pacific Picture agreements

16   were illegal.

17          In their first filings in this case, defense

18   counsel and defendants admitted -- this is at -- and I'm

19   flip-flopping these -- the Peary admission is at SER

20   322.  The defendant's admissions and briefing is at

21   SER 512.  They admit that those Pacific Pictures

22   agreements were unlawful.  Again, under their own case,

23   Huntington Life Science, SLAPP may not apply when

24   there's an admission that the act complained of is

25   illegal.  The Flatley case also says that.

ORAL ARGUMENT - 11/5/2012

Page 19

1          And why is that?

2          I'd like to give you an example.

3          If I came to you -- if all of my friends and I

4    decided we wanted to go out and vote tomorrow and I came

5    to you and we didn't have a way to get to the polling

6    station, if I came to you and I said, "I have this

7    special set of magic beans I want to sell you and it's

8    going to make you rich, and if you could trade me your

9    car and I give you these magic beans, will you do that?"

10   you'd do that.  I then go out and I take the car and I

11   take all these people to go vote.  And clearly my

12   purpose in getting the car was I wanted to get out to

13   vote tomorrow, a very important protected right.  That

14   wouldn't stop any one of you from suing me for

15   defrauding me with your car.

16         And that's where the California courts focus

17   like a laser on "What is the protective conduct being

18   challenged here?"

19         And in each one of our causes of action, we are

20   focused on admittedly illegal conduct.

21         Mr. Kendall ascribes all sorts of negative

22   motives to DC Comics.  But Cotati holds very clearly, as

23   does In re Episcopal Churches, our motives are

24   irrelevant.

25         Our motives were also pure.

ORAL ARGUMENT - 11/5/2012

1          The District Court has held based on their own

2    admissions that their contracts were illegal.

3          Mr. Toberoff told us, this Toberoff timeline

4    document is "a pack of lies."  One evidentiary ruling

5    after another has confirmed that he made the $15 million

6    bogus billionaire investor fraudulent statements to

7    induce the Siegels to do business with him.

8          Now as to the prong two questions -- this is

9    whether there's minimal merit to our claims, the Statute

10   of Limitation issues -- you don't need to reach those

11   questions because we win on prong one, and you don't get

12   to prong -- prong two unless we do not prevail on prong

13   one.  And again it's their burden on prong one.

14         On prong two, the burdens are split.  To show

15   that there's minimal merit to our claims affirmatively,

16   it's our burden.  For them to prove the viability of

17   their affirmative defenses, their Peregrine case holds

18   that it's their burden.

19         And here we have a very open factual issue.

20         You asked, "Why didn't they get their Statute

21   of Limitations issue ruled on below?"

22         The District Court issued a ruling saying, "I

23   will shortly on your Rule 12 motions."

24         These Rule 12 motions raise the Statute of

25   Limitations arguments, the litigation privilege

ORAL ARGUMENT - 11/5/2012

```
 1    arguments.

 2            Apparently afraid that the ruling wasn't going

 3    to come out their way, they withdrew the motion.  They

 4    have never filed a Rule 56(f) motion -- a Rule 56 motion

 5    in the intervening years.

 6            And most importantly, most importantly for this

 7    Court that's going to look at the second prong in the

 8    SLAPP test, we have a pending Rule 56(d) motion, which

 9    under this Court's Garrett decisions, we said, "We need

10    more discovery, including on the litigation privilege."

11            And if you look at the Edwards case, if you

12    look at the Mindys case, if you look Bylin case, that's

13    a highly fact-bound inquiry.

14            And what they're saying is, "Well, everything

15    we did we did with the intent to litigate."

16            Not so.  The documents that have come out, the

17    Toberoff timeline documents, the deposition admissions

18    show that between 2002 when the fraud occurs and 2004

19    Mr. Toberoff and Laura Siegel never entered into a

20    litigation agreement.

21            The record that has emerged in discovery has

22    shown that between 2001 when Mr. Peary and Mr. Toberoff

23    signed their business joint venture and 2010 no

24    litigation was initiated.

25            And so we told the District Court on each one
```

ORAL ARGUMENT - 11/5/2012

```
 1    of these defenses, on each one of these contested fact

 2    issues, "We need further discovery."

 3             And because the District Court ruled in our

 4    favor on prong one, he never had the opportunity to

 5    exercise his discretion whether to permit further

 6    discovery to -- to confront their Statute of Limitations

 7    and litigation privilege arguments.

 8             And to me the key case on the Statute of

 9    Limitations issues is really two.  One is Judge Thomas'

10    opinion in the Living Designs against Dupont case.  This

11    is a fungicide case out of Hawaii from the 1990s.  And

12    the issue there was whether fraudulent concealment of

13    evidence trumped the inquiry notice rules.  And the

14    answer there was "yes" because Dupont had made false

15    representations to opposing counsel to obtain a

16    settlement agreement.

17             And here we have the exact same thing.

18             If you look at Mr. Toberoff's representations

19    in the District Court about whether the Toberoff

20    timeline was accurate or not, he called it "a worthless

21    piece of garbage."  He called it "an inaccurate hit

22    piece."  He called it "a pack of lies."  He actually

23    chastised counsel for relying on that document and

24    filing this lawsuit and pursuing discovery.

25             One discovery ruling in this case after
```

ORAL ARGUMENT - 11/5/2012

1    another, exactly as in your Honor's Dupont case, has

2    proven those representations to be absolutely false, and

3    each one of those false representations has tolled the

4    running of the Statute of Limitations.

