1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
     parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
     dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:          (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

## UNITED STATES DISTRICT COURT

12

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

13

| | |
|---|---|
| 14  DC COMICS,<br><br>15            Plaintiff,<br><br>   vs.<br>16<br>   PACIFIC PICTURES CORPORATION;<br>17  IP WORLDWIDE, LLC; IPW, LLC;<br>   MARC TOBEROFF, an individual;<br>18  MARK WARREN PEARY, as personal<br>   representative of the ESTATE OF<br>19  JOSEPH SHUSTER; JEAN ADELE<br>   PEAVY, an individual; LAURA<br>20  SIEGEL LARSON, individually and as<br>   personal representative of the ESTATE<br>21  OF JOANNE SIEGEL,<br>   and DOES 1-10, inclusive,<br>22<br>23<br>24            Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**REPLY DECLARATION OF KEITH G. ADAMS IN SUPPORT OF DEFENDANTS' MOTION FOR ENTRY OF A FED R. CIV. P. 54(b) JUDGMENT ON OCTOBER 17, 2012 ORDER GRANTING PLAINTIFF DC COMICS' FIRST AND THIRD CLAIMS, AND FOR A STAY OF REMAINING CLAIMS**<br><br>*Reply filed concurrently*<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:         None Set<br><br>Date:   December 17, 2012<br>Time:   1:30 p.m.<br>Place:  Courtroom 11 |

25

26

27

28

## DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.    I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and submit this reply declaration in support of Defendants' Motion For Entry Of A Fed. R. Civ. P. 54(b) Judgment On October 17, 2012 Order Granting Plaintiff DC Comics' First And Third Claims, And For A Stay Of Remaining Claims.  I have personal knowledge of the matters set forth below.

2.    Attached hereto as Exhibit "A" is a true and correct copy of plaintiff DC Comics' ("DC") portion of a Joint Stipulation Regarding DC Comics' Motion For A Protective Order, which was served by DC on November 30, 2012.

3.    Attached hereto as Exhibit "B" is a true and correct copy of the transcript from the November 5, 2012 oral argument before the Ninth Circuit in *Larson vs. Warner Bros. Entertainment* (Ninth Circuit Appeal Nos. 11-56863, 11-56035).

Executed on December 3, at Malibu, California.

_____

Keith G. Adams

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11 DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

12        Plaintiff,                   | **DISCOVERY MATTER**

13        v.                           | **JOINT STIPULATION
                                        REGARDING DC COMICS'**
14 PACIFIC PICTURES                    | **MOTION FOR A PROTECTIVE**
   CORPORATION, IP WORLDWIDE,          | **ORDER**
15 LLC, IPW, LLC, MARC TOBEROFF,
   an individual, MARK WARREN          | NOTICE OF MOTION AND
16 PEARY, as personal representative of| MOTION, DECLARATIONS OF
   the ESTATE OF JOSEPH SHUSTER,       | MATTHEW T. KLINE AND
17 JEAN ADELE PEAVY, an individual,    | WAYNE M. SMITH, AND
   LAURA SIEGEL LARSON, an            | [PROPOSED] ORDER FILED
18 individual and as personal          | CONCURRENTLY HEREWITH
   representative of the ESTATE OF
19 JOANNE SIEGEL, and DOES 1-10,
   inclusive,                          | **Judge**:      Hon. Otis D. Wright II
20                                      | **Magistrate**: Hon. Ralph Zarefsky
          Defendants.
21                                      | **Hearing Date**:   Jan. 7, 2013
                                        | **Hearing Time**:   10:00 a.m.
22                                      | **Courtroom**:      540
                                        | **Discovery Cutoff**:  None Set
23                                      | **Pretrial Conference**: None Set
                                        | **Trial**:          None Set
24

25

26

27

28

**Exhibit A
2**

(continued from previous page)

MARC TOBEROFF (S.B. #188547)
  mtoberoff@ipwla.com
KEITH G. ADAMS (S.B. #240497)
  kgadams@ipwla.com
PABLO ARREDONDO (S.B. #241142)
  parredondo@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:   (310) 246-3101

Attorneys for Defendants Laura Siegel Larson,
Mark Warren Peary, and Jean Adele Peavy

RICHARD B. KENDALL (S.B. #90072)
  rkendall@kbkfirm.com
LAURA W. BRILL (S.B. #195889)
  lbrill@kbkfirm.com
NICHOLAS F. DAUM (S.B. #236155)
  ndaum@kbkfirm.com
KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067
Telephone:  (310) 556-2700
Facsimile:   (310) 556-2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**3**

Pursuant to Federal Rules of Civil Procedure 26, 34, and 37 and Central District Local Rule 37-2, the parties respectfully submit the following Joint Stipulation Regarding DC Comics' Motion For A Protective Order.  Pursuant to Central District Local Rule 37-1, the parties have attempted unsuccessfully to resolve their disputes and therefore respectfully seek the assistance of the Court.

Dated:       December ___, 2012        Respectfully Submitted,

O'MELVENY & MYERS LLP

By:_____
       Daniel M. Petrocelli
       Attorneys for Plaintiff DC Comics

Dated:       December ___, 2012        Respectfully Submitted,

TOBEROFF & ASSOCIATES

By:_____
       Marc Toberoff
       Attorneys for Defendants Laura
       Siegel Larson, Mark Warren Peary,
       and Jean Adele Peavy

Dated:       December ___, 2012        Respectfully Submitted,

KENDALL BRILL & KLIEGER LLP

By:_____
       Richard B. Kendall
       Attorneys for Defendants Marc
       Toberoff, Pacific Pictures
       Corporation, IP Worldwide, LLC,
       and IPW, LLC

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**4**

## I.    DC'S INTRODUCTORY STATEMENT

DC is forced to bring this motion based on defendants' refusal to enter into a routine stipulation excusing DC from logging tens of thousands of unquestionably privileged litigation documents created after the *Siegel* cases were filed in 2004. The parties agreed to the exact same stipulation in *Siegel*.  And at the outset of this case in 2010, the parties entered into a "placeholder" stipulation providing that defendants would not be required to log such litigation documents in responding to DC's then-pending discovery requests, and agreed to enter into an "overall" stipulation extending the same courtesy to DC after defendants served discovery requests.  Defendants made clear that while a "full-fledged logging agreement" was not necessary "at the moment because Defendants have not yet even served DC with any requests," the parties would finalize a complete, bilateral agreement later.

Defendants have now reneged on their promise.  Consistent with the parties' 2010 discussions, after defendants finally served document requests in late 2011, DC asked for a "full-fledged," bilateral logging agreement that would not require DC to log the voluminous litigation documents in its counsel's files.  After dragging out the process for months by declining to meet and confer, defendants rejected DC's proposed stipulation on the specious ground that DC should have to log communications revealing when it received the Toberoff Timeline.  Though this timing issue is irrelevant to *any* claim or material issue in this case, to address defendants' concern, DC reaffirmed the date it received the Timeline.  Defendants say this is not enough, and DC must instead waste hundreds of thousands of dollars preparing a privilege log that will lead to *no* relevant, discoverable evidence.

Defendants' true motive is clear:  to inflict unnecessary expense on DC and to attempt to distract from defendants' own discovery misconduct, which is the subject of a terminating sanctions motion now pending before Judge Wright.  DN 500, 527.  Defendants' tactical objectives do not validate their position or excuse their breaching their agreement with DC.  By rule and by agreement, DC is entitled

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**5**

to a protective order under Rule 26(c) and to the entry of the reasonable logging stipulation that the parties assured each other would issue.

## II.    DEFENDANTS' INTRODUCTORY STATEMENT

[TO BE INSERTED]

## III.    DC'S STATEMENT OF ISSUES IN DISPUTE

### A.    Relevant Background

1. Laura Siegel Larson commenced her two lawsuits against DC in October 2004, seeking declarations that her Superman and Superboy termination notices were valid and effective.  Case No. CV-04-8400, DN 1 ¶¶ 52-55; Case No. CV-04-8776, DN 1 ¶¶ 61-64.  After the two *Siegel* cases were consolidated for purposes of discovery, the parties agreed that privileged documents created after the commencement of the *Siegel* cases did not need to be listed on the parties' respective privilege logs.  Decl. of Wayne M. Smith ("Smith Decl."), Ex. A.  Such agreements are encouraged and routine.  *E.g.*, W. SCHWARZER ET. AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL §11:1920.1 (Rutter 2012) (recommending that, "*as to certain categories of documents that are obviously privileged (e.g., attorney-client correspondence, or internal memoranda prepared by litigation counsel after the case was filed)*, ask opposing counsel to stipulate that such documents may be withheld without being listed on a privilege log"); *Safety Mgmt. Sys. v. Safety Software Ltd.*, 2011 WL 4898085, *5 (S.D.N.Y. Oct. 5, 2011) ("[A]s a matter of convention, litigation counsel of record often stipulate informally that neither party need prepare a privilege log with respect to communications with litigation counsel that occurred after the lawsuit commenced.").

2. DC filed its complaint in this *Pacific Pictures* case in May 2010, DN 1, and served its first discovery requests on defendants that August, Decl. of Matthew T. Kline ("Kline Decl.") Ex.1; DN 161-14-161-17, 162.  For months, defendants refused to produce *any* documents or privilege logs.  DN 125.  Later that year, the parties began negotiating a stipulation requiring defendants to produce documents

JOINT STIP. RE: DC'S MOT. FOR PROTECTIVE ORDER

**Exhibit A**

**6**

by a date certain and setting out, among other things, the parties' obligations to log certain, but not all, privileged documents.  Kline Decl. ¶ 2; Exs. 2-3.

Counsel for DC made clear the stipulation was "a *placeholder* pending later agreement on an overall privilege log stipulation."  *Id.* Ex. 4 (emphasis added).  In this "placeholder" stipulation, the parties agreed that no party should have to log privileged documents created after this *Pacific Pictures* case was commenced on May 14, 2010.  *Id.* at 24.  As to privileged documents created before May 14, 2010, the parties agreed that it would be unduly burdensome for defendants to log privileged communications between or among their various attorneys.  *Id.*

DC pressed for a reciprocal provision excusing DC from having to log the hundreds of thousands of privileged communications between its in-house and outside counsel.  *Id.* at 20 (Mr. Petrocelli:  "I have revised the 'logging' exclusion to include … all privileged documents exchanged between outside counsel and in-house counsel on our side because they fall in the same limited category as those you seek to exclude -- documents solely by and between lawyers working on the case.").  Marc Toberoff, counsel for defendants, said that was an issue for another day, as it "gets into sticky issues which should best be dealt with in the negotiation of a *full logging agreement*," and "[i]f we start getting into the logging agreement issues here, it will bog down and prevent the timely completion of this stipulation." *Id.* Ex. 5 (emphasis added); *see id.* Ex. 6 (Mr. Toberoff promising to "address further aspects in negotiating a logging agreement").

