# EXHIBIT 1

## 2006 Lawyer-to-Lawyer Referral Guide

# Los Angeles Lawyer

June 2006 / $4

EARN MCLE CREDIT

**Inadvertently Produced Documents**
page 33

# Royal Treatment

Abhay Khosla and Steven T. Lowe explain the difficulties faced by artists seeking unpaid royalties **page 24**

## PLUS

New Federal E-Discovery Rules

Creative Uses of LLCs

Irrevocable Life Insurance Trusts

**EXHIBIT 1**
**4**

Exh. A 6



MCLE ARTICLE AND SELF-ASSESSMENT TEST

By reading this article and answering the accompanying test questions, you can earn one MCLE legal ethics credit.
To apply for credit, please follow the instructions on the test answer sheet on page 37.



Inadvertently produced documents create a conflict between lawyers' duties to their clients and to the courts

# On the Receiving End

by Kurt L. Schmalz

What should a lawyer do when he or she receives, through the inadvertence of opposing counsel, documents clearly subject to the attorney-client privilege or attorney work product doctrine? This question was how the court of appeal framed the issue in *State Compensation Insurance Fund v. WPS, Inc.* (commonly referred to as the *State Fund* case).[1] The issue, like so many others facing the appellate courts, is easier to state than it is to resolve. Indeed, it has perplexed courts and ethics experts for a long time.

Now, this troublesome issue involving the inadvertent production of documents is before the California Supreme Court in *Rico v. Mitsubishi Motors Corporation*, which could be one of the court's most important legal ethics decisions in recent years. In *Rico*, the supreme court will review the decision by the Fourth District Court of Appeal to affirm the trial court's order disqualifying an attorney who was the recipient of a privileged document through the inadvertence of opposing counsel.[2]

For more than 20 years, California courts have vacillated between

---

Kurt L. Schmalz, of Lurie, Zepeda, Schmalz & Hogan in Beverly Hills, practices business litigation with an emphasis on professional liability cases and legal ethics issues.

**EXHIBIT 1**
**5**

Exh. A 7

two opposing positions. Initially, courts found that an attorney receiving inadvertently produced documents had no duty to return the documents or to refrain from looking at them—and may even use the documents to benefit his or her client in the case. Later courts have held that an attorney must immediately return the inadvertently produced documents to opposing counsel, looking at the documents only to the extent necessary to determine their privileged nature.

One of the early seminal decisions on this issue is *Aerojet General Corporation v. Transport Indemnity Insurance*.[3] In *Aerojet*, the court of appeal reversed a sanctions order against the recipient attorney, noting that: "Once he had acquired the information in a manner that was not due to his own fault or wrongdoing, he cannot purge it from his mind. Indeed, his professional obligation demands that he utilize his knowledge about the case on his client's behalf."[4] The *Aerojet* court found it significant that the attorney receiving the purportedly privileged information did not violate any statutes, judicial decisions, rules of court, or rules of professional conduct in using the information he received to his client's advantage. In fact, the court noted that the attorney's primary duty was "to protect the interests of his own clients."[5]

The *Aerojet* decision, however, was not the final word on the inadvertent production issue. As discovery in complex litigation became more wide-ranging and voluminous, and the routine use of facsimile transmission made document production instantaneous, the problem of inadvertently produced privileged documents became even more prevalent and difficult. In 1992, the American Bar Association's Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 92-368, which addressed the inadvertent disclosure of confidential material.[6] The committee stated in its opinion that a lawyer who mistakenly receives privileged or confidential documents from opposing counsel should refrain from examining the documents, immediately notify opposing counsel who sent the documents, and return the documents if opposing counsel requests their return.[7] The ABA opinion represented a departure from the standard rule enunciated in *Aerojet*, which seemed to place a greater emphasis on the lawyer's duty to zealously represent the interests of the client than on the lawyer's duty of fair play as an "officer of the court." For this reason, ABA Formal Opinion 92-368 was not well received.[8]

Bowing to criticism, the ABA modified its position two years later in Formal Opinion 94-382, which created a course of action for a lawyer who, as a result of opposing counsel's mistake, receives privileged or confi-

dential material. In this circumstance, the lawyer 1) may review the materials only to the extent necessary to determine whether they are privileged and how appropriately to proceed, 2) should promptly notify opposing counsel that he or she has the materials, and 3) should follow the instruction of opposing counsel about the documents or refrain from using the materials until the court rules on how the materials should be handled.[9] Even though the ABA Model Rules of Professional Conduct and ABA Formal Opinions are not controlling in California, California courts tend to give them substantial weight and deference—especially when the California Rules of Professional Conduct and the State Bar Act do not address the issue and the rule does not conflict with California public policy.[10]

## *State Fund* and the ABA Opinions

In 1999, the Second District Court of Appeal in *State Fund*[11] moved California away from the *Aerojet* decision and closer to the ABA standard. Although it did not disapprove *Aerojet*, the court in *State Fund* limited *Aerojet* to its facts and adopted a rule for California that was nearly identical to ABA Formal Opinions 92-368 and 94-382. In *State Fund*, the appellate court reversed a sanctions order against an attorney who received—through the mistake of opposing counsel—privileged documents, which the attorney used against his opponent and even gave to another attorney litigating claims against the State Compensation Insurance Fund. After the receiving attorney refused opposing counsel's request to return the documents, the trial court found the attorney's conduct to be unethical and in bad faith and imposed monetary sanctions on the attorney and his client.[12]

In reversing the sanctions order, the *State Fund* court noted that the receiving attorney had not violated any California decision, statute, or rule of professional conduct. The court found that the attorney did not comply with ABA Formal Opinion 92-368 but emphasized that California did not follow the ABA rules. Nonetheless, the court used ABA Formal Opinion 92-368 as a guide in formulating a rule for California attorneys to follow.[13] The court ruled that a lawyer who receives clearly privileged documents from an adversary should: 1) stop reading the documents as soon as the privileged nature of the documents become apparent, 2) immediately notify opposing counsel that the lawyer has the documents, and 3) resolve any disputes about the handling of the documents with opposing counsel or refrain from using the documents until the court determines their disposition.[14]

The court in *State Fund* devised this rule after balancing the competing duties that

lawyers owe to their clients and to "the administration of justice."[15] Placing great weight on the "sanctity of the attorney-client privilege," the court made a pronouncement: "We believe a client should not enter the attorney-client relationship fearful that an inadvertent error by its counsel could result in a waiver of privileged information or the retention of the privileged information by an adversary who might abuse and disseminate the information with impunity."[16]

Notwithstanding the rule in *State Fund*, which places clear obligations on the lawyer receiving privileged documents, the court offered some consolation to the receiving attorney in its opinion. In reversing the sanctions order, the court held that "whenever a lawyer seeks to hold another lawyer accountable for misuse of inadvertently received confidential materials, the burden must rest on the complaining lawyer to persuasively demonstrate inadvertence." The court commented further that an attorney should not be subject to disqualification simply because he or she has been exposed to the confidential information of an adversary. Nevertheless, even though the court referred to disqualification as a "draconian" remedy, the court made it clear that in an appropriate case—presumably when the recipient attorney fails to follow the court's newly articulated rule—disqualification might be warranted.[17]

## The *Rico* Challenge

The *State Fund* court's discussion of disqualification of the receiving attorney as a possible sanction seems to have set the stage for the court of appeal's decision in *Rico*. The *Rico* court moved the rule on the receiving lawyer's ethical duty 180 degrees from the rule established in 1993 by *Aerojet* and well beyond the middle ground staked out by the court in *State Fund*.

*Rico* arose when counsel for a plaintiff in an SUV rollover case obtained a written summary of a conference between the defense attorney and defense experts about certain strengths and weaknesses in their case.[18] The plaintiff's attorney testified that he got the summary when a court reporter mistakenly delivered the document to him at a deposition. Defense counsel claimed that the plaintiff's attorney took the document from his files while defense counsel was out of the room. Despite the apparent conflict in the evidence, the trial court determined that the document had been inadvertently produced to plaintiff's counsel.[19] The production of the defense memorandum came to light when plaintiff's counsel used the document at a subsequent deposition in the case. Defense counsel learned of the document's use and demanded its prompt return.

After plaintiff's counsel refused to return

**EXHIBIT 1**
**6**

Exh. A 8



the document, defense counsel immediately filed a motion to disqualify the plaintiff's attorney and the plaintiff's experts, who had also reviewed a copy of the document. Following a lengthy hearing, the trial court found that the defense memorandum was subject to the attorney-client privilege and work product doctrine and that plaintiff's counsel violated his ethical duty by failing to notify opposing counsel that he had the document and was using it. The court, relying on the *State Fund* decision, granted the motion and disqualified the plaintiff's attorney and

of opposing counsel. The situation in states that follow the ABA Model Rules is even more confusing. Last year, as *Rico* came under review by California's highest court, the ABA reversed itself and withdrew Formal Opinion 92-368— the opinion that strongly influenced the *State Fund* decision.[23] On October 1, 2005, the ABA's ethics committee adopted Formal Opinion 05-437, which states:

A lawyer who receives a document from opposing parties or their lawyers and knows or reasonably should know

of the documents to the opposing counsel. However, an argument could be made that the more rigorous standard in Formal Opinion 94-382 applies when the inadvertently produced documents are clearly privileged or confidential. Rule 4.4 does not expressly address the inadvertent production of privileged documents.

### The Privilege Issue

With these sometimes conflicting developments, the California attorney who has the fortune (or misfortune) to receive, through the

experts because the attorney's review and use of the privileged document caused "unmitigatable prejudice" to the defense. The Fourth District Court of Appeal affirmed the disqualification order,[20] and the California Supreme Court granted review on June 9, 2004. At press time, oral argument in the case had not yet been scheduled.

The appellate court in *Rico* found that the rule for attorney conduct enunciated in *State Fund* provided the decisional basis that was lacking when the *Aerojet* case was decided. Even though the *State Fund* court considered disqualification of the receiving attorney a draconian remedy, the court in *Rico* had no difficulty in affirming the disqualification order. Both the trial and appellate courts in *Rico* were highly critical of the receiving attorney because he "studied the document carefully, made his own notes on it, discussed the meaning of the notes with the experts and based his litigation strategy and expert witness cross-examination upon the information contained in the document."[21] The appellate court acknowledged that the receiving attorney relied on the *Aerojet* case but still found his conduct to be unethical because he failed to make any "further inquiry into his ethical responsibilities," and "made full use of the privileged document" in violation of the ethical standards in *State Fund*.[22]

Hopefully, in deciding *Rico*, the state supreme court will resolve the uneasy tension between the *Aerojet* and *State Fund* decisions and give California attorneys a clear ethical standard to follow when they receive privileged documents through the mistake

that the document was inadvertently sent should promptly notify the sender in order for the sender to take protective measures. To the extent that Formal Opinion 92-368 opined otherwise, it is hereby withdrawn.

Under ABA Model Rule 4.4(b), "A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender." The commentary to the rule confirms that the receiving lawyer's only duty is to promptly notify the sender so that the sender can take appropriate action. However, the commentary states, "Whether the lawyer is required to take additional steps, such as returning the original document, is a matter of law beyond the scope of these Rules," is the question of whether the privileged status of a document has been waived."[24] The ABA standard is further clouded because even though ABA Formal Opinion 92-368 was withdrawn, ABA Formal Opinion 94-382— which addresses a lawyer's duty when the lawyer inadvertently receives "privileged or confidential materials" of an adverse party— apparently is still viable.

Thus, it is unclear whether the lawyer's duty is simply to notify opposing counsel of the receipt of the materials or is the more extensive duty outlined in ABA Formal Opinion 94-382 controls. Nonetheless, ABA Model Rule 4.4 and its commentary would most likely control in the jurisdictions that follow the ABA standards. The attorney's only duty under the rule is to disclose the receipt

mistake of opposing counsel, possibly privileged or confidential documents that opposing counsel did not want the attorney to see, faces some significant dilemmas. Certainly, the rule in *State Fund* is still good law in California, although its basis has been undermined by the ABA's withdrawal of ABA Formal Opinion 92-368 and the California Supreme Court's impending review of *Rico*. However, the efficacy of an ethical rule should be measured in its clarity and consistent application. At this point, at least until *Rico* is decided, California's standard—as well as the national standard—regarding what a receiving attorney should do with inadvertently produced documents is neither clear nor consistent.

The most problematic portion of the rule outlined in *State Fund*, and expanded in the *Rico* court of appeal decision, is the determination of whether the inadvertently produced document is actually privileged.[25] The difficulty begins with discerning when the receiving attorney's duty to contact opposing counsel about a mistakenly produced document arises. In *State Fund*, the inadvertently produced documents were clearly stamped with the heading "Attorney-Client Communication/Attorney Work Product" and the word "Confidential" on the first page of each form.[26] Thus, on their face, the documents put receiving counsel on notice that the opposing party believed the documents to be privileged and/or confidential. However, the documents inadvertently produced in *Aerojet* and *Rico* were not labeled "Confidential" or "Privileged," or any similar markings.[27] In

**EXHIBIT 1**
**7**

Exh. A 9



each of those cases, the appellate court offered an in-depth analysis of whether and to what extent the mistakenly produced documents were privileged at all.

In *Aerojet*, the court concluded that the document itself may have been confidential or even privileged, but the underlying information in the document (the identity of potential witnesses) was not privileged. This conclusion that the mistakenly produced information was not privileged was used by the *State Fund* court to distinguish *Aerojet* and limit the case to its facts, but how can the receiving attorney make the kind of analysis necessary to determine the privileged nature of a document if extensive review and analysis of the document is considered improper? There was no way the receiving attorney could have properly determined whether the document was privileged or not without reading and thoroughly analyzing it.

In *Rico*, the privilege issue was even more complicated. The trial court based its ruling on its assumption that any reasonable attorney would have known that the defense memorandum was subject to the attorney-client privilege and the work product doctrine. However, the appellate court found that the trial court was only half right. After extensive analysis, briefing, and oral argument by counsel, the trial court ruled that the memorandum was subject to the attorney-client privilege. This was an error, according to the appellate court. Nonetheless, the appellate court found that the memorandum was still protected because it consisted of attorney work product, even though the document had been prepared by a paralegal, apparently at a lawyer's request.

The appellate court reached this conclusion after an extensive analysis of the document and how it was prepared. According to the court, if the memorandum had been a transcription of a discussion between defense counsel and defense experts, it would not have been subject to absolute work product protection. However, the trial court found that the document included the thoughts and impressions of the defense attorney—and was therefore entitled to absolute attorney work product protection.

If a proper determination of the privileged nature of a document requires the extensive analysis of a trial court and an appellate court—after full briefing and oral argument of counsel—then it is difficult to fault an attorney for "meticulously examining" and analyzing a document that the attorney inadvertently received. Indeed, as the court observed 23 years ago in *Aerojet*, an attorney has an ethical duty not only to examine and analyze the adversary's document but to use the evidence to further the interests of the attorney's client.

Of course, an ethical dilemma arises when the inadvertently produced document clearly appears to be privileged, such as when the document is so labeled or when the document appears on the producing party's privilege log. Even then, the receiving attorney should not be faulted for reviewing and analyzing the document before contacting opposing counsel. Upon thorough review, the document may not be legitimately privileged or counsel may reasonably believe that any privilege has been waived. Moreover, given the high volume of documents produced in many cases and tight trial deadlines, the receiving lawyer may not appreciate the importance or privileged nature of the document until later in the case during trial preparation or expert discovery. In a close case, it would not be unreasonable for the receiving attorney to err on the side of protecting his or her client's interests in using the documents rather than to help opposing counsel clean up an embarrassing mistake.

And what if a clearly privileged document mistakenly produced to opposing counsel revealed that the producing party had destroyed key discoverable documents, was hiding witnesses, or was encouraging them to lie under oath? Indeed, in *Rico*, the court of appeal rejected the plaintiff's argument that the use of the inadvertently produced defense memorandum was justified because it revealed that the defense experts were lying about the technical evidence in the case. The court found that:

> Once the unintended reader ascertains that the writing contains an attorney's impressions, conclusions, opinions, legal research or theories, the reading stops and the contents of the document for all practical purposes are off limits....Unlike with the attorney-client privilege, there is no crime-fraud exception to the attorney work product rule. The absolute attorney work product privilege is just that, absolute.

If the *Rico* court's analysis survives supreme court review, then the smoking gun document that a litigator receives and reads may become a ticking time-bomb that could result in the attorney facing disqualification, monetary sanctions, and public reproval from the courts for being "unethical."

Perhaps the courts have put an unreasonable, and ultimately unworkable, burden on attorneys who receive, through no misconduct of their own, privileged documents from the opposing side. The courts can, without imposing severe punishments on the receiving attorney, preserve the integrity of the judicial process and sanctity of the attorney-client privilege and other privileges and protections by excluding from evidence on dispositive motions or at trial inadvertently

# MCLE Test No. 149

The Los Angeles County Bar Association certifies that this activity has been approved for Minimum Continuing Legal Education legal ethics credit by the State Bar of California in the amount of 1 hour.

**1.** To determine the scope of a lawyer's ethical duties when he or she receives, through the inadvertence of opposing counsel, privileged documents of the opposing side, the California Supreme Court currently has under review the lower court ruling in:
A. *Aerojet-General Corporation v. Transport Indemnity Insurance.*
B. *State Compensation Insurance Fund v. WPS, Inc. (State Fund).*
C. *Rico v. Mitsubishi Motors Corporation.*
D. All of the above.

**2.** The American Bar Association Model Rules of Professional Conduct and the ABA Formal Opinions are not controlling in California.
True.
False.

**3.** According to ABA Formal Opinion 94-382, a lawyer who receives an adverse party's privileged or confidential material as a result of a mistake by opposing counsel should:
A. Promptly notify opposing counsel that the lawyer has the material.
B. Immediately return the material to opposing counsel without reviewing it and before talking to opposing counsel.
C. Use the material against the adverse party to further the interests of the lawyer's client.
D. All of the above.

**4.** In *Aerojet*, the court noted that:
A. The attorney's primary duty was "to protect the interests of his own clients."
B. An attorney who receives and reviews inadvertently produced documents from the opposing side is subject to automatic disqualification.
C. "[A] client should not enter the attorney-client relationship fearful that an inadvertent error by its counsel could result in a waiver of privileged information to an adversary who might abuse and discriminate the information with impunity."
D. None of the above.

**5.** The ABA has withdrawn its Formal Opinion 05-437.
True.
False.

EXHIBIT 1
8

Exh. A  10



# M. NAIR, M.D.

Board Certified:
- Psychiatry
- Child Psychiatry
- Forensic Psychiatry
- Psychopharmacology
- Addiction Medicine
- Harvard and UC Trained

Consultations • IME • Deposition • Record Review
Second Opinion • Trial Testimony • Civil Litigation

**562.493.2218** • psychiatryforensic.com
State Bar Approved MCLE provider

433 N. Camden Dr., Suite 600, Beverly Hills, CA 90210

# RAHIMZADEH & ASSOCIATES

**EU, International, Real Estate and Business advice, Federal and New York law**

Tel 866 841 0936 • Fax 866 841 0937
Email RandA@RahimzadehandAssociates.com

www.RahimzadehandAssociates.com



# COMMERCE ESCROW COMPANY
## A Team That Knows the Business

Phil Graf and Mark Minsky lead teams of people with long and successful experience in all aspects of the escrow business. Often, a thorough understanding of the tangled web of real property complexities may be a decisive factor in a successful transaction.

