1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@toberoffandassociates.com*
2  Keith G. Adams (State Bar No. 240497)
    *kadams@toberoffandassociates.com*
3  Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@toberoffandassociates.com*
4  David Harris (State Bar No.255557)
    *dharris@toberoffandassociates.com*
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:         (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

12              **UNITED STATES DISTRICT COURT**

13       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | |
| vs. | Hon. Otis D. Wright II, U.S.D.J. |
| | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | **DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DC'S FOURTH, FIFTH, AND SIXTH CLAIMS** |
| | *Statement of Undisputed Facts and Conclusions of Law; Declaration of Keith Adams; and [Proposed] Order and Statement of Decision filed concurrently herewith* |
| | Complaint filed:   May 14, 2010 |
| | Discovery Cutoff:  None Set |
| | Trial Date:        None Set |
| Defendants. | Date:   March 11, 2013 |
| | Time:   1:30 p.m. |
| | Place:  Courtroom 11 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 11, 2013 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, and Jean Adele Peavy, Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC (collectively, "Defendants"), will and hereby do move for summary judgment, dismissing the Fourth, Fifth and Sixth Claims for Relief in plaintiff DC Comics' ("DC") first amended complaint pursuant to Fed. R. Civ. P. 56 – the only remaining claims in this case.

Defendants Marc Toberoff and Pacific Pictures Corporation move for summary judgment on DC's Fourth Claim for tortious interference with contract, as it is clearly barred by the statute of limitations.  Defendant Marc Toberoff moves for summary judgment on DC's Fifth Claim for tortious interference with prospective economic advantage, as it is also barred by the statute of limitations.  All Defendants moves for summary judgment on DC's Sixth Claim for declaratory relief, under California's Unfair Competition Law, because it is moot, preempted by the Copyright Act and barred, in part, by the statute of limitations.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, on November 28, 2012.  This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court.

Dated:  February 4, 2013           RESPECTFULLY SUBMITTED,
                                   /s/ Keith G. Adams
                                   _____
                                   TOBEROFF & ASSOCIATES, P.C.
                                   Attorneys for Defendants Mark Warren Peary *et al.*

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND .......................................... 3

    A.    The Shuster Termination .................................................................. 3

    B.    The Siegels' Terminations And Negotiations With DC ...................... 4

        1.    The Siegels Negotiate With DC ............................................. 4

        2.    The August 2002 Offer .......................................................... 5

        3.    The Siegels Regroup ............................................................. 5

    C.    The *Siegel* Litigation ..................................................................... 6

    D.    The Instant Action ........................................................................... 7

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ....................................................................................................... 8

I.    DC'S FOURTH CLAIM IS TIME-BARRED ............................................ 8

    A.    DC's Claim Accrued By No Later Than 2006 And Is Barred By The Two-Year Statute Of Limitations .................................................. 8

        1.    The Alleged Interference Consisted Of The 2001 And 2003 PPC Agreements And The 2003 Shuster Termination .................................................................... 8

        2.    The "Delayed Discovery" Rule Is Inapplicable Because DC Received The Shuster Termination In 2003 And The PPC Agreements In 2006 ............................................... 9

        3.    The "Timeline" Does Not Invoke The Delayed Discovery Rule ......................................................................... 11

        4.    There Was No "Concealment." And Concealment Is Irrelevant When A Party Has Inquiry Notice ........................ 12

        5.    The "Continuing Harm" Doctrine Does Not Apply To DC's Interference Claims .................................................. 12

II.    DC'S FIFTH CLAIM IS TIME-BARRED ............................................ 13

    A.    The Statute Was Triggered In 2002, And DC Was On Inquiry Notice Of Its Claim By 2006 .......................................................... 13

1     1. DC Was On Inquiry Notice Since At Least 2006 ................... 14

2     2. DC Read The Timeline In 2006 ................................. 16

3     3. DC's Statements And Conduct Demonstrate That It Was On Actual Notice Of Its Interference Claims .......................... 18

    B. DC's Interference Claim Is Time-Barred Even If Amended To Allege Interference With Contract .................................. 19

III. DC'S SIXTH CLAIM IS BARRED ........................................ 19

   A. DC's Sixth Claim Is Moot .......................................... 19

   B. DC's Sixth Claim Is Time-Barred As To The PPC Agreements ........ 21

   C. DC's Sixth Claim Is Preempted By The Copyright Act ..................... 21

CONCLUSION ................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) ...................................................................22

*American Rivers v. National Marine Fisheries Serv.*,
126 F.3d 1118 (9th Cir. 1997) ............................................................ 19-20

*Amtower v. Photon Dynamics, Inc.*,
158 Cal. App. 4th 1582 (2008) .................................................................18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................ 7-8

*Barber v. Superior Court*,
234 Cal. App. 3d 1076 (1991) ...................................................................12

*Betz v. Trainer Wortham & Co.*,
236 Fed. Appx. 253 (9th Cir. May 11, 2007) ...........................................21

*Blue Nile, Inc. v. Ice.com, Inc.*,
478 F. Supp. 2d 1240 (W.D. Wash. 2007) ...............................................22

*Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co.*,
688 F. Supp. 2d 940 (N.D. Cal. 2010) ......................................................13

*Brodzki v. United States*,
2012 WL 1536344 (N.D. Cal. May 1, 2012) ............................................11

*Celotex Corporation v. Catrett*,
477 U.S. 317 (1986) ................................................................................ 7-8

*Conerly v. Westinghouse Elec. Corp.*,
623 F.2d 117 (9th Cir. 1980) .....................................................................12

*Cortez v. Purolator Air Filtration Products Co.*,
23 Cal. 4th 163 (2000) ..............................................................................21

*Del Madera Properties v. Rhodes & Gardner, Inc.*,
820 F.2d 973 (9th Cir. 1987) .....................................................................22

*DHX, Inc. v. Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005) ............................................................ 19-20

*Eagle Precision Techs., Inc. v. Eaton Leonard Robolix, Inc.*,
2006 U.S. Dist. LEXIS 98598 (S.D. Cal. Apr. 5, 2006)................8, 10, 19

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ................................................................14

*Flowers v. Carville*,
310 F.3d 1118 (9th Cir. 2002) ................................................ 12-13

*Forcier v. Microsoft Corp.*,
123 F. Supp. 2d 520 (N.D. Cal. 2000) ....................................9, 15

*GO Computer, Inc. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) ......................................................16

*Hexcel Corp. v. Ineos Polymers, Inc.*,
681 F.3d 1055 (9th Cir. 2012) ....................................................11

*Intermedics, Inc. v. Ventritex, Inc.*,
822 F. Supp. 634 (N.D. Cal. 1993) ............................................18

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ........................................................10, 17

*Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*,
285 F.3d 848 (9th Cir. 2002) ......................................................21

*Kittel v. Thomas*,
620 F.3d 1203 (9th Cir. 2011) ....................................................21

