

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster
98-120 Queens Blvd., Apt. 4K
Rego Park, NY  11374

Ms. Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1, 1992, for as long as either one of you is alive.  Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practices and shall be subject to all applicable withholding taxes.  If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.

We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement.  We also reserve all of our other rights, remedies and defenses in such an event.

If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

Very truly yours,

DC Comics

By: _____
Paul Levitz

ACCEPTED AND AGREED TO:

_Frank Shuster_
Frank Shuster

Dated: 10/2/92

_Jean Shuster Peavy_
Jean Shuster Peavy

Dated: 10/2/92

EXHIBIT A
6

8

# GANG, TYRE, RAMER & BROWN, INC.
**ATTORNEYS AT LAW**

| | |
|---|---|
| NORMAN R. TYRE | JEFFREY M. MANDELL |
| HERMIONE K. BROWN | KEVIN S. MARKS |
| BRUCE M. RAMER | GREGG HARRISON |
| CHARLES A. SCOTT | NANCY L. BOXWELL |
| DONALD S. PASSMAN | BARBARA SILBERSUSCH |
| HAROLD A. BROWN | ONDRAUS JENKINS |
| LAWRENCE D. ROSE | |

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1996)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

**VIA TELECOPIER and U.S. MAIL**

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

      Re:    <u>Siegel Family – "Superman"</u>

Dear John:

      This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

    A.    <u>Definitions</u>.

        1.    "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

        2.    "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

    B.    <u>Financial Terms</u>.

        1.    A non-returnable, but recoupable advance of $2,000,000.

236172.1

312

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2.   A non-returnable, non-recoupable signing bonus of 1,000,000.

3.   D.C. Comics will forgive the $250,000 advance from last year -- stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.   There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5.   A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6.   A royalty of 1% of the cover price of DC Comics' publications. This

---

[1]   This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

313

EXHIBIT B
8

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.  Recoupment begins as of January 1, 2000.

8.  During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.  Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C.  Other Terms.

1.  The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.  If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

314

EXHIBIT B
9

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.  Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4.  D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.  The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.  In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.  Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.  D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

315

**EXHIBIT B**
**10**

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 5

9.    DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.    Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11.    At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.    The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13.    Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14.    Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

316

EXHIBIT B
11

**GANG, TYRE, RAMER & BROWN, INC.**
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:    Joanne Siegel
       Laura Siegel Larson
       Bruce Ramer
       Don Bulson

236172.1

317

**EXHIBIT B**
**12**

OCT-26-2001  17:24  JOHN SCHULMAN                          818 954 4768    P.01



**WARNER BROS.**
4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

John A. Schulman
Executive Vice President
and General Counsel

October 26, 2001

<u>Via Facsimile (310) 777-4801</u>
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA 90212

        Re:    <u>Siegels</u>

Dear Kevin:

        I have received, and have finally had a chance to review, your outline fax of October 19. I apologize for not responding earlier; I have been on the road.

        I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is. We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

        Thank you.

                                Sincerely,

                                John A. Schulman

JAS:hjl
cc:    Bruce Ramer, Esq. (w/encl)

**GTRB 0145**

A Time Warner Entertainment Company

**EXHIBIT C**

**13**

318

## October 2001 Outline

**Transfer**

- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual), . Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

**Initial Payment**

- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

319

EXHIBIT C
14

OCT-25-2001  17:25        JOHN SCHULMAN                          818 954 4768    P.03

320

EXHIBIT C
15

OCT-26-2001  17:25        JOHN SCHULMAN                        818 954 4768    P.04

321

EXHIBIT C
16

**Annual Payment (Advance)**
- $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
- Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
- Terminate when Action #1 US copyright terminates

**Widows Benefits** (not assignable or transferrable)
- $135,000/year
- Payable for Joanne's life, personal,
- Paid as now
- Medical, comparable to past, for life

**Royalty**
- Commencing for revenue received on or after 1/1/00
- All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
- 6% of DC's receipts from all Media licenses for use of the Properties, except:

  1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.

  2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

- 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

  1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

  2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

  3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

  4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

322

**EXHIBIT C**

**17**

OCT-25-2001  17:26       JOHN SCHULMAN                    818 954 4768      P.06

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

     1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

     2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

     3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

<u>Payment</u>

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

    47.5% Joanne Siegel
    23.75% Laura Siegel Larson
    23.75% Michael Siegel
    5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

<u>Advise</u> (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

323

**EXHIBIT C**
**18**

changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals which fall outside the safe harbors.

Safe Harbors for Intercompany Deals
• Salkind (Motion Pictures)
• Lois & Clark (TV)
• WB Television Animation Deal
• Merchandising representation practice

324

**EXHIBIT C**
**19**

OCT-25-2001  17:27      JOHN SCHULMAN                        818 954 4768      P.08

<u>Expedited Dispute Resolution</u> (Any claims between the parties)
* Arbitration
* Compensation damages only to Siegels
* No injunction against DC/WB breaches, no termination of rights, no reversion
* DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

<u>Medical Coverage/Son & Daughter (Grandsons only through minority)</u> (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

<u>Release and covenant not to sue by Siegels</u>
* Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
* Approve all deals made before 12/31/00

<u>Miscellaneous</u>
* Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
* Siegels defend and indemnify re third party claims
* Siegels defend and indemnify re Dennis claim
* Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
* DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts
* Siegels to refer all inquiries relating in any way to Properties to DC/WB.
* At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

**GTRB 0152**

TOTAL P.02

**EXHIBIT C**
**20**

325

## JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001by and between Pacific Pictures
Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu,
CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son
Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively,
"Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505)
466-4551, regarding the formation of a joint venture for the purpose of retrieving,
enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights,
property, title and interests in and to Joe Shuster's creations (hereinafter, such rights,
property and claims, are individually and collectively referred to as the "Rights").

    1.    The Rights shall include without limitation, all current and future rights,
claims, title, copyrights and interests in and to each character, story element, and indicia
associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN"
stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois
Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy,"
"Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

    2.    In consideration of the mutual covenants contained herein and other good
and valuable consideration, PPC and Claimants hereby form a joint venture (the
"Venture") to investigate, retrieve, enforce and exploit the Rights, including without
limitation, via the establishment of Joe Shuster's estate and the estate's termination
pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all
grant or transfers by Joe Shuster of any copyright interest in his creations. In
consideration for PPC'S contributions to the Venture and the mutual covenants contained
herein Claimants hereby transfer and assign to the Venture their rights, title and interests
in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's
office address shall be the California address set forth above.

    3.    PPC will pay any and all costs and expenses of the Venture, including the
legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as
document retrieval costs and filing fees, research costs, and any and all attorneys' fees,
costs and disbursements in connection with any legal actions or disputes concerning the
enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees,
PPC will be responsible for the payment of any legal filing fees, expert witness fees,
subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _____

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials

**EXHIBIT D**

**22**

PPC 00006

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.     The term ("Term") of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.     To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10.     All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

**EXHIBIT D**
**23**

PPC 00007

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation

_____                Date: _Nov. 28, 2001_
By: Marc Toberoff, President

_____                Date: _Nov. 28, 2001_
Jean A. Peavy

_____                Date: _Nov. 28, 2001_
Mark Warren Peary
(f/k/a Mark Warren Peavy)

**EXHIBIT D**
**24**

PPC 00008

# FROSS ZELNICK LEHRMAN & ZISSU, P.C.

ALVIN FROSS
·ALD J. LEHRMAN
STEPHEN BIGGER
MICHAEL I. DAVIS
ROGER L. ZISSU
MARIE V. DRISCOLL
RICHARD Z. LEHV
CAROL F. SIMKIN
MARGARET F. GOLDSTEIN
DAVID W. EHRLICH
SUSAN UPTON DOUGLASS
JANET L. HOFFMAN
PETER J. SILVERMAN
LAWRENCE ELI APOLZON
BARBARA A. SOLOMON
LISA PEARSON
MARK D. ENGELMANN
NADINE H. PARKER JACOBSON
ANDREW N. FREDBECK
GEORGES NAHITCHEVANSKY
CRAIG S. MENDE
PATRICK T. PERKINS
J. ALLISON STRICKLAND

866 UNITED NATIONS PLAZA
AT FIRST AVENUE & 48TH STREET
NEW YORK, N.Y. 10017

TELEPHONE: (212) 813-5900
FACSIMILE: (212) 813-5901
E-MAIL: fziz@frosszelnick.com

RECEIVED
FEB 0 4 2002

JAMES D. SILBERSTEIN
RUTH LAZAR
COUNSEL

MICHELLE P. FOXMAN
ROBERT A. BECKER
TAMAR NIV BESSINGER
ANGELA KIM
JOHN P. MARGIOTTA
LYDIA T. GOBENA
DIANE B. MELNICK
MICHAEL CHIAPPETTA
DANA WRUBEL
JESSICA MANN
JOSEPH R. MOLKO
EVAN GOURVITZ
CARLOS CUCURELLA
NANCY C. DICONZA
TANYA FICKENSCHER
ZOE HILDEN
LAUREN J. MANDELL

February 1, 2002

**VIA FEDEX**

Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212-2403

     Re:  Superman

Dear Kevin:

     I am pleased to enclose a draft agreement between your clients and DC Comics concerning the Superman property. As our clients have not seen this latest version of the agreement, I must reserve their right to comment. In addition, you will note that the draft agreement makes reference to certain "Stand Alone Assignments." We are finalizing those and, as soon as they are ready we will forward them to you.

     Very truly yours,

     Patrick T. Perkins

Encls.

cc:    John Schulman, Esq.
       Paul Levitz
       Lillian J. Laserson, Esq.
       Carol F. Simkin, Esq.

I:\PPERKINS\DCC\SUPER\020201 Ltr-K. Marks.doc

326

**EXHIBIT E**
**25**

02/01/02
4:51 PM

## AGREEMENT

AGREEMENT made this __ day of ___ 2002, by and between DC COMICS, a New York General Partnership comprised of Time Warner Entertainment, Co. L.P. and Warner Communications, Inc. (hereinafter "DC COMICS"), having its principal office at 1700 Broadway, New York, New York 10019, and Joanne Siegel, residing at 13900 Panay Way, R-115, Marina del Rey, CA 90292, Laura Siegel Larson, residing at 6400 Pacific Avenue, No. 106, Playa del Rey, CA 90293, the Estate of Jerome Siegel, (collectively "SIEGEL") and Michael Siegel, residing at _____ (except as otherwise indicated, hereinafter Joanne Siegel, Laura Siegel Larson and Michael Siegel are referred to collectively and individually as "The SIEGELS").

## DEFINITIONS

1.     The term "Works" is hereinafter defined collectively and individually as follows: any and all works, creations, material, matter, contributions, adaptations, modifications, derivative works and all other works of any kind whatsoever, including but not limited to all stories, literary and/or graphic works, episodes, elements, characters, treatments, likenesses, images, depictions, drawings, renderings, sketches, notes and/or indicia, and/or any component, draft of, or part or portion of any of the foregoing, regardless of whether or not subject to copyright protection, regardless of whether or not published, regardless of whether or not any person knows of the existence of the foregoing, wherever in the world created, and whenever created , and regardless of the medium or form of expression or exploitation (whether or not now existing).

327

**EXHIBIT E**
**26**

2.      The term "SUPERMAN" is hereinafter defined as the original comic book character now known as "SUPERMAN," jointly created by JEROME SIEGEL (the writer) and JOSEPH SHUSTER (the artist), whether or not called Superman at the time of creation.

3.      The phrase "SUPERMAN Works" is hereinafter defined collectively and individually as follows:  all Works (including but not limited to SUPERMAN and the first  story in which SUPERMAN appeared in Action Comics No. 1, dated June, 1938, "Action Comics No. 1" and in Action Comics No. 2, dated July, 1938, "Action Comics No. 2") that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SUPERMAN, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SUPERMAN Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Superman Notices" referenced _infra_ in definition paragraph number __.

4.      The phrase "ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created simultaneously with or before the creation of, whether or not included in, Action Comics No. 1 and/or Action Comics No. 2.

2

328

**EXHIBIT E**
**27**

5.   The phrase "POST ACTION COMICS NO. 1 SUPERMAN Works" is hereinafter defined collectively and individually as those Works comprising the SUPERMAN Works created after the creation of Action Comics No. 1 and Action Comics No. 2.

6.   The phrase "SUPERMAN Notices" is hereinafter defined as the seven (7) notices SIEGEL served upon DC COMICS purporting to terminate pursuant to Section 304 (c) of the U.S. Copyright Act as of April 16, 1999, grants by Jerome Siegel to DC COMICS's predecessor(s) of copyright rights in some or all of the SUPERMAN Works (copies of the SUPERMAN Notices, excluding the voluminous listing of SUPERMAN Works referenced therein, are attached hereto as Exhibits A - G).

