

# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

| DATE OF RECORDATION | |
|---|---|
| 8Dec03 | |

| VOLUME | DOC. NO. |
|---|---|
| 3505 | 773 |

| VOLUME | DOC. NO. |
|---|---|

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services



**RECORDED DOCUMENTS**                                    **FL-10A**

**DATE:**  March 12, 2004

IP Worldwide
9595 Wilshire Blvd. Suite 811
Beverly Hills, CA  90212

ATTN:  MARC TOBEROFF

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| VOLUME | 3505 |
| --- | --- |
| DOC. NO. | 773-774 |

The recording fee has been handled as follows:

| RECEIVED | $ |
| --- | --- |
| APPLIED | $ |
| REFUNDED (under separate cover) | $ |
| CHARGED TO YOUR DEPOSIT ACCOUNT | $ |

Sincerely yours,

Register of Copyrights

ENCL(S):
DOC(S):    2

Library of Congress
U.S. Copyright Office
101 Independence Ave, SE
Washington, DC 20559-6000
www.copyright.gov

63

FL-10A  01/2004: 12,000

**EXHIBIT M**
**108**

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**DOCUMENT COVER SHEET**
For Recordation of Documents
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION
(Assigned by Copyright Office)

DEC 0 8 2003

| Month | Day | Year |
|-------|-----|------|

Volume __3505__   Page __773__

Volume _____   Page _____

FUNDS RECEIVED

Do not write above this line.

## To the Register of Copyrights:

*Please record the accompanying original document or copy thereof.*

FOR OFFICE USE ONLY

**1** Name of the party or parties to the document spelled as they appear in the document (List up to the first three)

Time Warner Inc.

Time Warner

Warner Bros. Entertainment Inc.

**2** Date of execution and/or effective date of the accompanying document   Dec. 1, 2003
(month)(day)(year)

**3** Completeness of document
☒ Document is complete by its own terms.
☐ Document is not complete. Record "as is."

**4** Description of document
☐ Transfer of Copyright
☐ Security Interest
☐ Change of Name of Owner
☒ Termination of Transfer(s) (Section 304)
☐ Shareware
☐ Life, Identity, Death Statement [Section 302]
☐ Transfer of Mask Works
☐ Other _____

**5** Title of first work
as given in the document

"Superman"

**6** Total number
of titles
in document   8

**7** Amount of fee
calculated
$ 100

**8** Fee
enclosed
☒ Check
☐ Money Order

☐ Fee authorized to be charged to :
Copyright Office
Deposit Account number _____

Account name _____

**9** Affirmation*: I hereby affirm to the Copyright Office that the information given on this form is a true and correct representation of the accompanying document. This affirmation will not suffice as a certification of a photocopy signature on the document.
(Affirmation *must* be signed even if you are also signing Space 10.)

Signature

Date  12/1/03

(310) 246-3100   (310) 246-3101
Phone Number            Fax Number

**10** Certification*: Complete this certification in addition to the Affirmation if a photocopy of the original signed document is substituted for a document bearing the actual signature.
NOTE: This space *may not* be used for an official certification.
I certify under penalty of perjury under the laws of the United States of America that the accompanying document is a true copy of the original document.

Signature

IP Worldwide/Estate of Joseph Shuster
Duly Authorized Agent of:

12/1/03
Date

Recordation
will be mailed
in window
envelope to
this address:

Name▼   IP Worldwide/Marc Toberoff, Esq.

Number/Street/Apt▼   9595 Wilshire Blvd., Suite 811

City/State/ZIP▼   Beverly Hills, CA 90212

YOU MUST:
• Complete all necessary spaces
• Sign your Cover Sheet in Space 9
SEND ALL 3 ELEMENTS TOGETHER:
1. Two copies of the Document Cover Sheet
2. Check/money order payable to *Register of Copyrights*
3. Document
MAIL TO:
Library of Congress, Copyright Office
Documents Recordation Section, LM-462
101 Independence Avenue
Washington, D.C. 20559-6

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

*Knowingly and willfully falsifying material facts on this form may result in criminal liability.

**EXHIBIT M**
**109**

**65**

Rev: June 2002—20,000   Web Rev: June 2002   ♻ Printed on recycled paper

U.S. Government Printing Office: 2000-461-113/20,021



V3505 D773

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED COPYRIGHT RENEWAL TERM
## OF "SUPERMAN"

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappuccio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O.

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen, President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz, E.V.P. & Publisher

V3505 D773   Page 1

66

## EXHIBIT M

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co.

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr. Chairman

Marvel Entertainment Group, Inc.
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O.

Golden Books Publishing
1540 Broadway ____
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group, (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

V3-J5 D773   Page 2

**67**

**EXHIBIT M**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. §304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. §201.10, the undersigned Mark Warren Peary, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted work(s) entitled "SUPERMAN" made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Richard D. Parsons, Chief Executive Officer; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019, Attn: Barry M. Meyer, Chairman & C.E.O.; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel;  Warner Communications Inc., c/o Time Warner, Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Paul T. Cappucio, E.V.P. & General Counsel; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Peter Roth, President; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019, Attn: Roger Ames, Chairman & C.E.O.; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Dan Romanelli, President; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020, Attn: Rich Jacobsen, President; Time Warner Book Group, Inc., 1271 Avenue of

68

V3-..-3 D773   Page 3

the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Warner Books, Inc., 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Little, Brown, and Company, 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; DC Comics Inc., 1700 Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levtiz, E.V.P. & Publisher; Milton Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028, Attn: David E. Wilson, President; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861, Attn: Alan Hassenfeld, Chief Executive Officer; Wildstorm Productions, 888 Prospect Street, Suite 240, La Jolla, CA 92037, Attn: Jim Lee, Editor & Director; Wildstorm Productions, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, President & Publisher; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222, Attn: Michael Richardson, President; Cantharus Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819, Attn: Ilya Salkind; Ilya Salkind and Pierre Spengler, 12 Chiswick Lane, London W4 2JE, England, Attn: Albion Gee, Esq., Albion Gee & Co.; Hallmark Entertainment, Inc., 1325 Avenue of the Americas, 21st Floor, New York, NY 10019, Attn: Robert Halmi, Jr., Chairman; Marvel Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016, Attn: F. Peter Cuneo, President & C.E.O.; Golden Books Publishing, 1540 Broadway, New York, NY 10036, Attn: Amy Jarashow, Associate Publisher; Random House Golden Books for Young Readers, 1540 Broadway, New York, NY 10036, Attn: Kate Kilmo, Vice President & Publisher; Random House, Inc., 1745 Broadway, New York, NY

V3505 D773 Page 4

10019, Attn: Katherine J. Trager, Senior V.P. & General Counsel; Inkworks, 4320 Delta

Lake Drive, Raleigh, NC 27612, Attn: Allan Caplan, President & C.E.O.; Penguin Group

(USA) Inc., 375 Hudson Street, New York, NY 10014, Attn: David Shanks, C.E.O.; DK

Publishing, Inc., 375 Hudson Street, New York, NY 10014, Attn: Christopher Davis,

Publisher; Scholastic, Inc., 557 Broadway, New York, NY 10012, Attn: Richard

Robinson, Chairman & C.E.O.  Pursuant to 37 C.F.R. Section 201.10(d), service of this

notice is being made by first class mail, and additionally service of this notice is being

made by certified mail, return receipt requested, to the above grantees or successors at

the addresses shown.


    2.    The works (individually, "Work;" collectively, the "Works") to which this

Notice of Termination applies are as follows[1]: The title of the original copyrighted Work

to which this Notice of Termination applies is SUPERMAN, an illustrated comic book

story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics,

Vol. 1, No. 1, June, 1938 issue, which was published on April 18, 1938. This Work was

registered for copyright under registration No. B379787 and copyright was originally

---

[1] This Notice of Termination applies as well to each and every element of each Work,  including
without limitation, the story or stories, character or characters, the interplay of such characters,
theme or themes, settings or·locales, and includes, but is not limited to, Superman, his origins
and escape as an infant to Earth in a rocket ship, his super strength, his invulnerability (bullets
bounce off his chest and he's impervious to fire), his super speed, his ability to leap great
distances in a single bound, his telescopic vision, his super hearing and sense of smell,  his
sense of humor, his clean-cut good looks, his high morals, ethics and compassion, his mission
as a crime fighter and as a champion of the underdog, his stylized costume and cape, the
diamond shaped "S" insignia on his chest, his secret identity / alter ego as the mild mannered
bespectacled newspaper reporter, Clark Kent, the feisty and attractive female reporter love
interest, Lois Lane, the love triangle between Superman, Lois Lane and Clark Kent, Clark Kent's
boss / newspaper Editor (a.k.a. Perry White), the Daily Planet newspaper (f.k.a. the Daily Star)
where Clark Kent, Lois Lane and the Editor work, the great skyscraper metropolis where these
characters live (a.k.a. Metropolis), Superman's scientist father (a.k.a. Jor L) and Superman's
birthplace --a highly advanced but doomed distant planet (a.k.a. Krypton).

V3505  D773   Page  5

secured in this Work as of its April 18, 1938 publication date. This Work was written by Jerome Siegel and illustrated by Joseph Shuster.  Renewal of the copyright in and to this Work was made on June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, under renewal registration No. R362188.  This Work was based upon, incorporated, and constituted a slightly revised version of, the following Works to which this Notice of Termination also applies: twenty-four days (i.e., four six day weeks) of previously unpublished SUPERMAN newspaper comic strips, created c. 1934, written by Jerome Siegel and illustrated by Joseph Shuster.[2] The remaining Works to which this Notice of Termination applies are:

| Title | Name of Author | Date Copyright Secured | Copyright  Reg. No. |
|---|---|---|---|
| SUPERMAN story in comic book form | Jerome Siegel Joseph Shuster | Work created c.1933 | N/A[3] |

---

[2] In Siegel and Shuster v. National Comics Pub., Inc. et al., the court found that Jerome Siegel and Joseph Shuster were "the originators and authors of the cartoon character Superman and of the title Superman and first created cartoon material in which said character and title first appeared in 1934...," and further found that this material as incorporated in Action Comics No. 1 constituted:  "the formula for the continuing SUPERMAN series to come. It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance." Findings of Fact and Conclusions of Law by Referee J. Addison Young, ¶¶ 8, 22 (November 1, 1947); See also Siegel and Shuster v. National Comics Pub., Inc. et al., Opinion of Referee J. Addison Young, page 9 ("[the aforementioned material] certainly contained the full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did, I believe constitute a formula for the continuing series to come..."). In Siegel v. National Periodical Publications, Inc, the Second Circuit Court of Appeals reversed the District Court's determination that Action Comics No. 1 was a work-for-hire and held: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accomodate Superman to a magazine format." 508 F.2d 909, 914 (2nd Circuit 1974).

[3] The second and third Works listed in this table as well as the above-referenced 24 days of previously unpublished SUPERMAN newspaper comic strips were first published in a somewhat revised form on April 18, 1938 as Action Comics, Vol. 1, No. 1, June, 1938, which was registered for copyright under registration No. B379787 and renewed under registration No. R362188.

V3505 D773  Page 6

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|-------|----------------|------------------------|--------------------|
| 15 SUPERMAN daily comic strips (12 strips and 3 scripts) | Jerome Siegel Joseph Shuster | Work created c.1934 | N/A |
| Action Comics #2 [4] | Jerome Siegel Joseph Shuster | May 25, 1938 | B379788 |
| Action Comics #3 | Jerome Siegel Joseph Shuster | June 25, 1938 | B385466 |
| Action Comics #4 | Jerome Siegel Joseph Shuster | July 25, 1938 | B387907 |
| Action Comics #5 | Jerome Siegel Joseph Shuster | August 25, 1938 | B394784 |
| Action Comics # 6 | Jerome Siegel Joseph Shuster | September 26, 1938 | B394866 |
| Action Comics # 7 | Jerome Siegel Joseph Shuster | October 25, 1938 | B399214 |

V3505 D773  Page 7

3.   This Notice of Termination applies to the following grants, assignments,

transfers and/or agreements to the extent each grants, transfers or assigns the renewal

copyright (or any interest in or to the renewal copyright) to any Work identified

hereinabove:

(a)   A one page agreement between Detective Comics, Inc., on the one

hand and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip

SUPERMAN, on the other, executed on or about March 1, 1938;

_____

[4] Action Comics Nos. 2-6 were reprinted in Superman Nos. 1 and 3 (Copyright Reg. Nos.
AA299871 and B443035, respectively) to which this Notice of Termination, therefore, also
applies.

(b)    A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 4, 1937;

(c)    A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(d)    A three page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(e)    A two page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 19, 1939;

(f)    A seven page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about May 19, 1948;

(g)    A twelve page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 23, 1975.

4.    The effective date of termination shall be October 26, 2013.

**EXHIBIT M**

117

73

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304 (c) of the United States Copyright Act (17 U.S.C. §304(c)).

6.    Joseph Shuster died on July 30, 1992.  There is no living widow, child or grandchild of Mr. Shuster. The undersigned, Mark Warren Peary is the Executor of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304 (d), incorporating without limitation 17 U.S.C. § 304 (c)(2)(D), as to the grants of the transfers described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code.

Dated: November ⏋, 2003

*Mark Warren Peary*

Mark Warren Peary
Executor of the Estate of Joseph Shuster
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

V3505 D773   Page 9

**EXHIBIT M**
9
118

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE

OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF

"SUPERMAN", and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable

investigation to be made as to the current ownership of the rights being terminated,

including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed

this _10TH_ day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3uu5 D773  Page 10

75

**EXHIBIT M**
10
119

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM OF "SUPERMAN" to be served this 10th day of November, 2003, by First Class

Mail, postage prepaid, upon the following:

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappucio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group.
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen
President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

**EXHIBIT M**
120

76

V3ɔᴠ5 D773  Page 11

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
E.V.P. & Publisher

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson,
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler.
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr.
Chairman

Marvel Entertainment Group, Inc..
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

V3505 D773 Page 12

**EXHIBIT M**

77

12**121**

DK Publishing, Inc.                         Scholastic, Inc.
375 Hudson Street                           557 Broadway
New York, NY 10014                          New York, NY 10012
Attn: Christopher Davis, Publisher          Attn: Richard Robinson
                                            Chairman & CEO


I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of November, 2003, at Los Angeles, California.


Marc Toberoff, Esq.
9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773  Page 13

# Ip worldwide

March 29, 2004

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: "_Superman_"

Dear Joanne and Laura:

This is to confirm our understanding that the agreement ("Agreement") between you and IP Worldwide dated as of October 3, 2002 (executed by you on October 23, 2002) is re-instated and that the Term of the Agreement is extended until April 23, 2005.

Sincerely,

Marc Toberoff

Agreed and Accepted:

_Joanne Siegel_                     Date: _4/12/04_
Joanne Siegel

_Laura Siegel Larson_                     Date: _4/12/04_
Laura Siegel Larson

9701 Wilshire Boulevard, 10ᵗʰ Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: METoberoff@aol.com

**EXHIBIT N**
123

IPWW 00007

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

September 10, 2004

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor, Estate of Joseph Shuster
Jean Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren and Jean:

This is to confirm that (1) the joint venture agreement dated as of November 23, 2001 between you and Pacific Pictures Corp. and (2) the engagement agreement dated October 27, 2003 between the Estate of Joseph Shuster and Pacific Pictures Corp. have been cancelled.

Sincerely yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Mark Warren Peary

Jean A. Peavy

**EXHIBIT O**
**124**

PPC 00009

LAW OFFICES OF

# MARC TOBEROFF

As of November 23, 2001

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
Jean A. Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Re: Engagement for Professional Services

Dear Warren and Jean:

I am pleased to welcome you as my clients (the "Client"). This letter will confirm our understanding and agreement regarding the terms and conditions of my engagement.

1.    Scope of Engagement: You have engaged me to provide legal services with respect to

("Rights"). My representation without limitation encompasses

and the prosecution and defense of all rights, causes of actions and claims arising from the Rights (the "Claims"). In the event of litigation, the scope of services provided for under this Agreement includes the prosecution and defense of the Rights/Claims up through trial and legal services on appeal as reasonably required.

2.    General Responsibilities of Attorney and Client: It will be my responsibility to perform the legal services reasonably required in connection with the full enforcement, prosecution and defense of the Rights/Claims, to take reasonable steps to keep you informed of progress and developments and to respond promptly to your enquiries and communications.

It will be the Client's responsibility to cooperate fully with me by, among other things, providing me with relevant information and documents within Client's control, keeping me up to date with respect to any relevant developments and by making yourselves reasonably available for consultation. The Client's responsibilities also include approving risk taking decisions and negotiation strategy; determining acceptable settlement terms and advising us whether any document we have prepared or received and sent to you for your approval or review is consistent with your expectations.

Initials: _MWP_ _JEP_ _MT_

CONFIDENTIAL
MWP 00054

Page 2
Mark Warren Peary
Estate of Joseph Shuster
Jean A. Peavy
As of November 23, 2001

4.    Legal Fees: It is understood that the attorney's fees hereunder are not set by law but are negotiable between attorney and Client and have been negotiated by us.

In consideration of the services rendered and to be rendered by me hereunder you hereby agree to pay to and irrevocably assign to me: fifty (50%) ("Percentage Fee") of one hundred percent (100%) of any and all gross sums of money or other consideration recovered, confirmed or awarded by reason of or in connection with the above Rights and Claims ("Proceeds"). Proceeds include, without limitation, all fixed or contingent proceeds, whether payable or received during or after my engagement, in perpetuity, and any form of consideration, whether upfront or future fees, advances, guarantees, bonuses, deferments, royalties or profit participations of any kind. In computing the fee, the total sums payable, including without limitation, attorney's fees and interest upon a judgment, shall be deemed part of the amount recovered. My fees shall be payable as and when such monies or other consideration is payable to Client. I will be compensated for my legal services only if Proceeds are recovered, confirmed or awarded.

5.    Costs and Disbursements: I will advance all costs and disbursements ("Costs") expended or incurred in connection with my enforcement, prosecution and defense of the Rights/Claims. Such Costs shall include, without limitation,
                                    U.S. copyright office costs and fees, research costs, filing fees, investigation expenses, expert witness fees, consultant fees, accountant fees, investigator fees, subpoena and service of process fees, jury fees, transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, parking, travel costs, and messenger fees. My attorney's fees shall not be construed as Costs under this Agreement. Client authorizes me to incur all Costs reasonably necessary in my judgment, subject to the Client's prior approval of any extraordinary costs. All Costs advanced by me hereunder shall be reimbursed to me from Proceeds, subject to the presentation to Client of a reasonable accounting and/or receipts for said expenses prior to such reimbursement.

Initials: _WWP_ _JAP_ _wS_

REDACTED

**EXHIBIT P**
**126**

CONFIDENTIAL
MWP 00055

Page 3
Mark Warren Peary
Estate of Joseph Shuster
Jean A. Peavy
As of November 23, 2001

     6.    <u>Payment and Notices</u>: Client hereby authorizes and appoints me as their attorney-in-fact to collect and receive all Proceeds due relating to the Rights/Claims to endorse and deposit into a client trust account all checks and other moneys payable, to deduct my fees and Costs as set forth above, and to pay the remainder to Client within seven (7) days of my receipt of such Proceeds. All notices and payments hereunder shall be made to the parties at their respective address set forth on page 1 hereof unless and until either party gives the other party prior written notice of an address change.

     9.    <u>Miscellaneous</u>: This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. This Agreement shall be deemed to have been mutually drafted by the parties and no drafting presumption shall apply for or against either party. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed

Initials: _MWP_, _JAP_ _H_

Page 4
Mark Warren Peary
Estate of Joseph Shuster
Jean A. Peavy
As of November 23, 2001

herein. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

This Agreement shall be governed by the Laws of the State of California applicable to agreement made in and to be performed therein.

