WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: (310) 858-7888
Fax: (310) 550-7191

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
James D. Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: (212) 813-5900
Fax: (212) 813-5901

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820
Fax: (845) 265-2819

Attorneys for Defendants and Counterclaimant

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>              Plaintiffs,<br><br>     vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br>              Defendants. | Case Nos. [Consolidated for Discovery]:<br>     CV 04-8400 SGL (RZx)<br>     CV 04-8776 SGL (RZx)<br>Hon. Steven G. Larson, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J. |
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>              Plaintiffs,<br><br>     vs.<br><br>TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10,<br>              Defendants. | **DECLARATION OF WAYNE M. SMITH IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF WHISTLE-BLOWER DOCUMENTS**<br><br>**DISCOVERY MATTER LOCAL RULE 37**<br><br>Time: 10:00 a.m.<br>Date: April 16, 2007<br>Courtroom: 540<br>Mag. Judge Ralph Zarefsky<br>Discovery Cutoff: Nov. 17, 2006 |
| AND RELATED COUNTERCLAIMS | |

{F0010672.1}

**EXHIBIT X**
277

1   I, Wayne M. Smith, declare and state as follows:

2   1.   I am an attorney, admitted to practice before the Supreme Court of the

3   State of California and before this Court, and am employed by defendant Warner

4   Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and

5   Chief Patent Counsel. I submit this declaration in support of Defendants' Motion to

6   Compel Production of Whistle-blower Documents. I have personal knowledge of

7   the facts contained within this declaration, and, if called upon as a witness, I could

8   and would testify competently thereto.

9   2.   During the afternoon of June 28, 2006, I received a telephone call from

10  John A. Schulman, General Counsel of Warner Bros., who asked that I come to his

11  office. Upon arriving at his office, Mr. Schulman advised me that a set of

12  documents (the "Superman Documents") addressed to him and apparently relating

13  to the Siegel litigation had arrived from an anonymous source at his office that day.

14  Mr. Schulman informed me that the cover letter contained with the documents

15  indicated that other executives at Warner Bros. may have received the same set of

16  documents, and that he had called the offices of those executives to see if they had

17  received anything. He further advised me that he had asked those executives to send

18  the documents to his office without reviewing them, and that one set of documents

19  had already been delivered to him. Mr. Schulman handed me the stack

20  (approximately an inch high) of Superman Documents that he had received and

21  asked me to wait outside his office while he completed a meeting, after which we

22  would discuss them. The stack did not include any envelope or packaging in which

23  the documents may have arrived. This was not unusual as it has been my experience

24  that the practice of Mr. Schulman's office staff is to dispose of envelopes and

25  packaging upon opening mail.

26  3.   While I was waiting, I looked at what might be characterized as the

27  "cover letter" that came with the Superman Documents. The cover letter, which

28

{F00106723}                                    1

**EXHIBIT X**
**278**

1    was not signed, alleged various types of ethical misconduct on the part of the

2    Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also

3    asserted ethical misconduct – violating the terms of a confidentiality agreement by

4    leaking settlement information to the press – in connection with another litigated

5    matter where Plaintiffs' counsel had also represented a party adverse to Warner

6    Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's

7    misconduct. The letter also referenced the documents enclosed, providing an

8    overview of their contents and their connection to Plaintiffs' counsel's alleged

9    wrongdoing. I also thumbed through the Superman Documents contained with the

10    letter, but did not read any of them in detail. Meanwhile, an assistant for another

11    Warner Bros. executive delivered what appeared to be another set of Superman

12    Documents to Mr. Schulman's office. I did not observe that any of the three sets of

13    Superman Documents – (i) the set Mr. Schulman handed to me; (ii) the other set in

14    his office; or (iii) the set that was delivered while I was waiting outside his office –

15    was contained in an envelope or other packaging.

16        4.     I then met with Mr. Schulman. I told Mr. Schulman that based on the

17    contents of the cover letter and my brief thumbing through the documents, it

18    appeared that certain of the documents in the package were privileged. I said that

19    before I looked at the documents I wanted to review the case law in the area to

20    determine what level of review, if any, of the Superman Documents was

21    appropriate. Mr. Schulman agreed with this approach, gave me one set of the

22    documents, retained the other two sets that he had received, and advised me that he

23    had only looked at the cover letter that came with the documents and would not

24    review the documents at all.

25        5.     I returned to my office with the set of documents. I initially went on

26    the internet and performed a Google search relating to the issue of what obligations,

27    if any, governed the handling of the Superman Documents we had received. My

28    initial search located an article from the June 2006 Los Angeles Lawyer magazine

{F0010672 3 }

**EXHIBIT X**

1   entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of

2   which is attached as Exhibit "A" hereto) which was posted on the Los Angeles

3   County Bar Association web site.  The article concerns the obligations of lawyers

4   who unwittingly receive privileged documents from opposing counsel's files and

5   discusses various California cases that have dealt with the issue, including the *Rico*

6   *v. Mitsubishi Motors Corporation* case pending before the California Supreme

7   Court.

8          6.     I read the Schmalz article and then downloaded and studied the three

9   principal California cases it identifies:  *Aerojet-General Corporation v. Transport*

10  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

11  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

12  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

13  Cal.App.4th 51 (2004) (*review granted* June 9, 2004).  Based on my review of the

14  relevant California authorities, it appeared that a conservative approach to handling

15  the Superman Documents was to follow the procedure laid out by the Court in *State*

16  *Fund*, specifically:  (i) to review each document but to cease the review once it

17  became apparent that the document was privileged; (ii) to contact opposing counsel

18  and advise that the documents have been received; and (iii) to refrain from using any

19  information in the documents until there was either an agreement with opposing

20  counsel, or the court had determined the documents' disposition.

21         7.     Following my review of the law, I called Mr. Schulman and advised

22  him of the results of my research.  I said that I intended to review the Superman

23  Documents in accordance with *State Fund*.  At Mr. Schulman's request I also sent

24  copies of the three key cases and the article to Mr. Schulman's office.

25         8.     That evening, I took the Superman Documents home with me and spent

26  approximately a half hour reviewing them.  Certain of the documents – such as

27  executed agreements relating to Superman and correspondence between the

28  Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

[F00106721]

3

**EXHIBIT X**

**280**

1  privilege.  As I was going through the documents I placed them into three piles:  (i)
2  "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell
3  whether it was privileged or I believed the document covered subject matter where
4  privilege may have been waived in the case, as explained below).  In reviewing each
5  document, where it first appeared to me that it was entirely privileged, I ceased
6  reading it, placed the document in the "privileged" pile and did not look at it further.
7  After going through the documents, I placed a post-it note on the top of each pile
8  (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.
9  I did not look at the documents further.  Because I did not conduct a detailed review
10  of the Superman Documents, and because of the passage of time, I do not recall
11  their specific contents.  I do, however, recall generally the subject matter of certain
12  of the documents.

13      9.     The non-privileged pile was the second largest of the three.  It
14  contained what appeared to be agreements between, *inter alia*, the Siegels and/or
15  Shusters and various entities, as well as correspondence concerning the interest in
16  Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,
17  Michael Siegel.  To my knowledge, this last category of documents has never been
18  produced in the litigation

19      10.     The "?" pile was the smallest.  I believe that one or two of the
20  documents in this category potentially fall within the scope of a privilege waiver
21  based Plaintiffs' reliance on an affirmative defense that their predecessor counsel
22  did not have authority to accept a settlement proposal made by Defendants.
23  Defendants position on this privilege waiver is the subject of a separate Motion to
24  Compel filed concurrently herewith.

25      11.     The pile of documents I labeled "privileged" was the largest.

26      12.     Even from the brief review made, it appeared to me that, with the
27  exception of the cover letter (which also addressed the other litigation involving
28  Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

[F0010672 3]

EXHIBIT X
281

1  the instant litigation and were responsive to document requests the Defendants had

2  previously served on Plaintiffs.  However, it did not appear to me at the time that

3  any of the "non-privileged" documents had been produced in the litigation.

4  Moreover, at least some (and perhaps virtually all) of the privileged documents, as

5  well as those in the "?" pile, were, to the best of my knowledge, never identified in

6  any privilege log served by the Plaintiffs.

7      13.    The next morning, June 29, 2006, I returned with the Superman

8  Documents to see Mr. Schulman in his office.  Mr. Schulman and I discussed having

9  a neutral third party hold the documents pending either the parties' agreement as to

10  their disposition or order of the Court.  We decided to ask John Quinn, then with

11  Arnold & Porter, and former president of the Los Angeles County Bar Association,

12  to act as the neutral based on his reputation and legal ethics experience.  He agreed

13  and the following morning, June 30, 2006, the three sets of the Superman

14  Documents, including the set that I had categorized, were handed over to Mr. Quinn.

15  Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not

16  just those that were clearly or potentially privileged.  Further, we have not shared

17  the contents of the Superman Documents with any of the outside counsel

18  representing the Defendants in this action, nor have we used the contents of the

19  documents in the litigation.

20      I declare under penalty of perjury of the laws of the United States of America

21  that the foregoing is true and correct.

22      Dated this 26th day of March 2007 at Burbank, California.

23

24                                        Wayne M. Smith

25

26

27

28

**EXHIBIT X**
**282**

1  WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
3  9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California  90212
4  Telephone:  310-858-7888
Fax:        310-550-7191
5
  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
6  Roger L. Zissu (Admitted *pro hac vice*)
866 United Nations Plaza
7  New York, New York  10017
Telephone:  212-813-5900
8  Fax:        212-813-5901
9  PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
10  1711 Route 9D
Cold Spring, NY  10516
11  Telephone: 845-265-2820
Fax:        845-265-2819
12
  Attorneys for Defendants and Counterclaimant
13
           UNITED STATES DISTRICT COURT
14
    CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
15

| | |
|---|---|
| 16  JOANNE SIEGEL and LAURA SIEGEL LARSON,<br>17<br>18  Plaintiffs,<br>19  vs.<br>20  WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br>22<br>23  Defendants.<br>24<br>25<br>26<br>27  AND RELATED COUNTERCLAIMS.<br>28 | Case No. 04-8400 SGL (RZx)<br><br>Hon. Stephen G. Larson, U.S.D.J.<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Defendants' Opposition to Local Rule 56.1 Statement; Declaration of Michael Bergman and exhibits thereto]<br><br>Date:    July 23, 2007<br>Time:   10:00 a.m.<br>Place:  Courtroom 1 |

**EXHIBIT Y**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ......................................................... 1

SUMMARY JUDGMENT STANDARD ........................................ 4

DEFENDANTS' STATEMENT OF FACTS, INCLUDING
RELEVANT DISPUTED MATERIAL FACTS .............................. 5

    A.    The Origins of Superman ..................................................... 5

        1.    Action Comics No. 1 and the March 1, 1938
             Assignment ............................................................. 5

        2.    Siegel and Shuster's Further Grants to DC ............... 8

        3.    The Development of Superman by DC
             in Derivative Works ............................................... 9

    B.    The Prior Litigation Between the Parties'
        Predecessors ...................................................................... 11

        1.    The Westchester Action ........................................... 11

        2.    Corrections of Plaintiff's Statement of Facts
             With Respect to Westchester Action ....................... 12

        3.    The Prior Federal Action ........................................ 13

    C.    Termination Rights Under § 304(c) of the 1976 Act ........ 15

    D.    Plaintiffs' Superman Notices of Termination And
        Filing And Filing of These Actions ................................... 16

    E.    The Parties' 2001 Settlement ........................................... 18

    F.    Corrections With Respect to Plaintiffs' Settlement
        Concerning Judge Lew's Decision in The Superboy
        Action ................................................................................ 25

ARGUMENT ...................................................................................... 26

I.    MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY
    JUDGMENT WITH RESPECT TO PLAINTIFFS' RECAPTURE
    OF AN UNDIVIDED ONE HALF SHARE OF THE COPYRIGHT
    IN ACTION COMICS NO. 1 ....................................................... 26

**EXHIBIT V**
**284**

A.  Genuine Issues of Material Fact Preclude Summary Judgment on Defendants' Defense that Portions of Action Comics No. 1 Were Created As "Works Made for Hire"......................................................27

   1.  Certain Material Portions Of Action Comics No. 1 Were Created As Works Made For Hire By Siegel And Shuster Or By Third Parties And Thus, Cannot Be Subject To Termination......................................28

      a.  The Publication Of Action Comics No, 1.......................28

      b.  The Additional Action Comics No. 1 Materials Were Created As "Work For Hire" And Thus Cannot Be Subject To Termination ...............................29

         1)  The Addition Of Color To Action Comics No. 1 Was Work Prepared By Regular Employees Of Detective Within The Scope Of Their Employment...............................29

         2)  The Portion Of Action Comics No. 1 Created By Siegel And Shuster After Detective Told Them They "Could Proceed" Were Created At The Instance And Expense Of Detective And Are Thus Work For Hire ...........................30

   2.  Plaintiffs' Attempts To Demonstrate That The Additional Action Comics No. 1 Materials Are Not Work For Hire Are Without Merit And, At Best, Are Rife With Genuine Issues Of Material Fact. .........................34

      a.  The Existence Of A Written agreement Does Not Affect The Work For Hire Status Of The Additional Action Comics No. 1 Materials .................34

      b.  Plaintiffs' Res Judicata And Collateral Estoppel Argument to Avoid the Work for Hire Status of the Additional Actions Comics No. 1 Materials Are Equally Untenable ................................................................35

B.  Plaintiffs Failed to Terminate the 1948 Final Judgment, Leaving In Place an Operative Grant of Rights in Superman ................................................................39

C.  Joanne Siegel's Continued Acceptance of Benefits Under the 1975 Agreement Leaves in Place That Operative Grant................................................................40

D.  Genuine Issues of Material Facts Prevent Dismissal of Defendants' Statute of Limitations Defenses ................................................................47

EXHIBIT Y

285

1.    The Copyright Act's Statutes Of Limitations Bar Any Civil Action Not Commenced Within Three Years Of The Accrual Of A Claim.............................47

2.    Plaintiffs' Attempted Reliance Upon The "Tolling Agreement" Is Misplaced. ..........................................50

    a.    Summary Judgment Is Inappropriate Because There Are Genuine Issues Of Material Fact As To When Plaintiffs' Claim Of Co-Ownership Accrued And When The Tolling Agreement Terminated................................50

    b.    Regardless Of When The Claim Accrued And When The Tolling Agreement Expired, Any Claims Of Co-Ownership Of Copyright Against Entities Other Than DC Comics Are Time-Barred. .......................................52

II.    AS A MATTER OF LAW, AN EFFECTIVE TERMINATION PURSUANT TO THE SUPERMAN NOTICES OF TERMINATION CANNOT REQUIRE A PROFIT ACCOUNTING FROM EXPLOITATION OF FOREIGN COPYRIGHT .......................................53

    A.    BACKGROUND:  THE ESTABLISHED COPYRIGHT FRAMEWORK IN WHICH TERMINATION MUST BE CONSIDERED .................53

        1.    Rights of Co-Owners Of Copyright.........................53

        2.    National Treatment and Territorial Nature of the United States Copyright Act...................................54

        3.    The Presumption Against The Extraterritorial Effect of U.S. Legislation ....................................54

    B.    Plaintiffs Have Misstated a Joint Owner's Duty to Account Which Only Requires the Co-Owners to Share Its Own Profits ......................................57

    C.    Because Plaintiffs Cannot and Have Not Recaptured Any Ownership Interest in Foreign Copyrights, The Rules Governing Accountings Between Joint Owners Do Not Apply to Profits from Such Foreign Copyrights............................58

    D.    Only the Copyright Act, Not State or Any Other Law, Determines the Rights That Can be Recaptured By Means of a Copyright Termination Under Section 304 (c) ......................................59

1.   In The Copyright Act's Termination Provisions Congress Clearly and Broadly Expressed its Intent that the Terminating Party's Rights Could Not Affect a Grantee's Foreign Copyright Rights or Reach Actions Occurring Outside of the U.S. ......................... 59

    a.   The Copyright Act Does Not Include Any Indication Of Congressional and Intent to Cover Conduct Occurring Outside the U.S. ................. 60

    b.   Congress Has Clearly Manifested Its Contrary Intent, To Wit, That Any Termination and Recapture of Copyright Rights Under Sections 304(c) and 203 Cannot Apply to Any Conduct Occurring Outside the Country. ......................... 61

2.   Plaintiffs Do Not Own Any Interest in Foreign Copyright Rights Because These Are Not Subject to Termination ............................................. 61

3.   Plaintiffs' Theory That They Have Recaptured a Share of Foreign Copyrights On the Basis of State Common Law General Principles of Accounting Generally Governing The Rights of Property Co-Owners Disregards The Rules of National Treatment and Copyright Preemption ............................. 65

III.   WHETHER THE PARTIES ENTERED INTO AN ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A QUESTION OF FACT WHICH CANNOT BE RESOLVED ON SUMMARY JUDGMENT ............................................. 67

A.   It Has been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement ............................................. 69

B.   The Fact That the Parties Contemplated the Later Negotiation and Execution of a Long-Form Contract Does Not Negate the October 19 Agreement as a Matter of Law ............................. 71

C.   The October 19, 2001 Agreement Is An Acceptance Of DC Comics' Offer And Is Not A "Counteroffer" That Was Rejected By Defendants ......................... 74

D.   Plaintiffs' Parade Of Alleged "Material Differences" Between The October 19, 2001 Agreement, The Schulman Letter, And The February Long Form Is Irrelevant And Misleading ......................... 78

CONCLUSION ............................................. 85

EXHIBIT V
287

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Aalmuhammed v. Lee,*
    203 F.3d 1227 (9th Cir. 2000)..................................................................49

*American Title Ins. Co. v. Lacelaw Corp.,*
    861 F.2D 224 (9TH Cir. 1988)..................................................................44

*Ashton-Tate v. Ross,*
    916 F.2d 516 (9th Cir. 1990)..................................................................57

*Benz v. Compania Naviera Hildago, S.A.,*
    353 U.S. 138 (1957)..................................................................55

*Books-A-Million, Inc. v. H & N Enterprises, Inc.,*
    140 F.Supp.2d 846 (S.D. Ohio 2001)..................................................26

*Brattleboro Pub. Co. v. Winmill Pub. Corp.,*
    369 F.2d 565 (2d Cir. 1966)..................................................................31

*Brunswick Beacon, Inc. v. Schock-Hopchas Pub. Co.,*
    810 F.2d 410 (4th Cir. 1987)..................................................................32

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1981)..................................................................39

*Callie v. Near,*
    829 F.2d 888 (9th Cir. 1987)..................................................................68

*City of Saint Paul, Alaska v. Evans,*
    344 F.3d 1029 (9th Cir. 2003)..................................................................49

*Core-Vent Corp. v. Implant Innovations, Inc.,*
    53 F.3d 1252 (Fed. Cir. 1995)..................................................................79

*Craft v. County of San Bernardino,*
    468 F. Supp. 2d 1172 (D.D. Cal. 2006)..................................................4

*Creative Tech, Ltd. v. Aztech Sys. Pte., Ltd.,*
    61 F.3d 696 (9th Cir. 1995)..................................................................54

*Cytec Indus., Inc. v. B.F. Goodrich Co.,*
    32 F. Supp. 2d 821, 828-29 (S.D. Ohio 2002)..........................................26

*Dolman v. Agee,*
    157 F.3d 708 (9th Cir. 1998)..................................................................30, 34

**EXHIBIT Y**
**288**

*E.E.O.C. v. Arabian American Oil Co.,*
    499 U.S. 244 (1991) ...........................................................55

*Easter Seal Soc'y for Crippled Children v. Playboy Enters.,*
    815 F.2d 323 (5ᵗʰ Cir. 1987) ...............................................31

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
    63 U.S.P.Q.2d 1301 (S.D.N.Y. 2002),
    *aff'd,*342 F.3d 149 (2d Cir. 2003) ...........................29, 31, 49

*Feist Publs., Inc. v. Rural Telephone Serv.,*
    499 U.S. 340 (1991) ...........................................................13

*Foley Bros., Inc. v. Filardo,*
    336 U.S. at 281 (1949) .......................................................55

*Forward v. Thorogood,*
    985 F.2d 604 (1ˢᵗ Cir. 1993) ...............................................29

*Fred Ahlert Music Corp. v. Warner Chappell Music,*
    155 F.3d 17 (2nd Cir.1988) ....................................16, 62, 63

*Fred Ahlert Music Corp. v. Warner/Chappell Music,*
    958 F.Supp. 170 (S.D.N.Y. 1997) .....................................62

*Glow Indus v. Lopez,*
    273 F. Supp. 2d 1095, 1114 n. 98 (C.D. Cal. 2003)..........43

*Harrison v. PPG Indus., Inc.,*
    46 U.S. 578, 592 (1980) .....................................................65

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .............................................................66

*In re Artha Management, Inc.,*
    91 F.3d 326, 329 (21nd Cir. 1996).................................69, 71

*Inamed Corporation v. Kuzmak,*
    275 F. Supp. 2d 1100 (C.D. Cal. 2002)............69, 71, 79, 80, 85

*Itar-Tass Russion News Agency, Inc. v. Russian Kurier, Inc.,*
    153 F.3d 32 (2d Cir. 1988) ................................................54

*Jasper v. Sony Music Entertainment, Inc.,*
    378 F. Supp. 2d 334, (2005) ..............................................57

*Kewanee Oil Co. v. Bicron Corp.,*
    416 U.S. 470 (1974) ...........................................................66

EXHIBIT Y

*Leisure Time Enm't. v. Cal. Vista,*
    35 Fed. Appx. 565 (9th Cir. 2002) ............................................................... 60

*Lin-Brook Builders Hardware v. Gertler,*
    352 F.2d 298 (9th Cir. 1965) ............................................................ 29, 35

*Los Angeles News Service v. Reuters Television Intern. Ltd.,*
    144 F. 3d 987 (9th Cir. 1998), *cert. denied,* 525 U.S. 1141 (1999) ............ 60

*Marvel Character, Inc. v. Simon,*
    310 F.3d 280 (2d Cir. 2002) ............................................................. 37, 46

*May v. Morganelli-Heumann & Assocs.,*
    618 F.2d 1363 (9th Cir. 1980) ......................................................... 31

*McCulloch v. Sociedad Nacional de Marineros de Honduras,*
    372 U.S. 10 (1963) ........................................................................ 55

*Merchant v. Levy,*
    92 F.3d 51 (2d Cir. 1996) ............................................................... 49

*Meridian Project Sys., Inc. v. Hardin Const. Co.,*
    *426 F. Supp. 2d 1101 (E.D. Cal. 2006) ........................................... 26

*Microsoft Corp. v. AT&T Corp.,*
    127 S.Ct. 1746, (2007) ................................................................... 56

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005) ........................................ 15, 16, 46, 48

*National Union Fire Ins. Co. v. Argonaut Ins. Co.,*
    701 F.2d 95 (9th Cir. 1983) ......................................................... 43, 44

*Niss v. Columbia Pictures Indus., Inc.,*
    2000 U.S. Dist. LEXIS 18328 (S.D.N.Y) ........................................ 33

*Oddo v. Ries,*
    743 F.2d 630 (9th Cir. 1984) ................................................ 53, 57, 58

*Playboy Enters. v. Dumas,*
    53 F.3d 549 (2d Cir. 1995) ........................................................ 31, 33

*Pye v. Mitchell,*
    574 F.2d 476 (9th Cir. 1978) ....................................................... 53

*Rano v. Sipa Press, Inc.,*
    987 F.2d 580 (9th Cir. 1993) ....................................................... 66

*Roth v. Marquez,*
    942 F.2d 617 (9th Cir. 1991) ...................................................... 72

*Runoli Leathers Ltd. v. Mikhaeil,*
    2001 U.S. Dist. LEXIS 17896 at *7 (N.D. Cal. Oct. 23, 2001) .................. 81

*Sears Roebuck & Co. v. Stiffel Co.,*
    376 U.S. 225 (1964) ........................................................................ 66

*Self-Realization Fellowship Church v. Amanda Church of Self-Realization,*
    206 F.3d 1322 (9th Cir. 2000) ......................................................... 29, 31

*Shapiro Bernstein & Co. v. Jerry Vogel Music Co., Inc.,*
    223 F.2d 252 (2nd Cir. 1955) .......................................................... 30, 31-32

*Siegel v. National Periodical Publications,*
    364 F. Supp. 1032 (S.D.N.Y. 1973) ................................................. 13

*Siegel v. National Periodical Publications,*
    508 F.2d 909 (2d Cir. 1974) ..................................... 5-6, 13, 37, 39

*Sola Elec. Co. v. Jefferson Elec. Co.,*
    317 U.S. 172, 63 S.Ct. 172, 87 L.Ed. 165 (1942) ....................... 66

*Sony Corp. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ........................................................................ 15

*Stillman v. Travelers Ins. Co.,*
    88 F.3d 911 (11th Cir. 1996) .......................................................... 26

*Stone v. Williams,*
    970 F.2d 1043 (2d Cir. 1992), ....................................................... 48

*Subafilms, Ltd. v. MGM-Pathe Communications Co.,*
    24 F.3d 1088 (9th Cir. 1994), *cert. denied,* 513 U.S. 1001,
    115 S. Ct. 512, 130 L. Ed. 2d 419 (1994) ....................... 54, 60, 61

*Symphony Fabrics Corp. v. Podell Indus., Inc.,*
    94 Civ. 4373 (BSJ)1996 U.S. Dist. LEXIS 12767,
    *14 (S.D.N.Y. Aug. 30, 1996) ...................................................... 68

*T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987) .......................................................... 69

*Twentieth Century Fox Film Corp. v. Entertainment Distributing,*
    429 F.3d 869 (9th Cir. 2005) ........................ 29, 30, 31, 32, 33, 35

*United Dictionary Co. v. G&C Meriam,*
    208 U.S. 260, 28 S. Ct. 290 (1908) ................................................ 60

*Wady v. Provident Life & Accident Ins. Co. of Am.,*
    216 F. Supp. 2d 1060 (C.D.Cal. 2002) ........................................... 4

**EXHIBIT** vii

**291**

*Warner Bros. v. American Broadcasting Companies,*
    654 F.2d 205-06 (2d Cir. 1981)...................................................................10

*Zuill v. Shanahan,*
    80 F.3d 1366 (9th Cir. 1996).........................................................49, 53, 58

**STATE CASES**

*Alexander v. Codemasters Group Ltd.,*
    104 Cal.App.4th 129 (2002)......................................................................69

*Apablasa v. Merritt & Co.,*
    176 Cal. App. 2d 719 (1959)..............................................................68, 74

*Banner Entertainment,*
    62 Cal.App.4th 348 (1998)..........................................................68, 74, 75

*Beard v. Goodrich,*
    110 Cal.App.4th 1031 (2003)....................................................................75

*Beck v. American Health Group Int'l,*
    211 Cal.App.3d 1555 (1989)...............................................................71, 72

*Brown v. Republic Prods., Inc.,*
    26 Cal. 2d 867 (1945)...............................................................................57

*Duran v. Duran,*
    150 Cal. App. 3d 176 (1983)....................................................................72

*Ersa Grae Corp. v. Fluor Corp.,*
    1 Cal.App.4th 613 (1991)....................................................72, 76, 78

*Forgeron Inc. v. Hansen,*
    149 Cal. App. 2d 352 (1957).....................................................................72

*Harris v. Rudin, Richman & Appel,*
    74 Cal.App.4th 299 (1999).......................................................................71

*House of Prayer, etc. v. Evangelical Assoc. for India,*
    113 Cal.App.4th 48 (2003)........................................................................74

*Kern Sunset Oil Co. v. Good Roads Oil Co.,*
    214 Cal. 435, 6 P.2d 71 (Cal. 1931),  ..................................................41, 46

*Kitty-Anne Music Co. v. Swan,*
    112 Cal.App.4th 30 (2003)........................................................................76

**EXHIBIT Y**

**292**

*King v. Stanley,*
  32 Cal.2d 584 (1948)............................................................................76

*Kohn v. Jaymar-Rudy,*
  23 Cal.App.4th 1530, (1994)................................................................80

*Los Angeles v. Superior Court,*
  51 Cal. 2d 423 (1959)...........................................................................80

*Louis Lesser Enterprises, Ltd. v. Roeder,*
  209 Cal.App.2d 401 (1962)...........................................................71, 78

*Mancuso v. Krackov,*
  110 Cal.App.2d 113 (1952)..................................................................80

*Miller v. Reidy,*
  85 Cal.App. 757 (Cal. Ct. App. 1927)...........................................41, 46

*Patch v. Anderson,*
  66 Cal. App. 2d 63, 66 (1944).............................................................72

## FEDERAL STATUTES

**1909 Copyright Act**

17 U.S.C. § 24 (repealed) ...................................................................8, 37

**1976 Copyright Act**

17 U.S.C. § 28 (repealed) .......................................................................31

17 U.S.C. § 104(b)..................................................................................54

17 U.S.C. § 201(a) & (b) .........................................................................53

17 U.S.C. § 201(b)...................................................................................64

17 U.S.C. § 203(b)............................................................................16, 64

17 U.S.C. § 203(b)(1), (5).................................................................16, 62

17 U.S.C. § 203 (b)(5)............................................................................64

17 U.S.C. § 304(c).............................................................................passim

17 U.S.C. § 304(c)(5)........................................................................40, 48

17 U.S.C. § 304(c)(6)..............................................................................16

17 U.S.C. § 304(c)(6)(A) .................................................................63

17 U.S.C. § 304 (c)(6)(A) & (E).........................................................16

17 U.S.C. § 304(c)(6)(B) .................................................................41

17 U.S.C. § 304(c)(6)(D) ...........................................................41, 82

17 U.S.C. § 304(c)(6)(E) ........................................................2, 62, 65

17 U.S.C. § 401(a) ........................................................................60

17 U.S.C. § 507(b) ........................................................................47

Pub. L. No. 94-553, 90 Stat. 2541, § 304(a)(1976)................................15

**Copyright Act Legislative History**

H. Rep. No. 94-1476,
94th Cong. 2d Sess. at 140 (1976) .................................15, 31, 48, 53, 62

S. Rep. No. 94-473,
94th Cong. 1st Sess. (1975) ........................................................15, 48

Supplementary Register's Report on the General Revision
of U.S. Copyright Law at 72 (1965) ..............................................15, 48

**Other Statutes**

Bern Convention Implementation Act of 1988,
Publ. L. No. 100-568, 102 Stat. 2853 (1988) ......................................54

35 U.S.C. § 271 (f)(1).....................................................................56

37 C.F.R. § 201.10 (b)(1)(iv)..............................................................39

Fed. R. Civ. P.56(e) ........................................................................4

22 N.Y. Comp. Codes R. & Regs. Tit. 22 § 670.2[a][4] (2005) ..................13

N.Y. Civ. Prac. Act § § 57-74 (1924)(repealed)....................................13

**Treatises**

Howard B. Abrams, *The Law of Copyright* (2006), § 12:41 ...................................64

Paul Geller & Melville B. Nimmer, 1 *International Copyright Law and Practice* (2005) § 6[2][a][i], fn. 70......................................................64

Paul Goldstein, *Goldstein on Copyright* (3d ed. 2006), § 5.4.3 at 5:135 ..............64

Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases & Materials* (6th ed. 2006), 376-77.........................................................................64

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005)

    § 2.14 ..................................................................................30

    § 5.03[D]..............................................................................31

    § 6.03 ..................................................................................53

    § 6.10 ..................................................................................53

    § 6.12[B].............................................................................57

    § 9.03 ..................................................................................37

    § 11.02[B][2] ......................................................................64

    § 11.06[B] ...........................................................................39

William F. Patry

    *Choice of Law and International Copyright* (2000) 48 Am.J.Comp.L. 383, 447 (2000)...........................................................64

    *Copyright Law and Practice (2004)*, 495-97 ..............................................64

    *Latman's The Copyright Law* 109 (6th ed. 1986) ..................................16, 54

    *Patry on Copyright* (2006), § 7:42 & n.5 ......................................60, 61, 64

Weinstein Korn & Miller, New York Civil Practice: CPLR, ¶ 5011.21 (2d ed. 2007 ......................................................38

EXHIBIT vii
295

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Time Warner Inc., Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics ("DC") (collectively "Defendants") submit this memorandum in opposition to Plaintiffs Motion for Partial Summary Judgment in Case No. CV 04-8400 SGL (the "Superman Action").[1]

## PRELIMINARY STATEMENT

As the Court is aware, this action and the companion Superboy Action involve the comic book character "Superman," who first made his public appearance almost 70 years ago.  Plaintiffs are the widow and daughter of Jerome Siegel ("Siegel"), one of the two original creators of Superman.  By virtue of these actions, Plaintiffs seek to recapture, pursuant to Section 304(c) of the 1976 Copyright Act, certain copyright interests that Siegel originally conveyed to DC and its predecessors as early as 1938.

