COPY

FILED

2011 FEB 17 PM 3:38

CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:  (845) 265-2819

11 Attorneys for Defendants and Counterclaimant

12

13          **UNITED STATES DISTRICT COURT**

14          **CENTRAL DISTRICT OF CALIFORNIA**

15

16 JOANNE SIEGEL and LAURA          Case No. CV-04-8400 ODW (RZx)
   SIEGEL LARSON,
17                                  **SECOND AMENDED**
              Plaintiffs             **COUNTERCLAIMS**
18
                                    The Hon. Otis D. Wright II
19       v.

20 WARNER BROS.
   ENTERTAINMENT INC., DC
21 COMICS, and DOES 1-10,

22           Defendants

23
   WARNER BROS
24 ENTERTAINMENT INC, DC
   COMICS, and DOES 1-10
25
              COUNTERCLAIMANT
26
27         V.

28 JOANNE SIEGEL und LAURA
   SIEGEL LARSON

   COUNTERDEFENDANTS

                                    SECOND AMENDED
                                    COUNTERCLAIMS

                **EXHIBIT AA**
                    **400**

1    On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for

2    Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16.

3    Docket Nos. 637, 643.  For purposes of completeness, defendants hereby reassert

4    the counterclaims contained in the First Amended Counterclaims, Docket No. 42,

5    with changes to reflect only the current date, the updated pleading title, and the

6    Court's dismissal of Time Warner Inc. as a party to this action.  Defendants reserve

7    all rights, including to amend these counterclaims as and when appropriate.

8    Defendant/Counterclaimant DC Comics, for its Second Amended

9    Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura

10   Siegel Larson, alleges:

11                                   **PARTIES**

12   1.    Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a

13   New York General Partnership engaged in the business of, *inter alia*, creating,

14   exploiting, and licensing comic book stories and characters.  DC is the successor in

15   interest to all rights under copyright and other rights, including trademark rights

16   and the good will in and to the first Superman story and all other works and

17   products relating to the Superman character.

18   2.    Upon information and belief, Plaintiff/Counterclaim Defendant Joanne

19   Siegel is an individual and citizen of the State of California, in the County of Los

20   Angeles.  Upon further information and belief, Joanne Siegel is the widow of

21   Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

22   3.    Upon information and belief, Plaintiff/Counterclaim Defendant Laura

23   Siegel Larson is an individual and citizen of the State of California, in the County

24   of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a

25   daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and

26   Laura Siegel Larson are referred to herein as "the Siegels."

27

28

                                        - 1 -                    SECOND AMENDED
                                                                COUNTERCLAIMS

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of the subject matter hereof under the provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections 1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332, 1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18 U.S.C. § 1367.

5.      Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information and belief, a substantial part of the events giving rise to DC's claims occurred or a substantial part of the properties that are the subject of these counterclaims are situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found in this District.

## FACTS COMMON TO ALL COUNTERCLAIMS

### Background And History

6.      Upon information and belief, in or about 1933, Jerome Siegel ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on creating a number of stories, including a story entitled "The Reign of the Superman," which was published in a magazine put out by Siegel and Shuster themselves entitled "Science Fiction."  Upon further information and belief, other than the same name, the "Superman" character in this story shared very little, if any, similarity with the character that would later become known as Superman.

7.      Upon information and belief, in early 1933, Siegel and Shuster began collaborating on "comic strips," initially for syndication and eventually for publication in "comic books," a new and growing medium.  Among their work together were a number of comic strips featuring a character they named Superman. This Superman character bore virtually no resemblance to the character of the same name that had previously appeared in the "Science Fiction" magazine.  Upon

SECOND AMENDED
COUNTERCLAIMS

EXHIBIT AA
402

further information and belief, those works, which were never published, included: (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page synopsis covering an additional two months of daily comic strips; and (e) fifteen daily comic strips (collectively the "Unpublished Superman Works").

8.    Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9.    Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10.    On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years.  Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11.    Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics."  In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review.  At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12.    In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip

- 3 -

EXHIBIT AA
403

1  entitled 'Superman' . . . all good will attached thereto and exclusive right to the use

2  of the characters and story, continuity and title of strip . . ." and agreed not to

3  employ Superman and other characters in the strip "by their names contained

4  therein."

5    13.    DCI advertised the publication of the new comic story Superman and

6  the new title "Action Comics No. 1" in others of its publications, including but not

7  limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New

8  Adventure Comics No. 26," all of which are cover dated May 1938 and, upon

9  information and belief, were distributed in copies to the public on or before April 1,

10  1938.  These advertisements (the "Superman Ads"), which depict the Superman

11  character in his costume, exhibiting super-strength, show almost the entirety of

12  what would become the cover of "Action Comics No. 1."

13    14.    Upon information and belief, sometime prior to April 16, 1938, but

14  after the Superman Ads, DCI published the thirteen page Superman comic book

15  comprising the first Superman story in "Action Comics No. 1," bearing the "cover"

16  date June 1938 (hereinafter "Action Comics No. 1").  However, Action Comics No.

17  1 was not comprised entirely of the pre-existing Unpublished Superman Works.

18  Rather, upon information and belief, in response to DCI's instruction that the

19  Unpublished Superman Works be presented as a thirteen page comic book and

20  subject to DCI's right to control, Siegel and Shuster created additional materials to

21  complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

22    15.    After the publication of Action Comics No. 1, upon information and

23  belief, Siegel and Shuster supplied further original Superman stories at DCI's

24  instance and expense and subject to its right to control.  On September 22, 1938,

25  Siegel and Shuster entered into another employment agreement (the "DCI

26  September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been

27  doing the art work and continuity for said comics [including Superman comics] for

28  us. We wish you to continue to do said work and hereby employ and retain you for

- 4 -

**EXHIBIT AA**
**404**

1 said purposes . . . ."  The DCI September 22, 1938 Agreement also contained an

2 acknowledgement that DCI was the "exclusive" owner of Superman.

3        16.    Also on September 22, 1938, Siegel and Shuster entered into an

4 agreement with DCI and with the McClure Newspaper Syndicate (the "McClure

5 September 22, 1938 Agreement") concerning the use of Superman in newspaper

6 strips.

7        17.    All of Siegel and Shuster's contributions to Superman comic books

8 and comic strips published subsequent to Action Comics No. 1 as well as the

9 Additional Action Comics No. 1 Materials, were made either under the DCI March

10 1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure

11 September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by

12 one or more of these Agreements, or certain subsequent agreements affirming those

13 agreements, as employees of DCI or its successors or at DCI's instance and expense

14 and subject to DCI's right of control, with the result that the copyrights to all

15 Superman materials created by them after preparation of materials included in

16 Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are

17 owned exclusively by DC Comics as works made for hire under the then applicable

18 1909 Copyright Act.

19        18.    On November 30, 1938, Siegel wrote to DCI (the "November 1938

20 Letter") suggesting that it do a comic book named Superboy, "which would relate

21 to the adventures of Superman as a youth."  The November 30, 1938 Letter does

22 not contain any discussion of plot, dialogue, appearance, or any other copyrightable

23 material relating to Superboy.  DCI decided not to publish a "Superboy" comic at

24 that time.

25        19.    In 1939, among the Superman comics prepared by Siegel and Shuster

26 at the instance and expense of DCI and subject to its right of control, was Superman

27 No. 1, with a cover date of Summer 1939.  In Superman No. 1, Clark Kent was

28 depicted as a youth with super powers.

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**405**

20.     On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips.  In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21.     Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth.  The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests... America's outstanding boy hero: SUPERBOY!"  The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided not to publish a "Superboy" comic at that time.

22.     Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

- 6 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**406**

1  resemblance to anything contained in the Unpublished 1940 Superboy Script, and

2  such similarities as may exist are common to earlier Superman related material

3  owned by DCI.

4      23.    In 1947, Siegel and Shuster brought suit against, *inter alia*, DCI's

5  successor in interest, National Comics Publications, Inc. ("National") in the New

6  York Supreme Court in Westchester County (the "Westchester Action"). The

7  Westchester Action was, in part, the culmination of a dispute between Siegel and

8  Shuster and National over what Siegel and Shuster claimed was DCI's

9  unauthorized publication of Superboy. In the Westchester Action, in addition to

10  seeking redress in connection with Superboy, Siegel and Shuster sought to

11  invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938

12  Agreement was obtained by duress, and sought to recapture all rights in Superman.

13      24.    On November 21, 1947, the Court in the Westchester Action issued an

14  opinion (the "Westchester Opinion") after trial in which it found that the March 1,

15  1938 Agreement transferred to DCI all rights in Superman and that the DCI

16  September 22, 1938 Agreement was valid and not obtained under duress. The

17  Court also held that in publishing Superboy, DCI had acted "illegally."

18      25.    At the Court's request, the parties to the Westchester Action submitted

19  proposed fact findings and conclusions of law. On April 12, 1948, the Court

20  adopted fact findings and conclusions of law and issued an interlocutory judgment

21  (collectively the "Westchester Action Interlocutory Judgment"). The defendants in

22  the Westchester Action filed a notice of appeal, and the Westchester Action

23  Interlocutory Judgment was stayed pending appeal.

24      26.    Shortly thereafter, the parties to the Westchester Action entered into

25  two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948

26  Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948

27  Consent Agreement"). Under both documents, *inter alia*, Siegel and Shuster: (a)

28  agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledge

SECOND AMENDED
COUNTERCLAIMS

that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and exclusive owner of Superman, the conception, idea, continuity, pictorial representation and formula thereof in all media; (d) agreed that they were enjoined from creating, publishing or distributing any Superman work or any imitation thereof, and from using the title Superman or title that contained the word "Super"; (e) acknowledged that National was the sole owner of and owned exclusive rights in Superboy; (f) agreed that they were enjoined from creating, publishing or distributing Superboy or any imitation thereof; (g) agreed they were prohibited from representing their past connection with Superman and Superboy in such a way to confuse the public that such connection still existed; and (h) agreed they were prohibited from using any coloring, lettering or printing in referring to Superman or Superboy that was imitative of that used by National.

27.    In the 1960s, Siegel and Shuster again brought suit against National, this time in the United States District Court for the Southern District of New York for a declaration that they (and not National) owned the copyright in the renewal copyright term for Action Comics No. 1.  In a decision published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the district court held, *inter alia*, that the agreements between Siegel and Shuster on the one hand and DCI (and later National) on the other, intended to assign all rights in Superman to DCI and National, including renewal copyright rights.

28.    In a decision published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the lower court's ruling relating to National's ownership of all rights in Superman. Siegel and Shuster did not further appeal the ruling.

29.    On December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., then National's parent company (the

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**408**

"December 23, 1975 Agreement"). Under this agreement, Siegel and Shuster again acknowledged that Warner Communications, Inc. was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised . . . ."

30.    Under the December 23, 1975 Agreement, Siegel and Shuster each were to and did receive throughout their lives annual payments as well as medical insurance coverage. Upon Siegel's death, annual payments were to be made to Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The amount of the annual payment pursuant to the December 23, 1975 Agreement was increased over the years. Since Siegel's passing in 1996, Joanne Siegel has continuously received and accepted annual payments and health insurance under that agreement.

### DC Comics' Development And Licensing
### Of Superman Works And Products

31.    The initial graphic representations of the Superman character in 1938, now stylistically dated, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and run faster than an express train. In his ordinary life, the character is depicted as a mild-mannered newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego,

- 9 -

Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

32.    Since the publication of "Action Comics No. 1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33.    In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations.  These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34.    Over the years since Action Comics No. 1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Most notably, many of Superman's powers that are among his most famous today did not appear in Action Comics No. 1 but only appeared in later publications. These include: his ability to fly; his super-vision which enables him to see through walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his invulnerability to injury which is most often shown as bullets bouncing off his chest and/or arms.

