1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10  DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

11         Plaintiff,                   | **DISCOVERY MATTER**

12         v.                           | **JOINT STIPULATION
                                          REGARDING DC COMICS'**
13  PACIFIC PICTURES                      **MOTION (1) FOR LEAVE TO
    CORPORATION, IP WORLDWIDE,            CONDUCT FURTHER**
14  LLC, IPW, LLC, MARC TOBEROFF,         **DEPOSITION OF DEFENDANTS**
    an individual, MARK WARREN           **MARC TOBEROFF, LAURA
15  PEARY, as personal representative of  SIEGEL LARSON, AND MARK**
    the ESTATE OF JOSEPH SHUSTER,         **WARREN PEARY; AND (2) TO**
16  JEAN ADELE PEAVY, an individual,      **COMPEL DEFENDANTS MARC
    LAURA SIEGEL LARSON, an               TOBEROFF AND MARK**
17  individual and as personal           **WARREN PEARY TO RESPOND
    representative of the ESTATE OF       TO DEPOSITION QUESTIONS**
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,                          | NOTICE OF MOTION AND
19                                        MOTION, DECLARATION OF
           Defendants.                    MATTHEW T. KLINE, AND
20                                        [PROPOSED] ORDER FILED
                                          CONCURRENTLY HEREWITH
21
22
23
                                        | **Judge**:        Hon. Otis D. Wright II
24                                        **Magistrate**:   Hon. Ralph Zarefsky
25
                                        | **Hearing Date**:   March 11, 2013
26                                        **Hearing Time**:   10:00 a.m.
                                          **Courtroom**:      540
27                                        **Discovery Cutoff**: None Set
                                          **Trial**:          None Set
28

(continued from previous page)

MARC TOBEROFF (S.B. #188547)
  mtoberoff@toberoffandassociates.com
KEITH G. ADAMS (S.B. #240497)
  kadams@toberoffandassociates.com
PABLO D. ARREDONDO (S.B. #241142)
  parredondo@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, CA 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

Attorneys for Laura Siegel Larson,
Mark Warren Peary, and Jean Peavy

RICHARD B. KENDALL (S.B. # 90072)
  rkendall@kbkfirm.com
LAURA W. BRILL (S.B. # 195889)
  lbrill@kbkfirm.com
NICHOLAS F. DAUM (S.B. # 236155)
  ndaum@kbkfirm.com
KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 556-2700
Facsimile: (310) 556-2705

Attorneys for Marc Toberoff, Pacific Pictures
Corporation, IP Worldwide, LLC, and IPW, LLC

1    Pursuant to Federal Rules of Civil Procedure 26, 30, and 37 and Central

2    District Local Rules 7-18 and 37-2, the parties respectfully submit the following

3    Joint Stipulation Regarding DC Comics' Motion (1) For Leave To Conduct Further

4    Deposition Of Defendants Marc Toberoff, Laura Siegel Larson, and Mark Warren

5    Peary; and (2) To Compel Defendants Marc Toberoff and Mark Warren Peary To

6    Respond To Deposition Questions.  Pursuant to Central District Local Rule 37-1,

7    the parties have attempted unsuccessfully to resolve their disputes and therefore

8    respectfully seek the assistance of the Court.

9    Dated:        February 14, 2013            Respectfully Submitted,

10                                              O'MELVENY & MYERS LLP

11

12                                              By: /s/ Daniel M. Petrocelli

13                                                  Daniel M. Petrocelli
                                                    Attorneys for Plaintiff DC Comics

14   Dated:        February 14, 2013            Respectfully Submitted,

15                                              TOBEROFF & ASSOCIATES, P.C.

16

17                                              By:  /s/ Keith G. Adams

18                                                  Keith G. Adams
                                                    Attorneys for Defendants Laura
19                                                  Siegel Larson, Mark Warren Peary,
                                                    and Jean Adele Peavy
20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

**Page**

I.    DC COMICS' INTRODUCTORY STATEMENT ........................................ 1

II.   DEFENDANTS' INTRODUCTORY STATEMENT ................................... 3

III.  DC COMICS' STATEMENT OF ISSUES IN DISPUTE............................. 6

    A.    DC Needs At Least An Additional Day To Depose Marc
        Toberoff And His Three Companies, And Toberoff's Objections
        To Being Questioned About His Discovery Conduct Should Be
        Overruled.......................................................................................... 6

        1.    DC's Need For Extra Time.............................................. 6

        2.    DC's Need to Depose Toberoff Regarding His Discovery
                Conduct ........................................................................ 9

    B.    DC Needs An Additional Day To Depose Larson............................. 12

    C.    DC Needs An Additional Four Hours To Depose Peary, And His
        Objections To Two Lines Of Examination Should Be Overruled...... 15

        1.    DC's Need For Extra Time............................................ 15

        2.    Peary's Substantive Objections Should Be Overruled............. 16

                a.    DC Needs to Depose Peary Regarding the Pacific
                      Pictures Joint Venture and Agreements ......................... 16

                b.    DC Needs to Depose Peary Regarding Peary's Role
                      As Executor of the Shuster Estate ................................. 18

    D.    Conclusion ................................................................................... 19

IV.   DEFENDANTS' STATEMENT OF ISSUES IN DISPUTE ...................... 20

    A.    Factual And Procedural Background.................................................. 20

    B.    The Standard for Multiple Depositions ............................................. 22

    C.    DC Is Not Entitled To Re-Depose Mr. Toberoff ............................... 22

        1.    DC Is Not Entitled To Additional Time After Wasting
                 Considerable Time Re-Deposing Mr. Toberoff ...................... 22

        2.    DC's Rationales For Re-Deposing Mr. Toberoff Do Not
                 Hold Up ...................................................................... 24

        3.    DC Is Not Entitled To Depose Mr. Toberoff As An
                 Attorney ...................................................................... 28

    D.    DC Is Not Entitled To Re-Depose Ms. Larson .................................. 30

    E.    DC Is Not Entitled To Re-Depose Mr. Peary .................................... 34

    F.    DC Failed To Properly Meet-And-Confer.......................................... 41

    G.    If This Court Does Not Deny DC's Motion Then It Should
        Await The Outcome Of Defendants' Dispositive Motion................. 41

    H.    Defendants' Conclusion.................................................................... 42

1
2

<strong>TABLE OF CONTENTS</strong><br>(continued)

3

APPENDIX A        Marc Toberoff — Discovery Conduct

APPENDIX B        Mark Warren Peary —  Pacific Pictures Joint Venture and Agreements

APPENDIX C        Mark Warren Peary —  Peary's Role As Executor Of The Shuster Estate

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   DC COMICS' INTRODUCTORY STATEMENT

DC needs an extra day (of seven hours each) to depose defendants Marc Toberoff and Laura Siegel Larson, and an extra four hours to depose defendant Mark Warren Peary.  The grounds for this motion are well-recognized under Rule 30, and DC had hoped to obtain defendants' agreement to the extra time, given the complexity of the issues in the case; the 10-year time span the case covers; the fact that Toberoff is testifying for *four* defendants (himself and his three co-defendant companies); the summary judgment motion the Toberoff defendants are pursuing; and, *most importantly*, because of the emergence of key, new evidence the courts ordered defendants to produce or that defendants first proffered *after* they testified.

Indeed, this Court already ordered third-party witness Dawn Peavy to sit for a short, second day of deposition when two new documents involving her and her brother, Mark Peary, emerged.  DN 377.  DC seeks to depose defendants about these same two documents, the large array of Toberoff Timeline documents, and several other new documents that the Timeline documents helped reveal.  DC also needs to depose Toberoff and Larson concerning declarations they submitted to the courts in recent months.  The testimony DC seeks on all of these subjects is directly relevant to DC's three remaining state-law claims in this case and it will help address and refute defendants' corresponding statute-of-limitations defenses, on which they moved for summary judgment two days ago.

In addition to seeking an order compelling this extra deposition time, DC seeks an order overruling three sets of objections defendants made at their prior depositions.  These privilege and subject-matter objections were unfounded and impede DC's ability to address a number of open issues in the case, most pressingly defendants' limitations defense.

While Rule 30(d)(1) presumptively limits depositions to one, seven-hour day, courts "*must* allow additional time" to depose a witness "if needed to fairly examine the deponent."  FED. R. CIV. P. 30(d)(1) (emphasis added).  DC must show "good

JT STIP. RE: DC'S MOT. FOR LEAVE TO
CONDUCT DEPO & COMPEL RESPONSES

cause" to obtain such an order, FED. R. CIV. P. 30 advisory committee note, but that standard is easily met—especially here, given the emergence of new evidence, the complexity of the case, and the lengthy time period and many transactions at issue, *e.g. Hash v. Cate*, 2012 WL 6025726, at *3 (N.D. Cal. Dec. 4, 2012); *Kress v. Price Waterhouse Coopers*, 2011 U.S. Dist. LEXIS 126224, at *5-6 (E.D. Cal. Nov. 1, 2011); FED. R. CIV. P. 30 advisory committee note ("Good cause" exists if deposition, *inter alia*, "will cover events occurring over a long period of time" or new documents produced); W. Schwarzer *et al.*, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1374 (Rutter 2011) (same).  Such orders are fully appropriate even if the witness "was nothing but cooperative during his deposition"—which was not the case here.  *Cal. Earthquake Auth. v. Metro. West Secs., LLC*, 2012 WL 5880342, at *4 (E.D. Cal. Nov. 21, 2012).  Indeed, "[i]t is expected that in most instances" the parties "will make reasonable accommodations" concerning deposition time "to avoid the need for resort to the court."  FED. R. CIV. P. 30 advisory committee note; *accord Genentech, Inc. v. Trs. of Univ. of Penn.*, 2011 WL 7074212, at* 1 (N.D. Cal. Oct. 18, 2011).  DC could not obtain such accommodations from defendants, thus necessitating this motion.

II.   **DEFENDANTS' INTRODUCTORY STATEMENT**

Plaintiff DC Comics' ("DC") motion to compel an additional **eighteen hours** of deposition testimony from defendants Laura Siegel Larson, Mark Warren Peary, and their counsel, defendant Marc Toberoff, is unwarranted harassment.  DC has already obtained *two days* of deposition testimony from *each* of these individuals in this case and in the closely-related case, *Siegel v. Warner Bros. Entertainment, Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"). This deposition testimony extensively covered the matters relevant to this case.

After nearly forty hours of combined deposition testimony, enough is enough.  DC wholly fails to demonstrate the good cause required by Federal Rule of Civil Procedure 30(d)(2) for second depositions.  Throughout its depositions in this case, DC took a leisurely approach to questioning, and devoted considerable time to topics already covered during the full-length depositions in *Siegel*.  DC did so despite the Court's express instructions that it should not re-question these witnesses on the same topics covered in their *Siegel* depositions. Dkt. 95 at 57-59. DC should not be rewarded with yet another full day of deposing each of the same witnesses.

DC argues that it is entitled to re-depose Mr. Peary and Ms. Larson as to the stolen "Timeline" documents.  Not so.  DC knowingly took Mr. Peary's and Ms. Larson's depositions in 2011, at a time when production of the Timeline documents had been expressly stayed by this Court pending Ninth Circuit review.  Dkt. 262 at 4; Declaration of Matt Kline ("KD"), Ex. A.  Defendants moved for a protective order to stay the 2011 depositions until the Ninth Circuit's review was complete, expressly to avoid the specter of multiple depositions.  Dkt. 278.  The Court allowed DC to proceed with the depositions, but "forewarned" DC that it did so at its own peril because "courts, and this court is one of them, disfavor repeat depositions."  Dkt. 288 at 31.  DC chose on its own to proceed with all-day

1  depositions of these parties without waiting for the Timeline documents; it cannot

2  now use those same documents as grounds to re-depose them.

3      DC also points to its pending motion for an evidentiary hearing re:

4  terminating and evidentiary sanctions regarding DC's Fifth Claim, arguing that this

5  motion necessitates a third deposition of Mr. Toberoff.  *Infra* at 11.  This is a *post

6  hoc* rationalization.  DC chose to file, and then to re-file, its motion without ever

7  moving for more time to depose Mr. Toberoff.  DC controlled the timing of these

8  filings, and their content, and could and would have moved for further depositions

9  had it really thought them necessary.  DC's motion has been fully briefed; and

10  Judge Wright has expressly foreclosed further briefing.  Dkt. 580.  An already-

11  submitted motion is not a basis to award DC additional deposition time.

12      Defendants' pending summary judgment motion could also easily resolve

13  this case, and moot DC's instant motion, by disposing of DC's remaining Fourth,

14  Fifth and Sixth Claims.  Dkt. 577.  DC's Sixth Claim is mooted by the Court's

15  decision on its Third Claim, and is otherwise preempted by the Copyright Act.

16  DC's Fourth and Fifth Claims are barred by the applicable statute of limitations

17  based on a clear, undisputed record that shows that DC was on inquiry and actual

18  notice of its claims by 2006, at the latest.  The two-year statute of limitations on

19  DC's "interference" claims thus ran in 2008 – *two years* before DC filed suit.  Cal.

20  Code Civ. Proc. § 339(1); Dkt. 1.  Defendants' motion is based on the documents

21  and information already in DC's possession *by 2006*.  No amount of additional

22  discovery by DC *in 2013* will change the undisputed facts underlying Defendants'

23  motion.

24      DC's gamesmanship here is obvious.  DC met and conferred on re-deposing

25  Mr. Peary and Ms. Larson in **2011**, shortly after their depositions.  DC did not

26  move at that time.  DC received the "Timeline" documents in **May 2012**.  DC did

27  not move at that time either.  DC filed its original sanctions motion in **October

28  2012**, and re-filed it in **January 2013**.  DC did not move to re-depose prior to either

1   filing.  DC has also been on notice of Defendants' summary judgment motion since

2   **November 2012**, and has been well aware of Defendants' statute of limitations

3   defenses since **August 2010**.  If DC truly needed additional discovery, it would

4   have moved long before now.

