# EXHIBIT B

# Part 3 of 9

ROUGH DRAFT

10:55:19  1    Pickin Peavys?

10:55:19  2        A.  As a child as a childhood thing.

10:55:25  3        Q.  Who was in that band?

10:55:26  4        A.  Myself, mother and father, maybe an

10:55:30  5    occasional other musician.

10:55:32  6        Q.  And what did you play the ban Joe?

10:55:33  7        A.  Yes.

10:55:35  8        Q.  Okay.  So you have done some music in your

10:55:40  9    background and you've done some acting?

10:55:41 10        A.  Yes.

10:55:42 11        Q.  Have you ever been compensated for acting?

10:55:43 12        A.  Yes.

10:55:45 13        Q.  How long ago?

10:55:48 14        A.  Early 1980s.

10:55:56 15        Q.  So I want to go back a bit on your

10:55:58 16    relationship with your uncle Joe Shuster.

10:56:05 17            Did you ever spend one on one time with him

10:56:09 18    growing up?

10:56:09 19        A.  Some.

10:56:09 20        Q.  Did you go stay with him, for example, for

10:56:12 21    a while?

10:56:12 22        A.  There was one occasion I stayed with him

10:56:16 23    for a couple weeks.

10:56:18 24        Q.  When was that?

10:56:20 25        A.  That's when I thought I might become an

25

**EXHIBIT B**
**68**

ROUGH DRAFT

10:56:22  1    actor and I came out here and he let me stay in his

10:56:27  2    place for a while.

10:56:27  3        Q.  Late '80s?

10:56:28  4        A.  No.  That was the early '80s when I had all

10:56:32  5    my heir.

10:56:33  6        Q.  And when did you last see him before he

10:56:39  7    died?

10:56:39  8        A.  There -- there might have been an occasion

10:56:46  9    in the late '80s where we visited him, I believe.

10:56:52  10   It wasn't very long, though.

10:56:57  11       Q.  What wasn't very long?

10:56:59  12       A.  The visit was not long.

10:57:03  13       Q.  Did you speak with him by phone?

10:57:07  14       A.  Not much.  Mostly it was to his sister

10:57:11  15   Jean.

10:57:15  16       Q.  Were you -- so your contact with him

10:57:18  17   diminished in -- over the last years of his life?

10:57:27  18       A.  I don't know if it diminished.  There

10:57:31  19   was -- I would say it was pretty steady as it had

10:57:34  20   been.

10:57:37  21       Q.  But you hadn't seen him in 3 or 4 years,

10:57:37  22   right?

10:57:40  23       A.  I don't recall the last time I seen him if

10:57:43  24   that's what you're asking.  It was -- we had visited

10:57:45  25   him sometime in the late 1980s and he -- he had

                                                          26

**EXHIBIT B**
**69**

ROUGH DRAFT

10:57:50  1    gotten older and slower and had various health

10:57:55  2    problems so it wasn't -- it wasn't a whole lot said.

10:58:06  3    I don't recall speaking with him much at that time.

10:58:08  4        Q.  Did you ever have a conversation with --

10:58:11  5    with Joe Shuster about copyright interests or

10:58:16  6    termination of copyright interests?

10:58:18  7        A.  No.

10:58:20  8            MR. TOBEROFF:  Compound.

10:58:22  9            THE WITNESS:  No.  Never discussed that.

10:58:22 10    BY MR. PETROCELLI:

10:58:26 11        Q.  Did you ever have a conversation with Joe

10:58:28 12    Shuster about any contractual arrangements he had

10:58:34 13    with DC Comics or Time-Warner or Warner

10:58:39 14    communications or any other affiliated entity?

10:58:42 15            MR. TOBEROFF:  Compound.

10:58:45 16            THE WITNESS:  No.

10:58:45 17    BY MR. PETROCELLI:

10:58:51 18        Q.  Did he ever discuss with you any of his

10:58:55 19    pension arrangements or agreements?

10:58:57 20        A.  No.

10:59:00 21        Q.  Were you aware of them?

10:59:04 22        A.  I knew he was getting a pension.

10:59:06 23        Q.  From whom?

10:59:07 24        A.  Time-Warner, I believe.

10:59:15 25        Q.  Were you at all involved in his financial

27

**EXHIBIT B**
**70**

ROUGH DRAFT

10:59:19   1    affairs, helping him out with paying bills or things

10:59:23   2    like that?

