# EXHIBIT B

# Part 4 of 9

ROUGH DRAFT

```
11:25:37  1         Q.  And the exhibits?
11:25:38  2         A.  Yes.
11:25:42  3         Q.  Besides the 2008 consent agreement and your
11:25:45  4    deposition in the Siegel case together with the
11:25:48  5    exhibits of that deposition, what else did you
11:25:51  6    review in connection with this deposition?
11:25:55  7         A.  That's -- that's pretty much it.
11:26:02  8         Q.  Where did you get the consent agreement to
11:26:04  9    review, from the lock box?
11:26:10 10         A.  I -- I -- I -- yes or -- or it could have
11:26:15 11    been a copy.
11:26:16 12         Q.  Where -- where was the copy?
11:26:18 13         A.  The copy is -- it could be in a separate
11:26:22 14    folder.
11:26:24 15         Q.  What -- what's the name of the folder?
11:26:26 16         A.  The folder is legal.
11:26:29 17         Q.  Where is the folder maintained?
11:26:30 18         A.  The folder, there could be a copy in there
11:26:35 19    in the -- in the filing cabinet.
11:26:40 20         Q.  Is the 2008 consent agreement the last
11:26:44 21    agreement of any kind that you have signed in
11:26:49 22    connection with either this case or anything having
11:26:52 23    to do with the Joe Shuster termination issue?
11:26:55 24         A.  Yes.
11:26:57 25         Q.  Okay.  Who else signed the 2008 consent
```

49

ROUGH DRAFT

```
11:27:07  1   agreement?
11:27:07  2       A.  Would have been the -- Laura, Joanne
11:27:17  3   Siegel.
11:27:17  4       Q.  Laura Siegel and Joanne Siegel?
11:27:20  5       A.  Yes.
11:27:20  6       Q.  Anyone else?
11:27:21  7       A.  I think there was -- and -- and my attorney
11:27:28  8   signed it.
11:27:28  9       Q.  You mean Mr. Toberoff?
11:27:29 10       A.  Yes.
11:27:30 11       Q.  And did your mother Jean Peavy sign it?
11:27:33 12       A.  I don't recall if she did.  I just -- I
11:27:44 13   didn't read it.  I just scanned the -- the pages.  I
11:27:48 14   didn't -- I don't recall the signature page.  She
11:27:51 15   might have.
11:27:53 16       Q.  Do you know where you were when you signed
11:27:55 17   the document in -- in 2008?
11:27:57 18       A.  Yeah.  When I signed it, I was at home.
11:28:05 19       Q.  And what did you do after you signed it?
11:28:08 20   What did you do with it?
11:28:09 21       A.  Well, an original was FedExed to
11:28:14 22   Mr. Toberoff and I kept another original.
11:28:18 23       Q.  You signed two copies?
11:28:20 24       A.  Yes.
11:28:21 25       Q.  And you put the other original in your lock
```

ROUGH DRAFT

```
11:28:25  1   box?
11:28:25  2        A.  Yes.
11:28:26  3        Q.  Did you ever get back from Mr. Toberoff a
11:28:29  4   version that had more signatures on it?
11:28:30  5        A.  Well, yes, the version in the lock box
11:28:35  6   would have all the original signatures.
11:28:48  7        Q.  Why did you review -- why did you pick the
11:28:51  8   2008 concent agreement to review?
11:28:53  9        A.  Well, before I came I -- I brought out my
11:28:59 10   folder and it says legal Shuster case and I flipped
11:29:07 11   through documents, just looked at them and said what
11:29:09 12   do I want to bring, what don't I want to bring
11:29:12 13   and -- and that's all.  It was just a cursory review
11:29:15 14   of what I had in there and I left most of it at home
11:29:19 15   so it was just a cursory review of what I had.
11:29:23 16        Q.  What did you bring with you?
11:29:25 17        A.  I brought a copy of the legal retainer as
11:29:28 18   of 2001 and I brought a -- a copy of the first page
11:29:41 19   of the consent agreement with a cover letter that
11:29:47 20   was a communication between Mr. Toberoff and another
11:29:49 21   attorney so it was just like the first page of it,
11:29:54 22   just to jog my memory.  And --
11:29:56 23        Q.  Who was the other attorney?
11:29:57 24        A.  It was -- can I say that?  Just -- it was a
11:30:04 25   communication.  I don't know if that's privileged.
```

