# EXHIBIT B

# Part 5 of 9

ROUGH DRAFT

| | | |
|---|---|---|
| 11:59:47 | 1 | that's -- |
| 11:59:47 | 2 | MR. TOBEROFF:  Calls for speculation. |
| 11:59:48 | 3 | BY MR. PETROCELLI: |
| 11:59:48 | 4 | Q.  Did you explain to her what it meant? |
| 11:59:51 | 5 | MR. TOBEROFF:  Asked and answered. |
| 11:59:52 | 6 | THE WITNESS:  Just -- just what I said |
| 11:59:54 | 7 | before.  I can't remember exactly what I said. |
| 11:59:54 | 8 | BY MR. PETROCELLI: |
| 11:59:58 | 9 | Q.  What's your best recollection of what you |
| 11:59:59 | 10 | told her? |
| 12:00:00 | 11 | A.  That -- that that is some agreement that we |
| 12:00:10 | 12 | are making with the Siegels.  That would have been |
| 12:00:12 | 13 | about the extent of it. |
| 12:00:14 | 14 | Q.  Well, you explained to her that the |
| 12:00:17 | 15 | agreement had to do with Superman, right? |
| 12:00:17 | 16 | A.  Yes. |
| 12:00:20 | 17 | Q.  And you explained to her that it had to do |
| 12:00:22 | 18 | with settling your case, right? |
| 12:00:29 | 19 | A.  I suppose.  That's about it.  I wouldn't |
| 12:00:33 | 20 | have said any more. |
| 12:00:46 | 21 | Q.  Who -- whose the beneficiary of any money |
| 12:00:51 | 22 | that comes in as a result of the Superman |
| 12:00:53 | 23 | termination interest that Joe Shuster has asserted? |
| 12:01:00 | 24 | Who gets the money? |
| 12:01:01 | 25 | A.  We plan on any proceeds would go into a |

68

**EXHIBIT B**
**111**

ROUGH DRAFT

12:01:06  1    trust.

12:01:08  2        Q.  Well, your mother is the beneficiary,

12:01:08  3    correct?

12:01:13  4        A.  According to the will.  She -- she's

12:01:20  5    expressed that she wants me and my sister to -- to

12:01:25  6    have -- to have anything through a trust.

12:01:29  7        Q.  Under Joe Schuster's will, she's the sole

12:01:32  8    beneficiary, correct?

12:01:33  9        A.  Yes.

12:01:35 10        Q.  Okay.  And are you saying that your mother

12:01:39 11    has in turn created a testamentary documents that

12:01:46 12    pass the interest to you and your sister?

12:01:47 13        A.  She -- she has expressed that she wants any

12:01:52 14    proceeds to go into a trust for me and my sister.

12:01:56 15        Q.  Does such a trust exist?

12:01:58 16        A.  Not yet.

12:02:00 17        Q.  Does your mother have a will?

12:02:02 18        A.  Yes.

12:02:03 19        Q.  Have you ever seen it?

12:02:04 20        A.  Yes.

12:02:07 21        Q.  Does it name you as the executor?

12:02:10 22        A.  I believe.

12:02:16 23        Q.  Does it distribute her estate equally

12:02:20 24    between you and your sister Dawn?

12:02:25 25        A.  I believe.

69

**EXHIBIT B**
**112**

ROUGH DRAFT

12:02:27 1        Q.  Does it distribute the estate directly to

12:02:32 2    Dawn and you or to trusts of which Dawn and you are

12:02:36 3    beneficiaries?

12:02:37 4        A.  It doesn't -- it doesn't state trust in the

12:02:43 5    will but that's -- that's her intention.

12:02:46 6        Q.  How do you know that's her intention?

12:02:50 7        A.  We've talked about it.

12:02:52 8        Q.  When did she tell you that she want to

12:02:55 9    create trusts for you to receive her testamentary

12:02:58 10   disposition?

12:02:59 11       A.  Well, let me see, she wants -- she wants us

12:03:06 12   to -- to be provided for and secure and she's 90

12:03:13 13   years old and she's had a stroke so she knows she's

12:03:16 14   not going to be around forever and she doesn't

12:03:18 15   really have any need for -- for money.  So we've

12:03:25 16   discussed it for -- well, we've probably -- we've

12:03:30 17   properly discussed it for a few years.

12:03:33 18       Q.  In the last few years?

12:03:34 19       A.  Yes.

