# EXHIBIT B

# Part 6 of 9

ROUGH DRAFT

12:25:40  1          MR. PETROCELLI:  Correct.

12:25:41  2          THE WITNESS:  No.

12:25:41  3  BY MR. PETROCELLI:

12:25:42  4      Q.  Did you even consider it?

12:25:47  5      A.  I may have considered it.

12:25:48  6      Q.  You decided not to?

12:25:52  7      A.  Yes.

12:25:53  8      Q.  Did you discuss it with the Siegels?

12:25:58  9          MR. TOBEROFF:  The conflict waiver?

12:26:00 10          MR. PETROCELLI:  Yes.

12:26:01 11          THE WITNESS:  No, not directly.

12:26:01 12  BY MR. PETROCELLI:

12:26:03 13      Q.  Did you discuss with the Siegels whether

12:26:04 14  they were seeking separate counsel or independent

12:26:07 15  counsel in deciding whether to sign the conflict

12:26:09 16  waiver?

12:26:11 17      A.  No, I did not.

12:26:12 18      Q.  Do you know if they did?

12:26:14 19      A.  I don't.

12:26:20 20          MR. PETROCELLI:  I think we're going to run

12:26:22 21  out of videotape now so it's probably a good time to

12:26:24 22  go to lunch.

12:26:24 23          THE VIDEOGRAPHER:  This will mark the end

12:26:26 24  of Volume I Tape Number 1 in the deposition of Mark

12:26:30 25  Warren Peary.  Going off the record.  The time is

**EXHIBIT B**
**132**

ROUGH DRAFT

```
12:26:32   1    12:25.

12:27:45   2                    (At ^ ^ a.m. ^ p.m., the

           3           deposition of WARREN PEARY was

           4           adjourned for noon recess.)

           5    ///

           6    ///

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

90

ROUGH DRAFT

                    1              (At ^ ^ a.m. ^ p.m., the

                    2         deposition of WARREN PEARY was

                    3         reconvened.)

13:18:26   4

13:18:26   5         THE VIDEOGRAPHER:  We're back on the

13:18:35   6    record.  This marks the beginning of Volume I, Tape

13:18:38   7    Number 2 in the deposition of Mark Warren Peary.

13:18:41   8    The time is 1:17.

13:18:41   9

13:18:45  10              EXAMINATION (CONTINUED)

13:18:45  11    BY MR. PETROCELLI:

13:18:46  12         Q.  Mr. Peary, with respect to the conflict of

13:18:51  13    interest document that you signed in or about 2010

13:18:55  14    that we were talking about before the lunch break,

13:18:58  15    do you remember that?

13:18:58  16         A.  Yes.

13:18:59  17         Q.  Okay.  Did you understand that that

13:19:04  18    document that you signed pertained to the 2008

13:19:10  19    consent agreement?

13:19:14  20              MR. TOBEROFF:  You -- you -- I instruct you

13:19:17  21    not to answer regarding the contents of the consent

13:19:22  22    agreement -- it's a conflict waiver which is listed

13:19:26  23    on the privilege log and privileged.

13:19:28  24              THE WITNESS:  Yeah.  I'll have to follow my

13:19:30  25    attorney's advice.

                                                              91

**EXHIBIT B**
**134**

ROUGH DRAFT

13:19:30  1              (Instruction not to answer.)

13:19:30  2      BY MR. PETROCELLI:

13:19:31  3          Q.  Well, I'm not asking about the contents of

13:19:34  4      the consent agreement in this question I'm?

13:19:36  5              MR. TOBEROFF:  No, the conflict waiver.

13:19:36  6      BY MR. PETROCELLI:

13:19:42  7          Q.  Did you understand that the purpose of the

13:19:43  8      conflict waiver related to the consent agreement?

13:19:49  9              MR. TOBEROFF:  You can only answer that

13:19:50  10     question if you have an understanding of the purpose

13:19:52  11     of the conflict waiver separate and apart from your

13:19:55  12     communications with counsel.

13:19:59  13             THE WITNESS:  Well then all my

13:20:00  14     understanding is associated with my communications

13:20:03  15     with counsel.  So I guess I can't answer it.

13:20:03  16     BY MR. PETROCELLI:

13:20:07  17         Q.  You've -- but you've testified to some of

13:20:10  18     your communications with counsel on the subject of

13:20:12  19     this conflict waiver already before the lunch break.

13:20:20  20     In those communications that you had with counsel

13:20:22  21     about the conflict waiver, which you said that he

13:20:25  22     made you disclosure to you about a conflict of

13:20:27  23     interest and/or potential conflict of interest, said

13:20:31  24     that you could seek independent, Counsel, do you

13:20:34  25     recall --

92

**EXHIBIT B**
**135**

ROUGH DRAFT

13:20:34 1          A.  Yes.

13:20:35 2          Q.  Having related that to me?

13:20:36 3          A.  Yes.

13:20:37 4          Q.  Okay.  In your conversations with

13:20:41 5     Mr. Toberoff, was -- did you gain an understanding

13:20:47 6     of the purpose of your being presented with a

13:20:51 7     conflict waiver?

13:20:52 8          A.  Yes.

13:20:54 9          Q.  What was that purpose?

13:20:57 10              MR. TOBEROFF:  I instruct you not to

13:20:58 11    answer.

13:21:06 12              (Instruction not to answer.)

13:21:06 13    BY MR. PETROCELLI:

13:21:06 14          Q.  Was the purpose of the conflict waiver set

13:21:08 15    forth in the document?

13:21:11 16          A.  I believe so.

13:21:17 17          Q.  And again, this was a document you said

13:21:18 18    signed by the Siegel parties as well as the Shuster

13:21:23 19    side, right?

13:21:23 20          A.  Yes.

13:21:24 21          Q.  And Mr. Toberoff, correct?

13:21:25 22          A.  Yes.

13:21:26 23          Q.  Did your mother sign it?

13:21:36 24          A.  I don't remember.  I don't remember.

13:21:47 25          Q.  In or about 2008 at the time when you

93

**EXHIBIT B**
**136**

ROUGH DRAFT

13:21:50  1    signed the consent agreement, did you at that time

13:21:57  2    sign any document involving a conflict of interest

13:22:01  3    or a potential conflict of interest?

13:22:08  4         MR. TOBEROFF:  Objection.  Asks for a legal

13:22:09  5    conclusion and you could answer that question if you

13:22:15  6    have an understanding of conflict of interest and

13:22:17  7    potential conflict of interest outside of your

13:22:21  8    communications with me.

13:22:22  9         MR. PETROCELLI:  Let me rephrase that

13:22:23  10   question.

13:22:24  11        Q.  In or about 2008 when you signed the

13:22:27  12   consent agreement, did you also sign another

13:22:31  13   document that you believed related to the subject of

13:22:37  14   waiving conflicts of interest?

13:22:42  15        A.  I don't recall.

13:22:46  16        Q.  You don't -- you don't recall having done

13:22:47  17   so?

13:22:48  18        A.  I don't recall, no, having done so.

13:22:53  19        Q.  Okay.  Is the only time that you can recall

13:22:54  20   having signed a document related to conflicts of

13:22:58  21   interest is this one in 2010?

13:23:03  22        MR. TOBEROFF:  Vague and overbroad.

13:23:08  23        MR. PETROCELLI:  Let me rephrase it.

13:23:10  24        Q.  Is the only time that you can recall

13:23:12  25   signing a document waiving any potential or actual

94

ROUGH DRAFT

13:23:16  1    conflict of interest is the one that you signed in

13:23:19  2    2010?

13:23:22  3         A.  That's the one I recall.

13:23:24  4         Q.  Do you think there are others?

13:23:26  5         A.  I -- I don't remember any others.

13:23:39  6         Q.  Okay.  Okay.  Let me show you Exhibit 2

13:23:52  7    which is the 1975 agreement that Joe Shuster and

13:24:04  8    Jerry Siegel signed with Warner communications

13:24:06  9    calling for various payments to -- to both men and

13:24:13  10   their families.

13:24:15  11                   (The document referred to was

13:24:15  12                   marked for identification by the

13:24:15  13                   C.S.R. as Exhibit 2 and attached to

13:24:19  14                   this deposition.)

13:24:19  15   BY MR. PETROCELLI:

13:24:19  16        Q.  Have you seen this document before?

13:24:20  17        A.  No, sir.

13:24:27  18        Q.  You were asked about a pension agreement in

13:24:28  19   your Siegel deposition in 2006.

13:24:32  20             Did you have an understanding -- let me ask

13:24:39  21   you these questions prior to the time that you first

13:24:44  22   had any contact with Mr. Toberoff, okay?

13:24:47  23        A.  Uh-huh.

13:24:49  24        Q.  You first had contact with Mr. Toberoff

13:24:53  25   sometime in 2001.

95

**EXHIBIT B**

**138**

ROUGH DRAFT

13:24:55  1          Is that right?

13:24:56  2      A.  Yes.

13:24:56  3      Q.  In your Siegel deposition you said that you

13:25:03  4  were looking into the issue of copyright matters and

13:25:09  5  you came across Mr. Toberoff?

13:25:10  6      A.  Yes.

13:25:15  7      Q.  I think you said it might have been six

13:25:17  8  months or so or a few months prior to time that you

13:25:20  9  signed your first agreement in November 2001.  Does

13:25:22 10  that sound, right?

13:25:23 11      A.  Between the time I first contacted him and

13:25:26 12  then we signed an agreement?

13:25:27 13      Q.  Yeah, what was that time span?

13:25:30 14      A.  I remember I first contacted him in 2001.

13:25:35 15  That's all I can recall.

13:25:36 16      Q.  Okay.  And to provide a bit more detail,

13:25:38 17  did someone give you his number?

13:25:42 18      A.  I found it through research on my own.

13:25:44 19      Q.  When you say "research on your own, the

13:25:46 20  computer on the Internet?

13:25:47 21      A.  Yes, yes.

13:25:48 22      Q.  And how did you come across it?  What did

13:25:50 23  you search that yielded his name?

13:25:53 24      A.  I was doing research on copyright law and

13:25:56 25  changes to the copyright law and various searches

96

**EXHIBIT B**
**139**

ROUGH DRAFT

13:26:06  1    having to do with copyright and attorneys involved

13:26:08  2    in that entertainment.

13:26:09  3        Q.  And how many names were netted as a result

13:26:14  4    of your searches?

13:26:21  5        A.  Oh, boy, I can't recall that.  I was

13:26:22  6    impressed with when I came across information

13:26:27  7    regarding Mr. Toberoff's dealings.

13:26:31  8        Q.  On the Web site?

13:26:32  9        A.  Yes.  I was impressed.

13:26:33 10        Q.  What impressed you about what you saw on

13:26:35 11    the Web site?

13:26:36 12        A.  I was impressed with what I had read.  Gave

13:26:39 13    me the impression he had a great deal of knowledge

13:26:41 14    and talent and copyright law with property and

13:26:46 15    rights.

13:26:47 16        Q.  Had you -- did you visit his Web site?

13:26:53 17        A.  I don't recall his Web site in particular.

13:26:56 18        Q.  Was it an article you -- you recall having

13:26:59 19    read about him?

13:27:00 20        A.  Excuse me?

13:27:00 21        Q.  An article about him?  I mean what is it

13:27:03 22    that you read that impressed you?

13:27:04 23        A.  Jeez, it's so far back.  Various searches,

13:27:10 24    his mentions of lawyers and articles.  That's all I

13:27:15 25    can recall.

97

ROUGH DRAFT

13:27:15  1        Q.  Searches you're doing on your home

13:27:17  2   computer?

13:27:17  3        A.  Yes.

13:27:18  4        Q.  Okay.  When you -- whatever you read -- by

13:27:22  5   the way, did you save the material that mentioned

13:27:26  6   him?

13:27:26  7        A.  I don't think so from that time.  But I --

13:27:34  8   I got his contact information and contacted him.

13:27:37  9            MR. TOBEROFF:  Just focus on his question.

13:27:38 10   Only answer his question.

13:27:38 11   BY MR. PETROCELLI:

13:27:40 12        Q.  Did you contact anyone other?

13:27:41 13            MR. TOBEROFF:  Don't give a narrative.

13:27:41 14   BY MR. PETROCELLI:

13:27:43 15        Q.  Contact anyone other than him?

13:27:44 16        A.  Prior to that time, I did.

13:27:50 17        Q.  As a result of the research you were doing?

13:27:52 18        A.  Oh, at that time, no.

13:27:53 19        Q.  Okay.  So when you did the research, the

13:27:58 20   only person that you contacted as a result of that

13:28:02 21   research was Mr. Toberoff?

13:28:03 22        A.  At that time, yes.

13:28:04 23        Q.  Then you called him on the telephone?

13:28:06 24        A.  Yes.

13:28:07 25        Q.  And you had a phone conversation?

98

**EXHIBIT B**
**141**

ROUGH DRAFT

13:28:08  1        A.  Yes.

13:28:10  2        Q.  And after that phone conversation did you

13:28:12  3   have a meeting?

13:28:14  4        A.  In face to face.

13:28:19  5        Q.  Face-to-face meeting, right?

13:28:20  6        A.  Not at that time.

13:28:23  7        Q.  How long thereafter until you first met

13:28:28  8   him?

13:28:28  9        A.  When I first met him it was -- it was after

13:28:32  10  we had signed the original legal agreement.

13:28:36  11       Q.  So you had not met him prior to signing the

13:28:40  12  document.

13:28:42  13           Is that correct?

13:28:43  14       A.  Not face to face.

13:28:44  15       Q.  Okay.  Had your sister met him?

13:28:48  16       A.  No.

13:28:49  17       Q.  Had your mother?

13:28:50  18       A.  No.

13:28:53  19       Q.  Had you spoken to anybody who had met him

13:28:57  20  or worked with him prior to signing the document,

13:29:01  21  the first document?

13:29:02  22       A.  I don't believe so.

13:29:11  23       Q.  Did you -- did you have more than one

13:29:12  24  telephone call?

13:29:13  25       A.  Yes.

**EXHIBIT B**
**142**

ROUGH DRAFT

13:29:16  1       Q.  About how many?

13:29:22  2       A.  Boy, before signing the first agreement I

13:29:28  3   would have had to -- I don't know exactly but it was

13:29:32  4   a number of times.  I don't know to characterize.  I

13:29:36  5   don't have a log but I talked to him quite a bit.

13:29:41  6       Q.  Okay.  The agreement that you did sign

13:29:43  7   which I'll show you in a bit, were there drafts of

13:29:48  8   that that went back and forth as you recall or did

13:29:51  9   you get a document sign it and return it?

13:29:54 10       A.  There were drafts.

13:29:56 11       Q.  Did you keep copies of the drafts?

13:29:57 12       A.  No.

13:30:01 13       Q.  On your end, who was reviewing the drafts?

13:30:07 14       A.  I was.

13:30:09 15       Q.  Did you feel competent and capable to

13:30:11 16   understand what you were reading and made changes

13:30:15 17   and comments?

13:30:16 18       A.  Yes.

13:30:18 19       Q.  Okay.  Did you consult with anybody?

13:30:26 20       A.  Like another lawyer?

13:30:26 21       Q.  Yes.

13:30:26 22       A.  No.

13:30:29 23       Q.  Did you discuss with your mother in 2001

13:30:34 24   these -- your talking to Mr. Toberoff, your

13:30:40 25   telephone calls with him, receiving the draft

100

**EXHIBIT B**

**143**

ROUGH DRAFT

13:30:44 1    agreements, working on them, this whole activity,

13:30:46 2    did you share all of that with your mother?

13:30:52 3        A.  I'm sure I did.

13:30:54 4        Q.  Did she ask you to undertake this effort?

13:30:57 5        A.  No.  I -- I was doing all of this research

13:30:59 6    on my own.  She didn't know anything about it.

13:31:03 7        Q.  At one point did you disclose to her what

13:31:06 8    you were doing?

13:31:06 9        A.  Probably when I decided to work, retain

13:31:15 10   Mr. Toberoff.  It's probably when I really discussed

13:31:20 11   it.

13:31:20 12       Q.  Did you have a one-on-one conversation with

13:31:23 13   your mother or was your sister involved?

13:31:26 14       A.  Boy.

13:31:28 15       Q.  Family meeting?

13:31:30 16       A.  I can't actually visualize that in my mind.

13:31:33 17   I know I talked with Jean.  I don't recall talking

13:31:38 18   to Dawn at that time.

13:31:43 19       Q.  You -- why did you decide not to share with

13:31:47 20   your mother your -- your activities until just

13:31:52 21   before you were ready to sign the document?

13:31:58 22       A.  I was doing research on my own and she had

13:32:01 23   no interest or knowledge of any of -- of that, any

13:32:06 24   of rights or anything.  It was something I did

13:32:10 25   completely on my own because I wanted to be

101

**EXHIBIT B**
**144**

ROUGH DRAFT

13:32:12  1    thorough, so that's the reason.

13:32:19  2         Q.  And did you come to a point when you

13:32:20  3    thought like you had sufficient thorough information

13:32:23  4    that you could then talk with her?

13:32:25  5         A.  Yes.

13:32:26  6         Q.  And when you did talk with her was it in

13:32:31  7    that conversation that you first identified to her

13:32:33  8    that you had contacted Mr. Toberoff and you were

13:32:36  9    recommending him?

13:32:36 10         A.  I believe so.

13:32:42 11         Q.  Had she ever heard of Mr. Toberoff, to your

13:32:45 12    knowledge?

13:32:45 13         A.  No.

13:32:54 14         Q.  Did you put Mr. Toberoff in touch with the

13:32:57 15    Siegel family?

13:33:01 16         A.  If I recall, after we had signed a legal

13:33:05 17    agreement at some point we were -- we were happy

13:33:13 18    that my mother had talked with Joanne and mentioned

13:33:16 19    his name.

13:33:24 20         Q.  Were you present when your mother first

13:33:28 21    mentioned Mr. Toberoff to Joanne?

13:33:32 22         A.  No.

13:33:34 23         Q.  It's telephone call?

13:33:35 24         A.  Yes.

13:33:40 25         Q.  Okay.  You said that you had contacted a

