# EXHIBIT B

# Part 7 of 9

ROUGH DRAFT

15:57:59 1      A.  Yes.

15:58:00 2      Q.  And then 50 percent by Pacific Pictures

15:58:04 3  Corporation, correct?

15:58:04 4      A.  Yes.

15:58:07 5      Q.  So, you understood that even if this

15:58:13 6  venture was terminated for any reason, you would own

15:58:17 7  50 percent of the rights with your mother but PPC

15:58:21 8  would own the other 50 percent as a tenant in

15:58:24 9  common, correct?

15:58:27 10      A.  Well --

15:58:27 11      Q.  Not in the proceeds, but in the actual

15:58:29 12  rights?

15:58:29 13      A.  My -- my understanding is you can't

15:58:31 14  transfer something you have rights in.

15:58:34 15      Q.  And that's something that you learned after

15:58:37 16  you signed this agreement, correct?

15:58:41 17      A.  Well I believe I had some awareness of that

15:58:44 18  before I signed it.

15:58:45 19      Q.  You learned that after you signed this

15:58:47 20  agreement when you tried to fix the problem by

15:58:51 21  entering into the legal agreement in 2004 which you

15:58:55 22  then backdated back to 2001, correct?

15:59:02 23      MR. TOBEROFF:  Also let me just interject.

15:59:03 24  I don't want you answering questions that are based

15:59:07 25  on any legal understanding that you've received or

ROUGH DRAFT

15:59:11   1    knowledge or -- he is asking you information that

15:59:16   2    you just know all on your own.  I know it's hard to

15:59:17   3    distinguish between the two but -- but I'm going to

15:59:22   4    ask you to try and do that and not answer questions

15:59:24   5    based on conversations with attorneys.

15:59:28   6             THE WITNESS:  Okay.

15:59:28   7    BY MR. PETROCELLI:

15:59:47   8        Q.  Can you look at paragraph 2?  It says in

15:59:54   9    the middle, "In consideration for PPC" -- that's

15:59:57  10    Pacific Pictures Corporation's -- "contributions to

16:00:00  11    the venture," and you see venture is capital V,

16:00:00  12    right?

16:00:07  13        A.  Which line are you on?  Oh, yes, okay.

16:00:09  14        Q.  And that's the venture between Pacific

16:00:12  15    Pictures and you and your mother, correct?

16:00:12  16        A.  Yes.

16:00:15  17        Q.  Okay.  It says:

16:00:16  18             "In consideration for PPC's

16:00:18  19             contributions to the venture in the

16:00:19  20             mutual covenants contained here in,

16:00:22  21             claimants hereby transfer and

16:00:24  22             assign to the venture share rights,

16:00:27  23             titles and title and interests in

16:00:30  24             the rights."

16:00:31  25             Do you see that?

202

ROUGH DRAFT

16:00:31  1      A.  Yes.

16:00:32  2      Q.  So you understood when you signed this that

16:00:36  3  all of the Joe Shuster rights, termination rights to

16:00:40  4  the extent they existed were being transferred and

16:00:44  5  assigned to the venture just as it says, correct?

16:00:44  6      A.  Yes.

16:00:50  7      Q.  Now, are you saying you signed this

16:00:52  8  believing it was invalid because you can't make such

16:00:56  9  an assignment or transfer of the rights?  Or are you

16:00:59 10  telling me?

16:00:59 11      A.  No.

16:01:00 12      Q.  Now that it's something you learned

16:01:01 13  afterwards?

16:01:04 14      A.  I learned it afterwards.

16:01:07 15      Q.  Okay.  Let's continue.  How did you learn

16:01:11 16  it by the way?

16:01:15 17      A.  Discussions with my attorney.

16:01:17 18      Q.  Who is that?

16:01:20 19          MR. TOBEROFF:  I'll let you answer without

16:01:22 20  waiver.

16:01:22 21          MR. PETROCELLI:  I just need to know who

16:01:23 22  the attorney is.  I'd rather have you say

16:01:26 23  Mr. Toberoff.

16:01:26 24          THE WITNESS:  Mr. Toberoff?

16:01:28 25          MR. TOBEROFF:  But I'm saying lime's

203

**EXHIBIT B**
**246**

ROUGH DRAFT

16:01:29  1    letting him answer that question without waiver of

16:01:31  2    the privilege.

16:01:31  3    BY MR. PETROCELLI:

16:01:32  4        Q.  The reason I ask you that question is

16:01:34  5    because you may be referring to some other attorney

16:01:35  6    and I just have to have the record be clear?

16:01:39  7        A.  Okay.

16:01:39  8        Q.  So what did you learn from Mr. Toberoff

16:01:44  9    that was different from what you signed in 2001?

16:01:49 10            MR. TOBEROFF:  I'm instructing you not to

16:01:52 11    answer.  I've already let -- let -- give the gist of

16:01:56 12    it, and I'm sure Mr. Petrocelli could figure out the

16:01:58 13    rest on his own.

16:02:00 14            THE WITNESS:  Okay.

16:02:01 15            (Instruction not to answer.)

16:02:01 16    BY MR. PETROCELLI:

16:02:03 17        Q.  Did you ask Mr. Toberoff -- well, when you

16:02:09 18    signed this document you thought that Mr. Toberoff

16:02:10 19    was an expert in these issues right, termination

16:02:14 20    issues?

16:02:15 21        A.  Yes.

16:02:16 22        Q.  So when you later found out that you had

16:02:19 23    signed something that was not valid, did you ask him

16:02:25 24    why did you have us sign this document?  You were

16:02:28 25    the expert.  Did you get into that kind of

                                                          204

ROUGH DRAFT

16:02:32  1    discussion with him?

16:02:39  2            MR. TOBEROFF:  Don't -- don't -- I instruct

16:02:42  3    you not to give testimony as to what discussions you

16:02:45  4    got into or got -- didn't get into with me.

16:02:45  5    BY MR. PETROCELLI:

16:02:50  6        Q.  Did you talk to him on that subject?

16:02:52  7            MR. TOBEROFF:  I instruct you not to

16:02:54  8    answer.

16:02:54  9            (Instruction not to answer.)

16:02:57 10            MR. TOBEROFF:  The question is

16:02:59 11    rhetorical -- the question is rhetorical anyway.

16:02:59 12    BY MR. PETROCELLI:

16:03:03 13        Q.  I want to go back to where I was before

16:03:05 14    then paragraph 8 and when you signed this you

16:03:07 15    understood that in the event that this venture was

16:03:09 16    terminated for any reason, that PPC would own 50

16:03:14 17    percent of the rights as a tenant in common with

16:03:17 18    Jean and you, correct?

16:03:17 19        A.  Yes.

16:03:31 20        Q.  Okay.  Also by the way, in paragraph 10

16:03:35 21    there's a reference to approving Mr. Michael Cataron

16:03:39 22    to become the administrator of Joe Shuster's estate

16:03:43 23    once it's established.

16:03:44 24            Do you see that?

16:03:44 25        A.  Yes.

205

**EXHIBIT B**
**248**

ROUGH DRAFT

16:03:45  1          Q.  Whose idea was that?

16:03:51  2          A.  I'm not sure.

16:03:52  3          Q.  Why was he selected?  He is a guy -- you

16:03:55  4     don't even know what city he lives in?

16:03:57  5          A.  Well --

16:03:59  6          Q.  Why is he in here as -- as the executor of

16:04:02  7     Joe Shuster's estate?

16:04:08  8          A.  I don't recall why we had -- had him listed

16:04:11  9     at that time.

16:04:12  10         Q.  But your mother's -- but Joe's will said it

16:04:15  11    was to be your mother or if she's unable or

16:04:17  12    unwilling to serve, then you?

16:04:18  13         A.  Uh-huh.

16:04:19  14         Q.  It said nothing about Mr. Cataron?

16:04:21  15         A.  Uh-huh.

16:04:22  16         Q.  So why -- why did you agree to that?

16:04:27  17         A.  I don't know.

16:04:30  18         Q.  You don't know?

16:04:31  19         A.  I don't know.  I don't recall why we did.

16:04:35  20         Q.  Did Michael Cataron ever meet Joe Shuster?

16:04:37  21         A.  Yes.

16:04:40  22         Q.  Did they -- how well did they know each

16:04:43  23    other?

16:04:43  24         A.  Pretty well.

16:04:45  25         Q.  Do you have his contact information Michael

206

ROUGH DRAFT

16:04:47  1    Cataron?

16:04:49  2        A.  Yeah.

16:04:50  3        Q.  What is his phone number?

16:04:51  4        A.  Not with me.

16:04:54  5        Q.  And you don't know his address, right?

16:04:56  6        A.  Not on the top of my head.

16:04:59  7        Q.  Do you know his e-mail address?

16:05:00  8        A.  Not on the top of my head.

16:05:08  9        Q.  Now, go to paragraph 7.  It states:

16:05:11  10            "The venture and/or the estate

16:05:12  11            of Joe Shuster (to be established

16:05:15  12            here under) will retain Marc

16:05:20  13            Toberoff esquire to render legal

16:05:23  14            services in connection with the

16:05:25  15            rights in the venture, including in

16:05:30  16            connection with all legal disputes,

16:05:32  17            litigation, arbitration and/or

16:05:34  18            mediation regarding the rights, et

16:05:37  19            cetera."

16:05:40  20            Now, paragraph 7 says that the venture or

16:05:47  21    Mr. Shuster's estate will retain Mr. Toberoff.

16:05:47  22            Do you see that?

16:05:47  23        A.  Yes.

16:05:54  24        Q.  This -- Mr. Toberoff was not retained as a

16:05:57  25    lawyer in this document, though, right?

                                                                    207

**EXHIBIT B**
**250**

ROUGH DRAFT

16:06:01  1          MR. TOBEROFF:  Calls for a legal

16:06:01  2     conclusion.

16:06:01  3     BY MR. PETROCELLI:

16:06:03  4          Q.  Do you see a signature line for Marc

16:06:04  5     Toberoff esquire agreeing to render services?

16:06:09  6          MR. TOBEROFF:  Asked and answered.

16:06:13  7          You can answer.

16:06:13  8          THE WITNESS:  It's already been answered.

16:06:16  9          MR. TOBEROFF:  You can answer.

16:06:17 10          THE WITNESS:  .

16:06:17 11     BY MR. PETROCELLI:

16:06:20 12          Q.  When you signed this document, you

16:06:23 13     understood that you would have to sign another

16:06:26 14     document or the venture would, to retain

16:06:28 15     Mr. Toberoff, correct?

16:06:35 16          MR. TOBEROFF:  Assumes facts.

16:06:36 17          THE WITNESS:  My understanding this was

16:06:37 18     document retained Marc Toberoff as our tone.

16:06:37 19     BY MR. PETROCELLI:

16:06:40 20          Q.  Where does it say that?

16:06:44 21          A.  Paragraph 7.

16:06:44 22          Q.  Where is the signature of Mr. Toberoff?

16:06:49 23          A.  Signature page.

16:06:50 24          Q.  It says president, right?  Pacific Pictures

16:06:54 25     Corporation.  Where is there a signature line for

                                                            208

ROUGH DRAFT

16:06:56  1    Marc Toberoff esquire?

16:06:57  2         A.  He's also esquire.

16:07:03  3         Q.  But he signed the document only in his

16:07:04  4    capacity as the president of this company that was

16:07:08  5    doing a joint venture with you.  Did you -- did you

16:07:13  6    question why he is not signing on as a lawyer to

16:07:16  7    render the services contemplated by paragraph 7?

16:07:21  8    Did you have that discussion with him?

16:07:24  9              MR. TOBEROFF:  You can answer.  He's asking

16:07:27  10   whether you had a discussion, he just summarized

16:07:33  11   with me.

16:07:34  12             THE WITNESS:  Yes.

16:07:34  13             MR. TOBEROFF:  Do you understand the

16:07:35  14   question?  Do you want to repeat the question.

16:07:35  15              (The reporter read the record

16:07:35  16         as follows:

16:07:58  17              "^ QUESTION ^ ANSWER ").

16:07:58  18         MR. TOBEROFF:  Yes or no.

16:07:59  19         THE WITNESS:  I -- I don't recall if I

16:08:02  20   specifically asked him why he didn't sign, how

16:08:08  21   you're saying.

16:08:08  22   BY MR. PETROCELLI:

16:08:14  23         Q.  Did you express concern about entering into

16:08:17  24   a joint venture agreement that if it were ever

16:08:19  25   terminated for any reason Pacific Pictures would own

                                                          209

**EXHIBIT B**
**252**

ROUGH DRAFT

16:08:23 1    half the rights forever?

16:08:25 2        A.  Yes.

16:08:32 3        Q.  Who did you express that to?

16:08:35 4        A.  I expressed it to Marc Toberoff.

16:08:37 5        Q.  Did you explain that consequence to your

16:08:39 6    mother?

16:08:44 7        A.  I don't I don't know if I got into that

16:08:50 8    with her or not.  I don't remember.

16:08:51 9        Q.  Do you think that was important for her to

16:08:54 10   understand?

16:08:54 11       A.  Yes.

16:09:01 12       Q.  Why did you agree to that?

16:09:07 13       A.  Why?

16:09:08 14       Q.  Yes.  Why didn't you insist on a provision

16:09:10 15   that said in the event that the agreement is

16:09:12 16   terminated for any reason, that the rights revert

16:09:15 17   back to the Shusters, 100 percent of that?

16:09:22 18           MR. TOBEROFF:  Answer to the extent that

16:09:23 19   you have a recollection of why.

16:09:26 20           THE WITNESS:  Yeah, okay.

16:09:32 21           THE WITNESS:  My -- my recollection of why

16:09:33 22   is that -- that he was going to see this case

16:09:37 23   through no matter what and I thought that he would

16:09:42 24   and I had thought that there would be no reason it

16:09:48 25   would be canceled or terminated until the rights had

210

**EXHIBIT B**
**253**

ROUGH DRAFT

| | | |
|---|---|---|
| 16:09:52 | 1 | been pursued.  He had every -- every economic motive |
| 16:09:58 | 2 | to pursue it to the full evident extent. |
| 16:09:58 | 3 | BY MR. PETROCELLI: |
| 16:10:05 | 4 | Q.  But if he quit two years later or you fired |
| 16:10:08 | 5 | him or canceled this agreement, he owned half the |
| 16:10:11 | 6 | rights.  That didn't bother you? |
| 16:10:15 | 7 | MR. TOBEROFF:  Not according to you. |
| 16:10:18 | 8 | THE WITNESS:  No. |
| 16:10:18 | 9 | BY MR. PETROCELLI: |
| 16:10:21 | 10 | Q.  Okay.  Take a look at paragraph 7.  It |
| 16:11:14 | 11 | states there that the venture will retain Toberoff |
| 16:11:18 | 12 | to render legal services including in connection |
| 16:11:21 | 13 | with legal disputes and litigation. |
| 16:11:23 | 14 | Do you see that? |
| 16:11:23 | 15 | A.  Yes. |
| 16:11:26 | 16 | Q.  Legal disputes and litigation with whom? |
| 16:11:31 | 17 | MR. TOBEROFF:  I instruct you not to |
| 16:11:32 | 18 | answer.  This obviously deals with discussions with |
| 16:11:39 | 19 | counsel regarding potential litigation. |
| 16:11:40 | 20 | (Instruction not to answer.) |
| 16:11:40 | 21 | BY MR. PETROCELLI: |
| 16:11:42 | 22 | Q.  Well, it's fair to say that you understood |
| 16:11:44 | 23 | when you signed this that there was a prospect of |
| 16:11:50 | 24 | litigation with DC Comics or some Time-Warner |
| 16:11:53 | 25 | company, correct? |

211

**EXHIBIT B**
**254**

ROUGH DRAFT

16:11:54  1          MR. TOBEROFF:  Instruct you not to answer.

16:11:56  2     It implicates attorney-client communications.

16:11:58  3          (Instruction not to answer.)

16:11:58  4     BY MR. PETROCELLI:

16:11:59  5          Q.  You didn't -- you didn't need a lawyer to

16:12:01  6     tell you that, right?

16:12:02  7          MR. TOBEROFF:  Instruct you not to answer.

16:12:02  8          MR. PETROCELLI:  Why?

16:12:04  9          MR. TOBEROFF:  It implicates

16:12:05 10     attorney-client communications.

16:12:07 11          (Instruction not to answer.)

16:12:07 12          MR. PETROCELLI:  That doesn't cover any

16:12:08 13     privilege.  That's just un- -- unreasonable.

16:12:12 14          MR. TOBEROFF:  How he is assessing the

16:12:13 15     potential for litigation --

16:12:15 16          MR. PETROCELLI:  I didn't ask how he is

16:12:16 17     assessing.  Merely the fact.

16:12:18 18          MR. TOBEROFF:  Whether there is a potential

16:12:20 19     for litigation.

16:12:20 20     BY MR. PETROCELLI:

16:12:21 21          Q.  You understood -- you understood that when

16:12:26 22     you signed this there was some appreciation that you

16:12:31 23     would be in litigation?

16:12:32 24          MR. TOBEROFF:  Instruction.  Same

16:12:33 25     instruction.

212

**EXHIBIT B**
**255**

ROUGH DRAFT

16:12:34  1          (Instruction not to answer.)

16:12:34  2     BY MR. PETROCELLI:

16:12:58  3          Q.  So you shouldn't have been surprised when

16:12:59  4     you read the lawsuit that DC filed since you

16:13:05  5     contemplated litigation as early as 2001, correct?

16:13:08  6          MR. TOBEROFF:  I instruct you not to answer

16:13:10  7     as to your reactions in the midst of a litigation

16:13:15  8     because it implicates attorney-client

16:13:18  9     communications.

16:13:19 10          (Instruction not to answer.)

16:13:19 11          THE WITNESS:  I'll have to follow

16:13:21 12     Mr. Toberoff's advice.

16:13:21 13     BY MR. PETROCELLI:

16:13:22 14          Q.  When you saw the lawsuit from DC Comics

16:13:25 15     challenging the termination, that's something that

16:13:27 16     you understood could happen as early as 2001 when

16:13:31 17     you signed this joint venture agreement, correct?

16:13:34 18          MR. TOBEROFF:  Same instruction.

16:13:35 19          (Instruction not to answer.)

16:13:36 20          MR. PETROCELLI:  Again, I don't think these

16:13:39 21     questions are -- these instructions are proper.

16:13:42 22          MR. TOBEROFF:  I'm not going allow him to

16:13:44 23     answer how is he assessing potential litigation

16:13:49 24     after he has retained me.

