# EXHIBIT S

# PART 1 OF 7



# O'MELVENY & MYERS LLP

BEIJING         1999 Avenue of the Stars, 7th Floor        SAN FRANCISCO
BRUSSELS       Los Angeles, California 90067-6035        SHANGHAI
HONG KONG                                   SILICON VALLEY
LONDON           TELEPHONE (310) 553-6700          SINGAPORE
LOS ANGELES       FACSIMILE (310) 246-6779            TOKYO
NEWPORT BEACH           www.omm.com          WASHINGTON, D.C.
NEW YORK

August 17, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:     *DC Comics v. Pacific Pictures Corp. et al., CV-10-3633 (ODW) (RZx)*

Dear Counsel:

As you know, and as we discussed in recent letters, emails, and our call earlier this week, DC intends to move to re-open the depositions of defendants Laura Siegel Larson and Mark Peary based on several significant discovery disclosures and developments in this case that warrant further examination. In addition, DC intends to move to compel these witnesses' testimony concerning key lines of questioning that defense counsel persistently instructed the witnesses not to respond. In our letter to you dated July 11, 2011 (and in our subsequent phone conference), we detailed the defects in the objections defense counsel made during Peary's June 29, 2011, deposition. A copy of our July 11 letter (the "Peary Letter") is attached. Similarly defective objections were made at Larson's July 22, 2011, deposition, and we will move to have those objections overruled for the same reasons we will move to overrule the Peary objections. If you wish to abandon the Peary and/or Larson objections set forth in our Peary Letter and this letter, please let us know. If you refuse to withdraw the objections, and wish to discuss the matter further, we can do so next week. As discussed, we believe all necessary Rule 37 conferences have occurred on these issues, but to avoid any wasteful arguments to the contrary by defendants, we write this letter and invite you to discuss these issues by phone next week.

     1. Consent Agreement. Defense counsel instructed Larson not to answer any questions regarding the "substance of the consent agreement" between defendants that, at a minimum, prohibits the Siegel and Shuster families from entering into an agreement with DC without the consent of the other. Defense counsel refuses to produce the document—though he and

O'MELVENY & MYERS LLP
August 17, 2012 - Page 2

defendants have made many arguments about its substance—on the ground that it was "held to be privileged." Larson Tr. at 41:3-19. The lines of inquiry blocked by defense counsel included:

- whether any other side deal exists by which the Shuster heirs may claim a share of profits the Siegel heirs received from DC, *see id.* at 41:3-19;[1]

- whether the consent agreement contains any reference to Superboy, *see id.* at 42:20-44:18, 45:17-46:5; and

- Ms. Larson's understanding on how the consent provision works, *see id.* at 46:6-12.

As explained in our July 11 Peary Letter, defense counsel's objections are overbroad and not well-taken. Peary Letter at 1-5.

a. Magistrate Judge Zarefsky denied DC's motion to compel production of the consent agreement based on his application of law-of-the-case doctrine to the *Siegel* court's ruling that the agreement (1) was entered into in connection with mediation; and (2) is privileged based on Toberoff's representations "as an officer of the Court." Docket No. 163-11 at 724:9-11. Neither of these two bases for the Court's rulings bars the discovery DC seeks.

As to the first ground for His Honor's opinion, Peary confirmed at his subsequent deposition that the consent agreement was created—and continues to exist—separate and apart from any mediation discussion. Peary Tr. 53:21-54:6, 58:13-18, 72:5-7. Moreover, courts have established that parties can pursue alternative sources of discovery to prove the existence of facts disclosed during mediation—parties must be given an opportunity to "uncover new, admissible evidence ... not protected by the confidentiality statutes." *Benesch v. Green*, 2009 U.S. Dist. LEXIS 117641, at *12-13 (N.D. Cal. Dec. 17, 2009); *see also Foxgate v. Homeowners' Assoc.*, 26 Cal. 4th 1, 17-18 (2001) (allowing plaintiff to seek sanctions based on "assertion and evidence" other than "communications made during the mediation"); *Cassel v. Super. Ct.*, 2011 WL 102710 (Cal. Jan. 13, 2011) (citing *Benesch* and *Foxgate* favorably).

As to the second ground for His Honor's opinion, it has repeatedly been held and shown subsequent to His Honor's ruling that Toberoff's representations to DC and the courts cannot be trusted. *E.g.,* Docket Nos. 161-5 at 30-31; 209 at 12; 336; 457; 477 at 4-7; Docket No. 477; Aug. 7, 2012 letter from DC to Defendants. The Ninth Circuit, moreover, in an opinion that is the law of this case, expressly *called out defense counsel for refusing to produce non-privileged documents, compare In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012), *and id. at 1129* ("most of the[ Timeline] documents are not covered by attorney-client privilege because they do not represent communications between a lawyer and his client for the purpose of obtaining legal advice. *Cf. [U.S. v.] Ruehle*, 583 F.3d [600], 608-09 n.8 [(9th Cir.2009)]* (rejecting a presumption of privilege even when a communication involves a lawyer), *with id. at 1125* ("Considering every communication he had with the Heirs to be privileged—regardless of

---

[1] Appendix A to this letter highlights deposition questions and answers to which DC would seek to compel answers, as well as the right to ask related follow-up questions.

O'MELVENY & MYERS LLP
August 17, 2012 - Page 3

whether the communication was in his capacity as a business advisor or an attorney—Toberoff resisted all such [discovery].").

Moreover, Larson's and Peary's testimony—which was obtained after His Honor's ruling—makes clear that the consent agreement is a business agreement between the Siegels and the Shusters—affecting and impairing their putative copyright claims. *See* Peary Tr. 175:5-176:12; Larson Tr. at 42:20-25, 44:20-45:3, 45:17-46:4, 99:19-25. Privilege does not extend to such business arrangements, as the Ninth Circuit made clear in *Pacific Pictures*, 679 F.3d at 1125, 1129, and as many other cases hold, *e.g.*, *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege only applies where client seeks advice from lawyer "'*in his capacity as such*'"—not where lawyer acts as "business agent"); *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 526, 529 (D.D.C. 2005) (business agreements and communications between attorney and client not privileged); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981) (where services primarily non-legal in nature, "communications relating to that service should therefore not be privileged, even though performed by a lawyer"); *Marten v. Yellow Freight Sys.*, 1998 U.S. Dist. LEXIS 268, at *18 (D. Kan. Jan. 6, 1998) (recognizing that "when the legal advice is merely incidental to business advice, the privilege does not apply").

b. Larson and Peary also waived whatever privilege might otherwise have existed in the consent agreement by, at their depositions, selectively and strategically disclosing certain facts about the consent agreement. Counsel allowed Larson and Peary to provide testimony that counsel apparently believed helped defendants' case (using these disclosures as a sword)—including on topics such as who is purportedly bound by the agreement; whether it entitles the Shusters to share in money from the Siegels' claims; and whether it provides Toberoff additional remuneration. Larson Tr. at 41:3-6, 41:10-42:11, 42:18, 99:15-100:5; Peary Letter at 4-5 (collecting testimony). Defense counsel then improperly used privilege as a shield to shut off numerous lines of related inquiry—including on issues like Superboy, *e.g.*, Larson Tr. 42:20-44:18, 45:17-46:5, which is the subject of DC's unclean hands claim on which defendants threaten to move for summary judgment. *Compare* Docket No. 49 ¶¶ 129-33, 178, 86-91, *with*, *e.g.*, June 28, 2012, letter from Defendants to DC ("Pursuant to Federal Rule of Civil Procedure 56, Defendants will be bringing a cross-motion for partial summary judgment ... on DC's Third Claim for the reasons that have been extensively brief and discussed."). A privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *Fort James Corp. v. Solo Cup. Co.*, 412 F.3d 1340, 1349-51 (Fed. Cir. 2005).

2. <u>Other Issues</u>. Defense counsel instructed Larson not to answer several other questions on the basis of the attorney-client privilege. None of these subjects implicated the conveyance of legal advice:

- We asked questions concerning Larson's awareness of efforts to market the Siegels' putative Superman rights. *See* Larson Tr. 46:19-48:7. There is no basis for asserting privilege over such business communications. *See In re Pacific Pictures Corp.*, 679

O'MELVENY & MYERS LLP
August 17, 2012 - Page 4

F.3d 1121 at 1125, 1129; *Chen*, 99 F.3d at 1501 (privilege cannot apply where attorney acting primarily in business role); *accord Minebea*, 355 F. Supp. 2d at 529; *Davis*, 636 F.2d at 1043. That Ms. Larson may have learned about these business meetings and proposals from her attorneys does not make the entire topic immune from discovery. *See U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged.").

- We asked questions about the August 2002 communication from Kevin Marks to the Siegel heirs conveying Toberoff's and Emanuel's offer to acquire the Siegels' putative Superman rights (the "Marks Memo"). *See* Larson Tr. at 147:6-150:22, 156:13-23. Defendants waived privilege over the Marks Memo by disclosing it to the U.S. Attorney's Office in 2010, and thus the communication and its contents are appropriate subjects for examination of Larson. Docket Nos. 262 at 2-4; 279; *In re Pacific Pictures Corp.*, 679 F.3d at 1131.

- We asked questions about Larson's understanding of the value of the Siegels' putative Superman rights and how the heirs could monetize those rights. Larson Tr. 322:11-. DC's questions did not call for the divulgence of *any* privileged information—to the contrary, they were directed to Larson's understanding of the value of the Siegel's putative rights. *Cf. Martin*, 278 F.3d at 999.

These are examples of defense counsel's persistent instructions to Larson not to respond to key lines of questioning during her July 22 deposition. DC reserves the right to move on all objections in Appendix A or that subsequent events necessitate DC move on.

\*            \*            \*

Please let us know immediately if you will withdraw defense counsel's objections. If not, please let us know if you want to further meet and confer on these issues and, if so, when you are available. Again, the Kendall Brill firm should be a part of this discussion.

