# EXHIBIT S

# PART 3 OF 7

LAURA SIEGEL LARSON - 7/22/2011

Page 100

| 12:05:25 | 1 | to that extent, you can answer the question. |
| 12:05:27 | 2 | THE WITNESS: Well, there's no -- I can never |
| 12:05:28 | 3 | say the word. What is it? Remuneration? There's |
| 12:05:33 | 4 | no -- you know what I'm talking about. There's no |
| 12:05:35 | 5 | additional percentage. |
|  | 6 | BY MR. PETROCELLI: |
| 12:05:38 | 7 | Q. To Mr. Toberoff. |
| 12:05:39 | 8 | A. To Mr. Toberoff. |
| 12:05:40 | 9 | Q. As a result of anything in the consent |
| 12:05:42 | 10 | agreement. |
| 12:05:43 | 11 | A. Correct. |
| 12:05:43 | 12 | Q. Correct? |
| 12:05:45 | 13 | A. Correct. |
| 12:05:46 | 14 | Q. Okay. And to your knowledge, would there be |
| 12:05:50 | 15 | any percentage -- in addition to the 40 to |
| 12:05:56 | 16 | Mr. Toberoff, would there be any percentage or any fee |
| 12:05:59 | 17 | payable to Ari Emanuel or any of his companies? |
| 12:06:05 | 18 | A. No. |
| 12:06:06 | 19 | Q. So to your knowledge, he would not |
| 12:06:08 | 20 | participate at all in any current transaction. |
| 12:06:12 | 21 | MR. TOBEROFF: Asked and answered. |
|  | 22 | BY MR. PETROCELLI: |
| 12:06:13 | 23 | Q. Is that correct? |
| 12:06:13 | 24 | A. Correct. |
| 12:06:18 | 25 | Q. Out of the 60 percent or other proceeds that |

EXHIBIT S
537

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 101

| | | |
|---|---|---|
| 12:06:22 | 1 | you would receive, putting aside Mr. Toberoff's 40 |
| 12:06:27 | 2 | percent, would you have to share any of those proceeds |
| 12:06:31 | 3 | with anyone else as a result of any contractual |
| 12:06:34 | 4 | arrangements that you currently have? |
| 12:06:36 | 5 | MR. TOBEROFF:  I instruct you not to answer |
| 12:06:38 | 6 | to the extent your answer would necessarily reveal the |
| 12:06:45 | 7 | substance of the consent agreement held to be |
| 12:06:48 | 8 | privileged. |
| 12:06:50 | 9 | MR. PETROCELLI:  May I just take one shot at |
| 12:06:51 | 10 | you on this, Marc, because what the court held was |
| 12:06:56 | 11 | that a particular document, at least on that record, |
| 12:07:03 | 12 | was not discoverable at this time.  But the court did |
| 12:07:07 | 13 | not hold that any and all financial arrangements or |
| 12:07:11 | 14 | contractual arrangements between the parties or |
| 12:07:18 | 15 | between witnesses, and these parties are also |
| 12:07:22 | 16 | witnesses, are barred from discovery.  It goes |
| 12:07:26 | 17 | directly, among other things, to motive and -- |
| 12:07:31 | 18 | MR. TOBEROFF:  I think -- |
| 12:07:32 | 19 | MR. PETROCELLI:  -- a host of other |
| 12:07:33 | 20 | credibility issues. |
| 12:07:34 | 21 | MR. TOBEROFF:  I think I stated my |
| 12:07:36 | 22 | instruction, and if I wasn't clear -- I thought it was |
| 12:07:38 | 23 | clear. |
| 12:07:39 | 24 | MR. PETROCELLI:  The existence of those |
| 12:07:41 | 25 | arrangements are relevant and would be discoverable in |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON – 7/22/2011

Page 102

| | | |
|---|---|---|
| 12:07:45 | 1 | any case. |
| 12:07:47 | 2 | MR. TOBEROFF:  I said she can't disclose to |
| 12:07:49 | 3 | the extent there is another agreement out there in |
| 12:07:54 | 4 | which she's sharing her proceeds.  Other than anything |
| 12:07:59 | 5 | that speaks to that in the consent agreement she can |
| 12:08:02 | 6 | testify. |
| 12:08:02 | 7 | MR. PETROCELLI:  I'm suggesting to you that |
| 12:08:03 | 8 | the court did not issue an order categorically ruling |
| 12:08:15 | 9 | that we are unable to discover financial or |
| 12:08:19 | 10 | contractual arrangements between the parties even if |
| 12:08:25 | 11 | reflected in the consent agreement. |
| 12:08:28 | 12 | MR. TOBEROFF:  I -- the court doesn't have to |
| 12:08:29 | 13 | use those exact words. |
| 12:08:31 | 14 | MR. PETROCELLI:  I didn't say it had to use |
| 12:08:32 | 15 | those exact words, but that's the essence of your |
| 12:08:34 | 16 | position. |
| 12:08:35 | 17 | MR. TOBEROFF:  I disagree.  There are |
| 12:08:37 | 18 | certain -- the court held that the contents of that |
| 12:08:40 | 19 | document are privileged, and that therefore, if your |
| 12:08:44 | 20 | question by necessity requires her to divulge -- or it |
| 12:08:48 | 21 | may or may not, but to the extent it requires her to |
| 12:08:52 | 22 | divulge contents of the consent agreement, I'm |
| 12:08:55 | 23 | instructing her not to answer. |
| 12:09:04 | 24 | MR. PETROCELLI:  Okay.  Well, to the |
| 12:09:04 | 25 | extent -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 103

| | | |
|---|---|---|
| 12:09:04 | 1 | MR. TOBEROFF:  Well, if she answers in the |
| 12:09:06 | 2 | negative where she's not implicating any of the |
| 12:09:10 | 3 | contents of the consent agreement, I'm -- there's no |
| 12:09:13 | 4 | intention, to the extent I let her answer questions, |
| 12:09:15 | 5 | to waive the privilege as to the consent agreement. |
| 12:09:17 | 6 | MR. PETROCELLI:  I understand that's your |
| 12:09:19 | 7 | position, but, you know, we will obviously have to |
| 12:09:23 | 8 | litigate this issue before the court. |
| 12:09:30 | 9 | MR. TOBEROFF:  In other words, I don't |
| 12:09:31 | 10 | believe that you can, if there's a ruling that the |
| 12:09:33 | 11 | document is privileged, you can get around the ruling |
| 12:09:36 | 12 | by asking questions that unearth the contents of the |
| 12:09:40 | 13 | privileged documents. |
| 12:09:41 | 14 | MR. PETROCELLI:  I think you've |
| 12:09:43 | 15 | misapprehended the court's ruling, and the record now |
| 12:09:46 | 16 | is different in any event.  But I think we've |
| 12:09:50 | 17 | discussed it sufficient to persuade me you're not |
| 12:09:54 | 18 | going to change your mind at this deposition.  So we |
| 12:09:56 | 19 | will just proceed. |
| 12:10:02 | 20 | Q.  Are you aware of any other piece of paper of |
| 12:10:10 | 21 | any kind other than the consent agreement document |
| 12:10:18 | 22 | that expresses or reflects any arrangement between the |
| 12:10:25 | 23 | Siegels and the Shusters regarding the sharing of |
| 12:10:29 | 24 | proceeds? |
| 12:10:30 | 25 | MR. TOBEROFF:  I instruct you not to answer |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 104

| | | |
|---|---|---|
| 12:10:33 | 1 | to the extent that question implies the contents of |
| 12:10:36 | 2 | the consent agreement, but you can -- you can answer |
| 12:10:39 | 3 | whether there's any other document other than -- |
| 12:10:42 | 4 | there's a document -- excluding the consent agreement, |
| 12:10:45 | 5 | is there another document that provides for you to |
| 12:10:48 | 6 | share proceeds, you can answer that question. |
| | 7 | BY MR. PETROCELLI: |
| 12:10:50 | 8 | Q.    Or that just discusses it or references or |
| 12:10:53 | 9 | mentions.  It's not that it has to be a contract in |
| 12:10:55 | 10 | and of itself.  Any piece of paper. |
| 12:10:59 | 11 | A.    I can't think of any. |
| 12:11:01 | 12 | Q.    Did you -- did you engage in any negotiations |
| 12:11:09 | 13 | with anyone regarding the terms of the consent |
| 12:11:16 | 14 | agreement? |
| 12:11:16 | 15 | A.    Could you -- could you explain that a little |
| 12:11:20 | 16 | bit better?  I don't quite understand what you mean. |
| 12:11:23 | 17 | Q.    Yeah. |
| 12:11:23 | 18 | Who created the terms in the consent |
| 12:11:28 | 19 | document? |
| 12:11:29 | 20 | MR. TOBEROFF:  Vague and ambiguous as to |
| 12:11:31 | 21 | "created." |
| | 22 | BY MR. PETROCELLI: |
| 12:11:32 | 23 | Q.    Who came up with them? |
| 12:11:35 | 24 | A.    You mean who -- who wrote the document? |
| 12:11:39 | 25 | Q.    Not who was the scrivener who put the words |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 105

| | | |
|---|---|---|
| 12:11:42 | 1 | on the paper, but who conceived and who came up with |
| 12:11:47 | 2 | the terms that are subsequently put down in the paper? |
| 12:11:53 | 3 | A.   I think it evolved out of conversations that |
| 12:11:58 | 4 | my mother and I had with Mr. Toberoff and perhaps |
| 12:12:04 | 5 | conversations that the Shusters had with Mr. Toberoff. |
| 12:12:11 | 6 | Q.   Okay.  And do you recall that you wanted to |
| 12:12:18 | 7 | have particular provisions as part of the arrangement |
| 12:12:23 | 8 | that the Shusters had a different view about and that |
| 12:12:28 | 9 | there was kind of a back-and-forth exchange? |
| 12:12:32 | 10 | A.   I -- the way I recall it, there was -- |
| 12:12:34 | 11 | MR. TOBEROFF:  Wait.  Wait.  Wait.  Wait. |
| 12:12:35 | 12 | I'm not going to allow questions as to -- the consent |
| 12:12:40 | 13 | agreement is held to be privileged.  There's a joint |
| 12:12:42 | 14 | interest privilege between my representation of the |
| 12:12:45 | 15 | Siegels and my representation of the Shusters, the |
| 12:12:50 | 16 | Shusters we'll call them, and I'm not going to allow |
| 12:12:53 | 17 | questions as to characterizing conversations that are |
| 12:13:03 | 18 | privileged. |
| 12:13:03 | 19 | MR. PETROCELLI:  Are you instructing not to |
| 12:13:05 | 20 | answer on that question? |
| 12:13:06 | 21 | MR. TOBEROFF:  Yes. |
| | 22 | BY MR. PETROCELLI: |
| 12:13:15 | 23 | Q.   Did you agree to share in any of your |
| 12:13:21 | 24 | proceeds for this -- the disposition or sale or |
| 12:13:24 | 25 | settlement of the Siegel rights with the Shusters? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 106

| | | |
|---|---|---|
| 12:13:31 | 1 | MR. TOBEROFF:  I instruct you not to answer |
| 12:13:32 | 2 | that question to the extent that the question |
| 12:13:35 | 3 | implicates the contents of the consent agreement. |
| | 4 | BY MR. PETROCELLI: |
| 12:13:38 | 5 | Q.   Right now do you have an agreement in place |
| 12:13:41 | 6 | to share with the Shusters with respect to any sale or |
| 12:13:45 | 7 | disposition or settlement regarding the Siegel rights? |
| 12:13:50 | 8 | MR. TOBEROFF:  Same -- asked and answered. |
| 12:13:51 | 9 | Same instruction based on attorney-client privilege, |
| 12:13:55 | 10 | joint interest. |
| 12:14:07 | 11 | MR. PETROCELLI:  You know what?  This is |
| 12:14:09 | 12 | probably a good time to break. |
| 12:14:10 | 13 | THE WITNESS:  Okay. |
| 12:14:11 | 14 | MR. PETROCELLI:  We'll make it like 30 |
| 12:14:13 | 15 | minutes or 45 minutes. |
| 12:14:15 | 16 | MR. TOBEROFF:  Same objection.  Same |
| 12:14:17 | 17 | instruction.  Just kidding. |
| 12:14:18 | 18 | MR. PETROCELLI:  You're on a roll, Marc.  By |
| 12:14:21 | 19 | the way, that's not much different than your other |
| 12:14:23 | 20 | instructions. |
| 12:14:24 | 21 | THE VIDEOGRAPHER:  Off the record.  The time |
| 12:14:25 | 22 | is 12:14. |
| 12:14:27 | 23 | (Lunch recess taken at 12:14 p.m.) |
| | 24 | |
| | 25 | |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 107

1          LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011

2                          1:29 P.M.

3

12:15:00    4          (Whereupon, Ms. Seto was not present.)

13:29:24    5          THE VIDEOGRAPHER:  We are back on the record

13:29:26    6    at 1:29.

13:29:27    7                  EXAMINATION (Resumed)

8    BY MR. PETROCELLI:

13:29:27    9      Q.   Ms. Siegel, we took a longer break than I had

13:29:32   10    expected only because I understand and was told that

13:29:34   11    you needed to rest, and again, that's fine, and if you

13:29:39   12    continue to need to rest, just let us know.  All

13:29:41   13    right?

13:29:42   14      A.   Thank you.

13:29:43   15      Q.   And we did find an office here for you that

13:29:48   16    had a couch to accommodate you.

13:29:50   17      A.   Good.

13:29:51   18      Q.   Okay.  Sorry we didn't have room service, but

13:29:55   19    maybe -- maybe next time.

13:29:56   20      A.   Not necessary.

13:29:58   21      Q.   Okay.  So what I would like to do is I want

13:30:06   22    to go back to a point in time when for point of

13:30:14   23    reference you had been working with the lawyers at

13:30:23   24    Gang Tyre in conducting negotiations with Warner Bros.

13:30:26   25    and DC Comics, and for point of reference, let me show

EXHIBIT S
544
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 108

| | | |
|---|---|---|
| 13:30:32 | 1 | you Exhibit 48, which is a letter dated October 19, |
| 13:30:40 | 2 | 2001, from Kevin Marks to John Schulman. |
| | 3 | (Whereupon, Plaintiff's Exhibit 48 |
| 13:30:47 | 4 | was placed before the witness.) |
| | 5 | BY MR. PETROCELLI: |
| 13:30:48 | 6 | Q. And you have already testified about this |
| 13:30:50 | 7 | letter, I believe, and I'm not going to go into it, |
| 13:30:54 | 8 | but I just want to orient you regarding the time |
| 13:30:59 | 9 | period. |
| 13:31:00 | 10 | A. Okay. |
| 13:31:00 | 11 | Q. So you recall that in or about October of |
| 13:31:07 | 12 | 2001 this correspondence occurred regarding your |
| 13:31:16 | 13 | negotiations with Superman -- with Warner Bros. |
| 13:31:20 | 14 | regarding Superman and receiving a copy of your |
| 13:31:24 | 15 | lawyer's letter to Mr. Schulman that's been marked as |
| 13:31:27 | 16 | Exhibit 48; right? |
| 13:31:28 | 17 | A. Yes. |
| 13:31:30 | 18 | Q. Indicating that your family had accepted DC |
| 13:31:35 | 19 | Comics' offer based on the terms set forth in the |
| 13:31:37 | 20 | document; correct? |
| 13:31:39 | 21 | A. Yeah, it was a provisional acceptance. |
| 13:31:42 | 22 | Q. Okay. And I don't want to go through that. |
| 13:31:45 | 23 | The word "provisional" isn't in there, but you |
| 13:31:49 | 24 | testified to that in your previous deposition. |
| 13:31:51 | 25 | Now, as of this point in time, October 19, |

**EXHIBIT S**
**545**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 109

| 13:31:55 | 1 | 2001, is it fair to say that through different lawyers |
| 13:32:00 | 2 | you had been in discussions and negotiations with |
| 13:32:04 | 3 | Warner Bros. and DC Comics for a number of years? |
| 13:32:08 | 4 | Correct? |
| 13:32:08 | 5 | A.    A long time. |
| 13:32:11 | 6 | Q.    Going back to when -- even before the notices |
| 13:32:14 | 7 | of termination were served in 1997; right? |
| 13:32:18 | 8 | A.    No.  There were no negotiations before 1997. |
| 13:32:21 | 9 | Q.    But shortly -- but upon issuance of the |
| 13:32:24 | 10 | notice of termination, is that when the negotiations |
| 13:32:27 | 11 | began initially with Arthur Levine?  Correct? |
| 13:32:30 | 12 | A.    Yes, sometime during 1997. |
| 13:32:33 | 13 | Q.    Okay.  And they had been going on all the way |
| 13:32:36 | 14 | through October 19, 2001; correct? |
| 13:32:39 | 15 | A.    Yes. |
| 13:32:40 | 16 | Q.    Okay.  And they actually continued after |
| 13:32:44 | 17 | October 19, 2001.  This is not the last document in |
| 13:32:47 | 18 | the exchange; correct? |
| 13:32:49 | 19 | A.    Correct. |
| 13:32:51 | 20 | Q.    And you formally -- withdrawn. |
| 13:32:55 | 21 | You notified DC Comics at some point in time |
| 13:32:59 | 22 | that you were cutting off any further negotiations; |
| 13:33:03 | 23 | correct? |
| 13:33:03 | 24 | A.    Correct. |
| 13:33:04 | 25 | Q.    And you did so in writing; correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 110

| | | |
|---|---|---|
| 13:33:05 | 1 | A.    Correct. |
| 13:33:07 | 2 | Q.    And you notified DC Comics for the first time |
| 13:33:10 | 3 | that you were cutting off negotiations in a document |
| 13:33:13 | 4 | sent to them in October, 2001; is that correct? |
| 13:33:30 | 5 | A.    No. |
| 13:33:30 | 6 | Q.    Excuse me.  Let me withdraw the question. |
| 13:33:33 | 7 | First of all, let me find the document so I'm |
| 13:33:35 | 8 | not guessing on the dates.  I'm a year off. |
| 13:33:54 | 9 | The first time that you notified DC Comics or |
| 13:34:00 | 10 | Warner Bros. that you were cutting off negotiations |
| 13:34:04 | 11 | towards an agreement with him to sell your Superman |
| 13:34:07 | 12 | rights was when you sent your letter dated September |
| 13:34:11 | 13 | 21, 2002, that you signed together with your mother; |
| 13:34:15 | 14 | correct? |
| 13:34:16 | 15 | A.    Yes, that's correct. |
| 13:34:17 | 16 | Q.    Let me show you a copy of that letter.  That |
| 13:34:21 | 17 | is Exhibit 56. |
| | 18 | (Whereupon, Plaintiff's Exhibit 56 |
| 13:34:45 | 19 | was marked for identification.) |
| 13:34:46 | 20 | MR. TOBEROFF:  Did you say -- did you date |
| 13:34:47 | 21 | this letter in the last question? |
| 13:34:50 | 22 | MR. PETROCELLI:  Yes, I'll follow up on it. |
| 13:34:52 | 23 | The date was in the question, but it's also in the |
| 13:34:56 | 24 | exhibit number.  We have an exhibit number.  We have a |
| 13:35:02 | 25 | specific document, and the document is dated September |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 111

| | | |
|---|---|---|
| 13:35:04 | 1 | 21, 2002. So let me just -- |
| 13:35:07 | 2 | MR. TOBEROFF: I thought you had said 2001. |
| 13:35:10 | 3 | Maybe I heard it wrong. |
| 13:35:13 | 4 | MR. PETROCELLI: Okay. Let's start all over |
| | 5 | again. |
| 13:35:13 | 6 | What's the exhibit number? |
| 13:35:15 | 7 | MR. TOKORO: 56. |
| | 8 | BY MR. PETROCELLI: |
| 13:35:15 | 9 | Q. You have Exhibit 56 in front of you, which is |
| 13:35:17 | 10 | the letter that you and your mother sent to DC Comics |
| 13:35:21 | 11 | dated September 21, 2002, when you for the first time |
| 13:35:25 | 12 | cut off negotiations with them; correct? |
| 13:35:27 | 13 | A. Yes. |
| 13:35:28 | 14 | Q. Now, when -- did you write this letter |
| 13:35:33 | 15 | yourself? |
| 13:35:34 | 16 | A. No. |
| 13:35:35 | 17 | Q. Who wrote it? |
| 13:35:36 | 18 | A. My mother with some input from me. |
| 13:35:40 | 19 | Q. Well, your mother didn't type. |
| 13:35:42 | 20 | A. Well, she wrote it. She wrote it out in |
| 13:35:46 | 21 | longhand. |
| 13:35:46 | 22 | Q. How do you know? |
| 13:35:47 | 23 | A. How do I know? |
| 13:35:48 | 24 | Q. Yeah. |
| 13:35:50 | 25 | A. She gave it to me. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 112

| | | |
|---|---|---|
| 13:35:50 | 1 | Q. Where is the -- you have the paper that she |
| 13:35:55 | 2 | gave you? |
| 13:35:56 | 3 | A. I don't know. |
| 13:35:57 | 4 | Q. What did she write it on? |
| 13:36:04 | 5 | A. A piece of paper this big. Sometimes she |
| 13:36:07 | 6 | would write -- I don't remember this specific one. |
| 13:36:10 | 7 | Sometimes she would write on a yellow pad. Sometimes |
| 13:36:13 | 8 | she would write on a white pad. |
| 13:36:15 | 9 | Q. Did you type it? |
| 13:36:17 | 10 | A. Yes. |
| 13:36:17 | 11 | Q. Where did you type it? |
| 13:36:19 | 12 | A. I typed it on my computer. |
| 13:36:21 | 13 | Q. Your computer at your home? |
| 13:36:23 | 14 | A. Yes. |
| 13:36:24 | 15 | Q. That was which computer? The PC that you |
| 13:36:30 | 16 | said you had? |
| 13:36:30 | 17 | A. Yes. |
| 13:36:34 | 18 | Q. Did you show this letter to anybody after |
| 13:36:38 | 19 | typing it before it went out? |
| 13:36:40 | 20 | A. No. Just my mother and I saw it. |
| 13:36:42 | 21 | Q. Well, I'm curious about that. You had |
| 13:36:46 | 22 | Mr. Levine. You had Mr. -- what's George's last name? |
| 13:36:52 | 23 | A. Zadrozny. |
| 13:36:53 | 24 | Q. Zadrozny. |
| 13:36:54 | 25 | A. You pronounced it correctly. |

**Merrill   Corporation   -   Los Angeles**

**EXHIBIT S**
**549**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 113

| | | |
|---|---|---|
| 13:36:56 | 1 | Q.  You had Mr. Zadrozny.  You didn't have him |
| 13:36:59 | 2 | take a look at this before it went out? |
| 13:37:01 | 3 | A.  I don't recall us having them look at it. |
| 13:37:04 | 4 | Q.  And you had certainly been in touch with |
| 13:37:06 | 5 | Mr. Toberoff by this time, September 21, 2002. |
| 13:37:14 | 6 | A.  We had only learned of his existence at a |
| 13:37:23 | 7 | point shortly before this, but he -- you know, he |
| 13:37:29 | 8 | didn't see this, if that's what you're asking me. |
| 13:37:33 | 9 | Q.  How do you know he didn't see it?  You didn't |
| 13:37:35 | 10 | show it to him.  Is that what you're saying? |
| 13:37:37 | 11 | A.  Correct. |
| 13:37:44 | 12 | Q.  You said it was shortly before this letter, |
| 13:37:48 | 13 | Exhibit 56, which is dated September 21, 2002, that |
| 13:37:52 | 14 | you first interacted with Mr. Toberoff? |
| 13:37:57 | 15 | MR. TOBEROFF:  Misstates her testimony. |
| | 16 | BY MR. PETROCELLI: |
| 13:37:59 | 17 | Q.  That you first interacted with Mr. Toberoff? |
| 13:38:02 | 18 | MR. TOBEROFF:  Misstates the testimony. |
| 13:38:03 | 19 | THE WITNESS:  No, that we were first informed |
| 13:38:06 | 20 | of him. |
| | 21 | BY MR. PETROCELLI: |
| 13:38:08 | 22 | Q.  Is it your testimony that you never spoke to |
| 13:38:13 | 23 | Mr. Toberoff prior to September 21, 2002? |
| 13:38:17 | 24 | A.  I don't recall speaking with him before then. |
| 13:38:19 | 25 | Q.  Can you say so with certainty? |

EXHIBIT S
550

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 114

| | | |
|---|---|---|
| 13:38:23 | 1 | A.   I can't say so with absolute certainty. |
| 13:38:27 | 2 | Q.   Okay.  And do you have any way of refreshing |
| 13:38:33 | 3 | your recollection as to the exact date that you first |
| 13:38:36 | 4 | spoke to Mr. Toberoff? |
| 13:38:41 | 5 | A.   Well, my mother first spoke to Mr. Toberoff, |
| 13:38:46 | 6 | so -- |
| 13:38:46 | 7 | Q.   Before you did? |
| 13:38:47 | 8 | A.   Yes. |
| 13:38:50 | 9 | Q.   Do you know with certainty the date your |
| 13:38:53 | 10 | mother first spoke to Mr. Toberoff? |
| 13:38:54 | 11 | A.   No, I don't. |
| 13:38:56 | 12 | Q.   Do you know whether it was -- well, it was |
| 13:39:02 | 13 | certainly before September 21, 2002; correct? |
| 13:39:05 | 14 | A.   No.  I said I don't know when it was. |
| 13:39:08 | 15 | Q.   Nor do you know when your mother first spoke |
| 13:39:12 | 16 | with Mr. Toberoff; is that correct? |
| 13:39:13 | 17 | A.   Yes.  I don't know when she spoke to him. |
| 13:39:16 | 18 | Q.   Okay.  And you have no way of dating when |
| 13:39:19 | 19 | your mother first spoke with Mr. Toberoff just like |
| 13:39:21 | 20 | you don't have any way of dating when you did; |
| 13:39:23 | 21 | correct? |
| 13:39:23 | 22 | A.   Yes. |
| 13:39:24 | 23 | Q.   Okay.  Did you keep a calendar of |
| 13:39:29 | 24 | appointments, you know, like a daily reminder book or |
| 13:39:32 | 25 | anything else in which you made appointments? |

EXHIBIT S
551

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 115

| 13:39:34 | 1 | A. No, not really. |
| 13:39:35 | 2 | Q. Or did you do so on your computer? |
| 13:39:39 | 3 | A. No. |
| 13:39:39 | 4 | Q. Did your mother? |
| 13:39:40 | 5 | A. No. |
| 13:39:41 | 6 | Q. Not on the computer, but let's say some kind |
| 13:39:44 | 7 | of appointment book? Did she keep anything like that? |
| 13:39:46 | 8 | A. Not that I'm aware of. |
| 13:39:59 | 9 | Q. You had -- by the way, when your -- how did |
| 13:40:05 | 10 | you find out about your mother's first contact with |
| 13:40:11 | 11 | Mr. Toberoff? |
| 13:40:11 | 12 | A. Well, she told me. |
| 13:40:13 | 13 | Q. Did she tell you before she spoke with him or |
| 13:40:16 | 14 | after she spoke with him? |
| 13:40:18 | 15 | A. No. She was -- she -- we had been looking |
| 13:40:23 | 16 | for attorneys, and we had been talking to, you know, |
| 13:40:27 | 17 | different people. I had been doing research to try |
| 13:40:29 | 18 | and -- you know, like the Gerry Spence research that I |
| 13:40:33 | 19 | was doing. We were -- but it wasn't an easy process |
| 13:40:36 | 20 | trying to find, you know, an attorney that would be |
| 13:40:40 | 21 | willing to on a contingency fee -- excuse me -- on a |
| 13:40:46 | 22 | contingency fee that did not have a conflict with |
| 13:40:52 | 23 | Warner Bros. to, you know, to find additional |
| 13:40:57 | 24 | representation. |
| 13:40:58 | 25 | Q. Did you talk to Gerry Spence or your mother |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 116

| | | |
|---|---|---|
| 13:41:01 | 1 | talk to Gerry Spence or communicate with Gerry Spence |
| 13:41:03 | 2 | in some way in 2002? |
| 13:41:08 | 3 | A.   Yes. |
| 13:41:08 | 4 | Q.   Is that the only time you communicated with |
| 13:41:10 | 5 | him? |
| 13:41:10 | 6 | A.   Yes, because he appeared to have a conflict |
| 13:41:12 | 7 | of interest. |
| 13:41:13 | 8 | Q.   And that was the end of it? |
| 13:41:15 | 9 | A.   Yes. |
| 13:41:16 | 10 | Q.   Okay.  The -- did you -- your mother found |
| 13:41:35 | 11 | out about Mr. Toberoff from whom? |
| 13:41:36 | 12 | A.   From Jean Peavy. |
| 13:41:38 | 13 | Q.   And then she informed you, your mother did. |
| 13:41:44 | 14 | A.   Yes. |
| 13:41:44 | 15 | Q.   You were not on the call with -- |
| 13:41:46 | 16 | A.   No. |
| 13:41:46 | 17 | Q.   Okay.  And do you know from the time she told |
| 13:41:51 | 18 | you about Mr. Toberoff how long it was thereafter that |
| 13:41:59 | 19 | she met with Mr. Toberoff or spoke with him, "she" |
| 13:42:02 | 20 | being your mother? |
| 13:42:03 | 21 | A.   I don't really know. |
| 13:42:04 | 22 | Q.   In other words, did your mother come to you |
| 13:42:07 | 23 | and say, "Hey, there's some person named Marc Toberoff |
| 13:42:10 | 24 | that Jean Peavy told me about.  I would like you to do |
| 13:42:12 | 25 | some research into him or check into him"?  Did she |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 117

| | | |
|---|---|---|
| 13:42:16 | 1 | have that kind of conversation with you? |
| 13:42:18 | 2 | A.    She said, "It sounds interesting.  You know, |
| 13:42:21 | 3 | we should probably look into this some more." |
| 13:42:24 | 4 | Q.    And what did you do to look into it? |
| 13:42:32 | 5 | A.    I'm trying to remember.  I think -- I think I |
| 13:42:37 | 6 | searched his name on the Internet, you know, to see if |
| 13:42:41 | 7 | there was any information on him. |
| 13:42:43 | 8 | Q.   What did you find out from the Internet |
| 13:42:47 | 9 | search? |
| 13:42:47 | 10 | A.    I -- it's hard to remember.  It's a long time |
| 13:42:50 | 11 | ago, but I think that there was like a press article |
| 13:42:55 | 12 | or something about his involvement in some |
| 13:42:59 | 13 | intellectual property rights cases in which he was |
| 13:43:02 | 14 | protecting the interests of authors and creators. |
| 13:43:06 | 15 | Q.    Did you print that material? |
| 13:43:08 | 16 | A.    I did at the time, yeah. |
| 13:43:09 | 17 | Q.    And did you keep a copy of it? |
| 13:43:12 | 18 | A.    I did at that time, yeah, and I shared it |
| 13:43:16 | 19 | with my mother. |
| 13:43:18 | 20 | Q.    Do you still have it in your papers at home? |
| 13:43:20 | 21 | A.    I doubt it -- |
| 13:43:22 | 22 | Q.    You kept -- |
| 13:43:23 | 23 | A.    -- because I've been -- |
| 13:43:24 | 24 | Q.    -- the Gerry Spence material, but you didn't |
| 13:43:27 | 25 | keep the Marc Toberoff material? |

**EXHIBIT S**
**554**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 118

| | | |
|---|---|---|
| 13:43:27 | 1 | A.    I didn't keep the Gerry Spence material.  My |
| 13:43:31 | 2 | mom did.  It was among her things. |
| 13:43:35 | 3 | Q.    But you gave it to her because you downloaded |
| 13:43:35 | 4 | it from the computer; right? |
| 13:43:37 | 5 | A.    Yes, yes. |
| 13:43:37 | 6 | Q.    And did you find the materials that you |
| 13:43:38 | 7 | downloaded about Mr. Toberoff when you went through |
| 13:43:42 | 8 | your mom's files? |
| 13:43:44 | 9 | A.    I have not found it. |
| 13:43:46 | 10 | Q.    Have you gone through everything yet? |
| 13:43:49 | 11 | A.    No. |
| 13:43:49 | 12 | Q.    Okay.  You're still working through it? |
| 13:43:50 | 13 | A.    Yes. |
| 13:43:54 | 14 | Q.    Other than the Internet search, did you do |
| 13:43:57 | 15 | anything else to research Mr. Toberoff? |
| 13:44:00 | 16 | A.    Well, my mother did. |
| 13:44:02 | 17 | Q.    How do you know that? |
| 13:44:03 | 18 | A.    She told me. |
| 13:44:05 | 19 | Q.    And what did she tell you? |
| 13:44:06 | 20 | A.    She told me that she -- and this was at the |
| 13:44:11 | 21 | point when she called Mr. Toberoff and said that she |
| 13:44:15 | 22 | had gotten his name from Jean Peavy and she was |
| 13:44:19 | 23 | interested in knowing, you know, who he had |
| 13:44:22 | 24 | represented and, you know, what his attitude was |
| 13:44:26 | 25 | towards -- towards intellectual property.  So they had |

**Merrill    Corporation    -    Los Angeles**

**EXHIBIT S**
**555**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 119

| | | |
|---|---|---|
| 13:44:30 | 1 | a conversation. |
| 13:44:30 | 2 | Q.   You're now reporting what your mother told |
| 13:44:33 | 3 | you about her first conversation with Mr. Toberoff; |
| 13:44:35 | 4 | right? |
| 13:44:35 | 5 | A.   Yes. |
| 13:44:36 | 6 | Q.   But before that first conversation, before |
| 13:44:39 | 7 | Mr. Toberoff -- before she called Mr. Toberoff -- |
| 13:44:44 | 8 | well, let me ask you that question.  We lawyers |
| 13:44:48 | 9 | shouldn't assume anything, so forgive me for having to |
| 13:44:51 | 10 | ask so many questions. |
| 13:44:53 | 11 | Did she call Mr. Toberoff first, or did he |
| 13:44:57 | 12 | call her based on, you know, some reference that he |
| 13:45:01 | 13 | had been given? |
| 13:45:02 | 14 | A.   No.  Jean Peavy gave his phone number to my |
| 13:45:04 | 15 | mom, and my mom called him. |
| 13:45:07 | 16 | Q.   Okay.  And before your mom called |
| 13:45:10 | 17 | Mr. Toberoff, you had already given your mom the |
| 13:45:14 | 18 | downloaded commuter material about him? |
| 13:45:16 | 19 | A.   No.  No. |
| 13:45:17 | 20 | Q.   No.  So the sequence of events was Jean Peavy |
| 13:45:21 | 21 | told your mother about Mr. Toberoff, and without |
| 13:45:23 | 22 | consulting you, your mother then called Mr. Toberoff |
| 13:45:27 | 23 | and then reported the conversation to you? |
| 13:45:29 | 24 | A.   No.  I think -- well, you know, I'm trying to |
| 13:45:32 | 25 | remember it.  I think -- I think she had the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 120

| | | |
|---|---|---|
| 13:45:36 | 1 | conversation with Jean. She told me about it, and |
| 13:45:40 | 2 | then she said, you know, "We should be looking" -- "We |
| 13:45:44 | 3 | should look into this," and probably around that time |
| 13:45:48 | 4 | I started looking up things on the Internet, and she |
| 13:45:51 | 5 | placed a call to him because she had gotten his phone |
| 13:45:54 | 6 | number from Jean. |
| 13:45:56 | 7 | Q.    And you don't know whether you had given her |
| 13:45:59 | 8 | the Internet materials before or after her phone call |
| 13:46:03 | 9 | with Mr. Toberoff? |
| 13:46:05 | 10 | A.    No, I don't remember. |
| 13:46:06 | 11 | Q.    Okay. And so after the first phone call that |
| 13:46:10 | 12 | she reported to you -- |
| 13:46:10 | 13 | A.    Um-hum. |
| 13:46:11 | 14 | Q.    -- what was the next thing that happened? |
| 13:46:13 | 15 | A.    Well, she had asked for him to -- |
| 13:46:15 | 16 | MR. TOBEROFF:    Okay. I just want to say |
| 13:46:17 | 17 | that -- |
| 13:46:17 | 18 | THE WITNESS:    Yeah. |
| 13:46:18 | 19 | MR. TOBEROFF:    -- when it comes to general |
| 13:46:22 | 20 | subject matter of a conversation in these |
| 13:46:25 | 21 | conversations, you can disclose it, but I don't want |
| 13:46:28 | 22 | you to disclose what your mother said I said to her or |
| 13:46:31 | 23 | she said to me -- |
| 13:46:33 | 24 | THE WITNESS:    Okay. |
| 13:46:34 | 25 | MR. TOBEROFF:    -- because that would be |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 121

| | | |
|---|---|---|
| 13:46:35 | 1 | privileged. |
| 13:46:36 | 2 | MR. PETROCELLI: Well, I disagree. |
| 13:46:38 | 3 | MR. TOBEROFF: Even if she had not yet |
| 13:46:38 | 4 | retained me. |
| 13:46:39 | 5 | MR. PETROCELLI: But we're going to have to |
| 13:46:40 | 6 | make a record here. So if your lawyer instructs you |
| 13:46:45 | 7 | not to answer, that's one thing, but I don't want you |
| 13:46:47 | 8 | to answer my questions in a misleading way. So I'll |
| 13:46:50 | 9 | just ask the questions, and either you'll answer or he |
| 13:46:53 | 10 | will instruct you not to answer. |
| 13:46:54 | 11 | THE WITNESS: Um-hum. Um-hum. |
| 13:46:56 | 12 | MR. PETROCELLI: Okay. |
| 13:46:56 | 13 | Q. So I think my question was after this initial |
| 13:46:59 | 14 | phone call and you downloaded the material on |
| 13:47:08 | 15 | Mr. Toberoff, what was the next step in terms of any |
| 13:47:11 | 16 | further contacts with Mr. Toberoff? |
| 13:47:13 | 17 | A. Well, my mother wanted references, you know, |
| 13:47:17 | 18 | of other people that he had represented so that she |
| 13:47:21 | 19 | could, you know, interview them and get a feel for |
| 13:47:25 | 20 | what they thought of him and his work. |
| 13:47:30 | 21 | Q. Your mother wanted references? |
| 13:47:31 | 22 | A. Yes. |
| 13:47:32 | 23 | Q. And then she asked you to go and get them? |
| 13:47:36 | 24 | A. No. She obtained them. |
| 13:47:38 | 25 | Q. How do you know that? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 122

| | | |
|---|---|---|
| 13:47:41 | 1 | By the way, I have to keep asking you that |
| 13:47:43 | 2 | because your mom is not here to testify. |
| 13:47:45 | 3 | A.    I understand. |
| 13:47:46 | 4 | Q.    Okay. |
| 13:47:47 | 5 | A.    No.  She gave me a copy of the printout of |
| 13:47:50 | 6 | the names and phone numbers of the people. |
| 13:47:53 | 7 | Q.    Do you still have a copy of the printout? |
| 13:47:55 | 8 | A.    I don't know. |
| 13:47:57 | 9 | Q.    Okay.  When you say a printout, what do you |
| 13:48:02 | 10 | mean by that? |
| 13:48:03 | 11 | A.    Well, I remember it was typed, but, you know, |
| 13:48:07 | 12 | I don't -- I don't know whether it came by -- by |
| 13:48:11 | 13 | e-mail or whether it was mailed to her.  That part I |
| 13:48:14 | 14 | don't remember. |
| 13:48:14 | 15 | Q.    How would it have come -- it wouldn't have |
| 13:48:17 | 16 | come from your mother to you by e-mail; right? |
| 13:48:20 | 17 | A.    No, that's true.  That's true, because she |
| 13:48:22 | 18 | didn't get it by e-mail.  So she must have -- it could |
| 13:48:26 | 19 | have been faxed to her because she had a fax machine, |
| 13:48:29 | 20 | so it was either faxed to her or it was mailed to her. |
| 13:48:32 | 21 | Q.    And do you know who gave it to her, this |
| 13:48:35 | 22 | list? |
| 13:48:35 | 23 | A.    Mr. Toberoff. |
| 13:48:37 | 24 | Q.    I see.  Do you know any of the names on the |
| 13:48:44 | 25 | list? |

**EXHIBIT S**
**559**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 123

| | | |
|---|---|---|
| 13:48:44 | 1 | A.   Oh, I can't remember exactly. |
| 13:48:49 | 2 | Q.   Did you contact any of the people? |
| 13:48:51 | 3 | A.   My mother did.  My mother -- I was very |
| 13:48:55 | 4 | involved in something at that time, so -- |
| 13:48:57 | 5 | Q.   That was your divorce? |
| 13:49:00 | 6 | A.   It -- yeah. |
| 13:49:00 | 7 | Q.   Your divorce was around 2000; right? |
| 13:49:03 | 8 | A.   No.  We separated in 2000, and I was heavily |
| 13:49:05 | 9 | involved in divorce matters until -- it was either -- |
| 13:49:08 | 10 | I think it was 2005 when things finally wrapped up. |
| 13:49:13 | 11 | Q.   When you said you were involved with |
| 13:49:16 | 12 | something in 2002 around this time period -- |
| 13:49:19 | 13 | A.   Um-hum |
| 13:49:19 | 14 | Q.   -- that we're discussing, what were you |
| 13:49:22 | 15 | involved in? |
| 13:49:22 | 16 | A.   It could very well have been my divorce, or |
| 13:49:25 | 17 | it could have been illness on my part because my |
| 13:49:29 | 18 | multiple sclerosis and other illnesses that I have. |
| 13:49:32 | 19 | Q.   When -- |
| 13:49:32 | 20 | A.   But she took the initiative to make the phone |
| 13:49:35 | 21 | calls, and this is what I'm saying. |
| 13:49:37 | 22 | Q.   Okay.  And she contacted the references?  You |
| 13:49:40 | 23 | didn't contact any of them; is that right? |
| 13:49:44 | 24 | A.   I think I did contact one of them. |
| 13:49:46 | 25 | Q.   Who did you contact? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 124

| | | |
|---|---|---|
| 13:49:54 | 1 | A.    I don't know.  Maybe if I have some more time |
| 13:49:56 | 2 | to think about it, maybe it will come back to me. |
| 13:49:58 | 3 | Q.    You'll -- |
| 13:49:59 | 4 | A.    I'll think about it. |
| 13:50:01 | 5 | Q.    You'll let me know.  Okay? |
| 13:50:02 | 6 | A.    Yeah.  Yeah.  I mean I'll try and remember. |
| 13:50:12 | 7 | Q.    Do you remember any of the names your mom |
| 13:50:19 | 8 | contacted? |
| 13:50:21 | 9 | A.    Right here today at this minute, no.  I have |
| 13:50:28 | 10 | a mental picture of the page and with things typed on |
| 13:50:32 | 11 | it, but it's not clear enough for me to focus on, you |
| 13:50:35 | 12 | know, the names that were on it. |
| 13:50:37 | 13 | Q.    And you think it was a page that came from |
| 13:50:40 | 14 | Mr. Toberoff's office? |
| 13:50:40 | 15 | A.    Yes. |
| 13:50:42 | 16 | Q.    And it had several names on it? |
| 13:50:45 | 17 | A.    I -- I think it had at least three.  There |
| 13:50:48 | 18 | may have been more. |
| 13:51:00 | 19 | Q.    When is the last time you saw that piece of |
| 13:51:03 | 20 | paper? |
| 13:51:03 | 21 | A.    It's been a number of years. |
| 13:51:10 | 22 | Q.    After you and/or your mom made the phone |
| 13:51:16 | 23 | calls, did you and she discuss what you had learned? |
| 13:51:19 | 24 | A.    Yes. |
| 13:51:20 | 25 | Q.    Okay.  And you received, I assume, favorable |

EXHIBIT S
561

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 125

| 13:51:25 | 1 | reports? |
| 13:51:25 | 2 | A.   Yes.   She -- very favorable. |
| 13:51:29 | 3 | Q.   What was the next thing that then happened in |
| 13:51:32 | 4 | terms of contacting Mr. Toberoff? |
| 13:51:39 | 5 | A.   I think -- I think my mother said, you know, |
| 13:51:46 | 6 | "Maybe we should -- we should talk to him in person |
| 13:51:49 | 7 | and, you know, see if we like him." |
| 13:51:54 | 8 | Q.   And did that happen? |
| 13:51:55 | 9 | A.   Yes. |
| 13:51:56 | 10 | Q.   Who met with him? |
| 13:51:58 | 11 | A.   My mother and I. |
| 13:52:02 | 12 | Q.   And anyone else present? |
| 13:52:04 | 13 | A.   No. |
| 13:52:04 | 14 | Q.   Just you, your mother, and Mr. Toberoff? |
| 13:52:07 | 15 | A.   That's right. |
| 13:52:07 | 16 | Q.   And where was that meeting? |
| 13:52:09 | 17 | A.   It was in Beverly Hills. |
| 13:52:12 | 18 | Q.   At his -- |
| 13:52:12 | 19 | A.   An office in Beverly Hills. |
| 13:52:14 | 20 | Q.   His office? |
| 13:52:17 | 21 | A.   That first meeting I think we went to a |
| 13:52:20 | 22 | restaurant.   But -- no, no, no.   I think we met at the |
| 13:52:24 | 23 | Endeavor offices in a conference room. |
| 13:52:28 | 24 | Q.   Was Mr. Emanuel present at all? |
| 13:52:31 | 25 | A.   No, he was not. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 126

| | | |
|---|---|---|
| 13:52:31 | 1 | Q.    Did you -- when you were at the offices of |
| 13:52:37 | 2 | Endeavor meeting Mr. Toberoff, that was your first |
| 13:52:39 | 3 | time meeting with him; right? |
| 13:52:40 | 4 | A.    That's right. |
| 13:52:41 | 5 | Q.    And you had heard of Mr. Emanuel by then; |
| 13:52:55 | 6 | correct? |
| 13:52:55 | 7 | A.    No, we had not. |
| 13:52:57 | 8 | Q.    Did you ask why -- |
| 13:52:58 | 9 | A.    Oh, wait, wait, wait.  I'm sorry.  Yes, we |
| 13:53:00 | 10 | did. |
| 13:53:00 | 11 | Q.    Yeah, you were meeting in his firm; right? |
| 13:53:02 | 12 | A.    Yeah, but it wasn't -- he wasn't a part of |
| 13:53:05 | 13 | the discussion. |
| 13:53:08 | 14 | Q.    Did you ask why you were meeting in his |
| 13:53:11 | 15 | office? |
| 13:53:11 | 16 | A.    I think -- |
| 13:53:14 | 17 | MR. TOBEROFF:  Vague and ambiguous. |
| 13:53:16 | 18 | THE WITNESS:  We weren't meeting in his |
| 13:53:18 | 19 | office.  We were meeting in a conference room, and, |
| 13:53:22 | 20 | you know, there was no meeting with Mr. Emanuel. |
| | 21 | BY MR. PETROCELLI: |
| 13:53:28 | 22 | Q.    You said you had heard of him by then. |
| 13:53:31 | 23 | A.    I'm sorry.  Had heard of Mr. -- |
| 13:53:32 | 24 | Q.    Thank you.  You said you had heard of |
| 13:53:35 | 25 | Mr. Emanuel -- |

Merrill   Corporation   -   Los Angeles

EXHIBIT S
563

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 127

| | | |
|---|---|---|
| 13:53:35 | 1 | A.    Okay. |
| 13:53:35 | 2 | Q.    -- as of the date that you were meeting with |
| 13:53:38 | 3 | Mr. Toberoff and your mother in the conference room at |
| 13:53:41 | 4 | Endeavor. |
| 13:53:41 | 5 | A.    Yes. |
| 13:53:42 | 6 | Q.    Okay.  That was on -- Endeavor's offices are |
| 13:53:47 | 7 | in Beverly Hills I think on Camden; is that correct? |
| 13:53:51 | 8 | A.    Probably. |
| 13:53:51 | 9 | Q.    Okay.  And how had you heard of Mr. Emanuel? |
| 13:53:57 | 10 | A.    Well, he was in Variety and in The Hollywood |
| 13:54:01 | 11 | Reporter, and, you know, he had a, you know, a high |
| 13:54:06 | 12 | profile as, you know, as an agent. |
| 13:54:09 | 13 | Q.    But you had also heard of him in connection |
| 13:54:13 | 14 | with Mr. Toberoff; correct?  By the time you were |
| 13:54:15 | 15 | meeting with Mr. Toberoff in the Endeavor office? |
| 13:54:18 | 16 | A.    Yes. |
| 13:54:19 | 17 | Q.    Okay.  And is that something your mother |
| 13:54:22 | 18 | learned in her conversations with Mr. Toberoff that |
| 13:54:27 | 19 | she reported to you? |
| 13:54:30 | 20 | A.    She may have mentioned that. |
| 13:54:31 | 21 | Q.    Did you uncover any of that in your research |
| 13:54:34 | 22 | at all? |
| 13:54:36 | 23 | A.    I -- I think there may have been one -- one |
| 13:54:40 | 24 | article.  I mean there were certainly, you know, |
| 13:54:43 | 25 | things on the Internet about Emanuel that I read at |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 128

| | | |
|---|---|---|
| 13:54:47 | 1 | one point or another, but what the sequence was in |
| 13:54:50 | 2 | time, I can't recall. |
| 13:54:52 | 3 | Q.   After that -- were there any documents |
| 13:55:01 | 4 | displayed or used or exchanged at that first meeting |
| 13:55:06 | 5 | with Mr. Toberoff? |
| 13:55:08 | 6 | A.   No.   It was really a -- pretty much a casual |
| 13:55:13 | 7 | meet and greet kind of thing, just "Hi," you know. |
| 13:55:19 | 8 | Q.   Before entering into the first agreement with |
| 13:55:22 | 9 | Mr. Toberoff and Mr. Emanuel in October of 2002, the |
| 13:55:25 | 10 | one that we just saw -- |
| 13:55:27 | 11 | A.   Um-hum. |
| 13:55:28 | 12 | Q.   Actually, it says "as of October, 2002," had |
| 13:55:33 | 13 | you interviewed any other people to assist in |
| 13:55:39 | 14 | connection with your Superman issues? |
| 13:55:43 | 15 | A.   I -- |
| 13:55:45 | 16 | MR. TOBEROFF:   Vague. |
| 13:55:47 | 17 | THE WITNESS:   In what time frame are you |
| 13:55:49 | 18 | talking about? |
| | 19 | BY MR. PETROCELLI: |
| 13:55:51 | 20 | Q.   Oh, in 2002. |
| 13:55:55 | 21 | A.   2002, I believe I spoke to some people on the |
| 13:56:00 | 22 | phone, you know, following things that I found on the |
| 13:56:03 | 23 | Internet to try and see whether, you know, whether the |
| 13:56:06 | 24 | firm was taking on new clients or something like that. |
| 13:56:08 | 25 | Q.   Who did you speak to? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 129

| | | |
|---|---|---|
| 13:56:10 | 1 | A.    You know, I would have to see whether I can |
| 13:56:16 | 2 | remember that.  You know, this period of time is not |
| 13:56:18 | 3 | all that easy for me to recall. |
| 13:56:20 | 4 | Q.    You did speak to some lawyers? |
| 13:56:23 | 5 | A.    I don't know whether I spoke directly to like |
| 13:56:26 | 6 | the lawyer or whether I was speaking to an associate. |
| 13:56:30 | 7 | I really don't remember. |
| 13:56:32 | 8 | Q.    Did you speak to any -- |
| 13:56:33 | 9 | A.    But I wasn't particularly interested in them, |
| 13:56:35 | 10 | so it didn't kind of lodge itself in my memory. |
| 13:56:38 | 11 | Q.    Why did you call them if you weren't |
| 13:56:40 | 12 | interested in them? |
| 13:56:41 | 13 | A.    No.  I mean after talking and, you know, just |
| 13:56:44 | 14 | getting a feel for, you know, it was a company that |
| 13:56:47 | 15 | did have a conflict of interest or they were closely |
| 13:56:50 | 16 | aligned with a lot of studios, and it just didn't seem |
| 13:56:54 | 17 | to feel like a good fit for us. |
| 13:56:56 | 18 | Q.    Is it fair to say that you contacted |
| 13:57:00 | 19 | entertainment lawyers in town? |
| 13:57:02 | 20 | A.    Yes. |
| 13:57:02 | 21 | Q.    Okay.  And you obtained their names from |
| 13:57:08 | 22 | Internet work that you did? |
| 13:57:09 | 23 | A.    Well, you know, I had interviewed a lot of |
| 13:57:15 | 24 | entertainment attorneys prior to retaining Gang Tyre, |
| 13:57:21 | 25 | so I had already talked to and eliminated a number of |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 130

| | | |
|---|---|---|
| 13:57:25 | 1 | people a couple of years before this.  So, you know, |
| 13:57:30 | 2 | during -- from that search I already had knowledge of |
| 13:57:34 | 3 | people not to bother to contact this time. |
| 13:57:36 | 4 | Q.   You didn't go back to the people you had |
| 13:57:38 | 5 | eliminated; right? |
| 13:57:40 | 6 | A.   No, no, because at that time we interviewed a |
| 13:57:43 | 7 | lot of people. |
| 13:57:44 | 8 | Q.   Can you remember the names of any of the |
| 13:57:47 | 9 | firms that you contacted? |
| 13:57:48 | 10 | A.   Yeah.  There was somebody at William Morris. |
| 13:57:52 | 11 | There were some -- God, what was the -- I remember the |
| 13:57:57 | 12 | office.  There was an office on Olympic where there |
| 13:58:00 | 13 | was a fairly large firm. |
| 13:58:02 | 14 | Q.   Is that Mitchell, Silberberg & Knupp? |
| 13:58:05 | 15 | A.   It could have been.  It could have been.  I |
| 13:58:07 | 16 | think there was somebody in that office.  My |
| 13:58:10 | 17 | ex-husband had been asking around.  He's an attorney, |
| 13:58:13 | 18 | so he asked some people for referrals. |
| 13:58:16 | 19 | Q.   We're now talking about 2002. |
| 13:58:18 | 20 | A.   No.  I'm talking about prior to retaining |
| 13:58:22 | 21 | Gang Tyre in 1999. |
| 13:58:24 | 22 | Q.   Those are the folks that you contacted and |
| 13:58:28 | 23 | eliminated. |
| 13:58:28 | 24 | A.   Correct. |
| 13:58:29 | 25 | Q.   Someone at William Morris and someone -- |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 131

| | | |
|---|---|---|
| 13:58:32 | 1 | A.   There were probably at least five to seven. |
| 13:58:37 | 2 | Oh, what was the name of that guy?  We talked to Joel |
| 13:58:43 | 3 | Gotler. |
| 13:58:43 | 4 | Q.   Again, in '97? |
| 13:58:45 | 5 | A.   No.  '99. |
| 13:58:46 | 6 | Q.   '99.  Excuse me.  Right. |
| 13:58:48 | 7 | A.   Yeah.  I know we talked -- we met quite a bit |
| 13:58:52 | 8 | with Joel Gotler several times but ultimately decided |
| 13:58:55 | 9 | not to hire him and went with Gang Tyre. |
| 13:58:58 | 10 | Q.   Now going to 2002, other than Mr. Toberoff, |
| 13:59:04 | 11 | can you search your memory and tell me the names of |
| 13:59:08 | 12 | any firm or person that you contacted? |
| 13:59:10 | 13 | A.   I can think about it, but right now I can't |
| 13:59:13 | 14 | remember specifically. |
| 13:59:16 | 15 | Q.   Do you have some notes at home about this? |
| 13:59:21 | 16 | A.   Possibly. |
| 13:59:22 | 17 | Q.   Do you remember whether you actually met |
| 13:59:25 | 18 | anyone in person other than Mr. Toberoff? |
| 13:59:28 | 19 | A.   I don't think so. |
| 13:59:30 | 20 | Q.   Do you know whether your mother spoke to |
| 13:59:33 | 21 | other people other than Mr. Toberoff in 2002? |
| 13:59:40 | 22 | A.   I don't remember her mentioning anyone |
| 13:59:48 | 23 | specific. |
| 13:59:49 | 24 | Q.   What happened after the discussion with |
| 13:59:55 | 25 | Mr. Toberoff at the offices of Endeavor?  What was the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 132

| 13:59:58 | 1 | next thing that happened regarding your entering into |
| 14:00:00 | 2 | an agreement with Mr. Toberoff and Mr. Emanuel? |
| 14:00:05 | 3 | A. Well, we were -- we were very impressed with |
| 14:00:11 | 4 | Mr. Toberoff's history of commitment to helping |
| 14:00:20 | 5 | authors and his, you know, knowledge of intellectual |
| 14:00:24 | 6 | property issues, and we found a rapport with him that |
| 14:00:30 | 7 | we hadn't found with people that we had historically |
| 14:00:33 | 8 | spoken to, whether it was in 1999 or whenever, you |
| 14:00:36 | 9 | know. So it felt -- it felt comfortable. |
| 14:00:41 | 10 | Q. So what was the next step then after the |
| 14:00:46 | 11 | discussion at Endeavor? |
| 14:00:47 | 12 | A. Well, it was a discussion with my mom about, |
| 14:00:50 | 13 | you know, what was our comfort level. |
| 14:00:52 | 14 | Q. I see. |
| 14:00:53 | 15 | A. And so after that, I think we got back to him |
| 14:00:59 | 16 | and we asked to -- oh, yeah. This is when we asked to |
| 14:01:03 | 17 | see copies of briefs, things that he had done for |
| 14:01:08 | 18 | other clients, because we wanted to get a feel for the |
| 14:01:13 | 19 | quality of his work, his legal work. |
| 14:01:16 | 20 | Q. Did you get them? |
| 14:01:16 | 21 | A. Yes. |
| 14:01:16 | 22 | Q. What were they? Do you remember? |
| 14:01:18 | 23 | A. Well, they were specific to cases that he had |
| 14:01:25 | 24 | handled, and we liked them. |
| 14:01:27 | 25 | Q. How did you request them? |

EXHIBIT S
569

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 133

| | | |
|---|---|---|
| 14:01:31 | 1 | A.   A verbal request. |
| 14:01:33 | 2 | Q.   Over the telephone? |
| 14:01:34 | 3 | A.   I think we asked him in that -- in that |
| 14:01:37 | 4 | meeting, either in that meeting or over the telephone. |
| 14:01:40 | 5 | Q.   How long thereafter did you receive these |
| 14:01:43 | 6 | materials? |
| 14:01:43 | 7 | A.   Very quickly. |
| 14:01:45 | 8 | Q.   How did you receive them? |
| 14:01:48 | 9 | A.   Well, there was a big stack of them, so I |
| 14:01:51 | 10 | think they came in the mail. |
| 14:01:55 | 11 | Q.   And did you read them? |
| 14:01:57 | 12 | A.   Yes. |
| 14:02:00 | 13 | Q.   Did you have anyone else take a look at them? |
| 14:02:02 | 14 | A.   My mother looked at them. |
| 14:02:05 | 15 | Q.   Did you have anyone else like Mr. Levine or |
| 14:02:09 | 16 | Mr. -- |
| 14:02:09 | 17 | A.   George might have looked at them. |
| 14:02:11 | 18 | Q.   George. |
| 14:02:12 | 19 | A.   George might have looked at them. |
| 14:02:14 | 20 | Q.   You would have e-mailed them to him? |
| 14:02:17 | 21 | A.   No, because they didn't have it in electronic |
| 14:02:19 | 22 | form.  You know, if there -- if there was something |
| 14:02:22 | 23 | that I had a question about, I may have faxed, you |
| 14:02:26 | 24 | know, one of the briefs to him or something. |
| 14:02:31 | 25 | Q.   Do you remember what the specific documents |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 134

| | | |
|---|---|---|
| 14:02:33 | 1 | were that you received and reviewed? |
| 14:02:38 | 2 | A.  Are you asking me what the cases were? |
| 14:02:40 | 3 | Q.  Or anything you can recall about them. |
| 14:02:42 | 4 | A.  I -- I believe that one of them was -- maybe |
| 14:02:46 | 5 | it was a motion for summary judgment, and there |
| 14:02:50 | 6 | were -- there were -- you know, there were various |
| 14:02:53 | 7 | briefs.  They weren't all the same type of brief, |
| 14:02:55 | 8 | which was kind of, you know, reassuring because I |
| 14:02:58 | 9 | think my mom and I both wanted to get an idea for how |
| 14:03:03 | 10 | his -- how his mind worked, and so this told us, you |
| 14:03:07 | 11 | know, his approach and how he argues things having to |
| 14:03:11 | 12 | do with intellectual property. |
| 14:03:13 | 13 | Q.  Did you -- were they copyright termination |
| 14:03:17 | 14 | cases on behalf of similarly situated authors or |
| 14:03:22 | 15 | heirs? |
| 14:03:22 | 16 | A.  I don't think they were copyright |
| 14:03:26 | 17 | termination. |
| 14:03:27 | 18 | Q.  You still have those papers at your home? |
| 14:03:29 | 19 | A.  Could be. |
| 14:03:32 | 20 | Q.  Okay.  What was the next thing that happened |
| 14:03:34 | 21 | after you reviewed those materials that he sent you? |
| 14:03:38 | 22 | A.  We called him back and -- |
| 14:03:42 | 23 | Q.  A telephone call? |
| 14:03:43 | 24 | A.  Meaning my mother and I, yes.  I don't know |
| 14:03:47 | 25 | whether we were both on the phone or what, but, you |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

# LAURA SIEGEL LARSON - 7/22/2011

Page 135

| | | |
|---|---|---|
| 14:03:50 | 1 | know, either one or both of us said that we were, you |
| 14:03:55 | 2 | know, interested in him representing us. |
| 14:03:59 | 3 | Q.   What happened next? |
| 14:04:02 | 4 | A.   I think, you know, he said he was delighted, |
| 14:04:07 | 5 | and, you know, beyond that, I think we got into |
| 14:04:10 | 6 | discussing matters relating to our case. |
| 14:04:14 | 7 | Q.   What happened next? |
| 14:04:18 | 8 | A.   We formalized our arrangement. |
| 14:04:21 | 9 | Q.   And then you signed what we previously saw as |
| | 10 | Exhibit 45? |
| 14:04:28 | 11 | A.   Was that the -- |
| 14:04:29 | 12 | Q.   Is that 46?  What's the exhibit number? |
| 14:04:31 | 13 | A.   This one? |
| 14:04:32 | 14 | Q.   Let me see. |
| 14:04:33 | 15 | A.   45. |
| 14:04:34 | 16 | Q.   45.  Okay. |
| 14:04:37 | 17 | A.   Yes. |
| 14:04:39 | 18 | Q.   Which is the document that's dated as of |
| 14:04:43 | 19 | October 3, 2002; correct? |
| 14:04:47 | 20 | A.   Correct. |
| 14:04:50 | 21 | Q.   Now -- |
| 14:04:50 | 22 | A.   But the -- you know -- well -- |
| 14:04:53 | 23 | MR. TOBEROFF:  Wait for the question. |
| 14:04:55 | 24 | THE WITNESS:  I was just going to say -- |
| 14:04:56 | 25 | MR. TOBEROFF:  Wait. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON − 7/22/2011

Page 136

| | | |
|---|---|---|
| 14:04:57 | 1 | BY MR. PETROCELLI: |
| 14:04:58 | 2 | Q.  Now, prior to your getting this document, you |
| 14:05:04 | 3 | had to have some discussion about the role of Ari |
| 14:05:08 | 4 | Emanuel. |
| 14:05:09 | 5 | A.  Yes. |
| 14:05:09 | 6 | Q.  Given that you're not -- you were not given a |
| 14:05:13 | 7 | litigation retainer agreement of the sort that you |
| 14:05:15 | 8 | filed in 2004, but you're given a -- |
| 14:05:19 | 9 | MR. TOBEROFF:  Signed. |
| | 10 | BY MR. PETROCELLI: |
| 14:05:20 | 11 | Q.  -- representation -- |
| 14:05:21 | 12 | Excuse me? |
| 14:05:22 | 13 | MR. TOBEROFF:  You said "filed" in -- |
| 14:05:24 | 14 | MR. PETROCELLI:  Thank you. |
| 14:05:25 | 15 | Q.  Given that you did not receive and then sign |
| 14:05:28 | 16 | a litigation agreement in 2002, but instead received |
| 14:05:33 | 17 | and ended up signing this particular agreement, |
| 14:05:37 | 18 | Exhibit 45 -- |
| 14:05:37 | 19 | A.  Yes. |
| 14:05:38 | 20 | Q.  -- with a company called IP Worldwide signed |
| 14:05:42 | 21 | by Mr. Emanuel and Mr. Toberoff, at some point in your |
| 14:05:50 | 22 | chronology -- |
| 14:05:50 | 23 | A.  Um-hum. |
| 14:05:51 | 24 | Q.  -- there had to have been some discussion |
| 14:05:54 | 25 | about Mr. Emanuel; is that right? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 137

| | | |
|---|---|---|
| 14:05:56 | 1 | A.   Yes. |
| 14:05:57 | 2 | Q.   Okay.  And prior to signing this document, |
| 14:06:02 | 3 | Exhibit 45, did you meet Mr. Emanuel? |
| 14:06:04 | 4 | A.   I believe we did. |
| 14:06:06 | 5 | Q.   Okay.  And did your mother meet him? |
| 14:06:08 | 6 | A.   Yes. |
| 14:06:09 | 7 | Q.   Where did you meet him? |
| 14:06:10 | 8 | A.   At Endeavor. |
| 14:06:12 | 9 | Q.   Again, before signing Exhibit 45; right? |
| 14:06:15 | 10 | A.   I believe so. |
| 14:06:16 | 11 | Q.   Okay.  And who else was present at that |
| 14:06:18 | 12 | meeting? |
| 14:06:20 | 13 | A.   My mother, I was there, Mr. Emanuel, and |
| 14:06:25 | 14 | Mr. Toberoff. |
| 14:06:25 | 15 | Q.   Okay.  And this is the first time you met |
| 14:06:29 | 16 | Mr. Emanuel? |
| 14:06:30 | 17 | A.   Yes. |
| 14:06:31 | 18 | Q.   And did you have a draft of this agreement, |
| 14:06:38 | 19 | Exhibit 45, as of the date of your meeting with |
| 14:06:41 | 20 | Mr. Emanuel? |
| 14:06:42 | 21 | A.   I don't believe so. |
| 14:06:44 | 22 | Q.   And what was discussed at that meeting? |
| 14:06:53 | 23 | A.   Well, since that was the first time we were |
| 14:06:57 | 24 | meeting Mr. Emanuel, we wanted to know what his vision |
| 14:07:01 | 25 | was of the character and what he thought he might, you |

**EXHIBIT S**
**574**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 138

| | | |
|---|---|---|
| 14:07:06 | 1 | know, bring to us as a representative. |
| 14:07:10 | 2 | Q. Did you ask Mr. Emanuel about the nature of |
| 14:07:16 | 3 | his relationship with Mr. Toberoff and their business, |
| 14:07:19 | 4 | IPW, and what work they had done together or whether |
| 14:07:22 | 5 | this was their maiden voyage and, you know, things |
| 14:07:25 | 6 | like that? |
| 14:07:26 | 7 | A. No, because we knew that Ari's reputation was |
| 14:07:33 | 8 | huge. He had, you know, a long -- a long-term, you |
| 14:07:38 | 9 | know -- what am I trying to say? He had a long-term |
| 14:07:42 | 10 | high profile in the entertainment industry, and, you |
| 14:07:46 | 11 | know, that was -- those were his credentials. We had |
| 14:07:52 | 12 | researched Mr. Toberoff's credentials. We were |
| 14:07:55 | 13 | looking at them as two individuals who would be |
| 14:07:59 | 14 | serving different functions for us, but they were |
| 14:08:02 | 15 | united, so we were kind of getting a two for one in |
| 14:08:05 | 16 | the deal in a sense. |
| 14:08:06 | 17 | Q. A dynamic duo. |
| 14:08:08 | 18 | A. Yes. |
| 14:08:10 | 19 | Q. Okay. |
| 14:08:10 | 20 | A. You could say that. |
| 14:08:13 | 21 | Q. Now, as of the time -- |
| 14:08:17 | 22 | MR. TOBEROFF: That's a competing property. |
| 14:08:20 | 23 | MR. PETROCELLI: I understand. |
| 14:08:21 | 24 | THE WITNESS: I know. You know, dynamic duo. |
| 14:08:22 | 25 | I hear that. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 139

| | | |
|---|---|---|
| 14:08:25 | 1 | MR. PETROCELLI: Or we could go Clark Kent, |
| 14:08:26 | 2 | Superman, you know, either way. |
| 14:08:28 | 3 | Q. From the time that you first met Mr. Toberoff |
| 14:08:32 | 4 | until the meeting with Mr. Toberoff and Mr. Emanuel -- |
| 14:08:35 | 5 | A. Um-hum. |
| 14:08:36 | 6 | Q. -- what's a -- how long did that take in |
| 14:08:40 | 7 | between? |
| 14:08:40 | 8 | A. Not very long. |
| 14:08:41 | 9 | Q. A week? |
| 14:08:43 | 10 | A. Possibly. |
| 14:08:44 | 11 | Q. Okay. And again, that was also at the |
| 14:08:48 | 12 | offices of Endeavor? |
| 14:08:49 | 13 | A. Correct. |
| 14:08:49 | 14 | Q. And no one else was there except the four of |
| 14:08:53 | 15 | you; right? |
| 14:08:53 | 16 | A. No, because we went in at this -- for that |
| 14:08:56 | 17 | meeting we went into Mr. Emanuel's office. It wasn't |
| 14:09:01 | 18 | in a conference room. It was in Mr. Emanuel's office. |
| 14:09:04 | 19 | Q. But did anybody else participate at all in |
| 14:09:06 | 20 | any part of the meeting? |
| 14:09:08 | 21 | A. No. |
| 14:09:08 | 22 | Q. Like anybody else from his agency come in? |
| 14:09:11 | 23 | A. No. |
| 14:09:11 | 24 | Q. Okay. Now, did you understand that you were |
| 14:09:17 | 25 | doing this deal with Mr. Emanuel as part of IP |

## LAURA SIEGEL LARSON - 7/22/2011

Page 140

| | | |
|---|---|---|
| 14:09:23 | 1 | Worldwide or Mr. Emanuel as part of Endeavor or both? |
| 14:09:27 | 2 | A. No. By that time, you know, we understood |
| 14:09:31 | 3 | that, you know, that the intellectual property aspects |
| 14:09:36 | 4 | that we were interested in, you know, was under this |
| 14:09:40 | 5 | heading of IP Worldwide. |
| 14:09:44 | 6 | Q. Okay. Did you understand that Endeavor, the |
| 14:09:47 | 7 | talent agency, was somehow involved in your agreement |
| 14:09:52 | 8 | with IP Worldwide, or was it just Ari Emanuel and |
| 14:09:58 | 9 | Mr. Toberoff? |
| 14:09:59 | 10 | A. I believe that Endeavor was going to supply |
| 14:10:01 | 11 | some support services, but, you know, it was Ari |
| 14:10:09 | 12 | Emanuel that we were interested in. We weren't |
| 14:10:11 | 13 | interested in Endeavor. |
| 14:10:16 | 14 | Q. Okay. |
| 14:10:17 | 15 | Now, by the time of this meeting, and indeed |
| 14:10:20 | 16 | by the time of your first meeting with Mr. Toberoff -- |
| 14:10:24 | 17 | A. Um-hum. |
| 14:10:26 | 18 | Q. -- you had already heard that Mr. Toberoff |
| 14:10:29 | 19 | and Mr. Emanuel had presented an offer to your prior |
| 14:10:38 | 20 | counsel, Mr. Marks; right? |
| 14:10:40 | 21 | A. Yes. |
| 14:10:43 | 22 | Q. Okay. And an offer to acquire the property; |
| 14:10:45 | 23 | correct? |
| 14:10:48 | 24 | A. It was an offer to -- I believe to market the |
| 14:11:01 | 25 | property. |

**EXHIBIT S**
**577**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 141

| | | |
|---|---|---|
| 14:11:01 | 1 | Q.   An offer to market the property to whom? |
| 14:11:06 | 2 | A.   You know, I mean I don't have, you know, |
| 14:11:09 | 3 | anything in front of me right now.  I'm trying to |
| 14:11:12 | 4 | recall the exact terminology, but to represent -- to |
| 14:11:18 | 5 | represent us concerning our rights. |
| 14:11:21 | 6 | Q.   Now, when you heard that Ari Emanuel and Marc |
| 14:11:26 | 7 | Toberoff had approached Kevin Marks, it was -- |
| 14:11:31 | 8 | correct? |
| 14:11:31 | 9 | A.   Yes. |
| 14:11:32 | 10 | Q.   When you learned that Ari Emanuel and Marc |
| 14:11:37 | 11 | Toberoff had approached Kevin Marks about, as you just |
| 14:11:40 | 12 | put it, representing the property for purposes of |
| 14:11:46 | 13 | marketing it, was that before or after Jean Peavy gave |
| 14:11:55 | 14 | your mother the name of Marc Toberoff? |
| 14:12:03 | 15 | A.   I don't recall exactly, but it must have been |
| 14:12:08 | 16 | kind of like all around the same time. |
| 14:12:11 | 17 | Q.   Well, if Jean Peavy is giving the name of |
| 14:12:14 | 18 | Marc -- |
| 14:12:15 | 19 | A.   No, no, no.  It had to be after. |
| 14:12:17 | 20 | Q.   So Jean Peavy -- just to get the sequence |
| 14:12:21 | 21 | straight, Jean Peavy gives the name of Marc Toberoff |
| 14:12:23 | 22 | to your mother.  You and your mother then do some due |
| 14:12:29 | 23 | diligence on Marc Toberoff. |
| 14:12:30 | 24 | A.   Right. |
| 14:12:30 | 25 | Q.   And right around that same period of time |

LAURA SIEGEL LARSON - 7/22/2011

Page 142

| | | |
|---|---|---|
| 14:12:33 | 1 | when you're doing this due diligence about Marc |
| 14:12:39 | 2 | Toberoff, you suddenly hear that Marc Toberoff and Ari |
| 14:12:44 | 3 | Emanuel have contacted Kevin Marks? |
| 14:12:46 | 4 | A.   No, no.  That's why I said, after you said |
| 14:12:48 | 5 | that, that it had to have -- we -- we did not know of |
| 14:12:54 | 6 | Marc Toberoff, to my recollection, of Marc Toberoff or |
| 14:12:59 | 7 | Ari Emanuel independently of the information that we |
| 14:13:01 | 8 | were given by Kevin Marks.  We were in the process of |
| 14:13:06 | 9 | looking for other attorneys during that period of |
| 14:13:10 | 10 | time. |
| 14:13:10 | 11 | Q.   So -- |
| 14:13:11 | 12 | A.   So we had already -- you know, in March we |
| 14:13:13 | 13 | had contacted Gerry Spence.  We were looking at |
| 14:13:16 | 14 | various people. |
| 14:13:16 | 15 | Q.   And you said March because you saw the file |
| 14:13:19 | 16 | recently. |
| 14:13:20 | 17 | A.   A couple of days ago. |
| 14:13:21 | 18 | Q.   That had the date on it.  You would never |
| 14:13:25 | 19 | have remembered that; correct? |
| 14:13:27 | 20 | A.   No, I would not have remembered it. |
| 14:13:29 | 21 | Q.   So in March you contacted Gerry Spence.  He |
| 14:13:33 | 22 | had a conflict.  So continue. |
| 14:13:33 | 23 | A.   Yeah.  So we were thinking about other |
| 14:13:37 | 24 | attorneys.  At what point my mom revealed to Jean that |
| 14:13:39 | 25 | we were looking for other attorneys and she mentioned |

EXHIBIT S
579

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 143

| | | |
|---|---|---|
| 14:13:43 | 1 | his name, I'm not sure.  However, logic tells me that |
| 14:13:52 | 2 | it must have been after it was -- it was already |
| 14:13:57 | 3 | mentioned to us, you know, that Kevin Marks had |
| 14:14:00 | 4 | received contact from them because the name didn't |
| 14:14:03 | 5 | ring a bell.  You know, it just -- |
| 14:14:07 | 6 | Q.  I'm getting confused about the sequence, and |
| 14:14:09 | 7 | I want to be clear about this. |
| 14:14:10 | 8 | A.  Well, I'm confused about the sequence too. |
| 14:14:13 | 9 | Q.  Okay.  Well, maybe we can see if we can do |
| 14:14:15 | 10 | the best we can to get the best recollection you have |
| 14:14:18 | 11 | on this. |
| 14:14:18 | 12 | A.  Um-hum. |
| 14:14:21 | 13 | Q.  What happened first is the question -- |
| 14:14:23 | 14 | okay? -- your learning about Marc Toberoff from your |
| 14:14:31 | 15 | mother and your mother calling him up and you're |
| 14:14:35 | 16 | checking him out on the Internet or your learning |
| 14:14:40 | 17 | about Marc Toberoff and Ari Emanuel from Kevin Marks? |
| 14:14:48 | 18 | A.  I would be guessing.  I can't -- I can't 100 |
| 14:14:57 | 19 | percent say.  But -- |
| 14:15:00 | 20 | Q.  Well, when you had -- if Jean Peavy had told |
| 14:15:11 | 21 | your mother about a guy named Marc Toberoff -- |
| 14:15:15 | 22 | A.  Well, she said "I've got a lawyer." |
| 14:15:17 | 23 | Q.  -- you would have said, "Oh, that's the same |
| 14:15:19 | 24 | guy that Mark -- Kevin Marks just told us about, and |
| 14:15:24 | 25 | he's with Ari Emanuel," and you would have made that |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc