# EXHIBIT S

# PART 4 OF 7

## LAURA SIEGEL LARSON - 7/22/2011

Page 144

| | | |
|---|---|---|
| 14:15:28 | 1 | connection; correct? |
| 14:15:28 | 2 | A.  It sounds that way.  I don't remember it that |
| 14:15:31 | 3 | way, but as I said, logic sort of says that that would |
| 14:15:33 | 4 | probably be the case. |
| 14:15:34 | 5 | Q.  So then did you ask yourself why is a guy |
| 14:15:37 | 6 | that we're thinking about hiring as a lawyer calling |
| 14:15:42 | 7 | Kevin Marks and presenting himself as a person who |
| 14:15:45 | 8 | will market a property? |
| 14:15:48 | 9 | A.  You know, what Kevin Marks told us was that |
| 14:15:53 | 10 | Marc Toberoff was a lawyer, you know, who was |
| 14:15:57 | 11 | partnered with a Hollywood agent.  You know, it didn't |
| 14:16:00 | 12 | seem to us that he was recommending him as anything. |
| 14:16:06 | 13 | He wasn't recommending him at all.  You know, he was |
| 14:16:09 | 14 | simply relaying to us that there was an intellectual |
| 14:16:14 | 15 | property lawyer named Marc Toberoff who was partnered |
| 14:16:16 | 16 | with a Hollywood agent, you know, named Ari Emanuel. |
| 14:16:21 | 17 | Q.  And that they had called him to -- |
| 14:16:23 | 18 | A.  They had called him to see what the status |
| 14:16:25 | 19 | was of the Superman. |
| 14:16:28 | 20 | Q.  Well, let's be clear.  Mr. Marks -- Mr. Marks |
| 14:16:32 | 21 | didn't tell you that Marc Toberoff called him and |
| 14:16:35 | 22 | said, "Hey, Mr. Marks, I'm a lawyer, and I want to |
| 14:16:38 | 23 | take your client away from you." |
| 14:16:40 | 24 | A.  He didn't -- |
| 14:16:41 | 25 | MR. TOBEROFF:  Wait a second. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON – 7/22/2011

Page 145

| | | |
|---|---|---|
| 14:16:41 | 1 | BY MR. PETROCELLI: |
| 14:16:42 | 2 | Q.   He didn't say that to you; right? |
| 14:16:43 | 3 | A.   Yes, that's right. |
| | 4 | MR. TOBEROFF:  I don't want you getting |
| | 5 | into -- |
| 14:16:44 | 6 | THE WITNESS:  I shouldn't be talking about -- |
| 14:16:45 | 7 | MR. TOBEROFF:  -- the disclosure about what |
| 14:16:47 | 8 | Mr. Marks said to you or didn't say other than broad |
| 14:16:51 | 9 | subjects. |
| 14:16:52 | 10 | THE WITNESS:  Okay. |
| | 11 | BY MR. PETROCELLI: |
| 14:16:52 | 12 | Q.   But you have already testified that what |
| 14:16:56 | 13 | Mr. Marks told you is that these were two people who |
| 14:16:58 | 14 | were calling about marketing the property; correct? |
| 14:17:02 | 15 | A.   He didn't tell us anything.  He wrote |
| 14:17:06 | 16 | something to us in the mail. |
| 14:17:08 | 17 | Q.   Okay.  You received that by way of a written |
| 14:17:10 | 18 | communication. |
| 14:17:10 | 19 | A.   Correct. |
| 14:17:11 | 20 | Q.   A letter? |
| 14:17:12 | 21 | A.   Yes. |
| 14:17:14 | 22 | Q.   Okay.  Do you have a copy of it? |
| 14:17:18 | 23 | A.   I believe so. |
| 14:17:19 | 24 | Q.   When is the last time you saw it? |
| 14:17:21 | 25 | A.   It's been quite a while. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 146

| | | |
|---|---|---|
| 14:17:23 | 1 | Q.   And did Mr. Marks convey to you -- by the |
| 14:17:33 | 2 | way, to whom was the letter addressed? |
| 14:17:35 | 3 | A.   To my mother and to me. |
| 14:17:37 | 4 | Q.   And so he would have mailed -- he mailed two |
| 14:17:41 | 5 | copies, one to you and one to your mother at the |
| 14:17:44 | 6 | separate addresses? |
| 14:17:45 | 7 | A.   Yeah, I would think so. |
| 14:18:03 | 8 | Q.   Okay. |
| 14:18:04 | 9 | Hold on one second. |
| 14:18:23 | 10 | (Pause in proceedings.) |
| | 11 | BY MR. PETROCELLI: |
| 14:18:25 | 12 | Q.   Did -- |
| 14:18:26 | 13 | So I'm sorry.  I'm trying to get some |
| 14:18:29 | 14 | information from my colleagues so I can frame my next |
| 14:18:33 | 15 | question. |
| 14:18:36 | 16 | Did -- I apologize for asking you again, but |
| 14:18:38 | 17 | did you say you received a copy at your home and your |
| 14:18:42 | 18 | mother also received a copy? |
| 14:18:43 | 19 | A.   Yes. |
| 14:18:44 | 20 | Q.   Okay. |
| 14:18:52 | 21 | A.   However, my mother -- |
| 14:18:53 | 22 | MR. TOBEROFF:  Hey, there's no question |
| 14:18:54 | 23 | pending. |
| 14:18:55 | 24 | THE WITNESS:  Okay. |
| | 25 | BY MR. PETROCELLI: |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 147

| | | |
|---|---|---|
| 14:18:57 | 1 | Q.   Did you -- have you seen that letter in the |
| 14:18:59 | 2 | last week? |
| 14:18:59 | 3 | A.   No. |
| 14:19:00 | 4 | MR. TOBEROFF:  Asked and answered. |
| | 5 | BY MR. PETROCELLI: |
| 14:19:01 | 6 | Q.   Now, the letter said that an offer had been |
| 14:19:11 | 7 | made? |
| 14:19:11 | 8 | MR. TOBEROFF:  I instruct you not to answer |
| 14:19:13 | 9 | as to the contents of the attorney-client |
| 14:19:17 | 10 | communication.  I allowed you to broadly speak about |
| 14:19:20 | 11 | the subject matter. |
| | 12 | BY MR. PETROCELLI: |
| 14:19:21 | 13 | Q.   Did the letter state that Mr. Toberoff and |
| 14:19:28 | 14 | Mr. Emanuel were themselves seeking to acquire the |
| 14:19:36 | 15 | interest in your Superman rights? |
| 14:19:38 | 16 | MR. TOBEROFF:  Attorney-client privilege. |
| 14:19:39 | 17 | Instruct you not to answer. |
| | 18 | BY MR. PETROCELLI: |
| 14:19:41 | 19 | Q.   Did the letter say that Mr. Toberoff and |
| 14:19:49 | 20 | Mr. Emanuel had a wealthy investor who might be |
| 14:19:56 | 21 | interested in acquiring your rights? |
| 14:19:58 | 22 | MR. TOBEROFF:  Same instruction and |
| 14:20:00 | 23 | objection. |
| | 24 | BY MR. PETROCELLI: |
| 14:20:01 | 25 | Q.   Did the letter indicate that such an investor |

EXHIBIT S
584

3baac749-5ca5-4935-b47c-c3b4e6e0b4ffc

LAURA SIEGEL LARSON – 7/22/2011

Page 148

| | | |
|---|---|---|
| 14:20:04 | 1 | was willing to pay much more money than the last offer |
| 14:20:11 | 2 | Warner Bros. and DC Comics had made to you? |
| 14:20:16 | 3 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:16 | 4 | instruction. |
| | 5 | BY MR. PETROCELLI: |
| 14:20:16 | 6 | Q.   Did the letter indicate that such an investor |
| 14:20:22 | 7 | or party was interested in paying as much as |
| 14:20:27 | 8 | $15 million -- |
| 14:20:27 | 9 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:29 | 10 | instruction. |
| | 11 | BY MR. PETROCELLI: |
| 14:20:29 | 12 | Q.   -- plus additional terms including a back end |
| 14:20:31 | 13 | if a movie was made? |
| 14:20:33 | 14 | MR. TOBEROFF:  Same objection.  Same |
| 14:20:39 | 15 | instruction. |
| | 16 | BY MR. PETROCELLI: |
| 14:20:39 | 17 | Q.   What did you do after you got the letter? |
| 14:20:45 | 18 | MR. TOBEROFF:  Vague as to -- calls for a |
| 14:20:48 | 19 | narrative. |
| 14:20:50 | 20 | BY MR. PETROCELLI: |
| 14:20:50 | 21 | Q.   You understand what I'm asking you; right? |
| 14:20:52 | 22 | It's not like did you go get a cup of coffee.  What |
| 14:20:55 | 23 | did you do in reference to the letter? |
| 14:20:57 | 24 | A.   My mother got it several days before I did |
| 14:20:59 | 25 | because I was out of town. |

Merrill  Corporation  -  Los Angeles

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 149

| | | |
|---|---|---|
| 14:21:00 | 1 | Q. Okay. Did she discuss it with you? |
| 14:21:03 | 2 | A. When I was back, yes. |
| 14:21:04 | 3 | Q. What did she say to you? |
| 14:21:07 | 4 | MR. TOBEROFF: You can only talk about that |
| 14:21:09 | 5 | discussion to the extent you're not revealing the |
| 14:21:12 | 6 | contents of Mr. Marks' communication considering you |
| 14:21:18 | 7 | were both represented by the same attorney. |
| | 8 | BY MR. PETROCELLI: |
| 14:21:19 | 9 | Q. What did she say to you? |
| 14:21:21 | 10 | A. She was surprised. |
| 14:21:23 | 11 | MR. TOBEROFF: Object -- oh, you're answering |
| 14:21:24 | 12 | subject to my instruction; correct? |
| 14:21:26 | 13 | THE WITNESS: Yes. |
| 14:21:27 | 14 | MR. TOBEROFF: Okay. Go ahead. |
| | 15 | BY MR. PETROCELLI: |
| 14:21:29 | 16 | Q. And did -- what was she surprised about? |
| 14:21:38 | 17 | A. She was surprised to receive this |
| 14:21:42 | 18 | information. |
| 14:21:43 | 19 | Q. What about the information surprised her? |
| 14:21:49 | 20 | MR. TOBEROFF: You can answer so long as |
| 14:21:51 | 21 | you're not divulging the contents of the |
| 14:21:55 | 22 | attorney-client communication. |
| 14:21:56 | 23 | THE WITNESS: I know. Well, I'm thinking |
| 14:21:57 | 24 | about it. |
| 14:22:03 | 25 | I don't think there's anything that I could |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 150

| | | |
|---|---|---|
| 14:22:05 | 1 | say that would not divulge attorney-client privilege. |
| | 2 | BY MR. PETROCELLI: |
| 14:22:09 | 3 | Q. There was no attorney present during that |
| 14:22:11 | 4 | conversation with your mother. |
| 14:22:13 | 5 | A. No, but -- okay. Maybe I'm -- |
| 14:22:15 | 6 | MR. TOBEROFF: She's following my |
| 14:22:16 | 7 | instruction. |
| 14:22:16 | 8 | MR. PETROCELLI: Okay. I just want the |
| 14:22:19 | 9 | record to be clear that -- |
| 14:22:21 | 10 | THE WITNESS: I don't want to -- I maybe used |
| 14:22:23 | 11 | the wrong term. |
| | 12 | BY MR. PETROCELLI: |
| 14:22:24 | 13 | Q. This is just you and your mom talking; right? |
| 14:22:26 | 14 | A. Yes. |
| 14:22:38 | 15 | Q. When you got the letter, had you already by |
| 14:22:44 | 16 | that time heard of Mr. Toberoff? |
| 14:22:46 | 17 | MR. TOBEROFF: Asked and answered. |
| 14:22:49 | 18 | MR. PETROCELLI: It was not asked and |
| 14:22:50 | 19 | answered. It doesn't matter. |
| 14:22:53 | 20 | THE WITNESS: I don't believe so. But as I |
| 14:22:56 | 21 | said, that particular time for me, you know, what the |
| 14:23:00 | 22 | sequence of events was, I don't recall exactly. |
| 14:23:05 | 23 | BY MR. PETROCELLI: |
| 14:23:05 | 24 | Q. So in your view, was it a complete |
| 14:23:10 | 25 | coincidence that you got a letter about a man named |

## LAURA SIEGEL LARSON - 7/22/2011

Page 151

| | | |
|---|---|---|
| 14:23:14 | 1 | Toberoff who was interested in marketing the property |
| 14:23:19 | 2 | and then around the same time your mother gets a call |
| 14:23:23 | 3 | from Jean Peavy about a man named Toberoff? |
| 14:23:26 | 4 | MR. TOBEROFF: Misstates the record and lacks |
| 14:23:29 | 5 | foundation. |
| 14:23:31 | 6 | THE WITNESS: If I had heard of Toberoff |
| 14:23:34 | 7 | previous -- you know, prior to any communication, it |
| 14:23:38 | 8 | was only when I was doing kind of generic research of |
| 14:23:42 | 9 | who were lawyers who specialized in intellectual |
| 14:23:46 | 10 | property. So it wasn't -- it wasn't as if I was, you |
| 14:23:49 | 11 | know, I was looking for research on Marc Toberoff at |
| 14:23:56 | 12 | that point. If you go to Martindale Hubbell or |
| 14:23:59 | 13 | something and you type in a specialty and you look to |
| 14:24:01 | 14 | see what lawyers are available, that's the kind of |
| 14:24:06 | 15 | research that I was initially doing. |
| | 16 | BY MR. PETROCELLI: |
| 14:24:09 | 17 | Q. So you would have done that research, then, |
| 14:24:12 | 18 | prior to having received this letter mentioning the |
| 14:24:15 | 19 | name Marc Toberoff. |
| 14:24:16 | 20 | A. Generic research I would have done prior to. |
| 14:24:19 | 21 | Q. Which meant that your mother would have |
| 14:24:21 | 22 | received the call about Toberoff, again, prior to your |
| 14:24:25 | 23 | having gotten this letter. |
| 14:24:26 | 24 | A. No, not necessarily. What I was saying is |
| 14:24:30 | 25 | that as far back as when I was contacting Gerry |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 152

| | | |
|---|---|---|
| 14:24:33 | 1 | Spence, I was researching to see what types of lawyers |
| 14:24:37 | 2 | who, you know, might be able to help us existed |
| 14:24:43 | 3 | generically.  You know, I wasn't looking up |
| 14:24:46 | 4 | Mr. Toberoff.  And so I think your question was asking |
| 14:24:50 | 5 | me was I looking for Mr. Toberoff because Jean Peavy |
| 14:24:53 | 6 | had mentioned his name. |
| 14:24:54 | 7 | Q.   No.  I think you misunderstood my question. |
| 14:24:56 | 8 | A.   Okay. |
| 14:24:57 | 9 | Q.   And/or I miscommunicated it, so I apologize. |
| 14:24:59 | 10 | When you did your Internet search on |
| 14:25:02 | 11 | Mr. Toberoff, that wasn't because you were searching |
| 14:25:06 | 12 | entertainment lawyers and his named popped up.  That |
| 14:25:08 | 13 | was because your mother had mentioned that Jean had |
| 14:25:11 | 14 | given her that name and you were specifically looking |
| 14:25:14 | 15 | into that person; correct? |
| 14:25:15 | 16 | A.   When I looked specifically for him. |
| 14:25:18 | 17 | Q.   Okay.  And when you had done your generic |
| 14:25:22 | 18 | search that yielded the name Gerry Spence, for |
| 14:25:25 | 19 | example -- |
| 14:25:25 | 20 | A.   Um-hum. |
| 14:25:26 | 21 | Q.   -- you hadn't come across Mr. Toberoff's name |
| 14:25:29 | 22 | at that point in time; correct? |
| 14:25:30 | 23 | A.   I may have in terms of lawyers in the |
| 14:25:34 | 24 | Los Angeles area that handled intellectual property. |
| 14:25:36 | 25 | Q.   But you don't specifically recall having done |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 153

| | | |
|---|---|---|
| 14:25:38 | 1 | so, and if you did, you didn't follow up on it; |
| 14:25:41 | 2 | correct? |
| 14:25:42 | 3 | A. Yeah. I didn't put a gold star next to his |
| 14:25:44 | 4 | name and immediately do something, you know. |
| 14:25:46 | 5 | Q. But you did put a gold star next to Gerry |
| 14:25:51 | 6 | Spence's name. |
| 14:25:51 | 7 | A. Yes, but my mom put a gold star next to Gerry |
| 14:25:53 | 8 | Spence's name. |
| 14:25:53 | 9 | MR. TOBEROFF: They liked the jacket. |
| 14:25:55 | 10 | THE WITNESS: Yep. Well, my mom had seen him |
| 14:25:57 | 11 | like on CNN or something, and, you know -- |
| 14:26:02 | 12 | MR. TOBEROFF: He's got the gift. |
| 14:26:05 | 13 | MR. PETROCELLI: I won't comment. |
| 14:26:08 | 14 | THE WITNESS: I can read into that. |
| | 15 | BY MR. PETROCELLI: |
| 14:26:15 | 16 | Q. Now, when you did your search, by the way, |
| 14:26:20 | 17 | back in '99 and interviewed all those lawyers, Marc |
| 14:26:24 | 18 | Toberoff wasn't one of them; correct? |
| 14:26:25 | 19 | A. No. |
| 14:26:25 | 20 | Q. In fact, his name didn't even come up; right? |
| 14:26:28 | 21 | A. No. |
| 14:26:28 | 22 | Q. Is that correct? |
| 14:26:28 | 23 | A. That's correct. |
| 14:26:37 | 24 | Q. Okay. So getting back to the sequence here, |
| 14:26:47 | 25 | you -- by the time you had first spoken to your |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 154

| | | |
|---|---|---|
| 14:26:51 | 1 | mother -- excuse me.  You received this letter from |
| 14:26:56 | 2 | Kevin Marks mentioning Marc Toberoff and Ari Emanuel |
| 14:27:01 | 3 | after your mother had told you the name Marc Toberoff |
| 14:27:05 | 4 | that she had received from Jean Peavy; correct? |
| 14:27:07 | 5 | A.   As I said, I can't testify for sure. |
| 14:27:27 | 6 | Q.   Do you know the date of the letter that you |
| 14:27:31 | 7 | received from Mr. Marks that mentioned Mr. Toberoff? |
| 14:27:34 | 8 | A.   I haven't seen it in a long time. |
| 14:27:36 | 9 | Q.   Now, again -- |
| 14:27:40 | 10 | A.   No.  The answer is no. |
| 14:27:41 | 11 | Q.   -- I'm trying to press your recollection on |
| 14:27:44 | 12 | this.  But when you first saw the letter or heard |
| 14:27:49 | 13 | about it from your mother that mentioned Mr. Toberoff |
| 14:27:51 | 14 | and Mr. Emanuel, do you have a state of mind or did |
| 14:27:55 | 15 | you have a state of mind at the time that this is the |
| 14:27:59 | 16 | same person that you had already looked into and |
| 14:28:02 | 17 | indeed had already contacted? |
| 14:28:04 | 18 | A.   No.  As I said, there may have been some |
| 14:28:11 | 19 | generic information. |
| 14:28:12 | 20 | Q.   So by the time that Jean Peavy gave your |
| 14:28:16 | 21 | mother the name of Marc Toberoff, you would have |
| 14:28:22 | 22 | associated it with the same name you had seen in |
| 14:28:27 | 23 | Mr. Marks' letter; right? |
| 14:28:28 | 24 | A.   I really don't recall. |
| 14:28:48 | 25 | Q.   Did you -- you said your mother was surprised |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 155

| | | |
|---|---|---|
| 14:28:59 | 1 | when she got the letter. |
| 14:29:01 | 2 | A. Um-hum. |
| 14:29:02 | 3 | Q. What -- what did you do next with respect to |
| 14:29:07 | 4 | the letter? So, for example, did you contact |
| 14:29:16 | 5 | Mr. Marks? |
| 14:29:16 | 6 | A. Possibly. |
| 14:29:21 | 7 | Q. Were you interested in pursuing the |
| 14:29:33 | 8 | Toberoff/Emanuel proposal or introduction that was set |
| 14:29:36 | 9 | forth in the letter? |
| 14:29:39 | 10 | MR. TOBEROFF: When they first -- |
| | 11 | BY MR. PETROCELLI: |
| 14:29:41 | 12 | Q. Yeah. You saw the letter. The letter says, |
| 14:29:44 | 13 | you know, "These people called me and they're |
| 14:29:45 | 14 | interested in" whatever it is they said, and were you |
| 14:29:50 | 15 | and your mom interested in pursuing it? |
| 14:29:53 | 16 | A. We wanted to know what it was all about. |
| 14:29:57 | 17 | Q. Okay. And did you find out what it was all |
| 14:30:00 | 18 | about? |
| 14:30:00 | 19 | A. Eventually. |
| 14:30:01 | 20 | Q. How did you find out? |
| 14:30:04 | 21 | A. Through the contact that we had with Mr. -- |
| 14:30:11 | 22 | Mr. Toberoff and then Mr. Emanuel when my mother |
| 14:30:16 | 23 | placed a call to him and began to ask him some |
| 14:30:18 | 24 | questions. |
| 14:30:18 | 25 | Q. So by the time that your mother placed that |

EXHIBIT S
592

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 156

| | | |
|---|---|---|
| 14:30:21 | 1 | call, you had already had the letter from Mr. Marks |
| 14:30:24 | 2 | and were able to follow up on it? |
| 14:30:26 | 3 | A.   I don't know whether it was following up on |
| 14:30:28 | 4 | that.  I'm just -- you asked me how I got information |
| 14:30:32 | 5 | about them, and I'm just talking in general terms. |
| 14:30:34 | 6 | Q.   Did you get any information from Mr. Marks |
| 14:30:39 | 7 | beyond that letter? |
| 14:30:43 | 8 | A.   I can't recall any. |
| 14:30:48 | 9 | Q.   Did you have -- did you give Mr. Marks any |
| 14:30:55 | 10 | directions or instructions with respect to that |
| 14:31:01 | 11 | letter? |
| 14:31:03 | 12 | A.   No. |
| 14:31:04 | 13 | Q.   Did you -- did Mr. Marks tell you that if you |
| 14:31:26 | 14 | pursued any arrangement with Mr. Toberoff or |
| 14:31:30 | 15 | Mr. Emanuel, that it posed any legal risk to you? |
| 14:31:34 | 16 | MR. TOBEROFF:  Excuse me.  I instruct you not |
| 14:31:36 | 17 | to answer.  Attorney-client privilege. |
| | 18 | BY MR. PETROCELLI: |
| 14:31:38 | 19 | Q.   Did he tell you that he might be called upon |
| 14:31:41 | 20 | to testify and might have to testify in a way that was |
| 14:31:45 | 21 | not helpful to you? |
| 14:31:46 | 22 | MR. TOBEROFF:  Same objection.  Same |
| 14:31:49 | 23 | instruction. |
| | 24 | BY MR. PETROCELLI: |
| 14:31:49 | 25 | Q.   After receiving that letter did you |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 157

| | | |
|---|---|---|
| 14:31:52 | 1 | immediately fire Mr. Marks? |
| 14:31:54 | 2 | MR. TOBEROFF:  Which letter? |
| 14:31:55 | 3 | MR. PETROCELLI:  The letter that she |
| 14:31:57 | 4 | received, that your mother received, talking about |
| 14:31:59 | 5 | Mr. Toberoff and Mr. Emanuel. |
| 14:32:01 | 6 | THE WITNESS:  Not immediately. |
| | 7 | BY MR. PETROCELLI: |
| 14:32:03 | 8 | Q.  Did you receive any other letters from |
| 14:32:09 | 9 | Mr. Marks regarding Mr. Toberoff and Mr. Emanuel |
| 14:32:12 | 10 | except that one that you have already described? |
| 14:32:14 | 11 | A.  I don't believe so. |
| 14:32:17 | 12 | Q.  Did you have any meetings with Mr. Marks |
| 14:32:22 | 13 | following your receipt of that letter, a copy of which |
| 14:32:26 | 14 | your mother also received? |
| 14:32:30 | 15 | A.  I'm trying to reconstruct the time frame. |
| 14:32:46 | 16 | I don't remember whether we had a meeting |
| 14:32:48 | 17 | with him. |
| 14:32:50 | 18 | Q.  Or with Mr. Ramer?  Do you remember that? |
| 14:32:53 | 19 | A.  We almost never saw Mr. Ramer, so I know it |
| 14:32:57 | 20 | wouldn't have been with Mr. Ramer. |
| 14:32:58 | 21 | Q.  Mr. Marks by then was your lead lawyer? |
| 14:33:01 | 22 | A.  Yes. |
| 14:33:06 | 23 | Q.  Okay.  Did you discuss the letter with |
| 14:33:12 | 24 | anyone -- with anyone after you received it other than |
| 14:33:14 | 25 | your mother? |

EXHIBIT S
594

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 158

| | | |
|---|---|---|
| 14:33:23 | 1 | A.    We may have discussed it with George. |
| 14:33:27 | 2 | Q.    Did you send George a copy of the letter? |
| 14:33:29 | 3 | A.    I don't recall. |
| 14:33:36 | 4 | Q.    Did you discuss it with Jean Peavy? |
| 14:33:43 | 5 | A.    No. |
| 14:33:43 | 6 | Q.    You had learned at some point that Jean Peavy |
| 14:33:46 | 7 | had retained Mr. Toberoff at an earlier point in time; |
| 14:33:50 | 8 | correct? |
| 14:33:51 | 9 | A.    Yes.  When my mom had the conversation with |
| 14:33:54 | 10 | Jean, Mr. Toberoff was already her attorney. |
| 14:33:58 | 11 | Q.    Did Mr. -- did Ms. Peavy tell you that she |
| 14:34:03 | 12 | had entered into a joint venture agreement with |
| 14:34:06 | 13 | Mr. Toberoff's company, Pacific Pictures Corporation? |
| 14:34:12 | 14 | A.    No. |
| 14:34:12 | 15 | Q.    Did she share any of her agreements with you |
| 14:34:16 | 16 | or your mother? |
| 14:34:17 | 17 | A.    No. |
| 14:34:18 | 18 | Q.    Her agreements with Mr. Toberoff's company? |
| 14:34:28 | 19 | A.    No. |
| 14:34:28 | 20 | Q.    When did you first -- so when you first |
| 14:34:36 | 21 | contacted Mr. Toberoff, it was your belief that he was |
| 14:34:42 | 22 | already a lawyer working with the Shusters? |
| 14:34:45 | 23 | A.    Yes.  I -- you know, if that's the correct |
| 14:34:52 | 24 | sequence.  I'm trying to remember. |
| 14:34:54 | 25 | Q.    You're not sure of the exact sequence. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 159

| | | |
|---|---|---|
| 14:34:57 | 1 | A.    I'm not sure, no. |
| 14:34:57 | 2 | Q.    Okay.  I appreciate that. |
| 14:34:59 | 3 | A.    In general, you know. |
| 14:35:05 | 4 | Q.    Did you sign any conflict documents in 2002 |
| 14:35:08 | 5 | having to do with Mr. Toberoff's relationship with the |
| 14:35:18 | 6 | Shusters? |
| 14:35:18 | 7 | MR. TOBEROFF:  Don't discuss the contents of |
| 14:35:20 | 8 | the conflict waivers. |
| | 9 | BY MR. PETROCELLI: |
| 14:35:25 | 10 | Q.    You can answer that question. |
| 14:35:26 | 11 | A.    Well, no, I'm trying to remember.  There -- |
| 14:35:30 | 12 | you know, since this was 2002 and there was a conflict |
| 14:35:35 | 13 | waiver that accompanied this, so yes, we did sign a |
| 14:35:39 | 14 | conflict waiver in 2002. |
| 14:35:41 | 15 | Q.    And did that conflict waiver that you signed |
| 14:35:43 | 16 | in 2002, was that a conflict waiver with IP Worldwide |
| 14:35:48 | 17 | or with The Law Offices of Marc Toberoff, or do you |
| 14:35:51 | 18 | not remember? |
| 14:35:52 | 19 | A.    I don't remember. |
| 14:35:56 | 20 | Q.    Okay.  And did it have anything to do with |
| 14:36:01 | 21 | the Shusters? |
| 14:36:01 | 22 | A.    I -- well, I don't remember. |
| 14:36:03 | 23 | MR. TOBEROFF:  Don't discuss what the |
| 14:36:06 | 24 | conflict waiver -- excuse me.  Don't discuss the |
| 14:36:08 | 25 | substance of the conflict waiver.  It's privileged. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 160

| | | |
|---|---|---|
| 14:36:10 | 1 | THE WITNESS: Besides, I don't remember. |
| 14:36:16 | 2 | MR. TOBEROFF: It's moot. |
| | 3 | BY MR. PETROCELLI: |
| 14:36:27 | 4 | Q. Were you ever shown a copy of Mr. Toberoff's |
| 14:36:33 | 5 | agreements with the Shuster family? |
| 14:36:38 | 6 | A. No. |
| 14:36:38 | 7 | Q. Was your mother? |
| 14:36:41 | 8 | A. No. |
| 14:36:41 | 9 | Q. Do you know whether you requested that such |
| 14:36:44 | 10 | agreements be made available to any other counsel on |
| 14:36:48 | 11 | your behalf, like Arthur Levine or George? |
| 14:36:57 | 12 | A. No. |
| 14:36:58 | 13 | Q. Were you -- did you ever become aware that |
| 14:37:05 | 14 | Mr. Toberoff owned a company called Pacific Pictures? |
| 14:37:09 | 15 | A. Not until your lawsuit. |
| 14:37:13 | 16 | Q. Prior to my lawsuit did you become aware that |
| 14:37:20 | 17 | Mr. Toberoff through a company by whatever name |
| 14:37:23 | 18 | entered into a joint venture where his company |
| 14:37:26 | 19 | acquired 50 percent of the Shusters' termination |
| 14:37:29 | 20 | interests? |
| 14:37:37 | 21 | A. No. |
| 14:37:38 | 22 | Q. Prior to reading our lawsuit did you ever |
| 14:37:45 | 23 | become aware that the agreement Mr. Toberoff entered |
| 14:37:53 | 24 | into with the Shuster family was void under the |
| 14:37:59 | 25 | copyright statute? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 161

| | | |
|---|---|---|
| 14:38:01 | 1 | A.   I don't understand the question. |
| 14:38:05 | 2 | Q.   That he had entered into an agreement with |
| 14:38:07 | 3 | the Shuster family that violated a copyright statute? |
| 14:38:13 | 4 | A.   I have no knowledge of anything like that. |
| 14:38:20 | 5 | Q.   Are you aware that Mr. Toberoff has conceded |
| 14:38:24 | 6 | in this case that his Pacific Pictures agreement with |
| 14:38:30 | 7 | the Shuster family did not comply with the copyright |
| 14:38:36 | 8 | statute? |
| 14:38:36 | 9 | A.   No, I'm not aware of that. |
| 14:38:53 | 10 | Q.   Did anything about -- were you aware prior to |
| 14:39:04 | 11 | the filing of our lawsuit that Mr. Toberoff's Pacific |
| 14:39:12 | 12 | Pictures agreement with the Shusters concerned |
| 14:39:21 | 13 | Superboy as well as Superman? |
| 14:39:22 | 14 | A.   I wasn't -- |
| 14:39:24 | 15 | MR. TOBEROFF:  Wait.  Lacks foundation. |
| 14:39:26 | 16 | Assumes facts. |
| 14:39:27 | 17 | THE WITNESS:  I wasn't conscious of any |
| 14:39:31 | 18 | agreement. |
| | 19 | BY MR. PETROCELLI: |
| 14:39:31 | 20 | Q.   Since this lawsuit have you seen the written |
| 14:39:38 | 21 | agreement that Mr. Toberoff's Pacific Pictures company |
| 14:39:43 | 22 | entered into with the Shusters in 2001 relating to |
| 14:39:47 | 23 | both Superman and Superboy? |
| 14:39:51 | 24 | A.   I don't remember exactly what exhibits were |
| 14:39:54 | 25 | shown to me in my previous depositions.  So, you know, |

EXHIBIT S
598

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 14:40:00 | 1 | I remember that there was some document that was shown |
| 14:40:05 | 2 | to me, but exactly what it was, I really don't recall, |
| 14:40:10 | 3 | but I -- you know, so I can't really answer your |
| 14:40:14 | 4 | question. |
| 14:40:17 | 5 | Q.   Okay.  Was there anything about Mr. Marks' |
| 14:40:21 | 6 | letter to you that discussed Mr. Toberoff and |
| 14:40:26 | 7 | Mr. Emanuel that angered you or your mother? |
| 14:40:32 | 8 | MR. TOBEROFF:  You can answer whether the |
| 14:40:34 | 9 | letter angered you or your mother. |
| | 10 | BY MR. PETROCELLI: |
| 14:40:36 | 11 | Q.   Or upset you in some way. |
| 14:40:38 | 12 | MR. TOBEROFF:  You can answer that. |
| 14:40:42 | 13 | THE WITNESS:  We were kind of upset. |
| | 14 | BY MR. PETROCELLI: |
| 14:40:53 | 15 | Q.   Okay.  How long after you received the letter |
| 14:40:59 | 16 | that kind of upset you did you terminate Mr. Marks? |
| 14:41:07 | 17 | A.   Well, I don't recall the date of his letter, |
| 14:41:10 | 18 | so I can't really answer that. |
| 14:41:12 | 19 | Q.   I appreciate you don't know the dates, but in |
| 14:41:15 | 20 | terms of the passage of time, was it a day?  Was it |
| 14:41:18 | 21 | two days?  Was it two months?  Can you estimate for |
| 14:41:22 | 22 | me? |
| 14:41:23 | 23 | A.   I would say weeks, but I don't know how many |
| 14:41:39 | 24 | weeks. |
| 14:41:40 | 25 | Q.   Given that Mr. Marks' letter informed you |

## LAURA SIEGEL LARSON - 7/22/2011

Page 163

| | | |
|---|---|---|
| 14:41:45 | 1 | that Mr. Emanuel and Mr. Toberoff had an interest in |
| 14:41:50 | 2 | marketing the property, I assume you discussed with |
| 14:41:57 | 3 | both of Mr. Emanuel and Mr. Toberoff when you met with |
| 14:42:01 | 4 | them both what that interest was? |
| 14:42:04 | 5 | A.    Yes. |
| 14:42:04 | 6 | Q.    Okay.  And in that discussion did you inquire |
| 14:42:09 | 7 | whether they had an investor who was interested in |
| 14:42:15 | 8 | acquiring the property? |
| 14:42:16 | 9 | MR. TOBEROFF:  You can answer as to your |
| 14:42:18 | 10 | discussions with Mr. Emanuel. |
| 14:42:20 | 11 | THE WITNESS:  Um-hum. |
| 14:42:26 | 12 | Ari gave us information, you know, relating |
| 14:42:34 | 13 | to his offer, and, you know, I mean he, you know, he's |
| 14:42:41 | 14 | a rich guy.  He's got rich friends and you know, so |
| 14:42:46 | 15 | he, you know, had -- had good connections, and it was |
| 14:42:53 | 16 | interesting, but, you know -- |
| | 17 | BY MR. PETROCELLI: |
| 14:42:57 | 18 | Q.    Well, what did he say about his offer?  What |
| 14:43:03 | 19 | did you mean by "his offer"? |
| 14:43:04 | 20 | A.    Well, he -- he offered to put a substantial |
| 14:43:09 | 21 | amount of money up front and, you know, if he was able |
| 14:43:15 | 22 | to negotiate, you know, a good deal for us, that we |
| 14:43:23 | 23 | would have meaningful participation, and it sounded |
| 14:43:32 | 24 | interesting. |
| 14:43:32 | 25 | Q.    Let's be clear.  This would be a deal whereby |

**EXHIBIT S**
**600**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 164

| | | |
|---|---|---|
| 14:43:32 | 1 | you and your mom would sell your interest to |
| 14:43:36 | 2 | Mr. Emanuel. |
| 14:43:37 | 3 | A.    I don't believe we were selling our interest |
| 14:43:39 | 4 | to him. |
| 14:43:40 | 5 | Q.    What were you doing, then?  Partnering with |
| 14:43:45 | 6 | him? |
| 14:43:45 | 7 | A.    That's more the feel that I got from it. |
| 14:43:48 | 8 | Q.    Okay.  So it wasn't like you were going to |
| 14:43:50 | 9 | give up all your Superman interests and he would now |
| 14:43:53 | 10 | own them.  It was that there would be some business |
| 14:43:56 | 11 | arrangement between the two of you where you would |
| 14:43:59 | 12 | mutually exploit the property; correct? |
| 14:44:00 | 13 | A.    Mutually benefit from it, I believe was the |
| 14:44:03 | 14 | gist of it. |
| 14:44:06 | 15 | Q.    And how much did Mr. Emanuel say that he |
| 14:44:09 | 16 | would be willing to invest? |
| 14:44:14 | 17 | A.    Well, I think it was in the range of |
| 14:44:17 | 18 | 15 million. |
| 14:44:18 | 19 | Q.    Okay.  And did he identify anyone else who |
| 14:44:24 | 20 | might co-invest with him?  You said he had a lot of |
| 14:44:27 | 21 | rich friends. |
| 14:44:28 | 22 | A.    Um-hum.  Well, he didn't give us specific |
| 14:44:34 | 23 | names. |
| 14:44:34 | 24 | Q.    Did he identify any other -- did he say |
| 14:44:39 | 25 | anything about a Superman movie to you? |

**EXHIBIT S**
**601**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 165

| | | |
|---|---|---|
| 14:44:41 | 1 | A.    No, there was no mention of a movie. |
| 14:44:43 | 2 | Q.    But if there were a movie that could be |
| 14:44:46 | 3 | produced, then you might share in the exploitation of |
| 14:44:49 | 4 | it? |
| 14:44:50 | 5 | A.    On down the line if there was a movie. |
| 14:44:52 | 6 | Q.    Okay. |
| 14:44:53 | 7 | MR. TOBEROFF:  Are you referring to her |
| 14:45:01 | 8 | understanding of what a deal would be with Mr. Emanuel |
| 14:45:04 | 9 | or as to a conversation? |
| 14:45:07 | 10 | MR. PETROCELLI:  I'm talking about the |
| 14:45:08 | 11 | information she got from Mr. Emanuel at this meeting, |
| 14:45:12 | 12 | her conversation. |
| 14:45:19 | 13 | Q.    What happened -- |
| 14:45:20 | 14 | MR. TOBEROFF:  Well, then vague as to that. |
| 14:45:22 | 15 | BY MR. PETROCELLI: |
| 14:45:22 | 16 | Q.    What happened -- did you pursue with |
| 14:45:35 | 17 | Mr. Emanuel this interest that he expressed? |
| 14:45:38 | 18 | A.    My mother and I discussed it, and our feeling |
| 14:45:43 | 19 | was that if he was willing to come up with 15 -- he or |
| 14:45:49 | 20 | a group of people were willing to come up with |
| 14:45:52 | 21 | $15 million, that that told us that the property was |
| 14:45:57 | 22 | worth a lot more than that because why would he be |
| 14:46:01 | 23 | willing to pay full value for it?  And so in thinking |
| 14:46:06 | 24 | about how we wanted to proceed, we thought that it |
| 14:46:10 | 25 | would be better for us to simply have an arrangement |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 166

| | | |
|---|---|---|
| 14:46:14 | 1 | with him in which he would for a 10 percent or an |
| 14:46:20 | 2 | agent's fee negotiate these things for us, you know, |
| 14:46:23 | 3 | because his 10 percent of a much larger figure would |
| 14:46:28 | 4 | be better for us in the long run financially. |
| 14:46:31 | 5 | Q.   Did you then tell him at some point that you |
| 14:46:34 | 6 | were not interested in doing an arrangement with him |
| 14:46:40 | 7 | for the 15 million where he was a direct participant? |
| 14:46:44 | 8 | A.   Yes. |
| 14:46:44 | 9 | Q.   Was it at that meeting, or was it at a |
| 14:46:48 | 10 | subsequent meeting? |
| 14:46:48 | 11 | A.   I believe it was at a subsequent meeting. |
| 14:46:50 | 12 | Q.   And did you inform him of your decision and |
| 14:46:55 | 13 | your mother's decision not to do a deal with him where |
| 14:46:58 | 14 | he was a principal as opposed to an agent prior to |
| 14:47:02 | 15 | signing Exhibit 45, the IPW -- IP Worldwide agreement? |
| 14:47:08 | 16 | A.   Yes. |
| 14:47:13 | 17 | Q.   When you had this discussion with Mr. Emanuel |
| 14:47:17 | 18 | in his office at Endeavor together with your mother -- |
| 14:47:21 | 19 | I think you said Mr. Toberoff also was there? |
| 14:47:23 | 20 | A.   Um-hum. |
| 14:47:27 | 21 | Q.   -- did he confirm to you that he had |
| 14:47:33 | 22 | presented this same proposal to Mr. Marks sometime |
| 14:47:38 | 23 | before? |
| 14:47:38 | 24 | A.   I believe he did. |
| 14:47:40 | 25 | Q.   Okay.  And did he tell you whether or not he |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 167

| | | |
|---|---|---|
| 14:47:43 | 1 | had ever heard back from Mr. Marks? |
| 14:47:48 | 2 | A.   I don't recall him talking about it. |
| 14:47:49 | 3 | Q.   Did you tell him that you had instructed |
| 14:47:54 | 4 | Mr. Marks not to get back to him? |
| 14:48:02 | 5 | A.   No. |
| 14:48:03 | 6 | Q.   By the time of this meeting with Mr. Emanuel |
| 14:48:09 | 7 | in his office talking about this arrangement, had you |
| 14:48:12 | 8 | already terminated Mr. Marks? |
| 14:48:16 | 9 | A.   Yes. |
| 14:48:17 | 10 | Q.   Are you certain? |
| 14:48:19 | 11 | A.   I believe so.  It was -- it was right around |
| 14:48:22 | 12 | the same time, because we're talking about September, |
| 14:48:26 | 13 | you know, so sometime in September. |
| 14:48:32 | 14 | Q.   Was $15 million the number that Mr. Emanuel |
| 14:48:37 | 15 | mentioned to you more than any offer that DC Comics or |
| 14:48:44 | 16 | Warner Bros. had previously presented to you? |
| 14:48:47 | 17 | A.   Yes, I believe it was. |
| 14:48:56 | 18 | Q.   Did Mr. Emanuel identify any other investors |
| 14:49:05 | 19 | besides himself? |
| 14:49:06 | 20 | MR. TOBEROFF:  Asked and answered. |
| 14:49:08 | 21 | You can answer. |
| 14:49:15 | 22 | THE WITNESS:  No. |
| | 23 | BY MR. PETROCELLI: |
| 14:49:16 | 24 | Q.   Did you have an understanding that |
| 14:49:21 | 25 | Mr. Emanuel -- from Mr. Emanuel's proposal about |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 168

| | | |
|---|---|---|
| 14:49:24 | 1 | $15 million and whatever other terms there were |
| 14:49:32 | 2 | whether that would include some participation by |
| 14:49:37 | 3 | Mr. Toberoff? |
| 14:49:38 | 4 | MR. TOBEROFF: Vague and ambiguous as to -- |
| 14:49:40 | 5 | THE WITNESS: I -- I don't recall any mention |
| 14:49:42 | 6 | of that. |
| | 7 | BY MR. PETROCELLI: |
| 14:49:46 | 8 | Q. Okay. Was there any discussion at this |
| 14:49:49 | 9 | meeting about Michael Siegel's 25 percent ownership of |
| 14:49:57 | 10 | the Siegel termination interests? |
| 14:50:01 | 11 | A. I don't -- I don't believe that it was |
| 14:50:05 | 12 | discussed except to the extent of making him realize |
| 14:50:09 | 13 | that there was a Michael Siegel and that there was a |
| 14:50:14 | 14 | passive interest involved. |
| 14:50:18 | 15 | Q. Was there any discussion that the $15 million |
| 14:50:23 | 16 | would also involve the exploitation of Superboy |
| 14:50:29 | 17 | rights? |
| 14:50:29 | 18 | A. I think only Superman was mentioned. |
| 14:50:34 | 19 | Q. Did -- was there any discussion at this |
| 14:50:38 | 20 | meeting with Mr. Emanuel about the fact that DC Comics |
| 14:50:48 | 21 | would hold the remaining 50 percent of the copyright |
| 14:50:55 | 22 | interest for an extended period of time? |
| 14:50:58 | 23 | A. He was aware of that. |
| | 24 | THE REPORTER: Was that "50"? |
| 14:51:02 | 25 | MR. PETROCELLI: Fifty, yes. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 169

| | | |
|---|---|---|
| 14:51:02 | 1 | Q.   At least until 2013; right? |
| 14:51:05 | 2 | A.   He was aware of that. |
| 14:51:06 | 3 | Q.   And did he indicate whether that would |
| 14:51:14 | 4 | necessitate trying to reengage with DC comics or |
| 14:51:19 | 5 | Warner Bros. to do a deal? |
| 14:51:21 | 6 | A.   Well, he felt that they were the likely |
| 14:51:26 | 7 | purchaser if there was going to be a purchaser or, you |
| 14:51:29 | 8 | know, that a license agreement, you know, could be |
| 14:51:33 | 9 | entered into with them. |
| 14:51:37 | 10 | Q.   Did you -- when you got back to him and told |
| 14:51:41 | 11 | him that you preferred to work with him as an agent, |
| 14:51:44 | 12 | not as a business partner -- |
| 14:51:46 | 13 | A.   Um-hum. |
| 14:51:47 | 14 | Q.   -- did you and he have discussion then about |
| 14:51:51 | 15 | reengaging with Warner Bros. and DC Comics along the |
| 14:51:54 | 16 | lines that you had previously discussed? |
| 14:51:56 | 17 | A.   Yes. |
| 14:51:57 | 18 | Q.   And did he still agree that that was a |
| 14:52:01 | 19 | logical thing to do? |
| 14:52:02 | 20 | A.   Yes. |
| 14:52:03 | 21 | Q.   Okay.  Then he underwent -- undertook to do |
| 14:52:07 | 22 | that? |
| 14:52:08 | 23 | A.   At some point, yes. |
| 14:52:10 | 24 | MR. PETROCELLI:  Okay.  And why don't we stop |
| 14:52:15 | 25 | right now and take a short break.  We've been going |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 170

| 14:52:17 | 1 | for a bit. |
| 14:52:19 | 2 | THE VIDEOGRAPHER: This will mark the end of |
| 14:52:20 | 3 | Volume 1, tape number two, in the deposition of Laura |
| 14:52:23 | 4 | Siegel. Going off the record. The time is 2:52. |
| 14:52:44 | 5 | (A recess was taken.) |
| 15:22:09 | 6 | THE VIDEOGRAPHER: We are back on the record, |
| 15:22:11 | 7 | and this marks the beginning of Volume 1, tape number |
| 15:22:13 | 8 | three, of the deposition of Laura Siegel. The time is |
| 15:22:17 | 9 | 3:22. |
|  | 10 | BY MR. PETROCELLI: |
| 15:22:35 | 11 | Q. Was -- going back to your discussion with |
| 15:22:40 | 12 | Mr. Emanuel -- this was in his office -- Mr. Toberoff, |
| 15:22:49 | 13 | you, and your mother and Mr. Emanuel -- |
| 15:22:52 | 14 | A. Um-hum. |
| 15:22:54 | 15 | Q. Remember we were talking about that before |
| 15:22:56 | 16 | the break? |
| 15:22:57 | 17 | A. Yes. |
| 15:22:58 | 18 | Q. Did -- I think you said you were not sure |
| 15:23:02 | 19 | whether you had already terminated the services of |
| 15:23:06 | 20 | Mr. Marks as of the time of this discussion; correct? |
| 15:23:12 | 21 | A. You know, the time frame is difficult to |
| 15:23:15 | 22 | remember, but -- no, no, no, no. Wait. What am I |
| 15:23:20 | 23 | saying? No. We had -- we definitely had. I mean |
| 15:23:24 | 24 | back as far as May, you know, we were like 95 percent |
| 15:23:28 | 25 | there. We were, you know, going to cut off |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 171

| | | |
|---|---|---|
| 15:23:30 | 1 | negotiations and everything, you know, so we were |
| 15:23:35 | 2 | really, really close to doing it early on. |
| 15:23:38 | 3 | Q.   Now, this idea about cutting off negotiations |
| 15:23:41 | 4 | in May, is that something that you and Mr. Toberoff |
| 15:23:45 | 5 | discussed during the break? |
| 15:23:47 | 6 | A.   No. |
| 15:23:47 | 7 | Q.   Is it something that you have had some -- |
| 15:23:50 | 8 | A.   It was that I didn't -- |
| 15:23:51 | 9 | Q.   -- some recollection about or something? |
| 15:23:53 | 10 | A.   Well, like, you know, I didn't have an |
| 15:23:56 | 11 | opportunity really to clarify it before. |
| 15:23:57 | 12 | Q.   The truth of the matter is you did not cut |
| 15:24:00 | 13 | off negotiations with Warner Bros. until the date you |
| 15:24:04 | 14 | sent your letter; correct? |
| 15:24:05 | 15 | A.   Correct. |
| 15:24:06 | 16 | Q.   Okay. |
| 15:24:07 | 17 | A.   Yeah.  But we were contemplating it, was all |
| 15:24:10 | 18 | I was saying. |
| 15:24:10 | 19 | Q.   I didn't ask you about cutting off |
| 15:24:13 | 20 | negotiations, and I noticed that you injected that |
| 15:24:16 | 21 | into your testimony, and I would appreciate it if you |
| 15:24:18 | 22 | could just try to answer my questions. |
| 15:24:20 | 23 | A.   What was your question? |
| 15:24:21 | 24 | Q.   My question was about the discharge of |
| 15:24:28 | 25 | Mr. Marks. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 172

| | | |
|---|---|---|
| 15:24:28 | 1 | A.    Yes. |
| 15:24:37 | 2 | Q.    You had not discharged Mr. Marks as of the |
| 15:24:39 | 3 | time of that meeting with Mr. Emanuel; correct? |
| 15:24:43 | 4 | A.    No, that's not correct. |
| 15:24:44 | 5 | Q.    Had you written Mr. Marks the letter |
| 15:24:48 | 6 | terminating him? |
| 15:24:48 | 7 | A.    Yes. |
| 15:24:48 | 8 | Q.    Prior to the meeting? |
| 15:24:50 | 9 | A.    Yes. |
| 15:24:50 | 10 | Q.    Okay.  And why is it that you, given your |
| 15:24:54 | 11 | inability to recall with precision any of these other |
| 15:24:57 | 12 | dates, you remember that clearly or definitely, as you |
| 15:25:01 | 13 | said? |
| 15:25:01 | 14 | A.    Well, because you're pressing me on it now. |
| 15:25:04 | 15 | Q.    I've been pressing you on the sequence of |
| 15:25:07 | 16 | events throughout the day. |
| 15:25:08 | 17 | A.    Yeah. |
| 15:25:08 | 18 | Q.    But that one you know for sure. |
| 15:25:10 | 19 | A.    I just had a break and I had some water, and |
| 15:25:12 | 20 | I feel a little bit better. |
| 15:25:15 | 21 | Q.    So what is the date, then, of your meeting |
| 15:25:17 | 22 | with Mr. Emanuel? |
| 15:25:21 | 23 | A.    The date I couldn't tell you for sure, but, |
| 15:25:24 | 24 | you know, I knew that we felt that we were, you know, |
| 15:25:28 | 25 | completely free and clear of the Gang, you know, Tyre |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 173

| Time | # | Text |
|---|---|---|
| 15:25:32 | 1 | group before we had a meeting. |
| 15:25:34 | 2 | Q.   I didn't ask if you felt you were free and |
| 15:25:37 | 3 | clear.  I've asked whether you were a hundred -- I'll |
| 15:25:40 | 4 | ask it to you this way.  Are you 100 percent certain |
| 15:25:46 | 5 | that the date you met with Mr. Emanuel that you've |
| 15:25:48 | 6 | been testifying about with Mr. Toberoff and your |
| 15:25:54 | 7 | mother, by that date you had already sent your letter |
| 15:25:58 | 8 | terminating Mr. Marks? |
| 15:26:00 | 9 | MR. TOBEROFF:  Asked and answered. |
| 15:26:00 | 10 | THE WITNESS:  To the best of my recollection, |
| 15:26:01 | 11 | yes. |
|  | 12 | BY MR. PETROCELLI: |
| 15:26:03 | 13 | Q.   Okay.  So you're not a hundred percent |
| 15:26:05 | 14 | certain; correct? |
| 15:26:05 | 15 | A.   Correct. |
| 15:26:08 | 16 | Q.   Okay.  Now, do you have any way of |
| 15:26:13 | 17 | establishing the date of your meeting with |
| 15:26:15 | 18 | Mr. Emanuel? |
| 15:26:19 | 19 | A.   With Mr. -- |
| 15:26:20 | 20 | Q.   Emanuel. |
| 15:26:22 | 21 | A.   The exact date? |
| 15:26:24 | 22 | Q.   Yes. |
| 15:26:24 | 23 | A.   No. |
| 15:26:25 | 24 | Q.   Do you have any way of refreshing your |
| 15:26:27 | 25 | recollection about the date? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 174

| | | |
|---|---|---|
| 15:26:28 | 1 | A.   I can keep trying to remember.  I can keep |
| 15:26:31 | 2 | trying to think about it. |
| 15:26:32 | 3 | Q.   Is there any document or anything that would |
| 15:26:35 | 4 | refresh your memory that you're aware of? |
| 15:26:43 | 5 | A.   No, there are no documents. |
| 15:26:45 | 6 | Q.   Is there any document or anything that would |
| 15:26:47 | 7 | refresh your memory about the first time you met |
| 15:26:52 | 8 | Mr. Toberoff before the Mr. Emanuel meeting? |
| 15:26:55 | 9 | A.   No, there are no documents. |
| 15:26:56 | 10 | Q.   Is there anything else that would refresh |
| 15:26:58 | 11 | your recollection as to the date of that meeting? |
| 15:27:00 | 12 | A.   No, I don't think so. |
| 15:27:04 | 13 | Q.   When you met with Mr. Emanuel, did you and -- |
| 15:27:09 | 14 | was there any discussion in that meeting about the |
| 15:27:12 | 15 | fact that Kevin Marks might have to testify in a way |
| 15:27:18 | 16 | that was not helpful to you? |
| 15:27:20 | 17 | A.   In which meeting? |
| 15:27:22 | 18 | Q.   The meeting with Mr. Emanuel. |
| 15:27:23 | 19 | MR. TOBEROFF:  Excuse me.  Lacks foundation. |
| 15:27:25 | 20 | Assumes facts. |
| 15:27:28 | 21 | THE WITNESS:  I -- I don't recall any |
| 15:27:30 | 22 | discussion of that. |
| | 23 | BY MR. PETROCELLI: |
| 15:27:31 | 24 | Q.   Was there any discussion that if -- that |
| 15:27:43 | 25 | Warner Bros. or DC Comics may sue for interference? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 175

| | | |
|---|---|---|
| 15:27:47 | 1 | A.    With -- have a discussion with whom? |
| 15:27:51 | 2 | Q.    With Mr. Emanuel. |
| 15:28:03 | 3 | A.    No. |
| 15:28:03 | 4 | Q.    You understand that Warner Bros. in this case |
| 15:28:11 | 5 | is suing Mr. -- excuse me -- DC Comics in this case is |
| 15:28:15 | 6 | suing Mr. Toberoff and certain of his entities for |
| 15:28:22 | 7 | interfering with rights stemming from the negotiations |
| 15:28:30 | 8 | and discussions with you and your mother to acquire |
| 15:28:35 | 9 | the Siegel interest; correct? |
| 15:28:37 | 10 | A.    Yes. |
| 15:28:38 | 11 |        MR. TOBEROFF:  Misstates your own Complaint, |
| 15:28:40 | 12 | but that's okay. |
| | 13 | BY MR. PETROCELLI: |
| 15:28:41 | 14 | Q.    And you understand that we contend that |
| 15:28:55 | 15 | Mr. Toberoff's and Mr. Emanuel's proposal to Mr. Marks |
| 15:29:03 | 16 | and then to you about a $15 million investment was |
| 15:29:12 | 17 | designed to break off your dealings with DC Comics and |
| 15:29:18 | 18 | Warner Bros.  You understand that's our contention; |
| 15:29:21 | 19 | correct? |
| 15:29:22 | 20 | A.    That's your contention. |
| 15:29:23 | 21 | Q.    How do you know that's our contention? |
| 15:29:26 | 22 | A.    From -- from the Complaint in this action. |
| 15:29:29 | 23 | Q.    Okay.  And when you just gave your answer a |
| 15:29:35 | 24 | few minutes ago after the break -- by the way, you |
| 15:29:39 | 25 | spoke to Mr. Toberoff during break; correct? |

EXHIBIT S
612

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 176

| | | |
|---|---|---|
| 15:29:40 | 1 | A.    Yes.  He accompanied me to the restroom. |
| 15:29:46 | 2 | Q.    After the break -- after coming back from the |
| 15:29:51 | 3 | break and after speaking to Mr. Toberoff, you gave an |
| 15:29:57 | 4 | answer that was not responsive to my question about |
| 15:30:01 | 5 | being 95 percent sure that you were going to break off |
| 15:30:06 | 6 | dealings with DC as early as May.  Do you recall that? |
| 15:30:09 | 7 | A.    Yes, I do. |
| 15:30:10 | 8 | Q.    And you understood in giving that answer that |
| 15:30:12 | 9 | that would be helpful to Mr. Toberoff because it would |
| 15:30:20 | 10 | help establish that Mr. Toberoff did not interfere |
| 15:30:25 | 11 | with DC Comics' rights; correct? |
| 15:30:28 | 12 | A.    I was simply telling the truth. |
| 15:30:30 | 13 | Q.    I didn't ask you that question.  But you |
| 15:30:32 | 14 | understood that that answer was helpful to |
| 15:30:35 | 15 | Mr. Toberoff; correct? |
| 15:30:36 | 16 | A.    I wasn't thinking about that. |
| 15:30:38 | 17 | Q.    You have -- you understood that we were |
| 15:30:44 | 18 | making the interference claim; correct?  You said you |
| 15:30:48 | 19 | read the lawsuit; right? |
| 15:30:50 | 20 | A.    I did read the lawsuit. |
| 15:30:52 | 21 | Q.    And you were trying to help Mr. Toberoff |
| 15:30:57 | 22 | because he told you to give that answer and to work |
| 15:31:00 | 23 | that into one of your answers when you came back after |
| 15:31:03 | 24 | a break; correct? |
| 15:31:04 | 25 | A.    No.  No, that's not correct. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 177

| | | |
|---|---|---|
| 15:31:08 | 1 | Q.    Fortunately we have documents. |
| 15:31:15 | 2 | Speaking of which -- |
| 15:31:17 | 3 | MR. TOBEROFF:  Is that a question? |
| 15:31:19 | 4 | MR. PETROCELLI:  It is.  It is a prelude to a |
| 15:31:21 | 5 | question. |
| 15:31:25 | 6 | Q.    Mr. Marks sent you this document that you've |
| 15:31:30 | 7 | described in which Mr. Toberoff appeared on the scene |
| 15:31:36 | 8 | with Mr. Emanuel talking about a $15 million |
| 15:31:41 | 9 | investment, much greater than any offer Warner Bros. |
| 15:31:43 | 10 | or DC had ever made in mid August, 2002; correct? |
| 15:31:49 | 11 | A.    Well, as I said, I don't recall the date. |
| 15:31:51 | 12 | Q.    Okay.  Well, take a look at this privilege |
| 15:31:55 | 13 | log which we will mark as Exhibit 57. |
| | 14 | (Whereupon, Plaintiff's Exhibit 57 |
| 15:32:16 | 15 | was marked for identification.) |
| 15:32:17 | 16 | THE WITNESS:  Is there a page you want me to |
| 15:32:18 | 17 | look at? |
| | 18 | BY MR. PETROCELLI: |
| 15:32:21 | 19 | Q.    Yes.  Take a look at item number -- take a |
| 15:32:29 | 20 | look at the page that starts with or that ends with |
| 15:32:34 | 21 | item 628. |
| 15:32:39 | 22 | A.    Okay. |
| 15:32:44 | 23 | MR. TOBEROFF:  You got there pretty quickly. |
| 15:32:46 | 24 | THE WITNESS:  I got lucky. |
| 15:32:47 | 25 | MR. TOBEROFF:  Wait a second.  I need to turn |

**EXHIBIT S**
**614**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 178

| | | |
|---|---|---|
| 15:32:48 | 1 | to this. |
| 15:32:51 | 2 | Okay. |
| | 3 | BY MR. PETROCELLI: |
| 15:33:01 | 4 | Q. Now, you see the entry for 623? |
| 15:33:06 | 5 | A. Yes. |
| 15:33:07 | 6 | Q. Does Attorney Kevin Marks' letter to Joanne, |
| 15:33:11 | 7 | Laura Siegel -- Joanne is your mother; right? |
| 15:33:14 | 8 | A. Correct. |
| 15:33:15 | 9 | Q. -- Attorney Don Bulson and Attorney Bruce |
| 15:33:20 | 10 | Ramer. Do you see that? |
| 15:33:22 | 11 | A. Yes. |
| 15:33:23 | 12 | Q. Do you remember whether the letter you |
| 15:33:24 | 13 | received and that your mother received in which |
| 15:33:27 | 14 | Mr. Marks discussed the Toberoff/Emanuel proposal |
| 15:33:31 | 15 | was -- also included Mr. Bulson on it? |
| 15:33:35 | 16 | A. I don't remember. |
| 15:33:36 | 17 | Q. Okay. Did you discuss the letter with |
| 15:33:39 | 18 | Michael Siegel or Mr. Bulson? |
| 15:33:43 | 19 | A. I don't remember doing that. |
| 15:33:43 | 20 | Q. Mr. Bulson you understood to be Mr. Michael |
| 15:33:49 | 21 | Siegel's lawyer? |
| 15:33:49 | 22 | A. Correct. |
| 15:33:49 | 23 | Q. And you will see that was item number 623 on |
| 15:33:52 | 24 | this privilege log which has been marked as Exhibit -- |
| 15:33:54 | 25 | What? |

Merrill  Corporation  -  Los Angeles
800-826-0277                         www.merillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 179

| | | |
|---|---|---|
| 15:33:55 | 1 | MR. TOKORO:  57. |
| 15:33:56 | 2 | MR. PETROCELLI:  57. |
| 15:34:02 | 3 | Q.   And now we go to item 624, and that's a |
| 15:34:06 | 4 | document dated August 12, 2002, which is a letter to |
| 15:34:11 | 5 | you and your mother.  Do you see that? |
| 15:34:12 | 6 | A.   Yes. |
| 15:34:14 | 7 | Q.   And then if you skip down, there's a document |
| 15:34:17 | 8 | dated August 20, 2002, a letter to you, your mother, |
| 15:34:21 | 9 | with a copy to Bruce Ramer.  That's Mr. Marks' |
| 15:34:27 | 10 | partner; right? |
| 15:34:28 | 11 | A.   Yes. |
| 15:34:51 | 12 | Q.   Is it your recollection that the letter you |
| 15:34:55 | 13 | received occurred in or about August, 2002?  Does that |
| 15:35:00 | 14 | sound right timewise? |
| 15:35:01 | 15 | A.   I have no way of knowing whether it was back |
| 15:35:04 | 16 | here in July or if it was in August. |
| 15:35:07 | 17 | Q.   Okay. |
| 15:35:22 | 18 | You did not notify DC that you were cutting |
| 15:35:29 | 19 | off negotiations until after you heard about the |
| 15:35:37 | 20 | Toberoff/Emanuel offer from Kevin Marks; correct? |
| 15:35:45 | 21 | A.   Could have been. |
| 15:35:46 | 22 | Q.   Well, we saw that you cut off the -- |
| 15:35:49 | 23 | A.   In September. |
| 15:35:51 | 24 | Q.   Correct.  And that was after you had already |
| 15:35:53 | 25 | heard about the Toberoff/Emanuel proposal from |

**Merrill  Corporation  -  Los Angeles**

800-826-0277                                    www.merillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 180

| 15:35:58 | 1 | Mr. Marks; correct? |
| 15:36:00 | 2 | A.   It seems that way. |
| 15:36:22 | 3 | Q.   Okay. |
| 15:36:22 | 4 | Did you discuss with Mr. Emanuel in the |
| 15:36:26 | 5 | meeting that we've been talking about, the date of |
| 15:36:30 | 6 | which you can't give us -- |
| 15:36:31 | 7 | A.   Um-hum. |
| 15:36:32 | 8 | Q.   -- that Mr. Marks might take the position |
| 15:36:46 | 9 | that you already had reached an agreement with |
| 15:36:49 | 10 | Time-Warner and DC Comics? |
| 15:36:51 | 11 | MR. TOBEROFF:  Asked and answered. |
| 15:36:52 | 12 | THE WITNESS:  No.  I think you asked me.  I |
| 15:36:55 | 13 | said no. |
| | 14 | BY MR. PETROCELLI: |
| 15:36:55 | 15 | Q.   I didn't ask you that.  I asked you about |
| 15:36:58 | 16 | whether he would testify adversely to you.  This is a |
| 15:37:02 | 17 | different question. |
| 15:37:03 | 18 | A.   The answer is still no. |
| 15:37:04 | 19 | Q.   Okay.  You don't recall, or it's definitely |
| 15:37:07 | 20 | no? |
| 15:37:08 | 21 | A.   Well, I don't remember talking to Mr. Emanuel |
| 15:37:10 | 22 | about that subject. |
| 15:37:11 | 23 | Q.   This is in the group meeting now we're |
| 15:37:13 | 24 | talking about. |
| 15:37:18 | 25 | A.   Yeah, you're talking about with Mr. Emanuel |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 181

| | | |
|---|---|---|
| 15:37:21 | 1 | and my mother. |
| 15:37:22 | 2 | Q. Right. Did you have any discussion in that |
| 15:37:24 | 3 | meeting that Warner Bros. or DC Comics might take that |
| 15:37:28 | 4 | position, that there was already an agreement reached |
| 15:37:30 | 5 | and you're not going to be able to get out of it? |
| 15:37:34 | 6 | A. I don't believe so. I think we were looking |
| 15:37:36 | 7 | forward, not backward. |
| 15:37:37 | 8 | Q. But you had to appreciate that DC Comics and |
| 15:37:41 | 9 | Warner Bros. might have a different view than you; |
| 15:37:44 | 10 | right? That they might say you had no right to just |
| 15:37:48 | 11 | terminate a deal? |
| 15:37:49 | 12 | A. Everybody -- they could take that position if |
| 15:37:52 | 13 | they chose to. |
| 15:37:53 | 14 | Q. Correct, and what I'm asking you is whether |
| 15:37:55 | 15 | you discussed that with the folks at this meeting. |
| 15:38:00 | 16 | A. I don't remember discussing that. |
| 15:38:02 | 17 | Q. Okay. And you said you were looking forward, |
| 15:38:07 | 18 | meaning your focus was looking forward in making a new |
| 15:38:11 | 19 | deal. |
| 15:38:11 | 20 | A. Yes. |
| 15:38:26 | 21 | Q. Does the name David Michaels mean anything to |
| 15:38:28 | 22 | you? |
| 15:38:28 | 23 | A. Yes. |
| 15:38:31 | 24 | Q. Who is he, or how do you know him? |
| 15:38:34 | 25 | A. He was a guy who worked for a short amount of |

Merrill    Corporation    -    Los Angeles

800-826-0277                                    www.merillcorp.com/law

EXHIBIT S
618

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 182

| | | |
|---|---|---|
| 15:38:37 | 1 | time in Mr. Toberoff's office. |
| 15:38:40 | 2 | Q.   And how do you know that? |
| 15:38:42 | 3 | A.   Because when my mother and I went for, you |
| 15:38:45 | 4 | know, a meeting or two with Mr. Toberoff, he was |
| 15:38:49 | 5 | there, and I was introduced to him. |
| 15:38:55 | 6 | Q.   Do you know what year it was? |
| 15:39:02 | 7 | A.   What year was that?  I don't know.  Maybe |
| 15:39:08 | 8 | around 2004, 2005, in there somewhere. |
| 15:39:13 | 9 | Q.   Did you interact with him at all? |
| 15:39:16 | 10 | A.   You know, "Hello.  How are you."  You know, |
| 15:39:21 | 11 | he said, you know, he was excited to be working on |
| 15:39:30 | 12 | Superman. |
| 15:39:30 | 13 | Q.   When is the last time you had any interaction |
| 15:39:34 | 14 | with him of any kind or the last time your mother did, |
| 15:39:38 | 15 | to your knowledge? |
| 15:39:39 | 16 | A.   Yeah, it was -- it was late in -- I think it |
| 15:39:46 | 17 | was 2005.  Yeah, I think it was late in 2005. |
| 15:39:53 | 18 | Q.   What was the nature of that interaction? |
| 15:39:56 | 19 | A.   He contacted me and said he had some |
| 15:40:00 | 20 | information for my mother and me about our case. |
| 15:40:04 | 21 | Q.   Was he still working for Mr. Toberoff at that |
| 15:40:07 | 22 | time? |
| 15:40:08 | 23 | A.   It wasn't really clear to me. |
| 15:40:14 | 24 | Q.   What else was discussed? |
| 15:40:19 | 25 | A.   Other than -- are you talking about when he |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 183

| | | |
|---|---|---|
| 15:40:21 | 1 | first contacted me? |
| 15:40:22 | 2 | Q.   I thought I asked you when you and he last |
| 15:40:27 | 3 | interacted. |
| 15:40:28 | 4 | A.   Yes. |
| 15:40:28 | 5 | Q.   Was that the occasion? |
| 15:40:29 | 6 | MR. TOBEROFF:  She was -- I think she -- at |
| 15:40:32 | 7 | least I thought and she thought you were asking about |
| 15:40:34 | 8 | when he first contacted her. |
| 15:40:38 | 9 | MR. PETROCELLI:  Okay.  Let me rewind this a |
| 15:40:41 | 10 | bit. |
| 15:40:41 | 11 | THE WITNESS:  Okay. |
| | 12 | BY MR. PETROCELLI: |
| 15:40:42 | 13 | Q.   Is the last time -- when is the last time you |
| 15:40:45 | 14 | had any communication with David Michaels? |
| 15:40:49 | 15 | A.   Late in -- as I said, I believe it was 2005. |
| 15:40:52 | 16 | Q.   And that is because you received a telephone |
| 15:40:54 | 17 | call from him? |
| 15:40:55 | 18 | A.   A telephone call, and then he followed -- |
| 15:40:58 | 19 | followed that up with a meeting with my mom and me. |
| 15:41:02 | 20 | Q.   Okay.  And where did the meeting take place? |
| 15:41:07 | 21 | A.   At my condominium. |
| 15:41:11 | 22 | Q.   Did you tell Mr. Toberoff about this meeting? |
| 15:41:13 | 23 | A.   Later. |
| 15:41:15 | 24 | Q.   Not at the time. |
| 15:41:18 | 25 | A.   Not at the time. |

LAURA SIEGEL LARSON - 7/22/2011

Page 184

| | | |
|---|---|---|
| 15:41:18 | 1 | Q.   And that was a deliberate choice on your part |
| 15:41:27 | 2 | not to mention to Mr. Toberoff that you were having a |
| 15:41:27 | 3 | meeting with someone who used to work for him; |
| 15:41:27 | 4 | correct? |
| 15:41:27 | 5 | A.   Well, yeah, it was kind of an embarrassing |
| 15:41:30 | 6 | situation, but, you know, we were curious.  We wanted |
| 15:41:34 | 7 | to know what this guy had to say. |
| 15:41:40 | 8 | Q.   Okay.  And how long -- what -- how long was |
| 15:41:44 | 9 | it between the time he called you and the time that |
| 15:41:46 | 10 | you folks met at your home?  What was the -- a day?  A |
| 15:41:52 | 11 | couple of days? |
| 15:41:54 | 12 | A.   A few days. |
| 15:42:00 | 13 | Q.   Prior to the time that he called you, you |
| 15:42:04 | 14 | said you think it was maybe late '05? |
| 15:42:07 | 15 | A.   I think so. |
| 15:42:08 | 16 | Q.   What was the last time before then that you |
| 15:42:11 | 17 | had any kind of communication with him? |
| 15:42:14 | 18 | A.   It was, I guess, a couple of months before |
| 15:42:18 | 19 | that when I had seen him at Mr. Toberoff's office. |
| 15:42:24 | 20 | Q.   Okay.  And when he spoke to you on the phone |
| 15:42:28 | 21 | and said he had information for you, did he say he |
| 15:42:31 | 22 | wanted to meet you? |
| 15:42:32 | 23 | A.   Yes. |
| 15:42:32 | 24 | Q.   Okay.  And you agreed? |
| 15:42:36 | 25 | A.   Well, I said, "What is this about," you know, |

Merrill   Corporation   -   Los Angeles

800-826-0277                              www.merillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 185

| 15:42:38 | 1 | and he said, "I really don't want to talk about it on |
| 15:42:42 | 2 | the phone. You know, is it okay if I come by?" |
| 15:42:45 | 3 | Q. Okay. Did he tell you what the nature of the |
| 15:42:48 | 4 | information was? |
| 15:42:48 | 5 | A. No, he did not, not on the phone. |
| 15:42:50 | 6 | Q. So when you met with him, what did he tell |
| 15:42:52 | 7 | you? |
| 15:42:52 | 8 | MR. TOBEROFF: Okay. We have asserted |
| 15:42:55 | 9 | privilege between your conversation with David |
| 15:42:57 | 10 | Michaels other than pleasantries or saying "I want to |
| 15:43:00 | 11 | speak to you." As to your actual conversation, those |
| 15:43:04 | 12 | are privileged. |
| | 13 | BY MR. PETROCELLI: |
| 15:43:07 | 14 | Q. Did -- did he give you legal advice at this |
| 15:43:14 | 15 | meeting -- |
| 15:43:14 | 16 | MR. TOBEROFF: Don't -- don't -- |
| | 17 | BY MR. PETROCELLI: |
| 15:43:15 | 18 | Q. -- at a meeting that you secreted from your |
| 15:43:18 | 19 | lawyer? |
| 15:43:19 | 20 | MR. TOBEROFF: Don't -- |
| 15:43:19 | 21 | THE WITNESS: No, he was a lawyer. |
| 15:43:21 | 22 | MR. TOBEROFF: Wait. Wait. Wait. Don't -- |
| | 23 | BY MR. PETROCELLI: |
| 15:43:22 | 24 | Q. I know Mr. Michaels is a lawyer, but he did |
| 15:43:29 | 25 | not give you legal advice at this meeting; correct? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 186

| 15:43:32 | 1 | MR. TOBEROFF: Okay. I instruct you not to |
| 15:43:34 | 2 | answer as to the legal conclusion as to whether it's |
| 15:43:39 | 3 | legal advice, not legal advice. We have already |
| 15:43:42 | 4 | litigated this, and those communications were upheld |
| 15:43:45 | 5 | as privileged. |
| 15:43:46 | 6 | THE WITNESS: Okay. |
| 15:43:46 | 7 | MR. TOBEROFF: So we're going to follow the |
| 15:43:48 | 8 | court's ruling. |
| 15:43:49 | 9 | MR. PETROCELLI: You know, Marc, you have a |
| 15:43:52 | 10 | way of misstating the record. What the court ruled on |
| 15:43:56 | 11 | were certain written communications. As you know, |
| 15:44:00 | 12 | there has been no record put in front of the judge |
| 15:44:03 | 13 | about these conversations. So you can take the |
| 15:44:06 | 14 | position that the same reasoning and ruling would |
| 15:44:09 | 15 | apply, but I do object to your overstating the record. |
| 15:44:12 | 16 | MR. TOBEROFF: And I object to you accusing |
| 15:44:14 | 17 | me of misstating the record when I'm not. |
| 15:44:17 | 18 | MR. PETROCELLI: Okay, but you are misstating |
| 15:44:19 | 19 | it. |
| 15:44:19 | 20 | MR. TOBEROFF: No, I'm not. The whole |
| 15:44:22 | 21 | lawsuit that you designed and filed is designed to |
| 15:44:24 | 22 | improperly interfere with the attorney-client |
| 15:44:26 | 23 | relationship. So I have no doubt that you will |
| 15:44:28 | 24 | continue that attempt at interference at every chance |
| 15:44:32 | 25 | you get, try and learn every single privileged |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 187

| | | |
|---|---|---|
| 15:44:34 | 1 | communication you can possibly learn, and I object to |
| 15:44:37 | 2 | that. And the process, we have a lengthy list of |
| 15:44:40 | 3 | written communications from you and your cohorts at |
| 15:44:44 | 4 | your firm almost pathologically misstating the record. |
| 15:44:49 | 5 | MR. PETROCELLI: And -- |
| 15:44:49 | 6 | MR. TOBEROFF: So we can cross swords on -- |
| 15:44:51 | 7 | MR. PETROCELLI: Just -- |
| 15:44:52 | 8 | MR. TOBEROFF: If we had a score board as to |
| 15:44:54 | 9 | characterizing the record -- mischaracterizing the |
| 15:44:59 | 10 | record, I think you're way ahead of me. |
| 15:45:00 | 11 | MR. PETROCELLI: I doubt it. And I think you |
| 15:45:02 | 12 | are the lawyer who identified as privileged 15 |
| 15:45:06 | 13 | communications that a judge found to be bogus 15 out |
| 15:45:10 | 14 | of 15 times. |
| 15:45:11 | 15 | MR. TOBEROFF: He didn't find them bogus, but |
| 15:45:13 | 16 | you also challenged all the communications. So it was |
| 15:45:16 | 17 | something like 15 out of 150 that were found to be |
| 15:45:21 | 18 | privileged -- |
| 15:45:21 | 19 | MR. PETROCELLI: Irrelevant, because they did |
| 15:45:22 | 20 | not relate to the accounting issues. |
| 15:45:23 | 21 | MR. TOBEROFF: And you said none of them were |
| 15:45:25 | 22 | privileged. |
| 15:45:26 | 23 | MR. PETROCELLI: So let's get back on track |
| 15:45:28 | 24 | here. You -- |
| 15:45:29 | 25 | MR. TOBEROFF: And in fact, you're seeking -- |

EXHIBIT S

624

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 188

| | | |
|---|---|---|
| 15:45:30 | 1 | your whole lawsuit is based on privileged documents |
| 15:45:34 | 2 | stolen from my law firm that your client held onto for |
| 15:45:39 | 3 | about five months, illegally stolen property without |
| 15:45:42 | 4 | even letting us know. |
| 15:45:43 | 5 | MR. PETROCELLI: As far as I'm concerned, |
| 15:45:44 | 6 | there's zero evidence -- |
| 15:45:45 | 7 | MR. TOBEROFF: There's zero evidence? |
| 15:45:45 | 8 | Consider this an early holiday gift and an enclosing |
| 15:45:48 | 9 | document and your client said they got it in June or |
| 15:45:51 | 10 | July? |
| 15:45:52 | 11 | MR. PETROCELLI: Well, if you were right -- |
| 15:45:53 | 12 | MR. TOBEROFF: What holiday are you taking |
| 15:45:55 | 13 | about? July 4th? |
| 15:45:56 | 14 | MR. PETROCELLI: If you were right, then such |
| 15:45:57 | 15 | a person would be behind bars, would have been |
| 15:46:00 | 16 | criminally convicted, and no judge would have ever |
| 15:46:02 | 17 | ordered the production of those documents. |
| 15:46:05 | 18 | MR. TOBEROFF: Not necessarily, as we'll see. |
| 15:46:06 | 19 | MR. PETROCELLI: So I guess it's not as clear |
| 15:46:08 | 20 | cut as you're suggesting. |
| 15:46:10 | 21 | MR. TOBEROFF: We asked your client for -- |
| 15:46:12 | 22 | it's a studio that keeps track of everything going in |
| 15:46:15 | 23 | and out of that studio 18 different ways from Sunday, |
| 15:46:18 | 24 | and they didn't have a single record of three packages |
| 15:46:22 | 25 | of documents in the middle of a litigation that the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 189

| | | |
|---|---|---|
| 15:46:24 | 1 | general counsel to Alan Horn, the president or CEO -- |
| 15:46:29 | 2 | I forget which -- and the head of production, they |
| 15:46:34 | 3 | didn't have a single corroborating piece of evidence |
| 15:46:34 | 4 | as to when these three huge packages of documents |
| 15:46:40 | 5 | arrived at their firm, arrived at their studio. |
| 15:46:40 | 6 | MR. PETROCELLI:  Just like you mysteriously |
| 15:46:41 | 7 | don't have any evidence to date the contacts that you |
| 15:46:43 | 8 | made when you interfered with my client's rights? |
| 15:46:46 | 9 | MR. TOBEROFF:  I interfered with your |
| 15:46:48 | 10 | client's rights? |
| 15:46:48 | 11 | MR. PETROCELLI:  We'll get there. |
| 15:46:50 | 12 | MR. TOBEROFF:  This is something spun out of |
| 15:46:52 | 13 | whole cloth in order to try and leverage a settlement, |
| 15:46:55 | 14 | and we all know it. |
| 15:46:55 | 15 | MR. PETROCELLI:  We'll get there. |
| 15:46:56 | 16 | MR. TOBEROFF:  You will not get there. |
| 15:46:58 | 17 | MR. PETROCELLI:  It may take time, but |
| 15:47:00 | 18 | there's no quickness. |
| 15:47:01 | 19 | MR. TOBEROFF:  You don't have a prayer, and |
| 15:47:02 | 20 | you know it. |
| 15:47:04 | 21 | MR. PETROCELLI:  I don't need prayers. |
| 15:47:06 | 22 | MR. TOBEROFF:  You don't have a -- as -- |
| 15:47:11 | 23 | if -- I could use an expression from my father, but I |
| 15:47:15 | 24 | probably shouldn't. |
| 15:47:16 | 25 | MR. PETROCELLI:  No, you shouldn't.  You |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 190

| | | |
|---|---|---|
| 15:47:17 | 1 | shouldn't invoke your dad.  Okay? |
| 15:47:20 | 2 | Q.    Ms. Siegel, when you met with Mr. Michaels -- |
| 15:47:30 | 3 | first of all, did you take any notes? |
| 15:47:32 | 4 | A.    No, I don't believe so. |
| 15:47:33 | 5 | Q.    Did your mother? |
| 15:47:35 | 6 | A.    No. |
| 15:47:39 | 7 | Q.    What happened with respect to your |
| 15:47:42 | 8 | interaction with Mr. Michaels after he left? |
| 15:47:46 | 9 | Anything? |
| 15:47:47 | 10 | A.    After he left? |
| 15:47:47 | 11 | Q.    Yes, after the meeting was over. |
| 15:47:50 | 12 | A.    He sent -- he sent me a follow-up e-mail. |
| 15:47:57 | 13 | Q.    So you got just one e-mail from him? |
| 15:48:02 | 14 | A.    I'm remembering one in particular right now. |
| 15:48:06 | 15 | May have received more than one. |
| 15:48:07 | 16 | Q.    And did you respond to the e-mails? |
| 15:48:10 | 17 | A.    Yes, I did. |
| 15:48:16 | 18 | Q.    Did you basically tell him not to contact you |
| 15:48:19 | 19 | again? |
| 15:48:19 | 20 | A.    You bet. |
| 15:48:20 | 21 | Q.    Okay.  So after you responded to his e-mail, |
| 15:48:27 | 22 | did he respond to you again or communicate in any way |
| 15:48:32 | 23 | with you again, or your mother, for that matter? |
| 15:48:34 | 24 | A.    Yeah, I think he sent an e-mail apologizing |
| 15:48:38 | 25 | for trying to -- |

Merrill    Corporation    -    Los Angeles

800-826-0277                                    www.merrillcorp.com/law

EXHIBIT S
627

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 191

| | | |
|---|---|---|
| 15:48:39 | 1 | MR. TOBEROFF: Don't -- don't discuss the |
| | 2 | substance. |
| 15:48:41 | 3 | THE WITNESS: Okay. |
| | 4 | BY MR. PETROCELLI: |
| 15:48:42 | 5 | Q. Apologizing? |
| 15:48:43 | 6 | A. Apologizing to my mom and me. |
| 15:48:48 | 7 | Q. Okay. And when is the last time you saw |
| 15:48:50 | 8 | those e-mails? |
| 15:48:52 | 9 | A. It's been a long time. I don't know. |
| 15:48:54 | 10 | Q. What was he apologizing for? |
| 15:48:57 | 11 | A. For something that was discussed that it |
| 15:49:02 | 12 | seems to me that I cannot reveal. |
| 15:49:06 | 13 | Q. Do you remember what you and he discussed? |
| 15:49:09 | 14 | A. Yes. |
| 15:49:10 | 15 | Q. Okay. And I think I've asked you this, and I |
| 15:49:17 | 16 | think you have instructed. But did he give you legal |
| 15:49:19 | 17 | advice in that meeting? |
| 15:49:23 | 18 | MR. TOBEROFF: Calls for a legal conclusion. |
| 15:49:27 | 19 | THE WITNESS: May I answer that question? |
| 15:49:33 | 20 | MR. TOBEROFF: No, I don't think you can |
| 15:49:35 | 21 | answer that question, characterizing his |
| 15:49:39 | 22 | communications. There's been certain limited |
| 15:49:42 | 23 | disclosure as to David Michaels which was held not to |
| 15:49:46 | 24 | be a waiver of the privilege, and I don't want you to |
| 15:49:53 | 25 | go beyond that. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 192

15:49:54    1          THE WITNESS:  Okay.

            2     BY MR. PETROCELLI:

15:49:59    3          Q.   Did -- well, certainly when Mr. Michaels

15:50:06    4     apologized to you, he wasn't giving you legal advice,

15:50:10    5     was he?

15:50:12    6          A.   No.  It was at -- the apology was based on

15:50:16    7     something that had previously occurred.

15:50:20    8          Q.   And did -- do you know -- did Mr. -- to your

15:50:24    9     knowledge, did Mr. Michaels learn anything at the

15:50:29    10    meeting that caused him later to apologize?

15:50:34    11         A.   No.  It's not something that he learned.

15:50:36    12    It's -- he was apologizing for something that he did.

15:50:40    13         Q.   To you and your mother?

15:50:43    14         MR. TOBEROFF:  I will allow you to testify as

15:50:45    15    to what he apologized -- you know, I think we're --

15:50:51    16    you characterize as an apology broadly because I

15:50:57    17    believe it was disclosed previously and held not to be

15:51:00    18    a waiver of the privilege.  So you can testify

15:51:03    19    generally as to what he was apologizing for.

15:51:07    20         THE WITNESS:  It became very clear when he

15:51:10    21    was -- when he was at the meeting and then in this

15:51:13    22    follow-up e-mail that he sent to us that it was a bold

15:51:17    23    attempt on his part to steal my mom and I away from

15:51:22    24    Mr. Toberoff as clients, and he wanted us to sign with

15:51:26    25    him for him to be our attorney.

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 15:51:29 | 1 | BY MR. PETROCELLI: |
| 15:51:29 | 2 | Q.    And why would he apologize for that, to your |
| 15:51:33 | 3 | knowledge? |
| 15:51:34 | 4 | A.    Because we let him know that we were |
| 15:51:39 | 5 | outraged -- |
| 15:51:39 | 6 | Q.    Okay. |
| 15:51:40 | 7 | A.    -- that he would do that. |
| 15:51:41 | 8 | Q.    When did you let him know that? |
| 15:51:43 | 9 | A.    By e-mail. |
| 15:51:44 | 10 | Q.    You didn't tell him at the meeting? |
| 15:51:48 | 11 | A.    We told him that -- you know, we didn't -- |
| 15:51:52 | 12 | MR. TOBEROFF:  Wait. |
| | 13 | BY MR. PETROCELLI: |
| 15:51:52 | 14 | Q.    Did you kick him out of your house and say |
| 15:51:56 | 15 | "What are you doing here?" |
| 15:51:58 | 16 | A.    Let me put it this way.  All of his motives |
| 15:52:03 | 17 | were not revealed in our meeting.  It became much -- |
| 15:52:08 | 18 | it became clearer, you know, after the meeting when he |
| 15:52:13 | 19 | sent follow-up e-mails what his actual intention was. |
| 15:52:21 | 20 | Q.    After the meeting and before you received the |
| 15:52:27 | 21 | e-mails -- well, after he left the meeting with you, |
| 15:52:30 | 22 | did you have a belief that he was interested in having |
| 15:52:35 | 23 | you sign with him? |
| 15:52:37 | 24 | A.    On his way out the door he turned and said, |
| 15:52:41 | 25 | "I've got an idea.  You know, why don't you guys just, |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 194

| Time | # | Text |
|---|---|---|

15:52:44  1   you know, come with me and I'll introduce you to
15:52:47  2   another firm."
15:52:49  3        Q.   Did he identify the firm?
15:52:52  4        A.   No.  I think he was looking for a job at the
15:52:56  5   time.
15:52:58  6        Q.   Okay.  Had he been fired?
15:53:02  7        A.   I don't -- I don't know.
15:53:02  8        Q.   Did he tell you what his employment status
15:53:05  9   was?
15:53:05 10        A.   I think he said he was looking for a job.
15:53:12 11        Q.   And then when he said that to you as he was
15:53:15 12   going out the door, what did you or your mother say to
15:53:19 13   him?  "Don't waste your time" or you're not
15:53:22 14   interested, or what do you recall saying?
15:53:24 15        A.   It was -- it was like -- first of all, we
15:53:28 16   were shocked because we thought it was pretty
15:53:32 17   outrageous, and, you know, we felt that he had, you
15:53:35 18   know, come -- come in to talk to us under false
15:53:42 19   pretenses.  But he was -- he was on the way out the
15:53:45 20   door, and my mom and I, you know, didn't have to kick
15:53:47 21   him out because he was already leaving, but, you know,
15:53:51 22   we wanted to talk about it afterwards and figure out
15:53:54 23   what had just happened.
15:53:58 24        Q.   So after he left, what did you and your
15:54:01 25   mother discuss that you would do with this encounter

LAURA SIEGEL LARSON - 7/22/2011

Page 195

| 15:54:03 | 1 | that you just had? |
| 15:54:06 | 2 | A.   My mom and I said we didn't have a good |
| 15:54:08 | 3 | feeling about it, you know, but we just -- we wanted |
| 15:54:12 | 4 | to, you know, to kind of think, just as we do about |
| 15:54:15 | 5 | everything, think about things, talk about things, and |
| 15:54:18 | 6 | what could this guy's motivations possibly be. |
| 15:54:22 | 7 | Q.   Did he provide you any documents? |
| 15:54:25 | 8 | A.   He had documents with him, but he didn't |
| 15:54:27 | 9 | really provide them to me. |
| 15:54:29 | 10 | Q.   Did he show them to you? |
| 15:54:30 | 11 | A.   He was waving stuff around. |
| 15:54:32 | 12 | Q.   What was he waving?  Can you tell me the best |
| 15:54:35 | 13 | as you can recall any of the documents that he was |
| 15:54:37 | 14 | waving around? |
| 15:54:39 | 15 | A.   I did not see them enough to be able to read |
| 15:54:44 | 16 | them, so I couldn't identify them. |
| 15:54:47 | 17 | Q.   Well, when he was waving them around, he was |
| 15:54:51 | 18 | identifying them; right? |
| 15:54:52 | 19 | A.   He said, "I've got some stuff here and" -- |
| 15:54:55 | 20 | Q.   Did it relate to your case? |
| 15:54:57 | 21 | A.   He said -- he said it did. |
| 15:55:01 | 22 | Q.   Had he written this -- do you think he's the |
| 15:55:03 | 23 | author of this timeline document?  Are you familiar |
| 15:55:06 | 24 | with the timeline document? |
| 15:55:08 | 25 | A.   I saw it in your Complaint. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 196

| 15:55:09 | 1 | Q.    Okay.  And you had not seen it prior to |
| 15:55:19 | 2 | seeing it in our Complaint? |
| 15:55:21 | 3 | A.    No.  I don't recall ever seeing it before |
| 15:55:23 | 4 | your Complaint. |
| 15:55:24 | 5 | Q.    You had not -- you had not heard about the |
| 15:55:32 | 6 | litigation regarding it in your case back in 2006, '7, |
| 15:55:37 | 7 | and '8? |
| 15:55:38 | 8 | A.    Oh, well, I'm sorry.  I'm sorry.  I guess |
| 15:55:41 | 9 | you're right.  I guess it was before then. |
| 15:55:44 | 10 | Q.    Was this encounter with Mr. Michaels before |
| 15:55:47 | 11 | or after he sent -- withdrawn. |
| 15:55:51 | 12 | Do you believe he's the person who wrote this |
| 15:55:54 | 13 | timeline document? |
| 15:55:54 | 14 | A.    Yes, I do. |
| 15:55:55 | 15 | Q.    How do you know he wrote it? |
| 15:55:58 | 16 | A.    It sounds like him. |
| 15:56:01 | 17 | Q.    Let me make sure I put the document in front |
| 15:56:04 | 18 | of you just so we have a record. |
| 15:56:05 | 19 | A.    Okay. |
| 15:56:09 | 20 | MR. PETROCELLI:  This is Exhibit 58. |
| 15:56:10 | 21 | THE WITNESS:  Thank you. |
| | 22 | (Whereupon, Plaintiff's Exhibit 58 |
| 15:56:16 | 23 | was marked for identification.) |
| | 24 | BY MR. PETROCELLI: |
| 15:56:17 | 25 | Q.    Did you first learn of Exhibit 58, what we've |

EXHIBIT S
633

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 197

| | | |
|---|---|---|
| 15:56:20 | 1 | been calling the Toberoff timeline, before or after |
| 15:56:23 | 2 | your encounter with Mr. Michaels at your home? |
| 15:56:25 | 3 | A.   After. |
| 15:56:26 | 4 | Q.   Okay.  Was it shortly after or long after? |
| 15:56:31 | 5 | Can you estimate the time interval? |
| 15:56:36 | 6 | A.   I -- I think it was long after, but it |
| 15:56:39 | 7 | depends what you mean by long. |
| 15:56:41 | 8 | Q.   Months?  Years? |
| 15:56:42 | 9 | A.   It wasn't years. |
| 15:56:47 | 10 | Q.   Was -- so it's now your recollection that you |
| 15:56:53 | 11 | first saw this timeline document when the issues |
| 15:56:57 | 12 | surfaced in the case you brought? |
| 15:57:01 | 13 | A.   Well, whenever it was first produced for |
| 15:57:06 | 14 | whatever case that was, that was when I saw it. |
| 15:57:11 | 15 | What -- which case it was, there's so many different |
| 15:57:14 | 16 | cases and motions and things like that, I mean I |
| 15:57:16 | 17 | can't -- I can't remember exactly which one, but |
| 15:57:19 | 18 | whenever it was first presented, that -- in a legal |
| 15:57:23 | 19 | forum, that was the first time I saw it. |
| 15:57:26 | 20 | Q.   At some point in time you learned that Warner |
| 15:57:30 | 21 | Bros. had received and notified Mr. Toberoff that it |
| 15:57:34 | 22 | had received an anonymous submission regarding your |
| 15:57:40 | 23 | case; correct? |
| 15:57:41 | 24 | A.   Yes. |
| 15:57:43 | 25 | MR. TOBEROFF:  Anonymous submission.  I like |

EXHIBIT S
634

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 198

| | | |
|---|---|---|
| 15:57:47 | 1 | that. |
| | 2 | BY MR. PETROCELLI: |
| 15:57:48 | 3 | Q.  And at that time did you have an occasion to |
| 15:58:00 | 4 | see the document or the documents that Warner Bros. |
| 15:58:05 | 5 | had received?  Were they shown to you by Mr. Toberoff |
| 15:58:09 | 6 | or anyone else? |
| 15:58:12 | 7 | A.  I -- I don't remember when it was that I |
| 15:58:14 | 8 | first saw it. |
| 15:58:15 | 9 | Q.  When you saw the document for the first time, |
| 15:58:17 | 10 | that is, Exhibit 56 -- |
| 15:58:21 | 11 | Jason? |
| 15:58:23 | 12 | THE WITNESS:  58. |
| 15:58:24 | 13 | MR. TOKORO:  58. |
| 15:58:24 | 14 | MR. PETROCELLI:  58?  Okay. |
| 15:58:25 | 15 | Q.  When you saw Exhibit 58, did it discuss |
| 15:58:30 | 16 | matters similar to what had been discussed in the |
| 15:58:35 | 17 | meeting that Mr. Michaels had with you? |
| 15:58:37 | 18 | A.  Yes. |
| 15:58:39 | 19 | Q.  Okay. |
| 15:58:39 | 20 | A.  Because he was talking about unconscionable |
| 15:58:42 | 21 | fees, unconscionable fees. |
| 15:58:50 | 22 | Q.  And did you -- after the meeting that you had |
| 15:58:53 | 23 | with Mr. Michaels, did you relate the contents of the |
| 15:58:59 | 24 | meeting to Mr. Toberoff? |
| 15:59:03 | 25 | A.  Yes, at a certain point I did, yes. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 199

| | | |
|---|---|---|
| 15:59:08 | 1 | Q.   Did you do that before the e-mail exchange or |
| 15:59:12 | 2 | right after Mr. Michaels left your home? |
| 15:59:15 | 3 | A.   No.  It was after the e-mail exchange. |
| 15:59:17 | 4 | Q.   So even though I think you said you were |
| 15:59:21 | 5 | outraged by his suggestion as he left the door, it |
| 15:59:25 | 6 | wasn't until after this e-mail exchange that you first |
| 15:59:28 | 7 | mentioned it to Mr. -- Mr. Toberoff; right? |
| 15:59:31 | 8 | A.   Right. |
| 15:59:35 | 9 | Q.   Did you relate that discussion that you had |
| 15:59:38 | 10 | with Mr. Michaels to anybody else in order to see if |
| 15:59:43 | 11 | there was any, you know, anything to it? |
| 15:59:46 | 12 | A.   No. |
| 15:59:46 | 13 | Q.   Like, for example, George? |
| 15:59:48 | 14 | A.   No. |
| 15:59:48 | 15 | Q.   Or Arthur? |
| 15:59:50 | 16 | A.   No. |
| 15:59:51 | 17 | Q.   Arthur Levine I'm talking about. |
| 15:59:53 | 18 | A.   Correct. |
| 16:00:03 | 19 | Q.   The unconscionable fee, is that -- what was |
| 16:00:06 | 20 | the unconscionable fee?  The 40 percent fee? |
| 16:00:10 | 21 | A.   Yeah. |
| 16:00:20 | 22 | Q.   The document that you received and the e-mail |
| 16:00:24 | 23 | from Mr. Michaels following your meeting with him was |
| 16:00:28 | 24 | what?  A proposed engagement agreement? |
| 16:00:31 | 25 | MR. TOBEROFF:  You can answer that. |

EXHIBIT S
636

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 200

| | | |
|---|---|---|
| 16:00:32 | 1 | THE WITNESS: Yes. |
| | 2 | BY MR. PETROCELLI: |
| 16:00:34 | 3 | Q. And on the stationery of or letterhead of |
| 16:00:37 | 4 | what firm? |
| 16:00:38 | 5 | A. His -- his own, his home address. |
| 16:00:41 | 6 | Q. Okay. And did you ask for it? |
| 16:00:46 | 7 | A. Absolutely not. |
| 16:00:47 | 8 | Q. So it was unsolicited? |
| 16:00:49 | 9 | A. Unsolicited. |
| 16:00:51 | 10 | Q. What did you do with it? |
| 16:00:53 | 11 | A. Well, I discussed it with my mother, and we |
| 16:00:58 | 12 | wrote a response telling him, you know, that we had |
| 16:01:02 | 13 | absolutely no interest in that or in discussing |
| 16:01:06 | 14 | anything with him further. |
| 16:01:08 | 15 | Q. And then he wrote back saying "I'm sorry"? |
| 16:01:11 | 16 | A. Yeah, "Didn't want to offend you." |
| 16:01:15 | 17 | Q. And that's where it was left, with his |
| 16:01:18 | 18 | apology? |
| 16:01:18 | 19 | A. Yes. |
| 16:01:21 | 20 | Q. Okay. And what did his document provide? |
| 16:01:24 | 21 | A. What do you mean? |
| 16:01:26 | 22 | Q. What did it say, his unsolicited agreement or |
| 16:01:31 | 23 | proposed agreement? |
| 16:01:31 | 24 | A. Well, he actually sent two documents. |
| 16:01:34 | 25 | Q. What were the two documents? |

**EXHIBIT S**
**637**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

# LAURA SIEGEL LARSON - 7/22/2011

Page 201

| | | |
|---|---|---|
| 16:01:36 | 1 | A.   One was his draft of an unsolicited, you |
| 16:01:43 | 2 | know, agreement retaining him as our attorney at a -- |
| 16:01:48 | 3 | at a lower percentage than the one that Mr. Toberoff |
| 16:01:55 | 4 | had in our litigation agreement with him. |
| 16:01:57 | 5 | Q.   What was the percentage? |
| 16:01:58 | 6 | A.   I really don't -- I don't remember right now. |
| 16:02:00 | 7 | Q.   But you do remember it was lower. |
| 16:02:02 | 8 | A.   Yes.  Yes. |
| 16:02:04 | 9 | Q.   What was the other document? |
| 16:02:05 | 10 | A.   The other document was an unsolicited draft |
| 16:02:09 | 11 | that he had put together that he wanted us to sign |
| 16:02:15 | 12 | terminating -- |
| 16:02:15 | 13 | Q.   Mr. Toberoff? |
| 16:02:17 | 14 | A.   -- Mr. Toberoff. |
| 16:02:17 | 15 | Q.   Okay.  And you didn't ask for any of those |
| 16:02:19 | 16 | documents; right? |
| 16:02:20 | 17 | A.   No. |
| 16:02:20 | 18 | Q.   And there was no discussion at the meeting |
| 16:02:22 | 19 | that he was going to send you those documents? |
| 16:02:24 | 20 | A.   No. |
| 16:02:24 | 21 | Q.   That was a complete surprise to you; right? |
| 16:02:26 | 22 | A.   Yes.  It really pissed us off. |
| 16:02:30 | 23 | Q.   Okay.  And you -- what did the -- did the |
| 16:02:36 | 24 | letter terminating Mr. Toberoff -- Mr. Toberoff give a |
| 16:02:39 | 25 | reason for his termination? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 202

| | | |
|---|---|---|
| 16:02:41 | 1 | A.   No, I don't think so.  I think it was just, |
| 16:02:45 | 2 | you know, "We no longer want your services" or |
| 16:02:48 | 3 | something like that, and we had never said anything |
| 16:02:52 | 4 | like that to him.  In fact, we were very happy with |
| 16:02:56 | 5 | Mr. Toberoff. |
| 16:02:57 | 6 | Q.   Did Mr. Michaels explain to you why he |
| 16:03:02 | 7 | thought you should fire Mr. Toberoff? |
| 16:03:05 | 8 | A.   Because he said that he was charging us |
| 16:03:08 | 9 | unconscionable fees. |
| 16:03:10 | 10 | Q.   Did you do any diligence or checking into the |
| 16:03:17 | 11 | reasonableness of the fee after that discussion? |
| 16:03:24 | 12 | A.   No. |
| 16:03:25 | 13 | Q.   Did he explain to you why he thought it was |
| 16:03:29 | 14 | unconscionable? |
| 16:03:30 | 15 | A.   His discussion was -- it seemed to be coming |
| 16:03:35 | 16 | from a very confused person.  He was talking all over |
| 16:03:38 | 17 | the place and not very clear about what he was trying |
| 16:03:41 | 18 | to express, so it was very hard to follow what he was |
| 16:03:46 | 19 | saying. |
| 16:03:46 | 20 | Q.   Did he seem to you like he was not of sound |
| 16:03:52 | 21 | mind? |
| 16:03:52 | 22 | A.   He seemed extremely nervous and very, very |
| 16:03:58 | 23 | skittish about everything. |
| 16:04:01 | 24 | Q.   Did you think he was ill? |
| 16:04:04 | 25 | A.   He didn't look like he was ill.  It just |

EXHIBIT S
639

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 203

| | | |
|---|---|---|
| 16:04:07 | 1 | looked like he was -- |
| 16:04:08 | 2 | Q.    Mentally imbalanced? |
| 16:04:10 | 3 | A.    I don't know whether it was -- it's like he |
| 16:04:14 | 4 | knew he was doing something wrong and that -- that he |
| 16:04:17 | 5 | felt guilty about it and he was trying to kind of |
| 16:04:21 | 6 | cover his tracks or something. |
| 16:04:23 | 7 | Q.    Did he explain to you why he would care if |
| 16:04:30 | 8 | Mr. Toberoff was charging you an unconscionable fee? |
| 16:04:34 | 9 | A.    That's what didn't make sense to us at all. |
| 16:04:37 | 10 | You know, that's -- you know, it was like, you know, |
| 16:04:41 | 11 | "It hurts me to see this happening to you," you know. |
| 16:04:45 | 12 | So when the pitch came at the end for "Hey, I can do |
| 16:04:48 | 13 | this for you for less," it started, you know -- |
| 16:04:52 | 14 | Q.    Well, you said before that it was kind of a |
| 16:04:57 | 15 | passing comment as he walked out the door.  "Hey, I've |
| 16:04:59 | 16 | got an idea.  You can hire me."  Do you recall that? |
| 16:05:02 | 17 | A.    Yes. |
| 16:05:05 | 18 | Q.    When he said that, did you tell him "I have |
| 16:05:09 | 19 | no interest in hiring you," or I think you said you |
| 16:05:12 | 20 | didn't and that's why he followed up with those |
| 16:05:14 | 21 | e-mails; right? |
| 16:05:15 | 22 | A.    Yeah.  We just -- you know, it's like "Bye." |
| 16:05:20 | 23 | Q.    Well, when he was explaining this story to |
| 16:05:28 | 24 | you about unconscionable fees and all, did you ask |
| 16:05:28 | 25 | him, "Why are you telling us this?  What's your |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 204

| | | |
|---|---|---|
| 16:05:31 | 1 | purpose?  Why are you here?  What is the reason why |
| 16:05:34 | 2 | you're sharing this with us?" |
| 16:05:36 | 3 | A.    Because he -- |
| 16:05:38 | 4 | Q.    Did you ask him those questions? |
| 16:05:39 | 5 | A.    Well, as I said before, you know, he was |
| 16:05:42 | 6 | volunteering that out of the goodness of his heart. |
| 16:05:44 | 7 | You know, he felt that, you know, he as an attorney |
| 16:05:49 | 8 | had a -- what was it?  He had the responsibility to |
| 16:05:55 | 9 | talk to us about this. |
| 16:05:59 | 10 | Q.    Did he tell you that he had had some kind of |
| 16:06:03 | 11 | dispute or disagreement with Mr. Toberoff? |
| 16:06:06 | 12 | A.    No.  I don't recall him saying anything like |
| 16:06:07 | 13 | that. |
| 16:06:08 | 14 | Q.    Did he tell you that he had been fired? |
| 16:06:14 | 15 | A.    I think he just -- you know, I don't -- I |
| 16:06:21 | 16 | don't remember how he explained it.  I think he just |
| 16:06:25 | 17 | said, you know, "I'm no longer with the firm."  I |
| 16:06:28 | 18 | think that was it. |
| 16:06:29 | 19 | Q.    Okay.  And now, given this bizarre discussion |
| 16:06:36 | 20 | about a person who seemed skittish to you, talking |
| 16:06:41 | 21 | about unconscionable fees, kind of not making sense, |
| 16:06:45 | 22 | going outside, you know, and as he leaves he said |
| 16:06:48 | 23 | "Hey, I'll represent you," why didn't you immediately |
| 16:06:52 | 24 | call up Mr. Toberoff and say, "What's the story with |
| 16:06:55 | 25 | this guy?" |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 205

| | | |
|---|---|---|
| 16:06:57 | 1 | A. I don't know. You know, it just -- we |
| 16:07:01 | 2 | felt -- we felt uncomfortable about the whole thing, |
| 16:07:03 | 3 | and in a way we kind of felt sorry for the guy, you |
| 16:07:06 | 4 | know, because I mean here's this young guy. You know, |
| 16:07:11 | 5 | he's out of work. He said he was trying to do |
| 16:07:14 | 6 | something to help us. It turned out that he wasn't, |
| 16:07:19 | 7 | but, you know, we thought, you know, he'll just go |
| 16:07:23 | 8 | away. |
| 16:07:23 | 9 | Q. Why do you say it turned out that he wasn't? |
| 16:07:29 | 10 | A. No, I don't know why I said that. No, I just |
| 16:07:31 | 11 | mean that at that moment he didn't appear threatening |
| 16:07:34 | 12 | to us. You know, when we were right there, it wasn't |
| 16:07:39 | 13 | as if we felt we were physically in danger or |
| 16:07:43 | 14 | anything, but we became more concerned, you know, when |
| 16:07:45 | 15 | we started getting these e-mails, and fortunately, you |
| 16:07:49 | 16 | know, he wasn't in our presence, but, you know, I |
| 16:07:53 | 17 | started really getting concerned at that point about, |
| 16:07:55 | 18 | you know, what's going on with this guy? |
| 16:07:58 | 19 | Q. Did you forward the e-mails to Mr. Toberoff? |
| 16:08:03 | 20 | A. I did eventually, yes. |
| 16:08:07 | 21 | Q. Have you forwarded them to anyone else? |
| 16:08:09 | 22 | A. I don't believe so. |
| 16:08:19 | 23 | Q. Did he discuss with you other -- besides the |
| 16:08:23 | 24 | unconscionable fees, did he discuss with you other |
| 16:08:28 | 25 | matters of the sort set forth in Exhibit 58, the |

## LAURA SIEGEL LARSON - 7/22/2011

Page 206

| | | |
|---|---|---|
| 16:08:32 | 1 | Superman Marc Toberoff timeline? |
| 16:08:36 | 2 | A.    Well, you know, I know he said something to |
| 16:08:38 | 3 | us to the effect of "Did you know that Marc represents |
| 16:08:42 | 4 | the Shusters?"  Of course we knew that.  You know, I |
| 16:08:44 | 5 | mean he acted like that was, you know, a big |
| 16:08:47 | 6 | disclosure, that it was something that we didn't know |
| 16:08:50 | 7 | and that it was something -- that there was something |
| 16:08:53 | 8 | wrong with that.  And of course, you know, we knew |
| 16:08:56 | 9 | that because Jean Peavy had recommended Marc Toberoff. |
| 16:09:03 | 10 | So he kept, you know, trying to, you know, stir the |
| 16:09:08 | 11 | pot. |
| 16:09:09 | 12 | Q.    Did he discuss with you the idea that Marc |
| 16:09:21 | 13 | Toberoff together with Ari Emanuel claimed to have had |
| 16:09:27 | 14 | a billionaire, a mysterious billionaire investor as a |
| 16:09:34 | 15 | way of getting in the door with you? |
| 16:09:35 | 16 | A.    Yeah, well, he said a lot of things that we |
| 16:09:38 | 17 | thought was a lot of crap. |
| 16:09:40 | 18 | Q.    Was that one of them? |
| 16:09:41 | 19 | A.    That was one of them. |
| 16:09:42 | 20 | Q.    He said that at the meeting, or are you just |
| 16:09:47 | 21 | remembering what you think he wrote in the document? |
| 16:09:49 | 22 | A.    I don't know.  It could be that the document |
| 16:09:52 | 23 | is influencing me.  But I know that he, you know, he |
| 16:09:59 | 24 | was just constantly saying -- saying things that in |
| 16:10:04 | 25 | his mind he thought would shock us. |

## LAURA SIEGEL LARSON - 7/22/2011

Page 207

| 16:10:07 | 1 | Q. Did -- when he discussed -- when he discussed |
| 16:10:13 | 2 | the issue of the Shusters with you, did he talk about |
| 16:10:21 | 3 | issues related to Superboy? |
| 16:10:25 | 4 | A. I don't recall that coming up. |
| 16:10:27 | 5 | Q. Did he discuss with you that when |
| 16:10:35 | 6 | Mr. Toberoff first began to work with the Shusters, |
| 16:10:40 | 7 | that the Shusters claimed that Joe Shuster had been a |
| 16:10:48 | 8 | co-creator of Superboy and they were seeking rights to |
| 16:10:51 | 9 | Superboy? |
| 16:10:52 | 10 | MR. TOBEROFF: Misstates the record and the |
| 16:10:55 | 11 | evidence. |
| 16:10:55 | 12 | MR. PETROCELLI: I'm not purporting to state |
| 16:10:58 | 13 | anything. |
| 16:10:58 | 14 | MR. TOBEROFF: The way you're phrasing it. |
| 16:10:59 | 15 | MR. PETROCELLI: I'm asking a question. |
| 16:11:00 | 16 | MR. TOBEROFF: The way -- you had said |
| 16:11:02 | 17 | "discussed his claim that." You stated it as a fact |
| 16:11:08 | 18 | almost. |
| 16:11:08 | 19 | MR. PETROCELLI: It's called coaching the |
| 16:11:10 | 20 | witness. |
| 16:11:11 | 21 | Q. Can you answer that question? |
| 16:11:13 | 22 | A. Well, I believe you're asking me whether he |
| 16:11:16 | 23 | discussed Superboy with us? |
| 16:11:18 | 24 | Q. Generally, but I was asking for specifically |
| 16:11:20 | 25 | whether he discussed the idea that the Shuster family |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

# LAURA SIEGEL LARSON - 7/22/2011

Page 208

| | | |
|---|---|---|
| 16:11:25 | 1 | asserted that Joe Shuster was a co-creator of Superboy |
| 16:11:32 | 2 | and on that basis the Shusters were claiming copyright |
| 16:11:37 | 3 | termination interests. |
| 16:11:37 | 4 | A.   I -- |
| 16:11:39 | 5 | MR. TOBEROFF:  Wait.  Same objection.  Lacks |
| 16:11:40 | 6 | foundation.  Assumes facts. |
| 16:11:41 | 7 | THE WITNESS:  No, I don't recall that being |
| 16:11:45 | 8 | discussed. |
| | 9 | BY MR. PETROCELLI: |
| 16:11:46 | 10 | Q.   Did he discuss with you that after or as part |
| 16:11:54 | 11 | of working with the Siegel family, Mr. Toberoff caused |
| 16:12:01 | 12 | the Shusters to disavow any interest in Superboy? |
| 16:12:04 | 13 | A.   No, he did not discuss that with us. |
| 16:12:13 | 14 | Q.   You're aware that the Shusters when they |
| 16:12:21 | 15 | initially began working with Mr. Toberoff asserted an |
| 16:12:25 | 16 | interest in Superboy. |
| 16:12:27 | 17 | A.   Well, I really don't know much about the |
| 16:12:29 | 18 | Shuster case because that's their business. |
| 16:12:32 | 19 | Q.   Well, you were aware from reading our |
| 16:12:35 | 20 | lawsuit; right? |
| 16:12:35 | 21 | A.   From reading your lawsuit. |
| 16:12:37 | 22 | Q.   Right.  And you're aware from reading our |
| 16:12:41 | 23 | lawsuit that when Mr. Toberoff started working with |
| 16:12:46 | 24 | you and your mom, he then entered into a new |
| 16:12:51 | 25 | arrangement with the Shusters whereby they disavowed |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 209

| | | |
|---|---|---|
| 16:12:55 | 1 | any interest in Superboy. |
| 16:12:57 | 2 | A.   I don't know anything about his arrangements |
| 16:12:58 | 3 | with the Shusters. |
| 16:13:00 | 4 | Q.   Have you ever inquired of anybody why the |
| 16:13:04 | 5 | Shusters would give up their entire interest in |
| 16:13:07 | 6 | Superboy that they were asserting at one point in |
| 16:13:10 | 7 | time? |
| 16:13:10 | 8 | MR. TOBEROFF:  Assumes facts.  Lacks |
| 16:13:12 | 9 | foundation. |
| 16:13:12 | 10 | THE WITNESS:  I think they -- they found out |
| 16:13:16 | 11 | by reading more carefully the 1947 ruling. |
| | 12 | BY MR. PETROCELLI: |
| 16:13:21 | 13 | Q.   Well, that's an interesting point.  It's not |
| 16:13:23 | 14 | what I asked you.  That's your speculation; right? |
| 16:13:28 | 15 | A.   That's my speculation. |
| 16:13:30 | 16 | Q.   And you know there's a lot of documents after |
| 16:13:32 | 17 | 1947 that they could have read that would have |
| 16:13:36 | 18 | informed them that Joe Shuster was a co-creator of |
| 16:13:41 | 19 | Superboy; correct? |
| 16:13:41 | 20 | A.   I don't know that. |
| 16:13:42 | 21 | Q.   I know that you picked the 1947 ruling |
| 16:13:44 | 22 | because that's the one Mr. Toberoff likes to talk |
| 16:13:46 | 23 | about; right? |
| 16:13:48 | 24 | A.   No.  That's the one that my father told me |
| 16:13:51 | 25 | about my entire life. |

EXHIBIT S
646

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 210

| | | |
|---|---|---|
| 16:13:52 | 1 | Q.    But that's not the last word on the subject; |
| 16:13:54 | 2 | right? |
| 16:13:54 | 3 | A.    I don't know that that's the last word on the |
| 16:13:56 | 4 | subject. |
| 16:13:57 | 5 | Q.    And you're aware that there are documents |
| 16:13:58 | 6 | that both Joe Shuster and your dad caused to be filed |
| 16:14:03 | 7 | in which they claimed co-credit for Superboy; correct? |
| 16:14:06 | 8 | A.    I do not know that. |
| 16:14:07 | 9 | Q.    And you have seen those copyright |
| 16:14:10 | 10 | certifications. |
| 16:14:10 | 11 | A.    I don't recall anything like that. |
| 16:14:11 | 12 | Q.    Copyright registration documents; correct? |
| 16:14:15 | 13 | MR. TOBEROFF:  Just slow it down.  Let him |
| 16:14:18 | 14 | finish the question.  What's your answer? |
| 16:14:20 | 15 | THE WITNESS:  My answer is I have not seen |
| 16:14:21 | 16 | those.  I have not seen what you're referring to. |
| | 17 | BY MR. PETROCELLI: |
| 16:14:24 | 18 | Q.    But I had asked you not to surmise that the |
| 16:14:29 | 19 | Shusters must have read some opinion back in 1947.  I |
| 16:14:32 | 20 | had asked you if you had ever discussed with anyone |
| 16:14:36 | 21 | why they would disavow on the interest in Superboy |
| 16:14:42 | 22 | that they previously had -- |
| 16:14:43 | 23 | A.    Okay. |
| 16:14:44 | 24 | Q.    -- claimed. |
| 16:14:45 | 25 | A.    I didn't understand that that was your |

EXHIBIT S
647

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 211

| | | |
|---|---|---|
| 16:14:46 | 1 | question.  The answer to that is no. |
| 16:15:06 | 2 | Q.    Okay.  Do you have a copy of our Complaint |
| 16:15:14 | 3 | there just while we're on this subject? |
| 16:15:18 | 4 | A.    No, I don't. |
| 16:15:34 | 5 | Q.    You are aware that in Action Comics No. 1, |
| 16:15:39 | 6 | Mr. Shuster did the illustrations or worked on the |
| 16:15:43 | 7 | illustrations; correct? |
| 16:15:44 | 8 | A.    Yes. |
| 16:15:44 | 9 | Q.    And there's some depiction of Superman as a |
| 16:15:51 | 10 | youth with super powers; correct -- not in Action |
| 16:15:54 | 11 | Comics No. 1.  Excuse me.  In Superman No. 1. |
| 16:15:58 | 12 | A.    I haven't seen it for a long time. |
| 16:16:01 | 13 | Q.    Okay.  Well, rather than put you through a |
| 16:16:03 | 14 | memory test, can you take a look at our Complaint |
| 16:16:07 | 15 | which has been marked as Exhibit 59.  Turn to page 29, |
| 16:16:12 | 16 | paragraph 88. |
| | 17 | (Whereupon, Plaintiff's Exhibit 59 |
| 16:16:16 | 18 | was marked for identification.) |
| 16:16:17 | 19 | THE WITNESS:  29, paragraph 88, yes. |
| 16:16:18 | 20 | MR. PETROCELLI:  Yes. |
| 16:16:21 | 21 | Q.    When you read paragraph 88 and you saw the |
| 16:16:26 | 22 | first bullet under paragraph 88 which states that, in |
| 16:16:33 | 23 | part, "Toberoff had entered into the 2001 |
| 16:16:37 | 24 | joint-venture agreement with the Shuster Heirs, |
| 16:16:40 | 25 | specifying that the Shuster Heirs owned an interest in |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 212

| | | |
|---|---|---|
| 16:16:42 | 1 | 'Superboy,'" do you see that? |
| 16:16:43 | 2 | A.   I see that. |
| 16:16:44 | 3 | Q.   Was that the first time you had learned that? |
| 16:16:46 | 4 | A.   Yes, I believe so.  I don't recall, you know, |
| 16:16:52 | 5 | any -- any previous discussion. |
| 16:16:54 | 6 | Q.   Okay. |
| 16:16:55 | 7 | MR. TOBEROFF:  I object to the question to |
| 16:16:58 | 8 | the extent that you're characterizing allegations as |
| 16:17:11 | 9 | fact. |
| 16:17:11 | 10 | MR. PETROCELLI:  Can you get me the 2001. |
| 16:17:20 | 11 | Q.   Take a look at Exhibit 10, please. |
| | 12 | (Whereupon, Plaintiff's Exhibit 10 |
| 16:17:23 | 13 | was placed before the witness.) |
| 16:17:23 | 14 | THE WITNESS:  Thank you. |
| | 15 | BY MR. PETROCELLI: |
| 16:17:31 | 16 | Q.   This is an agreement by Pacific Pictures |
| 16:17:37 | 17 | Corporation through its president, Marc Toberoff, and |
| 16:17:42 | 18 | Jean Peavy and Warren Peary dated as of November 23, |
| 16:17:48 | 19 | 2001.  This has previously been marked as Exhibit 10. |
| 16:17:50 | 20 | Do you see that? |
| 16:17:51 | 21 | A.   Yes, I do. |
| 16:17:53 | 22 | Q.   Okay.  And you will see that in the first |
| 16:18:00 | 23 | paragraph it's discussing formation of a joint venture |
| 16:18:04 | 24 | with respect to Mr. Shuster's claimed copyright |
| 16:18:07 | 25 | interest.  Do you see that? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 213

| | | |
|---|---|---|
| 16:18:08 | 1 | A.   Well, I see it, but I'm not fully reading it. |
| 16:18:11 | 2 | Do you want me to spend the time to read it? |
| 16:18:16 | 3 | Q.   Not really just because I don't want to pass |
| 16:18:18 | 4 | the time. |
| 16:18:18 | 5 | Take paragraph 1, and you might read |
| 16:18:22 | 6 | paragraph 1 to yourself. |
| 16:18:25 | 7 | MR. TOBEROFF:  Before answering any questions |
| 16:18:26 | 8 | regarding this agreement, if there is a question as |
| 16:18:29 | 9 | opposed to a rhetorical statement, then I would like |
| 16:18:32 | 10 | you to please read whatever he's asking you very |
| 16:19:05 | 11 | carefully. |
| | 12 | BY MR. PETROCELLI: |
| 16:19:06 | 13 | Q.   You do see the reference there that the |
| 16:19:11 | 14 | rights that are the subject of this agreement include |
| 16:19:21 | 15 | Superboy and Smallville; correct? |
| 16:19:22 | 16 | A.   I see that it's written there. |
| 16:19:28 | 17 | Q.   Okay.  Was this shown to you at the time that |
| 16:19:31 | 18 | you entered into your first agreement with |
| 16:19:36 | 19 | Mr. Toberoff? |
| 16:19:36 | 20 | A.   No, it was not. |
| 16:19:40 | 21 | Q.   When you signed your agreement with |
| 16:19:43 | 22 | Mr. Toberoff in August, 2002 -- excuse me -- in |
| 16:19:46 | 23 | October, 2002, the one with IP Worldwide -- |
| 16:19:49 | 24 | A.   Yeah, the end of October. |
| 16:19:51 | 25 | Q.   The end -- whenever it was -- |

**EXHIBIT S**
**650**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON — 7/22/2011

Page 214

| 16:19:53 | 1 | A.    Yeah. |

16:19:53    2    Q.    -- were you aware that as of that point in

16:19:58    3    time that Mr. Toberoff had entered into a joint

16:20:02    4    venture through his company, Pacific Pictures, with

16:20:06    5    the Shusters regarding Superman rights that included,

16:20:09    6    without limitation, Superboy?

16:20:11    7        MR. TOBEROFF:  Misstates the paragraph 1.

8    BY MR. PETROCELLI:

16:20:15    9    Q.    You can answer.

16:20:17    10    A.    The information that we had from Jean Peavy

16:20:20    11    was that Mr. Toberoff was her attorney, and she didn't

16:20:25    12    supply us with any agreements or any more details than

16:20:29    13    that.

16:20:29    14    Q.    You didn't even know that Mr. Toberoff had

16:20:32    15    entered into a joint venture through his company,

16:20:36    16    Pacific Pictures?

16:20:37    17    A.    We knew that he was their attorney.

16:20:39    18    Q.    No, you're not answering my question.

16:20:41    19    A.    No, I'm trying to.  I'm sorry.

16:20:43    20    Q.    No.  What you're doing is you're continuing

16:20:45    21    to assert that Mr. Toberoff's your attorney because

16:20:49    22    you believe that it is important to his case and your

16:20:53    23    case to say that.

16:20:54    24        MR. TOBEROFF:  Please don't argue with the

16:20:55    25    witness.

EXHIBIT S
651

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 16:20:55 | 1 | THE WITNESS:  No, I'm not. |
| 16:20:57 | 2 | MR. TOBEROFF:  Wait a second.  Ask your |
| 16:20:59 | 3 | question.  Don't argue with her. |
| | 4 | BY MR. PETROCELLI: |
| 16:20:59 | 5 | Q.   I'm capable of asking a question that will |
| 16:21:02 | 6 | elicit that answer, but frankly, you know, we have |
| 16:21:05 | 7 | somewhat limited time.  I'm not asking that question, |
| 16:21:08 | 8 | so please bear with me. |
| 16:21:10 | 9 | Can you read my question back?  I move to |
| 16:21:12 | 10 | strike that answer as nonresponsive. |
| 16:21:14 | 11 | THE WITNESS:  Okay.  I just wanted to say I'm |
| 16:21:16 | 12 | sorry.  That's just the way I express myself |
| 16:21:19 | 13 | sometimes.  I'll try and listen more closely to your |
| 16:21:21 | 14 | question. |
| 16:21:22 | 15 | MR. TOBEROFF:  And I would advise you don't |
| 16:21:25 | 16 | let Mr. Petrocelli browbeat you with his argumentative |
| 16:21:29 | 17 | statements.  You answer the questions as you see fit. |
| 16:21:32 | 18 | THE WITNESS:  Um-hum. |
| 16:21:51 | 19 | (The record was read.) |
| 16:21:51 | 20 | THE WITNESS:  The answer is no. |
| 16:21:54 | 21 | MR. PETROCELLI:  Let me sharpen my question a |
| 16:21:56 | 22 | bit. |
| 16:21:56 | 23 | Q.   As of the time you had entered into the first |
| 16:21:59 | 24 | agreement with Mr. Toberoff, the IP Worldwide |
| 16:22:02 | 25 | agreement in October of 2002 or as of October, 2002, |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 216

| | | |
|---|---|---|
| 16:22:07 | 1 | were you aware that he, through Pacific Pictures or |
| 16:22:10 | 2 | any other entity, had entered into a joint venture |
| 16:22:16 | 3 | agreement with the Shusters regarding Superboy or |
| 16:22:19 | 4 | Superman? |
| 16:22:19 | 5 | A.   Would you speak up just a little bit?  I |
| 16:22:22 | 6 | think I got what you said, but I'd appreciate it if |
| 16:22:24 | 7 | maybe she could read it back. |
| 16:22:27 | 8 | MR. PETROCELLI:  Definitely I will try to |
| 16:22:28 | 9 | speak up. |
| 16:22:29 | 10 | THE WITNESS:  Thank you. |
| | 11 | (The record was read.) |
| 16:22:52 | 12 | THE WITNESS:  No, I was not aware of that. |
| | 13 | BY MR. PETROCELLI: |
| 16:22:54 | 14 | Q.   Were you aware of that as of the time that |
| 16:22:57 | 15 | you entered into what you call the litigation |
| 16:22:59 | 16 | agreement with Mr. Toberoff sometime in 2004? |
| 16:23:05 | 17 | A.   You're asking the same question about if I |
| 16:23:07 | 18 | knew about this? |
| 16:23:08 | 19 | Q.   Yes. |
| 16:23:09 | 20 | A.   No, I don't believe so. |
| 16:23:15 | 21 | Q.   And to your knowledge, your mother was not |
| 16:23:16 | 22 | aware of it either; correct? |
| 16:23:19 | 23 | A.   Except it's possible, because I have not read |
| 16:23:24 | 24 | it in a really long time, but it's possible that it |
| 16:23:26 | 25 | was disclosed in one of the -- one of the -- what was |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 217

| | | |
|---|---|---|
| 16:23:31 | 1 | it called?  The conflict.  It might have been |
| 16:23:38 | 2 | disclosed in the conflict document. |
| 16:23:39 | 3 | Q.  Are you saying that it was? |
| 16:23:40 | 4 | A.  I'm saying -- |
| 16:23:41 | 5 | MR. TOBEROFF:  Don't discuss the content of |
| 16:23:45 | 6 | conflict letter. |
| 16:23:45 | 7 | THE WITNESS:  Okay.  I'm saying I don't know. |
| | 8 | BY MR. PETROCELLI: |
| 16:23:54 | 9 | Q.  Okay.  So let's go back to paragraph 88 of |
| 16:23:58 | 10 | the Complaint, which is paragraph 59.  The second |
| 16:24:01 | 11 | bullet states "The original Superboy 'script' on which |
| 16:24:04 | 12 | the Siegel Heirs' ownership claims rely openly |
| 16:24:07 | 13 | contains the byline:  By Jerry Siegel and Joe |
| 16:24:10 | 14 | Shuster."  Do you see that? |
| 16:24:12 | 15 | A.  I do see that. |
| 16:24:13 | 16 | Q.  Were you aware of Superboy scripts -- prior |
| 16:24:17 | 17 | to reading this Complaint, were you aware that there |
| 16:24:19 | 18 | were Superboy scripts that contained a byline that |
| 16:24:23 | 19 | included Joe Shuster as well as Jerry Siegel? |
| 16:24:26 | 20 | A.  I -- I saw a script that had that written, |
| 16:24:31 | 21 | typed on it. |
| 16:24:31 | 22 | Q.  Just one. |
| 16:24:33 | 23 | A.  Well, I only believe there was one.  I can't |
| 16:24:35 | 24 | remember more than one. |
| 16:24:36 | 25 | Q.  Okay.  And you had seen that prior to reading |

## LAURA SIEGEL LARSON - 7/22/2011

Page 218

| | | |
|---|---|---|
| 16:24:42 | 1 | this lawsuit; is that right? |
| 16:24:43 | 2 | A.   I saw that a long time ago. |
| 16:24:45 | 3 | Q.   A long time ago.  And the next bullet talks |
| 16:24:49 | 4 | about "In 1948, a Court in Westchester, New York found |
| 16:24:55 | 5 | that Joe Shuster provided the artwork for the Superboy |
| 16:24:58 | 6 | story and More Fun Comics No. 101."  Were you aware of |
| 16:25:04 | 7 | that? |
| 16:25:04 | 8 | A.   Yes. |
| 16:25:04 | 9 | Q.   Okay.  And the next bullet says "In 1972 and |
| 16:25:06 | 10 | 1973, Siegel and Shuster together filed their own |
| 16:25:10 | 11 | copyright renewal notices with the copyright office |
| 16:25:12 | 12 | for Superboy, in which they identified Superboy as a |
| 16:25:15 | 13 | work that they had jointly created."  Were you aware |
| 16:25:17 | 14 | of that? |
| 16:25:18 | 15 | A.   I'm not aware of that. |
| 16:25:19 | 16 | Q.   When you read this, did you inquire of anyone |
| 16:25:25 | 17 | whether that was true or not? |
| 16:25:27 | 18 | A.   Well, I was surprised by it, and no, I didn't |
| 16:25:33 | 19 | inquire about it. |
| 16:25:34 | 20 | Q.   Well, given you were surprised by it, do you |
| 16:25:36 | 21 | mean it was not consistent with what you believed to |
| 16:25:39 | 22 | be true? |
| 16:25:39 | 23 | A.   Was this consistent? |
| 16:25:40 | 24 | Q.   This was inconsistent with what you believed |
| 16:25:43 | 25 | to be true; correct? |

LAURA SIEGEL LARSON - 7/22/2011

Page 219

| | | |
|---|---|---|
| 16:25:44 | 1 | A.   Could you ask that in another way?  I'm not |
| | 2 | following you. |
| 16:25:47 | 3 | Q.   You said you were surprised by it.  Why were |
| 16:25:49 | 4 | you surprised by it? |
| 16:25:50 | 5 | A.   I was surprised that this, what you're saying |
| 16:25:56 | 6 | here, occurred in 1972 and 1973. |
| 16:25:58 | 7 | Q.   Why were you surprised? |
| 16:26:00 | 8 | A.   Because I was not aware of it. |
| 16:26:03 | 9 | Q.   Okay.  And did you disbelieve it when you |
| 16:26:05 | 10 | read it? |
| 16:26:10 | 11 | A.   I questioned whether it was true or not. |
| 16:26:13 | 12 | Q.   And have you since found out whether or not |
| 16:26:16 | 13 | it's true? |
| 16:26:18 | 14 | A.   I believe that it falls under a discussion |
| 16:26:24 | 15 | that I had with Mr. Toberoff. |
| 16:26:28 | 16 | Q.   Okay.  Did you have that discussion after |
| 16:26:31 | 17 | reading it in the lawsuit that we filed in May, 2010, |
| 16:26:35 | 18 | the one that you just described? |
| 16:26:37 | 19 | A.   I believe so. |
| 16:26:38 | 20 | Q.   Okay.  Did Mr. Toberoff show you the |
| 16:26:47 | 21 | copyright renewal forms or the copyright registration |
| 16:26:50 | 22 | forms? |
| 16:26:50 | 23 | MR. TOBEROFF:  Attorney-client privilege. |
| 16:26:51 | 24 | Instruct you not to answer. |
| | 25 | BY MR. PETROCELLI: |

## LAURA SIEGEL LARSON - 7/22/2011

Page 220

| | | |
|---|---|---|
| 16:26:52 | 1 | Q.    Have you ever seen those forms, the ones |
| 16:26:56 | 2 | referenced in paragraph 88 of our lawsuit? |
| 16:26:58 | 3 | A.    I don't remember ever seeing them. |
| 16:27:01 | 4 | Q.    Take a look at Exhibit 17. |
| | 5 | (Whereupon, Plaintiff's Exhibit 17 |
| 16:27:09 | 6 | was placed before the witness.) |
| 16:27:10 | 7 | THE WITNESS:  Thank you. |
| | 8 | BY MR. PETROCELLI: |
| 16:27:16 | 9 | Q.    This is for the year 1972 listing of renewal |
| 16:27:20 | 10 | registrations from the copyright office.  The year |
| 16:27:23 | 11 | "1972" is in the top-left corner.  And -- well, first |
| 16:27:28 | 12 | of all, have you ever seen this document before? |
| 16:27:32 | 13 | A.    I've seen similar documents.  I can't tell |
| 16:27:36 | 14 | you whether I saw this page or not. |
| 16:27:38 | 15 | Q.    Well, have you ever seen a document which |
| 16:27:40 | 16 | identified the name Joe Shuster and Superboy? |
| 16:27:44 | 17 | A.    I don't recall that, no. |
| 16:27:51 | 18 | Q.    I'll show you one more for 1973.  Okay.  I'll |
| 16:27:56 | 19 | show you another one I forgot to include.  This is |
| 16:28:00 | 20 | Exhibit 18. |
| | 21 | (Whereupon, Plaintiff's Exhibit 18 |
| 16:28:02 | 22 | was placed before the witness.) |
| 16:28:02 | 23 | THE WITNESS:  Excuse me.  May I just have a |
| 16:28:04 | 24 | minute because I'm having trouble with this small |
| 16:28:07 | 25 | print. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 221

| | | |
|---|---|---|
| 16:28:24 | 1 | BY MR. PETROCELLI: |
| 16:28:25 | 2 | Q.    Take a look at Exhibit 18, which is a |
| 16:28:29 | 3 | November 15, 1972, certification of a copyright |
| 16:28:36 | 4 | registration for Superboy. |
| 16:28:40 | 5 | A.    Okay. |
| 16:28:41 | 6 | Q.    And you will see on the second page that the |
| 16:28:47 | 7 | two claimants are Jerome Siegel -- that's your |
| 16:28:51 | 8 | father -- as an author and Joe Shuster as an author |
| 16:28:56 | 9 | for the title "Superboy."  Do you see that? |
| 16:29:01 | 10 | A.    Yes. |
| 16:29:02 | 11 | Q.    And is this the first time you've seen this |
| 16:29:04 | 12 | document? |
| 16:29:04 | 13 | A.    Yes. |
| 16:29:08 | 14 | Q.    And finally, take a look at Exhibit 19, which |
| | 15 | is a listing of registrations for the year 1973. |
| | 16 | (Whereupon, Plaintiff's Exhibit 19 |
| 16:29:25 | 17 | was placed before the witness.) |
| | 18 | BY MR. PETROCELLI: |
| 16:29:26 | 19 | Q.    And you'll see a reference to "Superboy." |
| 16:29:38 | 20 | A.    I see "Superman." |
| 16:29:48 | 21 | Q.    You see under the name "Jerome Siegel" it |
| 16:29:52 | 22 | says "Superboy.  By Jerome Siegel"? |
| 16:29:54 | 23 | A.    This one entry, yeah.  All of these others |
| 16:29:56 | 24 | are Superman.  I see. |
| 16:29:57 | 25 | Q.    Do you see the one for Superboy where it says |

**Merrill   Corporation   -   Los Angeles**

800-826-0277                        www.merrillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 222

| | | |
|---|---|---|
| 16:30:00 | 1 | "By Jerome Siegel & Joe Shuster"? |
| 16:30:02 | 2 | A.    In More Fun Comics? |
| 16:30:04 | 3 | Q.    Yes.  Is that the first time you've seen this |
| 16:30:11 | 4 | document? |
| 16:30:11 | 5 | A.    Yeah, I believe so. |
| 16:30:21 | 6 | Q.    Okay.  Are you aware, going down to the next |
| 16:30:25 | 7 | bullet of paragraph 88, that in Action Comics No. 1, |
| 16:30:29 | 8 | Joe Shuster drew Superman as a very young boy |
| 16:30:34 | 9 | displaying a chair being held over his head? |
| 16:30:40 | 10 | A.    Yes.  You mean that one -- that one -- if I'm |
| 16:30:43 | 11 | recalling correctly, there's one panel. |
| 16:30:46 | 12 | Q.    If you turn the page -- |
| 16:30:49 | 13 | A.    That's the panel. |
| 16:30:51 | 14 | Q.    -- that's the panel that you're referring to? |
| 16:30:53 | 15 | MR. TOBEROFF:  Superbaby. |
| 16:30:54 | 16 | THE WITNESS:  As a baby, right. |
| | 17 | BY MR. PETROCELLI: |
| 16:30:55 | 18 | Q.    "Action Comics No. 1 (1930)."  Do you see that? |
| 16:30:58 | 19 | A.    Yes. |
| 16:30:58 | 20 | Q.    And you understood that Joe Shuster had |
| 16:31:01 | 21 | illustrated that; correct? |
| 16:31:02 | 22 | A.    Yes, he did. |
| 16:31:06 | 23 | Q.    And in the next panel on page 30 of the |
| 16:31:10 | 24 | Complaint, which is part of paragraph 88, were you |
| 16:31:17 | 25 | aware that Mr. Shuster had illustrated a -- Superman |

**EXHIBIT S**
**659**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc