# EXHIBIT S

# PART 5 OF 7

LAURA SIEGEL LARSON - 7/22/2011

Page 223

| | | |
|---|---|---|
| 16:31:24 | 1 | as a youth in Superman No. 1 in May of 1939? |
| 16:31:30 | 2 | A.   Well, this says it's from Superman No. 1, |
| 16:31:34 | 3 | and, you know, I don't recall it being, but I |
| 16:31:38 | 4 | recognize this panel.  So yes, this one panel I do |
| 16:31:42 | 5 | recognize. |
| 16:31:43 | 6 | Q.   Okay.  And then also comic strips in 1942 |
| 16:31:53 | 7 | depicting Superman as a youth as shown in the Superman |
| 16:32:01 | 8 | Sunday Strip, May 31, 1942, depicted on page 31 of our |
| 16:32:01 | 9 | Complaint, have you seen that panel before? |
| 16:32:02 | 10 | A.   No, I haven't seen that one before.  I don't |
| 16:32:04 | 11 | recall that one. |
| 16:32:05 | 12 | Q.   Now, given that Joe -- given this body of |
| 16:32:15 | 13 | evidence that Joe Shuster was a co-creator of |
| 16:32:24 | 14 | Superboy, are you aware of any reason why -- |
| | 15 | withdrawn. |
| 16:32:30 | 16 | Given this body of evidence regarding Joe |
| 16:32:39 | 17 | Shuster's role in the creation of Superboy, including |
| 16:32:44 | 18 | illustrating Superboy and filing the copyright |
| 16:32:48 | 19 | registrations in his name and so forth -- |
| 16:32:50 | 20 | MR. TOBEROFF:  Assumes facts.  Lacks |
| 16:32:52 | 21 | foundation. |
| | 22 | BY MR. PETROCELLI: |
| 16:32:53 | 23 | Q.   -- are you -- did you ever have any |
| 16:32:57 | 24 | discussion with anyone about why the Shusters two |
| 16:33:05 | 25 | years after entering into that agreement with |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 224

| | | |
|---|---|---|
| 16:33:07 | 1 | Mr. Toberoff's company in which they included as one |
| 16:33:11 | 2 | of the claimed rights -- rights to Superboy would then |
| 16:33:15 | 3 | disavow such rights? |
| 16:33:17 | 4 | MR. TOBEROFF: Assumes facts. Lacks |
| 16:33:19 | 5 | foundation. Misstates the record. |
| 16:33:24 | 6 | And you could answer excluding your |
| 16:33:29 | 7 | conversations with your attorneys. |
| 16:33:31 | 8 | THE WITNESS: And the question was did I |
| 16:33:33 | 9 | discuss this with anyone? |
| 16:33:34 | 10 | MR. PETROCELLI: Yes. |
| 16:33:39 | 11 | THE WITNESS: No one other than my attorney. |
| | 12 | BY MR. PETROCELLI: |
| 16:33:41 | 13 | Q.    And who is your attorney? |
| 16:33:43 | 14 | A.    Marc Toberoff. |
| 16:33:45 | 15 | Q.    And you discussed with your attorney -- |
| 16:33:48 | 16 | MR. TOBEROFF: Excuse me. Excuse me. I want |
| 16:33:51 | 17 | to make sure when you're answering these privileged |
| 16:33:54 | 18 | questions not to answer the question -- the questions |
| 16:33:58 | 19 | that invade the privilege, when I say to you you can |
| 16:34:02 | 20 | only answer to the extent of conversations excluding |
| 16:34:05 | 21 | your conversations with me, that means if you have a |
| 16:34:08 | 22 | conversation with somebody outside of your |
| 16:34:10 | 23 | conversations with me and they're not an attorney, you |
| 16:34:12 | 24 | can answer the question. Otherwise, you don't answer |
| 16:34:14 | 25 | the question. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 225

| 16:34:15 | 1 | THE WITNESS: Oh, oh. Okay. I'm sorry. I |
| 16:34:17 | 2 | didn't -- |
| 16:34:18 | 3 | MR. TOBEROFF: Don't answer the question in |
| 16:34:19 | 4 | such a way that by inference you're disclosing the |
| 16:34:22 | 5 | substance of your conversations with me. |
| 16:34:24 | 6 | THE WITNESS: Okay. I was confused. |
| 16:34:26 | 7 | MR. TOBEROFF: It's tricky. It can be |
| 16:34:27 | 8 | tricky. |
| 16:34:28 | 9 | THE WITNESS: Yeah. |
| | 10 | BY MR. PETROCELLI: |
| 16:34:29 | 11 | Q.   Did you ever discuss this with your mother? |
| 16:34:34 | 12 | MR. TOBEROFF: Discuss what? |
| | 13 | BY MR. PETROCELLI: |
| 16:34:35 | 14 | Q.   The issue that I've been talking about, |
| 16:34:39 | 15 | why -- why on the one hand the Shusters would claim an |
| 16:34:43 | 16 | interest in Superboy, particularly given some of the |
| 16:34:49 | 17 | evidence that I have discussed with you, and then on |
| 16:34:52 | 18 | the other hand relinquish any interest in Superboy two |
| 16:34:55 | 19 | years later. |
| 16:34:57 | 20 | MR. TOBEROFF: Mis- -- lacks foundation. |
| 16:34:59 | 21 | Assumes facts.  Misstates the record. |
| 16:35:01 | 22 | You can answer. |
| 16:35:03 | 23 | THE WITNESS: I don't -- I don't believe that |
| 16:35:04 | 24 | I -- that I discussed the way you asked the question. |
| | 25 | BY MR. PETROCELLI: |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 226

| | | |
|---|---|---|
| 16:35:10 | 1 | Q.    Well, did you discuss with your mother -- |
| 16:35:16 | 2 | MR. TOBEROFF:  You can say no.  Don't -- |
| | 3 | BY MR. PETROCELLI: |
| 16:35:17 | 4 | Q.    -- any issue relating to the relinquishment |
| 16:35:23 | 5 | of the Superboy interest or any claim to a Superboy |
| 16:35:27 | 6 | interest by the Shuster family? |
| 16:35:31 | 7 | A.    No. |
| 16:35:31 | 8 | MR. TOBEROFF:  Same -- you answered for me |
| 16:35:34 | 9 | too quickly for me to object. |
| | 10 | BY MR. PETROCELLI: |
| | 11 | Q.    Were -- |
| 16:35:35 | 12 | MR. TOBEROFF:  Excuse me.  Same objection. |
| | 13 | BY MR. PETROCELLI: |
| 16:35:43 | 14 | Q.    Were you aware prior to reading our lawsuit |
| 16:35:55 | 15 | that after Mr. Toberoff's agreement with you in |
| 16:36:01 | 16 | October, 2002, he entered into a new agreement with |
| 16:36:10 | 17 | the Shusters which deleted Superboy from the |
| 16:36:14 | 18 | definition of rights in their joint venture? |
| 16:36:18 | 19 | A.    No. |
| 16:36:18 | 20 | Q.    Take a look at Exhibit 13. |
| | 21 | (Whereupon, Plaintiff's Exhibit 13 |
| 16:36:28 | 22 | was placed before the witness.) |
| | 23 | BY MR. PETROCELLI: |
| 16:36:29 | 24 | Q.    Now, what's the other one?  Exhibit -- I want |
| 16:36:38 | 25 | you to put Exhibit 10 and Exhibit 13 next to each |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 227

| | | |
|---|---|---|
| 16:36:41 | 1 | other. |
| 16:36:43 | 2 | A.    What is 10?  What am I looking for? |
| 16:36:46 | 3 | Q.    I'll straighten this all out for you once you |
| 16:36:49 | 4 | get 10. |
| 16:36:50 | 5 | A.    Oh, I didn't get it yet.  That's why. |
| 16:36:54 | 6 | There's a copy here? |
| 16:36:55 | 7 | Q.    Yes. |
| 16:37:01 | 8 | A.    Do you want this back?  Do you need it, Marc? |
| 16:37:05 | 9 | MR. TOBEROFF:  I already have it. |
| 16:37:07 | 10 | THE WITNESS:  Okay. |
| | 11 | BY MR. PETROCELLI: |
| 16:37:07 | 12 | Q.    So just to make sure that we're oriented |
| 16:37:10 | 13 | correctly, Exhibit 10 is the first Joint Venture |
| 16:37:14 | 14 | Agreement between Mr. Toberoff's company and the |
| 16:37:17 | 15 | Shusters dated as of November 23, 2001, and Exhibit 13 |
| 16:37:30 | 16 | is the change or supplement to that joint venture |
| 16:37:36 | 17 | dated as of -- dated as of October 27, 2003, some two |
| 16:37:42 | 18 | years later.  Okay? |
| 16:37:43 | 19 | A.    Uh-huh. |
| 16:37:44 | 20 | Q.    And you will see in paragraph 1 of Exhibit 10 |
| 16:37:49 | 21 | where it discusses the rights, it references the |
| 16:37:52 | 22 | Superboy and Smallville.  I've already showed that to |
| 16:37:55 | 23 | you; right?  In Exhibit 10? |
| 16:37:57 | 24 | A.    Yes, I saw Exhibit 10. |
| 16:37:59 | 25 | Q.    And now if you go to Exhibit 13 where there's |

EXHIBIT S
664

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 228

| | | |
|---|---|---|
| 16:38:03 | 1 | a discussion of Superman in paragraph 1, you'll see |
| 16:38:13 | 2 | the word "Rights" in capital letter "R" is defined in |
| 16:38:16 | 3 | the first sentence of paragraph 1. Do you see that? |
| 16:38:19 | 4 | A.   Yes, I see it. |
| 16:38:20 | 5 | Q.   And then if you read the rest of that |
| 16:38:23 | 6 | paragraph you'll see a reference to "all rights to |
| 16:38:26 | 7 | proceeds from 'SUPERMAN,' or the 'SUPERMAN' stories in |
| 16:38:32 | 8 | comic books, including, without limitation, Client's |
| 16:38:36 | 9 | copyright termination interest in 'SUPERMAN.'" Do you |
| 16:38:40 | 10 | see that? |
| 16:38:40 | 11 | A.   Yes, I do. |
| 16:38:43 | 12 | Q.   And you do not see any reference in paragraph |
| 16:38:46 | 13 | 1 to Superboy or Smallville; is that correct? |
| 16:38:47 | 14 | MR. TOBEROFF:  Before you answer the |
| 16:38:48 | 15 | question, since he's asking you to compare these |
| 16:38:50 | 16 | paragraphs, I would like you to read the sentences |
| 16:38:52 | 17 | he's referring to carefully before you answer any |
| 16:38:54 | 18 | questions about it. |
| 16:38:56 | 19 | THE WITNESS:  Um-hum. |
| 16:39:12 | 20 | And your question was? |
| 16:39:14 | 21 | MR. TOBEROFF:  And read the other one he's |
| 16:39:15 | 22 | asking you to compare it to as well. |
| 16:39:17 | 23 | THE WITNESS:  Yeah, I did just read that. |
| 16:39:19 | 24 | Thank you. |
| | 25 | BY MR. PETROCELLI: |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 229

| 16:39:19 | 1 | Q. And you would agree with me you see no |
| 16:39:22 | 2 | reference to Superboy or Smallville in the discussion |
| 16:39:24 | 3 | of the rights in paragraph 1 of Exhibit 13, the 2003 |
| 16:39:29 | 4 | agreement; correct? |
| 16:39:29 | 5 | A. Yes. |
| 16:39:30 | 6 | Q. And in between these two joint venture |
| 16:39:34 | 7 | agreements, 2001 and 2003, that Mr. Toberoff entered |
| 16:39:38 | 8 | into with the Shusters is when he and you joined up |
| 16:39:45 | 9 | and signed your agreement in October of 2002; correct? |
| 16:39:50 | 10 | A. Yes. |
| 16:39:52 | 11 | Q. And when you signed this agreement with |
| 16:39:58 | 12 | Mr. Toberoff and Mr. Emanuel in October of 2002, you |
| 16:40:03 | 13 | were asserting a 100 percent interest to Superboy on |
| 16:40:07 | 14 | the ground that your father, Jerome Siegel, was the |
| 16:40:12 | 15 | sole creator of Superboy; correct? |
| 16:40:15 | 16 | MR. TOBEROFF: Vague and ambiguous. Where in |
| 16:40:18 | 17 | the agreement? Just in general? |
| 16:40:20 | 18 | MR. PETROCELLI: Just in general. |
| 16:40:21 | 19 | THE WITNESS: In general that our -- |
| | 20 | BY MR. PETROCELLI: |
| | 21 | Q. That was your point of view. |
| 16:40:24 | 22 | A. You said that our belief, our point of view |
| 16:40:27 | 23 | was that -- yes. |
| 16:40:28 | 24 | Q. And you expressed that point of view to |
| 16:40:31 | 25 | Mr. Emanuel and Mr. Toberoff, that your father was the |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 230

| | | |
|---|---|---|
| 16:40:34 | 1 | sole creator of Superboy and you were claiming a |
| 16:40:37 | 2 | hundred percent termination interest to Superboy; |
| 16:40:41 | 3 | correct? |
| 16:40:41 | 4 | MR. TOBEROFF: Vague as to time. |
| | 5 | BY MR. PETROCELLI: |
| 16:40:44 | 6 | Q. Correct? |
| 16:40:44 | 7 | A. Are you saying at the time in 2002? |
| 16:40:47 | 8 | Q. Yes. |
| 16:40:48 | 9 | A. Yes. |
| 16:40:48 | 10 | Q. And it was shortly -- a very short time after |
| 16:40:52 | 11 | you signed the agreement with Mr. Emanuel and |
| 16:40:57 | 12 | Mr. Toberoff in October, 2002, that your family issued |
| 16:41:03 | 13 | a notice of termination with respect to Superboy; |
| 16:41:05 | 14 | correct? |
| 16:41:06 | 15 | A. Yes. |
| 16:41:06 | 16 | Q. That was, in fact, the next month, in |
| 16:41:09 | 17 | November; correct? |
| 16:41:11 | 18 | A. It could have been November. |
| 16:41:12 | 19 | Q. And that notice of termination for Superboy |
| 16:41:15 | 20 | that your family filed or that was filed on behalf of |
| 16:41:18 | 21 | your family asserted that your father, Mr. Siegel, was |
| 16:41:22 | 22 | the sole creator of Superboy and you were claiming a |
| 16:41:25 | 23 | hundred percent termination interest, not 50 percent; |
| 16:41:28 | 24 | correct? |
| 16:41:28 | 25 | MR. TOBEROFF: Okay. Wait. I would like to |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 231

| Time | Line | Text |
|---|---|---|
| 16:41:30 | 1 | slow this down.  I need time to object.  Okay?  So |
| 16:41:34 | 2 | after he asks the question, count to 5 or 10 so I have |
| 16:41:37 | 3 | time to object even if I don't object.  Okay? |
| 16:41:40 | 4 | MR. PETROCELLI:  I don't think it's |
| 16:41:41 | 5 | reasonable to count to 5 to 10. |
| 16:41:44 | 6 | MR. TOBEROFF:  Count to 5. |
| 16:41:45 | 7 | MR. PETROCELLI:  You just need to pause. |
| 16:41:47 | 8 | MR. TOBEROFF:  I'm happy with 5. |
|  | 9 | MR. PETROCELLI:  Just be reasonable. |
| 16:41:49 | 10 | Can we repeat the question, please? |
| 16:41:51 | 11 | MR. TOBEROFF:  It's a common instruction. |
| 16:41:52 | 12 | You say count to 10 knowing no one is going to count |
| 16:41:56 | 13 | to 10 and you end up with 2. |
| 16:42:23 | 14 | (The record was read.) |
| 16:42:24 | 15 | THE WITNESS:  Yes. |
|  | 16 | BY MR. PETROCELLI: |
| 16:42:25 | 17 | Q.   And at the time that you authorized the |
| 16:42:26 | 18 | filing of that hundred percent Superboy termination |
| 16:42:29 | 19 | notice in November of 2002, were you aware that |
| 16:42:38 | 20 | Mr. Toberoff through his company, Pacific Pictures, |
| 16:42:41 | 21 | had entered into a joint venture agreement with the |
| 16:42:46 | 22 | Shusters in which they included among the rights of |
| 16:42:50 | 23 | the joint venture references to Superboy? |
| 16:43:00 | 24 | A.   No, we were not aware of that. |
| 16:43:02 | 25 | MR. PETROCELLI:  Okay.  We'll take your break |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 232

| | | |
|---|---|---|
| 16:43:04 | 1 | now. |
| 16:43:04 | 2 | THE WITNESS:  Thank you. |
| 16:43:05 | 3 | THE VIDEOGRAPHER:  Off the record.  The time |
| 16:43:08 | 4 | is 4:43. |
| 17:00:12 | 5 | (A recess was taken.) |
| 17:00:20 | 6 | THE VIDEOGRAPHER:  We're back on the record, |
| 17:00:22 | 7 | and this marks the beginning of tape number four in |
| 17:00:26 | 8 | the deposition of Laura Siegel.  The time is 5 |
| 17:00:28 | 9 | o'clock. |
| | 10 | BY MR. PETROCELLI: |
| 17:00:28 | 11 | Q.   Ms. Siegel, were you aware that in -- that |
| 17:00:34 | 12 | after Mr. Toberoff entered into his first agreement |
| 17:00:37 | 13 | with the Shusters in November, 2001, that around that |
| 17:00:43 | 14 | same period of time, I should say, that he contacted |
| 17:00:48 | 15 | Kevin Marks or left a voicemail for Kevin Marks -- |
| 17:00:54 | 16 | A.   I -- no. |
| 17:00:54 | 17 | Q.   -- on November 29, 2001? |
| 17:00:57 | 18 | A.   2001, no. |
| 17:00:58 | 19 | Q.   Did you learn about that contact from |
| 17:01:02 | 20 | Mr. Marks at that time? |
| 17:01:07 | 21 | A.   No. |
| 17:01:08 | 22 | Q.   And are you aware that in February, 2002, |
| 17:01:14 | 23 | February 6, to be exact, that Mr. Toberoff contacted |
| 17:01:19 | 24 | Kevin Marks again? |
| 17:01:23 | 25 | A.   No. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 233

| | | |
|---|---|---|
| 17:01:23 | 1 | MR. TOBEROFF:  What date? |
| 17:01:25 | 2 | MR. PETROCELLI:  February 6, 2002. |
| 17:01:27 | 3 | Q.   And are you aware -- and I'm basing these |
| 17:01:32 | 4 | questions off of, I'll tell you, the testimony of |
| 17:01:35 | 5 | Kevin Marks -- |
| 17:01:35 | 6 | A.   Okay. |
| 17:01:35 | 7 | Q.   -- in the case that you filed. |
| 17:01:37 | 8 | A.   Um-hum. |
| 17:01:39 | 9 | Q.   Are you aware -- |
| 17:01:40 | 10 | MR. TOBEROFF:  Allegedly. |
| | 11 | BY MR. PETROCELLI: |
| 17:01:41 | 12 | Q.   -- that Mr. Marks said or -- are you aware |
| 17:01:45 | 13 | that Mr. Toberoff told Mr. Marks that he was |
| 17:01:47 | 14 | interested in the Superman property and the Superboy |
| 17:01:51 | 15 | property when he called him and spoke to him for the |
| 17:01:53 | 16 | first time in February of 2002? |
| 17:01:56 | 17 | A.   2000 -- I can't hear you. |
| 17:02:01 | 18 | Q.   February, 2002.  Were you aware that |
| 17:02:01 | 19 | Mr. Toberoff told Mr. Marks that he was interested in |
| 17:02:03 | 20 | the Superman property and the Superboy property? |
| 17:02:06 | 21 | A.   No, I was not. |
| 17:02:07 | 22 | Q.   Mr. Marks did not convey that to you? |
| 17:02:09 | 23 | A.   No, he did not. |
| 17:02:13 | 24 | Q.   And are you aware that Mr. Marks told |
| 17:02:18 | 25 | Mr. Toberoff on that occasion that the Siegels were |

**EXHIBIT S**
**670**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 234

| 17:02:22 | 1 | very far along with DC Comics and at a documentation |
| 17:02:26 | 2 | phase? |
| 17:02:27 | 3 | A.    Well, I don't know that he had the |
| 17:02:28 | 4 | conversation. |
| 17:02:30 | 5 | Q.    Okay.  Were you aware that three days later |
| 17:02:33 | 6 | on February 9, 2002, Mr. Toberoff approached Steve |
| 17:02:38 | 7 | Spira, an executive at Warner Bros., at an event and |
| 17:02:42 | 8 | said that Warner Bros. had a Superman rights problem? |
| 17:02:46 | 9 | A.    No, I did not know that. |
| 17:02:48 | 10 | Q.    Take a look at the next exhibit in order, |
| 17:02:50 | 11 | which is Exhibit 60.  And this is an agreement -- |
| 17:03:08 | 12 | excuse me.  This is a document between Mr. Emanuel and |
| 17:03:11 | 13 | Mr. Toberoff dated June 3. |
| 17:03:15 | 14 | A.    Thank you. |
|  | 15 | (Whereupon, Plaintiff's Exhibit 60 |
| 17:03:24 | 16 | was marked for identification.) |
| 17:03:24 | 17 | THE WITNESS:  June 3. |
| 17:03:42 | 18 | MR. PETROCELLI:  Excuse me.  Exhibit 60 is a |
| 17:03:45 | 19 | redacted agreement, redacted meaning that we don't |
| 17:03:48 | 20 | have the whole agreement, just parts of it, signed |
| 17:03:52 | 21 | between Mr. Emanuel and Mr. Toberoff on or about |
| 17:03:57 | 22 | February 12, 2002. |
| 17:03:59 | 23 | Q.    Have you ever seen this document before -- or |
| 17:04:04 | 24 | have you ever seen the agreement in its entirety? |
| 17:04:11 | 25 | A.    No. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 235

| 17:04:11 | 1 | Q. And were you aware that IP Worldwide was |
| 17:04:20 | 2 | created as a combination between Mr. Emanuel and |
| 17:04:24 | 3 | Mr. Toberoff's company, Pacific Pictures Corporation? |
| 17:04:40 | 4 | A. No. |
| 17:04:41 | 5 | MR. TOBEROFF: I just want to object. This |
| 17:04:44 | 6 | document is stamped "Confidential," and I believe it |
| 17:04:47 | 7 | was stamped -- I believe by the Bates number this is a |
| 17:04:53 | 8 | document produced by Endeavor. |
| 17:05:00 | 9 | MR. PETROCELLI: In the Siegel case. |
| 17:05:01 | 10 | MR. TOBEROFF: In the Siegel case, and I |
| 17:05:02 | 11 | believe it was stamped "Confidential" pursuant to and |
| 17:05:06 | 12 | under a protective order in that case, and I'm just |
| 17:05:09 | 13 | objecting on that basis and not waiving any objections |
| 17:05:17 | 14 | to the use of this document in this deposition, and at |
| 17:05:22 | 15 | a minimum it should be subject to that protective |
| 17:05:29 | 16 | order because I believe the protective order extends |
| 17:05:32 | 17 | beyond the Siegel case. |
| 17:05:32 | 18 | MR. PETROCELLI: Okay. Well, we're willing |
| 17:05:37 | 19 | to treat it as such until we work this out. |
| 17:05:43 | 20 | Okay. I'm told that it was reproduced in |
| 17:05:46 | 21 | this case in the absence of any protective order. But |
| 17:05:50 | 22 | look, I'm not going to argue about that, so we'll |
| 17:05:52 | 23 | figure it out. |
| 17:05:55 | 24 | Next is a document dated May 9, 2002 -- |
| 17:06:06 | 25 | MR. TOKORO: Exhibit 61. |

EXHIBIT S
672

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 236

| | | |
|---|---|---|
| 17:06:07 | 1 | MR. PETROCELLI:  -- which will be Exhibit 61. |
| 17:06:08 | 2 | It's a letter from -- from Joanne Siegel to Richard |
| 17:06:19 | 3 | Parsons. |
| | 4 | (Whereupon, Plaintiff's Exhibit 61 |
| 17:06:19 | 5 | was marked for identification.) |
| | 6 | BY MR. PETROCELLI: |
| 17:06:23 | 7 | Q.   You testified about this letter in your prior |
| 17:06:26 | 8 | deposition in the Siegel case.  A couple of follow-up |
| 17:06:32 | 9 | questions. |
| 17:06:32 | 10 | Did you type this letter? |
| 17:06:34 | 11 | A.   Yes, I typed it. |
| 17:06:36 | 12 | Q.   And you typed it at your home? |
| 17:06:37 | 13 | A.   Yes. |
| 17:06:38 | 14 | Q.   Did you assist in drafting it? |
| 17:06:42 | 15 | A.   If I'm recalling correctly, my mom said |
| 17:06:46 | 16 | "Don't change one word."  She was pretty insistent, so |
| 17:06:50 | 17 | no, I did not make changes to it. |
| 17:06:52 | 18 | Q.   Did you show it to anybody before it went |
| 17:06:54 | 19 | out? |
| 17:06:54 | 20 | A.   No. |
| 17:06:54 | 21 | Q.   Did you discuss -- do you know if your |
| 17:07:02 | 22 | attorneys knew it had gone out, Mr. Marks? |
| 17:07:06 | 23 | A.   No. |
| 17:07:06 | 24 | Q.   They did not know? |
| 17:07:07 | 25 | A.   They did not know. |

**EXHIBIT S**

**673**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 237

| | | |
|---|---|---|
| 17:07:24 | 1 | Q.    Now, in this letter you say -- it states at |
| 17:07:40 | 2 | the very end -- |
| 17:07:43 | 3 | A.    You mean she says? |
| 17:07:44 | 4 | Q.    She says, correct -- that -- part of the last |
| 17:07:50 | 5 | paragraph "Have you been aware that your |
| 17:07:52 | 6 | representatives have gone too far?  If not, you do |
| 17:07:57 | 7 | now."  Were you -- was your mother concerned as far as |
| 17:08:02 | 8 | you knew that the lawyers were taking positions that |
| 17:08:06 | 9 | the company wasn't aware? |
| 17:08:09 | 10 | A.    Yes.  I believe that's what she was |
| 17:08:11 | 11 | expressing here. |
| 17:08:12 | 12 | Q.    Was there a response received to this letter? |
| 17:08:16 | 13 | A.    Oh.  Perhaps, but I don't know for sure. |
| 17:08:27 | 14 | Q.    Okay. |
| 17:08:28 | 15 | MR. TOBEROFF:  A response from Dick Parsons? |
| 17:08:30 | 16 | THE WITNESS:  That's what I assumed you |
| 17:08:32 | 17 | meant. |
| 17:08:32 | 18 | MR. PETROCELLI:  I did mean that, right. |
| 17:08:34 | 19 | THE WITNESS:  Dick Parsons' response. |
| | 20 | BY MR. PETROCELLI: |
| 17:08:35 | 21 | Q.    And the answer is you don't know. |
| 17:08:37 | 22 | A.    I don't know. |
| 17:08:37 | 23 | Q.    And do you know whether anyone else responded |
| 17:08:40 | 24 | to this letter? |
| 17:08:40 | 25 | A.    I don't -- I don't recall. |

**EXHIBIT S**
**674**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 238

| | | |
|---|---|---|
| 17:08:42 | 1 | Q. Okay. |
| 17:09:04 | 2 | Now, did at some point you make your lawyers |
| 17:09:08 | 3 | aware that your mother had sent this letter? |
| 17:09:11 | 4 | A. Actually, they found out, and then my mother |
| 17:09:15 | 5 | and I discussed it with them. |
| 17:09:16 | 6 | Q. How did they find out? From Warner Bros.? |
| 17:09:19 | 7 | A. Yes. |
| 17:09:23 | 8 | Q. And you wrote this letter on May 9, 2002. |
| 17:09:27 | 9 | A. No, I didn't write it. My mother did. |
| 17:09:29 | 10 | Q. Excuse me. You typed it for your mother? |
| 17:09:31 | 11 | A. Yes. |
| 17:09:31 | 12 | Q. And is it your testimony that every single |
| 17:09:33 | 13 | word was drafted by your mother and no one else? |
| 17:09:36 | 14 | A. That's correct. |
| 17:09:40 | 15 | Q. Including some of the legal-sounding |
| 17:09:46 | 16 | sentences? |
| 17:09:47 | 17 | A. That's right. She -- she was a hell of a |
| 17:09:54 | 18 | writer. |
| 17:09:54 | 19 | Q. Did she have a writing background? |
| 17:09:57 | 20 | A. She had written, yes. |
| 17:10:01 | 21 | Q. What had she written? |
| 17:10:01 | 22 | A. Well, she didn't -- she didn't get to sell |
| 17:10:04 | 23 | them, but she had written several books, and, you |
| 17:10:08 | 24 | know, she was constantly writing and drafting things |
| 17:10:11 | 25 | for my father through the years. |

EXHIBIT S

675

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 239

| | | |
|---|---|---|
| 17:10:13 | 1 | Q.   What kind of books had she written? |
| 17:10:16 | 2 | A.   Well, she wrote a children's book.  She |
| 17:10:18 | 3 | wrote, you know, just things that moved her, memories |
| 17:10:24 | 4 | that she had from her youth. |
| 17:10:25 | 5 | Q.   Did she ever write anything regarding |
| 17:10:28 | 6 | Superman or her husband's role in Superman? |
| 17:10:41 | 7 | A.   No. |
| 17:10:41 | 8 | Q.   And again, you sent this -- this letter was |
| 17:10:46 | 9 | sent by your mother on May 9, 2002, but it was not |
| 17:10:50 | 10 | until September 21, 2002, that DC was informed that |
| 17:10:55 | 11 | negotiations were being stopped; correct? |
| 17:10:58 | 12 | A.   Yes.  I mean we -- you know, by that time we |
| 17:11:01 | 13 | reached our decision, and that was it. |
| 17:11:05 | 14 | Q.   By that time, meaning September 21, 2002? |
| 17:11:08 | 15 | A.   By September 21, right. |
| 17:11:10 | 16 | Q.   2002. |
| 17:11:11 | 17 | A.   2002. |
| 17:11:12 | 18 | Q.   Okay.  Thank you. |
| 17:11:28 | 19 | At some point -- the reaction expressed in |
| 17:11:33 | 20 | this letter was to the -- a proposed agreement that |
| 17:11:43 | 21 | was sent to your lawyer by the folks at Warner Bros. |
| 17:11:46 | 22 | and DC Comics; is that correct? |
| 17:11:48 | 23 | A.   You're talking about the February -- |
| 17:11:50 | 24 | Q.   Yes. |
| 17:11:50 | 25 | A.   -- 2002 one?  Yes. |

**EXHIBIT S**

**676**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 240

| | | |
|---|---|---|
| 17:11:53 | 1 | Q.   And after that, your lawyer, Mr. Marks, |
| 17:11:56 | 2 | undertook to prepare a redraft of that document; |
| 17:11:59 | 3 | correct? |
| 17:11:59 | 4 | A.   After a long period of time he suggested that |
| 17:12:03 | 5 | he might do that. |
| 17:12:04 | 6 | Q.   Okay.  And you saw that redraft; right? |
| 17:12:08 | 7 | A.   Yes, I did. |
| 17:12:09 | 8 | MR. TOBEROFF:  Okay.  Try and stay away |
| 17:12:14 | 9 | from -- give ballpark things, but try and stay away |
| 17:12:16 | 10 | from the substance of your conversations with your |
| 17:12:18 | 11 | attorney, what he said, what you said. |
| 17:12:21 | 12 | THE WITNESS:  Right. |
| 17:12:22 | 13 | MR. TOBEROFF:  Don't try and stay away from |
| 17:12:25 | 14 | it.  Stay away from it. |
| | 15 | BY MR. PETROCELLI: |
| 17:12:32 | 16 | Q.   And did you ever have an occasion to see the |
| 17:12:35 | 17 | redraft that he prepared? |
| 17:12:37 | 18 | A.   That Kevin Marks prepared? |
| 17:12:39 | 19 | Q.   Yes. |
| 17:12:40 | 20 | A.   Yes. |
| 17:12:40 | 21 | MR. TOBEROFF:  I just want to tell you |
| 17:12:41 | 22 | because I don't want to read your work product, but on |
| 17:12:43 | 23 | the back of that thing you're holding up there's |
| 17:12:47 | 24 | language.  There's writing. |
| 17:12:52 | 25 | MR. PETROCELLI:  It's about Woody Harrelson |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 241

| | | |
|---|---|---|
| 17:12:54 | 1 | being a big Oscar nominee. |
| 17:12:58 | 2 | THE WITNESS:  How did it get in my file? |
| 17:13:01 | 3 | Tell Woody I said hi. |
| 17:13:03 | 4 | BY MR. PETROCELLI: |
| 17:13:04 | 5 | Q.   And you're aware that the date of that |
| 17:13:08 | 6 | redrafted long-form agreement was July 15, 2002? |
| 17:13:12 | 7 | A.   Sounds about right. |
| 17:13:50 | 8 | Q.   Shortly after the redraft was created, are |
| 17:13:55 | 9 | you aware that Mr. Toberoff called Mr. Marks to try to |
| 17:14:03 | 10 | set up a meeting with Mr. Toberoff and Mr. Emanuel? |
| 17:14:09 | 11 | A.   Set up a meeting with whom? |
| 17:14:12 | 12 | Q.   With Mr. Toberoff and Mr. Emanuel. |
| 17:14:14 | 13 | A.   No, no, no.  You're saying he called and |
| 17:14:16 | 14 | wanted to set up a meeting with Kevin Marks? |
| 17:14:19 | 15 | Q.   Or another -- Mr. Toberoff calls Mr. Marks to |
| 17:14:21 | 16 | try to arrange a meeting or a conference call with |
| 17:14:26 | 17 | Toberoff, Marks, and Emanuel. |
| 17:14:29 | 18 | A.   No, I was not aware of that. |
| 17:14:31 | 19 | Q.   Okay.  Then that -- according to Mr. Marks' |
| 17:14:35 | 20 | call logs, Mr. Toberoff made that contact on July 24, |
| 17:14:41 | 21 | 2002.  Do you have any recollection of Mr. Marks |
| 17:14:43 | 22 | having conveyed that to you? |
| 17:14:44 | 23 | A.   Mr. Marks did not. |
| 17:14:52 | 24 | Q.   Why are you -- are you certain he didn't? |
| 17:14:54 | 25 | A.   I'm very certain that he didn't. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 242

| | | |
|---|---|---|
| 17:14:55 | 1 | Q. Why is that? |
| 17:14:57 | 2 | A. Because when we -- we finally received |
| 17:15:01 | 3 | communication from Mr. Marks that he had been |
| 17:15:05 | 4 | contacted by -- by Mr. Toberoff, it was later than |
| 17:15:11 | 5 | that. So, you know, he didn't specify the date on |
| 17:15:16 | 6 | which -- on which he contacted him, but when did you |
| 17:15:19 | 7 | say that was? July what? |
| 17:15:21 | 8 | Q. 24th. |
| 17:15:21 | 9 | A. Yeah, I think it was shortly thereafter that |
| 17:15:24 | 10 | we found out about it, but he never referenced any |
| 17:15:28 | 11 | phone call in July, is what I'm trying to -- |
| 17:15:30 | 12 | Q. I see. |
| 17:15:31 | 13 | A. He didn't convey it to us. |
| 17:15:32 | 14 | Q. When you say you shortly found out about it, |
| 17:15:35 | 15 | meaning you shortly found out about the |
| 17:15:42 | 16 | Toberoff/Emanuel contact when you received the letter |
| 17:15:43 | 17 | from Mr. Marks. |
| 17:15:46 | 18 | A. I believe so, yes. |
| 17:15:48 | 19 | Q. That's the first time you found out from |
| 17:15:52 | 20 | Mr. Marks that Mr. Toberoff had contacted him; is that |
| 17:15:55 | 21 | right? |
| 17:15:55 | 22 | A. That's correct. |
| 17:15:58 | 23 | Q. And Mr. Marks had not told you about the |
| 17:16:01 | 24 | February contact. |
| 17:16:02 | 25 | A. No. |

EXHIBIT S
679

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 243

| | | |
|---|---|---|
| 17:16:02 | 1 | Q.   Or that Mr. Toberoff had called him in |
| 17:16:04 | 2 | November of '01. |
| 17:16:25 | 3 | A.   No. |
| 17:16:25 | 4 | Q.   Now, when Mr. -- according to Mr. Marks' |
| 17:16:31 | 5 | testimony, on August 8, 2002, there was a conference |
| 17:16:36 | 6 | call with Mr. Emanuel and Mr. Marks and Mr. Toberoff |
| 17:16:41 | 7 | in which Mr. Emanuel and Mr. Toberoff expressed their |
| 17:16:45 | 8 | interest in pursuing the property.  Did Mr. Marks |
| 17:16:51 | 9 | convey to you what had transpired in that call prior |
| 17:16:56 | 10 | to your receiving the letter from him about it? |
| 17:16:59 | 11 | A.   No, he did not. |
| 17:17:14 | 12 | Q.   Okay.  Take a look at Exhibit 54. |
| 17:17:25 | 13 | MR. TOBEROFF:  What was the number of the |
| 17:17:26 | 14 | Parsons letter? |
| 17:17:28 | 15 | THE WITNESS:  That's 61. |
| 17:17:29 | 16 | MR. TOKORO:  61. |
| 17:17:30 | 17 | MR. TOBEROFF:  Thank you. |
| | 18 | (Whereupon, Plaintiff's Exhibit 54 |
| 17:17:32 | 19 | was placed before the witness.) |
| | 20 | BY MR. PETROCELLI: |
| 17:17:33 | 21 | Q.   Exhibit -- excuse me.  Exhibit 54 is a letter |
| 17:17:38 | 22 | from your mother and you to Mr. Marks and Mr. Ramer of |
| 17:17:47 | 23 | Gang Tyre dated September 21, 2002 -- |
| 17:17:47 | 24 | A.   Um-hum. |
| 17:17:51 | 25 | Q.   -- stating that you had rejected the DC |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 244

| | | |
|---|---|---|
| 17:17:55 | 1 | Comics offer sent to you on February 4, 2002, as well |
| 17:18:01 | 2 | as Mr. Marks' redraft which was sent to you on July |
| 17:18:07 | 3 | 15, 2002.  Do you see that? |
| 17:18:08 | 4 | A.    Yes, I do. |
| 17:18:10 | 5 | Q.    And then you say due to irreconcilable |
| 17:18:13 | 6 | differences and so forth, that you're terminating |
| 17:18:18 | 7 | Mr. Marks' firm's services effective, I guess -- well, |
| 17:18:25 | 8 | immediately; right? |
| 17:18:26 | 9 | A.    That's right. |
| 17:18:28 | 10 | Q.    As of September 21, 2002; correct? |
| 17:18:32 | 11 | A.    Yes. |
| 17:18:32 | 12 | Q.    Now, you copied Michael Siegel on this as |
| 17:18:34 | 13 | well as his lawyer, Don Bulson.  As of this point in |
| 17:18:42 | 14 | time, September 21, 2002, you had heard about the |
| 17:18:51 | 15 | Toberoff/Emanuel discussion with Mr. Marks through his |
| 17:18:56 | 16 | letter to you.  You had now terminated Mr. Marks. |
| 17:19:04 | 17 | A.    Um-hum. |
| 17:19:06 | 18 | Q.    On the same date, September 21, 2002, you |
| 17:19:10 | 19 | advised DC that you were terminating negotiations with |
| 17:19:14 | 20 | them as well as with Warner Bros.; correct? |
| 17:19:16 | 21 | A.    Correct. |
| 17:19:18 | 22 | Q.    You copied Michael Siegel and Mr. Bulson on |
| 17:19:21 | 23 | these various letters.  Had you had conversations with |
| 17:19:26 | 24 | Michael as of this point in time about what you were |
| 17:19:30 | 25 | doing? |

EXHIBIT S
681

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 245

| | | |
|---|---|---|
| 17:19:30 | 1 | A.   We were -- we were frustrated because we felt |
| 17:19:42 | 2 | that the Ramer firm had really done as much as they |
| 17:19:46 | 3 | could do, and from -- okay.  I won't say what. |
| 17:19:50 | 4 | MR. TOBEROFF:  I want you to focus on his |
| 17:19:52 | 5 | question. |
| 17:19:52 | 6 | THE WITNESS:  Okay.  I'm sorry.  What was |
| 17:19:54 | 7 | your question? |
| | 8 | BY MR. PETROCELLI: |
| 17:19:55 | 9 | Q.   My question was given that you had copied |
| 17:19:59 | 10 | Mr. Siegel and his lawyer, Don Bulson, in these |
| 17:20:06 | 11 | important notifications that you sent out on September |
| 17:20:09 | 12 | 21, 2002, whether and to what extent you had |
| 17:20:14 | 13 | communicated with Mr. Siegel about these plans and |
| 17:20:17 | 14 | these activities. |
| 17:20:18 | 15 | A.   Oh.  No.  We didn't talk about them |
| 17:20:22 | 16 | beforehand.  We were -- |
| 17:20:23 | 17 | Q.   Just out of the clear blue you sent him a |
| 17:20:26 | 18 | copy of your letters? |
| 17:20:27 | 19 | A.   Yes.  That's the way I remember it. |
| 17:20:31 | 20 | Q.   Do you recall any discussion with him or his |
| 17:20:35 | 21 | lawyer, Mr. Bulson? |
| 17:20:38 | 22 | A.   You know, we didn't really communicate very |
| 17:20:41 | 23 | much. |
| 17:20:41 | 24 | Q.   Okay.  Why did you copy him? |
| 17:20:48 | 25 | A.   Because his attorney would on occasion |

**EXHIBIT S**
**682**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 246

| | | |
|---|---|---|
| 17:20:54 | 1 | communicate with Kevin Marks, and we wanted to let |
| 17:20:57 | 2 | them know that that was no longer appropriate, that |
| 17:20:59 | 3 | they were no longer representing us. |
| 17:21:03 | 4 | Q.   When you were -- you hadn't paid Kevin Marks |
| 17:21:08 | 5 | any fee because their firm was charging 5 percent of |
| 17:21:11 | 6 | whatever settlement might occur; right? |
| 17:21:14 | 7 | A.   We made regular payments on costs. |
| 17:21:16 | 8 | Q.   Costs. |
| 17:21:16 | 9 | A.   Only. |
| 17:21:17 | 10 | Q.   Was Mr. Siegel, Michael Siegel, sharing in |
| 17:21:20 | 11 | those costs? |
| 17:21:21 | 12 | A.   We asked him to, and there was an ongoing |
| 17:21:26 | 13 | dispute over that. |
| 17:21:27 | 14 | Q.   And had you asked him to share in those costs |
| 17:21:29 | 15 | all the way back to the beginning, starting with the |
| 17:21:33 | 16 | termination notice with Mr. Levine and then going |
| 17:21:35 | 17 | forward through the Marks firm? |
| 17:21:37 | 18 | A.   We requested that. |
| 17:21:40 | 19 | Q.   And did you bill him for it? |
| 17:21:42 | 20 | A.   Yes, we billed him for it. |
| 17:21:44 | 21 | Q.   Who prepared the bills? |
| 17:21:45 | 22 | A.   My mother and I did. |
| 17:21:47 | 23 | Q.   Who would you send the bills to? |
| 17:21:49 | 24 | A.   We sent -- we sent -- well, when you say |
| 17:21:51 | 25 | bills -- |

## LAURA SIEGEL LARSON - 7/22/2011

Page 247

| | | |
|---|---|---|
| 17:21:51 | 1 | Q.   Or statements or requests for his share of |
| 17:21:55 | 2 | the costs. |
| 17:21:56 | 3 | A.   I believe we gave that to Kevin Marks, and |
| 17:22:01 | 4 | Kevin Marks submitted it on our behalf. |
| 17:22:02 | 5 | Q.   What did you charge him?  25 percent of the |
| 17:22:06 | 6 | total costs? |
| 17:22:07 | 7 | A.   That -- that was what we asked for. |
| 17:22:09 | 8 | Q.   Or actually was it more than that?  Was it a |
| 17:22:12 | 9 | third?  How did you do the math? |
| 17:22:14 | 10 | A.   No, it was 25 percent.  I mean under |
| 17:22:17 | 11 | copyright law it was 50 percent for my mother, 25 |
| 17:22:20 | 12 | percent for me, 25 percent for Michael.  And so, you |
| 17:22:23 | 13 | know, we felt it was appropriate for him to have a |
| 17:22:27 | 14 | corresponding responsibility for costs. |
| 17:22:29 | 15 | Q.   When Mr. Ramer was doing the negotiations -- |
| 17:22:34 | 16 | Mr. Marks or Mr. Ramer, the Gang Tyre firm, with |
| 17:22:39 | 17 | Warner Bros. and DC Comics, was that on behalf of the |
| 17:22:42 | 18 | entire hundred percent Siegel interest, including |
| 17:22:45 | 19 | Michael's 25 percent? |
| 17:22:46 | 20 | A.   Yes, it was. |
| 17:22:48 | 21 | Q.   Had Michael entered into an engagement letter |
| 17:22:51 | 22 | with the Gang Tyre firm, to your knowledge? |
| 17:22:55 | 23 | A.   I don't believe he did. |
| 17:23:06 | 24 | Q.   Did Bulson and -- did Kevin Marks ever meet |
| 17:23:14 | 25 | Michael Siegel, to your knowledge? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 248

| | | |
|---|---|---|
| 17:23:15 | 1 | A.    I -- not to my knowledge. |
| 17:23:17 | 2 | Q.    Were there ever any joint meetings with all |
| 17:23:20 | 3 | of you together and Kevin Marks or Bruce Ramer? |
| 17:23:23 | 4 | A.    Not -- not all of us together, but I know |
| 17:23:27 | 5 | that Don Bulson, you know, did meet up with Kevin |
| 17:23:31 | 6 | Marks at one point. |
| 17:23:32 | 7 | Q.    When you sent out the -- excuse me.  When |
| 17:23:35 | 8 | your mother wrote out and you typed out and you sent |
| 17:23:39 | 9 | to Warner Bros. and DC Comics the letter in May |
| 17:23:44 | 10 | expressing your upset about the February -- |
| 17:23:44 | 11 | A.    This one?  Yeah. |
| 17:23:47 | 12 | Q.    -- long form agreement -- |
| 17:23:50 | 13 | A.    Um-hum. |
| 17:23:50 | 14 | Q.    -- did you first clear that with Michael |
| 17:23:50 | 15 | Siegel or Don Bulson? |
| 17:23:53 | 16 | A.    No. |
| 17:23:53 | 17 | Q.    Did you send them a copy of it? |
| 17:23:57 | 18 | A.    That I don't remember. |
| 17:24:08 | 19 | Q.    Oh.  Why was there a dispute between you and |
| 17:24:13 | 20 | your mother on the one hand and Michael Siegel on the |
| 17:24:16 | 21 | other hand regarding this issue prior -- yes, as of |
| 17:24:22 | 22 | September 21, 2002? |
| 17:24:23 | 23 | A.    You're talking about costs. |
| 17:24:24 | 24 | Q.    Was that the subject of the dispute, the |
| 17:24:26 | 25 | costs? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 249

| | | |
|---|---|---|
| 17:24:26 | 1 | A. Yes. |
| 17:24:27 | 2 | Q. And why was there a dispute about the costs? |
| 17:24:33 | 3 | A. Michael was the child of a very upsetting |
| 17:24:39 | 4 | divorce, and he -- you know, it hurts me to have to |
| 17:24:44 | 5 | say this, but, you know, he was a very kind of |
| 17:24:48 | 6 | confused guy and he really kind of couldn't keep |
| 17:24:50 | 7 | things straight.  It was very difficult to communicate |
| 17:24:54 | 8 | with him, and it was very upsetting to receive |
| 17:25:04 | 9 | communications from him that were kind of all over the |
| 17:25:08 | 10 | place, things that didn't really make any sense, and |
| 17:25:14 | 11 | he was very secretive, and he just couldn't really |
| 17:25:20 | 12 | grasp legal principles.  So discussions with -- |
| 17:25:24 | 13 | directly with him really didn't work.  It really |
| 17:25:32 | 14 | required attorneys to explain things to him, and |
| 17:25:34 | 15 | that's why he had his own attorney, who was, of |
| 17:25:38 | 16 | course, interpreting things, you know, for Michael and |
| 17:25:42 | 17 | explaining things to him.  But he didn't -- he didn't |
| 17:25:46 | 18 | have any -- any background in understanding the |
| 17:25:50 | 19 | history of, you know, the Superman litigations or -- |
| 17:25:54 | 20 | you know. |
| 17:25:54 | 21 | Q. What did he do for a living? |
| 17:25:55 | 22 | A. He was a plumber. |
| 17:26:00 | 23 | Q. And so you didn't grow up close at all. |
| 17:26:06 | 24 | A. I never met him. |
| 17:26:07 | 25 | Q. Ever? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 250

| | | |
|---|---|---|
| 17:26:07 | 1 | A.   Ever.  And he wouldn't send me any |
| 17:26:12 | 2 | photographs of himself. |
| 17:26:13 | 3 | Q.   He did or did not? |
| 17:26:14 | 4 | A.   Did not.  I sent him photographs of myself |
| 17:26:17 | 5 | and my children and asked him to reciprocate, and he |
| 17:26:23 | 6 | refused to do that.  So the first time I ever saw what |
| 17:26:27 | 7 | my brother looked like was after he died and I went to |
| 17:26:31 | 8 | the home that he had shared with his mother, and, you |
| 17:26:35 | 9 | know, found things like a dog dish, you know, in the |
| 17:26:38 | 10 | kitchen, and I said, "Where's the dog?"  And they |
| 17:26:41 | 11 | said, you know, the dog -- when I say "they," a friend |
| 17:26:45 | 12 | told me that the dog had died years before and -- you |
| 17:26:48 | 13 | know, but I found photographs of him in his home. |
| 17:26:52 | 14 | Q.   Your children never met with him either? |
| 17:26:54 | 15 | A.   No. |
| 17:26:54 | 16 | Q.   Did your mom ever meet him? |
| 17:26:56 | 17 | A.   No, I don't believe so.  He was -- he was |
| 17:27:01 | 18 | very young when the divorce occurred. |
| 17:27:04 | 19 | Q.   How old was he? |
| 17:27:06 | 20 | A.   5 or 6, I think. |
| 17:27:08 | 21 | Q.   What year was it that your dad divorced his |
| 17:27:11 | 22 | mom? |
| 17:27:11 | 23 | A.   It was in the 1940s. |
| 17:27:13 | 24 | Q.   And when did your mother and your father |
| 17:27:16 | 25 | marry? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 251

| | | |
|---|---|---|
| 17:27:16 | 1 | A.   In 1948. |
| 17:27:27 | 2 | Q.   How did you first get in touch with Michael |
| 17:27:31 | 3 | Siegel about this termination issue going back to |
| 17:27:37 | 4 | 1997? |
| 17:27:37 | 5 | A.   Well, my husband, who was an attorney -- |
| 17:27:41 | 6 | excuse me -- and also, you know, kind of helped us |
| 17:27:44 | 7 | with things, phoned -- phoned Michael and informed him |
| 17:27:50 | 8 | that, you know, he had a passive interest and, you |
| 17:27:54 | 9 | know, that he wanted to let him know about that, and, |
| 17:28:00 | 10 | you know, after -- after that, Michael retained an |
| 17:28:04 | 11 | attorney in Cleveland. |
| 17:28:06 | 12 | Q.   Did you ever meet Mr. Bulson? |
| 17:28:08 | 13 | A.   I did after Michael died. |
| 17:28:17 | 14 | Q.   Are you aware that Michael wanted to have a |
| 17:28:21 | 15 | will made out but never got -- |
| 17:28:25 | 16 | A.   He never did it. |
| 17:28:27 | 17 | Q.   Did you ever see what his wishes were? |
| 17:28:31 | 18 | A.   He had some kind of rambling communications |
| 17:28:33 | 19 | with his attorney. |
| 17:28:35 | 20 | Q.   To the effect that he did not want either you |
| 17:28:38 | 21 | or your mother to share in anything? |
| 17:28:40 | 22 | A.   He stated that in an e-mail, but the court |
| 17:28:44 | 23 | ruled otherwise.  Not for my mother, but for me. |
| 17:29:00 | 24 | Q.   The next exhibit is -- |
| 17:29:06 | 25 | Make sure we did. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 252

| | | |
|---|---|---|
| 17:29:15 | 1 | MR. TOKORO:  It's 56. |
| 17:29:17 | 2 | MR. PETROCELLI:  Are you sure? |
| 17:29:18 | 3 | MR. TOKORO:  Yes. |
| 17:29:22 | 4 | MR. PETROCELLI:  I thought he did multiple. |
| 17:29:32 | 5 | Q.  Going back to Exhibit 56 for a second, which |
| 17:29:35 | 6 | is your notification to DC Comics that you were |
| 17:29:39 | 7 | terminating negotiations dated September 21, 2002 -- |
| 17:29:43 | 8 | A.  Is it 54?  I have 54. |
| 17:29:46 | 9 | Q.  Can I see that? |
| 17:29:47 | 10 | A.  Yes.  I think that's only the Ramer and Marks |
| 17:29:51 | 11 | one. |
| 17:29:52 | 12 | Q.  Yes, this is the termination of the Gang Tyre |
| 17:29:55 | 13 | firm. |
| 17:29:55 | 14 | A.  I don't have that yet unless it's stapled to |
| 17:30:01 | 15 | this. |
| 17:30:01 | 16 | MR. TOKORO:  It was one of the early ones. |
| 17:30:03 | 17 | MR. PETROCELLI:  I showed it to you earlier |
| 17:30:05 | 18 | on, all the way on the bottom.  He'll fish it out for |
| 17:30:08 | 19 | you. |
| 17:30:09 | 20 | THE WITNESS:  Okay. |
| 17:30:12 | 21 | Oh, thank you. |
| | 22 | BY MR. PETROCELLI: |
| 17:30:13 | 23 | Q.  So you have in front of you now Exhibit 56? |
| 17:30:16 | 24 | A.  Um-hum. |
| 17:30:17 | 25 | Q.  And you will see that you're advising DC |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 253

| | | |
|---|---|---|
| 17:30:22 | 1 | about the termination of the Gang Tyre firm and that |
| 17:30:25 | 2 | you have instructed the Gang Tyre firm to take no |
| 17:30:28 | 3 | further actions on your behalf.  Do you see that? |
| 17:30:32 | 4 | A.   Yes, I do. |
| 17:30:32 | 5 | Q.   And September 21, 2002, is the first time |
| 17:30:38 | 6 | that you so advised DC Comics that you were |
| 17:30:39 | 7 | terminating the Gang Tyre firm and that they were to |
| 17:30:42 | 8 | take no further actions on your behalf; correct? |
| 17:30:45 | 9 | A.   Yes. |
| 17:30:45 | 10 | Q.   And that's the first time that you also |
| 17:30:47 | 11 | advised the Gang Tyre firm that they were to take no |
| 17:30:50 | 12 | further actions on your behalf; correct? |
| 17:30:52 | 13 | A.   Yes, that's correct. |
| 17:31:36 | 14 | Q.   Okay. |
| 17:31:36 | 15 | Okay.  Let me mark as the -- |
| 17:31:39 | 16 | MR. TOKORO:  62. |
| 17:31:40 | 17 | MR. PETROCELLI:  -- next exhibit in order, |
| 17:31:46 | 18 | Exhibit 62, a letter to DC Comics by your mother and |
| 17:31:51 | 19 | you dated October 28, 2002 -- |
| | 20 | (Whereupon, Plaintiff's Exhibit 62 |
| 17:32:00 | 21 | was marked for identification.) |
| 17:32:00 | 22 | MR. PETROCELLI:  -- giving notice of the |
| 17:32:05 | 23 | cancellation of a tolling period under a tolling |
| 17:32:08 | 24 | agreement. |
| 17:32:09 | 25 | Q.   Do you see that? |

## LAURA SIEGEL LARSON - 7/22/2011

Page 254

| | | | |
|---|---|---|---|
| 17:32:09 | 1 | A. | Yes, I do. |
| 17:32:11 | 2 | Q. | Now, did you type this document? |
| 17:32:13 | 3 | A. | Yes, I did. |
| 17:32:17 | 4 | Q. | Who drafted this document? |
| 17:32:19 | 5 | A. | My mother and I did. |
| 17:32:22 | 6 | Q. | Did you have the assistance of a lawyer? |
| 17:32:25 | 7 | A. | No. |
| 17:32:25 | 8 | Q. | Are you sure? |
| 17:32:27 | 9 | A. | I'm pretty sure.  I don't recall. |
| 17:32:29 | 10 | Q. | Even though you had already retained |

17:32:33   11   Mr. Emanuel and Mr. Toberoff?

17:32:39   12      A.   Without revealing the communication between

17:32:44   13   my former attorney and me, I will say that we were

17:32:50   14   informed by the Gang Tyre firm that we needed to pay

17:32:56   15   attention to the wording in the tolling agreement.

17:33:01   16      Q.   Why --

17:33:02   17      A.   So as a result of reading the tolling

17:33:04   18   agreement and seeing that notification was necessary

17:33:07   19   to certain people under the tolling agreement, we went

17:33:11   20   ahead, my mother and I, and drafted this.

17:33:14   21      Q.   Did you run it by a lawyer first?

17:33:17   22      A.   I -- I don't remember.

17:33:20   23      Q.   Even though you were now working with

17:33:22   24   Mr. Toberoff, you didn't --

17:33:24   25      A.   Oh --

**EXHIBIT S**
**691**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 255

| | | |
|---|---|---|
| 17:33:25 | 1 | Q.    -- show it to him? |
| 17:33:27 | 2 | A.    Well, actually -- |
| 17:33:29 | 3 | Q.    And it's in a totally different type face -- |
| 17:33:31 | 4 | A.    Possibly -- |
| 17:33:32 | 5 | Q.    -- than the prior document. |
| 17:33:33 | 6 | A.    That doesn't mean anything.  That's because, |
| 17:33:36 | 7 | you know, my computers were always on the fritz. |
| 17:33:43 | 8 | Q.    It's kind of -- |
| 17:33:44 | 9 | A.    No.  It's -- well, we had been talking to |
| 17:33:48 | 10 | Mr. Toberoff since the beginning of October about |
| 17:33:51 | 11 | retaining him.  We did not actually sign with him |
| 17:33:54 | 12 | until the end of October.  So we had not signed and |
| 17:33:58 | 13 | fully retained him at the time when my mother and I |
| 17:34:02 | 14 | were drafting this, because when you showed me -- you |
| 17:34:08 | 15 | showed me the -- our agreement earlier, I looked at |
| 17:34:11 | 16 | the back and the signature page said October 28. |
| 17:34:15 | 17 | Q.    No.  I think -- take a look at it again, |
| 17:34:28 | 18 | Exhibit 45. |
| 17:34:28 | 19 | A.    These are all mixed up. |
| 17:34:43 | 20 | Oh, 23.  I'm sorry.  I'm sorry.  The "3" |
| 17:34:46 | 21 | looked like an "8" to me when I looked at the Xerox |
| 17:34:49 | 22 | because it's not a great Xerox. |
| 17:34:52 | 23 | Q.    So now you're seeing more clearly that it was |
| 17:34:57 | 24 | as of October 23, 2002, that you had signed the IP |
| 17:35:01 | 25 | Worldwide agreement with Mr. Emanuel and Mr. Toberoff. |

Merrill  Corporation  -  Los Angeles

800-826-0277                                www.merrillcorp.com/law

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 256

| | | |
|---|---|---|
| 17:35:03 | 1 | A.   Yes. |
| 17:35:04 | 2 | MR. TOBEROFF:  Objection to "as of." |
| 17:35:06 | 3 | Otherwise -- |
| 17:35:07 | 4 | THE WITNESS:  We had just finalized our |
| 17:35:11 | 5 | agreement. |
| | 6 | BY MR. PETROCELLI: |
| 17:35:12 | 7 | Q.   And now does that cause you to believe that |
| 17:35:13 | 8 | you had some assistance in the preparation of the |
| 17:35:16 | 9 | tolling agreement? |
| 17:35:19 | 10 | A.   Well, we weren't advised to do it by |
| 17:35:22 | 11 | Mr. Toberoff.  He may have looked at the draft just to |
| 17:35:25 | 12 | make sure that the language was correct. |
| 17:35:28 | 13 | Q.   Well, why wouldn't you have him do it?  Why |
| 17:35:31 | 14 | are you -- |
| 17:35:31 | 15 | A.   You asked me if I remembered it. |
| 17:35:33 | 16 | Q.   You don't remember. |
| 17:35:35 | 17 | A.   Okay.  I'm trying to answer your question. |
| 17:35:37 | 18 | Q.   Before you answered with some degree of |
| 17:35:39 | 19 | certainty that you and your mother wrote this |
| 17:35:41 | 20 | document, which I must say seems implausible to me. |
| 17:35:44 | 21 | It's a -- it's a technical legal document that your |
| 17:35:49 | 22 | prior counsel had advised you was important for you to |
| 17:35:52 | 23 | pay attention to. |
| 17:35:53 | 24 | A.   Uh-huh. |
| 17:35:53 | 25 | Q.   And I'm just pressing you now on whether you |

LAURA SIEGEL LARSON - 7/22/2011

Page 257

| 17:35:56 | 1 | actually remember or you're just trying to surmise |
| 17:36:00 | 2 | that you prepared this document. |
| 17:36:03 | 3 | A.   I'm trying to surmise. |
| 17:36:08 | 4 | Q.   Okay.  Is it fair to say -- |
| 17:36:09 | 5 | A.   No, no.  Excuse me.  I don't think I really |
| 17:36:13 | 6 | answered -- you're saying do I think I prepared it? |
| 17:36:19 | 7 | Q.   Do you -- |
| 17:36:20 | 8 | A.   Or do I think somebody else prepared it? |
| 17:36:22 | 9 | Q.   Do you know whether, even though it went out |
| 17:36:25 | 10 | on your letterhead -- |
| 17:36:25 | 11 | A.   Yes. |
| 17:36:26 | 12 | Q.   -- do you know whether this was prepared by a |
| 17:36:29 | 13 | lawyer for you to send out? |
| 17:36:31 | 14 | A.   Oh.  It -- we did a draft -- my mother and I |
| 17:36:34 | 15 | did a draft, and to the best of my recollection, we |
| 17:36:39 | 16 | probably ran it by Mr. Toberoff. |
| 17:36:44 | 17 | Q.   Did you run it by Arthur or George, the other |
| 17:36:48 | 18 | lawyers? |
| 17:36:48 | 19 | A.   We might have. |
| 17:36:55 | 20 | Q.   When you were told by Gang Tyre to pay |
| 17:36:58 | 21 | attention to this, some concern was expressed to you |
| 17:37:02 | 22 | that deadlines might run? |
| 17:37:05 | 23 | MR. TOBEROFF:  Don't talk any more of |
| 17:37:07 | 24 | substance than he advised you to draw your attention |
| 17:37:10 | 25 | to the tolling agreement. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 258

17:37:11    1              THE WITNESS:  Yeah.  I mean that's really --

           2        BY MR. PETROCELLI:

17:37:14    3        Q.    Why did you send this out to DC Comics?

17:37:16    4              MR. TOBEROFF:  Privileged.  I instruct you

17:37:19    5        not to answer.

           6        BY MR. PETROCELLI:

17:37:19    7        Q.    Privilege with whom?  Who is the lawyer that

17:37:22    8        you're asserting your privilege with?

17:37:22    9              MR. TOBEROFF:  I'm going to --

17:37:23   10              MR. PETROCELLI:  I'm asking her, not you.

17:37:25   11              MR. TOBEROFF:  I'm asserting it on her

17:37:27   12        behalf.

17:37:28   13              MR. PETROCELLI:  I know, but I'm asking her.

17:37:28   14        Q.    With whom did you have an attorney-client --

17:37:31   15        who were the attorneys with whom you received legal

17:37:34   16        advice, if any, about the -- about this tolling

17:37:38   17        agreement, Exhibit 62?

17:37:40   18        A.    Well, as I testified before, I don't remember

17:37:43   19        exactly which attorneys we shared this with, but any

17:37:49   20        attorney that is in our employ I have an

17:37:52   21        attorney-client privilege with.  So --

17:37:54   22              MR. TOBEROFF:  And --

17:37:54   23              MR. PETROCELLI:  I know, but I'm asking you.

17:37:56   24              MR. TOBEROFF:  I'm asserting the

17:37:57   25        attorney-client privilege on your behalf with respect

Merrill  Corporation  -  Los Angeles

EXHIBIT S
695

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 259

| 17:37:58 | 1 | to Kevin Marks even though he has been terminated |
| 17:38:01 | 2 | since the subject of the communication is a tolling |
| 17:38:04 | 3 | agreement that was entered into that he negotiated and |
| 17:38:08 | 4 | entered into as part of his legal representation of |
| 17:38:10 | 5 | you. |
| | 6 | BY MR. PETROCELLI: |
| 17:38:12 | 7 | Q.   Did -- |
| 17:38:14 | 8 | MR. TOBEROFF:  Clearly privileged. |
| | 9 | BY MR. PETROCELLI: |
| 17:38:15 | 10 | Q.   With what lawyers specifically do you |
| 17:38:17 | 11 | remember discussing this tolling agreement with |
| 17:38:20 | 12 | prior -- this tolling notice, Exhibit 62, prior to |
| 17:38:24 | 13 | your sending it out? |
| 17:38:24 | 14 | A.   As I testified before, I don't recall. |
| 17:38:30 | 15 | Q.   And do you recall discussing it with any |
| 17:38:33 | 16 | lawyer? |
| 17:38:33 | 17 | A.   With my mother. |
| 17:38:35 | 18 | Q.   Any lawyer I said. |
| 17:38:37 | 19 | A.   I don't recall. |
| 17:38:40 | 20 | Q.   Okay.  Why did you send it out? |
| 17:38:44 | 21 | A.   Because in reading the tolling -- |
| 17:38:46 | 22 | MR. TOBEROFF:  Wait, wait, wait.  You've |
| 17:38:52 | 23 | testified that you received advice -- |
| 17:38:55 | 24 | MR. PETROCELLI:  Marc -- |
| 17:38:55 | 25 | MR. TOBEROFF:  Excuse me. |

Merrill   Corporation   -   Los Angeles

EXHIBIT S
696
3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 260

| | | |
|---|---|---|
| 17:38:56 | 1 | MR. PETROCELLI:  -- you're just coaching the |
| 17:38:58 | 2 | witness. |
| 17:38:58 | 3 | MR. TOBEROFF:  I'm not coaching the witness. |
| 17:39:00 | 4 | Attorney-client privilege.  Instruct you not to |
| 17:39:01 | 5 | answer.  I'm not going to explain it. |
| 17:39:04 | 6 | THE WITNESS:  Okay. |
| 17:39:05 | 7 | MR. TOBEROFF:  Is that better? |
| 17:39:08 | 8 | MR. PETROCELLI:  I can't control what you do. |
| 17:39:11 | 9 | I'm not here to critique you. |
| 17:39:14 | 10 | MR. TOBEROFF:  What exhibit number is this |
| 17:39:16 | 11 | one? |
| 17:39:16 | 12 | THE WITNESS:  That was 62.  This one you |
| 17:39:19 | 13 | mean; right? |
| 17:39:21 | 14 | MR. TOBEROFF:  Right. |
| 17:39:21 | 15 | THE WITNESS:  Yeah. |
| 17:39:53 | 16 | MR. PETROCELLI:  Let's look at the next |
| 17:39:54 | 17 | document, which is what? |
| 17:39:56 | 18 | MR. TOKORO:  63. |
| 17:39:57 | 19 | MR. PETROCELLI:  Exhibit 63? |
| 17:39:59 | 20 | MR. TOKORO:  63. |
| | 21 | (Whereupon, Plaintiff's Exhibit 63 |
| 17:40:10 | 22 | was marked for identification.) |
| 17:40:11 | 23 | THE WITNESS:  Thank you. |
| | 24 | BY MR. PETROCELLI: |
| 17:40:14 | 25 | Q.   This is a letter to Mr. Bulson with a copy to |

## LAURA SIEGEL LARSON – 7/22/2011

Page 261

| | | |
|---|---|---|
| 17:40:17 | 1 | Michael Siegel by you and your mother.  Do you see |
| 17:40:22 | 2 | that? |
| 17:40:22 | 3 | A.    Yes. |
| 17:40:23 | 4 | Q.    Enclosing your letter? |
| 17:40:30 | 5 | A.    Excuse me.  This? |
| 17:40:31 | 6 | Q.    Which was the prior exhibit, apparently; |
| 17:40:34 | 7 | right? |
| 17:40:34 | 8 | A.    Yes, it looks that way. |
| 17:40:37 | 9 | Q.    About the tolling agreement; correct? |
| 17:40:38 | 10 | A.    It looks that way. |
| 17:40:40 | 11 | Q.    It states notifying DC "that under the terms |
| 17:40:42 | 12 | of the April 6, 2000 Tolling Agreement, and due to our |
| 17:40:46 | 13 | written notification to DC Comics on September 21, |
| 17:40:51 | 14 | 2002 which totally stopped and ended negotiations with |
| 17:40:54 | 15 | that company, its parent company and all its |
| 17:40:58 | 16 | representatives, the Tolling Period has been |
| 17:41:02 | 17 | canceled."  Why did you send this to Michael Siegel's |
| 17:41:05 | 18 | lawyer? |
| 17:41:05 | 19 | A.    To keep him informed. |
| 17:41:13 | 20 | Q.    Did you get a response from Michael Siegel or |
| 17:41:16 | 21 | his lawyer to your letter in September when you sent |
| 17:41:20 | 22 | him copies of the September 21 letters?  Did you hear |
| 17:41:24 | 23 | from him at that time as to what's going on? |
| 17:41:26 | 24 | A.    I could have. |
| 17:41:27 | 25 | Q.    Do you remember? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 262

| | | |
|---|---|---|
| 17:41:28 | 1 | A.    I don't remember specifically. |
| 17:41:30 | 2 | Q.    Do you remember any communication with him |
| 17:41:33 | 3 | about why you're changing representatives? |
| 17:41:39 | 4 | A.    There probably -- there probably was, but I |
| 17:41:43 | 5 | can't remember specifically when it was. |
| 17:41:47 | 6 | Q.    Given your testimony that you never met him, |
| 17:41:52 | 7 | did you ever speak to him? |
| 17:41:57 | 8 | A.    No. |
| 17:41:58 | 9 | Q.    And to your knowledge, did your mother ever |
| 17:42:00 | 10 | speak to him? |
| 17:42:01 | 11 | A.    I think -- no, I don't think she even spoke |
| 17:42:06 | 12 | to him when he was a child. |
| 17:42:08 | 13 | Q.    So the only type of communication that you |
| 17:42:11 | 14 | actually had with Michael Siegel was in writing |
| 17:42:18 | 15 | directly to him or to Mr. Bulson; correct? |
| 17:42:21 | 16 | A.    It -- it was more often through his attorney. |
| 17:42:26 | 17 | It was occasionally directly with Michael.  But he was |
| 17:42:31 | 18 | sick for like long periods of time, so, you know, long |
| 17:42:37 | 19 | periods would go by and I wouldn't hear from him, and |
| 17:42:40 | 20 | then all of a sudden a letter would pop up. |
| 17:42:42 | 21 | Q.    And the only way that you would hear from him |
| 17:42:47 | 22 | was through a letter; right? |
| 17:42:48 | 23 | A.    Yes. |
| 17:42:48 | 24 | Q.    Did you have his phone number? |
| 17:42:49 | 25 | A.    I did not have his phone number. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 263

| | | |
|---|---|---|
| 17:42:51 | 1 | Q.   Did you give him your phone number? |
| 17:42:55 | 2 | A.   I don't remember whether I did or not. |
| 17:42:57 | 3 | Q.   Did you give him your e-mail address? |
| 17:43:03 | 4 | A.   We never communicated by e-mail, so I |
| 17:43:05 | 5 | probably did not. |
| 17:43:17 | 6 | Q.   Can you go to the next exhibit, which is the |
| 17:43:19 | 7 | Superboy termination notice that was sent out on your |
| 17:43:26 | 8 | behalf on November 8, 2002. |
| 17:43:31 | 9 | A.   Thank you. |
| 17:43:39 | 10 | Q.   Why didn't you send this out sooner? |
| 17:43:53 | 11 | MR. TOBEROFF:  You can answer except I |
| 17:43:56 | 12 | wouldn't go into anything that implicates |
| 17:43:59 | 13 | communication with an attorney. |
| 17:44:02 | 14 | THE WITNESS:  We had our hands full.  We had |
| 17:44:04 | 15 | a lot of -- a lot of things that were going on in the |
| 17:44:08 | 16 | case and trying to find a new attorney after we were |
| 17:44:15 | 17 | dissatisfied with the February offer from DC.  We |
| 17:44:20 | 18 | spent a long period of time just trying to decide what |
| 17:44:23 | 19 | to do with what was already before us, and once we |
| 17:44:29 | 20 | figured that out, then we turned our attention to |
| 17:44:35 | 21 | Superboy. |
| | 22 | BY MR. PETROCELLI: |
| 17:44:35 | 23 | Q.   Do you know when the earliest time was when |
| 17:44:37 | 24 | you could have sent out a notice of termination for |
| 17:44:39 | 25 | Superboy? |

## LAURA SIEGEL LARSON – 7/22/2011

Page 264

| | | |
|---|---|---|
| 17:44:39 | 1 | A.   No, I really don't. |
| 17:44:42 | 2 | Q.   Do you know whether you were bumping up |
| 17:44:44 | 3 | against a deadline to send out the Superboy notice? |
| 17:44:48 | 4 | A.   I think we were getting close to a deadline, |
| 17:44:50 | 5 | I think more in terms of end date than beginning date. |
| 17:44:55 | 6 | Q.   Did you have any discussions with any member |
| 17:45:03 | 7 | of the Shuster family that you were going to be |
| 17:45:06 | 8 | sending out the Superboy notice -- |
| 17:45:09 | 9 | A.   No. |
| 17:45:10 | 10 | Q.   -- claiming a hundred percent termination |
| 17:45:12 | 11 | interest? |
| 17:45:12 | 12 | A.   No, we did not. |
| 17:45:14 | 13 | Q.   Did you and your mother discuss whether you |
| 17:45:16 | 14 | should do so beforehand? |
| 17:45:18 | 15 | A.   Whether we should what? |
| 17:45:19 | 16 | Q.   Contact them beforehand and let them know. |
| 17:45:26 | 17 | A.   No. |
| 17:45:27 | 18 | Q.   Did you have any idea what their view was |
| 17:45:33 | 19 | about Mr. Shuster's termination interest with respect |
| 17:45:37 | 20 | to Superboy? |
| 17:45:39 | 21 | A.   We didn't talk to them about Superboy. |
| 17:45:43 | 22 | Q.   Well, were you not concerned that they might |
| 17:45:48 | 23 | protest or contest the assertion by the Siegel family |
| 17:45:53 | 24 | that Jerome Siegel was the sole creator and the sole |
| 17:45:57 | 25 | person entitled to claim a termination interest? |

**EXHIBIT S**

**701**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 265

| | | |
|---|---|---|
| 17:45:59 | 1 | A. No. |
| 17:46:02 | 2 | Q. Why not? |
| 17:46:05 | 3 | A. Because we were, you know, relying on the |
| 17:46:08 | 4 | Westchester decision. |
| 17:46:10 | 5 | Q. In 1947? |
| 17:46:11 | 6 | A. Yes, correct. |
| 17:46:12 | 7 | Q. But -- |
| 17:46:13 | 8 | A. '47, '48, whenever it was. |
| 17:46:15 | 9 | Q. How did you know they were aware of it? |
| 17:46:17 | 10 | A. We weren't trying to get inside their minds. |
| 17:46:20 | 11 | We were doing what we thought, you know, we had rights |
| 17:46:25 | 12 | to. |
| 17:46:26 | 13 | Q. But what if -- but did you discuss with your |
| 17:46:30 | 14 | mother the possibility that you may now be entering |
| 17:46:33 | 15 | into an area in which they might contest your |
| 17:46:43 | 16 | position? Did that thought ever occur to you? |
| 17:46:45 | 17 | A. We felt perfectly confident that we were |
| 17:46:47 | 18 | within our rights. |
| 17:46:48 | 19 | Q. I understand that you made a judgment that |
| 17:46:49 | 20 | you were within your rights, but did you give some |
| 17:46:52 | 21 | consideration to the idea that the family of Joe |
| 17:46:58 | 22 | Shuster might have a different view and might dispute |
| 17:47:01 | 23 | this in some way? |
| 17:47:05 | 24 | A. I don't recall that being a concern. |
| 17:47:07 | 25 | Q. Never even occurred to you? |

EXHIBIT S
702

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 266

17:47:08    1        A.   I don't think so.

17:47:13    2        Q.   And you knew that their lawyer was your

17:47:17    3    lawyer; right?

17:47:17    4        A.   Correct.

17:47:17    5        Q.   Did you ask your lawyer?

17:47:20    6        A.   Do we --

17:47:21    7             MR. TOBEROFF:   Don't disclose --

17:47:23    8             MR. PETROCELLI:   Yes.

17:47:24    9             MR. TOBEROFF:   Don't disclose -- I instruct

17:47:26   10    you not to answer.

17:47:27   11             THE WITNESS:   Okay.

           12    BY MR. PETROCELLI:

17:47:28   13        Q.   Did you ask Mr. Toberoff in his --

           14             MR. TOBEROFF:   Privilege.   Excuse me.

           15    BY MR. PETROCELLI:

17:47:31   16        Q.   Did you ask Mr. Toberoff in his capacity as a

17:47:35   17    lawyer for the Shusters what their view of the

17:47:39   18    Superboy issue was?

17:47:41   19             MR. TOBEROFF:   Privileged.   Instruct you not

17:47:42   20    to answer.

           21    BY MR. PETROCELLI:

17:47:42   22        Q.   I'm not asking about any conversations with

17:47:46   23    you as their lawyer, but with you as the Shuster

17:47:50   24    lawyer.

17:47:51   25             MR. TOBEROFF:   You know --

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 267

17:47:52  1    BY MR. PETROCELLI:

17:47:52  2        Q.    Did you understand my question?

17:47:54  3             MR. TOBEROFF:   Dan, you can't have it both

17:47:56  4    ways.   You can't ask me to keep my objections short

17:47:58  5    and accuse me of coaching and then when I keep it

17:48:00  6    short you engage me in conversations which makes me

17:48:03  7    defensive the next time I object so I explain my

17:48:05  8    objections.

17:48:05  9             MR. PETROCELLI:   Okay.   I just want to make

17:48:06  10   sure, though, based on your objections that you

17:48:08  11   understood and more importantly that the witness

17:48:10  12   understood.   So let me -- because I don't want to

17:48:13  13   argue with you, and I regret the few instances in

17:48:18  14   which we have and apologize if I said anything in

17:48:25  15   temper.

17:48:25  16            MR. TOBEROFF:   I accept your apology in this

17:48:27  17   limited instance.

17:48:30  18            MR. PETROCELLI:   And I accept yours.

17:48:32  19            MR. TOBEROFF:   I didn't apologize.

17:48:34  20            MR. PETROCELLI:   Noted.

17:48:36  21            THE WITNESS:   You guys.

          22   BY MR. PETROCELLI:

17:48:40  23        Q.    Did -- did you, knowing that a lawyer with

17:48:44  24   whom you were dealing, Marc Toberoff, was also a

17:48:50  25   person who represented the Shusters --

LAURA SIEGEL LARSON - 7/22/2011

Page 268

| 17:48:53 | 1 | A.    Um-hum. |
| 17:48:54 | 2 | Q.    -- did you ask Mr. Toberoff with his Shuster |
| 17:48:59 | 3 | lawyer hat on, not the Siegel lawyer hat on, to |
| 17:49:03 | 4 | discuss with you what the Shuster position was on |
| 17:49:10 | 5 | Superboy? |
| 17:49:10 | 6 | MR. TOBEROFF:   Instruct you not to answer. |
| 17:49:14 | 7 | Privilege. |
|  | 8 | BY MR. PETROCELLI: |
| 17:49:17 | 9 | Q.    Did you have any discussions with |
| 17:49:23 | 10 | Mr. Toberoff in his capacity as a lawyer for the |
| 17:49:29 | 11 | Shusters -- |
| 17:49:30 | 12 | MR. TOBEROFF:   Same. |
| 17:49:30 | 13 | THE WITNESS:   You can't separate them out, |
| 17:49:33 | 14 | though. |
| 17:49:33 | 15 | MR. TOBEROFF:   Same instruction. |
| 17:49:34 | 16 | THE WITNESS:   I couldn't separate them out. |
| 17:49:36 | 17 | MR. TOBEROFF:   Same instruction. |
|  | 18 | BY MR. PETROCELLI: |
| 17:49:41 | 19 | Q.    Can you answer that question for me? |
| 17:49:43 | 20 | A.    I think I've been instructed not to. |
| 17:49:49 | 21 | Q.    Okay.  And did you have any conversations |
| 17:49:51 | 22 | with your mother about what the Shuster position is or |
| 17:49:59 | 23 | might be regarding your issuance of a notice of |
| 17:50:03 | 24 | termination claiming a hundred percent of the |
| 17:50:06 | 25 | termination interest to Superboy? |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 269

| | | |
|---|---|---|
| 17:50:07 | 1 | A.   I don't believe we did. |
| 17:50:11 | 2 | Q.   And even though Ms. Peary had been kind |
| 17:50:20 | 3 | enough to refer Mr. Toberoff to your family -- |
| 17:50:23 | 4 | A.   Um-hum. |
| 17:50:24 | 5 | Q.   -- it didn't occur to you that you might want |
| 17:50:27 | 6 | to check with the Peary family or the Peavy family on |
| 17:50:32 | 7 | what their view is on Superboy before you filed a |
| 17:50:36 | 8 | notice claiming a hundred percent of the termination |
| 17:50:39 | 9 | interest? |
| 17:50:40 | 10 | A.   I can't -- I can't testify as to what my |
| 17:50:44 | 11 | mother may or may not have done. |
| 17:50:44 | 12 | Q.   Well, what about you? |
| 17:50:53 | 13 | A.   I did not. |
| 17:50:53 | 14 | Q.   Okay.  Did you tell your mother it might be a |
| 17:50:53 | 15 | good thing as a courtesy to let Ms. Peavy know? |
| 17:50:57 | 16 | A.   I don't recall. |
| 17:50:57 | 17 | Q.   You didn't give your mother that advice? |
| 17:51:00 | 18 | A.   I don't remember giving her advice. |
| 17:51:02 | 19 | Q.   Did your mother -- you certainly understood |
| 17:51:07 | 20 | how proud Jean Peavy was of her husband's |
| 17:51:13 | 21 | contributions -- |
| 17:51:13 | 22 | A.   Her brother. |
| 17:51:14 | 23 | Q.   -- her brother's contributions to Superman? |
| 17:51:17 | 24 | A.   Of course. |
| 17:51:18 | 25 | Q.   And the whole Superman history; correct? |

EXHIBIT S
706

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 270

| 17:51:23 | 1 | A. Of course. |
| 17:51:25 | 2 | Q. And you knew your father felt that way also; |
| 17:51:28 | 3 | right? |
| 17:51:28 | 4 | A. Yes. |
| 17:51:29 | 5 | Q. And your mother felt that way; correct? |
| 17:51:31 | 6 | A. We all did. |
| 17:51:32 | 7 | Q. And do you think that -- did it occur to you |
| 17:51:35 | 8 | that Jean Peavy might have some feelings about her |
| 17:51:40 | 9 | brother's getting credit for Superboy when you now |
| 17:51:45 | 10 | were claiming sole credit? |
| 17:51:46 | 11 | A. To the best of my recollection, it wasn't -- |
| 17:51:51 | 12 | it wasn't anything that we were concerned about or |
| 17:51:54 | 13 | worried about. We thought that they shared the same |
| 17:51:58 | 14 | view that we had. |
| 17:51:59 | 15 | Q. You had no basis to think that. What was |
| 17:52:02 | 16 | your basis? |
| 17:52:03 | 17 | A. I'm -- |
| 17:52:04 | 18 | Q. Some opinion in 1947 that you don't even know |
| 17:52:07 | 19 | that they were aware of? |
| 17:52:08 | 20 | A. Just discussions that I had had with my |
| 17:52:10 | 21 | father during his lifetime. |
| 17:52:14 | 22 | Q. Did you ever at any time have a discussion |
| 17:52:17 | 23 | with someone in the Shuster family about whether they |
| 17:52:21 | 24 | agreed with that position? |
| 17:52:22 | 25 | A. I did not. |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 271

| | | |
|---|---|---|
| 17:52:22 | 1 | Q.   Do you know if your mother did? |
| 17:52:25 | 2 | A.   She may have. |
| 17:52:25 | 3 | Q.   Do you know if she did? |
| 17:52:27 | 4 | A.   I do not know whether she did. |
| 17:52:42 | 5 | Q.   Did you inform the Peary or Peavy family |
| 17:52:52 | 6 | after you served the notice of termination claiming a |
| 17:52:56 | 7 | hundred percent termination interest for Superboy that |
| 17:52:58 | 8 | you had done so? |
| 17:52:59 | 9 | A.   Yes, I believe we did. |
| 17:53:01 | 10 | Q.   Who did so? |
| 17:53:03 | 11 | A.   I think my mother did. |
| 17:53:06 | 12 | Q.   How do you know she did? |
| 17:53:08 | 13 | A.   Well, just every so often she would talk to |
| 17:53:11 | 14 | Jean on the phone.  I mean they had a very friendly |
| 17:53:14 | 15 | relationship, and I think she brought it up. |
| 17:53:16 | 16 | Q.   She said, "Hey, Jean, just want you to know |
| 17:53:19 | 17 | we filed a notice of termination claiming a hundred |
| 17:53:21 | 18 | percent on Superboy"? |
| 17:53:24 | 19 | A.   Possibly.  I wasn't on the phone. |
| 17:53:25 | 20 | Q.   Are you speculating or do you know for a fact |
| 17:53:27 | 21 | that she told that to Ms. Peavy? |
| 17:53:30 | 22 | A.   I'm speculating what she said. |
| 17:53:32 | 23 | Q.   Okay.  Well, that's -- that's of no help to |
| 17:53:35 | 24 | us. |
| 17:53:49 | 25 | Okay.  Let's take a look at the next exhibit. |

**EXHIBIT S**
**708**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 272

| | | |
|---|---|---|
| 17:53:55 | 1 | At some point in time did Mr. Emanuel and |
| 17:54:00 | 2 | Mr. Toberoff approach you about their wanting to |
| 17:54:07 | 3 | pursue Michael Siegel's termination interest? |
| 17:54:11 | 4 | A.   Yes. |
| 17:54:12 | 5 | Q.   And that they were going to purchase it |
| 17:54:16 | 6 | themselves? |
| 17:54:17 | 7 | A.   That -- they -- it was Ari who was going to |
| 17:54:21 | 8 | purchase it. |
| 17:54:27 | 9 | Q.   Did Ari ask your permission? |
| 17:54:29 | 10 | A.   Yes, he did. |
| 17:54:31 | 11 | Q.   Okay.  Did you give it to him? |
| 17:54:33 | 12 | A.   Yes, we did. |
| 17:54:35 | 13 | Q.   Did you discuss the price that he would pay? |
| 17:54:44 | 14 | A.   No. |
| 17:54:44 | 15 | Q.   He said to you, "I want to buy Michael |
| 17:54:47 | 16 | Siegel's termination interest," and you said, "Fine"? |
| 17:54:53 | 17 | A.   Well, it wasn't only the word "fine."  We |
| 17:54:56 | 18 | talked about it a little bit more than that, but -- |
| 17:54:58 | 19 | Q.   Tell me what you said, and what did you guys |
| 17:55:01 | 20 | talk about in that regard? |
| 17:55:03 | 21 | A.   It was just that, you know, Michael was kind |
| 17:55:07 | 22 | of a loose cannon.  He was, you know -- he was |
| 17:55:11 | 23 | difficult to deal with.  At times he perfectly |
| 17:55:17 | 24 | understood that, you know, we should have a united |
| 17:55:20 | 25 | family front, and at other times he was, you know, |

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON – 7/22/2011

Page 273

| | | |
|---|---|---|
| 17:55:27 | 1 | kind of off the beam, and so it became increasingly |
| 17:55:34 | 2 | difficult to deal with him.  So it seemed that it |
| 17:55:39 | 3 | might be a good idea to have somebody who was friendly |
| 17:55:44 | 4 | to us acquire his rights. |
| 17:55:49 | 5 | Q.   Did you tell Michael that you were involved |
| 17:55:58 | 6 | in Ari, in the decision to have Ari Emanuel acquire |
| 17:56:03 | 7 | his termination interests? |
| 17:56:05 | 8 | A.   I don't believe we discussed it. |
| 17:56:06 | 9 | Q.   Well, you never had a conversation with him. |
| 17:56:09 | 10 | A.   No. |
| 17:56:12 | 11 | Q.   Okay.  And did you write him a letter saying, |
| 17:56:14 | 12 | "Michael, I want you to understand that I'm having Ari |
| 17:56:17 | 13 | Emanuel approach you to buy your interest because |
| 17:56:20 | 14 | you're out of control and this will be in my best |
| 17:56:23 | 15 | interest if I have this happen"?  Did you write that |
| 17:56:26 | 16 | kind of a letter to him? |
| 17:56:27 | 17 | A.   I did not write it in the words that you |
| 17:56:28 | 18 | used. |
| 17:56:29 | 19 | Q.   Did you write any letter to him advising him |
| 17:56:32 | 20 | that Michael -- that you were giving -- you had |
| 17:56:38 | 21 | approved Ari Emanuel purchasing his termination |
| 17:56:41 | 22 | interest? |
| 17:56:41 | 23 | A.   I believe that he wrote to me and had |
| 17:56:47 | 24 | mentioned it to me, and I responded and said if he |
| 17:56:50 | 25 | wanted to do it, I would not stand in his way. |

**EXHIBIT S**
**710**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

LAURA SIEGEL LARSON - 7/22/2011

Page 274

| | | |
|---|---|---|
| 17:56:53 | 1 | Q.   Did he write to you saying what? |
| 17:56:55 | 2 | A.   He said he was in need of immediate cash. |
| 17:57:00 | 3 | Q.   He happened to write to you just at the same |
| 17:57:04 | 4 | time that -- withdrawn. |
| 17:57:06 | 5 | When did he write this letter to you? |
| 17:57:09 | 6 | A.   It had to have been after an offer was made |
| 17:57:14 | 7 | to him because he was telling me about an offer. |
| 17:57:17 | 8 | Q.   Okay.  But when you -- you initially spoke |
| 17:57:21 | 9 | with Mr. Emanuel about his purchasing the interest |
| 17:57:27 | 10 | because you thought that would be beneficial to you |
| 17:57:30 | 11 | and your mother's interest; correct? |
| 17:57:33 | 12 | A.   And to Michael because he was looking for |
| 17:57:35 | 13 | money. |
| 17:57:36 | 14 | Q.   Well, I didn't ask you about that -- |
| 17:57:38 | 15 | A.   Sorry. |
| 17:57:38 | 16 | Q.   -- because you didn't know that Michael was |
| 17:57:40 | 17 | looking for money at the time.  He told you |
| 17:57:42 | 18 | afterwards. |
| 17:57:43 | 19 | A.   No.  I'm sorry.  He was always saying that he |
| 17:57:45 | 20 | needed money. |
| 17:57:46 | 21 | Q.   But he didn't call you up and say, "Look, I'm |
| 17:57:48 | 22 | looking for money," and it was for that reason that |
| 17:57:51 | 23 | you and Ari first had your discussion about his |
| 17:57:55 | 24 | buying the Super- -- about his buying Michael's |
| 17:57:56 | 25 | interest. |

EXHIBIT S
711

3baac749-5ca5-4935-b47c-c3b46e0b4ffc

## LAURA SIEGEL LARSON - 7/22/2011

Page 275

| | | |
|---|---|---|
| 17:57:56 | 1 | A.    No, he never called me. |
| 17:57:58 | 2 | Q.    Okay.  So you had no communication with |
| 17:57:59 | 3 | Michael that he wanted to sell his Superman interest |
| 17:58:03 | 4 | which led you to then authorize Ari to go ahead and do |
| 17:58:06 | 5 | it.  That's not what happened; correct? |
| 17:58:08 | 6 | A.    Could you ask it again?  I'm a little |
| 17:58:13 | 7 | confused. |
| 17:58:13 | 8 | Q.    You did not receive the communication from |
| 17:58:15 | 9 | Michael Siegel saying he needed money, he wanted to |
| 17:58:17 | 10 | sell his Superman interest, and for that reason you |
| 17:58:19 | 11 | then went to Ari and said, "Here, go buy it.  My |
| 17:58:23 | 12 | brother needs money."  There's no such document; |
| 17:58:26 | 13 | correct? |
| 17:58:26 | 14 | A.    It was -- is there a document.  I haven't |
| 17:58:29 | 15 | seen those documents in a really long time.  I can't |
| 17:58:32 | 16 | really answer your question. |
| 17:58:33 | 17 | Q.    Where are those documents? |
| 17:58:35 | 18 | A.    Whatever documents that -- |
| 17:58:36 | 19 | MR. TOBEROFF:  What documents are you |
| 17:58:37 | 20 | referring to? |
| | 21 | BY MR. PETROCELLI: |
| 17:58:38 | 22 | Q.    You said "I haven't seen those documents in a |
| 17:58:41 | 23 | long time."  Where are those documents? |
| 17:58:42 | 24 | A.    Any letters between myself and Michael. |
| 17:58:45 | 25 | Q.    Where are they? |

**EXHIBIT S**

**712**

3baac749-5ca5-4935-b47c-c3b46e0b4ffc