Marc Toberoff (State Bar No. 188547)
 mtoberoff@toberoffandassociates.com
Keith G. Adams (State Bar No. 240497)
 kadams@toberoffandassociates.com
Pablo D. Arredondo (State Bar No. 241142)
 parredondo@toberoffandassociates.com
David Harris (State Bar No. 255557)
 dharris@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Fax:           (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF KEITH G. ADAMS IN OPPOSITION TO PLAINTIFF DC COMICS' MOTION (1) FOR LEAVE TO CONDUCT FURTHER DEPOSITIONS; AND (2) TO COMPEL DEFENDANTS MARC TOBEROFF AND MARK WARREN PEARY TO RESPOND TO DEPOSITION QUESTIONS**<br><br>*Notice of Motion, Joint Stipulation and Declaration of Matthew Kline filed concurrently*<br><br>Complaint filed: May 14, 2010<br>Trial Date:        None Set<br><br>Date:          March 11, 2013<br>Time:          10:00 a.m.<br>Courtroom:  540 |

## DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.    I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and submit this declaration in opposition to plaintiff DC Comics' Motion (1) For Leave To Conduct Further Deposition Of Defendants Marc Toberoff, Laura Siegel Larson, And Mark Warren Peary; And (2) To Compel Defendants Marc Toberoff And Mark Warren Peary To Respond To Deposition Questions.

2.    Attached hereto as Exhibit "A" is a true and correct copy of a condensed transcript of the September 18, 2012 deposition of Marc Toberoff in the above-captioned matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed on the 13th day of February 2013, at Malibu, California.

_____

Keith G. Adams

1
DECLARATION OF KEITH G. ADAMS

# In The Matter Of:

*DC COMICS*
*v.*
*PACIFIC PICTURES CORPORATION*

———————————————————————————

*TOBEROFF, MARC  - Vol. 1*
*September 18, 2012*

———————————————————————————

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DC COMICS,                        )
                                  )
          Plaintiff,              )No.
                                  )CV-10-3633 ODW (RZx)
          VS.                     )
                                  )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as      )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an         )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL  )
LARSON, an individual, and   )
DOES 1-10, inclusive,        )
                                  )
          Defendants.             )
                                  )
          _____             )


VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012


Reported by:  SHANDA GABRIEL

CSR No. 10094

**EXHIBIT A**

**3**

Page 2

1        Videotaped deposition of MARC TOBEROFF,
2   taken on behalf of the Plaintiff, at 1999 Avenue of
3   the Stars, Los Angeles, California, commencing at
4   9:25 a.m., TUESDAY, SEPTEMBER 18, 2012, before
5   SHANDA GABRIEL, CSR No. 10094.
6
7   APPEARANCES:
8   FOR THE PLAINTIFF:
9        O'MELVENY & MYERS LLP
10        BY:  DANIEL M. PETROCELLI, ESQ.
11          JASON TOKORO, ESQ.
12        1999 Avenue of the Stars
13        7th Floor
14        Los Angeles, California  90067-6035
15        (310) 553-6700
16
17   FOR THE TOBEROFF ENTITY DEFENDANTS and MARC
    TOBEROFF:
18
19        KENDALL BRILL & KLIEGER LLP
20        BY:  RICHARD B. KENDALL, ESQ.
21        10100 Santa Monica Boulevard
22        Suite 1725
23        Los Angeles, California 90067
24        (310) 556-2700
25   ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER

Page 3

1
2            I N D E X
3   WITNESS         EXAMINATION         PAGE
4   MARC TOBEROFF      (BY MR. PETROCELLI)      6
5
6
7            E X H I B I T S
8   NO.      PAGE      DESCRIPTION
9   Exhibit 100   120   Incoming/Outgoing Call
                        Register
10
11   Exhibit 101   127   E-mail dated November 17,
                        2001 to Michael from Marc
                        Toberoff
12
13   Exhibit 102   152   Renner, Otto Pre-bill
                        worksheet
14   Exhibit 103   266   October 3, 2004 letter to
                        Joanne and Laura Siegel
15                      re: Engagement for
                        Professional Services
16
17   Exhibit 104   287   Incoming/Outgoing Call
                        Register
18   Exhibit 105   303   July 11, 2003 letter to
                        Michael from Laura
19
20   Exhibit 106   304   July 5, 2003 Fax
                        Transmittal to Marc
                        Toberoff from Laura Siegel
21                      Larson
22   Exhibit 107   304   July 8, 2003 Fax
                        Transmittal to Marc
23                      Toberoff from Laura Siegel
                        Larson
24
25

Page 4

1            I N D E X (CONTINUED)
2
3        PREVIOUSLY MARKED EXHIBITS
4        EXHIBIT NUMBER   PAGE
              9      99
5             10      97
              11     246
6             13     225
              20     262
7             21     262
              60     281
8             61     285
              75     209
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        LOS ANGELES, CALIFORNIA;
2        TUESDAY, SEPTEMBER 18, 2012
3        9:25 A.M.
4
5        THE REPORTER:  I am making the following
6   statements pursuant to Rule 30(b)(5) of the Federal
7   Rules of Civil Procedure:
8        My name is Shanda Gabriel, C.S.R. 10094,
9   the videographer is Fritz Sperberg, both contracted
10   by Merrill Corporation, 20750 Ventura Boulevard,
11   Suite 205, Woodland Hills, California.
12        Today's date is September 18, 2012, the
13   time is 9:25 a.m. and this deposition is being held
14   at 1999 Avenue of the Stars, Los Angeles,
15   California.
16        Would counsel please state your appearances
17   and whom you represent:
18        MR. PETROCELLI:  Daniel Petrocelli for
19   plaintiff, DC Comics.
20        MR. TOKORO:  Jason Tokoro for plaintiff, DC
21   Comics.
22        MR. KENDALL:  Richard Kendall on behalf of
23   the Toberoff entity defendants and Marc Toberoff.
24        THE REPORTER:  The witness is Marc
25   Toberoff.

                              2 (Pages 2 to 5)

EXHIBIT A
4

MARC   TOBEROFF - 9/18/2012

---

Page 6

1    Would you please raise your right hand to
2 be sworn in.
3          MARC TOBEROFF,
4       having been first duly sworn, was
5       examined and testified as follows:
6
7          EXAMINATION
8 BY MR. PETROCELLI:
9    **Q. I will address you as Mr. Toberoff for the**
10 **purpose of the deposition, if that's all right with**
11 **you.**
12    A. I won't be offended.
13    **Q. Can you tell us what your educational**
14 **background is?**
15    A. I went to -- starting with what, college?
16    **Q. Yeah.**
17    A. I went to McGill University, and then in my
18 third year I transferred to Princeton, and then I
19 didn't -- I missed my girlfriend, essentially, and
20 transferred -- decided to go back to McGill and
21 graduated from McGill after being at Princeton, I
22 think, for -- between a half a year and a year. I'm
23 not sure.
24    **Q. What year did you graduate?**
25    A. In 1977.

---

Page 7

1    **Q. And --**
2    A. And then I went to Columbia University
3 School of Law.
4    **Q. Immediately thereafter?**
5    A. Yeah.
6    **Q. And when did you graduate?**
7    A. In 1980.
8    **Q. '80? And then what did you do after you**
9 **graduated from Columbia Law School?**
10    A. I worked at a big law firm, Kelley Drye &
11 Warren.
12    **Q. Where?**
13    A. In New York, Park Avenue.
14    **Q. From when to when?**
15    A. I think it was approximately a year. I
16 don't -- I don't recall the time span.
17    **Q. And what did you do there?**
18    A. General litigation.
19    **Q. Thereafter?**
20    A. Thereafter, I believe I worked at a firm
21 called Beldock Levine & Hoffman, an entertainment
22 firm that did mostly music.
23    **Q. What's the second name?**
24    A. Levine.
25    **Q. Levine? Where was that located?**

---

Page 8

1    A. In Manhattan.
2    **Q. Okay.**
3    A. On -- in the 40s or 50s somewhere off --
4 between Madison and Park, I believe.
5    **Q. Were you a litigator there?**
6    A. No. That was more of a transactional
7 entertainment firm, although they handled some
8 litigation and I participated in some.
9    **Q. How long were you there?**
10    A. I -- I don't -- couldn't tell you.
11    **Q. Approximately when did you leave?**
12    A. I think it was approximately a year.
13    **Q. One year?**
14    A. Could -- could be -- could be less. Could
15 be a little more, could be a little less.
16    **Q. And thereafter?**
17    A. And then I worked at another entertainment
18 firm called Levine & Thall.
19    **Q. How do you spell the second name?**
20    A. T-h-a-l-l.
21    **Q. In Manhattan?**
22    A. Yes, that was on Madison Avenue, I believe.
23    **Q. What did you do there?**
24    A. That -- they had a transactional practice,
25 no litigation. It was more entertainment contracts

---

Page 9

1 with an emphasis on music.
2    **Q. How long were you there?**
3    A. Again, I don't -- the time span,
4 approximately a year. Could be less.
5    **Q. What did you do next?**
6    A. Then I worked for a director named Robert
7 Altman, film director.
8    **Q. Where?**
9    A. In New York.
10    **Q. What did you do for Mr. Altman?**
11    A. I was a glorified gopher.
12    **Q. You were not practicing law during that**
13 **time period?**
14    A. No, I was just handling just sort of all
15 sorts of business, quasi, legal, just like I said,
16 glorified gopher.
17    **Q. How long were you doing that?**
18    A. I think I had a title but --
19    **Q. What was it?**
20    A. -- I viewed myself --
21    **Q. You don't remember?**
22    A. I viewed myself as a glorified gopher.
23    **Q. Okay. How long did you work for**
24 **Mr. Altman?**
25    A. That wasn't -- it was about six months, I

---

3 (Pages 6 to 9)

**EXHIBIT A**

**5**

MARC   TOBEROFF - 9/18/2012

Page 10

1  think.
2      Q. And then what?
3      A. And then I -- and I'm not sure whether the
4  Altman was in between one of the legal jobs that I
5  mentioned or after.
6          And then I worked for a film producer by
7  the name of Elliott Kastner, who -- I started an
8  office for him in New York.
9      Q. What did you do for Elliott Kastner?
10     A. That was -- you know, I call that a
11  glorified gopher position also, but I think I was --
12  had more responsibilities there.  It was more
13  defined.  A New York office.  Advised him on
14  business and legal issues and worked on development
15  of new film products.  He was a real producer.  He
16  had produced about 60 movies with all the big stars.
17     Q. How long did you work for Mr. Kastner?
18     A. My recollection is hazy, but it was four
19  years, four, five years, four years, something in
20  that area.  I don't think as much as five, maybe
21  four is a good number.
22     Q. Was that the last job you had in New York
23  before moving to California?
24     A. Yes.
25     Q. What films did you work on while you were

Page 11

1  with Mr. Kastner during the four years?
2      MR. KENDALL: Overbroad.  Vague and
3  ambiguous.
4          THE WITNESS: We were shooting -- I think
5  the first film that was in production was a film
6  with Sidney Lumet directing called Garbo Talks, and
7  then after that, we did a film in New York called --
8  it was either called Falling Angel or the basis for
9  it was Falling Angel, Alan Parker directing, Robert
10  De Niro and Lisa Bonet.
11         And then in the interim there was a film
12  that we did as more of an independent film called
13  Oxford Blues, and we did a little film called Class
14  of Zombie High.  Probably a couple others.  I can't
15  recall.
16     Q. After working with Mr. Kastner, what did
17  you do?
18     A. I -- I moved out to California.
19     Q. And did you begin employment?
20     A. No.
21     Q. How long were you in California?
22     A. I was self- -- I was self-employed.
23     Q. Self-employed?  As what?
24     A. As a -- I was interested in breaking into
25  the film business and producing films.  And --

Page 12

1      Q. What years are we talking about?  Sorry.
2      A. And -- and if -- if I wasn't able to
3  generate an income in a certain period of time, I
4  would have to get a job.
5      Q. What years are we talking about now?
6      A. Probably --
7      Q. Late '80s?
8      A. No, no, I moved out -- I think I've been in
9  California some -- between around 16 years, 15, 16
10  years.
11     Q. So -- so we're talking early '90s?
12     A. I think mid-'90s.
13     Q. Mid-'90s.  Okay.
14     A. But I'm not sure.
15     Q. Were you self-employed as a lawyer or were
16  you self-employed as a person trying to make it in
17  the entertainment industry outside of the practice
18  of law?
19     A. I believe I was self- -- my focus,
20  initially my focus was on trying to produce films.
21     Q. And --
22     A. And I had some projects, some scripts that
23  I was developing and pitching around town as an
24  independent producer.
25     Q. Where were you officed?

Page 13

1      A. In the -- at home.
2      Q. Some -- somewhere in West L.A.?
3      A. Well, I rented a house in Bel Air in lower
4  Beverly Glen.
5      Q. Okay.
6      A. And the house had a separate sort of guest
7  house or a pool house, which I converted into an
8  office, and so that's how I went to work.  I went --
9  went downstairs into the garden and that was my
10  office.
11     Q. So for how long --
12     A. And I kept regular business hours, you
13  know, like somebody going to a regular office.
14     Q. How long did you carry out that activity
15  where you were focusing on being a film producer?
16     MR. KENDALL: I'm going to object to that
17  as vague and ambiguous.
18         THE WITNESS: Couple years.  Year --
19  coup- -- couple years, year and a half.  I'd say a
20  couple years.
21  BY MR. PETROCELLI:
22     Q. Then -- did you then undertake to do
23  something different?
24     A. I had a -- I don't know if I would use the
25  word "undertake."  In other words, one's career

4 (Pages 10 to 13)

**EXHIBIT A**

**6**

MARC    TOBEROFF - 9/18/2012

Page 14

1  evolves or morphs, due to things you choose to do,
2  due to opportunities that present themselves, so I
3  don't know if there was like a plan where I'm
4  saying, "Now I'm going to stop doing this and start
5  doing this," but there was a -- I got involved with
6  an intellectual property matter that was -- quickly
7  became a legal matter and -- in which I was able to
8  achieve a settlement.
9      Q. Is that a matter in which you had a client
10 or a matter in which you were the principal or both?
11     A. I believe he was a client.
12     Q. Was that -- what was the nature of that
13 matter?
14     MR. KENDALL: I'll caution you to keep your
15 answer very, very general so as not to reveal any
16 confidential attorney-client information.
17     THE WITNESS: The nature of the matter was
18 a gentleman who is the son of a famous writer who
19 had -- had done all sorts of interesting things,
20 like wrote movies for the Marx Brothers, and what I
21 focused on were his rights in a TV series called
22 Combat!, which is an old World War II series
23 starting Vic Morrow.
24 BY MR. PETROCELLI:
25     Q. Starting with that matter -- well, what did

Page 15

1  you do after that matter was concluded?
2      A. I didn't have to get a job.
3      Q. Because?
4      A. Because we settled the case. We
5  achieved -- we achieved a settlement, which in those
6  days from me was an enormous amount of money and I
7  didn't have to get a job, and so --
8      Q. Did that -- I'm sorry.
9      A. And that kind of galvanized a focus on
10 intellectual property.
11     Q. Did that matter involve copyright
12 termination issues?
13     A. No.
14     Q. Okay. Did -- so when you began to work
15 again, was it with the focus on intellectual
16 property?
17     A. I -- I -- to me that galvanized my interest
18 in intellectual property as a valuable component of
19 the entertainment industry.
20     Q. At some point in time did you go back to
21 work again for yourself or for --
22     A. I was always working. It was for myself.
23     Q. Well, I thought I heard you say you didn't
24 have to get a job.
25     A. That's right. I --

Page 16

1      Q. You meant for another person?
2      A. I could afford to continue to work for
3  myself, to be self-employed.
4      Q. Okay. So --
5      A. I've always worked. I'm a workaholic.
6  When I say "get a job," I don't mean, you know, go
7  surfing.
8      Q. Right.
9      A. I mean not to have to work for a boss but I
10 could be my own boss.
11     Q. So can you generally then describe the
12 nature of your self-employment from that point
13 forward?
14     A. After that case which resulted in a, you
15 know, legal settlement agreement, I began focusing
16 more on intellectual property, and starting with
17 what was the relevant legal aspect of that case,
18 which was separated rights under the Writers Guild
19 collectively bargaining agreement.
20     Q. That was the issue in the Combat! case?
21     A. That was the issue in the Combat! case
22 where, although he had a contract which purported to
23 waive his separated rights and that was the position
24 ABC Cap Cities took. You had a contract that
25 purported to waive those rights, you couldn't waive

Page 17

1  those rights. And, in fact, the Writers Guild
2  collective bargaining agreement acted as an
3  invisible agreement that superseded terms of the
4  writers' employment agreement to the extent they
5  were less favorable than the terms of the Writers
6  Guild agreement.
7      And -- and that to me was a very
8  interesting dynamic, because every -- I believe
9  everybody was referring to their employment
10 agreement to understand their rights, and there was
11 this collective bargaining agreement out there that
12 really superseded it.
13     And so after that, I started working a
14 great deal in the area of Writers Guild, rights
15 under the Writers Guild agreement, separated rights,
16 collectively bargaining, that type of thing.
17     Q. During this time -- first of all, in the
18 meantime had you become licensed as a lawyer in the
19 state of California?
20     A. I -- when I moved out here, I took the bar
21 pretty quickly. I remember studying for the bar. I
22 don't remember the year. I should have checked that
23 before the deposition but I didn't.
24     Q. When you began this work --
25     A. I know -- I know I took the bar when I was

5 (Pages 14 to 17)

EXHIBIT A
7

Page 18

1  in that particular house in Beverly Glen.
2     **Q. You did?**
3     A. Yeah.
4     **Q. Okay.**
5     A. Because I remember studying it -- for it in
6  that house.
7     **Q. Okay.**
8     A. I have a funny story to tell but I won't --
9     **Q. Maybe at a break.**
10    A. -- use up your time.
11       MR. KENDALL: I'm just going to caution you
12  to answer the questions. Save the comments for
13  another time.
14       THE WITNESS: Okay.
15  BY MR. PETROCELLI:
16    **Q. The -- around this time period when you**
17  **began to work for yourself with the focus on IP,**
18  **starting with this matter involving the Combat! show**
19  **and then continuing thereafter, did you form any**
20  **entities through which you functioned?**
21       MR. KENDALL: Vague and ambiguous.
22       THE WITNESS: I'm not sure if the question
23  is did I form entities -- no. I don't believe --
24  BY MR. PETROCELLI:
25    **Q. In other words, you were working without a**

Page 19

1  **loan-out company or some other company that -- with**
2  **which you were affiliated?**
3       MR. KENDALL: Vague and ambiguous.
4       THE WITNESS: I wasn't -- I had a company
5  which I had incorporated in the mid to late '80s
6  when I was in New York.
7  BY MR. PETROCELLI:
8     **Q. Which company was that?**
9     A. Pacific Pictures Corporation or Pacific
10  Pictures Corp., period, I think is the proper name.
11  I'm not sure.
12    **Q. And is that the same Pacific Pictures Corp.**
13  **that was a named party in this case?**
14    A. Yes.
15    **Q. Okay. And that company no longer exists,**
16  **was dissolved at some point?**
17    A. Correct.
18    **Q. And you're the legal successor to it?**
19    A. Yes.
20    **Q. When -- when did it dissolve?**
21    A. I believe that it was dissolved, initially
22  dissolved by the Secretary of State.
23    **Q. For California or New York?**
24    A. I think when -- I wasn't using it, and my
25  memory is hazy about this so I'll do the best I can.

Page 20

1       I think I wasn't using it, and my
2  accountant said that you don't need to pay, you
3  know, New York -- you know, if you're using it you
4  have to pay New York taxes and California taxes, so
5  I wasn't using it for that reason, and the New York
6  State just dissolved it.
7       And then I believe that I revived the
8  company, I revived the company, and then after, I
9  dissolved the company after reviving it.
10    **Q. Do you know when you revived it?**
11    A. It's hazy. I may -- I may have revived
12  it -- I think I revived it prior to entering into
13  forming another company called IPW.
14    **Q. Had you revived it prior to the time of**
15  **entering into the November 2001 agreement with the**
16  **Shusters?**
17    A. I -- I don't know if it had to be revived,
18  then. I'm not sure.
19    **Q. What was the name of your accountant at the**
20  **time?**
21    A. I don't know.
22    **Q. You don't remember?**
23    A. Not at all.
24    **Q. Is it the same accountant you have today?**
25    A. No.

Page 21

1    **Q. Other than Pacific Pictures Corp., did you**
2  **form any other entities through which you did any**
3  **kind of business?**
4    A. No, that was --
5       MR. KENDALL: Wait, wait. Just a minute.
6  Lacks foundation as to time.
7       THE WITNESS: That was it.
8  BY MR. PETROCELLI:
9    **Q. Okay. Are you still involved in the same**
10  **type of self-employment that you were going back to**
11  **your time on the Combat! matter and the focus on IP?**
12  **Is that fair to say you've been doing the same kind**
13  **of thing ever since to the present?**
14       MR. KENDALL: Vague and ambiguous.
15  Overbroad --
16       THE WITNESS: I wouldn't say that.
17       MR. KENDALL: Now, you need to wait a beat
18  so that I can make objections.
19       THE WITNESS: Sorry.
20  BY MR. PETROCELLI:
21    **Q. You may answer.**
22    A. I wouldn't say that, no.
23    **Q. Did there come a time when the nature of**
24  **your work changed?**
25    A. Yes.

6 (Pages 18 to 21)

MARC   TOBEROFF - 9/18/2012

Page 22

1      Q. When was that?
2      A. It was -- started to change when I had the
3  Dukes of Hazard case.
4      Q. Do you know what year that was?
5      A. 2005, 2004. I should say it started to
6  change when we filed the Superman action on behalf
7  of the Siegels, it was November of 2004, and then in
8  2005 we had the Dukes of Hazard case and then after
9  that, my business became primarily litigation. You
10 know, I would say -- yeah, primarily litigation.
11     Q. Is that true today?
12     A. Yes.
13     Q. And you still are engaged in some part of
14 business that consists of entrepreneurial activity
15 in the entertainment business?
16     MR. KENDALL: Vague and ambiguous.
17     THE WITNESS: I would say so, yes.
18 BY MR. PETROCELLI:
19     Q. Do you currently conduct that part of your
20 business through some entity?
21     A. It depends on the circumstance.
22     Q. What companies or entities, whether they be
23 corporations, partnerships, limited liability
24 companies, have you utilized over the years other
25 than Pacific Pictures Corp. about which you've

Page 23

1  already testified?
2      A. I have --
3      MR. KENDALL: Wait just a minute.
4      Vague and ambiguous. Overbroad.
5      THE WITNESS: I have a company called IPW,
6  LLC. That's the name of the company. It's not --
7  BY MR. PETROCELLI:
8      Q. Still have it?
9      A. I -- yes.
10     Q. Okay.
11     A. And I have another company called IP
12 Management.
13     Q. And you also have an entity through which
14 you practice law?
15     A. Yes, Toberoff & Associates.
16     Q. Is that a --
17     A. PC.
18     Q. An LLC?
19     A. No, it's a professional corporation.
20     Q. Professional corporation. Okay.
21     Are those the only three entities through
22 which you currently do business?
23     A. I would say so, yes.
24     Q. And are you the sole --
25     A. And I don't know if I currently do business

Page 24

1  through those entities. I do business through
2  Toberoff & Associates. I don't know if you would
3  say I'm doing business through IPW. And IP
4  Management is -- is -- is rare.
5      Q. What is IP Management?
6      A. It's a company that I had, I don't remember
7  what the original reason was for incorporating it,
8  but I just kept it. And IP Management is a -- is
9  a -- is a -- not a very active company.
10     Q. It's a California corporation?
11     A. Yeah.
12     Q. Are you the sole shareholder?
13     A. Yes. Yeah, I believe so.
14     Q. And IPW, what is it?
15     A. It's an LLC.
16     Q. Are you the sole member?
17     A. No, there are two members.
18     Q. The other one -- are you one of them?
19     A. Yes.
20     Q. And the other is whom?
21     A. Bruce Karsh.
22     Q. K-a-r-s-h?
23     A. K-a-r-s-h, correct.
24     Q. And you're the sole member of Toberoff &
25 Associates?

Page 25

1      A. It's not -- it's -- I'm the sole
2  shareholder.
3      Q. Sole shareholder. Okay.
4      Other than IPW, IP Management, Toberoff &
5  Associates and Pacific Pictures, are there any
6  entities, other entities with which you have been
7  affiliated in any of your business activities since
8  the time you came to California?
9      MR. KENDALL: Vague and ambiguous.
10     THE WITNESS: What do you mean
11 "affiliated"?
12 BY MR. PETROCELLI:
13     Q. You know, a partner of, an owner of, a
14 member of?
15     MR. KENDALL: Vague and ambiguous.
16     THE WITNESS: IP Worldwide, LLC.
17 BY MR. PETROCELLI:
18     Q. Any others?
19     MR. KENDALL: Vague and ambiguous.
20     THE WITNESS: I -- not that I -- there --
21 I've been in situations where you need to
22 incorporate a company to do -- to make a movie
23 for -- I'm not sure what the reasons are. It could
24 be a Guild reason, for one of the guilds, and they
25 don't accept this kind of company but they will

7 (Pages 22 to 25)

**EXHIBIT A**
**9**

MARC   TOBEROFF - 9/18/2012

Page 26

1  accept a corporation.  There are various Guild
2  rules, and companies were incorporated to make a
3  specific movie.  And those companies may still
4  exist -- my name could be affiliated with one of
5  those companies and it could still exist or not
6  exist.
7  BY MR. PETROCELLI:
8      Q.  Can you estimate the number of such
9  companies?
10     A.  No.
11     Q.  Were you -- when they were established,
12  were --
13     A.  For instance, there was -- there was a
14  company, I -- I get -- there was a company to do a
15  movie about -- I just forgot the title of the movie.
16  It was a movie about wine.  It may come to me later
17  on.  And I believe there was a special purpose, they
18  call it a special purpose vehicle that was
19  established for purposes of that movie.
20     Q.  When such entities have been established,
21  were you a shareholder of them or a member of them?
22     A.  I'm not sure.
23     Q.  Were you involved in setting them up?
24     A.  No.
25     Q.  Who would have knowledge about the status

Page 27

1  of these entities?
2      A.  I think basically whoever was the line
3  producer or primary producer of the picture.
4      Q.  And these are projects in which you had
5  some kind of participation?
6      MR. KENDALL:  Vague and ambiguou- --
7      THE WITNESS:  Yes.
8      MR. KENDALL:  Vague and ambiguous.
9  BY MR. PETROCELLI:
10     Q.  IP Worldwide, that was a limited liability
11  company?
12     A.  Yes.
13     Q.  And who were its members?
14     A.  Myself and Ari Emanuel.
15     Q.  And was Endeavor at the time also a member?
16     A.  I believe Endeavor -- I believe Endeavor
17  may have had some equity in it.  I believe 10
18  percent.
19     Q.  Did --
20     A.  I'm not sure whether they were a member or
21  whether they simply were entitled to a percentage of
22  proceeds.
23     Q.  A 10 percent contractual interest?
24     A.  Right.
25     Q.  Okay.  Did IP Worldwide get replaced

Page 28

1  effectively by IPW?
2      MR. KENDALL:  Vague and ambiguous.
3      THE WITNESS:  I -- I don't know "replaced,"
4  I would say they're a successor to the company, not
5  in a formal sense, but by virtue of the assets of IP
6  Worldwide being transferred to IPW.
7  BY MR. PETROCELLI:
8      Q.  When that occurred, that is when IPW was
9  created and succeeded to the assets of IP Worldwide,
10  you were the sole member of IPW, not Ari Emanuel,
11  correct?
12     A.  When the assets were being transferred?
13     Q.  When you created IPW in, I think you
14  said --
15     A.  I wasn't the sole member.  I think I said
16  Bruce Karsh was --
17     Q.  Oh, that's correct.  But Emanuel was not a
18  member?
19     A.  No, he is not a member.
20     Q.  Nor was Endeavor?
21     A.  No.
22     Q.  But Karsh came in as a member at that time?
23     A.  Yes.
24     Q.  And remains to this day?
25     A.  Yes.

Page 29

1      Q.  And what's the percentage interest between
2  you and Mr. Karsh and IPW?
3      A.  I have 90 percent and Mr. Karsh has 10
4  percent.
5      Q.  Okay.  And in IP Management, you are the
6  sole owner?
7      A.  I believe so, yes.
8      Q.  Okay.  What is -- what year was IP
9  Management created?
10     A.  I don't know.
11     Q.  For what purpose?
12     A.  I don't remember.  I think there was -- I
13  have a vague recollection of having a company that
14  was set up for another purpose, and that purpose
15  never came about, and I was going to dissolve the
16  company, and instead, I kept it and the name was
17  changed to IP Management, but it's a very -- it's an
18  inactive company.
19     Q.  Do you have any contractual --
20     A.  It's not completely inactive, but it's not
21  an active company.
22     Q.  Is your only business relationship with
23  Mr. Karsh through his co-membership in IPW?
24     THE WITNESS:  Yes.
25     MR. KENDALL:  Vague and ambiguous.

8 (Pages 26 to 29)

**EXHIBIT A**
**10**

MARC  TOBEROFF - 9/18/2012

Page 30

1    BY MR. PETROCELLI:
2        Q. You don't have any other contractual
3    arrangements with him?
4        A. It relates only to IPW.
5        Q. Does Mr. Karsh have a financial interest of
6    any kind of any proceeds or recoveries that might
7    come out of the Siegel or Shuster termination
8    interests?
9        MR. KENDALL: Calls for a legal conclusion.
10       THE WITNESS: No.
11   BY MR. PETROCELLI:
12       Q. In other words, were the Siegels and/or the
13   Shusters to enter into a settlement with DC,
14   Mr. Karsh would not participate in any of the
15   proceeds?
16       A. No.
17       MR. KENDALL: Calls for a legal conclusion.
18       Marc, I know you're a lawyer and I know you
19   think you know the right way to answer the question,
20   but I have to have a moment to interpose an
21   objection if I think it appropriate to do so. So
22   please do give me that opportunity.
23       THE WITNESS: Okay.
24   BY MR. PETROCELLI:
25       Q. Are the -- does IPW, the successor to IP

Page 31

1    Worldwide, have any financial interest in the
2    Shuster or Siegel termination interests, whether it
3    be Superman or Superboy?
4        MR. KENDALL: Calls for a legal conclusion.
5        THE WITNESS: No.
6    BY MR. PETROCELLI:
7        Q. Okay. At the time of the succession of
8    assets from IP Worldwide to IPW, did IP Worldwide
9    have any financial interest in the Siegel or Shuster
10   termination interests?
11       A. I don't believe so.
12       Q. They were excluded?
13       A. What do you mean "they were excluded"?
14       Q. At the time that you did -- IP Worldwide
15   was created in or about 2002 with you and Ari
16   Emanuel, correct?
17       A. Correct.
18       Q. And at that time, you had already, for
19   example, through PPC, Pacific Pictures, entered into
20   the November 2001 agreement with the Shusters,
21   correct?
22       A. Correct.
23       Q. Was that agreement and any interests that
24   PPC or you might have in that agreement part of your
25   arrangement with Mr. Emanuel through IP Worldwide?

Page 32

1        MR. KENDALL: Vague and ambiguous.
2        THE WITNESS: No.
3    BY MR. PETROCELLI:
4        Q. Was it specifically excluded?
5        A. Yes.
6        Q. Okay. And thereafter, IP Worldwide entered
7    into an agreement sometime in October 2002 with
8    Laura and Joanne Siegel, right?
9        A. Yes.
10       Q. An exclusive representation agreement?
11       A. Yes.
12       Q. And given that Mr. -- under that agreement,
13   I'm just sort of paraphrasing, IP Worldwide was
14   entitled to 10 percent of any recoveries or proceeds
15   made by the Siegels during the tenure of IP
16   Worldwide's exclusive representation, correct?
17       MR. KENDALL: Just a moment, please.
18       Thank you.
19       THE WITNESS: I think proceeds would be the
20   right answer.
21   BY MR. PETROCELLI:
22       Q. At the time that the assets of IP
23   Worldwide -- and I'm using this in the lay sense,
24   were folded into IPW, did -- did that include IP
25   Worldwide's contractual agreements with the Siegels?

Page 33

1        MR. KENDALL: Vague and ambiguous. Calls
2    for a legal conclusion.
3        THE WITNESS: No.
4    BY MR. PETROCELLI:
5        Q. What -- what happened to IP Worldwide's
6    agreement with the Siegels such that it was not
7    transferred to IPW?
8        A. There's not a -- let me just try and answer
9    it this way: The IP Worldwide agreement was
10   governed by a term. I don't know what the
11   initial --
12       Q. Eighteen months.
13       A. -- term --
14       Okay. So you had an 18-month term and then
15   there was an extension of that term and I don't know
16   what --
17       Q. Three months.
18       A. -- the exact date -- the exact time frame
19   of that extension. I don't know if it was three
20   months, I thought it was a little bit longer.
21       There was -- IP -- the -- the -- the IP
22   Worldwide agreement expired on its own. It wasn't
23   part of any assets that were transferred to IPW.
24       Q. Okay.
25       A. And I -- I'm not sure, but I believe it

9 (Pages 30 to 33)

**EXHIBIT A**
**11**

MARC  TOBEROFF - 9/18/2012

Page 34

1  had -- had expired before that or was about to
2  expire.  And was either -- moot, essentially moot.
3      **Q.  In 2004, you entered into what has been**
4  **referred to as a legal retainer agreement with the**
5  **Siegels, correct?**
6      A.  Correct.
7      **Q.  Was that done through IPW?**
8      A.  No.
9      **Q.  That was done through your law offices?**
10     A.  Correct, a litigation retainer agreement.
11     **Q.  And neither Mr. Karsh nor IPW had any**
12  **interest in any proceeds under that legal retainer**
13  **agreement, right?**
14     A.  Correct.
15     **Q.  And that legal retainer agreement remains**
16  **extant to this day.**
17       **Is that right?**
18     A.  Correct.
19     **Q.  All right.  Is it correct, then, that in**
20  **the event of any proceeds or recovery by way of**
21  **litigation outcome or transaction or settlement,**
22  **that Ari Emanuel would not be entitled to any**
23  **contractual payments?**
24     A.  Correct.
25       MR. KENDALL:  Calls for a legal conclusion.

Page 35

1  BY MR. PETROCELLI:
2      **Q.  Nor would any --**
3      A.  Sorry.
4      **Q.  -- any of his talent agencies, such as**
5  **Endeavor, William Morris Endeavor, correct?**
6      A.  Correct.
7        MR. KENDALL:  Calls for a legal conclusion.
8  BY MR. PETROCELLI:
9      **Q.  So he has no further interest in any of**
10  **this, correct?**
11       MR. KENDALL:  Calls for a legal conclusion.
12       THE WITNESS:  Correct.
13  BY MR. PETROCELLI:
14     **Q.  Did he or Endeavor receive any**
15  **consideration at the time that IP Worldwide was**
16  **folded into IPW?**
17     A.  Why don't we use the term "wound down."
18     **Q.  Wound down.  Fair enough.**
19     A.  Did they receive -- are you talking about
20  consideration -- when you say "consideration," are
21  you talking about in the legal sense or are you
22  talking about it in money?
23     **Q.  Well, start with money.**
24     A.  I mean, I -- there's probably -- let me put
25  it this way:  A lawyer would look at a document and

Page 36

1  could find consideration for the agreement, but they
2  didn't receive money --
3      **Q.  Can you --**
4      A.  -- or -- or some other asset when it was
5  wound down.
6      **Q.  Now, as part of the consider- -- as part of**
7  **the consideration that -- first of all, who received**
8  **the consideration?  Was it Ari or was it Endeavor?**
9        MR. KENDALL:  Lacks foundation.
10  BY MR. PETROCELLI:
11     **Q.  To your knowledge.**
12     A.  It was -- the -- the -- let me just --
13     **Q.  What was the nature of the consideration?**
14       MR. KENDALL:  Lacks foundation.
15       THE WITNESS:  The nature of the
16  consideration was that these assets, which consisted
17  of various interests and various intellectual
18  properties that the company had accumulated, would
19  be transferred to IPW, and -- but in the event that
20  there were proceeds from those assets, that Ari had
21  a carried interest in those proceeds.
22  BY MR. PETROCELLI:
23     **Q.  But that carried interest did not apply to**
24  **the new agreement made with the Siegels.  That**
25  **replaced the IP Worldwide agreement, correct?**

Page 37

1      A.  I don't know if it's correct to say
2  "replaced."  They were different agreements.
3      **Q.  Okay.**
4      A.  They -- one -- one came after the other.  I
5  don't know if it's correct to say "replaced."
6      **Q.  Did Mr. Emanuel negotiate with you for some**
7  **consideration in respect of the Siegel agreement**
8  **that IP Worldwide had entered into during the time**
9  **that you and he were members of IP Worldwide?**
10       MR. KENDALL:  Vague and ambiguous.
11       THE WITNESS:  Did he negotiate with me?
12  BY MR. PETROCELLI:
13     **Q.  Correct.**
14     A.  No.
15     **Q.  In other words, did he attempt to obtain**
16  **any consideration as a result of what would be your**
17  **ongoing efforts on behalf of the Siegels after the**
18  **winding down of IP Worldwide?**
19       MR. KENDALL:  Vague and ambiguous.
20       THE WITNESS:  No.  I think he asked me
21  about it.
22  BY MR. PETROCELLI:
23     **Q.  And you declined to offer him any**
24  **participation or any piece of the -- of the -- of**
25  **the proceeds.**

10  (Pages 34 to 37)

MARC    TOBEROFF - 9/18/2012

Page 38

1        Is that correct?
2    A. Correct.
3        Q. And he accepted that?
4    A. As far as I know.
5        Q. Okay. Do you have any documentation with
6 Mr. Emanuel that reflects the nature of your winding
7 down of this company, IP Worldwide?
8        MR. KENDALL: Vague and ambiguous.
9        THE WITNESS: We have a winding down
10 agreement.
11 BY MR. PETROCELLI:
12        Q. Is that the only document of which you are
13 aware?
14    A. I believe so. It was a winding down
15 agreement. It had exhibits to it.
16        Q. Since --
17    A. I believe it was one comprehensive
18 document.
19        Q. Right. Since the winding down of IP
20 Worldwide and the exit of Mr. Emanuel, has he
21 approached you regarding any financial interest in
22 the Shuster or Siegel cases or recoveries of
23 proceeds of any monies that might be forthcoming?
24        MR. KENDALL: Now, in responding to that
25 question, I just want to caution you that to the

Page 39

1 extent you had discussions with Mr. Emanuel that you
2 believe fall within the attorney-client privilege,
3 either communications or work product, depending on
4 whether this is in furtherance of the representation
5 of the clients, either try to make a judgment about
6 that or confer with me about it before you respond,
7 because I don't want you to waive the
8 attorney-client privilege with respect to any such
9 privileged communications.
10        THE WITNESS: Could you repeat the
11 question.
12 BY MR. PETROCELLI:
13        Q. Right. And to be clear, we can't have a
14 record where you are carving out information on the
15 basis of the privilege without letting me know.
16        So if you're going to assert the privilege
17 with respect to certain communications, I -- I need,
18 at minimum, to know some basic foundational
19 information so I can make my own judgments. Okay?
20    A. Okay. Could you repeat the question?
21        Q. Yeah.
22        I was asking whether you and Ari have had
23 any discussions since he exited IP Worldwide about
24 his or any of his agencies' participation in any
25 Siegel or Shuster monies, settlements, proceeds,

Page 40

1 recoveries, deals.
2        MR. KENDALL: Hold on for one moment.
3        I think you can answer that question "yes"
4 or "no" without any privilege concerns.
5        THE WITNESS: I would just need to clarify.
6        Are you referring to discussions where Ari
7 or Endeavor is asking for a percentage of any
8 recovery from the Siegel and Shuster matters?
9 BY MR. PETROCELLI:
10        Q. Or other type of consideration. You said
11 "percentage," but you know, some --
12    A. Right.
13        Q. -- some piece of the -- the action.
14    A. No.
15        Q. Okay. Have you had any communications on
16 that subject with Mr. Emanuel, since 2004?
17    A. Let me just go back.
18        Q. Or any of his representatives?
19    A. Let me just go back.
20        The second question that you -- the
21 question that you asked when I answered "no,"
22 overlaps with the question you answered [sic]
23 previously where I answered, "yes."
24        We discussed it and I said no.
25        Q. I understood from your testimony that that

Page 41

1 discussion occurred at the time of the winding down
2 as part of the negotiation of your wind-down
3 agreement.
4        Is that correct?
5    A. I'm not sure if it occurred at the time of
6 the winding down. The -- the -- the winding down
7 was handled by -- between the general counsel at
8 Endeavor, myself and Tom McGuire. Ari delegated
9 to him and Ari wasn't really involved in discussions
10 about it.
11        And the -- after -- I believe after that, I
12 recall a discussion with Ari about, you know,
13 whether he would have a piece of proceeds from the
14 Siegel litigation and I said no.
15        Q. That was the only such discussion?
16    A. Yeah. It could have been, you know, a
17 phone discussion, followed by a discussion in
18 person. I don't know if it was -- it was -- it
19 could have been spread out over two or three
20 conversations or it could have been one
21 conversation.
22        Q. And what did Ari say to you about that?
23    A. He said something to the effect that --
24 that he should be entitled to, you know, a piece of
25 that.

11 (Pages 38 to 41)

**EXHIBIT A**
**13**

MARC   TOBEROFF - 9/18/2012

Page 42

1    And -- and -- and I said, "First of all, I
2  can't share legal fees, I can't share legal fees
3  with you, and all I have are legal fees from that
4  case."
5    And I -- we may have joked or I may have
6  joked and said, "You didn't do anything."
7    And he may have said something to the
8  effect, "Since when do I have to do something to get
9  paid? Since when do I have to do something to make
10  money?"
11    Which is --
12    MR. KENDALL: Again, don't -- don't
13  comment.
14    THE WITNESS: Okay.
15    MR. KENDALL: State the facts.
16    THE WITNESS: Something to that effect.
17    MR. PETROCELLI: I believe he's stating
18  what transpired in the conversation, which was
19  responsive to my question.
20    THE WITNESS: No, I was about to give a
21  little flourish, so I appreciate the objection.
22  BY MR. PETROCELLI:
23    **Q. Have you recounted the conversation as best**
24  **you can recall it?**
25    A. Yes.

Page 43

1    **Q. Okay. When did that happen?**
2    A. I would say within -- I don't know, within
3  a year of the company being wound down. Could be
4  within six months. But I can't really put a time on
5  it.
6    **Q. Since the winding down of IP Worldwide,**
7  **have you had any other business agreements with**
8  **Mr. Emanuel or his agencies?**
9    MR. KENDALL: Vague and ambiguous.
10  Overbroad.
11    THE WITNESS: Not that I could think of
12  right now.
13  BY MR. PETROCELLI:
14    **Q. From e-mails that have been produced in**
15  **this case, is it correct that Mr. Emanuel reached**
16  **out to the U.S. Attorney's office regarding the**
17  **effort to identify and investigate the person who**
18  **wrote the timeline documents and took documents from**
19  **your office?**
20    A. I don't know what you mean by "reached
21  out." My understanding was that he made a call.
22    **Q. What are the circumstances, to your**
23  **knowledge, under which he made that call?**
24    A. My wanting to have the matter investigated.
25    MR. KENDALL: Okay. I want to caution you

Page 44

1  now that we're in an area that involves privilege,
2  so keep your answer general and I'm sure there will
3  be follow-up questions and we can clarify where the
4  privilege line should be drawn so that
5  Mr. Petrocelli has a record.
6    THE WITNESS: The circumstances are that I
7  wanted to have the matter investigated and had never
8  had any experience like that before and wasn't
9  getting any traction.
10  BY MR. PETROCELLI:
11    **Q. Did you speak to Mr. Emanuel about this**
12  **subject?**
13    A. Yes, I did.
14    **Q. Did you initiate that contact?**
15    A. Yes.
16    **Q. Why did you initiate it with Mr. Emanuel?**
17    MR. KENDALL: Okay. So now I need to
18  caution you, if -- if this is something that you
19  consider to be work product arising from your
20  representation of your clients, then I think you
21  should, in that circumstance, so indicate and
22  decline to answer the question.
23    If, on the other hand, you don't, then so
24  indicate and answer it.
25    THE WITNESS: I think it is work product.

Page 45

1  BY MR. PETROCELLI:
2    **Q. So on that question, you won't answer?**
3    A. Correct.
4    **Q. Okay. And we'll have a stipulation that**
5  **whenever you tell me that something is privileged or**
6  **it's work product, it means you're not going to**
7  **answer?**
8    A. Correct.
9    **Q. Okay. When you spoke with Mr. Emanuel on**
10  **this topic -- when was that, by the way?**
11    A. It would have been around the time of any
12  e-mails that were produced.
13    **Q. Okay. Did you discuss --**
14    A. Would have been -- would have been sometime
15  before that or shortly before that.
16    **Q. Was that the first communication you had**
17  **with Mr. Emanuel on the subject -- on any subject**
18  **related to the Siegel or Shuster issues since the**
19  **conversation where he asked for some consideration**
20  **and you declined to offer it to him?**
21    A. No.
22    **Q. You had had intervening communications?**
23    A. Casual conversations. He knows that's what
24  I've been working on almost exclusively for a very
25  long period of time.

12 (Pages 42 to 45)

**EXHIBIT A**
**14**

MARC   TOBEROFF - 9/18/2012

Page 46

1        Q.  And he checks in on it every now and then?
2        A.  He doesn't check in.  We will be talking
3    about something else and, "How is Superman going?"
4    We have casual, friendly conversations.
5        Q.  Have you worked with Mr. Emanuel in
6    connection with, for example, exploring potential
7    purchasers of the Siegel or Shuster interests?
8        MR. KENDALL:  Now I'm going to have to give
9    you that same admonition as to the context in which
10   this occurs and whether you believe that it falls
11   within your work product privilege.
12       THE WITNESS:  I think that is work product
13   as well.
14   BY MR. PETROCELLI:
15       Q.  Have such -- have you had conversations
16   with Mr. Emanuel on the subject of his assisting
17   with respect to potential purchasers of the Siegel
18   or Shuster interests?  You can answer that "yes"
19   or "no."
20       MR. KENDALL:  I think you can answer that
21   "yes" or "no" without waiving your privilege.
22       THE WITNESS:  Yes.  Without waiver of any
23   privilege.
24   BY MR. PETROCELLI:
25       Q.  Have you had any discussions with anybody

Page 47

1    other than Mr. Emanuel on that subject?
2        MR. KENDALL:  So now with that --
3    BY MR. PETROCELLI:
4        Q.  Let me exclude for the purpose of this
5    question, Joanne Siegel, Laura Siegel, Mr. Peary,
6    Ms. Peavy and Dawn Peavy.
7        MR. KENDALL:  And his -- and Mr. Toberoff's
8    counsel?
9        MR. PETROCELLI:  Yes.  He meaning you, your
10   firm?
11       MR. KENDALL:  Well, and members of his
12   firm, too.
13       MR. PETROCELLI:  Yes.
14       MR. KENDALL:  I'm sorry, I shouldn't have
15   said "members."  Associates.
16       MR. PETROCELLI:  Yes.  In other words, I'm
17   not interested in -- yes, Mr. Kendall's firm,
18   members of your firm, he and the Siegels and the
19   Shusters.
20       Q.  Other than those folks with whom you may
21   have discussed this topic, I'm not, at least not
22   right now inquiring about that, I'm asking about
23   people other than those individuals.
24       MR. KENDALL:  Could I just ask, would you
25   also include --

Page 48

1        MR. PETROCELLI:  Sure.
2        MR. KENDALL:  -- persons retained by
3    counsel for purposes of assisting with the
4    prosecution of cases on behalf of his clients or in
5    the defense of Mr. Toberoff?
6        MR. PETROCELLI:  Can you help me out?  Who
7    do you have in mind?  Are you talking about lawyers?
8        MR. KENDALL:  There could be litigation
9    support personnel, could be experts, you know.
10       MR. PETROCELLI:  Okay.  I'm not -- I'm not
11   talking about people who would be expert -- whose
12   business it is to render testimony in cases like,
13   you know, DecisionQuest.
14       Q.  I'm trying to focus on outside parties.  So
15   we started with Mr. Emanuel and now I'm asking you
16   whether there's anybody other than Mr. Emanuel who's
17   not part of your legal team.
18       A.  Whether I've had discussions?
19       MR. KENDALL:  Just a moment.
20       MR. PETROCELLI:  Yes.
21       MR. KENDALL:  Now, could you just phrase
22   what the question is so we have --
23   BY MR. PETROCELLI:
24       Q.  The question is whether you've had
25   communications on the subject of identifying or

Page 49

1    assisting in identifying or dealing with potential
2    purchasers of the Siegel or Shuster termination
3    interests?
4        A.  I'll answer yes.
5        Q.  With whom?
6        A.  Since we're getting into a tricky area of
7    work product or privilege, I want to confer with
8    Mr. Kendall --
9        MR. PETROCELLI:  Sure.
10       THE WITNESS:  -- about this.
11       MR. PETROCELLI:  Off the record?
12       THE WITNESS:  Yes.
13       MR. PETROCELLI:  Okay.
14       THE VIDEOGRAPHER:  Off the record.  The
15   time is 10:20.
16       (Brief recess.)
17       THE VIDEOGRAPHER:  Back on the record at
18   10:34.
19   BY MR. PETROCELLI:
20       Q.  We've had a brief break, you've had a
21   chance to chat with Mr. Kendall, and I guess we have
22   a pending question?
23       MR. KENDALL:  Well, if you're going to make
24   a record of what happened, I think you probably also
25   want to include that you took what you described as

                                    13 (Pages 46 to 49)

**EXHIBIT A**

**15**

MARC  TOBEROFF - 9/18/2012

Page 50

1  an urgent matter from another client during that
2  same interval, which extended the break.  Is that
3  correct?
4      MR. PETROCELLI:  Probably by three minutes
5  to four minutes, but that's correct.
6      THE WITNESS:  So, do you want to read back
7  the question?
8      (The reporter read the record
9      as follows:
10     "QUESTION:  The question is
11     whether you've had communications
12     on the subject of identifying or
13     assisting in identifying or dealing
14     with potential purchasers of the
15     Siegel or Shuster termination
16     interests?
17     "ANSWER:  I'll answer yes.
18     "QUESTION:  With whom?")
19     THE WITNESS:  Sony, Paramount, and Fox --
20  BY MR. PETROCELLI:
21     Q.  Can you identify --
22     A.  -- Studios.
23     Q.  Yes.  Can you identify the people at those
24  studios?
25     A.  At Sony, I forget the name of the

Page 51

1  gentleman.
2      Q.  The person you met with?
3      A.  Yeah.  He was -- he was quite high up in
4  the company, but I forget -- well, I remember now,
5  it's Peter Schlessel.  It's pronounced "Schlessel"
6  or "Schlessel."  I believe that's the name.
7      Q.  Just the two of you?
8      A.  Me, him, and a gentleman that introduced me
9  to him named Julio Caro, who is just a friend of
10 mine who is buddies with him.
11     Q.  This was a in-person meeting?
12     A.  Yes.
13     Q.  And when did it happen?
14     A.  I'm not sure.  I believe approximately four
15 years ago.
16     Q.  Before or after this lawsuit was filed?
17 This lawsuit was filed on May 14, 2010.
18     A.  After?
19     Q.  Afterwards?  Okay.
20     And the --
21     A.  Oh, this lawsuit?
22     Q.  This lawsuit.
23     A.  No, it was -- it was before this lawsuit
24 was filed.
25     Q.  Okay.

Page 52

1      A.  I believe it was approximately four years
2  ago.
3      Q.  Okay.  And you said that was Fox, right?
4      A.  No.  Sony.
5      Q.  That was Sony?
6      A.  Correct.
7      Q.  I'm sorry.  Fox?  Who were the
8  participants?
9      A.  Myself, Tom Rothman, a co-head of the
10 studio, Tom Rothman is the co-head of the studio and
11 people from his legal or business affairs department
12 whose names I don't recall.
13     Q.  Anybody other than you attend on your side?
14     A.  No.
15     Q.  And when did that meeting occur?
16     A.  I -- I don't recall.  The best way to date
17 it is that I produced a studio pass that had the
18 date on it --
19     Q.  Okay.
20     A.  -- of that meeting.
21     Q.  And then the third discussion?
22     A.  Third -- you mean the third entity?
23     Q.  Yes.
24     A.  Paramount?
25     What's the question?

Page 53

1      Q.  What were the participants?
2      A.  Participant was the head of Paramount film
3  division, whose name I don't remember.  I'm very bad
4  at names.  I don't remember his name at the moment.
5  And somebody from legal affairs and another person
6  from legal or business affairs.
7      Q.  Don't remember the names?
8      A.  I don't remember the names.  I believe
9  there were three people at the meeting.
10     Q.  And just you on your side?
11     A.  Yes.
12     Q.  And when did that occur?
13     A.  Approximately two years ago.  A year -- a
14 year -- year and a half to two years ago.
15     Q.  Can you give me the sequence of the three
16 meetings?
17     A.  Sony was the first.  I'm not sure whether
18 Paramount was the second or the third.
19     Q.  Has -- have you had discussions with
20 Mr. Emanuel in respect of any of those three
21 meetings or those three contacts?
22     MR. KENDALL:  Vague and ambiguous.
23     THE WITNESS:  I believe only with respect
24 to Paramount.
25 BY MR. PETROCELLI:

14 (Pages 50 to 53)

MARC  TOBEROFF - 9/18/2012

Page 54

1      Q.  What -- can you describe the nature of your
2  interactions with Mr. Emanuel on this subject, the
3  subject being potential purchasers of the rights?
4      MR. KENDALL:  I'll caution you in answering
5  that question to keep it general so that it does not
6  implicate your work product or communications in
7  furtherance of your representation of your clients.
8  BY MR. PETROCELLI:
9      Q.  If you're excluding anything in your
10  discussions with Mr. Emanuel, I need to know that.
11      MR. KENDALL:  Dan, I think the appropriate
12  way to go about it so that you have your record is
13  that the witness should -- should answer in a way
14  that does not create a privilege issue, and then you
15  should follow up if you choose to, and then the
16  witness can, depending on the question that you ask,
17  make a determination as to whether it calls for
18  privileged material.
19      But I'm hoping that the witness can at
20  least give you the general nature without -- in the
21  same way, for example, that it might be described in
22  a privilege log, without creating a risk of waiver.
23      THE WITNESS:  I think that's a logical way
24  to proceed.
25  BY MR. PETROCELLI:

Page 55

1      Q.  Well, I need to understand that if and when
2  you're giving me a general description, you're doing
3  so for that purpose rather than just categorically
4  giving me a general description of conversations
5  because you're excluding privileged information
6  without my knowledge.  That's my only concern.  I
7  need to know we're in that area.
8      MR. KENDALL:  And I think -- I think when I
9  make that objection, it's clear that we're in that
10  area.  And then you should -- you should follow up
11  as you think is appropriate.
12  BY MR. PETROCELLI:
13      Q.  Start with whatever you can tell me.
14      A.  So what's the question?
15      Q.  To describe your interactions with
16  Mr. Emanuel on the subject of potential purchasers
17  of the rights.
18      MR. KENDALL:  Same caution.
19      THE WITNESS:  Are you referring to those
20  three studios that I just mentioned or just
21  anything?
22  BY MR. PETROCELLI:
23      Q.  Anything.  In other words, I'm making the
24  question as broad as possible.
25      MR. KENDALL:  Overbroad.

Page 56

1      THE WITNESS:  All right.
2      MR. KENDALL:  And same objections --
3      THE WITNESS:  So I can ans- --
4      MR. KENDALL:  -- and cautions.
5      THE WITNESS:  -- I can answer that I've had
6  conversations with him on the subject of -- of
7  resolving the rights or monetizing the rights aside
8  from simply through settlement with Warner Bros. and
9  DC.
10  BY MR. PETROCELLI:
11      Q.  Did you say "aside from"?
12      A.  Yes.
13      Q.  You mean potential deals with people or
14  companies other than Warner Bros. and DC?
15      A.  Yes.
16      Q.  Okay.  And have you had these discussions
17  with Mr. Emanuel with an expectation that he might
18  play a role for which he might be compensated?
19      MR. KENDALL:  Just a moment, please.
20      I think you can answer that question.
21      THE WITNESS:  I don't recall conversations
22  that focus to any -- to any extent on his
23  compensation.
24  BY MR. PETROCELLI:
25      Q.  What was your purpose in having these

Page 57

1  discussions with Mr. Emanuel?
2      MR. KENDALL:  Again, I think you can answer
3  that question at a general level and then -- but do
4  not get into work product in describing it.
5      THE WITNESS:  I'm not going to disclose my
6  thought processes, which the purpose would entail,
7  but the subject was, as I said, to explore
8  opportunities for monetizing my clients' rights.
9  BY MR. PETROCELLI:
10      Q.  Can you disclose to me the specifics of
11  your conversations with Mr. Emanuel on that subject?
12      MR. KENDALL:  Same caution.
13  BY MR. PETROCELLI:
14      Q.  So to be clear, what I'm asking you to
15  elicit is everything you can remember about the
16  conversations without withholding any part of the
17  conversations.  I'm not asking for your thought
18  process for this question, I'm just asking you what
19  you and he discussed.
20      MR. KENDALL:  And overbroad.  Vague and
21  ambiguous.
22      Same caution.
23      THE WITNESS:  So, let me tell you what I am
24  not discussing on the basis of work product; that is
25  the -- my strategy with respect to monetizing those

15  (Pages 54 to 57)

**EXHIBIT A**
**17**

MARC  TOBEROFF – 9/18/2012

Page 58

1  rights, which in turn impinges on settlement with
2  Warner Bros. and DC and the value of those rights.
3  That I'm not -- any conversations that impinge on
4  that. But I can tell you that my conversations with
5  Ari are usually general and casual.
6  BY MR. PETROCELLI:
7      **Q. On what basis are you declining to tell me**
8  **everything you and Mr. Emanuel discussed?**
9      A. On the basis that certain things coming
10  from me are revealing my work product on behalf of
11  the Siegels and the Shusters.
12      **Q. What relationship, if any, does Mr. Emanuel**
13  **have with the Siegels or the Shusters?**
14      MR. KENDALL: I'm going to call -- I'm
15  sorry. I'm going to object as that calls for a
16  legal conclusion and it's vague and ambiguous.
17      THE WITNESS: He doesn't, to my knowledge,
18  have any direct relationship with the Siegels or the
19  Shusters.
20  BY MR. PETROCELLI:
21      **Q. And do you --**
22      A. His relationship is through me.
23      **Q. Do you have any agreement of any kind with**
24  **him in connection with your work on this case, on**
25  **the Siegel and Shuster litigation?**

Page 59

1      MR. KENDALL: Vague and ambiguous.
2      THE WITNESS: I wouldn't call it an
3  agreement.
4  BY MR. PETROCELLI:
5      **Q. What is it about your relationship with**
6  **Mr. Emanuel that you believe justifies not**
7  **disclosing your conversations with him?**
8      MR. KENDALL: Just a moment, please.
9      Lacks foundation. Vague and ambiguous.
10      And I'll caution you in answering that
11  question not to reveal either work product or
12  communications that you had with Mr. Emanuel in
13  furtherance of your representation of your clients
14  to the extent that those communications were
15  intended by you to be maintained as confidential.
16      MR. PETROCELLI: I think we're just going
17  around in circles.
18      I'm trying to understand why his
19  conversations with Ari would be work product as
20  opposed to his conversations with the man on the
21  street or the folks at Fox, Paramount or Sony.
22  What's different about the Ari communications such
23  that they --
24      MR. KENDALL: Just a minute.
25      MR. PETROCELLI: -- are subject to some

Page 60

1  claim of privilege? I'm only asking so that I can
2  understand the position in the event we decide to
3  litigate it.
4      MR. KENDALL: So, I think that your view is
5  a bit narrow in that there are two privileges that
6  may be implicated and that's why I gave the caution.
7      So one privilege is the work product
8  privilege. And when you ask the witness about his
9  thought processes or certain steps he took in
10  representation of his clients, then the work product
11  privilege is implicated.
12      But there's another privilege when you --
13  that's implicated when you ask about a conversation,
14  depending on the circumstances and you're free to
15  make -- you know, ask whatever you want to ask as
16  far as foundation, but that privilege is the
17  attorney-client privilege that adheres, if you are
18  contacting a third person in furtherance of your
19  attorney-client relationship and the communications
20  are intended to be confidential.
21      So I want to caution the witness, and
22  that's why I've done that, not to reveal either
23  category of privilege. And I think there are ways
24  for you to make a record of whatever foundation --
25  foundational facts you want to in order to pursue

Page 61

1  the matter if you choose to. I recognize you may
2  have a disagreement, but that's --
3      MR. PETROCELLI: Yeah, we do and I -- it's
4  usually my practice not to argue on the record about
5  these things. I'm just trying to get whatever
6  information I can.
7      MR. KENDALL: Right, and it's my practice,
8  too, but since you -- you asked me --
9      MR. PETROCELLI: I was hoping.
10      MR. KENDALL: -- what the basis was, I
11  thought I should respond.
12  BY MR. PETROCELLI:
13      **Q. Do you have any kind of written agreement**
14  **with Mr. Emanuel that your discussions with him are**
15  **intended to be confidential and he's not permitted**
16  **to disclose them to anybody?**
17      A. No.
18      **Q. Okay. Do you have a verbal agreement with**
19  **him to that effect?**
20      MR. KENDALL: Vague and ambiguous.
21      THE WITNESS: I would say yes, we have an
22  understanding of that when we're talking about
23  confidential matters.
24  BY MR. PETROCELLI:
25      **Q. Well, have you told him that he's not**

16 (Pages 58 to 61)

**EXHIBIT A**
**18**

MARC   TOBEROFF - 9/18/2012

Page 62

1  allowed to disclose those matters to anybody?
2      A. Yes.
3      Q. And has he agreed to that?
4      A. Yes.
5      Q. And how has he agreed to it?
6      A. Verbally.
7      Q. Okay. When did you first reach that
8  agreement with him, that verbal agreement?
9      A. When we first started discussing matters of
10 that nature.
11     Q. When did that happen?
12     A. It would be sometime after the commencement
13 of the Siegel lawsuit in late 2004.
14     Q. And what does Mr. Emanuel get in return for
15 having this verbal agreement with you and sharing
16 information with you and having discussions with
17 you? Is he being compensated? Is there anything
18 he's receiving for this role he's playing?
19     MR. KENDALL: Vague and ambiguous. Lacks
20 foundation.
21     THE WITNESS: No.
22 BY MR. PETROCELLI:
23     Q. Just out of friendship?
24     MR. KENDALL: Vague and ambiguous.
25     THE WITNESS: I can't --

Page 63

1      MR. KENDALL: Just a minute. Just a
2  minute.
3      THE WITNESS: Sorry.
4      MR. KENDALL: Calls for speculation.
5      THE WITNESS: I can't answer as to what his
6  motivations are.
7  BY MR. PETROCELLI:
8      Q. What are yours?
9      A. In furtherance of my clients.
10     Q. Have you withheld in this litigation e-mail
11 communications with Mr. Emanuel on the basis of this
12 verbal agreement -- this verbal confidentiality
13 agreement?
14     MR. KENDALL: I'm going to object to that
15 question on the ground that I don't think it's
16 proper for you to ask questions in this deposition
17 about Mr. Toberoff's actions or decisions in his
18 capacity as counsel for his clients or as -- in his
19 capacity as counsel for and his firm's counsel for
20 himself and the Toberoff entities.
21     So I think you're free to ask questions
22 that you would normally ask of a lay witness but not
23 about the discovery process.
24 BY MR. PETROCELLI:
25     Q. Have you --

Page 64

1      I'm not going to respond other than to have
2  you understand that when I don't respond, it doesn't
3  mean I agree.
4      MR. KENDALL: We can say that that's a
5  reciprocal understanding.
6      MR. PETROCELLI: Yes. It will save a lot
7  of chatter.
8      Q. The -- have you had written communications
9  with Mr. Emanuel since 2004 to the present?
10     A. Casual, casual e-mails.
11     Q. Related --
12     A. Not a lot. I don't -- I don't -- I
13 generally communicate with him by phone.
14     Q. Have you had --
15     A. He's not very responsive to e-mails and
16 things.
17     Q. Have you had written communications with
18 him since 2004 related to the Siegel or Shuster
19 interests?
20     A. I'm sure I have.
21     Q. Okay.
22     MR. KENDALL: Mr. Petrocelli, could I just
23 ask that you try to hold your questions until he's
24 finished answering. I think when you look at the
25 record eventually, you will see many interruptions

Page 65

1  where the answer continues, despite interjections by
2  you, and so I think it would be much easier for the
3  reporter if you wait until the witness has stopped
4  talking before you start talking again.
5      MR. PETROCELLI: I think the witness and I
6  are communicating easily and clearly and oftentimes,
7  as virtually all witnesses do, they pause between
8  words and don't complete their sentences all at once
9  so it's hard for me to know when the witness is
10 ending, but I'll make an effort to do better.
11     Q. The -- other than talking with you, are you
12 aware of any other activity that Mr. Emanuel has
13 undertaken or performed in connection with the
14 Siegel or Shuster interest since 2004 and the wind
15 down of IP Worldwide, other than conversations with
16 you?
17     MR. KENDALL: That would call for a "yes"
18 or "no."
19     THE WITNESS: Can you repeat the question?
20     MR. PETROCELLI: Yes.
21     (The reporter read the record
22 as follows:
23     "QUESTION: Other than talking
24 with you, are you aware of any
25 other activity that Mr. Emanuel has

17 (Pages 62 to 65)

**EXHIBIT A**
**19**

MARC  TOBEROFF - 9/18/2012

Page 66

1      undertaken or performed in
2      connection with the Siegel or
3      Shuster interest since 2004 and the
4      wind down of IP Worldwide, other
5      than conversations with you?")
6          THE WITNESS:  Not that I can recall.
7  BY MR. PETROCELLI:
8      **Q.  Are you aware, for example, of whether or**
9  **not he has had discussions with third parties**
10 **regarding the Siegel or Shuster interests?**
11         MR. KENDALL:  Vague and ambiguous.
12         THE WITNESS:  I'm not aware of a specific
13 instance.
14 BY MR. PETROCELLI:
15     **Q.  Have you made contact with any potential**
16 **purchaser -- withdrawn.**
17         **Have you made contact with any person or**
18 **entity regarding potential interests in the Siegel**
19 **or Shuster interests, other than the three studios**
20 **you mentioned, Fox, Paramount and Sony?**
21         MR. KENDALL:  Just a moment.
22         I think that question is vague, ambiguous
23 and overbroad.  And I just want to give a caution to
24 the witness, you have in the litigation disclosed
25 information concerning the contacts with the

Page 67

1  studios.
2          This question could call for -- potentially
3  for either work product or attorney-client
4  furtherance communications.  I don't know.  But
5  either -- I think answer the question if you can
6  without waiving privilege, and give Mr. Petrocelli a
7  chance to follow up, or I suggest you confer with me
8  so as not to waive any privileges.
9          THE WITNESS:  Without -- without waiver of
10 privilege, I cannot recall specific parties, but I'm
11 sure in the course of, you know, the eight years of
12 litigating the Siegel case, that there have been
13 additional conversations between me and third
14 parties of a very general nature.
15 BY MR. PETROCELLI:
16     **Q.  And you can't identify any of them?**
17     A.  I -- I -- I can't -- I can -- I can give
18 you one example of what makes me answer that way.
19         I had a conversation with a gentleman who
20 is part of a company set up by Haim Saban, which was
21 a new entity focused on intellectual property
22 rights.  And we had a lunch.  And I don't have a
23 specific recollection.  We talked about a lot of
24 different things at the lunch.  And we may have -- I
25 may have mentioned Superman in a general way, what

Page 68

1  the status of the case was in a general way in terms
2  of rulings that we have had that are favorable to
3  us.
4      **Q.  Do you know the name of the person?**
5      A.  I don't remember his name.
6      **Q.  Do you know when that happened?**
7      A.  I do not.
8      **Q.  Can you recall -- have you had any contact**
9  **with any private investment?**
10     A.  I remember it was a fish restaurant in the
11 Century City mall.
12     **Q.  Can you --**
13     A.  I don't remember his name.
14     **Q.  Can you recall the name, have you had any**
15 **contact with any private investment firms,**
16 **investment banks, private equity funds, potential**
17 **investors regarding potential interest in the**
18 **rights?**
19     A.  That triggered a recollection, and there's
20 a -- a gentleman I met, I also don't recall his
21 name, who was an investment banker who I have -- who
22 worked for a fund that's split off from Goldman
23 Sachs.  It's a very aggressive high-powered fund and
24 he was aware of the Superman case and he was
25 interested in Superman.

Page 69

1      **Q.  And you met with him?**
2      A.  We had -- we had only general
3  conversations.
4      **Q.  When was that?**
5      A.  Over a period of time.  He had --
6      **Q.  What years?**
7      A.  Trying to remember his -- his -- I would
8  say between two and four years.  There were -- he
9  was sort of a acquaintance who I would run into in
10 Century City and I believe he had offices at some
11 point in Century City.
12     **Q.  You don't know the name of that person?**
13     A.  I don't remember his name.
14     **Q.  Do you --**
15     A.  He was always asking about Superman.
16     **Q.  Do you have any documents that would**
17 **identify the name of either of these people that**
18 **you've just mentioned, the person associated with**
19 **Haim Saban and this other person in this fund?**
20     A.  I don't think so.
21     **Q.  And was that in the last two to four years**
22 **that you had those discussions with this fellow?**
23     A.  I would say two to four years is a -- I
24 think I've known him for about five years.
25     **Q.  And you don't know his name?**

18 (Pages 66 to 69)

**EXHIBIT A**
**20**

MARC   TOBEROFF - 9/18/2012

Page 70

1      A. His name might come to me in the course of
2  this conversation. But it wasn't a serious -- these
3  are just general, "What's happening with Superman,"
4  you know. A lot of people know that I'm involved
5  with the Superman case. And they ask me in a social
6  way about it and I will comment on it, and if they
7  have some -- you know, people might have a casual
8  conversation.
9      So in this particular instance, I remember
10  a casual conversation saying, "Are you interested in
11  somebody coming in and funding the litigation, and
12  described to me that this fund isn't afraid of
13  litigation," and they do that.
14      Q. Is anybody --
15      MR. KENDALL: Just one minute.
16      Mr. Toberoff, I'm going to ask you to focus
17  on the question and answer the question posed.
18      THE WITNESS: Okay.
19  BY MR. PETROCELLI:
20      Q. Is there anybody who is funding this
21  litigation other than you?
22      A. No.
23      Q. Has -- have you had any -- have you or
24  anybody else, to your knowledge, had any
25  negotiations, actual contractual negotiations, with

Page 71

1  a third party to do some kind of deal with respect
2  to the termination rights of the Siegels or
3  Shusters?
4      MR. KENDALL: Vague and ambiguous.
5  BY MR. PETROCELLI:
6      Q. Other than DC Comics, of course, and Warner
7  Bros.?
8      MR. KENDALL: Vague and ambiguous.
9      THE WITNESS: Are you asking me whether any
10  of these things that I've described have progressed
11  to the level of having an actual negotiation?
12  BY MR. PETROCELLI:
13      Q. Yes. Plus to the extent there were any
14  negotiations with anybody else that we haven't
15  covered, that's what I'm asking.
16      A. No.
17      Q. Okay. And have -- have there been any deal
18  terms exchanged with anyone regarding acquisition of
19  the rights?
20      A. No.
21      Q. To your knowledge, have any third parties
22  conducted any due diligence with respect to a
23  potential deal for acquisition of the rights?
24      MR. KENDALL: Lacks foundation. Calls for
25  speculation. Vague and ambiguous.

Page 72

1      THE WITNESS: I don't know. I would be
2  guessing.
3  BY MR. PETROCELLI:
4      Q. That's why I said "to your knowledge." In
5  other words, has anybody ever --
6      A. I don't have knowledge.
7      Q. -- asked you for materials to review?
8      A. I don't believe so.
9      Q. Have you written any assessment or --
10      A. I believe the closest thing to that would
11  be a reference to, you know, there's a published
12  decision that you can get.
13      Q. Have you prepared and sent any analyses to
14  any third parties regarding the -- the rights or
15  risks associated with obtaining the rights?
16      MR. KENDALL: Vague and ambiguous.
17      THE WITNESS: Not that I can recall, no.
18  BY MR. PETROCELLI:
19      Q. In the discussions that you had with the
20  studios and these other individuals whose names you
21  cannot recall, can you generally describe the
22  content of those discussions?
23      MR. KENDALL: Same cautions as before
24  concerning the attorney-client communications and
25  work product privileges.

Page 73

1  BY MR. PETROCELLI:
2      Q. You need to let me know whether you are
3  excluding things discussed in those conversations.
4      A. I understand. I'm thinking about them.
5      Q. If you need to go through them one by one,
6  that's fine. I'll give you the option of either
7  giving me the substance of them generally or
8  collectively or you can go one by one.
9      MR. KENDALL: I think right now the pending
10  question is can you recall them, so I was -- I think
11  you can answer that question. I just was cautioning
12  you not to go further. And then Mr. Petrocelli is
13  free to follow up as he deems appropriate. So that
14  really should be "yes" or "no" as to what you can
15  recall.
16      MR. PETROCELLI: Apparently that wasn't my
17  question. Someone's looking at Livenote. But I
18  don't use Livenote. But in any event, we can start
19  with that question.
20      THE WITNESS: What is the question?
21  BY MR. PETROCELLI:
22      Q. Are you able to recount the conversations
23  with the three studios and these other individuals
24  about the -- about any potential interest in
25  acquiring the rights?

19 (Pages 70 to 73)

**EXHIBIT A**
**21**

MARC  TOBEROFF - 9/18/2012

Page 74

1    A. Are you asking me whether I am able to
2  recall them?
3    Q. Yes.
4    A. I have a general recollection of the
5  conversations, yes.
6    Q. Can you recount them to me?
7    MR. KENDALL: That calls for a "yes" or
8  "no."
9    THE WITNESS: I believe that a lot of work
10  product is intricately bound up in those
11  conversations.
12  BY MR. PETROCELLI:
13    Q. In each of them?
14    A. Because those conversations naturally
15  entail discussions of the risks of litigation.
16    Q. And therefore on that basis you will
17  decline to provide the details of the
18  conversations --
19    MR. KENDALL: Mr. Toberoff --
20  BY MR. PETROCELLI:
21    Q. -- and I need not ask any more questions?
22  Trying to make my record so that I am not met with
23  an objection later on that I didn't ask the right
24  question.
25    MR. KENDALL: So Mr. Toberoff, I think

Page 75

1  perhaps we should confer on the matter of privilege
2  before you answer that question.
3    THE WITNESS: I was going to say subject to
4  conferring with my counsel, but if it's okay -- I
5  don't want to interrupt your deposition. If it's
6  okay with you, we can take a short break to confer.
7    MR. PETROCELLI: Well, when you need to
8  confer, you need to confer.
9    THE WITNESS: Okay.
10    THE VIDEOGRAPHER: Off the record. The
11  time is 11:07.
12    (Brief recess.)
13    THE VIDEOGRAPHER: Back on the record at
14  11:11.
15    THE WITNESS: So, I can describe my
16  conversations with Sony, Paramount and Fox to the
17  best of my recollection.
18  BY MR. PETROCELLI:
19    Q. Without excluding anything?
20    A. Not excluding.
21    Q. Excuse me?
22    A. I'm not excluding anything that was said.
23    Q. Okay. And what about with respect to the
24  other two individuals?
25    A. I'm not excluding.

Page 76

1    Q. Okay. So please do.
2    A. So where do you want me to start?
3    Q. Whatever way makes sense, chronological
4  order.
5    A. The -- I have just a general recollection
6  of the meetings with I believe it's Peter Schlessel
7  or "Schlessel" at Sony, and -- where I discussed the
8  state of the case in general, what rulings we've
9  had. I believe by that time, I believe it was after
10  the ruling in 2008, summary judgment ruling, and my
11  understanding of what joint owners of a copyright
12  interest are allowed to do.
13    Essentially each has the non-exclusive
14  right to exploit whatever copyrights they own
15  subject to a duty to account to the other party.
16    And I recall him saying that -- that Sony
17  was -- had a very good relationship with Warner
18  Bros. And I recall saying -- I don't recall the
19  specific words used, but I -- I recall a general
20  understanding that if there was a -- any -- any deal
21  made between Sony and my clients, that Sony would
22  then want to make a deal with Warner Bros., and how
23  that would work, sort of general conversations of
24  would that be before a deal is made with my clients
25  or after a deal, just general -- these were the

Page 77

1  topics of conversation that I recall. I don't
2  recall how those topics were resolved.
3    Q. Did you also discuss potential acquisition
4  of the Shuster interest?
5    A. I -- no, I don't think so. I think that
6  was -- I think the focus was on the Siegel interest
7  in the Sony conversation.
8    Q. Did Sony express any interest in pursuing
9  this?
10    A. They were interested. They were
11  interested, but -- they expressed interest, Yes.
12    Q. Did you discuss with them that if -- if and
13  when the Shuster termination became effective, that
14  there would effectively be a blocking right to
15  preclude Warner Bros. from proceeding with
16  exploitation of Superman?
17    MR. KENDALL: Just a moment, please.
18    Thank you.
19    THE WITNESS: I don't recall that.
20  BY MR. PETROCELLI:
21    Q. Was there any discussion whatsoever
22  regarding circumstances under which Warner Bros.
23  might not be able to proceed to exploit Superman
24  without the involvement of the Shuster and/or Siegel
25  interests?

20  (Pages 74 to 77)

EXHIBIT A
22

MARC  TOBEROFF - 9/18/2012

Page 78

1  A. I don't have any specific recollection of
2  that.
3  Q. Okay. And nothing came of that
4  conversation as a result of it, right? Afterwards,
5  I mean.
6  A. I don't know what you mean by "nothing came
7  of it."
8  Q. There has been no further contact?
9  A. I decided not to pursue it afterwards.
10  Q. With Sony?
11  A. Yes.
12  Q. Why?
13  A. That, I'm going to assert work product.
14  Q. Did you discuss your reasons with him?
15  A. No.
16  Q. Okay. What was the next?
17  A. The next -- the next, I believe, was
18  Paramount. I believe it was -- I'm not sure, but
19  I'm pretty sure it was Paramount was the next before
20  Fox. And at that meeting I recall them wanting me
21  to sort of run through the background of the case,
22  what is the case about, what rulings have we had in
23  the case, and I was essentially doing it for their
24  lawyers who were in the room. And I don't recall --
25  I recall the topic. I recall the conversation.

Page 79

1  And they expressed interest in -- I would
2  say keen interest in being in the Superman business.
3  Q. Was there any discussion of acquisition of
4  the Shuster interest at some point in the future?
5  A. I don't recall discussions about the
6  Shuster interests. I recall going over sort of the
7  general landscape of the litigation. And I
8  believe -- I believe this was before the 2010
9  lawsuit. I -- I believe it was.
10  Q. In the Sony meeting, did you disclose that
11  the Shusters had filed a notice of termination that
12  would become effective in 2013?
13  A. I don't specifically recall.
14  Q. And in the Fox meeting, did that come up?
15  A. I don't specifically recall discussions of
16  the Shuster termination.
17  Q. Were you discussing that -- either in the
18  Fox or Sony meetings that the studios would buy the
19  Siegel interest and receive an accounting from
20  Warner Bros. or they, themselves, would also be
21  involved in exploiting the property as a
22  co-copyright owner?
23  MR. KENDALL: Objection. Compound. Vague
24  and ambiguous.
25  THE WITNESS: I'm -- I'm simply going to

Page 80

1  testify as to what was said at those meetings, not
2  to what my assumptions were or impressions were.
3  BY MR. PETROCELLI:
4  Q. That was my question.
5  A. I'm trying not to -- to fill in the blanks.
6  Q. Right. Were the -- was that topic
7  discussed, whether they would exploit themselves or
8  whether they would just simply receive money from
9  Warner Bros.?
10  A. I don't believe it was specifically
11  addressed.
12  Let me see. I don't believe it was -- I
13  don't recall a conversation about -- in the Sony
14  meeting. I recall conversations with Paramount
15  about --
16  MR. KENDALL: He was asking about Fox in
17  his question.
18  THE WITNESS: Oh.
19  BY MR. PETROCELLI:
20  Q. Actually, I was asking about both, Sony and
21  Fox.
22  A. I recall in Paramount --
23  MR. KENDALL: I'm sorry. He's asking about
24  Sony and Fox.
25  THE WITNESS: Okay. I don't recall a

Page 81

1  conversation at Fox about that. And I don't recall
2  a conversation at Sony.
3  BY MR. PETROCELLI:
4  Q. Was I confused? Was the second
5  conversation that you were describing to me the Fox
6  conversation?
7  A. No, it was Paramount.
8  Q. Then I was confused. So would your answer
9  be the same for Paramount?
10  A. Paramount, I have a vague recollection of,
11  you know, Paramount being interested in doing a
12  Superman movie.
13  Q. Did you discuss any figures in -- in either
14  of these meetings or any of these three meetings
15  regarding the value of the Siegel rights that you
16  were there to talk about?
17  A. No.
18  Q. Were any figures discussed at all?
19  A. No.
20  Q. What about thereafter?
21  A. No.
22  Q. And on the Paramount meeting there were no
23  subsequent discussions?
24  A. With?
25  Q. With them?

21 (Pages 78 to 81)

**EXHIBIT A**
**23**

MARC   TOBEROFF - 9/18/2012

Page 82

1    A. No.
2    Q. Did you make a decision as you did similar
3    to Sony not to pursue subsequent discussions with
4    them?
5    A. No.
6    Q. But nothing happened relative to Paramount
7    after the Paramount meeting?
8        MR. KENDALL: Overbroad. Vague and
9    ambiguous.
10       THE WITNESS: After the Paramount meeting,
11   I checked with the agent at Endeavor who -- and I
12   forget, I'm terrible with names and I forget his
13   name as well. There was an agent, it may come -- it
14   just came to me. John Fogelman. He -- I checked
15   with him.
16       Q. Did he help arrange the meeting?
17       A. Yeah, he helped set up the meeting. He set
18   up the meeting for me.
19       Q. Did anybody help set up the -- the Sony
20   meeting?
21       A. My friend Julio Caro, who I mentioned.
22       Q. What about the Fox meeting?
23       A. No, I set that up myself. Tom --
24       Q. So Fogelman followed up at your request?
25       A. Tom Rothman went to law school with me at

Page 83

1    Columbia.
2        Q. Okay. You were talking about Fogelman.
3    I'm sorry.
4        A. So I followed up with Fogelman, and I -- I
5    didn't -- I don't -- there was no definitive answer
6    as to what's happening or what's the next step or I
7    don't recall any definitive answer.
8        Q. And what about Fox -- and nothing further
9    happened after the Fogelman followup?
10       MR. KENDALL: Overbroad. Vague and
11   ambiguous.
12       THE WITNESS: Not -- no.
13   BY MR. PETROCELLI:
14       Q. Did the Sony meeting occur before or after
15   the filing of this lawsuit?
16       A. Sony meeting occur -- when you say "this
17   lawsuit," I tend to think about the Siegel and the
18   Shuster together.
19       Q. Forgive me. The case that you filed.
20       A. The Shuster case?
21       Q. Yes.
22       A. Why don't we call this the Shuster case and
23   the other the Siegel case.
24       Q. Fair enough.
25       A. So Sony was before that --

Page 84

1        Q. And Paramount --
2        A. -- long before that.
3        Q. Before or after the Shuster case?
4        A. Long before.
5        Q. And Fox, before or after?
6        A. I believe before.
7        Q. Okay.
8        A. Paramount was before as well.
9        Q. All three of the studio meetings were
10   before?
11       A. I believe so.
12       Q. And since the Shuster case was filed, the
13   only discussions that you have had with potential
14   third parties, or third parties I should say, are
15   these two people who you can't recall from these
16   investor funds?
17       A. That was before the Shuster case was filed.
18       Q. All before?
19       A. Yes.
20       Q. So no -- no meetings, no communications
21   with third parties on this topic after the Shuster
22   case?
23       MR. KENDALL: Vague and ambiguous.
24       THE WITNESS: Not that I recall.
25   BY MR. PETROCELLI:

Page 85

1        Q. Okay. And on the Fox meeting, can you give
2    me your account of that meeting? I think that was
3    the third one in line.
4        A. Tom Rothman was personally interested, I
5    recall in his words, I said, "Are you interested in
6    Superman?"
7        And he said, "Who isn't?"
8        And I described basically the rulings that
9    we had gotten so far and that these rulings are
10   publically -- the lawyers acknowledged that they
11   already had, in doing their due diligence -- they
12   had already done due diligence and knew -- the
13   lawyers had read the decisions and knew what the
14   state of the litigation was.
15       I recall a -- I recall something to the
16   effect that Tom Rothman said he was going to have
17   his legal people evaluate, evaluate it.
18       Q. Did anything occur after the meeting,
19   follow up on the meeting?
20       A. No.
21       Q. In any of these three meetings, was there
22   any discussion of the need for the Shusters to agree
23   to any deal respecting the Siegel interests?
24       MR. KENDALL: Vague and ambiguous.
25   Argumentative.

22 (Pages 82 to 85)

MARC   TOBEROFF - 9/18/2012

Page 86

1    THE WITNESS:  No.  I don't recall -- I
2  recall the focus being on the Siegels and the
3  rulings that we had to date regarding the Siegels,
4  and what those rulings said the Siegels have and
5  don't have.
6    And -- and now that I phrase it that way, I
7  recall that in the Paramount meeting and in the Fox
8  meeting, but not in the Sony meeting, an attempt by
9  me to delineate what those works were to which the
10  Siegels had recovered their copyright pursuant to
11  Judge Larson's two partial summary judgment rulings,
12  and how there was an issue as to what the
13  elements -- still pending issues as to what the
14  elements are which are contained in those works, and
15  my, you know, trying to ballpark with them those
16  elements.
17    **Q.  Did the -- did these meetings occur after**
18  **the Siegels and Shusters and you had signed the**
19  **document that's been referred to in this case as the**
20  **consent agreement?**
21    A.  Sony, no.  I don't -- I think they occurred
22  before.
23    **Q.  The consent agreement was signed in 2008?**
24    A.  Yeah, may have -- Fox may have taken place
25  after that.  I don't know.  But it could just as

Page 87

1  easily have taken place before.
2    **Q.  Were your discussions --**
3    A.  It's easy enough to figure that out from --
4  by that parking pass, or studio admittance pass,
5  whatever that says.
6    **Q.  Were your discussions with the two investor**
7  **individuals generally along the same lines of the**
8  **studio discussions?**
9    A.  Not at all.
10    **Q.  How did they differ?**
11    A.  One was a meet and greet with Haim Saban's
12  company where we're just talking about an overall
13  relationship, and they were, you know, interested
14  in -- in intellectual properties as a base.  He had
15  made his fortune based on Power Rangers and, you
16  know, and they were interested in exploring other
17  branded properties, and we were just talking and I
18  don't have a specific recollection about -- you
19  know, I -- I have a general recollection, and part
20  of me is assuming that I mentioned Superman to them,
21  but I don't have a specific recollection of that.
22    **Q.  And nothing further happened after that**
23  **meet and greet?**
24    A.  No.
25    **Q.  Okay.**

Page 88

1    A.  We were -- we were -- you know, not -- not
2  for lack of mutual interest, just for lack of time.
3    **Q.  Do you know -- do you remember the name of**
4  **the company, the new company that was being formed?**
5    A.  No.
6    **Q.  Okay.  And finally with this last investor**
7  **individual?**
8    A.  Very casual conversations with him sort of,
9  you know, kind of pitching me.  But I didn't have
10  any, you know --
11    **Q.  Have you --**
12    A.  I'm just trying to think.
13    My recollection is bumping into him in the
14  Century City mall between the -- you know, 2049
15  and --
16    **Q.  Okay.**
17    A.  -- building, and him kind of pitching me
18  and saying, "What's happening with Superman?"  And
19  wanting to see if he could get in on it somehow.
20    **Q.  And nothing happened beyond that encounter**
21  **with this individual?**
22    A.  No.
23    MR. PETROCELLI:  Okay.  You can change the
24  tape.
25    THE VIDEOGRAPHER:  This will mark the end

Page 89

1  of Volume I, Tape Number 1 in the deposition of Marc
2  Toberoff.  Changing tapes at 11:32.
3    (Brief recess.)
4    THE VIDEOGRAPHER:  We're back on the
5  record.
6    This marks the beginning of Volume I, Tape
7  Number 2 in the deposition of Marc Toberoff.  The
8  time is 11:33.
9  BY MR. PETROCELLI:
10    **Q.  When you spoke to Ari Emanuel about**
11  **contacting the U.S. Attorney's office, did you**
12  **discuss with him why you were asking him to assist**
13  **in that?**
14    A.  Why I was asking him?  I don't know --
15  that's a little vague to me.
16    **Q.  Well, recount your conversation with him on**
17  **that subject.**
18    A.  It was, you know, a conversation to the
19  extent that, I don't know how this works, I've never
20  really been in this -- that kind of situation, but
21  that there was a surprising lack of attention,
22  something along the lines of, you know, "Everyone's
23  very busy with, you know, major crimes and I get the
24  feeling it's hard to get anybody's attention," and
25  whether he knew anyone, can call anyone to give this

23 (Pages 86 to 89)

**EXHIBIT A**
**25**

MARC   TOBEROFF - 9/18/2012

Page 90

1   some attention, just to review it.
2       **Q. What did he say?**
3       A. To review this matter. And just because I
4   know he knows a lot of people.
5       **Q. What did he say?**
6       A. And he said, "I'll call. Who are you --
7   I'll -- I'll call them up. Who are you -- who
8   should I call?"
9       And I gave him the name of who I had
10  figured out was -- at the USAO who was in charge of
11  what I believed would be the appropriate division,
12  in that sort of white collar crime division.
13      **Q. Did he, to your knowledge, contact that**
14  **person?**
15      A. He said he did. I don't know whether or
16  not he in fact did. I believe he did, yes.
17      **Q. Other than contact that person, did he do**
18  **anything else in regard to that matter?**
19      MR. KENDALL: Calls for speculation.
20  BY MR. PETROCELLI:
21      **Q. To your knowledge?**
22      A. Not to my knowledge.
23      **Q. Let me take you back to 2001. We started**
24  **out the deposition by walking through your**
25  **employment history.**

Page 91

1       **Do you remember the year when you first**
2   **learned of either the Siegel or Shuster termination**
3   **issue?**
4       MR. KENDALL: So I'll just interpose an
5   objection of asked and answered in the first session
6   of -- or in the last round of deposition. I guess
7   it was in the Siegel litigation. And I assume just
8   as you said during Laura Siegel's deposition, that
9   you don't intend to ask the same questions that have
10  been asked previously.
11      Is that correct?
12      MR. PETROCELLI: That's not correct.
13      THE WITNESS: Which, that you didn't say it
14  in the Siegel or that you're not going to do that
15  here?
16      MR. PETROCELLI: You know, it's -- it's
17  sort of unnecessary chatter, which I don't think is
18  productive. I've read your deposition in the Siegel
19  case, I'm familiar with it. I may or may not ask
20  some of the same questions from time to time.
21  Whatever information is in there, I'm aware of.
22  It's not my intention to re- -- replay that
23  examination. Obviously that examination occurred
24  many years ago without the benefit of a lot of
25  information that's now available, so we will be

Page 92

1   going over the same timeline of events. I think
2   that's obvious.
3       So with that, can you repeat the question,
4   please.
5       THE WITNESS: I just want to note that
6   what's salient of that, and I think what prompted
7   you to say at the Siegel deposition that you're not
8   going to repeat the questions is because in allowing
9   you to take depositions of the same parties whose
10  depositions you had taken on the same subjects in
11  the Siegel case, the Magistrate Zarefsky cautioned
12  that he expects that DC's counsel would not be just
13  asking the same questions.
14      MR. PETROCELLI: And I'm mindful of the
15  Court's rulings and where we are right now in the
16  case.
17      THE WITNESS: Okay.
18      MR. PETROCELLI: And I'm the last person in
19  this room who wants to waste time so --
20      THE WITNESS: Right.
21      MR. PETROCELLI: -- we'll do our best.
22      (The reporter read the record
23      as follows:
24      "QUESTION: Let me take you
25      back to 2001. We started out the

Page 93

1   deposition by walking through your
2   employment history. Do you
3   remember the year when you first
4   learned of either the Siegel or
5   Shuster termination issue?")
6       THE WITNESS: I don't know what you mean
7   by "Shuster termination issue." But to try and cut
8   through it, I -- I had read on the Internet, I
9   believe it was on the Internet, about the Shusters
10  having exercised -- Siegels having exercised their
11  termination rights and I believe that was sometime
12  in 2001.
13  BY MR. PETROCELLI:
14      **Q. Do you have any documents that would date**
15  **when that occurred?**
16      A. No.
17      **Q. Okay.**
18      A. I -- I remember that it was all over the
19  Internet.
20      **Q. Okay.**
21      A. That there were copies of the termination
22  notice that were posted on the Internet. And just
23  like they talked about these litigations on the
24  Internet, there was a tremendous amount of talk and
25  speculation as to what is happening with the

24 (Pages 90 to 93)

MARC   TOBEROFF - 9/18/2012

Page 94

1  Siegels, the Superman termination.
2       MR. KENDALL:  I'm going to caution you to
3  listen to the questions and ask the question
4  that's -- answer the question that is posed and wait
5  for the next question which might ask you for other
6  information instead of anticipating it.  Okay?
7       THE WITNESS:  Okay.
8  BY MR. PETROCELLI:
9       Q.  When you saw this Internet report or
10  whatever it was, is it just something you happened
11  to see fortuitously or were you endeavoring to
12  research and investigate ownership of rights
13  associated with Superman?
14       A.  I don't have a recollection of the latter.
15  I believe so it was the former.
16       Q.  Once you saw a reference to the Shusters
17  having filed --
18       A.  Siegel.
19       Q.  Excuse me.  Once you saw a reference to the
20  Siegels having filed some documents that terminate
21  copyright interests, did that then spawn an interest
22  on your part in investigating further?
23       A.  I'm trying to think back to 2001.  I do
24  have a recollection of Superman being all over the
25  Internet.  I don't know in thinking about it right

Page 95

1  now whether I -- actually, a question triggered this
2  thought.
3       I don't know whether I was looking into
4  Superman after I was contacted by Warren Peary or
5  was aware of the Siegel termination before I was
6  contacted by Warren Peary.  I don't know.
7       So when I say it was all over the Internet,
8  that I do recall.  But I don't recall whether I saw
9  it all over the Internet or I did a -- I typed in --
10  Googled "Superman" after I got a call from Warren
11  Peary.  It may very well have been the latter.  I
12  don't recall.
13       Q.  Do you have any documents that would
14  identify when Mr. Peary called you?
15       A.  You mean like a phone log or something?
16       Q.  Any -- any document or any -- any piece of
17  evidence that would establish when he contacted you?
18       A.  Not that I can think of.  Except the 2001.
19       Q.  Sometime prior to 2000- --
20       A.  No, I'm saying the 2001 PPC agreement --
21       Q.  Correct.
22       A.  -- means that he contacted me before that,
23  so that would be a document.
24       Q.  Right.  I meant affix the actual date
25  within a couple of days?

Page 96

1       A.  No.
2       Q.  Okay.  And do you know whether -- when
3  Mr. Peary contacted you, you were already familiar
4  to some degree with the Superman termination issue
5  because you read on the Internet something about it?
6       A.  That's the part I -- I couldn't say.
7       Q.  Okay.
8       A.  I may have -- I may have -- I may have been
9  aware of it or I may have looked into it after he
10  called me.
11       Q.  Whenever --
12       A.  I wouldn't be surprised if I -- if either
13  was the case.
14       Q.  When you did look into it, did you look
15  into it by yourself or did someone assist you?
16       A.  By myself.
17       Q.  Okay.  As of this point in time in 2001,
18  whether it's when you saw Superman all over the
19  Internet or when Mr. Peary called you, and I
20  appreciate you can't remember which happened first,
21  had you had any prior --
22       A.  May I ask --
23       MR. KENDALL:  Just a minute.  Let him
24  finish his question.
25       THE WITNESS:  Okay.

Page 97

1  BY MR. PETROCELLI:
2       Q.  You may -- you were about to say something?
3       A.  I'm just trying to figure out, and it would
4  be helpful if you gave me the date of the first
5  agreement with Warren Peary.
6       Q.  Sure.
7       A.  If you gave me that date, it might help me
8  to sort this out.
9       Q.  November 23, 2001 is the -- the date which
10  is recited in the first sentence.  It says,
11  "Agreement made as of November 23, 2001."  That's
12  been previously marked in this case as Exhibit 10,
13  signed by you, Warren Peary and Jean Peavy on
14  November 28, if that's helpful to you.  A copy of
15  Exhibit 10 is in front of you.
16           (The document referred to was
17           previously marked for
18           identification as Exhibit 10 and is
19           attached to this deposition.)
20       THE WITNESS:  Right.  So I don't -- again,
21  I don't know -- that doesn't -- I don't know whether
22  I was aware of the Siegels' termination before I got
23  that call or I started looking into Superman after I
24  got that call.
25  BY MR. PETROCELLI:

25  (Pages 94 to 97)

MARC  TOBEROFF - 9/18/2012

Page 98

1       Q. I think I asked you -- well, you answered
2   it. You did all the research yourself.
3       Is that right?
4       A. I believe so.
5       Q. Okay. Was anybody working with you at the
6   time, 2001?
7       MR. KENDALL: Vague and ambiguous.
8       THE WITNESS: 2001, no, I think I was just
9   working on my own.
10  BY MR. PETROCELLI:
11      Q. You testified in --
12      A. I first -- I believe in 2001 I was working
13  on my own. I didn't have an employee.
14      Q. In the Siegel deposition, you testified
15  that upon seeing the reference to the Siegel
16  termination on the Internet, you found some document
17  that referenced Arthur Levine, a lawyer for the
18  Siegels, and called him. Do you recall that
19  happening? Not the testimony, but that that, in
20  fact, happened?
21      A. Yes, I recall -- it wasn't some document,
22  it was -- the termination notice itself was posted
23  on the Internet. And at the end of the termination
24  notice it was signed, I believe, by Arthur Levine,
25  had his firm name and address, may have had his

Page 99

1   telephone number, I don't know.
2       Q. Okay.
3       A. But it's easy to look up.
4       MR. PETROCELLI: Do you want to put
5   Exhibit 9 in front of Mr. Toberoff, please. That's
6   the Siegel termination notice.
7       (The document referred to was
8           previously marked for
9           identification as Exhibit 9 and is
10          attached to this deposition.)
11  BY MR. PETROCELLI:
12      Q. And when you saw the reference, you'll see
13  on page bearing Bates number 1877, the name of
14  Arthur J. Levine at a law firm in Washington, D.C.
15  and that's -- this is the --
16      A. Are you looking at -- oh, okay. I didn't
17  realize it's at the very back here.
18      Q. In any event, you saw this termination
19  notice on the Internet and did you -- did you print
20  it, by the way?
21      A. I don't recall printing it.
22      Q. Okay. And you then called Mr. Levine?
23      A. And also --
24      Q. You're not sure if it was this big, thick
25  document, right?

Page 100

1       A. Yeah, I don't know.
2       Q. Right. What was your purpose in calling
3   Mr. Levine?
4       A. To find out the -- by that point, I believe
5   I was representing the Shusters and Superman was
6   created by Siegel and Shuster, and they each had --
7   were co-authors of a joint work, and I wanted to
8   find out what was the status of that termination.
9       Q. Are you confident that you called
10  Mr. Levine after Mr. Peary had contacted you?
11      A. I believe so, yes.
12      Q. Do you have any documents including phone
13  records that would evidence when you called
14  Mr. Levine?
15      A. No, I don't.
16      Q. And Mr. Levine advised you that the Siegels
17  were then represented by a different attorney, Kevin
18  Marks or Bruce Ramer?
19      MR. KENDALL: Asked and answered in the
20  first deposition.
21      THE WITNESS: I believe he advised me that
22  he did the termination, but after doing the
23  termination itself there were other lawyers in
24  Los Angeles that were -- transactional lawyers that
25  were representing the Siegels and he wasn't

Page 101

1   really -- he wasn't -- he still represents them but
2   he was not particularly active in that
3   representation. And he gave me the name of Kevin
4   Marks and the Gang, Tyre firm and may have given me
5   their phone number.
6   BY MR. PETROCELLI:
7       Q. What was your purpose in wanting to call
8   Mr. Marks or pursue anybody associated with the
9   Siegel interests?
10      MR. KENDALL: Now --
11      THE WITNESS: I don't want to reveal my
12  purposes or strategy, except generally to say that I
13  wanted to know what the status was.
14  BY MR. PETROCELLI:
15      Q. Status of what?
16      A. Of the other half of the copyright.
17      Q. In other words, whether the rights had been
18  conveyed to a third party or back to --
19      A. Whether --
20      Q. -- DC?
21      MR. KENDALL: Just a minute. Just a
22  minute. Finish your question.
23      MR. PETROCELLI: I did.
24      THE WITNESS: The status --
25      MR. KENDALL: Just a minute. Hold on.

26 (Pages 98 to 101)

**EXHIBIT A**
**28**

MARC   TOBEROFF - 9/18/2012

Page 102

1    So I'm going to object as compound.  There
2  were really two questions in what you asked.  One
3  was what was your purpose.  And as to that, I
4  believe the witness began to discuss work product
5  issues.  Then you asked a somewhat different
6  question and the witness began to answer about what
7  Mr. Marks said.  So that raises other privileged
8  considerations with respect to Mr. Marks'
9  communications with you, whether those were
10  privileged, whether the privilege has been waived as
11  to those, and so I just caution you to -- since you
12  have more knowledge about that than -- than I do, to
13  try to sort that through.  And if you can answer the
14  question without revealing privileged information,
15  please do so.  And then if there are areas where you
16  can't answer, I think if you just so indicate in a
17  general way and then Mr. Petrocelli can follow up to
18  make his record.
19    THE WITNESS:  So I'm -- I'm not --
20    MR. PETROCELLI:  Let me just repeat the
21  question.
22    THE WITNESS:  Okay.
23  BY MR. PETROCELLI:
24    **Q.  What was your purpose in contacting**
25  **Mr. Marks?**

Page 103

1    A.  I'll only speak in a general way, I'm --
2  not specifically because that will reveal work
3  product, and I'll do so if you agree that that's not
4  going to waive privilege here.
5    **Q.  We don't believe there is any privilege**
6  **attached to any of these conversations.**
7    A.  There's work product.
8    **Q.  Or -- or work product, for a variety of**
9  **reasons, including some mentioned by -- by**
10  **Mr. Kendall.**
11    MR. KENDALL:  So can I make the suggestion,
12  and each side has its positions with respect to
13  whether there is work product or whether
14  conversations that Mr. Marks is having might be in
15  furtherance of his -- his representation of his
16  clients, the Siegels at the time, or whether what
17  Mr. Toberoff is doing in a conversation with
18  Mr. Marks is within the furtherance of his
19  relationship -- of his attorney-client relationship
20  the Shusters at the time.
21    If we could just say that the general
22  answer that Mr. Toberoff has offered to give is
23  without prejudice to either side's positions and
24  will not constitute an additional basis for claiming
25  that there is a waiver of any such privileges.  I

Page 104

1  recognize you have a overarching provision
2  that there is -- position that there is no
3  privilege.
4    MR. PETROCELLI:  The difficulty with that
5  is while in concept that's generally agreeable,
6  answers may provide other bases to argue that
7  there's been a waiver.  He may, for example, say, "I
8  spoke to X, Y and Z" about a subject.  So --
9    MR. KENDALL:  I'm not --
10    MR. PETROCELLI:  The giving of the answer
11  isn't a waiver, but there may be information in the
12  answer that may furnish other grounds.
13    MR. KENDALL:  That's -- I think that's an
14  appropriate distinction to make.  The mere giving of
15  the answer will not.  If -- and we can take them
16  question by question.
17    MR. PETROCELLI:  And again, to be clear,
18  it's without prejudice to anybody's positions coming
19  into this deposition because, as you know,
20  Mr. Kendall, we have a series of objections to the
21  assertion of any kind of privilege to bar any of
22  these questions, and I appreciate that there's a
23  disagreement on that and we'll have to get it worked
24  out.
25    THE WITNESS:  Okay.  So I'll answer

Page 105

1  generally without waiver of privilege or work
2  product.  When I say "privilege," I'm referring to
3  work product as well.
4    That the purpose was to check the status of
5  the -- the Siegel termination.  "What do you mean
6  status?"  You know, had a complaint been filed?  Had
7  the matter been settled?  What -- what's the status?
8  BY MR. PETROCELLI:
9    **Q.  You saw from the -- by the way, for all**
10  **these privilege and work product assertions, in the**
11  **year 2001, there's only one -- who is the client?**
12    A.  Who is the client?
13    **Q.  Yes.**
14    A.  At the point when I was inquiring into the
15  status of the Siegel termination, the Shusters were
16  the clients.
17    **Q.  And who was the client or who were the**
18  **clients in 2002, through September 30, 2002?**
19    A.  To September 30, 2000- to -- 2002?  The
20  Shusters were the client.
21    **Q.  No other client?**
22    MR. KENDALL:  I'm going to object as
23  overbroad.  Vague and ambiguous.
24  BY MR. PETROCELLI:
25    **Q.  You can answer.**

27 (Pages 102 to 105)

**EXHIBIT A**
**29**

MARC  TOBEROFF - 9/18/2012

Page 106

1        MR. KENDALL:  And I'm going to have an
2  additional objection to it.  Lacks foundation.
3        THE WITNESS:  To the extent I was
4  communicating on behalf of IP Worldwide, or Ari
5  Emanuel, I would say there was a attorney-client
6  relationship there.  I handled all legal matters for
7  IP Worldwide.
8        MR. KENDALL:  I think we need to go off the
9  record for a minute, because there's a privilege
10  matter I need to discuss with the witness.
11  Shouldn't take long.
12        MR. PETROCELLI:  Okay.
13        THE VIDEOGRAPHER:  Off the record.  The
14  time is 11:59.
15        (Brief recess.)
16        THE VIDEOGRAPHER:  We're back on the record
17  at 12:04.
18  BY MR. PETROCELLI:
19        **Q. I think there was a pending question about**
20  **prior to September 30, 2002, who your clients were**
21  **regarding Superman, and you indicated that in all of**
22  **2001 it was Shuster, Joe Shuster.**
23        **Is that correct?**
24        A. No, I said Shuster and then I included IP
25  Worldwide.

Page 107

1        **Q. IP Worldwide comes about in 2002, right?**
2        A. Yes, and you said September --
3        **Q. Let's break this down.**
4        A. Didn't you say September 30, 2002?
5        **Q. For the purpose of this last question, I**
6  **focused just on 2001.**
7        A. Oh, okay.
8        **Q. So for 2001, the only client would have**
9  **been the Shusters, correct?**
10        A. Correct.
11        **Q. Okay.  In 2002, focusing on January 1 until**
12  **September 30, 2002, the Shusters remained the**
13  **client, correct?**
14        A. Correct.
15        **Q. Did you have any other clients during that**
16  **period of time with respect to Superman?**
17        A. IP Worldwide.
18        **Q. And --**
19        MR. KENDALL:  Just give me a moment.
20        I'll object to that as calling for a legal
21  conclusion.
22  BY MR. PETROCELLI:
23        **Q. And what Superman legal work were you doing**
24  **for IPW?**
25        MR. KENDALL:  Objection to the extent that

Page 108

1  it calls for work product or attorney-client
2  communications.
3        THE WITNESS:  I'll just answer generally
4  that I acted as general counsel for the joint
5  venture IP Worldwide, because I was a lawyer.  And
6  communications between Ari Emanuel, who was a
7  general partner or a member of IP Worldwide with me
8  regarding matters of a legal nature I believe are
9  privileged, we've asserted privilege and I'll assert
10  a privilege as to that.
11  BY MR. PETROCELLI:
12        **Q. And I'm only asking about matters related**
13  **to Superman.**
14        **Are you saying you had privileged**
15  **discussions with Ari Emanuel in 2002 related to**
16  **Superman where you were the lawyer and he was the**
17  **client?**
18        MR. KENDALL:  Vague and ambiguous.
19  Misstates the witness' answer and therefore lacks
20  foundation and is argumentative.
21        THE WITNESS:  When you say "you were the
22  lawyer and he was the client," that -- that
23  doesn't -- I don't know if that's the proper way to
24  describe a relationship within a company or a joint
25  venture between a member of that company and general

Page 109

1  counsel for that company.
2  BY MR. PETROCELLI:
3        **Q. Well, you were the only lawyer involved for**
4  **IPW during this period of time?**
5        A. It's not IPW, it's IP Worldwide.
6        **Q. You're right, IP Worldwide.  Correct?**
7        A. Yes, yes.
8        **Q. And the only other person who was**
9  **affiliated with IP Worldwide other than you is Ari**
10  **Emanuel, correct?**
11        A. Correct.
12        **Q. So are you saying you had conversations**
13  **between you and Ari Emanuel where, by virtue of your**
14  **status as a lawyer for IPW and -- Worldwide and his**
15  **status as a member of IP Worldwide, you're saying**
16  **they were privileged?**
17        A. Yes.
18        **Q. And they related to Superman?**
19        A. Yes.
20        **Q. Did they relate to the Shuster interest in**
21  **Superman?**
22        MR. KENDALL:  Vague and ambiguous.
23  Overbroad.
24        THE WITNESS:  I don't recall.
25  BY MR. PETROCELLI:

28 (Pages 106 to 109)

**EXHIBIT A**
**30**

Page 110

1      Q. You earlier testified that the Shuster
2  interest was excluded from IP Worldwide, correct?
3      A. That's correct.
4      Q. Okay.  Did you --
5      A. You said "relate."  That's a broad word.
6      Q. Correct.
7      Did you have discussions with Mr. Emanuel
8  on which you're asserting privilege involving the
9  Shuster termination interest?
10      MR. KENDALL: Just a moment.
11      Vague and ambiguous.  Overbroad.  I think
12  you can answer that question with a "yes" or a "no"
13  or whether you recall, but do not get into
14  discussions of that, if you can -- if it's your view
15  that those would be privileged.
16      THE WITNESS: I don't -- it's moot, because
17  I don't recall specific conversations.
18  BY MR. PETROCELLI:
19      Q. With Mr. Emanuel about the Shuster side of
20  the -- of Superman?
21      A. I don't recall a specific conversation.
22      Q. Okay.
23      A. But you may ask me a question that will
24  refresh my recollection.
25      This conversation started with you asking

Page 111

1  whether there was any other client or -- who had an
2  interest, and so I described that relationship for
3  that purpose.
4      Q. You had conversations with Mr. Emanuel
5  prior to September 30, 2002 regarding the Siegel
6  side of the Superman interest?
7      A. The Siegel?
8      Q. Yes.
9      A. No.
10      Q. What was the subject of your --
11      A. Not -- I should say not that I recall.
12      Q. Okay.  Do you recall any conversations with
13  Mr. Emanuel prior to September 30, 19- --
14  September 30, 2002 regarding Superman that you
15  believe are privileged?
16      A. It's too open-ended to -- to -- I'm sure
17  there were, but I can't just think of it in that
18  global sense.
19      MR. KENDALL: I think at this point we need
20  to confer on a matter of privilege.
21      THE WITNESS: Okay.
22      THE VIDEOGRAPHER: Off the record.  The
23  time is 12:11.
24      (Brief recess.)
25      THE VIDEOGRAPHER: Back on the record at

Page 112

1  12:13.
2      THE WITNESS: Okay.  So I'm going to amend
3  my answer.
4      Yes, I do recall conversations with Ari
5  Emanuel.  I'm getting confused on the dates.
6  September 30, 2002, I do recall conversations with
7  Ari Emanuel.
8  BY MR. PETROCELLI:
9      Q. When did they occur?
10      A. They occurred in -- leading up to, in
11  August 2002, a telephone conversation with Marks in
12  which I was on the phone with Ari Emanuel.  So they
13  occurred sometime before that.
14      Q. When is the first one you recall?
15      A. I don't recall specific -- I don't recall
16  specific conversations at specific times.
17      Q. Do you believe that the August 2002
18  conversation with Mr. Emanuel was the first such
19  privileged conversation you had with him in regard
20  to Superman?
21      MR. KENDALL: Objection.  Overbroad.  Just
22  a minute.
23      And I believe there's been prior testimony
24  about earlier communications with Mr. Emanuel in
25  regard to Superman being privileged.

Page 113

1      THE WITNESS: I don't believe that -- I
2  can't put dates on the conversations, but I do not
3  believe that the first conversation I had with Ari
4  Emanuel was in August, or even in July.
5  BY MR. PETROCELLI:
6      Q. To be clear, I'm asking you about
7  conversations with Ari Emanuel related to Superman
8  that you believe are privileged and hence won't
9  disclose to me.
10      A. I can't think of it that way in a general
11  sense and give you any kind of answer that's
12  complete.  You would have to ask me a question and
13  then I would have to think about conversations
14  relating to that question and then make a decision
15  whether or not to assert privilege regarding that
16  conversation.
17      Q. When is the first time you ever had a
18  conversation with Mr. Emanuel regarding Superman
19  ever?
20      MR. KENDALL: Asked and answered.
21      THE WITNESS: Yeah, I -- I -- I don't have
22  a specific recollection where I can answer, give you
23  a date, or -- or approximate date.
24  BY MR. PETROCELLI:
25      Q. Was it at or about the time that IP

29 (Pages 110 to 113)

**EXHIBIT A**
**31**

MARC  TOBEROFF - 9/18/2012

Page 114

1  Worldwide was formed between Mr. Emanuel and you?
2      A. I don't recall the specific conversation.
3      Q. When you formed --
4      A. I believe there -- there were conversations
5  but I don't have a recollection of a specific
6  conversation.
7      Q. Did you have a specific conversation with
8  Mr. Emanuel when forming IP Worldwide that the
9  Shuster side of the Superman interests was being
10  specifically excluded?
11     A. I believe I had a conversation but I don't
12  have a specific recollection of that conversation.
13     Q. And you are aware of a document that has
14  the initials J.S. in a --
15     A. Yes, that's why I didn't believe --
16     Q. An attachment that refers to excluded
17  endeavors?
18     A. I don't know if I'd use the word
19  "endeavors."
20     Q. Yes, no pun intended.
21     A. Not to confuse it with the agency.
22     Q. Exactly.
23     A. That's why I believe there were
24  conversations, but I don't have a specific
25  recollection of a conversation.

Page 115

1      Q. Other than Shusters and IP Worldwide, you
2  had no other clients with respect to Superman prior
3  to September 30, 2002, correct?
4      MR. KENDALL: Objection. Calls for a legal
5  conclusion. Lacks foundation.
6      THE WITNESS: No. There was -- there
7  was -- not clients, no.
8  BY MR. PETROCELLI:
9      Q. Are you unsure?
10     A. No, I'm just thinking of the November 2001
11  e-mail to Michael Siegel where he could be a
12  prospective client and we've asserted privilege with
13  respect to that e-mail and that initial
14  correspondence. But aside from that, no.
15     Q. You did not form an attorney-client
16  relationship with Michael Siegel in 2001.
17         Is that correct?
18     A. He did not become a client.
19     Q. Of yours, correct?
20     A. No, he did not --
21     Q. Or --
22     A. -- become a client.
23     Q. Ever?
24     A. No. He never did.
25     Q. Okay. So going back, then, to your --

Page 116

1  let's first back up to your call with Mr. Levine.
2         Did you ask him to send you any documents?
3      A. Not that I recall.
4      Q. Did he?
5      A. Not that I recall.
6      Q. Did you ask him if there were any
7  settlements of the Shuster interest -- of the Siegel
8  interest?  Excuse me.
9      A. Not that I recall.
10     Q. You knew from the termination notice that
11  the effective date was 1999 and you were calling
12  roughly two years after that, right?
13     MR. KENDALL: Objection. Calls for the
14  witness' thinking and work product.
15     THE WITNESS: I don't -- I don't recall
16  specifics of a conversation with Levine, other than
17  the gist of the conversation, I was inquiring as to
18  the status and him referring me to Kevin Marks and
19  the Gang, Tyre firm.
20  BY MR. PETROCELLI:
21     Q. When you had that --
22     A. And I believe it was a pretty short
23  conversation.
24     Q. When you had that call, you were aware that
25  the effective date of the Siegel termination was

Page 117

1  1999, correct?
2      A. I -- I don't know what my awareness was or
3  whether it registered in glancing over the
4  termination notice or not.
5      Q. You said "glance" --
6      A. I may have been aware, I may not have been
7  aware, or I may have been aware and not focused on
8  it. I don't recall.
9      Q. Did you discuss with him whether there had
10  been a disposition or resolution of the rights?
11     A. I don't recall having a conversation of
12  that nature with him.
13     Q. If you didn't have a conversation of that
14  nature with him, what were you talking about?
15     A. I don't recall, other than that I called to
16  inquire about the status.  I said, "What's the
17  status of that termination?  Are you handling that?"
18  I don't know.  In other words, I would be filling in
19  the blanks for you because I don't recall what was
20  actually said in the conversation.
21     Q. But when you asked what the status was, you
22  were aware at the time that one such possibility
23  might be that the Siegels had transferred their
24  rights to a third party?
25     MR. KENDALL: Objection.

30 (Pages 114 to 117)

Page 118

1   BY MR. PETROCELLI:
2       Q. Correct?
3           MR. KENDALL: Just a minute.
4           THE WITNESS: Go ahead.
5           MR. KENDALL: Argumentative. Vague and
6   ambiguous. Calls for a legal conclusion.
7           THE WITNESS: So I -- I'm just going to
8   tell you the following: I don't have a specific
9   recollection of the conversation. I have a general
10  recollection of the purpose why I was calling, and
11  I'm willing to share that purpose with you. But I'm
12  not willing to share with you my state of mind when
13  I'm calling in furtherance of the Shusters' interest
14  to find out the status of the other half of the
15  copyrights in which they would have a prospective
16  interest.
17          And aside from that, it's moot because I
18  don't recall what my -- I can tell you that it's
19  moot because I don't recall my specific -- whether I
20  knew or did not know or focused or didn't -- hadn't
21  focused.
22  BY MR. PETROCELLI:
23      Q. When -- he gave you the name of Kevin
24  Marks?
25      A. He did.

Page 119

1       Q. By the way, when -- so the record is clear,
2   whenever you tell me that you're not going to tell
3   me something, I'm obviously -- I'll obviously have
4   to accept that and I will reserve the right to
5   decide whether it's important enough for me to go in
6   and get a ruling on, but I don't want to have to
7   keep making a record and repeating myself.
8           MR. KENDALL: That's something that I think
9   in the context of that -- of this deposition should
10  be addressed to me. And I will say yes, we
11  understand that that is what you're doing.
12          MR. PETROCELLI: Okay.
13      Q. When -- so he gave you the name of Kevin
14  and you called Kevin up, right?
15      A. (Witness nods.)
16      Q. And we've seen records that indicate from
17  Marks' logs that it was around November 29.
18          Does that sound right?
19      A. It only sounds right as to approximate
20  recollection of what Marks' testimony was or -- or
21  the records that were exhibits.
22      Q. Okay. That --
23          Jason, can you show Mr. Toberoff --
24  what's -- we need to make an exhibit number. Is
25  that right?

Page 120

1           MR. TOKORO: Yeah, it's going to be 100.
2           MR. PETROCELLI: Exhibit 100.
3           (The document referred to was
4           marked for identification by the
5           C.S.R. as Exhibit 100 and attached
6           to this deposition.)
7   BY MR. PETROCELLI:
8       Q. Do you see the reference to your name on
9   the incoming calls of what I'll represent to you is
10  Mr. Marks' telephone log back on November 29, 2001?
11      A. Yes, yes.
12      Q. Okay. And you called and left a message
13  but did not speak with him, correct?
14      A. Yes. He misspelled my name, with a "K."
15      Q. The number 589-5151, that was your number
16  at the time?
17      A. Yes.
18      Q. Your phone number?
19          Now, we know from your testimony in the
20  Siegel case that you did finally speak with
21  Mr. Marks in February 2002. You recall
22  that, speaking to him then?
23      A. I don't -- I know that was the testimony.
24  I don't have a specific recollection --
25      Q. Okay.

Page 121

1       A. -- sitting here now of a specific time
2   speaking to him in February.
3       Q. Okay. After not receiving a telephone
4   return call from Mr. Marks, what, if anything, did
5   you do to inquire about or investigate the status of
6   the Siegel rights?
7           MR. KENDALL: Overbroad. Calls for a
8   narrative. And I'll object to the extent that it
9   calls for work product or communications that were
10  intended to remain confidential in furtherance of
11  your representation of your clients.
12          THE WITNESS: I think it's moot because I
13  don't recall -- I don't recall doing anything. Are
14  you asking between November and the alleged
15  February date?
16  BY MR. PETROCELLI:
17      Q. I am.
18      A. I don't recall doing anything.
19      Q. Did you reach out to anybody else to
20  inquire about the status of the Siegel rights?
21      A. I don't recall doing that.
22          MR. KENDALL: Why don't we take our break
23  now. You've got a 12:30 time right upon you.
24          MR. PETROCELLI: Okay. Roughly --
25          THE VIDEOGRAPHER: Off the record. The

31 (Pages 118 to 121)

**EXHIBIT A**
**33**

MARC  TOBEROFF - 9/18/2012

Page 122

```
1   time is 12:28.
2       (At 12:28 p.m., the deposition
3       of MARC TOBEROFF was adjourned for
4       noon recess.)
5   ///
6   ///
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
1       (At 1:14 p.m., the deposition
2       of MARC TOBEROFF was reconvened.)
3
4       THE VIDEOGRAPHER: Back on the record at
5   1:14.
6
7       EXAMINATION (CONTINUED)
8   BY MR. PETROCELLI:
9       Q. Are you ready?
10      A. Yes.
11      Q. Mr. Toberoff, prior to the February 2002
12  telephone call with Kevin Marks, is it fair to say
13  that you had some knowledge that the Siegels were in
14  talks with Warner Bros. or DC or some Warner Bros.
15  affiliate for the disposition of the rights?
16      MR. KENDALL: Lacks foundation.
17      THE WITNESS: I believe that on the
18  Internet there was speculation as to whether the
19  long-running Siegel/DC dispute had been settled.
20  I'm just paraphrasing. And -- and that was the
21  extent of -- of -- I believe that was my general
22  knowledge on the subject. I didn't have knowledge
23  and that was part of the reason why I was calling
24  for, to find out what was, in fact, the status.
25  BY MR. PETROCELLI:
```

Page 124

```
1       Q. Did you ask Ari Emanuel, given his vast
2   connections and relationships in the entertainment
3   community, to make some inquiries to find out what
4   the status of the rights --
5       A. I don't recall --
6       Q. -- was?
7       MR. KENDALL: Just a minute. Just a
8   minute.
9       Argumentative. Lacks foundation.
10      THE WITNESS: I don't recall asking him
11  that.
12  BY MR. PETROCELLI:
13      Q. Do you know if you did so?
14      A. I may have, but I don't recall it.
15      Q. Do you know if he did make any inquiries
16  about that?
17      A. I don't recall anything of that nature.
18      Q. Do you know -- do you recall having any
19  discussions with Mr. Emanuel about what the status
20  of rights might be with Warner Bros.?
21      A. I don't recall.
22      MR. KENDALL: Let me caution you with
23  respect to attorney-client communications and work
24  product privileges.
25      THE WITNESS: You know, without waiver of
```

Page 125

```
1   any privilege, I don't recall a conversation of that
2   nature.
3   BY MR. PETROCELLI:
4       Q. Did you attempt to locate the Siegels in
5   Los Angeles, Joanne Siegel and Laura Siegel?
6       MR. KENDALL: Lacks foundation as to time.
7       MR. PETROCELLI: I'm talking about the time
8   frame 2001 and you, know, early part of 2002. Let's
9   take it up to the February call with Kevin Marks.
10  February of '02.
11      THE WITNESS: I don't have a recollection
12  of attempting to locate Joanne or Laura Siegel in
13  Los Angeles.
14  BY MR. PETROCELLI:
15      Q. Did you make a -- a judgment not to attempt
16  to locate them and communicate with them?
17      MR. KENDALL: Objection to the extent that
18  it calls for work product.
19      THE WITNESS: I -- I -- my recollection is
20  that I had a initial conversation with Arthur
21  Levine, and that Arthur Levine directed me to Kevin
22  Marks of Gang, Tyre and I felt that was the
23  appropriate person to make inquiries to. And I
24  don't recall any efforts to locate the Siegels,
25  contact the Siegels or to find out contact
```

32 (Pages 122 to 125)

**EXHIBIT A**
**34**

MARC   TOBEROFF - 9/18/2012

Page 126

1 information directly for the Siegels in Los Angeles.
2 BY MR. PETROCELLI:
3    Q. Did you feel it was not appropriate for you
4 to try to contact the Siegels directly because you
5 had been told Kevin Marks was their lawyer?
6    A. I don't recall a thought process.  I don't
7 recall a specific thought process.  I believe I had
8 all of the contact information I needed since I had
9 their lawyer.
10    Q. But when you didn't hear back from their
11 lawyer for weeks, if not a couple of months, did you
12 give any thought to trying to reach out to them
13 directly, "them" being Joanne and Laura Siegel?
14    A. I don't recall thinking that, no.
15    Q. Was it a factor in your thought process at
16 the time that you were told they had a lawyer, were
17 represented by a lawyer?
18    A. I would assume so, but I don't recall a
19 specific thought process about that.
20    Q. You did reach out to Michael Siegel,
21 though, right?
22    A. In November of '01.
23    Q. Right.  And you went to some considerable
24 effort to track him down, right?
25       MR. KENDALL:  Objection.  Vague and

Page 127

1 ambiguous.  Lacks foundation.
2       THE WITNESS:  Sitting here, I don't recall
3 what efforts I made to.  I do recall that there was
4 some deposition testimony on the subject.
5 BY MR. PETROCELLI:
6    Q. You mean your prior deposition?
7    A. Yeah, I recall there may have been some
8 deposition testimony on the subject, but I don't
9 recall how considerable my efforts were or not
10 considerable.
11    Q. Well, you wrote to him saying that there
12 were thousands of Michael Siegels or thousands of
13 Siegels or words to that effect?
14    A. So then that's what I'm recalling.
15    Q. Right?
16    A. That's what I'm recalling.
17    Q. I'll show you that letter.  It's actually
18 an e-mail dated November 17, 2001.  And I'm told
19 that's Exhibit 101.
20       (The document referred to was
21       marked for identification by the
22       C.S.R. as Exhibit 101 and attached
23       to this deposition.)
24 BY MR. PETROCELLI:
25    Q. You understand this is an e-mail that was

Page 128

1 recently in this case ordered to be produced and has
2 been produced by --
3    A. I understand.
4    Q. -- by you?
5    A. It's our position in any -- any questions I
6 answer without waiver of that position, that this is
7 a privileged document and we're preserving that
8 objection.
9    Q. The -- you state in the e-mail -- well,
10 first of all, how did you get Mr. Siegel's e-mail
11 address?  I'm now talking about Michael Siegel, of
12 course, the person to whom you directed this e-mail.
13    A. I don't recall.
14    Q. And then you said:
15       "It wasn't an easy task since
16       there are about 2,000 Michael
17       Siegels in the U.S."
18       Do you see that?
19    A. Yes.
20    Q. Were you the one who ferreted through all
21 the Michael Siegels or did somebody assist you?
22    A. I don't think anybody assisted me in
23 November of 2001.
24    Q. How did you find him?
25    A. I don't have a specific recollection of how

Page 129

1 I found him, and I -- reading this now, I don't
2 believe the 2,000 is literal, I believe it's a --
3 just a light way to introduce myself saying, "You
4 are difficult to find.  There are 2,000 Michael
5 Siegels."
6    Q. Can you tell me as best as you can recall
7 how it was that you were able to locate him?
8    A. I would be speculating based on, you know,
9 knowledge of how you could locate somebody.
10    Q. You have no actual recollection?
11    A. I don't have a specific recollection of the
12 steps I took to locate Michael Siegel.
13    Q. Do you have a recollection of any of the
14 steps you took?
15    A. Not really.
16    Q. Did you get any information about him from
17 Arthur Levine?
18    A. I don't believe so.
19    Q. Did Arthur Levine identify anyone else to
20 you, other than Kevin Marks?
21    A. I don't believe so.
22    Q. Why on November 17 are you reaching out to
23 Michael Siegel rather than Joanne or Laura Siegel
24 who happened to reside in L.A.?
25    A. Because Joanne and -- I believe in

33 (Pages 126 to 129)

**EXHIBIT A**
**35**

MARC   TOBEROFF - 9/18/2012

Page 130

1  November 2001, that -- I'm ballparking here, I'm
2  giving you -- I'm trying to approximate, but I'm
3  in November of 2001 I was under the impression that
4  the Siegels were already represented by counsel.
5  And that -- that's it, that they were already
6  represented by counsel.
7       MR. KENDALL: Which Siegels?
8       THE WITNESS: That -- that Laura and Joanne
9  Siegel were represented by counsel with respect to
10 their termination interest.
11 BY MR. PETROCELLI:
12      Q. What was the basis of that knowledge?
13      A. I believe reading things on the Internet.
14      Q. By the time you wrote this e-mail on
15 November 17, 2001, had you spoken to --
16      A. Excuse me, let me take that back.
17      Q. -- Arthur Levine?
18      A. Let me take that back a step.
19      It may be something, in fact, because the
20 termination notice was posted and there was a large
21 law firm and a lawyer signing the termination notice
22 that they were represented with respect to their
23 termination interests by counsel.
24      Q. Although that notice was filed in 1997 and
25 it's now four years later, right?

Page 131

1       A. Right.
2       Q. You believe at the time that you reached
3  out to Michael Siegel and wrote this e-mail, that
4  you had spoken to Mr. Levine and gotten the name of
5  Kevin Marks and were told that he was counsel for
6  Laura and Joanne?
7       A. I couldn't date it that precisely. I
8  well -- I may well have, but regardless of whether I
9  did or not, you can come to that conclusion based on
10 the termination notice.
11      First of all, it's a very -- it's sort of a
12 heavy duty legal document and it's signed by Arthur
13 Levine with a lot of information about a large
14 Washington, D.C. law firm at the end of it.
15      Q. How did you come to learn that there was a
16 Michael Siegel?
17      A. Reading something about Superman, I think
18 it was on the Internet, reading about Superman or
19 that Superman -- something about Jerry Siegel.
20      Q. Did you make copies of the materials that
21 you read --
22      A. No.
23      Q. -- that provided some of the source
24 information for you?
25      A. No. But I believe there were histories. I

Page 132

1  don't know if Wikipedia existed then. I don't think
2  it did. But there were similar things available on
3  the Internet, the type of thing you'd find where if
4  you go on Wikipedia and you type in "Jerry Siegel"
5  that talk about, you know, Jerry Siegel, his life,
6  et cetera, et cetera.
7       Q. Well, do you recall having done that and
8  gotten the name of Michael Siegel that way?
9       A. I believe so, yes. Reading something that
10 Jerry Siegel was -- was married to Bella Siegel and
11 had one son and then got divorced and remarried, I
12 believe that information was available on the
13 Internet.
14      Q. Did you --
15      A. Readily available.
16      Q. Did you ask Arthur Levine about Michael
17 Siegel and whether he -- what his status was,
18 whether he had a lawyer, things like that?
19      A. I don't recall a conversation with Arthur
20 Levine regarding Michael Siegel.
21      Q. Do you believe you did not have such a
22 conversation or you just can't remember one way or
23 the other?
24      A. I believe I did not.
25      Q. Did you have a view that Michael Siegel was

Page 133

1  not represented by a lawyer when you wrote this
2  e-mail?
3       A. Yes.
4       Q. What informed that view?
5       A. Simply that I didn't -- that I didn't know
6  that he had a lawyer.
7       Q. You had an understanding --
8       A. I -- let me -- two things would have
9  informed that.
10      MR. KENDALL: Can I just -- before you say
11 two things would have --
12      THE WITNESS: Right.
13      MR. KENDALL: -- now you should be
14 testifying to facts, not to, you know, hypotheticals
15 that you're now thinking of as a lawyer.
16      So keep your -- keep your testimony -- if
17 you're actually remembering something that occurred,
18 then that's one thing and you should of course
19 reveal that.
20      THE WITNESS: So -- so I appreciate that.
21      I'm not -- I'm deducing. I'm not -- I'm
22 filling in the blanks.
23 BY MR. PETROCELLI:
24      Q. Witnesses do that all the time if it's
25 based on --

34 (Pages 130 to 133)

**EXHIBIT A**
**36**

MARC   TOBEROFF - 9/18/2012

Page 134

1    A. And I tell them not to.
2    **Q. If it's based on their best estimate and**
3   **recollection of what occurred, so just do your best.**
4    A. Okay. So the answer to that is I don't
5   have -- I don't have a recollection of why I didn't
6   think Michael Siegel was represented.
7    **Q. Do you recall trying to find out if he had**
8   **a lawyer?**
9    A. I wouldn't know how to do that. No, I
10   don't recall doing that.
11    **Q. You could have asked Mr. Levine, right?**
12    A. I didn't draw any connection between
13   Mr. Levine and Michael Siegel.
14    **Q. Did you --**
15    A. And that wasn't a topic of conversation.
16    **Q. Did you have a view when you spoke to**
17   **Mr. Levine that Michael Siegel was somehow not part**
18   **of the notice of termination or the -- the group**
19   **that was terminating the copyright interest?**
20    A. I don't -- well, let me say this: I don't
21   know whether I spoke to Arthur Levine before I wrote
22   this e-mail or after I wrote this e-mail. If
23   there's a date that -- there's something that has
24   come up where we've been able to narrow the date
25   with Arthur Levine, that might be helpful but I

Page 135

1   don't recall any -- Michael Siegel coming up at all
2   in the conversation with Arthur Levine or my
3   thinking about Michael Siegel while I'm speaking to
4   Arthur Levine.
5    **Q. Is it fair to say that when you did speak**
6   **to Arthur Levine after seeing whatever you saw on**
7   **the Internet, that you understood Michael Siegel was**
8   **not part of the group or the parties who were**
9   **terminating the Siegel copyright interest?**
10    A. Yes, I understood that.
11    **Q. Okay. What was your interest in reaching**
12   **out to Michael Siegel, given that he wasn't part of**
13   **the terminating group, if I could use that**
14   **expression?**
15    A. It would be representing him, because I
16   believe that he had an interest, because he was --
17   you know, the -- the spouses and children and
18   grandchildren had an interest, and he was a child.
19    **Q. But you understood at the time that if**
20   **others who had the ability and standing to terminate**
21   **the copyright interests were in the process of doing**
22   **so or had already done so, that Michael would be**
23   **entitled to money, right?**
24    MR. KENDALL: Just a minute.
25    Objection. Argumentative. Lacks

Page 136

1   foundation. And I'm going to express the caution
2   that this may be getting into a work product area,
3   so bear that in mind in answering the question.
4    THE WITNESS: I'm, first of all, sort of
5   overarching thing, in 2000- -- I don't want to
6   impute my knowledge today to my knowledge in 2001,
7   so I believe my knowledge in 2001 regarding
8   termination was pretty limited. And I -- I believe
9   that I knew that Michael had a 25 percent interest
10   of something.
11   BY MR. PETROCELLI:
12    **Q. That he had a -- some kind of financial**
13   **interest in that he could receive money as a result**
14   **of the termination of the rights?**
15    MR. KENDALL: Same objections and caution.
16    THE WITNESS: Yes, I believe that at that
17   time in 2001 I knew that much.
18   BY MR. PETROCELLI:
19    **Q. Why did you think he needed a lawyer?**
20    A. To represent him with respect to his
21   interest --
22    **Q. Did you have --**
23    A. Sort of self-evident.
24    **Q. Forgive me.**
25    **Did you have a belief that the Siegels who**

Page 137

1   **did terminate were not in contact with him and were**
2   **not working in collaborating with him?**
3    MR. KENDALL: Again, caution with respect
4   to work product and lacks foundation.
5   Argumentative. And compound.
6    THE WITNESS: I hadn't formed a belief one
7   way or another.
8   BY MR. PETROCELLI:
9    **Q. You later came to learn that Joanne and**
10   **Laura were in touch with Michael Siegel and his**
11   **lawyer, Don Bulson, right, in connection with the**
12   **termination?**
13    MR. KENDALL: Same objections and caution,
14   and add that to the extent you learned that from the
15   Siegels, that would seem to call for attorney-client
16   communications. By "the Siegels" I mean Laura and
17   Joanne.
18    THE WITNESS: Without waiver of any
19   privilege or work product, yes, I became aware of
20   that.
21    MR. KENDALL: Just one second. You don't
22   have to go off the record. I'm just going to grab
23   coffee and I'm going to be away from the microphone.
24    MR. PETROCELLI: Are you asking me to wait?
25    MR. KENDALL: Just a moment while I'm away

35 (Pages 134 to 137)

**EXHIBIT A**
**37**

Page 138

1  from the microphone.
2      MR. PETROCELLI: Okay.
3      (Pause in proceedings.)
4  BY MR. PETROCELLI:
5      **Q. You said that as of 2001 you had limited**
6  **knowledge of copyright termination issues.**
7      **Is that a fair statement?**
8      A. Yes.
9      **Q. Okay. Prior to your dealings on this**
10 **matter starting in 2001 with the Shusters and**
11 **Michael Siegel and, et cetera, had you had any prior**
12 **experience with termination of copyright interests?**
13     A. I was actually thinking about that question
14 before the deposition and I couldn't think of an
15 example.
16     **Q. Were you generally familiar with the**
17 **concept?**
18     MR. KENDALL: Vague and ambiguous.
19     THE WITNESS: I -- I believe my knowledge
20 was limited and it could well be that my initial
21 knowledge was with respect to Superman and the
22 publicity surrounding the Superman termination.
23 BY MR. PETROCELLI:
24     **Q. By the time that you received the phone**
25 **call from Mr. Peary, did you believe that you were**

Page 139

1  **fully qualified in the area of copyright termination**
2  **to collaborate with him?**
3      MR. KENDALL: Just a moment.
4      Lacks foundation. Argumentative.
5  Ambiguous. Vague.
6      THE WITNESS: I believe I was qualified.
7  BY MR. PETROCELLI:
8      **Q. I said "fully qualified," you said**
9  **"qualified."**
10     **You thought you were competent and**
11 **qualified to handle the matter?**
12     A. I felt, yes, and that I would do legal
13 research and go over the statute and these were
14 statutory rights and I would take it from there.
15     **Q. Okay. In this e-mail to Michael Siegel,**
16 **Exhibit 101, it states in the third paragraph:**
17         **"Based upon my research, I am**
18     **absolutely convinced that you**
19     **retain important rights with**
20     **respect to your father Jerome**
21     **Siegel's work, including Superman."**
22     **What research had you done?**
23     A. Looking at the termination provision.
24 That's what this paragraph refers to.
25     **Q. You're talking about section 304C?**

Page 140

1      A. The fact -- yeah, the termination section
2  304, there's different components, there's C,
3  there's D. But looking there, it's readily apparent
4  that termination rights go to a spouse, children or
5  grandchildren who has a child.
6      **Q. Were you absolutely convinced that the**
7  **Siegels had not entered into any kind of agreements**
8  **by the time that this e-mail was sent which might**
9  **have abridged Mr. Michael Siegel's rights?**
10     MR. KENDALL: Objection. Calls for a legal
11 conclusion. Vague, ambiguous and caution you with
12 respect to work product and attorney-client
13 communications with the Shusters as of this point in
14 time.
15     THE WITNESS: So first of all, when you
16 say "the Siegels," you're referring to Joanne and
17 Laura Siegel?
18 BY MR. PETROCELLI:
19     **Q. Correct.**
20     A. Not -- if we're saying "Siegels," I just
21 want it understood, whenever I say "Siegels," I mean
22 Laura and Joanne and that's true throughout the
23 case. I've never once talked generically about the
24 Siegels and meant it to refer to Michael Siegel.
25     So when -- I'll take the questions as

Page 141

1  referring to Laura and Joanne, and that when either
2  of us are speaking about Michael Siegel, we're going
3  to say "Michael" or we're going to say "Michael
4  Siegel," because there's been a lot of willful
5  confusion in this case on that point.
6      So in this instance, I -- I don't have a
7  specific recollection of my specific state of mind
8  at that particular period of time. I'm filling in
9  the blanks, so I can't answer that question. But I
10 believe that my knowledge about termination was
11 somewhat limited at that time and growing. I was
12 learning about it and I knew enough to know that as
13 a child, he had an interest in Superman.
14     **Q. You had no knowledge at the time you wrote**
15 **this e-mail whether or not Joanne and Laura Siegel**
16 **had already executed a -- a new grant or some other**
17 **disposition with Warner Bros. or DC Comics following**
18 **their termination, right?**
19     MR. KENDALL: Argumentative.
20     THE WITNESS: I -- I -- I didn't know
21 either way.
22 BY MR. PETROCELLI:
23     **Q. In addition to reading the copyright**
24 **statute, did you do any other research, any factual**
25 **research?**

36 (Pages 138 to 141)

Page 142

1    MR. KENDALL: Objection. Calls for work
2  product.
3    THE WITNESS: I don't recall -- when you're
4  talking about this period of time when I wrote this
5  letter?
6  BY MR. PETROCELLI:
7    Q.  Correct.
8    A.  I don't recall what my level of research
9  was. I presume I read about Superman and the
10 creation of Superman and I don't recall specifically
11 what my level of research was.
12   Q.  Had you investigated the chain of title of
13 the various grants?
14   MR. KENDALL: Objection.
15   THE WITNESS: I don't believe so.
16   MR. KENDALL: Calls for work product.
17 BY MR. PETROCELLI:
18   Q.  Had you searched for any published cases
19 involving the Shusters or the Siegels?
20   MR. KENDALL: Same objection.
21   THE WITNESS: So, wait a minute. We're
22 talking about November 17, 2001, and what's the date
23 of the Shuster agreement, October?
24 BY MR. PETROCELLI:
25   Q.  23 -- oh, Shuster agreement, November 23,

Page 143

1  2001. That's in front of you, I think.
2    A.  Yeah. I -- I don't know how far along I
3  was in terms of research.
4    Q.  Had you started any research?
5    A.  I don't know.
6    Q.  In the next paragraph you asked Mr. Michael
7  Siegel whether he had signed anything regarding the
8  rights, and you indicated that the documents may not
9  necessarily prevent or preclude his future rights.
10   Do you see that?
11   A.  Yes.
12   Q.  Why did you ask him that?
13   MR. KENDALL: Objection. Calls for work
14 product.
15   THE WITNESS: Yeah, I believe that is -- I
16 believe that is work product.
17 BY MR. PETROCELLI:
18   Q.  Had you --
19   A.  I think the answer is fairly apparent, but
20 it is work product.
21   Q.  Were you aware as of the time you wrote
22 this e-mail of the provision in section 304 dealing
23 with agreements to the contrary?
24   MR. KENDALL: Objection. Calls for work
25 product.

Page 144

1    THE WITNESS: I think that's work product
2  as well.
3  BY MR. PETROCELLI:
4    Q.  Your knowledge of that?
5    A.  My knowledge of the statute, what parts I
6  was aware of, how I believe they applied to the
7  situation or didn't apply.
8    Q.  Is it fair to say that you at least read
9  section 304 prior to the time you wrote this e-mail?
10   MR. KENDALL: Same objection.
11 Argumentative.
12   THE WITNESS: I -- is it fair to say that I
13 read 304?
14 BY MR. PETROCELLI:
15   Q.  Yes, the copyright statute on termination.
16   A.  I think I looked at it, yes.
17   Q.  Okay.
18   A.  But I can also answer generally, without
19 waiver of work product, that my -- remember I told
20 you how my first -- actually, I don't know if it was
21 the first or not, but I told you about the separated
22 rights case, about the Combat! case?
23   Q.  Yes.
24   A.  Well, what was glaring in that case and the
25 other side felt was their winning -- was their

Page 145

1  winning fact was that the contract contained a
2  waiver of separated rights, and I actually proved to
3  them that that was actually a fact quite contrary to
4  their interests, that they attempted to circumvent
5  the Writers Guild agreement.
6    So I was very familiar that there could
7  be -- people felt that their attempts by users of
8  intellectual property to waive rights that are
9  unwaivable, from -- from that experience.
10   Now, whether -- what was going through my
11 head at that particular time is work product, but I
12 don't recall.
13   Q.  Are you saying that that paragraph about
14 the effect of "any agreements you may have signed"
15 was prompted by your work on the separated rights
16 issue?
17   A.  I'm not saying it's prompted by that, but I
18 had an orientation towards intellectual property
19 rights that there could be all sorts of contractual
20 provisions where people try to dissuade people from
21 exercising their rights by purporting to have them
22 waive rights, and which are unenforceable in many
23 instances.
24   Q.  But you had a general awareness that based
25 upon looking at section 304, that there was a

37 (Pages 142 to 145)

MARC   TOBEROFF - 9/18/2012

Page 146

1  specific provision dealing with agreements to the
2  contrary.
3         MR. KENDALL: Objection. Calls for work
4  product. Argumentative.
5         THE WITNESS: That -- that's -- that is
6  work product. But it's moot because I don't have a
7  specific recollection. When I wrote this, I was
8  keying into the notwithstanding any agreement to the
9  contrary language, in section 304 or not.
10 BY MR. PETROCELLI:
11        Q. By the time you wrote this e-mail to
12 Michael Siegel, had you already been in contact with
13 the Shusters?
14        A. I can't answer that question definitively,
15 but I suspect that the -- I -- I -- I don't know
16 definitively, but I suspect that the contact from
17 the Shusters regarding Superman triggered this and I
18 know it triggered my call to Arthur Levine.
19        Q. You can definitively date the Peary call to
20 you before your call to Arthur Levine?
21        A. I can't date it, but I -- but if somebody
22 asked me, "What do you believe from what you do
23 know, what do you believe or what's your best
24 estimate?" that would be my estimate.
25        Q. When Mark Peary called you, by that point

Page 147

1  in time you had already seen the references that
2  were all over the Internet about Superman, right?
3  Before the termination of the -- of the copyright
4  interests, correct? You're shaking your head.
5        A. I'm -- I'm actually --
6        Q. Okay.
7        A. I'm actually just focused on the last
8  question. I'm trying --
9        Q. Okay.
10       A. -- I'm really trying to focus and recall
11 the ordering of these things, because they're --
12 there's a flurry of activity all happening around
13 the same time, and I -- and I don't know when the
14 Arthur Levine call was. I have no idea when the
15 Arthur Levine call was. So if there's anything that
16 could refresh my recollection on that, that would be
17 helpful.
18       But I don't recall when -- of whether the
19 Arthur -- I'm trying -- I don't have a month. All I
20 know is it must have been before February. If
21 February was the -- what we have -- it must have
22 been before this date here that we have in the
23 11-20 --
24       Q. You're referring to Kevin Marks' call log
25 for November 29, 2001?

Page 148

1        A. Yes.
2        Q. What's the exhibit number there just for
3  the record?
4        MR. TOKORO: 100.
5        THE WITNESS: Exhibit 100, so if I got
6  Kevin Marks' name from Arthur Levine, which I did,
7  and I called him on 11-29, I must have spoken to
8  Arthur Levine before 11-29.
9        And this is dated November 17, 12 days
10 earlier. So I don't know if I spoke to Arthur
11 Levine before I wrote this or soon after, but I am
12 seeing a flurry of activity in a very short time
13 period.
14       MR. KENDALL: I'd like to just have a
15 moment to confer with my client given that he's
16 talking about conversations that have privilege
17 issues associated with them. Just take a minute.
18       THE VIDEOGRAPHER: Off the record. The
19 time is 1:49.
20       (Brief recess.)
21       THE VIDEOGRAPHER: Back on the record at
22 1:54.
23 BY MR. PETROCELLI:
24       Q. Yes, I asked you just a few moments ago
25 whether or not you were aware about the Superman

Page 149

1  termination by the Siegels, Joanne and Laura, that
2  had been referenced on the Internet as of the time
3  you first received the phone call from Mark Peary.
4        A. I believe I was aware of it. But I -- I --
5        MR. KENDALL: Mr. Toberoff, I think you
6  answered the question so you're free to go on but
7  please focus on the question and answer the
8  question.
9  BY MR. PETROCELLI:
10       Q. Are you done with your answer?
11       A. Yes.
12       Q. Okay. In response to the e-mail to Michael
13 Siegel, Exhibit 101, did you come to learn whether
14 or not Michael had signed any agreements?
15       A. Can you repeat that, please?
16       Q. Yes.
17       Did you ever come to learn that Michael had
18 signed any agreements related to Superman in
19 response to the issue raised in the November 17
20 e-mail?
21       A. At any time?
22       MR. KENDALL: He's asking in your
23 conversations with Michael Siegel.
24       THE WITNESS: I didn't have conversations.
25       MR. PETROCELLI: I didn't ask him about his

38 (Pages 146 to 149)

**EXHIBIT A**
**40**

Page 150

1  conversations with Michael.
2      **Q. After sending this e-mail, November 17, did**
3  **there come a time when you learned whether or not**
4  **Michael had signed anything related to Superman?**
5      A. Only in the course of this litigation I
6  learned that he had a retainer agreement with Don
7  Bulson or Renner, Otto, but I don't think that's
8  what you're referring to.
9      **Q. No, I'm not.  No.  Some kind of property**
10  **rights agreement or settlement agreement or anything**
11  **like that?**
12      A. No.
13      **Q. Okay.  And you spoke to Mr. Bulson at some**
14  **point in either 2001 or 2002.**
15      **Is that right?**
16      A. Yes.
17      **Q. He called you after you sent this e-mail?**
18      A. I don't remember what the circumstances
19  were of conversations with Bulson, but I -- I
20  believe I spoke to him.  I believe I spoke to him
21  not -- not in 2001 but in 2002.
22      **Q. About what?**
23      A. I don't recall the conversation.  I'm -- I
24  would be filling in the blanks.
25      **Q. Did he call you or did you call him?**

Page 151

1      A. I believe that there was this e-mail, then
2  I believe there was a conversation with Bulson or
3  one or two conversations with Bulson, and then I
4  believe there was the next time I spoke to Bulson it
5  was about interest in buying Michael Siegel's
6  interest, which was after.
7      **Q. After what?**
8      A. The offer, the documented, you know,
9  whenever we entered into the conflict waiver with
10  the Siegels and there was a --
11      **Q. That was January 2003.**
12      A. Right.  So that's the next -- those are
13  the --
14      **Q. Okay.  And when do you believe you spoke to**
15  **Don Bulson after sending your e-mail to Michael**
16  **Siegel?**
17      A. I believe it was in 2002 but I don't know
18  when it was.
19      **Q. Did he call you or did you call me?**
20      A. I believe he called me.
21      **Q. Did you get any documents from him?**
22      A. I don't think so.
23      **Q. Did you ask him about any agreements along**
24  **the lines you had asked of Mr. Michael Siegel?**
25      A. I don't recall.

Page 152

1      MR. PETROCELLI:  Do you have a -- the
2  Bulson time records?  Is that the same exhibit
3  throughout, 102?  Okay.
4          (The document referred to was
5          marked for identification by the
6          C.S.R. as Exhibit 102 and attached
7          to this deposition.)
8  BY MR. PETROCELLI:
9      **Q. Let me show you certain time records -- you**
10  **now have in front of you certain time records that**
11  **have been produced in this case by Don Bulson, and**
12  **they've been marked as Exhibit 102, and you'll see**
13  **on the first -- I don't know if it's the first page,**
14  **it's the page with control number EOMS 00183 on the**
15  **bottom right-hand corner.  These have obviously been**
16  **redacted prior to their production to us.**
17      **In any event you'll see what appears to be**
18  **an entry on November 27, 2001 where:**
19      **"Review e-mail from Mike**
20      **Siegel, telephone conference with**
21      **Mike Siegel, telephone conference**
22      **with Mark Toberoff" -- Mark spelled**
23      **with a "K" not a "C."**
24      **And I know you said you thought the call**
25  **occurred in 2002, but looking at this now, it might**

Page 153

1  have occurred in November of 2001, right?
2      A. I don't have any reason to believe this is
3  incorrect.
4      **Q. Okay.  Which would have been, you know, ten**
5  **days or so after your e-mail to Michael Siegel.**
6      **In that call, did you discuss -- what did**
7  **you discuss with Mr. Bulson?**
8      A. I don't even recall the conversation.
9      **Q. Did you inquire about the status of the**
10  **rights as you had endeavored to do with Kevin Marks**
11  **on November 29?**
12      A. Again, drawing a blank with respect to -- I
13  know that when I spoke to Kevin -- Don Bulson in
14  2003 regarding a buyout on Michael Siegel's
15  interest, that -- on behalf of Ari Emanuel, that
16  I -- that was not the first time that I had spoken
17  to him.  I knew who he was, I was familiar with him,
18  I knew he represented Michael Siegel.  And from that
19  I surmised that I must have spoken to him in 2002,
20  but I don't remember my conversations with Bulson.
21      **Q. Well --**
22      A. Which leads me to believe they were pretty
23  uneventful.
24      **Q. That billing record -- the billing records,**
25  **Exhibit 102, will --**

39 (Pages 150 to 153)

MARC   TOBEROFF - 9/18/2012

Page 154

1       A. I'll see if it refreshes --
2       Q. -- do contain references to telephone calls
3   with you in 2002.
4       A. No, no, I understand.
5       Q. Let me get back to my question.
6       Do you recall discussing the status of
7   the -- of the Siegel rights, the rights terminated
8   by Michael -- by Laura and Joanne Siegel?
9       A. I don't.
10      Q. You came to learn, commencing with your
11  discussions with Don Bulson that Joanne and Laura
12  were in contact with Don Bulson and Michael Siegel
13  regarding their dealings with DC and Warner Bros.,
14  correct?
15      A. I don't know -- I would be -- you know, I'm
16  not saying I didn't.  I just can't -- since I have
17  no recollection of these conversations, in fact, I
18  hadn't even recalled that we spoke in 2001, I
19  thought it must have been sometime in 2002, I
20  don't -- can't say one way or another based on the
21  recollection of the conversation.
22      Q. Do you have any reason to believe you would
23  not have asked Mr. Bulson about the status of the
24  rights?
25      MR. KENDALL: Argumentative. Lacks

Page 155

1   foundation. Calls for speculation.
2       THE WITNESS: Not as I sit here now.  I
3   don't have a reason to believe that I did not.
4   BY MR. PETROCELLI:
5       Q. Did you discuss the status of the
6   relationship between Joanne and Laura and Michael?
7       MR. KENDALL: Same objections.
8       THE WITNESS: I have no recollection of the
9   contents of our conversation.
10  BY MR. PETROCELLI:
11      Q. Did you discuss with Mr. Bulson when you
12  and he first spoke that you were working with the
13  Shusters?
14      MR. KENDALL: Same objections.
15      THE WITNESS: I don't -- I don't recall
16  whether I did or not.
17  BY MR. PETROCELLI:
18      Q. Is it fair to say that you were exploring
19  whether or not the Siegels had yet to make a new
20  arrangement with Warner Bros., understanding that if
21  they had not, the Shusters and Siegels could join
22  forces and would have, combined, better bargaining
23  power?
24      MR. KENDALL: Objection. Lacks foundation.
25  Argumentative. Calls for speculation.

Page 156

1       THE WITNESS: I think that would be work
2   product.  But I don't -- again, I don't have a
3   specific recollection of that conversation.  Because
4   I don't have a recollection of the conversation, I
5   don't have a recollection of any purpose or strategy
6   behind my discussions in those phone conversations.
7   BY MR. PETROCELLI:
8       Q. When you began working with the Shusters,
9   you did have a sufficient understanding of the way
10  the copyright laws worked such that you appreciated
11  that they would be in a much stronger position if
12  the Siegels had not yet made a new agreement with DC
13  or Warner Bros., correct?
14      MR. KENDALL: Argumentative. Lacks
15  foundation.
16      THE WITNESS: I believe that's work
17  product.
18  BY MR. PETROCELLI:
19      Q. You understood that if the Shuster
20  termination notice would one day become effective,
21  combined with the Siegels, the two forces could join
22  hands and be in a much stronger position than each
23  of them individually might be, correct?
24      MR. KENDALL: Lacks foundation.
25      THE WITNESS: Without disclosing what my

Page 157

1   thought processes were with respect to in
2   furtherance of the Shusters, which the question
3   calls for, would be work product.
4   BY MR. PETROCELLI:
5       Q. But you -- I want to be clear about this.
6   My question is directed to your having that
7   understanding as of -- as early as 2001 when you
8   started to work with the Shusters.
9       Is that correct?
10      MR. KENDALL: Objection. Calls for work
11  product.  Vague and ambiguous.
12      THE WITNESS: Work product.
13  BY MR. PETROCELLI:
14      Q. When did you first find out that there was
15  no agreement between the Siegels and Warner Bros. or
16  DC following the Siegels termination?
17      A. I believe that would be in -- I recall in
18  February.
19      Q. February 2002?
20      A. Yes.
21      Q. With Kevin Marks?
22      A. Yes.
23      Q. And he definitively told you that the --
24  there was no agreement between the parties?
25      MR. KENDALL: Argumentative. Vague and

40 (Pages 154 to 157)

**EXHIBIT A**
**42**

MARC   TOBEROFF - 9/18/2012

Page 158

1  ambiguous.
2       THE WITNESS:  No, I -- it was implicit in
3  that conversation that -- first of all, in that
4  conversation he blew me off, as I testified
5  previously.  That's the best way to summarize it.
6  BY MR. PETROCELLI:
7       Q.  And have you read that deposition recently?
8       A.  I did go over it.
9            But it was implicit in so doing that there
10  was not an agreement.  And because if -- in the way
11  he blew me off, he would have just said, "We have an
12  agreement."
13       Q.  You're deducing that, right, to use your
14  word?
15       A.  It's not just deducing.  It's -- it's body
16  language.  I'm not just deducing it.  It's -- it's
17  the takeaway from the conversation.
18       Q.  To be clear, though, he did not say to you,
19  "There is no agreement," correct?
20       A.  It was clear to me in that conversation
21  that there was no agreement.
22       Q.  Did he say that to you?
23       A.  I don't recall him saying those words,
24  "There is no agreement."
25       Q.  What words did he say that made that clear

Page 159

1  to you?
2       A.  Words to the effect that, "We're in
3  negotiations with DC, I'm not at liberty to discuss
4  anything," and just feeling uncomfortable talking
5  about anything having to do with that case.
6       Q.  And from -- from that, you deduced that
7  there was no definitive agreement in place?
8       A.  That there was no agreement.
9       Q.  No agreement?
10           Was that information valuable to you at the
11  time?
12       A.  I don't know --
13       MR. KENDALL:  Vague and ambiguous.
14       THE WITNESS:  I don't know what you mean
15  by "valuable."
16  BY MR. PETROCELLI:
17       Q.  Well, what did you do --
18       A.  Was it relevant?
19       Q.  Yes, was it relevant to what you were
20  doing?
21       A.  Yes.
22       Q.  Did it cause you to believe that you,
23  either through IP Worldwide or through some other
24  entity or with some other person might be able to
25  pursue those rights that the Siegels had?

Page 160

1       A.  That's work product.  My thought process
2  with respect to that information is work product.
3       Q.  Work product in pursuit of which client's
4  work?
5       A.  Shusters'.
6       Q.  Okay.  Okay.  I'm going to come back to the
7  Kevin Marks conversation.  It's a little bit out of
8  sequence.
9            Let me go to the Shusters.  Make sure I've
10  covered this, though.
11           It's your testimony you have no
12  recollection whatsoever what you discussed with Don
13  Bulson on or about November 27, 2001?
14       A.  I have no recollection.  I don't even
15  remember --
16       Q.  Did you --
17       A.  -- we had spoken at that time.
18       Q.  -- receive any documents from him?
19       A.  I don't believe so, no.
20       Q.  Did you ask for any?
21       A.  I don't believe so, no.
22       Q.  Okay.  I'm going to go to this next exhibit
23  here that you have in front of you.  Exhibit 10, the
24  joint venture agreement made as of November 23, 2001
25  between PPC, Pacific Pictures and Jean Peavy and

Page 161

1  Mark Warren Peary.
2            Do you have that?
3       A.  Yes.
4       Q.  You read in your testimony in the Siegel
5  case that you recently reviewed that this joint
6  venture agreement, just like the supplemental one in
7  2003, was not a legal retainer agreement.  True?
8       MR. KENDALL:  Calls for a legal conclusion.
9       THE WITNESS:  I don't -- you're referring
10  to my recollection of my prior testimony?
11  BY MR. PETROCELLI:
12       Q.  You just read that in your prior
13  deposition?
14       A.  I don't -- I don't recall reading that in
15  my prior deposition.
16       Q.  Okay.  It's correct that this document,
17  Exhibit 10 --
18       A.  I read my testimony last week.
19       Q.  Okay.
20       A.  Midweek.
21       Q.  It's correct that this document, Exhibit
22  10, was not a legal retainer agreement, correct?
23       MR. KENDALL:  Objection.  Vague and
24  ambiguous.  Calls for a legal conclusion.
25       THE WITNESS:  I don't -- again, it's a

41 (Pages 158 to 161)

MARC  TOBEROFF - 9/18/2012

Page 162

1  legal conclusion.  I can't -- I can't -- I'm putting
2  my hat on as a fact witness, not as a lawyer.  So
3  I'm not going to give you my legal conclusion about
4  this.
5  BY MR. PETROCELLI:
6      Q.  At the time you entered into this
7  agreement, you understood that it was not a legal
8  retainer agreement, correct?
9          MR. KENDALL:  Objection.  Calls for a legal
10  conclusion.  Lacks foundation.
11      THE WITNESS:  This agreement calls for the
12  provision and -- and/or notes the provision of legal
13  services, but I don't know if you could style it as
14  a legal retainer agreement.
15  BY MR. PETROCELLI:
16      Q.  Well, when you entered into this agreement,
17  when you signed it, did you understand that it was a
18  legal retainer agreement?
19          MR. KENDALL:  Calls for a legal conclusion.
20  Lacks foundation.
21      THE WITNESS:  I understood that I would be
22  providing legal services to the venture and that I
23  would be providing legal services to the Shusters
24  who were, you know, partners in the joint venture --
25  joint venture.

Page 163

1  BY MR. PETROCELLI:
2      Q.  So is it your testimony then that you
3  understood that once this document had been signed,
4  this document caused you to be retained as the -- as
5  a lawyer for the Shusters?
6      A.  I believe that -- that this document
7  contemplates -- I believe that I was already
8  providing legal services and advice to the Shusters
9  prior to this document actually being signed on
10  November 28, and that the document provides for my
11  continuing provision -- there's a lot of "provide"
12  words in there -- but that the document contemplates
13  my continued provision of legal services of the
14  venture and to the Shusters.
15      Q.  So I didn't ask you whether you had been
16  rendering legal services beforehand.  I asked you
17  whether in signing this document did you believe
18  that it caused you to be retained as counsel to the
19  Shusters.  That was the effect of that document as
20  you understood it when it was signed?
21      A.  I don't --
22          MR. KENDALL:  Just a moment.  I'm going to
23  object as asked and answered and argumentative.
24  BY MR. PETROCELLI:
25      Q.  You can answer.

Page 164

1      A.  I don't know what you mean by caused me to
2  be retained?
3      Q.  Upon signing this document, did you believe
4  that when the document -- because the document was
5  executed, you had thereby been retained as counsel
6  or -- is that what you believe the effect of this
7  document was, was to retain you as the lawyer to the
8  Shusters?
9      A.  No.
10          MR. KENDALL:  Calls for -- vague and
11  ambiguous.  Calls for a legal conclusion.  Lacks
12  foundation.
13  BY MR. PETROCELLI:
14      Q.  Had you been retained as a lawyer for the
15  Shusters before signing this document?
16      A.  Not formally retained as in a signed
17  retainer agreement.
18      Q.  When is the first signed retainer agreement
19  you had with the Shusters for the rendition of your
20  legal services?
21          MR. KENDALL:  Calls for a legal conclusion.
22      THE WITNESS:  The first -- let me state it
23  this way:  This document, this document acknowledges
24  that I'm providing legal services and will continue
25  to provide legal services to the venture and to the

Page 165

1  Shusters in connection with their termination rights
2  and the probating of the Shusters estate.
3          There was no formal written retainer for my
4  legal services with the Shusters or to the joint
5  venture until an agreement in 2004, which actually
6  replaced this agreement.
7  BY MR. PETROCELLI:
8      Q.  So there's no agreement that was signed by
9  you as Marc Toberoff, the lawyer, with the Shusters
10  to render legal services until 2004.
11      Is that right?
12          MR. KENDALL:  Objection.  Argumentative.
13  Vague and ambiguous.  Calls for a legal conclusion.
14  Lacks foundation.
15      THE WITNESS:  I believe -- I -- I -- I
16  believe that it was contemplated that there would be
17  such an agreement but we never got around to it.
18  BY MR. PETROCELLI:
19      Q.  Until 2004?
20      A.  Until 2004.
21      Q.  The parties to this agreement are Pacific
22  Pictures Corporation on the one hand and Jean Peavy
23  and Mark Warren Peary on the other hand, correct?
24      A.  Correct.
25          MR. PETROCELLI:  We have to change the tape

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com/law

**EXHIBIT A**
**44**

MARC   TOBEROFF - 9/18/2012

Page 166

1  right now.
2       MR. KENDALL:  Can we just take a
3  couple-minute break to stretch?
4       THE VIDEOGRAPHER:  This will mark the end
5  of Volume I, Tape Number 2 in the deposition of Marc
6  Toberoff.  Going off the record.  The time is 2:19.
7       (Brief recess.)
8       THE VIDEOGRAPHER:  We're back on the
9  record.
10      This marks the beginning of Volume I, Tape
11 Number 3 in the deposition of Marc Toberoff.  The
12 time is 2:28.
13 BY MR. PETROCELLI:
14      Q.  You have Exhibit 10 in front of you,
15 Mr. Toberoff.  Paragraph 7 states:
16           "The venture and/or the
17           estate of Joe Shuster to be
18           established hereunder will retain
19           Marc Toberoff to render legal
20           services in connection with the
21           rights in the venture."
22      And it goes on.
23      No agreement was entered into retaining you
24 for legal services until 2004.
25      Is that correct?

Page 167

1       A.  No written agreement.
2       Q.  No written agreement.  Okay.
3       Now, at the time you prepared this joint
4  venture agreement in your capacity as president of
5  Pacific Pictures Corporation, you had the option of
6  also preparing a written legal retainer agreement at
7  the same time, correct?
8       MR. KENDALL:  Argumentative.
9       THE WITNESS:  What's the question?
10 BY MR. PETROCELLI:
11      Q.  Is that correct?
12      A.  Could I have just had a legal retainer
13 agreement?
14      Q.  Sure, yeah.  It's a different question but
15 that's fine.
16      A.  I think I could have proposed that.
17      Q.  And what was the reason that you elected to
18 use a joint venture agreement in lieu of a written
19 retainer agreement, a more conventional written
20 retainer agreement of the sort that, let's say, you
21 used in 2004?
22      MR. KENDALL:  Assumes facts.  Lacks
23 foundation.  Argumentative.
24      THE WITNESS:  I believe in 2000-- around
25 this time period, 2001, 2000-- remember I told you

Page 168

1  I had moved to Los Angeles and I was focusing on
2  some entertainment business-type of ventures and
3  also doing legal work, and I mentioned the Writers
4  Guild case that I was involved in.
5       So when it came to people who had
6  intellectual property rights -- I'm sorry, this is a
7  longer explanation.  Do you want the long
8  explanation?
9       Q.  If that's what it takes, sure.
10      A.  Okay.  So when it came to people with
11 rights, like someone had written a novel which would
12 make a good movie, what many independent people did
13 is they would enter into a free option regarding
14 those rights, and the free option would be for a
15 term, and at the end of the term you could exer- --
16 during the term you could exercise the option by
17 paying a fixed price for those rights and I had
18 developed this form of agreement originally as an
19 alternative to that and the reason --
20      Q.  "That" being what?
21      A.  An option.  An option purchase agreement.
22 And in an option purchase agreement, the person
23 doing the optioning, it's in their interest to make
24 the purchase price as low as possible so that they
25 could then use that as a building block to

Page 169

1  facilitate, let's say, making a movie, setting up a
2  movie, producing a movie.
3       And I didn't like that form of agreement.
4  I preferred a form of agreement where the ultimate
5  monetization was left open and that the rights
6  hold- -- both I and the rights holder could
7  participate in that in the way where our interests
8  were aligned rather than our interests being
9  misaligned because I'm trying to peg them at a low
10 purchase price even though they're giving me
11 something akin to a free option.
12      Q.  In the option paradigm, you would have a
13 period of time in which to exercise the option and
14 if you chose to exercise it, you would then pay a
15 pre specified amount of consideration?
16      A.  Right.  You have an option for a 24-month
17 term, the purchase price is 100,000, and you can
18 exercise that -- that option any time within that 24
19 months.
20      And so then you would control these rights
21 and you use that as a building block to produce a
22 movie or set up a movie at a studio, the lower the
23 price the easier it is for you to set up the movie
24 and, therefore, to leverage off of that, because
25 it's inexpensive, so that someone else could -- like

43 (Pages 166 to 169)

MARC   TOBEROFF - 9/18/2012

Page 170

1  if you were a producer, you could charge a much
2  bigger producer fee, and thereby the rights holder
3  would get shortchanged.
4       And so I viewed that as being -- not
5  having -- being aligned in interest. So I developed
6  this form of agreement for better or worse,
7  which is this joint venture agreement form.
8       So when that's -- the way this came about
9  is, I basically looked for a form of agreement with
10 a rights holder and used this form and then modified
11 it to -- in the descriptive paragraphs to mention
12 Superman and the particular rights at issue.
13      Q. Was it a prior joint venture agreement that
14 you had used or that you found elsewhere?
15      A. I believe this was based on a prior
16 agreement that I had used for somebody else, for
17 some other matter. But I couldn't tell you what
18 prior agreement.
19      Q. Can you turn back for a moment to Exhibit
20 101, the Michael Siegel e-mail, and at the very end
21 you list five references.
22      A. Yes.
23      Q. One of them, number 4, has reference to the
24 Combat! separated rights issue you previously
25 described, right?

Page 171

1  A. Exactly.
2  Q. The others, numbers 1, 2, 3 and 5, do they
3  involve copyright termination issues?
4  A. No.
5  Q. Did you have business arrangements, and by
6  that I mean other than legal retainer agreements,
7  with the references identified in 1 through 5?
8       MR. KENDALL: Vague and ambiguous. Calls
9  for a legal conclusion.
10      THE WITNESS: I -- I -- I don't believe I
11 had legal retainer agreements. The Ralston matter
12 was a litigation matter from the get-go. Gilligan's
13 Island was a Writers Guild arbitration from the
14 get-go. Roy Huggins, I don't know whether we
15 actually had an agreement or not. We had an ongoing
16 relationship where I was looking at his rights
17 because he had created so many famous
18 things, but I don't know --
19 BY MR. PETROCELLI:
20      Q. And number 2?
21      A. -- whether we had an agreement.
22      Swerling, I believe it was a legal retainer
23 with -- I believe it was a legal retainer.
24      Q. Given your explanation for why you elected
25 to use a joint venture agreement, is there a reason

Page 172

1  why you also did not contemporaneously prepare a
2  legal retainer agreement?
3       MR. KENDALL: Argumentative. Calls for a
4  legal conclusion.
5       THE WITNESS: I can't point -- you know,
6  other than laziness or something of that nature, I
7  can't point to a specific -- you know, a specific
8  reason or thinking that I don't want to do this. I
9  can't point to anything specific on that.
10 BY MR. PETROCELLI:
11      Q. At the time you entered into this
12 agreement, as it states you were the president of
13 PPC, right?
14      A. Yes.
15      Q. And the only representative of PPC,
16 correct?
17      A. The -- I was the only shareholder and
18 officer.
19      Q. Okay. And only employee, right?
20      A. I believe so in 2001, yeah.
21      Q. Paragraph 4 states:
22          "The terms of any and all
23       agreements regarding any of the
24       rights in any respect shall be
25       subject to the expressed written

Page 173

1          approval of claimants and PPC. The
2       parties each warrant and represent
3       that after signing this agreement,
4       they will not, without the
5       expressed written consent of all
6       the parties transfer, limit or
7       encumber the rights in any
8       respect."
9       The claimants were Jean and Mark and PPC
10 was your company, correct?
11      A. Correct.
12      Q. So when you executed this, you understood
13 that neither the Shusters nor PPC could make a deal
14 with respect to the rights without the written
15 consent of all three of you, correct? Namely Jean
16 Peavy, Mark Peary and PPC?
17      A. Yes, that's correct.
18      Q. And as far as PPC is concerned, the only
19 person acting for PPC was you, correct?
20      MR. KENDALL: Asked and answered.
21 Argumentative.
22      THE WITNESS: Yes.
23 BY MR. PETROCELLI:
24      Q. Is it fair to say that -- and by the way,
25 that provision remained in effect until when?

44 (Pages 170 to 173)

**EXHIBIT A**
**46**

MARC   TOBEROFF - 9/18/2012

Page 174

1    A.  I'd have to look at whether the 2003 PPC
2  agreement, what effect that had on this agreement.
3  But if that didn't have -- if that didn't effect
4  this provision, then it would be until we replaced
5  this agreement with a legal retainer dated as of
6  November 23rd, 2001.
7    Q.  But signed when?
8    A.  Signed in -- I think it was 2004.
9    Q.  Okay.  We'll get to that one.
10    Is it fair to say in 2001 when PPC entered
11  into this joint venture agreement with Jean Peavy
12  and Mark Peary, you understood that in a legal
13  retainer agreement, you as a lawyer would not be
14  permitted to include a provision that said that the
15  client requires your consent to settle, correct?
16    MR. KENDALL:  Objection.  Calls for a legal
17  conclusion.  Incomplete hypothetical.
18    THE WITNESS:  I know that's the case
19  sitting here today.  I can't -- I can't -- I don't
20  have a -- I don't have a specific knowledge of
21  whether I knew that in 2001.
22  BY MR. PETROCELLI:
23    Q.  Do you have any reason to believe you
24  didn't know that in 2001?
25    A.  I don't have a reason to believe either

Page 175

1  way.
2    THE VIDEOGRAPHER:  I'm getting some
3  transmissions from some sort of electronic device.
4    MR. KENDALL:  It's probably because I put
5  my iPad on my lap.  Sorry.
6    THE VIDEOGRAPHER:  Thank you.  Appreciate
7  it.  We're fine now.
8    MR. PETROCELLI:  Are we on the record?
9    Q.  One -- one reason to believe you did know
10  at the time that a lawyer cannot have an agreement
11  with a client that requires the lawyer's consent for
12  a client to settle --
13    A.  Uh-huh.
14    Q.  -- is that you were a lawyer in good
15  standing in California who would be chargeable with
16  that knowledge, correct?
17    A.  Are you asking me whether I should know --
18  you're asking -- you're asking me different things.
19  The first question is, do I know here sitting today
20  that I specifically knew that at that time, and I --
21  and I don't know the answer to that one way or the
22  other.
23    Q.  Then I asked you do you have any reason to
24  believe that you wouldn't have been aware of that
25  general principal, and you said, "I have no reason

Page 176

1  to believe either way."
2    Q.  Do you recall that?
3    A.  I have no reason to believe that I was not
4  aware of that, but you can ask your next question.
5    Q.  Okay.  I will.
6    You do agree with me that if you had used a
7  legal retainer agreement in lieu of a joint venture
8  agreement from inception, from November 23, 2001,
9  you could not have included a provision that
10  required your consent or PPP's [sic] consent in
11  order for the Shusters to make a settlement,
12  correct?
13    A.  Are you asking for my legal conclusion?
14    Q.  I'm asking whether you had that knowledge
15  in 2001.
16    MR. KENDALL:  It calls for a legal
17  conclusion.  Incomplete hypothetical.
18    THE WITNESS:  Just a second.
19    Do you want me to wait while you --
20  BY MR. PETROCELLI:
21    Q.  I don't think there's an instruction
22  pending.
23    MR. KENDALL:  Yeah, there's no instruction.
24  I'm listening.
25    THE WITNESS:  Okay.

Page 177

1  BY MR. PETROCELLI:
2    Q.  Do you need the question back?
3    A.  So -- no, I think I know the question.
4    If you're asking for my legal conclusion
5  sitting here today, I believe that's correct, yes.
6    Q.  I'm asking whether you knew in 2001 --
7  well, let me ask a different question.  Okay?
8  You've already answered that one.
9    Did you prepare any drafts of a legal
10  retainer agreement prior to executing Exhibit 10,
11  this joint venture agreement?
12    A.  I don't recall doing that.
13    Q.  How many times prior to Exhibit 10 had you
14  entered into a joint venture agreement with a party
15  whom you also acted as a lawyer?
16    A.  That's a difficult question because the
17  focus of these agreements or intellectual property
18  rights, because those were the focus of the
19  agreements, there -- there is a degree of legal
20  knowledge that's brought to bear on the subject
21  matter of the agreement.
22    So if, for instance, it was a larger
23  company and the company was in the intellectual
24  property business, they would have a general counsel
25  or a business affairs person, a lawyer, at that

45 (Pages 174 to 177)

**EXHIBIT A**
**47**

MARC   TOBEROFF - 9/18/2012

Page 178

1  company who would be evaluating the intellectual
2  property rights they were -- they were using as the
3  basis for conducting business.
4        I was doing that all -- all in the same, so
5  it involved some of these things, not originally but
6  may evolve to involve intellectual -- legal analysis
7  of things, and some wouldn't.  Some would be more
8  clear-cut.
9        And so I can't -- it's hard to specifically
10 answer that question because you'd have to take each
11 situation and look at each situation and see
12 whether -- how much from the get-go legal aspects
13 were envisaged.
14       Q.  Had you signed, prior to Exhibit 10,
15 partnership agreements or joint venture agreements
16 with people whom you regarded to be clients of your
17 law practice?
18       MR. KENDALL:  Vague and ambiguous.
19       THE WITNESS:  I don't know the answer to
20 that.
21 BY MR. PETROCELLI:
22       Q.  Had you signed any joint venture agreements
23 prior to Exhibit 10?
24       A.  I believe so, yes, because I believe this
25 was patterned --

Page 179

1        Q.  That's what you said.
2        A.  -- under an agreement.
3        And the provision you pointed to about
4  consenting to -- consenting to any agreements
5  regarding the rights is -- is to simulate the
6  exclusivity of an option.
7        If you have an option during the option
8  period, there can be no agreements regarding those
9  rights.  So it was to simulate that while giving the
10 rights holder the upside, rather than paying them at
11 a fixed low purchase price.
12       So that's the derivation of that, and this
13 is with sufficient detail that I believe it must
14 have been patterned under some other agreement.
15       Q.  Did you have any discussions -- with whom
16 did you negotiate this, Mark Peary?
17       A.  Yes.
18       Q.  Okay.  And I think as you previously
19 testified, you have no knowledge that Peary was
20 represented by a lawyer in those negotiations with
21 you, correct?
22       A.  I didn't deal with a lawyer but he may have
23 consulted a lawyer.
24       Q.  And you said he may have.  You have no
25 knowledge that he did, right?

Page 180

1        A.  I have no knowledge either way.
2        Q.  Okay.  No one to this day has ever
3  identified to you that he consulted with a lawyer,
4  correct?
5        MR. KENDALL:  Well, I caution you that to
6  the extent you've discussed that issue with any of
7  your clients, you would not be able to disclose that
8  information in responding to this question.
9        THE WITNESS:  I have no knowledge of that
10 either way.
11 BY MR. PETROCELLI:
12       Q.  You can't identify a lawyer by name who
13 Mr. Peary worked with in negotiating this joint
14 venture agreement with you, correct?
15       A.  Correct.
16       Q.  And there are no drafts of this agreement
17 in existence.
18       Is that correct?
19       A.  I don't think we had any drafts in our
20 file.  Anything that we had would have been
21 produced.  So if we didn't produce any drafts, we
22 didn't have any drafts.
23       Q.  And in -- you were the sole drafter,
24 correct?
25       MR. KENDALL:  Objection.  Vague and

Page 181

1  ambiguous.
2        THE WITNESS:  I drafted -- I believe this
3  went through a couple of iterations where I
4  responded to comments by Warren Peary, but other
5  than that, I drafted it.
6  BY MR. PETROCELLI:
7        Q.  So are you saying you sent him a draft, he
8  made comments, you sent him a revised draft, he made
9  comments, you went through that process?
10       A.  Yes, I believe so.
11       Q.  And you don't have copies of the prior
12 drafts?
13       A.  No.
14       Q.  How did you transmit it to him?
15       A.  Unless -- if we didn't produce any -- I
16 don't have a -- if we didn't produce any, we didn't
17 have copies, otherwise we would have produced them.
18       Q.  And how did you transmit the drafts to him?
19       A.  I believe by -- I don't -- I don't have a
20 specific recollection.  But I'm -- this was -- seems
21 to have been faxed and I don't believe in those days
22 you were PDFing --
23       Q.  Where do you see a fax?  The fax reference
24 I see has a 2006 Patrick Perkins law office.
25       A.  Oh, okay, I'm reading -- either -- it was

46 (Pages 178 to 181)

**EXHIBIT A**
**48**

MARC   TOBEROFF - 9/18/2012

Page 182

1  either -- it was probably transmitted by mail.
2      Q. You don't remember?
3      A. I don't remember.
4      Q. Okay.
5      A. But I -- I think it would have been by
6  mail.
7      Q. You did not actually meet either Jean --
8      A. We didn't.
9      Q. -- Peavy or Mark Peary before signing this,
10 correct?
11     A. Not in person.
12     Q. And did you have any conversations with
13 Jean prior to signing Exhibit 10?
14     A. Yes, I spoke to her.  I met her over the
15 phone.
16     Q. You spoke with her on the phone?
17     A. Yes, I believe so.
18     Q. Okay.
19     A. But I believe it was more of a sort of
20 general greeting-type conversation.
21     Q. Was there any discussion with Mr. Peary as
22 to why this was being structured as a joint venture
23 agreement and not an option agreement or -- or not
24 even a legal retainer agreement?
25     MR. KENDALL:  I'm going to caution you now

Page 183

1  that he's asking about communications that you had
2  with a person who became a client, so just think
3  about when the client relationship -- when the
4  confidential relationship towards the client
5  relationship began and do not reveal any
6  attorney-client communications.
7      THE WITNESS:  Without -- just to -- to --
8  you know, we have so many differences of opinion in
9  discovery, apparently, that it's silly to fight a
10 battle that's moot because I don't have a
11 recollection, so I don't -- without waiver of the
12 privilege, I don't have a recollection of a
13 conversation one way or another.
14 BY MR. PETROCELLI:
15     Q. Do you have a recollection of any
16 discussions with Jean or Mark, by Mark I mean Mark
17 Peary, regarding paragraph 4 which prevented them
18 from entering into an agreements without PPC's
19 consent?
20     MR. KENDALL:  Same caution and then just
21 one observation I think you're referring to
22 Mr. Peary as Mark Peary, and the witness is
23 referring to him by his middle name, Warren Peary,
24 and you just may want to clarify that.
25     THE WITNESS:  I know him as Warren so I

Page 184

1  refer to him as Warren.
2  BY MR. PETROCELLI:
3      Q. Warren is fine.
4      Did you have discussions with Warren or
5  with Jean regarding the restrictions in paragraph 4?
6      A. I don't recall one way or another, again,
7  without waiver of the privilege.
8      Q. Had you received any documents from Jean or
9  Warren in connection with the Shuster interests
10 prior to executing Exhibit 10?
11     A. I don't recall one way or another whether I
12 did or not.  At that -- before entering into this, I
13 don't recall.
14     Q. You asked them about agreements, correct?
15     A. I don't recall.
16     Q. You asked Michael Siegel about agreements
17 that could have an effect, pointing out that even if
18 he signed agreements, they might not have any legal
19 effect.  Do you recall we saw that in an e-mail?
20     MR. KENDALL:  Just a moment, please.
21     THE WITNESS:  No.
22     MR. KENDALL:  Just a moment, please.
23     THE WITNESS:  Sure.
24     MR. KENDALL:  Argumentative.  Lacks
25 foundation.

Page 185

1  BY MR. PETROCELLI:
2      Q. Do you have Exhibit --
3      A. Yeah, I have it.  That's not -- I don't
4  believe that's what the exhibit says.
5      Q. You see Exhibit 101, right?
6      A. Right.
7      Q. And you -- you see the reference to
8  paragraph 4 about "agreements you may have signed"?
9      A. Yes.
10     Q. That may not necessarily prevent or
11 preclude his future rights and it's worthwhile to
12 examine the issue more closely.
13     Do you see all of that in that paragraph?
14 I'm directing your attention to it, okay?  I've
15 asked you about that paragraph in the context of
16 your e-mail to Michael Siegel.
17     In your discussions with Warren or Jean
18 leading up to the execution of Exhibit 10, did you
19 likewise ask them about the existence of any
20 agreements that might effect the Joe Shuster
21 interests?
22     A. Well, the question assumes facts that I
23 asked Michael Siegel, and the e-mail, the paragraph
24 that you're pointing to is not asking Michael Siegel
25 whether he's done that, so --

47 (Pages 182 to 185)

**EXHIBIT A**
**49**

MARC   TOBEROFF - 9/18/2012

Page 186

1      Q. Well, I didn't mean to have you parse my
2  words so precisely. I'm merely trying to find out
3  whether you raised the issue with the Shusters prior
4  to all of you signing Exhibit 10, whether there
5  existed any agreements that you should review that
6  bore on the issue of the Shuster termination
7  interest or Shuster interests, Shuster copyright
8  interests.
9      A. I don't --
10     MR. KENDALL: Just a minute.
11     I'm going to caution you that depending on
12  when the communications occurred and whether they
13  were in the course of discussing possible legal
14  representation, these conversations may -- if they
15  did occur, may have been privileged.
16     THE WITNESS: So because the question
17  reveals the substance of any communication, even
18  though it's targeted at the time frame of the
19  communication, I'm -- it would be privileged but I
20  don't -- just to moot this issue, I don't remember
21  whether I had a discussion like that before signing
22  this agreement or after signing this agreement.
23  BY MR. PETROCELLI:
24     Q. What due diligence --
25     A. But if I did have a discussion like that, I

Page 187

1  would assert privilege regarding that discussion.
2      Q. Did you have a copy of the 1999 agreement
3  as of the time that you signed Exhibit 10?
4      A. I don't recall having a copy of the 1992
5  agreement.
6      Q. When did you first get a copy of it?
7      A. I don't know.
8      Q. Was it in the year 2001?
9      A. I don't know. I know at some point I got a
10  copy of it.
11     Q. How did you get it?
12     A. I don't know. When I say "I don't know," I
13  mean I don't recall.
14     Q. You don't --
15     A. I don't recall whether I got a copy of that
16  before we signed this or after we signed this. But
17  I know we had a copy of it, so at some point I got a
18  copy of it.
19     Q. So you can't tell me when you got it or
20  from whom you got it?
21     A. I don't recall sitting here in the
22  deposition, and I didn't research that before coming
23  here.
24     Q. You're certain you didn't have it as of the
25  time you signed Exhibit 10?

Page 188

1      A. I don't recall one way or another.
2      Q. What about the 1975 agreement?
3      A. I would be surprised if I did, but I don't
4  know one way or another.
5      Q. What about the '75 agreement? Did you have
6  that prior to signing Exhibit 10?
7      A. I don't believe I did.
8      Q. Did you have copies of any agreements
9  involving any Shusters prior to your signing Exhibit
10  10?
11     A. I don't know. I don't know what the extent
12  was of my research regarding Superman as of
13  November 23rd and November 28th, 2001.
14     Q. Do you recall inquiring of the Shusters
15  whether there were any agreements involving Joe
16  Shuster or involving any heirs of Joe Shuster?
17     MR. KENDALL: I'm going to caution you that
18  that would appear to call for privileged information
19  depending on when that inquiry was made and the
20  context in which it was made.
21     THE WITNESS: I -- I would assert privilege
22  over that if I recalled, but I don't recall one way
23  or the other.
24  BY MR. PETROCELLI:
25     Q. Prior to entering Exhibit 10, did you do

Page 189

1  any due diligence?
2      MR. KENDALL: Vague and ambiguous.
3      THE WITNESS: I --
4      MR. KENDALL: And calls for -- potentially
5  calls for work product depending on the timing and
6  context.
7      THE WITNESS: I don't know whether due
8  diligence is the correct way to describe it if
9  you're asking me whether I did research on Superman.
10  BY MR. PETROCELLI:
11     Q. On doing a deal with the Shusters.
12     A. I don't know what that means, due diligence
13  in that context. What does that -- usually due
14  diligence means --
15     Q. Ask about agreements, ask if they have any
16  papers that might be important. Have them send you
17  copies. Did you do any of that?
18     A. I don't know --
19     MR. KENDALL: Just a minute. You have to
20  give me an opportunity --
21     THE WITNESS: Sorry.
22     MR. KENDALL: -- when he's asking about
23  client communications, to interpose --
24     MR. PETROCELLI: You keep saying that. I'm
25  not. I'm not going to argue with you.

48 (Pages 186 to 189)

MARC  TOBEROFF - 9/18/2012

Page 190

1      MR. KENDALL: I didn't say you're not.
2      MR. PETROCELLI: He says you're -- I'm
3  asking him about client communications.
4      MR. KENDALL: Oh, I think that was.
5      MR. PETROCELLI: Okay, well, but you're
6  suggesting that I'm acknowledging that. You're
7  having negotiations, as far as I see, entering into
8  a joint venture agreement, and I don't think the
9  attorney-client privilege attaches to any of this.
10  I'm not going to argue that with you, but I'm not
11  asking you in my question for attorney-client
12  communications.
13      MR. KENDALL: I don't want to engage in
14  extended colloquy, but I'm sure you're aware that
15  under the laws of most states, the communications
16  with a potential client are, depending on the
17  context and the timing in relation to the retention,
18  privileged, and the client has a privilege to
19  assert.
20      So I think we might have a disagreement on
21  the law but it may be moot. But I need, in any
22  event, to give my client a caution so that he
23  doesn't inadvertently waive a privilege belonging to
24  the Shusters.
25      THE WITNESS: So --

Page 191

1      MR. PETROCELLI: With all due respect, I
2  think your client is the last person who needs the
3  caution, but in any event, starting to chew up a lot
4  of time with these long statements but proceed,
5  Mr. Toberoff.
6      THE WITNESS: That's why I'm trying to cut
7  through it by telling you, signaling to you when
8  something is moot while preserving the privilege.
9  BY MR. PETROCELLI:
10      Q. You're not signaling it, you're just saying
11  it. And I'm accepting your answers and moving on.
12      A. When -- the reason --
13      MR. KENDALL: I think we need to take a
14  little break because you're starting now to get a
15  little sloppy in your conversation when there's no
16  question pending.
17      THE WITNESS: Okay.
18      MR. KENDALL: And -- and you're doing so in
19  a context which is fraught with mines, seeing as how
20  you were --
21      MR. PETROCELLI: Can you have this
22  discussion off the record, please. We're going off
23  the record now, okay? If you want to take a break,
24  just say, "Take a break."
25      THE VIDEOGRAPHER: The time is 3:03.

Page 192

1      (Brief recess.)
2      THE VIDEOGRAPHER: Back on the record at
3  3:18.
4  BY MR. PETROCELLI:
5      Q. We have confirmed over the break that no
6  drafts of the joint venture agreement have been
7  produced.
8      Are you confident there were drafts?
9      A. I'm confident that this went through more
10  than one iteration.
11      Q. With Mr. Peary receiving an iteration,
12  commenting and your changing it?
13      A. Yes.
14      Q. And you didn't save it?
15      A. I couldn't find any other drafts.
16      Q. And Mr. Peary doesn't, to your knowledge,
17  have copies, either?
18      A. No, we couldn't -- we couldn't find other
19  drafts.
20      Q. You did anticipate at the time that there
21  might be legal proceedings as evidenced by the
22  document itself, correct?
23      A. In general, yes. But I certainly didn't --
24      MR. KENDALL: I think that was the
25  question.

Page 193

1      THE WITNESS: Okay.
2  BY MR. PETROCELLI:
3      Q. So we were talking about -- I was asking
4  you about agreements, whether you had requested
5  and/or reviewed any agreements beforehand.
6      And is it your best recollection that prior
7  to signing Exhibit 10, you had not reviewed any
8  prior agreements or correspondence involving the
9  Shusters?
10      MR. KENDALL: Asked and answered.
11      THE WITNESS: I don't have a recollection
12  of reviewing documents prior to entering into this
13  agreement.
14  BY MR. PETROCELLI:
15      Q. Did you review a copy of Joe Shuster's will
16  prior to entering into Exhibit 10?
17      A. No, I don't believe so.
18      Q. Did you know there was a will?
19      MR. KENDALL: I'm going to just caution you
20  given the time period to -- in the event that you
21  had conversations about a will, depending on the
22  context, they might be privileged.
23      THE WITNESS: I don't have an independent
24  recollection of knowing whether or not there was a
25  will. I could -- you know, there might be something

49 (Pages 190 to 193)

**EXHIBIT A**
**51**

MARC TOBEROFF - 9/18/2012

Page 194

1 in this joint venture agreement.
2 BY MR. PETROCELLI:
3     **Q. You knew that an estate had not been**
4 **probated, correct?**
5     A. I am surmising that from the paragraph that
6 talks about probating the estate, but I don't have
7 an independent recollection of knowing that.
8     **Q. All your information about the status of**
9 **the estate, identity of the executors, for example,**
10 **or anything else related to Joe Shuster's estate**
11 **came from talking to Warren.**
12     A. Talking to Jean and Warren.
13     **Q. Jean, you said, was more of a**
14 **pleasantry-type conversation, introductory**
15 **conversation, right?**
16     A. Right, but Warren may have asked Jean for
17 something, I may have asked Warren to ask Jean or --
18 but I was primarily dealing with Warren. Jean was
19 in the picture, but I was primarily dealing with
20 Warren.
21     **Q. Any reason why you didn't ask to see a copy**
22 **of the will?**
23     A. I don't know at what stage -- obviously in
24 the process of probating the will I would have
25 received a copy of the will, but I don't -- you're

Page 195

1 asking me about before entering into this agreement,
2 and I don't have an independent recollection of
3 that.
4     **Q. You knew when you entered into this**
5 **agreement that Jean had another child named Dawn,**
6 **right?**
7     A. I'm -- I don't know if that's correct. I
8 can't say definitively before entering into this
9 whether I knew about Dawn or not.
10     **Q. Prior to the 2003 agreement you knew about**
11 **Dawn, right?**
12     MR. KENDALL: I'm going to just caution you
13 again not to reveal any attorney-client
14 communications. So if that's something you learned
15 about on your own, that's one thing. If you learned
16 about it from a client, you shouldn't be answering a
17 question like that.
18     MR. PETROCELLI: I think that's absurd on
19 its face that his knowledge of the existence of Dawn
20 Peavy is possibly privileged no matter who it came
21 from.
22     **Q. In any event, go ahead, you can answer.**
23     MR. KENDALL: Just a moment.
24     MR. PETROCELLI: And if you're going to
25 withhold your answer on the ground of the objection,

Page 196

1 just please let me know.
2     MR. KENDALL: Just a moment. Let me make
3 sure I didn't misunderstand your question.
4     So I think the question was prior to the
5 2003 agreement you knew about Dawn, so to the extent
6 that that's something that you learned from your
7 clients as opposed to simply learning it some other
8 way or a meeting with Dawn, I think you need to be
9 cautious about the privilege. But I leave it to you
10 since you're the one who knows how you acquired the
11 information.
12     THE WITNESS: I don't have a specific
13 recollection of when I first heard about Dawn or met
14 Dawn, when Dawn came into the picture.
15 BY MR. PETROCELLI:
16     **Q. When --**
17     A. I was dealing with Warren primarily and
18 then next, Jean. I wasn't dealing with Dawn.
19     **Q. When did you first meet Dawn in person?**
20     A. I believe it was in connection with this
21 case.
22     **Q. Was it in preparation for her deposition in**
23 **this case or attendance at the deposition?**
24     A. I definitely met her then. I'm thinking if
25 I met her before that. Oh, I know when I met her.

Page 197

1 First time I met Dawn was the Superman Returns
2 premier. That was definitely the first time I met
3 her and may have been the first time I became aware
4 of her.
5     **Q. What year was that?**
6     A. Whenever Superman Returns was released.
7 There was a premier in which everybody was invited.
8     **Q. Here in L.A.?**
9     A. In L.A., so I think that was 2006. And
10 that's when I mentioned -- that's when I met Dawn.
11     **Q. Is --**
12     A. And that may have been the first time I had
13 heard about her.
14     **Q. Had you known about Dawn in 2001, would you**
15 **have included her in this agreement?**
16     MR. KENDALL: Objection. Incomplete
17 hypothetical. Calls for speculation.
18     THE WITNESS: I don't know. I -- I don't
19 know. I'd have to think about it. I don't --
20 BY MR. PETROCELLI:
21     **Q. Is there any reason why this agreement is**
22 **limited to Warren and Jean rather than Warren, Jean**
23 **and Dawn?**
24     A. I don't know what -- the answer to -- to
25 that. I could try and deduce the answer.

50 (Pages 194 to 197)

**EXHIBIT A**
**52**

MARC  TOBEROFF - 9/18/2012

Page 198

1    Q. Did Warren not tell you about his sister,
2  Dawn?
3    A. I don't know.
4    MR. KENDALL: Just a minute.  Now we're
5  getting into a privileged area, so you know, the
6  period leading up to the execution of this document,
7  but at some point I would expect that there were
8  conversations in contemplation of your engagement
9  that would be privileged.  You'll have to do your
10  best to -- to draw that line in a way that you think
11  is -- is consistent with the privilege laws.
12    THE WITNESS: I don't know what the answer
13  to that question is.  I -- I -- as we're going down
14  this road and asking questions, I could deduce that
15  I may have had a copy of the will and, therefore, I
16  was going off the will which mentions Warren and
17  mentions Jean.  And that those would be the relevant
18  people regarding the subject matter of the
19  agreement.  But I don't have a specific recollection
20  of that.  But it's -- that seems like a decent
21  deduction.
22  BY MR. PETROCELLI:
23    Q. Did Jean tell you that she had a daughter
24  named Dawn prior to your signing Exhibit 10?
25    MR. KENDALL: Same caution with respect to

Page 199

1  attorney-client communications.
2    THE WITNESS: She may have.
3  BY MR. PETROCELLI:
4    Q. According to this agreement, various rights
5  into Joe Shuster's creations are being transferred
6  by the claimants to the venture.  You can see that
7  in the first three paragraphs.
8    What rights of the claimants did you
9  believe they had at the time you signed this?
10    MR. KENDALL: Caution you with respect to
11  your work product.
12    THE WITNESS: The only rights that I was
13  aware of that they would have would be termination
14  rights, and that's only upon probating the estate.
15  This was, like I said, a general form of agreement
16  and that's how this general form read.  It had sort
17  of a broad preamble paragraph about your rights and
18  claims and not knowing whether it was a specific
19  right or whether it was a claim to a specific right
20  and what form that would take.
21  BY MR. PETROCELLI:
22    Q. Why did you believe that -- withdrawn.
23    If you didn't have the will you would not
24  have known for whose benefit such rights, such
25  termination rights may have existed, correct?

Page 200

1    A. Incorrect.
2    Q. How would you have known without the will?
3    A. Because it's -- the termination rights are
4  not based on a will.
5    Q. Well --
6    A. They're based on whether somebody is a --
7    Q. But -- I'm sorry, complete your answer.
8    A. -- a spouse, child or a grandchild, and if
9  there's no spouse, child or grandchild, then the --
10  the holder of the rights would be the executor,
11  administrator of the estate.
12    Q. When you signed Exhibit 10, did you have an
13  understanding that the only holder of any
14  termination rights would be the executor of the
15  estate?
16    A. Yes.
17    Q. So you knew there was an appointed executor
18  and a will?
19    A. I knew there was an appointed executor?
20    Q. Yeah, did you?
21    A. As we're going down this line of
22  questioning and you're asking me about Dawn and
23  you're saying why is Jean and Warren, I'm now
24  thinking that I may have had a copy of the will and
25  that was determining, but I don't know that for

Page 201

1  sure.  It may have been those are just the people I
2  was dealing with.  And I wasn't aware -- I wasn't
3  aware of Dawn.
4    Q. Did you obtain a copy of the will?  Do you
5  recall obtaining a copy of the will from Jean or
6  Warren prior to signing Exhibit 10?
7    A. No, I don't.
8    Q. There's no references in your privilege log
9  to any communications with them during this period
10  of time.
11    A. I don't -- yeah, I don't --
12    Q. Are you aware of that?
13    A. No.  I don't recall one way or another, and
14  my initial reaction was I was leaning towards that I
15  hadn't, and then in talking about Dawn I'm thinking,
16  well, maybe I did.  But I think that I -- I think --
17  I'm, you know, speculating.  I think that I was
18  essentially dealing with Warren and Jean and
19  believing that those were Joe Shuster's heirs and
20  that was -- turns out was correct.
21    Q. You understood, though, that even if an
22  executor had the standing to serve a notice of
23  termination, the proceeds that may result from any
24  effective termination or any agreement that's
25  entered into go to the designated beneficiaries, not

51 (Pages 198 to 201)

EXHIBIT A
53

MARC   TOBEROFF - 9/18/2012

Page 202

1    to the executor, correct?
2        MR. KENDALL: I'm going to object.
3    Incomplete hypothetical. Lacks foundation. Calls
4    for speculation. Calls for a legal conclusion.
5        THE WITNESS: I understand that sitting
6    here today.
7    BY MR. PETROCELLI:
8        Q. You understood that at the time you entered
9    into Exhibit 10, right?
10       A. I don't have a --
11       MR. KENDALL: Just a second. I couldn't
12    quite -- so what I'm reading is the question is --
13    and I don't think that's what you said is -- "you
14    understood that at the time you understood into
15    Exhibit 10" --
16       MR. PETROCELLI: "As of." But let me
17    rephrase the question.
18       Q. As of the time you entered into Exhibit 10,
19    you understood that the beneficiaries of Joe
20    Shuster's estate on whose behalf the executor must
21    act and serve, were whom? Did you know who they
22    were?
23       A. I believe it was Jean Peavy.
24       Q. Did you know that for a fact at the time
25    you entered into Exhibit 10?

Page 203

1        A. It's very hard for me to distinguish what I
2    know now and what I absolutely knew for a fact at
3    the time I entered into this agreement.
4        Q. Did you get any legal advice from anybody
5    before entering into this agreement?
6        A. No.
7        Q. Is there any reason why you didn't enter
8    into this agreement in Mark Peary's capacity as an
9    executor, as opposed to individually?
10       MR. KENDALL: Objection. Argumentative.
11    Incomplete -- no, just argumentative.
12       THE WITNESS: I don't understand that
13    question because Mark Peary was -- there was no
14    estate -- there was no executor of an estate. The
15    will had not been probated in 2001.
16    BY MR. PETROCELLI:
17       Q. You indicated in here that another
18    gentleman was going to act as the administrator of
19    the estate. A guy named Michael Catron in paragraph
20    10, correct?
21       A. Right.
22       Q. And the fact that it says, "The
23    administrator of Joe Shuster's estate," did that
24    suggest to you that you believed there was no will
25    and he died intestate?

Page 204

1        A. "Administrator" is a word that's used in --
2    interchangeably with "executor." "Personal
3    representative," "administrator" and "executor" are
4    very often used interchangeably.
5        Q. Is that how you intended to use it in
6    paragraph 10?
7        A. Yes.
8        Q. So you are certain that you knew there was
9    a will, you are certain that you knew it named Jean
10    Peary as the executrix, but yet Michael Catron is
11    being indicated for appointment as administrator?
12       MR. KENDALL: Objection. Argumentative.
13    Lacks foundation. Assumes facts.
14       THE WITNESS: And misstates my testimony.
15    I did not say I was certain. Originally I
16    thought that I wasn't aware of the will. I didn't
17    know one way or another whether I had gotten the
18    will before signing this. And then when you're
19    asking questions about Dawn, I think perhaps that's
20    why I was focusing on Jean and Mark. But I don't
21    know --
22       Q. You mean Jean and Warren?
23       A. Jean and Warren, correct. But I don't know
24    one way or another. So if the question is premised
25    on knowledge of a will before entering into it, I

Page 205

1    can't answer that question because I'm not accepting
2    that premise. I don't know either way. Could be
3    yes, could be no.
4        Q. Does the reference to Michael Catron jog
5    your recollection that you were unaware of a will
6    and that it named Jean as executrix?
7        MR. KENDALL: Argumentative. Lacks
8    foundation.
9        THE WITNESS: It -- it doesn't -- it
10    doesn't jog a memory, but I can deduce from that,
11    that that wouldn't be in there.
12    BY MR. PETROCELLI:
13       Q. That what?
14       A. If I had seen the will, I wouldn't have put
15    that in there, but it doesn't jog a specific
16    recollection.
17       Q. Do you recall any discussions with Jean
18    Peavy at or before entering into Exhibit 10 that
19    Michael Catron would replace her as a personal
20    representative of Joe Shuster's estate?
21       MR. KENDALL: I'm going to object to that
22    question as potentially calling for attorney-client
23    communications and caution the witness with respect
24    to that.
25    BY MR. PETROCELLI:

52 (Pages 202 to 205)

**EXHIBIT A**
**54**

MARC   TOBEROFF - 9/18/2012

Page 206

1    Q.  Do you recall any such discussions with
2  her?
3    A.  It -- it -- I -- what's the question again
4  specifically?  Can you repeat the question?
5    Q.  The question was whether or not you had
6  discussed with her that Michael Catron would serve
7  as personal representative of Joe's estate in lieu
8  of her?
9        MR. KENDALL:  Again, caution you, since
10 that's calling for a communication with someone who
11 became your client and at some point in the meet-up
12 presumably you were having confidential
13 communications with her.
14       THE WITNESS:  I'm trying to think whether
15 this is moot or not before I'll object on the basis
16 of privilege to questions about how to set up the
17 estate of Joe Shuster and discussions as to who
18 should be administrator and why.
19 BY MR. PETROCELLI:
20    Q.  And my questions are focused as of the
21 signing of Exhibit 10, right?  You understood that,
22 right?
23    A.  Well, whatever the focus is, you're asking
24 questions about the probating of the Shuster estate.
25 So those conversations are privileged.  But I don't

Page 207

1  have a specific recollection of the specific
2  conversation.
3    Q.  Did you know who Michael Catron was when
4  you signed Exhibit 10?
5    A.  I -- I knew how he related to the Shusters.
6    Q.  From Warren?
7    A.  From Warren or Jean.
8    Q.  Did you speak to Michael Catron?
9    A.  I recall speaking to him at some point.
10    Q.  Prior to signing Exhibit 10?
11    A.  I don't know if it was prior or after, but
12 I recall speaking to him and I recall some business
13 about him wanting to go to the premier.
14    Q.  How did you understand he related to the
15 Shusters at the time you signed Exhibit 10?
16    A.  Friend.  Long-time friend.
17    Q.  Did you have any written communication with
18 Mr. Catron whereby he agreed to serve as personal
19 representative of the estate?
20    A.  No.
21    Q.  Have you had any oral conversation with him
22 to that effect prior to signing Exhibit 10?
23    A.  I don't recall.
24    Q.  In paragraph 5 of Exhibit 10, it indicates
25 that 50 percent of the proceeds go to claimants, 50

Page 208

1  percent to PPC.  Claimants being defined previously
2  as Jean and Warren.
3       Why was the money split between Jean and
4  Warren if Jean were the sole beneficiary under Joe's
5  estate?
6       MR. KENDALL:  Caution you with respect to
7  attorney-client communications if that was told to
8  you in confidence.
9       THE WITNESS:  I don't think it says here
10 it's being -- I think that's misreading this
11 document.  It just says 50 percent is going to the
12 claimants and 50 percent to PPC.
13 BY MR. PETROCELLI:
14    Q.  Well, did you have an understanding about
15 the sharing arrangement between Warren and Jean as
16 of the time you signed Exhibit 10 with respect to
17 their 50 percent of the proceeds?
18    A.  I don't believe so.
19    Q.  Okay.  And do you -- did you have any
20 understanding why Warren would be getting anything
21 if Jean were the sole beneficiary?
22    A.  I -- I don't have an understanding.  I
23 think I viewed that as their business, what they
24 want to do amongst themselves with the proceeds is
25 their business.

Page 209

1    Q.  Did you obtain a copy of Jean's will prior
2  to signing Exhibit 10?
3    A.  I don't believe so.
4    Q.  When is the first time you have seen Jean's
5  will?
6    A.  I think it was fairly recently in this
7  case.  I think it was when you specifically
8  requested it.
9    Q.  Here's Exhibit 75, Mr. Toberoff, which is
10 Joe Shuster's will.  And -- excuse me, excuse me,
11 that's Jean Peavy's will.
12        (The document referred to was
13        previously marked for
14        identification as Exhibit 75 and is
15        attached to this deposition.)
16 BY MR. PETROCELLI:
17    Q.  Looking at that, do you see that's
18 consistent with your recollection that you first saw
19 it in connection with its production in this case as
20 opposed to at the time back in 2001?
21    A.  It's not inconsistent with it but I don't
22 see a date here.
23    Q.  The date of the last will and testament is
24 August 24, 2001.  That is the last will and
25 testament of -- of Jean Peavy.

53 (Pages 206 to 209)

**EXHIBIT A**
**55**

Page 210

1    Did you have an understanding as of the
2 date of Exhibit 10 that she had a will that she had
3 **just made that made Warren her sole beneficiary to**
4 **the exclusion of Dawn?**
5    A. No.
6    **Q. You have in this case asserted that Exhibit**
7 **10 is void ab initio, correct?**
8    MR. KENDALL: Are you asking that in his
9 capacity as a party or in his capacity as a lawyer?
10    MR. PETROCELLI: Any capacity. It's a
11 foundational question. I can point you -- point to
12 a reference to that effect in the brief.
13    MR. KENDALL: I think if you're asking
14 about briefs, so you're asking about argument
15 advanced by lawyers in briefs, that's not a proper
16 subject of this. If you're asking about
17 declarations, then I think it is. If it's a simple
18 foundation to ask whether he's aware --
19    MR. PETROCELLI: It is a simple
20 foundational question. It doesn't warrant a lot of
21 discussion.
22    MR. KENDALL: If it's simply foundational
23 and you don't intend to follow up on the drafting of
24 the brief, then I -- I think that's fine.
25    MR. PETROCELLI: That's correct. I don't.

Page 211

1    THE WITNESS: Okay. So I think you're
2 misstating the assertion. I think the assertion is
3 that the transfer, the purported transfer of -- I
4 have to find the specific provision in the
5 agreement.
6 BY MR. PETROCELLI:
7    **Q. Yeah. Can you show me the -- where in here**
8 **you have the -- this statement for the motion to**
9 **dismiss. Here it is right here. Okay.**
10    **Let me -- let me just read this from the**
11 **Shuster motion to dismiss filed on September 20,**
12 **2010. Again, it's foundational to my getting back**
13 **to 2001:**
14    **"In its third and sixth**
15    **claims, DC alleges that the 2001**
16    **and 2003 Pacific Pictures**
17    **agreements violated its purported**
18    **right of exclusivity. However, if**
19    **and to the extent the 2001 and 2003**
20    **Pacific Pictures agreements had**
21    **granted any Shuster termination**
22    **interest prior to October 26, 2013,**
23    **the effective date of the Shuster**
24    **termination, such transfers were**
25    **void ab initio under section**

Page 212

1    304(C)6(D) and had no legal force
2 or effect."
3    **I'll represent to you that's a statement**
4 **that I --**
5    A. Okay.
6    **Q. -- quoted verbatim out of the Shuster**
7 **motion to dismiss, paragraph 99, filed September 20,**
8 **2002.**
9    **Did you have that understanding when you**
10 **signed Exhibit 10?**
11    A. I don't believe I did. Otherwise -- well,
12 there are two --
13    **Q. What is it you're looking at? I'm just**
14 **curious.**
15    A. I'm looking at Exhibit 10.
16    **Q. Okay.**
17    A. I'm looking at the -- the way Exhibit 10
18 works is that it has a broad definition of rights
19 where it says that the joint ventures, for purpose
20 of investigating, retrieving, enforcing and
21 exploiting their rights -- I'm looking for the
22 definition of rights. Okay. So the definition of
23 rights is on top. It's:
24    "Regarding a formation of a
25    joint venture for purposes of

Page 213

1    retrieving, enforcing, exploiting
2    all of Joe Shuster's rights,
3    claims" --
4    (Reporter interruption.)
5    THE WITNESS: -- "and his
6    estates, rights, claims, copyrights,
7    property, title, interest, in any of
8    Joe Shuster's creations."
9    And that's defined as the rights with a
10 capital R. And it's a very broad provision to
11 define rights.
12    And then the next provision says that:
13    "Hereby form a joint venture
14    to investigate, retrieve and
15    enforce and exploit the rights"
16    with a capital R, "including" dot,
17    dot, dot "the estate's termination
18    pursuant to section 304C."
19    And then -- so that would -- that would
20 seem -- could be argued was enlarging, even further,
21 this broad definition of rights.
22    And then down below it says that:
23    "Claimants hereby transfer,
24    assign to the venture their right,
25    title and interest in the rights."

54 (Pages 210 to 213)

MARC   TOBEROFF - 9/18/2012

Page 214

1    So, I don't -- I don't believe as I sit
2  here today that -- I think that this agreement is
3  poorly drafted, but it may also be that at that
4  stage in 2001 I was not aware of that provision in
5  the copyright that states that you can't assign the
6  termination as, one, until after it's been
7  exercised, and, two, until -- to a third party until
8  the effective date of termination.
9        Q.  Are you certain you did not appreciate that
10 at the time you signed Exhibit 10?
11       A.  I'm not certain, but there's only two
12 possibilities.  One, that crept in here due to the
13 broad way that this is draft -- all encompassing way
14 this is drafted where first you say -- you
15 define the rights as everything, even though they
16 have no rights, which is a vestige from that type of
17 agreement I was using.
18       And then there's an attempt to focus in on
19 the particular situation here by talking what the
20 venture will do, in which case which mention
21 termination, the actual purpose of the venture, and
22 then there's an assignment using the capital R for
23 the rights to the venture, which would, by virtue of
24 the other paragraph, probably sweep in the
25 termination interest.

Page 215

1        Q.  Well, what other rights, besides the
2  estate's termination rights, were you seeking to
3  have transferred to the venture?
4        A.  The way I had this form of agreement, it
5  was -- it was -- a lot of times I would enter into
6  agreements where we -- the form of agreement I had
7  where I would enter into an agreement with someone
8  not knowing what rights they had, and they didn't
9  know what rights they had, and the purpose of the
10 joint venture was to investigate what rights they --
11 they had and to monetize those rights.
12       Q.  And whatever rights they did have by virtue
13 of this joint venture agreement were being hereby
14 transferred and assigned to the venture?
15       A.  That's what it says.
16       Q.  And the only rights of which you were
17 actually aware existed was the future termination
18 right of the estate, correct?
19       A.  Correct.
20       MR. KENDALL:  Wait.  Just a minute.
21 Objection.  Calls for a legal conclusion.  And --
22 BY MR. PETROCELLI:
23       Q.  Are you saying the thought never occurred
24 to you that in going through the various iterations
25 of this agreement and believing you were fully

Page 216

1  competent and qualified to render legal services as
2  well in the area of copyright termination in
3  particular, that this document was making a transfer
4  and assignment that could be void ab initio?
5        MR. KENDALL:  Argumentative.
6        THE WITNESS:  I don't believe -- I don't
7  believe I knew -- at this stage, I did not -- I do
8  not believe I had experience with termination
9  rights.  I was reading up on it based, I believe, on
10 the Siegel termination.  And I don't believe that I
11 knew all the ins and outs, and I don't believe -- if
12 I was aware of that provision, I would never have
13 had this assignment, because you're right that the
14 focus is termination rights, obviously, and that I
15 know enough to know that the only rights they could
16 have would be termination rights, despite the broad
17 drafting of this and that, therefore, if it's
18 assigning the rights, it would be assigning
19 termination rights.
20       No, I don't believe that I would have a
21 provision like that.  There would be no sense to
22 have a provision like that that would be void ab
23 initio.
24 BY MR. PETROCELLI:
25       Q.  Did you -- by the way, how did you satisfy

Page 217

1  yourself prior to entering into Exhibit 10 that the
2  estate did have a termination right?
3        MR. KENDALL:  Lacks foundation.
4        THE WITNESS:  I don't know what you mean
5  by how did I satisfy myself.  It's -- it's --
6  BY MR. PETROCELLI:
7        Q.  Well, how did you know, for example, Joe
8  Shuster did not leave a wife, spouse?
9        A.  It's easily discernible that Joe Shuster
10 wasn't --
11       Q.  How did you discern that prior to executing
12 Exhibit 10?
13       A.  Basic background, Internet research on Joe
14 Shuster.
15       Q.  You did that?
16       A.  Yes.
17       Q.  Prior to Exhibit 10?
18       A.  Yes.
19       Q.  What did you discover?
20       A.  That Superman was created by Joe Shuster
21 and Jerry Siegel, and that Joe Shuster, I -- I --
22 what I would usually do is look for an obituary or
23 something of that nature, and I don't recall
24 specifically, but I believe at the time I entered
25 into this, I knew that Joe Shuster didn't have a

55 (Pages 214 to 217)

MARC   TOBEROFF - 9/18/2012

Page 218

1  widow and didn't have any children or grandchildren.
2      Q. And how did you know that?
3      A. Based on basic research.
4      Q. What research --
5      A. And --
6      Q. -- did you do that told you whether or not
7  he had ever married?
8      A. Looking at obituaries.
9      Q. In the probate --
10     A. Usually an obituary, it says "Joe Shuster
11 is survived by."
12     Q. Okay. Did you know as of the time you
13 signed Exhibit 10 that he had been married?
14     A. Did I know that?
15     Q. Yes.
16     A. No.
17     Q. When probate papers were filed in 2003, you
18 were aware that there was a representation made to
19 the Court in one of the papers that he had never
20 been married?
21     MR. KENDALL: Objection. Lacks foundation
22 as to time.
23 BY MR. PETROCELLI:
24     Q. You're aware of that now, correct?
25     A. Yeah. What's the question?

Page 219

1      Q. You're aware of that now, correct?
2      A. That the probate paper said he had never
3  been married?
4      Q. Correct.
5      A. Vaguely.
6      Q. When did you first find out that he had
7  been married?
8      A. After that.
9      Q. After the filing of the probate papers?
10     A. If the probate paper said he was never
11 married, it means that I found out after that he was
12 married, very short-lived marriage or "short-lived"
13 if you're British, and that they got divorced.
14     Q. And what have you done to confirm that they
15 actually got divorced?
16     MR. KENDALL: I'm going to just caution you
17 with respect to that that it may call for work
18 product. So give that some consideration before you
19 respond and don't waive your work product.
20     THE WITNESS: I -- I -- I'm not going to go
21 into particulars of what I actually did to confirm
22 it, but it was -- I treated that with considerable
23 attention and confirmed that they got divorced.
24 BY MR. PETROCELLI:
25     Q. And you have records of --

Page 220

1      A. Because it was a big surprise to me.
2      Q. Do you have records that show the -- the --
3  the divorce, the legal divorce?
4      MR. KENDALL: I think now you're asking a
5  question about Mr. Toberoff's representation of his
6  clients, which I think calls for work product. I'll
7  caution you, Mr. Toberoff.
8      THE WITNESS: Without waiving my work
9  product, I -- I would have to check my files what I
10 still have or don't still have. I --
11 BY MR. PETROCELLI:
12     Q. Do you know --
13     A. I recall being very focused on that and
14 confirming that, because it came to me as a big
15 surprise.
16     Q. Did you also confirm whether the spouse or
17 former spouse was deceased?
18     MR. KENDALL: Same caution.
19     THE WITNESS: Sounds familiar. Without
20 waiving of any work product, it sounds familiar.
21 BY MR. PETROCELLI:
22     Q. You just -- you don't have a clear
23 recollection of that?
24     A. I don't have a clear recollection. I have
25 a clear recollection -- recollection of determining

Page 221

1  that they got divorced and, in fact, legally
2  divorced.
3      Q. I was asking about whether she -- when she
4  died, if she died?
5      A. Yeah, I have a vague recollection that she
6  did die, but -- but --
7      Q. So, circling back to a question I asked you
8  a while ago, I don't think it was answered and if it
9  was, I apologize for asking it again, but given your
10 knowledge that only the estate would have a
11 termination right and that was the only right of
12 which you were aware the Shusters had, why wasn't
13 this agreement prepared so that it was between PPC
14 and the estate of Joe Shuster by its personal
15 representative?
16     A. Because there was no --
17     MR. KENDALL: Argumentative.
18     THE WITNESS: -- there was no estate.
19 BY MR. PETROCELLI:
20     Q. Why wasn't it prepared such that it was
21 only between Jean, as executor, named under the will
22 of Joe Shuster and PPC?
23     MR. KENDALL: Argumentative.
24     THE WITNESS: Because she was elderly.
25 BY MR. PETROCELLI:

56 (Pages 218 to 221)

**EXHIBIT A**
**58**

MARC   TOBEROFF - 9/18/2012

Page 222

1    Q.  Meaning what?
2    A.  She was elderly and she declined to act as
3  an executor of an estate.
4    Q.  She didn't decline to act as of the signing
5  of Exhibit 10, though, correct?
6    A.  Yes, she didn't -- anyway, this is
7  revealing privileged information now.
8    Q.  She told you prior to the signing of
9  Exhibit 10 that she would not serve as executrix?
10    MR. KENDALL:  Just a minute.  I'm going to
11  object in light of the witness' last answer that it
12  appears to call for privileged information.
13    THE WITNESS:  Privileged.  I believe those
14  conversations are privileged as to the setting up of
15  the estate, other than what's as part of the estate
16  record.
17  BY MR. PETROCELLI:
18    Q.  So to be clear on this so there's no waste
19  of time here, you do recall discussions with Jean
20  and/or Warren on this subject and decline to answer?
21    MR. KENDALL:  Which subject?
22    MR. PETROCELLI:  The subject of -- of
23  Jean's willingness or unwillingness to serve as an
24  executrix for the purpose of serving a notice of
25  termination.

Page 223

1    THE WITNESS:  I don't recall specific
2  conversations.  I recall the result of
3  conversations.
4  BY MR. PETROCELLI:
5    Q.  The result being what?  Her unwillingness
6  to serve?
7    A.  Exactly.
8    Q.  That's all you recall, none of the
9  thinking, none of the reasons, no particulars, just
10  that?
11    A.  Yes.
12    Q.  Okay.  When did you come to appreciate that
13  the transfers were void under 304(C)60?
14    MR. KENDALL:  Calls for the witness' work
15  product.
16    THE WITNESS:  I can't put a date on it.
17  BY MR. PETROCELLI:
18    Q.  Was it before the Shuster lawsuit in May
19  2010?
20    A.  Yes.
21    Q.  Was it before the attempt to cancel the PPC
22  agreements and substitute a legal retainer agreement
23  in 2004?
24    MR. KENDALL:  I'm going to object as
25  apparently calling for work product.

Page 224

1    THE WITNESS:  I can't -- I can't put a date
2  on it, but -- I can't put a date on it.
3  BY MR. PETROCELLI:
4    Q.  Can you tell me whether it was before or
5  after the events I just described that took place in
6  2004?
7    A.  I would say certainly by 2004 I was
8  thinking of the next question, whether it was
9  before, you know, the 2003 agreement or not.
10  Because the 2003 agreement doesn't -- and it's
11  been -- it's been kind of swept into the 2001
12  agreement, and the briefing, and we pointed out
13  recently that the 2003 agreement doesn't, in fact,
14  assign termination rights to any joint venture.
15  They stay with the executor under the 2003
16  agreement.
17    Q.  Was that deliberate or are you just saying
18  that's just the way you now read the words?
19    MR. KENDALL:  Objection.
20    THE WITNESS:  No, no, that's --
21    MR. KENDALL:  Appearing to call for your
22  work product.
23    THE WITNESS:  Yeah, that's -- that's what
24  it says.
25  BY MR. PETROCELLI:

Page 225

1    Q.  Let's take a quick look at that.
2    A.  I assume if it says that, it's deliberate.
3    MR. PETROCELLI:  I'm going to do something
4  bold and go out of chronological order for a moment.
5    Can you give Mr. Toberoff a copy of the
6  2003 --
7    MR. TOKORO:  2003?
8    MR. PETROCELLI:  Yeah.
9    MR. TOKORO:  13.
10    (The document referred to was
11    previously marked for
12    identification as Exhibit 13 and is
13    attached to this deposition.)
14  BY MR. PETROCELLI:
15    Q.  You now have Exhibit 13, which is the
16  document with Mark Warren Peary as executor of the
17  estate of Joe Shuster dated as of -- dated
18  October 27, 2003, signed on October 30, 2003 by you
19  as president of PPC, by Mr. Peary as executor and
20  also by Ms. Peavy.
21    Do you see that?
22    A.  Yes, except to note that the agreement's
23  with the executor of the estate of Joe Shuster, not
24  with Jean Peavy.  She's just signing to say that
25  she's read it and familiar with it.

57 (Pages 222 to 225)

MARC  TOBEROFF - 9/18/2012

Page 226

1      Q.  Well, she says:
2          "I have read the foregoing
3      agreement and agree to its terms to
4      the extent any of my interests are
5      concerned."
6      Right?
7      A.  Yes.
8      Q.  Okay.  Now, looking at this document,
9   Exhibit 13, does it refresh your recollection as to
10  whether you came to appreciate that the transfer in
11  the November 2001 document, Exhibit 10, was void ab
12  initio?
13      A.  It doesn't specifically refresh my
14  recollection.
15      Q.  Okay.  Now, your point earlier that led us
16  to this document was that there's no additional
17  grant of rights here to the venture.  Is that what
18  you were pointing out to me?
19      A.  I believe that the -- this agreement calls
20  for a division of proceeds.  I believe it's as
21  follows.  The only person with a termination
22  interest who can expedite termination interest is
23  the executor of the estate of Joe Shuster.
24      Joe Shuster has this agreement, joint
25  venture agreement with PPC, which agrees to share

Page 227

1   proceeds from that termination interest, but is not
2   assigning the termination right to the joint
3   venture.
4      Q.  Well, the termination rights had already
5   been assigned to the joint venture in the prior
6   document, Exhibit 10, correct?
7      A.  Of course not.
8      Q.  Why do you say, "Of course not"?
9      A.  Hence this line of questioning.
10      Q.  Well, you say that because at some point
11  you realized that any such transfer would be void or
12  you're saying it was never intended to do so?
13      MR. KENDALL:  Just a minute.
14  BY MR. PETROCELLI:
15      Q.  Let me -- let me withdraw that.
16      When you signed Exhibit 10, were -- you
17  were intending to have transferred to PPC any future
18  termination rights that the Shusters might have,
19  knowing full well that the only way such rights
20  could be secured is by notice of termination served
21  by the estate, correct?
22      A.  Incorrect.
23      Q.  What's incorrect about that?
24      A.  The last part.
25      Q.  What's the last part?

Page 228

1      A.  The "knowing full well."  After "knowing
2   full well."
3      Q.  I believe you previously testified that you
4   knew that in order for the Shuster termination
5   interest to be enforced, the estate had to serve a
6   notice of termination, correct?
7      MR. KENDALL:  Argumentative.
8   BY MR. PETROCELLI:
9      Q.  You knew that?
10      MR. KENDALL:  Lacks foundation.
11      THE WITNESS:  Let me -- let me state it
12  simply.
13      I don't believe that when I entered into
14  the 2001 agreement I was aware that you can't
15  transfer a termination expectancy prior to serving a
16  termination notice and with respect to a third
17  party, which PPC was, or the joint venture was, I
18  should say, prior to the effective date of the
19  termination.
20  BY MR. PETROCELLI:
21      Q.  Right.  But you --
22      A.  In addition to that, in addition to that,
23  that there -- there -- neither Warren or Jean
24  individually in 2001 had a termination interest.
25      Q.  Yet you had them transfer whatever interest

Page 229

1   they did have to PPC, correct?
2      A.  No.  They didn't have a termination
3   interest because individually a nephew or a sibling
4   does not have termination rights.
5      Q.  That speaks to Warren.
6      A.  Speaks to her, too.  She didn't have
7   termination rights.
8      Q.  Oh, the sibling.  But nonetheless, you
9   included language whereby they were granting rights,
10  they, individually, were granting rights to PPC?
11      A.  Right.
12      MR. KENDALL:  Just a moment.  Give me a --
13  you guys --
14      MR. PETROCELLI:  We've covered this
15  already.  I don't need to go over it again.  I'm
16  going to go back to Exhibit 13 now.
17      MR. KENDALL:  So do you want to withdraw
18  that question so that I don't need to --
19      MR. PETROCELLI:  No.
20      MR. KENDALL:  -- focus on whether I need to
21  object?
22      MR. PETROCELLI:  The question was answered
23  and if -- I'm ready to proceed to a different
24  question.
25      THE WITNESS:  Well, then you should object.

58 (Pages 226 to 229)

**EXHIBIT A**
**60**

MARC  TOBEROFF - 9/18/2012

Page 230

1        MR. KENDALL:  If I have an objection I
2   should make it so you can correct it, but I got
3   distracted by the fact that the witness answered the
4   question before giving me a chance to object.
5        I'm going to object as unintelligible and
6   lacks foundation.  Assumes facts.  And
7   argumentative.
8   BY MR. PETROCELLI:
9        **Q.  Was -- was it your understanding that with**
10  **signing Exhibit 13 you were intending to revoke the**
11  **grants that were made in Exhibit 10?**
12       A.  I don't recall having that understanding.
13       **Q.  Okay.**
14       A.  I note that the agreement says
15  "supplement."  It doesn't say "revoke."
16       **Q.  The purpose of this agreement is, among**
17  **other things, for Warren, as executor, to engage PPC**
18  **as its, meaning Warren's, exclusive advisor for the**
19  **purpose of proceeding with the termination rights of**
20  **the estate?**
21       A.  That's what it says.
22       **Q.  And in paragraph 4, it states similar to**
23  **paragraph 4 of Exhibit 10, that:**
24       **"Client" -- who is defined as**
25       **Warren, the executor -- "cannot**

Page 231

1        **enter into any agreement without**
2        **the expressed written approval of**
3        **PPC."**
4        **Correct.**
5        A.  It's what it says.
6        **Q.  Did you receive any legal advice on the**
7   **propriety of an executor entering into such an**
8   **arrangement prior to your signing Exhibit 13?**
9        A.  I received legal advice as to the form
10  of -- I believe I received legal advice as to the
11  form of Exhibit 13.
12       **Q.  What do you mean by "form"?**
13       A.  But not specifically on the point of an
14  executor.  I don't recall receiving legal advice
15  specifically on an executor entering into this type
16  of agreement.
17       **Q.  Did you receive any -- any legal advice on**
18  **whether an executor could contractually agree to**
19  **require the consent of a third party in executing**
20  **contracts in the course of the executor's duties?**
21       A.  I -- I don't believe so.  But I --
22  recall -- first of all, when I'm discussing
23  receiving legal advice, it's without waiver.  I'm --
24  there's -- there have been certain privileged
25  communications that were held no longer privileged

Page 232

1   due to the sharing of the documents with the USAO,
2   the writ and the writ appeal, and one of those was a
3   memo which was an ethics memo, and reviewing, I
4   believe, the 2001 agreement, either the 2001
5   agreement or the form of the 2001 agreement, and --
6   which I, you know, wanted to be reviewed.
7        And as a result of that memo, I had asked
8   for, okay, well, if that form of agreement is
9   problematic, what form of agreement would you
10  suggest for agreements of this nature?
11       And this was the suggested form of
12  agreement which I modified, but I don't know if I
13  covered the executor.
14       **Q.  The point I was asking about, the executor?**
15       A.  Yeah, I don't know if it covered that
16  specific point.
17       **Q.  The -- the advice you just described having**
18  **received was from Armstrong Hirsch?**
19       A.  Yes.
20       **Q.  And did Armstrong -- was that Jim Jackoway?**
21       A.  It was his firm.
22       **Q.  His firm?**
23       A.  And then he had somebody else who he
24  referred to as his ethics, you know, person, or
25  maven to do the review.

Page 233

1        **Q.  Did they, to your knowledge, review and**
2   **approve the form of Exhibit 13?**
3        A.  They didn't -- well, when you say "review
4   and" -- they didn't review and approve this
5   agreement.  This agreement was based on --
6        **Q.  "This" being Exhibit 13?**
7        A.  This agreement was based on a suggested
8   form of agreement for moving forward with
9   intellectual property matters, not -- not specific
10  to the Shusters but more of a general template to be
11  used for IP Worldwide.
12       **Q.  And what was it about this -- what was the**
13  **issue that they believed as described to you by them**
14  **that this form attempted to solve?**
15       MR. KENDALL:  I'm going to object to that
16  question.  There's been a limited waiver as a result
17  of the writ proceedings with respect to that
18  document, but there hasn't been a waiver with
19  respect to further communications besides that
20  document.
21       MR. PETROCELLI:  There have been no such
22  limited waiver.
23       THE WITNESS:  Excuse me?
24       MR. PETROCELLI:  There's been no ruling of
25  which I am aware that says the waiver is limited.  I

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com/law

**EXHIBIT A**
**61**

MARC   TOBEROFF - 9/18/2012

Page 234

1    think that's your gloss on it.
2        MR. KENDALL:  I think it -- there's been,
3    as I understand it, communications between the
4    parties to the effect that your client, through you,
5    has asserted that there is a broad subject matter
6    waiver, and the position that's been advanced by
7    your opponents is that there is not.
8        MR. PETROCELLI:  That, I understand.  But
9    you were making the objection as though the limited
10   waiver was part of some court ruling or court order
11   in those terms.  And I don't believe that's correct.
12       MR. KENDALL:  Just a moment.  Let me
13   consult the record.  I don't think I meant to say
14   that and I'm not sure I did say that.
15   BY MR. PETROCELLI:
16       Q.  Can you answer the question?
17       MR. KENDALL:  Well, no, because I'm looking
18   at the record right now.
19       Yeah, I didn't say what you claim I said.
20       THE WITNESS:  What's the question?
21   BY MR. PETROCELLI:
22       Q.  Let me re-put the question to you.
23       What was the issue that the Jackoway firm
24   described to you or the concern that the Jackoway
25   firm described to you, that the form or format they

Page 235

1    suggested to you was intended to solve?
2        MR. KENDALL:  I'm going to caution you that
3    it's one thing to discuss that document but it's
4    another thing to discuss advice that's not contained
5    in that document.  And I will caution you that to do
6    so might waive privileges that you may currently
7    enjoy, recognizing that the parties have a
8    disagreement about that.
9        THE WITNESS:  So I'm not going to testify
10   beyond the contours of that ethics memo that was
11   written up.
12   BY MR. PETROCELLI:
13       Q.  Is it your recollection that the ethics
14   memo references this issue?
15       A.  What issue?
16       Q.  The issue that you just described, that the
17   form of Exhibit 13 was intended to address?
18       MR. KENDALL:  Vague and ambiguous.
19       THE WITNESS:  I -- I don't know if it does.
20   It really references on problematic or potentially
21   problematic areas that touch upon -- it reviewed the
22   2001 PPC agreement.  And like I said, the 2001 PPC
23   agreement was emblematic of a kind of a form and --
24   BY MR. PETROCELLI:
25       Q.  You don't have to repeat that.

Page 236

1        A.  Okay.  And without, you know, waiver of any
2    privilege, I wanted to have that reviewed for IP
3    Worldwide, going forward for IP Worldwide, and the
4    Jackoway firm was interested in -- we had a mutual
5    interest in Jackoway representing IP Worldwide, and
6    so they did that review for me, and what came out of
7    that review was a form of agreement which I -- was
8    the basis for the 2003 agreement.
9        Q.  And are you refusing to answer my question?
10       A.  I -- I --
11       MR. KENDALL:  Just a minute.  Just a
12   minute.
13       So now what is the question that you're
14   asking if he's refusing to answer?
15   BY MR. PETROCELLI:
16       Q.  What did the Jackoway firm explain to you
17   was the issue or concern that the form of Exhibit 13
18   was intended to address and resolve?
19       MR. KENDALL:  Okay.  So I think in light of
20   the witness' testimony he just gave, I need to
21   confer with him for a moment.
22       MR. PETROCELLI:  Okay.  Let's go off the
23   record.
24       THE WITNESS:  I'm going to limit it to the
25   memo.

Page 237

1        MR. KENDALL:  You're going to talk to me
2    first.
3        THE WITNESS:  Thanks.
4        THE VIDEOGRAPHER:  Off the record.  The
5    time is 4:20.
6        This will mark the end of Volume I, Tape
7    Number 3 in the deposition of Marc Toberoff.
8    Changing tapes at 4:20.
9        (Brief recess.)
10       THE VIDEOGRAPHER:  We're back on the
11   record.
12       This marks the beginning of Volume I, Tape
13   Number 4 in the deposition of Marc Toberoff.  The
14   time is 4:25.
15   BY MR. PETROCELLI:
16       Q.  I think I had a pending question,
17   Mr. Toberoff.
18       (The reporter read the record
19       as follows:
20       "QUESTION:  What did the
21       Jackoway firm explain to you was
22       the issue or concern that the form
23       of Exhibit 13 was intended to
24       address and resolve?")
25       THE WITNESS:  I'll answer that, provided

60 (Pages 234 to 237)

**EXHIBIT A**
**62**

MARC   TOBEROFF - 9/18/2012

Page 238

1   you agree that I'm not waiving privilege as to my
2   communications with the Jackoway firm, other
3   communications.
4   BY MR. PETROCELLI:
5       **Q. I think we have that agreement.**
6       A. Okay.  Those issues would be as outlined in
7   that ethics memo.
8       **Q. Okay.  I'm not going to take you through**
9   **that right this moment.**
10      **You did, as part of your inquiries with the**
11  **Jackoway firm, discuss whether they would be**
12  **directly involved in rendering advice, not just**
13  **generally on the form of your agreements but**
14  **specifically with respect to Superman, right?**
15  **Including perhaps doing the estate work?**
16      MR. KENDALL:  I'm going to caution you,
17  you're more aware than I am of -- of what's in the
18  document that was disclosed, but if that's in the
19  document that's disclosed, then I think it's fair
20  game.  If it's not, then we have to confront the
21  privilege issues that might be involved in
22  responding to that question.
23      THE WITNESS:  So what I'd like to do is be
24  able to answer your questions, as well as -- as
25  specifically as possible without waiving -- and to

Page 239

1   the extent of things already disclosed in those writ
2   documents that pertain to this issue, without
3   waiving privilege.
4   BY MR. PETROCELLI:
5       **Q. We have the agreement that by your**
6   **answering the question, it's not going to be argued**
7   **as an additional basis for waiver.**
8       A. Okay.  So with respect to -- as part of the
9   writ documents, I'm aware of the -- what I'll call
10  the ethics memo.  Was there another document that
11  pertained to ethics regarding an estate?
12      **Q. Well, look, I only asked you the question**
13  **because that's how I read one of the documents, and**
14  **without taking you through --**
15      A. Okay.  Let me ask it this way.
16      **Q. -- the documents --**
17      A. Well, let me ask it this way, how -- if I
18  may, because it will make it a lot easier --
19      **Q. Two.**
20      A. There are two --
21      **Q. That's what I recall.**
22      A. There are two separate memos that were
23  produced as part of the writ documents?
24      **Q. Yes.**
25      A. Okay.  So since that first -- first memo --

Page 240

1       **Q. I'm only asking you whether you contacted**
2   **that firm for the purpose, among others, of working**
3   **with you to handle matters specific to the Superman**
4   **work you were doing.**
5       MR. KENDALL:  I'd like to caution you that
6   since the premise of your discussing this is that
7   you believe it's in a memo that's been disclosed,
8   that the prudent thing for you to do would be to ask
9   to see the memo.
10      MR. PETROCELLI:  I'm not going to do that,
11  Dick, and you're wasting my time now.
12      **Q. Can you answer the question, yes or no?**
13      A. Repeat the question.
14      MR. PETROCELLI:  Yes.
15      (The reporter read the record
16      as follows:
17      "QUESTION:  I'm only asking
18      you whether you contacted that firm
19      for the purpose, among others, of
20      working with you to handle matters
21      specific to the Superman work you
22      were doing.")
23      MR. KENDALL:  I'm going to give you a
24  caution that I think you may be disclosing
25  attorney-client communications by this.  Now, you've

Page 241

1   got an agreement that it won't be a waiver, but you
2   have to make the judgment as to whether you want to
3   be doing that.
4       THE WITNESS:  Right.  Again, without
5   waiver, I don't know if I specifically anticipated
6   that they would work on Superman.  I think it was we
7   were -- we had a relationship where we were mutually
8   interested in each other, and they had a facility
9   and were willing to give me some advice.
10  BY MR. PETROCELLI:
11      **Q. In connection with the execution of Exhibit**
12  **13, did you have any discussions with Mr. Peary or**
13  **Jean Peavy that any part of Exhibit 10 might be**
14  **unlawful or void or otherwise legally problematic?**
15      A. Did I have any discussion, ever?
16      **Q. As of the time you signed Exhibit 13**
17  **with -- with Mr. Peary, with Warren.**
18      MR. KENDALL:  So --
19      THE WITNESS:  That's privileged.
20      MR. KENDALL:  -- I'm going to instruct
21  you -- right.
22  BY MR. PETROCELLI:
23      **Q. Did you -- was it your intention in signing**
24  **Exhibit 13 to rectify any problems with the document**
25  **that had been executed as Exhibit 10?**

61 (Pages 238 to 241)

MARC  TOBEROFF – 9/18/2012

Page 242

1        MR. KENDALL:  Vague and ambiguous.
2   Overbroad.
3        THE WITNESS:  I can't recall specifically,
4   but -- but one of the -- I don't know if "rectify"
5   is the right word, but one of the issues is that
6   leaving aside the non-transferability of termination
7   interest, one of the issues is that how can you
8   transfer issue -- how could you even transfer -- how
9   could you have any agreement regarding termination
10  that doesn't -- before the estate is actually
11  probated?
12  BY MR. PETROCELLI:
13       Q. Did you have that issue in mind when you
14  signed Exhibit 13?
15       A. Yes.
16       Q. And you started out that answer by saying,
17  "Apart from the transferability issue"?
18       A. Right.
19       Q. Did you have that issue in mind when you
20  signed Exhibit 13?
21       A. I can't recall whether I had that in mind.
22       Q. When you entered into Exhibit 10, you were
23  aware that the window for serving the notice of
24  termination would not open until 2003?
25       A. I was aware of the termination windows, how

Page 243

1   they worked.
2        Q. Were you aware that the earliest year in
3   which the termination notice could be served was in
4   2003?
5        A. I don't have a specific recollection, but I
6   believe that I was aware of that.  When I signed
7   Exhibit 10?
8        Q. Correct.
9        A. It's easier if you say 2001 agreement.
10       Q. Okay.  When you signed the 2001 agreement,
11  which is Exhibit 10, you were generally aware that
12  the termination window for the Shusters opened up in
13  2003?
14       A. I believe I was aware of that.
15       Q. I want to ask you about Superboy as it
16  relates to these agreements so we can focus your
17  attention on that, okay?
18       In the 2001 agreement, Exhibit 10, as
19  you'll see in the second paragraph, there's a
20  reference to Superboy in broadly describing what the
21  rights shall include.
22       Do you see that?
23       A. Yes.
24       Q. And then in the 2003 agreement, that's
25  Exhibit 13, there's no reference to Superboy,

Page 244

1   correct?
2        A. Nor any of those other things, correct.
3        Q. Right.
4        Was -- was it your intention as of the time
5   you executed Exhibit 13 that it not encompass
6   Superboy as a separate copyrightable property.
7        MR. KENDALL:  I'm just going to caution you
8   as to your work product and -- at that time.
9        If you consider that to be work product, we
10  may want to have a discussion outside -- off the
11  record about that.  But if you're comfortable
12  asking -- answering that question, feel free.
13       THE WITNESS:  I don't believe this --
14  that -- that implicates work product because I don't
15  believe that the conclusion you've drawn is correct.
16       In one you have a -- and I would need to
17  explain this.
18       In Exhibit 10, 2001 PPC agreement, you have
19  a -- an attempt to list, without limitation, some of
20  the elements of Superman.  In looking at that now,
21  particularly Mr. Mxyztplk, however you pronounce
22  that name, I don't even know that character, I
23  believe these characters came off of language in the
24  Siegel termination that -- that was available on the
25  Internet.  And that I -- in an effort to be

Page 245

1   complete, that was thrown into the Exhibit 10 2001
2   agreement.
3        In the 2003 agreement, I don't believe
4   there was an intent to exclude or include Superman.
5   I just believe --
6   BY MR. PETROCELLI:
7        Q. You meant Superboy?
8        A. Superboy.  I just believe there wasn't an
9   intent to list the elements that were listed in the
10  2001 agreement.
11       Q. In 2000--
12       A. I believe too much is being read into that.
13       Q. In 2003, did you, in entering into Exhibit
14  13, have the view that the Shusters had a right to
15  terminate with respect to Superboy, as well as
16  Superman?
17       MR. KENDALL:  Calls for work product.
18       THE WITNESS:  That would be work product
19  but it's -- it's moot because I can't pin down --
20  well, maybe I could pin it down.
21       MR. KENDALL:  I think you have to be
22  careful not to think aloud when you're talking about
23  privileged material.
24       THE WITNESS:  Okay.  Okay.  It's true.  So
25  what was the question?

62 (Pages 242 to 245)

**EXHIBIT A**
**64**

MARC  TOBEROFF - 9/18/2012

Page 246

1  BY MR. PETROCELLI:
2      Q. The question was whether you had a view at
3  the time you executed Exhibit 13, the 2003 agreement
4  with Warren, whether or not the Shusters had an
5  interest in Superboy, termination interest in
6  Superboy?
7      A. I believe I concluded that they didn't.
8      Q. When did you reach that conclusion?
9      A. The only reason I'm saying that is because
10 we filed a Superboy termination before entering into
11 that.
12     Q. In 2002?
13     A. Right. But I don't have -- otherwise I
14 didn't have a specific recollection, do I recall the
15 Superboy termination date.
16     MR. PETROCELLI: Could you show
17 Mr. Toberoff Exhibit 11, please.
18         (The document referred to was
19         previously marked for
20         identification as Exhibit 11 and is
21         attached to this deposition.)
22     MR. PETROCELLI: Which is the Superboy
23 notice of termination.
24     That notice of termination is dated
25 November 8, 2002.

Page 247

1      Q. Now, you prepared Exhibit 11, right?
2      A. Yes, I did.
3      Q. Okay. And it's a notice of termination
4  served on behalf of Joanne Siegel and Laura Siegel
5  Larson, right?
6      A. Correct.
7      Q. Is it fair to say that as of November 8,
8  2002, you had formed the view that the Shusters had
9  no termination interests in Superboy?
10     A. Yes.
11     Q. Okay. Did you have that view when you
12 entered into the 2001 agreement, Exhibit 10?
13     A. I don't believe I was focused on it one way
14 or another.
15     Q. Do you recall --
16     A. I don't believe the listing of Superboy is
17 indicative -- was indicative of a determination of
18 any kind. I think it was just an attempt to list
19 related elements of Superboy -- Superman, excuse me.
20     Q. I understand your answer that folks on our
21 side are reading too much into this, but --
22     A. No, that's -- that's not just -- that's not
23 just that.
24     MR. KENDALL: Don't argue with him. Just
25 answer the questions.

Page 248

1      THE WITNESS: Okay.
2  BY MR. PETROCELLI:
3      Q. I'm trying to establish what you knew when
4  or what you -- what views you formed when.
5          When you signed Exhibit 10, the 2001
6  agreement with the Shusters, did you have a view
7  about whether or not their future termination
8  interest would extend to Superboy?
9      A. I don't believe I did.
10     Q. Okay. So sometime between -- so there
11 wasn't any attempt in Exhibit 10 to exclude
12 Superboy, correct?
13     A. No.
14     Q. Okay. Sometime before November 8, 2002,
15 you formed the view that the Shusters had no
16 termination rights with respect to Superboy,
17 correct?
18     A. Correct.
19     Q. When did you form that view?
20     A. I can't put a date or even a month on it.
21     Q. When you formed that view, did you discuss
22 it with either Jean Peavy or Warren Peary?
23     MR. KENDALL: That would appear to call for
24 privileged communications.
25     THE WITNESS: Without waiving the substance

Page 249

1  of the communications, I can -- will you allow me to
2  answer whether I discussed the subject?
3  BY MR. PETROCELLI:
4      Q. Yeah. Did you discuss the subject?
5      MR. KENDALL: And you're agreeing that it
6  won't be a waiver?
7      MR. PETROCELLI: Yes.
8      Q. I am going to ask you additional questions
9  about it but we'll take it one by one.
10     A. Right, but you're not agreeing [sic] by
11 answering that question I'm waiving?
12     Q. Correct.
13     A. Yes.
14     Q. Did you have any communications with him on
15 that subject in writing?
16     A. I believe it was --
17     MR. KENDALL: Just a minute. So -- so I
18 think this is calling for a privileged
19 communication.
20     Can we just streamline this, are you
21 willing to agree that all questions up to a point
22 where you say "the agreement is off," are --
23     MR. PETROCELLI: Yes.
24     MR. KENDALL: -- answerable without
25 constituting a waiver?

63 (Pages 246 to 249)

MARC   TOBEROFF - 9/18/2012

Page 250

1      MR. PETROCELLI:  Yes, as we discussed at
2  the outset, because I pointed out to you that there
3  may be information in the answer that might provide
4  additional bases for arguments, but not the giving
5  of the answer is not going to be used against you as
6  a ground for waiver.
7      THE WITNESS:  I don't understand that
8  distinction.
9  BY MR. PETROCELLI:
10     **Q. If you said to me, "I discussed it with**
11 **your partner, Matt Kline, you know, ten years**
12 **ago" --**
13     A. I did.  He's actually on all of this.
14     MR. PETROCELLI:  So can we go back to the
15 examination?
16     MR. KENDALL:  I think that works.  But I
17 just want to be clear that what you're agreeing is
18 that until you say otherwise, these questions will
19 not constitute a waiver.
20     MR. PETROCELLI:  His giving of the answers,
21 yes, that's correct.
22     **Q. In any event, let's go back to where we**
23 **were.  I asked you if you had discussed this subject**
24 **of the Shusters having no termination interest with**
25 **Peary, you said yes, and now I'm asking you whether**

Page 251

1  **you had any written communications with him on that**
2  **subject?**
3      A. I don't believe it was in writing.
4      **Q. And the verbal communications that you had**
5  **with him, did you have such communications with him**
6  **prior to your serving Exhibit 11, the November 8,**
7  **2002 Superboy notice of termination?**
8      A. I believe so, yes.
9      **Q. Can you date those communications?**
10     A. No.
11     **Q. They were telephonic?**
12     A. Yes.
13     **Q. And you reviewed various materials on which**
14 **you formed the -- the basis for your conclusion?**
15     A. Yes.
16     **Q. Okay.  What materials inform that view that**
17 **you reviewed?**
18     A. Well, I can --
19     MR. KENDALL:  That would seem to call for
20 work product.
21     THE WITNESS:  But we have -- I think we've
22 already stated in our briefs what that's based on.
23     MR. KENDALL:  Okay.
24     THE WITNESS:  So without any additional
25 waiver to anything you can claim --

Page 252

1      MR. KENDALL:  We have that understanding.
2  I just --
3      THE WITNESS:  Okay.  So -- so the materials
4  were the 1947 findings of facts and conclusions of
5  law regarding Superboy, and the 1974 Second Circuit
6  opinion holding that those findings in the 1947
7  Westchester actions were preclusive and binding on
8  the parties and their successors.
9  BY MR. PETROCELLI:
10     **Q. Did you -- do you know whether Mr. Peary**
11 **received any independent legal advice on that**
12 **subject that is independent of you?**
13     A. I have no idea.
14     **Q. Do you know of anybody who actually gave**
15 **him any independent advice on that subject?**
16     A. I don't know.
17     **Q. When you -- did you form -- you cannot give**
18 **me even a month when you formed this view about**
19 **Superboy?**
20     A. I really -- I can't.  I have specific
21 recollections of a conversation, but I don't have a
22 specific recollection tying -- tying it to a month
23 or a time.
24     **Q. What did -- what did Mr. Peary say to you**
25 **when you had this discussion with him?**

Page 253

1      A. That's privileged.
2      **Q. Did -- did you discuss this subject with**
3  **the Siegels that --**
4      A. Yes.
5      **Q. Did you obtain a written conflict of**
6  **interest waiver of any kind from the Shusters with**
7  **regard to this subject?**
8      A. Yes.  I believe I did.
9      **Q. When was that?**
10     A. I believe it was in -- later in -- on in
11 2008.
12     **Q. Did you get a conflict of interest waiver**
13 **on this subject from the Siegels?**
14     A. I believe so.  I'd have to check.  I know I
15 had a conflict of interest with the Siegels when we
16 entered into the IP.
17     MR. KENDALL:  I think you may have
18 misspoken.  You said you know you have a conflict of
19 interest.  Did you mean waiver?
20     THE WITNESS:  Conflict of interest waiver.
21 I know I have a conflict of interest waiver, a
22 conflict waiver, I'll call it, with the Siegels when
23 we entered into the IP Worldwide agreement, and then
24 again when we filed the Siegel action in 2004.  And
25 I would have to check, but I wouldn't be surprised

64 (Pages 250 to 253)

**EXHIBIT A**
**66**

MARC   TOBEROFF - 9/18/2012

Page 254

1   if they encompassed Superboy.
2   BY MR. PETROCELLI:
3       Q. They're not specific to Superboy, you're
4   saying?
5       A. No. Not just about Superboy.
6       Q. The 2008 --
7       A. When you say "not specific to Superboy,"
8   you mean to the exclusion of other things?
9       Q. Correct.
10      A. No.
11      Q. Do they call out Superboy specifically?
12      A. That's what I -- I -- I would say I would
13  not be surprised if they do, or -- but I don't
14  know -- I can't answer you specifically whether they
15  do or not.
16      Q. The --
17      MR. KENDALL: You shouldn't be speculating
18  without -- without knowledge as to what's actually
19  in the document.
20      THE WITNESS: That's true.
21      MR. KENDALL: Just for -- one moment.
22      Fritz, could you just tell us where we are
23  on time?
24      THE VIDEOGRAPHER: Yes. 5:39 has been the
25  time on the record to this point.

Page 255

1       MR. KENDALL: Thank you.
2       MR. PETROCELLI: We will go to seven hours
3   today, but it will come as no surprise to you that I
4   will be seeking more time to complete the
5   examination, and we can talk about that some other
6   point not on the record.
7       THE WITNESS: And it actually does come as
8   a surprise to me.
9   BY MR. PETROCELLI:
10      Q. Okay.
11      A. Even for you.
12      Q. So let's go back to where we were.
13      The 2008 conflict waiver, was that specific
14  to Superboy?
15      A. No.
16      Q. Is that the same document as the consent
17  agreement?
18      A. No.
19      Q. So in 2008, you have a conflict waiver with
20  the Shusters, correct?
21      A. Yes.
22      Q. And do you have a separate conflict waiver
23  in 2008 with the Siegels?
24      A. Yes.
25      Q. That you executed at around the same time

Page 256

1   as the Shusters?
2       A. Yes.
3       Q. Is that the same document?
4       A. I don't know.
5       Q. In other words, did both sides or both
6   families sign the same conflict waiver?
7       A. I don't know. I believe they were
8   separate.
9       MR. PETROCELLI: Do you have it? Okay.
10      Q. When the -- how many agreements are you
11  aware of that both the Siegels and the Shusters
12  together have signed, either in counterpart or on
13  the same piece of paper, but were the parties to the
14  same agreement?
15      A. One.
16      Q. That's the 2008 consent agreement?
17      A. Yes.
18      Q. Okay. Other than they may have signed a
19  conflict waiver as well, but you're not sure about
20  that, right?
21      A. You mean if they signed together?
22      Q. Right.
23      A. I don't -- I don't believe they signed
24  together, but I would have to check that.
25      Q. Did Mr. Peary tell you when you informed

Page 257

1   him of your view regarding the fact that the
2   Shusters had no termination rights or interest in
3   Superboy, that he needed time to think about that
4   and do some independent research or talk to
5   somebody, or did he tell you that was not an issue
6   or -- of concern to him right when you told him?
7       MR. KENDALL: Objection.
8       THE WITNESS: Privileged.
9       MR. KENDALL: Privileged. And compound.
10  And argumentative.
11  BY MR. PETROCELLI:
12      Q. At the time that you told him this, the PPC
13  agreements were in effect, correct?
14      MR. KENDALL: Just a moment.
15  BY MR. PETROCELLI:
16      Q. The first PPC agreement was in effect
17  because you said you told him prior to 2001, right?
18  Prior to serving the termination notice in
19  November 2002, correct?
20      A. It was after the first PPC agreement.
21      Q. When -- in 2003 -- well, you served a
22  termination notice for the Shusters in 2003 after
23  the estate was set up, correct?
24      A. Yes.
25      Q. And the executor was appointed and -- and

65 (Pages 254 to 257)

**EXHIBIT A**
**67**

MARC   TOBEROFF - 9/18/2012

Page 258

1  all that, right?
2      A. Yes.
3      Q. And that notice of termination did not
4  extend to Superboy, correct?
5      A. No.
6      Q. That's incorrect?
7      A. When you say "extend to Superboy," I -- I
8  would answer as follows:  In a notice of
9  termination, you list the grant that's being
10  terminated and you list the works to which the
11  copy -- you list the works transferred by those
12  grants or the copyrights, the copyrights that were
13  transferred to -- I'm not stating this properly.
14      Q. No.
15      A. You list -- you list the -- not just -- I
16  don't want to use it too broadly.
17          You don't list the affected works.  The
18  central focus is you terminate -- you don't
19  terminate works, you terminate a grant.  The grant
20  granted what?  The grant granted copyrights in
21  works.
22          So you list -- would list those works.  So
23  to that extent, no, the termination would have no
24  effect.  The termination did not list Superboy.
25      Q. Okay.

Page 259

1      A. But there's a longer legal answer to that.
2      Q. You were -- in serving that notice of
3  termination, you had already concluded that the
4  Shusters had no termination interest in Superboy,
5  correct?
6          MR. KENDALL:  Asked and answered.
7          THE WITNESS:  In serving the Superboy
8  termination?
9  BY MR. PETROCELLI:
10      Q. No, in serving the Shuster termination
11  notice in 2003, by then you had already concluded
12  that the Shusters had no termination interests to
13  Superboy?
14          MR. KENDALL:  Asked and answered.
15          THE WITNESS:  Not -- not specifically, no.
16  BY MR. PETROCELLI:
17      Q. I'm correct.  Is that right?  You already
18  reached that view as early as November of 2002,
19  right?
20      A. Yes.
21      Q. Okay.  Did you document in any --
22      A. I need to --
23          MR. KENDALL:  I think the record is a
24  little garbled.
25          Could I ask the reporter to read back the

Page 260

1  last three questions and answers.
2          (The reporter read the record
3  as follows:
4          "QUESTION:  You were -- in
5  serving that notice of termination,
6  you had already concluded that the
7  Shusters had no termination
8  interest in Superboy, correct?
9          "MR. KENDALL:  Asked and answered.
10          "THE WITNESS:  In serving the Superboy
11  termination?
12          "QUESTION:  No, in serving the
13  Shuster termination notice in 2003, by
14  then you had already concluded that
15  the Shusters had no termination interests
16  to Superboy?
17          "MR. KENDALL:  Asked and answered.
18          "THE WITNESS:  Not -- not
19  specifically, no.
20          "QUESTION:  I'm correct.
21  is that right?  You already reached
22  that view as early as November of
23  2002, right?
24          "ANSWER:  Yes.")
25          THE WITNESS:  Okay.  I think just hearing

Page 261

1  that, I couldn't -- I couldn't follow it.  I think
2  there's maybe confusion between the Shuster Superman
3  termination notice and the Siegel Superboy
4  termination notice.
5  BY MR. PETROCELLI:
6      Q. I wasn't -- I thought that they were very
7  clear to me, so I have no reason to follow up on
8  them.
9          THE WITNESS:  Okay.  Well, can you read
10  me -- read them back again so to the extent I mixed
11  the two up, I'm answering correctly?
12          (The reporter read the record
13  as follows:
14          "QUESTION:  You were -- in
15  serving that notice of termination,
16  you had already concluded that the
17  Shusters had no termination
18  interest in Superboy, correct?")
19          THE WITNESS:  And what's the question
20  before that?
21          MR. KENDALL:  You can look at it on here,
22  maybe that will be easier.
23          MR. PETROCELLI:  Have you concluded looking
24  at that on the Livenote so I can resume questioning
25  you?

66 (Pages 258 to 261)

**EXHIBIT A**
**68**

MARC  TOBEROFF - 9/18/2012

Page 262

1    THE WITNESS: I'm just studying it. Okay.
2  BY MR. PETROCELLI:
3    Q. Okay? Let me direct your attention to
4  Exhibit 20. This is a -- an agreement --
5    A. I need -- are you referring to --
6    Q. New exhibit. I'm going to hand it to you.
7  This is --
8    A. Excuse me. I need to get some water. I'm
9  feeling kind of tired.
10    MR. PETROCELLI: Let's take a short break,
11  please.
12    THE VIDEOGRAPHER: Off the record. The
13  time is 5:00 o'clock.
14    (Brief recess.)
15    THE VIDEOGRAPHER: Back on the record at
16  5:06.
17    (The documents referred to
18    were previously marked for
19    identification as Exhibit 20 and 21
20    and is attached to this
21    deposition.)
22  BY MR. PETROCELLI:
23    Q. Mr. Toberoff, you have Exhibit 20 in front
24  of you, which is a -- a letter agreement with Warren
25  and Jean to the effect that the joint venture

Page 263

1  agreement of November 2001 and the engagement
2  agreement of October 2003 are being canceled.
3    Do you see that?
4    A. Yes.
5    Q. And then Exhibit 21 is a redacted letter
6  agreement regarding engagement for professional
7  services that is dated as of November 23, 2001.
8    Do you see that?
9    A. Yes.
10    Q. And do you know when that was actually
11  created and signed?
12    A. Sometime in 2004.
13    Q. Was it at or about the time of the
14  September 10, 2004 cancellation agreement, Exhibit
15  20?
16    A. Yes.
17    Q. Okay. Were these essentially prepared in
18  tandem, Exhibit 20 and 21?
19    A. I believe, yes.
20    Q. Okay. By the time you --
21    A. Let me see if there's a date on this
22  retainer.
23    MR. PETROCELLI: Is there a date on this?
24  No?
25    THE WITNESS: When they signed it.

Page 264

1    MR. PETROCELLI: We don't see a date on it.
2    Q. By the time that you executed Exhibit 20,
3  the September 10, 2004 agreement, had you come to
4  the view that the transfers set forth in the 2001
5  agreement were void ab initio?
6    A. I believe by 2- -- I believe by
7  September of 2004, I would have known that.
8    Q. Is that one of the reasons why the
9  agreement was canceled?
10    A. I don't -- I think there was -- it could
11  have been. I don't want to speculate, but I don't
12  have a specific recollection of focusing on that.
13  My specific recollection is that I wasn't
14  comfortable with the form of the agreement to begin
15  with. That's why I had it reviewed. And even after
16  I had the new form of agreement, I -- even though
17  that -- and again, without waiver of the
18  attorney-client relationship with the Jackoway firm,
19  I wasn't really comf- -- entirely comfortable with
20  that, either, and then just replaced it by a
21  retainer agreement, which coincided with the fact
22  that learning more about the termination rights,
23  feeling that everything surrounding Superman was in
24  anticipation of litigation, and -- and that it was
25  just a bad fit between how I used to do business

Page 265

1  starting with that 2001 form of agreement and even
2  under the 2003 agreement it was just simpler to have
3  a simple retainer.
4    And the idea was to replace -- to cancel
5  and replace that agreement with this retainer
6  agreement. That's why it was both dated as of the
7  exact same date.
8    Q. Was it prepared, that is Exhibit 20 and
9  Exhibit 21, at or about the time of commencement of
10  litigation in the Siegel case?
11    A. I think it was prepared before that.
12    Q. The Siegel litigation was in October 2004?
13    A. When we filed the Siegel lawsuit?
14    Q. Yes.
15    A. It was either October or November. I -- I
16  would -- it would be helpful to know the date when I
17  entered into the Siegel litigation retainer
18  agreement. I didn't know whether that was -- if
19  that was around September 10, 2004.
20    Q. Take a look at that document which has also
21  been produced to us in redacted form. It's dated
22  October 3, 2004.
23    THE WITNESS: October 3, 2004?
24    MR. PETROCELLI: Yeah. That will be marked
25  as Exhibit 103.

67 (Pages 262 to 265)

**EXHIBIT A**
**69**

MARC   TOBEROFF - 9/18/2012

Page 266

1        (The document referred to was
2    marked for identification by the
3    C.S.R. as Exhibit 103 and attached
4    to this deposition.)
5        MR. PETROCELLI:  We'll hand you that as
6    well.
7        Q.  What was the reason --
8        A.  So -- so --
9        Q.  I'm sorry, go ahead.
10       A.  What was -- wasn't there a question pending
11   where we were trying to date something?
12       Q.  Whether you entered into the -- these
13   agreements, Exhibit 20 and 21 with the Shusters at
14   or about the time you commenced litigation on behalf
15   of the Siegels.
16       You said you wanted to see the engagement
17   letter with the Siegels.
18       A.  It was -- it was before.  So the Siegel
19   agreement is -- it's dated October 3, 2004, and it
20   was signed on October 3, 2004, which means it would
21   have been negotiated beforehand.
22       And the -- this was probably signed on
23   September 10, 2004, the same time this agreement --
24   cancellation, so there was no doubling up of fees,
25   and -- so I believe the anticipation of litigation

Page 267

1    in the Siegel matter -- I think the litigation
2    surrounding the Siegel matter always impacted the
3    Shuster matter.
4        Q.  Is there any -- was there any part of your
5    new arrangement with the Shusters starting in or
6    about September 10, 2004, that prevented -- that
7    required them to get the consent of you, the Siegels
8    or anybody else to consummate a settlement?
9        A.  No.  That aspect of the 2001, 2003 PPC
10   agreements does not exist in the retainer agreement.
11       Q.  Okay.  And to be clear about that, if you
12   take a look at Exhibit 21 you'll see that there are
13   some redactions, including paragraphs 7 and 8 in
14   their entirety.
15       A.  Right.
16       Q.  Are you certain that there is no provision
17   in the unredacted agreement that pertain to the
18   Shusters' need for consent of someone else in order
19   to make a settlement?
20       A.  To be 100 percent certain, I would have to
21   look at the unredacted agreement, but I don't
22   believe that would be in here.
23       Q.  And the same question for Exhibit 103, the
24   Siegel retainer agreement, are you certain it
25   contained no provisions requiring the consent of

Page 268

1    others to consummate a settlement?
2        A.  I don't believe that had any requirement of
3    any other consent than Joanna and Laura to a
4    settlement.
5        Q.  Any such requirement --
6        A.  I don't believe the Shuster retainer
7    agreement has that also.  But in your -- your -- I
8    don't have the unredacted agreement in front of me
9    to verify that.
10       Q.  And that requirement after 2004, the first
11   time that requirement came into existence was in
12   2008 when the parties signed the consent agreement?
13       MR. KENDALL:  What requirement?
14       MR. PETROCELLI:  The requirement for the
15   consent of another to consummate a settlement.
16       THE WITNESS:  Well, again, we're getting
17   into an area of where we assert a privilege, and
18   privilege has been upheld, so my answer is without
19   waiver of privilege, same agreement, correct?
20   BY MR. PETROCELLI:
21       Q.  Yes.
22       A.  Okay.  And I'm also discussing what has
23   already been disclosed, which is essentially -- and
24   now I've forgotten the question.  So I prepared -- I
25   prepared the record to answer the question.

Page 269

1        Q.  My question was the first time that a
2    requirement for the consent of another to consummate
3    a settlement was 2008, after the 2004 agreements?
4        A.  With respect to the Siegels and Shusters?
5        Q.  Yes.  Correct.
6        A.  Yes.
7        Q.  Is the consent --
8        A.  But I would answer that more specifically,
9    it's not the consent of another.  You're technically
10   correct, but it's basically mutual consent of the
11   Siegels and Shusters to a settlement of their
12   termination interests.
13       Q.  Did they receive --
14       A.  Not my consent.
15       Q.  Your consent is not required at all?
16       A.  Absolutely not.
17       Q.  And not any entity associated with you?
18       A.  Correct.
19       Q.  Okay.  And no third party, it's just the
20   Siegels and the Shusters?
21       A.  Correct.
22       Q.  Okay.  Is -- is it both Mark --
23       A.  And -- and --
24       Q.  -- Warren Peary and Jean?
25       A.  I was just about to say that the -- the

68 (Pages 266 to 269)

MARC  TOBEROFF - 9/18/2012

Page 270

```
 1   consent, I believe, is the executor.
 2       Q. On the Shuster side?
 3       A. I believe so.
 4       Q. And on the Siegel side?
 5       A. I'm not 100 percent certain.
 6          On the Siegel side it was Laura and Joanne.
 7       Q. Now it's just Laura?
 8       A. Correct.
 9       Q. Did -- you said that there was a conflict
10   waiver signed by Peary in or about 2008, I believe?
11       A. Yes.
12       Q. What prompted that?
13       A. The consent agreement.
14          MR. KENDALL: Just a minute. I think we're
15   getting into a slightly different area.
16          So, again, I just want to caution you on
17   privilege. And I assume we have the same
18   understanding, that it will not be a waiver, so
19   you'll just have to make a determination whether
20   you -- you want to provide this information since it
21   may be privileged.
22          MR. PETROCELLI: I believe he answered the
23   question. He said "the consent agreement."
24          MR. KENDALL: So he did, but that's because
25   he didn't give me an opportunity to object first and
```

Page 271

```
 1   give him a caution first.
 2   BY MR. PETROCELLI:
 3       Q. Do you know whether the Shusters received
 4   independent legal advice regarding the conflict
 5   waiver or the consent agreement?
 6       A. I don't know whether they did or did not.
 7       Q. And do you know whether the Siegels did?
 8       A. I believe the Siegels did.
 9       Q. Do you know the name of the attorney?
10       A. George Zadorozny.
11       Q. George Zadorozny?
12       A. And I don't -- they may have -- I know that
13   whenever it came to something like that, they would
14   run it by George Zadorozny and/or George Zadorozny
15   and Arthur Levine or just George Zadorozny.
16       Q. Did you send copies of the consent
17   agreement to George or Arthur?
18       A. No, that wasn't the practice.
19          MR. KENDALL: Marc, take your hand away
20   from your face because it interferes with the
21   projection of your voice.
22          THE WITNESS: Okay.
23   BY MR. PETROCELLI:
24       Q. It also detracts from your -- your
25   appearance.
```

Page 272

```
 1       A. Sophisticated demeanor.
 2       Q. I know you said that Zadorozny would be
 3   involved in certain matters.
 4       A. "Zadorozny."
 5       Q. "Zadorozny."
 6       A. Yeah.
 7       Q. Do you know for certain if he was involved
 8   in the -- for the Siegels with respect to the 2008
 9   consent agreement?
10       A. Not 100 percent certain, but that's my
11   belief. Did the Siegels --
12       Q. Did the Siegels --
13       A. Put it another way, I would be very
14   surprised if he was not.
15       Q. Did the Siegels also sign a conflict waiver
16   in 2008?
17       A. Yes.
18       Q. Do you know if he was involved in that
19   document?
20       A. I thought you just asked me that.
21       Q. I asked you about the consent agreement.
22       A. Oh, okay.
23       Q. Did you --
24       A. Two separate documents, yeah.
25          So consent agreement, it would be the same
```

Page 273

```
 1   answer for both.
 2       Q. There are two documents that the Siegels
 3   signed in 2008?
 4       A. Yes.
 5       Q. Okay.
 6       A. And -- and now that you ask it that way, I
 7   have even -- I -- I think it's even -- it's even
 8   more likely that Zadorozny was involved with the --
 9   with respect to the consent agreement, yes, and
10   since there were two agreements, including a
11   conflict waiver -- a conflict waiver and a consent
12   agreement, I believe he was involved in reviewing
13   those.
14       Q. And Zadorozny was involved in reviewing the
15   2004 retainer agreement with Joanne and Laura?
16       A. Yes.
17       Q. Why did you date the engagement for
18   professional services that you signed with Warren in
19   2004 as of November 23, 2001?
20       A. Two reasons. One, I wanted to make it
21   clear that this agreement was replacing the PPC
22   agreements and two, I wanted -- it was -- it was
23   like an assertion of privilege over our
24   relationship, attorney-client relationship
25   commencing at the latest on November 23rd, 2001 when
```

69 (Pages 270 to 273)

**EXHIBIT A**
**71**

MARC   TOBEROFF - 9/18/2012

Page 274

1    we signed the PPC agreement.
2        Q. When you signed the -- excuse me. Are you
3    a signatory to the consent agreement?
4        A. Only as to approval as to form.
5        Q. Okay. Did you receive independent legal
6    advice? Did you receive legal advice regarding that
7    subject whether the Siegels and Shusters could sign
8    a consent agreement without violating some law,
9    including the copyright statute?
10       MR. KENDALL: So that may call for
11   privileged information given the specificity of the
12   question. I just caution you not to reveal any
13   attorney-client communications you may have had with
14   anyone who was acting as your counsel or providing
15   legal advice.
16       THE WITNESS: But I can answer outside
17   of -- I can answer whether or not -- revealing
18   whether or not I did is not --
19       MR. KENDALL: If the answer is no, then
20   you're not revealing any attorney-client
21   communication. If the answer is yes, then you might
22   be, and so then you have to make a judgment as to
23   whether you wish to reveal that.
24       THE WITNESS: Not -- not any -- not outside
25   of my firm.

Page 275

1    BY MR. PETROCELLI:
2        Q. Okay. Okay. Let's -- let's go back now to
3    2002.
4           You earlier in the deposition indicated
5    that you spoke to Kevin Marks in February '02, and
6    you thought it was clear from the conversation, even
7    though the words were not used, that there was no
8    agreement that the Siegels had entered into post
9    termination, correct?
10       MR. KENDALL: I'm sorry.
11       MR. PETROCELLI: Is that a short summary of
12   what we previously discussed?
13       MR. KENDALL: One moment for a second.
14   BY MR. PETROCELLI:
15       Q. Just a foundational question to get you
16   back there.
17       MR. KENDALL: Just give me a second.
18       I think it's argumentative and does not
19   accurately state the witness' testimony. But on
20   your representation that it's just foundational, I
21   think you can answer the question.
22       THE WITNESS: So --
23   BY MR. PETROCELLI:
24       Q. I'm drawing your attention back to that
25   conversation, okay?

Page 276

1        A. I -- I recall giving testimony as to that
2    conversation.
3        Q. Okay.
4        A. Whatever it was, it's in the record.
5        Q. In -- did you specifically ask Mr. Marks
6    whether there was any documentation that had been
7    prepared in connection with a settlement or an
8    agreement with Warner Bros. or DC?
9        A. I don't recall asking him that.
10       Q. Did you explain to him why you were
11   speaking to him on the subject?
12       A. I believe -- I believe I did.
13       Q. What did you say to him?
14       A. Let me say it this way. I don't have a
15   specific -- my specific recollection of the
16   conversation was it was a very short conversation
17   and that he blew me off, and that the gist of the
18   conversation was he was in negotiations, not
19   that he had reached an agreement.
20       Q. Did you call him back again, even though he
21   hadn't returned your phone call?
22       A. In February?
23       Q. Yes.
24       A. Yes, I called to check in on him. I called
25   a second time.

Page 277

1        Q. And by this time, having had some time
2    since you entered into the agreement with -- with
3    Shuster, did you express to him a potential interest
4    on your part to explore buying out the Siegel
5    interests?
6        MR. KENDALL: Just a moment. Okay.
7        THE WITNESS: I don't believe that in
8    February the conversation even got that far.
9    BY MR. PETROCELLI:
10       Q. Is this -- can you --
11       MR. TOKORO: Exhibit 100.
12   BY MR. PETROCELLI:
13       Q. You have Exhibit 100, which is Mr. Marks'
14   call log?
15       A. Yes.
16       Q. Which -- for February 6, 2002, which says:
17           "Potential buyout (end of
18           November.)"
19       Do you see that?
20       MR. KENDALL: It's page GTRB 0604.
21       MR. PETROCELLI: Yes, that's correct.
22       THE WITNESS: What's the page?
23   BY MR. PETROCELLI:
24       Q. Bates number 604.
25       A. Okay.

70 (Pages 274 to 277)

**EXHIBIT A**
**72**

MARC   TOBEROFF - 9/18/2012

Page 278

1      **Q. Does looking at that jog your memory that**
2   **you discussed the potential buyout with him?**
3        A. It doesn't jog a memory, but it -- it
4   suggests that I may have.
5        **Q. At that time --**
6        A. It says end of November.  That can only
7   refer to the fact he called end of November.
8   Because otherwise reading it literally it's talking
9   about a special buyout in November.
10       **Q. As of February 2002, did you have an**
11  **interest of exploring a buyout of the Siegel**
12  **interests?**
13       A. As of what date?
14       **Q. As of early part of 2002.**
15       A. I don't -- I don't -- according to this, I
16  did.  But I don't have a specific recollection of
17  that.  I have a recollection of that -- I have a
18  recollection of him basically blowing me off, no
19  traction to the conversation whatsoever and, you
20  know, him making me feel uncomfortable just staying
21  on the phone.  And that -- that the next time we
22  spoke, you know, closer to early August was when
23  that -- when that topic was broached.
24       **Q. You said earlier today that you got very**
25  **clearly the impression that there was no deal in**

Page 279

1   **place, correct?**
2        A. Yes.
3        **Q. Did he tell you that negotiations were**
4   **ongoing?**
5        A. I -- my impression was that they were in
6   negotiations.  I don't recall him saying,
7   "Negotiations are ongoing."
8        **Q. When did you first form the view that you**
9   **wanted to acquire the rights, the Siegel rights?**
10       A. Sometime in 2002.
11       **Q. Why did you want to do so?**
12       A. And it wasn't -- you say -- I would love
13  to -- you say form -- repeat what you just said
14  because I wasn't --
15       **Q. When did you decide you wanted to acquire**
16  **the Siegel rights?**
17       MR. KENDALL:  Lacks foundation and
18  argumentative.  Assumes facts.
19       THE WITNESS:  I don't believe I ever made a
20  decision that I personally would like to acquire the
21  Siegel rights.  I didn't have personally the money
22  to acquire the Siegel rights.  I wanted to be
23  associated with the Siegel rights.
24  BY MR. PETROCELLI:
25       **Q. In what capacity?**

Page 280

1        A. In any capacity.  Because I -- I --
2        **Q. Did you pitch this idea to Ari Emanuel**
3   **about an interest in acquiring the Siegel rights?**
4        MR. KENDALL:  I'll just caution you that
5   when you had communications with Mr. Emanuel at this
6   time in 2002, you need to consider whether those
7   were in furtherance of your representation of the
8   Shusters and consider whether that's privileged.
9        THE WITNESS:  What was the question?
10  BY MR. PETROCELLI:
11       **Q. When did you first broach the idea with Ari**
12  **Emanuel that he, in concert with you in some**
13  **capacity, might want to pursue the Siegel interests?**
14       MR. KENDALL:  That has the same issue but
15  it also lacks foundation.
16       THE WITNESS:  Without waiving -- again,
17  without waiving any privilege.
18       MR. KENDALL:  Let's just make sure
19  Mr. Petrocelli nodded in affirmative that it will
20  not waive.  Correct?
21       MR. PETROCELLI:  Yes.
22       THE WITNESS:  Okay.  First of all, I don't
23  think "pitching" him is the right word from your
24  last question, but made him aware of that there was
25  an opportunity regarding Superman, the Siegel

Page 281

1   Superman -- recaptured Siegel Superman copyrights
2   sometime in 2002.
3        And I would probably -- I don't know the
4   exact time, sometime between February and when we
5   spoke in August, and I would -- I believe it's
6   closer to August than to February.
7        **Q. Take a look at Exhibit 60 for a moment.**
8        **(The document referred to was**
9        **previously marked for**
10       **identification as Exhibit 60 and is**
11       **attached to this deposition.)**
12  BY MR. PETROCELLI:
13       **Q. This is a copy of the memorandum of**
14  **agreement that you signed with Mr. Emanuel on**
15  **February 12, 2002.  Exhibit 60, you have that in**
16  **front of you?**
17       A. Yes.
18       **Q. And did you --**
19       A. Let me just look.  I want to look at what
20  the dates are here.
21       **Q. Sure.**
22       **Did you discuss with Mr. Emanuel the**
23  **potential acquisition of the Siegel rights as of the**
24  **time that you signed Exhibit 60?**
25       A. I don't have a recollection of that.

71 (Pages 278 to 281)

**EXHIBIT A**
**73**

MARC   TOBEROFF - 9/18/2012

Page 282

1    Q. One way or the other or you don't believe
2  you did?
3    A. I don't believe I did.
4    Q. If you look at page 6 of Exhibit 60, which
5  bears control number EN 00007, do you have that in
6  front of you?
7    A. Yes.
8    Q. It says, "Legal claims" -- under "Appendix
9  1":
10       "Legal Claims/Litigation
11       (initialed due to confidentiality)
12       JS claims."
13    Do you see that?
14    A. Yes.
15    Q. What does that refer to?
16    A. Joseph Shuster claims.
17    Q. There was no --
18    A. And more specifically, my pre-existing
19  agreement, 2001 PPC agreement.
20    Q. There was no legal claims or litigation at
21  that time, correct?
22    A. It was just a generic way of referring to
23  those agreements as -- you know, as rights of
24  claims.
25    Q. Now, is there -- you did not --

Page 283

1    A. Let me just see the -- if we have the part
2  that refers to Appendix 1.
3    Q. If you look at the first page of the
4  agreement under B, from "PPC," (a)?
5    A. Right.
6    Q. "PPC's current IP business
7       subject to pre-existing
8       commitments and exclusions
9       per Appendix 1"?
10    A. So PPC had a 2001 agreement with the
11  Shusters. That's what "JS claims" refers to and --
12    Q. Was there any intention to exclude any
13  potential dealings for the acquisition of the Siegel
14  interests at the time that you executed Exhibit 60?
15    A. I don't believe so.
16    Q. Okay.
17    A. But I believe that -- I don't -- in answer
18  to your first question, the reason why I believe
19  that we -- we weren't discussing on this, is because
20  I -- I -- there was obviously an effort to exclude
21  the Shuster claims and I -- I -- I wouldn't want to
22  paint too much of an emphasis on that because it
23  would be in Emanuel's interest to include as much as
24  possible in the agreement.
25    Q. You would not want to place too much of an

Page 284

1  emphasis on it to whom, to Emanuel, you mean, at the
2  time?
3    A. Yes, because -- because -- because I didn't
4  want to -- I didn't want that to get shoehorned into
5  this agreement. I wanted to keep it separate.
6    Q. You're saying you wouldn't have been
7  talking about Superman?
8    A. I wouldn't have been emphasizing Superman
9  because that would then -- could possibly lead to
10  insistence that I include the Joe Shuster rights and
11  claims in the deal.
12    Q. When you did start to talk to Mr. Emanuel
13  about Superman, did you tell him that you did have
14  the Shuster side, a deal with the Shusters?
15    A. Yes.
16    Q. Okay.
17    A. I'm not sure if -- I believe that that
18  was -- that was disclosed when we entered into this
19  agreement. In other words, they knew what "JS
20  claims" meant.
21    Q. "They" being Emanuel?
22    A. Emanuel and Tom McGuire.
23    Q. And Tom McGuire?
24    A. Yeah.
25    Q. Okay. Go to Exhibit 61. That's a letter

Page 285

1  by Joanne Siegel dated May 9, 2002 to Richard
2  Parsons.
3       (The document referred to was
4       previously marked for
5       identification as Exhibit 61 and is
6       attached to this deposition.)
7  BY MR. PETROCELLI:
8    Q. When is the first time you saw this letter?
9    A. I can't put a date on it. I believe it
10  would be sometime after the IP Worldwide agreement
11  was entered into.
12    Q. In October 2002?
13    A. Whatever the day of the IP Worldwide
14  agreement is, yeah.
15    Q. Following your phone call with Kevin Marks
16  in February of 2002, did you make any efforts to
17  contact Joanne or Laura Siegel?
18    A. Repeat that, please. I was reading this.
19    Q. Following your phone call with Kevin Marks
20  in 2002, did you make any effort to contact the
21  Siegels, Joanne or Laura?
22    A. Joanne or Laura, no.
23    Q. Do you know whether Mr. Emanuel did at any
24  time?
25    A. I don't believe he did.

72 (Pages 282 to 285)

**EXHIBIT A**
**74**

MARC   TOBEROFF - 9/18/2012

Page 286

1    Q.  What, if anything, did you do following
2  that February 2002 phone call to Kevin Marks to
3  learn more about the status of the negotiations
4  between the Siegels and Warner Bros. or DC?
5        MR. KENDALL:  Objection.  Argumentative.
6  Lacks foundation.
7        THE WITNESS:  I don't know if I did
8  anything more.  I may or may not have.  Remember we
9  spoke earlier about a conversation with Don Bulson
10  and I said that between the initial -- we can look
11  back at the Don Bulson telephone log.  There may
12  have been another conversation with Don Bulson in
13  which I asked him, "What's happening with the
14  Siegels?"
15  BY MR. PETROCELLI:
16    Q.  Your -- turn to the Kevin Marks call log
17  again, Exhibit 100.  Page 615.  Bates number 615.
18  This is his call log for July 30, 2002.
19        MR. KENDALL:  Just a moment.  I don't think
20  that Exhibit 100 includes that.
21        THE WITNESS:  Exhibit 102.
22        MR. PETROCELLI:  We have to go to a new
23  exhibit.  Call that Exhibit 104.
24        THE WITNESS:  We have Exhibit --
25        MR. KENDALL:  That's Bulson.

Page 287

1        THE WITNESS:  Okay.
2        MR. KENDALL:  He asked for Kevin Marks.
3        THE WITNESS:  Okay.  I'm getting a little
4  tired.
5        MR. PETROCELLI:  Do you want to give
6  Mr. Toberoff Exhibit 104.
7        THE WITNESS:  Thank you.
8        (The document referred to was
9          marked for identification by the
10          C.S.R. as Exhibit 104 and attached
11          to this deposition.)
12        MR. KENDALL:  Mr. Toberoff, you said you
13  were getting a little tired.  Do you need a short
14  break just to, you know, focus or are you okay to go
15  on?
16        THE WITNESS:  Just maybe get a cold glass
17  of water.
18        MR. PETROCELLI:  Let's take a short break.
19        THE VIDEOGRAPHER:  Off the record.  The
20  time is 5:44.
21        (Brief recess.)
22        THE VIDEOGRAPHER:  We are back on the
23  record at 5:48.
24  BY MR. PETROCELLI:
25    Q.  So you have Exhibit 104 in front of you,

Page 288

1  the Kevin Marks call log, and you'll see an entry
2  for July 30, 2002 on page bearing Bates number 0615.
3    A.  Yes.
4    Q.  Okay.  In that call, by the time you made
5  that call, had you already reached an understanding
6  with Ari Emanuel that an attempt would be made to
7  engage Mr. Marks in a discussion about a potential
8  offer?
9        MR. KENDALL:  I'm going to object.  Were
10  you meaning to represent that the outgoing call from
11  Mr. Marks on page 615 was a call placed by Marc
12  Toberoff?
13        MR. PETROCELLI:  I don't know who placed
14  the call so I'm not making that reference.
15    Q.  Did you make a call to him on July 30?
16    A.  I don't think so.  There's -- there's a --
17  and I think there was some testimony interpreting
18  this call sheet by -- by Kevin Marks.  I don't
19  recall what it was.  But I see there's -- on the
20  out- call -- -going call sheet on Bates stamp 0614,
21  there's a call from a Marc Toberoff on 7-24-02 and
22  then there's a call --
23        MR. KENDALL:  I think you just misspoke.
24        THE WITNESS:  Oh, outgoing.
25  BY MR. PETROCELLI:

Page 289

1    Q.  Did you speak to Mr. Marks in or about
2  July, before the call that you had with him on which
3  Ari Emanuel also participated?
4    A.  There was some conversation between the
5  call where Ari was on the call.  I believe that two
6  things happened.  One was that there was calls and
7  messages left and that I eventually spoke to him.
8    Q.  "Him" being Kevin?
9    A.  Kevin.  And then we had one conversation.
10  And then there were attempts to set up a conference
11  call with Ari, myself and Kevin Marks.
12    Q.  Now, before the conference call with you,
13  Marks and Emanuel, you mentioned a prior call that
14  you had with Marks that took place in or about July?
15    A.  I think late July would be a good estimate.
16    Q.  Now, in that call, did you ask Mr. Marks
17  whether the negotiations were still ongoing, what
18  the status of the talks with Warner Bros. or DC was?
19    A.  I don't recall the specific words
20  exchanged, but I recall the gist of the
21  conversation, and the gist of the conversation was
22  what is the status of the Siegel rights, has an
23  agreement been concluded with Warner Bros., and his
24  tone was different.
25        While he didn't want to go into detail, he

Merrill   Corporation   -   Los Angeles
Los Angeles - 800-826-0277              www.merrillcorp.com/law

**EXHIBIT A**
**75**

MARC  TOBEROFF - 9/18/2012

Page 290

1  said in -- in pretty clear terms, something to the
2  effect, "But if you want to make an offer, I will
3  convey it to my clients."
4      **Q. Do you have a -- did you make any memo of**
5  **your conversation with Kevin Marks on this occasion?**
6      A. No.
7      **Q. Any writing that refers to it that you --**
8      A. Nothing --
9      **Q. What about your prior calls with him?**
10     A. Nothing that I could locate, no.
11     **Q. Is it true that Mr. Marks told you in this**
12  **call or in any of the prior calls that the Siegel**
13  **family had reached an agreement with DC Comics**
14  **subject to documentation?**
15     MR. KENDALL: Argumentative.
16     THE WITNESS: I -- I don't recall that at
17  all him saying we had reached an agreement subject
18  to documentation.
19     What I recall was going back, the initial
20  conversation, I think we're dating it in
21  February based on this call log, in which he
22  basically didn't want to talk about the subject but
23  indicated to me that he was in negotiations.
24  Then -- it was a very short conversation and he blew
25  me off.

Page 291

1      And then when we had a conversation which
2  we're now dating towards the end of July, it was a
3  different conversation.  He made it clear that the
4  rights were available but he didn't want to give me
5  any indication of how much the Siegels wanted for
6  those rights.
7  BY MR. PETROCELLI:
8      **Q. I want to be very clear on this:  Did he or**
9  **did he not tell you that the Siegel family had**
10  **reached an agreement with DC Comics subject to**
11  **documentation?**
12     A. I don't -- I don't recall him using those
13  words, "reached an agreement subject to" --
14     **Q. Did he lead you to believe with body**
15  **language, as you put it, or any other words that he**
16  **used, that DC -- that the Siegel family had reached**
17  **an agreement with DC Comics subject to**
18  **documentation?**
19     A. No, because he essentially invited an
20  offer.  He invited an offer, and when I use -- let
21  me describe -- when I use the word "body language"
22  obviously he's not in front of me so body language
23  is just a metaphor.  What I'm saying is, it was
24  clear from the gist of the conversation what was
25  happening.

Page 292

1      **Q. Did he tell you that he did not feel it was**
2  **appropriate for you to be making offers while he was**
3  **in the process of documenting an existing deal?**
4      MR. KENDALL: Argumentative.
5      THE WITNESS:  No, I think it's to the
6  contrary.  It was, "If you want to make an offer" --
7      MR. KENDALL: Don't interrupt him.
8      MR. PETROCELLI:  Yeah, I'm trying to get
9  through this briskly.
10     THE WITNESS:  It was -- well, pretty
11  important to your claims.
12     So he did not put it that way to me because
13  that would be contrary to inviting an offer.  He
14  said, "I'm not going to discuss with you money, but
15  if you want to make an offer, I will convey it to my
16  client."
17  BY MR. PETROCELLI:
18     **Q. Did he --**
19     A. And I followed that up by setting up a
20  meeting, a conference to do just that, in which he
21  willingly participated.
22     **Q. You've seen Mr. Marks' August 9, 2002**
23  **memo to the file or memo to Joanne Siegel, Laura**
24  **Siegel --**
25     A. Yes.

Page 293

1      **Q. -- and Don Bulson?**
2      A. Yes.
3      **Q. And you see where he states that he had**
4  **told you he reached an agreement with DC Comics**
5  **subject to documentation?**
6      MR. KENDALL:  I don't think it's in front
7  of the witness, right?
8      MR. PETROCELLI:  It's not in front of the
9  witness.
10     **Q. Do you recall --**
11     MR. KENDALL:  But you said, "And you see
12  where he states" so shouldn't he see where that is
13  stated before answering the question?
14  BY MR. PETROCELLI:
15     **Q. Do you recall having seen that in the memo?**
16     A. I recall the words "subject to
17  documentation," yes.
18     **Q. When you saw whatever he wrote there, when**
19  **you first saw that memo, did you believe that any of**
20  **the statements in it were inaccurate?**
21     MR. KENDALL:  Com- -- compound.  Vague and
22  ambiguous.  And I'm going to request that you place
23  the document before the witness so that he can
24  review the statements thereto, unless he has a clear
25  recollection of all the statements that were there.

74 (Pages 290 to 293)

**EXHIBIT A**
**76**

MARC  TOBEROFF - 9/18/2012

Page 294

1    THE WITNESS:  Yeah, since your question
2  wasn't just focused on that particular aspect, which
3  I think I already answered, then I would have to see
4  the documents to look at other aspects of the memo.
5  BY MR. PETROCELLI:
6    **Q.  With respect to the aspects that I did ask
7  you about, when you saw his August 9, 2002 memo, did**
8  **you believe that it was inaccurate in how it**
9  **referred to or reflected those aspects of your**
10 **conversations?**
11   MR. KENDALL:  Vague and ambiguous and --
12   THE WITNESS:  I -- I --
13   MR. KENDALL:  -- overbroad.
14   THE WITNESS:  -- have to look at the memo
15 to -- I want to see what he says in the memo.  If he
16 said in the memo, "I told Mr. Toberoff that we had a
17 deal subject to documentation," that would be -- I
18 believe is inaccurate.
19 BY MR. PETROCELLI:
20   **Q.  Have you had any discussions with him about**
21 **his having written something inaccurate in his memo?**
22   A.  Did I have discussions with him?
23   **Q.  Yeah, after you saw the memo, did you ever**
24 **have any conversations with Mr. Marks on that**
25 **subject?**

Page 295

1    MR. KENDALL:  So I'm just going to caution
2  you with respect to your conversations with
3  Mr. Marks, who had a client relationship with the
4  Siegels before you did, and still has
5  confidentiality obligations arising from that
6  period, and of course you have confidentiality
7  obligations, to be cautious in what you disclose so
8  as not to waive any privileges.
9  BY MR. PETROCELLI:
10   **Q.  Did you have any such discussions with him**
11 **on that subject after having seen his memo?**
12   A.  I'm -- it's our position that the writ
13 documents do not entail subject matter waiver, so
14 any -- those discussions with Marks would be
15 privileged, about the subject matter of his
16 representation or my representation.
17   **Q.  Did you have conversations with him on the**
18 **subject of his August 9, 2002 memo?**
19   A.  I don't recall a specific subject [sic]
20 about the August 9 memo.  I may have.
21   MR. KENDALL:  I think you might have just
22 misspoken.
23   Could you read back his answer.
24   (The reporter read the record
25   as follows:

Page 296

1    "QUESTION:  I don't recall a
2    specific subject [sic] about the
3    August 9 memo.  I may have.")
4    MR. KENDALL:  I think you meant to say
5  "conversation" not "subject."
6    THE WITNESS:  I don't recall a -- did I say
7  I don't recall a specific subject?
8  BY MR. PETROCELLI:
9    **Q.  I understood what you meant.**
10   A.  I meant conversation.
11   MR. KENDALL:  But the record needs to be
12 clear, Mr. Petrocelli.
13   THE WITNESS:  I meant "conversation."
14 BY MR. PETROCELLI:
15   **Q.  Did -- you testified in the Siegel**
16 **deposition to a subsequent conference call where**
17 **Mr. Emanuel made an offer of $15 million plus a**
18 **reference to some back-end participation.**
19   **You recall that offer on the conference**
20 **call?**
21   A.  When you say "subsequent," you mean
22 subsequent to what?
23   **Q.  Subsequent to this -- what we've been**
24 **calling this late July phone call to --**
25   A.  Where I said he invited an offer --

Page 297

1    **Q.  -- Kevin Marks.**
2    **Yes, subsequent to your -- the call that**
3  **you've just been talking about.**
4    A.  Okay.  Yes.  All right.
5    **Q.  Now, with respect to that conference call,**
6  **before the call had you had discussions with**
7  **Mr. Emanuel about what was to be conveyed to**
8  **Mr. Marks?**
9    A.  Yes.
10   **Q.  Okay.  With respect to the $15 million,**
11 **where was that money coming from?**
12   THE WITNESS:  Do we -- I don't want to
13 waive any privileges by answering that question.
14   MR. KENDALL:  So --
15   MR. PETROCELLI:  We disagree that there are
16 any privileges but we've had this understanding that
17 your giving of an answer isn't going to trigger a
18 waiver.
19   THE WITNESS:  Okay.
20   My understanding that the 15 million was
21 coming from Ari Emanuel, and that understanding
22 encompassed an understanding that Ari Emanuel was --
23 would, like anybody else making an acquisition, like
24 buying a house or buying a company, would finance
25 that acquisition as he saw fit.  Either with debt

75 (Pages 294 to 297)

MARC   TOBEROFF - 9/18/2012

Page 298

1  financing or from -- from -- from a bank or bringing
2  in equity partners.
3  BY MR. PETROCELLI:
4      Q. Did you -- do you know whether, at the time
5  the $15 million conversation occurred, this
6  conference call with Kevin Marks, that the $15
7  million had been funded already?
8      A. I -- I -- I think that's the wrong way to
9  look at it.
10     Q. I'm just asking whether the money had been
11 collected and gathered and was available?
12     A. The money -- I believe the money was
13 available because I believe that Ari Emanuel had
14 much more than $15 million in August of -- of -- of
15 2002.
16     Q. Did you ask Mr. Emanuel whether absent some
17 ability to obtain alternate financing, he was
18 prepared to put up the $15 million himself?
19     A. It was understood that he was prepared --
20 when you say "alternate form of financing" it's
21 understood that he was financing the offer.
22     Q. He, personally?
23     A. Yes, he personally, whether it's by -- and
24 assumed that he -- that -- and it was -- and I
25 assumed, like in any financial transaction, there

Page 299

1  would be a cash component, a debt component, and
2  possibly bringing in other equity investors.
3      Q. So the $15 million that would go to the
4  Siegels that was offered on the conference call, was
5  that a cash payment of $15 million or was that part
6  cash and the rest to be paid over time? How was
7  that structured in your call?
8      MR. KENDALL: Just a minute. Now, you've
9  moved to what was said.
10     MR. PETROCELLI: You don't have to dissect
11 my questions in the interest of time. I'll rephrase
12 the question, okay?
13     Q. When you made the offer on the conference
14 call, was the $15 million a cash payment to the
15 Siegels?
16     A. So I would answer the question this way.
17 Usually in a rights transaction or a rights
18 acquisition --
19     Q. Can you just stick with me?
20     A. No, because I don't want my answer to be
21 misunderstood when you say "cash payment," it was a
22 fixed payment as opposed to a contingent payment.
23     Q. I understand it was fixed, but if it had
24 been accepted, was the money to be paid all at once,
25 the 15 million, as opposed to over time?

Page 300

1      A. I don't think the negotiations had gotten
2  that far.
3      Q. Okay. But you understood that Mr. Emanuel
4  had the ability himself, personally, to come up with
5  the 15 million all at once if required?
6      MR. KENDALL: Objection. Asked and
7  answered.
8      THE WITNESS: I wouldn't view it as come up
9  with the $15 million. I would view it as the
10 capability of financing that transaction.
11 BY MR. PETROCELLI:
12     Q. Were you going to put up any part of the 15
13 million?
14     A. No.
15     Q. Okay.
16     A. And when I say "you" --
17     Q. You, Marc Toberoff?
18     A. Neither me nor IPW.
19     Q. Okay. Who would then under --
20     A. IP Worldwide. Now, I'm calling it IPW.
21     Q. IP Worldwide.
22     Who was to be the purchaser of the rights?
23     A. I envisaged that it would be Ari Emanuel.
24     Q. What role, if any, would IP Worldwide --
25     A. Or some designee of Ari Emanuel.

Page 301

1      Q. What role, if any, did you envision IP
2  Worldwide playing?
3      A. That IP Worldwide would have a carried
4  interest for bringing this opportunity in.
5      Q. Did you discuss with Mr. Emanuel, at the
6  time of this conference call, what that carried
7  interest would be?
8      A. No.
9      Q. Were you aware of any other investors or
10 people who were planning to provide any part of the
11 $15 million?
12     A. Not specific to that offer.
13     Q. Did --
14     A. I was aware that Mr. Emanuel made
15 investments in all sorts of things, and in those
16 investments he would invest with people. I had a
17 general awareness of that.
18     Q. Okay. Was there any other investor besides
19 Ari Emanuel who, to your knowledge, was interested
20 in acquiring the Siegel rights but who walked away
21 from it?
22     A. Any other investor interested in
23 acquiring --
24     Q. Besides Ari Emanuel, who you said was --
25     A. It's kind of vague, that question.

76 (Pages 298 to 301)

**EXHIBIT A**
**78**

MARC   TOBEROFF - 9/18/2012

Page 302

1        Q. Besides Ari Emanuel, who you said was the
2   person who was going to come up with the $15 million
3   to fund the offer?
4        A. I wouldn't use that term.
5        Q. Finance the $15 million, however you want
6   to put it, were you aware of any other person who
7   expressed an interest in investing in the Siegel
8   rights?
9        MR. KENDALL: Lacks foundation as to time.
10       THE WITNESS: In connection with this $15
11   million?
12   BY MR. PETROCELLI:
13       Q. I'll -- I'll let you answer that question
14   then I'm going to follow up.
15       A. No.
16       Q. Okay. In connection with any other offer,
17   not the $15 million offer to acquire the Siegel
18   rights?
19       MR. KENDALL: Vague and ambiguous.
20       THE WITNESS: Well, that would relate to
21   these other conversations we had about talking to
22   three different studios.
23   BY MR. PETROCELLI:
24       Q. Yeah, forget all of that.
25       I'm talking about in the 2002 or '3 time

Page 303

1   frame, was there any other person who came forward
2   or expressed an interest in acquiring the rights
3   besides Ari Emanuel?
4        A. There may have but I don't recall a
5   specific person.
6        Q. Let me show you a document.
7        MR. KENDALL: While Mr. Petrocelli is doing
8   that, could you just give me a time check.
9        THE VIDEOGRAPHER: 13 minutes remain in the
10   seven hours.
11       MR. KENDALL: Thank you.
12   BY MR. PETROCELLI:
13       Q. Can you -- can you show Mr. Toberoff Laura
14   Siegel's July 11, 2003 letter. Is there an exhibit
15   number for this?
16       THE REPORTER: 105.
17       (The document referred to was
18       marked for identification by the
19       C.S.R. as Exhibit 105 and attached
20       to this deposition.)
21   BY MR. PETROCELLI:
22       Q. Do you recall providing some comments and
23   revisions to this letter before Laura sent it out to
24   Michael?
25       A. I think this is the letter where there were

Page 304

1   comments to it.
2        MR. PETROCELLI: Can you show Mr. Toberoff
3   the two prior drafts, just to confirm that it's his
4   handwriting.
5        Mark that document dated July 5, 2003,
6   which has Bates number 138 on the bottom right-hand
7   corner as the next exhibit. What is it?
8        THE REPORTER: 106.
9        MR. PETROCELLI: 106. And then this
10   document which -- July 8 with Bates number 146 at
11   the bottom as Exhibit 107.
12       (The documents referred to were
13       marked for identification by the
14       C.S.R. as Exhibits 106 and 107 and
15       attached to this deposition.)
16   BY MR. PETROCELLI:
17       Q. Mr. Toberoff, looking at Exhibits 106 and
18   107, the two drafts that I just showed you, does
19   your handwriting appear on them as offering
20   revisions and/or comments?
21       A. Okay. So let me be specific. On 106, on
22   Bates number 1 -- SD 139, there's underlining, I
23   can't identify that as my underlying.
24       Q. Can you go to page 141?
25       A. Wait, wait, wait, let me finish.

Page 305

1        That little -- up above the underlining in
2   the first -- second paragraph, there's like a little
3   star thingamajiggy that -- I don't do those little
4   stars like that. So that's not -- I didn't do that.
5        Okay, next, 140, I don't know whether
6   that's my underlining.
7        Q. 141?
8        A. The word "draft, that's not my handwriting.
9        Q. "Opinion, re:"?
10       A. That's my handwriting.
11       Q. And the next page, is any of that
12   handwriting --
13       A. My wife says my handwriting looks like lice
14   so anything that looks like lice is my handwriting.
15       Q. Pages 142, -43, and -44 where there are
16   significant handwritten notations, is that your
17   handwriting?
18       A. Okay. So the word "draft" on the top of
19   all of these pages, that's not my handwriting. The
20   other writing is my handwriting. The crossed out
21   parts, I -- I -- I'm not sure who did that. Could
22   very well be me.
23       Q. Just focusing on the -- page 144 again,
24   there -- the handwritten words --
25       A. I haven't focused on it at all.

77 (Pages 302 to 305)

**EXHIBIT A**
**79**

MARC  TOBEROFF - 9/18/2012

Page 306

1    Q.  No, just is that -- any of your handwriting
2  on page 144 appear?
3    A.  The word "draft," no.  The other writing,
4  yes.  Crossed out stuff, presumably, but I don't
5  know.
6    Q.  Okay.  And in the interest of time, just
7  take a very quick look at 107.  And I don't need you
8  to go through all the pages but just, for example,
9  page 148 of Exhibit 107, the Bates number at the
10  bottom 148, does your handwriting appear on that
11  page?
12    A.  148, yes.
13    Q.  Okay.  Now, going to the final version of
14  the letter, which is Exhibit 105 signed by Laura.
15    A.  I just want to see -- okay.
16    Q.  Where there's a reference down at the
17  bottom of page 2 Bates stamped 134 [sic], "Why the
18  original investor left," when you were reviewing and
19  revising the letter, who did you understand the
20  original investor who left to be?
21    A.  I -- I don't know if I was focusing on
22  that.  I was looking at the letter, but if I focused
23  on that I would understand the original investor
24  would be Ari Emanuel since he was the original
25  investor.

Page 307

1    Q.  Now, where it says:
2        "Marc told the above to the
3      investor who found another place to
4      invest his money" --
5    A.  Yes.
6    Q.  -- that's Ari Emanuel?
7    A.  I -- I -- I don't know where that's coming
8  from.
9    Q.  Well, when you reviewed this letter --
10    A.  I have -- that's what I was just checking.
11    Q.  Did you tell Ari Emanuel that Kevin Marks
12  had told you that there was a deal with Time Warner
13  and DC, which caused Ari Emanuel to go find another
14  place to invest his money?
15    MR. KENDALL:  Just a moment, please.
16    THE WITNESS:  Well, I'm -- in answer to
17  your first question, I was checking these drafts to
18  see if this language was in the draft and I --
19  I either modified it, didn't touch it, or it was
20  never in them.
21  BY MR. PETROCELLI:
22    Q.  Well, let's focus on the final draft for a
23  moment.
24    A.  Okay.
25    Q.  Under the heading "Why the original

Page 308

1  investor left" --
2    A.  Okay.
3    Q.  -- did Kevin Marks ever tell you that the
4  Siegels had a deal with Time Warner and DC?
5    A.  No.
6    Q.  Did you ever tell Ari Emanuel that Kevin
7  Marks told you the Siegels had a deal with Time
8  Warner and DC?
9    A.  What was the question again?
10    Q.  Did you ever tell Ari Emanuel that Kevin
11  Marks had told you the Siegels had a deal with Time
12  Warner or DC?
13    A.  Did I ever tell Ari Emanuel that Kevin
14  Marks had told me that the Siegels had a, quote,
15  deal, end quote, with Time Warner and DC?
16      No, I don't recall telling Ari Emanuel
17  that.
18    Q.  Do you recall telling Ari Emanuel anything
19  that after which he then went and found another
20  place to invest his money?
21    MR. KENDALL:  Assumes fact not in evidence.
22    THE WITNESS:  I don't know what this refers
23  to, "Investor found another place to invest his
24  money."
25  BY MR. PETROCELLI:

Page 309

1    Q.  When you received drafts of this document
2  or even the final version of it, did you believe
3  that these statements were inaccurate?
4    A.  I don't know if I received the final
5  version before it was sent, and I would have to
6  see -- I may have.  I'm not saying I didn't, but I
7  don't know if I did, and I would have to see the
8  prior draft to see what they have under this
9  heading, "Why the original investor left."
10    Q.  Do you believe it is inaccurate?
11    A.  Which?  Do I believe --
12    Q.  Turn to page --
13    A.  -- what's inaccurate?
14    Q.  That statement is inaccurate?
15    MR. KENDALL:  Which statement?
16    THE WITNESS:  Which one?
17  BY MR. PETROCELLI:
18    Q.  That Marc told the above to the investor
19  who found another place to invest his money?
20    MR. KENDALL:  Compound.
21    THE WITNESS:  Yes.
22  BY MR. PETROCELLI:
23    Q.  Now go to Exhibit 10- -- I believe it's
24  107.  The prior draft.  107, Marc, Mr. Toberoff.
25  And under -- where it says Bates numbers

78 (Pages 306 to 309)

**EXHIBIT A**
**80**

MARC   TOBEROFF - 9/18/2012

Page 310

1  148, you see the statement, "Marc told this to
2  the" -- first of all, it says:
3          "Kevin Marks told Marc we had
4      a deal with DC."
5      Next statement:
6          "Marc told this" --
7      A. Wait, wait, which -- which -- 106?
8      Q. Correct. Bates number -- Exhibit 107,
9  Mr. Toberoff. Not 106.
10     A. Okay.
11     Q. And it's Bates number 148. Under the
12 heading "Why the original investor left."
13         Do you see that? Do you see your
14 handwriting? Can you read that to me?
15 A. I -- I can't. If I had a magnifying glass
16 I could.
17     Q. Are you able to read any of that to me?
18     A. It's hard for me to read. "Marc also" -- I
19 just see words. "Get back investor with anything
20 concrete regarding your interest because apparently
21 neither you nor Don Bulson" something "responded to
22 his interest for a long time." Something to that
23 effect.
24     Q. Were you aware of any investor, and I want
25 to put aside Ari Emanuel, anyone other than Ari

Page 311

1  Emanuel, okay, who you had conversations or
2  discussions with about acquiring the Siegel rights
3  but who then went elsewhere with his money, and this
4  again is in the 2002 or 2003 time frame?
5      A. We already answered that.
6      Q. And the answer is you're not aware of any?
7      A. Not that I'm not aware. There was no --
8  the investor was Ari Emanuel on the $15 million with
9  the only footnote that -- that Ari -- I did not know
10 whether Ari anticipated bringing in other people he
11 did deals with to participate in equity or to
12 finance it himself.
13     MR. KENDALL: Okay. Before you ask your
14 next question, could we have a time, Fritz?
15     THE VIDEOGRAPHER: Seven hours.
16     MR. KENDALL: Thank you.
17     MR. PETROCELLI: So since we're at the
18 seven-hour limit, we'll stop now. I'm not done with
19 my examination. I will discuss with you or
20 Mr. Kendall soon whether and to what extent you'll
21 agree to give more time. If I'm not able to reach
22 an agreement, then we'll have to deal with the issue
23 in other ways, okay? But in the meantime, I want to
24 thank you for your time.
25     THE WITNESS: Thank you.

Page 312

1      MR. KENDALL: In the meantime, do you want
2  to reach a stipulation with respect to this
3  transcript that the original will be --
4      THE WITNESS: Before we do that, I'd like
5  to just go off the record for one second and just
6  mention something to you.
7      THE VIDEOGRAPHER: Off the record. The
8  time is 6:22.
9      (Brief recess.)
10     MR. KENDALL: Stipulation is that the
11 original be sent to Mr. Toberoff with a copy to me.
12 And that Mr. Toberoff will have 30 days within which
13 to make any changes that he deems necessary. If no
14 changes are made and provided to you within 30 days,
15 then the transcript will be deemed to be usable in
16 lieu of the original -- that a copy of the
17 transcript will be deemed to be useable in lieu of
18 the original, and if changes are made we'll be
19 notified. And the court reporter can be relieved of
20 her duties under the Code and the transcript can be
21 signed under penalty of perjury.
22     MR. PETROCELLI: Yes.
23     THE REPORTER: Off the record?
24     MR. PETROCELLI: Yes.
25     THE VIDEOGRAPHER: This will mark the end

Page 313

1  of Volume I, Tape Number 4 in the deposition of Marc
2  Toberoff.
3      All original videotapes will be retained at
4  Merrill Legal Solutions at 20750 Ventura Boulevard,
5  Woodland Hills, California. Going off the record.
6  The time is 6:25.
7      (Deposition adjourned at 6:25 p.m.)
8              -oOo-
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

79 (Pages 310 to 313)

MARC   TOBEROFF - 9/18/2012

Page 314

```
1              DECLARATION
2
3
4
5
6        I hereby declare I am the deponent in the
7    within matter; that I have read the foregoing
8    deposition and know the contents thereof, and I
9    declare that the same is true of my knowledge except
10   as to the matters which are therein stated upon my
11   information or belief, and as to those matters, I
12   believe it to be true.
13       I declare under the penalties of perjury of
14   the State of California that the foregoing is true
15   and correct.
16       Executed on the _____ day of
17   _____ 2012, at
18   _____,
19   California.
20
21
22
23
24       _____
25              MARC TOBEROFF
```

Page 315

```
1    STATE OF CALIFORNIA   )
                           ) ss.
2    COUNTY OF LOS ANGELES )
3
4        I, Shanda Gabriel, Certified Shorthand
5    Reporter, Certificate No. 10094, for the State of
6    California, hereby certify:
7        I am the deposition officer that
8    stenographically recorded the testimony in the
9    foregoing deposition;
10       Prior to being examined the witness was by
11   me first duly sworn;
12       The foregoing transcript is a true record
13   of the testimony given.
14       Before completion of the deposition, review
15   of the transcript [X] was [] was not requested.  If
16   requested, any changes made by the deponent (and
17   provided to the reporter) during the period allowed
18   are appended hereto.
19
20   Dated _____.
21
22       _____
                Shanda Gabriel
23              CSR 10094
24
25
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

**EXHIBIT A**
**82**