1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8                 UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11   DC COMICS,                        Case No. CV 10-3633 ODW (RZx)

12              Plaintiff,             **DC COMICS' STATEMENT OF
                                       GENUINE ISSUES OF
13        v.                           MATERIAL FACT AND
                                       RESPONSE TO DEFENDANTS'
14   PACIFIC PICTURES                  CONCLUSIONS OF LAW IN
     CORPORATION, IP WORLDWIDE,        OPPOSITION TO DEFENDANTS'
15   LLC, IPW, LLC, MARC TOBEROFF,     MOTION FOR PARTIAL
     an individual, MARK WARREN        SUMMARY JUDGMENT ON DC'S
16   PEARY, as personal representative of  FOURTH, FIFTH AND SIXTH
     the ESTATE OF JOSEPH SHUSTER,     CLAIMS**
17   JEAN ADELE PEAVY, an individual,
     LAURA SIEGEL LARSON, an           Hon. Otis D. Wright II
18   individual and as personal
     representative of the ESTATE OF   **Hearing Date**:   March 11, 2013
19   JOANNE SIEGEL, and DOES 1-10,                    (_Hearing Vacated_)
     inclusive,
20
                Defendants.
21

22

23

24

25

26

27

28

Plaintiff DC Comics ("DC") submits this Statement Of Genuine Issues Of Material Fact And Response to Defendants' Conclusions of Law in response to Defendants' Statement Of Undisputed Facts And Conclusions Of Law In Support Of Motion For Partial Summary Judgment On DC's Fourth, Fifth and Sixth Claims. In Part I, DC responds to defendants' allegedly uncontroverted facts.  In Part II and its concurrently filed opposition to defendants' summary judgment motion ("Opp."), DC responds to defendants' purported conclusions of law.

# I.    DC'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| 1 | On October 2, 1992, DC entered into a one-page agreement with Joe Shuster's surviving siblings, Frank Shuster and Jean Adele Peavy (the "1992 Agreement").<br><br>Defendants' Evidence:  Dkt. 49 (First Amended Complaint; "FAC") ¶55; Declaration of Keith G. Adams ("AD"), Ex. A | **Undisputed** for purposes of this motion that DC entered into an agreement with Frank Shuster and Jean Peavy dated "as of August 1, 1992."<br><br>As the Court held in its October 17, 2012, order granting DC's motion for partial summary judgment on its First and Third Claims:<br><br>Four days after filing her affidavit in state court, Jean wrote to DC, identifying herself as "heir to [Joseph Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses."  (UF 15 .) Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated "[a]ny help that Time Warner could give to the family of Joe Shuster to pay his final |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | debts and expenses would be warmly appreciated." (Opp'n UF.) DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.) |
| | | On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. (UF 17.) Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. (Opp'n UF.) |
| | | Paul Levitz dealt with many authors and heirs during his decades as president of DC. When DC agreed to grant an author or heirs' request for additional money, Levitz would give them this admonition: "this |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|---------------------------------------------|---------------|
|     |                                             | agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.) The parties executed an agreement on October 2, 1992 under which DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19; Petrocelli Decl. Exh. 24.). |

DN 507 at 3-4.

The Court also found that:

> [T]he 1992 Agreement does in fact settle all prior agreements. As Blacks Law Dictionary confirms, "full settlement" is "a settlement and release of all pending claims between the parties." Black's Law Dictionary 1497 (9th ed. 2009). The 1992 Agreement extends such release to "all claims to any payments or other rights or remedies which [the Shusters] may have under any other agreement or

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | otherwise, whether now or hereafter existing regarding any copyrights...." (SUF 19.) Accordingly, the 1992 Agreement not only settled and released all "claims ... rights [and] remedies" concerning the Shuster copyrights under all prior agreements, but it also extended the release to such rights and remedies as might exist "otherwise." ( Id.) |
|     |                                           | Immediately after so settling all rights, the 1992 Agreement expressly and unambiguously provides: "In any event, you [Shuster's heir] now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever." (SUF 19; Petrocelli Decl., Exh. 24 (emphasis added).) |
|     |                                           | Plainly, this subsequent grant deals with the same subject matter settled immediately above (DC's copyright interests). In other words, the 1992 Agreement first settled all claims, and then granted DC "such rights" as were just settled, essentially revoking |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | and regranting all copyright agreements and interest. *Id.* at 7-8. |
| 2 | In November 2001, Joe Shuster's nephew, Mark Warren Peary, and Ms. Peavy entered into an agreement (the "2001 PPC Agreement") with Pacific Pictures Corporation ("PPC").  That agreement stated in part:<br><br>In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304(c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations.<br><br>Defendants' Evidence:  FAC ¶60; AD, Ex. D at 21 | **Undisputed** for purposes of this motion that Jean and Mark Peary entered into an agreement with Pacific Pictures signed by Jean, Peary, and Marc Toberoff in November 2001, which contains the language quoted by defendants.  AD Ex. D at 21. |
| 3 | On October 7, 2003, the Los Angeles Superior Court appointed Mr. Peary as executor of the estate of Joseph Shuster (the "Shuster | **Undisputed** for purposes of this motion that in 2003, a Los Angeles Superior Court appointed Peary to serve as executor of Joseph Shuster's |

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | Estate"). | estate.  AD Ex. J. |
| | Defendants' Evidence:  AD Ex. J | DC disputes the suggestion that the probate court appointed Peary executor in accordance with Shuster's will.  Peary asked the probate court to appoint him executor in place of his mother—and Peary has improperly chosen not to close the probate matter or distribute the Estate's assets to Jean, as Shuster's will and California law require, because Peary and Toberoff wish to persist in making their improper shell-game argument that the Shuster "executor" never signed the 1992 agreement, and thus the Shuster executor is not bound by it. DN 186 at 13; 334 at 9-10; 458 at 8, 15; 459-3 at 289-90; 468 at 7-8; 491 at 2-17.  The Court rightly rejected this tactic in granting summary judgment for DC on its First Claim. DN 507 at 5-13.  DC has moved to compel a further deposition of Peary and Toberoff concerning these and other topics. *See* DN 585 at 1-2, 6-12, 15-19. |
| 4 | On October 27, 2003, the Shuster Estate and PPC entered into an agreement (the "2003 PPC Agreement"). That agreement stated in part:<br><br>    Client hereby engages PPC as<br>    its exclusive advisor for the | **Undisputed** for purposes of this motion that Peary, as executor for the Estate of Joseph Shuster, entered into an agreement with Pacific Pictures signed by Jean, Peary, and Toberoff in October 2003, which contains the language quoted by defendants.  AD Ex. D at 21.  This |

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.<br><br>Defendants' Evidence:  AD, Ex. K at 102 | Court has declared this agreement in invalid, DN 507, 540, and this Court and the Ninth Circuit have rejected Toberoff's arguments that he entered into this illicit agreement in his capacity as a lawyer, as opposed to a businessman.  DN 337; *DC Comics v. Pacific Pictures Corp.*, 2013 WL 120807, at *1 (9th Cir. Jan. 10, 2013). |
| 5 | In November 2003, Mr. Toberoff, on behalf of the Shuster Estate, served on DC Comics ("DC") and filed a notice of termination under 17 U.S.C. § 304(d) of Joe Shuster's prior Superman copyright grants to DC (the "Shuster Termination").<br><br>Defendants' Evidence:  AD, Ex. M. | **Undisputed** for purposes of this motion that in November 2003, a Notice of Termination of Transfer Covering Copyright Renewal Term of "Superman" was served on DC on behalf of the Estate of Joseph Shuster.  AD Ex. M.<br><br>The Court has held that the Shusters' |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|---------------------------------------------|----------------|
|  |  | termination notice was invalid and ineffective.  DN 507 at 5-13.  It also found "problematic" Toberoff's and Peary's withholding of material facts from this notice.  *Id.* at 14-15 (noting that "the Court finds problematic Defendants' conduct – especially their failure to inform the copyright office of agreements which they themselves believed would affect ownership of the subject copyrights"). |
| 6 | On September 10, 2004, Toberoff, Peary and Peavy voluntarily cancelled the 2001 and 2003 PPC Agreements.<br><br>Defendants' Evidence:  AD, Ex. N; Ex. O | **Disputed**.<br><br>DC has briefed at length in its Rule 12 papers, DN 185 at 5-6; prior summary judgment briefing, DN 468 at 12; 471 at 66-67; 494-1 at 52-53; and other briefs, *e.g.*, DN 360 at 3-4; whether the Pacific Pictures agreements were ever "cancelled" and whether the Shusters' putative rights were assigned back to them in 2004.  Toberoff was fully aware that DC disputed his supposed "cancellation"—and no-harm-no-foul argument —but he tactically and improperly failed to address the issue in his motion.  As he well knows, DC has always contended—and Peary admitted at his deposition— that even though the 2001 and 2003 Pacific Pictures agreements were allegedly "cancelled" in 2004, they still assigned 50% of the Shuster family's putative rights to Toberoff and Pacific Pictures.  DN 49 ¶¶ 99-100; 305-37 at 1310:3-1314:6, |

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | 1316:9-15, 1434:14-1440:5; 307 at 6-9; 334 at 11-17.  It was not until August 2011—well after DC filed suit, and in connection with his SLAPP reply brief—that Toberoff disclaimed his rights under the Pacific Pictures contracts.  DN 322 at 1-2. |
| 7 | In September 2004, Toberoff, Peary and Peavy entered into a legal retainer agreement dated as of November 23, 2001.  Defendants' Evidence:  AD, Ex. P, Ex. FF at 473:1-8, 474:4-7 | **Undisputed** for purposes of this motion that in or around September 2004, Toberoff, Peary, and Peavy entered into a legal retainer agreement dated "as of November 23, 2001."  As DC has shown before, Toberoff deceptively back-dated this document improperly to avoid liability, *inter alia*, to DC in this case.  DN 493-1 at 256:18-257:6, 365:17-366:1. |
| 8 | In 1997, Jerome Siegel's widow, Joanne Siegel, and his daughter, Laura Siegel Larson (the "Siegels"), served on DC and filed notices of termination under 17 U.S.C. § 304(c) of Siegel's Superman copyright grants to DC (the "Siegel Termination").  Defendants' Evidence:  FAC ¶ 67 | **Undisputed** for purposes of this motion that in 1997, the Siegels served copyright termination notices on DC.  The Ninth Circuit rightly held that, regardless of the validity of these termination notices, the Siegels transferred whatever rights they recaptured to DC in a October 19, 2001, settlement agreement.  *See Larson v. Warner Bros. Entm't, Inc.*, 2012 WL 6822241, at *1 (Jan. 10, 2013); Case No. CV-04-8400, DN 702 at 1-6; Case No. CV-04-8776, DN 222 at 1-6. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| 9 | By letter dated April 15, 1999, DC contested the Siegel Termination.<br><br>Defendants' Evidence:  *Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1114 (C.D. Cal. 2008) | **Undisputed** for purposes of this motion that in a letter dated April 15, 1999, DC stated:<br><br>[Y]our clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed any rights at all, in Superman.  After a careful review of the Notices and background facts, we have concluded that your clients' attempt to effect a termination of Mr. Siegel's grant fails to meet the clearly stated requirements set out by Congress in Section 304 of the Copyright Act and therefore the Notices are invalid and of no force and effect. The notices were untimely and excessive in scope. As you know, we have been trying, without success, to meet and discuss this with you and your clients for two years.  Thus, Mr. Siegel's grant has not been, and now cannot be, terminated, and all rights granted by him are still owned exclusively by DC Comics.  DN 145-2 at 11-12.<br><br>The Ninth Circuit rightly held that, |

DC'S STATEMENT OF GENUINE ISSUES IN OPP. TO DEFS.' MSJ

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | regardless of the validity of these termination notices, the Siegels transferred whatever rights they recaptured to DC in a October 19, 2001, settlement agreement. *See Larson*, 2012 WL 6822241, at *1; Case No. CV-04-8400, DN 702 at 1-6; Case No. CV-04-8776, DN 222 at 1-6. |
| 10  | The Siegels thereafter engaged in negotiations with DC, represented by attorney Kevin Marks.<br><br>Defendants' Evidence:  FAC ¶ 68 | **Undisputed**, except to the extent it omits that the Ninth Circuit rightly held that the Siegels and DC reached a binding settlement agreement on October 19, 2001, and did not merely "negotiat[e]," as defendants now suggest. *See Larson*, 2012 WL 6822241, at *1. |
| 11  | On October 19, 2001, Marks sent DC a letter outlining and purporting to accept what he believed were the terms of an oral October 16, 2001 offer by DC.<br><br>Defendants' Evidence:  AD, Ex. B | **Disputed**, to the extent defendants use the word "purporting" to suggest that Marks' October 19, 2001, letter was anything other than a binding acceptance of DC's settlement offer of October 16, 2001.  The Ninth Circuit rightly held:  "We hold, as a matter of law, that [Marks'] October 19, 2001, letter did constitute such an acceptance," of "terms negotiated between the parties, and thus was sufficient to create a contract." *Larson*, 2012 WL 6822241, at *1. |
| 12  | On October 26, 2001, DC sent Marks its "outline" of what it believed the terms were.<br><br>Defendants' Evidence:  AD, Ex. C | **Disputed**, to the extent defendants suggest that John Schulman's October 26, 2001, letter undermined the validity or effectiveness of the parties' October 19, 2001, settlement |

DC'S STATEMENT OF GENUINE ISSUES IN OPP. TO DEFS.' MSJ

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|-----|-------------------------------------------|---------------|
|     | at 13                                     | agreement.  Defendants made these specious arguments in the Ninth Circuit, and the Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite the parties' subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1; *see id*. ("We hold, as a matter of law, that the October 19, 2001 letter *did* constitute such an acceptance.  [fn. 2:]  Larson, in her brief, states this question should be resolved as a matter of law.  [Citations omitted.] The October 19, 2001, letter itself plainly states that the heirs have 'accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties.  The terms are as follows….' What follows is five pages of terms outlining substantial compensation for the heirs in exchange for DC's continued right to produce Superman works.  The letter ends with Larson's attorney thanking DC's attorney for his 'help and patience in reaching this monumental accord.'  Further, although it is the objective, and not subjective, understandings of the parties that determine whether they reached an agreement, extrinsic |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | evidence of the parties' actions may be used to determine whether the oral offer referred to in the letter had, in fact, been made. *Cf. Wedeck v. Unocal Corp.*, 69 Cal. Rptr. 2d 501, 507-08 (Cal. Ct. App. 1997). Statements from the attorneys for both parties establish that the parties had undertaken years of negotiations, that they had resolved the last outstanding point in the deal during a conversation on October 16, 2001, and that the letter accurately reflected the material terms they had orally agreed to on that day. We reject Larson's arguments that either state or federal law precludes a finding that such a contract could have been created by the October 19, 2001, letter.  California law permits parties to bind themselves to a contract, even when they anticipate that 'some material aspects of the deal [will] be papered later.' *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011); *Harris v. Rudin, Richman & Appel*, 87 Cal. Rptr. 2d 822, 828 (Cal. Ct. App. 1999)  This principle applies notwithstanding the lack of an express reference to an intended future agreement, as long as the terms of any contract that may have been formed are sufficiently definite that a court could enforce them (as is |

- 13 -

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | undoubtedly the case here). *Facebook*, 640 F.3d at 1038 (noting the minimal requirements to form an enforceable contract, and that California law does not require express delegation regarding potential missing terms of a contract); *Patel v. Liebermensch*, 197 P.3d 177, 182-83 (Cal. 2008). That *Facebook* involved a contract signed by both parties does not render it any less controlling here; under California's statute of frauds, the only signature that is required is that of the party against whom a contract is sought to be enforced. *See Ulloa v. McMillin Real Estate & Mortg., Inc.*, 57 Cal. Rptr. 3d 1, 4-5 (Cal. Ct. App. 2007); *see also* 1 B.E. Witkin, *Summary of California Law, Contracts* § 359 (10th ed. 2005). Nor is 17 U.S.C. § 204(a) a bar to the validity of any such contract; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent' of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent."). |
| 13 | On February 1, 2002, DC sent a 56-page draft of the agreement it proposed.<br><br>Defendants' Evidence:  AD, Ex. E | **Disputed**, to the extent that defendants suggest the February 1, 2002, draft long-form agreement sent by DC's outside counsel undermined the validity or |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | effectiveness of the parties' October 19, 2001, settlement agreement. Defendants made these specious arguments in the Ninth Circuit, and the Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite the parties' subsequent disputes over finalization of the long-form contract.  *Larson*, 2012 WL 6822241, at *1 ("California law permits parties to bind themselves to a contract, even when they anticipate that 'some material aspects of the deal [will] be papered later.' *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011); *Harris v. Rudin, Richman & Appel*, 87 Cal. Rptr. 2d 822, 828 (Cal. Ct. App. 1999)."). |
| 14  | On May 9, 2002, Joanne Siegel sent a letter to DC's parent, AOL Time Warner, Inc. That letter stated in part:  …. Negotiations dragged on for four difficult years. We made painful concessions assured if we did we would arrive at an agreement. When we made these difficult concessions and reluctantly accepted [DC's] last proposal…we were stabbed in the back by a shocking contract. | **Undisputed** for purposes of this motion that Joanne Siegel sent a letter to Richard D. Parsons, then-Co-Chief Operating Officer of AOL Time Warner, Inc., dated May 9, 2002, which contains the language quoted by defendants.  Defendants omit other key language from this letter, including Joanne's admission that the Siegels "accepted [DC's] last proposal," referring to the October 19, 2001 settlement agreement.  AD Ex. F at 82. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | Your company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the [October 19] proposal. ….After four years we have no deal and this contract makes an agreement impossible.<br><br>Defendants' Evidence:  AD, Ex. F at 82, 84 | This is disputed to the extent defendants suggest that Joanne's May 9, 2002, letter undermined the validity or effectiveness of the parties' October 19, 2001, settlement agreement.  Defendants made these specious arguments in the Ninth Circuit, and the Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite the parties' subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1. |
| 15 | In 2002, Mr. Toberoff formed a joint venture with Ariel Emanuel, the CEO of the Endeavor Talent Agency (now William Morris Endeavor), called IP Worldwide, LLC.<br><br>Defendants' Evidence:  AD, Ex. G, Ex. FF at 472:10-24 | **Undisputed**; however, discovery into this business relationship is ongoing, and DC still needs to depose Toberoff, Toberoff in his capacity as representative of IP Worldwide, LLC, and Ari Emanuel, both in his individual capacity and as a representative for Endeavor.  *See* Decl. of Daniel M. Petrocelli ("Petrocelli Decl.") ¶¶ 13-15, 21; DN 585 at 1-2, 6-12 (DC's pending motion to compel these depositions). |
| 16 | In late July/August 2002, Mr. Toberoff informed Mr. Marks that he was working with Mr. Emanuel and inquired whether the Siegels were interested in licensing their rights.<br><br>Defendants' Evidence:  AD, Ex. S | **Disputed**, to the extent defendants suggest this was Toberoff's earliest effort to induce the Siegels to repudiate their October 19, 2001, settlement agreement with DC and enter into an agreement with him instead.  As hard-fought discovery in this case has now revealed, it is clear |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
|  | at 147:6-148:6; Ex. W at 249:10-250:2 | that Toberoff began reaching out to the Siegels and their representatives about obtaining their putative Superman rights as early as November 2001, *see* DN 493-7 at 787-88, and these fraudulent efforts continued throughout 2002, *see* DN 500-5 at 338; 500-6 at 418; DN 500-15 at 2565:18-2567:20, 2571:13-22, 2572:7-2574:25. As the recently revealed "Marks Memo"—and copies of it in Toberoff's files from 2002—also exposes, Marks told Toberoff and Larson that the Siegels had a deal with DC, as of 2001, and if the Siegels accepted Toberoff's competing offer from an unnamed investor, DC would likely sue Toberoff and Siegel. DN 500-5 at 338-39 ("I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.) The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for that matter) by D.C. Comics."). |
| 17 | In August 2002, Marks, Toberoff and Emanuel scheduled and held a conference call, in which an offer was made to purchase the Siegels' | **Disputed**, to the extent defendants suggest this was Toberoff's earliest effort to induce the Siegels to repudiate their October 19, 2001, |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | rights for $15 million (the "August 2002 Offer"). <br><br> Defendants' Evidence: AD, Ex. S at 149:2-150:5, Ex. W at 253:24-258:9 | settlement agreement with DC and enter into an agreement with him instead. It is clear that Toberoff began reaching out to the Siegels about buying their rights in November 2001, *see* DN 493-7 at 787-88, and these efforts continued throughout 2002, *see* DN 500-5 at 338; 500-6 at 418; 500-15 at 2565:18-2567:20, 2571:13-22, 2572:7-2574:2. As the recently revealed "Marks Memo"—and copies of it in Toberoff's files from 2002—also exposes, Marks told Toberoff and Larson that the Siegels had a deal with DC, as of 2001, and if the Siegels accepted Toberoff's competing offer from an unnamed investor, DC would likely sue Toberoff and Siegel. DN 500-5 at 338-39. <br><br> Defendants also omit that Toberoff falsely represented to the Siegels that: (1) he had an unnamed "billionaire investor" ready to purchase the Siegels' purported Superman rights for $15 million plus generous royalty rights, and (2) he could help the Siegels produce a Superman movie to compete with DC. DN 49 ¶ 185; 585 at 6-11. DC did not learn of the fraudulent offer Toberoff had made to the Siegels about the fictitious "billionaire investor" until December 2008, |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | when the Court ordered that DC be given a copy of the Toberoff Timeline.  DN 49 ¶¶ 102-04; 184 at 10-13; 334 at 22-23. |
| | | Toberoff's fraudulent representations about the fictitious billionaire were confirmed recently by non-privileged correspondence among the Siegels that courts ordered defendants to produce.  DN 253-2 at 4, 362-2 at 287, 500-4 at 311.  Toberoff's false promises were intended to induce the Siegels to repudiate their 2001 settlement agreement with DC.  *See* Opp. 3, 14; DN 49 ¶ 185. |
| 18 | Marks conveyed the August 2002 offer to the Siegels, but neither they nor Marks responded to it.<br><br>Defendants' Evidence:  AD, Ex. S at 150:23-151:24, Ex. W at 263:20-264:8 | **Disputed**.<br><br>Marks told Toberoff in February, July, and August 2002, that the Siegels had already reached an agreement with DC on October 19, 2001.  DN 305-14 at 358:4-360:17, 372:9-378:21.  Nonetheless, Marks felt "obliged" to pass on Toberoff's offer to the Siegels.  On August 9, 2002, Marks sent a letter to the Siegels stating :<br><br>    On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel.  Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency. |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|-----|---|---|
| | | They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights, and attaching Endeavor clients to projects that evolve…. |
| | | In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential. Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal.  I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal. |
| | | On August 8, the Toberoff/Emanuel Group took the initiative and made an offer. Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis…. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|------------------------------------------|---------------|
|     |                                          | Having received this proposal, I am obliged to pass it on to you. |
|     |                                          | I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation.  (If called to testify, I would have to testify as much.)  The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for that matter) by D.C. Comics…. |
|     |                                          | I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement. |
|     |                                          | My recommendation ultimately is to stay the course with D.C. Comics.  I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances…. |
|     |                                          | We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up with a written agreement that is |

- 21 -

| <ins>No.</ins> | <ins>Defendants' Allegedly Uncontroverted Fact</ins> | <ins>DC's Response</ins> |
|---|---|---|
| | | true to the deal that was made…. If, despite all those good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.  DN 500-5 at 338-39.

The Toberoff Timeline documents reveal that Larson shared this memo with Toberoff as early as November 6, 2002.  DN 500-5 at 337-39.

Shortly after receiving Toberoff's fraudulent business offer, the Siegels repudiated their 2001 agreement with DC.  *See* Opp. 3, 14; DN 49 ¶¶ 66-85.

Defendants also omit that Toberoff falsely represented to the Siegels that:  (1) he had an unnamed "billionaire investor" ready to purchase the Siegels' purported Superman rights for $15 million plus generous royalty rights, and (2) he could help the Siegels produce a Superman movie to compete with DC.  DN 49 ¶ 185; 585 at 6-11.  DC did not learn of the fraudulent offer Toberoff had made to the Siegels about the fictitious "billionaire investor" until December 2008, when the Court ordered that DC be |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | given a copy of the Toberoff Timeline. *Id.* ¶¶ 102-04; 184 at 10-13; 334 at 22-23. |
| | | Toberoff's fraudulent representations about the fictitious billionaire were confirmed recently by non-privileged correspondence among the Siegels that courts ordered defendants to produce. DN 253-2 at 4; 362-2 at 287; 500-4 at 311. Toberoff's false promises were intended to induce the Siegels to repudiate their 2001 settlement agreement with DC. *See* Opp. 3, 14; DN 49 ¶ 185. |
| 19 | On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC, terminating Marks and ending negotiations with DC Comics. The letter stated in part:<br><br>As we previously discussed with you and hereby affirm, we rejected DC Comics' offer for the Siegel Family interest in Superman and other characters sent to us by you on February 4, 2002. We similarly reject your redraft of the February 4, 2002 document which you sent to us on July 15, 2002. Therefore due to irreconcilable differences, after four years of painful and unsatisfying negotiations, this letter serves as formal | **Disputed**, to the extent defendants suggest this September 21, 2002, letter undermined the validity or effectiveness of the parties' October 19, 2001, settlement agreement. The Ninth Circuit rightly held, "as a matter of law," that the parties entered into a "binding" settlement agreement on October 19, 2001—despite the parties' subsequent disputes over finalization of the long-form contract. *Larson*, 2012 WL 6822241, at *1.<br><br>DC does not dispute for purposes of this motion that the Siegels sent a letter to Marks, dated September 21, 2002, which contains the language quoted by defendants.<br><br>DC does dispute that it learned of the |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | notification that we are totally stopping and ending all negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates, effective immediately.<br><br>Defendants' Evidence:  AD, Ex. H at 92 | fraudulent offer Toberoff had made to the Siegels about the fictitious "billionaire investor" before December 2008, when the Court ordered that DC be given a copy of the Toberoff Timeline.  DN 49 ¶¶ 102-04; 184 at 10-13; 334 at 22-23. |
| 20 | On October 3, 2002, the Siegels entered into an agreement with IP Worldwide, LLC to represent the Siegels' Superman termination interest (the "IP Worldwide Agreement"). That agreement stated in part:<br><br>1. In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.<br><br>2. IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and | **Disputed**.<br><br>DC disputes that the Siegels had any "Superman termination interest," since as the Ninth Circuit rightly held, they transferred whatever rights they recaptured to DC in the parties' October 19, 2001, settlement agreement.  *Larson*, 2012 WL 6822241, at *1.<br><br>DC further disputes defendants' mischaracterization of the IP Worldwide agreement as a "representation" agreement.  In reality, this was an unlawful, rights-tying agreement.  AD Ex. I at 95; *e.g.*, DN 307 at 12.<br><br>Discovery into this business relationship is ongoing, and DC still needs to depose Larson, Toberoff, Toberoff in his capacity as representative of IP Worldwide, LLC, and Emanuel, both in his individual capacity and as a representative for Endeavor.  *See* Petrocelli Decl. ¶¶ 13-15, 21; DN |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. …. <br><br> Defendants' Evidence: AD, Ex. I at 93 | 585 at 1-2, 6-14. <br><br> DC does not dispute for purposes of this motion that the Siegels entered into an agreement with IP Worldwide, LLC, dated October, 3, 2002, which contains the language quoted by defendants. |
| 21 | The IP Worldwide Agreement expired on April 23, 2005. <br><br> Defendants' Evidence: AD, Ex. I, Ex. N | **Disputed**. <br><br> DC does not dispute for purposes of this motion that Toberoff and the Siegels executed a letter agreement dated March 29, 2004, that purported to extend the Siegels' October 2002 agreement with IP Worldwide through April 23, 2005. AD Ex. N. Given defendants' refusal to allow complete discovery on this and other topics, DC does not know whether the agreement in fact expired on this date. DN 361; *see also* DN 305-24 at 809:23-810:5 (Larson testifying there may have been additional extensions); DN 585 at 1-2, 6-14 (DC's pending motion to compel). <br><br> Discovery into this business relationship is ongoing, and DC still needs to depose Larson, Toberoff, Toberoff in his capacity as representative of IP Worldwide, |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | LLC, and Emanuel, both in his individual capacity and as a representative for Endeavor.  *See* Petrocelli Decl. ¶¶ 13-15, 21; DN 585 at 1-2, 6-14. |
| 22 | In 2003, Mr. Toberoff and Mr. Emanuel, on the Siegels' behalf, recommenced settlement negotiations with DC.<br><br>Defendants' Evidence:  AD, Ex. L, Ex. T at 158:12-165:2, Ex. EE at 461-62 | **Disputed**, to the extent this disregards that, as the Ninth Circuit rightly held, the parties had already entered into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1.<br><br>Moreover, to the extent Toberoff is disclosing legal advice he gave the Siegels, he has effected a subject-matter waiver concerning that advice and must immediately produce all communications—whether he claimed privilege over them before or not—on this subject matter.  DN 205 at 14; FED. R. CIV. P. 502; *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 23-25 (9th Cir. 1981); *U.S. v. Nobles*, 422 U.S. 225, 239 (1975); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.'"); *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 472 (N.D. Cal. 2012) (holding that where party "attempted to use [privilege] as both a shield and a |

DC'S STATEMENT OF GENUINE ISSUES IN OPP. TO DEFS.' MSJ

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|-----|-------------------------------------------|---------------|
|     |                                           | sword, that is, to reveal a limited aspect of privileged communications in order to gain a tactical advantage in litigation" that the party "has waived the attorney-client privilege and work product protection as to all … communications concerning" the same subject).  Toberoff's knowing choice to inject this issue into this case, on an affirmative motion of his own, compels a finding of waiver. *Id.* |
| 23  | On October 8, 2004, Mr. Toberoff, as attorney for the Siegels, filed the *Siegel v. Warner Bros. Entertainment, Inc.* case (C.D. Cal. Case No. 04-CV-08400, ODW (RZx) ("*Siegel*")[,] which sought to validate the Siegel Termination, and to enforce the Siegels' copyright interests.<br><br>Defendants' Evidence:  FAC ¶ 91 | **Undisputed**, although it disregards that the Ninth Circuit held that the parties entered into a binding settlement agreement on October 19, 2001, and, as of that date, the Siegels transferred whatever copyrights they purported to hold to DC.  *Larson*, 2012 WL 6822241, at *1; Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |
| 24  | On February 17, 2005, DC counterclaimed in *Siegel*, that the October 19, 2001 letter constituted an enforceable contract.<br><br>Defendants' Evidence:  AD, Ex. AA at 425-428 | **Undisputed**.  The Ninth Circuit has held, "as a matter of law," that the parties did, in fact, enter into a "binding" settlement agreement on October 19, 2001.  *Larson*, 2012 WL 6822241, at *1.  DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| 25 | During discovery in *Siegel*, the 2001 PPC Agreement, the 2003 PPC Agreement and the 2002 IP Worldwide Agreement, were all produced to DC by November 15, 2006. <br><br> Defendants' Evidence:  AD, Ex. V at 200, Ex. BB at 444, Ex. CC at 449 | **Undisputed**. |
| 26 | In *Siegel*, DC took the deposition of Kevin Marks on October 7, 2006. <br><br> Defendants' Evidence:  AD, Ex. S | **Undisputed**. |
| 27 | Mr. Marks testified at his October 7, 2006 deposition about his communications with Mr. Toberoff. <br><br> Defendants' Evidence:  AD, Ex. S at 146:11-151:24 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Marks during his October 7, 2006, deposition in *Siegel* about his communications with Toberoff, or that this deposition revealed the fraudulent business offer concerning a "billionaire investor" that Toberoff made to the Siegels.  This fraudulent business offer was only first revealed to DC in December 2008, when it received the Toberoff Timeline, DN 42-14 at 213-21, and the Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012.  *Cf.* DN 500 at 4-21; 527 at 7-9. <br><br> The primary issue in *Siegel* was |

DC'S STATEMENT OF GENUINE ISSUES IN OPP. TO DEFS.' MSJ

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, 2001. *Larson*, 2012 WL 6822241, at *1.  The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached.  Case No. CV-04-8400, DN 161 at 45-60.  In this context, DC questioned Marks about specific calls with Toberoff appearing on his call log during the time the parties were negotiating over their long-form agreement. *E.g.*, AD Ex. S at 146:9-16 (asking Marks about call from Toberoff appearing on his call log the same day as a call between Marks and Schulman regarding the draft long-form agreement).<br><br>DC's questions developed evidence that Marks believed DC had reached a binding agreement with the Siegels, not the acts of fraud that DC challenges in this case.  DN 49 ¶¶ 78-85, 180-86.  These frauds were not exposed until late 2008 (and when DC received the Timeline) and after hard-fought discovery in this case.  DN 42-14 at 213-21; 500 at 4- |

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | 21; 527 at 7-9. |
| | | Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer. DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9. |
| 28 | Mr. Marks testified at his October 7, 2006 deposition about the August 2002 Offer to the Siegels.  <u>Defendants' Evidence:</u>  AD, Ex. S at 149:10-150:5 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Marks during his October 7, 2006, deposition in *Siegel* about the August 2002 Offer, or that this deposition revealed the fraudulent business conduct concerning a "billionaire investor." This fraudulent business offer was only first revealed to DC in December 2008, when it received the Toberoff Timeline, DN 42-14 at 213-21, and the Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012. *Cf.* DN 500 at 4-21; 527 at 7-9.  The primary issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | 2001. *Larson*, 2012 WL 6822241, at *1. The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached. Case No. CV-04-8400, DN 161 at 45-60. In this context, DC questioned Marks about specific calls with Toberoff appearing on his call log during the time the parties were negotiating over their long-form agreement. *E.g.*, AD Ex. S at 146:8-16 (asking Marks about call from Toberoff appearing on his call log the same day as a call between Marks and Schulman regarding the draft long-form agreement). |
|     |                                           | DC's questions developed evidence that Marks believed DC had reached a binding agreement with the Siegels, not the acts of fraud that DC challenges in this case. DN 49 ¶¶ 78-85, 180-86. These frauds were not exposed until late 2008 (and when DC received the Timeline) and after hard-fought discovery in this case. DN 42-14 at 213-21; 500 at 4-21; 527 at 7-9. |
|     |                                           | Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer.  DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9. |
| 29 | In *Siegel*, DC took the deposition of Mark Warren Peary on November 11, 2006.<br><br>Defendants' Evidence:  AD, Ex. U | **Undisputed**. |
| 30 | Mr. Peary testified at his November 11, 2006 deposition about the 2001 and 2003 PPC Agreements.<br><br>Defendants' Evidence:  AD, Ex. U at 171:6-196:13 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Peary during his November 11, 2006, deposition in *Siegel* about the 2001 and 2003 Pacific Pictures agreements.<br><br>In this half-day third-party deposition—to which Toberoff had strenuously objected and argued had "nothing" to do with the issues in *Siegel*, DN 61-15 at 84, 91—DC largely limited its questions regarding the PPC Agreements to why the 2003 agreement removed Superboy from its list of properties being transferred to Pacific Pictures, AD Ex. U at 173:15-176:12, and whether the agreement established an attorney-client relationship between Toberoff and Peary for purposes of determining privilege, *id.* at 172:11-173:4, 176:13-23, 181:18 -184:18.  Toberoff objected |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | to many of these questions and instructed Peary not to answer.  *Id.* at 173:15-174:2, 183:2-11, 193:8-194:17.<br><br>Peary did not testify about how Toberoff induced him to enter into the agreements; the relationship between the agreements and the 1992 Agreement; or whether the agreements prevented Peary from negotiating with DC in violation of DC's rights under the Copyright Act—issues central to DC's Fourth and Sixth Claims in this case.  DN 49 ¶¶ 174-79, 187-89. |
| 31 | In *Siegel*, DC took the deposition of Marc Toberoff on November 17, 2006.<br><br>Defendants' Evidence:  AD, Ex. W | **Undisputed**. |
| 32 | At the deposition of Mr. Toberoff on November 17, 2006, DC introduced the 2001 and 2003 PPC Agreements as exhibits.<br><br>Defendants' Evidence:  AD, Ex. W at 204:18-20, 223:17-19 | **Undisputed**. |
| 33 | Mr. Toberoff testified at his November 17, 2006 deposition about the 2001 and 2003 PPC Agreements and the Shuster Termination.<br><br>Defendants' Evidence:  AD, Ex. W at 204:18-230:8 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Toberoff during his November 17, 2006, deposition in *Siegel* about the 2001 and 2003 Pacific Pictures agreements and the Shuster termination notice.<br><br>DC's questions relating to the |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | | Pacific Pictures Agreements were largely limited to basic information about Pacific Pictures, whether the agreement was a legal retainer agreement or a business contract for purposes of determining privilege, and why the 2003 Agreement removes reference to the Superboy rights. *E.g.,* AD Ex. W at 205:4-207:8, 208:5-209:15, 210:10-212:9, 216:7-217:7, 221:4-223:5, 227:4-230:8. |
| | | DC did not ask, and Toberoff did not testify about how Toberoff induced Peary to enter into the agreements; the relationship between the agreements and the 1992 Agreement; or whether the agreements prevented Peary from negotiating with DC in violation of DC's rights under the Copyright Act—the central issues underlying DC's Fourth and Sixth Claims in this case.  DN 49 ¶¶ 174-79, 187-89. |
| | | DC still needs to examine Toberoff further concerning, *inter alia*, these issues and his discovery misconduct. *See* Petrocelli Decl. ¶¶ 13-15; DN 585 at 1-2, 6-12. |
| 34 | Mr. Toberoff testified at his November 17, 2006 deposition about his 2002 communications with Kevin Marks.  Defendants' Evidence:  AD, Ex. W | **Disputed**, to the extent defendants suggest that DC fully and completely examined Toberoff during his November 17, 2006, deposition in *Siegel* about his 2002 |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | at 240:17-260:11 | communications with Marks, or that this deposition revealed the fraudulent business offer concerning a "billionaire investor" that Toberoff made to the Siegels. This fraudulent business offer was only first revealed to DC in December 2008, when it received the Toberoff Timeline, DN 42-14 at 213-21, and the Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012. *Cf.* DN 500 at 4-21; 527 at 7-9.<br><br>The primary issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached. Case No. CV-04-8400, DN 161 at 45-60. In this context, DC asked Toberoff about his discussions with Marks in order to develop evidence that Marks believed DC had reached a binding |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | agreement with the Siegels, *e.g.,* AD Ex. W at 246:9-11 (asking whether Marks said the Siegels were "very far along" in their deal with DC), not that Toberoff had committed the acts of fraud that DC challenges in this case.  DN 49 ¶¶ 78-85, 180-86. These frauds were not exposed until late 2008 (and when DC received the Timeline) and after hard-fought discovery in this case.  DN 42-14 at 213-21; 500 at 4-21; 527 at 7-9.

Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer.  DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9.

DC still needs to examine Toberoff further concerning, *inter alia*, these issues and his discovery misconduct. *See* Petrocelli Decl. ¶¶ 13-15; DN 585 at 1-2, 6-12. |
| 35 | Mr. Toberoff testified at his November 17, 2006 deposition about the August 2002 Offer to the Siegels.

<u>Defendants' Evidence:</u>  AD, Ex. W at 257:14-259:14 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Toberoff during his November 17, 2006, deposition in *Siegel* about Toberoff's August 2002 offer to the Siegels, or that this deposition revealed the fraudulent business conduct concerning a |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
| | | "billionaire investor." This fraudulent business offer was only first revealed to DC in December 2008, when it received the Toberoff Timeline, DN 42-14 at 213-21, and the Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012. *Cf.* DN 500 at 4-21; 527 at 7-9. |
| | | The primary issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached. Case No. CV-04-8400, DN 161 at 45-60. In this context, DC questioned Toberoff in order to develop evidence that Marks believed DC had reached a binding agreement with the Siegels, *e.g.,* AD Ex. W at 246:9-11 (asking whether Marks said the Siegels were "very far along" in their deal with DC Comics), not the acts of fraud that |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|-----|-------------------------------------------|---------------|
|     |                                           | DC challenges in this case. DN 49 ¶¶ 78-85, 180-86. These frauds were not exposed until late 2008 (and when DC received the Timeline) and after hard-fought discovery in this case. DN 42-14 at 213-21; 500 at 4-21; 527 at 7-9. |
|     |                                           | Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer. DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9. |
|     |                                           | DC still needs to examine Toberoff further concerning, *inter alia*, these issues and his discovery misconduct. *See* Petrocelli Decl. ¶¶ 13-15; DN 585 at 1-2, 6-12. |
| 36  | Mr. Toberoff testified at his November 17, 2006 deposition about the 2002 IP Worldwide Agreement.\n\nDefendants' Evidence: AD, Ex. W at 266:23-268:16 | **Disputed**, to the extent defendants suggest that DC fully and completely examined Toberoff during his November 17, 2006, deposition in *Siegel* about the 2002 IP Worldwide Agreement.\n\nThe primary issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. The Siegels and Toberoff argued |

- 38 -

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|----------------|
| | | on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached.  Case No. CV-04-8400, DN 161 at 45-60.  In this context, DC questioned Toberoff about his interactions with the Siegels during the relevant time period in order to develop evidence that the Siegels had reached a binding agreement with DC.  DC did not ask about the wrongful means Toberoff used to induce the Siegels to enter into the 2002 IP Worldwide Agreement, or the other acts of fraud that DC challenges in this case.  DN 49 ¶¶ 78-85, 180-86.  These frauds were not exposed until late 2008 (and when DC received the Timeline) and after hard-fought discovery in this case.  DN 42-14 at 213-21; 500 at 4-21; 527 at 7-9.<br><br>Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer.  DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9. |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | | DC still needs to examine Toberoff further concerning, *inter alia*, these issues and his discovery misconduct. *See* Petrocelli Decl. ¶¶ 13-15; DN 585 at 1-2, 6-12. |
| 37 | DC's deposition of Mr. Toberoff in 2006 tracked the Fifth Claim. <br><br> Defendants' Evidence:  FAC ¶¶ 180-186; AD, Ex. W at 244:13-264:25 | **Disputed**. <br><br> The primary issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the signed letter agreement Marks sent Schulman on October 19, 2001.  *Larson*, 2012 WL 6822241, at *1.  The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached.  Case No. CV-04-8400, DN 161 at 45-60.  In this context, DC asked Toberoff about his discussions with Marks and interactions with the Siegels in order to develop evidence that the Siegels had reached a binding agreement with DC, *e.g.,* AD Ex. W at 246:9-11 (asking whether Marks said the Siegels were "very far along" in their deal with DC), not that Toberoff had committed the acts of fraud that DC challenges in this case.  DN 49 ¶¶ 78-85, 180-86.  These frauds were not exposed until late 2008 (and |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | when DC received the Timeline) and after hard-fought discovery in this case.  DN 42-14 at 213-21; 500 at 4-21; 527 at 7-9. |
| | | Neither Marks, Toberoff, nor the Siegels were questioned in *Siegel* about the evidence of fraud DC uncovered in this case, including the Marks Memo and the Siegel family's letters concerning Toberoff's false "billionaire investor" offer.  DN 225-4 at 3-4; 362-2 at 286-90; 500 at 14-21; 500-5 at 338-39; 527 at 4-5, 9. |
| 38 | On or before June 2006, DC's parent, Warner Bros. Entertainment Inc. ("Warner"), received packages of documents stolen from Mr. Toberoff's law firm, including privileged attorney-client communications, accompanied by an anonymous document entitled "Superman-Marc Toberoff Timeline" (the "Timeline").<br><br>Defendants' Evidence:  AD, Ex. X at 278 ¶ 2 | **Disputed**.<br><br>Warner is not "DC's parent."  9th Cir. Appeal Nos. 11-55863, 11-56034, DN 31-1 (Corporate Disclosure Statement).  Warner and DC are affiliates, and Warner owns no part of DC.<br><br>Moreover, DC did not receive the Timeline documents until June 28, 2006.  Warner Bros. attorney Wayne Smith testified that he received a phone call from John Schulman, then-General Counsel of Warner Bros., "[d]uring the afternoon of June 28, 2006" advising that a set of documents "had arrived from an anonymous source at his office that day."  AD Ex. X ¶ 2.  After conducting a cursory review of the documents, Smith concluded that certain documents involved privileged communications, and immediately turned over the |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | Timeline and attachments to a neutral escrow agent to hold while DC "sought to obtain them through ordinary discovery." *Id.* Ex. X ¶¶ 3-13; DN 163-12; 163-13 at 759:16-760:7; *In re Pacific Pictures*, 679 F.3d at 1125. |
| | | In *Siegel*, the court found that DC had acted "reasonably" and "professionally" in its receipt and handling of the Timeline documents, and ordered Toberoff to produce the Timeline, DN 163-13 at 760:3-761:5, which he finally did in December 2008, DN 163-15.  Until then, neither Smith, nor anyone at DC or Warner, nor DC or Warner's counsel had access to the Timeline or its contents, except in the narrow way described in Smith's declarations in *Siegel*. |
| | | This Court has repeatedly upheld the *Siegel* court's finding that DC acted properly in receiving and handling the Timeline documents, and has repeatedly rejected defendants' attempts to argue that DC received the Timeline before June 2006 and mishandled the documents.  *See* DN 550-5 at 27-31, 57-61; 550-3 at 30:3-7; 42-14 at 216-17; 42 at 8-14, 35-39; 95 at 55:25-56:1; 558; 579 at 3-4; 558.  Just last month, Magistrate Judge Zarefsky affirmed "that the earliest documents [Warner] has concerning receipt of the time line |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | | and its accompanying documents was in June 2006." DN 558 at 2.<br><br>DC cannot confirm whether the Timeline documents were "stolen" from Toberoff's offices. Indeed, Toberoff has backtracked off his claim that David Michaels stole them. DN 276-2 at 122-24 (Resp. No. 4); 544-2 at 27. Many of the documents contained are also *not* privileged, and yet Toberoff and defendants wrongly suppressed them for years, in violation of various court orders compelling them to produce the documents. *E.g.*, DN 500. |
| 39 | The Timeline accused Mr. Toberoff of wrongfully interfering with DC's relationships and agreements with the Shuster and Siegel heirs.<br><br>Defendants' Evidence: AD, Ex. R | **Undisputed**.<br><br>Discovery concerning the extent of Toberoff's fraudulent conduct in connection with the Siegel and Shuster heirs is still ongoing in this case, as DC explains in the accompanying Petrocelli Declaration. *See also* DN 585 at 1-2, 6-19 (Joint Stipulation Regarding DC Comics' Motion (1) For Leave To Conduct Further Deposition Of Defendants Marc Toberoff, Laura Siegel Larson, And Mark Warren Peary; And (2) To Compel Defendants Marc Toberoff, Laura Siegel Larson, And Mark Warren Peary To Respond To Deposition Questions). |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| 40 | Warner's in-house counsel, Wayne Smith (Vice President, Senior Litigation and Chief Patent Counsel) and John Schulman (General Counsel), who oversaw the *Siegel* litigation, read the Timeline in June 2006.<br><br>Defendants' Evidence:  AD, Ex. X at 278-79 ¶¶ 3-4 | **Disputed**.<br><br>Smith's 2007 declaration in *Siegel* describes in detail his limited review of the Timeline in 2006.  He testified that he received a phone call from Schulman "[d]uring the afternoon of June 28, 2006" advising that a set of documents "had arrived from an anonymous source at his office that day."  AD Ex. X ¶ 2.  After conducting a cursory review of the documents, Smith concluded that certain documents involved privileged communications, and immediately turned over the Timeline and attachments to a neutral escrow agent to hold while DC "sought to obtain them through ordinary discovery."  *Id.* Ex. X ¶¶ 3-13; 163-13 at 759:16-760:7; *In re Pacific Pictures*, 679 F.3d at 1125.  Smith did not "share the contents of the Superman Documents with any of the outside counsel representing the Defendants in this action," or "use[] the contents of the documents in the litigation."  AD Ex. X ¶ 13.  Until the Timeline was produced in December 2008 pursuant to court order, neither Smith, nor anyone at DC or Warner, nor DC or Warner's counsel had access to the Timeline or its contents, except in the narrow way described in Smith's declarations in *Siegel*.<br><br>In *Siegel*, the court found that DC had acted "reasonably" and "professionally" in its receipt and |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | | handling of the Timeline documents, and ordered Toberoff to produce the Timeline, DN 163-13 at 760:3-761:5, which he finally did in December 2008, DN 163-15.<br><br>This Court has repeatedly upheld the *Siegel* court's finding that DC acted properly in receiving and handling the Timeline documents, and has repeatedly rejected defendants' attempts to argue that DC received the Timeline before June 2006, mishandled the documents, or had access to the documents before December 2008. *See* DN 550-5 at 27-31, 57-61; 550-3 at 30:3-7; 42-14 at 216-17; 42 at 8-14, 35-39; 95 at 55:25-56:1; 558; 579 at 3-4; 558.<br><br>DC did not become aware of Toberoff's fraudulent conduct until it obtained the Timeline in December 2008, DN 42-14 at 213-21.  The Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012.  *Cf.* DN 500 at 4-21; 527 at 7-9. |
| 41 | In a March 27, 2007 declaration, Wayne Smith testified, in part, that:<br><br>2. During the afternoon of June 28, 2006, I received a telephone call from John A Schulman, General Counsel of Warner Bros., who asked that I come to his office. Upon arriving at his | **Undisputed** for purposes of this motion that Wayne Smith submitted a declaration in the *Siegel* case dated March 26, 2007, which contains the language quoted by defendants.<br><br>DC disputes any suggestion that it had access to the Timeline or enclosed documents before it was |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | office, Mr. Schulman advised me that a set of documents (the "Superman Documents") addressed to him and apparently relating to the Siegel litigation had arrived from an anonymous source at his office that day. Mr. Schulman informed me that the cover letter contained with the documents indicated that other executives at Warner Bros. may have received the same set of documents, and that he had called the offices of those executives to see if they had received anything. He further advised me that he had asked those executives to send the documents to his office without reviewing them, and that one set of documents had already been delivered to him. Mr. Schulman handed me the stack (approximately an inch high) of Superman Documents that he had received and asked me to wait outside his office while he completed a meeting, after which we would discuss them. The stack did not include any envelope or packaging in which the documents may have arrived. This was not unusual as it has been my experience that the practice of Mr. Schulman's | produced pursuant to court order in December 2008. Smith testified that, after conducting a cursory review of the Timeline on June 28, 2006, he concluded that certain documents involved privileged communications, and immediately turned over the Timeline and attachments to a neutral escrow agent to hold while DC "sought to obtain them through ordinary discovery." AD Ex. X ¶¶ 3-13; DN 163-12; 163-13 at 759:16-760:7; *In re Pacific Pictures*, 679 F.3d at 1125. He did "not share[] the contents of the Superman Documents with any of the outside counsel representing the Defendants in this action," or "use[] the contents of the documents in the litigation." AD Ex. X ¶ 13. Until the Timeline was produced in December 2008 pursuant to court order, neither Smith, nor anyone at DC or Warner, nor DC or Warner's counsel had access to the Timeline or its contents, except in the narrow way described in Smith's declarations in *Siegel*.<br><br>In *Siegel*, the court found that DC had acted "reasonably" and "professionally" in its receipt and handling of the Timeline documents, and ordered Toberoff to produce the Timeline, DN 163-13 at 760:3-761:5, which he finally did in December 2008, DN 163-15.<br><br>This Court has repeatedly upheld the *Siegel* court's finding that DC acted properly in receiving and handling |

DC'S STATEMENT OF GENUINE ISSUES IN OPP. TO DEFS.' MSJ

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | office staff is to dispose of envelopes and packaging upon opening mail.<br><br>3. While I was waiting, I looked at what might be characterized as the "cover letter" that came with the Superman Documents. The cover letter, which was not signed, alleged various types of ethical misconduct on the part of Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also asserted ethical misconduct – violating the terms of a confidentiality agreement by leaking settlement information to the press – in connection with another litigated matter where Plaintiffs' counsel had also represented a party adverse to Warner Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's misconduct. The letter also referenced the documents enclosed, providing an overview of their contents and their connection to Plaintiffs' counsel's alleged wrongdoing. I also thumbed through the Superman Documents contained with the letter, but did not read any of them in detail. …. | the Timeline documents, and has repeatedly rejected defendants' attempts to argue that DC received the Timeline before June 2006 and mishandled the documents. *See* DN 550-5 at 27-31, 57-61; 550-3 at 30:3-7; 42-14 at 216-17; 42 at 8-14, 35-39; 95 at 55:25-56:1; 558; 579 at 3-4; 558. Just last month, Magistrate Judge Zarefsky affirmed "that the earliest documents [Warner] has concerning receipt of the time line and its accompanying documents was in June 2006." DN 558 at 2.<br><br>DC did not become aware of Toberoff's fraudulent conduct until it obtained the Timeline in December 2008, DN 42-14 at 213-21. The Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012. *Cf*. DN 500 at 4-21; 527 at 7-9. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     | 4. I then met with Mr. Schulman. …. Mr. Schulman agreed with this approach, gave me one set of the documents, retained the other two sets that he had received, and advised me that he had only looked at the cover letter that came with the documents and would not review the documents at all.<br><br>Defendants' Evidence:  AD, Ex. X at 278-79 ¶¶ 2-4 |  |
| 42  | On July 5, 2006, Wayne Smith informed DC's then-outside counsel, Michael Bergman, of allegations in the Timeline, as confirmed by Mr. Bergman's declaration dated September 25, 2007, which stated, in part:<br><br>On July 5, 2006, I received a call from Wayne Smith, Vice President, Senior Litigation and Chief Patent Counsel of Warner Bros. Entertainment Inc., informing me that three Warner Bros. employees, including General Counsel John Schulman, had received packages on June 28, 2006 containing documents relating to the present litigation that had been sent by an anonymous source … Mr. Smith told me that the packages, apparently | **Disputed**.<br><br>DC does not dispute for purposes of this motion that Michael Bergman submitted a declaration in the *Siegel* case dated September 25, 2007, which contains the language quoted by defendants.<br><br>DC disputes that Smith "informed" Bergman "of allegations in the Timeline" in 2006.  Bergman's declaration merely states that Smith told him the Timeline alleged "various types of ethical misconduct" on Toberoff's part, and "explained how the enclosed documents related to the misconduct allegations."  AD Ex. Z ¶ 4. Nowhere does Bergman suggest that Smith told him of specific allegations in the Timeline—to the contrary, Smith's 2007 declaration makes clear that he did "not share[]" |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
|  | identical, each contained an unsigned cover letter alleging, among other things, various types of ethical misconduct on the part of Plaintiffs' counsel in connection with the present litigation and another previously litigated case. The cover letter also explained how the enclosed documents related to the misconduct allegations.<br><br>Defendants' Evidence:  AD, Ex. Z at 382-383 ¶ 4 | the contents of the Superman Documents with any of the outside counsel representing the Defendants in this action."  AD Ex. X ¶ 13. Until the Timeline was produced in December 2008 pursuant to court order, neither Smith, nor anyone at DC or Warner, nor DC or Warner's counsel had access to the Timeline or its contents, except in the narrow way described in Smith's declarations in *Siegel*.<br><br>Moreover, Bergman's declaration makes no mention of fraud allegations—the gravamen and basis of DC's state-law claims.  It makes vague mention of "ethical" misconduct—conduct for which the Siegels or Shusters could sue Toberoff.  DN 387-2 at 33:16-34:12. In *Siegel*, the court found that DC had acted "reasonably" and "professionally" in its receipt and handling of the Timeline documents, and ordered Toberoff to produce the Timeline, DN 163-13 at 760:3-761:5, which he finally did in December 2008, DN 163-15.<br><br>This Court has repeatedly upheld the *Siegel* court's finding that DC acted properly in receiving and handling the Timeline documents, and has repeatedly rejected defendants' attempts to argue that DC received the Timeline before June 2006, |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | | mishandled the documents, or used them in litigation.  *See* DN 550-5 at 27-31, 57-61; 550-3 at 30:3-7; 42-14 at 216-17; 42 at 8-14, 35-39; 95 at 55:25-56:1; 558; 579 at 3-4; 558.<br><br>DC did not become aware of Toberoff's fraudulent conduct until it obtained the Timeline in December 2008, DN 42-14 at 213-21.  The Siegels' written admissions concerning this fraud only emerged in discovery in this case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012.  *Cf.* DN 500 at 4-21; 527 at 7-9. |
| 43 | In May 2007, in the *Siegel* case, both sides filed motions for partial summary judgment.<br><br>Defendants' Evidence:  *Siegel*, 542 F. Supp. 2d at 1116; AD, Ex. Y | **Undisputed**.  Since then, the Ninth Circuit has reversed the district court's summary judgment ruling, holding "as a matter of law" that the parties entered into a "binding" settlement agreement on October 19, 2001.  *Larson*, 2012 WL 6822241, at *1.  DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |
| 44 | In DC's summary judgment briefing in *Siegel*, DC argued that Mr. Toberoff had interfered with DC's alleged agreement with the | **Disputed**.<br><br>The issue in *Siegel* was whether the parties had entered into a binding settlement agreement based on the |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | Siegels.<br><br>Defendants' Evidence:  AD, Ex. Y at 319-20, 363-64, 372 | signed letter agreement Marks sent Schulman on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. The Siegels and Toberoff argued on summary judgment in *Siegel* that there were material differences between the October 19, 2001, letter and the parties' later draft long-form agreements, and that these differences proved that no agreement had been reached.  Case No. CV-04-8400, DN 161 at 45-60.  DC contended that the parties had reached an agreement on the terms of an October 19, 2001 letter from Marks to Schulman.<br><br>None of DC's counterclaims in *Siegel* concern Toberoff's interference with the 2001 Settlement Agreement, or his fraudulent business conduct that induced the heirs to repudiate their agreement.  *See* Case No. CV-04-8400, DN 646.  DC conducted no discovery on these issues, as it was not aware of Toberoff's wrongful conduct, including his fraudulent business offer to the Siegels concerning a "billionaire investor," until it obtained the Timeline in December 2008, DN 42-14 at 213-21.  *See* DC's Responses to SUF 27-28, 34-37.  The Siegels' written admissions concerning this fraud only emerged in discovery in this |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|-----|-------------------------------------------|---------------|
|     |                                           | case—and despite Toberoff's obstructionist and improper discovery conduct—in 2011 and 2012.  *Cf.* DN 500 at 4-21; 527 at 7-9. |
| 45  | In DC's summary judgment briefing in *Siegel*, DC stated the following:<br><br>On July 30, Mr. Toberoff again contacted Mr. Marks to inquire as to the status of Plaintiffs' dealings with DC on the Superman property. (Bergman Decl. Exh. S (Marks Tr.) at 165:25-167:3.) When informed that there was a confidentiality agreement in place and that Mr. Marks would not speak with him about DC, Mr. Toberoff asked if Mr. Marks would be willing to enter into separate negotiations with him regarding the sale of the Siegels' Superman interests. (*Id.*) Mr. Marks declined to do so, but told Mr. Toberoff that if he had an offer to make, Mr. Marks would present it to his clients. (*Id.*) Accordingly, in early August, 2002, Mr. Toberoff's company, IPW [IP Worldwide], offered to purchase Plaintiffs' Superman copyright interests for $15 million and "a meaningful back-end." (*Id.* at | **Undisputed** for purposes of this motion that DC filed an Opposition to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Points and Authorities In Support Thereof in the *Siegel* case on May 29, 2007, which contains the language quoted by defendants.<br><br>DC disputes defendants' suggestion that DC was aware of Toberoff's fraudulent conduct in 2006.  The briefing defendants cite contains no mention of Toberoff's fraud, including his false business offer to the Siegels concerning a "billionaire investor," confirming that DC did not know about Toberoff's wrongdoing until it obtained the Timeline in December 2008, DN 42-14 at 213-21.  DC conducted no discovery on these issues in *Siegel*, as they were not the subject of any claims or counterclaims in that case.  *See* Case No. CV-04-8400, DN 646; DC's Responses to SUF 27-28, 34-37. |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | 167:7-169:25.) Mr. Marks communicated that offer to his clients. (*Id.* at 169:21-170:12.) | |
| | On September 21, 2002, Plaintiffs abruptly terminated Mr. Marks' and Gang Tyre's representation of them, without any prior notice, via a letter copied to Paul Levitz, DC's President and Publisher. (Bergman Decl. Exh. S (Marks Tr.) at 202:1-202:16; *Id.* Exh. DD.) On the same day, Plaintiffs sent a separate letter to DC repudiating the parties' October 19 agreement and purporting to break off all further negotiations, and claiming that February Draft contained "outrageous, never discussed, unacceptable demands." (Bergman Decl. Exh. BB.) Plaintiffs then promptly retained Mr. Toberoff to represent them (*id.* Exh. X (Toberoff Tr. at 106:1-107:4; 132:4-134:7), and after being advised by Mr. Toberoff's business partner that DC's offer for their Superman copyright interest was "ridiculously low" (*id.* Exh. EE (Laura Siegel Larson Tr.) at 28:15-28:18), entered into an agreement with IPW [IP Worldwide] dated | |

| No. | Defendants' Allegedly Uncontroverted Fact | DC's Response |
|---|---|---|
| | October 3, 2002 pursuant to which Plaintiff's retained IPW [IP Worldwide] to be their exclusive representative in connection with their Superman interests. (Bergman Decl. Exh. FF.)  Defendants' Evidence:  AD, Ex. Y at 319-20 | |
| 46 | In DC's summary judgment briefing in *Siegel*, DC also stated the following:  Moreover, as demonstrated below, Defendants have presented sufficient admissible evidence for a trier of fact to conclude that in October, 2001, (i) the parties' attorneys Mr. Schulman and Mr. Marks, with full authority from their respective clients, reached a meeting of the minds on all material terms pursuant to which Plaintiff would convey their Superman copyright interests to DC, (ii) that this agreement was contemporaneously memorialized and affirmed in a writing executed by Plaintiffs' counsel on October 19, 2001, and (iii) that the parties intended and expected to be bound by the terms of that agreements | **Undisputed** for purposes of this motion that DC filed an Opposition to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Points and Authorities In Support Thereof in the *Siegel* case on May 29, 2007, which contains the language quoted by defendants.  The Ninth Circuit recently reversed the district court's summary judgment ruling, holding "as a matter of law" that the parties did, in fact, enter into a "binding" settlement agreement on October 19, 2001.  *Larson*, 2012 WL 6822241, at *1.  DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | notwithstanding the fact that they contemplated negotiating and executing a more formal contract thereafter. In fact, the parties were proceeding along that basis, with the drafting and re-drafting of their more formal documentation, until Plaintiffs suddenly appeared to have second thoughts after being presented with a seemingly more lucrative offer by their current counsel, and abruptly jettisoned both the deal and their attorneys who negotiated it.<br><br>Defendants' Evidence:  AD, Ex. Y at 363-64 | |
| 47 | In DC's summary judgment briefing in *Siegel*, DC also stated the following:<br><br>Indeed, the evidence supports the conclusion that Plaintiffs' belated claim that the Schulman Letter changed the deal or that the February Draft was "unacceptable" is nothing other than an *ex post facto* excuse for Plaintiffs to reject the deal they had already made for the promise of a much more lucrative payday from their current counsel and the companies he controlled: Mr. Marks *never* disputed anything | **Undisputed** for purposes of this motion that DC filed an Opposition to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Points and Authorities In Support Thereof in the *Siegel* case on May 29, 2007, which contains the language quoted by defendants.<br><br>The Ninth Circuit recently reversed the district court's summary judgment ruling, holding "as a matter of law" that the parties did, in fact, enter into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1.  DC has filed a motion for |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | in the Schulman Letter, and similarly voice *no* concern about the February Draft until after he learned about his client's complaining letter to Time Warner's Chief Executive Officer; and even then he acknowledged to Mr. Schulman that although the draft was "very aggressive" and contained some things which had not been discussed *it was not contrary to what the parties had agreed to.* (Schulman Decl. ¶ 11.) Mr. Marks even tried his hand at re-crafting the draft into a form that would be acceptable to his client. (Bergman Decl. Exh. S (Marks Tr.) at 196:21-197:15, 198:25-199:3; *id.* Exh. BB.), but the effort came to naught when Plaintiffs abruptly fired Mr. Marks and terminated discussions with DC shortly after receiving Mr. Toberoff's "$15 million plus" offer. (*Id.* Exh. S (Marks Tr.) at 168:1-169:20.).<br><br>Defendants' Evidence:  AD, Ex. Y at 372 | summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222.<br><br>DC disputes defendants' suggestion that DC was aware of Toberoff's fraudulent conduct in 2006.  The briefing defendants cite contains no mention of Toberoff's fraud, including his false business offer to the Siegels concerning a "billionaire investor," confirming that DC did not know about Toberoff's wrongdoing until it obtained the Timeline in December 2008, DN 42-14 at 213-21.  DC conducted no discovery on these issues in *Siegel*, as they were not the subject of any claims or counterclaims in that case. *See* Case No. CV-04-8400, DN 646; DC's Responses to SUF 27-28, 34-37. |
| 48 | In 2008, during the *Siegel* litigation, an agreement was entered into by Joanne Siegel, Laura Siegel Larson, Mark Warren Peary, and Jean Adele Peavy (the | **Disputed**.<br><br>DC disputes defendants' mischaracterization of the 2008 Consent Agreement as a "collective |

| No. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | "2008 Agreement") to collectively negotiate with DC.<br><br>Defendants' Evidence:  Dkt. 160 at 50-51, 63, Dkt. 209 at 1-2, 4-5; AD, Ex. FF at 475:10-480:4 | negotiation" document or one related to litigation.  This Court rightly held that agreement "run[s] afoul" of the Copyright Act and is thus "invalid." DN 507 at 5, 17.  The Ninth Circuit has further held that "DC's claims [challenging the 2008 lock-up agreement] were not 'based on' protected activity…."  *DC Comics v. Pacific Pictures Corp.*, 2013 WL 120807, at *1 (9th Cir. Jan. 10, 2013).  "[T]he lock-up agreement appears to bind the heirs long after the expiration of any settlement negotiations.  Any protected conduct is thus merely the backdrop to—and not the basis of—[DC's] unfair competition claim." *Id.*  The Ninth Circuit's ruling is the law of this case, and defendants cannot continue to re-litigate this issue.  *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1258 (9th Cir. 2005) ("The law of the case doctrine requires a district court to follow the appellate court's resolution of an issue of law in all subsequent proceedings in the same case."); 4 W. SCWHARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 4:632 (Rutter 2012). |
| 49 | The district court granted, in part, the Siegels' summary judgment motion, holding that the Siegel Termination was valid as to <u>Action</u> | **Undisputed**.<br><br>The Ninth Circuit recently reversed the district court's summary |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | Comics, No. 1, and rejecting DC's claim that the parties had reached an agreement on October 19, 2001.<br><br>Defendants' Evidence: *Siegel*, 542 F. Supp. 2d at 1145. | judgment ruling, holding "as a matter of law" that the parties entered into a "binding" settlement agreement on October 19, 2001. *Larson*, 2012 WL 6822241, at *1. DC has filed a motion for summary judgment in the *Siegel* cases seeking judgment on its Fourth Counterclaim and dismissing all of Larson's claims.  Case No. CV-04-8400, DN 702; Case No. CV-04-8776, DN 222. |
| 50 | On April 26, 2010, Joanne Siegel, Laura Siegel Larson and Mark Warren Peary, along with their attorney, Marc Toberoff, held a settlement mediation with DC, but the parties did not reach a settlement.<br><br>Defendants' Evidence:  AD, Ex. DD | **Undisputed**.<br><br>Toberoff's disclosure of confidential mediation discussions—and false descriptions of them, in large part, *cf.* Mot. at 7:12-18 ("On May 14, 2010, *after the Siegel and Shuster heirs did not accept Warner's offer in a settlement mediation*, DC filed the instant action against its opposing counsel, Mr. Toberoff, and against the Siegel and Shuster heirs. SUF ¶¶50-51.") (emphasis added)— violates federal and California law, FED. R. EVID. 408 (prohibiting use of "conduct or statements made in compromise negotiations" to "prove liability for, invalidity of, or amount of a claim"); *Microsoft Corp. v. Suncrest Enter.*, 2006 WL 929257, at *2 (N.D. Cal. Jan 6, 2006); CAL. EVID. CODE § 1119; *Simmons v. Ghaderi*, 44 Cal.4th 570, 580, (2008) ("[S]tatements made during |

| NO. | DEFENDANTS' ALLEGEDLY UNCONTROVERTED FACT | DC'S RESPONSE |
|---|---|---|
| | | mediation and mediation materials are confidential not only during the mediation, but also after the mediation ends"), and is sanctionable. |
| 51 | On May 14, 2010, DC filed the instant action against Laura Siegel Larson, Joanne Siegel, and Mark Warren Peary, as personal representative of the Estate of Joseph Shuster and their counsel, Marc Toberoff.<br><br>Defendants' Evidence:  Dkt. 1 | **Disputed**.<br><br>DC filed its initial complaint on May 14, 2010, against Marc Toberoff and his various companies—Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC—as well as Joanne Siegel, Laura Siegel Larson, and Mark Warren Peary, as personal representative of the Estate of Joseph Shuster.  DN 1.  DC's complaint was *not* filed against Toberoff as "counsel" for the Siegel and Shuster heirs.  This Court and the Ninth Circuit rejected defendants' SLAPP motion and their erroneous—yet oft-repeated—assertions that Toberoff's alleged interference was "protected, litigation and settlement related conduct."  DN 337; *Pacific Pictures*, 2013 WL 120807, at *1. |

## II.   DC'S RESPONSE TO DEFENDANTS' CONCLUSIONS OF LAW

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| 1.  Summary judgment should be granted in Defendants' favor on DC's Fourth Claim for Relief (Dkt. 49 ("FAC") ¶¶ 174-79) for tortious interference with contract. The Fourth | Summary judgment cannot be granted in defendants' favor on DC's Fourth Claim for the reasons set forth in DC's opposition (Opp. 1-13).  Rather, judgment should be entered in *DC's* |

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| Claim, brought in 2010, is barred by the applicable two-year statute of limitations (Cal. Code of Civ. Proc. § 339(1)), which expired no later than 2008.<br><br>  Tortious interference claims accrue "at the date of the wrongful act" and "[can] not be later than the actual breach of the contract by the party who was wrongfully induced to breach." *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974). "[T]he statute of limitations [for tortious interference] began to run when the contract was actually breached." *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 530 (N.D. Cal. 2000). Here, the alleged breach consisted of the 2001 and 2003 PPC Agreements, and the resulting 2003 Shuster Termination, both well outside the statute of limitations period.<br><br>  DC cannot invoke the "delayed discovery" rule because all that is required to trigger the statute of limitations is inquiry notice, which occurs "once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988) (citations omitted). DC was served with the Shuster Termination in 2003; and DC was on actual and inquiry notice by November 15, 2006, when it was provided with complete and unredacted copies of both the 2001 and 2003 PPC Agreements. Defendants' Statement of Undisputed Facts ("SUF") | favor on its Fourth Claim for the reasons set forth in DC's cross-motion and Proposed Order. *Id.* 1-4. |

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| ¶ 25; *see Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1061 (9th Cir. 2012).<br><br>Because DC had actual and inquiry notice by 2006, any allegations by DC of fraudulent concealment are irrelevant. *Barber v. Superior Court*, 234 Cal. App. 3d 1076, 1083 (1991). The "continuing harm" doctrine does not apply to DC's interference claims. *Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 952 (N.D. Cal. 2010). | |
| 2.  Summary judgment should be granted in Defendants' favor on DC's Fifth Claim for Relief (FAC ¶¶ 180-86) for interference with prospective economic advantage. The Fifth Claim, brought in 2010, is barred by the applicable two-year statute of limitations (Cal. Code of Civ. Proc. § 339(1)), which expired no later than 2008.<br><br>Tortious interference claims accrue "at the date of the wrongful act" and "[can] not be later than the actual breach of the contract by the party who was wrongfully induced to breach." *Trembath*, 43 Cal. App. 3d at 836. "[T]he statute of limitations [for tortious interference] began to run when the contract was actually breached." *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d at 530. DC's Fifth Claim alleges that the tortious interference occurred in August 2002, when Mr. Toberoff informed the Siegels' counsel of an offer to purchase | Summary judgment cannot be granted in defendants' favor on DC's Fifth Claim for the reasons set forth in DC's opposition (Opp. 1-6, 14-18).  Rather, judgment should be entered in *DC's* favor on its Fifth Claim for the reasons set forth in DC's cross-motion and Proposed Order.  *Id.* 1-4. |

| | CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|---|

1
2  their Superman rights, and the alleged
3  breach occurred no later than September
   21, 2002, when the Siegels formally
4  ended negotiations with DC.
5          Plaintiff cannot invoke the
6  "delayed discovery" rule because all that
   is required to trigger the statute of
7  limitations is inquiry notice, which
8  occurs "once the plaintiff has notice or
   information of circumstances to put a
9  reasonable person on inquiry." *Jolly*, 44
10 Cal. 3d at 1110-11. On September 21,
11 2002, the Siegels formally terminated
   their counsel, Kevin Marks, and ended
12 his negotiations with DC. SUF ¶ 19. By
13 2003, DC knew that Mssrs. Toberoff and
14 Emanuel represented the Siegel
   termination interest when they resumed
15 negotiations with DC. SUF ¶ 22. By
16 2006, DC received, read and
17 investigated the "Timeline's" allegations
   of interference by Mr. Toberoff and DC
18 proceeded in *Siegel* to take extensive
19 depositions and document discovery,
20 revealing by late 2006 that: (1) Mssrs.
   Emanuel and Toberoff had made an
21 August 2002 offer to Mr. Marks to
22 purchase the Siegels' Superman
23 copyrights, and (2) shortly after the
   Siegels' ended Marks' negotiations with
24 DC on September 21, 2002, the Siegels
25 entered into an agreement dated October
26 3, 2002 with Emanuel/Toberoff's
   venture, IP Worldwide, LLC, to market
27 the Siegels' Superman rights. SUF ¶¶
28 15-22, 25-28, 34-37. Knowledge of the

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| Timeline's accusations of interference and of these events was sufficient to raise "suspicion," putting DC on inquiry notice. *See Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999); *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 172 (4th Cir. 2007). Demonstrating that DC was on actual or inquiry notice of its Fifth Claim, it explicitly argued on summary judgment in *Siegel* that by "a seemingly more lucrative offer" Mr. Toberoff had "interfered" with DC's relationship with Siegels. SUF ¶ 43-47. | |
| 3.  Summary judgment should be granted in Defendants' favor on DC's Sixth Claim for Relief (FAC ¶¶ 187-189) for unfair competition. | Summary judgment cannot be granted in defendants' favor on DC's Sixth Claim for the reasons set forth in DC's opposition (Opp. 1-4, 18-22).  Rather, judgment should be entered in *DC's* favor on its Sixth Claim for the reasons set forth in DC's cross-motion and Proposed Order.  *Id.* |
| (a).  DC's Sixth Claim is moot. The Court has already granted the relief sought by DC's Sixth Claim in connection with DC's Third Claim. Dkt. 507, 540. There is no longer a "live controversy" and therefore "the claim is moot … [and] must be dismissed." *American Rivers v. National Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). | DC's Sixth Claim is not moot, for the reasons set forth in DC's opposition (Opp. 19). |
| (b). DC's Sixth Claim is preempted by the Copyright Act. If a "state law unfair competition claim is | DC's Sixth Claim is not preempted, for the reasons set forth in DC's opposition |

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ

| CONCLUSION OF LAW | DC'S RESPONSE |
|---|---|
| based solely on rights equivalent to those protected by the federal copyright laws," it is preempted. *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998). DC's state-law Sixth Claim merely reformulates DC's Third Claim (FAC ¶¶165-73) under the Copyright Act and is premised on the same alleged Copyright Act violation, which it incorporates by reference. The claim is therefore preempted. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987); *Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987). | (Opp. 21-22). |
| (c).  DC's Sixth Claim is also largely barred by the applicable four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Unfair competition claims begin to run "on the date the cause of action accrued, not on the date of discovery." *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002). Insofar as it is based on the 2001 and 2003 PPC Agreements, which were cancelled in 2004, the claim is barred by the statute of limitations. | DC's Sixth Claim is not time-barred, for the reasons set forth in DC's opposition (Opp. 19-21). |

Respectfully submitted,

Dated:  February 15, 2013

By:  /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

OMM_US:71349970

DC'S STATEMENT OF GENUINE
ISSUES IN OPP. TO DEFS.' MSJ