# EXHIBIT A

ORIGINAL SHIPPED NOV 0 9 200

LODGED
CLERK, U.S. DISTRICT COURT

APR 2 8 2009

CENTRAL DISTRICT OF
EASTERN DIVISION    BY D

CERTIFIED COPY

09:58

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA )
SIEGEL LARSON, )
 )
        Plaintiffs, )
 )
    vs. )          No. 04-8400 (RSWL) (RZx)
 )
 )              -and-
WARNER BROS. ENTERTAINMENT )
INC., et al., )          No. 04-8776 (RSWL) (RZx)
 )
        Defendants. )
_____)
AND RELATED COUNTERCLAIMS.

DEPOSITION OF ARIEL Z. EMANUEL

Beverly Hills, California

Thursday, November 2, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

U.S. LEGAL
Support

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

```
1              Deposition of ARIEL Z. EMANUEL, taken

2         on behalf of Defendants and Counterclaimants,

3         at 9665 Wilshire Boulevard, 9th Floor, Beverly

4         Hills, California, beginning at 3:08 PM on

5         Thursday, November 2, 2006, before DAVID S.

6         COLEMAN, Certified Shorthand Reporter No. 4613.

7

8

9    APPEARANCES:

10

11   For Plaintiffs:

12         LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
13         Attorney at Law
           2049 Century Park East, Suite 2720
14         Los Angeles, California 90067
           310-246-3333
15

16
     For Defendants and Counterclaimant:
17
           WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
18         BY:  MICHAEL BERGMAN
               ADAM HAGEN
19         Attorneys at Law
           9665 Wilshire Boulevard, 9th Floor
20         Beverly Hills, California 90212
           310-858-7888
21         mbergman@wwllp.com

22

23

24

25

                                                              2
```

```
1    APPEARANCES (Continued):

2

3    For the Witness:

4        ALSCHULER GROSSMAN STEIN & KAHAN
         BY:  MICHAEL J. PLONSKER
5        1620 26th Street, 4th Floor - North Tower
         Santa Monica, California 90404-4060
6        310-907-1000

7

8    ALSO PRESENT:  TOM McGUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                          I N D E X

2

3

4    WITNESS               EXAMINATION          PAGE

5    ARIEL Z. EMANUEL

6                          BY MR. BERGMAN       6

7

8                             EXHIBITS

9

10   DEPOSITION                                 PAGE

11   1    Subpoena to Ariel Emanual dated       13
          October 5, 2006, and attached
12        documents

13   2    Letter from Michael Plonsker to       14
          Michael Bergman dated October 30,
14        2006, and attached documents

15   3    Fax from Marc Toberoff to Ariel Z.    19
          Emanuel dated 6-3-02
16
     4    Document from Marc Toberoff and Ariel 56
17        Emanual to Joanne Siegel and Laura
          Siegel Larson dated as of October 3,
18        2002

19   5    Letter from Marc Toberoff to Joanne   60
          Siegel and Laura Siegel Larson dated
20        January 21, 2002

21   6    Letter from Ariel Emanuel to Bruce    70
          Rosenblum, undated
22
     7    Document Bates No. EN00142            79
23
     8    Letter from Marc Toberoff to Tom      80
24        McGuire dated August 17, 2004

25
```

                                                        4

**U.S. LEGAL SUPPORT**
## EXHIBIT A
**6**

INDEX (Continued):


UNANSWERED QUESTIONS

Page     Line

9      12
11     18
23     18
27     8
29     6
32     3
33     8
35     7, 17
37     2, 20
38     17
39     11, 19
44     6
48     13
52     4, 8
69     11

5

1    Beverly Hills, California, Thursday, November 2, 2006

2                        3:08 PM

3

4                    ARIEL Z. EMANUAL,

5          having been first administered an oath,

6          was examined and testified as follows:

7

8                      EXAMINATION

9    BY MR. BERGMAN:

03:08 10    Q    Would you state your full name for the record,

03:08 11    please.

03:08 12    **A    Ariel Zev Emanuel.**

03:08 13    Q    Mr. Emanuel, have you had your deposition taken

03:08 14    before?

03:08 15    **A    Yes.**

03:08 16    Q    On how many occasions, approximately?

03:08 17    **A    I don't recall.**

03:08 18    Q    A number of them?

03:08 19    **A    I don't know how many.**

03:08 20    Q    Okay.  Let me just emphasize a few points.

03:09 21         I, of course, am here representing the DC

03:09 22    parties who are defendants and counterclaimants in this

03:09 23    action brought by Joanne and Laura Siegel.  I'll be

03:09 24    asking you questions, the reporter will take down

03:09 25    everything that is said verbatim and, at the conclusion

                                                                    6

03:09  1    of the deposition, will prepare it in typewritten form,

03:09  2    submit a copy to you for any corrections that you may

03:09  3    have and your signature.

03:09  4         You have been placed under oath.  Your testimony

03:09  5    carries with it the same force and solemnity of testimony

03:09  6    given in open court.  For that reason, please listen

03:09  7    carefully to my questions.  Don't answer a question

03:09  8    unless you understand it.  If you want me to repeat a

03:09  9    question or rephrase it, just say so.

03:09 10         Okay?

03:09 11    A    Yes.

03:09 12    Q    Do you understand?

03:09 13    A    Yes.

03:09 14    Q    Okay.  By whom are you employed and in what

03:09 15    capacity?

03:09 16    A    Endeavor.  I'm self-employed.

03:10 17    Q    You are a theatrical agent?

03:10 18    A    I'm a talent agent.

03:10 19    Q    Okay.  And how long have you been a talent

03:10 20    agent?

03:10 21    A    Approximately 15 years.

03:10 22    Q    Have you had any discussions with Marc Toberoff

03:10 23    today?

03:10 24    A    No.

03:10 25    Q    What discussions, if any, have you had with

7

03:10 1    Mr. Toberoff concerning this action since the action was

03:10 2    filed approximately two years ago?

03:10 3        MR. PLONSKER:  Can we ask a yes or no question

03:10 4    first, because there may be privilege issues, and I just

03:10 5    want to make sure that we cover that?

03:10 6        MR. BERGMAN:  Sure.

03:10 7    Q    Have you had any conversations with Marc

03:10 8    Toberoff concerning any aspect of this case since it was

03:10 9    filed approximately two years ago?

03:11 10   **A    Yes.**

03:11 11   Q    Okay.  On how many occasions have you discussed

03:11 12   this matter with Mr. Toberoff?

03:11 13   **A    Can I ask?  I don't know what falls under**

03:11 14   **client -- what the lawyer --**

03:11 15       MR. PLONSKER:  He is asking you just how many

03:11 16   times.  When he asks the substance, then I'll object if

03:11 17   it's appropriate, but right now he is just laying a

03:11 18   foundation, so you can answer how many times if you

03:11 19   recall.

03:11 20       THE WITNESS:  Maybe once or twice.

03:11 21   BY MR. BERGMAN:

03:11 22   Q    Okay.  Can you separate those -- if there were

03:11 23   two conversations, can you separate one from the other?

03:11 24   **A    I don't know when the first one happened.  The**

03:11 25   **second one happened recently.  I don't remember.**

8

03:11 1          Q    Okay.  Can you tell me what do you recall being

03:11 2     said by you and Mr. Toberoff during the first

03:12 3     conversation?

03:12 4          MR. PLONSKER:  All right.  I need to object.  To

03:12 5     the extent that it relates to IP Worldwide business or

03:12 6     former business, then I'm going to instruct you not to

03:12 7     answer on the grounds of the attorney-client privilege.

03:12 8     To the extent that it's unrelated to that business, then

03:12 9     you can respond.  And if you can't make a distinction,

03:1210     then I'm going to have to instruct you not to answer the

03:1211     whole thing.

03:1212          (Instruction not to answer.)

03:1213          THE WITNESS:  I don't really recall, so I can't

03:1214     really make the distinction, so I'm not going to answer.

03:1215          MR. BERGMAN:  Okay.  May I ask, Mr. Plonsker,

03:1216     what the basis of the attorney-client privilege is?

03:1217          MR. PLONSKER:  Mr. Toberoff was general counsel

03:1218     for IP Worldwide, LLP, I think it was, or --

03:1219          MR. TOBEROFF:  LLC.

03:1220          MR. PLONSKER:  -- LLC, and Mr. Emanuel was a

03:1221     member, so when they were dealing with IP Worldwide, LLC

03:1222     business, it would be privileged because of the attorney-

03:1223     client relationship.

03:1224          MR. BERGMAN:  We're going to have a problem with

03:1225     that.

                                                                    9

03:12 1          MR. PLONSKER:  Okay.

03:13 2          MR. BERGMAN:  And the problem, of course, is

03:13 3    that Mr. Toberoff and Mr. Emanuel were joint venturers.

03:13 4    They were in business together.  There is no indication

03:13 5    that there was an attorney-client relationship as opposed

03:13 6    to two entrepreneurs engaged in a joint venture.

03:13 7          MR. PLONSKER:  Okay, I understand your position.

03:13 8    We will just have to deal with it, but I need to protect

03:13 9    the privilege, and then we will have to figure out what

03:13 10   position IP Worldwide, LLC is going to take.

03:13 11         MR. BERGMAN:  Okay.

03:13 12         Mr. Toberoff, do you care to say what position

03:13 13   IPW, IP Worldwide, LLC is going to take?

03:13 14         MR. TOBEROFF:  I'm not here to testify.  They've

03:13 15   asserted the privilege.

03:13 16         MR. BERGMAN:  Okay.  I don't want to engage in

03:13 17   colloquy, but we will, of course, challenge the assertion

03:13 18   of that privilege and, if we prevail, bring Mr. Emanuel

03:13 19   back.

03:13 20         MR. PLONSKER:  Understood.

03:13 21         MR. BERGMAN:  Okay.

03:14 22         MR. TOBEROFF:  We should clarify for the record

03:14 23   when people use the term "IPW," they are referring to IP

03:14 24   Worldwide, LLC.

03:14 25         MR. PLONSKER:  That's the entity that I was

                                                              10

03:14 1    referring to.

03:14 2            MR. TOBEROFF:  Just to be clear.

03:14 3            MR. BERGMAN:  Very well.

03:14 4            MR. PLONSKER:  Okay.

03:14 5    BY MR. BERGMAN:

03:14 6        Q    Mr. Emanuel, in the first conversation that I

03:14 7    asked you about that you had with Mr. Toberoff, was he

03:14 8    giving you legal advice?

03:14 9        **A    I don't recall.**

03:1410        Q    Would you tell me then what was said in that

03:1411    first conversation by you and Mr. Toberoff?

03:1412            MR. PLONSKER:  I am going to have to object on

03:1413    the same grounds and instruct him not to answer until I

03:1414    know what was discussed, and if you would like me to go

03:1415    off the record and speak to the witness, I can do that,

03:1416    but I can't let him testify to the extent that it might

03:1417    be attorney-client communications.

03:1418            (Instruction not to answer.)

03:1419            MR. BERGMAN:  The choice is yours.  It might be

03:1420    easier.  We can save another trip --

03:1421            MR. PLONSKER:  Maybe do it during a break if

03:1422    you'd like.  It's your deposition.  Whatever you'd like

03:1423    me to do.

03:1424            MR. BERGMAN:  Okay.  Well, we are going to be

03:1525    dealing with this a great deal during the course of the

                                                              11

03:15 1    deposition.  Perhaps you and he should discuss it.

03:15 2         (Discussion off the record.)

03:15 3         MR. PLONSKER:  So you can tell him that.

03:15 4         THE WITNESS:  Let me check.

03:15 5         MR. PLONSKER:  You can say what you just said to

03:15 6    me in different words.

03:15 7         THE WITNESS:  I actually don't remember any of

03:15 8    the conversations, so it's not like you're gonna ask me

03:15 9    something and I'm going to recall you something.  You

03:1510    just asked me something.  I'm trying to recall it, and I

03:1511    don't recall any of the conversations.  So I'm not trying

03:1512    to -- I mean I don't know what --

03:1513         MR. PLONSKER:  That's okay.  You've answered.

03:1514    So it becomes irrelevant, because you can't recall.

03:1515    BY MR. BERGMAN:

03:1516      Q   What was discussed between you and Mr. Toberoff

03:1517    with respect to this lawsuit in the second conversation

03:1518    that you had with him?

03:1519         MR. PLONSKER:  Let me ask you, do you recall

03:1520    what was discussed during that conversation?

03:1521         THE WITNESS:  Only that Warner Bros. was

03:1522    coming -- you know, going to engage in some sort of

03:1623    lawsuit to try and figure out what was going on.

03:1624    BY MR. BERGMAN:

03:1625      Q   And do you recall anything else about that

                                                              12

03:16 1    conversation?

03:16 2            MR. TOBEROFF:  I would just like to make sure,

03:16 3    because we had this in another deposition, where we have

03:16 4    to make absolutely sure that if you're asserting the

03:16 5    privilege and then you are discussing it, that you are

03:16 6    not waiving the privilege.

03:16 7            MR. PLONSKER:  Can we agree -- I am letting him

03:16 8    answer because it seems like there is not much substance

03:16 9    that he remembers, but I want to make sure there is no

03:1610    waiver by me letting him respond.

03:1611            Is that acceptable?

03:1612            MR. BERGMAN:  I will stipulate that any

03:1613    responses regarding conversations with Mr. Toberoff will

03:1614    not constitute a waiver of any privilege.

03:1615            MR. PLONSKER:  Thank you.

03:1616            MR. BERGMAN:  Would the reporter mark as Exhibit

03:1617    1 a copy of the subpoena that was served upon

03:1618    Mr. Emanuel?

03:1619            (Deposition Exhibit 1 marked.)

03:1720            MR. PLONSKER:  Just so we're clear, you're

03:1721    taking his deposition today both individually and as the

03:1722    designee of Endeavor, because there were two subpoenas

03:1723    that were served?

03:1724            MR. BERGMAN:  That is correct, and so that

03:1725    Mr. Emanuel will be the witness representing Endeavor as

                                                                    13

03:17 1    well.

03:17 2          MR. PLONSKER:  Yes.

03:17 3          MR. BERGMAN:  So we can do it all in one

03:17 4    deposition.

03:17 5          MR. PLONSKER:  Please.

03:17 6    BY MR. BERGMAN:

03:17 7       Q    Mr. Emanuel, did you look at the subpoena which

03:17 8    was served upon you?

03:17 9       A    **No.**

03:1710       Q    Did you have anyone go through the subpoena and

03:1711    determine what documents you had that were responsive to

03:1712    the subpoena?

03:1713       A    **It went to Tom McGuire.**

03:1714       Q    And to your knowledge did Mr. McGuire collect

03:1715    all of the documents that you had that were responsive to

03:1716    the subpoena?

03:1717       A    **You should ask Mr. McGuire.  I have no idea.**

03:1718       Q    Okay.

03:1819       A    **I don't want to assume anything.**

03:1820       Q    Okay.

03:1821          Would the reporter mark as Exhibit 2 a series of

03:1822    documents, the top sheet being an October 30, 2006 letter

03:1823    from Mr. Plonsker, a two-page privilege log, and

03:1824    documents which have been Bates stamped EN 1 through 142.

03:1825          (Deposition Exhibit 2 marked.)

14

03:18 1    BY MR. BERGMAN:

03:18 2        Q    Mr. Emanuel, do you currently have any financial

03:18 3    interest in any rights that Joanne or Laura Siegel may

03:18 4    have in either the Superman or Superboy properties?

03:18 5            MR. PLONSKER:  Object.  Calls for a legal

03:18 6    conclusion.

03:18 7            You can answer.

03:19 8            THE WITNESS:  All I know is there was a -- say

03:19 9    the question again.  Excuse me.  I just want to make sure

03:1910    I can answer.

03:1911    BY MR. BERGMAN:

03:1912        Q    Do you currently have any financial interest in

03:1913    any portion of the Joanne or Laura Siegel interest in the

03:1914    Superman or Superboy properties?

03:1915            MR. PLONSKER:  Same objection.

03:1916            Go ahead.

03:1917            THE WITNESS:  I think so.

03:1918    BY MR. BERGMAN:

03:1919        Q    And could you tell me what that interest is?

03:1920        A    I do not know.

03:1921        Q    In what way does that financial interest arise?

03:1922            MR. PLONSKER:  Same objection.

03:1923            THE WITNESS:  In what interest does what?  What

03:1924    was the question?

03:1925    BY MR. BERGMAN:

                                                                    15

03:19  1          Q    On what basis do you have such an interest?

03:19  2          A    I don't know.  I do believe I have, but I don't

03:19  3    know what it is.

03:19  4          Q    Is there any document you could refer to to

03:19  5    determine what your interest is?

03:19  6          A    I actually don't know, so I'm answering it as

03:20  7    best I can for you.

03:20  8          Q    Do you have any current financial interest in

03:20  9    any portion of the moneys that Mr. Toberoff may recover

03:20 10    as a result of this action?

03:20 11          MR. PLONSKER:  Object.  Legal conclusion.

03:20 12          THE WITNESS:  I believe so.

03:20 13    BY MR. BERGMAN:

03:20 14          Q    And on what basis do you have such a financial

03:20 15    interest?

03:20 16          Do you have an agreement with Mr. Toberoff?

03:20 17          A    I believe so.

03:20 18          Q    And would you generally describe what that

03:20 19    agreement is?

03:20 20          A    I don't know what -- you asked me that question.

03:20 21    I answered that.

03:20 22          Q    Has Mr. Toberoff agreed to pay you any portion

03:20 23    of the fees he receives in this action?

03:20 24          A    I don't -- you're asking me for that answer

03:20 25    again.  You're asking the same question over.  I answered

                                                                          16

03:20 1    it.  I don't know, actually.  I believe that there's

03:21 2    something, but I don't know what it is.

03:21 3        Q    Who would know?

03:21 4        A    I believe Tom McGuire would know, so...

03:21 5            MR. BERGMAN:  Do you guys want to say something?

03:21 6            Off the record.

03:21 7            (Discussion held off the record.)

03:21 8    BY MR. BERGMAN:

03:21 9        Q    Do you, Mr. Emanuel, currently have any

03:21 10   financial interest in any share of the moneys that IP

03:21 11   Worldwide, LLC may derive from any Siegel interest in the

03:21 12   Superboy or Superman properties?

03:22 13       A    I --

03:22 14           MR. PLONSKER:  Object.  Legal conclusion.

03:22 15           Sorry.  Go ahead.

03:22 16           THE WITNESS:  I do not know.  I believe so, but

03:22 17   I do not know.

03:22 18   BY MR. BERGMAN:

03:22 19       Q    And again, would Mr. McGuire know?

03:22 20       A    I believe so.

03:22 21       Q    Aside from any financial interest that you might

03:22 22   have in either IP Worldwide or Mr. Toberoff's fees, do

03:22 23   you have any other financial interest in any share of

03:22 24   moneys that any person or entity may derive from the

03:22 25   Siegel interest in Superman and Superboy?

17

03:22 1         MR. PLONSKER:  Object.  Legal conclusion.

03:22 2 Overbroad.

03:22 3         THE WITNESS:  I have no idea what you just said.

03:22 4 BY MR. BERGMAN:

03:22 5    Q   Okay.  You want the reporter to repeat it and

03:22 6 perhaps --

03:22 7    **A   That would be great.**

03:22 8    **(Record read as follows:**

03:22 9       **"Q   Aside from any financial**

03:22 10    **interest that you might have in either**

03:22 11    **IP Worldwide or Mr. Toberoff's fees,**

03:22 12    **do you have any other financial**

03:22 13    **interest in any share of moneys that**

03:22 14    **any person or entity may derive from**

03:22 15    **the Siegel interest in Superman and**

03:22 16    **Superboy?")**

03:23 17         THE WITNESS:  Not that I know of.  I don't know.

03:23 18 BY MR. BERGMAN:

03:23 19    Q   Okay.  Has Mr. Toberoff ever acted as your

03:23 20 personal attorney?

03:23 21    **A   Not that I recall.**

03:23 22    Q   Has Mr. Toberoff ever acted to your knowledge as

03:23 23 counsel to the Endeavor agency?

03:23 24         MR. PLONSKER:  May call for speculation.  Fails

03:23 25 to lay a foundation.

18

03:23  1            THE WITNESS:  I have no idea.  I believe so.

03:23  2    BY MR. BERGMAN:

03:23  3        Q    Did you have any business relationship with

03:23  4    Mr. Toberoff prior to the formation of IP Worldwide, LLC?

03:23  5        **A    I don't recall.**

03:24  6            MR. BERGMAN:  I will ask the reporter to mark as

03:24  7    Exhibit 3 the documents which have been Bates stamped EN

03:24  8    1 through 7.

03:24  9            (Deposition Exhibit 3 marked.)

03:24 10    BY MR. BERGMAN:

03:24 11        Q    Would you look at page 4 of that document,

03:24 12    Exhibit 3, Mr. Emanuel --

03:24 13        **A    Yes.**

03:24 14        Q    -- and tell me if that is your signature?

03:24 15        **A    Yes.**

03:24 16        Q    To your knowledge is Mr. Toberoff the sole owner

03:25 17    of the entity Pacific Pictures Corporation?

03:25 18        **A    I don't know.**

03:25 19        Q    Have you ever dealt with any other individual

03:25 20    other than Mr. Toberoff with respect to Pacific Pictures

03:25 21    Corporation business?

03:25 22        **A    Not that I recall.**

03:25 23        Q    What were the circumstances which led up to the

03:25 24    formation of IP Worldwide, LLC?

03:25 25            MR. PLONSKER:  Overbroad.

                                                                    19

03:25 1          You can answer it if you understand it.

03:25 2          THE WITNESS:  What were the --

03:25 3   BY MR. BERGMAN:

03:25 4      Q   Okay, let me rephrase it for you.

03:25 5      **A   Okay.**

03:25 6      Q   You entered into Exhibit 3 --

03:25 7      **A   Right.**

03:25 8      Q   -- in October 2002 --

03:25 9          MR. PLONSKER:  Assumes facts not in evidence.

03:2510          MR. BERGMAN:  I'm sorry.  February 2002.

03:2511      Q   Prior to the formation of that LLC, did you

03:2612   discuss the formation with Mr. Toberoff?

03:2613      **A   I assume so.**

03:2614      Q   What did he say, and what did you say?

03:2615      **A   I don't recall.**

03:2616      Q   Do you recall any of the conversations or facts

03:2617   which led to the formation of this company?

03:2618      **A   I remember that Mr. Toberoff had, as I recall**

03:2619   **it, had read an article in I think Variety.  Mr. Toberoff**

03:2620   **had got rights to properties.  I thought that was**

03:2621   **interesting.  I called him in for a meeting, and I**

03:2622   **thought that would be an interesting thing to get**

03:2623   **involved with.  That's the kind of general basis of my**

03:2724   **understanding.**

03:2725      Q   Were there any further meetings with

                                                                20

03:27 1    Mr. Toberoff prior to approximately February 2002 when

03:27 2    the agreement was entered into?

03:27 3        A    I don't recall.

03:27 4        Q    Okay.  In the first conversation that you had

03:27 5    with Mr. Toberoff, was there any reference to the Siegel

03:27 6    interest in Superman or Superboy?

03:27 7        A    Can you repeat the question?  I'm sorry.

03:27 8        Q    Yes.

03:27 9             Would you repeat it, please.

03:27 10            (Record read.)

03:27 11            THE WITNESS:  Not that I recall.

03:27 12   BY MR. BERGMAN:

03:27 13       Q    Did you and he in that first meeting discuss any

03:27 14   particular intellectual property that you sought to

03:27 15   acquire?

03:27 16       A    Are you asking about acquiring?  I'm not sure

03:27 17   what the question was.

03:27 18       Q    Well, the purpose of IP Worldwide was to acquire

03:28 19   certain intellectual property, wasn't it?

03:28 20       A    I'm not -- not that I -- no.

03:28 21       Q    To your way of thinking --

03:28 22       A    That I understand that -- I mean you're drawing

03:28 23   a conclusion that you think IP Worldwide was -- I'm not

03:28 24   sure what your question is, but it doesn't make sense.

03:28 25   You're drawing a conclusion.

21

03:28 1      Q    Okay.   What was the business purpose of IP

03:28 2   Worldwide?

03:28 3      **A    Controlling rights.**

03:28 4      Q    What rights?

03:28 5      **A    Intellectual properties.**

03:28 6      Q    And were those rights in the possession of

03:28 7   Mr. Toberoff at the time?

03:28 8         MR. PLONSKER:  Calls for speculation.  Fails to

03:28 9   lay a foundation.

03:2810         THE WITNESS:  I don't recall.

03:2811   BY MR. BERGMAN:

03:2812      Q    Were you represented by counsel in the

03:2813   negotiation of Exhibit 3?

03:2914      **A    I think -- I don't recall.  It might have been**

03:2915   **Tom McGuire.**

03:2916      Q    And if it wasn't Mr. McGuire, would it have been

03:2917   no one, or was there someone else who might have been

03:2918   involved?

03:2919      **A    I don't recall.**

03:2920      Q    Was Endeavor represented by counsel in the

03:2921   negotiation of Exhibit 3?

03:2922         MR. PLONSKER:  Fails to lay a foundation.  Calls

03:2923   for speculation.

03:2924         Answer if you know.

03:2925         THE WITNESS:  I don't recall.

22

03:29 1    BY MR. BERGMAN:

03:29 2        Q    Did you negotiate -- did you personally

03:29 3    negotiate any of the terms that are contained in Exhibit

03:29 4    3?

03:30 5        **A    It was a while -- I don't really recall.  I**

03:30 6    **might have.  I don't really recall.  I'm sorry.**

03:30 7        Q    If you'll notice at page 1 of the document in

03:30 8    paragraph A 2 under the heading "From AE," there is the

03:30 9    line that reads, "Annual overhead of $," and then that

03:30 10   amount has been redacted out.

03:30 11           What was the annual overhead you were to

03:30 12   contribute to IP Worldwide?

03:30 13       **A    I don't --**

03:30 14           MR. PLONSKER:  I'm going to object to that on

03:30 15   the grounds of privacy and confidentiality.  That's why

03:30 16   we redacted it:  So we didn't have to share that

03:30 17   information with you.

03:30 18           (Unanswered question.)

03:30 19           MR. BERGMAN:  My purpose was to ascertain the

03:30 20   basis for the redaction.

03:30 21           MR. PLONSKER:  There it is.

03:30 22           MR. BERGMAN:  And the privacy concern is the

03:30 23   privacy of?

03:31 24           MR. PLONSKER:  Of Mr. Emanuel and Endeavor.

03:31 25   BY MR. BERGMAN:

                                                            23

03:31 1    Q   Mr. Emanuel, paragraph A of Exhibit 3 provides

03:31 2    for an ownership of the company, 50 percent to PPC, 40

03:31 3    percent to you, and 10 percent for Endeavor.

03:31 4         Did you negotiate that division of ownership

03:31 5    with Mr. Toberoff?

03:31 6    **A   I believe Mr. McGuire did, but I don't recall**

03:31 7    **who did that.**

03:31 8    Q   If you turn, please, sir, to page 2, paragraph C

03:31 9    2, it provides in part that if AE, you, opts to invest

03:3110    additional money in Newco to acquire certain IP for a

03:3211    profit, you'd be entitled to recoup that investment plus

03:3212    a 20 percent share.

03:3213         Did you in fact invest additional money in Newco

03:3214    to acquire certain intellectual property?

03:3215         MR. TOBEROFF:   Objection.   Misstates paragraph

03:3216    2.   It says a "20% return."

03:3217         MR. PLONSKER:   I'll join in the objection.

03:3218         You can answer if you know.

03:3219         THE WITNESS:   I don't recall.

03:3220    BY MR. BERGMAN:

03:3221    Q   Have you in fact recouped all of your investment

03:3222    in IP Worldwide?

03:3223    **A   I do not know.**

03:3224    Q   At the present time are you to your knowledge

03:3225    entitled to any moneys pursuant to the termination of IP

24

03:33 1    Worldwide?

03:33 2        **A    You asked --**

03:33 3            MR. PLONSKER:  Let me just object.  Assumes

03:33 4    facts not in evidence, but go ahead and answer.

03:33 5            MR. TOBEROFF:  Vague and ambiguous as to

03:33 6    "termination."

03:33 7            MR. PLONSKER:  And also calls for a legal

03:33 8    conclusion.

03:33 9            MR. TOBEROFF:  So we don't have to talk too

03:33 10   much, unless I state otherwise, I'm going to concur in

03:33 11   all his objections throughout this deposition.

03:33 12           MR. BERGMAN:  Fine.

03:33 13           THE WITNESS:  Repeat the question.

03:33 14           MR. BERGMAN:  Would you, please?

03:33 15           (Record read as follows:

03:32 16               "Q   At the present time are you

03:32 17               to your knowledge entitled to any

03:32 18               moneys pursuant to the termination of

03:33 19               IP Worldwide?")

03:33 20           THE WITNESS:  I don't -- you've asked this

03:33 21   question before.  I think I answered it before.  I don't

03:33 22   actually recall, and I don't have knowledge of it.

03:33 23   BY MR. BERGMAN:

03:33 24       Q   At page 1, B 1 provides for the contribution

03:33 25   from PPC to IP Worldwide of PPC's current IP business

25

03:34  1    subject to preexisting commitments and exclusions.

03:34  2         Were you aware at the time you entered into this

03:34  3    agreement that PPC had a joint venture agreement with the

03:34  4    heirs of Joe Shuster?

03:34  5    **A    I do not recall.**

03:34  6    Q    Do you know who Joe Shuster was?

03:34  7    **A    No.**

03:34  8    Q    He was the co-creator of Superman.

03:34  9         Do you know whether that joint venture agreement

03:34 10    between PPC and the Shuster heirs was included or

03:34 11    excluded from the IP Worldwide business?

03:35 12    **A    I --**

03:35 13         MR. PLONSKER:  Assumes facts not in evidence,

03:35 14    fails to lay a foundation, and calls for speculation.

03:35 15         THE WITNESS:  I don't recall.

03:35 16    BY MR. BERGMAN:

03:35 17    Q    Have you ever had any communications with the

03:35 18    heirs of Joe Shuster?

03:35 19    **A    What's their names?**

03:35 20    Q    Ms. Peavy and Mr. Peary.

03:35 21    **A    Not that I recall.**

03:35 22    Q    Have you ever had any communications with any

03:35 23    attorney for either of those two Shuster heirs?

03:35 24    **A    Not that I recall.**

03:35 25    Q    Did you ever discuss with Mr. Toberoff whether

                                                              26

03:35 1    IP Worldwide would attempt to obtain the rights of the

03:35 2    Shuster heirs to the Superman or Superboy properties?

03:35 3            MR. PLONSKER:  At what point in time?

03:35 4            MR. BERGMAN:  Any point.

03:35 5            MR. PLONSKER:  Then I'll object on the grounds

03:35 6    of the attorney-client privilege and instruct him not to

03:35 7    answer.

03:35 8            (Instruction not to answer.)

03:36 9    BY MR. BERGMAN:

03:36 10      Q    Prior to the formation of IP Worldwide, did you

03:36 11   discuss with Mr. Toberoff the acquisition of the rights

03:36 12   of the Shuster heirs in -- to the Superman or Superboy

03:36 13   properties?

03:36 14      **A    Not that I recall.**

03:36 15      Q    Subsequent to the winding up of IP Worldwide,

03:36 16   did you discuss with Mr. Toberoff the acquisition of any

03:36 17   of the Shuster interest to Superman or Superboy?

03:36 18            MR. PLONSKER:  I'm going to object in that I

03:36 19   believe it calls for a legal conclusion -- I'm sorry --

03:36 20   for an attorney-client privileged communication, but you

03:36 21   can answer yes or no if you know.

03:36 22            Do you recall?

03:36 23            THE WITNESS:  I don't.

03:37 24   BY MR. BERGMAN:

03:37 25      Q    What business activities did IP Worldwide engage

                                                                    27

03:37 1    in?

03:37 2        MR. PLONSKER:  Overbroad.  You mean generally,

03:37 3    specifically?

03:37 4    BY MR. BERGMAN:

03:37 5        Q    What did the business do?

03:37 6        MR. PLONSKER:  I think it's asked and answered,

03:37 7    but go ahead and tell him what the business was.

03:37 8        THE WITNESS:  We went after rights to

03:38 9    intellectual properties that were -- you know, that we

03:38 10   thought were available in the marketplace.

03:38 11   BY MR. BERGMAN:

03:38 12       Q    And did you obtain any such rights?

03:38 13       MR. PLONSKER:  You can answer yes or no.

03:38 14       THE WITNESS:  Yes.

03:38 15   BY MR. BERGMAN:

03:38 16       Q    In what intellectual properties?

03:38 17       MR. PLONSKER:  What's the purpose of this,

03:38 18   because that may not be public information?  It may

03:38 19   damage the business of IP Worldwide even as it's winding

03:38 20   up.  So why is that relevant to this lawsuit?

03:38 21       MR. BERGMAN:  Well, A, the business wound up a

03:38 22   couple of years ago.

03:38 23       MR. PLONSKER:  Not necessarily --

03:38 24       MR. BERGMAN:  -- and I believe it's relevant to

03:38 25   determine, among other things, the knowledge of the

28

03:38 1    witness concerning the value of intellectual properties.

03:38 2         MR. PLONSKER:  Well, you can ask him if he has

03:38 3    knowledge of that, but I'm going to instruct him not to

03:39 4    answer with respect to any properties other than the

03:39 5    Superman or Superboy properties.

03:39 6         (Instruction not to answer.)

03:39 7         MR. BERGMAN:  And the basis of that is?

03:39 8         MR. PLONSKER:  Privacy, privilege, trade secret.

03:40 9    BY MR. BERGMAN:

03:40 10        Q    Would you look at Exhibit 3 once again --

03:40 11        A    **Sure, no problem.**

03:40 12        Q    -- Mr. Emanuel, and turn to page 3 --

03:40 13        A    **Yes.**

03:40 14        Q    -- paragraph H?

03:40 15        A    **Yes.**

03:40 16        Q    Could you read that to yourself?

03:41 17        A    **Okay.**

03:41 18        Q    During the term of the IP Worldwide agreement,

03:41 19    did that entity acquire any interest in the Superman or

03:41 20    Superboy properties?

03:41 21        MR. PLONSKER:  Calls for a legal conclusion.

03:41 22        You can answer if you know.

03:41 23        THE WITNESS:  I don't recall.

03:41 24    BY MR. BERGMAN:

03:41 25        Q    Is there any document to which you could refer

29

03:41 1    to ascertain the answer to that question?

03:41 2        **A    You asked me before if I looked at -- I don't --**

03:41 3    **I didn't.  It went to Tom McGuire.  So I don't really --**

03:41 4    **I guess the answer would be no.  That -- my knowledge.**

03:41 5        Q    Is there any person you could speak with to

03:41 6    refresh your recollection concerning that matter before

03:41 7    the trial of this action in June of this year?

03:41 8        **A    Not that I know of.**

03:41 9        Q    June of next year.

03:41 10       **A    Not that I know of.**

03:42 11       Q    How active was your role in IP Worldwide?

03:42 12       **A    I don't know how you define "active."**

03:42 13       Q    Okay.  Could you estimate the amount of time you

03:42 14   devoted to the business?

03:42 15       MR. PLONSKER:  You mean compared to other things

03:42 16   that he was doing, or you mean -- how would you want him

03:42 17   to estimate?

03:42 18       MR. BERGMAN:  Any way the witness can answer

03:42 19   that question would be fine with me.

03:42 20       THE WITNESS:  Very limited.

03:42 21   BY MR. BERGMAN:

03:42 22       Q    Did you conduct certain meetings on behalf of IP

03:42 23   Worldwide?

03:42 24       **A    That I can recall, a few.**

03:42 25       Q    Aside from any meetings that you may have had

30

03:42 1    regarding the Superman and Superboy properties, did you

03:42 2    engage in any meetings on behalf of IP Worldwide?

03:43 3         A    **There might have been a few.**

03:43 4         Q    Do you recall who any of those meetings were

03:43 5    with?

03:43 6         A    **Mr. Toberoff.**

03:43 7         Q    Aside from Mr. Toberoff?

03:43 8         A    **I don't recall.  I'm sorry.**

03:43 9         Q    Are you familiar with Kevin Marks?

03:4310         A    **I don't know who he is.**

03:4311         Q    Okay.  He's an attorney at Gang, Tyre who

03:4312    represented Joanne and Laura Siegel prior to

03:4313    Mr. Toberoff.

03:4314         A    **Okay.**

03:4315         Q    Have you ever spoken with Mr. Marks?

03:4316         A    **I don't recall.**

03:4417         Q    Mr. Marks was deposed by me in this matter, and

03:4418    he testified that on or about February 6, just about four

03:4419    days subsequent to the apparent formation of IP

03:4420    Worldwide, he received a phone call from Mr. Toberoff who

03:4421    expressed an interest in acquiring the Siegel interest in

03:4422    Superman and Superboy.

03:4423         Had you prior to February 6 discussed with

03:4424    Mr. Toberoff whether IP Worldwide would seek to acquire

03:4425    the Siegel interest in Superman and Superboy?

31

03:44 1          MR. PLONSKER:  I'm going to instruct him not to

03:44 2   answer on the grounds of the attorney-client privilege.

03:44 3          (Instruction not to answer.)

03:44 4          MR. TOBEROFF:  Objection.  I don't believe

03:44 5   you've fairly reflected Mr. Marks' testimony.

03:45 6          MR. BERGMAN:  Is there an objection,

03:45 7   Mr. Toberoff?

03:45 8          MR. TOBEROFF:  I just made it.

03:45 9   BY MR. BERGMAN:

03:4510     Q   Were you aware shortly after the formation of IP

03:4511   Worldwide that Mr. Toberoff had contacted the attorney

03:4512   for the Siegels to discuss the acquisition of the Siegel

03:4513   potential interest in Superman and Superboy?

03:4514          MR. PLONSKER:  I'm going to object on the

03:4515   grounds that it may invade the attorney-client privilege

03:4516   with respect to communications with Mr. Toberoff.

03:4517          So to the extent that you can answer excluding

03:4518   any conversations with Mr. Toberoff, you can answer that

03:4519   question.  Otherwise, I'm instructing you not to answer.

03:4520          THE WITNESS:  I don't really recall.

03:4621   BY MR. BERGMAN:

03:4622     Q   Had you as of February 6, 2002, taken any steps

03:4623   to determine the value of the Siegel interest in Superman

03:4624   or Superboy?

03:4625     **A   What was the date?**

32

03:46 1      Q    February 6, 2002.

03:46 2      **A    I don't recall.**

03:46 3      Q    Prior to that date had you had any discussion

03:46 4  concerning the value of the Siegel interest with

03:46 5  Mr. Toberoff?

03:46 6          MR. PLONSKER:  Object on the grounds of the

03:46 7  attorney-client privilege and instruct him not to answer.

03:46 8          (Instruction not to answer.)

03:46 9          MR. BERGMAN:  Again, Counsel, I'm going to try

03:4710  to avoid colloquy, but this is a matter that may

03:4711  necessitate Mr. Emanuel coming back here.  The fact of

03:4712  such a discussion doesn't disclose any privileged

03:4713  communication.

03:4714          MR. PLONSKER:  You're asking about the substance

03:4715  of the communication also.

03:4716          MR. BERGMAN:  Well, I'm going to ask about the

03:4717  substance, but at this point I'm asking about the fact of

03:4718  it, did it occur.

03:4719          MR. TOBEROFF:  You actually described the

03:4720  substance --

03:4721          MR. PLONSKER:  Right.

03:4722          MR. TOBEROFF:  -- and asked him did that

03:4723  substantive conversation occur.  So just to be fair.

03:4724          MR. PLONSKER:  Right.

03:4725          MR. BERGMAN:  Your instruction stands?

33

03:47 1          MR. PLONSKER:  Of course.

03:47 2     BY MR. BERGMAN:

03:47 3          Q    And, Mr. Emanuel, when your counsel instructs

03:47 4     you not to answer, I presume you will not answer on that

03:47 5     basis?

03:47 6          **A    He's my counsel.**

03:47 7          Q    Okay.  Did there come any time after February 6,

03:48 8     2002, when Mr. Toberoff advised you of the fact that he

03:48 9     had had a conversation with the lawyer for Laura and

03:48 10    Joanne Siegel concerning Superman?

03:48 11         MR. PLONSKER:  I'm going to object on the

03:48 12    grounds of the attorney-client privilege.

03:48 13         You can answer that yes or no.

03:48 14         THE WITNESS:  Say the question again.  I'm

03:48 15    sorry.

03:48 16         MR. BERGMAN:  Would you repeat it, please?

03:48 17         (Record read as follows:

03:47 18         "Q    Okay.  Did there come any

03:47 19         time after February 6, 2002, when Mr.

03:48 20         Toberoff advised you of the fact that

03:48 21         he had had a conversation with the

03:48 22         lawyer for Laura and Joanne Siegel

03:48 23         concerning Superman?")

03:48 24         THE WITNESS:  I don't recall.

03:48 25    BY MR. BERGMAN:

                                                              34

03:48 1          Q    Did Mr. Toberoff at any time advise you that he

03:49 2    had asked Mr. Marks to discuss with him IP Worldwide's

03:49 3    possible acquisition of the Sup- -- of the Siegel

03:49 4    interest in the Superman property?

03:49 5          MR. PLONSKER:  Object on the grounds of the

03:49 6    attorney-client privilege and instruct him not to answer.

03:49 7          (Instruction not to answer.)

03:49 8    BY MR. BERGMAN:

03:49 9          Q    In or about February or March 2002, did

03:49 10   Mr. Toberoff tell you that he had a conversation with

03:49 11   Mr. Marks in which Mr. Marks told him that he, Marks, was

03:49 12   very far along in his negotiations with DC and at a

03:49 13   documentation phase for DC's acquisition of the Siegel

03:49 14   interest?

03:49 15         MR. PLONSKER:  Object on the grounds of the

03:49 16   attorney-client privilege and instruct him not to answer.

03:50 17         (Instruction not to answer.)

03:50 18         MR. TOBEROFF:  Did you mention a time period in

03:50 19   that question?

03:50 20         MR. BERGMAN:  Yes.

03:50 21         And, Counsel, you understand that that question

03:50 22   asked whether Mr. Toberoff told him that Mr. Marks had

03:50 23   made a certain statement?

03:50 24         MR. PLONSKER:  I'm understanding all the

03:50 25   questions.  I mean, you understand the parameters that

                                                              35

03:50 1    we've set, and I know you're going to ask the questions,

03:50 2    and I'm going to object, and then you may make a motion

03:50 3    to compel, and one of us will win, but we have to

03:50 4    establish the record now, so...

03:50 5        MR. BERGMAN:  Okay.

03:50 6    Q   During his deposition, Mr. Emanuel, Mr. Marks

03:50 7    testified to a second telephone call with Mr. Toberoff on

03:51 8    or about July 24, 2002.

03:51 9        At any time did Mr. Toberoff relay to you

03:51 10   anything that had been said by Mr. Marks during that

03:51 11   telephone conversation?

03:51 12       MR. PLONSKER:  I'll object on the grounds of the

03:51 13   attorney-client privilege, but you can answer yes or no.

03:51 14       THE WITNESS:  I don't recall.

03:51 15   BY MR. BERGMAN:

03:51 16   Q   During the period from --

03:51 17       MR. PLONSKER:  Hang on one second.

03:51 18       (Discussion off the record.)

03:51 19   BY MR. BERGMAN:

03:51 20   Q   During the period from February 6, 2002 until

03:51 21   approximately July 24, 2002, had you and Mr. Toberoff

03:51 22   discussed the possibility of IP Worldwide acquiring the

03:51 23   Siegel interest in Superman and Superboy?

03:52 24       MR. PLONSKER:  I'm going to object on the

03:52 25   grounds of the attorney-client privilege and instruct you

                                                              36

03:52 1    not to answer.

03:52 2            (Instruction not to answer.)

03:52 3    BY MR. BERGMAN:

03:52 4        Q    During the course of your association with

03:52 5    Mr. Toberoff and IP Worldwide, did he give you any legal

03:52 6    advice?

03:52 7            MR. PLONSKER:  Calls for a legal conclusion.

03:52 8    It's vague, overbroad.

03:52 9            THE WITNESS:  Not that I recall.

03:5210    BY MR. BERGMAN:

03:5211        Q    Had you as of July 24, 2002, taken any steps to

03:5212    determine the value of the Siegel interest in Superman

03:5213    and Superboy?

03:5214        **A    Not that I recall.  I don't remember.**

03:5315        Q    Between February 6, 2002 and July 24, 2002, did

03:5316    you and Mr. Toberoff have any discussions concerning the

03:5317    value of the Siegel interest in Superman and Superboy?

03:5318            MR. PLONSKER:  Object on the grounds of the

03:5319    attorney-client privilege and instruct him not to answer.

03:5320            (Instruction not to answer.)

03:5321    BY MR. BERGMAN:

03:5322        Q    During that same period of time, that is, from

03:5323    approximately February to July of 2002, had you discussed

03:5324    the value of the Siegel interest with anyone other than

03:5325    Mr. Toberoff?

37

03:53  1        A    Not that I recall.

03:53  2        Q    As of July 24, 2002, had you requested anyone

03:53  3   else to take steps to determine the value of the Siegel

03:54  4   interest in Superman and Superboy?

03:54  5             MR. PLONSKER:  Other than Mr. Toberoff, you

03:54  6   mean?

03:54  7             MR. BERGMAN:  Other than Mr. Toberoff.

03:54  8             THE WITNESS:  Not to my knowledge.  Not that I

03:54  9   recall.

03:54 10   BY MR. BERGMAN:

03:54 11        Q    Did Mr. Toberoff at any time prior to July 24,

03:54 12   2002, tell you what he believed the value of the Siegel

03:54 13   interest in Superman and Superboy to be?

03:54 14             MR. PLONSKER:  Object on the grounds of the

03:54 15   attorney-client privilege and instruct the witness not to

03:54 16   answer.

03:54 17             (Instruction not to answer.)

03:54 18   BY MR. BERGMAN:

03:54 19        Q    Did Mr. Toberoff at any time after July 24,

03:54 20   2002, discuss with you any aspect of any conversation

03:54 21   that he had had with Kevin Marks concerning the Siegel

03:54 22   interest in Superman and Superboy?

03:54 23             MR. PLONSKER:  Object on the grounds of the

03:55 24   attorney-client privilege.

03:55 25             You can answer yes or no.

                                                              38

03:55 1          THE WITNESS:  I don't recall.

03:55 2  BY MR. BERGMAN:

03:55 3     Q   At any time after July 24, 2002, did

03:55 4  Mr. Toberoff tell you in substance that Mr. Marks had

03:55 5  declined to enter into negotiations with him concerning

03:55 6  the possible acquisition by IP Worldwide of the Siegel

03:55 7  interest in Superman and Superboy?

03:55 8       MR. PLONSKER:  I'm going to object on the

03:55 9  grounds of the attorney-client privilege and instruct you

03:5510  not to answer.

03:5511       (Instruction not to answer.)

03:5512  BY MR. BERGMAN:

03:5513     Q   Did Mr. Toberoff at any time subsequent to July

03:5514  24, 2002, tell you that Mr. Marks had suggested that if

03:5515  he wanted to acquire the Siegel interest, he should make

03:5516  an offer?

03:5517       MR. PLONSKER:  Object on the grounds of the

03:5518  attorney-client privilege and instruct him not to answer.

03:5519       (Instruction not to answer.)

03:5520  BY MR. BERGMAN:

03:5521     Q   Were you aware as of July 2002 that Mr. Toberoff

03:5522  was negotiating or attempting to negotiate to acquire the

03:5523  Siegel interest in Superman and Superboy?

03:5524     **A   Not to my knowledge.**

03:5525     Q   When did you first become aware of that fact?

39

03:56  1          A    I don't recall.  I don't remember the dates.

03:57  2          Q    During the months of July and August 2002, did

03:57  3    you and Mr. Toberoff, your joint venturer, have any

03:57  4    discussions concerning the value of the Siegel interest

03:57  5    in Superman and Superboy?

03:57  6          MR. PLONSKER:  I'm going to object that it's

03:57  7    vague and ambiguous and instruct him not to answer on the

03:57  8    grounds of the attorney-client privilege.

03:57  9          You know what?  Let me withdraw that

03:57 10    objection.

03:57 11          You can answer yes or no.  Did you have a

03:57 12    communication about that to your recollection?

03:57 13          THE WITNESS:  Not that I recall.

03:57 14    BY MR. BERGMAN:

03:57 15          Q    As of the summer of 2002, did you have any

03:57 16    knowledge that Mr. Toberoff was seeking to acquire the

03:57 17    Siegel interest?

03:57 18          MR. PLONSKER:  You can say yes or no.

03:57 19          THE WITNESS:  I'm going to come back to that.

03:57 20          (Discussion off the record.)

03:58 21          THE WITNESS:  I'm sorry.  Can you repeat the

03:58 22    question?

03:58 23          MR. BERGMAN:  Yes.

03:58 24          Would you, please?

03:58 25          THE WITNESS:  Sorry about that.

40

03:58 1         MR. BERGMAN:  It's okay.

03:58 2         (Record read as follows:

03:57 3           "Q   As of the summer of 2002, did

03:57 4         you have any knowledge that Mr.

03:57 5         Toberoff was seeking to acquire the

03:57 6         Siegel interest?")

03:58 7         THE WITNESS:  The summer.  Which summer?

03:59 8 BY MR. BERGMAN:

03:59 9     Q   2002.

03:59 10     **A   You're asking me specific dates that I don't**

03:59 11 **recall, so my answer is I don't recall on those specific**

03:59 12 **things.  I don't recall.**

03:59 13     Q   When did you first become aware that

03:59 14 Mr. Toberoff was seeking to acquire the Siegel interest

03:59 15 for IP Worldwide?

03:59 16         MR. TOBEROFF:  Objection.  It assumes facts not

03:59 17 in evidence.

03:59 18         MR. PLONSKER:  I'll join.

03:59 19         Go ahead.

03:59 20         THE WITNESS:  I don't recall, first of all, that

03:59 21 he was attempting to acquire anything.  What I just said

03:59 22 to my lawyer --

03:59 23         MR. PLONSKER:  Don't tell him what you said to

03:59 24 me, but go ahead and answer the question.

03:59 25         THE WITNESS:  There was a meeting with the

41

03:59 1    Siegels.  I just don't recall the dates.

03:59 2    BY MR. BERGMAN:

03:59 3        Q    The period that I'm inquiring about now is

03:59 4    before I believe you had your meeting with the --

03:59 5        A    **Then I don't recall.**

03:59 6        Q    -- Siegels.  Okay.

03:59 7            Mr. Marks testified to a conference call that he

04:00 8    had with you and Mr. Toberoff on or about August 7 or 8,

04:00 9    2002.  Do you have any recollection of such a conference

04:00 10   call?

04:00 11       A    **No, I do not.**

04:00 12           MR. TOBEROFF:  Actually, his testimony was there

04:00 13   was a notation in his record on August 8th, and when

04:00 14   asked whether a conversation occurred on August 8, he

04:00 15   said no; that's a notation to set up a conference call,

04:00 16   but I believe it happened a couple of days after that.

04:00 17           MR. BERGMAN:  That's incorrect, Mr. Toberoff.

04:00 18           MR. PLONSKER:  We are not going to solve that,

04:00 19   so the question is, in early August do you remember

04:00 20   having a conference call?

04:00 21           THE WITNESS:  No.

04:00 22   BY MR. BERGMAN:

04:00 23       Q    Okay.  Do you remember participating in any

04:00 24   conference call with Mr. Marks regarding the Siegel

04:00 25   interest at any time?

42

04:00 1        **A    Not that I recall.**

04:00 2        Q    Prior to mid August 2002 had you taken any steps

04:01 3    to determine the value of the Siegel interest in Superman

04:01 4    or Superboy?

04:01 5            MR. PLONSKER:    Fails to lay a foundation.    May

04:01 6    call for speculation.

04:01 7            Go ahead.

04:01 8            THE WITNESS:    Wasn't that an asked and answered?

04:01 9            MR. PLONSKER:    You can answer it again.

04:0110            THE WITNESS:    I think my prior answer stands.

04:0111    BY MR. BERGMAN:

04:0112        Q    Well, the prior question dealt with a prior

04:0113    period of time.

04:0114        **A    I don't recall.**

04:0115        Q    Okay.    Do you recall making an offer to

04:0116    Mr. Marks to acquire the Siegel interest in Superman?

04:0117        **A    I don't recall.**

04:0118        Q    Do you recall offering Mr. Marks $15 million for

04:0119    the acquisition of the Siegel interest in Superman and

04:0120    Superboy?

04:0121        **A    I don't recall.**

04:0222        Q    Do you recall making any offer to Mr. Marks for

04:0223    the acquisition of that Siegel interest?

04:0224        **A    I don't recall.**

04:0225        Q    Prior to mid August 2002 did you have any

43

04:02 1    discussions with Mr. Toberoff concerning how much, if

04:02 2    anything, IPW, IP Worldwide should offer for the Siegel

04:02 3    interest in Superman?

04:02 4            MR. PLONSKER:  Object on the grounds of the

04:02 5    attorney-client privilege and instruct him not to answer.

04:02 6            (Instruction not to answer.)

04:02 7    BY MR. BERGMAN:

04:02 8        Q    To your knowledge, Mr. Emanuel, had Mr. Toberoff

04:02 9    taken any steps prior to mid August 2002 to determine the

04:03 10   value of the Siegel interest in Superman and Superboy?

04:03 11           MR. PLONSKER:  If you know other than from

04:03 12   communications with Mr. Toberoff, please respond.

04:03 13   Otherwise, I instruct you not to answer on the grounds of

04:03 14   the attorney-client privilege.

04:03 15           THE WITNESS:  I don't know.

04:03 16   BY MR. BERGMAN:

04:03 17       Q    And when you say you don't know, Mr. Emanuel,

04:03 18   are you -- is it that you don't know whether Mr. Toberoff

04:03 19   said that to you or whether some third party did?

04:03 20       A    I don't know.  I don't know how to answer that

04:03 21   question because I have no -- I don't recall it, and I

04:03 22   don't know it.

04:03 23           MR. PLONSKER:  From any source?

04:03 24           THE WITNESS:  From any source.

04:03 25   BY MR. BERGMAN:

                                                                    44

04:03 1          Q    So as you sit here now, you have no recollection

04:03 2    whatever of any steps that were taken by IP Worldwide to

04:03 3    acquire the Siegel interest?

04:03 4          MR. PLONSKER:   I'm going to object.   It

04:03 5    misstates his testimony.   During this period of time, are

04:03 6    you saying?

04:03 7          MR. BERGMAN:   I'm not purporting to state -- to

04:04 8    characterize his testimony.   I'm just trying to wrap

04:04 9    up --

04:0410          THE WITNESS:   What was the question?

04:0411          MR. PLONSKER:   Go ahead and ask the question,

04:0412    and then I will object again.

04:0413          MR. BERGMAN:   Would you please, David?

04:0414          (Record read as follows:

04:0315              "Q    So as you sit here now, you

04:0316          have no recollection whatever of any

04:0317          steps that were taken by IP Worldwide

04:0318          to acquire the Siegel interest?")

04:0419          MR. PLONSKER:   Object.   Fails to lay a

04:0420    foundation.   May call for speculation.   Overbroad.

04:0421    Vague.

04:0422          You can answer if you know.

04:0423          THE WITNESS:   I don't recall any of this, so, I

04:0424    mean...

04:0425    BY MR. BERGMAN:

                                                                    45

04:04  1    Q    Okay.

04:04  2    **A    I'm sorry.  You know, I...**

04:04  3    Q    Do you recall telling Mr. Marks in a telephone

04:04  4    conversation that you and Mr. Toberoff or some members of

04:05  5    Endeavor had set up a fund to acquire intellectual

04:05  6    property properties?

04:05  7    **A    No, I do not.**

04:05  8    Q    Had you in fact as of August 2002 set up a fund

04:05  9    with which to acquire intellectual property rights?

04:0510    **A    I don't recall.**

04:0511    Q    Did you at any point in time set up a fund with

04:0512    which to acquire intellectual property rights?

04:0513    **A    Not that I recall.**

04:0514    Q    Had you at any time obtained investors or any

04:0515    other source of funding for the purpose of acquiring the

04:0516    Siegel interest in Superman and Superboy?

04:0517         (Discussion off the record.)

04:0618         MR. BERGMAN:  Why don't we take five minutes.

04:0619         (Recess.)

04:1420         MR. BERGMAN:  Back on the record.

04:1421    Q    Mr. Emanuel, what, if anything, can you recall

04:1422    about any effort made by you on behalf of IP Worldwide to

04:1423    acquire the Siegel interest in Superman or Superboy?

04:1424    **A    I don't recall any of that.**

04:1525    Q    Do you recall having a conversation with any

                                                                    46

04:15 1    lawyer representing the Siegels and making any offer to

04:15 2    him to acquire that interest?

04:15 3        A    I do not recall that.

04:15 4        Q    Do you recall meeting with Joanne and Laura

04:15 5    Siegel on several occasions?

04:15 6        A    Yes.

04:15 7        Q    And do you recall that the first such meeting

04:15 8    took place in late 2002 or early 2003?

04:15 9        A    I don't recall those dates.

04:15 10       Q    At the point in time that you first met with

04:15 11   Mrs. Siegel and her daughter, had you obtained any

04:16 12   information from any source as to the value of the Siegel

04:16 13   interest in Superman or Superboy?

04:16 14       A    Not that I recall.

04:16 15       Q    As of the point in time when you first met with

04:16 16   the Siegels, had you learned from any source the nature

04:16 17   of the offer that had been made by DC Comics to the

04:16 18   Siegels to acquire their interest?

04:16 19       A    Not that I recall.

04:16 20       Q    When you met with the Siegels on that first

04:16 21   occasion, do you recall telling them that the DC offer

04:16 22   was, quote, "ridiculously low," close quote?

04:16 23       A    I don't recall.

04:17 24       Q    Had you, at the time you first met with the

04:17 25   Siegels, gotten any information as to what the DC offer

47

04:17 1    had been?

04:17 2         **A    Not that I recall.**

04:17 3         Q    Or what the true value of the Siegel interest

04:17 4    was?

04:17 5              MR. PLONSKER:  Vague.

04:17 6              THE WITNESS:  Not that I recall.

04:17 7    BY MR. BERGMAN:

04:17 8         Q    On what basis then would you have told the

04:17 9    Siegels that the DC offer was ridiculously low?

04:17 10             MR. PLONSKER:  Object and instruct him not to

04:17 11   answer.  He just said that he doesn't recall saying that,

04:17 12   so it assumes facts not in evidence.

04:17 13             (Instruction not to answer.)

04:17 14             THE WITNESS:  Thank you.

04:17 15   BY MR. BERGMAN:

04:17 16        Q    Do you deny saying that to them?

04:17 17        **A    I don't recall that I said it.**

04:17 18        Q    Does that mean that you don't deny it?

04:17 19        **A    It means I don't recall it.**

04:17 20        Q    I understand.

04:17 21             Do you deny it?

04:17 22        **A    I said I don't recall it.**

04:17 23             MR. PLONSKER:  So you've asked it twice.  He's

04:17 24   answered.  How can you say that you either admit or deny

04:17 25   if he doesn't recall?  I'm unclear.

                                                                    48

BY MR. BERGMAN:

Q   What do you recall of that first meeting with the Siegels?

A   That the older woman -- I don't recall her name right off the top of my head -- was talking about her husband, how he had created this property, and that Warner Bros. was trying to take away her pension, and she was very upset about it, and they had been through a long process with Warner Bros. and that she didn't feel that they were treating her properly.  That was the general gist of the conversation.

Q   What was the purpose of your meeting with the Siegels on that first occasion?

A   I think you would have to ask them that.

      From my perspective or from the Siegels' perspective?

Q   From your perspective.

A   To represent the rights.

Q   And did you discuss in that first meeting your desire to represent the rights?

A   I don't remember if that was discussed, but I believe so.  I don't really recall exactly the words that we used.

Q   And did you have any discussion with them as to what the rights you were seeking to represent were worth?

49

04:19 1     A    Not that I recall.

04:19 2     Q    Did either Laura or Joanne Siegel ask you what

04:19 3  you thought their interest was worth?

04:19 4     A    Not that I recall.

04:19 5     Q    Do you recall either of them asking you what you

04:19 6  would -- how you would market their rights?

04:19 7     A    Not that I recall.

04:20 8     Q    Do you recall anything else that occurred in

04:20 9  that first meeting?

04:2010     A    All that I recall was it a meet-and-greet, and

04:2011  she was really mainly talking about her dissatisfaction

04:2012  with Warner Bros., about their pension, about how long

04:2013  her husband worked and how she didn't think that she was

04:2014  being properly taken care of there and that they were not

04:2015  caring about it.

04:2016     Q    Was Mr. Toberoff present at that meeting?

04:2017     A    I believe so.

04:2018     Q    Do you recall anything he said to the Siegels at

04:2019  that meeting?

04:2020     A    No, I do not.

04:2021     Q    How did the meeting end?

04:2022     A    I think I just left because I had to go to

04:2023  another meeting, so I don't know if it ended when I was

04:2024  there.  I don't believe that it -- I think it might have

04:2025  continued.  I probably went to another meeting.

50

04:20 1        Q    At the conclusion of that meeting or at least

04:20 2    that part of it which you attended, had the Siegels

04:21 3    agreed that you would represent their interest?

04:21 4        A    I don't recall.

04:21 5        Q    Did the Siegels ever agree that you would

04:21 6    represent their interest?

04:21 7            MR. PLONSKER:  I'm going to object.  Vague.

04:21 8            Go ahead.

04:21 9            THE WITNESS:  I don't recall.

04:21 10    BY MR. BERGMAN:

04:21 11        Q    At that meeting did Mr. Toberoff make any

04:21 12    statement to the Siegels as to what he believed their

04:21 13    interest to be worth?

04:21 14        A    Not to my knowledge.

04:21 15        Q    To your knowledge did he make any statement to

04:21 16    them regarding his opinion of the DC Comics offer?

04:21 17        A    Not to my recollection.

04:21 18        Q    By the time of your first meeting with the

04:21 19    Siegels, were they represented by Mr. Toberoff?

04:22 20        A    I don't recall.

04:22 21        Q    Well, did you ask them whether they were

04:22 22    represented by counsel?

04:22 23        A    I don't recall.

04:22 24        Q    Prior to that first meeting with the Siegels,

04:22 25    did you have a discussion with Mr. Toberoff as to what

51

04:22 1    the purpose of the meeting was?

04:22 2              MR. PLONSKER:  Object on the grounds of the

04:22 3    attorney-client privilege and instruct him not to answer.

04:22 4              (Instruction not to answer.)

04:22 5    BY MR. BERGMAN:

04:22 6         Q    Or what you or he should say to the Siegels?

04:22 7              MR. PLONSKER:  Same objections and instruction.

04:22 8              (Instruction not to answer.)

04:22 9    BY MR. BERGMAN:

04:22 10        Q    Did you have any pre-meeting discussion at all

04:22 11   with Mr. Toberoff concerning what would occur at the

04:22 12   meeting?

04:22 13             MR. PLONSKER:  You can answer yes or no.

04:22 14             THE WITNESS:  I assume yes, but I don't recall

04:22 15   it.

04:22 16   BY MR. BERGMAN:

04:23 17        Q    Do you recall telling Laura and Joanne Siegel

04:23 18   that you had made -- in this first meeting that you had

04:23 19   made an assessment of the value of their interest?

04:23 20        **A    I don't recall.**

04:23 21        Q    Did you during that first meeting give them any

04:23 22   estimate of what you thought the value of their interest

04:23 23   was?

04:23 24        **A    I don't recall.**

04:23 25        Q    Was there any discussion at that first meeting

                                                                    52

04:23 1    with the -- with Laura and Joanne Siegel with respect to

04:23 2    Michael Siegel?

04:23 3        A    I don't know who that is.

04:23 4        Q    Okay.

04:23 5        A    So no, I don't recall that.  Sorry.  Sorry about

04:24 6    that.

04:24 7        Q    Michael Siegel is another heir of Joe Siegel.

04:24 8        A    Whatever.

04:24 9        Q    You've never heard that name before?

04:24 10       A    Not to my knowledge.

04:24 11       Q    To your knowledge have you ever signed a

04:24 12   contract in which you agreed to purchase his interest?

04:24 13       A    Not to my knowledge.  Not to my understanding.

04:24 14       Q    Did you have any awareness prior to today as to

04:24 15   whether Laura and Joanne Siegel owned the complete Siegel

04:24 16   interest in the Superman and Superboy characters?

04:24 17           MR. PLONSKER:  Vague.

04:24 18           THE WITNESS:  I don't remember.

04:24 19   BY MR. BERGMAN:

04:24 20       Q    Do you have any recollection that there was a

04:24 21   third individual who was entitled to a share of their

04:24 22   interest?

04:25 23       A    Oh, there's that guy in Cleveland.

04:25 24           MR. PLONSKER:  I'm sorry.  What did you say?

04:25 25           THE WITNESS:  There's a gentleman in Cleveland.

53

04:25 1    That's all I remember, somebody in Cleveland.

04:25 2    BY MR. BERGMAN:

04:25 3       Q    Okay.  And what do you remember about that

04:25 4    person?

04:25 5       A    **That you just kind of -- I don't -- there's**

04:25 6    **somebody in Cleveland that owned something.  I don't**

04:25 7    **remember exactly what it was, to be candid.**

04:25 8       Q    Do you have any recollection of discussing with

04:25 9    Laura and Joanne Siegel that you would acquire or attempt

04:2510    to acquire the interest of that person in Cleveland,

04:2511    Ohio?

04:2512       A    **Not to my knowledge, no.**

04:2613       Q    During 2002 was it your practice to have any

04:2614    Endeavor employee present at meetings such as the one

04:2615    with Laura and Joanne Siegel taking notes?

04:2616       A    **Not to my knowledge.**

04:2617       Q    Was it your practice in 2002 to have another

04:2618    Endeavor employee monitor your telephone calls?

04:2619       A    **What do you mean by monitor my telephone?**

04:2620       Q    Listen in on the phone conversations and take

04:2621    notes or whatever.

04:2622       A    **Not to my knowledge.  I mean sometimes**

04:2623    **assistants take -- listen to phone calls.**

04:2624       Q    During 2002 did you maintain or have an

04:2625    assistant maintain a log of your phone calls?

                                                                    54

04:27 1       A   I don't know.  I don't know if that's a

04:27 2  practice.  I have no idea.

04:27 3       Q   Well, does --

04:27 4       A   I don't know.

04:27 5       Q   Did you ever get a list of phone calls to be

04:27 6  returned?

04:27 7       A   No.  It's on a computer.

04:27 8       Q   What is on the computer?

04:27 9       A   My phone calls.

04:27 10       Q   And are those computerized -- is that

04:27 11  computerized data printed out --

04:27 12       A   No.

04:27 13       Q   -- for you?

04:27 14       Do you search it on a computer?

04:27 15       MR. PLONSKER:  Vague.

04:27 16       THE WITNESS:  I have no idea what you --

04:27 17  BY MR. BERGMAN:

04:27 18       Q   How do you obtain that information?

04:27 19       A   It's on my computer.

04:27 20       Q   Okay.  How do you recall your first meeting with

04:27 21  the Siegels ending?

04:27 22       A   I think I just got up and walked out because I

04:27 23  had another meeting, as I recall.

04:27 24       Q   And Mr. Toberoff remained with them?

04:27 25       A   I believe so.

55

04:28 1          MR. BERGMAN:  Would you mark as Exhibit 4,

04:28 2  please, a copy of an agreement dated as of October 3,

04:28 3  2002, Bates stamped 1878 through 1881.

04:28 4          (Deposition Exhibit 4 marked.)

04:29 5  BY MR. BERGMAN:

04:29 6      Q   My first question to you is whether you've ever

04:29 7  seen this document before.

04:29 8      **A   Not that I recall.**

04:29 9      Q   Is that your signature on the last page?

04:2910     **A   Yes.**

04:2911     Q   To your recollection did you read the agreement

04:2912  before you signed it?

04:2913     **A   Not to my knowledge.  Not to my recollection.**

04:2914     Q   Is that your general practice, Mr. Emanuel, not

04:2915  to read agreements before you sign them?

04:2916         MR. PLONSKER:  It's overbroad, vague, out of

04:2917  context.

04:2918         You can answer if you have a general practice.

04:2919         THE WITNESS:  I don't.

04:2920  BY MR. BERGMAN:

04:2921     Q   Why don't you continue looking at the agreement,

04:3022  and my question after you've done that will be whether

04:3023  you recall ever seeing this agreement before.

04:3024     **A   Didn't I just answer that?**

04:3025     Q   Well, I think you ought to read it before you

                                                              56

04:30 1    tell me that you haven't.

04:30 2        MR. PLONSKER:  Just review it, see if it

04:30 3    refreshes your recollection as to whether you've seen it.

04:30 4        THE WITNESS:  Okay.

04:31 5    BY MR. BERGMAN:

04:31 6        Q    Having reviewed the agreement, do you now recall

04:31 7    seeing this agreement before?

04:31 8        A    Vaguely.

04:31 9        Q    Was this agreement entered into following your

04:31 10    first meeting with Joanne and Laura Siegel, or did it

04:31 11    come after a second meeting that you had with them?

04:31 12        A    I don't recall.

04:31 13        Q    Do you recall having a second meeting with them?

04:31 14        A    Yes.

04:31 15        Q    Okay.  Would you tell me to the best of your

04:31 16    recollection what subjects were discussed at that

04:31 17    meeting?

04:31 18        A    A meeting that they wanted us to have at Warner

04:31 19    Bros. to help kind of settle their rights with Warner

04:31 20    Bros.

04:31 21        Q    And by that point in time had they agreed to pay

04:31 22    you a 10 percent fee or pay IP Worldwide a 10 percent

04:31 23    fee?

04:31 24        MR. PLONSKER:  Vague.  Compound.

04:31 25        THE WITNESS:  I don't recall.

57

BY MR. BERGMAN:

04:32  Q   You'll notice in paragraph 6 there is a provision --

04:32  A   I am saying -- but you are asking me at that point.  I don't recall at that point if they had done that.  I don't recall.

04:32  Q   Okay.  Do you recall why the term of the agreement which is set forth in paragraph 5 was limited to 18 months?

04:32  A   I do not.

04:32  Q   Prior to executing this agreement, Mr. Emanuel, had you obtained any information as to the value of the Siegel interest in Superman and Superboy?

04:32  A   Not to my knowledge.  Not to my recollection.

04:33  Q   Do you recall anything about your second meeting with the Siegels other than the fact that they wanted you to contact Warner Bros.?

04:33  A   All I remember is -- the only thing I remember is again she went into her pension discussion.  She went into -- the daughter went into having gone into long research about how many times Superman had appeared -- I don't even remember in what context that was -- and that -- on TV and all over the place, and that Warner Bros. was being ridiculously tough on them, and they didn't think that they were being treated fairly, and

58

04:34 1    **they wanted help.**

04:34 2         Q    And what was the nature of the help that they

04:34 3    said they wanted from you?

04:34 4         **A    They wanted us to help facilitate a deal with**

04:34 5    **Warner Bros. and them that they would conclude would be**

04:34 6    **fair.**

04:34 7         Q    And did they ask you during that second meeting

04:34 8    what you thought would be fair for such a deal?

04:34 9         **A    Not to my recollection.**

04:34 10        Q    At any point in time up until the time that you

04:34 11   contacted Warner Bros., had you discussed with the

04:34 12   Siegels what you thought you could obtain for them from

04:34 13   Warner Bros.?

04:34 14        **A    Not to my recollection.**

04:34 15        Q    Do you have any recollection of telling them in

04:34 16   substance that you could obtain more for them than had

04:35 17   been offered previously?

04:35 18        **A    That would -- well...**

04:35 19             **(Discussion off the record.)**

04:35 20             MR. PLONSKER:  So then answer -- then that's the

04:35 21   answer.

04:35 22             THE WITNESS:  Well, that would conclude that I

04:35 23   knew what was offered before, which I stated that I

04:35 24   didn't recall, so I don't know.

04:35 25   BY MR. BERGMAN:

                                                                    59

04:35  1          Q   And is it your testimony that when you did go to

04:35  2    Warner Bros., which we will get to in a minute, that you

04:35  3    had no idea of what it was that you would be asking for

04:35  4    from Warner Bros.?

04:35  5          **A   In -- my recollection is that -- and I'm not**

04:35  6    **sure I'm right.   My recollection is that Warner Bros.**

04:35  7    **wanted the meeting, my recollection of it.**

04:35  8          Q   Okay.   Well, you initiated the discussions with

04:35  9    Warner Bros., didn't you?

04:35 10          **A   I don't recall that.   I thought they wanted it,**

04:35 11    **so...**

04:36 12          MR. BERGMAN:   Would you mark, please, as Exhibit

04:36 13    5 a document dated January 21, 2002, Bates stamped 1888

04:36 14    to 1890.

04:36 15          (Deposition Exhibit 5 marked.)

04:36 16    BY MR. BERGMAN:

04:36 17          Q   Do you recall seeing this agreement before,

04:36 18    Mr. Emanuel?

04:36 19          MR. TOBEROFF:   I would just like to note for the

04:36 20    record that the date January 21, 2002 I believe is

04:36 21    supposed to be 2003.

04:36 22          MR. BERGMAN:   That's correct.

04:36 23          MR. TOBEROFF:   It says "January 21, 2002" on it.

04:36 24          MR. BERGMAN:   I agree it's a typo.   It's a

04:36 25    mis-type.

                                                                    60

04:36 1          MR. PLONSKER:  On the front page?

04:36 2          MR. BERGMAN:  Yeah.

04:36 3          MR. PLONSKER:  Okay.

04:36 4          MR. TOBEROFF:  It's on every page at the top,

04:37 5   the wrong date.

04:37 6          MR. PLONSKER:  I see.  Okay.

04:37 7          THE WITNESS:  I don't really recall this, but...

04:37 8   BY MR. BERGMAN:

04:37 9      Q   Is that your signature on the page Bates stamped

04:37 10  1890?

04:37 11     **A   Yes.**

04:37 12     Q   In the first paragraph of Exhibit 5, there is a

04:37 13  reference to a recent -- quote, "recent discussion and

04:37 14  disclosure to you of various risks and potential problems

04:37 15  regarding Michael Siegel," close quote.

04:37 16         My first question to you is what was said in

04:38 17  those recent discussions with the Siegels?

04:38 18         MR. PLONSKER:  Fails to lay a foundation.  May

04:38 19  call for speculation.

04:38 20         THE WITNESS:  I don't recall, so I'm sorry.

04:38 21  BY MR. BERGMAN:

04:38 22     Q   Okay.  What were the various risks and potential

04:38 23  problems regarding Michael Siegel which had been

04:38 24  disclosed to Joanne and Laura Siegel?

04:38 25         MR. PLONSKER:  Fails to lay a foundation.  May

                                                              61

04:38 1  call for speculation.

04:38 2       THE WITNESS:  I don't recall.

04:38 3  BY MR. BERGMAN:

04:38 4    Q   The paragraph goes on to refer to, quote, "the

04:38 5  mitigation of possible conflicts of interest with respect

04:38 6  to the following proposed remedial actions."

04:38 7       Do you have any understanding of what is meant

04:38 8  by that phrase?

04:38 9    A   **No.**

04:38 10   Q   Paragraph No. 1 states that you will, quote,

04:39 11 "attempt to purchase all of Michael Siegel's rights,

04:39 12 title and interest in Superman, Superboy and The Spectre

04:39 13 ('MS Interests') to be financed by you [sic]."

04:39 14      What was your purpose in attempting to purchase

04:39 15 all of Michael Siegel's rights?

04:39 16   A   **I don't recall.**

04:39 17   Q   How much were you preparing to pay to purchase

04:39 18 all of Michael Siegel's rights?

04:39 19   A   **I don't recall.**

04:39 20   Q   Did you have any discussion with Mr. Toberoff

04:40 21 regarding how much money you should pay to purchase all

04:40 22 of Michael Siegel's rights?

04:40 23      MR. PLONSKER:  You can say yes or no.

04:40 24      THE WITNESS:  Not to my knowledge.  Not that I

04:40 25 remember.

                                                              62

04:40 1    BY MR. BERGMAN:

04:40 2        Q    Were you aware before you saw this contract

04:40 3    today, Mr. Emanuel, that you had agreed to attempt to

04:40 4    purchase all of Michael Siegel's rights?

04:40 5        **A    I didn't recall this contract until I just saw**

04:40 6    **it, and I don't remember that.**

04:40 7            MR. TOBEROFF:  I didn't want to interrupt, talk

04:40 8    over him.  I didn't get it in quick enough, but it

04:40 9    misstates -- this doesn't say he agrees to purchase the

04:4010    rights.  It sets forth conditions should he purchase.

04:4011            MR. BERGMAN:  Well, am I correct that paragraph

04:4112    1 says, "Ariel Emanuel...will attempt to purchase all of

04:4113    Michael Siegel's rights"?

04:4114            MR. TOBEROFF:  It's not an agreement where he's

04:4115    bound to purchase the rights.  It says "attempt to

04:4116    purchase."  That's my only point.

04:4117    BY MR. BERGMAN:

04:4118        Q    What, if anything, did you do to attempt to

04:4119    purchase Michael Siegel's rights?

04:4120        **A    Nothing that I recall.**

04:4121        Q    When you signed Exhibit 5, did you have any

04:4122    intention of attempting to purchase all of Michael

04:4123    Siegel's rights?

04:4124            MR. PLONSKER:  Fails to lay a foundation.

04:4125            THE WITNESS:  I don't recall.

                                                                63

04:41 1    BY MR. BERGMAN:

04:41 2        Q    Paragraph 3 of Exhibit 5 sets forth certain

04:41 3    provisions which would take effect in the event Michael

04:42 4    Siegel agrees to the above purchase and settlement.   One

04:42 5    of those provisions is subparagraph (d) on the next page,

04:42 6    which provides that you would reimburse the Siegels for

04:42 7    25 percent of any expenses paid by them after October 17,

04:42 8    2000, in connection with the Jerome Siegel copyright

04:42 9    termination interests.

04:42 10        How did you arrive at that 25 percent figure?

04:42 11        MR. PLONSKER:   I'm going to object that I think

04:42 12   you didn't read the entire paragraph, and therefore it

04:42 13   may be incomplete, and I think it's vague, but go ahead

04:42 14   and answer if you --

04:42 15        THE WITNESS:   I actually don't remember how it

04:42 16   got there.

04:42 17   BY MR. BERGMAN:

04:42 18        Q    What was your purpose in agreeing to reimburse

04:42 19   the Siegels for that 25 percent of their expenses?

04:43 20        **A    I don't recall.**

04:43 21        Q    The paragraph above that, subparagraph (c),

04:43 22   provides in part that you will fully indemnify the

04:43 23   Siegels and hold them completely harmless from any loss

04:43 24   arising out of the purchase of the Michael Siegel

04:43 25   interest.

64

04:43 1            Why were you prepared to do that?

04:43 2        A   I don't recall.

04:43 3        Q   Had the Siegels asked that you do that?

04:43 4        A   I don't recall.

04:43 5        Q   Do you recall any of the circumstances that led

04:43 6    up to your execution of this agreement?

04:43 7        A   All I recall is when you just stated this

04:43 8    gentleman and whatever he -- I just remember his name.  I

04:44 9    don't remember any of the circumstances surrounding him.

04:44 10       Q   And do you recall any of the circumstances which

04:44 11   led up to the creation of Exhibit 5?

04:44 12       A   Not that -- not to my knowledge, no, because I

04:44 13   didn't remember this at all.

04:44 14       Q   Did Mr. Toberoff discuss the contents of this

04:44 15   agreement with you prior to your execution of it?

04:44 16           MR. PLONSKER:  You can say yes or no.

04:44 17           THE WITNESS:  Not that I recall.  I don't

04:44 18   recall.

04:44 19   BY MR. BERGMAN:

04:44 20       Q   Did you have any employee or attorney at

04:44 21   Endeavor review this agreement prior to the time you

04:44 22   executed it?

04:44 23       A   Not to my knowledge.  I don't recall.

04:45 24       Q   Had the Siegels asked you to purchase the

04:45 25   Michael Siegel interest?

                                                            65

04:45 1      A    I don't recall.

04:45 2      Q    Are you aware of any problems that would have

04:45 3  been avoided had you purchased the Michael Siegel rights?

04:45 4      A    I don't recall.

04:45 5      Q    Subparagraph 3 (e) provides that in the event

04:45 6  that the purchase of Michael Siegel rights occurred, you

04:45 7  would pay 25 percent of various listed sums, including

04:45 8  any fees, commissions or settlement amounts to the law

04:45 9  firm of Gang, Tyre, Ramer & Brown.

04:46 10         Why were you agreeing to do that?

04:46 11     A    I don't recall.

04:46 12     Q    Do you now recall that Gang, Tyre, Ramer & Brown

04:46 13 were the attorneys who represented the Siegels prior to

04:46 14 Mr. Toberoff?

04:46 15     A    No.

04:46 16     Q    What was the consideration that flowed to you

04:46 17 for your obligations to indemnify the Siegels and to pay

04:46 18 25 percent of their legal fees and the other obligations

04:46 19 you incurred under this agreement?

04:46 20         MR. PLONSKER:  Calls for a legal conclusion.

04:46 21 Vague.

04:46 22         THE WITNESS:  I have no idea.

04:46 23 BY MR. BERGMAN:

04:46 24     Q    What was your reason for entering into it?

04:46 25         MR. PLONSKER:  Fails to lay a foundation.  Calls

                                                                    66

04:46 1    for speculation.

04:46 2            THE WITNESS:  I don't even recall it, so then

04:46 3    you're asking me on something that I don't recall, to

04:46 4    then conclude what I don't recall it, so I can't really

04:47 5    answer that question.  I'm sorry.  I'm not trying to be

04:47 6    argumentative.  I just don't recall it, so you're asking

04:47 7    me a conclusion on a situation I don't remember.

04:47 8    BY MR. BERGMAN:

04:47 9        Q    Okay.  Following Exhibit 5 in which you agreed

04:4710    to attempt to purchase all of Michael Siegel's rights,

04:4711    did you take any steps to purchase all of Michael

04:4712    Siegel's rights?

04:4713        **A    Not to my knowledge.**

04:4714        Q    Did you contact Michael Siegel?

04:4715        **A    Not to my knowledge.**

04:4716        Q    Did you contact any attorney representing him?

04:4717        **A    Not to my recollection.**

04:4718        Q    Does the name Bulson, B U L S O N, seem familiar

04:4719    to you?

04:4720        **A    No.**

04:4721        Q    Do you recall ever speaking with an attorney by

04:4722    the name of Bulson representing Michael Siegel?

04:4723        **A    Not to my recollection.**

04:4824        Q    Did you write any letters to Michael Siegel or

04:4825    his representative attempting to purchase his rights?

                                                                    67

04:48 1          A    Not to my recollection.

04:48 2          Q    Do you have any recollection as to why you

04:48 3     didn't attempt to purchase all of Michael Siegel's

04:48 4     rights?

04:48 5          MR. PLONSKER:  I think that that misstates his

04:48 6     testimony.  You asked him one way.  He said he didn't

04:48 7     remember.  So now you're asking him -- it doesn't make --

04:48 8     okay.  So --

04:48 9          THE WITNESS:  He's asking a point on something I

04:4810     don't remember, so I don't remember.

04:4811          MR. PLONSKER:  Okay.

04:4812     BY MR. BERGMAN:

04:4813          Q    Putting time completely out of the picture,

04:4814     Mr. Emanuel, you entered into this contract.  That's your

04:4815     signature at the back of it.

04:4816          A    Correct.

04:4817          Q    Did you at any point in time make any attempt to

04:4918     purchase Michael Siegel's rights?

04:4919          A    Not to my knowledge.

04:4920          Q    Did you ever have any discussion with Laura or

04:4921     Joanne Siegel with respect to your agreement in Exhibit 5

04:4922     to attempt to purchase all of Michael Siegel's rights?

04:4923          A    I don't recall.

04:4924          Q    Did either of them ever call you up or meet with

04:4925     you and ask how are the negotiations with Michael Siegel

                                                                      68

04:49 1    going?

04:49 2        A    I don't recall.

04:49 3        Q    Did you ever purport to report to the Siegels as

04:49 4    to how the negotiations with Michael Siegel were going?

04:49 5        A    Not to my recollection.

04:49 6        Q    Did you ever discuss with Mr. Toberoff the

04:49 7    reason for your agreeing to attempt to purchase all of

04:50 8    Michael Siegel's rights?

04:50 9        MR. PLONSKER:  Object on the grounds of the

04:50 10   attorney-client privilege and instruct him not to answer.

04:50 11       (Instruction not to answer.)

04:50 12   BY MR. BERGMAN:

04:50 13       Q    Did you ever take any steps to determine what

04:50 14   Michael Siegel's rights in the Superman and Superboy

04:50 15   properties were worth?

04:50 16       A    Not to my recollection.

04:50 17       Q    Or what you should offer to Michael Siegel to

04:50 18   purchase his rights?

04:50 19       A    I don't even remember this Michael Siegel, so

04:50 20   you're asking me -- you keep on asking me the same

04:50 21   question.  I don't remember it.  I don't remember -- I

04:50 22   just remember this guy from Cleveland.  I don't -- I've

04:50 23   been answering I don't remember.  So it's not like --

04:50 24       MR. PLONSKER:  He's testing your memory, and --

04:50 25       THE WITNESS:  I know.  I appreciate that.

69

04:50  1    I'm -- you know, the -- and I appreciate it.  You brought

04:50  2    up -- it's the first time I remembered this thing from

04:50  3    Cleveland, but that's the -- I'll think about it some

04:51  4    more, but I don't think so.

04:51  5    BY MR. BERGMAN:

04:51  6        Q    Okay.  Thank you.  If you recall --

04:51  7        A    **I'll let you know.**

04:51  8        Q    -- during the course of the deposition, please

04:51  9    say so.

04:51 10        Okay?

04:51 11        A    **Sure.**

04:51 12        Q    Do you recall discussing the Laura and Joanne

04:51 13    Siegel interest in Superman with Bruce Rosenblum?

04:51 14        A    **No.**

04:51 15        MR. BERGMAN:  Would the reporter mark as Exhibit

04:51 16    6 a document that is undated.  It has previously been

04:51 17    introduced as an exhibit at a prior deposition and

04:51 18    purports to be from Mr. Emanuel.

04:52 19        (Deposition Exhibit 6 marked.)

04:52 20    BY MR. BERGMAN:

04:52 21        Q    Could you review that letter, Mr. Emanuel, and

04:52 22    tell me if it refreshes your recollection --

04:52 23        MR. PLONSKER:  Of -- I'm sorry.  I thought you

04:52 24    were done.  About?

04:52 25    BY MR. BERGMAN:

70

04:52 1         Q    -- about having any discussion with

04:52 2    Mr. Rosenblum concerning the Siegel interest?

04:52 3              THE WITNESS:  Repeat the question.  I'm sorry.

04:52 4              MR. BERGMAN:  Yes.  Could you repeat it, please.

04:52 5              (Record read as follows:

04:52 6                   "Could you review that letter, Mr.

04:52 7              Emanuel, and tell me if it refreshes

04:52 8              your recollection about having any

04:52 9              discussion with Mr. Rosenblum

04:5210              concerning the Siegel interest?")

04:5211              THE WITNESS:  No, it does not.

04:5212    BY MR. BERGMAN:

04:5213         Q    And I asked you that, sir, because you realize

04:5314    you begin by saying, "As discussed"?

04:5315         **A    I appreciate that.**

04:5316         Q    I notice the initials above your name "dbnr."

04:5317    Does that have any meaning to you?

04:5318         **A    Since I was once a secretary, dictated not read.**

04:5319         Q    Thank you.

04:5320         **A    I was a good secretary.**

04:5321         Q    I'll bet you were.

04:5322         **A    I was.**

04:5323         Q    Now, subsequent to this letter, although it

04:5324    isn't dated, but you did in fact have a meeting with John

04:5325    Schulman and certain other parties concerning the Siegel

                                                              71

04:53 1    interest, didn't you?

04:53 2        A    I have no idea of the time frame.

04:53 3        Q    Okay.  At any point in time.

04:53 4        A    I did have a meeting with a large gentleman from

04:54 5    Warner Bros., a lawyer, and a person from DC Comics and

04:54 6    Mr. Toberoff and myself.

04:54 7        Q    Okay.

04:54 8        A    I mean you're asking me about names.  I don't

04:54 9    recall except his and mine.

04:54 10       Q    Mr. Schulman is a large gentleman.

04:54 11       MR. PLONSKER:  He will be happy to be described

04:54 12   that way.

04:54 13       MR. BERGMAN:  Yes.

04:54 14       THE WITNESS:  He's a nice guy.

04:54 15       MR. PLONSKER:  Yes, he is.

04:54 16   BY MR. BERGMAN:

04:54 17       Q    What do you recall saying at that meeting?

04:54 18       A    I don't recall much.  The main discussions I

04:54 19   think were between Mr. Toberoff and...

04:54 20       MR. PLONSKER:  Mr. Schulman?

04:54 21       THE WITNESS:  ...Mr. Schulman, and I think the

04:54 22   gentleman from DC who had flown in, I think he said he

04:54 23   had flown in for the meeting, as I recall, and all I

04:54 24   remember him saying is something to the effect that all

04:54 25   we have is -- Mr. Schulman said something to the effect

72

04:55 1    that -- something about DC being a sub something.  It was

04:55 2    so convoluted.  And DC saying all we really have is 5

04:55 3    percent of gross of Superman, and that's all I -- I mean

04:55 4    there was kind of back-and-forth between them, and I was

04:55 5    kind of just taking it in.  I don't remember what I said,

04:55 6    if I said anything at all.  And I'm sorry that's a little

04:55 7    convoluted, so...

04:55 8    BY MR. BERGMAN:

04:55 9        Q    During the course of the meeting, did either you

04:5510    or Mr. Toberoff make an offer as to the amount of money

04:5511    which the Siegels were prepared to accept in exchange for

04:5512    their rights?

04:5513        **A    I don't recall.**

04:5514        Q    Do you recall any discussion as to the financial

04:5515    basis upon which the matter could be resolved?

04:5516        **A    I'm assuming it might have happened.  All I**

04:5617    **remember -- the only major financial kind of conclusion**

04:5618    **of it I remember was the guy from DC saying that all they**

04:5619    **had was 5 percent of gross, and it was a sub-company of**

04:5620    **Warner Bros., and I really didn't remember why that had**

04:5621    **anything to do with this situation, but that's what I**

04:5622    **remember.**

04:5623        Q    Do you recall during the course of that meeting

04:5624    offering to convey the Siegel rights to DC --

04:5625        **A    Actually, excuse me, I want to --**

73

04:56 1     Q    Okay.

04:56 2     A    I do remember the large gentleman saying that he

04:56 3 thought that -- he did go over -- he did say -- he said

04:56 4 something about their pension and paying their pension,

04:57 5 and this whole pension thing came up a lot, and that he

04:57 6 thought they were being fair, and I think I made the

04:57 7 statement, my normal statement, that fair is where you

04:57 8 end up.  I think that's -- I think that was stated from

04:57 9 my side.  I do remember that.  And that's all I really

04:57 10 recall.

04:57 11    Q    Do you remember either you or Mr. Toberoff

04:57 12 stating in substance that the Siegels wanted to end up

04:57 13 with $50 million for their interest?

04:57 14    A    I don't recall that.

04:57 15    Q    Do you recall any figure being given to DC by

04:57 16 either you or Mr. Toberoff during that meeting?

04:57 17    A    Not...  I don't -- all I remember is them

04:57 18 talking about money.  I don't -- and I don't remember

04:57 19 what the numbers were.  I don't, really.  I'm sorry.

04:58 20    Q    Okay.  As you went into that meeting,

04:58 21 Mr. Emanuel, did you have in mind any particular amount

04:58 22 of money or objective that you wanted to achieve in that

04:58 23 meeting?

04:58 24    A    I was just there to kind of listen and take it

04:58 25 all in and see if I could -- you know, kind of in my head

                                                                    74

04:58  1      just kind of take it all in and see where people stood.

04:58  2      I wasn't in there to negotiate, from my perspective going

04:58  3      in.

04:58  4          Q    Okay.  And was there any discussion as to the

04:58  5      amount of revenues that the Superman property was

04:58  6      generating at that time?

04:58  7          A    There might have been.  I don't recall.  There

04:58  8      might have been.

04:58  9          Q    Now, you say you weren't there to negotiate.

04:58 10      What was -- what were you there for?

04:58 11          A    Really I was there, you know, to -- I was

04:59 12      observing it, mainly.  I was kind of a presence.  I was

04:59 13      there to observe the parties.  I wasn't negotiating.

04:59 14          Q    Okay.  Was it discussed between you and

04:59 15      Mr. Toberoff that he would handle the negotiation at that

04:59 16      meeting?

04:59 17          A    I don't recall if there was a pre-meeting -- I

04:59 18      don't think there was a pre-meeting to that.

04:59 19          Q    Before you and Mr. Toberoff went into this

04:59 20      meeting with Mr. Schulman -- and the gentleman from DC

04:59 21      Comics is Paul Levitz, I believe.

04:59 22          A    Shorter gentleman.

04:59 23          Q    Yes.

04:59 24               Before going into that meeting, had you made any

04:59 25      determination in your mind as to the amount of money you

75

04:59 1     wanted to obtain for the Siegels?

04:59 2         A    Not to my knowledge.

04:59 3         Q    Did you ever reach that point where you decided

05:00 4     I want to get X dollars for their interest?

05:00 5         A    You know, in my other life as an agent, I never

05:00 6     determine value.  As -- again, as I said to you, fair is

05:00 7     where you end up so -- taught to me from a person from

05:00 8     Warner Bros., Art Stolnitz.

05:00 9              So when you say to me did I determine value, I

05:00 10    never do that, because where we end up is where we end

05:00 11    up.  That's where fair is from your side and from my

05:00 12    side.  So I never -- when you ask me do you have this

05:00 13    pre -- I don't.  I never do that.

05:00 14        Q    But isn't where you end up --

05:00 15        A    Is fair.

05:00 16        Q    -- molded and shaped by where you start?

05:00 17        A    No, not from my knowledge.  You should take some

05:00 18    lessons.  I've done -- my father says I've done pretty

05:01 19    well.

05:01 20        Q    How did the meeting at Warner Bros. end?

05:01 21        A    Schulman, the tall guy, I think said that, you

05:01 22    know -- I think he ended it that there was nothing more

05:01 23    to discuss or that we would -- I think that's what he

05:01 24    said, something like that.

05:01 25        Q    Did Mr. Schulman say that after a specific

                                                              76

05:01 1    figure had been raised by either Mr. Toberoff or by you?

05:01 2        **A    Not to my knowledge.  I don't recall that.**

05:01 3        Q    Did you report to Joanne or Laura Siegel

05:01 4    following that meeting as to what had transpired at that

05:01 5    meeting?

05:01 6        **A    Did I?**

05:01 7        Q    Yes.

05:02 8        **A    I don't remember.**

05:02 9        Q    Do you recall having a meeting with the two

05:02 10   Siegel women following the Warner's meeting?

05:02 11       **A    I only remember four meetings with the Siegels.**

05:02 12       Q    Okay.  We've covered two.

05:02 13       **A    I don't remember in what timeline.**

05:02 14       Q    Okay.  What do you recall transpiring at the

05:02 15   third meeting?

05:02 16       **A    I can't actually put it in context of a first,**

05:02 17   **second and third meeting.  I know there was a third**

05:02 18   **meeting because I remember there was four meetings.  I**

05:03 19   **don't remember.  I'm sorry.**

05:03 20       Q    Okay.  Do you have any recollection at all as to

05:03 21   what happened in either of the last two meetings that you

05:03 22   had with the Siegels?

05:03 23       **A    I don't want to assume anything because I'm**

05:03 24   **told -- I don't want to assume anything that then leads**

05:03 25   **to more hours here.  I'm assuming something was said, but**

77

05:03 1    **I don't remember, and I'm trying -- I'll try and think**

05:03 2    **about it.**

05:03 3        Q    At any meeting that you had with the Siegels at

05:03 4    any time, did you advance an opinion as to what their

05:03 5    rights were worth?

05:03 6        **A    Not to my knowledge and my recollection.**

05:03 7        Q    At any meeting with the Siegels, did you state

05:03 8    to them in substance what you thought you could obtain

05:03 9    from DC for their rights?

05:04 10       **A    Not to my knowledge.**

05:04 11       Q    To your recollection did you ever state to the

05:04 12   Siegels that you could obtain more money than Warner

05:04 13   Bros. and DC Comics had previously offered to Mr. Marks?

05:04 14       **A    Wasn't that asked and answered?**

05:04 15       MR. PLONSKER:  In a different form.  And I'm

05:04 16   going to object --

05:04 17       THE WITNESS:  I'll stay with the same answer.

05:04 18       MR. PLONSKER:  I'm going to object on the ground

05:04 19   that it fails to lay a foundation that he has any

05:04 20   knowledge as to what was offered to them by DC or Warner

05:04 21   Bros.  I think he said that he didn't remember or didn't

05:04 22   know.

05:04 23   BY MR. BERGMAN:

05:04 24       Q    As you sit here now, is it your understanding

05:04 25   that you never knew what Warner Bros. or DC Comics had

78

05:04 1    offered to the Siegels?

05:04 2         **A    No, I don't.**

05:04 3         Q    And therefore you would not have told the

05:04 4    Siegels that the DC offer was ridiculously low?

05:05 5         **A    I don't recall saying that.**

05:05 6         Q    Did you ever attempt to characterize to either

05:05 7    Joanne Siegel or Laura Siegel your opinion of the DC

05:05 8    offer?

05:05 9         **A    Not to my knowledge.   I don't recall.**

05:0510         MR. BERGMAN:  Off the record.

05:0511         (Discussion held off the record.)

05:0512         MR. BERGMAN:  Would you mark, please, as Exhibit

05:0513    7 a document Bates stamped EN 142.

05:0514         (Deposition Exhibit 7 marked.)

05:0615         MR. TOBEROFF:  Are you sure we have the right

05:0616    exhibit numbers, because I've been getting these in

05:0617    sequence, and the other one was marked 6 in another case?

05:0618         MR. BERGMAN:  Yes, and was 6 in this case as

05:0619    well, Marc.

05:0620         Q    Mr. Emanuel, Exhibit 7 is a document that was

05:0621    produced by your counsel.  You'll notice that there is

05:0622    writing in the upper left-hand corner saying "Toberoff."

05:0623         **A    Yeah.**

05:0624         Q    Is that your writing?

05:0625         **A    No.**

79

05:06 1          Q    Do you recognize whose writing it is?

05:06 2          A    No.

05:06 3          Q    Midway down the page over on the right-hand

05:06 4    side, there is handwriting that appears to say, "Superman

05:07 5    - may find problem now, but doesn't surface until after

05:07 6    the" I believe "term."

05:07 7               Is that your handwriting?

05:07 8          A    No.

05:07 9          Q    Do you recognize that handwriting?

05:0710          A    No.

05:0711          Q    Do you have any idea of what that notation

05:0712    refers to?

05:0713          A    No.

05:0714          MR. BERGMAN:  Would you mark as Exhibit 8 a

05:0715    document Bates stamped EN 8 through 19.

05:0716          (Deposition Exhibit 8 marked.)

05:0817    BY MR. BERGMAN:

05:0818          Q    Mr. Emanuel, would you look at page 5, please --

05:0819          A    Yes.

05:0820          Q    -- and tell me if that's your signature?

05:0821          A    Sorry.

05:0822               Absolutely, yes.  Signatures.

05:0823          Q    Yes.

05:0824               Do you recall seeing this agreement before?

05:0825          A    No.

80

05:08 1    Q.   Do you want to review it?

05:08 2    **A    Okay.   Absolutely.**

05:09 3         **Okay.**

05:09 4    Q    This agreement on its face provides for the

05:09 5    winding up, termination, conclusion of IP Worldwide --

05:09 6    **A    Correct.**

05:09 7    Q    -- LLC.

05:09 8         Can you tell me why the IP Worldwide, LLC

05:09 9    venture was terminated?

05:0910    **A    Because I didn't want to continue.**

05:0911    Q    And that was because of what?

05:1012    **A    I just didn't think it was worth my time**

05:1013    **anymore.**

05:1014    Q    Paragraph 2 of the agreement at page 2 provides

05:1015    for the assignment and transfer to IPW, LLC --

05:1116    **A    Yeah.**

05:1117    Q    -- certain rights.

05:1118    **A    Correct.**

05:1119    Q    Do you have any interest in IPW, LLC?

05:1120    **A    I don't remember any of this.   This was done by**

05:1121    **Tom McGuire, this conclusion, so I don't really remember.**

05:1122    **I just wanted out.   I told him to get me out.   So I don't**

05:1123    **recall.**

05:1124    Q    The agreement provides for the recoupment of

05:1125    certain invested funds.   It provides upon execution you

81

05:11 1    would reimburse to PPC a certain sum that has been

05:12 2    redacted.

05:12 3            What was the reason for you reimbursing funds to

05:12 4    Pacific Pictures in connection with the termination of

05:12 5    IPW Worldwide?

05:12 6        **A    You'll have to ask Tom McGuire.  I don't recall.**

05:12 7    **I truly said, "Just get me out of it, I want out of it,**

05:12 8    **and go negotiate the deal."**

05:12 9            MR. PLONSKER:  Okay.  Let's not get too much

05:1210    into communications with Tom because those would be

05:1211    privileged also.

05:1212            THE WITNESS:  Okay.

05:1213            MR. PLONSKER:  Next question, please.

05:1214            THE WITNESS:  That was a slap on the wrist.

05:1215            MR. PLONSKER:  That was.

05:1216    BY MR. BERGMAN:

05:1217        Q    At the top of page 3 the agreement provides that

05:1218    you would be solely responsible for payments, if any, to

05:1219    Endeavor arising under the joint venture agreement.

05:1320            Had Endeavor invested money in the joint

05:1321    venture?

05:1322        **A    No.**

05:1323        Q    Was Endeavor entitled to receive certain funds

05:1324    from the joint venture?

05:1325        **A    I don't recall.**

82

05:13 1      Q    Aside from your desire to get out of the IP

05:13 2   Worldwide, did you have any discussion with Mr. Toberoff

05:13 3   regarding the reasons why IP Worldwide was being

05:13 4   terminated?

05:13 5      **A    All I remember saying is I didn't want to**

05:13 6   **continue.  It wasn't worth my time.  I had -- it was a**

05:13 7   **distraction for me, and I needed to focus on the agency.**

05:14 8      Q    To your recollection had Mr. Toberoff suggested

05:14 9   that IP Worldwide be terminated?

05:1410      **A    I don't recall.**

05:1411      Q    Did the winding up of Worldwide have anything to

05:1412   do to your knowledge with the initiation of legal

05:1413   proceedings concerning the Siegel interest?

05:1414      **A    I don't recall.  All I recall is that I wanted**

05:1415   **out.**

05:1416      Q    Having looked at these agreements, do you have

05:1417   any further understanding than you did at the outset of

05:1418   the deposition as to what your financial interest, if

05:1519   any, is in the Siegel Superman interest at this point?

05:1520      **A    No.**

05:1521      Q    Aside from this agreement winding up IP

05:1522   Worldwide, have you entered into any other agreement with

05:1523   Mr. Toberoff concerning the Siegel interest in Superman

05:1524   or Superboy?

05:1525      **A    Not to my knowledge.**

                                                                      83

05:15 1        Q    Do you have any oral understanding with him

05:15 2   regarding any moneys you might receive as a result of the

05:15 3   outcome of this litigation?

05:15 4        **A    Not to my knowledge.**

05:15 5        Q    Okay.   Thank you.   I have nothing further.

05:15 6            MR. PLONSKER:   Okay.   Stipulation?

05:15 7            MR. BERGMAN:   Mr. Toberoff?

05:16 8            MR. PLONSKER:   Do you have a typical stipulation

05:16 9   you're referring to?

05:16 10            MR. TOBEROFF:   What's your question?

05:16 11            MR. BERGMAN:   Whether you have any.

05:16 12            MR. TOBEROFF:   No, I do not.

05:16 13            MR. BERGMAN:   In that event, I'm prepared to

05:16 14   stipulate that the reporter will be relieved of his

05:16 15   statutory duties, that the transcript of the deposition

05:16 16   will be delivered to Mr. Plonsker, and that Mr. Emanuel

05:16 17   will have 15 days following that delivery within which to

05:16 18   execute and/or correct the transcript?

05:16 19            MR. PLONSKER:   Do you have a date coming up that

05:16 20   it needs to be done by?   Since we have Thanksgiving

05:16 21   coming up, I just want to make sure he has enough time to

05:16 22   look at it.

05:16 23            MR. BERGMAN:   30 days?

05:16 24            MR. PLONSKER:   That's fine.

05:16 25            MR. BERGMAN:   Is that agreeable?

84

05:16  1          MR. TOBEROFF:  Fine with me.

       2

       3

       4

       5

       6

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

                                                              85

```
 1    STATE OF CALIFORNIA      )
                               ) ss
 2    COUNTY OF LOS ANGELES    )

 3

 4           I, DAVID S. COLEMAN, a Certified Shorthand

 5    Reporter, do hereby certify:

 6           That prior to being examined, the witness in the

 7    foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing

 9    but the truth;

10    That said proceedings were taken before me at

11    the time and place therein set forth and were taken

12    down by me in shorthand and thereafter transcribed

13    into typewriting under my direction and supervision;

14    I further certify that I am neither counsel

15    for, nor related to, any party to said proceedings,

16    nor in anywise interested in the outcome thereof.

17           In witness whereof, I have hereunto subscribed

18    my name.

19

20    Dated: ___NOV 0 8 2006_____

21

22    _____

23    DAVID S. COLEMAN
      CSR No. 4613

24

25
```

# EXHIBIT B

**From:** Seto, Cassandra
**Sent:** Thursday, February 21, 2013 4:45 PM
**To:** Kerry Garvis Wright
**Cc:** Kline, Matthew
**Subject:** RE: Ari's Deposition

Hi Kerry,

This is to confirm that the afternoon of March 19 works for Mr. Emanuel's deposition -- although, of course, we must reserve our right to depose him for the full seven hours, if necessary. (Again, we hope that will not be the case.) We'll serve an amended notice of deposition next week. Talk soon.

Thanks,
Cassie

**From:** Seto, Cassandra
**Sent:** Thursday, February 07, 2013 5:56 PM
**To:** 'Kerry Garvis Wright'
**Cc:** Kline, Matthew
**Subject:** Ari's Deposition

Hi Kerry,

Just wanted to confirm that we'll take Ari's February 12 deposition off-calendar for now, and you'll get us some dates in March that work for Ari and Patty.

Thanks,
Cassie

**Cassandra L. Seto**
**O'Melveny & Myers LLP**
1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067
Telephone: 310.246.6703 | Facsimile: 310.246.6779

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**EXHIBIT B**

# EXHIBIT C

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| DC Comics | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    CV 10-3633 ODW (RZx) |
| Pacific Pictures Corp., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Ariel Emanuel, c/o Kerry Wright, Esq., Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, 10250 Constellation Blvd., 19th Floor, Los Angeles, California 90067

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| | |
|---|---|
| Place:  O'MELVENY & MYERS LLP<br>1999 Avenue of the Stars, Suite 700<br>Los Angeles, CA  90067 | Date and Time:<br><br>03/19/2013 1:00 pm |

The deposition will be recorded by this method:    Stenographic, sound, and visual means

⊐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    02/25/2013

| | |
|---|---|
| *CLERK OF COURT* | OR |
| | /s/ Daniel M. Petrocelli |
| _____<br>*Signature of Clerk or Deputy Clerk* | _____<br>*Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    DC Comics
, who issues or requests this subpoena, are:

Daniel M. Petrocelli, O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor, Los Angeles, CA  90067
Email: dpetrocelli@omm.com, Phone: (310) 246-6850

**EXHIBIT C**
**90**

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  CV 10-3633 ODW (RZx)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*    Ariel Emanuel

was received by me on *(date)*    02/25/2013    .

☑ I served the subpoena by delivering a copy to the named individual as follows:

c/o Kerry Wright, Esq., Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, 10250 Constellation Blvd.,

19th Floor, Los Angeles, California  90067                    on *(date)*    02/25/2013    ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$

My fees are $                    for travel and $                    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    02/25/2013

_Server's signature_

Edward Bates

_Printed name and title_

First Legal Support
1517 W. Beverly B.
Los Angeles, CA 90026

_Server's address_

Additional information regarding attempted service, etc:

**EXHIBIT C**
**91**

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**EXHIBIT C**

**92**

# EXHIBIT D

**From:** Petrocelli, Daniel
**Sent:** Wednesday, February 27, 2013 9:48 AM
**To:** 'rkendall@kbkfirm.com'; Kline, Matthew
**Cc:** 'mtoberoff@toberoffandassociates.com'; 'kadams@toberoffandassociates.com'; 'kgarviswright@glaserweil.com'; 'tmcguire@wmeentertainment.com'; 'lbrill@kbkfirm.com'; 'ndaum@kbkfirm.com'; Seto, Cassandra; Tokoro, Jason
**Subject:** Re: DC Comics v. Pacific Pictures

Thanks Dick. To be clear, though, the Court's order specifies that lead counsel for each of the parties must meet in person, only your firm appears as counsel of record for the Toberoff parties, and the issue at hand involves solely the Toberoff parties. I want the record to be clear that we are not acquiescing in what the Court may regard as a violation of its order. Dan

**From:** Richard Kendall [mailto:rkendall@kbkfirm.com]
**Sent:** Wednesday, February 27, 2013 09:27 AM
**To:** Petrocelli, Daniel; Kline, Matthew
**Cc:** Marc Toberoff (mtoberoff@toberoffandassociates.com) <mtoberoff@toberoffandassociates.com>; Keith Adams (kadams@toberoffandassociates.com) <kadams@toberoffandassociates.com>; Kerry Garvis Wright (kgarviswright@glaserweil.com) <kgarviswright@glaserweil.com>; 'tmcguire@wmeentertainment.com' (tmcguire@wmeentertainment.com) <tmcguire@wmeentertainment.com>; Laura Brill <lbrill@kbkfirm.com>; Nicholas Daum <ndaum@kbkfirm.com>; Seto, Cassandra; Tokoro, Jason
**Subject:** RE: DC Comics v. Pacific Pictures

Dan:

Mr. Toberoff will be handling this matter on behalf of the Toberoff entities.

**⫷ Kendall Brill Klieger**

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct: (310) 272-7900

PLEASE NOTE: This message, including any attachments, may be privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**From:** Petrocelli, Daniel [mailto:dpetrocelli@omm.com]
**Sent:** Wednesday, February 27, 2013 7:53 AM
**To:** Kline, Matthew
**Cc:** Marc Toberoff (mtoberoff@toberoffandassociates.com); Richard Kendall; Keith Adams (kadams@toberoffandassociates.com); Kerry Garvis Wright (kgarviswright@glaserweil.com); 'tmcguire@wmeentertainment.com' (tmcguire@wmeentertainment.com); Laura Brill; Nicholas Daum; Seto, Cassandra; Tokoro, Jason
**Subject:** Re: DC Comics v. Pacific Pictures

Marc/Dick, we've not heard back.   The Court's order was explicit that we need to meet in person on this.  We can meet at any time today or tomorrow before noon at Dick's or our offices, but cannot wait longer given the need to promptly get our objections on file should you decline to change your position. Also, I am no longer available after noon tomorrow. Thanks.  Dan

**EXHIBIT D**
**93**

On Feb 26, 2013, at 12:20 PM, "Kline, Matthew" <mkline@omm.com> wrote:

Dear Marc and Dick:

We need to schedule an in-person meet-and-confer with you this week. *See* DN 593. DC will be filings objections to portions of DN 595, DN 595-3, and DN 595-4, and to all of DN 595-5. Defendants' submission of and reliance on Ari Emanuel's declaration on their reply brief in support of summary judgment, DN 595-5:

- is procedurally improper, *see Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007) ("It is well established that issues cannot be raised for the first time in a reply brief."); *Groupion, LLC v. Groupon, Inc.*, 2012 WL 3025711, at *3 (N.D. Cal. July 24, 2012) (striking reply);
- the substance of his declaration is directly refuted by Mr. Emanuel's prior sworn deposition testimony, *see infra*, and thus should be disregarded, *see Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012) ("a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember") (cited by *defendants*, DN 595 at 8:7-8); *Reinsdorf, v. Skechers U.S.A,* 2013 U.S. Dist. Lexis 16223at *18-19 (C.D. Cal. Feb. 6, 2013) (same; striking "sham" declaration); *accord Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009); *Scamihorn v. Gen. Truck Drivers*, 282 F.3d 1078, 1085 n.7 (9th Cir. 2002); *Collins v. U.S.*, 269 F.2d 745, 750 (9th Cir. 1959);
- and, as is omitted from defendants' filings, *cf.* DN 595-4 at 1:15-18; DN 595 at 2:11-12; DN 595-3 at 2:24-26, 8:18-9:11, DC noticed Mr. Emanuel's deposition for March 19, 2013, just weeks from now.

Unless defendants immediately withdraw DN 595, DN 595-3, DN 595-4, DN 595-5, and re-file them omitting the following offending page and line numbers--DN 595-5 (entire document); DN 595 2:3-8, 2:11-12; 4:14-16; DN 595-3 at 2:24-26; 8:19-21; 8:28-9:2; 9:5-11; DN 595-4 at 1:15-18 & Ex. C)--DC will file its objections with the Court.

In these objections, DC will show how defendants elicited false testimony from Mr. Emanuel who, in 2006, testified under oath that he had no "recollection" of events that he now, over six years later, claims to recall with great precision, based on a claim of "personal knowledge." *Compare, e.g.,* Mr. Emanuel's Nov. 2, 2006, Deposition:

<image001.png>


<image002.png>


<image003.png>
<image004.png>

*with* Mr. Emanuel's Feb. 22, 2013, Declaration, DN 595-5:

<image005.png>


Dan and I are available to meet with you at our offices or Dick's offices any day this week. We invite Mr. Emanuel's counsel to attend as well.

All rights reserved.

Matt Kline

**EXHIBIT D**
**94**

*************************************

**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

*Please consider the environment before printing this email*

**EXHIBIT D**
**95**

# EXHIBIT E

**Attachments:**    DC v PPC.Letter.Adams-KlineEmanuel Declaration.2.27.2013.final.pdf

**From**: Keith Adams [mailto:kadams@toberoffandassociates.com]
**Sent**: Wednesday, February 27, 2013 06:14 PM
**To**: Kline, Matthew
**Cc**: Marc Toberoff (mtoberoff@toberoffandassociates.com) <mtoberoff@toberoffandassociates.com>; Kerry Garvis
Wright (kgarviswright@glaserweil.com) <kgarviswright@glaserweil.com>; 'tmcguire@wmeentertainment.com'
(tmcguire@wmeentertainment.com) <tmcguire@wmeentertainment.com>; Petrocelli, Daniel; Seto, Cassandra; Tokoro,
Jason; Pablo Arredondo <parredondo@toberoffandassociates.com>
**Subject**: Re: DC Comics v. Pacific Pictures

Counsel:

Please see the attached correspondence.

On Tue, Feb 26, 2013 at 12:20 PM, Kline, Matthew <mkline@omm.com> wrote:

Dear Marc and Dick:


    We need to schedule an in-person meet-and-confer with you this week. *See* DN 593. DC will be filings
objections to portions of DN 595, DN 595-3, and DN 595-4, and to all of DN 595-5. Defendants' submission of
and reliance on Ari Emanuel's declaration on their reply brief in support of summary judgment, DN 595-5:


• is procedurally improper, *see Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007) ("It is well
established that issues cannot be raised for the first time in a reply brief."); *Groupion, LLC v. Groupon, Inc.*,
2012 WL 3025711, at *3 (N.D. Cal. July 24, 2012) (striking reply);

• the substance of his declaration is directly refuted by Mr. Emanuel's prior sworn deposition testimony, *see
infra*, and thus should be disregarded, *see Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012) ("a district
court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not
remember") (cited by *defendants*, DN 595 at 8:7-8); *Reinsdorf, v. Skechers U.S.A*, 2013 U.S. Dist. Lexis
16223at *18-19 (C.D. Cal. Feb. 6, 2013) (same; striking "sham" declaration); *accord Van Asdale v. Int'l Game
Tech.*, 577 F.3d 989, 998 (9th Cir. 2009); *Scamihorn v. Gen. Truck Drivers*, 282 F.3d 1078, 1085 n.7 (9th Cir.
2002); *Collins v. U.S.*, 269 F.2d 745, 750 (9th Cir. 1959);

• and, as is omitted from defendants' filings, *cf.* DN 595-4 at 1:15-18; DN 595 at 2:11-12; DN 595-3 at 2:24-
26, 8:18-9:11, DC noticed Mr. Emanuel's deposition for March 19, 2013, just weeks from now.


    Unless defendants immediately withdraw DN 595, DN 595-3, DN 595-4, DN 595-5, and re-file them
omitting the following offending page and line numbers--DN 595-5 (entire document); DN 595 2:3-8, 2:11-12;
4:14-16; DN 595-3 at 2:24-26; 8:19-21; 8:28-9:2; 9:5-11; DN 595-4 at 1:15-18 & Ex. C)--DC will file its
objections with the Court.

**EXHIBIT E**
**96**

In these objections, DC will show how defendants elicited false testimony from Mr. Emanuel who, in 2006, testified under oath that he had no "recollection" of events that he now, over six years later, claims to recall with great precision, based on a claim of "personal knowledge." *Compare, e.g.*, Mr. Emanuel's Nov. 2, 2006, Deposition:

7      Mr. Marks testified to a conference call that he

8      had with you and Mr. Toberoff on or about August 7 or

9      2002. Do you have any recollection of such a conferenc

10     call?

11        A   No, I do not.

23        Q   Okay. Do you remember participating in any

24     conference call with Mr. Marks regarding the Siegel

25     interest at any time?

Page 4

1        A   Not that I recall.

Q   Okay.  Do you recall making an offer to

Mr. Marks to acquire the Siegel interest in Superman?

A   I don't recall.

Q   Do you recall offering Mr. Marks $15 million for

the acquisition of the Siegel interest in Superman and

Superboy?

A   I don't recall.

Q   Do you recall making any offer to Mr. Marks for

the acquisition of that Siegel interest?

A   I don't recall.

21      Q   Mr. Emanuel, what, if anything, can you recall

22   about any effort made by you on behalf of IP Worldwide

23   acquire the Siegel interest in Superman or Superboy?

24      A   I don't recall any of that.

25      Q   Do you recall having a conversation with any

Page  4

1   lawyer representing the Siegels and making any offer

2   him to acquire that interest?

3      A   I do not recall that.

*with* Mr. Emanuel's Feb. 22, 2013, Declaration, DN 595-5:

> 2    I, Ariel Z. Emanuel, declare as follows:
> 3    1.    I am the Co-Chief Executive Officer of William Morris Endeavor, a
> 4    talent agency, and was a founding partner of The Endeavor Agency. I have personal
> 5    knowledge of the matters set forth in this declaration.
> 6    2.    In August 2002, I participated in a conference call with Marc Toberoff
> 7    and Kevin Marks, an attorney for Laura Siegel Larson and Joanne Siegel (the
> 8    "Siegels"), that had been scheduled to discuss the potential licensing of the Siegels'
> 9    "Superman" rights.
> 10   3.    During this August 2002 conference call, I made an offer to license the
> 11   Siegels' rights for $15 million plus a back-end participation to be negotiated.
> 12   4.    During this August 2002 conference call, neither Mr. Toberoff nor I
> 13   mentioned a "billionaire investor," because I was the investor. There was also no
> 14   mention by anyone of producing a Superman movie with the Siegels.
> 15   5.    Later in 2002 – 2004, I had meetings with the Siegels and Mr. Toberoff.
> 16   During these meetings, neither Mr. Toberoff nor I mentioned a "billionaire investor"
> 17   or our producing a "Superman" movie.

Dan and I are available to meet with you at our offices or Dick's offices any day this week.  We invite Mr. Emanuel's counsel to attend as well.

All rights reserved.

Matt Kline

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm*

**EXHIBIT E**
**99**

*of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are*
*not the intended recipient, you may not read, copy, distribute, or use this*
*information. If you have received this transmission in error, please notify the*
*sender immediately by reply e-mail and then delete this message.*

*Please consider the environment before printing this email*


--
Keith G. Adams

Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101
toberoffandassociates.com
_____

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your records accordingly.

_____

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kadams@toberoffandassociates.com

February 27, 2013

<u>Via E-Mail</u>

Matt Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your February 26, 2013 e-mail, in which you state that DC will object to the Declaration of Ari Emanuel (Dkt. 595-5), as well as portions of Defendants' combined Reply / Opposition (Dkt. 595) to DC's Cross-Motion for Summary Judgment (Dkt. 588; "Cross-Motion"), Defendants' Response to Mr. Petrocelli's Rule 56(d) declaration (Dkt. 595-3) and the Declaration of Pablo Arredondo (Dkt. 595-4).

Mr. Emanuel's declaration was properly submitted in *opposition* to DC's Cross-Motion. The plain truth is that Mr. Emanuel's testimony (Dkt. 595-5), as well as Mr. Marks' testimony on the same subject (Dkt. 312-2), shows that DC's repeated "fraud" allegations throughout its Cross-Motion and sanctions motion about a "billionaire investor" are a sham. As Defendants have maintained throughout this case, Mr. Emanuel, not some "mysterious billionaire," made the "$15 million offer" that DC's Fifth Claim targets. DC seeks to hide this simple fact from the Court.

The unprofessional accusations in your February 26 e-mail regarding Mr. Emanuel's sworn testimony are not well-taken.

It appears that DC is attempting to use Mr. Emanuel's declaration as an excuse to file a sur-reply, contrary to the Court's February 21, 2013 order, which could not be more clear. Dkt. 593 at 2 ("The Court does not invite, nor will it accept, any further briefing on the matter, regardless whether styled as a sur-reply to Defendants' Motion or a reply to DC's Cross-Motion.").

We would like to meet and confer in-person with you and Mr. Petrocelli on this issue in an effort to resolve this matter and avoid burdening the Court with unwarranted and improper filing. We are available anytime on March 6, 7 or 8, 2013, for an in-person meet-and-confer, and suggest 10:30 a.m. on March 6, subject to the schedule of Mr. Emanuel's counsel.

**TOBEROFF & ASSOCIATES, P.C.**

February 27, 2013
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 5

As you are aware, we have three major filings early next week:  Ms. Larson's two oppositions to
DC's two motions for summary judgment in the *Siegel* Superman and Superboy Cases (C.D. Cal.
Case Nos. 04-CV-08400; 04-CV-08776) due Monday, March 4, 2013, and Defendants' opening
brief to the Ninth Circuit in the *DC Comics* appeal due Tuesday, March 5, 2013.  So we are free
to travel to your offices for an in-person meeting *anytime* after our March 5, 2013 filing.

DC will not be prejudiced by the minimal time difference between this week and next, because
as set forth in the Court's February 21 Order, briefing on these motions closed with defendants'
last filing, and "the matter stands submitted."  Dkts. 581, 593 at 2.

1.      The central premise of DC's planned objection is that Mr. Emanuel's declaration is
improper "new matter" on reply.  As DC insisted and is well aware, Defendants filed both a
reply in support of its motion for summary judgment based on the statute of limitations and *an
opposition* to DC's cross-motion for summary judgment.  Dkt. 595.  Mr. Emanuel's declaration
does not relate to Defendants' statute of limitations defense.  It relates to DC's frivolous
allegations of "billionaire investor" misrepresentations in an August 2002 offer, made throughout
DC's Cross-Motion and sanctions motion, which are directly addressed in Mr. Emanuel's
declaration.

Defendants focused and limited their motion to the statute of limitations issues as to the Fourth
and Fifth Claims.

Despite the limited nature of Defendants' motion, DC's opposition/cross-motion egregiously
tried to bolster the merits of its ill-fated Fifth Claim and to prejudice the Court with repeated
allegations that Mr. Toberoff committed "fraud," untethered to any evidence, injecting this issue
into its Cross-Motion.  *See, e.g.,* Dkt. 588 (Cross-Motion) at 3 (referring to DC's "'billionaire
investor' fraud claims" and "that very fraud"), 14 (same; also arguing  "Toberoff repeatedly
represented that the Timeline's tale of the 'billionaire investor' fraud was a 'mockery'"), 18 n.6
(referring again to the supposed "'billionaire investor' fraud"); Dkt. 589 (DC's Statement of
Facts) at ¶16 (alleging "fraudulent efforts" to purchase the Siegels' rights), ¶17 ("Toberoff
falsely represented to the Siegels that: (1) he had an unnamed "billionaire investor" ready to
purchase the Siegels' purported Superman rights for $15 million…:" and referring to DC did not
learn of the fraudulent offer Toberoff had made to the Siegels about the fictitious "billionaire
investor" until December 2008), ¶18 (referring to "Toberoff's fraudulent business offer"), ¶19,
¶27, ¶28, ¶34, ¶35, ¶37, ¶39, ¶40, ¶41, ¶42, ¶44, ¶45, ¶47 (same effect).

DC cannot repeatedly make false accusations of fraud in its Cross-Motion, and then complain
when Defendants attempt to set the record straight in their opposition.

2.      Even if Mr. Emanuel's declaration is mischaracterized as submitted solely in defendants
reply (which makes no sense) this, as you know, is also entirely proper, as it addressed
arguments made by DC in its opposition/cross-motion. *See, e.g., High Sierra Hikers Ass'n v.*

**TOBEROFF & ASSOCIATES, P.C.**

February 27, 2013
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 5

*United States DOI*, 2012 U.S. Dist. LEXIS 74111, at *16 n.3 (N.D. Cal. May 29, 2012) ("With its reply brief, HSHA submitted a number of declarations attesting to the likelihood of irreparable harm. .... HSHA's reply evidence, however, is not new evidence, but rather a proper response to NPS's opposition arguments and will be considered."); *Bayway Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) ("[R]eply papers may properly address new material issues raised in the opposition papers."); *Proujansky v. Blau*, 2001 U.S. Dist. LEXIS 12694 (S.D.N.Y. Aug. 22, 2001) ("The proper functions of a reply brief are to respond to contentions made by the opposing party in its main brief and to reinforce contentions previously made in one's own main brief."); *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797-798 (W.D. Tenn. 2012) ("[T]his argument is not a new argument but rather a counterpoint in response to Plaintiffs' theory of competitive standing. This is entirely consistent with the proper purpose of a reply brief, to address the opposing party's arguments raised in a response brief.").

DC's cited cases on this issue are manifestly inapposite, and concern situations where entirely new arguments were made on reply, without any indication that they were in response to arguments made in opposition. *See Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007) (plaintiff disbarred by the State Bar, who sued numerous federal officials, "has not raised any issues affecting the federal appellees in his opening appellate brief," and did not even "articulate any colorable argument with respect to them" on reply; court did not further discuss the federal officials in its opinion); *Groupion, LLC v. Groupon, Inc.*, 2012 WL 3025711, at *3 (N.D. Cal. July 24, 2012) (noting, on a reply on a motion for reconsideration from summary judgment, "Groupion could have and should have asserted this argument in its opening motion").

3.      DC complains that Mr. Emanuel could not recall the details of this offer at his November 2, 2006 deposition, and that he remembers more details now.

As a preliminary matter, DC cites nothing in Mr. Emanuel's 2013 declaration that "contradicts" his 2006 testimony in *Siegel*.

DC argues that the fact Mr. Emanuel's recollection was apparently refreshed warrants striking his declaration as a "sham." DC ignores the Ninth Circuit's clear direction, <u>in the two leading Ninth Circuit cases DC cites</u>, that "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." *Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012). *See also Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-999 (9th Cir. 2009) (affirming striking of declaration where there was a direct "contradiction in testimony" because "[o]ur cases have emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit"). *Yeager* also clarifies that there are situations "in which a deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or his review of documents, record, or papers." 693 F.3d at 1080-81.

**TOBEROFF & ASSOCIATES, P.C.**

February 27, 2013
Re:   *DC Comics v. Pacific Pictures Corp.*
Page:   4 of 5

After DC launched this well-publicized lawsuit, which alleged that Mr. Emanuel's August 2002
offer was fraudulent, sued Mr. Emanuel's joint venture, IP Worldwide, LLC, and subpoenaed
Mr. Emanuel with numerous document requests, it would come as no surprise if Mr. Emanuel
focused on DC's frivolous allegations, and conferred with his counsel as to relevant
contemporaneous documents to refresh his recollection. By contrast, and as DC itself repeatedly
argued in its opposition, the "primary focus" of *Siegel* was elsewhere and its deposition
questioning in *Siegel* did not focus on "the acts of fraud that DC challenges in this case." Dkt.
589 at 29 ¶27.

The cases cited by DC are, once again, all manifestly inapposite and concern completely
inconsistent accounts. *See Yeager*, 693 F.3d at 1080 (noting that declarant's claim that
documents refreshed his recollection was implausible where there was no reason to recall new
facts in between deposition and summary judgment and he "'was shown over twenty exhibits
during his deposition in an attempt to refresh his recollection'"); *Reinsdorf v. Skechers U.S.A,*
2013 U.S. Dist. Lexis 16223at *18-19 (C.D. Cal. Feb. 6, 2013) (witness tried to "completely
change his answer," there was "no explanation for this untimely reversal," and there was a "clear
inconsistency" between prior and new testimony); *Scamihorn v. Gen. Truck Drivers*, 282 F.3d
1078, 1085 n.7 (9th Cir. 2002) (refusing to strike declaration; "in light of the corroborating
statements … [witnesses'] declaration sought to clarify statements made in his deposition, is not
a sham and therefore should not be excluded"); *Collins v. U.S.*, 269 F.2d 745, 750 (9th Cir. 1959)
(concerning contempt of court; requiring that testimony be "'plainly inconsistent, [] manifestly
contradictory, and [] conspicuously unbelievable'").

4.      Your erroneous claim, without any support, that Defendants "elicited false testimony
from Mr. Emanuel" is irresponsible. As DC is well-aware, Mr. Emanuel is the Co-Chief
Executive Officer of William Morris Endeavor, which has its own in-house legal department.
Mr. Emanuel is also represented by Patricia Glaser, chair of the litigation department at Glaser
Weil Fink Jacobs Howard Avchen & Shapiro, LLP, as well as Kerry Garvis Wright, a partner at
that same firm.

The notion that Defendants "elicited" false testimony from the well-respected and well-
represented Mr. Emanuel lacks credibility. The truth, as Defendants have consistently
maintained throughout this case, is that Mr. Emanuel made the August 2002 offer and was the
"investor." *See, e.g.*, Dkt. 75 at 8; 98 at 4-6; 231 at 16-18; 269 at 7-11; 312 at 9. There was no
"fraud." DC simply preferred to credit the anonymous slander in the Timeline, written by a
thief, over the testimony of every relevant witness.

5.      In sur-reply fashion, DC argues that Defendants "omitted" that "DC noticed Mr.
Emanuel's deposition for March 19, 2013, just weeks from now." DC served that deposition
notice via U.S. mail on February 25, 2013, the same day Defendants filed their reply papers, and
Defendants received the notice the next day, February 26, 2013. Despite the parties' extensive e-
mail correspondence, including over a dozen e-mails on February 25, 2013 alone, you never
bothered to serve an electronic copy of the deposition notice on Defendants, just as you have not

**TOBEROFF & ASSOCIATES, P.C.**

February 27, 2013
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  5 of 5

copied us on correspondence with Mr. Emanuel's counsel or timely provided us with copies of documents produced by Mr. Emanuel in response to DC's subpoena.

Hopefully, DC will reconsider filing its sur-repy in the form of an "objection" in light of the above and our in-person meet and confer next week.  If DC proceeds to file an objection, please attach this letter to any filing DC makes with the Court.

Nothing in this letter should be construed as a waiver or limitation of any of Defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

# EXHIBIT F

**From:** Petrocelli, Daniel
**Sent:** Thursday, February 28, 2013 11:35 AM
**To:** Marc Toberoff
**Cc:** kadams@toberoffandassociates.com; kgarviswright@glaserweil.com; tmcguire@wmeentertainment.com; Kline, Matthew; Seto, Cassandra
**Subject:** Re: DC Comics v. Pacific Pictures

Marc, I will rearrange my schedule to meet you tomorrow at 9:00 am at Pacific Dining Car on Wilshire Blvd in Santa Monica.

We disagree with the balance of your email and reserve all rights.

Thanks.

Dan


On Feb 28, 2013, at 11:26 AM, "Marc Toberoff" <mtoberoff@toberoffandassociates.com> wrote:

> Dan:
>
> We did offer to meet within the week, on March 6-7, the dates when Mr. Emanuel's in-house and outside counsel are also available, and they should attend the meet and confer, as Mr. Emanuel's declaration is the target of DC's unsupported accusations.
>
> The delay you speak of is caused almost entirely by your inability to meet next week. Nor is it reasonable to refer to counsel's "choice" to work on matters, when they are pursuant to Court-set deadlines, and consist of a major Ninth Circuit appeal brief in this case, and critical summary judgment oppositions in the two *Siegel* cases. Just like DC's counsel, opposing counsel have schedules and deadlines, as do Mr. Emanuel's counsel. The apparent presumption that DC's schedule takes precedence is not well taken. This is particularly true given that DC's contemplated sur-reply in the form of an "objection" is totally unwarranted and contrary to the Court's explicit February 21, 2013 Order.
>
> Notwithstanding all of the above, I can meet you half-way at 9 am tomorrow for breakfast in Brentwood, which I understand is close to your home, or in Santa Monica.
>
> All of defendants' rights are reserved.
>
> Marc


On Thu, Feb 28, 2013 at 7:31 AM, Petrocelli, Daniel <dpetrocelli@omm.com> wrote:
Marc, I was available all day yesterday to meet and confer in person, and you chose to send this lengthy letter rather than meet as required by the Court's order. Your choice to work on matters does not excuse your obligation to comply with the Court's order. I am available today through noon, I will make myself available again at 7:00 pm, and will rearrange my schedule to be available tomorrow. Please

1

immediately let me know if you will meet in person today or tomorrow. Next week I am out of the country until Friday, which makes it impossible for meet until Friday and which would push off the filing of any objections to the following week. It is unreasonable and prejudicial to force us to wait that long to meet and confer about objections to a single declaration while your motion remains submitted and able to be decided at any time, especially given that you are in town and in the office working. If you refuse to meet today or tomorrow (in addition to yesterday), then we request your stipulation to be filed today that a ruling on defendants' motion should be deferred for two weeks pending the meet and confer process regarding our objections. Please let me hear from you first thing this morning.

Thanks.

Dan

**From:** Keith Adams [mailto:kadams@toberoffandassociates.com]
**Sent:** Wednesday, February 27, 2013 06:14 PM
**To:** Kline, Matthew
**Cc:** Marc Toberoff (mtoberoff@toberoffandassociates.com) <mtoberoff@toberoffandassociates.com>; Kerry Garvis Wright (kgarviswright@glaserweil.com) <kgarviswright@glaserweil.com>; 'tmcguire@wmeentertainment.com' (tmcguire@wmeentertainment.com) <tmcguire@wmeentertainment.com>; Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; Pablo Arredondo <parredondo@toberoffandassociates.com>
**Subject:** Re: DC Comics v. Pacific Pictures

Counsel:

Please see the attached correspondence.

On Tue, Feb 26, 2013 at 12:20 PM, Kline, Matthew <mkline@omm.com> wrote:

Dear Marc and Dick:


We need to schedule an in-person meet-and-confer with you this week. *See* DN 593. DC will be filings objections to portions of DN 595, DN 595-3, and DN 595-4, and to all of DN 595-5. Defendants' submission of and reliance on Ari Emanuel's declaration on their reply brief in support of summary judgment, DN 595-5:


• is procedurally improper, *see Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007) ("It is well established that issues cannot be raised for the first time in a reply brief."); *Groupion, LLC v. Groupon, Inc.*, 2012 WL 3025711, at *3 (N.D. Cal. July 24, 2012) (striking reply);

• the substance of his declaration is directly refuted by Mr. Emanuel's prior sworn deposition testimony, *see infra*, and thus should be disregarded, *see Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012) ("a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember") (cited by *defendants*, DN 595 at 8:7-8); *Reinsdorf, v. Skechers U.S.A,* 2013 U.S. Dist. Lexis 16223at *18-19 (C.D. Cal. Feb. 6, 2013) (same; striking "sham" declaration); *accord Van Asdale v. Int'l Game Tech.*, 577 F.3d 989,

2

**EXHIBIT F**
**107**

998 (9th Cir. 2009); *Scamihorn v. Gen. Truck Drivers*, 282 F.3d 1078, 1085 n.7 (9th Cir. 2002); *Collins v. U.S.*, 269 F.2d 745, 750 (9th Cir. 1959);

- and, as is omitted from defendants' filings, *cf.* DN 595-4 at 1:15-18; DN 595 at 2:11-12; DN 595-3 at 2:24-26, 8:18-9:11, DC noticed Mr. Emanuel's deposition for March 19, 2013, just weeks from now.

Unless defendants immediately withdraw DN 595, DN 595-3, DN 595-4, DN 595-5, and re-file them omitting the following offending page and line numbers--DN 595-5 (entire document); DN 595 2:3-8, 2:11-12; 4:14-16; DN 595-3 at 2:24-26; 8:19-21; 8:28-9:2; 9:5-11; DN 595-4 at 1:15-18 & Ex. C)--DC will file its objections with the Court.

In these objections, DC will show how defendants elicited false testimony from Mr. Emanuel who, in 2006, testified under oath that he had no "recollection" of events that he now, over six years later, claims to recall with great precision, based on a claim of "personal knowledge." *Compare, e.g.*, Mr. Emanuel's Nov. 2, 2006, Deposition:



*with* Mr. Emanuel's Feb. 22, 2013, Declaration, DN 595-5:

Dan and I are available to meet with you at our offices or Dick's offices any day this week. We invite Mr. Emanuel's counsel to attend as well.

3

**EXHIBIT F**
**108**

All rights reserved.

Matt Kline

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm
of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are
not the intended recipient, you may not read, copy, distribute, or use this
information. If you have received this transmission in error, please notify the
sender immediately by reply e-mail and then delete this message.*

*Please consider the environment before printing this email*

--
Keith G. Adams

Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101
toberoffandassociates.com
_____

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your
records accordingly.
_____

This message and any attached documents may contain information from Toberoff & Associates,
P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not
read, copy, distribute, or otherwise use this information. If you have received this transmission in
error, please notify the sender immediately by reply e-mail and then delete this message.

--
Marc Toberoff

4

**EXHIBIT F**
**109**

Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101
toberoffandassociates.com

_____

Toberoff & Associates, P.C. has changed its website and e-mail addresses. Please update your records accordingly.

_____

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or otherwise use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

5

**EXHIBIT F**
**110**