O

1

2

3

4

5

6

7

8    **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   DC COMICS,                                    Case No. 2:10-cv-03633-ODW(RZx)

12              Plaintiff,                          **ORDER GRANTING**
                                                    **DEFENDANTS' MOTION FOR**
          v.                                        **SUMMARY JUDGMENT IN PART**
13                                                  **[577] AND DENYING DC'S MOTION**
     PACIFIC PICTURES CPRORATION; IP                **FOR SUMMARY JUDGMENT [588]**
14   WORLDWIDE, LLD; IPW, LLC; MARC
     TOBEROFF; MARK WARREN PEARY;
15   JEAN ADELE PEAVY; LAURA SIEGEL
     LARSON; and DOES 1–10, inclusive,
16
                Defendants.
17

18                      **I.    INTRODUCTION**

19         On October 17, 2012, this Court ruled in Plaintiff DC Comics' favor on its first

20   and third claims for declaratory relief, effectively nullifying the termination notices

21   Joe Shuster's heirs had filed and served on DC.  While that order is pending on

22   appeal, Defendants now move for summary judgment on DC's remaining state-law

23   interference claims.  In response, DC has cross-moved for summary judgment on its

24   sixth claim for declaratory relief under California's unfair-competition law.  The

25   Court **GRANTS** Defendants' motion as to DC's fourth and fifth claims and **DENIES**

26   / / /

27   / / /

28   / / /

1   the parties' cross-motions on DC's sixth claim pending resolution of Defendants'

2   appeal.[1]

3                    **II.    FACTUAL BACKGROUND**

4           Writer Jerome Siegel and illustrator Joe Shuster joined forces in the 1930s to

5   create the character that would eventually become Superman.   In 1937, they

6   surrendered their copyright interests in Superman to DC Comics when they joined DC

7   as independent contractors.   Factually, this action weaves together the separate but

8   often-convergent tales of the Siegel and Shuster heirs' attempts—with the help of

9   producer and attorney Marc Toberoff—to regain those Superman rights over the last

10  16 years.   DC's fourth claim focuses on the Shuster heirs' efforts, while its fifth claim

11  confronts the Siegel heirs' dealings.

12  **A.       The Shuster Termination**

13          On October 2, 1992, following Joe Shuster's death earlier in the year, DC

14  entered into an agreement with Shuster's surviving siblings, Frank Shuster and Jean

15  Adele Peavy (the "1992 Agreement").   (Undisputed Fact ("UF") 1.)   Under the

16  Agreement, Frank and Jean agreed to "settle[] all claims to any payments or other

17  rights or remedies" they may have had "under any other agreement or otherwise" in

18  exchange for DC's "agreement to pay [them], collectively, a total of $25,000 a year."

19  (Adams Decl. Ex. A.)

20          In 1998, Congress amended the 1976 Copyright Act to provide an author's

21  estate, "[i]n the event that the author's widow or widower, children and grandchildren

22  are not living," the right to recover the author's copyright by statutorily terminating

23  the   author's   old   copyright   grants.    *See*   17   U.S.C.   §   304(c)(2)(D).    In

24  November 2001—possibly as a result of the 1998 amendment—Jean and her son

25  Mark Peary (Shuster's nephew) entered into an agreement with Toberoff's loan-out

26  _____

27  [1] In light of Magistrate Judge Zarefsky's March 13, 2013 Order denying DC's request for leave to
    conduct further depositions and compel responses to deposition questions, the Court **DENIES** DC's

28  request for a Rule 56(d) continuance.   In any event, the evidence DC sought by way of its Rule 56(d)
    request has no bearing on the Court's disposition on these cross-motions.

1  company, Pacific Pictures Corporation (PPC) (the "2001 PPC Agreement"). (UF 2.)

2  The purpose of this agreement was "to investigate, retrieve, enforce and exploit"

3  Shuster's copyrights in the Superman works through "establishment of Joe Shuster's

4  estate" and the estate's exercise of its termination rights under § 304(c). (*Id.*)

5        On October 7, 2003, the Los Angeles County Superior Court appointed Mark

6  Peary to serve as executor of Shuster's estate. (UF 3.) Then on October 27, 2003,

7  Mark (as executor) entered into another agreement with Pacific Pictures signed by

8  Jean, Mark, and Toberoff (the "2003 PPC Agreement"). (UF 4.) Through this second

9  PPC agreement, the Shuster estate "engage[d] PPC as the exclusive advisor for the

10 purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's

11 rights, claims, copyrights, property, title and interests in and to Joe Shuster's

12 creations." (*Id.*) Among the rights contemplated in the 2003 PPC Agreement was the

13 Shuster estate's "termination interest in 'SUPERMAN' pursuant to Section 304(d) of

14 the U.S. Copyright Law." (*Id.*)

15       On November 10, 2003, Toberoff (acting as attorney for the Shuster estate)

16 served on DC Comics a notice of termination under 17 U.S.C. § 304(d). (UF 5.) This

17 termination notice was the subject of DC's first, second, and third claims in this

18 action.

19       On September 10, 2004, Toberoff, Jean, and Mark purported to voluntarily

20 cancel the 2001 and 2003 PPC Agreements. (UF 6.[2])

21       On October 17, 2012, this Court held that the 1992 Agreement constituted a

22 post-1976 revocation and re-grant of Shuster's Superman rights. (ECF No. 507.) As

23 a result, that revocation pulled the Shuster heirs' November 2003 termination notice

24 from the grasp of Congress's 1998 extension of an author's termination rights. (*Id.*)

25 That ruling is now on appeal before the Ninth Circuit.

26 ///

27

28 [2] DC's dispute over the effect and effectiveness of this "cancellation" does not factor into the Court's decision. The Court therefore merely notes this fact for the sake of a more complete factual record.

**B.     The Siegel Termination**

In 1997, Jerome Siegel's widow, Joanne Siegel, and his daughter, Laura Siegel Larson, filed and served on DC notices of termination of Siegel's Superman copyright grants to DC.  (UF 8.)  DC contested the termination on April 15, 1999, and the Siegels thereafter began negotiating a settlement with DC through Kevin Marks, their attorney at the time.  (UF 9–10.)

On October 19, 2001, Marks sent DC a letter outlining and accepting what he believed were the terms of an oral offer DC had made on October 16, 2001.  (UF 11.)  On October 26, 2001, DC responded to Marks with what it believed was a "more fulsome outline" of the deal's terms.  (UF 12.)  On February 1, 2002, DC's outside counsel followed up with a draft long-form agreement.  (UF 13.)

On May 9, 2002, Joanne Siegel—angered by DC's February draft—sent a letter to DC's parent company, AOL Time Warner, Inc., objecting to the draft and declaring that "[a]fter four years we have no deal and this [February 1] contract makes an agreement impossible."  (UF 14.)

Meanwhile, in February 2002 Toberoff formed a joint venture called IP Worldwide, LLC with Ariel Emanuel, then-CEO of the Endeavor Talent Agency.  (UF 15; Adams Decl. Ex. G.)  In late July or early August 2002—several months after Joanne's May 9 letter objecting to the February 1 draft—Toberoff informed Marks that he was working with Emanuel and inquired whether the Siegels might be interested in licensing their rights to them.  (UF 16.[3])

On August 8, 2002, Marks, Toberoff, and Emanuel participated in a conference call where Toberoff and Emanuel made a formal offer to purchase the Siegels' rights for $15 million.  (UF 17.)  DC contends (and Toberoff and Emanuel vehemently dispute) that this August 2002 offer also included false representations that Toberoff

---

[3] DC "disputes" this fact "to the extent defendants suggest this was Toberoff's earliest effort to induce the Siegels to repudiate their October 19, 2001, settlement agreement with DC and enter into an agreement with him instead."  (Pl.'s Statement of Genuine Disputes 16.)  Because the Court does not reach the merits of DC's fifth claim, DC's dispute on this fact is irrelevant to this Order.

1    (1) had an unnamed "billionaire investor" ready to fund the $15 million offer and

2    (2) could help the Siegels produce a Superman movie to compete with DC.  (Pl.'s

3    Statement of Genuine Disputes ("SGD") 17.)  The following day, Marks sent a letter

4    conveying the offer to the Siegels, but he cautioned them that he believed the Siegels

5    had an agreement with DC that was subject only to documentation.  (ECF No. 500-5,

6    at 338–39.)

7            On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC,

8    terminating Marks as their legal representative and reaffirming their intent to

9    discontinue "all negotiations with DC Comics."  (UF 19.)

10           On October 3, 2002, the Siegels entered into an agreement with IP Worldwide

11   (the "IP Worldwide Agreement") whereby the Siegels "grant[ed] IPW the exclusive

12   right to represent [them] and the Rights throughout the world in negotiating and

13   assisting [them] to arrange and negotiate the sale, lease, license and all other

14   dispositions or exploitations of the Rights."  (UF 20.)  Also under the Agreement,

15   IP Worldwide would "furnish and provide the legal services of Marc Toberoff, Esq.,

16   and the business services of Ariel Emanuel and IPW's support staff . . . to market and

17   negotiate" exploitation of the Superman rights.  (*Id.*)  Defendants characterize this

18   agreement as a representation agreement, while DC maintains it was in reality "an

19   unlawful, rights-tying agreement."  (SGD 20.)

20   **C.    *Siegel* Litigation and the Toberoff Timeline**

21           On October 8, 2004, after renewed negotiations with DC failed to result in a

22   settlement, Toberoff filed suit seeking to validate the Siegels' termination notice.

23   (UF 23.)  In response, DC asserted several counterclaims, including one arguing that

24   the October 19, 2001 letter from Marks to DC created a legally enforceable agreement

25   between the parties, notwithstanding the Siegels' later protestations.  (UF 24.)  The

26   Ninth Circuit has since held that the October 19 letter constituted a binding agreement

27   between the parties, *Larson v. Warner Bros. Entmt., Inc.*, Nos. 11-55863, 11-56034,

28   2012 WL 1113259, at *1 (9th Cir. Jan. 10, 2012), and this Court subsequently

1   confirmed that the October 19 agreement remains enforceable.  *Larson v. Warner*

2   *Bros. Entmt. Inc.*, Nos. 2:04–cv–08400–ODW(RZx), 2:04–cv–08776–ODW(RZx),

3   2013 WL 1164434 (C.D. Cal. Mar. 20, 2013).

4       On or before June 28, 2006, during discovery in *Siegel*, Warner Bros. (DC's

5   affiliate) received packages of anonymous documents likely stolen from Toberoff's

6   law firm, including many documents Toberoff maintained were attorney-client

7   privileged.  (UF 38.)  The packet was also accompanied by an anonymously drafted

8   cover letter titled "Superman/Marc Toberoff Timeline."  (*Id.*)  This Toberoff Timeline

9   accused Toberoff of wrongfully interfering with DC's relationships and agreements

10  with the Siegel heirs.  (UF 39.)  The parties continue to contest when Warner Bros.

11  actually received the Timeline, who at Warner Bros. actually received a copy of the

12  Timeline, and who and to what extent certain people read and fully digested the

13  contents of the Timeline.  Suffice it to say for purposes of these cross-motions that the

14  Timeline was ultimately produced in December 2008.  (ECF No. 153-15.)

15  **D.    This Action**

16      On May 14, 2010, DC filed this action against Pacific Pictures, IP Worldwide,

17  Mark Peary (as representative of the Shuster estate), Jean Peavy, Joanne Siegel, and

18  Laura Siegel Larson.  The Complaint asserted six claims: (1) declaratory relief as to

19  the invalidity of the Shuster copyright termination notice; (2) declaratory relief

20  regarding the scope of the Shuster termination notice; (3) declaratory relief with

21  respect to DC Comics' exclusivity period with the Shusters; (4) interference with the

22  1992 Shuster agreement; (5) interference with prospective economic advantage

23  regarding the October 19, 2001 Siegel-DC Comics agreement; and (6) declaratory

24  relief regarding the invalidity of the Shuster heirs' copyright assignment and consent

25  agreements.  As noted, the Court has already ruled on DC's first through third claims,

26  and that order is now on appeal before the Ninth Circuit.  (ECF Nos. 507, 541.)

27      Defendants now move for summary judgment on DC's fourth through sixth

28  claims for intentional interference and unfair business practices under California law.

1    (ECF No. 577.)  In response, DC filed a cross-motion for summary judgment on its

2    sixth claim.  (ECF No. 588.)  Additional facts will be discussed as necessary.

3                         **III.    LEGAL STANDARD**

4            Summary judgment should be granted if there are no genuine issues of material

5    fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

6    P. 56(c).  The moving party bears the initial burden of establishing the absence of a

7    genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

8    Once the moving party has met its burden, the nonmoving party must go beyond the

9    pleadings and identify specific facts through admissible evidence that show a genuine

10   issue for trial.  *Id.*; Fed. R. Civ. P. 56(c).  Conclusory or speculative testimony in

11   affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

12   summary judgment.  *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th

13   Cir. 1979).

14           A genuine issue of material fact must be more than a scintilla of evidence, or

15   evidence that is merely colorable or not significantly probative.  *Addisu v. Fred*

16   *Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).  A disputed fact is "material" where the

17   resolution of that fact might affect the outcome of the suit under the governing law.

18   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).  An issue is "genuine" if

19   the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving

20   party.  *Id.*  Where the moving and nonmoving parties' versions of events differ, courts

21   are required to view the facts and draw reasonable inferences in the light most

22   favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

23                         **IV.    DISCUSSION**

24           Defendants attack each of DC's state-law claims as untimely.  The thrust of

25   Defendants' argument is that these claims challenge Defendants' allegedly tortious

26   conduct between 2001 and 2003, and the record establishes that DC was on notice of

27   this conduct no later than 2006.  Further, while the statutes of limitations for these

28   claims range from two to four years, DC waited to file suit until 2010.  DC responds

1    that the Toberoff Timeline exposed critical information Toberoff had concealed, and

2    as a result the statute of limitations should have been tolled until (at the earliest)

3    December 2008 when the Timeline was produced.  The Court considers each of the

4    parties' arguments in turn.

5    **E.      DC Comics' Fourth Claim for Tortious Interference with Contract**

6         DC's fourth claim for intentional interference with contract alleges that

7    Toberoff's purpose in approaching the Shuster heirs in 2001 to enter into a joint

8    venture with Pacific Pictures was "to induce them to repudiate the 1992 Agreement

9    and grant him the rights [the Shuster heirs] had already granted to DC Comics."

10   (FAC ¶ 177.)  Defendants attack DC's tortious-interference claim as untimely.

11        The statute of limitations for tortious interference with contract in California is

12   two years.  *Kiang v. Strycula*, 231 Cal. App. 2d 809, 811–12 (1965); *see* Cal. Civ.

13   Proc. Code § 339(1).  A tortious-interference claim typically accrues "at the date of

14   the wrongful act." *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974).  But in no

15   event does a claim accrue "later than the actual breach of the contract by the party

16   who was wrongfully induced to breach," because the breach is the culmination of the

17   alleged wrong. *Id.*

18        Defendants contend the actual breach at issue in DC's fourth claim occurred

19   when the Shuster heirs entered into the 2001 Agreement with Pacific Pictures.

20   (Mot. 8 (citing ECF No. 337 (finding in the context of Defendants' anti-SLAPP

21   motion that the 2001 and 2003 Pacific Pictures Agreements "essentially gut the 1992

22   Agreement, purporting to assign to Toberoff those rights which were already assigned

23   to DC Comics")).)  Defendants also acknowledge DC's position that two later events

24   could have triggered the two-year statute of limitations: the execution of the 2003

25   Agreement reaffirming the 2001 Agreement and the service of the Shuster termination

26   notices in late 2003.  (Mot. 9; SUF 2, 4–5.)  Defendants maintain that regardless the

27   date the Court looks at, DC's fourth claim is time barred because the "alleged 'actual

28   / / /

1  breach' of the 1992 Agreement therefore occurred *seven to nine years* before DC filed
2  this suit in 2010."  (Mot. 9.)

3  DC responds that its fourth claim isn't based on a single breach occasioned by
4  the 2001 or 2003 Agreements, but rather "a series of contracts Toberoff induced the
5  Shusters to sign" that "violated DC's rights under its 1992 agreement with Joe
6  Shuster's heirs."  (Opp'n 6.)  According to DC, its FAC also challenged additional
7  consent agreements that remained in effect until October 2012 "when the Court
8  declared Toberoff's agreements invalid."  (Opp'n 7–8.)  In other words, DC primarily
9  invokes California's common-law continuing-wrong tolling rules.  DC alternatively
10  contends that the discovery rule, codified in California Code of Civil Procedure
11  section 339, tolled its fourth claim until December 2008 when it received the Toberoff
12  Timeline.  (Opp'n 10.)

13      *1.    Continuing-wrong principles do not apply to DC's tortious-interference*
14          *claims*

15  There are two main branches of the continuing-wrong accrual principals in
16  California: the continuing-violation doctrine and the theory of continuous accrual.
17  *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1197 (2013).  The continuing-
18  violation doctrine (or the continuing-tort doctrine, as the Ninth Circuit has referred to
19  it), "applies where there is no *single incident* that can fairly or realistically be
20  identified as the cause of significant harm."  *Flowers v. Carville*, 310 F.3d 1118, 1126
21  (9th Cir. 2002) (emphasis added) (internal quotation marks omitted); *see Aryeh*, 55
22  Cal. 4th at 1197 ("Some injuries are the product of a series of small harms, any one of
23  which may not be actionable on its own.").

24  In contrast, "continuous accrual applies whenever there is a continuing or
25  recurring obligation: When an obligation or liability arises on a recurring basis, a
26  cause of action accrues each time a wrongful act occurs, triggering a new limitations
27  period."  *Aryeh*, 55 Cal. 4th at 1199 (internal quotation marks omitted).  Unlike
28  continuing violations, where each alleged wrong may not itself create a legal right of

1  action, continuing accrual concerns situations where each alleged action "provides all

2  the elements of a claim—wrongdoing, harm, and causation—[such that] each may be

3  treated as an independently actionable wrong with its own time limit for recovery."

4  *Id.*  Thus, while the continuing-violation doctrine "renders an entire course of conduct

5  actionable, the theory of continuous accrual supports recovery only for damages

6  arising from those breaches falling within the limitations period."  *Id.*

7      DC concedes that "it remains an open question under California law whether

8  the 'continuing harm' doctrine applies to intentional interference claims."  (Mot. 8;

9  *see also* Reply 6 ("The 'continuing harm' or 'continuing accrual' doctrine has never

10  been applied by a California court to a tortious interference claim.").)  Indeed, the

11  parties cite no cases, and the Court has found none, directly applying either of

12  California's continuing-wrong principles to tortious-interference claims.[4]  Undeterred,

13  DC points to a recent California Supreme Court decision, *Aryeh v. Canon Business*

14  *Solutions, Inc.*, as reflecting that court's "receptiveness to applying *all* common-law

15  tolling doctrines to plaintiff's California-law claims."  (Opp'n 8 (citing *Aryeh*, 55 Cal.

16  4th at 1196–97).)  But DC reads *Aryeh* too broadly.

17      In *Aryeh*, the California Supreme Court considered whether to apply common-

18  law tolling doctrines to California's Unfair Competition Law, Cal. Bus. & Prof. Code

19  §§ 17200–17210, where the UCL was *silent* on "what it means for a UCL claim to

20  accrue."  *Aryeh*, 55 Cal. 4th at 1192–93.  The court noted that such silence

21  "trigger[ed] a presumption in favor of permitting settled common law accrual rules to

22  apply" and concluded that "the UCL is governed by common law accrual rules to the

23  same extent as any other statute."  *Id.* at 1193.

24  / / /

25

26  [4] At least one other federal court in California was likewise unable to find authority supporting
application of the continuing-violation theory to a claim for tortious interference with prospective
economic advantage, which shares the identical statute of limitations.  *See Boon Rawd Trading Int'l*
27  *v. Paleewong Trading Co., Inc.*, 688 F. Supp. 2d 940, 952 (N.D. Cal. 2010) ("Indeed, based upon an
examination of California decisions that have applied the 'continuing tort' doctrine, none have
28  extended the doctrine to the tort of intentional interference with prospective economic advantage.")

1      Unlike the UCL, California Code of Civil Procedure section 339 (which

2  supplies the statute of limitations for both of DC's tortious-interference claims)

3  expressly provides that a claim on a contract does not accrue until "discovery of the

4  loss or damage suffered by the aggrieved party."  Cal. Civ. Proc. Code § 339(1).  As

5  the Court in *Aryeh* noted, a statute must be construed in light of common-law

6  decisions, "unless its language clearly and unequivocally discloses an intention to

7  depart from, alter, or abrogate the common-law rule concerning the particular subject

8  matter."  *Aryeh*, 55 Cal. 4th at 1193.  By expressly providing for the common-law

9  discovery rule and no other common-law tolling principles, section 339 appears to

10  reflect the legislature's clear and unequivocal intent to preclude application of

11  common-law tolling mechanisms other than the discovery rule.  *See Wildlife Alive v.*

12  *Chickering*, 18 Cal. 3d 190, 195 (1976) ("Under the familiar rule of construction,

13  *expressio unius est exclusio alterius*, where exceptions to a general rule are specified

14  by statute, other exceptions are not to be implied or presumed.").  The Court therefore

15  has serious reservations about whether continuing-wrong principles could ever toll the

16  statute of limitations on claims for tortious interference with contract.

17      But the Court need not go so far as to hold that the continuing-wrong doctrines

18  unequivocally do not apply to intentional-interference claims, as neither principle

19  applies on the facts here.  With respect to continuing violations, DC contends

20  "Toberoff induced the Shusters to enter into a series of illicit, subsisting, rights-tying

21  contracts that continued to interfere with DC's rights through the filing of DC's

22  lawsuit."  (Opp'n 9.)  But DC's position now directly contradicts its fourth claim,

23  which alleges that "Toberoff's ultimate purpose in approaching the Shuster Heirs was

24  to induce them to repudiate the 1992 Agreement and grant him the rights they had

25  already granted to DC Comics."  (FAC ¶ 177.)  DC goes on to allege that Toberoff

26  carried out this purpose by forming a joint venture with the Shusters and Pacific

27  Pictures "for the express purpose of 'exploiting all of Joe Shuster's, and his estate's

28  / / /

1    rights, claims, copyrights, property, title and interests in and to Joe Shuster's

2    creations' through" termination of Shuster's grant to DC under 17 U.S.C. § 304.  (*Id.*)

3           As this Court has already found, "the Pacific Pictures Agreements essentially

4    gut[ted] the 1992 Agreement, purporting to assign to Toberoff those rights which were

5    already assigned to DC Comics."  (ECF No. 337, at 3.)  These agreements therefore

6    constituted at least an implied repudiation of the 1992 Agreement—a discrete act for

7    which DC could have filed suit.  Then on November 10, 2003, the Shusters served DC

8    with termination notices for the copyrights subject to the 1992 Agreement—another

9    overt act of repudiation for which DC could have filed suit.  And so on.  The Court

10   need not address each of Defendants' allegedly wrongful actions to convey the

11   obvious: DC's harm was not the result of small harms that may not have been

12   actionable on their own.  Rather, each was an independently actionable act.  The

13   continuing-violation doctrine therefore cannot apply here.

14          Neither can continuing-accrual principles apply.  In assessing the applicability

15   of continuing-accrual tolling, the court in *Aryeh* looked "to the nature of the obligation

16   allegedly breached."  55 Cal. 4th at 1200.  There, the court found that the defendant, a

17   lessor of copier machines, owed plaintiff, the lessee, a continuing "duty not to impose

18   unfair charges in monthly bills—[] a continuing one, susceptible to recurring

19   breaches." *Id.*

20          In contrast, here the 1992 Agreement—a purported one-time transfer of

21   Shuster's rights to DC—did not create a continuing obligation.  And while contracts

22   between parties often are capable of multiple minor, actionable breaches that alone

23   would be insufficient to invalidate the entire contract, DC complains of Toberoff's

24   aim to induce the Shusters' *repudiation* of the 1992 agreement entirely.  (FAC ¶ 177.)

25          As noted, continuing accrual addresses cases where each allegedly wrongful act

26   provides all the elements of a claim.  The elements of a claim for intentional

27   interference with contract are "(1) a valid contract between plaintiff and a third party;

28   (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed

1   to induce a breach or disruption of the contractual relationship; (4) actual breach or

2   disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas &*

3   *Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  At the latest, the

4   termination notices the Shuster heirs served on DC in November 2003 evidence the

5   heirs' unequivocal intention to have conclusively repudiated the 1992 agreement.

6   And importantly, DC identifies no other agreements it had with Shuster or the Shuster

7   heirs for which the later Shuster-Toberoff consent agreements could have caused new

8   and separate harms to DC.  Thus, the Court cannot find that any of Defendants'

9   actions after November 16, 2003, constituted a new and actionable harm for which a

10  new tortious-interference-with-contract claim could have accrued.

11          *2.      The discovery rule does not save DC's fourth claim*

12          DC also invokes section 339's discovery rule.  To this end, DC maintains that

13  "Toberoff's misconduct became actionable, at the very earliest, when Judge Larson

14  ordered the Timeline produced to DC in December 2008—17 months before DC filed

15  suit." (Opp'n 10.)  Not so.

16          As noted, California Code of Civil Procedure section 339 expressly provides

17  that a claim on a contract does not accrue until "discovery of the loss or damage

18  suffered by the aggrieved party."  Cal. Civ. Proc. Code § 339(1).  This so-called

19  "discovery rule" "postpones accrual of a cause of action until the plaintiff discovers,

20  or has reason to discover, the cause of action." *Nogart v. Upjohn Co.*, 21 Cal. 4th

21  383, 463 (1999).  A plaintiff "discovers" the cause of action the moment "he at least

22  suspects a *factual basis*, as opposed to a *legal theory*," for the elements of the claim—

23  in other words, when plaintiff suspects "that someone has done something wrong to

24  him." *Id.* (emphasis added) (internal quotation marks omitted).

25          DC is correct that "the discovery rule postpones accrual of a cause of action

26  until plaintiff discovers the facts underlying its claims." (Opp'n 10.)  But a plaintiff

27  need not suspect facts "supporting *each specific legal element of a particular cause of*

28  *action*" to have discovered that cause of action; rather, California courts "look to

1   whether the plaintiffs have reason to at least suspect that a *type* of wrongdoing has

2   injured them."   *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005)

3   (emphasis added).  "So long as a suspicion exists, it is clear that the plaintiff must go

4   find the facts; she cannot wait for the facts to find her."  *Jolly v. Eli Lilly & Co.*, 44

5   Cal. 3d 1103, 1111 (1988).

6       Defendants contend that DC was on inquiry notice of its tortious-interference

7   claim no later than November 10, 2003, when Toberoff filed termination notices on

8   the Shuster heirs' behalf.  (Mot. 10; SUF 5.)  This is a close call.  But the Court need

9   not resolve this issue because DC received *actual notice* of a potential claim on

10  November 15, 2006, when it received complete, unredacted copies of both the 2001

11  and 2003 Agreements.  (Mot. 10; SUF 25); *Eagle Precision Techs., Inc. v. Eaton*

12  *Leonard Robolix, Inc.*, No. 03CV352-BEN (WMc), 2006 WL 6544087, at *4 (S.D.

13  Cal. Apr. 6, 2006) (plaintiff in intervention "had sufficient information to 'at least

14  suspect' wrongdoing" when it "received a copy of the [interfering] Agreement").

15  Thus, by November 16, 2006, DC was equipped with the knowledge that

16  - In November 2001, the Shuster heirs entered into an agreement with Toberoff's

17    production company, Pacific Pictures, "to investigate, retrieve, enforce and

18    exploit" the Superman copyrights via "termination pursuant to Section 304(c)

19    of the U.S. Copyright Law" (SUF 2);

20  - In October 27, 2003, the Shuster estate entered into a second agreement with

21    Pacific Pictures for the same purpose (*see* SUF 4); and

22  - In November 2003, Toberoff served copyright termination notices on DC

23    Comics (SUF 5).

24  With this information, DC should have far more than *suspected* "that a type of

25  wrongdoing ha[d] injured" it.  *Fox*, 35 Cal. 4th at 807.

26      It does not matter, as DC tries to argue, that it didn't receive the Toberoff

27  Timeline until 2008 or that "important new evidence concerning Toberoff's web of

28  illicit consent agreements has come to light" in discovery in this matter.  (Opp'n 10.)

1   That the Toberoff Timeline supplied additional information supporting one of many

2   elements of its tortious-interference claim does not change the fact that DC had

3   enough information prior to 2008 to have filed suit and opened the door to discovery.

4   And that DC has uncovered important evidence in discovery once it did file suit is

5   wholly unremarkable—that's the purpose of discovery.  The point here is that DC had

6   more than enough knowledge by November 2006 to have tickled a suspicion that its

7   business relationship with the Shusters was being tampered with.  It was then—and

8   not when DC gathered the smoking-gun evidence supporting each element of its cause

9   of action—that it should have filed suit.

10        The Court therefore **GRANTS** Defendants' motion as to DC's fourth claim.

11   **F.      DC Comics' Fifth Claim for Tortious Interference with Prospective**

12   **         Economic Advantage**

13        DC's fifth claim alleges that Toberoff tortiously interfered with DC's

14   relationship with Joanne Siegel and Laura Siegel Larson when he conveyed an offer to

15   their then-attorney, Kevin Marks, to license their Superman rights in August 2002.

16   According to DC, this offer wrongfully induced the Siegels to end their negotiations

17   with DC (even though the Siegels had called an agreement with DC "impossible"

18   three months earlier in May 2002).  (Mot. 1.)

19        Like DC's fourth claim, DC's fifth claim for intentional interference with

20   prospective economic advantage is governed by section 339's two-year statute of

21   limitations.  *E.g.*, *Boon Rawd Trading*, 688 F. Supp. 2d at 952 (N.D. Cal. 2010).  The

22   parties raise similar arguments regarding the applicability of continuous-wrong

23   accruing principles and the discovery rule, albeit applied to a different set of facts, i.e.,

24   those facts relating to the Siegel heirs as opposed to the Shuster heirs.  For the reasons

25   addressed above, the Court questions whether continuing-wrong principles can even

26   apply to intentional-interference claims but nevertheless finds those principles

27   inapplicable here.  The Court therefore confines its discussion of DC's fifth claim to

28   / / /

1    when DC discovered Toberoff's alleged interference with its economic relations with

2    the Siegels.

3        Defendants insist that DC had actual notice of most of the facts underlying its

4    claim for tortious interference with prospective economic advantage by 2006.

5    Specifically,

6        • On September 21, 2002, DC received a letter from the Siegels terminating

7          Marks and formally ending all negotiations with DC.  (SUF 19.)

8        • By 2003, Emanuel and Toberoff had informed DC that they were representing

9          the Siegel interest and recommened negotiations with DC.  (SUF 22.)

10       • On October 7, 2006, DC deposed Marks, who testified that Emanuel and

11         Toberoff had made an offer in August 2002 to purchase the Siegels' Superman

12         rights for $15 million.  (SUF 26–28)

13       • By November 15, 2006, DC received a full, unredacted copy of the Siegels'

14         October 3, 2002 IP Worldwide Agreement, whereby the Siegels retained

15         Emanuel and Toberoff to "arrange and negotiate the sale, lease, license, and all

16         other dispositions and exploitations" of the Siegels' Superman rights.  (SUF 20,

17         25.)  This agreement was executed shortly after the Siegels formally fired

18         Marks and terminated negotiations with DC on September 21, 2002.

19       • On November 17, 2006, DC deposed Toberoff, questioning him at length about

20         the August 2002 offer and IP Worldwide Agreement.  (SUF 31, 34–36.)

21       Thus, by late 2006, DC knew that Toberoff offered to license the Siegels'

22   Superman copyrights in August 2002, knew that the Siegels had formally terminated

23   negotiations with DC in September 2002, and knew that the Siegels had entered into

24   an agreement with Toberoff and Emanuel in October 2002 to market the Superman

25   rights.  This was more than enough to alert DC of a potential claim for intentional

26   interference with prospective economic advantage.

27       But if any doubt remained, DC's own pleadings in the *Siegel* case

28   unequivocally reflect DC's notice of a potential claim as of 2007.  In May 2007, both

1    sides in *Siegel v. Warner Bros. Entertainment Inc.*, No. 2:04-cv-08400-ODW-RZ,

2    moved for summary judgment concerning, in part, whether the October 19, 2001 letter

3    constituted a binding agreement.  In its briefing, DC argued that the effort to reduce

4    the terms of that letter into a long-form agreement "came to naught when Plaintiffs

5    abruptly fired Mr. Marks and terminated discussions with DC shortly after receiving

6    Mr. Toberoff's '$15 million plus' offer."  (SUF 47.)  Thus, as late as May 2007, DC

7    itself set forth in a submission to this Court sufficient facts to have put it on notice that

8    it may have had an interference claim.

9         DC disputes Defendants' reference to Marks's and Toberoff's depositions

10   insofar as neither deposition revealed (and thus DC was unable to question either of

11   them on) "the fraudulent business offer concerning a 'billionaire investor' that

12   Toberoff made to the Siegels."  (SGD 27–28, 34–36.)  DC also argues that its 2007

13   briefing "contain[ed] no mention of Toberoff's fraud, including his false business

14   offer to the Siegels concerning a 'billionaire investor,' confirming that DC did not

15   know about Toberoff's wrongdoing until it obtained the Timeline in December 2008."

16   (SGD 47.)   As it does with its fourth claim, DC insists that it couldn't have

17   "discovered" its fifth claim until December 2008 when it received the Toberoff

18   Timeline revealing the fraudulent nature of Toberoff's business offer.  (*See* SGD 27–

19   28, 34–36.)

20        But DC's Timeline arguments amount to little more than diversionary attempt

21   to draw the Court's attention away from the fact that its fourth and fifth counterclaims

22   are unquestionably time barred.  Even without the Timeline, DC had more than

23   enough inquiry—if not actual—notice no later than late 2003 (with respect to its

24   fourth claim) and late 2006 (with respect to its fifth claim) to have piqued a reasonable

25   suspicion that Toberoff may have meddled in its business affairs with the Siegels and

26   Shusters.   Armed with this knowledge, DC "could have filed suit, basing its

27   interference claim[s] on known, non-privileged events (*e.g.*, the Siegels' ending of

28   negotiations and their retention of Toberoff / Emanuel shortly thereafter) and included

1   its other allegations on the basis of 'information and belief.'"  (Mot. 17.)  Further fact

2   investigation—including inquiry into the Timeline—is the very purpose of pretrial

3   discovery for which one files suit.  *Jolly*, 44 Cal. 3d at 1111 ("A plaintiff need not be

4   aware of the specific 'facts' necessary to establish the claim; that is a process

5   contemplated by pretrial discovery.")  In short, receipt of the Timeline and digestion

6   of the panoply of facts contained therein was mere surplusage considering the array of

7   facts it had well before 2008 putting it on suspicion of its claims.   Statutes of

8   limitation would mean very little if a claim did not accrue until the aggrieved party

9   was in actual possession of all the facts necessary to establish the claim.

10      For these reasons, the Court **GRANTS** Defendants' motion with respect to

11  DC's fifth claim.

12  **G.      The Court Defers Ruling on DC's Sixth Claim at this Time**

13      DC's sixth claim seeks a declaration that "[t]he various copyright assignments

14  and consent agreements between Toberoff and/or his companies, the Siegel Heirs, and

15  the Shuster Heirs are void and unenforceable, including under California's unfair

16  competition law."  (FAC ¶ 188 (citing Cal. Bus & Prof. Code §§ 17200–17210).)  As

17  framed, DC's sixth claim (like its third claim) seeks essentially the same relief DC

18  seeks through its first claim, albeit on state-law unlawful-competition grounds and

19  with respect to the Siegels *and* the Shusters.  *Compare* FAC ¶ 134 (First claim: "A

20  declaration by this Court regarding the validity of the Shuster Termination Notice is

21  warranted . . . to establish the parties' respective rights and obligations with respect to

22  the copyright interest in the Superman material."), *with* FAC ¶ 188 (Sixth claim: "A

23  declaration by this Court is warranted . . . to establish the parties' respective rights and

24  obligations with respect to the copyright interest in the Superman material.").

25      First, the Court notes that DC's sixth claim, unlike its first and third claims,

26  brings the Toberoff's dealings with the Siegels within its ambit (although only in

27  passing).  But DC's opposition and cross-motion focuses solely on Toberoff's dealing

28  with the Shusters and appears to disclaim the Siegels' role in its sixth claim.  (*See,*

1    *e.g.*, Opp'n 18 ("The Court's final judgment in DC's favor on its Third Claim . . .

2    compels that judgment enter in DC's favor on its Sixth Claim.").)  And in any event,

3    the relief DC seeks vis-à-vis the Siegels—a declaration of the parties' respective rights

4    and obligations with respect to the Superman copyrights—is duplicative of the relief it

5    sought in *Siegel v. Warner Bros. Entertainment Inc.*, No. 2:04-cv-08400-ODW-RZ

6    (C.D. Cal. filed Oct. 8, 2004).  The Court has already granted DC's requested relief in

7    that matter, and all that remains is for the Court to define the contours of the relief

8    regarding Superboy and the early Superman ads.  *Larson v. Warner Bros. Entmt. Inc.*,

9    Nos. 2:04–cv–08400–ODW(RZx), 2:04–cv–08776–ODW(RZx), 2013 WL 1164434

10    (C.D. Cal. Mar. 20, 2013).  Thus, to the extent DC has not disclaimed the Siegels' role

11    in its sixth claim, that claim is nevertheless moot with respect to Toberoff's dealings

12    with the Siegels.

13      This leaves the sixth claim as it applies to Toberoff's dealings with the

14    Shusters.  DC notes that this claim seeks to void the allegedly "illicit consent

15    agreements that violate the grant-making provisions in § 304(c)(6)(D)."  (Opp'n 21.)

16    DC specifically notes that the Court's December 11, 2012 Judgment in DC's favor on

17    its first and third claims "compels that judgment enter in DC's favor on its Sixth

18    Claim."  (Opp'n 18 (citing ECF No. 540).)  Given the Court's conclusion in the

19    Judgment that "the 2001 Pacific Pictures agreement, 2003 Pacific Pictures agreement,

20    and 2008 consent agreement[ ]are deemed invalid and unenforceable under section

21    304(c)(6)(D)," Defendants are correct that DC's sixth claim is *presently* moot.

22    Ordinarily this moot claim should be dismissed because it presents no live controversy

23    between the parties.  *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123

24    (9th Cir. 1997).

25      But the Court recognizes that aspects of its order granting DC's motion for

26    summary judgment on DC's first and third claims—the resolution of which is what

27    moots DC's sixth claim—is currently on appeal before the Ninth Circuit.  As the

28    parties well know by now, Defendants' notice of appeal "confer[red] jurisdiction on

1    the court of appeals and divest[ed this Court] of control over those aspects of the case

2    involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58

3    (1982).  As a result, this Court currently lacks jurisdiction to pass on the underlying

4    subject matter of DC's sixth claim.  Further, to the extent that the sixth claim presents

5    issues distinct from DC's first and third claims, the Court declines to reach those

6    issues at this time, as an affirmance by the Ninth Circuit would obviate the need to

7    reach these issues.

## V.    CONCLUSION

9    For the reasons set forth above, the Court **GRANTS** Defendants' motion for

10    summary judgment on DC's fourth and fifth claims, which are barred by the two-year

11    statute of limitations.  Defendants' motion with respect to DC's sixth claim and DC's

12    entire cross-motion on that claim are **DENIED WITHOUT PREJUDICE** pending

13    resolution of Defendants' current appeal before the Ninth Circuit.

15    **IT IS SO ORDERED.**

17    April 4, 2013

19    _____

20    **OTIS D. WRIGHT, II**
       **UNITED STATES DISTRICT JUDGE**