5         That's an intensely fact-bound issue, as your

6    Honor recognized in that case, that cannot be decided on

7    the cold record here and cannot be decided before the

8    District Court in its own discretion evaluates whether

9    further discovery is warranted under Rule 56(d).

10        Moreover, the consent agreement, as Mr. Kendall

11   conceded, is well within the statutory period.  But what

12   Mr. Kendall did not tell you is if there's a pending

13   discovery motion to obtain a copy of the consent

14   agreement or that Judge Wright in his ruling last -- a

15   couple weeks ago, the summary judgment ruling

16   invalidated all of their consent agreements, the earlier

17   PPC ones and the later consent agreement.

18        And so it's DC Comics' submission that this

19   case must fail and the District Court's ruling must be

20   affirmed because defendants have come nowhere close to

21   meeting their -- their burden on prong one to prove that

22   the SLAPP statute applies.

23        When you actually look at, as the courts

24   require, what conduct we're challenging, this is not

25   protected activity.

ORAL ARGUMENT - 11/5/2012

```
 1              And what is the best example of this?

 2              The best example of this is a long line of

 3    cases in California courts, including the Robles case,

 4    including the -- and I apologize, your Honors --

 5    including the Aguilar case, including the Baharian-Mehr

 6    case where it's actually conduct in the litigation

 7    itself that's being challenged.

 8              In the Robles case it was an expert witness

 9    testifying during his deposition.  And the litigants, as

10    here, said, "Well, hold on a second.  You're challenging

11    his classically protected speech.  He's -- he's giving a

12    deposition answer as an expert in a case.  You can't

13    possibly sue him."

14              And the court dug under that and said, "Hold on

15    a second.  They're not suing him for giving a deposition

16    answer.  They're suing him for negligence and a failure

17    to disclose conflicts of interest in connection with

18    that testimony.  The two are separate and distinct."

19              A similar case is the Baharian-Mehr case.

20    There you had officers and directors who chose outside

21    counsel to initiate litigation on behalf of the company

22    and the shareholders who questioning that decision.

23    And, as here, the defendants say, "Hold on a second.

24    This is a litigation choice.  We're choosing our

25    lawyers.  We're choosing litigation strategists.  How
```

ORAL ARGUMENT - 11/5/2012

1    dare you sue us."

2          And the Court said, "Hold on a second.  That's

3    not what you're being sued for.  You've being sued for

4    corporate waste, and this is a pattern and practice

5    consistent with those acts of corporate waste."

6          And if you look at the Episcopal Church case,

7    there the complaint is littered with references to the

8    very serious ecclesiastical dispute between a local

9    parish and the national parish concerning gay marriage.

10          And the Court said, "You know what?  We

11    understand that.  We understand that that's a big

12    political issue.  We understand that's the reason why

13    you're all fighting.  But guess what?  This is a

14    property case, and so SLAPP doesn't apply."

15          And perhaps the most important case to take a

16    look at is the Cotati case.  In the Cotati case a group

17    of mobile home owners challenge a new city regulation

18    governing their homes in Federal Court.  The city runs

19    right out and files for declaratory relief in State

20    Court, admittedly trying to gain a tactical advantage

21    against the -- the other side.

22          The California Supreme Court held, "We

23    understand that the city's complaint referenced page,

24    chapter and verse" -- the Cotati court case -- "but

25    what's really going on here?  The city ordinance is

**EXHIBIT 2**

**33**

ORAL ARGUMENT – 11/5/2012

Page 26

```
 1   being challenged.  That's the issue in controversy.

 2   That's what the complaint is really challenging."

 3         And it's the same thing here, your Honors.

 4   It's illegal rights tying agreements that we're

 5   challenging.  It's acts of interference through fraud

 6   that cases like Haneline, Newport Builders and a long

 7   line of cases say are not protected by SLAPP.  And all

 8   of these -- I'd especially encourage you to read Judge

 9   Fletcher's opinion in the Mindys case.  If you ever get

10   to the second part of the test, Mindys holds, SLAPP may

11   apply to certain conduct, but the litigation privilege,

12   that's the much tougher bar.  It didn't apply to the

13   trademark registration filings there.

14         Read the Edwards case.  It's the seminal case

15   in California talking about the litigation privilege.

16   It has absolutely no application to acts of fraud two

17   years prior to litigation or illegal business agreements

18   ten years prior.

19         I see my time is over, your Honor.  I'll sit

20   down.

21         Thank you.

22   JUDGE REINHARDT:  Thank you, Counsel.

23   RICHARD B. KENDALL, ESQ.:  All of the cases that

24   Mr. Kline just referred you to are cases in which the

25   essential elements of the claim of damage were satisfied
```

ORAL ARGUMENT - 11/5/2012

1    by unprotected activity.  The difference between this
2    case and all of those cases is that there is no damage
3    here other than the damage from protected activity.
4    Protected activity is the pursuit of termination
5    rights.
6              I call the Court's attention to the damage
7    allegation in the complaint, which is Paragraph 186,
8    which says, "As a result of Toberoff's misdeeds, the
9    Siegel heirs repudiated the DC Comics' agreement and
10   ended all further discussions, causing DC Comics to lose
11   the value of the agreement, to lose their ongoing
12   business relation with the Siegels, and incur subsequent
13   legal fees in legal disputes."
14             All of that results from the pursuit of
15   termination.  Similar allegation as to what happened as
16   a result of the alleged interference with the Shuster
17   agreement.  It is all because of the pursuit of the
18   termination rights.  And that's why all of these cases
19   are distinguishable.
20             One other point.
21             The argument that is made that the PPC Shuster
22   agreements were illegal and therefore not within SLAPP
23   is just completely wrong.  The cases they cite involve
24   criminal conduct, and criminal conduct is not protected
25   under the SLAPP statute.  Extortion is not protected.

ORAL ARGUMENT - 11/5/2012

```
 1   Hate speech is not protected.
 2            But there is nothing actually illegal about the
 3   agreements that were made between Mr. Toberoff and the
 4   Shusters.  It's just that they are unenforceable because
 5   of the operation of the copyright law window.  They're
 6   unenforceable.  They are not illegal.  There is no
 7   public policy whatsoever that would say that the
 8   anti-SLAPP statute doesn't apply on account of those
 9   agreements.
10            Thank you very much, your Honor.
11       JUDGE REINHARDT:  Thank you, Counsel.
12            The case just argued will be submitted.
13                      ---0---
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 2
36

ORAL ARGUMENT - 11/5/2012

```
 1              C E R T I F I C A T E

 2

 3         I, Melanie M. Faulconer, certify

 4    that the foregoing transcript is a true

 5    record of said proceedings, that I am not

 6    connected by blood or marriage with any of

 7    the parties herein, nor interested directly

 8    or indirectly in the matter in controversy,

 9    nor am I in the employ of counsel.

10         I have hereunto subscribed my name

11    this 14th day of November, 2012.

12         Damian Abzo

13    Damian Aly  on behalf of Melanie M. Faulconer

14                   MELANIE M. FAULCONER

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 3

**From:** Kline, Matthew
**Sent:** Tuesday, November 06, 2012 12:12 PM
**To:** Keith Adams (kgadams@ipwla.com); Pablo Arredondo (parredondo@ipwla.com)
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; Lens, Molly; Marc Toberoff (mtoberoff@ipwla.com); Richard Kendall; lbrill@kbkfirm.com; Nicholas Daum
**Subject:** DC Comics v. Pacific Pictures

Counsel:

We understand that defendants intend to file a Rule 54 motion this week concerning DC's First and Third Claims in the *Pacific Pictures* case. DC will oppose the motion because this case can, within the next few months, be brought to a final and decisive conclusion. Any appeal now would be inefficient and premature. Indeed, we are very concerned that defendants have filed so many interlocutory appeals in this case (five now)--all in an effort to forum-shop, and to stymie this case from being fully and finally adjudicated. We hope we can convince you, for the reasons below, not to file your motion. In any event, we wanted to make sure you had DC's position on these issues and that you accurately representing that position to the Court, including by submitting this letter with any filing.

The reasons for not filing a Rule 54 motion now are many. Among them:

1. DC has a pending motion concerning its Fifth Claim that ultimately could help resolve that claim. That motion, which is set for hearing in a few weeks, should be resolved before we litigate whether a piecemeal appeal should be taken on DC's other claims.
2. Relatedly, since defendants will not stipulate to judgment on DC's Sixth Claim based on the Court's ruling on DC's Third Claim, DC will need to move for summary judgment on that claim as well. That issue is narrow and should be resolved before any Rule 54 appeal is taken.
3. DC's Fourth Claim could soon be resolved as well--either on summary judgment in DC's favor, or absent that, following a short trial.
4. DC intends to seek certain of its fees and costs on its First and Third Claims, as is its right. Those issues should be adjudicated before any appeal premised on those Claims is taken.
5. The *Superboy* case can and should be resolved now. As the remaining open issues in that case are narrow, and DC is entitled to judgment as a matter of law, we intend to file a motion seeking summary judgment.
6. Before any appeal, including a Rule 54 appeal, is brought on DC's First and Third Claims against the Shusters, DC believes a court-ordered mediation with the Shuster family would be potentially productive. In the wake of the Court's summary judgment ruling, the family (a) no longer has to labor under the unlawful consent agreements; and (b) should now have a more sober assessment of their claims. *Cf.* Peary Depo. at 357:22-358:16 ("Q. So you -- you understand that given that the estate has already given up an interest in Superboy, and the estate could lose this case and the court could find that the Shuster termination notice is invalid, that you as executor could yield the estate zero. You have entertained that as a possible outcome, correct? MR. TOBEROFF: Assumes facts. Lacks foundation. You can answer in the most general fashion without going into any details..... THE WITNESS: I've only considered that like I would an asteroid hitting us and wiping out life on earth."). We will be asking the Court, pursuant to its Local Rules, to order such a mediation. We believe any appeal the Shusters take will be rejected, and the Court's summary judgment ruling will be affirmed, but DC is willing to discuss the saved costs of not having to brief the appeal as part of a settlement discussion.

1

**EXHIBIT 3**
**38**

In short, we suggest that we all take a pause this week and consider the best schedule and way to manage and fully resolve these cases. To that end, we hereby request a meet and confer on the issues set forth above on Tuesday, November 13, at 10 a.m. We can have that meeting in our office. At all events, the parties should strive to bring this case to a final, decisive end on all of the claims presented. Further piecemeal appeals are only a distraction and will delay matters and increase costs.

All of DC's rights are reserved.

Thanks,

Matt Kline

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

*Please consider the environment before printing this email*

2

**EXHIBIT 3**

# EXHIBIT 4

O

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

December 20, 2010

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6850

**VIA EMAIL SERVICE**

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al., CV-10-3633 (ODW) (RZx)*

Dear Counsel:

We have received the privilege logs for defendants Joanne Siegel, Laura Siegel Larson, Jean Peavy, and Mark Peary. The logs fail to satisfy defendants' obligations under Rule 26, *see* FED. R. CIV. P. 26(b)(5)(A). Pursuant to the meet and confer requirements of Rule 37, as well as our existing stipulation and court order, we will have our Rule 37 conference tomorrow and can further address the issues raised in this letter. To summarize, the defects in defendants' logs are numerous, and absent prompt agreement to remedy the logs, DC intends to file a motion to address the deficiencies. They include the following:

1.  Defendants have omitted essential identifying information, including the subject matter of the documents and all recipients of the communications at issue (*e.g.,* persons who were copied or otherwise received the communication). *See, e.g., In re CV Therapeutics, Inc.*, 2006 WL 1699536, at *2 (N.D. Cal. June 16, 2006) (privilege log must include subject matter of each document); *Helm v. Alderwoods Grp., Inc.*, 2010 WL 2951871, at *1-2 (N.D. Cal. July 27, 2010) ("[W]ithout the names of the author(s) and recipient(s) of each document, [party] cannot determine whether the attorney-client privilege applies."). Without this information, neither DC nor the Court can make a proper evaluation of the propriety of the claim of privilege.

2.  Based upon the limited information contained in the privilege logs, it is apparent that defendants' claims of privilege are overbroad and unwarranted. Defendants cannot shield from discovery documents reflecting Mr. Toberoff's private commercial, business activities as an "entrepreneur," movie "producer," "rights hunter," and/or businessman. Just because a document is exchanged between Mr. Toberoff and the Siegel and Shuster heirs does not make it privileged. *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).

**EXHIBIT 4**
**40**

O'MELVENY & MYERS LLP
December 20, 2010 - Page 2

3. Unprivileged documents do not become privileged simply by conveying them to one's attorney. *See Suezaki v. Superior Court*, 58 Cal. 2d 166, 176 (1962) (mere transmission, even if the parties intend confidentiality, "cannot create the privilege if none, in fact, exists"). For example, DC is aware that Ms. Larson sent a letter to her brother Michael Siegel on July 11, 2003 concerning the sale of his Superman interest to Mr. Toberoff's investor. *See* Case No. CV 04-8400, Docket No. 295-2 at 2-3. Defendants have never produced the letter. DC believes the letter has been withheld as attorney-client privileged because it was faxed to Mr. Toberoff, as reflected in the Siegel defendants' privilege log. *See* Siegel Privilege Log, Entries 715 & 716. This untenable claim of privilege calls into question the remainder of defendants' privilege log.

4. Defendants have no basis for asserting attorney-client privilege or work-product protection for documents involving Michael Siegel and/or Don Bulson. Mr. Siegel is the holder of the privilege, if any exists, in communications between himself and Mr. Bulson, and defendants cannot assert its protections on his behalf. *See* CAL. EVID. CODE § 953. Defendants' claims that documents are privileged under the joint defense or common-interest privilege are erroneous and were rejected by the U.S. District Court in Ohio. *In re: Subpoena Duces Tecum*, Docket No. 15, U.S. District Court Northern District of Ohio, Case No. 1:06 MC 99.

5. Your log provides no grounds for your blanket claim that communications involving Dennis Larson are attorney-client privileged. As discussed above, the fact that Mr. Larson is an attorney does not render all communications with him privileged, and defendants have not made a showing that Mr. Larson was providing legal advice in connection with each of the communications at issue.

6. Defendants' continued insistence that DC is not entitled to discover the consent agreements (or at least redacted versions of them) is without merit for, *inter alia*, the many reasons DC has explained in previous briefing on the subject. Docket No. 90 at 1, 16-24; Docket No. 125 at 12-18. We question why one document is listed in each log as evidencing the consent agreements—a document at only log entry number 27 of the Peary/Peavy Privilege Log and log entry number 2103 of the Siegel Privilege Log that you now describe as a "Collective Bargaining Agreement." We assume other agreements, drafts, and related documents exist, including correspondence. Nor do the logs identify the retainer agreements that the heirs signed; if such items are included on the log, we cannot tell because of the inadequate descriptions. These types of materials are discoverable, *see In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994) (retainer agreements not privileged); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not shield fee arrangements.")

Again, because of the paucity of information in defendants' logs, we cannot identify all issues and objections associated with them. We therefore reserve our right to supplement our position as and when we obtain additional information.

**EXHIBIT 4**
**41**

O'Melveny & Myers llp
December 20, 2010 - Page 3


      Pursuant to the Magistrate's order, we will meet and confer regarding these issues tomorrow, December 21, 2010, at 2:00 p.m. PST.  Please dial in to (866) 244-8528, Passcode: 224018, for our discussion tomorrow.


                Very truly yours,


                Matthew T. Kline
                of O'MELVENY & MYERS LLP


cc:    Daniel M. Petrocelli

CC1:841631


**EXHIBIT 4**
**42**

# EXHIBIT 5



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

December 29, 2010

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al., CV-10-3633 (ODW) (RZx)*

Dear Marc:

This letter follows up on the Rule 37 conference we held last week regarding the issues DC raised with defendants' document production and privilege logs in the *Shuster* matter. This letter is not intended to recount our full discussion, which lasted some 90 minutes, but to crystallize our open issues, so that when DC files its motion to compel, we have clear agreement at least on what issues the parties disagree. I have not recounted all of the arguments that either DC or defendants would assert in connection with DC's motion, as both sides can set forth their positions in the required joint statement. (We are also not yet in a position to address the Siegels' proposal to amend their complaint in their case against DC, which we also discussed on Tuesday's call. We received your proposed amendment and stipulation, but the press of the holidays, our in-person meeting on December 23 on other matters, and appellate briefing in the *Shuster* case have intervened. We hope to discuss these amendment-related issues when you return from your trip.)

As for the discovery issues in the *Shuster* case:

1. Defendants represented that they either produced or listed on their privilege logs all documents responsive to DC's document requests. You were going to confirm with Laura Siegel Larson that she has produced from her files, or her attorneys' files, all responsive communications she or her counsel had with her ex-husband or his counsel, assuming any such documents exist. Defendants further represented that they endeavored, where appropriate, to redact assertedly protected information from documents, rather than withhold the whole document completely. You were going to ask your associates to confirm that was the case for communications between Ms. Larson and her husband listed on the Siegels' log. Please confirm these items by January 4.

**EXHIBIT 5**
**43**

O'MELVENY & MYERS LLP
December 29, 2010 - Page 2

2. Defendants represented that all authors and recipients of the documents identified on their privilege logs have been listed on the logs. Defendants' logs do not identify who is a "to," "cc," or "bcc" to the communication, or if the recipient received the communication by other means. DC would like that information provided for these logs and others going forward and would be willing to provide the same detail in return. On specific sets of documents where the parties disputes are even more focused—*e.g.*, on any documents or communications involving Michael Siegel—we think it is especially important to have this level of specificity and will move to require it unless defendants agree to provide it now.

3. Defendants represented that if a sequence of communications involved multiple communications (for example, a letter from "Steve" to "Bob," which "Bob" then faxed to "Mary," and "Mary" hand delivered to "Ellen"), then defendants would have logged each of these communications (three in this instance) separately on their current privilege log. Please confirm this is the case by January 4.

4. Pursuant to the parties' December 6 stipulation, "Defendants and their counsel need not log internal communications solely between or among Defendants' counsel or between or among Defendants' counsel and anyone at the [Kendall] law firm." Docket No. 132 at 2 (emphasis added). We asked that defendants provide us a list of whom they considered "Defendants' counsel" for purposes of not logging documents. We offered to provide defendants a similar list. You said you would get back to us on that request. Please do so by January 4.

5. We believe defendants' privilege logs should include a description of the subject matter of the communications at issue. We understand defendants' position to be that the logs track the format of W. SCHWARZER, W. TASHIMA AND J. WAGSTAFFE, FED. CIV. PROC. BEFORE TRIAL, Form 11:A, meet the standards set forth in *Dole v. Melonas*, 889 F.2d 885 (9th Cir. 1989), and were held to be sufficient by Magistrate Judge Zarefsky in the *Siegel* cases. Defendants also represented that a large percentage of the entries in defendants' log are routine "litigation updates" over which no dispute regarding privilege claims could reasonably arise. Reserving all rights, we suggested that privilege logs in this case should include subject matter information, that defendants could use a short code—*e.g.*, "LU" for litigation updates—and more complete descriptions should be used for other sorts of documents, such as communications related to what DC calls the "consent agreements" in its complaint. Reserving all rights over the discoverability and admissibility of such documents, defendants acknowledged that such consent-agreement-related communications are listed on defendants' logs, but currently cannot be identified without a subject matter description. Reserving all rights, defendants suggested in the alternative that parties not list subject matter headings for each document on the log, but that each side identify categories of documents (*e.g.*, "consent-agreement-related" or "Toberoff-Timeline-related" documents) that would specifically need to be flagged. We find our proposal preferable, but are willing to submit the issue to the Magistrate to decide which alternative makes most sense. In no event, do we think it will be right for there to be no subject matter descriptions for any document on any of the logs. Please let us know defendants' final position on these matters by January 4.

**EXHIBIT 5**
**44**

O'MELVENY & MYERS LLP
December 29, 2010 - Page 3

6. Defendants represented that they are continuing to withhold communications involving Michael Siegel on joint interest and attorney-client privilege grounds. Defendants' preliminary position—which they wished to confirm—was that the district court in Ohio ordered produced all the Michael Siegel documents that must be produced. We disagreed, but agreed to review the Ohio court's rulings once again as well and their limitation—if any—on DC's current discovery in this case. We have done that research and believe DC is entitled to the Michael Siegel documents, or at least an *in camera* review of certain of these materials by the Magistrate. The documents at issue are listed at entries 28, 43-49, 51-59, 61-64, 66-73, 77-80, 87-88, 98, 101-104, 114-15, 118-19, 121-23, 127-31, 133-34, 136-39, 141-43, 145-58, 160-72, 174-84, 188-90, 192, 194, 197-219, 221, 226-29, 231-44, 247-52, 255-61, 267-70, 273-79, 281-82, 284, 290-92, 294-96, 300, 302, 304, 307, 309-11, 313-17, 319-42, 347-52, 354, 356-60, 362-64, 366, 368-69, 372-75, 377, 380, 399, 401-402, 406-408, 410-11, 413-14, 416-18, 420, 429-30, 433-34, 436-37, 443, 446-48, 460-61, 463-65, 472, 482, 489, 494-96, 507-13, 516-19, 521-24, 530-32, 545-46, 548-51, 553-58, 560-64, 566-69, 571-75, 577, 581-82, 585-90, 595, 598, 602, 604, 611-13, 623, 625-27, 629-31, 633, 635-37, 640-42, 644-50, 652-55, 664-66, 668, 672, 674-88, 690-99, 701, 704-11, 715-18, 720-34, 745-46, 755, 761-63, 765-67, 770-71, 776-77, 781-82, 786-88, 805, 815-16, 818-19, 909-10, 921-22, 946, 950, 952, 957, 974-82, 989-94, 1036-37, 1039-40, 1043-46, 1048, 1054, 1057, 1127, 1203-1205, 1345, 1360-62, 1370-71, 1375, 1409-1412, 1661-63, 2135, 2367, 2433-34, 2440, 2801, 2803, 2805-2806, 2833, 2836-40, 2846-47, 2849-50, 2864-66, 2872-74, 2940, 2945, 2962, 3007, 3011, 3077-78, 3082, 3097-99, 3103-3104, 3131, 3133-36, 3146, 3148, 3151-54, 3163-65, and 3215, of the Siegels' privilege log. We understand that defendants disagree that such documents should be produced or that an *in camera* review of some or all of these documents is appropriate, but we urge you to reconsider that proposal, in light of the Ohio court's rulings on defendants' previous joint-privilege claims. Please let us know defendants' final position on these issues by January 4.

7. We also discussed Siegel Privilege Log Entries 715 & 716, which we believe are a letter Laura Siegel Larson sent to Michael Siegel on July 11, 2003, and a fax by which the letter was then communicated to your law firm. We asked you to confirm whether our understanding of what these two documents were was correct, and we asked if you would agree to a court order that parties may not withhold non-privileged communications in this case on the grounds they were later sent to a lawyer. *See Suezaki v. Superior Court*, 58 Cal. 2d 166, 176 (1962) (mere transmission, even if the parties intend confidentiality, "cannot create the privilege if none, in fact, exists"). You declined to confirm whether our description of the two documents was correct, said you would want to review *Suezaki*, and declined to agree to such a court order. You said that defendants believed that DC had no right to obtain Siegel Privilege Log Entries 715 & 716 because of rulings Magistrate Zarefsky and Judge Larson made and because DC's suspicions regarding these documents can be traced to the Toberoff Timeline and related documents that the Timeline's author delivered to DC. You also contended that DC must have improperly reviewed the underlying documents in question—contrary to *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644 (1999). We disagree with defendants' positions completely and believe that the Magistrate should review these two documents in camera. If one or neither of them is privileged, we submit the communications should be produced.

**EXHIBIT 5**
**45**

O'MELVENY & MYERS LLP
December 29, 2010 - Page 4

8. We urged defendants, at a minimum, to produce redacted versions of what DC has described as the "consent agreements" and any and all related documents. As described by defendants, these documents reflect the splitting of rights and interests—which is not a privileged communication, but a legal act that impacts, *inter alia*, DC's rights in the Superman copyrights. To the extent the consent agreements and related documents reflect the conveyance of legal advice (and DC does not concede they do), defendants should redact that information and not withhold the agreements altogether. We understand defendants' position to be that they are under no obligation to produce these documents in any form because, *inter alia*, defendants apprised DC of their existence before and at a JAMS mediation session. It was our understanding based on our call that it is defendants' position that state and federal law related to mediations did not prevent DC from discovering and using these documents, but that it is defendants' position that a JAMS agreement that DC and defendants signed precluded their use, as did a ruling from Judge Larson. We disagree with your arguments about the JAMS agreement and Judge Larson's rulings.

9. We urged defendants to produce all drafts, iterations, and copies of retainer agreements with you and your law firm, relying on the case law cited in my letter of Monday, December 20, 2010. *See In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994) (retainer agreements not privileged); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not shield fee arrangements."). Defendants contended that to the extent a retainer agreement reflects strategy, such strategic statements could be redacted from the document. Reserving all rights, you suggested that defendants might be willing to enter a stipulation with DC, in which both sides would agree to produce redacted versions of their retainer agreements with counsel—as well as all drafts, etc. There is no relevance or other basis for demanding any written retainer agreement between us and our client. We do think your retainer agreements should be produced in full and any redactions inspected by the Magistrate in camera.

10. We raised that there are certain communications listed on the Toberoff Timeline documents that neither appear on defendants' logs nor have been produced. We provided the following document as an example, a May 13, 2003 letter from Michael Siegel to Laura Siegel Larson discussed in the last paragraph of page 3 on the Timeline, and other examples are listed in the footnote below.[1] You said that DC should not rely on the accuracy of the Timeline, but took under advisement our request that you verify whether such documents exist—and, if so, to either produce them, or list them on defendants' privilege logs.

11. Lastly, you agreed to confirm whether Entry 623 in the Siegels' privilege log in this case is the same document identified at Entry 325 of the Siegels' privilege log in the *Siegel* cases. I have copied and pasted both of these entries into the text of this document below:

---

[1] December 16, 2002 letter from Marc Toberoff and Ari Emanuel to Joanne Siegel and Laura Siegel Larson discussed on page 3; June 5, 2003 letter from Laura Siegel Larson to Michael Siegel discussed on page 4; and September-October 2003 "[l]etter with Ari Emanuel in which he would receive $2.5 million flat fee for 'negotiating services'" discussed on page 5.

**EXHIBIT 5**
**46**

O'MELVENY & MYERS LLP
December 29, 2010 - Page 5

Entry #623 in the Siegels' privilege log in this case:

| 623 | 8/9/2002 | Atty Kevin Marks | Joanne, Laura Siegel, Atty Don Bulson, Atty Bruce Ramer | Letter | Atty/Client | Defendants' Counsel |
|---|---|---|---|---|---|---|

Entry #325 in the Siegels' privilege log in the *Siegel* cases:

| 325 | 8/9/2002 | Joanne & Laura Siegel | Atty Kevin Marks | Letter | Atty/Client | Plaintiffs' Counsel |
|---|---|---|---|---|---|---|

Please confirm by January 4.

We intend to serve you with our portion of a joint stipulation regarding defendants' document production and privilege logs next week, unless these outstanding issues can be resolved before then. If you intend to get back to us with additional information or agree to produce the requested documents, you will need to do so before Tuesday, January 4, 2011, otherwise we will proceed with our motion.

Very truly yours,

Matthew T. Kline

cc:    Daniel M. Petrocelli, Esq.

CC1:841829

**EXHIBIT 5**
**47**

# EXHIBIT 6

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

January 4, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

This letter is in response to your December 29, 2010 letter regarding the December 21, 2010 meet-and-confer with respect to defendants' document production and privilege logs. As with your letter, this is not intended to be a complete statement of defendants' position and all of defendants' rights on these subjects are expressly reserved.

Notwithstanding that the parties agreed at the meet and confer not to quote back or characterize the other sides' statements, your letter misconstrues and/or mischaracterizes defendants' positions at various points. We address some, but have not attempted to address all such instances, below.

As to the specific issues raised in your letter:

1. *Dennis Larson/Laura Siegel Documents*: All of the documents listed on the Siegels' privilege logs wherein Dennis Larson is listed as an author or a recipient entail Dennis Larson acting as an attorney.

It appears from your request for "communications she or her counsel had with her ex-husband or his counsel" that you are asking for documents from Ms. Siegel and Mr. Larson's divorce proceedings. Such documents appear irrelevant to this case; however, we remain willing to discuss this relevance issue with you.

2. *To/cc/bcc*: As I stated in our meet and confer, defendants endeavored to list all recipients in their privilege logs, including those "cc'ed" or "bcc'ed." You cite no authority that a party is further required to break down on a privilege log the recipients of a communication by "to," "cc" or "bcc." Nor have you provided any rationale for your demand. Given that your request would

**EXHIBIT 6**
**48**

**TOBEROFF & ASSOCIATES, P.C.**

January 4, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 4

involve defendants re-reviewing every communication listed, including voluminous litigation communications since 2004, and would thus be extremely time-consuming to no particular end, defendants are not willing to undertake this burdensome exercise.

3. *Chains of Communications*:  Defendants endeavored to log each communication separately on the numerous newly logged documents in this case, and with respect to prior privilege logs previously approved by the court in the *Siegel* litigations, incorporated the logs as they were.

4. *List of Counsel:*  In exchange for your express agreement to identify all Plaintiffs' counsel for which internal communications are not logged, we are willing to identify all such "Defendants' counsel." Please confirm this agreement specifically and unequivocally.

5. *Subject Matter of Communications*:  While we disagree with your assertions, defendants are willing to enter into a reciprocal agreement with plaintiffs to mutually list the subject matter of logged documents. Pursuant to such an agreement, defendants would specifically designate all logged documents that reflect or refer to the so-called "Consent Agreement" or the "Toberoff Timeline," while litigation update communications will be listed as "LU." In exchange, DC would specifically designate all logged documents that reflect or refer to the following topics: the "Toberoff Timeline"; the "Stolen Documents"; the "JAMS Confidentiality Agreement"; Warner Bros. and/or DC's decision to sue Marc Toberoff and related entities; publicity regarding the initial filing of the *DC Comics* action; the corporate restructuring of DC in 2009 and any "DC summit" (or meetings) with respect thereto; and the purported "escrow" account created by DC in connection with the alleged 2002 settlement agreement.

6. *Michael Siegel Communications*:  DC's position with respect to these documents is grossly overreaching and unwarranted.  The Ohio Court already clearly denied DC's request to produce "joint interest" documents beyond the 15 already produced, in part because DC's motion "was geared to obtain recent, non-privileged correspondence," and because "[the] date chosen as a starting point, the date after settlement negotiations broke down between Movants and Plaintiffs, was also reasonable." August 13, 2008 Order at 6.  Furthermore, the Ohio Court distinguished and ordered the production of only 15 Michael Siegel communications because it found that those specific "documents relate to the offers …to purchase Michael Siegel's interest.  The primary subject *does not relate to settlement offers regarding Warner Bros.* or the risk of litigation." April 1, 2008 Order at 3.

DC had a full and fair opportunity to secure such documents, and successfully compelled the production of the 15 documents, but its motion to compel additional Michael Siegel communications was specifically denied. DC did not appeal that ruling and is bound by it.

Lastly, the documents sought in your letter go far beyond "joint interest" communications, and include pure attorney-client communications between Michael Bulson and his attorney (*e.g.*, Entry No. 127) without any legitimate basis.

**EXHIBIT 6**
**49**

**TOBEROFF & ASSOCIATES, P.C.**

January 4, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:  3 of 4

7. *Privilege Log Entries 715/716*:  As we stated in both our meet-and-confer and many times previously, Warner Bros., DC and their counsel's repeated attempts to exploit documents stolen from my law offices are more than improper. After Warner Bros. represented and convinced Magistrate Zarefsky in the *Siegel* litigation that it had carefully followed the sanitizing protocols of *State Fund*, it became blatantly obvious that this was not true.  This is clear from Mr. Smith's subsequent declarations (once the reference to Magistrate Zarefsky had been withdrawn by Judge Larson), recalling with alleged photographic precision documents he had purportedly only "thumbed through" years earlier, and is just as obvious from Warner Bros. and DC's repeated efforts to peak beneath the Siegels' privilege logs in search of alleged specific stolen documents.

You have misstated our position with respect to this issue.  Warner Bros. and DC's repeated and improper attempts to convince several different courts, as well as their purported "escrow attorney," to "peek behind" the Siegels' privilege logs, have each been rejected.  DC's endless attempts to re-litigate in this action every ruling against them in the *Siegel* action will not be permitted.

8. *Consent Agreement*:  Defendants will not be producing copies of the so-called "consent agreement" or "collective bargaining agreement" which was entered into and disclosed solely in connection with a court-ordered settlement mediation and pursuant to the parties' JAMS Confidentiality Agreement. Warner Bros., DC and their counsel have willfully breached such Agreement by their public references to the "consent agreement." Your letter omits that in addition to the strict protection afforded by the JAMS Confidentiality Agreement, the "consent agreement" is equally protected by the attorney-client privilege and the attorney work product doctrine, as consistently asserted by the Siegels and Shusters.

9. *Retainer Agreements:*  DC refuses to produce copies of its retainer agreements, while demanding that defendants produce theirs.  DC's retainer agreements and the information therein – such as the date of your firm's retention, and the existence therein of indemnification provisions regarding your SLAPP suit and malicious prosecution of opposing counsel and our potential counterclaims – will be very relevant to defendants' counterclaims.  Defendants remain willing to produce redacted copies of their retainer agreements, if DC will agree to produce its.

10. *Timeline Documents*:  You innocently twisted our statement.  We did not say that "DC should not rely on the accuracy of the Timeline"; we clearly stated that the ranting anonymous "Timeline" was inaccurate and untrustworthy.

One clear example is the "December 16, 2002 letter from Marc Toberoff and Ari Emanuel" that you describe in your letter.  There is no such letter.  However, a December 16, 2002 letter from Marc Toberoff to Ari Emanuel, Joanne Siegel, and Laura Siegel Larson was long ago produced to DC by the Siegels in the related *Siegel* actions at 01883-01884, as described in my May 21, 2007 declaration.  This letter was also "produced" in this action by the listing of these Bates nos. pursuant to the parties' stipulation.

**EXHIBIT 6**
**50**

**TOBEROFF & ASSOCIATES, P.C.**

January 4, 2011
Re:  *DC Comics v. Pacific Pictures Corp.*
Page:  4 of 4

As to the "September-October 2003 '[l]etter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services,"'" we cannot find any document matching that description.

11.  *Entry No. 623/Entry No. 325*:  We can confirm that the Siegel Defendants' Entry No. 623 is the same as Entry No. 325 in the revised privilege log that was served on DC on September 29, 2006 pertaining to the files that were in the offices of Gang, Tyre, Ramer & Brown.

Please contact me to discuss the remaining points.  It appears that your contemplated motion will involve subjects (2), (6), (7), and (8), as well as (5), if the parties are unable to firm up a compromise on that issue, and (9), if DC remains unwilling to enter into a reciprocal production agreement.

Lastly, I will be out of the state from January 5 and will not return until January 11, 2011, Joanne Siegel's deposition is scheduled for Wednesday, January 12 and Friday, January 14, 2011, and our opposition to DC's recent motion to dismiss in the second *DC Comics* appeal is due January 10, 2011. Accordingly, with respect to the discovery served by DC on December 10, 2010, which is currently due January 10, 2011, we would appreciate the courtesy of a brief extension until January 24, 2011 to respond.

Very truly yours,

Marc Toberoff

**EXHIBIT 6**
**51**