Toberoff confirmed that the parties' "placeholder" stipulation was only relevant to DC's then-pending discovery requests, and "a full-fledged logging agreement" would be negotiated after defendants served DC with discovery:

> I also took out the reference to DC 'affiliates' as it is too open ended, and if it means Warner Bros., we don't need it here if we *do not try to expand this stip relating to DC's Requests into a full-fledged logging agreement.  We also need not do this at the moment because Defendants have not yet even served DC with any requests for production.*  *Id.* Ex. 5 at 39 (emphases added).

- 3 -

**Exhibit A**
**7**

Given the exigency in finalizing a stipulation—caused by defendants' complete refusal to produce any documents until it was signed and the need to take depositions, DN 125 at 2—DC agreed to the "placeholder," with the understanding that the parties would negotiate a final, bilateral logging agreement after defendants served discovery requests on DC. This Court so-ordered the parties' stipulation on December 7, 2010 (the "December 2010 Order"). DN 133; Kline Decl. Ex. 4; *see id.* ¶¶ 3-4, Exs. 5-6.

Reflecting its interim status and the fact that *only* DC had served any discovery to date, the December 2010 Order imposed non-reciprocal obligations on the parties. With respect to the logging of privileged communications created prior to May 14, 2010, it provided:

> (a) *Defendants and their counsel* need not log internal communications solely between or among Defendants' counsel or between or among Defendants' counsel and anyone at the law firm of Kendall, Brill and Klieger, either in this case or the *Siegel* cases;
>
> (b) *DC and its <u>outside</u> counsel* need not log internal communications solely between or among DC's outside counsel, in either this case or the *Siegel* cases; however, and for the avoidance of doubt,
>
> (c) if a non-lawyer or <u>*in-house counsel*</u> is an author or recipient of any of the communications in subsections (a) and/or (b), such *communications must be logged*. DN 133 ¶ 5 (emphases added).

Because, as the parties agreed, the December 2010 Order was "a placeholder pending later agreement on an overall privilege log stipulation," it also provided that the agreement was "without waiver to any party's right in the future to seek a protective order." Kline Decl. Ex. 4; DN 133 ¶ 5.

3. In April 2011, the Court noted the parties' plan to finalize a global privilege-logging stipulation. DN 209 at 13 ("The Court will not foreclose the parties from reaching agreement themselves, as they appeared near to doing, on a [privilege-log] protocol that both sides will follow."). Thereafter, the parties continued their discussions of finalizing the privilege logging stipulation,

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**8**

1   exchanging letters and meeting and conferring by phone.  *E.g.*, Kline Decl ¶ 5; Exs.

2   7 ("Magistrate Zarefsky ... invited the parties to discuss a mutually acceptable

3   privilege-log protocol, and DC remains ready and willing to do so."), 8 ("[A]s

4   mentioned in Dan Petrocelli's April 14 letter and based upon Magistrate Zarefsky's

5   invitation to the parties, we would like to discuss a mutually acceptable privilege-

6   log protocol."), 10 at 61 ("[W]e have discussed the issue of a privilege-log protocol

7   and are working on a proposed stipulation; we will send you a draft when it is

8   available."); *see id.* Ex. 9.

9       As these discussions occurred, many other events in the case intervened.  *Id.*

10   ¶ 6.  The issue of finalizing a broader stipulation lay dormant until December 2011,

11   when defendants finally served their first document requests, after losing their

12   SLAPP motion and abandoning their Rule 12 motions.  *Id.*; DN 337, 343.

13       In its responses and objections to this discovery, DC told defendants that,

14   "[a]s to documents created prior to May 14, 2010, DC will not log work product or

15   privileged communications solely between or among DC's counsel, including

16   outside and in-house counsel."  Kline Decl. Ex. 11 at 64.  DC explained that

17   "[l]ogging such documents would constitute unreasonable and undue burden," and

18   invited defendants to meet and confer on this open issue.  *Id.*

19       Defendants complained about DC's privilege logs, and DC invited them to

20   meet and confer on the issue.  *E.g.*, *id.* ¶ 8, Exs. 13 at 93 ("If defendants want to

21   finalize the privilege logging stipulation that we completed only in part in 2010, we

22   are happy to do so."); 14 at 103 (recounting times defendants ignored DC's offers

23   to meet and confer); 17 at 254-55 ("Since [February 2012], contrary to defendants'

24   claim that DC 'did absolutely nothing' to finalize the stipulation, DC has repeatedly

25   invited the defendants to meet and confer to complete the privilege logging

26   stipulation.").  Rather than conferring, defendants asserted that DC waived privilege

27   over these communications by failing to log them.  *Id.* Ex. 14 at 103.

28

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**9**

Again, DC offered to meet and confer with defendants, and to address the one—*and only one*—specific complaint they raised:  that without complete privilege logs, defendants could not know "when Warner Bros./DC actually received" the Toberoff Timeline documents.  *Id.* ¶ 9, Exs. 16 at 252, 13, 9.  DC reminded defendants that this timing issue was irrelevant to any claim in this case, and that the Court had already stated in *Siegel* based on a sworn declaration by Warner Bros. that DC acted "reasonably" and "professionally" when it received the Timeline documents in June 2006.  *Id.* ¶ 9, Exs. 13 at 92, 17 at 255, Case No. CV 04-8400, DN 177 at 19:3-7.  The Court did not credit Toberoff's strident claims that DC had received the documents six months before.  Case No. CV-04-8400, DN 107 at 36-39; 177 at 9:2-10:13, 13:15-17:21.  Defendants never moved Judge Larson to review these findings, and when defendants complained about these issues five months later to Judge Larson, he held the right to raise these issues had been waived.  *Id.*; DN 374 at 4-5.  Nor have defendants *ever* sought to depose or subpoena David Michaels—the man they identified as the Timeline author, Kline Decl., Ex. 21 at 309—as to when the Timeline was delivered to Warner Bros.

Despite its irrelevance, to moot defendants' one issue and expedite negotiation of an "overall" privilege logging agreement, DC agreed to tell defendants the earliest date any reference is made to the Timeline in its files:

> We understand from our meeting that Marc seeks further log entries from DC flagging any communications regarding the Toberoff Timeline.  Defendants already possess Wayne Smith's declaration in *Siegel* setting forth the precise circumstances of DC's receipt and handling of the Timeline documents, and Judge Zarefsky's ruling finding that Mr. Smith acted appropriately and professionally.  Case No. CV 04-8400, Docket Nos. 108; 177 at 19:3-7.  Moreover, *to put this issue to rest, there are no documents or communications that relate to the Timeline that predate June 28, 2006*.  *Id.* Ex. 13 at 92 (emphasis added).

When defendants continued to press the issue, DC reaffirmed in two subsequent letters that it did not have any documents (privileged or otherwise) relating to the

JOINT STIP. RE: DC'S MOT. FOR PROTECTIVE ORDER

**Exhibit A**
**10**

Timeline that predate June 28, 2006. *Id.* Exs. 17 at 255 (DC's Oct. 22, 2012, letter); 19 at 263 (DC's Oct. 31, 2012, letter).

4. On October 10, 2012, DC moved Judge Wright to impose sanctions against defendants, including terminating sanctions, based on defendants' discovery misconduct in this case and in *Siegel*. DN 500, 527. During the meet-and-confer process on that motion, defendants again asserted that DC had waived privilege over un-logged communications. Kline Decl. ¶ 9, Ex. 14. DC reminded defendants they had never met-and-conferred on this issue—despite DC's invitations to do so—much less moved to compel. *Id.* ¶ 11, Ex. 14 at 103.

On October 5, 2012, DC sent defendants a proposed supplemental stipulation. *Id.* Ex. 15. The stipulation (the full text of which is reproduced in the margin) was clear, short, and bilateral.[1] DC asked defendants to provide any comment on it and to meet-and-confer about it, if need be. *Id.* at 114.

---

[1] Plaintiff DC Comics, together with those corporate affiliates named as defendants in *Siegel v. Warner Bros. Entm't Inc.* (Case No. 04-8400 ODW (RZx)) and *Siegel v. Warner Commc'ns Inc.* (Case No. 04-8776 ODW (RZx)) (the "Siegel Actions") and their subsidiaries (collectively, "DC"), and defendants Mark Warren Peary, Jean Adele Peavy, Laura Siegel Larson, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC (collectively, "Defendants"), by and through their respective counsel of record, hereby stipulate and agree as follows:

WHEREAS, the parties have identified certain documents subject to a claim of attorney-client privilege, attorney work-product doctrine, or any other privileges available under law ("Privileged Documents") that would be unduly burdensome to list on their respective privilege logs;

WHEREAS, the parties desire to supplement and modify the December 7, 2010, Order Granting Stipulation Re: Defendants' Production Of Documents And Privilege Logs (Docket No. 133);

NOW THEREFORE, the parties stipulate and agree to the following:

1. DC and defendant Laura Siegel Larson shall not be required to list on their respective privilege logs any Privileged Documents created on or after October 8, 2004, when the first complaint was filed in the Siegel Actions.

2. DC and Defendants shall not be required to list on their respective privilege logs any Privileged Documents created on or after May 14, 2010, when DC filed its complaint in the above-entitled action.

JOINT STIP. RE: DC'S MOT. FOR PROTECTIVE ORDER

**Exhibit A**
**11**

1    Defendants did not respond for 11 days, and then only when pressed by DC.

2    Kline Decl. Exs. 16-17.  On October 16—*six days* after DC filed its sanctions

3    motion—defendants flatly rejected DC's proposed supplemental stipulation.  *Id.*

4    Ex. 16.  Defendants again asserted that DC had somehow waived privilege over

5    pre-May 2010 documents—even though DC had expressly asserted objections

6    raising this very point, defendants had agreed in December 2010 that the issue

7    would need to be resolved by stipulation, DC had repeatedly invited defendants to

8    meet-and-confer to resolve the issue, and defendants had never moved to compel.

9    *Id.*; *id.* Ex. 17.

10    Defendants asserted only one reason for rejecting DC's proposed stipulation:

11    that they were "forced to generate privilege logs covering virtually every privileged

12    document … including thousands of documents from after the start of the *Siegel*

13    litigation," and "[w]hat's good for the goose is good for the gander."  *Id.* Ex. 16 at

14    252-53.[2]  Of course, defendants were not "forced" to log these documents, but

15    rather chose to do so, based on their strategic decision to renege on their prior

16    promises and to refuse to "negotiat[e] a full logging agreement."  *Id.* Ex. 5.

17    Similarly, defendants' "goose"/"gander" argument ignored that the December 2010

18    Order excuses them from logging pre-May 2010 privileged documents with counsel

19    generally, whereas DC was not given the same courtesy.  This was an asymmetrical

20    burden that both parties agreed would be corrected down the road.  DN 133 ¶ 5; *see*

21    Kline Decl. Ex. 3 at 15 (Mr. Toberoff's October 5, 2010, email stating that "[a]ll

22    sides have said they would like an agreement" on the issue of logging post-

---

23    3.  This stipulation is without prejudice or waiver to any party's right in the
24    future to request or move to compel the identification or logging of Privileged
      Documents, and is without prejudice or waiver to any party's right in the future to
25    seek a protective order in response to any such request or motion to compel.

26    IT IS SO STIPULATED.

27    [2] Given defendants' discovery misconduct involving their privilege logs, which
      is the subject of DC's pending sanctions motion, defendants' claim that they have
28    complied with the December 2010 Order is questionable.  DN 500, 527.

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**12**

1   litigation documents, as "it would obviously save *us all* a great deal of unnecessary

2   effort in trying to log years of privileged communications") (emphases added).

3       Defendants finally agreed to meet and confer on this motion and DC's

4   proposed privilege-log stipulation on October 25, 2012.  Kline Decl. ¶ 11.  During

5   that meet-and-confer, defendants stopped pressing their waiver argument and,

6   instead, argued that DC should be required to produce an itemized privilege log for

7   the entire October 2004 to May 2010 time period.  *Id.*  Defendants failed to offer

8   any justification for seeking to impose this undue burden and expense on DC, other

9   than that they said they thought it better for the case if everything is logged.  *Id*.

10  DC told defendants it would move the Court to approve its proposed final privilege-

11  logging stipulation as a protective order, but absent that, DC would provide a

12  supplemental privilege log.  *Id.*  This motion followed.

**B.    The Court Should Issue DC's Proposed Protective Order.**

14      Defendants recognize that logging internal privileged communications

15  created in the course of litigation is an unnecessary and wasteful exercise.  Kline

16  Decl. Ex. 3 (Mr. Toberoff acknowledging that "*[a]ll sides* have said they would

17  like an agreement" and that a stipulation "would *obviously save us all a great deal*

18  *of unnecessary effort in trying to log years of privileged communications*")

19  (emphases added); *see id.* ¶ 3; DN 133.  Indeed, in the "closely related *Siegel* case,"

20  defendants previously agreed that documents from exactly the same, parallel time

21  frame did *not* have to be logged, and the stipulations that they themselves proposed

22  in September and October 2010 would have implemented the *very* same

23  arrangement in this case.  Smith Decl. ¶ 2, Ex. A; Kline Decl. ¶ 2, Exs. 2-3.[3]

---

[3] Defendants' proposal provided, in relevant part:

[N]o party shall be required to list on their privilege logs the following
documents created on or after October 8, 2004, when the complaint was filed in
*Siegel v. Warner Bros. Ent. Inc.*, Case No. 04-CV-08400 ODW (RZx):

Attorney-client communications, attorney work product, and/or documents
protected by the joint defense privilege, common interest privilege,

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**13**

1     Since making these proposals, defendants have repeatedly argued the

2  interconnectivity of the *Siegel* and *Pacific Pictures* cases—and have done so to

3  their advantage, prevailing in at least one key discovery motion on this relatedness

4  ground.  *E.g.*, DN 495 at 2; 160 at 56-57; 209 at 3-4; 231 at 19-20; 252.

5     Defendants also do not challenge that the documents DC seeks not to log are

6  privileged.  Rather, they seek to force DC to devote substantial time and money to

7  producing a supplemental privilege log merely because "what's good for the goose

8  is good for the gander."  *Supra* at __.  As an initial matter, defendants should not be

9  permitted, through their tactical decision to delay finalization of a permanent,

10  bilateral logging agreement, to impose undue burden and expense on DC.  Further,

11  what defendants may or may not have done is irrelevant to the question whether

12  there is any need or justification for DC to log post-*Siegel* documents.  Compelling

13  DC to log such post-litigation communications would be extraordinarily

14  burdensome.  Logging just the privileged documents in the files of Wayne Smith—

15  Senior Litigation and Chief Patent Counsel for Warner Bros. Entertainment Inc. and

16  the attorney who has supervised outside counsel in the Superman cases for eight

17  years—would require approximately 1,400 attorney hours at an estimated cost

18  upwards of $700,000.  Smith Decl. ¶ 3.  This does not include the substantial time

19  and expense involved in logging the privileged documents found within other

20  custodians' files during this five-and-a-half year window, which is expected to be at

21  least as burdensome.  *Id.* ¶ 4.

22     Given that defendants do not dispute the privileged nature of these

23  documents, Rule 26(c)'s "undue burden" or expense test is easily satisfied.  FED. R.

24  CIV. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party

25  or person from annoyance, embarrassment, oppression, or undue burden or

26  expense…."); *see also* FED. R. CIV. P. 26(b)(2)(C)(iii) (the court "*must* limit the

27

28     mediation privilege, or the May 1, 2008 JAMS Confidentiality Agreement
       regarding settlement discussions.  Ex. 2 at 13, Ex. 3 at 18.

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**14**

1   frequency or extent of discovery otherwise allowed by these rules … if it

2   determines that the *burden or expense* of the proposed discovery outweighs its

3   likely benefit.…").  DC should be relieved of its obligation to log privileged

4   documents during the post-*Siegel* and pre-*Pacific Pictures* time frame.  *Id.*; *Eli Lilly*

5   *& Co. v. Valeant Pharm. Int'l*, 2011 WL 691982, at *2 (S.D. Ind. Feb. 15, 2011)

6   (party did not need to provide a privilege log in light of undue burden in logging

7   documents with marginal relevance).

8       The proposed order that DC hereby submits is fully reciprocal in nature, and

9   its simple terms are designed to avoid needless discovery disputes.  It states, in full:

10          1.  DC (as defined in the Court's December 7, 2010, order, DN
11      133) and defendant Laura Siegel Larson shall not be required to list on
        their respective privilege logs any "Privileged" (as defined in the
12      Court's December 7, 2010, order, DN 133) documents created on or
        after October 8, 2004, when the first complaint was filed in the *Siegel*
13      cases, Case Nos. CV-04-8400 ODW (RZx), CV-04-8776 ODW
        (RZx).
14

15          2.  DC and Defendants shall not be required to list on their
        respective privilege logs any Privileged Documents created on or after
16      May 14, 2010, when DC filed its complaint in this *Pacific Pictures*
17      case, Case No. CV 10-3633 ODW (RZx).

18          3.  This Order is without prejudice or waiver to any party's
19      right in the future to request or move to compel the identification or
        logging of Privileged Documents, and is without prejudice or waiver
20      to any party's right in the future to seek a protective order in response
        to any such request or motion to compel.
21

22   DC respectfully requests that this Court approve this protective order.

23   **C.    In The Alternative, The Court Should Allow Categorical Logging.**

24       Federal Rule of Civil Procedure 26(b)(5) provides that, absent agreement to

25   the contrary, parties must "describe the nature of the documents, communications,

26   or tangible things not produced or disclosed.…"  The Advisory Committee Notes

27   recognize that Rule 26(b)(5) "does not attempt to define for each case what

28   information must be provided when a party asserts a claim of privilege or work

- 11 -

**Exhibit A**
**15**

1   product protection." FED. R. CIV. P. 26(b)(5), Adv. Comm. Note.  Indeed, the

2   Advisory Committee Notes state that details concerning each withheld document

3   "may be appropriate if only a few items are withheld, *but may be unduly*

4   *burdensome when voluminous documents are claimed to be privileged or protected,*

5   *particularly if the items can be described by categories*." *Id.*

6        Here, "individually logging thousands of privileged attorney

7   communications" from, *e.g.*, DC's in-house counsel, "would be immensely

8   burdensome and have little, if any, benefit to [defendants]." *In re Motor Fuel*

9   *Temperature Sales Practices Litig.*, 2009 WL 959491, at *3 (D. Kan. Apr. 3, 2009).

10   In fact, defendants have identified no such benefit at all—other than (the improper

11   goal of) driving up DC's costs.  In such situations, courts routinely allow parties to

12   submit categorical privilege logs.  *E.g.*, *id.* (permitting the categorical logging of

13   "post-litigation attorney communications for which a privilege is asserted"); *U.S. v.*

14   *Magnesium Corp. of Am.*, 2006 WL 1699608, at *5-6 (D. Utah June 14, 2006)

15   (same).

16        Accordingly, in the event that this Court requires DC to log privileged

17   documents within the post-*Siegel* and pre-*Pacific Pictures* time frame, this Court

18   should allow DC to submit a categorical log in the form of an affidavit that "(a) the

19   withheld documents were (1) either prepared to assist in anticipated or pending

20   litigation, or (2) contain information reflecting communications between (i)

21   counsels or counsels' representatives, and (ii) plaintiff[] or plaintiff['s]

22   representatives, for the purposes of facilitating the rendition of legal services to

23   plaintiff[]; and (b) intended to be confidential communications." *In re Imperial*

24   *Corp. of Am.*, 174 F.R.D. 475, 479 (S.D. Cal. 1997).  Defendants' inability—for six

25   months—to offer any legitimate reason to require DC to shoulder the unnecessary

26   burden of logging the very privileged communications that defendants previously

27   agreed did not need to be logged in the "closely related *Siegel* case" speaks for

28   itself.

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A
16**

**D.     Conclusion**

DC's motion should be granted, and its Proposed Order should issue.  In the event that this Court denies DC's motion and finds that DC should submit a supplemental privilege log for the October 2004 to May 2010 time period, in light of the substantial burden involved, DC respectfully requests that it have until March 4, 2013 (eight weeks from the hearing on this motion) to provide such logs.

**IV.     DEFENDANTS' STATEMENT OF ISSUES IN DISPUTE**

[TO BE INSERTED]

Dated:     December __, 2012          Respectfully Submitted,

O'MELVENY & MYERS LLP

By:_____
          Daniel M. Petrocelli
          Attorneys for Plaintiff DC Comics

Dated:     December __, 2012          Respectfully Submitted,

TOBEROFF & ASSOCIATES

By:_____
          Marc Toberoff
          Attorneys for Defendants Laura
          Siegel Larson, Mark Warren Peary,
          and Jean Adele Peavy

Dated:     December __, 2012          Respectfully Submitted,

KENDALL BRILL & KLIEGER LLP

By:_____
          Richard B. Kendall
          Attorneys for Defendants Marc
          Toberoff, Pacific Pictures
          Corporation, IP Worldwide, LLC,
          and IPW, LLC

JOINT STIP. RE: DC'S MOT.
FOR PROTECTIVE ORDER

**Exhibit A**
**17**

ORAL ARGUMENT - 11/5/2012

Page 1

Appeal Nos. 11-56863, 11-56034

CERTIFIED COPY

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LAURA SIEGEL LARSON,
Plaintiff, Counterclaim-Defendant, Appellant,
and Cross Appellee,

v.

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
Defendants, Counterclaimants, Appellees,
and Cross-Appellants.

———————————

ON APPEAL FROM THE UNITIED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

———————————

ORAL ARGUMENT

HEARD BEFORE NINTH CIRCUIT PANEL:

REINHARDT, THOMAS, SEDWICK

NOVEMBER 5, 2012

TRANSCRIBED BY:  MELANIE M. FAULCONER

CSR NO. 6420

ORAL ARGUMENT - 11/5/2012

Page 2

```
 1                    PASADENA, CALIFORNIA

 2                    NOVEMBER 5, 2012

 3

 4                         ---0---

 5

 6     MARC TOBEROFF, ESQ.:  May it please the Court.  Good

 7     morning, your Honors.  My name is Marc Toberoff and I

 8     represent the Plaintiff, Laura Siegel Larson.

 9              I'd like to reserve 10 minutes of my 20 minutes

10     for rebuttal, if I may.

11              The Copyright Act's termination provisions were

12     designed to remedy the tremendous imbalance of power

13     between author/creators and media companies and to give

14     an author and an author's family an opportunity after a

15     very long waiting period to participate in the increased

16     market value of their works by finally recovering their

17     copyrights for the extended renewal term.

18              This case has become emblematic of the kind of

19     war of attrition an author's family must endure before

20     vindicating those rights.

21              I'm going to first turn to Warner Bros.'s

22     alleged settlement agreement defense.

23              Warner Bros.'s defense is based on a false

24     contract -- construct that it can artificially limit the

25     legal analysis to a single October 19th letter from the
```

Exhibit B
19

EXHIBIT 20
266

ORAL ARGUMENT - 11/5/2012

Page 3

1    Siegels' attorney and call that a contract, regardless

2    of the differing the terms in Warner Bros.'s October

3    26th counteroffer and vastly different terms in Warner

4    Bros.'s February 1st counteroffer, which were part and

5    parcel of the exact same contract negotiation.

6            The cases Warner Bros. relies on are in the

7    opposite, particularly the Facebook case.

8            In the Facebook case, unlike here, you had a

9    binding contract signed by the parties.  That contract

10   also contained a stipulation saying that it would be

11   binding and enforceable in a court of law.  So the

12   question before the Ninth Circuit was whether the terms

13   of that contract were sufficiently definite to be

14   enforceable.  And of course this Court, since it

15   basically called for the payment of fixed amounts of

16   cash and stock, found that it was enforceable.

17           None of that exists here.  After the

18   termination --

19       JUDGE REINHARDT:  Are you saying there was no

20   contract or that the contract, if it existed, was not --

21   not a contract that could be enforced?

22       MARC TOBEROFF, ESQ.:  There was no contract signed

23   by the parties.

24       JUDGE REINHARDT:  No.  I said -- that's your first

25   contention, that there's no contract.

**Exhibit B**
**20**

**EXHIBIT 20**
**267**

ORAL ARGUMENT - 11/5/2012

```
1            Is it your second contention or is that the
2     issue, whether there was a contract?
3            MARC TOBEROFF, ESQ.:  In this case --
4            JUDGE REINHARDT:  Yes.
5            MARC TOBEROFF, ESQ.:  -- the issue is whether
6     there's a binding contract.
7            JUDGE REINHARDT:  Okay.
8            MARC TOBEROFF, ESQ.:  So here after the effective
9     date of the settlement -- of the Siegels' termination in
10    April of 1999, on again/off again settlement discussions
11    ensued.
12            And on October 9th, John Schulman on behalf of
13    Warner Bros., their general counsel, and Kevin Marks on
14    behalf of the Siegels held a telephone conference.
15            On October 16th, Marks sends over a letter
16    purporting to set forth the terms that were discussed on
17    October 16th.
18            On October 19th in his letter, he's -- he's
19    going over the terms, but it's an equivocal letter
20    because at the end he says, "John, if I got anything
21    wrong, please let me know."
22            JUDGE THOMAS:  Why do you say that's equivocal?
23            MARC TOBEROFF, ESQ.:  Because it shows at the very
24    beginning it's indefinite because he's unsure of --
25            JUDGE THOMAS:  No.  That's using typical language.
```

**Exhibit B**
**21**

**EXHIBIT 20**
**268**

ORAL ARGUMENT - 11/5/2012

Page 5

```
 1    It makes -- "this is what I see."
 2            I mean, the response to it, if they -- if they
 3    had written back and said, "No.  You're right," you'd
 4    have to agree that there's a contract; right?
 5        MARC TOBEROFF, ESQ.:  That could be the case.
 6        JUDGE REINHARDT:  What could be the case?
 7        MARC TOBEROFF, ESQ.:  Well, you said --
 8        JUDGE REINHARDT:  "This is absolutely right.  This
 9    is the contract we agreed to," isn't -- wouldn't that be
10    enough?
11        MARC TOBEROFF, ESQ.:  It's further along than the
12    facts here, but what happened here isn't --
13        JUDGE REINHARDT:  That I know, but that wasn't the
14    question.
15        MARC TOBEROFF, ESQ.:  Okay.
16        JUDGE REINHARDT:  All right.  So this could be the
17    contract if the parties agreed to it?
18        MARC TOBEROFF, ESQ.:  That's correct, if the party
19    agreed to material terms, you could have a contract.
20        JUDGE REINHARDT:  Yeah.
21            So you don't think that it's proper for a
22    lawyer who says, "This is the contract we agreed to.  If
23    you have any question about it" --
24        MARC TOBEROFF, ESQ.:  I don't think it's --
25        JUDGE REINHARDT:  -- "tell me"?
```

**Exhibit B**
**22**

**EXHIBIT 20**
**269**

ORAL ARGUMENT - 11/5/2012

1      MARC TOBEROFF, ESQ.:  -- improper at all, but I

2    don't think that forms --

3      JUDGE REINHARDT:  But, I mean, that shows

4    uncertainty?

5      MARC TOBEROFF, ESQ.:  It's not an unequivocal

6    acceptance of terms, but -- but even that --

7      JUDGE REINHARDT:  No.  It's a statement of the

8    terms.

9      MARC TOBEROFF, ESQ.:  It's a statement of what he

10    perceived the terms as discussed on October 16th.

11         On October 26th, Schulman writes back while

12    he -- Marks then goes off to China.  On October 26th,

13    Schulman writes back and in effect says, "You got it

14    wrong.  Enclosed is a more fulsome outline of what we

15    believe the terms of the deal are."

16         That constitutes a counteroffer because the

17    terms outlined in the October 26th letter from Schulman

18    materially differ from the terms in the October 19th

19    letter from Marks.

20         A counteroffer in the State of California

21    extinguishes Marks' offer.  Marks' offer itself is a

22    counteroffer because he purports to accept an offer on

23    October 16th that Schulman then tells him was never

24    made.  You could stop right there --

25      JUDGE THOMAS:  He didn't say that.  He said that's

Exhibit B
23

EXHIBIT 20
270

ORAL ARGUMENT - 11/5/2012

1    "a more fulsome outline."

2            I mean, we have a -- there are sort of two

3    issues.  One is, did the parties ever agree to the

4    terms?  And -- and, two, were the terms embodied in the

5    first letter and-- and should a court enforce that?

6            And we've had -- there are cases that go a

7    little bit all over the map on that, but, I mean, there

8    are a lot of cases in which you say, "All right.  We

9    know you added some terms, but this is the agreement the

10   Court is going to enforce," and it's the simple

11   agreement as to terms.

12           So what -- what tells you that they're making a

13   true counteroffer as opposed to adding a bunch of

14   conditions that a court could later say, "Well, we're

15   not going to put those in because obviously the parties

16   didn't agree to them"?

17   MARC TOBEROFF, ESQ.:  Well, there's no agreement by

18   Warner Bros. as to the terms set forth in his letter.

19   In fact, there's disagreement.  There's disagreement as

20   to the properties that are being assigned.  There's

21   disagreement as to the essential term of compensation,

22   which you're dealing with a -- you're not dealing here

23   with a payment of cash and stock.  You're dealing with a

24   complex royalty system applicable to multiple media

25   where you're dealing with Marks that says, "We will not

EXHIBIT 20
271

1    indemnify Warner Bros.  We'll only warrant -- we haven't

2    sold these rights to someone else," and Warner Bros.

3    adding six or seven warranties with indemnifications

4    attached.

5        JUDGE REINHARDT:  Well, both sides agreed that they

6    had agreed to a contract.

7        MARC TOBEROFF, ESQ.:  No.  Both sides perceived that

8    they had a deal in principle.  And the cases have said

9    that a deal in principle does not make a binding

10   contract.

11       What happens is in his October 26th

12   counteroffer Schulman doesn't stop there but he makes

13   reference and incorporates by reference a February 1st

14   draft that then comes in and widens the gap between the

15   parties even further.

16       On -- on May 9th, Joanne Siegel reacts to the

17   new and different terms that are being added by Warner

18   Bros. and -- and rejects those terms and says, "There

19   will -- there is no agreement."

20       And on May 26th -- she wrote a letter to the

21   CEO of Time Warner, Dick Parsons.  On May 26th, 2002

22   Dick Parsons writes back and acknowledges that they had

23   no agreement.  He says, "We hope the parties can arrive

24   at an agreement."

25       From that point on, from October 19th of 2001

Exhibit B
25

EXHIBIT 20
272

1    until we filed suit in -- in October of 2004, Warner

2    Bros. not once said that, "We have an agreement and we

3    accept the terms in the October 19th letter."  They were

4    totally silent for three years about that.

5          They come up with this concocted defense when

6    we filed suit to enforce the termination rights.  Under

7    cop- --

8    JUDGE THOMAS:  You've described a lot of factual

9    considerations.

10          Why -- why isn't this a matter for trial as

11    opposed to summary judgment?

12    MARC TOBEROFF, ESQ.:  Because contract formation is

13    based on the objective manifestations of the parties'

14    intent.  And here you have that objective manifestation

15    in the form of three or four undisputed documents: the

16    October 19th offer or counteroffer, the October 26th

17    counteroffer, the February 26th counteroffer, the May

18    9th rejection, and the May 26th letter in response

19    acknowledging that there's no agreement.

20          Warner has not come up with anything that

21    creates a genuine issue of material fact.

22          It -- the Court not only was allowed to rule on

23    summary judgment, it was required to rule on summary

24    judgment.

25    JUDGE THOMAS:  Why do you say that, "required"?

ORAL ARGUMENT - 11/5/2012

Page 10

```
 1        MARC TOBEROFF, ESQ.:  Because -- because based on --
 2   based on this undisputed objective manifestation of the
 3   parties' intent there, was no meeting of the minds on
 4   the material terms.  The Court rightly said, "I can
 5   point to no document that contains the parties'
 6   agreement."
 7        Warner Bros. -- a negotiation is a give and
 8   take.  You can't take an offer -- you can't go back
 9   freeze in time and take an offer that a party made, a
10   proposal that you eviscerated by the counteroffer,
11   continued to grind the other side in negotiations, and
12   when that fails, reach back and try and resuscitate a
13   offer that has been extinguished by a counteroffer.
14        JUDGE REINHARDT:  Well, an agreement was reached,
15   according to your client's lawyer -- right? -- and he
16   advised the other side on August 9th that, "I must
17   caution.  I believe an agreement was reached last
18   October, albeit subject to documentation."
19        So the issue was whether the documentation
20   reflected the agreement.
21        MARC TOBEROFF, ESQ.:  The contract fell apart, as
22   many contract negotiations, in the attempt to focus on
23   the details of the agreement.
24        JUDGE REINHARDT:  There was an agreement and then
25   there was a dispute over the details, the documentation
```

**Exhibit B**
**27**

**EXHIBIT 20**
**274**

ORAL ARGUMENT - 11/5/2012

1    of it.

2       MARC TOBEROFF, ESQ.:  No.  There was a deal in

3    principle.  But that deal in principle, for instance,

4    involved a 6 percent royalty.  That 6 percent royalty

5    had all sorts of sliding scale reductions.  There were

6    exclusions as to revenues to -- to which that royalty

7    would apply, would not apply.  You had very important

8    issues (unintelligible) studio agreements.  You have a

9    series of warranties that have indemnifications attached

10   to them, and if someone is found that you've breached

11   that warranty, they withhold the money on the royalty.

12      JUDGE THOMAS:  No.  I understand that.

13      MARC TOBEROFF, ESQ.:  The question is not whether

14   that's an unusual term.  The question is whether it

15   had -- it was contained in the October 19th letter.  And

16   here he's saying, "There will be no indemnification from

17   the Siegels."

18           So the question is, does that become a material

19   term of the agreement?

20           And it certainly is a material term.  The fact

21   you have such indemnities customarily in agreements I

22   would submit is not the issue.

23           The question is, did they agree to it on

24   October 19th?  And they didn't.

25           Did Warner Bros. make that the condition of an

Exhibit B
28

EXHIBIT 20
275

ORAL ARGUMENT - 11/5/2012

1    agreement?  Yes, they did.

2            And if-- and if these -- you know, people say

3    "a deal is a deal" precisely when they don't have a

4    binding contract.

5            If these terms were not material to Warner

6    Bros., then why did they insist upon them?

7            If a deal is a deal, then why did they go --

8    why didn't they just accept the October 19th recitation

9    of the terms and why did they continue to grind the

10   Siegels in the October 26th outline and in their

11   horrendous contract?

12           If you -- the same attorney, Marks, who sent

13   that attorney-client communication, which ordinarily

14   would have been privileged but for the fact it was

15   stolen from my law offices, the same attorney that wrote

16   that testified at length at deposition why, although he

17   thought there was a deal, there was no binding contract,

18   and he goes term by term by term in sworn testimony

19   comparing the huge gaps between the parties that had

20   developed.

21           You can't form a contract for the parties.  The

22   contract -- the parties have to form a contract

23   themselves.  Nor can you go back and -- and arrest the

24   legal analysis.

25           JUDGE REINHARDT:  I don't understand what that

**Exhibit B**
**29**

**EXHIBIT 20**
**276**

```
1    means.

2              You can't form a contract between the parties

3    if you're their representative?

4       MARC TOBEROFF, ESQ.:  No.  A court cannot write a

5    contract for the parties when the parties themselves

6    cannot agree upon the terms.

7       JUDGE THOMAS:  No.  The only question is whether

8    they had an agreement in the earlier deal -- that's the

9    question -- and whether then there was a counteroffer

10   made later?  I mean, those are -- those are the two

11   questions.

12             I mean, if they had -- we have all sorts of

13   cases where you -- it happens all the time in

14   mediation.  Parties agree on principle.  They draft up a

15   set of principal points, and then they go draft

16   documents, and then another fight erupts and they say,

17   "Well, we can't agree on this."  It might be

18   indemnity.  It might be something else.  And then the

19   Court says, "All right.  I'm going to enforce the

20   initial agreement that you made, period."

21             Isn't that the question here?

22      MARC TOBEROFF, ESQ.:  No.  Here you don't even have

23   the first point.

24      JUDGE REINHARDT:  Well, that's --

25      MARC TOBEROFF, ESQ.:  Unlike --
```

**Exhibit B**                    **EXHIBIT 20**
**30**                            **277**

ORAL ARGUMENT - 11/5/2012

Page 14

```
 1        JUDGE THOMAS:  That's why --

 2        MARC TOBEROFF, ESQ.:  Unlike in the Facebook case

 3   where you have a signed document signed by the parties

 4   agreeing to certain terms that are definite and

 5   enforceable, you don't even have that here.

 6        And the reason we know you don't have that here

 7   is because rather than accept -- in your hypothetical

 8   you say they would accept the October 19th terms.  They

 9   did the opposite.  They didn't accept them.

10        JUDGE THOMAS:  Well, they purported to by saying,

11   "Here's a more fulsome."

12        Now, you -- you would say -- you say that's

13   artifice and they were actually counter- --

14        MARC TOBEROFF, ESQ.:  Of course.

15        JUDGE THOMAS:  -- counterclaiming.

16        MARC TOBEROFF, ESQ.:  In the Valente -- in the

17   Valente-Kritzer case this Court held that congratulatory

18   words as to --

19        JUDGE THOMAS:  Yeah.

20        MARC TOBEROFF, ESQ.:  -- finally arriving at a deal

21   or in our case a monumental accord are meaningless.

22        What you look to is the objective manifestation

23   and you don't have an agreement where you don't have a

24   mutual meeting of the minds on the material terms of an

25   agreement.
```

**Exhibit B**
**31**

**EXHIBIT 20**
**278**

ORAL ARGUMENT - 11/5/2012

1           And here the objective evidence proves that.

2     And that's why in summary judgment the Court was

3     required to find there was no agreement.  And there is

4     nothing that they put forward that raised a genuine

5     issue of fact as to contract formation.

6           I'd like to reserve the remainder for rebuttal.

7     JUDGE REINHARDT:  Thank you.

8     MARC TOBEROFF, ESQ.:  Thanks.

9     DANIEL M. PETROCELLI, ESQ.:  May it please the

10    Court.  Daniel Petrocelli with my colleagues Cassandra

11    Seto and Matt Kline for the DC Comics parties.

12          Turning initially to the issue of the

13    settlement agreement, it's our fundamental position that

14    this was not a matter appropriate for summary judgment

15    and that the Court should have allowed this to go to

16    trial on the lynchpin factual issues of whether or not

17    the parties reached an agreement, and if so, to what?

18          And our position in the Court below and in this

19    appeal was that the parties did reach an agreement with

20    the acceptance letter that the plaintiff's lawyer sent

21    to DC Comics on October 19, 2001 at SER 456.

22          This is a detailed recitation of terms written

23    in powerful legal language of acceptance which says, "We

24    hereby -- the Siegel family has accepted DC Comics'

25    offer," and then it goes on to say, "The terms are as

ORAL ARGUMENT - 11/5/2012

Page 16

```
 1    follows," and this was the culmination of two-and-a-half
 2    years of back and forth negotiations, and the record
 3    before the District Court was that this letter was
 4    written following a phone call between the two principal
 5    negotiators where they resolved the last deal point, and
 6    the testimony of Mr. Marks, the plaintiff's
 7    representative was, "We are closed.  We will send you
 8    the document."  Mr. Schulman responded, "Great.  We'll
 9    start working on a long form."
10         This document is then sent, and a week later
11    Mr. Schulman responds, and, very importantly, this
12    document is sent by one of the most experienced lawyers
13    in one of the most experienced law firms in the country
14    dealing with entertainment contracts.  This lawyer who
15    knows and probably has written thousands of times a
16    reservation of rights that this document is not binding
17    until and unless a long form or a more formal document
18    is executed says no such thing in this letter.
19       JUDGE REINHARDT:  Now, are you talking about
20    Mr. Schulman's letter?
21       DANIEL M. PETROCELLI, ESQ.:  No.  I'm talking about
22    the acceptance letter, the document that constitutes the
23    contract.  That's the letter of October 19, 2001.
24       JUDGE REINHARDT:  All right.  And then you said -- I
25    thought you said that the reply --
```

```
 1          DANIEL M. PETROCELLI, ESQ.:  Okay.

 2          JUDGE REINHARDT:  -- was written by Schulman.

 3          DANIEL M. PETROCELLI, ESQ.:  I may have misspoken.

 4               But in this document following the conversation

 5     with the DC representative, there's no indication in

 6     here that the parties do not intend to be bound until

 7     some future event.  There's no reservation, and the

 8     testimony in the record is, "We are closed."

 9               Then a week later, Mr. Schulman, the recipient

10     of Mr. Marks' letter and the other negotiator, responds

11     to it, and he states -- and I won't characterize it as a

12     counteroffer because I think that's begging the issue.

13     He states, "I've received it.  I've reviewed it.  I

14     enclose herewith for you and Bruce a more fulsome

15     outline of what we believe the deal we've agreed to is.

16     We're working on the draft agreement so that by the time

17     you have accomplished something of truly momentous

18     import, we will have this super matter transaction in

19     document form."  And then he goes on and flushes out in

20     more detail the same terms that appear in the October 19

21     letter and adds some things here and there to be sure,

22     like an indemnity or he flushes out a detail on some of

23     these royalty provisions.  These are essentially

24     immaterial variations and differences that are the

25     normal part of a process of commencing a long -- a long
```

ORAL ARGUMENT - 11/5/2012

Page 18

```
 1    form document.
 2            Now, the error, the fundamental error of
 3    analysis here both by the District Court and by
 4    Mr. Toberoff is -- is the fact that this process is
 5    going on, that there's now an effort to create a long
 6    form is dispositive of the -- of conclusion that
 7    there is no contract.
 8            And that's what the District Court ruled.
 9    Simply because the parties after the contract was formed
10    in the -- in the unambiguous acceptance letter, just
11    because of that, the fact that they now endeavor to do a
12    long form, the judge concluded as a matter of law there
13    can be no agreement.
14            And that's just wrong.
15            There are scores of cases.  This is an
16    extremely familiar situation where parties believe
17    they've reached a deal.  They have a confirmatory letter
18    or document.  They go off to prepare the long document.
19    Something happens, things breakdown, and one side then
20    says, "We don't have a deal."
21    JUDGE REINHARDT:  Was there any affidavit or
22    information introduced in the District Court as to the
23    custom and practice in the industry of reaching an
24    agreement, proceeding with it and then having the
25    documents prepared?
```

**Exhibit B**
**35**

**EXHIBIT 20**
**282**

ORAL ARGUMENT - 11/5/2012

1          DANIEL M. PETROCELLI, ESQ.:  There was no custom and

2     practice evidence in the record, but to be sure, that

3     would be highly relevant on the issue.

4          Mr. Schulman had a direct declaration in the

5     record saying that Mr. Larson's (sic) letter accurately

6     reflected all the terms of the deal and that he wasn't

7     intending to change anything and he was just flushing

8     out the detail.

9          Now the proof is in the pudding.

10          In response to this letter of October 26, which

11     the plaintiffs want to suggest is some material

12     departure, they even go so far as to say this is a

13     counteroffer.  In response to Mr. Schulman's letter,

14     Mr. Marks never objects.  He never reaches out and says,

15     "Wait a second.  You got a problem.  That's not what

16     we've agreed to."

17     JUDGE REINHARDT:  Tell me why, if that's correct, is

18     this matter for trial rather than summary judgment for

19     you?

20          DANIEL M. PETROCELLI, ESQ.:  Well, we did not move

21     for summary judgment in the Court below.

22     JUDGE REINHARDT:  You're not asking for that here?

23          DANIEL M. PETROCELLI, ESQ.:  Well, we think the

24     record evidence that there is an agreement is so strong

25     that we do think it can support a judgment in our favor,

**Exhibit B**
**36**

**EXHIBIT 20**
**283**

ORAL ARGUMENT - 11/5/2012

```
1    but we -- at the very minimum we believe that we're

2    entitled to a trial.

3           The judge just departed wildly from the summary

4    judgment standard.  He drew all that adverse inference

5    against us.  He -- he did not understand that the

6    question of whether or not the long form process does or

7    does not negate a prior agreement is a factual

8    question.

9           Your Honor dealt with that issue, if I may, in

10   the -- you had a case with Judge Pregerson on -- it was

11   the Best Interior -- the Best Interiors case, the same

12   situation.  The plaintiff was a labor union and they --

13   and they sued this company, and they had an agreement,

14   they had a handshake agreement, and then they went on to

15   do a long form, and things broke down, and the judge

16   concluded there was no deal as a matter of law, and this

17   Court reversed that and this Court said that the

18   question of the intent to contract is a fact issue.  The

19   question of whether the subsequent events undid the

20   prior agreement or didn't undo the prior agreement,

21   that's a fact question.

22   JUDGE THOMAS:  So are there undisputed facts or

23   not?

24           I mean, I -- I'm not sure I -- I understand

25   your answer because Judge Reinhardt was asking you, "Is
```

**Exhibit B**
**37**

**EXHIBIT 20**
**284**

ORAL ARGUMENT - 11/5/2012

Page 21

1    there sufficient evidence to -- for summary judgment in

2    your favor?"  And -- and you said, "Well, yes, there are

3    fact issues," so I'm --

4        DANIEL M. PETROCELLI, ESQ.:  There are -- there

5    are --

6        JUDGE THOMAS:  Tell me aside from the documents

7    themselves what genuine issues of material fact you

8    would raise.

9        DANIEL M. PETROCELLI, ESQ.:  The ques- -- the

10   threshold question of whether the parties intended to be

11   bound and by this letter, by this -- by this acceptance

12   letter or whether they intended not to be bound at that

13   time but only upon such time as they agreed to a long

14   form.  We say that they intended to be bound at this

15   time.

16        But that question and all the events that

17   happened, that's evidence that's relevant to the

18   threshold issue of whether or not there was a deal in

19   the first place.  It is not dispositive that there was

20   no deal.

21        And so that's the -- that's the fundamental

22   factual issue.

23        There's a second factual issue, I suppose, and

24   that's what -- what terms the parties agreed to.

25        Well, we -- our position is it's everything in

**Exhibit B**
**38**

**EXHIBIT 20**
**285**

ORAL ARGUMENT - 11/5/2012

```
 1    this letter, nothing more.  To the extent that

 2    Mr. Schulman's letter is perceived to have added terms

 3    or suggested new terms, they're not part of the deal.

 4    It's that simple.

 5         JUDGE THOMAS:  Why isn't that a matter of law that

 6    you can decide on the basis of the documents

 7    themselves?

 8         DANIEL M. PETROCELLI, ESQ.:  You can decide as a

 9    matter of law that if the parties reached the contract

10    as of October 19, everything thereafter doesn't matter.

11         What can't be decided as a matter of law is

12    that the parties did not reach an agreement.  That

13    cannot possibly be resolved against us with this record

14    of direct admissions by the plaintiffs that there was an

15    agreement, not only in the acceptance letter, not only

16    in the no response to Mr. Schulman's letter, thereby

17    indicating there was nothing significant or new or

18    different about it, but --

19         JUDGE REINHARDT:  Well, the second one was even more

20    fulsome than the first, I guess.

21         DANIEL M. PETROCELLI, ESQ.:  Excuse me?

22         JUDGE REINHARDT:  The second one was more fulsome

23    than the first.

24         DANIEL M. PETROCELLI, ESQ.:  The second one to be

25    sure was 50 pages of boilerplate, yes, but --
```

Exhibit B
39

EXHIBIT 20
286

ORAL ARGUMENT - 11/5/2012

Page 23

1          JUDGE THOMAS:  Well, except -- except perhaps as to
2     royalty rate.
3          DANIEL M. PETROCELLI, ESQ.:  Excuse me?
4          JUDGE THOMAS:  Except perhaps as to royalty rate.
5          DANIEL M. PETROCELLI, ESQ.:  Well, under royalty
6     rate, if you really read the letter between Mr. Schulman
7     and Mr. Marks, they're -- they're flushing out very
8     precise little details about when the royalty rate gets
9     reduced, if multiple characterizes are involved, if it's
10    a cameo appearance, if it's a special project.  I mean,
11    this is why sometimes documents take 50 pages or more.
12          But that's not a material term, the absence of
13    which would negate a contract, and if it were, that
14    itself is a question of fact.  And case after case say
15    the -- the importance to which the parties attach to
16    particular terms is a fact question.
17          There was a question to Mr. Toberoff earlier I
18    think by Judge Reinhardt about whether this document,
19    this -- this contract, this acceptance letter of October
20    19 has sufficient material terms to constitute a
21    contract.
22          It does.  It easily passes the test.  I mean,
23    the threshold, as the Facebook case illustrates, is very
24    low: price, term.  So there's no question that this
25    document contains sufficient terms that a court could

ORAL ARGUMENT - 11/5/2012

1    never look at this document and conclude as a matter of

2    law that it's not sufficient to be a contract.

3         Whether there are new and additional terms that

4    the parties wanted and whether that somehow gets added

5    on here or doesn't get on, that's a fact question that

6    takes testimony about the significance to which parties

7    attach to -- to the point, did they discuss it in their

8    negotiations, did they not discuss it, did they forget

9    to put in something, did they not forget, and that's the

10   subject of testimony.

11        Counsel has conflated this idea of the

12   objective hearing of contracts, which to be sure is how

13   the issue is decided, with the rules of evidence about

14   what kind of testimony is admitted in order to prove up

15   intent.

16        All kinds of testimony is admitted, including

17   custom and practice, including parties' state of mind as

18   to why they did certain things, why they said certain

19   things.

20        So at bottom we think that this case never

21   should have been thrown out, and importantly this has

22   the potential to dispose of this entire dispute.

23        Under this agreement, which took three years to

24   negotiate, the plaintiffs would receive an immediate

25   payment of $20 million, plus substantial future

**Exhibit B**
**41**

**EXHIBIT 20**
**288**

ORAL ARGUMENT - 11/5/2012

```
 1    consideration for the duration of the copyright term,

 2    which is 2033, plus medical benefits for their family

 3    and all kinds of other benefits.

 4            On the other hand, DC gets the transfer of the

 5    copyright interests that were recaptured by the Siegel

 6    family.  So they -- they transfer the copyright

 7    interests, and they get a lot of money.

 8        JUDGE REINHARDT:  Well, that's not -- that's

 9    not -- no need to try to persuade us it's a good deal

10    for them.  If they think it's a good deal --

11        DANIEL M. PETROCELLI, ESQ.:  Well --

12        JUDGE REINHARDT:  -- for them, they wouldn't be

13    here.

14        DANIEL M. PETROCELLI, ESQ.:  Well, that's correct,

15    your Honor, because they believed they had a better deal

16    when someone came along and offered them more, and --

17    and they then repudiated this agreement.

18            And one final comment.

19            This question about what we did and did not do

20    afterwards, that's a very incomplete recitation that was

21    received, but all of that is simply more relevant

22    evidence on the question of whether the parties at the

23    inception when they made their deal intended to be bound

24    or not.  That's just evidence of subsequent conduct of

25    the parties.  Whether it bears on the contract formation
```

Exhibit B
42

EXHIBIT 20
289

ORAL ARGUMENT - 11/5/2012

```
 1   or not is a relevance issue that's up to the trial judge
 2   here.
 3       JUDGE SEDWICK:  Let me ask you this question.
 4           We had read your papers to suggest you were
 5   seeking summary judgment, but assuming that you're
 6   either now only seeking a remand for trial or that we
 7   should independently decide that that's the most you
 8   could get, do you think that this Court needs to decide
 9   any of the other issues if we remand this case for trial
10   and whether there was an agreement?
11       DANIEL M. PETROCELLI, ESQ.:  I believe that since
12   this is potentially dispositive, it does not have to
13   because if this contract is proven and this contract is
14   enforced, that ends once and for all this dispute.
15   Every issue that is before your Honors and these very
16   large amount of briefs would all -- would all resolve.
17   That's why it took three years to do.  This wasn't some
18   initial offer.
19       JUDGE REINHARDT:  You may not be the one to answer
20   this question, but just out of curiosity, would it
21   resolve the prior case also?
22       DANIEL M. PETROCELLI, ESQ.:  Well, it would have a
23   significant impact at least on the damages in the prior
24   case and my view is it would go a long way to resolving
25   that one as well, at least insofar as the Siegel side is
```

**Exhibit B**
**43**

**EXHIBIT 20**
**290**

ORAL ARGUMENT - 11/5/2012

1    concerned.

2         I don't know if I have any time left.

3         JUDGE REINHARDT:  You have five minutes.

4         DANIEL M. PETROCELLI, ESQ.:  I would like to turn to

5    one other legal issue that's on a totally separate

6    subject, if your Honors don't have any additional

7    questions on this topic, and that has to do with a

8    decision, purely legal decision that the District Court

9    below made.

10        And what the Court decided was that this very

11   first Superman comic book, which is called "Action

12   Comics Number 1," SER 714, the District Court decided

13   that since this was largely created by Mr. Siegel and

14   Mr. Shuster long before DC came into the picture, "this"

15   being the character Superman in black and white

16   sketches, that he awarded the copyrights in the various

17   elements in this action comics book entirely to the

18   Siegels and the Shusters.

19        The error -- we -- we said to the judge, "We

20   don't challenge that in the main, except for this.  We,"

21   DC, "back in 1938 came up with the idea of making a

22   comic book.  Siegel and Shuster had drawn sketches of

23   Superman for newspaper strips in black and white.  We

24   want to create a comic book.  We want to put it in

25   color.  And we then retained them to do so."

Exhibit B
44

EXHIBIT 20
291

ORAL ARGUMENT - 11/5/2012

Page 28

```
 1              It is undisputed that certain elements of this
 2    were done by DC in concert with Shuster and Siegel but
 3    with other employees and artists.  So we asked the Court
 4    to declare certain parts of this -- certain parts of
 5    this owned by DC, either as a work for hire or as a
 6    joint work or other theories of ownership.
 7              The Court said he was -- the Court concluded it
 8    was precluded from doing so because of a decision back
 9    in the seventies in the Second Circuit by DC's
10    predecessor and Siegel and Shuster called the National
11    case, and the Court believed that the National case was
12    res judicata and/or collateral estoppel and prevented DC
13    from litigating the issue of whether it had ownership
14    interest and admittedly part of the contributions that
15    it made to Action Comics 1.
16              And I only wanted to address the Court's ruling
17    on collateral estoppel.  But it was clearly wrong for
18    the following reason, and this is a purely legal issue.
19              The National case back in the seventies was a
20    lawsuit about who owned the renewal copyright in Action
21    Comics 1, and this was before the new termination
22    legislation came about, the second 28-year renewal
23    term.
24              DC contended that it owned the renewal term for
25    two separate and independent reasons.
```

ORAL ARGUMENT - 11/5/2012

```
 1              One, the Siegel and Shuster parties transferred

 2      full ownership of their Superman elements way back when

 3      when they first met with DC and documented March 1.  So

 4      they said, "We own it by contract."

 5              Second, secondly DC said -- actually it was

 6      National, its predecessor, but I'll just call it "DC."

 7      DC said, "We own it because it was work for hire and we

 8      were the author of it, and so we own the renewal

 9      rights."  So they said, "We own the renewal right for

10      those reasons."

11              The District Court agreed on both counts, and

12      it went up to the Second Circuit.

13              The Second Circuit affirmed on the ground that

14      the conveyance of rights back in 1938 from Siegel and

15      Shuster to Na- -- to DC included the conveyance of the

16      rights to the renewal term, and so the decision below

17      was correct and it was affirmed.

18              The Second Circuit then went on to say,

19      however, that the ruling about work for hire was

20      incorrect, and it made some references to the fact that

21      Superman had been developed before DC came along, so how

22      could the entirety of Action Comics 1 be a work for

23      hire?

24              It's that language that the judge in this case,

25      the District Court, felt was binding on him.
```

Exhibit B
46

EXHIBIT 20
293

ORAL ARGUMENT - 11/5/2012

Page 30

```
 1              We pointed out below and pointed out in our

 2    papers, as a matter of law that cannot be res judicata

 3    or collateral estoppel because that was an adverse

 4    determination made in favor of a prevailing party and it

 5    was not necessary to the decision and it was dictum.

 6    We, for example, never could have appealed that

 7    decision.  We won, National did.  It never could have

 8    appealed solely for the purpose of addressing the

 9    alternative statement by the Court of Appeal that was

10    adverse to -- to National.

11              And case after case make this clear, including

12    the Fireman's Fund case in the Ninth Circuit, the --

13         JUDGE REINHARDT:  All right.  We're running out of

14    time.  Let me just ask you.

15              Is this -- is this issue resolved if you win on

16    the summary judgment question?

17         DANIEL M. PETROCELLI, ESQ.:  Yes.  Everything goes

18    away on the summary judgment, everything, your Honor.

19    It's -- it's the end of this case once and for all.

20         JUDGE REINHARDT:  All right.  Thank you very much.

21         DANIEL M. PETROCELLI, ESQ.:  Thank you very much,

22    your Honors.

23         MARC TOBEROFF, ESQ.:  Your Honors, Warner Bros.

24    cannot point to any place in 2001 where they accepted

25    the terms set forth in the October 19th, 2001 letter
```

**Exhibit B**
**47**

**EXHIBIT 20**
**294**

ORAL ARGUMENT - 11/5/2012

```
 1    from Marks.

 2              I don't know how one can find that a contract

 3    exists without mutual agreement of both sides.

 4              Instead of agreement from Warner Bros. we have

 5    disagreement as reflected in the October 26th letter and

 6    as reflected in Warner Bros.'s agreements.

 7              It's -- it's insane to say this is purely a

 8    question of formal documentation of an agreement of the

 9    parties when there is --

10    JUDGE REINHARDT:  The problem -- and maybe you can

11    comment on this, Mr. Toberoff.  The problem is that the

12    October 26th letter doesn't reject the October 19th

13    letter.  It says, "a more ful- -- I'm enclosing a

14    fulsome outline of what we believe the deal we've agreed

15    to is."

16              Now, the argument on the other side is that

17    that says, "We've agreed to a deal but we're giving you

18    a more expansive outline of what that deal is."

19              Now, what's the answer to that?

20    MARC TOBEROFF, ESQ.:  The answer to that is whether

21    or not there's a contract is not based on verbiage such

22    as "a more fulsome outline."  It's based on the

23    comparison of the terms.  And anything less than an

24    unequivocal acceptance of an offer is a counteroffer

25    extinguishing that offer.  It's been that way forever in
```

**Exhibit B**
**48**

**EXHIBIT 20**
**295**

ORAL ARGUMENT - 11/5/2012

1   California and it's still that way in California.  So

2   regardless of how you --

3     JUDGE REINHARDT:  Well, take -- take the example of

4   a movie distribution deal or a movie production deal

5   where the parties make -- they agree to the deal.  They

6   then start with the movie.  Finally in the middle of the

7   movie they get down to reducing everything to writing

8   and there's a disagreement but both parties agree that

9   "we have a deal."

10        Now, is that not an agreement without the

11   written exposition of it?

12     MARC TOBEROFF, ESQ.:  It depends on the terms of the

13   agreement.  Here -- here -- and there have been cases

14   about that where one side has argued, "In California and

15   Hollywood we do lunch.  We don't do contracts," and

16   they've rejected those arguments when it came down to

17   specific contract formation issues like this.

18        They cannot point to an acceptance of the terms

19   of the October 19th letter.  And instead we have --

20     JUDGE THOMAS:  Well, it depends on who is the

21   offerer and who is the-- who is the accepting party.

22        What-- what the October 19th letter says, "This

23   is to confirm our telephone conversation," it goes on to

24   say, "which we accept the DC Comics' offer of October

25   16th."

ORAL ARGUMENT - 11/5/2012

```
 1          So if there's a legitimate offer on the 16th

 2   and accepted on the 19th, does it really matter what

 3   happened after that?

 4          MARC TOBEROFF, ESQ.:  Yes, it does because on --

 5          JUDGE THOMAS:  I mean, if there's a contract

 6   formation as of this and it's reflected in the letter of

 7   the 19th, then -- then there's a deal.

 8          MARC TOBEROFF, ESQ.:  But this is an ongoing

 9   negotiation that continues into 2002.

10          JUDGE THOMAS:  No.  I understand that.

11          MARC TOBEROFF, ESQ.:  And that's acknowledged by all

12   the parties.  So you can't artificially limit the

13   analysis to an oral communication on October 16th and a

14   written communication on October 19th.

15          JUDGE THOMAS:  I'm just saying, to my mind at least,

16   I haven't come to rest on it, but it certainly suggests

17   that it's a more complicated situation, and therefore

18   there's a -- probably a genuine issue of material fact.

19          MARC TOBEROFF, ESQ.:  I -- I can see none.  And I

20   can tell you why.  Because when he refers to the October

21   16th conferen- -- teleconference and -- and asks, "Do

22   you agree that these are the terms?" because that's what

23   he says, he says, "If I got anything wrong, let me

24   know," he's essentially asking, "Do you agree, Warner

25   Bros., that these are the terms?" and all they would
```

**Exhibit B**
**50**

**EXHIBIT 20**
**297**

ORAL ARGUMENT - 11/5/2012

1    have to have done is said, "Yes," then you would have a

2    different situation.

3          And that's not the situation that exists here,

4    and the objective evidence shows that -- the undisputed

5    evidence shows that it's not the situation that exists

6    here.

7          What it shows is that Warner Bros. said,

8    "That's not what I believe" --

9       JUDGE THOMAS:  They didn't say that.

10      MARC TOBEROFF, ESQ.:  Yes, they did.

11      JUDGE THOMAS:  They said, "Here's -- here's a --

12   here's a larger outline."

13          Now today they say, "Well, that's essentially

14   the same terms."  And you can say, "Well, it's not the

15   same terms."

16          And, you know, obviously they didn't agree --

17   the parties did not agree on indemnity, period.  There's

18   no agreement on indemnity.

19          But the question for the Court is not

20   necessarily whether there was -- whether -- the question

21   is whether there was a contract formed before that.

22      MARC TOBEROFF, ESQ.:  Exactly.  This isn't -- well,

23   there's not a contract formed before that if when he

24   says, "This is the terms that we believe were

25   discussed," he doesn't just say, "more fulsome outline,"

**Exhibit B**                    **EXHIBIT 20**
**51**                          **298**

ORAL ARGUMENT - 11/5/2012

1    he says, "a more fulsome outline of what we believe the

2    terms are."  They then send over a contract and reserve

3    the right of Warner Bros. to -- to -- to revise the

4    terms, and they acknowledge that the Siegels can also

5    revise the terms.  It's not just a matter of these

6    indemnity provisions.

7            I would refer the Court --

8        JUDGE THOMAS:  No.  I understand that.  I just used

9    that as an example.

10           I mean, it often happens where you have a deal

11    reached, a deal letter like this, and then the parties

12    add terms, and they say, "Well, that's not part of our

13    deal," and then they may agree or disagree on subsequent

14    terms, but that doesn't alter the original agreement or

15    the fact that it's been made.

16        MARC TOBEROFF, ESQ.:  The problem is you have no

17    acceptance to those original terms.  The hypothetical

18    doesn't apply here.

19        JUDGE THOMAS:  Unless you say that this -- the --

20    the letter of the 19th accepts an offer of the 16th.

21        MARC TOBEROFF, ESQ.:  And -- and we have a letter

22    from October 26th saying that wasn't the offer, "This is

23    what we believe the deals are."

24           Now, I want to draw the Court's attention to a

25    chart in our reply brief below which impressed the

**EXHIBIT 20**
**299**

ORAL ARGUMENT - 11/5/2012

```
 1    District Court who dealt with this in tremendous

 2    detail.  It's in our reply excerpts at Pages 140 to 149

 3    where we outline the material differences.

 4              Warner acknowledges that the properties being

 5    assigned is an essential term using -- using words from

 6    the -- from the Facebook case.

 7              Well, the properties in the Marks' memo are

 8    limited to three properties: Superman, Superboy and

 9    Spectre.

10              The properties in Schulman's memo and then in

11    the February 1st agreement concern Superman, Superboy,

12    related properties and anything created for DC, whether

13    published or unpublished, by Siegel.  So there's an

14    expansion of what is even being assigned.

15              Secondly, the royalties.  You have a very

16    complex royalty situation here.  It's not like in

17    Facebook with a fixed amount of money and a fixed amount

18    of stock.  You have a 6 percent royalty which was

19    reducible to 3 percent, which is then reducible to 1 1/2

20    percent to 1 percent as an absolute floor.

21              Warner Bros. drills all sorts of holes in that

22    floor rendering them illusory and -- and having

23    situations where they would receive no money whatsoever

24    for the exploitation of Superman.

25              These are material contract terms.  You can't
```

Exhibit B
53

EXHIBIT 20
300

ORAL ARGUMENT - 11/5/2012

Page 37

```
 1    ignore them.  They change the -- the -- the dance

 2    between offer and counteroffer.  And that's the way

 3    contract formation is analyzed in the State of

 4    California.

 5           Warner Bros. has a situation where if Superman

 6    appears in a -- in another character's contract

 7    published by DC, like Green Arrow, for weeks Superman is

 8    appearing but the name is not in the title of the comic

 9    book, under -- under Schulman's scenario, you would

10    receive a -- excuse me -- under Marks' scenario, you

11    would receive a royalty.  Under Warner Bros.'s scenario,

12    you receive no royalty.

13           It comes as no surprise that all of the changes

14    made by Warner Bros., which they now say are boilerplate

15    and not material, were all decidedly in Warner Bros.'s

16    favor and affect the key terms of the agreement: the

17    scope of the properties, the royalties and

18    compensation.

19           The -- the warranties and indemnifications is

20    not a small matter because what happens with the studios

21    when you enter in a contract and you have substantial

22    contingent compensation and there's any claim by a third

23    party or anything happens which they can claim triggers

24    a warranty, they will withhold your -- they will

25    withhold your royalty payments.
```

ORAL ARGUMENT - 11/5/2012

Page 38

1           There are credit provisions where Marks says,

2   "We want credit in paid ads," because that's very

3   important to his clients and he testifies that to

4   effect.

5           Warner Bros.'s October 26th outline and their

6   long form says, "No credit in paid ads."  Warner Bros.

7   requires an elderly Joanne Siegel who is in her late

8   eighties to go on publicity tours promoting Superman.

9   None of this exists.  There's --

10  JUDGE REINHARDT:  Well, that doesn't sound like

11  (unintelligible) form.  As David's (sic) saying, "These

12  are the sort of -- the kind of things we put in our

13  contracts."

14          And, you know, that clause isn't drawn for her

15  individual -- you know, because they're concerned about

16  her.  That's a boilerplate provision.

17  MARC TOBEROFF, ESQ.:  Well, it's not boilerplate to

18  say that the Siegels have to indemnify Warner Bros. for

19  a claim for her ex-husband.

20  JUDGE REINHARDT:  No, no.  I'm talking about that

21  Joanne -- that Joanne Siegel has to go on a tour.  You

22  know, those are the kinds of things that have to be

23  worked out after there's a contract.

24  MARC TOBEROFF, ESQ.:  Well, but the royalty

25  provisions and the scope of the properties assigned go

**Exhibit B**
**55**

**EXHIBIT 20**
**302**

ORAL ARGUMENT - 11/5/2012

1    to the heart of this.  And under Section 204(a) of the

2    Copyright Act when you have an assignment of a

3    copyright, it has to be in writing signed by the

4    assignee.

5         Marks' letter does not assign any trans- -- any

6    copyrights.  It says, "We will.  We anticipate signing

7    those contracts."

8         Nobody in this exchange viewed the October 19th

9    letter outlining deal terms or the October 26th letter

10   outlining different deal terms as a binding, enforceable

11   contract.  Everybody understood that considering the

12   magnitude of these rights and the complexity of the

13   agreement that was being discussed that you would have a

14   final written agreement signed by both parties.

15   JUDGE THOMAS:  So how do we -- how do we determine

16   that as a matter of summary judgment, that everybody

17   understood?

18   MARC TOBEROFF, ESQ.:  Because -- because --

19   JUDGE THOMAS:  No.  I mean, you can't -- you can't

20   do that without -- without extrinsic evidence of the

21   parties.

22        And you well may be right.  I'm just saying.

23   But if you can't do it on the basis of the documents

24   alone.  If you have to rely on what you say is that

25   everybody understood, then that's extrinsic evidence

ORAL ARGUMENT - 11/5/2012

Page 40

```
 1   that requires a resolution by a fact-finder.
 2       MARC TOBEROFF, ESQ.:  I respectfully disagree, your
 3   Honor.  If you look at the October 26th Warner Bros.
 4   communication, it specifically refers, "We will have
 5   this matter drafted in contract form and we will send it
 6   to you."  So right there you know --
 7       JUDGE THOMAS:  Well, that's what happens in all
 8   cases.  You don't have a -- you always have --
 9       MARC TOBEROFF, ESQ.:  But that's not extrinsic
10   evidence.  That's objective evidence saying that --
11   showing that the parties anticipated that the form of
12   agreement would be a written agreement signed by both
13   parties.  And that's what's required by the Copyright
14   Act.  That never happened.  And then they send it over
15   and they reserve the right to --
16       JUDGE THOMAS:  I don't mean to quarrel with you.
17   I'm just -- you know, we're working through these --
18   these cases.
19           But what often happens when you have a
20   situation like this is the Court will say, "If you have
21   enough for specific enforcement of the terms to which
22   you agreed," and therefore you execute the unnecessary
23   assignments and so forth.
24           The fact that they weren't all executed I don't
25   think is dispositive.  /
```

**Exhibit B**
**57**

**EXHIBIT 20**
**304**

ORAL ARGUMENT - 11/5/2012

Page 41

```
1              Now, you may well be right on it.  I'm just

2    saying that it's a more complicated issue than --

3    MARC TOBEROFF, ESQ.:  Your Honor, I believe if you

4    peel back the veneer of comments like "a deal is a deal"

5    and look at the actual facts of this case carefully, you

6    will see that under every single principle in California

7    law about contract formation this fails as a matter of

8    law and you can make that determination on this

9    objective exchange of undisputed documents.  The parties

10   absolute -- in the State of Calif- --

11   JUDGE REINHARDT:  I think we've explored this

12   fully.  And you're seven minutes are over, so --

13             I mean, you know, these are not simple issues,

14   and I don't mean that the answer may not be simple, but

15   the case, as you say, you know, we're going to -- to the

16   extent that we haven't sufficiently read them, we'll

17   certainly explore them all, and, you know, we understand

18   the arguments of both side, and they're legitimate

19   arguments, so --

20   MARC TOBEROFF, ESQ.:  I'd just like to read to you

21   from a memo that you pointed out, Marks' memo, which by

22   the way is an extra-record document that should be made

23   part of this record, but I'd like to read to you what

24   Marks actually says in that memo.

25             He says, "I believe a deal will be finalized
```

**Exhibit B**
**58**

**EXHIBIT 20**
**305**

ORAL ARGUMENT - 11/5/2012

1    with DC Comics, even if this process is not entirely

2    smooth -- smooth.  If the parties cannot reach final

3    agreement, then the negotiations would be terminated."

4    That's what he says in an attorney-client communication

5    that they're saying proves there was a binding

6    contract.

7        JUDGE REINHARDT:  Okay.  Thank you.

8        MARC TOBEROFF, ESQ.:  Thank you, your Honor.

9        JUDGE REINHARDT:  The case just argued will be

10   submitted.

11                 ---0---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit B**
**59**

**EXHIBIT 20**
**306**