Commerce Escrow teams command an intricate understanding of the figures, interpretations, inclusions, contracts and financial, civic, state, city and county codes that permeate escrow and title transactions. These include commercial, industrial,

Phil Graf
President

Mark Minsky
Vice President

developer site acquisitions, single and multi-family, business opportunity, and stock transfer escrows.

Before beginning Commerce Escrow in 1980, Graf and Minsky were executives at Title Insurance and Trust Company. Graf, and later Minsky, served as Vice President and Manager of Escrow Operations in Los Angeles County.

Since its founding, Commerce Escrow continues to grow with its client base expanding throughout California and beyond.



## Commerce Escrow Company

1545 Wilshire Blvd./ Suite 600 / Los Angeles, CA 90017
213-484-0855 • 310-284-5700 • 888-732-6723
http://www.comescrow.com

produced privileged materials and any other evidence derived directly from those materials.[34] While the receiving attorney may have obtained some actual or perceived advantage over his or her opponent as a result of receiving an inadvertently produced document, this advantage is minimal if the attorney is unable to use the document or privileged information at trial.[35] Moreover, the courts should not be in the business of compelling attorneys to clean up their opposing counsel's mistakes. A lawyer should adhere to a duty of fair play as an officer of the court. However, the courts should be careful not to advance amorphous interpretations of fair play at the expense of the lawyer's fundamental duty to zealously represent his or her client.

In this time when ethical rules are not entirely clear and thus appear to be more like a moving target than they should be, California attorneys are well advised to protect themselves and their clients by promptly disclosing to opposing counsel in writing that they have received documents that may have been inadvertently produced. Thereafter, the burden should be on the producing attorney to put the issue before the court and demonstrate that: 1) the documents were given to opposing counsel through mistake, inadvertence, or neglect, 2) the documents are truly privileged, and 3) the privilege has not been waived.

The disclosure by the receiving attorney should be a safe harbor to defeat any subsequent motions by opposing counsel to disqualify the receiving attorney or experts or for monetary and other sanctions directed at the receiving attorney or his or her client. If appropriate, the court, after the disclosure, can exclude the privileged document from evidence and make any other in limine orders to protect the sanctity of privileged communications and the administration of justice. ■

[1] State Comp. Ins. Fund v. WPS, Inc. (State Fund), 70 Cal. App. 4th 644, 651 (1999).
[2] Rico v. Mitsubishi Motors Corp., 116 Cal. App. 4th 51, 10 Cal. Rptr. 3d 601 (2004), Cal. Sup. Ct. Case No. S123808 (rev. granted June 9, 2004). The supreme court's grant of review in Rico had the effect of depublishing the court of appeal decision so that it is no longer citable authority on this issue.
[3] Aerojet General Corp. v. Transport Indem. Ins. Co., 18 Cal. App. 4th 996, 1005 (1993).
[4] Id. at 1005-06.
[5] Id. at 1005.
[6] See The "OOPS" Factor, ABA J., Feb. 2006, at 26.
[7] ABA's Standing Committee on Ethics & Professional Responsibility, ABA Formal Op. No. 92-368.
[8] ABA J., supra note 6.
[9] ABA's Standing Committee on Ethics & Professional Responsibility ABA Formal Op. No. 94-382.
[10] State Comp. Ins. Fund v. WPS, Inc. (State Fund), 70 Cal. App. 4th 644, 656 (1999) ("[T]he ABA Model Rules of Professional Conduct may be considered as a collateral source, particularly in areas where there is no direct authority in California and there is no conflict

**EXHIBIT 1 9**

Exh. A  11



with the public policy of California," [emphasis in original]

[1] *Id.* at 644.

[2] *Id.* at 651.

[3] *Id.* at 655-56. Interestingly, the court did not appear to consider ABA Formal Opinion 94-382, which modified Formal Opinion 92-368. However, the rule developed by the court in *State Fund* is very similar to ABA Formal Opinion 94-382.

[4] *State Fund*, 70 Cal. App. 4th at 656-57.

[5] *Id.* at 657.

[6] *Id.*

[7] *Id.*

[8] *Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51, 10 Cal. Rptr. 3d 601, 603-04 [2004], Cal. Sup. Ct. Case No. S123808 [rev. granted June 9, 2004].

[9] *Id.*, 10 Cal. Rptr. 3d at 604. If the trial court had found that the receiving attorney had pilfered the document from opposing counsel, then the attorney would have been clearly guilty of misconduct and deserving of severe sanctions.

[10] *Id.* at 616-17.

[11] *Id.* at 613-14.

[12] *Id.* at 614-15.

[13] ABA 1.1, *supra* note 6.

[14] ABA MODEL RULES OF PROF'L CONDUCT R. 4.4 cmt.

[15] Even more perplexing is how to treat inadvertently produced documents that are "confidential" but not privileged. Most businesses consider their internal documents produced in discovery to be confidential. It seems unworkable for an attorney's obligation to be triggered every time he or she receives inadvertently produced confidential documents - especially when the documents (or information contained within them) are not privileged. *Aerojet General Corp. v. Transport Indem. Co.*, 18 Cal. App. 4th 996, 1005 [1993].

[16] *State Comp. Ins. Fund v. WPS, Inc.* (State Fund), 70 Cal. App. 4th 644, 648 [1999].

[17] *Aerojet*, 18 Cal. App. 4th at 1003; *Rico*, 10 Cal. Rptr. 3d at 614.

[18] *Rico*, 10 Cal. Rptr. 3d at 608.

[19] *Id.* at 609.

[20] *Id.* at 614-15.

[21] *Aerojet*, 18 Cal. App. 4th at 1005.

[22] *See Maxwell v. Otto*, 108 Cal. App. 4th 265 [2003]. The *Maxwell* court declined to apply the rule in *State Fund* to a case in which a crime victim was suing a criminal defense attorney for reviewing her mental health records. The court found that defense counsel received the privileged medical records inadvertently from the prosecution. However, since the documents were produced pursuant to subpoena and defense counsel's discovery requests, the court found that defense counsel could not reasonably have known that production of the records was "inadvertent." *Id.* at 286.

[23] *Rico*, 10 Cal. Rptr. at 616.

[24] Courts for decades have used exclusionary rules of evidence in criminal cases to protect defendants from evidence obtained by the government through unlawful searches and seizures. In these cases—in which there is arguably more at stake than in most civil litigation—the exclusion of improperly obtained evidence is sufficient to protect the defendant's interests and the administration of justice. Rarely are prosecutors or government officials punished for obtaining or trying to use evidence obtained from an unlawful search. With inadvertently produced documents in civil litigation, the receiving lawyer has not broken any laws or taken any intentional acts to violate the legal rights of the opposing party.

[25] In *Aerojet* and *State Fund*, the parties that inadvertently produced the documents ultimately won their respective cases. *Aerojet General*, 18 Cal. App. 4th at 1003-04, *State Comp. Ins. Fund v. WPS, Inc.* (State Fund), 70 Cal. App. 4th 644, 648 [1999].



WHAT'S A DAY OF YOUR TIME WORTH?

= 

Traffic School with MCLE Credit

MCLEforLawyers.com    (310) 552-5382



"Mickey's knowledge of the market and expertise in property values have been accurate and extremely helpful to my clients."
~Jon Summers, Freid and Goldman

Need a Realtor?
Mickey Kessler
Associate Manager
Direct: 310-442-1398

From beginning to end, I offer my full spectrum of real estate-related services specifically designed to serve the family law practice. Moreover, these services are offered without obligation.

How Can I Help You?
Real Estate for the Family Home
~ references available upon request ~
www.mickeykessler.com/familylaw.html

GREG DAVID DERIN
MEDIATOR
Entertainment • Intellectual Property
Complex Business • Real Estate • Employment

Honesty • Fairness • Commitment • Creativity • Excellence

www.derin.com                          310.552.1062
10100 Santa Monica Boulevard          Los Angeles, CA 90067

Luz Amelia McClellan
US FEDERAL COURT
CERTIFIED INTERPRETER
IN MEXICO

SERVITRANS
A BRIDGE OF COMMUNICATION

Tel. +52 (55) 51 35 17 63
E-mail la.mcc@servitrans.com.mx
www.servitrans.com.mx

Flexibility to work in both countries.

Fuente Beita #79, Col. Rincón del Pedregal, Mexico City

EXHIBIT 1
10

Exh. A  12

# EXHIBIT 2

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

July 19, 2006

Via Fax and US Mail

John J. Quinn
Arnold & Porter, LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017

Re: *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
    USDC Central District of CA, Case No. 04-08776 RSWL (AJWx)
    *Joanne Siegel and Laura Siegel Larson v. Time Warner, Inc. et al.*
    USDC Central District of CA, Case No. 04-08400 RSWL (AJWx)

Dear John:

I am writing with respect to your letter dated July 13, 2006 and your subsequent delivery of documents to my office on July 18, 2006.

As a preliminary matter, your July 13 letter mistakenly states that I agreed in our conversation on July 11, 2006 to follow the protocol outlined in your letter of July 5, 2006. I presumed from the tenor of your July 5 letter that the privileged documents referred to were documents to which *my clients* hold the privilege. I therefore requested in our July 11 teleconference that the documents be promptly disclosed and turned over to us. As a protocol I suggested that (1) an independent shop copy and bate stamp the documents, and provide you with only the total bate stamp number range; (2) all such documents including Warner Bros.' "originals" then be returned to my offices and (3) I review the documents and provide Warner Bros. with a privilege log as appropriate. We concluded with my stating that I would memorialize the above in an e-mail to you, however, I was pulled into another urgent matter, whereupon you sent your July 11 letter.

Upon opening the document package sent to my office yesterday, it was immediately apparent that the documents had been *stolen* from my legal files and are, in large part, clear attorney-client communications. Such illegally obtained documents should *not* have been reviewed in any manner by Wayne Smith, Warner Bros.' Senior Litigation Counsel.

**EXHIBIT 2**
**11**

132

024

**LAW OFFICES OF MARC TOBEROFF**

John J. Quinn, Esq.
July 19, 2006
Page 2


Your letter of July 5 states that Wayne Smith did not read or review the documents in detail but nonetheless somehow segregated the documents in three separate categories – "Privileged," "Non-Privileged" and "?." This segregation was passed on to me in the form of clipped copies marked with "post-its." It is logically impossible for Wayne Smith to have made this detailed segregation without reviewing the stolen documents in substance, which was improper. Upon realizing, as is plainly evident, that these documents had been stolen from my law offices, Warner Bros. should have immediately re-sealed the documents, notified me of this security breach and returned the documents to my offices, together with all pertinent details regarding its receipt of the documents.

We are understandably conducting an investigation into this shocking and unconscionable theft of confidential legal files from my offices and their disclosure at an important juncture in the above referenced litigations.

In connection with our investigation of this matter, request is hereby made that Warner Bros. furnish us with the following: (1) the date(s) each set of documents was received; (2) copies of all envelopes or packages enclosing the documents; (3) the method by which the documents were sent and, in the unlikely event the documents were delivered by hand, the name of the messenger (and messenger service) logged at Warner Bros.' security gate and (4) any other pertinent information regarding Warner Bros.' receipt of these documents. We would also like to inspect the "original" documents and enclosing envelopes or packages *as received* by Warner Bros.

Lastly, request is hereby made that any and all copies of these stolen documents (e.g., the retained set mentioned in your July 13 letter) be immediately returned to my law offices.

Warner Bros.' anticipated cooperation with respect to this very troubling matter is appreciated.

Very truly yours,

Marc Toberoff


cc: Michael Bergman, Esq.

133      025

**EXHIBIT 2**
**12**

# EXHIBIT 3

1  WEISSMANN WOLFF BERGMAN
        COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
16

| | |
|---|---|
| 17  JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
| 18          Plaintiffs, |     CV 04-8400 SGL (RZx) |
|         vs. |     CV 04-8776 SGL (RZx) |
| 19  WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC | Hon. Steven G. Larson, U.S.D.J. |
| 20  COMICS; and DOES 1-10, | Hon. Ralph Zarefsky, U.S.M.J. |
|          Defendants. | **NOTICE OF MOTION AND JOINT** |
| 21  JOANNE SIEGEL and LAURA SIEGEL LARSON, | **STIPULATION RE: DEFENDANTS' MOTION TO COMPEL** |
| 22          Plaintiffs, | **PRODUCTION OF WHISTLE-BLOWER DOCUMENTS** |
| 23          vs. | **DISCOVERY MATTER** |
| 24  TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER | **LOCAL RULE 37** |
| 25  BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION | Time: 10:00 a.m. |
| 26  PRODUCTION INC.; DC COMICS; and DOES 1-10, | Date: April 16, 2007 |
|          Defendants. | Courtroom: 540 |
| 27  AND RELATED COUNTERCLAIMS | Mag. Judge Ralph Zarefsky |
| | Discovery Cutoff: Nov. 17, 2006 |

28

{F0029699.1 }

**EXHIBIT 3**
**13**

1 | TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2 |     PLEASE TAKE NOTICE THAT on April 16, 2007 or as soon thereafter as

3 | the matter may be heard in the above-entitled action before the Honorable Ralph

4 | Zarefsky, United States Magistrate Judge, United States District Court for the

5 | Central District of California, Western Division, Roybal Federal Building, 225 East

6 | Temple Street, Los Angeles, California, Courtroom 540, defendants Warner Bros.

7 | Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros.

8 | Television Production Inc. and defendant and counterclaimant DC Comics

9 | ("Defendants"), will and hereby do move the Court to rule on this jointly filed

10 | stipulation pursuant to L.R. 37-3. Defendants have met and conferred with counsel

11 | for Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs" or the "Siegels")

12 | in writing on October 13, 2006 and by telephone conference on October 26, 2006, in

13 | accordance with Local Rule 37-1 of the Local Rules of the United States District

14 | Court for the Central District of California ("L.R."), and the parties were unable to

15 | resolve their discovery dispute regarding the failure to produce certain documents,

16 | copies of which were sent to defendant Warner Bros., apparently by an unidentified

17 | former employee of Plaintiffs' counsel, purporting to perform a "whistle-blower"

18 | function relative to Plaintiffs' counsel's conduct in this litigation and other matters

19 | (the "Whistle-blower Documents"). Some or all of the Whistle-blower Documents,

20 | which were segregated by a member of defendant Warner Bros. Entertainment

21 | Inc.'s legal department consistent with applicable law and which have not been used

22 | or relied upon in the litigation by Defendants to date, are likely to lead to the

23 | discovery of admissible evidence and should be produced by Plaintiffs and their

24 | counsel.

25 |     By this motion, Defendants request that the Court: (1) order Plaintiffs and

26 | their counsel to produce all of the non-privileged Whistle-blower Documents; and

27 | (2) order Plaintiffs and their counsel to produce all of the Whistle-blower documents

28 |

{F0029699.1 }

1

**EXHIBIT 3**

**14**

1  they now claim are privileged but that have not been identified on any privilege log,

2  including but not limited to, the privilege logs Plaintiffs were ordered by this Court

3  to turn over no later than September 29, 2006.

4          This motion is made pursuant to Rules 26 and 37 of the Federal Rules of Civil

5  Procedure and L.R. 37.  Defendants contend that the discovery sought hereby is

6  likely to lead to the discovery of admissible evidence, and good cause therefore

7  exists for it.  Defendants have made good faith and reasonable attempts to resolve

8  this matter without Court intervention, pursuant to L.R. 37, through numerous phone

9  conferences and correspondence, and the parties conducted a conference of counsel

10  pursuant to L.R. 37-1 on October 26, 2006, without success.  (*See* Declaration of

11  Michael L. Bergman, filed herewith, ¶¶ 16-19 & Exs. O-Q).

12          This motion is based on this notice of motion; the Joint Stipulation Re: DC's

13  Motion to Compel Production of Whistle-blower Documents; the declarations

14  submitted by the parties; any supplemental memoranda that may be filed in

15  connection with the Joint Stipulation; the pleadings and papers on file in this action;

16  and on such oral argument and other matters as the Court may properly consider at

17  the time of the hearing of this motion.

18  DATED: March 26 , 2007          FROSS ZELNICK LEHRMAN & ZISSU, P.C.

19                                                      PERKINS LAW OFFICE, P.C.

20                                                              -and-

21                                                      WEISSMANN WOLFF BERGMAN
                                                            COLEMAN GRODIN & EVALL LLP

22

23                                                      By: Michael Bergman

24                                                              Michael Bergman

25                                                      Attorneys for Defendants and Counterclaimant

26

27

28

{F0029699.1 }

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ................................................................................. iv

3  I.     DEFENDANTS' AUTHORITIES ............................................................... iv

4  II.    PLAINTIFFS' AUTHORITIES ................................................................... iv

5  JOINT STIPULATION ........................................................................................ 1

6  I.     DEFENDANTS' INTRODUCTORY STATEMENT ................................... 1

7  II.    PLAINTIFFS' INTRODUCTORY STATEMENT ...................................... 2

8  III.   DEFENDANTS' CONTENTIONS ............................................................. 3

9  A.     STATEMENT OF FACTS ......................................................................... 3

10         1.   The Relevant Pleadings and Defenses in the Actions ........................... 3

11         2.   Warner Bros.'s Receipt of the Whistle-blower Documents ................. 6

12         3.   Defendants' Attempt s to Obtain from Plaintiffs and their Counsel the

13              Whistle-blower Documents to Which they Are Entitled ................... 11

14  B.     THE DOCUMENT PRODUCTION REQUESTS

15         DEFENDANTS ASK THE COURT TO ENFORCE ................................... 13

16         1.   The Request and Plaintiffs' Response ................................................. 13

17         2.   The Subpoena and Plaintiffs' Response ............................................. 14

18  C.     PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE

19         REQUIRED AND COURT ORDERED PRIVILEGE LOGS ..................... 15

20  D.     THE PARTIES' MEET AND CONFER EFFORTS ................................... 16

21  E.     ARGUMENT .......................................................................................... 16

22         1.   Plaintiffs Should be Compelled to Produce the Non-

23              Privileged Whistle-blower Documents ............................................... 16

24              a.   Plaintiffs' Objections are Without Merit ................................... 17

25                  1)   There Is No Ambiguity As To The Documents

26                       Responsive To The Request And To the Subpoena ....... 18

27

28

{F0029699.1 }

i

**EXHIBIT 3**

**16**

1            2)     Plaintiffs And Their Counsel's Objections On The Basis

2                  Of Overbreadth, Burdensomeness, And Oppressiveness

3                  Are Without Merit ............................................................. 18

4            3)     The Circumstances Of The Whistle-blower Documents'

5                  Delivery Does Not Render The Documents Immune

6                  From Discovery ................................................................. 19

7      2.     Plaintiffs Should Be Compelled to Produce Any of

8            the Whistle-blower Documents That Have Not

9            Been Identified on Any Privilege Log ................................. 20

10    IV.    PLAINTIFFS' CONTENTIONS ........................................................ 22

11    A.    FACTUAL AND PROCEDURAL BACKGROUND .................................. 22

12      1.     Documents Stolen From The Office Of Plaintiffs' Counsel ........... 24

13      2.     Document Production and Privilege Logs .............................. 27

14    B.    ARGUMENT ............................................................................... 27

15      1.     Plaintiffs Have Properly Responded To Defendants' Requests

16            For Production, Produced Non-Privileged Responsive Documents

17            In Their Possession And Listed Privileged Documents In A

18            Privilege Log ............................................................... 27

19      2.     Defendants Improperly Seek To Gain An Advantage Through

20            Their Illicit Receipt Of Documents Stolen From The Offices Of

21            Plaintiffs' Counsel ........................................................... 28

22      3.     The Stolen Documents Have Been Produced Or Listed In

23            Extensive Privilege Logs ................................................. 30

24      4.     Defendants Have Brought This Motion For Unspecified

25            Documents Based On Speculative Accusations But No

26            Credible Evidence .......................................................... 31

27      5.     Defendants' Review, Retention And Handling Of The Stolen

28            Documents Was Improper .......................................... 33

{F0029699.1 }

ii

**EXHIBIT 3**

1  V.    DEFENDANTS' CONCLUSION.................................................................40

2  VI.   PLAINTIFFS' CONCLUSION..................................................................40

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{F0029699.1 }

iii

EXHIBIT 3

18

1

## **TABLE OF AUTHORITIES**

2

**I.    Defendants' Authorities**

3    *Aerojet-General Corp. v. Transport Indemnity Ins.*,
         18 Cal.App.4th 996 (1993)...................................................................8, 19

4

5    *American Dental Ass'n v. Korrhami*,
         No. CV 02-03853 DT (RZx), 2003 WL 24141018
         (C.D. Cal. May 9, 2003) (Zarefsky, M.J.),
6        *aff'd in part, rev'd in part on other grounds*,
         No. CV 02-3853 DT(CTx), 2003 WL 24141019
7        (C.D. Cal. July 14, 2003)........................................................................11

8    *Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.*,
         408 F.3d 1142 (9th Cir. 2005)................................................................20
9

10   *Clarke v. American Commerce Nat'l Bank*,
         974 F.2d 127, 129 (9th Cir. 1992).........................................................22

11   *Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*,
         135 F.R.D. 179 (E.D. Cal. 1991)...........................................................20
12

13   *Long v. Landvest Corp.*
         No. Civ. A. 04-2025-CM-DJ
         2006 WL 897612 (D. Kan. Mar. 31, 2006)............................................18
14

15   *Rico v. Mitsubishi Motors Corp.*,
         116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004) ....................8, 19

16   *State Compensation Ins. Fund v. WPS, Inc. (State Fund)*,
         70 Cal.App.4th 644 (1999)......................................................................8, 19
17

18   *Waddell & Reed fin., Inc. v. Torchmark Corp.*,
         222 F.R.D. 450 (D. Kan. 2004)..............................................................18

19   *Weil v. Investment Indicators Mgm't, Inc.*,
         647 F.2d 18 (9th Cir. 1981)....................................................................20
20

21   Fed. R. Civ. P. 26...................................................................................16-17

22   Local Rule 37-1 .........................................................................................16

**II.    Plaintiffs' Authorities**
23

**Federal Cases**
24

25   *Gomez v. Vernon*,
         255 F3d 1118 (9th Cir. 2001)................................................33-34, 39
26

27   *In re Grand Jury Proceedings Involving Berkley & Co., Inc.*,
         466 F. Supp. 863 (D. Minn. 1979)..........................................................36

28   *Kenyatta v. Kelly*,

375 F. Supp. 1175 (E.D. Pa. 1974)...............................................36

Mayman v. Martin Marietta Corp.,
    886 F. Supp. 1243 (D. Md. 1995).......................................35-36

Nardone v. United States,
    308 U.S. 338 (1939)........................................................35

Sackman v. Ligget Group, Inc.,
    173 F.R.D. 358 (E.D.N.Y. 1997).........................................35

Shell Oil Refinery v. Shell Oil Co.,
    143 F.R.D. 105 (E.D.La. 1992)..........................................34

Smith v. Armour Pharmaceutical Co.,
    838 F. Supp. 1573 (S.D.Fla. 1993).....................................35-36

Spacone v. Burke (In re Truck-A-Way),
    300 B.R. 31 (E.D. Cal. 2003)............................................34

United States ex rel. Mayman v. Martin Marietta Corp.,
    886 F. Supp. 1243 (D. Md. 1995).......................................35

Upjohn Co. v. United States,
    449 U.S. 383 (1981)........................................................33

**State Cases**

Aerojet-General Corp. v. Transport Indemnity Ins.,
    18 Cal. App. 4th 996 (1993)..........................................39-40

Cooke v. Superior Court,
    147 Cal. Rptr. 915 (1978).................................................35

Rico v. Mitsubishi Motors Corp.,
    116 Cal. App. 4th 51 (2004).............................................34

State Compensation Ins. Fund. v. WPS, Inc.(State Fund),
    70 Cal. App. 4th 644 (1999).........................................35, 39

**Federal Statutes**

17 U.S.C. § 304(c)...........................................................22-23

**Rules**

37 C.F.R. § 201.10..............................................................22

{F0029699.1 }

**EXHIBIT 3**

v

20

Fed. R. Civ. Proc. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Miscellaneous**

159 *American Law Reports Federal* 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

3-24 *Bender Practice Guide: Fed. Pretrial Civ. Proc. in Cal.* § 24.40 . . . . . . . . . . . 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{F0029699.1 }

**EXHIBIT 3** vi

21

# **JOINT STIPULATION**

## I.    **DEFENDANTS' INTRODUCTORY STATEMENT**

After almost two years of litigation, and through a complete twist of fortune, Defendants discovered that Plaintiffs had secreted and improperly suppressed copies of a series of documents that were clearly requested and should have been produced or identified in discovery. Defendants neither know about nor sought out these documents. Rather they were sent to executives at defendant Warner Bros. Entertainment Inc. ("Warner Bros.") unsolicited and anonymously, by what appears to be a whistle-blower intent on exposing alleged misconduct engaged in by Plaintiffs' counsel. The documents are relevant to the subject matter of this litigation, but had neither been produced in response to any discovery request, nor identified on Plaintiff's court-ordered privilege logs.

The anonymously sent documents are a mix of privileged and non-privileged material. In accordance with procedures laid out under applicable case law they were initially reviewed for privilege by a legal representative of Warner Bros. Then, all copies of the documents were turned over to a neutral third party for preservation and identification, who thereafter provided a Bates numbered copy to Plaintiffs' counsel. Defendants have not maintained copies of any of the documents, nor have they used them in any manner in the case. Indeed, Defendants' counsel have never seen the documents.

Defendants thereafter served discovery on Plaintiffs and their counsel to compel production of the non-privileged material, and identification of the remainder, but Plaintiffs have refused to produce documents or provide a privilege log. Even though there is also no dispute concerning the relevance of the documents, Plaintiffs object to their identification and production *solely* on the ground that their existence (and improper withholding) was revealed to Defendants by a former employee of Plaintiffs' counsel without his approval. Plaintiffs have

{F0029699.1 }

1

**EXHIBIT 3**

**22**

1  steadfastly refused to produce even the admittedly *non-privileged* materials

2  contained in the documents sent to Warner Bros. And their refusal to provide a

3  privilege log contravenes this Court's Order of August 14, 2006, which required

4  Plaintiffs to "produce all privilege logs, including any revisions, by September 29,

5  2006."

6      Whatever the provenance of the documents at issue, there can be no dispute

7  that (i) Defendants had nothing to do with their anonymous whistle-blower who sent

8  them to Warner Bros., (ii) their identification and production were clearly required

9  under Defendants' document production requests, and (iii) under these

10  circumstances, there is no basis for their continuing to be withheld. Thus, by this

11  motion Defendants move to compel Plaintiffs: (1) to produce all of the non-

12  privileged Whistle-blower Documents; and (2) to produce all of the Whistle-blower

13  documents they now claim are privileged but that were not included on any

14  privilege log.[1]

15  **II.    PLAINTIFFS' INTRODUCTORY STATEMENT**

16      After attempting without success to obtain privileged information in

17  redundant motions to compel, Defendants seek by this motion to benefit from the

18  wholesale theft and disclosure of legal files stolen from the law offices of Plaintiffs'

19  counsel. Defendants' disingenuously refer to the documents as "Whistleblower

20  Documents" and purport to have engaged in a series of sanitizing protocols. Yet, as

21  Defendants well know, the documents in question, which they admit are mostly

22  privileged, were *stolen* by a former attorney at the firm of Plaintiffs' counsel and

23  turned over to Defendants during this litigation in shocking violation of the

24  confidential attorney-client relationship and all ethical standards.

25

26  [1] Concurrent with the filing of this motion, Defendants are filing a separate motion requesting additional discovery because, in part, Plaintiffs have waived the

27  attorney-client and work product privileges with respect to Defendants' affirmative defense that the parties entered into a binding settlement agreement that would

28  dispose of all of Plaintiffs' claims.

{F0029699.1 }

**EXHIBIT 3** 2
23

1    Incredibly, Defendants call this theft and unethical disclosure – a "twist of

2    fortune."  Without a shred of credible evidence, and based solely on speculation and

3    innuendo, they proceed to accuse Plaintiffs and their counsel of secreting documents

4    to prop up their distasteful attempt to gain an advantage from this theft in this

5    litigation.

6        Plaintiffs have properly responded to Defendants' requests for production;

7    produced the non-privileged responsive documents in their possession and listed the

8    privileged documents in a privilege log.  Plaintiffs' counsel even double checked not

9    only Plaintiffs' files, but the files of subpoenaed third parties he represents, against

10   the stolen documents, and produced or listed in a privilege log the four unaccounted

11   for documents so located, even though they are largely irrelevant to these actions.

12       Plaintiffs will demonstrate herein that Defendants failed to abide by even the

13   mild standards applicable to *inadvertently* disclosed documents when receiving

14   privileged legal files clearly stolen from Plaintiffs.   Instead of immediately

15   informing Plaintiffs of this outrageous theft and returning the documents to

16   Plaintiffs' counsel forthwith, Defendants in-house counsel took several days to sift

17   through the documents while devising a strategy to benefit from the theft.

18   **III.    DEFENDANTS' CONTENTIONS**

19   **A.     STATEMENT OF FACTS**

20       **1.    The Relevant Pleadings and Defenses in the Actions**

21       Jerome Siegel ("Siegel"), together with Joseph Shuster ("Shuster"), co-

22   authored the first comic book story featuring the original Superman character, which

23   was published in 1938 by Detective Comics, Inc. ("Detective"), the predecessor of

24   defendant DC Comics ("DC").  The 1976 Copyright Act enacted a right of authors

25   and their families to terminate previous grants of rights under copyright within a

26   specific statutory framework.  Plaintiffs – Siegel's widow and daughter ("Plaintiffs"

27   or "the Siegels") – have instituted two actions seeking to recapture Siegel's

28

{F0029699.1 }

EXHIBIT 3   3
24

1  copyright rights with respect to the Superman character under the termination

2  provisions contained in Section 304(c) of the Act, 17 U.S.C. § 304(c).

3      The first action, Case No. CV 04-8400 PA (RZx) (the "Superman Action"), is

4  based on notices purporting to terminate a number of Siegel's copyright grants to

5  Detective dating back to 1937 (the "Superman Termination Notices"). The

6  Superman Termination Notices relate only to Siegel's – but not his co-author

7  Shuster's – 50% participation in these grants. Because the Superman works at issue

8  in the first action are joint works, and the Shuster grants of rights have not been

9  terminated, the Superman Action is principally an action for an accounting. It does

10 not attempt to prevent Defendants' continued exercise of rights in Superman works,

11 but instead seeks only a declaration of the effectiveness of the termination notices

12 and an accounting for the Siegel allocable share of the profits from exploitation of

13 rights in Superman works created following the purported effective date of the

14 termination.

15     The second action, Case No. CV 04-8776 PA (RZx) (the "Superboy Action"),

16 is based on a separate notice of termination under section 304(c) relating only to

17 Superboy (the "Superboy Termination Notice"), and purporting to terminate grants

18 allegedly made only by Siegel in the Superboy works. The Superboy Action seeks a

19 declaration that Plaintiffs have recaptured all rights in Superboy, and further alleges

20 that after the purported effective date of the Superboy Termination Notice,

21 Defendants' "ongoing exploitation of the 'Superboy' mythology," including the

22 production and distribution of the *Smallville* television series, infringes Plaintiffs'

23 copyright rights in certain identified Superboy works.

24     Defendants have, *inter alia*, denied the effectiveness of Plaintiffs' termination

25 notices. They also have denied Plaintiffs' claim for an accounting in the Superman

26 Action, as well as their claims of copyright infringement in the Superboy Action.

27 Additionally, defendant DC has filed counterclaims in both actions seeking

28

{F0029699.1 }

**EXHIBIT 3**

4

1  enforcement of a prior settlement agreement between the parties.  If DC's

2  counterclaims are successful, all of Plaintiffs' claims in both cases are moot.

3      DC's settlement claim is based in large part on a letter sent by Plaintiffs' prior

4  counsel on October 19, 2001, which unequivocally states that "the Siegel Family has

5  accepted D.C. Comics' offer of October 16, 2001," and which outlines all of the

6  material terms of the parties' agreement.  (*See, e.g.*, Exhibit <u>A</u> to the Declaration of

7  Michael L. Bergman submitted herewith ("Bergman Decl."), ¶¶ 47-56.)  In reply to

8  DC's counterclaims, Plaintiffs have denied that the parties reached any valid

9  settlement agreement.  (*See, e.g., id.* Exh. <u>B</u>, ¶¶ 47-56.)  Moreover, Plaintiffs have

10  asserted, as an affirmative defense, that their lawyers did not have authority, or

11  exceeded the scope of their authority, with respect to the settlement being asserted

12  by Defendants.  In particular, Plaintiffs have taken the position that their counsel did

13  not have prior authority to send the October 19, 2001 letter as it was written.  (*Id.* ¶

14  183.)

15      Additionally, Plaintiffs have argued that a draft of the long-form agreement

16  prepared by Defendants and submitted to Plaintiffs on February 1, 2002 added to

17  and materially changed the terms of the settlement they had accepted, and thus

18  justified their decision to not consummate their agreement with Defendants.  (*Id.* ¶

19  53.)  Indeed, on May 9, 2002, plaintiff Joanne Siegel − without the assistance or

20  participation of counsel − wrote letters to Time Warner's chief executives stating

21  that Defendants' draft long-form agreement had "stabbed us in the back" and "just

22  like the Gestapo" sought to "strip us naked of our legal rights."  (*Id.* Exh. <u>A</u>, ¶ 55.)

23  Plaintiffs' prior counsel, Kevin Marks of the Gang Tyre firm, has testified that on or

24  about August 8, 2002, he received a telephone call from Plaintiffs' current counsel,

25  Marc Toberoff (who at the time was not yet Plaintiffs' lawyer) in which Mr.

26  Toberoff with another person made an offer to buy Plaintiffs' termination rights at

27  issue in the settlement and in this case for $15 million plus a "meaningful back end"

28  royalty percentage.  (*Id.* Exh. <u>C</u> at 168-69.)  Mr. Marks transmitted this offer to

{F0029699.1 }

**EXHIBIT 3**
5

1  Plaintiffs and it was not accepted. (*Id.* at 169-70.) But six weeks later, in

2  September of that year, Plaintiffs dismissed Mr. Marks as counsel, in a letter which

3  they copied to DC's president. (*Id.* Exh. A, ¶ 56.)

         2.  **Warner Bros.'s Receipt of the Whistle-blower Documents**

5         During the afternoon of June 28, 2006, Wayne Smith, Vice President, Senior

6  Litigation and Chief Patent Counsel of defendant Warner Bros. ("Smith"), received

7  a telephone call from John A. Schulman, General Counsel of Warner Bros., who

8  asked that Smith come to his office. (Declaration of Wayne M. Smith submitted

9  herewith ("Smith Decl."), ¶ 2.) Upon arriving at his office, Mr. Schulman advised

10  Smith that a set of documents (the "Whistle-blower Documents," referred to by

11  Smith in his declaration as the "Superman Documents") addressed to him and

12  apparently relating to the instant litigation had arrived from an anonymous source at

13  his office that day. (*Id.* ¶ 2.) Mr. Schulman informed Smith that the cover letter

14  contained with the documents indicated that other executives at Warner Bros. may

15  have received the same set of documents, and that he had called the offices of those

16  executives to see if they had received anything. (*Id.* ¶ 2.) He further advised Smith

17  that he had asked those executives to send the documents to his office without

18  reviewing them, and that one set of documents had already been delivered to him.

19  (*Id.* ¶ 2.) Mr. Schulman handed Smith the stack (approximately an inch high) of

20  Whistle-blower Documents that he had received and asked Smith to wait outside his

21  office while he completed a meeting, after which they would discuss them. (*Id.* ¶ 2.)

22  The stack did not include any envelope or packaging in which the documents may

23  have arrived. (*Id.* ¶ 2.) This was not unusual as it has been Smith's experience that

24  the practice of Mr. Schulman's office staff is to dispose of envelopes and packaging

25  upon opening mail. (*Id.* ¶ 2.)

26         While Smith was waiting, he looked at what might be characterized as the

27  "cover letter" that came with the Whistle-blower Documents. (*Id.* ¶ 3.) The cover

28  letter, which was not signed, alleged various types of ethical misconduct on the part

1  of the Plaintiffs' counsel in connection with this case. (*Id.* ¶ 3.)  The cover letter

2  also asserted ethical misconduct – violating the terms of a confidentiality agreement

3  by leaking settlement information to the press – in connection with another litigated

4  matter where Plaintiffs' counsel had also represented a party adverse to Warner

5  Bros. (*Id.* ¶ 3.)  The letter appeared designed to right wrongs caused by Plaintiffs'

6  counsel's misconduct. (*Id.* ¶ 3.)  The letter also referenced the documents enclosed,

7  providing an overview of their contents and their connection to Plaintiffs' counsel's

8  alleged wrongdoing. (*Id.* ¶ 3.)

9         Smith also thumbed through the Whistle-blower Documents contained with

10  the letter, but did not read any of them in detail. (*Id.* ¶ 3.)  Meanwhile, an assistant

11  for another Warner Bros. executive delivered what appeared to be another set of

12  Whistle-blower Documents to Mr. Schulman's office. (*Id.* ¶ 3.)  Smith did not

13  observe that any of the three sets of Whistle-blower Documents – (i) the set Mr.

14  Schulman handed to me; (ii) the other set in his office; or (iii) the set that was

15  delivered while Smith was waiting outside his office – was contained in an envelope

16  or other packaging. (*Id.* ¶ 3.)

17         Smith then met with Mr. Schulman. (*Id.* ¶ 4.)  Smith told Mr. Schulman that

18  based on the contents of the cover letter and my brief thumbing through the

19  documents, it appeared that certain of the documents in the package were privileged.

20  (*Id.* ¶ 4.)  Smith said that before he looked at the documents he wanted to review the

21  case law in the area to determine what level of review, if any, of the Whistle-blower

22  Documents was appropriate. (*Id.* ¶ 4.)  Mr. Schulman agreed with this approach,

23  gave Smith one set of the documents, retained the other two sets that he had

24  received, and advised me that he had only looked at the cover letter that came with

25  the documents and would not review the documents at all. (*Id.* ¶ 4.)

26         Smith the returned to his office with the set of documents. (*Id.* ¶ 5.)  He

27  initially went on the internet and performed a Google search relating to the issue of

28  what obligations, if any, governed the handling of the Whistle-blower Documents

1    Warner Bros. had received. (*Id.* ¶ 5.)   His initial search located an article from the

2    June 2006 Los Angeles Lawyer magazine entitled "On the Receiving End," by Kurt

3    L. Schmalz (*id.* Ex. <u>A</u>) which was posted on the Los Angeles County Bar

4    Association web site. (*Id.* ¶ 5.)   The article concerns the obligations of lawyers who

5    unwittingly receive privileged documents from opposing counsel's files and

6    discusses various California cases that have dealt with the issue, including the *Rico*

7    *v. Mitsubishi Motors Corporation* case pending before the California Supreme

8    Court. (*Id.* ¶ 5.)

9           Smith read the Schmalz article and then downloaded and studied the three

10   principal California cases it identifies: *Aerojet-General Corporation v. Transport*

11   *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

12   *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

13   decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

14   Cal.App.4th 51 (2004) (*review granted* June 9, 2004). (*Id.* ¶ 6.)   Based on his

15   review of the relevant California authorities, it appeared that a conservative

16   approach to handling the Whistle-blower Documents was to follow the procedure

17   laid out by the Court in *State Fund*, specifically:  (i) to review each document but to

18   cease the review once it became apparent that the document was privileged; (ii) to

19   contact opposing counsel and advise that the documents have been received; and

20   (iii) to refrain from using any information in the documents until there was either an

21   agreement with opposing counsel, or the court had determined the documents'

22   disposition. (*Id.* ¶ 6.)

23          Following his review of the law, Smith called Mr. Schulman and advised him

24   of the results of his research. (*Id.* ¶ 7.)  Smith said that he intended to review the

25   Whistle-blower Documents in accordance with *State Fund*. (*Id.* ¶ 7.)  At Mr.

26   Schulman's request, he also sent copies of the three key cases and the article to Mr.

27   Schulman's office. (*Id.* ¶ 7.)

28          That evening, Smith took the Whistle-blower Documents home and spent

{F0029699.1 }

1   approximately a half hour reviewing them.  (*Id.* ¶ 8.)  Certain of the documents –

2   such as executed agreements relating to Superman and correspondence between the

3   Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

4   privilege.  (*Id.* ¶ 8.)  As he was going through the documents, Smith placed them

5   into three piles: (i) "non-privileged," (ii) "privileged," and (iii) "?" (where either he

6   could not tell whether it was privileged or he believed the document covered subject

7   matter where privilege may have been waived in the case, as explained below).  (*Id.*

8   ¶ 8.)  In reviewing each document, where it first appeared to Smith that it was

9   entirely privileged, he ceased reading it, placed the document in the "privileged"

10  pile and did not look at it further.  (*Id.* ¶ 8.)  After going through the documents,

11  Smith placed a post-it note on the top of each pile (indicating "privileged," "non-

12  privileged," or "?"), and fastened each pile together.  (*Id.* ¶ 8.)  Smith did not look at

13  the documents further.  Because he did not conduct a detailed review of the Whistle-

14  blower Documents, and because of the passage of time, Smith does not recall their

15  specific contents.  (*Id.* ¶ 8.)  He does, however, recall generally the subject matter of

16  certain of the documents.  (*Id.* ¶ 8.)

17       The non-privileged pile was the second largest of the three.  (*Id.* ¶ 9.)  It

18  contained what appeared to be agreements between, *inter alia*, the Siegels and/or

19  Shusters and various entities, as well as correspondence concerning the interest in

20  Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

21  Michael Siegel.  (*Id.* ¶ 9.)  To Smith's knowledge, this last category of documents

22  has never been produced in the litigation.  (*Id.* ¶ 9.)

23       The "?" pile was the smallest.  (*Id.* ¶ 10.)  Smith believes that one or two of

24  the documents in this category potentially fall within the scope of a privilege waiver

25  based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

26  did not have authority to accept a settlement proposal made by Defendants.

27  Defendants position on this privilege waiver is the subject of a separate Motion to

28  Compel filed concurrently herewith.  (*Id.* ¶ 10.)

{F0029699.1 }

9

**EXHIBIT 3**

**30**

1    The pile of documents labeled "privileged" was the largest. (*Id.* ¶ 11.)

2    Even from the brief review made, it appeared to Smith that, with the

3    exception of the cover letter (which also addressed the other litigation involving

4    Plaintiffs' counsel), all of the Whistle-blower Documents related to the subject

5    matter of the instant litigation and were responsive to document requests the

6    Defendants had previously served on Plaintiffs. (*Id.* ¶ 12.) However, it did not

7    appear to Smith at the time that any of the "non-privileged" documents had been

8    produced in the litigation. (*Id.* ¶ 12.)   Moreover, at least some (and perhaps

9    virtually all) of the privileged documents, as well as those in the "?" pile, were, to

10   the best of Smith's knowledge, never identified in any privilege log served by the

11   Plaintiffs. (*Id.* ¶ 12.)

12   The next morning, June 29, 2006, Smith returned with the Whistle-blower

13   Documents to see Mr. Schulman in his office. (*Id.* ¶ 13.) Mr. Schulman and Smith

14   discussed having a neutral third party hold the documents pending either the parties'

15   agreement as to their disposition or order of the Court. (*Id.* ¶ 13.) They decided to

16   ask John Quinn, then with Arnold & Porter, and former president of the Los Angeles

17   County Bar Association, to act as the neutral based on his reputation and legal ethics

18   experience. (*Id.* ¶ 13.) He agreed and the following morning, June 30, 2006, the

19   three sets of the Whistle-blower Documents, including the set that Smith had

20   categorized, were handed over to Mr. Quinn. (*Id.* ¶ 13.) Out of an abundance of

21   caution Warner Bros. handed over *all* the documents to Mr. Quinn, not just those

22   that were clearly or potentially privileged. (*Id.* ¶ 13.) Further, Warner Bros. has not

23   shared the contents of the Whistle-blower Documents with any of the outside

24   counsel representing the Defendants in this action, nor has it used the contents of the

25   documents in the litigation. (*Id.* ¶ 13.)

26

27

28

{F0029699.1 }

3.    **Defendants' Attempts to Obtain from Plaintiffs and their Counsel the Whistle-blower Documents to Which they Are Entitled.**

On July 5, 2006, Quinn wrote to Plaintiffs' counsel and to Defendants' outside counsel to inform them of Warner Bros.'s receipt of the Whistle-blower Documents and what Warner Bros. had done with them. (Bergman Decl. Ex. D.) The letter further suggested the following procedure for proper review and handling of the Whistle-blower Documents; (1) the Documents would be Bates stamped by an independent court reporter, a court appointed individual, or independent copy service under supervision; (2) counsel for Plaintiffs and Defendants would contact the Court to advise it of the existence of the Documents and the circumstances of their receipt; (3) if the Court agreed, the Documents would be deposited with the Court, otherwise, they would remain in Quinn's possession; and (4) the Documents would be reviewed by the Court or other individual agreed upon to determine whether any of the documents are protected by any claim of privilege or work product. Non-privileged documents would then be released to Defendants' litigation counsel. (*Id.*)

On July 11, 2006 Quinn and Plaintiffs' counsel had a conversation to discuss the Whistle-blower Documents. (*Id.* Ex. E.) According to Quinn, during that conversation, Plaintiffs' counsel agreed to the protocol set forth in Quinn's letter of July 5, 2006 and further agreed to send written confirmation of such. (*Id.*) On July 13, 2006, having heard nothing from Plaintiffs' counsel, including in response to subsequent calls, Quinn wrote to Plaintiffs' counsel confirming agreement to the protocol outlined in the July 5, 2006 letter and informing Plaintiffs' counsel that Quinn would: (1) have all sets of the Whistle-blower Documents Bates stamped by a paralegal from Quinn's office and have copy sets made; (2) personally retain a copy of the Bates stamped Documents; and (3) send a set of the Bates stamped Whistle-blower Documents to Plaintiffs' counsel. (*Id.*)

{F0029699.1 }

**EXHIBIT 3**
11
32

1  Plaintiffs' counsel did not respond to the July 13, 2006 letter.  On July 18,

2  2006, Quinn wrote another letter to Plaintiffs' Counsel and enclosed a Bates

3  stamped set of the Whistle-blower Documents.  (*Id.* Ex. F)  In the letter Quinn also

4  stated that he assumed that the next step in the process would be for Plaintiffs'

5  Counsel to prepare and serve a privilege log on Defendants' counsel.  (*Id.*)

6  On July 19, 2006, Plaintiffs' counsel wrote in response to Quinn's July 13 and

7  July 18 letters.  (*Id.* Ex. G.)  In his letter, Plaintiffs' counsel took issue with Quinn's

8  view that Plaintiffs' counsel had agreed to the protocol set forth in Quinn's letter of

9  July 5, 2006.  (*Id.*)  Rather, Plaintiffs' counsel asserted that during the July 11

10  telephone conference he had suggested a different protocol, namely, that: "(1) an

11  independent shop copy and bate stamp the documents and provide [Quinn] with

12  only the total bate stamp number range; (2) all such documents including Warner

13  Bros.' 'originals' then be returned to [Plaintiffs' counsel's] office and (3) Plaintiffs'

14  counsel review the documents and provide Warner Bros. with a privilege log as

15  appropriate."  (*Id.*)

16  Plaintiffs' counsel further alleged that the Whistle-blower Documents were

17  stolen legal files from his office that were "in large part, clear attorney-client

18  communications."  (*Id.*)  Plaintiffs' counsel went on to allege that Smith, Warner

19  Bros.'s in-house counsel, should not have reviewed the Whistle-blower Documents

20  in any manner.  (*Id.*)  Finally, Plaintiffs' counsel requested that he be furnished with:

21  "(1) the date(s) each set of documents was received; (2) copies of all envelopes or

22  packages enclosing the documents; (3) the method by which the documents were

23  sent and, in the unlikely event the documents were delivered by hand, the name of

24  the messenger (and messenger service) logged at Warner Bros' security gate and (4)

25  any other pertinent information regarding Warner Bros' receipt of these

26  documents."  (*Id.*)  Plaintiffs' counsel further requested to review the original

27  documents and that all copies of the Whistle-blower Documents be returned to him.

28  (*Id.*)

{F0029699.1 }

EXHIBIT 3  12

33

On July 24, 2006, Quinn wrote back to Plaintiffs' counsel, expressing regret over the disagreement about the telephone conversation between them on July 11, 2006 but pointing out that the only area of disagreement that remained between them was over the fact that Quinn had retained a copy of the Whistle-blower Documents. (*Id*. Ex. <u>H</u>.) Quinn reiterated that no one had read the documents and that the only reason he had suggested that a copy be retained by him or by the Court was so that no claim could be made that the documents were incomplete. (*Id*.) Quinn further urged Plaintiffs' counsel to get the Court involved in a resolution of the matter. (*Id*.)

On July 24, 2006, Defendants' counsel in these actions wrote to Plaintiffs' counsel and requested that Plaintiffs (1) provide Defendants with copies of each of the Documents as to which Plaintiffs were not asserting any attorney/client or work product privilege and (2) provide Defendants with a detailed privilege log. (*Id*. Ex. <u>I</u>.) Plaintiffs' counsel did not comply with the requests. (*Id*. ¶ 10.) As a result, on August 7, 2006, Defendants served Defendants'/Counterclaimant's Third Set Of Requests For The Production Of Documents And Things (the "Request") (*Id*. Ex. <u>J</u>) and on August 10, 2006 Defendants served a subpoena *duces tecum* on Plaintiffs' counsel (the "Subpoena") (*Id*. Ex. <u>K</u>). .The Request consisted of one document request and the subpoena was identical in scope. (*Id*. Exs. <u>J</u>, <u>K</u>.) Defendants' instant motion requests the Court to order production in compliance with these two discovery devices, both of which are set forth below along with the objections asserted by Plaintiffs and counsel.

**B.     THE DOCUMENT PRODUCTION REQUESTS DEFENDANTS ASK THE COURT TO ENFORCE**

**1.     The Request and Plaintiffs' Response**

**Request No. 66**

All Writings referenced in the July 5, 2006 letter from John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit A), and which were attached to or enclosed with the July 18, 2006 letter from

{F0029699.1 }

**EXHIBIT 3**

13

1  John J. Quinn, Esq. to Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit B).

2

(*Id*. Ex. J at 3.)

3

4  On September 6, 2006, Plaintiffs served their written objection to the Request

5  (the "Request Objection"), which asserted boilerplate general objections and, in

6  response to the specific document request read:

**Response to Request No. 66**

7

8  Plaintiffs object to this Request on the grounds that it is vague and ambiguous as to the phrase "all Writings referenced." Plaintiffs further object to this Request on the grounds that it is overbroad, burdensome and oppressive. Plaintiffs further object to this Request because it seeks documents or communications clearly protected by the attorney/client privilege and the attorney work product doctrine. Plaintiffs further object to this Request on the ground that Defendants are seeking to impermissibly gain an advantage in this litigation from their illicit receipt of clearly confidential and privileged documents clearly *stolen* from the files of Plaintiffs' counsel's law offices. In an effort to capitalize on this theft, Defendants improperly reviewed these *stolen files* well before notifying Plaintiffs' counsel of the theft or returning the *stolen files* to Plaintiffs' counsel. Defendants also improperly retained a copy of the *stolen files*. But for Defendants' receipt of these *stolen files*, Defendants would not have issued this Request.

9

10

11

12

13

14

15

16

17  (*Id*. Ex. L at 5.)

18  **2.    The Subpoena and Plaintiffs' Response**

19  The Subpoena to Plaintiffs' counsel contained the identical request as that set

20  forth in Document Request 66 served on Plaintiffs:

21  All Writings referenced in the July 5, 2006 letter from John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit A), and which were attached to or enclosed with the July 18, 2006 letter from John J. Quinn, Esq. to Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit B).

22

23

24

(*Id*. Ex. K.)

25

26  On August 23, 2006, Plaintiffs' counsel served a written objection (the

27  "Subpoena Objection" to the Subpoena. The Subpoena Objection was virtually

28

1    identical to the Request Objection, with the same boilerplate general objections and

2    then the following specific response to the Request:

3            Toberoff objects to this Subpoena on the grounds that it is
         vague and ambiguous as to the phrase "all writings referenced."

4        Toberoff further objects to this Subpoena on the grounds that it is
         overbroad, burdensome and oppressive. Toberoff further objects

5        to this Subpoena because it seeks documents or communications
         clearly protected by the attorney/client privilege and the attorney

6        work product doctrine. Toberoff further objects on the ground
         that Defendants are seeking to impermissibly capitalize on their

7        receipt of clearly confidential and privileged documents stolen
         from Toberoff's law offices, which Defendants improperly

8        reviewed before notifying Toberoff of the issue. But for the
         receipt of the stolen documents, Defendants would not have issued

9        this subpoena.

10   (*Id.* Ex. <u>M</u>.)

11   **C.    PLAINTIFFS' OBLIGATION AND FAILURE TO SERVE
        <u>REQUIRED AND COURT ORDERED PRIVILEGE LOGS</u>**

12

13        While the parties attempted to work out their dispute with respect to the

14   Whistle-blower documents, this Court issued an August 14, 2006 order on a motion

15   by Defendants to compel Plaintiff to produce documents not identified on a

16   privilege log. (*Id.* Ex. <u>N</u>.) In that Order, the Court held that "Plaintiff shall produce

17   all privilege logs, including any revisions, by September 29, 2006." (*Id.*)

18   Pursuant to the Court's Order of August 14, 2006, on September 29, 2006, Plaintiffs

19   produced a 46-page privilege log. (*Id.* Ex. <u>P</u>) However, to the best of Defendants'

20   knowledge, the vast bulk of the Whistle-blower Documents are not identified on the

21   privilege log. (Smith Decl. ¶ 12).

22        On September 28, 2006, the day before the Court-ordered deadline to produce

23   "all privilege logs," Defendants' counsel wrote a letter to Plaintiffs' counsel

24   pointing out that, notwithstanding Plaintiffs' counsel's invocation of the attorney-

25   client and work product privileges in the Subpoena Objection, he had failed to

26   produce a privilege log. (Bergman Decl. Ex. <u>Q</u>.) The September 28 letter requested

27   that Plaintiffs' counsel produce a privilege log. (*Id.*) To date, Plaintiffs' counsel

28   has failed to do so. (*Id.* ¶ 16.)

{F0029699.1 }

15
**EXHIBIT 3**

**D.    THE PARTIES' MEET AND CONFER EFFORTS**

Pursuant to Local Rule 37-1, on October 13, 2006, Defendants' counsel sent Plaintiffs' counsel a letter setting forth their position on the issues presented in this motion and outlining the relief sought in an attempt to avoid the need for Court intervention. (Bergman Decl. Exh. Q)  Counsel subsequently conducted a conference by telephone on October 26, 2006 in which Plaintiffs' counsel steadfastly refused to produce any of the non-privileged Whistle-blower Documents and further refused to produce a privilege log.  Plaintiffs' counsel's justification for this position was that the documents were stolen.  (*Id.* ¶ 19).  Plaintiffs' counsel has not swayed from his mantra that since the Whistle-blower documents were "stolen" from his office, neither he nor Plaintiffs have any obligation to produce them or identify them on a privilege log, even to the extent that the documents are neither privileged nor previously produced, notwithstanding their responsiveness to outstanding requests.  (*Id.* ¶ 19).  Thus, the parties have not been able to resolve the dispute.  (*Id.* ¶ 19.)

**E.    ARGUMENT**

**1.    Plaintiffs Should be Compelled to Produce the Non-Privileged Whistle-blower Documents**

There is no serious dispute here that all of the Whistle-blower Documents sought by the Request and by the Subpoena are within the scope of discovery as set forth by Rule 26 of the Federal Rules of Civil Procedure, which sets a broad standard for what is discoverable:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

{F0029699.1 }

16

**EXHIBIT 3**

1    Fed. R. Civ. P. 26(b)(1).  Although Rule 26(b)(2) sets forth limitations on discovery

2    that may be ordered following motion practice, Plaintiffs have sought no protective

3    order or other relief with regard to the discoverability of the testimony at issue.

4    Moreover, although Plaintiffs and their counsel make passing reference to relevance

5    in boilerplate objections, neither the specific Request Objection nor the specific

6    Subpoena Objection asserts any relevance objection.  (Bergman Decl.; Exs. L, M.)

7    Any such objection would be frivolous as the documents at issue are unquestionably

8    related to these litigations are thus "likely to lead to the discovery of admissible

9    evidence."  (Smith Decl. ¶¶ 2, 8-12.)

10         Nor is there any dispute that some of the Whistle-blower Documents

11   unquestionably are not protected by any privilege.  (*Id.* ¶¶ 8-9.)  Indeed, Plaintiffs'

12   counsel conceded this in his letter of July 19, 2006, stating only that the Whistle-

13   blower Documents were in "*large part*, clear attorney-client communications."

14   (Bergman Decl. Ex. G (emphasis added).)  Notably, he did not say that "all" of the

15   documents were privileged.  Moreover, during the meet and confer he did not take

16   the position that all of the Whistle-blower Documents were privileged.  (*Id.* ¶ 19.)

17            a.    **Plaintiffs' Objections are Without Merit**

18         Plaintiffs' and their counsel's asserted objections as to non-privileged

19   documents are without merit.  They are: (1) the Subpoena and the Request are

20   "vague and ambiguous" as they relate to the phrase "all writings referenced;" (2) the

21   Subpoena and the Request are "overbroad, burdensome and oppressive;" and (3)

22   Defendants are seeking to "gain an advantage in this litigation from [Defendants']

23   illicit receipt of clearly confidential and privileged documents clearly *stolen* from

24   the files of Plaintiffs' counsel's law offices."  Plaintiffs and their counsel go on to

25   argue that "but for" Defendants' receipt of the Whistle-blower Documents,

26   Defendants would never have issued either the Request or the Subpoena.  (Bergman

27   Decl. Exs. L, M.)

28         Each of these objections if entirely without merit.

{F0029699.1 }

**EXHIBIT 3** 17
38

### 1) There Is No Ambiguity As To The Documents Responsive To The Request And To the Subpoena.

The Request and the Subpoena seek production of "all writings" that are: (1) referenced in the July 5, 2006 from Quinn to Plaintiffs' counsel and (2) copies of which were attached to or enclosed with the July 18, 2006 letter from Quinn to Plaintiffs' counsel. (Bergman Decl. Exs. J, K.)  In other words, Defendants seek production of the Whistle-blower Documents.  Plaintiffs cannot seriously contend that they do not understand what documents Defendants seek through the Request and the Subpoena.

### 2) Plaintiffs And Their Counsel's Objections On The Basis Of Overbreadth, Burdensomeness, And Oppressiveness Are Without Merit.

"[P]arties asserting undue burden . . . have the burden to support their objection, by showing not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery. This typically requires providing an affidavit or other evidentiary proof of the expense or time involved in responding to the discovery request." *Long v. Landvest Corp.*, No. Civ. A. 04-2025-CM-DJ, 2006 WL 897612, *5 (D. Kan. Mar. 31, 2006).[2]

Here, production of the requested documents – the Whistle-blower Documents – would cause no burden to Plaintiffs or their counsel, let alone an unreasonable burden in light of the benefits to be secured from the discovery.  The Whistle-blower documents are not voluminous and have all been already collected, copied, and numbered.  (Smith Decl. ¶¶ 8-13; Bergman Decl. Exs. E, F, H, I.) Literally, all that would need to happen is for the Court to order Mr. Quinn to turn over the Whistle-blower Documents to Defendants.  No burden or oppression exists to Plaintiffs or anyone else in producing the responsive documents.

---

[2] *See also, Waddell & Reed fin., Inc. v. Torchmark Corp.*, 222 F.R.D. 450, 454 (D. Kan. 2004).

**EXHIBIT 3**
**39**
18

3)  **The Circumstances Of The Whistle-blower Documents' Delivery Does Not Render The Documents Immune From Discovery.**

The only substance of Plaintiffs' and their counsel's final non-privilege objection to producing the Whistle-blower Documents is that, because the Documents were allegedly "stolen" from Plaintiffs' counsel's office, the documents should be immune to discovery. As Plaintiffs and their counsel see it, "but for" this allegedly illicit taking of Documents by an unidentified former employee of Plaintiffs' counsel, Defendants would never have known about the existence of the Whistle-blower Documents and thus never would have served the Request and the Subpoena. This perverse reasoning is unsupported by the law.

While it is unfortunate that an apparent former employee of Plaintiffs' counsel felt the need to "blow the whistle" on his or her former employer by disclosing documents that, up to that point, had been hidden and not disclosed by Plaintiffs' counsel, this has no effect on whether the Whistle-blower Documents are discoverable. Indeed, none of the leading cases in California that discuss documents produced due to the inadvertence of counsel, <u>ever</u> hold or even suggest that such documents are *per se* not discoverable due to the circumstances of their production. *Aerojet-General Corp. v. Transport Indem. Ins.*, 18 Cal.App.4th 996 (1993), *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal.App.4th 644 (1999), and *Rico v. Mitsubishi Motors Corp.*, 116 Cal.App.4th 51 (2004) (*review granted* June 9, 2004).

In fact, the case law holds quite the opposite. "If the underlying information which respondents sought to prevent plaintiffs from using is not privileged, and if such information was revealed to plaintiffs' counsel through no fault or misconduct of his own, plaintiffs and their counsel were entitled to use it." *Aerojet*, 18 Cal.App.4th at 1005. That is the case here with respect to the non-privileged Whistle-blower Documents – the documents are not privileged and, notwithstanding Plaintiffs' baseless assertion of "illicit receipt," they were revealed to Warner Bros. through no fault or misconduct of its own. The documents literally appeared at

1   Warner Bros.'s doorstep, and were forwarded to in-house counsel immediately upon

2   receipt.  (Smith Decl. ¶¶ 2-3).  The materials were handled in accordance with

3   California law and no outside counsel for Defendants have ever seen the documents.

4   (*Id.* ¶¶ 4-13).

5          Moreover, as troubling as the apparent theft of documents from Plaintiffs'

6   counsel's office, is the fact that the Whistle-blower Documents were clearly

7   responsive to previously served document requests and that they were neither

8   produced nor identified on a privilege log.  (*Id.* ¶ 8-12.)  Now that these clearly

9   relevant and responsive documents have come to light, through no fault of

10  Defendants, to permit Plaintiffs to continue to withhold the documents would be a

11  perverse result.  Plaintiffs would thereby be empowered to shield from discovery

12  clearly discoverable documents that have been heretofore improperly withheld,

13  whose existence has been secreted, and which were never identified in a requested

14  and court ordered privilege log.  In sum, the circumstances of the Whistle-blower

15  Documents coming to Defendants' attention cannot be a bar to their production.

16         **2.      Plaintiffs Should Be Compelled to Produce
                      Any of the Whistle-blower Documents That**

17                   **Have Not Been Identified on Any Privilege Log**

18         "As with all evidentiary privileges, the burden of proving that the attorney-

19  client privilege applies rests not with the party contesting the privilege, but with the

20  party asserting it."  *Weil v. Investment Indicators Mgm't, Inc.*, 647 F.2d 18, 25 (9th

21  Cir. 1981).  As the Ninth Circuit has held, a privilege log is an absolute requirement

22  for the proper assertion of a privilege, including the attorney-client privilege and

23  work product doctrine; mere boilerplate objections or blanket refusals incorporated

24  into discovery responses are insufficient to assert a privilege.  *Burlington Northern*

25  *& Santa Fe Railway Co. v. United States Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir.

26  2005).  *See also Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*, 135 F.R.D.

27  179, 184-85 (E.D. Cal. 1991) (failure to "comply with a well settled requirement of

28

{F0029699.1 }

1  specifically identifying the evidence to which a privilege applies" constitutes a

2  waiver of the attorney-client privilege).

3      Plaintiffs and their counsel have stubbornly refused to produce a privilege log

4  of the Whistle-blower documents, not withstanding several requests both in writing

5  and on the telephone. (Bergman Decl. ¶¶ 16-19 & Exs. O-Q.)  Making matters

6  worse in this instance is the fact that Plaintiffs are repeat offenders – they have

7  already been found on at least one occasion to have failed to fulfill their obligation

8  to produce a privilege log.  As a result, this Court ordered Plaintiffs on August 14,

9  2007 to produce "all privilege logs, including any revisions, by September 29,

10  2006." (*Id.* Ex. N.)  Notwithstanding the obligation imposed by this standing order

11  of the Court, Plaintiffs have continued to refuse to produce a privilege log for the

12  Whistle-blower Documents.  What's more, to the best of Warner Bros.'s in-house

13  counsel's memory, the vast majority of potentially privileged documents in the stack

14  of Whistle-blower Documents are not identified on any of Plaintiffs' privilege log.

15  (Smith Decl. ¶ 12.)  Moreover, neither in response to correspondence or in

16  connection with the meet and confer process on this motion have Plaintiffs or their

17  counsel ever pointed to any entry in the existing privilege log that identifies any of

18  the Whistle-blower Documents.  (*Id.* ¶ 12; Bergman Decl. ¶ 16-19 & Exs. O-Q.)

19      At this point, because Plaintiffs and their counsel have purposely refused to

20  fulfill their obligation to provide a privilege log for the Whistle-blower Documents,

21  and because they have violated this Court's Order of August 14, 2006, they should

22  be deemed to have waived the privilege with respect to the Whistle-blower

23  Documents and should be ordered to produce such documents.[3]

24

25  [3] If the Court is unwilling to order a blanket waiver of privilege as a result of Plaintiffs' failure to list the documents at issue on a privilege log and resulting
26  violation of its August 14, 2006 order, Defendants respectfully request that the Court conduct an in camera review of the remaining documents to determine which,
27  if any, may be privileged.  This task cannot be performed by Defendants' counsel in view of the measures taken by Defendants to prevent disclosure without prior
28  approval of the Court.

[F0029699.1 ]

# IV.    PLAINTIFFS' CONTENTIONS

## A.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' Terminations regarding "Superman" and "Superboy" complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated by the Register of Copyrights.  Shortly after receiving the "Superman" Termination notices, the general counsel of Defendant Warner Bros. Entertainment Inc. ("Warner") and the President of Defendant DC, a wholly owned Warner subsidiary, each acknowledged the validity of the "Superman" Termination, and the parties began negotiations for Defendants' to license or purchase Plaintiffs' recaptured copyrights. (*See* Plaintiffs' First Amended Supplemental Complaint ("FASC"), ¶¶ 46-48). When these negotiations broke down due to Defendants' excessive demands, Defendants reversed their prior admissions two years earlier, and contested Plaintiffs' "Superman" Termination on April 15, 1999, one day before it became effective.

---

As established in the Smith Declaration, the scope of review is quite narrow as it would encompass a review of an estimated 85-150 pages of possibly privileged documents.  Moreover, because of Plaintiffs' purposeful failure to disclose the existence of these discoverable Whistle-blower Documents on a privilege log, the integrity of this case risks being compromised.  This fact, combined with the fact that, at least with respect to the Documents in the "?" pile segregated by Smith, by separate motion brought concurrently, the enforcement of a settlement agreement is an issue as to whether Plaintiffs have waived the privilege as to a subject matter pertaining to one of Defendants' main defenses in the cases, makes in camera review of the Whistle-blower Documents crucial to the ends of justice. If, after in camera inspection of the Whistle-blower Documents Plaintiffs claim are privileged, the Court finds that there are documents therein that are either not privileged or where such privilege has been waived, Defendants respectfully submit that Plaintiffs and their counsel should be ordered to produce such documents.

Such a narrow review is supported by the law of this Circuit. "A district court may conduct an in camera inspection of alleged confidential communications to determine whether the attorney-client privilege applies." *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  While Defendants are mindful that in camera review of documents is generally disfavored, it is permitted where the party seeking such review has submitted "detailed affidavits and other evidence narrowing the scope of the review to the extent reasonably possible." *American Dental Ass'n v. Korrhami*, No. CV 02-03853 DT (RZx), 2003 WL 24141018, *21 (C.D. Cal. May 9, 2003) (Zarefsky, M.J.), *aff'd in part, rev'd in part on other grounds*, No. CV 02-3853 DT(CTx), 2003 WL 24141019, (C.D. Cal. July 14, 2003).

{F0029699.1}

EXHIBIT 3    22
43

1    Defendants thereafter also claimed that the "Superboy" Termination was

2  somehow invalid.  On October 8, 2004, Plaintiffs filed their action for declaratory

3  relief and an accounting regarding the "Superman" Termination; and on October 22,

4  2004 filed their action for declaratory relief and copyright infringement regarding

5  the "Superboy" Termination.  The two actions were consolidated for purposes of

6  discovery only.

7    Plaintiffs moved for partial summary adjudication on February 15, 2006 to

8  establish that Plaintiffs had successfully recaptured and own Siegel's "Superboy"

9  copyrights pursuant to 17 U.S.C. §304(c).  Defendants cross-moved for summary

10  judgment claiming the "Superboy" Termination was invalid based largely on the

11  same purported claims and defenses they asserted with respect to "Superman."  On

12  March 23, 2006, the Court *granted* Plaintiffs' motion in its entirety and *denied*

13  Defendants' motion in its entirety.  Defendants' subsequently moved to have this

14  order certified for appeal, which motion was also *denied* by the Court.

15    Following the Court's ruling against them, Defendants, under the aegis of

16  discovery, embarked on a very aggressive campaign marked by a series of

17  exaggerated assaults on Plaintiffs' *attorney-client privilege and work product*, and

18  by numerous unwarranted motions to compel.  This motion is but one of a series of

19  Defendants' overreaching motions. Defendants filed a motion to compel regarding

20  the communications between Plaintiffs and their former counsel regarding the

21  termination of their services by Plaintiffs in September, 2002.  This motion was

22  denied by the Court on August 18, 2006. *See* Declaration of Marc Toberoff in

23  Opposition to Defendants Motion to Compel Whistle-Blower Documents ("Toberoff

24  Decl.") Ex. A.  Defendants moved to have this order reconsidered; this too was

25  denied by the Court on September 25, 2006.  Toberoff Decl., Ex. B. Defendants then

26  sought to retake Laura Siegel Larson and Joanne Siegel's depositions on the ground

27  they had been hindered in the deposition by Plaintiffs' counsel's assertion of

28  privilege regarding communications concerning the purported October, 2001

{F0029699.1 }

**EXHIBIT 3**
23

1    settlement agreement.  The Court denied this motion on November 7, 2006.

2    Toberoff Decl., Ex. C.

3         Undeterred, Defendants now seek to exploit to their advantage *legal files*

4    *stolen from Plaintiffs' counsel.*

**1.    Documents Stolen From The Office Of Plaintiffs'**
**Counsel**

7         On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a

8    cryptic letter from John J. Quinn ("Quinn"), an attorney with the firm, Arnold and

9    Porter LLP, notifying Toberoff on behalf of Defendants in the vaguest of terms that

10   Defendants had received three sets of documents (delivered to Warner's General

11   Counsel, John Schulman and two Warner executives, respectively) from an

12   unidentified source and that these documents had been reviewed by Wayne Smith,

13   Warner's Senior Litigation Counsel and segregated into three piles: "'Privileged,'

14   'Non-privileged' and '?.'"  *See* Declaration of Michael Bergman in Support of

15   Defendants' Motion to Compel Whistle-Blower Documents ("Bergman Decl."), Ex.

16   D.  The letter further stated that Quinn was in possession of the documents and

17   suggested a "protocol" for dealing with them.  *Id.*  Curiously the letter did not

18   identify what it was referring to and, in particular, omitted that the documents had

19   obviously been *stolen* from Toberoff's law firm. *Id.*   Nor did the letter offer to

20   return the documents to Toberoff, as is required, and stated instead "I will keep the

21   documents in my possession and allow access to them only upon your joint or the

22   Court's instructions." *Id.*

23         The next day, Defendants' counsel Michael Bergman ("Bergman") sent an *ex*

24   *parte* letter to this Court regarding the documents, without notifying Plaintiffs

25   beforehand.  Toberoff Decl., Ex. D.  Bergman's letter *also omitted* that the

26   documents in question, reviewed by Defendants' counsel, Wayne Smith, had

27   obviously been lifted from the office of Plaintiffs' counsel.  The Court rejected this

28   *ex parte* letter by minute order dated July 6, 2006.  *Id., Ex. E.*

{F0029699.1 }

**EXHIBIT 3**

24

1    On July 11, 2006, Quinn and Toberoff spoke telephonically regarding the

2    stolen documents. *Id.* ¶ 8. Toberoff inquired as to the nature of the documents

3    referred to in Quinn's July 5, 2006 letter and was informed *for the first time* that the

4    documents apparently came from Toberoff's own legal files. *Id.* Toberoff thereupon

5    demanded that the documents be returned immediately and rejected the "protocol"

6    outlined in the July 5 letter as geared to exploiting the documents in this litigation.

7    *Id.* Toberoff suggested instead that an independent shop copy and bate stamp all the

8    documents; that Arnold and Porter be provided with this bates stamp number range,

9    but not retain the stolen documents and that *all* of the documents, including the

10    'originals,' withheld by Warner Bros., be returned to Plaintiffs' counsel

11    immediately. *Id.* On July 13, by letter, Quinn announced, contrary to the wishes of

12    Plaintiffs' counsel, that he would have the documents bates stamped by his office,

13    send a copy of the bates stamped documents to Plaintiffs' counsel, and *retain the*

14    *originals* and a bates stamped set. Bergman Decl., Ex. E. On July 18, 2006, Quinn

15    delivered three sets of the stolen documents that had been bates stamped, but kept

16    the originals. Toberoff Decl. ¶ 10.

17    By letter dated July 19, 2006, Toberoff reiterated Plaintiffs' demand and

18    further requested that Warner Bros. furnish:

19

20    "(1) the date(s) each set of documents was received; (2) copies of all
     envelopes or packages enclosing the documents; (3) the method by
21    which the documents were sent and, in the unlikely event the
     documents were delivered by hand, the name of the messenger (and
22    messenger service) logged at Warner Bros. security gate and (4) any
     other pertinent information regarding Warner Bros.' receipt of these
23    documents. We would also like to inspect the "original" documents
     and enclosing envelopes or packages as received by Warner Bros."

24    *Id.*, Ex. F.

25    In response to Plaintiffs' July 19 letter, Bergman insisted by letter dated July

26    20, 2006 that Quinn retain possession of the three sets of the stolen documents (even

27    though Quinn had already done so on Warner's behalf), but Bergman provided no

28    information regarding Warner's receipt of the documents. *Id.*, Ex. G. Quinn

{F0029699.1 }

1   responded to Plaintiffs' July 19 letter by letter dated July 24, 2006 wherein Quinn

2   again insisted he would keep the original stolen documents pending further

3   instructions from Defendants or a court order, but again the information Plaintiffs

4   had requested regarding Warner's receipt of the stolen documents was not provided.

5   *Id.*, Ex. H.

6         On July 24, 2006, Defendants demanded that Plaintiffs specifically account to

7   them for each of the stolen documents by production and/or a privilege log keyed to

8   the stolen documents retained by Quinn.  Again, despite Plaintiffs' request, no

9   information was provided regarding the circumstances under which Warner received

10  the stolen documents.  Bergman Decl., Ex. I.

11        By letter dated July 26, 2007, Toberoff reiterated Plaintiffs' July 19 demand

12  for information regarding Warner's receipt of the stolen documents which

13  Defendants continued to ignore.   Toberoff Decl., Ex. I.  Defendants finally

14  responded by letter dated July 27, 2006, repeating merely that three apparently

15  identical sets of documents addressed to three different high placed Warner

16  executives had mysteriously arrived in envelopes on June 28, 2006; but that Warner

17  did not retain any of the three envelopes (or a copy of any envelopes) and that

18  Warner had no mailroom, security or executive office records, notes or logs of the

19  three substantial packages ever being signed in or received.  *Id.*, Ex. J.  In short,

20  Warner claimed to have no information whatsoever, concerning the purportedly

21  anonymous receipt by three high ranking Warner executives of substantial packages

22  containing numerous confidential documents relating to this lawsuit.  All such

23  information commonly kept by Studio security, mailrooms and executive offices

24  had mysteriously vanished.

25        On August 7, 2006, Defendants served a Third Set of Requests for Production

26  seeking the stolen documents.  Bergman Decl., Ex. J.   Plaintiffs objected to this

27  document request on September 6, 2006.  Bergman Decl., Ex. L.  On August 10,

28  2006 Defendants served a subpoena duces tecum on Plaintiffs' counsel also seeking

[F0029699.1 ]

1  the stolen documents.  Bergman Decl., Ex. K.   On August 23, 2006, Plaintiffs'

2  counsel served written objections to the subpoena.   Bergman Decl., Ex. M.

**2.    Document Production And Privilege Logs**

4      Plaintiffs produced documents on September 29, 2005 and supplemented this

5  production on October 6, 2006, November 6, 2006 and November 17, 2006.  *Id.*, Ex.

6  K. Plaintiffs produced a privilege log on July 20, 2006 and provided supplemental

7  privilege logs on September 29, 2006. *Id.*, Ex. L, M.

8      Documents were produced by third parties Jean Peavy and Warren Peary (the

9  "Shusters") on July 18, August 11 and August 14, 2006 in response to Defendants'

10  subpoena.  *Id.*, ¶ 19.  The Shusters served a privilege log on August 11, 2006.  *Id.*

11  Shusters served a supplemental privilege log on October 16, 2006. *Id.*, Ex. N.  Third

12  party IPW, LLC produced documents on November 15, 2006 in response to

13  Defendants' subpoena.  *Id.*, ¶ 21.  Third party Pacific Pictures Corporation produced

14  documents on November 15, 2006 in response to Defendants' subpoena.  *Id.*   Third

15  party Don Bulson produced a privilege log on October 23, 2006 in response to

16  Defendants' subpoena.  *Id.*, Ex. O.

17  **B.    ARGUMENT**

18      **1.    Plaintiffs Have Properly Responded To Defendants' Requests For**

19          **Production, Produced Non-Privileged Responsive Documents In**

20          **Their Possession And Listed Privileged Documents In A Privilege**

21          **Log**

22      Plaintiffs have readily complied with Defendants' discovery requests. As

23  stated above, Plaintiffs have produced over 2000 pages of documents in this action

24  on September 29, 2005, October 6, 2006, November 6, 2006 and November 17,

25  2006, collectively. *Id.*, Ex. K.  Plaintiffs also produced a 25 page privilege log with

26  342 entries on July 20, 2006, properly setting forth with respect to each

27  communication, the date, sender, recipient, the nature of the privilege claimed, the

28  document type and present location of the document. *Id.*, Ex. L.

{F0029699.1 }

27

**EXHIBIT 3**

**48**

1    Defendants filed a motion to compel claiming, in part, that Plaintiffs' July 20,

2    2006 privilege log was insufficient.  This motion was denied in its entirety by the

3    Court on August 18, 2006. *Id.*, Ex. A. The Court found that the format used by

4    Plaintiffs was sufficient and thus Plaintiffs had adequately asserted the attorney-

5    client privilege and work product doctrine. [4]  *Id.* at 5.  Defendants moved to have

6    this order reconsidered, which was denied by the Court on September 25, 2006. *Id.*,

7    Ex. B.  Thereafter, Plaintiffs provided supplemental privilege logs on September 29,

8    2006, containing 585 entries.  *Id.*, Ex. M.

9        Plaintiffs Laura Siegel Larson and Joanne Siegel had their depositions taken

10   in early August, 2006.  Defendants moved to retake both of these depositions on the

11   ground they had been hindered by Plaintiffs' counsel's assertion of privilege

12   regarding communications about the purported October, 2001 settlement agreement.

13   The Court denied this motion on November 7, 2006. *Id.*, Ex. C.

14              **2.    Defendants Improperly Seek To Gain An Advantage**

15                    **Through Their Illicit Receipt Of Documents Stolen From**

16                    **The Offices Of Plaintiffs' Counsel**

17       When one peels away the layers of their motion, Defendants impermissibly

18   seek to gain an advantage in this litigation from their receipt of documents *stolen*

19   *from the legal files of Plaintiffs' counsel*.  Defendants call this shocking theft a

20   "twist of fortune."  This is all quite improper, if not reprehensible.  To make matters

21   much worse, the majority of the stolen documents, as admitted by Defendants, are

22

23

---

[4] Rather than cite to and fairly describe the Court's August 18, 2006 order, Defendants misleadingly exaggerate, out of context, the Court's August 14 minute order regarding Plaintiffs' privilege log, which was modified by the Court's August 18 order. (*See* Sec. III. Plaintiffs' Contentions at 15:12-15).  Plaintiffs were not "ordered" to produce a supplemental log as Defendants proclaim; they informed the Court at the hearing on Defendants' motion that given the long background history of this case Plaintiffs' were in the process of supplementing their log to cover additional time periods.  The Court merely set a deadline for Plaintiffs to submit their supplemental log.  Toberoff Decl., Ex. A.

{F0029699.1}

28

**EXHIBIT 3**

**49**

1  classic attorney-client privileged communications.   Declaration of Wayne Smith

2  ("Smith Decl."), ¶ 11.

3        Both parties are bound by FRCP 34 with respect to the discovery and

4  production of documents responsive to each other's requests and the service of

5  privilege logs listing documents withheld by either on the basis of privilege.

6  However, Defendants, by their motion, claim special benefits and advantages due to

7  a theft of documents stolen from the law offices of Plaintiffs' counsel.  At

8  Defendants' direction the stolen documents were both retained and bates numbered

9  in order to force Plaintiffs to jump through hoops and satisfy tests non-applicable to

10  Defendants or any other parties to a lawsuit under the FRCP or Local Rules.

11  Perversely, Plaintiffs, who were victimized and prejudiced by this theft, covert

12  disclosure and Defendants' *review* of privileged communications, are the target of

13  Defendants' motion.

14        Defendants use terms like "Whistle-blower Documents," "neutral" attorneys

15  (retained and compensated by them) and purportedly sanitized protocols to mask the

16  uneasy appearance of their conduct and overreaching motion.  One need only think

17  about Defendants' admission that the majority of stolen documents are *clearly*

18  *attorney-client privileged* to realize that their theft and wholesale disclosure to the

19  other side in this litigation has none of the ethical attributes of "whistle-blowing."  It

20  is believed that these documents were stolen by a disgruntled former attorney of

21  Plaintiffs, in shocking violation of the confidential attorney-client relationship and

22  privilege.[5]  Toberoff Decl., ¶ 23.

23        Faced with this illegal and onerous theft of documents, Defendants stoop to

24  smearing Plaintiffs' counsel by speculation and innuendo, *without a shred of*

25

26

_____

27  [5] The same would apply to any employee of the law firm of Plaintiffs' counsel, as
their work is conducted within the ambit of counsel's confidential attorney-client
28  relationship.

{F0029699.1 }

1    *evidence*, to somehow justify their conduct or cleanse the theft from which they

2    eagerly seek to benefit.  *See* Smith Decl., ¶ 12.

3              3.    **The Stolen Documents Have Been Produced Or Listed In**

4                    **Extensive Privilege Logs**

5              Plaintiffs' counsel has reviewed the stolen documents and compared them to

6    Plaintiffs' legal files.  Plaintiffs' counsel has found that all but 2 non-privileged

7    documents in Plaintiffs' legal files had long ago been produced or listed by

8    Plaintiffs in their privilege logs.  Toberoff Decl., ¶ 22.   The documents, consisting

9    of 2 letters from Plaintiff Joanne Siegel to DC Comics' executive Paul Levitz,

10   although clearly already in Defendants' possession, have recently been produced.

11   *Id.*  There are also 2 privileged e-mail communications between Plaintiffs and their

12   present counsel dated after the commencement of this action which were not listed

13   in Plaintiffs' privilege logs because the parties have agreed not to list post-complaint

14   attorney-client communications on their respective privilege logs. *Id.*

15            Additionally, Plaintiffs' counsel searched the files of other persons or entities

16   it represents that have been subpoenaed in this case, in search of any stolen

17   documents that had not been produced or listed in a privilege log *even though this*

18   *motion to compel is only directed at Plaintiffs. Id.*, ¶ 23.

19            Plaintiffs' counsel found in the files of IPW, LLC, one IP Worldwide fax

20   cover page having little relevance to this action, which it has nonetheless recently

21   produced to Defendants. *Id.*

22            Plaintiffs' counsel re-searched the files of Jean Peavy, Warren Peary, and the

23   Estate of Joe Schuster (the "Shusters") and found 3 irrelevant, but non-privileged

24   documents regarding the probating of Joe Shuster's Estate, that Plaintiffs do not

25   believe were previously produced.  Plaintiffs recently produced these documents.

26   *Id.* ¶ 24.  Plaintiffs' counsel found 1 privileged document from the Shuster files,

27   again concerning probate, which he has listed on behalf of the Shusters on a

28   supplemental privilege log. *Id.*

{F0029699.1 }

**EXHIBIT 3**
30

4.    **Defendants Have Brought This Motion For Unspecified Documents Based On Speculative Accusations But No Credible Evidence**

Defendants wrongfully accuse Plaintiffs and their counsel of secreting unspecified documents based on vague statements and innuendo without any credible evidence to back up their accusations.  Defendants rely solely on the vague, purported recollections of attorney Wayne Smith ("Smith"), Warner's Senior VP, Litigation, who oversees this litigation on Defendants' behalf.  While claiming that he did not read, but only "brief[ly]" glanced at the documents to quickly conclude that the bulk were attorney-client privileged, Smith asserts that "[t]o my knowledge, [the non-privileged] documents have never been produced in this litigation." Smith Decl., ¶¶ 8, 9, 12.

Mr. Smith's claim that he now recalls from a clipped 30 minute review (purportedly, nine months ago in June, 2006) whether these documents were produced in Plaintiffs' 2000 page production is highly dubious.  Smith states in his declaration: "at least some (and perhaps virtually all) of the privileged documents, as well as those in the "?" pile, were, to the best of my knowledge, never identified in any privilege log served by Plaintiffs." Smith Decl., ¶ 12.  This statement is odd as Smith claims to have briefly reviewed the documents on June 28, 2006 and to have turned *all* of them over to John Quinn on June 30, 2006. *Id.* ¶ 8, 13.  However, Plaintiffs did not serve their first privilege log until July 20, 2006 and served their supplemental privilege log on September 29, 2006.  Toberoff Decl., Exs. L, M.  The privilege logs list the simple information (date, sender, recipient, etc.) in the form approved by the Court's August 18, 2006 order.  *Id.* Ex. A.  It seems strange that after a 30 minute review, Smith could now recall, or even recall in late July and late September, the dates of documents missing from Plaintiffs' subsequent privilege logs (containing hundreds of entries).  Tellingly, Smith does not even mention the document production and privilege logs of subpoenaed third parties (*i.e.*, the

1  Shusters, Don Bulson, Pacific Pictures Corporation and IPW, LLC) provided

2  subsequent to his purported review, though many of the stolen documents were

3  obviously lifted from such files.  Toberoff Decl., ¶ 22.

4      According to Smith, "[i]n reviewing each document when it first appeared to

5  me that it was entirely privileged, I ceased reading it, placed the document in the

6  "privileged" pile and did not look at it further." Smith Decl, ¶ 8.  Moreover,

7  "because of the passage of time, I do not recall the specific documents." *Id*.  If

8  Smith is taken at his word, he could not possibly have concluded that the stolen

9  documents were not included among the nearly 2000 documents produced by

10 Plaintiffs or documents produced by subpoenaed third parties, nor could he

11 reasonably assess the hundreds of entries on Plaintiffs' subsequently produced

12 privilege logs and the privilege logs of such third parties.  For instance, the privilege

13 log of Don Bulson, Esq., the attorney of Michael Siegel, Laura Siegels' now

14 deceased step-brother, contains 422 entries.  Toberoff Decl., Ex. O.

15     Again, Smith claims "I did not conduct a detailed review of the Superman

16 Documents, and because the passage of time, I do not recall their specific contents.

17 I do, however, recall generally the subject mater of certain documents."  Toberoff

18 Decl., ¶ 8.  However, Smith's declaration only cites one subject – irrelevant to this

19 action [6]: "correspondence concerning the interest in Superman that might be owned

20 by plaintiff Laura Siegel's estranged step-brother, Michael Siegel [now deceased]."

21 *Id.*, ¶ 9.  Smith conveniently makes no reference to the lengthy privilege log of

22 Michael Siegel's attorney, Don Bulson, that naturally encompassed this subject.

23 Toberoff Decl., Ex. O.

24     Thus, Defendants' motion to compel is based entirely on Plaintiffs' alleged

25 failure to have produced or have listed in their privilege log documents purportedly

26 ─────────────

27 [6] Under 17 U.S.C.§ 304(c), Plaintiffs' control author Jerry Siegel's termination
interest and Michael Siegel had only a passive beneficial interest and right to share

28 in any monies paid to Plaintiffs with respect to this interest.

1  responsive to Defendants' document requests; but Defendants and Smith fail to

2  identify which requests and any non-privileged documents or even document

3  categories that were not produced, except documents relating to the single barely

4  relevant subject discussed above.[7]

5       Without any credible evidence, Defendants are content to brazenly accuse

6  Plaintiffs of "secreting documents." Defendants inconsistently claim that Smith

7  merely "thumbed through" the stolen documents, "but did not review them in

8  detail," yet base their entire motion and accusations on Smith's vague unspecified

9  recollections of the documents in comparison to the thousands of documents

10  produced by Plaintiffs and multiple third parties or listed on their respective

11  privilege logs.

12      **5.**    **Defendants' Review, Retention And Handling Of The Stolen**

13                  **Documents Was Improper**

14       The attorney-client privilege has been recognized as "the oldest of the

15  privileges for confidential communications known to the common law." *Upjohn Co.*

16  *v. United States*, 449 U.S. 383, 389 (1981). Practicing attorneys recognize the

17  importance of the privilege and the safe harbor that it provides to encourage "full

18  and frank communication between attorneys and their clients and thereby promote

19  broader public interest in the observance of law and administration of justice." *Id.*

20       A lawyer who receives materials that on their face appear to be subject to the

21  attorney-client privilege or otherwise confidential, under circumstances in which it

22  is clear that the materials were not intended for the receiving lawyer, should refrain

23  from examining the materials, notify the sending lawyer, and abide by the

24  instructions of the lawyer who sent them. *Gomez v. Vernon*, 255 F3d 1118, 1131-

25  1132 (9th Cir. 2001); 3-24 *Mathew Bender Practice Guide: Federal Pretrial Civil*

26  *Procedure in California* § 24.40.

27  _____

[7] *See* November 7, 2006 Order, p. 2, Toberoff Decl., Ex. C (the parties, as required by

28  Local Rule 37 must "set forth seriatim particular disputed discovery responses"

{F0029699.1 }

1    In *Gomez*, over a period of nine months, the Idaho Department of Corrections

2  implicitly authorized and encouraged department employees to search for and

3  photocopy letters regarding litigation strategies from opposing counsel that were

4  kept in inmates' legal files.  The Court found this behavior highly improper as these

5  documents were plainly privileged: "the most sensitive kind – the kind that any trial

6  lawyer would recognize as privileged, highly valuable, very confidential, and

7  potentially devastating in the wrong hands."  The court, in imposing sanctions, held

8  that the Department ignored their ethical duties to gain an advantage in the

9  litigation. *Gomez*, 255 F3d at 1131-1132

10    Similarly, in *Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51

11  (2004)(review granted June 9, 2004), cited by Defendants,  a lawyer was

12  disqualified from further representation after perusing opposing counsel's work

13  product while at a deposition *which he should have known he was not entitled to see*

14  *or possess.  Rico* reasoned, "a brief look [at the document] and simple phone call

15  could have resolved the matter.  Instead [counsel] 'studied the document carefully,

16  made his own notes on it…and based his litigation strategy'" on it.  *Id.* at 71.

17  Having failed to briefly review the document and contact opposing counsel when it

18  became obvious it was privileged, the court felt disqualification was necessary as

19  "plaintiffs' counsel…had information that inevitably would have been used in

20  preparing for trial." *Id.* at 73.   *See Spacone v. Burke(In re Truck-A-Way)*, 300 B.R.

21  31, 39 (E.D. Cal. 2003)(lawyer disqualified because, upon discovery of an

22  opponent's privileged documents, he *conditioned the documents release upon his*

23  *opponent providing a privilege log); see also Shell Oil Refinery v. Shell Oil Co.*, 143

24  F.R.D. 105, 108 (E. D. La. 1992)(plaintiff subject to sanctions for improperly

25  obtaining proprietary documents from one of defendant corporation's employees).[8]

26

27  [8]  It should also be noted that the unauthorized receipt by an opposing party of
     privileged documents does not waive the privilege.  *See United States ex rel.*

28  *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

{F0029699.1 }

**EXHIBIT 3** 34

1    Defendants purport to rely on *State Compensation Ins. Fund. v. WPS, Inc.*

2  *(State Fund)*, 70 Cal. App. 4th 644, 656 (1999)(lawyer receiving privileged materials

3  "should refrain from examining the materials any more than is essential to ascertain

4  if the materials are privileged, and shall immediately notify the sender that he or she

5  possesses material that appears to be privileged") and on the ABA Formal Opinion

6  94-382. However, State Fund and the ABA Formal Opinion deal with a common

7  occurrence – the *inadvertent disclosure* by counsel of a couple privileged documents

8  – *not the wholesale theft of legal files from an opposing counsel's law firm.*

9    Defendants must not be permitted to benefit *in any respect* from the "fruits"

10  of this outrageous theft.[9] *See Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365

11  (E.D.N.Y. 1997) (prohibiting the deposition testimony of an expert who would base

12  his opinion on a privileged document that was stolen and disseminated to the

13  public); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978) (evidence

14  excluded in divorce action when receipt of confidential information about husband,

15  including confidential communications between husband and his lawyer, was

16  purloined and passed to lawyer by husband's unfaithful agent without complicity of

17  receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not

18  condone conduct which is condemned for public policy reasons, even if the result of

19  judicial action is to harm the innocent recipient of the unlawfully disclosed

20  information. This is especially so when the information is released as a result of a

21  crime"); *Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md.

22  1995)(court refused to consider records stolen by a party's former employee); *Smith*

23  _____

24  1995)(privilege deemed not waived as to document stolen by fired employee); *see also Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D.Fla. 1993).

25

26  [9] The exclusionary "fruit of the poisonous tree" doctrine, though applicable to criminal cases is analogous. The exclusionary rule extends not only to primary

27  evidence obtained illegally, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Nardone v. United States*,

28  308 U.S. 338, 341 (1939).

{F0029699.1 }

**EXHIBIT 3**5
56

1     *v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla. 1993)(court

2     denied use of memorandum widely distributed after its *unauthorized* release); *In re*

3     *Grand Jury Proceedings Involving Berkley & Co., Inc.*, 466 F. Supp. 863, 869 (D.

4     Minn. 1979)(court precluded documents retained without authorization by a

5     terminated employee); *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (court

6     precluded documents stolen by a third party from defendants, even though the

7     documents had already been produced by defendants to the plaintiffs).

8        Here, Defendants conduct regarding the stolen documents, aimed at

9     exploiting what they view as a "twist of fortune," is highly improper. (*See* Sec. III.

10    Defendants' Contentions at 1:3-6). They did not immediately notify Plaintiffs upon

11    receipt of the stolen documents, nor did they honor Plaintiffs' wishes with respect

12    thereto. While Defendants go to great lengths to cleanse their conduct and create

13    the appearance of propriety, their improper objectives and the crime at the root of

14    this matter color their actions and elicit many uneasy questions that are the subject

15    of an ongoing investigation.

16        Defendants and Smith highlight the special detailed attention and care

17    allegedly given to the stolen documents: first, legal research; second, a carefully

18    circumscribed review, and third, the hiring of an alleged "neutral" to hold *all* the

19    documents. Yet, despite this studious attention and Defendants' astonishing receipt

20    in the middle of a heated lawsuit (by three high ranking Warner executives, two of

21    which were legal counsel) of documents plainly from the files of opposing counsel,

22    Warner claims not to have kept *any* of the three or more envelopes in which the

23    delivery was made and claims to have *no corroborating record whatsoever of the*

24    *date of the delivery* (*e.g.*, Studio mailroom, security or executive office logs or

25    notes). This is all the more incredulous as Studios and attorneys commonly keep

26    records of such deliveries.

27        Plaintiffs' question the date Defendants claim to have "anonymously"

28    received the stolen documents. Defendants claim that the documents were first

1  received on June 28, 2006.  Smith Decl., ¶ 2.   Yet, the anonymous cover letter [10]

2  referred to by Smith, which enclosed the documents, ends by stating "consider this

3  an early Christmas present."  Toberoff Decl., ¶ 27.   It is hard to imagine that the

4  sender would refer to Christmas *in June*.

5        Notably absent is a declaration from Warner's General Counsel John

6  Schulman ("Schulman"), who directly received the stolen documents, testifying as

7  to the date of his receipt.  Smith Decl., ¶ 2.  Instead, Defendants present Smith's

8  declaration offering pure hearsay that "Schulman advised me that… [the documents]

9  had arrived from an anonymous source at his office that day [June 28, 2006]."

10  Smith Decl., ¶ 2.

11        Plaintiffs' counsel believe that an attorney formerly employed by Plaintiff's

12  counsel for a short term lifted the documents from the firm's legal files while

13  employed and thereafter furnished the documents to Warner.   Toberoff Decl., ¶ 25.

14  This attorney was terminated in November, 2005.  *Id.* at ¶26.  After this attorney

15  was terminated, he contacted Plaintiffs and other Toberoff clients in December,

16  2005 and tried to convince them to retain him and to terminate Toberoff by falsely

17  disparaging Toberoff and by offering a reduced contingent fee.  *Id.*  By all accounts,

18  the attorney's motives were financial.   He was rejected by Plaintiffs and Toberoff's

19  other clients in December, 2005.  *Id.*  It is believed that soon thereafter he

20  communicated with Warner and disclosed the privileged documents he had stolen

21  from Toberoff's legal files – hence, his reference to an "early Christmas present."

22        Questions remain and an investigation is still underway regarding this

23  disgraceful event.   For instance, we do not yet know the full extent of this

24  attorney's communications with Warner.

25

26  [10]  This letter by a disgruntled and misguided attorney formerly employed by
    Plaintiff's counsel was not attached by Defendants and is not attached by Plaintiffs
27  because it is defamatory, potentially violates the attorney-client privilege and work
    product doctrine and should not be further published through the public record of
28  this action.  Toberoff Decl., ¶ 27.

{F0029699.1 }

**EXHIBIT 3**
37
58

1    It is believed that Warner may have well received their "early Christmas

2  present" in December, 2005, and waited, deciding whether or when to disclose this

3  very troubling matter.  Moreover, even if Defendants received the stolen documents

4  in June, 2006, they did not bring this to Plaintiffs' immediate attention, as even

5  "inadvertent disclosure" case-law dictates.  *See State Fund*, 70 Cal. App. 4th 644 at

6  656.   They belatedly mention the "anonymous" receipt of documents in a letter

7  dated July 5, 2006 and then in only the vaguest of terms as "certain documents."

8  Bergman Decl., Ex. D.  Plaintiffs did not learn that the documents were *their*

9  documents, until July 11, 2006 (two weeks after Defendants purportedly received

10 them) and only when Plaintiffs' counsel was able to press Defendants as to the

11 nature of the "certain documents" referred to by them.  Toberoff Decl., ¶ 8.

12    Defendants refer to Quinn as a "neutral," and seek to purify their objectives

13 through his stature as former head of the Los Angeles Bar Association; but it is clear

14 that Quinn and his law firm have been *retained* by Warner to "advise" it with

15 respect to the stolen documents.  Bergman Decl., Ex. D.  Unsurprisingly, the

16 protocol suggested in Quinn's July 5, 2006 letter (and subsequent letters) regarding

17 the documents favor or protect Warner's interests.  *Id*.  Quinn, to his credit, never

18 presented himself as a "neutral."   Toberoff Decl., ¶ 8.

19    After Quinn's July 5, 2006 letter, on July 6, like clockwork, Defendants' lead

20 counsel, Bergman, wrote to this Court *ex parte* in an effort to place the stolen

21 documents before the judges adjudicating this case.  Id., Ex. D.  Tellingly, neither,

22 Quinn, nor Bergman, state in their letters to Plaintiffs and the Court, respectively,

23 what at this point was blatantly obvious to Defendants – *the documents had been*

24 *stolen from the law offices of Plaintiffs' counsel*.

25    Only after Plaintiffs demanded the return of the stolen documents did

26 Defendants finally return *bates stamped copies* to them to Plaintiffs' counsel on July

27 18, 2006, *three weeks* after their purported receipt on June 28, 2006, and six months

28

{F0029699.1 }

1  after "Christmas." *Id.*, ¶ 10. However, Defendants insisted on retaining the

2  originals of the stolen documents. Bergman Decl., Ex. F.

3      Even by its own account, Warner's conduct was improper. Upon receipt of

4  the stolen documents, Warner should have *immediately* contacted Plaintiffs' counsel

5  and returned all copies of the stolen files to him upon his request. *Gomez v. Vernon*,

6  255 F3d 1118, 1131-1132 (9th Cir. 2001); *State Fund*, 70 Cal. App. 4th 644 at 656.

7  Instead, Defendants waited a full week to notify Plaintiffs' counsel and then, only in

8  the vaguest of terms, and after *three weeks* provided Plaintiffs with alleged copies of

9  the documents, while retaining the original of the stolen documents, though the

10  majority of the documents were clearly privileged.

11      Warner also improperly read and analyzed the stolen documents. Defendants

12  claim that they did not read or review the documents *in any detail*; and yet Warner's

13  Senior Litigation Counsel, Smith, admits reviewing the documents *twice* (once

14  outside Schulman's office and again, at his home) and to segregating the documents

15  into three categories – clearly "privileged," potentially privileged ("?") and "non-

16  privileged." Smith Decl. ¶¶ 3, 8. It is logically impossible to have performed this

17  detailed segregation without reviewing and analyzing *the substance* of the stolen

18  documents, which was improper. *Gomez v. Vernon*, 255 F3d 1118, 1132 (9th Cir.

19  2001)("The confidential status of the letters was facially evident – they were on

20  legal letterhead easily identifiable as that of opposing counsel").

21      Defendants' rely on *Aerojet-General Corp. v. Transport Indemnity Ins.*, 18

22  Cal. App. 4th 996 (1993) for the purported principle that a party has no duty to

23  inform opposing counsel of the *inadvertent* disclosure of privileged and

24  unprivileged documents, but instead can use any *unprivileged* information contained

25  in the document advantageous to their case. Firstly, *Aerojet* has been roundly

26  criticized and its holding severely curtailed by *State Fund*, 70 Cal. App. 4th at 656

27  (1999). *State Fund* imposes the exact opposite requirement: an ethical duty

28  *immediately* to disclose inadvertently received privileged information to the other

{F0029699.1 }

39

**EXHIBIT 3**

**60**

1  side. [11] *Id.* Secondly, *Aerojet* like *State Fund* concerns the *inadvertent* disclosure of

2  documents by opposing counsel not the deliberate theft of documents from opposing

3  counsel.

4      Even by their own account Defendants contravened *State Fund,* (applicable to

5  an innocent *inadvertent* disclosure) by failing to contact Plaintiffs' counsel for

6  several days despite the *obvious* appearance that a large number of privileged

7  documents had been stolen from Plaintiffs' legal files.  Instead, they carefully

8  reviewed the documents and segregated them into separate "privileged," "non

9  privileged" and even "?" piles.  The delay appears to have been deliberate – to allow

10 Defendants' in-house counsel to devise a strategy to maximize their chances of

11 benefiting from what they and their outside counsel view herein as a "twist of

12 [good] fortune."  Their efforts must not be rewarded.

13 **V.    DEFENDANTS' CONCLUSION**

14     For the reasons set forth herein, Defendants respectfully request that their

15 motion be granted.

16 **VI.   PLAINTIFFS' CONCLUSION**

17     For the reasons set forth herein, Plaintiffs respectfully request that

18 Defendants' motion to compel be denied in its entirety; that Defendants be ordered

19 to return all originals and copies of the stolen documents to Plaintiffs forthwith, and

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26

27 [11] More precisely, an attorney who inadvertently receives plainly privileged documents *must refrain from examining the materials any more than is necessary to*

28 *determine that they are privileged*, and must immediately notify the sender. *Id.*

1  that Defendants be barred from using the stolen documents in any fashion in this

2  litigation.

3  DATED:  March 26, 2007

WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
FROSS ZELNICK LEHRMAN & ZISSU, P.C.

5                                                      -and-

6                                              PERKINS LAW OFFICE, P.C.

7

8  By: _____
                  Michael Bergman

9                                              Attorneys for Defendants and Counterclaimant

10 DATED:  March 25, 2007                LAW OFFICES OF MARC TOBEROFF, P.C.

11

12                                             By: _____
                  Marc Toberoff

13

14                                             Attorneys for Plaintiffs/Counterclaim-Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{F0016236 1 }

41

**EXHIBIT 3**

**62**

# EXHIBIT 4



CIVIL AND CRIMINAL TAX CONTROVERSY

R E C E I V E D
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAY 0 4 2012

FILED _____
DOCKETED _____
         DATE    INITIAL

Judge O'Scannlain
Office of the Clerk
James R. Browning Courthouse
U.S. Court of Appeals
  for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

May 4, 2012

RE: In Re: Pacific Pictures Corp. (No.11-71844)

Judge O'Scannlain:

      Forty-eight hours ago, it was brought to my attention that the Ninth Circuit (Court) had determined that I, a licensed attorney in the state of California, with an impeccable professional record, am a criminal. Specifically, the Court concluded, on the basis of *allegations*, that I stole documents from Mark Toberoff's (Toberoff) offices, drafted a timeline, and sent the timeline along with the documents to D.C. Comics executives. I did not steal documents, draft a timeline, or send same to D.C. Comics. None of these facts have ever been determined to be true by a court of law. The inclusion of my name and the completely false factual accounts within the Ninth Circuit Opinion (Opinion) clearly suggest to the reader, as demonstrated by the enormous and growing coverage on the internet, that I in fact was the alleged perpetrator. The only remedy is to withdraw the Opinion and remove all references to me and any facts indicating that I was responsible for any of the aforementioned acts. Due process mandates that this happen immediately.

      The circumstances of my departure from Toberoff's law firm are these. Approximately two weeks before my abrupt departure, I learned that I was being provided stolen law student passwords to conduct online research on matters. I did not inform Toberoff of my discovery. Instead, I concluded research assignments via use of the UCLA Law Library and a borrowed set of Nimmer on Copyright from the law firm Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro (Christensen Miller). In and around the same time, I also discovered facts that would have to be immediately disclosed to the Siegels *to protect their interests* pursuant to the California Rules of Professional Conduct and the State Bar Act.

2901 West Coast Highway, Suite 200, Newport Beach, California 92663
Tel: (949) 334-3101 | Fax: (949) 207-3411 | Web: www.DTMtax.com | Email: david@DTMtax.com

1

EXHIBIT 4
63



On the afternoon of my exit, Toberoff was involved in a dispute with opposing counsel in an unrelated matter and asked me to research issues he wanted to include in a letter that afternoon. At that point, I had no option but to vacate the premises. Contrary to Toberoff's *allegations*, I did not leave the firm "without incident". Shortly thereafter, I contacted the Siegels as required under the California Rules of Professional Conduct and the State Bar Act. That was the impetus of the meeting. It was not, as Toberoff alleges, to solicit the Siegels. It is important to note that the subject of representation was discussed, but the attorney-client privilege forbids me from disclosing why—a convenient wall for Toberoff. However, if Laura Siegel wishes to waive the privilege, I would be more than happy to provide that information to the Court. After the meeting, I confirmed, with a prominent California ethics attorney, that I had no further ethical responsibilities with the Siegels. I thereafter focused my career in the area of taxation, in particular, tax litigation.

To my knowledge, at no time after Toberoff learned of the alleged theft, did he, or the Siegels, contact the State Bar of California (State Bar) to report my alleged actions or any suspicions. Indeed, I have never been contacted by the State Bar in regards to this alleged incident. This is not surprising given that any such allegation against me would have permitted me to discuss all that was necessary to repel any false claims of professional misconduct on my part, specifically, the facts disclosed to the Siegels. Toberoff did contact the Federal Bureau of Investigations (FBI) to investigate the alleged theft in 2007 (Opinion at 4244, ¶2). Not surprisingly, I was never contacted by the FBI. Notably, I successfully completed a background investigation in 2008 when I was hired as an attorney-adviser for the United States Tax Court in Washington, D.C. Remarkably, I have not been contacted by Toberoff, the Siegels, or his legal representatives to discuss the alleged theft.

In February 2011, <u>fifteen months ago</u>, I was contacted by the Department of Justice (DOJ). Apparently Toberoff alleged I had committed a crime. We had a pleasant meeting during which I responded to all questions posed, without hesitation, and without representation, and fully aware of the fact that lying to them would subject me to criminal prosecution. I answered "No." when asked whether I had sent the documents to Warner Bros. (Warner). I also answered "No." when asked whether I was part of an elaborate scheme with Warner to infiltrate Toberoff's firm, steal his documents, and then return the documents to Warner. Apparently, the fact that my previous employment with Christensen Miller, a firm that has represented Warner, somehow justified Toberoff's outlandish claim. The meeting ended and I have not been contacted since. There will not be an indictment.

2901 West Coast Highway, Suite 200, Newport Beach, California 92663
Tel: (949) 334-3101 | Fax: (949) 207-3411 | Web: www.DTMtax.com | Email: david@DTMtax.com

2

**EXHIBIT 4**
**64**



The relevant facts in the Opinion include the following:

### REFERENCE ONE

"While the preexisting litigation was pending, Toberoff hired lawyer David Michaels to work for one of his companies. Michaels remained in Toberoff's employ for only about three months before absconding with copies of several documents from the Siegel and Shuster files. Unsuccessful in his initial attempt to use the documents to solicit business from the Heirs, Michaels sent the documents to executives at D.C. Comics. While he did not include his name with the package, he did append a cover letter, written in the form of a timeline, outlining in detail Toberoff's alleged master plan to capture Superman for himself." (Opinion at 4244, ¶1)

### REFERENCE TWO

"Ultimately, in April 2007, a magistrate judge ordered certain documents, including Michaels' cover letter, turned over to D.C. Comics." (Opinion at 4244, ¶2)

### REFERENCE THREE

"Michaels' cover letter formed the basis of the lawsuit and was incorporated into the complaint." (Opinion at 4244, ¶3)

### REFERENCE FOUR

"Toberoff has continued to resist the use of any of the documents taken from his offices, including those already disclosed to D.C. Comics and especially Michaels' letter." (Opinion at 4244, ¶3)

### REFERENCE FIVE

"About a month after the suit was filed, Toberoff asked the Office of the United States Attorney for the Central District of California to investigate Michaels." (Opinion at 4245, ¶1)

### REFERENCE SIX

"There is no evidence that Toberoff and the Office of the U.S. Attorney agreed before the disclosure jointly to pursue sanctions against Michaels." (Opinion at 4253, ¶1)

2901 West Coast Highway, Suite 200, Newport Beach, California 92663
Tel: (949) 334-3101 | Fax: (949) 207-3411 | Web: www.DTMtax.com | Email: david@DTMtax.com

3

**EXHIBIT 4**
**65**



CIVIL AND CRIMINAL TAX CONTROVERSY

The Court, by publishing these allegations as fact, has committed a grave error that must be corrected immediately to protect my professional reputation and my fundamental right to due process. First consider a small sampling of how widely disseminated this misinformation has become and how readily the audience interprets what the Court has written as true:

See http://www.law.com/jsp/lawtechnologynews/PubArticleLTN.jsp?id=1334527980923 ("Instead the ruling revolves around the strange actions of an attorney, David Michaels, who worked briefly for Toberoff around 2006. _After leaving the firm, Michaels sent documents he'd copied from the heirs' files to D.C. Comics, **according to the Ninth Circuit**, along with a laboriously detailed timely of Toberoff's alleged plan for recapturing the rights to Superman for himself._ "Consider it an early holiday gift," Michaels wrote."). (Emphasis added)

See also http://www.hollywoodreporter.com/thr-esq/warner-bros-wins-big-superman-jerry-siegel-joe-shuster-312982 ("In the midst of working on the case to terminate the studio's rights to Superman, many of Toberoff's documents were taken by one of his former associates, David Michaels, who, reportedly frustrated by his own successful attempt to solicit business from the Superman heirs, sent the sensitive documents to Warners' offices.").

See also http://blogs.findlaw.com/ninth_circuit/2012/04/no-attorney-client-privilege-for-superman-lawsuit-stolen-documents.html ("David Michaels, a former Toberoff associate, stole documents detailing the arrangement from Toberoff, and sent them to D.C. Comics with a timeline he constructed to reveal Toberoff's plot to acquire Superman.").

Even prominent law firms such as Paul Hastings, Dechert, and Bingham, to name a few, have already posted articles on their websites discussing the Opinion with my name in bright lights as a criminal. The damage to my reputation is obvious, and completely undeserving. I did what was required of me under the professional rules of responsibility and have been rewarded with having my reputation destroyed. It is difficult to comprehend how the Court writes on the one hand that "[t]he ethical and professional conduct raised by Toberoff's actions will likely occur to many readers", yet on the other takes the ethically-challenged lawyer's allegations against me as established fact and in the process, erroneously and definitively tells all readers that I was guilty of misconduct. (Opinion at 4243, ¶3)

2901 West Coast Highway, Suite 200, Newport Beach, California 92663
Tel: (949) 334-3101 | Fax: (949) 207 3411 | Web: www.DTMtax.com | Email: david@DTMtax.com

4

**EXHIBIT 4**
**66**



Before the State Bar could determine whether I was guilty of professional misconduct, due process would require that it provide me notice, afford me the right to counsel, the right to present evidence, and the right to testify in my own defense. Had the DOJ decided to move forward with a prosecution, it could not, as the Court does, pronounce guilt absent due process. The Opinion has obliterated this fundamental right by incorporating these false statements of crime and professional misconduct. These allegations are simply those of an attorney seeking to deflect attention away from his own professional misconduct that is the subject of this litigation.

Given the gravity of this error, the damage to my professional reputation, and the disregard of my fundamental right to due process, I respectfully request that the Court withdraw the Opinion and remove the above-cited references immediately so that I may take remedial action to eradicate the harm. The largest tax conference of the year is next week in Washington, D.C. If this is not corrected prior to that meeting, I fear the damage amongst my professional peers will be permanent.

I have not provided a copy of this letter to the parties. My participation in this matter going forward is wholly irrelevant as the alleged conduct of the parties occurred well before my brief association with Toberoff. Moreover, I did not provide documents to D.C. Comics.

The statements in this letter are protected by the litigation privilege.

I would also like to respectfully request that chambers contact me (1) to confirm that this letter has been received and that a copy has been provided to the Judges; and (2) to update me as to the status of the decision. The clerk's office has been gracious in allowing me to fax this letter to you given its exigency. I can be readily reached at 714.742.9561, or emailed at david@dtmtax.com.

Sincerely,

David Michaels, Esq.

2901 West Coast Highway, Suite 200, Newport Beach, California 92663
Tel: (949) 334-3101 | Fax: (949) 207-3411 | Web: www.DTMtax.com | Email: david@DTMtax.com

5

**EXHIBIT 4**
**67**

# EXHIBIT 5

**Attachments:**          DC 00172-311 Corp Structure as of 063009.pdf


**From:** Tokoro, Jason
**Sent:** Friday, December 07, 2012 8:16 PM
**To:** 'David Harris'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Lens, Molly; Pearson, Ashley; Marc Toberoff; Keith Adams; Pablo Arredondo
**Subject:** RE: DC v. PPC

Counsel,

Please see the attached production of documents by DC Comics.

Best and thanks,

Jason

**From:** David Harris [mailto:dharris@ipwla.com]
**Sent:** Friday, December 07, 2012 7:37 PM
**To:** Seto, Cassandra
**Cc:** Petrocelli, Daniel; Kline, Matthew; Lens, Molly; Tokoro, Jason; Pearson, Ashley; Marc Toberoff; Keith Adams; Pablo Arredondo
**Subject:** DC v. PPC

Counsel,

Please see below the correspondence sent on behalf of Keith Adams.

*          *          *

Cassie:

I write in partial response to your December 6, 2010 letter.  That letter stated that "DC has some materials to produce to you today, but needs your agreement that documents it marks as 'Confidential' will be treated as such under the terms of the protective order in *Siegel*."  Defendants agree.

All of Defendants' rights and arguments are reserved.

Keith Adams

David Harris
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101
---------------------
This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1

**EXHIBIT 5**

**68**

# EXHIBIT 6

**From:** Tokoro, Jason
**Sent:** Monday, December 17, 2012 2:19 PM
**To:** Marc Toberoff; Keith Adams; Pablo Arredondo; David Harris; Richard Kendall; Laura Brill; Nicholas Daum
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Subject:** DC v. PPC

Counsel,

Please see the below correspondence sent on behalf of Matthew T. Kline.

\*          \*          \*

Counsel,

Pursuant to our December 6 letter and your agreement to treat documents marked "Confidential" as such under the terms of the protective order in *Siegel*, we are delivering to you a CD containing another supplemental document production in keeping with the rolling production DC said it would make.

As for the 65-page motion you served at 10:34 p.m. on Friday night—with no prior notice to DC, and with the clear intent of adversely impacting the holiday schedules of DC and its counsel—defendants have violated their meet-and-confer obligations by filing an improper motion in the middle of an ongoing meet-and-confer.  Unless defendants withdraw the motion immediately, DC will apprise the Court of defendants' violation of the Local Rules (grounds alone to deny the motion, *see* DN 467), and DC will suspend its accelerated efforts to make additional document productions as a compromise to defendants, as defendants have so deliberately and without any cause abandoned the good-faith meet-and-confer process in which DC was engaging.

DC reserves all rights.

Matt Kline

1

**EXHIBIT 6**
**69**

# ARNOLD & PORTER LLP

**John J. Quinn**
John_Quinn@aporter.com

213.243.4080
213.243.4199 Fax

44th Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

July 5, 2006

Marc Toberoff, Esq.  *(By Messenger)*
2049 Century Park East, Suite 2720
Los Angeles, CA  90067

Michael Bergman, Esq.  *(By Messenger)*
Weissman, Wolff, Bergman, Coleman, Grodin & Evall, LLP
9665 Wilshire Blvd., Suite 900
Beverly Hills, CA  90212

Roger L. Zissu, Esq.  *(By U. S. Mail)*
Fross, Zelnick, Lehrman & Zissu, P.C.
866 UN Plaza
At First Avenue & 48th Street
New York, NY  10017

Patrick Perkins, Esq. *(By U.S. Mail)*
Perkins Law Office
1711 Rt. 9D
Cold Spring, NY  10516

   Re: *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Time Warner Inc., et al.*
     USDC Central District of CA Case No. 04-08776 RSWL (AJWx);
     *Joanne Siegel, etc., Laura Siegel Larson, etc. v. Warner Bros. Entertainment*
     USDC Central District of CA Case No. CV. 04-8400 DDP (RZx)

Gentlemen:

   I have been asked to advise John Schulman, General Counsel of Warner Bros., in connection with certain documents delivered to the Warner Bros. offices during the middle of last week.  One set of documents was delivered to Mr. Schulman and one set was delivered to each of two Warner Bros. executives.  The source or sender of the documents was not identified and no effort has been made to determine whether the three sets are identical in every respect.

   Wayne Smith, Senior Litigation and Chief Patent Counsel of Warner Bros., made a cursory review of the document, did not read or review them in detail, but, recognizing that some of the documents may be privileged, segregated them in three separate categories, namely, "Privileged", "Non-privileged" and "?".

**EXHIBIT 6**
**70**

DC 00312

# ARNOLD & PORTER LLP

Marc Toberoff, Mike Bergman, Rodger Zissu, Patrick Perkins
July 5, 2006
Page 2

Although I have seen the documents, I have not read them or any part of them. I now have the three sets of documents in my possession at my office. I have been asked by Mr. Schulman to contact counsel involved in the pending litigation, advise them of the existence of the documents and the circumstances surrounding their receipt, and suggest a procedure for the proper review and handling of the documents.

Let me suggest the following:

1.  In order to protect the integrity of the documents and avoid any questions, I think they should be Bates stamped by an independent court reporter, court appointed individual, or independent copy service under some supervision.

2.  I would strongly suggest counsel contact the Judge or the Magistrate Judge assigned to this matter and advise him or her of the existence of the documents and circumstances of their receipt.

3.  If agreed, the documents could then be deposited with the Judge or the Magistrate Judge while a procedure for their review is planned. As an alternative, I will retain the documents and await instructions from you or the Court.

4.  The documents should be reviewed by the Judge, the Magistrate Judge or other individual agreed upon to determine whether some or any of the documents are protected by the claim of "Privilege" or "Work Product". Those documents afforded no protection can then be released to the litigation attorneys for defendants.

I hope you will not think me presumptuous in making these suggestions. My only objective is to carry out Mr. Schulman's request that these documents be handled in a proper and efficient manner. In the meantime, I will keep the documents in my personal possession and allow access to them only upon your joint or the Court's instructions.

Yours very truly,

John J. Quinn

JJQ:rn
cc: John A. Schulman, Esq

**EXHIBIT 6**
**71**

DC 00313

# EXHIBIT 7

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

December 18, 2012

<u>Via E-Mail</u>

Cassandra Seto
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Cassie:

I write in response to the parties' meet-and-confer on November 27-28, 2012, and your letter dated December 6, 2012 ("December 6 Letter"), following up on such discussions, regarding Laura Siegel Larson's First Set of Requests for Production ("Requests") and Mark Warren Peary's First Set of Interrogatories ("Interrogatories").

## I.     TIMELINE DOCUMENTS

DC's offer on these Requests is the equivalent of no response at all.  DC merely offers to produce: (1) a July 5, 2006 hearsay letter from Arnold Porter that is already in Defendants' possession; and (2) its non-privileged communications with David Michaels that DC is obligated to produce, if and only if Defendants agree to produce their communications with Mr. Michaels, which Magistrate Zarefsky upheld as privileged. Dkt. 262 at 4.  These proposals are obviously inadequate, and Defendants have therefore moved to compel the production of documents responsive to these Timeline Requests, as DC is aware.

## II.     OTHER DOCUMENT REQUESTS

With respect to the other Requests, Defendants respond to DC's December 6, 2012 proposal below.  Defendants' acceptance of any proposals (or any later proposals by DC) is without waiver of any of Defendants' objections or arguments regarding DC's deficient search efforts.

Absent a resolution of these issues by December 21, 2012, and an agreement to produce the responsive documents by no later than January 14, 2012, Defendants will have no choice but to move to compel as to open issues regarding these Requests.

**EXHIBIT 7**

**72**

**TOBEROFF & ASSOCIATES, P.C.**

December 18, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 6

**Request No. 27 (Warner/DC's Information Infrastructure):** DC has yet to specify what it is willing to produce in response to this request. To the extent, if any, that DC's description of its search protocols is intended to be responsive, Defendants' response as to such alleged protocols is set forth in Section IV, *infra.*

**Request No. 29 (Similar Complaints And Counterclaims Filed By DC/Warner In Other Cases):** Defendants accept DC's proposal in its December 6 Letter to produce all "complaints or counterclaims involving claims for tortious interference with prospective economic advantage or tortious interference with contract filed by DC Comics or Warner Bros. Entertainment Inc. in the United States between 2000 and the present."

**Request No. 30 (Documents Referring to This Case and/or *Siegel*):** It is unclear from the December 6 Letter whether DC is offering to produce all "communications with third-parties concerning the Siegel or Pacific Pictures cases and internal analyses concerning the effect of these cases on DC's business." If that is the case, Defendants accept DC's proposal.

**Request No. 31 (Minutes of Board of Directors Meetings or Directors' resolutions relating to Defendants or Siegel litigations):** DC claims that I agreed "to limit this request to minutes of Board of Directors meetings or resolutions of DC Comics, Warner Bros. Entertainment Inc., and Time Warner concerning the Siegel or Pacific Pictures lawsuits." This does not comport with my recollection or Pablo's notes, and the request includes any minutes or resolutions as to "any of Defendants." Defendants therefore propose that DC produce "minutes of Board of Directors meetings or resolutions of DC Comics, Warner Bros. Entertainment Inc., and Time Warner concerning the Siegel or Pacific Pictures lawsuits, or any of its opposing parties in such suits."

**Requests Nos. 66-69 (Retention of O'Melveny & Myers LLP):** DC argues that these requests are moot because "defendants have asserted they know when O'Melveny was retained in this case." December 6 Letter at 6. This is sophistry. Defendants know merely the date O'Melveny was substituted in as counsel in the *Siegel* case, which does not necessarily reflect when the firm was retained. Defendants are entitled to test DC's contentions. Defendants propose that DC produce its retainer agreement that shows the date of O'Melveny's retention.

**Request No. 83 (Agreements with Private Investigators):** DC stated that it retained "Kroll Associates" in May 2010 to do "very limited" work in connection with this matter, and asserts that all of the work performed is privileged and attorney work-product. However, DC also states that "DC is willing to consider producing certain documents on this topic if defendants will do the same." What is DC offering exactly? Is DC offering to produce all non-privileged, non-work product documents and information obtained as a result of Kroll's investigation?

**Request No. 84-87 (Agreements and Communications with PR Agencies):** DC offers to produce no additional documents in response to these requests. These requests are relevant because (a) DC's agreements and communications with PR agencies could contain contradictions between DC's private and public statements related to this case, and (b) DC has

**EXHIBIT 7**
**73**

**TOBEROFF & ASSOCIATES, P.C.**

December 18, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 6

repeatedly relied on third-party press articles in this litigation.  DC/Warner's influence over such articles, whether directly or through third-party PR agencies, would obviously be relevant.  If DC is unwilling to reconsider its position on this topic, Defendants will move to compel.

**Request No. 89 (Communications re: Marc Toberoff):**  This request sought "All COMMUNICATIONS between YOU and any person or entity REGARDING Marc Toberoff." DC vaguely claims that it is "willing to consider a reasonable compromise proposal."  On the November 29 call, I offered to narrow this request to (1) include only communications with third parties, and (2) exclude court filings in cases where Mr. Toberoff was counsel.  Defendants ask that DC respond to this reasonable proposal.  Failing a timely concrete proposal from DC as to this request, Defendants will move to compel.

**Requests Nos. 70-82 (Communications with the Siegels and Third Parties):**  With respect to communications with Joanne Siegel, Laura Siegel Larson, Dennis Larson and Michael Siegel (Request Nos. **70-73**), DC offered to "conduct[] a reasonable search for such communications that have not already been produced, and produc[e] responsive documents."  Defendants accept this offer.

With respect to communications with "Josh Ryland, Don Bulson, Renner Otto, Susan Allison, Kevin Marks, Bruce Ramer, Gang Tyre, Ari Emanuel, and William Morris Endeavor" (Requests Nos. **74-82**), DC claimed that Defendants were asking for "all such communications," that locating responsive documents would be unduly burdensome, and that "DC is willing to consider searching for and producing such documents if and when defendants do the same."

This is unacceptable.

Josh Ryland and Don Bulson both work for Renner Otto, former counsel for Michael Siegel.  DC has not asserted that it has any communications with them that do not involve this case or *Siegel*, and there is no basis for DC to claim that locating these communications would be burdensome. DC's communications with Mssrs. Ryland and Bulson, and with Renner Otto, are relevant and must be produced immediately.

The other Requests (regarding Susan Allison, Kevin Marks, Bruce Ramer, Gang Tyre, Ari Emanuel, and William Morris Endeavor) were all expressly limited to "COMMUNICATIONS ... REGARDING this case or the *Siegel* Litigations."  Such communications are obviously relevant, and must be produced immediately.

Unless DC reconsiders, and agrees to produce all its communications with Josh Ryland, Don Bulson, Renner Otto, Susan Allison, Kevin Marks, Bruce Ramer, Gang Tyre, Ari Emanuel, and William Morris Endeavor regarding this case and/or the *Siegel* Litigations, Defendants will have no choice but to move to compel.

**EXHIBIT 7**

**74**

**TOBEROFF & ASSOCIATES, P.C.**

December 18, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   4 of 6

**Requests Nos. 90-125 (Requests re: DC's Complaint Allegations):** DC agreed in its October responses to the Requests that it would "conduct a reasonably diligent search of the documents in the possession, custody or control of relevant custodians and … produce by designation or otherwise all non-privileged, responsive documents."

Over two months have elapsed, however, and DC still has not produced its documents responsive to these Requests. DC's December 6 Letter essentially re-offered to "conduct a reasonable search and produce any responsive documents that have not previously been produced" – but DC is already under an obligation to do so, and should have produced these documents months ago.

Defendants agree that DC need not produce documents in response to Request Nos. 94-96, which primarily relate to "work-for-hire" allegations.

If DC does not agree by December 21, 2012 to produce all documents responsive to these Requests by January 14, 2013, Defendants will move to compel.

**III.     DC's RESPONSES TO MARK WARREN PEARY'S INTERROGATORIES**

As with Ms. Larson's Requests, absent a resolution of the issues related to Mr. Peary's Interrogatories by December 21, 2012, and an agreement to produce amended interrogatory responses by no later than January 14, 2012, Defendants will have no choice but to move to compel.

**Interrogatory Nos. 1-4:** If DC intends to serve "amended responses," it should do so as soon as possible.

**Interrogatory No. 5:** DC asserts that this interrogatory asking DC to identify communications between Warner/DC and third parties that refer to the 1992 Agreement needs to be limited in scope. The Interrogatory is inherently limited to (1) communications, (2) with third parties, (3) that took place after 1992, and (4) that specifically mention the 1992 Agreement. This is sufficiently narrow. DC's communications with third parties regarding the 1992 Agreement are obviously relevant to DC's arguments that the 1992 Agreement was "interfered" with. Provided that DC agrees to run the additional searches it suggests, and serve an amended response as to any uncovered communications, Defendants will not move to compel on DC's current, inadequate response.

**Interrogatory Nos. 9-12:** Defendants disagree with DC's contention that Interrogatory Nos. 9-12 are rendered moot by the Court's summary judgment order. DC's Fourth Claim alleges, in part, that the Shuster estate's filing of termination notices breached the 1992 Agreement, and that Mr. Toberoff's assistance with the termination constituted interference with the 1992 agreement. Defendants are entitled to discovery regarding both the 1992 Agreement and the termination that DC maintains is the alleged interference.

**EXHIBIT 7**

TOBEROFF & ASSOCIATES, P.C.

December 18, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:    5 of 6

**Interrogatory Nos. 13-15:**  DC has confirmed that it will amend its answers to Interrogatory Nos. 13-15.  Defendants disagree with DC's claim that these Interrogatories are moot, especially in light of DC's Sixth Claim.

## IV.    DC'S SEARCH EFFORTS IN DISCOVERY

Defendants requested that DC provide a thorough description of its search efforts to date. Despite indicating during the meet-and-confer that DC would cooperate, your letter makes clear that DC is unwilling to do so.

You now describe Defendants' questions about DC's discovery efforts as "improper", "misplaced" and "moot." DC oddly asserts that Defendants do not "truly believe" that DC "belatedly produced" the highly responsive Bonesteel and Josephson documents, even though DC turned those documents over during and even *after* summary judgment briefing.  Defendants disagree on all fronts and are confident that the Court will as well.

It is clear that absent the Court's involvement, DC will not take its discovery obligations seriously.  Your description of DC's past search efforts consists solely of a list of names of individuals whose files counsel for DC allegedly searched and reviewed.  This list is incomplete on its face (listing only "examples") and does not include individuals whose files DC has admitted to searching – notably, Damon Bonesteel.

DC's list is also of little substantive value.  It does not include any titles or departments for the individuals it names, even though it is plain that such basic information is critical to understanding DC's search efforts.  Nor does it provide any information on DC's search methodologies; it does not say what search queries, automated discovery software, or sampling techniques were used, even though Defendants specifically requested this information.

DC states that "[t]here is no comprehensive database for DC and Warner Bros.' electronic files," but that "legal and business affairs employees have access to a document management system called 'E-Docs DM 5.3.'"  December 6 Letter at 8.  Elsewhere in the letter, reference is made to the E-Docs "library" of various departments (*e.g.*, DC Comics' Business & Legal Affairs).  DC's response does not clarify what type of documents (e.g., all business communications or just executed agreements) are usually deposited in the E-Docs library; all other departments or divisions using the E-Docs system; what databases or document management systems (if any) are used by other departments or divisions; whether there are other database or document management systems used by DC or Warner's various Business and Legal Affairs departments; etc.  Moreover, it strains credibility that Warner, which is frequently involved in litigation, has to search the personal computers of individual executives and employees every time it is faced with a discovery request, or that there are no other document management systems for other departments.

**EXHIBIT 7**

76

**TOBEROFF & ASSOCIATES, P.C.**

December 18, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  6 of 6

Defendants noted that they needed an organizational chart showing the departments within Warner and DC in order to understand the current state of DC's search efforts and what remains to be done. Instead of providing a chart that would be useful for this purpose, DC provided only a June 30, 2009 "corporate structure" document that shows nothing beyond the names and ownership of Time Warner's subsidiaries. As you must surely be aware, this document does not provide the information that Defendants need or requested. Furthermore, the document is obviously out-of-date, as DC Comics – the plaintiff in this case – was restructured into "DC Entertainment Inc.," a division of Warner Bros., in or around September 2009, and this is not even reflected therein.

DC's letter also demonstrates that DC has failed in other ways to meet its affirmative discovery obligations. It admits that DC failed to search a whole host of key custodians, including Alan Horn, Patti Connolly, Jeff Rabinov, Steven Spira, Ana de Castro, Amy Genkins, Alex McAuley, and Maria Tinoco. It also shows that DC has willfully not turned over its communications with David Michaels, which are clearly not privileged (unlike communications between Mr. Michaels and the Siegels) and are highly responsive to Defendants' discovery requests.

DC's offer to "run additional searches" on the document databases of its assorted Business & Legal Affairs departments only if Defendants "withdraw their (baseless) threat to file a motion" is also inappropriate. December 6 Letter at 2-3. DC has an affirmative obligation to run any potentially useful searches on these key databases. Nor can Defendants know if the additional searches would be adequate, because DC did not provide *any* information regarding the search queries and protocols it has used to date.

DC's compliance with its ordinary affirmative discovery obligations is not a bargaining chip. Unless DC complies with its obligations and conducts the searches it admits that it neglected, and also provides substantial additional information about its corporate structure, search efforts, and document retention systems (which would be responsive to Request No. 27), Defendants will move to compel the same and bring DC's discovery misconduct to the Court's attention.

Very truly yours,

Keith Adams

**EXHIBIT 7**
**77**