*Kodadek v. MTV Networks*,
152 F.3d 1209 (9th Cir. 1998) ....................................................21

*M&F Fishing, Inc. v. Sea-PAC Ins. Managers, Inc.*,
202 Cal. App. 4th 1509 (2012) ..................................................20

*MEECO Mfg. Co. v. True Value Co.*,
U.S. Dist. LEXIS 25986 (W.D. Wash. Apr. 3, 2007) ................22

*Miller v. Bechtel Corp.*,
33 Cal. 3d 868 (1983) ...........................................................17-18

*Mirbeau of Geneva Lake, LLC v. City of Lake Geneva*,
746 F. Supp. 2d 1000 (E.D. Wis. 2010) ....................................11

*Motown Record Corp. v. George A. Hormel & Co.*,
657 F. Supp. 1236 (C.D. Cal. 1987) ..........................................22

*Pitts v. Terrible Herbst, Inc.*,
653 F.3d 1081 (9th Cir. 2011) ....................................................19

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) ................................................................10

*Ritchie v. Williams*,
395 F.3d 283 (6th Cir. 2005) ...................................................................21

*Sabety v. Pomona Valley Hosp. Med. Ctr., Inc.*,
2001 Cal. App. Unpub. LEXIS 529 (Cal. App. 2d Dist. Dec. 20, 2001) ...............17

*Samuels v. Forest*,
2007 WL 3149285 (Cal. App. Oct. 30, 2007) ........................................16

*Stockton Citizens for Sensible Planning v. City of Stockton*,
48 Cal. 4th 481 (2010) ...........................................................................8

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) ......................................10

*Suckow Borax Mines Consolidated v. Borax Consolidated*,
185 F.2d 196 (9th Cir. 1951) .................................................................12

*Tatyana Evgenievna Drevaleva v. United States*,
2010 U.S. Dist. LEXIS 51687 (N.D. Cal. May 26, 2010) ....................20

*Trembath v. Digardi*,
43 Cal. App. 3d 834 (1974) ......................................................8-9, 14, 19

*Trenton v. Infinity Broadcast'g Corp.*,
865 F. Supp. 1416 (C.D. Cal. 1994) .....................................................21

*Yumul v. Smart Balance, Inc.*,
733 F. Supp. 2d 1117 (C.D. Cal. 2010) ................................................12

**<u>Statutes</u>**

17 U.S.C. § 301 .....................................................................................21

17 U.S.C. § 304 ...............................................................................*passim*

Cal. Bus. & Prof. Code § 17208 ...........................................................21

Cal. Code of Civ. Proc. § 339(1) .......................................................8, 13

F.R.C.P. 56 ..........................................................................................7-8

TABLES OF CONTENTS AND AUTHORITIES

**INTRODUCTION**

1      This motion for summary judgment is straightforward:  DC Comics' ("DC")

Fourth, Fifth, and Sixth Claims are time-barred.  DC alleges that Defendants engaged

in tortious conduct between **2001 and 2003**.  The record shows that DC was on

notice of this supposedly tortious conduct by no later than **2006**.  And yet DC did not

file suit that year.  Nor did it file in 2007, 2008, or even 2009.  Instead, DC sat on its

alleged rights, and did not file suit until May 2010 – nearly a decade after the

supposed torts had occurred and nearly half a decade after it was put on notice.

These state-law claims were filed much too late, and are conclusively barred by the

statute of limitations.

      DC's Fourth Claim alleges that Mr. Toberoff and Pacific Pictures Corp.

("PPC") tortiously interfered with DC's 1992 agreement with Joseph Shuster's

siblings by entering into **2001** and **2003** agreements with Mark Warren Peary (both of

which were cancelled in **2004**), and by serving notices of termination.  This claim is

barred by the two-year statute of limitations applicable to interference claims, which

started to run, at the very latest, when DC had enough information to make a

reasonable person "suspicious," thereby putting DC on inquiry notice.

      Here, DC received the Shuster termination notice in **2003**; and was provided

with complete, unredacted copies of both the 2001 and 2003 PPC agreements in

**2006**.  With the termination notice and agreements in hand, DC was on actual notice

of its Fourth Claim, and the clock started ticking.  The statute of limitations ran out in

**2008**, at the latest, two years before DC filed this suit.

      DC's Fifth Claim alleges that Mr. Toberoff tortiously interfered with its

relationship with Joanne Siegel and Laura Siegel Larson when he conveyed an offer

to their attorney to license their Superman rights in **August 2002**.  According to DC,

this offer wrongfully induced the Siegels to end their negotiations with DC (even

though the Siegels had called an agreement with DC "impossible" months earlier).

      This claim is also barred by the applicable two-year statute of limitations.  DC

1    received a **September 21, 2002** letter from the Siegels formally ending negotiations.

2    When negotiations resumed in **2003**, it became aware that the Siegels were

3    represented by Mr. Toberoff and Ari Emanuel.  By mid-**2006,** DC claims it received

4    an anonymous, so-called "Timeline," containing the false accusation that the August

5    2002 offer was fraudulent.  DC disclosed the Timeline's allegations to its outside

6    counsel in **2006**.  Its outside counsel took extensive discovery in **2006**, including

7    deposition testimony from all relevant witnesses about the August 2002 offer, the

8    Siegels' September 21, 2002 letter ending negotiations, and their subsequent October

9    3, 2002 agreement with IP Worldwide (Toberoff/Emanuel), which was produced to

10   DC in late-**2006**.

11          There is no need to speculate whether all of this was enough to put DC on

12   notice of its Fifth Claim – the answer is found in DC's own briefs in the related

13   *Siegel* case.  During summary judgment, in **2007**, DC explicitly argued that Mr.

14   Toberoff had "interfered" with its relationship with the Siegels.  According to DC,

15   the Siegels "abruptly fired [their former counsel] and terminated discussions with DC

16   shortly after receiving Mr. Toberoff's '$15 million plus' offer."  Statement of

17   Undisputed Facts ("SUF") ¶47; *see also* SUF ¶46 (DC:  Siegels agreed to a contract

18   "until [they] suddenly appeared to have second thoughts after being presented with a

19   seemingly more lucrative offer by their current counsel [Toberoff].").

20          By no later than 2006, DC had more than sufficient information to trigger the

21   applicable two-year statute of limitations.  DC did not file until four years later in

22   **2010** – two years after the statute had run out.

23          DC's Sixth Claim alleges that the expired 2001 and 2003 PPC agreements, as

24   well as a 2008 agreement between the Siegels and Shusters, ran afoul of California's

25   "Unfair Competition Law."  This claim is moot.  The only relief DC seeks is to have

26   the agreements declared invalid – relief DC already secured when the Court ruled in

27   DC's favor on its Third Claim.  The jurisdiction of federal courts is limited to "live"

28   controversies, and courts lack the authority to issue advisory opinions on moot

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

1    claims.  This claim is also preempted because it is based entirely upon an alleged

2    violation of the Copyright Act.  Finally, to the extent it is based on the 2001 and 2003

3    PPC Agreements, the claim is barred by the applicable four-year statute of

4    limitations, which began to run on the date of supposed injury, *i.e.*, when these

5    agreements were entered into.

6                                             * * *

7         As this Court has recognized, the central legal issue in this case was whether

8    the Shuster estate's notices of termination under the Copyright Act were valid.  *See*

9    Dkt. 533 at 3 (Court: "The resolution of DC's First Claim regarding the validity of

10   the Shuster Termination is []'of far greater economic importance to the parties than

11   any of DC's peripheral state-law claims.'") (citation omitted).  DC's long time-barred

12   Fourth, Fifth, and Sixth Claims were tacked onto its complaint in the hope of putting

13   pressure on the Shuster executor (Mr. Peary), his mother Ms. Peavy, Ms. Larson, and

14   their long-time counsel, Mr. Toberoff.  Now that the Court has ruled on the validity

15   of the Shuster termination, these "peripheral" state-law claims are all that remain of

16   this case.  *Id.*  It is time to dispose of these stale secondary claims and finally bring

17   the *DC Comics* case to a close.  *See* 9th Cir. Appeal No. 11-56934, Dkt. 66 at 3

18   (Ninth Circuit noting that "arguments based on the legal sufficiency of DC's claims

19   … are properly directed to the district court in the form of a dispositive motion").

20                    **FACTUAL AND PROCEDURAL BACKGROUND**

21        **A.      The Shuster Termination**

22        After Joe Shuster's death, DC entered into a one-page agreement dated

23   October 2, 1992 with his surviving siblings, Frank Shuster and Jean Adele Peavy (the

24   "1992 Agreement").  SUF ¶1.[1]  In 1998, Congress amended the 1976 Copyright Act,

25   and provided an author's estate with the right to recover the author's copyrights by

26

27   _____

[1] In 2012, this Court held that the 1992 Agreement nullified the Shuster estate's termination
right by effectively revoking Shuster's prior Superman copyright assignments to DC and

28   simultaneously re-assigning Shuster's Superman copyrights to DC in a non-terminable post-
January 1, 1978 grant.  Dkt. 507.

                                             3

statutorily terminating the author's old copyright grants.  Pub. L. 105-298 (1998); 17 U.S.C. § 304(c)(2)(D).  In November 2001, Mr. Peary and his mother, Ms. Peavy, entered into a November 23, 2001 agreement with Mr. Toberoff's "loan-out" company, Pacific Pictures Corp. (the "2001 PPC Agreement") "to investigate, retrieve, enforce and exploit" Joe Shuster's claims and copyrights "via the establishment of Shuster's estate and the estate's termination pursuant to Section 304(c) of the U.S. Copyright Law (Title 17, U.S.C.)...."  SUF ¶2.  Thereafter, Joe Shuster's estate was probated, and Mr. Peary was appointed the estate's executor on October 7, 2003.  SUF ¶3.  The Shuster Estate entered into an agreement dated October 27, 2003 (the "2003 PPC Agreement") "engag[ing] PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's, rights," including the estate's "copyright termination interest in 'SUPERMAN' pursuant to Section 304(d) of the U.S. Copyright Law."  SUF ¶4.

In November 2003, Mr. Toberoff, as attorney for the Shuster Estate, served on DC and filed a notice of termination under 17 U.S.C. § 304(d) of Joe Shuster's prior Superman copyright grants to DC (the "Shuster Termination").  SUF ¶5.

In September 2004, Toberoff, Peary and Peavy voluntarily cancelled the 2001/2003 PPC Agreements, and entered into a legal retainer agreement dated as of November 23, 2001.  SUF ¶¶6-7.

### B.    The Siegels' Terminations And Negotiations With DC

#### 1.    The Siegels Negotiate With DC

In 1997, Jerome Siegel's widow, Joanne Siegel, and his daughter, Laura Siegel Larson, filed and served on DC, pursuant to 17 U.S.C. § 304(c), notices of termination of Siegel's Superman copyright grants to DC (the "Siegel Termination"). SUF ¶8.  On April 15, 1999, one day before the Siegel Termination became effective, DC contested it.  SUF ¶9.  The Siegels engaged in negotiations with DC, represented by attorney Kevin Marks.  SUF ¶10.  On October 19, 2001, Marks sent DC a letter outlining and purporting to accept what he believed were the terms of an oral October

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

16 offer by DC (the "October 19, 2001 Letter"). SUF ¶11. On October 26, 2001, DC sent Marks its "outline" of what it believed the terms were. SUF ¶12. Months later, on February 1, 2002, DC sent a 56-page draft of the agreement it proposed. SUF ¶13. Angered by DC's February 1 proposal, Joanne Siegel sent a letter to DC's parent company on May 9, 2002, which stated:

> Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted [DC's] last proposal … we were stabbed in the back by a shocking contract. Your company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the [October 19] proposal. …. After four years we have no deal and this contract makes an agreement impossible.

SUF ¶14.

## 2.    The August 2002 Offer

In late July/August 2002, three months *after* Joanne Siegel had declared an agreement with DC "impossible," Mr. Toberoff informed Marks that he was working with Ari Emanuel, the CEO of Endeavor (now William Morris Endeavor) and inquired whether the Siegels were interested in licensing their rights. SUF ¶¶15-16. Marks, Toberoff and Emanuel then scheduled and held a conference call in August 2002, during which an offer was made to purchase the Siegels' rights for $15 million (the "August 2002 Offer"). SUF ¶17. Marks conveyed the August 2002 Offer to the Siegels, but neither they nor Marks responded to it. SUF ¶18.

## 3.    The Siegels Regroup

On September 21, 2002, after years of grinding negotiations, the Siegels sent a letter to Marks, with a copy to DC, terminating Marks and providing "notification that we are totally stopping and ending all negotiations with DC." SUF ¶19. On October 3, 2002, the Siegels entered into an agreement with IP Worldwide, LLC (the "IP Worldwide Agreement"), a joint venture between Mr. Toberoff and Emanuel, to represent their Superman termination interest. SUF ¶20. The IP Worldwide Agreement provided for "the legal services of Marc Toberoff, Esq. and the business services of Ariel Emanuel to market and negotiate the sale, license [or] settlement …

1   of the [Siegel Termination] Rights." SUF ¶20.[2]  In 2003, Toberoff and Emanuel, on

2   the Siegels' behalf, recommended settlement negotiations with DC.  SUF ¶22.

3       **C.**    **The *Siegel* Litigation**

4       After renewed negotiations with DC did not result in settlement, Mr. Toberoff

5   filed the *Siegel* case in October 2004 to validate the Siegel Terminations, and enforce

6   the Siegels' copyrights.  SUF ¶23.  In response, DC asserted various alleged

7   defenses, and argued, for the first time in three years, that the October 19, 2001 Letter

8   was an enforceable contract.  SUF ¶24.

9       On or before June 2006, Warner Bros. (DC's parent company and co-

10  defendant in *Siegel*) received packages of anonymous documents stolen from Mr.

11  Toberoff's law firm, including privileged attorney-client communications,

12  accompanied by an anonymous document entitled "Superman/Marc Toberoff

13  Timeline."  SUF ¶38.  The "Timeline" accused Mr. Toberoff of wrongfully

14  interfering with DC's relationships and agreements with the Shuster and Siegel heirs.

15  SUF ¶39.  Warner's in-house counsel – Wayne Smith (Vice President, Senior

16  Litigation and Chief Patent Counsel) and John Schulman (General Counsel), who

17  oversaw the *Siegel* litigation for both Warner and DC – read the Timeline in June

18  2006.  SUF ¶¶40-41.  In July 2006 Mr. Smith informed DC's outside litigation

19  counsel of the Timeline's interference allegations.  SUF ¶42.

20      During discovery in *Siegel*, the 2001 and 2003 PPC Agreements with the

21  Shusters and the 2002 IP Worldwide Agreement with the Siegels were all produced

22  to DC by November 15, 2006.  SUF ¶25.  DC took extensive discovery on the 2001

23  and 2003 PPC Agreements.  SUF ¶¶29-33.  DC also took extensive discovery on the

24  August 2002 Offer, the Siegels' cessation of negotiations and the IP Worldwide

25  Agreement.  SUF ¶¶26-28, 31, 34-36.

26      In May 2007, in *Siegel*, both sides filed motions for partial summary judgment.

27  SUF ¶43.  In opposition, DC argued that Mr. Toberoff had interfered with DC's

28  _____

[2] The IP Worldwide Agreement expired on April 23, 2005.  SUF ¶21.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

1   negotiations with the Siegels via the August 2002 "offer[] to purchase [their]

2   Superman copyright interests for $15 million." SUF ¶¶44-47.  On March 26, 2008,

3   the district court granted the Siegels' motion, held that the Siegel Termination was

4   valid and rejected DC's claim that the parties had reached an agreement on October

5   19, 2001.  *Siegel v. Warner Bros. Ent., Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008).

6       The *Siegel* case was thereafter transferred to this Court, which entered a Rule

7   54(b) judgment in May 2011.  *Siegel*, Dkt. 669.  On appeal, the Ninth Circuit found

8   that the October 19, 2001 Letter was sufficient to create a contract on October 19,

9   2001, and remanded the case for further adjudication of DC's contract claims.  9th

10  Cir. Appeal No. 11-55863, Dkt. 70-1.

11      **D.    The Instant Action**

12      On May 14, 2010, after the Siegel and Shuster heirs did not accept Warner's

13  offer in a settlement mediation, DC filed the instant action against its opposing

14  counsel, Mr. Toberoff, and against the Siegel and Shuster heirs.  SUF ¶¶50-51.

15  Along with three federal claims aimed at the Shuster Termination, DC brought

16  California state-law claims:  its Fourth and Fifth Claims, against Mr. Toberoff for

17  purported tortious interference, and its Sixth Claim, against all defendants for

18  declaratory relief under California's unfair competition law ("UCL").  SUF ¶51.

19      **LEGAL STANDARD**

20      Summary judgment is appropriate where the record "show[s] that there is no

21  genuine issue as to any material fact and that the moving party is entitled to

22  judgment as a matter of law."  F.R.C.P. 56(c).  The moving party bears the initial

23  burden of demonstrating the absence of a genuine issue of material fact.  *Anderson v.*

24  *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is material only if it affects

25  the outcome.  *Id.* at 248.  The moving party need not disprove the other party's case.

26  *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party

27  meets its initial burden, the "adverse party may not rest … [on its] pleadings," and

28  must demonstrate by "admissible" evidence the existence of a genuine issue of

1  material fact for trial.  F.R.C.P. 56(c), *Celotex*, 477 U.S. at 323.  "[T]he mere

2  existence of a scintilla of evidence" is insufficient.  *Anderson*, 477 U.S. at 252.

3       Where claims are barred by the statute of limitations, courts must dismiss them

4  irrespective of their purported merits.  *See Stockton Citizens for Sensible Planning v.*

5  *City of Stockton*, 48 Cal. 4th 481, 499 (2010) ("A statute of limitations … operates

6  conclusively across-the-board.  It does so with respect to all causes of action….").

## ARGUMENT

## I.   DC'S FOURTH CLAIM IS TIME-BARRED

### A.   DC's Claim Accrued By No Later Than 2006 And Is Barred By The Two-Year Statute Of Limitations

11       DC's Fourth Claim (Dkt. 49, First Amended Complaint ("FAC") ¶¶ 174-79)

12  for tortious interference with contract, based on Mr. Toberoff's alleged inducement

13  of the Shusters to breach the 1992 Agreement, is barred by the two-year statute of

14  limitations.  Cal. Code of Civ. Proc. § 339(1).  A claim of tortious interference with

15  contract accrues on "the date of the wrongful act" and "[can]not be later than the

16  actual breach of the contract by the party who was wrongfully induced to breach."

17  *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974); *see Eagle Precision Techs.,*

18  *Inc. v. Eaton Leonard Robolix, Inc.*, 2006 U.S. Dist. LEXIS 98598, at *6-7 (S.D. Cal.

19  Apr. 5, 2006) ("At the very latest, the statute of limitations beg[ins] to run on the date

20  [the plaintiff] learn[s] of the breach….").

### 1.   The Alleged Interference Consisted Of The 2001 And 2003 PPC Agreements And The 2003 Shuster Termination

23       Here, DC has alleged, and this Court has accepted, that the supposed "actual

24  breach" at issue in DC's Fourth Claim occurred when the Shuster heirs "form[e]d a

25  joint venture [with] … Pacific Pictures Corporation [the 2001 PPC Agreement] … to

26  exploit the Shusters' copyrights."  Dkt. 337 at 2-3 ("[T]he Pacific Pictures

27  Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff

28  those rights which were already assigned to DC Comics"); *see also* Dkt. 304 at 13

1   (DC: "[The] Fourth Claim challenges Toberoff's deals with the Shusters [the

2   2001/2003 PPC Agreements] that interfere with DC's rights under its prior

3   agreements with the Shusters"); Dkt. 334 at 18 (DC: "DC's Fourth Claim challenges

4   their business conduct in having Pacific Pictures enter into a contract with the

5   Shusters [the 2001 PPC Agreement]…."); FAC ¶177 (DC: "Toberoff's ultimate

6   purpose was to induce them to repudiate the 1992 Agreement….  Toberoff knew that

7   his actions in having his company [PPC] enter into a joint venture with the Shusters

8   [the 2001 PPC Agreement] for the purpose of terminating DC's rights [was]

9   substantially certain to interfere with [the] 1992 Agreement….").

10      DC alleged that the Shuster Termination constituted "interference" as well.  *Id.*

11  *See also* FAC ¶6 ("Toberoff also induced the Shuster heirs to serve a notice of

12  termination … [as to] the same alleged interests they had granted to DC Comics

13  under the parties' 1992 agreement."), ¶60 ("The 2001 [PPC Agreement] provided that

14  this purpose would be realized in part via 'the establishment of Joe Shuster's estate

15  … and the estate's termination pursuant to 17 U.S.C. § 304(c)….'").

16      Leaving aside the dubious nature of DC's legal theory that a joint venture to

17  exercise statutory termination rights is tortious, the Shuster heirs and PPC formed

18  their joint venture in 2001 (2001 PPC Agreement); reaffirmed it in 2003 after the

19  Shuster Estate was probated (2003 PPC Agreement); and thereafter served the

20  Shuster Termination on DC in late-2003.  SUF ¶¶2, 4-5.  The alleged "actual breach"

21  of the 1992 Agreement therefore occurred *seven to nine years* before DC filed this

22  suit in 2010, and "the [two-year] statute of limitations [for tortious interference]

23  began to run when the contract was actually breached."  *Forcier v. Microsoft Corp.*,

24  123 F. Supp. 2d 520, 530 (N.D. Cal. 2000) (citing *Trembath*, *supra*).

25          **2.      The "Delayed Discovery" Rule Is Inapplicable Because DC**

26                  **Received The Shuster Termination In 2003 And The PPC**

27                  **Agreements In 2006**

28      DC has argued that the statute of limitations was tolled under California's

9

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

"delayed discovery rule."  However, this rule is "an exception to the general rule" that "'postpones accrual of a cause of action until the plaintiff discovers, *or has reason to discover*, the cause of action.'"  *Eagle Precision Techs., Inc.*, 2006 U.S. Dist. LEXIS 98598, at *8 (emphasis added) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).

Under this rule, all that is required to trigger the statute of limitations is *inquiry notice*, which occurs "once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988) (citations omitted).  "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim."  *Id.* at 1111.  "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.  So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her."  *Id*; *Norgart*, 21 Cal. 4th at 397-398 (interference claims accrue when plaintiff "at least suspects … that someone has done something wrong") (citations omitted).

DC was unequivocally on notice four or more years before it filed this suit.  DC was served with the Shuster Termination on November 10, 2003.  SUF ¶5; *see* FAC ¶ 177 ("terminating DC's rights [was] substantially certain to interfere with [the] 1992 Agreement….");  *see Streamcast Networks, Inc. v. Skype Techs., S.A.*, 2006 WL 5441237, at *10 (C.D. Cal. Sept. 14, 2006) (interference claim accrued once plaintiff knew that counterparty sought to "terminate the [contract]").

Moreover, in *Siegel*, **DC was provided with complete unredacted copies of both the 2001 and 2003 PPC Agreements by November 15, 2006**, putting DC on actual notice.  SUF ¶25; *see Eagle Precision Techs., Inc.*, 2006 U.S. Dist. LEXIS 98598, at *6-7 (statute "began to run on the date [plaintiff] learned of the breach … when it received a copy of the [interfering] Agreement").  DC even introduced and relied upon the PPC Agreements as exhibits in its November 17, 2006 deposition of Mr. Toberoff, and extensively questioned him about both the Shuster Termination

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

1    and the 2001/2003 PPC Agreements.  SUF ¶¶31-33.

2         The statute of limitations thus began to run *at the very latest* on November 15,

3    2006, when DC was on actual notice of the alleged interference and breach caused by

4    the 2001 and 2003 PPC Agreements and had long before received the 2003 Shuster

5    Termination.  *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1061 (9th

6    Cir. 2012) (plaintiff had inquiry notice once it "knew of two specific [] agreements"

7    underpinning the claim).  DC's Fourth Claim expired at the very latest on November

8    15, 2008, and must be rejected as DC filed in 2010, long after the statute had run.

9    *See Brodzki v. United States*, 2012 WL 1536344, at *1 (N.D. Cal. May 1, 2012)

10   ("The court must dismiss Plaintiff's complaint … because the statute of limitations

11   for his claims has passed."); *Mirbeau of Geneva Lake, LLC v. City of Lake Geneva*,

12   746 F. Supp. 2d 1000, 1018 (E.D. Wis. 2010) (holding that the "court has no choice

13   but to dismiss [tortious interference] claims" where the "events providing a cause of

14   action … occurred well outside of the statute of limitations period").

15         **3.    The "Timeline" Does Not Invoke The Delayed Discovery Rule**

16         DC has also argued that the statute of limitations was tolled under California's

17   "delayed discovery rule" because it was supposedly unaware of the facts until

18   Defendants formally produced the anonymous "Timeline" in 2008.  This is not true.

19   First, DC has admitted that in-house counsel received and read the Timeline in 2006,

20   and then conveyed the Timeline's accusations to outside counsel.  SUF ¶¶40-42; *see*

21   section II.A.2, *infra*.  Second, as shown directly above, the PPC Agreements and

22   Shuster Termination placed DC on actual and inquiry notice without the Timeline.

23   Indeed, DC's Fourth Claim is based directly on the PPC Agreements and the Shuster

24   Termination themselves.  *See, e.g.,* FAC ¶¶6, 60-64, 90, 177-78.  At the moment DC

25   received copies of the PPC Agreements in 2006, it could have written and filed

26   almost the exact same Fourth Claim as it did in 2010, *two years* after the limitations

27   period had expired.

28   ///

### 4.   There Was No "Concealment," And Concealment Is Irrelevant When A Party Has Inquiry Notice

DC has argued that Defendants somehow "concealed" the relevant facts, but Defendants served and filed the Shuster Termination in 2003 and *voluntarily* produced the allegedly tortious 2001 and 2003 PPC Agreements in 2006.  Moreover, "the fraudulent concealment tolling provision does not come into play, whatever the lengths to which a defendant has gone to conceal his wrongs, if a plaintiff is on notice of a potential claim," as DC unquestionably was after it received the PPC Agreements and Shuster Termination.  *Barber v. Superior Court*, 234 Cal. App. 3d 1076, 1083 (1991).  DC also has not "pled with [the requisite] particularity" fraudulent concealment as to its Fourth Claim, because it does not and indeed cannot show any "circumstances indicating that [it] was not at fault for failing to discover [the facts] earlier, and … that [it] had no actual or constructive knowledge of facts sufficient to put [it] on inquiry."  *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1133 (C.D. Cal. 2010); *see Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir. 1980) (plaintiff must show affirmative conduct on the part of the defendant "which would lead a reasonable person to believe that there was no claim for relief"); *Suckow Borax Mines Consolidated v. Borax Consolidated*, 185 F.2d 196, 209 (9th Cir. 1951) (a "bare allegation" of fraudulent concealment "falls far short of the particularity of statement required by Rule 9(b)").

### 5.   The "Continuing Harm" Doctrine Does Not Apply To DC's Interference Claims

DC has erroneously argued that the statute is tolled due to purported "continuing harm" from the 2001 and 2003 PPC Agreements – cancelled in 2004. The "continuing harm" doctrine is inapplicable because it applies only "where there is 'no single incident' that can 'fairly or realistically be identified as the cause of significant harm.'"  *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) (citations omitted) (where lawsuit based on publication of a book, publication, not

continuing distribution, triggered the statute; "[t]he only thing 'continuing' about this tort was [the plaintiff's] protracted failure to bring a lawsuit when she had the chance").  The "continuing harm" doctrine has no application here, where the PPC Agreements can be "fairly" and "realistically" identified as the supposed cause of, and basis for, DC's claim.  *Id.  See also* Dkt. 337 (Court's order, holding that the "gravamen" of DC's claim is that Mr. Toberoff "reach[ed] out to, and form[ed] a joint venture between the Shusters and Pacific Pictures Corporation").

Moreover, the courts have expressly rejected "continuing harm" theories with respect to claims for tortious interference.  *See Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 952 (N.D. Cal. 2010).  Indeed, DC can cite ***no*** case applying the "continuing harm" doctrine to interference claims.  *Id.* (noting that no California case has "extended the doctrine [of continuing harm] to the tort of intentional interference with prospective economic advantage" or contract).

## II.    DC'S FIFTH CLAIM IS TIME-BARRED

### A.    The Statute Was Triggered In 2002, And DC Was On Inquiry Notice Of Its Claim By 2006

Like its Fourth Claim, DC's Fifth Claim (FAC ¶¶ 180-86) for interference with prospective economic advantage, filed in 2010, is barred by the two-year statute of limitations.  Cal. Code of Civ. Proc. § 339(1).

DC's Fifth Claim alleges that Mr. Toberoff tortiously interfered with DC's relationship with the Siegels by conveying an August 2002 offer to the Siegels' then-counsel, Kevin Marks, to purchase their Superman copyrights for $15 million.  FAC ¶¶77-79 ("On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels…. Toberoff claimed the investor would give the Siegel Heirs $15 million cash up front…. [A]s a result of Toberoff's fraudulent inducements, the Siegel Heirs stated that they would repudiate their agreement with DC Comics and accept Toberoff's [August 2002] offer.").  DC alleges that this "interference" caused the Siegels to end negotiations and "repudiate their agreement and business

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

relationship" with DC (FAC ¶¶185-86), even though Joanne Siegel had already declared an agreement "impossible" months earlier.  SUF ¶14.  This is all alleged to have occurred in *2002*, eight years before DC filed this suit.  FAC ¶¶77-84.  As set forth above, the date of accrual "[can] not be later than the actual breach of the contract by the party who was wrongfully induced to breach," *Trembath*, 43 Cal. App. 3d at 836, which DC alleged was in 2002.  FAC ¶¶77-84, 185-86.

### 1. DC Was On Inquiry Notice Since At Least 2006

As with its Fourth Claim, DC previously attempted to salvage its time-barred Fifth Claim by pleading ignorance.  However, the "delayed discovery rule" does not save DC's claim from the statute of limitations.

By 2006 DC had actual notice of most of the alleged "facts" underlying its Fifth Claim and the type of wrong allegedly done, and was therefore on inquiry notice of its claim as a whole.  As the California Supreme Court has explained, "[r]ather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them."  *Fox v. Ethicon Endo-Surgery*, *Inc.*, 35 Cal. 4th 797, 807-08 (2005).

First, DC received a letter from the Siegels terminating their counsel, Kevin Marks, and formally ending all negotiations on **September 21, 2002**.  *See* SUF ¶19; FAC ¶¶79-80 ("On or around September 21, 2002, the Siegel Heirs sent a letter to Marks terminating him as their attorney.  On or around September 21, 2002, based on Toberoff's inducements and other acts of interference described above, the Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC Comics Agreement.").

Second, by **2003**, Emanuel and Toberoff had informed DC that they now represented the Siegel interest, and recommended negotiations with DC.  SUF ¶22.

Third, on October 7, **2006**, DC deposed the Siegels' former attorney, Kevin Marks, who testified that Emanuel and Toberoff had made an offer in **August 2002** to purchase the Siegels' Superman rights for $15 million.  SUF ¶¶26-28; *see* FAC

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

¶¶77-79 (quoted above).

Fourth, by November 15, **2006**, DC received a full unredacted copy of Laura and Joanne Siegel's **October 3, 2002** agreement with IP Worldwide, LLC, retaining Emanuel and Toberoff to "arrange and negotiate the sale, lease, license, and all other dispositions or exploitations" of the Siegels' Superman rights, shortly after the Siegels had formally terminated negotiations with DC on **September 21, 2002**. SUF ¶¶20, 25; FAC ¶81 ("On October 23, 2002, the Siegel Heirs formalized an agreement with defendant IP Worldwide….").

Fifth, on November 17, **2006**, DC deposed Mr. Toberoff , questioning him *at length* about the August 2002 Offer and IP Worldwide Agreement. SUF ¶¶31, 34-36. In fact, DC's deposition of Mr. Toberoff in 2006 tracks its Fifth Claim. SUF ¶37.

By late 2006 then, DC knew (1) all about the August 2002 Offer to license the Siegels' Superman copyrights; (2) that the Siegels had formally terminated negotiations on September 21, 2002 and (3) that by October 3, 2002, the Siegels had entered into an agreement with Emanuel/Toberoff to market their Superman rights. *See* FAC, ¶78 ("On August 8, 2002, Toberoff conveyed an offer to Marks for presentation to the Siegels…."); Fifth Claim, ¶185 ("Toberoff knew his actions [the August 2002 offer] were substantially certain to interfere with the Siegel Heirs' agreement and ongoing business dealings with DC Comics."); ¶186 ("As a direct result of Toberoff's misdeeds, the Siegel Heirs repudiated the Siegel-DC Comics Agreement….").

This juxtaposition of events was more than sufficient to have at least put DC on ***inquiry notice*** as to its Fifth Claim that Mr. Toberoff interfered with DC's alleged prospective economic relationship or agreement with the Siegels by conveying the August 2002 Offer to purchase the Siegels' rights. *See Forcier*, 123 F. Supp. 2d at 531 (where plaintiff knew that allegedly misappropriated technology had been sold to a company, that knowledge alone triggered "inquiry" notice as to any interference claims against that company, even if plaintiff did not know any additional facts to

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

1  support interference); *Samuels v. Forest*, 2007 WL 3149285, at *8 (Cal. App. Oct.

2  30, 2007) (tortious interference claim accrued when the plaintiff "knew as of June 26

3  that [Defendant] was no longer interested in negotiating with him, and as of July 9

4  that the Buyout Agreement had been breached"); *GO Computer, Inc. v. Microsoft*

5  *Corp.*, 508 F.3d 170, 172 (4th Cir. 2007) (affirming summary judgment where

6  plaintiff was "on inquiry notice of their claims as of 1992, when enough red flags had

7  flown that a reasonably diligent person would have investigated and acted.").

### 2.  DC Read The Timeline In 2006

9      According to DC, it did not know enough to put it on notice of its Fifth Claim

10  until 2008 when the Court held in *Siegel* that privilege had been waived on the

11  Timeline.  Not true.  DC received, read and investigated the Timeline in 2006.

12      DC alleged that Warner, its parent-company, and DC's co-defendant in *Siegel*,

13  received the Timeline in June 2006.  SUF ¶38.  And Warner admitted that when it

14  received the anonymous Timeline, *at least* two of its attorneys in charge of the *Siegel*

15  litigation (Wayne Smith and John Schulman, its General Counsel) read the Timeline.

16  SUF ¶41-3 (Smith:  "I looked at what might be characterized as the 'cover letter' that

17  came with the [Stolen] Documents.  The cover letter, which was not signed …

18  referenced the documents enclosed, providing an overview of their contents and their

19  connection to Plaintiffs' counsel's alleged wrongdoing.  I also thumbed through the

20  [stolen] Documents contained with the letter, but did not read any of them in

21  detail."), ¶41-4 ("I told Mr. Schulman that based on the contents of the cover letter

22  and my brief thumbing through the documents, it appeared that certain of the

23  documents in the package were privileged. …. Mr. Schulman … advised me that he

24  had only looked at the cover letter that came with the documents ….").

25      In fact, DC's outside counsel testified that on July 5, **2006**, Wayne Smith

26  called him and informed him of the "unsigned cover letter [the Timeline] alleging,

27  among other things, various types of ethical misconduct on the part of Plaintiffs'

28  counsel [Mr. Toberoff] in connection with present litigation" and that the "cover

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

letter also explained how the enclosed [stolen] documents related to the misconduct allegations."  SUF ¶42.  DC/Warner cannot read the Timeline's allegations, convey them to outside counsel, and now pretend that it was not "on notice."

That Defendants' asserted privilege over the Timeline, and were not held to have waived privileged until 2008, did not toll the statute of limitations.  *See Sabety v. Pomona Valley Hosp. Med. Ctr., Inc.*, 2001 Cal. App. Unpub. LEXIS 529, at *16 (Cal. App. 2d Dist. Dec. 20, 2001) (rejecting argument that statute of limitations should be tolled since "[plaintiff] lacked the means of discovery of the actual information [to support his claim] because the defendants asserted a privilege against discovery of [the information]'").

As set forth in *Jolly*, 44 Cal 3d at 1110-11, the statute of limitations is not tolled while all of the facts and evidence are gathered.  Rather, the statute begins to run when a reasonable person has suspicion of wrongdoing and is thus put on inquiry notice.  Having already read and conveyed the Timeline's contents to outside counsel in 2006, DC did not need the Timeline to investigate its suspicions of "interference."  In fact, after conveying the Timeline's allegations to outside counsel in 2006, DC immediately did just that – it investigated its suspicions by taking extensive discovery in *Siegel* as to Mr. Toberoff's communications with Marks, the August 2002 Offer, the IP Worldwide Agreement, *etc*. SUF ¶¶26-31, 34-36.

Moreover, even without this discovery, DC, after reading the Timeline in 2006, could have filed suit, basing its interference claim on known, non-privileged events (*e.g*., the Siegels' ending of negotiations, and their retention of Toberoff / Emanuel shortly thereafter) and included its other allegations on the basis of "information and belief," as is routine legal practice and as DC actually did in the untimely complaint it filed four years later in this case.  *See also Jolly,* 44 Cal. 3d at 1111 ("A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery.");  *Miller v. Bechtel Corp.*, 33 Cal. 3d 868, 875 (1983) (fraud claim accrued when party had "serious doubts" and "suspicions," even

17

though party did not secure the documentary evidence until later); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 641 (N.D. Cal. 1993) (noting it "simply is *not* the law" that a cause of action does not accrue "until a plaintiff is in a position to present evidence which will … establish facts which make liability a legal certainty") (emph. added).  For the purposes of the statute of limitations, all that matters is that DC read the Timeline in 2006 and that document triggered the statute by placing DC on inquiry notice of its interference claims.  *See Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1596-97 (2008) (claim barred where plaintiff "admittedly read all the pertinent documents" outside the statute of limitations period).

### 3.     DC's Statements And Conduct Demonstrate That It Was On Actual Notice Of Its Interference Claims

Demonstrating that DC was well-aware of its interference claim long before it now argues, DC claimed throughout its **2007** summary judgment briefs in *Siegel* that Mr. Toberoff had interfered with DC's alleged agreement with the Siegels by conveying the August 2002 Offer.  SUF ¶¶44, 45 (referencing Mr. Toberoff's contacts with Marks and discussing the August 2002 "offer[] to purchase [the Siegels'] Superman copyright interests for $15 million" and the Siegels' subsequent agreement with IP Worldwide), 46 (claiming the Siegels agreed to be bound by the October 19, 2001 Letter "until [they] suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel [Toberoff]").

In fact, DC pointedly argued in **2007** that Mr. Toberoff's purported interference had caused the end of its alleged agreement:  "[T]he effort [to draft an acceptable long-form] came to naught when [the Siegels] abruptly fired Mr. Marks and terminated discussions with DC shortly after receiving Mr. Toberoff's '$15 million plus' offer."  SUF ¶47.  This, like DC's complaint here, mirrored the Timeline's accusations (read by DC in 2006) of interference.  Given that DC made these arguments in 2007, based solely on information it had in 2002-2003, its reading

of the Timeline in 2006, and its pre-2007 discovery, DC cannot now evade the two-year statute of limitations by feigning ignorance until 2008.

### B.   DC's Interference Claim Is Time-Barred Even If Amended To Allege Interference With Contract

A footnote in DC's complaint states "[i]f DC Comics' claims [about an enforceable agreement] are accepted, it will amend this Complaint to include a claim for interference with contract." FAC at 57 ¶181 n.6. Such amendment would be futile, because the claim still fails. As set forth above, the "accrual date" for a claim of interference with contract is "the actual breach of the contract" (*Trembath*, 43 Cal. App. 3d at 836), or, at the "very latest," when the plaintiff learns of the breach. *Eagle Precision Techs., Inc.*, 2006 U.S. Dist. LEXIS 98598, at *6-7. DC alleged that the Siegels' May 9, 2002 and September 21, 2002 letters "repudiated" and thereby breached the October 19, 2001 agreement, triggering the statute on any claim for interference with contract. FAC ¶¶185-86. Nor can the "delayed discovery" rule save this claim because, as shown above, DC had knowledge by 2006 of the August 2002 Offer – the crux of its interference claim(s). SUF ¶¶25-28, 31, 34-36, 40. In short, an amended claim for "interference with contract" would be barred for all of the same reasons its current claim for "interference with prospective economic advantage" is barred.

## III.   DC'S SIXTH CLAIM IS BARRED

### A.   DC's Sixth Claim Is Moot

DC's Sixth Claim (FAC ¶¶ 187-189) for unfair competition is moot. "The doctrine of mootness … requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "A claim is moot if it has lost its character as a present, live controversy," and if "the claim is moot … [it] must be dismissed." *American Rivers v. National Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1174 (9th Cir. 2005) ("It has long

1  been settled that we have no authority 'to give opinions upon moot questions….'")

2  (citations omitted).

3        Here, summary judgment to DC on its Third Claim rendered DC's Sixth Claim

4  moot, as the Court already held that the long-cancelled 2001/2003 PPC Agreements

5  and the 2008 Agreement are invalid and unenforceable.  *See* Dkt. 540 ("[T]he 2001

6  Pacific Pictures agreement, 2003 Pacific Pictures agreement, and 2008 consent

7  agreement … are deemed invalid and unenforceable….").  This is the same relief –

8  indeed, the only relief – that DC seeks in its Sixth Claim.  FAC ¶¶188-89 (the

9  "various copyright assignment and consent agreements between Toberoff and/or his

10  companies, the Siegel Heirs, and the Shuster Heirs are void and unenforceable").

11        There is no "live controversy" (*American Rivers*, 126 F.3d at 1123) between

12  the parties, because the agreements that DC alleged "unfairly violate DC Comics'

13  rights and interests" (FAC ¶188) have already been declared invalid.  *See Tatyana*

14  *Evgenievna Drevaleva v. United States*, 2010 U.S. Dist. LEXIS 51687, at *4 (N.D.

15  Cal. May 26, 2010) (claim is moot when party "has obtained the relief [it] sought");

16  *DHX, Inc*, 425 F.3d at 1174 ("It has long been settled that we have no authority 'to

17  give opinions upon moot questions or abstract propositions, or to declare principles

18  or rules of law which cannot affect the matter in issue in the case before [us].'")

19  (citations omitted).

20        DC's Sixth Claim is also moot as a practical matter because the Court granted

21  DC summary judgment on its First Claim, declaring that the Shuster Termination was

22  invalid and that the Shuster Estate recovered no Superman copyrights.  Dkt. 507 at

23  13, 16.  DC could not have been denied an alleged "right" to exclusively negotiate

24  over copyrights that the Shuster Estate did not recover, and which DC still owned.

25        Furthermore, DC cannot seek damages or attorney fees on its Sixth Claim.  *See*

26  *M&F Fishing, Inc. v. Sea-PAC Ins. Managers, Inc.*, 202 Cal. App. 4th 1509, 1522-23

27  (2012) ("[A]ttorney fees and damages, including punitive damages, are not available"

28  under California's UCL).  Because there is no "live controversy" or relief to grant,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS

1   DC's claim must be rejected as moot.  *See Kittel v. Thomas*, 620 F.3d 1203, 1206

2   (9th Cir. 2011) ("The Constitution limits the jurisdiction of the federal courts to live

3   controversies, and as such, the federal courts may not issue advisory opinions.").

## B.   DC's Sixth Claim Is Time-Barred As To The PPC Agreements

5        The bulk of DC's Sixth Claim is also barred by the statute of limitations.

6   "Actions under the UCL must be brought within four years of accrual of the cause of

7   action."  *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 179

8   (2000); Cal. Bus. & Prof. Code § 17208.  Although in California state court it

9   remains "an open question … whether [and to what extent] the discovery rule

10  applies" to UCL Claims (*Betz v. Trainer Wortham & Co.*, 236 Fed. Appx. 253, 256

11  (9th Cir. May 11, 2007)), the Ninth Circuit has held that UCL claims "are subject to a

12  four-year statute of limitations which beg[ins] to run on the date the cause of action

13  accrued, ***not on the date of discovery***."  *Karl Storz Endoscopy Am., Inc. v. Surgical

14  Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (emphasis added).

15       DC's Sixth Claim targets the 2001 and 2003 PPC Agreements.  FAC ¶188.

16  Under *Karl Storz,* DC's claim accrued when those agreements were entered into.  DC

17  cannot assert "continuing harm" because the PPC Agreements were cancelled in

18  2004.  SUF ¶6.  DC's UCL claim is time-barred as to the PPC Agreements.

## C.   DC's Sixth Claim Is Preempted By The Copyright Act

20       The Copyright Act "broadly preempts state law claims" like DC's Sixth Claim

21  under California's UCL for violation of a purported "right" under the Copyright Act

22  (FAC ¶¶187-88).  *Ritchie v. Williams*, 395 F.3d 283, 285 (6th Cir. 2005); *see* 17

23  U.S.C. § 301(a).  If a "state law unfair competition claim is based solely on rights

24  equivalent to those protected by the federal copyright laws," it is preempted.

25  *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998).  *See also Trenton v.

26  Infinity Broadcast'g Corp.*, 865 F. Supp. 1416, 1428 (C.D. Cal. 1994) ("'The fact that

27  the state-created right is either broader or narrower than its federal counterpart will

28  not save it from preemption.'") (citation omitted).

To avoid preemption, the plaintiff must demonstrate that its "state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005).

DC's state-law Sixth Claim merely reformulates DC's Third Claim under the Copyright Act. *Compare* FAC ¶172 (Third Claim: "to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material") *with* ¶189 (Sixth Claim: to "establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material"). DC's Sixth Claim, like the Third Claim, is based on a purported violation of DC's alleged "right" under the Copyright Act, 17 U.S.C. § 304(c)(6)(D); it incorporates such Third Claim allegations by reference and makes no additional substantive allegations. *See* FAC ¶¶187-88; *Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing UCL claim that incorporated by reference copyright allegations).[3] As DC's UCL claim is based on and intertwined with its Copyright Act claim, it is preempted. *See Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (UCL claim preempted where "constructed upon the premise" of a Copyright Act violation).

## CONCLUSION

Summary judgment should be granted to Defendants as to DC's Fourth, Fifth and Sixth Claims, and this case brought to a close.

Dated:  February 4, 2013        RESPECTFULLY SUBMITTED,
                                /s/ Keith G. Adams
                                _____
                                TOBEROFF & ASSOCIATES, P.C.
                                Attorneys for Defendants Mark Warren Peary *et al.*

_____

[3] *See also Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1250 (W.D. Wash. 2007) ("Plaintiff's [UCL] claim is dismissed as preempted because by incorporating the copyright claims by reference, the [UCL] claim is based on rights equivalent to those protected by copyright."); *MEECO Mfg. Co. v. True Value Co.*, 2007 U.S. Dist. LEXIS 25986 at *14 (W.D. Wash. Apr. 3, 2007) (same).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FOURTH, FIFTH, AND SIXTH CLAIMS