7.   The phrase "SUPERMAN Derivative Works" is hereinafter defined as collectively and individually as follows:  all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the ACTION COMICS NO. 1 SUPERMAN Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST ACTION COMICS NO. 1 SUPERMAN Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

8.   The phrase "SUPERMAN Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, character names, fictional elements, words,

3

329

**EXHIBIT E**
**28**

phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, associated with, or arising out of or relating to the use and/or exploitation of the SUPERMAN Works and/or the SUPERMAN Derivative Works.

9.    The term "SUPERMAN Property" is hereinafter defined to mean the following: (i) each of the pre-existing characters and elements which first appeared in the SUPERMAN Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

A.    (1)  First appearance in a story or programming (including comics, television, film and other media) with Superman and/or Superman logo as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

(2)  First appearance in a story or programming (including comics, television, film and other media) without Superman and/or Superman logo as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 9(A)(1) above or any of the characters or elements which appear in the SUPERMAN Works; and

B.    Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

4

330

**EXHIBIT E**
**29**

10.     The term "SPECTRE" is hereinafter defined as the original character known as "SPECTRE," created by JEROME SIEGEL.

11.     The phrase "SPECTRE Works" is hereinafter defined collectively and individually as follows: all Works (including but not limited to SPECTRE and the first Spectre stories launched: (1) in an ad in More Fun Comics issue No. 51, dated January 1940 (the appearance of the SPECTRE character); (2) in More Fun Comics issue No. 52, dated February 1940 (illustrated 10-page comic book story); (3) in More Fun Comics issue No. 53, dated March 1940 (illustrated 10 page comic book story); and (4) in More Fun Comics issue No. 54, dated April 1940 (illustrated 10 page comic book story)) that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of SPECTRE, that were ever created (in whole, in part or jointly) by JEROME SIEGEL, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS, or any of its predecessor(s), regardless of whether any or all rights therein were granted by JEROME SIEGEL to DC COMICS, its predecessors, or any other entity, and regardless of whether The SIEGELS have sought to terminate any such grant. The phrase "SPECTRE Works" therefore includes, by way of example only, and without any limitation whatsoever, any and all Works referred to in the "Spectre Notices" referenced _infra_ in definition paragraph number __.

12.     The phrase "MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created

5

331

**EXHIBIT E**
**30**

simultaneously with or before the creation of, whether or not included in More Fun Comics issue No. 51, dated January 1940 and More Fun Comics Issue No. 52, dated February 1940.

13.    The phrase "POST MORE FUN COMICS SPECTRE Works" is hereinafter defined collectively and individually as those Works comprising the SPECTRE Works created after the creation of More Fun Comics issue No. 52, February 1940.

14.    The phrase "SPECTRE Notices" is hereinafter defined as the four (4) notices SIEGEL served upon DC COMICS purporting to terminate as of November 27, 2000 pursuant to Section 304 (c) of the U.S. Copyright Act, grants by Jerome Siegel to DC COMICS' predecessor(s) of copyright rights in some or all of the SPECTRE Works (copies of the SPECTRE Notices are attached hereto as Exhibits _ - _.).

15.    The phrase "SPECTRE Derivative Works" is hereinafter defined as collectively and individually as follows: all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or derive from, are based upon and/or arise out of the MORE FUN COMICS SPECTRE Works and all Works that in any manner depict, include, embody, refer to, describe, relate to, concern, are associated with, or preceded, lead to and/or contributed in any manner to the development of, or derive from, are based upon and/or arise out of the POST MORE FUN COMICS SPECTRE Works, that were not created (in any part) by JEROME SIEGEL, regardless of who created them, regardless of whether they were created for or provided or furnished to, or paid for by DC COMICS or any of its predecessor(s), regardless of whether they were created on a work for hire basis for DC COMICS or any of its predecessor(s), and regardless of whether any or all rights therein were granted to DC COMICS or any of its predecessor(s).

6

332

**EXHIBIT E**
**31**

16.     The phrase "SPECTRE Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of or relating to the use and/or exploitation of the SPECTRE Works and/or the SPECTRE Derivative Works.

17.     The term SPECTRE Property is hereinafter defined to mean the following: (i) each of the pre-existing characters which first appeared in the SPECTRE Works; and (ii) such other characters and/or elements, if any, that may be created hereafter and meet the following criteria:

    A. (1) First appearance in a story or programming (including comics, television, film and other media) with Spectre as predominant component of its title; provided, however, that planted spin-offs (as such term is understood in the entertainment industry), including without limitation Jack Kirby's Fourth World and its related characters, shall be excluded; or

        (2) First appearance in a story or programming (including comics, television, film and other media) without Spectre as predominant component of its title and which, if not authorized by DC COMICS, would constitute an infringement of the copyright or trademark of DC COMICS in or to either any of the characters or elements covered under subparagraph 17(A)(1) above or any of the characters or elements which appear in the SPECTRE Works; and

    B. Such character and/or element is sufficiently developed so as to be distinguished from mere stock characters or scenes a faire.

7

333

**EXHIBIT E**
**32**

18.     The phrase "OTHER SIEGEL Works" is hereinafter defined individually and collectively as those Works, other than the SUPERMAN Works or the SPECTRE Works, if any, that were created in whole or in part by Jerome Siegel, with respect to which he received any payment or compensation from DC COMICS and/or its predecessor(s), regardless of the terms surrounding, or amount of, such payment or compensation or whether such Works were created on a work-for-hire basis for DC COMICS and/or its predecessor(s) and regardless of whether or not any or all rights were granted by Jerome Siegel to DC COMICS and/or its predecessor(s) in such Works, and regardless of whether The SIEGELS have sought to terminate any such right.

19.     The phrase the "OTHER Marks" is hereinafter defined as all trade and service marks, including but not limited to characters, words, phrases, logos, images, symbols, indicia and/or other designations of origin of any kind, and all goodwill therein, throughout the world, in any way related or appurtenant to, or arising out of, or relating to the use and/or exploitation of the OTHER SIEGEL Works.

20.     The phrase "The WORKS" is hereinafter defined collectively and individually as the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works.  (It is intended that the definition of The WORKS includes all elements, parts and/or portions of the SUPERMAN Works, the SPECTRE Works, the SUPERMAN Derivative Works, the SPECTRE Derivative Works and the OTHER SIEGEL Works and all material and/or matter contained therein.)

21.     The phrase "The MARKS" is hereinafter defined collectively and individually as the SUPERMAN Marks, the SPECTRE Marks and the OTHER Marks.

22.     The "Tolling Agreement" refers to the Agreement dated April 6, 2000 between DC COMICS and the SIEGELS tolling the statute of limitations claims of the respective parties.

334

**EXHIBIT E**
**33**

23.     The terms "Licensing" and "License(s)" refer to DC COMICS authorizing any third party to commercially exploit the SUPERMAN Property and the SPECTRE Property.

24.     The term "Revenues" is hereinafter defined as all amounts actually received by DC COMICS in United States Dollars from the Licensing of rights in the SUPERMAN Property and the SPECTRE Property, less any unrecouped foreign taxes, import duties and/or currency exchange losses.  Revenues shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property and the SPECTRE Property.  Any advance against royalties paid to DC COMICS by a licensee shall be considered actually received by DC COMICS when the advance becomes nonreturnable.  Notwithstanding the foregoing, in such cases where an advance is paid in respect of multiple properties which include the SUPERMAN Property or the SPECTRE Property, the advance shall be considered received when and as it is allocated among all such properties.

25.     The term "Net Sales" is hereinafter defined as the number of copies or units which are actually sold by DC COMICS through DC COMICS' wholesale and retail distribution channels, less the number of copies or units which are returned, damaged, lost, distributed by DC COMICS as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent (70%) off of cover price.

26.     The term "Dispute" shall mean any and all controversies, Claims or disputes arising out of or related to The WORKS, The MARKS, or to this Agreement or to the Stand Alone Assignments, or any one of them, or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of the state or federal statutory or common law rights or duties.

335

**EXHIBIT E**
**34**

27. "Reversionary" rights shall mean:

a. any and all reversionary rights and interests similar in effect to and including those referred to in the proviso to section 5(2) of the U.K. Copyright Act 1911 and/or those referred to in paragraph 27 of Schedule 1 to the U.K. Copyrights, Designs and Patents Act 1988;

b. any and all reversionary rights and interests similar in effect to and including those referred to in Section 14 of the Canadian Copyright Act;

c. any and all termination rights and renewals and extensions of the term of copyright similar in effect to and including those provided for under the laws of the U.S.;

d. any all reversionary rights and interests similar in effect to and including those which arise in countries with compulsory heirs or inheritance provisions such as in Columbia, Spain, Cuba or Panama;

e. any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) similar in effect to reversionary rights which have vested absolutely or contingently or which might hereafter vest absolutely or contingently by operation of law or otherwise in any part of the world in The SIEGELS and/or any heir, successor, assign or personal representative of The SIEGELS;

f. any and all rights of whatsoever kind or nature (whether now existing or hereafter created or conferred) including any copyright rights or rights in the nature of copyright rights which at any time revert to or are acquired by The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS for any reason at any time and/or which form part of or accrue to Jerome Siegel's residuary estate;

336

**EXHIBIT E**
**35**

g.    in each case, for all countries or jurisdictions, present and future, throughout the world, affected by such rights or in which such rights exist, for the full term thereof including all renewals, extensions, revisions, and revivals thereof, whenever arising and including all vested and future reversionary rights whether now existing or hereafter created or conferred and together with all rights of action (including without limitation the right to use for past infringements), powers and benefits belonging or accrued to the foregoing or any of them or to The SIEGELS or any heir, successor, assign or personal representative of The SIEGELS in respect thereof.

## WHEREAS CLAUSES

WHEREAS, it is the parties' intent and DC COMICS' desire to acknowledge and honor the contributions made by Jerome Siegel by granting to The SIEGELS the benefits and payments provided herein; and

WHEREAS, it is the parties' intent and The SIEGELS' desire to vest in DC COMICS, forever, exclusive enjoyment and control over and all right, title and interest in, and arising out of The WORKS and The MARKS, including all future use thereof by DC COMICS  and any and all future versions and adaptations thereof in any form or medium, including all rights The SIEGELS own, have ever owned or could ever claim to own on any basis in and to The WORKS and The MARKS (including any rights The SIEGELS could claim as members of the public, whether upon the expiration of any copyrights relating to The WORKS or otherwise, and/or whether upon the cancellation, loss or abandonment of any of The MARKS), including but not limited to all copyright and trademark rights and good will associated therewith throughout the world, whenever and wherever any of said rights arise; and

**EXHIBIT E**
**36**

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties acknowledge that the SUPERMAN Derivative Works and the SPECTRE Derivative Works were created as works made for hire for DC COMICS and/or its predecessor(s) in interest but that if for any reason, any one of the SUPERMAN Derivative Works or the SPECTRE Derivative Works, or any portion thereof was not a work made for hire for any reason whatsoever: (i) the SIEGELS hereby simultaneously terminate any existing grant therein, if any, and make a new grant to DC COMICS of all rights without limitation whatsoever throughout the world therein, and (ii) such shall have no effect whatsoever on the fact that the remaining SUPERMAN Derivative Works and/or SPECTRE Derivative Works, or any portion thereof are works made for hire;

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties wish simultaneously to terminate contractually all grants by Jerome Siegel, and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its predecessor(s) relating to the SUPERMAN Works and SPECTRE Works to the extent, for whatever reason whatsoever such grants were not terminated by the SUPERMAN AND SPECTRE Notices, and  to make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to the SUPERMAN Works and SPECTRE Works; and

WHEREAS, for the purposes of this Agreement and to effectuate the parties' intent as set forth herein, the parties hereby wish simultaneously to terminate contractually all grants (if any) relating to the OTHER SIEGEL Works by Jerome Siegel and or any other person or entity claiming rights directly or indirectly through Jerome Siegel, to DC COMICS and/or its

338

**EXHIBIT E**
**37**

predecessor(s) and make a new grant to DC COMICS of all rights, without any limitation whatsoever throughout the world with respect to such works, and

WHEREAS, it is the parties' intent that this Agreement supersede all prior agreements, negotiations, and/or understandings between DC COMICS and/or its predecessors on the one hand and Jerome Siegel and/or The SIEGELS on the other;

NOW, THEREFORE, in consideration of good and valuable consideration, receipt of which The SIEGELS hereby acknowledge, it is mutually agreed by and between The SIEGELS and DC COMICS as follows.

## TERMS

1. <u>GRANT OF RIGHTS</u>. The parties expressly agree that in order to effectuate the parties' intent as set forth herein, the "Stand Alone Assignment" documents attached hereto as Exhibits -__- (hereinafter "Stand Alone Assignment(s)") shall be executed simultaneously with the execution of this Agreement. The parties further agree that upon execution of this Agreement each of the Stand Alone Assignments shall be a separate transfer of rights and forever after shall be irrevocable and remain effective, independent of, and separate and apart from the other text and provisions set forth in this Agreement and shall have full force and effect, irrevocably and in perpetuity, regardless of the enforceability, validity, invalidity of or compliance by DC COMICS with any of such other text and provisions.

a) <u>Grant Of All Rights In The SUPERMAN Works.</u>

i) <u>Grant Of All Rights In The ACTION COMICS NO. 1</u>
<u>SUPERMAN Works.</u> If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the

**EXHIBIT E**
**38**

ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective as of April 15, 1999, upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including any renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

ii)   <u>Grant Of All Rights In The POST ACTION COMICS NO. 1 SUPERMAN Works.</u> The SIEGELS acknowledge that all of the POST ACTION COMICS NO. 1 SUPERMAN Works were created as works made for hire for DC COMICS's predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they do not have and will never come into any rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST

14

**340**

**EXHIBIT E**
**39**

ACTION COMICS NO. 1 SUPERMAN Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in the SUPERMAN Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST ACTION COMICS NO. 1 SUPERMAN Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST ACTION COMICS NO. 1 SUPERMAN Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SUPERMAN Works or SUPERMAN Derivative Works.

b)  <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Derivative Works</u>. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of

15

any kind and can never claim any rights of any kind in the SUPERMAN Derivative Works as such works were prepared as works made for hire for DC COMICS and its predecessors in interest and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Derivative Works or in any portion thereof, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SUPERMAN Works or SUPERMAN Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SUPERMAN Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

    c)  <u>Acknowledgement/Grant Of All Rights In The SUPERMAN Marks.</u>  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SUPERMAN Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SUPERMAN Marks for whatever reason whatsoever (including as members of the public anywhere in the world should the SUPERMAN Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the SUPERMAN Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

16

342

**EXHIBIT E**
**41**

d)   Grant Of All Rights In The SPECTRE Works.

i)   Grant Of All Rights In The MORE FUN COMICS SPECTRE

Works. If for any reason whatsoever any grant made at any time by Jerome Siegel, or any other

person or entity claiming rights directly or indirectly through him in the SPECTRE Works to DC

COMICS and/or its predecessor(s) in interest concerning the MORE FUN COMICS SPECTRE

Works was not terminated by the SUPERMAN Notices, the parties hereby agree for the purpose

of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in

this sub-paragraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit

__, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and

are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other

person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the

MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously

and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to

DC COMICS, effective as of November 23, 2000, upon the signing hereof, and forever after, all

rights, title and interest of every kind whatsoever, including but not limited to all copyright

rights, throughout the world, in and to the MORE FUN COMICS SPECTRE Works, for all terms

of protection, including any renewals and extensions thereof, and all claims or causes of action

of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel, or those

claiming through any of them, own, or have ever owned or claimed, or could possibly ever

claim, including as members of the public when the copyright(s) or any of them expire in the

SPECTRE Works or SPECTRE Derivative Works.

ii)   Grant Of All Rights In The POST MORE FUN COMICS

SPECTRE Works. The SIEGELS acknowledge that all of the POST MORE FUN COMICS

17

343

**EXHIBIT E**
**42**

SPECTRE Works were as works made for hire for DC COMICS' predecessor(s)-in-interest. The SIEGELS, therefore, acknowledge that they have no and will never come into any such rights, title or interest in such works or any part thereof and thus, hereby, expressly waive and release any and all claim of any rights or interest therein. If for any reason, the POST MORE FUN COMICS SPECTRE Works are deemed not to be works made for hire, and to the extent, for whatever reason whatsoever that any grant made at any time by Jerome Siegel , or any other person or entity claiming rights directly or indirectly through him in the SPECTRE Works, to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works was not terminated by the SPECTRE Notices, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS' compliance with the other provisions in this subparagraph, and their execution of the Stand Alone Assignment attached hereto as Exhibit __, simultaneous with their execution of this Agreement, The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (and/or any such other person or entity) at any time to DC COMICS and/or its predecessor(s) in interest concerning the POST MORE FUN COMICS SPECTRE Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective November 23, 2000,  upon the signing hereof, and forever after, all rights, title and interest of every kind whatsoever, including but not limited to all copyright rights, throughout the world, in and to the POST MORE FUN COMICS SPECTRE Works, for all terms of protection, including all renewals and extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto that The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or

18

344

**EXHIBIT E**
**43**

could possibly ever claim, including as members of the public when the copyright(s) or any of them expire in the SPECTRE Works or SPECTRE Derivative Works.

e) <u>Acknowledgement/Grant Of All Rights In The SPECTRE Derivative Works</u>. The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Derivative Works and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Derivative Works, including as members of the public anywhere in the world when the copyright(s) (or any of them) in the SPECTRE Works or SPECTRE Derivative Works expire, as set forth in the Stand Alone Assignment attached as Exhibit _ hereto, they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest throughout the world in and to the SPECTRE Derivative Works, including but not limited to all copyright rights, for all terms of protection, including any renewals or extensions thereof, and all claims or causes of action of any kind relating or appurtenant thereto.

f) <u>Acknowledgement/Grant Of All Rights In The SPECTRE Marks.</u> The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the SPECTRE Marks and that all such rights are owned solely and exclusively by DC COMICS. However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the SPECTRE Marks for whatever reason whatsoever, (including as members of the public anywhere in the world should the SPECTRE Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS) they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS,

19

345

**EXHIBIT E**
**44**

effective November 23, 2000, upon the signing hereof, and forever after, all rights, title and interest in the SPECTRE Marks, including any good will associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

g) <u>Grant Of All Rights In The OTHER SIEGEL Works.</u>  To the extent that any OTHER SIEGEL Works exist, the parties hereby agree for the purpose of this Agreement that, contingent upon The SIEGELS's compliance with the next sentence in this paragraph, The SIEGELS have the right to, and are, contractually terminating any grant made at any time to DC COMICS and/or its predecessor(s) in interest by Jerome Siegel, or any other person or entity claiming rights directly or indirectly through him in The OTHER SIEGEL Works, concerning such OTHER SIEGEL Works. In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment and relinquish to DC COMICS, effective upon the signing hereof, and forever after all rights, title and interest of every kind whatsoever, including but not limited to copyright rights, throughout the world for all terms of protection, including any renewals or extensions thereof, The SIEGELS or Jerome Siegel or those claiming through any of them, own, or have ever owned or claimed, or could possibly ever claim, including as members of the public with respect to the OTHER SIEGEL Works when the copyright(s) or any of them therein expire and all claims or causes of action of any kind relating or appurtenant thereto.

h) <u>Acknowledgement/Grant Of All Rights In The OTHER Marks</u>.  The SIEGELS hereby represent, warrant and acknowledge that they own no rights of any kind and can never claim any rights of any kind in the OTHER Marks and that all such rights are owned solely and exclusively by DC COMICS.  However, to the extent The SIEGELS own, have ever owned or could possibly ever claim any rights in the OTHER Marks for whatever reason

**EXHIBIT E**
**45**

whatsoever, (including as members of the public anywhere in the world should the OTHER Marks or any one of them become cancelled, abandoned or otherwise lost to DC COMICS), they hereby irrevocably and in perpetuity grant, transfer, assign and relinquish to DC COMICS, effective April 15, 1999 upon the signing hereof, and forever after, all rights, title and interest in the OTHER Marks including any goodwill associated therewith and all claims or causes of action of any kind relating or appurtenant thereto.

2. <u>Payments To The Siegels And Other Financial And Related Terms.</u>  In complete consideration to The SIEGELS for any and all rights arising out of Jerome Siegel's contributions and authorship, and the other understandings and agreements herein made by The SIEGELS, DC COMICS shall pay (or shall provide, where applicable) to The SIEGELS the following:

a) <u>Initial Payments</u>

i) Upon full execution of this Agreement, a non-recoupable payment of $1,000,000;

ii) Upon full execution of this Agreement, an advance of $2,000,000 against The SIEGELS' royalty payments under ¶2(d) hereof;

iii) Upon full execution of this Agreement , the payment of $250,000 heretofore made to the SIEGELS pursuant to the agreement of November 20, 2000 between SIEGEL and DC COMICS, receipt of which is hereby acknowledged by The SIEGELS, shall become non-recoupable.

b) <u>Annual Payments (Advances)</u>

i) For ten years commencing in 2002, payable on March 31st of each year, an annual, recoupable advance of $500,000 against any amount due to The SIEGELS hereunder.

21                                                      347

**EXHIBIT E**

**46**

ii)  Commencing in 2012, and annually thereafter, DC COMICS shall pay The SIEGELS an advance payment calculated as follows:

(A) For each year in which DC COMICS has fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i),  the following year's advance shall be an amount equal to 75% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

(B) For each year in which DC CCOMICS shall not have fully recouped all previously paid advances, including those provided under subparagraphs 2(a)(ii) and 2(b)(i), then until such time, if ever, as DC COMICS shall have fully recouped all the foregoing advances, the following year's advance shall be an amount equal to the greater of $100,000 or 25% of the average of the last three years of The SIEGELS' royalty payments received under subparagraphs 2(d)(iii) hereof and 2(d)(iv) hereof, payable on March 31st of each year and recoupable against any amount due to The SIEGELS hereunder.

iii)    All payments made under this paragraph shall be non-interest bearing for the year in which each such payment is made. Thereafter, interest shall be calculated at 100% of the prime interest rate charged from time to time by The Bank of America or, if such institution is defunct, any other commercially recognized financial institution designated by DC COMICS on amounts paid that remain unrecouped as of December 31st of the year of payment, and shall be recoupable against any amount due to The SIEGELS hereunder.

22

348

**EXHIBIT E**
**47**

iv)   The Siegels shall receive no further payments under this paragraph 2(b) after March 31 of the year immediately following the year in which the copyright in Action Comics No. 1 expires;

c)   <u>Widow's Benefits</u>

i)   For each year of Joanne Siegel's life, a non-assignable, non-transferable annual payment to Joanne Siegel of $135,000, payable periodically, but not less frequently than in equal monthly installments and The SIEGELS acknowledge such payments have been paid through 2001 and through _____, 2002;

ii)   Medical benefits will be provided to Joanne Siegel for the duration of her life with terms comparable to those provided to her in the past [include exhibit with details]. DC COMICS shall cooperate with Joanne Siegel in her efforts to obtain a medical identification card.

d)   <u>Royalties</u>

i)   Commencing for Revenues received on or after January 1, 2000;

ii)   6% of DC's Revenues from all media Licenses, including Licenses for motion pictures, television, radio, legitimate stage, sound recordings, and electronic media, for use of the SUPERMAN Property and/or the SPECTRE Property, except:

(A)   with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC COMICS property similar in stature and used in a like manner (e.g., a Superman and Batman film video), the 6% shall be reduced to 3%;

(B)   with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC COMICS properties and where

**EXHIBIT E**
**48**

the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

        iii)    6% of DC COMICS' Revenues from all publishing Licenses and merchandising Licenses for use of the SUPERMAN Property and/or the SPECTRE Property (including but not limited to product Licensing, promotional Licensing, and Licenses for the sale of entertainment goods and services such as theme parks or publications), except:

        (A)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reduced to 3%;

        (B)    with respect to Licenses which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%;

        (C)    with respect to Licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the SUPERMAN Property and/or the SPECTRE Property, DC shall allocate Revenues derived from the License based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reduced to not less than 1%;

        (D)    with respect to merchandise relating to the SUPERMAN Property and/or the SPECTRE Property actually produced by DC Comics, 10% of Revenues

350

**EXHIBIT E**
**49**

less costs, and subject to the pro rata allocations set forth above, shall be deemed DC Comics' Revenues for purposes of royalty computation.

    iv)  1% of Revenues derived from extraordinary mixed Licenses, such as the License agreement dated April 1, 1998 by and between Warner Bros. Consumer Products, DC COMICS, Premier Parks Inc., and Six Flags Theme Parks Inc. (which involves numerous characters, including DC COMICS and Looney Toons characters), and other Licenses where Revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the SUPERMAN Property and/or the SPECTRE Property or to other properties in which The SIEGELS do not share.

    v)  1% of the cover price of Net Sales of DC COMICS' own editions of publications based on the SUPERMAN Property and/or the SPECTRE Property.  A publication shall be considered based on the SUPERMAN Property when one of the characters that comprises the SUPERMAN Property shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).  A publication shall be considered based on the SPECTRE Property when one of the characters that comprises the SPECTRE Property shall be the title of the publication (e.g., Spectre) or shall be the title of all the features within the publication (e.g., More Fun Comics containing only Spectre stories).  However:

    (A)  with respect to publications which commingle the SUPERMAN Property and/or the SPECTRE Property with multiple other DC properties and

25

**EXHIBIT E**

**50**

where the SUPERMAN Property and/or the SPECTRE Property is neither the predominant creative element nor the sole predominant identity or title of the publication in question (e.g., Justice League, Superfriends, Superman and Batman team up stories), the 1% shall be reduced to ½ %;

(B)     with respect to publications which are comprised of multiple stories and include one or more stories based on the SUPERMAN Property and/or the SPECTRE Property, the 1% shall be calculated on DC Comics' pro rata allocation of Net Sales among all stories which comprise the publication;

(C)     with respect to publications which are sold to the public through DC COMICS' customary distribution channels and that do not have a cover price or a suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated on an amount equal to twice the wholesale price received by DC COMICS on account of such publications.

(D)     with respect to publications which are sold to the public through distribution channels other than DC COMICS' customary distribution channels, whether or not with a cover price or suggested retail price, the 1% (as may be reduced in accordance with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications;

(E)     with respect to publications which are given away to the public without charge for a purpose other than for providing the equivalent of a public service announcement, or for advertising, promoting or publicizing DC COMICS and/or AOLTW Companies, their businesses, products or services, the 1% (as may be reduced in accordance

26

352

**EXHIBIT E**
**51**

with subparagraphs (A) and (B) above) shall be calculated upon an amount equal to 10% of revenues received by DC COMICS on account of such publications.

(F)      there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the SUPERMAN Property and/or the SPECTRE Property when those other characters do not appear in the title of the publication or feature in question;

(G)      there will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE Property appears in publications or stories based on other properties and the characters do not appear in the title of the publication or feature in question.

vi)      All royalties hereunder  shall cease to be earned by The SIEGELS for Revenues received after the expiration of the U.S. Copyright in Action Comics No. 1, except on motion pictures released in the last five years before the end of the copyright term of Action Comics No. 1, which shall earn royalties for five years from the date of the release, and except on television series, which shall earn royalties for three years from the last initial television broadcast of consecutive years of original episodes, even if such goes beyond the term of copyright of Action Comics No. 1. It is expressly understood and agreed that royalty payments made under this subparagraph shall be due only on Revenues received directly from the Licensing of exhibition and/or broadcast rights to the above motion pictures and television series and not from Revenues received indirectly, such as from the sale of any goods or provision of any services ancillary or collateral thereto.

vii) The SIEGELS acknowledge that DC COMICS, and/or other companies either wholly or partially controlled by DC COMICS' corporate parent AOL Time

27

**353**

**EXHIBIT E**
**52**

Warner, Inc. (the "AOLTW Companies"), shall have the unlimited right to use the WORKS, and the MARKS in all forms of advertising, promotion and publicity to promote DC COMICS, AOLTW, their businesses, products and services without any payment obligation to The SIEGELS.

    e)    <u>Payment Designations</u>  All monies due The SIEGELS hereunder, except the widow's benefit, shall be paid in the following manner:

    47.5% to Joanne Siegel

    23.75 to Laura Siegel Larson

    23.75 to Michael Siegel

    5.00 to Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three persons listed above may designate one or more persons to receive money due to him or her with a limit of up to three such persons during the life of DC COMICS' payment obligations hereunder.  Such designations shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

    f)    <u>Medical Insurance For Michael Siegel, Laura Siegel Larson, James Larson and Michael Larson</u>  DC Comics shall provide medical and dental insurance, or reimbursement for the cost of the same at DC COMICS's then current cost, for Laura Siegel Larson and Michael Siegel for their lives, and for James Larson and Michael Larson for the period of their minority (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is understood that neither Laura Siegel Larson nor Michael Siegel is an employee of DC Comics) (Attached as Exhibit __ hereto is a copy of the medical coverage guidelines that currently apply).  DC Comics shall reimburse Laura Siegel Larson for premiums

**354**

she has paid for medical and dental insurance for her and James and Michael Larson from November 20, 2000 through the date of commencement of the insurance provided hereunder.

g) <u>Acknowledgement Of No Entitlement To Any Further Or Additional Payment</u>. The SIEGELS hereby acknowledge and agree that, but for the payments provided for in paragraph 2 herein, they are not entitled to, and never shall be entitled to, and shall not receive any other payments or consideration of any kind whatsoever from DC COMICS and/or its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and/or past, present or future parents, subsidiaries, divisions, affiliates, related companies, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys or licensees.

3. <u>DC COMICS Exclusive Ownership Of All Rights In The WORKS And The MARKS.</u> The SIEGELS acknowledge that, by the grant set forth in Paragraph 1 above, or otherwise, DC COMICS retains the sole and exclusive enjoyment and control and continuous, sole and exclusive ownership of, and sole and exclusive right to exploit The WORKS, to make such changes therein as DC COMICS in its sole discretion may determine, to exploit the same by means of any possible derivative works in any and all media or otherwise and to copyright such derivative works in its own name and the name of its nominee(s), for all terms of protection, including any renewals or extensions thereof, throughout the world, in all languages and forms, in all media now known or hereafter known, along with all claims or causes of action appurtenant thereto. DC COMICS also retains the sole and exclusive enjoyment and control over, and sole ownership of, and sole and exclusive right to exploit The MARKS as DC COMICS in its sole discretion may determine, including all goodwill associated therewith, along with all claims or causes of action appurtenant to The MARKS.

29

355

**EXHIBIT E**
**54**

4.   <u>The SIEGELS Reserve No Rights With Respect To The WORKS Or The MARKS.</u>
The SIEGELS acknowledge and agree that it is the intent of this Agreement to vest in DC
COMICS _____ exclusively, all rights of any kind in The WORKS and The MARKS, and all
future depictions and forms of exploitation based thereon, for DC COMICS's sole and exclusive
use, enjoyment, control, and benefit.  The SIEGELS acknowledge and agree that effective with
the grant made herein, and regardless of anything that occurs or does not occur in the future,
including but not limited to, any change(s) in law(s) applicable in any manner whatsoever to this
Agreement or its terms, whether facts are, or evidence is, learned or claimed to have been
learned relating in any manner whatsoever to this Agreement or its terms, whether any person or
entity believes for whatever reason, justified or otherwise, that this Agreement and/or its terms
are in any manner just or unjust to The SIEGELS or any of them, and/or whether or not any of
the works that are the subject of this Agreement fall into the public domain for any reason
whatsoever, The SIEGELS have no right to use nor any right, title, or interest of any nature in
The WORKS or The MARKS.  By way of example only and without limitation, as of the
effective date hereof and forever thereafter, The SIEGELS have no, and shall have no right to,
and covenant not to, exploit, or enter into any negotiations or transactions with respect to, or
related to, or to terminate any grant in or relating to The WORKS and/or The MARKS, and own
no and shall own no rights, title or interest, including but not limited to any Reversionary Rights,
of any kind whatsoever anywhere in the world in The WORKS and/or The MARKS or have any
right to use or authorize the use of any of the foregoing on any basis.

5.   <u>The SIEGELS Shall Not Challenge DC Comics's Rights Granted Hereunder Or
Under The Stand Alone Assignments.</u>  The SIEGELS covenant not to and shall not challenge,
make any claim against or concerning, or take any action, directly or indirectly, to interfere with

30

356

**EXHIBIT E**
**55**

or reduce DC COMICS's ownership or exclusive benefit from, control over, and enjoyment of,
or exclusive right to exploit The WORKS or The MARKS, including but not limited to the rights
granted in The WORKS or The MARKS hereunder, or authorize, aid, abet or assist any other
person or entity in doing so.

6.   No Right To Terminate New Grant.  Further to paragraph 4, The SIEGELS hereby
acknowledge that, by serving the SUPERMAN AND SPECTRE Notices, they have sought to
terminate any and all earlier grants by Jerome Siegel to DC COMICS and/or its predecessors in
interest in the SUPERMAN and SPECTRE Works pursuant to Section 304(c) of the Copyright
Act and they know of no such grants which were not identified in said Notices.  The SIEGELS
further acknowledge and represent and warrant that, within the meaning of the Copyright Act,
this Agreement is a new grant in the SUPERMAN and SPECTRE Works and OTHER SIEGEL
Works (and the SUPERMAN and SPECTRE Derivative Works), and that pursuant to this
Agreement, neither they nor anyone claiming rights under or through them or Jerome Siegel
have any right(s) or will ever have any right(s) whatsoever to terminate the grants contained
herein or to claim any Reversionary Rights in The WORKS or The MARKS under any provision
of the Copyright Act, or under any other statute, regulation, common law principle, body of law
or otherwise throughout the world.  The SIEGELS hereby designate DC COMICS as the
administrator, personal representative, and/or trustee of Jerome Siegel for the purposes of
termination of copyright grants with respect to the SUPERMAN and SPECTRE Works.

7.   Third Party And Intercompany Licenses.

a)     DC COMICS shall enter into any and all Licenses with unaffiliated third parties
with respect to the SUPERMAN Property and the SPECTRE Property as DC COMICS, in its
sole discretion, elects to and The SIEGELS shall have no right whatsoever to challenge any such

357

**EXHIBIT E**
**56**

License or any of the terms thereof entered into by DC COMICS, its parents, affiliates, subsidiaries, licensees or sub-licensees, for any reason whatsoever or to make any claim for breach of this Agreement or liability hereunder on account of any such License or the terms thereof.

(b)     The SIEGELS hereby acknowledge their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in so doing, may License, *inter alia*, the SUPERMAN Property.  The SIEGELS shall have no right whatsoever to challenge any such License or any of the terms thereof, on any basis, provided that: (i) the terms of such License are commercially reasonable and fair as if entered into with an unaffiliated third party at the time entered into: or (ii) DC COMICS' share of proceeds on account of such License are no less favorable to DC COMICS than its share of proceeds in the applicable safe harbor agreement identified below which safe harbor agreements are hereby acknowledged to be commercially reasonable and fair within the meaning of subparagraph (i) above; or (iii) if DC COMICS' share of proceeds is less favorable to DC COMICS than under the applicable safe harbor agreement identified below, if DC COMICS pays The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below.  If DC COMICS enters into an intercompany agreement that is not covered by an applicable safe harbor agreement or if DC COMICS elects not to pay The SIEGELS royalties based on imputed Revenues calculated pursuant to the financial terms of the applicable safe harbor agreement identified below, , then The SIEGELS may challenge such agreement under the procedures set forth in the Dispute Resolution section paragraph __, but only on the basis that the agreement is not commercially reasonable and fair in light of all the circumstances.  In no event shall The SIEGELS have the

358

**EXHIBIT E**
**57**

right to challenge any intercompany deal on the basis that it is a transaction with an AOLTW Company, or on the basis of whether or not there is an advance or guarantee, or because DC COMICS did not hold an auction in respect thereof.

    c)    The applicable safe harbor agreements are as follows:

        i)    For live action and animated feature length theatrical motion pictures: the larger of 5% of worldwide gross revenues or 7.5% of domestic gross revenues received by an affiliated motion picture distributor in the United States in U.S. Dollars from exploitation of the motion pictures, less taxes (including duties and other governmental fees), collection costs and trade association dues. Notwithstanding the foregoing, in respect of Licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices or delivered electronically to the consumer, gross revenues shall mean 20 % of (i) gross wholesale rental income received therefrom by an affiliated distributor and (ii) gross wholesale sales income received therefrom by an affiliated distributor, less a reasonable amount for returns.

        ii)    For animated direct to home video productions:  $80,000 for each hour of the direct to home video production (pro rata for longer or shorter) and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the home video production.  As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

        iii)    For live action television programs: 3% of the first 1.5 million dollars of Gross Receipts received by an affiliated television production company in the United States in U.S. Dollars from exploitation of each program , and 4.5% of Gross Receipts on all

**EXHIBIT E**
**58**

amounts in excess of 1.5 million dollars received by an affiliated television production company in the United States in U.S. Dollars from such exploitation. As used herein, Gross Receipts shall mean the then standard definition of Gross Receipts used by Warner Bros. Television (or any successor in interest thereto).

   iv) For animated television programs: a flat fee of $35,000 per episode for the first 65 episodes; $40,000 per episode thereafter; and 30% of Defined Proceeds received by an affiliated animation production company in the United States in U.S. Dollars from exploitation of the programs. As used herein, Defined Proceeds shall mean the then standard definition of Defined Proceeds used by Warner Bros. Animation (or any successor in interest thereto).

   v) For video games:

    (A) For products intended for PC/Mac platforms: 10% of net sales of up to 150,000 units of each product received by an affiliated video game company in the United States in U.S. Dollars, and 13% of such sales in excess of 150,000 units. As used in this paragraph (v), "net sales" shall mean the affiliated video game company's then standard definition of net sales.

    (B) For Products intended for all other platforms: 5% of net sales received by an affiliated video game company in the United States in U.S. Dollars for each such product.

   vi) For licensed merchandise excluding any of the other categories set forth in this safe harbor provision: Arrangement between DC COMICS and Warner Bros. Consumer Products, pursuant to which Warner Bros. Consumer Products deducts a 25% fee

34

360

**EXHIBIT E**
**59**

from gross revenues received in the United States in U.S. Dollars on account of licensed merchandise agreements, and remits 75% of such gross revenues to DC COMICS.

vii)   For licensed publishing:  10% of net wholesale sales received by an affiliated publishing company in the United States in U.S. Dollars for each licensed publication.  As used herein, "net wholesale sales" shall mean the affiliated publishing company's then standard definition of net wholesale sales.

viii)   For website uses of Flash Animations and collateral material intended to supplement or support the Flash Animations: 5% of an affiliated online production company's Gross Proceeds received in the United States in U.S. Dollars from its exploitation of the animations and collateral material after it has recouped its Production Costs.  As used herein, Gross Proceeds and Production Costs shall mean the then standard definition of Gross Proceeds and Production Costs used by Warner Bros. Online (or any successor in interest thereto).

8.   Accounting.  Royalties due in accordance with paragraph 2(d) hereof (i.e., amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) shall be payable annually on March 31 of the year following the close of the annual accounting period.  All payments shall be accompanied by a statement of account.  The year 2000 statement and payment, if any, shall be made on March 31, 2002

9.   Audit.  The SIEGELS may audit the books and records of DC COMICS solely in order to verify statements issued to The SIEGELS hereunder.  Any such audit shall be at The SIEGELS' expense.  Any audit shall be conducted only upon reasonable notice by a certified public accountant during regular business hours at DC COMICS' offices and in such manner as not to interfere with DC COMICS' normal business activities.  In no event shall an audit with

35

361

**EXHIBIT E**
**60**

respect to any statement start later than twelve (12) months after the date of that statement nor shall any audit continue for longer than five (5) consecutive business days, nor shall audits be made more frequently than once a year, nor shall the books and records supporting any statement be audited more than once. All statements shall be binding upon The SIEGELS and not subject to any claims or proceedings unless objection is made in writing by a majority of The SIEGELS stating the basis thereof and delivered to DC COMICS within twelve (12) months of the date of the statement to which objection is made, or if an audit is started within that period, then within thirty (30) days of the completion of that audit. The SIEGELS and their certified public accountant (and any employee thereof) shall keep confidential all information received from DC COMICS during the Audit.

    10.    <u>Appointment Of DC COMICS As Attorney-in-Fact; Provision And Filing Of Documents.</u>

    a)  <u>The SIEGELS Shall Furnish DC COMICS With Documents And Shall File Assignments and Execute Documents.</u>  Within _____ of the effective date hereof, and thereafter, The SIEGELS shall at all times cooperate with and furnish DC COMICS with copies of all documents in their custody, possession or control or that of their attorneys pertaining to the rights in and history and creation of The WORKS and/or The MARKS. The SIEGELS further undertake that they shall within ____ of the effective date hereof file with the United States Copyright Office and serve true and correct copies on DC COMICS of the Stand Alone Assignments attached hereto as Exhibit _ and shall execute any and all other documents as requested by DC COMICS to confirm DC COMICS' ownership of The WORKS and The MARKS. The parties hereto each agree to execute and deliver any and all further documents as may be required to carry out the terms and intentions of this Agreement, including but not

36

362

**EXHIBIT E**
**61**

limited to all assignments, powers of attorney and other appropriate documents relating to the copyrights, trademarks and all other rights at issue and/or which DC COMICS may reasonably request for filing and recording or other purposes.

b) <u>The SIEGELS Appoint DC COMICS as Their Attorney-In-Fact.</u> The SIEGELS hereby further irrevocably appoint DC COMICS, and/or any persons designated by it, as their attorney-in-fact, coupled with an interest therein, with respect to The WORKS and The MARKS. DC COMICS is, thus, hereby made fully authorized to execute any and all such documents for and in the name of The SIEGELS, or any of them, and to bind The SIEGELS and their heirs, successors and assigns thereby with respect to The WORKS and The MARKS.

11. <u>Conduct Of The Business.</u>

a) <u>No Disparagement By Parties.</u> The SIEGELS shall not disparage or criticize DC COMICS, its parent, related companies, affiliates, subsidiaries, employees, officers, directors, attorneys, agents, predecessors, successors, assigns, or licensees or their properties. DC COMICS shall not disparage or criticize and shall not authorize the disparagement or criticism of The SIEGELS or their employees, officers, directors, attorneys, agents, predecessors or successors.

b) <u>Press Releases And Promotion.</u> The SIEGELS and DC COMICS shall issue a joint press release in the form attached as Exhibit _ announcing their entry into this Agreement. Thereafter, The SIEGELS:

(i)     upon DC COMICS' request, shall continue to positively publicize The WORKS, including making themselves reasonably available for public appearances (with any travel or related expenses paid by DC COMICS and subject to their health and availability);

**363**

**EXHIBIT E**
**62**

(ii)     shall not make any personal appearances, issue statements, grant interviews, and/or engage in other activities they may wish to conduct relating to The WORKS (and/or The MARKS) without the prior written consent of DC COMICS, not to be unreasonably withheld;

(iii)     shall not contact or cause any third party to contact any licensee or sublicensee of DC COMICS of any of The WORKS or The MARKS.

c)   The SIEGELS Shall Refer Inquiries.   The SIEGELS shall not, directly or indirectly, indicate to any other person or entity, that they own any rights in, or have any role with respect to the future exploitation of The WORKS and/or The MARKS in any manner, or have any role in DC COMICS' business in relationship to The WORKS and/or The MARKS. However, if The SIEGELS should receive inquiries concerning The WORKS and/or The MARKS, they shall promptly and fully refer any and all such inquiries to DC COMICS.

d)   Advise.   DC COMICS shall provide the opportunity for The SIEGELS who sign this Agreement to be informed about major developments (e.g. motion pictures, television programs, theme park attractions, major changes planned in publications), concerning The SUPERMAN Works and The SIEGELS will have an opportunity to give their input with respect thereto, but this does not rise to the level of a consultation right. The SIEGELS will be informed of such developments periodically. To facilitate this, The SIEGELS will appoint one of them to receive occasional written updates from DC COMICS and with whom, upon request, a DC COMICS representative will meet once a year to provide a broader overview of current developments. The SIEGELS may not at any time or for any reason, assign or transfer to any other person or entity the right to receive the information or provide the input described

**EXHIBIT E**
**63**

herein. Further, The SIEGELS shall at all times keep the information provided to them by DC COMICS confidential and not disclose it to any other person or entity.

e)     Credit.

(i) On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster", or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations.  DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(ii)     On new works based upon the SUPERMAN Works, and/or the SUPERMAN Derivative Works first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of the copyright of Action Comics No. 1, DC COMICS shall provide the following credit: "By Special Arrangement with the Jerry Siegel Family".  The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

**365**

**EXHIBIT E**
**64**

(iii) On new works based upon the SPECTRE Works first created after the effective date hereof (excluding later episodes of ongoing television series) DC COMICS shall provide a credit along the lines of "Spectre created by Jerry Siegel and Bernard Bailey", "Created by Jerry Siegel and Bernard Bailey", or "Based on the characters created by Jerry Siegel and Bernard Bailey"(as applicable) on motion pictures (main titles on screen only) television programs (main titles only), print publications (such as comics and/or books), and on all other works where credit to creators is customary. The size and placement of the foregoing credit shall be subject to DC COMICS' sole discretion, and shall be consistent with guild and other obligations. DC COMICS shall be allowed a commercially reasonable period of time within which to commence the phase-in of this credit.

(iv) No failure to comply with the provisions of this paragraph nor any failure of any other person to comply therewith shall constitute a breach by DC COMICS of this Agreement, such as to entitle The SIEGELS to injunctive relief; provided, upon notice by The SIEGELS, DC COMICS shall use reasonable efforts to prospectively cure any such failure to comply with the provisions of this paragraph.

f)    DC COMICS Right To Use Materials. DC COMICS shall have the right at its sole discretion to use photos and "bios" of or concerning Jerome Siegel in publicity or advertising materials concerning its properties, including The WORKS and/or The MARKS.

g)    DC COMICS Shall Have Exclusive Control Over The WORKS And The MARKS. DC COMICS shall have exclusive control over the manner, forum, medium, and all other exploitation of The WORKS and The MARKS, and such matters will be within its sole discretion and The SIEGELS shall have no right of approval whatsoever in regard thereto. Nothing in this Agreement shall be construed as requiring DC COMICS to exploit, or continue to

40                                                    366

**EXHIBIT E**
**65**

exploit, The WORKS and The MARKS nor shall anything in this Agreement be construed so as to create a fiduciary duty owed to The SIEGELS.

h)  First Opportunity To Negotiate. The SIEGELS shall offer DC COMICS, or such parent, related company, affiliate, subsidiary and/or division as it may designate a first opportunity to negotiate for the rights in any biographical works in any media pertaining to Jerome Siegel.

12. Representations And Warranties, Covenant Not To Sue And Indemnification.

a)  The SIEGELS Have The Right and Power To Enter Agreement. The SIEGELS hereby represent, warrant, agree and covenant that (i) they have the right and power to enter into this Agreement and to grant all rights which are granted by them herein and covered by this Agreement, (ii) neither they nor Jerome Siegel have granted any right, license, or permission, or entered into any transaction or agreement in relation to or with respect to, the subject matter hereof, to any other party or encumbered any of The SIEGELS' (or Jerome Siegel's) rights or interests in The WORKS or The MARKS in any way, (iii) they know of no other party with any rights of any kind to or that claim to have any rights of any kind to The WORKS or The MARKS, (iv) they shall not, at any time hereafter, solicit, initiate or enter into any negotiation, transaction or agreement or grant any right, license, or permission in relation or with respect to the subject matter covered by this Agreement to any other party or otherwise encumber, in any way, any rights granted to DC COMICS herein, including, but not limited to, any copyright termination interest or any Reversionary Rights in any rights relating to The WORKS; (iv) they shall not at anytime hereafter, regardless of whether The WORKS fall into the public domain, or any other occurrence or non-occurrence, exploit The WORKS or The MARKS, or license or authorize anyone else to do so, except to the extent provided herein; (v)

41

**367**

any and all rights that they own, owned, claim or claimed in The WORKS or The MARKS, including but not limited to all trademark rights (if any) and copyright rights, and all termination rights arising under the U.S. Copyright Act and Reversionary Rights, if any, derive and flow directly and only from Jerome Siegel; (vi) no person or entity other than The SIEGELS and/or DC COMICS own any rights or could possibly claim any rights of any nature in, or arising out of, any Works created by Jerome Siegel; (vii) they know of no Works other than the SUPERMAN Works and SPECTRE Works (notwithstanding and without diminishing in any manner the provisions in this Agreement relating to The OTHER SIEGEL Works and the OTHER Marks) created by Jerome Siegel in which they claim any rights; (viii) they know of no Works included among the SUPERMAN Works that were not listed in the SUPERMAN Notices (ix) Joanna Siegel is the sole executor, trustee, administrator and personal representative of Mr. Siegel and his estate.

     b)  <u>Release And Covenant Not To Sue By The SIEGELS.</u>

    i)    As of the date of execution of this Agreement, The SIEGELS and their descendants, ancestors, dependents, estates, heirs, predecessors, successors and assigns and past, present and future, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively referred to as "RELEASOR"), hereby release and discharge now and forever DC COMICS and its descendants, ancestors, dependents, heirs, predecessors, successors and assigns and past, present and future parents, subsidiaries, divisions, affiliates, related companies, partners, executors, administrators, agents, trustees, affiliates, employees, officers, directors, partners, shareholders, consultants, representatives, servants, attorneys and licensees (hereinafter individually and collectively

**368**

**EXHIBIT E**
**67**

referred to as "RELEASEE") from any and all past, present, future, actual and/or potential claims, demands, entitlements, obligations, actions, injuries, causes of action, suits, debts, dues, sums of money, accounts, reckonings, losses, (including but not limited to lost earnings, revenues, fees and/or royalties) bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, settlements, expenses, counsel fees, costs, extents and executions (hereinafter referred to collectively and individually as "Claim(s)") throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASOR could have asserted or could assert against RELEASEE relating in any manner to The WORKS and/or The MARKS, regardless of whether or not such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property, including but not limited to any Claim(s) to benefit in any manner, other than as provided for herein from any transactions, understandings and agreements made with respect to The WORKS and/or The MARKS as of the date of execution of this Agreement.

    ii)    In addition to the foregoing and except as otherwise provided herein, RELEASOR hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner, or in any forum, anywhere in the world, whatsoever, against the RELEASEE arising out of any of RELEASEE'S past, present or future acts relating to The WORKS and/or The MARKS or out of any other claim of rights or from facts acquired by RELEASOR, subsequent to the last date of execution hereof.

    RELEASOR expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law

*369*

**EXHIBIT E**
**68**

(including but not limited to any Reversionary Rights, and/or any rights and benefits under California Civil Code, Section 1542, and any and all other provisions of all comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement..

    c)  <u>Release And Covenant Not To Sue By DC COMICS.</u>

    i)    As of the date of execution of this Agreement, RELEASEE hereby releases and discharges now and forever RELEASOR from any and all Claim(s) throughout the world that exist as of, or existed prior to, the last date of execution hereof, that RELEASEE could have asserted or could assert against RELEASOR relating in any manner to The WORKS and/or The MARKS, regardless of whether such Claim(s) are in law, admiralty, equity, or otherwise, regardless of whether or not such Claim(s) were known, foreseen or unforeseen, patent or latent, and whether or not such Claim(s) involve real, personal and/or intangible property.

    ii)    In addition to and in accordance with the foregoing, and except as otherwise provided herein, RELEASEE hereby irrevocably warrants and covenants now and forever that it shall not, now or ever, sue or otherwise assert a Claim of any nature, in any manner whatsoever, or in any forum, anywhere in the world, against the RELEASOR arising out of any of RELEASOR'S acts as of, or prior to, the last date of execution hereof, relating to The WORKS and/or The MARKS.

    RELEASEE expressly and forever waives any and all rights and benefits conferred on it (if any) by the provisions of any State, Federal or other domestic or foreign law (including but not limited to California Civil Code, Section 1542, and any and all other provisions of all

370

**EXHIBIT E**
**69**

comparable, equivalent, analogous, similar or related statutes and principles in common law of the United States and all foreign jurisdictions) and expressly agrees that the releases and covenants in this paragraph extend to claims that it did not know of, or suspect to exist, in its favor at the time of executing this Agreement that, if known, may have materially affected this Agreement.

d)      The SIEGELS Indemnify DC Comics.  RELEASOR shall jointly and severally indemnify, defend and hold harmless RELEASEE against any and all Claim(s) at the time such Claim(s) are incurred, resulting or arising from any claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) by:

(i)      RELEASEE against RELEASOR arising out of a breach or claimed breach by RELEASOR (or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel) of any of the terms of this Agreement;

(ii)      RELEASOR, the estate and/or heirs of Jerome Siegel, Dennis Larsen, and/or any other person or entity, without any limitation whatsoever,

(a)      asserting any right in The WORKS and/or The MARKS;

(b)      seeking to terminate any grant(s) made, or right(s) granted herein or in the Stand Alone Assignments;

(c)      claiming any Reversionary Rights in The WORKS or The MARKS;

(d)      that in any manner interferes with DC COMICS' exclusive rights in and/or ownership of The WORKS and/or The MARKS, including but not limited to any claim or challenge to DC COMICS' right and power to enter into this Agreement with The SIEGELS and/or to DC COMICS' exercise, to the full extent authorized, of the right to exploit

45

371

**EXHIBIT E**
**70**

the rights granted to it herein and to deliver as compensation to The SIEGELS the payment and options set forth herein;

      (e)    relating to The SIEGELS representations and warranties herein, including but not limited to:  i) their representations and warranties of ownership; and ii) their right or power to enter into this agreement and to grant to DC COMICS the rights granted herein;

      (iii)    Dennis Larsen against RELEASEE in any manner relating to compensation or payments under this Agreement.

RELEASOR's obligation to indemnify RELEASEE hereunder is fully binding regardless of whether or not any of the aforementioned claim(s), allegation(s), assertion(s), challenge(s), objection(s), demand(s), proceeding(s), action(s) or suit(s) are founded, valid, established in law or fact, or based on evidence.

e)    DC COMICS Indemnifies The SIEGELS.  DC COMICS agrees to and shall defend and indemnify those members of the Siegel family who sign this Agreement against any claims or damages incurred by them arising out of or relating to claims brought by third parties against The SIEGELS due to wrongful acts by DC COMICS and/or Warner Bros. concerning The WORKS and/or The MARKS. DC COMICS shall do this, at its option, by adding those members of the Siegel family who sign this Agreement as named insured(s) on any applicable Errors & Omissions Insurance policy, or through direct indemnification, subject to the limitations set forth in this Agreement.

13. Confidentiality.  Except for the agreed upon press release and the information contained therein referred to in paragraph __ above, The SIEGELS shall keep confidential all contents of this Agreement.

46                        372

**EXHIBIT E**
**71**

14.     Dispute Resolution.

     a)   Choice of Law.  This Agreement, and all claims of any nature or type whatsoever related to or concerning the subject matter of this Agreement, shall be governed by New York law

     b)     DC COMICS' Equitable Remedies Unlimited.  The SIEGELS agree that this Agreement and all rights granted herein by them to DC COMICS may be specifically enforced by DC COMICS, including by an action seeking temporary, preliminary and/or permanent injunctive relief.  It is further agreed that any attempt by the SIEGELS to use, authorize others to use, or to attempt to prevent others from using the SUPERMAN Property and the SPECTRE Property will cause immediate and irreparable harm to DC COMICS and that the SIEGELS are estopped from making any argument that DC COMICS is not irreparably harmed by such action. Any Dispute asserted by DC COMICS may, at the sole option of DC COMICS, be adjudicated in any court of competent jurisdiction, including but not limited to, the courts of the State of New York, in the borough of Manhattan.  The SIEGELS hereby consent to the jurisdiction of New York state and federal courts in the borough of Manhattan.

     c)     Arbitration As Sole Remedy To Address Disputes By The SIEGELS.  Any Dispute raised by The SIEGELS shall be resolved exclusively by arbitration according to the procedures set forth in the "Arbitration Procedures Rider" attached as Exhibit __ hereto and incorporated herein by reference. The remedies of The SIEGELS under or with respect to this Agreement shall be strictly and irrevocably limited to arbitration for  an accounting of moneys due.  The SIEGELS shall have no right to, and irrevocably waive and release any rights they may

**373**

**EXHIBIT E**

**72**

otherwise have or obtain in the future to seek, any injunctive or other equitable relief of any kind, for any reason whatsoever.  Under no circumstances, including the failure of DC COMICS to keep or perform any of its duties or obligations under this Agreement, shall The SIEGELS, or any of them or anyone claiming rights through or under them or Jerome Siegel, have the right to rescind, revoke, cancel or terminate this Agreement, the Stand Alone Assignments, or any of the rights granted in any of those documents to DC COMICS and covenant not to do so.  Further, in no event shall any such rights revert to or be possessed by The SIEGELS or anyone claiming rights through or under them.

    d)    <u>Limit On Remedy Available To The SIEGELS</u>.  If for any reason whatsoever this Agreement and/or The SIEGELS' grant of rights to DC COMICS provided herein is claimed to be, or is, ineffective, void, voidable or revocable, in whole or in part, or if for any reason The SIEGELS and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns and/or those of Jerome Siegel make any future claim against or challenge to DC COMICS' sole and exclusive ownership of and right to exploit any and all rights in The WORKS or any other works owned by DC COMICS throughout the world, or any part thereof, on any basis or on any theory, or somehow obtain any Reversionary Rights in The WORKS or The MARKS it is expressly understood and agreed that the sole remedy is to seek compensation due under this Agreement pursuant to the Arbitration Procedures set forth in Exhibit __ hereto.  The SIEGELS further agree that in the event any such claim or challenge results in any liability or damage to DC COMICS, except for the amount provided in paragraph _ below (i.e. annual compensation to ____ of $100,000), any amounts that might otherwise be due to The SIEGELS under this Agreement shall be reduced by an amount equivalent to any liability or damage suffered by DC COMICS on such claim or challenge, which DC COMICS may offset against

48

**374**

**EXHIBIT E**

**73**

any sums due to The SIEGELS herein.  The parties acknowledge that the financial benefit

flowing to The SIEGELS under this Agreement represents a greater amount than what The

SIEGELS would have received from a court of competent jurisdiction in an attempt to enforce

the Notices and any purported rights thereunder.  As consideration for this, The SIEGELS

expressly agree that in any event, including but not limited to any change in law or otherwise, the

compensation owing to The SIEGELS pursuant to paragraphs ___ of this Agreement shall

constitute a cap upon the amount DC COMICS shall ever be liable for or obligated to pay to The

SIEGELS or anyone else claiming under or through The SIEGELS and/or Jerome Siegel

regardless of the basis of any such claim.

   e)    No Payment Due Unless Provided For Herein  Except as provided in paragraph

2(e), The SIEGELS acknowledge that any right to payment for any use of the SUPERMAN or

SPECTRE Works to which Michael Siegel may be entitled shall be limited to a percentage of

sums paid pursuant to this Agreement and to be negotiated directly between SIEGEL and

Michael Siegel.  None of The SIEGELS or their heirs, executors, trustees, administrators,

successors or assigns are due, or ever will be due, anything whatsoever from DC COMICS to the

extent it is not expressly provided for herein.

   f)    Suspension Of Payments To The SIEGELS.  If for any reason The SIEGELS

and/or any of their heirs, trustees, attorneys, executors, administrators, successors and/or assigns

and/or those of Jerome Siegel make any future claim against, or challenge to, or in any manner

diminish, or interfere with, whether directly, indirectly or by operation of law, DC COMICS'

sole and exclusive ownership and enjoyment of and right to exploit in any manner it so chooses

in The WORKS and/or The MARKS or any other works or marks owned by DC COMICS

throughout the world and/or any and all rights therein, or any part thereof, on any basis or on any

375

**EXHIBIT E
74**

theory (including but not limited to claiming any Reversionary Rights in The WORKS or The MARKS), it is expressly understood and agreed that all payments to The SIEGELS shall be suspended until the claim is finally resolved.

15.    Non Assignability Of Rights Granted To The Siegels.  The SIEGELS shall not assign, transfer, sell, license, or give away any of the rights provided to them under this Agreement, and any such assignment shall be null and void.  The SIEGELS expressly agree that their heirs and/or all person(s) or entity or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement are expressly bound by this Agreement to the same extent to which The SIEGELS are bound by it.  The SIEGELS shall expressly notify in writing (in their wills and/or other documentation as appropriate) their heirs and/or all person(s) or entities claiming rights under or through The SIEGELS or Jerome Siegel with respect to any of the subject matter of this Agreement that such person(s) or entity or entities are bound by the terms hereof to the same extent to which The SIEGELS are bound by it.

16. MISCELLANEOUS

        a)  Severability.  In the event any provision hereof affecting The SIEGELS' grant of rights to DC COMICS under or pursuant to this Agreement is determined for any reason by any competent court to be unenforceable, such determination shall not affect the effectiveness of any other provision hereof providing for the grant of rights by The SIEGELS to DC COMICS, so that The SIEGELS's grant of rights shall be enforced to the fullest extent allowable by law in accordance with the parties' intent hereunder.

        b)  Successors.  This Agreement is enforceable against and binding upon the parties' heirs, executors, trustees, administrators, agents, attorneys, licensees, officers, employees, directors, consultants, successors and assigns.

**376**

**EXHIBIT E**
**75**

c) <u>Amicable Resolution.</u> This Agreement represents the amicable resolution of the dispute between DC COMICS and The SIEGELS referenced in paragraph 7 of the Tolling Agreement.

d) <u>Modification in Writing.</u> This Agreement may be modified only by a writing signed by each party hereto.

e) <u>Entire Agreement.</u> This Agreement contains the complete understanding between the parties concerning the subject matter hereof and all prior representations, agreements and understandings are merged herein.

f) <u>Arms Length.</u> The parties hereto mutually acknowledge and agree that this Agreement and the terms and provisions memorialized herein have been fully negotiated with the assistance of qualified legal counsel at "arms length" and, consequently, no rule of interpretation or construction which would result in any interpretation or construction in favor, or to the detriment of, one party over another party shall apply.

g) <u>Counterparts.</u> The parties shall execute this Agreement in 4 counterparts so that each party may retain an original.

h) <u>Captions.</u> The captions of this Agreement are for convenience only and shall not be construed as part hereof or affect the construction or interpretation of any provisions of this Agreement.

<u>AGREED AND ACCEPTED</u>:

DC COMICS, a division of Warner Bros., a      By: _____

Time-Warner Entertainment Company               Joanne Siegel


By: _____                      Date: _____


**377**

51

**EXHIBIT E**

**76**

Title: _____          By: _____

                                       Laura Siegel Larson

Date: _____

                                  Date: _____

                                  The Estate of Jerome Siegel

                                  By:_____
                                  Joanne Siegel as sole executor, trustee,
                                  administrator and personal representative of
                                  Jerome Siegel and his estate

                                  Date: _____

                                  By: _____

                                       Michael Siegel

                                  Date: _____

52                        **378**

**EXHIBIT E**
**77**

## **ACKNOWLEDGMENT**

STATE OF        )

                        SS.:

COUNTY OF       )


On _____ __, 2001 before me _____ personally came _____ to me known, by me duly sworn, did depose and say that deponent resides at _____

that deponent is the _____of DC COMICS, a division of Warner Bros., a Time-Warner

Entertainment Company, the entity described in, and which executed the foregoing Agreement

that [deponent knows the seal of the corporation, that the seal affixed thereto is the corporate

seal, that it was affixed by order of the board of the corporation; and that deponent signed

deponent's name thereto by like order.]

53

379

**EXHIBIT E**
**78**

## **ACKNOWLEDGMENT**

State of          )

                      :ss:

County of          )


      On          2001 before me personally came Joanne Siegel to me known, and known to

me to be the individual described in, and who executed the foregoing Agreement, and duly

acknowledged to me that she executed the same.


_____

Notary Public

**380**

**EXHIBIT E**
**79**

## <u>ACKNOWLEDGMENT</u>

State of      )

          :ss:

County of     )

On      2001 before me personally came Laura Siegel Larson to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that she executed the same.

———————————————————
Notary Public

**381**

**EXHIBIT E**
**80**

## **ACKNOWLEDGMENT**

State of       )

              :ss:

County of     )

      On        2001 before me personally came Michael Siegel to me known, and known to me to be the individual described in, and who executed the foregoing Agreement, and duly acknowledged to me that he executed the same.

_____

Notary Public

\\UNP1\VOL2\FIRMDOCS\PPERKINS\DCC\SUPER\Siegel Draft Agreement 020201.doc

56

*382*

**EXHIBIT E**
**81**

JOANNE SIEGEL
13929 Marquesas Way #201-A
Marina Del Rey, CA  90292
(310) 821-5894
May 9, 2002

Richard D. Parsons
Co-Chief Operating Officer
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

Dear Dick,

I am Joanne Siegel, widow of Superman's creator Jerry Siegel.  In 1997, as Jerry's heirs, our daughter Laura and I had the unique opportunity to regain Jerry's share of the Superman copyright.

With the assistance of three attorneys, two of them copyright specialists, Laura and I successfully terminated Jerry's seven grants and our Washington, DC copyright expert sent out the Notices of Termination then filed our copyright for Superman in a timely manner.  For years we had had a friendly relationship with the D C Comics people and were on very friendly terms with Jerry Levin.  We remained friends after the terminations were filed.  They knew that we acted not out of malice but were exercising our rights granted by the U. S. Congress.  Because Joe Shuster, Superman's artist, had no surviving spouse or children, his rights were not terminated but are held by D C Comics.

Every step in the termination process, the filing, the timing, were carefully researched, checked and rechecked with knowledgeable attorneys on both coasts before going ahead.  We then hired two additional Beverly Hills entertainment attorneys as our negotiators.  Negotiations dragged on for four difficult years.  We made painful concessions assured if we did we would arrive at an agreement.  When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract.

Your company's unconscionable contract dated February 4, 2002 contained new, outrageous demands that were not in the proposal.  The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve.  It attempts to discredit my late husband, Jerry Siegel, whose creations the company and its predecessors have greedily cashed in on for more than sixty four years.

Page 1

000000676

EXHIBIT  Z

**EXHIBIT F**
**82**

232

That contract was sent to us three months ago. The company may think its representatives are very clever but with that contract they have sunk not only themselves and the company but you, Jerry Levin and Steve Case down to a very low level.

Granted, Jerry gave us an advance two years ago which while very much appreciated, was of short term help. But we are owed more than three years of profits accounting on Superman and related properties which has not been paid. In addition, my disabled daughter still has not received the medical coverage she and her children were promised several years ago.

As for the contract, your representatives surely know that we would never do the unethical things demanded by them. For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted, is deceitful.

After more than half a century of D C Comics and its predecessors enjoying huge profits from my late husband's creations, while we lived in poverty for many of those years, the company is not satisfied. The beast hungers for more. Just like the Gestapo, your company wants to strip us naked of our legal rights. Is that moral? Does that contract demonstrate the company's true "core values" as stated in the Stockholders Annual Report? What about the "social responsibility" that's supposed to be the mission of the company's Values and Human Development Committee on which you serve? Is it all a lie to the stockholders and the public?

It is to the everlasting shame of everyone in leadership roles at the company that they allowed that disgraceful contract to be sent to us. There was no concern for the suffering it would cause Jerry Siegel's widow and his ailing, impoverished daughter.

This contract shows AOL Time Warner and D C Comics to be a greedy corporation without morals, ready to allow its representatives to commit an inhumane act. Are your representatives afraid if we are treated fairly other comics creators or their heirs will also want to be treated fairly in the future? Isn't it about time? Shouldn't everyone be treated fairly? Or is that not "good business" in this company?

I had hoped that Laura's and my good relationships with Jerry Levin and D C Comics would continue after we reached an agreement. When my husband died, Jerry Levin told me that my daughter and I were part of the Time Warner family, part of the company's history. They were beautiful words we appreciated. Another time, in a letter to me, he talked about honoring Jerry because of his huge

Page 2

000000677

EXHIBIT F
83

233

contribution to the company. It sounded sincere. But this contract seeks to discredit Jerry Siegel and to undermine our rights, a direct contradiction to what was said.

After four years we have no deal and this contract makes an agreement impossible. Have you been aware that your representatives have gone too far? If not, you do now. They have shown you and your company in the worst possible light. Is that the reputation you want?


Joanne Siegel


Page 3

000000678


EXHIBIT F
84

234

JUN-03-03  02:49pm  From-  T-582  P.001/007  F-860

# CONFIDENTIAL

**Ip** worldwide

*free nopunch*

9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212
Tel: (310) 246-3100; Fax: (310) 246-3101

*To Joel Mantel*

---

## FACSIMILE COVER PAGE

| | |
|---|---|
| TO: Ariel Z. Emanuel | FAX: 310-248-2033 |
| FROM: Marc Toberoff | PAGES (including cover): 7 |
| DATE: 6/3/02 | RE: AE/PPC IPW Agreement |

**COMMENTS:**

<u>Confidential</u>

Attached as requested is an executed copy of the agreement dated February 2, 2002 between Ariel Emanuel and Pacific Pictures Corp. regarding IP Worldwide, LLC.





RECEIVED
JUN 3 2003
Tom McGuire

---

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

EN00001

EXHIBIT 20
665

# CONFIDENTIAL

## MEMORANDUM OF AGREEMENT

The following sets forth the deal terms of the agreement between Pacific Pictures Corporation f/s/o Marc Toberoff ("PPC") and Ariel Emanuel ("AE") to form a joint venture ("Newco") to acquire and exploit intellectual property rights ("IP"):

A.    Basic Structure

    Newco will be a separate entity (probably a limited liability company ("LLC") whose equity will be owned 50% by PPC; 40% by AE, 10 % by Endeavor.

B.    Contributions to Newco.

    1.    From PPC:

        (a)    PPC's current IP business
            (subject to pre-existing commitments and exclusions per Appendix "I" and ¶ D below)

        (b)    Marc Toberoff's ("MT") exclusive IP services;
- IP legal skills;
- IP contacts, precedent and goodwill;
- Access to extensive IP research (6 years) and IP hit list;

    2.    From AE:

        (a)    Annual Overhead of $          + ppi) plus

1

EN00002

EXHIBIT 29
666

CONFIDENTIAL

**C.    Annual Allocation of Gross Receipts:**

1.    PPC will be entitled to the first $          as deferred salary for year 1. AE will next recoup his overhead expenditure for year 1 ($          ). Any remaining gross receipts in year 1 will be divided as set forth below. In year 2, PPC will then be entitled to the next $          as deferred salary for year 2. AE will next recoup his overhead expenditure for year 2 ($          ). To the extent PPC and AE were not paid their respective $1 million and $          in years 1 and 2 respectively, those sums will carry over to subsequent years in the same recoupment priority. Following said recoupment, Newco gross receipts will be distributed 50% to PPC, 40% to AE, and 10% to Endeavor. All revenues derived from Newco IP go through Newco, excluding commissions on third party Endeavor clients. It is the intention of the parties to share fairly in the values generated by transactions hereunder.

If Newco is entitled to less than 100% of payments for certain IP, yet it is arranged for Endeavor to receive 10% of 100% of said IP payments, then, in such case, Endeavor will not also commission Newco's less than 100% IP payment, and the above distribution of Newco gross receipts will be adjusted so that the net effect is that PPC receives 50% of the aggregate gross receipts, AE receives 40% and Endeavor 10%.

2.    Without obligation to spend money, if AE opts to invest additional money in Newco to acquire certain IP for a profit, AE will be entitled to recoup its investment from gross receipts, plus a 20% return, with the balance of gross receipts distributed per ¶ C 1 above. If AE/Newco doesn't invest in certain IP after 30 days of its introduction to AE/Newco, MT will be free to set up said IP outside of Newco after notice to AE.

**D.    PPC's Current IP/Allocation of Gross Receipts**

1.    On PPC's pre-existing IP assets (as set forth in Appendix I ¶ A) that are not set-up, Newco has the right to participate in the revenue stream if AE or Endeavor attaches a key element and/or actually sets up the project during the Term as follows: Newco receives 50% of 100% of PPC revenues from the IP (excluding Producer fees); Endeavor in addition receives 10% of MT Producer fees and 100% of its third party client commissions.

2.    On PPC's projects that are already set up (as set forth in Appendix I B) ¶ D1 above applies if the Rights revert or return to PPC by some other means (turnaround, expiration of option) during the Term. Otherwise, if AE or Endeavor contributes something material to greenlight a project already set up by MT/PPC,

2

EN00003

EXHIBIT 29
669

Newco receives 25% of 100% of PPC revenues from the IP (excluding Producer fees); Endeavor in addition receives 10% of MT Producer fees and 100% of its third party client commissions.

    3.    With respect to the legal disputes identified in Appendix I C, if there is an opportunity for AE to contribute services to settle such disputes, MT will negotiate with AE a reasonable fee to AE, subject to AE's settlement of such disputes.

E.    MT's Producer fees

    Newco will not be actively engaged in film production. MT, personally, will be attached as a Producer to Newco IP and personally receive screen credit and a fee (fixed and contingent) for such services outside of Newco to be negotiated by MT in good faith with the financier/distributor of such IP derived projects. Endeavor will receive an agent's commission of 10% of such MT Producer fees.

F.    Additional AE Right

    1.    AE has the absolute right to decline to participate in certain IP in which case any such IP deals are outside Newco and PPC directly receives 100% of the IP and producer proceeds, if any.

G.    Term

    The Term shall be two years, commencing on or about March 1, 2002 once this agreement is executed and Newco's offices and principal staff are in place.

H.    Dissolution of the Venture

    Upon dissolution, Newco assets acquired during the Term will be owned by the parties in the same proportion as their equity in Newco as tenants in common, and gross receipts from assets acquired or assets set up during the Term will continue to be divided and payable per the terms of this Agreement. Pre-existing PPC assets set forth in Appendix 1 remain owned by PPC unencumbered.

I.    Dispute Resolution

    In the event of any disputes between the parties concerning this agreement, any such dispute will be resolved first by meaningful informed discussions, chaired by a mutually approved mediator. If those discussions do not result in a resolution the parties will submit any such dispute to binding

Jun-04-03   02:43pm   From-                                    T-582  P.005/007  F-860

CONFIDENTIAL

expedited arbitration before a single arbitrator familiar with the entertainment business.

J.    General

The parties will in good faith execute such further documents as are necessary or desirable to carry out the purposes and intent of this agreement. The parties contemplate that they will enter into a longer form agreement(s) incorporating the terms hereof, but until such time or in the event no such longer agreement is executed, this agreement is and will remain binding.

This agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties acknowledge that they have not signed this agreement in reliance on any promise or representation not expressly set forth herein. This agreement may not be assigned by either party. This Agreement shall bind and inure to the benefit of the parties and their respective heirs and executors. Executed facsimile copies of this agreement shall be valid and acceptable with the same force and effect as executed originals.

This agreement shall be construed and applied pursuant to the laws of the State of California applicable to agreements made and to be performed therein.

AGREED, UNDERSTOOD AND ACCEPTED:


_____          Date: 2/12/02
Ariel Emanuel


Pacific Pictures Corporation

_____          Date: 2/12/02
By: Marc Toberoff, President


4

EN00005

EXHIBIT 29
679

CONFIDENTIAL

Ariel Emanuel - w – Pacific Pictures Corporation

APPENDIX 1

REDACTED

EN00006

EXHIBIT 20

676

Jun-04-03   02:45pm   From-                                                    T-582   P.007/007   F-860

# CONFIDENTIAL

Ariel Emanuel - w – Pacific Pictures Corporation

## APPENDIX 1 (Continued)

C.     Legal Claims/Litigation (initialed due to confidentiality)

JS Claims


REDACTED


6

EN00007

EXHIBIT 29
678

**Joanne Siegel**
**13929 Marquesas Way #201A**
**Marina Del Rey, CA 90292**

**Laura Siegel Larson**
**6400 Pacific Avenue #106**
**Playa Del Rey, CA 90293**

September 21, 2002

Kevin S. Marks, Esq.
Bruce M. Ramer, Esq.
Gang, Tyre, Ramer & Brown, Inc.
132 South Rodeo Drive
Beverly Hills, CA 90212

Dear Kevin and Bruce,

As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.

This letter is also notification that, effective immediately, we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of your firm's partners, associates and employees as representatives of the Siegel Family interest regarding Superman, Superboy, the Spectre and all related characters and entities. We instruct you to take no further actions on our behalf.

Please return all materials regarding the above including but not limited to files, correspondence, notes and documents to us forthwith. These should be sent to Joanne Siegel at the above address.

It is a shame that four years were wasted due to DC Comics and AOL Time Warner's greed. We have no intention of publically disparaging DC or any individual in the parent company. However, should DC or its parent company, officers, attorneys, representatives or spokespersons disparage us or our rights, we will vigorously respond in kind.

Sincerely,

*Joanne Siegel*

Joanne Siegel

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

CC: Michael Siegel
    Don Bulson, Esq.
    Paul Levitz

**EXHIBIT H**
**92**

# Ip worldwide

As of October 3, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

**RECEIVED**

OCT 2

**Marc Toberoff**

Re: "*Superman*"

Dear Joanne and Laura:

This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property commonly known as "*Superman*," including, without limitation, all characters and copyright interests therein (jointly and individually, "Rights"):

1.    In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.

2.    IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. IPW will also provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above. IPW will be solely responsible for Marc Toberoff's legal fees in connection herewith, if any.

3.    The terms of any and all agreements regarding the Rights will require Owner's express written approval.

4.    IPW will pay its own costs and expenses in connection with this Agreement, including without limitation, office overhead, photocopying, messenger fees, postage and overnight mail, long distance telephone and fax charges, travel and accommodation costs and any legal fees to Marc Toberoff, and such costs will not be recoupable from Proceeds hereunder. Notwithstanding this, in the event IPW advances or loans Owner moneys to pay costs in furtherance of the Rights (e.g., US Copyright Office fees and audit fees, if any) the terms and repayment of any such advances or loans will be set forth in a separate written agreement between the parties.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

IPW 00001

**EXHIBIT I**
93

P. 03

Oct-21-02   08:18pm   From-

T-288   P.005/013   F-766

# Ip worldwide

Page 2
Retainer Agreement/ *Superman*
As of October 3, 2002

5.      The term ("Term") of this Agreement is eighteen (18) months from the
date this Agreement is executed by all parties. In the event the parties are actively
negotiating an agreement regarding the Rights when the Term is due to expire, the Term
will automatically be extended for three (3) additional months. In the event during the
Term either Marc Toberoff or Ariel Emanuel are unable to render services in
connection with this Agreement for a continuous period greater than three (3) months due
to death, incapacity or otherwise, Owner may in its discretion terminate this Agreement
prior to the expiration of the Term.

6.      In consideration of the services to be furnished by IPW hereunder you
hereby agree to pay and authorize IPW to retain out of all gross compensation, moneys or
other consideration that may be payable or recovered for or by reason of Owner's Rights
whether by negotiation, dispute resolution, settlement or otherwise ("Proceeds"): a fee
("Fee") of ten percent (10%) of any and all gross compensation payable including ,
without limitation, option, quitclaim or licensing fees, purchase price, settlement
amounts, advances, fixed and/or contingent compensation. In computing IPW's fee no
deduction will be made from gross Proceeds, including, without limitation, no deduction
for Owner's taxes, expenses and/or moneys payable to any and all third parties if any.
IPW's Fee shall apply to any and all agreements regarding the Rights made during the
Term or the material terms of which are substantially negotiated during the Term and/or
to any agreements between Owner and an investor or buyer introduced by IPW to Owner
during the Term. For the avoidance of doubt, in the event *"Superman"* and the Rights are
sold, settled, licensed or otherwise exploited in conjunction with other characters or rights
owned or controlled by Owner (e.g., *"Superboy"*); it is understood and agreed that IPW
will not "double dip" and the above 10% IPW Fee will apply to gross Proceeds from any
said joined transaction(s).

Notwithstanding the above, for purposes of computing IPW's Fee,
Proceeds will not include Joanne Siegel's annual "pension" payments which commenced
in 1996 (currently $ 126,148 annually, plus cost of living increases or bonuses, if any)
and her full medical and dental coverage provided by AOL Time Warner which
consideration and interests pre-date and are wholly separate from her copyright
termination interests.

/// 
/// 
/// 
/// 
/// 
/// 

IPW 00002

EXHIBIT I
94



Page 3
Retainer Agreement/ *Superman*
As of October 3, 2002

7.      Owner hereby authorizes IPW to collect and receive all Proceeds due and payable; to endorse and deposit any checks or moneys payable into a client trust account on Owner's behalf; to deduct IPW's fee as set forth above; whereupon IPW will promptly pay the remainder directly to Owner as directed by Owner in writing. It is understood that the Rights may involve multiple rights and claims against multiple parties and accordingly IPW's above fee shall be applicable to each Rights payment or recovery from any party and same is not contingent on any other Rights payment.

8.      Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.

9.      All notices and/or payments hereunder shall be made to the parties at the addresses set forth on page 1 hereof unless and until either party gives the other prior written notice of a change of address.

10.     The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and Owner.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by both parties. The parties acknowledge that they fully understand the terms and conditions of this Agreement and have agreed to such terms and conditions after negotiation, mature thought and deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. The terms of this Agreement shall be construed pursuant to their fair meaning, not for or against either party. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals. This Agreement shall be governed by the

IPW 00003

EXHIBIT I
95

# Ip worldwide

Page 4
Retainer Agreement/ *Superman*
As of October 3, 2002

Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased and excited to work with you and will do our very best to handle this matter in a dedicated manner and to achieve results satisfactory to you.

Yours sincerely,

Marc Toberoff
Authorized signatory

Ariel Emanuel
Authorized signatory

Agreed, Understood and Accepted:

Joanne Siegel

Date: *October 23rd-2002*

Laura Siegel Larson

Date: *October 23, 2002*

IPW 00004

EXHIBIT I
96

ORIGINAL                                                              8/25

FILED
LOS ANGELES SUPERIOR COURT

OCT 0 7 2003

JOHN A. CLARKE, CLERK
BY M. CASTELUM, DEPUTY

1  **RODI, POLLOCK, PETTKER, GALBRAITH
   & CAHILL, A Law Corporation**
2  **JOHN D. PETTKER (SBN 42346)**
   444 South Flower Street, Suite 1700
3  Los Angeles, CA  90071-2901
   Telephone: 213-895-4900
4  Facsimile: 213-895-4750

5  Attorneys for MARK WARREN PEARY,
   Petitioner

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF LOS ANGELES

10

11 | In the Matter of the Estate of | **NO. BP-080635** |

12 | JOSEPH SHUSTER, also known as JOE SHUSTER, | **ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING INDEPENDENT ADMINISTRATION OF ESTATE WITH LIMITED AUTHORITY** |

13 | | |

14 |                              Deceased. | |

15 | | **Hearing Date:  8-25-03
Dept. 5 at 9:15 a.m.** |

16

17

18        Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters

19 testamentary and for authorization to administer estate under the Independent Administration of

20 Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster,

21 deceased (the "decedent"), and such petition came on regularly for hearing and approval by the

22 Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the

23 Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding. JOHN D. PETTKER of Rodi,

24 Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner,

25 and no one appeared in opposition.

26        On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

27        1.      All notices required by law have been given.

28 / / /

                                        1
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

1    2.    The decedent died on July 30, 1992, a resident of the County of Los Angeles, State

2    of California.

3    3.    The decedent died testate, leaving a will dated June 28, 1988.  This will has never

4    been revoked but was lost or inadvertently destroyed.  Such will is admitted to probate by Minute

5    Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

6    ## LAST WILL AND TESTAMENT OF

7    KNOW ALL PERSONS BY THESE PRESENTS:

8    I

9    That, I JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind

10   and memory, and not acting under duress, menace, fraud or the undue influence of any person

11   whomsoever, do make, publish and declare this my Last Will and Testament.

12

13   I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the

14   execution of this Will.

15   II

16   I make no bequest, gift or devise to my children named in Paragraph I, or to any other

17   child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their

18   ___N/A___ will provide for them.

19   III

20   I hereby direct and order that all just debts for which proper claims are filed against my

21   estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my

22   death as is practicable; provided, however, that this direction shall not authorize any creditor to

23   require payment of any debt or obligation prior to its normal maturity in due course.

24   IV

25   I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and

26   remainder of my estate, whether real or personal, and wheresoever situated.  In the event that Jean

27   Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

28   /  /  /

RGD, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 985-4900

2
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

1  result of a common accident, illness or disaster, then I give, devise and bequeath the residue and

2  remainder of my estate to my nephew, MARK WARREN PEARY.

3                                          V

4         I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will

5  and Testament, to act without bond.  In the event that my sister is for any reason unable or

6  unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor,

7  also without bond.

8                                          VI

9         I further direct that my estate be settled without the intervention of any court, except to the

10 extent required by law, and that my executrix settle my estate in such a manner as shall seem best

11 and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell,

12 exchange and convey the personal and real property of my estate without an order of court for that

13 purpose and without notice, approval or confirmation and in all other respects to administer and

14 settle my estate without the intervention of court.

15                                         VII

16        I hereby revoke any and all former Wills and Codicils thereto made by me and declare this

17 my Last Will and Testament.

18        In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

19

20                                        JOSEPH SHUSTER
                                          Testator

21 STATE OF CALIFORNIA        )
                              )  ss.
22 COUNTY OF LOS ANGELES )

23        Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June,

24 1988:

25        (1)    I am over the age of eighteen (18) years and competent to be a Witness to the Will

26 of JOSEPH SHUSTER (the Testator);

27        (2)    The Testator, in my presence and in the presence of the other Witnesses whose

28 signatures appear below:

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

---

3

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

1   (a)  Declared the foregoing instrument consisting of one pages, of which this is the

2 last to be his Will;

3   (b)  Requested me and the other Witnesses to act as Witnesses to his Will and to

4 make this affidavit; and

5   (c)  Signed such instrument;

6  (3) I believe the Testator to be of sound mind, and that in so declaring and signing, he

7 was not acting under any duress, menace, fraud, or undue influence;

8  (4) The other witnesses and I, in the presence of the Testator and of each other now

9 affix our signatures as Witnesses to the Will and make this affidavit.

10 Tom Fenaughty       Robert Williams

11 3374 Overland Ave., #1     3545 Mentone Ave. #3

12 Los Angeles, CA 90064     Los Angeles, California 90034

13 SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

14   [NOTARIAL SEAL]   F. PATRICK HAGERTY
            Notary Public in and for the State of California,

15            residing at Santa Monica, Calif.

16 **THE COURT ORDERS:**

17  1. MARK WARREN PEARY is appointed Executor of the decedent's Will recited

18 above, and letters testamentary shall issue on qualification.

19  2. The Executor is granted limited authority to administer the estate under the

20 Independent Administration of Estates Act (there is no authority, without court supervision, to (1)

21 sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money

22 with the loan secured by an encumbrance upon real property).

23  3. The Executor is also granted the following special power in addition to the general

24 powers conferred upon him by law and under the Independent Administration of Estates Act:

25 The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d)

26 of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C.

27 §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings

28 necessary or appropriate in connection with this action.

ROD, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

4

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

1    4.    Bond is fixed at $6,000.00.

2    Dated: _____

3

4                                                    _____
                                                     Judge Pro Tem of the Superior Court
5          OCT 0 7 2008

6    264438_1.doc                                    H. RONALD HAUPTMAN,
                                                     JUDGE PRO TEM
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROD, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

5

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

---

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1. Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2. In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3. PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _____, _____

**EXHIBIT K**
**102**

PPC 00001

## PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

PPC 00002

**EXHIBIT K**
**103**

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.      To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.      All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.      This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.      This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MT_, _MW_

PPC 00003

**EXHIBIT K**
**104**

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

## Approval of Engagement of Pacific Pictures Corp.

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor          Date: 10-30-03
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my
interests are concerned.

Jean A. Peavy          Date: 10-30-03

**EXHIBIT K**
**105**

CONFIDENTIAL



*endeavor*

<u>Via Messenger</u>

Mr. Bruce Rosenblum
Warner Bros.
4000 Warner Blvd.
Bldg. 2, Room 215
Burbank, CA 91522

Dear Bruce,

As discussed, I represent Joanne Siegel and Laura Siegel Larson, the heirs of Jerry Siegel, the sole creator of SUPERBOY.

I've enclosed a courtesy copy of the Notice of Termination regarding SUPERBOY which applies as well to SMALLVILLE. The Termination document was served on November 8, 2002 by certified mail, return receipt requested and regular mail on a number of Warner Bros. people including Barry Meyer and Peter Roth.

The Termination was recorded with the Copyright Office on November 20, 2002. In fact, when my assistant went to the US Copyright internet site and punch in SMALLVILLE, the Termination comes up.

I'm informed that <u>effective November 17, 2004</u> this terminates prior assignments of SUPERBOY to WB's predecessors, at which time the entire U.S. copyright to SUPERBOY reverts to my clients and that afterwards WB can not make any new programs based on this copyright including new SMALLVILLE episodes.

Apparently in a prior 1947 New York case against WB's predecessor the Court decided that the story of Superman as a teenager with superpowers is a separate copyright from SUPERMAN (called SUPERBOY) solely owned by Mr. Siegel; that after the lawsuit Siegel assigned this to WB's predecessors, but that under US Copyright law my clients are now entitled to get back this copyright by the Termination. It seems the central issue here was already decided in 1947 and that this is binding today — that depicting SUPERMAN as a teenager is a separate copyright (called SUPERBOY) owned by Mr. Siegel and soon his heirs.

If both sides are willing to try I believe if with my help we can find a real business solution to this before it gets turned over to the lawyers and their self-fulfilling prophecies of a drawn out legal nightmare.

Best,

dbnr
Ariel Emanuel

TOTAL P.02

**EXHIBIT L**
**106**