We are very pleased to represent you in connection with this matter. If the foregoing terms meet with your approval, kindly so indicate by signing three originals of this engagement letter and returning them to us for counter-signature, and we will return two fully executed originals to you.

Very truly yours,

Marc Toberoff

Agreed, understood and accepted:

Mark Warren Peary

Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Jean A. Peavy

CONFIDENTIAL
MWP 00057

LAW OFFICES OF
# MARC TOBEROFF

October 3, 2004

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: Engagement for Professional Services

Dear Joanne and Laura:

I am pleased that you (the "Client") have decided to retain my law firm (the "Firm") as your counsel. The Firm is committed to providing efficient and responsive services to its clients. This letter will confirm our understanding and agreement regarding the terms and conditions of our engagement.

     1.    Scope of Engagement: The Firm will represent the Client with respect to the prosecution and defense of all rights, causes of actions and claims arising from

     The scope of services provided for under this Agreement includes the prosecution and defense of the Claims up through trial and legal services on appeal and through final disposition of the Claims as reasonably required. In connection with its prosecution and defense of the Claims hereunder, the Firm will also render such services as are reasonably required to further secure or strengthen the Client's Claims and related intellectual property interests arising from the Claims.

     2.    Conditions Precedent: This Agreement will not take effect and the Firm will have no obligation to provide legal services, until the Firm receives this Agreement signed by the Client.

     3.    General Responsibilities of Attorney and Client: It will be the Firm's responsibility to perform the legal services reasonably required in connection with the full prosecution and defense of the Claims, to take reasonable steps to keep you informed of progress and developments and to respond promptly to your enquiries and communications.

     It will be the Client's responsibility to cooperate fully with the Firm in its work by, among other things, providing us with relevant information and copies of documents within Client's control, keeping the Firm up to date with respect to any
Initials: _____ , _____ , _____ .

REDACTED

CONFIDENTIAL
LSL 00213

Page 2
Joanne Siegel and Laura Siegel Larson
October 3, 2004

relevant developments and by making yourselves reasonably available for consultation. The Client's responsibilities also include: (a) approving decisions involving risk (given that Client acknowledges that litigation is inherently risky); (b) approving legal and negotiation strategy; (c) determining acceptable settlement terms and figures, and (d) advising us whether any document we have prepared or received and sent to you for your approval or review is consistent with your expectations, as the case may be.

     5.   <u>Legal Fees:</u> It is understood that the attorney's fees hereunder are not set by law but are negotiable between attorney and client and have been negotiated by Client with the Firm.

     (a)   In consideration of the services rendered by the Firm hereunder the Firm shall be entitled to and you hereby agree to pay to the Firm: one-third (33.33%) ("Percentage Fee") of one hundred percent (100%) of any and all gross sums of money or other consideration recovered, confirmed or awarded by reason of or in connection with the above Claims ("Gross Proceeds") prior to the deduction of any costs, fees, liens or disbursements, whether recovered by suit, arbitration, mediation or other form of dispute resolution, verdict, judgment, settlement or otherwise. Sixty (60) days before trial the Firm's one-third Percentage Fee shall increase to forty percent (40%), and thereafter this will be the applicable Percentage Fee from that point forward through appeals, if any, and final disposition of the Claims. Gross Proceeds include, without limitation, all fixed or contingent proceeds, whether payable or received during or after the Firm's engagement, in perpetuity, and any form of consideration, whether upfront or future fees, advances, guarantees, bonuses, deferments, royalties or profit participations of any kind. In computing the Firm's fee, the total sums payable, including without limitation, interest upon a judgment, shall be deemed part of the amount recovered.

Initials: _____ . _____ _____

REDACTED **EXHIBIT Q**
**130**
CONFIDENTIAL
LSL 00214

Page 3
Joanne Siegel and Laura Siegel Larson
October 3, 2004

It is understood that the Claims involve multiple rights/claims against
multiple defendants and accordingly the above Percentage Fee calculation shall be
applicable to each Claim to the extent that there is any recovery (whether through trial,
arbitration or settlement) on any such Claim, at the time of such recovery, and are not in
any way contingent on the prosecution or maintenance of any other Claims or actions.

Any attorney's fees awarded by the Court, pursuant to statute or contract,
in connection with the subject matter of this representation, shall be paid to the Firm and
shall be applied against the fee obligation under this Agreement but shall not discharge
nor limit Client's fee obligation under this Agreement. Any Costs awarded by the Court,
in connection with the subject matter of this representation, shall be paid to the Firm and
shall be applied against the Client's obligation to reimburse the Firm's Costs under this
Agreement but shall not discharge nor limit Client's Cost reimbursement obligation
under this Agreement.

Notwithstanding anything to the contrary contained herein, the Firm's
Percentage Fee will not apply to the following consideration: (i) the non-refundable
$250,000 advanced by Time Warner to the Siegels in November, 2000 against the
resolution of the Superman Claim; (ii) Joanne Siegel's annual non-advance "pension"
payment by Time Warner of $126,148 per year, plus the cost of living increases to such
payment and (iii) medical, dental or life insurance provided to Joanne Siegel, Laura
Siegel Larson, Michael Siegel, and Laura's children, Michael Larson and James Larson..
Although the Percentage Fee applies to other non-cash in kind consideration (excluding
(iii) above), if any, paid as part of a recovery on a Claim, it does not apply to minor non-
cash perks such as tickets to movie premieres, conventions, dinners, free or discounted
merchandise.

The Firm will be compensated for its legal services and reimbursed for the
costs and disbursements advanced by it (as set forth below) only if Gross Proceeds are
recovered, subject to paragraph 9 below.

Initials: _A̶T̶_, _JL_. _LSL_.

Page 4
Joanne Siegel and Laura Siegel Larson
October 3, 2004

The Firm will be solely responsible for the legal fees of any outside attorneys retained by the Firm, if any, in connection with its prosecution of the Claims hereunder. In the event the Firm wishes to retain such outside attorney(s), the Firm will furnish Client with the identity and credentials of such attorney(s). Such retention of outside attorneys, if any, shall in each instance be subject to Client's prior written approval.

(b)    The 33.33% Percentage Fee set forth in paragraph 5 (a) above will apply upon the filing of a complaint, if any, in the U.S. District Court for the Central District of California (or other Court of competent jurisdiction) with respect to any Claim(s). Prior to such filing, the Firm will research and prepare the complaint regarding the Claims, plus any required accompanying documents, for filing an action on the Claims, in consideration for a reduced Percentage Fee equal to two and one-half percent (2.5 %) of Gross Proceeds.

However, upon the filing of the complaint, if any, the Firm's reduced fee will be deemed part of and absorbed in the Percentage Fee applicable pursuant to Paragraph 5(a) above.

6.    Costs and Disbursements: The Firm will advance all costs and disbursements ("Costs") expended or incurred in connection with its prosecution or defense of the Claims. Such Costs shall include, without limitation, filing fees, investigation expenses, expert witness fees, consultant fees, accountant fees, investigator fees, subpoena and service of process fees, jury fees, transcript costs, third-party photocopying, photocopying at the Firm (at the agreed rate of five cents per page), postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, parking, travel costs, and messenger fees. No attorney's fees shall be construed as Costs under this Agreement. Client authorizes the Firm to incur all Costs reasonably necessary in the Firm's judgment, subject to the Client's prior approval of any individual cost item exceeding $3,000. All Costs advanced by the Firm shall be reimbursed to the Firm from Gross Proceeds in addition to and after payment of the Percentage Fee pursuant to paragraph 5 above and shall not be included in or deducted from such fee. The Firm will furnish Client with a reasonably detailed statement of the Costs on a quarterly basis.

Initials: _____

Page 5
Joanne Siegel and Laura Siegel Larson
October 3, 2004

    7.    <u>Lien for Attorney's Fees and Costs</u>: The Firm will have a lien for attorney's fees and Costs advanced applicable to all Claims and/or Gross Proceeds that are the subject of the Firm's representation under this Agreement.

    8.    <u>Payment and Notices</u>: Client hereby authorizes and appoints the Firm as their attorney-in-fact to collect and receive all Gross Proceeds due relating to the Claims, to endorse and deposit into a client trust account all checks and other moneys payable, to deduct the Firm's compensation as set forth above, and to pay the remainder to Client within seven (7) days of the Firm's receipt of such proceeds. A statement of all deductions including the applicable Percentage Fee and itemized Costs, if any, shall be sent by the Firm to Client with each such payment. All notices and payments hereunder shall be made to the parties at their respective address set forth on page 1 hereof unless and until either party gives the other party prior written notice of an address change.

    11.    <u>Miscellaneous</u>: This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. This Agreement shall be deemed to have been mutually drafted by the

Initials: _HT_. _JS_. _LSL_.

REDACTED

**EXHIBIT Q**

**133**

CONFIDENTIAL
LSL 00217

Page 6
Joanne Siegel and Laura Siegel Larson
October 3, 2004

parties and no drafting presumption shall apply for or against either party. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall be binding upon and inure to the benefit of the parties' heirs, executors, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

This Agreement shall be governed by the Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased to represent you in connection with this matter. If the foregoing terms meet with your approval, kindly so indicate by signing four originals of this engagement letter and returning them to us for counter-signature, and we will return two fully executed originals to you.

Very truly yours,

Marc Toberoff

Agreed, understood and accepted:

_____     Date: _October 3, 2004_
Joanne Siegel

_____     Date: _October 3, 2004_
Laura Siegel Larson

Initials: _MT_, _JS_, _LSL_

REDACTED

EXHIBIT Q
134

CONFIDENTIAL
LSL 00218

# SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

***As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.***

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

**EXHIBIT R**
**135**

Q 0001

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

**EXHIBIT R**
**136**

Q 0002

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%, Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit.  DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003:  Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme).* Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

**EXHIBIT R**
**137**                                    Q 0003

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

**EXHIBIT R
138**

Q 0004

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...".   In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

**EXHIBIT R**
**139**

Q 0005

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.  He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.  In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).  According to the settlement amount, he received an unconscionable 50% contingency fee.

6

**EXHIBIT R 140**

Q 0006

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:   Alan F. Horn
      Jeff Robinov
      John Schulman
      Patti Connolly

7

**EXHIBIT R**
**141**

Q 0007

ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON,                )
                              )
          Plaintiffs,         )
                              )
     vs.                      )     No. 04-8400 (RSWL)(RZx)
                              )
WARNER BROS. ENTERTAINMENT )          -and-
INC., et al.,                 )
                              )     No. 04-8776 (RSWL)(RZx)
          Defendants.         )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

EXHIBIT S

142

1          Deposition of KEVIN S. MARKS, taken on

2      behalf of Defendants and Counterclaimants,

3      at 9665 Wilshire Boulevard, 9th Floor, Beverly

4      Hills, California, beginning at 10:05 AM on

5      Saturday, October 7, 2006, before DAVID S.

6      COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9  APPEARANCES:

10

11  For Plaintiffs:

12      LAW OFFICES OF MARC TOBEROFF
        BY:  MARC TOBEROFF
13      Attorney at Law
        2049 Century Park East, Suite 2720
14      Los Angeles, California 90067
        310-246-3333
15

16  For Defendants and Counterclaimant:

17      WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
        BY:  MICHAEL BERGMAN
18      Attorney at Law
        9665 Wilshire Boulevard, 9th Floor
19      Beverly Hills, California 90212
        310-858-7888
20      mbergman@wwllp.com

21        -and-

22      PERKINS LAW OFFICE
        BY:  PATRICK T. PERKINS
23      Attorney at Law
        1711 Route 9D
24      Cold Springs, New York 10516
        845-265-2820
25

2

1   APPEARANCES (Continued):

2

3   For the Witness:

4       JEFFER MANGELS BUTLER & MARMARO
        BY:  MARC MARMARO
5       Attorney at Law
        1900 Avenue of the Stars, 7th Floor
6       Los Angeles, California 90067-4308
        310-203-8080
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

ORIGINAL SHIPPED    OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA ) 
SIEGEL LARSON, )
        )
        Plaintiffs, )
        )
    vs. )        No. 04-8400 (RSWL)(RZx)
        )
WARNER BROS. ENTERTAINMENT )        -and-
INC., et al., )
        )        No. 04-8776 (RSWL)(RZx)
        Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

**EXHIBIT S**
**145**

05:15 1    between the two letters?

05:15 2              MR. MARMARO:  Do you mean the draft long form?

05:15 3              MR. BERGMAN:  Yes.

05:15 4              THE WITNESS:  I did put a call in to

05:15 5    Mr. Schulman during this time period, but I don't recall

05:15 6    that we spoke.  I found out he was on vacation.  Or I

05:16 7    would later learn he was on vacation.

05:16 8    BY MR. BERGMAN:

05:16 9         Q    Returning to your phone register at page 614 --

05:16 10        A    One moment, please.

05:16 11        Q    There is a reference to a phone call from

05:16 12   Mr. Toberoff at 6:09.  Was that call completed that day?

05:16 13   Did you return it?

05:16 14        A    I don't know if it was completed that day.

05:16 15        Q    Did you return it at some point?

05:16 16        A    Yes, I believe so.

05:17 17        Q    Before I get into that, let me just make sure.

05:17 18   If you look at page 615, you'll see another reference to

05:17 19   a phone call from Mr. Toberoff.

05:17 20              Was your reply to the phone call that you

05:17 21   received on the 24th made prior to the 30th, or was it

05:17 22   after the 30th?

05:17 23              MR. MARMARO:  30th of July?

05:17 24              MR. BERGMAN:  Yes.

05:17 25              THE WITNESS:  I believe, looking at these

                                                                 165

05:17 1    records, that what must have happened is I returned the

05:17 2    call, didn't reach Mr. Toberoff; he called back, and

05:17 3    we -- on the 30th, and we spoke subsequent, either on

05:17 4    that day or subsequent to that day.

05:17 5    BY MR. BERGMAN:

05:17 6        Q    Would it be accurate to say that you do not

05:18 7    recall speaking -- actually speaking with Mr. Toberoff

05:18 8    twice during the last week of July '02?

05:18 9        A    I recall one conversation.

05:1810        Q    Okay.  Can you tell me to the best of your

05:1811    recollection what was said by each of you and

05:1812    Mr. Toberoff in that conversation?

05:1813        A    I think Mr. Toberoff said he was -- wanted to

05:1814    check in with me to see where we were in our dealings

05:1815    with DC Comics, and I think I told him then that -- and I

05:1816    may have also said it in our first conversation -- that

05:1817    we had a confidentiality agreement with DC Comics, and I

05:1918    didn't feel at liberty to discuss the status of our

05:1919    dealings with him.

05:1920        Mr. Toberoff said, "Can you tell me what DC

05:1921    Comics offered you," and I said, "No.  We have a

05:1922    confidentiality agreement."

05:1923        And I believe Mr. Toberoff said, "Would you be

05:1924    willing to enter into negotiations with me," and I

05:1925    believe I said, "Initiating negotiations, no.  That's

                                                          166

05:19 1    something that makes me very uncomfortable.  If you have

05:19 2    an offer, present it to me, and I'll present it to the

05:19 3    client."

05:19 4        Q    Do you recall what he said in response?

05:20 5        A    I think that was the summary of the substance of

05:20 6    the conversation other than goodbyes.

05:20 7        Q    If you turn the page to 616, you will see a

05:20 8    reference to a conference call, quote, "with Mark, Kevin,

05:20 9    and Ari Emanuel at Endeavor," close quote.  There also

05:2010    appears to be a notation, "approximately 20 minutes."

05:2011        Do you see that?

05:2012        A    Yes, and it looks like the "20" is crossed out,

05:2013    and it says "5 to 10" above it.

05:2014        Q    I see.  Okay.

05:2015        Off the record.

05:2016        (Discussion held off the record.)

05:2017    BY MR. BERGMAN:

05:2018        Q    Would you describe to the best of your

05:2119    recollection and as specifically as possible what was

05:2120    said by each of the three of you during that

05:2121    conversation?

05:2122        A    I think this record may actually be setting up a

05:2123    conference call rather than the conference call, but

05:2124    ultimately there was a conference call at this time

05:2125    period.

167

```
05:21 1        Q    I see.  Okay.

05:21 2             Do you recall how long after August 7 that

05:21 3   conference call took place?

05:21 4        A    Within the next day or two.

05:21 5        Q    I see.

05:21 6             Would you tell me --

05:21 7        A    If not on that date.

05:21 8        Q    -- what was involved and what was said in that

05:21 9   conversation?

05:21 10       A    Yes.  Mr. Toberoff and Mr. Emanuel both spoke.

05:22 11  I can't completely tell you who said what, but I think

05:22 12  Mr. Toberoff may have very briefly referenced past

05:22 13  conversations, and then I believe it was Mr. Emanuel who

05:22 14  explained that either they or some other people or

05:22 15  perhaps some members of the Endeavor Talent Agency had

05:22 16  set up a fund or were in the process of setting up a fund

05:22 17  to acquire intellectual property rights which they would

05:22 18  then package with clients from the Endeavor Talent

05:23 19  Agency, then take those to studios to exploit the

05:23 20  package, and they understood that the Siegel family had

05:23 21  an interest in the termination rights and viewed that as

05:23 22  perhaps the most valuable of properties and wanted to

05:23 23  make a proposal.

05:23 24       Q    Okay.  What did you say?

05:23 25       A    I said in substance and effect, "I'm listening."
```

168

05:23 1 And I'm not sure who spoke, but they made a proposal of

05:23 2 $15 million and what was described as a meaningful back

05:23 3 end, which I understood to be a contingent compensation

05:23 4 position or a royalty position in the exploitation of the

05:23 5 property.

05:24 6     Q   And was that for the entire Siegel Superman

05:24 7 interest?  Did it include Michael's?

05:24 8     A   I don't think that was discussed, but that's how

05:24 9 I understood it.

05:2410     Q   Did they say -- attempt to quantify what that

05:2411 meaningful back end would be?

05:2412     A   They did not.  I believe I asked, but they did

05:2413 not.

05:2414     Q   And what else did you say?

05:2415     A   I asked if there was anything else, and they

05:2416 said "No," and then I asked if this was a proposal that

05:2417 was conditioned on their doing due diligence about the

05:2418 rights, and they said again in substance and effect, "No,

05:2519 it's not.  We've done our due diligence already.  This is

05:2520 the offer."

05:2521     Q   Anything else you can recall of that

05:2522 conversation?

05:2523     A   I think I said, "Thank you, and I will

05:2524 communicate this to the client" or "take this back to the

05:2525 client."

169

05:25 1      Q   And did you in fact do that?

05:25 2          MR. MARMARO:  Before you answer the question, is

05:25 3      there any objection to the answer?  The question calls

05:25 4      for a communication between Mr. Marks and the clients.

05:25 5          MR. TOBEROFF:  Without a waiver, no, whether or

05:25 6      not you communicated that to the client.

05:25 7          MR. MARMARO:  A yes or a no.

05:25 8          THE WITNESS:  Yes.

05:25 9      BY MR. BERGMAN:

05:2510      Q   And was that a communication within let's say a

05:2511      week of the conference call?

05:2512      A   Yes.

05:2513      Q   Your phone register, 617, indicates a call from

05:2614      Mr. Toberoff on August 29.  Was that call returned?

05:2615      A   I -- was it returned.  I don't know.

05:2616          MR. TOBEROFF:  Which number -- Bates number?

05:2617          MR. BERGMAN:  617.

05:2618      Q   Do you recall having a telephone conversation

05:2619      with Mr. Toberoff subsequent to the conference call?

05:2620      A   The best I can say is that it may be that

05:2621      Mr. Toberoff called to see if I had a response, and I

05:2622      could only have said at that time that the clients had

05:2723      been away, and I don't have a response.  I have -- I am

05:2724      not certain about that.

05:2725      Q   Did there ever come a time when you communicated

                                                              170

```
 1
 2
 3
 4
 5
 6
 7
 8              I, KEVIN S. MARKS, do hereby declare under
 9     penalty of perjury that I have read the foregoing
10     transcript; that I have made any corrections as appear
11     noted, in ink, initialed by me, or attached hereto; that
12     my testimony as contained herein, as corrected, is true
13     and correct.
14              EXECUTED this _____ day of _____,
15     20_____, at _____, _____.
                              (City)                    (State)
16
17
18
19              _____
20              KEVIN S. MARKS
21
22
23
24
25
```

205

```
 1   STATE OF CALIFORNIA    )
                            ) ss
 2   COUNTY OF LOS ANGELES  )

 3

 4        I, DAVID S. COLEMAN, a Certified Shorthand

 5   Reporter, do hereby certify:

 6        That prior to being examined, the witness in

 7   the foregoing proceedings was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing

 9   but the truth;

10        That said proceedings were taken before me at

11   the time and place therein set forth and were taken

12   down by me in shorthand and thereafter transcribed

13   into typewriting under my direction and supervision;

14        I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings,

16   nor in anywise interested in the outcome thereof.

17        In witness whereof, I have hereunto subscribed

18   my name.

19

20   Dated:  OCT 1 7 2006

21

22

23   DAVID S. COLEMAN
     CSR No. 4613

24

25
```

ORIGINAL SHIPPED    NOV 0 9 2006

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON, )
)
        Plaintiffs, )
)
    vs. )       No. 04-8400 (RSWL)(RZx)
)
WARNER BROS. ENTERTAINMENT )       -and-
INC., et al., )
)       No. 04-8776 (RSWL)(RZx)
        Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED
ORIGINAL**

DEPOSITION OF ARIEL Z. EMANUEL

Beverly Hills, California

Thursday, November 2, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**

*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

**EXHIBIT T**

154

1          Deposition of ARIEL Z. EMANUEL, taken

2     on behalf of Defendants and Counterclaimants,

3     at 9665 Wilshire Boulevard, 9th Floor, Beverly

4     Hills, California, beginning at 3:08 PM on

5     Thursday, November 2, 2006, before DAVID S.

6     COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9     APPEARANCES:

10

11     For Plaintiffs:

12          LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
13          Attorney at Law
           2049 Century Park East, Suite 2720
14          Los Angeles, California 90067
           310-246-3333
15

16

17     For Defendants and Counterclaimant:

18          WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
           BY:  MICHAEL BERGMAN
19               ADAM HAGEN
           Attorneys at Law
20          9665 Wilshire Boulevard, 9th Floor
           Beverly Hills, California 90212
21          310-858-7888
           mbergman@wwllp.com

22

23

24

25

                                                    2

1    APPEARANCES (Continued):

2

3    For the Witness:

4        ALSCHULER GROSSMAN STEIN & KAHAN
         BY:  MICHAEL J. PLONSKER
5        1620 26th Street, 4th Floor - North Tower
         Santa Monica, California 90404-4060
6        310-907-1000

7

8    ALSO PRESENT:  TOM McGUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          3

```
 1         Beverly Hills, California, Thursday, November 2, 2006

 2                              3:08 PM

 3

 4                    ARIEL Z. EMANUAL,

 5         having been first administered an oath,

 6         was examined and testified as follows:

 7

 8                           EXAMINATION

 9    BY MR. BERGMAN:

03:08 10        Q    Would you state your full name for the record,

03:08 11    please.

03:08 12        A    Ariel Zev Emanuel.

03:08 13        Q    Mr. Emanuel, have you had your deposition taken

03:08 14    before?

03:08 15        A    Yes.

03:08 16        Q    On how many occasions, approximately?

03:08 17        A    I don't recall.

03:08 18        Q    A number of them?

03:08 19        A    I don't know how many.

03:08 20        Q    Okay.  Let me just emphasize a few points.

03:09 21             I, of course, am here representing the DC

03:09 22    parties who are defendants and counterclaimants in this

03:09 23    action brought by Joanne and Laura Siegel.  I'll be

03:09 24    asking you questions, the reporter will take down

03:09 25    everything that is said verbatim and, at the conclusion
```

                                                                6

I'm -- you know, the -- and I appreciate it.  You brought

up -- it's the first time I remembered this thing from

Cleveland, but that's the -- I'll think about it some

more, but I don't think so.

BY MR. BERGMAN:

Q   Okay.  Thank you.  If you recall --

**A   I'll let you know.**

Q   -- during the course of the deposition, please

say so.

Okay?

**A   Sure.**

Q   Do you recall discussing the Laura and Joanne

Siegel interest in Superman with Bruce Rosenblum?

**A   No.**

MR. BERGMAN:  Would the reporter mark as Exhibit

6 a document that is undated.  It has previously been

introduced as an exhibit at a prior deposition and

purports to be from Mr. Emanuel.

(Deposition Exhibit 6 marked.)

BY MR. BERGMAN:

Q   Could you review that letter, Mr. Emanuel, and

tell me if it refreshes your recollection --

MR. PLONSKER:  Of -- I'm sorry.  I thought you

were done.  About?

BY MR. BERGMAN:

70

Q   -- about having any discussion with Mr. Rosenblum concerning the Siegel interest?

THE WITNESS:  Repeat the question.  I'm sorry.

MR. BERGMAN:  Yes.  Could you repeat it, please.

(Record read as follows:

"Could you review that letter, Mr. Emanuel, and tell me if it refreshes your recollection about having any discussion with Mr. Rosenblum concerning the Siegel interest?")

THE WITNESS:  No, it does not.

BY MR. BERGMAN:

Q   And I asked you that, sir, because you realize you begin by saying, "As discussed"?

**A   I appreciate that.**

Q   I notice the initials above your name "dbnr." Does that have any meaning to you?

**A   Since I was once a secretary, dictated not read.**

Q   Thank you.

**A   I was a good secretary.**

Q   I'll bet you were.

**A   I was.**

Q   Now, subsequent to this letter, although it isn't dated, but you did in fact have a meeting with John Schulman and certain other parties concerning the Siegel

71

interest, didn't you?

A   I have no idea of the time frame.

Q   Okay.  At any point in time.

A   I did have a meeting with a large gentleman from
Warner Bros., a lawyer, and a person from DC Comics and
Mr. Toberoff and myself.

Q   Okay.

A   I mean you're asking me about names.  I don't
recall except his and mine.

Q   Mr. Schulman is a large gentleman.

MR. PLONSKER:  He will be happy to be described
that way.

MR. BERGMAN:  Yes.

THE WITNESS:  He's a nice guy.

MR. PLONSKER:  Yes, he is.

BY MR. BERGMAN:

Q   What do you recall saying at that meeting?

A   I don't recall much.  The main discussions I
think were between Mr. Toberoff and...

MR. PLONSKER:  Mr. Schulman?

THE WITNESS:  ...Mr. Schulman, and I think the
gentleman from DC who had flown in, I think he said he
had flown in for the meeting, as I recall, and all I
remember him saying is something to the effect that all
we have is -- Mr. Schulman said something to the effect

72

that -- something about DC being a sub something.  It was so convoluted.  And DC saying all we really have is 5 percent of gross of Superman, and that's all I -- I mean there was kind of back-and-forth between them, and I was kind of just taking it in.  I don't remember what I said, if I said anything at all.  And I'm sorry that's a little convoluted, so...

BY MR. BERGMAN:

Q   During the course of the meeting, did either you or Mr. Toberoff make an offer as to the amount of money which the Siegels were prepared to accept in exchange for their rights?

A   **I don't recall.**

Q   Do you recall any discussion as to the financial basis upon which the matter could be resolved?

A   **I'm assuming it might have happened.  All I remember -- the only major financial kind of conclusion of it I remember was the guy from DC saying that all they had was 5 percent of gross, and it was a sub-company of Warner Bros., and I really didn't remember why that had anything to do with this situation, but that's what I remember.**

Q   Do you recall during the course of that meeting offering to convey the Siegel rights to DC --

A   **Actually, excuse me, I want to --**

73

Q   Okay.

A   I do remember the large gentleman saying that he thought that -- he did go over -- he did say -- he said something about their pension and paying their pension, and this whole pension thing came up a lot, and that he thought they were being fair, and I think I made the statement, my normal statement, that fair is where you end up.  I think that's -- I think that was stated from my side.  I do remember that.  And that's all I really recall.

Q   Do you remember either you or Mr. Toberoff stating in substance that the Siegels wanted to end up with $50 million for their interest?

A   I don't recall that.

Q   Do you recall any figure being given to DC by either you or Mr. Toberoff during that meeting?

A   Not...  I don't -- all I remember is them talking about money.  I don't -- and I don't remember what the numbers were.  I don't, really.  I'm sorry.

Q   Okay.  As you went into that meeting, Mr. Emanuel, did you have in mind any particular amount of money or objective that you wanted to achieve in that meeting?

A   I was just there to kind of listen and take it all in and see if I could -- you know, kind of in my head

74

just kind of take it all in and see where people stood. I wasn't in there to negotiate, from my perspective going in.

Q   Okay.  And was there any discussion as to the amount of revenues that the Superman property was generating at that time?

A   There might have been.  I don't recall.  There might have been.

Q   Now, you say you weren't there to negotiate. What was -- what were you there for?

A   Really I was there, you know, to -- I was observing it, mainly.  I was kind of a presence.  I was there to observe the parties.  I wasn't negotiating.

Q   Okay.  Was it discussed between you and Mr. Toberoff that he would handle the negotiation at that meeting?

A   I don't recall if there was a pre-meeting -- I don't think there was a pre-meeting to that.

Q   Before you and Mr. Toberoff went into this meeting with Mr. Schulman -- and the gentleman from DC Comics is Paul Levitz, I believe.

A   Shorter gentleman.

Q   Yes.

Before going into that meeting, had you made any determination in your mind as to the amount of money you

75

wanted to obtain for the Siegels?

   A   Not to my knowledge.

   Q   Did you ever reach that point where you decided I want to get X dollars for their interest?

   A   You know, in my other life as an agent, I never determine value. As -- again, as I said to you, fair is where you end up so -- taught to me from a person from Warner Bros., Art Stolnitz.

      So when you say to me did I determine value, I never do that, because where we end up is where we end up. That's where fair is from your side and from my side. So I never -- when you ask me do you have this pre -- I don't. I never do that.

   Q   But isn't where you end up --

   A   Is fair.

   Q   -- molded and shaped by where you start?

   A   No, not from my knowledge. You should take some lessons. I've done -- my father says I've done pretty well.

   Q   How did the meeting at Warner Bros. end?

   A   Schulman, the tall guy, I think said that, you know -- I think he ended it that there was nothing more to discuss or that we would -- I think that's what he said, something like that.

   Q   Did Mr. Schulman say that after a specific

76

figure had been raised by either Mr. Toberoff or by you?

A   **Not to my knowledge.  I don't recall that.**

Q   Did you report to Joanne or Laura Siegel
following that meeting as to what had transpired at that
meeting?

A   **Did I?**

Q   Yes.

A   **I don't remember.**

Q   Do you recall having a meeting with the two
Siegel women following the Warner's meeting?

A   **I only remember four meetings with the Siegels.**

Q   Okay.  We've covered two.

A   **I don't remember in what timeline.**

Q   Okay.  What do you recall transpiring at the
third meeting?

A   **I can't actually put it in context of a first,
second and third meeting.  I know there was a third
meeting because I remember there was four meetings.  I
don't remember.  I'm sorry.**

Q   Okay.  Do you have any recollection at all as to
what happened in either of the last two meetings that you
had with the Siegels?

A   **I don't want to assume anything because I'm
told -- I don't want to assume anything that then leads
to more hours here.  I'm assuming something was said, but**

77

1

2

3

4

5

6

7

8         I, ARIEL Z. EMANUAL, do hereby declare under

9   penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14         EXECUTED this _____ day of _____,

15  20____, at _____, _____.

                        (City)              (State)

16

17

18

19         _____

20         ARIEL Z. EMANUAL

21

22

23

24

25

86

STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF LOS ANGELES    )


        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated: __**NOV 0 8 2006**__


        _____
        DAVID S. COLEMAN
        CSR No. 4613

1

1        UNITED STATES DISTRICT COURT

2     FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                                          ORIGINAL

4    JOANNE SIEGEL,              )
     LAURA SIEGEL LARSON         )
5                                )
                Plaintiffs,      )
6                                )
        v.                       )   CASE NO. CV 04-8400
7                                )            CV 04-8776
     WARNER BROS, et al.         )
8                                )
                Defendants.      )
9

10

11

12

13        DEPOSITION OF MARK WARREN PEARY
             November 11, 2006
14              8:30 a.m.
           317 Paseo de Peralta
15         Santa Fe, New Mexico

16

17        PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

18   TAKEN BY:  MR. PATRICK PERKINS
                Attorney for the Defendants
19

20

21

22   REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                    Bean & Associates, Inc.
23                  Professional Court Reporting Service
                    500 Marquette, Northwest, Suite 280
24                  Albuquerque, New Mexico 87102

25   (3519B) MC

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
EXHIBIT
168

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4         MR. MARC TOBEROFF
           2049 Century Park East, #2720
 5         Los Angeles, California 90067

 6   For the Defendants:

 7         PERKINS LAW OFFICE, P.C.
           1711 Route 9D
 8         Cold Spring, New York 10516
           BY:  MR. PATRICK PERKINS
 9

10   ALSO PRESENT:   MS. MARGO MOIR, Videographer

11

12              I N D E X

13   EXAMINATION OF MARK WARREN PEARY

14   By Mr. Perkins                                3

15   CERTIFICATE OF COMPLETION OF DEPOSITION      86

16   WITNESS SIGNATURE/CORRECTION PAGE            88

17

18       EXHIBITS MARKED OR FORMALLY IDENTIFIED

19   1.  Subpoena in a Civil Case                  6

20   2.  Subpoena in a Civil Case                 13

21   3.  Joint Venture Agreement                  24

22   4.  Privilege Log                            37

23   5.  October 27, 2003 agreement              40

24   6.  Order Admitting Will to Probate         48

25   7.  Notice of Termination of Transfer ...   50
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
169

3

8.   March 12, 2004 Register of Copyrights documents  57

9.   September 10, 2004 cancellation letter          59

10. April 26, 2005 letter, Levitz to Peavy, Peary    64

11. May 12, 2005 letter, Toberoff to Perkins         71

                       *     *     *

                 MARK WARREN PEARY,

     after having been first duly sworn under

     oath, was questioned and testified as follows:

          MR. TOBEROFF:  Before we start, I would just

like to note at the outset of the deposition that we

have discussed timing, and that we have to leave at

4 o'clock sharp so that I can make a flight.

          I would also just like to object that

plaintiffs were not -- I was not given notice as

attorney for Warren Peavy, the witness, that this

deposition was going to be videotaped as I believe is

required by the rules.

          Oh, excuse me.  The Notice.  I'm seeing it's

not in the subpoena.  It may be required in the

subpoena, it's not in the subpoena but it is in the

Notice to me.

                     EXAMINATION

BY MR. PERKINS:

     Q.   Good morning, Mr. Peary.  My name is Patrick

Perkins.  I represent the defendants, DC Comics, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
170

24

1    counsel, and then we had discussed possible uses of

2    rights, but we really -- I employed him as counsel

3    very soon after I contacted him.

4         MR. PERKINS:  Would you mark that, please?

5         (Exhibit 3 marked.)

6    Q.   (By Mr. Perkins)  I have asked the court

7    reporter to mark as Exhibit 3 a document that's

8    entitled Joint Venture Agreement.  Could you turn to

9    the last page of this document, please?

10        MR. TOBEROFF:  Before you ask him questions

11   about an isolated portion of the document, I think you

12   should look it over because the rest of the agreement

13   may provide context for whatever question Mr. Perkins

14   is asking.

15        MR. PERKINS:  Well, I didn't ask any

16   questions yet, but I was just --

17        MR. TOBEROFF:  I presume you were about to?

18        MR. PERKINS:  I was just going to ask him if

19   it was his signature on the last page, because if it's

20   not, then it's going to be a very different

21   examination.

22   Q.   (By Mr. Perkins)  Is this your signature on

23   the last page?

24   A.   Yes.

25   Q.   Okay.  Have you seen this agreement before

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
171

25

1    today?

2        A.    Yes.

3        Q.    Did you read it before you signed it?

4        A.    Yes.

5        Q.    Okay.  Why don't you go ahead and go through

6    the agreement, because I am going to ask you some

7    questions about it now.

8              Have you had occasion to read through the

9    document?

10       A.    Yes.

11       Q.    Now, this agreement is a Joint Venture

12   Agreement; correct?

13             MR. TOBEROFF:  Objection, calls for a legal

14   conclusion.  You can answer.

15       A.    Well, that's what it says here.

16       Q.    What did you understand you were doing when

17   you signed this agreement?

18       A.    We were employing Marc Toberoff, Esquire, as

19   our attorney to exploit any rights we may have in

20   connection with Superman.

21       Q.    And so what was Pacific Pictures

22   Corporation's role in this whole agreement, then, your

23   understanding?

24             MR. TOBEROFF:  Calls for speculation.

25       A.    Um -- I don't know how to characterize

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
172

26

1  exactly what Pacific Pictures' role is my.

2  Understanding is that this is when we employed Marc

3  Toberoff as our attorney, and this was a business name

4  he was using.  That's my understanding.

5      Q.  Did you -- did you get legal counsel to

6  advise you on this agreement before entering into it?

7      A.  No.

8      Q.  Now, in the first paragraph -- in the

9  paragraph that's named -- that listed number 1, do you

10  see that?

11      A.  Yes.

12      Q.  It lists a number of characters.  Do you see

13  that?

14      A.  Yes.

15      Q.  Now, I promised the court reporter that I

16  wouldn't reference one particular character because of

17  the difficulty in spelling it, so we won't go through

18  all of them.  But I want to draw your attention to two

19  specific characters.  Before I do, who decided which

20  names and characters would be included in paragraph

21  1?

22          MR. TOBEROFF:  Objection, attorney-client

23  privileged information.  Instruct you not to answer.

24          Also attorney work-product.

25      Q.  Are you going to follow your counsel's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
173

27

1  instructions not to answer.

2       THE WITNESS:  Yes.

3       MR. TOBEROFF:  Mr. Perkins, for the

4  remainder of this deposition please assume that he is

5  going to follow his counsel and do not ask him after

6  each question whether he is going to follow the

7  instruction.  I find that improper.

8       MR. PERKINS:  It's actually not,

9  Mr. Toberoff.  I have to ask the question because if I

10  just leave it with your instruction and don't ask, I

11  open myself up to the possibility that at trial he

12  could answer the question saying I was never asked

13  whether I would follow the instruction.

14       MR. TOBEROFF:  Okay.  So let's say for the

15  remainder of the deposition when I instruct you not to

16  answer are you going to follow my instructions?

17       THE WITNESS:  Yes.

18       MR. PERKINS:  That's fine.  Thank you.

19       MR. TOBEROFF:  Okay.  Then you don't need to

20  keep asking him.

21       MR. PERKINS:  Thank you.

22     Q.   (By Mr. Perkins)  Do you have any

23  understanding as to why the character Superboy is

24  listed in paragraph one of this agreement?

25     A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
174

28

1    Q.   In the research that you did concerning

2    copyright law relating to Superman, was it your belief

3    that some of the rights that you may have held were

4    rights relating to Superboy?

5    A.   No.

6    Q.   And I also note that paragraph one mentions

7    Smallville.  Do you see that?

8    A.   Yes.

9    Q.   Do you have any understanding as to why that

10   was included in this paragraph?

11   A.   No, I don't.

12   Q.   Do you know what Smallville is?  What that's

13   referring to there?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's -- it was a name that was created by --

17   in connection with the story in connection with

18   Superboy.

19   Q.   And based on the --

20   A.   Or actually, let me finish, because --

21        MR. TOBEROFF:  Wait.

22   A.   It was actually -- I'm recalling, it was

23   part of the whole story from the very beginning, if

24   I'm recalling the whole story, the whole Superman

25   story.  From the very beginning it was used in there,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

EXHIBIT

175

29

1   so that's all I know about it.

2       Q.    And based on the research that you did, was

3   it your belief that the copyright rights that you may

4   have had rights to would include rights in Smallville?

5       A.    When you say Smallville, are you talking

6   about, like, the TV show that's on or --

7       Q.    That -- I'm sorry -- yes.

8       A.    Oh.

9           MR. TOBEROFF:  Calls for a legal conclusion

10   as to rights he would have.

11       A.    That's -- that's not really my understanding

12   that that's part of our rights.

13       Q.    You testified earlier, if I'm not mistaken

14   and if I get it wrong please tell me, and I'm sure

15   Mr. Toberoff will jump in and say that I

16   mischaracterized it.  The joint -- the purpose of this

17   document was to hire Mr. Toberoff as your attorney.

18   Is that an accurate characterization of your belief.

19           MR. TOBEROFF:  Asked and answered.  Oh,

20   mischarac- -- okay.  Strike that.

21       A.    Yes.  My understanding was that, that this

22   is the document that we used to hire Mr. Toberoff as

23   our attorney.

24       Q.    If you could turn to the second page in

25   paragraph 5, do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
176

30

1    A.   Yes.

2    Q.   That paragraph provides for a division of

3    proceeds of 50 percent to you and your mother and 50

4    percent to Pacific Pictures, do you see that?

5    A.   Let's see.  Who are the claimants again?

6    Let's see.  Let's see.

7    Q.    In the top paragraph of the first page, it

8    identifies Jean A. Peavy and her son Mark Warren

9    Peary --

10   A.   Oh.

11   Q.   -- individually and collectively as

12   claimants.  Do you see that?

13   A.   Yes.

14   Q.   So, turning back to paragraph 5?

15   A.   Uh-huh.

16   Q.   There is a division of 50 percent to you and

17   your mother and 50 percent to Pacific Pictures.  Do

18   you see that?

19   A.   Yes.

20   Q.   And, do you recall how the parties to this

21   agreement came up with that division?

22        MR. TOBEROFF:  Vague and ambiguous.

23   A.    It's discussions, just discussions between

24   us and Mr. Toberoff.

25   Q.   And what was the basis for choosing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

EXHIBIT

177

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    particular division of proceeds?

2            MR. TOBEROFF:   Vague and ambiguous, asked

3    and answered.

4        A.    Yes, it was pretty much what I said before,

5    it was just based on just discussions over time.

6        Q.    Well, were there certain considerations that

7    went into determining this percentage?

8        A.    Perhaps the amount of work involved, the

9    amount of time, the commitment, like, it was the idea

10   it was not an immediate thing, it might take many

11   years.

12           Level of -- just, you know, that's it.

13       Q.    In entering into this Joint Venture

14   Agreement, what there any discussion as to how much

15   revenue was anticipated would come in, in exploiting

16   the rights here?

17       A.    Oh, I -- I don't recall discussing exact

18   figures, no.

19       Q.    Discuss -- do you recall general amounts?

20       A.    You know, that's -- that's not something we

21   really talked too much about.   It was more having to

22   do with what the exact copyright law states what our

23   rights might be.   We really didn't discuss figures

24   much.

25       Q.    Did you enter into a separate written

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
178

32

1    agreement with Mr. Toberoff concerning his

2    representation of you as a lawyer?

3        A.    This is all I recall, right here.

4            MR. TOBEROFF:  I want to interject.  The

5    question was vague and ambiguous at the time.

6        Q.    If I could ask you to turn to page 3 of the

7    document and take a look at paragraph 8, which is the

8    first paragraph on the page?  Could you please read

9    that paragraph to yourself, and then I'm going to ask

10   you some questions about it.

11       A.    Oh, okay.

12            Okay.

13       Q.    The second sentence of this agreement

14   states, and I quote, "Upon the expiration of the term

15   and the winding up of the venture, or in the event of

16   termination of the venture for any reason, all rights,

17   property or assets of the venture will be held 50

18   percent by the claimants and 50 percent by PPC as

19   tenants in common, and claimants and PPC will each be

20   entitled to receive and continue to receive 50 percent

21   of all proceeds derived from the rights after

22   termination of the venture."

23            My question is, Mr. Peary, what was your

24   understanding as to what, if any relationship, would

25   continue to exist between you and Pacific Pictures in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
179

33

1   the event that this agreement was terminated?

2          MR. TOBEROFF:  Calls for a legal conclusion,

3   the document speaks for itself.

4      A.    My understanding of what that meant?

5   Probably death, if he died.

6      Q.    What -- what was your understanding of what

7   would happen to the rights that are at issue in this

8   agreement in the event that this agreement was

9   terminated?

10         MR. TOBEROFF:  Same objections, calls for a

11  legal conclusion.  The document speaks for itself.

12     A.    What would happen to the rights?

13     Q.    Well, who would own them?

14         MR. TOBEROFF:  Are you asking him to read

15  the document and tell you what it means?

16     Q.    I'm asking you, Mr. Peary, what your

17  understanding was of what would happen to the rights

18  if the agreement was terminated at the time that you

19  signed the agreement?

20     A.    Well, it was terminated at some later date.

21     Q.    Yes.

22     A.    The rights would be split 50 percent.

23     Q.    If I could have you go back to page -- to

24  the first page of Exhibit 3, in paragraph 3 there is

25  reference to PPC paying costs and expenses of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
180

34

1   venture.   Do you see that?

2       A.    Yes.

3       Q.    And it refers to -- it lists a number of

4   costs and fees.  My question, Mr. Peary, is, were you

5   ever made aware as to whether any costs or fees were

6   incurred by the venture?

7           MR. TOBEROFF:  Vague and ambiguous.

8       A.    There were -- there was some fees associated

9   with the establishment of the Joe Shuster estate.

10  That's pretty much all I know.

11      Q.    Were you aware of any other attorneys' fees

12  that were incurred in connection with this venture?

13          MR. TOBEROFF:  Objection, vague and

14  ambiguous.

15      A.    The only fees I am aware of is fees

16  associated with the establishment of the Shuster

17  estate.

18      Q.    Now, you mentioned that under this agreement

19  you believe that you were hiring Mr. Toberoff as your

20  attorney.  What is your understanding of the fee

21  arrangement with Mr. Toberoff for his legal services?

22          MR. TOBEROFF:  Asked and answered.

23      A.    Yes.  My understanding is what it says in

24  paragraph 5 that we discussed.

25      Q.    All right.  Hold on to that document, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
181

35

1  I'm going to mark something else and we're going to go

2  back to it.

3          MR. TOBEROFF:  I'm getting a glass of

4  water.

5          THE VIDEOGRAPHER:  Your mike.

6          MR. TOBEROFF:  Oh, sorry.

7          (A discussion was held off the record.)

8      Q.   (By Mr. Perkins)  Before you look at Exhibit

9  4, I would like you to go back to Exhibit 3 for a

10 moment, Mr. Peary.  Is this document, this agreement

11 the first agreement between you and Mr. Toberoff that

12 you believe established him as your attorney?

13     A.   Yes.

14     Q.   And the date on the back page of this, it's

15 signed November 28, 2001; correct?

16     A.   Yes.

17     Q.   Did you have any discussions with

18 Mr. Toberoff prior to November 28, 2001?

19         MR. TOBEROFF:  Just a second.  I need to put

20 on my mike.

21         Objection, asked and answered.

22     A.   Yes.  I would refer you back to the prior

23 answer about when I first talked to him.

24     Q.   He wasn't your lawyer when you first talked

25 to him; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
182

36

1    A.    Not at first.

2    Q.    Do you remember what you said during your

3  first conversation with Mr. Toberoff?

4        MR. TOBEROFF:    Objection.    I would like to

5  counsel -- instruct you not to answer questions about

6  your conversation because they are privileged, even

7  though I had not yet been retained.    Your

8  conversations and our interviews are still privileged.

9  So I instruct you not to answer any questions as to

10 the substance of our conversations when you first

11 contacted me.

12   Q.    Did you ever have any conversations with

13 Mr. Toberoff as the President of Pacific Pictures, as

14 opposed to as your lawyer?

15       MR. TOBEROFF:    Vague and ambiguous, calls

16 for a legal conclusion.

17   A.    Um -- you know, I would say I contacted him

18 seeking legal advice.

19   Q.    But in November you entered into this

20 agreement which is a joint venture with the company

21 called Pacific Pictures; correct?

22   A.    Yes.

23   Q.    And Mr. Toberoff is the president of Pacific

24 Pictures Corporation; correct?

25       MR. TOBEROFF:    Assumes facts not in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
EXHIBIT
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

183

37

1   evidence.

2       A.    Well, that's what it says here.

3       Q.    That's what the document says.  So my

4   question, sir, is, did you ever have discussions

5   with Mr. Toberoff in his capacity as the President of

6   Pacific Pictures Corporation?

7           MR. TOBEROFF:  Objection, calls for a legal

8   conclusion, calls for speculation.

9       A.    Yes.  I wasn't really aware of the Pacific

10  Pictures -- as having any dealings with Pacific

11  Pictures, because I have always talked with Marc

12  Toberoff, the man, as seeking legal advice.

13      Q.    So it's your testimony, as you sit here

14  today, that all of the discussions that you had with

15  Mr. Toberoff were in the context of his role as your

16  lawyer?

17          MR. TOBEROFF:  Asked and answered.

18      A.    Yes.

19          (Exhibit 4 marked.)

20      Q.    Okay.  If you could take a look at Exhibit

21  4, this is a document that's -- it's one of these

22  lawyer things that people who don't litigate will

23  scratch their heads about, and I'm going to try to

24  explain to you what it is, and Mr. Toberoff will chime

25  in if I have got it wrong.  It's identified a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
184

38

1    privilege log, and it is a list of documents that was

2    provided to us by your lawyer among the documents that

3    were responsive to the subpoena that your lawyer has

4    taken the position are protected by the

5    attorney-client privilege, and therefore we cannot see

6    them.  Do you understand that?

7        A.    Yes.

8        Q.    And so this log goes through and gives the

9    date of the document, and it gives who the author is

10   and it gives what kind of document it is and what the

11   privilege claim is.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  The second document on here

14   identifies an attorney named John Pettker,

15   P-E-T-T-K-E-R.  Do you see that?

16       A.    Yes.

17       Q.    Who is John Pettker?

18       A.    He is an attorney involved in establishing

19   the Joe Shuster estate.

20       Q.    And who -- who hired him?

21       A.    Our attorney, Marc Toberoff.

22       Q.    Did you have any direct dealings with

23   Mr. Pettker?

24       A.    No, I don't believe so.

25       Q.    Going back to Exhibit 3 for a moment, if we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
185

1   could, if you could turn to the third page of the

2   document?  You have testified on a couple of occasions

3   that one of the things that was going to happen as a

4   result of this joint venture was to establish the Joe

5   Shuster estate; is that correct?

6          MR. TOBEROFF:  Misstates his testimony as to

7   on behalf of the venture.

8      Q.   Well, then -- that's a good point.  At some

9   point you undertook to establish the Joe Shuster

10  estate; is that accurate?

11     A.   Well, I -- it was -- it was between me and

12  Marc Toberoff.  As far as my understanding of it, that

13  that was legally necessary to establish the estate.

14     Q.   Okay.  And if you look at paragraph 10, the

15  last sentence reads, and I quote, "The parties hereby

16  approve Michael Catron," C-A-T-R-O-N, "for appointment

17  as the administrator of Joe Shuster's estate, once it

18  is established."  Who is Michael Catron?

19     A.   He is -- he is a friend.

20     Q.   And is he, in fact, the administrator of Joe

21  Shuster's estate?

22     A.   No.

23     Q.   And why not?

24     A.   We changed, decided to change that,

25  discussion with Marc Toberoff.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
186

40

1    Q.    Who initially came up with the name Michael

2    Catron as the administrator?

3         MR. TOBEROFF:  Came up with it?  Vague and

4    ambiguous.

5    A.    I'm not sure who first came up with it.  He

6    is a long-time friend.  That's all I can say.

7         MR. PERKINS:  Would you mark this for me?

8         (Exhibit 5 marked.)

9    Q.    (By Mr. Perkins)  I have asked the court

10   reporter to mark as Exhibit 5 a document that is dated

11   October 27, 2003.  It is addressed to Mark Warren

12   Peary, and it is from Pacific Pictures Corporation.

13   If I could invite your attention to the last page,

14   please?

15        Is that your signature?

16   A.    Yes.

17   Q.    And did you read this document before you

18   signed it?

19   A.    Yes.

20   Q.    Mr. Peary, what was the purpose of entering

21   into this agreement?

22   A.    As far as I understand, the purpose of this

23   was after I was appointed executor of the Shuster

24   estate.

25   Q.    And why did you need to enter this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
187

41

1  agreement, having been appointed executor of the

2  Shuster estate?

3      A.   I assume since my legal role changed that

4  this needed to be another agreement.

5      Q.   Did you receive legal counsel from anyone

6  prior to entering into this agreement with respect to

7  this agreement?

8           MR. TOBEROFF:   Are you asking whether he

9  sought an outside attorney?

10      A.   An outside attorney?

11      Q.   Yes.

12      A.   Other than Marc Toberoff?

13      Q.   Yes, other than Marc Toberoff.

14      A.   No, I don't believe so.

15      Q.   And as of October 27, 2003, when you signed

16  this agreement, had there been any -- strike that.

17           As of October 27, 2003, when you signed this

18  agreement, did you have any idea as to the value of

19  the rights that are at issue in this document?

20           MR. TOBEROFF:   Vague and ambiguous.

21      A.   Do I have any I -- did I have any idea as to

22  the value?  It wasn't really discussed between me --

23           MR. TOBEROFF:   Don't talk about discussions

24  with me.

25      A.   Okay.  So, no, I guess -- I guess not.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT

188

42

1  don't really have -- did not really have any idea of

2  the value, no.

3      Q.   As of October 27, 2003, to your knowledge,

4  had any effort been made to place a value on these

5  rights, either by you or by anyone connected to you?

6          MR. TOBEROFF:  Objection, vague and

7  ambiguous.  And by value, do you mean a specific

8  dollar figure?  In other words, you have asked this

9  question several times as to value.  What do you mean?

10     Q.   Well, what -- Mr. Peary, when I use the term

11 value in connection with rights, what do you

12 understand me to mean?

13     A.   I understand you to mean a dollar figure.

14     Q.   Okay.  So, using that as the definition, as

15 of October 27, 2003, to your knowledge, had anyone

16 placed a value on the rights that are at issue in this

17 agreement?

18         MR. TOBEROFF:  Anyone in the world?

19     Q.   Anyone, to your knowledge?

20     A.   No, not to my knowledge.  Not any specific

21 amount, no.

22     Q.   Was there a general amount?

23     A.   No.

24     Q.   Mr. Peary, are you aware of any offers that

25 have been made to you, either directly or through a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
189

43

1   representative, to either purchase or license any of

2   the rights that are at issue in Exhibit 5?

3       A.   Yes, I recall something.

4       Q.   Tell me what you recall.

5       A.   Let's see.  We received a letter from DC

6   Comics with -- it was addressed to me and my mother,

7   and it was some kind of an offer made -- I don't

8   recall the exact details.

9       Q.   Other than the offer from DC Comics, have

10  any other offers been made?

11      A.   No.

12      Q.   To your knowledge, have any offers been

13  solicited on your behalf to any third party?

14      A.   No.

15      Q.   Mr. Peary, who is Joanne Siegel?

16      A.   She is Jerry Siegel's wife.

17      Q.   Do you know her personally?

18      A.   I have met her a few times.

19      Q.   When is the last time that you spoke with

20  her?

21      A.   It would have been in July of this year.

22      Q.   And what was the context of that

23  conversation?  Was it in person?

24      A.   Yes.

25      Q.   Where did you speak with her?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
190

59

1    Q.   Have you seen it before today?

2         MR. TOBEROFF:   Asked and answered.

3    A.   Yes, I did answer that before.

4         MR. TOBEROFF:   Well, you can answer.

5    Q.   Indulge me.  I don't remember.

6    A.   Oh, okay.  I don't recall seeing this, this

7    one sheet here.  But every other page following I

8    have.

9         MR. TOBEROFF:   I mean, if it helps I can

10   represent to you that this --

11        MR. PERKINS:   You know, I would rather

12   not --

13        MR. TOBEROFF:   Okay.

14        MR. PERKINS:   -- have you testify to that.

15        MR. TOBEROFF:   All right.

16        MR. PERKINS:   Here you go.

17        (Exhibit 9 marked.)

18   Q.   (By Mr. Perkins)  I have asked the court

19   reporter to mark as Exhibit 9 a one-page document that

20   bears Bates number 133, and it's dated September 10,

21   2004.  Have you seen this document before today?

22   A.   Yes.

23   Q.   And is that your signature, twice?

24   A.   Yes.

25   Q.   This document states that, quote, "1, The

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

EXHIBIT
191

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

60

```
 1    Joint Venture Agreement dated as of November 23, 2001
 2    between you and Pacific Pictures Corp; and 2, the
 3    Engagement Agreement dated October 27, 2003 between
 4    the Estate of Joseph Shuster and Pacific Pictures Corp
 5    have been cancelled," closed quote.  Do you see that?
 6         A.   Yes.
 7         Q.   Why is it that the two agreements referenced
 8    are -- were canceled by this document?
 9         A.   It was replaced by a retainer directly with
10    Marc Toberoff as our attorney.
11         Q.   If I could have you take a look at Exhibit
12    4, which is the privilege log?
13         A.   Uh-huh.
14         Q.   Can you identify from any of these documents
15    which of the documents listed in the log are this
16    other retainer agreement directly with Marc Toberoff?
17         A.   It doesn't say it here.  It just says
18    "letters."  I can't really identify just from this.
19         Q.   Yes, neither can I.  Do you have -- do you
20    know whether the document is an agreement or a letter?
21         A.   We have a legal retainer with Marc Toberoff
22    as our attorney.  The estate has a legal retainer.
23         Q.   And do you know what the date of that is?
24         A.   Um -- it's around the time of this -- this
25    letter here from Exhibit 9.  It's --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
192

61

1    Q.   When you entered into this agreement or when
2  you signed this document and entered into the retainer
3  agreement, did the nature of your business
4  relationship with Mr. Toberoff change?
5         MR. TOBEROFF:  Mis -- mischaracterizes the
6  testimony, vague and ambiguous.  You can answer.
7    A.   No, the nature did not change.
8    Q.   And are the business terms of the new
9  agreement the same or similar to the business terms in
10  the two agreements that are canceled by Exhibit 9?
11         MR. TOBEROFF:  Attorney-client privilege and
12  instruct you not to answer as to the terms of our
13  retainer agreement.
14    Q.   Mr. Peary, under the terms of the retainer
15  agreement are you or the estate required to pay
16  Mr. Toberoff a percentage of revenues from Superboy?
17         Excuse me.  Just a minute.
18         I'm going to withdraw the question because I
19  didn't mean to say Superboy.  Let's go back and do
20  that again.
21         MR. TOBEROFF:  I was wondering what I was
22  going to say.
23    Q.   Under the retainer agreement with
24  Mr. Toberoff, is the estate and/or you or your mother
25  required to pay Mr. Toberoff a percentage of revenues

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
193

1  derived from exploitation of copyrights of Joseph

2  Shuster?

3          MR. TOBEROFF:  Vague and ambiguous, calls

4  for a legal conclusion.  Are you asking -- he can

5  answer solely as to whether it's a contingent fee, the

6  retainer agreement provides for contingent fees or

7  hourly fees.  As I understand, you are entitled to

8  know that.  He can answer that question.  But I don't

9  -- other questions as to terms of the agreement, I am

10 instructing him not to answer.

11     Q.   Let me ask you, then, that question.  Is it

12 a contingent fee agreement?

13     A.   Yes.

14     Q.   And what is the percentage that you are to

15 pay?

16          MR. TOBEROFF:  Instruct you not to answer,

17 attorney-client privilege.

18     Q.   Now, going back to -- if I could ask you to

19 pull out Exhibit 3 and Exhibit 9?

20     A.   Okay.

21     Q.   All right.  If you would look at Exhibit 3,

22 and I would ask you to go to page -- to the third page

23 of the document, paragraph 8?  I asked you questions

24 about this paragraph, and in particular, what your

25 understanding was of what would happen to the rights

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
194

63

1    at issue in this agreement if for any reason the

2    agreement was terminated.  Do you remember those

3    questions that I asked you?

4         A.    Yes.

5         Q.    And you testified that you believed that if

6    the agreement were terminated for any reason, that the

7    ownership would remain 50-50.  Do you recall that

8    testimony?

9         A.    Yes.

10         Q.    Okay.  So my question is, is it the

11    intention under Exhibit 9 that the terms of paragraph

12    8 that we have talked about would remain in play,

13    namely, that having canceled the agreement, the

14    ownership split remains 50-50 between you and Pacific

15    Pictures?

16              MR. TOBEROFF:  That calls for a legal

17    conclusion.

18         A.    What my understanding is, it's -- applies to

19    Marc --

20              MR. TOBEROFF:  Don't testify to the terms of

21    our legal retainer agreement.

22              If you could answer without doing that you

23    could answer.

24         A.    Yes, I -- I guess it would -- it involves

25    the legal retainer agreement, the terms of that, so I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
195

64

1    guess I can't say anything.

2        Q.    Did you receive any counsel, legal counsel

3    from any lawyer, other than Mr. Toberoff, with respect

4    to entering into Exhibit 9?

5        A.    No.

6        Q.    Is there any relationship at this point

7    between the estate and Pacific Pictures Corporation?

8            MR. TOBEROFF:  Objection, vague and

9    ambiguous, calls for a legal conclusion, you could

10   answer.

11       A.    My understanding is that the agreement with

12   Pacific Pictures has been supplanted with a new legal

13   retainer.

14           (Exhibit 10 marked.)

15       Q.    I have asked the court reporter to mark as

16   Exhibit 10 a document dated April 28, 2005.  It's

17   bearing Bates numbers 1 through 7, and it's a letter

18   addressed to Jean Adele Peavy and Mark Warren Peary

19   from Paul Levitz at DC Comics.  Have you seen this

20   letter before today?

21       A.    Yes.

22       Q.    Did you review this letter carefully when

23   you received it?

24       A.    Yes, I read it.

25       Q.    And did you form any impressions as to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
196

86

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JOANNE SIEGEL,              )
     LAURA SIEGEL LARSON         )
 5                               )
                   Plaintiffs,   )
 6                               )
         v.                      )  CASE NO. CV 04-8400
 7                               )            CV 04-8776
     WARNER BROS, et al.         )
 8                               )
                   Defendants.   )
 9

10        CERTIFICATE OF COMPLETION OF DEPOSITION

11      I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   MARK WARREN PEARY was taken before me at the request
     of, and sealed original thereof retained by:
13
14           Attorney for the Defendants
             PERKINS LAW OFFICE, P.C.
15           1711 Route 9D
             Cold Spring, New York 10516
16           BY:  MR. PATRICK PERKINS

17      I FURTHER CERTIFY that copies of this certificate
     have been mailed or delivered on _____, with
18   changes, if any, by the witness appended, to the
     following counsel of record and parties not
19   represented by counsel:

20           Attorney for the Plaintiffs
             MR. MARC TOBEROFF
21           2049 Century Park East, #2720
             Los Angeles, California 90067
22
        I FURTHER CERTIFY that examination of this
23   transcript and signature of the witness were requested
     by the witness and all parties present.
24
        On November 21, 2006 , a letter was mailed or
25   delivered to Mr. Toberoff regarding obtaining
     signature of the witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
197

87

1    I FURTHER CERTIFY that the recoverable cost of the
     original and one copy of the deposition, including
2    exhibits to Mr. Perkins is $____508.68____.

3    I FURTHER CERTIFY that I did administer the oath
     to the witness herein prior to the taking of this
4    deposition; that I did thereafter report in
     stenographic shorthand the questions and answers set
5    forth herein, and the foregoing is a true and correct
     transcript of the proceeding had upon the taking of
6    this deposition to the best of my ability.

7    I FURTHER CERTIFY that I am neither employed by
     nor related to nor contracted with (unless excepted by
8    the rules) any of the parties or attorneys in this
     case, and that I have no interest whatsoever in the
9    final disposition of this case in any court.

10

11   _____
     MABEL JIN CHIN
12   Certified Court Reporter #81
     License expires:  12/31/2006
13

14

15

16

17

18

19

20   (3519B) MC
     Date taken:  November 11, 2006
21   Proofread by:  LR

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
198

89

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4
     JOANNE SIEGEL,                )
 5   LAURA SIEGEL LARSON           )
                                   )
 6                Plaintiffs,      )
                                   )
 7       v.                        ) CASE NO. CV 04-8400
                                   )            CV 04-8776
 8   WARNER BROS, et al.           )
                                   )
 9                Defendants.      )

10

11                    AFFIDAVIT

12   Deposition of:  MARK WARREN PEARY

13   Date taken:  November 11, 2006

14

15       The witness in this case was notified of the need

16   for signature on _____.

17       Failure of the witness to timely sign this

18   deposition has resulted in the filing of this

19   deposition on _____.

20

21   _____ BEAN & ASSOCIATES

22

23

24

25   (3519B) MC
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT

199

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re:  *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
     USDC Central District of CA, Case No. 04-08400 SGL (RZx)
     *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
     USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-00016. In addition, enclosed please find Pacific Pictures Corporation's production of documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:  Patrick T. Perkins, Esq.
     James D. Weinberger, Esq.

ORIGINAL SHIPPED   DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA      )
SIEGEL LARSON,               )
                             )
          Plaintiffs,        )
                             )
     vs.                     )        No. 04-8400 (RSWL)(RZx)
                             )
WARNER BROS. ENTERTAINMENT )          -and-
INC., et al.,                )
                             )        No. 04-8776 (RSWL)(RZx)
          Defendants.        )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*S u p p o r t*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

**EXHIBIT W**
**201**

1          Deposition of MARC TOBEROFF, taken on

2       behalf of Defendants and Counterclaimants,

3       at 9665 Wilshire Boulevard, 9th Floor, Beverly

4       Hills, California, beginning at 1:46 PM on

5       Friday, November 17, 2006, before DAVID S.

6       COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs and the Witness:

12        LAW OFFICES OF MARC TOBEROFF
          BY:  MARC TOBEROFF
13             NICHOLAS C. WILLIAMSON
          Attorneys at Law
14        2049 Century Park East, Suite 2720
          Los Angeles, California 90067
15        310-246-3333

16

17   For Defendants and Counterclaimant:

18        WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
          BY:  MICHAEL BERGMAN
19             ADAM HAGEN
          Attorneys at Law
20        9665 Wilshire Boulevard, 9th Floor
          Beverly Hills, California 90212
21        310-858-7888
          mbergman@wwllp.com
22

23

24

25

                                                    2

```
 1        Beverly Hills, California, Friday, November 17, 2006

 2                          1:46 PM

 3

 4                     MARC TOBEROFF,

 5            having been first administered an oath,

 6            was examined and testified as follows:

 7

 8                      EXAMINATION

 9   BY MR. BERGMAN:

10        Q    State your full name for the record, please.

11        A    Marc Toberoff.

12        Q    Have you had your deposition taken before,

13   Mr. Toberoff?

14        A    Once.

15        Q    And when was that?

16        A    I think about nine years ago.

17        Q    Here in California?

18        A    Yes.

19        Q    In what type of a case?

20        A    It was a commercial litigation.

21        MR. BERGMAN:  Mr. Williamson, is Mr. Toberoff

22   appearing for Pacific and IPW, LLC as well as his own

23   subpoena?

24        MR. WILLIAMSON:  Yes.

25        MR. BERGMAN:  Okay.
```

01:46 (lines 10-15)
01:47 (lines 16-25)

6

03:07 1    "not particularly" is because the word "active" is

03:07 2    another one of these -- you know, it's a subjective, so I

03:07 3    say not particularly depending on how one defines

03:07 4    "active."

03:07 5        Q    Okay.  When to the best of your knowledge was

03:07 6    the Smashbox Entertainment, LLC formed?

03:07 7        A    I don't remember when it was formed.  I believe

03:07 8    it was about three years ago.

03:07 9        Q    And what activities, if any, has Smashbox

03:0810    Entertainment engaged in since its formation?

03:0811        A    I believe it was going to be the production

03:0812    entity for a film project; I don't remember what it was,

03:0813    and for purposes of the -- I believe one of the guilds --

03:0814    I think the Writers Guild needed a signatory company.

03:0815    And it may or may not have been a signatory to the

03:0816    Writers Guild, but it was ultimately not used as the

03:0817    production entity.

03:0818        Q    Okay.

03:0919            Would you mark as Exhibit 13 a document entitled

03:0920    "Joint Venture Agreement" made as of November 23, 2001.

03:0921            (Deposition Exhibit 13 marked.)

03:0922            THE WITNESS:  If we are going to go into a more

03:0923    detailed session, could I just use the restroom before we

03:0924    do that?

03:0925            MR. BERGMAN:  Of course.  Why don't we take a

                                                                    49

03:09 1   five-minute break.

03:09 2         (Recess.)

03:15 3   BY MR. BERGMAN:

03:15 4       Q   Referring to the last page of Exhibit 13,

03:15 5   Mr. Toberoff, I note that this copy does not bear your

03:15 6   signature.  It bears the Peary and Peavy signatures.

03:15 7         To your recollection did you ever sign a copy of

03:16 8   Exhibit 13?

03:16 9       A   I recall a joint venture agreement that was

03:1610   signed, I believe -- I recall because I believe that

03:1611   document was produced, but I don't know -- I would have

03:1612   to compare this to that document to know whether there

03:1613   were any changes between the two.

03:1614       Q   I know that the parties to this agreement are

03:1615   Ms. Peavy and Mr. Peary on the one hand and Pacific

03:1616   Pictures Corporation on the other.

03:1617         Am I correct that you've identified Pacific

03:1618   Pictures Corporation as a loan-out company?

03:1619       A   I said I believe as it was initially conceived

03:1620   in whenever it was in the '80s, that's how I conceived

03:1621   it:  As a loan-out company.

03:1622       Q   Well, did the nature of Pacific Pictures'

03:1723   business ever change from being a loan-out company to

03:1724   being something else?

03:1725       A   To determine that, I'd have to know what the

50

EXHIBIT W
205

legal definitions of a loan-out company.  When I use the term loan-out company," in the entertainment business when you do -- for example, if you're serving as a producer on a film or a writer, for instance, or a director, most people have a company that they -- which is a sole proprietorship that loans out their services, and I believe that people who do that originally for tax purposes.  I'm not sure what the reasons are for that.  So I believe when it was initially incorporated, that was the purpose, but then afterwards I would just use Pacific Pictures a lot for anything.

Q    Anything that you personally were involved in?

A    I would -- yeah, I would tend to use it for most things that I was involved in.

Q    Okay.

A    So I don't know if at that point it's a loan-out company or just a company.

Q    And the address given here for Pacific Pictures Corporation, 23852 Pacific Coast Highway, does that continue to be the address of Pacific Pictures Corporation?

A    You mean as registered with the California Secretary of State?

Q    Well, as operating in actuality, does Pacific Pictures maintain offices?

51

03:18 1          A    It's not active since -- I think -- didn't you

03:18 2   ask me earlier about Pacific, and I said at the end of

03:19 3   2000 -- -- towards the end of 2003 I stopped using it?

03:19 4   So it doesn't -- you know, I guess there is a distinction

03:19 5   between a technical office for purposes of registration

03:19 6   with the Secretary of State and active offices.  I used

03:19 7   to work out of my home in Malibu, and this was the

03:19 8   mailing address used for myself and Pacific Pictures.

03:19 9          Q    When was your first communication with either

03:1910   Miss Peavy or Mr. Peary concerning the Joe Shuster

03:1911   interest, if any, in Superman?

03:1912          MR. WILLIAMSON:   Objection.   Assumes facts not

03:1913   in evidence.   Vague and ambiguous.

03:2014          THE WITNESS:   Sometime around mid 2001.

03:2015   BY MR. BERGMAN:

03:2016          Q    And how did that initial communication come

03:2017   about?

03:2018          A    Warren Peary -- the last name is P E A R Y --

03:2019   called me up and -- he called me up.

03:2020          Q    And what did he say?

03:2021          A    He said he wanted -- was interested in -- I

03:2022   think he said that he got my name off of some article he

03:2023   had read on the Internet and that he wanted a lawyer to

03:2024   help him to figure out what rights the Joe Shuster estate

03:2125   would have in Superman.

                                                        52

03:21 1    Q    And what did you reply?

03:21 2         MR. WILLIAMSON:  Objection.  Attorney-client

03:21 3    privilege.  Instruct you not to answer.

03:21 4         (Instruction not to answer.)

03:21 5         MR. BERGMAN:  The Joint Venture Agreement

03:21 6    between Pacific Pictures, which Mr. Toberoff has

03:21 7    testified is owned wholly by him and is basically a

03:21 8    loan-out company, and the Peavy and Peary individuals is

03:21 9    a business arrangement.  It is not a legal representation

03:21 10   document.  It is on its face a joint venture agreement.

03:21 11   There is no privilege applicable to that.  Mr. Toberoff

03:21 12   was not retained as an attorney.  He was -- he entered

03:21 13   into a joint venture for the purpose of retrieving and

03:22 14   enforcing and exploiting all of Joe Shuster's and his

03:22 15   estate's rights, claims and copyrights.  Certainly at

03:22 16   this point in time that I'm asking Mr. Toberoff about, he

03:22 17   was an entrepreneur, not an attorney.

03:22 18        MR. WILLIAMSON:  Objection.  Mr. Bergman, you

03:22 19   are completely misstating his testimony, the documents

03:22 20   and the record before us.  Whether or not there was a

03:22 21   retainer agreement between Mr. Toberoff and Mr. Peary and

03:22 22   Miss Shuster is, frankly, irrelevant.  I instruct him not

03:22 23   to answer.

03:22 24   BY MR. BERGMAN:

03:22 25        Q    Mr. Toberoff, I'll assume that when

53

03:22 1    Mr. Williamson instructs you not to answer, you will

03:22 2    refuse to answer on that basis?

03:22 3        A    Generally, yes.  I -- without waiver -- again,

03:23 4    let me say in any of these areas where we may have a

03:23 5    difference of opinion as attorney-client -- obviously

03:23 6    when you are taking a deposition of an attorney, you can

03:23 7    surmise that there will be a lot of things that are

03:23 8    protected by the attorney-client privilege and by work

03:23 9    product.  To the extent -- I'd like it to be understood

03:23 10   that to the extent I am able to give you a general answer

03:23 11   to certain questions without revealing the substance of

03:23 12   attorney-client communications or work product, I don't

03:23 13   want that to be misconstrued or claimed to be a waiver at

03:23 14   any point in this deposition of attorney-client privilege

03:23 15   or work product doctrine.

03:23 16        MR. BERGMAN:  I will not assert such a waiver.

03:23 17        THE WITNESS:  So I would just answer generally

03:23 18   that Mr. Peary called me with respect to Superman rights,

03:23 19   as I already mentioned, and my response was, because it

03:24 20   was Superman, was that yes, I would be interested in

03:24 21   representing him with respect to that.

03:24 22   BY MR. BERGMAN:

03:24 23        Q    Did you tell him that you'd be interested in

03:24 24   entering into a joint venture with Peary and Peavy in

03:24 25   order to exploit their interest?

                                                                54

MR. WILLIAMSON:  Objection.  Attorney-client

privilege --

THE WITNESS:  No, I did not, but other than

giving you the basic subject matter, which I've already

given you, and why he was calling me, the rest of our

communications would be privileged, and they're

privileged on the basis that he was obviously seeking

legal advice, and I was dispensing legal advice.

BY MR. BERGMAN:

Q   And at what point in time did your activities

change from that of rendering legal advice to entering

into a joint venture with the Peary and Peavy --

MR. WILLIAMSON:  Objection.  Assumes facts not

in evidence.

BY MR. BERGMAN:

Q   -- individuals?

A   It didn't change.

Q   You did enter into a joint venture with them,

did you not?

A   I entered into a joint venture agreement with

them, yes.

Q   How many communications did you have with either

Peary or Peavy from the time of that first conversation

until November 23, 2001, the as of date of this joint

venture agreement?

55

A    I don't recall.

Q    What is your best estimate?

A    I don't -- we had at least one, we probably had more than one, but other than that I don't have a basis for estimating.

Q    Did you have any face-to-face meetings with either Peavy or Peary prior to November 23, 2001?

A    No.

Q    Prior to this joint venture agreement, had you ever entered into a joint venture agreement with a client?

        MR. WILLIAMSON:  Objection.  Vague and ambiguous.

        THE WITNESS:  I don't know what you mean by that.

BY MR. BERGMAN:

Q    Well, you've testified that you were contacted and served as a lawyer, and yet, as Exhibit 13 demonstrates, you entered into a joint venture agreement with them under which you received 50 percent of whatever their recovery might have been.

A    That misstates the document.

Q    No, it doesn't misstate the document.

        Am I correct that paragraph 5 of the agreement states that any moneys received from enforcement,

56

settlement or exploitation of any of the rights -- I'll skip something -- will be shared, divided and payable 50 percent to claimants and 50 percent to PPC?

A   You've -- the words you've read appear there. The document speaks for itself.  I'm playing both the role now of the witness and to a certain extent making objections to your question, but you would have to take -- read the whole paragraph in context to give a fair meaning as to what it says.

Q   Who drafted this agreement?

A   I drafted it.

Q   Okay.  Were the -- was Peary or Peavy represented by an attorney in connection with the negotiation of this agreement?

A   I don't -- I didn't deal with an attorney, but I don't know whether or not they were represented by an attorney, whether they sought outside legal advice regarding the agreement.

Q   Did you suggest to them that they do obtain independent legal advice before entering into the agreement?

        MR. WILLIAMSON:  Objection.  Attorney-client.

        THE WITNESS:  Yes, I did.

BY MR. BERGMAN:

Q   Had there been any prior drafts of this

57

agreement?

    A   I believe so, yes.

    Q   And had Peavy or Peary requested any changes in the prior draft?

    A   I believe so, yes.

    Q   What changes had they requested?

    A   I don't recall the specific changes, but I believe there was more than one draft, and I believe the reason for that is because of comments or revisions by Warren.

    Q   And are you still in possession of those prior drafts?

    A   No.

    Q   What happened to them?

    A   I don't know.  I'm not in possession of them. Otherwise, we would have produced them.

    Q   Have you searched for them?

    A   I searched the files.  I searched Pacific Pictures's files for any documents regarding the Shusters, yes.

    Q   Have you asked the Peary --

    A   I did that in response --

    Q   -- Peary or Peavy individuals whether they had any prior drafts?

    A   Yes.

58

Q   And am I correct that they did not and that they did not produce any?

A   Yes.  They actually did not even have a copy of the fully signed agreement.  What you're looking at -- I believe they didn't.  To my recollection, I believe this was the only copy that they had still retained, what is Exhibit 13.  This didn't come from my files.  This came from Peavy's and Peary's production in response to the subpoena you served on them.

Q   I note that in paragraph 1 of the Joint Venture Agreement, there is a reference to Superboy.

Did you -- have you at any point in time discussed with the Shuster heirs the conflict between the Siegel position and the Shuster heirs' position regarding Superboy?

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.  Attorney-client.  Instruct you not to answer.

(Instruction not to answer.)

BY MR. BERGMAN:

Q   Did PPC in fact pay, as provided in paragraph 3, the legal fees and costs of setting up Joe Shuster's estate?

A   I believe so, yes.

Q   Did the Shuster heirs request that PPC receive a

59

lesser share than 50 percent of all moneys and proceeds derived from the rights?

MR. WILLIAMSON:  Objection.  Attorney-client privilege.

MR. BERGMAN:  That's absolutely ridiculous, Mr. Williamson.  How can you say it's attorney-client privilege when it's part of an agreement between two parties?

THE WITNESS:  Okay.  Are you referring to the Joint Venture Agreement?

BY MR. BERGMAN:

Q   Yes.

A   Okay.  I think Mr. Williamson thought -- okay.

Q   Paragraph 5 provides --

A   Can you repeat the question?  I believe I can answer that.

Q   Yes.  It provides for a 50-50 split.  At any time prior to signing this agreement, did the Shuster heirs or either of them request that the percentage for PPC be less than 50 percent?

A   They may have.

Q   But do you recall them doing so?

A   I don't have a specific recollection, but I can't say they didn't.

Q   Did you regard 50 percent as a reasonable

60

**interest** for Pacific's services?

A   Of course.  Otherwise I wouldn't have put it in the document.

Q   Did you regard 50 percent as being a reasonable **fee** for lawyer's services?

A   I don't know what you're referring to.

Q   Well, did the -- aside from giving you or Pacific Pictures 50 percent of any recovery, did the Shusters additionally agree to pay you any fees as a lawyer?

A   That's privileged.

Q   Does that mean you decline to answer?

A   Yes.

(Unanswered question.)

Q   Other than the 50 percent share that is provided for in paragraph 5 of the Joint Venture Agreement, were you compensated in any way by the Shuster heirs for your legal services?

A   You mean in addition to the 50 percent?

Q   Correct.

A   No.

Q   In connection with this Joint Venture Agreement, did either Peary --

A   And you used the word "compensated," because this is a -- in other words, I haven't received any money

61

from the Shusters to date or any compensation in

connection with this or any other agreement.

    Q   They have subsequent to this --

    A   Since 2001.

    Q   They have subsequent to this agreement retained

you as an attorney, have they not?

    A   Yes.

    Q   And when was that?

    A   I don't -- I know it was at some time before the

lawsuit was filed in the Siegel case.  I also know that

this agreement was cancelled.  I am not sure when the

legal retainer agreement was entered into, but I believe

it was definitely entered into before this agreement was

cancelled.

    Q   In connection with the Joint Venture Agreement,

Exhibit 13, did either Peary or Peavy ask you whether 50

percent was a customary amount for an entity such as PPC

to receive?

    A   I don't recall them saying that.

    Q   Do you recall any negotiation at all about the

50 percent?

    A   Not specifically.  I believe there was some

negotiation or discussion regarding the fee stated in

this agreement.

    Q   I didn't hear that last.

62

03:35 1        A    I believe there was some discussion regarding

03:35 2   the fee based in this agreement, but I can't give you --

03:35 3   I don't have a specific recollection of the negotiation,

03:36 4   as you've provided it.

03:36 5        Q    Well, in connection with the Joint Venture

03:36 6   Agreement, Exhibit 13, did you ever ask for more than 50

03:36 7   percent?

03:36 8        A    No.

03:36 9        Q    And did Peary or Peavy ever offer less than 50

03:36 10  percent?

03:36 11       A    I don't think -- I think the discussions were of

03:36 12  an explanation as to what that would cover, what, you

03:36 13  know, I would do, whether they would be responsible for

03:36 14  any costs or whether I would be responsible for all

03:36 15  costs, things of that nature, which had relevance to the

03:36 16  50 percent.  In other words, if there were any attorneys

03:36 17  involved, would they incur any additional fees, costs,

03:36 18  expenses, things of that nature, and the answer to that

03:37 19  was no.

03:37 20       Q    Paragraph 11 states in part that "The parties

03:37 21  further acknowledge that they have not signed this

03:37 22  agreement in reliance on any promise or representation

03:37 23  not expressly set forth in this agreement."

03:37 24       Prior to their execution of this agreement, did

03:37 25  you make any promise or representation to Peary and Peavy

                                                              63

03:37 1    that is not contained in this agreement?

03:37 2        A    I don't believe so, no.

03:37 3        Q    What did you state to them which led to the

03:37 4    formation of this joint venture?

03:37 5        How did the relationship between the two parties

03:37 6    become that of joint venturers?

03:37 7        ·    MR. WILLIAMSON:   Objection.   Vague and

03:38 8    ambiguous.

03:38 9        THE WITNESS:   I -- I don't -- I believe that

03:3810    when I did this agreement at the time in 2001, I was

03:3811    using Pacific Pictures for everything, and I was entering

03:3812    into agreements where I was -- like I described

03:3813    previously, where I was representing rights holders for

03:3814    purposes of marketing their rights, for setting up

03:3815    movies, things of that nature, and when I -- when it came

03:3816    to the Peavys, I used Pacific Pictures in a similar way,

03:3817    because very often when I entered into those agreements

03:3818    previously, I would do it -- either have some kind of

03:3819    management agreement or a loose joint venture, and so I

03:3920    used -- initially with the Peavys, I used a similar

03:3921    structure, and then in retrospect I felt it was -- that

03:3922    it would have -- it's -- it would have been a lot cleaner

03:3923    just to have a regular legal retainer agreement, and we

03:3924    entered into a legal retainer agreement.

03:3925    BY MR. BERGMAN:

                                                            64

Q    Well, you testified earlier that you were initially contacted in your capacity as a lawyer. Somehow that shifted by November 23, 2001, to your becoming a joint venturer with the Shuster heirs.

How did that change in the relationship evolve?

MR. WILLIAMSON:  Objection.  Misstates your testimony.

THE WITNESS:  What you're saying is incorrect. It didn't shift.  A lot of my work prior to this agreement, particularly as I've described in the entertainment industry, to varying degrees would require a certain amount of legal work, legal analysis, research, because it was all rights based in the entertainment industry.  Rights were the platform for doing business in the entertainment industry, and I -- you know, instead of having two separate agreements, a legal retainer agreement that covered the legal and then a business arrangement to cover the aspects of making deals in the entertainment industry, at least at that time I was just using Pacific Pictures and I would have one agreement, but that's not to say there was no legal relationship.  I just didn't have a legal retainer agreement, but they were definitely, and particularly in this case, seeking my legal advice, giving my legal advice, doing legal research.  When the Shuster estate was probated, you

65

know, arranging for an estate lawyer, overseeing that lawyer.

BY MR. BERGMAN:

Q   So is it your testimony that this Joint Venture Agreement was merely a disguised legal retainer agreement?

A   No.  Those are your words.

Q   It was a business arrangement, was it not?

A   No --

MR. WILLIAMSON:  Objection.  Misstates prior testimony.

THE WITNESS:  -- as I said, can I didn't have a separate -- I had a joint venture agreement -- in other words, there is not a particular -- this is what I was doing with regard to other things, and I did -- that were probably less legal in nature, and I used the same general structure for the Miss Jean Peavy and Warren Peary -- we'll call them the Shusters -- I used the same general structure at that time.  And it's not that this is a legal retainer agreement.  It's just that I didn't have a separate legal retainer agreement.  And I don't think there is a...

BY MR. BERGMAN:

Q   Is it your testimony that because you didn't have a legal retainer agreement, you utilized this Joint

66

Venture Agreement as a substitute?

        A    No.  I just didn't draft and draw up a separate legal retainer agreement to cover my legal services.

        Q    Do you consider a 50 percent share of any recovery to be a reasonable attorney's fee?

        A    It depends on the circumstances.  I've seen agreements at 50 percent when lawyers are working on contingency, which I take it you rarely, if ever, do -- well, you're not talking about a retainer agreement. You're talking about the Joint Venture Agreement, so...

            Are you asking me about this agreement, or are you asking me separate and apart from that?

        Q    Well, frankly, based on your testimony, Mr. Toberoff, I don't understand whether you regarded this as your legal retainer agreement or as a business arrangement under which your company would get 50 percent of any recovery.

        A    I think I was very clear in telling you that this was not a legal retainer agreement.

        Q    Okay.  Since this was not a legal retainer agreement, what is the basis of your asserting the attorney-client privilege regarding it?

        A    I've been answering your questions about this agreement, if you've noticed.

        Q    No --

                                                          67

A    The assertion of the attorney-client privilege goes to matters where you start to ask questions that go to the giving of legal advice or legal strategies, mental impressions, things protected by the work product doctrine.

Q    The record will speak for itself on that.

In paragraph 11 there is the sentence about four lines up from the bottom of the page that begins, "The parties have mutually participated in the negotiation and drafting of this Agreement..."

Did either Peary or Peavy engage in the drafting of this agreement?

A    Only to the extent -- remember I told you earlier that I believe it went through a few drafts in response to requests, revisions, comments by Warren?  So to that extent, yes.

MR. BERGMAN:  Would you mark as Exhibit 14, please, a document on Pacific Pictures Corporation letterhead dated October 27, 2003?

(Deposition Exhibit 14 marked.)

BY MR. BERGMAN:

Q    My first question is going to be whether that is your signature on the last page of Exhibit 14, Mr. Toberoff.

A    Yes, it is.

68

                    Actually, looking at the date of this document,

I can narrow the other question you asked:  When we

entered into a legal or retainer agreement.  Still I

think it might be between the date of this and the date

of the cancellation of these two agreements.

        Q   Okay.

        A   I'm not positive, but that's...

        Q   Am I correct that you drafted Exhibit 14?

            MR. WILLIAMSON:  Objection.  Vague and

ambiguous.

            THE WITNESS:  Yes, I did.

BY MR. BERGMAN:

        Q   Were --

        A   With input from Warren.

        Q   What input did you receive from Mr. Peary?

        A   I don't recall specific items, but we discussed

it.

        Q   Okay.  So am I correct you formed the -- you

probated the estate of Joseph Shuster and then entered

into this agreement with the executor of his estate?

            MR. WILLIAMSON:  Objection.  Assumes facts not

in evidence.  It's vague and ambiguous.

            THE WITNESS:  What's the question?

BY MR. BERGMAN:

        Q   The question is, were you involved in the

                                                            69

probate of Joseph Shuster's estate?

       MR. WILLIAMSON:   Objection.   Vague and ambiguous.

       THE WITNESS:   Yes.

BY MR. BERGMAN:

   Q   What was your involvement?

   A   I arranged for a -- since trusts and estates is a specialty of the law, I arranged for an attorney who's a -- who does nothing but trusts and estates work to handle the probating of the estate.

   Q   And what was the purpose in entering into this October 27, 2003 agreement, Exhibit 14?

   A   I think this agreement -- I'd have to compare it line by line to Exhibit 13, but I think this agreement is very similar if not the same to Exhibit 13, but the purpose was to, since -- was to include the executor in the agreement.

   Q   Has Pacific Pictures Corporation advanced or loaned any money to either Peary or Peavy?

   A   You mean like a personal loan?  I don't recall it loaning money to the Shusters.

   Q   Or advancing any money to the Shusters?

   A   I don't recall that, no.

   Q   To the best of your recollection, did you personally advance or loan any money to the Shuster

70

heirs?

MR. WILLIAMSON:  Objection.  Asked and answered.

THE WITNESS:  I don't think so, no.

BY MR. BERGMAN:

Q  Did any other entity of which you are a member or shareholder advance or loan any money to Peary or Peavy?

A  I don't believe so.

Q  Paragraph 3 reads in part that "PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate," close quote.

In addition to paying the legal fees and costs of setting up the Shuster estate, did PPC pay any other costs or expenses in connection with its agreement with Peary and Peavy?

A  They may have paid filing fees with the U.S. Copyright Office, things of that nature, document retrieval fees from the U.S. Copyright Office, things of that nature.

Q  Did you negotiate Exhibit 14 with any attorney representing either the executor of the estate or Miss Peavy?

MR. WILLIAMSON:  Objection.  Vague and

71

ambiguous.

THE WITNESS:  No, I did not.

BY MR. BERGMAN:

Q   When you discussed either the original Joint Venture Agreement or this Exhibit 14 with Peavy and Peary, was there any discussion regarding the ownership of the character Superboy?

MR. WILLIAMSON:  Objection.  Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  I don't know.  I don't recall a discussion of that.

BY MR. BERGMAN:

Q   Have you ever discussed ownership of the character Superboy with either Peary or Peavy?

A   That would be privileged.

(Unanswered question.)

Q   Prior to the time that you entered into the retainer agreement that you have testified to, did you have any discussion with either Peary or Peavy concerning the ownership of the character Superboy?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  That would also be privileged.

(Unanswered question.)

BY MR. BERGMAN:

Q   So is it your position --

72

A    I can just tell you, as I sit here today, I don't recall, but to the extent I had discussed it, it would be privileged.

Q    And is it your position, Mr. Toberoff, that the attorney-client relationship between you and Peary and Peavy resulted from the Joint Venture Agreement, Exhibit 13?

A    Absolutely not.

Q    Did it result -- that relationship result from Exhibit 14?

A    No.  It didn't result from a document.  It resulted from them seeking legal advice from the very first call and my providing it, which established a confidential relationship.

Q    With the exception of exhibits 13 and 14, have you ever entered into a joint venture agreement with a client?

A    I think that's --

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I think you already asked that. What do you mean by that?

BY MR. BERGMAN:

Q    I think it speaks for itself.

A    I don't understand.  Not to me.  Clarify that.

73

Q   Exhibit 13 is a joint venture agreement which in essence provides for a 50-50 split of proceeds between your company, Pacific Pictures Corporation, and the Shuster heirs.  Have you ever entered into a similar joint venture agreement with any legal client?

MR. WILLIAMSON:  Objection.  The document speaks for itself.  Vague and ambiguous.

THE WITNESS:  I don't know.  As I mentioned to you before, there have been situations where I'm involved with -- I'm trying to explain it to you.  If somebody is -- normally, if someone is -- options a book and simply -- and then seeks to set up a film or to monetize that book by licensing film rights or producing a film, it's a very simple, straightforward type of situation, and when we spoke about BLUE MOVIE, for instance, you asked me about that, and I said I had optioned that book.

But in some cases when you're dealing in rights and copyrights, due to the intricasies of copyright law and what's involved, there can be a business side, but everything having to do with the rights and chain of title and issues regarding the rights that may arise are of a very legal nature, so it's very possible to have a business agreement but to in fact be dealing with a lot of legal issues and providing legal advice, and I believe that -- I shouldn't say I believe -- I know that's the

74

case here.

I would say this instance is probably, as it unfolded, more of a legal nature, and that's why in retrospect, and of course everyone's a genius in retrospect, I decided that it should be a simple legal retainer agreement, and in retrospect it would have been better off just being that from the outset.  And that's it.

BY MR. BERGMAN:

Q   Do you believe that there is an inherent ethical conflict in being both a business partner and a lawyer for individuals regarding the same matter?

A   It could pose potential conflicts, yes.  That's one of the reasons I changed it.

MR. BERGMAN:  Would you mark as Exhibit 15, please, a one-page document dated September 10, 2004.

(Deposition Exhibit 15 marked.)

BY MR. BERGMAN:

Q   Exhibit 15 is the cancellation agreement that you referred to earlier, Mr. Toberoff?

A   I don't know if I referred to it as a cancellation agreement, but this Exhibit 15 is the document whereby we cancelled Exhibit 13 and Exhibit 14, yes.

Q   What led up to the decision to cancel the

75

November 23, 2001 joint venture and the October 27, 2003

agreement?

    A   Exactly what I have previously testified to.

    Q   Which is what?

    A   Which is I believe that in retrospect we should

have simply had a legal retainer agreement.  It would

have been a cleaner way to handle the relationship.

    Q   Did this September 10, 2004 agreement, Exhibit

15, result in any way from your filing of the Siegel

actions against the DC Comics and the Warner parties?

    MR. WILLIAMSON:  Objection.  Assumes facts not

in evidence.  Vague and ambiguous.

    THE WITNESS:  I would say that's relevant to it.

It's not the sole reason.  But the reason I say that is

I'm looking at the date of this agreement, and I believe

this is near when -- I don't know the exact date we

filed, I don't recall the exact date the Siegels filed,

but I believe this is before that or around the same

time.

BY MR. BERGMAN:

    Q   In what respect was this agreement related to

the filing of the Siegel actions?

    A   Well, I wouldn't use the term "related."  I

would say it's relevant to it because the Siegel actions

regarded the exercise of termination rights under the

76

Copyright Act that the Siegels had regarding Superman, and by that time the Shusters had also, I believe, exercised their termination rights and served termination notices.  I believe.  I'm not sure of the exact dates. And the matter had gone from obviously the filing of lawsuits that had taken on an even -- you know, much more litigious nature and had become purely legal, I would say.

     Q   At any point in time did you discuss with the Shuster heirs the conflict between the Siegel position that they owned 100 percent of Superboy and what would otherwise be the result for the Shuster heirs if in fact they only -- if in fact the Siegels only owned 50 percent of Superboy?

          MR. WILLIAMSON:  Objection.  Assumes facts not in evidence, and it violates the attorney-client privilege.

          THE WITNESS:  The substance of those conversations would be privileged, but yes, I did disclose the conflicts to both the Siegels and the Shusters.

BY MR. BERGMAN:

     Q   And did the Shuster heirs accept that conflict position and tell you they had no objection to it?

     A   Their reaction, that's privileged.

77

(Unanswered question.)

Q    Who initiated the cancellation of the two prior agreements with the Shuster heirs?

A    I did.

Q    And what did you tell them with respect to that, why you wanted to cancel those agreements?

A    I don't recall.

Q    Did they object to the cancellation?

A    No.

Q    Are there any presently operative agreements between either or both Peavy and Peary on the one hand and Pacific Pictures on the other?

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  Not to my knowledge.

BY MR. BERGMAN:

Q    Are there presently any operative agreements between Peary --

A    Oh, wait.  These two agreements had been cancelled, and there are no other agreements.  The only agreement is a legal retainer agreement between myself and the Shusters.  There are no other agreements.  And the two prior agreements have been cancelled.

Q    Okay.  There are no other agreements between them and any of your entities?

78

A    That's correct.

MR. BERGMAN:  Would you mark as Exhibit 16 a seven-page document bearing the Bates stamp EN 1 through EN 7.

(Deposition Exhibit 16 marked.)

BY MR. BERGMAN:

Q    Is that your signature on Bates stamp number 5?

A    Yes, it is.

Q    The joint venture which is referred to as, quote, "Newco," close quote, at page EN 2, is that the entity which you have described as IP Worldwide, LLC?

A    No.

Q    Is that --

A    Oh, excuse me.  Excuse me.  That's incorrect. Newco -- this is -- anticipates forming IP Worldwide, LLC, so Newco would be IP Worldwide, LLC.

Q    And IP Worldwide, LLC was formed as a result of your agreement with Mr. Emanuel?

A    It was formed after this agreement.

Q    But you'll notice that your transmittal, the June 3, '02 transmittal of this document, refers to the agreement as "regarding IP Worldwide, LLC."

A    Yeah.  I think by the time when this agreement was first drafted, it hadn't yet been formed, but by the time that it was signed, it may have been formed, because

79

04:07 1    **this** is in June -- see, this is transmitting it in June

04:08 2    of '02, and actually it was signed in February of '02, so

04:08 3    by June IP Worldwide had been formed.

04:08 4        Q   To the best of your recollection, was it in fact

04:08 5    transmitted on June 3, '02?  Because I note there is an

04:08 6    inconsistency between the date shown on the fax page and

04:08 7    the received stamp of Mr. McGuire, which indicates June

04:08 8    3, 2003.

04:08 9        A   There -- I would say there's several -- as you

04:08 10   know from our depositions when sometimes I have trouble

04:08 11   keeping track of the exhibits that I'm marking, numbers

04:08 12   aren't one of my strengths, and sometimes I would use a

04:08 13   form with the wrong year on it and forget to change the

04:08 14   year.  So I'm -- I would -- I would just have to look at

04:09 15   this and try and deduce --

04:09 16       Q   I note that --

04:09 17       A   Excuse me.

04:09 18       Q   -- the dates next to the signatures on EN 5 are

04:09 19   both February 12, '02.

04:09 20       A   Right.  So this document was I believe signed

04:09 21   February 12, '02.  It says here June 3, '02.  I believe

04:09 22   that that should be June 3, '03.

04:09 23       Q   Your transmittal?

04:09 24       A   The transmittal of the executed copy.  I believe

04:09 25   this was simply Ari saying, "Hey, do you have a copy of

80

our agreement," and my giving to him on June 4th '03.

Q    I see.  Even though the agreement had been executed a year and a half earlier?

A    Yeah.  He -- Tom McGuire may have -- would have kept Ari's copy -- my guess is or estimation is that Tom McGuire would have kept the copy.  Maybe he didn't have it or couldn't find it, and he asked me to send him another copy at this time, but it was quite some time after the agreement had been executed.

And you see here where it says up here "To Joel Mandel" and it's crossed out?

Q    Right.

A    Joe Mandel is a business manager for Ari Emanuel, and so it may have been Joe Mandel wanted to see a copy of the agreement.  Tom either didn't have one or didn't want to search his files, so they just asked me to send it over.

Q    Okay.  With reference then to the execution date of February 12, 2002, how much prior to that date did you have your first conversation with Mr. Emanuel regarding what was to become this joint venture?

A    I don't know.  I don't know how -- it would have been sometime prior.

Q    Had you known Mr. Emanuel prior to the time that you began discussing this agreement with him?

81

A    No.

Q    Who proposed as between you and Mr. Emanuel that the two of you enter into this joint venture agreement?

A    He originally sought me out and was interested in forming a business relationship.

Q    And what did he say in that regard?

A    I don't remember specifically, but I can give you the gist of the conversation. He, I believe, had read some -- an article or some articles on me in Variety regarding high-profile intellectual property rights or titles I'd been involved with, and he believed that there was a synergy between the fact that he was one of the founders of a very big talent agency with access to talent and that I had knowledge and access to potentially valuable intellectual property rights, because in the entertainment industry the -- you know, the key elements are intellectual property, talent and the financing.

Q    Prior to entering into the October -- rather, the February 2, 2002 joint venture agreement with Mr. Emanuel, did you tell him that you had acquired an interest in the Shuster heirs' rights to Superman?

A    I did not. I think that that mischaracterizes -- I'm not sure if that correctly states the relationship with the Shusters, but I did not mention to him the Shusters.

82

Q   Prior to February 2, 2002, did you have any discussion with Mr. Emanuel concerning any Superman rights?

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't believe so, and the reason -- I don't have a specific recollection, but I'm deducing -- when I answer, "I don't believe so," I'm deducing that from if you turn to Bates stamp 7 of Exhibit 16, do you see where it says, "Legal Claims/Litigation"?

Q   Yes.

A   -- Appendix 1?  I believe Appendix 1, if you -- Appendix 1 is an appendix of excluded -- things that are excluded from this agreement.  I'm trying to find it for you in the agreement.

Yes, if you look at page 4 -- Bates stamp 4, it's page 3 of the agreement, Bates stamp 4, it's paragraph D Arabic 3 where it says, "With respect to the legal disputes identified in Appendix 1 C" -- that's not the paragraph.  There is another paragraph where I believe it excludes from the purview of IP Worldwide --

Q   Are you referring to paragraph D 2 at Bates stamp EN 3?

A   I don't think that -- my recollection, and I

83

04:16 1 would have to find the agreement, is that there is a

04:16 2 paragraph in the agreement that excludes certain items or

04:17 3 has special treatment for certain items listed in

04:17 4 Appendix 1, and in Appendix 1 -- in Appendix 1 C where it

04:17 5 says "Legal Claims/Litigation," the intention was to

04:17 6 exclude those things listed there from the purview of the

04:17 7 agreement, and it says "JS Claims," and that refers to

04:17 8 Joseph Shuster claims, and when you asked me whether I

04:17 9 had disclosed to Mr. Emanuel, I deduced the answer "I

04:1710 don't believe so" because I used the initials -- it says,

04:1711 "(initialed due to confidentiality)." I used those

04:1712 initials "JS" so as not to disclose the name Joseph

04:1813 Shuster, and I believe that's further -- you know, this

04:1814 agreement was entered into -- and it was probably

04:1815 negotiated before that, but it was signed on February 12,

04:1816 '02, and it is -- was certainly negotiated earlier than

04:1817 that. This is further indication that I regarded my

04:1818 dealings with the Shusters as confidential, privileged

04:1819 claims, legal claims.

04:1820     Q   To summarize your testimony, is it your

04:1821 testimony that the Shuster claims and whatever rights

04:1822 specific had under the joint venture agreement were

04:1923 expressly excluded from the operation of the February 2,

04:1924 2002 joint venture?

04:1925     MR. WILLIAMSON:  Objection.  Misstates the

84

testimony.

THE WITNESS:  Yes, it was not part of IP Worldwide.

If you look at on Bates -- page 1 of the agreement, Bates stamp 2, I think one of the provisions which talks about the appendix, it talks about the contributions from PPC, and it says, "PPC's current IP business," but then PPC stands for Pacific Pictures Corporation, and then it says, "subject to...exclusions per Appendix '1'..."

MR. BERGMAN:  Off the record.

(Discussion held off the record.)

(Recess.)

(Deposition Exhibit 17 marked.)

MR. BERGMAN:  Back on the record.

Q   I am not going to get to that right now.

If you recall, Mr. Toberoff, Kevin Marks testified at his deposition concerning certain communications that he had with you, and he -- his records, and they were -- this particular call was reflected on GTRB 600, reflected a call from you to Mr. Marks on November 29, 2001.  Mr. Marks testified that he did not return that particular call.

How did you know that Mr. Marks was involved in the representation of the Siegel interest in Superman?

85

A   I had seen on the Internet I think it was one of these comic book -- like a comic book journal had posted the Siegels' termination notice or a copy of one of their termination notices, and at the end of that notice the name of their attorney who had done the termination notice, Arthur Levine, and I believe I had his name and address.  I'm not sure if the phone number was there, but it may be.  And I spoke to Arthur Levine, and he in sum and substance told me that he wasn't -- you know, had done the termination but wasn't very active at that point and said the lawyer representing the Siegels was Kevin Marks.

        Did you mention the date of that call?

    Q   His phone log showed November 29, 2001.

    A   I just want to check the date of my agreement with the Shusters, the first one.

    Q   That was November 23, 2001.

    A   Yeah.

    Q   So this came six days after --

    A   I believe it was shortly after -- I called him shortly after I made an agreement with the Shusters.

    Q   Had you learned from the Shuster heirs that there was -- that Kevin Marks represented the Siegels?

    A   No.

    Q   Okay.

86

A    It was from Arthur Levine.

Q    What was it that prompted you to call Mr. Marks?

A    I believe at that time I was just trying to find out the status.

Q    Prior to the November 29, 2001 initial call to Mr. Marks, had you and Mr. Emanuel discussed the Siegel interest in Superman?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  Yeah.  Actually, at IP Worldwide I was general counsel to IP Worldwide.  I handled all of the contracts, anything legal, any negotiations, you know, just like any other general counsel would for a company, and so Ari's lawyer has asserted, and I believe that's correct, that there was an attorney-client relationship there and that my communications with Ari as to, you know, things that he wanted to do would be protected by the attorney-client privilege and attorney work product.

BY MR. BERGMAN:

Q    Once again, you were a joint venturer with Mr. Emanuel, were you not?

A    That's correct, but I was also part of the company.  In other words, what I did for the company and whether or not I was a joint venturer, the underlying organization of those companies are different issues.

87

Q   Are you refusing to answer my last question based on the attorney-client privilege?

MR. WILLIAMSON:  Which question?

THE WITNESS:  Which question?  I want to make sure --

MR. BERGMAN:  Could you repeat the question?

THE WITNESS:  -- we are we referring to the same question?

(Record read as follows:

"Q   Prior to the November 29, 2001 initial call to Mr. Marks, had you and Mr. Emanuel discussed the Siegel interest in Superman?")

THE WITNESS:  That's privileged.  To answer your question, yes.

(Unanswered question.)

BY MR. BERGMAN:

Q   That doesn't even come close to being privileged.  The fact of discussing something doesn't ask what you disclosed to him, what you told him, what you advised him.

A   Normally an attorney would not disclose the subject of discussions on which he's providing legal advice.

Q   Do you stand by your refusal to answer that

88

U.S. LEGAL SUPPORT
**EXHIBIT W**
**243**

question?

A    Can you read the question back to me again?

(Record read as follows:

"Q    Prior to the November 29,

2001 initial call to Mr. Marks, had

you and Mr. Emanuel discussed the

Siegel interest in Superman?")

THE WITNESS:  I can tell you that it's moot

because I don't recall a discussion with Mr. Emanuel

regarding Superman, but if we had, the substance of those

conversations would be privileged.

BY MR. BERGMAN:

Q    Mr. Marks testified that you called him again on

or about February 6, 2002.  He pointed to a phone log

which has been Bates stamped GTRB 604.  Mr. Marks

testified that he returned your call that day or shortly

afterwards.

Can you tell me, please, to the best of your

recollection and with as much specificity as you can what

you said and what Mr. Marks said in that first telephone

conversation?

MR. WILLIAMSON:  Objection to the extent that

he's claiming to testify as to what Mr. Marks testified

in his deposition.

If you have a recollection of what he's talking

89

04:39 1    about, you can answer.

04:39 2         THE WITNESS:  Yeah, I'm not -- in -- I had the

04:39 3    opportunity to look over Mr. Marks' transcript after his

04:39 4    deposition, and there were certain -- it's not a major

04:39 5    point, but there were certain testimony as to dates where

04:40 6    he would say, "I believe we spoke one or two days after,"

04:40 7    and he would say "or subsequently," and so it wasn't

04:40 8    really -- I recall in reading his transcript that on some

04:40 9    of these conversations it was around that time, but it

04:4010    wasn't really firm.  In other words, he would start to

04:4011    give you the impression in his testimony that he spoke on

04:4012    the next day or two days after, but then he would say "or

04:4013    subsequently," so I have -- only to that extent I don't

04:4014    know if the dates are correct.

04:4015    BY MR. BERGMAN:

04:4016         Q   What do you recall being said by the two of you

04:4017    during your first telephone conversation?

04:4018         A   I -- to put it simply, he blew me off very

04:4019    politely.

04:4020         Q   What had you requested that he blew off?

04:4121         A   I don't specifically recall what I asked him,

04:4122    but it was similar to the first call where I was calling

04:4123    to know what the status was of the Siegels' rights, what

04:4124    the status was of their rights, and he politely blew me

04:4125    off, didn't want to tell me or talk to me, and got off

                                                              90

the phone.

Q    Did you ask him what the status of the Siegels' discussions with DC Comics were?

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.

THE WITNESS:  No, I don't believe I asked him about that.

BY MR. BERGMAN:

Q    Do you recall Mr. Marks telling you in that first conversation that he was very far along with DC Comics and at a documentation phase?

A    I don't recall --

MR. WILLIAMSON:  Objection.  Marc, let me object.  Assumes facts not in evidence.  Vague and ambiguous.

THE WITNESS:  I don't recall him -- whether or not he said DC Comics, and I don't recall him using those specific words.  He may have, but I don't recall that.  I don't recall the specifics of what he said, but I just recall the end result of him blowing me off.

BY MR. BERGMAN:

Q    What were the specifics of what you said?

A    I just told you.  I was inquiring as to the status of the rights.  I didn't ask him about something specific.

91

Q   And all you can recall of that conversation is that you asked him about the status of the rights?

A   Yes.  And he said he can't talk about that.  I don't remember him saying something about -- I don't recall him mentioning DC Comics specifically, the name DC Comics, and I don't recall him saying those words "documentation phase."  I don't recall the specifics of the conversation.  I recall the result of the conversation.

Q   Okay.  Have you told me everything you can recall about your first conversation with Mr. Marks concerning the Siegel interest?

A   Everything I can recall today, yes.

Q   Is there anything you could look to to refresh your recollection as to what he or you said during that conversation?

A   I don't know.  Maybe.

Q   Did you make any notes of the conversation?

A   No.

Q   Did you prepare a memorandum afterwards reiterating what had been said?

A   I don't think so.

Q   Mr. Marks testified to having a second conversation with you on or about July 30, 2002.

Do you recall speaking a second time with

92

Mr. Marks?

        MR. WILLIAMSON:  Objection to the extent it misstates the record of Mr. Marks' testimony at his deposition.

        MR. BERGMAN:  What was that objection?

        MR. WILLIAMSON:  I'm objecting to the extent that it misstates the testimony of Mr. Marks at his deposition.

        MR. BERGMAN:  In what way does it misstate the testimony?

        MR. WILLIAMSON:  I don't know if it does or not. We haven't seen the transcript.

        MR. BERGMAN:  Then how can you object that it misstates the testimony?

        MR. WILLIAMSON:  Because I need to preserve it, and I don't know what you are reading off of, I don't know what representation you're making.  So if you want to give us the deposition testimony as an exhibit, we'll be happy to look at it.  To the extent you are not going to, I'm going to object.

        THE WITNESS:  Actually, again, this is one of these areas where I believe his testimony is unclear as to the date.  I'm not saying it's a big issue.  I'm just saying it's unclear as to the date.  I'm not sure, in reading his transcript, that conversation may have

93

been -- what was the date you mentioned?

BY MR. BERGMAN:

Q   July 30.

A   May have been July 30th, or it may have been in early August.

Q   Okay.  Whether it was --

A   I'm not -- I remember, in reading his transcript, it was unclear to me what the dates were, and I didn't have a specific recollection of the dates.

Q   Okay.  Whether it was the last week in July or the first week in August, what do you recall saying and what do you recall Mr. Marks saying in that second phone conversation?

A   I do not recall the specific words that were said.  I recall the substance of the conversation.

Q   And what was the substance?

A   And the substance or effect of the conversation was that whereas before he had totally, as I would say, blew me off, now, even though he chose his words carefully and was somewhat guarded, he was clearly -- his body language, if you will, to the extent there is body language in a telephone conversation, was make an offer. In other words, he indicated that the Siegel rights were available, and if there was an interest in those rights, you can make an offer, but he can't discuss anything with

94

04:46 1   me.  That was the sort of the substance and effect of the

04:46 2   conversation, but I don't recall the specific words used.

04:46 3       Q   At page 166 of Mr. Marks' deposition commencing

04:47 4   at line 10, I asked him the following question:

04:47 5       "Q   Can you tell me to the best of your

04:47 6   recollection what was said by each of you and Mr.

04:47 7   Toberoff in that conversation?

04:47 8       "A   I think Mr. Toberoff said he was --

04:47 9   wanted to check in with me to see where we

04:47 10  were in our dealings with DC Comics."

04:47 11      Stopping at that point, do you recall asking him

04:47 12  where he was in his dealings with DC Comics?

04:47 13      A   No, I don't recall referring to dealings.  I was

04:47 14  referring to the rights and whether those rights were

04:47 15  available.

04:47 16      Q   He goes on to say, quote, "And I think I told

04:47 17  him then that -- and I may have also said it in our first

04:47 18  conversation -- that we had a confidentiality agreement

04:47 19  with DC Comics, and I didn't feel at liberty to discuss

04:48 20  the status of our dealings with him."

04:48 21      Do you recall Mr. Marks telling you that?

04:48 22      A   I don't specifically recall him mentioning that.

04:48 23  He may have.

04:48 24      Q   Mr. Marks then goes on at line 20 of his

04:48 25  deposition at page 166, quote --

95

A    When I say, "He may have," he may have mentioned to me that the reason he was -- in other words, he may have said something like, "I'm not trying to be cagey, but we have a confidentiality agreement," but I don't specifically recall him saying that.  If he did, it was in that context.

Q    He goes on to say, quote, line 20, page 166, "Mr. Toberoff said, 'Can you tell me what DC Comics offered you,' and I said, 'No.  We have a confidentiality agreement,'" close quote.

Did you ask Mr. Marks in that conversation to tell you what DC Comics offered him?

A    I -- again, I don't believe there were references to DC Comics.  I don't believe I knew at the time who -- I don't -- in other words, I don't believe at that time I knew that he was negotiating with DC Comics, so I don't believe there was a mention of DC Comics.

Q    Mr. Marks' testimony goes on, line 23 of that same page, quote, "And I believe Mr. Toberoff said, 'Would you be willing to enter into negotiations with me,' and I believe I said, 'Initiating negotiations, no.  That's something that makes me very uncomfortable.  If you have an offer, present it to me, and I'll present it to the client,'" close quote.

Do you recall saying to Mr. Marks whether he

96

would be willing to enter into negotiations with you?

    A   Yeah, I don't speak that way, so I doubt that I said, "Would you be willing to enter into negotiations with me?" It's just not my style. I would speak more directly.

    Q   Well --

    A   In other words, if you invite somebody to dance, I would never say, "Would you be willing to dance with me?" I would say, "Do you want to dance?"

    Q   What did you say to Mr. Marks in substance as to whether he wanted to dance with you?

    A   I was using that as a metaphor.

    Q   I understand.

    A   The thrust of the conversation was I wanted to know -- I was interested in the rights, and I wanted to know if the rights were available or not, and, if they were available, would make an offer with respect to those rights, and he in essence said, "Yes, they are available. Make an offer."

    Q   As of July --

    A   And I may have inquired as to what his clients wanted for the rights or something of that nature, and he wouldn't give me any information. He just said, "Make an offer."

    Q   As of the end of July 2002, had you had any

97

discussion with Peavy or Peary concerning Joanne or Laura Siegel's interest?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  What are the dates?

BY MR. BERGMAN:

Q    The end of July 2002.

A    Can you repeat the question, please, or read it back to me?

Q    As of the end of July 2002, had you had any discussion with Peary or Peavy concerning Joanne or Laura Siegel's interest in the Superman property?

A    Those discussions would be privileged.  I'm not gonna answer questions about what discussions I had with the Shusters.  That's attorney-client privilege, attorney work product regarding the Siegels' interest.

(Unanswered question.)

Q    As of the end of July 2002?

A    From the point I started speaking to them till the present, my discussions with them regarding the Siegels' interest, regarding their interest, regarding Superman, regarding that whole legal situation is attorney-client privileged and also protected by the work product doctrine.

Q    Okay.  Mr. Marks went on to testify concerning a conference call that he had with you and Mr. Emanuel.

98

The date of that conference call as set by Mr. Marks with reference to his phone logs which were marked GTRB 616 was that the conversation occurred within a day or two of August 7, 2002.

Prior to the time -- you do recall having a conference call with Mr. Marks and Mr. Emanuel, don't you?

A   I do.  As far as a date, again the date -- I have a -- I originally called -- this is just commenting on the date.  I originally recall that my assistant I had mentioned before, Andrew, I had asked him to set up a conference call, and I believe that was the reference in Marks' -- the exhibit to Marks' deposition, and that was noted -- that initial referenced conference call, that's the one where he talks about it's "20," and it's crossed out and says, "5 to 10 minutes," something like that, on the exhibit.  That was Andrew calling to set up a conference call.

But I have a specific recollection that after I tried to get dates from the Marks side -- or Andrew tried to get dates from Kevin Marks' office, it was very hard to pin down Ari Emanuel for that conference call.

So just talking about the date, I know he said it would have happened one or two days after that.  I think that conference call could have happened 10 days

99

after that.

Q    Okay.

A    Because I remember specifically being a little frustrated with Ari Emanuel's assistant because they kept saying, "Yes, and I'll have to speak to him," and he wouldn't come back to me with a date.  So that's all.

Q    Prior to that conference call, whether it occurred on August 7 or 10th or 15th or whenever --

A    Right.  Let's say mid August.

Q    Okay.

    -- had you taken any steps to place a monetary value on the Siegel interest?

    MR. WILLIAMSON:  Objection.  Vague and ambiguous, and objection on attorney-client, work product grounds.

    Instruct you not to answer.

    (Instruction not to answer.)

    THE WITNESS:  I'm going to follow that instruction.

BY MR. BERGMAN:

Q    To your knowledge had Mr. Emanuel taken any steps to place a monetary value on the Siegel interest in Superman prior to the conference call?

    MR. WILLIAMSON:  Objection to the extent it calls for attorney work product, and objection on the

100

grounds it calls for speculation.

THE WITNESS:  And also attorney-client

privilege, because if I knew it, it would be through

communications by Mr. Emanuel.

(Unanswered question.)

BY MR. BERGMAN:

Q   Mr. Marks testified with respect to that

conference call beginning at page 168 of his deposition,

line 12 -- line 11, "I think Mr." -- I had asked him what

was said in the conversation.  Quote, "I think

Mr. Toberoff may have very briefly referenced past

conversations, and then I believe it was Mr. Emanuel who

explained that either they or some other people or

perhaps some members of the Endeavor Talent Agency had

set up a fund or were in the process of setting up a fund

to acquire intellectual property rights which they would

then package with clients from the Endeavor Talent

Agency."

Do you recall Mr. Emanuel stating that in

substance during the conversation?

A   Not specifically, no.  He may have.

Q   Okay.  Do --

A   I recall him, you know, doing the equivalent of

in a meeting what they call warming up the room where --

which he's very good at, in which he sort of just spoke

101

04:58 1  **generally**, but I don't specifically recall that.  He may

04:58 2  **have**.

04:58 3      Q   Had you or Mr. Emanuel set up a fund to acquire

04:58 4  **intellectual** property rights at that time?

04:58 5      MR. WILLIAMSON:  Objection.  Attorney-client

04:58 6  **privilege**.  Attorney work product.

04:58 7      THE WITNESS:  Without a waiver of those

04:58 8  **privileges**, I can speak for myself.  I had not set up a

04:58 9  **fund**, no.

04:5810  **BY MR.** BERGMAN:

04:5811      Q   To your knowledge had Mr. Emanuel?

04:5812      A   I believe Endeavor or Mr. Emanuel had a fund and

04:5913  **access** to a lot of financing.

04:5914      Q   Continuing with Mr. Marks' testimony concerning

04:5915  **that** conference call between you and he and Mr. Emanuel,

04:5916  **I'm at** page 169 of his deposition, line 1, quote, "And

04:5917  **I'm** not sure who spoke, but they made a proposal of $15

04:5918  **million** and what was described as a meaningful back end,

04:5919  **which** I understood to be a contingent compensation

04:5920  **position** or a royalty position in the exploitation of the

04:5921  **property**," close quote.

04:5922      Did you or Mr. Emanuel propose acquiring the

04:5923  **Siegel** rights to Mr. Marks for $15 million together with

04:5924  **a** meaningful back end?

04:5925      A   I wasn't the one who made that offer.

102

05:00  1     Mr. Emanuel made that offer, and I specifically remember

05:00  2     that, because I remember when he was talking about the

05:00  3     back end, I remember thinking it was just something odd,

05:00  4     the way he had mentioned the back end.

05:00  5          Q    Was --

05:00  6          A    But I remember that he was the one who stated

05:00  7     that.

05:00  8          Q    Was the offer by Mr. Emanuel for $15 million?

05:00  9          A    Yes.

05:00 10          Q    And did he mention what he had in mind with

05:00 11     respect to the meaningful back end?

05:00 12          A    No.

05:00 13          MR. WILLIAMSON:   Objection.   Indefinite as to

05:00 14     time and place.   Are you referring to that conversation?

05:00 15          MR. BERGMAN:   Yes.

05:00 16          MR. WILLIAMSON:   Okay.

05:00 17          THE WITNESS:   No.

05:00 18     BY MR. BERGMAN:

05:00 19          Q    Okay.   Do --

05:00 20          A    I believe the offer was that if the fixed amount

05:01 21     was acceptable, that we would go on to work out a back

05:01 22     end.

05:01 23          Q    Okay.   Mr. Marks goes on to testify -- and I am

05:01 24     omitting some of his testimony.   I'm at line 16 on page

05:01 25     169 -- "And then I," Mr. Marks, "asked if this was a

                                                                    103

proposal that was conditioned on their doing due diligence about the rights, and they said again in substance and effect, 'No, it's not. We've done our due diligence already. This is the offer.'"

Do you recall that being said during this late July or mid August telephone conversation?

A   I don't recall that specifically, but it doesn't sound like something I would say.

Q   Do you recall --

A   That sounds like an agent talking.

Q   Do you recall anything else about the conference call between you, Mr. Marks and Mr. Emanuel in mid August?

A   Not sitting here, no.

Q   Again, did you make any notes of that conversation?

A   I may have. I don't know. It wasn't a long conversation, nor a complicated one, so my guess is I did not make notes. I didn't -- there weren't any in the file.

Q   Okay. Mr. Marks testified, again utilizing his phone register at page 617, that there was a call from you subsequent to the conference call on August 29, and he couldn't recall whether or not he had responded to that call.

104

Do you recall calling Mr. Marks following the conference call?

A     I don't.  When I read that in the transcript, I was trying to think what that was and whether we spoke, and I don't have any -- I don't have a recollection of speaking to him after that.

Q     Okay.  He testifies that you and he did not speak after that but that you had called him, according to his phone logs, on August 29.

A     I don't have a specific recollection of calling him.  I may have.

Q     Following the conference call -- strike that.

Had Mr. Emanuel discussed the $15 million figure with you prior to the conference call?

MR. WILLIAMSON:  Objection --

THE WITNESS:  I --

MR. WILLIAMSON:  -- attorney -- objection. Attorney-client privilege.  Work product.  I instruct you not to answer.

(Instruction not to answer.)

THE WITNESS:  I'm going to follow that instruction.

BY MR. BERGMAN:

Q     In relation to -- and you can answer this in relation to the mid August conference call if you want or

105

in reference to any other facts if you want.  When did you have your very first conversation with either Laura or Joanne Siegel?

A    What was the first part of the question?  In relation to what?

Q    I was suggesting that if you could answer that question with respect -- in relation to the mid August telephone conversation that you had, whether it was a month or two months afterwards, but my --

A    Are you talking about the conversation with -- the conference call with Ari Emanuel and Kevin Marks?

Q    Correct.

A    It was long after that.  I believe it was the end of October of that year.

Q    End of October 2002?

A    Yes, mid to end, sometime in October.  I'm not -- I believe it was sometime in October, and the basis of that belief is the agreement between the Siegels and IP Worldwide --

Q    Is dated October -- as of October 3.

A    Right.  And it was signed towards the end of October.  So I believe the initial contact was early October.

Sometimes when I do agreements, when they're dated as of -- when they're dated as of, I -- that's when

106

there were sort of the parties came together.  So I believe the initial conversation may have been like right at the beginning of August -- I mean, excuse me, right at the beginning of October 2003.

Q    How did that initial conversation, whenever it occurred, come about?  Who called who?

A    Joanne Siegel called me.

Q    And did she say how she had gotten your name or number?

A    Yes.  She said she had gotten it from Jean, Jean Peavy.

Q    And what in substance did Laura Siegel say to you at that time?

A    It was Joanne, actually.

Q    Oh, I'm sorry.

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  Without waiver of the privilege, I can just tell you the introductory remarks were that she had gotten my number from Jean Peavy, something to the effect that "Jean Peavy likes you a lot and is very -- highly recommended you," something of that nature, and that she was looking for an attorney and would be interested to talk to me about representing her.  That was the sum and substance of it.

BY MR. BERGMAN:

107

Q   And did you tell Joanne Siegel in that conversation that you had been speaking with Mr. Marks?

A   I don't recall whether I told her that in that conversation or not.  I may have.

Q   Do you recall telling her in that initial conversation that you had been interested in acquiring her rights?

A   I may have.  I recall when she called me, I was surprised, you know, because it's Jerry Siegel's widow and because of the sort of less than enthusiastic demeanor of Mr. Marks -- actually I shouldn't say -- in other words, he was just very -- Mr. Marks was very sparse, I should say, and polite in his communication but didn't exhibit, you know -- the first conversation was he was very -- like I said, he blew us off; the second conversation, he was much more receptive, but all of a sudden I was getting a call from Joanne Siegel.  So I may have mentioned at that time that I had been in contact with Kevin Marks, but I don't specifically recall.

Q   During the period from the conference call with Mr. Emanuel and Mr. Marks until the first telephone call from Joanne Siegel, had you done anything to inquire about the offer which you had made to Mr. Marks or which Mr. Emanuel had made to Mr. Marks?

A   I don't --

108

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't specifically recall, but it may have been that -- what was in his log where he said he didn't believe we spoke, but there was a call registered, so I may have called him for that purpose, but I don't specifically recall that phone call, probably because he didn't return it.

BY MR. BERGMAN:

Q   What else do you recall of the first conversation with Joanne Siegel?

A   That's it.

Q   How many days -- how did the conversation end?

A   I believe we set an appointment to meet.  I'm not certain, but I believe -- I have a vague recollection of meeting with Joanne and I believe Laura for lunch.

Q   Approximately --

A   We met in person.

Q   Approximately how long after that first call from Joanne?

A   Right away.

Q   Within a day or two?

A   I believe so.

Q   And where did you meet with them for lunch?

A   I don't recall.

109

Q    Would you tell me to the best of your recollection what was said by each of you at that meeting?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  No, I'm not going to tell you that, because after she told me she's interested in my providing legal services to her, even at that stage those conversations are protected by the attorney-client privilege.  I gave you the subject matter, but...

(Unanswered question.)

BY MR. BERGMAN:

Q    Did you at any time tell either Joanne or Laura Siegel that Mr. Emanuel had offered $15 million to acquire their rights?

A    Again, our -- those conversations at that point would be privileged.  Those communications between me and her would be privileged.

(Unanswered question.)

Q    Did you at any time disclose to either of the Siegels that you had been inquiring to purchase their rights?

A    Again, my -- you just asked me this same question, so I would say my answer is the same, but I believe, without disclosing my communications or their communications to me on that subject, I believe Mr. Marks

110

testified that he had disclosed that to them.  I believe.

I'd have to review his transcript.

    Q   Okay.

    A   So I believe they knew about that, but I'm not

going to disclose the substance of my communications with

them.

        (Unanswered question.)

    Q   What had occurred in the period between mid

August to early October which changed your intentions

from acquiring the Siegel interest to representing the

Siegel interest?

        MR. WILLIAMSON:  Objection.  Misstates

testimony.

        THE WITNESS:  Yeah, I wouldn't -- you say

changed my intentions.

BY MR. BERGMAN:

    Q   Well --

    A   Like I said, I received a phone call from Joanne

Siegel, and she was looking for new representation, and

it was her intention, and I agreed to represent her.

        Off the record.

        (Discussion off the record.)

        MR. BERGMAN:  I previously marked a document as

Exhibit 17, and I will get back to it in a moment, but

for now I am going to ask the court reporter to mark as

111

Exhibit 18 the October 3, 2002 agreement between the Siegels and an entity identified as IPW.

    (Deposition Exhibit 18 marked.)

    MR. WILLIAMSON:  I would just like to state for the record that the caption on the page is actually "IP Worldwide" for Exhibit 18.

    MR. BERGMAN:  Well, that is what appears at the top of the page, and the first paragraph refers to "IPW." I don't know if they're the same company, and I am going to ask Mr. Toberoff that question in a moment.

    THE WITNESS:  Actually, the first paragraph says, "...agreement and understanding between you ('Owner') and us..."  it merely uses "IPW" as a defined term referring to us, and us is IP Worldwide.

BY MR. BERGMAN:

    Q   So this agreement -- the IP party to this agreement is IP Worldwide, LLC --

    A   Correct.

    Q   -- as opposed to IPW, LLC.

    Is that correct?

    A   Correct.

    Q   Okay.  And that is your signature at IPW 4?

    A   Correct.

    Q   And I note that the agreement was signed by the Siegels on October 23, and is it your best recollection,

112

Mr. Toberoff, that within three weeks of your first

communication from the Siegels, you entered into this

agreement with them?

          MR. WILLIAMSON:  Objection.  Misstates prior

testimony.

          THE WITNESS:  I believe an agreement was -- yes,

I believe the agreement -- my general recollection was

that the time between meeting and entering into an

agreement was a fairly compressed time, so three weeks

would not surprise me.

BY MR. BERGMAN:

     Q   Okay.  From the time of your lunch meeting with

Joanne and Laura Siegel until October 23 of 2002, did you

have any further meetings with them?

     A   I may have.  I don't recall if we had further.

It may have been telephone conversations.

          And when you say "meetings," I take it you mean

in-person meetings?

     Q   Yes.

     A   I don't recall.  We may have had telephone

conversations.

     Q   Do you specifically recall telephone

conversations with them during that period?

     A   I don't.  I don't.

     Q   Were the Siegels represented by independent

                                                       113

counsel in connection with this agreement?

    A   I believe, yes.

    Q   Who was that?

    A   George -- last name starts with a Z, George Zadorozny.  I'm not sure how to spell it.

    Q   And did you negotiate with that lawyer?

    A   I can't say for sure.  I believe so, but I...  I believe so.  The reason I can't say for sure is I also -- when I entered into the retainer agreement with the Siegels, I specifically recall negotiating with Mr. Zadorozny, and I believe Mr. Zadorozny was involved in this agreement as well, but I don't -- I don't recall if -- I believe I did, but I don't have a specific recollection of it.

    Q   And when did you enter into a retainer agreement with the Siegels?

    A   Before -- definitely before we filed suit, and I believe it was...  I can't give you a date.

    Q   Were there any prior drafts --

    A   I'd have to look at the -- I'd have to check my file.

    Q   Okay.  Were there any prior drafts of the October 3, '02 agreement prior to Exhibit 18?

    A   Yes.  It went through various drafts.

    Q   And --

114

A    The Siegels are very specific.

Q    And what aspects of it were revised by the Siegels?

A    I don't specifically remember the aspects.  I just remember several drafts and several rounds of comments and them being very specific and, you know, focused on every word.

Q    And all of that occurred between the period from October 3 to October 23?

A    Yes, I believe so.  I think it went back and forth very quickly.

Q    Paragraph 2 of Exhibit 1 provides in part that, quote, "IPW will furnish and provide the legal services of Marc Toberoff Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license," et cetera, "of the rights..."

Who was IPW's support staff that is referred to in paragraph 2 of Exhibit 18?

A    Okay.  When you say "IPW," you mean IP Worldwide?  I think for clarity --

Q    I am quoting.

A    I know, but for a clear record you should probably say IP Worldwide, because when you hear the

115

record --

Q    Okay.  I didn't want to modify the text of the document.

Who was IP Worldwide's support staff at that point?

A    As I said, we had two employees at the time, but since Ari Emanuel had the entire Endeavor agency, three floors of the -- of offices filled with people --

Q    And were --

A    -- even though they were not technically employees of IPW -- IP Worldwide, IP Worldwide could draw on that staff for support services.

Q    And did it in fact draw upon that staff for support?

A    Yeah.  Yes, I should say.

Q    And who at Endeavor did it draw upon?

A    As needed, certain questions about transactional things, meaning of terms.  You know, Tom McGuire was very knowledgeable in making entertainment deals, a transactional lawyer, their general counsel.  They had a video game person.  They had a television person.  They had a statistical analyst.  They had an in-house investment banker.

Q    As of the time that you signed Exhibit 18, Mr. Toberoff, had you seen Marks' October 19, 2001 letter

116

to John Schulman?

MR. WILLIAMSON: Objection. Assumes facts not in evidence. Lacks foundation.

THE WITNESS: I hadn't seen any letters.

Could you repeat the question.

BY MR. BERGMAN:

Q Yes. As of the time that you signed this agreement, which I presume was sometime after October 3 and prior to October 23 or around October 23, had you seen the letter sent by Mr. Marks to John Schulman dated October 19, 2001?

A I don't believe so.

Q Had you seen --

A And I also don't believe the Siegels -- just knowing the Siegels, I don't believe that they would have been quite so forthcoming with information prior to actually having a signed agreement.

Q So is it your best recollection that you had not seen the October 19th letter prior to executing Exhibit 18?

A Like I said, I don't know if I did or not, but I don't have a recollection of it. I'd have to --

Q Had you seen the --

A If you showed me something to refresh that recollection, but I don't recall seeing that.

117

Q    Had you --

A    In other words, I can't put a date -- I can't put a date on when I saw that particular letter.

Q    Well, I'm not asking for the date.  I'm asking --

A    No, I can't even put a general -- I would have trouble nailing down the time when I first saw that letter.

Q    Prior to the time that you executed Exhibit 18, had you seen any documents that had been exchanged between the Siegels and DC Comics?

A    I don't recall seeing those documents.  I know the documents you're referring to because they're part of the documents in the case, in the litigation, but I don't recall seeing those documents, no.

Q    Prior to the time that you executed Exhibit 18, had the Siegels told you what the DC Comics offer generally consisted of?

        MR. WILLIAMSON:  Objection.  Attorney-client.

        THE WITNESS:  That would be privileged.

        (Unanswered question.)

BY MR. BERGMAN:

Q    No, that wouldn't be privileged if they had told you what the documents consisted of, what the letter said.

118

A    I disagree.

Q    Okay.

A    Whether or not they -- the substance -- you're asking a question which goes to the substance of my communications with the Siegels, so I believe that would be privileged.

Q    Has IP Worldwide advanced or loaned any funds to either of the Siegels since October 3, 2002?

MR. WILLIAMSON:   Objection.  Vague and ambiguous.

THE WITNESS:   No.

BY MR. BERGMAN:

Q    Had any of your other entities?

MR. WILLIAMSON:   Objection.  Vague and ambiguous.

THE WITNESS:   No.

BY MR. BERGMAN:

Q    Have you personally?

A    No.

Q    Okay.  Paragraph 5 of the agreement provides for an 18-month term.  Who had suggested a term of 18 months?

A    They did.

Q    Did they say why?

A    No.  I believe a longer term, and I don't recall what the longer term was, but it may have been 24 months,

119

1.

2.

3.

4.

5.

6.

7.

8        I, MARC TOBEROFF, do hereby declare under

9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14        EXECUTED this _____ day of _____,

15  20_____, at _____, _____.

                   (City)             (State)

16.

17.

18.

19.

20  _____

    MARC TOBEROFF

21.

22.

23.

24.

25.

150

STATE OF CALIFORNIA     )
                        ) ss
COUNTY OF LOS ANGELES   )


        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated:   **NOV 3 0 2006**


_____

DAVID S. COLEMAN
CSR No. 4613