Plaintiffs have now moved for partial summary judgment in both actions, seeking to establish some of their claims and to eliminate some of Defendants' defenses.  In this Superman Action, Plaintiffs ask the Court to summarily decide (1) that their seven separate notices of termination with respect to Superman (the "Superman Notices") are valid and effective, and served to restore to Plaintiffs as of April 16, 1999 any copyright interests previously granted by Siegel to DC and its predecessors, not withstanding Defendants' various asserted challenges to the Notices; (2) that Plaintiffs are entitled to share in all post-termination revenues from the exploitation of the recaptured Superman copyrights, even those revenues generated from exploitation outside of the United States;[2] and (3) that the

---

[1] Because Plaintiffs have made two submissions of their summary judgment motions, one series of motions in this Superman Action, Case No. CV 04-8400 SGL (RZx) and the other in Case No. CV 04-8776 SGL (RZx) (the "Superboy Action"), Defendants have similarly served and filed two sets of opposition papers, one in connection with each motion.

[2] Indeed, although not the specific subject of this motion, Plaintiffs even more broadly seek to share in the revenues from the exploitation of the pre-termination Superman

1   settlement agreement Plaintiffs entered into with Defendants in October, 2001,

2   resolving all of the claims they are now prosecuting, is not binding and enforceable

3   on them.

4       But Plaintiffs' motions are not well taken; rather, they are founded upon a

5   grab bag of arguments that invoke cherry-picked language taken out of context,

6   and disregard obvious fact issues, established law and common sense.

7   Accordingly, the issues presented by Plaintiffs in this motion are simply not

8   subject to determination in their favor *as a matter of law*.

9       First, as demonstrated below, the validity and effectiveness of Plaintiffs'

10  Superman Notices cannot be established until certain factual issues which underlie

11  Defendants' challenges are litigated and determined at trial; namely (i) whether

12  portions of the Superman strip in *Action Comics No. 1* – the entirety of which

13  Plaintiffs claim to have recaptured – were actually "works for hire" not subject to

14  termination under the Copyright Act; (ii) whether Plaintiffs' failure to terminate

15  the final judgment on consent in the 1948 state court action between the parties

16  leaves in place an operative grant of rights in Superman; (iii) whether Plaintiffs'

17  continuing acceptance of benefits under a 1975 agreement between the parties

18  leaves intact the operative Superman grant under that agreement; and (iv) whether

19  Plaintiffs are barred by the statute of limitations from pursuing their declaratory

20  relief claims on the termination claims.  (*See* Section I.A-D, *infra*).

21      Second, Plaintiffs' requested ruling that they are entitled, under state law

22  principles, to an accounting for a co-owner's 50 percent share of "all profits earned

23  from Plaintiffs' recaptured 'Superman' copyrights both in the United States and

24  foreign territories," contradicts the long-established rule against the extraterritorial

25  application of U.S. law and the express terms of the statute that provides for

26  copyright recapture.  17 U.S.C. § 304 (c)(6)(E).  Even if there were a state law

27

28  works; the exploitation of portions of the Superman mythology and characters owned
    exclusively by DC and not subject to termination; and from the exploitation of the
    Superman family of trademarks – *none* of which is permissible under the termination
    provisions of the Copyright Act and established precedent,

EXHIBIT 2

297

1    principle entitling one who is not an owner of a foreign copyright to share in the

2    profits from exploitation of a jointly owned work outside of the U.S. (which there

3    is not), it would be pre empted and foreclosed by Congress' clear and

4    unambiguous expression to the contrary with respect any recapture of copyright

5    under section 304(c). In addition, the Supreme Court has consistently held that

6    whether a federal statute can reach foreign conduct in the way Plaintiffs request is

7    a question of statutory interpretation, and that unless a statute "clearly" manifests

8    Congress' intent to have legislation apply extraterritorially, it cannot be judicially

9    interpreted to do so. The Supreme Court has characterized this rule as "a cannon

10   of construction" creating a presumption against the foreign application Plaintiffs

11   seek for the Copyright Act. As such, the Copyright Act's termination provisions

12   limit the effect of any recapture to U.S. Copyright rights only, and Plaintiffs are not

13   entitled to share in any revenues generated from the foreign exploitation of

14   Superman. (*See* Section II.A-D, *infra.*)

15        Finally, Plaintiffs cannot circumvent their settlement agreement and dispose

16   of DC's Counterclaims on that contract as a matter of law. There are significant

17   and fundamental questions of fact as to whether the parties entered into a binding

18   agreement on October 19, 2001, resolving all of the claims which Plaintiffs are

19   asserting here, when Plaintiffs' attorney and authorized representative sent a letter

20   to DC's counsel expressly stating that "*The Siegel Family . . . has accepted D.C.*

21   *Comics offer of October 16, 2001 in respect of the 'Superman' . . . properties*" and

22   proceeded to set out in detail each of the material terms of that agreement. That is,

23   DC's Counterclaims simply are not amenable to summary adjudication: The

24   question of whether the agreement reached by the parties on October 19, 2001, and

25   memorialized by Plaintiffs' counsel in an executed writing on the same date, is

26   binding turns on questions of fact which are within the ultimate province of the

27   jury, and are not appropriate for resolution by the Court at this juncture. (*See*

28   Section III.A-D, *infra.*)

1  Plaintiffs' motion for summary judgment is part and parcel of their

2  misguided effort to recover more than they ever would be entitled to even if they

3  succeed on the merits. Defendants' opposition, along with Defendants' own

4  Motion for Partial Summary Judgment, are designed to expose the absence of legal

5  basis for this endeavor and to cut both actions down to their proper size.

6  ## SUMMARY JUDGMENT STANDARD

7  Under Rule 56, a party seeking summary judgment bears the initial burden

8  of informing the court of the basis of its motion and of identifying those portions of

9  the pleadings and discovery responses that demonstrate the absence of a genuine

10  issue of material fact. *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F.

11  Supp. 2d 1060, 1065 (C.D. Cal. 2002). The Court construes all evidence and

12  reasonable inferences drawn therefrom in favor of the non-moving party. *Craft v.*

13  *County of San Bernardino*, 468 F. Supp. 2d 1172, 1175 (C.D. Cal. 2006). To the

14  extent Plaintiffs' motions raise issues of law as to the validity and effect of the

15  Superman Notices, Defendants submit these must be decided in Defendants' favor.

16  With respect to facts bearing on Plaintiffs' attempt to prevent a trial on the parties'

17  settlement, Plaintiffs cannot carry their burden of establishing as a matter of law

18  that the parties did not agree to be bound by the comprehensive letter of Plaintiffs'

19  counsel who expressly and with full authority confirmed all of the material terms

20  of such an agreement. Defendants' showing on this point more than satisfies its

21  obligation to demonstrate, by admissible evidence, the specific facts showing that

22  there is a genuine issue for trial. *Id. See also* Fed. R. Civ. P.56(e).

23

24

25

26

27

28

# DEFENDANTS' STATEMENT OF FACTS, INCLUDING
## RELEVANT DISPUTED MATERIAL FACTS[3]

### A.    The Origins of Superman

#### 1.    *Action Comics No. 1 and the March 1, 1938 Assignment*

In the 1930s, Plaintiffs' predecessor, Siegel, along with his creative partner, artist Joseph Shuster ("Shuster"), jointly conceived of and created a cartoon strip that ultimately became the first Superman story.  (*See* Declaration of Paul Levitz ("Levitz Decl."), ¶ 4.)  Their proposed syndicated strip of Superman was rejected numerous times over several years by a number of different publishers.

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics, Inc. ("Detective") (DC's predecessor) under which they provided artwork and continuity (*i.e.*, new stories) relating to a number of pre-existing characters other than Superman.  (Exhibit A to the Declaration of Michael Bergman ("Bergman Decl."), submitted herewith.)  That agreement provided, *inter alia*, that "any new and additional features which [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to [Detective]."  (*Id.* Exh. A.)  Accordingly, Siegel and Shuster's submission of the Superman materials they had theretofore created was pursuant to the terms of that agreement.

Detective decided that it would exercise its option under the December 4, 1937 agreement and publish Superman, and by letter dated February 1, 1938, Detective editor Vin Sullivan returned the materials submitted by Siegel and Shuster and instructed them to "[s]tart in immediately on the thirteen (13) page feature of SUPERMAN for the new Action Comics Magazine."  (Bergman Decl. Exh. B.)  Siegel and Shuster were instructed to revise and expand such materials into a "full-length production suitable for magazine publication . . . ."  (*Siegel v.*

---

[3] The uncontroverted facts summarized in this section are relevant as background as to each of the grounds for denying Plaintiffs' motion for partial summary judgment.  All of these uncontroverted facts, disputed facts and relevant evidence are submitted herewith in Defendants' Response to Plaintiffs' Local Civil Rule 56.1 Statement of Uncontroverted Facts and Conclusions of Law.

1    *National Periodical Publications, Inc.*, 508 F.2d 909. 911 (2d Cir. 1974); Bergman

2    Decl. Exh. C.)  Siegel and Shuster's editor further instructed them that the work

3    should be "the very best" and "without imperfections." (Bergman Decl. Exh. C.)

4            Subsequently, on March 1, 1938, Siegel and Shuster executed an assignment

5    to Detective of all of their rights in Superman and in any previously created work

6    employing that character (the "1938 Assignment") (Levitz Decl. ¶ 5; Declaration of

7    Marc Toberoff in Support of Plaintiffs' Motion for Partial Summary Judgment

8    ("Toberoff Decl.") Exh. E.)[4]  The 1938 Assignment represented Detective's

9    exercise of the option granted to it by Plaintiffs under the December 4, 1937

10   Agreement.  (Bergman Decl. Exh. B.)[5]  In a contemporaneous letter of March 1,

11   1938 to Siegel, Detective executive Jack Liebowitz reiterated the need to provide

12   eight panels per page and chastised Siegel for failing to do so in connection with

13   *Action Comics No. 1*, and stating that, were Detective not so pressed for time that

14   he "would have rejected them." (Bergman Decl. Exh. F.)

15           Thus, at Detective's instruction, Siegel and Shuster expanded and adapted

16   their existing Superman strips into a format suitable for a comic book.  In a sworn

17   affidavit dated March 7, 1973, submitted in connection with a lawsuit brought by

18   Siegel and Shuster against DC's predecessor National Periodical Publications

19   (discussed below), Shuster testified that he "drew *several additional pictures* to

20   illustrate the story continuity and these appear on page 1 of the first Superman

---

21   [4] Detective then announced the debut of its *Action Comics* series, and Superman, in

22   full page announcements in its May, 1938 issues of some of its existing publications,
     including *More Fun Comics No. 31*, published on April 5, 1938 (Bergman Decl. Exh. D),

23   and *Detective Comics No. 15*, published on April 8, 1938 (*id.* Exh. E).  Both magazines
     contained full-page ads which reproduced the cover of the soon to be published first issue

24   of *Action Comics*.  Defendants have moved for summary judgment that Plaintiffs' failure
     to terminate these announcements excludes them from the scope of the Superman

25   Notices.

26   [5] Although Plaintiffs claim that the December 4, 1937 Agreement did not "pertain to
     Superman" (Plaintiffs' Memorandum of Points and Authorities in Support of Motion for

27   Partial Summary Judgment ("Pl. Mem.") at 5), the findings of fact in the Westchester
     Action, on which Plaintiffs otherwise so heavily rely, state precisely the opposite:  "The
     instrument of March 1, 1938 [the 1938 Assignment] . . . represented the exercise by

28   Detective Comics, Inc. of the option granted to it by the said agreement of December 4,
     1937." (Toberoff Decl. Exh. B, Finding of Fact No. 29.)

**EXHIBIT Y**
**301**
6

1   release. This was done so that we would be certain of having a sufficient number

2   of panels to make a thirteen page release." (Bergman Decl. Exh. G. at 2.)   Shuster

3   further testified that at this time he also drew the last panel in *Action Comics No. 1*.

4   (*Id.* at 2.) Siegel confirms this in his own affidavit dated March 1, 1973, testifying,

5   in part, that "[u]pon receiving word from Detective that we could proceed, Joe

6   Shuster, under my supervision . . . added several pictures to illustrate the story

7   continuity." (*Id.* Exh. H at 5.) Siegel further testified that "the scientific

8   explanation on page 1 of the release and the last panel at the foot of page 13" were

9   added. (*Id.* at 5.) In addition, the cover to *Action Comics No. 1*, which was based

10  on a panel in the story, was also prepared by Detective. On February 22, 1938,

11  Detective sent Siegel a "silverprint" it had prepared of the cover. (Bergman Decl.

12  Exh. I.)

13       In addition to these "several" additional pictures, cover and new text added

14  after Detective said Siegel and Shuster "could proceed," more subject matter was

15  added to *Action Comics No. 1*. As was the custom in the industry in 1938, Siegel

16  and Shuster provided their materials in black and white. (Declaration of Jack

17  Adler ("Adler Decl."), ¶¶ 3-4.) Color was then added at the printing step, with

18  colors often decided upon by the publisher. (*Id.*) Specifically, employees on staff

19  at Detective were provided with Siegel and Shuster's black and white work and

20  decided upon the colors to be added, including but not limited to, the colors of

21  Superman's now iconic costume. (*Id.* ¶ 4.) (The new drawings and text added to

22  *Action Comics No. 1* by Siegel and Shuster after they were told they "could

23  proceed" and the addition of color by Detective employees are collectively referred

24  to as the "Additional *Action Comics No. 1* Materials.")

25       The first Superman story was published by Detective on April 18, 1938 in

26  *Action Comics No. 1*, which had a cover date of June 1938. (Levitz Decl. ¶ 5;

27  Bergman Decl. Exh. J.) Since *Action Comics No. 1* contained more than one

28  feature, it was a collective work and was considered a periodical magazine under

1   the 1909 Copyright Act ("1909 Act"), 17 U.S.C. § 24 (repealed).  In describing the

2   Copyright renewal certificates for *Action Comics No. 1* and the Superman story

3   contained therein, Plaintiffs have repeatedly asserted that the renewal claims were

4   made simply by Detective's successor "as proprietor of copyright."  (Pl. Mem. at 6

5   n. 2, 21).  What the renewal certificates actually state, however, is that Detective's

6   successor, National Periodical Publications, made its renewal claims "as proprietor

7   of a work made for hire."  (Toberoff Decl. Exh. F at DCC 00045628.)

8               **2.      Siegel and Shuster's Further Grants to DC**

9         Following publication of *Action Comics No. 1*, Detective decided to engage

10  Siegel and Shuster to provide additional Superman stories and artwork for

11  subsequent comic book issues, including *Action Comics*.  To this end, Detective

12  drew up and initiated two further agreements that Siegel and Shuster entered into

13  with Detective on September 22, 1938 (collectively the "September 1938

14  Agreements"), which specifically related to Superman and other named characters.

15  (Bergman Decl. Exhs. K, L.)

16        The first of the September 1938 Agreements includes the standard

17  ingredients of a work for hire relationship under the 1909 Act's "instance and

18  expense" test applicable to independent contractors engaged to furnish creative

19  material to a hiring party.  As the copyright owner of certain comic books and

20  strips, including "Superman," Detective expressly "employ[ed] and retain[ed]"

21  Siegel and Shuster to continue to furnish for the duration of the agreement three

22  separate categories of further material for use in future issues, and provided the

23  payments they would receive.  (*Id.* Exh. K.)  The first category covered continuing

24  material for already existing monthly comic books and strips featuring five named

25  characters, including "Superman."  The second category covered material that

26  could be used in "any strip or comic or newspaper or magazine" including such

27  five named "titles or the characters or continuity thereof or in any wise similar

28  thereto."  Siegel and Shuster agreed not to furnish the material in such first two

categories to any other person or entity "in the United States or in any foreign
country" for the duration of the agreement.  For the third category, "any *other*
artwork or continuity suitable for use as comics or comic strips" (emphasis added),
Siegel and Shuster gave Detective "the right of first refusal thereof . . . at a price no
greater than that offered to you by any other party."  The key distinction between
the first two categories on one hand, and the third, on the other, was between
material relating to any of the five named characters featured in already existing
comic books or any titles or characters "in any wise similar thereto" and all "other"
material not related to these characters.  (*Id*. Exh. K.)  This agreement further
provided that with respect to Siegel's and Shuster's submissions "[a]ll material, art
and copy shall be owned by us [Detective] and at our option, copyrighted or
registered in our name or in the names of the parties designated by us."  It also
provided Detective with the right to terminate the agreement and substitute other
artists if their submissions were not "up to the standard" required for its magazines.
(*Id*. Exh. K.)

The second of the September 1938 Agreements included the McClure
Newspaper Syndicate as an additional party and added the terms under which
Siegel and Shuster would prepare Superman newspaper comic strips, as well as a
provision in which they acknowledged Detective's right to sell such strips to
foreign newspapers.  (*Id*. Exh. L).  Both Agreements make clear that Siegel and
Shuster were to furnish Superman comics *only* to Detective.  (*Id*. Exhs. K, L.)

### 3.   The Development of Superman by DC in Derivative Works

The initial graphic representations of the Superman character in 1938, in a
simple cartoon style, presented his adventures with a limited number of characters
in settings that had the look and feel of that particular period.  (Bergman Decl.
Exh. J; Levitz Decl. ¶ 6.)  From *Action Comics No. 1* we know only that Superman
is a "champion of the oppressed" who was sent as an infant to Earth aboard a space
ship from an unnamed distant planet destroyed by old age.  (Bergman Decl. Exh.

**EXHIBIT Y**
**304**

1  J).  Superman is depicted as possessed of extraordinary physical abilities, including

2  superhuman strength and the ability to leap 1/8th of a mile, hurdle a twenty-story

3  building and run faster than an express train.  (*Id.*)  In his ordinary life, the

4  character is depicted as a cowardly newspaper reporter known as Clark Kent, and

5  in his alter ego, Superman is a costumed heroic figure using his extraordinary

6  physical abilities to fight against crime.  (*Id.*)

7        In the almost 70 years since the publication of *Action Comics No. 1*, DC has

8  authored or supervised the creation of, and has published and distributed,

9  thousands of other comic books and syndicated newspaper comic strips containing

10  additional adventures of Superman throughout the United States and abroad in

11  many millions of copies.  (Levitz Decl. ¶ 6.)  These derivative works have changed

12  his appearance and added decades of new material to further define, update and

13  develop the character in an ongoing flow of new exploits and supporting characters

14  resulting in the creation of an entire fictional Superman "universe."  (*Id.* ¶ 6.)  In

15  the years following the publication of *Action Comics No. 1*, Detective and its

16  successors consistently secured, exclusively in their own names, the original and

17  renewal term copyright registrations for all comic books in which Superman

18  appeared.  At all times the renewal certificates stated in each case that the renewals

19  were made as "proprietor of a work for hire."  (*See, e.g.*, Toberoff Decl. Exh. F.)

20  In this time frame, DC has also overseen the creation, development and licensing

21  of the character in a variety of media, including but not limited to radio, novels,

22  live action and animated motion pictures, television, live theatrical productions,

23  merchandise and theme park exploitations.  (Levitz Decl. ¶ 6.)

24        As judicially recognized, *see Warner Bros. v. American Broadcasting*

25  *Companies*, 654 F.2d 205-06 (2d Cir. 1981), the presentations of Superman since

26  1938, provided first by Detective and then DC, were not a static depiction but an

27  ever-evolving portrayal, featuring new super powers, new villains and new

28  components to the Superman universe and backstory.  (Levitz Decl. ¶ 7.)  Indeed,

the Superman story and characters evolved on an episode-by-episode basis as directed by the editors of DC for decades. (*Id.* ¶ 7.) Significantly, many of Superman's powers that are among his most famous today did *not* appear in *Action Comics No. 1* but only appeared in later publications. (*Id.* ¶ 7.) These include his ability to fly; his super-vision which enables him to see through walls ("x-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his ability to survive in space without atmospheric protection; and his "heat vision," the ability to aim rays of extreme heat with his eyes. (*Id.* ¶ 7.) Also absent from *Action Comics No. 1* was any reference to some of the more famous story elements now associated with Superman but at the time not yet created, such as "Kryptonite" or the name of Superman's home planet "Krypton," the "Fortress of Solitude," and the "Daily Planet." (*Id.* ¶ 7.) In addition, some of the most recognizable supporting characters associated with Superman do not appear in *Action Comics No. 1*, including Jimmy Olsen and villains Lex Luthor and Brainiac. (*Id.* ¶ 7.)[6]

**B.** **The Prior Litigation Between the Parties' Predecessors**

**1.** **The Westchester Action**

In 1947, Siegel and Shuster commenced an action in the Supreme Court of the State of New York (the "Westchester Action") against, *inter alia,* DC's predecessor National Comics Publications, Inc. ("National"), Detective's parent company. (Bergman Decl. Exh. M.) The Westchester Action did not involve federal copyright doctrines; instead, Siegel and Shuster sought to annul and rescind their prior agreements with Detective in an effort to reclaim rights in Superman, and also sued for National's alleged improper use of the "entire plan" and "conception" of the "Superboy" character, a juvenile version of Superman. (*Id.*)

---

[6] Unlike many creative properties developed for media in later decades, in its early days there was no Superman "bible" which explored aspects of the property not yet presented in the comics. (*Id.* ¶ 7.)

On November 21, 1947, the referee to whom the case was referred issued a report making "interlocutory findings" substantially rejecting Siegel and Shuster's claims regarding Superman. (*Id*. Exh. N, ¶¶ 10-11.) Based on his interlocutory rulings, the referee subsequently entered an "Interlocutory Judgment" which, *inter alia*, declared National to possess the sole and exclusive right to exploit Superman and other Superman characters. (Toberoff Decl. Exh. A at 3.)

The parties both appealed from the referee's decision. However, while the appeals were pending, they settled their dispute, and on or about May 19, 1948, entered into a stipulation (the "Stipulation") under which the Interlocutory Judgment was to be "in all respects vacated" and the action dismissed in its entirety. (*Id*. Exh. C.) Pursuant to the Stipulation, the court entered a "Final Judgment" which provided that the Interlocutory Judgment "be and the same hereby is in all respects vacated," declaring and adjudging that National "is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERMAN . . . and to create, publish, sell, and distribute . . . cartoon or other comic strip material containing the characters SUPERMAN . . . and all other characters which have heretofore appeared in said cartoon or other comic strip material . . . ." (*Id*. Exh. D.) The Final Judgment also permanently enjoined Siegel and Shuster from exploiting and using the title SUPERMAN and any Superman material. (*Id*. Exh. D). Relying on the Final Judgment, National – and then DC – has continued to publish comics, conduct merchandising and license television programs under the name "Superman" in the almost 60 years since. (Levitz Decl. ¶ 9.)

### 2.   Corrections of Plaintiff's Statement of Facts With Respect to Westchester Action

Plaintiffs' statement of undisputed facts concerning the Westchester Action requires certain corrections. First, as the Court is aware, it is Defendants' position that the vacated interlocutory findings in that action can have no preclusive effect

1   here, and Defendants' Motion for Reconsideration on that issue is currently under

2   submission with the Court.  Nevertheless, with respect to Detective's ownership

3   rights regarding the first published appearance of Superman in *Action Comics No.*

4   *1* pursuant to the 1938 Assignment (Toberoff Decl. Exh. <u>E</u>),[7] it must be noted that

5   unlike the referee's interlocutory findings and conclusions concerning Superboy,

6   the Superman findings were not changed by either the Stipulation (Toberoff Decl.

7   Exh. <u>C</u>) or the Final Judgment (*id*. Exh. <u>D</u>) entered on in that action.[8]

8                    **3.    The Prior Federal Action**

9        In 1969, Siegel and Shuster again sued DC's predecessors, this time

10  claiming to own the renewal copyrights in Superman (the "Federal Action").

11  Summary judgment was granted against Siegel and Shuster by the United States

12  District Court for the Southern District of New York in a published opinion, *Siegel*

13  *v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973)

14  ("*National I*") (Toberoff Decl. Exh. <u>S</u>), and was affirmed by the Second Circuit

15  Court of Appeals in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909

16  (2d Cir. 1974) ("*National II*") (Toberoff Decl. Exh. <u>T</u>), with the Second Circuit

17  holding that *all* of Siegel's and Shuster's copyright interests in Superman,

18

19      [7] Plaintiffs' reference to Jerome Siegel as having conceived of the original idea for a
        Superman comic strip and to the character as "unique" because of his superpowers and
20      performance of good acts for the public, Pl. Mem. at 4, incorrectly suggests that no
        similar hero had ever existed before and that uniqueness is a criterion for
21      copyrightability.  However, as explained by Defendants' expert Rovin, there were similar
        heroes before, and originality in the sense that the particular strips, including their
22      dialogue, storyline and images, had their origin with Siegel and Shuster, not uniqueness
        or novelty, is all that was required for copyright protection. *Feist Publs., Inc. v. Rural*
23      *Telephone Serv.*, 499 U.S. 340 (1991).

24      [8] Plaintiffs' assertion that "no appeal was perfected," citing to the Referee's opinion
        dated November 21, 1947, is designed to mislead: as noted in the Final Judgment
25      (Toberoff Decl. Exh. <u>D</u> at 2), both sides filed notices of appeal from the Interlocutory
        Judgment, following which the parties settled upon the terms and conditions contained in
26      the Final Judgment.  To "perfect" an appeal in New York means only that the appeal
        briefs and record on appeal have been filed in the appellate court.  "Perfecting an appeal"
27      in New York means that an appellant has taken all steps necessary to place the appeal on
        the court's calendar for argument (*i.e.*, by filing a brief and the record) (*see* 22 N.Y.
28      Comp. Codes R. & Regs. Tit. 22 § 670.2[a][4] (2005); N.Y. Civ. Prac. Act §§ 557-74
        (1924) (repealed) (steps required to perfect of appeal)), a stage of the case having no
        relevance here or to Defendants' *sub judice* Motion for Reconsideration.

including all renewal rights, had previously been conveyed to DC's predecessors in the 1938 Assignment. *Id.* at 912-13. The Court reached this conclusion on the basis of the *res judicata* effect of the Final Judgment entered in the Westchester Action. *Id.* at 912-13. Superboy was not at issue in the Federal Action. *National I*, 364 F. Supp. at 1035.

   After the conclusion of the Federal Action, the parties entered into a further agreement, dated December 23, 1975 (the "1975 Agreement"), in which Siegel and Shuster confirmed, "immediately after the signing of this agreement," that all right, title and interest in Superman resided in National and its parent and affiliated corporations, effectively re-granting whatever rights they had in Superman under copyright. (Bergman Decl. Exh. MM, at 1-2.) In return, Siegel and Shuster received the following consideration:  (a) $20,000 each per year; (b) if Siegel died before Dec. 31, 1985, Joanne Siegel would receive $20,000 per year until December 31, 1985 and then $10,000 per year for the rest of her life; (c) Shuster's brother Frank would receive $10,000 per year upon Shuster's death until December 31, 1985 and $5,000 per year for the rest of his life; (d) Siegel and Shuster would be included on the company medical plan; and (e) they would receive a credit line on some Superman publications while Siegel and/or Shuster remained alive. (*Id.* at 2-4.)

   Over the years the 1975 Agreement was modified and the payment amounts increased. In 1982, the agreement was amended at Joanne Siegel's request to extend her "widow's benefit" by maintaining it at the same level irrespective of the date of Siegel's death. (Bergman Decl. Exhs. NN, OO.) Indeed, since Siegel's death in 1996, Joanne Siegel has remained on Warner Bros.' medical insurance and has continued to accept and receive annual payments, most recently in excess of $100,000 annually, despite the fact that the initial agreement only provided for payments to Joanne Siegel if Siegel died before December 31, 1985. (Leviz Decl., ¶ 9.) Currently, and since the outset of this action in 2004, Mrs. Siegel receives

1  annual payments of $135,000, totaling over $1,000,000 since the purported

2  effective date of the Superman Notices.  (*Id.*)

3       **C.**   **Termination Rights Under § 304(c) of the 1976 Act**

4      In 1976, Congress enacted a comprehensive new copyright statute (the

5  "1976 Act"), which resulted from an extraordinary 20 year legislative effort.  *Sony*

6  *Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 462 n.9 (1984).  Under the

7  prior 1909 Act, copyright protection was available for an original 28-year term that

8  could be renewed for another 28 years.  The 1976 Act extended the renewal term

9  for copyrights subsisting on January 1, 1978 by 19 years, thereby increasing the

10  combined term of available protection from 56 to 75 years.  *See* Pub. L. No. 94-

11  553, 90 Stat. 2541, § 304(a) (1976).

12      To give "the author or the dependents of the author . . . a chance to benefit

13  from the extended [renewal] term," the 1976 Act included a new "termination"

14  option.  H. R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976) ("H. Rep.") at 140; S.

15  Rep. No. 94-473, 94th Cong. 1st Sess. (1975) ("S. Rep.") at 123; *see* 17 U.S.C. §

16  304(c).  This option enabled the author and the author's heirs to terminate certain

17  subsisting grants of rights under copyright that had been made by the author or his

18  heirs before January 1, 1978.  It did not apply to "a work made for hire."  *Id*.  The

19  goal was to give authors and their descendants "the right to renegotiate" their prior

20  transfers originally made when the true value of the copyrighted works was

21  unknown.  Supplementary Register's Report on the General Revision of U.S.

22  Copyright Law at 72 (1965) (hereafter "Supp. Reg. Rep."); H. Rep. at 124; S. Rep.

23  at 108; *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d. 1036, 1046 (9th Cir.

24  2005).

25      However, the new termination provision was not meant to be one-sided;

26  rather, it reflected "a practical compromise that would further the objectives of the

27  copyright law while recognizing the problems and legitimate needs of all interests

28  involved," H. Rep. at 124; S. Rep. at 108, and created "a practical benefit for

authors and their families without being unfair to publishers, film producers and other users." Supp. Reg. Rep. at 72; *Milne*, 430 F.3d at 1046. Thus, in crafting the copyright termination right, Congress intended to protect the rights of authors and their families as well as those of publishers and others to whom they had granted rights. To achieve this goal, Congress in both of the new statute's termination provisions, sections 304(c) and 203, drew a line providing that the new reversion of rights is subject to specified "limitations" on the "effect of termination," 17 U.S.C. § 304(c)(6). *See, e.g.*, 17 U.S.C. §§ 203 (b)(1) & (5) and 304 (c)(6)(A) & (E).

Accordingly, the statute makes very clear that termination under section 304(c) is not "automatic," H. Rep. at 124; *accord* Pl. Mem. at 15, but merely an "option" available under specified circumstances and only where certain notice and timing requirements are met, William F. Patry, *Latman's The Copyright Law* 109 (6th ed. 1986) ("*Patry's Latman*"),[9] *Milne* 340 F.3d at 1045, and also subject to discreet "limitations." 17 U.S.C. §§ 304(c)(6) and 203(b); *Fred Ahlert Music Corp. v. Warner Chappel Music*, 155 F.3d 17, 19 (2d Cir. 1998) ("an author's termination rights are not unlimited").

### D.   Plaintiffs' Superman Notices of Termination And Filing of These Actions

On April 3, 1997, Plaintiffs mailed the Superman Notices – seven separate notices of termination under section 304(c) of the 1976 Act, purporting to terminate Siegel's copyright grants to DC's predecessors in the Superman character and comic book stories dating back to 1938, and effective as of April 16, 1999. (Toberoff Decl. Exhs. G-M.) Among the copyright grants the Siegels purport to terminate in the Superman Notices is the 1975 Agreement. (Toberoff Decl. Exh. M.) Under that agreement, however, since Siegel's death, plaintiff Joanne Siegel has continued to accept monthly payments and receive health

---

[9] Relevant excerpts from *Patry's Latman* are attached at Bergman Decl. Exh. O.

insurance coverage. (Bergman Decl. Exhs. MM-OO.)  By letter dated December 18, 1997, Defendants placed Plaintiffs on notice that they considered the Superman Notices to be defective in several respects. (Bergman Decl. Exh. GG.)

By letter dated April 15, 1999, DC rejected the efficacy of the Superman Notices, including the Notice pertaining to the 1975 Agreement. (Toberoff Decl. Exh. Q.)  The same day, DC's president Paul Levitz wrote to Joanne Siegel stating, *inter alia*, that "DC will continue to provide the income and insurance benefits you [sic] that you have been receiving under the [December 23,] 1975 agreement, without prejudice to our rights under that agreement, as long as we all continue to pursue the goal of working together." (Bergman Decl. Exh. P.)  As promised, DC has continued to pay, and Joanne Siegel continued to accept the benefits of the 1975 Agreement after April 15, 1999 and to this day. (Levitz Decl. ¶¶ 8-10.)

Moreover, the Superman Notices purport to terminate Siegel's – but not Shuster's – participation in the copyright grants to Detective. (Toberoff Decl. Exhs. G-M, ¶ 2.)  Therefore, even if the Superman Notices are effective, DC remains (through Shuster's unterminated interests) a co-owner of the copyrights which are the subject of the Notices, and retains all the rights of a co-owner to exploit those copyrights without being subject to a claim for infringement. Accordingly, in the Superman Action, filed on October 8, 2004,[10] Plaintiffs essentially seek an accounting and a one-half share in the profits from the exploitation of Superman after the effective date of their Notices. (FASMC, ¶¶ 54(c), 57-59, 66-73, 105(d), 106, 108-110.)

Plaintiffs' operative complaint and their present motion cast a wide – and Defendants believe excessive – net with respect to the profits they seek to share: Thus, Plaintiffs allege that they are entitled not only to a share of the profits arising from the domestic exploitation of Superman copyrights, but also to a share of the

---

[10] Plaintiffs' First Amended Complaint in the Superman Action (Bergman Decl. Exh. Q) is hereinafter referenced as the "FASMC."

**EXHIBIT Y**

**312**

17

profits arising from any foreign exploitation of the character.  (FASMC, ¶ 58(a);

Pl. Mem. at 25-28.)  Plaintiffs further allege that they are entitled to a share of the

profits arising from the exploitation the Superman trademarks, including the

related characters and symbols associated with the character.  (FASMC, ¶¶ 61-63,

107.)  Finally, Plaintiffs allege that they are entitled to share in the profits of

Defendants from the post-termination exploitation of derivative works that had

been prepared by Defendants before the effective date of the termination.

(FASMC, ¶¶ 58(c), 66-73.)[11]

### E.    The Parties' 2001 Settlement

Shortly after receiving the Superman Notices in April, 1997, DC Comics

initiated discussions with Plaintiffs' representative (then Arthur Levine, a

prominent copyright attorney with the Washington, D.C. firm of Finnegan,

Henderson, Farabow, Garret & Dunner) in an attempt to determine if the parties

could come to an acceptable resolution of their respective claims concerning the

Superman property.  (Bergman Decl. Exh. R (transcript of Paul Levitz deposition

("Levitz Tr.")) at 175:5-175:15; *id.* Exh. S ("Marks Tr.") at 27:19- 28:6.)  When

sporadic discussions over the following months yielded no results, on April 15,

1999 – the day before the purported effective date of the Superman Notices – DC

set forth in a comprehensive writing its formal rejection of the Notices,[12]

contesting both their validity and their scope, and asserting that DC remained the

sole copyright owner of all aspects of the Superman property, with full right to

exploit that property as it chose, without the need to account to or share with

Plaintiffs any of the proceeds of that exploitation.  (Toberoff Decl. Exh. Q.)

---

[11] Plaintiffs' claims that they are entitled to profits arising from exploitation of
Superman trademarks and post-termination exploitation of derivative works prepared
prior to the effective date of termination are not the subject of this motion.  Defendants,
have, however, moved for summary judgment on these claims, which motion is currently
pending before the Court.

[12] DC had previously notified Plaintiffs of certain deficiencies in the Notices in letters
set to Plaintiffs' counsel on November 5, 1997 (Bergman Decl. Exh. T) and December
18, 1997 (*id.* Exh. U).

1    Two weeks later, on April 30, 1999, DC was contacted by Bruce Ramer, an

2    attorney with the Beverly Hills law firm of Gang, Tyre, Ramer & Brown, Inc.

3    ("Gang Tyre"), and was advised that Gang Tyre had been retained to represent

4    Plaintiffs' interests in connection with the Superman Notices. (Bergman Decl.

5    Exh. V.) The parties then began negotiations in earnest, with Kevin Marks of

6    Gang Tyre ultimately becoming the lead negotiator for Plaintiffs, and John

7    Schulman, General Counsel and Executive Vice President of Warner Bros.

8    Entertainment Inc. ("Warner Bros."), the lead negotiator for DC. (Declaration of

9    John Schulman ("Schulman Decl."), ¶ 4; Bergman Decl. Exh. S (Marks Tr.) at

10   24:15-25:10.)[13]

11   The discussions between Mr. Marks and Mr. Schulman were extensive and

12   far-reaching, spanning some two and a half years, and consisting of several face to

13   face meetings as well as numerous communications both written and oral, with the

14   parties addressing and resolving certain key issues before moving on to other

15   issues. (Schulman Decl. ¶ 5.)[14] These negotiations culminated on October 16,

16   2001, when Mr. Marks and Mr. Schulman reached agreement on what they both

17   understood to be the final outstanding deal point in a global resolution designed to

18   settle all of Plaintiffs' claims and potential claims related to the Superman Notices.

19   (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11; Schulman Decl. ¶¶ 6-7.)[15]

20   Accordingly, on October 19, 2001, apparently after obtaining his clients' approval

21   (Bergman Decl. Exh. S (Marks Tr.) at 145:16-146:4), Mr. Marks called Mr.

22

23   [13] Although Mr. Schulman remained exclusively employed by Warner Bros., his services were provided to DC for this purpose.   (Bergman Decl. Exh. W (Schulman Tr.) at 95:14-96:16; Schulman Decl. ¶ 4.)

24

25   [14] On April 6, 2000, Plaintiffs and Defendant DC Comics entered into a tolling agreement to encourage continued negotiations (the "Tolling Agreement"). (Schulman Decl.¶ 5; Toberoff Decl. Exh. Z.)

26   [15] Contrary to Plaintiffs' unsupported assertion in their moving papers (*see* Pl. Mem.

27   at 46 lines 13-16), Mr. Marks and Mr. Schulman did not discuss "many different terms, including contingent compensation formulas" in that conversation.  Instead, the

28   conversation was limited to one item, agreement on which "closed the deal," because the parties had already previously come to an understanding on all of the other components of the agreement. (Bergman Decl. Exh. S (Marks Tr.) at 132:11-134:11.)

1   Schulman to tell him that "we are closed" (*id*. at 134:19-135:5); he then sent Mr.

2   Schulman a letter confirming their earlier telephone conversation and expressly

3   stating that "the Siegel Family (through Joanne Siegel and Laura Siegel Larson the

4   majority owners of the terminated copyright interests) has accepted D.C. Comics

5   offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties."

6   (Toberoff Decl. Exh. <u>BB</u>, hereinafter the "Marks Letter".)[16]  The Marks Letter

7   went on to set forth, in six single-spaced pages, the terms of the parties' deal,

8   concluding with a thanks to Mr. Schulman for his "help and patience in reaching

9   this monumental accord."  (*Id*.)  As Mr. Marks testified to at deposition, as of

10  October 19, 2001, he "believed that an accord had been reached on the terms

11  exactly set forth in this letter." (Bergman Decl. Exh. <u>S</u> (Marks Tr.) at 148:3-

12  148:14.)

13      The deal reached by the parties contemplated, among other things, that upon

14  transfer to DC of all of Plaintiffs' Superman interests, DC would provide Plaintiffs

15  with up-front payments in the amount of $3 million, as well as a substantial

16  guaranteed advance against certain royalties based on DC's on-going exploitation

17  of the Superman properties.  (Toberoff Decl. Exh. <u>BB</u> (Marks Letter) at ¶ B;

18  Schulman Decl. ¶ 6.)  Although the parties anticipated that a more formal

19  document would be drawn up, neither Mr. Marks nor Mr. Schulman – nor, indeed,

20  any other representatives of the parties – expressed in any way that the parties'

21  October 19 agreement was not complete or would not be binding unless and until

22  that more formal document was executed.  (Schulman Decl. ¶ 10.)

23      On October 26, 2001, Mr. Schulman started the process of the long-form

24  documentation, by sending Mr. Marks a letter enclosing "a more fulsome outline"

25  of the deal, and noting that they were working on a draft so that the transaction

26  could be "in document form" shortly.  (Schulman Decl. ¶ 8; Toberoff Decl. Exh.

27

28
    ---
    [16] "Spectre," another property authored by Jerry Siegel, was the subject of a separate
    termination notice served by Plaintiffs, and is not at issue in these actions.

**EXHIBIT Y**
**315**
20

CC (hereinafter the "Schulman Letter").)  The five-page outline reiterated the

material points in the Marks Letter, fleshing out some details on certain terms that

Mr. Marks had generally addressed, and, in at least one instance, including an

agreed-upon point that Mr. Marks appeared to have forgotten to include.  (*Id.*)

Mr. Marks reviewed the Schulman Letter some weeks later.  (Bergman Decl.

Exh. S (Marks Tr.) at 149:17-149:22.)  Although he testified at deposition that he

noted some differences between the Schulman Letter and his letter of October 19,

Mr. Marks acknowledged that he did not discuss it with or send it on to his clients

(*id.* at 203:10-14), and he *never* advised Mr. Schulman that his "more fulsome

outline" of the parties' deal materially changed, misstated, or otherwise did not in

fact accurately reflect their prior discussions and ultimate agreement.   (*Id.* at

150:24-151:3; Schulman Decl. ¶ 9.)  Instead, Mr. Marks expected to address the

differences he noted in the Schulman Letter in the context of finalizing the

documentation of the long-form contract.  (Bergman Decl. Exh. S (Marks Tr.) at

163:21-164:1.)

Thereafter, DC prepared a long form contract reflecting the material terms of

the agreement, and providing for the formal assignment of any copyright interests

Plaintiffs might have in the Superman property to DC.  (Schulman Decl. ¶ 9.)  DC

immediately acted on the agreement, by including in the license agreement it was

then finalizing with Warner Bros. for the next Superman motion picture a specific

contractual requirement that Warner Bros. accord two separate screen credits –

namely, "Superman created by Jerry Siegel and Joe Shuster" and "By Special

Arrangement with the Jerry Siegel Family" – which credits had been negotiated by

Plaintiffs and were required under the terms of the parties' October agreement.

(Schulman Decl. ¶ 10.)[17]  DC also set up a reserve account for the monies that

would be due to Plaintiffs under the financial terms of the agreement upon the

---

[17] That agreement was negotiated in the latter part of 2001, and was executed in the
Spring of 2002. (Schulman Decl. ¶ 10.)

1  formal transfer of their Superman interests to DC.  (Bergman Decl. Exh. R (Levitz

2  Tr.) at 289:9-290:1.)[18]

3       In or about late November, 2001, shortly after the parties reached their

4  accord – and completely unbeknownst to DC – Mr. Marks was contacted by

5  Plaintiffs' present counsel, Marc Toberoff, who was then acting as a principal for

6  an entity called "IP Worldwide, LLC" ("IPW") which was, according to Mr.

7  Toberoff, in the business of acquiring intellectual property rights.  (Bergman Decl.

8  Exh. S (Marks Tr.) at 151:4-152:19; id. Exh. X (Toberoff Tr.) at 87:5-87:10.)  Mr.

9  Toberoff also was a principal of Pacific Pictures Corporation ("PPC"), a motion

10  picture production company which had, just a few days earlier, entered into a joint

11  venture agreement with the heirs of Joe Shuster "for the purpose of retrieving,

12  enforcing and exploring" all of Shuster's "rights, claims, copyrights, property, title

13  and interests" in his "creations," particularly Superman.  (Bergman Decl. Exh.

14  Y.)[19]  Mr. Toberoff informed Mr. Marks that he was interested in acquiring the

15  Siegels' interest in the Superman property, but was advised by Mr. Marks that

16  Plaintiffs were already in the "documentation phase" with DC for those interests.

17  (Bergman Decl. Exh. S (Marks Tr.) at 152:3-153:22.)

18       On February 1, 2002, DC's attorneys forwarded to Mr. Marks a long-form

19  contract for his review.  (Schulman Decl. ¶ 9; Bergman Decl. Exh. S (Marks Tr.) at

20  177:18-177:21; Toberoff Decl. Exh. DD) (hereinafter the "February Draft".)  Mr.

21  Marks received and reviewed the February Draft (Bergman Decl. Exh. S (Marks

22  Tr.) at 182:1-182:2), and apparently sent it on to his clients.  Mr. Marks did not

23  inform Mr. Schulman, or DC's attorneys who had prepared the document, that the

24

25

26    [18] As of the latter part of 2006, that reserve account totaled approximately $20 million.  (Id. at 295:6-295:15.)

27    [19] The joint venture agreement provides for the venture to retain the services of Marc
28  Toberoff to render legal services in connection with all disputes concerning Shuster's
rights.  (Id. Exh. Y)  It also provides for the Shusters to share any proceeds "from the
enforcement, settlement or exploitation" of their rights 50/50 with PPC.  (Id.)

**EXHIBIT Y**

317  22

1   February Draft was contrary in any material respect to the deal that had been

2   agreed to by the parties in October. (Schulman Decl. ¶ 11.)

3           On May 9, 2002, more than three months after being sent the February

4   Draft, Joanne Siegel − without the participation or even the prior knowledge of Mr.

5   Marks (Bergman Decl. Exh. S (Marks Tr.) at 181:14-181:24) − sent a letter to

6   Richard Parsons, the Chief Executive Officer of Time Warner Inc. (then known as

7   AOL Time Warner Inc.), complaining that the proposed long-form contract was

8   "unconscionable." (Bergman Decl. Exh. Z.) Mrs. Siegel acknowledged that

9   Plaintiffs had "accepted John Schulman's last proposal six months ago" but stated

10   that the February Draft contained "demands which were not in the proposal we

11   accepted . . . ." (Id.)

12           On May 16, 2002, after receiving a copy of Mrs. Siegel's letter, Mr.

13   Schulman called Mr. Marks to ask what had prompted the letter, and whether there

14   were any problems he should be aware of. (Schulman Decl. ¶ 11; Bergman Decl.

15   Exh. S (Marks Tr.) at 181:14-182:10.) Mr. Marks advised Mr. Schulman that he

16   had not seen and did not know about the letter. (Schulman Decl. ¶ 11; Bergman

17   Decl. Exh. S (Marks Tr.) at 181:14-181:24.) Mr. Marks further stated, in

18   substance, that while the February Draft was "very aggressive" he could "deal with

19   it," and that although the draft contained certain things that had not been agreed to,

20   it was "not contrary to what [had been] agreed to." (Schulman Decl. ¶ 11 & Exh.

21   A.)[20]

22           On May 21, Mr. Parsons sent a letter in response to Mrs. Siegel's May 9

23   missive, in which he stated that "each of the major points covered in the draft

24   agreement which was provided to your representatives, more than three months

25   ago, accurately represented the agreement previously reached between your

26   representatives and [AOL Time Warner]" and concluding that he hoped the

27

28   _____

[20] Schulman Decl. Exhibit A is Mr. Schulman's contemporaneous notes of his May 16, 2002 telephone conversation with Mr. Marks. (Id. ¶ 11.)

23

1   agreement could be "closed" based upon the prior discussions. (Bergman Decl.

2   Exh. AA.)  Neither Mrs. Siegel nor any of her representatives ever responded to

3   this letter.

4       Mr. Marks thereafter drafted a long-form contract that he apparently felt

5   would be more acceptable to his clients. (Bergman Decl. Exh. S (Marks Tr.) at

6   196:21-197:15; Bergman Decl. Exh. BB.)  That draft long-form was transmitted to

7   Plaintiffs on July 15, 2002, but was not provided to DC. (Bergman Decl. Exh. S

8   (Marks Tr.) at 198:25-199:3; Schulman Decl. ¶ 12.)[21]

9       On July 30, Mr. Toberoff again contacted Mr. Marks to inquire as to the

10  status of Plaintiffs' dealings with DC on the Superman property. (Bergman Decl.

11  Exh. S (Marks Tr.) at 165:25-167:3.)  When informed that there was a

12  confidentiality agreement in place and that Mr. Marks would not speak with him

13  about DC, Mr. Toberoff asked if Mr. Marks would be willing to enter into separate

14  negotiations with him regarding the sale of the Siegels' Superman interests. (*Id.*)

15  Mr. Marks declined to do so, but told Mr. Toberoff that if he had an offer to make,

16  Mr. Marks would present it to his clients. (*Id.*)  Accordingly, in early August,

17  2002, Mr. Toberoff's company, IPW, offered to purchase Plaintiffs' Superman

18  copyright interests for $15 million and "a meaningful back-end." (*Id.* at 167:7-

19  169:25.)  Mr. Marks communicated that offer to his clients. (*Id.* at 169:21-170:12.)

20      On September 21, 2002, Plaintiffs abruptly terminated Mr. Marks' and Gang

21  Tyre's representation of them, without any prior notice, via a letter copied to Paul

22  Levitz,  DC's President and Publisher. (Bergman Decl. Exh. S (Marks Tr.) at

23  202:1-202:16; *Id.* Exh. DD.)  On the same day, Plaintiffs sent a separate letter to

24  DC repudiating the parties' October 19 agreement and purporting to break off all

25  further negotiations, and claiming that February Draft contained "outrageous,

26  _____

27  [21] Defendants have not seen a copy of that draft long-form, and Plaintiffs have refused
    to produce it on the basis of the attorney client privilege.  Defendants' motion to compel
28  its production was denied by Magistrate Zarefsky. (Bergman Decl. Exh. CC)  It is
    therefore not possible to know what was in that draft or if it differed materially from the
    February Draft.

**EXHIBIT Y**
**319**
24

1    never discussed, unacceptable demands." (Bergman Decl. Exh. <u>BB</u>.)  Plaintiffs

2    then promptly retained Mr. Toberoff to represent them (*id*. Exh. <u>X</u> (Toberoff Tr. at

3    106:1-107:4; 132:4-134:7), and after being advised by Mr. Toberoff's business

4    partner that DC's offer for their Superman copyright interests was "ridiculously

5    low" (*id*. Exh. <u>EE</u> (Laura Siegel Larson Tr.) at 28:15-28:18), entered into an

6    agreement with IPW dated October 3, 2002 pursuant to which Plaintiffs retained

7    IPW to be their exclusive representative in connection with their Superman

8    interests.  (Bergman Decl. Exh. <u>FF</u>.)[22]

9         Later attempts by the parties to resolve these issues did not reach fruition,

10   and Plaintiffs subsequently filed these actions.  DC has accordingly filed

11   counterclaims against Plaintiffs for breach of contract and to enforce the terms of

12   the October 19, 2001 agreement between the parties.  (*Id*. Exh. <u>GG</u>.)[23]

13        **F.    Corrections With Respect to Plaintiffs' Statement**

14              **Concerning Judge Lew's Decision in The Superboy Action**

15        As the Court now knows from Defendants' Motion for Reconsideration,

16   Judge Lew's March 24, 2006 Order (the "Lew Order," Toberoff Decl. Exh. <u>U</u>) did

17   not, as Plaintiffs assert, find that the copyright law defenses which formed the basis

18   for Defendants' own cross motion for partial summary judgment in the Superboy

19   Action substantively "lacked merit." (Pl. Mem. at 9.)  In fact, the scope and effect

20   of the Lew Order is limited – relying almost exclusively on the vacated

21   Interlocutory Findings in the Westchester Action, and reaching only the extent of

22   Plaintiffs' very narrow cross-motion for partial summary judgment in the Superboy

23   Action.  Significantly, Plaintiffs did not move in either case to dismiss DC's

24   affirmative defenses or First Amended Counterclaims, the bulk of which do not

---

[22] Pursuant to the representation agreement, IPW was to provide the services of Marc Toberoff in connection with the negotiation, sale or license of Plaintiffs' Superman rights, but the parties agreed that such services would not include litigation, which services, if required, would be provided by Mr. Toberoff subject to good faith negotiation of a mutually acceptable agreement. (*Id*.)

[23] DC's First Amended Counterclaims (Bergman Decl. Exh. <u>GG</u>) are hereinafter referred to as the "FACC."

1    overlap with and were not litigated as part of Plaintiffs' motion for partial

2    summary judgment in the Superboy Action.[24]  Those unlitigated counterclaims

3    remain a part of the instant action.

4                              **ARGUMENT**[25]

5    **I.    MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY**

6          **JUDGMENT WITH RESPECT TO PLAINTIFFS'**

7          **RECAPTURE OF AN UNDIVIDED ONE HALF SHARE OF**

8          **THE COPYRIGHT RIGHTS IN *ACTION COMICS NO. 1***

9          Plaintiffs' request that the Court declare its Superman Notices legally

10   effective to recapture an undivided fifty percent interest in the copyrights to the

11

12

13   [24] In the earlier motion. Defendants argued that. as a matter of law under established
14   copyright doctrines. Siegel's Superboy submissions (1) were derivative of pre-existing
     Superman works. (2) constituted "works for hire" under the applicable 1909 Act test, and
     as such were owned by DC's predecessor. and (3) had never been "published" or
15   registered as unpublished works: therefore. they were not eligible for termination and
     recapture under section 304(c). Defendants also argued (4) that Plaintiffs' Superman
16   Notices did not list the May 21. 1948 Final Judgment. Relying almost exclusively on the
     vacated Interlocutory Findings in the Westchester Action as precluding Defendants'
17   substantive copyright law contentions. Judge Lew (i) ruled that it was harmless error for
     the Superman Notices to omit the Final Judgment as a terminated grant because Plaintiffs
18   had listed the Stipulated Settlement that preceded the Final Judgment on consent. (ii)
     rejected on the basis of collateral estoppel and res judicata. without addressing the merits,
19   each of Defendants' other copyright defenses: (iii) found that Siegel's Superboy
     submissions had been "published" in *More Fun Comics No. 101*. and (iv) held that
20   consequently Plaintiffs had recaptured the "Superboy copyrights" as of November 17,
     2004. *(Id.)* The "Superboy copyrights" were not defined or described in the Order
21   (Toberoff Decl. Exh. U at 6-14).

22   [25] Plaintiffs' motion is, on its own terms, limited to only certain of Defendants'
     defenses to termination, namely, that certain portions of *Action Comics No. 1* constituted
23   a work made for hire; that the Superman Notices were required to list the 1948 Final
     Judgment; that Joanne Siegel's continued acceptance of benefits under the 1975
24   Agreement served to nullify Plaintiffs' termination of the grant contained therein; that the
     FASMC is barred by the statute of limitations; that foreign profits are not recoverable;
25   and that the FASMC is barred by settlement. Defendants, of course have pled additional
     affirmative defenses and counterclaims which they retain. *See, e.g., Meridian Project*
26   *Svs.. Inc. v. Hardin Const. Co.,* 426 F. Supp. 2d 1101. 1110 (E.D. Cal. 2006) ("Because
     defendant's affirmative defenses were not raised in plaintiff's initial summary judgment
27   motion. the court will not address the issues raised by the affirmative defenses; those
     defenses remain viable in the litigation.") (citing *Stillman v. Travelers Ins. Co.,* 88 F.3d
28   911, 913-14 (11th Cir. 1996); *Books-A-Million, Inc. v. H & N Enterprises, Inc.,* 140
     F.Supp.2d 846, 851 (S.D. Ohio 2001). *See also Cytec Indus., Inc. v. B.F. Goodrich Co.,*
     232 F. Supp. 2d 821, 828-29 (S.D. Ohio 2002).

1  original Superman strips published in *Action Comics No. 1* cannot be decided on

2  summary judgment.

3      A.   **Genuine Issues of Material Fact Preclude Summary**

4           **Judgment on Defendants' Defense that Portions of *Action***

5           ***Comics No. 1* Were Created As "Works Made for Hire"**

6      Plaintiffs' action is characterized primarily by their dogged effort to seek

7  profits attributable to works never created by Jerry Siegel or to works that Plaintiffs

8  cannot, as a matter of law, recapture.  Plaintiffs' attempt to dismiss Defendants'

9  focused work for hire defense arises out of the same overreaching.  As Plaintiffs

10 concede, Defendants <u>are not</u> seeking to invalidate the Superman Notices by

11 claiming that the entirety of *Action Comics No. 1* is a work made for hire.  Rather,

12 Defendants merely assert that there are material portions of *Action Comics No. 1*

13 that were created as works made for hire, either by Siegel and Shuster, or by third

14 parties.  Through their Fifth Alternative Counterclaim For Declaration Of

15 Limitations On The Scope Of The Superman Notices And The Superboy Notice

16 (FACC (Bergman Decl. Exh. <u>GG</u>), ¶¶ 106-135), and their Sixth Alternative

17 Counterclaim For Declaration Regarding The Principles To Be Applied In An

18 Accounting (*id.* ¶¶ 136-139), Defendants seek properly to define the scope of

19 profits to which Plaintiffs would be entitled in the event the Superman Notices are

20 deemed valid.  Specifically, as relates to the work for hire defense, Defendants

21 plead that "[a]ny accounting of recoverable profits for exploitation of Superman

22 would be reduced to that portion of such profits that are attributable to the

23 copyrightable elements from *Action Comics No. 1* less the Additional *Action*

24 *Comics No. 1* Materials (if any), actually present in the Superman works subject to

25 accounting.  (*Id.* ¶ 137(d).)  In other words, Plaintiffs should not be entitled to share

26 in profits attributable to those portions of *Action Comics No. 1* that were created as

27 "work for hire" by them or by third parties.

28

**EXHIBIT Y**
**322**

27

1

2     **1.      Certain Material Portions Of _Action Comics No._**

3     **_1_ Were Created As Works Made For Hire By**

4     **Siegel And Shuster Or By Third Parties, And**

5     **Thus Cannot Be Subject To Termination.**

6            a.      The Publication Of _Action Comics No. 1_

7     Plaintiffs seek to re-write history by claiming that the Additional _Action_

8     _Comics No. 1_ Materials requested by DC on February 1, 1938 and added to the first

9     Superman story consisted exclusively of re-cutting and pasting Siegel and Shuster's

10    pre-existing Superman materials into a different format.  (Pl. Mem. at 5.)  This,

11    however, is untrue.  In fact, as set forth above and shown in a sworn affidavit of Joe

12    Shuster, DC requested detailed revisions and changes in order to make the story

13    suitable for publication.  Shuster testified in the Federal Action upon which

14    Plaintiffs now rely that he "drew _several additional pictures_ to illustrate the story

15    continuity and these appear on page 1 of the first Superman release.  This was done

16    so that we would be certain of having a sufficient number of panels to make a

17    thirteen page release."  (Bergman Decl. Exh. <u>G</u> at 2.)  Shuster further testified that

18    at this time he also drew the last panel in _Action Comics No. 1._  (_Id._)  Siegel

19    confirms this in his own affidavit, testifying, in part, that "[u]pon receiving word

20    from Detective that we could proceed, Joe Shuster, under my supervision . . . added

21    several pictures to illustrate the story continuity."  (_Id._ Exh. <u>H</u> at 5.)  Siegel further

22    testified that "the scientific explanation on page 1 of the release and the last panel

23    at the foot of page 13" were added.  (_Id._)  Additional material, such as color, was

24    added by Detective's employees.  (Adler Decl. ¶¶ 3-4.)  Detective also prepared the

25    cover for _Action Comics No. 1._  (Bergman Decl. Exh. <u>I</u>.)  It cannot be disputed that

26    these Additional _Action Comics No. 1_ Materials constituted more than a mere cut-

27    and-paste job.

28

28

  **b.**  **The Additional *Action Comics No. 1* Materials Were Created As "Work For Hire" And Thus Cannot Be Subject To Termination.**

  Plaintiffs acknowledge, as they must, that a copyrighted work prepared as a "work for hire" is not subject to termination under section 304(c) of the Copyright Act.  (Pl. Mem. at 28.)  As Plaintiffs further and reluctantly concede, under the 1909 Act (the version that applies here to works created before January 1, 1978), the courts -- including those in the 9th Circuit -- universally hold that the "work for hire" designation extends to works created by independent contractors, as well as to works created within the scope of a traditional employment relationship by a regular employee.  Specifically, an independent contractor is considered an "employee" and a hiring party an "employer" for purposes of the 1909 Act if the work is made at the hiring party's "instance and expense."  *See, e.g., Twentieth Century Fox Film Corp. v. Entertainment Distrib.,* 429 F.3d 869, 877 (9th Cir. 2005); *Self-Realization Fellowship Church v. Amanda Church of Self-Realization,* 206 F.3d 1322, 1326 (9th Cir. 2000); *Lin-Brook Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.,* 342 F.3d 149, 163 (2d Cir. 2003); *Forward v. Thorogood,* 985 F.2d 604, 606 (1st Cir. 1993).

  **1)**  **The Addition Of Color To *Action Comics No. 1* Was Work Prepared By Regular Employees Of Detective Within The Scope Of Their Employment.**

  According to eye-witness Jack Adler, the colorist for *Action Comics No. 1,* Siegel and Shuster's work that would comprise the Superman story in *Action Comics No. 1* was provided to the Detective production staff in black and white. (Adler Decl. ¶ 4.)  Members of Detective's staff, who were regular or traditional employees of Detective, then decided upon the color that would be applied

29

throughout the magazine. (*Id.*) As a leading copyright treatise explains, "[a]n

original combination or arrangement of colors should be regarded as an artistic

creation capable of copyright protection. Thus, adding colors to a previously black

and white picture may constitute an original copyrightable contribution." 1

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.14 (2006)

("*Nimmer*"). Thus, this important copyrightable addition made to *Action Comics

No. 1* by persons *other than Siegel and Shuster*, employees of Detective working

within the scope of their employment, constitutes work for hire and cannot be

terminated. 17 U.S.C. § 304(c). As a result, assuming *arguendo* that the

Superman Notices are valid, any recapture of rights excludes the color present in

*Action Comics No. 1* and, consequently, any calculation of profits would be

required to exclude any profits attributable to any such color.[26]

> **2)     The Portions Of *Action Comics No. 1* Created
> By Siegel And Shuster After Detective Told
> Them They "Could Proceed" Were Created At
> The Instance And Expense Of Detective And
> Are Thus Work For Hire.**

In cases that do not involve traditional employers and employees, the

"instance and expense" test determines the work was for "hire" either because a

hiring party commissioned a work or because the prospect of employment was the

"motivating factor" that induced the work's creation.[27] *Twentieth Century Fox,*

---

[26] Defendants have moved for partial summary judgment on their counterclaim that Plaintiffs have failed to timely terminate the first published visual depiction of Superman, a black and white announcement reproducing the cover of *Action Comics No. 1*. When combined with the fact that Plaintiffs also cannot claim rights in the colors of Superman's costume, any profit recovery by Plaintiffs, if their termination notices were valid, would have to exclude profits attributable to the appearance of Superman's iconic costume.

[27] Plaintiffs, relying upon three cases, claim that courts have "often refused to apply the work for hire doctrine *even in the context of an employer-employee* relationship." (Pl. Mem. at 29, emphasis in original.) Plaintiffs' statement is both wrong and a *non-sequitur*. First, Defendants' work for hire defense, as it relates to Siegel and Shuster, is not alleged in the context of a regular or traditional employer-employee relationship. The first of the cases cited by Plaintiffs, *Dolman v. Agee*, 157 F.3d 708 (9th Cir. 1998), is in the employer-employee context and thus is irrelevant. The second of Plaintiffs' cases,

429 F.3d at 879.  A finding that the employer is the motivating force gives rise to a "presumption" of work for hire ownership that could only be altered by an "express" agreement of the hiring party to the contrary.  *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980).[28]  By the time of the adoption of the 1976 Act, courts applying the "instance and expense test" under the 1909 Act had developed "an almost irrebut[t]able presumption that any person who paid another to create a copyrightable work is the 'author' of the work for purposes of the statute, absent an agreement to the contrary."  *Easter Seal Soc'y for Crippled Children v. Playboy Enters.*, 815 F.2d 323, 327 (5th Cir. 1987).  "[A] party who hires another to create a copyrightable work is the 'author' of the work for the purposes of the statute, absent an agreement to the contrary."  *Playboy Enters. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995).

The "instance and expense" inquiry focuses on at whose instance the work was created, at whose expense, and "the degree to which the 'hiring party' has 'the right to control or supervise the artist's work.'"  *Twentieth Century Fox*, 429 F.3d at 879.  However, this relates solely to the abstract right to control or supervise, not to whether the hiring party actually exercised that right.  Indeed, the hiring party is "thought to maintain the 'right' to control simply by paying for the work and having the power to refuse to accept it."  *Self Realization Fellowship Church*, 206

---

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., Inc.*, 223 F.2d 252 (2nd Cir. 1955), does not include any ruling on work for hire.  The third case cited by Plaintiffs, *Forward v. Thorogood, supra*, is also off the mark.  That case involved an ownership dispute relating to the *common law copyright* in certain unpublished tape recordings of a musical group.  The court rejected plaintiff's attempt to claim work for hire of the common law copyright due to a failure of proof with respect to both instance and expense – the band members were not plaintiff's employees and there was no evidence that plaintiff had "commissioned" or compensated them.  985 F.2d at 606.

[28] *See also Brattleboro Pub. Co. v. Winmill Pub. Corp.*, 369 F.2d 565, 567 (2d Cir. 1966); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 62 U.S.P.Q.2d 1301, 1318 (S.D.N.Y. 2002), *aff'd*, 342 F.3d 149 (2d. Cir. 2003); 1 *Nimmer* § 5.03[D] at 5-56.10; section 201 (b) of the 1976 Act ("[i]n the case of a work made for hire," the hiring party "is considered the author . . . *unless the parties have expressly agreed otherwise* in a written instrument signed by them.") (emphasis added), which the legislative history describes as adopting the basic principle of 1909 Act law, H. Rep. at 121, and 17 U.S.C. § 28 (repealed).

1   F.3d at 1326; *Easter Seal*, 815 F.2d at 327; *Lin-Brook*, 352 F.2d at 300.  Thus,

2   "[b]efore 1978, it mattered little, if at all, that the commissioner neither possessed

3   nor exercised the right to direct the manner in which the work was done."

4   *Brunswick Beacon, Inc. v. Schock-Hopchas Pub. Co.*, 810 F.2d 410, 412 (4th Cir.

5   1987).  The recipient need only possess the power to "accept, reject or modify" the

6   work.  *Twentieth Century Fox*, 429 F.3d at 880.

7          Siegel's sworn affidavit leaves no doubt that Detective was the motivating

8   factor behind the Additional *Action Comics No. 1* Materials prepared by Siegel and

9   Shuster.  Indeed, Siegel testified that such work did not go forward until they

10  received word from Detective that such work could proceed.  (Bergman Decl. Exh.

11  H at 5.)  Both Siegel and Shuster's affidavits are corroborated by the documentary

12  evidence, including but not limited to, letters from their editor at Detective

13  instructing them to revise and expand their existing work into a work suitable for

14  publication in a comics magazine.  (*Id*. Exhs. B, C.)  While much of what ended up

15  in *Action Comics No. 1* was prepared before any relationship was instituted with

16  Detective, *National*, 508 F.2d at 914, the "several pictures" that make up the

17  Additional *Action Comics No. 1* Materials were prepared only *after* Detective

18  made the commitment that they would publish Superman and only *after* Detective

19  told Siegel and Shuster they "could proceed." (*Id*. Exh. G at 2; Exh. H at 5.)  The

20  evidence demonstrates that Detective was the "motivating factor" behind the

21  Additional *Action Comics No. 1* Materials created by Siegel and Shuster.  At the

22  very least, there is a genuine issue of material fact as to this question.

23          The facts further demonstrate that Detective had the right of supervision as

24  exhibited by its right to accept or reject Siegel and Shuster's work.  Indeed, in his

25  letter of March 1, 1938 to Siegel, Detective executive Jack Liebowitz reiterated the

26  need to provide eight panels per page and chastised Siegel for failing to do so in

27  connection with *Action Comics No. 1*, stating that, were Detective not so pressed

28  for time, he "would have rejected them." (*Id*. Exh. F.)  That Detective did not

1   reject *Action Comics No. 1* is immaterial.  The evidence establishes that Detective

2   maintained the right to supervise Siegel and Shuster as demonstrated by its ability

3   to demand high quality work (*id*. Exhs. <u>B</u>, <u>C</u>.), and by its ability to accept or reject

4   their work (*id*. Exh. <u>F</u>).  Plaintiffs themselves concede this important fact in their

5   brief, acknowledging that "Detective was under no obligation to pay Siegel and

6   Shuster . . . until . . . Detective *had accepted it for publication* . . . ."  (Pl. Mem. at

7   32.)

8        In their moving papers, Plaintiffs suggest that Detective's supervision of

9   Siegel and Shuster's work during February 1938 is of no legal effect because

10  Detective assertedly held no rights in Superman until the 1938 Assignment was

11  executed on March 1 of that year.  (Pl. Mem. at 32)  But this is incorrect.  As

12  demonstrated above, Detective held an exclusive option to Superman under the

13  December 4, 1937 Agreement with Siegel and Shuster.  (Toberoff Decl. Exh. <u>B</u>.)

14  As such, Detective's supervision of Siegel and Shuster in February 1938 was in

15  furtherance of rights Detective already held in Superman.

16       The "expense" prong of the "instance and expense" test is also met.  Where

17  the work at issue is to be produced by the hiring party who takes on "all the

18  financial risk" the work is created at the employer's expense.  *Twentieth Century*,

19  429 F.3d 869 at 881.  The expense element is also satisfied when the employing

20  party "simply" pays any sum certain to the creator − regardless of amount and

21  regardless of whether these works were ever published.  *Playboy*, 53 F.3d at 555.

22  *See also Niss v. Columbia Pictures Indus., Inc.*, 2000 U.S. Dist. LEXIS 18328 at

23  *28 (S.D.N.Y. Dec. 20, 2000).  Here, there is no dispute Siegel and Shuster were

24  paid for *Action Comics No. 1*, including the Additional *Action Comics No. 1*

25  Materials.  (Bergman Decl. Exh. <u>F</u>.)  Thus, just as is the case with the color added

26  by Detective employees, the "several additional" panels drawn by Shuster after

27  Siegel and Shuster were instructed to "proceed" with *Action Comics No. 1*, were

28  prepared at the instance and expense of Detective and thus cannot be terminated.

## 2. Plaintiffs' Attempts To Demonstrate That The Additional *Action Comics No. 1* Materials Are Not Work For Hire Are Without Merit And, At Best, <u>Are Rife With Genuine Issues Of Material Fact.</u>

Plaintiffs attempt to overcome Defendants' work for hire defense by claiming that the existence of a written agreement assigning rights to Detective "belies" that the Additional *Action Comics No. 1* Materials were created as a work for hire. (Pl. Mem. at 32-33.) In addition, Plaintiffs claim that Defendants are precluded under the doctrines of *res judicata* and collateral estoppel from asserting that the Additional *Action Comics No. 1* Materials were created as work for hire. Neither argument has any support.

### a. The Existence Of A Written Agreement Does Not Affect The Work For Hire Status Of The Additional *Action Comics No. 1* Materials

Plaintiffs cite to one case – *Dolman v. Agee, supra* – in an attempt to establish the general proposition that the existence of an agreement assigning copyright rights would rebut the presumption that a work is made for hire. (Pl. Mem. at 33.) However, Plaintiffs' argument is without merit.

First, the 1938 Assignment has no relevance to the work for hire status of the addition of color to *Action Comics No. 1* by employees of Detective. Such copyrightable contribution was added not by Siegel and Shuster but by employees of Detective working within the scope of their employment. (Adler Decl. ¶ 3-4.)

Second, Plaintiffs fail to disclose to the Court that, as recently as 2005, the Ninth Circuit *rejected* the very argument Plaintiffs seek to make here. In *Twentieth Century Fox*, the work at issue, an autobiography of Dwight Eisenhower, was deemed to be a work for hire. The defendants sought to overcome the presumption that Eisenhower's work was "for hire" by pointing to a book contract purporting to assign all rights in the work to the publisher. The

34

1   Ninth Circuit, citing to its well-established precedent in *Lin-Brook*, stated that the

2   agreement, without more, was insufficient to rebut the presumption that the book

3   was created at the instance and expense of the publisher.  *Twentieth Century Fox*,

4   429 F.3d at 881 (citing *Lin-Brook*, 352 F.2d at 300).

5           In *Twentieth Century Fox*, the Ninth Circuit also distinguished *Dolman*,

6   explaining that in that case it relied upon evidence in addition to the existence of

7   the assignment agreement, "including evidence that the assignee filed copyright

8   registrations and renewals naming Shields as the author."  *Id.* at 882, n.4.  In this

9   case, other than the 1938 Assignment, Plaintiffs have adduced *no evidence* to rebut

10  the presumption that the Additional *Action Comics No. 1* Materials created by

11  Siegel and Shuster was intended to be "work for hire."[29]

12          In sum, there is no general rule that the existence of an assignment of rights

13  serves to rebut the strong presumption that a work created at the instance and

14  expense of a commissioner is, in fact, a work for hire.

> **b.      Plaintiffs' *Res Judicata* And Collateral**
>
> **Estoppel Arguments to Avoid the Work for**
>
> **Hire Status of the Additional *Action Comics***
>
> ***No. 1* Materials Are Equally Untenable**

19          Without a single citation to any case law, Plaintiffs claim that the Second

20  Circuit's reversal in *National II* of the district court's finding that *Action Comics*

21  *No. 1* was a work made for hire precludes Defendants under the doctrines of *res*

22  *judicata* and collateral estoppel "from again claiming that Action Comics,[sic] No.

23  1, *or any part thereof*, is a "work for hire."  (Pl. Mem. at 31, emphasis added.)

24  Plaintiffs mischaracterize the Second Circuit's statement and are wrong as a matter

25  of law.

---

27  [29] Moreover, because there is material in *Action Comics No. 1* that was undisputedly created prior to Siegel and Shuster receiving their assignment to "proceed" with additional work on Superman, the 1938 Assignment was necessary to assign rights in such pre-existing work.  This can have no bearing on the parties' intent as to the new work created.

**EXHIBIT Y**
**330**
55

A comic book such as *Action Comics No. 1* that contained more than one feature, such as the first Superman story, was a collective work and considered a periodical magazine under the 1909 Act.  As noted above, the copyright for Siegel and Shuster's contributions to that story was renewed in 1965 in the name of National "as proprietor of a work for hire."  (Toberoff Decl. Exh. F at DCC 00045630.)

Notwithstanding the 1938 Assignment (*id*. Exh. E), the 1948 Final Judgment (*id*. Exh. D) and such renewal copyright registration (*id*. Exh. F), Siegel and Shuster sued National in 1969 for a declaration that they owned the renewal copyright in their contributions to the *Action Comics No. 1* periodical, and for copyright infringement in continuing to publish Superman comic books and otherwise exploit the Superman character.   Since the only issue raised by Siegel and Shuster in the Federal Action related to the copyright ownership *of their own contribution*, the case did not relate to the ownership of the renewal copyright for any of the Additional *Action Comics No. 1* Materials added to the first Superman story by Detective's employees.

On a motion for summary judgment, the district court in *National I* had found against Siegel and Shuster on two grounds: (1) that Siegel and Shuster had assigned all rights -- including all renewal rights -- in earlier grants and (2) that *Action Comics No. 1* was a work made for hire.  The Second Circuit in *National II* affirmed the lower court's ruling as to the first ground.  However, with respect to the work for hire ruling it did not join the lower court's opinion.  Specifically, the Court of Appeals found that, because the district court's finding of "work for hire" was purportedly based upon the findings of the state court in the Westchester Action, such finding was not warranted because "that issue was not litigated" in the Westchester Action.  The Second Circuit went on to find that on the record before it, the evidence was not otherwise "sufficient to create the presumption that the strip was a work for hire" as to the Superman material authored by Siegel and

1   Shuster that pre-existed their submission of it to Detective.  *National II*, 508 F.2d at

2   914.  (*National I* together with *National II*, are referred to herein as the "National

3   Litigations").

4       "Under the doctrine of res judicata . . . a <u>final judgment</u> on the merits of an

5   action precludes the parties or their privies from relitigating claims that were or

6   could have been raised in that action."  *Marvel Character, Inc. v. Simon*, 310 F.3d

7   280, 286-287 (2d Cir. 2002) ("*Simon*") (emphasis added).  The Second Circuit's

8   decision and statement in *National II* is a far cry from *res judicata* with regard to

9   the entirety of the first Superman story published in *Action Comics No. 1*, including

10   the Additional *Action Comics No. 1* Materials authored by Detective's employees.

11       First, nowhere in the record have Plaintiffs provided a final judgment from

12   the National Litigations.

13       Second, the issue that Defendants raise in this action, namely that DC is the

14   copyright proprietor of a *portion* of *Action Comics No. 1* which was created after

15   Siegel and Shuster's preexisting material and as a work for hire, was never raised

16   in the National Litigations, nor, more importantly, could it have been.  In the

17   National Litigations, only a finding that *all* of *Action Comics No. 1*, not just the

18   pre-existing material forming most of the first Superman story, was created as work

19   for hire could have achieved National's objective of establishing that Siegel and

20   Shuster were not entitled to the renewal right for all of the material comprising this

21   feature.  Section 24 of the 1909 Copyright Act, 17 U.S.C. § 24 (repealed) (the

22   operative act in the National Litigations) permitted the periodical owner, Detective,

23   to obtain the renewal copyright for the whole collective work it published, but also

24   permitted authors who contributed *portions* to a periodical to obtain the renewal

25   copyright in their contributions, provided the same were not works for hire.  *See* 3

26   *Nimmer* § 9.03.  This is in stark contrast to the issue asserted by Defendants in this

27   case, namely, that because portions of *Action Comics No. 1* were created as work

28   for hire, such portions are not subject to termination under section 304(c) and, as a

**EXHIBIT Y**
**332**   37

result, to the extent the Superman Notices are valid, any profits to which Plaintiffs may be entitled cannot include profits attributable to the Additional *Action Comics No. 1* Materials.

Finally, the doctrine of *res judicata* is never applicable to a party's defense. *See* 10 Weinstein Korn & Miller, New York Civil Practice: CPLR, ¶ 5011.21 (2d ed. 2007) ("Insofar as a defense is not, itself, a claim for relief, its 'prior adjudication' effect should be viewed as one of collateral estoppel and not as *res judicata*."). Thus, the question of whether or not a defense previously raised and rejected can again be asserted is determined by the rules of collateral estoppel, to which we now turn.

Plaintiffs' assertion of collateral estoppel to block Defendants from raising work for hire is, however, similarly unavailing. Under the doctrine of collateral estoppel, an issue (as opposed to a claim) is precluded from re-litigation when all of the following conditions are met: (1) the resolution of the issue was necessary to support a valid and final judgment on the merits; (2) the identical issue was raised in the prior proceeding; (3) the issue was actually litigated and decided in the prior case; and (4) there was a "full and fair" opportunity to litigate the issue. *Simon,* 310 F.3d at 288-89. None of these conditions are met here.

First, as is evidenced by the fact that the work for hire issue was decided *against* National but the case was decided *in its favor*, the issue of whether or not *Action Comics No. 1*, and in particular, any portion thereof, was a work for hire, cannot be deemed "necessary" to support a final judgment. Second, the identical issue being raised by Defendants here – *i.e.*, that *portions* of *Action Comics No. 1* were prepared as work for hire – was undisputedly *never* raised in the National Litigations, let alone actually litigated or decided in the prior case. Third, the issue was not actually "decided." The Second Circuit made no finding that *Action Comics No. 1* was *not* a work for hire, only that the district court's ruling to the contrary based on *res judicata* was incorrect, and that the other evidence of record

1   was not "sufficient to create the presumption that the strip was a work for hire."

2   *National II*, 508 F.2d at 914.  Finally, there was no "full and fair" opportunity to

3   litigate the issue in the National Litigations.  As explained above, because only a

4   finding that *all* of *Action Comics No. 1* was work for hire would have defeated

5   Siegel and Shuster's claim, the issue of whether portions of the work were work for

6   hire could not have been raised.

7                                        *       *       *

8       Based upon the foregoing, Plaintiffs' summary judgment motion as to

9   Defendants' work for hire defense as it relates to portions of *Action Comics No. 1*

10  must be denied.

11  **B.     Plaintiffs Failed to Terminate the 1948 Final Judgment,**

12  **        Leaving In Place An Operative Grant of Rights in Superman**[30]

13      As set forth above, the termination provisions of the 1976 Act sought to

14  forge a balance between authors' rights to renegotiate and fair notice to publishers.

15  This is why a notice of termination "must" identify "the grant" to which it applies.

16  37 C.F.R. § 201.10 (b)(1)(iv).  Thus, if an author entered into five separate grants

17  of rights for the same work, and a notice of termination identifies only four of the

18  grants, the fifth grant remains "intact" and the grantee's rights thereunder

19  unaffected.  *Cf. Burroughs*, 683 F.2d at 621-22; *Milne*, 430 F.3d at 1048 (copyright

20  termination invalid where pre-1978 grant is still effective); 3 *Nimmer* § 11.06[B] at

21  11-40.22(1) n.63.  The Superman Notices fail to terminate the grant in the Final

22  Judgment in which Siegel, *inter alia*, effectuated the transfer to National of the sole

23  and exclusive ownership of all rights relating to "Superman."  (*Compare* Toberoff

24  Decl. Exhs. G-M *with* Exh. D at 3-4.)  Because Plaintiffs failed to identify the

25  Final Judgment, the grant of rights in Superman found therein remains intact.

26  _____

27  [30] Defendants acknowledge that the Lew Order in the Superboy Action resolved this
    issue in Plaintiffs' favor in that action.  However, Defendants have challenged certain

28  portions of that order in a Motion for Reconsideration in that case, currently *sub judice*,
    and wish to preserve their rights in the event it is necessary for this issue to be dealt with
    on appeal.

1    Plaintiffs' excuses for failing to terminate the Final Judgment do not hold

2  water.  First, they contend that that the document contained no operative grant and

3  thus did not have to be terminated.  According to Plaintiffs, since Siegel transferred

4  "Superman" to Detective in the 1938 Assignment, the Final Judgment could not as

5  a matter of law have conveyed "Superman" since it was already owned by

6  National.  (Pl. Mem. at 34-35.)  This is illogical and belied by Plaintiffs' actions in

7  drafting the Superman Notices, in which they identified in addition to the 1938

8  Assignment *six other grants of rights under copyright relating to Superman*,

9  including both the Westchester Action Stipulation and the 1975 Agreement in

10  which rights "to the Superman . . . characters" (Bergman Decl. Exh. MM at 1),

11  were transferred.  If Plaintiffs' theory about the Final Judgment not containing a

12  grant of copyright in Superman is correct, then it was unnecessary to seek to

13  terminate all of the grants of copyright rights relating to Superman once the 1938

14  Assignment was terminated.  But of course, those other grants and the Final

15  Judgment *all* had to be terminated for the rights granted and re-granted therein to

16  be terminated.  Moreover, the fact that the Final Judgment came only two days

17  after the Stipulation (as opposed to ten years) is of no moment – without it the

18  rights identified in the Stipulation would not have been transferred.

19    As such, since the Superman Notices failed to terminate a still-operative

20  grant of rights in Superman, Plaintiffs' motion for summary judgment on the

21  effectiveness of their termination must be denied.

22  **C.    Joanne Siegel's Continued Acceptance of Benefits Under**

23  **the 1975 Agreement Leaves in Place That Operative Grant**

24    An author or his heirs entitled to termination cannot effectively convey away

25  beforehand their right of termination.  As provided in section 304(c)(5),

26  "[t]ermination of the grant may be effected notwithstanding any agreement to the

27  contrary, including an agreement to make a will or to make any future grant."  On

28  the other hand, once, as here, a termination notice has been served and thereby

1   "vested," *see* 17 U.S.C. (c)(6)(B), the terminating party is free to make a further

2   grant to the "original grantee or such grantee's successor in title." 17 U.S.C. §

3   304(c)(6)(D).

4        It is indisputable that following service and vesting of the Superman Notices

5   in April 1997, one of which identified and was directed specifically to the 1975

6   Agreement (Toberoff Decl. Exh. M̲), plaintiff Joanne Siegel continued, and to this

7   day continues, to accept the widow's benefits afforded to her under the 1975

8   Agreement and the subsequent modifications increasing those benefits. (Levitz

9   Decl. ¶¶ 9-10.) Indeed, since the purported effective date of the Superman Notices,

10   Mrs. Siegel has collected more than $1 million pursuant to the 1975 Agreement

11   she now claims to have terminated. (*Id.*) By Mrs. Siegel's continued acceptance

12   of the widow's benefit after the effective date of the Superman Notice directed at

13   the 1975 Agreement, Plaintiffs have effectively re-accepted the terms of the grant

14   set forth in that Agreement. Plaintiffs cannot simultaneously claim that the 1975

15   Agreement has been terminated while accepting the benefits thereunder. Thus, all

16   rights in Superman are owned entirely by Defendant DC.

17        This equitable principle has long been established under California law, best

18   illustrated by cases relating to real property. *See, e.g., Miller v. Reidy*, 85 Cal.App.

19   757, 762, (1927) ("This was a clear attempt to eat the cake and still keep it. For the

20   lessors month after month to accept rents specified in the lease, and at the same

21   time declare that there was a forfeiture, results in an irreconcilable

22   inconsistency."); *Kern Sunset Oil Co. v. Good Roads Oil Co.*, 214 Cal. 435, 440

23   (1931) ("acceptance of rent by the landlord from the tenant, after the breach of a

24   condition of the lease, with full knowledge of all the facts, is a waiver of the breach

25   and precludes the landlord from declaring forfeiture of the lease by reason of said

26   breach."). This black letter principle applies here, where Plaintiffs are seeking to

27   retain the benefits of the 1975 Agreement while at the same time asserting that

28   their purported termination has rendered legally ineffective the very same

**EXHIBIT Y**
**336** 41

1    agreement in this case.  Like the plaintiff in *Miller*, the Siegels cannot have their

2    cake and eat it too.

3        Recognizing their untenable position, Plaintiffs now argue that the widow's

4    benefits being paid to Mrs. Siegel are not the product of the 1975 Agreement, but

5    of some later, free-standing and un-related agreement.  (Pl. Mem. at 38).

6    Plaintiffs' contentions on this issue, however, are directly contradicted by Mrs.

7    Siegel's own written words.

8        As an initial matter, there is no dispute that Mrs. Siegel has continued to

9    receive and accept no less than $10,000 per year under the 1975 Agreement.  As

10   detailed above, the 1975 Agreement provides that after Jerry Siegel's death, Mrs.

11   Siegel will be paid $10,000 per year for the remainder of her life.[31]  (Bergman

12   Decl. Exh. MM at 2-4.)  Mrs. Siegel has been paid, and she has accepted, those

13   monies since Jerry Siegel's death in 1996.  (Levitz Decl. ¶¶ 9-10.)  These payments

14   have been made and accepted irrespective of whether (i) there has been any

15   amendment to the 1975 Agreement increasing the payment amounts, or (ii) rather

16   than under an amendment of the 1975 Agreement, the amounts in excess of

17   $10,000 are being paid in connection with some sort of separate and free-standing

18   agreement as Plaintiffs allege.  (*Id.* ¶¶ 8-10.)

19       Plaintiffs ignore the language in the 1975 Agreement that provides for

20   payments to Mrs. Siegel upon Jerry Siegel's death for the rest of her life, and Mrs.

21   Siegel's acceptance of those payments through the present, asserting instead that

22   Mrs. Siegel's widow's benefits are being paid "at Mrs. Siegel's request" in

23   connection with a March 15, 1982 letter from then-Time Warner General Counsel

24   Martin Payson, and that such letter constituted a separate and free-standing

25

26   [31] Plaintiffs' counsel applies his own self-serving reading to the 1975 Agreement, claiming now that Mrs. Siegel was not entitled to any payments under the 1975

27   Agreement because Mr. Siegel's death post-dated December 31, 1985.  (Pl. Mem. at 38.) While admittedly the 1975 Agreement is not the model of clarity on this point, it is clear

28   that Plaintiff Joanne Siegel believed that the 1975 Agreement was to be read to pay her a widow's benefit for the remainder of her life, *regardless* of when Mr. Siegel died. (Bergman Decl. Exh. NN.)

**EXHIBIT Y**

**337**  42

1   agreement (Pl. Mem. at 38 & Toberoff Decl. Exh. FF).  First, Mrs. Siegel's request

2   did not in any way affect the $10,000 per year she was entitled to receive for life

3   under the 1975 Agreement in the event she survived her husband.  (Toberoff Decl.

4   Exh. FF.)  Rather, she was requesting that, in the event she survived Jerry Siegel,

5   her widow's benefits be maintained at the same level as Jerry Siegel's payments

6   after December 31, 1985, rather than be reduced to $10,000 per year as provided

7   under the 1975 Agreement.  (*Id.*)  This is established by the February 14, 1982

8   written request from Mrs. Siegel to Steven Ross, the former Chairman of the Board

9   of Time Warner Inc. – the letter to which the March 15, 1982 letter relied on by

10  Plaintiffs responds *and which Plaintiffs have omitted from their motion*.  (Bergman

11  Decl. Exh. NN).  In that letter, Mrs. Siegel plainly and explicitly requested that her

12  benefits *under the 1975 Agreement* not be reduced on December 31, 1985 in the

13  event Jerry Siegel pre-deceased her: "*Without an amendment to the contract* stating

14  that *the same income* continue to me, my financial security is in jeopardy."

15  (Bergman Decl. Exh. NN at 3 (emphasis added).)  The March 15, 1982 letter from

16  Mr. Payson constitutes an acceptance of Mrs. Siegel's request to amend the 1975

17  Agreement.

18       The evidence thus establishes that (i) Mrs. Siegel has continued to receive

19  and accept at least $10,000 per year in widow's benefits under the 1975

20  Agreement, and (ii) that the amounts she has received above and beyond the

21  $10,000 are in connection with an amendment to the 1975 Agreement.  This alone

22  is sufficient to create a factual issue on the question of whether the continuing

23  acceptance of widow's benefits was under the 1975 Agreement, thus leaving it

24  operative and in effect despite Plaintiffs' service of a notice of termination directed

25  to that agreement.  *See, e.g.*, *Glow Indus v. Lopez*, 273 F. Supp. 2d 1095, 1114 n.

26  98 (C.D. Cal. 2003) (questions of parties' intent under contract not appropriate for

27  summary judgment) (citing *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701

28  F.2d 95, 97 (9th Cir. 1983)).

1    Plaintiffs next claim that even if the payments to Mrs. Siegel are under the

2    1975 Agreement and the agreement remains in effect, Plaintiffs' termination rights

3    still are not affected because that agreement contains no grants, only a

4    confirmation of past grants.  (Pl. Mem. at 38.)  But Plaintiffs are barred from

5    contending that the 1975 Agreement contained no grant of rights by the doctrine of

6    judicial admissions.  "Factual assertions in pleadings and pretrial orders, unless

7    amended, are considered judicial admissions conclusively binding on the party

8    who made them."  *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226

9    (9th Cir. 1988) (citation omitted).

10    In their operative pleading, Plaintiffs concede that they filed and served

11    notices of copyright termination directed at seven separate grants of rights, which

12    included the 1975 Agreement.  (FASMC (Bergman Decl. Exh. Q), ¶¶ 38-39.)

13    Indeed, Plaintiffs themselves refer to the 1975 Agreement as one of seven "prior

14    grant(s)."  (Pl. Mem. at 1.)  Plaintiffs cannot now run from their pleading and claim

15    that the 1975 Agreement is not, in fact, a grant, but instead was included in the

16    case out of "an abundance of caution."  (Pl. Mem. at 37.)

17    Even if Plaintiffs were permitted to repudiate their judicial admission at this

18    late stage in the litigation, their story does not hold water.  Plaintiffs prepared and

19    served a separate, 555-page notice of copyright termination containing in excess of

20    15,000 separate works, directed at the 1975 Agreement.  (Toberoff Decl. Exh. M.)

21    Plaintiffs then filed that document with Copyright Office, at a cost of several

22    thousand dollars.  From the outset of the case, Defendants have asserted as a

23    defense to Plaintiffs' claim the fact of Plaintiff Joanne Siegel's continued

24    acceptance of benefits under the 1975 Agreement.  The issue has been the subject

25    of extensive discovery and exchange of documents.  Nevertheless, throughout this

26    process, Plaintiffs have never either withdrawn the notice of termination directed at

27    the 1975 Agreement from the U.S. Copyright Office, or sought to amend their

28

1  pleading to withdraw their claim for a declaration that the notice of termination

2  directed at the 1975 Agreement is valid.

3        Indeed, if Plaintiffs' new contention were true, then virtually all of their

4  termination notices would have been legally meaningless and superfluous and

5  Plaintiffs would have needlessly expanded the scope and cost of this litigation.[32]

6  The more logical and realistic view is, of course, that Plaintiffs terminated the 1975

7  Agreement because it contained a grant of rights, and thus "resuscitation" of that

8  grant by Mrs. Siegel's continued acceptance of benefits thereunder would leave

9  DC with a complete set of rights in Superman.  At the very least, the inconsistency

10  between Plaintiffs' actions and their argument in this motion is sufficient to create

11  a genuine issue of fact to preclude any summary judgment.

12        Plaintiffs next contend that, assuming the 1975 Agreement granted

13  Defendants rights in Superman and remains intact, that this could have no impact

14  on the present action and Plaintiffs' termination rights since they were not parties

15  to the Agreement. (Pl. Mem. at 39).  According to Plaintiffs, the 1975 Agreement

16  could thus not "effectively assign Plaintiffs' termination interest" because they

17  were not signatories thereto.  (*Id.* at 39.)  But Plaintiffs are missing the point:

18  Defendants do not contend that the 1975 Agreement assigned *Plaintiffs'*

19  *termination interest* to Defendants – indeed, the termination right did not even

20  exist when the 1975 Agreement was executed and any grant *in futuro* of Plaintiffs'

21  rights subject to termination would be an ineffective "agreement to the contrary"

22  under section 304(c)(5).  Instead, Defendants claim that as a matter of equity,

23  Plaintiffs cannot claim on the one hand that the 1975 Agreement and its grant of

24  rights in Superman is terminated by virtue of the Superman Notices while at the

25  

26  [32] If Plaintiffs do, in fact, now take the position that all of the Superman Notices after the first one were superfluous, Plaintiffs ought now to withdraw those notices of

27  termination and dismiss any claims directed at such notices with prejudice.  Of course, because Plaintiffs have forced Defendants to defend these claims, Defendants would

28  request that the Court exercise its discretion under section 505 of the Copyright Act and award Defendants their attorneys' fees as the prevailing parties with respect to these termination notices.

1   same time continuing to reap the benefits of the financial payments provided under

2   that very same grant.  (Bergman Decl. Exhs. NN, OO; Levitz Decl. ¶¶ 8-10.)

3   Having chosen to accept those benefits, Plaintiffs have thus *de facto* made a further

4   post-termination grant to DC, National's successor-in-title, and waived their right

5   to make such a grant to anyone else.  *See Miller*, 85 Cal.App. at 762; *Kern Sunset*

6   *Oil*, 214 Cal. at 440.

7          For the same reason, Plaintiffs' final argument that the 1975 Agreement

8   cannot affect their termination rights because it is an "agreement to the contrary"

9   under section 304(c)(5) falls away as well.  Section 304(c)(5), which sets forth that

10  termination may be effected notwithstanding an "agreement to the contrary," was

11  drafted to prevent "litigation-savvy publishers" from utilizing, before and at the

12  outset of the life of a creative work, their "superior bargaining position to compel

13  authors to agree that a work was [not eligible for termination] in order to get their

14  works published."  *Simon*, 310 F.3d at  290-91.  But Defendants do not contend

15  here that the 1975 Agreement contains a provision in which the Siegels give up

16  their termination rights; nor do Defendants claim that at any time before Plaintiffs'

17  termination rights vested they agreed to make a future grant.[33]  Instead, they claim

18  that Plaintiffs' continued acceptance of benefits under the 1975 Agreement

19  nullifies the termination of the Agreement, leaving the grant contained therein in

20  place.

21          In short, because Plaintiffs continue to reap the benefits they bargained for

22  under the 1975 Agreement, they cannot at the same time seek to profit from the

23  alleged termination thereof.  *Milne*, 430 F.3d at 1048 (copyright termination

24  invalid where pre-1978 grant is still effective).  As such, Plaintiffs' motion for

25  summary judgment should be denied.

26

27

28      [33] In any event, it would be nonsensical to assert that an underlying copyright grant
        subject to termination can itself be an "agreement to the contrary" under the statute; if so,
        the termination provisions would make no sense.

**D.    Genuine Issues of Material Fact Prevent Dismissal
of Defendants' Statute of Limitations Defenses**

By this suit, Plaintiffs seek a declaration that the Superman Notices are valid and that they are co-owners of copyright in certain Superman works.  In their First Amended Counterclaims, Defendants assert that Plaintiffs' suit is barred by the Copyright Act's three-year statute of limitations.  (Answer ¶ 110; FACC ¶¶ 90-96.) On their motion, Plaintiffs seek to dismiss Defendants' statute of limitations defense.  Plaintiffs' motion in this regard is legally defective and rife with fact issues.

**1.    The Copyright Act's Statute Of Limitations
Bars Any Civil Action Not Commenced Within
Three Years Of The Accrual Of A Claim.**

The Copyright Act provides: "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The statutory language is all-encompassing and no exceptions are provided or suggested.  There can be no dispute but that the instant litigation – an action for a declaration that the Superman Notices are valid and, as a result, Plaintiffs have become co-owners of copyright in "Superman" – is a "civil action" brought under the Copyright Act.  In the face of the plain language of the statute, Plaintiffs nonetheless argue – based upon misguided "policy" arguments and upon misunderstood out-of-circuit authority that has expressly been disregarded by the Ninth Circuit – that the Copyright Act's statute of limitations cannot apply here.  Plaintiffs are wrong.

Without citation to a single case or statutory provision, Plaintiffs, after addressing the alleged policy reasons for the termination right they purport to assert, claim that "Congress surely did not intend that its concerted efforts to safeguard this important recapture right could so easily be foiled by a publisher's predictable denial of a termination notice's validity, allegedly triggering the statute

of limitations." (Pl. Mem. at 42.)  Plaintiffs' one-sided description of the termination right and facts is, at best, misleading.  As noted above, the termination right was not intended as a one way street but was carefully crafted as "a practical compromise" to protect not just "authors and their families" but also "publishers, film producers and other users."  H. Rep. at 124; S. Rep. at 108; Supp. Reg. Rep. at 72; *Milne*, 430 F.3d at 1046.  These efforts included the development of specific safeguards designed to protect the interests of all concerned.  Thus, while section 304(c) excludes from grants subject to termination dispositions by will, it specifically proscribes any author or any member of his family from making any "agreement to the contrary" such as "an agreement to make a future grant."  17 U.S.C. § 304(c)(5).

Moreover, even if Plaintiffs could establish the one-sided policy arguments they put forward, such arguments cannot exempt Plaintiffs from the Copyright Act's express time bar on civil actions brought under the Act.  Plaintiffs themselves concede that Congress engaged in concerted efforts to draft the termination provisions and cite in their brief to numerous detailed rules and procedures governing the termination right. (Pl. Mem. at 13-16.)  Had Congress chosen to exempt rights recaptured by means of the termination procedure from the statute of limitations set forth in section 507(b), it would have so specified in the statute.

Plaintiffs also seek to overcome Defendants' statute of limitations defense by claiming that the Copyright Act's statute of limitations does not apply to civil actions asserting copyright ownership.  (Pl. Mem. at 43.)  In support of this claim, Plaintiffs cite to the *Second Circuit's* decision in *Stone v. Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993).[34]  However, Plaintiffs fail to disclose to the Court that *the Ninth Circuit* has held that the Copyright Act's

---

[34] Plaintiffs fail to disclose that since its holding in *Stone*, the Second Circuit has unequivocally recognized that the Copyright Act's statute of limitations applies to the assertion of co-ownership disputes, which, if not commenced within three years of accrual, are lost forever. *Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996).

1   statute of limitations *does* apply to civil actions, such as this one, asserting

2   copyright co-ownership.  In *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996),

3   the Ninth Circuit unequivocally held that "[a] claim for a declaratory judgment of

4   co-ownership and the relief ancillary to such a claim is a civil action, and 'no civil

5   action shall be maintained . . . unless it is commenced within three years after the

6   claim accrued.'"  The Ninth Circuit in *Zuill* considered the Second Circuit's

7   decision in *Stone*, calling its facts "highly idiosyncratic," and expressly declined to

8   follow or even distinguish the decision "because it is not controlling authority in

9   this circuit."[35]  *Id.* at 1370.  The law in the Second Circuit is in any event the same

10   – a copyright co-ownership claim is time barred unless it is commenced within

11   three years after the claim accrued.  *Merchant*, 92 F.3d at 56-67.  *See also Hogarth*,

12   342 F.3d at 164.  The Ninth Circuit in *Zuill* effectively rejected the substantive

13   arguments advanced by Plaintiffs on their motion, including but not limited to, the

14   citation to legislative history.  *Zuill*, 80 F.3d at 1369, n.1.[36]

15       Because Plaintiffs have brought this civil action under the Copyright Act,

16   under the controlling precedent in the Ninth Circuit, the three-year statute of

17   limitations of the Copyright Act applies.

18

19

---

20   [35] Plaintiffs' failure to disclose the holding in *Zuill* is even more troubling in light of their reliance upon *Aalmuhammed v. Lee*, 203 F.3d 1227 (9th Cir. 2000) (Pl, Mem. at 41-

21   42.)  Citing to its prior decision in *Zuill*, the Ninth Circuit in *Aalmuhammed* reiterated that "[a] claim of authorship of a joint work must be brought within three years of when it

22   accrues."

23   [36] For several reasons, there is no basis for Plaintiffs' suggestion (Pl. Mem. at 42, n.10) that section 507(b) should bar any of Defendants' arguments because they did not

24   file an action within 3 years after service of the Superman Notices seeking a declaration of copyright ownership.  First, Defendants' arguments are pleaded in affirmative defenses

25   challenging Plaintiffs' termination, and are not the subject of a counterclaim for a declaration of copyright ownership.  Second, even if DC had pleaded counterclaims that

26   could have been untimely, the laundry list of thirty-nine (39) affirmative defenses Plaintiffs pleaded to DC's counterclaims do not include statute of limitations.  As such, a

27   statute of limitations defense to DC's counterclaims can no longer be asserted.  Third, it is well established that even where defendant has filed a time-barred counterclaim, a

28   statute of limitations would not prevent an affirmative defense to a plaintiff's claim. *Hogarth*, 342 F.3d at 163-64 (collecting cases).  *See also City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1035-36 (9th Cir. 2003).

**EXHIBIT Y**

**344**

49

2. **Plaintiffs' Attempted Reliance Upon The "Tolling Agreement" Is Misplaced.**

   a. **Summary Judgment Is Inappropriate Because There Are Genuine Issues Of Material Fact As To When Plaintiffs' Claim Of Co-Ownership Accrued And When The Tolling Agreement Terminated.**

As Plaintiffs concede, under the Copyright Act "claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Id.* at 1369. Plaintiffs claim that an express repudiation was received on April 15, 1999 but that the statute of limitations was tolled beginning on April 6, 2000 when the parties entered into the Tolling Agreement (Schulman Decl. ¶ 5; Toberoff Decl. Exh. Z). (Pl. Mem at 40.) Plaintiffs further claim that the Tolling Agreement remained effective until October 4, 2002 and that, because the instant action was commenced on October 8, 2004, Plaintiffs beat the expiration of the statute of limitations by four days. (*Id.* at 41.)

Plaintiffs' defense to the statue of limitations fails for two reasons. First, Plaintiffs received a first express repudiation by letter dated December 18, 1997. In that letter, Defendants placed Plaintiffs on notice that they considered the Superman Notices to be defective in several respects, thus beginning the statute of limitations running. (Bergman Decl. Exh. GG.) As a result, even assuming *arguendo* that the Tolling Agreement remained in effect until October 4, 2002 (a fact Defendants dispute), on that date, only **256 days** remained before the statute of limitations expired. Plaintiffs did not file their complaint until **734 days** after Plaintiffs claim the Tolling Agreement terminated, well after the statute of limitations had run.

Even if Plaintiffs can demonstrate that they did not understand that the December 18, 1997 letter constituted an express repudiation of their claim of co-

ownership, there is a genuine material issue of fact as to when the Tolling

Agreement ceased to be in effect.  The Tolling Agreement provides that it would

"remain in effect until 10 business day after the earlier of: (a) one of the parties

terminating negotiations, in writing, relating to the Notices, **or (b) the parties**

**reaching an amicable resolution of the dispute between them relating to the**

**Notices.**"  (Toberoff Decl. Exh. Z, emphasis added.)

As Plaintiffs concede, on October 19, 2001, prior counsel for Plaintiffs sent

the six-page Marks Letter to John Schulman, confirming that his clients had

"accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and

'Spectre' properties."  (Toberoff Decl. Exh. BB.)  The Marks Letter goes on to

outline in detail all material terms to which the parties had agreed.  (*Id*.)  For

purposes of the Tolling Agreement, the Marks Letter represents the "amicable

resolution" provided for in the Tolling Agreement.  Ten business days thereafter --

on October 30, 2001 -- the Tolling Agreement expired by its own terms.  That

Plaintiffs have, after the fact, sought to "put the Genie back in the bottle" and have

reneged on an agreement they accepted on October 19, 2001, cannot serve also to

"reactivate" the Tolling Agreement.

Defendants anticipate that Plaintiffs will argue that no "amicable resolution

of the dispute" was reached, advancing the same arguments urged in the portion of

their motion directed to enforceability of the October 19, 2001 Agreement.  But

even if the October 19, 2001 Agreement is not ultimately enforced, it is nonetheless

clear that as of October 19, 2001 a resolution of the dispute had "been reached,"

and the Tolling Agreement ended.  This is confirmed by Joanne Siegel's own letter

of May 9, 2002 where she attempts to repudiate the October 19, 2001 Agreement,

but concedes that "we . . . accepted John Schulman's last proposal six months ago."

(Bergman Decl. Exh. Y)

Thus, even if Plaintiffs claim they did not understand their claim of co-

ownership to be expressly repudiated until April 15, 1999, because the Tolling

**EXHIBIT Y**
**346**
51

Agreement expired on October 30, 2001, Plaintiffs waited 1430 days to bring suit (on October 8, 2004) well beyond the 1095 days permitted under the Copyright Act.  As a result, Plaintiffs' claims are time-barred.

        **b.**    **Regardless Of When The Claim Accrued And When The Tolling Agreement Expired, Any Claims Of Co-Ownership Of Copyright Against Entities Other Than DC Comics Are Time-Barred.**

In their Fourth Claim for Relief, Plaintiffs assert that they are co-owners of copyright in Superman with Defendant Warner Bros. in addition to DC.[37]  While the existence of the Tolling Agreement may have tolled the statute of limitations on Plaintiffs' copyright co-ownership claims against DC for some amount of time (the length of which is in dispute), no such argument is available with respect to Plaintiffs' co-ownership claims against Defendant Warner Bros.  The Tolling Agreement is solely between DC and Plaintiffs.  None of the other Defendants is mentioned in, let alone a party to, the Tolling Agreement.  Thus, even taking the later accrual date advanced by Defendants – April 15, 1999 – because no claims of co-ownership with Warner Bros. are tolled for any period of time, the statute of limitations on such claims has clearly run as to it or any other non-party to the agreement.

---

[37] Defendants dispute this and have moved for summary judgment on the claim that DC and Warner Bros. are alter-egos.

**EXHIBIT Y**
**347**  52

**II.   AS A MATTER OF LAW, AN EFFECTIVE TERMINATION PURSUANT TO THE SUPERMAN NOTICES OF TERMINATION CANNOT REQUIRE A PROFIT ACCOUNTING FROM EXPLOITATION OF FOREIGN COPYRIGHTS**

**A.   Background: The Established Copyright Framework In Which Termination Must Be Considered**

Since section 304(c) was enacted and must be considered in the framework of the remaining provisions of the 1976 Act, the particularly relevant provisions of the Act are summarized below.

**1.   Rights of Co-Owners Of Copyright**

Section 201 of the 1976 Act carried forward the basic 1909 Act principles that copyright "vests initially in the author or authors of the work," that "authors of a joint work are co-owners of [the] copyright" and that "[i]n the case of works made for hire the employer . . . is considered the author . . ." and initial owner of copyright.  17 U.S.C. § 201(a) & (b).  *See also* H. Rep. at 120-21.  Under the 1909 Act, as today, each joint author is a co-owner who possesses "an undivided ownership in the entire work, including all of the contributions contained therein" 1 *Nimmer* § 6.03, at 6-7; *see Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978)), and who can nonexclusively exercise all the rights of the copyright owner subject only to a duty to account to other co-owners for their share of "profits" earned from such use or licensing (1 *Nimmer* § 6.10; *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984)).  A joint author *cannot* be liable for infringement of copyright from such use or licensing.  *Id. See also Zuill*, 80 F.3d at 1369.[38]

---

[38] Since no representative of Shuster exercised any termination right under Section 304(c), even assuming that Plaintiffs validly exercised their termination right, DC retains Shuster's share of any purportedly terminated Superman work, fully entitled to exercise such co-ownership rights today subject only to its duty to account.

**EXHIBIT Y**
**348**

53

## 2. National Treatment and Territorial Nature of the United States Copyright Act

Both in the United States and abroad, under the rule of so-called "national treatment," works authored in the U.S., such as the first Superman comic strip in *Action Comics No. 1*, are afforded the same protection in other countries as that provided therein to their own citizens. *See Itar-Tass Russian News Agency, Inc. v. Russian Kurier, Inc.*, 153 F.3d 32, 89 & n.8 (2d Cir. 1988); *Patry's Latman*, at 302.[39]  As a result, for any one work by an American or foreign author there can be as many separate copyrights as there are countries affording copyright protection. Under the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"), to which the United States has adhered since 1989 (*see* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988)), such national treatment of copyright protection means that the substantive law of the country in which copyright infringement is alleged will govern a claim, even if the law of that country differs from the law of the country in which the work was created. *See also Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1097 (9th Cir. 1994).  As explained by the Court of Appeals in *Subafilms*, national treatment implicates a rule of territoriality in which "[t]he applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national or in which the work was first published." *Id.* at 1097.  *See also Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 701 (9th Cir. 1995).

## 3. The Presumption Against The Extraterritorial Effect of U.S. Legislation

Whether a federal statute can cover in whole or in part any conduct overseas is a question of statutory interpretation, where the party claiming extraterritorial

---

[39] In order for foreign works to have the benefit of "national treatment" in the U.S., at least one of the indicia of reciprocity specified in Section 104(b) must be satisfied.  17 U.S.C. § 104(b).

1    effect bears the burden of proof to overcome the well established presumption to

2    the contrary.  As noted by Chief Justice Rehnquist,

3              It is a longstanding principle of American law 'that

4              legislation of Congress, unless a contrary intent appears,

5              is meant to apply only within the territorial jurisdiction

6              of the United States." *Foley Bros., 336 U.S. at 285*.  This

7              "canon of construction . . . is a valid approach whereby

8              unexpressed congressional intent may be ascertained."

9              *Ibid*.  It serves to protect against unintended clashes

10             between our laws and those of other nations which could

11             result in international discord.  *See McCulloch v.*

12             *Sociedad Nacional de Marineros de Honduras, 372 U.S.*

13             *10, 20-22 (1963)*.

14             In applying this rule of construction, we look to see

15             whether 'language in the [relevant Act] gives any

16             indication of a congressional purpose to extend its

17             coverage beyond places over which the United States has

18             sovereignty or has some measure of legislative control.'

19             *Foley Bros., supra at 285*.  We assume that Congress

20             legislates against the backdrop of the presumption against

21             extraterritoriality.  Therefore, unless there is 'the

22             affirmative intention of the Congress clearly expressed,'

23             *Benz, supra, at 147*, we must presume it 'is primarily

24             concerned with domestic conditions.'  *Foley Bros., supra,*

25             *at 285*.

26   *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*").  *See*

27   *also id.* at 250 (party asserting that a statute has extraterritorial application of U.S.

28   law "must make the affirmative showing" that it does so).

1    Furthermore, as the Supreme Court has very recently explained, even where
2  it can be shown that Congress in one provision of a statute has clearly manifested
3  in express statutory language an intention to cover events taking place in foreign
4  territories that are specifically described therein, the presumption against doing so
5  precludes "an expansive interpretation" of such a provision and "tugs strongly
6  against" its liberal construction. *Microsoft Corp. v. AT&T Corp.*, 127 S.Ct. 1746,
7  1751, 1758 (April 30, 2007). *Microsoft* involved the Patent Act under which "[i]t
8  is the general rule . . . that no infringement occurs when a patented product is made
9  and sold in another country" but to which Congress in 1984 had added a specific
10  exception in Section 271(f) providing that an infringement occurs when one
11  "supplies from the United States," for "combination" abroad a patented invention's
12  "components." 35 U.S.C. § 271(f)(1); *see id.* at 1746. The Court held that this
13  provision did not apply to computer software first sent from the United States to a
14  foreign manufacturer on a master disk, or by electronic transmission, then copied
15  by the foreign recipient on computers made and sold abroad. As Justice Ginsburg
16  concluded, where Congress did not address "any arguable gaps" in the reach of
17  Section 271(f), "our precedent leads us to leave in Congress' court" whether there
18  should be any expansion of a specific statutory provision, even one that admittedly
19  targeted certain foreign conduct for coverage by the patent laws:

20           If the patent law is to be adjusted better 'to account for
21           the realities of software distribution' [citation omitted],
22           the alteration should be made after focused legislative
23           consideration, not by the Judiciary forecasting Congress'
24           likely disposition.

25  *Id.* at 1760.

26

27

28

**B.** **Plaintiffs Have Misstated a Joint Owner's Duty to Account Which Only Requires the Co-Owner to Share Its Own Profits**

While Plaintiffs accurately note the general principle that each of two joint authors own an undivided fifty percent interest in the copyright of the work, they have misstated the rule concerning the accountings of profits from exploitation of such jointly owned works. First of all, the rule only governs how joint owners account *to each other with respect to their own profits,* not anyone else's.[40] As explained by the Court of Appeals, "[a] co-owner of a copyright must account to other co-owners *for any profits he earns* from licensing or use of the copyright." *Oddo,* 743 F. 2d at 633 (emphasis added). Furthermore, under established law, a co-owner of a copyright is limited to a claim for his share of the profits received by the other co-owner from the license of the copyright; he does not have the right to pursue a claim for a share in the profits of the licensee as well. *See Ashton-Tate v. Ross,* 916 F.2d 516, 522-23 (9th Cir. 1990) (a copyright holder is entitled to share in licensing proceeds from co-owner, not in a licensee's profits); and *Brown v. Republic Prods., Inc.,* 26 Cal. 2d 867, 868 (1945) (upholding judgment that a copyright holder could not obtain accounting from co-owner's licensees). *See also Jasper v. Sony Music Entm't, Inc.,* 378 F. Supp. 2d 334, 346 (S.D.N.Y. 2005); 1 *Nimmer* § 6.12[B] ("A right of accounting may be enforced only as against the joint owner-licensor and not as against his licensee.").

Accordingly, it is only Defendant DC that would have any duty to account to or share with Plaintiffs its profits from the Superman property, if Plaintiffs termination notices are valid.

---

[40] Defendants have moved for summary judgment dismissing all claims of Plaintiffs brought against defendant Warner Bros. Entertainment Inc. and Time Warner Inc. as alter egos of defendant DC in an unfounded attempt to reach any of their Superman-related profits in the accounting claims.

**C.   Because Plaintiffs Cannot and Have Not Recaptured Any Ownership Interest in Foreign Copyrights, The Rules Governing Accountings Between Joint Owners Do Not Apply to Profits from Such Foreign Copyrights**

Plaintiffs argue that they are entitled to a one half share of all profits − both foreign and domestic − from any exploitation of Siegel's recaptured interest in the Superman copyrights because state law general accounting principles so provide. Plaintiffs' theory is based on the false premise that by virtue of a statutory copyright termination one could become a joint owner of not only U.S. copyright rights but also foreign copyrights. However, as noted above, for any particular work there are separate copyrights for each different country and, as also shown below, neither Section 304(c) nor any other legal rule has provided or could give Plaintiffs any copyright ownership interest outside the U.S.[41]

The cases Plaintiffs rely upon to support their claim for a share of the foreign profits from exploitation of Superman copyrights (Pl. Mem. at 25-28), are all actions where the plaintiff was the co-owner of *all* copyright rights in the works at issue. But where, as here, there is no such extensive co-ownership interest, these decisions can have no application. In short, if you are not a co-owner as to foreign rights, you do not have a co-owner's right to participate in foreign revenues.

---

[41] Notwithstanding their above-quoted pleading, Plaintiffs now concede, as they must, that their claim to one-half share of profits from foreign exploitation of Superman as a joint owner does not derive from any principles dealing with copyright infringement. (Pl. Mem. at 25-28); *Oddo v. Reis, supra*, 743 F. 2d at 633 (as between co-owners of a copyright, "the duty to account does not derive from the copyright law's proscription of infringement"); *accord Zuill*, 80 F.3d at 1369.

**EXHIBIT Y**

**353**

58

**D.** **Only the Copyright Act, Not State or Any Other Law, Determines the Rights That Can be Recaptured By Means of a Copyright Termination Under Section 304 (c)**

**1.** **In The Copyright Act's Termination Provisions Congress Clearly and Broadly Expressed its Intent that the Terminating Party's Rights Could Not Affect a Grantee's Foreign Copyright Rights or Reach Actions Occurring Outside of the U.S.**

It is undisputed that from March 1, 1938 until the April 16, 1999 purported effective date of the Superman Notices, DC as Detective's successor-in-interest has owned and exercised all worldwide rights under copyright in and to all of the Superman works for the original and renewal terms of protection. The sole basis for Plaintiffs' right to claim any ownership of copyright in such works today is Congress' decision in the 1976 Act to provide authors and their heirs with a right to terminate pre-1978 grants of copyright rights in specified conditions and to the limited extent that the statute allows in 17 U.S.C. § 304(c). In other words, whatever co-ownership rights Plaintiffs can claim to own today are creatures of statute, emanating solely from Section 304(c), which defines the scope, effect and limitations of any termination thereunder. It is undisputed that Plaintiffs have never been granted any other rights in the works at issue and, as demonstrated below, it cannot be gainsaid that under such provision itself the co-owner of a termination interest cannot recapture any rights except an undivided one-half share of the U.S. copyright rights. Accordingly, it is *only* DC that would have any duty to account to or share with Plaintiffs *only* its profits from U.S. uses of the Superman property, if Plaintiffs' termination notices are valid.

### a.    The Copyright Act Does Not Include Any Indication Of Congressional Intent to Cover Conduct Occurring Outside the U.S.

As noted by Patry, "*every* court to have examined the issue has held that Congress did not intend the Copyright Act to be applied extraterritorially beginning with the Supreme Court in 1908." [footnote omitted] (emphasis added). 7 William F. Patry, *Patry on Copyright*, § 25:86 at 25-236 (2007) (hereinafter *Patry on Copyright*")[42] (citing *United Dictionary Co. v. G&C Meriam*, 208 U.S. 260, 264, 28 S. Ct. 290 (1908) and collecting cases, including *Leisure Time Enm't v. Cal Vista*, 35 Fed. Appx. 565 (9th Cir. 2002); *Los Angeles News Service v. Reuters Television Intern. Ltd.*, 144 F. 3d 987 (9th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999); and *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1096 (9th Cir. 1994), *cert. denied*, 513 U.S. 1001, 115 S. Ct. 512, 130 L. Ed. 2d 419 (1994)).

In the rare  situation when Congress has intended to make an exception to the presumption against extraterritoriality, it has clearly expressed that intent. Thus, from January 1, 1978 until the U.S. adherence to the Berne Convention in March of 1989, when the statute was amended with regard to its copyright notice requirements, the Copyright Act included explicit language requiring the affixation of notice to copies of works distributed in both the U.S. and overseas.  17 U.S.C. § 401(a) (notice required on works "published in the United States or elsewhere") (before amended).  Apart from this exception, Congress has made it clear in Section 602(b) that the Copyright Act does not otherwise apply extraterritorially: "In a case where the making of the copies or phonorecords would have constituted an infringement of copyright if this title had been applicable, their importation is prohibited."  As pointed out in the Patry treatise:

---

[42] Relevant excerpts from *Patry on Copyright* are attached at Bergman Decl. Exh. HH.

1    Obviously, if the unauthorized making of copies overseas
2    was unlawful under Title 17, this section would be
3    wholly unnecessary.  In reviewing the possible
4    extraterritoriality of the Copyright Act under the *Aramco*
5    decision, the Ninth Circuit, sitting *en banc*, also noted the
6    presence of section 602, and described its presence as
7    'doubly fortifying' the presumption against the statute's
8    extraterritoriality.

9    7 *Patry on Copyright*, § 25:86 at 25-238 (citing *Subafilms*, 24 F.3d at 1096).[43]

### b.    Congress Has Clearly Manifested Its Contrary Intent, To Wit, That Any Termination and Recapture of Copyright Rights Under Sections 304(c) and 203 Cannot Apply to Any Conduct Occurring Outside the Country.

Plaintiffs' arguments about entitlement to share in profits earned from the exploitation of U.S. copyright rights in foreign territories ignore (a) the fact that under the Copyright Act Plaintiffs do not own and can never own, without a grant from DC, any foreign copyrights in any Superman works, and (b) the express limiting effect of the provisions of Section 304(c) of the statute making it clear that Plaintiffs' termination can in no way affect DC's continuing exclusive rights to exploit its foreign copyrights in such works.  This broad statutory limitation includes no exceptions.

### 2.    Plaintiffs Do Not Own Any Interest in Foreign Copyright Rights Because These Are Not Subject to Termination

Section 304(c)(6) specifically provides that: "[I]n **all cases** the reversion of rights under this section is subject to" specified "limitations," including that

---

[43] In *Subafilms*, the Court also held that authorizing in the U.S. acts that are allegedly infringing abroad cannot constitute an actionable act of infringement under the U.S. Copyright Act.  24 F.3d at 1090-91.

**EXHIBIT Y**
**356**
61

"[t]ermination of a grant under this subsection affects only those rights covered by the grants that arise under this title [*i.e.* the Copyright Act], and *in no way affects rights arising under any other Federal, State, or foreign laws.*" 17 U.S.C. § 304(c)(6)(E) (emphasis added). This sweeping and unequivocal language does not merely restrict a terminating party's right to recapture so as to include U.S. copyrights but not foreign copyrights. It is broader: termination "**in no way affects rights**" arising under foreign laws. As Congress explained in the legislative history, "rights [of grantees] under other Federal, State or foreign laws are **unaffected.**" H. Rep. at 126 (emphasis added) (describing Section 203's nearly identical termination right as to post-1978 grants).[44]

The statutory limitation restricting the effect of termination to domestic copyright grants has been recognized by the Second Circuit Court of Appeals:

> The Copyright Act of 1976 . . . expanded the rights of authors and their heirs by automatically extending the life of their copyrights by 19 years, for a total of 75 years . . . and by allowing authors (or, if the authors are deceased, their statutory heirs) to terminate, for the period of the extended copyrights, any *domestic* copyrights interests in their work that they may have granted to others . . . .

*Fred Ahlert Music Corp.*, 155 F.3d at 18 (emphasis added).[45] In *Ahlert*, after noting the fact of the termination, the court stated further that "Warner's *domestic* rights in the Song reverted to Dixon's heirs" and that Warner, which was the successor to rights of the original grantee, retained the foreign rights after

---

[44] Section 304(c) is a close but not exact counterpart of Section 203, which provides a right to terminate an author's post-1977 grants of copyright rights. H. Rep. at 140. The same limitation on termination with respect to rights under other federal, state or foreign laws appears in Section 203. 17 U.S.C. §§ 203(b)(1), (5).

[45] Similarly, the District Court concluded that "[w]hile the [heirs] terminated defendant's right to use the song in the United States, defendant retained a grant to license the song everywhere else in the world except the United States." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 958 F. Supp. 170, 172, n. 1 (S.D.N.Y. 1997).

**EXHIBIT Y
357** 62

termination. *Id.* at 20 (emphasis added). *Ahlert* concerned a copyright termination under Section 304(c) by the statutory heirs of one of the two joint authors of the song "Bye Bye Blackbird" registered for copyright in 1926 (the "Song"). Prior to the 1953 renewal of the copyright, the co-authors had assigned their respective copyright interests in the Song to defendant Warner's predecessor in interest, who proceeded to authorize a derivative recording of the Song. Following service of an effective termination notice, the statutory heirs assigned their recaptured copyright in the Song to plaintiff. The Court analyzed the parties' rights as though one of the joint authors, Dixon, was sole author. 155 F.2d at 20, n.4. While the precise issue before the court was whether a particular post-termination use by defendant Warner of the pre-termination derivative work in the United States was covered by the "existing derivative works" exception to Section 304(c)(6)(A), both the parties and the Court acted on the unquestioned presumption that the termination affected only the domestic copyright, and that the foreign rights to both the Song and the derivative work remained unaffected and could continue to be exploited by the defendant Warner *without accounting to plaintiff.* Accordingly, after noting the fact of the termination, the court stated: "Thus, Warner's *domestic rights* in the Song reverted to Dixon's heirs." *Id.* at 20 (emphasis added).

All commentators are also in agreement on this point. According to *Nimmer*, Congress not only made a clear choice but also, because of the territorial nature of copyright protection, had no power to do otherwise:

> A grant of copyright 'throughout the world' is terminable *only with respect* to **uses** *within the geographic limits of the United States*. Because copyright has no extraterritorial operation, arguably American law is precluded from causing the termination of rights based on foreign copyright laws. . . . [E]ven if the conflicts rule of a foreign nation were to call for application of the

1    American termination rule of contract law, that rule by its

2    own terms excepts from termination the grant of those

3    rights arising under foreign copyright law.

4    3 *Nimmer* §11.02[B][2]. Other commentators are in accord. *See*, *e.g.*, 1 William

5    F. Patry, *Copyright Law & Practice*, 495-97 (2004) (exceptions to termination

6    include "rights that arise under any . . . foreign law"); William F. Patry, *Choice of*

7    *Law and International Copyright*, 48 Am.J.Comp.L. 383, 447 (2000) ("One

8    provision is quite clear, however:  termination only affects U.S. rights."); Paul

9    Geller & Melville B. Nimmer, 1 *International Copyright Law and Practice*, §

10   6[2][a][i], fn. 70 (2005) ("*Geller*") (noting that *Nimmer* "clarif[ies] that only the

11   transfer of U.S. copyright would be terminated by invoking the U.S. right to

12   terminate."); 1 Paul Goldstein, *Goldstein on Copyright*, § 5.4.3 at 5:135 (3d ed.

13   2006); 2 Howard B. Abrams, *The Law of Copyright*, § 12:41 (2006) ("The Act

14   limits its application to termination of grants of rights based upon the United States

15   Copyright laws . . . ."); 2 *Patry on Copyright*, § 7:42 & n.5.[46] As stated by Patry in

16   his law review article:

17          Sections 203(b)(5) and 304(c)(6)(E) both state, in

18          relevant part, that termination 'affects only those rights

19          covered by the grants that arise under this title [17

20          U.S.C.], and in no way affects rights ... under foreign

21          laws.'  Accordingly, where a U.S. author conveys

22          worldwide rights and terminates under either section,

23          grants in all other countries remain valid according to

24          their terms or provisions in other countries' laws.

25   48 Am.J.Comp.L. at 447.

26

27   ────────────────────

[46] That termination cannot affect rights arising under foreign copyright laws is such a
28   basic tenet of the termination provisions, it is taught to law students in introductory
     copyright courses. *See*, *e.g.*, Robert A. Gorman & Jane C. Ginsburg, *Copyright: Cases &*
     *Materials*, 376-77 (6th ed. 2006).

3. **Plaintiffs' Theory That They Have Recaptured a Share of Foreign Copyrights On the Basis of State Common Law Principles of Accounting Generally Governing The Rights of Property Co-Owners Disregards The Rules of National Treatment and Copyright Preemption**

In the face of Congress' clear and unambiguous language in both the statute and the legislative history, Plaintiffs nevertheless assert that a recapture of United States rights under copyright under section 304(c) entitles them, in the case of Superman, to participate equally with Defendants in revenues derived from foreign exploitation because under state common law rules of accounting co-owners share with each other the profits from their commonly owned property.  (Pl. Mem. 25-28).  Any such theory would make no sense here because it is inconsistent with and would render entirely meaningless the copyright statute's express language to the contrary.  Congress was undoubtedly fully cognizant of such general accounting principles, as well as the principles of national treatment and the inability of United States copyright law to have extraterritorial application, and decided in the clearest of terms that termination "in no way affects rights arising under . . . foreign laws" (17 U.S.C. § 304(c)(6)(E)).[47]  Although accounting actions between co-owners of copyright are generally ones that can be brought under state law, where the parties have no co-ownership relationship as to foreign copyright rights, one cannot bootstrap such general common law principles of accounting into a copyright

---

[47] Equally far fetched would be any contention that because Congress did not expressly prohibit the operation of such state law accounting principles in the termination provision, Congress meant to have them apply under section 304(c)(6)(E).  Plaintiffs' burden is to establish Congress' manifest intent in section 304(c) to have U.S. law reach conduct occurring beyond our borders.  Neither the statute nor the legislative history of the 1976 Act contains any statement of intention to provide such an exception.  As observed by Justice Stewart," . . . it would be a strange canon of construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980).

**EXHIBIT Y**
**360**
65

1  ownership interest that one has not obtained, and that the Congress expressly

2  decided one could not obtain.

3       Further, to the extent that Plaintiffs contend such state law accounting

4  principles trump Congress' decision to exclude foreign copyright rights from

5  termination, they run afoul of the Constitution's Supremacy Clause, Article VI,

6  and the most basic tenets of "conflict pre-emption." As noted by Nimmer ". . .

7  even apart from Section 301[of the Copyright Act], the general proposition

8  pertains in copyright law, or elsewhere, that 'a state law is invalid that stands as an

9  obstacle to the accomplishment of the full purposes and objectives of Congress.'"

10  1 *Nimmer* § 1.01[B][3][a] (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

11  As explained by Chief Justice Berger in *Kewanee Oil Co. v. Bicron Corp.*, 416

12  U.S. 470, 479-80 (1974), where state law touches upon and is inconsistent with

13  federal statutes,

14           it is "familiar doctrine" that the federal policy "may not

15           be set at naught, or its benefit denied" by the state law.

16           *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 172, 173,

17           176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942). "This is

18           true, of course, even if the state law is enacted in the

19           exercise of otherwise undoubted state power." . . . If the

20           scheme of protection developed by Ohio respecting trade

21           secrets "clashes with the objective of the federal patent

22           laws," *Sears Roebuck & Co. v. Stiffel Co., supra*, 376

23           U.S., at 231, 84 S.Ct. at 789, then the state law must fall.

24       The objectives of the termination provisions of the Copyright Act have been

25  specifically held to be the basis for pre-empting inconsistent state principles of

26  contract law. *See Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993),

27  where the Ninth Circuit held that since a California contract rule would directly

28

1   conflict with the termination provisions for post 1978 grants set forth in section

2   203 of the Copyright Act, it was pre-empted and "federal law must control." *Id.*

3       As noted above, in crafting the termination provisions of the statute as it did,

4   Congress drew a very clear line dividing just what rights could and could not be

5   recaptured via termination.  Under these circumstances, any rule or principle of

6   state law that conflicts with that decision must fall and is foreclosed by the

7   Copyright Act.  Here, insofar as Superman is concerned, because the termination

8   of only *Siegel's domestic* Superman copyright grants is involved, the Superman

9   Notices can have no effect on DC's legal right as the sole owner of the foreign

10  copyrights to continue to exploit those works outside of the United States without

11  any obligation to account to Plaintiffs.[48]

12  **III.   WHETHER THE PARTIES ENTERED INTO AN**

13          **ENFORCEABLE AGREEMENT ON OCTOBER 19, 2001 IS A**

14          **QUESTION OF FACT WHICH CANNOT BE RESOLVED ON**

15          **SUMMARY JUDGMENT**

16      Plaintiffs move this Court for an order dismissing DC's Third and Fourth

17  Alternative Counterclaims for breach of contract and declaratory relief, asserting

18  that there was no enforceable agreement between the parties as alleged by DC.

19  That is, Plaintiffs would have this Court summarily resolve the question of whether

20  or not a binding contract was formed between the parties on October 19, 2001

21  regarding the transfer of Plaintiffs' Superman copyright interests to DC.  But such

22  a determination is not the province of the Court at this juncture:  It would require

23  the Court to address and resolve questions of fact, weigh the evidence, and assess

24  the credibility of the witnesses, none of which can properly be done on summary

25

26  ───────────────

27  [48] As noted above, any act by DC or its licensees in the exercise of some or all of the rights of copyright as a co-owner in the United States and exclusive owner outside the country can *never* constitute an *infringing* act in the United States or overseas. DC,

28  which remains the sole owner of the foreign copyrights in foreign jurisdictions, is entitled to exercise all rights of ownership in such other jurisdictions without infringing any rights which may be held by Plaintiffs.

**EXHIBIT Y**

**362**   67

1  judgment.  Indeed, it has routinely been held that the question of the formation of a

2  contract is for the trier of fact upon considering the appropriate evidence.  *See*

3  *Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) (whether

4  parties mutually intended to be bound by terms contained in a proposed written

5  agreement is to be determined from the facts and circumstances of a particular case

6  and is a question of fact); *Symphony Fabrics Corp. v. Podell Indus., Inc.,* 94 Civ.

7  4373 (BSJ) 1996 U.S. Dist. LEXIS 12767, *14 (S.D.N.Y. Aug. 30, 1996) (to

8  determine whether a contract has been formed, the trier of fact must evaluate the

9  objective manifestations of the intent of the parties).

10      In general, an enforceable contract requires a meeting of the minds on the

11  material terms, along with an intention by the parties to be bound.  *Apablasa v.*

12  *Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959); *Callie v. Near*, 829 F.2d 888,

13  891 (9th Cir. 1987) ("In addition to the intent of the parties to bind themselves, the

14  formation of a settlement contract requires agreement on its material terms.").

15  Plaintiffs have failed to provide any sworn testimony from either of them

16  containing any objective evidence that the October 19, 2001 Letter did not

17  represent a "meeting of the minds" on all material terms.  This evidentiary failing

18  alone dooms Plaintiffs' motion.

19      Moreover, as demonstrated below, Defendants have presented sufficient

20  admissible evidence for a trier of fact to conclude that in October, 2001, (i) the

21  parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their

22  respective clients, reached a meeting of the minds on all material terms pursuant to

23  which Plaintiffs would convey their Superman copyright interests to DC, (ii) that

24  this agreement was contemporaneously memorialized and affirmed in a writing

25  executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties

26  intended and expected to be bound by the terms of that agreement notwithstanding

27  the fact that they contemplated negotiating and executing a more formal contract

28  thereafter.  In fact, the parties were proceeding along on that basis, with the

drafting and re-drafting of their more formal documentation, until Plaintiffs suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel, and abruptly jettisoned both the deal and their attorneys who negotiated it.

This evidence cannot be rejected or negated *as a matter of law* as would be required in a motion for summary judgment. *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th 129, 141 (2002) ("where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist."). Indeed, in assessing the existence of a contract on summary judgment, the court *must* draw all inferences in the light most favorable to the non-moving party. *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1116 (C.D. Cal. 2002) (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987)). Accordingly, Plaintiffs' motion for partial summary judgment on these claims must be denied, and DC should be permitted to present its contract Counterclaims to a jury for determination at trial.

### A.   It Has Been Established In This Action That Mr. Marks Had Full Authority to Act on Behalf of Plaintiffs in Connection with The October 19, 2001 Agreement

As a preliminary matter, the question of Mr. Marks' authority to act on behalf of and to bind Plaintiffs to an agreement with DC is no longer an issue in this case. Generally, an attorney is *presumed* to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority. *See In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2nd Cir. 1996). In their Reply to DC's Counterclaims on the contract issues, Plaintiffs expressly asserted as their Thirty-Seventh affirmative defense that "Plaintiffs' attorneys lacked

authority and/or exceeded the scope of their authority with respect to the purported

settlement agreement alleged by Counterclaimant." (Bergman Decl. Exh. II.)

Notwithstanding this stated defense, Plaintiffs vigorously resisted all attempts by

Defendants to inquire into the scope of Mr. Marks' authority, and specifically into

whether or not Plaintiffs had authorized in advance or had consented to his

communication to DC on October 19, 2001, that "the Siegel Family . . . has

accepted" DC's offer. (Bergman Decl. JJ; *see also id.* Exh. S (Marks Tr.) at

146:21-147:11.) However, in response to Defendants' motions to compel

Plaintiffs and Mr. Marks to produce documents and respond to deposition

questions regarding his authority − and in an apparent attempt to forestall any order

by the Court in that regard − Plaintiffs' current attorney, Mr. Toberoff, conceded in

open court, *without qualification*, that the Marks Letter represented the statements

of Plaintiffs themselves. (Bergman Decl. Exh. KK.) Accordingly, relying on Mr.

Toberoff's statement and finding it to be binding on Plaintiffs, the Court *dismissed*

Plaintiffs' affirmative defense denying Mr. Marks' authority, and ruled that the

statements contained in the Marks Letter are the statements of Plaintiffs:

> To make sure of Plaintiffs' position, the Court, at the
> hearing on April 30, 2007, directly asked Plaintiffs'
> counsel whether the statements in the October 19, 2001
> letter represented the statements of Plaintiffs. Plaintiffs'
> counsel replied with an unqualified "yes." That answer
> binds Plaintiffs here. To further make absolutely sure
> that there is no remaining issue as to Mr. Marks'
> authority in connection with the October 19, 2001 letter,
> the Court hereby strikes the thirty-seventh affirmative
> defense from the reply to the counterclaims in both cases.

(Bergman Decl. Exh. <u>LL</u>.)[49]

**B.    The Fact That the Parties Contemplated the Later**

**Negotiation and Execution of a Long-Form Contract Does**

**Not Negate the October 19 Agreement as a Matter of Law**

Plaintiffs assert that even if the parties had "provisionally" agreed on all material terms of their deal in October, 2001, "given the importance and complexity of the subject matter and proposed deal points, any agreement would need to be reduced to a written contract in mutually acceptable fashion."  (Pl. Mem. at 59-60.)  From this premise, Plaintiffs argue that since no long-form contract was in fact finalized and executed, no enforceable agreement can exist.  (*Id.* at 60-61.)  But the mere fact that the parties contemplated, and embarked on the process of drafting, a later, long-form contract, does not establish *as a matter of law* that the parties did not intend their agreement, as memorialized in the Marks Letter, to be binding.  *See Inamed Corp.*, 275 F. Supp. 2d at 1116 ("whether the parties intended that the letter agreement be a binding contract or rather an agreement to negotiate a further contract is a question of fact."); *Beck v. American Health Group Int'l*, 211 Cal. App. 3d 1555, 1562 (1989) ("Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties.").

Thus, where the parties intend to be bound – even if they expect to further reduce their informal writing to a more formal one – "the failure to follow it with a more formal writing <u>does not negate the existence of the prior contract</u>."  *Harris v. Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999) (emphasis added).[50]  *See also Louis Lesser Enters., Ltd. v. Roeder*, 209 Cal. App. 2d 401, 404 (1962)

---

[49] The Court's order also found that "An attorney is presumed to have authority to act on his client's behalf, and a settlement entered into by the attorney can be set aside only upon affirmative proof that the client did not give the attorney the appropriate authority.  *In re Artha Mgm't, Inc.*, 91 F.3d 326, 329 (2d Cir. 1996) (Bergman Decl. Ex. <u>LL</u>.)

[50] Holding, in overruling a demurrer, that "[w]hether the parties intended their communications to be a binding settlement agreement or an agreement to further negotiate after a formal draft was prepared is a factual question. . . ."  *Id.* at 308.

**EXHIBIT Y**
**366**

71

1  ("[P]reliminary negotiations ordinarily result in a binding contract when all of the

2  terms are definitely understood, even though the parties intend to execute a formal

3  writing."); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 624 at n3 (1991)

4  (an agreement which contemplates subsequent, more detailed documentation is <u>not</u>

5  invalid if the parties have agreed to its existing terms).

6       Defendants do not dispute that the parties contemplated further

7  documentation of their agreement, including the preparation of formal assignments

8  reflecting the transfer of Plaintiffs' copyright interests to DC.  However, they

9  contend that the evidence — and the reasonable inferences to be drawn from that

10 evidence — supports a finding that the parties intended to be bound to the terms of

11 their agreement reached on October 19, 2001, even before any such formal

12 document was prepared and signed:  Unlike the circumstances of the cases on

13 which Plaintiffs rely,[51] neither Mr. Marks nor Mr. Schulman conditioned their

14 agreement on the execution of more formal documentation, either in their

15 correspondence, or orally.  (Schulman Decl. ¶ 10.)  In fact, both the Marks Letter

16 and the Schulman Letter speak to a *presently existing* agreement.  (Toberoff Decl.

17 Exhs. <u>BB</u>, <u>CC</u>.)[52]  Thus, for example, the detailed Marks Letter states of the

18 parties' agreement that "the terms are as follows," and contains many references to

19 "this deal."  It sets forth all the material terms of the parties' agreement, and makes

20 no mention of the preparation of a long-form agreement — that is, it operates as a

21 stand alone document.  Indeed, the only mention of additional documentation in

22 the Marks Letter is with respect to ministerial-type documents relating to the

23

24 [51] *See, e.g., Patch v. Anderson*, 66 Cal. App. 2d 63, 66 (1944); *Beck v. American Health Group Int'l, Inc.*, 211 Cal. App. 3d 155, 163 (1989); *Duran v. Duran*, 150 Cal.

25 App. 3d 176, 180 (1983); *Roth v. Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957)

26 [52] The Marks Letter expressly states that "the Siegel Family ... <u>has accepted</u> D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre'

27 properties," and acknowledges that a deal has been reached:  "Many thanks for help and patience in <u>reaching this monumental accord</u>."  (Toberoff Decl. Exh. <u>BB</u>.)  Mr.

28 Schulman's follow up correspondence encloses "a more fulsome outline of what we believe <u>the deal we've agreed to</u> is," filling in a few details, but otherwise in accord with the material terms set forth in the Marks Letter.  (*Id.* Exh. CC.)

1   copyright transfers: "The Siegel Family would agree to execute further

2   documents, and D.C. Comics would be appointed as attorney-in-fact to execute

3   such documents if the Siegel Family fails to do so within a reasonable period of

4   time." (*Id*. Exh. BB.) The Schulman Letter similarly states only that the "Siegels

5   will execute further documents as may be necessary to evidence DC's ownership

6   of rights; designate WB as attorney in fact." (*Id*. Exh. CC.)

7        Nor is there any other type of indication in the Marks Letter that the

8   agreement the parties had reached as reflected therein was not immediately

9   binding. On the contrary, Mr. Marks' choice of language reflects a deliberate

10  effort to fully document the parties' agreement in the letter without the necessity

11  for further negotiation of outstanding terms, without the need for additional

12  documentation, and inviting the very type of response Mr. Schulman provided in

13  his letter of October 26, 2001. (*Id*. Exh. BB) Likewise, the Schulman Letter (*id*.

14  Exh. CC), which started the process of the more formal documentation that was

15  admittedly contemplated by the negotiators, also contains no indication that the

16  parties are not bound unless a more formal agreement is executed. In fact, DC

17  *affirmatively acted* on the understanding that there was an immediate agreement,

18  by negotiating for Warner Bros. to include Plaintiffs' credits in the upcoming

19  motion picture *Superman Returns* (Schulman Decl. ¶ 7), and by setting up a

20  reserve for the payment of all monies due to Plaintiffs pursuant to the terms of the

21  agreement. (Bergman Decl. Exh. R (Levitz Tr.) at 289:9-290:1.)

22       Similarly, in her May 9, 2002 letter to Richard Parsons, Mrs. Siegel

23  *acknowledged* that the parties had reached an accord six months earlier, but

24  protested only – *albeit* strongly – that the February Draft (Toberoff Decl. Exh.

25  DD) did not reflect that agreement. (Bergman Decl. Exh. Z.)[53] Tellingly,

26

27

28

[53] "We made painful concessions assured if we did we would arrive at an agreement. When we made those difficult concessions and reluctantly accepted John Schulman's last proposal six months ago, we were stabbed in the back with a shocking contract. . . . For your representatives to condition our receiving financial compensation for our rights on

EXHIBIT 7
368
73

1   Plaintiffs have submitted no evidence of any contemporaneous objective

2   manifestation by them or their counsel of an intent not to be bound until the

3   execution of a long-form.  Indeed, Plaintiffs' have submitted *no evidence*

4   *whatsoever* of their purported intention not to be bound − whether objective or

5   subjective − in connection with this motion.

6       C.    **The October 19, 2001 Agreement Is An Acceptance Of DC**

7               **Comics' Offer And Is Not A "Counteroffer" That Was**

8               **Rejected By Defendants**

9       Plaintiffs concede that the October 19, 2001 Agreement is drafted as an

10   "acceptance" of an offer made on October 16, 2001.  (Pl. Mem. at 57.)  However,

11   because Plaintiffs now attempt to avoid the agreement reached via that acceptance,

12   they seek to characterize the October 19, 2001 Agreement as a "counteroffer" that

13   was later rejected by Defendants.  (*Id.*)  Defendants absolutely reject this

14   characterization − Defendants have consistently maintained and assert again now

15   that the October 19, 2001 Agreement represented an acceptance of all material

16   terms offered by Mr. Schulman on behalf of Defendant DC.  (Schulman Decl. ¶¶

17   10, 13-15.)

18       As noted above, a contract is established when there is a meeting of the

19   minds between the parties on all material terms of their agreement, *Apablasa*, 176

20   Cal. App. 2d at 726, and its formation is a question *of fact* to be determined from

21   the particular circumstances of each case, *Banner Entertainment*, 62 Cal. App. 4th

22   at 358.  *What* the material terms of the contract are "depends on the circumstances

23   of the agreement, including the agreement and its context, the subsequent conduct

24   of the parties, and the remedy sought."  *House of Prayer, etc. v. Evangelical Assoc.*

25   *for India*, 113 Cal. App. 4th 48, 53 (2003).  To ascertain whether the requisite

26   meeting of the minds exists − that is, whether the parties have assented "to the

27

28   demands which were not in the proposal we accepted, is deceitful."  (*Id.,* emphasis
added.)

1  same thing in the same sense" – the trier of fact must evaluate the evidence of the

2  parties' objective intent; namely "the outward manifestations of [their] consent."

3  *Banner Entm't*, 62 Cal. App. 4th at 358; *Beard v. Goodrich*, 110 Cal. App. 4th

4  1031, 1039-40 (2003).

5      The evidence before the Court certainly supports the conclusion that as of

6  the October 19, 2001 Marks Letter (Toberoff Decl. Exh. <u>BB</u>) the parties had

7  agreed to all material terms of their agreement, and intended to be bound thereby.

8  First, Mr. Marks, an experienced transactional lawyer, carefully worded his letter

9  to use the powerful legal language of acceptance – "The Siegel Family . . . *has*

10  *accepted* D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and

11  'Spectre' properties." (*Id.*) This choice of binding contractual language was not

12  accidental. Rather, the only reasonable inference is that the use of this language

13  was a deliberate attempt on the part of Plaintiffs' former counsel to conclude what

14  had been lengthy and complex negotiations and bind DC to the agreement.

15      Second and further supporting the conclusion that the October 19, 2001

16  Agreement contains all material terms agreed to by the parties, is the fact that Mr.

17  Marks painstakingly outlined in six single-spaced pages all of the material terms

18  that Plaintiffs were accepting. The only reasonable inference is that Mr. Marks

19  documented the terms he (and thus his clients) considered to be the material terms

20  accepted by Plaintiffs.

21      Third, DC's main negotiator, Mr. Schulman, has confirmed under oath in

22  response to Plaintiffs' current motion that the October 19, 2001 Agreement

23  accurately documented the material terms that had been offered on behalf of DC.

24  (Schulman Decl. ¶ 7.)

25      Plaintiffs point to alleged discrepancies between the Marks Letter, the

26  Schulman Letter, and the February Draft in an attempt to get out from under the

27  October 19, 2001 Agreement. But even *if* the Schulman Letter or the February

28  Draft did not comport in some respects with the parties' agreement as

1   memorialized in the Marks Letter, or added additional terms that had not been

2   discussed, that would mean only that the Schulman Letter and the February Draft

3   did not constitute the agreement of the parties, *not* that the previous October 19

4   agreement was somehow vitiated. *See e.g. Kitty-Anne Music Co. v. Swan*, 112 Cal.

5   App. 4th 30, 37-38 (2003) (holding that the parties had an enforceable agreement

6   which plaintiffs breached, notwithstanding the fact that they never executed a draft

7   long-form agreement prepared by plaintiffs which contained terms "drastically"

8   different from the parties' prior deal memo, because the additional documentation

9   was simply "intended to carry out the terms of the deal memo" which of itself

10   constituted the parties' contract). *See also King v. Stanley*, 32 Cal. 2d 584, 589

11   (1948) (letters constituted enforceable written agreement for purchase of real

12   property; court rejected defendant's contention that the escrow instructions did not

13   follow the alleged contract obligations but included different terms which had not

14   been accepted on the basis that "such instructions do not take the place of the

15   agreement of sale <u>but merely carry it into effect. They are subject to modification</u>

16   <u>without affecting the finality of the agreement already reached.</u>") (emphasis

17   added); and *Ersa Grae Corp.*, 1 Cal. App. 4th at 624 (in rejecting argument that

18   executed counteroffer was merely an agreement to agree, court noted that

19   "[s]pecific definitions and lease terms were to be the subject of subsequent

20   documentation and the parties were obligated to complete the documentation in

21   good faith. No more is required.").

22       DC does not assert in its Counterclaim that the Schulman Letter or the

23   February Draft constitutes the agreement of the parties; instead, it is seeking to

24   enforce, and suing for breach of, the agreement reached on October 19, 2001 by

25   Mr. Marks and Mr. Schulman as expressly reflected in the Marks Letter.

26   (Bergman Decl. Exh. <u>GG</u>, ¶¶ 98-105.) Accordingly, if the admissible evidence and

27   the reasonable inferences drawn therefrom can support a finding that the parties

28   reached an agreement on all material terms on October 19, 2001, and intended to

be bound to those terms − as Defendants contend they do − then DC's
Counterclaims are sufficient to go to a jury *whether or not* any subsequent
correspondence or proposed draft long-form agreement might have changed or
added terms, and despite the fact that no formal contract was never executed.[54]

Indeed, the evidence supports the conclusion that Plaintiffs' belated claim
that the Schulman Letter changed the deal or that the February Draft was
"unacceptable" is nothing other than an *ex post facto* excuse for Plaintiffs to reject
the deal they had already made for the promise of a much more lucrative payday
from their current counsel and the companies he controlled: Mr. Marks *never*
disputed anything in the Schulman Letter, and similarly voiced *no* concern about
the February Draft until after he learned about his client's complaining letter to
Time Warner's Chief Executive Officer; and even then he acknowledged to Mr.
Schulman that although the draft was "very aggressive" and contained some things
which had not been discussed *it was not contrary to what the parties had agreed
to.* (Schulman Decl. ¶ 11.) Mr. Marks even tried his hand at re-crafting the draft
into a form that would be acceptable to his client. (Bergman Decl. Exh. S (Marks
Tr.) at 196:21-197:15, 198:25-199:3; *id.* Exh. BB.), but the effort came to naught
when Plaintiffs abruptly fired Mr. Marks and terminated discussions with DC
shortly after receiving Mr. Toberoff's "$15 million plus" offer. (*Id.* Exh. S (Marks
Tr.) at 168:1-169:20.)

In sum, Defendants assert that there is a triable issue of fact on the question
of the parties' intent to be bound to the terms of their October 19, 2001 agreement
as reflected in the Marks Letter prior to the execution of an anticipated long-form

---

[54] As noted above, DC acted on the agreement by negotiating for Plaintiffs to receive
their credits on *Superman Returns* (Schulman Decl. ¶ 10) and by setting up a reserve
account for Plaintiffs' payments under the agreement. (Bergman Decl. Exh. R (Levitz
Tr.) at 289:9-290:1.)

1   contract, and Defendants are entitled to have that question determined by the trier

2   of fact at trial.[55]

**D.    Plaintiffs' Parade Of Alleged "Material Differences" Between
The October 19, 2001 Agreement, The Schulman Letter, And
The February Long Form Is Irrelevant And Misleading**

6   In support of their argument that, as a matter of law, there was no "meeting

7   of the minds" so as to constitute an enforceable agreement between the parties,

8   Plaintiffs have presented this Court with a 9-page chart purporting to identify the

9   "material" differences in deal terms between the Marks Letter, the Schulman

10   Letter, and the February Draft (the "Chart").  As an initial matter, and as set forth

11   above, this argument is nothing more than a "straw man."  Defendants do not

12   contend that the Schulman Letter or the February Draft constitutes the agreement

13   of the parties, but rather that the agreement is as set forth in the Marks Letter, and

14   was concluded on October 19, 2001, when Mr. Marks, with full authority from his

15   clients, stated that "The Siegel Family . . . *has accepted* D.C. Comics offer of

16   October 16, 2001."  (Toberoff Decl. Exh. BB, emphasis added).  Accordingly, any

17   purported differences between the Marks Letter and any subsequent

18   correspondence or documentation between the parties cannot affect the Court's

19   determination as to whether it can rule, as a matter of law, that no enforceable

20   agreement was entered into on October 19, 2001.

21   But even if the later communications can be considered to be of

22   consequence in this analysis, it must be remembered that Mr. Marks *at no time*

23   expressed any concern, disagreement, or dissatisfaction with the terms of the

24   Schulman Letter, nor did he say that the Schulman Letter did not in fact accurately

25

---

26   [55] *Louis Lesser*, 209 Cal. App. 2d at 404 "[P]reliminary negotiations ordinarily result
in a binding contract when all of the terms are definitely understood, even though the
parties intend to execute a formal writing."  The rationale behind this principle is clear:

27   "Any other rule would always permit a party who has entered into a contract like this to
violate it, whenever the understanding was that it should be reduced to another written

28   form, by simply suggesting other and additional terms and conditions." *Ersa Grae Corp.*,
1 Cal. App. 4th at 624, n3.

EXHIBIT Y
373

78

reflect the essential provisions of the agreement that the parties had reached. (Schulman Decl. ¶ 9; Bergman Decl. Exh. S (Marks Tr.) at 150:24-151:7.) Mr. Marks received the Schulman Letter, reviewed it, and awaited receipt of a draft long-form contract, *saying nothing.* (*Id.* at 150:24-151:7.) He did not challenge the Schulman Letter or seek to correct it, and did not disavow any of its terms or dispute that an agreement had been reached as reflected in its contents. (*Id.*)

Similarly, upon receipt of the February Draft, Mr. Marks did not protest any of its provisions to Mr. Schulman. Indeed, it was not until three months later when he learned that his client had complained to Time Warner Inc.'s CEO about the document that he expressed any reservations at all about the draft long-form. (Schulman Decl. ¶ 11.) And even then, Mr. Marks acknowledged to Mr. Schulman that the February Draft was *not* contrary to the parties' agreement, and undertook a re-write which would be more acceptable to his client. (*Id.*) That is, Mr. Marks' "outward manifestations" of intent support the reasonable inference that, under the particular facts and circumstances of this negotiation, the parties believed there was an existing agreement on all material points, and that neither the Schulman Letter nor the February Draft negated that agreement.[56]

Additionally, Plaintiffs do not establish, or even explain, how any of the purported differences reflected in the Chart – even if they were relevant to the Court's analysis on this motion – are "material" in the context of the parties' negotiations and ultimate agreement. Instead, Plaintiffs simply point to the Chart and indiscriminately label all the supposed differences contained therein as being "material," with no discussion, evidence or analysis as to how any of these purported differences undermine the parties' previously reached agreement, thus

---

[56] "One measure of whether terms are 'material' is whether they have been the subject of debate and discussion during the parties' negotiations." *Inamed*, 275 F. Supp. 2d at 1123. "[I]f these items were material to [defendant and his attorney] . . . [he] should have insisted that [the informal letter agreement] include provisions covering these items. His 'mental reservations [on the subjects] are legally irrelevant.'" *Id.* at 1122 (citing *Core-Vent Corp. v. Implant Innovations, Inc.*, 53 F.3d 1252, 1256 (Fed. Cir. 1995)).

1  making any meaningful response by Defendants effectively impossible. (Pl. Mem.

2  at 47, 48.)[57]  As a general matter, the essential terms of a contract are those which,

3  if uncertain, would render the enforcement of the remainder of the agreement

4  unfair; all other terms are deemed non-essential.  *Los Angeles v. Superior Court,*

5  51 Cal. 2d 423, 433 (1959).  Stated otherwise, the material terms of a contract are

6  those from which the court can determine if there has been a breach of the

7  agreement and award damages.  *Inamed,* 275 F. Supp. 2d at 1120.  The defense of

8  uncertainty is disfavored, and the court should enforce an agreement if it appears

9  that the parties intended to enter into a contract and the outlines of the agreement

10 are sufficiently definite that the court knows what is to be enforced.  *Id.* at 1120-

11 21.  *See also Mancuso v. Krackov,* 110 Cal. App. 2d 113, 115 (1952) "The law

12 does not favor the destruction of contracts on the ground of indefiniteness, and if it

13 be feasible the court will so construe the agreement as to carry into effect the

14 reasonable intention of the parties if that can be ascertained."

15        In the context of these negotiations, a trier of fact could reasonably conclude

16 that any differences between the Marks Letter and the Schulman Letter or the

17 February Draft were not "material" to the parties' agreement.  Terms that typically

18 are considered to be material to a contract as a matter of law include the subject

19 matter of the agreement, and the financial and performance terms expected of the

20 parties.  *See, e.g., Kohn v. Jaymar*-Ruby, 23 Cal. App. 4th 1530, 1534 (1994);

21

22   _____

[57] This is complicated by the fact that the Chart itself is egregiously misleading in its

23 representation of the contents of the two October letters:  At times it purports to quote the
letters; at times it paraphrases them; and at times it just presents argument.  Further, since

24 the outline contained in the Schulman Letter does not track the format of the Marks
Letter, the Chart double-counts purported differences (*see e.g.* "Scope of Agreement" and

25 "Grant of Rights" at 48-49); splits up provisions thereby exaggerating so-called
differences (*see e.g.* "Gross Revenue Definition" and "Royalty re: Media and

26 Merchandising" pp. 49-50); and implies differences in terms where there exist only
differences in language (*see e.g.* "Royalty re: DC Publications" pp. 50-51 and "Audit

27 Rights" at 56).  The chart is additionally confusing because it is impossible to tell
whether Plaintiffs are claiming that there are material differences between all three

28 documents; between the Marks Letter and the Schulman Letter; between the Mark Letter
and the February Draft; or even between the Schulman Letter and the February Draft (*see
e.g.* "Attorney in Fact", at 53).

**EXHIBIT Y**
**375**  80

1   *Runoli Leathers Ltd. v.* Mikhaeil, 2001 U.S. Dist. LEXIS 17896 at *7 (N.D. Cal.

2   Oct. 23, 2001).  Here, the Chart does not identify *any* differences between the

3   October letters and the February Draft regarding the core financial terms of the

4   deal, and Mr. Marks acknowledged that there were none.  (Bergman Decl. Exh. S

5   (Marks Tr.) at 192:9-192:19.)  Further, although the Chart purports to identify

6   differences in both the scope of the rights granted by Plaintiffs and in the

7   circumstances in which the royalty payments to Plaintiffs can be adjusted, no such

8   differences in fact exist.

9        *Scope of Agreement/Grant of Rights* (Chart at 48)

10       As to the scope of the agreement and the rights granted (*see* Chart at 48), the

11  parties agreed that Plaintiffs would transfer to DC the entirety of their interest in all

12  Superman and Spectre-related properties, whenever created, and that Plaintiffs

13  would not exploit any aspects of those properties, even if and when they fell into

14  the public domain.  (Schulman Decl. ¶ 14; Bergman Decl. Exh. S (Marks Tr.) at

15  125:21-127:12.)  The Marks Letter (Toberoff Decl. Exh. BB) and the Schulman

16  Letter (*id.* Exh. CC) both reflect that understanding, even though stated in

17  somewhat different language.[58]  With respect to the transfer of Plaintiffs' interests

18  in Superman, Superboy, Spectre, and all related characters or properties, there is no

19

20  _____

[58] The Marks Letter (Toberoff Decl. Exh. BB) provides that "The 'Property' means all
Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois
& Clark and Smallville), and the Spectre property, and includes all pre- and post-
termination works (including the so-called Superman library), characters, names and
trademarks relating to the Property" (Marks Letter ¶ A.1); "The Siegel Family would
transfer all of its rights in the 'Superman' and 'Spectre' properties (including
'Superboy'), resulting in 100% ownership to D.C. Comics, as between the Siegel Family
and D.C. Comics" (Marks Letter ¶ C.1); and that "At the end of the U.S. Copyright term,
the Siegel Family agrees that it will not exploit the Property, even though it is in the
public domain" (Marks Letter ¶ C.11).  The Schulman Letter (*id.* Exh. CC) – which
contains a bullet-point outline – states "Regrant, grant, etc.; 100% of rights wherever
created, arising out of Siegel's authorship and/or contributions for DC Comics (whether
or not published), including post term rights as members of public; 100% of rights,
whenever created, arising out of Siegel's authorship and/or contributions re Superman,
Superboy, Spectre and related properties – even if not created for DC Comics; All
properties, including but not limited to Superman, Superboy, Spectre, and all rights of
any kind (i.e. copyrights, trademarks, indicia) therein (the "Properties").  (Schulman
Letter, Outline at 1.)

**EXHIBIT Y**

1   meaningful difference between the Marks Letter and the Schulman Letter.  While

2   the Schulman Letter uses broader language than the Marks Letter, and appears to

3   sweep up characters and properties which are *not* related to Superman, Superboy

4   and Spectre (*e.g.* by using the "including but not limited to" language), this is a

5   distinction without a legal difference:

6          Prior to his death, Siegel could have authored only two types of work for

7   copyright purposes; namely, those that were works for hire, and those that were

8   not.  Copyright in works for hire belong at inception to the hiring party – whether

9   DC or anyone else – who is deemed to be the copyright "author," and accordingly

10  are not subject to recapture or conveyance by Siegel or his heirs.  *See* 17 U.S.C.

11  §304(c).  Therefore, to the extent the definitions of "Properties" in the Schulman

12  Letter potentially encompassed Siegel's works for hire, those works never did or

13  could belong to Siegel or his heirs, and therefore could not be the subject of any

14  conveyance or grant.  Similarly, because of the specific restrictions of Section

15  304(c), Plaintiffs could not convey to DC any properties for which Siegel was the

16  original copyright author (*i.e.* works that were *not* for hire) unless those works

17  were the subject of a previously served notice of termination under Section 304(c).

18  *See* Section 304(c)(6)(D).[59]  The only notices of termination which had been

19  served by Plaintiffs on DC as of October, 2001, were for Spectre and Superman

20  related properties (including Superboy).  Accordingly, those were the only

21  properties that could have been the subject of any valid grant or transfer by

22  Plaintiffs to DC.  That is, under these facts and circumstances, the differences

23  between the Marks Letter and the Schulman Letter concerning the scope of the

24  rights granted are not material.

25

26

27  _____

    [59] "A further grant, or agreement to make a further grant, of any right covered by a
    terminated grant is valid only if it is made after the effective date of the termination.  As

28  an exception, however, an agreement for such a further grant may be made between the
    author [or his heirs] and the original grantee or such grantee's successor in title, <u>after the
    notice of termination has been served</u> ...."  *Id.* (emphasis added).

82

1    <u>*Royalty Provisions*</u> *(Chart at 49-51)*

2          Although it is unclear from the Chart, Plaintiffs seem to be arguing that the

3    definitions of the revenues in which Plaintiffs are entitled to share are different in

4    the Marks and Schulman Letter, and that the royalties payable on those revenues

5    are also different.  But Plaintiffs' Chart is highly deceptive; it misleadingly

6    presents only truncated quotations from the two October letters, splits up the

7    discussions in the letters so as to disguise their true contents, and adds

8    argumentative statements that find no support in the letters themselves.[60]   In

9    reality, both the Marks Letter and the Schulman Letter similarly define the base

10   royalties payable on DC's publication revenues and on non-publication (*i.e.*

11   "Media") revenues, and both expressly provide for reductions in those base royalty

12   rates payable to Plaintiffs.  The amount and circumstances under which those

13   reductions can be made also comport in all respects between the two letters.

14   (*Compare* Marks Letter (Toberoff Decl. Exh. <u>BB</u>), ¶¶ 5-6; Schulman Letter (*id.*

15   Exh. <u>CC</u>), Outline at 2-3.)[61]

16   _____

17   [60] For example, in order to create the appearance of differences in the stated deal
     terms, Plaintiffs' Chart quotes the Marks Letter (Toberoff Decl. Exh. <u>BB</u>) as providing
18   for a royalty calculation based on DC's "worldwide gross revenues derived from the
     Property" but fails to include the immediately succeeding clause in the letter expressly
19   excluding "revenues derived from D.C. Comics' publications." (*See* Chart at 49; Marks
     Letter, ¶ A.2.).  And it quotes the Schulman Letter (*id.* Exh. <u>CC</u>) as providing for a
20   royalty calculation based on "DC's receipts from all Media licenses for use of the
     Properties" but *adds* the clause "subject to substantial additional reductions of the royalty
21   rate" – *language not found in the Schulman Letter* – implying that such reductions are
     inconsistent with the Marks Letter.  (*See* Chart at 49; Schulman Letter, Outline at 2.)

22   [61] In fact, Plaintiffs' attempts to make the letters at odds in this regard is disingenuous
     in the extreme:  For example, Plaintiffs assert that, in contrast to the broader language of
23   the Schulman Letter, the Marks Letter allows for reduction of the royalty rate to 1% only
     in the limited instance when the Properties are used in connection with other DC/Warner
24   Bros. properties at the Six Flags amusement park (*see* Chart at 49-50).  But what the
     Marks Letter *actually* states is that the royalty can be reduced to 1% "in extraordinary
25   cases *such as* D.C. Comics/Warner Bros. overall license to Six Flags." (Toberoff Decl.
     Exh. <u>BB</u> ¶ 5.)  The Schulman Letter simply contained language attempting to describe
26   those "extraordinary cases." (*Id.* Exh. <u>CC</u>, Outline at 3.)  Similarly, Plaintiffs state in the
     Chart that the Schulman Letter anticipates instances where there would be no royalty
27   payable to Plaintiffs on certain publications, whereas the Marks Letter provides for the
     publication royalties to be "in no event less than 0.5%." (*See* Chart at 50-51.)  But what
28   the Marks Letter *actually* provides for is a royalty floor of 0.5% *other than when there is
     a "cameo" appearance by the characters.* (Marks Letter ¶ 6.)  That is, the parties agreed
     there would be instances where no royalty would be payable on publications, when the

EXHIBIT
378
83

1    A review of the Marks Letter and the Schulman Letter – outside the

2 distorting lens of Plaintiffs' Chart – shows that the parties were in agreement in all

3 material respects on the calculation of Plaintiffs' royalties, and that the language

4 differences in the two letters represented nothing more than an attempt by Mr.

5 Schulman to clarify the agreement and flesh out the Marks Letter as the first step

6 toward documenting the long-form contract.  (Schulman Decl. ¶¶ 8-9, 13-15.)  In

7 the one instance that there arguably is a difference in language in connection with

8 the royalty provisions – that is, where the Schulman Letter provides for payments

9 to Plaintiffs beyond the expiration of the copyright term for the properties if a

10 motion picture or television program is produced in the few years prior to

11 expiration (Toberoff Decl. Exh. CC, Outline at 3), and the Marks letter includes the

12 language "other substantial projects (*akin to motion picture and television projects*)

13 (*id*. Exh. BB, ¶ 9, emphasis added), Plaintiffs utterly fail to establish that the

14 difference meets the "materiality" test articulated in the case law, or that such

15 difference could not be addressed and accommodated in the process of

16 documenting the long-form as anticipated by Mr. Marks.  (Bergman Decl. Exh. S

17 (Marks Tr.) at 162:11-164:1.).

18    *Other Provisions*

19    The remaining "differences" identified in the Chart are either *not differences

20 at all*,[62] or cannot be determined to be "material" as a matter of law under the

21

22

23

24 characters made a cameo appearance, and the Schulman Letter was simply trying to define what constituted a "cameo" appearance.  (Schulman Letter (Toberoff Decl. Exh.CC), Outline at 3; Schulman Decl. ¶ 13.)

25 [62] *See, e.g.,* "Audit Rights" (Chart at 56).  Although the Chart deliberately omits it,
26 both the Marks Letter and the Schulman Letter expressly state that Plaintiffs are to have "full audit rights"; the Schulman Letter adds only the clarification that it will be pursuant
27 to standard [Warner Bros.] language. *See also* "Attorney in Fact" (Chart at 53); "Credit" (Chart at 52); and "Release" (Chart at 54).  As to each of these items the language in the
28 Schulman Letter was the functional equivalent of the language of the Marks Letter, or merely clarified an ambiguity or filled in a gap regarding an agreed upon point. (Schulman Decl. ¶¶ 14, 15.)

1   circumstances of the parties' negotiations,[63] particularly since the parties had

2   already previously reached agreement on all material points as documented in the

3   Marks Letter, and were merely going through the later process of refining the

4   provisions of that agreement into a long-form contract.  Here, the actions of

5   Plaintiffs' representative, Mr. Marks, objectively support only the conclusion that

6   the parties had reached a deal, that the Schulman Letter was not materially

7   inconsistent with that deal, and that what distinctions did exist would be addressed

8   in the long-form documentation.  Accordingly, whether the purportedly "different"

9   terms in the Schulman Letter and the February Draft were material to the parties

10  under the circumstances of this case, or impact in any way on the determination of

11  the earlier formation of their agreement, are questions of fact to be resolved after

12  the taking and weighing of evidence at trial.

13                              *        *        *

14          For the foregoing reasons, Defendants respectfully request that the Court

15  deny Plaintiffs motion for partial summary judgment as to DC Comics' Third and

16  Fourth Alternative Counterclaims in this action.

17                              **CONCLUSION**

18          For the reasons set forth herein, Plaintiffs' motion for partial summary

19  judgment should be denied.

20

21  DATED:      May 29, 2007          Respectfully submitted,

22

23

24  By _____

25          Michael Bergman
        Attorneys for Defendants and Counterclaimant

26

27  _____
    [63] *See, e.g., Inamed, supra,* where the court held that items such as license
28  termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute
    resolution were *not material* terms in the context of the parties' negotiations, because
    they were not the subject of much debate and discussion.  275 F. Supp. 2d at 1122.

**EXHIBIT Y**
**380**          85

1   WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
2   Michael Bergman (SBN 37797)
    Anjani Mandavia (SBN 94092)
3   9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California  90212
4   Telephone:  310-858-7888
    Fax:        310-550-7191
5   Email:      mbergman@wwllp.com

6   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
7   James Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
8   New York, New York  10017
    Telephone:  212-813-5900
9   Fax:        212-813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, NY  10516
12  Telephone:  845-265-2820
    Fax:        845-265-2819

13
    Attorneys for Defendants and Counterclaimant
14
                    UNITED STATES DISTRICT COURT
15
        CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
16

17  JOANNE SIEGEL and LAURA          ) Case No. SA CV 04-8400 SGL (RZx)
    SIEGEL LARSON,                   ) Case No. SA CV 04-8776 SGL (RZx)
18                                   )
                                     ) Hon. Stephen G. Larson, U.S.D.J.
19          Plaintiffs,              ) Hon. Ralph Zarefsky, U.S.M.J.
                                     )
20      vs.                          ) **DECLARATION OF MICHAEL**
                                     ) **BERGMAN IN RESPONSE TO**
21                                   ) **THE DECLARATION OF MARC**
    TIME WARNER INC., WARNER         ) **TOBEROFF FILED PURSUANT**
22  COMMUNICATIONS INC. WARNER       ) **TO THE COURT'S SEPTEMBER**
    BROS. ENTERTAINMENT INC.,        ) **17, 2007 ORDER**
23  WARNER BROS. TELEVISION          )
    PRODUCTION INC., DC COMICS,      ) **DISCOVERY MATTER**
24  and DOES 1-10,                   ) **LOCAL RULE 37**
                                     )
25          Defendants.              )
                                     )
26                                   )
                                     )
27                                   )
                                     )
28  AND RELATED COUNTERCLAIMS.       )
                                     )

**EXHIBIT Z**
**381**

I, Michael Bergman, declare under penalty of perjury:

1.    I am a member of Weissmann Wolff Bergman Coleman Grodin & Evall LLP, counsel for Defendants.  This declaration, based upon my own personal knowledge and our office's records, is submitted in response to the Declaration of Marc Toberoff Filed Pursuant To The Court's September 17, 2007 Order.

2.    This declaration addresses two issues.  The first issue is whether the nine Escrow Documents that "slipped through the cracks" should be withheld from production based upon Plaintiffs' and Mr. Toberoff's current assertions of the attorney-client privilege.  As explained below, each of the three categories of documents addressed in Mr. Toberoff's declaration -- the "defamatory cover letter" to the Escrow Documents, the post-litigation attorney-client communications, and Mr. Toberoff's correspondence with third party Michael Siegel's attorney Don Bulson -- should be produced to Defendants.

3.    The second issue is how the escrow holder should handle the remaining Escrow Documents, which was not addressed in the Court's September 17, 2007 Minute Order.  To fully comply with Magistrate Judge Zarefsky's April 30, 2007 Order, the escrow holder, as the only neutral party with access to the Escrow Documents, should use Mr. Toberoff's May 21, 2007 declaration to match up the Escrow Documents with the privilege log entries and production documents listed in that declaration to ensure that he is releasing the proper documents and confirm that no additional documents have "fallen through the cracks."

### Background

4.    Some background is necessary to place Plaintiffs' and Mr. Toberoff's current privilege claims in context.  This dispute dates back to June of 2006.  On July 5, 2006, I received a call from Wayne Smith, Vice President, Senior Litigation and Chief Patent Counsel of Warner Bros. Entertainment Inc., informing me that three Warner Bros. employees, including General Counsel John Schulman, had received packages on June 28, 2006 containing documents relating to the present

litigation that had been sent by an anonymous source.  (The parties now refer to these documents as the "Escrow Documents," the designation used by Magistrate Judge Zarefsky during the April 30, 2007 Hearing).  Mr. Smith told me that the packages, apparently identical, each contained an unsigned cover letter alleging, among other things, various types of ethical misconduct on the part of Plaintiffs' counsel in connection with the present litigation and another previously litigated case.  The cover letter also explained how the enclosed documents related to the misconduct allegations.  Mr. Smith advised me that he had discussed the situation with Mr. Schulman, and that they had determined -- after Mr. Smith read an article from Los Angeles Lawyer addressing the obligations of lawyers who unwittingly receive privileged documents from opposing counsel's files, along with the main California cases identified therein -- that Mr. Smith would follow the procedure outlined in the case *State Compensation Insurance Fund v. WPS, Inc.*, 70 Cal. App. 4th 644 (1999).  That procedure required the document recipient: (i) to review each document but to cease the review once it became apparent that the document was privileged; (ii) to contact opposing counsel and advise that the documents have been received; and (iii) to refrain from using any information in the documents until there was either an agreement with opposing counsel, or the court had determined the documents' disposition.

5.      Mr. Smith advised me that during the evening of June 28, 2006, he had undertaken the procedure described in *State Compensation*.  He told me that the Escrow Documents included a number of apparently privileged documents, but that they also included non-privileged documents that he believed had not been produced in the litigation.  Mr. Smith also advised that he had discussed the results of his *State Compensation* review of the Escrow Documents with Mr. Schulman and that they had decided to turn the documents over to a neutral third party, pending resolution of the disposition of the Escrow Documents, either pursuant to the agreement of the parties or order of the Court.

**EXHIBIT Z$_2$**

6.      Mr. Smith further advised that on June 30, 2006 the Escrow Documents had been turned over to John Quinn, then an attorney at Arnold & Porter LLP and the former president of the Los Angeles County Bar Association. Mr. Quinn sent a letter to counsel dated July 5, 2006.  Attached hereto as Exhibit A is a true and correct copy of that letter.

7.      Mr. Quinn subsequently Bates labeled a set of the Escrow Documents and sent them to Mr. Toberoff, retaining a set for himself to hold in escrow. Although the parties spoke on the phone and exchanged correspondence regarding the Escrow Documents, they were unable to agree upon the proper disposition of those documents.  Defendants subsequently served a request for production on Plaintiffs on August 7, 2007 and a personal subpoena on Mr. Toberoff on August 10, 2007, asking for the production of the Escrow Documents.  Attached hereto as Exhibit B is a true and correct copy of Defendants'/Counterclaimant's Third Set Of Requests For The Production Of Documents And Things, and attached hereto as Exhibit C is a true and correct copy of the Subpoena in a Civil Case directed to Mr. Toberoff.

8.      Attached hereto as Exhibit D is a true and correct copy of Plaintiffs' Response to Defendants'/Counterclaimant's Third Set Of Requests For The Production Of Documents And Things, served on September 6, 2006.

9.      Attached hereto as Exhibit E is a true and correct copy of Toberoff's Objections to Defendants' Subpoena, served on August 23, 2006.

10.      Pursuant to an August 14, 2006 Order by Magistrate Judge Zarefsky on another discovery motion requiring Plaintiffs to "produce all privilege logs, including any revisions, by September 29, 2006," Plaintiffs served their privilege log on September 29, 2006.  However, Mr. Toberoff never served a privilege log supporting his privilege objections to Defendants' Subpoena.  Attached hereto as Exhibit F is a true and correct copy of a letter from my associate Adam Hagen to Mr. Toberoff dated September 28, 2006 requesting that Mr. Toberoff serve a

1  privilege log in support of his privilege objections.  Mr. Toberoff never responded

2  to that letter and never served a privilege log on Defendants.

3  ### Defendants' Motion To Compel

4       11.    Defendants subsequently initiated the joint stipulation process to

5  compel Plaintiffs and Mr. Toberoff to produce all non-privileged Escrow

6  Documents and/or all Escrow Documents not identified on any privilege log.

7  Defendants filed their joint stipulation on March 26, 2007, and their supplemental

8  memorandum on April 2, 2007.

9       12.    Magistrate Judge Zarefsky heard Defendants' motion on April 30,

10  2007.  Attached hereto as Exhibit G is a true and correct copy of the transcript

11  from that hearing.  In pertinent part, Mr. Toberoff unequivocally represented to

12  Magistrate Judge Zarefsky not once, but several times, that -- save for two

13  documents that Plaintiffs produced to Defendants after Defendants filed the Joint

14  Stipulation -- all of the Escrow Documents had been either previously produced to

15  Defendants or listed on a privilege log:

16       The Court:  The question is: Have you otherwise produced [the

17       documents]?  That's all that's at issue, isn't it?

18       Mr. Toberoff:  I have, your Honor.  I have put in a declaration

19       unequivocally that even though I'm not obligated to do so, and jump

20       through hoops of having to respond and own up to documents stolen

21       from my legal files, an obligation that does not apply to the

22       defendants in this case and does not apply to parties under Rule 34, I

23       nonetheless went through every single one of those documents, which

24       they, instead of returning the originals, returned to me with Bate

25       stamps, checked it against our production, and found two documents

26       that were non-privileged that hadn't been produced that consisted of

27       letters from plaintiffs to DC Comics, which I produced.

28

1    The Court:  See, your declaration doesn't quite say that, Mr.

2    Toberoff.  I read your declaration.

3    Mr. Toberoff:  The intention of the declaration is to say exactly

4    what I'm saying now; that I went through my files, not just the

5    plaintiffs' files, which is all the motion pertains to, but all my files, all

6    the third-party witness files --

7    The Court:  Forgive me for interrupting.  Your declaration does

8    say that.  What your declaration doesn't say is that you went through

9    these, let's call them 'whistleblower' documents, even though that

10   may not be an accurate statement, you went through these

11   whistleblower documents, and that you verified that each of the

12   whistleblower documents either had been produced or had been listed

13   on the privilege log.  It doesn't say that.

14   Mr. Toberoff:  That is the case, your Honor, and that was

15   certainly my intention to say that, and I'm saying that now.

16   The Court:  All right, then we can get that cleared up

17   immediately.

18   Mr. Toberoff:  I'd be happy to take an oath and say that,

19   because that is precisely what I did.

20   (Tr. at 10:17 - 12:2).

21   The Court:  But Mr. Toberoff, you tell me that everything that's

22   not privileged has been produced except for two small items, and

23   everything that is -

24   Mr. Toberoff: We produced those items, your Honor.

25   (Tr. at 15:12 - 15:14).

26   The Court:  Well, now, Mr. Toberoff, didn't you tell me there

27   were only two documents that hadn't been produced that were

28   unprivileged?

1    Mr. Toberoff:  That's correct, but the ones that have been

2    produced, we still need to match up, and the ones that were listed on

3    the privilege log we would still need to match up.  And we've

4    produced the two documents that haven't been produced.

5    (Tr. at 32:9 - 32:16).

6    The Court:  And you are saying that in the escrow documents

7    there are some documents that came from third parties?

8    Mr. Toberoff:  Absolutely.  Well, they're actually -

9    The Court:   Excuse me.  But documents that nevertheless had

10   already been produced?

11   Mr. Toberoff:  Yes.

12   (Tr. at 33:4 - 33:10).

13   Magistrate Judge Zarefsky, noting that there was some "wiggle room" in Mr.

14   Toberoff's declaration, issued the following Order:

15   The Court:  Now, I told you, Mr. Toberoff, that I saw a little

16   wiggle room in your declaration.  You tell me you didn't mean for

17   there to be any.  So, here's what I'm going to do.  Not later than May

18   7th, that's a week from today, I want you to submit a declaration that

19   does identify by the Bates numbers of the escrow documents and the

20   corresponding Bates numbers of documents already produced, those

21   among the escrow documents which are unprivileged and have

22   already been produced.

23   So, you take the Bates numbers of the escrow documents and

24   say, 'Here are the corresponding Bates numbers of the documents that

25   have already been produced.'  Take the Bates numbers of the escrow

26   documents and correspond to the listings on the privilege log of the

27   documents which have not have been produced because they were

28   privileged.  All right?  So, put that in your declaration.

**EXHIBIT Z6**

**387**

1      Then the escrow holder, Mr. Bergman, [sic] is to return to the

2   plaintiffs any documents which are identified in the declaration as

3   being privileged and having been identified on the privilege logs.

4      The others can be delivered to trial counsel for defendants

5   because they're either unprivileged, or, if they were privileged,

6   privilege has been waived because they weren't listed on the privilege

7   log.

8                              * * *

9      The Court:  Do you understand what I've ordered you to put in

10   the declaration?

11      Mr. Toberoff:  I do, your Honor.

12   Towards the end of the hearing, in the context of Mr. Toberoff's request for

13   additional time to complete the declaration ordered by Magistrate Judge Zarefsky,

14   he repeated his Order:

15      Mr. Toberoff:  Okay.  Could you please repeat it for me,

16   because I want to make sure I'm clear.

17      The Court:  For example, Bates number, . . . Escrow document

18   00004 corresponds to previously produced document 00006.  Escrow

19   document 00007 corresponds to previously produced document

20   00009, and so on.

21      Mr. Toberoff:  Okay.

22      The Court:  Privilege escrow document 00015 is a privilege

23   document which was listed on the privilege log as document such and

24   such.

25      Mr. Toberoff:  Okay.

26      The Court:  Privileged documents get returned.  The privilege

27   documents that were listed on the privilege log get returned.  The

28   others get sent to defense counsel.

**EXHIBIT Z₇**

1　　　Mr. Toberoff:  The others get sent to defense counsel?

2　　　The Court:  From the escrow.

3　　　Mr. Toberoff:  Right.  Even though we've produced them, but

4　because we're saying they're not privileged, they will get sent to

5　defense counsel.  Okay.

6　(Tr. at 30:5 - 31:5).

7　**Actions Taken Subsequent To Magistrate Judge Zarefsky's Order**

8　　　13.　　After Magistrate Judge Zarefsky issued his Order, I followed up with

9　Mr. Quinn, who had since left Arnold & Porter to take a position as a neutral at

10　JAMS/Endispute, and I proposed that Mr. Quinn continue to oversee the escrow

11　process to carry out the Court's Order.  Attached hereto as Exhibit H is a true and

12　correct copy of my letter to Mr. Quinn dated May 16, 2007.

13　　　14.　　On May 18, 2007, David Eisen, Mr. Quinn's former partner at Arnold

14　& Porter, responded to my letter, informing Mr. Toberoff and I that he had

15　assumed custody of the Escrow Documents after Mr. Quinn's departure from the

16　firm, and that he was "prepared to fulfill the terms of Magistrate Judge Zarefsky's

17　order."  He also requested that one of the parties send him "the briefs on the

18　relevant motion and the transcript of the hearing" in order to assist him in the

19　process.  Attached hereto as Exhibit I is Mr. Eisen's letter to Mr. Toberoff and I

20　dated May 18, 2007.

21　　　15.　　Mr. Toberoff served the declaration ordered by Magistrate Judge

22　Zarefsky on May 21, 2007.  Attached hereto as Exhibit J is a true and correct copy

23　of the Declaration of Marc Toberoff Pursuant to Magistrate Judge Zarefsky's April

24　30, 2007 Order.  That declaration listed a number of documents that had neither

25　been listed on a privilege log nor previously produced.

26　　　16.　　Mr. Toberoff attached a cover letter to the May 21, 2007 declaration,

27　with the instruction that "[a]ny Documents not identified in my Declaration as

28　listed in a privilege log or as previously produced to Defendants are to be produced

**EXHIBIT Z$_8$**

to Defendants, <u>with the exception of the clearly Privileged Litigation
Communications</u> identified in my declaration." (emphasis in original).  Attached
hereto as Exhibit <u>K</u> is a true and correct copy of that cover letter.

17.   I responded to Mr. Toberoff's letter on May 22, 2007 and attached the
following documents to assist Mr. Eisen in his review of Mr. Toberoff's
declaration: the April 30, 2007 hearing transcript; the documents Mr. Toberoff had
identified in his declaration as having previously been produced, so that Mr. Eisen
could compare them to the Escrow Documents Mr. Toberoff claimed were
corresponding; the privilege logs Mr. Toberoff cited in his declaration so that Mr.
Eisen could compare the pertinent entries to the Escrow Documents Mr. Toberoff
claimed he had listed on those privilege logs; and the briefing on Defendants'
motion to compel that Mr. Eisen requested in his May 18, 2007 letter.  Attached
hereto as Exhibit <u>L</u> is a true and correct copy of my May 22, 2007 letter, with the
attachments omitted.

18.   Mr. Toberoff then responded to my letter, instructing Mr. Eisen,
among other things, that he was not to use Mr. Toberoff's declaration to confirm
that the Escrow Documents he would be releasing actually corresponded to the
production documents and privilege log entries listed in Mr. Toberoff's
declaration.  Attached hereto as Exhibit <u>M</u> is a true and correct copy of Mr.
Toberoff's letter to Mr. Eisen dated May 23, 2007.

19.   Because Defendants believed that Mr. Toberoff was preventing Mr.
Eisen from complying with Magistrate Judge Zarefsky's April 30, 2007 Order, we
initiated the meet-and-confer process, and on September 17, 2007 Defendants filed
their Joint Stipulation Re: Defendants' Motion to Compel Compliance With The
Court's 4/30/07 Order And Motion For Sanctions.

### This Court's September 17, 2007 Order

20.   During the Hearing in front of this Court on September 17, 2007, the
Court held an impromptu argument regarding the Escrow Documents.  It issued a

1  ruling from the bench and then subsequently issued an Order that the escrow

2  attorney submit to the Court for *in camera* review the nine documents Mr.

3  Toberoff had identified as being under dispute because they had not previously

4  been produced to Defendants or identified on a privilege log.  The Court also

5  ordered Mr. Toberoff to submit a declaration "setting forth the ground for any

6  claim of privilege relating to said documents."  Defendants have submitted this

7  declaration in response to Mr. Toberoff's declaration.

8       21.   Mr. Toberoff's declaration, at paragraph 6, represents that the

9  "handful of documents [that had neither been listed on a privilege log nor

10  previously produced to Defendants] fall[s] into three categories that slipped

11  between the 'cracks' of [Magistrate Judge Zarefsky's] Order but are clearly

12  privileged: (i) 6 *post-litigation attorney-client communications*, which, pursuant to

13  the parties' standing agreement . . . need not have been listed in a privilege log to

14  preserve the privilege . . . ; (ii) the "defamatory cover letter" enclosing and

15  describing the contents of the stolen Escrow Documents, including many of the

16  attorney-client communications that are identified on the privilege logs of

17  Plaintiffs and non-party witnesses . . .; and (iii) 2 letters between [Mr. Toberoff]

18  and Don Bulson, Esq., the attorney for Plaintiff Laura Siegel Larson's half-brother,

19  Michael Siegel, who is a statutory beneficiary of the 'Superman' termination

20  notices, which were listed in Mr. Bulson's privilege log and properly identified as

21  such in [Mr. Toberoff's] May 21, 2007 declaration."  Below, I explain why

22  Plaintiffs and Mr. Toberoff should be required to produce the Escrow Documents

23  falling into each of these three categories (hereinafter the "Disputed Documents").

24       22.   Before delving into each individual category, it is important to point

25  out that "fell through the cracks" is a misnomer.  Plaintiffs and Mr. Toberoff have

26  been in possession of the Escrow Documents since Mr. Quinn Bates labeled and

27  sent the documents to Mr. Toberoff on July 18, 2006, and they have had several

28

**EXHIBIT 7** 0

391

1  opportunities to state their privilege contentions with respect to the Disputed

2  Documents.

3     23.   Plaintiffs' and Mr. Toberoff's first opportunity to assert that the

4  Disputed Documents are protected by the attorney-client privilege came after

5  Defendants served separate discovery requests to Plaintiffs and Mr. Toberoff, each

6  of which specifically called for the production of the Escrow Documents.

7  Plaintiffs served a privilege log on the September 29, 2006 deadline but did not

8  identify the Disputed Documents in that privilege log.  Mr. Toberoff himself made

9  the choice entirely to forgo serving a privilege log supporting the privilege

10 assertions he made in response to Defendants subpoena duces tecum to him

11 personally.

12     24.   Mr. Toberoff had a second opportunity to raise his and Plaintiffs'

13 contentions with respect to the privileged nature of the Disputed Documents during

14 the April 30, 2007 hearing in front of Magistrate Judge Zarefsky.  As described in

15 Paragraph 12 above, however, Mr. Toberoff expressly avowed several times that

16 all of the Escrow Documents had been either produced or listed on a privilege log.

17     25.   Mr. Toberoff and Plaintiffs had a third opportunity to raise their

18 contentions regarding the Disputed Documents by filing objections to Magistrate

19 Judge Zarefsky's April 30, 2007 ruling within 10 days, as provided by Local Rule

20 72-2.1.  They did not file any objections, however.

21     Given these facts, Defendants dispute Mr. Toberoff's characterization of the

22 Disputed Documents as having "fallen through the cracks."

23 **The "Defamatory" Cover Letter To The Escrow Documents**

24     26.   The first reason the "defamatory cover letter" should be released to

25 Defendants is that it falls directly within the purview of Magistrate Judge

26 Zarefsky's Order requiring the escrow holder to turn over any documents not

27 previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.

28

27.    Mr. Toberoff's assertion at Paragraph 15 that the cover letter was not the subject of Defendants' Joint Stipulation regarding the Escrow Documents is incorrect.  Defendants' Motion was based on Plaintiffs' and Mr. Toberoff's failure to produce documents or provide a privilege log in response to their request for production to Plaintiffs and their subpoena to Mr. Toberoff, both of which asked for "*All Writings* referenced in the July 5, 2006 letter from John J. Quinn, Esq. to, among others, Marc Toberoff, Esq. . . ., and which were attached to or enclosed with the July 18, 2006 letter from John J. Quinn, Esq. to Marc Toberoff, Esq." (emphasis added).  Because the "defamatory cover letter" was among the documents referenced in Mr. Quinn's letter and enclosed with Mr. Quinn's July 18, 2006 letter, it was the subject of Defendants' discovery requests and properly put at issue in Defendants' Motion.

28.    Second, in light of Mr. Toberoff's prior statements about the privileged nature of the "defamatory cover letter," Mr. Toberoff's current declaration does not establish that the document should be protected by the attorney-client privilege.  In conjunction with the briefing on Defendants' original motion to compel, Mr. Toberoff submitted a March 23, 2007 declaration specifically addressing the privilege issue and stating, at paragraph 27, that the letter "is defamatory and in other respects *potentially violates* the attorney-client privilege," (emphasis added) even though it had never been listed on Plaintiffs' or any other privilege log. .  Attached as Exhibit N hereto is a true and correct copy of the March 23, 2007 Declaration of Marc Toberoff in Opposition to Defendants' Motion to Compel Production of Whistle Blower Documents.  This "potential" objection was neither raised at the April 30, 2007 hearing nor in the May 21, 2007 declaration following the hearing.  Indeed, the first time the "potential" privilege was ever asserted to the Court was in the declaration just submitted on September 20, 2007.

**Post-Litigation Attorney-Client Communications**

29.     The Disputed Documents containing post-litigation communications between Mr. Toberoff and his clients should be produced because they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs.

30.     That Mr. Toberoff referenced these documents at Paragraph 22 to his March 23, 2007 declaration in Opposition to Defendants Motion to Compel Production of Whistle Blower Documents only further supports Defendants' position that the documents did not just "fall through the cracks." During the hearing before Magistrate Judge Zarefsky on April 30, 2007, Mr. Toberoff unequivocally stated that all of the Escrow Documents had been either produced or listed on a privilege log. His several unequivocal affirmations during the Hearing effectively prevented Magistrate Judge Zarefsky from considering whether Mr. Toberoff's failure to serve a privilege log in response to the subpoena issued to him personally (as opposed to the requests for production served on Plaintiffs) waived any assertion that the post-litigation communications could be protected by the attorney-client privilege. After all, although Defendants do not deny that they entered into an agreement with Plaintiffs regarding post-litigation attorney-client communications, that agreement was only with respect to documents on both Plaintiffs' and Defendants' privilege logs which post-dated the litigation and the disclosure of which would invade work product. Moreover, no arrangement was **ever** made with Mr. Toberoff regarding the contents of his privilege log.

**Mr. Toberoff's Correspondence With Michael Siegel's Attorney Don Bulson**

31.     The first reason the Disputed Documents concerning correspondence with third party Don Bulson should be produced to Defendants is that they fall directly within the purview of Magistrate Judge Zarefsky's Order requiring the escrow holder to turn over any documents not previously produced or listed on any of Plaintiffs' or Mr. Toberoff's privilege logs. Mr. Bulson has acted as attorney at

**EXHIBIT 23**
**394**

relevant times for plaintiff Laura Siegel Larson's half-brother Michael Siegel, who though now deceased has a 25% share of the termination interests being litigated in this case.

32.　The following timeline explains why these particular Disputed Documents could not have been listed on Mr. Bulson's privilege log, as Mr. Toberoff contends they were:

33.　Warner Bros. received the Escrow Documents from an unidentified sender on <u>June 28, 2006</u>.

34.　Mr. Quinn sent Mr. Toberoff Bates labeled copies of the Escrow Documents on <u>July 18, 2006</u>.

35.　Defendants served Plaintiffs with their request for production of the Escrow Documents on <u>August 7, 2006</u>, and Defendants served Mr. Toberoff with a personal subpoena on <u>August 10, 2006</u>.

36.　On <u>August 11, 2006</u>, Defendants served an unrelated subpoena duces tecum, issued out of the United States District Court for the District of Ohio, on Don Bulson, the attorney of Michael Siegel, Jerry Siegel's deceased son.  At that time, Mr. Bulson was not represented by Mr. Toberoff.

37.　It was only sometime after Defendants served the subpoena on Mr. Bulson that Mr. Toberoff's associate Nicholas Williamson contacted Mr. Bulson. Attached hereto as Exhibit <u>O</u> is a true and correct copy of the Declaration of Nicholas C. Williamson, Esq. In Opposition to Defendants' Motion To Compel Documents Pursuant To Subpoena Duces Tecum.  At paragraph 3 of Exhibit <u>O</u>, Mr. Williamson states that "[u]pon receipt of Defendants' August 11, 2006 Subpoena Duces Tecum ("Subpoena"), I immediately contacted Bulson regarding documents he had relevant to the subpoena."

38.　During his conversation with Mr. Bulson, Mr. Williamson learned that the relevant files had been forwarded to attorney Melvin Bancheck.  (Exhibit <u>O</u> at ¶ 3.)

39.    Mr. Williamson subsequently contacted Mr. Bancheck, who provided

him with the relevant documents some time after September 7, 2006.  (Exhibit O at

¶¶ 4-5).

40.    Because Mr. Toberoff refused to produce any documents or privilege

log on Mr. Bulson's behalf, Defendants filed a motion to compel before the

District Court of Ohio on October 20, 2006.  Waiting until after Defendants had

filed their motion, on October 23, 2006, Mr. Toberoff's office provided Defendants

with Mr. Bulson's privilege log, which purported to list all of the documents from

Mr. Bulson's files.  Defendants' motion to compel in Ohio, which among other

things challenges Mr. Bulson's assertion of the common-interest privilege, remains

pending, and has been since November 2006.

41.    Mr. Toberoff is now asserting that the Disputed Documents

concerning correspondence between Mr. Toberoff and Mr. Bulson should not be

produced because they were listed on *Mr. Bulson's* October 23, 2006 privilege log.

Given the facts as described above, that is a physical impossibility, since the

Escrow Documents were taken from Mr. Toberoff's files and sent to Warner Bros.

in June 2006, whereas Mr. Bulson's documents were not in Mr. Toberoff's files

until, at the earliest, September 7, 2006.

42.    In addition, the privilege log entries referenced by Mr. Toberoff

indicate that the letters were correspondence between Mr. Toberoff and Mr.

Bulson.  It is reasonable to conclude that the documents taken from Mr. Toberoff's

files and included among the Escrow Documents were Mr. Toberoff's copies of

that correspondence, which were never listed on a privilege log or produced.  It is

not accurate for Mr. Toberoff to cite to the entries on Mr. Bulson's privilege log

because those entries relate to Mr. Bulson's copies of those documents, which

could not have been included among the Escrow Documents.

43.    Even indulging the unwarranted assumption that these Bulson

documents "fell through the cracks," Plaintiffs' and Mr. Toberoff's privilege

**EXHIBIT Z**5

1   assertion does not meet the test required to establish the common-interest

2   exception to the attorney-client privilege.  Plaintiffs and Mr. Toberoff are asserting

3   that they did not waive their attorney-client privilege when they initiated

4   communications with third party Mr. Bulson.  Given their relationship between

5   Plaintiffs and Mr. Bulson's client Michael Siegel, however, they cannot meet their

6   burden.

7        44.    Michael Siegel (now deceased), owned a vested 25% share of the

8   copyright termination interest that is the subject of the current litigation.  His

9   position vis-à-vis Plaintiffs' ownership shares is certainly adversarial, as it has

10  been at least since Plaintiffs' September 21, 2002 letter to Defendants purported to

11  repudiate Plaintiffs' October 2001 settlement with Defendants (prior to the

12  purported repudiation, Michael Siegel stood to benefit from the Settlement

13  Agreement and his interests were arguably aligned with Plaintiffs' interests with

14  respect to the settlement.)  Attached hereto as Exhibit P is a true and correct copy

15  of that letter.      45.    After Plaintiffs repudiated that settlement agreement,

16  Plaintiffs retained a California company, IP Worldwide, LLC ("IPW"), in which

17  Mr. Toberoff was a principal, to represent them in connection with efforts to

18  exploit their termination interest.  Attached hereto as Exhibit Q is a true and correct

19  copy of an agreement between IP Worldwide, LLC and Joanne Siegel and Laura

20  Siegel Larson, dated as of October 3, 2002.

21       46.    Then, in January 2003, Plaintiffs and IPW entered into a second

22  agreement in which they acknowledged certain "risks and potential problems

23  regarding Michael Siegel" and agreed that IPW partner Ariel Emanuel "will

24  attempt to purchase all of Michael Siegel's rights, title and interest" in his

25  termination rights in connection with IPW's representation of Plaintiffs.  Attached

26  hereto as Exhibit R is a true and correct copy of an agreement between IP

27  Worldwide, LLC and Joanne Siegel and Laura Siegel Larson, dated January 21,

28  2003.

47.     These agreements suggest that Mr. Toberoff's communications with Mr. Bulson on Plaintiffs' behalf were not made in the pursuit of a common legal interest.  Rather, Mr. Toberoff, as Plaintiffs' representative and on behalf of IPW, was attempting to negotiate a purchase of Michael Siegel's rights in the copyright termination interest.  This type of relationship does fall within the common interest exception to the attorney-client privilege, which requires that the parties pursue a common legal interest, not a common business interest.

**The Remaining Escrow Documents**

48.     Finally, although the Court's September 17, 2007 Minute Order instructs the escrow holder to turn over the nine Disputed Documents to the Court, it does not address how he should handle the remaining Escrow Documents.

49.     Defendants request that, pursuant to Magistrate Zarefksy's April 30, 2007 Order, the escrow holder be required to use Mr. Toberoff's declaration to match up the Escrow Documents with the privilege log entries and production documents listed in that declaration to ensure that he is releasing the proper documents.  If the Court is concerned about the burden on the escrow agent, it could conduct the review *in camera*.

50.     By undertaking this review, Mr. Eisen or the Court can ensure that he complies with Magistrate Judge Zarefsky's Order that the Escrow Documents be returned to Mr. Toberoff *only* if they have been listed on Plaintiffs' privilege logs.  If any of the Escrow Documents do not correspond to the privilege log entries Mr. Toberoff has provided, those documents should be turned over to Defendants.

51.     Given the facts described above, that Magistrate Judge Zarefsky's Order was founded on the representation Mr. Toberoff solemnly made during the hearing that each Escrow Document had either been produced or listed on a privilege log, there is even more of a reason for Mr. Eisen to undertake this analysis.  Mr. Toberoff has taken the position that only nine documents "slipped through the cracks."  However, it is impossible for Defendants, who do not have

1   access to the Escrow Documents, to determine if any additional documents "fell

2   through the cracks," or if Mr. Toberoff's has accurately represented that the

3   remaining documents all correspond to privilege log entries.  Mr. Eisen, as a

4   neutral party with access to the Escrow Documents, is in a unique position to

5   undertake this analysis.  Moreover, Defendants have reason to believe that

6   additional documents have indeed "slipped through the cracks."  Indeed,

7   Defendants' original concern regarding the Escrow Documents was that they

8   included *nonprivileged*, responsive documents that had not been produced by

9   Defendants.  As mentioned above, Mr. Smith undertook an initial review of the

10  Escrow Documents pursuant to the *State Compensation* case.  During that review,

11  he segregated the Escrow Documents into three categories: "non-privileged,"

12  "privileged," and "?"  Among the "non-privileged" category of Escrow Documents

13  was correspondence between plaintiff Laura Siegel Larson and her estranged (now

14  deceased) step-brother, Michael Siegel, relating to Mr. Siegel's share of the

15  termination interest at stake in the litigation.  Plaintiffs have not produced any such

16  correspondence in this litigation, and it has not been identified on any of the

17  privilege logs.  Thus, these documents would also appear to have "fallen through

18  the cracks," yet are not among the nine documents provided by Mr. Toberoff to the

19  Court.  An actual comparison of the Escrow Documents to the allegedly

20  corresponding privilege log entries is the only way to confirm that all non-

21  privileged documents contained within the Escrow Documents have been

22  produced, and we respectfully request that it be ordered to occur.

23       I declare under penalty of perjury of the laws of the United States of

24  America that the foregoing is true and correct.

25       Dated this 25th day of September, 2007 at Beverly Hills, California.

26

27                                      Michael Bergman

28

**EXHIBIT Z**18

**399**