- 10 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**410**

35.     One notable part of the evolution of the appearance of the Superman character undertaken by DC Comics and its predecessors, has been the transformation of the emblem on the chest of Superman's costume. In Action Comics No. 1, the emblem was comprised of a small yellow inverted triangle bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics No. 1 Crest"). Thereafter, in changing the appearance of Superman and his costume, DC Comics and/or its predecessors significantly changed the Action Comics No. 1 Crest. Bearing little if any resemblance to the original, it is now a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield Device"). The S in Shield Device, as transformed by DC Comics and its predecessors, has become a strong symbol, standing alone, of all goods and services relating to Superman and his sole source, DC Comics and its predecessors.

36.     At all relevant times, DC Comics, its predecessors in interest and licensees have duly complied with the provisions of the 1976 Copyright Act and its 1909 predecessor statute with respect to securing copyright protection for the numerous works in which the Superman character has appeared and establishing DC Comics' copyright ownership thereof, including the original and all works based upon and derived therefrom, and have received from the Register of Copyrights, valid and subsisting certificates of copyright registration and renewal with respect thereto.

37.     DC Comics and its predecessors have, since 1938, continuously held themselves out as the exclusive owners of all rights under copyright in Superman.

38.     DC Comics has over many decades adopted and made long, continuous and exclusive use of (a) the name and mark Superman and (b) certain key symbols and indicia of origin in connection with and to identify all authorized uses of the Superman character in print and all other media (sometimes hereinafter the "Superman symbols and indicia of origin"). The Superman name and mark and

SECOND AMENDED
COUNTERCLAIMS

Superman symbols and indicia of origin include, *inter alia*, Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases. Most notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a plane!...It's Superman!" first used in the introduction to the 1940 radio program The Adventures of Superman, and thereafter continuously repeated in Superman television programming and various Superman publications. All of these Superman symbols and indicia of origin have been used on and in connection with a wide variety of publications and licensed goods and services, as they have been added to the Superman character and mythology under DC Comics' and/or its predecessors' supervision and direction, but, in any event, for the earliest symbols, since as early as 1938.

39.     As a result of the above-described continuous and exclusive use by DC Comics of the Superman name and mark, as well as the Superman symbols and indicia of origin for over sixty years, the names, marks and symbols and the appearance of the Superman character have become famous and the public has come to recognize that all publications, entertainment and products featuring Superman or bearing such marks all come from the same source, namely, DC Comics, and that DC Comics is the exclusive source of the Superman character and all uses of the character on and in connection with any goods and services.

40.     DC Comics owns dozens of federal trademark registrations for Superman related indicia across a broad array of goods and services. Those registrations include, but are not limited to the following for the following marks: (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177, 1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803, 1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b) SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026, 1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

SECOND AMENDED
COUNTERCLAIMS

EXHIBIT AA
412

1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the "S in Shield" Device (either alone or as part of a rendering of Superman) 2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233, 1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630, 1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150, 1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No. 2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g) SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623, 1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i) SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881; (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306; (1) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304; (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No. 1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No. 1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and indicia of origin, the "Superman Marks").

41. These registrations alone suffice to show the unusual breadth and scope of the use of such marks related to Superman by DC Comics or its licensees on or in connection with a broad range of goods and services, all of which have come to be seen over six decades by countless consumers as indicating an exclusive authorization or sponsorship thereof by plaintiff DC Comics, the publisher and source of all Superman comic books and other Superman productions and products.

### The Superman Notices Of Termination

42. On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice

SECOND AMENDED
COUNTERCLAIMS

of Termination of Transfer Covering Extended Renewal. Those documents purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the Siegels' share in the following grants of copyright: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19 1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975 Agreement (collectively the "Superman Notices"). However, the Siegels served no notice terminating their share of the copyright grant in the May 21, 1948 Consent Agreement.

43. The Superman Notices purport to terminate the Siegels' share of the above grants listed therein in the Unpublished Superman Works, Action Comics No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1 Works"). However, in none of the seven Superman Notices, or anywhere else, do the Siegels purport to terminate their share of any copyright grant in the Superman Ads.

44. In the Superman Notices, the Siegels expressly recognize and acknowledge that the character Superboy is a derivative work based on Superman. The Superman Notices expressly identify Superboy as part of the Superman "family" of characters in which the Siegels are purporting to terminate their grants. Indeed, the more than 15,000 works listed in the Superman Notices include hundreds of publications and other works that feature *only* Superboy (as opposed to Superman), and also Superman No. 1 with a cover date of Summer 1939, in which Superman is depicted as a youth.

45. In late November, 1998, DC Comics received from Plaintiffs/Counterclaim Defendants. Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents entitled Notice of Termination of Transfer Covering Extended Renewal. Those documents purport to terminate, effective November 27, 2000, the Siegels'

- 14 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**414**

1   share it the following grants of copyright relating to the character known as "The

2   Spectre": (a) the December 4, 1937 Agreement; (b) a September 22, 1938

3   Agreement; (c) and October 10, 1939 Agreement and (d) a second October 10,

4   1939 Agreement (collectively the "Spectre Notices").

5        46.    The Spectre Notices purport to terminate the Siegels' share of the

6   above grants in: (a) the Spectre character appearing in costume in an ad in issue No.

7   51 of "More Fun Comics" with a cover date of January 1940; (b) the first Spectre

8   comic book story published in issue No. 52 of "More Fun Comics" with a cover

9   date of February 1940; (c) part 2 of the first Spectre comic book story published in

10  issue No. 53 of "More Fun Comics" with a cover date of March 1940, and hundreds

11  of additional works listed the Spectre Notices (collectively the "Spectre Works").

12  **The Parties' Negotiations**

13  **And The Agreement Reached**

14       47.    On April 17, 1997, less than ten days after DC Comics received the

15  Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation.

16  The Siegels requested that DC Comics make an initial settlement proposal. But

17  prior to making such proposal, DC Comics requested that the parties enter into a

18  confidentiality agreement. Frustrated by the Siegels' delay in responding to its

19  proposed form confidentiality agreement, on November 5, 1997, DC Comics'

20  counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you

21  in the past, our client has elected, for settlement purposes only, not to respond to the

22  [Superman Notices] served upon them by challenging their validity or scope *at this*

23  *time*." (Emphasis added.)

24       48.    On December 17, 1997, DC Comics and the Siegels finally entered

25  into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded its

26  first substantive proposal with respect to the copyrights at issue, and in connection

27  therewith also raised certain defects in the termination notice, stating "that there is a

28  substantial legal issue as to the effectiveness of your clients' termination of DC's

- 15 -

SECOND AMENDED<br>COUNTERCLAIMS

**EXHIBIT AA**<br>**415**

1  interest in the Superman Comic."  For more than six months despite repeated

2  requests for feedback, DC Comics heard no response to its December 18, 1997

3  proposal. Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC

4  Comics' counsel that did not respond to the proposal but only requested more

5  information.

6      49.    On July 23, 1998, DC Comics provided the Siegels with the answers to

7  the questions posed in their counsel's letter of June 19, 1998.  Despite requests for

8  feedback for another several months, DC Comics again received no response to its

9  proposal.

10      50.    Having heard no response from the Siegels, on April 15, 1999, one day

11  before the purported "Effective Date" set forth in the Superman-Notices, DC

12  Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim

13  Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things,

14  the reasons it considered the Superman Notices to be invalid.

15      51.    On April 30, 1999, DC Comics received a letter from the firm of

16  Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented the

17  Siegels in negotiations with DC Comics.  Thereafter, the parties engaged in

18  extensive negotiations with their respective lawyers attending meetings in

19  California and New York, and exchanging proposals.  During that time period, at

20  the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance

21  Payment") to the Siegels which payment was agreed to be an advance against any

22  future sums provided under an agreement to be entered into between the parties.

23      52.    On October 16, 2001, a legal representative for DC Comics made an

24  offer to the Siegels through Gang, Tyre by telephone.  On October 19, 2001, Kevin

25  Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001 offer.

26  That day, Mr. Marks wrote a letter confirming that the Siegels had "accepted D.C.

27  Comics offer of October 16, 2001" and outlined all of the material terms in detail.

28  Those terms included, *inter alia*, that the Siegels transferred or would transfer all of

- 16 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**416**

their rights in the Superman property (which was defined in the letter as Superman, Superboy and related properties including but not limited to Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre." In exchange, the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d) significant guaranteed minimum payments as advances against royalties; and (e) percentage royalties from DC Comics' exploitations of Superman across all media, worldwide.

53.  By return letter of October 26, 2001, DC Comics' representative wrote back providing a "more fulsome outline" of the agreed upon points. Neither the Siegels nor any of their representatives in any way disputed the October 26, 2001 confirmatory outline from DC Comics. On February 1, 2002, DC Comics forwarded a draft of a more formal written agreement memorializing the terms agreed to in the October 19 and 26, 2001 correspondence.

54.  After the October 2001 agreement, DC Comics entered into a written Option Purchase Agreement with Warner Bros., A Division of Time Warner Entertainment Company, L.P. (now known as defendant Warner Bros. Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics granted to Warner Bros. the option to license certain exclusive rights in Superman, and Warner Bros. has commenced photography of a feature-length motion picture based on the property.

55.  On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 2002, but purporting to object to unspecified provisions of the formal written draft and repudiating the agreement reached by the parties in October 2001. To this day, the Siegels have not identified a single provision of the February 1, 2002 formal

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**417**

1  draft that was inconsistent with the provisions in the Siegels' October 19, 2001
2  acceptance of DC Comics' proposal.

3       56.    On September 30, 2002, however, DC Comics received a letter from
4  the Siegels stating they were breaking off all discussions with DC Comics and
5  again repudiating the agreement reached by the parties in October 2001.

6  **The Superboy Termination Notices**

7       57.    Notwithstanding the fact that the Siegels had already purported to
8  terminate grants with respect to the Superboy character effective April 16, 1999, on
9  November 8, 2002, the Siegels mailed to DC Comics another Notice of
10  Termination of Transfer purporting to relate solely to Superboy (the "Superboy
11  Notice"). The Superboy Notice purports to terminate, effective November 17, 2004,
12  only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the
13  December 23, 1975 Agreement, and identifies many of the same works identified in
14  the Superman Notices. As was the case with the Superman Notices, the Siegels
15  served no notice terminating the copyright grant in the May 21, 1948 Consent
16  Agreement.

17       58.    The Superboy Notice purports to terminate the above grants regarding
18  the following works: (a) the unpublished November 30, 1938 Letter; (b) the
19  unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d)
20  approximately 1,600 additional titles.  However, the Superboy Notice lists and
21  purports to terminate grants of rights under copyright relating to hundreds of the
22  same works already purportedly terminated by the earlier Superman Notices.  The
23  Superboy Notice does not purport to terminate the 1939 depiction of Superman as a
24  youth in Superman No. 1.

25       59.    In the Superboy Notice, the Siegels make the claim that Superboy is a
26  "separate and distinct copyrighted work and character from the copyrighted work
27  and character Superman."  This contention is erroneous.

28

- 18 -

SECOND AMENDED<br>COUNTERCLAIMS

**EXHIBIT AA**<br>**418**

60.     In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy.  This contention is also erroneous.

61.     Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville."  "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62.     On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia*, that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63.     On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64.     On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

**The Siegels' Filing Of Two Related Cases**

65.     On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

- 19 -

SECOND AMENDED
COUNTERCLAIMS

# FIRST COUNTERCLAIM FOR DECLARATION
## THAT THE SUPERMAN NOTICES AND THE
### SUPERBOY NOTICE ARE INEFFECTIVE

66.     DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67.     DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

### #1 The May 21, 1948 Consent Agreement Has Not Been Terminated

68.     The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69.     As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect. Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

### #2 The December 23, 1975 Agreement

70.     Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71.     By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

- 20 -

SECOND AMENDED
COUNTERCLAIMS

72.     By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

73.     Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

74.     Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

75.     Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the December 23, 1975 Agreement, and the grant of copyright therein, remains in full force and effect.

SECOND AMENDED
COUNTERCLAIMS

EXHIBIT AA
421

76.     Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

### #3 The Unpublished Superboy Works

77.     In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

78.     Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

79.     Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

80.     Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision.  As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any copyrightable material therefrom and DC Comics remains the sole owner thereof. Therefore, the Superboy Notice is ineffective.

### #4 Siegel Owned No Copyright In Superboy

81.     The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

SECOND AMENDED
COUNTERCLAIMS

EXHIBIT AA
422

82.     Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83.     Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84.     As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned ab initio by the copyright owner in Superman.

85.     Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus, the Superboy Notice is ineffective.

### #5 The Superman Notices Were Not Timely Served

86.     Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87.     All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304 (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999, was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3) and such notices

- 23 -

SECOND AMENDED
COUNTERCLAIMS

1  of termination were served less than two years before the allowable effective date in

2  violation of 17 U.S.C. § 304 (c) (4) (A).

3       88.    On information and belief, plaintiffs deny DC Comics' contentions

4  and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above.

5  Accordingly, an actual controversy has arisen and now exists between

6  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

7       89.    A justiciable controversy exists concerning the above issues and a

8  judicial declaration is necessary and appropriate to determine the parties' respective

9  rights with regard thereto.

## SECOND ALTERNATIVE COUNTERCLAIM FOR DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS

14       90.    DC Comics repeats and realleges paragraphs 1 - 89 above as if fully

15  set forth herein.

16       91.    Since as early as 1998, Plaintiffs/Counterclaim Defendants were on

17  notice of DC Comics' position that the Superman Notices contained legal defects.

18  Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim

19  Defendants were on notice that DC Comics rejected the Superman Notices and

20  asserted exclusive ownership of all copyright in Superman.

21       92.    Since April 16, 1999, the purported effective date of the Superman

22  Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of

23  their purported co-ownership of copyright in Action Comics No. 1.

24       93.    In response to DC Comics' above actions and assertion and such

25  deprivation to the Siegels of the benefits of their alleged copyright co-ownership,

26  Plaintiffs/Counterclaim Defendants took no action until filing the instant action on

27  October 8, 2004, more than six years after DC Comics advised

28  Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

- 24 -

SECOND AMENDED
COUNTERCLAIMS

1   and more than five years after being placed on notice by DC Comics of its claim of

2   exclusive ownership of copyright in Superman and that it rejected and repudiated

3   the Superman Notices and during which time period the Siegels were deprived of

4   benefits to which they claim they are entitled.

5        94.    Because Plaintiffs/Counterclaim Defendants' claim of partial

6   ownership of copyright accrued more than three years prior to

7   Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into

8   consideration any purported agreements to toll the statute of limitations, any claim

9   of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is

10  barred by the three-year statute of limitations of the Copyright Act.

11       95.    On information and belief, plaintiffs deny DC Comics' contentions

12  and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above.

13  Accordingly, an actual controversy has arisen and now exists between

14  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

15       96.    A justiciable controversy exists concerning the above issues and a

16  judicial declaration is necessary and appropriate to determine the parties' respective

17  rights with regard thereto.

18                **THIRD ALTERNATIVE COUNTERCLAIM**

19                  **FOR BREACH OF CONTRACT**

20       97.    DC Comics repeats and realleges paragraphs 1 - 96 above as if fully

21  set forth herein.

22       98.    In or about October 2001, Plaintiffs/Counterclaim Defendants entered

23  into a written agreement with DC Comics memorialized by the authorized agent of

24  Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of

25  DC Comics, John Schulman, which subsequently was confirmed and ratified in

26  writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"),

27  pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1)

28  transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

- 25 -

SECOND AMENDED
COUNTERCLAIMS

transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in any and all past, present, and future Superman and Superboy-related properties, works, characters, names, and trademarks (collectively, the "Superman Works"), (2) agreed to accept certain compensation from DC Comics in consideration of any and all rights, title, and interest which they may have in the Superman Works (the "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim related to the Superman Works other than for breach of the Agreement (the "Covenant Not To Sue").

99.    DC Comics has performed all of its obligations under the Agreement, except to the extent such performance has been prevented or excused by the acts or omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without limiting the foregoing, DC Comics established a reserve account of the moneys due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the Agreement but for their repudiation and breach of the Agreement as herein alleged. DC Comics always has been and remains ready, willing, and able to perform all of its obligations under the Agreement, and will resume doing so upon either a withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the Agreement or a final adjudication that the Agreement is enforceable and binding on the parties.

100.    Plaintiffs/Counterclaim Defendants have repudiated and otherwise breached the Agreement by, among other things:

a.    Claiming, including in this action, that they have not transferred and are not contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all of their rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, and refusing to execute a formal written transfer thereof to DC Comics;

- 26 -

b.     Repudiating the Financial Terms and claiming, including in this action, that they are entitled to additional compensation for the Superman Works; and

c.     Initiating this action in violation of the Covenant Not To Sue.

101.   As a direct and foreseeable result of the contractual breaches on the part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been damaged in an amount to be proven at trial.

<h2 style="text-align:center">FOURTH ALTERNATIVE COUNTERCLAIM FOR<br>DECLARATORY RELIEF REGARDING THE AGREEMENT</h2>

102.   DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.

103.   An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:

a.     Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

b.     If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c.     If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to

- 27 -

DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner.

104.   DC Comics is informed and believes, and on that basis alleges, that Plaintiffs/Counterclaim Defendants dispute these contentions.

105.   DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct.

## FIFTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION OF LIMITATIONS ON THE SCOPE OF THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE

106.   DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

107.   In the event the Superman Notices and/or the Superboy Notice are deemed effective and the settlement agreement between the parties is not enforced, DC Comics asserts the following alternative counterclaim for a declaration limiting the scope and reach of the Superman Notices and the Superboy Notice in six separate and independent ways.

108.   DC Comics contends that:

### #1 The Superman Ads

109.   The regulations governing the contents of notices of termination promulgated by the U.S. Copyright Office under authority of the 1976 Copyright Act require, in relevant part, that a notice of termination served pursuant to section 304 (c) of the 1976 Copyright Act name "each work to which the notice of termination applies."

- 28 -

SECOND AMENDED
COUNTERCLAIMS

110.   Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

111.   The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

112.   The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

113.   Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

### #2 Use Of Superman And Superboy Derivative Works Prepared Prior To The Purported Effective Dates Of The Superman Notices And The Superboy Notice

114.   The Superman Notices purport to terminate the Siegels' share in the Copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works").  Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

115.   The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

- 29 -

SECOND AMENDED
COUNTERCLAIMS

116.   The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117.   Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118.   All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119.   The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No 1 but only appeared later in the Post Action Comics No. 1 Works.

120.   Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.  Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

SECOND AMENDED
COUNTERCLAIMS

EXHIBIT AA
430

**#4 Superboy Is A Derivative Work Based On Superman**

121.   In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth."  In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests...America's outstanding boy hero: SUPERBOY!"

122.   As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

123.   Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

124.   The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture U.S. Copyrights therein, such recapture could not affect DC Comics' continuing right to create and exploit new derivative works that do not include such new copyrightable subject matter, including but not limited to, the television series "Smallville."

**#5 The Derivative Work Superboy Is A Joint Work Of Authorship**

125.   Upon information and belief, the Siegel Superboy Proposals were joint works of authorship as they were prepared jointly with Shuster and because it was intended that their contents would be merged with artwork to create a comic book or comic strip.

126.   As eventually published, the works containing the Superboy character included both artwork and storyline.

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**431**

127.   The joint author's share in the Siegel Superboy Proposals is owned by DC Comics and cannot be terminated either by the Superman Notices or the Superboy Notice.

128.   As a result of the foregoing, DC Comics right to continue to exploit the Siegel Superboy Proposals and any derivative works based thereon cannot be affected by either the Superman Notices or the Superboy Notice.

### #6 "Smallville" Is Not Derived From Superboy

129.   Among the derivative works based upon Superman and authorized b DC Comics is the weekly television series, "Smallville."

130.   Regardless of whether the Superboy Notice is effective and further regardless of whether Superboy is a derivative work based upon Superman, "Smallville" was derived from and based upon Superman and is not a derivative work based upon the Siegel Superboy Proposals or any succeeding Superboy comic or Superboy work exploited by DC Comics and/or its predecessors prior to May 21, 1948.  Beyond sharing the idea of depicting Superman as a youth, Smallville is not substantially similar to the Siegel Superboy Works.

131.   Thus, irrespective of any accounting issues relating to the Siegels' purported right to receive compensation with respect to new episodes of "Smallville," DC Comics' right to continue to authorize production, distribution, and airing of "Smallville" television episodes remains unaffected by the Superman Notices and the Superboy Notice.

### #7 The Additional Action Comics No. 1 Materials

132.   The Additional Action Comics No. 1 Materials created in 1938 were prepared at the instance and expense of DCI and subject to its right to control. Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials were "works made for hire" and copyright therein was owned by DCI *ab initio*.

133.   Because the Additional Action Comics No. 1 Materials were works made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

- 32 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**432**

17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the Additional Action Comics No. 1 Materials.

134. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

135. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

## SIXTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION REGARDING THE PRINCIPLES TO BE APPLIED IN AN ACCOUNTING

136. DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135 above as if fully set forth herein.

137. DC Comics contends that in the event the Superman Notices and/or the Superboy Notice were deemed valid and effective, any accounting to which the Siegels would be entitled relating to Superman (including its derivative work Superboy, collectively for this Counterclaim "Superman") would be subject to the following limitations and reductions:

    a. The Siegels would not be entitled to any revenues derived from exploitation of Superman outside of the United States because termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of non-United States copyrights. 17 U.S.C. § 304 (c) (6) (E).

    b. The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

- 33 -

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**433**

c. Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d. Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present it the Superman works subject to accounting.

e. Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f. The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights. As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

SECOND AMENDED
COUNTERCLAIMS

**EXHIBIT AA**
**434**

g.    Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect expenses, taxes, and DC Comics' independent role as a publisher of Superman.

h.    Subject to all reductions aforesaid and otherwise determined by the Court to be applicable, the Siegels would be entitled to an accounting of only one-half of the copyright co-owner's profits.

138.   On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics as to the above issues.

139.   A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1.    Declaring that the Superman Notices and the Superboy Notice are ineffective for one or more of the reasons set forth in DC Comics' First Counterclaim;

2.    In the event that the Superman Notices and/or the Superboy Notice are deemed effective, for damages according to proof at trial on DC Comics' Third Alternative Counterclaim;

3.    In the event that the Superman Notices and/or the Superboy Notice are deemed effective, declaring on DC Comics' 'Fourth Alternative Counterclaim that, pursuant to the Agreement:

a.    Plaintiffs/Counterclaim Defendants have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

- 35 -

SECOND AMENDED COUNTERCLAIMS

**EXHIBIT AA**
**435**

b.     In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c.     In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner;

4.     In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that the scope and effect of the Superman Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth Alternative Counterclaim;

5.     In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that any accounting to which Plaintiffs/Counterclaim Defendants may be entitled will be limited by all applicable principles, including but not limited to, those set forth in DC Comics' Sixth Alternative Counterclaim;

6.     Awarding DC Comics its costs and reasonably attorneys' fees incurred in connection with DC Comics' defenses and claims herein seeking declarations with respect to copyright ownership; and

- 36 -

SECOND AMENDED
COUNTERCLAIMS

1        7.     Awarding DC Comics such other and further relief as may be just.

2

3 Dated:     February 17, 2011        Respectfully Submitted,

4                             O'MELVENY & MYERS LLP

5                           By:

6                             Daniel M. Petrocelli
                            Attorneys for Defendants and
7                             Counterclaimant

8

CC1:844136

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED
COUNTERCLAIMS

1 | Marc Toberoff (State Bar No. 188547)
  mtoberoff@ipwla.com
2 | Keith G. Adams (State Bar No. 240497)
  kgadams@ipwla.com
3 | TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 3630
4 | Los Angeles, California, 90067
Telephone:  (310) 246-3333
5 | Fax:          (310) 246-3101

6 | Attorneys for Defendants Mark Warren
Peary, as personal representative of the
7 | Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
8 | as personal representative of the Estate of
Joanne Siegel

9

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
|---|---|
| Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CONSOLIDATED MOTION AND MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
|  | Complaint filed:  May 14, 2010 Trial Date:  None Set |
|  | Date:     November 14, 2011 Time:     1:30 p.m. Place:    Courtroom 11 |
| Defendants. |  |

EXHIBIT BB
438

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (State Bar No. 90072)
 *rkendall@kbkfirm.com*
Laura W. Brill (State Bar No. 195889)
 *lbrill@kbkfirm.com*
Nicholas F. Daum (State Bar No. 236155)
 *ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:   (310) 556-2700
Facsimile:    (310)556-2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

**EXHIBIT BB**
**439**

# TABLE OF CONTENTS

| Exhibit | Document | Page |
|---------|----------|------|
| | Request for Judicial Notice | 1 |
| A | August 1, 1992 Agreement between DC Comics and Frank Shuster & Jean Peavy | 8 |
| B | November 23, 2001 Agreement between Pacific Pictures Corporation and Mark Warren Peary & Jean Adele Peavy | 9 |
| C | October 3, 2002 Agreement between IP Worldwide, Inc. and Joanne Siegel & Laura Siegel Larson | 13 |
| D | October 27, 2003 Agreement between Pacific Pictures Corporation and Mark Warren Peary | 17 |
| E | Notice of Termination re: Copyright Renewal Term of "Superman," served by the Estate of Joseph Shuster, recorded with the U.S. Copyright Office on December 3, 2003. | 21 |
| F | September 10, 2004 letter between Pacific Pictures Corporation and Mark Warren Peary & Jean Adele Peavy | 37 |
| G | November 15, 2006 letter from Marc Toberoff to DC Comics, in the related case *Siegel v. Warner Bros. Entertainment Inc., et al.*, USDC Case No. CV-04-8400-ODW (RZx) | 38 |
| H | Cover Pages, Exhibit Lists and Exhibits from the November 17, 2006 deposition of Marc Toberoff, in the related *Siegel* case | 41 |
| I | December 30, 2008 Declaration of DC Comics' Counsel, attaching May 2, 2008 Letter, in the related *Siegel* case | 58 |
| J | May 17, 2011 Judgment (Docket No. 669) in the related *Siegel* case | 62 |

Pursuant to Rule 201 of the Federal Rules of Evidence, defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC ("Defendants"), respectfully request that this Court take judicial notice of the following documents, submitted in support of Defendants' Consolidated Motion to Dismiss Plaintiff DC Comic's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).  In ruling on a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6), a court may consider matters subject to judicial notice.  *See Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1111-12 (C.D. Cal. 2003) ("In deciding a motion to dismiss…a court may consider…matters that may be judicially noticed pursuant to Federal Rule of Evidence 201."); *Haye v. United States*, 461 F.Supp. 1168, 1174 (C.D. Cal. 1978) ("Subsection (d) [of Rule 201] makes the taking of judicial notice mandatory if the Court is so requested and supplied with the necessary information.").[1]

1.      Defendants request that the Court take judicial notice of the agreement between Plaintiff DC Comics ("DC"), on the one hand, and Frank Shuster and Jean Peavy, on the other hand, dated as of August 1, 1992 (the "1992 Shuster Agreement").  A true and correct copy of the 1992 Shuster Agreement is attached hereto as **Exhibit A**.

On a motion to dismiss under Rule 12(b)(6), courts are permitted to consider documents incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to

---

[1]  *See generally In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) ("[T]he Court may take judicial notice of documents on which allegations in the [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided the authenticity of those documents are not in dispute."); *Parrino v. FHP Healthcare, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (stating judicial notice prevents "plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based.").

1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

**EXHIBIT BB**

**441**

the document or the document forms the basis of the plaintiff's claim."); *Von Koenig v. Snapple Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010) (where parties requested judicial notice of juice and tea bottle labels and labels formed the basis of the relevant causes of action, court considered labels for the purpose of defendant's motion to dismiss). *See generally Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1997) (holding that "documents critical to plaintiff's claims, but not explicitly incorporated in his complaint" may be judicially noticed and considered by a district court on a motion to dismiss). As the 1992 Shuster Agreement is referred to throughout DC's first amended complaint (FAC) in this action (*see*, *e.g.*, FAC ¶¶ 3-4, 6, 51-55, 112-117, 125-128, 175-179) and is the basis in part of Plaintiff's First and Second Claims for Relief, it is proper for the Court to consider the 1992 Shuster Agreement on Defendants' motion to dismiss.

2. Defendants request that the Court take judicial notice of the agreement between Pacific Pictures Corporation ("PPC"), on the one hand, and Jean Peavy and Mark Warren Peary, on the other hand, made as of November 23, 2001 (the "2001 PPC Agreement"). The 2001 PPC Agreement is attached hereto as **Exhibit B**.

On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2001 PPC Agreement is referred to throughout the Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 6, 11, 60-65, 90, 98-99, 120, 132, 169, 177-178, 192-193) and is an alleged basis for Plaintiff's First, Third, Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2001 PPC Agreement on Defendants' motion to dismiss.

3. Defendants request that the Court take judicial notice of the agreement between IP Worldwide, Inc., on the one hand, and Joanne Siegel and Laura Siegel Larson, on the other hand, dated as of October 3, 2002 ("the 2002 IPWW Agreement"). The 2002 IPWW Agreement is attached hereto as **Exhibit C**. On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS
**EXHIBIT BB**
**442**

reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2002 IPWW Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 8, 81-84, 188, 193) and is an alleged basis of Plaintiff's Third, Fifth and Sixth Claims for Relief, it is proper for the Court to consider the 2002 IPWW Agreement on Defendants' motion to dismiss.

4.     Defendants request that the Court take judicial notice of the agreement between PPC, on the one hand, and Jean Peavy and Mark Warren Peary, on the other hand, dated October 27, 2003 (the "2003 PPC Agreement"). The 2003 PPC Agreement is attached hereto as **Exhibit D**. On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2003 PPC Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 10-11, 90, 92, 98-99, 101, 120, 130, 132, 169, 177-178, 192-193) and is an alleged basis of Plaintiff's First, Third, Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2003 PPC Agreement on Defendants' motion to dismiss.

5.     Defendants request that the Court take judicial notice of the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" (the "Shuster Termination") served by Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, on Plaintiff DC Comics, among others, on November 10, 2003 and recorded with the U.S. Copyright Office on December 3, 2003. A true and correct copy of the Notice of Termination and Certificate of Recordation with the U.S. Copyright Office is attached hereto as **Exhibit E**.

On a motion to dismiss under Rule 12(b)(6), courts are permitted to consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the Notice of Termination is referred to throughout plaintiff's FAC in this action (*see*, *e.g.*, FAC ¶¶ 92-101, 105-164) and is an alleged basis of Plaintiff's First, Second and Fourth Claims for Relief, it is proper for the Court to consider the Notice of Termination on Defendants' motion to dismiss.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

**EXHIBIT BB**

**443**

Moreover, the Court may take judicial notice of such records from the U.S. Copyright Office. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (taking judicial notice of copyright registrations); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (holding that on a motion to dismiss a court may take judicial notice of matters of public record outside the pleadings).

6.     Defendants request that the Court take judicial notice of the agreement between PPC, on the one hand, and Jean Peavy and Mark Warren Peary, on the other hand, dated September 10, 2004 (the "2004 PPC Agreement"). The 2004 PPC Agreement is attached hereto as **Exhibit F**. On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2004 PPC Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 99, 121, 169, 171-172, 177-178) and an alleged basis of Plaintiff's First, Third, Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2004 PPC Agreement on Defendants' motion to dismiss.

7.     Defendants request that the Court take judicial notice that DC Comics was in possession of the 2001 and 2003 PPC Agreements, and the 2002 IPWW Agreement on or before November 17, 2006.  Rule 201 of the Federal Rules of Evidence permits a court to take judicial notice of a fact that is "not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "Subsection (d) [of Rule 201] makes the taking of judicial notice mandatory if the Court is so requested and supplied with the necessary information." *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).  That the 2001 and 2003 PPC Agreements and 2002 IPWW Agreement were produced to DC in the closely-related case *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx) ("*Siegel*") is not subject to reasonable dispute.  Such agreements,

attached hereto as Exhibits B, C and D, respectively, were Bates stamped as follows:

2001 PPC Agreement:    PPC 00005-00008

2003 PPC Agreement:    PPC 00001-00004

2002 IPWW Agreement:    IPW 00001-00004

*See also* November 15, 2006 letter from Marc Toberoff to counsel for DC, including facsimile cover sheet, attached hereto as **Exhibit G**, enclosing the document productions Bates-stamped IPW 00001-00016 and PPC 00001-00009; *Werner v. Werner*, 267 F.3d 288, 295-296 (3d Cir. 2001) (determination on a motion to dismiss of whether defendants produced corporate meeting minutes during discovery in related state court action "is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned by [defendants]").

Moreover, it cannot be disputed that DC Comics had possession of the 2001 and 2003 PPC Agreements, and the 2002 IPWW Agreement on or before November 17, 2006, as they were introduced as exhibits by DC Comics in its deposition of Marc Toberoff in *Siegel*, which took place on November 17, 2006. *See* cover pages and exhibits list of the transcript of the deposition of Marc Toberoff and documents stamped as Exhibits 13, 14, & 18 thereto, attached hereto as **Exhibit H**; *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (court takes judicial notice on a motion to dismiss of conference call transcripts for the fact that statements were made on the dates specified).

8.    Defendants request that the Court take judicial notice of a letter from attorney Marc Toberoff to DC's attorney Michael Bergman dated May 2, 2008, which was "Exhibit B" to the Declaration of Michael Bergman in Support of DC's Motion to Compel filed on December 30, 2008 (Docket Nos. 395-1, 395-2) in the related *Siegel* case. A true and correct copy of the December 30, 2008 Declaration of Michael Bergman and the May 2, 2008 Letter, as redacted by DC's counsel, is attached hereto as **Exhibit I**. It is proper for the Court to take judicial notice of proceedings and determinations of prior related litigation. 1-201 *Weinstein's Federal*

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

**EXHIBIT BB**

**445**

*Evidence* § 201.12[3] ("Courts have the power to judicially recognize their own records of prior litigation closely related to the present case"). *See Stein v. State of Arizona*, 2010 WL 2541136 (D. Ariz. June 18, 2010) (on motion to dismiss, taking judicial notice of plaintiff's sentencing documents and release order in related criminal case against plaintiff) (citing *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir. 1988)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, of briefs, pleadings, memoranda, expert reports from related litigation); *Kourtis v. Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005) ("[C]ourt records from related proceedings can be taken into account without converting a motion to dismiss into a summary judgment motion"), *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008).

9.     Defendants request that the Court take judicial notice of the Judgment dated May 17, 2011 (Docket No. 669), that this Court entered in the related *Siegel* case.  A true and correct copy of the Judgment is attached hereto as **Exhibit J**.  It is proper for the Court to take judicial notice of proceedings and determinations of prior related litigation.  1-201 *Weinstein's Federal Evidence* § 201.12[3].  *See Stein*, 2010 WL 2541136 (citing *Emrich,* 846 F.2d at 1198); *Reyn's Pasta Bella, LLC,* 442 F.3d at 746 n.6.

Pursuant to Federal Rules of Evidence 201, and for the reasons set forth above, Defendants respectfully request that this Court take judicial notice of the documents described above.

Dated:  October 14, 2011          RESPECTFULLY SUBMITTED,

/s/ Laura Brill
Laura Brill

KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff,  Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS
**EXHIBIT BB**
**446**

1    /s/ Marc Toberoff
     Marc Toberoff
2
3    TOBEROFF & ASSOCIATES, P.C.
     Attorneys for Defendants Mark Warren Peary, as
4    personal representative of the Estate of Joseph
     Shuster, Jean Adele Peavy, and Laura Siegel
5    Larson, individually and as personal representative
     of the Estate of Joanne Siegel
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7

EXHIBIT BB
447

1 | DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2 | MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3 | CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4 | O'MELVENY & MYERS LLP
   | 1999 Avenue of the Stars, 7th Floor
5 | Los Angeles, CA 90067-6035
   | Telephone: (310) 553-6700
6 | Facsimile: (310) 246-6779

7 | PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8 | PERKINS LAW OFFICE, P.C.
   | 1711 Route 9D
9 | Cold Spring, NY 10516
   | Telephone: (845) 265-2820
10 | Facsimile: (845) 265-2819

11 | Attorneys for Plaintiff DC

12 | **UNITED STATES DISTRICT COURT**

13 | **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  DC COMICS, | Case No. CV 10-3633 ODW (RZx) |
| 15         Plaintiff, | **DC COMICS' RESPONSE TO** |
| 16       v. | **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT** |
| 17  PACIFIC PICTURES | **ON CONSOLIDATED MOTION** |
| 18  CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, | **TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) (Docket No. 331-** |
| 19  an individual, MARK WARREN PEARY, as personal representative of | **1)** |
| 20  the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, | Hon. Otis D. Wright II |
| 21  LAURA SIEGEL LARSON, an individual and as personal | **Hearing Date**: November 14, 2011 |
| 22  representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, | **Hearing Time**: 1:30 p.m. <br> **Place**: Courtroom 11 |
| 23  inclusive, | |
| 24         Defendants. | Complaint Filed: May 14, 2010 <br> Discovery Cutoff: None Set <br> Trial Date: None Set |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1   Plaintiff DC Comics hereby responds to defendants' Request for Judicial
2   Notice In Support of Consolidated Motion To Dismiss Pursuant To Fed. R. Civ. P.
3   12(b)(6).  Docket No. 331-1.  DC does not oppose the Court taking judicial notice
4   of the evidence requested by defendants and would have told defendants as much
5   had they contacted DC before filing the request.  DC does object to defendants'
6   efforts, yet again, Docket No. 328, to evade the Court's page limitation on Rule 12
7   briefing by repeating and augmenting their Rule 12 arguments in the body of their
8   request for judicial notice.  *E.g.*, Docket No. 331-1 at 4-5.  Such additional
9   argument should be stricken and are further grounds to deny defendants' re-filed
10  Rule 12 motion.

11  Dated:  October 24, 2011                    Respectfully Submitted,

12                                              By:  /s/ Daniel M. Petrocelli
13                                                   Daniel M. Petrocelli

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 1 -                    DC' RESPONSE TO DEF'S REQUEST FOR
                         JUDICIAL NOTICE ISO MOT. TO DISMISS

**EXHIBIT CC**
**449**

**Patricia Perello**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Monday, October 24, 2011 8:33 PM |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 2:10-cv-03633-ODW -RZ DC Comics v. Pacific Pictures Corporation et al Response (non-motion) |

<span style="color:red">**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered by Petrocelli, Daniel on 10/24/2011 at 8:32 PM PDT and filed on 10/24/2011

| | |
|---|---|
| **Case Name:** | DC Comics v. Pacific Pictures Corporation et al |
| **Case Number:** | 2:10-cv-03633-ODW -RZ |
| **Filer:** | DC Comics |
| **Document Number:** | 335 |

**Docket Text:**
**RESPONSE filed by Plaintiff DC Comics *to Defendants' Request For Judicial Notice [333]* (Petrocelli, Daniel)**

**2:10-cv-03633-ODW -RZ Notice has been electronically mailed to:**

Cassandra L Seto    cseto@omm.com, swatson@omm.com

Daniel M Petrocelli    dpetrocelli@omm.com

Keith Gregory Adams    kgadams@ipwla.com

Laura W Brill    lbrill@kbkfirm.com, docket@kbkfirm.com, jcontreras@kbkfirm.com

Marc Toberoff    mtoberoff@ipwla.com

Matthew T Kline    mkline@omm.com

Nathalie E Cohen    ncohen@kbkfirm.com, docket@kbkfirm.com

Nicholas Calvin Williamson    nwilliamson@ipwla.com

1

**EXHIBIT CC**
**450**

Nicholas Frederic Daum    ndaum@kbkfirm.com, docket@kbkfirm.com

Patrick T Perkins    pperkins@ptplaw.com

Richard B Kendall    rkendall@kbkfirm.com, docket@kbkfirm.com, ghunter@kbkfirm.com

**2:10-cv-03633-ODW -RZ Notice has been delivered by First Class U. S. Mail or by other means to: :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\10-24-11 DC's Response to Def's RJN.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=10/24/2011] [FileNumber=12505082-0] [ada63944ff848646d2e37153047f39f0d570d7804d6e3d66dadc35322006ec150e 36d110b6a905fe8794d8638926944dc20b2a2ebce551921bca000c1dc319ff]]

**EXHIBIT CC**
**451**

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Circuit Mediation Office
Phone (415) 355-7900 Fax (415) 355-8566
http://www.ca9.uscourts.gov/mediation

# MEDIATION QUESTIONNAIRE

The purpose of this questionnaire is to help the court's mediators provide the best possible mediation service in this case; it serves no other function. Responses to this questionnaire are **not** confidential. Appellants/Petitioners must electronically file this document within 7 days of the docketing of the case. 9th Cir. R. 3-4 and 15-2. Appellees/Respondents may file the questionnaire, but are not required to do so.

| | |
|---|---|
| 9th Circuit Case Number(s): | 11-56934 |
| District Court/Agency Case Number(s): | CV-10-3633 |
| District Court/Agency Location: | Central District of California, Western Division |
| Case Name: | DC Comics v. Pacific Pictures Corporation, et al. |
| If District Court, docket entry number(s) of order(s) appealed from: | 337 |
| Name of party/parties submitting this form: | Defendants, Pacific Pictures Corp. et al. |

## Please briefly describe the dispute that gave rise to this lawsuit.

Attorney Marc Toberoff represents the heirs of Superman's co-creators, Siegel and Shuster, in long-standing copyright litigation with DC Comics ("DC") and its parent, Warner Bros. Entertainment Inc. ("Warner"), which commenced in 2004. After years of litigation, Mr. Toberoff won key victories on behalf of his clients in Siegel v. Warner Bros. Entertainment Inc., C.D. Cal. Case No. 04-CV-08400, 542 F. Supp. 2d 1098 (C.D. Cal. 2008) (the "Siegel Case"), vindicating the heirs' right pursuant to 17 U.S.C. § 304(c) to terminate Siegel and Shuster's old Superman copyright grants to DC. DC retaliated by filing baseless state-law claims for tortious interference against Mr. Toberoff and entities with which he has been affiliated to obtain economic leverage over Mr. Toberoff and his long-time clients. Mr. Toberoff contends that the claims arise from protected activity, including his efforts to assist the heirs in vindicating their rights under federal copyright law.

## Briefly describe the result below and the main issues on appeal.

On August 13, 2010, defendants moved to strike DC's Fourth, Fifth, and Sixth Claims pursuant to California's Anti-SLAPP statute; that motion was vacated on September 7, 2010, when DC filed an amended complaint. On September 20, 2010, defendants filed a new Anti-SLAPP motion as to DC's amended complaint; that motion was vacated on October 14, 2010 after full briefing. On January 14, 2011, defendants refiled their Anti-SLAPP motion, and the parties then re-submitted their briefing in January 2011. On March 9, 2011, the District Court ordered the parties to once again re-submit their briefing, which the parties did in March 2011. On June 1, 2011, at DC's request, the District Court ordered the parties to file new opposition and reply briefs, which the parties did in August 2011. On October 25, 2011, the District Court denied the Anti-SLAPP motion on the grounds that DC's Fourth, Fifth and Sixth Claims were not subject to the Anti-SLAPP statute. That order is immediately appealable pursuant to Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003).

Describe any proceedings remaining below or any related proceedings in other tribunals.

The statutory termination rights of Siegel's heirs regarding Superman were litigated in the closely related Siegel Case. The District Court held that the Siegels' termination was valid as to the first Superman story published in Action Comics, No. 1 and other original Superman works. The case was then transferred to Judge Otis Wright on November 20, 2009. Thereafter, a F.R.C.P. 54(b) judgment was entered, and the remainder of the case was stayed pending an appeal by both sides of the Rule 54(b) judgment, currently before the Ninth Circuit, Case No. 11-55863.

In this action, C.D. Cal. Case No. 10-CV-3633, the District Court found that defendants had waived privilege on numerous attorney-client communications that had been stolen from Mr. Toberoff's law firm and delivered to Warner because Mr. Toberoff had produced the documents to the U.S. Attorney's Office, pursuant to a grand jury subpoena and confidentiality agreement, as a condition of their investigation/prosecution of this crime. That order is currently before this Circuit on a writ proceeding, Case No. 11-71844.

DC has taken the position that while this appeal is pending, it is entitled to pursue discovery on claims at issue in this appeal, as well as interrelated federal claims asserted in its complaint.

Provide any other thoughts you would like to bring to the attention of the mediator.

The parties engaged in formal mediation sessions before the Hon. Daniel Weinstein (Ret.) in May-June 2008, September 2009 and April 2010. The parties' efforts were unsuccessful. DC thereafter filed this action in May 2010. The parties have scheduled a further mediation for December 1, 2011.

Any party may provide additional information *in confidence* directly to the Circuit Mediation Office at ca09_mediation@ca9.uscourts.gov. Please provide the case name and Ninth Circuit case number in your message. Additional information might include interest in including this case in the mediation program, the case's settlement history, issues beyond the litigation that the parties might address in a settlement context, or future events that might affect the parties' willingness or ability to mediate the case.

## CERTIFICATION OF COUNSEL

I certify that:

☒ a current service list with telephone and fax numbers and email addresses is attached (see 9th Circuit Rule 3-2).

☒ I understand that failure to provide the Court with a completed form and service list may result in sanctions, including dismissal of the appeal.

Signature | /s/ Marc Toberoff

("s/" plus attorney name may be used in lieu of a manual signature on electronically-filed documents.)

Counsel for | Laura Siegel Larson, Jean Adele Peavy and Mark Warren Peary

**Note:** Use of the Appellate ECF system is mandatory for all attorneys filing in this Court, unless they are granted an exemption from using the system. **To file this form electronically** in Appellate ECF, complete the form, and then print the filled-in form to PDF (File > Print > PDF Printer/Creator). Then log into Appellate ECF and choose Forms/Notices/Disclosure > File a Mediation Questionnaire.

## <u>SERVICE LIST</u>

1

2  O'MELVENY & MYERS LLP
Daniel M. Petrocelli
3    *dpetrocelli@omm.com*
Matthew T. Kline
4    *mkline@omm.com*
Cassandra L. Seto
5    *cseto@omm.com*
1999 Avenue of the Stars, 7th Floor
6  Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
7  Facsimile:  (310) 246-6779

8

9  Attorneys for Plaintiff-Appellee,
DC Comics
10

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins
  *pperkins@ptplaw.com*
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:  (845) 265-2819

Attorneys for Plaintiff-Appellee,
DC Comics

11  TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
12    *mtoberoff@ipwla.com*
Keith G. Adams
13    *kgadams@ipwla.com*
2049 Century Park East, Suite 3630
14  Los Angeles, California 90067
Telephone:  (310) 246-3333
15  Facsimile:  (310) 246-3101

16

17  Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal
18  representative of the Estate of Joseph
Shuster, Jean Adele Peavy, and Laura
19  Siegel Larson, individually and as
personal representative of the Estate of
20  Joanne Siegel

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (State Bar No. 90072)
  *rkendall@kbkfirm.com*
Laura W. Brill (State Bar No. 195889)
  *lbrill@kbkfirm.com*
Nicholas F. Daum (State Bar No. 236155)
  *ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:  (310) 556-2700
Facsimile:  (310)556-2705

Attorneys for Defendants-Appellants,
Marc Toberoff, Pacific Pictures
Corporation, IP Worldwide, LLC, and
IPW, LLC

21

22

23

24

25

26

27

28

SERVICE LIST

1

**Patricia Perello**

---

| | |
|---|---|
| **From:** | ca9_ecfnoticing@ca9.uscourts.gov |
| **Sent:** | Wednesday, November 09, 2011 7:37 PM |
| **To:** | Docket |
| **Subject:** | 11-56934 DC Comics v. Pacific Pictures Corporation, et al "File a Mediation Questionnaire" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

### United States Court of Appeals for the Ninth Circuit

**Notice of Docket Activity**

The following transaction was entered on 11/09/2011 at 7:37:17 PM PST and filed on 11/09/2011

| | |
|---|---|
| **Case Name:** | DC Comics v. Pacific Pictures Corporation, et al |
| **Case Number:** | 11-56934 |
| **Document(s):** | Document(s) |

**Docket Text:**
Filed (ECF) Appellants Laura Siegel Larson, Mark Warren Peary and Jean Adele Peavy Mediation Questionnaire. Date of service: 11/09/2011. [7961209] (MT)

The following document(s) are associated with this transaction:
**Document Description:** Main Document
**Original Filename:** DC v. PPC.Appeal.Anti-SLAPP.Mediation_Questionnaire.11.9.2011.print.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1106763461 [Date=11/09/2011] [FileNumber=7961209-0] [1ded8e517f31d672ca0cf9ffc7066cda7a63dfab676b54f552fd56a6741c4f9952c431b27850aa3be7eefe74c423a2 d157725c1b4bd2be083a49552e780e2d7c]]

**Document Description:** Service List
**Original Filename:** DC v. PPC.Appeals.Anti-SLAPP.Service-List.11.9.2011.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1106763461 [Date=11/09/2011] [FileNumber=7961209-1] [06e2f6f60b42b9ef94b30e7da187dd9ef98a094e499c2f1148d7b032054c9357d4974829b9ac56a8123f0f699d4f0 868362882fa635d397d8f6c728ddb5d11d7]]

**Notice will be electronically mailed to:**

Petrocelli, Daniel
Mr. Kendall, Richard B., Attorney

1

**EXHIBIT DD**
**455**

Brill, Laura W.
Toberoff, Marc
Mr. Kline, Matthew T.
Ms. Seto, Cassandra
Mr. Perkins, Patrick
Mr. Daum, Nicholas Frederic, Attorney
Mr. Adams, Keith Gregory, Attorney

2

**EXHIBIT DD**
**456**

1    TOBEROFF & ASSOCIATES, P.C.
     Marc Toberoff (State Bar No. 188547)
2     *mtoberoff@ipwla.com*
     Keith G. Adams (State Bar No. 240497)
3     *kgadams@ipwla.com*
     Pablo D. Arredondo (State Bar No. 241142)
4     *parredondo@ipwla.com*
     22631 Pacific Coast Highway, #348
5    Malibu, California, 90265
     Telephone:   310.246.3333
6    Facsimile:    310.246.3101

7

8    Attorneys for Defendants Marc Toberoff,
     Pacific Pictures Corporation, IP
     Worldwide, LLC, and IPW, LLC

9

                    **UNITED STATES DISTRICT COURT**

10

             **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

11

12   DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

                    Plaintiff,           Hon. Otis D. Wright II, U.S.D.J.
13
            vs.                          **DEFENDANT MARC**
14                                       **TOBEROFF'S RESPONSE TO**
     PACIFIC PICTURES CORPORATION;       **PLAINTIFF DC COMICS'**
15   IP WORLDWIDE, LLC; IPW, LLC;        **SECOND SET OF**
     MARC TOBEROFF, an individual;       **INTERROGATORIES**
16   MARK WARREN Peary, as personal
     representative of the ESTATE OF     Complaint Filed:  May 14, 2010
17   JOSEPH SHUSTER; JEAN ADELE          Trial Date:  None Set
     PEAVY, an individual; LAURA
18   SIEGEL LARSON, individually and as
     personal representative of the ESTATE OF
19   OF JOANNE SIEGEL,
20   and DOES 1-10, inclusive,
21
                    Defendants.
22

23

24

25

26

27

28

1    Defendant Marc Toberoff ("Defendant") responds as follows to the Second Set

2  of Interrogatories dated January 24, 2012 (the "Interrogatories") propounded by

3  plaintiff DC Comics ("Plaintiff" or "DC").

4                                    **I.**

5                        **PRELIMINARY STATEMENT**

6    Defendant will construe the terms "YOU" and "YOUR" to refer to Marc

7  Toberoff.

8    No incidental or implied admissions are intended by Defendant's responses to

9  the Interrogatories.  The supplying of any fact does not constitute an admission by

10  Defendant that such fact is relevant or admissible.  The fact that Defendant has

11  responded to any interrogatory is not intended to be and shall not be construed as a

12  waiver by Defendant of all or any part of any objection to any interrogatory.

13  Defendant reserves until the time of trial all objections as to the relevance or

14  admissibility of any facts provided in its answers to the Interrogatories.

15  The responses set forth herein are based on information now available to Defendant

16  and Defendant reserves the right to revise, correct, add, clarify or supplement the

17  general and specific objections and responses set forth herein.

18                                   **II.**

19                    **RESPONSES TO INTERROGATORIES**

20    Subject to, and without waiving the qualifications above, Defendant responds

21  to each individual Interrogatory as follows:

22  **Interrogatory No. 26**

23    DESCRIBE in detail all efforts YOU have made to MARKET any rights

24  involving SUPERMAN and/or SUPERBOY.

25  **Response to Interrogatory No. 26**

26    Defendant objects to this interrogatory on the grounds that it is vague and

27  ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this

28  request on the grounds that it is not reasonably limited in scope.  Defendant objects to

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES

**EXHIBIT EE**
**458**

this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

In 2004, Ari Emanuel and Marc Toberoff engaged in negotiations with Warner Bros. Entertainment Inc. regarding the sale and/or license of Joanne Siegel and Laura Siegel Larson's (the "Siegels") rights in Superman and Superboy to Warner. However Warner Bros. proposed terms that were virtually identical to its settlement proposal to the Siegels in 2001-2002, which they had rejected.  The Siegels once again rejected such proposal.

Subsequently, there have been settlement discussions with DC Comics/Warner Bros. in *DC Comics v. Pacific Pictures Corp.*, Case No. 10-CV-03633, *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx), and *Siegel v. Time Warner Inc. et al.*, Case No. 04-CV-08776 ODW (RZx).  Mediation sessions were held with Hon. Daniel Weinstein (Ret.) of JAMS in May-June 2008, September 2009 and April 2010, and with Judge Weinstein and Kenneth Ziffren in December 2011.  The mediation has yet to result in a settlement, however, discussions are ongoing.

On December 4, 2008, in an in-person meeting with Peter Schlessel, then President of Worldwide Affairs for Sony Pictures Entertainment, Marc Toberoff discussed the potential license to Sony Pictures Entertainment of the Superman rights recaptured by the Siegels.  They had a follow-up telephone conversation several weeks later.

In April-May 2010, Marc Toberoff discussed the potential license to Paramount Pictures of the Superman rights recaptured by the Siegels with Rob

Moore, Vice Chairman of Paramount Pictures, and his support staff.  There was an initial telephone call including John Fogelman, Marc Toberoff, and Rob Moore on April 21, 2010; a further call including John Fogelman, Marc Toberoff and Rob Moore on April 29, 2010; and an in-person meeting including John Fogelman, Marc Toberoff and Rob Moore on May 12, 2010 at the Paramount Pictures lot.  In addition, there were various e-mails exchanged between April 21 and May 11, 2010.

On November 19, 2010, in an in-person meeting with Tom Rothman, CEO of Fox Filmed Entertainment, and his support staff, Marc Toberoff discussed the potential license to Filmed Entertainment of the Superman rights recaptured by the Siegels.

**Interrogatory No. 27**

IDENTIFY any PERSONS with whom YOU have COMMUNICATED in connection with efforts to MARKET any rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 27**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this request on the grounds that it is not reasonably limited in scope.  Defendant objects to this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

Laura Siegel Larson, c/o Toberoff & Associates, P.C., 22631Pacific Coast Highway, Suite #348, Malibu, California 90265.

Joanne Siegel, deceased.

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

EXHIBIT EE
460

1   Mark Warren Peary and Jean Adele Peavy, c/o Toberoff & Associates, P.C.,

2   22631 Pacific Coast Highway, Suite #348, Malibu, California 90265.

3   Warner Bros. Entertainment Inc./DC Comics, including John Schulman,

4   Wayne Smith, Paul Levitz, Dianne Nelson and John Rogovin, 4000 Warner

5   Boulevard, Burbank, California, 91522, as well as outside counsel for the same.

6   William Morris Endeavor, including Ari Emanuel and John Fogelman, 9601

7   Wilshire Boulevard, Beverly Hills, California 90212.

8   Sony Pictures Entertainment, including its then President of Worldwide Affairs

9   Peter Schlessel, 10202 West Washington Boulevard, Culver City, California 90232.

10   Paramount Pictures Corporation, including its then Vice-Chairman Robert

11   Moore, 5555 Melrose Avenue, Hollywood, CA, 90038.

12   Fox Filmed Entertainment Group, including its then Chief Executive Officer,

13   Thomas Rothman, 10201 W. Pico Blvd., Los Angeles, CA 90035.

14   **Interrogatory No. 28**

15   DESCRIBE in detail when any efforts YOU have made to MARKET any

16   rights involving SUPERMAN and/or SUPERBOY took place.

17   **Response to Interrogatory No. 28**

18   Defendant objects to this interrogatory on the grounds that it is vague and

19   ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this

20   request on the grounds that it is not reasonably limited in scope.  Defendant objects to

21   this request to the extent that it seeks information which is not reasonably calculated

22   to lead to the discovery of relevant and admissible evidence.  Defendant additionally

23   objects to this request to the extent that it seeks communications or items protected

24   by the attorney-client privilege, the attorney work product doctrine and any other

25   privilege or immunity available under law or arising from contractual obligation.

26   Subject to and without waiving the foregoing general and specific objections,

27   Defendant responds, without limitation, as follows:

28   As to discussions with Warner Bros. Entertainment, Inc. and DC Comics, from

4

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES

2003 to the present.

As to discussions with Sony Pictures Entertainment, December 2008.

As to discussions with Paramount Pictures, April-May 2010.

As to discussions with Fox Filmed Entertainment Group, November 19, 2010.

**Interrogatory No. 29**

DESCRIBE in detail all COMMUNICATIONS YOU have had with actual or potential INVESTORS concerning rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 29**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this request on the grounds that it is not reasonably limited in scope.  Defendant objects to this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

Beginning in or around March 2002, and sporadically since then, Marc Toberoff has had discussions with Ari Emanuel concerning potential "INVESTORS," including Mr. Emanuel himself, in Superman rights recaptured by the Siegels.

On December 4, 2008, in an in-person meeting with Peter Schlessel, then President of Worldwide Affairs for Sony Pictures Entertainment, Marc Toberoff discussed the potential license to Sony Pictures Entertainment of the Superman rights recaptured by the Siegels.  They had a follow-up telephone conversation several weeks later.

In April-May 2010, Marc Toberoff discussed the potential sale and/or license of the "Superman" rights recaptured by the Siegels with Rob Moore, Vice Chairman of Paramount Pictures and his support staff.  There was an initial telephone call including John Fogelman, Marc Toberoff, and Rob Moore on April 21, 2010; a further call including John Fogelman, Marc Toberoff and Rob Moore on April 29, 2010; and an in-person meeting including John Fogelman, Marc Toberoff and Rob Moore on May 12, 2010 at the Paramount lot.  In addition, there were various e-mails exchanged between April 21 and May 11, 2010.

On November 19, 2010, in an in-person meeting with Tom Rothman, CEO of Fox Filmed Entertainment, and his support staff, Marc Toberoff discussed the potential license of the Superman rights recaptured by the Siegels.

**Interrogatory No. 30**

IDENTIFY any PERSON with whom YOU have COMMUNICATED concerning actual or potential INVESTORS in rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 30**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this request on the grounds that it is not reasonably limited in scope.  Defendant objects to this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

William Morris Endeavor, including Ari Emanuel and John Fogelman, 9601 Wilshire Boulevard, Beverly Hills, California 90212.

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**EXHIBIT EE**
**463**

1    Sony Pictures Entertainment, including its then President of Worldwide Affairs
2    Peter Schlessel, 10202 West Washington Boulevard, Culver City, California 90232.
3    Paramount Pictures Corporation, including its then Vice-Chairman Robert
4    Moore, 5555 Melrose Avenue, Hollywood, CA, 90038.
5    Fox Filmed Entertainment Group, including its then Chief Executive Officer,
6    Thomas Rothman, 10201 W. Pico Blvd., Los Angeles, CA 90035.
7    **Interrogatory No. 31**
8    DESCRIBE in detail when YOU have COMMUNICATED with actual or
9    potential INVESTORS concerning rights involving SUPERMAN and/or
10   SUPERBOY.
11   **Response to Interrogatory No. 31**
12   Defendant objects to this interrogatory on the grounds that it is vague and
13   ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this
14   request on the grounds that it is not reasonably limited in scope.  Defendant objects to
15   this request to the extent that it seeks information which is not reasonably calculated
16   to lead to the discovery of relevant and admissible evidence.  Defendant additionally
17   objects to this request to the extent that it seeks communications or items protected
18   by the attorney-client privilege, the attorney work product doctrine and any other
19   privilege or immunity available under law or arising from contractual obligation.
20   Subject to and without waiving the foregoing general and specific objections,
21   Defendant responds, without limitation, as follows:
22   With Ari Emanuel, since March, 2002, sporadic and ongoing.
23   With Sony Pictures Entertainment, on December 4, 2008.
24   With Paramount Pictures, April-May 2010.
25   With Fox Filmed Entertainment Group, on November 19, 2010.
26
27
28

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES
**EXHIBIT EE**
**464**

1    Dated:  February 23, 2012          TOBEROFF & ASSOCIATES

2
                                        /s/ Keith G. Adams
3                                       _____
                                        Keith G. Adams
4                                       Attorneys for Defendants

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES

**EXHIBIT EE**
**465**

<u>**VERIFICATION**</u>

I declare under penalty of perjury that on information and belief the facts set forth in the foregoing answers to the Interrogatories are true to the best of my present knowledge and belief.

DATED:  February 23, 2012

 Marc Toberoff
Print Name of Signatory

Signature

DEFENDANT MARC TOBEROFF'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

_____

*TOBEROFF, MARC  - Vol. 1*

*September 18, 2012*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DC COMICS,                      )
                                )
            Plaintiff,          )No.
                                )CV-10-3633 ODW (RZx)
        VS.                     )
                                )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as         )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an            )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL  )
LARSON, an individual, and   )
DOES 1-10, inclusive,           )
                                )
            Defendants.         )
                                )
            _____)



VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012



Reported by:  SHANDA GABRIEL

CSR No. 10094

EXHIBIT FF
468

MARC  TOBEROFF - 9/18/2012

```
 1            Videotaped deposition of MARC TOBEROFF,

 2   taken on behalf of the Plaintiff, at 1999 Avenue of

 3   the Stars, Los Angeles, California, commencing at

 4   9:25 a.m., TUESDAY, SEPTEMBER 18, 2012, before

 5   SHANDA GABRIEL, CSR No. 10094.

 6

 7   APPEARANCES:

 8   FOR THE PLAINTIFF:

 9            O'MELVENY & MYERS LLP

10            BY:  DANIEL M. PETROCELLI, ESQ.

11                 JASON TOKORO, ESQ.

12            1999 Avenue of the Stars

13            7th Floor

14            Los Angeles, California  90067-6035

15            (310) 553-6700

16                                                    09:25:49

     FOR THE TOBEROFF ENTITY DEFENDANTS and MARC
17   TOBEROFF:                                        09:25:49

18

              KENDALL BRILL & KLIEGER LLP
19
              BY:  RICHARD B. KENDALL, ESQ.
20
              10100 Santa Monica Boulevard
21
              Suite 1725
22
              Los Angeles, California 90067
23
              (310) 556-2700
24

25   ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER
```

MARC   TOBEROFF - 9/18/2012

```
 1                 LOS ANGELES, CALIFORNIA;

 2              TUESDAY, SEPTEMBER 18, 2012

 3                      9:25 A.M.

 4

 5          THE REPORTER:  I am making the following

 6    statements pursuant to Rule 30(b)(5) of the Federal

 7    Rules of Civil Procedure:

 8          My name is Shanda Gabriel, C.S.R. 10094,

 9    the videographer is Fritz Sperberg, both contracted

10    by Merrill Corporation, 20750 Ventura Boulevard,

11    Suite 205, Woodland Hills, California.

12          Today's date is September 18, 2012, the

13    time is 9:25 a.m. and this deposition is being held

14    at 1999 Avenue of the Stars, Los Angeles,

15    California.

16          Would counsel please state your appearances

17    and whom you represent:                              09:25:39

18          MR. PETROCELLI:  Daniel Petrocelli for        09:25:39

19    plaintiff, DC Comics.                                09:25:40

20          MR. TOKORO:  Jason Tokoro for plaintiff, DC   09:25:42

21    Comics.                                              09:25:44

22          MR. KENDALL:  Richard Kendall on behalf of    09:25:44

23    the Toberoff entity defendants and Marc Toberoff.    09:25:47

24          THE REPORTER:  The witness is Marc

25    Toberoff.
```

EXHIBIT FF

MARC  TOBEROFF - 9/18/2012

```
 1          Would you please raise your right hand to
 2     be sworn in.
 3                    MARC TOBEROFF,
 4            having been first duly sworn, was
 5            examined and testified as follows:
 6
 7                    EXAMINATION
 8     BY MR. PETROCELLI:
 9          Q.  I will address you as Mr. Toberoff for the      09:26:02
10     purpose of the deposition, if that's all right with     09:26:06
11     you.                                                    09:26:08
12          A.  I won't be offended.                           09:26:08
13          Q.  Can you tell us what your educational          09:26:11
14     background is?                                          09:26:15
15          A.  I went to -- starting with what, college?      09:26:16
16          Q.  Yeah.                                          09:26:16
17          A.  I went to McGill University, and then in my    09:26:22
18     third year I transferred to Princeton, and then I      09:26:28
19     didn't -- I missed my girlfriend, essentially, and     09:26:37
20     transferred -- decided to go back to McGill and        09:26:41
21     graduated from McGill after being at Princeton, I      09:26:45
22     think, for -- between a half a year and a year.  I'm   09:26:47
23     not sure.                                              09:26:51
24          Q.  What year did you graduate?                    09:26:51
25          A.  In 1977.                                       09:26:53
```

MARC  TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | of these entities? | 09:52:34 |
| 2 | A.  I think basically whoever was the line | 09:52:36 |
| 3 | producer or primary producer of the picture. | 09:52:38 |
| 4 | Q.  And these are projects in which you had | 09:52:43 |
| 5 | some kind of participation? | 09:52:44 |
| 6 | MR. KENDALL:  Vague and ambiguou- -- | 09:52:44 |
| 7 | THE WITNESS:  Yes. | 09:52:44 |
| 8 | MR. KENDALL:  Vague and ambiguous. | 09:52:47 |
| 9 | BY MR. PETROCELLI: | 09:52:48 |
| 10 | Q.  IP Worldwide, that was a limited liability | 09:52:54 |
| 11 | company? | 09:52:58 |
| 12 | A.  Yes. | 09:52:58 |
| 13 | Q.  And who were its members? | 09:53:00 |
| 14 | A.  Myself and Ari Emanuel. | 09:53:01 |
| 15 | Q.  And was Endeavor at the time also a member? | 09:53:08 |
| 16 | A.  I believe Endeavor -- I believe Endeavor | 09:53:11 |
| 17 | may have had some equity in it.  I believe 10 | 09:53:16 |
| 18 | percent. | 09:53:18 |
| 19 | Q.  Did -- | 09:53:19 |
| 20 | A.  I'm not sure whether they were a member or | 09:53:20 |
| 21 | whether they simply were entitled to a percentage of | 09:53:22 |
| 22 | proceeds. | 09:53:25 |
| 23 | Q.  A 10 percent contractual interest? | 09:53:26 |
| 24 | A.  Right. | 09:53:28 |
| 25 | Q.  Okay.  Did IP Worldwide get replaced | 09:53:30 |

MARC  TOBEROFF - 9/18/2012

Page 174

```
 1        A.   I'd have to look at whether the 2003 PPC        14:39:42
 2   agreement, what effect that had on this agreement.        14:39:47
 3   But if that didn't have -- if that didn't effect         14:39:53
 4   this provision, then it would be until we replaced       14:39:55
 5   this agreement with a legal retainer dated as of         14:40:02
 6   November 23rd, 2001.                                      14:40:05
 7        Q.   But signed when?                                14:40:06
 8        A.   Signed in -- I think it was 2004.               14:40:09
 9        Q.   Okay.  We'll get to that one.                   14:40:11
10             Is it fair to say in 2001 when PPC entered      14:40:22
11   into this joint venture agreement with Jean Peavy         14:40:26
12   and Mark Peary, you understood that in a legal            14:40:28
13   retainer agreement, you as a lawyer would not be          14:40:38
14   permitted to include a provision that said that the       14:40:41
15   client requires your consent to settle, correct?         14:40:44
16             MR. KENDALL:  Objection.  Calls for a legal     14:40:50
17   conclusion.  Incomplete hypothetical.                     14:40:50
18             THE WITNESS:  I know that's the case             14:41:00
19   sitting here today.  I can't -- I can't -- I don't        14:41:01
20   have a -- I don't have a specific knowledge of           14:41:04
21   whether I knew that in 2001.                              14:41:08
22   BY MR. PETROCELLI:                                        14:41:08
23        Q.   Do you have any reason to believe you          14:41:10
24   didn't know that in 2001?                                 14:41:11
25        A.   I don't have a reason to believe either        14:41:17
```

EXHIBIT FF
473

MARC   TOBEROFF - 9/18/2012

Page 265

```
 1    starting with that 2001 form of agreement and even          17:10:29

 2    under the 2003 agreement it was just simpler to have         17:10:33

 3    a simple retainer.                                           17:10:39

 4            And the idea was to replace -- to cancel             17:10:40

 5    and replace that agreement with this retainer                17:10:42

 6    agreement.  That's why it was both dated as of the           17:10:44

 7    exact same date.                                             17:10:47

 8       Q.  Was it prepared, that is Exhibit 20 and               17:10:49

 9    Exhibit 21, at or about the time of commencement of          17:10:56

10    litigation in the Siegel case?                               17:10:58

11       A.  I think it was prepared before that.                  17:11:04

12       Q.  The Siegel litigation was in October 2004?            17:11:05

13       A.  When we filed the Siegel lawsuit?                     17:11:07

14       Q.  Yes.                                                  17:11:13

15       A.  It was either October or November.  I -- I            17:11:13

16    would -- it would be helpful to know the date when I        17:11:16

17    entered into the Siegel litigation retainer                  17:11:20

18    agreement.  I didn't know whether that was -- if             17:11:22

19    that was around September 10, 2004.                          17:11:29

20       Q.  Take a look at that document which has also           17:11:37

21    been produced to us in redacted form.  It's dated           17:11:40

22    October 3, 2004.                                             17:11:43

23            THE WITNESS:  October 3, 2004?                       17:11:48

24            MR. PETROCELLI:  Yeah.  That will be marked          17:11:50

25    as Exhibit 103.                                              17:11:51
```

**EXHIBIT FF**

**474**

MARC  TOBEROFF - 9/18/2012

Page 268

```
 1    others to consummate a settlement?                      17:15:24
 2         A.  I don't believe that had any requirement of    17:15:26
 3    any other consent than Joanna and Laura to a            17:15:37
 4    settlement.                                              17:15:44
 5         Q.  Any such requirement --                         17:15:44
 6         A.  I don't believe the Shuster retainer            17:15:46
 7    agreement has that also.  But in your -- your -- I       17:15:48
 8    don't have the unredacted agreement in front of me      17:15:56
 9    to verify that.                                          17:15:59
10         Q.  And that requirement after 2004, the first     17:16:00
11    time that requirement came into existence was in        17:16:06
12    2008 when the parties signed the consent agreement?     17:16:08
13              MR. KENDALL:  What requirement?                17:16:14
14              MR. PETROCELLI:  The requirement for the       17:16:15
15    consent of another to consummate a settlement.          17:16:16
16              THE WITNESS:  Well, again, we're getting       17:16:23
17    into an area of where we assert a privilege, and        17:16:25
18    privilege has been upheld, so my answer is without      17:16:27
19    waiver of privilege, same agreement, correct?           17:16:30
20    BY MR. PETROCELLI:                                       17:16:30
21         Q.  Yes.                                            17:16:33
22         A.  Okay.  And I'm also discussing what has         17:16:33
23    already been disclosed, which is essentially -- and     17:16:37
24    now I've forgotten the question.  So I prepared -- I    17:16:41
25    prepared the record to answer the question.             17:16:45
```

MARC  TOBEROFF - 9/18/2012

Page 269

```
 1        Q.  My question was the first time that a        17:16:46

 2   requirement for the consent of another to consummate   17:16:48

 3   a settlement was 2008, after the 2004 agreements?      17:16:51

 4        A.  With respect to the Siegels and Shusters?     17:16:57

 5        Q.  Yes.  Correct.                                17:16:57

 6        A.  Yes.                                          17:16:57

 7        Q.  Is the consent --                             17:17:01

 8        A.  But I would answer that more specifically,    17:17:10

 9   it's not the consent of another.  You're technically   17:17:13

10   correct, but it's basically mutual consent of the      17:17:15

11   Siegels and Shusters to a settlement of their          17:17:19

12   termination interests.                                 17:17:21

13        Q.  Did they receive --                           17:17:22

14        A.  Not my consent.                               17:17:25

15        Q.  Your consent is not required at all?          17:17:28

16        A.  Absolutely not.                               17:17:30

17        Q.  And not any entity associated with you?       17:17:31

18        A.  Correct.                                      17:17:34

19        Q.  Okay.  And no third party, it's just the      17:17:34

20   Siegels and the Shusters?                              17:17:39

21        A.  Correct.                                      17:17:39

22        Q.  Okay.  Is -- is it both Mark --               17:17:40

23        A.  And -- and --                                 17:17:51

24        Q.  -- Warren Peary and Jean?                     17:17:53

25        A.  I was just about to say that the -- the       17:17:54
```

**EXHIBIT FF**
**476**

MARC  TOBEROFF - 9/18/2012

Page 270

```
 1    consent, I believe, is the executor.              17:17:58

 2        Q.  On the Shuster side?                       17:18:04

 3        A.  I believe so.                              17:18:05

 4        Q.  And on the Siegel side?                    17:18:08

 5        A.  I'm not 100 percent certain.               17:18:09

 6            On the Siegel side it was Laura and Joanne.  17:18:11

 7        Q.  Now it's just Laura?                       17:18:14

 8        A.  Correct.                                   17:18:15

 9        Q.  Did -- you said that there was a conflict  17:18:19

10    waiver signed by Peary in or about 2008, I believe?  17:18:24

11        A.  Yes.                                       17:18:34

12        Q.  What prompted that?                        17:18:35

13        A.  The consent agreement.                     17:18:35

14            MR. KENDALL:  Just a minute.  I think we're  17:18:37

15    getting into a slightly different area.            17:18:38

16            So, again, I just want to caution you on   17:18:40

17    privilege.  And I assume we have the same          17:18:43

18    understanding, that it will not be a waiver, so    17:18:47

19    you'll just have to make a determination whether   17:18:49

20    you -- you want to provide this information since it  17:18:51

21    may be privileged.                                 17:18:55

22            MR. PETROCELLI:  I believe he answered the  17:18:56

23    question.  He said "the consent agreement."        17:18:58

24            MR. KENDALL:  So he did, but that's because  17:19:06

25    he didn't give me an opportunity to object first and  17:19:07
```

**EXHIBIT FF**

**477**

MARC   TOBEROFF - 9/18/2012

Page 271

```
 1    give him a caution first.                          17:19:10

 2    BY MR. PETROCELLI:                                 17:19:10

 3        Q.  Do you know whether the Shusters received  17:19:12

 4    independent legal advice regarding the conflict    17:19:16

 5    waiver or the consent agreement?                   17:19:22

 6        A.  I don't know whether they did or did not.  17:19:23

 7        Q.  And do you know whether the Siegels did?   17:19:27

 8        A.  I believe the Siegels did.                 17:19:32

 9        Q.  Do you know the name of the attorney?      17:19:34

10        A.  George Zadorozny.                          17:19:35

11        Q.  George Zadorozny?                          17:19:40

12        A.  And I don't -- they may have -- I know that 17:19:42

13    whenever it came to something like that, they would 17:19:46

14    run it by George Zadorozny and/or George Zadorozny  17:19:48

15    and Arthur Levine or just George Zadorozny.        17:19:54

16        Q.  Did you send copies of the consent         17:19:58

17    agreement to George or Arthur?                     17:20:00

18        A.  No, that wasn't the practice.              17:20:06

19        MR. KENDALL:  Marc, take your hand away         17:20:08

20    from your face because it interferes with the      17:20:09

21    projection of your voice.                          17:20:12

22        THE WITNESS:  Okay.                            17:20:13

23    BY MR. PETROCELLI:                                 17:20:13

24        Q.  It also detracts from your -- your         17:20:16

25    appearance.                                        17:20:18
```

EXHIBIT FF
478

MARC  TOBEROFF - 9/18/2012

Page 272

| | | |
|---|---|---|
| 1 | A.  Sophisticated demeanor. | 17:20:18 |
| 2 | Q.  I know you said that Zadorozny would be | 17:20:23 |
| 3 | involved in certain matters. | 17:20:28 |
| 4 | A.  "Zadorozny." | 17:20:30 |
| 5 | Q.  "Zadorozny." | 17:20:31 |
| 6 | A.  Yeah. | 17:20:31 |
| 7 | Q.  Do you know for certain if he was involved | 17:20:34 |
| 8 | in the -- for the Siegels with respect to the 2008 | 17:20:37 |
| 9 | consent agreement? | 17:20:45 |
| 10 | A.  Not 100 percent certain, but that's my | 17:20:46 |
| 11 | belief. | 17:20:50 |
| 12 | Q.  Did the Siegels -- | 17:20:53 |
| 13 | A.  Put it another way, I would be very | 17:20:53 |
| 14 | surprised if he was not. | 17:20:55 |
| 15 | Q.  Did the Siegels also sign a conflict waiver | 17:20:56 |
| 16 | in 2008? | 17:20:59 |
| 17 | A.  Yes. | 17:21:00 |
| 18 | Q.  Do you know if he was involved in that | 17:21:00 |
| 19 | document? | 17:21:01 |
| 20 | A.  I thought you just asked me that. | 17:21:05 |
| 21 | Q.  I asked you about the consent agreement. | 17:21:07 |
| 22 | A.  Oh, okay. | 17:21:09 |
| 23 | Q.  Did you -- | 17:21:10 |
| 24 | A.  Two separate documents, yeah. | 17:21:11 |
| 25 | So consent agreement, it would be the same | 17:21:12 |

```
 1    answer for both.                                  17:21:14
 2         Q.  There are two documents that the Siegels 17:21:16
 3    signed in 2008?                                   17:21:18
 4         A.  Yes.                                      17:21:19
 5         Q.  Okay.                                     17:21:19
 6         A.  And -- and now that you ask it that way, I 17:21:19
 7    have even -- I -- I think it's even -- it's even  17:21:23
 8    more likely that Zadorozny was involved with the -- 17:21:29
 9    with respect to the consent agreement, yes, and   17:21:35
10    since there were two agreements, including a      17:21:39
11    conflict waiver -- a conflict waiver and a consent 17:21:43
12    agreement, I believe he was involved in reviewing 17:21:46
13    those.                                            17:21:47
14         Q.  And Zadorozny was involved in reviewing the 17:21:48
15    2004 retainer agreement with Joanne and Laura?    17:21:51
16         A.  Yes.                                      17:21:55
17         Q.  Why did you date the engagement for       17:22:00
18    professional services that you signed with Warren in 17:22:05
19    2004 as of November 23, 2001?                     17:22:08
20         A.  Two reasons.  One, I wanted to make it    17:22:13
21    clear that this agreement was replacing the PPC   17:22:15
22    agreements and two, I wanted -- it was -- it was  17:22:19
23    like an assertion of privilege over our           17:22:27
24    relationship, attorney-client relationship        17:22:33
25    commencing at the latest on November 23rd, 2001 when 17:22:37
```

```
 1    we signed the PPC agreement.                          17:22:42

 2         Q.  When you signed the -- excuse me.  Are you   17:22:45

 3    a signatory to the consent agreement?                 17:22:50

 4         A.  Only as to approval as to form.              17:22:52

 5         Q.  Okay.  Did you receive independent legal     17:22:59

 6    advice?  Did you receive legal advice regarding that  17:23:03

 7    subject whether the Siegels and Shusters could sign   17:23:06

 8    a consent agreement without violating some law,       17:23:14

 9    including the copyright statute?                       17:23:19

10         MR. KENDALL:  So that may call for               17:23:21

11    privileged information given the specificity of the   17:23:23

12    question.  I just caution you not to reveal any       17:23:26

13    attorney-client communications you may have had with  17:23:31

14    anyone who was acting as your counsel or providing    17:23:34

15    legal advice.                                         17:23:37

16         THE WITNESS:  But I can answer outside            17:23:46

17    of -- I can answer whether or not -- revealing        17:23:53

18    whether or not I did is not --                        17:23:56

19         MR. KENDALL:  If the answer is no, then          17:23:57

20    you're not revealing any attorney-client              17:23:59

21    communication.  If the answer is yes, then you might  17:24:01

22    be, and so then you have to make a judgment as to     17:24:06

23    whether you wish to reveal that.                      17:24:08

24         THE WITNESS:  Not -- not any -- not outside      17:24:12

25    of my firm.                                           17:24:15
```

MARC  TOBEROFF - 9/18/2012

Page 314

```
 1                         DECLARATION

 2

 3

 4

 5

 6           I hereby declare I am the deponent in the

 7    within matter; that I have read the foregoing

 8    deposition and know the contents thereof, and I

 9    declare that the same is true of my knowledge except

10    as to the matters which are therein stated upon my

11    information or belief, and as to those matters, I

12    believe it to be true.

13           I declare under the penalties of perjury of

14    the State of California that the foregoing is true

15    and correct.

16           Executed on the _____ day of

17    _____ 2012, at

18    _____,

19    California.

20

21

22

23

24           _____

25                         MARC TOBEROFF
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277           www.merrillcorp.com/law

**EXHIBIT FF**
**482**

MARC  TOBEROFF - 9/18/2012

Page 315

```
 1    STATE OF CALIFORNIA      )
                               )  ss.
 2    COUNTY OF LOS ANGELES  )

 3

 4            I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7            I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10            Prior to being examined the witness was by

11    me first duly sworn;

12            The foregoing transcript is a true record

13    of the testimony given.

14            Before completion of the deposition, review

15    of the transcript [X] was [] was not requested.  If

16    requested, any changes made by the deponent (and

17    provided to the reporter) during the period allowed

18    are appended hereto.

19

20    Dated _____.

21

22                      _____
                                Shanda Gabriel
23                              CSR 10094

24

25
```

EXHIBIT FF
483