5         It was not until Defendants filed their summary judgment motion that DC

6   finally served this motion.  The timing of DC's motion – a mere 48 hours after

7   Defendants' motion was filed – makes it plain that DC's real objective is to simply

8   delay summary judgment for as long as possible.  DC has had more than a full and

9   fair opportunity to depose all three witnesses and has already deposed each of them

10   twice (Ms. Larson, thrice).  DC has not shown good cause for additional

11   depositions of these parties.  This three-year-old case can and should be brought to

12   a close.

III.   **DC COMICS' STATEMENT OF ISSUES IN DISPUTE**

    A.   **DC Needs At Least An Additional Day To Depose Marc Toberoff And His Three Companies, And Toberoff's Objections To Being Questioned About His Discovery Conduct Should Be Overruled.**

       1.   <u>DC's Need For Extra Time</u>.  DC advised defendants prior to taking Toberoff's deposition that it did not believe it could complete his deposition in seven hours given the complexity of this case, the numerous claims and parties, and Toberoff's assertion that he would be testifying both as an individual and as the Rule 30(b)(6) designee for all three of the corporate defendants whose depositions DC had separately noticed.  Kline Decl. Exs. D, I, J.  DC was entitled to depose each of the Toberoff defendants for seven hours, but offered to take just two days (or 14 hours) to depose all four.  *Id.* Ex. D.  Defendants refused.  *Id.* Exs. E, H.

DC attempted to complete the four Toberoff defendants depositions in one day, on September 18, 2012.  *Id.* Ex. W.  It was not able to do so, given the number of defendants, complexity of the case, and several improper objections.  *E.g., id.* at W, Y.  In seven hours, DC got through many of the Siegel-related issues in the case (which bear on DC's Fifth Claim), but not all of them, nor the many Pacific Pictures and Shuster issues that relate to DC's Fourth and Sixth Claims.  Among other documents, DC did not have time to depose Toberoff about a 2011 Pacific Pictures agreement he prepared after this case was filed or memos from the Armstrong Hirsch firm to Toberoff discussing the ethical failings inherent in his business relationship with the Shusters.  *E.g.*, *id.* Ex. Y.  Defendants also prevented DC from deposing Toberoff about his discovery conduct, which bears on DC's three state-law claims and defendants' affirmative defenses.  *Infra* at 10-12.

The good-cause standard for ordering extra deposition time is easily met, *see Perry v. Kelly-Springfield Tire Co., Inc.*, 117 F.R.D. 425, 426 (N.D. Ind. 1987), and courts allow such additional deposition time where, *inter alia*:

- new documents emerge after the first deposition, *see* FED. R. CIV. P. 30 advisory committee note; RUTTER, *supra*, § 11:1374;[1]

- "the examination will cover events occurring over a long period of time," FED. R. CIV. P. 30 advisory committee note; *see In re Intel Corp. Microprocessor Antitrust Litig.*, 2008 WL 5377979, at *3-4 (D. Del. Dec. 18, 2008) (authorizing 14- and 15-hour depositions where exam covered eight years of conduct);

- the case is "complex[]," *Hash*, 2012 WL 6025726, at *3; *accord Baker v. PPL Corp.*, 2011 WL 1811106, at *2-3 (M.D. Pa. May 12, 2011); *Umbach v. Carrington Inv. Partners (US), LP*, 2012 WL 4854657, at *2 (D.Conn. Oct. 11, 2012); and/or

- the deponent played a pivotal role in the facts at issue in the case, *Cal. Earthquake,* 2012 WL 5880342, at *4.

*Any one* of these criteria is sufficient ground alone to grant this motion.  *Id.* DC meets all four independent bases above, and the testimony it seeks is directly relevant to the core issues still to be litigated in this case.  As examples:

- DC has yet to depose Toberoff on important new documents that were produced in the case, including: many of the Timeline documents, his recent declaration concerning his discovery conduct, and the Pacific Pictures and Peary documents noted above.  *Supra* at 6; *infra* at 10-12.  The substance of these documents is relevant to DC's affirmative claims (the Armstrong Hirsch memos, for example, disclose and detail Toberoff's improper dealings

---

[1] *Accord Keck v. Union Bank of Switzerland*, 1997 WL 411931, *1 (S.D.N.Y. July 22, 1997) ("a second deposition is often permitted, where new information comes to light"); *Dixon v. Certainteed Corp.*, 164 F.R.D. 685, 692 (D. Kan. 1996) ("good cause" to redepose in negligence action where defendant failed to produce safety report written by witness); *St. Clair v. U.S.*, 21 F.R.D. 330, 331 (S.D.N.Y. 1958) (granting leave to redepose where matters sought to be examined were "only recently disclosed"); *Kress*, 2011 U.S. Dist. LEXIS 126224, at *5-6 ("'Good cause' for an order exists where … new documents have been produced.").

with the Shusters), and the timing and method of production of the Timeline and related documents evince, for example, Toberoff's fabricated story about a non-existent "billionaire investor"—all of which is directly relevant to DC's claims and its refutation of defendants' limitations defense and pending summary judgment motion. *Infra* at 10-12; DN 500 at 2-3, 14-15, 20.

• DC also needs to examine Toberoff concerning his and his companies' *10-plus years of conduct*, starting with their initial contacts with the heirs in 2001, through the new contracts they had the heirs sign in 2011, and Toberoff's declaration in 2012. DC only got about halfway through this complicated chronology in Toberoff's September 18 deposition. *Supra* at 6.

• This case is also complex, and virtually every issue is contested—from the timing and substance of Toberoff's contacts with the heirs and their representatives, to the web of some 11 contracts he had the heirs sign, to the meaning of each contract. *E.g.*, DN 184; 185 at 12-25; 577. Toberoff's objections to questions about his dealings not only slowed down the first day of his examination, *e.g.*, Kline Decl. Exs. W, Y, but DC has to depose all four of the Toberoff defendants, as each entered into different of the offending agreements at issue. *E.g.*, DN 307 at 5-13.

• The existence and importance of these additional named defendant witnesses, *in itself*, entitles DC to more deposition time. *E.g.*, *Provide Commerce, Inc. v. Preferred Commerce, Inc.*, 2008 WL 360588, at *3 (S.D. Fla. Feb. 8, 2008) ("this Court did not find any case law that barred a second deposition of an individual who was first deposed in his individual capacity and then called to testify a second time on behalf of the corporation"); *ICE Corp. v. Hamilton Sundstrand Corp.*, 2007 WL 1732369, at *3 (D. Kan. June 11, 2007) (same; "Rule 30(b)(6) anticipates such an occurrence…. Just because [defendant] may choose to designate certain individuals as its corporate designees whose fact depositions have already occurred does not

insulate [it] from the requirements of Rule 30(b)(6).  Such a finding would eviscerate Rule 30(b)(6).").[2]  As an example, in *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, 2006 WL 2734289, at *1 (N.D. Cal. Sept. 25, 2006), defendant Spencer was the president and sole owner of defendant FWS, which in turn controlled defendant BMC.  The court allowed plaintiff to depose Spencer three separate times—once in his individual capacity, once as the 30(b)(6) designee of FWS, and once as designee of BMC.  *Id.* at *1-2.

- Last, no one can dispute that Toberoff, the businessman, is who DC's claims target.  DC's complaint makes this clear, DN 49, as has the briefing and court rulings permitting its claims to proceed.  DN 184; 185 at 1-4, 13-25; 307; 334 at 17-25; 337; *see In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124-26, 1127 n.4 (9th Cir. 2012); *DC Comics v. Pacific Pictures Corp.*, 2013 WL 120807, at *1 (9th Cir. Jan. 10, 2013).  Toberoff's central role is grounds alone to grant DC's motion to afford the extra time it seeks.  *E.g.*, *Cal. Earthquake*, 2012 WL 5880342, at *4 (ordering extra day to depose witness, given "magnitude of the factual issues presented and [witness's] role in the facts which give rise to them"); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2008 WL 5377979, at *4 (same).

   2. <u>DC's Need to Depose Toberoff Regarding His Discovery Conduct.</u>  At his September 18 deposition, Toberoff's counsel (Richard Kendall) instructed Toberoff not to answer any questions concerning "Mr. Toberoff's actions or decisions in his capacity as counsel," including questions "about the discovery process."  Appendix A.  Kendall has also asserted that *Toberoff* himself handled almost all document discovery in this case—both as counsel for the Toberoff defendants and for the Siegel and Shuster heirs.  DN 500 at 14-21; 500-3 at 25, 27,

---

[2] *Accord Smith v. Gen. Mills, Inc.*, 2009 WL 2525462, at *5 (S.D. Ohio Aug. 13, 2009); *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 17 (1st Cir. 2000); *Sabre v. First Dominion Capital, LLC*, 2002 WL 31556379, at *2 (S.D.N.Y. Nov. 15, 2002).

55, 106, 122.  DC reserved its right to move to compel answers from Toberoff about his "discovery conduct," and defendants' objection to this line of questions—set forth below[3]—should be overruled for at least three reasons.

First, Toberoff's withholding from discovery key evidence of his interactions with the Siegel and Shuster heirs—now revealed in the production of the Toberoff Timeline documents and other related correspondence among the heirs, *e.g.*, DN 500—is directly relevant to defendants' statute-of-limitations defense to DC's Fourth through Sixth Claims.  Toberoff's concealment of evidence of his conduct—now confirmed in non-privileged, never-before-produced letters among the heirs, *id.*—directly supports DC's fraudulent concealment, delayed discovery, and equitable tolling arguments that refute defendants' limitations defense.  *E.g.,* DN 184 at 8-13; 185 at 12-13; 307 at 22-25; 334 at 22-23; *e.g., Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365-66 (9th Cir. 2005); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004); *Suh v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal. 1997); *Hansen v. Bear Film Co.*, 28 Cal. 2d 154, 178 (1946); *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009).  Defendants have precipitously moved for summary judgment on their limitations defense, DN 577, only compounding the need to depose Toberoff on these matters—and to do so now.  Such discovery into exactly when and how

---

[3] Appendix A at 45 (emphasis added):
[MR. PETROCELLI:]  Have you withheld in this litigation e-mail communications with Mr. Emanuel on the basis of this verbal agreement -- this verbal confidentiality agreement?
MR. KENDALL: I'm going to object to that question on the ground that I don't think it's proper for you to ask questions in this deposition about Mr. Toberoff's actions or decisions in his capacity as counsel for his clients or as -- in his capacity as counsel for and his firm's counsel for himself and the Toberoff entities.
So I think you're free to ask questions that you would normally ask of a lay witness *but not about the discovery process*.
MR. PETROCELLI: Have you – I'm not going to respond other than to have you understand that when I don't respond, it doesn't mean I agree.
*See* Kline Decl. Exs. W-Y (meet-and-confer correspondence that followed).

1    evidence was concealed and emerged is directly relevant to DC's response to this

2    limitations defense, as cases like *Living Designs* show.  *See* 431 F.3d at 357-59

3    (defendants concealed and lied about adverse evidence during first case; plaintiff

4    filed second case alleging defendants fraudulently induced settlement of first case;

5    statute-of-limitations defense rejected in second case, because triable issues of fact

6    existed as to when plaintiffs discovered defendants' fraud and related evidence).

7          Second, the discovery DC seeks is directly relevant to its pending sanctions

8    motion.  DN 500, 573, 575.  Toberoff's conduct in responding to DC's discovery

9    requests both on behalf of himself and as counsel to the Siegel and Shuster heirs is

10    a perfectly appropriate subject for deposition.  *E.g.*, *In re Static Random Access*

11    *Memory (SRAM) Antitrust Litig.*, 257 F.R.D. 580, 587 (N.D. Cal. 2009) (party

12    deposed regarding discovery response verification); *Bowoto v. Chevron Corp.*,

13    2006 WL 2589198, at* 1 (N.D. Cal. Aug. 30, 2006) (same); *Specht v. Google, Inc.*,

14    268 F.R.D. 596, 602 (N.D. Ill. 2010) (discovery into interrogatory answers proper).

15    That Toberoff made the ethically suspect decision to represent himself, his

16    companies, and the heirs in responding to discovery, *cf. Pacific Pictures*, 679 F.3d

17    at 1124, does not shield him from questions regarding his and his clients' discovery

18    responses.  Indeed, as courts have held, while there are "difficulties inherent in

19    deposing counsel" about discovery matters, such inquiries *are appropriate*,

20    especially when, as here, counsel "was not merely acting as counsel but also had a

21    previous business relationship with plaintiffs."  *Specht*, 268 F.R.D. at 602.

22          Third, Toberoff and his counsel chose to have him submit an 8-page, fact-

23    intensive declaration about his and defendants' discovery conduct, in opposition to

24    DC's pending sanctions motion.  DN 518.  The declaration covers the precise topics

25    about which DC sought to examine Toberoff just weeks before—when Kendall

26    instructed Toberoff not to answer.  Defendants cannot inject such factual claims

27    into the case and refuse to have Toberoff be deposed concerning them.  *Cf., e.g.,*

28    *Wald v. Costco Wholesale Corp.*, 2005 WL 425864, at *4 (S.D.N.Y. Feb. 22, 2005)

(ordering witness produced for "additional deposition regarding her new declaration" where declaration "elaborate[d] in considerable detail" on opinions). Such a deposition is especially important given that Toberoff's factual claims in the new declaration are brand new, inherently suspect, and contradicted by his many earlier statements in sworn declarations and in open court. *See* DN 527 at 1, 3-5, 7.

### B.    DC Needs An Additional Day To Depose Larson.

DC deposed Larson on July 22, 2011, DN 305-24—before many important documents in this case were produced, and just one month before the Court ordered DC to submit its final opposition to defendants' SLAPP motion, DN 270. Given this timing—and given the then-pendency of defendants' writ petition concerning the Timeline documents—DC has yet to depose Larson on important newly produced documents including: (1) letters Larson sent to her half-brother Michael Siegel, dated November 2, 2002, and July 11, 2003; (2) many of the Timeline documents she wrote, received, or otherwise has knowledge regarding; and (3) two recent sworn declarations she submitted that contain factual allegations that bear on DC's Fifth and Sixth Claims. Many of these documents, including Larson's recent declaration, are discussed in great detail in DC's pending sanctions motion and reply brief in support of the same. DN 500 at 1-3, 6-21; 527 at 2-3, 5-7, 9.

Good cause clearly exists to examine Larson regarding these newly produced documents. DC did not have access to them when they last deposed Larson, and Larson refused to produce them before, even though the courts have now held they were not privileged or any privilege in them was waived. *Id.*; *see* RUTTER, *supra*, § 11:1374; *supra* at 6-9 & n.1. To summarize several of these newly emerged documents, there are, among others:

- *Larson's November 2, 2002, Letter.* In its Fifth Claim, DC alleges that Toberoff misrepresented that he had a "billionaire investor" willing to purchase the Siegels' putative Superman rights, if they cut their ties with DC. DN 49, FAC ¶¶ 180-86. Toberoff and Larson initially denied, in briefs and

depositions, that Toberoff ever mentioned such a "billionaire," DN 98 at 2-3; 99 at 2-3; 305 at 1018:18-1020:4, 1024:24-1025:12; they claimed Ari Emanuel had been the third-party investor, DN 231 at 17; 269 at 8-11; 312 at 9; and they swore the Toberoff Timeline, which disclosed the "billionaire," was a pack of lies, DN 98 at 2-3; 160 at 71-72; 196 at 1-5, 10.  After seeking *for several years* to obtain Laura's correspondence with her half-brother Michael, the Court ordered her to produce a November 2, 2002, letter she wrote him.  DN 451 at 6.  The Court entered this order on June 21, 2012— some 11 months *after* DC deposed Larson in July 2011.  In her November 2002 letter to Michael, Larson described "extensive meetings [she had] with Toberoff and Emmanuel" during which she learned that "the <u>billionaire investor</u> who was offering $15 million … invested his money elsewhere." DN 455-2 at 4.  Larson's letter—about which DC is fully entitled to depose Larson—confirms that Toberoff (1) told Larson about a "billionaire investor;" (2) the "billionaire" was *not* Emanuel, and (3) the non-existent "billionaire" disappeared when Larson cut her ties with DC.  In recent court filings—including on DC's pending sanctions motion—defendants dispute this is how the letter should be read.  DN 466 at 15-16; 524 at 16-17; 526 ¶¶ 10-14.  DC is entitled to depose Laura to test that claim.

• *Larson's July 11, 2003, Letter.*  DC's Fifth Claim alleges that Toberoff "falsely represent[ed]to the Siegels that he would help them produce a competing Superman motion picture."  DN 49 ¶ 185.  Defendants claim Toberoff made no such promise.  *E.g.,* DN 312 at 3.  However, on May 13, 2003, Michael wrote to Larson claiming that when Toberoff first approached the Siegels, Toberoff had "his own production company" and "was going to team with [Ari] Emanuel and make a [Superman] movie."  DN 253-2 at 4. While Larson responded in a July 11, 2003, letter that Toberoff "has no plans to produce a Superman movie," she did not respond to Michael's claim

regarding Toberoff's initial fraud.  DN 362-2 at 287.  By withholding Laura's July 2003 letter from DC until three months after Larson was deposed (and withholding drafts of the letter until 2012, DN 500 at 18-19; 500-6 at 377-416), defendants prevented DC from questioning Larson about this exchange.

• *The "Marks Memo."*  Among the Timeline documents disclosed in May 2012 is an August 9, 2002, memo from Kevin Marks to Larson in which he states he "told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics" in 2001, that Toberoff made a competing business offer to the Siegels nonetheless, and if Larson accepted that competing offer, DC might sue Larson and Toberoff.  DN 500-5 at 338-39. DC has every right to depose Larson about this Memo, as it is powerful proof of DC's Fifth Claim for interference.  DN 49, FAC ¶¶ 184-85; Appeal No. 11-56934, DN 29; 37-1 at 15-17.

• *Larson's August 2 and November 19, 2012, Declarations.*  Larson filed two sworn declarations over a year after her July 2011 deposition in which she makes multiple sworn statements directly relevant to DC's billionaire investor claim.  *See* DN 466-2 ¶¶ 2-4, 6; 526 ¶¶ 6, 7, 10-12, 15.  These declarations directly contradict Larson's November 2002 letter, DN 527 at 7, are the subject of pending dispositive motions in the case, *id.*, and are further grounds for DC to re-depose Larson.  *Supra* at 7-11.

Again, these are just five examples of new documents on which DC seeks to depose Larson.  There are others like them among the Timeline documents and recent court filings defendants have made—including Toberoff's declaration, DN 518, and Larson's contested fee negotiations with Toberoff, DN 445-1 at 1163-66. DC needs one more day to complete its examination of Larson and to question her regarding all of these new materials.  Rule 30 provides that courts "must allow additional time" to depose a witness "if needed to fairly examine" her.  FED. R. CIV. P. 30(d)(1).  Here, that is plainly the case.

**C.    DC Needs An Additional Four Hours To Depose Peary, And His Objections To Two Lines Of Examination Should Be Overruled.**

1.    <u>DC's Need For Extra Time.</u>  DC advised defendants at Peary's deposition that it needed more time to complete it, including to address Toberoff's improper privilege objections.  *See* Kline Decl. Ex. B.  DC easily meets the good-cause standard for extra deposition time to examine Peary, and the testimony it seeks is directly relevant to the issues still to be litigated on its Fourth through Sixth Claims. There are several new documents that DC needs to examine Peary about, including Timeline documents, Jean Peavy's will, and a 2011 Pacific Pictures contract:

- *Timeline Documents*.  Included among the Timeline documents—first produced in May 2012, *after* Peary was deposed—are two May 2003 memos drafted by Armstrong Hirsch.  DN 500-5 at 348-76.  The memos directly relate to DC's Fourth and Sixth Claims, which challenge Toberoff's illicit business dealings with the Shusters.  DN 49, FAC ¶¶ 187-89.  The memos discuss how the Pacific Pictures agreements violate California probate laws, Rules of Professional Responsibility, and the State Bar Act.  DN 500-5 at 350-51, 355-62.  DC should be permitted to examine Peary about these memos and what Toberoff told Peavy (his business partner) about them, as well as similar Timeline documents.  They all are part of the lengthy course of illegal agreements and dealings Toberoff had with Peary—some of which the Court criticized as deceptive, and others of which it held to be unlawful in granting DC judgment on its federal claims in this case.  DN 507 at 14-17.

- *Jean Peavy's Will & the 2011 Pacific Pictures Agreement*.  DC has yet to depose Peary about his mother, defendant Jean Peavy's, will and the August 2, 2011, letter agreement signed by Peary, Jean, Toberoff, and Pacific Pictures.  DN 314-2 at 118-19; 360-2 at 235-36.  This Court permitted DC an additional 90 minutes time to depose Peary's sister, Dawn Peavy, concerning

these same documents, which were produced *after* Peary and Peavy were deposed in the summer of 2011.  DN 377; 382 at 7:24-9:1.  Peary is a key defense witness in this case, and as DC showed in obtaining additional deposition time for Peavy, Peary misled his sister about the contents of their mother's will.  DN 360 at 6-11; 371 at 1-3.  Peary's misrepresentations about his mother's will presents fertile ground for cross-examination in a tort case such as this one, where witness credibility is such a contested issue.  *Id.*

Likewise, the 2011 Pacific Pictures agreement that Toberoff obtained from the Shuster heirs is directly relevant to refute the statute-of-limitations arguments defendants are now making, since it is an agreement entered into well within the statutory period.  *See* DN 458 at 23-25; 468 at 10-12.  The creation of the 2011 agreement (in response to this lawsuit) also refutes defendants' false claim that when they "cancelled" the early Pacific Pictures agreement in 2004, Toberoff gave back to the Shusters his 50% stake in their purported rights.  DN 577 at 8-13, 21.  As DC showed in motion practice and at Peary's deposition, Toberoff still held the rights up until August 2011—continuing the harm DC suffered.  DN at 49, FAC ¶¶ 9, 58-64; 169; 305-37 at 1310:3-1314:6, 1316:9-15, 1434:14-1440:5; 307 at 6-9; 334 at 11-17; *see Suh*, 987 F. Supp. at 795; DN 458 at 7-9, 23-25; 468 at 10-12.

2.    Peary's Substantive Objections Should Be Overruled.

*a.    DC Needs to Depose Peary Regarding the Pacific Pictures Joint Venture and Agreements.*  At his June 29, 2011, deposition, Toberoff instructed Peary not to answer many of DC's questions concerning the agreements between the Shuster heirs and defendant Pacific Pictures.  *See generally* Appendix B.  Peary's sole basis for refusing to testify was that he had discussions with Toberoff on these issues.  To take one example of such an exchange:

> Q:  Why did you agree in lieu of entering into a traditional lawyer-client agreement to hire the services of a lawyer?  Whether it's

on a contingent fee or an hourly fee, why did you agree to enter into a joint venture with Pacific Pictures, a company that is not a law firm?

MR. TOBEROFF:  You can't -- unless you can answer that question independent of your discussions with me, I instruct you not to answer.

THE WITNESS:  Okay.  I'll have to follow your advice.

*Id.* at 45.  Given Toberoff's dual role as the Shusters' business partner *and* lawyer, these instructions were improper and should be overruled.

Peary's reasons for going into business with Toberoff—a business counterparty—and the thoughts and comments that counterparty exchanged with him to induce him to enter into a business relationship are not privileged.  *See Pacific Pictures*, 679 F.3d at 1125, 1127 n.4.  Such testimony—about why and how Peary and his family were induced by Toberoff to breach the Shuster family's binding 1992 Agreement with DC and enter into a business deal with Toberoff instead—is directly relevant to DC's Fourth and Sixth Claims, which challenge the creation, ongoing conduct, and content of that business relationship, which lasted through 2011.  DN 49, FAC ¶¶ 180-89; DN 458 at 23-25; 468 at 10-12.

While Toberoff has asserted he really only had a relationship with the heirs as their lawyer, the District Court and Ninth Circuit have repeatedly rejected that claim.  The District Court did so in denying Toberoff's SLAPP motion, DN 337; the Ninth Circuit did so in calling out Toberoff for his ethical braches and abuses of privilege claims over business communications, *Pacific Pictures*, 679 F.3d at 1124-25, 1127 n.4; and the Ninth Circuit did so again in denying Toberoff's SLAPP appeal, *DC Comics*, 2013 WL 120807, at *1.  Toberoff made a deliberate choice to negotiate and deal with the Shusters as a businessman, DN 307 at 13-15, and he signed the contracts as "Marc Toberoff, President" of Pacific Pictures, DN 305-54 at 2069; 305-55 at 2073, 337; *DC Comics*, 2013 WL 120807 at *1.  Peary testified that the Shusters did not enter into their legal retainer agreement with Toberoff until 2004—despite the misleading "As of November 23, 2001," date in the retainer agreement.  Kline Decl. Ex. A at 5:23-6:9.  All this confirms that Toberoff had a

non-legal, business relationship with the Shusters for many years.  DN 307 at 13-15.  There is no basis for asserting privilege over Mr. Toberoff's communications with the Shusters in his business capacity.  *Cf. Pacific* Pictures, 679 F.3d at 1125 ("Considering every communications he had with the Heirs to be privileged—regardless of whether the communication was in his capacity as a business advisor or an attorney—Toberoff resisted all such efforts" to obtain the Timeline documents.); *id.* at 1127 n.4 (such objections improper; collecting cases); *U.S. v. Chen*, 99 F.3d 1495,1501 (9th Cir. 1996) (privilege cannot apply where attorney acting in business role); *U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged."); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981).

    b. *DC Needs to Depose Peary Regarding Peary's Role As Executor of the Shuster Estate.*  Toberoff also instructed Peary not to answer questions concerning his role and actions as the named executor of the Estate of Joseph Shuster.  *See generally* Appendix C.  For example, Toberoff prevented Peary from testifying about why Peary agreed to relinquish the Estate's claim to an interest in <u>Superboy</u> and whether and how the Estate was compensated for doing so. Appendix C at 50-55.

   This Superboy "quid pro quo" is relevant to DC's Fourth and Sixth Claims. For example, DC alleges that Toberoff "induced the Shusters to manipulate claims of ownership in Superboy" by having the Shuster Estate relinquish its claim to an interest in Superboy and permit the Siegel heirs to bring copyright infringement claims against DC.  DN 49, FAC ¶ 178; 491 at 3-17.  Documentary evidence, including the 2001 and 2003 Pacific Pictures agreements, have already begun to show Toberoff's manipulation of the Estate's claims in Superboy, DN 305-54 at 2066; 305-55 at 2070, and Peary's reasoning for deciding, as executor of the Estate, to disclaim its ownership interest in Superboy is highly relevant to this disputed

issue.  DN 491 at 17-24; 493 ¶¶ 13-17.  Similarly, DC should be permitted to examine Peary about whether the Shusters' retainer agreement with Mr. Toberoff— which Peary executed in 2004 as executor of the Shuster Estate—contains references to the Siegel heirs and/or Superboy.  *See* DN 305-40.

Peary refused to answer all such questions on the ground that he had no understanding of these issues aside from what he was told by Toberoff.  *See generally* Appendix C.  That does not matter, because this was a business agreement, and thus the conversation cannot be blanketed in privilege.  *See In re Pacific Pictures*, 679 F.3d at 1125, 1127 n.4; *Chen*, 99 F.3d at 1501; *Martin*, 278 F.3d at 999; *Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d 1028, 1043.  Moreover, as the executor of the Estate of Joseph Shuster, Peary has a fiduciary duty to act in good faith and exercise sound judgment independent of what he is told by his attorney.  *See* CAL. PROB. CODE § 9600(a); *Estate of Sanders*, 40 Cal. 3d 607, 616 (1985); *Estate of Beach*, 15 Cal. 3d 623, 631 (1975).  DC is entitled to testimony concerning Peary's thoughts and judgment.  Finally, DC's questions to Peary about the retainer agreement were directed to whether it contains references to the Siegel heirs and Superboy, Appendix C at 55-57—which has nothing to do with the conveyance of legal advice, and is thus fair game.  *Cf.* DN 209 at 11; *In re Grand Jury Proceedings*, 33 F.3d 1060, 1063-64 (9th Cir. 1994); *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999).

### D.    Conclusion

DC's motion to compel should be granted.  DC should have an extra day to depose Toberoff and Larson, and an extra four hours to depose Peary.  Defendants' three lines of objections—addressed above, and specifically set forth in DC's proposed order and Appendices A-C—should be overruled.

## IV.  DEFENDANTS' STATEMENT OF ISSUES IN DISPUTE

### A.  Factual And Procedural Background

After reading and conveying the allegations in the so-called "Timeline" to outside counsel in 2006 (Dkt. 577-1 ¶¶40-42), DC extensively deposed Marc Toberoff, Laura Siegel Larson[4], and Mark Warren Peary in 2006 in the closely related *Siegel* case regarding the allegations and claims DC thereafter made in this case.  *See* Dkt. 61 at 25-30; 61-1, Ex. B; 305-18; 305-52; 577-1 at 6-7 ¶¶27, 31.  *See also* Dkt. 209 at 4 (This Court:  "From a realistic standpoint, the present case is so closely related as to be considered properly part of the same case as *Siegel*….").

Then, after filing the instant action in May 2010, and attaching the anonymous Timeline to its complaint, DC immediately sought to re-depose Ms. Siegel and Mr. Peary as to its accusations.  Dkt. 44.  Defendants requested that this Court stay such depositions until after a decision on their anti-SLAPP motion, noting that DC had already deposed them on many of the same topics.  Dkt. 58, 61.  This Court granted the motion in part, and stayed depositions for two months.  Dkt. 74.  At oral argument, this Court made clear that it disfavored second depositions and admonished DC not to waste time on already-covered ground:

> A party is entitled to take another party's deposition. The scope of the examination is determined by relevance, and relevance is determined by the pleadings.  ***And a party should not have to needlessly go over material that was previously testified to.  And absent compelling circumstances, a party should not have to testify more than once in a case***.
> …
> ***I will depend upon counsel to not needlessly go over material that has been covered***, even if it has been covered in another case, and to focus on what is truly needed.  ***And it will not be my present expectation to either enlarge the amount of time available for a deposition or to allow second depositions of these witnesses***.  I'm not ruling it out, but it's not my present expectation.

Dkt. 95 at 57-59 (emphases added).

Thereafter, DC brought a motion to compel the production of the privileged "Timeline" documents stolen from Mr. Toberoff's law firm.  Dkt. 205.  On May 25,

---

[4] In fact, DC deposed Ms. Larson twice in the *Siegel* case.  See Dkt. 61-2, Ex. B at 88, Ex C at 251.

1   2011, this Court held that Defendants had waived privilege on the documents, but

2   stayed its ruling "until all review is exhausted." Dkt. 262 at 3. Defendants sought

3   review of that ruling before Judge Wright and then the Ninth Circuit. Dkt. 276,

4   287.

5           On June 13, 2011, Defendants moved for a protective order staying Mr.

6   Peary's and Ms. Larson's depositions until review was "exhausted," on the grounds

7   that proceeding with the depositions before the issue of the "Timeline" documents

8   was fully resolved would "only invite motions to compel further depositions of Mr.

9   Peary and Ms. Larson, and unnecessarily expose them to repeated depositions in

10  this case." Dkt. 278 at 1. The Court denied Defendants' motion, but expressly

11  warned DC about proceeding without the Timeline documents:

12          Now, I've expressed before my reluctance about multiple depositions of the
            same witness. And I'm not ruling now on a motion that might be made in the
13          future. ***But, in general, courts, and this court is one of them, disfavor repeat
            depositions. The plaintiff knows this. And the plaintiff is forewarned and
14          the plaintiff can adjust its schedule if it so chooses***.

15  Dkt. 288 at 31 (emphasis added). Despite this warning, and this Court's prior

16  admonition regarding repeat questions, DC proceeded with all-day, seven-hour

17  depositions of Mr. Peary and Ms. Larson before the issue of the Timeline

18  documents was resolved.

19          The Ninth Circuit ultimately upheld this Court's waiver ruling, and the

20  Timeline documents were produced to DC on May 11, 2012. Dkt. 427-1 ¶8; Dkt.

21  427-3, Ex. G at 244-45. Subsequently, on September 18, 2012, DC deposed Mr.

22  Toberoff, also for the full seven hours. Declaration of Keith Adams ("AD"), Ex. A.

23          **B.    The Standard for Multiple Depositions**

24          Federal Rule of Civil Procedure 30(d)(2) dictates that "a deposition is limited

25  to one day of seven hours." As there is no reason to subject anyone to redundant

26  depositions, "repeat depositions are disfavored." *Lobb v. United Air Lines*, 1993

27  U.S. App. LEXIS 17495, at *2-3 (9th Cir. Cal. July 8, 1993) (citing *Graebner v.*

28  *James River Corp.*, 130 F.R.D. 440 (N.D. Cal. 1989)). Courts "limit a deposition to

1    seven hours absent a showing of good cause for additional time." *Independence*

2    *Park Apartments v. U.S.*, 59 Fed. Cl. 765, 769 (Fed. Cl. 2004); *see Melhorn v. New*

3    *Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) ("Absent

4    some showing of need or good reason for doing so, a deponent should not be

5    required to appear for a second deposition."); *Sentry Ins. v. Shivers*, 164 F.R.D.

6    255, 256 (D. Kan. 1996) (citations omitted) ("Scheduling a second deposition of the

7    same person without a showing of good reason will generally support a finding of

8    annoyance and undue burden or expense."). This Court has repeatedly endorsed

9    these principles in this case. *See* Dkt. 95 at 57-58, 288 at 31.

10       **C.    DC Is Not Entitled To Re-Depose Mr. Toberoff**

11              1.    DC Is Not Entitled To Additional Time After Wasting

12                    Considerable Time Re-Deposing Mr. Toberoff

13       The Ninth Circuit has held that "eliminating duplicative discovery" is an

14    important consideration in discovery practice. *Beckman Indus., Inc. v. Int'l Ins.*

15    *Co.*, 966 F.2d 470, 475 (9th Cir. 1992). This Court has similarly cautioned that it

16    "will depend upon counsel to not needlessly go over material that has been covered,

17    even if it has been covered in another case." Dkt. 95 at 59. DC's demand for a

18    third deposition of Mr. Toberoff runs afoul of this.

19       DC asserts that it did not have time to address all of the "Siegel-related issues

20    in the case" or the "Pacific Pictures and Shuster issues." *Supra* at 6. Between this

21    case and the closely-related *Siegel* case, however, DC deposed Mr. Toberoff on

22    these topics for fourteen hours. DC points to virtually no new documents or

23    information since it last deposed Mr. Toberoff in September 2012, *after* production

24    of the "Timeline" documents. Despite the Court's clear admonitions, and Rule

25    30(d)(2)'s time limits, DC wasted considerable time at Mr. Toberoff's 2012

26    deposition (AD, Ex. A) including on topics already covered:

27

28

| Topic | 2006 Depo (Dkt. 305-18)[5] | 2012 Depo (AD, Ex. A) |
|---|---|---|
| Mr. Toberoff's early work experience and background | 16:21-25:19 | 6:13-21:5 |
| 2001 and 2003 PPC Agreements | 204:18-230:8 | 160:22-164:9; 167:2-170:8; 171:24-184:7; 192:5-18; 207:24-209:3 |
| Shuster Termination | 204:18-230:8 | 186:1-9; 199:4-201:3 |
| Communications with Kevin Marks | 240:17-260:11 | 100:16-101:9; 119:3-121:18; 157:17-160:8 |
| August 2002 Offer to Siegels | 257:14-259:14 | 286:1-303:5 |
| 2002 IP Worldwide Agreement | 226:23-268:12 | 31:7-34:2; 35:14-36:21; 37:6-43:5 |
| Theft of Documents/Investigation | 142:1-147:6 | 43:14-45:15; 89:10-90:22 |
| Negotiations with third-parties re: Superman | | 66:8-87:24 |

In fact, DC admitted at Mr. Toberoff's 2012 deposition that it intended to re-question him on topics already covered in his prior deposition. AD, Ex. A at 91-92 (Mr. Toberoff's Counsel: "I assume just as you said during Laura Siegel's deposition, that you don't intend to ask the same questions that have been asked previously. Is that correct?" DC's Counsel: "That's not correct."). In the seven hours DC had to depose Mr. Toberoff (in addition to the seven hours it had deposed Mr. Toberoff in *Siegel*) DC could have easily addressed the topics it now cites as reasons for a third deposition. Instead, DC wasted time covering well-trod ground (*e.g.,* Mr. Toberoff's intial contacts with Mr. Peary), general background (*e.g.,* Mr. Toberoff's education and early work experience) and matters of interest to DC, but irrelevant to DC's claims (*e.g.,* Mr. Toberoff's communications as the Siegels' counsel in 2008-2010). *See* AD, Ex. A at 6:13-21:5, 66:8-87:24.

---

[5] Deposition citations are to the internal pages found in the deposition transcript.

1    DC not only proceeded at a leisurely pace, it also cavalierly assumed, despite

2    Rule 30(d)(2) and the Court's admonitions, that it could have as much time as it

3    desired to depose Mr. Toberoff.  AD, Ex. A at 255:2-6 (DC's Counsel: "We will go

4    to seven hours today, but it will come as no surprise to you that I will be seeking

5    more time to complete the examination, and we can talk about that [at] some other

6    point not on the record.").  DC's idleness during its prior depositions does not

7    justify a third deposition of its opposing counsel.

8            2.    DC's Rationales For Re-Deposing Mr. Toberoff Do Not Hold

9                  Up

10   DC has offered a range of confused and overlapping rationales for an

11   additional deposition of Mr. Toberoff.  None hold up.

12   Corporate Defendants:  DC asserts that it is entitled to additional deposition

13   time because Mr. Toberoff is the Fed. R. Civ. P. 30(b)(6) corporate designee of

14   closely-held entities Pacific Pictures Corp. (long-dissolved), IP Worldwide, LLC,

15   (long inactive) and IPW, LLC (not involved).  *See supra* at 8 ("DC has to depose all

16   four of the Toberoff defendants, as each entered into different of the offending

17   agreements…").  Not so.  As set forth in *San Francisco Bay Area Rapid Transit*

18   *Dist. v. Spencer*, 2006 U.S. Dist. LEXIS 73135, at *2-3 (N.D. Cal. Sept. 25, 2006),

19   cited by DC, while individuals may be simultaneously deposed in an individual

20   capacity and as a Rule 30(b)(6) witness, "[d]eponents are entitled to the

21   presumption that their testimony will be limited to seven hours – even if they are

22   testifying both individually and as a corporate designee."

23   This Court has also repeatedly recognized that the discovery DC sought of

24   these companies was overbroad given the issues actually present in this case.  *See*

25   Dkt. 262 at 5 ("These document requests are hopelessly overbroad, calling for

26   everything there is about companies with which Mr. Toberoff has been associated.

27   The motion is denied as to these requests."), 377 (denying in large part DC's

28   motion to compel documents from these corporate defendants), 439 at 2-3 (denying

1  "motion to enforce" order re: production of documents from these corporate

2  defendants).

3       Defendants also made it clear in **2011**, over a year before Mr. Toberoff's

4  deposition, that he would testify both personally *and* as the Rule 30(b)(6) witness

5  for those companies, which would adopt his testimony.  *See* KD, Ex. C at 391, Ex.

6  E at 39, Ex. H at 403.  This procedure has been repeatedly upheld by the Courts.

7  *See, e.g.*, *Sabre v. First Dominion Capital, LLC*, 2001 WL 1590544, at *3-4

8  (S.D.N.Y. Dec. 12, 2001) ("In the case of many closely held corporations, the

9  knowledge of an individual concerning a particular subject also constitutes the total

10  knowledge of the entity.  In such a situation, the witness could simply adopt the

11  testimony he or she provided in a former capacity, thereby obviating the need for a

12  second deposition."); *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, 2002 U.S.

13  Dist. LEXIS 9218, at *18 (S.D.N.Y. May 20, 2002) ("[T]here appears to be no

14  obstacle to the entity's complying with its obligations under Rule 30(b)(6) by

15  adopting the witness's testimony in his individual capacity.").  Mr. Toberoff's

16  serving as a Rule 30(b)(6) witness for these closely-held entities does not entitle

17  DC to additional depositions.

18      <u>Armstrong Hirsch Memos:</u>  DC asserts that it requires additional time to

19  depose Mr. Toberoff about Armstrong Hirsch's legal memos examining the 2001

20  PPC Agreement on Mr. Toberoff's behalf.  AD, Ex. A at 231:17-232:13.  DC

21  mischaracterizes these documents as discussing "ethical failings."  *Supra* at 7-8.  In

22  reality, as Mr. Toberoff testified, he voluntarily sought Armstrong Hirsch's legal

23  opinion about the 2001 PPC Agreement because he was uncertain and

24  uncomfortable with the form of agreement he had used.  *Id.*  Furthermore, it is

25  undisputed that, in 2004, Mr. Toberoff and the Shusters voluntarily cancelled the

26  2001 PPC Agreement addressed in the memo, and replaced it with a standard legal

27  retainer agreement, retroactive to 2001.  Dkt. 577-1 ¶¶6-7.

28

1    DC does not show good cause to re-depose Mr. Toberoff on these memos.

2    DC was in possession of these documents when it deposed Mr. Toberoff in 2012,

3    and, in fact, already questioned him on that topic.  AD, Ex. A at 231:17-232:13.

4    More importantly, these legal memos have no bearing on DC's remaining claims.

5    While DC argues vaguely that the memos are relevant because they purportedly

6    relate to Mr. Toberoff's "improper dealings with the Shusters" (*supra* at 7-8), DC

7    fails to set forth how these memos actually connect to its claims.  *See* Dkt. 95 at 57

8    (The Court:  "The scope of the examination is determined by relevance, and

9    relevance is determined by the pleadings.").

10   Even if the Court interpreted DC's reference to "improper dealings" to refer

11   to DC's Fourth Claim (for interference with contract) (FAC ¶¶174-79), the memos

12   would still be irrelevant.  A claim for tortious interference requires:  "(1) a valid

13   contract between plaintiff and a third party; (2) defendant's knowledge of this

14   contract; (3) defendant's intentional acts designed to induce a breach or disruption

15   of the contractual relationship; (4) actual breach or disruption of the contractual

16   relationship; and (5) resulting damage."  *Pacific Gas & Electric Co. v. Bear Stearns*

17   *& Co.* ("*PG&E*"), 50 Cal. 3d 1118, 1126 (1990).  It does not require any wrongful

18   or improper conduct, and the memos, even if one accepted DC's

19   mischaracterizations of them, are therefore irrelevant to the Fourth Claim.

20   <u>Statute of Limitations Defense:</u>  DC asserts that "important new documents"

21   purportedly bear on Defendants' statute of limitations defense.  *Supra* at 7-8.

22   First, none of these documents are "new"; all of them were produced *before*

23   Mr. Toberoff's 2012 deposition.

24   Second, DC's relevancy argument is a red herring.  As set forth in

25   Defendants' summary judgment motion, the key question on the statute of

26   limitations issue is when DC had **inquiry notice** of its claims.  Dkt. 577 at 9-12, 13-

27   19.  The California Supreme Court has held that the question is whether "the

28   plaintiff has notice or information of circumstances to put a reasonable person on

-26-

1   inquiry;" the plaintiff "need not be aware of the specific 'facts' necessary to

2   establish the claim," but only needs a "suspicion of wrongdoing." *Jolly v. Eli Lilly*

3   *& Co.*, 44 Cal. 3d 1103, 1110-11 (1988) (citations omitted).

4        On its Fourth Claim, DC alleged that Mr. Toberoff tortiously interfered with

5   DC's 1992 agreement with Joseph Shuster's siblings by entering into the 2001 and

6   2003 PPC Agreements with Mark Warren Peary (both cancelled in 2004), and by

7   serving notices of termination.  FAC ¶¶174-179.  As set forth in Defendants'

8   motion, DC received the Shuster termination notice in 2003 and was provided with

9   complete, unredacted copies of both the 2001 and 2003 PPC agreements in 2006.

10  Dkt. 577-1 ¶25.  With the termination notice and agreements in hand, DC was on

11  actual notice of its Fourth Claim.  *See* Dkt. 500 at 8-13.

12       Similarly, DC's Fifth Claim alleges that Mr. Toberoff tortiously interfered

13  with its relationship with Laura and Joanne Siegel when he conveyed an offer to

14  their attorney to license their Superman rights in August 2002.  FAC ¶¶180-186.

15  DC was on notice of this claim by 2006.  DC received a September 21, 2002 letter

16  from the Siegels formally ending negotiations.  Dkt. 577-1 ¶19.  When negotiations

17  resumed in 2003, it became aware that the Siegels were represented by Mr.

18  Toberoff.  *Id.* ¶22.  By mid-2006, DC claims it received the anonymous, so-called

19  "Timeline," containing the false accusation that the August 2002 offer was

20  fraudulent.  *Id.* ¶38.  DC admitted in declarations that its in-house counsel read the

21  Timeline in 2006.  *Id.* ¶41.  DC's outside counsel declared that DC disclosed the

22  Timeline's allegations to them in 2006.  *Id.* ¶42.  Its outside counsel then took

23  extensive discovery in 2006, including deposition testimony from all relevant

24  witnesses, about the August 2002 offer, the Siegels' September 21, 2002 letter

25  ending negotiations, and their subsequent October 3, 2002 agreement with IP

26  Worldwide (Toberoff/Emanuel), which was itself produced to DC in 2006.  *Id.*

27  ¶¶20, 25-28, 31, 34-36.

28

1    Lest there be any doubt that DC was on notice, during 2007 summary

2    judgment briefing in *Siegel*, DC explicitly argued that Mr. Toberoff had interfered

3    with its relationship with the Siegels and that the Siegels "abruptly fired Mr. Marks

4    and terminated discussions with DC shortly after receiving Mr. Toberoff's '$15

5    million plus' offer." *Id.* ¶¶44-47.  *See* Dkt. 577 at 13-19.

6    DC alludes to tolling based on supposed "concealment," but "the fraudulent

7    concealment tolling provision does not come into play, whatever the lengths to

8    which a defendant has gone to conceal his wrongs, if a plaintiff is on notice of a

9    potential claim." *Barber v. Superior Court*, 234 Cal. App. 3d 1076, 1083 (1991).

10   DC's need for additional discovery to oppose Defendants summary judgment

11   motion is a fabrication.  For statute of limitations purposes, the issue is whether DC

12   had sufficient knowledge and information outside the limitations period to be on

13   inquiry or actual notice of its "interference" claims.  Repeat depositions of Mr.

14   Toberoff and/or the other witnesses to purportedly obtain additional information *in

15   2013* are not relevant to this issue, which turns on the information in *DC's*

16   possession before May 14, 2008 (*i.e.*, two years before DC filed suit).  Defendants

17   meticulously demonstrated that DC was on notice by 2006.  Dkt. 577 at 9-19.  DC's

18   false accusations of discovery misconduct are likewise irrelevant to Defendants'

19   summary judgment motions for the same reason.

20           3.     <u>DC Is Not Entitled To Depose Mr. Toberoff As An Attorney</u>

21   DC expressly argues that it needs to depose Mr. Toberoff about his actions

22   "as counsel for the Toberoff defendants and for the Siegel and Shuster heirs."

23   *Supra* at 9-10.  As set forth by the Ninth Circuit, there is a high bar to deposing

24   opposing counsel with regard to his/her role as an attorney.  *See Willer v. Las Vegas

25   Valley Water Dist.*, 1999 U.S. App. LEXIS 7831, at *8-9 (9th Cir. Apr. 19, 1999)

26   ("A party seeking to depose opposing counsel … must show that (1) the desired

27   information cannot be obtained by any other means; (2) the desired information is

28   relevant and non-privileged; and (3) the desired information is crucial to the

-28-

1   preparation of the case."); *American Cas. Co. of Reading, Pa. v. Krieger*, 160

2   F.R.D. 582, 585 (S.D. Cal. 1995) (party seeking to depose opposing counsel has the

3   burden of "demonstrat[ing] the propriety and the need for the deposition").

4        Such depositions are allowed only in the most exceptional circumstances.

5   *See Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999) ("Federal

6   courts have disfavored the practice of taking the deposition of a party's attorney;

7   instead the practice should be employed only in limited circumstances."); *Stull v.

8   YTB Int'l, Inc.*, 2010 U.S. Dist. LEXIS 93480 (S.D. Ill. Sept. 8, 2010) ("In

9   particular, taking the deposition of opposing counsel is highly disfavored and is

10  allowed only in exceptional circumstances.") (collecting cases); *Carehouse

11  Convalescent Hospital v. Superior Court*, 143 Cal. App. 4th 1558, 1562 (2006)

12  ("Depositions of opposing counsel are presumptively improper, severely restricted,

13  and require 'extremely' good cause.").

14       DC does not cite these standards, because it cannot meet them.  For the

15  reasons set forth above, the "discovery" DC seeks about how Toberoff &

16  Associates handled discovery requests on behalf of the Siegel and Shuster heirs is

17  irrelevant to Defendants' motion for summary judgment.

18       Nor does DC's trumped-up motion for an evidentiary hearing re: sanctions

19  justify deposing Mr. Toberoff for his actions as counsel for the Siegel and Shuster

20  heirs in this or the *Siegel* case.  Judge Wright made it clear on February 4, 2013 that

21  "[b]ecause this [sanctions] motion has already been fully briefed, the Court will not

22  accept any further briefing on this matter absent leave of Court upon a showing of

23  good cause."  Dkt. 575 (citations omitted).  On February 8, 2013, Judge Wright

24  then took the motion under submission.  Dkt. 580.  There is no basis to order a

25  second deposition based on a motion that has already been taken under submission.

26       Furthermore, DC's own actions demonstrate that a second deposition of Mr.

27  Toberoff is superfluous to its motion.  DC filed its sanctions motion on October 10,

28  2012, *before* seeking to re-depose Mr. Toberoff.  Dkt. 500.  If DC genuinely felt it

1  needed additional deposition testimony from Mr. Toberoff to support its sanctions

2  motion, it could and would have sought a second deposition of Mr. Toberoff before

3  filing its motion.

4      On December 5, 2012, Judge Wright denied DC's original motion as

5  jurisdictionally defective due to a then-pending anti-SLAPP appeal regarding DC's

6  state-law claims.  Dkt. 533 at 1.  After this, DC again could have filed its present

7  motion to re-depose Mr. Toberoff, as discovery was not stayed, but DC again chose

8  not to do so.  Instead, DC re-filed its motion on February 4, 2013, within an hour

9  after the Ninth Circuit had issued its mandate, and simply re-attached **all** of the

10  prior briefing (Dkt. 573), prompting Judge Wright to close the briefing.

11      DC's argument that Mr. Toberoff's November 14, 2012 declaration (in

12  opposition to DC's sanctions motion) justifies re-deposing him is also meritless.

13  Again, if DC believed this declaration necessitated a further deposition, it would

14  have brought this motion *before* re-filing its sanctions motion on February 4, 2013.

15      DC's own actions demonstrate that its fully-briefed sanctions motion, already

16  taken under submission by Judge Wright, provides no excuse for a second

17  deposition.

18      **D.**   **DC Is Not Entitled To Re-Depose Ms. Larson**

19      DC also fails to demonstrate good cause to re-depose Ms. Larson for another

20  full day.  Notwithstanding the Court's admonition "to not needlessly go over

21  material that has been covered" (Dkt. 95 at 59), DC extensively re-examined Ms.

22  Larson at her 2012 deposition on many topics already covered by DC at her 2006

23  *Siegel* deposition:

| Topic | 2006 Depo (Dkt. 61-1, Ex. B) | 2011 Depo (Dkt. 305-25) |
|---|---|---|
| The separate "Superboy" action | 14:19-15:2 | 217:9-231:24; 219:16-24 |
| First contact with Marc Toberoff | 17:6-17:19; | 53:10-13;113:22- |

| Topic | 2006 Depo (Dkt. 61-1, Ex. B) | 2011 Depo (Dkt. 305-25) |
|---|---|---|
| | 24:10-17 | 121:13 |
| Marc Toberoff's representation of Joanne and Laura Siegel Larson | 24:10-17; 61:12-21 | 93:1-6 |
| Marc Toberoff's representation of Jean Peavy and Mark Warren Peary | 24:15-17; 25:12-25 | 158:6-162:4 |
| Discussions between Joanne Siegel and Laura Siegel Larson, and/or Kevin Marks, and Marc Toberoff about the acquisition of Superman rights | 25:22-26:5 | 143:20-151:15; 177:6-11; 179:3-24; 232:11-234:9; 241:8-243:11 |
| Knowledge of Intellectual Properties Worldwide, LLC | 26:21-27:14 | 54:21-55:2; 58:15-16 |
| The IP Worldwide Agreement | 34:5-38:16; 52:16-21 | 255:23-256:1; 285:21-288:14 |
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between October 2001 and February 2002 | 45:3-46:22; 125:1-133:22; 139:12-140:17; 143:12-145:9; 147:4-150:24; 153:7-154:16; 159:7-159:19; 162:8-168:18;174:10-194:11; 204:10-205:21; 216:4-10; 261:12-265:10 | 107:21-110:5 |
| Joanne Siegel and Laura Siegel Larson's termination of Gang Tyre | 56:17-24 | 162:15-24; 253:1-13 |
| Expiration of the IP Worldwide Agreement | 60:1-60:8 | 61:11-62:1 |
| Marc Toberoff's contingency agreement with Joanne Siegel and Laura Siegel Larson | 72:8-73:8 | 93:1-6; 94:10-20 |

| Topic | 2006 Depo (Dkt. 61-1, Ex. B) | 2011 Depo (Dkt. 305-25) |
|---|---|---|
| Joanne Siegel and Laura Siegel Larson's "settlement" discussions with DC between 1997 and October 2001 | 64:16-65:6; 85:17-88:1; 221:21-241:9; 245:3-248:13 | 108:25-109:15 |
| The Superboy script by Jerry Siegel | 92:25-93:3 | 217:9-24 |
| The Superboy materials created by Jerry Siegel | 93:20-97:20 | 221:25-223:11 |
| The separate "Superboy" notice of termination | 105:7-107:4 | 230:10-231:24; 263:6-265:24 |
| The drafting and meaning of the May 9, 2002 letter sent by Joanne Siegel | 133:19-139:10; 140:14-141:6; 146:2-147:3; 210:18-216:3; 217:25-221:13 | 235:24-239:12 |
| Joanne Siegel's September 21, 2002 letter to DC's Publisher | 261:15-262:7 | 239:8-15; 243:12-246:3 |

It is noteworthy, and the Court may recall, that Ms. Larson is stricken with Multiple Sclerosis, Fribromyalgia and related disorders, all of which are quite painful and debilitating. Dkt. 88. It has been extremely difficult physically for her to sit through repeated lengthy depositions in *Siegel* and this case (*id*.), and she should not be compelled to do so again without a particularly strong showing of good cause.

It is clear from DC's last deposition in this case, that the reason DC seeks yet another deposition of Ms. Larson are not the excuses DC gives here, but the simple fact that DC failed at her last all-day deposition to properly marshal its time and, as shown above, wasted much time re-questioning Ms. Larson on already covered topics. Dkt. 305-25 at 333:10-19. Moreover, even though it was 7:00 p.m. and Ms.

1    Larson had endured a long day and seven hours of questioning, she generously

2    offered to stay longer and to answer any further questions so as to avoid another

3    motion by DC to compel yet another deposition of her.  *Id.*

4         DC's newfound excuse for re-deposing Ms. Larson is "new documents"

5    (*supra* at 12-14), but those documents do not justify a fourth deposition of Ms.

6    Larson.

7         Timeline Documents (July 2003 Letter/Drafts; Marks Memo):  DC

8    mischaracterizes the Timeline documents – specifically, the July 11, 2003 letter,

9    drafts thereof, and an August 9, 2002 memorandum from Ms. Larson's attorney

10   Kevin Marks – to justify a third deposition of Ms. Larson.  *Supra* at 12-14.[6]

11        DC's tactics are transparent.  DC knew that all of these documents were

12   among the "Timeline" documents (Dkt. 49, Ex. A; 316 at 1; 362 at 2; Siegel, Dkt.

13   478), and that their production was stayed pending the Ninth Circuit's writ review.

14   DC consciously chose to depose Ms. Larson over Defendants' objection that this

15   would lead to requests by DC for multiple depositions; and when allowed to

16   proceed, DC was "forewarned" that this Court "disfavor[ed]" second depositions.

17   Dkt. 288 at 31.  DC ignored this, and now seeks precisely the second deposition

18   that Defendants objected to in advance and that this Court cautioned against.  Such

19   gamesmanship should not be rewarded.

20        The November 2, 2002 Letter, Ms. Larson's August 2 and November 19,

21   2012 Declarations:  The November 2002 letter and Ms. Larson's virtually identical

22   declarations do not provide any basis to re-depose her.  *Supra* at 12-14.  DC claims

23   the November 2002 letter supports its "billionaire investor" allegations in its Fifth

24

25

26   _____
     [6] For example, DC claims that in the August 9, 2002 memo, Mr. Marks stated that he told
     Mr. Toberoff that the Siegels had reached a deal with DC, while omitting Marks'
27   qualifying language – "subject to documentation" (Dkt. 500-5 at 338); and DC frivolously
     argues that Ms. Larson's affirmative statements in her July 11, 2003 letter that Mr.
28   Toberoff had "'no plans to produce a Superman movie'" do not relate to Michael Siegel's
     speculation that Mr. Toberoff planned to make a Superman movie.  *Supra* at 13-14.

1    Claim, and that Ms. Larson's August 2 and November 19, 2012 declarations
2    supposedly "contradict" that letter.  *Supra* at 12-14.

3        Ms. Larson's declarations simply and clearly explain her letter and why she
4    used the term "billionaire" therein.  Dkt. 466-2 ¶5 ("Prior to this litigation, the
5    terms 'billionaire' and/or 'billionaire investor were, to my knowledge, used
6    exclusively in communications between my half-brother, Michael Siegel, and
7    me…."); 526 ¶13 ("Prior to this litigation, the terms 'billionaire' and/or 'billionaire
8    investor' were, to my knowledge, used exclusively in communications between my
9    half-brother, Michael Siegel, and me…."), ¶14 ("My use of the term 'billionaire' in
10   correspondence with Michael Siegel was simply as a colloquial term to signify a
11   wealthy investor).

12       Furthermore, it is clear from DC's complaint that it will amend the Fifth
13   Claim to be for interference with contract in light of the Ninth Circuit's recent
14   ruling that the Siegels accepted DC's offer in October 19, 2001.  FAC at 57 n.6 ("If
15   DC Comics' claims [re: alleged October 19, 2001 agreement] are accepted, it will
16   amend this complaint to include a claim for interference with contract....").  In that
17   event, DC's false allegations regarding supposed misrepresentations about a
18   "billionaire investor" would be irrelevant because claims for interference with
19   contract do not require any "wrongful act," as set forth above.

20       Larson's Fee Negotiations with Toberoff:  DC argues that it is entitled to
21   discovery as to Ms. Larson's purported "fee negotiations" with Mr. Toberoff.
22   (*supra* at 14).  However, DC does not even attempt to articulate a theory of
23   relevance for this topic, and Mr. Toberoff's legal contingency fee is manifestly
24   irrelevant to any of DC's claims or Defendants' defenses in this case.

25       **E.    DC Is Not Entitled To Re-Depose Mr. Peary**

26       DC claims that it is entitled to re-depose Mr. Peary for an additional four
27   hours.  *Supra* at 15-19.  As with Mr. Toberoff and Ms. Larson, DC extensively and
28   "needlessly" (Dkt. 95 at 59) re-examined Mr. Peary at his 2012 deposition on many

topics already covered at his 2006 *Siegel* deposition, and should not be granted any additional time:

| Topic | 2006 Deposition (Dkt. 305-52) | 2011 Depo (Dkt. 305-38) |
|---|---|---|
| The 1975 Agreement between Jerry Siegel and Warner Bros., and further amendments to that agreement | 18:10-19:1 | 102:6-17; 121:16-23 |
| Mark Warren Peary's first contact with Marc Toberoff | 20:1-21:17; 22:6-22:21; 35:17-37:18 | 102:25-109:25 |
| Mark Warren Peary's retention of Marc Toberoff as counsel | 23:18-24:3, 29:13-29:23; 57:20-58:11; 60:7-61:7; 61:14-62:13 | 178:22-182:14 |
| The 2001 Pacific Pictures Agreement | 24:6-35:16 | 142:20-143:7; 178:23-179:12; 185:1-14; 196:10-198:2 |
| The inclusion of "Superboy" in the 2001 Pacific Pictures Agreement | 27:22-29:12 | 207:8-19; 283:12-25 |
| The 50/50 split in revenues under the Pacific Pictures Agreement | 29:24-31:12 | 205:16-207:2 |
| The "Expiration" clause of the 2001 Pacific Pictures Agreement | 32:6-33:22; 62:21-64:13 | 208:3-210:9; 214:9-15 |
| The establishment of the Estate of Joseph Shuster | 38:13-40:24; 48:7-49:23; 50:4-12; 56:5-17 | 80:12-20; 146:17-149:5; 272:14-278:24; 275:7-282:5 |
| The 2003 Pacific Pictures Agreement | 40:7-41:14 | 198:3-198:6; 229:14-25; 287:9-295:15 |

| Topic | 2006 Deposition (Dkt. 305-52) | 2011 Depo (Dkt. 305-38) |
|---|---|---|
| Relationship with Joanne Siegel and Laura Siegel | 43:15-47:2; | 115:12-116:6; 167:14-18; 172:9-174:3; 235:4-237:8; 247:15-248:19 |
| The original copy of Joseph Shuster's will | 48:24-49:23 | 144:13-146:16 |
| The Shuster Notice of Termination | 50:14-56:25 | 163:18-166:25 |
| Works not listed in the Shuster Notice of Termination, including "Superboy," which was solely authored by Jerome Siegel | 55:13-56:4 | 167:22-168:8; 169-171:1; 299:6-324:3 |
| Signature of the Shuster Notice of Termination | 50:14-22 | 298:5-25 |
| The 2004 cancellation of the Pacific Pictures Agreements | 59:18-60:10 | 330:11-332:5-13 |
| Joanne Siegel's first contact with Marc Toberoff | 83:23-84:21 | 107:24-109:14 |

DC's pretexts for re-deposing Mr. Peary fare no better than its other excuses.

Timeline Documents:  As with Ms. Larson and Mr. Toberoff, DC deposed Mr. Peary knowing full well that it did not have the "Timeline" documents, and despite this Court's specific warning in light of this precise issue that multiple depositions are disfavored.  DC's tactical decision to proceed despite this admonition is not "good cause" to re-depose Mr. Peary, but rather good cause to deny DC's motion.

Furthermore, the only specific documents DC cites are the two attorney-client memorandums from the Armstrong Hirsh firm to Mr. Toberoff described above. *Supra* at 15.  Mr. Peary has no firsthand knowledge of these documents, and DC presents no theory why such documents are relevant to any of DC's claims.

1   Dkt. 305-38 at 271:19-22 ("Q: Have you seen a – any opinion or memoranda from
2   the Armstrong Hirsch Firm on the subject of your agreement?  A: No.").

3       <u>Jean Peavy's Will:</u>  Ms. Peavy's will was executed on November 14, 2000,
4   *before* the PPC Agreements and *before* any contact between Mr. Toberoff and Mr.
5   Peary or Ms. Peavy, and does not mention termination rights or Superman.  Dkt.
6   371-4, Ex. C at 6-20.  Ms. Peavy's will is not mentioned anywhere in DC's
7   complaint, nor does it relate in any way to Defendants' statute of limitations
8   defenses.  DC provides no theory of relevance to the claims or defenses in this case,
9   and instead vaguely argues that Ms. Peavy's will somehow relates to "witness
10  credibility." *Supra* at 16.  As this Court has noted, topics that "are far afield from
11  the relevance tether" (Dkt. 558 at 4) are not a sound basis for discovery.

12      <u>The 2011 Letter:</u>  What DC falsely calls the "2011 Pacific Pictures
13  Agreement" is nothing more than a letter signed by Mr. Toberoff, Mr. Peary, and
14  Ms. Peavy, confirming their 2004 cancellation and replacement of the 2001 and
15  2003 PPC Agreements with a legal retainer agreement retroactive to 2001.  Dkt.
16  314-2, Ex. D at 118-119.  The 2011 letter nips in the bud DC's attempts to sow
17  confusion as to the PPC Agreements' supposed continuing effect.  FAC ¶¶62, 99-
18  100.

19      DC nonetheless argues that the 2011 letter shows that Mr. Toberoff "gave
20  back" termination interests supposedly transferred by the 2001 and 2003 PPC
21  Agreementa. *Supra* at 16.  This argument is directly barred by Judge Wright's
22  decision that, as a matter of law under 17 U.S.C. § 304(c)(6)(D), the 2001 and 2003
23  PPC Agreements "did not transfer ownership of the subject copyrights."  Dkt. 507
24  at 15.  Moreover, even if the Shusters could make such as transfer (and they could
25  not) DC's theories would be further mooted by Judge Wright's ruling that the
26  Shuster estate's statutory termination was ineffective, as the Shusters had no
27  copyright expectancy to transfer to their venture.  Dkt. 507 at 13.

28

1    <u>DC's Delays:</u>  Furthermore, DC has had Ms. Peavy's will and the 2011 letter

2    since September 2011.  Dkt. 314-2 (letter); 360-1 ¶18 (will).  If either document

3    was of actual import, DC would have moved for a second deposition of Mr. Peary

4    long ago, and not waited for a year and a half.

5    <u>Privileged Attorney-Client Information:</u>  DC argues that improper attorney-

6    client privilege objections were made as to certain conversations between Mr.

7    Toberoff and Mr. Peary.  Mr. Peary testified about his relationship with Mr.

8    Toberoff and the PPC Agreements in general.  *See, e.g.,* AD, Ex. A at 102:24-

9    113:4.  Mr. Peary clearly testified that he understood Mr. Toberoff to be acting as

10    his attorney when their relationship began in 2001.  Dkt. 305-52 at 23:18-24:3.  Mr.

11    Toberoff testified to this attorney-client relationship as well.  Dkt. 145-2, Ex. B at

12    52, 65-66.  Confirming this testimony, the PPC Agreements clearly state that Mr.

13    Toberoff would "render legal services in connections with the Rights" (Dkt. 305-

14    55, Ex. 54 ¶7) and would "furnish directly to the [Shusters] all legal services

15    required by the [Shusters] in connection with the rights."  Dkt. 305-56, Ex. 55 ¶2.

16    In November 2003, Mr. Toberoff drafted, served on DC and filed with the U.S.

17    Copyright Office a notice of termination under 17 U.S.C. § 304(d) of Joe Shuster's

18    prior Superman copyright grants to DC, signed by Mr. Toberoff as "Counsel for the

19    Estate of Joseph Shuster."  Dkt. 577-1 ¶5; 578-2, Ex. M at 119.  In September 2004,

20    Toberoff, Peary and Peavy voluntarily cancelled the 2001/2003 PPC Agreements,

21    and entered into a legal retainer agreement dated "as of November 23, 2001," the

22    date as the 2001 PPC Agreement.  Dkt. 577-1 ¶¶6-7.

23    In short, despite the original form of agreements used, Mr. Peary had a long-

24    standing attorney-client relationship with Mr. Toberoff.  The objections were

25    properly made as to specific questions regarding the legal advice Mr. Toberoff gave

26    Mr. Peary, and Mr. Peary's reasoning and legal conclusions based on such advice.

27    *See* Appendix B at 45 ("Why did you agree in lieu of entering into a traditional

28    lawyer-client agreement to hire the services of a lawyer [in the PPC Agreement]?"),

1   45 ("What did you and he [Mr. Toberoff] discuss on this subject as to why you

2   were entering into a joint venture agreement rather than a normal attorney-client

3   agreement?"), 46 ("And that was the result of the advice given to you that the

4   Shuster estate had no interest in Superboy?"), 47 ("Why – and – but you also in

5   connection with that decision received advice that certain parts of your agreement

6   might not be valid, correct?").  Such conversations concerning legal representation

7   are squarely privileged.  *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir.

8   1982) ("[C]lient's ultimate motive for litigation or for retention of an attorney is

9   privileged.").

10      Superboy "Quid Pro Quo":  DC makes vague conspiratorial speculations

11  about some sort of Superboy "*quid pro quo*," but the "Superboy" issue is very

12  straightforward.  The Siegels' statutory Superboy termination and claims are based

13  on (1) a script Jerome Siegel wrote on his own, and (2) a 1948 court ruling that

14  Siegel (not Siegel and Shuster) was the sole creator of Superboy.  Dkt. 478 at 20-

15  22.  The Shuster estate did not file a Superboy termination or make equivalent

16  claims for the obvious reason that they could not.  DC, for unfathomable reasons

17  and without any support, repeatedly attempts to recast this straightforward legal

18  decision by the Shuster estate into a back-room, kick-back agreement with the

19  Siegels.

20      DC now argues that its allegations of a (non-existent) Superboy *quid pro quo*

21  relate to its "Fourth and Sixth Claims."  *Supra* at 18-19.  DC argued the opposite to

22  Judge Wright, who accepted DC's representations and properly considered the issue

23  moot as part of DC's already-adjudicated First Claim:

24      DC next moves for Reconsideration of the May 23, 2011 Order Denying
        Motion for Review Re: Production of Defendants' Consent Agreement.  **As**
25      **DC explains,** "the Consent Agreement relates to (the then) pending summary
        judgment motions, **particularly as DC's unclean-hands claim alleges that**
26      **the Consent Agreement contains an improper quid pro quo** in which the
        Siegels will pay off the Shusters for falsely disclaiming any ownership
27      interest in the Superboy character."  Mot. at 1; *see also* Mot. 13 ("The
        Superboy quid pro quo is at the heart of DC's First Claim.").  **Not only has**
28      **this discovery matter been repeatedly litigated and reviewed, but now**

-39-

**that the Court has resolved DC's First Claim in its favor, it follows that this motion is MOOT**.

Dkt. 533 at 2 (emphasis added; internal citations omitted).[7]  And indeed, DC's allegations of a *quid pro quo* are in DC's First Claim.  FAC ¶¶131-33.  They are referred to in passing in the Fourth Claim (*id.* ¶178) solely as part of a gratuitous allegation that Mr. Toberoff's actions were "wrongful," which is not even an element of such a claim for interference with contract.  *See PG&E*, 50 Cal. 3d at 1126 (requiring no "wrongful act" for a claim of interference with contract).  And the allegation appears nowhere at all in the Sixth Claim.  FAC ¶¶187-89.

Furthermore, the main question DC seeks to have answered by Mr. Peary is whether his 2004 legal retainer agreement with Mr. Toberoff "contains references to the Siegel heirs and/or Superboy" in redacted portions of the agreement.  *Supra* at 19.  When this Court ordered Defendants to produce that agreement, it expressly stated that Defendants "may submit redacted copies of [the] retainer agreements, redacting privileged information."  Dkt 209 at 11.  The redactions to that agreement made by Defendants pursuant to that order were then expressly upheld by this Court (Dkt. 267-1 at 14-17; 285), and DC is not permitted to evade these two rulings through the artifice of deposition questions.

Notwithstanding the above, to put this issue to rest, and without waiver of privilege, Defendants can confirm that the retainer agreement contains no references to either the Siegel heirs or Superboy.  As Defendants stated before when DC challenged the redactions to the retainer agreement:  "Defendants can [] safely say that the redactions do not concern any arrangements between the Siegels and the Shusters, or any limitations on settlement as hypothesized by DC."  Dkt. 267-1 at 28.

---

[7] DC's speculation that the 2008 agreement between the Siegels and Shusters (consistently held to be privileged) contained the supposed *quid pro quo* for the Shuster estate not pursuing Superboy claims *in 2003* make no sense as a matter of simple timing.

## F.    DC Failed To Properly Meet-And-Confer

As demonstrated by the correspondence DC attached to its motion, the last time the parties exchanged correspondence on these issues was many months ago: as to Ms. Larson and Mr. Peary on August 1, 2012 (KD, Ex. R at 431); and as to Mr. Toberoff on October 25, 2012.  KD, Ex. Y at 798.  Because of the long delays, DC never conferred on many issues in its motion – *e.g.*, Ms. Larson's August 2 and November 19, 2012 declarations, or Mr. Toberoff's November 19, 2012 declaration.

Despite DC's failure to meet and confer, it now complains that Defendants failed to offer "'reasonable accommodations' concerning deposition time." *Supra* at 2 (citation omitted).  DC ***never*** made any offer that even resembled a compromise. As DC's own letters show, it insisted on additional full-day depositions of each of the parties with no limit on subject matter, while reserving the right to seek further depositions later.  KD, Exs. R, W, Y.  DC has taken this abusive stance even though the topics set forth in DC's letters and motion cannot possibly justify additional full-day depositions of unlimited scope.

## G.    If This Court Does Not Deny DC's Motion Then It Should Await The Outcome Of Defendants' Dispositive Motion

DC's motion can and should be denied outright.  However, if the Court ia inclined to grant any portion of DC's motion, it should await the outcome of Defendants' pending summary judgment motion, which may well dispose of this case.

As discussed above, Defendants' motion for summary judgment, which seeks to resolve all of DC's outstanding claims in this case (DC's Fourth, Fifth and Sixth Claims), should be fully briefed by February 25, 2013, and Judge Wright has stated that he will then take it under submission. Dkt. 581.  If Defendants' motion is granted, the case will be over.  Otherwise, Judge Wright will decide what, if anything, remains of this case, which in turn will determine what topics are

1   "relevant" going forward.  Judge Wright's decision could easily come before, or

2   shortly after the hearing on this motion.  It would hardly make sense for this Court

3   to permit a second deposition of Mr. Peary as to DC's Fourth Claim, or to have Ms.

4   Larson be deposed again as to DC's Fifth Claim, only to have those claims

5   dismissed as time-barred.  If this Court is inclined to grant DC any requested relief,

6   it should do so **after** Judge Wright's summary judgment decision, so as to tailor any

7   such relief to the claims and issues, if any, that remain at this advanced stage of the

8   case.

9          **H.**     **Defendants' Conclusion**

10          For all of the reasons stated above, DC's motion to compel second

11  depositions of Ms. Larson, Mr. Peary and Mr. Toberoff must be denied.

Dated:        February 14, 2013            Respectfully Submitted,

                                           O'MELVENY & MYERS LLP


                                           By: /s/ Daniel M. Petrocelli
                                               Daniel M. Petrocelli
                                               Attorneys for Plaintiff DC Comics

Dated:        February 14, 2013            Respectfully Submitted,

                                           TOBEROFF & ASSOCIATES, P.C.


                                           By:  /a/ Keith G. Adams
                                               Keith G. Adams
                                               Attorneys for Defendants Laura
                                               Siegel Larson, Mark Warren Peary,
                                               and Jean Adele Peavy



                                   Attestation

I hereby attest that the other signatories listed, on whose behalf the filing is

submitted, concur in the filing's content and have authorized the filing.

Dated:  February 14, 2013            O'MELVENY & MYERS LLP

                                     By:   /s/ Daniel M. Petrocelli
                                          Daniel M. Petrocelli

# APPENDIX A

## Marc Toberoff – Discovery Conduct

page 63
10   Q.  Have you withheld in this litigation e-mail
11   communications with Mr. Emanuel on the basis of this
12   verbal agreement -- this verbal confidentiality
13   agreement?
14       MR. KENDALL:  I'm going to object to that
15   question on the ground that I don't think it's
16   proper for you to ask questions in this deposition
17   about Mr. Toberoff's actions or decisions in his
18   capacity as counsel for his clients or as -- in his
19   capacity as counsel for and his firm's counsel for
20   himself and the Toberoff entities.
21       So I think you're free to ask questions
22   that you would normally ask of a lay witness but not
23   about the discovery process.
24   BY MR. PETROCELLI:
25   Q.  Have you --
page 64
1       I'm not going to respond other than to have
2   you understand that when I don't respond, it doesn't
3   mean I agree.
Kline Decl. Ex. V at 788:10-789:3.

## APPENDIX B

### Mark Warren Peary – Pacific Pictures Joint Venture and Agreements

page 184

12      Q.  Now, what -- what did you do -- withdrawn.

13          Why did you agree in lieu of entering into

14  a traditional lawyer-client agreement to hire the

15  services of a lawyer?  Whether it's on a contingent

16  fee or an hourly fee, why did you agree to enter

17  into a joint venture with Pacific Pictures, a

18  company that is not a law firm?

19          MR. TOBEROFF:  You can't -- unless you can

20  answer that question independent of your discussions

21  with me, I instruct you not to answer.

22          THE WITNESS:  Okay.  I'll have to follow

23  your advice.

24          (Unanswered question.)

_____

page 203

4      Q.  What did you and he discuss on this subject

5  as to why you were entering into a joint venture

6  agreement rather than a normal attorney-client

7  agreement?

8          THE WITNESS:  Can I --

9          MR. TOBEROFF:  You can't answer that

10  question.

11          THE WITNESS:  Okay.

12          MR. TOBEROFF:  You cannot answer that

13  question.

14          THE WITNESS:  Okay.  Okay.

15          (Unanswered question.)

16          MR. TOBEROFF:  I'm instructing him not to

17  answer that question.

18          MR. PETROCELLI:  Attorney-client privilege,

19  right?

20          MR. TOBEROFF:  Yes.

21          THE WITNESS:  Okay.

_____

-45-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

page 204
15    Q.  Did you have any discussion about giving
16  away 50 percent of your rights to a joint venture?
17    A.  Yes.
18    Q.  With whom?
19    A.  Marc Toberoff.
20    Q.  What did you and he discuss on that
21  subject?
22        MR. TOBEROFF:  I instruct you not to answer
23  as to the substance of our discussions.
24        (Unanswered question.)

_____

page 288
16    Q.  Is that correct, sir?  There's no reference
17  to Superboy in paragraph 1, correct?
18    A.  I don't see it.
19    Q.  And there was in the first version,
20  correct?
21    A.  Yes.
…
page 289
 9    Q.  And in paragraph 1 of Exhibit 13 there's no
10  reference to Superboy or Smallville.
11        Is that correct?
12    A.  Yes.
13    Q.  Okay.  And that was the result of the
14  advice given to you that the Shuster estate had no
15  interest in Superboy?
16        MR. TOBEROFF:  I instruct you not to answer
17  as to the advice given to you.  You can't answer
18  that question.
19        (Unanswered question.)
20  BY MR. PETROCELLI:
21    Q.  When you signed this, you understood that
22  Superboy was not part of the agreement, correct?
23        MR. TOBEROFF:  Instruct you not to answer
24  to the extent your understanding is based on
25  conversations with me.

_____

page 330
2     Q.  Why -- and -- but you also in connection
3  with that decision received advice that certain
4  parts of your agreement might not be valid, correct?
5     A.  I believe so.
6     Q.  What parts?
7        MR. TOBEROFF:  I'll -- I'll -- I'll -- he
8  can't go into that without divulging the substance
9  of his communications with me on the subject.
10  BY MR. PETROCELLI:
11     Q.  Well, as the executor of the estate
12  entering into -- well, let me start all over again.
13        Take a look at Exhibit 20.
14          (The document referred to was
15          marked for identification by the
16          C.S.R. as Exhibit 20 and attached
17          to this deposition.)
18  BY MR. PETROCELLI:
19     Q.  This is the September 10, 2004 document
20  that you signed and your mother also signed,
21  correct?
22     A.  Yes.
23     Q.  You signed it both in your individual
24  capacity as executor of Mr. Shuster's estate?
25     A.  Yes.
page 331
1     Q.  And it says -- it's a letter from
2  Mr. Toberoff to you and to Ms. Peavy, right?
3     A.  Yes.
4     Q.  It says:
5        "This is to confirm that, 1,
6        the joint venture agreement dated
7        as of November 23, 2001 between you
8        and Pacific Pictures Corporation
9        and, 2, the engagement agreement
10        dated October 27, 2003 between the
11        estate of Joseph Shuster and
12        Pacific Pictures Corp. have been
13        canceled.  Sincerely yours, Marc
14        Toberoff."
15        And it's on the letterhead of Pacific

-47-

16  Pictures Corporation.
17       Do you see that?
18       A.  Yes.
19       Q.  When you agreed to this cancellation, what
20  provisions of your prior agreement did you believe
21  were invalid?
22            MR. TOBEROFF:  Same instruction.
23            (Unanswered question.)

---

page 338
22       Q.  Pacific Pictures is not a party to this
23  agreement you said, right?
24       A.  Not to the legal retainer.
25       Q.  Right.  So you're saying that -- who told
page 339
 1  you that the word "canceled" means that the
 2  termination provisions of the joint venture
 3  agreements no longer apply?
 4            MR. TOBEROFF:  Assumes facts.  Lacks
 5  foundation.
 6  BY MR. PETROCELLI:
 7       Q.  Is that something that you just thought of
 8  right now or is that something that you were told at
 9  the time that by using one word "canceled" instead
10  of the word "terminated," that would solve the
11  problem?
12       A.  That's my understanding of it.
13       Q.  And who told you that?
14            MR. TOBEROFF:  Assumes facts.  Lacks
15  foundation.
16            THE WITNESS:  I told myself that.
17  BY MR. PETROCELLI:
18       Q.  No one told you that, in other words,
19  right?  That's something you've come up with on your
20  own?
21       A.  We have a clear -- a clear understanding
22  when we switched from the joint venture to the legal
23  retainer.  We clearly understood each other.
24       Q.  Who is "we"?
25       A.  Me and Marc Toberoff.

-48-

page 340
1      Q.  How do you know that?
2      A.  Because we discussed it.
3      Q.  What did you -- what did you and he discuss
4   in that regard?
5          MR. TOBEROFF:  I'll allow you to answer
6   that question without waiver of the attorney-client
7   privilege.
8          THE WITNESS:  We discussed --
9          MR. TOBEROFF:  Do you agree that I'm not
10   waiving the privilege by allowing him to answer
11   that?
12          MR. PETROCELLI:  No.
13          MR. TOBEROFF:  Okay.  Then I instruct you
14   not to answer with our discussions.
15          (Unanswered question.)

Kline Decl. Ex. A at 7:12-24, 8:4-21, 9:15-24, 10:16-11:25, 22:2-23:23, 24:22-26:15.

## APPENDIX C

## Mark Warren Peary – Peary's Role As Executor Of The Shuster Estate

page 289
9    Q.  And in paragraph 1 of Exhibit 13 there's no
10  reference to Superboy or Smallville.
11        Is that correct?
12    A.  Yes.
13    Q.  Okay.  And that was the result of the
14  advice given to you that the Shuster estate had no
15  interest in Superboy?
16        MR. TOBEROFF:  I instruct you not to answer
17  as to the advice given to you.  You can't answer
18  that question.
19        (Unanswered question.)
20  BY MR. PETROCELLI:
21    Q.  When you signed this, you understood that
22  Superboy was not part of the agreement, correct?
23        MR. TOBEROFF:  Instruct you not to answer
24  to the extent your understanding is based on
25  conversations with me.

_____

page 302
12   Q.  Well, since 2003 to the present have you
13  ever purported to serve a notice of termination for
14  Superboy on behalf of the Shuster estate?
15    A.  No.
16    Q.  Okay.  And do you have any intention right
17  now to do so?
18        MR. TOBEROFF:  Don't discuss your
19  intentions as to legal acts in this case.
20  BY MR. PETROCELLI:
21    Q.  In your capacity as executor, do you have a
22  current intention of which you are currently aware
23  to serve a notice of termination with respect to
24  Superboy?
25        MR. TOBEROFF:  Instruct you not to answer
page 303
1   that.
2        (Unanswered question.)

-50-

3        MR. PETROCELLI:  On what ground?
4        MR. TOBEROFF:  On the ground that any
5   intention he has as to exercising his -- exercising
6   whatever rights he may or may not have under the
7   copyright act are the product of any discussions
8   with his counsel.

---

page 312
3        Q.  And is it fair to say that had these
4   documents been made available to you, you would have
5   taken them into account in making a decision whether
6   or not to delete Superboy, correct?
7        MR. TOBEROFF:  Calls for a legal conclusion
8   as to a complex issue.
9        MR. PETROCELLI:  Hardly.
10        MR. TOBEROFF:  You're so wrong.
11        MR. PETROCELLI:  Hardly.
12        MR. TOBEROFF:  You're so wrong.
13        MR. PETROCELLI:  You didn't -- you didn't
14   listen to my question.
15        MR. TOBEROFF:  I listened to it.
16   BY MR. PETROCELLI:
17     Q.  Can you answer my question?
18     A.  Would I have --
19     Q.  Taking these documents into account had
20   they been made available to you?
21     A.  I don't think it would have made a
22   difference because the legal situation with regard
23   to --
24        MR. TOBEROFF:  Don't testify based on
25   conversations with your attorney.
page 313
1        THE WITNESS:  Okay.  Then I can't say
2   anything.

---

page 317
3     Q.  Now, my question to you is, would you have
4   wanted to know about various documents in which --
5   that evidence your uncle claiming co-authorship of

-51-

6   Superboy and filing copyright registrations as late
7   as the mid-'70s in making a determination to remove
8   the -- any interest of the estate to Superboy?
9       MR. TOBEROFF:  Objection.  Assumes facts.
10  Lacks foundation.  It mischaracterizes the exhibits.
11      You can answer.
12      THE WITNESS:  My answer is I don't think it
13  would have made any difference, so no.
14  BY MR. PETROCELLI:
15   Q.  Why wouldn't it have made a difference?
16      MR. TOBEROFF:  You can only answer that to
17  the extent that your knowledge is not based on
18  conversations with me regarding Superboy.
19      THE WITNESS:  I -- I -- it's kind of legal.
20  I -- I just know --
21      MR. TOBEROFF:  You can only answer that --
22  please follow my instruction.  If your conversations
23  are based on knowledge independent of your
24  discussions with me, I'm happy for you to answer the
25  question.  If they're not, then you can't answer the
page 318
1   question.  That's it.
2       THE WITNESS:  Okay.
3   BY MR. PETROCELLI:
4    Q.  As --
5    A.  My -- my knowledge of it is -- is based
6   mostly on my discussions, so I guess I can't answer
7   it.
8    Q.  You're the executor of the estate.  You
9   filed legal documents in that capacity.  You filed
10  them as a matter of public record.
11      On what basis did you file documents
12  concluding that the estate had no interest in
13  Superboy?
14      MR. TOBEROFF:  You can answer that as -- as
15  long as your basis is not based on conversations and
16  advice with your -- from and with your attorney.
17      THE WITNESS:  Okay.  So what do I know
18  separate from talking with my attorney?
19      MR. TOBEROFF:  Don't involve him in that
20  thought process.  Think to yourself whether you have

21  an understanding separate from your conversations
22  with me or if you can separate it, then you can
23  answer the question.  If not, I instruct you not to
24  answer.
25      THE WITNESS:  Well, my knowledge is tied to
page 319
1  my discussions with Marc Toberoff.  I don't know how
2  to separate it.
3  BY MR. PETROCELLI:
4      Q.  I'm asking you for your judgement --
5      MR. TOBEROFF:  I instruct you not to
6  answer.
7  BY MR. PETROCELLI:
8      Q.  I'm asking you to answer the question based
9  on your judgment and your -- your capacity as the
10  executor of the estate.  You're the decision-maker,
11  not your lawyer.
12      MR. TOBEROFF:  It's the same instruction.
13  His question doesn't change my instruction.
14      THE WITNESS:  I have to follow the
15  instruction.
16      (Unanswered question.)
_____

page 320
2      Q.  Okay.  Do you think that Joe Shuster would
3  have had a better understanding of whether he was a
4  co-author of Superboy than Marc Toberoff?
5      MR. TOBEROFF:  Calls for a legal
6  conclusion.  Lacks foundation.
7      THE WITNESS:  All I know is these -- these
8  terminations were based upon a -- a renewal period
9  that -- that doesn't currently apply.
10      MR. TOBEROFF:  Don't -- don't discuss --
11  BY MR. PETROCELLI:
12      Q.  How do you know what you just said?
13      MR. TOBEROFF:  Excuse me.
14  BY MR. PETROCELLI:
15      Q.  You just said that these renewals don't
16  apply.  What did you mean by that?
17      MR. TOBEROFF:  Excuse me.  I'm going to

18  make my instruction again.  I'm instructing you not
19  to testify based on advice or information that you
20  have only received from your attorney.
21      Do you understand that instruction?  Do you
22  understand that instruction?
23      THE WITNESS:  Not to testify to information
24  that I have received from my attorney?
25      MR. TOBEROFF:  Yes.

page 321

1      Do you understand that instruction?
2      THE WITNESS:  Yes.
3      MR. TOBEROFF:  Okay.  So if you have
4  knowledge outside of your conversations with me or
5  outside of advice that I have given you, then you
6  can testify.
7      THE WITNESS:  Okay.  Well --
8      MR. TOBEROFF:  And you don't have to feel
9  bad about it.  Just you make the decision whether
10  it's based on knowledge -- the knowledge -- based on
11  advice and knowledge you've obtained from me and
12  conversations with me, in which event I instruct you
13  not to answer.  You don't have to feel bad about not
14  answering.  You don't answer the question.  You're
15  instructed not to answer.
16      If, however, you have information based on
17  your own independent knowledge that's not part and
18  parcel of your discussions and advice from me, then
19  you -- then you can answer the question and only
20  then.
21      Do you understand that?
22      THE WITNESS:  Okay.  Yes.
23      MR. TOBEROFF:  Okay.  Good.
24  BY MR. PETROCELLI:
25   Q.  So answer the question now.

page 322

1    A.  So my -- my -- my understanding is based on
2  my discussions with Marc Toberoff, my -- and where
3  we discuss copyright law.  That's --
4    Q.  But you -- you made a judgment.  It was
5  your decision to make, not Mr. Toberoff's.  You made
6  a judgment to enter into an amendment to a joint

-54-

7  venture removing certain rights from the venture.
8  And in what -- when you made that judgment I
9  would -- I want you to tell me what was the basis of
10  that judgment?
11      MR. TOBEROFF:  Asked and answered.
12      I instruct you not to answer.  You've
13  already answered the question.  The basis is legal
14  advice.  You don't have to answer and you don't have
15  to speak.
16      (Unanswered question.)
17      MR. TOBEROFF:  Next question.
18  BY MR. PETROCELLI:
19    Q.  And when you made the judgment as the
20  executor of the estate to reject any claim to
21  Superboy, what was the basis of that judgment?
22      MR. TOBEROFF:  Same instruction.
23      (Unanswered question.)

_____

page 330
2    Q.  Why -- and -- but you also in connection
3  with that decision received advice that certain
4  parts of your agreement might not be valid, correct?
5    A.  I believe so.
6    Q.  What parts?
7      MR. TOBEROFF:  I'll -- I'll -- I'll -- he
8  can't go into that without divulging the substance
9  of his communications with me on the subject.
10  BY MR. PETROCELLI:
11    Q.  Well, as the executor of the estate
12  entering into -- well, let me start all over again.
13      Take a look at Exhibit 20.
14      (The document referred to was
15      marked for identification by the
16      C.S.R. as Exhibit 20 and attached
17      to this deposition.)
18  BY MR. PETROCELLI:
19    Q.  This is the September 10, 2004 document
20  that you signed and your mother also signed,
21  correct?
22    A.  Yes.

23      Q.  You signed it both in your individual
24   capacity as executor of Mr. Shuster's estate?
25      A.  Yes.
page 331
1      Q.  And it says -- it's a letter from
2   Mr. Toberoff to you and to Ms. Peavy, right?
3      A.  Yes.
4      Q.  It says:
5           "This is to confirm that, 1,
6         the joint venture agreement dated
7         as of November 23, 2001 between you
8         and Pacific Pictures Corporation
9         and, 2, the engagement agreement
10          dated October 27, 2003 between the
11          estate of Joseph Shuster and
12          Pacific Pictures Corp. have been
13          canceled.  Sincerely yours, Marc
14          Toberoff."
15          And it's on the letterhead of Pacific
16   Pictures Corporation.
17          Do you see that?
18      A.  Yes.
19      Q.  When you agreed to this cancellation, what
20   provisions of your prior agreement did you believe
21   were invalid?
22          MR. TOBEROFF:  Same instruction.
23          (Unanswered question.)
_____

page 342
3   Q.  And does this document, Exhibit 21, contain
4   any provisions in it that deal with agreements with
5   the Siegels or getting the consent of the Siegels?
6          MR. TOBEROFF:  You have to read the
7   document.
8          MR. PETROCELLI:  I'm talking about the
9   parts that are omitted.  The redacted parts.
10          MR. TOBEROFF:  He can't testify as to the
11   redacted parts, obviously.
12          Instruct you not to answer any questions
13   about the redacted parts.

-56-

14        (Unanswered question.)
15        MR. PETROCELLI:  With resp- -- yeah,
16   because I can read the parts that have been produced
17   to us.
18     Q.  Based on your review of the entire
19   document, was there any reference in the document to
20   the Siegels?
21        MR. TOBEROFF:  Instruct you not to answer.
22        (Unanswered question.)
23   BY MR. PETROCELLI:
24     Q.  Was there -- is there any reference in the
25   document to Superboy?
page 343
 1        MR. TOBEROFF:  Are you asking him
 2   whether -- about the omitted portions in the
 3   document?
 4        MR. PETROCELLI:  Yes.
 5        MR. TOBEROFF:  Okay.
 6        MR. PETROCELLI:  In other words, I can read
 7   the portion --
 8        MR. TOBEROFF:  Since you're concerned about
 9   your time, we can save a lot of time, I'm going to
10   instruct him not to answer any question as to the
11   redacted portions of the agreement that have been
12   upheld by the court.
13        (Unanswered question.)

_____

page 352
10     Q.  In your role as executor of the estate, is
11   it your testimony that you have been able to -- you
12   can't do anything or even think of anything that
13   doesn't involve the legal advice of Marc Toberoff?
14     A.  That's correct.
15     Q.  Okay.  So everything that you do and
16   everything that you know as the executor of the
17   estate is based on the legal advice of Marc
18   Toberoff?
19        MR. TOBEROFF:  Vague.
20        THE WITNESS:  Yes.  Follow my counsel.
21   BY MR. PETROCELLI:

22      Q.  And -- well, I didn't ask you whether you
23   follow your counsel.  I'm asking you in your role
24   as -- you're executor, you don't have any judgment
25   or any ideas or any thoughts other than what
page 353
 1   Toberoff discusses with you.
 2        Is that correct?
 3        MR. TOBEROFF:  Misstates his testimony.
 4        You can answer.
 5        THE WITNESS:  That's correct.

Kline Decl. Ex. A at 11:9-25, 12:12-13:8, 14:3-15:2, 16:3-18:16, 19:2-21:23, 22:2-
23:23, 27:3-28:13, 29:10-30:5..