10:59:23   3        A.  Not while he was alive.

10:59:26   4        Q.  When he died, though, you -- you did go

10:59:29   5    through and reconstruct all of his payments and

10:59:32   6    checks and tried to get a handle on how much money

10:59:36   7    he had.

10:59:38   8            Is that right?

10:59:38   9            MR. TOBEROFF:  Vague.

10:59:43  10            You can answer.

10:59:43  11            THE WITNESS:  The only thing I recall is I

10:59:45  12    helped my mother clear up his affairs.  That's about

10:59:55  13    the only involvement I had at the -- after he died.

10:59:55  14    BY MR. PETROCELLI:

11:00:03  15        Q.  And after he died, were you assisting your

11:00:11  16    mom in her discussions with either DC Comics or

11:00:17  17    Time-Warner about financial arrangements?

11:00:22  18            MR. TOBEROFF:  Lacks foundation.  Assumes

11:00:24  19    facts.

11:00:30  20            THE WITNESS:  I -- no, I really had nothing

11:00:32  21    to do with what she was saying.

11:00:32  22    BY MR. PETROCELLI:

11:00:34  23        Q.  Okay.  I'll come back to that in a bit.

11:00:39  24            You are aware that DC Comics has filed a

11:00:47  25    lawsuit against you and other defendants, including

                                                             28

**EXHIBIT B**
**71**

ROUGH DRAFT

11:00:55 1    Mr. Toberoff?

11:00:56 2        A.  Yes.

11:01:02 3        Q.  Let me show you a copy of the complaint

11:01:03 4    which is Exhibit 1.

11:01:06 5              (The document referred to was

11:01:06 6              marked for identification by the

11:01:06 7              C.S.R. as Exhibit 1 and attached to

11:01:16 8              this deposition.)

11:01:16 9              MR. PETROCELLI:  Actually the first amended

11:01:19 10   complaint.

11:01:19 11             MR. TOBEROFF:  Is this -- I thought this --

11:01:21 12   the other blog was Exhibit 1.

11:01:23 13             MR. PETROCELLI:  No, no.  I premarked them,

11:01:25 14   as I said,.  So that was -- I identified that on the

11:01:28 15   record as Exhibit 24.

11:01:40 16             You have a copy of that blog that's been

11:01:43 17   marked by the reporter, mark?  This one right here?

11:01:47 18   Why don't you put that over there so we can keep the

11:01:50 19   exhibits organized that's for the reporter thank

11:01:56 20   you.

11:01:56 21       Q.  This lawsuit was first filed on I believe

11:01:58 22   it was May 14, 2010 and a copy of the complaint at

11:02:05 23   the time was served on you, did you read the

11:02:08 24   complaint?

11:02:09 25       A.  I scanned it.

29

**EXHIBIT B**
**72**

ROUGH DRAFT

11:02:11  1        Q.  Scanned it?

11:02:12  2        A.  Yes.

11:02:14  3        Q.  Did you discuss it with your mom?

11:02:22  4        A.  Her -- not -- not -- not really.  She

11:02:28  5    faculties are not -- not very good because of her

11:02:34  6    stroke.  She's -- she's perhaps aware -- she's

11:02:38  7    probably aware of it I'm sure.

11:02:40  8        Q.  When the lawsuit was served on you and you

11:02:42  9    became aware of it did you have any discussion at

11:02:45  10   all with your mother about it, even -- even in the

11:02:48  11   most general terms, like, you know, "They filed a

11:02:50  12   case against us or anything like that?

11:02:52  13       A.  That would be the only extent of it.  I

11:02:56  14   would have mentioned something.  That's it.

11:03:00  15       Q.  Do you recall what, if anything, she said

11:03:02  16   to you?

11:03:06  17       A.  Her -- her faculties are such that I

11:03:09  18   don't think she completely understands what's going

11:03:11  19   on with this.

11:03:13  20       Q.  "With this," meaning --

11:03:14  21       A.  This.

11:03:14  22       Q.  All the legal issues?

11:03:16  23       A.  This legal -- yes.

11:03:18  24       Q.  Did you discuss it with your sister Jean

11:03:26  25   with whom you were living at the time?

30

**EXHIBIT B**
**73**

ROUGH DRAFT

11:03:27 1       A.  You mean --

11:03:28 2       Q.  Your sister Dawn, excuse me?

11:03:29 3       A.  Dawn.

11:03:32 4       Q.  What -- what is Dawn's last name?  Does she

11:03:35 5  go by Peary?

11:03:37 6       A.  She uses Peavy right now.

11:03:38 7       Q.  Peavy.  Excuse me.  Okay.  And what is your

11:03:46 8  address?

11:03:46 9       A.  51 Camino Cabo, Santa Fe, New Mexico,

11:03:58 10  87508.

11:04:00 11       Q.  Who owns the house?

11:04:01 12       A.  I do with -- with my mother.

11:04:10 13       Q.  Did you discuss the lawsuit with -- with

11:04:12 14  Dawn?

11:04:13 15       A.  No.

11:04:16 16       Q.  Never?

11:04:16 17       A.  No.  She hasn't -- she hasn't been involved

11:04:23 18  in any of the legal issues.  She just has a general

11:04:25 19  awareness of it.

11:04:27 20       MR. TOBEROFF:  If I might, just focus --

11:04:28 21  just answer his question and focus on the question.

11:04:28 22  BY MR. PETROCELLI:

11:04:31 23       Q.  Did you tell her that you were coming here

11:04:32 24  for a deposition?

11:04:33 25       A.  She's aware of that.

31

ROUGH DRAFT

11:04:38  1        Q.  Based on your interactions with her, do you

11:04:39  2    believe she's aware that a lawsuit has been filed by

11:04:42  3    DC comics against you and others with respect to the

11:04:46  4    Joe Shuster termination interest?

11:04:48  5        A.  I don't know if I've discussed that with

11:04:51  6    her.

11:04:53  7        Q.  Have you discussed this case with anyone

11:04:55  8    else other than Marc Toberoff?

11:04:57  9        A.  No.

11:05:02  10       Q.  Have you discussed it with any other

11:05:06  11   lawyers besides Mr. Toberoff?

11:05:08  12          MR. TOBEROFF:  Including lawyers at my

11:05:09  13   firm.

11:05:09  14          MR. PETROCELLI:  Not including any lawyers

11:05:11  15   at Mr. Toberoff's firm.  Anybody else.

11:05:14  16          THE WITNESS:  No.

11:05:14  17   BY MR. PETROCELLI:

11:05:16  18       Q.  Who is Michael Cataron?

11:05:20  19       A.  He is a friend.

11:05:23  20       Q.  Where does he live?

11:05:24  21       A.  He lives in Pennsylvania.

11:05:28  22       Q.  How did you become acquainted with him?

11:05:30  23       A.  I became acquainted with him -- I don't

11:05:40  24   recall.  I've known him since I was younger.

11:05:43  25       Q.  You grew up together?

32

**EXHIBIT B**
**75**

ROUGH DRAFT

11:05:44  1        A.  No, he knew the family.  He knew our family

11:05:48  2    and I knew him since I can't recall exactly.  We've

11:05:52  3    known him for years though.

11:05:53  4        Q.  What does he do for a living?

11:05:55  5        A.  He is some kind of a teacher, I believe.

11:05:59  6        Q.  What city in Pennsylvania?

11:06:01  7        A.  I don't recall.

11:06:04  8        Q.  When was the last time you had any contact

11:06:07  9    with him?

11:06:07 10        A.  Personal or on the phone or --

11:06:12 11        Q.  Anyway.  On the phone, writing, e-mail,

11:06:14 12    anything.

11:06:19 13        A.  I must have spoken with him in the last

11:06:21 14    year on the phone.

11:06:26 15        Q.  And you don't know what city he lives in?

11:06:28 16        A.  I can't recall.  Usually I just talk to him

11:06:32 17    on the phone.

11:06:32 18        Q.  Do you know how old he is?

11:06:33 19        A.  I believe he's in his 50s.

11:06:40 20        Q.  Do you have an e-mail address?

11:06:41 21        A.  Yes.

11:06:42 22        Q.  What is it?

11:06:44 23        A.  W Peary at comcast.net.

11:06:54 24        Q.  Is that P EA R Y?

11:06:57 25        A.  Yes.

33

**EXHIBIT B**

**76**

ROUGH DRAFT

11:06:58  1        Q.  And do you know if your sister Dawn has an

11:07:00  2    e-mail address?

11:07:00  3        A.  She uses 1 through work.  I can't recall.

11:07:08  4        Q.  Does your mom have one?

11:07:09  5        A.  No.

11:07:18  6        Q.  Are you generally familiar with the nature

11:07:20  7    of DC Comics' claims in this case?

11:07:22  8        A.  Somewhat.

11:07:29  9        Q.  Are you aware -- and again, very generally,

11:07:34 10    that DC Comics is challenging the termination notice

11:07:40 11    served by the estate of Joe Shuster?

11:07:45 12        A.  Yeah, I saw that here.

11:07:47 13        Q.  And by challenging," I mean DC is

11:07:53 14    contending that the termination notice is not valid

11:07:55 15    or not effective.  Do you have a general

11:07:58 16    understanding of that?

11:08:00 17        A.  Just from what I read here.

11:08:02 18        Q.  Okay.  You also -- do you also have an

11:08:05 19    understanding that DC claims that certain agreements

11:08:19 20    that you and/or your mother entered into violate

11:08:24 21    it's rights under the copyright laws?  Do you have a

11:08:27 22    general understanding that DC is making that

11:08:30 23    contention?

11:08:33 24            MR. TOBEROFF:  I just want to instruct you,

11:08:35 25    Warren, to the extent he asks you a question whether

                                                                    34

**EXHIBIT B**

**77**

ROUGH DRAFT

11:08:39  1   you have an understanding, you can answer that

11:08:42  2   question as to what your understanding is, provided

11:08:44  3   that understanding is not based on your

11:08:47  4   conversations with me and is based on something

11:08:50  5   independent of your communications with me.  If

11:08:55  6   it's -- if your understanding is solely based on

11:08:57  7   your communications with me, you can't discuss with

11:09:03  8   Mr. Petrocelli what your answer is because you would

11:09:07  9   be difficult individual the substance of your

11:09:08  10  communications with me.

11:09:09  11          Do you understand that?

11:09:11  12          THE WITNESS:  Yes.

11:09:12  13          MR. TOBEROFF:  So you can answer solely to

11:09:14  14  the extent you have an understanding independent of

11:09:17  15  your discussions with me.

11:09:18  16          THE WITNESS:  Okay.

11:09:18  17  BY MR. PETROCELLI:

11:09:19  18      Q.  You read the complaint you said -- you said

11:09:21  19  you scanned it, right?

11:09:21  20      A.  Yes.

11:09:23  21      Q.  So when you scanned the complaint did you

11:09:27  22  understand that among other things that DC was

11:09:29  23  contending that certain agreements that you and/or

11:09:33  24  your mother entered into entitled "It's rights under

11:09:36  25  the copyright laws?

35

**EXHIBIT B**
**78**

ROUGH DRAFT

11:09:40  1          MR. TOBEROFF:  Again can you only answer

11:09:41  2   that question to the extent have you some

11:09:43  3   independent understanding, independent of your

11:09:45  4   discussions with me.

11:09:47  5          THE WITNESS:  My understanding of this is

11:09:54  6   intricately linked to my discussions with Marc

11:09:57  7   Toberoff.

11:09:57  8   BY MR. PETROCELLI:

11:09:58  9      Q.  When you receive the complaint and scanned

11:10:03 10   it that was before you spoke to Mr. Toberoff about

11:10:05 11   the contents of the complaint, correct?

11:10:10 12          MR. TOBEROFF:  Assumes facts.

11:10:15 13          THE WITNESS:  I scanned it.

11:10:15 14   BY MR. PETROCELLI:

11:10:16 15      Q.  And so I'm focusing on that point in time

11:10:19 16   before any communication with Mr. Toberoff.

11:10:23 17          MR. TOBEROFF:  I'd like you to answer his

11:10:24 18   question.  He asked you a question and you didn't

11:10:27 19   answer it.

11:10:27 20          MR. PETROCELLI:  I think he answered it?

11:10:29 21          MR. TOBEROFF:  No, he didn't.

11:10:31 22          THE WITNESS:  What was the question.

11:10:31 23   BY MR. PETROCELLI:

11:10:32 24      Q.  Let me re -- rewind this, okay?

11:10:35 25          I want you to focus on the time when you

                                                         36

**EXHIBIT B**
**79**

ROUGH DRAFT

| 11:10:39 | 1 | received the complaint and you scanned it before you |
| 11:10:42 | 2 | spoke to Mr. Toberoff about it? |
| 11:10:44 | 3 | MR. TOBEROFF: Assumes facts. |
| 11:10:44 | 4 | BY MR. PETROCELLI: |
| 11:10:46 | 5 | Q. Are you with me? |
| 11:10:47 | 6 | A. Uh-huh. |
| 11:10:48 | 7 | Q. Okay. At that point in time, did you have |
| 11:10:53 | 8 | a general understanding that DC was claiming that |
| 11:10:57 | 9 | certain agreements you or your mother entered into |
| 11:10:59 | 10 | violated it's rights? |
| 11:11:03 | 11 | MR. TOBEROFF: Okay and again, my |
| 11:11:03 | 12 | instruction to you is if you had an understanding |
| 11:11:06 | 13 | that's independent of your discussions with me, you |
| 11:11:09 | 14 | can answer the question. If you don't, I instruct |
| 11:11:12 | 15 | you not to answer. |
| 11:11:13 | 16 | THE WITNESS: All my understanding is based |
| 11:11:18 | 17 | on my discussions with Mr. Toberoff. |
| 11:11:18 | 18 | BY MR. PETROCELLI: |
| 11:11:22 | 19 | Q. Well you had an understanding at some level |
| 11:11:24 | 20 | when you read the complaint, right? |
| 11:11:28 | 21 | A. |
| 11:11:28 | 22 | MR. TOBEROFF: Assumes facts. |
| 11:11:29 | 23 | THE WITNESS: I don't really -- I don't |
| 11:11:31 | 24 | really understand the -- the complaints, to tell you |
| 11:11:37 | 25 | the truth. I don't. So all my understanding is, is |

37

**EXHIBIT B**
**80**

ROUGH DRAFT

11:11:44  1    bound with my discussions with Marc Toberoff.

11:11:44  2    BY MR. PETROCELLI:

11:11:46  3        Q.  Well, when you received it and you saw it

11:11:47  4    you picked it up and you scanned it you said.

11:11:47  5            Is that right?

11:11:47  6        A.  Yes.

11:11:52  7        Q.  And you did that before having an in depth

11:11:55  8    discussion with Mr. Toberoff about the document

11:11:56  9    correct?

11:12:01 10            THE WITNESS:  Your asking what my

11:12:03 11    understanding of this is.

11:12:04 12            MR. TOBEROFF:  Is he ask whether.

11:12:05 13            MR. PETROCELLI:  Mark.

11:12:06 14            MR. TOBEROFF:  I'm sorry.  Focus on the

11:12:07 15    question.

11:12:07 16    BY MR. PETROCELLI:

11:12:08 17        Q.  Yeah. When you got the document, you

11:12:12 18    scanned it and you did that before having an in

11:12:17 19    depth conversation with Mr. Toberoff about the

11:12:20 20    contents of the complaint, correct?

11:12:22 21            MR. TOBEROFF:  Assumes facts.

11:12:27 22            THE WITNESS:  I don't remember if I read

11:12:30 23    through it first or talked to Marc Toberoff first.

11:12:34 24    I really don't.  I don't know what the timeline is

11:12:36 25    on that.

38

**EXHIBIT B**
**81**

ROUGH DRAFT

11:12:36  1    BY MR. PETROCELLI:

11:12:37  2        Q.  Speaking of timelines, did you read the

11:12:39  3    last document that the attachment to the complaint

11:12:43  4    called the Toberoff timeline?

11:12:49  5        A.  Yes, I -- I scanned that.

11:12:50  6        Q.  Okay.  When you scanned the Toberoff

11:12:52  7    timeline that's attached as exhibit -- Exhibit A to

11:13:04  8    the complaint, is that the first time you had ever

11:13:09  9    seen the Toberoff timeline?

11:13:11 10        A.  No.

11:13:14 11        Q.  When had you first seen it?

11:13:20 12        A.  I had seen it sometime before.  I don't

11:13:23 13    recall when.  There's so much documents that -- so

11:13:26 14    much discussions that I was aware of this.

11:13:32 15        Q.  This document?

11:13:32 16        A.  Yes.

11:13:33 17        Q.  Do you know when you first became aware of

11:13:35 18    it?

11:13:40 19        A.  I couldn't give you a date.  I know that I

11:13:43 20    had become aware of it.

11:13:51 21        Q.  When you -- had you received a copy of it

11:13:54 22    prior to seeing it attached to the complaint?

11:13:58 23        A.  I had -- I had seen it some point I know I

11:14:04 24    had seen it.  I don't know if it was -- how it came

11:14:08 25    to me.  I don't recall.  Because I get so much.  I

                                                          39

**EXHIBIT B**
**82**

ROUGH DRAFT

11:14:13  1    do recall seeing it.

11:14:14  2          Q.  You get so much what?

11:14:15  3          A.  Material.

11:14:16  4          Q.  Okay.  What do you do with the material

11:14:18  5    that you get?

11:14:19  6          A.  If it comes by mail, I keep it.  E-mail, if

11:14:28  7    it -- I look at it.  Keep some of it if I need to,

11:14:32  8    if not it just gets taken away.

11:14:36  9          Q.  You've -- you delete e-mails?

11:14:38  10         A.  Yes.

11:14:39  11         Q.  Related to this case?

11:14:40  12         A.  Well, if it -- if it isn't some -- some --

11:14:46  13   some -- some communications I would delete.  Only

11:14:49  14   documents I would save.

11:14:57  15         Q.  When you say only documents you would safe,

11:15:00  16   what do you mean by that?  You mean attachments to

11:15:02  17   e-mails?

11:15:02  18         A.  Legal documents.  Things -- things that

11:15:05  19   should be kept.

11:15:08  20         Q.  Have you had this e-mail address for the

11:15:10  21   past three years?

11:15:11  22         A.  Yes.

11:15:13  23         Q.  Do you have any other?

11:15:17  24         A.  No.

11:15:20  25         Q.  Have you been made aware of the need to

40

**EXHIBIT B**

**83**

ROUGH DRAFT

11:15:23  1    preserve evidence since the moment this case was

11:15:27  2    filed?

11:15:31  3        A.  Preserve evidence?  Can you clarify?

11:15:34  4        Q.  Have you been made -- have you been made

11:15:37  5    aware of -- that should you not delete e-mails or

11:15:45  6    discard material that could be evidence in this

11:15:49  7    case?

11:15:49  8        A.  I don't believe I've deleted anything that

11:15:53  9    would be evidence.

11:15:56 10        Q.  I asked you if you've been made aware that

11:15:58 11    you should not do so?

11:15:59 12            MR. TOBEROFF:  Objection.  The only way he

11:16:02 13    could be made aware of is through communications

11:16:04 14    with his attorney so you're asking him.

11:16:08 15            MR. PETROCELLI:  Mark that's not

11:16:09 16    necessarily true.

11:16:10 17            MR. TOBEROFF:  How else could he be made

11:16:12 18    aware.

11:16:12 19            MR. PETROCELLI:  His sister could have told

11:16:17 20    him.  I mean I would appreciate you don't prompt him

11:16:17 21    that way.

11:16:17 22            MR. TOBEROFF:  Excuse me I'm not prompting.

11:16:19 23            You could answer the question if so long --

11:16:22 24    regard to whether you were made aware to preserve

11:16:25 25    evidence by someone other than your attorney.

41

**EXHIBIT B**
**84**

ROUGH DRAFT

11:16:32  1          THE WITNESS:  So are you asking if -- if I

11:16:36  2     was supposed to save this, if I received it, if I

11:16:40  3     was made aware to save it?

11:16:40  4     BY MR. PETROCELLI:

11:16:43  5          Q.  No.

11:16:44  6          A.  Oh.

11:16:44  7          Q.  I'm asking something different than that.

11:16:46  8          A.  Oh.

11:16:46  9          Q.  I'm asking whether you have been made aware

11:16:51  10    that you are required to preserve material that

11:16:55  11    could be evidence relevant to this case?

11:16:58  12          MR. TOBEROFF:  And -- and --

11:17:00  13          Q.  BY MR. PETROCELLI:  You can answer that

11:17:01  14    "yes" or "no"?

11:17:01  15          MR. TOBEROFF:  And I'm instructing you that

11:17:03  16    you can answer that question with respect to any

11:17:06  17    party except an attorney.

11:17:08  18          MR. PETROCELLI:  And by the way, just for

11:17:11  19    the record, because I don't like to have big

11:17:13  20    arguments on the record.

11:17:14  21          MR. TOBEROFF:  I agree.

11:17:14  22          MR. PETROCELLI:  I don't even agree with

11:17:16  23    that instruction because I believe that's

11:17:18  24    discoverable even if it comes from counsel.

11:17:20  25          Q.  But -- but I can't -- there's no judge here

                                                          42

**EXHIBIT B**
**85**

ROUGH DRAFT

11:17:24  1   so I can't force you to answer over your attorney's

11:17:30  2   instructions and I'm going to assume that you're

11:17:32  3   going to abide by your attorney's instructions at

11:17:34  4   all times.

11:17:34  5        Is that right?

11:17:35  6        A.  Yes, that's correct.

11:17:35  7        Q.  Okay.

11:17:39  8        (Instruction not to answer.)

11:17:39  9   BY MR. PETROCELLI:

11:17:40 10        Q.  Prior to -- on what -- from the time that

11:17:44 11   this lawsuit became aware, other than conversations

11:17:48 12   with Mr. Toberoff, were you aware of an obligation

11:17:52 13   to preserve evidence related to this case?

11:17:57 14        A.  I'm not sure.  I --

11:18:07 15        Q.  Going back to the first agreement you

11:18:10 16   entered into with Mr. Toberoff or one of his

11:18:13 17   entities, which I think is sometime in

11:18:16 18   November 2001, from that point on, were you aware of

11:18:25 19   an obligation to preserve evidence related in any

11:18:30 20   way to the Joe Shuster termination issue?

11:18:34 21        MR. TOBEROFF:  Same instruction.

11:18:37 22        You can answer outside of communications

11:18:38 23   with your attorney.

11:18:42 24        THE WITNESS:  I'm not -- my understanding

11:18:48 25   is that any documents that need to be saved would be

43

**EXHIBIT B**
**86**

ROUGH DRAFT

| | | |
|---|---|---|
| 11:18:53 | 1 | saved by my attorney.  So I wouldn't -- I don't -- I |
| 11:19:00 | 2 | don't know specifically if it was something I'm |
| 11:19:06 | 3 | supposed to save.  I'm not -- I'm not sure I |
| 11:19:08 | 4 | understand the question. |
| 11:19:08 | 5 | BY MR. PETROCELLI: |
| 11:19:15 | 6 | Q.  From whom -- where in your home are the -- |
| 11:19:23 | 7 | are the papers related to this case or any legal |
| 11:19:28 | 8 | matter having to do with Joe Shuster? |
| 11:19:31 | 9 | A.  I've a filing cabinet. |
| 11:19:37 | 10 | Q.  How many drawers? |
| 11:19:38 | 11 | A.  Three. |
| 11:19:41 | 12 | Q.  When did you start to collect that material |
| 11:19:47 | 13 | that is contained in these drawers of this filing |
| 11:19:51 | 14 | cabinet? |
| 11:19:54 | 15 | A.  It would have been with the original legal |
| 11:19:57 | 16 | agreement. |
| 11:19:59 | 17 | Q.  Back in 2001? |
| 11:20:00 | 18 | A.  Yes. |
| 11:20:01 | 19 | Q.  Where is the cabinet located? |
| 11:20:03 | 20 | A.  In a study. |
| 11:20:06 | 21 | Q.  In your home? |
| 11:20:07 | 22 | A.  Yes. |
| 11:20:08 | 23 | Q.  And that has all the physical copies of |
| 11:20:12 | 24 | documents? |
| 11:20:13 | 25 | A.  Yes. |

44

**EXHIBIT B**
**87**

ROUGH DRAFT

11:20:15  1        Q.   And besides -- it fills up three drawers?

11:20:19  2        A.   No.  It shares it with a host of other

11:20:22  3    papers.

11:20:22  4        Q.   Okay.  And besides that filing cabinet,

11:20:27  5    where else, if anyplace do you keep any copies of

11:20:31  6    documents relating to this -- this matter?

11:20:37  7        A.   Perhaps a lock box.

11:20:43  8        Q.   What's --

11:20:44  9        A.   A lock box.

11:20:45  10       Q.   What do you mean by "a lock box?

11:20:46  11       A.   Just a fire proof lock box.

11:20:48  12       Q.   In your house?

11:20:49  13       A.   Yes.

11:20:50  14       Q.   And how big, is it?

11:20:51  15       A.   Very small.  Hand held.

11:20:53  16       Q.   What do you have in there?

11:20:56  17       A.   Oh, original documents of all kinds.

11:21:01  18   Titles, house, car titles, everything like that.

11:21:06  19       Q.   As pertains to Joe Shuster what do you

11:21:14  20   have?

11:21:14  21       A.   Oh,.  The -- the original -- original

11:21:19  22   signed agreements, legal agreements and retainers

11:21:23  23   that I have with my attorney.

11:21:30  24       Q.   Anything else?

11:21:30  25       A.   There might be the original will might be

45

**EXHIBIT B**
**88**

ROUGH DRAFT

11:21:40  1    in there.  I would have -- I'm not sure.

11:21:44  2         Q.  Anything else?

11:21:44  3         A.  Not pertaining to the case, no.

11:21:48  4         Q.  How many agreements are there in your lock

11:21:51  5    box between you and Mr. Toberoff or any of his

11:21:56  6    companies?

11:21:57  7         A.  There is -- there's only one.

11:22:02  8         Q.  Which one is that?

11:22:03  9         A.  That's the legal retainer.

11:22:07  10        Q.  What's the date of it?

11:22:08  11        A.  It is -- it is active as of 2001.

11:22:19  12        Q.  But created after the fact?

11:22:20  13        A.  Yes.

11:22:23  14        Q.  When was it created?

11:22:24  15        A.  2004, I believe.

11:22:32  16        Q.  And is that the last document you have

11:22:39  17   signed with Mr. Toberoff or any of his entities?

11:22:44  18        A.  With Mr. Toberoff.

11:22:45  19        MR. TOBEROFF:  You mean last agreement or

11:22:47  20   any document?

11:22:47  21   BY MR. PETROCELLI:

11:22:49  22        Q.  Is that the last agreement, contract, that

11:22:54  23   you have signed with Mr. Toberoff or any of his

11:22:56  24   entities, the one in 2004 that you said goes back to

11:23:03  25   2001?

**EXHIBIT B**
**89**

ROUGH DRAFT

11:23:05  1        A.  Yes.

11:23:07  2        Q.  Have you signed any other agreements at any

11:23:13  3    time since 2004 relating to legal representation,

11:23:20  4    relating to this case in any way?

11:23:22  5        A.  Yes.

11:23:24  6        Q.  What have you signed?

11:23:25  7        A.  It's a.

11:23:28  8            MR. TOBEROFF:  Don't go into -- just --

11:23:36  9    just give a very -- the title or -- don't go into

11:23:40 10    details of the document.

11:23:40 11            THE WITNESS:  It's called a consent

11:23:42 12    agreement.

11:23:42 13    BY MR. PETROCELLI:

11:23:45 14        Q.  Is that in your lock box?

11:23:46 15        A.  Yes.

11:23:50 16        Q.  Why didn't you mention it earlier when I

11:23:52 17    asked you about the agreements in your lock box?

11:23:55 18            MR. TOBEROFF:  Argumentative.

11:24:01 19            THE WITNESS:  I -- I mentioned what I had

11:24:07 20    recalled.

11:24:07 21    BY MR. PETROCELLI:

11:24:10 22        Q.  So you're now recalling as additional

11:24:12 23    documents that you signed?

11:24:12 24        A.  I -- I recall -- I stated what the

11:24:18 25    documents I recalled.

47

**EXHIBIT B**
**90**

ROUGH DRAFT

11:24:20  1         Q.  You now recall that you signed something
11:24:22  2    called a consent agreement and that's also in your
11:24:24  3    lock box?
11:24:25  4         A.  Yes.
11:24:26  5         Q.  Okay.  When was that signed?
11:24:30  6         A.  That was 2008, I believe.
11:24:38  7         Q.  When is the last time you saw it, or a copy
11:24:42  8    of it?
11:24:46  9         A.  Fairly recently I reviewed it last, I don't
11:24:51 10    know, maybe in the last month or so I might have
11:24:53 11    reviewed it.
11:24:54 12         Q.  Why?
11:24:54 13         A.  Because I was thinking about this case
11:25:00 14    because of this.
11:25:02 15         Q.  This deposition?
11:25:03 16         A.  Yes.
11:25:06 17         Q.  Besides the 2008 consent agreement, what
11:25:09 18    else did you review in connection with this
11:25:13 19    deposition?
11:25:13 20         A.  I reviewed my prior deposition for the
11:25:19 21    Siegel case and exhibits.  That's -- that's what
11:25:30 22    I've reviewed.
11:25:32 23         Q.  Did you have a copy of your prior
11:25:34 24    deposition?
11:25:36 25         A.  Yes.

                                                              48

**EXHIBIT B**
**91**