51

ROUGH DRAFT

```
11:30:07  1              MR. TOBEROFF:  Well --
11:30:07  2              THE WITNESS:  Just.
11:30:08  3              MR. TOBEROFF:  I -- I think you can -- I
11:30:12  4     think you can give the name of the attorney.
11:30:15  5              THE WITNESS:  It was Bergman.
11:30:15  6     BY MR. PETROCELLI:
11:30:17  7         Q.  Michael Bergman?
11:30:19  8         A.  Yes.
11:30:19  9              MR. TOBEROFF:  That's not privileged.
11:30:20 10              THE WITNESS:  No, okay.  Okay.  Yeah.
11:30:20 11     BY MR. PETROCELLI:
11:30:24 12         Q.  When did you arrive in Los Angeles for this
11:30:26 13     deposition?
11:30:27 14         A.  Oh, it was -- it was a Monday afternoon,
11:30:33 15     Monday.
11:30:34 16         Q.  Of this week?
11:30:35 17         A.  Yes, of this week.
11:30:37 18         Q.  And have you had meetings with Mr. Toberoff
11:30:42 19     to get ready for this deposition?
11:30:43 20         A.  Yes.  We talked.
11:30:48 21         Q.  Who attended the meetings?
11:30:49 22         A.  Just Mr. Toberoff.
11:30:52 23         Q.  How long did you meet in total since you
11:30:56 24     arrived Monday afternoon?
11:30:57 25         A.  Yeah, a couple hours.
```

52

ROUGH DRAFT

```
11:31:03  1     Q.  When?  Monday?
11:31:05  2     A.  No, primarily yesterday.
11:31:10  3     Q.  At Mr. Toberoff's office?
11:31:11  4     A.  No, in my hotel.
11:31:13  5     Q.  Where is your hotel?
11:31:14  6     A.  Hyatt.
11:31:17  7     Q.  Right here in Century City?
11:31:19  8     A.  Yes.
11:31:20  9     Q.  The Hyatt century plaza?
11:31:24 10     A.  Yes.
11:31:24 11     Q.  And were you shown any documents yesterday
11:31:32 12  when you met with Mr. Toberoff?
11:31:35 13     A.  We reviewed the prior deposition and
11:31:41 14  exhibits and the -- reviewed our agreements.
11:31:46 15     Q.  What agreements?
11:31:47 16     A.  The legal retainer and the -- the complaint
11:31:55 17  from DC and the supporting legal documents, quite --
11:32:01 18  quite a few but just -- just that stuff.
11:32:07 19     Q.  Did you also show Mr. Toberoff the consent
11:32:11 20  agreement pages that you had taken with you?
11:32:14 21     A.  Yes, just the -- the copy that I brought to
11:32:17 22  jog my memory.
11:32:19 23     Q.  Okay.
11:32:33 24         MR. TOBEROFF:  Is this a good time for a
11:32:34 25  short break, Dan to use the restroom.
```

53

ROUGH DRAFT

```
11:32:36  1            MR. PETROCELLI:  Okay.
11:32:38  2            THE VIDEOGRAPHER:  Off the record.  The
11:32:40  3     time is 11:31.
11:32:45  4            (Brief recess.)
11:42:27  5            THE VIDEOGRAPHER:  Back on the record at
11:42:38  6     11:41.
11:42:38  7     BY MR. PETROCELLI:
11:42:41  8        Q.  Mr. Peary, did you travel here alone?
11:42:44  9        A.  Yes.
11:42:50 10        Q.  Besides the -- some of the pages from the
11:42:53 11     2008 concent agreement and I think you said the your
11:43:02 12     legal retention agreement as well?
11:43:02 13        A.  Yes.
11:43:04 14        Q.  Did you bring any other documents with you
11:43:07 15     when you took your trip here?
11:43:08 16        A.  No.
11:43:10 17        Q.  Just those two documents?
11:43:11 18        A.  Yes.
11:43:14 19        Q.  Did you take the complaint?
11:43:15 20        A.  No.
11:43:22 21        Q.  Other than the 2008 consent agreement, have
11:43:28 22     you signed any other papers that any member of the
11:43:34 23     Siegel family also has signed?
11:43:37 24        A.  No.
11:43:39 25        Q.  Is that the only one?
```

54

ROUGH DRAFT

| | | |
|---|---|---|
| 11:43:39 | 1 | A. Yes. |
| 11:43:48 | 2 | Q. Have you spoken to any member of the Siegel |
| 11:43:51 | 3 | family since this lawsuit was filed back in May of |
| 11:43:56 | 4 | 2010? |
| 11:44:07 | 5 | A. 2010. Yes. |
| 11:44:11 | 6 | Q. With whom? |
| 11:44:14 | 7 | A. With -- with Joanne before she died. And |
| 11:44:18 | 8 | once with Laura. |
| 11:44:23 | 9 | Q. Did you attend funeral services for Joanne? |
| 11:44:26 | 10 | A. No. |
| 11:44:29 | 11 | Q. Any member of your family attend? |
| 11:44:31 | 12 | A. No. |
| 11:44:34 | 13 | Q. Did you speak to Laura before or after |
| 11:44:36 | 14 | JoAnne's passing? |
| 11:44:40 | 15 | A. After. |
| 11:44:43 | 16 | Q. Addressing first your -- was it a phone |
| 11:44:46 | 17 | call with Joanne before she passed? |
| 11:44:48 | 18 | A. Yes. |
| 11:44:49 | 19 | Q. What was the -- what did you talk about? |
| 11:44:52 | 20 | A. The phone call after she passed. |
| 11:44:54 | 21 | Q. The one with Joanne before she died? |
| 11:44:56 | 22 | A. Oh, Joanne. |
| 11:44:57 | 23 | Q. That was a phone call? |
| 11:44:58 | 24 | A. Yes. |
| 11:45:03 | 25 | Q. What did the two of you talk about? |

55

ROUGH DRAFT

```
11:45:04  1       A.  It was more or less friendly chitchat.  We
11:45:11  2   did not discuss any legal issues.
11:45:13  3       Q.  You called her?
11:45:14  4       A.  She called me.  And she speaks with Jean as
11:45:18  5   well, of course.
11:45:19  6       Q.  Did she speak with Jean?
11:45:20  7       A.  Yes.
11:45:26  8       Q.  So the purpose of the call as far as you
11:45:28  9   know, was pure pleasantries?
11:45:30 10       A.  Yes.
11:45:33 11       Q.  Nothing at all discussed about legal
11:45:35 12   issues?
11:45:35 13       A.  No.  I didn't discuss any legal issues.
11:45:39 14       Q.  Did your mother?
11:45:40 15       A.  I'm not aware she did.
11:45:43 16       Q.  Was it just the two of you on the phone?
11:45:46 17       A.  Yes.
11:45:46 18       Q.  Joanne and you?
11:45:47 19       A.  Yes.
11:45:48 20       Q.  Did you then pass the phone to your mom?
11:45:49 21       A.  Yes.
11:45:54 22       Q.  And that's the only time you've spoken to
11:45:57 23   Joanne prior to her death for a long period of time?
11:46:01 24       A.  I may have spoken with her just a couple
11:46:07 25   times in the recent past.
```

ROUGH DRAFT

| | | |
|---|---|---|
| 11:46:10 | 1 | Q. About what? |
| 11:46:11 | 2 | A. It's -- she usually calls when she was |
| 11:46:14 | 3 | alive she usually calls to speak with Jean and I |
| 11:46:19 | 4 | kind of talk to her like a grandson would talk to a |
| 11:46:22 | 5 | grandmother kind of -- her faculties weren't, I |
| 11:46:28 | 6 | don't think, the way old people are, you have to be |
| 11:46:33 | 7 | kind of slow and friendly, so it's friendly, kind of |
| 11:46:36 | 8 | grandson top grandmother type talk basically. How |
| 11:46:41 | 9 | are you, what are you doing, you know, and what -- |
| 11:46:44 | 10 | what's going on, what are your -- pleasantries. No |
| 11:46:50 | 11 | legal. |
| 11:46:51 | 12 | Q. Were you very close to her? |
| 11:46:53 | 13 | A. I was -- I knew her. I wouldn't say close, |
| 11:46:59 | 14 | but I did know her. |
| 11:47:01 | 15 | Q. When was the last time you saw her before |
| 11:47:04 | 16 | she passed? |
| 11:47:04 | 17 | A. That would have been in 2008. |
| 11:47:16 | 18 | Q. What was the occasion? |
| 11:47:17 | 19 | A. Oh,. It was -- there was a summer of |
| 11:47:22 | 20 | Superman event in Cleveland. |
| 11:47:28 | 21 | Q. Did you attend a mediation in April 2010 |
| 11:47:36 | 22 | where she was also present? |
| 11:47:37 | 23 | A. Yes. |
| 11:47:41 | 24 | Q. So you saw her then too? |
| 11:47:42 | 25 | A. Yes. |

57

ROUGH DRAFT

| Time | Line | |
|---|---|---|
| 11:47:44 | 1 | Q. Did you spend any time with her before or |
| 11:47:48 | 2 | after the mediation session? |
| 11:47:53 | 3 | A. No. |
| 11:47:54 | 4 | Q. Was that mediation session in April 2010 |
| 11:47:56 | 5 | the last time you saw her? |
| 11:48:00 | 6 | A. In person, yes. |
| 11:48:02 | 7 | Q. You said you spoke with her daughter Laura? |
| 11:48:05 | 8 | A. Yes. |
| 11:48:07 | 9 | Q. When was that? |
| 11:48:09 | 10 | A. After see died. |
| 11:48:11 | 11 | Q. What was the purpose of that? Phone call? |
| 11:48:14 | 12 | A. Yes. |
| 11:48:16 | 13 | Q. To give your condolences? |
| 11:48:17 | 14 | A. Yes. |
| 11:48:18 | 15 | Q. And have you spoken to Laura since then? |
| 11:48:25 | 16 | A. No. |
| 11:48:28 | 17 | Q. You identified the document that the |
| 11:48:30 | 18 | Siegels and you signed as a consent agreement. |
| 11:48:34 | 19 | Is the word -- is that the title of the |
| 11:48:37 | 20 | document? |
| 11:48:43 | 21 | A. I believe the title, if I'm allowed to say |
| 11:48:45 | 22 | that. |
| 11:48:46 | 23 | MR. TOBEROFF: Objection. Actually you |
| 11:48:51 | 24 | can -- you can testify as to the title but that's |
| 11:48:54 | 25 | it. Not to any contents of the document. |

58

ROUGH DRAFT

```
11:48:57  1                THE WITNESS:  I recall the title says
11:48:59  2      Superman agreement.
11:48:59  3      BY MR. PETROCELLI:
11:49:03  4          Q.  Why did you use the word "consent
11:49:06  5      agreement"?
11:49:08  6          A.  It's.
11:49:11  7                MR. TOBEROFF:  You can only answer that if
11:49:11  8      that answer is not based on communication with your
11:49:14  9      attorney.
11:49:15 10                THE WITNESS:  It's -- it's -- it's all
11:49:17 11      based on my communication with my attorney.
11:49:17 12      BY MR. PETROCELLI:
11:49:23 13          Q.  What's --
11:49:23 14          A.  The term.
11:49:25 15          Q.  The use of the term?
11:49:26 16          A.  The use of the term, yes.
11:49:30 17                (Instruction not to answer.)
11:49:30 18      BY MR. PETROCELLI:
11:49:42 19          Q.  When you signed the 2008 consent agreement,
11:49:50 20      did you -- what did you understand the purpose of
11:49:51 21      this agreement to be?  Why were you signing it?
11:49:57 22                MR. TOBEROFF:  You can only answer that --
11:49:58 23      actually, I instruct you not to answer because the
11:50:01 24      sole -- your sole understanding is through
11:50:03 25      communications with me.
```

59

ROUGH DRAFT

```
11:50:04  1              (Instruction not to answer.)
11:50:04  2       BY MR. PETROCELLI:
11:50:05  3          Q.  You read the document before you signed it,
11:50:05  4       didn't you?
11:50:09  5          A.  Yes, but I'll have to follow my attorney's
11:50:11  6       advice.
11:50:12  7          Q.  Well, based on your reading of the
11:50:14  8       document, what did you understand the purpose of
11:50:16  9       your signing it to be?
11:50:18 10              MR. TOBEROFF:  I instruct you not to answer
11:50:19 11       if you -- put it this way.  You can only answer the
11:50:23 12       question if you have an understanding independent of
11:50:24 13       your conversations with me.
11:50:28 14              THE WITNESS:  Well, all my understanding is
11:50:30 15       based on my communication with my attorneys so I
11:50:32 16       can't say anything.
11:50:33 17              (Instruction not to answer.)
11:50:33 18       BY MR. PETROCELLI:
11:50:34 19          Q.  Are you saying that when -- when you read
11:50:36 20       the document, you derived absolutely no
11:50:39 21       understanding from reading the words?
11:50:41 22          A.  My understanding is intricately bound with
11:50:43 23       my communications with Marc Toberoff.
11:50:46 24          Q.  Can you answer my question?
11:50:47 25          A.  I don't believe I can.
```

60

EXHIBIT B
103

ROUGH DRAFT

```
11:50:49  1            MR. TOBEROFF:  He did.
11:50:49  2       BY MR. PETROCELLI:
11:50:52  3            Q.  It wasn't responsive to my question.  My
11:50:54  4       question was when you read the document are you
11:50:57  5       saying that you drew no understanding at all from
11:51:00  6       reading the words on the page of the document?
11:51:07  7            MR. TOBEROFF:  It's -- it's all based upon
11:51:10  8       my understanding is intricately bound to my
11:51:14  9       communications with my attorney.
11:51:14 10       BY MR. PETROCELLI:
11:51:19 11            Q.  Are you saying that had you not spoken to
11:51:20 12       your attorney you would have had no idea what --
11:51:26 13       what you were signing?
11:51:28 14            A.  What if I had no idea?
11:51:30 15            Q.  Right.  You signed a -- a document together
11:51:34 16       with other individuals.  Are you saying that you did
11:51:38 17       not understand what you were signing except for what
11:51:41 18       Marc Toberoff had to tell you?
11:51:42 19            MR. TOBEROFF:  Asked and answered.
11:51:43 20       Misstates his testimony.
11:51:47 21            THE WITNESS:  My understanding is -- is
11:51:52 22       bound up what whatever I have is bound up.
11:51:52 23       BY MR. PETROCELLI:
11:51:56 24            Q.  I appreciate you keep repeating that phrase
11:52:00 25       your understanding is bound up or intricately bound
```

61

**EXHIBIT B**
**104**

ROUGH DRAFT

```
11:52:03  1    up.  I'm asking you something different than that.
11:52:05  2    I'm not required to simply accept that phrase?
11:52:07  3         A.  Uh-huh.
11:52:08  4         Q.  Did you understand that you were entering
11:52:12  5    into a contract, an agreement, with the Siegels when
11:52:17  6    you signed the document?
11:52:23  7         A.  Yes.
11:52:24  8         Q.  Did you understand that the agreement that
11:52:25  9    you were entering into required that you could not
11:52:32 10    settle any claim with DC Comics without the consent
11:52:38 11    of the Siegels?
11:52:39 12             MR. TOBEROFF:  I instruct you not to
11:52:41 13    answer.  The document has been hailed to be
11:52:44 14    privileged and off limits and they can't ask you
11:52:47 15    questions about the contents of the document.
11:52:48 16    Instructs you not to answer.
11:52:50 17             (Instruction not to answer.)
11:52:50 18             MR. PETROCELLI:  I don't agree with that as
11:52:53 19    you well know.
11:52:54 20         Q.  Is there any arrangement whereby you would
11:52:57 21    have the authority to approve any kind of settlement
11:52:59 22    that Joanne Siegel might enter into with DC comics?
11:53:03 23             MR. TOBEROFF:  Instruct you not to answer.
11:53:07 24             (Instruction not to answer.)
11:53:07 25             MR. PETROCELLI:  Mark you allowed that
```

62

ROUGH DRAFT

```
11:53:09  1    verbatim question to be answered at the first -- at
11:53:12  2    the Siegel session of his deposition.
11:53:13  3         MR. TOBEROFF:  I'm instructing him not to
11:53:15  4    answer and as you suggested we shouldn't debate
11:53:17  5    these things in the deposition.
11:53:21  6         MR. PETROCELLI:  So is it possible to
11:53:23  7    answer.
11:53:23  8         MR. TOBEROFF:  I'm going to instruct him --
11:53:25  9    just to shorten this, I will instruct him not to
11:53:28 10    answer any questions regarding the substance of the
11:53:30 11    consent agreement.
11:53:30 12    BY MR. PETROCELLI:
11:53:33 13         Q.  So is it possible for Joanne Siegel and
11:53:36 14    Laura Siegel Larson to settle their case with DC
11:53:40 15    Comics and you would have no say so in that.
11:53:41 16         Is that accurate?
11:53:42 17         MR. TOBEROFF:  I instruct you not to answer
11:53:48 18    on the basis of attorney-client privilege.
11:53:48 19    BY MR. PETROCELLI:
11:53:50 20         Q.  And if they were to settle and receive
11:53:52 21    money from DC Comics, is there any arrangement by
11:53:55 22    which you would receive any of that money?
11:53:57 23         MR. TOBEROFF:  Same instruction.
11:53:57 24         (Instruction not to answer.)
11:53:57 25    BY MR. PETROCELLI:
```

63

ROUGH DRAFT

```
11:54:06  1        Q.  Are you able right now on behalf of the Joe
11:54:09  2   Shuster estate to enter into an agreement with DC
11:54:13  3   regarding the Shuster termination interests without
11:54:17  4   the consent of any -- anyone else?
11:54:22  5             MR. TOBEROFF:  Same instruction.
11:54:24  6   Attorney-client privilege.
11:54:25  7             (Instruction not to answer.)
11:54:26  8             THE WITNESS:  I'll have to follow my
11:54:27  9   attorney's advice.
11:54:27 10   BY MR. PETROCELLI:
11:54:32 11        Q.  Do you have a current agreement to share
11:54:36 12   with any member of the Siegel family in any
11:54:39 13   settlement or other recoveries having to do with the
11:54:43 14   Superman termination interests?
11:54:47 15             MR. TOBEROFF:  I instruct you not to answer
11:54:48 16   based on privilege.
11:54:49 17             (Instruction not to answer.)
11:54:57 18             MR. PETROCELLI:  When you say "based on
11:54:59 19   privilege, to be clear, what privilege, Mr. -- are
11:55:02 20   you talking about the attorney-client privilege.
11:55:04 21             MR. TOBEROFF:  Attorney-client privilege,
11:55:05 22   work product, the privilege that was upheld by
11:55:10 23   magistrate shuriskey SP, Judge Larson in your motion
11:55:14 24   that was denied as to obtaining the consent
11:55:16 25   agreement.  If you can't obtain the consent
```

64

ROUGH DRAFT

```
11:55:19  1    agreement because you're not entitled to view the
11:55:21  2    substance of the consent agreement you're not
11:55:24  3    entitled to get at that substance through
11:55:27  4    questioning my client.
11:55:28  5           MR. PETROCELLI:  We -- we disagree.
11:55:33  6           MR. TOBEROFF:  That's fine.
11:55:33  7    BY MR. PETROCELLI:
11:55:34  8        Q.  Is the consent agreement that you signed in
11:55:36  9    2008 still in effect?
11:55:39 10        A.  Yes.
11:55:48 11        Q.  Have you had any discussions with any
11:55:50 12    member of the Siegel family about it at any time
11:55:55 13    both before or after signing it?
11:55:59 14        A.  Not directly.
11:56:00 15        Q.  What does that mean?
11:56:01 16        A.  All my discussions is through my attorney.
11:56:04 17        Q.  How do you have a discussion with the
11:56:08 18    Siegels through the attorney?
11:56:09 19        A.  Then the answer is no.
11:56:11 20        Q.  What did you mean when you said not
11:56:13 21    directly, through your attorney?
11:56:14 22        A.  All my communication about the agreement
11:56:17 23    is -- is through my discussions with my attorney and
11:56:22 24    what he has told me the Siegels have communicated.
11:56:27 25    That's what I mean.
```

65

ROUGH DRAFT

```
11:56:28  1         Q.  Have you ever had a -- a discussion with
11:56:43  2    your mom about the consent agreement?
11:56:56  3         A.  She -- she -- I may have -- she has a --
11:57:04  4    little interest in this.  Her faculties as I said,
11:57:08  5    are -- are poor and I don't recall if I've mentioned
11:57:14  6    it to her or not because it's a detail.
11:57:19  7         Q.  Back in 2008 she was of sound mind,
11:57:19  8    correct?
11:57:25  9         A.  That's when she had her stroke.
11:57:27 10         Q.  Before or after the consent agreement?
11:57:29 11         A.  I don't -- I don't recall.  I don't -- I
11:57:38 12    don't know if I've ever discussed it with her or
11:57:41 13    not.  I mean she's not -- she's not that interested
11:57:46 14    in legal matters.  I know that she -- she -- she
11:57:53 15    knows about it.  I don't know if she understands it.
11:58:00 16         Q.  How do you know she knows about it?
11:58:01 17         A.  I -- I -- she would have been aware of it.
11:58:05 18         Q.  How do you know that?
11:58:05 19         A.  Well, I -- as far as I know, she -- as far
11:58:10 20    as -- as far as I can remember, I probably have said
11:58:14 21    something.  That's all I can say.  I mean that's --
11:58:17 22         Q.  What did you say to her?
11:58:20 23         A.  I -- if I had said anything, it would just
11:58:23 24    have been that there's -- I don't remember what I
11:58:29 25    said to her frankly.  I mean I don't know what to
```

66

ROUGH DRAFT

11:58:31 say because I don't -- I don't remember my words.
11:58:33 She doesn't really.
11:58:34 MR. TOBEROFF: Don't speculate.
11:58:35 THE WITNESS: Right. I -- I -- it would be
11:58:37 speculating. I don't remember.
11:58:43 MR. PETROCELLI: Don't interrupt the
11:58:44 witness, please.
11:58:49 Q. Have you -- do you think the consent
11:58:55 agreement was an important document at the time that
11:58:58 you signed it?
11:58:59 A. Yes.
11:59:01 Q. Did you think your mother had a right to
11:59:02 know what it meant?
11:59:08 A. Did she have a right to know?
11:59:11 Q. Yeah. Do you think she was entitled to
11:59:12 know what -- what document you were signing that was
11:59:16 important?
11:59:19 A. She -- she's not directly involved in this
11:59:23 case so I don't know how to answer that. She -- she
11:59:29 doesn't -- there's not a legal right.
11:59:36 Q. I didn't mean a legal right.
11:59:36 A. Yeah.
11:59:38 Q. I mean do you think she would want to know
11:59:39 that kind of information?
11:59:40 A. Would she want to know, yeah. Well