12:03:35 20       Q.  And when you've discussed it, given the

12:03:37 21   comments you've made about your mom's mental state,

12:03:41 22   do you believe that she understood what she was

12:03:43 23   talking about?

12:03:44 24            MR. TOBEROFF:  Assumes facts.

12:03:48 25            THE WITNESS:  Yes she understands.

70

**EXHIBIT B**
**113**

ROUGH DRAFT

12:03:48  1    BY MR. PETROCELLI:

12:03:49  2        Q.  In talking about things like trusts and

12:03:51  3    such, she's competent to discuss those topics, in

12:03:51  4    your view?

12:03:55  5        A.  She understands the --

12:03:56  6            MR. TOBEROFF:  Excuse me.  You have to

12:03:57  7    leave time for me to object after asks the question.

12:04:01  8    You got to pause after he asks the question so I

12:04:03  9    have time to object.

12:04:06  10            The question assumes facts.

12:04:06  11   BY MR. PETROCELLI:

12:04:10  12        Q.  You can answer.

12:04:11  13        A.  Okay.

12:04:13  14        Q.  Want me to repeat the question?

12:04:14  15        A.  Yes.

12:04:16  16        Q.  Yeah.  When you have been talking with her

12:04:17  17   about -- in the last couple of years regarding such

12:04:20  18   issues as trusts for your benefit and Dawn's

12:04:24  19   benefit, do you believe that she was competent to

12:04:27  20   talk about and understand those ideas?

12:04:31  21            MR. TOBEROFF:  Misstates testimony.

12:04:33  22            THE WITNESS:  I -- I believe she

12:04:38  23   understands the idea.  I know what her intentions

12:04:41  24   are.  She's expressed them to me.

12:04:41  25   BY MR. PETROCELLI:

71

**EXHIBIT B**
**114**

ROUGH DRAFT

12:04:43 1        Q.  Verbally?

12:04:44 2        A.  Yes.

12:04:45 3        Q.  What has she said to you?

12:04:46 4        A.  She wants us to be provided for.  To be

12:04:49 5    secure.

12:04:52 6        Q.  You already are provided for her in her

12:04:54 7    will, right?

12:04:57 8        A.  I'm in her -- her will.

12:04:58 9        Q.  Right?

12:04:59 10       A.  Yes.

12:05:00 11       Q.  Why -- why the specific -- in other words,

12:05:03 12   did she discuss with you that she wants you to

12:05:05 13   receive the inheritance together with Dawn through a

12:05:07 14   trust?

12:05:10 15       A.  That's -- that's what we have discussed.

12:05:12 16       Q.  Who is the "we"?

12:05:14 17       A.  Me and my mother.

12:05:15 18       Q.  Has Dawn been part of the discussion?

12:05:17 19       A.  I -- I don't know specifically about

12:05:22 20   trusts.  But she knows she's a part of this.

12:05:25 21       Q.  Is there any particular discussion that

12:05:28 22   you've had about trusts as to why it would be a

12:05:31 23   trust rather than just a bequest under a will?

12:05:34 24       A.  As to like in financial planning terms,

12:05:38 25   that kind of thing?

72

**EXHIBIT B**
**115**

ROUGH DRAFT

12:05:38  1        Q.  Yes.

12:05:40  2        A.  It's -- the idea is it's a sensible means

12:05:46  3    of per -- preserving assets so that they're not

12:05:51  4    wasted and squandered so it's a long-term thing.

12:05:57  5    And not wasted away.

12:06:00  6        Q.  Wasted by you and Dawn?

12:06:01  7        A.  Yes.

12:06:04  8        Q.  Is your mom expressed reservations that you

12:06:07  9    or Dawn might waste the money absent a trust?

12:06:11 10        A.  No.  That's -- that is a -- the purpose of

12:06:14 11    a trust, to preserve assets.

12:06:17 12        Q.  Do you have an estate or trust lawyer?

12:06:19 13        A.  Yes.

12:06:23 14        Q.  Who is it?

12:06:27 15        A.  The -- there's an attorney that established

12:06:29 16    the Shuster estate.

12:06:32 17        Q.  Here in Los Angeles, the probate attorney?

12:06:35 18        A.  I believe so.

12:06:37 19        Q.  And have you consulted him regarding estate

12:06:40 20    planning in recent years?

12:06:42 21        A.  No.  Not on that issue, no.

12:06:45 22        Q.  Not on the issue of the trust?

12:06:46 23        A.  That's correct.

12:06:48 24        Q.  Have you in discussions with your mother

12:06:51 25    about the will, the trust and the financial

73

**EXHIBIT B**
**116**

ROUGH DRAFT

12:06:53  1    planning, have ever discussed how much money might

12:06:58  2    be received one day for your benefit and Dawn's

12:07:02  3    benefit?

12:07:03  4        A.  No.  We haven't got into that.

12:07:10  5        Q.  For example, have you said, you know, it

12:07:12  6    would be in approximately 5 million or 10 million or

12:07:16  7    100 million or any numbers, discuss in your

12:07:22  8    conversations with your mother?

12:07:23  9        A.  I don't recall getting into figures with

12:07:29  10   her.  We just -- no, I don't.

12:07:34  11       Q.  Have you ever had anybody try to do an

12:07:38  12   estimate for you as to how much you might recover

12:07:40  13   one day as a result of Joe Schuster's asserted

12:07:44  14   termination interests?

12:07:48  15       A.  I -- I know.

12:07:49  16           MR. TOBEROFF:  You -- you could answer that

12:07:51  17   question solely if it's outside of the

12:07:57  18   attorney-client relationship.

12:08:00  19           THE WITNESS:  All I know is that my

12:08:04  20   attorney, Marc Toberoff, has.

12:08:06  21           MR. TOBEROFF:  Don't -- don't discuss what

12:08:07  22   your attorney has done.

12:08:08  23           THE WITNESS:  Okay.  Okay.

12:08:09  24           MR. TOBEROFF:  The --

12:08:10  25           THE WITNESS:  I don't have any -- no, I

74

**EXHIBIT B**
**117**

ROUGH DRAFT

12:08:12  1    don't have any idea of economic value outside of my

12:08:16  2    discussions, no.

12:08:16  3    BY MR. PETROCELLI:

12:08:17  4        Q.  Have you ever met or spoken or communicated

12:08:20  5    with anybody who you understood to be estimating the

12:08:26  6    value of the termination interest?

12:08:27  7        A.  No.

12:08:29  8        Q.  Have you ever provided any information to

12:08:31  9    any such person?

12:08:31 10        A.  No.

12:08:38 11        Q.  Did you tell your mother in your

12:08:42 12    conversations over the years and in particular about

12:08:46 13    the consent agreement that any agreement with DC or

12:08:54 14    settlement with DC requires the consent of the

12:08:56 15    Siegels?

12:09:05 16        MR. TOBEROFF:  Am I allowed to answer that?

12:09:07 17    Is that --

12:09:07 18    BY MR. PETROCELLI:

12:09:09 19        Q.  You are.

12:09:09 20        MR. TOBEROFF:  Actually, I'll let you

12:09:27 21    answer that question without waiver of any privilege

12:09:31 22    that could apply.

12:09:31 23        THE WITNESS:  Okay.  So the question being

12:09:34 24    she --

12:09:50 25        MR. PETROCELLI:  Can you repeat the

75

**EXHIBIT B**
**118**

ROUGH DRAFT

12:09:51 1    question.

12:09:51 2              (The reporter read the record

12:09:51 3         as follows:

12:09:52 4              "^ QUESTION ^ ANSWER " ).

12:09:52 5         THE WITNESS:  Yes.

12:09:52 6    BY MR. PETROCELLI:

12:09:54 7         Q.  What did you say in that regard?

12:09:59 8         A.  Pretty much what -- what you said there.

12:10:04 9         Q.  Did you discuss with her what would happen

12:10:12 10   if, for example, you wanted to do a settlement or an

12:10:16 11   agreement with DC but the Siegels did not, how you

12:10:19 12   would deal with that circumstance?

12:10:27 13        A.  I don't recall going into that detail of

12:10:30 14   what ifs.

12:10:32 15        Q.  Did your mom ask you, well, what if we

12:10:35 16   can't agree with the Siegels?  I mean what happens

12:10:37 17   then?  Did she put that --

12:10:40 18        A.  No.

12:10:41 19        Q.  -- question to you in so many words?

12:10:42 20        A.  No.

12:10:46 21        Q.  Do you -- did -- if she had put that

12:10:48 22   question to you, could you have answered it?

12:10:53 23        MR. TOBEROFF:  Again, don't testify based

12:10:56 24   on knowledge and communications you received --

12:11:00 25   don't testify based on knowledge you received

76

**EXHIBIT B**
**119**

ROUGH DRAFT

12:11:02  1    through your communications with your attorney.

12:11:07  2            THE WITNESS:  I -- all I can.

12:11:08  3            MR. TOBEROFF:  And I also, when he asks you

12:11:11  4    about conversations, if you understand the substance

12:11:14  5    of the conversation you can give him that substance.

12:11:17  6    If you understand the exact words you used, you can

12:11:19  7    give him the exact words but if you don't remember

12:11:21  8    the exact words you used, don't make up the words to

12:11:25  9    fill in the blanks.  That would be speculating.

12:11:27 10            THE WITNESS:  Uh-huh.  The question again

12:11:33 11    being.

12:11:33 12    BY MR. PETROCELLI:

12:11:33 13        Q.  Did you have an understanding in

12:11:38 14    discussions with your mom about the consent

12:11:40 15    agreement what would happen if the Siegels and you

12:11:43 16    could not agree?

12:11:45 17            MR. TOBEROFF:  Asked and answered.

12:11:49 18            THE WITNESS:  I didn't discuss that with

12:11:51 19    her.

12:11:51 20    BY MR. PETROCELLI:

12:11:52 21        Q.  Did you have an awareness in your own mind

12:11:57 22    of what would happen?

12:11:59 23        A.  I'm aware.

12:11:59 24        Q.  Had she asked you the question, could you

12:12:01 25    have answered it?

77

**EXHIBIT B**
**120**

ROUGH DRAFT

12:12:02  1          A.  Oh,.

12:12:02  2              MR. TOBEROFF:  You can only answer the next

12:12:04  3      question to the extent you have an understanding

12:12:06  4      that's separate and apart from your communications

12:12:09  5      with me.

12:12:10  6              THE WITNESS:  Just -- okay.

12:12:14  7              It's just we -- I thought the agreement was

12:12:17  8      good.  It was mutually beneficial.  That's -- that's

12:12:24  9      all I can say.

12:12:24  10     BY MR. PETROCELLI:

12:12:25  11         Q.  Why did you think it was good and mutually

12:12:28  12     beneficial?

12:12:28  13             MR. TOBEROFF:  I instruct you not to

12:12:29  14     answer.

12:12:30  15             (Instruction not to answer.)

12:12:32  16             THE WITNESS:  I follow --

12:12:34  17             MR. TOBEROFF:  I instruct you not to

12:12:35  18     answer.

12:12:35  19             THE WITNESS:  I follow my attorney's

12:12:36  20     advice.

12:12:36  21     BY MR. PETROCELLI:

12:12:47  22         Q.  Can I get an answer to my prior question,

12:12:50  23     which was, did you have an awareness of what would

12:12:52  24     happen in the event the Siegels and the Schusters

12:12:55  25     could not agree on -- on an agreement with DC?

78

**EXHIBIT B**
**121**

ROUGH DRAFT

12:13:03  1      A.  I didn't think it was a problem.

12:13:06  2           MR. TOBEROFF:  He -- that's not his

12:13:08  3  question.

12:13:08  4           THE WITNESS:  No?

12:13:11  5           MR. TOBEROFF:  Focus on the question.

12:13:11  6           THE WITNESS:  Say it again.

12:13:12  7           MR. TOBEROFF:  It's a "yes" or "no"

12:13:15  8  question.

12:13:15  9           THE WITNESS:  Did I have -- say it again

12:13:16 10  please.

12:13:16 11  BY MR. PETROCELLI:

12:13:17 12     Q.  Did you have an understanding in your

12:13:19 13  conversations with your mom about the 2008 consent

12:13:22 14  agreement, what would happen?

12:13:25 15     A.  Oh,.

12:13:25 16     Q.  If the Siegels and you could not agree?

12:13:27 17     A.  Did I have an understanding.

12:13:28 18           MR. TOBEROFF:  In his conversations with

12:13:30 19  his mom.

12:13:30 20           MR. PETROCELLI:  Yeah.

12:13:31 21     Q.  At the time that you were -- during the

12:13:34 22  period of time when you were having these

12:13:34 23  discussions with your mom?

12:13:35 24     A.  Did have I an understanding.

12:13:36 25     Q.  Yeah.  Had she asked you, well, what did

79

**EXHIBIT B**
**122**

ROUGH DRAFT

12:13:39 1    she call you, Warren?

12:13:41 2         A.  Yes.

12:13:42 3         Q.  Okay, well, Warren, what happens if the

12:13:44 4    Siegels and we can't agree?  We want to do's deal

12:13:46 5    and the Siegels don't want to do a deal and, you

12:13:48 6    know, consent is required, how do we get out of

12:13:51 7    that?

12:13:53 8              First of all, did she ever ask you such a

12:13:55 9    thing?

12:13:56 10             MR. TOBEROFF:  Asked and answered you can

12:14:00 11   answer again.

12:14:01 12             THE WITNESS:  No.

12:14:01 13   BY MR. PETROCELLI:

12:14:02 14        Q.  Did you ever explain to her that

12:14:07 15   circumstance or walk her through that situation?

12:14:11 16             MR. TOBEROFF:  Asked and answered.

12:14:14 17             You can answer.

12:14:14 18             THE WITNESS:  I -- I don't recall getting

12:14:18 19   to that level of detail.  She didn't ask any more

12:14:22 20   about it.

12:14:22 21   BY MR. PETROCELLI:

12:14:30 22        Q.  And had she asked you, could you have

12:14:32 23   answered the question?  That's a "yes" or "no."

12:14:37 24        A.  Yes.

12:14:38 25        Q.  Okay.  What would you have said?

80

**EXHIBIT B**
**123**

ROUGH DRAFT

12:14:39  1              MR. TOBEROFF:  Instruct you not to answer.

12:14:40  2      You can't divulge the substance of the consent

12:14:42  3      agreement.

12:14:43  4              (Instruction not to answer.)

12:14:43  5      BY MR. PETROCELLI:

12:14:58  6          Q.  Do you have any current arrangement for the

12:15:05  7      consent agreement or otherwise whereby the Shuster

12:15:12  8      interests share in any proceeds or recovery

12:15:16  9      attributable to Superboy?

12:15:19  10             MR. TOBEROFF:  Okay.  On this question,

12:15:23  11     I -- I will make an exception and allow him to

12:15:27  12     answer that question provided you agree that his

12:15:30  13     answering the question is not a waiver of any

12:15:32  14     privilege regarding the consent agreement.

12:15:34  15     Otherwise I'll instruct him not to answer.

12:15:46  16             MR. PETROCELLI:  I guess I'll have to do

12:15:47  17     this on a question by question basis.  So as to this

12:15:53  18     particular question and answer, that's acceptable.

12:15:56  19             MR. TOBEROFF:  Okay.  Do you want to.

12:15:58  20             MR. PETROCELLI:  Do you want to repeat the

12:15:59  21     question.

12:16:00  22             MR. TOBEROFF:  Read back the question.

12:16:23  23             (The reporter read the record

12:16:23  24             as follows:

12:16:24  25                 "^ QUESTION ^ ANSWER ").

81

**EXHIBIT B**
**124**

ROUGH DRAFT

12:16:24  1          THE WITNESS:  No.

12:16:24  2     BY MR. PETROCELLI:

12:16:31  3          Q.  Does the consent agreement -- under the

12:16:33  4     concent agreement as you understand it, would the

12:16:39  5     Shuster interest share in any proceeds or recovery

12:16:44  6     be attributable to Superboy?

12:16:47  7          MR. TOBEROFF:  This is the same question.

12:16:49  8     Do we have the same agreement.

12:16:50  9          MR. PETROCELLI:  We do.  It's not the same

12:16:54  10    question because he limited it to the consent

12:16:54  11    agreement.

12:16:54  12         MR. PETROCELLI:  Do we have the same

12:16:58  13    agreement that I will allow him to answer but that

12:16:58  14    will not be deemed --

12:16:58  15         MR. PETROCELLI:  Yes.

12:17:00  16         MR. TOBEROFF:  A waiver of the privilege as

12:17:00  17    to any other questions or the document?

12:17:02  18         MR. PETROCELLI:  Yes.

12:17:03  19         MR. TOBEROFF:  You can answer.

12:17:03  20         THE WITNESS:  Okay.  No

12:17:03  21    BY MR. PETROCELLI:

12:17:07  22         Q.  Have the Schusters, by the Shusters I mean

12:17:13  23    you, your mom, the estates of Joe Shuster, the

12:17:17  24    Shuster interest, have the Shusters ever had any

12:17:21  25    agreement with the Siegels regarding Superboy?

82

**EXHIBIT B**
**125**

ROUGH DRAFT

12:17:28  1        A.  No.

12:17:34  2        Q.  Is it your understanding that if the

12:17:42  3   Siegels were to be paid or recover money associated

12:17:47  4   with Superboy, that it would belong solely to them

12:17:50  5   and not to the Shuster side?  Is that your

12:17:55  6   understanding?

12:17:56  7        A.  Yes.

12:18:02  8        Q.  Have you ever had any discussions with any

12:18:08  9   member of the Siegel family about Superboy and

12:18:16 10   sharing or not sharing  in recoveries associated

12:18:20 11   with Superboy?

12:18:21 12        A.  No.

12:18:24 13        Q.  Have you ever had a discussion with your

12:18:24 14   mother about whether the Schusters had an interest

12:18:32 15   in Superboy?

12:18:37 16        A.  No.

12:18:37 17        Q.  You never once raised that subject with

12:18:39 18   her?

12:18:41 19        A.  No.

12:18:42 20        Q.  Has she ever discussed it with you?

12:18:45 21        A.  No.

12:18:46 22        Q.  At any time, even going back to the time

12:18:49 23   when Joe Shuster was alive?

12:18:51 24        A.  We never discussed that.

12:18:53 25        Q.  Did you ever discuss it with Joe Shuster?

83

**EXHIBIT B**
**126**

ROUGH DRAFT

12:18:55  1        A.  No.

12:19:07  2        Q.  Okay.  Okay.  Would you agree that I don't

12:19:15  3    need to ask any more questions about his knowledge

12:19:19  4    about the consent agreement because you're -- you're

12:19:22  5    going to assert the same objections?

12:19:24  6        MR. TOBEROFF:  If you're asking as to the

12:19:26  7    substance of contents of the consent agreement I

12:19:29  8    will assert same.

12:19:30  9        MR. PETROCELLI:  The existence of the terms

12:19:31 10    and provisions, the substance of them, the contents

12:19:34 11    of them.

12:19:34 12        MR. TOBEROFF:  Yes.

12:19:36 13        MR. PETROCELLI:  Okay.  Let me just make

12:19:48 14    sure I nail this down.

12:19:51 15        Q.  After signing the consent agreement in

12:19:57 16    2008, did you ever sign a piece of paper that you

12:20:04 17    thought was amending or modifying the consent

12:20:07 18    agreement?

12:20:08 19        A.  No.

12:20:11 20        Q.  Okay.  Or cancelling it?

12:20:12 21        A.  No.

12:20:13 22        Q.  Okay.  When you signed the consent

12:20:25 23    agreement in 2008, your lawyer at the time was whom?

12:20:34 24        A.  Marc Toberoff.

12:20:36 25        Q.  Who did you understand -- did you

                                                            84

**EXHIBIT B**
**127**

ROUGH DRAFT

12:20:39  1    understand that the Siegels were represented by

12:20:41  2    counsel?

12:20:41  3        A.   Yes.

12:20:44  4        Q.   Who did you understand their counsel to be?

12:20:46  5        A.   Marc Toberoff.

12:20:51  6        Q.   Did you consult with any attorney other

12:20:55  7    than Marc Toberoff about signing a document with the

12:20:59  8    Siegels?

12:20:59  9        A.   No.

12:21:02  10       Q.   Did you consult with anyone other than Marc

12:21:06  11   Toberoff on that subject, attorney or not?

12:21:08  12       A.   No.

12:21:11  13       Q.   Did you give any thought or consideration

12:21:17  14   to whether there were conflict of interest given

12:21:21  15   Mr. Toberoff's representation of the Siegels and the

12:21:27  16   Schusters?  Did that thought cross your mind?

12:21:33  17       A.   I suppose.

12:21:33  18       Q.   When it crossed your mind, in what respect

12:21:39  19   did you think about it?

12:21:41  20       MR. TOBEROFF:  You could only answer that

12:21:42  21   to the extent you have an understanding of conflict

12:21:45  22   of interest independent of your discussions with me.

12:21:52  23       THE WITNESS:  Okay.  Well, my whole

12:21:56  24   understanding is -- is bound up with my

12:22:00  25   conversations with Marc Toberoff.

85

**EXHIBIT B**
**128**

ROUGH DRAFT

| | | |
|---|---|---|
| 12:22:04 | 1 | MR. TOBEROFF:  Then I instruct you not to |
| 12:22:06 | 2 | answer. |
| 12:22:06 | 3 | (Instruction not to answer.) |

```
12:22:06   4    BY MR. PETROCELLI:

12:22:10   5         Q.  Did you receive any disclosures from

12:22:13   6    Mr. Toberoff regarding potential or actual conflict

12:22:17   7    of interest?

12:22:18   8         A.  Yes.

12:22:20   9         Q.  In what form?

12:22:24  10         A.  He sent a -- he sent a -- a letter, a

12:22:29  11    waiver, a document.

12:22:33  12         Q.  Is that a document separate from the

12:22:35  13    consent agreement that you signed?

12:22:38  14         A.  Yes.

12:22:39  15         Q.  Did you sign that document?

12:22:40  16         A.  Yes.

12:22:44  17         Q.  So that's another document you signed

12:22:46  18    right, you -- that you didn't mention earlier.

12:22:53  19              Is that in your lock box?

12:23:01  20         A.  I suppose.

12:23:02  21         Q.  Did you bring -- bring it with you?

12:23:07  22         A.  The waiver of conflict of interest?

12:23:07  23         Q.  Right?

12:23:10  24         A.  Is that the --

12:23:11  25              MR. TOBEROFF:  He is asking whether you
```

86

**EXHIBIT B**
**129**

ROUGH DRAFT

12:23:12  1    brought that document with you to answer.

12:23:13  2              THE WITNESS:  The waiver of conflict of

12:23:14  3    interest.

12:23:14  4    BY MR. PETROCELLI:

12:23:15  5        Q.  Correct.  That's how you call the document

12:23:17  6    right?

12:23:18  7        A.  Yeah.

12:23:18  8        Q.  And it's a separate document from the

12:23:19  9    consent agreement.

12:23:19 10            Is that right?

12:23:19 11        A.  Yes.

12:23:22 12        Q.  Who are the signatories to that document?

12:23:29 13        A.  I believe that -- that I am and the Siegels

12:23:32 14    and Mr. Toberoff.

12:23:38 15        Q.  When was that signed?

12:23:39 16        A.  2010, I believe.

12:23:54 17        Q.  Two years after the consent agreement?

12:23:57 18        A.  Yeah, if my memory is right.

12:24:03 19        Q.  And after the filing of this lawsuit?

12:24:05 20        A.  I don't know if it was after.  I don't

12:24:10 21    recall the date.  I think it was sometime -- I don't

12:24:14 22    recall the date.

12:24:16 23        Q.  The date's on the document, right?

12:24:20 24        A.  Yeah, it's not on this document though.

12:24:22 25        Q.  No it's on the conflict of interest

87

**EXHIBIT B**
**130**

ROUGH DRAFT

| | | |
|---|---|---|
| 12:24:24 | 1 | document right? |
| 12:24:24 | 2 | A. Yeah. |
| 12:24:25 | 3 | Q. Does the conflict of interest document say |
| 12:24:27 | 4 | at that time date is effective as to some earlier |
| 12:24:29 | 5 | point in time? Like the legal representation |
| 12:24:33 | 6 | documents you described, it went back from 04 to 01? |
| 12:24:40 | 7 | A. I don't know. |
| 12:24:41 | 8 | Q. Did you -- were you advised to seek |
| 12:24:49 | 9 | independent counsel before signing or even in |
| 12:24:54 | 10 | considering whether to sign the conflict of waiver? |
| 12:24:56 | 11 | A. Yes. |
| 12:24:58 | 12 | Q. Who told you that? |
| 12:25:00 | 13 | A. Mr. Toberoff. |
| 12:25:01 | 14 | Q. What did he tell you? |
| 12:25:03 | 15 | A. He said that I could seek separate counsel. |
| 12:25:10 | 16 | Ask -- ask someone else. |
| 12:25:11 | 17 | Q. Did he suggest any lawyers to you? |
| 12:25:14 | 18 | A. No. |
| 12:25:18 | 19 | Q. Okay. Did he tell you this in a verbal |
| 12:25:20 | 20 | conversation or in a letter? |
| 12:25:22 | 21 | A. Probably verbal. |
| 12:25:30 | 22 | Q. Did you seek separate counsel? |
| 12:25:31 | 23 | A. No. |
| 12:25:34 | 24 | Q. Did you make any inquiries at all? |
| 12:25:38 | 25 | MR. TOBEROFF: As to separate counsel? |

88

**EXHIBIT B**
**131**