102

**EXHIBIT B**
**145**

ROUGH DRAFT

13:33:43  1    lawyer at some time before Mr. Toberoff.

13:33:46  2            Was that a fellow in Albuquerque?

13:33:49  3        A.  Yes.  There was a lawyer in Albuquerque.

13:33:52  4        Q.  And what was that person's name?

13:33:53  5        A.  I don't think I remember it because I

13:33:58  6    didn't do any -- I didn't sign anything with him.

13:34:02  7        Q.  What year was that?

13:34:03  8        A.  Would have first been, I believe, 1999.

13:34:15  9        Q.  Is 1999 the first time that you started to

13:34:20  10   think about researching copyright issues related to

13:34:25  11   Mr. Shuster or his estate?

13:34:27  12       A.  Boy, the first time I started thinking

13:34:33  13   about that.  Probably I thought about it earlier.

13:34:39  14       Q.  When is the first time you actually did

13:34:40  15   anything on that subject?

13:34:42  16       A.  As far as research?

13:34:46  17       Q.  You said you probably thought about it

13:34:47  18   earlier, right?

13:34:51  19       A.  Uh-huh.

13:34:51  20       Q.  So when is the first time you decided to do

13:34:53  21   something, whether it be start looking things up the

13:34:56  22   Internet, start making inquiries to friends, maybe

13:34:59  23   look for a lawyer regarding the subject of his

13:35:03  24   copyright and whether he had a termination interest

13:35:07  25   and?

103

**EXHIBIT B**
**146**

ROUGH DRAFT

13:35:07  1        A.  Yeah.

13:35:08  2        Q.  Related Superman.

13:35:13  3        A.  Yeah that might have been when I first

13:35:15  4    looked through the copyright code, maybe 1998 I was

13:35:19  5    looking through that and then after that that's when

13:35:25  6    I contacted an attorney in Albuquerque.

13:35:31  7        Q.  Did you meet with him?

13:35:36  8        A.  Yes.

13:35:36  9        Q.  Where?

13:35:37  10       A.  In Albuquerque.

13:35:38  11       Q.  Who attended the meeting?

13:35:40  12       A.  I think it was just me.

13:35:45  13       Q.  Did your mom know what you were doing?

13:35:49  14       A.  I don't believe so.

13:35:55  15       Q.  And you decided not to higher this fellow?

13:35:57  16       A.  That's correct.

13:35:58  17       Q.  And you don't know his name?

13:36:00  18       A.  I can't recall.

13:36:01  19       Q.  Did you get any documents from him?

13:36:03  20       A.  I don't -- I don't think so.

13:36:11  21       Q.  Where did you get his name from?

13:36:16  22       A.  That's a long time back.  I don't know if

13:36:21  23    it was the -- the phone book or under a attorneys it

13:36:26  24    said intellectual property or something of that

13:36:28  25    nature.  I really don't remember.

104

**EXHIBIT B**

**147**

ROUGH DRAFT

13:36:30  1        Q.  Why didn't you hire him?

13:36:34  2        A.  Gee, I think it's because I thought they

13:36:37  3    maybe weren't as good as the best.  Maybe they

13:36:43  4    didn't know everything that they should have.

13:36:46  5        Q.  They is whom?

13:36:47  6        A.  The attorney.

13:36:48  7        Q.  Was it a law firm?

13:36:50  8        A.  It was -- well, it was one attorney in a

13:36:52  9    firm.

13:36:55 10        Q.  Okay.  And so after that -- that was the

13:36:58 11    first person you've ever -- lawyer you've ever

13:37:02 12    contacted?

13:37:02 13        A.  Yes.

13:37:03 14        Q.  In pursuit of this issue, right?

13:37:03 15        A.  Yes.

13:37:05 16        Q.  But before you contacted that lawyer, had

13:37:07 17    you spoken to other people, like in the comic book

13:37:10 18    business or in entertainment business about this

13:37:16 19    issue?

13:37:20 20        A.  It's possible that just in conversation

13:37:27 21    that I talked with other people but not lawyers.

13:37:29 22        Q.  Okay.  Were you starting to do research?

13:37:34 23        A.  Yes.

13:37:36 24        Q.  Is there any particular reason why you

13:37:37 25    didn't come across Mr. Toberoff's name back in 1999

                                                          105

**EXHIBIT B**
**148**

ROUGH DRAFT

13:37:41  1    when you were first -- or in '98 when you were first

13:37:44  2    looking into this?

13:37:45  3         A.  Well, I didn't think of contacting a lawyer

13:37:52  4    at all until sometime in '99.

13:37:54  5         Q.  Right?

13:37:55  6         A.  Probably the second half.  Because I wasn't

13:37:59  7    sure of what rights were available under the law.

13:38:02  8    And I -- I guess I wanted to go to a local lawyer

13:38:08  9    that was right there in town so I could just drive

13:38:10 10    to the office and meet with them.

13:38:19 11         Q.  In Santa Fe?

13:38:19 12         A.  That was in Albuquerque.

13:38:19 13         Q.  That was Albuquerque?

13:38:19 14         A.  That was Albuquerque.

13:38:19 15         Q.  You were living in Albuquerque then?

13:38:19 16         A.  Yes, just before I moved.

13:38:20 17         Q.  Living alone?

13:38:21 18         A.  I think it was -- it was after my father

13:38:24 19    died so I was with -- I was just with -- with my

13:38:29 20    mother just the two of us.

13:38:32 21         Q.  When your dad passed you were all living in

13:38:35 22    Albuquerque?

13:38:36 23         A.  Yes.

13:38:37 24         Q.  Okay.  And then you folks moved to?

13:38:42 25         A.  Santa Fe.

106

**EXHIBIT B**
**149**

ROUGH DRAFT

13:38:43  1       Q.  Santa Fe?

13:38:44  2       A.  Yes.

13:38:46  3       Q.  So you expanded your search then as time

13:38:52  4  on -- went by and extended it to Los Angeles?

13:38:56  5       A.  Yes.

13:38:58  6       Q.  Okay.  So from the time that you met with

13:39:03  7  this attorney in Albuquerque until the time that you

13:39:05  8  identified Mr. Toberoff, had you identified any

13:39:08  9  other attorneys in between then, those two time

13:39:12 10  periods?

13:39:17 11       A.  I -- I didn't talk with any others.  Is

13:39:21 12  that what you're asking?

13:39:21 13       Q.  Yes.

13:39:24 14       A.  Okay.

13:39:26 15       Q.  Were you referred to any?

13:39:27 16       A.  No.

13:39:29 17       Q.  Okay.  And you said you got a -- you were

13:39:33 18  studying the copyright code.  How did you get a copy

13:39:36 19  of it?

13:39:39 20       A.  It must have been -- must have been at the

13:39:42 21  university library re because I photocopied some

13:39:46 22  sheets.

13:39:47 23       Q.  University of New Mexico?

13:39:48 24       A.  I believe so.

13:39:56 25       Q.  Okay.  What else did you research besides

107

**EXHIBIT B**
**150**

ROUGH DRAFT

13:40:00  1    the copyright code?  What other materials?

13:40:07  2        A.  With regard to.

13:40:08  3        Q.  This issue of whether there was any

13:40:10  4    copyright rights that your family might have.

13:40:18  5        A.  I found out that there was legislation that

13:40:20  6    was passed that -- that gave the -- broadened the

13:40:28  7    scope of rights to estates.

13:40:35  8        Q.  How did you find out about that

13:40:37  9    legislation?

13:40:40  10        A.  Oh just looking around.

13:40:45  11        Q.  Had you heard that the Siegel family had or

13:40:51  12    was in the process of pursuing termination rights on

13:40:54  13    behalf of Jerome Siegel?

13:40:57  14        A.  I had heard that.

13:40:58  15        Q.  And how had you heard that?

13:41:05  16        A.  Oh, boy.  I don't know exactly.  I just

13:41:11  17    know I had heard about it.  I --

13:41:18  18        Q.  Did you come across a notice of termination

13:41:22  19    of copyright interest that the Siegel family served

13:41:27  20    in 1997?

13:41:31  21        A.  Did I see that?

13:41:31  22        Q.  Yes.

13:41:32  23        A.  Their notice of termination?

13:41:34  24        Q.  No I did see that.

13:41:36  25        Q.  Okay.  Did you speak to Joanne or Laura

108

**EXHIBIT B**
**151**

ROUGH DRAFT

13:41:39  1    Siegel about their having filed such a notice of

13:41:43  2    termination around the time that they did?

13:41:46  3        A.  Not at that time.

13:41:48  4        Q.  Do you know if your mom did?

13:41:50  5        A.  I don't believe so.

13:41:52  6        Q.  Is it -- is it -- was it upon learning that

13:41:54  7    they were seeking to terminate copyright interest

13:42:00  8    that spurred you to begin inquiring about the same

13:42:03  9    thing?

13:42:08 10        A.  I'm sure it's a factor.

13:42:09 11        Q.  What were the other factors?

13:42:15 12        A.  I don't know.  I guess that's the main

13:42:17 13    thing that spurred me.

13:42:20 14        Q.  At the time that you began thinking about

13:42:23 15    this, were you under the belief that your family had

13:42:27 16    no termination interests?

13:42:33 17        A.  At one time I had thought that and later

13:42:37 18    changed -- changed my mind.

13:42:40 19        Q.  What changed your mind?

13:42:42 20        A.  The legislation.

13:42:45 21        Q.  Prior to the legislation, you're talking

13:42:49 22    about a change to the copyright act?

13:42:51 23        A.  Yes.

13:42:51 24        Q.  That became effective in or about 1998,

13:42:51 25    right?

109

**EXHIBIT B**
**152**

ROUGH DRAFT

13:42:55  1      A.  Yeah, I believe.

13:42:56  2      Q.  Sometimes known as the Sonny Bono copyright

13:42:59  3  extension act?

13:43:00  4      A.  Yes.

13:43:01  5      Q.  Okay.  Prior to your learning about that

13:43:06  6  act, you were of the view that your family had no

13:43:09  7  termination rights?

13:43:10  8      A.  I didn't -- didn't think so.  I wasn't

13:43:17  9  certain.  I -- I wasn't positive so that's what

13:43:24  10  spurred me to do the research.

13:43:27  11      Q.  And why did you think that the family might

13:43:30  12  not have termination rights prior to the -- the

13:43:33  13  change in the law?

13:43:35  14      A.  The -- when I looked at the copyright code,

13:43:41  15  it -- it only stated certain relations to creators

13:43:47  16  at that time, spouses and children, and it didn't

13:43:52  17  say anything else.

13:43:54  18      Q.  And you were aware that Joe Shuster had

13:43:57  19  died without a surviving spouse, correct?

13:43:57  20      A.  Yes.

13:44:00  21      Q.  And without a surviving child or

13:44:04  22  grandchild, correct?

13:44:05  23      A.  That's correct.

13:44:08  24      Q.  And you were also aware that he had never

13:44:10  25  exercised a right of termination during his

110

**EXHIBIT B**
**153**

ROUGH DRAFT

13:44:12   1    lifetime, right?

13:44:15   2        A.   That's right.

13:44:15   3        Q.   But you were aware that he did have an

13:44:17   4    opportunity to have done so prior to his death?

13:44:20   5        A.   I'm not -- I'm not sure about those

13:44:32   6    details.  I'm not sure.

13:44:32   7        Q.   Did you discuss with your mother from time

13:44:38   8    to time this idea or view that because he did not

13:44:41   9    leave a surviving spouse or issue that he -- this is

13:44:47  10    after he died, I mean --

13:44:49  11        A.   Uh-huh.

13:44:49  12        Q.   That there was no right of termination?  Is

13:44:54  13    that a topic you discussed with your mom?

13:44:56  14        A.   I don't think it was discussed until I got

13:45:01  15    serious about confirming we actually had rights.

13:45:08  16    And then at that point probably at that point I

13:45:11  17    probably discussed it.

13:45:14  18            MR. TOBEROFF:  Again Warren, if you have a

13:45:17  19    basis for -- if you remember discussing something,

13:45:24  20    of course, talk about it.  But if you don't have a

13:45:27  21    specific memory or any memory, don't speculate as to

13:45:34  22    what you probably did or probably didn't do.

13:45:34  23            MR. PETROCELLI:  Mark honestly, I don't

13:45:36  24    think that's necessary.  He wasn't speculating.

13:45:37  25            THE WITNESS:  I didn't say he was

                                                              111

**EXHIBIT B**
**154**

ROUGH DRAFT

13:45:38 1    speculating.

13:45:39 2         MR. PETROCELLI:  I know there's no reason.

13:45:40 3         MR. TOBEROFF:  I'm cautioning him.

13:45:41 4         MR. PETROCELLI:  No reason to caution him

13:45:43 5    not to speculate when he is not speculating.

13:45:45 6         MR. TOBEROFF:  Actually, I think he may

13:45:47 7    have been speculating but I'm not going to pass

13:45:48 8    judgments on that.  I'm just advising my client not

13:45:50 9    to -- there's a human tendency to try to fill in the

13:45:57 10   blanks.

13:45:58 11        MR. PETROCELLI:  You understand though that

13:45:59 12   I'm entitled to your best recollection no matter how

13:46:04 13   faint or vague it might be.

13:46:05 14       A.  Yes, and it is faint often.

13:46:07 15       Q.  Okay.  That's okay.

13:46:11 16

13:46:11 17        MR. TOBEROFF:  Is he also entitled to your

13:46:13 18   best estimation if you have a basis for estimating.

13:46:13 19   BY MR. PETROCELLI:

13:46:15 20       Q.  I am.

13:46:19 21        So getting back to where we were did you

13:46:29 22   ever discuss with your mother whether Joe Shuster

13:46:32 23   had a right of termination with regard Superman

13:46:37 24   copyrights prior to the time that Joe died in?

13:46:41 25        MR. TOBEROFF:  Asked and answered.

112

**EXHIBIT B**
**155**

ROUGH DRAFT

13:46:42  1           THE WITNESS:  No.

13:46:42  2    BY MR. PETROCELLI:

13:46:45  3        Q.  Were you even aware of the subject prior to

13:46:48  4    the time of Joe -- that Joe died?

13:46:50  5           MR. TOBEROFF:  Asked and answered.

13:46:51  6           THE WITNESS:  No.

13:46:51  7    BY MR. PETROCELLI:

13:46:54  8        Q.  When is the first time you ever learned

13:46:57  9    about the side that an heir an author, I should say

13:47:04 10    could terminate a right interest?

13:47:08 11           MR. TOBEROFF:  You mean a copyright grant.

13:47:10 12           MR. PETROCELLI:  Copyright grant, yes.

13:47:14 13           THE WITNESS:  Probably around 1998.

13:47:14 14    BY MR. PETROCELLI:

13:47:19 15        Q.  And how did you become aware of it?

13:47:20 16        A.  I became aware of the idea of the

13:47:26 17    possibility, it's as I stated before, I did some

13:47:33 18    research in copyrigh law --

13:47:36 19        Q.  Yeah, I want to make sure you're

13:47:37 20    understanding what I'm asking.  I'm not asking you

13:47:39 21    when you standard to believe that the Shuster family

13:47:42 22    had the ability to terminate a copyright grant? I'm

13:47:45 23    asking when did you first become aware that there

13:47:47 24    was even such a thing possible in the law of

13:47:51 25    copyright that creators could terminate copyright

113

**EXHIBIT B**
**156**

ROUGH DRAFT

13:47:54  1  grants?

13:47:55  2      A.  It's -- well, it would be around that time

13:47:58  3  and that's when I heard something about the Siegel

13:48:01  4  termination.

13:48:03  5      Q.  Okay.  And when you heard that, did you

13:48:08  6  talk to your mom about it and ask -- because she was

13:48:11  7  the sole beneficiary of the estate, whether she knew

13:48:15  8  anything about this, whether she had ever spoken to

13:48:18  9  her brother about it, you know --

13:48:20  10      A.  Well, no, I don't think so.  Initially I

13:48:23  11  didn't think that we had anything.

13:48:24  12      Q.  Why did you think that?  Because your

13:48:27  13  reading of the code?

13:48:28  14      A.  Yes.

13:48:29  15      Q.  Okay.  Did you -- during this period, '97,

13:48:34  16  '98 that you're now describing, did you come across

13:48:41  17  any of the agreements that Joe had signed with DC or

13:48:47  18  Warner Bros. including Exhibit 2 in front of you?

13:48:50  19      A.  No.

13:48:53  20      Q.  As of the time that you first contacted

13:48:54  21  Mr. Toberoff, had you come across Exhibit 2?

13:49:00  22      A.  No.

13:49:03  23      Q.  Had you come across any of the agreements

13:49:06  24  that had been signed either by Joe Shuster or by

13:49:11  25  Jean Peavy or by Frank Shuster?

114

**EXHIBIT B**
**157**

ROUGH DRAFT

13:49:13 1          A.  I don't believe so.

13:49:17 2          Q.  Were you aware of the existence of such

13:49:19 3     agreements as of the time you contacted

13:49:21 4     Mr. Toberoff?

13:49:23 5          A.  I don't think so.

13:49:30 6          Q.  And re mines me, I may have asked you this,

13:49:32 7     when was the first time you saw Exhibit 2?

13:49:41 8          MR. TOBEROFF:  Lacks foundation.  Assumes

13:49:43 9     facts.

13:49:47 10         You can answer.

13:49:47 11         THE WITNESS:  Oh.  I don't think I've seen

13:49:50 12    it before, actually.

13:49:50 13    BY MR. PETROCELLI:

13:49:52 14         Q.  Before today?

13:49:52 15         A.  Yes.

13:49:53 16         Q.  Okay.  When your uncle died Joe Shuster in

13:50:33 17    July of 1992, did you become aware about any

13:50:37 18    dealings that your mother then had with DC Comics or

13:50:42 19    Warner communications regarding financial affairs?

13:50:48 20         A.  Yeah, the only dealing I'm aware of is she

13:50:55 21    asked for them to cover some expenses because he

13:50:58 22    had -- he had more debts than assets.

13:51:01 23         Q.  Okay.  Well take a look at Exhibit 3.

13:51:07 24    Jason.  You can maybe make a file there so we don't

13:51:15 25    lose track of the official exhibits.  Mr. Peary can

115

**EXHIBIT B**
**158**

ROUGH DRAFT

13:51:19  1    also take that complaint.  Put that over there, too.

13:51:22  2    Thank you.

13:51:23  3              (The document referred to was

13:51:23  4              marked for identification by the

13:51:23  5              C.S.R. as Exhibit 3 and attached to

13:51:23  6              this deposition.)

13:51:23  7    BY MR. PETROCELLI:

13:51:26  8        Q.  Exhibit 3 is two documents.  One is a

13:51:32  9    handwritten note from Jean Peavy to Paul, Paul is

13:51:36 10    Paul Levitz, dated August 21, 1992 and then there's

13:51:41 11    a typewritten letter from Jean to Marty Payson ckdoc

13:51:47 12    the then vice president of Time-Warner dated

13:51:49 13    August 21, 1992.

13:51:52 14              Have you ever seen either of these

13:51:53 15    documents before?

13:51:59 16        A.  I don't believe so, no.

13:52:02 17        Q.  In 1992 -- well turn to the top of page 2

13:52:19 18    of the typewritten letter.

13:52:28 19              Your mom's typewritten letter.  Do you have

13:52:30 20    that?

13:52:30 21        A.  Yes.

13:52:30 22        Q.  And you'll see at the very top of the page

13:52:33 23    in that first paragraph that says this is very

13:52:35 24    embarrassing"?

13:52:36 25        A.  Yes.

116

**EXHIBIT B**
**159**

ROUGH DRAFT

13:52:38  1        Q.  She says in the middle of the sentence, in

13:52:41  2    the middle of the paragraph:

13:52:42  3             "I had my son itemize Joe's

13:52:45  4         1992 checks and bank statements to

13:52:47  5         see where his money went.  We've

13:52:51  6         been able to account for most of

13:52:53  7         his checks."

13:52:53  8        And that's something that you did at your

13:52:56  9    mom's request, right?

13:52:56  10       A.  Yeah, at the time of his death.

13:52:56  11       Q.  Correct?

13:52:56  12       A.  Yes.

13:52:58  13       Q.  Okay.  Were you aware that your mother was

13:53:00  14   communicating with Time-Warner about these matters?

13:53:07  15       A.  I had some awareness.

13:53:09  16       Q.  Did you help her draft the letters?

13:53:12  17       A.  I -- no, I did not.

13:53:14  18       Q.  Were you living with her at the time?

13:53:15  19       A.  Yes, I was -- after my father had died and

13:53:21  20   before we moved to Santa Fe, yes.

13:53:23  21       Q.  I thought your dad died in 1996?

13:53:25  22       A.  Yes.

13:53:25  23       Q.  This is 1992?

13:53:26  24       A.  Wait a minute.  After?  Oh I'm mixed up.

13:53:28  25   Sorry.  Okay well he was alive, then. , yeah.

117

**EXHIBIT B**
**160**

ROUGH DRAFT

13:53:31  1    Anyway, I -- 1992.  That's a long time ago.  Didn't

13:53:38  2    realize.

13:53:38  3         I -- no, I did not help her with this,

13:53:41  4    though.  I did not see this.

13:53:42  5         Q.  Do you know if your dad was helping your

13:53:44  6    mom write these letters?

13:53:46  7         A.  No, I don't know.

13:53:53  8         Q.  Did you attend Joe Shuster's funeral?

13:53:56  9         A.  Yes.

13:54:02  10        Q.  The one in Los Angeles or the memorial

13:54:03  11   service in New York?

13:54:04  12        A.  It was New York.

13:54:15  13        Q.  Videographer interruption.

13:54:15  14   BY MR. PETROCELLI:

13:54:18  15        Q.  The next paragraph on the second page of

13:54:24  16   your mother's typewritten letter it indicates that

13:54:35  17   Joe was paying over $1,200 a month to Joanne Siegel

13:54:40  18   for some kind of commission.

13:54:41  19        Do you see that?

13:54:41  20        A.  Yes.

13:54:42  21        Q.  Were you aware over the years that your

13:54:47  22   uncle was paying a commission to the Siegel family?

13:54:55  23        A.  Not at the time.

13:54:57  24        Q.  And after your uncle's death in 1992, were

13:55:01  25   you aware that those commission payments continued?

118

**EXHIBIT B**
**161**

ROUGH DRAFT

13:55:08  1        A.  After his death?

13:55:11  2        Q.  Yes.  Were you aware whether any commission

13:55:13  3    payments continued to Joanne Siegel after Joe's

13:55:16  4    death based on money that Warner Bros. or Warner

13:55:21  5    communication or DC was paying to the Shuster

13:55:25  6    family?

13:55:26  7        A.  She might have mentioned something about

13:55:29  8    it.

13:55:30  9        Q.  She being whom?

13:55:30  10       A.  Jean.

13:55:32  11       Q.  Mentioned to you that commissions were

13:55:33  12   being paid?

13:55:34  13       A.  I -- I think she mentioned something.

13:55:36  14   That's all I can recall.

13:55:37  15       Q.  And do you know why commissions were being

13:55:41  16   paid to Joanne Siegel for monies paid to the Shuster

13:55:44  17   family?

13:55:45  18       A.  Not really.

13:55:49  19       Q.  Did you ever ask why are we paying her

13:55:52  20   money?

13:55:52  21       A.  Well, it was Joe, she told me it was Joe

13:55:56  22   that was paying.

13:55:56  23       Q.  What about after Joe's death?

13:55:59  24       A.  No.

13:55:59  25       Q.  No what?

119

**EXHIBIT B**
**162**

ROUGH DRAFT

13:55:59  1       A.  There was nothing paid after his death.

13:56:05  2       Q.  Okay.  Go down to the fourth paragraph,

13:56:07  3   take a quick look at that, Joe's lady friend?

13:56:10  4       A.  Uh-huh.

13:56:20  5       Q.  It said Joe's lady friend admitted to me

13:56:24  6   how generous he had been to her and her son.  Her

13:56:27  7   son is a psychology professor.

13:56:27  8           Do you see that?

13:56:30  9       A.  Yes.

13:56:30  10      Q.  Do you know who Joe's lady friend was at

13:56:33  11  that time?

13:56:38  12      A.  I never met her, I just saw pictures as we

13:56:43  13  stated earlier yes, sir I just saw pictures of her.

13:56:46  14      Q.  Is it your understanding the reference to

13:56:48  15  the lady friend was the woman that Joe had married

13:56:50  16  because you talked about pictures of Joe's former

13:56:52  17  spouse?

13:56:52  18      A.  That's a good question.  Joe's lady friend

13:56:59  19  Ts must have been another lady friend after.

13:57:01  20      Q.  Did you ever meet that person?

13:57:03  21      A.  No.

13:57:04  22      Q.  Do you know who the son is, the psychology

13:57:05  23  professor?

13:57:05  24      A.  I think I very briefly met him very briefly

13:57:11  25  after Joe's death.

120

**EXHIBIT B**
**163**

ROUGH DRAFT

13:57:13  1     Q.  Where did you meet him?

13:57:16  2     A.  He came by Joe's a apartment briefly.

13:57:20  3     Q.  Do you remember his name?

13:57:21  4     A.  Oh, boy, no.

13:57:22  5     Q.  Have you had any contact with him since?

13:57:23  6     A.  No.

13:57:24  7     Q.  Do you know where he taught?

13:57:28  8     A.  No, I don't remember.

13:57:36  9     Q.  And then if you go to the last page of your

13:57:37 10   mother's letter, you'll see a reference to the

13:57:41 11   agreement with Joanne Siegel to take 20 percent of

13:57:44 12   his, his being Joe's being.

13:57:48 13        Have you ever seen a written agreement to

13:57:50 14   that effect?

13:57:51 15     A.  No, I haven't.

13:57:59 16     Q.  Now, did you have any interactions at all

13:58:01 17   in 1992 with the people at Time-Warner, time --

13:58:06 18   Time-Warner or DC Comics?

13:58:07 19     A.  No.

13:58:08 20     Q.  Like Paul Levitz or Marty Payson, any of

13:58:11 21   those people?

13:58:12 22     A.  No, I did not.  SP.

13:58:13 23     Q.  At any time prior to contacting

13:58:17 24   Mr. Toberoff did you have any contact with any

13:58:20 25   representatives of DC Comics or Time-Warner?

121

**EXHIBIT B**
**164**

ROUGH DRAFT

13:58:26  1        A.  If -- if I had -- I might have had contact

13:58:32  2    but it wasn't regarding any rights.

13:58:34  3        Q.  What was it regarding?

13:58:36  4        A.  I think my mother had written to Paul about

13:58:41  5    A I've got a screen play, are you interested?  And

13:58:45  6    there was another book that I had written to submit

13:58:51  7    to Warner books and she had asked for a contact.

13:58:57  8    That's all I recall.

13:58:58  9        Q.  Did you ever talk to Frank Shuster, he was

13:59:01 10    your uncle, right?

13:59:01 11        A.  Yes.

13:59:03 12        Q.  About Joe Shuster's copyright interests?

13:59:08 13        A.  No.

13:59:18 14        Q.  Do you know what year your uncle passed

13:59:22 15    away?

13:59:22 16        A.  I don't recall the exact year.

13:59:29 17        Q.  1996 sound right?

13:59:32 18        A.  Yeah.

13:59:32 19        Q.  Okay.  Prior to Frank Shuster's death,

13:59:39 20    that's what I meant by your uncle?

13:59:43 21        A.  Uh-huh.

13:59:43 22        Q.  Prior to Frank Shuster's death in 1996, to

13:59:46 23    be clear, you never had any discussions with him on

13:59:49 24    the subject of copyright interests or terminating

13:59:50 25    copyright interests?

122

**EXHIBIT B**
**165**

ROUGH DRAFT

13:59:50  1        A.  No, I did not.

13:59:52  2        Q.  Okay.  Can you turn to Exhibit 4?

14:00:14  3        A.  Oh, okay.

14:00:14  4            (The document referred to was

14:00:14  5            marked for identification by the

14:00:14  6            C.S.R. as Exhibit 4 and attached to

14:00:16  7            this deposition.)

14:00:16  8    BY MR. PETROCELLI:

14:00:16  9        Q.  This is a letter from Frank Shuster to Paul

14:00:18 10    Levitz dated September 10, 1992.

14:00:23 11            Have you ever seen this letter before

14:00:24 12    today?

14:00:35 13        A.  I don't think so --

14:00:36 14        Q.  Did you become aware that after Joe

14:00:37 15    Shuster's death as a result of your mother's efforts

14:00:46 16    DC Comics or Time-Warner agreed to make pension

14:00:54 17    payments or payments to the Shuster family?

14:00:57 18        A.  I was aware of a pension agreement.

14:01:02 19        Q.  And are you aware that after Joe Shuster's

14:01:04 20    death, that -- that the folks at Time-Warner or DC

14:01:12 21    Comics agreed to increase payments?

14:01:17 22        A.  No, I didn't know the details, no.

14:01:21 23        Q.  Was your father working in 1992 or was he

14:01:27 24    retired or disabled?

14:01:33 25        A.  I believe he was mostly retired.

123

**EXHIBIT B**
**166**

ROUGH DRAFT

14:01:40  1          Q.  Do you know if he had a pension?

14:01:41  2          A.  Yes.

14:01:44  3          Q.  From where?

14:01:50  4          A.  It was a teacher retirement system and a

14:01:52  5     civil service.

14:01:54  6          Q.  From Texas?

14:01:55  7          A.  Yes.

14:01:58  8          Q.  El- -- where did you say?

14:01:59  9          A.  Texas A&M.

14:02:01  10         Q.  That's right, Texas A&M.

14:02:03  11             Did your mother have any source of income

14:02:10  12    in 1992 in the years thereafter other than what she

14:02:13  13    received from DC Comics or Time-Warner?

14:02:16  14         A.  She had a survivor's pension.

14:02:23  15         Q.  From your dad -- for your dad's employment?

14:02:26  16         A.  Yes.

14:02:26  17         Q.  Other than that?

14:02:26  18         A.  No.

14:02:31  19         Q.  And forgive me, I don't remember your

14:02:33  20    answer, but have you seen this document Exhibit 4

14:02:37  21    before today?

14:02:38  22         A.  I don't believe so.

14:02:43  23         Q.  Okay.  Were you aware that Frank Shuster

14:02:46  24    had requested that payments -- were you aware that

14:02:54  25    Time-Warner or DC Comics was making payments also to

124

**EXHIBIT B**
**167**

ROUGH DRAFT

14:02:58  1    Frank Shuster after Joe Shuster's death?

14:03:03  2        A.  I don't -- no, I don't think I knew the

14:03:05  3    details.

14:03:05  4        Q.  Did you know that he was receiving money?

14:03:07  5        A.  No.

14:03:12  6        Q.  I'll direct you to the third paragraph of

14:03:16  7    this letter by Frank to Paul Levitz.  He states the

14:03:22  8    suggestion that payments were made in her name,

14:03:25  9    meaning your mother's name -- she would not pursue

14:03:30 10    the termination of the Superman copyright as

14:03:33 11    provided for to creators heirs in the 1976 U.S.

14:03:38 12    copyright act and that she could send me whatever

14:03:43 13    money I wanted as a gift which would not be taxable

14:03:45 14    to me."

14:03:46 15        Were you aware of an arrangement whereby DC

14:03:50 16    Comics or Time-Warner agreed to give money to Jean

14:03:55 17    who in turn would then gift it to Frank.

14:03:58 18        A.  I never heard that from her, those details,

14:04:04 19    no.

14:04:05 20        Q.  Did you know of any of this prior to the

14:04:07 21    time you contacted Mr. Toberoff?

14:04:09 22        A.  I don't think I did.

14:04:14 23        Q.  Prior to the time you contacted

14:04:16 24    Mr. Toberoff, did you know that Frank Shuster had

14:04:21 25    suggested that Jean Peavy would not pursue the

125

**EXHIBIT B**
**168**

ROUGH DRAFT

| | | |
|---|---|---|
| 14:04:26 | 1 | termination of the Superman copyright under the 1976 |
| 14:04:31 | 2 | U.S. copyright act? |
| 14:04:32 | 3 | A.  I didn't know anything about this. |
| 14:04:36 | 4 | Q.  Is this the first time you've learned about |
| 14:04:40 | 5 | that? |
| 14:04:40 | 6 | A.  Yes. |
| 14:04:41 | 7 | Q.  Okay.  Go to the second page of this letter |
| 14:04:51 | 8 | and you'll see in the second paragraph that it |
| 14:04:53 | 9 | refers to the memorial service held in New York on |
| 14:04:56 | 10 | September 24.  It says: |
| 14:05:00 | 11 | "Some of Joe's relatives have |
| 14:05:02 | 12 | said they would like to attend." |
| 14:05:05 | 13 | You indicated you attended, right. |
| 14:05:05 | 14 | A.  Yes. |
| 14:05:08 | 15 | Q.  Who else attended, if you remember? |
| 14:05:12 | 16 | A.  Oh, boy.  There was -- it seems to me that |
| 14:05:19 | 17 | some of Siegel's relatives might have been there |
| 14:05:21 | 18 | because they lived in the northeast part of the |
| 14:05:23 | 19 | country. |
| 14:05:23 | 20 | Q.  The Siegel relatives? |
| 14:05:25 | 21 | A.  A few.  I don't recall -- I didn't know |
| 14:05:27 | 22 | really any of the others.  I don't recall any other |
| 14:05:32 | 23 | Shuster relatives besides Frank. |
| 14:05:34 | 24 | Q.  Your sister attend, Dawn? |
| 14:05:39 | 25 | A.  No.  I don't think so. |

126

ROUGH DRAFT

14:05:40  1      Q.  Your father?

14:05:40  2      A.  Yes.

14:05:41  3      Q.  And your mother?

14:05:42  4      A.  Yes.

14:05:43  5      Q.  And Frank?

14:05:44  6      A.  Right.

14:05:47  7      Q.  Let's turn to Exhibit 5.

14:05:59  8          (The document referred to was

14:05:59  9          marked for identification by the

14:05:59 10          C.S.R. as Exhibit 5 and attached to

14:06:02 11          this deposition.)

14:06:02 12  BY MR. PETROCELLI:

14:06:03 13      Q.  Exhibit 5 is an agreement apparently signed

14:06:08 14  by Frank Shuster and Jean Peavy on October 2, 1992

14:06:13 15  dated as of August 1, 1992.

14:06:18 16          An agreement between DC Comics and Jean

14:06:22 17  Shuster Peavy and Frank Shuster.

14:06:25 18          Have you ever seen this document before

14:06:27 19  today?

14:06:28 20      A.  Yes.

14:06:29 21      Q.  When did you first see this document?

14:06:30 22      A.  I -- I found it in -- when I started

14:06:36 23  working with Marc Toberoff and we were -- it came up

14:06:42 24  at that time, sometime around -- sometime around

14:06:45 25  that time, as I recall.

127

**EXHIBIT B**

**170**

ROUGH DRAFT

14:06:49  1        Q.  Where did you find this document?

14:06:54  2        A.  Where -- that's a good question.  Marc

14:06:59  3    Toberoff might have showed it to me.  I don't -- I

14:07:03  4    don't recall where I first saw it.  I know that I

14:07:05  5    saw it around that time.

14:07:07  6        Q.  Did you send -- after you retained

14:07:11  7    Mr. Toberoff or around the time you retained him,

14:07:13  8    did you collect materials and send them to him?

14:07:17  9        A.  Yes.

14:07:20  10       Q.  Was this Exhibit 5 one of the documents you

14:07:24  11   sent him?

14:07:26  12       A.  It could have been.

14:07:28  13       Q.  Did you discuss Exhibit 5 with your mother?

14:07:31  14       A.  I don't know.  I don't remember.  I

14:07:40  15   don't -- I -- that was when I saw it.  I didn't know

14:07:44  16   it was until at that time, I didn't-I didn't know

14:07:48  17   she had this.

14:07:50  18       Q.  When you saw it is when you first learned

14:07:51  19   that -- that Frank and Jean were getting $25,000 a

14:07:57  20   year and all?

14:07:58  21       A.  Yes.

14:07:58  22       Q.  The other details in this?

14:08:00  23       A.  Yes.

14:08:06  24       Q.  Now at the -- around this time then you had

14:08:08  25   been doing your research on the copyright

128

**EXHIBIT B**
**171**

ROUGH DRAFT

14:08:11  1    termination issue, including having read the 1998

14:08:16  2    amendment to the copyright law right?

14:08:18  3        A.  Yes.

14:08:18  4            MR. TOBEROFF:  Objection.  Misstates his

14:08:20  5    testimony.

14:08:20  6    BY MR. PETROCELLI:

14:08:23  7        Q.  And?

14:08:25  8            MR. TOBEROFF:  Give me time to object

14:08:26  9    please and listen carefully to all aspects of his

14:08:30 10    questions.

14:08:30 11    BY MR. PETROCELLI:

14:08:32 12        Q.  You had -- you reached out to Mr. Toberoff

14:08:41 13    in 2001, you said, and you had reached out to the

14:08:45 14    Albuquerque lawyer around the second half of 1999?

14:08:49 15        A.  Yes.

14:08:49 16        Q.  And in between that time period, were you

14:08:55 17    steadily doing research on this issue of whether

14:08:58 18    there were termination rights under the -- under the

14:09:01 19    copyright laws?  Or had you put it down for a while

14:09:05 20    and then started up again in 2001?

14:09:12 21        A.  Oh, I -- I don't remember exactly how much

14:09:15 22    research I did this between those times.  I'm not

14:09:18 23    sure.  I might have set it aside and started up

14:09:22 24    again.

14:09:23 25        Q.  And at the point when you first went to

129

**EXHIBIT B**

**172**

ROUGH DRAFT

14:09:27  1    your mom to explain that you had been doing this

14:09:30  2    research, and you had reached out and found a lawyer

14:09:34  3    that you wanted to recommend?

14:09:35  4         A.  Uh-huh.

14:09:37  5         Q.  -- did you discuss this letter with her and

14:09:40  6    whether this letter affected the family's ability to

14:09:45  7    claim any termination rights?

14:09:47  8         A.  I didn't know about it, then.

14:09:49  9         Q.  Well, you learned about it not long

14:09:53 10    thereafter, right, because you found it as among the

14:09:56 11    materials that you were gathering for Mr. Toberoff,

14:09:56 12    right?

14:09:59 13         A.  When I entered into an agreement with

14:10:01 14    Mr. Toberoff around that time.

14:10:05 15         Q.  It's when you found it, right?

14:10:05 16         A.  Yes.

14:10:08 17         Q.  And you don't remember where you found it?

14:10:09 18         A.  It would have been -- it would have been in

14:10:16 19    Jean's files somewhere.

14:10:18 20         Q.  When you say "Jean's files, do you call

14:10:20 21    your mom Jean?

14:10:21 22         A.  Oftentimes.  Sometimes mom and oftentimes

14:10:24 23    Jean.

14:10:24 24         Q.  Okay.  When you -- where are Jean's files,

14:10:41 25    as you put it, -- strike that.

                                                            130

**EXHIBIT B**
**173**

ROUGH DRAFT

14:10:42  1          Where were -- you were living in 19 -- in

14:10:47  2    2001 when you retained Mr. Toberoff in the same home

14:10:52  3    you're living now?

14:10:53  4        A.  Yes.

14:10:54  5        Q.  Okay.  And does Jean have her own study or

14:10:57  6    place where she keeps her files?

14:10:59  7        A.  Yes.

14:11:00  8        Q.  Separate from yours?

14:11:01  9        A.  Yes.

14:11:04 10        Q.  And when you were doing your research, did

14:11:07 11    you even before you called Mr. Toberoff, did you go

14:11:12 12    through Jean's files to see what documents she had

14:11:15 13    relating to Joe Shuster's copyrights?

14:11:21 14        A.  No.  I didn't.

14:11:32 15        Q.  At the time -- at the time that you first

14:11:45 16    saw Exhibit 5, I assume you read it, correct?

14:11:45 17        A.  Yes.

14:11:55 18        Q.  Okay.  And you saw the reference in the

14:11:57 19    second paragraph to fully settling all claims to any

14:12:10 20    payments or other rights or remedies which you may

14:12:12 21    have under any other agreement or otherwise whether

14:12:16 22    now or hereafter existing regarding any copyrights,

14:12:20 23    trademarks or other property right and any and all

14:12:24 24    works created in whole or in part by your brother

14:12:27 25    Joseph Shuster or any works based there on.

                                                        131

**EXHIBIT B**
**174**

ROUGH DRAFT

14:12:32  1         You read that language, right?

14:12:32  2    A.   Yes.

14:12:34  3    Q.   And you also read the next sentence which

14:12:36  4  said in any event you now grant to us any such

14:12:39  5  rights and release us.  Our licensees and all others

14:12:45  6  and it goes on and I won't read the rest of the --

14:12:48  7  the legal words there.

14:12:50  8         When you read those words in that second

14:12:54  9  paragraph, did you believe they had any impact on

14:13:00 10  whether your family had any termination rights?

14:13:08 11    A.   If I can answer that, I -- no, I did not

14:13:12 12  think it affected the -- the rights that I was

14:13:16 13  looking at.

14:13:17 14    Q.   And why is that?

14:13:20 15    A.   Because the copyright act allows the

14:13:25 16  estate's rights.

14:13:32 17    Q.   Because the copyright act allows the

14:13:37 18  estate's rights?

14:13:38 19    A.   Grants estates rates.

14:13:40 20    Q.   Okay.

14:13:41 21    A.   Estates, rights.

14:13:42 22    Q.   Okay.

14:13:45 23         MR. TOBEROFF:  Apostrophe you mean.

14:13:45 24  BY MR. PETROCELLI:

14:13:47 25    Q.   Apostrophe you mean?

132

**EXHIBIT B**
**175**

ROUGH DRAFT

14:13:48  1        A.  Okay, yes.

14:13:50  2        Q.  Did you consult with anyone other than

14:13:53  3    Mr. Toberoff whether this paragraph had any affect

14:13:57  4    on any termination rights you were inquiring about?

14:14:00  5        A.  No.

14:14:03  6        Q.  Did you go to your mom and say, Jean,

14:14:06  7    what's this about, you know, why did we do this, ask

14:14:13  8    her to explain the circumstances to you?  Did you

14:14:15  9    have any discussion with her about this agreement

14:14:19  10   and in particular, the paragraph that I just read to

14:14:23  11   you?

14:14:25  12       A.  I'm sure I asked her about it.

14:14:28  13       Q.  What did she say?

14:14:31  14       MR. TOBEROFF:  Again, I just -- and I'm --

14:14:35  15   I want you to freely testify based on your memory

14:14:38  16   but when you say "I'm sure I asked her about it,"

14:14:41  17   that makes me wonder whether you recall asking her

14:14:45  18   about it or you're assuming you asked her about it.

14:14:49  19   I don't want you to make assumptions and speculate.

14:14:51  20       THE WITNESS:  Okay.

14:14:51  21       MR. TOBEROFF:  I want you to testify from

14:14:51  22   memory.

14:14:52  23       THE WITNESS:  I don't remember.

14:14:53  24       MR. TOBEROFF:  Even if you have the

14:14:54  25   slightest memory I want you to testify as to that

                                                              133

ROUGH DRAFT

14:14:57  1    memory as Mr. Petrocelli aptly put it.

14:15:01  2            THE WITNESS:  I don't remember what I said.

14:15:02  3    I can't recall the conversation.  I'm just assuming

14:15:05  4    that I asked her about it.

14:15:09  5            MR. TOBEROFF:  I don't want you to assume.

14:15:10  6    I want you to testify from your memory.

14:15:12  7            THE WITNESS:  Okay. Well I don't recall the

14:15:13  8    conversation.

14:15:13  9    BY MR. PETROCELLI:

14:15:20  10       Q.  Now, you said you read that paragraph and

14:15:24  11   having studied the copyright code in which estates

14:15:28  12   had certain rights you believe that this paragraph

14:15:30  13   had no bearing on the estates' rights, correct?

14:15:39  14       A.  Yes.

14:15:40  15       Q.  Is that a conclusion that you reached

14:15:43  16   without much thought or did you think about it?  Did

14:15:46  17   you go back and look at the code?  Did you ask

14:15:51  18   around?  Did you inquire of the Siegels?

14:15:55  19       A.  I am -- employed Marc Toberoff to represent

14:15:58  20   me.

14:16:06  21       Q.  And is that the answer to my question?

14:16:07  22       A.  Yes, yes.

14:16:08  23       Q.  So in order to determine the impact that

14:16:09  24   this had you wanted Mr. Toberoff to assist in that?

14:16:12  25       A.  Yes.

**EXHIBIT B**

**177**

ROUGH DRAFT

14:16:13  1          Q.  Okay.  Did you receive any money when you

14:16:20  2   signed the first document or agreement with

14:16:23  3   Mr. Toberoff?

14:16:24  4          A.  No.

14:16:26  5          Q.  Did he pay you or your family any money?

14:16:28  6          A.  No.

14:16:51  7          Q.  As we'll see momentarily, you -- the first

14:16:55  8   agreement you signed was with a company that

14:17:00  9   Mr. Toberoff owned called Pacific Pictures

14:17:04 10   Corporation.  Do you remember the name of that

14:17:05 11   company?

14:17:06 12          A.  Yes.

14:17:09 13          Q.  Did you receive any money or did members of

14:17:11 14   your family receive any money from Pacific Pictures

14:17:14 15   Corporation?

14:17:14 16          A.  No.

14:17:14 17          Q.  Or any other entity with which Mr. Toberoff

14:17:17 18   was affiliated?

14:17:18 19          A.  No.

14:17:26 20          Q.  Now, I'll come back to this letter moment,

14:17:40 21   this agreement, Exhibit 5, but let's go to Exhibit 6

14:17:43 22   now.

14:17:43 23              (The document referred to was

14:17:43 24              marked for identification by the

14:17:43 25              C.S.R. as Exhibit 5 and attached to

135

**EXHIBIT B**

**178**

ROUGH DRAFT

14:17:52  1          this deposition.)

14:17:52  2      BY MR. PETROCELLI:

14:17:53  3          Q.  Exhibit 6 is a document, letter between

14:17:55  4      Frank Shuster and Paul Levitz dated October 2, 1992.

14:18:07  5      Which briefly states in consideration of the

14:18:09  6      agreement dated as of August 1, 1992, between DC

14:18:13  7      Comics, myself and Jean Shuster Peavy, I hear by way

14:18:17  8      of any rights or remedies that I may have under the

14:18:19  9      agreement dated December 23, 1975 between Warner

14:18:25 10      communications, Inc., Jerome Siegel and Joseph

14:18:29 11      Shuster.

14:18:30 12          This is the first time you've seen this

14:18:35 13      document?

14:18:35 14          A.  Yes.

14:18:36 15          Q.  Okay.  One second.  Jason --

14:18:51 16          (Pause in proceedings.)

14:18:51 17      BY MR. PETROCELLI:

14:19:08 18          Q.  After Joe Shuster passed away in 1992, did

14:19:11 19      you assist in finding an estate lawyer or anybody to

14:19:17 20      deal with his estate issues?

14:19:22 21          A.  No.

14:19:30 22          Q.  Did you come across a copy of his will in

14:19:33 23      1992?

14:19:34 24          A.  I don't know if we found his copy.  We had

14:19:43 25      a copy and an original.  I don't know if we found

136

**EXHIBIT B**

**179**

ROUGH DRAFT

14:19:48  1    his copy.  It was disorganized.

14:19:52  2        Q.  Did you find an original?

14:19:54  3        A.  Yes.

14:19:56  4        Q.  Is there any reason why the original wasn't

14:19:58  5    made available when the probate was opened in

14:20:01  6    Los Angeles in 2003?

14:20:04  7        A.  Yes.

14:20:06  8        Q.  What's the reason?

14:20:06  9        A.  My mother had lost it back in a file

14:20:10  10   somewhere, mixed up.  We found it later.

14:20:15  11       Q.  When did you start using your lock box?

14:20:22  12       A.  Soon thereafter.

14:20:23  13          MR. PETROCELLI:  Jason does this have an

14:20:25  14   Exhibit Number?

14:20:27  15          MR. TOKORO:  Yes, it's number 26.

14:20:31  16          MR. PETROCELLI:  I already used 26 I

14:20:32  17   thought, no?  I used 24.  Okay.

14:20:37  18             (The document referred to was

14:20:37  19             marked for identification by the

14:20:37  20             C.S.R. as Exhibit 26 and attached

14:20:38  21             to this deposition.)

14:20:38  22   BY MR. PETROCELLI:

14:20:38  23       Q.  Take a look at Exhibit 26.

14:20:43  24          This is a copy of Mr. Shuster's -- what

14:20:48  25   purports to be Mr. Shuster's last will and

137

**EXHIBIT B**
**180**

ROUGH DRAFT

14:20:50   1    testament.  And you've seen a copy of his will

14:20:56   2    before, right?

14:20:56   3        A.  Yes.

14:20:59   4        Q.  And by the way, on the second page it

14:21:01   5    identifies a couple of the -- it identifies two

14:21:05   6    witnesses to the execution of his will.  Do you know

14:21:11   7    who these people are?

14:21:14   8        A.  Not personally, no.

14:21:16   9        Q.  Have you ever spoken to them?

14:21:16   10       A.  No.

14:21:24   11       Q.  One is named Tom last name seems to be FA?

14:21:29   12           MR. TOBEROFF:  FE.

14:21:30   13           MR. PETROCELLI:  FE N/A U G H T Y and the

14:21:37   14   other one appears to be Robert S Williams.

14:21:40   15           Q.  But you don't know either of them.

14:21:41   16           Is that right ?

14:21:42   17       A.  I don't know them.

14:21:43   18       Q.  Either of these two people?

14:21:44   19       A.  I don't know them, no.

14:21:46   20       Q.  Never heard the names before, right?

14:21:50   21       A.  Only when I saw the -- the will.

14:21:52   22       Q.  Did you try contacting them?

14:21:54   23       A.  No.

14:21:55   24       Q.  Okay.  Now attached to this document on the

14:21:58   25   third page of Exhibit 26 is an affidavit of Jean

                                                            138

**EXHIBIT B**
**181**

ROUGH DRAFT

14:22:03  1    Peavy under California probate code section 13101.

14:22:12  2    It's dated August 17, 1992 and it's signed by Jean

14:22:15  3    Peavy.

14:22:16  4         Do you -- have you ever seen this document

14:22:19  5    before?

14:22:20  6    A.   I might have seen this document.

14:22:31  7    Q.   Do you know --

14:22:31  8    A.   I might have seen this.

14:22:33  9    Q.   What do you remember about it?

14:22:36 10    A.   I know that his estate was so small that he

14:22:38 11    had to go through the small estates -- small estates

14:22:49 12    code or something like that.  That was -- that's all

14:22:52 13    I know.

14:22:52 14    Q.   Do you know who prepared this document?

14:22:56 15    A.   I don't remember.

14:22:59 16    Q.   Did you assist in finding a person to

14:23:01 17    prepare it?

14:23:05 18    A.   Yeah, I might have assisted.

14:23:07 19    Q.   Who did you locate?  An attorney?

14:23:14 20    A.   No.  I don't believe so.  I don't believe

14:23:14 21    so.

14:23:18 22    Q.   Who did you locate?

14:23:19 23    A.   It would have been either a friend,

14:23:34 24    unless -- unless I helped with it.  I'm not sure.

14:23:38 25    Q.   Which friend?

139

**EXHIBIT B**
**182**

ROUGH DRAFT

14:23:39  1        A.  I don't -- I don't know.  I don't remember.

14:23:41  2    I -- it's -- it's quite a while back.

14:23:46  3        Q.  A friend in -- in Los Angeles?  Or where

14:23:51  4    you lived?

14:23:52  5        A.  Yeah, it could have been Los Angeles.

14:23:53  6        Q.  What friend did you have in Los Angeles

14:23:55  7    that might have assisted you in 1992?

14:23:57  8        A.  I might have done this.  Just with the

14:23:59  9    small estate -- I might have assisted her with this.

14:24:04  10   I'm not recalling

14:24:04  11       Q.  You might have prepared it?

14:24:05  12       A.  I might have.  Yeah, it's been a long time.

14:24:15  13       Q.  What happens to the shares of stock in

14:24:16  14   time -- in the Time-Warner rights?  Those were given

14:24:19  15   to your mom?

14:24:20  16       A.  Yeah, those were stock rights, I believe.

14:24:23  17   Not copyright rights.  Stock.  It was -- gee, it

14:24:29  18   must have -- I don't know, she must have -- she must

14:24:34  19   have sold the stock for cash, I guess.

14:24:37  20       Q.  To have prepared a document like this, did

14:24:42  21   you research the law books and find a -- a model

14:24:45  22   that you could use?

14:24:50  23       A.  I must have.  I -- it was such a -- this --

14:24:53  24   the estate had a negative net worth or it was very

14:24:57  25   small.  It was very small.  That's what it was.

140

**EXHIBIT B**
**183**

ROUGH DRAFT

14:24:59  1       Q.  Under $60,000?

14:25:00  2       A.  Yes.  Yeah it was smaller than that even,

14:25:02  3   so --

14:25:03  4       Q.  Paragraph 5 says it's under $60,000?

14:25:05  5       A.  Right.

14:25:05  6       Q.  Right?

14:25:06  7           Okay let's take a look at Exhibit 7.

14:25:12  8             (The document referred to was

14:25:12  9             marked for identification by the

14:25:12 10             C.S.R. as Exhibit 7 and attached to

14:25:21 11             this deposition.)

14:25:21 12           THE WITNESS:  7?

14:25:21 13   BY MR. PETROCELLI:

14:25:25 14       Q.  This is a letter from Jean to Paul Levitz

14:25:28 15   of DC dated April 27, 1995 thanking Paul for the

14:25:37 16   book the adventures of Superman by Lawther, L O W T

14:25:42 17   H ER that Paul sent.  Talking about the low us and

14:25:48 18   Clark show and then states being in the middle I do

14:25:53 19   hope you will remember Frank and myself once again.

14:25:56 20   Is it possible to reward us with a gift versus a

14:26:00 21   bonus so that there's no tax liability to us."

14:26:06 22           Did you become -- first of all, have you

14:26:11 23   seen this document Exhibit 7 before today.

14:26:13 24       A.  I don't think I have, no.

14:26:16 25       Q.  Were you aware that from time to time your

141

**EXHIBIT B**
**184**

ROUGH DRAFT

14:26:18  1    mom had requested bonuses or -- or gifts from DC in

14:26:26  2    addition to what was provided in the 1992 agreement?

14:26:32  3        A.  She might have mentioned something.  I have

14:26:36  4    not seen this.

14:26:41  5        Q.  Let's turn to the next exhibit, Exhibit 8.

14:26:44  6    This is a letter from Jean to Paul Levitz dated

14:26:47  7    September 7, 1999.

14:26:50  8            (The document referred to was

14:26:50  9            marked for identification by the

14:26:50  10           C.S.R. as Exhibit 8 and attached to

14:27:01  11           this deposition.)

14:27:01  12   BY MR. PETROCELLI:

14:27:02  13       Q.  In the first paragraph it says Mike Catron

14:27:04  14   recently sent me a video he made of the 1919 action

14:27:08  15   number 1 comic book panel which I had participated

14:27:11  16   in.

14:27:11  17           Mike Catron is a fellow you know who lives

14:27:15  18   in Pennsylvania.

14:27:15  19           Is that right?

14:27:15  20       A.  Yes.

14:27:16  21       Q.  Okay.  Is is one of Mikes hobbies comic

14:27:23  22   books or is he involved in the comic book business

14:27:25  23   somehow?

14:27:26  24       A.  Yes, he is interested.

14:27:28  25       Q.  As a hobby or professionally?

142

**EXHIBIT B**
**185**

ROUGH DRAFT

14:27:29  1        A.  Yes, possibly.

14:27:31  2        Q.  Had you ever seen this video that he sent

14:27:33  3     your mom?

14:27:37  4        A.  I don't know if I saw that video.  I don't

14:27:40  5     remember.

14:27:40  6        Q.  Have you ever seen this letter before

14:27:42  7     today, Exhibit 8?

14:27:45  8        A.  No, this is -- this is her doing.

14:27:52  9        Q.  And you see in the third paragraph it says

14:27:54  10    had you once told Frank and I that instead of a

14:27:56  11    yearly raise of the pension you would prefer to

14:27:59  12    offer a bonus directly from DC itself.  I'm making

14:28:03  13    that request again for 1999.

14:28:04  14        Did she discuss any of these affairs with

14:28:07  15    you that she was asking for bonuses and how much she

14:28:10  16    would receive and so forth?  Would she discuss these

14:28:18  17    matters with you?

14:28:19  18        A.  From time to time.

14:28:19  19        Q.  How much was she receiving do you know?

14:28:24  20        A.  As far as I know, every now and then she

14:28:27  21    would get a small bonus.

14:28:33  22        Q.  Did she ever ask for your help in any way?

14:28:36  23        A.  No, these letters are hers.  I didn't have

14:28:41  24    any involvement in this.

14:28:44  25        Q.  Did you have the view that let's say around

                                                              143

**EXHIBIT B**
**186**

ROUGH DRAFT

14:28:46  1    1998 to 1999, that your family had not been

14:28:52  2    adequately compensated by DC Comics or Time-Warner?

14:28:58  3        A.  Did I have that view?

14:28:58  4        Q.  Yes.

14:28:58  5        A.  Yes.

14:29:01  6        Q.  What informed that view?

14:29:08  7        A.  What informed the view?

14:29:09  8        Q.  Yeah, why did you feel that way?

14:29:13  9        A.  The value of Superman from my own ideas of

14:29:20 10    what I know of it.

14:29:27 11        Q.  When did you first have that view?

14:29:30 12        A.  About how much Superman is worth?

14:29:32 13        Q.  That you did not believe your family was

14:29:34 14    being properly compensated?

14:29:40 15        A.  When did I first have that view?  Well,

14:29:46 16    maybe later on when I -- when I -- I realized how --

14:29:56 17    how broke Joe was when he died and I know that

14:30:02 18    Superman had brought in billions in revenues over

14:30:06 19    the years and they had a -- basically just how --

14:30:14 20    how poor he was in relation to the value of

14:30:18 21    Superman.

14:30:20 22        Q.  But you also knew that Joe never felt the

14:30:22 23    need to terminate or try to terminate his copyright

14:30:26 24    grants, right?

14:30:30 25            MR. TOBEROFF:  Assumes facts.

                                                        144

**EXHIBIT B**
**187**

ROUGH DRAFT

14:30:31  1          THE WITNESS:  My knowledge of the history

14:30:36  2     is that they did try to get rights back at times.

14:30:36  3     BY MR. PETROCELLI:

14:30:40  4          Q.  He never tried to get rights back under the

14:30:43  5     termination provisions of the 1976 copyright act,

14:30:43  6     right?

14:30:47  7          A.  Not that I -- no, not on that.

14:30:49  8          Q.  Did you ever inquire why if he felt -- if

14:30:53  9     he was as broke as -- as you say he was, why he

14:30:56 10     didn't seek to terminate any copyright grants that

14:31:00 11     he had given?

14:31:02 12          A.  I didn't ask him about it.

14:31:04 13          Q.  Did you ask your mother?

14:31:05 14          A.  No.

14:31:11 15          Q.  Did you become aware as part of your

14:31:13 16     research that as early as 1994 Joe Shuster had the

14:31:17 17     right to serve a notice of copyright termination

14:31:23 18     under the 1976 act?

14:31:24 19          A.  No.

14:31:26 20          Q.  And that he lived for eight years without

14:31:29 21     having done so?

14:31:32 22          A.  I was not aware.

14:31:35 23          Q.  After you saw how broke he was, and I know

14:31:37 24     you were involved in totaling up the -- the checks

14:31:39 25     and the bills that we saw from your mother's letter,

145

**EXHIBIT B**
**188**

ROUGH DRAFT

14:31:44  1    did you discuss with your mother the idea that hey,

14:31:47  2    what happened here?  You know, why is he so broke?

14:31:50  3    Superman has made billions?

14:31:55  4        A.  Yeah, might have -- might have asked her

14:31:58  5    about it.

14:31:58  6        Q.  What did she say?

14:32:02  7        A.  That it's just expressed that it was just

14:32:08  8    an injustice and it was just -- it wasn't right,

14:32:14  9    that type of thing.

14:32:19 10        Q.  How did you know as early as $19.92 when

14:32:23 11    Joe Shuster died that Superman had --, as you put

14:32:26 12    it, generated billions of in revenue?

14:32:28 13        A.  Well, I had seen Superman all my life.  I

14:32:32 14    grew up -- grew up with Superman and the -- the big

14:32:37 15    movie in '79, the big Superman movie or '78, I was

14:32:44 16    aware that was the first big Blockbuster super hero

14:32:48 17    movie that started the whole genre of superior hero

14:32:53 18    movies that is just the range so I'm just aware

14:32:55 19    of -- of how wide spread it is and popular.

14:32:58 20        Q.  You were aware of this in 1992 when Joe

14:33:00 21    died broke, right?

14:33:02 22        A.  Yeah, just in general of how the history of

14:33:06 23    Superman and how big it is.

14:33:13 24        Q.  And come you had this conversation with

14:33:15 25    your mother right after Joe's death, you're telling

146

**EXHIBIT B**
**189**

ROUGH DRAFT

14:33:23 1    us that she agreed with you?

14:33:24 2        A.  Well, she expressed to me that she thought

14:33:31 3    it was an injustice and did I agree with her is that

14:33:34 4    what you're asking?

14:33:35 5        Q.  Yes?

14:33:36 6        A.  Well, yes.

14:33:39 7        Q.  The injustice that she expressed to you was

14:33:41 8    that Joe had so little money when Superman had

14:33:44 9    generated so much?

14:33:45 10        A.  Yes.

14:33:53 11        Q.  So did it come as a surprise to you then

14:33:55 12    that she entered into an agreement after that

14:33:59 13    conversation with DC and Time-Warner in which she

14:34:06 14    gave up any copyright interest that the family might

14:34:10 15    have?

14:34:10 16        A.  I don't know what her thinking was.

14:34:13 17            MR. TOBEROFF:  Sorry.  Assumes facts.

14:34:16 18    Lacks foundation.

14:34:16 19    BY MR. PETROCELLI:

14:34:18 20        Q.  She didn't consult with you, right?

14:34:18 21        A.  No.

14:34:20 22        Q.  She was certainly of sound mind in 1992,

14:34:20 23    right?

14:34:20 24        A.  Yes.

14:34:24 25        Q.  When she was expressing to you the

147

**EXHIBIT B**
**190**

ROUGH DRAFT

14:34:26 1    injustice after Joe's death, you didn't think she --

14:34:30 2    she was mentally infirm, you thought that she was

14:34:34 3    healthy and sound and knew exactly what she was

14:34:35 4    saying, right?

14:34:36 5        A.  Yes.

14:34:36 6        Q.  And in -- and she didn't consult with you

14:34:41 7    when she signed that agreement, Exhibit 5, as of

14:34:46 8    August 31, 1992, correct?

14:34:48 9        A.  That's correct.

14:34:50 10       Q.  And when you saw it, were you surprised

14:34:52 11   that she had signed that agreement given her

14:34:54 12   statements to you that it was an injustice?

14:34:57 13       A.  Well, yes.

14:34:59 14       Q.  Do you think that she felt like the

14:35:00 15   injustice had been rectified by virtue of her having

14:35:05 16   obtains that agreement from DC?

14:35:07 17           MR. TOBEROFF:  Calls for speculation.

14:35:09 18           THE WITNESS:  I can answer.

14:35:09 19   BY MR. PETROCELLI:

14:35:17 20       Q.  Did you discuss that with her when you saw

14:35:18 21   the letter?

14:35:20 22       A.  Yeah what was the original question?

14:35:21 23       Q.  When you saw the letter, the agreement,

14:35:23 24   Exhibit 5, and I misspoke, I said August 31, it's

14:35:28 25   August 1, 1992, when you found it and you saw it,

148

**EXHIBIT B**
**191**

ROUGH DRAFT

14:35:36  1    did you have a discussion with her to the effect

14:35:38  2    that -- about whether she felt better now that the

14:35:42  3    injustice had been -- had been rectified because DC

14:35:47  4    has -- had entered into this agreement?

14:35:50  5        A.  No, she didn't feel it had been rectified.

14:35:52  6        Q.  How do you know?

14:35:54  7        A.  This is what I recall her telling me 17,000

14:35:57  8    year after tax as a pension didn't feel it was

14:36:01  9    rectified.

14:36:02  10       Q.  Did she -- but you didn't know about this

14:36:04  11   agreement when she told you that, right?

14:36:06  12       A.  No. , no.

14:36:06  13       Q.  And when you saw the agreement, did you

14:36:09  14   have a discussion with her about why did you sign

14:36:11  15   it?

14:36:11  16       A.  Well, well, yeah, I -- I -- I -- I can't

14:36:17  17   recall what exactly I said but I -- I -- I'm sure I

14:36:20  18   talked with her.

14:36:22  19       Q.  Do you know why -- did you ask her well

14:36:26  20   since we -- since you knew about it the time you

14:36:29  21   signed this agreement how valuable Superman was, we

14:36:32  22   had talked about how it was an injustice that Joe

14:36:35  23   died broke when it made so much money, what was your

14:36:38  24   thinking in signing this agreement, Exhibit 5?  Did

14:36:42  25   you have that kind of conversation with her?

149

**EXHIBIT B**
**192**

ROUGH DRAFT

14:36:43  1        A.  Oh, if I asked her that?

14:36:45  2        Q.  Did you have that kind of discussion with

14:36:46  3    her?

14:36:46  4        A.  I -- I -- her thinking was that.

14:36:50  5            MR. TOBEROFF:  Answer the question.

14:36:50  6    BY MR. PETROCELLI:

14:36:51  7        Q.  Did you have that kind of a discussion with

14:36:53  8    her?

14:36:53  9        A.  Oh,.  Okay.  Did --

14:36:56  10       Q.  Are you tracking what I'm asking you?

14:36:57  11       A.  Yes.  Yes.  I -- I asked her.

14:37:03  12       Q.  And what did she say?

14:37:06  13       A.  That she didn't feel that it had rectified

14:37:10  14   anything.

14:37:11  15       Q.  Did you ask well then why did you sign it?

14:37:15  16   Why didn't ask you for more?

14:37:16  17       A.  I don't -- I don't recall the details.

14:37:19  18       Q.  Did she say I asked for millions and they

14:37:21  19   said no?

14:37:23  20       A.  I -- I think she didn't believe she had any

14:37:26  21   rights at that time.

14:37:30  22       Q.  Why did she agree to give up termination

14:37:33  23   rights if she didn't have any?

14:37:35  24       A.  I don't know.

14:37:36  25           MR. TOBEROFF:  Assumes facts.  Lacks

                                                              150

**EXHIBIT B**

**193**

ROUGH DRAFT

14:37:39  1    foundation.  You got to -- we're speeding up here so

14:37:41  2    you got to keep the same -- he can speed it up.  You

14:37:44  3    stay the same pace.  Give me time to object.

14:37:47  4         THE WITNESS:  Okay.

14:37:47  5    BY MR. PETROCELLI:

14:37:52  6         Q.  Did she have a discussion with you where

14:37:55  7    she said I agree to give up termination rights even

14:38:03  8    though I didn't have any?

14:38:08  9         A.  I don't -- I don't think she understood

14:38:14 10    exactly what she signed.  I don't think she

14:38:17 11    understood the details.  That's my impression.

14:38:22 12         Q.  She didn't tell you that she didn't

14:38:26 13    understand it, right?

14:38:27 14         A.  That was my impression that she didn't.

14:38:29 15         Q.  But she didn't tell you that, right?

14:38:31 16         A.  That -- specifically that I don't

14:38:32 17    understand the details?

14:38:33 18         Q.  Right.  She did not say to you, I did not

14:38:36 19    understand what I was signing back in 1992",

14:38:36 20    correct?

14:38:40 21         A.  She didn't say that specifically.

14:38:46 22         Q.  And, in fact, she never once brought this

14:38:48 23    agreement to your attention until you first found it

14:38:50 24    and asked her about it, right?

14:38:51 25         A.  Yes.

                                                          151

**EXHIBIT B**
**194**

ROUGH DRAFT

14:38:52  1         Q.  Were you upset when you saw that she had

14:38:58  2     signed this agreement?

14:38:58  3         A.  Yes.

14:39:01  4         Q.  Why?

14:39:04  5         A.  I -- I didn't know if it affected our

14:39:07  6     rights or not.

14:39:09  7         Q.  Why?  Why didn't you know?

14:39:13  8         A.  I didn't know because I'm not a legal

14:39:15  9     expert.

14:39:18 10         Q.  But you were concerned about it, right?

14:39:21 11         A.  I had concerns.

14:39:24 12         Q.  Did you ask her why she didn't consult with

14:39:29 13     a lawyer in 1992?  Or whether she had?

14:39:34 14         A.  I don't know if I asked her about that.

14:39:36 15         Q.  Do you know if she had?

14:39:39 16         A.  I don't know.

14:39:43 17         Q.  Were you upset that she hadn't consulted

14:39:47 18     with you in 1992 before signing this document?

14:39:51 19         A.  Was I upset?  Well, I couldn't do anything

14:39:53 20     about it.  So I -- I decided to -- to pursue legal

14:40:00 21     advice instead of getting upset.

14:40:04 22         Q.  Do you have Exhibit 8 in front of you?  Do

14:40:14 23     you have it in front of you?

14:40:15 24         A.  Yes.

14:40:16 25         Q.  The last paragraph says -- this is your

152

**EXHIBIT B**
**195**

ROUGH DRAFT

14:40:18  1    mother's letter again, September 7, 1999:

14:40:22  2                    "I have learned from the

14:40:23  3                    Internet that Joanne Siegel has

14:40:25  4                    filed a copyright claim for

14:40:27  5                    Superman.  I want you to know that

14:40:29  6                    I intent to continue to honor our

14:40:31  7                    pension agreement.  I would however

14:40:35  8                    appreciate a generous bonus for

14:40:37  9                    this year as you have done many

14:40:39 10                    times in the past."

14:40:45 11        Q.  And this is the first time you've seen this

14:40:48 12    letter?

14:40:48 13        A.  Yes.

14:40:50 14        Q.  Okay.  And your mother did not tell you

14:40:52 15    that she was expressing her gratitude to DC as late

14:40:55 16    as 1999, even after knowing that the Siegel family

14:40:58 17    had terminated their interest -- had sought to

14:41:02 18    terminate their copyright?

14:41:03 19        A.  No, I did not know about this.

14:41:04 20        Q.  And did you not know that your mother with

14:41:07 21    knowledge that the Siegel family had filed for

14:41:11 22    copyright termination, told DC that she intended to

14:41:17 23    honor their agreement?

14:41:18 24        A.  I didn't know this letter.

14:41:26 25        Q.  Are you aware of any letter that Jean wrote

                                                              153

**EXHIBIT B**
**196**

ROUGH DRAFT

14:41:28 1    to DC after she signed the 1992 agreement saying

14:41:31 2    that DC was mistreating her or that there was a

14:41:35 3    grave injustice being perpetrated on her, or her

14:41:38 4    family?

14:41:41 5        A.  I'm not aware of any of her letters really.

14:41:44 6        Q.  Have you ever seen such a letter to that

14:41:46 7    effect?

14:41:46 8        A.  No.

14:42:00 9        Q.  After you have the conversation with Jean

14:42:04 10   following Joe's death about the injustice, did you

14:42:09 11   continue to have conversations with her over the

14:42:12 12   years from let's say 1992 to 2001 about this

14:42:18 13   injustice?

14:42:20 14       A.  I believe it came up from time to time.

14:42:28 15       Q.  And when it came up she was not telling you

14:42:31 16   that she was thanking and expressing her gratitude

14:42:36 17   to DC and affirmatively telling them she had no

14:42:40 18   intent to exercise any copyright termination rights?

14:42:43 19       A.  No, she wasn't telling me that.

14:43:02 20       Q.  Have you -- did you make this letter

14:43:04 21   available to Mr. Toberoff when you signed the first

14:43:08 22   document with him?

14:43:11 23       A.  Exhibit 8?

14:43:11 24       Q.  Yes.

14:43:18 25       A.  I don't remember.

154

**EXHIBIT B**
**197**

ROUGH DRAFT

14:43:19  1      Q.  You had never seen it before now, right?

14:43:21  2      A.  No, I don't -- I don't remember Siegel it

14:43:25  3  before now, so -- no, I don't.

14:43:31  4      Q.  Do you think it -- it matters that your --

14:43:35  5  your mom specifically told DC in September of 1999

14:43:40  6  that she had no intent to terminate any interest in

14:43:42  7  Superman?

14:43:46  8          MR. TOBEROFF:  Ambiguous.  You can only

14:43:48  9  answer to the extent your answer to that question

14:43:50  10 isn't based on conversations with your attorney and

14:43:53  11 legal advice from your attorney.

14:43:58  12         THE WITNESS:  Yeah, well, issues of -- of

14:44:03  13 rights are all based on my attorney discussions.

14:44:08  14         (Instruction not to answer.)

14:44:08  15 BY MR. PETROCELLI:

14:44:09  16     Q.  What about your conversations with your

14:44:11  17 mom?  When you -- have you had any conversations

14:44:18  18 with her in recent years when you -- in which you

14:44:27  19 asked her why were you -- why did you tell DC you

14:44:31  20 wouldn't exercise any rights even after you knew

14:44:33  21 that the law had changed and that the Siegel family

14:44:38  22 was doing so?  Did you ever have that kind of

14:44:40  23 conversation with her?

14:44:40  24     A.  I never berated her.

14:44:42  25     Q.  I didn't say berate her.  Did you inquire

155

**EXHIBIT B**
**198**

ROUGH DRAFT

14:44:45 1    of her?

14:44:46 2        A.  Inquire.

14:44:46 3        Q.  Why she would tell DC that she had no

14:44:49 4    intent to exercise any copyright claims, no intent

14:44:52 5    to terminate?

14:44:55 6        A.  Did I --

14:44:56 7        Q.  Even after the Siegel family terminated

14:45:01 8    following the 1998 change in the law?

14:45:07 9            MR. TOBEROFF:  Assumes facts.  Lacks

14:45:13 10   foundation.

14:45:13 11       A.  I never really asked her that specifically.

14:45:13 12   BY MR. PETROCELLI:

14:45:22 13       Q.  When you -- did you remember when you

14:45:27 14   finally sat down and told her that you had been

14:45:29 15   doing all of this research and all of this work and

14:45:32 16   wanted to go out and hire a lawyer and -- and

14:45:37 17   terminate grants in Superman that Joe Shuster had

14:45:44 18   made years before?  Do you remember that

14:45:46 19   conversation?

14:45:49 20           MR. TOBEROFF:  Assumes facts.  Lacks

14:45:52 21   foundation.

14:45:52 22           THE WITNESS:  Not -- not the specific

14:45:57 23   conversation, no.  Not a specific conversation.

14:45:57 24   BY MR. PETROCELLI:

14:46:02 25       Q.  Well, you said you hasn't -- you didn't

156

**EXHIBIT B**
**199**

ROUGH DRAFT

14:46:04  1    tell her initially because you wanted to be

14:46:07  2    thorough, remember?

14:46:07  3        A.  Right.

14:46:08  4        Q.  And you were doing this research, you

14:46:09  5    identified Mr. Toberoff and then at some point you

14:46:12  6    told her?

14:46:12  7        A.  Yes.

14:46:14  8        Q.  That you had been -- did you tell her look,

14:46:16  9    Jean, or mom, I've been?

14:46:17 10        A.  Yeah.

14:46:18 11        Q.  Doing all this work and I want to go ahead

14:46:21 12    and do this?

14:46:23 13        A.  At some point I would have said something

14:46:25 14    to that effect.

14:46:30 15        Q.  And do you remember what she said to you?

14:46:32 16        A.  She didn't -- it was not really.  It was

14:46:42 17    something that was my initiative so no she didn't

14:46:45 18    say anything particular.

14:46:53 19        Q.  Exhibit 9, take a look at Exhibit 9.

14:47:03 20            (The document referred to was

14:47:03 21            marked for identification by the

14:47:03 22            C.S.R. as Exhibit 9 and attached to

14:47:16 23            this deposition.)

14:47:16 24            MR. PETROCELLI:  This is the notice of

14:47:19 25    termination sent by the Siegels in 1997.

157

**EXHIBIT B**
**200**

ROUGH DRAFT

14:47:31 1        Q.  Have you ever seen this before?

14:47:32 2        A.  No.

14:47:34 3        Q.  Did you come across this in any of your

14:47:36 4    research?

14:47:39 5        A.  No.  I did not look at this.

14:47:40 6        Q.  Your mom wrote that she saw that the Siegel

14:47:42 7    family had -- had effectuated a termination by

14:47:48 8    looking on the Internet.

14:47:50 9            She would use the Internet as of 1999?

14:47:55 10       A.  That was probably a result of my research

14:47:59 11   on the Internet.

14:48:01 12       Q.  Did she use the computer?

14:48:02 13       A.  No.

14:48:04 14       Q.  So you found it on the Internet?

14:48:06 15       A.  Yes.

14:48:07 16       Q.  How did you find it?

14:48:10 17       A.

14:48:10 18           MR. TOBEROFF:  Let's be clear.  Are you

14:48:11 19   asking whether he found this document on the

14:48:13 20   Internet?

14:48:13 21           MR. PETROCELLI:  No.  I'm asking about the

14:48:15 22   facts of termination.

14:48:17 23           THE WITNESS:  Oh.  Just general searches.

14:48:24 24   Lots of different sites.

14:48:24 25   BY MR. PETROCELLI:

                                                              158

**EXHIBIT B**
**201**

ROUGH DRAFT

14:48:27  1        Q.  Is that how you first learned it or was it

14:48:29  2    mentioned by the Siegel family and then you went on

14:48:32  3    the Internet to follow up?  Do you remember what the

14:48:34  4    sequence?

14:48:35  5        A.  I first found out about it in my own

14:48:37  6    research.

14:48:37  7        Q.  Did you come across this document, Exhibit

14:48:39  8    9?

14:48:43  9        A.  No.

14:48:43  10       Q.  Have you ever seen it before today?

14:48:44  11       A.  No.

14:48:51  12       Q.  When you learned that the Siegels had

14:48:53  13   terminated in 1999 as a result of your research, did

14:48:55  14   you understand that they had terminated a copyright

14:48:59  15   grants with respect to both Superman and Superboy?

14:49:03  16       A.  Yes.

14:49:04  17       Q.  That was in the research that you found?

14:49:11  18       A.  I don't know if I had that level of

14:49:13  19   understanding until I consulted with Marc Toberoff.

14:49:15  20       Q.  Prior to consulting with Marc Toberoff, did

14:49:19  21   you have a view based on the research that you had

14:49:23  22   done or anything else about whether the Shuster

14:49:26  23   family had any rights to Superboy as opposed

14:49:29  24   Superman?

14:49:36  25       A.  I didn't consider Superboy.  I mainly

159

**EXHIBIT B**
**202**

ROUGH DRAFT

14:49:38  1    focused on Superman.

14:49:40  2        Q.  Well, you were aware of Superboy, right?

14:49:40  3        A.  Yes.

14:49:43  4        Q.  Did you have a -- did you make a decision

14:49:48  5    not to -- to exclude Superboy from your

14:49:50  6    consideration?

14:49:53  7        A.  That was only after consulting with my

14:49:56  8    attorney.

14:49:56  9        Q.  Your attorney is Richard Toberoff.

14:49:57 10        Is that right?

14:49:58 11        MR. TOBEROFF:  Don't talk about the

14:49:59 12    substance of your consultation with your attorney

14:50:01 13    either directly or by implication.

14:50:01 14    BY MR. PETROCELLI:

14:50:07 15        Q.  Your attorney is Mr. Toberoff for the

14:50:07 16    record.

14:50:07 17        Is that right?

14:50:07 18        A.  Yes.

14:50:07 19        Q.  Again I'm referring to before --

14:50:10 20        A.  Oh,.

14:50:10 21        Q.  -- you ever spoke to Mr. Toberoff.  Are you

14:50:12 22    with me?

14:50:13 23        A.  Yes.

14:50:14 24        Q.  Okay.  When you were doing your research

14:50:16 25    about termination of copyright grants and reading

160

**EXHIBIT B**
**203**

ROUGH DRAFT

14:50:20  1    the Code, the 1998 change of law, and so forth, you

14:50:31  2    were not making a calculated effort to exclude

14:50:34  3    Superboy from your consideration, right?

14:50:39  4        A.  Specifically.

14:50:39  5        Q.  Not specifically.  And you had no view at

14:50:43  6    the time whether Joe Shuster did or did not have any

14:50:45  7    claim to Superboy, right?

14:50:47  8        A.  Right.

14:50:50  9        Q.  And that's a view that you've only come to

14:50:52  10   hold after you contacted Mr. Toberoff, correct?

14:50:55  11       A.  Yes.

14:50:55  12       Q.  Okay.

14:51:01  13       Q.  Now prior to contacting Mr. Toberoff did

14:51:06  14   you do any research regarding Joe Shuster's role

14:51:14  15   with respect to Superboy?

14:51:16  16       A.  I -- I had a cursory knowledge of his role.

14:51:23  17       Q.  Where did you get it from?

14:51:25  18       A.  Just my understanding of the history.

14:51:29  19       Q.  Where did you get it from?

14:51:32  20       A.  It would have been various sources.  Just

14:51:34  21   reading articles about their ideas for Superboy and

14:51:41  22   just the history of articles of different kinds.

14:51:47  23       Q.  Did you do any searches of the copyright

14:51:50  24   records?  Registrations, copyright registrations, to

14:51:56  25   see what kind of copyrights Joe Shuster had filed

161

**EXHIBIT B**

**204**

ROUGH DRAFT

14:52:03 1   over the years?

14:52:05 2       A.  No, not that.

14:52:11 3       Q.  Okay.  Did you -- did you review any of the

14:52:17 4   old comic books related to Superboy to see the buy

14:52:21 5   lines?

14:52:24 6       A.  I had seen reproductions.

14:52:27 7       Q.  And did you see Joe Shuster's name

14:52:28 8   attributed to Superboy together with Jerry Siegel's?

14:52:31 9       A.  Yes.

14:52:34 10      Q.  And did you ask your mother about what she

14:52:39 11  knew regarding Joe's contributions to the creation

14:52:43 12  of Superboy?

14:52:44 13      A.  Yes.

14:52:45 14      Q.  What did she tell you?

14:52:48 15      A.  Just that they -- it was one of the

14:52:52 16  derivative characters.

14:52:54 17      Q.  Derivative of what?

14:52:55 18      A.  Of Superman.

14:53:03 19      Q.  So when you were researching copyright

14:53:08 20  termination issues in 1998 and 1999 after the change

14:53:13 21  in law and after you heard about what the Siegel

14:53:15 22  family was doing, you were looking at it broadly,

14:53:23 23  right, Superman, Superboy, whatever Joe had an

14:53:25 24  interest in, you wanted to know, correct?

14:53:27 25      A.  Yes.

162

**EXHIBIT B**
**205**

ROUGH DRAFT

14:53:29  1        Q.  By the way, why didn't you contact the
14:53:32  2    Siegels' lawyer?
14:53:37  3        A.  We didn't discuss their filing at the time.
14:53:40  4    They didn't say anything about that to us.
14:53:42  5        Q.  But once you found out they had filed it,
14:53:45  6    as you did and as your mom wrote to DC, why didn't
14:53:51  7    you instead of doing all this research to find an
14:53:54  8    attorney, why didn't you just pick up the phone and
14:53:56  9    call Joanne, a woman that you said was like a
14:53:59 10    grandmother to you, and say hey, who is your
14:54:05 11    attorney?
14:54:06 12            MR. TOBEROFF:  Misstates his testimony.
14:54:11 13            THE WITNESS:  It -- I -- I came to
14:54:15 14    understand they weren't entirely happy with their
14:54:17 15    attorney.
14:54:17 16    BY MR. PETROCELLI:
14:54:20 17        Q.  When did you understand that?
14:54:22 18        A.  I don't know.  I just heard that they
14:54:24 19    weren't.
14:54:24 20        Q.  Who told you that?
14:54:26 21        A.  I don't remember.
14:54:27 22        Q.  Can't identify anybody who told you such a
14:54:30 23    thing?
14:54:30 24        A.  No.
14:54:33 25        Q.  Did you call and ask them and say, hey, I'm

163

**EXHIBIT B**
**206**

ROUGH DRAFT

14:54:37  1    looking for an attorney regarding the Joe Shuster

14:54:42  2    rights situation and how about your attorney?  Or I

14:54:49  3    heard that your attorney, you may not be happy with

14:54:52  4    your attorney.  Did you have those kinds of

14:54:55  5    discussions with him before contacting Mr. Toberoff?

14:55:00  6        A.  I did not discuss it with him, no.

14:55:05  7        Q.  Is it fair to say that you wanted your own

14:55:07  8    attorney, not the same attorney that the Siegel

14:55:10  9    family had?

14:55:13  10       A.  That's not quite right.

14:55:15  11       Q.  Is that part of it?

14:55:18  12       A.  No.  It's not.

14:55:19  13       Q.  You didn't have any concern whatsoever

14:55:21  14   about sharing the same lawyer that the Siegel family

14:55:24  15   had?

14:55:26  16       A.  That -- that was not the issue.

14:55:28  17       Q.  I didn't ask you if that was the issue.

14:55:31  18           MR. TOBEROFF:  Asked and answered twice.

14:55:31  19   BY MR. PETROCELLI:

14:55:32  20       Q.  I asked you whether you had any concern at

14:55:34  21   all about sharing the same attorney that they had

14:55:37  22   when you were looking for an attorney.

14:55:42  23       A.  I didn't think about that at the time.

14:55:45  24       Q.  Are you saying the thought never occurred

14:55:46  25   to you to calling the Siegels and ask them who their

164

**EXHIBIT B**
**207**

ROUGH DRAFT

14:55:52  1    attorney was and at least have a conversation with

14:55:54  2    that person?

14:55:55  3        A.  Not after I found out they were unhappy

14:55:58  4    with their attorney.

14:55:58  5        Q.  What about before you found out they were

14:56:00  6    unhappy?

14:56:01  7        A.  Well, I don't know about that.  It's around

14:56:04  8    the time that I was looking into the rights issue

14:56:09  9    that I came to be aware that they were unhappy with

14:56:12  10   their attorney.

14:56:13  11       Q.  What year was that?

14:56:15  12       A.  I don't recall.

14:56:18  13       Q.  And yet you can't tell us how or who or

14:56:23  14   what you heard or anything about this notion that

14:56:26  15   they were unhappy with their attorney?

14:56:30  16       A.  Not really.  This conversations my mother

14:56:38  17   would have with Joanne could have been trauma it

14:56:44  18   could have been from something I -- I read.

14:56:46  19       Q.  Did you call them up and ask them if they

14:56:48  20   were unhappy with their attorney?

14:56:53  21       A.  No.

14:56:54  22           MR. TOBEROFF:  Asked and answered.

14:56:54  23   BY MR. PETROCELLI:

14:57:00  24       Q.  Do you know why they were unhappy with

14:57:03  25   their attorney?

165

**EXHIBIT B**
**208**

ROUGH DRAFT

14:57:03  1          A.  Not exactly.

14:57:08  2          Q.  What do you mean exactly"?  Do you know

14:57:09  3      anything about why they were unhappy with their

14:57:10  4      attorney that you learned prior to calling

14:57:18  5      Mr. Toberoff?  Not after?

14:57:20  6          A.  Oh, no, not -- not prior.  I don't know

14:57:23  7      exactly.

14:57:23  8          Q.  Okay.  Did you have any inkling that they

14:57:27  9      were unhappy with their attorney prior to your

14:57:30 10      calling Mr. Toberoff?

14:57:31 11          A.  Yes.

14:57:33 12          Q.  But you dont have any details?

14:57:34 13          A.  No.

14:57:36 14          Q.  And you never spoke to them about it?

14:57:37 15          A.  No.

14:57:44 16          Q.  We'll take a short break.

14:57:46 17              THE VIDEOGRAPHER:  Off the record.  The

14:57:47 18      time is 2:56.  There will mark end of Volume I, Tape

14:57:53 19      Number 2 in the deposition of Mark Warren Peary.  Of

15:04:15 20      of test tested test test test test test tested

15:08:49 21      test test test test of test test as you sit here

15:17:12 22      today.

15:17:12 23              THE VIDEOGRAPHER:  We're back on the

15:17:20 24      record.  This marks the beginning of Volume I, Tape

15:17:22 25      Number 3 in the deposition of Mark Warren Peary.

166

**EXHIBIT B**
**209**

ROUGH DRAFT

15:17:25  1    The time is 3:16.

15:17:25  2    BY MR. PETROCELLI:

15:17:30  3        Q.  Do you have any agreement to share in any

15:17:35  4    accounting recovery that the Siegels might obtain in

15:17:39  5    their case against DC or Warner Bros.?

15:17:48  6            MR. TOBEROFF:  I instruct you not to answer

15:17:50  7    that because it delves into the potential substance

15:17:56  8    of the consent agreements.

15:17:58  9            (Instruction not to answer.)

15:17:58 10            THE WITNESS:  I'll have to follow my

15:18:00 11    attorney's advice.

15:18:00 12    BY MR. PETROCELLI:

15:18:08 13        Q.  Putting aside the consent agreement, the

15:18:10 14    2008 consent agreement for the moment, have you

15:18:14 15    signed any agreement by which the Shuster interests

15:18:22 16    would share in any accounting recovery by the Siegel

15:18:28 17    parties?

15:18:31 18            MR. TOBEROFF:  Asked and answered.

15:18:32 19            You can answer.

15:18:34 20            THE WITNESS:  As I stated before, is

15:18:44 21    that --

15:18:45 22            MR. TOBEROFF:  You can answer the question.

15:18:45 23            THE WITNESS:  I can answer that?  Okay.

15:18:47 24            MR. TOBEROFF:  I'm just objecting for the

15:18:48 25    record that it's asked and answered.

167

**EXHIBIT B**
**210**

ROUGH DRAFT

```
15:18:50  1              THE WITNESS:  I understand?

15:18:51  2              MR. TOBEROFF:  But you can answer it again.

15:18:53  3              THE WITNESS:  No.

15:18:53  4    BY MR. PETROCELLI:

15:18:54  5         Q.  As part of the 2008 consent agreement, is

15:18:57  6    there a provision by which the Shusters share in any

15:19:00  7    accounting recoveries that the Siegels might obtain?

15:19:05  8              MR. TOBEROFF:  I instruct you not to answer

15:19:06  9    as to the contents of the consent agreement.

15:19:09 10              (Instruction not to answer.)

15:19:09 11    BY MR. PETROCELLI:

15:19:15 12         Q.  When you -- when you were doing the

15:19:19 13    research on Mr. Toberoff, did you come to learn that

15:19:29 14    in addition to being an experienced entertainment

15:19:32 15    attorney, that he was also a producer of literary

15:19:39 16    properties, including motion pictures and other

15:19:43 17    popular titles?

15:19:45 18         A.  Yes.

15:19:49 19         Q.  And how did you come to learn that?

15:19:54 20         A.  In our discussions.

15:19:57 21         Q.  With Mr. Toberoff?

15:19:58 22         A.  Yes.

15:20:10 23         Q.  Did you also see descriptions of

15:20:17 24    Mr. Toberoff's business activities outside of his

15:20:21 25    law practice on the Internet when you were doing
```

168

ROUGH DRAFT

15:20:23  1    your research?

15:20:27  2      A.  No.

15:20:28  3      Q.  References to him as an entrepreneur and

15:20:32  4    producer?

15:20:33  5      A.  No, I don't recall that.

15:20:34  6      Q.  You didn't check his Web site?

15:20:40  7      A.  Not initially, no.

15:20:41  8      Q.  At some point did you?

15:20:42  9      A.  I don't recall. I don't remember checking

15:20:47 10    his Web site.

15:20:50 11      Q.  Did you speak to anybody about Mr. Toberoff

15:20:54 12    before signing the document after having called him

15:20:57 13    and spoken to him, did you call around for

15:21:00 14    references?

15:21:01 15        MR. TOBEROFF: Asked and answered.

15:21:02 16        You can answer.

15:21:03 17        THE WITNESS: I -- I don't remember doing

15:21:14 18    that.

15:21:14 19    BY MR. PETROCELLI:

15:21:20 20      Q.  Did you speak to anybody else at his office

15:21:22 21    or at any of his companies?

15:21:24 22        MR. TOBEROFF: At any time?

15:21:25 23        MR. PETROCELLI: Prior to signing.

15:21:28 24        THE WITNESS: Not about any issues.

15:21:28 25    BY MR. PETROCELLI:

169

**EXHIBIT B**
**212**

ROUGH DRAFT

15:21:32  1       Q.  About what?

15:21:35  2       A.  Did I speak to anyone who -- maybe they

15:21:37  3   answered the phone.  So, no.

15:21:46  4       Q.  If you -- if you said you didn't do any

15:21:48  5   research -- did you do any research at all on any of

15:21:52  6   his companies like Pacific Pictures Corporation?

15:21:54  7       A.  No.

15:21:59  8       Q.  But yet you signed a contract with Pacific

15:22:03  9   Pictures Corporation?

15:22:03  10      A.  That was a -- a legal.

15:22:07  11          MR. TOBEROFF:  Just answer the question.

15:22:09  12          THE WITNESS:  Okay.  Yes.

15:22:09  13   BY MR. PETROCELLI:

15:22:11  14      Q.  Did you do any research on what was Pacific

15:22:16  15   Pictures corporation before you signed a contract

15:22:17  16   with it?

15:22:17  17      A.  No.

15:22:22  18      Q.  Did you think Pacific Pictures Corporation

15:22:23  19   was the name of a law firm?

15:22:28  20      A.  I didn't -- I didn't think about it.

15:22:31  21      Q.  In fact, the documents that you signed

15:22:33  22   specifically state that Pacific Pictures is not a

15:22:36  23   law firm, right?

15:22:42  24      A.  I -- I -- yes, I guess that's correct.

15:22:44  25      Q.  So why did you enter into a contract with a

170

ROUGH DRAFT

15:22:47 1    company that was not a law firm?

15:22:52 2        A.   That's how we retained our attorney.

15:22:55 3        Q.   Why -- why did you retain your attorney by

15:22:58 4    entering into a contract with a company that was in

15:23:01 5    the motion or in the entertainment production

15:23:03 6    business called Pacific Pictures?

15:23:07 7            MR. TOBEROFF:  Assumes facts not in

15:23:09 8    evidence.

15:23:13 9            THE WITNESS:  I don't know why he used that

15:23:14 10   format exactly.

15:23:14 11   BY MR. PETROCELLI:

15:23:16 12       Q.   Well, why were you comfortable with it?

15:23:23 13       A.   It established our legal relationship with

15:23:25 14   one another.

15:23:27 15       Q.   Why didn't you assign a simple

15:23:31 16   attorney-client legal agreement that doesn't involve

15:23:35 17   a motion -- an entertainment company called Pacific

15:23:39 18   Pictures?

15:23:40 19           MR. TOBEROFF:  Assumes facts not in

15:23:41 20   evidence.

15:23:43 21           THE WITNESS:  I don't know.

15:23:43 22   BY MR. PETROCELLI:

15:23:45 23       Q.   Did you get any advice on it from anyone

15:23:49 24   other than Mr. Toberoff?

15:23:51 25           MR. TOBEROFF:  Assumes facts not in

171

**EXHIBIT B**
**214**

ROUGH DRAFT

15:23:51  1    evidence.

15:23:54  2            THE WITNESS:  No.

15:23:54  3    BY MR. PETROCELLI:

15:23:58  4        Q.  Why did you enter into a joint venture with

15:24:03  5    Pacific Pictures?

15:24:08  6        A.  I -- I don't know why he used that

15:24:10  7    particular form.

15:24:12  8        Q.  Why are you saying -- why are you answering

15:24:14  9    my questions by telling me what Mr. Toberoff did?

15:24:17 10    You're a person, you're making decisions.  You

15:24:21 11    understood that this was an important matter, right?

15:24:21 12        A.  Yes.

15:24:24 13        Q.  You -- you had your mother's interest at

15:24:28 14    heart, right?

15:24:32 15            MR. TOBEROFF: .

15:24:32 16    BY MR. PETROCELLI:

15:24:32 17        Q.  She was the sole beneficiary of the

15:24:34 18    termination interest that you were seeking to

15:24:36 19    pursue, correct?

15:24:38 20        A.

15:24:38 21            MR. TOBEROFF:  Assumes facts.  Lacks

15:24:38 22    foundation.

15:24:38 23    BY MR. PETROCELLI:

15:24:42 24        Q.  Am I correct, sir, that your mother, not

15:24:44 25    you, and not your sister, was the sole beneficiary

172

**EXHIBIT B**
**215**

ROUGH DRAFT

15:24:47  1    of any termination interest that the estate could --

15:24:51  2    could obtain, correct?

15:24:53  3            MR. TOBEROFF:  Assumes facts lacks

15:24:57  4    foundation.  Calls for a legal conclusion.

15:24:58  5            THE WITNESS:  I guess it's a legal

15:25:02  6    conclusion.  I don't know if I'm going to answer it,

15:25:06  7    if I'm qualified to answer.

15:25:06  8    BY MR. PETROCELLI:

15:25:09  9        Q.  I'm not asking you about legal conclusions.

15:25:11  10   I'm asking you, you signed agreements, you're acting

15:25:15  11   as an executor, you have legal duties to the Court,

15:25:18  12   you have legal duties to the beneficiary and you

15:25:22  13   can't hide behind the privilege on all these

15:25:26  14   questions.  I've been very careful in how I'm asking

15:25:28  15   these questions?

15:25:31  16           MR. TOBEROFF:  Objection.

15:25:31  17   BY MR. PETROCELLI:

15:25:32  18       Q.  So let me try this again?

15:25:34  19           MR. TOBEROFF:  Argumentative.

15:25:36  20           MR. PETROCELLI:  Well, he's parroting your

15:25:38  21   objections.  And I've been tolerant of it but I

15:25:42  22   don't want this to get carried away with that.

15:25:48  23           MR. TOBEROFF:  Argumentative.  Don't focus.

15:25:48  24           MR. PETROCELLI:  Let's try it again.

15:25:52  25           MR. TOBEROFF:  On the argument just focus

173

**EXHIBIT B**
**216**

ROUGH DRAFT

15:25:53  1    on his questions.  Every piece and every part of his

15:25:56  2    question, and answer it to the best of your ability.

15:25:56  3    BY MR. PETROCELLI:

15:26:04  4        Q.  Exactly.

15:26:04  5            You understood that when you were pursuing

15:26:08  6    this termination interest, your research, you're

15:26:10  7    looking out to hire a lawyer, your wanting to see if

15:26:14  8    your family had rights, your concern about the 1992

15:26:18  9    agreement, all of the things that we've been

15:26:21  10   discussing, you were pursuing this for the benefit

15:26:25  11   of your mother who was the sole beneficiary under

15:26:29  12   Joe Shuster's will, correct?

15:26:32  13           MR. TOBEROFF:  Assumes facts.  Lacks

15:26:36  14   foundation.

15:26:36  15           THE WITNESS:  Yes.

15:26:36  16   BY MR. PETROCELLI:

15:26:37  17       Q.  Okay.  You're not a personal beneficiary,

15:26:37  18   right?

15:26:46  19       A.  I am a per.

15:26:48  20       Q.  But your mother could change her will,

15:26:51  21   correct?  You don't have a legal right to this money

15:26:53  22   that the estate may recover, correct?

15:26:55  23           MR. TOBEROFF:  Talking about him

15:26:57  24   personally?

15:26:57  25           MR. PETROCELLI:  Correct.

                                                              174

**EXHIBIT B**
**217**

ROUGH DRAFT

15:26:57  1          THE WITNESS:  Yes.

15:26:57  2   BY MR. PETROCELLI:

15:26:58  3          Q.  Your mother could decide to give it all to

15:27:00  4   charity, right?

15:27:00  5          A.  Yes.

15:27:01  6          Q.  Okay.  Now, you understand that you have

15:27:05  7   fiduciary duty to your mother as the person who took

15:27:13  8   up this cause to pursue this termination interest,

15:27:13  9   right?

15:27:17 10          MR. TOBEROFF:  Calls for a legal

15:27:18 11   conclusion.  Could you answer to the sentence you

15:27:21 12   have knowledge.

15:27:21 13   BY MR. PETROCELLI:

15:27:21 14          Q.  I didn't ask you if you had a fiduciary

15:27:24 15   duty, I asked you did you understand that you had a

15:27:26 16   fiduciary duty?

15:27:27 17          A.  Yes.

15:27:28 18          Q.  Okay.  And then you also agree to serve as

15:27:33 19   the executor of your mother's estate in lieu of your

15:27:36 20   mother, right?

15:27:37 21          MR. TOBEROFF:  Assumes facts.  Lacks

15:27:40 22   foundation.  You can answer.

15:27:41 23          THE WITNESS:  Yes.

15:27:41 24   BY MR. PETROCELLI:

15:27:42 25          Q.  In 2003, your mother was competent.  She

175

**EXHIBIT B**
**218**

ROUGH DRAFT

15:27:45  1    had the ability to serve as an executor, correct?

15:27:45  2        A.  Yes.

15:27:54  3        Q.  Yet you were the executor, not her,

15:27:58  4    correct?

15:27:58  5        A.  Yes.

15:27:59  6        Q.  And you filed papers with the Court which

15:28:01  7    we'll -- we'll talk about, but?

15:28:04  8        A.  Yes.

15:28:05  9        Q.  Agreeing to be the executor, right?

15:28:07 10        A.  Yes.

15:28:09 11        Q.  Now, what -- what did you do -- withdrawn.

15:28:20 12            Why did you agree in lieu of entering into

15:28:26 13    a traditional lawyer client agreement to hire the

15:28:30 14    services of a lawyer, whether it's on a contingent

15:28:33 15    fee or an hourly fee, why did you agree to enter

15:28:37 16    into a joint venture with Pacific Pictures, a

15:28:45 17    company that is not a law firm?

15:28:50 18            MR. TOBEROFF:  You can't -- unless you can

15:28:56 19    answer that question independent of your discussions

15:28:58 20    with me, I instruct you not to answer.

15:29:02 21            THE WITNESS:  Okay.  I'll have to follow

15:29:07 22    your advice.

15:29:10 23            (Instruction not to answer.)

15:29:10 24    BY MR. PETROCELLI:

15:29:10 25        Q.  But you understood that Mr. Toberoff not

176

ROUGH DRAFT

15:29:13  1    only acted as a lawyer in some of your dealings with

15:29:16  2    him, but he also acted as the president of a company

15:29:19  3    with whom you entered interest a joint venture,

15:29:21  4    correct?

15:29:21  5         A.  Yes.

15:29:24  6         Q.  And that company was called Pacific

15:29:26  7    Pictures, correct?

15:29:26  8         A.  Yes.

15:29:30  9         Q.  And that company is not a law firm,

15:29:30  10   correct?

15:29:35  11        A.  Not the company.

15:29:36  12        Q.  Right.  And did you do any background on

15:29:41  13   what Pacific Pictures was, what it did in -- in

15:29:46  14   its -- in its business?

15:29:48  15            MR. TOBEROFF:  Asked and answered.

15:29:48  16   BY MR. PETROCELLI:

15:29:49  17        Q.  What assets it owned?

15:29:51  18        A.  My.

15:29:52  19            MR. TOBEROFF:  Asked and answered.  You can

15:29:54  20   answer.

15:29:54  21            THE WITNESS:  It's already -- my purpose in

15:30:00  22   contacting him was to retain legal counsel.

15:30:00  23            MR. PETROCELLI:

15:30:00  24        Q.  I didn't ask you about your purpose in

15:30:09  25   contacting him.  I'm not trying to be difficult but

**EXHIBIT B**
**220**

ROUGH DRAFT

15:30:09  1    can you repeat my question?

15:30:09  2              (The reporter read the record

15:30:09  3         as follows:

15:30:21  4              "^ QUESTION ^ ANSWER ").

15:30:21  5         THE WITNESS:  Not really, no.

15:30:21  6    BY MR. PETROCELLI:

15:30:25  7         Q.  Did you think it was a typical to enter

15:30:28  8    into a joint venture agreement with an entertainment

15:30:35  9    company instead of a standard lawyer-client

15:30:38 10    engagement letter if you're trying to secure the

15:30:42 11    services of a lawyer?

15:30:43 12              MR. TOBEROFF:  Assumes facts.

15:30:43 13    BY MR. PETROCELLI:

15:30:44 14         Q.  Did that strike you as standard or did that

15:30:46 15    strike you as somewhat unusual?

15:30:49 16         A.  I'm not familiar enough to -- for -- to

15:30:54 17    have struck me as being outline or untoward or

15:30:59 18    anything.

15:31:00 19         Q.  Well, have you ever entered into a joint

15:31:02 20    venture with anyone before?

15:31:03 21         A.  No.

15:31:10 22         Q.  This is the first joint venture you ever

15:31:13 23    entered into?

15:31:13 24         A.  Yes.

15:31:15 25         Q.  Did you -- were you concerned that by

178

**EXHIBIT B**
**221**

ROUGH DRAFT

15:31:25  1    entering into a joint venture for the purpose of

15:31:31  2    pursuing Joe Shuster's termination interests, if

15:31:36  3    any, that you were violating the law?

15:31:38  4        A.  No.

15:31:42  5        Q.  Did you receive any advice on that subject?

15:31:44  6        A.  No.

15:31:48  7        Q.  Are you aware that in the lawsuit that DC

15:31:51  8    has filed, it claims that your agreements with

15:31:55  9    Pacific Pictures did in fact violate the law?

15:32:01  10       A.  I may have scanned it.

15:32:07  11       Q.  Why did you just scan it?  You seem very

15:32:11  12   adept at reading code provisions that you find on

15:32:14  13   your own, the copyright code, the amendments in 1998

15:32:24  14   and yet you just scanned a lawsuit against you?

15:32:27  15       A.  Yes.

15:32:28  16       Q.  And against your mother relating to the

15:32:32  17   matters as to which you are executor?  And you

15:32:36  18   didn't read it carefully?  Not once?

15:32:42  19       A.  I -- I scanned it because I -- I find

15:32:47  20   the -- the claims to be unfounded and -- and it

15:32:52  21   ticks me off that they're filing the claim and I am

15:32:55  22   referring all of the detailed analysis to my

15:32:59  23   attorney because it angers me to read -- read these

15:33:04  24   claims.

15:33:05  25       Q.  Well, how could it anger you to read the

                                                                    179

**EXHIBIT B**
**222**

ROUGH DRAFT

15:33:11  1    how could it anger you unless you first understood

15:33:13  2    what the claims were which you would need to read

15:33:17  3    the complaint rather than just scan it in order to

15:33:19  4    understand?  How would you be angry about it?

15:33:22  5        A.  I understood the gist of the claims and I

15:33:27  6    find -- find them to be reprehensible that they

15:33:34  7    would sue us for trying to give us something that

15:33:37  8    the law grants to us.

15:33:39  9        Q.  Okay.  And you had that view on your own

15:33:41  10   before talking to Mr. Toberoff.

15:33:41  11           Is that right?

15:33:41  12       A.  Yes.

15:33:45  13       Q.  That's based on your scanning but not

15:33:47  14   reading carefully the complaint, right?

15:33:51  15       A.  I got the gist of it.

15:33:52  16       Q.  And -- and you did not read it word for

15:33:55  17   word.

15:33:55  18           Is that correct?

15:34:02  19       A.  I got the gist of it perhaps not word for

15:34:04  20   word.

15:34:07  21       Q.  You did not read it word for word.

15:34:08  22           Is that correct?

15:34:09  23       A.  I'd say so.

15:34:14  24       Q.  Is that the first time that a lawsuit's

15:34:16  25   been filed against you?

180

**EXHIBIT B**
**223**

ROUGH DRAFT

15:34:17 1        A.  Yes.

15:34:18 2        Q.  First time to your knowledge, a lawsuit has

15:34:19 3    been filed against your mother?

15:34:23 4        A.  Yes.

15:34:24 5        Q.  And you didn't bother to read the complaint

15:34:26 6    word for word?

15:34:27 7            MR. TOBEROFF:  He's answered that question

15:34:28 8    three times.  You don't have to answer that question

15:34:30 9    again.

15:34:30 10           THE WITNESS:  I already answered.

15:34:30 11   BY MR. PETROCELLI:

15:34:32 12       Q.  What's the answer?

15:34:33 13       A.  What I said before.

15:34:33 14       Q.  Which is what?

15:34:38 15       A.  That I read the gist of it then discussed

15:34:40 16   it with my attorney.

15:34:41 17       Q.  After you read the gist of it, you said you

15:34:46 18   got angry.

15:34:46 19           Is that right?

15:34:46 20       A.  Yes.

15:34:49 21       Q.  And why did you get angry?

15:34:55 22           MR. TOBEROFF:  He already answered that

15:34:57 23   question on his own.

15:35:00 24           But you can answer it again.

15:35:02 25           THE WITNESS:  Because DC is fighting us on

181

**EXHIBIT B**
**224**

ROUGH DRAFT

15:35:09  1    grants and rights that are granted to us by law

15:35:13  2    instead of cooperating.

15:35:13  3    BY MR. PETROCELLI:

15:35:21  4        Q.  How do you know that DC's claims are

15:35:24  5    unfounded?

15:35:27  6        A.  That's my impression from my reading and my

15:35:31  7    discussions.

15:35:32  8        Q.  Well, before talking to -- to Mr. Toberoff

15:35:34  9    based on your reading of the claims, why would you

15:35:39 10    have concluded that they're unfounded?

15:35:43 11        A.  They're trying to deny our termination

15:35:46 12    rights.  Is that pisses me off.

15:35:52 13        Q.  Are you -- but at the time that you -- but

15:35:58 14    you, yourself, didn't know about the 1992 agreement

15:36:01 15    at the time you began to undertake this research and

15:36:05 16    as you've already testified, you, yourself, were

15:36:08 17    concerned when you saw the agreement for the first

15:36:10 18    time.  And it was only after you retained

15:36:16 19    Mr. Toberoff that you formed the view that the

15:36:21 20    agreement posed no threat, correct?

15:36:24 21        A.  I was unsure what the agreement meant.

15:36:28 22        Q.  Now, could you not appreciate that DC

15:36:31 23    Comics, given even your apparent concern on reading

15:36:34 24    the agreement, might have a different view and that

15:36:37 25    that could be a matter on which reasonable minds

182

ROUGH DRAFT

15:36:40  1    could differ?

15:36:48  2         A.  What I know is that Jean and Frank had no

15:36:51  3    termination rights so it's irrelevant to this case.

15:36:55  4         Q.  How do you know that?

15:36:56  5         A.  I know that from my research and my

15:36:58  6    discussions with my attorney.

15:37:02  7         Q.  Can you appreciate that there -- well, if

15:37:04  8    they didn't have any rights, why did they agree in

15:37:12  9    writing in order to get money in order to get more

15:37:14 10    money for your family that they wouldn't assert any

15:37:19 11    such rights even if they were hereafter created?

15:37:22 12         A.  I don't know.

15:37:23 13              MR. TOBEROFF:  Misstates their letters.

15:37:26 14              MR. PETROCELLI:  Not really.

15:37:28 15              MR. TOBEROFF:  Yes, it does.

15:37:28 16    BY MR. PETROCELLI:

15:37:30 17         Q.  Well can you appreciate that -- that that's

15:37:36 18    an issue that should be resolved by the Courts?

15:37:40 19    That's a serious issue?  When you read the complaint

15:37:45 20    did that occur to you?

15:37:48 21         A.  If it has to be resolved by the courts it

15:37:50 22    will be.

15:37:51 23         Q.  And you've seen letters today that you've

15:37:53 24    never seen before, even though your attorney has a

15:37:59 25    advised you, as you've said, letters that which your

183

**EXHIBIT B**

**226**

ROUGH DRAFT

15:38:02  1    mother said she had no intention to pursue

15:38:03  2    termination rights, even after knowing about the

15:38:06  3    change of the law, even after knowing about the

15:38:08  4    Siegel family?

15:38:09  5        A.  She wrote letters to everyone frequently I

15:38:14  6    didn't know anything about.  She was always writing

15:38:16  7    and chatting and I was unaware of all this back and

15:38:21  8    forth chitchatting and letters that she was writing

15:38:24  9    off.

15:38:24  10       Q.  So you're belittling your mother?

15:38:26  11       A.  No, I'm not belittling my mother.

15:38:28  12       Q.  In 1999 writing letters?

15:38:30  13       A.  I'm not belittling her.

15:38:31  14       Q.  That -- well, sounds like you're saying

15:38:34  15   that her letters have no real meaning or consequence

15:38:37  16   and that you would have known better.  Is that a

15:38:39  17   what you're suggesting?

15:38:40  18       A.  No, no.

15:38:40  19           MR. TOBEROFF:  It.

15:38:40  20   BY MR. PETROCELLI:

15:38:42  21       Q.  Okay?

15:38:42  22           MR. TOBEROFF:  Just focus on the questions.

15:38:42  23   BY MR. PETROCELLI:

15:38:48  24       Q.  So what you're suggesting by your answer

15:38:50  25   about your mother just chitchatting is that those

184

**EXHIBIT B**
**227**

ROUGH DRAFT

15:38:52 1    letters have no real significance.

15:38:52 2          Is that right?

15:38:59 3      A.  I don't know.  She wrote letters to lots of

15:39:03 4    people I didn't know about.

15:39:05 5      Q.  You don't think your mother was capable of

15:39:07 6    expressing how she really felt about things?

15:39:10 7          MR. TOBEROFF:  Vague and ambiguous.

15:39:10 8    BY MR. PETROCELLI:

15:39:14 9      Q.  Is that what you're suggesting?

15:39:15 10     A.  No.  I don't know how to answer that.

15:39:18 11     Q.  In 1999 did your mother understand how to

15:39:21 12   express her feelings about things?

15:39:23 13     A.  Yes.

15:39:24 14     Q.  And in 1992 did she understand that?

15:39:25 15     A.  Yes.

15:39:45 16     Q.  Let me show you -- by the way, after you

15:39:48 17   hired Mr. Toberoff, have you had occasion to do any

15:39:50 18   research on all the entertainment companies with

15:39:54 19   which he is associated?

15:39:59 20         MR. TOBEROFF:  Assumes facts.  Vague and

15:40:00 21   ambiguous.

15:40:00 22   BY MR. PETROCELLI:

15:40:00 23     Q.  Such as intellectual properties worldwide,

15:40:04 24   such as IPW?

15:40:06 25     A.  I'm aware of those.

185

**EXHIBIT B**
**228**

ROUGH DRAFT

15:40:07 1      Q.  And have you researched those companies to

15:40:10 2  see what kind of business Mr. Toberoff conducts and

15:40:17 3  through those companies?

15:40:18 4          MR. TOBEROFF:  Assumes facts.

15:40:21 5          THE WITNESS:  Minimally.

15:40:21 6  BY MR. PETROCELLI:

15:40:28 7      Q.  Did you know about those other companies

15:40:30 8  when you entered into the first agreement with

15:40:33 9  Pacific Pictures?

15:40:38 10         MR. TOBEROFF:  Assumes facts.

15:40:39 11         THE WITNESS:  I don't remember about those

15:40:41 12 other companies specifically.

15:40:41 13 BY MR. PETROCELLI:

15:40:45 14     Q.  Do you believe that when you are having a

15:40:47 15 conversation with Mr. Toberoff in his role as

15:40:51 16 president of Pacific Pictures, that every one of

15:40:53 17 your conversations is a -- is an attorney client

15:40:56 18 privileged conversations?

15:40:58 19         MR. TOBEROFF:  Assumes facts.  Ask --

15:41:01 20 really asks for a legal conclusion.

15:41:02 21         MR. PETROCELLI:  No, I didn't.  I didn't

15:41:04 22 ask him what the law was I asked for his state of

15:41:07 23 mind.

15:41:07 24         MR. TOBEROFF:  His state of mind as to what

15:41:09 25 the law is.

186

**EXHIBIT B**
**229**

ROUGH DRAFT

15:41:09 1    MR. PETROCELLI: Correct.

15:41:11 2    MR. TOBEROFF: Okay.

15:41:11 3    MR. PETROCELLI: That's correct.

15:41:11 4    MR. TOBEROFF: I don't accept that carve

15:41:13 5  out.

15:41:16 6    You can answer the question.

15:41:16 7    THE WITNESS: Okay. At the time it was

15:41:20 8  Pacific Pictures. All my dealings were with Marc

15:41:23 9  Toberoff as my attorney.

15:41:23 10 BY MR. PETROCELLI:

15:41:28 11   Q. You never once communicated with the

15:41:30 12 president of Pacific Pictures, the company with whom

15:41:32 13 you entered interest a joint venture agreement?

15:41:34 14   A. No.

15:41:36 15   Q. Do you even know who the president is?

15:41:37 16   A. I -- not really. It never came up.

15:41:43 17   Q. Did you see it in the document you signed

15:41:45 18 who the president was?

15:41:46 19   A. No.

15:41:47 20   Q. You didn't read the document that you

15:41:48 21 signed?

15:41:49 22   A. Yes.

15:41:51 23   Q. And the document said that Marc Toberoff

15:41:53 24 was the president of Pacific Pictures right?

15:41:57 25   MR. TOBEROFF: Only answer to the extent

187

**EXHIBIT B**
**230**

ROUGH DRAFT

15:41:59  1   have you a recollection of that.  Otherwise he can

15:42:01  2   show you the document.

15:42:02  3        THE WITNESS:  Okay.  I don't recall.  I'd

15:42:03  4   have to see the document.

15:42:04  5        MR. PETROCELLI:  I'll slow it to you.. Next

15:42:06  6   document is Exhibit 10.

15:42:07  7        (The document referred to was

15:42:07  8        marked for identification by the

15:42:07  9        C.S.R. as Exhibit 10 and attached

15:42:24 10        to this deposition.)

15:42:24 11   BY MR. PETROCELLI:

15:42:25 12        Q.  I notice you're looking right to the end

15:42:28 13   where I wanted to direct you and you see it says

15:42:30 14   Marc Toberoff, president of Pacific Pictures

15:42:32 15   cooperation correct?

15:42:34 16        A.  Yes.

15:42:34 17        MR. TOBEROFF:  He actually was not for the

15:42:36 18   record looking right to the end he was looking in

15:42:38 19   the middle.

15:42:38 20   BY MR. PETROCELLI:

15:42:40 21        Q.  Signature page.  Do you see any signature

15:42:46 22   on this document that says Marc Toberoff, attorney?

15:42:50 23        A.  No.

15:42:55 24        Q.  Okay.  And this is in fact -- and for the

15:43:00 25   record, I will describe it as a document

188

**EXHIBIT B**
**231**

ROUGH DRAFT

15:43:02  1    entitled "Joint venture agreement as of November 23,

15:43:08  2    2001 by and between Pacific Pictures Corporation and

15:43:11  3    Jean Peavy and her son Mark Warren Peavy formerly

15:43:17  4    known as -- Mark Warren Peary formerly known as Mark

15:43:22  5    Warren Peavy signed by you correct on November 28,

15:43:27  6    2001?

15:43:27  7        A.  Yes.

15:43:27  8        Q.  And by your mother Jean?

15:43:29  9        A.  Yes.

15:43:30 10        Q.  On the same day?

15:43:33 11        A.  Yes.

15:43:33 12        Q.  And you -- and then you see that

15:43:37 13    Mr. Toberoff signed it as president of Pacific

15:43:40 14    Pictures on November 28, 2001, correct?

15:43:40 15        A.  Yes.

15:43:48 16        Q.  And this was the only agreement that you

15:43:51 17    signed in 2001 with Mr. Toberoff, right?

15:43:51 18        A.  Yes.

15:43:58 19        Q.  And you didn't sign any agreements with him

15:44:00 20    in 2002, correct?

15:44:03 21        A.  Not to my recollection.

15:44:04 22        Q.  And you signed another agreement with him

15:44:06 23    in 2003 also as president of Pacific Pictures,

15:44:06 24    correct?

15:44:06 25        A.  Yes.

189

**EXHIBIT B**
**232**

ROUGH DRAFT

15:44:16   1        Q.  And the first time you signed if he

15:44:17   2    agreement with him where he signed as a lawyer was

15:44:21   3    in 2004, correct?

15:44:21   4        A.  Yes.

15:44:24   5        Q.  That's what you've been calling the legal

15:44:25   6    retainer agreement, right?

15:44:25   7        A.  Yes.

15:44:28   8        Q.  Okay.  Now, you certainly understood this

15:44:37   9    agreement -- withdrawn you did read this agreement

15:44:40   10   word for word before you signed it, correct?

15:44:40   11       A.  Yes.

15:44:43   12       Q.  You didn't just scan it, right?

15:44:43   13       A.  Yes.

15:44:45   14       Q.  You understood that signing this was a

15:44:48   15   matter of extreme importance, correct?

15:44:50   16            MR. TOBEROFF:  Hold on.  I needs you're

15:44:51   17   answering his questions too quickly without me being

15:44:54   18   able to interject an objection okay?  You got to

15:44:57   19   pause after he asks his question so that I can

15:44:59   20   object.  He is saying correct you're saying yes

15:45:02   21   immediately and I can't object in between.

15:45:13   22            Do you understand?  Just slow is it down so

15:45:14   23   I can object.

15:45:14   24            (The reporter read the record

15:45:14   25            as follows:

190

**EXHIBIT B**
**233**

ROUGH DRAFT

15:45:23  1              "^ QUESTION ^ ANSWER ").

15:45:23  2          THE WITNESS:

15:45:27  3          MR. TOBEROFF :  You can answer.

15:45:28  4          THE WITNESS:  Yes.

15:45:28  5     BY MR. PETROCELLI:

15:45:32  6          Q.  Did you go over this carefully with your

15:45:34  7     mother before you and she signed?

15:45:39  8          A.  I went over it with her.

15:45:47  9          Q.  Now, when you signed this, did you

15:45:50 10     understood that you were expecting to at some point

15:46:00 11     serve a notice of termination with respect to the

15:46:03 12     Shuster interest.

15:46:03 13              Is that right?

15:46:03 14          A.  Yes.

15:46:07 15          Q.  Did you have an understanding when you

15:46:09 16     signed Exhibit 10 when you would serve that notice?

15:46:12 17          A.  Yes.

15:46:16 18          Q.  When?

15:46:20 19          MR. TOBEROFF:  You can -- you CAN'T --

15:46:23 20     since you've testified that you viewed me as your

15:46:26 21     attorney and you're seeking legal advice from me,

15:46:30 22     any -- you can't answer that question because that

15:46:32 23     question would be based on your discussions with me

15:46:34 24     acting as your counsel with respect to the

15:46:36 25     termination notices.  So I instruct you not to

191

**EXHIBIT B**
**234**

ROUGH DRAFT

15:46:44   1    answer.

15:46:44   2             MR. PETROCELLI:  You know we're not going

15:46:45   3    to solve the problem today of course but we dispute

15:46:48   4    that you can cover every single conversation you had

15:46:51   5    with him based on the attorney-client privilege in

15:46:55   6    the face of these documents and other facts.

15:46:58   7             (Instruction not to answer.)

15:46:58   8             MR. PETROCELLI:  Do the best I can.

15:47:09   9        Q.  Based on the research that you had done

15:47:10  10    before contacting Mr. Toberoff, did you have an

15:47:14  11    understanding as to when the earliest you could

15:47:18  12    serve a notice of termination was?

15:47:23  13             MR. TOBEROFF:  Separate from your

15:47:23  14    conversations with me.

15:47:24  15             THE WITNESS:  Well.

15:47:25  16             MR. PETROCELLI:  Well, it has to be

15:47:26  17    separate because I said before.

15:47:28  18             THE WITNESS:  Okay.  I don't believe I

15:47:32  19    understood that level of detail at that time.

15:47:32  20    BY MR. PETROCELLI:

15:47:43  21        Q.  Now you said that there were drafts of this

15:47:45  22    that went back and forth.  What changes did you make

15:47:48  23    prior to agreeing to this Exhibit 10?

15:48:05  24        A.  I believe I had some issues with if

15:48:12  25    something had happened to Marc Toberoff bodily harm

192

**EXHIBIT B**
**235**

ROUGH DRAFT

15:48:16 1    or something of that nature.

15:48:23 2         Q.  You asked him to address that?

15:48:24 3         A.  Yes.  I don't recall what else there was

15:48:32 4    discussions.

15:48:33 5         Q.  Did you -- did you have any discussions as

15:48:35 6    to why you were entering into a joint venture

15:48:41 7    agreement rather than a regular attorney-client

15:48:43 8    agreement?  And why he wasn't signing as Marc

15:48:48 9    Toberoff the lawyer?  Any discussions on that

15:48:50 10   subject?

15:48:54 11        A.  Yes.  It was -- it was clear to me that he.

15:48:59 12        MR. TOBEROFF:  Just -- just answer his --

15:49:01 13   he asked you whether you had any discussions with

15:49:04 14   me.

15:49:04 15        THE WITNESS:  Yes.

15:49:04 16        MR. TOBEROFF:  And you're launching --

15:49:06 17        MR. PETROCELLI:  I didn't actually ask with

15:49:08 18   you, I said any discussions.

15:49:10 19        MR. TOBEROFF:  And you are launching --

15:49:10 20        MR. PETROCELLI:  He said yes.

15:49:12 21        MR. TOBEROFF:  He just wanted to know if

15:49:14 22   ycu had any discussions --

15:49:15 23        THE WITNESS:  Yes.

15:49:15 24   BY MR. PETROCELLI:

15:49:15 25        Q.  With whom?

193

ROUGH DRAFT

15:49:16  1          MR. TOBEROFF:  Excuse me.  When he asks you

15:49:17  2  a question, I know it's difficult, try and answer

15:49:19  3  the question.  Don't launch into a narrative.

15:49:19  4  BY MR. PETROCELLI:

15:49:21  5      Q.  With whom?

15:49:22  6      A.  With Marc Toberoff.

15:49:27  7      Q.  What did he say and what did you say on

15:49:30  8  that subject?

15:49:30  9      A.  Can I answer?

15:49:41 10          MR. TOBEROFF:  You can -- what's the

15:49:42 11  question again?  Can you read it back to me or can

15:49:44 12  you repeat it to me.

15:49:46 13          MR. PETROCELLI:  Yeah.

15:49:47 14      Q.  What did you and he discuss on this subject

15:49:49 15  as to why you were entering into a joint venture

15:49:52 16  agreement rather than a normal attorney-client

15:49:54 17  agreement?

15:49:54 18      A.  Can I --

15:50:00 19          MR. TOBEROFF:  You can't answer that

15:50:01 20  question.

15:50:02 21          THE WITNESS:  Okay.

15:50:02 22          MR. TOBEROFF:  You cannot answer that

15:50:03 23  question.

15:50:03 24          THE WITNESS:  Okay.  Okay.

15:50:05 25          (Instruction not to answer.)

194

**EXHIBIT B**
**237**

ROUGH DRAFT

15:50:06 1          MR. PETROCELLI:

15:50:07 2          MR. TOBEROFF:  I'm instructing him not to

15:50:09 3    answer that question.

15:50:09 4          MR. PETROCELLI:  Attorney-client privilege,

15:50:09 5    right.

15:50:11 6          MR. TOBEROFF:  Yes.

15:50:12 7          THE WITNESS:  Okay.

15:50:12 8    BY MR. PETROCELLI:

15:50:15 9      Q.  Did you discuss with your mother why she

15:50:18 10   and you were forming a joint venture with a company

15:50:23 11   called pacific pictures corporation?

15:50:27 12     A.  No.

15:50:28 13     Q.  Have you ever heard of Pacific Pictures

15:50:30 14   Corporation before?

15:50:30 15     A.  No.

15:50:31 16     Q.  Were you aware of anything that it had

15:50:33 17   done?

15:50:33 18     A.  It had -- we had discussed -- discussed it.

15:50:42 19   I can't recall the details now.

15:50:44 20     Q.  Did you inquire whether Pacific Pictures

15:50:47 21   Corporation had -- had owned any other termination

15:50:53 22   interests?  Or this was the first one?

15:51:00 23         MR. TOBEROFF:  Lacks foundation.

15:51:05 24         THE WITNESS:  No, I don't know about that.

15:51:05 25   BY MR. PETROCELLI:

195

**EXHIBIT B**
**238**

ROUGH DRAFT

15:51:15  1        Q.  Did you have any discussion about giving

15:51:21  2    away 50 percent of your rights to a joint venture?

15:51:26  3        A.  Yes.

15:51:29  4        Q.  With whom?

15:51:29  5        A.  Marc Toberoff.

15:51:31  6        Q.  What did you and he discuss on that

15:51:34  7    subject?

15:51:40  8            MR. TOBEROFF:  I instruct you not to answer

15:51:41  9    as to the substance of our discussions.

15:51:44  10           (Instruction not to answer.)

15:51:44  11   BY MR. PETROCELLI:

15:51:47  12       Q.  Did you discuss that with your mother?

15:51:49  13       A.  Not -- not details, no.

15:51:58  14       Q.  Why didn't you go over this in detail with

15:52:00  15   your mother, explain exactly what was happening?

15:52:05  16   You were creating a joint venture, you're giving up

15:52:08  17   50 percent of the rights?

15:52:09  18       A.  She -- she read it.

15:52:13  19       Q.  So -- and you assumed that by her reading

15:52:16  20   it that she knew exactly what she was doing?

15:52:18  21       A.  Yes.

15:52:27  22       Q.  Just like she knew exactly what she was

15:52:29  23   doing when she signed the 92 agreement, right?

15:52:35  24       A.  I don't know.

15:52:36  25       Q.  Unsure?

196

**EXHIBIT B**
**239**

ROUGH DRAFT

15:52:37  1        A.  Unsure, yeah.

15:52:39  2        Q.  But not this one ten years later.

15:52:48  3            Was there any negotiation over the 50

15:52:52  4    percent?  Did you say 50 percent?  You got to be

15:52:54  5    kidding me?  How about 5 percent?  Or 10 percent?

15:53:01  6    You know was there any conversation about that?

15:53:06  7            MR. TOBEROFF:  You can answer at that.

15:53:06  8    BY MR. PETROCELLI:

15:53:07  9        Q.  You said there were drafts that went back

15:53:09 10    and forth?

15:53:09 11        A.  Yes, there were conversations.

15:53:10 12        Q.  What were they?  Relate them to me.

15:53:17 13            THE WITNESS:  Can I answer.

15:53:18 14            MR. TOBEROFF:  You can answer as to whether

15:53:19 15    there were negotiations regarding the 50 percent.

15:53:24 16    But not as to -- not -- just whether we had the

15:53:28 17    conversation.  Actually you already answered that.

15:53:30 18            THE WITNESS:  Yeah.

15:53:31 19            MR. TOBEROFF:  But you can't answer the

15:53:33 20    substance of our conversations.

15:53:35 21            THE WITNESS:  We had discussed the split.

15:53:35 22    BY MR. PETROCELLI:

15:53:42 23        Q.  Did you seek a lower split?  Lower for

15:53:47 24    the -- for Pacific Pictures?

15:53:51 25        A.  I -- I had asked about the split and we

                                                          197

**EXHIBIT B**
**240**

ROUGH DRAFT

15:53:55  1      discussed it back and forth and what would be

15:53:59  2      involved on Marc Toberoff's part, the work involved,

15:54:04  3      the cost he would bear.

15:54:08  4          Q.  Did you suggest a different number?

15:54:10  5          A.  I don't remember if I did.  We arrived at

15:54:24  6      a -- a mutual agreement after talking about it.

15:54:31  7          Q.  Did you check around on whether 50 percent

15:54:37  8      was appropriate for this joint venture?

15:54:40  9          A.  Check around?

15:54:46 10          Q.  Research.

15:54:48 11              MR. TOBEROFF:  Vague.

15:54:55 12              THE WITNESS:  I don't remember if I did or

15:54:56 13      not.

15:54:56 14      BY MR. PETROCELLI:

15:55:04 15          Q.  Once you signed Exhibit 10, you were

15:55:07 16      satisfied that you understood all of its terms and

15:55:10 17      provisions?

15:55:13 18          A.  Yes.

15:55:15 19          Q.  Okay.  And you understood that it included

15:55:18 20      in addition to Superman elements, Superboy as well,

15:55:24 21      including smallville, right?

15:55:27 22          A.  I saw that, yes.

15:55:34 23          Q.  And you didn't make any effort to exclude

15:55:36 24      Superboy or smallville from this agreement Exhibit

15:55:38 25      10, correct?

**EXHIBIT B**
**241**

ROUGH DRAFT

15:55:40  1        A.  No.

15:55:40  2        Q.  In fact, it's specifically included,

15:55:43  3    correct?

15:55:43  4        A.  Yes.  Can I finish answering that?

15:55:55  5        Q.  Sure?

15:55:56  6            MR. TOBEROFF:  No.

15:55:56  7            THE WITNESS:  No?  Okay.

15:55:57  8            MR. TOBEROFF:  Wait for the --

15:55:58  9            THE WITNESS:  Okay.

15:55:59 10            MR. TOBEROFF:  Just answer the question.

15:56:00 11            THE WITNESS:  Okay.  I didn't know if I

15:56:03 12    answered it.

15:56:03 13    BY MR. PETROCELLI:

15:56:10 14        Q.  Now, you -- can you turn to paragraph 8.

15:56:18 15    Starting with the second sentence it says:

15:56:21 16                "Upon the expiration of the

15:56:22 17            term and the winding up of the

15:56:24 18            venture or in the event of

15:56:26 19            termination of the venture for any

15:56:28 20            reason, all rights, property or

15:56:31 21            assets of the venture will be held

15:56:34 22            50 percent by the claimants and 50

15:56:37 23            percent by PPC as tenants in

15:56:41 24            common."

15:56:42 25        Do you see that?

199

**EXHIBIT B**
**242**

ROUGH DRAFT

15:56:42 1        A.  Yes.

15:56:43 2        Q.  It goes on to continue from there.

15:56:45 3            Now you understood when you signed this

15:56:47 4    that rights is a defined word.  Do you see it has

15:56:52 5    capital R?

15:56:52 6        A.  Yes.

15:56:53 7        Q.  And it's defined in the first paragraph as

15:56:57 8    all of the Joe Shusters and his estate's rights,

15:57:02 9    claims, copyrights, property, title and interests

15:57:07 10   into Joe Shuster's creations?

15:57:08 11       A.  Yes.

15:57:09 12       Q.  Okay?  And you understood that once you

15:57:15 13   signed this document, those rights became the

15:57:18 14   property of the venture called the Joe Shuster

15:57:22 15   venture, correct?

15:57:30 16       A.  My understanding is that it's a -- a -- an

15:57:36 17   interest -- an interest in proceeds coming from the

15:57:40 18   rights.

15:57:44 19       Q.  It says all rights properties or assets of

15:57:47 20   the venture.

15:57:49 21           Do you see that? Paragraph 8?

15:57:49 22       A.  Yes.

15:57:52 23       Q.  Will be in the event of a termination for

15:57:54 24   any reason will be held 50 percent by the claimants,

15:57:58 25   that's and you your mother, right?

200

**EXHIBIT B**
**243**