16:13:49 25          MR. PETROCELLI:  It's just going to have to

213

**EXHIBIT B**
**256**

ROUGH DRAFT

16:13:52  1    get sorted out in court.

16:13:55  2         Q.  Go to paragraph 4.  It says:

16:13:59  3              "The terms of any and all

16:14:00  4         agreements regarding any of the

16:14:02  5         rights and any respects shall be

16:14:04  6         subject to the express written

16:14:06  7         approval of claimants and PPC.  The

16:14:10  8         parties each warrants and represent

16:14:11  9         that after signing this agreement

16:14:13 10         they will not without the expressed

16:14:15 11         written consent of all the parties

16:14:16 12         transfer limit or encumber the

16:14:18 13         rights in any respect."

16:14:20 14              When you signed this, you understood that

16:14:24 15    you could not enter into any agreement with DC

16:14:30 16    Comics or any affiliate of DC Comics without the

16:14:35 17    expressed written consent of Pacific Pictures,

16:14:35 18    correct.

16:14:35 19         A.  Yes.

16:14:40 20         Q.  And in your mind who is Pacific Pictures?

16:14:45 21         A.  Marc Toberoff.

16:14:50 22         Q.  And so you understood that you -- you, and

16:14:54 23    your family could not enter into a contract with DC

16:14:58 24    Comics no matter how badly you wanted unless Marc

16:15:03 25    Toberoff consented, correct?

214

**EXHIBIT B**
**257**

ROUGH DRAFT

16:15:03  1      A.  Yes.

16:15:09  2      Q.  Did you think that that was an appropriate

16:15:17  3  power for a lawyer to have over a client?

16:15:24  4      A.  I thought it was in his best interest to --

16:15:35  5      Q.  That's not what I asked you?

16:15:36  6          MR. TOBEROFF:  He's trying to answer your

16:15:37  7  question.

16:15:37  8          MR. PETROCELLI:  Yes.

16:15:38  9      Q.  Did you think -- did you think that it was

16:15:44 10  proper for lawyers to impose that -- to have such

16:15:52 11  a -- an agreement with a client that the client

16:15:54 12  can't settle without the lawyer's consent no matter

16:15:58 13  how much the client wants to settle?

16:16:04 14      A.  At the time I didn't consider it

16:16:05 15  unreasonable.

16:16:08 16      Q.  Did you think it was appropriate?  Did you

16:16:11 17  have any knowledge on that subject whether the

16:16:13 18  lawyers are even permitted under the law to have

16:16:17 19  such arrangements?

16:16:21 20      A.  No, I -- I was not aware.

16:16:22 21      Q.  Did you do any research on that subject?

16:16:27 22      A.  Not specifically this, no.

16:16:30 23      Q.  Were you aware that it's not lawful for a

16:16:33 24  lawyer to have such a -- an agreement with a client?

16:16:39 25      A.  Not at the time.

215

**EXHIBIT B**
**258**

ROUGH DRAFT

16:16:40  1        Q.  Have you since become aware of that?

16:16:42  2        A.  Yes.

16:16:46  3        Q.  When?

16:16:55  4        A.  Sometime 2003.

16:16:57  5        Q.  How?

16:17:01  6        A.  Discussions with Marc Toberoff.

16:17:11  7        Q.  What led -- what prompted those

16:17:13  8  discussions?

16:17:13  9        A.  We -- we both realized that this format was

16:17:20  10  not -- not the best approach to take.

16:17:25  11        Q.  Why was it not the best approach?

16:17:30  12        A.  We decided a legal retainer, a standard

16:17:33  13  legal retainer was a preferred association.

16:17:36  14        Q.  You said in 2001 when you signed this,

16:17:42  15  you -- you were not even able to appreciate the

16:17:44  16  difference between a standard legal retainer and a

16:17:46  17  joint venture agreement.  Do you recall giving that

16:17:49  18  testimony?  You said you were not even in a position

16:17:54  19  to note that there was anything unusual about it.

16:17:57  20  Do you recall giving me that answer?

16:17:58  21        MR. TOBEROFF:  I believe that misstates his

16:17:59  22  testimony.

16:17:59  23        MR. PETROCELLI:  I don't think so.

16:18:01  24        THE WITNESS:  What -- what did I say?

16:18:01  25  BY MR. PETROCELLI:

216

ROUGH DRAFT

16:18:02  1          Q.  So you were aware in 2001 when you signed

16:18:04  2     the agreement that you were agreeing to a -- an

16:18:08  3     arrangement that was different from the standard

16:18:11  4     lawyer client agreement in setting up a joint

16:18:15  5     venture with Pacific Pictures?

16:18:16  6               MR. TOBEROFF:  Misstates his testimony.

16:18:16  7     BY MR. PETROCELLI:

16:18:18  8          Q.  I'm asking you now.

16:18:20  9          A.  What did I say before?

16:18:22 10          Q.  Let's not get hung occupy what you said

16:18:25 11     before.  It's a new question?

16:18:26 12          A.  Okay.

16:18:26 13          Q.  Okay?  Can you read it back please?

16:18:26 14               (The reporter read the record

16:18:26 15               as follows:

16:18:43 16               "^ QUESTION ^ ANSWER ").

16:18:43 17               THE WITNESS:  Was I aware that it was

16:18:45 18     different than the standard legal retain center.

16:18:45 19     BY MR. PETROCELLI:

16:18:48 20          Q.  In 2001 when you signed Exhibit 10?

16:18:50 21          A.  2001.

16:18:51 22          Q.  Were -- were -- were you --

16:18:53 23          A.  I was.

16:18:53 24          Q.  Aware that you were signing a contract that

16:18:58 25     was different from the standard lawyer client

217

**EXHIBIT B**
**260**

ROUGH DRAFT

16:19:01  1      agreement?

16:19:03  2          A.  I was not keenly aware of that.

16:19:06  3          Q.  But you became keenly aware of it in 2003,

16:19:06  4      correct?

16:19:10  5          A.  Sometime in there.

16:19:12  6          Q.  Okay.  You said that you and Mr. Toberoff

16:19:14  7      decided that this approach was not the best approach

16:19:19  8      and you should revert to a lawyer -- a standard

16:19:22  9      lawyer client agreement, right?

16:19:24  10         A.  Yes.

16:19:25  11         Q.  Okay.  What prompted that?

16:19:32  12         A.  I -- I don't remember.  We just discussed

16:19:36  13     things over time.

16:19:40  14         Q.  You said you learned that the -- it was not

16:19:46  15     lawful for a lawyer to be able to withhold his

16:19:49  16     consent to a client settlement.

16:19:53  17         A.  I did -- at the time I didn't know that --

16:19:56  18     that was the case.

16:19:56  19         Q.  But you knew that in 03, right?

16:19:59  20         A.  Whenever -- whenever we started discussing

16:20:02  21     changing the form, then at some point after that we

16:20:09  22     agree we needed to change it, I became aware of

16:20:11  23     that.

16:20:14  24         Q.  Was it -- did he just call you up one day

16:20:16  25     and say we have to make a change?  What brought the

218

**EXHIBIT B**
**261**

ROUGH DRAFT

16:20:19  1     change about?

16:20:20  2         A.  I don't remember.

16:20:30  3         Q.  Did you get any legal advice from someone

16:20:32  4     other than Mr. Toberoff when he told you that a

16:20:37  5     change was required?

16:20:38  6         A.  No.

16:20:43  7         Q.  Did it cause you any concern after you

16:20:45  8     learned that you had signed an agreement that had

16:20:47  9     legal problems associated with it?

16:20:51 10         A.  No, because we were replacing it with a

16:20:54 11     better one.

16:20:57 12         Q.  How do you know it was been?  You thought

16:21:02 13     the first one was good?

16:21:03 14         A.  Well, maybe I got smarter.

16:21:07 15         Q.  In other words, you -- you believed what

16:21:09 16     Mr. Toberoff told you, correct?

16:21:09 17         A.  Yes.

16:21:13 18         Q.  Okay.  But you believed him in 2001 when

16:21:15 19     you signed the invalid agreement, right?

16:21:20 20         A.

16:21:20 21             MR. TOBEROFF:  Assumes facts.

16:21:22 22             THE WITNESS:  I'm not aware it was invalid.

16:21:22 23     BY MR. PETROCELLI:

16:21:31 24         Q.  Do you -- when you -- you ultimately signed

16:21:34 25     a document -- well, I'll get to that.

                                                            219

**EXHIBIT B**
**262**

ROUGH DRAFT

16:21:47  1              Did you come to learn that there were --

16:21:52  2      the agreement that you signed with Mr. Toberoff this

16:21:55  3      joint venture agreement in 2001 and again, in 03 did

16:22:03  4      violate the copyright laws, correct?

16:22:07  5              MR. TOBEROFF:  Mischaracterizes.  Strike

16:22:07  6      that.

16:22:12  7              You can answer.

16:22:13  8              THE WITNESS:  I didn't know that

16:22:17  9      specifically.  That it violated copyright laws.  But

16:22:22 10      it wasn't the best structure.

16:22:22 11      BY MR. PETROCELLI:

16:22:25 12          Q.  Okay.  Tell me how it wasn't the best

16:22:27 13      structure?

16:22:28 14          A.  We needed to have a standard legal

16:22:30 15      retainer.

16:22:31 16          Q.  Why?

16:22:32 17          A.  Because that was the best structure.

16:22:33 18          Q.  Why?  Why was it the best?  In what way was

16:22:39 19      it better?

16:22:39 20              MR. TOBEROFF:  The whys get into his

16:22:41 21      conversations with me.  And so you can't get into

16:22:44 22      that.

16:22:44 23      BY MR. PETROCELLI:

16:22:45 24          Q.  You understood when you changed this

16:22:47 25      structure or at least attempted to change the

220

**EXHIBIT B**
**263**

ROUGH DRAFT

```
16:22:50  1    structure that the Pacific picture agreements
16:22:55  2    constituted a violation of the copyright laws,
16:23:01  3    correct?  Did you have at that understanding at that
16:23:02  4    time?
16:23:02  5         A.  At that time -- at that time, no.
16:23:04  6         Q.  Did you come to that understanding
16:23:06  7    afterwards?
16:23:10  8              MR. TOBEROFF:  You can't answer that
16:23:11  9    without divulging attorney-client communications.
16:23:16 10    Instruct you not to answer.
16:23:17 11              (Instruction not to answer.)
16:23:18 12              THE WITNESS:  I have to follow Marc
16:23:20 13    Toberoff's advice.
16:23:20 14    BY MR. PETROCELLI:
16:23:22 15         Q.  You -- you are familiar with an aspect of
16:23:27 16    the copyright law in the sections dealing with
16:23:30 17    termination that the grantee -- that the grantor
16:23:39 18    cannot enter into an agreement with anyone other
16:23:43 19    than the grantee until the termination is effective?
16:23:49 20              MR. TOBEROFF:  I instruct you not to
16:23:50 21    answer.  He can't possibly answer those legal
16:23:52 22    questions without divulging his communications with
16:23:55 23    his attorney.
16:23:55 24              (Instruction not to answer.)
16:23:56 25              MR. PETROCELLI:  Why?  He is perfectly
```

221

**EXHIBIT B**
**264**

ROUGH DRAFT

16:23:57   1    capable of knowing that and he reads the codes, he

16:24:01   2    researches and he reads all the legal papers.

16:24:03   3        MR. TOBEROFF: You're exaggerating his

16:24:05   4    testimony.

16:24:05   5        MR. PETROCELLI: No, I'm not.

16:24:10   6        MR. TOBEROFF: Same instruction. When I

16:24:11   7    instruct you, you don't answer. You don't have to

16:24:13   8    keep asserting that you're --

16:24:13   9    BY MR. PETROCELLI:

16:24:13   10      Q. You -- you are --

16:24:13   11        MR. TOBEROFF: Excuse me. You don't have

16:24:15   12    to keep asserting that you're going to follow my

16:24:16   13    instruction. We've already established you're going

16:24:18   14    to follow my instruction.

16:24:18   15    BY MR. PETROCELLI:

16:24:20   16      Q. You read the complaint or you scanned it

16:24:21   17    but got the gist of it that DC Comics was contending

16:24:28   18    in the lawsuit that these Pacific Pictures

16:24:30   19    agreements violated the exclusivity provisions of

16:24:33   20    the copyright statute. You got the gist of that,

16:24:33   21    right?

16:24:39   22      A. The exclusivity provisions?

16:24:41   23      Q. In the copyright termination provisions,

16:24:44   24    correct.

16:24:46   25      A. I'm not sure I -- I have enough legal

222

ROUGH DRAFT

16:24:48  1      knowledge about the exclusivity provisions.

16:24:50  2          Q.  Did you get the gist of the claim that DC

16:24:56  3      Comics made in the lawsuit that these Pacific

16:24:59  4      Pictures agreements violated certain provisions of

16:25:02  5      the copyright statute?

16:25:04  6          A.  I got the gist.

16:25:05  7          Q.  And did you understand that DC Comics was

16:25:08  8      contending that the Shusters did not have the legal

16:25:14  9      right to enter into an agreement with anyone other

16:25:20 10      than DC until and unless their termination became

16:25:24 11      effective?

16:25:29 12          MR. TOBEROFF:  You can only answer to the

16:25:30 13      extent you scanned the complaint on your own and you

16:25:35 14      came to that conclusion.

16:25:36 15          THE WITNESS:  I may not be fully aware of

16:25:39 16      that detail.

16:25:39 17      BY MR. PETROCELLI:

16:25:42 18          Q.  Are you aware that Mr. Toberoff has stated

16:25:44 19      in papers filed with the court that these Pacific

16:25:47 20      picture agreements were void?

16:25:54 21          A.  Yes.

16:25:55 22          Q.  How did you become aware of that?

16:25:58 23          A.  Through our discussions.

16:26:00 24          Q.  Did you read any of the legal filings that

16:26:02 25      are made in this case?

                                                                  223

ROUGH DRAFT

16:26:03   1        A.  The voiding of the Pacific Pictures or
16:26:12   2    anything else?
16:26:13   3        Q.  Well, you understand you filed the lawsuit
16:26:15   4    and then your -- your counsel has filed a motion to
16:26:19   5    dismiss the lawsuit and through lots of briefs have
16:26:23   6    been filed.  Do you read that material?
16:26:25   7        A.  I read some of it.
16:26:31   8        Q.  Are you aware that Mr. Toberoff has
16:26:33   9    acknowledged that the Pacific Pictures agreements
16:26:37  10    did not comply with the copyright laws?
16:26:41  11        A.  Yes.
16:26:45  12        Q.  Why did you sign agreements that did not
16:26:47  13    comply with the copyright laws?
16:26:51  14        A.  At the time I was unaware.
16:26:55  15        Q.  Why were you unaware?
16:26:58  16        A.  I'm not a lawyer.
16:27:01  17        Q.  You relied on Mr. Toberoff?
16:27:07  18        A.  Yes.
16:27:07  19        Q.  Having learned that you signed agreements
16:27:17  20    that violated the copyright law why did you think
16:27:26  21    that DC Comics had no right to file a claim?
16:27:31  22            MR. TOBEROFF:  Objection.  I'm objecting to
16:27:33  23    your use of the word "violated the copyright laws."
16:27:35  24    Also stated in that paper something being invalid --
16:27:35  25            MR. PETROCELLI:  You don't need to --

224

**EXHIBIT B**
**267**

ROUGH DRAFT

16:27:37 1          MR. TOBEROFF:  Under the copyright law and

16:27:39 2     violating law is two separate --

16:27:40 3          MR. PETROCELLI:  That's not appropriate,

16:27:42 4     Marc.

16:27:42 5          MR. TOBEROFF:  Okay.

16:27:44 6          MR. PETROCELLI:  We don't need to teach

16:27:45 7     Mr. Peary the niceties of copyright law.

16:27:50 8          MR. TOBEROFF:  I'm not teaching him.

16:27:51 9          MR. PETROCELLI:  Let's move on.  What's the

16:27:58 10    next Exhibit 11?  Okay.

16:28:00 11         Q.  Now, after signing this document exhibit

16:28:03 12    10, sometime there after your -- your mother put

16:28:14 13    Joanne Siegel in touch with Marc Toberoff, right?

16:28:14 14         A.  Yes.

16:28:18 15         Q.  And do you know when that happened?

16:28:25 16         A.  I believe sometime in 2003.

16:28:31 17         Q.  Were you keeping close -- in close contact

16:28:36 18    with Mr. Toberoff about his contacts with the Siegel

16:28:42 19    family prior to the time the Siegel family hired

16:28:46 20    him?

16:28:49 21         MR. TOBEROFF:  Assumes facts.  Lacks

16:28:55 22    foundation.  Do you understand the question?

16:28:55 23         THE WITNESS:  Was I in closes contact with

16:28:57 24    him regarding the Siegels?

16:28:57 25    BY MR. PETROCELLI:

225

**EXHIBIT B**
**268**

ROUGH DRAFT

16:29:00  1        Q.  Yes.  As he was courting the Siegels?

16:29:03  2            MR. TOBEROFF:  Assumes facts.  Lacks

16:29:05  3    foundation.  Object to the word "courting the

16:29:06  4    Siegels" -- the phrase "courting the Siegels."

16:29:09  5            THE WITNESS:  I was aware he had a --

16:29:13  6            MR. TOBEROFF:  Do you understand what the

16:29:14  7    question is because I don't.

16:29:16  8            THE WITNESS:  Maybe not.  I don't know.

16:29:17  9            MR. PETROCELLI:  He was about to answer it.

16:29:18 10    Of course he understood what the question was.

16:29:20 11            MR. TOBEROFF:  No, it's very confusing.

16:29:20 12    Can you read back --

16:29:21 13            MR. PETROCELLI:  It's not confusing.

16:29:23 14            MR. TOBEROFF:  Okay.  Let me just restate

16:29:23 15    that.  Could you read back the question for me.

16:29:29 16            MR. PETROCELLI:  We're into the courtship

16:29:31 17    of the Siegels, Marc.  Come on this is a good part of

16:29:34 18    the exam.

16:29:34 19            MR. TOBEROFF:  I object to your

16:29:36 20    self-serving word courtship as I do to the word

16:29:38 21    "violation of the copyright act.

16:29:51 22            (The reporter read the record

16:29:51 23        as follows:

16:29:52 24            "^ QUESTION ^ ANSWER ").

16:29:52 25            THE WITNESS:  Yes.

226

**EXHIBIT B**
**269**

ROUGH DRAFT

16:29:52 1    BY MR. PETROCELLI:

16:29:54 2        Q.  Did you approve of Mr. Toberoff taking on

16:30:03 3    the representation of the Siegels?

16:30:11 4        A.  Yes.

16:30:11 5        Q.  Did you feel that in some way that might

16:30:14 6    conflict with your interests or your mother's

16:30:19 7    interests?

16:30:22 8        A.  I thought it would potentially be an

16:30:24 9    advantage.

16:30:25 10        Q.  How so?

16:30:29 11            MR. TOBEROFF:  You can only answer that if

16:30:30 12    you formed an opinion as to that that's not bound up

16:30:36 13    with your discussions with me.

16:30:36 14    BY MR. PETROCELLI:

16:30:40 15        Q.  Now look?

16:30:41 16            MR. TOBEROFF:  If you have an opinion

16:30:42 17    that's independent of your advice of, Counsel, you

16:30:45 18    can answer.  If not, you instruct you not to.

16:30:50 19            THE WITNESS:  Okay.  Well, my opinion is

16:30:51 20    bound up in discussions.

16:30:54 21            (Instruction not to answer.)

16:30:54 22    BY MR. PETROCELLI:

16:30:55 23        Q.  Just because something may be bound up in

16:30:58 24    discussions, whatever that means, doesn't mean that

16:31:01 25    you can't have a thought of your own.  That you

227

**EXHIBIT B**
**270**

ROUGH DRAFT

16:31:06  1    can't convey?

16:31:08  2              MR. TOBEROFF:  Argumentative and don't

16:31:10  3    listen to his instructions listen to mine and I

16:31:12  4    instruct you not to answer unless you can answer

16:31:14  5    independently of your discussions with me.

16:31:18  6              THE WITNESS:  Well, my.

16:31:18  7    BY MR. PETROCELLI:

16:31:21  8        Q.  Why did you believe that Marc Toberoff

16:31:26  9    representing the Siegels would be to your advantage?

16:31:31  10             MR. TOBEROFF:  Same instruction.

16:31:31  11             (Instruction not to answer.)

16:31:31  12   BY MR. PETROCELLI:

16:31:35  13        Q.  Did you discuss that with anyone?

16:31:37  14        A.  My belief as to why it's an advantage?

16:31:39  15             MR. TOBEROFF:  Excuse me.  I'm instructing

16:31:41  16   you not to answer what your belief was based on your

16:31:44  17   testimony that it's bound up with your discussions

16:31:47  18   with me.  What's the -- what's the next question?

16:31:47  19   BY MR. PETROCELLI:

16:31:51  20        Q.  Did you discuss that with anyone?

16:31:52  21             MR. TOBEROFF:  Other than me?

16:31:53  22             MR. PETROCELLI:  No, I said with anyone.

16:31:56  23             THE WITNESS:  You can.

16:31:56  24   BY MR. PETROCELLI:

16:31:57  25        Q.  Answer that yes or no?

228

**EXHIBIT B**
**271**

ROUGH DRAFT

16:31:58  1          MR. TOBEROFF:  You can answer whether you

16:31:59  2     discussed the subject with your attorney yes or no.

16:32:01  3          MR. PETROCELLI:  I didn't say with your

16:32:03  4     attorney I said with anyone.

16:32:04  5          MR. TOBEROFF:  With anyone with anyone.

16:32:05  6          THE WITNESS:  With anyone else.

16:32:05  7     BY MR. PETROCELLI:

16:32:06  8       Q.  No with anyone?

16:32:07  9       A.  Oh, yes.

16:32:08  10      Q.  With whom?

16:32:08  11      A.  Well, Marc Toberoff.

16:32:09  12      Q.  Anyone else?

16:32:10  13      A.  No.

16:32:12  14      Q.  Did you discuss it with your mother?

16:32:16  15          MR. TOBEROFF:  Asked and answered.

16:32:24  16          THE WITNESS:  I -- I don't recall if I

16:32:29  17     discussed it with her.

16:32:29  18     BY MR. PETROCELLI:

16:32:31  19      Q.  You realize -- you believe that it was

16:32:36  20     advantageous for Marc Toberoff to also represent the

16:32:39  21     Siegels and you didn't discuss that with your

16:32:42  22     mother?

16:32:43  23          MR. TOBEROFF:  Asked and answered.

16:32:48  24          THE WITNESS:  Just what I said.  That.

16:32:53  25          MR. TOBEROFF:  Just.

                                                      229

**EXHIBIT B**
**272**

ROUGH DRAFT

16:32:53  1    BY MR. PETROCELLI:

16:32:55  2        Q.  What did you -- you said you can't recall.

16:32:58  3        A.  Yes.

16:32:59  4        Q.  Do you believe you would have discussed

16:33:01  5    that with her given the nature of its importance?

16:33:06  6            MR. TOBEROFF:  Don't speculate.  Only

16:33:07  7    testify as to your memory.

16:33:09  8            THE WITNESS:  Yeah, I don't know.

16:33:09  9    BY MR. PETROCELLI:

16:33:12 10        Q.  It's not speculation.  It's based on a

16:33:14 11    practice that would you have had of conveying and

16:33:16 12    sharing and communicating with your mother on

16:33:19 13    matters that were important to this topic.  Is it

16:33:26 14    fair to say that you had that practice of sharing

16:33:28 15    important and discussing important information

16:33:32 16    relating to the Superman issue after you retained

16:33:34 17    Mr. Toberoff that would you have discussions on

16:33:36 18    important developments with your mother?

16:33:40 19            MR. TOBEROFF:  Vague.

16:33:43 20            THE WITNESS:  Some.

16:33:43 21    BY MR. PETROCELLI:

16:33:45 22        Q.  Did you believe that this was an important

16:33:46 23    development, whether or not Mr. Toberoff should

16:33:51 24    become the lawyers for the Siegels given that you

16:33:52 25    believed he also was your family's lawyer?

                                                    230

**EXHIBIT B**
**273**

ROUGH DRAFT

16:33:55  1        A.  Yes.

16:33:56  2        Q.  Do you believe based on the importance of

16:33:57  3   that information that you discuss that with your

16:34:01  4   mother?

16:34:04  5        A.  Probably.

16:34:08  6        Q.  And what did you and she discuss on that

16:34:10  7   subject?

16:34:12  8            MR. TOBEROFF:  Only answer if you have a

16:34:13  9   recollection.

16:34:15 10            MR. PETROCELLI:  That's true of every

16:34:16 11   answer?

16:34:17 12            MR. TOBEROFF:  But I want to make sure.

16:34:19 13   Witnesses have a tendency.  Not this witness but any

16:34:21 14   witness has a tendency to try to fill in the blanks.

16:34:26 15            THE WITNESS:  My mother, she liked Marc

16:34:31 16   Toberoff a lot personally.  She had spoken with him

16:34:36 17   and she -- she thought she would be helping the

16:34:40 18   Siegels by referring them to him.

16:34:40 19   BY MR. PETROCELLI:

16:34:44 20        Q.  Did you discuss how this would be

16:34:47 21   advantgeous to the Shuster family by having

16:34:51 22   Mr. Toberoff also represent the Siegels?

16:34:57 23        A.  I don't think we discussed that at that

16:34:59 24   time.

16:34:59 25        Q.  Why didn't you discuss that?  Wasn't that

                                                              231

ROUGH DRAFT

16:35:02  1    the -- the most important part of the discussion?

16:35:13  2        A.  The -- the advantages came up in

16:35:18  3    discussions over time as we discussed back and forth

16:35:23  4    with Marc Toberoff.  That's -- that's --

16:35:27  5        Q.  I'm asking about you your discussions with

16:35:29  6    your mother because I'm trying to get at information

16:35:31  7    that's clearly and plainly discoverable.

16:35:35  8        A.  At that time we did not discuss any

16:35:39  9    specific strategic value for having the Siegels and

16:35:47 10    Toberoff work together.

16:35:49 11        Q.  Why did you not discuss that subject with

16:35:51 12    your mother given it's importance?

16:35:55 13        A.  I don't know.

16:35:59 14        Q.  You made a decision not to bring it up?

16:36:03 15        A.  I know she recommended him to the Siegels

16:36:06 16    because she liked him and trusted him and -- and she

16:36:11 17    thought it would be a good idea for them to talk to

16:36:14 18    him and that's -- that was at that point that's all

16:36:18 19    we discussed.

16:36:19 20        Q.  And you never once discussed with her your

16:36:21 21    views as to how it would be advantageous to the

16:36:25 22    Shusters to have Mr. Toberoff represent the Siegels?

16:36:28 23            MR. TOBEROFF:  Asked and answered twice.

16:36:29 24            THE WITNESS:  Not at that time.

16:36:29 25    BY MR. PETROCELLI:

                                                                232

ROUGH DRAFT

16:36:32  1        Q.  At any time?

16:36:33  2        A.  At any time -- some -- some -- some time

16:36:49  3    later I suppose.

16:36:50  4        Q.  Tell me what you said to her about those

16:36:54  5    advantages.

16:36:55  6        A.  It was based upon my discussions with Marc

16:37:01  7    Toberoff about the value of having all the rights.

16:37:10  8        Q.  Tell me what you said to your mother?

16:37:12  9        A.  That's what I told her.

16:37:13 10        Q.  On that subject.

16:37:14 11            You said it was based on?

16:37:16 12        A.  Yes.

16:37:17 13        Q.  I didn't ask you what it was based on.

16:37:18 14        A.  Okay.

16:37:18 15        Q.  I'm asking you what you actually said to

16:37:21 16    her.

16:37:22 17        A.  Okay.

16:37:22 18        Q.  Tell me what you said to her about why it

16:37:24 19    was valuable to have all the rights.

16:37:29 20        A.  I believe that's all I said.

16:37:30 21        Q.  What did you mean by that?

16:37:33 22        A.  Just what it says.  Valuable to have all

16:37:36 23    the rights.

16:37:36 24        Q.  Valuable to whom?

16:37:38 25        A.  To all of us.

233

**EXHIBIT B**
**276**

ROUGH DRAFT

16:37:39  1          Q.  Who are all?

16:37:40  2          A.  Siegels and Shusters together.

16:37:49  3          Q.  Valuable in that you can demand and command

16:37:55  4     more money?  Valuable in that sense?

16:37:57  5          A.  Well, there's -- there's.

16:38:04  6               MR. TOBEROFF:  Excuse me.  You can testify

16:38:07  7     as to what you specifically said to your mother but

16:38:11  8     you can't testify as to your understanding of the

16:38:14  9     value if that value is based on discussions with

16:38:19 10     your attorney.

16:38:21 11               MR. PETROCELLI:  That's not exactly true if

16:38:23 12     he has discussed that subject with his mother.

16:38:26 13               MR. TOBEROFF:  That's what I just said.

16:38:27 14     You can testify.

16:38:29 15               MR. PETROCELLI:  But even if the

16:38:30 16     information came from you.

16:38:31 17               MR. TOBEROFF:  He can testify.

16:38:32 18               MR. PETROCELLI:  Entirely.

16:38:34 19               MR. TOBEROFF:  Only to what he said to his

16:38:35 20     mother even if the information came from me.

16:38:35 21               MR. PETROCELLI:  Correct.

16:38:37 22               MR. TOBEROFF:  If he didn't say that to his

16:38:39 23     mother and he just said I think this is a good

16:38:41 24     idea --

16:38:41 25               MR. PETROCELLI:  Well --

                                                              234

**EXHIBIT B**
**277**

ROUGH DRAFT

16:38:42  1          MR. TOBEROFF:  Then -- then you can't say

16:38:43  2    why do you think it was a good idea.

16:38:44  3          MR. PETROCELLI:  I'm also entitled to ask

16:38:45  4    about his state of mind as to why he said what he

16:38:48  5    said to his mother.

16:38:51  6          MR. TOBEROFF:  This isn't a hearsay

16:38:53  7    objection, this is a privilege objection.

16:38:55  8          MR. PETROCELLI:  No, but we're trying to

16:38:56  9    get at discovery.

16:38:59 10          MR. TOBEROFF:  Okay.

16:38:59 11          MR. PETROCELLI:  And its relevant for that

16:39:04 12    purpose.

16:39:05 13          MR. TOBEROFF:  You can testify as to what

16:39:06 14    you said to your mother.  If he asks you why you

16:39:10 15    said that and the whys and the wheres are based on

16:39:13 16    your conversations with me, I instruct you not to

16:39:17 17    testify.  That's.

16:39:18 18          MR. PETROCELLI:  Well, I don't accept that.

16:39:19 19          THE WITNESS:  Well.

16:39:19 20    BY MR. PETROCELLI:

16:39:20 21       Q.  Let me ask my next question.

16:39:21 22          Did you -- you did not sign a conflict

16:39:37 23    waiver in 2001, 2002 or '3 having to do with

16:39:45 24    Mr. Toberoff representing the Siegels, right?

16:39:49 25       A.  Right.

235

**EXHIBIT B**
**278**

ROUGH DRAFT

16:39:49  1          Q.  You were never presented with one either,

16:39:49  2   right?

16:39:53  3          A.  I don't think so.

16:40:05  4          Q.  Did you -- did Mr. Toberoff discuss with

16:40:11  5   you his attempts to reach out to the Siegels prior

16:40:17  6   now, this is prior to the time that Mr. Toberoff

16:40:21  7   went to work for the Siegels which I will represent

16:40:23  8   to you was sometime in the late summer of 2002.

16:40:31  9          MR. TOBEROFF:  That's incorrect.  That's

16:40:34  10  misrepresentation of fact.

16:40:36  11         Q.  September, October 2002?

16:40:46  12         Q.  Prior to that time?

16:40:47  13         MR. TOBEROFF:  Nobody used ever use

16:40:49  14  October as late summer.

16:40:50  15         MR. PETROCELLI:  Well it's a little bit

16:40:52  16  unclear.

16:40:52  17         MR. TOBEROFF:  If you say I'm taking a

16:40:54  18  summer holiday.

16:40:54  19         MR. PETROCELLI:  You've got a September --

16:40:55  20  you've got a September date in there where she's

16:40:58  21  terminated the lawyers.  I think it's September 21.

16:41:03  22  I think there's a letter there.  I may be mixing my

16:41:06  23  dates up.  Let's call it October.  I'm not going

16:41:10  24  to -- vouching for the date, but let's just say

16:41:13  25  prior to October 2002, prior to that time -- well,

236

ROUGH DRAFT

16:41:18  1    let me do it differently.

16:41:19  2        Q.  Did there come a time where you learned

16:41:25  3    that Mr. Toberoff had been retained by the Siegels?

16:41:28  4        A.  Yes.

16:41:29  5        Q.  How did you find out?

16:41:30  6        A.  He told me.

16:41:31  7        Q.  Okay.  Prior to that time when he told you

16:41:37  8    he was retained by the Siegels, and you think that

16:41:40  9    was in 2003 you said, right?

16:41:45 10        A.  That's -- that's what I had thought.  I

16:41:47 11    didn't -- I don't remember.

16:41:52 12        Q.  Did -- did the Joanne Siegel or Laura

16:41:56 13    Siegel have any discussions with you or your mother

16:42:02 14    to your knowledge, about the decision to hire

16:42:02 15    Mr. Toberoff?

16:42:02 16        A.  No, discussions with me.

16:42:07 17        Q.  Do you know whether they had any

16:42:08 18    discussions with your mother to the effect hey, I

16:42:11 19    met him or I've talked to him, I think I'm -- I

16:42:14 20    think I'm going to retain him?

16:42:16 21        A.  I don't know what they said to her.

16:42:17 22        Q.  Did they call you up to ask if it would

16:42:20 23    pose any problem with respect to you or your mother

16:42:26 24    if he went to work for the Siegels?

16:42:28 25        A.  No.

237

**EXHIBIT B**
**280**

ROUGH DRAFT

16:42:36 1          Q.  Have you -- were you told about -- by

16:42:40 2     Mr. Toberoff about any of his efforts to contact the

16:42:44 3     Siegels or make contact with them prior to the time

16:42:47 4     he was retained by them?

16:42:48 5          A.  No.

16:42:54 6          Q.  Did you learn about what he was -- about

16:42:59 7     his efforts to get in touch with them from any other

16:43:03 8     source?

16:43:03 9          A.  No.

16:43:09 10         Q.  So is what you're telling me that at one

16:43:15 11    point you told him that you had no issue with his

16:43:18 12    representing the Siegels and then the next time you

16:43:22 13    discussed the subject with him, he told you he was

16:43:25 14    the lawyer for the Siegels and there was no

16:43:27 15    discussion in between on that subject?

16:43:32 16         A.  I don't know.

16:43:33 17         Q.  When did you and Mr. Toberoff have the

16:43:36 18    discussion about it being mutually advantageous for

16:43:43 19    Mr. Toberoff to also represent the Siegels?  When

16:43:48 20    did you have that discussion?

16:43:50 21         A.  Sometime after they retained him.

16:43:54 22         Q.  Oh after they retained him?

16:43:55 23         A.  Yes.

16:43:57 24         Q.  Okay.  So prior to the time that the

16:44:00 25    Siegels retained Mr. Toberoff, other than your

238

**EXHIBIT B**
**281**

ROUGH DRAFT

16:44:05 1    mother putting -- other than your mother making a

16:44:09 2    phone call to Joanne, you had no knowledge about

16:44:16 3    Mr. Toberoff contacting the Siegels or trying to

16:44:20 4    become their lawyer or anything like that?

16:44:22 5          MR. TOBEROFF: Lacks foundation. Assumes

16:44:25 6    facts as to trying to become their lawyer.

16:44:32 7          THE WITNESS: I don't know about that.

16:44:32 8    BY MR. PETROCELLI:

16:44:36 9        Q. Do you -- when did -- when did you and your

16:44:45 10   mother discuss that she would recommend Mr. Toberoff

16:44:49 11   to Joanne Siegel? Was that before or after you

16:44:52 12   signed the 2001 agreement with Mr. Toberoff?

16:44:57 13       A. Before or after we signed the 2001

16:45:05 14   agreement?

16:45:05 15       Q. Yes.

16:45:09 16       A.

16:45:09 17         MR. TOBEROFF: Do you understand the

16:45:10 18   question?

16:45:12 19         THE WITNESS: Yeah yeah.

16:45:12 20         MR. TOBEROFF: Do you understand the

16:45:13 21   question.

16:45:13 22   BY MR. PETROCELLI:

16:45:14 23       Q. Exhibit 10 was signed in November 2001

16:45:16 24   right Exhibit 10 you have that in front of you the

16:45:18 25   joint venture agreement?

239

**EXHIBIT B**
**282**

ROUGH DRAFT

16:45:19  1        A.  Yes.

16:45:19  2        Q.  Was it before or after you signed Exhibit

16:45:21  3    10 that you and your mother had a discussion about

16:45:24  4    putting him -- putting -- having Joanne Siegel --

16:45:29  5    telling Joanne Siegel about Marc Toberoff?

16:45:31  6        A.  I don't know if we specifically discussed

16:45:34  7    it.  She mentioned him.

16:45:38  8        Q.  She whom?

16:45:38  9        A.  My mother.  In just a phone conversation.

16:45:42  10        Q.  To whom?

16:45:43  11        A.  To Joanne.

16:45:45  12        Q.  Before or after?

16:45:46  13        A.  After.

16:45:47  14        Q.  How long after?

16:45:50  15            MR. TOBEROFF:  Asked and answered.

16:45:50  16            THE WITNESS:  I don't know.

16:45:50  17    BY MR. PETROCELLI:

16:45:52  18        Q.  And you were there when she mentioned it or

16:45:56  19    she told you about it afterwards?

16:45:57  20        A.  She told me.

16:45:58  21        Q.  Okay.  And what did she tell you she had

16:46:01  22    done?

16:46:04  23        A.  I don't remember exactly what she said.

16:46:08  24        Q.  Okay.  Did you have a follow-up

16:46:09  25    conversation with Mr. Toberoff about the fact that

                                                    240

**EXHIBIT B**
**283**

ROUGH DRAFT

16:46:11  1    your mother had mentioned him to Joanne Siegel?

16:46:15  2        A.  No.

16:46:17  3        Q.  Did you have any conversations with him

16:46:19  4    about whether it would be a good idea or a bad idea

16:46:22  5    for him also to represent the Siegel family?

16:46:26  6            MR. TOBEROFF:  I instruct you not to answer

16:46:28  7    as to the substance of our conversations whether

16:46:30  8    it's a good idea or bad idea.

16:46:32  9            (Instruction not to answer.)

16:46:32 10    BY MR. PETROCELLI:

16:46:33 11        Q.  Did you -- when is the next time you had

16:46:35 12    any conversation with anyone about the subject of

16:46:39 13    mark Siegel having some kind of a relationship with

16:46:44 14    the Siegels?

16:46:45 15            MR. TOBEROFF:  Mark.

16:46:45 16    BY MR. PETROCELLI:

16:46:46 17        Q.  Marc Toberoff having some kind of

16:46:49 18    relationship with the Siegels after this one event

16:46:52 19    that you describe where your mother told you she

16:46:54 20    spoke to Joanne?

16:46:55 21        A.  When is the next time I talked to anyone?

16:46:57 22        Q.  On that subject correct.

16:47:01 23        A.  Other than Marc Toberoff?

16:47:02 24        Q.  No including Marc Toberoff.

16:47:03 25        A.  Oh.

241

ROUGH DRAFT

16:47:05  1          MR. TOBEROFF:  You can't -- okay.  I'll let

16:47:08  2     you answer that.

16:47:08  3          THE WITNESS:  I don't remember.

16:47:08  4     BY MR. PETROCELLI:

16:47:10  5       Q.  Was it before or after Mr. Toberoff was

16:47:13  6     retained by the Siegels?

16:47:14  7       A.  I don't -- I don't remember.  Too long ago.

16:47:24  8       Q.  Did Mr. Toberoff discuss with you that

16:47:26  9     there was a -- that he was approaching the Siegels

16:47:29 10     not to represent them as a lawyer but to do a

16:47:32 11     business transaction with them?

16:47:35 12          MR. TOBEROFF:  Assumes facts.  Lacks

16:47:41 13     foundation.  Instruct you not to answer as to the

16:47:44 14     substance of our conversations.

16:47:45 15          (Instruction not to answer.)

16:47:45 16     BY MR. PETROCELLI:

16:47:46 17       Q.  Did he discuss that he was aware of an

16:47:50 18     investor, very wealthy investor, maybe even a

16:47:54 19     billionaire investor who wanted to do a deal for the

16:47:59 20     Superman rights?

16:48:00 21          MR. TOBEROFF:  Same instruction.

16:48:04 22          (Instruction not to answer.)

16:48:04 23          MR. TOBEROFF:  As to our discussions or

16:48:06 24     conversations.

16:48:06 25     BY MR. PETROCELLI:

242

**EXHIBIT B**
**285**

ROUGH DRAFT

16:48:06  1        Q.  Did he discuss with you that he was going

16:48:08  2    to approach the Siegels about such an investor?

16:48:14  3            MR. TOBEROFF:  Same instruction.

16:48:16  4            (Instruction not to answer.)

16:48:16  5    BY MR. PETROCELLI:

16:48:19  6        Q.  Have you ever come to learn that

16:48:23  7    Mr. Toberoff had discussions with the Siegels about

16:48:27  8    an investor who would buy their Superman rights?

16:48:35  9            MR. TOBEROFF:  You can only answer that if

16:48:39 10    you have knowledge independent of your discussions

16:48:39 11    with me.

16:48:41 12            THE WITNESS:  I don't have knowledge

16:48:43 13    independent of my discussions.

16:48:45 14            MR. TOBEROFF:  Then I instruct you not to

16:48:47 15    answer.

16:48:47 16            (Instruction not to answer.)

16:48:47 17    BY MR. PETROCELLI:

16:48:48 18        Q.  Did you have discussions with Mr. Toberoff

16:48:51 19    on that topic in 2002?

16:48:55 20            MR. TOBEROFF:  Same instruction.

16:48:55 21            (Instruction not to answer.)

16:48:55 22    BY MR. PETROCELLI:

16:49:00 23        Q.  Did you have discussions with Mr. Toberoff

16:49:01 24    on -- about the Siegels in 2002?

16:49:07 25            MR. TOBEROFF:  Just about the Siegels?

243

**EXHIBIT B**
**286**

ROUGH DRAFT

16:49:08  1        MR. PETROCELLI:  Anything related to the

16:49:09  2   Siegels.

16:49:11  3        MR. TOBEROFF:  You can -- you could

16:49:13  4   answer -- without waiver of privilege, you can

16:49:16  5   answer whether we had any discussions on the subject

16:49:17  6   of the Siegels if you remember.  Date specific.

16:49:22  7        THE WITNESS:  I don't remember

16:49:23  8   specifically.  I can only assume.  I don't remember.

16:49:23  9   BY MR. PETROCELLI:

16:49:28  10      Q.  You said earlier that you saw a document

16:49:30  11  called the Toberoff timeline and you saw it prior to

16:49:37  12  Siegel that it was attached to the lawsuit that we

16:49:39  13  filed.

16:49:39  14      A.  Yes.

16:49:41  15      Q.  Okay.  And when you saw that document you

16:49:43  16  read it?

16:49:44  17      A.  Yeah, scanned it.

16:49:50  18      Q.  Scanned again?

16:49:50  19      A.  Yeah, I read it.

16:49:52  20      Q.  Read it?

16:49:53  21      A.  I didn't think much of it.

16:49:55  22      Q.  What does that mean?

16:49:59  23      A.  You want me to explain my -- my feelings

16:50:01  24  about what that is?

16:50:03  25      Q.  Sure.

244

**EXHIBIT B**
**287**

ROUGH DRAFT

16:50:05  1          A.  I think that someone came in intentionally

16:50:12  2     to try to set Marc Toberoff up to make him look bad

16:50:16  3     and sent an anonymous letter.

16:50:23  4          Q.  What's the basis?

16:50:24  5          A.  Without -- without signing.  That's what

16:50:26  6     I -- my belief and feeling is about that.

16:50:29  7          Q.  Why -- why did you form that belief, that

16:50:34  8     someone was trying to set him up?

16:50:34  9          A.  Because --

16:50:36  10         Q.  Set him up for what?

16:50:37  11         A.  Because documents were stolen.

16:50:39  12         Q.  What does that mean they were stolen?

16:50:41  13         A.  Documents were stolen from his office.

16:50:43  14         Q.  How do you know that?

16:50:44  15         A.  He told me.

16:50:47  16         Q.  Do you know it from any other source?

16:50:54  17         A.  Just from a -- a later as a grand jury

16:51:02  18    subpoena regarding that theft.

16:51:04  19         Q.  You were examined if front of the grand

16:51:07  20    jury?

16:51:07  21         A.  No, there was -- I was aware of a grand

16:51:10  22    jury subpoena regarding that theft issue.

16:51:12  23         Q.  How did you become aware of that?

16:51:14  24              MR. TOBEROFF:  You're getting into an area

16:51:17  25    where your awareness is solely based on

245

**EXHIBIT B**
**288**

ROUGH DRAFT

16:51:20  1    conversations with me.  You were talking quickly and

16:51:22  2    you meant when you said he told me I would have

16:51:25  3    objected to that attorney-client privilege.

16:51:26  4            MR. PETROCELLI:  He learned about the grand

16:51:27  5    jury --

16:51:27  6            MR. TOBEROFF:  You got that out before I

16:51:28  7    could object.

16:51:28  8            THE WITNESS:  Oh, sorry.

16:51:29  9            MR. TOBEROFF:  So I would slow it down.

16:51:32 10    BY MR. PETROCELLI:

16:51:33 11        Q.  The grand jury subpoena came from

16:51:35 12    Mr. Toberoff.

16:51:35 13            Is that right?

16:51:36 14        A.  Yes.

16:51:37 15        Q.  And the information about the circumstances

16:51:39 16    of how those documents got created came from

16:51:43 17    Mr. Toberoff, right?

16:51:44 18            MR. TOBEROFF:  I instruct you not to

16:51:45 19    answer.

16:51:45 20            (Instruction not to answer.)

16:51:46 21            THE WITNESS:  Okay.

16:51:46 22    BY MR. PETROCELLI:

16:51:47 23        Q.  Well, you said he is the one who told you

16:51:49 24    they were stolen, right?

16:51:49 25        A.  Yes.

246

**EXHIBIT B**
**289**

ROUGH DRAFT

16:51:53  1        Q.  Have you ever spoken to the person who

16:51:56  2    allegedly took the documents?

16:51:57  3        A.  No.

16:52:02  4        Q.  Did you ever speak to the Siegels about

16:52:04  5    whether anything said in the document is true?

16:52:10  6             MR. TOBEROFF:  Vague.  You mean the

16:52:11  7    timeline?

16:52:12  8             MR. PETROCELLI:  Yeah.

16:52:12  9        Q.  Did you ever talk to the Siegels about

16:52:14  10   whether anything stated in the timeline is true?

16:52:17  11       A.  No.

16:52:22  12       Q.  Why not?

16:52:23  13       A.  I don't know.

16:52:27  14       Q.  You saw in there references to Mr. Toberoff

16:52:30  15   misleading the Siegels?

16:52:32  16       A.  Yes.

16:52:33  17       Q.  Okay.  And trying to you know corner the

16:52:37  18   rights mainly for himself?

16:52:40  19       A.  I saw that.

16:52:44  20       Q.  Okay.  And you saw in there that there were

16:52:46  21   references of making statements to the Siegels that

16:52:49  22   there was a billionaire investor when in fact there

16:52:51  23   wasn't?

16:52:56  24       A.  I read that.

16:52:56  25       Q.  Okay.  Did you discuss any of that with

247

**EXHIBIT B**
**290**

ROUGH DRAFT

16:52:58  1        your mother when you first read that material?

16:53:04  2            A.  I don't recall.

16:53:09  3            Q.  And the -- did you give any thought to

16:53:12  4        talking to the Siegels about whether any of it was

16:53:17  5        true?

16:53:21  6                MR. TOBEROFF:  Asked and answered.

16:53:22  7                THE WITNESS:  I did not discuss it with

16:53:26  8        them.

16:53:26  9        BY MR. PETROCELLI:

16:53:27  10            Q.  Did you give any thought to discussing it

16:53:29  11       with them?

16:53:29  12            A.  I don't know if I gave any thought.

16:53:37  13            Q.  Did you do anything to look into the -- the

16:53:42  14       truth of what was said in that document?  See if any

16:53:49  15       of it was true?

16:53:50  16            A.  I I'm aware that there were a number of

16:53:55  17       factual errors and falsehoods as a matter of fact.

16:53:59  18       A lot of concoctuns, things that are concocted that

16:54:05  19       are factually incorrect.

16:54:06  20            Q.  How do you know they are?

16:54:07  21            A.  Because I'm familiar with some of the

16:54:09  22       timelines.

16:54:10  23            Q.  Let me show it to you.  It's Exhibit 25.

16:54:31  24                (The document referred to was

16:54:31  25                marked for identification by the

248

ROUGH DRAFT

16:54:31  1         C.S.R. as Exhibit 25 and attached

16:54:33  2         to this deposition.)

16:54:33  3  BY MR. PETROCELLI:

16:54:33  4      Q.  Identify for me what you know to be false.

16:54:40  5      A.  Well, I have to go through it.

16:54:41  6      Q.  To be clear, you received this -- you first

16:54:44  7  saw this document years ago, right?

16:54:50  8      A.

16:54:52  9         MR. TOBEROFF:  Asked and answered.

16:54:52 10         THE WITNESS:  Yeah, I already answered.

16:54:52 11  BY MR. PETROCELLI:

16:54:55 12      Q.  Please answer my question?

16:54:55 13         MR. TOBEROFF:  You can -- when I say asked

16:54:57 14  and answered that's for the record -- excuse me.

16:54:59 15  When I say asked and answered, I'm not instructing

16:55:02 16  you not to answer.  I'm making an objection for the

16:55:04 17  record.

16:55:04 18         You can answer again -- you can answer

16:55:07 19  again unless I instruct you.

16:55:08 20         THE WITNESS:  Oh.  I don't remember exactly

16:55:15 21  when I saw it I know I have seen it before today.

16:55:17 22         MR. PETROCELLI:  Have and you got it from

16:55:18 23  Mr. Toberoff when you did see it for the first time,

16:55:18 24  right?

16:55:18 25      A.  Yes.

249

**EXHIBIT B**
**292**

ROUGH DRAFT

16:55:24 1        Q.  Now can you answer my question.  I snow you

16:55:24 2    have to look at the documents but my question is to

16:55:27 3    identified what you know to be false.

16:55:36 4        MR. TOBEROFF:  Take your time reading the

16:55:37 5    document.

16:55:41 6        THE WITNESS:  Well --

16:55:43 7        MR. TOBEROFF:  There's a lot in here.

16:55:44 8        THE WITNESS:  Yeah, it is.  There is a lot

16:55:46 9    in here.  There's a lot in here.

16:56:36 10       Well one inaccuracy is here on page 3,

16:56:40 11   March 2003.  It charachterizes March 3rd, 2003 -- it

16:56:49 12   characterizes Marc Toberoff as, quote, messing up

16:56:52 13   relationships for his own personal benefits and as

16:56:55 14   if DC and the Siegels had a great relationship and

16:56:59 15   when it in fact that they had a cut off talks fired

16:57:04 16   their attorneys and -- and wrote a letter calling

16:57:10 17   Time-Warner -- comparing them to the gestapo in

16:57:15 18   their dealings with them.  He is saying that Marc

16:57:17 19   Toberoff is interfering with all the relationships

16:57:19 20   up to this point.  It was already -- the

16:57:21 21   relationship was already bad.

16:57:21 22   BY MR. PETROCELLI:

16:57:23 23       Q.  Let me stop you right there.

16:57:24 24       How do you know what you just said?

16:57:26 25       A.  Well, I -- I know and independently that

250

**EXHIBIT B**
**293**

ROUGH DRAFT

16:57:31 1   the Siegels fired their lawyer.

16:57:32 2      Q.  How do you know that?

16:57:33 3      A.  I'm -- how do I know that?  I'm aware

16:57:41 4   from -- I'm aware from them at some point they

16:57:46 5   informed us of that.  And that they had broken off

16:57:53 6   negotiations with -- with DC because they were

16:57:57 7   unhappy with the terms.  And I know that also from

16:58:02 8   my discussion with Marc Toberoff.

16:58:05 9      MR. TOBEROFF:  Don't talk with your

16:58:06 10   discussions with me.

16:58:07 11      THE WITNESS:  Okay.  Okay.

16:58:07 12   BY MR. PETROCELLI:

16:58:10 13      Q.  When you -- you had previously told me that

16:58:13 14   you couldn't recall any contact with the Siegels

16:58:17 15   about their relationship with Toberoff and I asked

16:58:25 16   you a number of times about the time period up to

16:58:29 17   the time when Mr. Toberoff was first retained by

16:58:32 18   them.  Now, you're telling me they told you that

16:58:36 19   they broke off talks and all this other stuff.  Did

16:58:40 20   you learn that after the fact?

16:58:41 21      MR. TOBEROFF:  Misstates his testimony.

16:58:42 22      THE WITNESS:  Yes, it does misstated my

16:58:44 23   testimony.

16:58:44 24   BY MR. PETROCELLI:

16:58:45 25      Q.  How does it misstate your testimony?

251

**EXHIBIT B**
**294**

ROUGH DRAFT

16:58:46  1        A.  The only -- the only thing that I knew at

16:58:49  2    the time that my mother contacted Joanne --

16:58:51  3        Q.  Correct?

16:58:51  4        A.  -- was that they were not happy with their

16:58:54  5    attorney and she recommended Marc Toberoff.  And

16:58:57  6    that's the only thing that I knew from them at that

16:59:00  7    time.

16:59:00  8        Q.  Well, that's not what you testified testify

16:59:02  9    on but let me -- let me go over this again.

16:59:04  10           Are you saying that your mother had a phone

16:59:08  11   call with Joanne Siegel after you and she signed

16:59:14  12   Exhibit 10 in November 2001 and in that phone call

16:59:21  13   Joanne Siegel says I'm not happy with my attorney

16:59:25  14   and your mother says oh, let me introduce to you

16:59:28  15   Marc Toberoff?  And that occurs in a conversation

16:59:32  16   after November 2001?

16:59:34  17       A.  Yes.

16:59:36  18       Q.  All in one conversation?

16:59:39  19       A.  I don't know about that.

16:59:46  20       Q.  Okay.  And other than that, you had no

16:59:49  21   other contact with the Siegels prior to the time

16:59:52  22   that they hired Mr. Toberoff?  You said that

16:59:57  23   already, correct?

17:00:00  24       A.  Phone contact?

17:00:01  25       Q.  Any contact.

252

**EXHIBIT B**
**295**

ROUGH DRAFT

17:00:02  1       A.  I --

17:00:03  2       Q.  2001 all the way through 2002 up to the

17:00:07  3   time they hired Mr. Toberoff?

17:00:08  4       A.  I -- I don't know if I had no phone contact

17:00:12  5   at all.  I don't remember.  I don't remember that.

17:00:18  6       Q.  Did you have any contact with him during

17:00:19  7   that time period from the moment your mom made that

17:00:22  8   phone call until the time that they hired

17:00:24  9   Mr. Toberoff?

17:00:24  10      A.  I -- I don't -- I do not remember.

17:00:26  11      Q.  Okay.  And did your mother have any contact

17:00:28  12   with him during that year?

17:00:34  13          MR. TOBEROFF: .

17:00:34  14   BY MR. PETROCELLI:

17:00:34  15      Q.  From the time that she made that first

17:00:36  16   phone call until the time they hired Mr. Toberoff

17:00:38  17   sometime in September or October 2002?

17:00:41  18      A.  I -- I don't know if there was any.

17:00:43  19          MR. TOBEROFF:  Assumes facts.  Lacks

17:00:44  20   foundation.

17:00:44  21   BY MR. PETROCELLI:

17:00:45  22      Q.  Okay you don't know, right?

17:00:46  23      A.  I don't know if there was any subsequent

17:00:49  24   phone call.

17:00:49  25      Q.  So why where you getting the information?

253

**EXHIBIT B**
**296**

ROUGH DRAFT

17:00:51  1    Other than from Mr. Toberoff where did you get the

17:00:53  2    information that they break off talks and gestapo

17:00:57  3    letter and all this other kind of stuff?  Where did

17:00:59  4    that in from?

17:01:01  5         A.  Well, in the present I have gotten much of

17:01:04  6    this from my discussions with Marc Toberoff.

17:01:08  7         Q.  Okay.

17:01:09  8              MR. TOBEROFF:  Don't talk about your

17:01:11  9    discussions with me.

17:01:11  10   BY MR. PETROCELLI:

17:01:12  11        Q.  So the reason why you know is that the

17:01:13  12   statements in here are untrue is what Marc Toberoff

17:01:15  13   has told you?

17:01:16  14        A.  And -- and there has been -- there has been

17:01:20  15   contact with the -- the Siegels.

17:01:24  16        Q.  Tell me about it.  When?

17:01:27  17        A.  I -- I don't know.  They call every now and

17:01:30  18   then to wish Merry Christmas and happy birthday

17:01:36  19   and -- and usually my mother has talked with them

17:01:39  20   and she has become aware of their situation in

17:01:43  21   casual conversation.

17:01:47  22        Q.  This is what your mother has told you?

17:01:49  23        A.  Yes.

17:01:50  24        Q.  Okay.  And -- and in casual conversation

17:01:55  25   they said I wrote a gestapo letter?

                                                              254

ROUGH DRAFT

17:01:59  1        A.  I don't know if they -- they discussed that

17:02:02  2    particular thing.

17:02:02  3        Q.  So here's what I'm trying to find out from

17:02:05  4    you because this is how we got on to this subject

17:02:12  5    what -- what information do you have that any of

17:02:16  6    this is un through, other than what Marc Toberoff

17:02:16  7    has told you?  I don't -- for the purpose of this

17:02:18  8    question, I am not interested in what Marc Toberoff

17:02:21  9    told you?

17:02:22 10        MR. TOBEROFF:  And I'm instructing you not

17:02:24 11    to answer as to what I've told you.

17:02:29 12        THE WITNESS:  Okay.  You're instructing me

17:02:32 13    not to answer?

17:02:33 14        MR. TOBEROFF:  No.  You can answer the

17:02:34 15    question but don't answer if you can as to -- don't

17:02:41 16    answer based on our conversations.  So you've

17:02:45 17    testified to a gestapo letter.  If you have a basis

17:02:49 18    other than conversations with me that you can

17:02:51 19    recollect, you can discuss that with him.  That's

17:02:53 20    what he was asking you.

17:02:54 21        THE WITNESS:  Uh-huh.

17:02:54 22    BY MR. PETROCELLI:

17:02:57 23        Q.  Tell me what you know to be untrue based on

17:03:00 24    information that you have obtained from people other

17:03:03 25    than Marc Toberoff?

**EXHIBIT B**
**298**

ROUGH DRAFT

17:03:04  1        A.  Well, I know there are things to be untrue

17:03:06  2   that are -- are based on my discussions with Marc

17:03:12  3   Toberoff.

17:03:12  4        Q.  And I'm not asking about you that?

17:03:14  5        A.  Okay.  I guess I can't say it then.

17:03:16  6        Q.  Okay?

17:03:17  7        MR. TOBEROFF:  Well, you can -- you can

17:03:18  8   look at the letter and you -- you have to.

17:03:20  9        MR. PETROCELLI:  We don't have to spend any

17:03:21 10   more time on it if that's your answer?

17:03:21 11        MR. TOBEROFF:  No.

17:03:24 12        MR. PETROCELLI:  But if you want to read

17:03:26 13   through it you tell me if there's anything that you

17:03:28 14   know to be untrue based on something other than Marc

17:03:33 15   Toberoff telling you.

17:03:34 16        MR. TOBEROFF:  And what I'm suggesting to

17:03:36 17   you is that.

17:03:36 18   BY MR. PETROCELLI:

17:03:37 19        Q.  Now, what is it you're pointing out to him

17:03:39 20   you're not allowed to do that?

17:03:41 21        MR. TOBEROFF:  He is pointing out a

17:03:42 22   paragraph.  Can you take this thing from the very

17:03:44 23   beginning -- wait -- since he's asked the question,

17:03:47 24   this document is several pages long, it's goes on

17:03:53 25   for 7 pages.  Read every single line and answer when

                                                        256

ROUGH DRAFT

```
17:03:59  1    you reach something that you believe is untrue and

17:04:03  2    you can talk about it because it's not based on

17:04:05  3    conversation with me, you can tell Mr. Petrocelli

17:04:10  4    what you believe is untrue, if anything, and why.

17:04:13  5    That's it.  And take your time because it's his

17:04:17  6    deposition and you can -- you need to spend the time

17:04:21  7    to answer the question properly.  It's very

17:04:23  8    time-consuming assignment.

17:04:23  9    BY MR. PETROCELLI:

17:04:25 10        Q.  What paragraph did you just point out to

17:04:27 11    Mr. Toberoff?

17:04:29 12            MR. TOBEROFF:  You can answer that.

17:04:30 13            THE WITNESS:  The one on -- referencing

17:04:36 14    October 27, 2003.

17:04:36 15    BY MR. PETROCELLI:

17:04:40 16        Q.  What page is that on?

17:04:41 17        A.  5.

17:04:45 18        Q.  Okay.  Tell me about that paragraph.

17:04:46 19    Why -- why were you pointing it out?

17:04:53 20        A.  It completely mischaracterizes the current

17:04:57 21    legal agreement.

17:05:00 22        Q.  How so?

17:05:00 23        A.  That we have.

17:05:02 24        Q.  How does it mischaracterize it?

17:05:05 25        A.  Can I go into that?
```

257

ROUGH DRAFT

17:05:09  1        Q.  Well, again this is based on -- this is

17:05:11  2    based on what you know not based on what Marc

17:05:15  3    Toberoff told you.  So that's -- that's what you're

17:05:19  4    answering.

17:05:21  5        MR. TOBEROFF:  You can't go -- what are you

17:05:23  6    talking about can you go into the details of our

17:05:26  7    retainer agreement?

17:05:27  8        THE WITNESS:  Why this is false.

17:05:31  9        MR. TOBEROFF:  Let me read it.

17:05:57 10        MR. PETROCELLI:  Do you have to change the

17:05:59 11    videotape.

17:05:59 12        THE VIDEOGRAPHER:  I do you have

17:06:00 13    approximately a minute or a little bit more.

17:06:02 14        MR. PETROCELLI:  Okay?

17:06:04 15        MR. TOBEROFF:  Yes.  Are you talking about

17:06:04 16    the highlighted portion?

17:06:06 17        THE WITNESS:  Yes.

17:06:07 18        MR. TOBEROFF:  Yes you can -- you can --

17:06:09 19    you can answer that.

17:06:12 20        THE WITNESS:  Okay.

17:06:14 21        MR. PETROCELLI:  Well, we're going to have

17:06:15 22    to change the videotape right now.

17:06:16 23        THE WITNESS:  Oh.

17:06:17 24        THE VIDEOGRAPHER:  Okay.  This will mark

17:06:19 25    the end of Volume I, Tape Number 3 in the deposition

258

**EXHIBIT B**
**301**

ROUGH DRAFT

17:06:21  1    of Mark Warren Peary.  Changing tapes at 5:05.

17:06:26  2           (Brief recess.)

17:18:26  3           THE VIDEOGRAPHER:  We are back on the

17:18:33  4    record and this marks the beginning of Volume I,

17:18:36  5    tape number 4 in the deposition of Mark Warren

17:18:39  6    Peary.  The time is 5:17.

17:18:39  7    BY MR. PETROCELLI:

17:18:44  8        Q.  You were going to tell me what was

17:18:46  9    inaccurate about the October 27, 2003 reference in

17:18:51 10    the timeline document Exhibit 25?

17:18:54 11        A.  Yes.

17:18:57 12        Q.  Without telling me about your conversations

17:18:59 13    with Mr. Toberoff on that subject?

17:19:00 14        A.  Yes.  The -- the new legal retainer

17:19:08 15    completely superseded all the old agreements with

17:19:12 16    Pacific Pictures and canceled those out completely

17:19:18 17    and so this completely mischaracterizes his interest

17:19:23 18    in -- in any proceeds.

17:19:31 19        Q.  We'll talk about that when we get to it.

17:19:33 20           Anything else?

17:19:35 21        A.  There -- there are probably lots of things

17:19:39 22    if I had a lot of time to study it it's full of

17:19:42 23    inaccuracies and mischaracterizations.  Just -- I

17:19:50 24    would just say in -- in general that Marc Toberoff

17:19:59 25    is -- is probably one of the hardest working.

                                                        259

**EXHIBIT B**
**302**

ROUGH DRAFT

17:20:02  1        Q.  That's not what I'm asking you?

17:20:04  2        A.  Dedicated lawyers.

17:20:05  3            MR. PETROCELLI:  Move to strike it's

17:20:06  4    non-responsive.

17:20:08  5            MR. TOBEROFF:  Let him answer.

17:20:09  6            MR. PETROCELLI:  We're not doing that.

17:20:11  7            MR. TOBEROFF:  And this mischaracterizes --

17:20:13  8    BY MR. PETROCELLI:

17:20:14  9        Q.  Not -- I was asking you about if there were

17:20:16 10    any other particular statements in here.

17:20:17 11            MR. TOBEROFF:  He is answering you.  You

17:20:19 12    cut off his answer because you didn't want to hear

17:20:21 13    it.

17:20:21 14            MR. PETROCELLI:  I'm asking about specific

17:20:22 15    statements in here.

17:20:24 16            MR. TOBEROFF:  He's answering.  Objection.

17:20:29 17    You need to let the witness answer.

17:20:29 18    BY MR. PETROCELLI:

17:20:40 19        Q.  Let me ask you a question about the last --

17:20:43 20    right after that paragraph you pointed out to me it

17:20:46 21    says:

17:20:50 22            "N T inquires into the

17:20:51 23            legality of entering into the

17:20:52 24            Pacific Pictures Corporation

17:20:54 25            agreement with the Peavys heirs the

260

ROUGH DRAFT

17:20:58  1          Shuster estate using the law firm

17:21:00  2          Armstrong Hirsch Jackoway Tyerman

17:21:02  3          and Wertheimer."

17:21:06  4          Did Mr. Toberoff discuss with you that he

17:21:11  5     had obtained legal advice from the Armstrong her

17:21:17  6     issue firm on the subject of the legality of your

17:21:19  7     agreement.

17:21:19  8          MR. TOBEROFF:  Instruct you not to answer

17:21:21  9     as to the substance of our discussions.

17:21:24 10          (Instruction not to answer.)

17:21:24 11     BY MR. PETROCELLI:

17:21:25 12          Q.  Have you seen a -- any opinion or memoranda

17:21:31 13     from the Armstrong Hirsch firm on the subject of

17:21:35 14     your agreement?

17:21:38 15          A.  No.

17:21:40 16          Q.  Have you spoken to anyone other than

17:21:42 17     Mr. Toberoff on the subject of the validity or

17:21:47 18     legality of your Pacific Pictures agreements?

17:21:49 19          MR. TOBEROFF:  Asked and answered.

17:21:50 20          You can answer again.

17:21:51 21          THE WITNESS:  No.

17:21:51 22     BY MR. PETROCELLI:

17:21:52 23          Q.  Okay.  Put this document aside in the

17:21:56 24     interest of time.

17:21:58 25          MR. TOBEROFF:  So you're not interested in

261

**EXHIBIT B**
**304**

ROUGH DRAFT

17:21:59  1    him finishing his answer about what's inn correct

17:22:02  2    about this document.

17:22:03  3         MR. PETROCELLI:  I'm going to have to come

17:22:04  4    back to it if I have time but since I'm working on a

17:22:08  5    budget right here I got to make better use of my

17:22:10  6    time.

17:22:22  7         Q.  Now, in 2003 you -- you became the executor

17:22:31  8    of the Joe Shuster estate, correct?

17:22:31  9         A.  Yes.

17:22:35 10         Q.  And did your mother indicate that she was

17:22:37 11    unwilling to serve?

17:22:41 12         A.  We had no such discussion.

17:22:47 13         Q.  Well, did she say why wasn't she named the

17:22:50 14    executor of the estate pursuant to the will?

17:22:55 15         A.  I'm the one that has initiated the whole --

17:23:02 16    the whole project.  I've been involved in it with

17:23:06 17    Marc Toberoff from the beginning and I'm active and

17:23:12 18    knowledgeable on it.

17:23:15 19         Q.  You never had any discussion that your

17:23:16 20    mother was unable or unwilling to serve as executor.

17:23:22 21         Is that correct?

17:23:22 22         A.  Right.

17:23:23 23         Q.  Take a look at Exhibit 12 which is a

17:23:29 24    collection of papers from the probate proceeding.

17:23:42 25         (The document referred to was

                                                          262

**EXHIBIT B**
**305**

ROUGH DRAFT

17:23:42  1           marked for identification by the

17:23:42  2           C.S.R. as Exhibit 12 and attached

17:23:43  3           to this deposition.)

17:23:43  4   BY MR. PETROCELLI:

17:23:44  5       Q.  Now you'll see your signature.

17:23:49  6   September 30, 2003, Mark Warren Peary.

17:23:53  7       A.  Okay.

17:23:54  8       Q.  On the first page?

17:23:57  9           Do you see that?

17:23:58 10       A.  Yes.

17:23:59 11       Q.  Do you see your signature on the second

17:24:00 12   page?

17:24:00 13       A.  Yes.

17:24:01 14       Q.  These applications for the administration

17:24:04 15   of the estate?

17:24:05 16       A.  Yes.

17:24:06 17       Q.  Do you see your signature there under the

17:24:08 18   date September 30, 2003?

17:24:09 19       A.  Yes.

17:24:12 20       Q.  Now, if we go to the next page we have

17:24:14 21   proof of subscribing witness Tom Fenaughty

17:24:20 22   F-e-n-a-u-g-h-t-y the same person who witnessed Joe

17:24:22 23   Shuster's will.

17:24:27 24           Do you see that? It's on page 3?

17:24:28 25       A.  Oh, 3.

ROUGH DRAFT

17:24:30  1          Q.  Did you have any contact with him, put him

17:24:36  2     in touch with your lawyer?

17:24:45  3          A.  I didn't have personal contact.

17:24:46  4          Q.  John Petker SP is the name of the probate

17:24:49  5     attorney that was retained to do this work on behalf

17:24:51  6     of the Shuster estate?

17:24:52  7          A.  Yes.

17:24:53  8          Q.  Did you understand that he was reaching out

17:24:55  9     to Mr. Fenaughty?

17:24:58  10         A.  I -- I wasn't aware.

17:25:06  11         Q.  Okay.  Just flipping through to page -- go

17:25:22  12    to the page that's -- Jason, can you -- can you help

17:25:28  13    him find these pages because they're not marked.  Go

17:25:32  14    get this page for him.  At the top it says in the

17:25:34  15    matter of the estate of Joseph Shuster decedent

17:25:38  16    attachment 2 D 1 et cetera et cetera.

17:25:57  17         Do you have that page in front of you?

17:26:00  18         MR. TOBEROFF:  Just a second.  I need to

17:26:02  19    get it too.

17:26:13  20         MR. KLINE:  It's towards the back.

17:26:13  21    BY MR. PETROCELLI:

17:26:17  22         Q.  While he is looking for that, do you have

17:26:21  23    that page in front of you, sir?

17:26:23  24         A.  Yes.

17:26:23  25         Q.  Okay.  And you'll see that it's an

                                                              264

**EXHIBIT B**
**307**

ROUGH DRAFT

17:26:26  1    attachment to a -- if you go two pages earlier, it's

17:26:29  2    a petition for probate and this is an attachment to

17:26:34  3    it that you signs on July 15, 2003.  Correct?

17:26:34  4        A.  Yes.

17:26:40  5        Q.  Okay.  And that's your signature above the

17:26:42  6    name Mark Warren Peary, right?

17:26:45  7            MR. TOBEROFF:  Is he referring to this

17:26:46  8    document.  You're looking at this document.  He is

17:26:48  9    asking you about this.

17:26:49 10            THE WITNESS:  Uh-huh.

17:26:49 11    BY MR. PETROCELLI:

17:26:50 12        Q.  Okay.  Do you have that in front of you now

17:26:52 13    the right document?

17:26:53 14        A.  Yes.

17:26:56 15        Q.  Do you see that that's an attachment to a

17:26:58 16    petition that appears two pages earlier in the

17:27:02 17    stack?  I think that's why -- you're looking at the

17:27:04 18    right document?

17:27:05 19        A.  I was looking at this petition.

17:27:07 20        Q.  Yes you were.  Okay.  Now, go back to the

17:27:09 21    attachment that bears your signature and the date

17:27:10 22    July 15, 2003.  And for the record, this is all part

17:27:14 23    of Exhibit 12.

17:27:16 24            Now look at paragraph 1.  It says that

17:27:22 25    second sentence:

ROUGH DRAFT

17:27:24  1          "Jean Adele Peavy."

17:27:25  2          That's your mother, right?

17:27:26  3      A.  Yes.

17:27:27  4      Q.  Jean Adele Peavy who is the sister of the

17:27:29  5  decedent is also the sole beneficiary under the

17:27:33  6  decedent's will.  And the sole heir at law of the

17:27:36  7  decedent's estates under the laws of intestacy.

17:27:41  8          Do you see that?

17:27:41  9      A.  Yes.

17:27:41  10     Q.  And you signed this statement indicating

17:27:45  11 that that was a truthful statement correct?

17:27:48  12     A.  Yes.

17:27:48  13     Q.  That was not a truthful statement though,

17:27:56  14 correct?  Because under the laws of intestacy your

17:28:00  15 mother Jean Adele Peavy was not the sole air at law

17:28:03  16 under the laws of intestacy, she ask Frank Shuster

17:28:10  17 were the heirs at law?

17:28:11  18         MR. TOBEROFF:  Calls for a legal

17:28:12  19 conclusion.  You're asking him to -- to -- this is

17:28:15  20 something.

17:28:15  21 BY MR. PETROCELLI:

17:28:16  22     Q.  Is that correct?

17:28:18  23         MR. TOBEROFF:  You can only answer if you.

17:28:18  24 BY MR. PETROCELLI:

17:28:19  25     Q.  At the time?

                                                     266

**EXHIBIT B**
**309**

ROUGH DRAFT

17:28:20  1          MR. TOBEROFF:  If you feel equipped to

17:28:22  2    answer these questions can you answer.

17:28:23  3          MR. PETROCELLI:  You don't have to tell him

17:28:25  4    not to answer, Marc.

17:28:26  5          MR. TOBEROFF:  I'm not telling him not to

17:28:27  6    answer.  I'm advising him only answer to the extent

17:28:30  7    you feel equipped to answer.  He is going into legal

17:28:30  8    teritory --

17:28:30  9          MR. PETROCELLI:

17:28:34  10       Q.  That's true of all questions.

17:28:35  11         MR. TOBEROFF:  -- I'm not sure I even

17:28:37  12   understand because I'm not a trust and estates

17:28:40  13   lawyer.

17:28:40  14   BY MR. PETROCELLI:

17:28:41  15       Q.  When Joe Shuster died had he two siblings

17:28:44  16   who survived him, correct, Jean and Frank?

17:28:47  17       A.  Yes.

17:28:47  18       Q.  Okay.

17:28:52  19       Q.  Why did you write here that Jean would have

17:28:55  20   been the sole heir at law under the laws of

17:28:58  21   intestacy?

17:28:59  22         MR. TOBEROFF:  Misstates the report

17:29:03  23    record.

17:29:03  24         MR. PETROCELLI:

17:29:03  25       Q.  Do you know what that means under the laws

                                                          267

**EXHIBIT B**
**310**

ROUGH DRAFT

17:29:06  1    of intestacy?

17:29:07  2        A.  Please explain.

17:29:08  3        Q.  It means that if you had died without a

17:29:13  4    will based on the statutory laws of -- of

17:29:15  5    disposition?

17:29:18  6        A.  Uh-huh.

17:29:18  7        Q.  And are you aware that under authorize laws

17:29:20  8    that Jean was not the sole air -- was one of two

17:29:26  9    heirs?

17:29:29 10        A.  All I know that she -- she had a will.

17:29:36 11    That's all I'm aware of.

17:29:38 12        Q.  Who prepared this document?

17:29:39 13        A.  I am not certain.

17:29:41 14        Q.  What did you do to assure yourself that the

17:29:44 15    statements were truthful before you made them to the

17:29:47 16    Court?

17:29:47 17        A.  I trusted the state attorneys.

17:29:54 18        Q.  Did you understand that this was a serious

17:29:56 19    matter that you're making a filing with a court

17:29:58 20    representing that Ms. -- that your mother was the

17:30:03 21    sole heir at law because you did not have an

17:30:07 22    original will you had a copy and you were

17:30:11 23    representing to the Court that it should accept the

17:30:14 24    copy because even if no will existed she would still

17:30:16 25    be the sole heir?  You understood that of the

268

**EXHIBIT B**
**311**

ROUGH DRAFT

17:30:19  1    purpose of this filing?

17:30:22  2        A.  Frank Shuster was dead at that time.

17:30:26  3    That's my understanding of it.

17:30:30  4        Q.  But you understood that when Joe died Frank

17:30:32  5    was alive, as well as your mother, correct?

17:30:35  6        A.  At that time.

17:30:36  7        Q.  Did Joe have -- did Frank have a will?

17:30:38  8        A.  I believe so.

17:30:44  9        Q.  Do you know so?

17:30:46  10       A.  I -- I can't -- I can't say with certainty.

17:30:55  11       Q.  Did you understand that you were making a

17:30:57  12   filing with the Court in that it was your obligation

17:31:00  13   to provide the Court with accurate information?

17:31:07  14           MR. TOBEROFF:  You can answer that.

17:31:11  15           THE WITNESS:  Yes.

17:31:11  16   BY MR. PETROCELLI:

17:31:13  17       Q.  Turn the page.  In the next attachment to

17:31:18  18   the probate petition that you filed it said the

17:31:22  19   decedent never married and never had any children.

17:31:27  20           That also is false?

17:31:30  21       A.  It was a mistake.

17:31:34  22       Q.  Why did you allow this to be filed and why

17:31:36  23   did you sign it if it was untrue?

17:31:42  24       A.  It was simply a mistake.

17:31:44  25       Q.  Did you scan this or did you read this?

269

**EXHIBIT B**
**312**

ROUGH DRAFT

| | | |
|---|---|---|
| 17:31:54 | 1 | A.  I -- I don't know. |
| 17:31:57 | 2 | Q.  And go to the 1, 2, 3, 4, 5th page from |
| 17:32:05 | 3 | the -- from the end, document called declination to |
| 17:32:09 | 4 | act as personal representative signed by Jean Peavy. |
| 17:32:19 | 5 | And this document signed in the same day that you |
| 17:32:21 | 6 | sign the do you remember we just looked at.  Your |
| 17:32:24 | 7 | mom is -- is declining to serve as personal |
| 17:32:30 | 8 | representative of Joe Shuster's estate.  As |
| 17:32:35 | 9 | indicated in paragraph 3. |
| 17:32:35 | 10 | Do you see that? |
| 17:32:35 | 11 | A.  Yes. |
| 17:32:39 | 12 | Q.  Do you have any understanding why she so |
| 17:32:41 | 13 | declined? |
| 17:32:46 | 14 | A.  She didn't want to be bothered with this. |
| 17:32:49 | 15 | Q.  Is that what she told you? |
| 17:32:51 | 16 | A.  To that effect. |
| 17:32:52 | 17 | A.  I don't want to be bothered with this? |
| 17:32:54 | 18 | What does that mean. |
| 17:32:58 | 19 | A.  She wants me to handle these affairs. |
| 17:33:00 | 20 | Q.  In paragraph 1 it says I am the only |
| 17:33:02 | 21 | sibling of the decedent Joseph Shuster. |
| 17:33:02 | 22 | Do you see that? |
| 17:33:06 | 23 | A.  At the time that's true. |
| 17:33:09 | 24 | Q.  She wasn't the only sibling Joe Shuster had |
| 17:33:12 | 25 | two siblings correct? |

270

**EXHIBIT B**
**313**

ROUGH DRAFT

17:33:13  1        A.  Yes.

17:33:13  2        Q.  She was the only living sibling?

17:33:15  3        A.  Yes.

17:33:27  4        Q.  Did Frank have any familiar leave his own?

17:33:29  5        A.  No.

17:33:41  6        Q.  Is there any reason that you can think of

17:33:43  7  why all these mistakes were made in these documents?

17:33:52  8           MR. TOBEROFF:  Assumes facts.  Lacks

17:33:54  9  foundation.

17:33:54  10          THE WITNESS:  I'm not sure.

17:33:54  11  BY MR. PETROCELLI:

17:33:56  12      Q.  There seems to have been an effort not to

17:33:58  13  identify the existence of either Joe Shuster's wife

17:34:02  14  or Frank Shuster, Joe Shuster's brother?

17:34:07  15          MR. TOBEROFF:  Misstates the document.

17:34:07  16  BY MR. PETROCELLI:

17:34:09  17      Q.  Were you a representing to represent to the

17:34:12  18  Court that only ask your mother were the sole

17:34:17  19  interested parties in Joe Shuster's estate?

17:34:19  20      A.  Well, at this time that's correct.

17:34:23  21      Q.  But did you make a decision not to disclose

17:34:26  22  to the Court that he had been married and that he

17:34:32  23  had a brother and let the Court sort out whether

17:34:32  24  there were any interests there?

17:34:32  25      A.  No.

271

EXHIBIT B
314

ROUGH DRAFT

17:34:34  1        Q.  You just signed the documents that the

17:34:37  2    lawyers put in front of you without reading them

17:34:39  3    carefully?

17:34:39  4        A.  I -- I signed the -- I read the documents

17:34:45  5    what required signatures.

17:34:47  6        Q.  The purpose of your becoming the executive

17:34:50  7    estate was to be able to serve the termination

17:34:52  8    notice, correct?

17:34:52  9        A.  Yes.

17:34:55 10        Q.  Can you take a look at the next exhibit,

17:34:57 11    Exhibit 13.  Before I go to Exhibit 13, which is the

17:35:10 12    letter -- another agreement with Pacific Pictures

17:35:13 13    dated October 27, 2003, take a look at -- where is

17:35:32 14    the Superboy termination?  What exhibit number is

17:35:34 15    that?

17:35:44 16            Take a look at exhibit 11, please.  Of

17:35:49 17    paragraph Exhibit 11 is the notice of termination of

17:35:54 18    grants regarding Superboy filed by Mr. Toberoff on

17:36:01 19    behalf of the Siegels?

17:36:01 20            (The document referred to was

17:36:01 21            marked for identification by the

17:36:01 22            C.S.R. as Exhibit 11 and attached

17:36:04 23            to this deposition.)

17:36:04 24        MR. TOBEROFF:  This is Shuster 11?

17:36:08 25        MR. PETROCELLI:  Exhibit 11 right.

272

**EXHIBIT B**
**315**

ROUGH DRAFT

17:36:11 1      Q.  After you entered into the November 2001

17:36:14 2  Pacific Pictures joint venture agreement, which

17:36:18 3  mentioned that the rights included Superboy, did

17:36:24 4  you -- you said you became aware at some point of

17:36:26 5  that -- of some issue regarding Superboy.

17:36:26 6          Is that right?

17:36:26 7      A.  Yes.

17:36:33 8      Q.  What did you become aware of?

17:36:34 9      A.  That the Shuster estate doesn't have rights

17:36:39 10 to it.

17:36:41 11     Q.  How did you learn that?

17:36:43 12     A.  Through my attorney Marc Toberoff.

17:36:45 13     Q.  Did you learn it from any other source?

17:36:47 14     A.  No.

17:36:49 15     Q.  Did you do any work to verify it?  Did you

17:36:54 16 contact any other counsel?

17:36:55 17     A.  No.

17:36:56 18     Q.  Did you get a second opinion from anybody?

17:36:58 19     A.  No.

17:37:02 20     Q.  Okay.  Did you do any independent review to

17:37:07 21 determine whether Mr. Toberoff was, correct?

17:37:12 22     A.  I -- I did some research on my own.

17:37:17 23     Q.  After he told you?

17:37:19 24     A.  I believe.

17:37:20 25     Q.  What research did you do?

273

**EXHIBIT B**
**316**

ROUGH DRAFT

17:37:23 1        A.  There was a 1947 case where the courts

17:37:28 2    awarded Superboy to Jerry Siegel.

17:37:31 3        Q.  Mr. Toberoff pointed that out to you,

17:37:31 4    correct?

17:37:33 5        A.  Well, I became aware of that --

17:37:34 6        Q.  He --

17:37:35 7        A.  -- and that's correct.

17:37:36 8        Q.  He pointed it out to you, correct?

17:37:37 9        A.  I was aware of that case prior to that.

17:37:39 10       Q.  Were you aware of that when you signed the

17:37:43 11   November 2001 joint venture agreement?

17:37:44 12       A.  I don't know if I was aware of the legal

17:37:50 13   details.

17:37:50 14       Q.  You were aware of the case?

17:37:51 15       A.  I was aware of the case back to 47.

17:37:53 16       Q.  And you became aware of the legal details

17:37:55 17   as a result of conversations with Mr. Toberoff,

17:37:55 18   correct?

17:37:59 19       A.  Yes.

17:38:00 20       Q.  And then you became aware so your -- you

17:38:11 21   accepted Mr. Toberoff advice that the Shuster estate

17:38:13 22   had no interest in Superboy, correct?

17:38:13 23       A.  Yes.

17:38:16 24       Q.  Okay.  And you became aware around the same

17:38:20 25   time that the Siegels were claiming 100 percent

                                                         274

**EXHIBIT B**
**317**

ROUGH DRAFT

17:38:27 1      rights to Superboy, correct?

17:38:31 2          A.  I don't know exactly when I became aware of

17:38:34 3      it.

17:38:34 4          Q.  But you became aware of that, right?

17:38:36 5          A.  I did.

17:38:36 6          Q.  And you became aware of that at a time when

17:38:41 7      Mr. Toberoff was representing the Siegels, correct?

17:38:44 8          A.  Sometime in there.

17:38:46 9          Q.  Okay.  And Exhibit 11 is the Superboy

17:38:50 10     notice of termination that the Siegels filed at the

17:38:57 11     time that they were represented by Mr. Toberoff.

17:39:00 12              Did you see it at the time?

17:39:01 13         A.  No.

17:39:04 14         Q.  Okay.  Now, thereafter you then entered

17:39:09 15     into an amendment to your joint venture agreement to

17:39:14 16     delete Superboy from the venture, correct?

17:39:14 17         A.  Yes.

17:39:18 18         Q.  And you did that?

17:39:18 19             MR. TOBEROFF:  Excuse me.  Excuse me.

17:39:18 20     BY MR. PETROCELLI:

17:39:28 21         Q.  Take a look at Exhibit 13?

17:39:32 22             MR. TOBEROFF:  Okay.

17:39:32 23     BY MR. PETROCELLI:

17:39:33 24         Q.  Do you have that in front of you?  You can

17:39:34 25     put the other exhibits away?

                                                              275

ROUGH DRAFT

17:39:36 1          MR. TOBEROFF:  You need to weight after he

17:39:37 2    asks a question before you answer particularly when

17:39:40 3    he asks a leading question.  Wait give me a chance

17:39:42 4    to object okay?  So what's the question.

17:39:50 5          MR. PETROCELLI:  Does very Exhibit 13 in

17:39:51 6    front of him Marc?

17:39:57 7          THE WITNESS:  Yes.

17:39:57 8    BY MR. PETROCELLI:

17:39:58 9       Q.  Is that Exhibit 13?  Okay.  Can you push

17:40:00 10   aside the other exhibits?  Thank you.  Okay.

17:40:06 11         Can you take these exhibits and move those

17:40:07 12   over there so -- they're obstructing my view.  Thank

17:40:14 13   you and also the big thick one as well.

17:40:20 14         Now, Exhibit 13 is dated October 27, 2003

17:40:28 15   directed to you as now the new executor of the

17:40:32 16   estate, right?

17:40:32 17      A.  Yes.

17:40:36 18      Q.  Okay.  And if you go to the end, it is

17:40:41 19   signed by you as executor on October 30, 2003,

17:40:41 20   right?

17:40:41 21      A.  Yes.

17:40:52 22      Q.  And it's signed by Jean Peavy your mother

17:40:58 23   on the same date correct?

17:40:59 24      A.  Yes.

17:40:59 25      Q.  And it's signed by Mr. Toberoff as

                                                              276

**EXHIBIT B**
**319**

ROUGH DRAFT

17:41:01  1    president of PPC, correct?

17:41:06  2        A.  Yes.

17:41:06  3        Q.  Okay.  And you do see in paragraph 2 here

17:41:10  4    that it states PPC is not a law firm, right?

17:41:10  5        A.  Yes.

17:41:17  6        Q.  Okay.  And you understood that when you

17:41:18  7    signed it, right?

17:41:21  8        A.  Yes.

17:41:21  9        Q.  And you -- and the first paragraph and you

17:41:24  10   read this carefully before signing it and you

17:41:27  11   understood it when you signed it right?  It being

17:41:31  12   Exhibit 13?

17:41:32  13       A.  Yes.

17:41:34  14       Q.  Okay.  And it states that this letter

17:41:38  15   was -- is intended to supplement your prior joint

17:41:42  16   venture agreement dated as of November 31, 2001,

17:41:42  17   right?

17:41:42  18       A.  Yes.

17:41:50  19       Q.  And in paragraph 1 it re defines the rights

17:41:55  20   but this time excludes Superboy, correct?

17:42:01  21           MR. TOBEROFF:  Wait.  Just one second.

17:42:12  22   Objection.  You're mischaracterizing the agreement.

17:42:12  23   BY MR. PETROCELLI:

17:42:19  24       Q.  Is that correct, sir?  There's no reference

17:42:26  25   to Superboy in paragraph 1, correct?

277

**EXHIBIT B**
**320**

ROUGH DRAFT

17:42:28  1        A.  I don't see it.

17:42:29  2        Q.  And there was in the first version,

17:42:29  3    correct?

17:42:29  4        A.  Yes.

17:42:32  5        Q.  And there's no reference?

17:42:33  6            MR. TOBEROFF:  Excuse me I'd like to give

17:42:35  7    him the first version so he can compare the two.

17:42:35  8    BY MR. PETROCELLI:

17:42:38  9        Q.  Do you have exhibit -- what's the Exhibit

17:42:41  10    Number mark?

17:42:41  11            MR. TOBEROFF:  10.

17:42:41  12    BY MR. PETROCELLI:

17:42:43  13        Q.  Do you have Exhibit 10 and you see the

17:42:44  14    reference to Superboy in Smalville?  What paragraph

17:42:47  15    is it contained in Exhibit 10?

17:42:49  16        A.  1.

17:42:49  17        Q.  And in paragraph 1 of Exhibit 13 there's no

17:42:52  18    reference to Superboy or smallville.

17:42:52  19            Is that correct?

17:42:52  20        A.  Yes.

17:42:57  21        Q.  Okay.  And that was the result of the

17:43:00  22    advice given to you that the Shuster estate had no

17:43:04  23    interest in Superboy?

17:43:05  24            MR. TOBEROFF:  I instruct you not to answer

17:43:07  25    as to the advice given to you.  You can't answer

278

**EXHIBIT B**
**321**

ROUGH DRAFT

17:43:10  1     that question.

17:43:11  2               (Instruction not to answer.)

17:43:11  3     BY MR. PETROCELLI:

17:43:12  4         Q.  Whether you signed this you understood that

17:43:13  5     Superboy was not part of the agreement, correct?

17:43:15  6               MR. TOBEROFF:  Instruct you not to answer

17:43:16  7     to the extent your understanding is based on

17:43:18  8     conversations with me.

17:43:19  9               MR. PETROCELLI:  Come you you can't -- you

17:43:21 10     can't block all examination on this subject.

17:43:23 11               MR. TOBEROFF:  You shouldn't be surprised

17:43:25 12     Mr. Petrocelli after suing your opposing counsel for

17:43:28 13     six years.  You shouldn't be surprised.

17:43:30 14               MR. PETROCELLI:  For six years?

17:43:30 15               MR. TOBEROFF:  That's right.  You're DC.

17:43:32 16     Seven years.

17:43:37 17               MR. PETROCELLI:  I'm going to through and

17:43:38 18     follow that, but --

17:43:45 19               MR. TOBEROFF:  In talking about -- excuse

17:43:47 20     me.  In talking about these agreementses, if he is

17:43:49 21     comparing this agreement to this agreement make sure

17:43:52 22     you read carefully what is he comparing it to before

17:43:55 23     you answer.

17:43:55 24     BY MR. PETROCELLI:

17:44:00 25         Q.  You can put aside paragraph -- excuse me,

279

**EXHIBIT B**
**322**

ROUGH DRAFT

17:44:03  1     the Exhibit 10.  I'm going to focus on Exhibit 13

17:44:08  2     because we've been through Exhibit 10 already.

17:44:10  3          When you signed -- when you as the executor

17:44:17  4     signed this supplement to your joint venture

17:44:21  5     agreement with your joint venture partner Pacific

17:44:28  6     Pictures Corporation, you understood that you were

17:44:30  7     eliminating Superboy from the definition of rights

17:44:34  8     contained in paragraph 1, correct?

17:44:41  9          MR. TOBEROFF:  He's asking you at the time

17:44:42  10     that you signed it so you can only answer that

17:44:44  11     question what your understanding was at the time you

17:44:49  12     signed it.

17:44:49  13          THE WITNESS:  Yes.

17:44:49  14     BY MR. PETROCELLI:

17:44:51  15          Q.  Okay.  And in paragraph 4 you see that you

17:45:04  16     understood by virtue of your agreeing to paragraph 4

17:45:08  17     that on behalf of the Shuster estate you as executor

17:45:13  18     required the agreement of PPC Pacific Pictures

17:45:17  19     Corporation to enter into any agreement regarding

17:45:19  20     the Superman rights, correct?

17:45:19  21          A.  Yes.

17:45:23  22          Q.  And you understood in paragraph 7 that upon

17:45:31  23     the expiration of the term of this joint venture

17:45:34  24     agreement or in the event of a termination for any

17:45:40  25     reason that the estate would hold 50 percent of the

280

**EXHIBIT B**
**323**

ROUGH DRAFT

17:45:49  1    rights and Pacific Pictures Corporation would hold

17:45:54  2    the remaining 50 percent as tenants in common,

17:45:54  3    correct?

17:45:54  4        A.  Yes.

17:46:04  5        Q.  Did you discuss with your mother the

17:46:08  6    elimination of Superboy from your joint venture

17:46:11  7    agreement?

17:46:18  8        A.  I don't remember a specific discussion.

17:46:24  9        Q.  Do you -- did you believe that that was an

17:46:26  10   important matter?

17:46:27  11       A.  Yes.

17:46:30  12       Q.  And you as the executor, you -- you

17:46:34  13   understood you had a fiduciary duty to your mother

17:46:36  14   in her role as the sole beneficiary, correct?

17:46:36  15       A.  Yes.

17:46:40  16       Q.  And you were signing an agreement

17:46:48  17   subtracting rights from the prior agreement,

17:46:48  18   correct?

17:46:53  19            MR. TOBEROFF:  Lacks foundation.  Assumes

17:46:55  20   facts.  Mischaracterizes the exhibit.

17:46:55  21   BY MR. PETROCELLI:

17:47:01  22       Q.  In your capacity as the executor the Court

17:47:04  23   appointed executor who applied for and obtained the

17:47:08  24   right and power to administer this estate with

17:47:13  25   respect to this issue, you understood that in

281

**EXHIBIT B**
**324**

ROUGH DRAFT

17:47:18  1    signing this document you were removing from the

17:47:27  2    estate any claim to the Superboy rights, correct?

17:47:35  3        A.  Only with regard to this document.

17:47:38  4        Q.  Well, what other document were you

17:47:39  5    reserving it in?

17:47:43  6        A.  My understanding was we didn't have rights.

17:47:46  7    That's why this agreement did not include it in

17:47:48  8    Superboy.

17:47:48  9        Q.  But you -- it was included in the first

17:47:51  10   agreement that you signed in November, Exhibit 10?

17:47:54  11       MR. TOBEROFF:  Here is the exhibit.

17:47:54  12   BY MR. PETROCELLI:

17:47:56  13       Q.  Paragraph 1?

17:47:56  14       A.  Yes.

17:47:57  15       MR. TOBEROFF:  Is he referring again when

17:47:58  16   he refers to Exhibit 10, paragraph 1 in the en

17:48:02  17   conclusion of Superboy I'd like you to read

17:48:04  18   paragraph 1 to see the way Superboy is included.

17:48:07  19       MR. PETROCELLI:  You know, please don't?

17:48:07  20       MR. TOBEROFF:  No.

17:48:09  21       MR. PETROCELLI:  It's not appropriate.

17:48:10  22       MR. TOBEROFF:  It's only fair that when you

17:48:11  23   talk about something, he looks at it.

17:48:13  24       MR. PETROCELLI:  He doesn't need you to

17:48:14  25   tell him how to read it, okay.

**EXHIBIT B**
**325**

ROUGH DRAFT

17:48:16  1            MR. TOBEROFF:  I'm not telling him --

17:48:16  2            MR. PETROCELLI:  That's just inappropriate.

17:48:17  3            MR. TOBEROFF:  I'm telling him to read it.

17:48:19  4            MR. PETROCELLI:  No, you're telling him

17:48:20  5    more than that.  Let's not go down this path.

17:48:22  6        Q.  What did you as the executor on behalf of

17:48:26  7    the estate get as consideration for giving up any

17:48:30  8    claim to Superboy?

17:48:32  9            MR. TOBEROFF:  Assumes facts.  Lacks

17:48:33 10    foundation.

17:48:36 11            THE WITNESS:  My understanding is the

17:48:40 12    Shuster estate.

17:48:40 13            MR. PETROCELLI:

17:48:41 14        Q.  Did you understand my question?  Let me ask

17:48:44 15    it again.

17:48:48 16        A.  Repeat it.

17:48:48 17        Q.  Yes.  As the executor of the Shuster

17:48:57 18    estate, in executing Exhibit 13, the October 27,

17:48:57 19    2003 amendment to your joint venture agreement, what

17:49:01 20    did the estate get in return forgiving up any and

17:49:05 21    all claim to Superboy?

17:49:07 22            MR. TOBEROFF:  Assumes facts and lacks

17:49:13 23    foundation.

17:49:13 24            THE WITNESS:  I think the question

17:49:14 25    mischaracterizes the situation.

                                                            283

**EXHIBIT B**
**326**

ROUGH DRAFT

17:49:14  1    BY MR. PETROCELLI:

17:49:18  2         Q.  Can you answer the question?

17:49:19  3              MR. TOBEROFF:  Is he trying and you're

17:49:20  4    interrupting his answer.

17:49:21  5              MR. PETROCELLI:  No.

17:49:22  6              MR. TOBEROFF:  Excuse me.

17:49:22  7              MR. PETROCELLI:  Is he arguing and he is

17:49:23  8    not answering my question?

17:49:25  9              MR. TOBEROFF:  No, he's.

17:49:26 10              MR. PETROCELLI:

17:49:26 11         Q.  Do you understand the question, sir?

17:49:27 12         A.  I think it mischaracterizes the situation.

17:49:29 13         Q.  It's not up to you to make that decision.

17:49:31 14    That's for a judge to make.

17:49:33 15

17:49:33 16              MR. TOBEROFF:  He can answer.

17:49:33 17    BY MR. PETROCELLI:

17:49:34 18         Q.  Do you understand the question?

17:49:35 19         A.  I don't know how to answer it because it

17:49:37 20    assumes certain things that are -- that I don't

17:49:40 21    believe are true.

17:49:40 22    BY MR. PETROCELLI:

17:49:42 23         Q.  What, if anything, did the estate get for

17:49:44 24    removing the words Superboy" and smallville from

17:49:49 25    your joint venture agreement from the way they

EXHIBIT B
327

ROUGH DRAFT

17:49:52  1    appeared in Exhibit 10?

17:49:55  2         MR. TOBEROFF:  Again he's referring to

17:49:57  3    Exhibit 10.  Please look at Exhibit 10 and the way

17:49:59  4    they appeared in Exhibit 10.  Those are your words

17:50:02  5    Mr. Petrocelli.  So please look at the way Superboy

17:50:06  6    appeared in Exhibit 10.

17:50:07  7         MR. PETROCELLI:  Mark you don't need to

17:50:08  8    repeat my question to him now really you're starting

17:50:11  9    to get out of hand here.

17:50:12  10        MR. TOBEROFF:  I've been pretty good I've

17:50:14  11   been a good boy.

17:50:15  12        MR. PETROCELLI:  Let's keep it that pay

17:50:17  13   okay.

17:50:18  14        MR. TOBEROFF:  Please look at Exhibit 10

17:50:20  15   which he's referred to before you answer the

17:50:21  16   question.

17:50:21  17   BY MR. PETROCELLI:

17:50:27  18       Q.  So what's the answer?

17:50:29  19       A.  What did we get?

17:50:31  20       Q.  Yes.  What did you get in return for your

17:50:33  21   agreement to delete the references to Superboy and

17:50:38  22   smallville?

17:50:45  23       A.  All I can say is I don't think we have

17:50:48  24   rights to it.

17:50:48  25       Q.  I didn't ask you whether you thought had

285

**EXHIBIT B**
**328**

ROUGH DRAFT

17:50:50  1     you rights.  I ask you what, if anything, did you

17:50:53  2     get for agreeing to do this supplement?

17:50:56  3         A.  There was -- okay there was no remuneration

17:50:58  4     or compensation or anything.

17:51:01  5         Q.  None, right?

17:51:02  6         A.  Okay.

17:51:03  7         Q.

17:51:03  8             Is that correct?

17:51:05  9             MR. TOBEROFF:  He just answered you.

17:51:06 10             THE WITNESS:  That's what I said.

17:51:06 11     BY MR. PETROCELLI:

17:51:07 12         Q.  Okay.  And and the estate of which you were

17:51:12 13     in charge of administering did not seek a second

17:51:15 14     opinion from another lawyer on that subject.

17:51:15 15             Is that right?

17:51:20 16         A.  That's correct.

17:51:20 17         Q.  The sole advice that you accepted was the

17:51:24 18     lawyer who represented the Siegels who were

17:51:28 19     asserting 100 percent ownership.

17:51:28 20             Is that correct?

17:51:28 21         A.  Yes.

17:51:41 22         Q.  Did you disclose to the probate court that

17:51:45 23     you had executed this amendment deleting any

17:51:48 24     reference to Superboy and smallville for no

17:51:53 25     remuneration or compensation based on the advice of

286

**EXHIBIT B**
**329**

ROUGH DRAFT

17:51:56  1    the lawyer for the Siegels who were claiming 100

17:52:01  2    percent rights to Superboy?  Did you make that

17:52:03  3    disclosure to the probate court?

17:52:06  4         A.  I don't believe so.

17:52:13  5         Q.  When you -- in connection with your

17:52:17  6    decision to accept the advice of Mr. Toberoff, were

17:52:28  7    you made aware of any copyright -- before I get

17:52:40  8    there, turn to Exhibit 14.

17:52:44  9              (The document referred to was

17:52:44  10             marked for identification by the

17:52:44  11             C.S.R. as Exhibit 14 and attached

17:52:44  12             to this deposition.)

17:52:53  13        MR. PETROCELLI:  Exhibit 14 is the --

17:53:00  14   notice of termination prepared by Mr. Toberoff on

17:53:03  15   behalf of the Schusters that was sent out this

17:53:10  16   November -- November 7, 2003.

17:53:14  17        Q.  You've seen this document before?

17:53:16  18        A.  Yes.

17:53:17  19        Q.  And you signed it correct if you look at

17:53:25  20   page 9?  You signed it as the executor of the estate

17:53:28  21   of Joseph Shuster?

17:53:29  22        A.  Yeah, let me find it.  I don't see the

17:53:34  23   signature page.

17:53:35  24        Q.  It's page 9, Mr. Peary if you look at the

17:53:38  25   numbers in the center of the page?

287

ROUGH DRAFT

17:53:39  1        A.  The center?

17:53:41  2        Q.  The one -- the one on the right-hand corner

17:53:43  3    would be 17.

17:53:44  4        A.  Oh.  Okay.  The signature page oh, okay,

17:53:44  5    yes.

17:53:57  6        Q.  That's your signature as the executor of

17:53:58  7    the Joseph Shuster estate?

17:54:00  8        A.  Yes.

17:54:00  9        Q.  And you executed this document Exhibit 14

17:54:02 10    the notice of termination a little more than a week

17:54:06 11    after the Exhibit 13 the amendment to the joint

17:54:12 12    venture agreement dated October 27, 2003, correct?

17:54:16 13        A.  Yes.

17:54:17 14        Q.  Okay.  And this notice of termination

17:54:23 15    includes no reference to Superboy or smallville,

17:54:23 16    correct?

17:54:30 17        A.  I believe that's correct.

17:54:33 18        Q.  Okay.

17:54:33 19            MR. TOBEROFF:  Don't -- don't -- you have

17:54:34 20    to read the document before you can answer it do I.

17:54:39 21            THE WITNESS:  Okay.  I don't remember it

17:54:43 22    being in there.

17:54:43 23    BY MR. PETROCELLI:

17:54:44 24        Q.  Well based on your prior testimony you

17:54:46 25    would not expect it to be there because you said did

                                                          288

**EXHIBIT B**
**331**

ROUGH DRAFT

17:54:49  1    you not believe the estate had any such interest

17:54:51  2    based on the advise you received, correct?

17:54:53  3        A.  I would not expect it.

17:54:54  4            MR. TOBEROFF:  Calls for a legal

17:54:55  5    conclusion.  Legal document.

17:54:55  6    BY MR. PETROCELLI:

17:55:08  7        Q.  I'm going to ask you another question now?

17:55:10  8            MR. TOBEROFF:  Are you asking him Mr. It's

17:55:12  9    in here or not.

17:55:12  10           MR. PETROCELLI:  No, I'm not.  It's

17:55:14  11   innocent there.  I'll represent that.

17:55:18  12       Q.  To be clear, when you executed this notice

17:55:21  13   of termination you understood that Superboy was not

17:55:24  14   included, correct?

17:55:24  15       A.  Yes.

17:55:29  16       Q.  Okay.  Did you disclose to the probate

17:55:30  17   court that you had served in your capacity as

17:55:34  18   executor a notice of termination that did not extend

17:55:37  19   to Superboy?

17:55:38  20       A.  Did I give notice to the probate court?

17:55:43  21       Q.  Did you make that disclosure to the probate

17:55:45  22   court yes?

17:55:45  23       A.  I don't recall that.

17:55:48  24       Q.  You didn't do that, right?

17:55:51  25       A.  I don't recall doing that.

289

**EXHIBIT B**
**332**

ROUGH DRAFT

17:55:57 1          Q.  Okay.  Now, and you understood that by not

17:55:58 2     serving notice of termination with respect to

17:56:00 3     Superboy that the state would be forever giving up

17:56:06 4     any ability to recapture or terminate or recapture

17:56:10 5     any Superboy rights, correct?

17:56:14 6               MR. TOBEROFF:  Assume -- calls for a legal

17:56:16 7     conclusion.  Assumes facts and lacks foundation.

17:56:19 8               MR. PETROCELLI:

17:56:19 9          Q.  You can answer.

17:56:20 10         A.  I'm not sure what the legal technicalities.

17:56:22 11         Q.  You understood that by not seeking to

17:56:26 12    terminate is the estate was giving up any claim even

17:56:29 13    to Superboy right?

17:56:32 14              MR. TOBEROFF:  Calls for a legal

17:56:33 15    conclusion.

17:56:36 16              THE WITNESS:  All I know is it wasn't -- it

17:56:38 17    wasn't a notice was not given in this document.

17:56:38 18    BY MR. PETROCELLI:

17:56:43 19         Q.  Or in any other document right?

17:56:47 20         A.  No.

17:56:47 21         Q.   Correct?

17:56:48 22         A.  That's correct.

17:56:48 23         Q.  In fact, the -- the time within which to

17:56:52 24    file a notice of termination with respect to

17:56:55 25    Superboy on behalf of the Shuster estate expired 11

290

**EXHIBIT B**
**333**

ROUGH DRAFT

17:56:58  1    days later on November 18, 2003 correct?

17:57:04  2           MR. TOBEROFF:  Assumes facts lacks

17:57:06  3    foundation.  Calls for a legal conclusion.

17:57:09  4           THE WITNESS:  I'm not positive of the

17:57:11  5    details.

17:57:11  6    BY MR. PETROCELLI:

17:57:12  7        Q.  But you do know now that as you sit here

17:57:15  8    now as the executor of the Joseph Shuster estate

17:57:17  9    that the time has long passed for -- for the estate

17:57:21 10    filing a notice of termination with respect to

17:57:23 11    Superboy, correct?

17:57:24 12           MR. TOBEROFF:  You can -- can you only

17:57:25 13    answer these questions requiring legal knowledge

17:57:28 14    number 1 if you know one way or another and number

17:57:32 15    2, if it's not based on your discussions with me.

17:57:35 16    That's it.

17:57:38 17           THE WITNESS:  Okay.  I'm -- I'm not sure.

17:57:38 18    BY MR. PETROCELLI:

17:57:41 19        Q.  Well since 2003 to the present have you

17:57:44 20    ever purported to serve a notice of termination for

17:57:47 21    Superboy on behalf of the Shuster estate?

17:57:49 22        A.  No.

17:57:52 23        Q.  Okay.  And do you have any intention right

17:57:53 24    now to do so?

17:57:58 25           MR. TOBEROFF:  Don't discuss your

291

**EXHIBIT B**
**334**

ROUGH DRAFT

17:57:59  1    intentions as to legal acts in this case.

17:57:59  2    BY MR. PETROCELLI:

17:58:04  3         Q.  In your capacity as executor do you have a

17:58:06  4    current intention of which you are currently aware

17:58:08  5    to serve a notice of termination with respect to

17:58:12  6    Superboy?

17:58:12  7              MR. TOBEROFF:  Instruct you not to answer

17:58:13  8    that.

17:58:14  9              (Instruction not to answer.)

17:58:14  10             MR. PETROCELLI:  On what ground?

17:58:16  11             MR. TOBEROFF:  On the ground that any

17:58:17  12    intention he has as to exercising his -- exercising

17:58:21  13    whatever rights he may or may not have under the

17:58:23  14    copyright act the product of any discussions with

17:58:27  15    his counsel.

17:58:28  16             MR. PETROCELLI:  That's not a fair response

17:58:29  17    to my question.

17:58:30  18             MR. TOBEROFF:  I disagree.

17:58:30  19    BY MR. PETROCELLI:

17:58:33  20         Q.  Have you reviewed any drafts of any notices

17:58:35  21    of termination with respect to Superboy?

17:58:37  22         A.  No.

17:58:43  23         Q.  Okay.  Take a look at Exhibit 15.  At the

17:58:48  24    at the time that Mr. Toberoff gave you advice that

17:58:51  25    the estate had no claim to Superboy, did

                                                                      292

**EXHIBIT B**
**335**

ROUGH DRAFT

17:58:55  1    Mr. Toberoff show you Exhibit 15?

17:58:58  2          MR. TOBEROFF:  Misstates his testimony.

17:58:59  3    Misstates the record.  This is 15?

17:59:06  4          MR. PETROCELLI:  Yes.  15 is a 1940

17:59:11  5    Superboy script.

17:59:14  6        Q.  Have you seen this document before?

17:59:18  7        A.  No, I don't think so.

17:59:20  8        Q.  Okay.  And so I take it from your answer

17:59:22  9    that prior to serving the notice of termination

17:59:28 10    Exhibit 14 you were not aware of this document.

17:59:28 11          Is that correct?

17:59:28 12        A.  Yes.

17:59:34 13        Q.  Okay.  And the document says in the first

17:59:38 14    sentence or first paragraph:

17:59:45 15            "Panel occupies full page

17:59:46 16            contains the title Superboy the buy

17:59:48 17            line by Jerry Siegel and Joe

17:59:51 18            Shuster."

17:59:52 19          And then it goes on.

17:59:57 20          Were you aware of the existence of this

18:00:02 21    script by which Joe Shuster was identified as one of

18:00:09 22    the two buy line people?

18:00:12 23          MR. TOBEROFF:  Vague.  Unintelligible.

18:00:17 24          THE WITNESS:  I haven't seen this before.

18:00:17 25    BY MR. PETROCELLI:

                                                          293

**EXHIBIT B**
**336**

ROUGH DRAFT

18:00:27 1        Q.  Take a look at Exhibit 16.

18:00:29 2              (The document referred to was

18:00:29 3              marked for identification by the

18:00:29 4              C.S.R. as Exhibit 16 and attached

18:00:43 5              to this deposition.)

18:00:43 6   BY MR. PETROCELLI:

18:00:44 7        Q.  Do you have Exhibit 16?

18:00:46 8              Prior to serving the notice of termination,

18:00:50 9   exhibit 14, were you aware of Exhibit 16?

18:01:02 10  Exhibit 16 is more -- a copy of parts of more fun

18:01:07 11  comics number 101.

18:01:20 12       A.  Are you asking me if I've ever seen this

18:01:22 13  before?

18:01:22 14       Q.  Yes.

18:01:34 15       A.  I don't recognize this first page

18:01:37 16  specifically showing Superboy, no.

18:01:39 17       Q.  You're referring to page -- the second page

18:01:42 18  of this exhibit?

18:01:42 19       A.  Yes.

18:01:43 20       Q.  That has the picture of Superboy on it?

18:01:44 21       A.  Yes.

18:01:45 22       Q.  Were you aware that copyright renewal

18:01:53 23  registrations were filed indicating that in the name

18:01:59 24  of both Joe Shuster and Jerome Siegel with respect

18:02:04 25  to more fun comics 101?

                                                        294

**EXHIBIT B**
**337**

ROUGH DRAFT

18:02:06  1        MR. TOBEROFF:  Lacks foundation.

18:02:06  2    BY MR. PETROCELLI:

18:02:12  3        Q.  Were you aware prior to the time that you

18:02:13  4    sent out -- that you signed the termination notice,

18:02:17  5    exhibits 14, that copyright registration renewals

18:02:25  6    for Superboy by Jerome Siegel and Joe Shuster had

18:02:29  7    been filed with the copyright office?

18:02:30  8        A.  At -- at what -- at what time?

18:02:39  9        Q.  As of the time you sent out the notice of

18:02:40 10    termination in November 2003.

18:02:43 11        A.  As of -- no.

18:02:46 12        Q.  Were you aware -- were you aware of either

18:02:49 13    this -- any such copyright registration renewals or

18:02:55 14    Exhibit 15, the Superboy script at the time that you

18:02:58 15    signed the amendment to the joint venture deleting

18:03:00 16    Superboy?

18:03:04 17        A.  Copyright renewals in the '60s?  1960s?

18:03:11 18        Q.  No.  71 -- 72.

18:03:13 19        A.  72.  Okay.

18:03:17 20        Q.  Were you aware of those documents the

18:03:20 21    renewal registration for Superboy in the name of Joe

18:03:24 22    Shuster and secretary re Siegel and were you aware

18:03:25 23    of the Superboy script Exhibit 15 when you deleted

18:03:30 24    or agreed to delete Superboy from your joint

18:03:33 25    venture?

                                                        295

**EXHIBIT B**
**338**

ROUGH DRAFT

18:03:36  1          A.  I was not aware of the specific documents.

18:03:40  2          Q.  The ones that I just asked you about,

18:03:40  3  correct?

18:03:42  4          A.  Yeah, right.  I've never seen those.

18:03:44  5          Q.  Okay.  Take a look at Exhibit 17.

18:03:47  6              (The document referred to was

18:03:47  7              marked for identification by the

18:03:47  8              C.S.R. as Exhibit 17 and attached

18:04:02  9              to this deposition.)

18:04:02 10  BY MR. PETROCELLI:

18:04:02 11          Q.  At the time that you signed the -- at the

18:04:06 12  time that you signed the -- the supplement to the

18:04:12 13  joint venture agreement removing Superboy and

18:04:18 14  smallville, were you aware that your uncle Joe

18:04:22 15  Shuster in the 1970s claimed a joint interest in

18:04:25 16  Superboy in copyright filings?

18:04:30 17          MR. TOBEROFF:  Misstates the evidence.

18:04:32 18  Assumes facts and lacks foundation.

18:04:36 19          THE WITNESS:  No.

18:04:36 20  BY MR. PETROCELLI:

18:04:40 21          Q.  Okay.  Take a look at Exhibit 17.  Do you

18:04:44 22  see the reference -- I'll represent to you this is a

18:04:49 23  listing of copyright renewal registrations and do

18:04:53 24  you see the name Joe Shuster?

18:04:55 25          A.  Oh.  Yes.

296

**EXHIBIT B**
**339**

ROUGH DRAFT

18:04:59  1       Q. And you see Superboy under the name Joe

18:05:04  2  Shuster?

18:05:04  3       A. Yes.

18:05:05  4       Q. And it says Siegel Jerome?

18:05:09  5       A. Yes.

18:05:10  6       Q. Then you go under Siegel Jerome.

18:05:13  7       Do you see that couple entries down?

18:05:16  8       A. Yes.

18:05:16  9       Q. It says Superboy by Jerome Siegel and Joe

18:05:19 10  Shuster in more fun comics January to February 1945

18:05:28 11  copyright sign 18 November 1944 B 653651 Jerome

18:05:35 12  Siegel and Joe Shuster and then there's some

18:05:40 13  other -- other data.

18:05:42 14       Were you aware of such copyright

18:05:46 15  registration filings when you agreed to remove

18:05:56 16  Superboy from your joint venture agreement?

18:05:58 17       A. No.

18:06:01 18       Q. When you served the termination notice

18:06:03 19  without reference to Superboy?

18:06:04 20       A. No.

18:06:07 21       Q. Did Mr. Toberoff provide these -- any of

18:06:09 22  these documents to you, Exhibits 15, 16 and 17?

18:06:16 23  That I've just gone through with you?

18:06:21 24       A. I don't believe so.

18:06:23 25       Q. Take a look at Exhibit 18.

297

**EXHIBIT B**
**340**

ROUGH DRAFT

18:06:24  1            (The document referred to was

18:06:24  2            marked for identification by the

18:06:24  3            C.S.R. as Exhibit 18 and attached

18:06:31  4            to this deposition.)

18:06:31  5            THE WITNESS:  Can we get some

18:06:33  6    air-conditioning in here?

18:06:33  7    BY MR. PETROCELLI:

18:06:39  8        Q.  Exhibit 18 is an application for

18:06:41  9    registration of a claim to renewal of copyright.

18:06:49 10    Indicating for Superboy more fun comics 101

18:06:57 11    indicating co-authors Jerome Siegel and Joe Shuster.

18:07:02 12    Do you see that document?

18:07:03 13        A.  Yes.

18:07:07 14        Q.  Is this the first time you're Siegel this

18:07:09 15    document?

18:07:09 16        A.  Yes.

18:07:12 17        Q.  I take it that this document was not

18:07:14 18    provided to you by Mr. Toberoff.

18:07:14 19            Is that correct?

18:07:14 20        A.  Yes.

18:07:23 21        Q.  You were unaware of this document when you

18:07:26 22    removed Superboy and smallville from the joint

18:07:29 23    venture agreement, correct?

18:07:29 24        A.  Yes.

18:07:34 25        Q.  And whether you sent out the termination

                                                            298

ROUGH DRAFT

18:07:36  1    notice without reference to Superboy, correct?

18:07:36  2        A.  Yes.

18:07:42  3        Q.  And you reference some case in the 1940's.

18:07:45  4            Do you recall that? That Mr. Toberoff

18:07:49  5    mentioned to you?

18:07:49  6        A.  Yes.

18:07:53  7        Q.  And you're aware that these filings are

18:07:55  8    made in the 1970s some 25 years later?

18:07:57  9        A.  Yes.

18:08:03 10        Q.  Take a look at Exhibit 19.

18:08:06 11            (The document referred to was

18:08:06 12            marked for identification by the

18:08:06 13            C.S.R. as Exhibit 19 and attached

18:08:16 14            to this deposition.)

18:08:16 15    BY MR. PETROCELLI:

18:08:16 16        Q.  Exhibit 19 is another page from --

18:08:22 17    indicating copyright registration filings.

18:08:25 18            Do you have that in front of you?

18:08:27 19        A.  Yes.

18:08:28 20        Q.  Do you see the reference to Joe Shuster?

18:08:30 21        A.  Yes.

18:08:34 22        Q.  This is for the year 1973.  The one I just

18:08:39 23    showed you before, Exhibits -- exhibit 17 was for

18:08:42 24    the year 1972.

18:08:47 25            And you'll see the reference to Joe Shuster

**EXHIBIT B**
**342**

ROUGH DRAFT

18:08:50  1     and Superboy which is then cross-referenced down to

18:08:55  2     Jerome Siegel where it also indicates that both the

18:09:00  3     names of Jerome Siegel and Joe Shuster for Superboy

18:09:03  4     in more fun comics.

18:09:05  5              Do you see that?

18:09:05  6        A.   Yes.

18:09:08  7        Q.   And were you aware that they had filed

18:09:12  8     copyright renewal registrations in 1973 with respect

18:09:16  9     to Superboy, that is Joe Shuster had together with

18:09:19 10     Jerome Siegel?

18:09:20 11        A.   I had some vague awareness that they were

18:09:26 12     filing for renewal copyrights and they were denied.

18:09:29 13        Q.   With respect to Superboy?

18:09:30 14        A.   With all the -- all the elements.

18:09:36 15        Q.   I'm asking you specifically did you know

18:09:37 16     about the Superboy copyright registration renewals

18:09:40 17     when you signed those documents?

18:09:41 18        A.   A general vague idea of Superman and

18:09:44 19     related elements.

18:09:45 20        Q.   But you didn't have they specific knowledge

18:09:47 21     of the Superboy registration filings.

18:09:49 22              Is that correct?

18:09:49 23        A.   Not specifically Superboy.

18:09:51 24        Q.   None these documents with respect to

18:09:52 25     Superboy had been made available to you at the time

                                                              300

·

ROUGH DRAFT

18:09:55  1    you signed the amendment to the joint venture

18:09:58  2    agreement on October 27, 2003 removing Superboy,

18:09:58  3    correct?

18:10:06  4        A.  Yes.

18:10:07  5        Q.  And is it fair to say that had these

18:10:09  6    documents been made available to you you would have

18:10:11  7    taken them into account in making a decision whether

18:10:14  8    or not to delete Superboy, correct?

18:10:17  9            MR. TOBEROFF:  Calls for a legal conclusion

18:10:17  10   as to a complex issue.

18:10:21  11           MR. PETROCELLI:  Hardly.

18:10:22  12           MR. TOBEROFF:  You're so wrong.

18:10:25  13           MR. TOBEROFF:  You're so wrong.

18:10:27  14           MR. PETROCELLI:  You didn't listen to my

18:10:28  15   question.

18:10:28  16           MR. TOBEROFF:  I listened to it.

18:10:28  17   BY MR. PETROCELLI:

18:10:33  18       Q.  Can you answer my question?

18:10:34  19       A.  Would I have --

18:10:34  20       Q.  Taken these documents into account had they

18:10:38  21   been made available to you?

18:10:39  22       A.  I don't think it would have made a

18:10:43  23   difference because the legal situation with regard

18:10:46  24   to.

18:10:48  25           MR. TOBEROFF:  Don't testify based on

ROUGH DRAFT

18:10:50 1    conversations with your attorney.

18:10:51 2         THE WITNESS:  Okay then I can't say

18:10:52 3    anything.

18:10:52 4    BY MR. PETROCELLI:

18:10:56 5      Q.  Did your -- you were unaware of these

18:10:56 6    documents, correct?

18:10:59 7      A.  Of these specific documents.

18:10:59 8      Q.  Correct.  Right.

18:11:02 9         And you were -- is it fair to say that

18:11:07 10   would you have wanted to know about these -- these

18:11:11 11   documents prior to having made the decision to sign

18:11:14 12   those -- the amended joint venture agreement?

18:11:20 13        MR. TOBEROFF:  Calls for a legal

18:11:21 14   conclusion.

18:11:22 15        THE WITNESS:  I knew their renewal requests

18:11:25 16   were denied back in the early '70s.

18:11:25 17   BY MR. PETROCELLI:

18:11:29 18     Q.  You're not -- you're not answering my

18:11:31 19   question?

18:11:31 20        MR. TOBEROFF:  He is answering your

18:11:32 21   question.  You keep cutting him off -- excuse me I'm

18:11:35 22   talking being.

18:11:35 23   BY MR. PETROCELLI:

18:11:36 24     Q.  You testified?

18:11:36 25        MR. TOBEROFF:  Excuse me excuse me excuse

302

**EXHIBIT B**
**345**

ROUGH DRAFT

18:11:37  1    me.  Excuse me, I'm talking.

18:11:38  2             MR. PETROCELLI:  Don't waste my time.

18:11:40  3             MR. TOBEROFF:  I will not I will not.

18:11:40  4    BY MR. PETROCELLI:

18:11:42  5        Q.  You already testified, sir?

18:11:43  6             MR. TOBEROFF:  I will not.

18:11:44  7             MR. PETROCELLI:  Sir, you testified.

18:11:45  8             MR. TOBEROFF:  You're talking over me I

18:11:46  9    will not have you talk over me now.

18:11:48 10             MR. PETROCELLI:  Take a break off the

18:11:49 11    record court or we're on the record I don't agree to

18:11:53 12    go off the record.

18:11:53 13             MR. PETROCELLI:  I do not agree to go off

18:11:56 14    the record.

18:11:57 15             MR. PETROCELLI:  I'm not going let you chew

18:11:58 16    up my time making speeches.

18:12:00 17             MR. TOBEROFF:  I'm not chewing up your time

18:12:01 18    don't talk over me you're going to let me finish.

18:12:05 19             MR. PETROCELLI:  Terminate the deposition

18:12:06 20    if you continue.

18:12:06 21             MR. TOBEROFF:  You can do whatever you see

18:12:08 22    fit I'm going to finish my sentence.

18:12:10 23             MR. PETROCELLI:  Finish your sentence and

18:12:12 24    you've got 20 seconds.

18:12:14 25             MR. TOBEROFF:  You're wasting time.  You

303

**EXHIBIT B**
**346**

ROUGH DRAFT

18:12:15  1    don't tell me how long I get to speak.

18:12:17  2         MR. PETROCELLI:  You're timed go.

18:12:18  3         MR. TOBEROFF:  When he says something that

18:12:20  4    you don't want him to say you cut him off.  It's an

18:12:23  5    old trick.  My client when he is attempting to

18:12:26  6    answer your question, you have to let him finish the

18:12:29  7    answer.  He was about to -- he was talking and you

18:12:31  8    cut him off and then when I objected and said please

18:12:34  9    let me client finish you cut me off and standard

18:12:36  10   talking over me.  Please don't do that.  I'm

18:12:39  11   finished.

18:12:39  12   BY MR. PETROCELLI:

18:12:40  13        Q.  Mr. Court how did do I on the 20 seconds?

18:12:42  14        MR. PETROCELLI:  Just made it.

18:12:43  15        Q.  I -- I don't want you to be telling me

18:12:46  16   about copyright registration renewals that were

18:12:49  17   denied when you have already specifically testified

18:12:52  18   that you have no knowledge that these specific

18:12:55  19   Superboy registrations were designed.  It's not

18:12:58  20   responsive and it's not helpful.

18:13:00  21        MR. TOBEROFF:  And you can -- can you

18:13:02  22   answer the question anyway you see fit.

18:13:02  23   BY MR. PETROCELLI:

18:13:04  24        Q.  And if you do I will?

18:13:05  25        MR. TOBEROFF:  You're talking over me

**EXHIBIT B**
**347**