Very truly yours,

/s/ Jason H. Tokoro

Jason H. Tokoro
for O'MELVENY & MYERS LLP

Enclosure

cc:    Daniel M Petrocelli, Esq.; Matthew T. Kline, Esq.; Defense Counsel

**EXHIBIT S**
**435**

# Appendix A

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

## *LARSON, LAURA SIEGEL - Vol. 1*

### *July 22, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

## LAURA SIEGEL LARSON - 7/22/2011

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,                          )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )   Case No.
                                    )
PACIFIC PICTURES CORPORATION,       )   CV-10-3633 ODW (RZx)
IP WORLDWIDE, LLC, IPW, LLC,        )
MARC TOBEROFF, an individual,       )
MARK WARREN PEARY, as               )
personal representative of          )
the ESTATE OF JOSEPH SHUSTER,       )
JEAN ADELE PEAVY, an                )
individual, JOANNE SIEGEL,          )
an individual, LAURA SIEGEL         )
LARSON, an individual, and          )
DOES 1-10, inclusive,               )
                                    )
                    Defendants.     )
_____    )

DEPOSITION OF:

        LAURA SIEGEL LARSON

        FRIDAY, JULY 22, 2011

        9:45 A.M.

Reported by:

        Kathleen E. McCarthy

        CSR No. 4483

EXHIBIT S
438

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 2

1            Deposition of LAURA SIEGEL LARSON, the witness,

2    taken on behalf of the Plaintiff, on Friday, July 22,

3    2011, 9:45 a.m., at 1999 Avenue of the Stars,

4    Sixteenth Floor, Los Angeles, California, before

5    Kathleen E. McCarthy, CSR No. 4483.

6

7    APPEARANCES OF COUNSEL:

8        FOR PLAINTIFF:

9            O'MELVENY & MYERS LLP

10           BY:  DANIEL M. PETROCELLI, ESQ.

11               MATTHEW T. KLINE, ESQ.

12               JASON TOKORO, ESQ.

13               CASSANDRA L. SETO, ATTORNEY AT LAW

14           1999 Avenue of the Stars

15           Seventh Floor

16           Los Angeles, California  90067-6035

17           (310) 553-6700

18

19       FOR DEFENDANTS:

20           TOBEROFF & ASSOCIATES

21           BY:  MARC TOBEROFF, ESQ.

22           2049 Century Park East

23           Suite 3630

24           Los Angeles, California  90067

25           (310) 246-3333

**EXHIBIT S**
**439**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 3

1      APPEARANCES (Continued):

2        ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT S
440
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 4

1                                INDEX

2       WITNESS              EXAMINATION        PAGE

3       LAURA SIEGEL LARSON

4                            Mr. Petrocelli      10

5

6                            EXHIBITS

7       NO.        PAGE         DESCRIPTION

8       Exhibit 55   13    Last Will of Joanne Siegel;

9                          Durable Power of Attorney for

10                         Management of Property and

11                         Personal Affairs (LSL 00414 -

12                         00428 and LSL 00430 - 00450)

13      Exhibit 56   110   Letter to Paul Levitz from Joanne

14                         Siegel and Laura Siegel Larson

15                         dated September 21, 2002

16                         (WB006022)

17      Exhibit 57   177   Siegel Privilege Log

18      Exhibit 58   196   Superman -- Marc Toberoff Timeline

19                         (Q 0001 - Q 0007)

20      Exhibit 59   211   First Amended Complaint dated

21                         September 3, 2010

22      Exhibit 60   234   Facsimile Cover Page to Ariel Z.

23                         Emanuel from Marc Toberoff dated

24                         6-3-02; Memorandum of Agreement

25                         (EN00001 - 00007)

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 5

```
 1                     INDEX (Continued)

 2                       EXHIBITS

 3    NO.          PAGE       DESCRIPTION

 4    Exhibit 61   236    Letter to Richard D. Parsons from

 5                        Joanne Siegel dated May 9, 2002

 6                        (000000676 - 000000678)

 7    Exhibit 62   253    Letter to Lillian J. Laserson from

 8                        Joanne Siegel and Laura Siegel

 9                        Larson dated October 28, 2002

10                        (000001299 - 000001300)

11    Exhibit 63   260    Letter to Don W. Bulson from

12                        Joanne Siegel and Laura Siegel

13                        Larson dated November 1, 2002 (LSL

14                        00451)

15    Exhibit 64   285    Letter to Joanne Siegel and Laura

16                        Siegel Larson from Marc Toberoff

17                        dated November 26, 2002

18                        (000001894)

19    Exhibit 65   289    Letter to Joanne Siegel, Laura

20                        Siegel Larson, and Ariel Emanuel

21                        from Marc Toberoff dated December

22                        16, 2002 (000001883 - 000001884)

23

24

25
```

**EXHIBIT S**
**442**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 6

1                           INDEX (Continued)

2                     PREVIOUSLY MARKED EXHIBITS

3        NO.        PAGE            DESCRIPTION

4     Exhibit 45    60    Letter to Joanne Siegel and Laura

5                         Siegel Larson from Marc Toberoff

6                         and Ariel Emanuel dated as of

7                         October 3, 2022 (000001878 -

8                         000001881)

9     Exhibit 48    108   Letter to John A. Schulman from

10                        Kevin S. Marks dated October 19,

11                        2001; Transmission Report (GTRB

12                        0302 - 0308)

13    Exhibit 10    212   Joint Venture Agreement made as of

14                        November 23, 2001 (134 - 137)

15    Exhibit 17    220   Renewal Registrations

16    Exhibit 18    220   U.S. Copyright Office certificate;

17                        Application for Registration of a

18                        Claim to Renewal Copyright

19    Exhibit 19    221   List of books

20    Exhibit 13    226   Letter to Mark Warren Peary from

21                        Marc Toberoff dated October 27,

22                        2003 (125 - 128)

23

24

25

EXHIBIT S
443

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 7

1                          INDEX (Continued)

2                   PREVIOUSLY MARKED EXHIBITS

3       NO.         PAGE              DESCRIPTION

4       Exhibit 54    243     Letter to Kevin S. Marks and Bruce

5                             M. Ramer from Joanne Siegel and

6                             Laura Siegel Larson dated

7                             September 21, 2002; Transmission

8                             Report (GTRB 0321 - 0322)

9       Exhibit 46    293     Letter to Joanne Siegel and Laura

10                            Siegel Larson from Marc Toberoff

11                            dated January 21, 2002 (000001888

12                            - 000001890)

13      Exhibit 30    298     Letter to Laura from Michael

14                            Siegel dated May 13, 2003 (LSL

15                            00211 - 00212)

16

17

18

19

20

21

22

23

24

25

EXHIBIT S
444

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 8

1               INDEX (Continued)

2          INSTRUCTIONS NOT TO ANSWER

| PAGE | LINE | PAGE | LINE | PAGE | LINE |
|------|------|------|------|------|------|
| 27 | 4 | 106 | 1 | 323 | 3 |
| 27 | 12 | 106 | 9 | 324 | 12 |
| 28 | 3 | 147 | 8 | 325 | 13 |
| 28 | 11 | 147 | 17 | 326 | 10 |
| 33 | 13 | 147 | 22 | 326 | 13 |
| 34 | 11 | 148 | 4 | 327 | 15 |
| 41 | 13 | 148 | 10 | 327 | 24 |
| 41 | 19 | 148 | 15 | 328 | 7 |
| 42 | 1 | 156 | 16 | 328 | 17 |
| 42 | 23 | 156 | 23 | 328 | 22 |
| 44 | 13 | 186 | 1 | 329 | 1 |
| 45 | 1 | 219 | 24 | 329 | 23 |
| 46 | 1 | 258 | 4 | 330 | 7 |
| 46 | 9 | 260 | 4 | 330 | 17 |
| 48 | 7 | 266 | 9 | 332 | 10 |
| 50 | 17 | 266 | 19 | 333 | 1 |
| 101 | 5 | 268 | 6 | | |
| 103 | 25 | 268 | 15 | | |
| 105 | 21 | 322 | 14 | | |

## LAURA SIEGEL LARSON - 7/22/2011

Page 9

| | | |
|---|---|---|
| | 1 | LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011 |
| | 2 | 9:45 A.M. |
| 08:45:40 | 3 | |
| 09:45:27 | 4 | THE VIDEOGRAPHER:  Good morning.  This marks |
| 09:45:29 | 5 | the beginning of Volume 1, videotape number one, in |
| 09:45:32 | 6 | the deposition of Laura Siegel in the matter entitled |
| 09:45:36 | 7 | DC Comics versus Pacific Pictures Corporation, et al., |
| 09:45:40 | 8 | filed in the United States District Court for the |
| 09:45:42 | 9 | Central District of California.  This is Case No. |
| 09:45:45 | 10 | CV-10-3633 ODW (RZx) |
| 09:45:51 | 11 | Today's date is July 22, 2011, and the time |
| 09:45:53 | 12 | on the video monitor is 9:45 a.m. |
| 09:45:57 | 13 | The video operator today is Fritz Sperberg, a |
| 09:46:01 | 14 | notary public contracted by Merrill Legal Solutions at |
| 09:46:03 | 15 | 20750 Ventura Boulevard, Woodland Hills, California. |
| 09:46:08 | 16 | This video deposition is taking place at 1999 |
| 09:46:12 | 17 | Avenue of the Stars in Los Angeles and was noticed by |
| 09:46:15 | 18 | Daniel Petrocelli of O'Melveny & Myers. |
| 09:46:17 | 19 | Counsel, please identify yourselves and state |
| 09:46:18 | 20 | whom you represent. |
| 09:46:20 | 21 | MR. PETROCELLI:  Dan Petrocelli for DC |
| 09:46:24 | 22 | Comics. |
| 09:46:25 | 23 | MR. TOBEROFF:  Mark Toberoff for Laura Siegel |
| 09:46:28 | 24 | Larson and Warren Peavy -- Peary and Jean Peavy. |
| 09:46:35 | 25 | MR. PETROCELLI:  We also have Jason Tokoro |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 10

| 09:46:36 | 1 | and Matt Kline of O'Melveny here as well. |

09:46:41  2        THE WITNESS:  Excuse me.  Which is Matt and

09:46:42  3    which is --

09:46:43  4        MR. PETROCELLI:  Jason --

09:46:44  5        THE WITNESS:  Jason, and Matt --

09:46:45  6        MR. PETROCELLI:  -- is to my right --

09:46:45  7        THE WITNESS:  Okay.

09:46:45  8        MR. PETROCELLI:  -- and then Matt is down at

09:46:48  9    the end there.

09:46:48  10        THE WITNESS:  All right.  Thank you.

09:46:48  11        THE VIDEOGRAPHER:  The court reporter today

09:46:50  12    is Kathy McCarthy of Merrill.

09:46:50  13        Would the reporter please swear in the

09:46:52  14    witness.

09:46:52  15

16                LAURA SIEGEL LARSON,

17        having been first duly sworn, was

18        examined and testified as follows:

09:47:02  19

09:47:02  20        THE VIDEOGRAPHER:  You may begin.

21

09:47:03  22                EXAMINATION

23    BY MR. PETROCELLI:

09:47:04  24        Q.  Could you please state your full name.

09:47:07  25        A.  Laura Siegel Larson.

## LAURA SIEGEL LARSON - 7/22/2011

Page 11

| | | |
|---|---|---|
| 09:47:08 | 1 | Q.  And shall I call you Ms. Larson? |
| 09:47:10 | 2 | A.  That's fine. |
| 09:47:11 | 3 | Q.  Thank you. |
| 09:47:13 | 4 | Ms. Larson, first of all, let me express our |
| 09:47:17 | 5 | condolences of the passing of your mother earlier this |
| 09:47:21 | 6 | year, and we're sorry about that.  And I understand |
| 09:47:29 | 7 | also that you may have some need for a rest or breaks |
| 09:47:34 | 8 | during the course of the day. |
| 09:47:35 | 9 | A.  Yes. |
| 09:47:36 | 10 | Q.  And please let us know whenever you need to |
| 09:47:43 | 11 | take a break because you're not feeling well or you're |
| 09:47:45 | 12 | tired.  Just say so and we'll stop.  Okay? |
| 09:47:48 | 13 | A.  All right. |
| 09:47:51 | 14 | Q.  Okay.  Let me just begin by saying you |
| 09:47:55 | 15 | understand that we're taking this deposition in a case |
| 09:47:58 | 16 | filed by DC Comics? |
| 09:47:59 | 17 | A.  Yes. |
| 09:47:59 | 18 | Q.  Okay.  And you have previously been deposed |
| 09:48:05 | 19 | in the lawsuit that you filed a few years back.  You |
| 09:48:10 | 20 | recall that? |
| 09:48:10 | 21 | A.  Yes. |
| 09:48:12 | 22 | Q.  I want you to know that I have reviewed your |
| 09:48:16 | 23 | testimony in your deposition, and I will endeavor not |
| 09:48:21 | 24 | to go over or repeat things you have already said.  To |
| 09:48:24 | 25 | be sure, though, there will be overlap, and I will be |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 12

| | | |
|---|---|---|
| 09:48:28 | 1 | mindful, though, of not wasting your time or my time |
| 09:48:32 | 2 | by asking you things we already know. |
| 09:48:33 | 3 | A.   Good. |
| 09:48:37 | 4 | Q.   You are the executrix of your mother's |
| 09:48:42 | 5 | estate? |
| 09:48:42 | 6 | A.   That's correct. |
| 09:48:43 | 7 | MR. PETROCELLI:  Okay.  Let me show you as |
| 09:48:47 | 8 | the first deposition exhibit -- |
| 09:48:50 | 9 | And forgive me.  What is the convention that |
| 09:48:51 | 10 | we're using here? |
| 09:48:55 | 11 | MR. TOKORO:  We're continuing the exhibit |
| 09:48:57 | 12 | numbers from the last time. |
| 09:48:58 | 13 | MR. PETROCELLI:  Okay.  I'm told we're |
| 09:48:59 | 14 | continuing exhibit numbers from when we last left off. |
| 09:49:02 | 15 | So what is the next in order? |
| 09:49:04 | 16 | MR. TOKORO:  This is going to be number 53. |
| 09:49:07 | 17 | MR. PETROCELLI:  So we're going to mark as -- |
| 09:49:10 | 18 | MR. TOKORO:  55.  I'm sorry.  55. |
| 09:49:12 | 19 | MR. PETROCELLI:  -- 55 your mother's Last |
| 09:49:16 | 20 | Will and a Durable Power of Attorney as one document. |
| 09:49:19 | 21 | I just have a couple questions about them. |
| 09:49:31 | 22 | THE WITNESS:  Thank you.  Let me just ask, |
| 09:49:32 | 23 | could you speak up just a little bit more because I |
| 09:49:35 | 24 | also have a hearing impairment, so it would help. |
| 09:49:38 | 25 | MR. PETROCELLI:  Sure.  It's important that |

**EXHIBIT S**
**449**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 13

| | | |
|---|---|---|
| 09:49:39 | 1 | you hear me. |
| 09:49:41 | 2 | THE WITNESS:  Yes. |
| 09:49:41 | 3 | MR. PETROCELLI:  So I'm glad you pointed that |
| 09:49:43 | 4 | out. |
| | 5 | (Whereupon, Plaintiff's Exhibit 55 |
| 09:49:49 | 6 | was marked for identification.) |
| | 7 | BY MR. PETROCELLI: |
| 09:49:49 | 8 | Q.   These two documents, your mother's Last Will |
| 09:49:52 | 9 | and the Durable Power of Attorney, were executed in |
| 09:49:58 | 10 | November of 2000, according to the documents, November |
| 09:50:01 | 11 | 14, 2000.  To your knowledge, these are the last time |
| 09:50:06 | 12 | your mother executed a Will and Power of Attorney? |
| 09:50:09 | 13 | A.   Yes, that's correct. |
| 09:50:11 | 14 | Q.   And you were appointed as the person who |
| 09:50:16 | 15 | would have power of attorney over her affairs -- |
| 09:50:21 | 16 | A.   Yes. |
| 09:50:22 | 17 | Q.   -- in the year 2000? |
| 09:50:23 | 18 | A.   I think there were some limitations to that, |
| 09:50:25 | 19 | though. |
| 09:50:26 | 20 | Q.   Based on what the document says? |
| 09:50:27 | 21 | A.   Yes. |
| 09:50:28 | 22 | Q.   And in the year 2000 was your mother of sound |
| 09:50:32 | 23 | mind and health? |
| 09:50:33 | 24 | A.   Oh, yes, of course. |
| 09:50:50 | 25 | Q.   Did there come a time since 2000 to the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 14

| | | |
|---|---|---|
| 09:50:54 | 1 | present when she exhibited symptoms of dementia? |
| 09:51:02 | 2 | A.   No. |
| 09:51:02 | 3 | Q.   So until she passed away, she was of sound |
| 09:51:05 | 4 | mind? |
| 09:51:05 | 5 | A.   Oh, absolutely. |
| 09:51:08 | 6 | Q.   On page 2 of the will, there are different |
| 09:51:16 | 7 | beneficiaries named.  Michael Larson and James Larson |
| 09:51:19 | 8 | are your two children? |
| 09:51:20 | 9 | A.   That's correct. |
| 09:51:20 | 10 | Q.   And those are the only grandchildren of your |
| 09:51:23 | 11 | mother? |
| 09:51:23 | 12 | A.   Yes. |
| 09:51:25 | 13 | Q.   And Sophie Halko, H-a-l-k-o, that's your |
| 09:51:29 | 14 | mom's sister, your aunt? |
| 09:51:30 | 15 | A.   It's her only surviving sister, yes. |
| 09:51:33 | 16 | Q.   Only surviving sibling? |
| 09:51:36 | 17 | A.   Yes. |
| 09:51:37 | 18 | Q.   Where does she live? |
| 09:51:37 | 19 | A.   In Ohio, Cleveland, Ohio. |
| 09:51:41 | 20 | Q.   Has lived there her whole life? |
| 09:51:43 | 21 | A.   Yes. |
| 09:51:43 | 22 | Q.   Okay.  And how old is she? |
| 09:51:46 | 23 | A.   She's in her eighties. |
| 09:51:48 | 24 | Q.   And does she live alone, or is she married? |
| 09:51:51 | 25 | A.   No.  She's living with her son. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 15

| | | |
|---|---|---|
| 09:51:53 | 1 | Q.   Son.   Okay.   What's his name? |
| 09:51:55 | 2 | A.   Gregory -- well, she has more than one son, |
| 09:51:58 | 3 | but Gregory is living with her now. |
| 09:52:00 | 4 | Q.   Gregory Halko? |
| 09:52:01 | 5 | A.   Yes. |
| 09:52:02 | 6 | Q.   And who is, finally, George Zadrozny, Esq. |
| 09:52:08 | 7 | of -- |
| 09:52:08 | 8 | A.   Yes.   He's -- |
| 09:52:09 | 9 | Q.   -- Timber Bay Circle, Oldsman, Florida? |
| 09:52:13 | 10 | A.   He's a long-time friend and also served as an |
| 09:52:17 | 11 | attorney for us in the early days of the terminations. |
| 09:52:23 | 12 | Q.   What do you consider the early days of the |
| 09:52:26 | 13 | termination? |
| 09:52:26 | 14 | A.   Well, it was prior to my father's death.   So |
| 09:52:30 | 15 | he was a -- he was a consultant helping, you know, my |
| 09:52:35 | 16 | mother and father learn about the -- about the |
| 09:52:38 | 17 | copyright law. |
| 09:52:40 | 18 | Q.   Your father passed in 1996? |
| 09:52:42 | 19 | A.   Correct. |
| 09:52:43 | 20 | Q.   Okay.   Did there come a time when |
| 09:52:49 | 21 | Mr. Zadrozny stopped rendering services as a lawyer to |
| 09:52:52 | 22 | any member of your family? |
| 09:52:54 | 23 | A.   No.   I mean he's -- you know, he's on an |
| 09:53:00 | 24 | as-needed basis. |
| 09:53:00 | 25 | Q.   Has he continued to render services to this |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 16

| | | |
|---|---|---|
| 09:53:03 | 1 | day? |
| 09:53:05 | 2 | A.    When needed. |
| 09:53:06 | 3 | Q.    When is the last time he has been called upon |
| 09:53:10 | 4 | to give any advice? |
| 09:53:16 | 5 | A.    I really don't remember, but, you know, it |
| 09:53:21 | 6 | was fairly recently. |
| 09:53:24 | 7 | Q.    In connection with Superman? |
| 09:53:27 | 8 | A.    I -- I don't remember if the last time that I |
| 09:53:31 | 9 | spoke to him was about Superman or whether it had to |
| 09:53:34 | 10 | do with my mother's estate. |
| 09:53:41 | 11 | Q.    Has he provided advice regarding Superman |
| 09:53:52 | 12 | since the time that you retained Mr. Toberoff? |
| 09:53:58 | 13 | A.    Regarding -- could you clarify your question? |
| 09:54:00 | 14 | Q.    Yeah.  I'm trying to deliberately be very |
| 09:54:03 | 15 | vague -- not vague, but broad -- |
| 09:54:06 | 16 | A.    It is broad. |
| 09:54:07 | 17 | Q.    -- because I want to stay away from privilege |
| 09:54:09 | 18 | issues, so I'm not asking you, at least right now, |
| 09:54:12 | 19 | about any specific subject matter.  I'm just trying to |
| 09:54:16 | 20 | generally understand if this person is a relevant |
| 09:54:19 | 21 | witness to anything.  And so the question I'm putting |
| 09:54:22 | 22 | to you is whether since the time that you first |
| 09:54:27 | 23 | entered into a relationship with Mr. Toberoff back in |
| 09:54:33 | 24 | 2002, since that time to the present, has Mr. Zadrozny |
| 09:54:40 | 25 | rendered any legal advice regarding Superman? |

**EXHIBIT S**
**453**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 17

| 09:54:42 | 1 | A.   Yes. |

09:54:42   1      A.   Yes.

09:54:43   2      Q.   And when is the last time that he has done

09:54:47   3   so?

09:54:47   4      A.   As I said, I can't recall, but I would be

09:54:52   5   guessing.

09:54:52   6      Q.   Has he done so since your mother passed away?

09:54:55   7      A.   Not regarding Superman.

09:54:57   8      Q.   Not regarding.  And prior to your mom's

09:55:00   9   passing, you don't remember the last time?

09:55:03  10      A.   No.

09:55:03  11      Q.   Did you send him a copy of the lawsuit in

09:55:07  12   this case?

09:55:08  13      A.   Yes.

09:55:10  14      Q.   Okay.  And without getting into the details,

09:55:15  15   have you had discussions --

09:55:16  16      A.   Oh, I'm sorry.  When you say in this case,

09:55:19  17   you're talking about the current -- the current one

09:55:21  18   that we're discussing.

09:55:22  19      Q.   The DC Comics case, correct.

09:55:23  20      A.   That I don't recall.

09:55:24  21      Q.   But the other case you did.

09:55:25  22      A.   Yes.

09:55:25  23      Q.   The one you filed.

09:55:26  24      A.   Yes.

09:55:30  25      Q.   Okay.  Is he -- how old is Mr. Zadrozny?  Do

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merillcorp.com/law

EXHIBIT S
454

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 18

| | | |
|---|---|---|
| 09:55:36 | 1 | you know? |
| 09:55:39 | 2 | A.    I would say he's probably somewhere between |
| 09:55:43 | 3 | 58 and 62. |
| 09:55:44 | 4 | Q.    And he's still an active member of the bar? |
| 09:55:46 | 5 | A.    Yes. |
| 09:55:49 | 6 | Q.    Does he work with a firm? |
| 09:55:51 | 7 | A.    No.  He works independently. |
| 09:56:03 | 8 | Q.    If you go to page 15 of the will, there are |
| 09:56:08 | 9 | two witnesses who attested to the will.  I just want |
| 09:56:14 | 10 | to make sure we know who they are.  The first one |
| 09:56:17 | 11 | looks like to be the signature of the lawyer who |
| 09:56:20 | 12 | prepared the document, Gary Ruttenberg; is that |
| | 13 | correct? |
| 09:56:24 | 14 | A.    Yes. |
| 09:56:24 | 15 | Q.    And the second person is his legal assistant, |
| 09:56:27 | 16 | Mary Carrier? |
| 09:56:27 | 17 | A.    That's true. |
| 09:56:29 | 18 | Q.    And how long have Mr. Ruttenberg -- how long |
| 09:56:31 | 19 | has Mr. Ruttenberg been a lawyer for your family? |
| 09:56:38 | 20 | A.    Probably -- well, the only -- only thing that |
| 09:56:43 | 21 | he ever dealt with was, you know, wills.  You know, I |
| 09:56:46 | 22 | mean he had nothing to do with any other legal |
| 09:56:49 | 23 | matters.  So if we needed something having to do with |
| 09:56:52 | 24 | a will, I believe that -- that that would be 19 -- |
| 09:57:06 | 25 | about 1995. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 19

| | | |
|---|---|---|
| 09:57:11 | 1 | Q.   That had to do with a prior will? |
| 09:57:14 | 2 | A.   No, had to do with my father's will. |
| 09:57:16 | 3 | Q.   Your father's will.  Okay.  And since 2000 |
| 09:57:21 | 4 | when he prepared your mother's will until your mom |
| 09:57:25 | 5 | passed earlier this year, did you have any interaction |
| 09:57:29 | 6 | with him at all regarding Superman? |
| 09:57:31 | 7 | A.   No. |
| 09:57:31 | 8 | Q.   Or did your mother, to your knowledge? |
| 09:57:33 | 9 | A.   No. |
| 09:57:34 | 10 | Q.   Has Mr. Zadrozny, to your knowledge, reviewed |
| 09:57:39 | 11 | any of the -- any agreements relating in any way to |
| 09:57:47 | 12 | Superman? |
| 09:57:48 | 13 | A.   Could you be more specific? |
| 09:57:51 | 14 | Q.   H'm.  The notice of termination that you |
| 09:57:56 | 15 | served in 1997, did he have anything to do with its |
| 09:58:01 | 16 | preparation? |
| 09:58:01 | 17 | A.   He was a consultant for us at that time. |
| 09:58:05 | 18 | Q.   Was he at all involved in any way regarding |
| 09:58:13 | 19 | your negotiations and discussions with Warner Bros. or |
| 09:58:16 | 20 | DC Comics prior to your relationship with |
| 09:58:19 | 21 | Mr. Toberoff? |
| 09:58:19 | 22 | A.   You know, he was not a negotiator. |
| 09:58:21 | 23 | Q.   Was he consulted from time to time in regard |
| 09:58:23 | 24 | to those matters? |
| 09:58:26 | 25 | A.   As a friend, perhaps. |

EXHIBIT S
456

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 20

| 09:58:29 | 1 | Q. Okay. |
| 09:58:30 | 2 | A. I don't -- I don't really -- |
| 09:58:32 | 3 | Q. So, for example -- |
| 09:58:33 | 4 | A. May I just clarify? |
| 09:58:34 | 5 | Q. Sure. |
| 09:58:35 | 6 | A. My mother really communicated with him far |
| 09:58:40 | 7 | more than I did, so I really couldn't be exactly sure |
| 09:58:42 | 8 | of the answer to that. |
| 09:58:50 | 9 | Q. Okay. Did you ever communicate with him |
| 09:58:53 | 10 | during the time when there were discussions with |
| 09:58:57 | 11 | Warner Bros. let's say from 1997 until the time that |
| 09:58:59 | 12 | you started your relationship with Mr. Toberoff, let's |
| 09:59:02 | 13 | say during that five-, six-year period of time? You |
| 09:59:06 | 14 | recall there were lots of discussions and negotiations |
| 09:59:09 | 15 | with DC Comics and Warner Bros.? |
| 09:59:10 | 16 | A. Um-hum. Yes. |
| 09:59:12 | 17 | Q. You have to answer audibly. |
| 09:59:13 | 18 | A. Yes. |
| 09:59:16 | 19 | Q. At some point in time you were represented, |
| 09:59:18 | 20 | your family was, by -- is it George Levine? Arthur |
| | 21 | Levine. Excuse me. |
| | 22 | A. Arthur Levine. |
| 09:59:22 | 23 | Q. And then Kevin Marks and Bruce Ramer of the |
| 09:59:27 | 24 | Gang Tyre firm. |
| 09:59:27 | 25 | A. Yes. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 21

| | | |
|---|---|---|
| 09:59:27 | 1 | MR. TOBEROFF:  Wait until he finishes the |
| 09:59:30 | 2 | question. |
| 09:59:30 | 3 | THE WITNESS:  I'm sorry. |
| 09:59:31 | 4 | MR. TOBEROFF:  And you need to give me time |
| 09:59:33 | 5 | in case I want to object. |
| | 6 | BY MR. PETROCELLI: |
| 09:59:34 | 7 | Q.   And prior to Mr. Toberoff, were you |
| 09:59:39 | 8 | represented by any other lawyer, you or any member of |
| 09:59:40 | 9 | your family, regarding Superman besides Arthur Levine |
| 09:59:47 | 10 | and besides the Gang Tyre law firm? |
| 10:00:02 | 11 | A.   No. |
| 10:00:11 | 12 | Q.   Okay. |
| 10:00:12 | 13 | Did Mr. -- to your knowledge, did |
| 10:00:16 | 14 | Mr. Zadrozny review any agreements that you or members |
| 10:00:21 | 15 | of your family entered into with Mr. Toberoff? |
| 10:00:24 | 16 | A.   Yes. |
| 10:00:26 | 17 | Q.   Which agreements? |
| 10:00:28 | 18 | A.   The original documents when we were retaining |
| 10:00:35 | 19 | his legal services in 2002 and also when we entered |
| 10:00:43 | 20 | into a litigation agreement with him in -- I believe |
| 10:00:48 | 21 | that was 2004. |
| 10:00:50 | 22 | Q.   And "with him," you meant with Mr. Toberoff. |
| 10:00:53 | 23 | A.   Correct. |
| 10:00:55 | 24 | Q.   Do you know whether Mr. Zadrozny charged your |
| 10:01:00 | 25 | family for any legal fees for reviewing those |

## LAURA SIEGEL LARSON - 7/22/2011

Page 22

| | | |
|---|---|---|
| 10:01:04 | 1 | documents? |
| 10:01:05 | 2 | A.  Yes. |
| 10:01:05 | 3 | Q.  How do you know that? |
| 10:01:07 | 4 | A.  My mother told me. |
| 10:01:10 | 5 | Q.  Do you know how much he charged? |
| 10:01:12 | 6 | A.  It was a very low hourly rate. |
| 10:01:17 | 7 | Q.  After this litigation document in 2004 that |
| 10:01:22 | 8 | you entered into -- when I say "you," you know I'm |
| 10:01:24 | 9 | talking about really you and your mother. |
| 10:01:28 | 10 | A.  Correct. |
| 10:01:29 | 11 | Q.  Joanne Siegel. |
| 10:01:30 | 12 | A.  Us as the Siegels. |
| 10:01:31 | 13 | Q.  But I'm not talking about Michael Siegel. |
| 10:01:33 | 14 | A.  No, no.  He wasn't -- he had nothing to do |
| 10:01:36 | 15 | with that. |
| 10:01:37 | 16 | Q.  We'll deal with him separately. |
| 10:01:39 | 17 | MR. TOBEROFF:  I just want to for clarity, |
| 10:01:41 | 18 | when "you" does not refer to her and her mother and |
| 10:01:45 | 19 | refers just to her, you need to tell her. |
| 10:01:47 | 20 | MR. PETROCELLI:  Fair enough.  Fair enough. |
| 10:01:50 | 21 | I will try to be clear. |
| 10:01:55 | 22 | I forgot what I was asking.  So it was a |
| 10:01:59 | 23 | clever device by good lawyers to get you off track. |
| 10:02:06 | 24 | What was I asking?  Senior moment here. |
| 10:02:22 | 25 | (The record was read.) |

## LAURA SIEGEL LARSON - 7/22/2011

Page 23

| | | |
|---|---|---|
| 10:02:22 | 1 | MR. PETROCELLI: Okay. There you go. |
| 10:02:24 | 2 | THE WITNESS: Okay. |
| | 3 | BY MR. PETROCELLI: |
| 10:02:25 | 4 | Q. So after the litigation document that you and |
| 10:02:27 | 5 | your family entered into with Mr. Toberoff in 2004, |
| 10:02:31 | 6 | were there any other documents, to your knowledge, |
| 10:02:34 | 7 | that were sent to Mr. Zadrozny for his review related |
| 10:02:40 | 8 | to Superman? |
| 10:02:41 | 9 | A. I don't recall. |
| 10:02:44 | 10 | Q. You signed a document sometime in or about |
| 10:02:49 | 11 | 2008 that the Shusters also signed, some agreement; |
| 10:02:52 | 12 | correct? |
| 10:02:53 | 13 | A. Yes. |
| 10:02:54 | 14 | Q. And Mr. Toberoff also signed that; correct? |
| 10:02:57 | 15 | A. Yes. |
| 10:02:59 | 16 | Q. Did Mr. Zadrozny, to your knowledge, review |
| 10:03:05 | 17 | that document? |
| 10:03:05 | 18 | A. Yes. |
| 10:03:07 | 19 | Q. Did he review that document prior to the time |
| 10:03:10 | 20 | you signed it? |
| 10:03:11 | 21 | A. Yes. |
| 10:03:14 | 22 | Q. How do you know he reviewed it? |
| 10:03:20 | 23 | A. Because he and I spoke about it. |
| 10:03:27 | 24 | Q. How long before you signed it -- withdrawn. |
| 10:03:33 | 25 | Did you send him a copy of it before signing |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 24

| | | |
|---|---|---|
| 10:03:35 | 1 | it? |
| 10:03:36 | 2 | A.  Yes. |
| 10:03:37 | 3 | Q.  Was he here in town with you or -- |
| 10:03:40 | 4 | A.  No. |
| 10:03:40 | 5 | Q.  He was living in Florida? |
| 10:03:42 | 6 | A.  Yes. |
| 10:03:42 | 7 | Q.  Has he lived in Florida the whole time you've |
| 10:03:45 | 8 | been dealing with him? |
| 10:03:45 | 9 | A.  Yes. |
| 10:03:51 | 10 | Q.  Okay.  Did any other attorney besides |
| 10:03:53 | 11 | Mr. Zadrozny review that document, to your knowledge, |
| 10:03:57 | 12 | before you or your mother signed it? |
| 10:03:58 | 13 | A.  Which document are you speaking of? |
| 10:04:00 | 14 | Q.  This 2008 -- we've been calling it a consent |
| 10:04:04 | 15 | agreement. |
| 10:04:05 | 16 | A.  Oh.  The -- no. |
| 10:04:11 | 17 | Q.  How many documents have you or your mother |
| 10:04:15 | 18 | signed that the Shusters also signed, one or more |
| 10:04:19 | 19 | Shuster people? |
| 10:04:20 | 20 | A.  Only one. |
| 10:04:32 | 21 | Q.  Was the 2008 consent agreement the last |
| 10:04:41 | 22 | document you asked or your mother asked, to your |
| 10:04:44 | 23 | knowledge, Mr. Zadrozny to review related to Superman? |
| 10:04:49 | 24 | A.  I believe so. |
| 10:04:52 | 25 | Q.  Have you signed any other documents related |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 25

| | | |
|---|---|---|
| 10:04:56 | 1 | to Superman after the 2008 consent agreement that you |
| 10:05:02 | 2 | signed together with the Shusters and Mr. Toberoff and |
| 10:05:05 | 3 | your mother? |
| 10:05:07 | 4 | A.   I don't remember any other document. |
| 10:05:22 | 5 | Q.   How did you obtain a copy -- withdrawn. |
| 10:05:26 | 6 | Did you or your mother send the draft of the |
| 10:05:29 | 7 | 2008 consent agreement to Mr. Zadrozny, or did someone |
| 10:05:33 | 8 | else send it on your behalf? |
| 10:05:36 | 9 | A.   I believe my mother sent it. |
| 10:05:40 | 10 | Q.   And do you know how long before your signing |
| 10:05:48 | 11 | it your mother sent it to him? |
| 10:05:52 | 12 | A.   I don't know.  I would be guessing, but, you |
| 10:05:54 | 13 | know -- |
| 10:05:55 | 14 | MR. TOBEROFF:  Don't guess. |
| 10:05:56 | 15 | THE WITNESS:  You know. |
| | 16 | BY MR. PETROCELLI: |
| 10:05:57 | 17 | Q.   On the subject of guessing, your lawyer said |
| 10:06:00 | 18 | don't guess, and I concur with that except that you |
| 10:06:02 | 19 | need to understand that there's a wild guess, which we |
| 10:06:06 | 20 | don't want to know about.  Wild speculation we don't |
| 10:06:08 | 21 | want to know about.  But if you have some basis to |
| 10:06:12 | 22 | estimate something or approximate something based on |
| 10:06:14 | 23 | your overall knowledge, we are entitled to that, just |
| 10:06:19 | 24 | so you keep that in mind.  Okay? |
| 10:06:22 | 25 | A.   Um-hum.  Yes.  You pointed -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 26

| | | |
|---|---|---|
| 10:06:24 | 1 | Q. Yeah. |
| 10:06:26 | 2 | A. Pointing reminder. |
| 10:06:27 | 3 | Q. The pointing is not to be rude at all. It's |
| 10:06:30 | 4 | just that -- |
| 10:06:31 | 5 | A. I understand. |
| 10:06:31 | 6 | Q. -- to make sure that you answer audibly. |
| 10:06:33 | 7 | MR. TOBEROFF: Give me time to object. |
| 10:06:38 | 8 | MR. PETROCELLI: Mr. Toberoff does like to |
| 10:06:39 | 9 | object, so we don't want -- we don't want to take away |
| 10:06:44 | 10 | that pleasure. |
| 10:06:45 | 11 | MR. TOBEROFF: I like to have something to do |
| 10:06:47 | 12 | at deposition. |
| 10:06:47 | 13 | MR. PETROCELLI: You don't need to be here, |
| 10:06:49 | 14 | you know. |
| 10:06:50 | 15 | THE WITNESS: Yes, he does. I would miss him |
| 10:06:52 | 16 | if he wasn't here. |
| | 17 | BY MR. PETROCELLI: |
| 10:06:55 | 18 | Q. Did -- do you remember if there were any |
| 10:07:00 | 19 | changes made to the consent agreement after |
| 10:07:04 | 20 | Mr. Zadrozny reviewed it? |
| 10:07:08 | 21 | A. I don't remember. |
| 10:07:13 | 22 | Q. Did you discuss it with him? |
| 10:07:15 | 23 | A. Yes. |
| 10:07:17 | 24 | Q. What did you and he discuss about it? |
| 10:07:22 | 25 | MR. TOBEROFF: Actually, you can't disclose |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 27

| | | |
|---|---|---|
| 10:07:24 | 1 | that. |
| 10:07:24 | 2 | THE WITNESS:  I didn't think I could. |
| 10:07:26 | 3 | MR. TOBEROFF:  Attorney-client privilege, and |
| 10:07:27 | 4 | I instruct you not to answer. |
| | 5 | BY MR. PETROCELLI: |
| 10:07:29 | 6 | Q.   Did you discuss with your mother what you and |
| 10:07:35 | 7 | Mr. Zadrozny talked about? |
| 10:07:42 | 8 | A.   Probably. |
| 10:07:45 | 9 | Q.   As best as you can remember, what did you and |
| 10:07:48 | 10 | your mom say to each other in that regard? |
| 10:07:53 | 11 | MR. TOBEROFF:  Joint client privilege. |
| 10:07:54 | 12 | Instruct you not to answer. |
| | 13 | BY MR. PETROCELLI: |
| 10:07:55 | 14 | Q.   I'm referring to discussions that the two of |
| 10:07:57 | 15 | you had privately, not with Mr. Zadrozny in the room |
| 10:08:01 | 16 | or on the phone.  You understand that? |
| 10:08:04 | 17 | A.   I hear what you're saying. |
| 10:08:06 | 18 | Q.   Okay.  And I'm asking you to tell me what you |
| 10:08:08 | 19 | discussed with your mother regarding what Mr. Zadrozny |
| 10:08:13 | 20 | did or said. |
| 10:08:15 | 21 | MR. TOBEROFF:  You can answer so long as your |
| 10:08:17 | 22 | answer doesn't disclose the substance of conversations |
| 10:08:21 | 23 | that you had with Mr. Zadrozny. |
| 10:08:23 | 24 | THE WITNESS:  Um-hum. |
| 10:08:26 | 25 | That we were grateful for his input. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 28

| 10:08:29 | 1 | BY MR. PETROCELLI: |
| 10:08:29 | 2 | Q. What was his input? |
| 10:08:32 | 3 | MR. TOBEROFF: I instruct you not to answer. |
| 10:08:35 | 4 | Attorney-client privilege. |
| | 5 | BY MR. PETROCELLI: |
| 10:08:37 | 6 | Q. You and your mother discussed his input? |
| 10:08:40 | 7 | A. Yes. |
| 10:08:41 | 8 | Q. What did the two of you discuss about his |
| 10:08:44 | 9 | input? |
| 10:08:44 | 10 | MR. TOBEROFF: Attorney-client privilege. |
| 10:08:46 | 11 | Joint client privilege. I instruct you not to answer. |
| | 12 | BY MR. PETROCELLI: |
| 10:08:48 | 13 | Q. Did he provide any input to you or your |
| 10:08:53 | 14 | mother in writing? |
| 10:08:56 | 15 | A. I don't believe so. |
| 10:08:57 | 16 | Q. Did he mark up a document and send you some |
| 10:09:01 | 17 | revisions or tell you -- send you some revisions in |
| 10:09:05 | 18 | writing? |
| 10:09:06 | 19 | A. I don't recall that. |
| 10:09:06 | 20 | Q. Were there any -- did you e-mail him at all? |
| 10:09:10 | 21 | A. Well, on other occasions, but, you know, not |
| 10:09:13 | 22 | regarding this. |
| 10:09:16 | 23 | Q. Did you meet with him in person regarding the |
| 10:09:19 | 24 | 2008 consent agreement? |
| 10:09:20 | 25 | A. No. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 29

| 10:09:20 | 1 | Q.   Did you meet with him in person regarding the |
| 10:09:24 | 2 | 2004 litigation agreement with Mr. Toberoff? |
| 10:09:28 | 3 | A.   No. |
| 10:09:28 | 4 | Q.   And did you meet with him in person regarding |
| 10:09:31 | 5 | the 2002 agreement with Mr. Toberoff? |
| 10:09:41 | 6 | A.   No. |
| 10:09:41 | 7 | Q.   And to be clear, Mr. Zadrozny is the only |
| 10:09:48 | 8 | lawyer to review your agreements with Mr. Toberoff? |
| 10:09:52 | 9 | A.   No, that's not correct. |
| 10:09:54 | 10 | Q.   Okay.  Is he the only lawyer to review the |
| 10:09:57 | 11 | 2008 consent agreement? |
| 10:10:02 | 12 | A.   I believe so. |
| 10:10:06 | 13 | Q.   Okay.  And with respect to the 2002 |
| 10:10:12 | 14 | agreement, the first agreement with Mr. Toberoff, who |
| 10:10:12 | 15 | reviewed that agreement, if anyone, other than |
| 10:10:15 | 16 | Mr. Zadrozny? |
| 10:10:16 | 17 | A.   I believe Arthur Levine looked at it, if I'm |
| 10:10:20 | 18 | recalling correctly. |
| 10:10:23 | 19 | Q.   During the time that you were working with |
| 10:10:26 | 20 | Gang Tyre, Bruce Ramer and Kevin Marks of Gang Tyre, |
| 10:10:29 | 21 | you were still calling on Mr. Levine from time to |
| 10:10:31 | 22 | time -- |
| 10:10:32 | 23 | A.   Yes. |
| 10:10:32 | 24 | Q.   -- with regard to Superman? |
| 10:10:34 | 25 | A.   Yes. |

# LAURA SIEGEL LARSON - 7/22/2011

Page 30

| | | |
|---|---|---|
| 10:10:34 | 1 | Q. And have you continued to do so even after |
| 10:10:37 | 2 | your relationship with Mr. Toberoff began? |
| 10:10:42 | 3 | A. Yes. |
| 10:10:43 | 4 | Q. And to the present? |
| 10:10:47 | 5 | A. Well, I haven't talked to Arthur in a really |
| 10:10:50 | 6 | long time. |
| 10:10:50 | 7 | Q. When is the last time that you or your mother |
| 10:10:54 | 8 | consulted with Mr. Levine regarding Superman? |
| 10:11:04 | 9 | A. I don't remember. I couldn't give you a |
| 10:11:07 | 10 | date. |
| 10:11:07 | 11 | Q. Would it be within the last five years? |
| 10:11:14 | 12 | A. Possibly. |
| 10:11:16 | 13 | Q. Did Mr. Levine review the 2004 litigation |
| 10:11:22 | 14 | agreement with Mr. Toberoff? |
| 10:11:23 | 15 | A. Yes, he did. |
| 10:11:25 | 16 | Q. Did any other lawyer besides Mr. Levine and |
| 10:11:29 | 17 | Mr. Zadrozny review the 2002 agreement with |
| 10:11:31 | 18 | Mr. Toberoff, to your knowledge? |
| 10:11:36 | 19 | A. Are you saying, you know, on my behalf? |
| 10:11:39 | 20 | Q. Or your mother's behalf, yes. |
| 10:11:42 | 21 | A. No. |
| 10:11:43 | 22 | Q. The same question for the 2004 litigation |
| 10:11:46 | 23 | agreement. |
| 10:11:47 | 24 | A. No other lawyer besides Arthur and George. |
| 10:11:50 | 25 | Q. Okay. Arthur Levine and George Zadrozny. |

**EXHIBIT S**
**467**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

# LAURA SIEGEL LARSON - 7/22/2011

Page 31

| | | |
|---|---|---|
| 10:11:55 | 1 | A.    Correct. |
| 10:11:56 | 2 | Q.    And the 2008 consent agreement was just |
| 10:11:59 | 3 | George, not Arthur. |
| 10:12:00 | 4 | A.    I believe so.  I -- I don't remember talking |
| 10:12:05 | 5 | to Arthur about it, but I might have, but I really |
| 10:12:09 | 6 | think it was just George. |
| 10:12:12 | 7 | Q.    Do you know whether the Shusters had any |
| 10:12:18 | 8 | lawyer review the 2008 consent agreement? |
| 10:12:22 | 9 | A.    I have no idea. |
| 10:12:31 | 10 | Q.    Do you recall that Mr. Toberoff sent you some |
| 10:12:41 | 11 | letters regarding a potential conflict of interest |
| 10:12:46 | 12 | with respect to acquiring Michael Siegel's termination |
| 10:12:53 | 13 | interest? |
| 10:12:54 | 14 | A.    I believe he did, yes. |
| 10:12:56 | 15 | Q.    And I'll show them to you as we get into it. |
| 10:12:59 | 16 |      Do you know whether any lawyer for you or |
| 10:13:02 | 17 | your mother reviewed those documents? |
| 10:13:06 | 18 | A.    I'm -- probably -- I'm guessing, but I |
| 10:13:11 | 19 | probably would have had George look at that also. |
| 10:13:18 | 20 | Q.    You're not -- |
| | 21 | A.    Zadrozny. |
| 10:13:18 | 22 | Q.    -- sure, is it fair to say? |
| 10:13:20 | 23 | A.    I'm not sure, but I -- I would say probably. |
| 10:13:31 | 24 | Q.    The record will show that those consent -- |
| 10:13:35 | 25 | excuse me -- those disclosure -- withdrawn. |

**EXHIBIT S**
**468**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 32

| 10:13:38 | 1 | The record will show that those conflict of |
| 10:13:40 | 2 | interest letters were sent to you -- |
| 10:13:44 | 3 | What year was that? |
| 10:13:48 | 4 | MR. TOKORO:  2002, 2003. |
| | 5 | BY MR. PETROCELLI: |
| 10:13:49 | 6 | Q.   -- 2002, 2003, that general time frame.  And |
| 10:13:52 | 7 | I'll show them to you when we get to them, but for |
| 10:13:55 | 8 | now -- and again, I'm trying to get a broad picture of |
| 10:13:58 | 9 | who is involved in all this. |
| 10:14:04 | 10 | Have you received any conflict of interest |
| 10:14:10 | 11 | letters from Mr. Toberoff since those ones in 2002 and |
| 10:14:15 | 12 | 2003 related to Michael Siegel? |
| 10:14:21 | 13 | MR. TOBEROFF:  Vague and -- are you asking |
| 10:14:23 | 14 | whether any other conflict of interest letters, |
| 10:14:27 | 15 | period, or any other conflict of interest letters |
| 10:14:30 | 16 | relating to Michael Siegel? |
| 10:14:33 | 17 | MR. PETROCELLI:  Let me clarify. |
| 10:14:37 | 18 | Q.   Other than conflict of interest letters |
| 10:14:40 | 19 | related to Michael Siegel -- |
| 10:14:42 | 20 | A.   Yes. |
| 10:14:43 | 21 | Q.   -- have you received any conflict of interest |
| 10:14:46 | 22 | letters from Mr. Toberoff in the course of your |
| 10:14:49 | 23 | relationship with him? |
| 10:14:51 | 24 | A.   Well, every time there was any sort of |
| 10:14:56 | 25 | agreement that we were entering into with |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 33

| | | |
|---|---|---|
| 10:14:58 | 1 | Mr. Toberoff, he would disclose to us any conflicts of |
| 10:15:02 | 2 | interest that he had in writing. |
| 10:15:06 | 3 | Q.   Which -- can you give -- can you be more |
| 10:15:11 | 4 | specific? |
| 10:15:12 | 5 | A.   For the 2002 agreement. |
| 10:15:16 | 6 | Q.   There's a letter he sent to you disclosing |
| 10:15:19 | 7 | conflicts of interest? |
| 10:15:20 | 8 | A.   I believe so. |
| 10:15:22 | 9 | Q.   And what do you -- what do you understand the |
| 10:15:25 | 10 | potential conflict of interest to have been that he |
| 10:15:27 | 11 | was disclosing to you? |
| 10:15:29 | 12 | MR. TOBEROFF:  Attorney-client privilege.  I |
| 10:15:30 | 13 | instruct you not to answer. |
| | 14 | BY MR. PETROCELLI: |
| 10:15:39 | 15 | Q.   Was that conflict of interest -- do you know |
| 10:15:42 | 16 | who it is? |
| 10:15:44 | 17 | A.   Do I know who what is? |
| 10:15:45 | 18 | Q.   Bad question. |
| 10:15:46 | 19 | As you sit here now, do you remember the |
| 10:15:49 | 20 | subject matter of the conflict of interest letter that |
| 10:15:52 | 21 | you received from Mr. Toberoff at the time that you |
| 10:15:55 | 22 | entered into the first agreement with him in 2002? |
| 10:15:59 | 23 | A.   I don't -- |
| 10:16:00 | 24 | MR. TOBEROFF:  You can answer. |
| 10:16:01 | 25 | THE WITNESS:  I don't remember details. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 34

| 10:16:04 | 1 | BY MR. PETROCELLI: |
| 10:16:04 | 2 | Q.  Are you certain that you received in writing |
| 10:16:11 | 3 | a conflict of interest letter when you entered into |
| 10:16:17 | 4 | the written agreement with Mr. Toberoff in 2002? |
| 10:16:21 | 5 | MR. TOBEROFF:  Asked and answered. |
| 10:16:24 | 6 | THE WITNESS:  Yes. |
|  | 7 | BY MR. PETROCELLI: |
| 10:16:29 | 8 | Q.  Did that conflict of interest letter pertain |
| 10:16:32 | 9 | in any way to Mr. Toberoff's relationship with the |
| 10:16:38 | 10 | Shusters? |
| 10:16:39 | 11 | MR. TOBEROFF:  I instruct you not to answer |
| 10:16:41 | 12 | as to the contents of any conflict of interest waivers |
| 10:16:48 | 13 | based on the attorney-client privilege, attorney work |
| 10:16:51 | 14 | product. |
|  | 15 | BY MR. PETROCELLI: |
| 10:16:52 | 16 | Q.  Did you sign any document relating to a |
| 10:16:59 | 17 | conflict of interest that you received from |
| 10:17:03 | 18 | Mr. Toberoff at the time you signed your first |
| 10:17:07 | 19 | agreement with him in 2002? |
| 10:17:10 | 20 | A.  Yes. |
| 10:17:12 | 21 | Q.  And who else, to your knowledge, signed such |
| 10:17:15 | 22 | a document? |
| 10:17:19 | 23 | A.  My mother. |
| 10:17:19 | 24 | Q.  Were there any other signatories to such a |
| 10:17:22 | 25 | document? |

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 35

| | | | |
|---|---|---|---|
| 10:17:22 | 1 | A. | Mr. Toberoff. |
| 10:17:23 | 2 | Q. | Were there any other signatories? |
| 10:17:25 | 3 | A. | I don't believe so. |
| 10:17:25 | 4 | Q. | This is in 2002 now. |
| 10:17:27 | 5 | A. | Yeah. |
| 10:17:29 | 6 | Q. | Okay. |
| 10:17:29 | 7 | A. | I'm trying to follow that.  Yes.  No other -- |
| 10:17:33 | 8 | Q. | Like did the Shusters sign the document? |
| 10:17:35 | 9 | A. | No. |
| 10:17:36 | 10 | Q. | Okay. |

10:17:42    11         Is the next conflict of interest document

10:17:45    12    that you recall receiving from Mr. Shuster -- from

10:17:49    13    Mr. Toberoff, again, unrelated to Michael Siegel, in

10:17:54    14    2004 when you signed the litigation agreement with

10:17:57    15    him?

10:17:57    16         A.    Yes.

10:17:58    17         Q.    Okay.  And you are certain that you received

10:18:02    18    and signed such a document?

10:18:04    19         A.    Yes.

10:18:08    20         Q.    Have you reviewed either the 2002 conflict

10:18:13    21    document that you signed or the 2004 conflict document

10:18:16    22    that you signed recently?

10:18:19    23         A.    No, not for a long time.

10:18:23    24         Q.    Do you remember who the signatories are to

10:18:26    25    the 2004 conflict document that you signed?

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 36

| 10:18:31 | 1 | A.    It would have been my mother and me and |
| 10:18:33 | 2 | Mr. Toberoff. |
| 10:18:38 | 3 | Q.    Do you know if that document was reviewed by |
| 10:18:42 | 4 | Mr. Zadrozny? |
| 10:18:42 | 5 | A.    I believe it was. |
| 10:18:45 | 6 | Q.    Was it reviewed by anyone else? |
| 10:18:48 | 7 | A.    I believe it was reviewed by Arthur Levine. |
| 10:18:53 | 8 | Q.    Is 2004 the last time that you received a |
| 10:18:59 | 9 | conflict of interest document from Mr. Toberoff? |
| 10:19:02 | 10 | A.    No. |
| 10:19:03 | 11 | Q.    When is the last time -- let me ask it this |
| 10:19:05 | 12 | way.  When is the next time after the 2004 litigation |
| 10:19:12 | 13 | agreement? |
| 10:19:12 | 14 | A.    Well, I know we received one in 2008. |
| 10:19:18 | 15 | Q.    Is the conflict of interest document that you |
| 10:19:20 | 16 | received in 2008 one that you also signed? |
| 10:19:26 | 17 | A.    Yes. |
| 10:19:28 | 18 | Q.    Your mother signed it? |
| 10:19:30 | 19 | A.    Yes. |
| 10:19:30 | 20 | Q.    And who else signed it? |
| 10:19:35 | 21 | A.    Mr. Toberoff, Warren Peary, and Jean Shuster |
| 10:19:44 | 22 | Peavy. |
| 10:19:44 | 23 | MR. PETROCELLI:  Peary is P-a-e-r-y. |
| 10:19:47 | 24 | THE WITNESS:  Yes. |
| | 25 | BY MR. PETROCELLI: |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 37

| 10:19:49 | 1 | Q. Okay. Did you have someone review that 2008 |
| 10:19:54 | 2 | conflict document that you received from Mr. Toberoff? |
| 10:19:56 | 3 | A. Yes. |
| 10:19:57 | 4 | Q. And who reviewed it? |
| 10:19:59 | 5 | A. George Zadrozny and -- yes, I believe it was |
| 10:20:02 | 6 | just George. As I said, I don't remember whether or |
| 10:20:06 | 7 | not Arthur was involved with that. |
| 10:20:11 | 8 | Q. Okay. Do you know whether any lawyer |
| 10:20:14 | 9 | reviewed it on behalf of the Shuster family? |
| 10:20:16 | 10 | A. I have no idea. |
| 10:20:18 | 11 | Q. Is the 2008 conflict document that you |
| 10:20:23 | 12 | reviewed and signed a separate document from the 2008 |
| 10:20:29 | 13 | consent agreement that you signed? |
| 10:20:32 | 14 | A. Yes. I believe they were two separate |
| 10:20:34 | 15 | documents. |
| 10:20:34 | 16 | Q. So there are actually two documents, then, |
| 10:20:37 | 17 | that bear your signature and a signature of a member |
| 10:20:42 | 18 | of the Shuster family related to Superman. |
| 10:20:45 | 19 | A. Well, they were in essence all the, you know, |
| 10:20:49 | 20 | the same issue. It was all, you know, all at one |
| 10:20:53 | 21 | time. |
| 10:20:53 | 22 | Q. I understand that. |
| 10:20:55 | 23 | A. They were given to us. |
| 10:20:56 | 24 | Q. Two separate documents, though. |
| 10:20:57 | 25 | A. Two separate documents, I believe. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 38

| | | |
|---|---|---|
| 10:20:58 | 1 | Q.    Okay.  And is that the last time in 2008 that |
| 10:21:05 | 2 | you signed a conflict of interest document received |
| 10:21:08 | 3 | from Mr. Toberoff? |
| 10:21:09 | 4 | A.    I believe so. |
| 10:21:11 | 5 | Q.    Is that the last time in 2008 that you |
| 10:21:14 | 6 | received a conflict of interest document from |
| 10:21:15 | 7 | Mr. Toberoff? |
| 10:21:17 | 8 | A.    Yes. |
| 10:21:19 | 9 | Q.    And are you certain that you have signed no |
| 10:21:26 | 10 | other conflict of interest documents or any other |
| 10:21:30 | 11 | documents with the Shuster family other than the 2008 |
| 10:21:34 | 12 | consent agreement and the related conflict document? |
| 10:21:40 | 13 | A.    Those were the only occasions on which we |
| 10:21:44 | 14 | signed a document that the Shusters also signed. |
| 10:21:49 | 15 | Q.    And even with respect to that issue in 2008, |
| 10:21:51 | 16 | were there any other documents that you recall having |
| 10:21:54 | 17 | signed together with the Shusters? |
| 10:21:56 | 18 | A.    I'm sorry.  Could you repeat that? |
| 10:21:58 | 19 | Q.    Were there any other documents that you |
| 10:21:59 | 20 | recall having signed with the Shusters other than |
| 10:22:02 | 21 | those two documents, the 2008 consent agreement and |
| 10:22:06 | 22 | the related conflict document? |
| 10:22:08 | 23 | A.    No. |
| 10:22:15 | 24 | Q.    Okay. |
| 10:22:16 | 25 | Did you have any discussions with either Jean |

EXHIBIT S
475

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 39

| | | |
|---|---|---|
| 10:22:22 | 1 | Peavy or Warren Peary about the 2008 consent |
| 10:22:31 | 2 | agreement? |
| 10:22:32 | 3 | A.    No, we did not. |
| 10:22:34 | 4 | Q.    To your knowledge, did your mother? |
| 10:22:36 | 5 | A.    I don't believe so. |
| 10:22:48 | 6 | Q.    Have you ever had any discussion with any |
| 10:22:52 | 7 | member of the Shuster family regarding the 2008 |
| 10:22:58 | 8 | consent agreement? |
| 10:23:02 | 9 | A.    I can't recall any discussion that we had. |
| 10:23:08 | 10 | Q.    Have you ever -- you understand that in this |
| 10:23:14 | 11 | lawsuit DC is alleging certain issues with respect to |
| 10:23:18 | 12 | that document? |
| 10:23:21 | 13 | A.    I think, you know, that's one of several |
| 10:23:24 | 14 | things in that lawsuit. |
| 10:23:25 | 15 | Q.    Have you read the lawsuit? |
| 10:23:26 | 16 | A.    Yes.  Not recently, but I've read it. |
| 10:23:32 | 17 | Q.    After this lawsuit was filed, which you |
| 10:23:34 | 18 | believe was on or about May 14 of 2010, did you have |
| 10:23:38 | 19 | any discussion with either Jean Peavy or Warren Peary |
| 10:23:43 | 20 | about the lawsuit? |
| 10:23:50 | 21 | A.    No. |
| 10:23:50 | 22 | Q.    Did you talk to your mother about the |
| 10:23:54 | 23 | lawsuit? |
| 10:23:54 | 24 | A.    Yes. |
| 10:23:58 | 25 | Q.    Did you talk to your mother about the consent |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 40

| | | |
|---|---|---|
| 10:24:01 | 1 | agreement after the filing of the lawsuit? |
| 10:24:10 | 2 | A.   The consent -- the consent agreement from |
| 10:24:13 | 3 | 2008 after the lawsuit was filed in 2010? |
| 10:24:16 | 4 | Q.   Exactly.  You're very good. |
| 10:24:22 | 5 | A.   Have to try and follow this. |
| 10:24:22 | 6 | Q.   You're following it perfectly. |
| 10:24:23 | 7 | A.   You're throwing a lot of dates at me here. |
| 10:24:28 | 8 | I don't remember any particular conversation |
| 10:24:31 | 9 | that we had. |
| 10:24:32 | 10 | Q.   Okay. |
| 10:24:38 | 11 | Have you signed any conflict document since |
| 10:24:45 | 12 | the filing of this lawsuit in May, 2010? |
| 10:24:51 | 13 | A.   I don't believe so. |
| 10:24:55 | 14 | Q.   And have you signed any agreements at all |
| 10:25:00 | 15 | with Mr. Toberoff since the filing of this lawsuit in |
| 10:25:06 | 16 | May, 2010? |
| 10:25:09 | 17 | A.   No. |
| 10:25:09 | 18 | Q.   And to your knowledge, your mother didn't |
| 10:25:12 | 19 | either; correct? |
| 10:25:12 | 20 | A.   No. |
| 10:25:13 | 21 | Q.   Is that correct? |
| 10:25:13 | 22 | A.   Correct.  She did not. |
| 10:25:15 | 23 | Q.   Okay.  Do you have any agreements with any |
| 10:25:43 | 24 | member of the Shuster family regarding Superman other |
| 10:25:53 | 25 | than the 2008 consent agreement or the conflict |

EXHIBIT S

477

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 41

| | | |
|---|---|---|
| 10:25:58 | 1 | document related to it? |
| 10:26:06 | 2 | A.   No. |
| 10:26:06 | 3 | Q.   Do you have any arrangements with the Shuster |
| 10:26:13 | 4 | family to share in any monies that either the Shusters |
| 10:26:17 | 5 | or the Siegels receive for the sale of their Superman |
| 10:26:24 | 6 | rights, including in settlement of litigation? |
| 10:26:28 | 7 | MR. TOBEROFF:  Excuse me.  Could you read |
| 10:26:30 | 8 | back that question for me? |
| 10:26:51 | 9 | (The record was read.) |
| 10:26:51 | 10 | MR. TOBEROFF:  To the extent any part of that |
| 10:26:56 | 11 | question reveals the substance of -- any part of it |
| 10:27:00 | 12 | reveals the substance of the consent agreement, which |
| 10:27:02 | 13 | was held to be privileged twice, I would instruct you |
| 10:27:05 | 14 | not to answer. |
| | 15 | BY MR. PETROCELLI: |
| 10:27:15 | 16 | Q.   Do you have any arrangement to share with the |
| 10:27:25 | 17 | Shusters any monies that the Siegel family might |
| 10:27:33 | 18 | receive with respect to their accounting on Superman? |
| 10:27:40 | 19 | MR. TOBEROFF:  Same instruction.  Same basis. |
| | 20 | BY MR. PETROCELLI: |
| 10:27:43 | 21 | Q.   Do you have any arrangements with the |
| 10:27:46 | 22 | Shusters to share in any money that the Siegel family |
| 10:27:51 | 23 | might receive with respect to the disposition of |
| 10:27:58 | 24 | Superboy rights or settlement of litigation regarding |
| 10:28:02 | 25 | Superboy? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 42

| 10:28:02 | 1 | MR. TOBEROFF:  Same instruction.  We made an |
| 10:28:07 | 2 | exception with respect to Warren Peary based on an |
| 10:28:12 | 3 | agreement that that exception would not constitute a |
| 10:28:14 | 4 | waiver of privilege.  If we had the same agreement |
| 10:28:16 | 5 | with respect to Laura Siegel, I will let her answer |
| 10:28:19 | 6 | that question.  Otherwise I have to instruct her not |
| 10:28:21 | 7 | to answer. |
| 10:28:24 | 8 | MR. PETROCELLI:  Well, you know, it's a bit |
| 10:28:29 | 9 | unprincipled to be selectively waiving, but for the |
| 10:28:35 | 10 | purpose of this question, I'll make that agreement. |
| 10:28:43 | 11 | MR. TOBEROFF:  You can answer. |
| 10:28:45 | 12 | THE WITNESS:  Could you -- |
| 10:28:46 | 13 | MR. TOBEROFF:  Read back the question? |
| 10:28:48 | 14 | THE WITNESS:  Yeah.  Would you ask the |
| 10:28:49 | 15 | question again, please? |
| 10:28:50 | 16 | MR. PETROCELLI:  Please repeat it. |
| 10:29:08 | 17 | (The record was read.) |
| 10:29:09 | 18 | THE WITNESS:  No. |
|  | 19 | BY MR. PETROCELLI: |
| 10:29:11 | 20 | Q.   Does the consent agreement that you signed |
| 10:29:16 | 21 | with the Shusters make any reference at all to |
| 10:29:22 | 22 | Superboy? |
| 10:29:24 | 23 | MR. TOBEROFF:  I instruct you not to answer |
| 10:29:27 | 24 | based on the consent agreement being held to be |
| 10:29:31 | 25 | privileged, not disclose the substance. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 43

| Time | Line | Text |
|---|---|---|
| 10:29:38 | 1 | MR. PETROCELLI:  And to be clear, with |
| 10:29:40 | 2 | respect to the last several questions on which you |
| 10:29:45 | 3 | have instructed, you decline to allow the witness to |
| 10:29:52 | 4 | answer even were I to agree that it would not |
| 10:29:55 | 5 | constitute a waiver of any privilege? |
| 10:29:59 | 6 | MR. TOBEROFF:  If you would agree -- in some |
| 10:30:02 | 7 | instances if you agree that it doesn't constitute a |
| 10:30:04 | 8 | waiver of privilege, I could allow her to answer |
| 10:30:10 | 9 | certain questions. |
| 10:30:11 | 10 | MR. PETROCELLI:  Okay. |
| 10:30:12 | 11 | MR. TOBEROFF:  But -- |
| 10:30:12 | 12 | MR. PETROCELLI:  I notice you didn't extend |
| 10:30:14 | 13 | the offer with respect to some of those questions, but |
| 10:30:16 | 14 | you did on the Superboy, so -- |
| 10:30:18 | 15 | MR. TOBEROFF:  You know, there are a number |
| 10:30:20 | 16 | of issues here surrounding, you know -- also, you |
| 10:30:25 | 17 | know, when the answer to something is no, you're not |
| 10:30:27 | 18 | revealing the content, so it wouldn't actually be |
| 10:30:30 | 19 | privileged, but I don't necessarily know how the |
| 10:30:34 | 20 | witnesses is going to answer. |
| 10:30:35 | 21 | MR. PETROCELLI:  Okay.  Well, with respect |
| 10:30:38 | 22 | to -- with respect to my question, then, about |
| 10:30:40 | 23 | arrangements that you have with the Shusters regarding |
| 10:30:43 | 24 | the sharing in any Superman recoveries or proceeds, I |
| 10:30:49 | 25 | would like the witness to answer, and I will agree |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 44

| | | |
|---|---|---|
| 10:30:52 | 1 | that her answer is not a waiver of any privilege. |
| 10:30:54 | 2 | MR. TOBEROFF: She already answered that |
| 10:30:55 | 3 | question. She said no. |
| 10:30:57 | 4 | MR. PETROCELLI: Not with respect to |
| 10:30:58 | 5 | Superman. She did with respect to Superboy. |
| 10:31:01 | 6 | MR. TOBEROFF: I thought you said -- |
| 10:31:02 | 7 | MR. PETROCELLI: Did I misspeak? |
| 10:31:03 | 8 | THE WITNESS: I kind of lost track for a |
| 10:31:06 | 9 | minute. |
| 10:31:06 | 10 | MR. PETROCELLI: Let me put it again for the |
| 10:31:08 | 11 | record, then. |
| 10:31:08 | 12 | MR. TOBEROFF: As to that question, we are |
| 10:31:11 | 13 | asserting privilege, and I'm instructing her not to |
| 10:31:13 | 14 | answer. |
| 10:31:13 | 15 | MR. PETROCELLI: Okay. So even though I |
| 10:31:15 | 16 | would agree that the answer would not affect the |
| 10:31:17 | 17 | waiver. |
| 10:31:18 | 18 | MR. TOBEROFF: Yes. |
| 10:31:19 | 19 | MR. PETROCELLI: Okay. |
| 10:31:51 | 20 | Q. And does the -- did you discuss with your |
| 10:31:55 | 21 | mother at any time whether or not to enter into an |
| 10:32:04 | 22 | agreement with the Shusters regarding the sharing of |
| 10:32:09 | 23 | recoveries or proceeds from Superman? |
| 10:32:18 | 24 | A. I believe we talked about it. |
| 10:32:21 | 25 | Q. Can you relate that discussion to me? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc